**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re: Highland Capital Management, L.P.**

§
§  Case No. **19-34054-sgj11**

**The Dugaboy Investment Trust et al- Appellant**

§
vs.                                                                        §

**Highland Capital Management, L.P.**
**Et al-** Appellee

§                          **3:25-cv-02072-S**
§

[4333]  **Memorandum of Opinion and Order Regarding Stay Requests (Addressing DE #4326 and 4308) entered on 7/21/25**

# Volume 18

# APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | |

*INDEX*

**APPELLANT THE DUGABOY INVESTMENT TRUST'S STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL FROM THE BANKRUPTCY COURT'S ORDER REGARDING STAY REQUESTS [ADDRESSING DE ## 4326 & 4308]**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4353] on August 4, 2025 in the above-captioned case from the Bankruptcy Court's July 21, 2025 *Memorandum Order and Opinion Regarding Stay Requests [Addressing DE ## 4326 & 4308]*[Docket No. 4333], hereby submits this *Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1.   **Did the Bankruptcy Court err in faulting Dugaboy's Stay Request because Dugaboy did not make a "standard" request for a stay pending appeal pursuant to Federal Bankruptcy Rule 8007?**

2.   **Did the Bankruptcy Court err in determining that the Bankruptcy Rule 9019 settlement proceeding was not "a proceeding involving a charitable trust"?**

3.   **Did the Bankruptcy Court err in concluding there was insufficient evidence connecting Mark Patrick's involvement in this Court's Rule 9019 settlement proceedings to the allegations of wrongdoing against Patrick in the Cayman Islands proceeding?**

4.   **Did the Bankruptcy Court err in failing to recognize that the new evidence of Mark Patrick's misconduct exposed in the Cayman Islands proceeding fatally undermines the 9019 settlement by establishing that Patrick lacked authority to enter into the settlement?**

5.   **Did the Bankruptcy Court err in concluding that a stay was unnecessary because Dugaboy could still pursue remedies against Mark Patrick in the Cayman Islands proceeding?**

6.   **Did the Bankruptcy Court err in failing to recuse itself under 28 U.S.C. § 455 due to the appearance of partiality created by the presiding judge's authorship of novels that bear striking factual and thematic similarities to the Highland Capital Management bankruptcy proceedings and portray hedge fund principals in an overtly negative**

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow.

1

light, thereby depriving Dugaboy of an impartial judge with respect to the stay motion?

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

*Vol. 1*

*000001*

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4353] filed by Appellant;

*000023*

2. Bankruptcy Court's *Memorandum Opinion and Order Regarding Stay Requests [Addressing DE ## 4236 & 4308* [Docket No. 4333];

*000039*

3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June 25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

*Vol. 2*

*000569*

*000730*

*000734*

*Vol. 3*

*000771*
*Thru Vol. 5*

*Vol. 5*
*003493*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 3/18/2021 | 2060 | Motion to recuse Judge Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| 3/18/2021 | 2061 | Brief in support filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/18/2021 | 2062 | Support/supplemental document Appendix to Motion to Recuse filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/23/2021 | 2083 | Order denying motion to recuse (related document #2060) Entered on 3/23/2021. (Okafor, M.) |

| | | | |
|---|---|---|---|
| Vol. 5<br>003504 | 4/6/2021 | 2169 | Amended notice of appeal filed by Interested Party James Dondero (RE: related document(s)2149 Notice of appeal). (Lang, Michael) |
| 003519 | 4/15/2022 | 2205 | Statement of issues on appeal, filed by Interested Party James Dondero (RE: related document(s)2083 Order on motion to recuse Judge). (Lang, Michael) |
| 003521 | 4/15/2021 | 2206 | Appellant designation of contents for inclusion in record on appeal filed by Interested Party James Dondero (RE: related document(s)2169 Amended notice of appeal). Appellee designation due by 04/29/2021. (Lang, Michael) |
| 003530 | 2/9/2022 | 3264 | DISTRICT COURT MEMORANDUM OPINION AND ORDER - The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292 (a) and the Court is without jurisdiction over this appeal of the Bankruptcy Court's Recusal Order. The Court further denies Appellants leave to appeal the Recusal Order under § 1292 (b), denies Appellants' request to withdraw the reference of their motion to recuse, and denies Appellants' request to construe their appeal as a petition for writ of mandamus. Accordingly, the Court dismisses this appeal for lack of jurisdiction. (Ordered by Judge Ed Kinkeade on 2/9/2022). Civil Action number:3:21-cv-00879-K, DISMISSED for lack of jurisdiction (RE: related document(s)2083 Order on motion to recuse Judge). Entered on 2/9/2022 (Whitaker, Sheniqua) Modified on 2/25/2022 (Whitaker, Sheniqua). (Entered: 02/25/2022) |
| Vol 6<br>003544 | 7/20/2022 | 3406 | Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: #1 Appendix Appendix (Lang, Michael) Modified text on 7/21/2022 (Ecker, C.). |
| 003909 | 8/1/2022 | 3422 | Notice of hearing on Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.).). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3406, (Lang, Michael) |

| | | | |
|---|---|---|---|
| *Vol 6*<br><br>*003912* | 8/15/2022 | 3444 | Response opposed to (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Attachments: #1 Exhibit A (Annable, Zachery) |
| *Vol. 7*<br><br>*003936*<br>*Thru End of Vol 14* | 8/15/2022 | 3445 | Exhibit List (Appendix in Support of Highland Capital Management, L.P.'s Objection to Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 USC 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3444 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Index 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 (Annable, Zachery) |
| *Vol 15*<br><br>*011840* | 8/15/2022 | 3446 | Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

4

| | | | |
|---|---|---|---|
| *Vol. 15* | | | Depositions) Filed by Debtor Highland Capital Management, L.P. (Annable, Zachery) |
| *011855* | 8/15/2022 | 3447 | Declaration re: (Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi). (Annable, Zachery) |
| *011864* | 8/17/2022 | 3456 | Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.)). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3446 and for 3449, (Annable, Zachery) |
| *011869* | 8/22/2022 | 3463 | Reply to (related document(s): 3444 Response filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. (Lang, Michael) |
| *011874* | 8/24/2022 | 3466 | Amended Notice of hearing filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.)., 3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

*Vol 15*

|  |  |  |  |
|---|---|---|---|
|  |  |  | Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.), 3462 Order converting the August 31, 2022 at 9:30 AM Hearing on (A) The motion for final appealable order and supplement to motion to recuse and (B) related motions to strike and compel to a preliminary status/scheduling conference (RE: related document(s)3406 Motion for leave filed by Interested Party James Dondero, 3446 Motion to strike document filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel filed by Debtor Highland Capital Management, L.P.). Entered on 8/19/2022 (Ecker, C.)). Status Conference to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga. (Lang, Michael) |
| *011877* | 8/26/2022 | 3470 | Amended motion for final appealable order and proposed supplement to the record filed by Interested Party James Dondero (RE: related document(s)3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support). (Attachments: #1 Appendix (Lang, Michael) MODIFIED text to match PDF on 9/1/2022 (Ecker, C.). |
| *012039* | 8/26/2022 | 3471 | Stipulation by James Dondero and Highland Capital Management, L.P.. filed by Interested Party James Dondero (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi, 3449 Motion to compel Lawyers' Depositions.). (Lang, Michael) |
|  | 8/31/2022 *N/A* *No PDF Available* | 3478 | 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.) (Edmond, Michael) |
| *012047* | 9/1/2022 | 3479 | Order denying amended motion of James Dondero, Highland Capital Management Fund Advisors, L.P., Nexpoint Advisors, |

*Vol. 15*

*O12050*

*O12077*

*Vol. 16*

*O12079*

*O12357*

| | | | |
|---|---|---|---|
| | | | L.P. The Dugaboy Investment Trust Get Good Trust and, Nexpoint Real Estate Partners, LLC, F/K/A HCRE Partners, A Delaware Limited Liability Company for final appealable order and supplement to motion to recuse pursuant to 28 U.S.C. Section 455 (RE: related document(s)3470 Brief filed by Interested Party James Dondero). Entered on 9/1/2022 (Okafor, Marcey) |
| | 9/1/2022 | 3480 | Transcript regarding Hearing Held 08/31/2022 (27 pages) RE: Status Conference Re: Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 (#3406). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 11/30/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.)). Transcript to be made available to the public on 11/30/2022. (Rehling, Kathy) |
| | 9/27/2022 | 3541 | Motion to recuse Judge Stacey G. C. Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| | 9/72/2022 | 3542 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3541 Motion to recuse Judge Stacey G. C. Jernigan). (Attachments: #1 Appendix (Lang, Michael) |
| | 10/14/2022 | 3567 | Agreed Scheduling Order on renewed motion to recuse (related document #3541) Entered on 10/14/2022. (Okafor, Marcey) |

| | | | |
|---|---|---|---|
| *Vol. 16*<br>*012361* | 10/17/2022 | 3570 | Motion to recuse Judge Stacey G. C. Jernigan - AMENDED Filed by Interested Party James Dondero (Lang, Michael) |
| *Vol. 17*<br>*012363* | 10/17/2022 | 3571 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Attachments: #1 Appendix (Lang, Michael) |
| *012641* | 10/31/2022 | 3595 | Response opposed to (related document(s): 3541 Motion to recuse Judge Stacey G. C. Jernigan filed by Interested Party James Dondero, 3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| *Vol. 18*<br>*012697*<br>*Thru End of Vol. 21* | 10/31/2022 | 3596 | Support/supplemental document (Appendix in Support of Highland's Objection to Renewed Motion to Recuse Pursuant to 28 U.S.C. 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3595 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 (Annable, Zachery) |
| *Vol. 22*<br>*016732* | 3/3/2023 | 3673 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Lang, Michael) |
| *016737* | 3/6/2023 | 3675 | Memorandum of Opinion and Order Denying Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. Section 455 (RE: related document(s)3570 Motion to recuse Judge filed by Interested Party James Dondero). Entered on 3/6/2023 (Okafor, Marcey) |
| *016773* | 3/6/2023 | 3676 | Order Denying Amended Renewed Motion to Recuse Pursuant to U.S.C. Section 455 (related document #3570) Entered on 3/6/2023. (Okafor, Marcey) |
| *016809* | 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland |

| | | | |
|---|---|---|---|
| *Vol. 22* | | | Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| *016827* | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery)) |
| *016830* | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| *016855* | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| *016863* | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *016865* | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *Vol. 23* *016867* *Thru end of Vol. 25* | 6/20/2025 | 4255 *(to be submitted to Clerk on flash drive)* | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 |

| | | | |
|---|---|---|---|
| | | | Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| *Vol. 26* *019524* | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |
| *019527* | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent |

| | | | |
|---|---|---|---|
| | | | Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart, #3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
| *Vol. 27*  *019847* | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| *019871* | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| *019998* | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| *Vol. 28*  *020013* | 6/23/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| *020230* | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 (Deitsch-Perez, Deborah) |
| *020241* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic). (Attachments: #1 Exhibit 126 (Annable, Zachery) |

| | | | |
|---|---|---|---|
| *Vol. 28*<br><br>*020266* | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| *Vol. 29*<br><br>*020267* | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| *020271* | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust. Entered on 6/27/2025 (Okafor, M.) |
| *020282* | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| *020289* | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |

| Vol. 29 | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| 020296 | | | |
| 020298 | 7/10/2025 | 4308 | Notice Letter from the Office of the Texas Attorney General Requesting a Stay filed by Interested Party State of Texas. (Stone, Johnathan) |
| 020300 | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| 020309 | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| 020311 | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| Vol. 30 | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related |
| 020407 | | | |

| | | | |
|---|---|---|---|
| | | | document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| | 7/21/2025 | 4334 | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M.) |
| | 8/4/2025 | 4353 | Notice of appeal. Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A) (Harper, Geoffrey) |
| | 8/5/2025 | 4359 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| | 8/15/2025 | 4372 | Motion to recuse Judge Filed by Interested Parties James Dondero, NexPoint Advisors, L.P., NexPoint Asset Management, L.P., NexPoint Real Estate Advisors, L.P., The Dugaboy Investment Trust, The Get Good Non Exempt Trust No 2 (Attachments: #1 Proposed Order (Harper, Geoffrey) |

Dated: August 18, 2025          Respectfully submitted,

**WINSTON & STRAWN LLP**

By: */s/ Geoffrey S. Harper*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

14

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**CRAWFORD, WISHNEW & LANG PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

***Counsel for Appellant The Dugaboy Investment
Trust***

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 18, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) *(admitted pro hac vice)*
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |

## APPENDIX IN SUPPORT OF HIGHLAND'S OBJECTION TO RENEWED
## MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455 AND BRIEF IN SUPPORT

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

012697

| Ex. | Description | Appx. # |
|---|---|---|
| 1. | *Order* affirming Bankruptcy Court's Contempt Order, Case No. 3:21-cv-01590-N, Docket No. 42 (N.D. Tex. August 17, 2022) | 1-14 |
| 2. | Transcript of August 31, 2022 Hearing | 15-42 |
| 3. | **RESERVED** | 43-76 |
| 4. | **RESERVED** | 77-183 |
| 5. | *Answering Brief of Appellee Highland Capital Management, L.P.*, Case No. 3:21-cv-00879-K, Docket No. 20 (N.D. Tex. July 28, 2021) | 184-244 |
| 6. | *Appendix in Support of Answering Brief of Appellee Highland Capital Management, L.P. Brief*, Case No. 3:21-cv-00879-K, Docket No. 21 (N.D. Tex. July 28, 2021) | 245-2048 |
| 7. | *Appellants' Response to Debtor's Motion for Leave to Intervene in Appeal of Recusal Order*, Case No. 3:21-cv-00879-K, Docket No. 5 (N.D. Tex. May 17, 2021) | 2049-2064 |
| 8. | *Order* on Debtor's Motion for Leave to Intervene in Appeal of Recusal Order, Case No. 3:21-cv-00879-K, Docket No. 10 (N.D. Tex. June 10, 2021) | 2065-2068 |
| 9. | *Memorandum Opinion and Order*, Case No. 3:21-cv-00879-K, Docket No. 28 (N.D. Tex. December 10, 2021) | 2069-2073 |
| 10. | *Appellants' Response to the Court's December 10, 2021 Memorandum Opinion and Order*, Case No. 3:21-cv-00879-K, Docket No. 29 (N.D. Tex. December 15, 2021) | 2074-2084 |
| 11. | *Debtor's Response to Appellants' Brief Regarding the Court's December 10, 2021 Memorandum Opinion and Order*, Case No. 3:21-cv-00879-K, Docket No. 31 (N.D. Tex. December 20, 2021) | 2085-2097 |
| 12. | *Memorandum Opinion and Order*, Case No. 3:21-cv-00879-K, Docket No. 39 (N.D. Tex. February 9, 2022) | 2098-2112 |
| 13. | *Partial Final Award*, Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P., Case No. 01-16-0002-6927 (March 6, 2019) | 2113-2175 |
| 14. | *Final Award*, Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P., Case No. 01-16-0002-6927 (April 29, 2019) | 2176-2199 |
| 15. | *May 17, 2019 Transcript,* Daugherty v. Highland Capital Management, L.P., C.A. No. 2018-0488-MTZ (Del. Ch. May 17, 2019) | 2200-2297 |
| 16. | *Order Denying Application to Certify Interlocutory Appeal,* C.A. No. 2018-0488-MTZ (Del. Ch. July 8, 2019) | 2298-2311 |

| Ex. | Description | Appx. # |
|---|---|---|
| 17. | *Order Denying Alleged Debtors' Joint Motion to Dismiss the Involuntary Petitions Filed by Joshua N. Terry For Lack of Subject Matter Jurisdiction or, Alternatively, to Compel Arbitration*, Case No. 18-30264-sgj11, Docket No. 75 (Bankr. N.D. Tex. Mar. 20, 2018) | 2312-2316 |
| 18. | *Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified*, Case No. 18-30264-sgj11, Docket No. 829 (Bankr. N.D. Tex. Jan. 31, 2019) | 2317-2546 |
| 19. | *Opinion* affirming Confirmation Order, Case No. 3:19-cv-00291-D, Docket No. 75 (N.D. Tex. July 18, 2019) | 2547-2631 |
| 20. | *Opinion* affirming Confirmation Order, Case No. 19-10847 (5th Cir. June 17, 2021) | 2632-2636 |
| 21. | *Motion for an Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas*, Case No. 19-12239 (CSS), Docket No. 86 (Bankr. D. Del. Nov. 11, 2019) | 2637-2796 |
| 22. | Transcript of December 2, 2019 hearing (Bankr. D. Del. December 2, 2019) | 2797-2935 |
| 23. | Transcript of January 9, 2020 hearing | 2936-3027 |
| 24. | Transcript of February 19, 2020 hearing | 3028-3216 |
| 25. | Transcript of March 4, 2020 hearing | 3217-3338 |
| 26. | Transcript of December 16, 2020 hearing | 3339-3405 |
| 27. | Letter from K&L Gates dated December 22, 2020 | 3406-3409 |
| 28. | Letter from K&L Gates dated December 23, 2020 | 3410-3413 |
| 29. | Transcript of January 26, 2021 hearing | 3414-3671 |
| 30. | Transcript of February 8, 2021 Bench Ruling on Confirmation Hearing | 3672-3723 |
| 31. | Transcript of January 8, 2021 hearing, Adversary Proc. No. 20-03190-sgj (Bankr. N.D. Tex. January 8, 2021) | 3724-3929 |
| 32. | Transcript of May 20, 2021 hearing | 3930-4016 |
| 33. | *Memorandum Opinion and Order*, Case No. 21-cv-03129-B, Docket No. 28 (N.D. Tex. Sep. 2, 2022) | 4017-4038 |

| Ex. | Description | Appx. # |
|---|---|---|
| 34. | *Debtor's Amended Witness and Exhibit List With Respect to Evidentiary Hearing to be Held on June 8, 2021* [Docket No. 2421] | 4039-4102 |
| 35. | Transcript of September 12, 2022 hearing | 4103-4164 |
| 36. | Chart re: Matters Awaiting Final Judgment | 4165-4169 |

*[Remainder of Page Intentionally Blank]*

DOCS_NY:46665.2 36027/003

012700

Dated:  October 31, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

012701

# EXHIBIT 1

App. 00001
012702

Case 19-34054-sgj11   Doc 3596-1   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 1 Filed 06/20/25   Page 24 of 1017   PageID 13651
Case 3:21-cv-01590-N   Document 42   Filed 08/17/22   Page 1 of 13   PageID 11629

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JAMES DONDERO,                    §
                                  §
          Appellant,              §
                                  §
v.                                §          Civil Action No. 3:21-CV-1590-N
                                  §
HIGHLAND CAPITAL                  §
MANAGEMENT, L.P.,                 §
                                  §
          Appellee.               §

## <u>ORDER</u>

This Order addresses James Dondero's appeal [16] from an Order of Contempt of the Bankruptcy Court for the Northern District of Texas against him.  *See Highland Cap. Mgmt., L.P. v. Dondero* (*In re Highland Cap. Mgmt., L.P.*), 2021 WL 2326350 (Bankr. N.D. Tex. June 7, 2021) (the "Contempt Order").  The parties agree that one of the monetary sanctions exceeded the Bankruptcy Court's authority, and the Court therefore reverses that penalty.  With respect to all other challenged components of the contempt order, however, the Court finds neither clear error nor abuse of discretion and affirms.

### I. THE ORIGINS OF THE DISPUTE

This is an appeal from an Order of the Bankruptcy Court for the Northern District of Texas finding Dondero in contempt for violating the terms of a Temporary Restraining Order ("TRO") and assessing monetary sanctions.  In its order, the Bankruptcy Court thoroughly detailed the history of the bankruptcy case that ultimately led to the adversary proceeding in which Dondero was held in contempt.  Contempt Order, at *2–3.  The

ORDER – PAGE 1

Case 19-34054-sgj11    Doc 3596-1    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 1 Filed 06/254    Page 25 of 1017    PageID 13652
Case 3:21-cv-01590-N    Document 42    Filed 08/17/22    Page 2 of 13    PageID 11630

bankruptcy involved a large alternative asset manager, Highland Capital Management, L.P. ("Highland"). *Id.* at *2. Dondero co-founded Highland and at the time of its entry into Chapter 11 bankruptcy served as its President and CEO. *Id.* at *1.

To understand the contempt finding at issue in this appeal requires some discussion of the relationship between the bankruptcy debtor — Highland Capital Management, L.P. — and many related entities that were not part of the bankruptcy case, some of which remain under Dondero's control to this day. As the Bankruptcy Court cogently explained:

> [I]t should be understood that there are at least hundreds of entities—the lawyers have sometimes said 2,000 entities—within the Highland byzantine organizational structure (sometimes referred to as the "Highland complex"), most of which are not subsidiaries of the Debtor, nor otherwise owned by Highland. And only Highland itself is in bankruptcy. However, these entities are very much intertwined with Highland—in that they have shared services agreements, sub-advisory agreements, payroll reimbursement agreements, or perhaps, in some cases, less formal arrangements with Highland. Through these agreements Highland (through its own employees) has historically provided resources such as fund managers, legal and accounting services, IT support, office space, and other overhead. Many of these non-Debtor entities appear to be under the de facto control of Mr. Dondero—as he is the president and portfolio manager for many or most of them—although Mr. Dondero and certain of these entities stress that these entities have board members with independent decision-making power and are not the mere "puppets" of Mr. Dondero [(the "Dondero-Affiliated Entities")].

*Id.* at *3.

Early in the case — under pressure from the Unsecured Creditors Committee ("UCC") and U.S. Trustee, who wanted a Chapter 11 trustee appointed — Dondero agreed to resign to permit a "complete overhaul of the governance structure" at Highland. *Id.* at *2. A new board of Independent Directors came in, one of whom ultimately became Highland's CEO. *Id.* Dondero remained an unpaid employee of Highland while

ORDER – PAGE 2

Case 19-34054-sgj11    Doc 3596-1    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 1 Filed 40/25/4    Page 26 of 1017    PageID 13653
Case 3:21-cv-01590-N    Document 42    Filed 08/17/22    Page 3 of 13    PageID 11631

continuing to serve as a portfolio manager for several non-debtor investment vehicles (whose assets Highland managed on their behalf). *Id.*

Permitting Dondero to retain a formal relationship with Highland soon became "untenable" after he began vocally opposing aspects of the bankruptcy process and challenging actions taken by the new CEO. *Id.* at *3. Highland terminated Dondero, after which the tension only increased. *Id.*

In November 2020, shortly after Dondero's termination, Highland's new CEO ordered the disposition of assets — SKY and AVYA equity securities — held by several special-purpose entities ("SPEs") managed by Highland. *Id.* at *6, *14. The SPEs held assets, which backed claims on the cashflows generated by those assets. Each SPE issued different classes of these claims, each with different payment priority. This general scheme describes a wide variety of debt investments collectively referred to as "structured products." In this case specifically, the claims were collateralized loan obligations ("CLOs"), though the relevant investments owned by the SPEs were actually stocks instead of loans. *Id.* at *6. Some of the Dondero-Affiliated Entities owned the riskiest category of the structured products issued by the SPEs managed by Highland. *Id.* Crucially, the terms of this investment did not imbue the owner of these investments with any right to control the manner in which Highland managed the SPEs' assets. *Id.*

Dondero (on behalf of certain Dondero-Affiliated Entities) contacted Highland employees and instructed them to stop trading the securities. *Id.* Based on this interference, Highland moved for entry of a TRO. *Id.* at *7. The Bankruptcy Court held a hearing and

ORDER – PAGE 3

Case 19-34054-sgj11    Doc 3596-1    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 1 Filed 05/05/24    Page 27 of 1017    PageID 13654
Case 3:21-cv-01590-N    Document 42    Filed 08/17/22    Page 4 of 13    PageID 11632

entered a TRO against Dondero on December 10, 2020. *Id.* at *10. The TRO prohibited

Dondero from:

> (a) communicating (whether orally, in writing, or otherwise), directly or
> indirectly, with any Board member unless Mr. Dondero's counsel and
> counsel for the Debtor are included in any such communication; (b) making
> any express or implied threats of any nature against the Debtor or any of its
> directors, officers, employees, professionals, or agents; (c) communicating
> with any of the Debtor's employees, except as it specifically relates to shared
> services currently provided to affiliates owned or controlled by Mr. Dondero;
> (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's
> business, including but not limited to the Debtor's decisions concerning its
> operations, management, treatment of claims, disposition of assets owned or
> controlled by the Debtor, and pursuit of the Plan or any alternative to the
> Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code.

*Id.* at *7.

Almost immediately, Highland became aware that Dondero was continuing to

behave adversely to its interests in ways that arguably violated the terms of the TRO. *Id.*

at *14. Less than a month after the Bankruptcy Court entered the TRO — before the

hearing on a preliminary in junction could even be held — Highland filed a motion for

contempt. *Id.* at *7, *8 n.44. After a two-day hearing, the Bankruptcy Court found that

Dondero had attempted to interfere in Highland's trading in SKY and AVYA securities

after the TRO went into effect. *Id.* at *21. It also found that he had impermissible contacts

with Highland employees. *Id.* at *22. The Bankruptcy Court held him in contempt and

assessed two monetary sanctions: $450,000 in compensatory damages for Highland's legal

expenses and a further $100,000 for each unsuccessful appeal (or request for

reconsideration) of the contempt order. *Id.* at *25–26.

ORDER – PAGE 4

Case 19-34054-sgj11   Doc 3596-1   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 1Filed 06/06/25   Page 28 of 1017   PageID 13655
Case 3:21-cv-01590-N   Document 42   Filed 08/17/22   Page 5 of 13   PageID 11633

Dondero appeals the Bankruptcy Court's contempt order. He asserts that the finding that he interfered with Highland's trading activity after the TRO lacks any evidentiary support. He also argues that the provision of the TRO pertaining to permissible contacts with Highland employees is impermissibly vague. Finally, he contends that the monetary sanctions are marred — in whole or in part — by various deficiencies.

## II. STANDARD OF REVIEW

A district court "reviews a bankruptcy court's findings of fact for clear error, and its legal conclusions de novo." *Ingalls v. Thompson (In re Bradley)*, 588 F.3d 254, 261 (5th Cir. 2009). It reviews contempt orders for abuse of discretion. *FDIC v. LeGrand*, 43 F.3d 163, 166 (5th Cir. 1995). A court may hold a party in contempt where it has found by clear and convincing evidence that "1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000) (quoting *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992)). The movant bears the burden of proof on these points. *Id.*

## III. THE BANKRUPTCY COURT'S FINDING OF POST-TRO VIOLATIONS IS NOT CLEARLY ERRONEOUS

The Bankruptcy Court found that Dondero had violated the TRO by interfering with Highland's sales of SKY and AVYA equity securities in late December 2020. Dondero objects that no evidence in the record supports a finding of interference in any dispositions occurring after the TRO went into effect. The Court concludes, however, that evidence in

ORDER – PAGE 5

Case 19-34054-sgj11   Doc 3596-1   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 1 Filed 06/25/4   Page 29 of 1017   PageID 13656
Case 3:21-cv-01590-N   Document 42   Filed 08/17/22   Page 6 of 13   PageID 11634

the record (and cited by the Bankruptcy Court in its Order) reasonably supports the finding of a post-TRO violation.

Though the Bankruptcy Court's order does quote from emails and reference events that occurred prior to the TRO, the record supports the Court's ultimate conclusion that Dondero interfered with Highland's trading in late December.  For one, Dondero admitted at a deposition in early January that he had interfered with dispositions in late December.  R. 06838–06839.[1]  On appeal, Dondero suggests without explicitly asserting (because it would be an incorrect statement) that the transcript of the deposition was not properly in evidence in the contempt proceeding.[2]  Even were that true, however, it would not suffice to demonstrate clear error.  Without a doubt, Dondero denied any post-TRO interference in his live testimony at the hearing on the motion for contempt.  R. 08958.  But Highland's counsel impeached him with his earlier inconsistent testimony.  R. 08959.  At that point, the Bankruptcy Court as fact finder properly weighed the witness's credibility to determine which of the inconsistent statements was true.  It concluded that the earlier admission was truthful.  Nothing more need be said on this point.  The Bankruptcy Court's factual conclusion does not constitute clear error.

---

[1] For clarity, the Court refers to material in the Record on Appeal by reference to Bates numbers.  An index for the record can be found at Docket Entry 7-1.
[2] The transcript came in as part of Highland's Exhibit 28, which the Bankruptcy Court admitted into evidence.  R. 08912.

ORDER – PAGE 6

App. 000087
012708

Case 19-34054-sgj11   Doc 3596-1   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 1 Filed 08/06/25   Page 30 of 1017   PageID 13657
Case 3:21-cv-01590-N   Document 42   Filed 08/17/22   Page 7 of 13   PageID 11635

## IV.  THE TRO STATED ITS TERMS
## WITH SUFFICIENT CLARITY

Dondero next asserts two purely legal arguments why the TRO cannot serve as a basis for contempt.  Both arguments turn on whether the TRO met the specificity requirements of Federal Rule of Civil Procedure 65(d).  First, he argues that the TRO impermissibly required reference to a document other than the TRO itself.  Alternatively, Dondero contends that the TRO failed to state clearly and unambiguously the conduct that it prohibited.  Neither argument is availing.

The TRO proscribed "communication with any of [Highland's] employees, except as it specifically relates to shared services currently provided to" Dondero-affiliated entities connected to Highland.  Contempt Order, at *7.  Dondero argues that this clause requires reference to the written agreements between these affiliated entities and Highland.  As a matter of pure textual analysis, this argument fails.  It does not expressly refer the reader to any written agreement at all.  Rather than incorporate the specifics of an outside writing, the TRO merely refers to the operational reality — those "services currently provided" — as of the time the TRO took effect.  As the former lead executive at Highland no one was as well-placed to understand the way Highland and the relevant entities had conducted themselves previously.  Dondero's attempts to muddy the waters by casting doubt on the future arrangement between Highland and the Dondero-affiliated entities (as Highland emerged from bankruptcy) fails to establish that the TRO required reference to documents presumably predating the bankruptcy.  And, as Highland points out by way of a parade of horribles, it is difficult to identify a limiting principle in Dondero's argument.  Appellee's

ORDER – PAGE 7

012709
Appx. 00006

Case 19-34054-sgj11   Doc 3596-1   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 1 Filed 09/09/254   Page 31 of 1017   PageID 13658
Case 3:21-cv-01590-N   Document 42   Filed 08/17/22   Page 8 of 13   PageID 11636

Br., at 22 [34] (asking whether Dondero's argument implies that the TRO's reference to Highland's employees requires resort to a written employee roster).  The Court agrees that Dondero's interpretation of Rule 65(d) would create an unworkable standard.

As an alternate argument, Dondero contends that the same section of the TRO fails to state the conduct it prohibits with adequate specificity, thereby violating Rule 65(d). Much of this argument repackages the objection to the purported incorporation of the shared services agreements raised in the first argument.  Dondero draws heavily from several clauses of these agreements to demonstrate the ambiguity they create with respect to what conduct is or is not permitted by the TRO.  But the language of these agreements only matters insofar as the TRO requires resort to them, a position this Court has already rejected.  The principle of fair notice guides the application of the specificity standard — the TRO's proscriptive language should "be framed so that those enjoined will know what conduct the court has prohibited." *Am. Airlines*, 228 F.3d at 578 (quoting *Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 373 (5th Cir. 1981)).  Consequently, the "mere fact that . . . interpretation is necessary does not render the injunction so vague and ambiguous that a party cannot know what is expected of him." *Martin's Herend Imps., Inc. v. Diamond & Gem Trading U.S. of Am. Co.*, 195 F.3d 765, 771 (5th Cir. 1999).  The Court holds that the challenged provision of the TRO meets this fair notice standard considering that the enjoined individual was the long-time chief executive of the Highland empire and had sufficient insight into how services were shared between Highland and the related entities to enable him to comply.

ORDER – PAGE 8

012710

Case 19-34054-sgj11    Doc 3596-1    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 1 Filed 10/06/25    Page 32 of 1017    PageID 13659
Case 3:21-cv-01590-N    Document 42    Filed 08/17/22    Page 9 of 13    PageID 11637

At the conclusion of his challenge to the TRO's specificity, in a single short paragraph, Dondero also challenges the factual findings supporting the conclusion that he failed to comply with the TRO.  The Bankruptcy Court enumerated numerous offending contacts between Dondero and Highland employees, only a subset of which he challenges.  The Court concludes that the myriad communications identified by the Bankruptcy Court substantiate its factual finding sufficiently to surpass the low bar of clear error review easily.

### V. THE COURT REVERSES THE UNSUCCESSFUL-APPEAL SANCTION BUT AFFIRMS THE COMPENSATORY SANCTION

Dondero attacks both categories of monetary sanctions awarded by the Bankruptcy Court.  First, he argues that it lacked the authority to impose a $100,000 sanction for "each level of rehearing, appeal, or petition for *certiorari*" unsuccessfully pursued.  Contempt Order, at *26.  Highland concedes this point in its brief.  Accordingly, this Court reverses the forward-looking sanction applicable to unsuccessful appeals.

The Bankruptcy Court also awarded the Highland $450,000 to compensate it for the "loss and expense resulting from [Dondero's] non-compliance with the TRO." *Id.*  This award consists of $365,921 in attorney's fees incurred in December 2020 and January 2021, $33,400 in estimated legal fees preparing for and conducting the hearing on the motion for contempt, and an additional $50,000 in estimated additional expenses.  *Id.* at *25.  Dondero complains that (i) the fees from December 2020 and January 2021 lack proper support, (ii) the Bankruptcy Court lacked authority to award compensatory damages for the latter two categories at all, and (iii) that all three categories include fees for work

ORDER – PAGE 9

Case 19-34054-sgj11    Doc 3596-1    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 1 Filed 01/06/25 4    Page 33 of 1017    PageID 13660
Case 3:21-cv-01590-N    Document 42    Filed 08/17/22    Page 10 of 13    PageID 11638

not associated with the claims on which Highland prevailed.  The Court rejects all of these

arguments and affirms the Bankruptcy Court's compensatory damages award.

Courts possess an inherent power to enforce their orders via civil contempt.  *Cook*

*v. Ochsner Found. Hosp.*, 559 F.2d 270, 272 (5th Cir. 1977).  "Discretion, including the

discretion to award attorneys' fees, must be left to a court in the enforcement of its decrees."

*Id.*  Quite logically, then, a Bankruptcy Court's assessment of monetary sanctions for civil

contempt is reviewed for abuse of discretion.  *In re Bradley*, 588 F.3d at 261.  Likewise,

the basis for the *amount* of attorney's fees awarded by the court is also assessed under an

abuse of discretion standard.  *See Cook*, 559 F.2d at 273 (holding that amount of attorney's

fees awarded as compensatory damages in civil contempt proceeding must conform to

standard articulated in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir.

1974)).

The Court first dispenses with Dondero's objection that the Bankruptcy Court

abused its discretion in awarding fees incurred during the period from December 2020 to

January 2021.  In support of this amount, Highland provided eighty-seven pages of line-

by-line time entries that specified the biller and the work performed.  R. 008108–008196.

That these records date back to November (before issuance of the TRO) is of no moment

because the Bankruptcy Court only awarded attorney's fees for work performed during

December and January.  Contempt Order at *25.  The Bankruptcy Court, relying on its

familiarity with the work provided by Highland's counsel garnered in the course of this

proceeding scrutinized the time entries to ensure that it included only work that pertained

to the contempt proceeding.  The amount awarded for December 2020 constitutes less than

ORDER – PAGE 10

Case 19-34054-sgj11   Doc 3596-1   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 1 Filed 12/06/25   Page 34 of 1017   PageID 13661
Case 3:21-cv-01590-N   Document 42   Filed 08/17/22   Page 11 of 13   PageID 11639

a third of the total amount billed to Highland for December 2020 by its counsel.  The Bankruptcy Court concluded that the documentation before it adequately established the reasonableness and necessity of the fees charged.  It had ample experience with Highland's counsel — both in terms of the nature of the work and its cost — garnered over the course of this years-long proceeding.  Relying on those voluminous records does not constitute an abuse of discretion.

The Court next addresses Dondero's contention that the Bankruptcy Court impermissibly included fees predating the contemptuous conduct.  Assuming the Bankruptcy Court included fees incurred in preparing or arguing the motion for TRO, did it abuse its discretion?  Dondero argues, citing *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178 (2017), that the Bankruptcy Court could only award fees that would not have been incurred but-for his misconduct.  While this rule did apply to restrict the Bankruptcy Court's authority to grant fees, Dondero's frames his but-for test far more narrowly than the language of *Goodyear Tire* requires.  A trial court "may decide, for example, that all (or a set percentage) of a particular category of expenses — say, for expert discovery—were incurred solely because of a litigant's bad-faith conduct." *Goodyear Tire*, 137 S. Ct. at 1187.  Some circumstances warrant the shifting of all fees in a case (or from a moment in the case). *Id.*  Where a specific course of litigant misconduct sets off a new phase of litigation that results in a party incurring fees which it would not have incurred absent the misconduct, a court may properly shift fees for that entire phase of the case. *See id.* at 1188 (noting that a court may shift fees from some moment onward if "all fees in the litigation, or a phase of it, . . .  would not have been incurred except for the misconduct").

ORDER – PAGE 11

012713

Appx. 00012

Case 19-34054-sgj11    Doc 3596-1    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 1 Filed 010602514    Page 35 of 1017    PageID 13662
Case 3:21-cv-01590-N    Document 42    Filed 08/17/22    Page 12 of 13    PageID 11640

This phase of the case began with Dondero's November misconduct which resulted in the issuance of a TRO. That pattern of conduct — the behavior found contemptuous closely mirrors the interference giving rise to the TRO — continued largely unabated through the relevant period in time. The Bankruptcy Court did not abuse its discretion in concluding that the fees related to the TRO would not have been incurred but-for the discrete pattern of misconduct giving rise to the ultimate finding of contempt.

Dondero's argument that the but-for test prohibits the inclusion of fees incurred in support of non-contemptuous conduct also fails. Unlike in *Fox v. Vice*, 563 U.S. 826 (2011), a precursor case to *Goodyear Tire*, the issue is one of *factual allegations* and not discrete *legal claims*. Highland alleged a broad set of facts in support of the same legal theory. The level of specificity in billing that Dondero seeks to impose is utterly unworkable because no attorneys segregate their billing based on the factual allegation they are currently working in support of. Moreover, as the Supreme Court squarely addressed this kind of nit-picky argument when it noted:

> The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time. And appellate courts must give substantial deference to these determinations, in light of the district court's superior understanding of the litigation.

*Fox*, 563 U.S. at 838 (internal citations omitted). In sum, the Bankruptcy Court did not abuse its discretion in awarding attorney's fees for the work related to the contempt motion, including work addressing factual allegations ultimately found noncontemptuous.

ORDER – PAGE 12

012714

Case 19-34054-sgj11   Doc 3596-1   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 1   Filed 04/04/25   Page 36 of 1017   PageID 13663
Case 3:21-cv-01590-N   Document 42   Filed 08/17/22   Page 13 of 13   PageID 11641

Finally, the Court affirms the Bankruptcy Court's inclusion of estimated fees related to the contempt hearing itself as well as for additional expenses. Again, "trial courts may take into account their overall sense of a suit[] and may use estimates in calculating and allocating" attorney's fees. *Id.* The Bankruptcy Court used extremely conservative assumptions regarding the additional time expended in preparing for and conducting the hearing. The Bankruptcy Court likewise drew on its substantial knowledge of the scope of work required in this case to arrive at a conservative estimate for legal work and other necessary expenses associated with prosecuting Dondero's contemptuous conduct. While Dondero may seek "auditing perfection," that is not the standard. This Court rejects the contention that the Bankruptcy Court's compensatory sanction rose to the level of an abuse of discretion.

## CONCLUSION

In consideration of the foregoing, the Court affirms all challenged components of the Bankruptcy Court's Contempt Order, save for its sanction of $100,000 for each unsuccessful appeal of that Order. As to the unsuccessful-appeal penalty, the Court reverses the Bankruptcy Court's sanction as an abuse of discretion.

Signed August 17, 2022.

David C. Godbey
United States District Judge

ORDER – PAGE 13

# EXHIBIT 2

```
 1                  IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
 2                              DALLAS DIVISION

 3                                    )    Case No. 19-34054-sgj-11
       In Re:                         )    Chapter 11
 4                                    )
       HIGHLAND CAPITAL               )    Dallas, Texas
       MANAGEMENT, L.P.,              )    August 31, 2022
 5                                    )    9:30 a.m. Docket
                                      )
 6          Reorganized Debtor.       )
                                      )    STATUS CONFERENCE RE: MOTION
 7                                    )    FOR FINAL APPEALABLE ORDER
                                      )    FILED BY JAMES DONDERO
 8     _____)    [3406]

 9                        TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                   UNITED STATES BANKRUPTCY JUDGE.

11     APPEARANCES:

12     For the Reorganized      Jeffrey Nathan Pomerantz
       Debtor:                  PACHULSKI STANG ZIEHL & JONES, LLP
13                              10100 Santa Monica Blvd.,
                                 11th Floor
14                              Los Angeles, CA  90067
                                (310) 277-6910
15
       For the Reorganized      Melissa S. Hayward
16     Debtor:                  HAYWARD, PLLC
                                10501 N. Central Expressway,
17                               Suite 106
                                Dallas, TX  75231
18                              (972) 755-7104

19     For James Dondero,       Michael Justin Lang
       Movant:                  CRAWFORD WISHNEW & LANG, PLLC
20                              1700 Pacific Avenue, Suite 2390
                                Dallas, TX  75201
21                              (214) 817-4500

22     Recorded by:             Michael F. Edmond, Sr.
                                UNITED STATES BANKRUPTCY COURT
23                              1100 Commerce Street, 12th Floor
                                Dallas, TX  75242
24                              (214) 753-2062

25
```

2

1    Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
2                                 Shady Shores, TX  76208
                                  (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.

Case 19-34054-sgj11   Doc 3596-2   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 2 Filed 06/23   Page 40 of 1017   PageID 13667

3

1            DALLAS, TEXAS - AUGUST 31, 2022 - 9:40 A.M.

2            THE COURT:  All right.  We have a status conference

3    in the Highland matter.  So, before I get appearances, let me

4    just kind of set the stage here.  The impetus for this was a

5    motion filed by six different entities, including James

6    Dondero and NexPoint and HCMFA and Dugaboy Family Trust.  It

7    was titled a Motion for Final Appealable Order and Supplement

8    to Motion to Recuse Pursuant to 28 U.S.C. Section 455.

9        So that was filed, and then Highland filed a motion to

10   strike certain items that were in the appendix.  And there was

11   -- how many -- I've been counting pages here.  I think there

12   was a 365-page appendix.  And Highland wanted to strike

13   certain documents in that appendix.  And then there was an

14   alternative request by Highland to compel depositions of

15   certain persons if those documents weren't stricken.

16       So I felt the need for a status conference.  After

17   originally setting this motion for hearing, I decided to

18   convert today to a status conference because, to be perfectly

19   honest, I didn't understand what in the heck the Movants were

20   procedurally seeking.

21       Okay.  So, I'm aware that Highland's motion to strike and

22   Highland's motion to compel were later resolved by

23   stipulation, but -- and then I guess an amended motion was

24   filed by Movants.  But I'm still confused, and so I just want

25   to kind of talk about process and procedure.

4

1      I will say -- and I see Mr. Pomerantz on the video, and

2    Ms. Hayward and many others -- if we want to talk more

3    generally status, I'm open to that, because I have become

4    aware that the Fifth Circuit affirmed in substantial part the

5    confirmation order, so I don't know if, in light of that, the

6    parties want to talk about big-picture status.

7            MR. POMERANTZ:  Your Honor, I could address that

8    briefly.  I don't think we're prepared today --

9            THE COURT:  Okay.

10           MR. POMERANTZ:  -- for a number of reasons.  One

11   because the other adversaries aren't here.  But suffice it to

12   say we read the order and we intend to bring an appropriate

13   motion before Your Honor to implement the Fifth Circuit

14   opinion, and will do so relatively soon.

15           THE COURT:  Okay.  Thank you.  All right.  So, with

16   that, let me go ahead and get formal appearances on the motion

17   before the Court.  So, for the Movants, Mr. Lang, are you the

18   one appearing for the Movants?

19           MR. LANG:  Yes, Your Honor.

20           THE COURT:  All right.  And for Highland, who do we

21   have appearing on this motion, the status conference?

22           MR. POMERANTZ:  Good morning.  Jeff Pomerantz;

23   Pachulski Stang Ziehl & Jones; on behalf of Highland Capital.

24           THE COURT:  Okay.  And I'll just ask.  I know we have

25   observers, but is there anyone else who wanted to make an

5

1    appearance on this particular motion?

2        (No response.)

3            THE COURT:  All right.  Well, Mr. Lang, I'm turning

4    it over to you.  Can you explain to me exactly what you're

5    seeking with your motion?  I know it's about recusal, --

6            MR. LANG:  Sure.

7            THE COURT:  -- but we've plowed a lot of ground, and

8    I'm kind of confused about the --

9            MR. LANG:  No, that's good.  That's fair.

10           THE COURT:  -- procedure.

11           MR. LANG:  And I just want to let you know that we

12   conferred with Highland's counsel, and they have no objection

13   -- and I understand the Court, you know, has some issues that

14   you want to discuss -- but they have no objection to our

15   request to remove the reservation language.

16       Highland also, now that we have stipulated to the removal

17   of the three documents that they had an issue with, Highland

18   also doesn't object to Movants' appendix and supplementing the

19   record.  And likewise, Movants do not object to Highland's

20   appendix and supplementation of the record.  Just so you know,

21   that's unopposed on those issues.

22       With respect to what we are seeking, we are seeking for

23   the Court just to issue an order removing the reservation

24   language.  As the Court is aware, Judge Kinkeade raised the

25   issue about that reservation language in the response

6

1    briefing.  Highland seized upon that language and -- or,

2    argued that the recusal order was not final because Your Honor

3    had, you know, could potentially supplement or amend the

4    recusal order in the future.

5         And we are trying to get this in a position to get this

6    reviewed on appeal, even if it's through mandamus, and are

7    trying to eliminate any obstacles that might pop up due to

8    that reservation language.  So, it's really that simple on

9    that issue.

10             THE COURT:  Okay.  Let me --

11             MR. POMERANTZ:  Your Honor, may I --

12             THE COURT:  Well, yes, but let me just ask this one

13   very basic question.  If all you are seeking at the end of the

14   day is for this Court to remove the one sentence at the end of

15   the March order that provided the Court reserves the right to

16   supplement or amend, why didn't you just file a motion saying

17   that?

18             MR. LANG:  Well, we say --

19             THE COURT:  And what I'm talking about is it's a

20   lengthy motion.  As I mentioned, it had 365 pages of

21   supplemental material.  And that's why we're here on a status

22   conference, because I didn't understand exactly what you were

23   seeking to do.  You know, why would you file such a thick

24   motion if all you were seeking was for me to remove?  Why

25   wouldn't you have just said -- you know, I guess cited Rule

7

1   54?  I guess that would be the applicable authority.  I mean,

2   so help me to understand.  Have you evolved your approach?

3   Did you originally think you wanted more and then now you're

4   seeking to narrow it to just having the Court delete that

5   sentence, or what?

6           MR. LANG:  No.  That goes to your second issue about

7   the supplementation.  You know, the United States Supreme

8   Court in the *Liteky* case states that, you know, when you've

9   got a recusal, you look at events occurring in the course of

10  the proceedings that evidence deep-seated favoritism or

11  antagonism.  So you look at the entire course of the

12  proceeding.

13      We put in additional examples.  I think all but one of the

14  transcripts was after the recusal motion was filed and after

15  the order.  And it is, you know, this isn't a single-issue

16  case and it's not a situation where, you know, for example,

17  the Court owns stock in a company that was one of the parties.

18  This is, you know, from our perspective, it's an ongoing case

19  that's still in process, and that in the course of the

20  proceedings there have been statements made and things that

21  happened that we believe are going to be reviewed to apply the

22  standard.

23      And so it is -- the supplementation goes to things that

24  happened after the recusal.  And so we are supplementing to

25  add that.  And that's -- even the Fifth Circuit says that you

8

1  look at the entire course of the judicial proceedings when

2  reviewing a recusal motion.

3       So that's -- that was the second point that you raised,

4  which is why, 17 months after the order, are we supplementing?

5  It is because the proceedings continued and we believe it's

6  just additional examples and -- that support the relief that

7  we request, and we're putting it in the record, and we wanted

8  the Court to review it.

9       I think we say in the motion, or in the reply, you know,

10  we don't -- we don't think the Court is going to come to a

11  different conclusion, but regardless, we wanted to put the

12  information in the record and put it before the Court, and the

13  Court can review it and make the ruling that the Court is

14  going to make, and then we'll just go from there.

15            THE COURT:  All right.  One more question for now,

16  and then, Mr. Pomerantz, I'll hear from you.

17       Again, I care about procedure, as I hope any court does.

18  It occurred to me that there were two ways that might

19  procedurally be proper to raise the issues here.  One, as I

20  mentioned, just a simple, I guess, Rule 54 motion:  Please,

21  Judge, take out that last sentence of your order, because some

22  day we want to have a final order that we can appeal.  And I

23  don't think taking out that order, I mean, that one sentence,

24  is going to make it a final order.

25       But then the second -- so that could have been the motion.

9

 1   Or you could have filed just a new motion to recuse, I guess,
 2   and added a new record.
 3       But it just felt like you were -- well, I was just
 4   confused.  That's why we're here.  And I said I was going to
 5   turn to Mr. Pomerantz, but one more question for you.  Do you
 6   think if I remove the one sentence from my March 2021 order,
 7   all of a sudden you have a final appealable order that you
 8   could immediately file a new appeal on?
 9            MR. LANG:  No.  What I previously said was that that
10   language, as Highland argued, creates, you know, an argument
11   that the Court has left open the issue on recusal.  And we
12   think that removing that language makes Your Honor's ruling on
13   this final for purposes of allowing us to seek mandamus.  So
14   that's -- that's why we -- just remove the argument that if we
15   seek mandamus, that, no, the Court is not done with this
16   issue, the Court has left open the prospect, you know,
17   prospect of later amending or supplementing the ruling.  And
18   so we're just trying to get that hurdle out of the way.
19            THE COURT:  Okay.  So you acknowledge that if the
20   last sentence is removed, it's still not going to be a final
21   appealable order because of the posture of the bankruptcy
22   case, but you think it somehow gives you the ability to seek a
23   petition for writ of mandamus?
24            MR. LANG:  I think it removes an argument when we
25   seek a petition for writ of mandamus that this is not -- that

10

1    the Court is not done with this issue and therefore it would

2    be premature.

3        So we're just removing -- again, the argument was made

4    after Judge Kinkeade raised the issue about that language in

5    the order, the argument was made by Highland that that

6    language means that the Court is not done with the issue,

7    potentially not done, and the Court reserved the right to

8    visit that issue at a later date, and therefore, you know, the

9    judge -- the Court's not done dealing with the issue.

10        So we are asking the Court, just remove that language,

11   remove that potential obstacle, and allow us to go forward

12   with whatever procedural rights we have.

13            THE COURT:  Okay.

14            MR. LANG:  We're not asking the Court --

15            THE COURT:  I'm just trying --

16            MR. LANG:  -- to declare --

17            THE COURT:  I'm trying not to waste judicial

18   resources.  And as I understood the Judge Kinkeade ruling,

19   which I went back and read -- I hadn't read it before you

20   filed this new motion -- while he makes a passing reference to

21   the last sentence of my March 2021 order, he gives about five

22   reasons why an order denying a motion to recuse is not a final

23   appealable order until the end of the proceedings it's filed

24   in.

25        And so I read the opinion as there was established case

11

1   law that, even if that last sentence hadn't been in there, you

2   didn't have a final appealable order.  Do you read it

3   differently?

4          MR. LANG:  No, I don't read his opinion differently.

5   And that's why I said that, you know, as far as the petition

6   for writ of mandamus, we don't have to have a final -- the

7   proceeding doesn't have to be final.  It's a different avenue

8   for appeal.

9      And so Judge Kinkeade did not consider, even though we

10  asked him to go ahead and just consider this a petition for

11  writ of mandamus, Judge Kinkeade denied that request, so he

12  did not rule on that issue.  And that's why, again, removing

13  the language eliminates the argument under the mandamus --

14  when the mandamus is filed, it just eliminates the argument

15  that the Court is not done dealing with the issue.

16         THE COURT:  He denied -- okay.  Well, there was

17  something in that ruling that made you think, hey, if you go

18  back and get this last sentence removed, then maybe I would

19  consider a petition for writ of mandamus in this context?

20         MR. LANG:  No.  At the end of the order, he said he

21  denies Appellants' request to construe their appeal as a

22  petition for writ of mandamus.  So the way it was procedurally

23  postured, he said it could not be appealed.

24         THE COURT:  Did --

25         MR. LANG:  But the mandamus position remains open.

12

1    And when he, being Judge Kinkeade, after the briefs were

2    filed, he obviously was looking at it, he questioned his

3    jurisdiction, he requested briefing on the jurisdiction,

4    because in that order that he sent out requesting the

5    briefing, he pointed out -- you know, one of the issues he

6    pointed out was the Court's language, the reservation language

7    in the order.  And, again, Highland argued that because of

8    that language, among other things, that language made the

9    order not final.

10        So all we're saying, all we're asking is just remove that

11   language so when we file the writ of mandamus that argument

12   isn't there.  The Court is done dealing with the issue.

13   Nobody can disagree with it.

14        You know, nobody -- Highland is not agreeing that we, you

15   know, can seek mandamus, so I'm not saying that.  And I'm not

16   asking the Court to agree to that.  Mandamus is a -- we

17   believe is an option.  It's still on the table.  And we're

18   just dealing with one issue that came up before and just

19   trying to head it off before -- so that we don't have to come

20   back down and ask the Court to remove it later.

21            THE COURT:  All right.  Mr. Pomerantz, what do you

22   want to say about this?

23            MR. POMERANTZ:  So, Your Honor, this is extremely

24   frustrating.  I know Your Honor had said you didn't want to

25   waste Court time.  There has already been a tremendous amount

13

1   of Court time that's wasted.

2       When we got this motion, it was a head-scratcher.  We read

3   it as seeking way more things than what Mr. Lang is saying

4   now.  If he had called up and asked us if we had any issue,

5   subject to Your Honor's agreement, to remove that last

6   sentence, we would have said we don't, because the briefing

7   before the District Court and the District Court's decision

8   have really nothing to do with that last sentence.  Maybe the

9   -- Judge Kinkeade mentioned it in his December order, but it's

10  clear, as Your Honor mentions, from the reading of the

11  District Court opinion that it is irrelevant.

12      And the argument that the Court, the District Court which

13  denied interlocutory appeal is somehow, once that sentence is

14  eliminated, going to entertain and grant a writ of mandamus is

15  farcical.  It's just not going to happen.  And unfortunately,

16  what's going to happen is we're going to have to spend more

17  time, more money, and more effort.

18      And Your Honor, I know the motion to strike has been

19  resolved, but I'd just like to mention it, because this is --

20  continues to be frustrating from the Highland side.  They

21  filed an appendix that sought to slip in three letters written

22  by attorneys for various Dondero entities that were

23  essentially a smear campaign, a smear campaign on Mr. Seery, a

24  smear campaign on the Independent Directors, incidentally,

25  which may be actionable in its own right.

14

 1      That had nothing to do with bias.  They wanted to slip

 2   that in, somehow it would get into the appellate record, if

 3   and when they ever got to an appeals court.

 4      So what do we do, Your Honor?  We called them up, called

 5   Mr. Lang up and said, will you withdraw the letters?  There's

 6   no basis for those to be included in the appendix.  He said

 7   no.  Said, okay, will you make the deponents -- the people who

 8   wrote the letters available for deposition?  Wouldn't agree to

 9   that, either.

10      And then we go to the time and the money, we file our

11   motion to strike, and lo and behold, which has become a

12   considerable pattern in this case, Your Honor, what does Mr.

13   Lang do?  He calls up and says, I will withdraw the letters.

14   Okay?  That's aside.  We got what we wanted.  There's nothing

15   we can do.  But it is kind of frustrating, how that -- how

16   that played out.

17      Your Honor, this motion, to the extent it asks for that

18   sentence to be removed, that's fine.  Again, we think it's a

19   legal nullity.  What Mr. Lang asked for in his motion is for

20   Your Honor to issue a final order.  Your Honor can't determine

21   whether your order is final.  We've made that point in our

22   opposition.  It seems maybe now Mr. Lang is walking back on

23   that.  There's nothing you can do.  Your Honor can issue an

24   order; it'll be up to the District Court.

25      With respect to the supplement, Your Honor, as we put in

15

1   the record, we think all the quote/unquote evidence that was

2   submitted just is a severe mischaracterization of the record.

3   And it's important, Your Honor, that not only does the -- we

4   agree that the evidence can come in, but we think Your Honor

5   has to make a determination whether those additional

6   allegations of bias and evidence do in fact demonstrate bias.

7   What we think Mr. Lang wanted to do, or the Appellants wanted

8   to do, or the Movants, they wanted to have that information

9   come in and argue at first blush to the Appellate Court that

10  that is bias, without having had Your Honor make the initial

11  determination, as you would have if there was a motion to

12  reconsider, as you would have if there was a new motion.

13       And so we think it's very important that Your Honor

14  consider those additional allegations.  We think categorically

15  they do not demonstrate any bias, and our Exhibit A goes

16  through each item and points out the severe

17  mischaracterizations.

18       So, Your Honor, we've wasted a lot of time.  We've wasted

19  a lot of money.  But if all they want is to remove that

20  sentence, supplement the record, have Your Honor deny the

21  motion yet again after considering the additional evidence, we

22  do not have an opposition to that.  But it was -- kind of took

23  a long time and a lot of money to get to this place.

24       Thank you, Your Honor.

25            THE COURT:  All right.  And Mr. Lang, on the subject

16

1     of it took a lot of time and a lot of money, estate resources,

2     to get to this place, I just want to note a couple of things.

3     And I guess I'm happy to hear any response to these things

4     that I feel very frustrated about.

5         Again, my focus at this point is judicial resources as

6     well as estate resources.  And no judge, no judge looks

7     lightly on a motion to recuse.  Okay?  Any judge, I would

8     think, is going to have some self-introspection.  Like, oh my

9     goodness, what would motivate someone to think this needs to

10    be urged?

11        But, so on the topic of -- again, I want you to respond to

12    this, Mr. Lang -- my concern about judicial resources and

13    estate resources.

14        The timeline here -- and I always talk about timelines, I

15    know -- but this Court signed the confirmation order in this

16    case February 22, 2021, and your motion to recuse was filed

17    about a month later, March 18, 2021.  Now, here's the first

18    thing I'll mention about judicial resources and estate

19    resources.  Your motion and brief to recuse included an

20    appendix that was 200 -- no, excuse me, 2,722 pages long.

21    Okay?

22        So any judge, again, has to take it seriously when a

23    motion to recuse is filed.  And the standard is I have to

24    stand back and look at would a reasonable person have concerns

25    here.  So I can't just say, I know I'm not biased, I don't

17

1    think I'm biased; I have to look at what a reasonable person

2    might think.

3        So you presented to me a 2,722-page appendix for me to do

4    my job and look at what would a reasonable person think.  So,

5    then would it raise a doubt in the mind of a reasonable

6    observer as to the judge's impartiality?

7        So I think here's another point that goes to judicial

8    resources.  I had my law clerk, just out of curiosity, count

9    up for me how many orders that I had signed as of the day that

10   the motion to recuse was filed, March 18, 2021, and I had

11   presided over the bankruptcy case for 15 months at that point,

12   but it had been in Delaware for two months before Dallas.  On

13   the day you had filed your motion to recuse, March 18, 2021, I

14   had signed 263 orders in the Highland bankruptcy case and the

15   adversary proceedings.  It's a lot more now, of course.  But

16   so I suppose, if I was really to do my job thoroughly, I might

17   look not merely at your 2,722 pages of appendix attached to

18   your motion to recuse, but all 263 orders I had entered to

19   see, hmm, would a reasonable observer question my

20   impartiality?

21       So, anyway, this is all about judicial resources and

22   estate resources.  So, going down the timeline, March 23,

23   2021, five days after you filed the motion to recuse -- after,

24   I will tell you, I won't say I dropped everything to pore

25   through this, but spent a lot of time -- I issued an order

18

1   denying the motion to recuse.

2       Now, here's inside baseball, okay, if there ever was:  The

3   last sentence, reserving the right to supplement or amend,

4   here's why I did it.  I didn't know it would cause a brouhaha.

5   Maybe I didn't give it enough thought.  But in reading the

6   case law during those many days and hours I spent focusing on

7   your motion to recuse, I realized that most of the case law

8   says you don't have to have a hearing, okay, the statute

9   doesn't require a hearing, the case law says you don't have to

10  have a hearing.  And I cited some of that my order.  But I

11  thought, these Movants, after seeing this order, they may come

12  back and say, you didn't give us our day in court.  We wanted

13  a hearing.  We weren't just going to rely on our 2,722-page

14  appendix.  We wanted to put on witnesses.

15      So I didn't have to stick that sentence in there, but I

16  was just sort of anticipating what the Movants might do.

17      Okay.  So, live and learn.  I guess I won't, if I'm ever

18  confronted with the situation again, do that.  But that's what

19  that was about.

20      So, my law clerk went and looked at the appellate record

21  in the past few days, because, I mean, again, head-scratcher.

22  We were trying to get a feel for how big a deal was this

23  sentence, okay, to the District Court, if at all.  But anyway,

24  we happened to note that in July, July 20, 2021, the District

25  Court record on appeal was supplemented with 1,001 more pages

19

1   of record.  So I guess, goodness gracious, poor Judge Kinkeade

2   and his staff, they had 3,723 pages of appendix.  I don't even

3   know if that's all.  You know, I don't know.

4       But so Judge Kinkeade dismissed the appeal because he said

5   my order was interlocutory on February 9, 2022, and then we

6   didn't see a motion for rehearing or an appeal to the Fifth

7   Circuit or a petition for writ of mandamus to the Fifth

8   Circuit.  Five and half months later, this new motion for

9   final appealable order and supplement to the motion to recuse

10  is filed, containing 365 more pages.  And then I see that, Mr.

11  Lang, you filed an amended motion to take out certain of the

12  items, with the agreement, the stipulation that was reached

13  with Debtor's counsel, so it's now a 154-page appendix.

14      But I should add that, in Highland's objection to your

15  latest motion, they attached 86 exhibits, and I couldn't count

16  all those exhibits, but it was more than 5,500 pages.  And it

17  was, as I understood it, sort of almost like a rule of

18  optional completeness.  If you're going to submit these 154

19  pages to supplement the record, we think you need to attach

20  more than snippets of a transcript here and there.  You need

21  to have the whole context.

22      So, anyway, I -- you know, look at what you're doing.  I'm

23  just -- and I guess I could totally appreciate and understand

24  if there had been a brief order from Judge Kinkeade saying,

25  because of that one sentence, this is an interlocutory order,

20

 1   no leave to appeal an interlocutory order is warranted, end of
 2   order.  And, frankly, when you filed your motion, this latest
 3   motion, having not seen Judge Kinkeade's order, I thought
 4   that's what it was going to say.
 5       So, from the tone of your motion, it sounded like that's
 6   all his order was about, just:  I have a problem with this
 7   last sentence, it makes the whole order interlocutory.  And
 8   then I go back and read it and he gives four or five different
 9   reasons why an order denying a motion to recuse is
10   interlocutory until the end of the case.  I know that's a
11   bizarre concept in the world of bankruptcy, but he considered
12   this is even the rule in the world of bankruptcy.
13       So, anyway, help me to understand why this isn't
14   unnecessary carpet-bombing the Court, me and whoever might
15   hear your petition for writ of mandamus, and the Debtor
16   estate, carpet-bombing us with paper and causing us to expend
17   resources.  And, again, we've got this backdrop of the
18   original motion to recuse being filed 15 months after I
19   started presiding over the case and after I had signed 263
20   orders.
21       Please, Mr. Lang, please help me to understand if this is
22   warranted.  Why, I mean, help me to understand why this is not
23   wasting resources in your view and why this isn't just some
24   strategy.  Again, I'm trying to not play psychologist, I'm
25   really trying to understand why you think this is fine.

1        MR. LANG:  Well, Your Honor, we've moved to recuse,

2    and we've stated the grounds, and we have put in documents

3    from the record that we think support those grounds.  We have

4    not unnecessarily carpet-bombed.  We've cited to the various

5    transcripts.  The length of the record is directly related to

6    the length of the transcripts mostly, the various transcripts

7    throughout the proceeding.  And so, you know, with respect to

8    the 2,722 pages of appendix, most of those are just complete

9    copies of transcripts.

10       But again, we're just creating our record to support our

11   position on our motion.  And the current motion is eight

12   pages.  It's got reference to the additional grounds that

13   we've set forth that we think support our motion.  And we

14   attached the various documents and transcripts that, again,

15   support -- we think support our position.  And we're making

16   our record for appeal.

17       And as far as Mr. Pomerantz and the withdrawing of the

18   letters, you know, I was getting ready for trial when Mr.

19   Morris called.  And he said, they're hearsay.  We had a brief

20   conversation.  I disagreed.  They filed their motion.  When I

21   got the time to look at it, I read through it, and Mr. Morris

22   and I had a conversation, and we decided, you know what, we

23   don't need them, we'll pull them out.  Let's just do away with

24   this issue.  It's not worth the time to deal with it.

25       I'm sorry they had to file their motion.  But, you know, I

22

 1   couldn't drop everything at that moment to look through.  And
 2   again, the reason that he gave was hearsay.  So, you know,
 3   it's not gamesmanship.  It was just, look, you know, when we
 4   got down to looking at it, when I looked at it, I decided it
 5   wasn't worth the effort and the hassle, and we agreed to pull
 6   them down and withdraw them.  And that's why I filed the
 7   amended motion.
 8       As far as the current appendix, Your Honor, we're just
 9   making a record.  You know, we're trying to get this thing
10   reviewed.  We're making sure the Court is aware of all the
11   grounds and having considered all the grounds and all the
12   actions that we think support our motion.  We're giving the
13   Court the opportunity to look at it, and then just enter the
14   order without that language and we'll deal with the mandamus.
15       Again, the issue is ultimately going to be reviewed.
16   We're trying to get it reviewed.  And you're right, you know,
17   we don't have to, you know, you didn't have to have a hearing
18   on the first deal, you don't have to have a hearing on this
19   one.
20           THE COURT:  Okay.
21           MR. POMERANTZ:  Your Honor, this is -- this is just
22   one more match in furtherance of Mr. Dondero's stated desire,
23   as you've heard many times, to burn the place down.  We would
24   have hoped, and I guess it would have been naïve to hope, as I
25   know Your Honor has hoped throughout the case, that at some

23

1   point in time the Dondero side would stop blaming Your Honor,

2   blaming Mr. Seery, blaming the estate, and actually look at

3   what he can do to put an end to this.  Pay his notes, stop

4   raising frivolous claims, so everyone can go on with his life.

5   That's what the estate wanted to do and wants to do.  That's

6   what Mr. Seery wants to do.  Unfortunately, Mr. Dondero

7   doesn't seem capable of it, and this is just one more match on

8   the flames.  And Mr. Lang, doing his job, following his

9   client's wishes, is just one more player in that.  But it is

10  extremely frustrating.

11         THE COURT:  Okay.  All right.  Here's what I'm going

12  to do.  First, I'm simply going to deny the pending amended

13  motion for final appealable order and supplement to motion to

14  recuse, as it is procedurally improper as framed.  Okay?  It

15  was kind of like a Rule 54 motion.  It was kind of like a new

16  motion to recuse.  It was kind of like a Rule 59 motion for,

17  you know, new -- to put in new evidence, have a new trial, but

18  way untimely for that.

19     So I'm just denying the motion that's before me.  Okay?

20  And by doing that, I mean, I guess, I guess the stipulation

21  and order that's before me on the motion to strike and the

22  motion to compel, I guess I'll -- it's in my queue, I'll sign

23  it, unless someone tells me there is a reason it doesn't make

24  sense to sign it.

25     But I'm denying the motion before me.  But just so it's

24

1    clear, Mr. Lang, it's without prejudice to you either filing a

2    simple Rule 54 motion, without attachments, that simply asks

3    me to strike the last sentence of my original order denying

4    your motion to recuse from March 2021.

5        If you give me a simple Rule 54-based motion simply asking

6    me to strike that sentence, I'll sign it.  Without a waiting

7    period.  Without a hearing.  And I assume Mr. Pomerantz

8    doesn't have a problem with that.

9            MR. POMERANTZ:  That is correct, Your Honor.  If all

10   that motion asks for, we would not oppose that.

11           THE COURT:  Okay.  It's also, my ruling today denying

12   your motion, is without prejudice to you filing a new motion

13   to recuse, if that's what you want to do, to start this over

14   and supplement the record.

15       But, you know, proceed as you will.  This Court is going

16   to do its duty.  And, well, if you want to do that, you do

17   that, but I'll have a more elaborate order if I have to rule

18   on a new motion to recuse.  Among other things, I'm going to

19   point out to the Court above, whoever hears this, that because

20   I think timeliness was always an issue I raised in your

21   original order, you know, filing a motion to recuse after

22   confirmation, 15 months after this judge was assigned to the

23   case, and after the judge had signed 263 orders.

24       You know, we have case authority, as I'm sure you

25   researched and know, that talk about timeliness.  Even though

25

 1  it's not baked into the statute, 28 U.S.C. Section 455, it is

 2  a factor.  And so this is not *A v. B* litigation.  This is a

 3  case affecting many, many people.  And at some point, don't we

 4  have to wonder why a motion would be filed after 263 orders?

 5  If your clients legitimately think there was bias, I don't

 6  know why they didn't raise the issue way, way earlier in the

 7  case.

 8      And that's why these appendices are so huge, right?  It

 9  dovetails with the timeliness.  Okay?  Fifteen months.

10  There's a huge, huge, huge, huge record.

11      So, anyway, do you have any questions, Mr. Lang?

12      Again, I  will say it for at least the third time this

13  morning:  I'm worried about judicial resources and estate

14  resources.  Okay?  And, you know, I have to worry about I'll

15  loosely call my bosses, okay, you know, the courts that grade

16  my papers.  The District Court who hears appeals and hears

17  petitions for writ of mandamus.  The Fifth Circuit.  They're

18  going to get frustrated with me if -- well, you know, if, for

19  example, I had ruled on this motion before me today, a clearly

20  procedurally defective motion.  And if I just willy-nilly let

21  people put things in the record without a procedurally proper

22  basis, it just makes more work for the Court of Appeals,

23  right?

24      So it's not just about the lawyers here.  It's not just

25  about me and my staff.  It's about the people who grade my

26

```
1   papers.  If I granted your motion as it's pending here before
2   me today, I have every reason to think, whether it's Judge
3   Kinkeade or the Fifth Circuit, they would think, what is this
4   judge doing?  Okay?  So it's just procedurally defective, what
5   you filed.  Okay?  But, again, you've got the ruling.  Do you
6   have any questions?
7           MR. LANG:  I don't.
8           THE COURT:  We're adjourned.
9           THE CLERK:  All rise.
10      (Proceedings concluded at 10:25 a.m.)
11                        --oOo--
12
13
14
15
16
17
18
19
20                      CERTIFICATE
21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.
23   /s/ Kathy Rehling                    08/31/2022
24  _____    _____
    Kathy Rehling, CETD-444                     Date
25  Certified Electronic Court Transcriber
```

27

INDEX

1
2    PROCEEDINGS                                              3

3    WITNESSES

4    -none-

5    EXHIBITS

6    -none-

7    RULINGS                                                 23

8    END OF PROCEEDINGS                                      26

9    INDEX                                                   27

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT 3

012744

# EXHIBIT 4

012745

# EXHIBIT 5

App. 004 84

012746

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5 Filed 06/26/25    Page 68 of 1017    PageID 13695
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 1 of 66    PageID 10087
Docket #0020  Date Filed: 7/28/2021

Case No. 3:21-cv-00879-K

---

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

---

**JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT FUND
ADVISORS, L.P., NEXPOINT ADVISORS, L.P., THE DUGABOY
INVESTMENT TRUST, THE GET GOOD TRUST, AND NEXPOINT REAL
ESTATE PARTNERS, LLC,**

**Appellants,**

v.

**HON. STACEY G. C. JERNIGAN AND HIGHLAND CAPITAL
MANAGEMENT, L.P.**

**Appellees.**

---

**On Appeal from the United States Bankruptcy Court
Northern District of Texas, Dallas Division
The Honorable Stacey G. C. Jernigan, United States Bankruptcy Court**

**In re:  Highland Capital Management, L.P.
Case No. 19-34054 (Jointly Administered)**

---

### ANSWERING BRIEF OF APPELLEE
### HIGHLAND CAPITAL MANAGEMENT, L.P.

---



Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 06/06/25   Page 69 of 1017   PageID 13696
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 2 of 60   PageID 10688

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        rfeinstein@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        jelkin@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Appellee*

Appx. 00186

012748

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 04/06/251   Page 70 of 1017   PageID 13697
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 3 of 60   PageID 10689

# TABLE OF CONTENTS

                                                                                  **Page**

CORPORATE DISCLOSURE STATEMENT ...........................................................1

I.     STATEMENT OF ISSUES AND STANDARD OF REVIEW ........................2

II.    SUMMARY OF THE RESPONSE ...............................................................3

III.   STATEMENT OF FACTS ...........................................................................6

   A.   The Bankruptcy Court Presides Over the Acis Bankruptcy Case,
and the Delaware Court Transfers this Case to the Bankruptcy Court
for that Very Reason ......................................................................................6

   B.   Appellants File the Recusal Motion ..........................................................11

      1.   The December 2019 Transfer Motion............................................12

      2.   The January 2020 Settlement Hearing .........................................12

      3.   The February 19, 2020 Application to Employ Hearing ...........13

      4.   The December 2020 Restriction Motion........................................16

      5.   The January 2021 Hearing on the Debtor's Motion for
Injunctive Relief..............................................................................20

      6.   The February 2021 Confirmation Hearing...................................22

      7.   Article Referencing PPP Loans .....................................................28

      8.   Mandatory Injunction ....................................................................29

   C.   The Bankruptcy Court Denies the Recusal Motion....................................31

   D.   Appellants Appeal the Bankruptcy Court's Recusal Order ........................32

IV.    SUMMARY OF THE ARGUMENT .................................................................33

V.     ARGUMENT ..................................................................................................35

   A.   The Bankruptcy Court Properly Exercised Its Discretion in
Finding the Recusal Motion Was Untimely .................................................35

   B.   The Bankruptcy Court Properly Exercised Its Discretion in
Denying the Recusal Motion on the Merits.................................................43

      1.   There Is No Extrajudicial Bias Present Here ..............................45

      2.   The Bankruptcy Court Does Not Harbor Deep-Seated
Antagonism Toward Appellants .......................................................49

CONCLUSION....................................................................................................52

DOCS_NY:43746.7 36027/002

App. 0187

012749

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5   Filed 06/06/25   Page 71 of 1017   PageID 13698
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 4 of 60   PageID 10690

# TABLE OF AUTHORITIES

**CASES**

*Andrade v. Chojnacki*,
  338 F.3d 448 (5th Cir. 2003) ....................................................................... passim

*Apple v. Jewish Hosp. & Med. Ctr.*,
  829 F.2d 326 (2d Cir. 1987) ...............................................................................39

*Bossart v. Havis*,
  389 B.R. 511 (S.D. Tex.), aff'd sub nom. *In re Bossart*, 296 F. App'x 398
  (5th Cir. 2008) ......................................................................................................3

*Brown v. Oil States Skagit Smatco*,
  664 F.3d 71 (5th Cir. 2011) ...............................................................................46

*Caperton v. A.T. Massey Coal Co.*,
  556 U.S. 868 (2009) ...........................................................................................49

*Conkling v. Turner*,
  138 F.3d 577 (5th Cir. 1998) ....................................................................... 45, 46

*Da Silva Moore v. Publicis Groupe*,
  868 F. Supp. 2d 137 (S.D.N.Y. 2012) ........................................................ 38, 40

*Davis v. Board of School Comm'rs*,
  517 F.2d 1044 (5th Cir. 1975) ...........................................................................32

*Delesdernier v. Porterie*,
  666 F.2d 116 (5th Cir. 1982) .............................................................................36

*Garcia v. Woman's Hosp. of Texas*,
  143 F.3d 227 (5th Cir. 1998) .............................................................................51

*Grambling University Nat. Alumni Ass'n v. Board of Sup'rs for La. System*,
  286 Fed.Appx. 864 (5th Cir. 2008) ...................................................................35

*Henderson v. Department of Public Safety and Corrections*,
  901 F.2d 1288 (5th Cir. 1990) ..................................................................... 48, 51

*Hill v. Breazeale*,
  197 Fed.Appx. 331 (5th Cir. 2006) .............................................................. 37, 43

*Hill v. Schilling*,
  495 Fed. Appx. 480 (5th Cir. 2012) ................................................... 2, 3, 35, 42

*Hill v. Schilling*,
  No. 3:07–CV–2020–L, 2014 WL 1516193, (N.D. Tex. Apr. 17, 2014).............38

*Hirczy v. Hamilton*,
  190 Fed. Appx. 357 (5th Cir. 2006) ............................................................ 39, 43

*In re Chevron U.S.A., Inc.*,
  121 F.3d 163 (5th Cir. 1997) .............................................................................49

iv

App. 012750

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5 Filed 06/06/25    Page 72 of 1017    PageID 13699
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 5 of 60    PageID 10691

*In re Ramba, Inc.*,
   416 F.3d 394 (5th Cir. 2005) ..................................................................3

*Johnson v. Mississippi*,
   403 U.S. 212 (1971) ............................................................................49

*Lieb v. Tillman (In re Lieb)*,
   112 B.R. 830 (Bankr. W.D.Tex 1990) ................................................32

*Liteky v. U.S.*,
   510 U.S. 540 (1994) ..................................................................... passim

*Love v. Tyson Foods, Inc.*,
   677 F.3d 258 (5th Cir. 2012) ................................................................3

*Marshall v. Jerrico*,
   446 U.S. 238 (1980) ............................................................................48

*Martin v. Monumental Life Ins. Co.*,
   240 F.3d 223 (3d Cir. 2001) ...............................................................42

*Miller v. Sam Houston State University*,
   986 F.3d 880 (5th Cir. 2021) ..............................................................48

*Preston v. Tenet Healthsystem Memorial Med. Ctr., Inc.*,
   485 F.3d 793 (5th Cir. 2007) ................................................................3

*Travelers Ins. Co. v. Liljeberg Enters., Inc.*,
   38 F.3d 1404 (5th Cir. 1994) ..............................................................35

*U.S. v. Jordan*,
   49 F.3d 152 (5th Cir. 1995) ................................................................44

*U.S. v. Olis*,
   571 F.Supp.2d 777 (5th Cir. 2008) ....................................................41

*U.S. v. Sanford*,
   157 F.3d 987 (5th Cir. 1998) .................................................. 35, 36, 38

*U.S. v. Williams*,
   127 Fed. Appx. 736 (5th Cir. 2005) ...................................................51

*U.S. v. York*,
   888 F.2d 1050 (5th Cir. 1989) ............................................................42

*United States v. Bremers*,
   195 F.3d 221 (5th Cir. 1999) ..............................................................43

*United States v. Landerman*,
   109 F.3d 1053 (5th Cir. 1997) ............................................................51

*Vieux Carre Prop. Owners, Residents & Assocs. v. Brown*,
   948 F.2d 1436 (5th Cir. 1991) ............................................................44

*Weisshaus v. Fagan*,
   456 Fed.Appx. 23 (2d Cir. 2012) .................................................. 40, 42

DOCS_NY:43746.7 36027/002

Appx. 00180
012751

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5 Filed 06/06/251    Page 73 of 1017    PageID 13700
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 6 of 60    PageID 10692

**STATUTES**

11 U.S.C. § 330 ................................................................................................ 14
28 U.S.C. § 455 .......................................................................................... passim

DOCS_NY:43746.7 36027/002

012752

Appx. 08189

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S      Document Exhibit 5 Filed 10/30/25    Page 74 of 1017    PageID 13701
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 7 of 60    PageID 10693

# CORPORATE DISCLOSURE STATEMENT

Appellee Highland Capital Management, L.P. is a limited partnership, the general partner of which is Strand Advisors, Inc., a privately held corporation. No publicly held corporation owns 10% or more of the interest in either entity.

1

App. 00181
012753

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 09/06/25   Page 75 of 1017   PageID 13702
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 8 of 60   PageID 10694

Appellee Highland Capital Management, L.P. ("Highland" or the "Debtor"), the debtor and debtor-in-possession in the above-captioned chapter 11 bankruptcy case (the "Bankruptcy Case"),  hereby submits its Answering Brief to the Opening Brief of appellants James Dondero ("Mr. Dondero"), Highland Capital Management Fund Advisors, L.P. ("HCMFA"), NexPoint Advisors, L.P. ("NPA," and together with HCMFA, the "Advisors"), The Dugaboy Investment Trust ("Dugaboy"), The Get Good Trust ("Get Good," and together with Dugaboy, the "Trusts"), and NexPoint Real Estate Partners, LLC (collectively, "Appellants") in respect of their appeal from the *Order Denying Motion to Recuse, Pursuant to 28 U.S.C. § 455,* (*see* R. 31)[1] (the "Recusal Order"), entered by the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on March 18, 2021.

## I.      STATEMENT OF ISSUES AND STANDARD OF REVIEW

The issue on appeal is whether the Bankruptcy Court properly exercised its discretion in denying Appellants' *Motion to Recuse, Pursuant to 28 U.S.C. § 455*, (*see* R. 2338) (the "Recusal Motion").   The standard of review for a denial of a motion to recuse is abuse of discretion. *See Andrade v. Chojnacki*, 338 F.3d 448, 454 (5th Cir. 2003); *Hill v. Schilling*, 495 Fed. Appx. 480, 483 (5th Cir. 2012). "[D]eference ... is the hallmark of abuse-of-discretion review." *Love v. Tyson Foods,*

---

[1] Refers to Appellants' Record on Appeal [Docket No. 9].  Any reference to "Supp. R." refers to Appellants' Supplemental Record [Docket No. 19].

DOCS_NY:43746.7 36027/002

App. 00192
012754

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 01/06/25   Page 76 of 1017   PageID 13703
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 9 of 60   PageID 10695

*Inc.*, 677 F.3d 258, 262 (5th Cir. 2012). "A district court abuses its discretion if it: (1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts." *Hill*, 495 Fed. Appx. at 483 (internal quotations omitted). "A finding of fact is clearly erroneous only when although there may be evidence to support it, the reviewing court on the entire [record] is left with the definite and firm conviction that a mistake has been committed." *Preston v. Tenet Healthsystem Memorial Med. Ctr., Inc.*, 485 F.3d 793, 796–97 (5th Cir. 2007) (internal quotations omitted). "Stated differently, a 'factual finding is not clearly erroneous if it is plausible in the light of the record read as a whole.'" *Bossart v. Havis*, 389 B.R. 511, 515 (S.D. Tex.), *aff'd sub nom. In re Bossart*, 296 Fed. App'x 398 (5th Cir. 2008) (quoting *In re Ramba, Inc.*, 416 F.3d 394, 402 (5th Cir. 2005)). For the reasons below, the Bankruptcy Court properly exercised its discretion in denying the Recusal Motion.

## II.    SUMMARY OF THE RESPONSE

Under Mr. Dondero's direction, the Debtor was forced to file for bankruptcy in October 2019 to protect itself from an avalanche of adverse rulings entered against Highland and Dondero-controlled affiliates. For nearly a decade, courts and arbitration panels in Texas, Delaware, New York, and in foreign jurisdictions such as the Cayman Islands, Bermuda, and Guernsey, issued a series of rulings against Mr. Dondero and his enterprise, some with stinging rebukes.

DOCS_NY:43746.7 36027/002

App. 00123
012755

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 01/06/25   Page 77 of 1017   PageID 13704
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 10 of 60   PageID 10696

Now, over a year after the Debtor's bankruptcy proceeding was transferred to the Bankruptcy Court,[2] Appellants complain that the Bankruptcy Court is biased against Mr. Dondero, as if no other judge or fact-finder had previously ruled against him and the entities he controls. Appellants base their appeal on snippets of out-of-context quotes and on eight specific rulings out of the dozens entered by the Bankruptcy Court, while ignoring the mountain of evidence justifying that Court's rulings.

While Appellants' egregious omissions of evidence and other portions of the record are addressed below, it is noteworthy that Appellants have appealed only one of the eight orders and judgments they complain of. If the Bankruptcy Court's bias and prejudice was as open and notorious as Appellants now contend, Appellants would have appealed all of them, and their failure to do so is telling.

Rather than seeking disqualification "at the earliest possible moment," as litigants are required under applicable Fifth Circuit precedent, Appellants sat on their hands for almost a year and a half after supposedly first concluding that the Bankruptcy Court was biased. According to Appellants, the Debtor first expressed these concerns in the fall of 2019 when—then under Mr. Dondero's control—it opposed a motion to transfer venue to the Bankruptcy Court on the express basis that

---

[2] "Bankruptcy Court" refers to the United States Bankruptcy Court for the Northern District of Texas, The Hon. Stacey G. C. Jernigan presiding.

DOCS_NY:43746.7 36027/002

012756

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5   Filed 01/26/51    Page 78 of 1017    PageID 13705
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 11 of 60    PageID 10697

it was not objective.  App. Brief ¶¶ 1-2.  Appellants contend that the Bankruptcy

Court's bias was on full display during hearings held on (i) January 9, 2020, (ii)

February 19, 2020, (iii) June 30, 2020, (iv) July 8, 2020, and (v) September 2020.

*Id.* ¶¶ 3-6, 24-26.  Rather than seek recusal at any time during 2020, Appellants

waited until mid-March 2021 (after at least three additional adverse rulings were

entered against them),[3] days before the Bankruptcy Court was to conduct an

evidentiary hearing on the Debtor's motion to hold Mr. Dondero in contempt of

court.[4]  Based on Appellants' collective failure to promptly seek disqualification, the

Bankruptcy Court properly denied the Recusal Motion as "untimely."

      Appellants have not—and cannot—meet their heavy burden of proving that

the Bankruptcy Court abused its discretion in denying the Recusal Motion on the

---

[3] Appellants contend that the Bankruptcy Court's rulings and comments in (a)
December 2020, (b) January 2021, and (c) and early February 2021, all conveyed
bias and prejudice.  App. Brief ¶¶ 7-22.

[4] Notably, Appellants *do not* contend that the Bankruptcy Court exhibited any bias
or prejudice against Mr. Dondero with respect to its (a) *Order Granting Debtor's
Motion for Temporary Restraining Order Against James Dondero*, entered on
December 10, 2020 (R. 7233) ("Mr. Dondero's TRO"), or its (b) *Order Granting
Debtor's Motion for Preliminary Injunction Against James Dondero*, entered on
January 12, 2021 (R. 7382).  The Bankruptcy Court held an evidentiary hearing on
the Debtor's contempt motion promptly after denying the Recusal Motion and on
June 7, 2021, issued a 55-page *Memorandum Opinion and Order Granting in Part
Plaintiff's Motion to Hold James Dondero in Civil Contempt of Court for Alleged
Violation of TRO* (*see* Supp. R. 474) (the "Contempt Order").  The Contempt Order
included an exhaustive recitation of facts and over 170 detailed footnotes as well as
(ironically) express findings in Mr. Dondero's favor that mitigated the consequences
of the Contempt Order.

DOCS_NY:43746.7 36027/002

Appx. 00195

012757

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5   Filed 03/06/25   Page 79 of 1017   PageID 13706
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 12 of 60   PageID 10698

merits.  Seen in context, the record demonstrates that (a) numerous courts and tribunals have consistently ruled against Mr. Dondero and his enterprise, thereby demonstrating that the Bankruptcy Court does not stand alone, (b) the Bankruptcy Court's rulings and orders are unassailable (as evidenced by, among other things, Appellants' decision to appeal only one of those complained of), (c) there is **_no_** evidence presented of extrajudicial bias or prejudice, and (d) no objective person would find that Mr. Dondero and his enterprise are the victims of improper judicial conduct rising to the extraordinary remedy of recusal.

## III.   <u>STATEMENT OF FACTS</u>

### A.   <u>The Bankruptcy Court Presides Over the Acis Bankruptcy Case, and the Delaware Court Transfers this Case to the Bankruptcy Court for that Very Reason</u>

Between 2008 and October 16, 2019, courts and arbitration panels in multiple domestic and foreign jurisdictions handed down a plethora of judgments and orders against Mr. Dondero, the Debtor, and other entities then under Mr. Dondero's control.[5]

For example, in March 2019, a blue-ribbon arbitration panel issued a 56-page decision in which it (a) rejected nearly every argument advanced by the Debtor and

---

[5] An overview of some of the prepetition litigation involving the Debtor and other Dondero-related parties is set forth in the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, Case No. 19-34054-sgj11, Docket No. 1473 (Bankr. N.D. Tex. Nov. 24, 2020) at 20-24 (Appx. 1:31-35).

6

012758
Appx. 00196

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5   Filed 10/06/25   Page 80 of 1017   PageID 13707
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 13 of 60   PageID 10699

made highly critical assessments of the credibility of Highland's witnesses, (b) found

that the Debtor had breached its fiduciary duties to its investors, breached certain

agreements, and engaged in other wrongful conduct, and (c) rendered an award

against the Debtor in excess of $150 million.[6]  Just two months later, in an unrelated

case, the Chancery Court in the state of Delaware (i) found that the Dondero-related

defendants improperly withheld dozens of documents in discovery on privilege

grounds, and (ii) ruled that there was "a reasonable basis to believe that a fraud has

been perpetrated" such that the Chancery Court applied the "crime-fraud exception"

to the attorney-client privilege in any event.[7]

The adverse rulings against Mr. Dondero and his controlled entities are

legion—and have resulted in the imposition of judgments and awards totaling more

than $1 billion (inclusive of interest).  The Bankruptcy Court had no involvement in

any of these cases.

---

[6] *See Partial Final Award* rendered in the arbitration captioned *Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P.*, Case No. 01-16-0002-6927.  (Appx. 2:181-242).  The Partial Final Award was incorporated into the arbitration panel's final award (Appx. 3:244-266), and a hearing in the Delaware Chancery Court to have the award confirmed was about to begin when Mr. Dondero caused the Debtor to file for bankruptcy protection for the purpose of gaining the protection of the automatic stay.

[7] *Daugherty v. Highland Capital Management, L.P.*, C.A. No. 2018-0488-MTZ, May 17, 2019 transcript (bench ruling on motion to compel production of documents) at 10-15.  (Appx. 4:277-282).  The Dondero-related defendants made three desperate but unsuccessful attempts to overturn or stay the Chancery Court's rulings.  *See Order Denying Application to Certify Interlocutory Appeal*, entered in C.A. No. 2018-0488-MTZ on July 8, 2019 ¶ K-L.  (Appx. 5:366-378).

DOCS_NY:43746.7 36027/002

Appx. 00187
012759

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5   Filed 05/02/25   Page 81 of 1017   PageID 13708
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 14 of 60   PageID 10700

The Bankruptcy Court's experience with Mr. Dondero and the Debtor began in January 2018, when it was assigned a case captioned *In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex.) (the "Acis Bankruptcy"). The Acis Bankruptcy was involuntarily commenced by Joshua Terry, a former Highland executive who had obtained an arbitration award against the Acis entities then under Mr. Dondero's control, but who could not collect on the judgment because Mr. Dondero allegedly orchestrated a fraudulent transfer of assets that left the Acis debtors judgment proof. Mr. Dondero and Mr. Terry were the chief antagonists in the highly contested Acis Bankruptcy, and the Bankruptcy Court made numerous credibility findings against Mr. Dondero and his associates before confirming a plan of reorganization that effectively transferred control of a valuable business from Mr. Dondero and Highland to Mr. Terry.[8]

With various judgment creditors bearing down, on October 16, 2019, the Debtor filed this case in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court") expecting it to be a more hospitable forum. Less

---

[8] *See*, *e.g.*, (a) *Order Denying Alleged Debtors' Joint Motion to Dismiss the Involuntary Petitions Filed by Joshua N. Terry for Lack of Subject Matter Jurisdiction or, Alternatively, to Compel Arbitration*, Case No. 18-30264-sgj11, Docket No. 75 (Bankr. N.D. Tex. Mar. 20, 2018) (Appx. 7:540-543); and (b) *Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified,* Case No. 18-30264-sgj11, Docket No. 829 (Bankr. N.D. Tex. Jan. 31, 2019) (Appx. 8:545-773).

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S      Document Exhibit 5 Filed 06/06/25   Page 82 of 1017   PageID 13709
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 15 of 60   PageID 10701

than two weeks later, on November 1, 2019, the Official Committee of Unsecured

Creditors (the "UCC") filed their *Motion for an Order Transferring Venue of this*

*Case to the United States Bankruptcy Court for the Northern District of Texas,* Case

No. 19-12239 (CSS), Docket No. 86 (Bankr. D. Del. Nov. 11, 2019) (Appx. 6:380-

538)[9] (the "Transfer Motion").  The UCC laid out its intentions in filing the Transfer

Motion:

> [T]he Dallas Bankruptcy Court is already intimately familiar with the
> Debtor's principals and complex organizational structure [because the
> Acis Bankruptcy is pending in that Court].  Specifically, the Dallas
> Bankruptcy Court has (a) heard multiple days' worth of material
> testimony from the Debtor's principal owner (James Dondero), the
> Debtor's minority owner (Mark Okada), the Debtor's general counsel,
> at least two assistant general counsels, and numerous other employees
> of the Debtor and other witnesses; and (b) issued at least six published
> opinions . . . [The Bankruptcy Court is] intimately familiar with the
> Debtor's business, principal owner, and key executives.  For these
> reasons, the Dallas Bankruptcy Court is uniquely positioned to
> oversee this chapter 11 case.

(*Id.* ¶ 2).

The Delaware Court agreed.   During a December 2, 2019 hearing, the

Delaware Court stated that it would grant the Transfer Motion, reasoning:

> This is a unique case … [T]his case is very focused on responding to
> existing [Acis] litigation. And that existing litigation of a former
> affiliate, as of a few months ago, and a pending appeal that could make
> it a current affiliate, is located in the Northern District of Texas. The
> [Bankruptcy Court] has done a tremendous amount of work and has

---

[9] Refers to the Debtor's appendix filed with this brief.

DOCS_NY:43746.7 36027/002

012761

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5 Filed 10/06/25 1    Page 83 of 1017    PageID 13710
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 16 of 60    PageID 10702

> … issued a number of opinions, had a number of trials.  That work
> creates a familiarity with the facts, issues, and players in a case …

(R. 2488:23-35-2499:1-11).

Mr. Dondero and Appellants knew **on December 2, 2019** that they were being

sent back to the very Bankruptcy Court that took a justifiably stern view of Mr.

Dondero and his associates.[10]  Indeed, that is exactly why the Debtor (then under

Mr. Dondero's control) opposed the Transfer Motion.[11]

Fully cognizant that he would soon face a Bankruptcy Court with substantial

knowledge of (some of) his business practices, Mr. Dondero never caused the Debtor

to (a) appeal the Delaware Court's order granting the Transfer Motion, or (b) seek

the Bankruptcy Court's recusal on the basis of bias or prejudice (at least not until

March 2021).

---

[10] Mr. Dondero and entities controlled by him appealed the Acis confirmation order, but the appeals were denied by the United States District Court for the Northern District of Texas and the United States Court of Appeals for the Fifth Circuit.  *See* (a) *Opinion* affirming Confirmation Order Case No. 3:19-cv-00291-D, Docket No. 75 (N.D. Tex. July 18, 2019) (Appx. 9:775-858); (b) *Opinion* affirming Confirmation Order, Case No. 19-10847 (5th Cir. June 17, 2021) (Appx. 10:860-863).

[11] *See Objection of the Debtor to Motion of Official Committee of Unsecured Creditors for an Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas*, Case No. 19-12239 (CSS), Docket No. 118 (Bankr. D. Del. Nov. 12, 2019) (Appx. 11:865-891).

DOCS_NY:43746.7 36027/002

Appx. 00200
012762

Case 19-34054-sgj11 Doc 3596-5 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 5 Filed 01/06/25 51 Page 84 of 1017 PageID 13711
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 17 of 60 PageID 10703

**B.** **Appellants File the Recusal Motion**

On March 18, 2021, Appellants filed their Recusal Motion requesting that the Bankruptcy Court recuse itself from any adversary proceedings and future contested matters involving Appellants or any entity connected to Mr. Dondero. In their Recusal Motion, Appellants argue that the Bankruptcy Court is "predisposed against Mr. Dondero" because it: (i) had "negative opinions about Mr. Dondero formed during the Acis case;" (ii) "made repeated reference to proceedings in the Acis case to justify findings made in this case" and made "repeated negative statements about Mr. Dondero;" (iii) "threatened sanctions on" Appellants and "questioned the good-faith basis" of certain of their positions; (iv) declared Appellants "vexatious litigants; (v) concluded that an entity "connected to or controlled by Mr. Dondero" is "no more than a tool of Mr. Dondero;" and (vi) purportedly disregarded "the testimony of any witness with a connection to Mr. Dondero as *per se* less credible." Recusal Motion ¶ 67. In support of their Recusal Motion, Appellants cite to a number of proceedings that occurred between December 2019 and February 2021 in an attempt to show that the Bankruptcy Court's comments and rulings demonstrate a "deep-seeded antagonism" toward Appellants resulting from "extrajudicial" bias emanating from the Acis Bankruptcy. *See id.* ¶ 68. Appellants mischaracterize the facts of these hearings by cherry-picking quotes out of context and by ignoring the considerable evidence underlying each of the orders at issue.

App. 00201
012763

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5   Filed 09/09/25   Page 85 of 1017    PageID 13712
Case 3:21-cv-00879-K    Document 20   Filed 07/28/21    Page 18 of 60    PageID 10704

### 1.    The December 2019 Transfer Motion

Appellants argue that "the risk of prejudice to Mr. Dondero in this [Bankruptcy] Court has been apparent since this Bankruptcy's inception in Delaware," citing to comments made during the hearing on the Transfer Motion where Debtor's counsel "expressly acknowledged that the UCC's actual motive in seeking transfer to [the Bankruptcy Court] was [that] Court's pre-existing negative views" of Mr. Dondero from the Acis Bankruptcy. Recusal Motion ¶¶ 4-5. As noted *supra*, Mr. Dondero controlled the Debtor and directed its counsel to oppose the Transfer Motion on this basis during the December 2, 2019 hearing. The Delaware Court rejected this argument, and in fact relied on the Bankruptcy Court's extensive familiarity with the parties as one of the bases for transferring venue of the Highland Bankruptcy Case to the Bankruptcy Court. (*See* R. 2488).

### 2.    The January 2020 Settlement Hearing

Appellants cite to the Bankruptcy Court's comments made during a January 9, 2020 hearing as evidence of the Bankruptcy Court's alleged bias toward Mr. Dondero resulting from the Acis Bankruptcy. Recusal Motion ¶¶9-13. On January 9, 2020, the Bankruptcy Court held an evidentiary hearing, (R. 2519), on the *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*), Case No. 19-34054-sgj11, Docket No. 281 (Bankr. N.D. Tex.

DOCS_NY:43746.7 36027/002

App. 000302

012764

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 02/06/25   Page 86 of 1017   PageID 13713
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 19 of 60   PageID 10705

Dec. 27, 2019) (Appx. 12:893-992) (the "Settlement Motion").  The settlement set forth in the Settlement Motion was prompted by (a) concerns expressed by the UCC about the integrity of the Debtor's management (under Mr. Dondero's stewardship) due to its history of self-dealing, creditor avoidance asset transfers, and other breaches of fiduciary duty, and (b) the possibility that the UCC might seek the appointment of a trustee.

The Bankruptcy Court entered an order granting the Settlement Motion (R. 7291) (the "Settlement Order").  Pursuant to the Settlement Order, Mr. Dondero, the Debtor's founder and former CEO, voluntarily surrendered control of the Debtor to an independent board of three directors, Russell Nelms, John Dubel, and James P. Seery, Jr. (the "Board").  The Settlement Order directed Mr. Dondero not to "cause any Related Entity to terminate any agreements with the Debtor."  (R. 7293).  In finding that this "language is very important" to protect the Debtor, the Bankruptcy Court noted that in the Acis Bankruptcy, "Mr. Dondero was surreptitiously liquidating funds," and "doing things behind the scenes that were impacting the value of the Debtor in a bad way." (R. 2597).  Mr. Dondero did not object to this language and signed off on the Settlement Order.

### 3.    The February 19, 2020 Application to Employ Hearing

Appellants cite to the February 19, 2020, hearing on the Debtor's *Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley &*

Appx. 00203
012765

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 02/06/25   Page 87 of 1017   PageID 13714
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 20 of 60   PageID 10706

*Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* (the "Foley Application") (R. 415) as another example of the Bankruptcy Court's "predisposition against Mr. Dondero." Recusal Motion ¶¶ 14-15.  Appellants argue that the Bankruptcy Court discounted "the testimony of demonstrably independent witnesses who testified" in support of the Foley Application on a "pre-determined basis that any person sharing an opinion with Mr. Dondero … was somehow being unduly influenced by him." Recusal Motion ¶¶ 14-16.  Appellants mischaracterize the facts of this hearing.

Through the Foley Application, the Debtor sought to retain Foley on behalf of both the Debtor ***and*** a non-Debtor entity, Neutra Ltd. ("Neutra"), in the appeal of the Acis confirmation order and related matters (the "Acis Appeal").  In support of the Foley Application, the Debtor disclosed that: (i) Neutra was wholly owned by Mr. Dondero and his partner, Mark Okada, and (ii) the Debtor intended to pay for Foley's representation of Neutra in the Acis Appeal.[12]  The UCC and Acis objected

---

[12] The Debtor justified its payment of Neutra's fees under 11 U.S.C. § 330 (which does not allow the payment of non-debtor legal fees) by arguing, *inter alia*, that if Neutra were successful in its appeal of the involuntary petition entered in the Acis Bankruptcy (a) the Acis Bankruptcy would be unwound, (b) the equity in Acis would return to the Debtor, (c) the Debtor would regain the benefit of certain management fees that were otherwise being paid to Acis for the benefit of its new owner, Mr. Terry, and (d) the Debtor would have negotiating leverage with respect to Acis' $75 million claim against the Debtor's estate.  *See* R. 2761:10-25-R. 2762:1-16. *See* (i) *Debtor's Omnibus Reply in Support of (i) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date,* Case No. 19-12239 (CSS),

DOCS_NY:43746.7 36027/002

Appx 90304

012766

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 02/06/25   Page 88 of 1017   PageID 13715
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 21 of 60   PageID 10707

to the Foley Application on the ground that the Debtor should not be permitted to use estate assets to support Neutra, a Dondero-controlled entity.[13]

Russell Nelms testified in support of the Application. Mr. Nelms was subject to a lengthy cross-examination which undermined the Debtor's arguments. (R. 2666-2723). The Bankruptcy Court approved the Debtor's retention of Foley, but determined that the evidence was insufficient to justify expending estate assets to pay the legal fees of Neutra, a non-Debtor entity in which the Debtor held no interest. (R. 2785-2790). The Bankruptcy Court's ruling on the Foley Application was not, as Appellants contend, premised on any "pre-determined" bias toward Mr. Dondero to "contest positions that could benefit Mr. Dondero." (App. Brief ¶ 16). It was

---

Docket No. 159 (Bankr. D. Del. Nov. 21, 2019) (Appx. 13:994-1258), *and (ii) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 70 (Bankr. D. Del. Oct. 29, 2019) (Appx. 14:1260-1296).

[13] *See* (i) *Limited Objection to the Debtor's: (i) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date; and (ii) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 116 (Bankr. D. Del. Nov. 12, 2019) (Appx. 15:1298-1391); *Limited Objection of the Official Committee of Unsecured Creditors to the Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP and Lynn Piker Cox & Hurst as Special Texas Counsel and Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 120 (Bankr. D. Del. Nov. 12, 2019) (Appx. 16:1393-1398).

DOCS_NY:43746.7 36027/002

Appx. 00205
012767

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 03/06/25   Page 89 of 1017   PageID 13716
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 22 of 60   PageID 10708

based on its determination that the Debtor failed to prove that the estate would benefit by paying a non-Debtor's legal fees, as required by applicable law.

Neither Mr. Dondero nor Neutra appealed the Bankruptcy Court's evidence-based order on the Foley Application.

### 4. The December 2020 Restriction Motion

Appellants cite to certain of Judge Jernigan's comments and rulings made at the conclusion of an evidentiary hearing held on December 16, 2020 (the "December Hearing") [14] as evidence of bias. Appellants argue that the Bankruptcy Court improperly denied their Restriction Motion as "frivolous," despite being filed in "good faith." (Recusal Motion ¶¶ 18-26).

In their Restriction Motion, the movants (*i.e.*, the Advisors and certain investment funds managed by the Advisors (the "Retail Funds," and with the Advisors, the "Movants")) asked the Bankruptcy Court to "impose a temporary restriction on the Debtor's ability, as portfolio manager, to cause CLOs to sell assets." (Restriction Motion ¶ 17). The Movants called as their only witness Dustin Norris, the Executive Vice President of each of the Movants ("Mr. Norris"). During the December Hearing, Mr. Norris made the following admissions:

---

[14] The December Hearing was held in connection with that certain *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles*, (R. 2798), brought by the Advisors and the Retail Funds (the "Restriction Motion").

DOCS_NY:43746.7 36027/002

Appx. 00306

012768

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5   Filed 04/02/25   Page 90 of 1017   PageID 13717
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 23 of 60   PageID 10709

**The Debtor Had the Exclusive Contractual Right to Buy and Sell CLO Assets**

- The Debtor is the portfolio manager for each of the CLOs in which the Advisors caused the Retail Funds to invest (December 2020 Transcript at 41:18-24) (R. 6265);
- The Debtor's management of the CLOs is governed by written agreements (*id.* at 41:25-42:3) (R. 6265-6266);
- None of the Movants are parties to the Debtor's CLO management agreements (*id.* at 42:4-11) (R. 6266);
- The Debtor, as the CLO Portfolio Manager, has the responsibility to buy and sell assets on behalf of the CLOs (*id.* at 42:12-24) (R. 6266);
- Nobody other than the Debtor has any right or authority to buy and sell assets in the CLOs in which the Retails Funds invested (*id.* at 42:25-43:3) (R. 6266-6267); and
- Holders of preferred CLO shares, such as the Retail Funds, "do not make investment decisions on behalf of the CLOs" and the Advisors knew that when they caused the Retail Funds to make their investments (*id.* at 43:4-17) (R. 6267).

**The Movants Did Not Accuse the Debtor of Any Wrongdoing**

- The Movants did not allege or contend that the Debtor (a) engaged in fraudulent conduct; (b) breached any agreement by effectuating any transactions; or (c) violated any CLO management agreement (*id.* at 49:5-50:10) (R. 6273-6274); and
- The Movants did not question the Debtor's business judgment nor could they since they did not know why the Debtor executed the transactions and never even asked (*id.* at 50:11-51:15) (R. 6274-6275).

**Mr. Dondero Controls the Movants and Caused the Restriction Motion to Be Filed**

- Mr. Dondero owns and controls the Advisors (*id.* at 28:20-22) (R. 6252); (35:14-36:15) (R. 6259-6260);
- The Advisors manage the Retail Funds; Mr. Dondero serves as the Portfolio Manager of each of the Retail Funds and caused the Retail Funds to invest in the CLOs managed by the Debtor (*id.* at 28:23-29:4) (R. 6252-6253), 36:16-22 (R. 6260);

DOCS_NY:43746.7 36027/002

Appx. 00207
012769

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 05/05/25   Page 91 of 1017   PageID 13718
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 24 of 60   PageID 10710

- The "whole idea" for the Restriction Motion initiated with Mr. Dondero (*id.* at 29:19-22 (R. 6253), 41:6-10 (R. 6265)); and
- The Retail Funds' Boards did not authorize the filing of the Restriction Motion (*id.* at 37:23-38:6 (R. 6261-6262).

## Mr. Norris Was Not a Competent Witness and Had No Credibility

- Mr. Norris admitted that he does not make investment decisions, is not an investment manager, and has never worked for a CLO (*id.* at 39:7-16) (R. 6263);
- Mr. Norris (a) did not write his Declaration filed in support of the Restriction Motion, (b) did not provide any substantive comments to his Declaration, and (c) relied on the Advisors' "management" (including Mr. Dondero) for all "key information" in his Declaration (*id.* at 40:11-24) (R. 6264); and
- Mr. Norris did not bother to review the very CLO management agreements the Movants were seeking to interfere with (*id.* at 42:12-16) (R. 6266).

## The Movants Did Not Notify Any Other CLO Investors of the Restriction Motion

- The Movants hold (a) less than 50% of the preferred interests in 12 of the 15 CLOs at issue, and (b) less than 70% of the preferred interests in the other three CLOs at issue (*id.* at 44:22-45:7) (R. 6268-6269);
- Yet, the Restriction Motion was pursued solely on behalf of the Movants (*id.* at 46:22-25) (R. 6270);
- The Movants did not notify any other holder of CLO interests of the Restriction Motion and made no attempt to do so (*id.* at 47:1-12) (R. 6271);
- The Movants made no attempt to obtain the consent of all of the holders of the preferred shares to seek the relief sought in the Restriction Motion (*id.* at 47:13-16 (R. 6271));
- Mr. Norris did not know whether any other holder of CLO preferred shares wanted the relief sought in the Restriction Motion (*id.* at 47:17-21) (R. 6271);
- Mr. Norris did not know whether the Debtor's counterparties in the CLO management agreements (*i.e.*, the CLOs) wanted the relief sought in the Restriction Motion (*id.* at 47:22-48:1) (R. 6271-6272); and

18

Appx. 06208
012770

Case 19-34054-sgj11 Doc 3596-5 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 5 Filed 026062 51 Page 92 of 1017 PageID 13719
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 25 of 60 PageID 10711

- Mr. Norris had no personal knowledge of the two transactions described in his Declaration; he testified that he was "very remote" and he didn't have "much knowledge." (*id.* at 53:22-55:13) (R. 6277-6279).

Based, in large part, on Mr. Norris's testimony, the Bankruptcy Court (a) found that there was no factual or legal basis for the Restriction Motion, and (b) declared the Restriction Motion "frivolous," and (c) granted the Debtor's motion for a directed verdict. (December Hearing Transcript at 64:1-7) (R. 6287). While Appellants contend that the "Bankruptcy Court inscrutably blamed Mr. Dondero" for the Restriction Motion, (App. Brief ¶ 11), Mr. Norris provided all the evidence the Court needed to reach its conclusion:

Q: The whole idea for this motion initiated with Mr. Dondero; isn't that right?

A: The concern, yes, the concern originated, and his concern was voiced to our legal and compliance team.

(*Id.* at 41:6-9) (R. 6265).[15]

The Restriction Motion was a misguided effort by Mr. Dondero and his associates to exert control over the Debtor. The Motion was frivolous.

---

[15] *See also id.* at 29:21-22 ("the initial cause for concern was raised by Mr. Dondero himself") (R. 6253); 28:20-22 (Mr. Dondero has a control relationship with the Advisors) (R. 6252); 26:11-17 (responsibility for the Retail Funds' portfolio management and investment decisions are delegated to the Advisors) (R. 6250); 35:14-36:15 (Mr. Dondero owns and controls the Advisors); (R. 6259-6260); 37:23-38:6 (the Retail Funds' Boards did not authorize the filing of the Restriction Motion) (R. 6261-6262).

DOCS_NY:43746.7 36027/002

App. 00200

012771

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 5 Filed 02/06/25   Page 93 of 1017   PageID 13720
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 26 of 60   PageID 10712

5.     <u>**The January 2021 Hearing on the Debtor's Motion for Injunctive Relief**</u>

Unchastened by the debacle of the December Hearing, Mr. Dondero caused the Advisors and Retails Funds to continue to interfere with and unjustifiably threaten the Debtor. Consequently, on January 6, 2021, the Debtor filed its *Verified Original Complaint for Declaratory and Injunctive Relief* against the Advisors and Retail Funds (R. 1962) seeking injunctive relief after they interfered with the Debtor's trading activities and sent the Debtor a flurry of written correspondence (the "<u>K&L Gates Letters</u>") (R. 4158-4160, 4161-4163) threatening to terminate the Debtor's CLO management agreements and asserting specious claims. (R. 8069). The Bankruptcy Court held an exhaustive evidentiary hearing on the TRO Motion on January 26, 2021 (the "<u>TRO Hearing</u>"), during which it admitted voluminous documentary evidence and assessed the credibility of multiple witnesses, including that of Mr. Dondero. (*See* TRO Hearing Transcript) (R. 6291). At the conclusion of the TRO Hearing, the Bankruptcy Court determined that the TRO was necessary to protect the Debtor's interests pending a hearing on the preliminary injunction. (*See id.)*

Appellants cite to certain aspects of the TRO Hearing as evidence of the Bankruptcy Court's bias against Mr. Dondero while minimizing their conduct and

012772

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5   Filed 02/06/25   Page 94 of 1017   PageID 13721
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 27 of 60   PageID 10713

noting that the Debtor did not prove specific damages. (App. Brief ¶¶ 12-17.)[16] But, consistent with the balance of the Recusal Motion, Appellants fail to disclose keys facts that caused the Bankruptcy Court to focus on Mr. Dondero: (a) the evidence established that he controlled the Advisors and Retails Funds and was involved in all of the acts complained of, and (b) their conduct implicated two court orders.

*First*, the Settlement Order expressly prohibited Mr. Dondero from "caus[ing] any Related Entity to terminate any agreements with the Debtor." (Settlement Order ¶ 9).  The evidence established that the Advisors were "Related Entities" for purposes of the Settlement Order,[17] yet the K&L Gates Letters expressly and improperly threatened to seek to terminate the Debtor's CLO management agreements.

*Second*, Mr. Dondero's TRO enjoined him from, among other things, "causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting on his behalf, from, directly or indirectly"

---

[16]  Notably, the Debtor never attempted to prove damages during the TRO Hearing as it would have undermined its claim for equitable relief.

[17] This fact was (a) first established during the December Hearing (*see supra* at 12), (b) was confirmed at the TRO Hearing, and (c) was subsequently admitted to by the Advisors as part of the resolution of the adversary proceeding.  *See Declaration of John A. Morris in Support of Debtor's Motion for Entry of an Order Approving Settlement Pursuant to Bankruptcy Rule 9019 and Authorizing Actions Consistent Therewith*, Case No. 19-34054-sgj11, Docket No. 2590 (Bankr. N.D. Tex. July 20, 2021) Ex. A ¶ 2(c) (*see* Appx. 17:1408) (settlement agreement in which each of the Advisors represents and warrants that it (i) is controlled by Mr. Dondero and (ii) is a "Related Party" for purposes of paragraph 9 of the Settlement Order).

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5   Filed 04/06/25   Page 95 of 1017   PageID 13722
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 28 of 60   PageID 10714

making express or implied threats against the Debtor or interfering with the Debtor's

business. (*See* R. 7235). Yet, that is precisely what the evidence showed Mr.

Dondero did. (*TRO Hearing Transcript* at 42:9-107:10) (R. 6332-6397).

Given the evidence and the clear and unambiguous orders in effect, it would

have been shocking if the Bankruptcy Court ignored Mr. Dondero and instead

treated the Advisors and Retail Funds as if they were independent third-party actors.

Mr. Dondero controlled the Advisors and the Retail Funds. He clearly "caused" or

"encouraged" or "conspired" with them to engage in wrongful conduct. The Court's

focus on Mr. Dondero was entirely justified—particularly when seen in the context

of the applicable Bankruptcy Court orders that the Appellants pretend did not exist.

### 6.   The February 2021 Confirmation Hearing

Appellants cite to the February 2021 confirmation hearing on the Debtor's

Plan[18] (the "February 2021 Confirmation Hearing") in support of their argument that

the Bankruptcy Court was biased against Appellants. *See* Recusal Motion ¶¶ 38-50.

Appellants principally contend that during the February 2021 Confirmation Hearing,

the Bankruptcy Court: (i) "summarily rejected ***all*** of the objections" to the Plan when

such objections were no different than those raised by the U.S. Trustee whose good

faith was "not questioned;" (ii) found the objections were not asserted in good faith,

---

[18] Refers to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* (as amended, the "Plan").

Appx. 00212

012774

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 03/06/25   Page 96 of 1017   PageID 13723
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 29 of 60   PageID 10715

(iii) concluded, "without basis," that the entity Appellants were "controlled by Mr. Dondero"; (iv) disregarded witness testimony of Mr. Jason Post on the ground that the witness had left the Debtor's employ to work for one of the Advisors; and (v) wrongfully accused of Appellants of being "vexatious litigants." *See id.*

First, Appellants' confirmation objections were far more extensive than those filed by the U.S. Trustee, and included objections to (i) plan provisions that had no impact on them as they held no claims in the subject classes (the absolute priority rule), (ii) the assumption of certain executory contracts to which they were not party (the actual contract counterparties had consented to assumption of the contracts by the Debtor), and (iii) common plan provisions like debtor releases, plan supplements and a plan injunction.[19]

Moreover, the Bankruptcy Court included Appellants in the process by considering their objections. (R. 2085 ¶¶ 18-19); (R. 2102-2104).   Appellants'

---

[19]  Appellants did not include their objections to confirmation in the record on appeal. They can be found at Bankruptcy Docket Nos. 1661 (Dondero) (Appx. 18:1423-1430), 1667 (Trusts) (Appx. 19:1432-1465), 1670 (Funds and Advisors) (Appx. 20:1467-1516), and 1673 (NexPoint Real Estate Partners) (Appx. 21:1518-1524). The *Limited Objection of the U.S. Trustee* is at Docket No. 1671(Appx. 22:1526-1531).  All Appellants' objections to confirmation were addressed at length in the *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1814] (Appx. 23:1533-1600) and *Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management* [Docket No. 1807] (Appx. 24:1602-1726) and by the Bankruptcy Court in its February 8, 2021 oral ruling on confirmation (R. 3371) and in the Confirmation Order (R. 2085).

DOCS_NY:43746.7 36027/002

012775

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5   Filed 03/06/25   Page 97 of 1017   PageID 13874
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 30 of 60   PageID 10716

objections were not overruled "summarily." Rather, the Bankruptcy Court conducted a two-day evidentiary hearing, at the conclusion of which it made detailed findings of fact and conclusions of law supporting the overruling of all the objections, including those of Appellants. Appellants were not treated any differently than any other objector at the February 2021 Confirmation Hearing.

The Bankruptcy Court also did not "disregard" the testimony of Mr. Post "solely" because Mr. Post had left the employ of the Debtor to work for the Advisors. This only was one of many factors the Bankruptcy Court considered in determining that Mr. Post's testimony was not credible. For instance:

> 1.   Mr. Post testified at the confirmation hearing on behalf of both the Advisors and the Funds. (February 2021 Confirmation Hearing Transcript at 51:12 (R. 4872)). For twelve years, Mr. Post served as the Assistant Chief Compliance Officer ("CCO") for the Debtor, the Advisors and the Retail Funds, but left to become the CCO for the Advisors and the Retail Funds contemporaneously with Mr. Dondero leaving the Debtor. (*Id.* at 56:14-57:1). Mr. Post had no knowledge about the relationship between the board members for each of the Retail Funds and either the Debtor (during the years it was controlled by Mr. Dondero) or Mr. Dondero, and no board member (who presumably had knowledge and who Appellants contend are independent

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5    Filed 03/26/25    Page 98 of 1017    PageID 13725
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 31 of 60    PageID 10717

actors) ever testified at any hearing or proceeding. (*Id.* at 57-61) (R. 4878-4882).

2.      Mr. Post testified that the Advisors manage and provide investment advice to the Retail Funds, and that the Advisors have been owned and controlled by Mr. Dondero for the entire period of time he served in the capacity of assistant CCO for the various entities. (*Id.* at 61:12-62:6) (R. 4882-4883).

3.      Mr. Post testified that he left the Debtor because of "conflicts that were created by being an employee of the Debtor and by also serving as the assistant CCO to the named Funds and the Advisors, and it coincided with Jim [Dondero] toggling over from HCMLP [the Debtor] to NexPoint [one of the Advisors].  It just made sense more functionally and from a silo perspective for me to be the named CCO for that entity since he [Mr. Dondero] was no longer an employee of HCMLP [the Debtor]." (*Id.* at 62:16-63:8) (R. 4883-4884). On cross-examination, Mr. Post acknowledged that the conflicts he mentioned had existed as of the Petition Date but claimed they had become "more evident as time progressed."  (*Id.* at 63:15-23) (R. 4884).

Based on this testimony, the Bankruptcy Court concluded that Mr. Post had left the employ of the Debtor to follow Mr. Dondero, that the alleged conflicts only became an issue when Mr. Dondero started his feud with the Debtor, and that his

Appx. 00215

012777

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5   Filed 03/26/25   Page 99 of 1017   PageID 13726
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 32 of 60   PageID 10718

testimony about the alleged independence of the Retail Funds' boards was not within the scope of his knowledge and was contradicted by the prior testimony of Mr. Norris, as discussed below.

In finding Mr. Post's testimony not to be credible, the Bankruptcy Court also considered the testimony of Mr. Dustin Norris.[20]  Mr. Post acknowledged that he had never reviewed Mr. Norris's testimony and was unaware of the nature or extent of his testimony.  (February 3, 2021 Confirmation Hearing Transcript at 59:12-19) (R. 4880).  Mr. Norris testified that Mr. Dondero had a control relationship with the Advisors, and that he is a portfolio manager for each of the Retail Funds, but that relationship is subject to the annual review by the Funds' boards.  (*Id*. at 28:20-29:4) (R. 6252-6253).

Mr. Norris acknowledged that the Advisors were owned and controlled by Mr. Dondero.  (February 3, 2021 Confirmation Hearing Transcript at 35:14-36:15) (R. 6259-6260).  Mr. Norris further acknowledged that the Retail Funds are managed by the Advisors, the Advisors control the Retail Funds' investment decisions, and Mr. Dondero is either the (or one of the) portfolio managers of each of the Retail Funds. (*Id*. at 36:19-37:13) (R. 6260-6261).  Mr. Norris further testified that the Funds' boards make no investment decisions, (*id*. at 37:14-22) (R. 6261), and did not participate in or approve the filing of the motion then at issue because it wasn't part

---

[20] (*See id.* at 63) (R. 6287).

DOCS_NY:43746.7 36027/002

012778

Appx. 00216

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 04/04/25   Page 100 of 1017   PageID 13727
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 33 of 60   PageID 10719

of their duties.  (*Id.* at 37:23-38:6) (R. 6261-6262).  Mr. Norris testified that the directors were nearly identical for the dozen or so funds managed by the Advisors (who were controlled by Mr. Dondero), including the Retail Funds, and that many of the board members had, at various times, worked for Mr. Dondero at the Debtor or otherwise had long-standing relationships with him.  (*Id.* at 55:19-58:6) (R. 6279-6282).  Based on this evidence, the Bankruptcy Court determined that the Advisors and the Retail Funds were controlled by Mr. Dondero.  The Bankruptcy Court's conclusion in this regard was thus not based, as Appellants represent, on the Bankruptcy Court's "disregard" of Mr. Post's testimony, but rather the entirety of the evidence presented and credibility of all witnesses.

Appellants' allegation that the Bankruptcy Court unfairly determined them to be "vexatious litigants" is equally unfounded.  The Bankruptcy Court did not actually find Appellants to be "vexatious litigants."  Rather, as part of the Court's analysis of the legal basis for approving the Plan's Gatekeeper Provision, the Bankruptcy Court determined that a court may approve a gatekeeper provision when the evidence shows a party may be subject to extensive and frivolous litigation. (Confirmation Order ¶¶ 80-81) (R. 2142-2143); (R. 6548 at 45:12-47:17 R. 6592-6594).  The Debtor presented such evidence, and, accordingly, the Bankruptcy Court took judicial notice of all the actions that had been filed by Appellants through objections, appeals or adversary proceedings, as well as all the litigation the Debtor

App. 012779

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 06/36/0561   Page 101 of 1017   PageID 13728
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 34 of 60   PageID 10720

was forced to participate in due to the actions of Mr. Dondero and his related
entities.[21]  For the convenience of the Court, the Debtor has summarized all this
litigation in a chart that was filed as an exhibit to *Debtor's Reply in Support of the
Debtor's Motion to Enforce the Order of Reference*, Case No. 21-842 [Docket No.
43] and is included herein. (*See* Appx. 29:1786-1797).[22]  The chart was created from
the public record in this Bankruptcy Case which is part of the confirmation record.
Based on this evidence, the Bankruptcy Court determined that the Gatekeeper
Provision was necessary and appropriate to protect the Debtor from litigation of the
type and magnitude that had been filed during the case.  The vexatious litigant
analogy was only one part of the legal basis for the Bankruptcy Court's approval of
the Plan Gatekeeper Provision.  (R. 6548 at 45:12-47:17 R. 6592-6594).

### 7.     Article Referencing PPP Loans

Appellants contend that the Bankruptcy Court's inquiries into COVID-related
"PPP loans" was evidence of bias against Mr. Dondero.  Recusal Motion ¶ 52.  As
fully disclosed by the Bankruptcy Court, the inquiries were prompted by an
extrajudicial source (a newspaper article) that purportedly noted that "Mr. Dondero

---

[21] The exhibits entered into the record at the confirmation hearing included the
dockets from certain specified litigation as well as all documents and exhibits on the
docket of the bankruptcy case and all exhibits necessary for impeachment.  *See
Debtor's Witness and Exhibit Lists for Confirmation Hearing* (as amended) (Docket
Nos.  1822, 1866, 1877 and 1895) (Appx. 25:1728-1740; Appx. 26:1742-1754;
Appx. 27:1756-1769; and Appx. 28:1771-1784).

[22] This chart reflects the status of Dondero-related litigation as of July 13, 2021.

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5 Filed 06/06/25    Page 102 of 1017    PageID 13729
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 35 of 60    PageID 10721

or affiliates" received PPP loans.  Because of the vagueness of the article, the Bankruptcy Court sought information about the Debtor and ordered it to disclose any PPP loans it had received.  The Debtor responded to the court at a subsequent hearing that the Debtor had not obtained any PPP loans.  Neither Mr. Dondero nor any of his affiliated entities were asked to provide any information, no action was taken against them and the issue was never raised in court again.  Appellants' reliance on this event is emblematic of the lack of merit – and candor -- in the Recusal Motion and this appeal.

### 8.    Mandatory Injunction

Appellants cite to the February 23, 2021 hearing on the Debtor's motion for a mandatory injunction (the "Mandatory Injunction").  (Recusal Motion ¶ 27).  The Mandatory Injunction related to Appellants' failure to provide for a transition of the services previously provided by the Debtor under certain shared service agreements (the "SSAs").  Historically, the Debtor had provided back and middle office support to certain of the Appellants under the SSAs, including the Advisors.  The Debtor publicly disclosed that it would be materially reducing its work force and would no longer provide services under the SSAs.  Consistent therewith, the Debtor exercised its contractual rights to terminate the SSAs in November 2020 with the termination of the Advisors' SSAs becoming effective January 31, 2021.  (R. 4178).  The Advisors, which manage a series of retail funds, failed to adopt or implement a

29

App. 012781

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 06/36/2561   Page 103 of 1017   PageID 13730
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 36 of 60   PageID 10722

transition plan that would replace the services provided under the SSAs and allow them to manage their funds without risk of default following termination of the SSAs. (*See id.*) Because the Advisors manage retail, (*i.e.*, "mom and pop,") money, the Debtor was rightfully concerned that there would be significant legal and regulatory exposure both to the Advisors and the Debtor if the Advisors' funds could not operate and, to prevent a catastrophic result, the Debtor agreed to a series of extensions of the SSAs. This position was untenable. To avert the potential liability and to extricate itself from its unwanted contractual relationship with the Advisors, the Debtor sought, on an emergency basis, an order requiring the Advisors to implement a transition plan by the end of February before the Debtor would be forced to reduce its workforce and be unable to provide services under the SSAs. (*Id.*) Thus, this Mandatory Injunction was not "frivolous," as Appellants imply, (*see* Recusal Motion ¶ 50), but wholly necessary to protect the Debtor's estate from significant loss or risk of litigation. During the hearing, the Advisors (for the first time) stated unequivocally that they had adopted an operating plan to obtain or provide all services previously provided by the Debtor under the SSAs and could manage their funds without the Debtor's assistance. (*See* R. 4199-4437). Having credited the Advisors' testimony, the Bankruptcy Court issued its order finding the Debtor's motion for a Mandatory Injunction "moot." (R. 4194-98).

Appx. 00329
012782

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 06/86/2561   Page 104 of 1017   PageID 13731
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 37 of 60   PageID 10723

C.     **The Bankruptcy Court Denies the Recusal Motion**

On March 23, 2021, the Bankruptcy Court issued its Recusal Order denying the Recusal Motion on the grounds that it was (i) not "timely," and (ii) without merit. Regarding timeliness, the Bankruptcy Court found that "the timing does not seem to pass muster," reasoning that the Recusal Motion (i) "was filed more than 15 months after" the Case was transferred to the Bankruptcy Court; (ii) "comes after many dozens of orders have been issued by the [Bankruptcy] Court," and (iii) "comes on the eve of a contempt hearing." (Recusal Order at 7). The Bankruptcy Court further found that, even if the Recusal Motion had been timely, recusal was not warranted on the merits.

The Bankruptcy Court noted that Appellants' allegations of "extrajudicial" bias resulting from the Acis Bankruptcy were "at the heart of the" Recusal Motion. (Recusal Order at 7). The Bankruptcy Court explained that it did not form any animus or bias toward Appellants during the Acis Bankruptcy and concluded that any knowledge learned from the Acis Bankruptcy did not constitute "extrajudicial" knowledge warranting recusal. (*Id.*)

The Bankruptcy Court also found that "more generally," it does not harbor, and has not shown, any "personal bias or prejudice" against Appellants. (Recusal Order at 10). The Bankruptcy Court explained that it "has merely addressed motions, objections and other pleadings as they have been presented," and "has

31

Appx 00321
012783

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5 Filed 08/06/25    Page 105 of 1017    PageID 13732
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 38 of 60    PageID 10724

issued and enforced orders where requested and warranted." *Id.*  The Bankruptcy

Court noted that: "This court and all courts sometimes use strong words as part of

managing a complex and contentious case. None of this should be interpreted as

'bias' or 'prejudice." *Id.*  The Bankruptcy Court reasoned that "clashes between a

court and counsel for a party [are] an insufficient basis for disqualification under

Section 455. (Citing *Lieb v. Tillman (In re Lieb)*, 112 B.R. 830, 835-36 (Bankr. W.D.

Tex 1990) (citing *Davis v. Board of School Comm'rs*, 517 F.2d 1044, 1050-52 (5th

Cir. 1975) (holding that disqualification should be determined "on the basis of

conduct which shows a bias or prejudice or lack of impartiality by focusing on a

party rather than counsel.")).  To that end, the Bankruptcy Court explained, it has

"the utmost respect for [Appellants]" and it has "no disrespect for Mr. Dondero on

a personal level or any of the [Appellants]."  (*Id.*)

Accordingly, the Bankruptcy Court determined, in an exercise of its

discretion, that Appellants' assertions did not "rise to the threshold standard of

raising a doubt in the mind of a reasonable observer as to" the Bankruptcy Court's

impartiality.  (Recusal Order at 10).

**D.    Appellants Appeal the Bankruptcy Court's Recusal Order**

On April 1, 2021, Appellants appealed the Bankruptcy Court's Recusal Order

on the grounds that (i) the Recusal Motion was "timely" and (ii) the Bankruptcy

Court "erred in denying the Recusal Motion on the merits." (App. Brief at 19-20).

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 06/06/25   Page 106 of 1017   PageID 13733
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 39 of 60   PageID 10725

In support of their appeal, Appellants argue that the Bankruptcy Court abused its discretion in finding that the Recusal Motion was untimely because, in pertinent part: (i) "timeliness is not an express condition of a recusal motion under § 455," and (ii) the Bankruptcy Court's bias "did not manifest itself until late 2020 and early 2021." (*Id.* at 19). Appellants further argue that: (i) the Bankruptcy Court exhibits "deep-seated antagonism toward" Appellants "that went well beyond 'normal' admonishment," (*id.* at 20), and (ii) even if there is a "lack of extrajudicial knowledge, it is not fatal" to the Recusal Motion because "Appellants are entitled a full and fair opportunity to make their case in an impartial forum." (*Id.* at 19-20). For the reasons that follow, the Bankruptcy Court properly exercised its discretion in denying the Recusal Motion.

## IV.   SUMMARY OF THE ARGUMENT

The Bankruptcy Court properly exercised its discretion in denying the Recusal Motion pursuant to 28 U.S.C. § 455 ("Section 455") on the grounds that it was (i) untimely and, independently, (ii) without merit. First, the Bankruptcy Court properly applied the "timeliness" requirement to Section 455, as mandated by the statute and applicable case law. In order to be timely, a party must move for recusal at the "earliest moment" after learning the facts forming the basis for recusal. The Bankruptcy Court properly determined that the Recusal Motion was untimely because Appellants waited 15 months to bring the Recusal Motion, after dozens of

App. 012785

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 04/06/25   Page 107 of 1017   PageID 13734
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 40 of 60   PageID 10726

orders had been issued by the Bankruptcy Court, and on the eve of a hearing on a pending contempt motion against Mr. Dondero.

The Bankruptcy Court also properly exercised its discretion in finding that, had the Recusal Motion been timely, it was without merit on the grounds that: (i) there was no "extrajudicial" bias present, and (ii) the facts of this case do not rise to the extreme circumstance of showing a "deep seated antagonism" toward Appellants warranting recusal.  The law is clear that recusal is not warranted where comments or opinions formed by the court result from events that transpire during current or prior proceedings, *i.e.*, intrajudicial bias, unless the movant can demonstrate such comments rise to the rare level of a "deep-seated antagonism" or "favoritism."  Here, there was no "extrajudicial" source forming the Bankruptcy Court's alleged "bias." Rather, all events cited by Appellants relate to either judicial rulings or judicial comments, or "intrajudicial" sources.  These types of events are nearly exempt from recusal.   There is also no evidence of the Bankruptcy Court's "deep seated antagonism" toward Appellants such that a reasonable person would question its impartiality in this Case.   Based on the entirety of the proceedings, the exceptional and rare remedy of recusal is not warranted.

App. 00324
012786

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5  Filed 04/25/61   Page 108 of 1017   PageID 13735
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 41 of 60   PageID 10727

## V. <u>ARGUMENT</u>

A. <u>The Bankruptcy Court Properly Exercised Its Discretion in</u>
<u>Finding the Recusal Motion Was Untimely</u>

The Bankruptcy Court properly exercised its discretion in denying the Motion

to Recuse on the basis that it was untimely. Appellants argue that the Bankruptcy

Court abused its discretion in finding that the Recusal Motion was untimely

principally on the grounds that: (i) "timeliness is not an express condition of a recusal

motion under § 455," (ii) the Bankruptcy Court's bias "did not manifest itself until

late 2020 and early 2021," and (iii) that the Debtor's motion for contempt against

Mr. Dondero was "pending" when Appellants filed the Recusal Motion is

"irrelevant." (*See* App. Brief. ¶¶ 36-44). Appellants' arguments are without merit.

As the Bankruptcy Court correctly stated, recusal motions brought under

Section 455(a) must be "timely." *Hill*, 495 Fed. App'x at 483; *see also Grambling*

*Univ. Nat'l Alumni Ass'n v. Board of Supervisors for La. System*, 286 Fed. App'x

864, 867 (5th Cir. 2008) (noting that while "[s]ection 455 does not contain an explicit

timeliness requirement … this Court has consistently inferred such a requirement")

(citing *U.S. v. Sanford*, 157 F.3d 987, 988 (5th Cir. 1998)). "The timeliness rule

requires that 'one seeking disqualification must do so at the earliest moment after

knowledge of the facts demonstrating the basis for such disqualification.'" *Sanford*,

157 F.3d at 988–89 (quoting *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 38 F.3d

1404, 1410 (5th Cir. 1994)).

35

App. 00325
012787

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5 Filed 04/08/25    Page 109 of 1017    PageID 13736
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 42 of 60    PageID 10728

"The most egregious delay—the closest thing to *per se* untimeliness—occurs when a party already knows the facts purportedly showing an appearance of impropriety but waits until after an adverse decision has been made by the judge before raising the issue of recusal." *Sanford*, 157 F.3d at 988–89.  Courts have "rejected recusal challenges on appeal when the challenger waited to see if he liked an outcome before springing the recusal issue," and "rejected other challenges on appeal as simply too late under the facts to be timely." *Id.* at 989; *see also Delesdernier v. Porterie*, 666 F.2d 116, 122 (5th Cir. 1982) ("Congress did not enact § 455(a) to allow counsel to make a game of the federal judiciary's ethical obligations; we should seek to preserve the integrity of the statute by discouraging bad faith manipulation of its rules for litigious advantage.") The Bankruptcy Court, therefore, correctly applied the "timeliness" requirement in analyzing the Recusal Motion.

The Bankruptcy Court also properly exercised its discretion in determining that the Motion to Recuse was "untimely" because it was filed: (i) "more than 15 months after the case was transferred to the Bankruptcy Court," (b) "after many dozens of orders" were issued by the Bankruptcy Court, and (iii) "on the eve of a contempt hearing." (Recusal Order at 7).

As the Bankruptcy Court found, Appellants learned about the facts purportedly showing an "appearance of impropriety" fifteen (15) months before

App. 00326
012788

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 04/06/25   Page 110 of 1017   PageID 13737
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 43 of 60   PageID 10729

filing their Motion to Recuse. *See, e.g.*, Recusal Motion ¶ 1 (discussing Appellants' awareness of Bankruptcy Court's alleged "pre-existing, negative views of" Mr. Dondero during December 2, 2019 Motion to Transfer hearing); *id.* at 3 (alleging that the "prejudice to Mr. Dondero has been apparent since the inception of this Case").[23]  Appellants learned about the Bankruptcy Court's purported "bias" in open court around this same time. *See id.* ¶ 3 (citing Bankruptcy Court's language from January 9, 2020 hearing as evidence of bias).  Appellants cite to adverse decisions rendered by the Bankruptcy Court from as early as February 2020, which they contend show its "predisposition against Mr. Dondero." *See id.* ¶¶ 5-6.

Despite learning the requisite facts giving rise to their Recusal Motion as early as December 2019, and throughout the following 15 months, Appellants did not move to recuse until March 2021.  During these 15 months, the Bankruptcy Court expended significant judicial resources overseeing the Bankruptcy Case and Appellants' litigation.  Appellants fail to offer any credible explanation for their delay in bringing the Recusal Motion at any point after the first moments of learning of the Bankruptcy Court's purported "bias" over one year ago.  This, alone, constitutes "*per se* untimeless." *See Hill v. Breazeale*, 197 Fed. App'x 331, 335 (5th Cir. 2006) (holding district court did not abuse its discretion in denying motion to recuse as untimely where party "waited, for no given reason, to raise the issue until

---

[23] *See also supra* at 5-7.

App. 00327
012789

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5 Filed 04/45/2661    Page 111 of 1017    PageID 13738
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 44 of 60    PageID 10730

after the district court ruled against him"); *Sanford*, 157 F.3d at 989 (affirming district court's denial of recusal motion as untimely where party "knew of the facts purportedly causing an appearance of impropriety," but waited until after an adverse decision to raise the recusal issue); *Grambling*, 286 Fed. App'x at 867-88 (affirming denial of recusal motion as "*per se*" untimely where "despite having knowledge of the facts underlying its recusal argument," party "did not immediately move to have this case assigned to a judge from another division or district and instead allowed the case to linger … for nearly ten months. When the [party] finally acted, it did so only after [the judge] had dismissed its claims"); *Hill v. Schilling*, No. 3:07–CV–2020–L, 2014 WL 1516193, at *3 (N.D. Tex. Apr. 17, 2014) (affirming judge's finding that motion to recuse was untimely where it was brought "some eleven months after [plaintiff] and his counsel first became aware of the" facts giving rise to alleged perception of bias); *Da Silva Moore v. Publicis Groupe*, 868 F. Supp. 2d 137, 155 (S.D.N.Y. 2012) ("Plaintiffs here had the requisite knowledge no later than January 4, 2012, but the recusal request did not come until nearly three months later," noting "I have made no efforts to hide my views, relationships or affiliations. If plaintiffs truly believed that any of these issues, individually or collectively, created a bias or the appearance of partiality, they should have promptly moved for my recusal.")

38

012790

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18 5   Filed 06/06/25   Page 112 of 1017   PageID 13739
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 45 of 60   PageID 10731

Based on their own pleading and allegations, Appellants' contention that the Bankruptcy Court's bias "did not manifest itself until late 2020 and early 2021" is without merit. (App. Brief ¶¶ 38-42). Such an assertion also contradicts Appellants' own argument that the Bankruptcy Court's "bias" against Mr. Dondero was "apparent" from this Case's inception. (*See* Recusal Motion ¶ 3). Even assuming it was not until "late 2020" that such a "manifestation" of bias presented itself, the Recusal Motion would still be untimely because Appellants waited several months to bring the Recusal Motion, during which time the Bankruptcy Court held evidentiary hearings for injunctive relief in *three* separate adversary proceedings as well as a two-day contested confirmation hearing—all of which involved some or all of the Appellants. As discussed *supra*, this is precisely the type of delay that courts routinely find "untimely." *See Hirczy v. Hamilton*, 190 Fed. App'x 357, 360 (5th Cir. 2006) (affirming district court's denial of motion to recuse as "untimely" where party "learned directly" from the judge in open court of potential bias, yet "he waited over two months until and after the adverse decision to file his motion to recuse" further noting that because motion was untimely, "a substantive review for abuse of discretion is unnecessary"); *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 334 (2d Cir. 1987) (motion untimely where party waited two months after events giving rise to charge of bias or prejudice before making its recusal motion);

DOCS_NY:43746.7 36027/002

App. 000329

012791

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5Filed 04/25/61    Page 113 of 1017    PageID 13740
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 46 of 60    PageID 10732

*Da Silva*, 868 F. Supp. 2d at 155. Appellants otherwise offer no credible legal or factual basis in support of their "manifestation" argument. [24]

The Bankruptcy Court also appropriately considered the fact that the Recusal Motion came on the "eve of the contempt hearing." (Recusal Order at 7); *see Weisshaus v. Fagan,* 456 Fed. App'x 23, 34 (2d Cir. 2012) (noting that "[a]lthough there was no dispositive ruling as to [defendant] at the time [plaintiff] brought her recusal motion, the district court aptly noted that the motion came on the heels of its direction that [plaintiff] submit to a deposition, thus strongly suggesting that the motion was a mere fall-back position in response to an adverse ruling."); *Da Silva*, 868 F. Supp. 2d at 154 (denying recusal motion where "[i]t appears that plaintiffs are improperly using the recusal motion as a 'fall-back position' to an unfavorable ruling.")

Appellants' remaining contentions regarding "timeliness" are equally frivolous. Nevertheless, they warrant a response. Appellants' attempt to distinguish the Bankruptcy Court's cite to *Davies* is in vain. Appellants assert that *Davies* "does not support the Order" because there, a party moved to recuse "almost a year after an adverse ruling." (App. Brief ¶¶ 36-37 (quoting *Davies,* 68 F.3d at 1130-31)). But that is exactly what happened here. *See supra* at 27-29. As alleged by Appellants,

---

[24] The only case Appellants cite in support of this contention is *Davies*—the same case they try to distinguish from the present facts, (*see* App. Brief ¶ 37), and a case which does not even support that statement.

DOCS_NY:43746.7 36027/002

App. 00339

012792

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5Filed 48/0561   Page 114 of 1017   PageID 13741
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 47 of 60   PageID 10733

the Recusal Motion was filed more than one year after (a) an adverse ruling was granted (*i.e.*, the Transfer Motion) in December 2019 (App. Brief ¶¶1-2); (b) the Bankruptcy Court improperly relied on its opinions of Mr. Dondero to include certain provisions in the Settlement Order on January 9, 2020 (*id.* at ¶¶3-4); and (c) the Bankruptcy Court's bias allegedly caused it reached conclusions without evidence and render an adverse ruling in connection with the February 2020 hearing on the Foley Application (*id.* ¶¶ 5-6).

Finally, Appellants' cite to the Delaware Bankruptcy Court's statements regarding the "presumption" that the Bankruptcy Court would follow the "rules of evidence" early in the Case, (App. Brief. ¶ 9), is entirely irrelevant for purposes of this Appeal, and should be disregarded by the Court.[25]  Indeed, Appellants' failure to appeal any of the orders complain of (other than the Confirmation Order) demonstrates that Appellants themselves generally find no fault in the actual conclusions reached and orders entered by the Bankruptcy Court.

In light of the expansive nature of this Case and the Bankruptcy Court's extensive knowledge of the proceedings that it has overseen throughout the last 21 months, interests of judicial economy also support the Bankruptcy Court's denial of the Recusal Motion. *See U.S. v. Olis*, 571 F. Supp. 2d 777 (5th Cir. 2008) (affirming

---

[25] Nothing in the Recusal Motion alleges the Bankruptcy Court has failed to follow the Federal Rules of Evidence.

DOCS_NY:43746.7 36027/002

App. 00231
012793

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 09/09/25   Page 115 of 1017   PageID 13742
Exhibit 5   Page 49 of 61
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 48 of 60   PageID 10734

denial of recusal motion as untimely where party was aware of facts stated in recusal motion "well before he filed" the motion, noting that party "had duty to file [ ] motion for recusal before the court's judicial resources were spent on resolution of motions" and party "neither argues nor explains why his delay" was reasonable); *Hill*, 495 Fed. App'x at 484 ("Particularly in light of the expansive nature of these proceedings, considerations of judicial economy likewise countenance our conclusion that the district court did not abuse its discretion"); *United States v. York*, 888 F.2d 1050, 1055 (5th Cir. 1989) ("The motivation behind a timeliness requirement [for Section 455] is [] to a large extent one of judicial economy"); *Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 237 (3d Cir. 2001) ("After a massive proceeding such as this, when the court has invested substantial judicial resources and there is indisputably no evidence of prejudice, a motion for recusal of a trial judge should be supported by substantial justification, not fanciful illusion"); *Weisshaus*, 456 Fed. App'x at 34 (affirming district court's denial of recusal motion as untimely where party "waited almost nineteen months" to file the recusal motion, at which point the district court had already expended substantial judicial resources overseeing and adjudicating" the parties' claims).

Accordingly, the Bankruptcy Court was well within its discretion in finding Appellants' Recusal Motion untimely. For this reason alone, the Recusal Motion was properly denied. *See Hill*, 495 Fed. App'x at 482 (affirming denial of recusal

App. 00332
012794

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5Filed 05/09/25   Page 116 of 1017   PageID 13743
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 49 of 60   PageID 10735

motion solely because it was "untimely," noting "[b]ecause we affirm on the basis of untimeliness, we do not reach the merits of the recusal issue"); *Hirczy*, 190 Fed. App'x at 360 (noting that because recusal motion was untimely, "a substantive review for abuse of discretion is unnecessary."); *Andrade*, 338 F.3d at 459 ("[U]ntimely motions to recuse are ordinarily rejected.")

**B.     The Bankruptcy Court Properly Exercised Its Discretion in
         Denying the Recusal Motion on the Merits**

Even if the Recusal Motion had been timely, the Bankruptcy Court did not abuse its discretion in denying Appellants' Motion to Recuse on the merits.   A motion for recusal is committed to the sound discretion of the district court. *Hill*, 197 Fed. Appx'x at 335.   "The judge abuses [their] discretion in denying recusal where a reasonable [person], cognizant of the relevant circumstances surrounding [the] judge's failure to recuse, would harbor legitimate doubts about that judge's impartiality." *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir. 1999).

Pursuant to Section 455:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify [themselves] in any proceeding in which [their] impartiality might reasonably be questioned.

(b) [They] shall also disqualify [themselves] in the following circumstances:

(1) Where [they] has a personal bias or prejudice concerning a party, a personal knowledge of disputed evidentiary facts concerning the proceeding.

28 U.S.C. § 455(a) and (b)(1).

App. 00328
012795

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 06/06/25   Page 117 of 1017   PageID 13744
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 50 of 60   PageID 10736

"The standard for bias is not 'subjective,' as it once was, but, rather, 'objective.'" *Andrade*, 338 F.3d at 454-55 (citing *Vieux Carre Prop. Owners, Residents & Assocs. v. Brown*, 948 F.2d 1436, 1448 (5th Cir. 1991)). In other words, it "is with reference to the 'well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person' that the objective standard is currently established." *Id.* (quoting *United States v. Jordan*, 49 F.3d 152, 156 (5th Cir. 1995)). "Another maxim is that review should entail a careful consideration of context, that is, the entire course of judicial proceedings, rather than isolated incidents." *Id.* at 455. Finally, the common-law doctrine called the "extrajudicial source rule" under Section 455 "divides events occurring or opinions expressed in the course of judicial proceedings from those that take place outside of the litigation context and holds that the former rarely require recusal." *Id.* Ultimately, to succeed in an appeal of a denial of a recusal motion, the appellant must: (1) demonstrate that the alleged comment, action, or circumstance was of "extrajudicial" origin, (2) place the offending event into the context of the entire trial, and (3) do so by an "objective" observer's standard. They must also demonstrate that the "district court's refusal to recuse was not merely erroneous, but, rather, an abuse of discretion." *Id.* at 456-62.

As the Bankruptcy Court properly determined, none of the circumstances requiring disqualification under Section 455 are present here.

DOCS_NY:43746.7 36027/002

App. 00324

012796

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5Filed 06/05/25    Page 118 of 1017    PageID 13745
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 51 of 60    PageID 10737

## 1.    <u>There Is No Extrajudicial Bias Present Here</u>

The Bankruptcy Court correctly found that any knowledge learned from the Acis Bankruptcy is insufficient to constitute "extrajudicial" knowledge warranting recusal. (*See* Recusal Order at 9).  The core of Appellants' argument on appeal is that the Bankruptcy Court's "extrajudicial" bias toward Appellants stemmed from opinions formed during the Acis Bankruptcy. (*See* App. Brief. ¶¶ 3-4).  Appellants' argument is frivolous.

As articulated by the most prominent Supreme Court case on recusal, "[o]pinions formed by the judge on the basis of facts of prior proceedings do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also Conkling v. Turner*, 138 F.3d 577, 592 (5th Cir. 1998) ("As a general rule, for purposes of recusal, a judge's 'personal' knowledge of evidentiary facts means 'extrajudicial,' so facts learned by a judge in his or her judicial capacity regarding the parties before the court, whether learned in the same or a related proceeding, cannot be the basis for disqualification") (internal quotations omitted).  Rather, opinions or beliefs formed from events on the record or from prior proceedings, or "intrajudicial" opinions, are subject to a "deferential" review, and are the "type of opinions/expressions that *Liteky* holds nearly exempt from causing recusal." *Andrade*, 338 F.3d at 460-62.

DOCS_NY:43746.7 36027/002

App. 000335

012797

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 06/58/25-61   Page 119 of 1017   PageID 13746
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 52 of 60   PageID 10738

Any opinion allegedly formed by the Bankruptcy Court from the Acis Bankruptcy, a prior proceeding, is thus not contemplated by the "extrajudicial" source rule and is precisely the type of opinion that is exempt from warranting recusal. *See Litkey*, 510 U.S. at 555; *Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 81 (5th Cir. 2011) (affirming denial of motion for recusal where "the only facts the [judge] learned about [party's] conduct were learned from judicial proceedings in the instant case and in previous cases"); *Conkling*, 138 F.3d at 592 ("As a general rule, for purposes of recusal, a judge's 'personal' knowledge of evidentiary facts means 'extrajudicial,' so facts learned by a judge in his or her judicial capacity regarding the parties before the court, whether learned in the same or a related proceeding, cannot be the basis for disqualification") (internal quotations omitted).[26]

For these same reasons, Appellants' reliance on the Bankruptcy Court's rulings as evidence of "antagonism" is equally deficient. (*See, e.g.*, App. Brief ¶¶ 55-56). "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion … and can only in the rarest circumstances evidence the degree of favoritism or antagonism required … when no extrajudicial source is involved." *Liteky*, 510 U.S. at 555. Here, Appellants rely on various rulings issued by the

---

[26] Appellants rely on only one allegedly "extrajudicial" source relating to the Bankruptcy Court's inquiries into COVID-related "PPP loans." (App. Brief. ¶ 24). However, as noted *supra*, the Bankruptcy Court took no action against Mr. Dondero or any of the Appellants and did not even ask them to respond.

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 06/04/25   Page 120 of 1017   PageID 13747
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 53 of 60   PageID 10739

Bankruptcy Court to demonstrate "bias." *See* App. Brief. ¶¶ 7-11 (citing to Bankruptcy Court's grant in part and denial in part on Foley Application; *id.* ¶¶ 12-17 (citing to Bankruptcy Court's denial of Appellants' Restriction Motion), *id.* ¶¶ 27-28 (citing to Bankruptcy Court's grant of Debtor's TRO Motion against Advisors and Funds); *id.* ¶ 57 (citing to Bankruptcy Court's holding that Debtor's motion for Mandatory Injunction against Advisors and Funds was "moot"); *id.* ¶ 57 (citing to Bankruptcy Court's denial of Dugaboy's motion to compel the Debtor to file "unduly burdensome" financial reports); *id.* ¶ 58 (citing June 17 Order requiring Appellants to disclose inter alia, whether they are "creditors" of the Debtor and Mr. Dondero's ownership interest in entities "with ties to Mr. Dondero"). These rulings, none of which involve an extrajudicial source, simply do not rise to the rare circumstance of evidencing the degree of antagonism warranted for recusal. *See Liteky*, 510 U.S. at 555 ("Almost invariably, judicial rulings are proper grounds for appeal, not for recusal"); *Andrade*, 338 F.3d at 456 (denying recusal based on judicial rulings where events cited "are embodied in judicial actions that Appellants could have, but did not, appeal"). Appellants fail to even address the established law set forth under *Liteky*, which plainly forecloses their remedy of recusal, and instead merely cite to *Liteky* in a few footnotes while twisting its holdings. (*See* App. Brief ¶¶ 54-55 fn. 114, 115, 117). Simply put, Appellants offer no credible legal or factual basis for recusal. *See Henderson v. Dep't of Pub. Safety and Corrs.*, 901 F.2d 1288,

App. 00327

012799

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5 Filed 06/06/25    Page 121 of 1017    PageID 13748
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 54 of 60    PageID 10740

1296 (5th Cir. 1990) ("[E]ven the most superficial research would have put [the

party] on notice that the factual circumstances he alleged were not grounds for

recusal" under *Liteky*, noting "there is absolutely no case authority cited by [party]

to the contrary.")

Appellants' "due process" argument that "even a lack of extrajudicial

knowledge is not fatal because Appellants are entitled to make their case in an

impartial forum," App Brief. ¶¶50, 54, is frivolous and should be summarily rejected

by the Court.  Appellants fail to support any notion of a "due process" violation.  Nor

could they.  The record of this Case shows the great extent to which the Bankruptcy

Court has respected the due process rights of Appellants, notwithstanding their

limited, if any, skin in the game.  The cases cited by Appellants in support of their

contention are entirely inapplicable.  *Miller v. Sam Houston State Univ.,* 986 F.3d

880, 893 (5th Cir. 2021) does not address the standard for "recusal" under Section

455 or the "extrajudicial" source rule.  Rather, *Miller* deals with whether a case

should be reassigned to a different district court judge on remand after the original

judge did not give plaintiff the opportunity for discovery and *sua sponte* dismissed

a plaintiff's claim of sex discrimination and retaliation under the Fair Labor Standers

Act. *Marshall v. Jerrico*, 446 U.S. 238 (1980) also does not address recusal motions,

but deals with whether the "reimbursement provision of the [Fair Labor Standards]

Act violate the Due Process Clause." *Id.* at 243.  Appellants' remaining case cites on

DOCS_NY:43746.7 36027/002

Appx 00338

012800

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5 Filed 06/25/61    Page 122 of 1017    PageID 13749
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 55 of 60    PageID 10741

this point are equally irrelevant.[27]    The types of exceptional circumstances warranting recusal in those cases are not present here.  Appellants otherwise offer no legal basis in support of their argument.  Accordingly, the Bankruptcy Court properly exercised its discretion in finding that there was no "extrajudicial" source warranting recusal.

### 2. The Bankruptcy Court Does Not Harbor Deep-Seated Antagonism Toward Appellants

The Bankruptcy Court also properly exercised its discretion in finding that it did not harbor any "deep-seated antagonism" toward Appellants such that it would raise "doubt in the mind of a reasonable observer" as to the Bankruptcy Court's impartiality. (Recusal Order at 10).  Appellants contend that the Bankruptcy Court's "repeated negative statements about Mr. Dondero" and "reference to proceedings in the Acis Bankruptcy to justify findings made in the Highland" case justify recusal. (App. Brief ¶¶ 51-58).  Appellants' arguments are without merit.

---

[27] For example, the Court in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), reversed a denial of a recusal motion as a "matter of due process" where, following entry of a $50 million judgment against a corporation in favor of the CEO, that CEO contributed $3 million to help elect the same judge who the CEO knew would preside over corporation's appeal.  The Court in *Johnson v. Mississippi*, 403 U.S. 212 (1971), found recusal of a judge was necessary where that judge "was a defendant in one of petitioner's civil rights suits and a losing party at that."  *Id.* at 215.  The Court in *In re Chevron U.S.A., Inc.*, 121 F.3d 163, 167 (5th Cir. 1997), denied a petition for writ of mandamus challenging denial of recusal premised on racist remarks, where, although a "reasonable person might indeed harbor doubts about the trial judge's impartiality" in a "racially-charged case such as the instant one," the judge had already presided over the case for so long such that recusal at that stage "would be unprecedented."

DOCS_NY:43746.7 36027/002

Appx. 00239
012801

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5 Filed 05/08/25    Page 123 of 1017    PageID 13750
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 56 of 60    PageID 10742

"Judicial remarks that are critical or disapproving of, or even hostile to, counsel for the parties or their cases, ordinarily do not support a bias or partiality challenge." *Liteky*, 510 U.S. at 555. In support of their argument that the Bankruptcy Court harbored "bias" toward Appellants, Appellants refer to a number of the Bankruptcy Court's remarks regarding, *inter alia*: (i) the "importance" of the language in Settlement Order and Mr. Dondero abiding by its terms, (App. Brief ¶¶ 3-4), (ii) its "concern" regarding Mr. Dondero's appeal of Acis, (*id.* ¶ 6), (iii) the Restriction Motion as "frivolous," (*id.* ¶ 11); and (iv) its reminder to Mr. Dondero that the Settlement Order prohibits him from terminating the Debtor's agreements after evidence established that he was likely behind the K&L Gates Letters, (*id.* ¶ 17).

In relying on such statements, Appellants again disregard the law on recusal. *See Andrade*, 338 F.3d at 459 (affirming denial of recusal motion premised on judge's negative comments made on the record – including describing a witness as "crazy, murdering son-of-a-bitch" and referring to parties' attempt to introduce certain evidence as "bullcrap," – noting that appellants "brief omits citing the most prominent Supreme Court statement on point (citing *Liteky*, 510, U.S. at 555)). As the Bankruptcy Court properly found, Appellants' cited remarks are, at best, "clashes between a court and counsel," and such remarks are "simply insufficient" for recusal. (Recusal Order at 10). *See United States v. Landerman*, 109 F.3d 1053, 1066 (5th

App. 000349
012802

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5 Filed 06/58/2561    Page 124 of 1017    PageID 13751
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 57 of 60    PageID 10743

Cir. 1997) (affirming denial of motion to recuse where district judge allowed "the Government more leeway during its questioning and did interrupt defense counsel's questioning more often than the Government's questioning"); *Garcia v. Woman's Hosp. of Texas*, 143 F.3d 227, 230 (5th Cir. 1998) (affirming denial of motion to recuse where district judge had made unflattering comments about plaintiff's ability to prove her case).

Based on the entirety of the proceedings before the Bankruptcy Court, in which all events raised by Appellants relate to either the Bankruptcy Court's knowledge of prior proceedings or the Bankruptcy Court's remarks during these proceedings, the exceptional remedy of recusal is not warranted. *See United States v. Williams*, 127 Fed. App'x 736, 737-38 (5th Cir. 2005) ("As our review of the entire context of the judicial proceedings in which the events challenged in this case arose reveals no disqualifying judicial bias, we conclude that there was no abuse of discretion in the district court's denial of [the] recusal motion"); *Henderson*, 901 F.2d at 1296 (affirming court's denial of recusal motion, where "none of the circumstances requiring disqualification under § 455 are present here" and "the trial judge was well within his discretion in finding that the motion for recusal was not well founded, either in fact or in law.")  The Bankruptcy Court, therefore, properly exercised its discretion in finding that Appellants' assertions do not "rise to the

Case 19-34054-sgj11    Doc 3596-5    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5 Filed 06/06/25    Page 125 of 1017    PageID 13752
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 58 of 60    PageID 10744

threshold standard of raising doubt in the mind of a reasonable observer' as to the judge's impartiality." (Recusal Order at 10).

Accordingly, the Bankruptcy Court was well within its discretion in denying the Recusal Motion on the merits.

## <u>CONCLUSION</u>

For the foregoing reasons, the Debtor respectfully requests that this Court affirm the Recusal Order.

DOCS_NY:43746.7 36027/002

App. 00342

012804

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5 Filed 06/06/25   Page 126 of 1017   PageID 13753
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 59 of 60   PageID 10745

Dated:  July 28, 2021                **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
         rfeinstein@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         jelkin@pszjlaw.com
         hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

DOCS_NY:43746.7 36027/002

Appx. 00343

012805

Case 19-34054-sgj11   Doc 3596-5   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S     Document Exhibit 5  Filed 06/06/25   Page 127 of 1017     PageID 13754
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 60 of 60   PageID 10746

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 8015</u>

This document complies with the type-volume limit of Fed. R. Bankr. P. 8015(a)(7)(B)(i) because, according to Microsoft Word, it contains 12,803 words, excluding the portions of the document exempted by Fed. R. Bankr. P. 8015(g).


By: <u>*/s/ Zachery Z. Annable*</u>
Zachery Z. Annable

DOCS_NY:43746.7 36027/002

012806

# EXHIBIT 6

Appx 00345

0112807

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 02/06/2304    Page 129 of 1017    PageID 13756
Docket #0021  Date Filed: 7/28/2021
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1 of 1803    PageID 10747

Case No. 3:21-cv-00879-K

---

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

---

**JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., NEXPOINT ADVISORS, L.P., THE DUGABOY INVESTMENT TRUST, THE GET GOOD TRUST, AND NEXPOINT REAL ESTATE PARTNERS, LLC,**

**Appellants,**

v.

**HON. STACEY G. C. JERNIGAN AND HIGHLAND CAPITAL MANAGEMENT, L.P.**

**Appellees.**

---

**On Appeal from the United States Bankruptcy Court
Northern District of Texas, Dallas Division
The Honorable Stacey G. C. Jernigan, United States Bankruptcy Court**

**In re:  Highland Capital Management, L.P.
Case No. 19-34054 (Jointly Administered)**

---

**APPENDIX IN SUPPORT OF ANSWERING BRIEF OF
APPELLEE HIGHLAND CAPITAL MANAGEMENT, L.P.**

---



1934054210728000000000007

Appx 00346

0 1 2 8 0 8

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 25-6   Filed 06/25/04   Page 130 of 1017   PageID 13757
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 2 of 1803   PageID 10748

Appellee Highland Capital Management, L.P. ("Highland" or the "Debtor"),

the debtor and debtor-in-possession in the above-captioned chapter 11 bankruptcy

case (the "Bankruptcy Case"), hereby files this appendix in support of the Answering

Brief of Appellee Highland Capital Management, L.P. (the "Brief").

## TABLE OF CONTENTS

| Appx. | Description |
|---|---|
| 1. | *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, Case No. 19-34054-sgj11, Docket No. 1473 (Bankr. N.D. Tex. Nov. 24, 2020) |
| 2. | *Partial Final Award*, Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P., Case No. 01-16-0002-6927 (March 6, 2019) |
| 3. | *Final Award*, Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P., Case No. 01-16-0002-6927 (April 29, 2019) |
| 4. | *May 17, 2019 Transcript,* Daugherty v. Highland Capital Management, L.P., C.A. No. 2018-0488-MTZ (Del. Ch. May 17, 2019) |
| 5. | *Order Denying Application to Certify Interlocutory Appeal,* C.A. No. 2018-0488-MTZ (Del. Ch. July 8, 2019) |
| 6. | *Motion for an Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas*, Case No. 19-12239 (CSS), Docket No. 86 (Bankr. D. Del. Nov. 11, 2019) |
| 7. | *Order Denying Alleged Debtors' Joint Motion to Dismiss the Involuntary Petitions Filed by Joshua N. Terry for Lack of Subject Matter Jurisdiction or, Alternatively, to Compel Arbitration*, Case No. 18-30264-sgj11, Docket No. 75 (Bankr. N.D. Tex. Mar. 20, 2018) |
| 8. | *Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified*, Case No. 18-30264-sgj11, Docket No. 829 (Bankr. N.D. Tex. Jan. 31, 2019) |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-18   Filed 04/25/25   Page 131 of 1017   PageID 13758
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 3 of 1803   PageID 10749

| 9. | *Opinion* affirming Confirmation Order, Case No. 3:19-cv-00291-D, Docket No. 75 (N.D. Tex. July 18, 2019) |
|---|---|
| 10. | *Opinion* affirming Confirmation Order, Case No. 19-10847 (5th Cir. June 17, 2021) |
| 11. | *Objection of the Debtor to Motion of Official Committee of Unsecured Creditors for an Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas*, Case No. 19-12239 (CSS), Docket No. 118 (Bankr. D. Del. Nov. 12, 2019) |
| 12. | *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, Case No. 19-34054-sgj11, Docket No. 281 (Bankr. N.D. Tex. Dec. 27, 2019) |
| 13. | *Debtor's Omnibus Reply in Support of (i) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date; and (ii) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 159 (Bankr. D. Del. Nov. 21, 2019) |
| 14. | *Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 70 (Bankr. D. Del. Oct. 29, 2019) |
| 15. | *Limited Objection to the Debtor's: (i) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date; and (ii) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 116 (Bankr. D. Del. Nov. 12, 2019) |
| 16. | *Limited Objection of the Official Committee of Unsecured Creditors to the Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP and Lynn Piker Cox & Hurst as Special Texas Counsel and Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 120 (Bankr. D. Del. Nov. 12, 2019) |

Appx 00248

012810

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6 Filed 05/12/25304   Page 132 of 1017   PageID 13759
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 4 of 1803   PageID 10750

| | |
|---|---|
| 17. | *Declaration of John A. Morris in Support of Debtor's Motion for Entry of an Order Approving Settlement Pursuant to Bankruptcy Rule 9019 and Authorizing Actions Consistent Therewith*, Case No. 19-34054-sgj11, Docket No. 2590 (Bankr. N.D. Tex. July 20, 2021) |
| 18. | *James Dondero's Objection to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, Case No. 19-34054-sgj11, Docket No. 1661 (Bankr. N.D. Tex. Jan. 5, 2021) |
| 19. | *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* filed by Get Good Trust, The Dugaboy Investment Trust, Case No. 19-34054-sgj11, Docket No. 1667 (Bankr. N.D. Tex. Jan. 5, 2021) |
| 20. | *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund, Case No. 19-34054-sgj11, Docket No. 1670 (Bankr. N.D. Tex. Jan. 5, 2021) |
| 21. | *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)*, Case No. 19-34054-sgj11, Docket No. 1673 (Bankr. N.D. Tex. Jan. 5, 2021) |
| 22. | *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization*, Case No. 19-34054-sgj11, Docket No. 1671 (Bankr. N.D. Tex. Jan. 5, 2021) |
| 23. | *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, Case No. 19-34054-sgj11, Docket No. 1814 (Bankr. N.D. Tex. Jan. 22, 2021) |
| 24. | *Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management,* |

Appx 00249

012811

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 06/25/304   Page 133 of 1017   PageID 13760
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 5 of 1803   PageID 10751

|     |     |
| --- | --- |
|     | Case No. 19-34054-sgj11, Docket No. 1807 (Bankr. N.D. Tex. Jan. 22, 2021) |
| 25. | *Debtor's Witness and Exhibit List with Respect to Confirmation Hearing to be Held on January 26, 2021*, Case No. 19-34054-sgj11, Docket No. 1822 (Bankr. N.D. Tex. Jan. 22, 2021) |
| 26. | *Debtor's Amended Witness and Exhibit List with Respect to Confirmation Hearing to be Held on February 2, 2021*, Case No. 19-34054-sgj11, Docket No. 1866 (Bankr. N.D. Tex. Jan. 29, 2021) |
| 27. | *Debtor's Second Amended Witness and Exhibit List with Respect to Confirmation Hearing to be Held on February 2, 2021*, Case No. 19-34054-sgj11, Docket No. 1877 (Bankr. N.D. Tex. Feb. 1, 2021) |
| 28. | *Debtor's Third Amended Witness and Exhibit List with Respect to Confirmation Hearing to be Held on February 3, 2021*, Case No. 19-34054-sgj11, Docket No. 1895 (Bankr. N.D. Tex. Feb. 4, 2021) |
| 29. | *Summary of Dondero Entity Litigation*, Case No. 3:19-cv-00842-B, Docket No. 43 at 546-557 (N.D. Tex. July 13, 2021) |

DOCS_NY:43760.2 36027/002

012812

Appx 00250

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 07/06/25   Page 134 of 1017   PageID 13761
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 6 of 1803   PageID 10752

Respectfully submitted,

Dated:  July 28, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
       rfeinstein@pszjlaw.com
       jmorris@pszjlaw.com
       gdemo@pszjlaw.com
       hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

DOCS_NY:43760.2 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 00/00/25304    Page 135 of 1017    PageID 13762
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 7 of 1803    PageID 10753

# APPENDIX 1

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6 FiledPage 05/06/135304    Page 136 of 1017    PageID 13763
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 8 of 1803    PageID 10754
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 1 of 178

Docket #1473  Date Filed: 11/24/2020

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
| | ) |
| Debtor. | ) |
| | ) |

**DISCLOSURE STATEMENT FOR THE FIFTH AMENDED PLAN OF
REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.**

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



¶1934054201124000000000002

Appellee Appx. 00002
Appx. 00253
012815

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 01/06/25804    Page 137 of 1017    PageID 13764
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 9 of 1803    PageID 10755
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 2 of 178

**ARTICLE I. EXECUTIVE SUMMARY** ...................................................................6

    **A.**    **Summary of the Plan** .................................................................6

    **B.**    **An Overview of the Chapter 11 Process** ...................................8

    **C.**    **Purpose and Effect of the Plan** ................................................8

        1.    The Plan of Reorganization .................................................8

        2.    Plan Overview .....................................................................9

        3.    Voting on the Plan ...........................................................10

        4.    Confirmation of the Plan ..................................................11

        5.    Confirming and Effectuating the Plan .............................12

        6.    Rules of Interpretation .....................................................12

        7.    Distribution of Confirmation Hearing Notice and Solicitation Package to Holders of Claims and Equity Interests.................12

        8.    Instructions and Procedures for Voting ...........................14

        9.    The Confirmation Hearing ...............................................15

        10.    The Deadline for Objecting to Confirmation of the Plan .........16

        11.    Notice Parties ...................................................................16

        12.    Effect of Confirmation of the Plan ..................................16

    **D.**    **Effectiveness of the Plan** .......................................................17

    **E.**    **RISK FACTORS** .................................................................17

**ARTICLE II. BACKGROUND TO THE CHAPTER 11 CASE AND SUMMARY OF BANKRUPTCY PROCEEDINGS TO DATE** ...............17

    **A.**    **Description and History of the Debtor's Business** .................17

    **B.**    **The Debtor's Corporate Structure** ........................................17

    **C.**    **Business Overview** .................................................................18

    **D.**    **Prepetition Capital Structure** ...............................................18

        1.    Jefferies Margin Borrowings (Secured)...........................18

        2.    The Frontier Bank Loan (Secured) ..................................19

        3.    Other Unsecured Obligations ...........................................19

**Appellee Appx. 00003**

*Appx. 00254*

012816

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 01/06/25804 Page 138 of 1017   PageID 13765
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 10 of 1803   PageID 10756
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 3 of 178

|  |  | 4. | Equity Interests | 20 |
| **E.** | **SEC Filings** | | | 20 |
| **F.** | **Events Leading Up to the Debtor's Bankruptcy Filings** | | | 20 |
| **G.** | **Additional Prepetition Litigation** | | | 21 |
| **H.** | **The Debtor's Bankruptcy Proceeding** | | | 24 |
| **I.** | **First Day Relief** | | | 24 |
| **J.** | **Other Procedural and Administrative Motions** | | | 25 |
| **K.** | **United States Trustee** | | | 25 |
| **L.** | **Appointment of Committee** | | | 26 |
| **M.** | **Meeting of Creditors** | | | 26 |
| **N.** | **Schedules, Statements of Financial Affairs, and Claims Bar Date** | | | 26 |
| **O.** | **Governance Settlement with the Committee** | | | 27 |
| **P.** | **Appointment of James P. Seery, Jr., as Chief Executive Officer and Chief Restructuring Officer** | | | 27 |
| **Q.** | **Mediation** | | | 28 |
| **R.** | **Postpetition Settlements** | | | 28 |
|  |  | 1. | Settlement with Acis and the Terry Parties | 28 |
|  |  | 2. | Settlement with the Redeemer Committee | 29 |
| **S.** | **Certain Outstanding Material Claims** | | | 30 |
| **T.** | **Treatment of Shared Service and Sub-Advisory Agreements** | | | 31 |
| **U.** | **Portfolio Managements with Issuer Entities** | | | 32 |
| **V.** | **Resignation of James Dondero** | | | 33 |
| **W.** | **Exclusive Periods for Filing a Plan and Soliciting Votes** | | | 33 |
| **X.** | **Negotiations with Constituents** | | | 34 |
| **Y.** | **Highland Capital Management, L.P. Retirement Plan and Trust** | | | 34 |
| **ARTICLE III.** | **SUMMARY OF THE PLAN** | | | 35 |
| **A.** | **Administrative and Priority Tax Claims** | | | 35 |
|  |  | 1. | Administrative Expense Claims | 35 |
|  |  | 2. | Professional Fee Claims | 36 |
|  |  | 3. | Priority Tax Claims | 37 |
| **B.** | **Classification and Treatment of Classified Claims and Equity Interests** | | | 37 |

- ii -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 10/26/25804    Page 139 of 1017    PageID 13766
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 11 of 1803    PageID 10757
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 4 of 178

| | | |
|---|---|---|
| | 1. | Summary ...................................................................................37 |
| | 2. | Elimination of Vacant Classes ....................................................38 |
| | 3. | Impaired/Voting Classes .............................................................38 |
| | 4. | Unimpaired/Non-Voting Classes .................................................38 |
| | 5. | Impaired/Non-Voting Classes .....................................................38 |
| | 6. | Cramdown ...................................................................................39 |
| **C.** | **Classification and Treatment of Claims and Equity Interests** .......................39 |
| | 1. | *Class 1 – Jefferies Secured Claim* .............................................39 |
| | 2. | *Class 2 – Frontier Secured Claim* ..............................................39 |
| | 3. | *Class 3 – Other Secured Claims* .................................................40 |
| | 4. | *Class 4 – Priority Non-Tax Claims* .............................................40 |
| | 5. | *Class 5 – Retained Employee Claims* ..........................................41 |
| | 6. | *Class 6 – PTO Claims* ................................................................41 |
| | 7. | *Class 7 – Convenience Claims* ...................................................41 |
| | 8. | *Class 8 – General Unsecured Claims* ..........................................42 |
| | 9. | *Class 9 – Subordinated Claims* ...................................................43 |
| | 10. | *Class 10 – Class B/C Limited Partnership Interests* ...................44 |
| | 11. | *Class 11 – Class A Limited Partnership Interests* .......................44 |
| **D.** | **Special Provision Governing Unimpaired Claims** ............................................45 |
| **E.** | **Subordinated Claims** ...................................................................................45 |
| **F.** | **Means for Implementation of the Plan** .........................................................45 |
| | 1. | Summary ....................................................................................45 |
| | 2. | The Claimant Trust .....................................................................46 |
| | (a) | *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.* ..................................................................46 |
| | (a) | *Claimant Trust Oversight Committee* .........................................47 |
| | (b) | *Purpose of the Claimant Trust.* ..................................................48 |

- iii -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 01/30/25804    Page 140 of 1017    PageID 13767
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 12 of 1803    PageID 10758
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 5 of 178

| | | |
|---|---|---|
| (c) | *Purpose of the Litigation Sub-Trust.* | 48 |
| (d) | *Claimant Trust Agreement and Litigation Sub-Trust Agreement.* | 48 |
| (e) | *Compensation and Duties of Trustees.* | 50 |
| (f) | *Cooperation of Debtor and Reorganized Debtor.* | 50 |
| (g) | *United States Federal Income Tax Treatment of the Claimant Trust.* | 50 |
| (h) | *Tax Reporting.* | 50 |
| (i) | *Claimant Trust Assets.* | 51 |
| (j) | *Claimant Trust Expenses.* | 51 |
| (k) | *Trust Distributions to Claimant Trust Beneficiaries.* | 51 |
| (l) | *Cash Investments.* | 51 |
| (m) | *Dissolution of the Claimant Trust and Litigation Sub-Trust.* | 52 |
| 3. | The Reorganized Debtor | 52 |
| (a) | *Corporate Existence* | 52 |
| (b) | *Cancellation of Equity Interests and Release* | 53 |
| (c) | *Issuance of New Partnership Interests* | 53 |
| (d) | *Management of the Reorganized Debtor* | 53 |
| (e) | *Vesting of Assets in the Reorganized Debtor* | 53 |
| (f) | *Purpose of the Reorganized Debtor* | 54 |
| (g) | *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets* | 54 |
| 4. | Company Action | 54 |
| 5. | Release of Liens, Claims and Equity Interests | 55 |
| 6. | Cancellation of Notes, Certificates and Instruments | 55 |
| 7. | Cancellation of Existing Instruments Governing Security Interests | 56 |

- iv -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 04/06/25804   Page 141 of 1017   PageID 13768
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 13 of 1803   PageID 10759
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 6 of 178

8.   Control Provisions ............................................................................56

9.   Treatment of Vacant Classes .........................................................56

10.  Plan Documents .............................................................................56

11.  Highland Capital Management, L.P. Retirement Plan and
     Trust.............................................................................................56

A.   **Treatment of Executory Contracts and Unexpired Leases**............................57

     1.   Assumption, Assignment, or Rejection of Executory Contracts
          and Unexpired Leases...............................................................57

     2.   Claims Based on Rejection of Executory Contracts or
          Unexpired Leases.....................................................................58

     3.   Cure of Defaults for Assumed or Assigned Executory
          Contracts and Unexpired Leases...............................................58

B.   **Provisions Governing Distributions** ...........................................................59

     1.   Dates of Distributions ...............................................................59

     2.   Distribution Agent .....................................................................60

     3.   Cash Distributions .....................................................................60

     4.   Disputed Claims Reserve ..........................................................60

     5.   Distributions from the Disputed Claims Reserve ......................61

     6.   Rounding of Payments ...............................................................61

     7.   *De Minimis* Distribution .............................................................61

     8.   Distributions on Account of Allowed Claims ...........................62

     9.   General Distribution Procedures................................................62

     10.  Address for Delivery of Distributions .......................................62

     11.  Undeliverable Distributions and Unclaimed Property...............62

     12.  Withholding Taxes.....................................................................63

     13.  Setoffs........................................................................................63

     14.  Surrender of Cancelled Instruments or Securities .....................63

     15.  Lost, Stolen, Mutilated or Destroyed Securities .......................63

**Appellee Appx. 00007**

**Appx. 00358**

012820

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 05/25804   Page 142 of 1017   PageID 13769
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 14 of 1803   PageID 10760
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 7 of 178

| | | | |
|---|---|---|---|
| **C.** | | **Procedures for Resolving Contingent, Unliquidated and Disputed Claims** | 64 |
| | 1. | Filing of Proofs of Claim | 64 |
| | 2. | Disputed Claims | 64 |
| | 3. | Procedures Regarding Disputed Claims or Disputed Equity Interests | 64 |
| | 4. | Allowance of Claims and Equity Interests | 64 |
| *Allowance of Claims* | | | 64 |
| *Estimation* | | | 65 |
| *Disallowance of Claims* | | | 65 |
| **D.** | | **Effectiveness of the Plan** | 66 |
| | 1. | Conditions Precedent to the Effective Date | 66 |
| | 2. | Waiver of Conditions | 67 |
| | 3. | Effect of Non-Occurrence of Conditions to Effectiveness | 67 |
| | 4. | Dissolution of the Committee | 67 |
| **E.** | | **Exculpation, Injunction, and Related Provisions** | 68 |
| | 1. | General | 68 |
| | 3. | Exculpation | 69 |
| | 4. | Releases by the Debtor | 70 |
| | 5. | Preservation of Rights of Action | 71 |
| *Maintenance of Causes of Action* | | | 71 |
| *Preservation of All Causes of Action Not Expressly Settled or Released* | | | 72 |
| | 6. | Injunction | 72 |
| | 7. | Term of Injunctions or Stays | 73 |
| | 8. | Continuance of January 9 Order | 73 |
| **F.** | | **Article XII.D of the Plan** | 74 |
| **G.** | | **Binding Nature of Plan** | 74 |
| **H.** | | **Statutory Requirements for Confirmation of the Plan** | 74 |
| | 1. | Best Interests of Creditors Test | 75 |

- vi -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 06/25/804 Page 143 of 1017    PageID 13770
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 15 of 1803    PageID 10761
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 8 of 178

|   | 2. | Liquidation Analysis | 75 |
|   | 3. | Feasibility | 76 |
|   | 4. | Valuation | 77 |
|   | 5. | Acceptance by Impaired Classes | 77 |
|   | 6. | Confirmation Without Acceptance by Impaired Classes | 78 |
|   | 7. | No Unfair Discrimination | 78 |
|   | 8. | Fair and Equitable Test | 78 |

**ARTICLE IV. RISK FACTORS** ..................................................................................... 79

    **A.**    **Certain Bankruptcy Law and Other Considerations** ................................ 79

|   | 1. | Parties in Interest May Object to the Debtor's Classification of Claims and Equity Interests, or Designation as Unimpaired. | 79 |
|   | 2. | The Debtor May Not Be Able to Secure Confirmation of the Plan. | 79 |
|   | 3. | The Conditions Precedent to the Effective Date of the Plan May Not Occur. | 80 |
|   | 4. | Continued Risk Following Effectiveness. | 80 |
|   | 5. | The Effective Date May Not Occur. | 80 |
|   | 6. | The Chapter 11 Case May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code | 81 |
|   | 7. | Claims Estimation | 81 |
|   | 8. | The Financial Information Contained Herein is Based on the Debtor's Books and Records and, Unless Otherwise Stated, No Audit was Performed. | 81 |

    **B.**    **Risks Related to Recoveries under the Plan** ............................................... 81

|   | 1. | The Reorganized Debtor and/or Claimant Trust May Not Be Able to Achieve the Debtor's Projected Financial Results | 81 |
|   | 2. | Claim Contingencies Could Affect Creditor Recoveries | 82 |
|   | 3. | If Approved, the Debtor Release Could Release Claims Against Potential Defendants of Estate Causes of Action With Respect to Which the Claimant Trust Would Otherwise Have Recourse | 82 |

Appellee Appx. 00009
Appx. 00300
012822

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 01/06/25804   Page 144 of 1017   PageID 13771
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 16 of 1803   PageID 10762
Case 19-34054-sgj11   Doc 1473   Filed 11/24/20   Entered 11/24/20 10:24:41   Page 9 of 178

C.    **Investment Risk Disclaimer** ............................................................. 82

    1.    Investment Risks in General. ..................................................... 82

    2.    General Economic and Market Conditions and Issuer Risk. .................. 82

D.    **Disclosure Statement Disclaimer** ...................................................... 83

    1.    The Information Contained Herein is for Disclosure Purposes
        Only. ...................................................................................... 83

    2.    This Disclosure Statement was Not Approved by the SEC. ................ 83

    3.    This Disclosure Statement Contains Forward-Looking
        Statements. ............................................................................. 83

    4.    No Legal or Tax Advice is Provided to You by This
        Disclosure Statement. ............................................................... 83

    5.    No Admissions Are Made by This Disclosure Statement. ................. 84

    6.    No Reliance Should Be Placed on Any Failure to Identify
        Litigation Claims or Projected Objections. .................................. 84

    7.    Nothing Herein Constitutes a Waiver of Any Right to Object
        to Claims or Equity Interests or Recover Transfers and Assets. .............. 84

    8.    The Information Used Herein was Provided by the Debtor and
        was Relied Upon by the Debtor's Advisors. ................................. 84

    9.    The Disclosure Statement May Contain Inaccuracies. ..................... 84

    10.   No Representations Made Outside the Disclosure Statement
        Are Authorized. ....................................................................... 85

**ARTICLE V. ALTERNATIVES TO CONFIRMATION AND
EFFECTIVENESS OF THE PLAN** ................................................................ 85

**ARTICLE VI. U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN** ....................................................................................................... 85

A.    **Consequences to the Debtor** ............................................................. 86

    1.    Cancellation of Debt ............................................................... 86

    2.    Transfer of Assets .................................................................. 87

B.    **U.S. Federal Income Tax Treatment of the Claimant Trust** ............... 87

C.    **Consequences to Holders of Allowed Claims** ................................. 88

    1.    Recognized Gain or Loss ......................................................... 88

**Appellee Appx. 00010**
**Appx. 00301**
012823

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10    Filed 03/03/25804  Page 145 of 1017    PageID 13772
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 17 of 1803   PageID 10763
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41    Page 10 of 178

2.    Distribution in Discharge of Accrued Unpaid Interest ..............................89

3.    Information Reporting and Withholding ...................................................89

**D.    Treatment of the Disputed Claims Reserve**........................................................89

**ARTICLE VII. RECOMMENDATION** ...................................................................90

**Appellee Appx. 00011**

**Appx. 00362**

012824

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 09/25/04   Page 146 of 1017   PageID 13773
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 18 of 1803   PageID 10764
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 11 of 178

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned cases (the "Debtor"), is sending you this document and the accompanying materials (the "Disclosure Statement") because you are a creditor or interest holder in connection with the *Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management, L.P.*, dated November 24, 2020, as the same may be amended from time to time (the "Plan").[2] The Debtor has filed a voluntary petition under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code").

This Disclosure Statement has not yet been approved by the Bankruptcy Court as containing adequate information within the meaning of section 1125(a) of the Bankruptcy Code. The Debtor intends to seek an order or orders of the Bankruptcy Court (a) approving this Disclosure Statement as containing adequate information and (b) confirming the Plan.

A copy of the Plan is attached hereto as **Exhibit A**.

The Debtor believes that the Plan is fair and equitable, will maximize the value of the Debtor's Estate, and is in the best interests of the Debtor and its constituents. Notably, the Plan provides for the transfer of the majority of the Debtor's Assets to a Claimant Trust. The balance of the Debtor's Assets, including the management of the Managed Funds, will remain with the Reorganized Debtor. The Reorganized Debtor will be managed by New GP LLC – a wholly-owned subsidiary of the Claimant Trust. This structure will allow for continuity in the Managed Funds and an orderly and efficient monetization of the Debtor's Assets.

The Claimant Trust, the Litigation Trust, or the Reorganized Debtor, as applicable, will institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action without any further order of the Bankruptcy Court, and the Claimant Trust and Reorganized Debtor, as applicable, will sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets and resolve all Claims, except as otherwise provided in the Plan, the Claimant Trust Agreement, or the Reorganized Limited Partnership Agreement.

---

**IMPORTANT INFORMATION ABOUT THIS
DISCLOSURE STATEMENT FOR YOU TO READ**

**The Debtor is providing the information in this Disclosure Statement to Holders of Claims and Equity Interests in connection with the Debtor's Plan. Nothing in this Disclosure Statement may be relied upon or used by any Entity for any purpose other than with respect to confirmation of the Plan. The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose.**

**This Disclosure Statement has not been filed for approval with the Securities and Exchange Commission ("SEC") or any state authority and neither the SEC nor any state authority has passed upon the accuracy or adequacy of this Disclosure Statement or upon**

---

[2] All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan. To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern.

- 1 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 06/20/25804    Page 147 of 1017    PageID 13774
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 19 of 1803    PageID 10765
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 12 of 178

the merits of the Plan. Any representation to the contrary is a criminal offense. This Disclosure Statement does not constitute an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction.

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The Debtor considers all statements regarding anticipated or future matters to be forward-looking statements. Forward-looking statements may include statements about:

- the effects of insolvency proceedings on the Debtor's business and relationships with its creditors;

- business strategy;

- financial condition, revenues, cash flows, and expenses;

- financial strategy, budget, projections, and operating results;

- variation from projected operating and financial data;

- substantial capital requirements;

- availability and terms of capital;

- plans, objectives, and expectations;

- the adequacy of the Debtor's capital resources and liquidity; and

- the Claimant Trust's or the Reorganized Debtor's ability to satisfy future cash obligations.

Statements concerning these and other matters are not guarantees of the Claimant Trust's or Reorganized Debtor's future performance. There are risks, uncertainties, and other important factors that could cause the Claimant Trust's or Reorganized Debtor's actual performance or achievements to be different from those that may be projected. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and is not necessarily in accordance with federal or state securities laws or other similar laws.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 01/06/25804   Page 148 of 1017   PageID 13775
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 20 of 1803   PageID 10766
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 13 of 178

      **No legal or tax advice is provided to you by this Disclosure Statement. The Debtor urges each Holder of a Claim or an Equity Interest to consult with its own advisers with respect to any legal, financial, securities, tax or business advice in reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby. Further, the Bankruptcy Court's approval of the adequacy of disclosures contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Plan or a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein.**

      **Pachulski Stang Ziehl & Jones LLP ("PSZ&J") is general insolvency counsel to the Debtor. Development Specialists, Inc. ("DSI") is the Debtor's financial advisor. PSZ&J, DSI, and the Independent Board (as defined below) have relied upon information provided by the Debtor in connection with preparation of this Disclosure Statement. PSZ&J has not independently verified the information contained herein.**

      **This Disclosure Statement contains, among other things, summaries of the Plan, the management of the Reorganized Debtor, the Claimant Trust, certain statutory provisions, certain events in the Debtor's Chapter 11 Case, and certain documents related to the Plan that are attached hereto and incorporated herein by reference or that may be filed later with the Plan Supplement. Although the Debtor believes that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that the summaries do not set forth the entire text of such documents or statutory provisions or every detail of such events. In the event of any conflict, inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern and control for all purposes. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtor's management. The Debtor does not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.**

      **In preparing this Disclosure Statement, the Debtor relied on financial data derived from the Debtor's books and records and on various assumptions regarding the Debtor's business. The Debtor's management has reviewed the financial information provided in this Disclosure Statement. Although the Debtor has used its reasonable business judgment to ensure the accuracy of this financial information, the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been audited (unless otherwise expressly provided herein) and no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtor's business and its, the Reorganized Debtor's, and the Claimant Trust's future results. The Debtor expressly cautions readers not to place undue reliance on any forward-looking statements contained herein.**

      **This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation or waiver. Rather, this Disclosure Statement shall constitute a statement made in settlement negotiations related to potential contested matters, potential adversary proceedings and other pending or threatened litigation or actions.**

Appellee Appx. 00014
Appx. 00365
012827

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 02/06/25804    Page 149 of 1017    PageID 13776
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 21 of 1803    PageID 10767
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 14 of 178

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in the Disclosure Statement. Except as provided under the Plan, the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, may seek to investigate, file and prosecute Claims and Causes of Action and may object to Claims or Equity Interests after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies any such Claims or Equity Interests or objections to Claims or Equity Interests on the terms specified in the Plan.

The Debtor is generally making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof where feasible, unless otherwise specifically noted. Although the Debtor may subsequently update the information in this Disclosure Statement, the Debtor has no affirmative duty to do so. Holders of Claims and Equity Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since the Disclosure Statement was sent. Information contained herein is subject to completion, modification, or amendment. The Debtor reserves the right to file an amended or modified Plan and related Disclosure Statement from time to time.

The Debtor has not authorized any Entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Debtor has not authorized any representations concerning the Debtor or the value of its property other than as set forth in this Disclosure Statement.

Holders of Claims or Equity Interests must rely on their own evaluation of the Debtor and their own analyses of the terms of the Plan in considering the Plan. Importantly, each Holder of a Claim should review the Plan in its entirety and consider carefully all of the information in this Disclosure Statement and any exhibits hereto, including the risk factors described in greater detail in ARTICLE IV herein, "Risk Factors."

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims against, and Holders of Equity Interests in, the Debtor will be bound by the terms of the Plan and the transactions contemplated thereby.

The effectiveness of the Plan is subject to certain material conditions precedent described herein and set forth in Article IX of the Plan. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to become effective will be satisfied (or waived).

- 4 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 02/30/25 804 Page 150 of 1017    PageID 13777
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 22 of 1803    PageID 10768
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 15 of 178

## EXHIBITS

**EXHIBIT A** – Plan of Reorganization

**EXHIBIT B** – Organizational Chart of the Debtor

**EXHIBIT C** – Liquidation Analysis/Financial Projections

> THE DEBTOR HEREBY ADOPTS AND INCORPORATES EACH EXHIBIT
> ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH
> FULLY SET FORTH HEREIN.

Appellee Appx. 00016
012829
Appx. 00307

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 04/04/25804   Page 151 of 1017   PageID 13778
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 23 of 1803   PageID 10769
Case 19-34054-sgj11   Doc 1473   Filed 11/24/20   Entered 11/24/20 10:24:41   Page 16 of 178

# ARTICLE I.
## EXECUTIVE SUMMARY

**This Disclosure Statement is provided for informational purposes only.**

**In the opinion of the Debtor, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for the highest distributions to the Debtor's creditors and interest holders. The Debtor believes that any delay in confirmation of the Plan would result in significant administrative expenses resulting in less value available to the Debtor's constituents. In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Equity Interests than that which is proposed under the Plan. Accordingly, the Debtor recommends that all Holders of Claims and Equity Interests support confirmation of the Plan.**

This Executive Summary is being provided to Holders of Allowed Claims and Equity Interests as an overview of the material items addressed in the Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (including all exhibits attached hereto and to the Plan and the Plan Supplement), and should not be relied upon for a comprehensive discussion of the Disclosure Statement and/or the Plan. Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization or liquidation. As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code. This Disclosure Statement includes, without limitation, information about:

- the Debtor's operating and financial history;

- the significant events that have occurred to date;

- the Confirmation process; and

- the terms and provisions of the Plan, including key aspects of the Claimant Trust and the Reorganized Debtor, certain effects of Confirmation of the Plan, certain risk factors relating to the Plan, and the manner in which distributions will be made under the Plan.

The Debtor believes that any alternative to Confirmation of the Plan would result in significant delays, litigation, and additional costs, and ultimately would diminish the Debtor's value. **Accordingly, the Debtor strongly supports confirmation of the Plan.**

## A.     Summary of the Plan

The Plan represents a significant achievement for the Debtor. As discussed herein, the Plan provides that the Claimant Trust will receive the majority of the Debtor's assets, including Causes of Action. The assets being transferred to the Claimant Trust are referred to, collectively, as the Claimant Trust Assets. The Claimant Trust will – for the benefit of the Claimant Trust

Appellee Appx. 00017
Appx. 00208
012830

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 250 of 1804   Page 152 of 1017   PageID 13779
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 24 of 1803   PageID 10770
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 17 of 178

Beneficiaries – monetize the Claimant Trust Assets, pursue the Causes of Action, and work to conclude the various lawsuits and litigation claims pending against the Estate.

The Plan also provides for the reorganization of the Debtor. This will be accomplished by the cancellation of the Debtor's current Equity Interests, which consist of partnership interests held by: The Dugaboy Investment Trust;[3] the Hunter Mountain Investment Trust ("Hunter Mountain"); Mark Okada, personally and through family trusts; and Strand, the Debtor's general partner. On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. The Reorganized Debtor will be managed by the Claimant Trust, as the managing member of New GP LLC.

The Reorganized Debtor will oversee the monetization of the Reorganized Debtor Assets, which consist of, among other Assets, the management of the Managed Funds. The net proceeds from the Reorganized Debtor Assets will ultimately be distributed to the Claimant Trust and available for distribution to the Claimant Trust Beneficiaries.

The following is an overview of certain other material terms of the Plan:

- Allowed Priority Non-Tax Claims will be paid in full;

- Allowed Retained Employee Claims will be Reinstated;

- Allowed Convenience Claims will receive the lesser of (i) 85% of their Allowed Claim or (ii) such Holder's Pro Rata share of the Convenience Claims Cash Pool (*i.e.*, $13,150,000). Holders of Convenience Claims can elect the treatment provided to General Unsecured Claims by making the GUC Election on their Ballots;

- Allowed General Unsecured Claims and Allowed Subordinated Claims will receive their Pro Rata share of Claimant Trust Interests. The Claimant Trust Interests distributed to Allowed General Unsecured Claims will be senior to those distributed to Allowed Subordinated Claims as set forth in the Claimant Trust Agreement. Holders of General Unsecured Claims that are liquidated as of the Confirmation Date can elect the treatment provided to Convenience Class Election by reducing their Claims to $1,000,000 and making the Convenience Class Election on their Ballots; and

- Allowed Class B/C Limited Partnership Interests and Allowed Class A Limited Partnership Interests will receive their Pro Rata share of the Contingent Claimant Trust Interests.

---

[3] The Dugaboy Investment Trust is a Delaware trust created to manage the assets of James Dondero and his family.

Appellee Appx. 00018
Appx. 00360
012831

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 6   Filed 06/23804 Page 153 of 1017   PageID 13780
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 25 of 1803   PageID 10771
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 18 of 178

**B.      An Overview of the Chapter 11 Process**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Pursuant to chapter 11 of the Bankruptcy Code, a debtor may remain in possession of its assets and business and attempt to reorganize its business for the benefit of such debtor, its creditors, and other parties in interest.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by a bankruptcy court makes the plan binding upon the debtor and any creditor of or interest holder in the debtor, whether or not such creditor or interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.

The commencement of a Chapter 11 case creates an estate comprised of all of the legal and equitable interests of a debtor in property as of the date that the bankruptcy petition is filed. Sections 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession," unless the bankruptcy court orders the appointment of a trustee.  The filing of a bankruptcy petition also triggers the automatic stay provisions of section 362 of the Bankruptcy Code which provide, among other things, for an automatic stay of all attempts to collect prepetition claims from a debtor or otherwise interfere with its property or business.  Except as otherwise ordered by the bankruptcy court, the automatic stay generally remains in full force and effect until the consummation of a plan of reorganization or liquidation, following confirmation of such plan of reorganization.

The Bankruptcy Code provides that upon commencement of a chapter 11 bankruptcy case, the Office of the United States Trustee may appoint a committee of unsecured creditors and may, in its discretion, appoint additional committees of creditors or of equity interest holders if necessary to assure adequate representation.  Please see ARTICLE II for a discussion of the U.S. Trustee and the statutory committees.

Upon the commencement of a chapter 11 bankruptcy case, all creditors and equity interest holders generally have standing to be heard on any issue in the chapter 11 proceedings pursuant to section 1109(b) of the Bankruptcy Code.

The formulation and confirmation of a plan is the principal objective of a chapter 11 case. The plan sets forth the means of satisfying the claims against and equity interests in the debtor.

**C.      Purpose and Effect of the Plan**

1.      <u>The Plan of Reorganization</u>

The Debtor is reorganizing pursuant to chapter 11 of the Bankruptcy Code.  As a result, the Confirmation of the Plan means that the Debtor's business will continue to operate following confirmation of the Plan through the Claimant Trust and the Reorganized Debtor to monetize assets for distribution to Holders of Allowed Claims.  The Claimant Trust will hold the Claimant Trust Assets and manage the efficient monetization of, the Claimant Trust Assets.  The Claimant Trust will also manage the Reorganized Debtor through the Claimant Trust's ownership of the Reorganized Debtor's general partner, New GP LLC.  The Claimant Trust will also be the sole limited partner in the Reorganized Debtor.  The Reorganized Debtor will manage the wind down

- 8 -

Appellee Appx. 00019
Appx. 00379
012832

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-8    Filed 02/25/804    Page 154 of 1017    PageID 13781
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 26 of 1803    PageID 10772
Case 19-34054-sgj11  Doc 1473  Filed 11/24/20    Entered 11/24/20 10:24:41    Page 19 of 178

of the Managed Funds as well as the monetization of the balance of the Reorganized Debtor Assets. The Claimant Trust will also establish a Litigation Sub-Trust in accordance with the Plan, which will also be for the benefit of the Claimant Trust Beneficiaries. The Litigation Sub-Trust will receive the Estate Claims. The Litigation Trustee shall be the exclusive trustee of the Estate Claims included in the Claimant Trust Assets subject to oversight by the Claimant Trust Oversight Committee

A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or an equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such Entity voted on the plan or affirmatively voted to reject the plan.

2.    <u>Plan Overview</u>

The Plan provides for the classification and treatment of Claims against and Equity Interests in the Debtor. For classification and treatment of Claims and Equity Interests, the Plan designates Classes of Claims and Classes of Equity Interests. These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Equity Interests.

The following chart briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan.[4] Amounts listed below are estimated.

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for eight Classes of Claims against and/or Equity Interests in the Debtor.

**The projected recoveries set forth in the table below are estimates only and therefore are subject to change. For a complete description of the Debtor's classification and treatment of Claims or Equity Interests, reference should be made to the entire Plan and the risk factors described in ARTICLE IV below. For certain classes of Claims, the actual amount of Allowed Claims could be materially different than the estimated amounts shown in the table below.**

---

[4] This chart is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. References should be made to the entire Disclosure Statement and the Plan for a complete description.

- 9 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 2/30/25804    Page 155 of 1017    PageID 13782
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 27 of 1803    PageID 10773
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 20 of 178

| Class | Type of Claim or Interest | Estimated Prepetition Claim Amount [1] | Impaired | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|---|
| 1 | Jefferies Secured Claim | $0.00 | No | No | 100% |
| 2 | Frontier Secured Claim[2] | $5,209,964 | Yes | Yes | 100% |
| 3 | Other Secured Claims | $551,116 | No | No | 100% |
| 4 | Priority Non-Tax Claim | $16,489 | No | No | 100% |
| 5 | Retained Employee Claim | $0 | No | No | 100% |
| 6 | PTO Claims [3] | $1,181,886 | No | No | 100% |
| 7 | Convenience Claims[4] | $12,064,333 | Yes | Yes | 85.00% |
| 8 | General Unsecured Claims[5] | $180,442,199 | Yes | Yes | 85.31% |
| 9 | Subordinated Claims | Undetermined | Yes | Yes | Undetermined |
| 10 | Class B/C Limited Partnership Interests | N/A | Yes | Yes | Undetermined |
| 11 | Class A Limited Partnership Interests | N/A | Yes | Yes | Undetermined |

[1] Excludes Priority Tax Claims and certain other unclassified amounts totaling approximately $1.1 million owed to Joshua and Jennifer Terry and Acis under a settlement agreement.

[2] Excludes interest accrued postpetition estimated at $318,000, which will be paid on the Effective Date. The Liquidation Analysis/Financial Projections provide for the payment of postpetition interest.

[3] Represents outstanding PTO Claims as of September 30, 2020. PTO Claims are subject to adjustment depending on the amount of actual prepetition PTO Claims outstanding as of the Effective Date. PTO claims are accounted for in the Liquidation Analysis/Financial Projections as an administrative claim and will be paid out in ordinary courses pursuant to applicable state law.

[4] Represents the estimated gross prepetition amount of Convenience Claims with a total payout amount estimated at 85% of $12.06 million, or $10.25 million. This number includes approximately $1.113 million of potential Rejection Claims and assumes that Holders of Allowed General Unsecured Claims that are each less than $2.50 million opt into the Convenience Class.

[5] Assumes no recovery for UBS, the HarbourVest Entities, IFA, Hunter Mountain, and an Allowed Claim of only $3,722,019 for Mr. Daugherty (each as discussed further below). Assumes $1.440 million of potential rejection damage claims. The Liquidation Analysis/Financial Projections assume Highland RCP, LP and Highland RCP Offshore, LP offset their Claim of $4.4 million against amounts owed to the Debtor.

    3.    <u>Voting on the Plan</u>

Under the Bankruptcy Code, acceptance of a plan by a Class of Claims or Equity Interests is determined by calculating the number and the amount of Claims voting to accept, based on the actual total Allowed Claims or Equity Interests voting on the Plan. Acceptance by a Class of Claims requires more than one-half of the number of total Allowed Claims in the Class to vote in favor of the Plan and at least two-thirds in dollar amount of the total Allowed Claims in the Class to vote in favor of the Plan. Acceptance by a Class of Equity Interests requires at least two-thirds in amount of the total Allowed Equity Interests in the Class to vote in favor of the Plan.

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 25-18 6 Filed 0/90/25804 Page 156 of 1017 PageID 13783
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 28 of 1803 PageID 10774
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 21 of 178

Under the Bankruptcy Code, only Classes of Claims or Equity Interests that are "Impaired" and that are not deemed as a matter of law to have rejected a plan under Section 1126 of the Bankruptcy Code are entitled to vote to accept or reject the Plan. Any Class that is "Unimpaired" is not entitled to vote to accept or reject a plan and is conclusively presumed to have accepted the Plan. As set forth in Section 1124 of the Bankruptcy Code, a Class is "Impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that Class are modified or altered.

Pursuant to the Plan, Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims and Equity Interests in those Classes are entitled to vote to accept or reject the Plan. Whether a Holder of a Claim or Equity Interest in Class 2 and Class 7 through Class 11 may vote to accept or reject the Plan will also depend on whether the Holder held such Claim or Equity Interest as of November 23, 2020 (the "Voting Record Date"). The Voting Record Date and all of the Debtor's solicitation and voting procedures shall apply to all of the Debtor's Creditors and other parties in interest.

Pursuant to the Plan, Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

Pursuant to the Plan, there are no Classes that will not receive or retain any property and no Classes are deemed to reject the Plan.

4.      Confirmation of the Plan

(a)      Confirmation Generally

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation. The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed below.

The confirmation of a plan by the Bankruptcy Court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan discharges a debtor from any debt that arose before the confirmation of such plan and provides for the treatment of such debt in accordance with the terms of the confirmed plan.

(b)      The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

The Debtor will provide notice of the Confirmation Hearing to all necessary parties. The Confirmation Hearing may be adjourned from time to time without further notice except for an

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 06/30/25804   Page 157 of 1017   PageID 13784
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 29 of 1803   PageID 10775
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 22 of 178

announcement of the adjourned date made at the Confirmation Hearing of any adjournment thereof.

     5.      <u>Confirming and Effectuating the Plan</u>

     It is a condition to the Effective Date of the Plan that the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtor and the Official Committee of Unsecured Creditors (the "<u>Committee</u>").  Certain other conditions contained in the Plan must be satisfied or waived pursuant to the provisions of the Plan.

     6.      <u>Rules of Interpretation</u>

     The following rules for interpretation and construction shall apply to this Disclosure Statement:  (1) capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meaning ascribed to such terms in the Plan; (2) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document shall be a reference to such document in the particular form or substantially on such terms and conditions described; (3) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references in this Disclosure Statement to Sections are references to Sections of this Disclosure Statement; (6) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in this Disclosure Statement; (7) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (8) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

     7.      <u>Distribution of Confirmation Hearing Notice and Solicitation Package to Holders of Claims and Equity Interests</u>

     As set forth above, Holders of Claims in Class 1 and Class 3 through Class 6 are not entitled to vote on the Plan.  As a result, such parties will not receive solicitation packages or ballots but, instead, will receive this a notice of non-voting status, a notice of the Confirmation Hearing, and instructions on how to receive a copy of the Plan and Disclosure Statement.

     The Debtor, with the approval of the Bankruptcy Court, has engaged Kurtzman Carson Consultants LLC (the "<u>Voting Agent</u>") to serve as the voting agent to process and tabulate Ballots for each Class entitled to vote on the Plan and to generally oversee the voting process. The following materials shall constitute the solicitation package (the "<u>Solicitation Package</u>"):

- This Disclosure Statement, including the Plan and all other Exhibits annexed thereto;

Appellee Appx. 00023
Appx. 00274
012836

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 6 Filed 3006125804 Page 158 of 1017 PageID 13785
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 30 of 1803 PageID 10776
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 23 of 178

- The Bankruptcy Court order approving this Disclosure Statement (the "Disclosure Statement Order") (excluding exhibits);

- The notice of, among other things, (i) the date, time, and place of the hearing to consider Confirmation of the Plan and related matters and (ii) the deadline for filing objections to Confirmation of the Plan (the "Confirmation Hearing Notice");

- A single Ballot, to be used in voting to accept or to reject the Plan and applicable instructions with respect thereto (the "Voting Instructions");

- A pre-addressed, postage pre-paid return envelope; and

- Such other materials as the Bankruptcy Court may direct or approve.

The Debtor, through the Voting Agent, will distribute the Solicitation Package in accordance with the Disclosure Statement Order. The Solicitation Package is also available at the Debtor's restructuring website at www.kccllc.net/hcmlp.

On November 13, 2020, the Debtor filed the Plan Supplement [D.I. 1389] that included, among other things, the form of Claimant Trust Agreement, the Litigation Sub-Trust Agreement, the Reorganized Limited Partnership Agreement, New GP LLC Documents, the New Frontier Note, the Senior Employee Stipulation, and the identity of the initial members of the Claimant Trust Oversight Committee. The Plan Supplement also includes a schedule of the Causes of Action that will be retained after the Effective Date. The Plan Supplement may be supplemented or amended through and including December 18, 2020. If the Plan Supplement is supplemented, such supplemented documents will be made available on the Debtor's restructuring website at www.kccllc.net/hcmlp.

If you are the Holder of a Claim or Equity Interest and believe that you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Voting Agent by writing to Kurtzman Carson Consultants LLC, via email at HighlandInfo@kccllc.com and reference "Highland Capital Management, L.P." in the subject line or by telephone at toll free: (877) 573-3984, or international: (310) 751-1829. If your Claim or Equity Interest is subject to a pending claim objection and you wish to vote on the Plan, you must file a motion pursuant to Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim or Equity Interest for voting purposes or you will not be entitled to vote to accept or reject the Plan. Any such motion must be filed so that it is heard in sufficient time prior to the Voting Deadline to allow for your vote to be tabulated.

**THE DEBTOR, THE REORGANIZED DEBTOR, AND THE CLAIMANT TRUSTEE, AS APPLICABLE, RESERVE THE RIGHT THROUGH THE CLAIM OBJECTION PROCESS TO OBJECT TO OR SEEK TO DISALLOW ANY CLAIM OR EQUITY INTEREST FOR DISTRIBUTION PURPOSES.**

- 13 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 32 of 25804   Page 159 of 1017   PageID 13786
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 31 of 1803   PageID 10777
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 24 of 178

8.    Instructions and Procedures for Voting

All votes to accept or reject the Plan must be cast by using the Ballots enclosed with the Solicitation Packages or otherwise provided by the Debtor or the Voting Agent. No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise. The Bankruptcy Court has fixed November 23, 2020, as the Voting Record Date for the determination of the Holders of Claims and Equity Interests who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan. The Voting Record Date and all of the Debtor's solicitation and voting procedures shall apply to all of the Debtor's Creditors and other parties in interest.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot.

**The deadline to vote on the Plan is January 5, 2021 at 5:00 p.m. (prevailing Central Time) (the "Voting Deadline")**. In order for your vote to be counted, your Ballot must be properly completed in accordance with the Voting Instructions on the Ballot, and received no later than the Voting Deadline at the following address, as applicable:

**If by first class mail, personal delivery, or overnight mail to:**

**HCMLP Ballot Processing Center**
**c/o KCC**
**222 N. Pacific Coast Highway, Suite 300**
**El Segundo, CA 90245**

**If by electronic voting:**

**You may submit your Ballot via the Balloting Agent's online portal. Please visit http://www.kccllc.net/hcmlp and click on the "Submit Electronic Ballot" section of the website and follow the instructions to submit your Ballot. IMPORTANT NOTE: You will need the Unique Electronic Ballot ID Number and the Unique Electronic Ballot PIN Number set forth on your customized ballot in order to vote via the Balloting Agent's online portal. Each Electronic Ballot ID Number is to be used solely for voting on those Claims or Interests on your electronic ballot. You must complete and submit an electronic ballot for each Electronic Ballot ID Number you receive, as applicable. Parties who cast a Ballot using the Balloting Agent's online portal should NOT also submit a paper Ballot.**

Only the Holders of Claims and Equity Interests in Class 2 and Class 7 through Class 11 as of the Voting Record Date are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning them in the envelope provided to the Voting Agent so as to be actually received by the Voting Agent by the Voting Deadline. Each Holder of a Claim and Equity Interest must vote its entire Claim or Equity Interest, as applicable, within a particular Class either to accept or reject the Plan and may not split such votes. If multiple Ballots are received from the same Holder with respect to the same Claim or Equity Interest prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to

Appellee Appx. 00025
Appx. 00276
012838

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 03/25804   Page 160 of 1017   PageID 13787
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 32 of 1803   PageID 10778
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 25 of 178

reflect that voter's intent and will supersede and revoke any prior Ballot.  The Ballots will clearly indicate the appropriate return address.  It is important to follow the specific instructions provided on each Ballot.

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS.  IT IS IMPORTANT THAT THE HOLDER OF A CLAIM OR EQUITY INTEREST IN THE CLASSES ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

If you have any questions about (a) the procedure for voting your Claim or Equity Interest, (b) the Solicitation Package that you have received, or (c) the amount of your Claim or Equity Interest, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any appendices or Exhibits to such documents, please contact the Voting Agent at the address specified above.  Copies of the Plan, Disclosure Statement and other documents filed in these Chapter 11 Case may be obtained free of charge on the Voting Agent's website at www.kccllc.net/hcmlp or by calling toll free at: (877) 573-3984, or international at: (310) 751-1829.  You may also obtain copies of pleadings filed in the Debtor's case for a fee via PACER at pacer.uscourts.gov.  Subject to any rules or procedures that have or may be implemented by the Court as a result of the COVID 19 Pandemic, documents filed in this case may be examined between the hours of 8:00 a.m. and 4:00 p.m., prevailing Central Time, Monday through Friday, at the Office of the Clerk of the Bankruptcy Court, Earle Cabell Federal Building, 1100 Commerce Street, Room 1254, Dallas, Texas 75242-1496.

The Voting Agent will process and tabulate Ballots for the Classes entitled to vote to accept or reject the Plan and will file a voting report (the "Voting Report") by January 11, 2021.  The Voting Report will, among other things, describe every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late, illegible (in whole or in material part), unidentifiable, lacking signatures, lacking necessary information, or damaged.

**THE DEBTOR URGES HOLDERS OF CLAIMS AND EQUITY INTERESTS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN BY THE VOTING DEADLINE.**

9.    The Confirmation Hearing

**The Bankruptcy Court has scheduled Confirmation Hearing Dates on January 13, 2021, and January 14, 2021, at 9:30 a.m. prevailing Central time.**  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtor without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-18   Exhibit 6   Filed 04/06/25804   Page 161 of 1017   PageID 13788
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 33 of 1803   PageID 10779
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 26 of 178

10.     The Deadline for Objecting to Confirmation of the Plan

**The Bankruptcy Court has set a deadline of January 5, 2021, at 5:00 p.m. prevailing Central time, for the filing of objections to confirmation of the Plan (the "Confirmation Objection Deadline")**.  Any objection to confirmation of the Plan must:  (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name of the objecting party and the amount and nature of the Claim of such Entity or the amount of Equity Interests held by such Entity; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the parties set forth below (the "Notice Parties").

**CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.  INSTRUCTIONS WITH RESPECT TO THE CONFIRMATION HEARING AND DEADLINES WITH RESPECT TO CONFIRMATION WILL BE INCLUDED IN THE NOTICE OF CONFIRMATION HEARING APPROVED BY THE BANKRUPTCY COURT.**

11.     Notice Parties

- Debtor:  Highland Capital Management, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201 (Attn:  James P. Seery, Jr.);

- Counsel to the Debtor:  Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California 90067-4003 (Attn:  Jeffrey Pomerantz, Esq.; Ira Kharasch, Esq., and Gregory Demo, Esq.);

- Counsel to the Committee:  Sidley Austin, LLP, One South Dearborn, Chicago, Illinois 60603 (Attn:  Matthew Clemente, Esq., and Alyssa Russell, Esq.); and

- Office of the United States Trustee, 1100 Commerce Street, Room 976, Dallas, Texas 75242 (Attn: Lisa Lambert, Esq.).

12.     Effect of Confirmation of the Plan

The Plan contains certain provisions relating to (a) the compromise and settlement of Claims and Equity Interests; (b) exculpation of certain parties; and (c) the release of claims against certain parties by the Debtor.

**The Plan shall bind all Holders of Claims against and Equity Interests in the Debtor to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder (i) will receive or retain any property or interest in property under the Plan, (ii) has filed a proof of claim in the Chapter 11 Case, or (iii) did not vote to accept or reject the Plan.**

Appellee Appx. 00027
Appx. 00278
0112840

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 35 of 25804    Page 162 of 1017    PageID 13789
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 34 of 1803    PageID 10780
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 27 of 178

**D.**     **Effectiveness of the Plan**

It will be a condition to the Effective Date of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article IX of the Plan.  Following confirmation, the Plan will go into effect on the Effective Date.

**E.**     **RISK FACTORS**

**Each Holder of a Claim or an Equity Interest is urged to consider carefully all of the information in this Disclosure Statement, including the risk factors described in ARTICLE IV herein titled, "Risk Factors."**

**ARTICLE II.**
**BACKGROUND TO THE CHAPTER 11 CASE AND SUMMARY OF BANKRUPTCY PROCEEDINGS TO DATE**

**A.**     **Description and History of the Debtor's Business**

Prior to the Petition Date, the Debtor was a multibillion-dollar global alternative investment manager founded in 1993 by James Dondero and Mark Okada.  A pioneer in the leveraged loan market, the firm evolved over twenty-five years, building on its credit expertise and value-based approach to expand into other asset classes.

As of the Petition Date, the Debtor operated a diverse investment platform, serving both institutional and retail investors worldwide.  In addition to high-yield credit, the Debtor's investment capabilities include public equities, real estate, private equity and special situations, structured credit, and sector- and region-specific verticals built around specialized teams.  Additionally, the Debtor provided shared services to its affiliated registered investment advisers.

**B.**     **The Debtor's Corporate Structure**

The Debtor is headquartered in Dallas, Texas.  The Debtor itself is a Delaware limited partnership and one of the principal operating arms of the Debtor's business.  As of the Petition Date, the Debtor employed approximately 76 people, including executive-level management employees, finance and legal staff, investment professionals, and back-office accounting and administrative personnel.

Pursuant to various contractual arrangements, the Debtor, as of the Petition Date, provided money management and advisory services for approximately $2.5 billion of assets under management shared services for approximately $7.5 billion of assets managed by a variety of affiliated and unaffiliated entities, including other affiliated registered investment advisors.  None of these affiliates filed for Chapter 11 protection.  As of September 30, 2020, the Debtor provided money management and advisory services for approximately $1.641 billion of assets under management and shared services for approximately $7.136 billion of assets managed by a variety of affiliated and unaffiliated entities, including other affiliated registered investment advisors.  Further, on the Petition Date, the value of the Debtor's Assets was approximately

- 17 -

012841

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 06/25/804   Page 163 of 1017   PageID 13790
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 35 of 1803   PageID 10781
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 28 of 178

$566.5 million. As of September 30, 2020, the total value of Debtor's Assets totaled approximately $328.3 million.

The drop in the value of the Debtor's Assets and assets under management was caused, in part, by the COVID-19 global pandemic. Specifically, the decline was the result of, among other things, the drop in value of the Debtor's assets generally, the loss of value in the Prime Accounts discussed below, the professional and other costs associated with the Chapter 11 Case, and the reserve of approximately $59 million against a loan receivable listed as an asset.

| Asset | | 10/16/2019 | 9/30/2020 |
|---|---|---|---|
| Investments (FV)[1] | | $232,620,000 | $109,479,000 |
| Investments (Equity) | | $161,819,000 | $101,213,000 |
| Cash/Cash Equivalents | | $2,529,000 | $5,888,000 |
| Management/Incentive | Fees | $2,579,000 | $3,350,000 |
| Receivable | | | |
| Fixed Assets, net | | $3,754,000 | $2,823,000 |
| Loan Receivables | | $151,901,000 | $93,445,000[2] |
| Other Assets | | $11,311,000 | $12,105,000 |
| | Totals | $566,513,000 | $328,302,000 |

[1] Includes decrease in value of assets, costs of Chapter 11 Cases, and assets sold to satisfy liabilities.

[2] Net of reserve of $59 million.

The Debtor's organizational chart is attached hereto as <u>Exhibit B</u>. The organizational chart is not all inclusive and certain entities have been excluded for the sake of brevity.

**C.     Business Overview**

The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates. For additional liquidity, the Debtor, prior to the Petition Date, would sell liquid securities in the ordinary course held through its prime brokerage account at Jefferies, LLC ("<u>Jefferies</u>"), as described in additional detail below. The Debtor would also, from time to time, sell assets at non-Debtor subsidiaries and distribute those proceeds to the Debtor in the ordinary course of business. During calendar year 2018, the Debtor's stand-alone annual revenue totaled approximately $50 million. During calendar year 2019, the Debtor's stand-alone revenue totaled approximately $36.1 million.

**D.     Prepetition Capital Structure**

1.     <u>Jefferies Margin Borrowings (Secured)</u>

The Debtor is party to that certain *Prime Brokerage Customer Agreement* with Jefferies dated May 24, 2013 (the "<u>Brokerage Agreement</u>"). Pursuant to the terms of the Brokerage Agreement and related documents, the Debtor maintains a prime brokerage account with

- 18 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 07/06/25804   Page 164 of 1017   PageID 13791
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 36 of 1803   PageID 10782
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 29 of 178

Jefferies (the "<u>Prime Account</u>"). A prime brokerage account is a unique type of brokerage account that allows sophisticated investors to, among other things, borrow both money on margin to purchase securities and common stock to facilitate short positions. A prime brokerage account also serves as a custodial account and holds client securities in the prime broker's street name.

As of the Petition Date, the Debtor held approximately $57 million of equity in liquid and illiquid securities (the "<u>Securities</u>") in the Prime Account. Pursuant to the Brokerage Agreement, the Debtor granted a lien in favor of Jefferies in the Securities and all of the proceeds thereof.

However, because of the economic distress caused by the COVID-19 global pandemic, the value of the Securities held in the Prime Account dropped since the Petition Date, and Jefferies has exerted significant pressure on the Debtor to liquidate the Securities to satisfy margin calls. As of September 30, 2020, the equity value of the Securities in the Prime Account was approximately $23.3 million, and the Debtor owed no amounts to Jefferies. The Debtor has been actively selling Securities to cover operating expenses and professional fees.

2.      <u>The Frontier Bank Loan (Secured)</u>

The Debtor and Frontier State Bank ("<u>Frontier Bank</u>") are parties to that certain *Loan Agreement* dated as of August 17, 2015 (the "<u>Original Frontier Loan Agreement</u>"), pursuant to which Frontier Bank loaned to the Debtor the aggregate principal amount of $9.5 million. On March 29, 2018, the Debtor and Frontier Bank entered into that certain First Amended and Restated Loan Agreement (the "<u>Amended Frontier Loan Agreement</u>"), amending and superseding the Original Frontier Loan Agreement. Pursuant to the Amended Frontier Loan Agreement, Frontier Bank made an additional $1 million loan to the Debtor (together with the borrowings under the Original Frontier Loan Agreement, the "<u>Frontier Loan</u>"). The Frontier Loan matures on August 17, 2021.

Pursuant to that certain Security and Pledge Agreement dated August 17, 2015, between Frontier Bank and the Debtor, as amended by the Amended Frontier Loan Agreement, the Debtor's obligations under the Frontier Loan are secured by 171,724 shares of voting common stock of MGM Holdings, Inc. (collectively, the "<u>Frontier Collateral</u>").

The aggregate principal balance of the Frontier Loan was approximately $5.2 million. As of September 30, 2020, the value of the Frontier Collateral was approximately $13.1 million, and approximately $318,000 in postpetition interest had accrued.

3.      <u>Other Unsecured Obligations</u>

As discussed below, the Plan provides for four Classes of unsecured claims: (i) PTO Claims, (ii) the Convenience Claims, (iii) the General Unsecured Claims, and (iv) the Subordinated Claims.

The Debtor has various substantial litigation claims asserted against it, which have been classified as General Unsecured Claims. In addition, as of the Petition Date, the Debtor had ordinary course trade debt, unaccrued employee bonus obligations and loan repayment, and

- 19 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 03/25/2804   Page 165 of 1017   PageID 13792
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 37 of 1803   PageID 10783
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 30 of 178

contractual commitments to various affiliated and unaffiliated non-Debtor entities for capital calls, contributions, and other potential reimbursement or funding obligations that were potentially in the tens of millions of dollars.  The Debtor is still assessing these claims and its liability for such amounts.  These Claims have been classified as Convenience Claims and Subordinated Claims.

    4.   <u>Equity Interests</u>

The Debtor is a Delaware limited partnership.  As of the Petition Date, the Debtor had three classes of limited partnership interest (Class A, Class B, and Class C).  The Class A interests were held by The Dugaboy Investment Trust, Mark Okada, personally and through family trusts, and Strand, the Debtor's general partner.  The Class B and C interests were held by Hunter Mountain.

In the aggregate, the Debtor's limited partnership interests were held: (a) 99.5% by Hunter Mountain; (b) 0.1866% by The Dugaboy Investment Trust, (c) 0.0627% by Mark Okada, personally and through family trusts, and (d) 0.25% by Strand.

**E.    SEC Filings**

The Debtor is an investment adviser registered with the SEC as required by the Investment Advisers Act of 1940.  As a registered investment adviser, the Debtor is required to file (at least annually) a Form ADV.  The Debtor's current Form ADV is available at https://adviserinfo.sec.gov/.

Following the Effective Date, it is anticipated that the Reorganized Debtor will maintain its registration with the SEC as a registered investment adviser.

**F.    Events Leading Up to the Debtor's Bankruptcy Filings**

The Chapter 11 Case was precipitated by the rendering of an Arbitration Award (as that term is defined below) against the Debtor on May 9, 2019, by a panel of the American Arbitration Association (the "<u>Panel</u>"), in favor of the Redeemer Committee of the Highland Crusader Fund (the "<u>Redeemer Committee</u>").

The Debtor was formerly the investment manager for the Highland Crusader Funds (the "<u>Crusader Funds</u>") that were formed between 2000 and 2002.  In September and October 2008, as the financial markets in the United States began to fail, the Debtor was flooded with redemption requests from Crusader Funds' investors, as the Crusader Funds' assets lost significant value.

On October 15, 2008, the Debtor placed the Crusader Funds in wind-down, thereby compulsorily redeeming the Crusader Funds' limited partnership interests. The Debtor also declared that it would liquidate the Crusader Funds' remaining assets and distribute the proceeds to investors.

However, disputes concerning the distribution of the assets arose among certain investors.  After several years of negotiations, a Joint Plan of Distribution of the Crusader Funds

- 20 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 06/25/04   Page 166 of 1017   PageID 13793
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 38 of 1803   PageID 10784
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 31 of 178

(the "Crusader Plan"), and the Scheme of Arrangement between Highland Crusader Fund and its Scheme Creditors (the "Crusader Scheme"), were adopted in Bermuda and became effective in August 2011. As part of the Crusader Plan and the Crusader Scheme, the Redeemer Committee was elected from among the Crusader Funds' investors to oversee the Debtor's management of the Crusader Funds.

Between October 2011 and January 2013, in accordance with the Crusader Plan and the Crusader Scheme, the Debtor distributed in excess of $1.2 billion to the Crusader Funds' investors. The Debtor distributed a further $315.3 million through June 2016.

However, disputes subsequently arose between the Redeemer Committee and the Debtor. On July 5, 2016, the Redeemer Committee (a) terminated and replaced the Debtor as investment manager of the Crusader Fund, (b) commenced an arbitration against the Debtor (the "Arbitration"), and (c) commenced litigation in Delaware Chancery Court, to, among other things, obtain a status quo order in aid of the arbitration, which order was subsequently entered.

Following an evidentiary hearing, the Panel issued (a) a *Partial Final Award,* dated March 6, 2019 (the "March Award"), (b) a *Disposition of Application for Modification of Award,* dated March 14, 2019 (the "Modification Award"), and (c) a *Final Award,* dated May 9, 2019 (the "Final Award" and together with the March Award and the Modification Award, the "Arbitration Award"). Pursuant to the Arbitration Award, the Redeemer Committee was awarded gross damages against the Debtor in the aggregate amount of $136,808,302; as of the Petition Date, the total value of the Arbitration Award was $190,824,557, inclusive of interest

Prior to the Petition Date, the Redeemer Committee moved in the Chancery Court to confirm the Arbitration Award. For its part, the Debtor moved to vacate parts of the Final Award contending that certain aspects were procedurally improper. The Redeemer Committee's motion to confirm the Arbitration Award and the Debtor's motion to vacate were fully briefed and were scheduled to be heard by the Chancery Court on the day the Debtor filed for bankruptcy

On the Petition Date, the Debtor believed that the aggregate value of its assets exceeded the amount of its liabilities; however, the Debtor filed the Chapter 11 Case because it did not have sufficient liquidity to immediately satisfy the Award or post a supersedeas bond necessary to pursue an appeal.

## G.    Additional Prepetition Litigation

In addition to the litigation with the Redeemer Committee described above, the Debtor, both directly and through certain subsidiaries, affiliates, and related entities, was party to substantial prepetition litigation. Although the Debtor disputes the allegations raised in this litigation and believes it has substantial defenses, this litigation has resulted in substantial Claims against the Debtor's Estate, each of which has been classified as a General Unsecured Claim. To the extent that these litigation Claims cannot be resolved consensually, they will be litigated by the Claimant Trustee or Reorganized Debtor, as applicable. The Debtor's major prepetition litigation is as follows:

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 04/06/25804   Page 167 of 1017   PageID 13794
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 39 of 1803   PageID 10785
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 32 of 178

- Redeemer Committee:  The dispute with the Redeemer Committee is described in ARTICLE II.F above.  As discussed in ARTICLE II.R, the Bankruptcy Court entered an order approving a settlement that resolves the Redeemer Committee's claims against the Estate; however, that order is currently subject to appeal.

- Acis Capital Management, L.P., & Acis Capital Management GP, LLC:   On January 30, 2018, Joshua Terry filed involuntary bankruptcy petitions against both Acis Capital Management, L.P. ("Acis LP") and its general partner, Acis Capital Management GP, LLC ("Acis GP," and collectively with Acis LP, "Acis") in the Bankruptcy Court for the Northern District of Texas, Dallas Division, the Honorable Judge Jernigan presiding (the same judge presiding over the Chapter 11 Case), Case No. 18-30264-SGJ (the "Acis Case").  Mr. Terry had been an employee of the Debtor and a limited partner of Acis LP.  Mr. Terry was terminated in June 2016, and obtained a multi-million dollar arbitration award against Acis.  Overruling various objections, the Bankruptcy Court entered the orders for relief for the Acis debtors in April 2018, and a chapter 11 trustee was appointed.  The Debtor filed a proof of claim against Acis and an administrative claim.  Acis disputes the Debtor's claim, and the Debtor has not received any distributions on its claim to date.  On January 31, 2019, Acis's chapter 11 plan was confirmed, and Mr. Terry become the sole owner of reorganized Acis. Several appeals remain pending, including an appeal of the entry of the Acis orders for relief and the Acis confirmation order.

  The Acis trustee commenced a lawsuit against the Debtor, among others, alleging fraudulent conveyance and other causes of action in relation to the Debtor's alleged prepetition effort to control and transfer away Acis's assets to avoid paying Mr. Terry's claim.  After the confirmation of the Acis plan, reorganized Acis allegedly supplanted the Acis Trustee as plaintiff and filed an amended complaint against the Debtor and other defendants, which claims comprise Acis's pending proof of claim against the Debtor.

  As discussed in ARTICLE II.R, the Bankruptcy Court entered an order approving a settlement that resolves  Acis's claims against the Estate; however, that order is currently subject to appeal.

- UBS Securities LLC and UBS AG London Branch:  UBS Securities LLC ("UBS Securities") filed a proof of claim in the amount of $1,039,957,799.40 [Claim No. 190] (the "UBS Securities Claim"), and UBS AG, London Branch ("UBS London," and together with UBS Securities, "UBS") filed a substantively identical proof of claim in the amount of $1,039,957,799.40 [Claim No. 191] (the "UBS London Claim" and together with the UBS Securities Claim, the "UBS Claim").  The UBS Claim was based on the amount of a judgment UBS received on a breach of contract claim against funds related to the Debtor that were unable to honor margin calls in 2008.  Although the Debtor had no obligation under UBS's contracts with the funds, UBS alleges the Debtor is liable for the judgment because it (i) breached an alleged duty to ensure that the funds could pay UBS, (ii) caused or permitted $233 million in alleged fraudulent transfers to be made by

Appellee Appx. 00033
Appx. 00284
012846

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 6   Filed 4/10/25804 Page 168 of 1017    PageID 13795
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 40 of 1803   PageID 10786
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 33 of 178

Highland Financial Partners, L.P. ("HFP") in March 2009, and (iii) is an alter ego of the funds. The Debtor believes there are meritorious defenses to most, if not all, of the UBS Claim for numerous reasons, including: (i) decisions by the New York Appellate Division that limited UBS's claims to the March 2009 transfers that it alleges were fraudulent; (ii) those decisions should also apply to any alter ego claim (which at this time has not been formally asserted against the Debtor); (iii) UBS settled claims relating to $172 million of the $233 million in alleged fraudulent transfers and the Debtor is covered by the release; and (iv) the March 2009 transfers were in any event part of a wholly legitimate transaction that did not target UBS and for which HFP received fair consideration. Those and several additional defenses are described in the *Debtor's Objection to Proofs of Claim 190 and 191 of UBS Securities LLC and UBS AG, London Branch* [D.I. 928].

On October 19, 2020, both the Debtor and the Redeemer Committee filed motions seeking partial summary judgment of the UBS Claim, which, if granted, will significantly decrease the UBS Claim.[5] UBS responded to these motions on November 6, 2020 [D.I. 1341]. On November 20, 2020, the Bankruptcy Court granted partial summary judgment in favor of the Debtor and the Redeemer Committee. It is anticipated that the Bankruptcy Court will enter a formal order within the next couple of weeks.

- Patrick Daugherty: Patrick Daugherty has Filed a Proof of Claim for "at least $37,483,876.62" [Claim Nos. 67; 77] (the "Daugherty Claim").[6] Mr. Daugherty is a former limited partner and employee of the Debtor. The Daugherty Claim has three components, and Mr. Daugherty asserts claims: (1) for indemnification for any taxes Mr. Daugherty is required to pay as a result of the IRS audit of the Debtor's 2008-2009 tax return; (2) for defamation arising from a 2017 press release posted by the Debtor; and (3) arising from a pending Delaware lawsuit against the Debtor, which seeks to recover a judgment of $2.6 million in respect of Highland Employee Retention Assets ("HERA"), plus interest, from assets Mr. Daugherty claims were fraudulently transferred to the Debtor. The Daugherty Claim also seeks (a) the value of Mr. Daugherty's asserted interest in HERA, which he values at approximately $26 million; and (b) indemnification for fees incurred in the Delaware action and in previous litigation in Texas State Court. The Debtor believes that the Daugherty Claim should be allowed in the amount of

---

[5] See *Debtor's Motion for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 of UBS Securities LLC and UBS AG, London Branch* [D.I. 1180]; *Debtor's Opening Brief in Support of Motion for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 of UBS Securities LLC and UBS AG, London Branch* [D.I. 1181]; *Redeemer Committee of the Highland Crusader Fund and the Crusaders Funds' Motion for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 of UBS AG, London Branch and UBS Securities LLC* [D.I. 1183]; and *Redeemer Committee of the Highland Crusader Fund and the Crusaders Funds' Brief in Support of Motion for Partial Summary Judgment and Joinder in the Debtor's Motion for Partial Summary Judgment on Proof of Claim No. 190 and 191 of UBS AG, London Branch and UBS Securities LLC* [D.I. 1186].

[6] On October 23, 2020, Mr. Daugherty filed *Patrick Hagaman Daugherty's Motion for Leave to Amend Proof of Claim No. 77* [D.I. 1280] pursuant to which Mr. Daugherty has asked leave to amend the Daugherty Claim to assert damages of $40,710,819.42. On November 17, 2020, the Bankruptcy Court approved Mr. Daugherty's request to amend the Daugherty Claim from the bench.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 04/26/25804   Page 169 of 1017   PageID 13796
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 41 of 1803   PageID 10787
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 34 of 178

$3,722,019; however, the Debtor believes, for various reasons, that the balance of the Daugherty Claim lacks merit. The Debtor's defenses to the Daugherty Claim are described in the *Debtor's (i) Objection to Claim No. 77 of Patrick Hagaman Daugherty and (ii) Complaint to Subordinate Claim of Patrick Hagaman Daugherty* [D.I. 1008].

**H.    The Debtor's Bankruptcy Proceeding**

On October 16, 2019, the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"). On December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Chapter 11 Case to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court").[7] The Debtor continues to operate its business and manage its properties as debtor-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

An immediate effect of commencement of the Chapter 11 Case was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts, the enforcement of liens against property of the Debtor, and the continuation of litigation against the Debtor during the pendency of the Chapter 11 Case. The automatic stay will remain in effect, unless modified by the Bankruptcy Court, until the later of the Effective Date and the date indicated in any order providing for the implementation of such stay or injunction.

**I.    First Day Relief**

On or about the Petition Date, the Debtor filed certain "first day" motions and applications (the "First Day Motions") with the Delaware Bankruptcy Court seeking certain immediate relief to aid in the efficient administration of this Chapter 11 Case and to facilitate the Debtor's transition to debtor-in-possession status. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Frank Waterhouse in Support of First Day Motions* [D.I. 11] (the "First Day Declaration"). At a hearing on October 19, 2019, the Delaware Bankruptcy Court granted virtually all of the relief initially requested in the First Day Motions [D.I. 39, 40, 42-44].

The Delaware Bankruptcy Court subsequently entered an order authorizing the Debtor to pay critical vendor claims on a final basis [D.I. 168]. Following the transfer of the Chapter 11 Case to the Bankruptcy Court, the Bankruptcy Court entered an order authorizing the Debtor to continue its cash management system on a final basis [D.I. 379].

The First Day Motions, the First Day Declaration, and all orders for relief granted in this case can be viewed free of charge at https://www.kccllc.net/hcmlp.

---

[7] All docket reference numbers refer to the docket maintained by the Bankruptcy Court.

Appellee Appx. 00035
Appx. 00286
012848

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 04/30/25804   Page 170 of 1017   PageID 13797
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 42 of 1803   PageID 10788
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 35 of 178

**J.      Other Procedural and Administrative Motions**

On and after the Petition Date, the Debtor also filed a number of motions and applications to retain professionals and to streamline the administration of the Chapter 11 Case, including:

- _Interim Compensation Motion_.  On October 29, 2019, the Debtor filed the _Debtor's Motion Pursuant o Sections 105(a), 330 and 331 of the Bankruptcy Code for Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals_ [D.I. 72] (the "Interim Compensation Motion").  The Interim Compensation Motion sought to establish procedures for the allowance and payment of compensation and reimbursement of expenses for attorneys and other professionals whose retentions are approved by the Bankruptcy Court pursuant to section 327 or 1103 of the Bankruptcy Code and who will be required to file applications for allowance of compensation and reimbursement of expenses pursuant to section 330 and 331 of the Bankruptcy Code.  On November 14, 2019, the Delaware Bankruptcy Court entered an order granting the Interim Compensation Motion [D.I. 141].

- Ordinary Course Professionals.  On October 29, 2019, the Debtor filed the Motion of the Debtor for an Order Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course of Business [D.I. 75] (the "OCP Motion").  The OCP Motion sought authority for the Debtor to retain and compensate certain professionals in the ordinary course of its business.  On November 26, 2019, the Delaware Bankruptcy Court entered an order granting the OCP Motion [D.I. 176].

- _Retention Applications_.  During the course of the chapter 11 case, the Delaware Bankruptcy Court or Bankruptcy Court, as applicable, have approved a number of applications by the Debtor seeking to retain certain professionals pursuant to sections 327, 328 and/or 363 of the Bankruptcy Code, including Pachulski Stang Ziehl & Jones LLP as legal counsel [D.I. 183], Development Specialists, Inc. as chief restructuring officer and financial advisor [D.I. 342], Kurtzman Carson Consultants LLC as administrative advisor [D.I. 74], Mercer (US) Inc. as compensation consultant [D.I. 381], Hayward & Associates PLLC as local counsel [D.I. 435], Foley Gardere, Foley & Lardner LLP as special Texas counsel [D.I. 513], Deloitte Tax LLP as tax services provider [D.I. 551], Wilmer Cutler Pickering Hale and Dorr LLP as regulatory and compliance counsel [D.I. 669], and Hunton Andrews Kurth LLP as special tax counsel [D.I. 763].

**K.      United States Trustee**

While the Chapter 11 Case was pending in the Delaware Bankruptcy Court, the U.S. Trustee for Region 3 appointed Jane Leamy as the attorney for the U.S. Trustee in connection with this Chapter 11 Case (the "Delaware U.S. Trustee").  Following the transfer of the Chapter 11 Case to the Bankruptcy Court, the Delaware U.S. Trustee no longer represented the U.S. Trustee, and the U.S. Trustee for Region 6 appointed Lisa Lambert as the attorney for the U.S. Trustee in connection with this Chapter 11 Case (the "Texas U.S. Trustee," and together with the

Appellee Appx. 00036
Appx. 00285
012849

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 04/06/25804    Page 171 of 1017    PageID 13798
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 43 of 1803    PageID 10789
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 36 of 178

Delaware U.S. Trustee, the "U.S. Trustee"). The Debtor has worked cooperatively to address concerns and comments from the U.S. Trustee's office during this Chapter 11 Case.

**L.    Appointment of Committee**

On October 29, 2019, the Delaware U.S. Trustee appointed the Committee in this Chapter 11 Case [D.I. 65]. The members of the Committee are (a) Redeemer Committee of Highland Crusader Fund, (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP, LLP. Meta-E Discovery is a vendor to the Debtor. The other members of the Committee are litigants in prepetition litigation with the Debtor as described in ARTICLE II.G. The Bankruptcy Court approved the retention of Sidley Austin LLP as counsel to the Committee [D.I. 334], Young Conaway Stargatt & Taylor, LLP as Delaware co-counsel to the Committee [D.I. 337], and FTI Consulting, Inc. as financial advisor to the Committee [D.I. 336].

**M.    Meeting of Creditors**

The meeting of creditors under section 341(a) of the Bankruptcy Code was initially scheduled for November 20, 2019, at 9:30 a.m. (prevailing Eastern Time) at the J. Caleb Boggs Federal Building, 844 N. King Street, Room 3209, Wilmington, Delaware 19801, and was rescheduled to December 3, 2019, at 10:30 a.m. (prevailing Eastern Time). At the meeting of creditors, the Delaware U.S. Trustee and creditors asked questions of a representative of the Debtor.

Following the transfer of the Chapter 11 Case to the Bankruptcy Court, the Texas U.S. Trustee scheduled an additional meeting of creditors under section 341(a) for January 9, 2020, at 11:00 a.m. (prevailing Central Time) at the Office of the U.S. Trustee, 1100 Commerce Street, Room 976, Dallas, Texas 75242, at the conclusion of that meeting, the Texas U.S. Trustee continued the meeting to January 22, 2020. The Texas U.S. Trustee and creditors asked questions of a representative of the Debtor at the January 9 and January 22, 2020 meetings.

**N.    Schedules, Statements of Financial Affairs, and Claims Bar Date**

The Debtor filed its Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules") on December 19, 2019 [D.I. 247-248]. A creditor whose Claim is set forth in the Schedules and not identified as contingent, unliquidated or disputed may have elected to file a proof of claim against the Debtor.

The Bankruptcy Court established (i) April 8, 2020 as the deadline for Creditors (other than governmental units) to file proofs of claim against the Debtor; (ii) April 13, 2020, as the deadline for any governmental unit (as such term is defined in section 101(27) of the Bankruptcy Code), (iii) April 23, 2020, and as the deadline for any investors in any fund managed by the Debtor to file proofs of claim against the Debtor; and (iv) May 26, 2020 as the deadline for the Debtor's employees to file proofs of claim against the Debtor pursuant to and accordance with Court's order entered on April 3, 2020 [D.I. 560].[8] Consequently, the bar date for filing proofs

---

[8] During the course of its Chapter 11 Case, the Debtor entered into stipulations to extend the Bar Date for certain other claimants or potential claimants.

Appellee Appx. 00037
Appx. 00288
012850

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 04/5 of 25804    Page 172 of 1017    PageID 13799
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 44 of 1803    PageID 10790
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 37 of 178

of claims has passed and any claims filed after the applicable bar date will be considered late filed.

**O.    Governance Settlement with the Committee**

On January 9, 2020, the Bankruptcy Court entered the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [D.I. 339] (the "Settlement Order").

Among other things, the Settlement Order approved a term sheet (the "Term Sheet") agreed to by the Debtor and the Committee pursuant to which the Debtor agreed to abide by certain protocols governing the production of documents and certain protocols governing the operation of the Debtor's business (the "Operating Protocols"). Under the Operating Protocols, the Debtor agreed to seek consent from the Committee prior to entering into certain "Transactions" (as defined in the Operating Protocols. The Operating Protocols were amended on February 21, 2020, with the consent of the Committee [D.I. 466].

Pursuant to the Term Sheet, the Debtor also granted the Committee standing to pursue certain estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor, and the Related Entities (as defined in the Operating Protocols) (collectively, the "Estate Claims"). To the extent permitted, the Estate Claims and the ability to pursue the Estate Claims are being transferred to either the Claimant Trust or Litigation Sub-Trust pursuant to the Plan.

In connection with the Settlement Order, an independent board of directors was also appointed at Strand, the Debtor's general partner (the "Independent Board"). The members of the Independent Board are John S. Dubel, James P. Seery, Jr., and Russell Nelms. The Independent Board was tasked with managing the Debtor's operations during the Chapter 11 Case and facilitating a reorganization or orderly liquidation of the Debtor's Estate.

**P.    Appointment of James P. Seery, Jr., as Chief Executive Officer and Chief Restructuring Officer**

Following their appointment in January 2020, the Independent Board determined that it would be more efficient for the Debtor to have a traditional corporate management structure, i.e. a fully engaged chief executive officer supervised by the Independent Board. The Independent Board ultimately determined that Mr. Seery – a member of the Independent Board – had the requisite experience and expertise to lead the Debtor. On June 23, 2020, the Debtor filed *Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc to March 15, 2020* [D.I. 774] (the "Seery Retention Motion") to retain Mr. Seery as chief executive officer, chief restructuring officer, and foreign representative).

The Bankruptcy Court entered an order approving the Seery Retention Motion on July 16, 2020 [D.I. 854]. Mr. Seery was retained as the Debtor's chief executive officer and the duties of Bradley Sharp of DSI as the Debtor's chief restructuring officer and foreign representative were transferred to Mr. Seery.

Appellee Appx. 00038
Appx. 00289
012851

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 04/01/25804   Page 173 of 1017   PageID 13800
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 45 of 1803   PageID 10791
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 38 of 178

**Q.     Mediation**

On August 3, 2020, the Bankruptcy Court entered the *Order Directing Mediation* [D.I. 912] pursuant to which the Bankruptcy Court ordered the Debtor, the Committee, UBS, Acis, the Redeemer Committee, and Mr. Dondero into mediation and appointed Sylvia Mayer and Allan Gropper as the mediators (the "Mediators").  The mediation began on August 27, 2020, and is still open as of the date of this Disclosure Statement

**R.     Postpetition Settlements**

    1.     Settlement with Acis and the Terry Parties

With the assistance of the Mediators, on September 9, 2020, (i) the Debtor, (ii) Acis LP, (iii) Acis GP, and (iv) Joshua N. Terry, individually and for the benefit of his individual retirement accounts, and Jennifer G. Terry, individually and for the benefit of her individual retirement accounts and as trustee of the Terry Family 401-K Plan (together, the "Terry Parties") executed that certain Settlement Agreement and General Release.  On September 23, 2020, the Debtor filed the *Debtor's Motion for Entry of an Order Approving Settlement with (a) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (b) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (c) Acis Capital Management, L.P. (Claim No. 159) and Authorizing Actions Consistent Therewith* [D.I. 1087] (the "Acis Settlement Motion").

The Settlement Agreement and General Release contain the following material terms, among others:

- The proof of claim filed by Acis [Claim No. 23] will be Allowed in the amount of $23,000,000 as a General Unsecured Claim.

- On the Effective Date of the Plan (or any other plan of reorganization confirmed by the Bankruptcy Court), the Debtor will pay in cash to:

  o   Mr. and Mrs. Terry in the amount of $425,000 plus 10% simple interest (calculated on the basis of a 360-day year from and including June 30, 2016), in full and complete satisfaction of the proof of claim filed by the Terry Parties [Claim No. 156];

  o   Acis LP in the amount of $97,000, which amount represents the legal fees incurred by Acis LP with respect to the N*WCC, LLC v. Highland CLO Management, LLC, et al.*, Index No. 654195/2018 (N.Y. Sup. Ct. 2018), in full and complete satisfaction of the proof of claim filed by Acis LP [Claim No. 159]; and

  o   Mr. Terry in the amount of $355,000 in full and complete satisfaction of the legal fees assessed against Highland CLO Funding, Ltd., in *Highland CLO Funding v. Joshua Terry*, [No Case Number], pending in the Royal Court of the Island of Guernsey;

**Appellee Appx. 00039**
**Appx. 00299**
**012852**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 04/06/25804   Page 174 of 1017   PageID 13801
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 46 of 1803   PageID 10792
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 39 of 178

The Settlement Agreement also provides that within five days of the Bankruptcy Court's approval of the Settlement Agreement and the General Release, the Debtor will move to withdraw, with prejudice, the proofs of claim that the Debtor filed in the Acis bankruptcy cases and the motion filed by the Debtor in the Acis bankruptcy cases seeking an administrative claim for postpetition services provided to Acis.

On October 5, 2020, James Dondero filed an objection to the Acis Settlement Motion [D.I. 1121] (the "Dondero Objection"). On October 28, 2020, the Bankruptcy Court entered an order approving the Acis Settlement Motion and overruling the Dondero Objection in its entirety [DI.I. 1347]. On November 9, 2020, Mr. Dondero filed a notice of his intent to appeal the order approving the Acis Settlement Motion.

The foregoing is a summary only, and all parties are encouraged to review the Acis Settlement Motion and related documents for additional information on the Settlement Agreement and General Release.

2.    Settlement with the Redeemer Committee

The Debtor, Eames, Ltd., the Redeemer Committee, and the Crusader Funds (collectively, the "Settling Parties") executed a settlement (the "Redeemer Stipulation"). The Redeemer Stipulation was also executed, solely with respect to paragraphs 10 through 15 thereof, by Hockney, Ltd., Strand,  Highland CDO Opportunity Master Fund, L.P., Highland Credit Strategies Master Fund, L.P., Highland Credit Opportunities CDO, L.P., House Hanover, LLC, and Alvarez & Marsal CRF Management, LLC (collectively, the "Additional Release Parties"). On September 23, 2020, the Debtor filed *Debtor's Motion for Entry of an Order Approving Settlements with (A) the Redeemer Committee of the Highland Crusader Funds (Claim No. 72), and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [D.I. 1089] seeking approval of the Redeemer Stipulation (the "Redeemer Settlement Motion").

The Redeemer Stipulation contains the following material terms, among others:

- The proof of claim filed by the Redeemer Committee [Claim No. 72] will be Allowed in the amount of $137,696,610 as a General Unsecured Claim;

- The proof of claim filed by the Crusader Funds [Claim No. 81] will be Allowed in the amount of $50,000 as a General Unsecured Claim;

- The Debtor and Eames, Ltd., each (a) consented to the cancellation of certain interests in the Crusader Funds held by them, and (b) agreed that they will not object to the cancellation of certain interests in the Crusader Funds held by the Charitable Donor Advised Fund;4

- The Debtor and Eames each acknowledged that they will not receive any portion of certain reserved distributions, and the Debtor further acknowledged that it will not receive any payments from the Crusader Funds in respect of any deferred fees, distribution fees, or management fees;

- 29 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 5-18  6  Filed 04/30/25804  Page 175 of 1017    PageID 13802
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 47 of 1803    PageID 10793
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 40 of 178

- The Debtor and the Redeemer Committee agreed to a form of amendment to the shareholders' agreement for Cornerstone Healthcare Group and to a process to monetize Cornerstone Healthcare Group;

- Upon the effective date of the Redeemer Stipulation, the Settling Parties and the Additional Release Parties shall exchange releases as set forth in the Redeemer Stipulation; and

- All litigation between the Debtor, Eames, Ltd., and the Additional Highland Release Parties (as defined in the Redeemer Stipulation) on the one hand, and the Redeemer Committee and the Crusader Funds, on the other hand, will cease.

On October 16, 2020, UBS filed an objection to the Redeemer Settlement Motion [D.I. 1190] (the "UBS Objection"). On October 22, 2020, the Bankruptcy Court entered an order approving the Redeemer Settlement Motion and overruling the UBS Objection in its entirety [DI.I. 1273]. On November 6, 2020, UBS filed a notice of its intent to appeal the order approving the Redeemer Settlement Motion.

The foregoing is a summary only, and all parties are encouraged to review the Redeemer Settlement Motion and related documents for additional information on the Redeemer Stipulation.

**S.     Certain Outstanding Material Claims**

As discussed above, April 8, 2020, was the general bar date for filing proofs of claim. The Debtor has begun the process of resolving those Claims. Although each Claim represents a potential liability of the Estate, the Debtor believes that, in addition to UBS's Claim, the Claims filed by Integrated Financial Associates, Inc. ("IFA"), the HarbourVest Entities,[9] and Hunter Mountain represent the largest unresolved Claims against the Estate.

- IFA Proof of Claim. IFA filed a proof of claim [Claim No. 93] (the "IFA Claim") seeking damages in the amount of $241,002,696.73 arising from the purported joint control of the Debtor and NexBank, SSB, and the Debtor's management of various lenders to IFA. The Debtor believes that IFA's claim should be disallowed in its entirety. IFA's claim and the Debtor's defenses thereto are described in greater detail in the *Objection to Proof of Claim No. 93 of Integrated Financial Associates, Inc.* [D.I. 868]. On October 4, 2020, the Bankruptcy Court entered the *Order Approving Stipulation Regarding Proof of Claim No. 93 of Integrated Financial Associates, Inc.* [D.I. 1126], which capped the IFA Claim, for all purposes, at $8,000,000.

- HarbourVest Entities Proofs of Claim. The HarbourVest Entities are investors in Highland CLO Funding, Ltd. ("HCLOF") and filed proofs of claim against the

---

[9] "HarbourVest Entities" means HarbourVest 2017 Global Fund, L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment, L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners, L.P.

Appellee Appx. 00041
Appx. 00292
012854

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 04/09/25804   Page 176 of 1017   PageID 13803
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 48 of 1803   PageID 10794
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 41 of 178

Debtor's Estate [Claim No. 143, 147, 149, 150, 153, 154] (the "HarbourVest Claims"). The Debtor included an assertion of "no liability" in respect of the HarbourVest Claims in its Debtor's *First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No-Liability Claims; and (f) Insufficient Documentation Claims* [D.I. 906]. HarbourVest provided a response in its *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [D.I. 1057]. The HarbourVest Entities' response argued that the Debtor's objection should be overruled, and set forth allegations in support of claims under federal and state law and Guernsey law, including claims for fraud, violations of securities laws, breaches of fiduciary duties, and RICO violations. The Debtor intends to vigorously defend the HarbourVest Claims on various grounds, including, among others, the failure to state a claim upon which relief can be granted, the lack of reasonable reliance, the lack of misrepresentations, the lack of reasonable reliance, the failure to mitigate damages, the parties' agreements bar or otherwise limit the Debtor's liability, and waiver and estoppel. The HarbourVest Entities invested approximately $80 million in HCLOF but seek an allowed claim in excess of $300 million dollars (after giving effect to treble damages for the alleged RICO violations).

• <u>Hunter Mountain Proof of Claim</u>. Hunter Mountain is one of the Debtor's limited partners. Hunter Mountain filed a proof of claim [Claim No. 152] seeking a $60,298,739 indemnification claim against the Debtor because of the Debtor's alleged failures to make priority distributions to Hunter Mountain under the Debtor's Partnership Agreement. The Debtor believes that it has meritorious defenses to Hunter Mountain's claim. Hunter Mountain's claim and the Debtor's defenses to such claim are described in greater detail in the *Debtor's (i) Objection to Claim No. 152 of Hunter Mountain Investment Trust and (ii) Complaint to Subordinate Claim of Hunter Mountain Investment Trust and for Declaratory Relief* [D.I. 995]. The Debtor believes that Hunter Mountain's proof of claim should either be disallowed in its entirety or subordinated in its entirety.

In addition to the foregoing, the UBS Claim (in the amount of $1,039,957,799.40) and the Daugherty Claim (in the amount of $40,710,819.42) remain outstanding. As set forth above, partial summary judgment on the UBS Claim was granted in favor of the Debtor and the Redeemer Committee on November 20, 2020, and a formal order is expected to be entered within the next couple of weeks.

The Daugherty Claim has been allowed for voting purposes only in the amount of $9,134,019 [D.I. 1422]. In a bench ruling on November 20, 2020, the Bankruptcy Court allowed UBS Claims for voting purposes only in the amount of $94,761,076 [D.I. 1646].

**T.      Treatment of Shared Service and Sub-Advisory Agreements**

As discussed in the Plan, the Reorganized Debtor will manage the wind down of the Managed Funds. However, it is not anticipated that either the Reorganized Debtor or the

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 05/06/25804   Page 177 of 1017   PageID 13804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 49 of 1803   PageID 10795
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 42 of 178

Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities[10] pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities.

Currently, the Debtor receives approximately $2.2 million per month in revenue from such contracts. However, in order to service those contracts, the Debtor must maintain a full staff and the cost of providing services under such contracts, among other factors, has historically resulted in a net loss to the Debtor. As such, the Debtor does not believe that assuming these contracts would benefit the Estate.

Further, the contracts generally contain anti-assignment provisions which the Debtor believes may be enforceable under 11 U.S.C. § 365(c). These provisions, therefore, would arguably prevent the assignment of such contracts without the consent of the Debtor's contract counterparty. However, even if 11 U.S.C. § 365(c) would not prevent assignment, the contracts are generally terminable at will by either party. As such, assuming and assigning such contracts without the consent of the contract counterparty would be of nominal or no benefit to the Estate. It is doubtful that any assignee would provide consideration to the Debtor for the assignment of such contract as the contract counterparty could simply terminate the contract immediately following assignment. As such, the Debtor does not believe that there is any benefit to the Estate in attempting to assign these contracts.

Notwithstanding the foregoing disclosure, the Debtor is currently assessing whether it is both possible and in the best interests of the Estate to assume and assign such shared services and sub-advisory agreements to a Related Entity.

During the course of this Chapter 11 Case, Mr. Daugherty stated that he would be willing to assume the Debtor's obligations under the shared service and sub-advisory contracts. The Independent Directors reviewed Mr. Daugherty's proposal and for the foregoing reasons, among others, determined that it was not workable and would provide no benefit to the Estate.

**U.    Portfolio Managements with Issuer Entities**

The Debtor is party to certain portfolio management agreements (including any ancillary agreements relating thereto collectively being the "Portfolio Management Agreements" and each a "Portfolio Management Agreement") with ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd. (each an "Issuer"  and collectively the "Issuers") wherein the Debtor agreed to generally provide certain services to each Issuer in the Debtor's capacity as a portfolio manager in exchange for certain fees as described in the applicable Portfolio Management Agreement.

---

[10] For the avoidance of doubt, the Debtor does not consider any of the Issuers (as defined herein) to be a Related Entity.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 05/02/804   Page 178 of 1017   PageID 13805
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 50 of 1803   PageID 10796
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 43 of 178

The Issuers filed proofs of claim [Claim No. 165, 168, and 169] asserting claims against the Debtor for damages arising from, relating to or otherwise concerning (i) such Issuer's Portfolio Management Agreement(s) with the Debtor, including, without limitation, failure to perform or other breach of the Portfolio Management Agreement(s), rejection of the Portfolio Management Agreement(s), any cure amount as a result of assumption of the Portfolio Management Agreement(s), any adequate assurance of future performance as a result of assumption of the Portfolio Management Agreement(s), and any failure to provide and pay for indemnification or other obligations under the Portfolio Management Agreement(s); and (ii) the action or inaction of the Debtor to the detriment of such Issuer (collectively, the "Issuer Claims"). The Debtor believes that it has satisfied its obligations to the Issuers; that the Issuer Claims lack merit; and that the Debtor will have no liability with respect to the Issuer Claims. However, such proofs of claim remain outstanding.

The Issuers have taken the position that the rejection of the Portfolio Management Agreements (including any ancillary documents) would result in material rejection damages and have encouraged the Debtor to assume such agreements. Nonetheless, the Issuers and the Debtor are working in good faith to address any outstanding issues regarding such assumption. The Portfolio Management Agreements may be assumed either pursuant to the Plan or by separate motion filed with the Bankruptcy Court.

The Debtor is still assessing its options with respect to the Portfolio Management Agreements, including whether to assume the Portfolio Management Agreements.

**V.      Resignation of James Dondero**

On October 9, 2020, Mr. Dondero resigned as an employee and portfolio manager of the Debtor.

**W.      Exclusive Periods for Filing a Plan and Soliciting Votes**

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief. If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the petition date to solicit acceptances to the plan. During these exclusive periods, no other party in interest may file a competing plan of reorganization; however, a court may extend these periods upon request of a party in interest and "for cause."

The Debtor filed motions to extend the exclusive period, and the Bankruptcy Court entered the following orders granting such applications:

- Order Granting Debtor's Motion for Entry of an Order Pursuant to 11 U.S.C. § 1121(d) and Local Rule 3016-1 Extending the Exclusivity Periods for the Filing and Solicitation of Acceptances of a Chapter 11 Plan [D.I. 460];

- Agreed Order Extending Exclusive Periods by Thirty Days [D.I. 668];

Appellee Appx. 00044
Appx. 00295
012857

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 05/26/25804   Page 179 of 1017   PageID 13806
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 51 of 1803   PageID 10797
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 44 of 178

- • Order Granting Debtor's Third Motion for Entry of an Order Pursuant to 11 U.S.C. § 1121(d) and Local Rule 3016-1 Further Extending the Exclusivity Periods for the Filing and Solicitation of Acceptances of a Chapter 11 Plan [D.I. 820]; and

- • Order Further Extending the Debtor's Exclusive Period for Solicitation of Acceptance of a Chapter 11 Plan [D.I. 1092].

Pursuant to the foregoing orders, the Bankruptcy Court extended the exclusivity period through June 12, 2020, for the filing of a plan, which was subsequently extended through July 13, 2020, and again through August 12, 2020.  The Bankruptcy Court also extended the exclusivity period for the solicitation of votes to accept such plan through August 11, 2020, which was subsequently extended through September 10, 2020, and again through October 13, 2020, and December 4, 2020.

## X.      Negotiations with Constituents

The Debtor, Mr. Dondero, and certain of the creditors have been negotiating a consensual reorganization plan for the Debtor that contemplates the Debtor continuing its business largely in its current form.  Those negotiations have yet to reach conclusion but are continuing, and the negotiations were part of the previously discussed mediation.  There is no certainty that those negotiations will reach a consensual resolution of the Debtor's bankruptcy case.

## Y.      Highland Capital Management, L.P. Retirement Plan and Trust

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  29 U.S.C. §§ 1301-1461.

The Debtor is the contributing sponsor of the Pension Plan.  As such, the PBGC asserts that Debtor is liable to contribute to the Pension Plan the amounts necessary to satisfy the minimum funding standards in ERISA and the Internal Revenue Code of 1986, as amended ("IRC").  See 29 U.S.C. §§ 1082, 1083; 26 U.S.C. §§ 412, 430.  As the sponsor of the Pension Plan, the PBGC asserts Debtor is also liable for insurance premiums owed to PBGC.  See 29 U.S.C. §§ 1306, 1307.  The PBGC asserts that any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) are also jointly and severally liable with the Debtor for such obligations relating to the Pension Plan.

The Pension Benefit Guaranty Corporation ("PBGC"), the federal agency that administers the pension insurance program under Title IV of ERISA, filed contingent proofs of claims against the Debtors for (1) the Pension Plan's potential underfunded benefit liabilities; (2) the potential  unliquidated unpaid minimum funding contributions owed to the Pension Plan; and (3) the potential unliquidated insurance premiums owed to PBGC.  The PBGC acknowledges that, as of the date of this Disclosure Statement, there is nothing currently owed by the Debtor to the PBGC.

The Debtor reserves the right to contest any claims filed by the PBGC for any reason.

- 34 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 05/30/25804 Page 180 of 1017   PageID 13807
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 52 of 1803   PageID 10798
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 45 of 178

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC.  In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

No provision contained in the Disclosure Statement, the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof), shall be construed as discharging, releasing, exculpating, or relieving any person or entity, including the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, government policy, or regulatory provision.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions for satisfaction, release, injunction, exculpation, and discharge of claims in the Plan, Confirmation Order, or the Bankruptcy Code.

### ARTICLE III.
### SUMMARY OF THE PLAN

---

**THIS ARTICLE III IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE MATERIAL TERMS OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS ARTICLE III AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL CONTROL AND GOVERN.**

---

A.     **Administrative and Priority Tax Claims**

1.     Administrative Expense Claims

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions

- 35 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 05/06/25 804    Page 181 of 1017    PageID 13808
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 53 of 1803    PageID 10799
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 46 of 178

relating thereto without further notice to or order of the Bankruptcy Court. All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

2.    Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline. Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement. The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date. Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

Appellee Appx. 00047
Appx. 00288
012860

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 05/06/25804   Page 182 of 1017   PageID 13809
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 54 of 1803   PageID 10800
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 47 of 178

    3.    <u>Priority Tax Claims</u>

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, or (b) such other less favorable treatment as agreed to in writing by the Debtor and such Holder.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

**B.**    **Classification and Treatment of Classified Claims and Equity Interests**

    1.    <u>Summary</u>

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

Appellee Appx. 00048
Appx. 00299
012861

Case 19-34054-sgj11  Doc 3596-6  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:25-cv-02072-S  Document Exhibit 6  Filed 06/25/804  Page 183 of 1017  PageID 13810
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 55 of 1803  PageID 10801
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20  Entered 11/24/20 10:24:41  Page 48 of 178

**Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

2. Elimination of Vacant Classes

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

3. Impaired/Voting Classes

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

Please refer to "Distribution of Confirmation Hearing Notice and Solicitation Package to Holders of Claims and Equity Interests" and "Instructions and Procedures for Voting" in ARTICLE I.C.7 and ARTICLE I.C.8 for a discussion of how the how votes on the Plan will be solicited and tabulated.

4. Unimpaired/Non-Voting Classes

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

5. Impaired/Non-Voting Classes

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

- 38 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 570 of 804   Page 184 of 1017   PageID 13811
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 56 of 1803   PageID 10802
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 49 of 178

6. <u>Cramdown</u>

If any Class of Claims or Equity Interests is deemed to reject the Plan or does not vote to accept the Plan, the Debtor may (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with the terms of the Plan and the Bankruptcy Code. If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**C. Classification and Treatment of Claims and Equity Interests**

1. *Class 1 – Jefferies Secured Claim*

- *Classification*: Class 1 consists of the Jefferies Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired. Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*: Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

2. *Class 2 – Frontier Secured Claim*

- *Classification*: Class 2 consists of the Frontier Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim: (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note. The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

Appellee Appx. 00050
Appx. 00301
012863

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 05/08/25804 Page 185 of 1017    PageID 13812
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 57 of 1803    PageID 10803
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 50 of 178

- *Impairment and Voting*:  Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject the Plan.

  The New Frontier Note will include the following terms:  (i) an extension of the maturity date to December 31, 2022; (ii) quarterly interest only payments; (iii) a payment on the New Frontier Note equal to fifty percent of the outstanding principal on December 31, 2021, if the New Frontier Note is not paid in full on or prior to such date; (iv) mandatory prepayments from the proceeds of the sale of any collateral securing the New Frontier Note; and (v) the payment of fees and expenses incurred in negotiating the terms of the New Frontier Note.

3. <u>*Class 3 – Other Secured Claims*</u>

- *Classification*:  Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*:  Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

4. <u>*Class 4 – Priority Non-Tax Claims*</u>

- *Classification*:  Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

Appellee Appx. 00051
Appx. 00302
012864

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 59 of 2580 04   Page 186 of 1017   PageID 13813
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 58 of 1803   PageID 10804
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 51 of 178

- • *Impairment and Voting*: Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

5. <u>*Class 5 – Retained Employee Claims*</u>

- • *Classification*:  Class 5 consists of the Retained Employee Claims.

- • *Allowance and Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- • *Impairment and Voting*: Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

6. <u>*Class 6 – PTO Claims*</u>

- • *Classification*:  Class 6 consists of the PTO Claims.

- • *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- • *Impairment and Voting*: Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

  "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

7. <u>*Class 7 – Convenience Claims*</u>

- • *Classification*:  Class 7 consists of the Convenience Claims.

- • *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is

Appellee Appx. 00052
Appx. 00303
012865

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 60 of 258 04   Page 187 of 1017   PageID 13814
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 59 of 1803   PageID 10805
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 52 of 178

Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*:  Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject the Plan.

  *"Convenience Claim"* means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election.  For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

  *"Convenience Claim Pool"* means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein.  Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

  By making the GUC Election on their Ballots, each Holder of a Convenience Claim can elect the treatment provided to General Unsecured Claims.

8.  <u>*Class 8 – General Unsecured Claims*</u>

- *Classification*:  Class 8 consists of the General Unsecured Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes the Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and

- 42 -

Appellee Appx. 00053
012866

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 06/06/25804   Page 188 of 1017   PageID 13815
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 60 of 1803   PageID 10806
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 53 of 178

will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject the Plan.

    "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an:  (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

    "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

9.    *Class 9 – Subordinated Claims*

- *Classification*:  Class 9 consists of the Subordinated Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 9 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive either (i) the treatment provided to Allowed Class 8 Claims or (ii) if such Allowed Class 9 Claim is subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court, its Pro Rata share of the Subordinated Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

    Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject the Plan.

    "*Subordinated Claim*" means any Claim that (i) is or may be subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court or (ii) arises from a

- 43 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 62 of 25804   Page 189 of 1017   PageID 13816
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 61 of 1803   PageID 10807
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 54 of 178

Class A Limited Partnership Interest or a Class B/C Limited Partnership Interest.

10. _Class 10 – Class B/C Limited Partnership Interests_

- _Classification_:  Class 10 consists of the Class B/C Limited Partnership Interests.

- _Treatment_:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- _Impairment and Voting_:  Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject the Plan.

11. _Class 11 – Class A Limited Partnership Interests_

- _Classification_:  Class 11 consists of the Class A Limited Partnership Interests.

- _Treatment_:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

Appellee Appx. 00055
Appx. 00306
0112868

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 06/30/25804 Page 190 of 1017    PageID 13817
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 62 of 1803    PageID 10808
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 55 of 178

- • *Impairment and Voting*:  Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject the Plan.

**D.    Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**E.    Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Under section 510 of the Bankruptcy Code, upon written notice, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

**F.    Means for Implementation of the Plan**

1.    <u>Summary</u>

The Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner.  The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement.  Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC.  The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to the Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan.  The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

- 45 -

Appellee Appx. 00056

Appx. 00307

012869

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 04/25/25804   Page 191 of 1017   PageID 13818
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 63 of 1803   PageID 10809
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 56 of 178

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in the Plan and the Claimant Trust Agreement.

    2.    <u>The Claimant Trust</u>[11]

    (a)    *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant

---

[11] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

Appellee Appx. 00057
Appx. 06308
012870

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 06/25/804    Page 192 of 1017    PageID 13819
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 64 of 1803    PageID 10810
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 57 of 178

Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in Article IV of the Plan, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in Article IV of the Plan, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

       (a)    *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

Appellee Appx. 00058
Appx. 00300
012871

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 06/06/25804   Page 193 of 1017   PageID 13820
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 65 of 1803   PageID 10811
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 58 of 178

(b)     *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in the Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in Article IV.C of the Plan.

(c)     *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

(d)     *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

- the payment of the Claimant Trust Expenses;

- the payment of other reasonable expenses of the Claimant Trust;

- the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

- the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

- the orderly monetization of the Claimant Trust Assets;

- litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

- the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 06/06/25804   Page 194 of 1017   PageID 13821
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 66 of 1803   PageID 10812
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 59 of 178

•    the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

•    the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement.  The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expenses and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court.  Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee.  In all circumstances, the Claimant Trustee shall act in the best interests of the Claimant Trust Beneficiaries and with the same fiduciary duties as a chapter 7 trustee.

The Litigation Sub-Trust Agreement generally will provide for, among other things:

•    the payment of other reasonable expenses of the Litigation Sub-Trust;

•    the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

•    the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

Appellee Appx. 00060
Appx. 00631
012873

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 08/05/25804    Page 195 of 1017    PageID 13822
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 67 of 1803    PageID 10813
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 60 of 178

(e)    *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate.  The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

(f)    *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

(g)    *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as:  (a) a transfer of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests.  Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets.  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

(h)    *Tax Reporting.*

The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

Appellee Appx. 00061
Appx. 000312
012874

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 04/11/25 804   Page 196 of 1017   PageID 13823
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 68 of 1803   PageID 10814
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 61 of 178

The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

(i)    *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in the Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court.  Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

(j)    *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

(k)    *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

(l)    *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are

- 51 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6   Filed 07/06/25804   Page 197 of 1017   PageID 13824
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 69 of 1803   PageID 10815
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 62 of 178

investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

   (m) *Dissolution of the Claimant Trust and Litigation Sub-Trust.*

   The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

   Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

   3. <u>The Reorganized Debtor</u>

   (a) *Corporate Existence*

   The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

Appellee Appx. 00063
Appx 00314
012876

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 07/00/25804   Page 198 of 1017   PageID 13825
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 70 of 1803   PageID 10816
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 63 of 178

(b)     *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

(c)     *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor.  Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

(d)     *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee.  The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor.  Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes.  Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

(e)     *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under the Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 5 108 6    Filed 07/20 25804    Page 199 of 1017    PageID 13826
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 71 of 1803    PageID 10817
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 64 of 178

(f)    *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in the Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court

(g)    *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement.  As set forth in the Reorganized Limited Partnership Agreement, the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor.  Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in Article IV.B.1 of the Plan, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

4.    <u>Company Action</u>

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 6 Filed 07/36/25804 Page 200 of 1017 PageID 13827
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 72 of 1803 PageID 10818
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 65 of 178

of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in the Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

5.  Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, Article IV.C.2 of the Plan.

6.  Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the

- 55 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 07/03804   Page 201 of 1017   PageID 13828
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 73 of 1803   PageID 10819
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 66 of 178

cancellation thereof, except the rights provided for pursuant to the Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, Article IV.C.2 of the Plan.

7.      Cancellation of Existing Instruments Governing Security Interests

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

8.      Control Provisions

To the extent that there is any inconsistency between the Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, the Plan shall control.

9.      Treatment of Vacant Classes

Any Claim or Equity Interest in a Class considered vacant under Article III.C of the Plan shall receive no Plan Distributions.

10.      Plan Documents

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I of the Plan) and fully enforceable as if stated in full herein.

11.      Highland Capital Management, L.P. Retirement Plan and Trust

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461. The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal

- 56 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 07/5012504   Page 202 of 1017   PageID 13829
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 74 of 1803   PageID 10820
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 67 of 178

Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC.  In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code.  The Debtor reserves the right to contest any such liability or responsibility.

A.      **Treatment of Executory Contracts and Unexpired Leases**

1.      Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to a Final Order of the Bankruptcy Court entered prior to the Effective Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan Supplement, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Effective Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments.  Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts

- 57 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 07/00/25804   Page 203 of 1017   PageID 13830
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 75 of 1803   PageID 10821
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 68 of 178

and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4), as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [D.I. 1122].

2. Claims Based on Rejection of Executory Contracts or Unexpired Leases

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Effective Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Effective Date. Any Rejection Claims that are not timely Filed pursuant to the Plan shall be forever disallowed and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

3. Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with the Plan and setting forth the proposed cure amount (if any).

Appellee Appx. 00069
Appx. 00329
012882

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 07/06/25804 Page 204 of 1017   PageID 13831
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 76 of 1803   PageID 10822
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 69 of 178

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to Article V.C of the Plan shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment.  Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to Article V.C of the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

**B.**      **Provisions Governing Distributions**

     1.      Dates of Distributions

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein.  If any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in the Plan.  Except as otherwise provided in the Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to the Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under the Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

Appellee Appx. 00070
Appx. 09321
012883

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 107 of 258804   Page 205 of 1017   PageID 13832
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 77 of 1803   PageID 10823
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 70 of 178

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests. The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

2.    Distribution Agent

Except as provided herein, all distributions under the Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter. The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

3.    Cash Distributions

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

4.    Disputed Claims Reserve

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

As used above, "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant

Appellee Appx. 00071
Appx 00322
012884

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 07/9 of 25804   Page 206 of 1017   PageID 13833
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 78 of 1803   PageID 10824
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 71 of 178

Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

"*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

HarbourVest and Mr. Daugherty have objected to the mechanisms for calculating the amount of the Disputed Claims Reserve with respect to the HarbourVest Claim and the Daugherty Claim, respectively, and intend to press their objections at the hearing for confirmation of the Plan.

5. <u>Distributions from the Disputed Claims Reserve</u>

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount. To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of the Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of the Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date. For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests. If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

6. <u>Rounding of Payments</u>

Whenever the Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under the Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under the Plan.

7. *De Minimis* <u>Distribution</u>

Except as to any Allowed Claim that is Unimpaired under the Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in Article VI.I of the Plan within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall

- 61 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 80 of 25804   Page 207 of 1017   PageID 13834
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 79 of 1803   PageID 10825
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 72 of 178

revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

8.     Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim or as provided in the Plan, all distributions shall be made pursuant to the terms of the Plan and the Confirmation Order. Except as otherwise provided in the Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

9.     General Distribution Procedures

The Distribution Agent shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under the Plan shall not be subject to any claim by any Person.

10.     Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under the Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

11.     Undeliverable Distributions and Unclaimed Property

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under the Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

Appellee Appx. 00073
Appx. 00324
012886

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 810 of 25804    Page 208 of 1017    PageID 13835
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 80 of 1803    PageID 10826
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 73 of 178

12.    <u>Withholding Taxes</u>

In connection with the Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate.  As a condition to receiving any distribution under the Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws.  If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.

13.    <u>Setoffs</u>

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder.  Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

14.    <u>Surrender of Cancelled Instruments or Securities</u>

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to Article IV of the Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

15.    <u>Lost, Stolen, Mutilated or Destroyed Securities</u>

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by the Plan, deliver to the Distribution Agent:  (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any

Appellee Appx. 00074
Appx. 00325
012887

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 08/26/25804   Page 209 of 1017   PageID 13836
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 81 of 1803   PageID 10827
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 74 of 178

damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed
Claim or Equity Interest. Upon compliance with Article VI.O of the Plan as determined by the
Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for
all purposes under the Plan, be deemed to have surrendered such security or note to the
Distribution Agent.

**C.      Procedures for Resolving Contingent, Unliquidated and Disputed Claims**

      1.      Filing of Proofs of Claim

      Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or
unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was
required to file a Proof of Claim on or prior to the Bar Date.

      2.      Disputed Claims

      Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as
applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed
Claim or Disputed Equity Interest or any other appropriate motion or adversary proceeding with
respect thereto, which shall be litigated to Final Order or, at the discretion of the Reorganized
Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without
further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation
Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or
withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the
Effective Date without further notice to creditors (other than the Entity holding such Disputed
Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such
Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the
amount compromised for purposes of the Plan.

      3.      Procedures Regarding Disputed Claims or Disputed Equity Interests

      No payment or other distribution or treatment shall be made on account of a Disputed
Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity
Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim
or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by
stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of
the Claim or Equity Interest.

      4.      Allowance of Claims and Equity Interests

      Following the date on which a Disputed Claim or Disputed Equity Interest becomes an
Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a
distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

                 *Allowance of Claims*

      After the Effective Date and subject to the other provisions of the Plan, the Reorganized
Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and

Appellee Appx. 00075
Appx. 00326
012888

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 08/30/25804   Page 210 of 1017   PageID 13837
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 82 of 1803   PageID 10828
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 75 of 178

defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

*Estimation*

Subject to the other provisions of the Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with the Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation proceeding.

*Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

Appellee Appx. 00076
Appx. 00327
012889

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-18 6   Filed 04/04/25804   Page 211 of 1017   PageID 13838
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 83 of 1803   PageID 10829
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 76 of 178

D.     **Effectiveness of the Plan**

    1.     <u>Conditions Precedent to the Effective Date</u>

       The Effective Date of the Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of Article VIII.B of the Plan of the following:

- the Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to the Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have been entered, not subject to stay pending appeal, and shall be in form and substance reasonably acceptable to the Debtor and the Committee.  The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate the Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in the Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under the Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent; (iii) the implementation of the Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under the Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under the Plan upon the Effective Date.

- All documents and agreements necessary to implement the Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect.  All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 6   Filed 85 of 254   Page 212 of 1017    PageID 13839
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 84 of 1803   PageID 10830
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 77 of 178

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement the Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Professional Fee Reserve shall be funded pursuant to the Plan in an amount determined by the Debtor in good faith.

2.    <u>Waiver of Conditions</u>

The conditions to effectiveness of the Plan set forth in Article VIII of the Plan (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate the Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

3.    <u>Effect of Non-Occurrence of Conditions to Effectiveness</u>

Unless waived as set forth in Article VIII.B of the Plan, if the Effective Date of the Plan does not occur within twenty calendar days of entry of the Confirmation Order, the Debtor may withdraw the Plan and, if withdrawn, the Plan shall be of no further force or effect.

4.    <u>Dissolution of the Committee</u>

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

Appellee Appx. 00078
Appx. 005320
012891

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 06/25/804    Page 213 of 1017    PageID 13840
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 85 of 1803    PageID 10831
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 78 of 178

**E.    Exculpation, Injunction, and Related Provisions**

1.    <u>General</u>

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

For purposes of the following provisions:

- "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

- "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

- "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO

- 68 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 07/06/25804   Page 214 of 1017   PageID 13841
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 86 of 1803   PageID 10832
Case 19-34054-sgj11   Doc 1473   Filed 11/24/20   Entered 11/24/20 10:24:41   Page 79 of 178

Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

2.   Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

3.   Exculpation

Subject in all respects to Article XII.D of the Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation  in connection with the foregoing clauses (i)-(v); *provided, however,* the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Plan, including Article IV.C.2 of the Plan, protecting such Exculpated Parties from liability.

Appellee Appx. 00080
Appx. 00331
012893

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 08/25/2504   Page 215 of 1017   PageID 13842
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 87 of 1803   PageID 10833
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 80 of 178

4.      Releases by the Debtor

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to Article IX.D of the Plan (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with

Appellee Appx. 00081
Appx. 00832
012894

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 89 of 25804   Page 216 of 1017   PageID 13843
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 88 of 1803   PageID 10834
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 81 of 178

respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to Article IX.D of the Plan will vest and the Employee will be indefeasibly released pursuant to Article IX.D of the Plan if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

In addition to the obligations set forth in Article IX.D of the Plan, as additional consideration for the foregoing releases, the Senior Employees will waive their rights to certain deferred compensation owed to them by the Debtor. As of the date hereof, the total deferred compensation owed to the Senior Employees was approximately $3.9 million, which will be reduced by approximately $2.2 million to approximately $1.7 million. That reduction is composed of a reduction of (i) approximately $560,000 in the aggregate in order to qualify as Convenience Claims, (ii) approximately $510,000 in the aggregate to reflect the Convenience Claims treatment of 85% (and may be lower depending on the number of Convenience Claims), and (iii) of approximately $1.15 million in the aggregate to reflect an additional reduction of 40%.

As of the date of this Disclosure Statement, the Debtor has not identified any Causes of Action against any Released Parties. However, as set forth above, during the Chapter 11 Case, the Committee was granted sole standing to investigate and pursue the Estate Claims, which may include Causes of Action against certain of the Released Parties. As of the date of this Disclosure Statement, the Committee has not identified any Estate Claims against any Released Parties. The Debtor currently believes that there are no material Estate Claims or other Causes of Action against any Released Party.

5.     Preservation of Rights of Action

*Maintenance of Causes of Action*

Except as otherwise provided in the Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as

Appellee Appx. 00082
Appx. 00635
012895

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 6 Filed 0906 of 25804 Page 217 of 1017 PageID 13844
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 89 of 1803 PageID 10835
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 82 of 178

appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

*Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Causes of Action have been expressly released in the Plan or any other Final Order (including, without limitation, the Confirmation Order). In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

6.  <u>Injunction</u>

Upon entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective Related Persons, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether proof of such Claims or Equity Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective Related Persons, are permanently enjoined, on and after the Effective Date, with respect to such Claims and Equity Interests, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any

Appellee Appx. 00083
Appx. 00334
012896

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 01/06/25804    Page 218 of 1017    PageID 13845
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 90 of 1803    PageID 10836
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 83 of 178

judgment, award, decree, or order against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or against property or interests in property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

The injunctions set forth herein shall extend to any successors of the Debtor, the Reorganized Debtor, and the Claimant Trust and their respective property and interests in property.

**Subject in all respects to Article XII. D of the Plan, no Entity may commence or pursue a claim or cause of action or any kind against any Protected Party that arose from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice, that such claim or cause of action represents a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Entity to bring such claim against any such Protected Party; *provided, however,* the foregoing will not apply to Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. As set forth in Article XI of the Plan, the Bankruptcy Court will have sole jurisdiction to adjudicate any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted.**

      7.      Term of Injunctions or Stays

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

      8.      Continuance of January 9 Order

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on

Appellee Appx. 00084
Appx. 00335
012897

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 09/26/25804   Page 219 of 1017   PageID 13846
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 91 of 1803   PageID 10837
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 84 of 178

January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date until the dissolution of each of the Claimant Trust and the Litigation Trust.

**F.      Article XII.D of the Plan**

Article XII.D of the Plan provides that, notwithstanding anything in the Plan to the contrary, nothing in the Plan will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

**G.      Binding Nature of Plan**

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in Article IX of the Plan, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan.  All Claims and Debts shall be fixed and adjusted pursuant to the Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a)

**H.      Statutory Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtor believes that:  (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtor has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.  Specifically, the Debtor believes that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtor has complied and will comply with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Debtor's bankruptcy case, or in connection with the Plan and incident to the case, has been or will be disclosed to the Bankruptcy Court, and any such payment:  (i) made before the confirmation of the Plan is reasonable; or (ii) is subject to the

Appellee Appx. 00085
Appx. 00336
012898

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 09/25/804   Page 220 of 1017   PageID 13847
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 92 of 1803   PageID 10838
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 85 of 178

approval of the Bankruptcy Court as reasonable if it is to be fixed after confirmation of the Plan;

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan will have accepted the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code;

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims and Priority Claims will be paid in full in Cash on the Effective Date, or as soon thereafter as is reasonably practicable;

- Confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor thereto under the Plan;

- The Debtor has paid or will pay all fees payable under section 1930 of title 28, and the Plan provides for the payment of all such fees on the Effective Date; and

- The Plan provides for the continuation after the Effective Date of payment of all retiree benefits, if applicable.

1.   <u>Best Interests of Creditors Test</u>

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the bankruptcy court find, as a condition to confirmation of a chapter 11 plan, that each holder of a claim or equity interest in each impaired class:  (i) has accepted the plan; or (ii) among other things, will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such Person would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.   To make these findings, the Bankruptcy Court must:  (a) estimate the net Cash proceeds (the "<u>Liquidation Proceeds</u>") that a chapter 7 trustee would generate if the Debtor's Chapter 11 Case were converted to a chapter 7 case on the Effective Date and the assets of such Debtor's Estate were liquidated; (b) determine the distribution (the "<u>Liquidation Distribution</u>") that each non-accepting Holder of a Claim or Equity Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (c) compare each Holder's Liquidation Distribution to the distribution under the Plan that such Holder would receive if the Plan were confirmed and consummated.

2.   <u>Liquidation Analysis</u>

Any liquidation analysis, including the estimation of Liquidation Proceeds and Liquidation Distributions, with respect to the Debtor (the "<u>Liquidation Analysis</u>") is subject to numerous assumptions and there can be no guarantee that the Liquidation Analysis will be accurate.  No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims and Equity Interests  at the projected amounts of Allowed Claims

Appellee Appx. 00086
Appx. 00935
012899

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 04/01/25804   Page 221 of 1017   PageID 13848
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 93 of 1803   PageID 10839
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 86 of 178

and Equity Interests set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtor has projected an amount of Allowed Claims and Equity Interests that represents its best estimate of the chapter 7 liquidation dividend to Holders of Allowed Claims and Equity Interests.  The estimate of the amount of Allowed Claims and Equity Interests set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any Plan Distribution to be made on account of Allowed Claims and Equity Interests under the Plan and Disclosure Statement.

The full Liquidation Analysis is attached hereto as **Exhibit C**.

Furthermore, any chapter 7 trustee appointed in a chapter 7 liquidation would have to confront all of the issues described in this Disclosure Statement, including the prepetition litigation claims.  This process would be significantly time-consuming and costly, and reduce any recoveries available to the Debtor's Estate.  The Debtor believes that liquidation under chapter 7 would result in (i) smaller distributions being made to creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of executory contracts in connection with the cessation of the Debtor's operations, and (iii) the failure to realize greater value from all of the Debtor's assets.

Therefore, the Debtor believes that confirmation of the Plan will provide each Holder of a Claim with a greater recovery than such Holder would receive pursuant to the liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

3.     Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor, or any successor to the Debtor, unless the plan contemplates such liquidation or reorganization.  For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtor has analyzed the ability of the Claimant Trust and the Reorganized Debtor to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their business.  A copy of the financial projections prepared by the Debtor is attached hereto as **Exhibit C**.

The Debtor believes that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtor analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.  The Debtor believes that its available Cash and any additional proceeds from the Debtor's Assets will be sufficient to allow the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, to make all payments required to be made under the Plan.  Accordingly, the Debtor believes that the Plan is feasible.

Appellee Appx. 00087
Appx. 00338
012900

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 05/06/25804    Page 222 of 1017    PageID 13849
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 94 of 1803    PageID 10840
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 87 of 178

4.    <u>Valuation</u>

In order to provide information and full disclosure to parties in interest regarding the Debtor's assets, the Debtor estimates that its value and the total value of its Assets, as of September 30, 2020, was approximately $328.3 million.

5.    <u>Acceptance by Impaired Classes</u>

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accepts the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default— (a) cures any such default that occurred before or after the commencement of the Chapter 11 Case, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (b) reinstates the maturity of such claim or interest as such maturity existed before such default; (c) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (d) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (e) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan and are not insiders. Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of equity interests as acceptance by holders of at least two-thirds in amount of the allowed interests of such class. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. Section 1126(d) of the Bankruptcy Code, except as otherwise provided in section 1126(e) of the Bankruptcy Code, defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of equity interests in that class actually voting to accept or to reject the plan.

Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims or Equity Interests in any voting class must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Class, and without considering whether the Plan "discriminates unfairly" with respect to such Class, as both standards are described herein.

Appellee Appx. 00088
Appx. 00539
012901

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6   Filed 06/25/804 Page 223 of 1017   PageID 13850
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 95 of 1803   PageID 10841
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 88 of 178

6.        <u>Confirmation Without Acceptance by Impaired Classes</u>

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if less than all impaired classes entitled to vote on the plan have accepted it, *provided* that the plan has been accepted by at least one impaired class of claims.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired Class's rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Debtor's request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

7.        <u>No Unfair Discrimination</u>

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

8.        <u>Fair and Equitable Test</u>

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

The condition that a plan be "fair and equitable" to a non-accepting Class of Secured Claims includes the requirements that:  (a) the Holders of such Secured Claims retain the liens securing such Claims to the extent of the Allowed amount of the Claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the Plan; and (b) each Holder of a Secured Claim in the Class receives deferred Cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date of the Plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting Class of unsecured Claims includes the requirement that either: (a) the plan provides that each Holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such Claim; or (b) the Holder of any Claim or Equity Interest that is junior to the Claims of such Class will not receive or retain under the plan on account of such junior Claim or Equity Interest any property.

The condition that a plan be "fair and equitable" to a non accepting Class of Equity Interests includes the requirements that either: (a) the plan provides that each Holder of an Equity Interest in that Class receives or retains under the plan, on account of that Equity Interest, property of a value, as of the Effective Date of the plan, equal to the greater of (i) the allowed

Appellee Appx. 00089
Appx. 00849
012902

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 6 Filed 09/6/25804 Page 224 of 1017 PageID 13851
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 96 of 1803 PageID 10842
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 89 of 178

amount of any fixed liquidation preference to which such Holder is entitled, (ii) any fixed redemption price to which such Holder is entitled, or (iii) the value of such interest; or (b) if the Class does not receive such an amount as required under (a), no Class of Equity Interests junior to the non-accepting Class may receive a distribution under the plan.

To the extent that any class of Claims or Class of Equity Interests rejects the Plan, the Debtor reserves the right to seek (a) confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XIII.C of the Plan.

The Debtor believes that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for non-consensual confirmation of the Plan.

### ARTICLE IV.
### RISK FACTORS

> **ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTOR'S BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.**

A.    **Certain Bankruptcy Law and Other Considerations**

    1.    Parties in Interest May Object to the Debtor's Classification of Claims and Equity Interests, or Designation as Unimpaired.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Holders of Claims or Equity Interests or the Bankruptcy Court will reach the same conclusion.

There is also a risk that the Holders of Claims or Equity Interests could object to the Debtor's designation of Claims or Equity Interests as Unimpaired, and the Bankruptcy Court could reach the same conclusion.

    2.    The Debtor May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, findings by the bankruptcy court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a

Appellee Appx. 00090
Appx. 00844
012903

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 06/25/804 Page 225 of 1017   PageID 13852
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 97 of 1803   PageID 10843
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 90 of 178

need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to Holders of Claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the Bankruptcy Court will confirm the Plan. The Bankruptcy Court could decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.

If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan of reorganization or liquidation would be on terms as favorable to Holders of Claims as the terms of the Plan. In addition, there can be no assurance that the Debtor will be able to successfully develop, prosecute, confirm and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtor's creditors.

> 3.    The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not take place.

> 4.    Continued Risk Following Effectiveness.

Even if the Effective Date of the Plan occurs, the Debtor, the Reorganized Debtor, and Claimant Trust will continue to face a number of risks, including certain risks that are beyond its control, such as changes in assets, asset values, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of liquidation reflecting the Plan will achieve the Debtor's stated goals.

In addition, at the outset of the Chapter 11 Case, the Bankruptcy Code provides the Debtor with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtor will have retained the exclusive right to propose the Plan upon filing its petition. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtor's ability to achieve confirmation of the Plan in order to achieve the Debtor's stated goals.

> 5.    The Effective Date May Not Occur.

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

Appellee Appx. 00091
Appx. 005142
012904

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 09/06/25804    Page 226 of 1017    PageID 13853
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 98 of 1803    PageID 10844
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 91 of 178

6.      The Chapter 11 Case May Be Converted to Cases Under Chapter 7 of the
        Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the
debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a
case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be
appointed or elected to liquidate the debtor's assets for distribution in accordance with the
priorities established by the Bankruptcy Code.  The Debtor believes that liquidation under
chapter 7 would result in significantly smaller distributions being made to creditors than those
provided for in the Plan because of (a) the likelihood that the assets would have to be sold or
otherwise disposed of in a disorderly fashion over a short period of time, rather than selling the
assets in an orderly and controlled manner, (b) additional administrative expenses involved in the
appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would
be entitled to priority, that would be generated during the liquidation.

7.      Claims Estimation

There can be no assurance that the estimated Claim amounts set forth herein are correct,
and the actual amount of Allowed Claims may differ from the estimates.  The estimated amounts
are subject to certain risks, uncertainties, and assumptions.  Should one or more of these risks or
uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of
Allowed Claims may vary from those estimated herein.

8.      The Financial Information Contained Herein is Based on the Debtor's Books and
        Records and, Unless Otherwise Stated, No Audit was Performed.

**The financial information contained in this Disclosure Statement has not been
audited**.  In preparing this Disclosure Statement, the Debtor relied on financial data derived from
their books and records that was available at the time of such preparation.  Although the Debtor
has used its reasonable business judgment to ensure the accuracy of the financial information
provided in this Disclosure Statement and, while the Debtor believes that such financial
information fairly reflects its financial condition, the Debtor is unable to warrant or represent that
the financial information contained herein and attached hereto is without inaccuracies.

**B.      Risks Related to Recoveries under the Plan**

1.      The Reorganized Debtor and/or Claimant Trust May Not Be Able to Achieve the
        Debtor's Projected Financial Results

The Reorganized Debtor or Claimant Trust, as applicable, may not be able to achieve
their projected financial results.  The Financial Projections represent the best estimate of the
Debtor's future financial performance, which is necessarily based on certain assumptions
regarding the anticipated future performance of the Reorganized Debtor or Claimant Trust, as
well as the United States and world economies in general, and the investment industry in which
the Debtor operates.  The Debtor's Financial Projections include key assumptions on (i) target
asset monetization values, (ii) timing of asset monetization, and (iii) costs to effectuate the Plan.
In terms of achieving target asset monetization values, the Debtor faces issues including
investment assets with cross-ownership across related entities and challenges associated with

- 81 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 10/06/25 804 Page 227 of 1017   PageID 13854
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 99 of 1803   PageID 10845
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 92 of 178

collecting notes due from affiliates. The Debtor's Financial Projections anticipate that all investment assets will be sold by 2022, which may be at risk due to the semi-liquid or illiquid nature of the Debtor's assets, as well as general market conditions, including the sustained impact of COVID-19. Costs are based on estimates and may increase with delays or any other unforeseen factor. If the Reorganized Debtor or Claimant Trust do not achieve their projected financial results, the recovery for Claimant Trust Beneficiaries may be negatively affected and the Claimant Trust may lack sufficient liquidity after the Effective Date.

2.   <u>Claim Contingencies Could Affect Creditor Recoveries</u>

The estimated Claims and projected creditor recoveries set forth in this Disclosure Statement are based on various assumptions the actual amount of Allowed Claims may differ from the estimates. Should one or more of the underlying assumptions ultimately prove incorrect, the actual Allowed amounts of Claims may vary materially from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtor cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

3.   <u>If Approved, the Debtor Release Could Release Claims Against Potential Defendants of Estate Causes of Action With Respect to Which the Claimant Trust Would Otherwise Have Recourse</u>

The Claimant Trust Assets will include, among other things, Causes of Action, including Estate Claims that will be assigned to the Litigation Sub-Trust. The Committee's investigation of potential Estate Claims is still ongoing. Because the Committee has not concluded its investigation as of the date hereof, and such investigation will be transferred to the Litigation Trustee, there is no certainty of whether there are viable Estate Claims against any of the Released Parties. In the event there are viable Estate Claims against any of the Released Parties, such claims cannot be pursued for the ultimate benefit of Claimant Trust Beneficiaries if the Debtor Release is approved.

**C.   Investment Risk Disclaimer**

1.   <u>Investment Risks in General.</u>

The Reorganized Debtor is and will remain a registered investment adviser under the Investment Advisers Act of 1940, and the Reorganized Debtor will continue advising the Managed Funds. No guarantee or representation is made that the Reorganized Debtor's or the Managed Funds' investment strategy will be successful, and investment results may vary substantially over time.

2.   <u>General Economic and Market Conditions and Issuer Risk.</u>

Any investment in securities carries certain market risks. Investments by the Reorganized Debtor, the Managed Funds, or the Claimant Trust may decline in value for any number of reasons over which none of the Managed Funds, the Reorganized Debtor, the Claimant Trust, or the Claimant Trustee may have control, including changes in the overall

- 82 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Page 100 of 1804   Page 228 of 1017   PageID 13855
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 100 of 1803   PageID 10846
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 93 of 178

market and other general economic and market conditions, such as interest rates, availability of credit, inflation rates, economic uncertainty, changes in laws, currency exchange rates and controls and national, international political circumstances (including wars and security operations), and acts of God (including pandemics like COVID-19). The value of the Managed Funds or the assets held by the Reorganized Debtor or Claimant Trust may also decline as a result of factors pertaining to particular securities held by the Managed Funds, Reorganized Debtor, or Claimant Trust, as applicable, such as perception or changes in the issuer's management, the market for the issuer's products or services, sources of supply, technological changes within the issuer's industry, the availability of additional capital and labor, general economic conditions, political conditions, acts of God, and other similar conditions. All of these factors may affect the level and volatility of security prices and the liquidity and the value of the securities held by the Managed Fund, Reorganized Debtor, or Claimant Trust. Unexpected volatility or illiquidity could impair the Managed Funds', Reorganized Debtor's, or Claimant Trust's profitability or result in it suffering losses.

**D.    Disclosure Statement Disclaimer**

      1.    <u>The Information Contained Herein is for Disclosure Purposes Only.</u>

The information contained in this Disclosure Statement is for purposes of disclosure in connection with the Plan and may not be relied upon for any other purposes.

      2.    <u>This Disclosure Statement was Not Approved by the SEC.</u>

Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

      3.    <u>This Disclosure Statement Contains Forward-Looking Statements.</u>

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.

      4.    <u>No Legal or Tax Advice is Provided to You by This Disclosure Statement.</u>

**This Disclosure Statement is not legal or tax advice to you**. The contents of this Disclosure Statement should not be construed as legal, business or tax advice, and are not personal to any person or entity. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than as a disclosure of certain information to determine how to vote on the Plan or object to confirmation of the Plan.

Appellee Appx. 00094
Appx. 00845
012907

Case 19-34054-sgj11  Doc 3596-6  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:25-cv-02072-S  Document 15-16  Filed 10/26/25  Page 229 of 1017  PageID 13856
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 101 of 1803  PageID 10847
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20  Entered 11/24/20 10:24:41  Page 94 of 178

5.     <u>No Admissions Are Made by This Disclosure Statement.</u>

The information and statements contained in this Disclosure Statement will neither (i) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtor) nor (ii) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, the Reorganized Debtor, the Claimant Trust, Holders of Allowed Claims or Equity Interests, or any other parties in interest.

6.     <u>No Reliance Should Be Placed on Any Failure to Identify Litigation Claims or Projected Objections.</u>

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtor or the Reorganized Debtor or Claimant Trustee, as applicable, may seek to investigate, file and prosecute litigation rights and claims against any third parties and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such litigation claims or objections to Claims or Equity Interests.

7.     <u>Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Equity Interests or Recover Transfers and Assets.</u>

The Debtor, the Reorganized Debtor, the Claimant Trustee, or any party in interest, as the case may be, reserve any and all rights to object to that Holder's Allowed Claim regardless of whether any Claims or Causes of Action of the Debtor or its Estate are specifically or generally identified herein.

8.     <u>The Information Used Herein was Provided by the Debtor and was Relied Upon by the Debtor's Advisors.</u>

Counsel to and other advisors retained by the Debtor have relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtor have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

9.     <u>The Disclosure Statement May Contain Inaccuracies.</u>

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtor has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtor nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, the information contained in this Disclosure Statement is as of the date of the Disclosure Statement and does not address events that may occur after such date. The Debtor may update this Disclosure Statement but is not required to do so.

Appellee Appx. 00095
Appx. 00545
012908

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 03/25/804   Page 230 of 1017   PageID 13857
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 102 of 1803   PageID 10848
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 95 of 178

10.    <u>No Representations Made Outside the Disclosure Statement Are Authorized.</u>

No representations concerning or relating to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. You should promptly report unauthorized representations or inducements to the counsel to the Debtor and the U.S. Trustee.

## ARTICLE V.
## ALTERNATIVES TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN

If no chapter 11 plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtor's assets. If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan of reorganization or liquidation would be on terms as favorable to Holders of Claims as the terms of the Plan. In addition, there can be no assurance that the Debtor will be able to successfully develop, prosecute, confirm and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtor's creditors.

## ARTICLE VI.
## U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

Implementation of the Plan will have federal, state, local or foreign tax consequences to the Debtor and Holders of Equity Interests as well as Holders of Claims. No tax opinion or ruling has been sought or will be obtained with respect to any tax consequences of the Plan, and the following discussion does not constitute and is not intended to constitute either a tax opinion or tax advice to any person.

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to the Debtor and to Holders of Claims. This discussion assumes that each Holder of Claims is for United States federal income tax purposes:

- An individual who is a citizen or resident of the United States for federal income tax purposes;

- a corporation (or other entity treated as a corporation for United States federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- any other person that is subject to U.S. federal income taxation on a net income basis.

- an estate the income of which is subject to United States federal income tax without regard to its source; or

- a trust (1) that is subject to the primary supervision of a United States court and the control of one or more United States persons or (2) that has a valid election in effect under applicable treasury regulations to be treated as a United States person.

- 85 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 10/06/25   Page 231 of 1017   PageID 13858
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 103 of 1803   PageID 10849
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 96 of 178

This discussion also assumes that each Holder holds the Claims as capital assets under Section 1221 of the Internal Revenue Code.

The summary provides general information only and does not purport to address all of the federal income tax consequences that may be applicable to the Debtor or to any particular Holder of Claims in light of such Holder's own individual circumstances.  In particular, the summary does not address the federal income tax consequences of the Plan to Holders of Claims that may be subject to special rules, such as non-U.S. persons, insurance companies, financial institutions, regulated investment companies, broker-dealers, persons who acquired Claims as part of a straddle, hedge, conversion transaction or other integrated transaction, or persons who acquired Claims  in connection with the performance of services; persons who hold Claims through a partnership or other pass-through entity and tax-exempt organizations.  The summary does not address foreign, state, local, estate or gift tax consequences of the Plan, nor does it address the federal income tax consequences to Holders of Equity Interests.

This summary is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), the final, temporary and proposed Treasury regulations promulgated thereunder, judicial decisions and administrative rulings and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof and all of which are subject to change (possibly with retroactive effect) by legislation, judicial decision or administrative action. Moreover, due to a lack of definitive authority, substantial uncertainties exist with respect to various tax consequences of the Plan.

**THE TAX CONSEQUENCES TO THE HOLDERS OF CLAIMS OR EQUITY INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.  MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE TAX LAW.  THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FOREIGN, FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN.**

A.    **Consequences to the Debtor**

It is anticipated that the consummation of the Plan will not result in any federal income tax liability to the Debtor.  The Debtor is a partnership for federal income tax purposes. Therefore, the income and loss of the Debtor is passed-through to the Holders of its Equity Interests, and the Debtor does not pay federal income tax.

1.    Cancellation of Debt

Generally, the discharge of a debt obligation of a debtor for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) creates cancellation of indebtedness ("COD") income that must be included in the debtor's income.  Due to the nature of the Impaired Claims, it is anticipated that

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 05/23/24    Page 232 of 1017    PageID 13859
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 104 of 1803    PageID 10850
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 97 of 178

the Debtor will not recognize any material amount of COD income. If any such COD income is recognized, it will be passed-through to the Holders of its Equity Interests, and the Holders of such Equity Interest generally will be required to include such amounts in income, unless a Holder is entitled to exclude such amounts from income under Section 108 of the Internal Revenue Code, based on the Holder's individual circumstances.

    2.    <u>Transfer of Assets</u>

Pursuant to the Plan, the Debtor's assets (including the Claimant Trust Assets and Reorganized Debtor Assets) will be transferred directly or indirectly to the Claimant Trust. For federal income tax purposes, any such assets transferred to the Claimant Trust will be deemed to have been transferred to the Claimant Trust Beneficiaries followed by the transfer by such Holders to the Claimant Trust of such assets in exchange for the respective Holders' beneficial interests in the Claimant Trust. The Claimant Trust thereafter will be treated as a grantor trust for federal income tax purposes. See U.S. Federal Income Tax Treatment of the Claimant Trust, below.

The Debtor's transfer of its assets pursuant to the Plan will constitute a taxable disposition of such assets. As discussed above, the Debtor is a partnership for federal income tax purposes. Any gain or loss recognized as a result of the taxable disposition of such assets will be passed through to the Holders of Equity Interests in the Debtor. The Debtor will not be required to pay any tax as a result of such disposition.

**B.**    **U.S. Federal Income Tax Treatment of the Claimant Trust**

It is intended that the Claimant Trust will be treated as a "grantor trust" for U.S. federal income tax purposes. In general, a grantor trust is not a separate taxable entity. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an advanced ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. Consistent with the requirements of Revenue Procedure 94-45, the Claimant Trust Agreement requires all relevant parties to treat, for U.S. federal income tax purposes, the transfer of the Debtor's assets to the Claimant Trust as (i) a transfer of such assets to the Claimant Trust Beneficiaries (to the extent of the value of their respective interests in the applicable Claimant Trust Assets) followed by (ii) a transfer of such assets by such beneficiaries to the Claimant Trust (to the extent of the value of their respective interests in the applicable Claimant Trust Assets), with the beneficiaries being treated as the grantors and owners of the Claimant Trust.

The Plan and the Claimant Trust Agreement generally provide that the Claimant Trust Beneficiaries must value the assets of the Claimant Trust consistently with the values determined by the Claimant Trustee for all U.S. federal income tax purposes. As soon as possible after the Effective Date, the Claimant Trustee, based upon his good faith determination after consultation with his counsel and other advisors, shall inform the beneficiaries in writing as to his estimate of the value of the assets transferred to the Claimant Trust and the value of such assets allocable to each Class of beneficiaries.

Consistent with the treatment of the Claimant Trust as a grantor trust, the Claimant Trust Agreement will require each beneficiary to report on its U.S. federal income tax return its allocable share of the Claimant Trust's income, gain, loss or deduction that reflects the

Appellee Appx. 00098
Appx. 00840
012911

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/25   Page 233 of 1017   PageID 13860
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 105 of 1803   PageID 10851
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 98 of 178

beneficiary's interest in the interim and final distributions to be made by the Claimant Trust. Furthermore, certain of the assets of the Claimant Trust will be interests in the Reorganized Debtor, which will be a partnership for U.S. federal income tax purposes. The income, gain, loss or deduction of the Reorganized Debtor will also flow through the Claimant Trust to the beneficiaries of the Claimant Trust. Therefore, a beneficiary may incur a federal income tax liability with respect to its allocable share of the income of the Claimant Trust (including the income of the Reorganized Debtor) whether or not the Claimant Trust has made any distributions to such beneficiary. The character of items of income, gain, deduction, and credit to any beneficiary and the ability of such beneficiary to benefit from any deduction or losses will depend on the particular situation of such beneficiary. The interests of the beneficiaries may shift from time to time as the result of the allowance or disallowance of claims that have not been allowed at the Effective Date, which could give rise to tax consequences both to the Holders of claims that have, and have not been, allowed at the Effective Date. The Claimant Trustee will file with the IRS tax returns for the Claimant Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and will also send to each beneficiary a separate statement setting forth such beneficiary's share of items of Trust income, gain, loss, deduction, or credit. Each beneficiary will be required to report such items on its U.S. federal income tax return. Holders are urged to consult their tax advisors regarding the appropriate federal income tax treatment of distributions from the Claimant Trust.

The discussion above assumes that the Claimant Trust will be respected as a grantor trust for U.S. federal income tax purposes. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Claimant Trust and the beneficiaries could differ materially from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Claimant Trust).

**C.      Consequences to Holders of Allowed Claims**

1.      Recognized Gain or Loss

In general, each Holder of an Allowed Claim will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such Holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) such holder's adjusted tax basis in such Claim (other than any Claim for accrued but unpaid interest). In general, the "amount realized" by a Holder will equal the sum of any cash and the aggregate fair market value of any property received by such Holder pursuant to the Plan (for example, such Holder's undivided beneficial interest in the assets of the Claimant Trust). A Holder that receives or is deemed to receive for U.S. federal income tax purposes a non-cash asset under the Plan in respect of its Claim should generally have a tax basis in such asset in an amount equal to the fair market value of such asset on the date of its receipt or deemed receipt. See U.S. Federal Income Tax Treatment of the Claimant Trust, above for more information regarding the tax treatment of the Claimant Trust Interests.

Where gain or loss is recognized by a Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the claim was acquired at

Appellee Appx. 00099
Appx. 00859
012912

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 10/06/25   Page 234 of 1017   PageID 13861
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 106 of 1803   PageID 10852
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 99 of 178

a market discount, and whether and to what extent the Holder had previously claimed a bad debt deduction.

A Holder who, under the Plan, receives in respect of an Allowed Claim an amount less than the Holder's tax basis in the Allowed Claim may be entitled to a deduction for U.S. federal income tax purposes. The rules governing the character, timing and amount of such a deduction place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

2.    Distribution in Discharge of Accrued Unpaid Interest

Pursuant to the Plan, a distribution received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest. However, there is no assurance that the IRS would respect such allocation for federal income tax purposes. In general, to the extent that an amount received (whether cash or other property) by a Holder of a claim is received in satisfaction of interest that accrued during its holding period, such amount will be taxable to the Holder as interest income if not previously included in the Holder's gross income. Conversely, a Holder generally recognizes a deductible loss to the extent that it does not receive payment of interest that has previously been included in its income. Holders of Claims are urged to consult their tax advisors regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

3.    Information Reporting and Withholding

All distributions to Holders of Allowed Claims under the Plan are subject to any applicable withholding tax requirements. Under federal income tax law, interest, dividends, and other reportable payments, may, under certain circumstances, be subject to "backup withholding" (currently at a rate of up to 24%). Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**D.    Treatment of the Disputed Claims Reserve**

Pursuant to the Plan, the Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity. Such taxes will be paid out of the Disputed Claims Reserve and therefore may reduce amounts paid to Holders of Allowed Claims from the Claimant Trust. If the Claimant Trustee does not make such an election to treat the Disputed Claims Reserve as a separate taxable entity, the net income, if any, earned in the Disputed Claims Reserve will be taxable to the Holders of Allowed Claims in accordance with

Appellee Appx. 00100
Appx. 00851
012913

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 08/25/25   Page 235 of 1017   PageID 13862
Exhibit 6   Page 100 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 107 of 1803   PageID 10853
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 100 of 178

the principles discussed above under the heading "U.S. Federal Income Tax Treatment of the Claimant Trust", possibly in advance of any distributions to the Holders.

**AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES OF THE PLAN.**

**ARTICLE VII.
RECOMMENDATION**

In the opinion of the Debtor, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for the highest distribution to the Debtor's creditors and interest holders.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Equity Interests than that which is proposed under the Plan. Accordingly, the Debtor recommends that all Holders of Claims and Equity Interests support confirmation of the Plan.

Appellee Appx. 00101
Appx. 00852
012914

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 09/25/25    Page 236 of 1017    PageID 13863
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 108 of 1803    PageID 10854
Case 19-34054-sgj11   Doc 1473   Filed 11/24/20    Entered 11/24/20 10:24:41    Page 101 of
178

Dated:  November 24, 2020

Respectfully submitted,

HIGHLAND CAPITAL MANAGEMENT, L.P.

James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring
Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.Com:

*Counsel for the Debtor and Debtor-in-Possession*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 10/06/25    Page 237 of 1017    PageID 13864
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 109 of 1803    PageID 10855
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 102 of
178

**EXHIBIT A**

**PLAN OF REORGANIZATION**

Appellee Appx. 00103

012916
Appx. 00354

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 01/06/25   Page 238 of 1017   PageID 13865
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 110 of 1803   PageID 10856
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 103 of
178

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND**
**CAPITAL MANAGEMENT, L.P.**

| **PACHULSKI STANG ZIEHL & JONES LLP** | **HAYWARD & ASSOCIATES PLLC** |
|---|---|
| Jeffrey N. Pomerantz (CA Bar No.143717) | Melissa S. Hayward (TX Bar No. 24044908) |
| Ira D. Kharasch (CA Bar No. 109084) | Zachery Z. Annable (TX Bar No. 24053075) |
| Gregory V. Demo (NY Bar No. 5371992) | 10501 N. Central Expy, Ste. 106 |
| 10100 Santa Monica Boulevard, 13th Floor | Dallas, TX 75231 |
| Los Angeles, CA 90067 | Telephone: (972) 755-7100 |
| Telephone: (310) 277-6910 | Facsimile: (972) 755-7110 |
| Facsimile:  (310) 201-0760 | Email: MHayward@HaywardFirm.com |
| Email: jpomerantz@pszjlaw.com | ZAnnable@HaywardFirm.com: |
| ikharasch@pszjlaw.com |  |
| gdemo@pszjlaw.com |  |

Counsel for the Debtor and Debtor-in-Possession

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

- 1 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/2025   Page 239 of 1017   PageID 13866
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 111 of 1803   PageID 10857
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 104 of
178

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME,
    GOVERNING LAW AND DEFINED TERMS ................................................1

    A.     Rules of Interpretation, Computation of Time and Governing Law ....................1

    B.     Defined Terms ..................................................................................................2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS ................16

    A.     Administrative Expense Claims..........................................................................16

    B.     Professional Fee Claims.....................................................................................17

    C.     Priority Tax Claims.............................................................................................17

ARTICLE III. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS
    AND EQUITY INTERESTS ......................................................................18

    A.     Summary .............................................................................................................18

    B.     Summary of Classification and Treatment of Classified Claims and
           Equity Interests...................................................................................................18

    C.     Elimination of Vacant Classes ...........................................................................18

    D.     Impaired/Voting Classes.....................................................................................19

    E.     Unimpaired/Non-Voting Classes ........................................................................19

    F.     Impaired/Non-Voting Classes.............................................................................19

    G.     Cramdown............................................................................................................19

    H.     Classification and Treatment of Claims and Equity Interests.............................19

    I.     Special Provision Governing Unimpaired Claims ...............................................24

    J.     Subordinated Claims...........................................................................................24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ..............................24

    A.     Summary .............................................................................................................24

    B.     The Claimant Trust .............................................................................................25

    1.     *Creation and Governance of the Claimant Trust and Litigation Sub-
           Trust.* ..................................................................................................................25

    2.     *Claimant Trust Oversight Committee* ..................................................................26

Appellee Appx. 00105

Appx. 00856

012918

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1186    Filed 10/30/25    Page 240 of 1017    PageID 13867
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 112 of 1803    PageID 10858
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 105 of
178

**Page**

3.    *Purpose of the Claimant Trust.* ...............................................................27

4.    *Purpose of the Litigation Sub-Trust.* .....................................................27

5.    *Claimant Trust Agreement and Litigation Sub-Trust Agreement.* .....................28

6.    *Compensation and Duties of Trustees.* ...................................................29

7.    *Cooperation of Debtor and Reorganized Debtor.* ................................29

8.    *United States Federal Income Tax Treatment of the Claimant Trust.* ...............30

9.    *Tax Reporting.* ........................................................................................30

10.   *Claimant Trust Assets.* ...........................................................................30

11.   *Claimant Trust Expenses.* .......................................................................31

12.   *Trust Distributions to Claimant Trust Beneficiaries.* ...........................31

13.   *Cash Investments.* ...................................................................................31

14.   *Dissolution of the Claimant Trust and Litigation Sub-Trust.* ...............................31

C.    The Reorganized Debtor ........................................................................32

1.    *Corporate Existence* ................................................................................32

2.    *Cancellation of Equity Interests and Release* .....................................32

3.    *Issuance of New Partnership Interests* .................................................32

4.    *Management of the Reorganized Debtor* ..............................................32

5.    *Vesting of Assets in the Reorganized Debtor* .......................................33

6.    *Purpose of the Reorganized Debtor* ......................................................33

7.    *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets* ..................................................................33

D.    Company Action ......................................................................................34

E.    Release of Liens, Claims and Equity Interests......................................34

F.    Cancellation of Notes, Certificates and Instruments...........................35

G.    Cancellation of Existing Instruments Governing Security Interests..................35

- iii -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 10/06/25   Page 241 of 1017   PageID 13868
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 113 of 1803   PageID 10859
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 106 of
178

|  | | **Page** |
|---|---|---|
| H. | Control Provisions | 35 |
| I. | Treatment of Vacant Classes | 36 |
| J. | Plan Documents | 36 |
| K. | Highland Capital Management, L.P. Retirement Plan and Trust | 36 |

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .......... 37

| A. | Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases | 37 |
|---|---|---|
| B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 38 |
| C. | Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases | 38 |

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .......... 39

| A. | Dates of Distributions | 39 |
|---|---|---|
| B. | Distribution Agent | 40 |
| C. | Cash Distributions | 40 |
| D. | Disputed Claims Reserve | 40 |
| E. | Distributions from the Disputed Claims Reserve | 40 |
| F. | Rounding of Payments | 41 |
| G. | *De Minimis* Distribution | 41 |
| H. | Distributions on Account of Allowed Claims | 41 |
| I. | General Distribution Procedures | 41 |
| J. | Address for Delivery of Distributions | 41 |
| K. | Undeliverable Distributions and Unclaimed Property | 42 |
| L. | Withholding Taxes | 42 |
| M. | Setoffs | 42 |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-6    Filed 05/23/25    Page 242 of 1017    PageID 13869
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 114 of 1803    PageID 10860
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 107 of
178

**Page**

N.    Surrender of Cancelled Instruments or Securities ................................................43

O.    Lost, Stolen, Mutilated or Destroyed Securities ................................................43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
         UNLIQUIDATED AND DISPUTED CLAIMS............................................43

A.    Filing of Proofs of Claim ................................................................43

B.    Disputed Claims................................................................43

C.    Procedures Regarding Disputed Claims or Disputed Equity Interests ...............44

D.    Allowance of Claims and Equity Interests.................................................44

1.    *Allowance of Claims* ................................................................44

2.    *Estimation* ................................................................44

3.    *Disallowance of Claims* ................................................................45

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN ................................................45

A.    Conditions Precedent to the Effective Date ................................................45

B.    Waiver of Conditions................................................................46

C.    Effect of Non-Occurrence of Conditions to Effectiveness ...............................47

D.    Dissolution of the Committee ................................................................47

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS ................47

A.    General................................................................47

B.    Discharge of Claims................................................................47

C.    Exculpation ................................................................48

D.    Releases by the Debtor................................................................48

E.    Preservation of Rights of Action................................................................50

1.    *Maintenance of Causes of Action* ................................................................50

2.    *Preservation of All Causes of Action Not Expressly Settled or Released*...........50

F.    Injunction ................................................................50

Appellee Appx. 00108
Appx. 00350
012921

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/25/804  Page 243 of 1017    PageID 13870
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 115 of 1803    PageID 10861
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 108 of
178

**Page**

    G.     Term of Injunctions or Stays.................................................................51

    H.     Continuance of January 9 Order .........................................................52

ARTICLE X. BINDING NATURE OF PLAN ...................................................52

ARTICLE XI. RETENTION OF JURISDICTION................................................52

ARTICLE XII. MISCELLANEOUS PROVISIONS ............................................54

    A.     Payment of Statutory Fees and Filing of Reports ...............................54

    B.     Modification of Plan ............................................................................55

    C.     Revocation of Plan ..............................................................................55

    D.     Obligations Not Changed.....................................................................55

    E.     Entire Agreement .................................................................................55

    F.     Closing of Chapter 11 Case .................................................................55

    G.     Successors and Assigns........................................................................56

    H.     Reservation of Rights...........................................................................56

    I.     Further Assurances ..............................................................................56

    J.     Severability .........................................................................................57

    K.     Service of Documents ..........................................................................57

    L.     Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of
           the Bankruptcy Code............................................................................58

    M.     Governing Law ....................................................................................58

    N.     Tax Reporting and Compliance ...........................................................58

    O.     Exhibits and Schedules ........................................................................59

    P.     Controlling Document .........................................................................59

Appellee Appx. 00109
Appx. 00300
012922

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 07/25/25    Page 244 of 1017    PageID 13871
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 116 of 1803    PageID 10862
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 109 of
178

## DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "Debtor"), proposes the following chapter 11 plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan. The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein. There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents. All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein. Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

### A.     Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns;

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 116   Filed 110/08/025 1804   Page 245 of 1017   PageID 13872
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 117 of 1803   PageID 10863
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 110 of
178

(h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America.  The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

**B.** <u>**Defined Terms**</u>

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.  "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2.  "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3.  "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4.  "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5.  "*Affiliate*" means an "affiliate" as defined in section 101(2) of the Bankruptcy Code and also includes any other Entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such affiliate.  For the purposes of this definition, the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6.  "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not

2

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 01/06/25    Page 246 of 1017    PageID 13873
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 118 of 1803    PageID 10864
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 111 of
178

unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7. "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8. "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9. "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10. "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11. "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

15. "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

Appellee Appx. 00112
Appx. 00303
012925

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 02/06/25    Page 247 of 1017    PageID 13874
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 119 of 1803    PageID 10865
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 112 of
178

16. "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19. "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims.  The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20. "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21. "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22. "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23. "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

24. "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

Appellee Appx. 00113
Appx. 00304
012926

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/804   Page 248 of 1017   PageID 13875
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 120 of 1803   PageID 10866
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 113 of
178

25. "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26. "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC.  For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27. "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28. "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement.  The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29. "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30. "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold Claimant Trust Interests unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

Appellee Appx. 00114
Appx. 00365
012927

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/04   Page 249 of 1017   PageID 13876
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 121 of 1803   PageID 10867
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 114 of
178

31. "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32. "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34. "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35. "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36. "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37. "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38. "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41. "*Convenience Claim*" means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

42. "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein. Any Cash remaining in the Convenience Claim Pool after all

Appellee Appx. 00115
Appx. 00305
012928

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1036 of 1804    Page 250 of 1017    PageID 13877
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 122 of 1803    PageID 10868
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 115 of 178

distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43. "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44. "*Contingent Claimant Trust Interests*" means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved. As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45. "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46. "*Delaware Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

47. "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48. "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49. "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50. "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

Appellee Appx. 00116
Appx. 00307
012929

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 04/25/24    Page 251 of 1017    PageID 13878
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 123 of 1803    PageID 10869
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 116 of
178

51. "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52. "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53. "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54. "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55. "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56. "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

57. "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

58. "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

59. "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

60. "*Estate Claims*" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [D.I. 354].

61. "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the

8

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-6   Filed 05/23/25   Page 252 of 1017   PageID 13879
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 124 of 1803   PageID 10870
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 117 of
178

Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

62. "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

63. "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

64. "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

65. "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

66. "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

67. "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

68. "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

69. "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an:  (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

70. "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

71. "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

Appellee Appx. 00118
Appx. 00369
012931

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 06/25/25   Page 253 of 1017   PageID 13880
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 125 of 1803   PageID 10871
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 118 of
178

72. "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

73. "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

74. "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

75. "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

76. "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

77. "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

78. "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

79. "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

80. "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement.  As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

81. "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

82. "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

Appellee Appx. 00119
Appx. 00379
012932

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 10/06/25   Page 254 of 1017   PageID 13881
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 126 of 1803   PageID 10872
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 119 of
178

83. "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

84. "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

85. "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

86. "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

87. "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

88. "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

89. "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

90. "*Petition Date*" means October 16, 2019.

91. "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices, and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

92. "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

93. "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

94. "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of

Appellee Appx. 00120
Appx. 00371
012933

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Exhibit    Page 108 of 1804    Page 255 of 1017    PageID 13882
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 127 of 1803    PageID 10873
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 120 of
178

Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

95. "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

96. "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

97. "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

98. "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

99. "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

100. "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

101. "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

102. "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

103. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

Appellee Appx. 00121
Appx. 00372
012934

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 129 of 1804   Page 256 of 1017   PageID 13883
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 128 of 1803   PageID 10874
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 121 of
178

104.    "*Protected Parties*" means, collectively, (i) the Debtor and its successors
and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the
Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the
Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant
Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the
members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP
LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case,
(xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through
(xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada,
NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor
Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed
entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed
entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund
Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain
Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any
trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

105.    "*PTO Claims*" means any Claim for paid time off in favor of any Debtor
employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section
507(a)(4) of the Bankruptcy Code.

106.    "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

107.    "*Reinstated*" means, with respect to any Claim or Equity Interest, (a)
leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder
of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b)
notwithstanding any contractual provision or applicable law that entitles the Holder of such
Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity
Interest after the occurrence of a default: (i) curing any such default that occurred before or after
the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy
Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be
cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed
before such default; (iii) compensating the Holder of such Claim or Equity Interest for any
damages incurred as a result of any reasonable reliance by such Holder on such contractual
provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to
perform a nonmonetary obligation, other than a default arising from failure to operate a non-
residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code,
compensating the Holder of such Claim or Equity Interest (other than any Debtor or an insider of
any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and
(v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles
the Holder of such Claim.

108.    "*Rejection Claim*" means any Claim for monetary damages as a result of
the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

109.    "*Related Entity*" means, without duplication, (a) James Dondero, (b) Mark
Okada, (c) Grant Scott, (d) Hunter Covitz, (e) any entity or person that was an insider of the

Appellee Appx. 00122

Appx. 00375

012935

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/24   Page 257 of 1017   PageID 13884
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 129 of 1803   PageID 10875
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 122 of
178

Debtor on the Petition Date under Section 101(31) of the Bankruptcy Code, including any non-statutory insider, (f) any entity that, after the Effective Date, is controlled directly or indirectly by James Dondero, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, and (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries.

110.     "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present and former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, employees, subsidiaries, divisions, management companies, and other representatives, in each case solely in their capacity as such.

111.     "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

112.     "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

113.     "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust.  For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

114.     "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

115.     "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

116.     "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

117.     "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

118.     "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the

Appellee Appx. 00123
Appx. 00374
012936

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-6   Filed 03/06/25   Page 258 of 1017   PageID 13885
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 130 of 1803   PageID 10876
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 123 of 178

creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

119.    "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

120.    "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

121.    "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

122.    "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

123.    "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

124.    "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

125.    "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

126.    "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

127.    "*Subordinated Claim*" means any Claim that (i) is or may be subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court or (ii) arises from a Class A Limited Partnership Interest or a Class B/C Limited Partnership Interest.

128.    "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

129.    "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

130.    "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

Appellee Appx. 00124
Appx. 00375
012937

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 03/26/25   Page 259 of 1017   PageID 13886
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 131 of 1803   PageID 10877
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 124 of 178

131.   "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

132.   "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

133.   "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

134.   "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

135.   "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

### A.   Administrative Expense Claims

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

Appellee Appx. 00125
Appx. 00376
012938

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 03/25/804    Page 260 of 1017    PageID 13887
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 132 of 1803    PageID 10878
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 125 of
178

B.    **Professional Fee Claims**

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline.  Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement.  The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date.  Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

C.    **Priority Tax Claims**

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, or (b) such other less favorable treatment as agreed to in writing by the Debtor and such Holder.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

Appellee Appx. 00126
Appx. 00377
012939

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 04/01/25   Page 261 of 1017   PageID 13888
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 133 of 1803   PageID 10879
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 126 of
178

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

A.   **Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

B.   **Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

C.   **Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of

18

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Page 1056 of 1804   Page 262 of 1017   PageID 13889
Exhibit 6   Page 135 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 134 of 1803   PageID 10880
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 127 of
178

voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**D.   Impaired/Voting Classes**

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

**E.   Unimpaired/Non-Voting Classes**

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

**F.   Impaired/Non-Voting Classes**

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

**G.   Cramdown**

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**H.   Classification and Treatment of Claims and Equity Interests**

   1.   *Class 1 – Jefferies Secured Claim*

- *Classification*: Class 1 consists of the Jefferies Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired. Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*: Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan

19

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1186   Filed 06/25/804   Page 263 of 1017   PageID 13890
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 135 of 1803   PageID 10881
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 128 of
178

pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

2. *Class 2 – Frontier Secured Claim*

- *Classification*: Class 2 consists of the Frontier Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim: (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note. The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*: Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

3. *Class 3 – Other Secured Claims*

- *Classification*: Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*: Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

4. *Class 4 – Priority Non-Tax Claims*

- *Classification*: Class 4 consists of the Priority Non-Tax Claims.

20

Appellee Appx. 00129
Appx. 00880
012942

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 07/06/25    Page 264 of 1017    PageID 13891
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 136 of 1803    PageID 10882
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 129 of
178

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5.    *Class 5 – Retained Employee Claims*

- *Classification*:  Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6.    *Class 6 – PTO Claims*

- *Classification*:  Class 6 consists of the PTO Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

Appellee Appx. 00130
Appx. 00881
012943

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 03/25   Page 265 of 1017   PageID 13892
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 137 of 1803   PageID 10883
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 130 of
178

7. <u>*Class 7 – Convenience Claims*</u>

- *Classification*: Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*:  Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8. <u>*Class 8 – General Unsecured Claims*</u>

- *Classification*: Class 8 consists of the General Unsecured Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

9. <u>*Class 9 – Subordinated Claims*</u>

- *Classification*: Class 9 consists of the Subordinated Claims.

Appellee Appx. 00131
Appx. 00882
0̶1̶2̶9̶4̶4̶

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 03/21/25   Page 266 of 1017   PageID 13893
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 138 of 1803   PageID 10884
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 131 of
178

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 9 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive either (i) the treatment provided to Allowed Class 8 Claims or (ii) if such Allowed Class 9 Claim is subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court, its Pro Rata share of the Subordinated Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10.   <u>Class 10 – Class B/C Limited Partnership Interests</u>

- *Classification*: Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

Appellee Appx. 00132
Appx. 00885
012945

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1186   Filed 04/06/25 1804   Page 267 of 1017   PageID 13894
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 139 of 1803   PageID 10885
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 132 of
178

11.   _Class 11 – Class A Limited Partnership Interests_

- _Classification_:  Class 11 consists of the Class A Limited Partnership Interests.

- _Treatment_:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

   Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- _Impairment and Voting_:  Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

**I.   Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**J.   Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Under section 510 of the Bankruptcy Code, upon written notice, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THIS PLAN**

**A.   Summary**

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

Appellee Appx. 00133
Appx. 00884
012946

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 04/16/25    Page 268 of 1017    PageID 13895
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 140 of 1803    PageID 10886
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 133 of
178

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner.  The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement.  Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC.  The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan.  The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement.  Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

**B.    The Claimant Trust**[2]

*1.          Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries.  Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

Appellee Appx. 00134
Appx. 00885
012947

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1    Filed 04/26/25    Page 269 of 1017    PageID 13896
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 141 of 1803    PageID 10887
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 134 of
178

rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2.        *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be

Appellee Appx. 00135
Appx. 00886
012948

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 04/06/25    Page 270 of 1017    PageID 13897
Exhibit 6    Page 143 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 142 of 1803    PageID 10888
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 135 of
178

overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3.        *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4.        *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

Appellee Appx. 00136
Appx. 00885
012949

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 04/02/25   Page 271 of 1017   PageID 13898
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 143 of 1803   PageID 10889
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 136 of
178

*5.*          *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

(i)      the payment of the Claimant Trust Expenses;

(ii)     the payment of other reasonable expenses of the Claimant Trust;

(iii)    the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)    the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)     the orderly monetization of the Claimant Trust Assets;

(vi)    litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)   the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii)  the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)    the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expenses and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. In all circumstances, the Claimant Trustee shall act in the best interests of the Claimant Trust Beneficiaries and with the same fiduciary duties as a chapter 7 trustee.

28

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1 86    Filed 04/30/25 1804    Page 272 of 1017    PageID 13899
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 144 of 1803    PageID 10890
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 137 of
178

The Litigation Sub-Trust Agreement generally will provide for, among other things:

(i)    the payment of other reasonable expenses of the Litigation Sub-Trust;

(ii)    the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii)    the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6.    _Compensation and Duties of Trustees._

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.    _Cooperation of Debtor and Reorganized Debtor._

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

Appellee Appx. 00138
Appx. 00389
012951

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Page 1046 of 1804   Page 273 of 1017   PageID 13900
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 145 of 1803   PageID 10891
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 138 of 178

8.        United States Federal Income Tax Treatment of the Claimant Trust.

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as: (a) a transfer of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9.        Tax Reporting.

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10.        Claimant Trust Assets.

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the

Appellee Appx. 00139
Appx. 00599
012952

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Page 106 of 121, 804    Page 274 of 1017    PageID 13901
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 146 of 1803    PageID 10892
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 139 of 178

Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

11.        _Claimant Trust Expenses._

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12.        _Trust Distributions to Claimant Trust Beneficiaries._

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, _provided_ that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13.        _Cash Investments._

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; _provided, however,_ that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14.        _Dissolution of the Claimant Trust and Litigation Sub-Trust._

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as:  (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Claimant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the

Appellee Appx. 00140
Appx. 00591
012953

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 04/28/25    Page 275 of 1017    PageID 13902
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 147 of 1803    PageID 10893
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 140 of
178

Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

C.    **The Reorganized Debtor**

  *1.*   *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

  *2.*   *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

  *3.*   *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

  *4.*   *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant

Appellee Appx. 00141
Appx. 00392
012954

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 04/09/25   Page 276 of 1017   PageID 13903
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 148 of 1803   PageID 10894
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 141 of 178

Trustee.  The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor.  Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes.  Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5.          *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6.          *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7.          *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement.   As set forth in the Reorganized Limited Partnership Agreement, the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor.  Any assets distributed to the Claimant Trust

Appellee Appx. 00142
Appx. 00393
012955

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/06/25   Page 277 of 1017   PageID 13904
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 149 of 1803   PageID 10895
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 142 of 178

will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

**D.      Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

**E.      Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the

Appellee Appx. 00143
Appx. 005394
012956

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 05/16/25   Page 278 of 1017   PageID 13905
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 150 of 1803   PageID 10896
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 143 of 178

Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable.  For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### F.      Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### G.      Cancellation of Existing Instruments Governing Security Interests

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

### H.      Control Provisions

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

Appellee Appx. 00144
Appx. 00395
012957

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/26/25   Page 279 of 1017   PageID 13906
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 151 of 1803   PageID 10897
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 144 of
178

**I.    Treatment of Vacant Classes**

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

**J.    Plan Documents**

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

**K.    Highland Capital Management, L.P. Retirement Plan and Trust**

The Highland Capital Management, L.P. Retirement And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461. The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code. The Debtor reserves the right to contest any such liability or responsibility.

Appellee Appx. 00145
Appx. 09386
012958

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Filed 05/30/25    Page 280 of 1017    PageID 13907
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 152 of 1803    PageID 10898
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 145 of
178

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**     **Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases**

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to a Final Order of the Bankruptcy Court entered prior to the Effective Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan Supplement, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Effective Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Appellee Appx. 00146
Appx. 00387
012959

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/16/25   Page 281 of 1017   PageID 13908
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 153 of 1803   PageID 10899
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 146 of
178

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4), as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

**B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Effective Date shall be deemed rejected, pursuant to the Confirmation Order.  Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Effective Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred.  If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

**C.     Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree.  The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment.  Any and all Proofs of Claim based upon Executory Contracts

**Appellee Appx. 00147**
**Appx. 002960**
**012960**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1    Page 1556 of 1804    Page 282 of 1017    PageID 13909
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 154 of 1803    PageID 10900
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 147 of
178

or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

### ARTICLE VI.
### PROVISIONS GOVERNING DISTRIBUTIONS

A.    **Dates of Distributions**

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein.  If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan.  Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests.  The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

Appellee Appx. 00148
Appx. 00399
012961

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/2 Exhibit 6   Page 1056 of 1804 Page 283 of 1017   PageID 13910
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 155 of 1803   PageID 10901
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 148 of
178

**B.      Distribution Agent**

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter.  The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

**C.      Cash Distributions**

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

**D.      Disputed Claims Reserve**

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

**E.      Distributions from the Disputed Claims Reserve**

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount.  To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date.  For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests. If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

Appellee Appx. 00149
Appx. 004409
012962

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/06/25   Page 284 of 1017   PageID 13911
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 156 of 1803   PageID 10902
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 149 of
178

**F.**   **Rounding of Payments**

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

**G.**   *De Minimis* **Distribution**

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

**H.**   **Distributions on Account of Allowed Claims**

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

**I.**   **General Distribution Procedures**

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

**J.**   **Address for Delivery of Distributions**

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

Appellee Appx. 00150
Appx. 00401
012963

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/06/25   Page 285 of 1017   PageID 13912
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 157 of 1803   PageID 10903
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 150 of
178

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

**K.**   **Undeliverable Distributions and Unclaimed Property**

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

**L.**   **Withholding Taxes**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

**M.**   **Setoffs**

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to

42

Appellee Appx. 00151
Appx. 009402
012964

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 05/06/25   Page 286 of 1017   PageID 13913
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 158 of 1803   PageID 10904
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 151 of
178

such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

**N.**    **Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

**O.**    **Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent:  (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest.  Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

### ARTICLE VII.
### PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

**A.**    **Filing of Proofs of Claim**

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

**B.**    **Disputed Claims**

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest or any other appropriate motion or adversary proceeding with respect thereto, which shall be litigated to Final Order or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such

Appellee Appx. 00152
Appx. 002403
012965

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 Page 1006 of 1804   Page 287 of 1017   PageID 13914
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 159 of 1803   PageID 10905
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 152 of
178

Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

**C.**  **Procedures Regarding Disputed Claims or Disputed Equity Interests**

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

**D.**  **Allowance of Claims and Equity Interests**

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

*1.*  *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

*2.*  *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation proceeding.

Appellee Appx. 00153

Appx. 001404

012966

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/02/25   Page 288 of 1017   PageID 13915
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 160 of 1803   PageID 10906
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 153 of 178

3. *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

**ARTICLE VIII.
EFFECTIVENESS OF THIS PLAN**

A. **Conditions Precedent to the Effective Date**

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have been entered, not subject to stay pending appeal, and shall be in form and substance reasonably acceptable to the Debtor and the Committee. The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering

Appellee Appx. 00154
Appx. 002465
012967

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Page 1026 of 1804   Page 289 of 1017   PageID 13916
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 161 of 1803   PageID 10907
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 154 of
178

into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Agreement, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect.  All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

**B.**     **Waiver of Conditions**

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan.  The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized

46

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1 Exhibit 6    Filed 06/02/25 Page 1063 of 1804    Page 290 of 1017    PageID 13917
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 162 of 1803    PageID 10908
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 155 of 178

Debtor, or the Claimant Trust, as applicable.

**C.    Effect of Non-Occurrence of Conditions to Effectiveness**

Unless waived as set forth in ARTICLE VIII.B, if the Effective Date of this Plan does not occur within twenty calendar days of entry of the Confirmation Order, the Debtor may withdraw this Plan and, if withdrawn, the Plan shall be of no further force or effect.

**D.    Dissolution of the Committee**

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto).  The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

**ARTICLE IX.**
**EXCULPATION, INJUNCTION AND RELATED PROVISIONS**

**A.    General**

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

**B.    Discharge of Claims**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose

47

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/25   Page 291 of 1017   PageID 13918
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 163 of 1803   PageID 10909
Case 19-34054-sgj11  Doc 1473  Filed 11/24/20   Entered 11/24/20 10:24:41   Page 156 of 178

before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

## C. __Exculpation__

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v); _provided_, _however,_ the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

## D. __Releases by the Debtor__

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal

48

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/25   Page 292 of 1017   PageID 13919
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 164 of 1803   PageID 10910
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 157 of 178

misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims

Appellee Appx. 00158
Appx. 004409
012971

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 10/06/25 1804   Page 293 of 1017   PageID 13920
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 165 of 1803   PageID 10911
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 158 of 178

brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

**E.   Preservation of Rights of Action**

*1.   Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

*2.   Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

**F.   Injunction**

Upon entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective Related Persons, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether proof of such Claims or Equity Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest,

Appellee Appx. 00159
Appx. 06410
012972

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-6   Filed 06/02/25   Page 294 of 1017   PageID 13921
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 166 of 1803   PageID 10912
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 159 of 178

along with their respective Related Persons, are permanently enjoined, on and after the Effective Date, with respect to such Claims and Equity Interests, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or against property or interests in property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

The injunctions set forth herein shall extend to any successors of the Debtor, the Reorganized Debtor, and the Claimant Trust and their respective property and interests in property.

**Subject in all respects to ARTICLE XII.D, no Entity may commence or pursue a claim or cause of action of any kind against any Protected Party that arose from or is related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice, that such claim or cause of action represents a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Entity to bring such claim against any such Protected Party; *provided, however,* the foregoing will not apply to Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date.  As set forth in ARTICLE XI, the Bankruptcy Court will have sole jurisdiction to adjudicate any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted.**

G.     <u>Term of Injunctions or Stays</u>

Unless otherwise provided in this Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

51

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/25   Page 295 of 1017   PageID 13922
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 167 of 1803   PageID 10913
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 160 of
178

**H.**      **Continuance of January 9 Order**

Unless otherwise provided in this Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date until the dissolution of each of the Claimant Trust and the Litigation Trust.

## ARTICLE X.
## BINDING NATURE OF PLAN

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan. All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

## ARTICLE XI.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan as legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

Appellee Appx. 00161
0012974

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 06/25/25    Page 296 of 1017    PageID 13923
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 168 of 1803    PageID 10914
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 161 of
178

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

Appellee Appx. 00162

Appx. 00413

012975

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Filed 07/06/25    Page 297 of 1017    PageID 13924
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 169 of 1803    PageID 10915
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 162 of 178

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

### ARTICLE XII.
### MISCELLANEOUS PROVISIONS

**A.    Payment of Statutory Fees and Filing of Reports**

All outstanding Statutory Fees shall be paid on the Effective Date.  All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed.  The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee.  The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/06/25   Page 298 of 1017   PageID 13925
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 170 of 1803   PageID 10916
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 163 of
178

**B.      Modification of Plan**

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

**C.      Revocation of Plan**

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee.  If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

**D.      Obligations Not Changed**

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

**E.      Entire Agreement**

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

**F.      Closing of Chapter 11 Case**

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

Appellee Appx. 00164
Appx. 06415
012977

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 07/26/25   Page 299 of 1017   PageID 13926
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 171 of 1803   PageID 10917
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 164 of
178

**G.      Successors and Assigns**

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

**H.      Reservation of Rights**

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs.  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

**I.      Further Assurances**

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

Appellee Appx. 00165
Appx. 00416
012978

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1186   Filed 07/36/25 1804   Page 300 of 1017   PageID 13927
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 172 of 1803   PageID 10918
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 165 of
178

**J.**      <u>Severability</u>

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**K.**      <u>Service of Documents</u>

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

<u>If to the Claimant Trust:</u>

Highland Claimant Trust
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  James P. Seery, Jr.

<u>If to the Debtor:</u>

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  James P. Seery, Jr.

<u>with copies to:</u>

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Attn:   Jeffrey N. Pomerantz, Esq.
       Ira D. Kharasch, Esq.
       Gregory V. Demo, Esq.

Appellee Appx. 00166
Appx. 00415
012979

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Page 1746 of 1804   Page 301 of 1017   PageID 13928
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 173 of 1803   PageID 10919
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 166 of
178

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey N. Pomerantz, Esq.
          Ira D. Kharasch, Esq.
          Gregory V. Demo, Esq.

**L.      Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code**

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

**M.      Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

**N.      Tax Reporting and Compliance**

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

Appellee Appx. 00167
Appx. 00418
012980

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Page 175 of 1804    Page 302 of 1017    PageID 13929
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 174 of 1803    PageID 10920
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 167 of
178

**O.**    **Exhibits and Schedules**

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

**P.**    **Controlling Document**

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control.  The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

Appellee Appx. 00168

Appx. 00119

012981

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 07/05/25    Page 303 of 1017    PageID 13930
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 175 of 1803    PageID 10921
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 168 of 178

Dated:  November 24, 2020

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

James P. Seery, Jr.
Chief Executive Officer and Chief
Restructuring Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/06/25   Page 304 of 1017   PageID 13931
Exhibit B   Page 107 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 176 of 1803   PageID 10922
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 169 of
178

**EXHIBIT B**

**ORGANIZATIONAL CHART OF THE DEBTOR**

Appellee Appx. 00170
012983
Appx. 00421

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 178 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 177 of 1803    PageID 10923

Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 170 of
178



Appellee Appx. 00171

012984

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/06/25   Page 306 of 1017   PageID 13933
Exhibit C   Page 1079 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 178 of 1803   PageID 10924
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 171 of
178

**EXHIBIT C**

**LIQUIDATION ANALYSIS/FINANCIAL PROJECTIONS**

Appellee Appx. 00172

012985

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 180 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 179 of 1803    PageID 10925
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 172 of
178

*Highland Capital Management, L.P.*
*Disclaimer For Financial Projections*

   This document includes financial projections for July 2020 through December 2022 (the "Projections") for Highland Capital Management, L.P. "Company"). These Projections have been prepared by DSI with input from management at the Company. The historical information utilized in these Projections has not been audited or reviewed for accuracy by DSI.

   This Memorandum includes certain statements, estimates and forecasts provided by the Company with respect to the Company's anticipated future performance. These estimates and forecasts contain significant elements of subjective judgment and analysis that may or may not prove to be accurate or correct. There can be no assurance that these statements, estimates and forecasts will be attained and actual outcomes and results may differ materially from what is estimated or forecast herein.

   These Projections should not be regarded as a representation of DSI that the projected results will be achieved.

   Management may update or supplement these Projections in the future, however, DSI expressly disclaims any obligation to update its report.

   These Projections were not prepared with a view toward compliance with published guidelines of the Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding historical financial statements, projections or forecasts.

11/13/2020

Appellee Appx. 00173

012986

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 181 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 180 of 1803    PageID 10926
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 173 of
178

*Highland Capital Management, L.P.*
*Statement of Assumptions*

    A. Plan effective date is January 31 ,2021.
    B. All investment assets are sold by December 31, 2022.
    C. All demand notes are collected in the year 2021.
    D. All notes receivable with maturity dates beyond 12/31/2022 are sold in Q4 2022; in
       interim interest income and principal payments are collected as they become due.
    E. Fixed assets used in daily business operations are sold in February 2021.
    F. Accrual for employee bonuses as of January 2021 are reversed and not paid.
    G. All Management advisory or shared service contracts are terminated on their terms by the effective date or shortly thereafter
    H. Post-effective date, the reorganized Debtor would retain three HCMLP employees as contractors to help monetize the remaining assets.
    I. Litigation Trustee budget is $6,500,000.
    J. Unrealized gains or losses are not recorded on a monthly basis; all gains or losses are recorded as realized gains or losses upon sale of asset.
    K. Plan does not provide for payment of interest to Class 8 holders of general unsecured claims, as set forth in the Plan. If holders of general unsecured claims receive 100%
       of their allowed claims, they would then be entitled to receive interest at the federal judgement rate, prior to any funds being available for claims or
       interest of junior priority.
    L. Plan assumes zero allowed claims for UBS, IFA, the HarbourVest entities (collectively "HV") and Hunter Mountain Investment Trust ("HM").
    M. Claim amounts listed in Plan vs. Liquidation schedule are subject to change; claim amounts in Class 8 assume $0 for UBS, IFA, HM and HV.
       Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets
    N. With the exception of Class 2 - Frontier, Classes 1-7 will be paid in full within 30 days of effective date.
    O. Class 7  payout limited to 85% of each individual creditor claim or in the aggregate $13.15 million. Plan currently projects Class 7 payout of $9.96 million.
    P. See below for Class 8 estimated payout schedule; payout is subject to certain assets being monetized by payout date:
        o By September 30, 2021 - $50,000,000
        o By March 31, 2022 – additional $50,000,000
        o By June 30, 2022 – additional $25,000,000
        o All remaining proceeds are assumed to be paid out on or soon after all remaining assets are monetized.

11/13/2020

**Appellee Appx. 00174**

012987

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 182 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 181 of 1803    PageID 10927
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 174 of
178

*Highland Capital Management, L.P.*
*Plan Analysis Vs. Liquidation Analysis*
*(US $000's)*

|  | Plan Analysis | Liquidation Analysis |
|---|---:|---:|
| Estimated cash on hand at 1/31/2020 | $        25,076 | $        25,076 |
| Estimated proceeds from monetization of assets [1][2] | 190,445 | 149,197 |
| Estimated expenses through final distribution[1][3] | (33,642) | (36,232) |
| Total estimated $ available for distribution | 181,879 | 138,042 |
| Less: Claims paid in full |  |  |
| Unclassified [4] | (1,078) | (1,078) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 - Jefferies Secured Claim | - | - |
| Class 2 - Frontier Secured Claim [6] | (5,463) | (5,463) |
| Class 3 - Other Secured Claims | (551) | (551) |
| Class 4 – Priority Non-Tax Claims | (16) | (16) |
| Class 5 - Retained Employee Claims | - | - |
| Class 6 - PTO Claims | - | - |
| Class 7 - Convenience Claims [7][8][9] | (10,255) | - |
| Subtotal | (27,937) | (17,682) |
| Estimated amount remaining for distribution to general unsecured claims | 153,942 | 120,359 |
| Class 8 – General Unsecured Claims [8][10] | 176,049 | 192,258 |
| Subtotal | 176,049 | 192,258 |
| % Distribution to general unsecured claims | 87.44% | 62.60% |
| Estimated amount remaining for distribution | - | - |
| Class 9 – Subordinated Claims | *no distribution* | *no distribution* |
| Class 10 – Class B/C Limited Partnership Interests | *no distribution* | *no distribution* |
| Class 11 – Class A Limited Partnership Interest | *no distribution* | *no distribution* |

*Footnotes:*
*[1] Assumes chapter 7 Trustee will not be able to achieve same sales proceeds as Claimant Trustee*
   *Assumes Chapter 7 Trustee engages new professionals to help liquidate assets*
*[2] Sale of investment assets, sale of fixed assets, collection of accounts receivable and interest receivable*
*[3] Estimated expenses through final distribution exclude non-cash expenses:*
   *Depreciation of $462 thousand in 2021*
*[4] Unclassified claims include payments for priority tax claims and settlements with previously approved by the Bankruptcy Court*
*[5] Represents $4.7 million in unpaid professional fees and $4.5 million in timing of payments to vendors*
*[6] Debtor will pay all unpaid interest estimated at $253 thousand of Frontier on effective date and continue to pay interest quarterly at 5.25% until Frontier's collateral is sold*
*[7] Claims payout limited to 85% of each individual creditor claim or limited to a total class payout of $13.15 million*
*[8] Class 7 includes $1.1 million estimate for aggregate contract rejections damage and Class 8 includes $1.4 million for contract rejection damages*
*[9] Assumes 3 claimants with allowed claims less than $2.5 million opt into Class 7 along with claims of Senior Employees*
*[10] Class estimates $0 allowed claim for the following creditors: IFA, HV, HM and UBS; assumes RCP claims offset against HCMLP interest in RCP fund*

*Notes:*
*All claim amounts are estimated as of November 20, 2020 and subject to change*

11/13/2020

Appellee Appx. 00175
Appx. 01428
012988

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 183 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 182 of 1803    PageID 10928
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 175 of
178

**Highland Capital Management, L.P.**
**Balance Sheet**
**(US $000's)**

| | Actual Jun-20 | Actual Sep-20 | Forecast ---> Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | |
| Cash and Cash Equivalents | $ 14,994 | $ 5,888 | $ 28,342 | $ 4,934 | $ 96,913 | $ 90,428 | $ 106,803 | $ 52,322 | $ 23,641 | $ 21,344 | $ - |
| Other Current Assets | 13,182 | 13,651 | 10,559 | 9,629 | 7,746 | 7,329 | 5,396 | 6,054 | 6,723 | 7,406 | - |
| Investment Assets | 320,912 | 305,961 | 261,333 | 258,042 | 133,026 | 81,793 | 54,159 | 54,159 | 54,159 | 54,159 | - |
| Net Fixed Assets | 3,055 | 2,823 | 2,592 | 1,348 | - | - | - | - | - | - | - |
| **TOTAL ASSETS** | $ 352,142 | $ 328,323 | $ 302,826 | $ 273,952 | $ 237,684 | $ 179,550 | $ 166,358 | $ 112,535 | $ 84,523 | $ 82,910 | $ - |
| | | | | | | | | | | | |
| **Liabilities** | | | | | | | | | | | |
| Post-petition Liabilities | $ 26,226 | $ 19,138 | $ 19,280 | $ 2,891 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Pre-petition Liabilities | 126,365 | 126,343 | 121,950 | | | | | | | | |
| Claims | | | | | | | | | | | |
| Unclassified | - | - | - | - | - | - | - | - | - | - | - |
| Class 1 – Jefferies Secured Claim | - | - | - | - | - | - | - | - | - | - | - |
| Class 2 - Frontier Secured Claim | - | - | - | 5,210 | - | - | - | - | - | - | - |
| Class 3 - Other Secured Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 4 – Priority Non-Tax Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 5 – Retained Employee Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 6 - PTO Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 7 – Convenience Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 8 – General Unsecured Claims | - | - | - | 176,049 | 176,049 | 126,049 | 126,049 | 76,049 | 51,049 | 51,049 | 22,107 |
| Class 9 – Subordinated Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 10 – Class B/C Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Class 11 – Class A Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Claim Payable | 126,365 | 126,343 | 121,950 | 181,259 | 176,049 | 126,049 | 126,049 | 76,049 | 51,049 | 51,049 | 22,107 |
| **TOTAL LIABILITIES** | $ 152,591 | $ 145,481 | $ 141,230 | 184,150 | 176,049 | 126,049 | 126,049 | 76,049 | 51,049 | 51,049 | 22,107 |
| | | | | | | | | | | | |
| Partners' Capital | 199,551 | 182,842 | 161,596 | 89,802 | 61,635 | 53,501 | 40,309 | 36,486 | 33,473 | 31,860 | (22,107) |
| **TOTAL LIABILITIES AND PARTNERS' CAPITAL** | $ 352,142 | $ 328,323 | $ 302,826 | $ 273,952 | $ 237,684 | $ 179,550 | $ 166,358 | $ 112,535 | $ 84,523 | $ 82,910 | $ - |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Exhibit 6   Page 184 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 183 of 1803   PageID 10929
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 176 of
178

**Highland Capital Management, L.P.**
*Profit/Loss*
*(US $000's)*

| | Actual | Actual | Forecast ---> | | | | | | |
| | Jan 2020 to June 2020 Total | 3 month ended Sept 2020 | 3 month ended Dec 2020 | Total 2020 | 3 month ended Mar 2021 | 3 month ended Jun 2021 | 3 month ended Sept 2021 | 3 month ended Dec 2021 | Total 2021 |
|---|---|---|---|---|---|---|---|---|---|
| Revenue | | | | | | | | | |
| Management Fees | $ 6,572 | $ 1,949 | $ 2,651 | $ 11,173 | $ 779 | $ - | $ - | $ - | $ 779 |
| Shared Service Fees | 7,672 | 3,765 | 3,788 | 15,225 | 1,263 | - | - | - | 1,263 |
| Other Income | 3,126 | 538 | 340 | 4,004 | 113 | - | - | - | 113 |
| Total revenue | $ 17,370 | $ 6,252 | $ 6,779 | $ 30,401 | $ 2,154 | $ - | $ - | $ - | $ 2,154 |
| Operating Expenses [1] | 13,328 | 9,171 | 9,079 | 31,579 | 8,428 | 1,646 | 1,807 | 2,655 | 14,536 |
| Income/(loss) From Operations | $ 4,042 | $ (2,918) | $ (2,301) | $ (1,177) | $ (6,274) | $ (1,646) | $ (1,807) | $ (2,655) | $ (12,381) |
| Professional Fees | 17,522 | 7,707 | 7,741 | 32,971 | 5,450 | 5,058 | 2,048 | 1,605 | 14,160 |
| Other Income/(Expenses) [2] | 2,302 | 1,518 | 1,057 | 4,878 | (59,016) | 573 | 423 | 423 | (57,598) |
| Operating Gain/(Loss) | $ (11,178) | $ (9,107) | $ (8,985) | $ (29,270) | $ (70,741) | $ (6,130) | $ (3,432) | $ (3,837) | $ (84,139) |
| Realized and Unrealized Gain/(Loss) | | | | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | - | (763) | 522 | - | - | (241) |
| Net Realized Gain/(Loss) on Sale of Investment | (28,418) | 1,549 | (12,167) | (39,036) | (290) | 19 | (4,702) | (8,006) | (12,979) |
| Net Change in Unrealized Gain/(Loss) of Investments | (29,929) | (7,450) | - | (37,380) | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | (94) | (94) | - | (22,578) | - | (1,349) | (23,927) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | (80,782) | (1,700) | - | (82,482) | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ (139,129) | $ (7,601) | $ (12,262) | $ (158,992) | $ (1,053) | $ (22,037) | $ (4,702) | $ (9,355) | $ (37,147) |
| Net Income | $ (150,307) | $ (16,708) | $ (21,247) | $ (188,262) | $ (71,794) | $ (28,167) | $ (8,134) | $ (13,192) | $ (121,287) |

*Footnotes:*
[1] Operating expenses include an adjustment in January 2021 to account
for expenses that have not been accrued or paid prior to effective date.
[2] Other income and expenses of $61.2 million in January 2021 includes:
[a] $77.7 million was expensed to record for the increase of
allowed claims.
[b] Income of $15.8 million for the accrued, but unpaid payroll liability related to
the Debtor's deferred bonus programs amount written-off.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 185 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 184 of 1803    PageID 10930
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 177 of
178

**Highland Capital Management, L.P.**
*Profit/Loss*
*(US $000's)*

|  | Forecast ---> | | | | | |
|  | 3 month ended Mar 2022 | 3 month ended Jun 2022 | 3 month ended Sept 2022 | 3 month ended Dec 2022 | Total 2022 | Plan |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| Management Fees | $ - | $ - | $ - | $ - | $ - | 779 |
| Shared Service Fees | - | - | - | - | - | 1,263 |
| Other Income | - | - | - | - | - | 113 |
| Total revenue | $ - | $ - | $ - | $ - | $ - | 2,154 |
| Operating Expenses | 1,443 | 643 | 758 | 1,088 | 3,932 | 18,468 |
| Income/(loss) From Operations | $ (1,443) | $ (643) | $ (758) | $ (1,088) | $ (3,932) | (16,314) |
| Professional Fees | 2,788 | 2,788 | 1,288 | 1,288 | 8,153 | 22,313 |
| Other Income/(Expenses) | 408 | 419 | 434 | 184 | 1,444 | (56,154) |
| Operating Gain/(Loss) | $ (3,823) | $ (3,013) | $ (1,613) | $ (2,193) | $ (10,641) | (94,780) |
| **Realized and Unrealized Gain/(Loss)** | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | (51,775) | (51,775) | (52,016) |
| Net Realized Gain/(Loss) on Sale of Investment | - | - | - | - | - | (12,979) |
| Net Change in Unrealized Gain/(Loss) of Investments | - | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | (23,927) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ - | $ - | $ - | $ (51,775) | $ (51,775) | (88,922) |
| Net Income | $ (3,823) | $ (3,013) | $ (1,613) | $ (53,967) | $ (62,415) | (183,702) |

11/13/2020
**Appellee Appx. 00178**
**Appx. 01429**
012991

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 186 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 185 of 1803    PageID 10931
Case 19-34054-sgj11  Doc 1473  Filed 11/24/20   Entered 11/24/20 10:24:41    Page 178 of
178

*Highland Capital Management, L.P.*
*Cash Flow Indirect*
*(US $000's)*

| | Forecast ----> | | | | | | | | | |
| | Sep-20 | Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net (Loss) Income | $ (16,708) $ | (21,247) | $ (71,794) $ | (28,167) $ | (8,134) $ | (13,192) | $ (3,823) $ | (3,013) $ | (1,613) $ | (53,967) |
| Cash Flow from Operating Activity | | | | | | | | | | |
| (Increase) / Decrease in Cash | | | | | | | | | | |
| Depreciation and amortization | 231 | 231 | 231 | 231 | - | - | - | - | - | - |
| Other realized (gain)/ loss | - | - | 763 | (522) | - | - | - | - | - | 51,775 |
| Investment realized (gain)/ loss | (1,549) | 12,262 | 290 | 22,559 | 4,702 | 9,355 | - | - | - | - |
| Unrealized (gain) / loss | (9,150) | - | - | - | - | - | - | - | - | - |
| (Increase) Decrease in Current Assets | (470) | 3,092 | 930 | 1,884 | 417 | 1,933 | (658) | (669) | (684) | 2,010 |
| Increase (Decrease) in Current Liabilities | (7,110) | (4,251) | (54,172) | (2,891) | - | - | - | - | - | - |
| Net Cash Increase / (Decrease) - Operating Activities | (34,757) | (9,913) | (123,752) | (6,907) | (3,015) | (1,904) | (4,481) | (3,681) | (2,297) | (182) |
| | | | | | | | | | | |
| Cash Flow From Investing Activities | | | | | | | | | | |
| Proceeds from Sale of Fixed Assets | - | - | 250 | 1,639 | - | - | - | - | - | - |
| Proceeds from Investment Assets | 25,650 | 32,366 | 3,002 | 102,457 | 46,531 | 18,278 | - | - | - | 7,780 |
| Net Cash Increase / (Decrease) - Investing Activities | 25,650 | 32,366 | 3,252 | 104,096 | 46,531 | 18,278 | - | - | - | 7,780 |
| | | | | | | | | | | |
| Cash Flow from Financing Activities | | | | | | | | | | |
| Claims payable | - | - | (73,997) | - | - | - | - | - | - | - |
| Claim reclasses/(paid) | - | - | 181,259 | (5,210) | (50,000) | - | (50,000) | (25,000) | - | (28,942) |
| Maple Avenue Holdings | - | - | (4,975) | - | - | - | - | - | - | - |
| Frontier Note | - | - | (5,195) | - | - | - | - | - | - | - |
| Net Cash Increase / (Decrease) - Financing Activities | - | - | 97,092 | (5,210) | (50,000) | - | (50,000) | (25,000) | - | (28,942) |
| | | | | | | | | | | |
| Net Change in Cash | $ (9,107) $ | 22,454 | $ (23,408) $ | 91,979 $ | (6,484) $ | 16,374 | $ (54,481) $ | (28,681) $ | (2,297) $ | (21,344) |
| Beginning Cash | 14,994 | 5,888 | 28,342 | 4,934 | 96,913 | 90,428 | 106,803 | 52,322 | 23,641 | 21,344 |
| Ending Cash | $ 5,887 $ | 28,342 | $ 4,934 $ | 96,913 $ | 90,428 $ | 106,803 | $ 52,322 $ | 23,641 $ | 21,344 $ | - |

11/13/2020

Appellee Appx. 00179
Appx. 019129
012992

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S     Document 15-186    Filed 08/05/25    Page 314 of 1017     PageID 13941
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 186 of 1803    PageID 10932

# APPENDIX 2

Appellee Appx. 00180

Appx. 00131
012993

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 06/25/04   Page 315 of 1017   PageID 13942
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 187 of 1803   PageID 10933

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

---

REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND,

                Claimant,

v.                                Case No. 01-16-0002-6927

HIGHLAND CAPITAL MANAGEMENT, L.P.,

                Respondent.

---

## PARTIAL FINAL AWARD

    WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with Section 9.03 of the Joint Plan of Distribution, and the Scheme of Arrangement, both entered into between the above-named parties and adopted in July 2011, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby, AWARD, as follows:

I.      Introduction
      A.     The Parties
           1.     Claimant is a Committee of Redeemers in the Highland Crusader Fund (the "Committee"). Pursuant to the Joint Plan of Distribution of the Crusader Funds ("the Plan") and the Scheme of Arrangement between Highland Crusader Fund and its Scheme Creditors ("the Scheme")[1], HC300, the Committee was elected from among the investors in the Crusader Fund to oversee the management of the Crusader Fund by Highland Capital Management, L.P. (Highland Capital). The Plan and the Scheme are the governing documents which contain the arbitration agreements giving rise to this arbitration. The Committee is represented by Terri Mascherin, Andrew Vail, and Shaun Van Horn of Jenner & Block LLP.

           2.     Respondent, or Highland, is an investment manager and, until July 2016, served as such for the Highland Crusader Funds ("Crusader Funds" or the "Funds") that were formed between 2000 and 2002. The Funds consisted of one "Onshore Fund" and two "Offshore Funds," and the capital that was raised through these entities was pooled into a "Master

---

[1] The Plan was implemented with respect to Highland Crusader Offshore Funds by a "Scheme of Arrangement" ("Scheme") sanctioned by the Supreme Court of Bermuda. The Scheme incorporates the Plan and, unless otherwise noted, the Plan and Scheme contain effectively identical provisions. Unless the context requires otherwise, we will refer primarily to the Plan.

1

Appellee Appx. 00181
Appx. 00432
012994

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 10/06/25    Page 316 of 1017    PageID 13943
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 188 of 1803    PageID 10934

Fund." The capital was invested primarily in "undervalued senior secured loans and other securities of financially troubled firms" among other asset types. HC-17, at HC-117.0010[2]. Highland is represented by Gary Cruciani, Travis DeArmand, Michael Fritz of McKool Smith, LLP.

B.    The Arbitrators
1.    The three arbitrators, whose appointment was formalized by the International Center for Dispute Resolution ("ICDR"), a division of the American Arbitration Association ("AAA"), were David M. Brodsky, Chair, John S. Martin, Jr., and Michael D. Young.

II.    Background of the Dispute
A.    The 2008 Financial Crisis
1.    From 2000 until 2007, the Crusader Funds had double-digit annual returns, but in September and October 2008, as the financial markets in the United States began to fail, Highland Capital was flooded with redemption requests from Crusader Fund investors, as the Crusader Funds' assets lost significant value.

2.    On October 15, 2008, Highland Capital placed the Crusader Funds in wind-down, "compulsorily redeeming" Crusader Fund's limited partnership interests. Highland Capital also declared that it would liquidate the remaining assets and distribute the proceeds to investors. However, disputes over the appropriate distribution of the assets arose between those investors who had voluntarily redeemed their interests earlier in 2008 but had not yet been paid their redemption amount ("Prior Redeemers") and those who were compulsorily redeemed in October 2008 ("Compulsory Redeemers") (collectively, the "Redeemers").

B.    The Plan and Scheme
1.    At about the same time, an investor raised allegations of misconduct by Highland Capital and filed a wind-up petition in the Supreme Court of Bermuda. In 2011, after several years of negotiations among the Prior Redeemers, Compulsory Redeemers, and Highland, the Plan and Scheme were adopted and became effective in August 2011. The adoption of the Scheme and Plan was to "enable the orderly management, sale, and distribution of the assets" by Highland and the right of the Redeemers Committee to oversee Highland's services. HC-300 at 300.017.

---

[2] There are three sets of exhibits that will be referred to herein, Joint Exhibits (referred to as JX- —), Redeemer Committee Exhibits (RC- —), and Highland Capital Exhibits (HC- __).

Appellee Appx. 00182
Appx. 00123
012995

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 25-1 Exhibit 186 Page 1006 of 1804 Page 317 of 1017    PageID 13944
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 189 of 1803    PageID 10935

2.      Central to the Scheme and Plan was the role of the Redeemer Committee, which was created so as to allow the investors in the Funds to have a greater level of influence over the affairs of Highland Capital than an ordinary creditors' committee would have in the liquidation of the Fund; that increased "level of influence" was particularly manifest in the Committee's ability to approve or disapprove of actions that Highland was contemplating taking, right of first refusal on other activities Highland wished to engage in, and the Committee's ability to terminate the services of Highland on 30 days' notice "with or without Cause."  HC-300 at 300.016. Thus, the relationship between the Redeemer Committee and Highland, although grounded in contract, was designed to become one of mutual cooperation and confidence.

3.      Pursuant to §2.04 of the Plan, a ten-person committee of Crusader Fund investors, composed of five representatives of the Prior Redeemers and five representatives of the Compulsory Redeemers, was created. HC-300, § 2.04. As part of the Plan and Scheme, Highland Capital continued to serve as the investment manager for the Crusader Funds. As part of its duties as investment manager, Highland Capital was to liquidate fund assets and distribute the proceeds to the Crusader Fund investors pursuant to an agreed 43-month distribution schedule. In addition, as an incentive to Highland in its liquidation of assets, the Scheme and Plan provided that the Deferred Fees would be paid to Highland if it completed the full liquidation.

4.      It is not disputed that, between October 2011 and January 2013, Highland Capital distributed in excess of $1.2 billion to the Crusader Fund investors. It is also not disputed that the Crusader Funds were not completely liquidated when Highland paid itself the Deferred Fees in January and April 2016 and the Funds remain unliquidated as of the time of these hearings.

C.      The Arbitration Agreement

1.      Sections 2.09 and 9.03 set forth the terms and conditions by which these disputes are to be resolved in arbitration. Section 2.09 provides, in relevant part, that "in the event of a dispute between the Crusader Funds or the Redeemer Committee and HCMLP, ... the applicable representatives shall confer in god faith in an attempt to resolve the dispute...If the dispute cannot be resolved by mediation it will be referred to arbitration in accordance with Section 9.03."

2.      Section 9.03 provides, in relevant part, that "Any dispute referred to in Section 2.09...shall be subject to and decided by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof pursuant to applicable law. Arbitration shall be conducted in New York, New York."

D.      Termination of Highland Capital and Ensuing Litigation

3

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 09/06/25   Page 318 of 1017   PageID 13945
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 190 of 1803   PageID 10936

1.      For reasons set forth below, disputes began to arise between the Redeemer Committee and Highland Capital, culminating in the termination of Highland Capital as investment manager by letter and notice dated July 5, 2016, for cause and without cause, with termination being effective on August 4, 2016, RC-318. Highland Capital was replaced as investment manager by Alvarez & Marsal CRT Management, LLC ("A&M"). JX-31.

2.      On July 5, 2016, the Committee filed a Notice of Claim before the AAA, commencing an arbitration against Highland, RC-319, and also commenced litigation in Delaware Chancery Court, inter alia, to obtain a status quo order in aid of the arbitration. On July 8, 2016, a Vice Chancellor entered an oral status quo order in aid of this arbitration, pending the adjudication of the Committee's request for interim relief by an AAA arbitrator on an emergency basis pursuant to AAA Rule 38. On August 2, 2016, an Emergency Interim Order was entered by an Emergency Arbitrator appointed by the ICDR, which order replicated the oral status quo order entered in Delaware Chancery Court.

3.      On July 21, 2016, Highland filed its Answering Statement, denying the claims and asserting affirmative defenses.

E.      The Arbitration

1.      This Tribunal was established as of October 31, 2016. The parties consented to the appointment of the Tribunal.

2.      On October 14, 2016, Claimant filed an Amended Notice of Claim, seeking specific performance, injunctive relief, declaratory relief, money damages, and disgorgement arising out of the allegedly willful misconduct and violations of fiduciary and contractual duties by Highland Capital as investment manager of the Highland Crusader Fund. Claimant sought four species of relief: (a) an award requiring Highland Capital to provide to the Committee all information about the Fund and its assets as required by Section 2.05 of the Plan and Section 4.6 of the Scheme; (b) an award of money damages, including disgorgement, for Highland Capital's allegedly willful misconduct and breaches of its fiduciary and contractual duties, and for any unjust enrichment; (c) an injunction requiring Highland to return the so-called Deferred Fees and Distribution Fees to the Crusader Fund; and (d) declarations that the Consenting Compulsory Redeemers are entitled to payment of the Deferred Fee Account, and that Highland is not entitled to advancement of expenses and legal fees.

4

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 09/26/25    Page 319 of 1017    PageID 13946
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 191 of 1803    PageID 10937

3.      On December 14, 2016, Respondent filed a motion for partial summary adjudication, seeking dismissal of those claims seeking monetary damages, seeking relief as both breaches of contract and of fiduciary duties, and seeking relief barred by the applicable Statute of Limitations; by Order of March 1, 2017, we denied such motions without prejudice to their being renewed upon the development of a fuller record.

4.      On February 16, 2017, Claimant filed a motion for partial summary adjudication, seeking an order compelling Highland to comply with its alleged contractual obligation under the Plan and Scheme to provide the Committee with the Crusader Fund's books, records and other information from 2011 to 2016. By Order, dated April 21, 2017, we entered a Partial Final Award, granting the relief sought by Claimant, and ordering Highland, inter alia, to produce non-privileged documents, as described in the Order.

5.      On April 11, 2017, Respondent moved for Summary Adjudication of its counterclaim for advancement to defend against the claims brought by the Claimant in the Arbitration and in the parallel Delaware action, Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P., C.A. No. 12533-VCG (Del. Ch.) (the "Delaware Action").  Respondent sought a mandatory injunction requiring the Fund to escrow and segregate Crusader Fund assets to cover its indemnification and advancement rights.  By Order and Partial Final Award in favor of Claimant, dated July 20, 2017, we denied Highland's motions for advancement in this Arbitration and in the parallel Delaware Action and for the mandatory injunction, on the ground that the "inter-party indemnification exception" applies.

6.      On December 8, 2017, Highland moved to amend its Counterclaims against the Redeemer Committee of the Highland Crusader Fund and for leave to file a third party demand for arbitration against Alvarez & Marsal CRF Management, LLC ("A&M CRF"), Alvarez & Marsal North America, LLC ("A&M NA"), and House Hanover, LLC ("House Hanover").  On January 11, 2018, following a pre-hearing conference call, Respondent filed a revised proposed amended Counterclaim against the Committee alone, raising counterclaims of breach of the covenant of good faith and fair dealing in the its performance and enforcement of the Plan, breach of its fiduciary duty, and aiding and abetting the breach of fiduciary duty by A&M CRF, A&M NA and House Hanover.

5

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Page 1036 of 1804   Page 320 of 1017   PageID 13947
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 192 of 1803   PageID 10938

7.     By Order dated January 25, 2018, we granted the motion to amend Highland's counterclaims that raised direct claims of breach of fiduciary duty, breach of contract, and breach of the covenant of good faith and fair dealing arising out of the so-called Deferred Fees allegedly owed to Highland, and denied the balance of Highland's request for leave to file Counterclaims and Third Party Claims.

8.     On February 1, 2018, Respondent filed an Amended Answer and Counterclaims, seeking an order that the Committee account to Highland as an investor therein for all payments, gains, profits, and advantages obtained as a result of the Committee's alleged wrongful actions; that the Committee pay money damages, disgorge, and make restitution to Highland for damages arising from the Committee's alleged breaches of contract, breaches of the covenant of good faith and fair dealing, and breaches of fiduciary duty, including by awarding Highland the Deferred Fees allegedly improperly withheld, as well as an award of Highland's fees and expenses, including reasonable attorneys' fees incurred in this action; and such other relief as the Panel deems fair and equitable.

9.     On February 15, 2018, Claimant moved to strike portions of the Counterclaims on the grounds that certain of the new pleadings went beyond the limitations set by the Panel in the January 25 Order by including allegations that relate directly to claims the Panel had ordered not be included in the revised Counterclaim.  By Order dated April 1, 2018, we granted the motion of the Claimant to strike portions of the Counterclaim and directed Respondent to submit a revised Counterclaim to Claimant and the Panel.

10.     By Order dated March 19, 2018, we directed that "any party wishing to make a motion shall write a letter to the Panel, with copy to opposing counsel, seeking permission to make such motion..."

11.     By letter dated March 28, 2018, Highland requested permission to file a motion for partial summary adjudication with respect to the Committee's breach of fiduciary duty claims that accrued before July 5, 2013, which Highland contends are barred by the statute of limitations.  By Order dated April 5, 2018, relying upon AAA Commercial Arbitration Rule 33, we denied Highland's application to make a motion for partial summary adjudication, without prejudice to their doing so at the close of the Committee's main case at the hearing, if such factual and legal issues were briefed in the Pre-Hearing Briefs.

12.     On April 5, 2018, Respondent filed its revised Amended Counterclaims, seeking relief, as earlier, for alleged breaches of contract, of fiduciary duty, and of the covenant of good faith and fair dealing.

6

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Filed 10/06/25    Page 321 of 1017    PageID 13948
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 193 of 1803    PageID 10939

13.   On July 12, 2018, Highland moved to strike what it characterized as a new claim by the Committee.  The Committee opposed the motion. By Order dated July 22, 2018, the motion to strike was denied.

14.   On August 19, 2018, after a series of discovery motions were decided, the Parties entered into a Joint Proposed Pre-Hearing Consent Order, which was So Ordered by the Panel.

F.   Hearing Dates and Witnesses

1.   An evidentiary hearing was held in New York, N. Y. on September 12-14, 17-18, 20-21, and 24-25, 2018.

2.   Claimant presented the oral testimony of Eric Felton, Burke Montgomery, David Morehead, and Brian Zambie, all Members of the Redeemer Committee; Steven Varner, Alvarez & Marsal ("A&M"); Robert Collins, PriceWaterhouseCoopers; and two experts, Scott Meadow, Analysis Group; and Basil Imburgia, FTI Consulting.

3.   Respondent presented the oral testimony of Isaac Leventon, Esq., Highland internal counsel; Brant Behr, Redeemer Committee Member; Matt Jameson, formerly employed by Highland Capital; Scott Ellington, General Counsel, Highland Capital; the deposition testimony of Thomas Sargent, the Compliance Officer of Highland; and two experts, James Finkel, Duff and Phelps, and Karl Snow, Bates and White.

G.   Post-Hearing

1.   On October 24, 2018, Claimant filed its Post-Hearing Memorandum on its Claims and Respondent filed its Post-Hearing Memorandum on its Counterclaim.

2.   On November 17, 2018, Claimant filed its Reply to Respondent's Post-Hearing Memorandum and Respondent filed its Reply to Claimant's Post-Hearing Memorandum.

3.   On November 30, 2018, the Panel heard closing arguments from counsel to the Parties.

4.   On December 10, 2018, the Parties filed Supplemental Post-Trial Memoranda, dealing with questions asked by the Panel during closing arguments.

5.   On December 12, 2018, the record was declared closed.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 09/56/25 1804    Page 322 of 1017    PageID 13949
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 194 of 1803    PageID 10940

6.    On January 5, 2019, at the request of the Panel, the Parties consented to the adjournment of the timing of the award from January 11, 2019 to February 28, 2019. On February 25, at the request of the Panel, the Parties consented to the extension of the deadline to March 7, 2019.

H.    Issues to be Determined

1.    Claimant has pleaded four claims of breaches of fiduciary duty and of breaches of contract, arising out of similar fact patterns, as follows:

   a)    The taking of the Deferred Fees;
   b)    The payment of Distribution Fees;
   c)    The purchase of Plan claims without Redeemer Committee approval; and
   d)    The transfer of Barclays' Fund interests without Redeemer Committee approval.

2.    Separately, Claimant has pleaded claims of breach of fiduciary duty, as follows:

   a)    Engaging in related party transactions without Redeemer Committee approval
   b)    Refusing to settle claims brought by Credit Suisse;
   c)    Refusing to resolve the claims brought by UBS, which included a Temporary Restraining Order ("TRO"); and
   d)    Failing to make a good faith effort to sell the Cornerstone asset.

3.    In addition, Claimant seeks a declaratory judgment that there should be an immediate distribution of the Deferred Fee Account to the Consenting Compulsory Redeemers.

4.    Respondent has pleaded one counterclaim against the Redeemer Committee, alleging that the Committee breached its contractual and fiduciary duties by delaying liquidation of the Fund's assets after July 2016, and depriving Respondent of its right to receive the remaining funds in the Deferred Fees account payable upon complete liquidation of the Fund.

8

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/21/804   Page 323 of 1017   PageID 13950
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 195 of 1803   PageID 10941

5.      Both Claimant and Respondent have also made claims for the recovery of their attorneys' fees and costs.

I.      Applicable Law

1.      At the outset, we address which law applies to which claims.  It is not in dispute that Claimant's breach of contract claims are governed by the law of New York State.  However, Claimant contends that the law of New York State also applies to the breach of fiduciary duty claims, as the breaches are claimed to arise from Highland's relationship with the Fund and its investors under the Plan, which provides for New York law. Respondent argues that any fiduciary duties owed by Highland arise under its services as investment manager of the Crusader Fund, and, thus, are governed by the law governing the Fund's Governing Documents, the state of Delaware.

2.      Although there are few, if any, significant differences between New York and Delaware regarding fiduciary duties of entities in the position of Highland vis-a-vis its investors and the Committee, we find that the governing law on the breach of fiduciary duty claims is most appropriately that of New York, the state whose law governs regarding the Plan and rights of the parties under the Plan.

III.   Discussion of The Issues
A.      We recognize and appreciate the exemplary efforts by counsel for each Party. The results set forth herein are not a reflection of any difference in the quality of those presentations, but of our review of the evidentiary record and of the relevant law.

B.      Taking of Deferred Fees

1.      When the Plan and Scheme were adopted, a prominent feature was the creation of a Deferred Fee Account which was designed to provide an incentive to Highland to liquidate expeditiously the Crusader Fund of its assets. Deferred Fees were annual performance fees payable to Highland but deferred until, as, and when there would be a "complete liquidation" of the Crusader Funds' assets," Scheme §1.5.2, Plan §2.02, HC-300.

9

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 25-1   Filed 10/06/25   Page 324 of 1017   PageID 13951
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 196 of 1803   PageID 10942

2.      The evidence is uncontested that, as of the close of the hearing record in this matter, the Crusader Funds have not been completely liquidated. It is also uncontested that, on January 21 and April 6, 2016, Highland distributed to itself a total of $32,313,000 in Deferred Fees. JX-25 at 14; JX-26 at 13.  Highland's stated rationale, or "position," for making the payment without there first having been complete liquidation was set forth in the financial statements of the Funds for the year-end 2015, issued on April 22, 2016: the UBS TRO "prevented the full liquidation" and that Highland "would have received the Deferred Fees...but-for the impact of the restraining order still in place." Thus, Highland "believe[d] its right to receive the [Deferred Fees] crystalized as of the date the [TRO] was lifted," or January 21, 2016, JX-025.0010.

3.      The core of Highland's position was that, in January 2016, it sought, received, and relied on the advice of its outside counsel Akin Gump that the UBS TRO created an impossibility for it to have earned the Deferred Fees, thus allowing the self-payment. However, based upon the evidence heard, we do not find that Highland relied upon any such advice in executing its plan to take the Deferred Fees.

4.      We find that in January 2016, Highland's CEO James Dondero raised the possibility of taking the Deferred Fees before complete liquidation with Thomas Surgent, a Deputy General Counsel and Chief Compliance Officer at Highland, who then discussed the idea with Highland's General Counsel, Scott Ellington. Surgent Dep. 133:4-19.  Mr. Ellington testified that, in January 2016, he and others spoke on several occasions with lawyers from Akin Gump regarding the premature taking of the Deferred Fees, and that he received the advice that "the deferred fees could be taken under the circumstances," that it was a "calculated risk," and that, if successfully challenged, Highland would owe only "nominal interest." Tr. 10 167:14-168:25; 167:14-168:25.

5.      However, Mr. Ellington's testimony is not supported by the hourly billing records of Akin Gump, which do not show any time being billed in January 2016 for anything having to do with this or any other Highland-related issue. RC-523; Tr. 11 136:9-14. Furthermore, Highland's Assistant General Counsel, Isaac Leventon, testified that neither he, nor, he was certain, anyone else at Highland, consulted with outside counsel in January 2016 regarding taking the Deferred Fees.  Tr. 7 236:11-24.   When Highland executed on its "position" by paying itself the Deferred Fees in January and again in early April, Highland did not disclose the self-payment to its independent auditor or the Redeemer Committee.

10

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 09/03/24    Page 325 of 1017    PageID 13952
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 197 of 1803    PageID 10943

6.      It was not until April 11, 2016, almost a week after it took the second tranche of
Deferred Fees that Highland belatedly informed its independent auditor, PriceWaterhouse
Coopers (PwC), of what it had done by sending it draft financial statements for the year
ending December 31, 2015, in which Highland disclosed, without explanation, a "change ...
related to how [they were] ... treating the deferred fee distribution." RC-288. On April 12, a
meeting was held between Highland and PwC, at which PwC sought an explanation from
Highland for the change in position and asked for a memorandum from Highland's counsel
and a "copy of the letter that was sent [to the Redeemers Committee] notifying them of the
position," JX-28.

7.      On April 12, Highland proceeded to have, apparently for the first time in 2016,
discussions with Akin Gump about a justification for its taking the Deferred Fees prior to
"complete liquidation." According to Akin Gump's billable time records, on April 12, there
was a telephone "call with Thomas Surgent regarding interpretation of distribution plan and
charging of fees during period of TRO." Following that call, on April 19, there was another
call with Mr. Surgent and Mr. Leventon "regarding audit disclosures with respect to legal
doctrine applicable to fee dispute…," following which an Akin Gump attorney started to
draft a memo on the "impossibility" issue. After further calls and discussions regarding the
drafting of the disclosure to the auditor, a memorandum was finalized and sent to PwC on
April 22, 2016, the day that the financials were issued. See RC-523; Tr. 11 136:9-14.)

8.      Although Mr. Ellington testified the Akin Gump memo was "entirely generated by
Akin Gump," without any participation by anyone from Highland, Tr. 10 189:14-21, there is
contrary and indisputable evidence that, in fact, someone at Highland drafted footnotes to
the financials that were then provided to Akin Gump and appear in the Akin Gump memo,
see Tr. 7 283:19-284:9; compare RC-289 with HC-277.  Further, Mr. Leventon exchanged
with Akin Gump and commented upon at least four separate drafts of the Akin Gump memo
before it was finalized. RC-291; RC-295; -RC300; RC-302; JX-29; Tr. 7 291:4-295:19.

9.      We find that Highland made a deliberate and calculated decision to make no
disclosure to the Committee of the actual taking of the Deferred Fees until the issuance of
the 2015 financial statements on April 22, 2016, but that, in the course of communicating
with PwC about its "position," Highland allowed PwC to conclude that it had informed the
Redeemer Committee of its position regarding the payment of the Deferred Fees, and did not
correct the misimpression. RC-441. It did so to induce PwC to provide the opinion Highland
needed to have clean financials.

11

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 09/05/25   Page 326 of 1017   PageID 13953
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 198 of 1803   PageID 10944

10.     This was not the first time that Highland had sought to use the so-called "impossibility defense" as a basis for suspending its obligations under the Plan. In 2013, Highland had proposed to use the doctrine in an attempt to avoid making distributions pursuant to the Realization Schedule, attached to the Plan and Scheme. Highland's then-outside counsel, Christopher Panos, now a federal bankruptcy judge, was asked to provide an opinion to allow such action but he expressed strong reservations about the use of that doctrine in an affirmative context, RC-153.

11.     Thereafter, Highland tried to secure another opinion that would be more supportive of its position and received a PowerPoint presentation from Akin Gump in November 2014, HC-356, that provided some additional arguments but, ultimately, focused on the doctrine being able to be used only as a defense, see, e.g., HC-356 at 16.

12.     Finally, when in early 2015, Highland asserted to Committee counsel that, by reason of the UBS TRO, "all applicable distribution dates, distribution thresholds and fees payable" were tolled, by reason of the UBS TRO, JX-22, Committee counsel had strongly rejected such use of the TRO to attempt to justify Highland's failure to meet "either the Realisation Schedule or the distribution threshold for the Deferred Fee Account." RC-219.

13.     Notwithstanding two prior and unsuccessful attempts to use the doctrine to evade its obligations, Highland was not deterred and in late 2015 and early 2016, with the assistance of its inside counsel, but not on the advice of Akin Gump,planned for and then executed on the strategy to take the Deferred Fees.

14.     Under New York law, the doctrine of impossibility does not create an affirmative right to engage in any conduct; rather, under certain circumstances, it acts as a defense to claims of breach of contract. When an unforeseeable event, such as an injunction, occurs, and the actions of the non-performing contract party have not contributed to the occurrence, and the occurrence renders the performance of a contractual obligation objectively impossible, a party's contractual obligation can be excused. Kel Kim Corp. v. Cent. Mkts., Inc., 70 N.Y.2d 900, 902 (1987) ("While such defenses [as impossibility] have been recognized in the common law, they have been applied narrowly, due in part to judicial recognition that the purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances"); JJ. Cassone Bakery, Inc. v. Consolidated Edison Co. of New York, Inc., 168 Misc.2d 272, 278, 638 N.Y.S.2d 898 (N.Y. Sup. 1996), rev'd in part on other grounds, 240 A.D.2d 634, 659 N.Y.S.2d 293 (2d Dept. 1997).  Absent such factors, the doctrine of impossibility is not available to excuse a party's performance and cannot be used to justify affirmative conduct.

12

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/25/804    Page 327 of 1017    PageID 13954
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 199 of 1803    PageID 10945

15.     Highland attempts to squeeze itself into the four conditions, but its effort fails.  First, Highland argues that it is defending itself against accusations of breach of contract by invoking, defensively, the impossibility defense.  But it is Highland's illegitimate use of the impossibility defense to justify an affirmative act — the taking of the Deferred Fees — that is under attack, not its citation of the impossibility defense in 2018 as a defense to its breach of contract in 2016.

16.     Highland also argues that the TRO "rendered the complete liquidation of the Fund under the Plan's Realization Schedule objectively impossible." Closing Brief at 61. But Highland confuses the Realization Schedule which deals with timely distributions with the Deferred Fees which come into play only upon complete liquidation of the Fund with no deadline. Plan §2.02; Scheme §1.5.2.  In any case, when the UBS TRO was dissolved on January 21, 2016, there was nothing that prevented Highland from completing the liquidation.

13

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 06/25/04   Page 328 of 1017   PageID 13955
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 200 of 1803   PageID 10946

17.     None of the factors allowing the doctrine of impossibility apply to the taking of the Deferred Fees.  Indeed, we find that Highland — and its inside counsel —knew none of the factors were applicable when Highland asserted the defense. First, the UBS TRO was not unforeseeable; in fact, as Mr. Panos had advised his client in 2013, "UBS had already filed suit and was threatening to get an injunction at the time of the approval of the Scheme."  Second, Highland's own acts gave rise to the UBS TRO, as it was UBS's accusation of Highland's fraudulent transfer of assets that gave rise to the TRO, as Mr. Panos again had advised Highland.  Third, as Mr. Leventon himself testified at the hearings, "the TRO did not do away with Highland's obligation to complete liquidation of the fund." Tr. 7 262:6-10. Finally, the doctrine of impossibility gives rise to no affirmative rights to take action in violation of a contract. Once again, Mr. Panos had given this critical advice to Highland in 2013.

18.     We have considered the other elements of Highland's defense to this claim and find them similarly wanting. We find that Highland's paying itself the Deferred Fees in 2016 constituted a breach of both the Scheme and Plan.  Given that finding, we need not reach the issue of whether the self-payment also constituted a breach of fiduciary duty by Highland to the Committee.

19.     As to remedy, under New York law, damages may be awarded for a breach of contract based upon the damages suffered by the claimant. Here, the damage suffered is the full amount of the Deferred Fees prematurely taken, plus prejudgment interest from the date of the taking.  "Prejudgment interest is generally granted 'in order to compensate the injured party for the loss, over a period of time, of the use of the property to which it was entitled.'" Panix Prods., Ltd v. Lewis, 2003 WL 21659370, at *2 (S.D.N.Y. 2003)(citing Lewis v. S.L. & E., Inc. 831 F.2d 37, 40 (2d Cir.1987)).  Although Respondent has raised good arguments as to why the interest rate should be nominal at best, we exercise our discretion to award statutory pre-judgment interest at 9% from the date of the taking, so as to measure as accurately as possible the totality of the damage that we perceive the Fund suffered by reason of the Deferred Fees being taken prematurely.

20.     Respondent also argues that the Tribunal lacks the authority to order a return of the moneys taken.  But measuring the damages suffered by the Fund by referencing the full amount of the Deferred Fees taken is not the same as literally ordering a return of the moneys. It is an appropriate measure of the damages because the Fees were to have stayed within the Fund until they were appropriately earned, and while in the Fund, they were to serve as a protection and cushion against creditors. In addition, very importantly, keeping the Deferred Fees was to have acted as an incentive to Highland to complete liquidation of the portfolio, an event that had not occurred when Highland was terminated and still has not occurred. Taking the Deferred Fees deprived the investors of all of those benefits. The Deferred Fees in the amount of $33,313,000 should be returned in full, and with full statutory interest of 9% from the dates of taking in January and April 2016 through the date of this Partial Final Award.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 02/26/25   Page 329 of 1017   PageID 13956
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 201 of 1803   PageID 10947

C.   Distribution Fees

1.   Under the Plan, Highland was to receive fees in the amount of 125 basis points based on "all amounts actually Distributed to Redeemers during each quarter following the
        Effective Date . . . provided that assets equal to or in excess of the amount scheduled in the Realisation Schedule have been distributed to Redeemers during such quarter (with amounts distributed to Redeemers in excess of scheduled distributions for prior quarters being carried over.)" (Emphasis added) (Plan §2.01; Scheme §4.4.)

2.   Claimant alleges that Highland breached the provisions of the Plan by paying itself distribution fees totaling $14.5 million despite not having "actually" distributed to the Redeemers each quarter the minimum required to have been paid by the Realisation Schedule (Plan Appx. A).  The Committee alleges that Highland paid itself distribution fees eight times, but that the only time Highland met or exceeded the goals set by the Realization Schedule was in the quarters ending January 31, 2013, and April 30, 2013. Other than those two quarters, Claimant contends that Highland missed the target in every other time period.  Claimant also charged Highland with a breach of fiduciary duty, arising out of similar facts.

3.   The Committee alleges that six of the distribution fee payments were improper because Highland improperly calculated the amount paid to the Redeemers in one or more of the following ways: (1) in treating Deferred Fees as Distributions; (2) in withholding tax obligations from payments to Redeemers, but counted them for purposes of qualifying for its fee; (3) in improperly including amounts that it reserved to pay Barclays, amounts used to pay the Barclays settlement, and amounts paid to its affiliate Eames in its calculation of Distributions; and (4) in borrowing on margin and improperly treating such borrowings as "excess cash" under the Plan and, therefore, as Distributions.

4.   In addition, Claimant argues that if Highland missed any quarterly hurdle set in the Realisation Schedule, its deficiency would carry over to the next quarter, giving Highland an accordingly higher hurdle, or watermark, to meet in that next quarter.  In other words, Claimant urges that the Realisation Schedule was intended to be cumulative.

5.   Cumulative Quarterly Hurdles

a)   Starting with the last issue first, the language in the Plan in question is as follows: "HCMLP will receive fees in cash ... (b) provided that assets equal to or in excess of the amount scheduled in the Realisation Schedule have been distributed to Redeemers during such quarter (with amounts distributed to Redeemers in excess of scheduled distributions for prior quarters being carried over)." HC-300 at 74 (emphasis added). Plan §2.01.

15

Appellee Appx. 00195
Appx. 00146
013008

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 Exhibit Page 203 of 1804 Page 330 of 1017   PageID 13957
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 202 of 1803   PageID 10948

b)       Claimant argues that, although the foregoing language is not explicit regarding both the positive and negative cumulative nature of the Realisation Schedule, there is evidence sufficient to establish that requirement from the text itself and from the testimony of those who negotiated the clause in the Plan, citing the testimony of Mr. Montgomery ("The Realisation Schedule was a cumulative concept. 100 million during one period, 100 million to the next, 200 million during the next. . . . it was designed to be cumulative. It was a stack.") Tr. 3 307:5-19.  The Committee also points out that Highland kept internal accounting schedules that treated the Schedule as cumulative, including RC-364 at pp. 10, 23, 36, 49, 62, 75, 88, 101, 114, 127, 140; see also Tr. 4 196:17-197:19; Tr. 9 256:14-259.

c)       Finally, the Committee urges that there would be "perverse incentives" if Highland were allowed to treat the Schedule as cumulative if it got ahead of the distribution schedule but not if it fell behind, because if Highland knew it could not make a quarterly target, it would have the incentive to skip that quarter and wait until the next quarter where it would meet the Realisation Schedule for only that quarter. This would have the undesirable effect of delaying liquidation but not adversely affecting Highland's receipt of incentive fees.

d)       Highland strongly urges that the clause in question is unambiguous in requiring only a positive carry-forward, with no hint that a failure to meet a quarterly hurdle imposed an obligation to reach a high water mark that would meet both the prior hurdle and the present quarterly hurdle. In addition, Highland argues that, as Mr. Montgomery conceded on cross-examination, the Plan could have contained a cumulative shortfall provision, but that the inclusion of such language was never discussed with Highland, Tr. 3 at 308:7-13, and such could have been incorporated into the Plan had that been the Parties' intent.

e)       Highland also criticizes the Committee's "perverse incentive" argument, arguing, first, that Highland was highly incentivized to liquidate as quickly as possible so it could receive Distribution Fees during the pendency of the 36-month Realisation Schedule (§2.02) and obtain the $10 million Deferred Fee by distributing $1.7 billion within 43 months of the Plan's Effective Date (§6.02); and, secondly, "if Highland fell too far behind," it would lose its incentive to continue expeditious liquidation of the Fund's assets. Respondent's Post-Hearing Brief at 57. See Tr. Day 12 at 169:3-18 (Snow).

16

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 02/06/25   Page 331 of 1017   PageID 13958
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 203 of 1803   PageID 10949

f)      In interpreting the section of the Plan, it is significant that the language regarding a positive carry-forward appears in a parenthetical phrase, not in the main operative text. Without considering the parenthetical, we read the main operative text as setting a test that Highland has to meet — each quarter, assets "equal to or in excess of the amount scheduled in the Realisation Schedule" must be distributed to Redeemers, or else Highland will not "receive fees in cash" that quarter. Thus, each separate quarter, Highland has to make a required distribution or will not be paid fees.  But if each quarter there is a test that Highland has to meet, it would defeat the purpose of the quarterly test for Highland to be able to garner fees by just meeting the goal for one particular quarter without regard to how it had performed the prior quarter. Without a reward or a penality each quarter dependent upon whether it met (or exceeded) the goal, Highland could undermine the objective of the clause. The supplemental parenthetical phrase simply makes explicit one benefit to Highland of overachieving such quarterly goal. We conclude that §2.01 requires both a positive and negative cumulative process.

g)      To read it otherwise would create a perverse incentive of encouraging Highland to skip quarters. The contrary is not true: by having both a positive and negative cumulative obligation, Highland loses no incentive to continue to liquidate, perhaps at a faster pace than it in fact adopted, if it were to fall behind.

h)      Though we reach our conclusion without need to rely on extrinsic evidence, we note that our interpretation is supported by Mr. Montgomery's testimony regarding Highland's request to include a parenthetical to make clear that it would not lose the benefit of an over-distribution and could carry it forward. See JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009).

D.    Deferred Fees as Distributions

1.      With respect to Highland's treating Deferred Fees as Distributions, the Committee urges that Deferred Fees being reserved in an account for possible later distribution were not amounts "actually Distributed" or the kind of Distributions made to Redeemers as part of the return to them of their investment.

2.      Highland defends on the basis that the Committee's position that Deferred Fees should not be included in calculating Distribution Fees is inconsistent with the parties' course of performance. From the outset, Highland argues that it included Deferred Fees in its calculation of Distribution Fees and gave written notice of its inclusion to the Committee on at least four occasions. HC-552; HC-591; HC-592; HC-593. However, Highland is not making the argument that the Plan was amended by what it says was its known conduct.

17

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 12/06/25   Page 332 of 1017   PageID 13959
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 204 of 1803   PageID 10950

3.      Highland also argues that its successor, A&M, also included Deferred Fees in its calculation of Distribution Fees based upon the substantively identical language in the A&M investment management agreement, HC-56 at 6, and received a Distribution Fee based on that calculation in October 2016.

4.      We find that whether Highland's conduct was disclosed to the Committee or whatever A&M may have done are both irrelevant to the issue in this case, because, as we analyze the evidence adduced, the only relevant issue is whether including Deferred Fees in the calculation of Distribution Fees is authorized by the language of the Plan, and we find that it is not.

5.      The Plan sets forth a program of fees capable of being paid to Highland: if Highland met certain quarterly goals of distributions made to Redeemers, as set forth in the Realisation Schedule, it was entitled to receipt of certain Distribution Fees; if it distributed at least $1.7 billion to the Redeemers prior to the 43d month following the Effective Date, it was entitled to receive payment of the fees in the Deferred Fee Account in accordance with Section 2.02 of the Plan.

6.      The Plan distinguished what Highland had to do to qualify to receive each category of Fees. With respect to Deferred Fees, the Plan provides that "Highland shall not be deemed to be a Redeemer in respect of the deferred fees." We read that sentence as making clear that Highland's setting aside of Deferred Fees into a account that it might eventually be able to draw upon should not be construed as a form of distribution such that, if it were a Redeemer, it could be construed as an "actual" distribution.  Because Highland is not "deemed to be a Redeemer," its payment to a fund is not equivalent to a Distribution to an investor.

7.      We find that this language is not ambiguous and does not allow for the practice used by Highland to beef up the amount of Distribution Fees it received.

18

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit Filed 12/06/25 1804 Page 333 of 1017   PageID 13960
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 205 of 1803   PageID 10951

E.      Withholding Taxes as Distributions

1.      The evidence at the hearing was that, as required in the Plan, HC-300 at 80, Highland took into account the amount of taxes that should be withheld and paid those amounts to the appropriate taxing authorities; however, Highland also included those withheld amounts in the calculation of amounts "actually" distributed to Redeemers.  The Committee contends that such withheld amounts were not "actually Distributed to Redeemers," and points out that, in fact, only a subset of Redeemers — the Offshore Fund investors — were subject to tax withholding, RC-62; Tr. 9 275:5-23, while some investors were nonprofits that did not pay taxes at all,  Tr. 12 167:5-24.  The Committee also points out that, when first informed in 2012 that Highland had counted tax withholdings toward the May 1, 2012 Distribution, the Committee objected, demanding successfully that Highland make up that shortfall. RC-68; Tr. 3 301:6-12; Tr. 9 278:4-279:16.

2.      Highland makes two points in its defense: first, tax withholdings made on behalf of an employee are considered "compensation," so tax withholdings for Crusader investors should also be treated in a "common-sense manner" as "distributions" to those investors; and second, Highland disclosed its methodology in at least one monthly report in November 2013, HC-591 at 14 (Nov. 2013 Summary Report), to which the Committee never objected.

3.      We need not consider either of these defenses because we find the language of the Plan supports the treatment by Highland of these amounts. As stated above, "Distributions" is defined as "Amounts to be paid to Redeemers under the Plan, including amounts to be paid to Redeemers under the Scheme..." §1.01. The operative language regarding withholding for taxes is as follows: "In connection with ... all Distributions to be made hereunder, the Crusader Funds shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any ... taxing authority, and all Distributions hereunder shall be subject to any such withholding ... requirements. The Crusader Funds are hereby authorized to take any and all actions that may be necessary or appropriate to comply with any such requirements."

4.      Read together, we find that "the amounts paid to Redeemers" were "subject to ... withholding requirements" and thus, were appropriately included within the calculation of amounts distributed to Redeemers, even if, in fact, it was an indirect payment. We find for Highland on this branch of the Committee's claim.

Appellee Appx. 00199
Appx. 00459
013012

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 02/06/25    Page 334 of 1017    PageID 13961
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 206 of 1803    PageID 10952

F.    Payments to Barclays and Eames as Distributions

1.    In 2006 and 2007, Barclays and a Highland affiliate entered into two securities transactions — a prepaid forward transaction and an accreting strike option transaction. In connection with those two transactions, Barclays became an investor in the Highland Funds. JX-5. In late 2008, Barclays submitted redemptions for its full interests in the Highland Funds, which Highland did not honor. Litigation between Barclays and Highland entities ensued. When the Plan and Scheme were adopted, Barclays did not consent and became what it is referred to as a Non-Consenting Redeemer. HC-300, at HC-300.0075.

2.    Thereafter, when Fund assets were disposed of and amounts distributed to Redeemers, no amounts were actually paid to Barclays; instead, amounts equivalent to those that Barclays would have received if it was a Consenting Redeemer were paid into the Redeemer Trust Account. That Account was set up for the purpose of segregating the deposited funds so they could be "used to pay all costs of HCM-Related Parties and the Redeemer Committee to defend, respond to, settle and satisfy any Claims by Crusader Fund Redeemers excluding Plan Claims ("Redeemer Claims") and ... to defend, respond to, settle and satisfy any such Redeemer Claims in advance of any amounts otherwise properly available for such purposes out of the assets of the Crusader Funds." Plan 6.01.

3.    Notwithstanding such amounts remained in a designated account at a major financial institution, Highland treated such reserves as "actual" Distributions and paid itself fees based on the amounts reserved. The Committee argues that amounts reserved in the Redeemer Trust Account were not "actually Distributed" and that fees taken by Highland for such deposits were taken in breach of the Plan.

4.    We find that Highland's treatment of the reserves as Distributions violated the terms of the Plan.

5.    In July 2012, Highland, Barclays, and other entities entered into a settlement agreement, resolving all of the claims between and among them. JX-5. As part of the settlement, Barclays received both the cash reserved since August 2011 and several additional cash distributions expected between July and December 2012, essentially the exact distribution amounts that it was entitled to as a Consenting Redeemer. Tr. Day 9 at 146:12-19 (Palmer); HC-275; HC Demo 10 at 4. Pursuant to the settlement, Barclays became a Consenting Redeemer, see JX-5 at 12 (§ 11.3). Highland treated such portion of the settlement payments as "Distributions" and paid itself the fees associated with that amount of Distributions. The Committee contends that any payments to Barclays were in settlement of various claims, in exchange for which there was a "relinquishment and/or abandonment" of all of Barclays' rights and interests in the Highland Funds, JX-5 at 3, and, thus, such payments were not Distributions.

20

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1    Filed 08/25/25    Page 335 of 1017    PageID 13962
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 207 of 1803    PageID 10953

6.      Finally, as part of the settlement, the two limited partner interests that Barclays had in the Funds were transferred to a newly-formed and wholly-owned affiliate of Highland, Eames; amounts equivalent to what Barclays would have received as an investor after the settlement were paid to Eames, totaling $35.1 million, and Highland treated such amounts as Distributions and paid itself the appropriate fees.  The Committee urges that the transfer of LP interests was in violation of Section 2.05(f) which gives that the Committee "the authority to approve or disapprove the assignment or transfer of interests in the Feeder Funds or Plan Claims," HC-300, and that the transfer was explicitly disapproved, RC-79 ("The Crusader Redeemer Committee does not believe that Highland has the right to take assignment of Barclays' interest in the Crusader Fund. The Committee believes its approval is required for any such assignment under the Plan/Scheme, and the Committee is not willing to approve that assignment."). Furthermore, the Barclays Settlement Agreement provided that the settlement was subject to Highland's receiving all necessary approvals under the Crusader Plan of Liquidation, which the Committee contends Highland did not receive. HC-330, §12.3.2, at HC-330.0014.

7.      Highland argues, first, that the Committee's right to approve or disapprove of the transfer of interests under Section 2.05(f) is not applicable because under Section 2.05(g)[3], the Barclays settlement did not give Barclays more than it would have received as a Consenting Compulsory Redeemer; that, in any case, 2.05(f) is subject to the "reasonableness" test under Section 2.07[4]; and, finally, that it was entitled to keep the LP interests because the LP interests were in the Redeemer Trust account, citing to HC-275. We find that Highland breached the Plan and Scheme by transferring the LP interests to a wholly-controlled affiliate after the Committee had specifically disapproved of the transfer. Its rejection was reasonable in that it was acting in the best interests of the other investors to have a smaller investment base that would have a greater portion of the asset distributions. The accounting ledger maintained by Highland, which created much confusion at the hearing, was not evidence that the LP interests were in the Redeemer Trust account; we agree with the Committee that the spreadsheet was an accounting convenience for Highland.

8.      We also find that Highland breached the Plan by taking fees in connection with amounts reserved in the Redeemer Trust Account; by no stretch of the imagination could one reasonably conclude — or argue — that an amount reserved in an account that was available to settle and pay costs in connection with all forms of Redeemer Claims could be considered as amounts "actually Distributed" to Redeemers. In any case, with respect to the amounts reserved, no Redeemer received any Distribution in the quarters when Highland claimed fees.

---

[3] "The Redeemer Committee will have, subject to the execution and delivery of customary and reasonable confidentiality agreements:... (g) the authority to approve or disapprove any settlement by the Crusader Funds with Barclays that would be in excess of what Barclays would receive as a Consenting Compulsory Redeemer..."

[4] "The approval of the Redeemer Committee with respect to any matter submitted for approval under Sections 2.05 or 2.06 shall not be unreasonably withheld."

21

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1209 of 1804    Page 336 of 1017    PageID 13963
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 208 of 1803    PageID 10954

9.      We also find that Highland breached the Plan by taking fees in connection with amounts reserved in the Redeemer Trust Account; by no stretch of the imagination could one reasonably conclude — or argue — that an amount reserved in an account that was available to settle and pay costs in connection with all forms of Redeemer Claims could be considered as amounts "actually Distributed" to Redeemers. In any case, with respect to the amounts reserved, no Redeemer received any Distribution in the quarters when Highland claimed fees.

10.     Finally, we find that when Barclays received the amounts, as part of the Settlement Agreement, that had been set aside in 2012 as if Barclays was then a Consenting Redeemer, it did not receive such amounts as Distributions "actually" paid to a Redeemer but rather as part of the Settlement amount. Although Barclays was "deemed" to have become a "Consenting Redeemer," it had that status only for the moment in time sufficient to transfer its LP interests to Eames. As the Settlement Agreement noted, "certain payments will be made by the Highland Entities to Barclays … in consideration of the settlement of the Claims hereunder and the assignment, relinquishment and/or abandonment by Barclays of all rights and interests it had in the Fund Interests…" HC-330 at HC-330.0003. Highland breached the Plan by treating the amounts paid to Barclays as if they had been received as a Consenting Compulsory Redeemer as Distributions.

11.     We conclude that it was improper for Highland to include in the calculation of the amounts distributed to the Redeemers:

a)      The Distribution Fee attributable to the amounts reserved in the Redeemer Trust Account;

b)      The Distribution Fee attributable to the amounts paid in settlement of the Barclays claims; and

c)      The Distribution Fee attributable to the value of the LP interests and amounts transferred to Eames.

22

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Page 106 of 1804    Page 337 of 1017    PageID 13964
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 209 of 1803    PageID 10955

G.    Margin Borrowings as Distributions

1.    In January and April 2012, Highland caused the Fund to borrow $60 million from its Jefferies brokerage account to distribute to Redeemers. The Committee contends that it did so because Highland had not liquidated enough assets to meet the Realisation Schedule. After learning about the loans in September 2012, the Committee protested and directed Mr. Dondero at the September 2012 meeting to take no further margin loans without its consent. Tr. 2 353:2-22; RC-85; JX-8. The Committee contends that Highland's taking such margin loans to reach the Realisation Schedule and then paying itself Distribution Fees based on having reached the quarterly goal with the assistance of the margin borrowing breached the Plan because the margin borrowing did not constitute Excess Cash resulting from the liquidation of assets from which Distributions must come. Plan §§1.01, 3.01; Scheme §§2.4.1, 2.4.2.

2.    Highland maintains that, as it was authorized under the Plan, to engage in margin borrowing, and that amounts were actually distributed to the Redeemers, such payments to the Redeemers were appropriately treated as Distributions qualifying it to receive Distribution Fees.

3.    We find that such margin borrowings, which were authorized under the Plan, did not qualify as the type of Distribution that would entitle Highland to receive a Distribution Fee. The plain language of the Plan requires that any Distribution Fee be paid to Highland only upon the appropriate amount of Excess Cash having been accumulated from the sale of "assets equal to or in excess of the amount scheduled in the Realisation Schedule…" The "assets" referred to are the "assets, respectively, of the Onshore Fund, Offshore Fund I and Offshore Fund II…" §2.01. No such assets were sold and therefore no Excess Cash was accumulated to be distributed to the Redeemers.

Appellee Appx. 00203
Appx. 00454
013016

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 Exhibit Page 210 of 1804   Page 338 of 1017   PageID 13965
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 210 of 1803   PageID 10956

4.      The Committees expert, Mr. Imburgia, determined that the result of Highland's including the above improper items in the calculation of Distributions to Redeemers in calculating its entitlement to Distribution Fees, resulted in Highland paying itself Distribution Fees to which it was not entitled by an overpayment of $14,452,275 in Distribution Fees. The Committee is entitled to judgment in that amount plus interest at the rate of 9% from the date of each improper fee. RX 408, Schedule 2.1

H.      Purchase of Plan Claims[5]

1.      From December 2013 through January 2016, Highland purchased twenty-seven Plan Claims from Crusader investors for itself, without the approval of the Committee [ Tr. 5 50:5-8.] The Committee contends that such purchases breached the Plan, because if it had known that the Plan Claims were available for sale, it would have exercised its ROFR.  Tr. 3 163:11-24; Tr. 4 389:3-390:23. The Committee urges that the UBS TRO, said by Highland to block any purchases by the Fund during its pendency, does not in fact bar such purchases; in any event, the Committee points out that it is conceded that the Fund had assets other than the allegedly restrained assets with which to make purchases outside of the restrained assets. The Committee seeks damages equivalent to the value of the Claims at the time they were sold, any profits or benefits realized by Highland, and pre-judgment interest at 9%, for a total of $8,897,899 plus interest.

2.      Highland raises a number of defenses. First, it argues that, during the period that the TRO was in effect, the Committee agreed with the advice given by the Fund's (and Highland's) counsel in the UBS case, Lackey Hershman, that the TRO, at minimum, prevented the Fund from spending cash to buy-out other investors before UBS's claims were resolved. See Tr. Day 7 at 319:17-332:3. Thus, Highland contends that the Committee cannot prove it would have purchased the Claims had they been offered to it.

---

[5] Plan §1.01: "Plan Claim. The claim of a Redeemer to payment of, or based upon, the Redemption Amount relating to the redemption of its shares or withdrawal of its capital account balance, as the case may be, in the Crusader Funds as detailed in Section 4.01."

24

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 12/26/25   Page 339 of 1017   PageID 13966
Exhibit 6   Page 212 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 211 of 1803   PageID 10957

3.      But the record doesn't support that interpretation. First, refuting the idea that the Committee agreed with the advice being relayed to them is the exchange of correspondence between counsel for the Committee counsel and Highland set forth in RC-360, in which Committee counsel rejected the advice said to have been received from outside counsel, and stated how the Plan Claims should be dealt with if Highland were to persist in asserting that the TRO so blocked the Committee's exercise of its ROFR: "the Committee does not agree with Highland's interpretation of the UBS TRO because the expenditure of money to redeem interests is not a "Distribution" and, in any event, if Highland feels strongly that it cannot use the Funds' assets in this way, any acquisition of the interests by Highland or an affiliate is subject to the Committee's exercising its rights under Section 5.04 when the TRO is lifted or when the interests can, in Highland's opinion, be acquired by the Fund consistent with the UBS TRO. Otherwise, the Committee did not approve of the transfer of the Scheme Claims." RC-360 at 87-88.

4.      Furthermore, before the TRO, when presented with the opportunity to purchase Plan Claims, the Committee exercised its right of first refusal (ROFR) on five occasions, see RC-358. During the pendency of the TRO, the Committee was informed about only five of twenty-eight Plan Claims purchases and disapproved each of the purchases by Highland, but the disapprovals were ignored. The Committee informed Highland that it disagreed about the scope of the TRO but that if Highland, as Fund Manager believed the TRO prevented the Fund from purchasing the Plan Claims, then it would be consistent with the Committee's ROFR for the right to be exercised when the TRO was lifted. HC-580.

5.      We find that the Committee would have exercised its ROFR if it had been given full information and had not Highland been preventing the exercise of the ROFR by invoking the TRO and misrepresenting to buyers that it had the ROFR.

Appellee Appx. 00205
Appx. 00456
013018

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 03/25/804   Page 340 of 1017   PageID 13967
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 212 of 1803   PageID 10958

6.      As a second defense, Highland contends that during the period that the UBS TRO was in effect, it relied on advice of counsel that the TRO prevented the Crusader Fund from acquiring any Plan Claims, thus opening the door for Highland to purchase the Plan Claims that would otherwise have been subject to the Committee's ROFR under §§2.05(f)[6] and 5.04[7] of the Plan.

7.      Mr. Leventon testified that the TRO was obtained by UBS in response to UBS's allegation that Crusader Funds had participated in a fraudulent transfer of assets from a UBS debtor; the TRO restricted transfer of assets but because those assets had been acquired about four years previously and disposed of in the ordinary course of business, "the UBS TRO was essentially designed to 'collateralize' UBS against the March 25, 2009 asset transfer. And if they couldn't be collateralized with those exact assets and the exact actual cash ... or cash equivalent, then it had to be collateralized with something else. And that something else was the assets of the fund." Day 7 at 328:12-20.  That testimony would suggest that from the moment that the TRO went into effect, the Fund was under constraints not to purchase any Plan Claims or other assets.

8.      But this explanation is not convincing.  Regarding the advice received from Lackey Hershman, Mr. Leventon testified that the majority of the advice received was orally and over time, and that the advice was "an evolving interpretation" that "crystallized...in the first quarter of 2014." Id. at 330:9-17.  The advice consisted of "a bunch of verbal conversations, but a lot of that advice is embodied in that memo [HC259] that Lackey wrote to the Crusader Fund. Because we wanted the Committee to understand our quandary."  Day 7 at 319:17-332:3 (Emphasis added).

---

[6] Plan §2.07(f): "The Redeemer Committee shall have ... the authority to approve or disapprove the assignment or transfer of interests in the Feeder Funds or Plan Claims; provided that such proposed assignment or transfer shall be deemed to be rejected if not affirmatively approved in writing within 30 days of submission to the Redeemer Committee..."

[7] Plan § 5.04: "No assignment or transfer of a Plan Claim after the Effective Date may be purchased by [Highland] or its affiliates without such Plan Claim first being offered to, and rejected by, the Crusader Funds."

Appellee Appx. 00206
Appx. 00457
013019

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 04/25/804   Page 341 of 1017   PageID 13968
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 213 of 1803   PageID 10959

9.      The Lackey Hershman memo, dated July 23, 2014, HC-259, deals only with the practical consequences of seeking an amendment to the UBS TRO while an appeal was pending, and does not provide any advice regarding the scope or interpretation of the UBS TRO.[8]  Notably, there is no other document from Lackey Hershman presented at the hearing, even including emails, that supports Mr. Leventon's explanation.

10.     Perhaps in recognition of the thin basis for its claim that it relied on the advice of counsel, Highland requests that the Panel draw no inferences from the "relatively few written communications on this issue," because there was, Highland contends, "unrebutted testimony" of the "contemporaneous advice of counsel." Highland points to a letter from an internal counsel at Highland to the Committee that cites advice from outside counsel regarding the effect of the TRO on the Committee's ability to purchase Plan Claims, RC-360 ("outside counsel to HCMLP has advised that the temporary restraining order which has been imposed by the Court in UBS Securities LLC et al. v. Highland Capital Management, L.P. prohibits the Crusader Funds from purchasing the Scheme Claims using assets of the Crusader Funds").

11.     The statement by internal counsel is the type of hearsay that was received in evidence only because this was an arbitration but to which, under the circumstances, we accord little substantive weight. We find more persuasive the absence of any writing, even an e-mail, directly from the law firm regarding the scope of the TRO and restrictions against the Fund using its assets to purchase Plan Claims or similar items.

12.     Further, we find that, even before the TRO went into effect, and thus well before any advice from counsel would have been received, Highland was laying the groundwork for purchasing the Plan Claims for itself and bypassing the Committee's ROFR.

---

[8] On questioning by members of the Panel, Mr. Leventon referred to the Lackey Hershman memo in broad terms:

"As set forth in the Lackey memorandum, which we all have, Lackey reported that UBS said that, Crusader and Highland Credit Strategies could neither distribute cash to anybody, nor sell assets, nor make any payments outside of the normal course of business...ARBITRATOR BRODSKY: Is the Lackey Hershman memo you're referring to the one that is HC-259, dated July 23, 2014? THE WITNESS: I believe that's correct. ARBITRATOR BRODSKY: I don't see any reference to conversations relayed to you by counsel about what UBS said. I see a sentence on page RC-3208 at the top, it says, "UBS counsel stated that they're not willing to enter into such a stipulation unless Crusader provided detailed discovery of its cash and asset holdings," et cetera, et cetera. Is that what you were referring to? THE WITNESS: Yes. They were not willing to modify the TRO in order to permit the sale of assets unless Credit Strategies, Crusader and other defendants handed over detailed financial information that they would not otherwise be entitled to in discovery. And we were advised that that was a prohibitive risk."

Day 8 170:10-17, 173:4-174:7.

27

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1 186    Filed 12/05/25 1804    Page 342 of 1017    PageID 13969
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 214 of 1803    PageID 10960

13.      On May 29, 2013, Highland caused the Board of the Master Fund, which it controlled, to adopt a resolution, as follows:  "Whereas, ... (2) certain investors from time-to-time desire to sell their interests as redeemed, unpaid shareholders, in the Company ... (any such shares, 'Offered Shares'); (3) one or more principal accounts (the "Related Accounts') in which James Dondero ... and/or Highland ... have material, direct and indirect, financial and ownership interests, have enters a bid to purchase certain of Offered Shares; (4) the bid of the Related Account(s) is equal to or greater than the highest bid; ...Now Therefore Resolved That (1) the undersigned Directors hereby consent to the Proposed Transaction and any future transfers of Offered Shares to the Related Account(s)..." RC-276 at 5; Tr. 7 63:25-68:14.

14.      This pre-approval of transfers of interests in the Fund to Mr. Dondero, Highland, or its affiliates does not reference the Committee's ROFR, but it enabled Highland, falsely, to claim that it had a ROFR.  Using that Resolution, Mr. Leventon informed multiple investors interested in possible transfers of their interests, that Highland had a ROFR to purchase any Plan Claims, never mentioning the Committee's prior and superior ROFR. RC276[9]; RC280; RC434. This conduct alone constituted a breach of the Plan, because it deprived the Committee from having any insight into the transactions as to which the Plan gave them rights to purchase the underlying interests.

15.      Furthermore, by the time Highland received the Lackey Hershman memo in July 23, 2014, Highland had purchased fourteen Plan Claims, nine of which were not disclosed to the Committee. Thereafter, Highland purchased another thirteen Plan Claims without any disclosure to the Committee. Mr. Leventon testified that the only reason for Highland not to consult the Committee about the 27 purchases in 2013, 2014, and 2015 was its interpretation of the TRO. Day 7, 172:2-10.

16.      Additional actions by Highland further demonstrate that the reliance on the TRO was a facade, designed to enable Highland to attempt to purchase a majority interest in the Fund without the Committee's knowledge. In May 2014 and again in January 2016, Highland hired a broker to solicit all Fund investors, except those who were on the Committee, to buy their interests at half or approximately half of the NAV that Highland had itself set. RC417; Tr. 7 95:8-20, 96:8-23; RC425.

---

[9] "By way of Written Resolution, the Board of Directors of [the Fund] determined that if the Investment Manager or an affiliate offers to purchase the shares in the Fund, then that bid shall be accepted if it is the highest bid. See Written Resolution of the Directors of the Fund dated May 29, 2013. The Board may, in its absolute discretion, approve transfers. ... Accordingly, the Investment Manager, as authorized by the applicable documents, hereby bids 60.25 cents of NAV for purchase of 100% of Crown Alpha's capital balance as of the November 2015 NAV date"

Appellee Appx. 00208
Appx. 00159
013021

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1186   Filed 06/25/804   Page 343 of 1017   PageID 13970
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 215 of 1803   PageID 10961

17.     The broker, Wake2O, used talking points drafted by Highland that misrepresented on
whose behalf Wake2O was acting, represented, without apparent foundation, that the
offering price of 50% or 55% of NAV was "[t]he current best market bid" and that price
would go down in the future, and, finally, that the TRO prevented the Fund from making
distributions and that the Fund held many illiquid assets. RC420; Tr. 7 101:4-11 ("Q: And so
one of the things that Highland wanted Wake to convey to investors was, hey, you might
want to sell your interest in Crusader because right now there's this TRO and you're not
going to be able to get any distributions, right?  A.· · That's probably a fair paraphrasing.").

18.     Throughout Wake2O's engagements, it was under pressure from Highland's CEO to
pursue investors so that Highland could obtain a greater share of the Fund. See, e.g., RC-250
("[K]eep pushing as much and many as quickly as possible....")(August 2015); and RC-426
("Our CEO is keen on starting the process as soon as possible. Please let us know if we can
start Monday.") (January 2016); Tr. 7 135:6-137:18.

19.     It was also in this period that Highland undertook a renewed effort to keep the
Redeemers Committee in the dark about their purchasing activities. Mr. Leventon was
significantly involved in providing direction, as well as drafting talking points, to Wake2O to
"reach out to all non-committee members," (emphasis added); Tr. 7 146:16-149:7.  Highland
offered Wake2O an incentive fee to acquire interests representing $200 million of NAV, but
made clear to Wake2O that they should try to achieve that goal without contacting members
of the Redeemer Committee. Tr. 7 157:13-161:2. The amount of $200 million was not an
accidental target; it was just $4 million of NAV more than what the Redeemer Committee
held, Tr. 7 155:15-23.  Wake2O's efforts resulted in the acquisition by Highland of a
significant number of Plan Claims, amounting to just shy of $200 million, RC418; RC360;
RC419; RC422; RC423; RC424.

Appellee Appx. 00209
Appx. 00469
013022

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 11/06/25 1804    Page 344 of 1017    PageID 13971
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 216 of 1803    PageID 10962

20.     Finally, Highland continued misrepresenting to investors that it had a ROFR and never mentioned in its communications that the Committee was the entity actually possessing that right.  Mr. Leventon was the principal instrument through which this misrepresentation and omission were communicated, Tr. 55:19-25 ("Q.·Mr. Leventon, have you ever sent an e-mail to an investor telling the investor that Highland Capital has a right of first refusal in the event the investor wants to sell its interest in the fund? A. With respect to the Crusader Fund, I don't recall having done so."); but see RC-276; RC-280; RC434; Tr. 7 74:22-76:23.)[10]

21.     Based upon the testimony at the hearing, we have serious doubts about the scope of the advice given, if any.  In addition, as now conceded, there were adequate untainted funds under the control of the Crusader Funds to have enabled the Committee to exercise its ROFR as to the Plain Claims, had they been informed in a timely way, as mandated by the Plan. 10/24/18 Highland Ltr. to Panel at 2; RC-408 at 37.

22.     Further, from our examination of the language[11] in the TRO, we conclude that the restrained assets were narrowly circumscribed, and the broad position taken by Highland was not well-grounded. The TRO restrained the Crusader Fund only from transferring or disposing of property received, or its cash equivalent, in March 2009 "from Highland Financial Partners, L.P. in connection with the Termination, Settlement and Release Agreement, dated March 20, 2009." JX13; RC134. The TRO did not preclude the Fund's sale of unrestricted assets or use of a significant amount of cash in the Fund. JX13.

23.     We also find that Highland's reliance on the UBS TRO was pretextual to support Highland's true goal of benefiting itself over the interests of the Fund and the Committee. We find that Highland breached the Plan and Scheme by its actions and injured the Committee by its breach. We also found that Highland breached its fiduciary duty to the Committee by so acting.

---

[10] It appears that Mr. Leventon was also involved in a misrepresentation to the Committee about the purchase of a Plan Claim after the TRO had expired. In June 2016, he requested the Committee's approval for the purchase of a Plan Claim by an entity he described as a third party that was not affiliated with Highland. But in the course of soliciting the sale of the Plan Claim, Mr. Leventon represented that Highland was exercising a ROFR on behalf of itself or its affiliates. Tr. 7 87:6-89:11; RC-434. In fact, we find that the third party, Charitable DAF Fund, L.P. ("DAF"), was an affiliate of Highland. RC-435; Tr. 7 82:1384:21.  Based on what Mr. Leventon stated, the Committee approved the transfer. RC-316.

[11] "ORDERED, that pending the hearing on this motion, Defendants Highland Crusader Offshore Partners, L.P., and Highland Credit Strategies Master Fund, L.P., are temporarily restrained from transferring or otherwise disposing of property received (or if property has already been transferred or disposed to, the cash equivalent) in March 2009 from Highland Financial Partner,s L.P. in connection with the Termination, Settlement and Release Agreement, dated March 20, 2009."

Appellee Appx. 00210
Appx. 00101
013023

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-11   Filed 03/25/804   Page 345 of 1017    PageID 13972
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 217 of 1803    PageID 10963

24.    In the calculation of damages owed to the Redeemer Committee by Highland, we have assumed that any Plan or Scheme Claims purchased by Highland would have been purchased at the same discounted price as Highland did. However, the damages methodology used by the Committee's expert witness on damages makes the assumption that the fair market value of each of the Plan Claims was the NAV that Highland had established in each of the relevant months. We do not adopt this methodology because of the uncertainty as to whether a discount should be applied to the NAV in calculating the appropriate fair market value.

25.    Rather, we adopt the alternative approach suggested by the Committee, which is rescission.  We order Highland to transfer the 28 Plan or Scheme Claims to the Redeemer Committee, to pay to the Committee whatever financial benefits Highland received from the 28 transactions, less what Highland paid for the Plan Claims, plus interest at the rate of 9%, from the date of each purchase. We will leave the hearing open until the parties have worked out the exact financial details to comply with this order.

I.    Related Party Transactions

1.    The Committee contends that Highland breached its fiduciary duties by engaging in multiple related-party transactions without seeking or gaining the approval of the Committee  The Plan provision in questions requires the Committee's approval of "all transactions between the Crusader Funds and any other HCM-Related Party, while it serves as investment manager of the Crusader Funds, including any 'cross trade' between the Crusader Funds and any other account managed or advised by HCMLP," Plan §2.06; Scheme §4.7.1 (emphasis added).

2.    First, we must resolve the interpretation question left open by the Order of March 1, 2017, denying Respondent's motion for partial summary adjudication regarding these claims. We found that the language cited above was ambiguous because while Respondent argued that "Crusader Funds" is defined as meaning only four entities, the Master Fund, Onshore Fund, Offshore Fund I and Offshore Fund II, Id., § 1.01, and does not include Crusader Fund "portfolio companies" and other affiliated "entities," Claimant argued that if Crusader Fund meant only those four entities, there would be no meaning to the "including 'cross trades' language of §2.06, because none of the four entities directly owns assets and thus could not engage in cross trades with each other or with any other account managed by Highland. Thus, the language 'including "cross trades" must refer to entities broader than just the defined entities within Crusader Funds, or else that portion of §2.06(a) prohibiting cross trades would be read out of the Plan. Accordingly, we denied without prejudice the motion to dismiss the breach of contract and fiduciary duty claims based on the so-called affiliate transactions until after the record has been more fully developed.

31

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Filed 09/25/804    Page 346 of 1017    PageID 13973
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 218 of 1803    PageID 10964

3.      At the hearing, testimony was taken from two Redeemer Committee members, Messrs. Montgomery and Behr, regarding the drafting of the section in question. Mr. Montgomery testified that he negotiated the terms of the Plan with Michael Colvin, who was then Highland's General Counsel, telling him that the Committee "needed a related-party transaction prohibition, and he agreed to that. And the understanding was that it included everything on the Highland side and everything on the Crusader side… we thought there was agreement that it was including everything on the Highland side and everything on the Crusader side…" Tr. 2, 234:2-6, 235:2-5. Although in response to a question from a member of the Panel, Mr. Montgomery could not recall the specific language he and Mr. Colvin used to convey this understanding, and on cross-examination, he could not provide a reason for how the specific clause was drafted on this point, we credit Mr. Montgomery's testimony on this point.

4.      Although of limited evidentiary significance, Mr. Behr's testimony that before the adoption of the Plan and Scheme he had had discussions with someone at Highland, whom he recalled was Mr. Colvin, about concerns regarding Highland expensing board fees paid to its portfolio companies, Tr. 9 76:17-25, 77:2, supported Mr. Montgomery's testimony, cited above, that the subject of prohibiting certain related party transactions was part of the negotiations over the Plan. His recollection was supported in part by his contemporaneous notes of having raised that subject in the negotiations. HC508 at 142.

Appellee Appx. 00212
013025

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 12/06/25   Page 347 of 1017   PageID 13974
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 219 of 1803   PageID 10965

5.      In addition, the Committee makes the point that the occasional course of conduct between the parties before the relationship between the parties became a matter of some dispute reflected the belief that the Plan and Scheme required that Highland seek the Committee's approval before engaging in transactions that involved entities other than the four specific Crusader Fund entities in the definition. See, e.g., Tr. 4 213:6-9.[12] Under the established law relating to contract interpretation, "How the parties perform a contract necessarily is manifested after execution of the contract, but their performance is highly probative of their state of mind at the time the contract was signed." Gulf Ins. Co. v. Transatlantic Reinsurance Co., 886 N.Y.S.2d 133, 143 (First Dept. 2009); "[T]he parties' course of performance under the contract is considered to be the 'most persuasive evidence of the agreed intention of the parties.' … 'Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.'" Federal Ins. Co. v. Americas Ins. Co., 691 N.Y.S.2d 508, 512 (First Dept. 1999).

6.      Based on the foregoing evidence, we resolve the ambiguity in favor of a broad definition of the term "Crusader Funds" to include not only the four specific entities named in §2.06 but also the Crusader Fund "portfolio companies" and other affiliated "entities. The Committee contends that Highland engaged in two types of transactions that required but did not receive its consent: (1) transactions between Highland affiliates and Fund portfolio companies, and (2) transactions directly between Highland affiliates and the Fund entities.

J.      Related Party Transactions with Portfolio Companies.

1.      The Committee contends that Highland breached §2.06 by causing Fund portfolio companies to pay board fees, advisory fees and D&O insurance premiums.

2.      Highland responds that transactions between Highland affiliates and Fund portfolio companies were expressly disclosed to the Fund's investors, see HC-230 at 34-36, and that the investors specifically agreed such transactions were permissible, see HC-118 at 7. Accordingly, Highland urges that there can be no fiduciary duty breaches.

3.      Furthermore, Highland urges that the claims arose in 2011 or 2012, and in any case were disclosed to Highland counsel by April 6, 2013, JX-12, and, thus, would be barred by the three-year statute of limitations. Highland characterizes the proof regarding such claims as failing to establish more than the occurrence of "isolated or sporadic acts."

---

[12] We note that one of Highland's outside counsel also occasionally used the term "Crusader Funds" or "Crusader" when describing transactions between portfolio companies and Highland affiliates, RC83 at 2-3; see JX12; JX10.

Appellee Appx. 00213
Appx. 00404
013026

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Exhibit   Page 220 of 1804   Page 348 of 1017   PageID 13975
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 220 of 1803   PageID 10966

4.      The Committee claims that the statute of limitations should be tolled under the
"continuing violation doctrine," which applies where "separate violations of the same type,
or character, are repeated over time," and not where the claims are "based on a single
decision that results in lasting negative effects." Moses v. Revlon, 2016 U.S. Dist. LEXIS
106431, *18 (S.D.N.Y. 2016).  Under prevailing New York law, "The continuing violations
doctrine 'will toll the limitations period to the date of the commission of the last wrongful
act where there is a series of continuing wrongs.' Shelton v. Elite Model Mgt., 11 Misc.3d
345, 361 (Sup Ct, New York County 2005); 78/79 York Assoc. v. Rand, 175 Misc.2d 960, 966
(Civ Ct, New York County 1998) … However, 'it will only be predicated on continuing
unlawful acts and not on the continuing effects of earlier unlawful conduct.' Selkirk v. State
of New York, 249 A.D.2d 818, 819 (3d Dept 1998)." Pankin v. Perlongo, 2012 WL 7868667,
at *2 (Sup. Ct. N.Y. Cnty. 2012).

5.      The evidence brought forth by the Committee failed to show that the payments made
by Highland for insurance premiums or for advisory fees were parts of a series of continuing
wrongs. Rather, there appear to have been a series of discrete payments made in no regular
or consistent pattern and in no similar amounts.[13] Under the circumstances, we find in favor
of Highland on these claims. We do not reach the issue of whether disclosure to investors
would bar a claim for breach of fiduciary duty.

K.     Related Party Transactions with Highland Affiliates

1.      The Committee contends that in 2013 and 2014, without seeking its permission as
required under §2.06, Highland sold shares in four CLO assets held by the Master Fund,
known as Eastland CLO, Ltd., Grayson CLO, Ltd., Greenbriar CLO, Ltd., and Stratford CLO,
Ltd. (the "CLOs"), in what it characterizes as "pre-approved" transactions to Highland
affiliates, without seeking the Committee's approval, as required by §2.06(a), which, as noted
above, prohibits "any 'cross-trades' between the Crusader Funds and any other account
managed or advised by HCMLP."

2.      The proof at the hearing showed that, with no disclosure to the Committee, Highland
sold CLOs to brokers it used for other securities transactions who, within a very short time of
purchasing the CLOs, sold some or all of the CLOs to Highland affiliates.[14] The Committee
urges that such sales were breaches of fiduciary duty as well as breaches of the Plan.

---

[13] Insurance premiums were paid on behalf of four entities (American Home Patient, Inc., Cornerstone Healthcare, Nex-Tech Aerospace, and Trussway Holdings)
in 2011 and 2012; no payment to any of the entities was the same as to any other entity. RC355, Schedule 6.1. As to the portfolio company advisory fees, various
fees were paid over varying years between 2011 and 2016 by six different portfolio entities to Barrier or NexBank as advisors; with the exception of two years for
one of the entities, each payment of an advisory fee was of a different amount.

[14] As set forth in the Expert Report of Basil Imburgia, RC408, Highland engaged in the following transactions:
- It sold 32,500 shares of Grayson CLO at a settlement amounts of $560 and $570 per share, of which $25,500 were sold to NexPoint, with a reported
  value of $570 per share, Table 19;
- It sold 32,250 shares of Eastland CLO at settlement amounts of $611.40 and $613.90, of which 25,250 were sold to NexPoint, with a reported value of
  $730 and $670, Table 20;

34

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 12/26/25   Page 349 of 1017   PageID 13976
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 221 of 1803   PageID 10967

3.      Highland contends that the sales in question were not cross trades but were rather "market-bearing transactions" between Highland and an independent financial institution, which then sold to a Highland affiliate. But this contention is belied by the fact that the transactions bore all of the hallmarks of pre-arranged trades, designed to avoid obtaining the consent of the Committee. See JX-30 at 3 ("Trading assets between two affiliated accounts through a broker may be considered a Cross Trade…"). Indeed, Mr. Dondero, the Chief Executive Officer, is heard on a tape made by then-Chief Portfolio Manager Joshua Terry, suggesting "run[ning a CLO trade] through some broker," RC-263A. By using a middleman between itself and its affiliate, Highland sought to avoid the description of a "cross trade," but the reality is that the transactions were effectively cross trades and we will treat them as such.

4.      That said, however, the substance of the transaction, arguably, benefitted the Committee, because assets of the Fund were liquidated, which was a principal goal of the Plan and Scheme.  Yet the problem with these transactions is that Highland had a perfectly clear path to effectuate these trades without any question being raised as to their bona fides – it could have sought the consent of the Committee under §2.06, which consent could not be unreasonably withheld under §2.07, HC-300. We find that Highland's failure to do so constitutes a breach of the Plan.

5.      We are left with the question of whether Highland's roundabout trading method caused any damage to the Fund.  It appears Highland sold the CLOs to a broker for one value and then the broker turned around and sold the CLOs to the Highland affiliate for a higher value. Thus, the Fund received less than it was entitled to receive had the transaction been done without the middleman, and the damage to the Fund is the difference in the two values. While the Committee's expert Basil Imburgia did not use that methodology to calculate the damages associated with these trades, the information on the price paid to the funds and the price paid to the broker is set forth in the expert report of Highland's expert, Mr. Snow, HC-526 at 41.  The Committee contends that the difference is approximately $450,000. The Committee is entitled to judgment for the amount of the difference with interest from the date of the sale from the funds, Since none of the experts did the appropriate calculation, as with other items, we leave it for the parties to confer and agree upon the total amount of damages including 9% interest and we will leave the record open to resolve that amount.

---

- It sold 31,000 shares of Greenbriar at settlement amounts of $713.60 and $665.00, of which all of the shares were sold to NexPoint at reported values of $730.00 and $670.00, Table 21; and
- It sold 31,500 shares of Stratford at settlement amounts of $661.70 and $660.00, of which 25,500 were sold to NexPoint at reported values of $724.49 and $665.00, Schedule 22.

35

Appellee Appx. 00215
Appx. 00406
013028

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 03/05/25   Page 350 of 1017   PageID 13977
Exhibit 6   Page 223 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 222 of 1803   PageID 10968

L.      Failure to Settle Credit Suisse Trades/Litigation

1.      The Committee contends that Highland committed willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors, both by failing to settle two trades Highland made on behalf of the Fund in September 2008 with Credit Suisse (relating to the purchase from Credit Suisse of syndicated loans in the amount of $23.5/9 for properties known as Goldfield and Westgate) and by failing to settle the litigation initiated by Credit Suisse in July 2013 regarding the same trades. The Committee asserts that, despite clear legal authority requiring that Highland settle the trades and the subsequent litigation, Highland refused to do so because it sought to use its refusal to settle the trades and litigation as leverage against Credit Suisse with respect to other claims not involving the Fund that Highland had against Credit Suisse. Thus, the Committee contends Highland put its own interests ahead of the interests of the Fund. Consequently, the Committee further alleges, that by its delaying the settlement of the trades and then of the litigation, Highland caused the Fund to incur seven-plus years of statutory interest that could have been avoided but which the Fund had to pay in January 2016 when the trades and the litigation were ultimately settled.

2.      Highland poses multiple defenses to the Committee contentions. First, Highland argues that the Committee's claim first accrued in 2008 when it allegedly failed to settle the trades and therefore was released by Section 7.01 of the Plan,[15] releasing Highland from all claims, known or unknown, "from the beginning of the world to the Effective Date" of the Plan in August 2011. Second, Highland contends that even if this claim was resurrected after the effective date of the Plan and Scheme, said claim would have arisen in 2011 and was thus barred by the three years statute of limitations for breach of fiduciary duty claims. Third, Highland argues that it did not breach its fiduciary duty as it was only exercising its legitimate business judgment in not settling the trades or the litigation and that the Committee has otherwise failed to show that Highland committed willful misconduct in this regard. Finally, Highland asserts that if the Tribunal finds that it breached its fiduciary duty, any damages that might be owing should be at a reduced amount from what the Committee claims.

---

[15] Section 7.01 provides, as follows: "Section7.01. Upon the Effective Date, each of the Consenting Redeemers, for themselves and on behalf of any of their respective officers, directors, shareholders, partners, members, employees, affiliates, investors, agents and representatives and any other person or entity entitled to assert a Claim (defined below) by, through, under, or on behalf of any Consenting Redeemer, hereby releases each of the HCM-Related Parties and each of the other Consenting Redeemers, from any and all accounts, actions, agreements, causes of action, claims, contracts, covenants, controversies, damages, debts, demands, executions, expenses, judgments, liabilities, obligations, omissions, promises, representations, and fights to payment, and all other liabilities of every kind, nature and description whatsoever, liquidated and unliquidated, fixed and contingent, matured and unmatured, disputed and undisputed, legal and equitable, state and federal, secured and unsecured, accrued and unaccmed, known and unknown, choate and inchoate (each, a "Claim"), which each Consenting Redeemer has, may have or ever had against any or all of the HCM-Related Parties and the other Consenting Redeemers from the beginning of the world to the Effective Date related to each of the Crusader

Appellee Appx. 00216
Appx. 004 07
013029

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 12/06/25    Page 351 of 1017    PageID 13978
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 223 of 1803    PageID 10969

Funds, including without limitation its administration and wind-down; provided, however, that such release shall not operate to release any claims arising from this Plan or based on larceny within the meaning of Section 155.05 of the New York Penal Code ("Larceny Claims"), provided that such exception shall not apply to Larceny Claims within the scope of knowledge of the releasing party as of the Effective Date. The benefit of the release in this Section 7.01, as it related to the HCM-Related Parties, is held in trust by the Crusader Funds for the HCM-Related Parties, and the Crusader Funds hereby assign the benefit of the release in this Section 7.01 in their favor."

37

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1 18-6    Filed 12/26/25 Page 352 of 1017    PageID 13979
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 224 of 1803    PageID 10970

3.      With respect to the issue of the release, the Tribunal concludes that Section 7.01
releases any claims that the Committee might have with respect to the failure by Highland to
settle the Credit Suisse trades through the Effective Date of the Plan, but the Committee has
not released any claims that arose after the Effective Date of the Plan. The Tribunal need not
decide whether the continuous post-August 2011 failure to settle the trades automatically
gives rise to new post-Effective Date claims; once Credit Suisse commenced litigation in July
2013 and the Committee renewed its demand that Highland settle the trades  and the
litigation, and once Highland again failed to do so, a new claim arose, at least as of that point
in time. This new claim would not be released under Section 7.01 since it arose after the
Effective Date of the Plan. Accordingly, Tribunal views Highland's continuous failure to
settle the trades and litigation after July 2013 (until January 2016, and subject to the
temporary withdrawal by the Committee of its demand that Highland settle the trades and
litigation in September of 2013, as discussed below) as the potentially actionable conduct that
the Tribunal will analyze below.

4.      As to the statute of limitations issue, the Tribunal agrees with Highland that a three
years statute of limitations applies to breach of fiduciary duty claims and therefore any
conduct outside the three years limitations period is not actionable.  The Committee filed in
this Arbitration its breach of fiduciary claim with respect to the unsettled Credit Suisse
trades and litigation on July 5, 2016. Consequently, given the application of the statute of
limitations, any claim for relief for any period prior to July 5, 2013 is barred by the statute of
limitations and the Tribunal will not consider conduct prior to this date to be actionable nor
will it consider any claim for damages for the period prior to July 5, 2013.

5.      The Tribunal finds that Highland committed willful misconduct, thereby breaching
its fiduciary duty to the Fund and its investors, by failing to settle the two subject trades with
Credit Suisse. The Tribunal finds that, whatever strategy Highland intended or whatever
judgment calls it made, or purported to make, with respect to the settlement of these trades,
it was under a clear legal obligation to settle the trades but failed to do so.

Appellee Appx. 00218

Appx. 00460

013031

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Page 1266 of 1804 Page 353 of 1017    PageID 13980
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 225 of 1803    PageID 10971

6.      Highland's then General Counsel admitted to at least a general awareness of the legal obligation under the LSTA regime to settle trades promptly (and to litigate later if there is a dispute regarding same). Tr. 10 288:2-12, 290:13-22, 291:15-20; and there is other evidence to the same effect. See, e.g., JX-12 at RC00100770-771. Despite this clear legal obligation, and despite Committee requests that it do so, Highland refused to settle the trades in order to provide itself with leverage vis-a-vis Credit Suisse on another dispute. Even if, as argued by Highland, its prevailing on this other dispute would advantage the Fund, once the Committee demanded that Highland settle the trades, as it first did during the limitations period on August 7, 2013, Highland should have done so given both the acknowledged weakness in its defenses and that its purported goal in not doing so at least primarily advantaged itself and not the Fund (even if the Fund might have gained some marginal potential advantage if Highland prevailed in the other dispute). In light of the preceding, Highland's refusal to settle the trades constitutes willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors.

7.      The Tribunal finds that the actionable willful misconduct by Highland for which damages will be due occurred during the period September 8, 2014 through January 14, 2016. The reason for the end date is clear and undisputed: on that date, Highland caused the Fund to pay for the trades and the interest due. As for the start date, the earliest possible start date, in light of the above analysis, is August 7, 2013 which is when the Committee first demanded during the limitations period that the trades be settled. But, in September 2013, counsel for the parties interacted and the Committee withdrew its demand that Highland settle the trades. HC-476a. The Committee argues that it was not apprised by Highland of relevant information at the time, and therefore the Fund should not be bound by its agent's withdrawal of the demand, but the Tribunal concludes that, notwithstanding Highland's failure to provide this information, the Committee's counsel independently analyzed the relevant issues and the Committee is responsible for the decisions flowing from that analysis. On or around September 8, 2014, after the trial court entered summary judgment in favor of Credit Suisse in the litigation, the Committee reinstated its demand that Highland settle the trades; since Highland did not do so until January 14, 2016, it is, under our analysis above, responsible for damages accruing during the period from September 8, 2014 through January 14, 2016.

Appellee Appx. 00219
Appx. 00479
013032

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1186   Filed 12/06/25 804   Page 354 of 1017   PageID 13981
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 226 of 1803   PageID 10972

8.      The Tribunal adopts the damages theory advanced by the Committee: the pre-judgment interest that the Fund had to pay during September 8, 2014 through January 14, 2016, minus the gain it achieved during the same period by virtue of having the use of the subject $23.5 million. However, neither party presented a damages analysis consistent with the preceding parameter. Accordingly, the Tribunal directs that the Parties jointly confer to calculate an amount of damages that takes into account the following parameters: (i) the damages period is between September 8, 2014 and January 14 , 2016; (ii) the 9% statutory interest (ordered by the New York State Supreme Court in September 2014) is to be applied on a simple basis to the total principal amount due ($23.5 million); (iii) the amount of the "off-set" is to be calculated using the factor utilized by Claimant's expert – the Treasury Yield Rates for the damages periods specified in (i); and (iv) 9% statutory, pre-judgment interest is to be applied on a simple basis to the result of the calculations in (i) – (iii) from January 14, 2016 to the date of this Partial Final Award.

M.    The Delay in Settling the UBS Litigation

1.      As noted above, Highland, Crusader and Credit Strategies were parties to an action commenced by UBS which alleged that certain securities had been fraudulently transferred by Highland to the funds. As a result, the funds were enjoined from transferring the subject assets during the course of the litigation.

2.      In May 2015, UBS, Highland, Crusader and Credit Strategies reached an agreement in principle to settle the litigation. Under the terms of that agreement Crusader was to pay UBS $25 million and Highland was to pay $35.75 million. A separate agreement between the Committee and Highland provided that, no sooner than December 30, 2016, Highland could recapture $33.75 million through incentive fees that could be generated through the liquidation of Crusader assets. RC-227.

3.      The settlement agreement was to be finalized on May 30, 2015, but Highland refused to go through with the settlement because Credit Strategies would not release claims against Highland. Tr. 3 21:10-22:3; Tr. 3 24:16-25:6; Tr. 10 316:20-317:23. Ultimately the Committee negotiated a its own settlement, pursuant to which Crusader paid UBS $25 million on July 1, 2015, and an additional amount of $30 million on December 29, 2015.

4.      The Committee argues that, had Highland not blown up the original settlement, it would not have had to pay the $30 million to UBS on December 29, 2015, and it would have retained those funds at least until December 30, 2016, when that amount might have been transferred to Highland if it had earned that amount in incentive fees. The Committee, therefore, seeks as damages 9% interest on the $30 million from December 29, 2015 to December 30, 2016, which its expert calculated to be $2,041,664.

40

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 12/06/25 1804    Page 355 of 1017    PageID 13982
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 227 of 1803    PageID 10973

5.      Highland denies that it has any liability and asserts that is protected by the business judgment rule. It also argues that 9% interest is not appropriate. Further, Highland urges that the Committee's expert did not otherwise account for the fact that Highland might have earned $33.75 million in incentive compensation and, therefore, there was a net benefit to the fund.

6.      There is no basis for Highland's claim that its conduct is protected by the business judgment rule. In deciding whether or not to settle the UBS litigation, Highland was acting as a fiduciary with respect to Crusader and had a fiduciary duty not to place its own interests above that of Crusader. As the New York Court of Appeals stated in Birnbaum v. Birnbaum, 73 N.Y. 461, 466 (1989):"It is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interest the fiduciary is to protect . . . . This is a sensitive and ' inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a  fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty. (Citations omitted.)"

7.      Thus, Highland was not free to place its own interests above that of Crusader and had an obligation to settle UBS's claims against Crusader regardless of its concerns about possible claims against it by Credit Strategies.

8.      There can be no question that Highland's action in refusing to settle with UBS resulted in Crusader being deprived the use of $30 million in cash between July 1, 2015 and December 30, 2016, the first day on which Highland would have been entitled to receive any of the incentive fees. Here, as with the Deferred Fees, it is appropriate to award interest on that amount at the rate of 9% to compensate Crusader for that loss.

41

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-11    Filed 09/25/25 1804    Page 356 of 1017    PageID 13983
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 228 of 1803    PageID 10974

9.    The problem with Highland's claim that it might have earned an incentive fees of $33.75 million is that Highland offered no evidence that would suggest that its incentives fees would ever have reached even the $30 million amount that the Committee is willing to concede might have been reached. Since the original settlement agreement was negotiated at a time when there was no plan in place to terminate Highland as the fund manager, the incentive fee structure was based on events that would ultimately occur in periods after the Committee terminated Highland. Since neither party made any effort at the hearing to calculate incentive fees, it seems apparent that such a calculation was not possible. In these circumstances, the Committee's assumption that Highland would have earned $30 million in incentive fees by December 29, 2016 is generous and there is no basis for a finding that Highland would have earned more than that in incentive fees.

10.    We award Claimant as damages 9% interest on the $30 million from December 29, 2015 to December 30, 2016, which its expert calculated to be $2,041,664.

N.    Cornerstone

1.    Highland Cornerstone Healthcare Group ("Cornerstone") is a company that owns Long Term Acute Care (LTAC) hospitals in which the Fund owns a minority equity interest. At the time of the adoption of the Plan and Scheme, Highland owned or controlled 100% of the shares of Cornerstone. Two groups of funds, Crusader Funds and Highland Credit Strategies Fund ("Credit Strat"), owned more than 50% of the shares of Cornerstone. Between 2011 and 2013, Highland was secretly engaged in the process of valuing and, eventually, selling the interest held by Credit Strat in Cornerstone. In September 2013, after a process in which the Credit Strat Redeemer Committee was kept completely in the dark as to the sales process that was underway, and which was later found to be unfair to the investors in Credit Strat, see RC-306, Highland arranged for the purchase of Credit Strat's interest by Cornerstone itself at the price of $2,956.03 per share, see JX-16. This price was below the most recent mark set by Highland, and below the value of between $3,424 and $4,434 per share that Highland's investment bankers, Houlihan Lokey, found to be fair for the purchase of the minority interest, see HC-431.

42

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 12/06/25    Page 357 of 1017    PageID 13984
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 229 of 1803    PageID 10975

2.      Following the purchase of the Credit Strat interest, the Crusader Funds owned 41.8% of Cornerstone, see RC-138 at 7. The Crusader Funds learned of the sale and made known their interest to Highland in having their interest in Cornerstone sold.  But when Highland offered to buy their interest for the same price of $2,956.03 per share as the Credit Strat interest, the Committee engaged Ernst & Young ("E&Y") as its advisor to analyze the offer and prepare a response. E&Y prepared two analyses of the value of the Cornerstone asset. The first, HC-577, found that, as of the fall of 2013, "Cornerstone's offer to purchase Crusader's share for $43.8 mm is below Crusader's current carrying value and at the low end of the range of values developed in this Report" and that "based on information provided and reviewed to date it would appear that the lower end of the range is more reasonable to expect that (sic) the higher end of the range," Id. at 5.

3.      The Committee then requested that E&Y prepare a supplemental report, and, in January 2014, E&Y rendered a second report, finding that Cornerstone underperformed expectations for 2013 and that the changes occurring in the healthcare field were creating uncertainty in the industry in which Cornerstone operated.  HC-577 at 19. E&Y reduced its range to $44 million to $63 million, by imposing a discount from its prior range as of year-end 2013 by 10% to 25%. In discussions with counsel to the Committee, E&Y suggested countering with a purchase price in the range of $50 million to $54 million "for negotiation purposes." Id.

4.      Thereafter, on March 28, 2014, after the Committee had considered its options, it made a counter-offer within the range suggested by E&Y at $52,342,188, or $3,529 per share, plus a 50% recapture provision in the event of a sale within three years. JX-18.  The counter-offer was at the 2013 year-end market value, as calculated by Highland. Id. Highland never responded to this counter-offer despite repeated overtures to Highland by the Committee, and despite the desire of the Claimant Redeemer Committee and the mandate of the Scheme and Plan to liquidate all of the assets of the Crusader Fund, the interest in Cornerstone held by the Crusader Funds has not been sold.

5.      Claimant contends that the failure of Highland, during the period it was the investment manager of the Funds, to make any good faith effort to sell the Funds' shares in Cornerstone, constituted a breach of fiduciary duty.

6.      As part of its claim of breach of fiduciary duty, the Committee urges that Highland is collaterally estopped from denying the findings of the arbitration tribunal in the arbitration brought by the Redeemer Committee of Credit Strat arbitration tribunal regarding, inter alia, the Cornerstone transaction. RC-306 (4/6/16 Credit Strategies Fund Final Award).

43

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit Page 1201 of 1804 Page 358 of 1017    PageID 13985
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 230 of 1803    PageID 10976

7.    In particular, as it bears on this dispute, the Committee contends that Highland is estopped from denying the following findings: (1) Highland controlled Cornerstone; (2) the per share price at which Highland sold Credit Strat's interest was unfair; and (3) a price of $3,929 per share was a fair price, based upon the Houlihan Lokey valuation.

8.    Highland contends that the Credit Strat Tribunal's findings do not bind Highland in this proceeding, because the two arbitration proceedings deal with "fundamentally different" issues, such that collateral estoppel does not apply.

9.    First, Highland urges that the Credit Strat Tribunal was dealing with the ramifications of a consummated sale, where it found that Highland controlled both Cornerstone's offer and Credit Strat's acceptance. HC-220 at 8, 30, whereas in this proceeding, the evidence is that Cornerstone made an offer to the Committee, but Highland had no role in the Crusader Fund's evaluation of or counter to that offer and no sale occurred.

10.    Secondly, Highland points out that in Credit Strat, the retention of Houlihan Lokey and the entire process that Houlihan Lokey engaged in was a secret that the Credit Strat Committee was unaware of, whereas, in this proceeding, the Houlihan report as well as other financial information was made available to the Crusader Committee, HC-577 at 577.0002, Tr. Day 5 at 114:12-117:18 (Zambie).

11.    The doctrine of collateral estoppel requires that an issue being litigated in the second case be the same as was fully litigated by the same party in the first action. Fuchsberg & Fuchsberg v. Galizia, 300 F.3d 105, 109 (2d Cir. 2002) ("[C]ollateral estoppel prevents a party from relitigating an issue decided against that party in a prior adjudication. It may be invoked to preclude a party from raising an issue (1) identical to an issue already decided (2) in a previous proceeding in which that party had a full and fair opportunity to litigate.") (internal quotations and citations omitted).

12.    Although there are differences in the way in which the sale process took place, we do not find that such differences obscure the fact that some issues are substantially identical in both proceedings.

44

Appellee Appx. 00224
Appx. 00475
013037

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 136   Filed 12/26/25804   Page 359 of 1017   PageID 13986
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 231 of 1803   PageID 10977

13.    The principal finding that we think is binding on Highland in this proceeding is that the price of $3,929 per share, based upon Houlihan Lokey's valuation, was a fair price. Claimant also argues that Respondent is bound by the finding that the offering price Highland made for the Credit Strat position, which was the same price as offered to the Redeemers Committee here, was unfair. But we think that finding would fly in the face of Claimant's own adviser, E&Y, who found that such a price was at the low end of a fair range. Accordingly, we do not think it appropriate to adopt such a finding as binding in this proceeding.

14.    Highland also contends that, with respect to the possible sale of the Cornerstone interest, it was not in a fiduciary relationship with the Committee, which was relying on EY for negotiating assistance, not on Highland, as Highland was sitting opposite to the Committee in the negotiation.  Tr. Day 5 at 116:10-117:18 (Zambie).

15.    While the Committee was not relying on Highland for financial advice or guidance with respect to Cornerstone in the period between the Fall of 2013, when an offer of $2,956.03 per share was made, and the early Spring of 2014, when the counter-proposal were made, the Committee did rely on Highland, in its role as investment manager, both before and after those dates, to liquidate the Fund as rapidly as possible.

16.    But by Highland's choosing to have the Crusader Funds, along with several other entities controlled by Highland, invest in Cornerstone, Highland voluntarily placed itself in a conflict position: it owed fiduciary obligations to the Crusader Funds to maximize the liquidation process, while being the control person of Cornerstone whose own interests were to have any purchase price be as low as possible. As investment manager, Highland was obligated to be fully responsible to the Committee, but could not do so as long as it also continued to play an active role as controlling party of Cornerstone with respect to the Committee's desire to sell.

17.    The hearing record is that, other than making the offer in September 2013, Highland took no steps to market or sell the Fund's interest in Cornerstone. Tr. 1 347:16-349:2; 364:12-22.  At meetings held with representatives of the Committee, the Committee asked about plans to sell assets and Highland never discussed, or appeared to have a plan by which it proposed to sell the Cornerstone asset. Tr. 1 349:4-22; 365:13-17; Tr. 4 55:14-20; RC-317 at 2("Mr. Jameson noted that for the remainder of the portfolio, formal strategies for disposition are not in place.").  When Committee representatives met periodically with Jim Dondero, the CEO, he made it clear that he ran the sales operation completely and did not wish to be questioned or have the portfolio managers questioned as to the timing of any particular sale.

45

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 03/25/21   Page 360 of 1017   PageID 13987
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 232 of 1803   PageID 10978

18.     We find that Highland had a fiduciary duty not to place its own interests above that of Crusader, Birnbaum v. Birnbaum, 73 N.Y. at 466 (1989), but rather to subordinate its own economic interests behind its fiduciary obligation to the Crusader Funds. Guth v. Loft, 5 A.2d 503, 510 (Del. 1939) ("The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest."); Weinberger v. UOP, Inc., 457 A.2d 701, 710 (Del.1983) ("There is no dilution of [fiduciary] obligation where one holds dual or multiple directorships."); see also Carsanaro v. Bloodhound Technologies, Inc., 65 A.3d 618 (Del. 2013).  Highland's failure to subordinate its own interests to those of the Committee led directly to its failure to engage in a fair negotiating process with the Committee. By failing to do so, Highland breached its fiduciary duty to the Fund.   Caruso v. Metex Corp., 1992 WL 237299, at *16 (E.D.N.Y. July 30, 1992), People ex rel. Spitzer v. Grasso, 50 A.D.3d 535, 546 (1st Dep't 2008). That breach of fiduciary duty was a continuing offense through the period of time that Highland was the investment manager of the Crusader Fund, as Highland never itself took, or authorized Cornerstone to take, any action in response to the counter-offer that was made in February 2014.

19.     Highland argues that the Committee must overcome the business judgment rule that "the defendant [fiduciaries] have acted on an informed basis and in the honest belief they acted in the best interest of the [client]," citing CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd., No. 03 CIV. 7936 (DAB), 2007 WL 2915181, at *4 (S.D.N.Y. Oct. 4, 2007), in turn citing Aronson v. Lewis, 473 A.2d 805, 812 (Del.1984)("While each director must meet this obligation, a decision made by the board of directors will be presumed, under the business judgment rule, to have been made 'on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company,' unless the plaintiff shows that the presumption does not apply.").

20.     But here, we find that Highland's decisions regarding the purchase of the Cornerstone shares from the Crusader Funds — from the offer to purchase, the ignoring of the counteroffer, and the failure to engage in or authorize a negotiation process — were made with the willful intent to benefit itself and not the Crusader Funds investors. See JX-19; Tr. 1 379:17-380:8.  The Business Judgment Rule does not protect Highland or its officers from scrutiny for alleged breaches of fiduciary duty under these circumstances.

46

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 86   Filed 12/06/25-1804   Page 361 of 1017      PageID 13988
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 233 of 1803   PageID 10979

21.     The question then is what is the appropriate price at which the sale should take place. "[I]n determining whether a fiduciary has acted prudently, a court may examine a fiduciary's conduct throughout the entire period during which the investment at issue was held. The court may then determine, within that period, the 'reasonable time' within which divesture of the imprudently held investment should have occurred. What constitutes a reasonable time will vary from case to case and is not fixed or arbitrary. The test remains 'the diligence and prudence of prudent and intelligent [persons] in the management of their own affairs' (id., at 511 [citations omitted])." Matter of Estate of Janes, 90 N.Y.2d 4, 54 (1997); Public Service Co. of Colorado v. Chase Manhattan Bank, N.A., 577 F.Supp. 92, 107 (S.D.N.Y.1983) (Lumbard, CJ, sitting by designation)("where there is no sale, it is impossible to fix exactly the moment by which the loan should have been sold or the amount that could have been obtained; "[p]robably the only rule is that the court will use its common sense and determine what under all the circumstances it is fair to say that the trustee ought to have received if he had done his duty in selling the property within a reasonable time," (quoting Scott on Trusts)).

22.     To satisfy its obligation under the Plan to liquidate the Fund's assets as rapidly and as fairly as possible, Highland did not have "to cause Cornerstone to purchase the Fund's Cornerstone shares for a specific price and at the specific time demanded by the Committee…," Highland Post-Hearing Brief at 11, but it did have a duty to place the Funds' interest above its own and to obtain the best price possible for the Funds' Cornerstone interest. Thus, when it decided it wished to make an offer to purchase the Funds' Cornerstone shares, it was obligated to do so at the fair market value and not to attempt to take advantage of the fact that it had placed the funds in a position where it was the only available buyer.

23.     Highland argues that it makes no sense to assess damages based upon a hypothetical sale of the Cornerstone asset, because, first, since the shares have never been sold, there is no realized loss; and, second, "other than Cornerstone's $43.8 million offer, there is no evidence of any other willing buyer for Cornerstone's assets at any price."

24.     We reject the first argument because it ignores what we have found to be the breach of fiduciary duty —the obligation to pursue and consummate a sale at a fair and reasonable price. The Fund was damaged by reason of Highland's failure to fulfill that obligation.

47

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 05/02/25    Page 362 of 1017    PageID 13989
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 234 of 1803    PageID 10980

25.     As to the second argument, Highland defeats its own argument by pointing out that, in the real world, there is only Cornerstone available as a buyer. But, because of Highland's own financial objectives, there has been no indication since April 2014 when it failed to authorize a counteroffer that Highland was interested in directing Cornerstone, which it controlled, to make an offer to purchase the shares at anything other than a bargain basement and unfair price.

26.     Using our equitable powers, we believe that a fair price can be derived by using the fair market value of the shares of $3,929 per share, based upon Houlihan's valuation prepared on July 15, 2013, adjusted downward by 10-25% by the year-end discount caused by several factors cited by E&Y. The average of that discount results in a fair market valuation of $3,241.43, which amount is what we find should have been offered to pay for the Cornerstone shares.

27.     We order that Highland pay to the Committee $3,241.43 per share, or $48,070,407, and order that the Committee simultaneously cause the Crusader Fund to surrender its interest in Cornerstone to Highland.

28.     With respect to an award of pre-judgment interest, "[a]lthough an action for breach of fiduciary duty is generally considered of an equitable nature, '[e]ven on [such] a claim with equitable underpinnings ... prejudgment interest [is] mandatory where the only relief sought was compensatory damages.' Lewis v. S.L. & E., Inc. 831 F.2d 37, 39 (2d Cir.1987) (citing Spector v. Mermelstein, 485 F.2d 474, 481 (2d Cir.1973))(emphasis added).

29.     Regarding the rate of pre-judgment interest to be applied, Claimant argues for the application of New York's statutory rate of interest of 9% as most appropriate. Under CPLR §5001(a), "in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion." See 212 Inv. Corp. v. Kaplan, 16 Misc. 3d 1125(A), at *9 (Sup. Ct. N.Y. Cnty. 2007); Panix Prods., Ltd v. Lewis, id; Summa Corp. v. Trans World Airlines, 540 A.2d 403, 409 (Del. 1988).

30.     Under CPLR §5004, New York applies pre-judgment interest at 9%, simple annual interest. Under the circumstances here, where the breach of fiduciary duty deprived the investors of the Crusader Funds of a significant distribution and partial return of their equity, we exercise our "broad discretion, subject to principles of fairness, in fixing the rate to be applied," Summa Corp. v. Trans World Airlines, Inc., id., and we award interest at the statutory rate of 9%, simple annual interest, pursuant to New York law, from April 15, 2014, through the date of this Partial Final Award. We pick this date as it is the date by which we believe Highland and/or Cornerstone (as controlled by Highland) should have responded to the Committee offer.

IV.    The Return of the Deferred Fees

48

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/25/24    Page 363 of 1017    PageID 13990
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 235 of 1803    PageID 10981

A.    Under §§2.02 and 6.02 of the Plan, if Highland distributed $1.7 billion within 43 months of the Plan's Effective Date, Highland could obtain $10 million in Deferred Fees that had been placed in the special account at the outset to incentivize Highland's rapid liquidation.  There is no question that Highland did not meet that goal by the 43rd month and, thus, in Count Three of its Amended Demand, the Committee seeks the immediate return to the Fund of those proceeds by a declaration that the Fund should distribute the right to receive payment in respect of the funds in the Deferred Fee Account to the Consenting Compulsory Redeemers.

B.    Highland objects on the ground that the UBS TRO eliminated the 47-month schedule applicable to the Deferred Fee Account, invoking the Impossibility Doctrine, discussed in detail above, and argues that, upon the eventual complete liquidation of the Fund, it will be entitled to the $10 million in the Deferred Fee Account.

C.    For reasons set forth earlier, we reject the argument that, under the Impossibility Doctrine, Highland was relieved of the requirement that it achieve complete liquidation of the Fund within 43 months, and, thus, is entitled to the $10 million in Deferred Fees upon complete liquidation. Highland had the opportunity to achieve the complete liquidation despite the duration of the UBS TRO, but chose, for its own reasons, not to do so. The Impossibility Doctrine does not provide a basis for granting Highland affirmative relief.

D.    We order the return to the Crusader Fund the $10 million in the Deferred Fee Account.

V.    Counterclaims

A.    Respondent has brought two principal counterclaims: first, it seeks to recover the remainder of Deferred Fees to which it says it is entitled now because Claimant should have completed the complete liquidation of the Fund's assets by December 31, 2017, at the latest; and, second, it seeks damages against the Committee for breach of the Plan and of its fiduciary duties to Highland by failing to oversee A&M's liquidation of Fund assets and for approving, without adequate, if any, scrutiny, A&M's fees, said to be exorbitant.

B.    As to the breach of fiduciary duty claim, the fiduciary duty relation is said to arise from Highland's status as an investor in the Crusader Funds.  Highland's Post-Hearing Brief at at 3-5. However, we have previously stricken those portions of Highland's Amended Counterclaim that alleged it was suing as an investor. Panel Order, April 1, 2018, at 4. Furthermore, even assuming that, as an investor, Highland had standing to bring a claim for breach of fiduciary duty, as stated below, we find that no breach of duty has been proved with respect to any of the allegations in Respondent's Amended Counterclaim.

49

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/02/25   Page 364 of 1017   PageID 13991
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 236 of 1803   PageID 10982

C.      Specifically, we have examined the record thoroughly and, aside from the testimony of Highland's expert, James Finkel, and its former portfolio manager, Mr. Jameson, there is insufficient evidence of a purposeful and wrongful delay in liquidation or a failure by the Committee to oversee and scrutinize A&M's performance, nor any activity of A&M that the Committee aided and abetted that was proved wrongful.

D.      Mr. Finkel had a distinguished thirty-plus year career in capital markets, investment banking, and investment advisory work, including as a liquidator of the assets of alternative investment funds. But his opinion that Highland or any reasonable manager or liquidator would have completed liquidation by the end of 2017, at the latest, was not based on anything more than his unverified judgment, and not on a close examination of the facts in this record. For example, he conceded that, in reaching his opinions, he didn't consider the amount of information A&M provided to investors, didn't review A&M's time records or evaluate the quality of the work performed by A&M, and didn't consider the consequences of the lack of cooperation of Highland with A&M, among other critical deficiencies. Tr.10 367:10-372:3. Similarly, his opinion that, because of what he regarded as a flawed compensation structure, A&M's primary focus was on the time it spent on projects, rather than on results achieved, was based on one assumption that time-based work is, inevitably, less likely to be focused, an assumption that we reject as a sound basis of criticism of A&M's contribution. We find that Mr. Finkel's opinions were not soundly based and we reject them.

50

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1186   Filed 12/16/04.804 Page 365 of 1017   PageID 13992
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 237 of 1803   PageID 10983

E.      Mr. Jameson worked for Highland for almost seven years as co-head of Private Equity, responsible for sourcing and executing private equity investments and monetizing existing portfolio companies. He testified that he was aware of the UBS TRO and had been advised that he could not sell assets during its pendency. He was aware that Cornerstone did not comply with requests by A&M for information but did not think he had the power to direct Cornerstone to do so Tr 10 28:18-30:3. He also testified that, had Highland remained as its investment manager, it would have sold the Cornerstone asset by December 31, 2017, and that Highland Capital's purchase of Cornerstone from the Crusader Fund at a negotiated price around the mark set by Highland would have been logical. Tr. 10 30:4-35:23. He also testified, in response to questioning by the Tribunal, that little, if anything, would have changed in Highland's ability to negotiate a sale with the Committee when it was replaced by A&M as its investment manager, Tr. 10 119:8-121:23.  On balance, despite Mr. Jameson's on-the-ground role as portfolio manager, his testimony did not support the allegations of Highland in its counterclaims; if anything, his intimate understanding of the Cornerstone asset and how Highland controlled the process by which Cornerstone was or wasn't being marketed supported the Committee's contentions that Highland could have negotiated a fair disposition of the Cornerstone asset had it chosen to do so.

F.      As to an alleged delay in the liquidation of the Fund's assets, the weight of the credible evidence is that Highland, not A&M, was responsible for any delay in liquidating the balance of the assets in the Crusader Fund after Highland was discharged and A&M was retained.

1.      We note that we have previously found that Highland, after refusing to respond to numerous requests by the Committee for books and records, should make a thorough search of its books and records and produce all non-privileged documents in its possession, custody, or control on certain relevant topics. Thus, we rejected several arguments put up by Highland to prevent the Committee and A&M from gaining access to critical books and records. Order and Partial Award, April 21, 2017.

51

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1186    Filed 03/06/25    Page 366 of 1017    PageID 13993
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 238 of 1803    PageID 10984

2.    But, even when ordered to do so, Highland again refused to produce documents on at least two other occasions, requiring additional motions addressed to this Tribunal, Order, June 20, 2017; Order, October 21, 2017.

3.    In addition, there was unrebutted testimony that Highland produced "hundreds of thousands" of documents in single-page PDF format, requiring the better part of three or more months of A&M's time to correlate and organize. Tr. 6 25:4-19.

4.    By contrast, other than Mr. Finkel's testimony, there was little or no evidence of A&M's procrastinating or proceeding with deliberate slowness or that the Committee failed in its oversight of A&M.

5.    We have considered all of the other factual and legal arguments made by Highland in support of its counterclaims and conclude that Highland is not entitled to recover the remaining Deferred Fees being held in the Fund's cash account and that the Committee did not breach Sections 2.02 of the Plan and 1.5.2 of the Scheme, the covenant of good faith and fair dealing, or its fiduciary duties to Highland and other investors. We dismiss Highland's counterclaims in their entirety.

VI.    Attorneys' Fees and Other Costs

A.    Both parties have requested attorneys' fees relating to all claims asserted in the Amended Demand, Highland's Answer, Highland's Amended Counterclaims, and Claimant's Answer to the Counterclaims. Am. Dem. at 53-54; Highland Answer, October 16, 2016, at 21-22; Highland Am. Counterclaim, April 15, 2018; Committee Answer to Counterclaims. Under AAA Commercial Arbitration Rules, Rule 47(d)(ii), those mutual demands for attorneys' fees submitted the issue to arbitration and gave this Panel the authority to award attorneys' fees, in its discretion. AAA Rule 47(d)(ii). "[M]utual demands for counsel fees in an arbitration proceeding constitute, in effect, an agreement to submit the issue to arbitration, with the resultant award being valid and enforceable." R.F. Lafferty & Co., Inc. v. Winter, 161 A.D.3d 535, 536 (1st Dep't 2018) (internal quotation marks and citations omitted).

B.    The Committee urges that an award of attorneys' fees to it is justified by Highland's having "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," InterChem 59 Asia 2000 Pte. Ltd. v. Oceana Petrochem. AG, 373 F. Supp. 2d 340, 355 (S.D.N.Y. 2005) (citation omitted), and that the record shows numerous examples of Highland acting in bad faith.

52

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1186   Filed 04/06/25   Page 367 of 1017   PageID 13994
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 239 of 1803   PageID 10985

C.      Highland acknowledges the Tribunal's discretion to order an award of attorneys' fees but opposes an imposition of attorneys' fees here. First, Highland argues that denying the Committee's request for attorneys' fees would be consistent with Section 9.02 of the Plan which provides that "each of the Crusader Funds retains obligations it has to pay . . . legal fees." HC-300 at 86. But this section of the Plan does not deal with the issue of fee-shifting being ordered by an arbitral tribunal. Nor, given Rule 47(d)(ii), would an order of this Tribunal shifting the responsibility of fees from one party to another be contrary to the so-called American rule, as both parties have sought this relief which is authorized under the prevailing rules of this Tribunal.

D.      Second, Highland urges that the only basis upon which the Committee is seeking an award is that Highland allegedly engaged in bad faith and vexatious conduct, citing only InterChem Asia 2000 Pte. Ltd. v. Oceana Petrochem. AG, 373 F. Supp. 2d 340, 355 (S.D.N.Y. 2005). Highland points out that the Court in InterChem Asia justified an arbitrator's imposition of an award of attorneys' fees because of one party's "bad faith" conduct during the arbitration, principally concerning discovery issues. Here, the Committee cites seven examples of alleged bad faith, but only one dealt with such conduct during the arbitration, "failing to provide the Committee with the books and records of the Fund, resulting in an extensive discovery process, producing records as single-paged TIFs, and resulting in a Panel ruling against them," citing the Tribunal's Panel Opinion and Final Partial Award, dated April 17, 2017.

E.      We are exercising our discretion to grant Claimant's request for attorneys' fees and costs and to deny Respondent's request for the same relief. We do not base our award on any concern of bad faith or oppressive conduct by Highland's able trial counsel, who acted professionally throughout these proceedings. However, with respect to each of the claims on which we have determined that the Committee is entitled to prevail, we have noted above the many occasions where, during the time it was investment manager and thereafter, Highland engaged in conduct that breached the Plan, breached fiduciary duties, involved secrecy, misrepresentations, and false statements by the most senior executives, and constituted willful misconduct. Furthermore, large portions of the defense set forth by Highland's witnesses were unworthy of belief and reflect the fact that Highland knew that it had no legitimate defense to many of the Committee's claims. Accordingly, in our discretion, based on the foregoing, we award Claimant its legal fees and costs for the litigation of this arbitration.

VII.    CONCLUSION AND AWARD

A.      With respect to the claims below for which we find liability and direct the payment of damages and interest, if the Parties are not able to agree on the amount of damages or interest, we direct them to submit simultaneous briefs to the Panel on the issues within thirty (30) days of the date of this Partial Final Award; there will be no reply briefs unless otherwise directed.

B.      We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on the breach of contract claims as follows:

Appellee Appx. 00233
Appx. 00484
013046

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-116    Filed 04/06/25    Page 368 of 1017    PageID 13995
Exhibit 116    Page 240 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 240 of 1803    PageID 10986

1.      The taking of the Deferred Fees: We order that, within twenty (20) days of the date of this Partial Final Award, Respondent, Highland Capital Management, pay to the Claimant the Deferred Fees in the amount of $33,313,000, with statutory interest of 9%, calculated on a simple basis, from the dates of taking in January and April 2016 through the date of this Partial Final Award.

2.      The payment of Distribution Fees: As found above, with respect to each of the following categories, we find that the Respondent is liable for damages in the amount set forth in the Expert Report of Claimant's damages expert, Basil Imburgia, $14,452,275, plus 9% interest, calculated on a simple basis, from the respective dates such Fees were taken:

  a)      The Distribution Fees attributable to the payment of Deferred Fees;

  b)      The Distribution Fee attributable to the amounts reserved in the Redeemer Trust Account;

  c)      The Distribution Fee attributable to the amounts paid in settlement of the Barclays claims;

  d)      The Distribution Fee attributable to the value of the LP interests and amounts transferred to Eames;

  e)      The Distribution Fees attributable to the amount of margin borrowings; and

  f)      The Distribution Fees attributable to the cumulative nature of the calculation, as discussed above.

Appellee Appx. 00234

Appx. 00485

013047

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 186   Filed 04/26/25 1804   Page 369 of 1017   PageID 13996
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 241 of 1803   PageID 10987

C.      We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on the breach of fiduciary duty claims as follows:

    1.      Engaging in related party transactions without Redeemer Committee approval:

    2.      Purchase of Plan claims without Redeemer Committee approval: Within twenty (20) days of the date of this Partial Final Award, we order Respondent, Highland Capital Management, to transfer the 28 Plan or Scheme Claims to the Redeemer Committee, to pay to the Committee whatever financial benefits Highland received from the 28 transactions, less what Highland paid for the Plan Claims, plus interest at the rate of 9%, from the date of each purchase, calculated on a simple basis;

    3.      Sale of CLO interests - The Committee is entitled to judgment for the amount of the difference between the sale and repurchase prices with interest from the date of the sale from the funds. We direct the Parties promptly to confer and agree upon the total amount of damages including 9% interest, calculated on a simple basis; if the Parties are not able to agree on the amount of damages, we direct the Parties to submit briefs to the Panel on the issues within thirty (30) days of the date of this Partial Final Award;

    4.      Failure to settle Credit Suisse claims: We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on this claim and direct the Parties promptly to confer to calculate an amount of damages that takes into account the parameters set forth in the body of this Award; if the Parties are not able to agree on the amount of damages, we direct the Parties to submit briefs to the Panel on the issues within thirty (30) days of the date of this Partial Final Award;

    5.      The UBS litigation: We find in favor of Claimant, Redeemers Committee of the Highland Crusader Fund, and award damages in the amount of 9% simple interest on $30 million from December 29, 2015 to December 30, 2016, which shall be paid to the Redeemer Committee by Highland Capital Management within twenty (20) days of the date of this Partial Final Award; and

    6.      The Cornerstone Asset: We find in favor of Claimant and direct Highland Capital Management, within twenty (20) days of the date of this Partial Final Award, to pay the Redeemer Committee the amount of $48,070,407, plus interest at 9%, on simple basis, in return for which the Fund will transfer title to the shares to Highland.

D.      We grant Claimant's request for a declaratory judgment, seeking the immediate distribution of the Deferred Fee Account, and order the payment of the $10 million in the Account to the Committee for disbursal to the Consenting Compulsory Redeemers within twenty (20) days of the date of this Partial Final Award.

Appellee Appx. 00235
Appx. 00486
013048

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1 6    Filed 24/36/25 1804    Page 370 of 1017    PageID 13997
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 242 of 1803    PageID 10988

E.    We find against Respondent on its counterclaim and dismiss the counterclaim with prejudice.

F.    We grant Claimant's request for reasonable attorneys' fees and costs and deny Respondent's request for an award of attorneys' fees and costs. With respect to the amount of fees and expenses that Claimant seeks, the parties should promptly confer to determine whether they can agree on an amount. If the parties can not agree, Claimant shall file an affidavit or petition setting out its claim with appropriate documentation within fifteen (15) days of the date of this Award, unless counsel agree otherwise. Respondent shall respond within fifteen (15) days thereafter, unless counsel agree otherwise. There will be no reply opportunity absent leave of the Tribunal.

G.    We will leave the hearing open until all issues set forth above have been agreed upon by the Parties or decided by the Tribunal.

Appellee Appx. 00236
Appx. 00487
013049

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 04/25/804   Page 371 of 1017   PageID 13998
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 243 of 1803   PageID 10989

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019

_____
David M. Brodsky, Chair

_____
John S. Martin, Jr.

_____
Michael D. Young

Appellee Appx. 00237
Appx. 00488
013050

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 04/56/23.804 Page 372 of 1017    PageID 13999
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 244 of 1803    PageID 10990

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019

_____
David M. Brodsky, Chair


_____
John S. Martin, Jr.



_____
Michael D. Young

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-116   Filed 06/25/... Page 373 of 1017   PageID 14000
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 245 of 1803   PageID 10991

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019

David M. Brodsky, Chair

John S. Martin, Jr.

Michael D. Young

Appellee Appx. 00239
Appx. 00490
013052

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 12/06/25    Page 374 of 1017    PageID 14001
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 246 of 1803    PageID 10992

State of NEW YORK                    )

                                     )    SS:

County of NEW YORK                   )

I, David M. Brodsky, do hereby affirm upon my oath as Arbitrator that I am the individual described in
and who executed this instrument, which is our Partial Final Award.


_____3/6/19_____                     _____
Date                                 David M. Brodsky, Chairperson



State of NEW YORK                    )

                                     )    SS:

County of NEW YORK                   )

On this __6__ day of MARCH, 2019, before me personally came and appeared David M. Brodsky, to
me known and known to me to be the individual described in and who executed the foregoing
instrument and he acknowledged to me that he executed the same.


_____
Notary Public

        MEENA M. GULATI
Notary Public, State of New York
       No. 01GU5015872
  Qualified in New York County
Commission Expires August 2, 2021


55

Appellee Appx. 00240

013053

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 12/06/25 1804 Page 375 of 1017    PageID 14002
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 247 of 1803    PageID 10993

State of FLORIDA                    )

                                   )    SS:

County of LEE                      )

I, JOHN S. MARTIN, JR.,, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.

Date  March 5, 2019                     _____
                                        John S. Martin, Jr.

State of Florida                   )

                                   )    SS:

County of Lee                      )

On this 5th day of MARCH, 2019, before me personally came and appeared John S. Martin, Jr.,, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

ROBIN A. YEOMANS
MY COMMISSION # GG 121122
EXPIRES: November 3, 2021
Bonded Thru Notary Public Underwriters

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 04/06/25   Page 376 of 1017   PageID 14003
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 248 of 1803   PageID 10994

State of NEW YORK                    )

                                    )   SS:

County of NEW YORK                  )

I, Michael D. Young, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.


3 -5 -19                              _Michael Young_
Date                                  Michael D. Young


State of NEW YORK                    )

                                    )   SS:

County of NEW YORK                  )

On this 5 day of MARCH, 2019, before me personally came and appeared Michael D. Young, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.


_Vickie L. Johnston_
Notary Public
VICKIE L. JOHNSTON
Notary Public - State of New York
No. 01JO6113098
Qualified in Queens County
My Commission Expires July 19, 20 20

1

Appellee Appx. 00242
Appx. 00493
013055

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-116    Filed 06/25   Page 377 of 1017    PageID 14004
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 249 of 1803    PageID 10995

# APPENDIX 3

Appellee Appx. 00243

Appx. 00494
013056

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1 Exhibit    Page 250 of 1804    Page 378 of 1017    PageID 14005
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 250 of 1803    PageID 10996

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND,

Claimant,

v.

Case No. 01-16-0002-6927

HIGHLAND CAPITAL MANAGEMENT, L.P.,

Respondent.

### FINAL AWARD

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with Section 9.03 of the Joint Plan of Distribution, and the Scheme of Arrangement, both entered into between the above-named parties and adopted in July 2011, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby, AWARD, as follows:

A. On March 6, 2019, we issued a Partial Final Award, finding Respondent Highland Capital Management, L.P. ("Respondent") liable in a number of respects and awarding damages, interest, attorneys' fees, and costs to Claimant Redeemer Committee of the Highland Crusader Fund ("Claimant"), as described, in relevant part, below. We "le[ft] the hearing open until all issues set forth ... have been agreed upon by the Parties or decided by the Tribunal."

B. In response to an email from Claimant, dated March 7, 2019, seeking clarification on an apparent omission from the Partial Final Award, we issued a Disposition of Application for Modification of Award dated March 14, 2019 ("Modification of Award").[1]

C. This Final Award incorporates the Partial Final Award and the Modification of Award (together, the "Partial Award"). We re-adopt all prior findings and conclusions of the Partial Award, except as specifically modified hereinafter.

D. We have before us the following:

---

[1] The Modification of Award referred to Rule R-46 of the AAA Commercial Arbitration Rules, instead of Rule R-50, as the basis for the modification of a clerical error, relying upon the predecessor version of Rule R-50. The substantive text of old Rule R-46 and present Rule R-50 are the same.

1

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 05/26/25    Page 379 of 1017    PageID 14006
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 251 of 1803    PageID 10997

a.  Respondent's Memorandum, dated March 17, 2019, requesting that (1) the Panel withdraw its Modification of Award entered on March 16, 2019; (2) cease any further attempts to award additional damages, attorneys' fees, or costs that are not expressly set forth in the Partial Award; and (3) reconfirm that the hearing and all evidence is closed and the Panel is not empowered to take any further action beyond the issuance of its Partial Award ("Respondent's March 17 Memorandum").

b.  Claimant's Submission Regarding Fees and Costs, dated March 21, 2019, made pursuant to Rules R-28, R-47, R-53, R-54, and R-55, AAA Commercial Arbitration Rules, seeking an award of $11,865,181.28 in attorneys' fees and costs, including Claimant's attorneys' fees, AAA administrative fees, arbitration expenses, fees incurred by A&M, expert fees, and Panel compensation paid by the Respondent Highland on behalf of the Committee in this arbitration ("Claimant's Fee Submission").

c.  Claimant's Application, dated March 25, 2019, made pursuant to Rule 50, AAA Commercial Arbitration Rules, to modify the Partial Award, issued by this Panel on March 6, 2019 (Claimant's March 25 Application").

d.  Claimant's and Respondent's Joint Submission on Damages dated April 5, 2019, in which the Parties agreed on the mathematical calculation of the amount of damages and interest contained in the Partial Award and Modification of Award, subject to Highland's objections to the inclusion of any damages awards that were not specified in the Partial Award and subject to objections on two specific issues: (1) whether the Eames residual LP interests would be extinguished; and (2) whether prejudgment interest awarded by the Panel will continue to run after March 6, 2019 until the earlier of the date the amount awarded is paid to the Committee for the benefit of the Fund, or the date on which a Final Judgment is issued on the Award ("Joint Submission").

e.  Respondent's Memorandum dated April 5, 2019 opposing the motion to modify the Partial Award; and opposing any award for damages, attorneys' fees, or costs ("Respondent's April 5 Memorandum").

f.  Claimant's Memorandum dated April 5, 2019 arguing that (1) the Panel should award further damages in connection with the Barclays claim measured by the Fund's loss of the residual value of the Eames LP interests, either by extinguishing the former Barclays LP interests, or alternatively, by awarding an appropriate amount of damages to compensate the Fund for loss of the value of those interests, which the Committee puts at $11,589,474; and (2) the Panel should award prejudgment interest through the date the Award is paid or final judgment is entered ("Claimant's April 5 Memorandum").

g.  On April 10, 2019, Respondent sought leave, which we granted on consent, to file an additional Memorandum on two issues raised by Claimant in its April 5

2

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 06/25/1804   Page 380 of 1017   PageID 14007
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 252 of 1803   PageID 10998

Memorandum, namely, that Claimant adds a new and improper request that interest after March 6, 2019 be compound, and not simple, interest by applying an additional 9% statutory interest to both (a) the damages awarded and (b) the interest accrued through March 6, 2019; and that Claimant has provided a new and improper damages calculation relating to the extinguishment of the Eames LP interests.

h.  Having reopened the record on March 6, 2019, for additional submissions, as described above, we deem the record closed as of April 10, 2019.

E.  Issues

    a.  Fees and costs

1.  In the Partial Award, we evaluated the competing claims made by Claimant and Respondent regarding an award of fees, which both sides had sought in their pleadings. As we noted in the Partial Award, ¶VI.A, 52, AAA Commercial Arbitration Rule R-47 (d)(ii) authorizes the Arbitrator to award attorneys' fees if, as here, "all parties have requested such an award . . . " "[M]utual demands for counsel fees in an arbitration proceeding constitute, in effect, an agreement to submit the issue to arbitration, with the resultant award being valid and enforceable." *R.F. Lafferty & Co., Inc. v. Winter*, 161 A.D.3d 535, 536 (1st Dep't 2018) (internal quotation marks and citations omitted); *In re U.S. Offshore, Inc. and Seabulk Offshore Ltd.*, 753 F. Supp. 86, 92 (S.D.N.Y. 1990) ("If both parties sought attorney's fees, . . . then both parties agreed *pro tanto* to submit that issue to arbitration, and the arbitrators had jurisdiction to consider that issue and to award them.")."

2.  During closing oral arguments, Respondent did not mention its own request for an award of fees, but "*acknowledge[d] the Tribunal's discretion* to order an award of attorneys' fees…" Indeed, Respondent made oral and written closing arguments that conceded that it was "*not disputing the discretion that the Panel has* [to award fees]." Tr. 13 444:2-3 (emphasis added). In its closing slides, Respondent also urged that "The Panel *should exercise its discretion in applying the American Rule*." Respondent Closing Slides at 261 (emphasis added).

3.  Respondent also argued that denying the Claimant's request for attorneys' fees would be consistent with Section 9.02 of the Plan which provides that "each of the Crusader Funds retains obligations it has to pay . . . legal fees." Second, Respondent urged that the only basis upon which Claimant is seeking an award is that Respondent allegedly engaged in bad faith and vexatious conduct.

3

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 02/06/25   Page 381 of 1017   PageID 14008
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 253 of 1803   PageID 10999

4. Respondent now chooses to oppose the grant of fees on grounds distinctly different from those set forth above. It belatedly argues an alleged lack of proof and the Panel's being *functus officio* to award fees.

    1. Respondent argues that the Panel "found that the evidence in the record was insufficient to determine many of the Committee's claims for damages, as well as its claims for costs and fees." Resp. April 5 Mem. 14.

    2. But that is incorrect; we did not find any insufficiency; instead, with no objection, we adopted a well-recognized method of dealing with attorneys' fees and costs by deciding entitlement before amount. See *Franco v. Dweck*, 87 N.Y.S.3d 5 (2018) ("Contrary to respondents' contention, the final award did not run afoul of the doctrine of *functus officio*, which precludes an arbitrator from altering in substance a prior award (see *Matter of Wolff & Munier [Diesel Constr. Co.]*, 41 A.D.2d 618, 340 N.Y.S.2d 455 [1st Dept. 1973] ). As the partial final award *expressly reserved* the issue of attorneys' fees, it cannot bar a *subsequent* award of those fees (see *Shimon v. Silberman*, 26 Misc.3d 910, 914–915, 891 N.Y.S.2d 891 [Sup. Ct., Kings County 2009] )."

5. Accordingly, we reject Respondent's new positions. From at least the time the pre-hearing briefs, witness lists, and list of exhibits were mutually filed, it was clear that whichever side that was going to seek attorneys' fees if it prevailed was reserving on the specific rates and amounts of legal fees, as well as costs and expenses, many of which had not yet been incurred. To do otherwise would be a waste of resources. Not once did Respondent ever raise the question of proof regarding attorneys' fees and costs; by its silence and conduct, Respondent consented to the process regarding proof of attorneys' fees that the Panel was following, see CCA Guide to Best Practices in Commercial Arbitration (3d edition), 246.

6. Second, we explicitly denominated the award of March 6 as a "Partial Final Award," making clear to the Parties that the arbitral proceeding was still ongoing. We also explicitly left the hearing open so that the Parties could meet and confer or make submissions, including providing additional evidence, "until *all issues* set forth ... have been agreed upon by the Parties or decided by the Tribunal." Under these circumstances, the doctrine of *functus officio* does not apply. *Kennecott Utah Copper Corp. V. Becker*, 186 F.3d 1261, 1270-71 & n.4 (10th Cir. 1999) (*Functus*

4

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 06/05/25   Page 382 of 1017   PageID 14009
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 254 of 1803   PageID 11000

*officio* provides that, "once an arbitrator has issued a *final* award and thus discharged his or her office, that arbitrator lacks any continuing power to revise the award or issue a new one.")(emphasis added).

   i.   Accordingly, we turn to an examination of the application for attorneys' fees and costs, sought by Claimant:

       a.   Claimant seeks the following in fees and costs:

          i.   Jenner & Block Fees - $9,278,248.99

              1.   In support of its fee application, Claimant has provided detailed time records, billing records, and a declaration of Andrew Vail, a partner of Jenner & Block, that establishes that records were maintained on a contemporaneous basis, that time billed on duplicative, inefficient, or extraneous to the arbitral proceeding was excluded from the application, and that hourly rates, and a fixed-fee discount, where applicable, were discounted by 15%. Vail Declaration ¶¶13-18. The hourly rates are shown to be comparable to rates charged by other similar firms and consistent with prevailing market rates for attorneys of similar high levels of expertise and experience. We note that Respondent does not object to the amount sought, except on the bases previously discussed. We find the request for legal fees to be reasonable, especially given the complex factual and legal setting, and grant Claimant's application.

          ii.   FTI Expert Fees - $1,274,853.26; and A&M Arbitration Fees - $655,160.00

              1.   In support of the FTI fees, Claimant submitted a declaration, with supporting exhibits, of Mr. Vail, who affirmed that the fees reflected "services that were necessary for the Committee to prosecute its claims against [Respondent] and to defend against [Respondent's] counterclaims, and … the amounts charged for such services were reasonable given the necessity of those services." Vail Declaration ¶26.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 86   Filed 02/06/25   Page 383 of 1017   PageID 14010
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 255 of 1803   PageID 11001

2. In support of the A&M Arbitration Fees, Claimant has provided the declaration of Steven Varner, a Managing Director of A&M, who affirms that A&M maintained billing records on a contemporaneous basis for its services throughout the course of this arbitration, but did not keep detailed descriptions of its billed time for specific matters within that engagement. He further affirmed that he and another managing director compiled a "conservative estimate of the time that A&M personnel spent on matters that were specifically required in connection with HCMLP's failure to timely provide A&M with books and records relating to the Fund." That work totaled approximately $655,160.00, after discounts were applied to their normal billing rates. Varner Declaration ¶¶6, 7, and 10.

3. Claimant is not seeking recovery for over $140,000 in attorneys' fees and costs for A&M's counsel to pursue information from Cornerstone pursuant to Del. Code Ann. tit. 8 § 220. Varner Declaration ¶8.

4. Respondent principally opposes the fees of FTI and A&M on the grounds that "while the AAA Rules permit the award of certain expenses (e.g. administrative costs and Panel compensation), they are much more restrictive when it comes to witness costs for the parties. In fact, Rule 54 expressly divides expenses into two categories: (i) witness expenses—which are to be borne by the party presenting the witness; and (ii) '[a]ll other expenses'—which may be apportioned by the arbitrator(s)."

5. While acknowledging some dispute among the courts as to whether Rule R-54 permits a prevailing party to recover its expert witness fees, Claimant urges that the weight of authority provides that both consulting and testifying witness fees are recoverable under the AAA's rules, citing *Dealer Comp*.

6

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 6 Page 1250 of 1804 Page 384 of 1017 PageID 14011
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 256 of 1803 PageID 11002

*Servs., Inc. v. Hammonasset Ford Lincoln-Mercury, Inc.*, 2008 WL 5378065, at *2, *4 (S.D. Tex. Dec. 22, 2008) (confirming final arbitration award that included expert witness fees); *In re Pos'tive Produc, Inc. v Thermal C/M Services, Inc.*, 2011 WL 13220365, at *4 (N.Y. Sup. Ct. Nov. 18, 2011) (confirming award that included "expert fees and costs"); and *Cardno Int'l Pty, Ltd. v. Merino*, 2017 WL 6034172 (S.D. Fla. Oct. 30, 2017).

6. Rule 47(a) gives the Tribunal the power to "grant any remedy or relief that the arbitrator deems *just and equitable* and within the scope of the agreement of the parties…", while Rule 47(c) provides that "In the final award, the arbitrator *shall* assess the fees, expenses, and compensation provided in Sections R-53, R-54, and R-55. The arbitrator *may apportion* such fees, expenses, and compensation among the parties in such amounts *as the arbitrator determines is appropriate*." (Emphasis added.) Parsing these sections in conjunction with R-54 leads us to conclude that we have the power to award the expenses of the arbitration, including expert fees, as we deem just, equitable, and appropriate. *White Springs Agric. Chemicals, Inc. v. Glawson Investments Corp.*, No. 3:07-CV-752-J-25JRK, 2010 WL 11507082, at *4 (M.D. Fla. Sept. 13, 2010) (confirming award where tribunal awarded prevailing party its expert fees), *aff'd*, 660 F.3d 1277 (11th Cir. 2011).

7. Under the complex circumstances presented here, we find that the experts were essential to the prosecution of the Claimant's case and that their services, and consequent fees, were a necessary obligation the Claimant was bound to its members to undertake in its pursuit of the claims against Respondent.

7

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-1 Page 1258 of 1804 Page 385 of 1017 PageID 14012
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 257 of 1803 PageID 11003

8. We note, specifically with respect to the A&M fees, that a large portion of the fees appear to relate to "time spent organizing the tens of thousands of individual page PDF files that HCMLP provided as books and records instead of complete documents." Varner Declaration ¶7.

9. From our observations at the hearing and our review of the reported rates and fees of FTI and A&M, we conclude that such fees were fair and reasonable and we find that it would be "just and equitable" and "appropriate" relief to award Claimant all of the expert fees it seeks, and we do so.

   iii. Respondent does not object to the following categories of fees sought by Claimant:

1. AAA Administrative Costs - $64,750.00;
2. Court Reporter Hr'g Costs - $114,697.77;
3. Court Reporter Dep. Costs - $28,890.04; and
4. AAA Panel Compensation - $448,581.22 (to date).

  b. Accordingly, in our discretion, we award Claimant the total sought in fees, costs, and expenses, as detailed and updated in section F. below.

b. Claimant's Motion for Modification of the Partial Final Award
   i. On March 25, 2019, Claimant moved, pursuant to AAA Rule 50, to modify the Partial Final Award in several respects.

1. First, with respect to the Partial Final Award regarding the finding of liability of Respondent with respect to the Barclays LP interests, Claimant moved to correct a clerical error that resulted in the omission of a Barclays damages paragraph from the Partial Final Award by modifying that Award to include the paragraph set forth in the Panel's March 14, 2019 Modification of Award.

2. Second, also pursuant to Rule 50, Claimant moved that the Panel modify the award to address other clerical, typographical, and computational errors in the Partial Final Award.

3. AAA Rule 50 provides in relevant part, as follows: "R-50. Modification of Award. Within 20 calendar days after the

Appellee Appx. 00251

Appx. 00502

013064

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 186   Filed 12/09/25 1804   Page 386 of 1017   PageID 14013
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 258 of 1803   PageID 11004

transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already decided. The other parties shall be given 10 calendar days to respond to the request. The arbitrator shall dispose of the request within 20 calendar days after transmittal by the AAA to the arbitrator of the request and any response thereto."

4. With respect to the Barclays issues, Respondent contends both that Rule 50 does not apply and that the doctrine of *functus officio* divests the Panel of the power to modify the Partial Final Award, as the Panel would be adding an "additional award" that "represents an entirely new award of $34 million in damages not included in the [Partial Final Award] ... constitut[ing] a material revision of the award."(Respondent's April 5 Memorandum at 5).

5. First, we are not adding an "additional award," as it is clear from the structure of the Partial Final Award that a paragraph was missing from the damages portion; all other findings of liability were accompanied by a section delineating the applicable damages except for the finding of a breach of the Plan and Scheme by reason of the transfer of LP interests to Eames. In other words, we found liability in two respects but omitted a paragraph regarding the remedy for Respondent's breach of the Plan and Scheme that we had found with respect to the transfer, without the required Committee approval, of Barclays' fund interests to itself through entities it controlled as part of the settlement. That omission is a classic example of a clerical error.

6. Second, although the effect of the Modification was to add additional damages to the award against the Respondent, the Panel did not "materially revise" the Partial Final Award since liability had already been found.

7. In addition, as previously discussed, the doctrine of *functus officio* "provides that, *while an arbitrator may correct clerical, typographical, or computational errors in a final award, he has no power to revisit the merits of the award after it has issued...*" *Int'l Broth. Of Elec. Workers, Local Union 824 v. Verizon Florida, LLC*, 803 F.3d 1241, 1250 (11th Cir. 2015). However, we did not issue a final award; it was explicitly labeled a Partial Final Award and was explicitly subject to being supplemented by subsequent presentations of damages analyses by both Parties.

9

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 6 Filed 06/25/804 Page 387 of 1017 PageID 14014
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 259 of 1803 PageID 11005

8. Finally, there is ample case law for the proposition that the Panel is not divested of power, even when issuing a final award, from correcting clerical, typographical, or computational errors. See *Rain CII Carbon, LLC v. ConocoPhillips Co.*, 674 F.3d 469, 472-73 (5th Cir. 2012); *E. Seaboard Const. Co., Inc. v. Gray Const., Inc.*, 553 F.3d 1, 5-6 (1st Cir. 2008).

9. Respondent also argues that the Panel is barred from correcting the Partial Final Award by AAA Rule 45, which provides that "The award shall be made ... no later than 30 calendar days from the date of closing the hearing..." Respondent urges that "the parties agreed that the final award would be made on or before March 7, 2019. Accordingly, any award made after that date is untimely and beyond the scope of the Panel's authority." (Resp. April 5 Mem. at 7). But, once again, this argument ignores the explicit nature of the March 6 Partial Final Award, which "le[ft] the hearing open until all issues set forth above have been agreed upon by the Parties or decided by the Tribunal."

10. Respondent also argues that we are "reopening" the record in violation of AAA Rule 40. That rule provides, in relevant part, as follows: "The hearing may be reopened on the arbitrator's initiative, or by the direction of the arbitrator upon application of a party, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed to by the parties in the arbitration agreement, the matter may not be reopened unless the parties agree to an extension of time. When no specific date is fixed by agreement of the parties, the arbitrator shall have 30 calendar days from the closing of the reopened hearing within which to make an award..."

11. We acknowledge that a communication from the AAA, dated December 12, 2018, stated that the "no additional evidence is to be submitted and that the hearings are declared closed as of December 12, 2018," but this statement was subsequently withdrawn by the previously-quoted language of the Partial Final Award where we explicitly left the record open "until all issues set forth ... have been agreed upon by the Parties or decided by the Tribunal."

12. That language is equivalent to the language that "we will reopen the hearing." *Int'l Bhd. of Teamsters Local 959 v. Horizon Lines of Alaska, LLC*, 22 F. Supp. 3d 1005, 1007–08 (D. Alaska 2014) ("Where an arbitrator specifically retains jurisdiction to resolve disputes regarding damages, that indicates that the arbitrator did not intend the award to be Final. Put simply, an arbitration award that postpones the determination of a remedy should not constitute

10

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/25/24    Page 388 of 1017    PageID 14015
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 260 of 1803   PageID 11006

a final and binding award"); *Golden v. Lim*, 2016 WL 520302, at *3, *9 (E.D. Mich. Feb. 10, 2016)(holding that the arbitrator had the authority under the AAA Rules to reopen the hearing to accept further submissions on attorneys' fees).

13. Second, even if the relief sought required a reopening of the record, Rule 40 authorizes the Panel to do so "upon the application of a party," so long as doing so did not violate "the specific time agreed to by the parties in the arbitration agreement" for the making of the award. No such time period is set forth in the arbitration agreement. Finally, we interpret Rule 40 to be speaking to the instance of reopening the hearing after the final award is made, which is, again, not the situation we are in.

ii. We grant Claimant's application under AAA Rule 50[2] and formally correct the clerical error by re-adopting the additional paragraph, previously included in the Panel's March 16 Modification of Award, as follows:

1. "Insert the following paragraph at page 54, immediately after VII.B.2.f: "3. The transfer of Barclays Fund interests: By transferring, without the required Committee approval, Barclays' fund interests to itself through entities it controlled as part of the settlement, Highland breached the Plan and Scheme. We award the Committee damages measured by the benefits Highland received in excess of the amount it would have been entitled to receive from the Redeemer Trust Account because Barclays claim was settled for less than its value. In Table 11, Version 2, Claimant's damages expert, Basil Imburgia, calculated that such an amount totaled $34,661,749. RC-522. As with other amounts awarded, the Parties are to confer to determine the actual amount of damages including the 9% interest to date."

iii. Claimant also moves under Rule 50 to correct four other clerical errors, set forth below, as to which Respondent does not object. The motion is granted; the clerical errors are set forth below and corrected as noted:

1. The Partial Final Award reference to the amount of Deferred Fees improperly taken from the Fund by Highland as "$33,313,000" (Partial Final Award at 14, 54) is corrected to read "$32,313,000."

---

[2] We acknowledge Respondent's interesting linguistic analysis of the differences between ICDR Article 33 and AAA Rule 50, see Respondent April 5 Memorandum at 5-6, but we deny the underlying premise that what we are being asked to do is to make an "additional award as to claims, counterclaims, or setoffs presented but omitted from the award." We had found liability as to two claims involving the Barclays LP interests but omitted the damages component of one of the two liability findings. That does not constitute an award as to a claim argued by Claimant but omitted from the partial final award.

11

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 12/26/25    Page 389 of 1017    PageID 14016
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 261 of 1803    PageID 11007

2.  The Partial Final Award reference to the amount of improper
    Distribution Fees calculated by Mr. Imburgia as $14,452,275
    (Partial Final Award at 24, 54) is corrected to read "$14,457,275."

3.  The Partial Final Award reference to the amount of "$23.5/9" and
    "$23.5 million" (Partial Final Award at 36, 40) is corrected to read
    "$23,938,568."

4.  The Partial Final Award reference to the incentive period as ending
    on "December 30, 2016" (Partial Final Award at 40, 41, 42, 55) is
    corrected to read "September 30, 2016."

iv.  Eames

1.  In the March 6 Partial Final Award, as modified herein, we found
    Respondent liable for having transferred the Barclays LP interests
    to an entity which it wholly controlled, Eames [LLC].[3] We
    awarded damages "measured by the benefits Highland received in
    excess of the amount it would have been entitled to receive from
    the Redeemer Trust Account because Barclays claim was settled
    for less than its value." We estimated — but did not find — that
    amount by referring to a damages calculation by Claimant's
    damages expert, Basil Imburgia, who "calculated that such an
    amount totaled $34,661,749. RC-522." "As with other amounts
    awarded," we directed "the Parties ... to confer to determine the
    actual amount of damages including the 9% interest to date."

2.  The Parties have conferred and disagree as to the appropriate
    amount of damages for Respondent's breach of the Plan and
    Scheme. Claimant asserts that the appropriate amount of damages
    is $29,609,015, which is lower than the amount estimated by its
    expert and cited in the Partial Final Award, because "the value of
    the Barclays interests which [Respondent] now controls through
    Eames is expressly excluded, as it would be extinguished and that
    value would be spread amongst the remaining Fund investors."
    Claimant April 5 Memorandum, 5.

3.  Thus, Claimant urges that "the Panel should either (1) award
    $29,609,015 and order the extinguishment of the Barclays LP
    interests owned and controlled by Highland, or (2) award
    $29,609,015 plus the current value of those LP interests, which its

---

[3] We found, and it is not disputed, that Highland controls Eames through an entity, Hockney, Ltd., that
Highland wholly owns, and which, along with Eames, was created solely for the purpose of holding the
Barclays LP interests for Highland's financial benefit. JX24; Tr. Day 8 83:21-86:13; Tr. Day 9 144:21-25,
220:18-25.)

Appellee Appx. 00255
Appx. 00506
013068

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/1804   Page 390 of 1017   PageID 14017
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 262 of 1803   PageID 11008

damages expert estimates to be $11,589,474. Claimant April 5 Mem. at 10; Imburgia April 5 Declaration, ¶15.

4. Respondent urges that the "March 16 Modification contains specific language awarding the Committee a specific amount of monetary damages." However, as discussed above, that is not what the Panel did. We directed the Parties to confer on the exact amount to be awarded and to come to the Panel if they could not agree.

5. Respondent further argues that nowhere in the March 6 Partial Final Award or the March 16 Modification did the Panel award Claimant equitable relief concerning the Barclays Claim, and that had the Panel wanted to do so, it knew how to do so.

6. Respondent goes on to argue that Eames is not a party to this arbitration, and, therefore, the Panel lacks the authority to issue an award determining Eames' legal rights and obligations." Even if the Panel determines that the remaining equity interest should have been extinguished at the time of the 2012 settlement, "the fact remains that the equity interest was transferred to—and is still held by—Eames." Respondent April 5 Memorandum, 21-22.

7. Finally, in its April 10 submission, Respondent objects to the Claimant's calculation of interest on any award regarding Barclays or the other claims, to wit, Claimant's April 5 Request adds an improper request that interest after March 6, 2019 be compound, and not simple, interest by applying an additional 9% statutory interest to both (a) the damages awarded and (b) the interest accrued through March 6, 2019.

8. We disagree with Respondent's arguments except as relating to the compounding of interest sought by Claimant, which we discuss more fully below. First, when we found that "Highland breached the Plan and Scheme by transferring the LP interests to a wholly-controlled affiliate after the Committee had specifically disapproved of the transfer," we sought a remedy to deprive Respondent of the benefits that it had received illegitimately, or, in other words, to void the Eames transaction and put the parties back into the position they should have been in. Respondent may not benefit in the future by its breach of the Plan and Scheme, and the illegitimate transaction it engaged in, by forfeiting some, but receiving future, benefits through its absolute control of the entity it created, Eames.

13

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Filed 06/03/25    Page 391 of 1017    PageID 14018
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 263 of 1803    PageID 11009

9. Second, although Eames is not a party in this proceeding, that is irrelevant to the relief we grant. The operating party throughout all of the machinations that resulted in the transfer of Barclays' LP interests to an entity it created solely for the purpose of holding such interests was, and remains, Respondent. It is completely within its power to unwind the transfer and re-transfer those interests back to the Fund for the benefit of its investors, as we now order.

10. Regarding the appropriate amount upon which to award interest, for reasons set forth below, we reject Claimant's argument that $29,609,015 is the appropriate amount upon which to award interest, as to do so would be to violated well-settled law in New York regarding pre-judgment interest, CPLR §§5003-5004.

11. We award Claimant monetary damages against Respondent in the amount of $21,768,743, plus 9% simple prejudgment interest from the date of the breach until the earlier of either (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

12. We further order that Respondent take all necessary steps to cause the improperly taken Fund LP interests currently owned and controlled by Respondent through Eames, Ltd to be returned to Claimant within sixty (60) days from the date of transmittal of this Final Award to the Parties.

v. Interest

1. In the March 6 Partial Final Award, we awarded damages and interest through the date of that award, but then, as already referred to, directed the Parties to confer regarding all damages and interest issues. Claimant now urges that we award 9% prejudgment interest on the damage amounts awarded until the earlier of: (1) the date on which the amounts due are paid to the Committee for the benefit of the Fund; or (2) the date on which a court of competent jurisdiction enters a final judgment on the Final Award.

2. However, as Respondent points out, Claimant is, in effect, arguing for a compounding of interest upon interest. We agree. The effect of Claimant's interest calculations would violate New York law, as an award of 9% interest post-March 6 on an amount that already includes 9% interest from the breach through March 6, would amount to compound interest after March 6, 2019. "[T]he statutory

14

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/23/25   Page 392 of 1017   PageID 14019
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 264 of 1803   PageID 11010

scheme [in New York] for awarding …, where applicable, prejudgment interest, does not provide for compound interest." *520 East 81st Street Associates* v. *State of New York*, 19 AD3d 24 (2005).

3. Respondent also contends that the March 6 Partial Final Award contained specific language awarding interest "through the date of this Partial Final Award"— i.e., March 6, 2019, and that awarding interest through any other date would constitute an untimely modification of the Partial Final Award.

4. We disagree with Respondent that changing the termination date of prejudgment interest would constitute an untimely modification. Although the Partial Final Award did use the date of March 6 as a reference point for calculation of interest, that fact is not determinative of this issue. We also explicitly left open calculations of damages and interest until the Parties had fully conferred on the extremely complex financial calculations that had to be made. Among the calculations was a further calculation of interest.  It is not an unlawful modification of the Partial Final Award to make, as we do here, a final award on all damages and interest issues based upon a final record.

5. Furthermore, failing to continue the running of interest through payment or entry of a final judgment could well, under the circumstances presented here, result in Fund investors with no compensation for their documented losses during that time, as well as provide an incentive to Respondent to prolong the confirmation process. We have already had occasion to comment on Respondent's tactics of putting forth witnesses who were "unworthy of belief" and an "[il]legitimate defense to many of the Committee's claims." Partial Award ¶VI(E). We will not adopt a result that would allow Respondent to impose more hardships on the Fund Investors.

6. We award Claimant 9% prejudgment simple interest on all sums awarded from the dates of each breach through the earlier of the date paid or the entry of a final judgment.

F.  FINAL AWARD

   a.  We reaffirm the findings of fact, conclusions of law, and findings of liability as set forth in the March 6 Partial Award, and make the following awards with respect to such findings and conclusions:

Appellee Appx. 00258
Appx. 06509
013071

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 06/02/25   Page 393 of 1017   PageID 14020
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 265 of 1803   PageID 11011

    i.   Claimant's Application to modify the Partial Final Award is granted pursuant to the Disposition of Application for Modification dated March 14, 2019.

    ii.   Claimant's Motion to Correct Errors is granted, on consent; the clerical errors are set forth below and corrected as noted:

        1.   The Partial Final Award reference to the amount of Deferred Fees improperly taken from the Fund by Highland as "$33,313,000" (Partial Final Award at 14, 54) is corrected to read "$32,313,000."

        2.   The Partial Final Award reference to the amount of improper Distribution Fees calculated by Mr. Imburgia as $14,452,275 (Partial Final Award at 24, 54) is corrected to read "$14,457,275."

        3.   The Partial Final Award reference to the amount of "$23.5/9" and "$23.5 million" (Partial Final Award at 36, 40) is corrected to read "$23,938,568."

        4.   The Partial Final Award reference to the incentive period as ending on "December 30, 2016" (Partial Final Award at 40, 41, 42, 55) is corrected to read "September 30, 2016."

        5.   In all other respects, the Partial Final Award dated March 6, 2019 and the Disposition of Application for Modification dated March 14, 2019 are reaffirmed and incorporated by reference.

    iii.   For the Deferred Fee Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the Deferred Fees in the amount of $32,313,000 as directed in the Partial Final Award, plus prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the dates of the breaches and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

    iv.   For the Distribution Fee Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $14,457,275, plus prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the dates of breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

    v.   For the Taking of Plan Claims, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21,

Appellee Appx. 00259

Appx. 06519
013072

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 06/02/25 1804    Page 394 of 1017    PageID 14021
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 266 of 1803    PageID 11012

2019, the amount of $3,106,414. The Panel further orders that LP interests identified in RC411 be transferred to Claimant for the benefit of the Crusader Fund or that Claimant cause the Fund to extinguish those claims. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to $3,106,414 beginning on March 7, 2019 and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

vi.  For the CLO Trades Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $449,375.00. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple, from the dates of the breaches and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

vii.  For the Credit Suisse Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $2,735,411. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple on that sum, from the date of the breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

viii.  For the UBS Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $2,041,664. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the date of breach until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

ix.  For the Cornerstone Claim, the Panel awards the following relief: the Panel orders Respondent to pay to Claimant, on or before May 21, 2019, the amount of $48,070,407 for the sale of the Crusader Fund's shares in Cornerstone. The Panel also awards pre-prejudgment interest at the New York statutory rate of 9% simple on that sum from the date of breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award. When the amount awarded for the Cornerstone claim is paid by Respondent, Claimant shall cause the Crusader Fund to tender its Cornerstone shares to Respondent.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit6   Page 1206 of 1804   Page 395 of 1017   PageID 14022
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 267 of 1803   PageID 11013

    x.   For the Barclays Claim, the Panel awards the following relief:

        1.   The Panel orders Respondent to pay to Claimant, on or before May 21, 2019, the amount of $21,768,743. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the date of the breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

        2.   Further to the Barclays Claim, the Panel orders that Respondent take all necessary steps to cause the improperly taken Fund LP interests currently owned and controlled by Respondent through Eames, Ltd to be transferred to Claimant for the benefit of the Crusader Fund within sixty (60) days from the date of transmittal of this Final Award to the Parties, or, alternatively, that Claimant cause the Fund to extinguish those interests.

    xi.   For Claimant's Application for Legal Fees, Costs, and Expenses, we award Claimant $11,351,850.06 in fees, costs, and expenses as per the following:

        1.   Jenner & Block Fees - $9,278,248.99;
        2.   FTI Expert Fees - $1,274,853.26;
        3.   A&M Arbitration Fees - $655,160.00;
        4.   Court Reporter Hr'g Costs - $114,697.77;
        5.   Court Reporter Dep. Costs - $28,890.04

    xii.   The administrative fees and expenses of the International Centre for Dispute Resolution (ICDR) totaling US$94,693.88 and the compensation and expenses of the Tribunal totaling US$887,427.89 shall be borne by Respondent. Therefore, Respondent shall reimburse Claimant the additional sum of US$514,163.97, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Claimant.

G.   We have carefully considered, although not discussed in their entirety herein, all arguments made by Claimant and Respondent. Any other claims or requests for relief, made by either Party, are denied.

18

Appellee Appx. 00261
Appx. 00512
013074

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 12/06/25 1804    Page 396 of 1017    PageID 14023
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 268 of 1803    PageID 11014

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, USA.

Date: April 29, 2019


David M. Brodsky, Chair


John S. Martin, Jr.


Michael D. Young

19

Appellee Appx. 00262
Appx. 06513
013075

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 07/06/25   Page 397 of 1017   PageID 14024
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 269 of 1803   PageID 11015

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, USA.

Date: April 29, 2019

_____

David M. Brodsky, Chair


_____

John S. Martin, Jr.

_____
Michael D. Young

Appellee Appx. 00263

013076
Appx. 06514

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 06/25/25   Page 398 of 1017   PageID 14025
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 270 of 1803   PageID 11016

State of New York      )
                           )   SS:

County of New York     )

I, David M. Brodsky, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

_____5/9/19_____
Date

_____
David M. Brodsky, Chairperson

State of New York      )
                           )   SS:

County of New York     )

On this __9__ day of May, 2019, before me personally came and appeared David M. Brodsky, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

ISAIAS MATEO
NOTARY PUBLIC-STATE OF NEW YORK
No. 01MA6274151
Qualified in New York County
My Commission Expires 12-31-2020

20

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 02/26/2025 804 Page 399 of 1017    PageID 14026
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 271 of 1803    PageID 11017

State of Florida      )
                  )  SS:
County of Lee     )

I, John S. Martin, Jr., do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our ____ Final Award.

_Date April 29,2019                                      _____

                                       John S. Martin, Jr., Arbitrator


State of Florida      )
                  )  SS:
County of Lee     )

On this 29th day of April, 2019, before me personally came and appeared John S. Martin, Jr., to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

Notary Public

ROBIN A. YEOMANS
MY COMMISSION # GG 121122
EXPIRES: November 3, 2021
Bonded Thru Notary Public Underwriters

Appellee Appx. 00265
013078

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 02/06/25   Page 400 of 1017   PageID 14027
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 272 of 1803   PageID 11018

State of New York  )
                   )   SS:
County of New York )

I, Michael D. Young, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our        Final Award.

_____4/29/19_____
Date

_____
Michael D. Young, Arbitrator

State of New York  )
                   )   SS:
County of New York )

On this 29 day of April, 2019, before me personally came and appeared Michael D. Young, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

VICKIE L. JOHNSTON
Notary Public - State of New York
No. 01JO6113098
Qualified in Queens County
My Commission Expires July 19, 20 2U

22

Appellee Appx. 00266
013079

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-16 Filed 07/06/25 Page 401 of 1017 PageID 14028
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 273 of 1803 PageID 11019

# APPENDIX 4

Appellee Appx. 00267

Appx. 00518
0713080

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/56/25   Page 402 of 1017   PageID 14029
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 274 of 1803   PageID 11020

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PATRICK DAUGHERTY,                          :
                                            :
                Plaintiff,                  :
                                            :
        v                                   :   C. A. No.
                                            :   2017-0488-MTZ
HIGHLAND CAPITAL MANAGEMENT, L.P.,          :
HIGHLAND EMPLOYEE RETENTION ASSETS          :
LLC, HIGHLAND ERA MANAGEMENT LLC, and       :
JAMES DONDERO,                              :
                                            :
                Defendants,                 :
                                            :
        and                                 :
                                            :
HIGHLAND EMPLOYEE RETENTION ASSETS          :
LLC,                                        :
                                            :
                Nominal Defendant.          :

                         - - -

                    Chancery Courtroom No. 12D
                    Leonard L. Williams Justice Center
                    500 North King Street
                    Wilmington, Delaware
                    Friday, May 17, 2019
                    1:30 p.m.

                         - - -

BEFORE:  HON. MORGAN T. ZURN, Vice Chancellor

                         - - -

RULINGS OF THE COURT ON PLAINTIFF'S MOTION TO COMPEL
          AND MOTIONS FOR COMMISSIONS
ORAL ARGUMENT AND RULINGS OF THE COURT ON PLAINTIFF'S
MOTION FOR STATUS QUO ORDER AND DEFENDANTS' MOTION TO
DISMISS COUNT IX OF SECOND AMENDED VERIFIED COMPLAINT
--------------------------------------------------------
           CHANCERY COURT REPORTERS
       Leonard L. Williams Justice Center
       500 North King Street - Suite 11400
           Wilmington, Delaware 19801
               (302) 255-0533

Appellee Appx. 00268
Appx. 00519
013081

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/16/25   Page 403 of 1017   PageID 14030
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 275 of 1803   PageID 11021

2

1   APPEARANCES:

2        THOMAS A. UEBLER, ESQ.
         JOSEPH L. CHRISTENSEN, ESQ.
3        McCollom D'Emilio Smith Uebler LLC
           for Plaintiff

4

5        JOHN L. REED, ESQ.
         DLA Piper LLP (US)
6             -and-
         MARC D. KATZ, ESQ.
7        of the Texas Bar
         DLA Piper LLP (US)
8          for Defendants

9

10                          - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 07/02/25   Page 404 of 1017   PageID 14031
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 276 of 1803   PageID 11022

3

1              THE COURT:  Good afternoon.  Please be

2    seated.

3              First I wanted to acknowledge, we have

4    an honored guest with us today.  We have the Honorable

5    Essam Yahyaoui, who is a judge from Tunisia.  He

6    presides over the commercial chamber of Tunisia's

7    First Instance Court.  So he's here to observe with

8    his colleagues.

9              Welcome, sir.

10             All right.  I'm going to start with

11   the motion to compel, and then we'll move on to the

12   motion for commission.  And then there may be

13   questions, and maybe take a break and regroup and we

14   can move on with the other motions.

15             I'm going to grant Daugherty's motion

16   to compel in part.  For simplicity, I'm going to refer

17   to Abrams & Bayliss as A&B.  And I see four categories

18   of documents at issue here.  The first is regarding

19   the initiation, negotiation, and establishment of A&B

20   as Highland's escrow agent.  The second is regarding

21   A&B's legal work during the pendency of the Texas

22   action to determine whether and how Daugherty might

23   access the escrowed assets.  The third is A&B's work

24   responding to the Texas subpoena.  And the fourth is

Appellee Appx. 00270
Appx. 00521
013083

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 07/06/25   Page 405 of 1017   PageID 14032
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 277 of 1803   PageID 11023

4

1   documents regarding A&B's resignation as Highland's

2   escrow agent.

3            I grant the motion to compel as to

4   Categories 1, 2, and 4 for one of two reasons.

5            The first reason is unfortunately my

6   *in camera* review confirmed Daugherty's fear that

7   Highland is improperly withholding documents in

8   Categories 1 and 4 illustrating A&B's service and

9   resignation as escrow agent, which are nonprivileged

10  materials.

11           In a hearing on September 18, 2018,

12  concerning an earlier subpoena, Vice Chancellor

13  Glasscock stated that "... information regarding the

14  actions of Abrams & Bayliss in connection with its

15  operation of the escrow as agents of Highland, HERA,

16  those documents, that information is relevant, and it

17  doesn't appear to me to be generally privileged."

18  That's a quote from the transcript.

19           Highland has been adamant that it was

20  only withholding documents that implicated its role as

21  legal counsel, and not in its role as escrow agent.

22  For example, on page 28 of the transcript from the

23  April 12th argument, Highland's counsel stated that,

24  "We do not assert any privilege based solely on Abrams

Appellee Appx. 00271
Appx. 00522
013084

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 07/06/25   Page 406 of 1017   PageID 14033
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 278 of 1803   PageID 11024

5

1   & Bayliss's roles as escrow agents.  It's purely

2   because they have the dual roles both as escrow agents

3   and also legal counsel, that when they were in the

4   capacity of legal counsel, those communications were

5   privileged."

6            At that argument, I requested the

7   documents and stated I would review them *in camera*.  I

8   expressed my frustration that I had already given

9   Highland multiple chances, and invited it to redo its

10  privilege log for a final time.

11           In reviewing the documents, I

12  concluded that more than 70 documents that were

13  withheld based on claims of privilege or work product

14  protection were improperly withheld.  Those documents

15  were Privilege Log No. 1 through 25, 27 through 29,

16  35, 36, 41, 54, 56, 62, 85 through 87, and 336 through

17  372.

18           This represents nearly 20 percent of

19  the 372 documents in the log.  But even that doesn't

20  tell the full story, because more than 200 of the

21  listed documents were simply attachments to e-mails

22  collecting documents in response to the Texas

23  subpoena.  Excluding those, more than 50 percent of

24  the documents listed were improperly withheld as

Appellee Appx. 00272
Appx. 00528
013085

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 03/06/25   Page 407 of 1017   PageID 14034
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 279 of 1803   PageID 11025

6

1   privileged.

2            Documents regarding A&B's nonlegal

3   work and resignation as escrow agent are not

4   privileged or work product because when A&B agreed to

5   be an escrow agent, it stepped into a nonlegal role

6   despite its status as a law firm.

7            The cases are clear on that point.

8   *Northeast Credit Union v. CUMIS*: "It is well

9   understood ... that the services of an escrow agent,

10  even when that escrow agent is an attorney, are not

11  legal services."  *CCS Associates v. Altman*: "[C]ourts

12  have specifically held that an attorney in the role of

13  escrow agent does not transform communications

14  pertaining to the administration of the escrow account

15  into privileged documents."  The first case is from

16  the District of New Hampshire, and the second one is

17  from the Eastern District of Pennsylvania.

18            These non-Delaware decisions more

19  specifically enunciate a principle common in our own

20  law.  Including an attorney, or having an attorney

21  perform nonlegal work, does not attach the privilege

22  to the communications or the work.  That is because

23  "... the attorney-client privilege protects legal

24  advice only, [and] not business or personal advice."

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 06/25/804   Page 408 of 1017   PageID 14035
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 280 of 1803   PageID 11026

7

1  That's a quote from *MPEG v. Dell* from this court in

2  2013.

3              And as Vice Chancellor Laster said in

4  the *Facebook Class C Reclassification* litigation,

5  "Making the lawyer the point person creates a pretext

6  for invoking the attorney-client privilege, but it is

7  only a pretext."  That's from his December 12th, 2016

8  order in Case No. 12286-VCL.

9              Categories 1 and 4 reflect

10  communications between A&B and Highland concerning the

11  start of the escrow relationship, or A&B resigning as

12  escrow agent.  To be sure, there were legal

13  ramifications and issues regarding the work A&B was

14  doing in setting up and then ending the escrow

15  relationship.  But any legal component of A&B's

16  escrow-related work was secondary to the role as

17  escrow agent.  A&B was a contractual counterparty with

18  Highland under the escrow agreement, and each had

19  obligations under that agreement.

20              A&B did perform legal work on the

21  escrow issue.  For example, A&B attorneys analyzed

22  what document 351 on the log calls the "HERA

23  Strategy."  But that legal advice was not for the

24  benefit of Highland, who was A&B's contractual

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 06/25/25   Page 409 of 1017   PageID 14036
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 281 of 1803   PageID 11027

8

1    counterparty.  A&B could potentially claim that its

2    attorneys were providing legal services to A&B as

3    escrow agent.  But that is not what is before me; A&B

4    has claimed no privilege.  The only issue is whether

5    Highland can claim a privilege and withhold the

6    communications containing A&B's legal analysis

7    regarding its service as escrow agent.

8                    I think an example here might be

9    helpful.  If Highland had retained a bank or other

10   repository to act as escrow agent rather than a law

11   firm, the result would be more clear.  If the

12   employees of that non-law firm escrow agent

13   communicated internally about the relationship or the

14   contract, it would not be privileged.

15                   If those employees received legal

16   advice from attorneys about how to structure the

17   escrow, what the terms of the escrow agreement meant,

18   or how it could fulfill Highland's request to unwind

19   the escrow and transfer the assets back, Highland

20   could not claim that the in-house or outside counsel

21   retained by the escrow agent was providing legal

22   advice for Highland's benefit.  It would be much

23   clearer that the attorneys were providing legal advice

24   to, and for the benefit of, the escrow agent, not its

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 1986  Filed 12/30/25 1804  Page 410 of 1017   PageID 14037
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 282 of 1803   PageID 11028

9

1   contractual counterparty, Highland.

2                   The facts here are more muddied

3   because there are only lawyers involved because

4   Highland selected a law firm, that otherwise

5   represented Highland, to act as escrow agent.  But the

6   result should be the same.  A&B's privilege over its

7   in-house advice regarding its conduct under the escrow

8   agreement does not belong to Highland just because A&B

9   is itself Highland's attorney.

10                   The next question is one of remedy for

11   improperly withholding so many of the documents as

12   privileged.  Waiver "... has been characterized as a

13   'harsh result' typically only justified 'in cases of

14   the most egregious conduct by the party claiming the

15   privilege.'"  That's from *TCV v. TradingScreen*.

16                   "If a party falls substantially short

17   of the well-established requirements, then waiver is

18   an appropriate consequence that helps dissuade parties

19   from engaging in dilatory tactics."  That's from

20   *Mechel Bluestone v. James C. Justice Companies.*

21                   Daugherty has been dogged in his

22   pursuit of these documents, and Highland was just as

23   resolute in refusing to produce them.  Vice Chancellor

24   Glasscock said last September these types of documents

Appellee Appx. 00276
Appx. 00527
013089

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 1201/6/25 1804   Page 411 of 1017   PageID 14038
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 283 of 1803   PageID 11029

10

1    are not privileged.  I gave Highland multiple

2    opportunities to address this.  Because Highland stuck

3    by its position and continued to assert such a large

4    percentage of improper privilege assertions while

5    claiming it was producing documents concerning A&B's

6    role as escrow agent, any privilege related to that

7    topic is waived, and a full waiver of Highland's

8    privilege could be an appropriate consequence.

9              But I am reluctant to go that far

10   because Categories 2 and 3 were properly withheld and

11   logged adequately.  Category 2 relates to a memorandum

12   A&B prepared analyzing avenues available for Daugherty

13   to pursue the escrowed assets.  This work started in

14   February 2014.  Category 3 relates to efforts to

15   collect documents in response to the subpoena for the

16   Texas case.  I conclude Highland's unjustified

17   withholding of other documents related to the escrow

18   was not so egregious as to waive any privilege over

19   these two sets of documents.

20             This brings me to the crime-fraud

21   exception.  If Categories 1 and 4 were privileged, I

22   would conclude that the crime-fraud exception applies

23   and so A&B should produce those documents regardless.

24   I reach the same conclusion for Category 2, the subset

Appellee Appx. 00277
Appx. 00528
013090

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 Page 1205 of 1804  Page 412 of 1017   PageID 14039
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 284 of 1803   PageID 11030

11

1   of documents related to A&B's 2014 memorandum that

2   were privileged and properly logged.

3                    Rule of Evidence 502(d)(1) says that

4   "There is no privilege ... If the services of the

5   lawyer were sought or obtained to enable or aid anyone

6   to commit or plan to commit what the client knew or

7   reasonably should have known to be a crime or fraud."

8                    To fall within this exception, "... a

9   mere allegation of fraud is not sufficient; there must

10  be a prima facie showing that a reasonable basis

11  exists to believe a fraud has been perpetrated or

12  attempted."  That's from *Princeton Insurance Company*

13  *v. Vergano.*  That case also explains that "... when a

14  client seeks out an attorney for the purpose of

15  obtaining advice that will aid the client in carrying

16  out a crime or a fraudulent scheme, the client has

17  abused the attorney-client relationship and stripped

18  that relationship of its confidential status."

19                    The client must intend the

20  communications to be used as a bases for the fraud.

21  "The advice must advance, or the client must intend

22  the advice to advance the client's ... fraudulent

23  purpose."  That's from *Buttonwood Tree Partners v.*

24  *R.L. Polk.*

Appellee Appx. 00278
Appx. 00529
013091

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit Page 2 of 25 Page 413 of 1017 PageID 14040
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 285 of 1803 PageID 11031

                                                               12

 1              As Chief Justice Strine wrote while
 2    Vice Chancellor in *Princeton Insurance v. Vergano*,
 3    "The quintessential circumstance [when this exception
 4    applies] is when the client obtains the advice of the
 5    lawyer in order to help shape a future course of
 6    criminal or fraudulent activity.  This is the classic
 7    situation when the privilege gives way, as the
 8    societal purpose of the confidential relationship has
 9    been entirely subverted, with the client seeking the
10    expertise of someone learned in the law not so as to
11    comply with the law or mitigate legitimately the
12    consequences of his prior behavior, but to craft a
13    course of future unlawful behavior in the most
14    insidiously effective manner."
15              Here, there is a reasonable basis to
16    believe a fraud has been perpetrated.  Daugherty's
17    claim for fraudulent conveyance survived a motion to
18    dismiss, and I will refer the parties to Vice
19    Chancellor Glasscock's January 16, 2018 opinion on
20    that point.
21              The question is whether Highland
22    sought the services of attorneys to enable or aid it
23    in furtherance of that fraud.  I believe there is a
24    reasonable basis to believe that as well.  Highland's

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/04   Page 414 of 1017   PageID 14041
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 286 of 1803   PageID 11032

13

1   attorney at Andrews Kurth contacted A&B almost

2   immediately after the Texas judgment became final and

3   nonappealable.  That's at Exhibit K.

4              Highland claims A&B then provided it

5   legal advice interpreting the escrow agreement, and

6   A&B resigned as escrow agent intending to cause, and

7   in fact causing, the assets to return to

8   Highland/HERA.  That is the transfer that Daugherty

9   claims was fraudulent.

10             This was not the first legal work A&B

11  performed in pursuit of keeping the escrowed assets

12  from Daugherty.  Starting in February 2014, it

13  analyzed Daugherty's ability to get at the assets

14  while the appeal was pending.  Because that appears to

15  be the beginning of the efforts that culminated in the

16  allegedly fraudulent acts, the crime-fraud exception

17  strips the privilege from these documents.

18             Daugherty has made a *prima facie*

19  showing that a reasonable basis exists to believe that

20  a fraud has been perpetrated, and that Highland sought

21  A&B to serve as escrow agent and to provide legal

22  analysis in furtherance of that fraud; specifically,

23  to protect the escrowed assets from Daugherty while

24  the Texas case was pending, and then to transfer them

Appellee Appx. 00280
Appx. 00531
013093

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1186   Filed 03/07/25   Page 415 of 1017   PageID 14042
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 287 of 1803   PageID 11033

14

1    back to Highland after the Texas verdict was

2    finalized.  I conclude any privilege Highland claims

3    over A&B's legal advice regarding the escrow

4    arrangement and A&B's resignation has been stripped

5    under the crime-fraud exception.

6                    I want to be clear on what I am not

7    saying.  I am not saying that a fraud claim merely

8    surviving a motion to dismiss permits the supposed

9    victim to invade the defendant's privilege for any

10   legal advice the defendant received in regards to the

11   underlying transaction or act.  This is a unique case

12   in which it presently appears that the law firm that

13   provided the legal advice, one, was a contractual

14   counterparty to the defendant in the very contract

15   under which the fraudulent transfer was allegedly

16   made; two, provided legal advice interpreting that

17   agreement and charting the course for the transfer;

18   and, three, implemented its own advice to effectuate

19   the transfer.

20                   On these allegations, which are

21   supported by the documents I have reviewed, it appears

22   the defendant sought the firm's legal advice to

23   further the alleged fraud based on the terms of the

24   contract to which the defendant and the firm were

Appellee Appx. 00281
Appx. 00532
013094

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 06/25/Page 1209 of 1804   Page 416 of 1017   PageID 14043
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 288 of 1803   PageID 11034

15

1    parties.  Based on these uncommon facts, the

2    crime-fraud exception applies here.

3                    Accordingly, the privilege is either

4    nonexistent or waived as I just described for

5    Categories 1, 2, 4; in other words, all documents

6    regarding A&B's service as escrow agent.  The

7    crime-fraud exception also applies to documents in

8    these categories designated as work product, under

9    *Playtex v. Columbia* out of the Superior Court.

10                    I find that Category 3, regarding the

11   Texas subpoena, was properly logged as privileged, and

12   that the crime-fraud exception does not reach those

13   documents.  Daugherty has not alleged that the

14   subpoena response was in furtherance of the fraud.

15   Category 3 comprises the families associated with

16   lines 91 through 327, which are the parent e-mails

17   attaching documents collected in response to a

18   subpoena.

19                    Mr. Katz, is any of that unclear?

20                    MR. KATZ:  No, Your Honor.  It's

21   clear.

22                    THE COURT:  Mr. Uebler, any questions?

23                    MR. UEBLER:  No questions, Your Honor.

24   Thank you.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1186   Filed 09/06/25 1804   Page 417 of 1017   PageID 14044
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 289 of 1803   PageID 11035

16

         1                 THE COURT:  Thank you.

         2                 We'll turn to the motion for

         3      commissions.

         4                 Daugherty seeks commissions to take

         5      the depositions of James C. Bookhout and Marc D. Katz,

         6      both of DLA Piper.  I will refer to Mr. Bookhout and

         7      Mr. Katz collectively as "the requested deponents."

         8      Both requested deponents represented Highland in its

         9      dispute with Daugherty in Texas, beginning in 2012,

        10      and Mr. Katz and his colleagues at DLA represent

        11      Highland in this action as well.  Daugherty seeks fact

        12      testimony from the requested deponents on five topics,

        13      all pertaining to the events surrounding the escrow as

        14      alleged in Daugherty's operative complaint.

        15                 The discovery Daugherty seeks is

        16      clearly within the bounds of Court of Chancery

        17      Rule 26.  And, based on the privilege log Highland

        18      produced for the escrow-related documents, the

        19      requested deponents have personal knowledge of at

        20      least some of the escrow events.

        21                 The parties disagree on the threshold

        22      standard for evaluating whether counsel can be

        23      deposed.  Highland contends this court has adopted the

        24      *Shelton* test, while Daugherty points to a series of

Appellee Appx. 00283
013096

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1136   Filed 10/02/25-1804   Page 418 of 1017   PageID 14045
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 290 of 1803   PageID 11036

17

1    standards from *Rainbow Navigation*, *Sealy Mattress*,

2    *Kaplan & Wyatt*, and *Dart*.

3              I note that in a transcript ruling

4    from 2018 in *LendUS, LLC v. Goede*, Vice Chancellor

5    Glasscock considered in the first instance whether it

6    was necessary to gather the evidence sought from

7    counsel, given the risk of disqualification.  I agree

8    this is a threshold consideration present in all the

9    cases the parties have cited.  And I conclude, like

10   Vice Chancellor Glasscock did in *LendUS*, that

11   Daugherty has not made a sufficient showing that he

12   needs to depose Mr. Bookhout and Mr. Katz at this

13   juncture.

14             As I just explained in my ruling on

15   Daugherty's motion to compel, Daugherty will receive

16   A&B's documents regarding the escrow.  Daugherty can

17   also depose the escrow agents.  He can depose the

18   Highland principals who were involved.  And I do not

19   see that any of this has happened yet.  He should

20   pursue those avenues before pursuing one that

21   jeopardizes Highland's choice of counsel.  His motions

22   for commission for the proposed deponents are denied

23   without prejudice.

24             I am mindful that trial is scheduled

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 02/26/25   Page 419 of 1017   PageID 14046
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 291 of 1803   PageID 11037

18

 1  for September, and that -- if Daugherty renews his

 2  motions after taking the rest of the fact discovery --

 3  the risk of disqualification carries more prejudice to

 4  Highland the closer we get to trial.  I also note that

 5  the discovery cutoff in this case is June 28, 2019.  I

 6  am, therefore, interspersing an intermediate discovery

 7  cutoff.

 8            Escrow discovery, including

 9  depositions of fact witnesses other than the requested

10  deponents, must be complete by June 14th, 2019, and

11  Daugherty must make any renewed motion for commission

12  by June 17, 2019, with briefing on that motion to be

13  expedited.

14            The burden this timeframe places on

15  both parties I think is appropriate in light of the

16  requested deponents' apparent knowledge of significant

17  aspects of Daugherty's allegations, and in light of

18  the desire to protect Highland's choice of counsel.

19  Any renewed motion by Daugherty must demonstrate what

20  gaps in the record he needs to fill, and why he

21  believes the requested deponents can fill those gaps.

22            Mr. Uebler, is any of that unclear?

23            MR. UEBLER:  Your Honor, nothing is

24  unclear about that ruling, but I do have a question

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 03/05/25   Page 420 of 1017   PageID 14047
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 292 of 1803   PageID 11038

19

1    about the escrow agent depositions.  Can the parties

2    assume that the ruling that the Court has made with

3    respect to the documents will also apply to deposition

4    testimony? in other words, categories that may be

5    subject to privilege such as the subpoena response,

6    but all other escrow-related categories would

7    presumably be fair game and not subject to privilege

8    in a deposition?

9                 THE COURT:  That's correct, at least

10   as to A&B.  I note that we haven't really tested the

11   boundaries of where my ruling might go with regard to

12   DLA.  And I think that's probably another conversation

13   we would need to have.

14                 MR. UEBLER:  Understood.  Thank you.

15                 THE COURT:  Thank you.

16                 Mr. Katz, is any of that unclear?

17                 MR. KATZ:  No, Your Honor.  That's

18   clear.

19                 THE COURT:  I'll give you-all maybe

20   ten minutes to kind of regroup a little bit, and then

21   I'll hear the motion for status quo order first.

22                 We're in recess.

23        (Recess taken from 1:53 p.m. until 2:00 p.m.)

24                 THE COURT:  Mr. Uebler?

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 09/20/25   Page 421 of 1017   PageID 14048
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 293 of 1803   PageID 11039

20

1              MR. UEBLER:  Your Honor, my colleague,

2    Mr. Christensen, is going to argue the status quo

3    motion.  But I'd just like to point out, we had an

4    issue with our File & Serve converting Word documents

5    to pdf, and it would drop the occasional citation in

6    footnotes.  I don't know if it's our system or theirs.

7    But, in any event, we've brought revised copies of our

8    papers with all the citations for the Court.

9              THE COURT:  Thank you.

10             MR. UEBLER:  You're welcome.

11             MR. CHRISTENSEN:  Good afternoon, Your

12   Honor.  Joseph Christensen from McCollom D'Emilio for

13   the plaintiff, Pat Daugherty.

14             I just want to start very briefly with

15   how we got here.  Your Honor is familiar with the

16   facts, so I won't go over that in too much detail.

17   But I do want to highlight some of the additional

18   points that we included in our briefing related to

19   what Highland was saying about these assets during the

20   Texas action.

21             So Thomas Surgent, during the Texas

22   action, he was the chief compliance officer of

23   Highland.  During the Texas action, he testified that

24   the assets listed in the escrow agreement were being

Appellee Appx. 00287
Appx. 00528
013100

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-11   Exhibit Page 2056 of 1804   Page 422 of 1017   PageID 14049
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 294 of 1803   PageID 11040

21

1    held for Pat's benefit for his interest in HERA.

2    These are all from Exhibit V.  That one is at page 15

3    of 53.

4                   Jim Dondero, the head of Highland,

5    testified that Pat's share of all the assets,

6    including the cash, is in escrow.  He also testified

7    that Pat's *pro rata* share of all the assets, including

8    the cash, are all sitting in escrow.  There's been

9    nothing deducted or removed from Pat's account.  And

10   he also said that the escrow agreement was to protect

11   Pat Daugherty.

12                  The point of all these statements was

13   to convince everybody who would listen that these

14   assets were being held for Pat Daugherty, and that if

15   he prevailed in the Texas action, he would obtain

16   those assets.  And we haven't done anything with them.

17   We haven't offset any legal expenses, which is also

18   noted in our reply brief.

19                  Coupled with the statements that Pat

20   continued to hold the HERA units, this was a clear

21   expression that Highland was trying to convince people

22   that they intended to hold onto these assets but give

23   them to Pat if he prevailed in the Texas action.

24                  In HERA's closing argument its counsel

Appellee Appx. 00288
Appx. 00539
013101

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/25/25    Page 423 of 1017    PageID 14050
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 295 of 1803    PageID 11041

22

1    said, "If Pat Daugherty happens to prevail in his

2    lawsuit against Lane, Patrick and HERA you heard Jim

3    Dondero testify he gets his interest, which is

4    currently escrowed in the third-party escrow account,

5    all of it."

6                    And the jury clearly believed that the

7    escrow meant to preserve Daugherty's interest.  One of

8    the questions the jury sent back to the judge in the

9    Texas action referred to his -- that is Pat's -- HERA

10   units currently in escrow.  That's the third to the

11   last page in Exhibit U.

12                   The defendants now say, "Well, sure,

13   Pat continued to be an owner of HERA, but there was

14   never anything in HERA, at least during the Texas

15   action and before the Texas action."  Which reminds me

16   of a scene from my life at a movie theater with my two

17   sons, where the younger one was complaining that his

18   brother wouldn't give him the box of candy.  He asked

19   me to intervene, and I told him to give him the box of

20   candy, at which point the older brother emptied the

21   candy into his popcorn and gave him the empty box.

22                   That's exactly what happened here.

23   When they told everyone they were holding assets for

24   Pat's benefit, they would now have you believe that

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 07/01/25   Page 424 of 1017   PageID 14051
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 296 of 1803   PageID 11042

23

1    what they really meant was that he was just entitled

2    to an empty box, and they had no intention -- and Pat

3    should have known that they never had any intention of

4    ever letting him have them.

5                    There are two possibilities to explain

6    the contrast between what they said during the Texas

7    action and what they're saying now.  One is that they

8    knew at the time that they were never going to give

9    them back.  The other is that they believed at the

10   time and were sincere in saying that they would give

11   them back, but they later changed their mind.

12                   Under either of those circumstances,

13   Daugherty prevails on at least one of his claims.  If

14   they changed their mind but initially intended it, his

15   promissory estoppel claim is very strong.  If they

16   never intended from the beginning to give them to him,

17   then his fraud and unjust enrichment claims are

18   equally strong.  The status quo order should be

19   entered to make sure that they can't do either of

20   those things this time.

21                   I think that's all the background we

22   need, except for a clarification on what Daugherty is

23   seeking.  He is seeking those assets.  His relief --

24   Your Honor will note that we did not include in our

Appellee Appx. 00290
Appx. 00541
013103

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 02/06/25   Page 425 of 1017   PageID 14052
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 297 of 1803   PageID 11043

24

1    briefing any discussion of our claims for

2    indemnification.  Our indemnification claim is

3    effectively a monetary relief sort of claim.  But we

4    did discuss promissory estoppel, unjust enrichment,

5    and fraudulent transfer.  Each one of those theories

6    includes potential relief divesting those assets from

7    whoever holds them, which brings me to the next point,

8    which is that we do not know where these assets are.

9              We have asked the defendants where

10   these assets are; were they ever transferred after

11   December 2016.  They told us they would not provide

12   any information on those requests.  And that's at our

13   Exhibit L, Request No. 8 and 11, and Exhibit W, our

14   Request No. 34 and 37.

15             THE COURT:  I'm certainly not inviting

16   more or different motions.  But isn't the remedy for

17   that a motion to compel instead of a motion for a

18   status quo order?

19             MR. CHRISTENSEN:  It would be.  And we

20   are not seeking through this status quo order

21   effectively a back door to answering these requests

22   for documents and interrogatories.  But the fact that

23   they will not tell us where these assets are is

24   consistent with the prior behavior in the Texas action

Appellee Appx. 00291
Appx. 00542
013104

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1136   Filed 09/26/25   Page 426 of 1017   PageID 14053
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 298 of 1803   PageID 11044

25

1    and gives us a lot of pause about waiting until the

2    end of this trial.

3                    So we started out this case with -- I

4    guess I should first turn to the defendants' argument

5    that the Court doesn't have power to enter this status

6    quo order.  Clearly it does.  The kind of relief that

7    we're seeking is in aid of the ultimate relief that we

8    are seeking.  Because we are trying to obtain or move

9    particular assets, we are seeking the status quo order

10   to make sure those assets are still available for the

11   court to issue an effective ruling at the end of this

12   case.

13                   THE COURT:  And how do you get around

14   the *Hillsboro* and *HEM* cases that discourage

15   intermediate injunctive relief for the purpose of

16   preserving assets?

17                   MR. CHRISTENSEN:  Well, I think

18   generally the cases are referring to when you're

19   seeking monetary relief.  And that's not what we're

20   doing in this case.  And I think the history is

21   probably the most important point in this situation.

22                   One simply cannot ignore that the very

23   assets and the very parties in this litigation -- the

24   reason we're here is because we were chasing after

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-116   Filed 06/25/804   Page 427 of 1017   PageID 14054
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 299 of 1803   PageID 11045

26

1    these assets that we believe we obtained the right to

2    in the previous action.  So it's a unique situation.

3    None of the cases involve the same parties and the

4    same assets.

5              And the cases -- even the cases that

6    have history as a basis for granting the status quo

7    order, none of them have this kind of sort of clear

8    evidence that there was a fraud and moving of assets

9    to defeat a judgment in an earlier iteration of the

10   dispute between the parties.

11             THE COURT:  And how does that sort of

12   long history or long series of allegations of fraud

13   and hiding assets, how does that square up with the

14   requirement that the harm to be prevented by the

15   status quo order be imminent?

16             MR. CHRISTENSEN:  The imminence, Your

17   Honor, to be frank, is probably the most difficult

18   aspect of our situation to square with the law.

19   Because -- in part because they haven't told us

20   whether things have been transferred, where things

21   are, we cannot give Your Honor very many facts about

22   some imminent action that is going to take place.

23             But at the same time, we -- again, we

24   started as a frog in a pot at a very high temperature

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/25   Page 428 of 1017   PageID 14055
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 300 of 1803   PageID 11046

27

1    having come out of the experience in Texas.  Then

2    adding to that was the fact that they will not tell us

3    where these assets are.  They will not tell us whether

4    they are currently in a solvent entity or not.  They

5    will not really just come out and say whether those

6    assets are still in Highland or not.  There's a

7    suggestion in their brief that can be read as a

8    representation that they are in the Highland and never

9    have left, but they also make the argument in their

10   brief that the assets never went over to Abrams &

11   Bayliss; that during the whole time that Abrams &

12   Bayliss was holding the assets, that really Highland

13   held the assets, retained legal title, and Abrams &

14   Bayliss was simply holding onto them in trust.  We

15   don't know if something like that is happening in this

16   case either.

17              On top of that, we had -- and what

18   spurred us to action was the affidavit of Highland

19   saying that they did not have current assets to

20   satisfy the judgment in the *Crusader Redeemer* action.

21   So that's on the front end of that judgment.  We, at

22   this point, don't know what Highland is going to look

23   like from a solvency standpoint on the back end of

24   that after those assets have gone out the door, and so

Appellee Appx. 00294
013107
Appx. 00545

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 03/26/25   Page 429 of 1017   PageID 14056
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 301 of 1803   PageID 11047

28

```
 1   at some point we have to act.  We need to act before
 2   the end of this case.
 3                  We didn't believe that we had enough
 4   imminence at the beginning of this case that we would
 5   get a status quo order or a preliminary injunction.
 6   But when they filed that affidavit saying that in a
 7   cash flow basis they were insolvent for purposes of
 8   satisfying a judgment, against the backdrop of all the
 9   history, it starts to look like we're doing a replay
10   of what happened in Texas.
11                  Your Honor referred to, I think, a
12   memo from Abrams & Bayliss talking about the HERA
13   strategy.  And what we're afraid of is that there is a
14   HERA Strategy Version 2 that we do not know about
15   right now and they just won't tell us.  So at some
16   point, in order to avoid them doing the same thing
17   again, we have to act.  We can't, unfortunately,
18   identify when they're going to do that in the same
19   clean kind of way that one often can in a status quo
20   or preliminary injunction case.  But the danger, I
21   would submit, is just as high as in those cases.
22                  I've talked some about the history.
23   And the defendants do talk about three of the cases
24   that we talked about regarding the history.  They
```

Appellee Appx. 00295
Appx. 00546
013108

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-13   Filed 03/06/25   Page 430 of 1017   PageID 14057
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 302 of 1803   PageID 11048

29

1   address the *Crusader Redeemer* action that Your Honor

2   is familiar with, the *UBS* litigation, and the *Acis*.

3   The ones that they don't mention are *Trussway*, for

4   example.

5                 *Trussway*, in this court under Vice

6   Chancellor Glasscock, he actually already found that

7   the kind of history that one would have to establish

8   to obtain a status quo order was found with respect to

9   these principals.  He said he took into account the

10  "... prior history of the controllers of the entities

11  in examining equitable matters that come before us."

12  And true to the way he is, he said, "... I would just

13  as soon not list all the reasons I have that make me

14  suspicious that a remedy will not be available here

15  ...."  "But I think it suffices to say that I have

16  experience with other cases involving the principals

17  here."  And he went on.  That's from page 40 of

18  Exhibit S, which is the transcript in the *Trussway*

19  action.

20                 On the next page he said that, "...

21  given ... some of the factors that I've mentioned,

22  including the Acis bankruptcy and my other experiences

23  with the principals here ... there is a reasonable

24  probability that without some action, any victory will

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 07/06/25   Page 431 of 1017   PageID 14058
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 303 of 1803   PageID 11049

1  be a Pyrrhic victory."

2            THE COURT:  It sounds like what you're

3  suggesting is that given the track record of Highland

4  in this action and in other actions, that you're

5  suggesting that the imminence requirements be

6  dispensed with because of what's going on here.

7            MR. CHRISTENSEN:  I don't think I

8  would say that, Your Honor.  I would say that given

9  the caginess on discovery, we are not able to identify

10  the moment of imminence.  But we are, through the

11  history, able to establish the same point as

12  imminence.

13            Imminence is this -- the point of

14  addressing imminence is that if you don't address

15  this, it is going to happen, and it's going to happen

16  very soon.  We can't tell you that it's going to

17  happen very soon, but we can tell you that there's

18  every reason to believe that it will happen before the

19  end of this trial.

20            THE COURT:  But what about the -- I

21  think many times when one is considering imminence,

22  there's sort of a *laches*-esque element that comes into

23  it.  And this case was filed in 2017.  So this "it"

24  that we're discussing very well may have already

Appellee Appx. 00297
Appx. 00548
013110

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 05/21/804   Page 432 of 1017   PageID 14059
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 304 of 1803   PageID 11050

31

1    happened.

2                   And so I wonder what the justification

3    is for sort of after the fact -- maybe, I don't

4    know -- after the fact then seizing up Highland simply

5    based on the way that things have played out in other

6    cases.

7                   MR. CHRISTENSEN:  So I think I can

8    explain why we didn't act earlier, and why it wouldn't

9    have been justified to act earlier, and so why we

10   shouldn't be subject to *laches* on this argument.

11                  When we started, we had no reason to

12   believe that those assets had gone anywhere other than

13   Highland.  Then the Acis bankruptcy discussed that

14   Dondero was moving out tens of millions of dollars to

15   his charitable foundation.  That was another brick in

16   the wall.  Then we got the discovery responses that

17   were not responsive.

18                  And to be clear, we have not given up

19   on that.  We had a meet-and-confer as recently as this

20   morning, and one on Friday of last week, in which we

21   are trying to get these documents.  It doesn't appear

22   that we're going to have much success on our own.  But

23   we are absolutely pursuing that and have pursued those

24   documents as vigorously as we pursued the Abrams &

Appellee Appx. 00298
Appx. 00549
013111

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/25   Page 433 of 1017   PageID 14060
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 305 of 1803   PageID 11051

32

1    Bayliss documents.

2                    To mix the metaphors, the straw that

3    broke the camel's back was the *Crusader Redeemer*

4    action where Highland said:  We cannot pay this

5    judgment right now.  We have more assets than

6    liabilities, but we cannot pay this right now.

7                    And it's also important to remember

8    that it's not just large judgments that Highland has a

9    history of not paying, and it's not only Daugherty's

10   relatively small judgment that they refused to pay.

11   But in the Acis bankruptcy, it was an $8 million claim

12   at issue, and they made him go through -- or are still

13   going through involuntary bankruptcy.

14                   So I think we acted when it was

15   prudent to act.  And before that occurred, I don't

16   think any member of this court would have been likely

17   to give us relief without something to point to, a

18   reason to believe that Highland wouldn't pay apart

19   from the history.

20                   THE COURT:  And the reason is that

21   affidavit in the *Redeemer* case stating that Highland

22   doesn't have the liquid assets to pay the $175 million

23   judgment?  That's what you're interpreting to say that

24   they will not pay or will somehow manage to avoid

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/02/25   Page 434 of 1017   PageID 14061
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 306 of 1803   PageID 11052

33

1    paying Mr. Daugherty's -- what is allegedly owed to

2    him?

3                    MR. CHRISTENSEN:  We aren't sure about

4    the damages, but effectively, yes.  That Highland --

5    which is, we assume, the most solvent of any of the

6    entities -- now has a cash flow solvency issue.  And

7    so at that point we felt we needed to act.

8                    THE COURT:  Understand.

9                    MR. CHRISTENSEN:  The other thing that

10   I think Your Honor should consider, it doesn't fit

11   exactly within the three factors of a status quo or a

12   preliminary injunction standard; but I think Your

13   Honor should also take into account that it may not be

14   a question of whether or not Highland is able to

15   satisfy the judgment, but whether it will, even if it

16   is able.

17                   THE COURT:  That's what I'm wondering.

18   That's the part that I'm wondering how that's being

19   derived from the affidavit in the *Redeemer* case, if

20   that's the precipitating factor.  Am I understanding

21   you to read that affidavit only to inform solvency and

22   not intent?

23                   MR. CHRISTENSEN:  It is consistent

24   with an intent to make people work for their

Appellee Appx. 00300
Appx. 00551
013113

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1186   Filed 08/05/25   Page 435 of 1017   PageID 14062
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 307 of 1803   PageID 11053

34

1   judgments, but I mostly consider it separately.  And

2   what I'm really referring to, the short name for it is

3   spite.  It appears, if you look, not only at the

4   previous action in Texas, but also the Josh Terry

5   situation, that a major factor motivating whether or

6   not Highland pays judgments is how Highland feels or

7   how Jim Dondero feels about the people who are trying

8   to collect that judgment.

9                And so you have the court in the

10  bankruptcy case in *Acis* said that the expenditures

11  were out of whack versus what's at stake.  Or in the

12  *Credit Strategies Fund* case -- which the defendants

13  did not address -- the factual findings there refer to

14  some notes from a call between those parties and

15  Dondero.  Those notes read, "Dondero directly

16  threatens Concord and Brant personally.  We are very

17  good at being spiteful."

18                And so that spite doesn't -- it's not

19  one of the factors normally considered on a status quo

20  motion or a preliminary injunction.  I do think, as a

21  matter of equity, Your Honor ought to consider that.

22  And I think it's consistent with, and maybe grows out

23  of the kind of considerations that Vice Chancellor

24  Glasscock was taking into account in the *Trussway*

Appellee Appx. 00301
Appx. 00652

013114

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 09/25/25   Page 436 of 1017   PageID 14063
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 308 of 1803   PageID 11054

35

1    action.

2                    I think I'll skip to likelihood of

3    success on the merits.  We do think the likelihood of

4    success on the merits prong of this analysis is fairly

5    straightforward.  At a big-picture level, Daugherty

6    had a claim on these assets, either directly or

7    through HERA.  He was entitled to that compensation,

8    he earned it, and it was taken from him after he

9    proved his entitlement not only to damages -- which he

10   received in the amount of 2.6 million and has never

11   seen, but also the underlying assets.

12                   So for fraudulent transfer purposes,

13   we think actual intent to hinder, delay, or defraud

14   based on the documents that we have seen so far is

15   compelling evidence that there was actual intent to

16   hinder, delay, or defraud.

17                   Your Honor only has to find that we

18   have a reasonable probability of success on one of our

19   claims.  You do not have to decide that we have a

20   reasonable probability of success on all of them.  And

21   that comes out of the *Destra Targeted Income* case.

22                   But we also think our other claims are

23   quite strong, the alternative bases under fraudulent

24   transfer law.  We do not believe that HERA got

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/804   Page 437 of 1017   PageID 14064
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 309 of 1803   PageID 11055

36

1   equivalent value, for example, in the transfer.

2   Unjust enrichment, it's an equitable doctrine, so in

3   some sense you back away and look at what really

4   happened, what's the substance.

5             And again, what happened was Daugherty

6   earned compensation, he proved his entitlement to it,

7   and then it was taken from him.  That enriched

8   Highland; it impoverished Daugherty to the extent that

9   he was entitled to it.  There was obviously a

10  connection between those two results.

11            And as far as their defense of

12  justification, the evidence doesn't seem to show that.

13  I take their justification argument to mean that they

14  were justified in taking the money because of the

15  legal expenses.  But the bills that we have seen so

16  far do not support that HERA was receiving the benefit

17  of those legal expenses.

18            And just briefly on the promissory

19  estoppel claim -- I'm not going to spend much time on

20  that; you'll hear a lot about that in a minute.  But I

21  do want to refer to those quotations from the Texas

22  trial as additional reasons that support our

23  probability of success on the merits of that claim.

24  They demonstrate that throughout the trial, the

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 11/06/25   Page 438 of 1017   PageID 14065
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 310 of 1803   PageID 11056

37

1    strategy appears to have been to convince the jury

2    that Highland was the good guy because they were --

3    don't worry, they're going to hold on to the assets

4    for Pat.  Pat is going to get those assets if he

5    proves his entitlement to them.  But -- you know, so

6    don't think we're bad for taking them.  Tell us that

7    we win now and we don't have to give them to him.

8                 The narrowest way to grant the motion,

9    I think, is based on probability of success of the

10   fraudulent transfer claim for actual intent to hinder,

11   delay, or defraud.  And Your Honor only needs to find

12   that to issue the status quo order.

13                On the balance of equities, also seems

14   very clear to us.  On the one hand, our client would

15   go through potentially another half a decade or decade

16   of litigation if he has to chase these assets again.

17   And it would be a real shame to have to do that twice.

18   On the other hand, the defendants, the harm that they

19   identify on their side is that it would lower the bar

20   for future plaintiffs against Highland that are

21   seeking monetary damages to obtain a status quo order.

22   And on that point, I just have to point out, again,

23   that it is not only monetary damages that we are

24   seeking, but seeking to move the escrow assets.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 12/05/25   Page 439 of 1017   PageID 14066
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 311 of 1803   PageID 11057

38

1               The other harm that they identify is
2    the harm to their reputation if they're required to
3    freeze these assets for what I take them to perceive
4    as a very small claim.  But again, we're not only
5    seeking monetary assets, so this is not just, as they
6    characterize it, a $3 million claim but a claim on
7    specific assets.  And their history of paying small
8    claims is not great.  So we think the balance of
9    equity also favors Daugherty.
10              Unless Your Honor has any other
11   questions, that's all I have.
12              THE COURT:  I don't.  Not at this
13   time.  Thank you.
14              MR. REED:  Good afternoon, Your Honor.
15   John Reed from DLA Piper for the defendants.
16              First of all, I want to apologize for
17   what happened at the last hearing.  We were only into
18   the case for like two days.  I had no idea that the
19   lawyer that was going to present was not going to be
20   able to answer Your Honor's questions.  I was not
21   happy about that, probably much more unhappy than the
22   Court was and the Court was very unhappy.
23              Mr. Katz is the lawyer most familiar
24   with everything in this case.  And he's here today to

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11 36   Filed 03/06/25 1804   Page 440 of 1017   PageID 14067
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 312 of 1803   PageID 11058

39

1   present the arguments and should be able to answer all

2   of Your Honor's questions.

3               THE COURT:  I appreciate your comment.

4   Thank you.

5               MR. KATZ:  Your Honor, may I approach?

6               THE COURT:  Yes.

7               MR. KATZ:  Thank you for letting me be

8   heard today.

9               And as Mr. Reed said, I echo his

10  apologies for the last hearing.  I apologize that I

11  was not able to be here at that last hearing.  But if

12  Your Honor does have questions about -- I understand

13  Your Honor's ruling, but if Your Honor does have

14  questions about any of those matters, I'm happy to

15  address those as well.

16              THE COURT:  Thank you.

17              MR. KATZ:  With respect to the status

18  quo motion.  Obviously, the Court is aware of the

19  legal standard.  I'm not going to go into that.  I

20  just want to address a few of the points that counsel

21  addressed.

22              And I'd like to start with the

23  irreparable harm element, which is one of the required

24  elements.  And counsel said a number of times that

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 10/06/25   Page 441 of 1017   PageID 14068
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 313 of 1803   PageID 11059

40

1    they're seeking the assets, not just monetary relief.

2    And I presume that that argument is being proffered

3    because they recognize, otherwise, the issue with

4    irreparable harm component that they have to show.

5                    And I note, just by way of background,

6    is that the Texas award was not in favor of

7    Mr. Daugherty vis-a-vis HERA.  It was not for specific

8    assets; it was a monetary award.  And, moreover,

9    Mr. Daugherty never had ownership of -- direct

10   ownership of any assets in HERA.  Mr. Daugherty was a

11   shareholder in an LLC and the LLC owned some assets.

12                   So if their lawsuit is now seeking

13   recovery of specific assets as opposed to monetary

14   relief, I note that there's a host of procedural and

15   substantive issues with that which I think goes well

16   to the likelihood of success on the merits.

17                   But the point for us today, Your

18   Honor, is that a monetary award would certainly be

19   sufficient to recompense Mr. Daugherty if he were to

20   prevail on any of his claims in this case.  And

21   there's no evidence -- and maybe more importantly,

22   there's no evidence that's been offered to the Court

23   in support of the status quo motion that would

24   demonstrate otherwise.  And when I say "demonstrate

Appellee Appx. 00307
Appx. 00558
013120

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 05/23/25   Page 442 of 1017   PageID 14069
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 314 of 1803   PageID 11060

41

1   otherwise," demonstrate that there are assets that

2   were in HERA that can't be valued, or some other basis

3   to show some sort of irreparable harm.  That issue is

4   not even addressed.

5            We're -- this is, I think, very

6   apparently a case that -- where there is no

7   irreparable harm.  And money can certainly compensate

8   for any harm that Mr. Daugherty may be able to prove

9   ultimately that he suffered.  The only evidence on

10  that issue, I think as Your Honor correctly pointed

11  out, was the affidavit of Scott Ellington.  And that

12  affidavit says to the contrary.  It says, "... the

13  value of Highland's assets exceed[s] the amount of the

14  ... Award."

15           There's absolutely no evidence in

16  connection with the status quo motion that would show

17  that there is irreparable harm or there is insolvency.

18  In fact, what a good counsel wants to do is make

19  allegations of what they believe is inappropriate

20  conduct some by Highland, some by Highland's

21  affiliates.  And I note that the conduct that they've

22  cited to in their motion are allegations taken from

23  pleadings in other cases, as opposed to direct

24  evidence of anything that has been done by Highland.

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 316 of 1804 Page 443 of 1017   PageID 14070
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 315 of 1803   PageID 11061

42

1    And most of it, again, is not directly Highland

2    allegations to any extent.

3                    There is -- and then also as Your

4    Honor appropriately, I believe, questioned counsel

5    about, there's no evidence of anything imminent on the

6    horizon that might give rise to any potential concern

7    that would support the status quo order.  And what

8    they're seeking is really, truly an extraordinary

9    remedy.  And I don't believe that they've pointed to

10   any concrete basis which they can meet the high

11   standard that they need to show to justify a status

12   quo order.

13                   THE COURT:  How do you justify the

14   situation here from the one in *Trussway*?

15                   MR. KATZ:  Well, I guess, Your Honor,

16   in two ways.  One, in *Trussway*, there's allegations of

17   specific conduct.  Where here, we've got -- there's no

18   allegations of any conduct that they believe is about

19   to occur or evidence to support that.

20                   THE COURT:  I suspect they would say

21   that's because you haven't answered their questions,

22   but I don't know.

23                   MR. KATZ:  Well, but, Your Honor, I

24   guess that it would also go back to the irreparable

Appellee Appx. 00309
Appx. 00509
013122

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-6   Filed 07/07/25   Page 444 of 1017   PageID 14071
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 316 of 1803   PageID 11062

43

 1   harm issue that, you know, there's nothing that --

 2   even the allegations, that if they were able to

 3   provide some supportive allegations in this case as

 4   opposed to relying on allegations in other cases,

 5   there would still be -- they still have not shown that

 6   there's any risk of insolvency or potential

 7   irreparable harm.

 8              And the *Mitsubishi* case that they

 9   cited in their brief I think is very on point.  And on

10   this issue where they had -- the Court noted that

11   there was an allegation -- actually more than an

12   allegation -- there actually was a prior incident that

13   the Court had very serious concerns about but that on

14   its own wasn't enough.  It was -- the Court

15   specifically found that the defendant in that case was

16   insolvent.  And they also found that there was a sale

17   being negotiated, actual evidence of a sale, where the

18   assets were going to be transferred.  But we don't

19   have that type of evidence with us in this case, Your

20   Honor.

21              On the likelihood of success on the

22   merits, Counsel spent a little bit of time on that

23   issue.  But I think it's important, Your Honor, again,

24   that this is an extraordinary remedy they're seeking

Appellee Appx. 00310
Appx. 00501

013123

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 06/25/25   Page 445 of 1017   PageID 14072
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 317 of 1803   PageID 11063

44

 1  that has a heightened standard.  And their motion on

 2  the likelihood of success on the merits simply has

 3  conclusory allegations, that they believe they're

 4  going to be able to prevail on the merits without

 5  addressing the specific elements and what evidence

 6  they've got to show the specific elements.

 7              I note, you know, Counsel, in a number

 8  of pleadings has -- and I know Your Honor has noted

 9  this as well -- that Judge Glasscock had expressed his

10  skepticism about when he was trying to determine what

11  the nature of the escrow agreement was.  And I note

12  that Judge Glasscock, when he was doing that, also

13  when he was talking about the formation of the escrow

14  agreement, he was not talking about the resignation of

15  Abrams & Bayliss or the -- what happened to the assets

16  that formerly were held by HERA.

17              And, in fact, even Judge Glasscock

18  indicated at that time that it may be that this

19  fraudulent transfer claim was appropriate for summary

20  judgment.  I think his direct quote -- I know I wrote

21  it down.  His direct quote was that it wasn't

22  prepared -- on page 79 and 80 of the transcript, that,

23  "It may be ... perfectly fit ... for a motion for

24  summary judgment.  I'm just not convinced I can get

Appellee Appx. 00311
Appx. 00562

013124

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-6   Filed 10/06/25   Page 446 of 1017   PageID 14073
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 318 of 1803   PageID 11064

45

1  rid of it on a motion to dismiss ...."  That was his
2  quote.
3          But I think that has been turned on
4  its head a little bit to say that because he didn't
5  understand the purpose of the escrow agreement and why
6  that was formed, that somehow that shows that the
7  fraudulent transfer claim is a sure-fire winner.  In
8  fact, I also note that Judge Glasscock dismissed the
9  same fraudulent transfer claim against Mr. Dondero in
10  the motion to dismiss.
11          So we think there's a number of
12  problems with each of the claims.  And I know we're
13  going to get to the promissory estoppel claim.  But I
14  think a couple of issues with that is that we've
15  got -- that claim is predicated on two statements that
16  were by individuals that I don't believe were clear
17  and unequivocal type of statements that could support
18  a promissory estoppel claim.  But moreover, they went
19  to the representation of what was in the terms of the
20  escrow agreement.
21          And I believe the law is fairly clear
22  that if there is a contract provision that addresses
23  the issue at hand, then you cannot have a promissory
24  estoppel claim based on a representation about that

Appellee Appx. 00312
Appx. 00503
013125

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 3/06/25 804   Page 447 of 1017   PageID 14074
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 319 of 1803   PageID 11065

46

1   contract claim.  And Mr. Daugherty is absolutely

2   seeking relief pursuant to the provisions in the

3   escrow agreement.  And that, in and of itself, would

4   knock out his promissory estoppel claim.

5                    And then -- and maybe the biggest

6   problem -- I think he's got a number of problems with

7   the promissory estoppel claim, but maybe the biggest

8   one is reasonable reliance.  Again, Mr. Daugherty

9   hasn't even alleged that any of the statements were

10  made for the purpose of causing Mr. Daugherty to

11  reasonably -- to rely, and that it would be reasonable

12  to expect him to do so.

13                   But Mr. Daugherty's conduct -- he

14  alleges that he would not have paid the judgment and

15  that he would have sought to invalidate the escrow

16  agreement at trial.  And I think both of those are --

17  they're also, again, conclusory allegations that he's

18  made without sufficient -- he has not made allegations

19  in his complaint in this action sufficient to

20  withstand, I believe, a motion to dismiss, and

21  certainly not to show a likelihood of success on the

22  merits for the status quo motion.

23                   But what he's really said and what he

24  explained in the briefing that he meant by that is

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 06/25/804   Page 448 of 1017   PageID 14075
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 320 of 1803   PageID 11066

47

```
 1   that he would have sought offset.  The problem that

 2   Mr. Daugherty has there is he -- offset is an

 3   affirmative defense.

 4               THE COURT:  I mean, we're all about to

 5   get into that very deeply, so ...

 6               MR. KATZ:  Okay, Your Honor.  Thank

 7   you, I appreciate that.

 8               But the likelihood of success on the

 9   merits on the promissory estoppel claim, I think, is

10   very low.  He's got similar issues on the unjust

11   enrichment claim because of the representations and

12   because of the equivalent value that HERA received in

13   exchange for the assets.

14               On the fraudulent transfer claim, we

15   don't believe that there was a transfer and there's

16   been evidence of a transfer.  And Counsel may respond

17   to that and say, "Well, that's because Highland hasn't

18   shown where the assets are."  I'm anticipating that to

19   be their response on that.

20               But I think Your Honor identified the

21   point that that's not why you get a status quo motion.

22   If they think there's evidence that they need, you

23   know, there's a motion to compel.  But for purposes of

24   their motion, they have not produced any -- have not
```

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 3/26/25 1804   Page 449 of 1017   PageID 14076
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 321 of 1803   PageID 11067

48

1  cited to any evidence, have not even made the

2  allegation that -- other than a conclusory

3  allegation -- that they have a likelihood to succeed

4  on the merits.

5           And then finally, Your Honor, I think

6  they have the same -- the last element, that with the

7  harm to him, the harm to Mr. Daugherty would outweigh

8  the harm to Highland.  They simply have a conclusory

9  allegation in their motion without providing any

10  support for that, Your Honor.

11           And again, I just -- I'm happy to talk

12  about that issue further, but I think on a motion of

13  this seriousness with the heightened standard, that

14  they need to show that conclusory allegations are not

15  sufficient.

16           THE COURT:  Thank you.

17           MR. KATZ:  Thank you, Your Honor.

18           MR. CHRISTENSEN:  Just briefly, Your

19  Honor.

20           I suppose it's an interesting

21  philosophy of language, a question of what counts as

22  something being conclusory.  But we have certainly

23  done more than offer a conclusion.  We have laid out a

24  timeline of actual intent to delay or defraud with

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-6   Filed 03/21/25   Page 450 of 1017   PageID 14077
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 322 of 1803   PageID 11068

49

1    respect to the fraudulent transfer claim.

2                    And just the items that are attached

3    to our motion at Exhibit N, O, P, and Q, are a series

4    of e-mails and events that I think anybody bringing a

5    fraudulent transfer claim might characterize any one

6    of them as a smoking gun.  That is more than a

7    conclusion.  Our conclusion that this transfer was

8    done with actual intent to defraud is based on very

9    particular, very detailed, minute-by-minute documents.

10   So it is certainly not conclusory.  It's sort of

11   conclusory to call that conclusory.

12                   And it's important, also, to remember

13   that when Vice Chancellor Glasscock suggested that

14   potentially the fraudulent transfer claim could be fit

15   for summary judgment disposition, he also said things

16   like "Maybe there's a perfectly reasonable explanation

17   for this."  I think discovery has shown that there is

18   not a perfectly reasonable explanation for this.  And

19   he did not have access to those documents, nor did we

20   at the time that he made that statement.

21                   As far as seeking this relief rather

22   than simply monetary damages, that has been in our

23   complaint since the beginning.

24                   THE COURT:  What is the -- can you

Appellee Appx. 00316
Appx. 00507
013129

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11 6   Filed 07/06/25   Page 451 of 1017   PageID 14078
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 323 of 1803   PageID 11069

50

1    address the point that the Texas award is monetary and

2    not for the specific assets that are mentioned now in

3    your briefing?

4              MR. CHRISTENSEN:   Sure.   I can.

5              I'll address that by saying, quoting

6    again HERA's closing argument in the Texas trial.

7    "... [I]f Pat Daugherty happens to prevail in his

8    lawsuit against Lane, Patrick and HERA you heard Jim

9    Dondero testify, he gets his interest, which is

10   currently escrowed in the third-party escrow account,

11   all of it."

12             We have made a claim for promissory

13   estoppel that statements like that with codefendants

14   show clear evidence of a promissory estoppel claim.

15   That kind of statement shows how the statement was

16   meant to be perceived, it shows how people did

17   perceive it.

18             And I want to go to the jury question

19   because we actually have -- unlike many cases where

20   the idea of an objective standard, what would a

21   reasonable person do, is sort of an academic question.

22   But in this case we have a jury, which is sort of the

23   quintessential reasonable person, writing back to the

24   judge, "If we assign a dollar value to 'Fair Market

Appellee Appx. 00317
Appx. 00508
013130

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 05/23/25   Page 452 of 1017   PageID 14079
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 324 of 1803   PageID 11070

51

1    Value of Daugherty's HERA units' in Question 18" --

2    that's the question that awarded him $2.6 million --

3    "is this in exchange for his HERA units currently in

4    escrow, or in addition to them?"  The judge instructed

5    back, "Do not discuss or consider the effect your

6    answers will have."

7                    And then the final judgment made clear

8    that it was not in exchange for those assets in

9    escrow, that it was in addition to them.  And there

10   was appellate litigation about that issue, and it was

11   settled that it was not a replacement for those units.

12   But my point really is:  We have very clear evidence

13   that the Texas judgment and the people making the

14   Texas judgment believed that those assets were being

15   held in escrow for Pat Daugherty, which is exactly

16   what the defendants tried to tell the jury to believe

17   in their closing arguments.

18                    So the fact that the Texas judgment

19   was purely monetary is, A, not entirely true; and, B,

20   it's not -- does not defeat the promises that they

21   made throughout that trial, nor the fact that they

22   transferred the assets once the judgment came through.

23                    Let's see.  On the promissory estoppel

24   claim, it's just not what they said at trial, that Pat

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 06/25/804   Page 453 of 1017   PageID 14080
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 325 of 1803   PageID 11071

52

1    Daugherty had an interest in this LLC but, by the way,

2    there's nothing in it.  So if you award him anything,

3    it's going to be completely valueless.

4                I want to respond just briefly to the

5    point that these assets can be valued.  And they can

6    be.  This court is very experienced in appraisals.

7    But the easiest and most efficient way to deal with

8    this, the value, is to give the assets themselves

9    rather than require, effectively, a -- more than one

10   appraisal inside of this case, because there are

11   assets held by a private equity fund, and those assets

12   include private companies.  So we would have to have a

13   sort of quasi-appraisal action contained inside of

14   this, instead of doing what is much easier for the

15   parties and the Court and just addressing those assets

16   in an equitable manner and providing an equitable

17   remedy.

18                The affidavit does say that they are

19   solvent.  I believe the affidavit was also given by

20   the same person that the -- it was either the

21   arbitration panel in *Credit Strategies Fund* or the

22   Bankruptcy Court in *Acis* said that Isaac Levinson's

23   statements were not credible and that his statements

24   contradicted documentary evidence in a clear way.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Exhibit   Page 326 of 1804   Page 454 of 1017   PageID 14081
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 326 of 1803   PageID 11072

53

1          In addition, they don't say by how
2   much they are solvent.  It could be the case, based on
3   the face of that affidavit, that they are solvent by a
4   million dollars.  We simply don't know.  And again,
5   the question of solvency as it relates to irreparable
6   harm in most of these cases is in a sort of antiseptic
7   environment where it really is just a matter of:  Does
8   this party have sufficient assets?
9          And again, that's not the only
10  question in this case.  The question in this case is:
11  If the Court does nothing, what is the risk that
12  Highland will do exactly what it has done to these
13  assets vis-a-vis this litigant before?
14          That's all I have, Your Honor.
15          THE COURT:  Thank you.
16          My intention is to hear the status quo
17  order and the motion to dismiss and then take a break
18  and see if I can get something together to share my
19  thoughts.  So let's move on to the motion to dismiss,
20  unless folks want to take a short break.
21          MR. KATZ:  I'm prepared to proceed,
22  unless Counsel wants a break.
23          MR. UEBLER:  I'm prepared to go
24  forward.

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 08/06/25   Page 455 of 1017   PageID 14082
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 327 of 1803   PageID 11073

54

1                    THE COURT:  All right.  You may

2      proceed.

3                    MR. KATZ:  Thank you, Your Honor.

4                    So I won't belabor the procedural

5      background, because I know Your Honor is familiar with

6      it, other than to say that after Judge Glasscock had

7      dismissed a large number of Mr. Daugherty's claims,

8      there was -- a promissory estoppel claim was then

9      added.  And we filed the motion to dismiss as to that

10     claim, and that's the motion that we're here for

11     today.

12                   To prevail on a promissory estoppel

13     claim, Mr. Daugherty has to allege a conceivable set

14     of circumstances that would allow a showing that there

15     was a promise that was made, that it was reasonable,

16     that the expectation of the promisor was to induce the

17     action of forbearance on the part of the promisee,

18     that the promisee reasonably relied on the promise and

19     took action to his detriment, and such promise is

20     binding because injustice can be avoided only by

21     enforcement of the promise.

22                   And I do want to -- I will be

23     efficient, but I want to address each of these

24     elements, Your Honor.  And the -- I want to start with

Appellee Appx. 00321
Appx. 00572
013134

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 Filed 06/25/2504   Page 456 of 1017   PageID 14083
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 328 of 1803   PageID 11074

55

1    the reasonable reliance.  As I mentioned a moment ago

2    in connection with the status quo order, that

3    Mr. Daugherty is really claiming that he would have

4    sought offset had Mr. Dondero -- actually, I

5    apologize, I want to take a quick step back.

6                      Although Counsel's pointed to a

7    closing argument of HERA, that I believe he attributed

8    to Highland's counsel, I just want to be clear for the

9    record that the statement that Counsel just read from

10   the closing argument was for HERA, not for Highland,

11   and there was separate counsel.

12                      THE COURT:  Hasn't there separately

13   been an assertion of a common interest?

14                      MR. KATZ:  There was, Your Honor.  But

15   I just believe Counsel -- I'm sure it was

16   inadvertent -- said "Highland."  And I just want to be

17   clear for the record that that statement was on behalf

18   of HERA at closing argument.

19                      But, more importantly, in the

20   complaint they only allege two statements: a statement

21   by Jim Dondero at trial and a statement by Mr. Klos in

22   a declaration made several months after the final

23   judgment.  And so when Mr. Daugherty claims that his

24   reasonable reliance was not seeking offset at the

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1    Filed 03/06/25    Page 457 of 1017    PageID 14084
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 329 of 1803    PageID 11075

56

1    trial, the second statement can't be a basis of that;

2    and the issue that Mr. Daugherty has, that there can't

3    be a reasonably conceivable set of circumstances to

4    show reasonable reliance for a couple of reasons.

5              One, the date that Mr. Daugherty filed

6    his counterclaims with his claims, he had -- the LLC

7    agreement with Highland's offset provision against the

8    value of HERA was in that document.  In fact, that was

9    the basis of one of Mr. Daugherty's claims, that there

10   was going to be -- there was the risk of this improper

11   offset.  He was challenging those provisions.

12             But yet he never pled offset as a

13   defense.  And it is a required affirmative defense

14   under Texas law.  And it is clear that when the final

15   judgment was entered, that's *res judicata*, that issue

16   was barred.

17             So Mr. Daugherty is saying that now

18   had Jim Dondero not testified as he did on the stand,

19   that he would have filed the declaratory judgment

20   action to offset the judgment that Highland obtained

21   against him from the judgment he obtained against HERA

22   cannot serve as the basis for a promissory estoppel

23   claim in this action because he would be barred as a

24   matter of law.

Appellee Appx. 00323
Appx. 00574
013136

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 06/25/24   Page 458 of 1017   PageID 14085
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 330 of 1803   PageID 11076

57

1            THE COURT:  Is that a little too

2    technical?  I mean, is the point a little more

3    abstract than that, which is that had Dondero not

4    testified as he did and assured everyone in the

5    courtroom that the escrow was there for Daugherty's

6    satisfaction down the road, that there are plenty of

7    different options he could have taken?  I mean, any

8    sort of resistance or leverage or anything like that

9    in regards to paying his own judgment, whether or not

10   a technical offset was procedurally available to him,

11   seems to be kind of reducing this a little bit too far

12   down into the technicalities.

13            MR. KATZ:  Well, I don't believe so,

14   for two reasons.  But the most important one being

15   there's no reasonably conceivable set of circumstances

16   where he could have taken action.  And I'll address

17   that momentarily.

18            But to the point, that was his

19   response.  That's what's in his pleading, both in his

20   complaint and in response to the motion to dismiss.

21   That's what he said he would have done.  And that

22   wasn't available to him.

23            And it wasn't just filing a

24   declaratory judgment action for offset that he would

Appellee Appx. 00324
Appx. 00575
013137

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1    Filed 06/25/84    Page 459 of 1017    PageID 14086
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 331 of 1803    PageID 11077

58

 1    have been barred from doing.  He had two years to

 2    plead offset as a defense or to plead facts in the

 3    Texas action that arguably could have given rise to

 4    some reliance claim.

 5                THE COURT:  It seems odd to claim that

 6    there was no reliance because he didn't do something

 7    before the act in question happened.

 8                MR. KATZ:  Well, Your Honor, in fact,

 9    quite the opposite.  As Mr. Daugherty said in his

10    reply brief to the status quo motion -- and this is on

11    page 2 and 3 of Daugherty's reply brief -- "In fact,

12    during the trial and before Daugherty won his

13    judgment, Defendants stressed that Daugherty was an

14    owner of HERA units."  Then he puts in a footnote, "At

15    the same time, Defendants took the position that

16    Daugherty held no economic interest in HERA.

17    Accordingly, Daugherty did not take the purported

18    admissions at face value and litigated for a judgment

19    that he retained his HERA units."

20                And the significance of that, Your

21    Honor -- it's the same significance as what I was

22    trying to say a moment ago and I probably did not say

23    it very clearly -- is from the moment he filed this

24    claim, he was aware that, as he says here, that his

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 03/25/804   Page 460 of 1017   PageID 14087
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 332 of 1803   PageID 11078

59

1  value -- the value of his shares in HERA were

2  valueless, as Highland was saying they were.  Because

3  that was one of his claims in the lawsuit.  And he did

4  not do anything to try to protect that vis-a-vis a

5  judgment that Highland might get against him at any

6  time during the trial.

7            So to think that, "Oh, well, he was

8  about to do it" after two years, knowing everything

9  that he knew, the LLC agreement allowing the offset,

10  Highland taking the position that his units were

11  valueless even though he was suing for it, that

12  somehow he was going to try to offset his claim

13  against HERA against Highland's claim against him, and

14  he just didn't do it because Jim made the statement he

15  did on the stand is not a reasonably credible

16  position.  It's not something that could have a -- or

17  there could be a reasonably conceivable set of

18  circumstances to show a reasonable and detrimental

19  reliance.

20            And I think -- and, Your Honor, if you

21  also look at the whole circumstances around

22  Mr. Dondero's statement on the stand, was not -- in

23  fact, the question -- it was by HERA's counsel that

24  was questioning him at the time.  And the question

Appellee Appx. 00326
Appx. 00577
013139

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 10/06/25   Page 461 of 1017   PageID 14088
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 333 of 1803   PageID 11079

60

```
 1    was:  The assets that are being escrowed, or the money

 2    that's being escrowed right now, what happens to them?

 3    And I think it's significant for a couple of reasons.

 4                 One, right now they're talking about

 5    the day that the question was asked.  They're not

 6    talking about a day in the future.  And I think it's

 7    also significant that that was --

 8                 THE COURT:  Maybe that was the

 9    question, but the answer was, "In the future they will

10    go to him."

11                 MR. KATZ:  That's -- Your Honor,

12    respectfully, that's not the way I read it.  But I

13    think the point is -- two points, Your Honor.  One,

14    that was a question by HERA's counsel; that was not a

15    question by Daugherty's counsel.

16                 If this was so important that

17    Daugherty was going to forego seeking to invalidate

18    the escrow agreement or trying to do trial amendment

19    and get a new claim in, there was no action by his

20    counsel to follow up and say:  Let's be clear.  Let's

21    not talk about right now, let's talk about in the

22    future.  And again -- or ask about what about the

23    resignation provisions, what about the termination

24    provisions.
```

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 03/05/25   Page 462 of 1017   PageID 14089
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 334 of 1803   PageID 11080

61

1            There's a whole host of conditional
2    circumstances that show that Mr. Daugherty,
3    purportedly relying on that statement to not try to
4    bring a declaratory judgment action for offset or to
5    seek to invalidate the escrow agreement would have
6    been reasonable reliance.  Again -- because, in fact,
7    up until that point, Mr. Daugherty not only waited two
8    years, he waited past the amended pleading deadlines.
9    In the face of what he says, I'm being told by
10   Highland that my assets are valueless.  You know, and
11   to the extent they say that I'm still owning HERA
12   units, I never believed that there was anything there.
13   But yet he didn't do anything about it before
14   Mr. Dondero made the statement to HERA's counsel.
15            So, again, all of those, all of that
16   goes to whether he could have -- show any circumstance
17   where he could have reasonably relied.
18            Similarly, I think if you look -- and
19   I bring in these things to show Your Honor what is not
20   in the complaint or not in the response to the motion
21   to dismiss.  After the judgment, he claims that he was
22   entitled to this offset, but yet he paid his full
23   judgment.  He could have just paid the difference in
24   the judgment.

Appellee Appx. 00328
Appx. 00579
013141

62

1           THE COURT:  That's the point, is that
2    he paid the whole judgment; right?  Kind of chipperly
3    wrote the check and thought it was all going to work
4    out in the end.
5           MR. KATZ:  Right.  Well, without --
6    but with the whole circumstances and you look at his
7    allegations, if his allegations are to be believed,
8    it's not reasonable to believe that somebody who was
9    going to do what he did but for Jim Dondero's
10   statement would have, again, waited for two years, not
11   filed -- not done -- taken the legal actions that he's
12   now claiming he would have taken.
13          He did seek to amend his pleadings
14   right before trial.  These were not in there.  That
15   was, again, before these statements.  Again, it's not
16   credible to believe that he reasonably relied.  And he
17   hasn't alleged anything.
18          Again -- and so that was why I said
19   initially to Your Honor's question, there are two
20   points.  One, when you look at the totality of what he
21   didn't allege and what he didn't do, that there can be
22   no set of circumstances where he reasonably relied,
23   but then when you look at what he says he would have
24   done, which is the offset.  And he would have been

Appellee Appx. 00329

Appx. 00589

013142

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-1186 Filed 13/06/25 1804 Page 464 of 1017 PageID 14091
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 336 of 1803 PageID 11082

63

1    legally barred from doing that because he waived it.
2    Also because -- and the law is cited in our motion,
3    that because Highland and HERA are separate entities,
4    there wouldn't have been an offset between those
5    judgments anyway.
6              So the two things he says that he
7    would have done was seek to invalidate the escrow;
8    which, again, he was aware of that escrow agreement
9    before trial.  He sought to amend his pleadings before
10   trial but did not address that escrow agreement at
11   all.
12             He has shown that he believes that
13   his -- before Mr. Dondero made that statement, he
14   didn't -- he thought his HERA units had been rendered
15   valueless and that's how he was litigating the case.
16   But he didn't try to "invalidate" the escrow
17   agreement.  He also doesn't explain or provide any
18   allegation of what that means, to invalidate the
19   escrow settlement.
20             He doesn't provide any legal theory or
21   allegation of evidence to support a legal theory that
22   would show that had he sought to invalidate the escrow
23   agreement that the court would have allowed that
24   amendment and it would have changed the outcome.

Appellee Appx. 00330
Appx. 00581
013143

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 06/25/25   Page 465 of 1017   PageID 14092
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 337 of 1803   PageID 11083

64

 1                     The next element I want to talk about
 2     was that a promise was made.  And, again, he's
 3     identified two promises: one by David Klos, one by Jim
 4     Dondero.  There's -- the one by Mr. Klos, again, was
 5     done several months after trial.  The one by
 6     Mr. Dondero is obviously during trial.  But both of
 7     those statements, when you look at them, are not
 8     unequivocal statements of -- there was no set of
 9     circumstances where Mr. Daugherty will not be paid
10     this money on a final, nonappealable judgment.  And --
11     which is what --
12                     THE COURT:  Why is that not exactly
13     what Mr. Dondero said?
14                     MR. KATZ:  Well, Your Honor,
15     Mr. Dondero was being asked a question about the
16     language in the escrow agreement, that specific
17     provision.  And he was being asked based on
18     circumstances right now.  And perhaps if I give you an
19     analogy.  If I hire an employee and I'm paying the
20     employee $50,000 a year and they're an at-will
21     employee, and somebody asks me, "Well, how much does
22     that employee make?" I'm not likely going to say,
23     "Well, annually $50,000 a year, but I can terminate
24     them at any time."  Or "$50,000 a year, but less

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11 86   Filed 03/03/25 1804   Page 466 of 1017   PageID 14093
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 338 of 1803   PageID 11084

65

1    withholding," or other caveats.

2              And the question that was asked to

3    Mr. Dondero is the -- right now the assets that are --

4    and I apologize, I don't -- I can grab the quotation.

5    I don't have it right in front of me.  But the key

6    part was that it was predicated on right now, what

7    happens right now if there's a final judgment.

8              So -- and, again, this is Mr. Dondero

9    who's an individual defendant who is not being

10   questioned as a representative of Highland.  And what

11   they want to do is take that statement and say this is

12   an unequivocal statement that was binding Highland.

13   And it just doesn't rise to that level under the legal

14   standard.

15             And, you know -- but, moreover --

16   again, because what -- Mr. Dondero was reading the

17   escrow agreement on the stand as a layman, but that's

18   really more significantly the point, is that if the

19   alleged promises are subject to termination by a

20   contract -- I know this is in our pleading, the

21   *TrueBlue HRS Holding* case -- promissory estoppel does

22   not apply where a fully integrated and enforceable

23   contract governs the promise at issue.

24             And that's the issue, is the contract

Appellee Appx. 00332
Appx. 00583
013145

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 04/02/25   Page 467 of 1017   PageID 14094
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 339 of 1803   PageID 11085

66

1    is the contract; it means what it means.  And the --

2    unless there -- I don't believe, Your Honor, that they

3    even alleged that there is some promise, unequivocal

4    promise, that Mr. Dondero or Mr. Klos made that was

5    not subsumed by the escrow agreement.  And that's

6    really the basis of their claim here.

7                    They also have to show that the claim

8    is necessary to avoid injustice.  And obviously, they

9    have brought a fraudulent transfer claim and an unjust

10   enrichment claim arising out of the same course of

11   conduct, that they claim these representations are

12   related to those claims.  And I think the case law is

13   fairly clear on this, that this is exactly the type of

14   situation where a promissory estoppel claim is not

15   necessary to avoid injustice.

16                   THE COURT:  But is the conclusion to

17   be taken from your argument that nothing can ever be

18   pled in the alternative to a promissory estoppel

19   claim?

20                   MR. KATZ:  No, not at all.  But I

21   believe that you would have to have a set of

22   circumstances where there wasn't a fully integrated

23   enforceable contract, and that the underlying promises

24   weren't about the interpretation of that contract.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 04/00/25   Page 468 of 1017   PageID 14095
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 340 of 1803   PageID 11086

67

1                And then, finally, Your Honor, I'm
2    going to use the word "conclusory" again, that they --
3    well, actually not even conclusory, Your Honor.  They
4    didn't even plead that Highland intended to induce
5    reliance or that Highland should have reasonably
6    expected to induce reliance by Mr. Daugherty.
7                And I don't think that's necessarily
8    an accident.  I think that's because the statements
9    that they're relying on were not statements that were
10   made on behalf of Highland.  They're individual
11   statements.  And I think that it would be fairly
12   tortured to say otherwise.
13               So, Your Honor, again, for each of
14   those reasons, we don't think that they have pled any
15   reasonably conceivable set of circumstances that could
16   support the promissory estoppel claim.
17                    THE COURT:  Thank you.
18                    MR. KATZ:  Thank you, Your Honor.
19                    MR. UEBLER:  Good afternoon again,
20   Your Honor.
21                    THE COURT:  Good afternoon.
22                    MR. UEBLER:  I'll start with the
23   promise that was made.  And before I do, I think I
24   heard Mr. Katz talking about the standard to prevail

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1426 of 1804   Page 469 of 1017   PageID 14096
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 341 of 1803   PageID 11087

68

1   on a claim.  And I understand we're a little bit late

2   in the game of this lawsuit.  But this is a 12(b)(6)

3   motion and the standard is reasonably conceivable.

4              So I just want to reset where we are

5   on this motion and talk about the promise that was

6   made, briefly.  So what was the promise?  The promise

7   was Jim Dondero testifying at trial, under oath, that

8   Mr. Daugherty's assets would be held in escrow and

9   released to him through HERA if he won in Texas.  I

10  mean, it was as simple as that.

11             You may have been left with the

12  impression from Mr. Katz's presentation that the line

13  of questioning was about the terms of the escrow

14  agreement.  I can save all of us and just refer to the

15  pages of the testimony, or I'd be glad to read the

16  preceding three or four questions to set that up.  But

17  it was not interpreting the escrow agreement.  And

18  Mr. Katz didn't have the testimony on hand, but I do.

19  And the question was:

20             "Question:  Okay, so -- so if

21  Mr. Daugherty somehow prevails in his lawsuit against

22  Patrick Boyce and Lane Britian and HERA, what happens

23  to Mr. Daugherty's interest that's being escrowed

24  right now with a third-party escrow agent?

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1436 of 1804   Page 470 of 1017   PageID 14097
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 342 of 1803   PageID 11088

69

1               "Answer:   They go to him.

2               "Question:   I'm sorry?

3               "Answer:   They go to him via to HERA

4     and then to him."

5               Is that promise consistent with the

6     escrow agreement?  Yes.  Is that promise separate and

7     apart from the escrow agreement?  Yes.  Mr. Dondero

8     wasn't there interpreting a contract.  He was there

9     making a promise to Daugherty and to the jury.

10               And just as we allege in paragraph 131

11    of our complaint, it was the reasonable expectation of

12    Highland, when that promise was made, that it was

13    going to be relied on.

14               THE COURT:  Tell me more how the

15    statement was separate and apart from the contract.

16               MR. UEBLER:  The statement is separate

17    and apart from the contract because I think --

18    Mr. Katz would be the first one to tell you that

19    Mr. Daugherty was not a party to the escrow agreement.

20    Mr. Daugherty, on the face of it, has no rights under

21    that escrow agreement.

22               So this idea that Highland proposes

23    that because there's a contract out there that also

24    addresses the subject matter of the promise, the

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 346 of 1804   Page 471 of 1017   PageID 14098
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 343 of 1803   PageID 11089

70

1    promisee is, therefore, precluded from relying on that

2    promise, it just -- it doesn't hold water.  They

3    don't -- they didn't cite any cases.

4                We said it's not the law of Delaware

5    and never should be.  Highland shouldn't be allowed to

6    contract with Abrams & Bayliss and then use that

7    contract to say that a promise made to Daugherty that

8    Daugherty seeks to enforce, that is -- you know,

9    follows the terms of that contract but doesn't

10   expressly give any rights to Daugherty, that's just --

11   that's not an argument that the Court should accept,

12   in our view.  So that's why I say it's separate from

13   the contract.

14               And that also gets into the

15   alternative claim argument, too.  Are we entitled to

16   bring promissory estoppel and a fraudulent transfer

17   claim and an unjust enrichment claim?  I think the

18   *Chrysler* case in the Supreme Court settled that

19   question a long time ago.  And I think Rule 8 of this

20   court does, too.

21               So, of course, there's overlap in what

22   was promised and what's in the escrow.  Although, I

23   will point out, the escrow -- Mr. Katz said something

24   like -- he referred to a host of conditional

Appellee Appx. 00337

Appx. 00588

013150

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Exhibit   Page 345 of 1804   Page 472 of 1017   PageID 14099
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 344 of 1803   PageID 11090

71

 1   circumstances in the escrow agreement.  And I think

 2   his point was paragraph 5 and paragraph 10 that they

 3   had relied on when Abrams & Bayliss resigned.  Well,

 4   you won't find any of that in the promise that was

 5   made by Jim Dondero under oath to Pat Daugherty and

 6   the jury.  So whatever conditional circumstances may

 7   be in that contract, they're not in that promise.

 8                    And the notion that Jim Dondero was

 9   testifying in his individual capacity, I think we

10   debunked that in Exhibit A to our answering brief --

11   which was Highland's own witness list -- that provided

12   an entire paragraph of what Mr. Dondero would be

13   testifying about, including testimony in support of

14   Highland's and Cornerstone's claims against Daugherty

15   and the damages suffered and the third-party

16   defendants' defenses to claims asserted against them.

17                    So Jim Dondero is Highland.  He is

18   HERA.  He's HERA ERA management.  He controls them

19   all.  Mr. Katz pointed out that the closing argument

20   by HERA's lawyer in Texas was just HERA's lawyer.

21   Well, Jim Dondero controls HERA, just as he controls

22   Highland.  So I view that as a distinction without a

23   difference.

24                    But what that closing argument did was

Appellee Appx. 00338
Appx. 00589
013151

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 345 of 1804   Page 473 of 1017   PageID 14100
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 345 of 1803   PageID 11091

72

```
 1    reaffirm the promise -- I thought I had it here.  So
 2    what was said on closing argument by HERA's counsel,
 3    just after Jim Dondero made the promise, was "... if
 4    Pat Daugherty happens to prevail in his lawsuit
 5    against Lane, Patrick and HERA you heard Jim Dondero
 6    testify he gets his interest, which is currently
 7    escrowed in the third-party escrow account, all of
 8    it."
 9                    Then we had the other promise, which
10    was that September -- September of 2014, the Klos
11    affidavit.  It restated the promise.  This gets to the
12    reasonableness of the reliance of Daugherty's
13    promise -- the promise to Daugherty.  He kept hearing
14    this.
15                    And the idea that Daugherty should
16    have somehow foreseen in either the six weeks between
17    when Highland sprung the escrow agreement on him
18    before trial or when Dondero testified or when Klos
19    submitted his affidavit -- by the way, as the senior
20    finance of Highland Capital -- that Daugherty should
21    have foreseen two years from now when he went to pay
22    the judgment that Highland was going to break that
23    promise.
24                    So the idea that Daugherty should have
```

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1 of 25   Page 474 of 1017   PageID 14101
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 346 of 1803   PageID 11092

73

1    done something between December 2013 and December of

2    2016, I think entirely misses the point of our claim.

3    The reliance that we allege -- and it's paragraph 133

4    of our complaint -- is "In further reliance on the

5    promises of Highland Capital and its agents, on

6    December 14, 2016, nine days after Highland Capital

7    secretly obtained the Escrow funds, Daugherty wired

8    approximately $3.2 million in cash to Highland Capital

9    in satisfaction of its award of attorneys' fees in the

10   Texas Action."

11                   That was the reliance.  What could

12   have been done, other than a cash payment, Daugherty

13   could have just engaged in self-help.  He could have

14   paid the difference between the 2.6 and the 2.8 of the

15   judgments.  He could have not paid anything at all.

16   He at least should have had the chance to go to court

17   like the petitioner did in the *Bonham Bank* case that

18   we cite from Texas to explain to a judge why, under

19   these circumstances, even though there are three

20   different litigants involved, these claims should be

21   offset.  But he didn't even get that chance because he

22   relied on Highland's promises and he wired the full

23   amount.  They took away that chance from him.

24                   We don't have to prove today whether

Appellee Appx. 00340
Appx. 00591
013153

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 03/25/25   Page 475 of 1017   PageID 14102
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 347 of 1803   PageID 11093

74

1    he would have won on that setoff claim in Texas or

2    anywhere else.  We just have to prove that it's

3    reasonably conceivable that he was deprived of that

4    chance because he reasonably relied, to his detriment,

5    on a promise that was made under oath and repeated.

6                    In their opening brief, the defendants

7    stated that "Injustice can (and should) be avoided

8    through collection efforts in the Texas Action, which

9    Daugherty has not even attempted to pursue, making

10   this claim premature."

11                   I just wanted to point out, this was

12   in Exhibit B to Highland's own opening brief.  They

13   attached Mr. Daugherty's interrogatory responses.  And

14   if you look at Interrogatory 36 on page 25,

15   Mr. Daugherty stated that "... apart from filing this

16   action to collect his Texas judgment, he filed for a

17   writ of execution in Texas on July 7, 2017, which was

18   unsuccessful because Highland Capital claimed HERA had

19   no assets.  The return of service was dated

20   September 26, 2017."

21                   I think that's totally irrelevant to

22   the questions before the Court, but I wanted to point

23   out that Mr. Daugherty did, in fact, attempt some

24   collection efforts in Texas and those were

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 03/05/25   Page 476 of 1017   PageID 14103
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 348 of 1803   PageID 11094

75

1    unsuccessful.

2              I'd also like to point out that in

3    addition to being able to plead alternative claims,

4    this is one of those cases where injustice can only be

5    avoided through the enforcement of this promise,

6    notwithstanding the other claims out there.  The

7    injustice to be avoided is allowing Highland Capital

8    to walk away with both judgments from the Texas

9    action.  They got Daugherty's 3.2 million, and they

10   got his HERA assets.  And that's the injustice to be

11   avoided.

12             When you and Mr. Katz were discussing

13   this element, he referred to a fully integrated

14   contract.  Again, he would be the first to tell you,

15   I'm sure, that Daugherty has no rights under that

16   fully integrated contract.  So the fact that there is

17   a similar contract out there is not relevant to the

18   analysis.

19             That's all I have, Your Honor.

20             THE COURT:  Thank you.

21             MR. UEBLER:  Thank you.

22             MR. KATZ:  Your Honor, can I just

23   address a couple points?

24             THE COURT:  Yes.

Appellee Appx. 00342
013155
Appx. 00593

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/24   Page 477 of 1017   PageID 14104
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 349 of 1803   PageID 11095

76

1            MR. KATZ:  For clarity purposes,

2    Counsel -- this is the second time they've read the

3    statement from HERA's counsel during the closing

4    argument.  That was not part of the statements that

5    were alleged to be part of the detrimental reliance in

6    either the complaint or in the response to the motion

7    to dismiss.

8            And I think that's significant, again,

9    because Counsel is certainly correct that what they

10   say is that Daugherty would not have paid the judgment

11   against him by Highland.  But their explanation of

12   what that means is that he would have sought offset or

13   sought to invalidate the escrow agreement, both of

14   which could only have been done, been sought, during

15   trial.  I suspect that's why they are not relying on

16   the statement that was made at closing argument where

17   it would have been too late for them to make those

18   allegations.

19           Highland had a judgment, a fully

20   perfected final judgment, collectible judgment that

21   Mr. Daugherty paid.  And from the motion to dismiss

22   perspective, claiming that he would have filed either

23   or both of two things that were barred by *res judicata*

24   does not provide the basis to avoid -- where there's a

Appellee Appx. 00343
Appx. 00594
013156

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1186   Filed 06/25/1804   Page 478 of 1017   PageID 14105
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 350 of 1803   PageID 11096

77

1    reasonably conceivable set of circumstances that those

2    allegations could support to avoid a motion to

3    dismiss.

4              And, again, we're really just talking

5    about Jim Dondero's statement because, as Counsel

6    recognized, the Klos statement was made, I believe,

7    roughly five months after the -- four or five months

8    after the final judgment was entered.

9              And then, finally, lastly, I just want

10   to touch on the escrow agreement.  Of course we

11   recognize Mr. Daugherty is not a party to that

12   agreement.  But Mr. Daugherty's case is that he is

13   asserting rights under that escrow agreement.  He is

14   certainly saying that there was a transfer under that

15   agreement and that that agreement required the assets,

16   the money being held pursuant to that escrow

17   agreement, to go to HERA, which then Mr. Daugherty as

18   the shareholder of HERA would have had rights to.

19             And, you know, we disagree with some

20   of the underlying factual basis.  We don't agree that

21   there was a transfer.  But I think counsel for

22   Mr. Daugherty would certainly not say that there's not

23   a fully enforceable promise in that escrow agreement

24   that they are seeking relief under.

Appellee Appx. 00344
Appx. 00595
013157

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/25/25    Page 479 of 1017    PageID 14106
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 351 of 1803    PageID 11097

78

```
 1                   And that's -- and just as importantly,
 2    Mr. Dondero's statement was exclusively an
 3    interpretation of that promise.  And that's why -- and
 4    I think that's exactly what the TrueBlue case is
 5    referring to.  And there's a fully integrated contract
 6    that has the promise that legally and factually
 7    determines what the rights under that contract are.
 8                   And Mr. Dondero's interpretation of
 9    that contract -- even if it's the exact same as the
10    contract or even if it's different than the
11    contract -- doesn't change that the claim is pursuant
12    to the contract and not for promissory estoppel.
13                   THE COURT:  What is your understanding
14    of Mr. Daugherty's ability to sue to enforce the
15    escrow agreement in a way that benefits him?
16                   MR. KATZ:  Well, he is a shareholder
17    of HERA.  And as a shareholder of HERA -- I mean, I'd
18    have to think through all the res judicata, collateral
19    estoppel, statute of limitations issues that all have
20    come out about all the issues that have been
21    litigated.
22                   THE COURT:  I just mean from the terms
23    of the contract.
24                   MR. KATZ:  I don't believe that
```

Appellee Appx. 00345
Appx. 00596
013158

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 03/30/25   Page 480 of 1017   PageID 14107
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 352 of 1803   PageID 11098

79

1    Mr. Daugherty is a third-party beneficiary of the

2    contract, if that's Your Honor's question.  He's

3    certainly not a direct party to the contract, but he

4    is a shareholder of HERA.  And their allegations are

5    that Highland was contractually obligated to send

6    money to HERA under that agreement.

7                    I think there are potentially

8    technical legal issues under that.  That's, of course,

9    not the claim that Mr. Daugherty has brought.  And --

10   but if Mr. Daugherty had any rights, it would be

11   through HERA.

12                   THE COURT:  So is it your

13   understanding that the point of the doctrine that

14   you're relying on, that there can't be both a contract

15   and a claim for promissory estoppel, is that those

16   rights substantially overlap?

17                   MR. KATZ:  I would suspect that's

18   probably the policy reason behind those decisions.

19                   THE COURT:  So if Mr. Daugherty

20   doesn't have contractual rights under the escrow

21   agreement, why does that knock out his promissory

22   estoppel claim?

23                   MR. KATZ:  Because it's the same --

24   because whatever rights he has under the contract,

Appellee Appx. 00346
Appx. 00587
013159

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 57/06/25   Page 481 of 1017   PageID 14108
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 353 of 1803   PageID 11099

80

1    whether he has rights or not, are no different than

2    any rights he would have vis-a-vis Mr. Dondero's

3    interpretation of what that contract said, what that

4    contractual language says.

5                    THE COURT:  Go ahead.

6                    MR. KATZ:  I think that the policy is

7    is not to create quasi-contractual claims when there

8    is a contract, regardless of who's the party to the

9    contract.

10                   And, actually, I think it's even --

11   there's no wiggle room around this situation because

12   it's not -- Mr. Dondero was -- I mean, I think the

13   quote was, "They go to Mr. Daugherty through HERA" is

14   the quote.  He wasn't saying something -- there's not

15   been an allegation, for example, that Mr. Dondero's

16   statement or Mr. Klos' statement created a separate

17   contract between Mr. Dondero or Mr. Daugherty.

18                   I mean -- and that's not what -- I

19   mean, there hasn't been an allegation that that's what

20   they were saying -- that Mr. Dondero was saying that

21   or Mr. Klos was saying that.  The allegation is they

22   were saying that's what the contract, the escrow

23   agreement, means.  And that's why you can't have a

24   separate claim, because the contract means what it is

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/21/84   Page 482 of 1017   PageID 14109
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 354 of 1803   PageID 11100

81

```
 1   and the contract determines the rights.
 2                   THE COURT:  I understand.
 3                   MR. KATZ:  Thank you, Your Honor.
 4                   THE COURT:  Thank you.
 5                   MR. UEBLER:  May I, briefly?
 6                   THE COURT:  Briefly.
 7                   MR. UEBLER:  Just to be clear, Your
 8   Honor, we very much rely on the Klos statement as a
 9   separate promise on behalf of Highland in the
10   affidavit.  We think it also supports the
11   reasonableness of the reliance on Mr. Dondero's
12   promise on behalf of Highland.  But we view the Klos
13   affidavit as part of the promise generally.
14                   With respect to the closing argument
15   by HERA, we didn't use it sooner because we just --
16   actually, I have to give credit where credit is due --
17   my colleague, Mr. Christensen just found it.  We
18   didn't try the Texas case, so we did find it in the
19   record.
20                   And fortunately for us, Highland
21   agrees on pages 13 and 14 of their own motion to
22   dismiss that the Court can "[consider] additional
23   materials from related litigation that were not
24   attached to the complaint if the plaintiff relied on
```

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 05/05/25   Page 483 of 1017   PageID 14110
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 355 of 1803   PageID 11101

82

```
1    those materials in casting his complaint, as Daugherty

2    has done with regard to the Texas Action."

3                    The last paragraph on page 14 goes on

4    to say, "To the extent the Court finds that the Texas

5    Action materials are not already subject to

6    consideration based on Daugherty's extensive reliance

7    on them, Defendants respectfully request that the

8    Court take judicial notice of the documents under

9    Delaware Rule of Evidence 202(d)(2)."

10                   So we submit that the Court certainly

11   can consider the trial transcript from the Texas

12   action as further support for the reasonableness of

13   Mr. Daugherty's reliance.

14                   And my final point with respect to the

15   escrow agreement and the notion -- I think that what

16   Mr. Katz said is that Daugherty, in his view, has no

17   direct rights under that agreement.  The only real

18   direct relevance of the escrow agreement with respect

19   to the promissory estoppel claim is that it's even

20   more evidence of the reasonableness of Mr. Daugherty's

21   reliance on the promise because it's consistent with

22   that promise.

23                   Thank you, Your Honor.

24                   THE COURT:  Thank you.
```

Appellee Appx. 00349
Appx. 00609
013162

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1136   Filed 05/06/25   Page 484 of 1017   PageID 14111
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 356 of 1803   PageID 11102

83

1               Anything to -- Mr. Katz, I'll give you
2     the last word.
3               MR. KATZ:  No, Your Honor.
4               Just to address Counsel's last point
5     about just finding the statement.  You know, again, I
6     think that the issue is what did Mr. Daugherty
7     actually rely on.  Their claim is that when he wired
8     $3.2 million -- not what statements Counsel has found
9     in the record recently that could be retroactively
10    applied that way.
11              And Counsel's -- again, the complaint
12    that is in front of Your Honor that has the
13    allegations rely on the two statements and is very
14    clear that -- it is explained in their briefing --
15    that the remedies -- that the detrimental reliance was
16    forbearance from taking action in the Texas lawsuit.
17              So anything that occurred anytime
18    after they could raise issues in a Texas lawsuit could
19    not have been a basis for detrimental reliance.
20              THE COURT:  Thank you.
21              I'm going to take a recess.  It will
22    be at least 20 minutes.  So stretch your legs, do
23    whatever.  It'll probably be longer than that.  But --
24    thanks for your patience, but it's faster this way in

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit    Page 485 of 1017    PageID 14112
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 357 of 1803    PageID 11103

84

1    the short term.

2                        So we are in recess.

3        (Recess taken from 3:35 p.m. until 4:18 p.m.)

4                        THE COURT:  Thank you for your

5    patience.

6                        I'm going to start with the motion for

7    a status quo order.  It is denied.  We have some time

8    constraints this afternoon, so I will cut to the

9    chase.  Daugherty has not established a threat of

10   imminent irreparable harm as he must.  It is clear

11   that Daugherty is pursuing this relief now based on

12   what happened in the *Redeemer* case.  This complaint

13   was filed in July 2017, and he did not seek the relief

14   that he's now seeking until after the papers on the

15   status quo order dispute were filed in the *Redeemer*

16   case.  And Daugherty cites Highland's submissions in

17   that case in his brief.

18                       I disagree with Daugherty's reading of

19   the *Redeemer* papers as indicating that Highland is in

20   "severe financial distress" and is "unable to satisfy"

21   the arbitration judgment at issue there.  And the

22   facts are very different as between the two cases.

23   Before going to arbitration, there were issues

24   involving control over assets that led to Highland

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1186   Filed 06/25/1804   Page 486 of 1017   PageID 14113
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 358 of 1803   PageID 11104

85

1    making representations to the Court in the *Redeemer*

2    case.  And in the more recent request for a status quo

3    order related to confirming an arbitration judgment,

4    there was no separate claim that this court needed to

5    adjudicate, like Daugherty's fraudulent transfer claim

6    here.

7              And, finally, the *Redeemer* parties

8    ultimately stipulated to a status quo order.  So I

9    don't think that anything that this court did in

10   entering the agreed-upon status quo order is helpful

11   in deciding whether to issue one in this case.

12             Daugherty says that Highland has a

13   pattern of avoiding judgments, but has given me no

14   reason to think that Highland is going to do something

15   between now and a post-trial opinion that would make

16   it incapable of satisfying a judgment, nor is there

17   anything in the *Redeemer* case that leads me to believe

18   that.

19             Quite frankly, if Highland is as good

20   at avoiding judgments as Daugherty claims, Highland

21   would have already moved the assets.  Daugherty, in

22   his reply, touches on that point and raises concerns

23   about whether the assets have already been

24   transferred.  He used a metaphor about the straw

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 360 of 1804   Page 487 of 1017   PageID 14114
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 359 of 1803   PageID 11105

86

1    breaking the camel's back.  I'm going to use a

2    different ungulate.  He's provided no reason to

3    believe the horse is not already out of the barn or

4    that the horse is going to imminently flee the barn.

5                   So I fully appreciate that Daugherty

6    says that this is what happened to him in Texas, and

7    I've indicated before that I agree with Vice

8    Chancellor Glasscock's sentiment that what happened

9    here fails more than the smell test.  But that doesn't

10   mean that there is a sufficient imminent threat that

11   it's going to happen here with Highland.

12                   I also distinguish this case from Vice

13   Chancellor Glasscock's entry of a status quo order in

14   the *Trussway* matter, which admittedly was, in part,

15   based on Highland's "prior history."  In that ruling,

16   Vice Chancellor Glasscock noted the unique appraisal

17   remedy that was at issue there, and distinguished that

18   property right -- which is meant to substitute for a

19   stockholder's ability to insist on unanimity in a

20   merger -- from recovery in a tort or contract case.

21   Daugherty is seeking the more common sort of recovery

22   here, so I do not find *Trussway* instructive.

23                   So, in sum, because Daugherty's motion

24   for a status quo order is based on a recent

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-116   Filed 06/02/25   Page 488 of 1017   PageID 14115
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 360 of 1803   PageID 11106

87

```
 1    development that does not support a conclusion that
 2    Daugherty faces imminent irreparable harm, the motion
 3    for a status quo order is denied.
 4              Mr. Christensen, do you have any
 5    questions about that?
 6              MR. CHRISTENSEN:  No, I do not.
 7              THE COURT:  Okay.  Anything from DLA?
 8              MR. KATZ:  No, Your Honor.
 9              THE COURT:  Thank you.
10              Moving on to the motion to dismiss.
11    Highland's motion to dismiss Count IX of the amended
12    complaint is denied.  Count IX is a claim for a
13    promissory estoppel.  And to state a claim for
14    promissory estoppel, a plaintiff must plead four
15    elements.
16              The first is that a promise was made.
17    The second is that it was the reasonable expectation
18    of the promisor to induce action or forbearance on the
19    part of the promisee.  The third is the promisee
20    reasonably relied on the promise and took action to
21    his detriment.  The fourth is that the promise is
22    binding because injustice can be avoided only by
23    enforcement of the promise.  That's all from the
24    Chrysler case out of the Supreme Court in 2003.
```

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 6   Filed 06/25/04   Page 489 of 1017   PageID 14116
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 361 of 1803   PageID 11107

88

1          On Highland's motion to dismiss, I
2    applied a reasonable conceivability standard of
3    Rule 12(b)(6).  Under that standard, I must accept all
4    well-pleaded factual allegations as true, accept even
5    vague allegations in the complaint as well-pleaded if
6    they provide the defendant notice, draw all reasonable
7    inferences in favor of the plaintiff, and deny the
8    motion unless the plaintiff could not recover under
9    any reasonably conceivable set of circumstances
10   susceptible of proof.  That familiar standard is from
11   *Century Mortgage Company v. Morgan Stanley.*
12          Applying this standard, plaintiff has
13   adequately pled the four elements.  First, Highland
14   made promises through representations it and its
15   agents made in the Texas action.  Highland, through
16   testimony, explained that Daugherty would receive the
17   escrowed assets upon a judgment being finalized.
18          Daugherty cites testimony from James
19   Dondero, Highland's cofounder and president.  On
20   direct examination, Dondero was asked what would
21   happen to Daugherty's interest that was being held in
22   escrow, and Dondero stated that it would go to
23   Daugherty via HERA if he won.  This testimony is cited
24   in paragraphs 43 and 129 of the complaint.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11 6   Filed 03/25/804 Page 490 of 1017   PageID 14117
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 362 of 1803   PageID 11108

89

1            Highland tries to distance itself from

2    Dondero, but it cannot do so at this stage.  Highland

3    says Dondero was testifying in a personal capacity.

4    But the witness list Highland filed in the Texas

5    action shows that is not the case.  That is Exhibit A

6    to Daugherty's answering brief.  Highland had no

7    response to this in its reply brief, beyond

8    reiterating its original argument that Dondero was not

9    speaking on Highland's behalf.

10            Based on the allegations of the

11   complaint, including Dondero's role, it is reasonably

12   conceivable he was speaking on behalf of Highland.

13            Other support for the alleged promise

14   comes from an affidavit attached as Exhibit I to the

15   complaint from David Klos.  Klos submitted the

16   affidavit and stated he had "... personal knowledge of

17   the facts stated in this affidavit as the Senior

18   Manager of Finance for Highland Capital ..." and

19   because he oversaw accounting relating to HERA.  Klos

20   reiterated in his affidavit what the escrow agreement

21   says, and Dondero testified to, which is that after a

22   final nonappealable judgment, A&B, as the escrow

23   agent, would transfer the deposit assets to HERA.

24            Highland also tries to distance itself

Appellee Appx. 00356
Appx. 00607
013169

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 08/26/25   Page 491 of 1017   PageID 14118
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 363 of 1803   PageID 11109

90

1   from Klos.  And it cannot do so, as the document

2   presented to the Texas court states Klos was providing

3   the affidavit in his capacity as Highland's Senior

4   Manager of Finance.  At this stage, that is

5   sufficient.

6               Together, these allegations are

7   sufficient to establish that Highland made a promise

8   that the assets would be held in escrow and released

9   to Daugherty, via HERA, if Daugherty won in Texas.

10              Second, the reasonable expectation of

11  Highland as the promisor was to induce action or

12  forbearance on the part of Daugherty as promisee.

13              In briefing, Highland says the

14  statements were not directed to Daugherty, "... but

15  rather [to] the jury, the judge, legal counsel, the

16  public, and so forth."  That's a quote from page 20 of

17  Highland's reply.  It simply makes no sense to say

18  that the statements were directed to everyone else

19  involved in the legal proceeding -- indeed, in the

20  world by virtue of including "the public" -- but not

21  Daugherty, who had the greatest interest in that

22  proceeding.  It is reasonably conceivable the

23  reasonable expectation of someone discussing the

24  escrow agreement, as Highland did, would have been to

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/05/25   Page 492 of 1017   PageID 14119
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 364 of 1803   PageID 11110

91

1   induce action or forbearance by their adversary in the

2   litigation.

3                Third, it is reasonably conceivable

4   that Daugherty reasonably relied on the promise and

5   took action to his detriment.

6                Daugherty could have pursued other

7   strategies if the escrow was not in place.  Daugherty

8   paid a judgment in the same case to Highland, which he

9   alleges was in the amount of $3.2 million.  If

10  Daugherty knew what would happen with the escrow, he

11  could have fought tooth and nail for an offset of the

12  judgment amounts.

13               Highland focuses on the availability

14  of a triangular offset in this situation, asserting

15  that even if HERA owed Daugherty money, Daugherty was

16  legally unable to offset the judgment he owed Highland

17  by what he was owed from HERA.  I think that misses

18  the point, which is that Daugherty forewent even

19  trying to obtain the offset, and bringing the issue to

20  the attention of the Texas court.

21               He could have argued for other

22  provisions in the final judgment, but he didn't.  He

23  paid his judgment and expected HERA and Highland would

24  do the same as set forth in the escrow agreement.

Appellee Appx. 00358
Appx. 06809
013171

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 16   Filed 06/05/25 04 Page 493 of 1017   PageID 14120
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 365 of 1803   PageID 11111

92

1          Other members of this court have

2   adopted a "no-chumps policy," meaning that good guys

3   should not feel like chumps for following the rules.

4   Daugherty played the game straight, and alleges

5   Highland and HERA didn't.  It is at least reasonably

6   conceivable that Daugherty pursued the strategy he did

7   because of the promises Highland made during the

8   course of the litigation.

9          And that reliance was reasonable.

10  Highland says Daugherty should have expected the worst

11  because the language of the escrow agreement allowed

12  the escrow agent to resign at any time, and so it was

13  never a sure thing that the assets would be available

14  to Daugherty.

15          In its reply, Highland says there was

16  never any promise "... that the Escrow Agreement would

17  never be terminated or that the Deposit Assets would

18  never be transferred back to Highland ...."  That

19  reflects a dim view of the world, the way adversaries

20  should evaluate the representations and promises made

21  during litigation, and how the people making those

22  promises should conduct themselves.  Daugherty has

23  adequately pled it was reasonable for him to rely on

24  the statements he's identified.

Appellee Appx. 00359
Appx. 00819
013172

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 07/02/25   Page 494 of 1017   PageID 14121
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 366 of 1803   PageID 11112

93

1          Fourth and finally, it is reasonably

2     conceivable that the promise is binding because

3     injustice can be avoided only by enforcement of the

4     promise.

5          Daugherty has made the point that

6     Highland walked away from the Texas litigation with

7     the benefit of both judgments.  It received the assets

8     supposedly held in escrow to satisfy the judgment for

9     Daugherty, and it received payment from Daugherty to

10    satisfy the judgment against him.

11         Black's Law Dictionary defines

12    "injustice" as "an unjust state of affairs;

13    unfairness."  As myself and Vice Chancellor Glasscock

14    have indicated, Daugherty's allegations raise serious

15    concerns over the fairness of how things played out in

16    Texas.  It may be that the only way to avoid injustice

17    is to enforce the promises.

18         It is not fatal to Daugherty that he

19    has pled alternative theories of relief.  Our Rule 8

20    allows it, and our Supreme Court has blessed doing so

21    for promissory estoppel in the *Chrysler v. Chaplake*

22    *Holdings* case.  At the pleadings stage, those

23    alternative theories of relief can go forward.

24         Highland also claims promissory

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 06/25/1804   Page 495 of 1017   PageID 14122
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 367 of 1803   PageID 11113

94

1  estoppel is not needed to prevent injustice because

2  the alleged promises are incorporated within the

3  escrow agreement, an enforceable contract.  But

4  Daugherty is not a party or a third-party beneficiary,

5  and so cannot sue under the contract's terms.  For

6  those reasons, the motion to dismiss is denied.

7                    Mr. Katz, any questions?

8                    MR. KATZ:  No, Your Honor.

9                    THE COURT:  Anything from you,

10  Mr. Uebler?

11                    MR. UEBLER:  No, Your Honor.

12                    THE COURT:  I'd like to, then, talk

13  about how we're going to get the summary judgment

14  briefing done in time for trial and in time for me to

15  have a minute to think about it.

16                    MR. KATZ:  Your Honor, we conferred --

17  my colleague conferred with Mr. Uebler this morning.

18  I think we've worked out a schedule.

19                    THE COURT:  How long does that

20  schedule leave me to think about it?

21                    MR. UEBLER:  Let me take a stab at

22  this, Your Honor, and see if it makes any sense to

23  you.  So it's my understanding that the defendants are

24  going to cross-move, or Highland -- it's a claim

Appellee Appx. 00361
Appx. 06812
013174

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 06/25/24   Page 496 of 1017   PageID 14123
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 368 of 1803   PageID 11114

95

1    against Highland.  Highland will cross-move for

2    summary judgment, and we will receive an answering

3    brief/opening brief by June 14th.  We'll reply by

4    June 28th.  And then looks like July 17th will be the

5    final brief.

6                    And I'm sure I speak for all the

7    parties when I say we have no intention of imposing a

8    burden on the Court to resolve that motion prior to

9    trial.  I think -- at least my view, and Mr. Katz and

10   Mr. Reed can chime in -- we don't necessarily need to

11   resolve the summary judgment/indemnification claim

12   before trial because there's really not that much, if

13   any, issue of fact to try regarding indemnification.

14                   I would propose that we resolve on the

15   papers, when the Court's able to do so, the issue of

16   entitlement.  And then, to the extent there's an issue

17   of allocation or reasonableness, we can get together

18   and propose something similar to Vice Chancellor

19   Laster's *Fitracks* opinion.  That was an advancement

20   case, but I would envision something similar here.

21                   So we're working in parallel and not

22   burdening anybody prior to trial on those issues.

23                   THE COURT:  Anything to add?

24                   MR. KATZ:  No, Your Honor.

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 07/06/25   Page 497 of 1017   PageID 14124
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 369 of 1803   PageID 11115

96

```
1                    THE COURT:  All right.  That works for
2   me, then, especially with the logical conclusion that
3   this can just kind of float in parallel to the real
4   merits issues to be handled at trial.
5                    Anything else that we need to discuss
6   today while we're all together?
7                    MR. KATZ:  Not from our side.
8                    THE COURT:  We pretty much handled
9   every aspect of the case today.  Thank you, all, for
10  your presentations, they were helpful.  And we'll be
11  in touch.
12                   We're adjourned.
13                   (Court adjourned at 4:33 p.m.)
14                           - - -
15
16
17
18
19
20
21
22
23
24
```

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/04   Page 498 of 1017   PageID 14125
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 370 of 1803   PageID 11116

97

<u>CERTIFICATE</u>

1

2

3            I, KAREN L. SIEDLECKI, Official Court

4   Reporter for the Court of Chancery of the State of

5   Delaware, Registered Merit Reporter, and Certified

6   Realtime Reporter, do hereby certify that the

7   foregoing pages numbered 3 through 96 contain a true

8   and correct transcription of the proceedings as

9   stenographically reported by me at the hearing in the

10  above cause before the Vice Chancellor of the State of

11  Delaware, on the date therein indicated, except for

12  the rulings at pages 3 through 19 and 84 through 94

13  which were revised by the Vice Chancellor.

14            IN WITNESS WHEREOF I have hereunto set

15  my hand at Wilmington, this 22nd day of May, 2019.

16

17

18

19            /s/ Karen L. Siedlecki

20    ----------------------------
         Karen L. Siedlecki
21      Official Court Reporter
       Registered Merit Reporter
22     Certified Realtime Reporter

23

24

CHANCERY COURT REPORTERS

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 07/26/25    Page 499 of 1017    PageID 14126
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 371 of 1803    PageID 11117

# APPENDIX 5

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-6    Filed 07/06/25    Page 500 of 1017    PageID 14127
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 372 of 1803    PageID 11118

EFiled: Jul 08 2019 04:21PM EDT
Transaction ID 63518449
Case No. 2017-0488-MTZ

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PATRICK DAUGHERTY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2017-0488-MTZ |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, | ) | |
| L.P., HIGHLAND EMPLOYEE | ) | |
| RETENTION ASSETS LLC, | ) | |
| HIGHLAND ERA MANAGEMENT LLC, | ) | |
| and JAMES DONDERO, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| HIGHLAND EMPLOYEE | ) | |
| RETENTION ASSETS LLC, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

### ORDER DENYING APPLICATION TO
### CERTIFY INTERLOCUTORY APPEAL

WHEREAS:

A.    Plaintiff Patrick Daugherty was a partner and senior executive of Defendant Highland Capital and certain of its affiliates from 1998 until his resignation in 2011.

B.    Highland sued Daugherty in Texas, and Daugherty countered with claims against Highland and Highland Employee Retention Assets LLC ("HERA") (the "Texas Action").

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 37/06/25804    Page 501 of 1017    PageID 14128
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 373 of 1803    PageID 11119

C.    During the course of the Texas Action, Defendants represented to the Texas court that Highland had placed Daugherty's HERA interests, worth approximately $3.1 million, in escrow with Abrams & Bayliss LLP as escrow agent.

D.    Highland received a judgment against Daugherty, and Daugherty received a judgment against HERA.  Daugherty paid the judgment against him. HERA did not pay the judgment against it.  The day after the Texas judgment became final and non-appealable, Abrams & Bayliss resigned as escrow agent and transferred the escrow assets it held back to Highland.  HERA claimed to have no assets to satisfy a judgment.

E.    Daugherty responded by filing his complaint in this action on July 6, 2017.  Vice Chancellor Glasscock, who previously presided over this case, dismissed some of Daugherty's claims.  Daugherty then filed his first amended complaint.  The case was reassigned to me in October 2018.  After Daugherty filed his second amended complaint, I denied a motion to dismiss.  The surviving claims are for fraudulent transfer, unjust enrichment, and indemnification.

F.    On February 2, 2018, Daugherty served a subpoena on Abrams & Bayliss.[1]  Defendants moved to quash the subpoena "in its entirety given the privileged and sensitive nature of the information requested and Daugherty's

---

[1] D.I. 52.

2

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Page 375 of 1804   Page 502 of 1017   PageID 14129
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 374 of 1803   PageID 11120

failure to demonstrate relevance to this lawsuit."[2]   Vice Chancellor Glasscock
heard the motion to quash.   He started the argument by stating "general
principles":

> First, information regarding the actions of Abrams & Bayliss in
> connection with its operation of the escrow as agents of Highlands,
> HERA, those documents, that information is relevant, and it doesn't
> appear to me to be generally privileged. Second, to the extent the
> subpoena requests attorney client privilege material, I'm going to need
> a privilege log to decide issues of privilege, waiver, and common
> interest doctrine. Third, it is appropriate to seek discovery from the
> escrow agent as well as from the defendants.  Fourth, the subpoena in
> question is overbroad as it seeks information far beyond Abrams &
> Bayliss' documents as escrow agents, and I'm not going to require a
> third party to answer overbroad discovery requests that surely
> implicate attorney-client privilege.  Fifth, I am therefore disposed to
> quash the subpoena with leave to file a more narrow subpoena. And
> once that subpoena is issued, there needs to be a meaningful meet and
> confer as to what is producible and what is not so that the disputes that
> come to me are tailored to the discoverability of the documents and
> any privilege that may apply.[3]

G.     Daugherty again subpoenaed Abrams & Bayliss, which produced 285
documents.   Daugherty and Abrams & Bayliss met and conferred.   Defendants
asserted more than 300 documents were privileged.

H.     Daugherty challenged Defendants' privilege assertions by moving to
compel (the "Motion").   Daugherty challenged whether documents relating to
Abrams & Bayliss's work as escrow agent were properly withheld, and argued the

---

[2] D.I. 61 ¶ 2.

[3] D.I. 97 at 3-4.

Appellee Appx. 00368
Appx. 00619
013181

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/24   Page 503 of 1017   PageID 14130
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 375 of 1803   PageID 11121

crime-fraud exception vitiated any proper assertion of privilege.  I heard argument

on April 12.[4]  The hearing was not productive as Defendants could not articulate

the scope of their claimed privilege.  I gave Highland yet another chance to defend

its privilege and reconsider its privilege log, and specifically requested Abrams &

Bayliss's engagement letter and billing records.  I also requested to review the

withheld documents *in camera*.[5]

I.      After receiving and reviewing the documents on the Defendants'

privilege log *in camera*, I granted the Motion (the "Motion to Compel Ruling").

The privilege log was organized chronologically, and the withheld documents fell

into four categories.  The first comprised documents regarding the initiation,

negotiation, and establishment of Abrams & Bayliss as Highland's escrow agent.

The second comprised Abrams & Bayliss's legal work during the pendency of the

Texas action to determine whether and how Daugherty might access the escrowed

assets.  The third category comprised Abrams & Bayliss's work responding to a

subpoena in Texas.  And the fourth comprised documents regarding Abrams &

Bayliss's resignation as Highland's escrow agent.

J.      For reasons set forth at length in the Motion to Compel Ruling, I

concluded that "unfortunately my *in camera* review confirmed Daugherty's fear

---

[4] D.I. 181.

[5] D.I. 181 at 37-38.

4

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-6    Filed 07/02/25    Page 504 of 1017    PageID 14131
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 376 of 1803   PageID 11122

that Highland is improperly withholding documents in categories 1 and 4 illustrating A&B's service and resignation as escrow agent, which are nonprivileged materials."[6]   I decided any privilege related to the topics in categories 1 and 4 was waived, but stopped short of a broader waiver.[7] Additionally, I concluded that even assuming categories 1 and 4 were privileged, the crime fraud exception applied to categories 1, 2 and 4.[8]

K.   On May 24, 2019, Defendants moved for reargument.[9]   On June 3, Defendants moved to stay the implementation of the Ruling pending interlocutory appeal.   On June 17, I denied Defendants' motion for reargument and declined to stay the decision pending interlocutory appeal (the "Reargument Ruling" and together with the "Motion to Compel Ruling," the "Rulings").[10]   I ordered the parties to agree upon a framework under Delaware Rule of Evidence 510(f) to govern discovery under the Rulings, which was entered on June 27.

---

[6] D.I. 218 at 4.

[7] *Id*. at 10 ("Because Highland stuck by its position and continued to assert such a large percentage of improper privilege assertions while claiming it was producing documents concerning A&B's role as escrow agent, any privilege related to that topic is waived, and a full waiver of Highland's privilege could be an appropriate consequence. … I conclude Highland's unjustified withholding of other documents related to the escrow was not so egregious as to waive any privilege over these two sets of documents.").

[8] *Id*. at 10-15.

[9] D.I. 211.

[10] D.I. 253 (unredacted, filed under seal); D.I. 254 (redacted).

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 07/06/25    Page 505 of 1017    PageID 14132
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 377 of 1803    PageID 11123

L.      On June 17, Defendants applied for certification of an interlocutory appeal of the Rulings (the "Application").[11]   Defendants identified three issues for certification:

> 1.      Can Delaware courts apply the crime-fraud exception to destroy both attorney-client privilege and work-product protection without sufficient prima facie evidence that a party committed or attempted a fraud?
>
> 2.      Can Delaware courts apply the crime-fraud exception to destroy both attorney-client privilege and work-product protection with respect to communications years before an alleged fraudulent transfer and without specific findings that each communication at issue was made in furtherance of the alleged fraud?
>
> 3.      Can the Court impose a waiver of privilege as punishment from a party's good faith, but ultimately incorrect, assertion of privilege?[12]

M.      Plaintiff filed his opposition to the Application on June 27.

N.      Under Supreme Court Rule 42(b), there are to be no interlocutory appeals "unless the order of the trial court decides a substantial issue of material importance that merits appellate review before a final judgment."[13]

O.      "If the 'substantial issue' requirement is met, this Court will then analyze whether 'there are substantial benefits that will outweigh the certain costs

---

[11] D.I. 231.

[12] D.I. 231 at 5.

[13] Supr. Ct. R. 42(b)(i).

6

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Page 1379 of 1804   Page 506 of 1017   PageID 14133
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 378 of 1803   PageID 11124

that accompany an interlocutory appeal.'"[14]  Under Supreme Court Rule 42(b)(iii)

the Court weighs the following factors along with "its own assessment of the most

efficient and just schedule to resolve the case":

> (A) The interlocutory order involves a question of law resolved for the first time in this State; (B) The decisions of the trial courts are conflicting upon the question of law; (C) The question of law relates to the constitutionality, construction, or application of a statute of this State, which has not been, but should be, settled by this Court in advance of an appeal from a final order; (D) The interlocutory order has sustained the controverted jurisdiction of the trial court; (E) The interlocutory order has reversed or set aside a prior decision of the trial court, a jury, or an administrative agency from which an appeal was taken to the trial court which had decided a significant issue and a review of the interlocutory order may terminate the litigation, substantially reduce further litigation, or otherwise serve considerations of justice; (F) The interlocutory order has vacated or opened a judgment of the trial court; (G) Review of the interlocutory order may terminate the litigation; or (H) Review of the interlocutory order may serve considerations of justice.

P.      "If the balance is uncertain, the trial court should refuse to certify the

interlocutory appeal."[15]

**IT IS ORDERED**, this 8th day of July, 2019, that the Application is

DENIED based on the following:

1.      The Rulings did not decide "a substantial issue of material importance

that merits appellate review before a final judgment."[16]  "The 'substantial issue'

---

[14] *Sider v. Hertz Glob. Hldgs., Inc.*, 2019 WL 2501481, at *4 (Del. Ch. June 17, 2019) (quoting Supr. Ct. R. 42(b)(ii)).

[15] Supr. Ct. R. 42(b)(iii).

Appellee Appx. 00372
Appx. 00623
013185

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 06/25/1804   Page 507 of 1017   PageID 14134
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 379 of 1803   PageID 11125

requirement is met when an interlocutory order decides a main question of law which relates to the merits of the case, and not to collateral matters."[17]  "Generally speaking, the substantive element of the appealability of an interlocutory order must relate to the merits of the case, not to matters of discovery."[18]   That "proscription against interlocutory review of discovery rulings 'does not change merely because the discovery/disclosure order implicates the attorney-client privilege.'"[19]   The Rulings decided the application and waiver of the attorney-client and work product privileges, not a main issue on the merits.  The Rulings did not decide a substantial issue of material importance that warrants appellate review before a final judgment.

    2.    Highland argues that it is not seeking "appellate review simply so that an appellate court can re-review each communication at issue and evaluate the privilege determinations made. . . . What [it] seeks is different.  It challenges the

---

[16] Supr. Ct. R. 42(b)(i).

[17] *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2861717, at *1 (Del. Ch. July 22, 2008).

[18] *In re Examworks Grp., Inc.*, 2018 WL 1672991, at *2 (Del. Ch. Apr. 05, 2018) (ORDER) (quoting *Castaldo v. Pittsburgh-Des Moines Steel Co.*, 301 A.2d 87, 87 (Del. 1973)); *accord Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 1993 WL 478084, at *1 (Del. Nov. 16, 1993) (ORDER); *see also Deloitte LLP v. Klig*, 2010 WL 3736141, at *1 (Del. Sept. 27, 2010) (ORDER) (refusing interlocutory appeal of order finding waiver of privilege).

[19] *Certain Underwriters at Lloyd's, London v. Monsanto Co.*, 1991 WL 134471, at *1 (Del. June 7, 1991) (ORDER) (citations omitted) (quoting *In re Rinehardt*, 575 A.2d 1079, 1081 (Del. 1990)).

Appellee Appx. 00373
Appx. 00524
013186

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/804   Page 508 of 1017   PageID 14135
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 380 of 1803   PageID 11126

Order's _legal conclusions_ that will reverberate throughout this action."[20]  This is a

distinction without a difference.  Whether a party properly asserted a privilege, or

whether an exception to the privilege applies, is a legal conclusion.  The question

is whether it is the type of legal conclusion that warrants interlocutory review.  It is

not.

3.     Turning to the factors underpinning whether there are substantial

benefits that will outweigh the costs of interlocutory appeal, Highland identifies

only Supreme Court Rule 42(b)(iii)(B) and (H) as favoring its Application.  I

therefore "limit[] my review principally to those" issues.[21]  In short, the high costs

of piecemeal litigation and interlocutory appeals outweigh the value of this

Application.  This is particularly true here where trial will start on September 10

and there are other ongoing discovery disputes requiring the parties' attention.[22]

4.     The Rulings do not conflict with decisions of other trial courts.[23]

Defendants have not identified any Delaware decision at odds with the Rulings on

the crime-fraud exception.  Defendants cite authorities, such as _Buttonwood Tree_

---

[20] D.I. 231 at 6 (emphasis in original).

[21] _Chemours Co. v. DowDuPont Inc._, 2019 WL 2404817, at *3 (Del. Ch. June 7, 2019).

[22] On July 5, I attempted to quantify and remedy Defendants' other discovery
shortcomings by appointing a third-party neutral to collect documents.  D.I. 255.  It is
possible that trial will have to be postponed.  But this possibility, borne from Defendants'
failure to collect their own documents, should not support the relief Defendants seek
here.

[23] Supr. Ct. R. 42(b)(iii)(B).

9

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/25   Page 509 of 1017   PageID 14136
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 381 of 1803   PageID 11127

*Value Partners, L.P. v. R.L. Polk & Co.*,[24] and *Princeton Ins. Co. v. Vergano*,[25]

discussed in the Rulings, and argue the Court erred in ruling Daugherty had made a

*prima facie* showing of fraud.  Defendants do not dispute that Abrams & Bayliss

assisted Highland in the transaction that Daugherty claims was fraudulent, but

argue he "has not established through a prima facie showing [] that the transaction

*was* fraudulent."[26]

     5.    Distilled, Defendants' argument is that Daugherty has not shown

sufficient evidence of fraud in Highland's "desire to avoid paying money to

Daugherty."[27]   In arguing the Court applied a standard that was too low,

Defendants advocate for a standard that is too high.   As explained in the

Reargument Ruling, "the party opposing the privilege is not required to introduce

evidence sufficient to support a verdict of crime or fraud or even to show that it is

more likely than not that the crime or fraud occurred."[28]  Discovery to date, and *in

camera* review, indicate that Defendants used Abrams & Bayliss as their escrow

agent, made numerous representations to the Texas court and Daugherty that assets

to satisfy any judgment were held in escrow, held the assets in escrow differently

---

[24] 2018 WL 346036 (Del. Ch. Jan. 10, 2018).

[25] 883 A.2d 44 (Del. Ch. 2005).

[26] D.I. 231 at 9 (emphasis in original).

[27] *Id.* at 9 n.2.

[28] D.I. 254 at 11 (quoting *Kickflip, Inc. v. Facebook, Inc.*, 2016 WL 5929003, at *5 (D. Del. Sept. 14, 2016)).

Appellee Appx. 00375
Appx. 00626
013188

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 03/21/24   Page 510 of 1017   PageID 14137
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 382 of 1803   PageID 11128

than represented, and then at the end of it all directed Abrams & Bayliss to transfer assets from that same escrow to Highland to avoid satisfying the judgment to Daugherty.[29]   Daugherty met his burden of showing a *prima facie* case of fraud sufficient to warrant the crime-fraud exception.   Defendants cite no Delaware decisions that conflict with this analysis.   As a result, they have not shown interlocutory review is warranted to resolve conflicting decisions.

6.   Defendants also argue that the Court applied the crime-fraud exception too broadly and "did not make the factual finding needed to support its conclusion that each communication [] 'was made in furtherance of a fraud' and thus fell within the exception."[30]   In fact, *in camera* review showed that the documents in category 2 reflected "efforts that culminated in the allegedly fraudulent acts."[31]   The Court made the factual finding Defendants seek.   Again, Defendants cannot identify Delaware decisions that conflict with this analysis, and so have not shown interlocutory review is warranted.

7.   Finally, Defendants argue the Rulings conflict with precedent concerning the sanction of a punitive waiver.   Defendants have failed to present a conflict among trial court decisions that merits interlocutory review.   Waiver was

---

[29] I described specific documents in the Reargument Ruling, but sealed that portion of the transcript pending resolution of Defendants' Application and will not repeat that description here.  *See* D.I. 253 at 13-15.

[30] D.I. 231 at 10.

[31] D.I. 218 at 13.

Appellee Appx. 00376

Appx. 00527

013189

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit Filed 06/25/1804 Page 511 of 1017 PageID 14138
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 383 of 1803 PageID 11129

based on Defendants' persistence in claiming privilege over the work of their escrow agent, after Vice Chancellor Glasscock informed them that work was not privileged, and after they were given multiple opportunities to follow those instructions.[32] The waiver component of the Rulings "applied settled principles of law" on the application and waiver of privilege.[33] "An improperly asserted claim of privilege is no claim at all."[34] Further, for reasons explained in the Reargument Ruling, Defendants misconstrued the Motion to Compel Ruling: I concluded categories 1 and 4 were not privileged, but went on to make the point that even if they were, that privilege would have been waived. Defendants have not identified any documents or testimony that they assert are privileged but that they must produce as a result of the waiver.

8. The second factor Defendants address is that interlocutory review may serve considerations of justice.[35] Defendants seek interlocutory relief on the secondary holding that categories 1 and 4 would be waived if they were privileged, and on the crime-fraud exception, in pursuit of a different set of guideposts for the remainder of the case. The Supreme Court has declined to intervene to move discovery guideposts, even where the attorney-client privilege (and any harm

---

[32] Ex. 254 at 19-22.

[33] *Klig v. Deloitte LLP*, 2010 WL 3489735, at *9 (Del. Ch. Sept. 7, 2010) (describing decisions applying principle).

[34] *Id*. at *4.

[35] Supr. Ct. R. 42(b)(iii)(H).

Appellee Appx. 00377
Appx. 00528
013190

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/25/804    Page 512 of 1017    PageID 14139
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 384 of 1803    PageID 11130

flowing from disclosure) is at issue.[36]  This factor does not support interlocutory appeal.

9.    Neither side argues any of the remaining factors set out in Supreme Court Rule 42(b)(iii).  None of those factors apply here.

10.    In line with our State's general preference against interlocutory appeals, I decline to certify the Rulings for interlocutory review.

  /s/ Morgan T. Zurn  
Vice Chancellor Morgan T. Zurn

---

[36] *Supra* ¶ 1.

Appellee Appx. 00378
Appx. 00629
013191

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 08/26/25   Page 513 of 1017    PageID 14140
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 385 of 1803   PageID 11131

# APPENDIX 6

Appellee Appx. 00379

0113192

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16   Filed 07/03/25   Page 514 of 1017    PageID 14141
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 386 of 1803    PageID 11132
Case 19-12239-CSS    Doc 86    Filed 11/01/19    Page 1 of 16

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) **Hearing Date: TBD** |
| | ) **Objection Deadline: TBD** |

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**FOR AN ORDER TRANSFERRING VENUE OF THIS CASE TO THE UNITED**
**STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS**

The official committee of unsecured creditors (the "Committee") of Highland Capital

Management, L.P. (the "Debtor"), hereby submits this motion (this "Motion") for entry of an order,

substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to

28 U.S.C. §§ 1408 and 1412 and Rule 1014 of the Federal Rules of Bankruptcy Procedure

("Bankruptcy Rules"), transferring the venue of the above-captioned chapter 11 case to the United

States Bankruptcy Court for the Northern District of Texas.

**PRELIMINARY STATEMENT**

1.    Although a debtor's choice of venue generally warrants deference, this case

presents unique facts that make a change in venue appropriate.  The Debtor has only one location

in the United States—its Dallas, Texas headquarters, which houses the Debtor's management and

key personnel.  In fact, the Debtor's headquarters sit less than two miles from the United States

Bankruptcy Court for the Northern District of Texas (the "Dallas Bankruptcy Court"), making the

venue clearly more convenient for the Debtor and its management than Delaware.  Additionally,

---

[1]    The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Page 1306 of 1804   Page 515 of 1017   PageID 14142
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 387 of 1803   PageID 11133
Case 19-12239-CSS   Doc 86   Filed 11/01/19   Page 2 of 16

although the Debtor's creditors span the nation, a substantial number of the Debtor's creditors (including several of the top twenty unsecured creditors and Committee members) are concentrated in Texas, or the Midwest more broadly. Likewise, nearly all of the professionals active in this case are concentrated in Texas, Chicago, or Los Angeles. The Dallas Bankruptcy Court is more centrally located and easily accessible to the key parties in this case, along with their advisors. Transferring venue from Wilmington, Delaware to Dallas, Texas would result in greater efficiencies and significant cost savings for the Debtor's estate.

2. Moreover, the Dallas Bankruptcy Court is already intimately familiar with the Debtor's principals and complex organizational structure—the involuntary chapter 11 cases of the Debtor's former affiliates and current Committee members, Acis Capital Management, L.P. and Acis Capital Management GP, L.P. (collectively, "Acis") are pending in the Dallas Bankruptcy Court. Specifically, the Dallas Bankruptcy Court has (a) heard multiple days' worth of material testimony from the Debtor's principal owner (James Dondero), the Debtor's minority owner (Mark Okada), the Debtor's general counsel, at least two assistant general counsels, and numerous other employees of the Debtor and other witnesses; and (b) issued at least six published opinions to date, many of which have been affirmed on appeal to the United States District Court for the Northern District of Texas (the "Dallas District Court") in subsequent published opinions. The Dallas Bankruptcy Court is still presiding over an adversary proceeding commenced by the Debtor and its affiliates, and the Debtor's appeal of Acis's confirmed chapter 11 plan is still pending before the Fifth Circuit. As evidenced by the published opinions, the Dallas Bankruptcy Court and the Dallas District Court are intimately familiar with the Debtor's business, principal owner, and key executives. For these reasons, the Dallas Bankruptcy Court is uniquely positioned to oversee this chapter 11 case.

ACTIVE 250501748

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 05/06/25   Page 516 of 1017   PageID 14143
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 388 of 1803   PageID 11134
Case 19-12239-CSS   Doc 86   Filed 11/01/19   Page 3 of 16

3.     The Committee respectfully submits that, for the reasons set forth above and discussed more fully below, based on the unique facts of this case, both the interests of justice and convenience of the parties justify an exception to the general deference granted to a debtor's choice of venue and warrant the transfer of venue to the Dallas Bankruptcy Court.

## JURISDICTION

4.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Committee confirms its consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.     The statutory and other bases for the relief requested herein are 28 U.S.C. §§ 1408 and 1412, Bankruptcy Rule 1014, and Local Rule 1014-1.

## BACKGROUND

6.     On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").   The Committee was appointed by the United States Trustee on October 29, 2019 [Docket No. 65].

**I.     The Debtor's Connections to Dallas.**

7.     As noted in the Voluntary Petition [Docket No. 1], the Debtor's principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201, which also serves as the Debtor's

Appellee Appx. 00382
Appx. 00635
013195

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit B    Page 1800 of 1804    Page 517 of 1017    PageID 14144
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 389 of 1803    PageID 11135
Case 19-12239-CSS    Doc 86    Filed 11/01/19    Page 4 of 16

international headquarters, and, in fact, its only office in the United States. *See Declaration of Frank Waterhouse in Support of First Day Motions* [Docket No. 9] (the "First Day Declaration"), ¶ 7. Although it is unclear how many of the Debtor's 76 employees are based in the Debtor's international offices, presumably those employees based in the U.S. live in or around the Debtor's headquarters in Dallas, Texas. Furthermore, all but one of the Debtor's equity holders are also located in Dallas, Texas. *See* Voluntary Petition [Docket No. 1], at pg. 14. In sum, Dallas, Texas is the epicenter of the Debtor's operations.

**II.    The Dallas Bankruptcy Court's Familiarity with the Debtor.**

8.    Prior to the commencement of this chapter 11 case, the Debtor was (and currently remains) actively involved in the involuntary chapter 11 case of Acis, its then-affiliate and current Committee member, captioned *In re Acis Capital Mgmt., L.P.*, Case No. 18-30264 (SGJ) (the "Acis Bankruptcy"). Until 2019, Acis was the "structured credit arm of Highland." *In re Acis Capital Mgmt., L.P.*, Nos. 18-30264 (SGJ), 2019 Bankr. LEXIS 292, at *17 n. 21 (Bankr. N.D. Tex. Jan. 31, 2019) (the "Acis Confirmation Opinion"), *aff'd*, 604 B.R. 484 (N.D. Tex. 2019).[2] Acis did not have any of its own employees and, instead, contracted with the Debtor to perform all day-to-day functions, meaning that all Acis corporate representatives and witnesses in the Acis Bankruptcy were employees of the Debtor. *Id.* at *9. Moreover, there was complete overlap between Acis and the Debtor at the executive level, with the Debtor's CEO James Dondero serving as President of Acis and the Debtor's CFO, and first day declarant, Frank Waterhouse serving as Treasurer.

9.    The Acis Bankruptcy commenced on January 30, 2018, when Joshua N. Terry filed involuntary petitions against Acis to commence chapter 7 cases in the Dallas Bankruptcy Court.

---

[2] The Acis Confirmation Opinion is attached hereto as **Exhibit B**.

Appellee Appx. 00383
Appx. 00634
013196

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/804   Page 518 of 1017   PageID 14145
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 390 of 1803   PageID 11136
Case 19-12239-CSS   Doc 86   Filed 11/01/19   Page 5 of 16

In connection with a hotly-contested trial on the involuntary petitions, the Dallas Bankruptcy Court heard seven days of testimony and argument, entered orders for relief and issued a written opinion, which is attached hereto as **Exhibit C** (the "Acis Involuntary Opinion"). Testimony included that of the Debtor's co-founder and CEO, James Dondero, the Debtor's co-founder and then-Chief Investment Officer, Mark Okada, the Debtor's General Counsel, Scott Ellington, the Debtor's Controller, David Klos, and the Debtor's Assistant General Counsel, Isaac Leventon.

10.     In May 2018, the Acis bankruptcy cases were converted from Chapter 7 to Chapter 11, and a Chapter 11 Trustee was appointed "due to what the bankruptcy court perceived to be massive conflicts of interest with regard to the Debtors' management." *See* Acis Confirmation Op. at *15.

11.     The Debtor and its affiliates were, and remain, exceptionally active throughout the Acis Bankruptcy, objecting to virtually every action proposed by the Chapter 11 Trustee throughout the case. *See In re Acis Capital Mgmt., L.P.*, 603 B.R. 300, 302 (Bankr. N.D. Tex. 2019). As a result, the Dallas Bankruptcy Court was forced to conduct many evidentiary hearings, during which the Debtor's executives and employees were often called to testify. Overall, between the Acis Bankruptcy and related adversary proceedings, the Dallas Bankruptcy Court has to date reviewed approximately 700 exhibits, heard more than thirty days of testimony and oral argument, and issued six opinions. The Dallas District Court has also ruled on three appeals related to the Acis Bankruptcy, all of which were filed by the Debtor and/or its affiliates. The Debtor's appeal of the Acis confirmation order is now pending before the Fifth Circuit.[3]

12.     The Dallas Bankruptcy Court is also currently adjudicating a number of fraudulent transfer causes of action that Acis has brought against the Debtor and certain of its non-debtor

---

[3]     *See generally Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel Nunc Pro Tunc to the Petition Date* [Docket No. 69] and

Appellee Appx. 00384
Appx. 00635
013197

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 06/25/25   Page 519 of 1017   PageID 14146
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 391 of 1803   PageID 11137
Case 19-12239-CSS   Doc 86   Filed 11/01/19   Page 6 of 16

affiliates in a consolidated adversary case (the "Acis Adversary Proceeding"). Distilled to its essence, the Acis Adversary Proceeding concerns actions taken by the Debtor and its affiliates to denude the Acis debtors' estates of their value and frustrate an imminent, substantial judgment against Acis. *See Acis Capital Mgmt., GP, LLC v. Highland Capital Mgmt., L.P. (In re Acis Capital Mgmt., L.P.)*, 600 B.R. 541, 549 (Bankr. N.D. Tex. 2019) (the "Acis Arbitration Opinion").[4]

13.     In sum, the Dallas Bankruptcy Court and the Dallas District Court are already intimately familiar with the Debtor's complex structure, its management, and key personnel, and are well-versed in the contentious relationship between the Debtor and several of its largest creditors, including members of the Committee. Accordingly, the Dallas Bankruptcy Court is uniquely situated to oversee this chapter 11 case.

## RELIEF REQUESTED

14.     By this Motion, the Committee requests entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A**, transferring the venue of this chapter 11 case to the Dallas Bankruptcy Court.

## BASIS FOR RELIEF

### III.     The Dallas Bankruptcy Court is an Appropriate Venue Under 28 U.S.C. § 1408.

15.     Section 1408 of title 28 of the United States Code provides that bankruptcy cases may be commenced in the district court for the district "in which the domicile, residence, principal place of business in the United States, or principal assets in the United States" of the debtor is

---

*Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel Nunc Pro Tunc to the Petition Date* [Docket No. 70] (describing the Debtor's ongoing litigation and involvement with the Acis Bankruptcy).

[4] A copy of the Acis Arbitration Opinion is attached hereto as **Exhibit D**.

ACTIVE 250501748

Appellee Appx. 00385
013198

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 03/06/25    Page 520 of 1017    PageID 14147
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 392 of 1803    PageID 11138
Case 19-12239-CSS    Doc 86    Filed 11/01/19    Page 7 of 16

located or the district "in which there is a pending case under title 11 concerning such person's affiliate."

16.    The Debtor's headquarters, and indeed its only office in the United States, is located in Dallas, Texas.  Moreover, had this chapter 11 case commenced mere months ago, the Acis Bankruptcy would be a "pending case under title 11 concerning" the Debtor's affiliate.[5]  The Dallas Bankruptcy Court easily satisfies the statutory venue requirements under 28 U.S.C. § 1408.

**IV.    The Court Should Exercise its Discretion to Transfer Venue to the Dallas Bankruptcy Court.**

17.    It is within a court's discretion to transfer a case to another venue if it is "in the interest of justice or for the convenience of the parties."  28 U.S.C. § 1412.  Courts have interpreted this statutory provision to create two distinct bases upon which transfer of venue may be granted: interest of justice *or* convenience of the parties.  *See In re Qualtec Inc.*, No. 11-12572 (KJC), 2012 WL 527669, at *6 (Bankr. D. Del. Feb. 16, 2012).  Movants for transfer of venue have the burden of showing that a transfer is warranted based on the preponderance of the evidence.[6]  *Id.* at *5.

**A.    Transferring Venue to the Dallas Bankruptcy Court Would Serve the Convenience of the Parties.**

18.    In determining whether a venue transfer would serve the convenience of the parties, courts generally examine the following six factors: "(a) proximity of the creditors of every kind to the court; (b) proximity of the debtor; (c) proximity of the witnesses who are necessary to the administration of the estate; (d) the location of the debtor's assets; (e) the economic administration of the estate; and (f) the necessity for ancillary administration in the event of liquidation."  *In re*

---

[5] The Debtor ceased to be an affiliate of Acis following confirmation of the Acis plan of reorganization in January 2019, when equity in reorganized Acis was distributed to Mr. Terry in exchange for a reduction of his allowed claim.

[6] To meet its burden herein, the Committee is relying on the record of this case, including the First Day Declaration, and the established record of the Acis Bankruptcy.  The Committee therefore does not anticipate there being any need to hold an evidentiary hearing on this Motion.

Appellee Appx. 00386
Appx. 00637
013199

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 136   Filed 07/06/25   Page 521 of 1017   PageID 14148
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 393 of 1803   PageID 11139
Case 19-12239-CSS   Doc 86   Filed 11/01/19   Page 8 of 16

*Rests. Acquisition I, LLC*, No. 15-12406 (KG), 2016 WL 855089, at *2 (Bankr. D. Del. Mar. 4, 2016) (*quoting Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co. (In re Commonwealth Oil Refining Co.)*, 596 F.2d 1239, 1247 (5th Cir. 1979)). Under this analysis, the factor given the most weight is the economic and efficient administration of the estate. *Id.*

### 1.     Proximity of Creditors of Every Kind to the Court.

19.     Of the Debtor's twenty largest unsecured creditors, at least seven[7] are listed as having Texas addresses: Acis, Joshua and Jennifer Terry, McKool Smith, P.C., Foley Gardere, DLA Piper LLP (US), Lackey Hershman LLP, and Andrews Kurth LLP. *See* Voluntary Petition [Docket No. 1]. Additionally, of the total known claims at this juncture, it appears that a significant number of the Debtor's creditors are located in Texas, and the rest of the creditors appear to be scattered across the United States. No known creditors appear to be based in Delaware. *See id.*

20.     Courts may also focus on the location of the debtor's and creditors' professionals in deciding whether to transfer venue. *See In re Caesars Entm't Operating Co., Inc.*, No. 15-10047 (KG), 2015 WL 492529, at *6 (Bankr. D. Del. Feb. 2, 2015). The Committee's proposed counsel is primarily located in Chicago, Illinois, but also maintains an office in Dallas, Texas (where its litigation team for this case is based). If this case were to proceed before this Court, the Committee would have to retain Delaware co-counsel.[8] Additionally, several of the Debtor's largest creditors are separately represented by counsel based in the Midwest: the Acis is represented by the Rogge Dunne Group and Winstead PC in Dallas [Docket No. 81], the Redeemer Committee of the Highland Crusader Fund is represented by Jenner & Block LLP primarily out of its Chicago office

---

[7] Additionally, although listed with a North Carolina address, CLO Holdco, Ltd. is an affiliate of and controlled by the Debtor, whose principal place of business is in the Northern District of Texas. The Debtor also lists Reid Collins & Tsai's New York office, despite the fact that the firm is a Texas limited liability partnership based in Texas.

[8] Under Local Rule 9010-1(d), the Committee has until November 27, 2019, to obtain Delaware co-counsel, if necessary.

ACTIVE 250501748

Appellee Appx. 00387
Appx. 00628
0113200

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-116   Filed 05/02/25   Page 522 of 1017   PageID 14149
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 394 of 1803   PageID 11140
Case 19-12239-CSS   Doc 86   Filed 11/01/19   Page 9 of 16

[Docket Nos. 1, 36], and USB Securities LLC and UBS AG London Branch is represented by Latham & Watkins LLP, which has an office in Houston [Docket No. 85].

21.     Considering the proximity of both the Debtor's creditors and their professionals to the Dallas Bankruptcy Court, this factor should weigh in favor of transfer.  *See In re Rehoboth Hosp., LP*, No. 11-12798 (KG), 2011 WL 5024267, at *3 (Bankr. D. Del. Oct. 19, 2011) (concluding that, on balance, this factor favored transfer to Texas when the overwhelming majority of creditors were located in Texas).

### 2.     Proximity of the Debtor to the Court.

22.     Courts have noted that this inquiry should focus primarily on the parties that must appear in court.  *See Caesars Entm't Operating Co., Inc.*, 2015 WL 495259, at *6.  The Debtor's headquarters, and only office located in the United States, is in Dallas, Texas.  *See* First Day Decl., at ¶ 7.  As a result, it is likely that any of the Debtor's personnel who would have to appear in court are located in Dallas, Texas.  The Debtor has no connection to Delaware other than the fact that it was formed there.

23.     The Committee concedes that Debtor's counsel maintains an office in Delaware but does not have an office in Dallas.  That said, Debtor's counsel represents itself as having a "national presence," including in the Fifth Circuit,[9] and its lead lawyers on this matter are based in Los Angeles.  The Debtor's proposed financial advisor team is also predominantly based in Los Angeles with several members located in Chicago.  No proposed advisor from Development Specialists, Inc. is located on the East Coast, let alone in Delaware.  *See Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain Development Specialists, Inc. to Provide a Chief Restructuring Officer, Additional Personnel, and Financial Advisory and*

---

[9] *See* http://www.pszjlaw.com/about-presence.html#circuit5.

ACTIVE 250501748

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit   Page 1306 of 1804   Page 523 of 1017   PageID 14150
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 395 of 1803   PageID 11141
Case 19-12239-CSS   Doc 86   Filed 11/01/19   Page 10 of 16

*Restructuring-Related Services,* Nunc Pro Tunc *as of the Petition Date* [Docket No. 75], Ex. A. Accordingly, the Committee respectfully submits that this factor weighs in favor of transferring venue to the Dallas Bankruptcy Court.

> **3.     Proximity of the Witnesses Necessary to the Administration of the Estate.**

24.     The Committee anticipates that the witnesses likely to be necessary in this chapter 11 case are the Debtor's management, who are all located in Dallas, Texas, or the Debtor's financial advisors, who are all located in either Chicago, Illinois, or Los Angeles, California. Dallas, Texas, is significantly closer to any potential witness than Wilmington, Delaware.  Thus, the Committee respectfully submits that this factor also weighs in favor of transferring venue to the Dallas Bankruptcy Court.

> **4.     Location of the Assets.**

25.     The location of the Debtor's assets is not as important as other factors where "the ultimate goal is rehabilitation rather than liquidation." *See In re Caesars Entm't Operating Co., Inc.*, 2015 WL 495259, at *6 (quoting *In re Enron Corp.*, 274 B.R. 327, 347 (Bankr. S.D.N.Y. 2002)).  Although the Committee believes that the Debtor's U.S. assets would be located at the Debtor's headquarters in Dallas, Texas, the Committee does not believe this factor important to the Court's decision.

> **5.     Economic Administration of the Estate.**

26.     As noted above, the most important factor is the economic and efficient administration of the Debtor's estate. *Id.*  The Committee does not dispute the ability of this Court to administer this chapter 11 case in a just and efficient manner.  That said, there are many factors that make the Dallas Bankruptcy Court the more economical venue.  As discussed in more detail below as part of the "interests of justice" analysis: (1) there is a higher concentration of creditors

ACTIVE 250501748

Appellee Appx. 00389
Appx. 00649
013202

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 06/25/804    Page 524 of 1017    PageID 14151
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 396 of 1803    PageID 11142
Case 19-12239-CSS    Doc 86    Filed 11/01/19    Page 11 of 16

and creditors' counsel in Texas and the Midwest than elsewhere in the country; (2) the Debtor and

all of its U.S. personnel are in Dallas, Texas; (3) Dallas, Texas is more centrally located in the

United States than Wilmington, Delaware and arguably easier and cheaper for parties to travel to;

(4) most creditors would need to obtain Delaware co-counsel if venue remains before this Court;

and (5) the Dallas Bankruptcy Court and the Dallas District Court has already expended great time

and effort familiarizing itself with the Debtor, the Debtor's operations, and the disputes between

the Debtor and some of its largest creditors.  For these reasons and the reasons set forth below in

Section II.B, this factor weighs heavily in favor of transferring venue to the Dallas Bankruptcy

Court.  *See In re Qualteq, Inc.* 2012 WL 527669, at *6 (noting that same considerations for this

factor arise in applying the "interest of justice" prong).

**6.      Necessity for Ancillary Administration if Liquidation Should Result.**

27.      "Most cases do not consider liquidation because it is illogical to focus on liquidation

contingencies when the goal of the bankruptcy is reorganization."  *In re Dunmore Homes, Inc.*,

380 B.R. 663, 672 (Bankr. S.D.N.Y. 2008).  However, should this case be converted to a

liquidation, the Debtor's personal property would be predominantly located in Dallas, Texas.  As

a result, this factor also weighs in favor of transfer.

**B.      Interests of Justice**.

28.      When determining whether a transfer would serve the interests of justice, courts

consider whether such transfer "would promote the efficient administration of the estate, judicial

economy, timeliness, and fairness."  *Caesars Entm't Operating Co., Inc.*, 2015 WL 495259, at *7

(quotations omitted).  The interests of justice standard is a "broad and flexible standard which must

be applied on a case-by-case basis."  *In re Safety-Kleen Corp.*, Adv. Proc. No. 00-1984, 2001

Bankr. LEXIS 1296, at *6 (Bankr. D. Del. Aug. 27, 2001) (citing *Gulf States Expl. Co. v. Manville

Forest Prods. Corp. (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1391 (2d Cir. 1990)).

Appellee Appx. 00390

Appx. 00641

013203

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 08/06/25   Page 525 of 1017   PageID 14152
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 397 of 1803   PageID 11143
Case 19-12239-CSS   Doc 86   Filed 11/01/19   Page 12 of 16

1.     **Judicial Economy.**

29.     Judicial economy would be served by transferring this case to the Dallas Bankruptcy Court. At the time of this filing, this Court has only held one hearing, granting interim relief for a handful of routine "first day" motions. In contrast, the Dallas Bankruptcy Court has heard at least 30 days of testimony, including that of the Debtor's executives, and conducted countless hearings in the Acis Bankruptcy. With the exception of the Debtor's proposed chief restructuring officer and Mr. Waterhouse, the Dallas Bankruptcy Court is familiar with nearly all of the Debtor's senior management. As summarized above, the Dallas Bankruptcy Court and Dallas District Court have already devoted multiple days of court time to the Debtor.

30.     Additionally, Acis's claim against the Debtor (which is listed on the list of twenty largest unsecured creditors) and the Debtor's proof of claim and administrative claim against Acis (which is technically an asset of the Debtor's estate) are currently pending in the Dallas Bankruptcy Court. Judicial economy would best be served by utilizing the time and resources already extended by the Dallas Bankruptcy Court in connection with these claims. This factor weighs overwhelmingly in favor of transfer. Indeed, it is hard to imagine a case where judicial economy would be better served by a transfer of venue under 28 U.S.C. § 1412.

31.     Courts in this district have historically placed a particular emphasis "on the 'learning curve' that typically militates against a transfer. *See In re Rests. Acquisition I, LLC*, No. 15-12406 (KG), 2016 WL 855089, at *5 (Bankr. D. Del. Mar. 4, 2016). This case is unique in that the "learning curve" that typically militates against a transfer in the interests-of-justice basis is actually *inverted*. That is, it is not the proposed transferee court that will have a "learning curve," but rather it is this Court that would. Given that this Court has only considered first day relief, and on an interim basis, while the Dallas Bankruptcy Court and Dallas District Court both have

ACTIVE 250501748

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit    Page 1800 of 1804    Page 526 of 1017    PageID 14153
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 398 of 1803    PageID 11144
Case 19-12239-CSS    Doc 86    Filed 11/01/19    Page 13 of 16

intimate familiarity with the parties and their businesses, transferring the venue would be in furtherance of judicial economy.

### 2.    Economic and Efficient Administration of the Bankruptcy Estate.

32.    As previously noted, there are economic efficiencies available in Dallas, Texas that are not available in Wilmington, Delaware.  Venue in Dallas would allow the Debtor's employees to easily attend hearings in this case and thus eliminate the need for air travel for most witnesses. The Debtor's headquarters are located in The Crescent in Dallas, Texas, approximately 1.2 miles from the Dallas Bankruptcy Court.  By contrast, this Court is located approximately 1,437 miles from the Debtor's headquarters.  Travel to this Court from the Debtor's headquarters requires, at a minimum, a 30-minute car ride to Dallas/Fort Worth International Airport, approximately three hours flying time to Philadelphia International Airport, and then a 30-minute car ride to Wilmington, Delaware.  The foregoing does not take into account recommended early arrival times at airports for check-in, flight delays, traffic, or the need for overnight stays in Wilmington.  If this case remains in Delaware, critical management personnel will be required to spend extended periods away from their offices when they should be focused on maximizing value for all creditors.

33.    Additionally, as the Debtor's professionals and proposed CRO are primarily located in Los Angeles, venue in Dallas would eliminate hours of travel time and the administrative expense associated with the same.  Dallas-Fort Worth International Airport, consistently the third-busiest airport in the country (behind Chicago O'Hare and Atlanta Hartsfield-Jackson), offers nearly 1,800 flights per day.  American Airlines alone offers approximately 14 non-stop flights per day from LAX to DFW.  According to FlightSphere.com, there are approximately 20 total flights per day from LAX to DFW and 7 flights per day from DAL to LAX.  By contrast, according to FlightSphere.com, there are approximately 10 flights per day from DFW to Philadelphia and approximately 8 flights per day from DAL to Philadelphia.  The flight from LAX to DFW is

ACTIVE 250501748

Appellee Appx. 00392
Appx. 00643
013205

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 04/06/25    Page 527 of 1017    PageID 14154
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 399 of 1803    PageID 11145
Case 19-12239-CSS    Doc 86    Filed 11/01/19    Page 14 of 16

approximately 3 hours, whereas the flight from LAX to Philadelphia is approximately 6 hours. *See In re Rehoboth Hosp., LP,* No. 11-1279 (KG), 2011 Bankr. LEXIS 3992, at *15 (Bankr. D. Del. October 19, 2011) (transferring venue of a single asset real estate case from Delaware to Texas because "the estate may incur significant travel costs to obtain the testimony of witnesses that are located in Texas").

34.    Additionally, Rule 45 of the Federal Rules of Civil Procedure, incorporated by Bankruptcy Rule 9016, mandates that contested non-party discovery disputes (potentially like those related to the Debtor's approximately 2,000 non-debtor affiliates) be heard in the place of compliance, which would most likely be in the Northern District of Texas.  The Committee is already aware of the Debtor's history of contesting discovery.  *See, e.g., Hamilton Partners, L.P. v. Highland Capital Mgmt., L.P.,* CV 6547-VCN, 2016 WL 61223, at *1 (Del. Ch. Feb. 2, 2016). It is therefore likely that the Dallas District Court and Dallas Bankruptcy Court will need to hear and resolve multiple discovery disputes.  In light of that inevitability, it would be sensible to transfer this case so that related disputes aren't being heard in multiple venues.

35.    There is no doubt that transferring venue to Dallas would promote the economic and efficient administration of this chapter 11 case.  This factor weighs in favor of transfer.

### 3.    Timeliness.

36.    As of the date of this Motion, this case has only been pending for 16 days.  The Committee is also seeking to have this Motion heard on an expedited basis, as set forth in the motion to shorten notice filed concurrently herewith.  *Cf. In re Jones*, 39 B.R. 1019, 1020 (Bankr. S.D.N.Y. 1984) ("[t]he debtor's motion to change venue is untimely given the fact that this case was commenced over one and one-half years ago").  The Court has only considered the Debtor's request for first day relief on an interim basis.  The next hearing is not scheduled until November 19, 2019.  The Motion is timely and this factor weighs in favor of transfer.

ACTIVE 250501748

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 04/16/25    Page 528 of 1017    PageID 14155
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 400 of 1803    PageID 11146
Case 19-12239-CSS    Doc 86    Filed 11/01/19    Page 15 of 16

**4.     Fairness.**

37.     Transferring this chapter 11 case to a venue where employees, creditors, and numerous other parties-in-interest may more easily participate in the restructuring process would be manifestly fair.  To the extent the Debtor chose this forum in order to distance itself from largely unfavorable findings, fairness dictates that this case should be transferred.

*        *        *        *        *

38.     For the foregoing reasons, it is both in the interest of justice and for the convenience of the parties that this chapter 11 case be transferred to the Dallas Bankruptcy Court.  The majority of the parties and professionals involved in this chapter 11 cases are more centrally located to Dallas, Texas than Wilmington, Delaware, which would create significant costs savings to the Debtor's estate compared to keeping the case in Delaware.  Moreover, the Dallas Bankruptcy Court and Dallas District Court are both well-versed in the facts and issues that will undoubtedly need to be addressed in this chapter 11 case.  As such, the Committee respectfully requests that this Court transfer venue of this case to the Dallas Bankruptcy Court.

**<u>NOTICE</u>**

39.     Notice of this Motion will be provided to (i) the Debtor, (ii) the Office of the United States Trustee for the District of Delaware, and (iii) any party that has requested notice pursuant to Local Rule 2002-1 as of the date of this Motion.  In light of the nature of the relief requested herein, the Committee submits that no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

ACTIVE 250501748

Appellee Appx. 00394
Appx. 00645
013207

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1402 of 1804    Page 529 of 1017    PageID 14156
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 401 of 1803    PageID 11147
Case 19-12239-CSS    Doc 86    Filed 11/01/19    Page 16 of 16

WHEREFORE, the Committee respectfully requests that the Court enter the Proposed

Order, substantially in the form attached hereto as **<u>Exhibit A</u>**, granting the relief requested herein

and such other and any further relief as the Court may deem just and proper.


Dated:  November 1, 2019                    SIDLEY AUSTIN LLP
       Wilmington, Delaware

                                   */s/ Bojan Guzina*
                                   Bojan Guzina
                                   Matthew A. Clemente
                                   Alyssa Russell
                                   One South Dearborn Street
                                   Chicago, Illinois 60603
                                   Telephone:  (312) 853-7000
                                   Facsimile:  (312) 853-7036

                                        -and-

                                   Jessica C. K. Boelter
                                   787 Seventh Avenue
                                   New York, New York 10019
                                   Telephone: (212) 839-5300
                                   Facsimile: (212) 839-5599

                                        -and-

                                   Penny P. Reid
                                   Paige Holden Montgomery
                                   2021 McKinney Avenue
                                   Suite 2000
                                   Dallas, Texas 74201
                                   Telephone: (214) 981-3300
                                   Facsimile: (214) 981-3400

                                   PROPOSED ATTORNEYS FOR THE OFFICIAL
                                   COMMITTEE OF UNSECURED CREDITORS

ACTIVE 250501748

Appellee Appx. 00395
Appx. 00646
013208

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 04/06/25    Page 530 of 1017    PageID 14157
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 402 of 1803    PageID 11148
Case 19-12239-CSS    Doc 86-1    Filed 11/01/19    Page 1 of 3

**Exhibit A**

**Proposed Order**

ACTIVE 250501748

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 04/06/25   Page 531 of 1017   PageID 14158
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 403 of 1803   PageID 11149
Case 19-12239-CSS   Doc 86-1   Filed 11/01/19   Page 2 of 3

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) **Ref. Docket No.:** ___ |

**ORDER TRANSFERRING VENUE OF THIS CASE TO THE UNITED STATES**
**BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS**

Upon the motion (the "Motion")[2] of the Committee requesting entry of an order (this "Order") transferring the venue of the above-captioned chapter 11 case to the United States Bankruptcy Court for the Northern District of Texas; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue of this Motion being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and adequate notice of, and the opportunity for a hearing on, the Motion having been given; and it appearing that no other or further notice need be provided; and this Court having found that the relief requested in the Motion and provided for herein is in the best interest of the Debtor, creditors of the Debtors, and other parties in interest; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon the record herein, and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

---

[1]   The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2]   Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

ACTIVE 250501748

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit    Page 405 of 1804    Page 532 of 1017    PageID 14159
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 404 of 1803    PageID 11150
Case 19-12239-CSS    Doc 86-1    Filed 11/01/19    Page 3 of 3

1.    Pursuant to Rule 1014(b), in the interest of justice and for the convenience of parties, the above-captioned chapter 11 case shall proceed in the Dallas Bankruptcy Court. Accordingly, the Court will transfer this case to the Dallas Bankruptcy Court pursuant to 28 U.S.C. § 1412.

Dated: _____, 2019
Wilmington, Delaware

_____
Honorable Christopher S. Sontchi
United States Bankruptcy Judge

ACTIVE 250501748

Appellee Appx. 00398
Appx. 00640
0132111

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 04/06/25   Page 533 of 1017   PageID 14160
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 405 of 1803   PageID 11151
Case 19-12239-CSS   Doc 86-2   Filed 11/01/19   Page 1 of 48

**Exhibit B**

**Acis Confirmation Opinion**

ACTIVE 250501748

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 186   Filed 14/076/025 1804   Page 534 of 1017   PageID 14161
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 406 of 1803   PageID 11152
Case 18-30264-sgj11-DC 823 927 55ed D1 c 31612   Efiltered 11/01/39/19 a5e12:0448 Page 1 of 47



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed January 31, 2019**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-SGJ-11 |
| | § | (Chapter 11) |
| Debtor. | § | |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT GP, | § | CASE NO. 18-30265-SGJ-11 |
| L.L.C., | § | (Chapter 11) |
| | § | |
| Debtor. | § | |

### BENCH RULING AND MEMORANDUM OF LAW IN SUPPORT OF:
### (A) FINAL APPROVAL OF DISCLOSURE STATEMENT; AND (B)
### CONFIRMATION OF CHAPTER 11 TRUSTEE'S THIRD AMENDED JOINT PLAN

Before this court is a request by the Chapter 11 Trustee (herein so called) for final

approval of the adequacy of a disclosure statement and for confirmation of his Third Amended

1

Appellee Appx. 00400
Appx. 00651
013213

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 08/25   Page 535 of 1017   PageID 14162
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 407 of 1803   PageID 11153
Case 18-30264-sgj11   Doc 1392   Filed 01/31/19   Page 3 of 48   Page 2 of 47

Joint Plan of Reorganization,[1] as amended, modified or supplemented (the "Plan"), for the two

above-referenced debtors: (1) Acis Capital Management, L.P. (the "Debtor-Acis"), a Delaware

limited partnership, and (2) Acis Capital Management GP, LLC, a Delaware limited liability

company (the general partner of the Debtor-Acis; collectively, the "Debtors"). The two chapter

11 cases have been administratively consolidated.[2]

      The hearing on these matters transpired over multiple days in December 2018, and the

court considered the testimony of more than a dozen witnesses, more than 700 exhibits, and

hundreds of pages of legal briefing. Based on the foregoing, the court ***overrules all objections***

and will confirm the Plan, including all proposed modifications to it. The Chapter 11 Trustee has

demonstrated, by a preponderance of the evidence, that the Plan, as modified, satisfies the

applicable provisions of the Bankruptcy Code including but not limited to Sections 1122, 1123,

1127, and 1129 of the Bankruptcy Code.[3] The court also approves on a final basis the adequacy

of the accompanying disclosure statement to the Plan, determining that it meets the requirements

set forth in Section 1125 of the Bankruptcy Code. Notice and solicitation with respect to the

---

[1] Exhs. 508 & 509; *see also* DE ## 660, 661, 693, 702, & 769. References to "DE # __" from time to time in this ruling relate to the docket number at which a pleading or other item appears in the docket maintained in these administratively consolidated Bankruptcy Cases, in Case # 18-30264.

[2] Note that the Debtor-Acis is, essentially, the debtor that is the operating company. As a general partner, Acis Capital Management GP, LLC is legally obligated on all of the operating company's debt. *See* 6 Del. C. § 17-403(b) ("Except as provided in this chapter, a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law in effect on July 11, 1999 (6 Del. C. § 1501 et seq.) to persons other than the partnership and the other partners."); *see also* 6 Del. C. § 15-306(a) ("(a) Except as otherwise provided in subsections (b) and (c) of this section, all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law"). The Plan jointly addresses both of the Debtors' debts.

[3] *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.),* 994 F.2d 1160, 1165 (5th Cir. 1993); *In re Sears Methodist Ret. Sys.,* No. 14-32821-11, 2015 Bankr. LEXIS 709, at *8 (Bankr. N.D. Tex. Mar. 5, 2015); *In re Couture Hotel Corp.,* 536 B.R. 712, 732 (Bankr. N.D. Tex. 2015); *In re Mirant Corp.,* No. 03-46590, 2007 Bankr. LEXIS 4951, at *19-20 (Bankr. N.D. Tex. Apr. 27, 2007).

2

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-11    Page 409 of 1804    Page 536 of 1017    PageID 14163
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 408 of 1803    PageID 11154
Case 18-30264-sgj11    Doc 892-35    Filed 01/31/19    Page 1 of 48    Page 3 of 47

Plan is determined to have complied with the applicable Bankruptcy Rules and due process. The court provides reasoning for its ruling below. The court directs the Chapter 11 Trustee to submit to the court for signing the proposed Findings of Fact and Conclusions of Law and Order that were filed at DE # 814. This Bench Ruling supplements those Findings of Fact and Conclusions of Law and Order and, where appropriate, should be considered additional findings and conclusions as contemplated by Fed. R. Bankr. Proc. 7052.

I.    **Background.**[4]

The above-referenced bankruptcy cases (the "Bankruptcy Cases") have been pending since January 30, 2018 and have been astonishingly contentious. The Chapter 11 Trustee has been in place since on or about May 14, 2018. The Plan (which is the fourth one proposed by the Chapter 11 Trustee) has been objected to by three related entities: (a) Highland Capital Management, L.P. ("Highland"), (b) Highland CLO Funding Ltd. ("HCLOF Guernsey"), and (c) Neutra, Ltd. ("Neutra Cayman"). The Chapter 11 Trustee loosely refers to these three objectors (the "Objectors") as "the Highlands" because they are not only related to each other (*i.e.,* they are all, directly or indirectly, part of the Highland 2,000-member corporate organizational structure), but they also have been in "lockstep" with one another in objecting to virtually every position taken by the Chapter 11 Trustee during the Bankruptcy Cases.[5] These Objectors' parties-in-interest status will be explained below.

---

[4] For a complete set of background facts, the court incorporates herein by reference its Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Petitions, entered April 13, 2018. DE # 118. Exh. 243.

[5] It is also undisputed that, prior to the appointment of the Chapter 11 Trustee, **the Debtors** and Highland were affiliated and had a close relationship. Exhs. 17, 18, 22-27, 251, 619 & 649.

Appellee Appx. 00402
Appx. 00653
013215

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11 186   Filed 04/06/25 804   Page 537 of 1017   PageID 14164
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 409 of 1803   PageID 11155
Case 18-30264-sgj11   Doc 3927-5   Filed 01/31/19   Page 5 of 448   Page 4 of 47

In simplest terms, the Debtor-Acis, which was formed in the year 2011, is primarily a
CLO portfolio manager. [6]  It manages hundreds of millions of dollars' worth of CLOs (which is
an acronym for "collateralized loan obligations").  Specifically, it provides fund management
services to various special purpose entities that hold CLOs.  The Debtor-Acis was providing
management services for five such special purpose entities (the "Acis CLOs") as of the time that
it and its general partner were put into the involuntary Bankruptcy Cases.  The parties have
informally referred to the special purpose entities themselves as the "CLO Issuers" or "CLO Co-
Issuers" but, to be clear, these special purpose entities (hereinafter, the "CLO SPEs") are
structured as follows:  (a) on the asset side of their balance sheets, the entities own pieces of
senior debt owed by large corporations and, therefore, earn revenue from the variable interest
payments made by those corporations on such senior debt; and (b) on the liability side of their
balance sheets, the entities have obligations in the form of notes (*i.e.,* tranches of fixed interest
rate notes) on which the CLO SPEs themselves are obligated—the holders of which notes are
mostly institutions and pension funds (these tranches of notes are usually rated anywhere from
Triple A to Single B, depending upon things such as their interest rate and perceived risk).  The
CLO SPEs make a profit, based on the spread or "delta" between: (a) the variable rates of
interest paid on the assets that the CLO SPEs own (*i.e.,* the basket of senior notes); and (b) the
fixed rates of interest that the CLO SPEs must pay on their own tranches of debt.  At the bottom
of the CLO SPEs' capital structure is their equity (sometimes referred to as "subordinated notes,"
but these "notes" are genuinely equity).  As portfolio manager, the Debtor-Acis manages the
CLO SPEs' pools of assets (by buying and selling senior loans to hold in the CLO SPEs'

---

[6] The Debtor-Acis has managed other funds, from time to time, besides CLOs.

Appellee Appx. 00403
Appx. 00654
013216

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 04/06/25   Page 538 of 1017   PageID 14165
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 410 of 1803   PageID 11156
Case 18-30264-sgj11   Doc 1238   Filed 01/31/19   Entered 01/31/19 15:16:04   Page 5 of 47

portfolios) and communicates with investors in the CLO SPEs. The CLO SPEs' tranches of notes are traded on the Over-the-Counter market.

To be perfectly clear, none of the CLO SPEs themselves are in bankruptcy. This has never been threatened or a concern. Only the Debtor-Acis which ***manages*** the CLO business is in bankruptcy. For the most part, the CLO SPEs have continued somewhat "business as usual" during the Chapter 11 Bankruptcy Cases (*i.e.,* they have continued to receive interest payments on their baskets of loans; the usual interest payments on their tranches of debt have been paid;[7] and baskets of loans have been bought and sold from time to time). The CLO SPEs have retained their own separate counsel during the Chapter 11 cases, have appeared from time-to-time on matters, and are not currently objecting to the Plan. There is also an indenture trustee (U.S. Bank National Association) for the CLO SPEs' debt, that has seemingly faithfully carried on its role during the Chapter 11 Bankruptcy Cases without many objections to the bankruptcy process—only making occasional statements aimed at ensuring that the indentures for the CLOs are not interfered with or disrespected. The indenture trustee has retained and appeared through its own separate counsel during the Chapter 11 Bankruptcy Cases and is not currently objecting to the Plan.

Historically, the Debtor-Acis has had four main sets of contracts that were at the heart of its business and allowed it to function. The Chapter 11 Trustee has from time-to-time credibly

---

[7] The evidence reflected that there have been a couple of occasions recently when there were insufficient funds to make distributions to the equity. *E.g.,* Transcript 12/11/18 (PM) [DE # 790], at p. 15 (line 2) through p. 16 (line 18). But it appears to this court that these missed distributions were due to actions of Highland—as later explained herein—in improperly, surreptitiously attempting to liquidate the Acis CLOs, from the time period after the Chapter 11 Trustee was appointed, until the bankruptcy court issued an injunction to temporarily halt Highland's actions. *E.g.,* Transcript 12/11/18 (AM) [DE # 789], p. 67 (line 14) through p. 68 (line 6).

Appellee Appx. 00404
013217
Appx. 00655

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit Page 40 of 25 1804    Page 539 of 1017    PageID 14166
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 411 of 1803    PageID 11157
Case 18-30264-sgj11    Doc 3927-5    Filed 01/31/19    Entered 11/01/19 15:17:04    Page 6 of 47

testified that these agreements essentially created an "eco-system" that allowed the Acis CLOs to

be effectively and efficiently managed by the Debtor-Acis.

    1.  <u>The PMAs with the CLO SPEs.</u>[8]

    First, the Debtor-Acis has various portfolio management agreements (the "PMAs") ***with***

***the CLO SPEs***, pursuant to which the Debtor-Acis earns management fees. The PMAs have

been the primary "assets" (loosely speaking) of the Debtor-Acis (to be more precise, the PMAs

are executory contracts pursuant to section 365 of the Bankruptcy Code). They are what

generate revenue for the Debtor-Acis.

    2.  <u>The Sub-Advisory Agreement with Highland.</u>[9]

    Second, the Debtor-Acis had a Sub-Advisory Agreement (herein so called) with an

insider, ***Highland*** (*i.e.,* one of the Objectors). Highland's "insider" status will be further

explained below. Pursuant to this agreement, the Debtor-Acis essentially sub-contracted for the

use of Highland front-office personnel/advisors to perform management services for the Debtor-

Acis (*i.e.,* so that the Debtor-Acis could fulfill its obligations to the CLO SPEs under the PMAs).

The Debtor-Acis paid handsome fees to Highland pursuant to this agreement. This, too, was an

executory contract pursuant to section 365 of the Bankruptcy Code. As explained below, this

agreement was rejected (with bankruptcy court approval)[10] by the Chapter 11 Trustee during the

Bankruptcy Cases, when the Chapter 11 Trustee credibly represented that he had not only found

resources to provide these services at a much lower cost to the estate, but he also had begun to

---

[8] Exhs. 6-10.

[9] Exh. 17.

[10] *See* 11 U.S.C. § 365(a).

Appellee Appx. 00405
Appx. 00656
013218

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Exhibit   Page 540 of 1017   PageID 14167
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 412 of 1803   PageID 11158
Case 18-30264-sgj11   Doc 3927-3   Filed 01/31/19   Entered 01/31/19 15:18:04   Page 7 of 47

believe that Highland was engaging in stealth efforts to liquidate the Acis CLOs, to the detriment

of the Debtor-Acis's creditors.[11]

      3.   The Shared Services Agreement with Highland.[12]

      Third, the Debtor-Acis also had a Shared Services Agreement (herein so called) with

Highland, pursuant to which the Debtor-Acis essentially sub-contracted for the use of Highland's

back-office services (again, so that the Debtor-Acis could fulfill its obligations to the CLO SPEs

under the PMAs).  To be clear, the Debtor-Acis had no employees of its own—only a couple of

officers and members.  The Debtor-Acis paid handsome fees to Highland for the personnel and

back-office services that Highland provided to the Debtor-Acis.  This, too, was an executory

contract pursuant to section 365 of the Bankruptcy Code.  As explained below, this agreement

was also rejected by the Chapter 11 Trustee during the Bankruptcy Cases (with bankruptcy court

approval) for the same reasons that the Sub-Advisory Agreement with Highland was rejected.

      4.   The Equity PMA.[13]

      Fourth, until a few weeks before the Bankruptcy Cases were filed, the Debtor-Acis also

had yet another portfolio management agreement (distinct from its PMAs with the CLO SPEs)

whereby the Debtor-Acis provided services not just to the CLO SPEs themselves, but separately

to the equity holder in the CLO SPEs.  This portfolio management agreement with the equity

holder in the CLO SPEs is sometimes referred to by the parties as the "ALF PMA," but it would

probably be easier to refer to it as the "Equity PMA" (for ease of reference, the court will refer to

---

[11] *See* Transcript 12/11/18 (AM) [DE # 789], at p. 48 (line 15) through p. 49 (line 16); p. 50 (line 12)
through p. 52 (line 7).

[12] Exh. 18.

[13] Exh. 11.

Appellee Appx. 00406
Appx. 00657
013219

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 541 of 1017    PageID 14168
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 413 of 1803    PageID 11159
Case 18-30264-sgj11    Doc 2375    Filed 01/31/19    Entered 01/31/19 15:04:48    Page 8 of 47

it as the "Equity/ALF PMA"). [14]   The Debtor-Acis did not earn a specific fee pursuant to the

Equity/ALF PMA, but the Chapter 11 Trustee and certain of his witnesses credibly testified that

the Debtor-Acis considered the agreement valuable and very important, because it essentially

gave the Debtor-Acis the ability to control the whole Acis CLO eco-system—in other words,

gave the Debtor-Acis the ability to make substantial decisions on behalf of the CLO SPEs'

*equity*—distinct from making decisions for the CLO SPEs themselves pursuant to the PMAs.

The more credible evidence before the court suggests that the Equity/ALF PMA delegated to the

portfolio manager (*i.e.,* the Debtor-Acis) the right to control the terms of any liquidation of

collateral in an optional redemption under the terms of the CLO indentures. [15]   In any event,

shortly before the Bankruptcy Cases were filed, agents of Highland and/or others controlling the

Debtor-Acis (including but not limited to Mr. James Dondero—the chief executive officer of

both the Debtor-Acis and of Highland):  (a) caused the Debtor-Acis to terminate this Equity/ALF

PMA (notably, the counter-party to this agreement, the equity owner, would have only been able

to terminate it "for cause" [16]); and (b) then caused the equity owner to enter into a new Equity

PMA with a newly formed offshore entity called Highland HCF Advisor, Ltd. ("Highland

HCF"). [17]   Mr. Dondero, in addition to being the chief executive of Highland and the Debtor-

Acis, also became the president of the newly formed Highland HCF. [18]   The Equity/ALF PMA

---

[14] There were actually different iterations of the Equity/ALF PMA including one dated August 10, 2015, and another dated December 22, 2016.

[15] Transcript 12/18/18 [DE # 804], at pp. 77-78.  *See also* Exh. 11 at §§ 5 and 6.

[16] The Equity/ALF PMA provided that the Debtor-Acis could only be removed as portfolio manager "for cause" at § 14(a)-(e).  Exh. 11.  On the contrary, the Debtor-Acis could terminate the Equity/ALF PMA without cause upon at least ninety (90) days' notice, pursuant to § 13(a)-(c).  Exh. 11.

[17] Exh. 23 (testimony of Scott Ellington), p. 175 (lines 6-25); *see also* Transcript 12/11/18 (AM) [DE # 789], at p. 54 (line 11) through p. 55 (line 5).

[18] *Id.* at p. 266 (lines 1-4).

Appellee Appx. 00407
Appx. 00658
013220

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 04/15/25   Page 542 of 1017   PageID 14169
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 414 of 1803   PageID 11160
Case 18-30264-sgj11   Doc 1293   Filed 01/31/19   Page 9 of 47

would have been an executory contract of the Debtor-Acis, pursuant to section 365 of the
Bankruptcy Code, if it had not been terminated shortly before the Bankruptcy Cases.  The court
has heard credible testimony that leads it to conclude that the Equity/ALF PMA would have been
assumed by the Debtor-Acis, pursuant to section 365 of the Bankruptcy Code, if not terminated
by agents of Highland on the eve of bankruptcy.  The court has heard credible testimony that it is
important for a portfolio manager to have not only the PMAs with the CLO SPEs themselves,
but also with the equity owners of the CLO SPEs.

## II.   A Few More Basics About CLOs.

In the world of CLOs (like other public debt instruments) there are occasionally
redemptions, refinancings, and resets.  A redemption is essentially when the equity in the CLO,
before maturity, calls for the liquidation of the collateral in the CLO and the repayment of the
tranches of notes, so that the CLO comes to an end.  A refinancing is when a lower interest rate
can be accomplished in the market place on the tranches of debt of the CLO, but the maturity
date and other terms remain in place (similar to a refinancing on a home mortgage).  This can
happen typically after a two-year non-call period.  A reset is when the maturity date, the
reinvestment period, or other changes in the terms of a CLO (beyond simply interest rate) are
accomplished.[19]

It should be noted that the top tranche of notes in the CLO SPEs (AAA-rated) is
considered the "controlling" class, and a majority of holders in this class can terminate the CLO
manager (*i.e.*, the Debtor-Acis LP) for cause on 45 days' notice, but these folks have apparently
been content to ignore the Bankruptcy Cases and the fighting between the Debtor-Acis and

---

[19] *See generally* Transcript 2/9/2018 [DE # 26], at p. 74-75.

Appellee Appx. 00408
Appx. 00659
013221

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Page 416 of 1804   Page 543 of 1017   PageID 14170
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 415 of 1803   PageID 11161
Case 18-30264-sgj11   Doc 2392   Filed 01/31/19   Entered 01/31/19 15:11:04   Page 10 of 47

Highland (as further described below)—no doubt because they are earning their fixed income stream without a hitch. And the bottom tranche of "notes" in the CLO SPEs (the equity) has voting rights and is a capital provider and, in certain ways, controls the CLO SPEs, by virtue of having the ability to make a redemption call after a certain "no-call" period—which would force a liquidation of the basket of loans in the CLO, with the proceeds paying down the tranches of notes, starting at the top with the Triple A's. But, by virtue of the Equity/ALF PMA, the Debtor-Acis was really acting for the equity. It seems substantially likely to the court that this is why Highland and its agents caused the Debtor-Acis to terminate the Equity/ALF PMA (which, as mentioned above, was an agreement that the equity could have only terminated "for cause"—and it appears there would have been no "cause").

### III.   The Non-Insider Creditors.

The Debtor-Acis does not have many creditors. The non-insider creditors are, for the most part, Joshua Terry ("Mr. Terry") and a few vendors (most of which are law firms).

Mr. Terry commenced the Bankruptcy Cases with the filing of involuntary bankruptcy petitions. Mr. Terry was the human being who formerly, quite successfully served as the portfolio manager for the Debtor-Acis for many years. Mr. Terry was terminated under contentious circumstances on June 9, 2016, after getting into disagreements with Mr. Dondero. Mr. Terry was technically an employee of Highland itself (like all employees are, in the Highland family of companies—no matter which subsidiary or affiliate they work for). After his employment termination, Highland sued Mr. Terry in September 2016. Mr. Terry asserted claims back against Highland and both of the above-referenced Debtors. The litigation was referred to arbitration, and, after a ten-day arbitration trial in September 2017 before "JAMS," Mr. Terry obtained an Arbitration Award (herein so called), on October 20, 2017, jointly and

Appellee Appx. 00409
013222
Appx. 00569

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 04/08/25   Page 544 of 1017   PageID 14171
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 416 of 1803   PageID 11162
Case 18-30264-sgj11   Doc 2755   Filed 01/31/19   Page 11 of 47

severally, against both of the Debtors in the amount of $7,949,749.15, plus post-award interest at the legal rate.  A Final Judgment (the "Terry Judgment") confirming the Arbitration Award was entered on December 18, 2017, in the same amount as that contained in the Arbitration Award— $7,949,749.15.

Mr. Terry commenced the Bankruptcy Cases when he became concerned that the Debtor-Acis was being rendered insolvent and unable to pay creditors including himself, due to actions undertaken by Highland and its agents immediately after entry of the Arbitration Award (*e.g.,* transfers of assets, contracts, and business away from the Debtor-Acis).

The Debtor-Acis also is obligated on large administrative expense claims, since: (a) a Chapter 11 Trustee was appointed very early—due to what the bankruptcy court perceived to be massive conflicts of interest with regard to the Debtors' management; and (b) the Objectors have opposed virtually every action taken by the Chapter 11 Trustee during the Bankruptcy Cases, resulting in many long hearings.

## IV. <u>The Objectors (all of which are "Insiders").</u>

*There are no non-insider creditors objecting to the Plan*.  Mr. Terry supports the Plan. The CLO SPEs and Indenture Trustee do not oppose the Plan.  None of the vendors oppose the Plan.  The U.S. Trustee is not opposing the Plan.  As a technical matter, two impaired classes of creditors voted to accept the Plan.[20]  *So who are the Objectors to the Plan (which Plan will be further described below) and what is their party-in-interest status here?*

As earlier mentioned, the Objectors are: (a) Highland, (b) HCLOF Guernsey, and (c) Neutra Cayman.  As noted earlier, the Chapter 11 Trustee frequently refers to them collectively as "The Highlands"—but the Objectors do not like this conflation.  At one time Highland and

---

[20] Classes 2 and 3.  *See* Exh. 613.

Appellee Appx. 00410
Appx. 00561
013223

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 04/08/25   Page 545 of 1017   PageID 14172
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 417 of 1803   PageID 11163
Case 18-30264-sgj11   Doc 2275   Filed 01/31/19   Page 12 of 47

HCLOF Guernsey had the same lawyers.  They do not anymore.  However, they frequently file joint pleadings and take the same positions.  Highland and Neutra Cayman do still have the same lawyers.

    1.   <u>Highland.</u>

    Highland is a Dallas, Texas-based company that is a Registered Investment Advisor. Highland was founded in 1993 by Mr. Dondero, originally with a 75% ownership interest, and Mark K. Akada ("Mr. Akada"), originally with a 25% ownership interest.  As mentioned earlier, Mr. Dondero is the chief executive of Highland.  Highland, through its organizational structure of approximately 2,000 separate business entities, manages approximately $14-$15 billion of investor capital in vehicles including CLOs, private equity funds, and mutual funds.  Highland provides employees to entities in the organizational structure, such as it did with the Debtor-Acis, through the mechanism of shared services agreements and sub-advisory agreements (as mentioned above).  ***Notably, Highland's chief executive, Mr. Dondero, served as the President of the Debtor-Acis at all relevant times prepetition***.[21]  Highland claims to be a large creditor of the Debtor-Acis for services provided to the Debtor-Acis under the Shared Services Agreement and the Sub-Advisory Agreement.  The Chapter 11 Trustee disputes these claims and has asserted numerous claims back against Highland in an adversary proceeding (the "Highland Entities Adversary Proceeding").

    In any event, Highland is a ***disputed insider creditor***.  It is an "insider," as contemplated by Bankruptcy Code section 101(31)(C), because it, beyond any shadow of a doubt, controlled the Debtor-Acis until these Bankruptcy Cases developed to the point of having a Chapter 11

---

[21] One witness, Hunter Covitz, referred to the Debtor-Acis as the "structured credit arm of Highland." Transcript 12/13/18 (AM) [DE # 793], at p. 57.

Appellee Appx. 00411
Appx. 00662
013224

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 04/06/25   Page 546 of 1017   PageID 14173
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 418 of 1803   PageID 11164
Case 18-30264-sgj11   Doc 2839-2   Filed 01/31/19   Entered 01/31/19 15:11:04   Page 13 of 47

Trustee take charge of the Debtor-Acis.  Highland does not seem to dispute that it is an insider.[22]

But, for the avoidance of doubt, Highland should be considered an insider of the Debtor-Acis for

at least the following reasons:  (a) the same human being (Mr. Dondero) was president of the

Debtor-Acis and was the chief executive of Highland; (b) Highland's General Counsel, Scott

Ellington, testified that Mr. Dondero controlled them both;[23] and (c) Highland provided the

Debtor-Acis with employees and management services pursuant to the Sub-Advisory Agreement

and Shared Services Agreement.[24]

Additionally, the court believes that the Chapter 11 Trustee made a convincing argument

in connection with Plan confirmation (and his justification for the separate classification of

Highland's claim in the Plan from other general unsecured creditors) that Highland should also

be regarded as a "competitor" of the Debtor-Acis at this juncture, since they are both in the fund

management business and Highland's control over the Debtor-Acis has now been divested.

Highland's competitor status, in addition to its insider status, warrants additional scrutiny of its

---

[22] Under section 101(31) of the Bankruptcy Code, an insider includes certain enumerated parties, such as an officer of the debtor, affiliate, *etc.*  Further, the list of enumerated "insiders" is not exclusive or exhaustive.  *See Wilson v. Huffman (In re Missionary Baptist Foundation of Am., Inc.),* 712 F.2d 206, 210 (5th Cir. 1983). Recently, the United States Supreme Court stated: "Courts have additionally recognized as insiders some persons not on that [101(31)] list—commonly known as 'nonstatutory insiders.'  The conferral of that status often turns on whether the person's transactions with the debtor (or another of its insiders) were at arm's length." *U.S. Bank N.A. v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 963 (2018). The Fifth Circuit has noted that "cases which have considered whether insider status exists generally have focused on two factors in making that determination: (1) the closeness of the relationship between the parties and (2) whether the transaction . . . [was] conducted at arm's length."  *Browning Interests v. Allison* (*In re Holloway*), 955 F.2d 1008, 1011 (5th Cir. 1992).

[23] *E.g.,* Exh. 23, at pp. 160 (line 15) through 161 (line 4); p. 196 (lines 14-19); p. 219 (lines 1-21).

[24] *See* 11 U.S.C. §§ 101(2)(D); (31)(C)(5).  The court notes that, although Highland has, from time to time, alleged that Mr. Terry is a "non-statutory insider" of the Trustee, it has never put on any credible evidence to support this contention.

Appellee Appx. 00412
013225

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 04/06/25   Page 547 of 1017   PageID 14174
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 419 of 1803   PageID 11165
Case 18-30264-sgj11   Doc 392-5   Filed 01/31/19   Page 14 of 47

motivations in objecting to the Plan.  More importantly, it provides a sound legal and business justification for separately classifying its claim in the Plan.

> 2.  HCLOF Guernsey.

The second Objector, HCLOF Guernsey, is an entity formed in the island nation of Guernsey.  It has two allegedly independent Directors from Guernsey who have provided testimony in connection with confirmation of the Plan.  It was enormously clear to the court (as will be elaborated upon below) that the two Directors of HCLOF Guernsey are—stated in the kindest way possible—mere "figureheads" for HCLOF Guernsey and they defer to Highland *entirely* to tell them what to do, what to say, and when.  In any event, HCLOF Guernsey is the owner of the equity in the CLO SPEs (as earlier mentioned, this equity is sometimes referred to as the "subordinated notes" in the CLO SPEs).  According to HCLOF Guernsey's 2017 Annual Report and Audited Financials, all of its subordinated notes issued by the Acis CLOs are physically held at and are pledged to HCLOF Guernsey's lender, NexBank, which happens to be a Dallas bank that is an affiliate of Highland.[25]  HCLOF Guernsey was created in the year 2015 and was formerly known as "ALF."[26]  Its name was changed on October 30, 2017 (ten days after Mr. Terry's Arbitration Award was entered), to allegedly distance itself from the Debtor-Acis. The equity owner HCLOF Guernsey, in turn, has three equity owners:  (i) a 49% equity owner that is a charitable fund (*i.e.,* a donor advised fund or "DAF") that was seeded with contributions from *Highland*, is managed/advised by *Highland*, and whose *independent trustee is a long-time friend of Highland's chief executive officer, Mr. Dondero*; (ii) 2% is owned by *Highland employees*; and (iii)  a 49% equity owner that is a third-party institutional investor based in

---

[25] Exh. 647.

[26] "ALF" is short-hand for Acis Loan Funding, Ltd.

Appellee Appx. 00413
Appx. 00504
013226

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 04/16/25   Page 548 of 1017   PageID 14175
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 420 of 1803   PageID 11166
Case 18-30264-sgj11   Doc 3927-5   Filed 02/33/19   Entered 01/31/19 15:11:04   Page 15 of 47

Boston, Massachusetts that only recently invested in HCLOF Guernsey (*i.e.,* in November 2017, just after the Terry Arbitration Award was issued), and desires to remain passive and anonymous (hereinafter, the "Passive Investor").[27]  Notably, the Debtor-Acis itself owned a small percentage of HCLOF Guernsey, in addition to providing management services to it, until October 24, 2017 (four days after the Terry Arbitration Award was issued).

The court has allowed HCLOF Guernsey to vigorously participate in the confirmation hearing (and other hearings during the Bankruptcy Cases), although its party-in-interest status has been questionable.  So how is HCLOF Guernsey a party-in-interest?  The answer is a bit of a stretch—but the court has decided it is impacted by the Plan, so it should have the right to object. Its party-in-interest status has evolved during the Bankruptcy Cases.

First, early on in these Bankruptcy Cases, HCLOF Guernsey (together with Highland) sued the Chapter 11 Trustee in the above-mentioned "Highland Entities Adversary Proceeding"—mostly, if not entirely, seeking injunctive relief.  At that point, the Chapter 11 Trustee treated HCLOF Guernsey as a disputed creditor,[28] since it was seeking equitable relief that could arguably be monetized.[29]  However, HCLOF Guernsey subsequently withdrew its requests for relief in that Highland Entities Adversary Proceeding.  But then, the Chapter 11 Trustee subsequently filed claims *against* HCLOF Guernsey in the Highland Entities Adversary Proceeding (along with his claims against Highland and a couple of other Highland entities) asserting avoidance actions and other causes of action against HCLOF Guernsey (among other

---

[27] The testimony was that the Passive Investor committed to a $150 million investment ($75 million immediately and $75 million callable over the next several years).

[28] In fact, on August 15, 2018, the Chapter 11 Trustee filed a proof of claim on behalf of HCLOF Guernsey.  HCLOF Guernsey has since objected to the proof of claim.

[29] *See* 11 U.S.C. §§ 101(5)(B) & 101(10).

15

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-16 Filed 04/25/25 Page 549 of 1017 PageID 14176
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 421 of 1803 PageID 11167
Case 18-30264-sgj11 Doc 1392-35 Filed 01/31/19 Entered 01/31/19 Page 16 of 47

things, the Chapter 11 Trustee alleged that HCLOF Guernsey schemed with Highland to

terminate the Equity/ALF PMA, in a step toward systematically dismantling the Debtor-Acis of

its value). Thus, HCLOF Guernsey may ultimately owe money to this estate. But most

importantly, HCLOF Guernsey should be deemed a party-in-interest because of a proposed

temporary injunction in the Plan that essentially would enjoin (for a finite, defined period)

HCLOF Guernsey from exercising certain of its rights with regard to its equity in the CLO SPEs,

pending resolution of the Highland Entities Adversary Proceeding. This temporary injunction in

the Plan, directed towards HCLOF Guernsey and affiliates, will be further described below.

3. Neutra Cayman.

Neutra Cayman is a Cayman island exempted company that is the equity owner *of the*

***Debtor-Acis itself*** (in contrast to HCLOF Guernsey, which only owns equity in the CLO SPEs).

Neutra Cayman only acquired its equity interest in the Debtor-Acis the day after the Terry

Judgment was entered (on December 18, 2017), and for no consideration, from the Dugaboy

Investment Trust (a family trust on which Mr. Dondero's sister is named trustee, that previously

owned 74.9% of the Debtor-Acis) and from Mr. Akada (who previously owned 25% of the

Debtor-Acis).[30] The court concludes that Neutra Cayman has standing to object to the Plan,

---

[30] The court is repeatedly referring to the Debtor-Acis but, to be clear, there are two consolidated Debtors: Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP/LLC"). *See* note 2, *supra*. When Acis LP was first formed, it was owned by one general partner (Acis GP/LLC, with a .1% interest) and it had three limited partners: (a) the Dugaboy Investment Trust (a Dondero family trust of which either Mr. Dondero or his sister, Nancy Dondero, have been the trustee at all relevant times) with a 59.9% interest; (b) Mr. Terry with a 25% interest; and (c) Mr. Akada with a 15% interest. When Acis GP/LLC was formed (*i.e.,* the .1% owner of Acis LP), its sole member was the Dugaboy Investment Trust. After Mr. Terry was terminated by Highland, his 25% limited partnership interest in Acis LP was forfeited and divided among the two remaining limited partners: Mr. Akada (increasing his interest by 10% up to 25%), and the Dugaboy Investment Trust (increasing its interest by 15% up to 74.9%). But, most importantly, on the day after entry of Mr. Terry's Final Judgment (*i.e.,* on December 18, 2017), both Mr. Akada and the Dugaboy Investment Trust conveyed their entire limited partnership interests in Acis LP—25% and 74.9%, respectively—to Neutra Cayman. The Dugaboy Investment Trust also conveyed its 100% membership interest in Acis GP/LLC to Neutra Cayman.

Appellee Appx. 00415
Appx. 00505
013228

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Page 423 of 1804   Page 550 of 1017   PageID 14177
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 422 of 1803   PageID 11168
Case 18-30264-sgj11   Doc 1923-5   Filed 01/31/19   Page 1804   Page 17 of 47

since it is an equity owner of the Debtors (albeit only having acquired its equity about a month before the bankruptcy). As with HCLOF Guernsey, the court also concludes that Neutra-Cayman is absolutely, beyond any reasonable doubt, controlled by Highland, as explained further below.

## V.     The Plan.

The Plan is fairly simple, considering the complexity of the business and the relationships, and the contentiousness of the Bankruptcy Cases. Again, there aren't many creditors.

The Plan proposes[31] that the Debtor-Acis, as a "Reorganized Debtor," will continue with the business operations of the Debtors after the Effective Date[32] of the Plan. Specifically, the Debtor-Acis will assume, pursuant to section 365 of the Bankruptcy Code, its CLO PMAs and continue to serve as the portfolio manager to the CLO SPEs (and as to any resets of the CLOs therein). The Reorganized Debtor will continue to earn fees and will pay claims from post-Effective Date income as provided in the Plan. The Reorganized Acis will actively pursue additional fund management contracts. Again, there is no objection by the CLO SPEs to the Plan, and the indenture trustee on the tranches of CLO notes has no objection.

Mr. Terry (again, the former human manager of the Debtor-Acis and also the largest creditor) shall receive 100% of the equity interests in the Reorganized Debtor, in exchange for a negotiated $1 million reduction in his partially secured claim.[33] The remainder of his claim will

---

[31] This is merely a high-level summary of the Plan. The Plan terms, as modified, shall in all ways govern, not this summary.

[32] The "Effective Date" is defined, essentially, as the first business day which is fourteen (14) days after entry of an order confirming the Plan, if the confirmation order is not stayed.

[33] Mr. Terry has asserted partial secured status as to his claim in the proofs of claim he has filed in these cases. The Chapter 11 Trustee credibly testified that there was no other logical party to take the equity of

Appellee Appx. 00416
Appx. 00507
013229

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1426 of 1804    Page 551 of 1017    PageID 14178
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 423 of 1803    PageID 11169
Case 18-30264-sgj11    Doc 1392-75    Filed 01/31/19    Entered 01/31/19 15:19:04    Page 18 of 47

be treated as an unsecured claim. Each unsecured creditor will receive on the Plan Effective Date an unsecured cash flow note in the full amount of its claim, which notes will mature three years after the Effective Date of the Plan, with equal quarterly payments of principal and interest, at 5% interest per annum. These cash flow notes are expected to yield payment in full (actually 102%) to the unsecured creditors.[34]

As for the sub-advisory and shared services agreements with Highland, as noted earlier, the Chapter 11 Trustee, with bankruptcy court approval, has already (as of August 2018) rejected these during the Bankruptcy Cases, pursuant to section 365 of the Bankruptcy Code. The Chapter 11 Trustee caused the Debtor-Acis to subsequently contract, with bankruptcy court approval, with a different entity, Brigade Capital Management, L.P. ("Brigade"), to provide the sub-advisory and shared services going forward, for a minimum two-year term (unless the Reorganized Debtor and Brigade otherwise agree), at a much cheaper cost than Highland.[35] Thus, Brigade will provide sub-servicing and sub-advisory services to the Reorganized Debtor.

---

the Reorganized Debtor, at this juncture, and that he had negotiated this reduction to Mr. Terry's secured claim, and he thought it was justified by the circumstances of this case. While the Objectors have argued that the secured status of Mr. Terry's claim may be subject to challenge under section 547(b) of the Bankruptcy Code, section 547(b) is discretionary (*e.g.*, a "trustee may avoid any transfer" that might be avoidable as a preference). The Chapter 11 Trustee credibly emphasized that this was negotiated treatment of an asserted secured claim, and he had no "exclusivity" on proposing a plan if someone else had wanted to propose something different. Transcript 12/11/18 (AM) [DE # 789], at p. 70 (line 3) through p. 71 (line 2).

[34] Insider claims—namely Highland—are separately classified from general unsecured claims under the Plan. To the extent such claims are ultimately allowed (after any allowed defenses and offsets), and to the extent such claims are not equitably subordinated by Bankruptcy Court adjudication, these claims will receive the same treatment as other general unsecured claims (cash flow notes). To the extent any of these claims are ultimately allowed but equitably subordinated, they will receive subordinated promissory notes, accruing interest at 5% per annum, that will not be payable until all non-subordinated claims have been paid in full (they will have maturity dates to occur on the earlier of: (i) the date that is two years after the date all Unsecured Cash Flow Notes have been paid in full, or (ii) five years after the Effective Date). The expected recovery under the Plan for the insider claims is from 65% to 100%.

[35] An entity named Cortland Capital Markets Services LLC ("Cortland") is actually providing some of the back-office shared services agreement type functions.

Appellee Appx. 00417
Appx. 005508
013230

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Filed 04/25/25    Page 552 of 1017    PageID 14179
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 424 of 1803    PageID 11170
Case 18-30264-sgj11    Doc 3922-5    Filed 11/01/19    Page 19 of 47

As for the Equity/ALF PMA, it is not an agreement with the Debtor-Acis anymore to either be assumed or rejected, pursuant to section 365. However, in the Highland Entities Adversary Proceeding, the Chapter 11 Trustee seeks to avoid the termination of the Equity/ALF PMA. Pursuant to the Plan, the Reorganized Debtor will be vested with certain Assets of the Debtors, including Estate Claims and Estate Defenses, to be administered and liquidated by the Reorganized Debtor.

    1.    The Highland Entities Adversary Proceeding (Adv. Proc. No. 18-03212).

Suffice it to say that the Highland Entities Adversary Proceeding is a somewhat significant part of the Plan; it is what justifies the temporary injunction that is a critical part of the Plan. With regard to the Highland Entities Adversary Proceeding, the Defendants in it (there are five of them) are: (i) Highland; (ii) HCLOF Guernsey; (iii) Highland HCF (*i.e.,* the Cayman Island entity that was recently formed to essentially replace the Debtor-Acis under the Equity/ALF PMA); (iv) Highland CLO Management, Ltd. ("Highland Management") (an entity registered in the Cayman Islands on October 27, 2017—seven days after Mr. Terry's Arbitration Award); and (v) Highland CLO Holdings, Ltd. (yet another entity incorporated in the Cayman Island on October 27, 2017). The Highland Entities Adversary Proceeding is essentially a multi-faceted fraudulent transfer action. The statutory predicates for the relief sought are sections 502, 542, 544, 547, 548, and 550 of the Bankruptcy Code and Texas Business & Commerce Code § 24.001 et seq. ("TUFTA").

Distilled to its essence, the Highland Entities Adversary Proceeding argues that Highland, along with its related Co-Defendants, ***orchestrated a systematic transfer of value away from the Debtor-Acis to other Highland entities*** (all of those transferee-entities are offshore entities—whereas the Debtor-Acis is a Delaware entity), beginning almost immediately after Mr. Terry

Appellee Appx. 00418
Appx. 00660
013231

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhib6    Page 426 of 1804    Page 553 of 1017    PageID 14180
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 425 of 1803    PageID 11171
Case 18-30264-sgj11    Doc 1239-27    Filed 01/31/19    Page 20 of 47

was terminated in June 2016, and continuing on during Mr. Terry's litigation/arbitration with the Debtor-Acis, and then rapidly unfolding after the Arbitration Award. This was allegedly done to denude the Debtor-Acis of value and make the Debtors "judgment proof." This was allegedly also done to ensure that the Debtor-Acis's very valuable business as portfolio manager would be taken over by other Highland entities and remain under Highland's and Mr. Dondero's control.[36]

The evidence is rather startling on this point. Among other things, pursuant to amendments made to the Debtor-Acis's Sub-Advisory Agreement and Shared Services Agreements with Highland, starting soon after Mr. Terry was terminated, the fees owed by the Debtor-Acis to Highland under these agreements shot up to an enormously higher level. Then, in April 2017, a new CLO was issued (or actually a former Acis CLO was reset) and a new Highland-affiliated Cayman Island entity was ultimately put in place to manage it instead of the Debtor-Acis (even though the Debtor-Acis managed all other CLOs in the Highland corporate empire). Numerous other transactions were undertaken through the Fall of 2017, removing assets and agreements away from the Debtor-Acis. For example, a multi-million dollar note receivable owed to the Debtor-Acis by Highland was transferred out of the Debtor-Acis,[37] and

---

[36] Exh. 627.

[37] On November 3, 2017, the Debtor-Acis, Highland, and Highland Management (a newly created, offshore Highland affiliate) entered into that certain Agreement for Assignment and Transfer of Promissory Note (the "Note Assignment and Transfer Agreement"). Exh. 225. The Note Assignment and Transfer Agreement, among other things, transferred a $9.5 million principal amount promissory note executed by Highland and payable to the Debtor-Acis (the "Note"), Exh. 218, from the Debtor-Acis to Highland Management (the "Note Transfer"). The Assignment and Transfer Agreement memorializing this transaction is signed by Mr. Dondero for the Debtor-Acis. The document recites that (i) Highland is no longer willing to continue providing support services to the Debtor-Acis, (ii) the Debtor-Acis, therefore, can no longer fulfill its duties as a collateral manager, and (iii) Highland Management agrees to step into the collateral manager role if the Debtor-Acis will assign the Note to it. Notably, Highland Management was registered in the Cayman Islands on October 27, 2017, roughly a week before the Note Transfer. Thus, Highland Management had no portfolio or collateral management experience whatsoever when it entered the Assignment and Transfer Agreement. To the contrary, it appears Highland Management was an entity that was created specifically to hold the Note and eventually take possession of the CLO PMAs in an international forum that would be difficult for Mr. Terry to reach. The Debtor-

Appellee Appx. 00419
Appx. 00579
013232

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 36-186    Page 426 of 1804    Page 554 of 1017    PageID 14181
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 426 of 1803    PageID 11172
Case 18-30264-sgj11    Doc 2392-35    Filed 01/30/19    Entered 01/30/19 15:32:04    Page 21 of 47
Case 19-12239-CSS    Doc 33-19    Filed 11/13/19    Page 22 of 48

shares in HCLOF Guernsey held by the Debtor-Acis were sold back to HCLOF Guernsey (four days after the Arbitration Award). And then the Equity/ALF PMA was terminated so that the Debtor-Acis would no longer have management-control over HCLOF Guernsey as its portfolio manager—arguably putting Highland in a position to liquidate the Acis CLOs and put the Debtor-Acis out of business. Specifically, on October 27, 2017, just seven days after Mr. Terry's Arbitration Award, the Debtor-Acis ostensibly terminated its own portfolio management rights under the Equity/ALF PMA[38] and transferred its authority and its valuable portfolio management rights—for no value—to Highland HCF, an affiliate of Highland. It appears that the only alleged consideration for these transfers, to the extent there was any, was the satisfaction of purported debts owed to other Highland entities or their representatives.

---

Acis appears to have received no or insufficient consideration for the Note Transfer. The primary consideration for the Note Transfer was an alleged payable due from the Debtor-Acis to Highland in the approximate amount of $7.5 million for participation fees, which was transferred to Highland Management shortly before the Note Assignment and Transfer Agreement was entered. The validity of the alleged "participation fees" is unknown. The remainder of the consideration for the Note Transfer is a promise to pay certain expenses of the Debtor-Acis, which has apparently never occurred. In any event, it appears highly likely that the Note Transfer took away the Note as an asset from which Mr. Terry could collect his judgment.

[38] As mentioned earlier, the Equity/ALF PMA provided that the Debtor-Acis could only be removed as portfolio manager by the equity owner (now known as HCLOF Guernsey) *"for cause"* at § 14(a)-(e). Exh. 11. Meanwhile, the Debtor-Acis could terminate the Equity/ALF PMA without cause upon at least ninety (90) days' notice, pursuant to § 13(a)-(c). Exh. 11. It would appear that these terms were wholly ignored by the persons orchestrating the Equity/ALF PMA termination. It appears that the Debtor-Acis was simply manipulated to consent and agree to its removal and replacement as portfolio manager of HCLOF Guernsey. This transfer of the Debtor-Acis's portfolio management rights to the offshore entity Highland HCF was accomplished by way of a new portfolio management agreement entered into by the equity owner (now known as HCLOF Guernsey) and Highland HCF on October 27, 2017, which empowered Highland HCF with the same broad authority to direct the management of HCLOF Guernsey as was previously held by the Debtor-Acis LP under the Equity/ALF PMA. *See* Exh. 19, October 27, 2017 PMA §§ 1 & 5(a)-(q). This agreement appears to have been further solidified in a second portfolio management agreement dated November 15, 2017. Exh. 215. The Debtor-Acis received no consideration for this transfer.

Appellee Appx. 00420
Appx. 00671
013233

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-6 Filed 04/06/25 Page 555 of 1017 PageID 14182
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 427 of 1803 PageID 11173
Case 18-30264-sgj11 Doc 3927-55 Filed 01/30/19 Entered 01/30/19 15:12:54 Page 22 of 47

The Highland Defendants argue that the Equity/ALF PMA (its termination being arguably the most significant transfer referenced in the Highland Entities Adversary Proceeding) did not have value. But the evidence convinces the court that it absolutely did. A witness, Mr. Zachary Alpern, credibly testified that the portfolio manager (under the Equity/ALF PMA) made decisions regarding the underlying financial instruments including seeking an optional redemption and negotiating a reset. Mr. Alpern also credibly testified about the importance, in the CLO industry, of the portfolio manager having control of a CLO's equity to ensure an "evergreen fee stream."[39] Additionally, Mr. Terry also credibly testified that the portfolio manager (not the CLO equity interest holder) has the right to control the terms of the liquidation of collateral in an optional redemption under the terms of the indentures.[40] The Chapter 11 Trustee also credibly testified that the Equity/ALF PMA allowed the Debtor-Acis to have control of an optional redemption.[41] Finally, a witness, Mr. Klein, credibly testified about the value of the Equity/ALF PMA and the negative impact of its transfer on the Debtor-Acis LP. [42]

To be clear, Highland and HCLOF Guernsey have argued in opposition to the Chapter 11 Trustee's position that it is HCLOF Guernsey—the actual equity holder of the CLO SPEs—that had/has the absolute power and authority to control the CLO SPEs' destinies and it is ludicrous to suggest otherwise. However, not only does the Equity/ALF PMA appear to this court to have delegated the relevant power and authority *to the Debtor-Acis*, but Highland's own expert on this

---

[39] Exh. 404, Transcript 8/23/18 (AM) at pp. 65-67, 81-93 and Transcript 8/23/18 (PM) at pp. 34-35, 38-40, 46, and 49.

[40] Transcript 12/18/18 [DE # 804], at pp. 77-78. *See also* Exh. 405, Transcript 8/27/18 (AM) at pp. 63-75.

[41] Exh. 405, Transcript 8/27/18 (AM) at p. 53.

[42] Exh. 405, Transcript 8/27/18 (PM) at pp. 143-144, 147-159 and 205-207.

Appellee Appx. 00421
Appx. 00672
013234

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 03/25/804   Page 556 of 1017   PageID 14183
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 428 of 1803   PageID 11174
Case 18-30264-sgj11   Doc 3927-3 Filed 01/31/19   Entered 01/31/19 15:24:04   Page 23 of 47

topic, Mr. Castro, testified that the "actual humans" who would make the decision for HCLOF

Guernsey as to whether to request an optional redemption of the Acis CLOs were not the

HCLOF Guernsey directors but, rather, Highland executives Mr. Dondero, Mr. Okada, and

Highland employee Mr. Covitz (acting for Highland HCF).[43]  Moreover, Mr. Alpern credibly

testified that, before the Terry Arbitration Award, the Debtor-Acis, as the portfolio manager

under the Equity/ALF PMA, rather than the HCLOF Guernsey's directors, issued the notices of

optional redemption for HCLOF Guernsey.[44]

      The court concludes that the Chapter 11 Trustee has demonstrated a likelihood of

success on the merits with regard to his claims set forth in the Highland Entities Adversary

Proceeding.  Therefore, the Temporary Injunction that is part of the Plan is supportable (as

further explained below).  Of course, the nature and extent of the rights ultimately recovered by

the Debtor-Acis will either be determined in the Highland Entities Adversary Proceeding or, as

HCLOF Guernsey's own Guernsey expert conceded, in a binding arbitration in Dallas, Texas

under the terms of the Equity/ALF PMA.[45]

      2.   The Plan Injunction.

      The most controversial aspect of the Plan—the aspect of it that seems to be the primary

focus of the Objectors—is a ***portion*** of an injunction in the Plan (the "Temporary Injunction").

The Temporary Injunction would ***temporarily*** enjoin the following parties ***from effectuating an***

***optional redemption or liquidating the Acis CLOs*** and related actions: (i) Highland; (ii) HCLOF

---

[43] Exh. 406, Transcript 8/28/18 (PM) at pp. 61-63.

[44] Exh. 404, Transcript 8/23/18 (AM) at pp. 85-89 and Exhs. 323-325 (Notices of Optional Redemption signed by the Debtor-Acis as portfolio manager of HCLOF).

[45] Transcript 12/13/18 (PM) [DE #794], at pp. 116, 118-19, 122, 124 (Corfield); *see also*, p. 140 (McGuffin).

Appellee Appx. 00422
Appx. 00673
013235

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Exhibit    Filed 06/25/25    Page 557 of 1017    PageID 14184
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 429 of 1803    PageID 11175
Case 18-30264-sgj11-DC 3892-75ledDoc3619    Filed 01/31/19 Page 24 of 47    Page 24 of 47

Guernsey; (iii) CLO Holdco, Ltd. (the donor advised fund, seeded with Highland contributions and managed by Highland that owns 49% of HCLOF Guernsey); (iv) Neutra Cayman; (v) Highland HCF (the Cayman Island entity created shortly before the Bankruptcy Cases to replace the Debtor-Acis under the Equity/ALF PMA); (vi) Highland Management (the Highland-created entity that entered into a portfolio management agreement with a new Acis-CLO that was established in 2017); and (vii) any affiliates of Highland and their respective employees, agents, representatives, transferees, assigns, and successors.[46] This Temporary Injunction is proposed to only last until the earlier of when:  (a) the creditors of the Debtors are paid in full; (b) resolution of the Highland Entities Adversary Proceeding; (c) a material breach in the Plan; or (d) the bankruptcy court terminates the Temporary Injunction upon request of a party-in-interest. ***Fully consensual resets of the Acis CLOs are permissible if HCLOF Guernsey, as the equity owner in the CLO SPEs, chooses to agree to resets***.  The basis for the Temporary Injunction is as follows:  The Chapter 11 Trustee has asserted numerous claims in the Highland Entities Adversary Proceeding against Highland, HCLOF Guernsey, and affiliates, including claims to recover the Debtor-Acis's rights under the Equity/ALF PMA.[47]  The Temporary Plan Injunction essentially provides for the continuation, after the Effective Date, of injunctive relief that the bankruptcy court previously granted in its Preliminary Injunction Order (the "Preliminary Injunction") [DE # 21 in Adversary No. 18-03212-sgj] entered on July 10, 2018 in the Highland Entities Adversary Proceeding.  The Preliminary Injunction was originally set to expire by its

---

[46] There is another portion of this Plan injunction that is more of a general plan injunction (*i.e.,* very typical) that would prohibit actions against the Debtors, Reorganized Debtor and the Estate Assets, based on acts occurring before the Effective Date, which would be permanent and would not expire upon the occurrence of any event that causes the Temporary Plan Injunction to expire.

[47] *See* Exh. 627, Trustee's Counterclaims and Claim Objection.

Appellee Appx. 00423
Appx. 00574
013236

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-186 Filed 04/16/25 Page 558 of 1017 PageID 14185
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 430 of 1803 PageID 11176
Case 18-30264-sgj11 Doc 3927 Filed 01/31/19 Entered 01/31/19 Page 25 of 47

own terms upon confirmation of the Plan but would be extended pursuant to an order confirming

the Plan, through the Effective Date of the Plan.

As the Fifth Circuit has stated, the four elements to justify a preliminary injunction are (a)

substantial likelihood of success on the merits; (b) substantial threat that the plaintiff will suffer

irreparable injury; (c) the threatened injury outweighs any harm the injunction might cause the

defendant; and (d) the injunction is in the public interest.[48] Each element is present in these

cases.

*Immediate and Irreparable Harm.* The court finds and concludes that the Temporary

Injunction is legally permissible, necessary, and appropriate to avoid immediate and irreparable

harm to the Reorganized Debtor (*i.e.,* evisceration of the Acis CLOs, by parties with unclean

hands, that would have no authority to effectuate a liquidation of the CLOs, absent the

prepetition wrongful termination of the Equity/ALF PMA). Mr. Scott, a director of HCLOF

Guernsey, testified that, absent the Temporary Plan Injunction, HCLOF Guernsey would call for

an optional redemption of the Acis CLOs.[49] The testimony of Ms. Bestwick, the other director

of HCLOF Guernsey, also implied that, when the injunction expires, HCLOF Guernsey would

redeem the Acis CLOs so that they could once again be managed by Highland.[50] The Chapter 11

Trustee credibly testified that if the Acis CLOs are liquidated, there is nothing for the Debtor-

Acis to manage.[51] The Chapter 11 Trustee credibly testified that the Temporary Plan Injunction

---

[48] *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *Women's Med. Ctr. of N.W. Houston v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001); *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998).

[49] Exh. 721, Mr. Scott Depo. at pp. 204.

[50] Exh. 719, Bestwick Depo. at p. 112.

[51] Exh. 405, Transcript 8/27/18 (AM) at p. 40.

Appellee Appx. 00424
Appx. 00675
013237

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 04/26/25   Page 559 of 1017   PageID 14186
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 431 of 1803   PageID 11177
Case 18-30264-sgj11   Doc 3927-55   Filed 01/31/19   Entered 01/31/19   Page 26 of 47

is very important because it protects the revenues under the Acis PMAs, which is a source of potential recovery to creditors under the Plan.[52]  Mr. Terry credibly testified that the Temporary Plan Injunction is a critical component of the Plan and that the Debtor-Acis would have no going concern value without it.  In fact, without the Plan Injunction, Mr. Terry will be precluded from reorganizing the business and paying creditors.[53]

The Objectors have argued that the Chapter 11 Trustee cannot suffer irreparable harm because he has an adequate remedy at law.  This argument misses the mark.  The destruction of the Debtors' ongoing business, which has the potential to repay creditors under the Plan in two years, constitutes irreparable harm.  The fact that the estate possesses a number of avoidance claims for damages against Highland and its affiliates, and could potentially obtain damages on such claims, does not render the destruction of the Debtor-Acis's ongoing business any less harmful.  Indeed, according to the Fifth Circuit:

> [T]he mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.' For example, some courts have found that a remedy at law is inadequate if legal redress may be obtained only by pursuing a multiplicity of actions.[54]

*Likelihood of Success on the Merits.*  The Chapter 11 Trustee has also demonstrated a likelihood of succeeding on the merits in the Highland Entities Adversary Proceeding.

---

[52] Transcript 12/11/18 (AM) [DE # 789], at pp. 71-72.

[53] Transcript 12/12/18 (AM) [DE # 791], at pp. 40-41, 54-55.

[54] *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (citing *Lee v. Bickell*, 292 U.S. 415, 421 (1934) ("we are not in doubt, the multiplicity of actions necessary for redress at law [is] sufficient . . . to uphold the remedy by injunction.")).

Appellee Appx. 00425
Appx. 00676
013238

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 4/03/25   Page 560 of 1017   PageID 14187
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 432 of 1803   PageID 11178
Case 18-30264-sgj11   Doc 2392-7   Filed 01/31/19   Entered 01/31/19   Page 27 of 47   Page 27 of 47

The record contains substantial evidence of both intentional and constructive fraudulent transfers with regard to the Equity/ALF PMA and other assets.[55]  The numerous prepetition transfers that occurred around the time of and after the Terry Arbitration Award appear more likely than not to have been made to deprive the Debtor-Acis of value and with actual intent to hinder, delay or defraud the Debtors' creditors.  Highland's only purported business justifications for the prepetition transfers were that the Passive Investor demanded it and that the Debtor-Acis's brand was toxic in the market place.[56]  However, these business justifications were not supported (and, in fact, were contradicted) by the evidence.

Indeed, while representatives of Highland and its affiliates said that the Passive Investor's demands were the reason for the termination (*i.e.*, essentially a "transfer") of the Equity/ALF PMA, the Passive Investor's representative testified that this was untrue and that these alleged demands were never made by the Passive Investor.[57]  In fact, the Passive Investor was just that— a passive, minority investor in HCLOF Guernsey with no ability to influence or control any of

---

[55] *E.g.,* Exh. 22, Transcript 2/6/18 at pp. 82-109, 130, 202-244, and the exhibits discussed therein; Exh. 201, Transcript 3/21/18 at pp. 110-133 & 186-191; Exh. 24, Transcript 3/22/18 at pp. 71-75 & pp. 204-205; Transcript 12/11/18 [DE # 789], at pp. 52-56; *see also* Transcript 8/27/18 (AM) [DE # 552], at p. 52; Transcript 12/12/18 (PM) [DE # 792], at pp. 92-98;

[56] Highland General Counsel Scott Ellington testified that the Passive Investor said it had no interest in doing business with the Debtor-Acis because the Debtor-Acis brand was purportedly toxic and, consequently, nothing associated with the Debtor-Acis could be managed or marketed as a CLO.  Exh. 23, Transcript 2/7/18 at pp. 55-58.  Mr. Ellington further testified that the Passive Investor demanded that the Equity/ALF PMA be transferred.  Exh. 23, Transcript 2/7/18 at pp. 203-204.  Mr. Ellington also testified that, because the Passive Investor would be putting in additional capital in connection with any reset CLOs, it had the ability to "start calling the shots" and dictate the terms of any reset transactions.  Exh. 23, Transcript 2/7/18 at p. 226.  Additionally, Highland executive Mark Okada testified that a reset transaction could not be performed by the Debtor-Acis because the market would not accept the Debtor-Acis as a portfolio manager and the Debtor-Acis was no longer risk-retention compliant.  Exh. 25, Transcript 3/23/18 at p. 53.  Additionally, Mr. Dondero testified that the "Boston investor" deal was contingent on getting away from the Debtor-Acis and getting a new collateral manager.  Exh. 25, Transcript 3/23/18 at pp. 143-144.

[57] *See* Exh. 720 and excerpts read in to the trial record on 12/11/18 (PM) at pp. 149-157.

27

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 04/25/21 804    Page 561 of 1017    PageID 14188
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 433 of 1803    PageID 11179
Case 18-30264-sgj11    Doc 892    Filed 01/31/19    Page 28 of 47

the actual investment decisions.[58]  The only other business justification Highland and HCLOF

Guernsey have suggested for the prepetition transfers was that the Debtor-Acis "was a shell" and

not capable of being risk retention compliant.[59]  However, Highland portfolio manager Hunter

Covitz testified that in October 2017, prior to the Terry Arbitration Award, there was a structure

in place that would comply with risk retention.[60]  Mr. Covitz could not convincingly distinguish

why the "shell" status of the Debtor-Acis was distinguishable from the "shell" status of other

Highland-related entities that were the recipients of various fraudulent transfers.[61]  Mr. Covitz

also subsequently admitted that the Passive Investor did not request that the Debtor-Acis end its

involvement with HCLOF Guernsey through the Equity/ALF PMA fraudulent transfer or request

that ALF change its name to HCLOF [Guernsey].[62]  Mr. Covitz's testimony contradicted the

testimony provided by Scott Ellington, General Counsel[63] and Mr. Dondero.[64]  And, at bottom, if

the Debtor-Acis was a thinly capitalized "shell," it appears to be only because Highland

systematically made it that way after the Terry Arbitration Award.

    The evidence established overwhelmingly that there is a substantial likelihood that the

transfers were part of an intentional scheme to keep assets away from Mr. Terry as a creditor.

Highland put on an expert, Mr. Greenspan, who testified that he did not consider whether the

---

[58] Exh. 720, Depo. of Passive Investor representative at pp. 32-33.

[59] Transcript 12/13/18 (AM) [DE # 793], at pp. 55-58.

[60] Transcript 12/13/18 (AM) [DE # 793], at pp. 77-78.

[61] Transcript 12/13/18 (AM) [DE # 793], at p. 78; Transcript 12/18/18 [DE # 804], at pp. 59-63.

[62] Transcript 12/13/18 (AM) [DE # 793], at p. 103.

[63] See Exh. 23, Transcript 2/7/18 at pp. 177-178.

[64] See Ex. 25, Transcript 3/23/28 at pp. 143-44.

Appellee Appx. 00427
Appx. 00678
013240

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 04/25/25   Page 562 of 1017   PageID 14189
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 434 of 1803   PageID 11180
Case 18-30264-sgj11   Doc 3927-55   Filed 01/31/19   Entered 01/31/19   Page 29 of 47

Equity/ALF PMA transfer was an "actual" fraudulent transfer, but only considered whether the transfer was "constructively" fraudulent.[65]  While Highland has taken the position that termination of the Equity/ALF PMA was not a transfer, Mr. Greenspan testified that the termination of a contract can constitute a transfer and acknowledged that the definition of a transfer in the Bankruptcy Code does not include a value component.[66]

*Balance of Harms.*  The Chapter 11 Trustee has also shown the balance of harms weighs in his and the estates' favor in granting the Plan's Temporary Injunction.  The Chapter 11 Trustee is entitled to the Temporary Injunction pending resolution of the claims asserted in the Highland Entities Adversary Proceeding.  The Chapter 11 Trustee credibly testified that the Temporary Plan Injunction is important to the Plan, because it allows the cash flow from the CLO management to be collected by the Reorganized Debtor, and that is the source of revenue available at this time to pay creditors.[67]  Mr. Terry also credibly testified that the Temporary Plan Injunction is a critical component of the Plan necessary to preserve the Debtors' going concern value and allow the Reorganized Debtor to generate new business and repay creditors.[68]  Conversely, in this court's view, there is no real harm to Highland or the Co-Defendants because they can ask for a reset under the Plan.[69]  Mr. Scott, a director of HCLOF Guernsey, testified that

---

[65] Transcript 12/12/18 (PM) [DE # 792], at pp. 116-117 and 161.

[66] Transcript 12/12/18 (PM) [DE # 792], at pp. 92-98.  Section 548(a)(1)(A) of the Bankruptcy Code only requires that a transfer be made with actual intent to hinder, delay or defraud creditors.  In the context of an intentionally fraudulent transfer claim, questions of value are immaterial. 11 U.S.C. § 548(a)(1)(A).  The definition of "transfer" under the Texas Uniform Fraudulent Transfer Act ("TUFTA") also does not include a value component.  Tex. Bus. & Comm. Code Ann. § 24.002(12) (West, Westlaw through 2017).

[67] Transcript 12/11/18 (AM) [DE # 789], at pp. 71-72.

[68] Transcript 12/12/18 (AM) [DE # 791], at pp. 40-41, 54-55.

[69] Transcript 12/11/18 (AM) [DE # 792], at p. 92.

Appellee Appx. 00428
Appx. 00679
013241

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 406 of 1804    Page 563 of 1017    PageID 14190
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 435 of 1803    PageID 11181
Case 18-30264-sgj11    Doc 2392-55    Filed 01/31/19    Entered 01/31/19 15:13:04    Page 30 of 47

HCLOF Guernsey can sell its interest in the subordinated notes in the market.[70]  The Chapter 11 Trustee credibly testified that the Temporary Plan Injunction would not impair the value of the subordinated notes because a rational investor would not want to liquidate the Acis CLOs, but rather would acquire them to do a reset under the Plan.[71]  Mr. Terry credibly testified that even if the Acis CLOs are not reset, it still does not make sense to redeem the Acis CLOs.[72]

    *Public Interest.*  Finally, issuance of the Plan Injunction is consistent with public policy. Public policy favors the equitable collecting of a debtor's assets, maximizing the value of those assets, and distributing the proceeds in an orderly fashion in accordance with the priorities and safeguards set forth in the Bankruptcy Code, rather than in an uncontrolled, piecemeal, and potentially wasteful way.  Public policy also supports successful reorganizations.[73]  The public interest is furthered by confirming a plan that saves the Debtor-Acis's business operations and allows it to pay its creditors under a successful plan of reorganization.  The public interest is also furthered by maintaining the status quo through the Temporary Plan Injunction so that the avoidance action relating to the Equity ALF PMA can be determined on its merits.  The public interest is not furthered by allowing potential wrongdoers to complete the last step in what appears likely to have been a scheme to strip the Debtor-Acis of its assets, steal its business, and leave it unable to pay creditors.  The public interest is not furthered by leaving the Debtors

---

[70] Exh. 721, Mr. Scott Depo. at p. 28.

[71] Transcript 12/11/18 (PM) [DE # 790], at pp. 23-24.

[72] Transcript 12/12/18 (AM) [DE #791], at p. 82.

[73] *Tex. Comptroller of Pub. Accounts v. Transtexas Gas Corp. (In re Transtexas Gas Corp.)*, 303 F.3d 571, 580 (5th Cir. 2002).

Appellee Appx. 00429

Appx. 00689

013242

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/04   Page 564 of 1017   PageID 14191
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 436 of 1803   PageID 11182
Case 18-30264-sgj11   Doc 3827-5   Filed 01/31/19   Page 31 of 47

without sufficient resources to pursue and effectively litigate potentially valuable causes of action.

In sum, the court finds and concludes that the proposed Plan injunction (including the Temporary Injunction) is legally permissible and justified under all the circumstances.  It is narrowly tailored to address the specific harm to which it is directed and comports with governing case and statutory authority and applicable rules of bankruptcy and civil procedure. The Plan Injunction is consistent with Fifth Circuit precedent.[74]  Such an injunction would not violate section 524(e) of the Bankruptcy Code.  That subsection provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."[75]  The Plan Injunction would not affect the liability of any entity, or the liability of any property.  The injunction would only temporarily prohibit Highland and its Co-Defendants from exercising one form of economic recourse, thereby preserving the status quo while the Chapter 11 Trustee and/or Reorganized Debtor has a fair opportunity to prosecute the

---

[74] The Fifth Circuit, in an unpublished opinion, has recognized the propriety of an injunction to preserve the status quo in cases where equitable relief is sought.  *See Animale Group v. Sunny's Perfume, Inc.,* 256 F. App'x 707, 709 (5th Cir. 2007) ("Because Defendants seek equitable relief, the district court was authorized to preserve the status quo by entering a limited asset freeze.").  The Chapter 11 Trustee's claims in the Highland Entities Adversary Proceeding to avoid fraudulent transfers seek equitable relief. *See United States ex rel. Rahmen v. Oncology Assocs., P.C.,* 198 F.3d 489, 498 (4th Cir. 1999) ("The complaint's request to void transfers as fraudulent—a form of rescission—is also an equitable remedy."); *Dong v. Miller,* No. 16-CV-5836 (NGG) (JO), 2018 U.S. Dist. LEXIS 48506, at *30-31 (E.D.N.Y. Mar. 23, 2018) ("The setting-aside of a fraudulent conveyance is a form of equitable relief.").  *See also Iantosca v. Step Plan Servs.,* 604 F.3d 24, 33 (1st Cir. 2010) (affirming preliminary injunction where creditors had a "colorable claim that appellants' own supposed interest under the settlement rests upon a fraudulent conveyance"); *Seidel v. Warner (In re Atlas Fin. Mortg., Inc.),* Adv. No. 13-03222, 2014 Bankr. LEXIS 140 at *10 (Bankr. N.D. Tex. Jan. 14, 2014) (granting preliminary injunction where complaint sought avoidance of fraudulent transfers under the Bankruptcy Code and the Texas Uniform Fraudulent Conveyance Act); *Paradigm Biodevices, Inc. v. Centinel Spine, Inc.,* No. 11 Civ. 3489 (JMF), 2013 U.S. Dist. LEXIS 66858, at *7 (S.D.N.Y. May 9, 2013) (authority to grant preliminary injunction existed because plaintiff alleged not only a legal claim for money damages, but also an equitable claim to avoid fraudulently transferred assets).

[75] 11 U.S.C. § 524(e).

Appellee Appx. 00430
Appx. 00681
013243

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 04/08/25   Page 565 of 1017   PageID 14192
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 437 of 1803   PageID 11183
Case 18-30264-sgj11   Doc 3929-5   Filed 01/31/19   Page 32 of 47

Highland Entities Adversary Proceeding.[76]  Likewise, the proposed injunction does not

contravene any other provision of the Bankruptcy Code or the Bankruptcy Rules.[77]  Finally, the

Chapter 11 Trustee's avoidance claim relating to the Equity/ALF PMA transfer under TUFTA

also provides a statutory basis for injunctive relief.[78]

> 3.  Feasibility of the Plan—Specific Findings and Conclusions Regarding Mr. Terry and Brigade.

The Objectors have challenged the feasibility of the Plan.[79]  The court finds and

concludes that the preponderance of the evidence supported the feasibility of the Plan.  Among

other things, the Chapter 11 Trustee credibly testified that Mr. Terry has an excellent track

record as a portfolio manager, and that there is no reason why Mr. Terry will not be able to

obtain new business—that is, new portfolios to manage which will provide additional revenue

streams for the Reorganized Debtor.[80]  The evidence was credible and compelling that Mr. Terry

---

[76] *See In re Seatco, Inc.*, 259 B.R. 279, 283-84 (Bankr. N.D. Tex. 2001) (approving temporary injunction of suit against nondebtor on guaranty of debt treated in plan).

[77] *Compare Omni Mfg. v. Smith (In re Smith),* 21 F.3d 660, 666-67 (5th Cir. 1994) (disapproving injunction extending time to file proof of claim beyond limits set in Bankruptcy Rules 3003(c)(3) and 9006(b)(1)); *Chiasson v. Bingler (In re Oxford Mgmt.),* 4 F.3d 1329, 1334 (5th Cir. 1993) (disapproving injunction ordering payment that altered distribution scheme set forth in § 726(b)); *Unites States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986) (disapproving injunction ordering spousal support payments contrary to § 523(a)(5)).

[78] Tex. Bus. & Comm. Code Ann. § 24.008 (West, Westlaw through 2017) (providing a creditor may obtain "an injunction against further disposition by the debtor or the transferee, or both, of the asset transferred or of other property . . . [or] any other relief the circumstances may require.").  TUFTA's injunction provision is construed broadly and courts have found that "[a] claim for fraudulent transfer under Texas law contemplates the issuance of a preliminary injunction." *Sargeant v. Al Saleh*, 512 S.W.3d 399, 413 (Tex. App.—Corpus Christi 2016, no pet.); *accord, Janvey v Alguire*, 647 F.3d 585, 602-03 (5th Cir. 2011).

[79] 11 U.S.C. § 1129(a)(11).

[80] Transcript 12/11/18 (AM) [DE # 789], at p. 90 (lines 5-12).  Moreover, to the extent there are any gaps, recoveries from the Highland Entities Adversary Proceeding might eventually be available for ongoing operations and payment of creditors.

Appellee Appx. 00431
Appx. 00682
013244

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 04/06/25   Page 566 of 1017    PageID 14193
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 438 of 1803   PageID 11184
Case 18-30264-sgj11   Doc 1392-5   Filed 01/31/19   Entered 01/31/19 15:13:44   Page 33 of 47

will be capable of fulfilling the equity owner position in the Reorganized Debtor (stepping in to essentially run the Reorganized Debtor) and will be able to ensure the feasibility of the Plan. He is well qualified to reorganize the Debtor-Acis. Mr. Terry testified that his role with the Reorganized Debtor will be similar to the role he very successfully performed for the Debtor-Acis.[81] The Debtor-Acis received numerous awards during Mr. Terry's service as the portfolio manager of the Acis CLOs.[82] The arbitration panel that issued the Arbitration Award found that Mr. Terry was terminated for essentially doing the right thing for investors.[83] Mr. Terry credibly testified that numerous market participants have expressed an interest in working with the Reorganized Debtor if the Plan is confirmed.[84]

Moreover, the court finds and concludes that Brigade (who stepped in as sub-advisor in place of Highland during the Bankruptcy Cases and is a registered investment advisor) is qualified to serve as a sub-advisor to the Reorganized Acis. Mr. Jared Worman, a portfolio manager for Brigade,[85] credibly testified that Brigade, founded in the year 2007, currently has $20 billion of total assets under management, $5 billion of which consists of six U.S. CLOs, two U.S. CDOs, and three European CLOs.[86] Mr. Worman credibly testified that Brigade has issued 17 CLOs and has reset or refinanced several of them.[87] Mr. Worman and Mr. Terry credibly

---

[81] Transcript 12/11/18 (PM) [DE # 790], at pp. 172-73.

[82] Transcript 12/11/18 (PM) [DE # 790], at pp. 162-163 and Exh. 752.

[83] Transcript 12/11/18 (PM) [DE # 790], at pp. 161-62.

[84] Transcript 12/12/18 (AM) [DE # 791], at pp. 16-18.

[85] Mr. Worman has an undergraduate degree from Emory University and an MBA from Wharton.

[86] Transcript 12/11/18 (PM) [DE # 790], at p. 84.

[87] Transcript 12/11/18 (PM) [DE # 790], at p. 86.

Appellee Appx. 00432
Appx. 00683
013245

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Page 440 of 1804   Page 567 of 1017   PageID 14194
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 439 of 1803   PageID 11185
Case 18-30264-sgj11   Doc 3892-55   Filed 01/31/19   Page 1504 of 48   Page 34 of 47

testified that Brigade is willing to serve as sub-advisor to the Reorganized Acis for fifteen basis points.[88]  Highland attempted to show with evidence and argument that Brigade had made some failed trades since stepping in as sub-advisor to the Acis CLOs and that this perhaps made them unfit to serve in this role.  But Mr. Terry credibly testified that the fact that a few failed trades were made by Brigade does not make them unfit to serve as sub-advisor to Reorganized Acis, and that trades out of compliance with the applicable CLO tests occasionally happen, and Brigade has handled them appropriately.[89]  In fact, the evidence suggested that at least ten failed trades occurred while Highland was acting as sub-advisor to the Debtor-Acis.[90]

Highland's suggestions that Brigade is not up to the task to manage the Reorganized Debtor are specious.  Likewise, HCLOF Guernsey's insistence that it will not be getting the benefit of its bargain if the Acis CLOs are not managed by Highland personnel going forward appears to be a manufactured position aimed at thwarting Mr. Terry at all costs.  Not only is there no credible evidence of Brigade mismanagement but, to the contrary, it appears that Highland (prior to the Debtor-Acis's rejection of the Sub-Advisory Agreement and Shared Services Agreement), intentionally liquidated assets of the CLO SPEs and built up cash without reasonable justification.  Specifically, Mr. Terry credibly testified that there were $85 million in purchases in the Acis CLOs in the hours leading up to the entry of the orders for relief, but virtually no purchases of loans in the CLOs afterwards—only sales.[91]  And Mr. Worman further

---

[88] Transcript 12/11/18 (PM) [DE # 790], at p. 89; Transcript 12/12/18 (AM) [DE # 791], at p. 62.

[89] Transcript 12/11/18 (PM) [DE # 790], at pp. 182-83; Transcript 12/18/18 [DE # 804], at pp. 72-73.

[90] *See* Exhs. 727, 728; Transcript 12/11/18 (PM) [DE # 790], at pp. 71-74, 182-83.

[91] Transcript 12/12/18 (AM) [DE # 791], at pp. 18-19, 28-31; Transcript 12/18/18 [DE # 804], at pp. 87-89; *see also,* Terry Demonstrative.

Appellee Appx. 00433
Appx. 00684
013246

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 04/06/25   Page 568 of 1017   PageID 14195
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 440 of 1803   PageID 11186
Case 18-30264-sgj11   Doc 1892-2   Filed 01/31/19   Entered 01/31/19 15:13:04   Page 35 of 47

credibly testified that Highland, while acting as sub-advisor, allowed approximately $380 million in cash to build up in the Acis CLOs.  Meanwhile, Brigade has subsequently reduced that cash balance by $280 million to approximately $100 million.[92]  Mr. Worman also credibly testified that Brigade has purchased approximately $300 million in loans for the Acis CLOs.[93]  The Chapter 11 Trustee and Mr. Terry both credibly testified that the build-up of cash in the Acis CLOs while Highland was sub-advisor, rather than the loans acquired by Brigade, left the Acis CLOs without sufficient interest income to make a distribution to the equity holders.[94]  Certain contradictory testimony of Hunter Covitz was not convincing that:  (a) there were very few conforming loans available to be purchased for the Acis CLOs in the approximately four months that elapsed between the entry of the Order for Relief and the time when Highland was terminated as sub-advisor;[95] and (b) it made more sense to accumulate cash to pay down the AAA notes rather than invest in new loans.[96]  The court found more convincing the testimony of Mr. Terry:  (a) that there was $310 billion of performing loans rated above CCC in the S&P loan index in May of 2018 available for purchase in CLO-6 that would have satisfied the weighted average life test;[97] (b) that Highland purchased loans for CLO-7 that would have satisfied the weighted average life constraints in the Debtor-Acis's CLO-4, CLO-5, and CLO-6;[98] and (c)

---

[92] Transcript 12/11/18 (PM) [DE # 790], at p. 100.

[93] Transcript 12/11/18 (PM) [DE # 790], at pp. 70, 94.

[94] Transcript 12/11/18 (AM) [DE # 789], at pp. 67-69; Transcript 12/11/18 (PM) [DE # 790], at pp. 70-71; Transcript 12/12/18 (AM) [DE # 791] at pp. 34-37.

[95] Transcript 12/13/18 (AM) [DE # 793], at pp. 12-13.

[96] Transcript 12/13/18 (AM) [DE # 793], at pp. 13-16.

[97] Transcript 12/18/18 [DE # 804], at p. 87.

[98] Transcript 12/18/18 [DE # 804], at pp. 87-88.

Appellee Appx. 00434
Appx. 00685
013247

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 04/25/25   Page 569 of 1017   PageID 14196
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 441 of 1803   PageID 11187
Case 18-30264-sgj11   Doc 3927-5   Filed 01/30/19   Entered 01/30/19   Page 36 of 47
Case 19-34054-sgj11   Doc 3927-5   Filed 01/30/19   Page 374 of 49

that, although there was no change in market conditions, Highland essentially stopped buying

collateral for the Acis CLOs[99] after the entry of the Orders for Relief.[100]

    4.   <u>Resets—Non-impairment of Anyone's Rights.</u>

        The Plan only contemplates ***consensual*** resets of the Acis CLOs—in other words, only if

HCLOF Guernsey requests resets.[101]  Messrs. Worman and Terry both credibly testified that they

believed the Reorganized Acis and Brigade could perform a consensual reset of the Acis

CLOs.[102]  Mr. Terry credibly testified that other asset managers have been able to issue or reset

CLOs after a bankruptcy proceeding.[103]  Mr. Terry also credibly testified that he wants to come

to a resolution with HCLOF Guernsey and consensually reset the Acis CLOs.[104]

        HCLOF Guernsey has taken the position that it and its new Passive Investor (new as of

mid-November 2017—just before the Bankruptcy Cases) only want to be involved with CLOs

that are managed by Highland or Highland affiliates.  Is the Plan impairing their rights—to the

extent the Plan (and any subsequent re-sets) brings in Brigade as the sub-advisor to the

Reorganized Debtor (whereas Highland was in that sub-advisor role before)?  It appears no.  The

---

[99] Transcript 12/18/18 [DE # 804], at pp. 88-89.

[100] Highland has also argued that the Plan is not feasible because the administrative expense claims are extremely high (to which the Chapter 11 Trustee responds, it is of Highland's making, since Highland has objected to literally every action proposed by the Chapter 11 Trustee).  The court does not believe there is a legitimate feasibility problem here.  Not only has the court not ruled yet on final professional fee applications, but the Chapter 11 Trustee represented that certain professionals have agreed to defer their fees (beyond payment in full on the Effective Date) as necessary.

[101] *See* Plan § 6.08.

[102] Transcript 12/11/18 (PM) [DE # 790], at pp. 86-90, 176-178; Transcript 12/12/18 (AM) [DE # 793], at pp. 16-18.

[103] Transcript 12/11/18 (PM) [DE # 790], at pp. 179-180.

[104] Transcript 12/18/18 [DE # 804], at p. 74.

Appellee Appx. 00435
Appx. 00686
013248

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1    Filed 04/30/25    Page 570 of 1017    PageID 14197
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 442 of 1803    PageID 11188
Case 18-30264-sgj11    Doc 39275    Filed 01/31/19    Entered 01/31/19 at 13:30    Page 37 of 47

Offering Memorandum between HCLOF Guernsey and the Passive Investor, dated November 15, 2017, pursuant to which the Passive Investor agreed to invest in HCLOF Guernsey, provided that there may be a change in circumstances following the date of the Offering Memorandum and that any forward-looking statements in the Offering Memorandum involved risks and uncertainties "because they relate to events and depend on circumstances that may or may not occur in the future."[105]  Heather Bestwick, one of the HCLOF Guernsey directors, testified that the Offering Memorandum does not require HCLOF Guernsey to invest only in Highland-managed funds[106] and instead expressly provides that HCLOF Guernsey will invest in "CLOs managed by other asset managers."[107]  Another witness, Mr. McGuffin, testified that the HCLOF Guernsey directors' fiduciary duties require them to act independently and objectively in the best interests of HCLOF Guernsey, and also require them to consider a change in circumstances.[108]  HCLOF Guernsey's counsel, HCLOF Guernsey's director, and the Passive Investor have all testified that they would consider doing a reset with the Reorganized Acis in the event the Plan is confirmed.[109]

Mr. Terry credibly testified that a reset of the Acis CLOs can occur after the expiration of the reinvestment periods of the Acis CLOs.[110]  The Plan is feasible regardless of whether a reset of the Acis CLOs is requested by HCLOF Guernsey.  Messrs. Phelan and Terry both credibly

---

[105] See Exh. 90, HCLOF Guernsey Offering Memorandum, at pp. 4-5.

[106] See Exh. 719, Bestwick Depo., at pp. 109, 118-121.

[107] See Exh. 90, HCLOF Offering Memorandum, at p. 12.

[108] Transcript 12/13/18 (PM) [DE # 794], at pp. 142-145.

[109] See Exh. 602, p. 12 of 70 (statement by HCLOF Guernsey's Counsel); Exh. 719 at pp. 166-167 (Heather Bestwick); Exh. 720, p. 72.

[110] Transcript 12/18/18 [DE # 804], at pp. 82-83.

Appellee Appx. 00436
Appx. 00685
013249

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 04/06/25   Page 571 of 1017   PageID 14198
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 443 of 1803   PageID 11189
Case 18-30264-sgj11   Doc 3927-5   Filed 01/31/19   Entered 01/31/19 15:13:04   Page 38 of 47

testified that the Reorganized Debtor will have cash flow from multiple potential sources—including the revenues from the CLO PMAs with the Acis CLOs, potential new business developed by the Reorganized Acis, and the outcome of any potential litigation claims.[111]

## VI.    General Credibility Assessments.

In ruling in a contested matter such as confirmation, and weighing the preponderance of the evidence, the credibility of witnesses and contradictions in their testimony naturally can be significant.  Here, there were some noteworthy problems and contradictions with some of the testimony provided by the Objectors' witnesses.  They are summarized below.

### 1.    Scott Ellington: A Seemingly Manufactured Narrative to Justify Prior Actions.

Scott Ellington testified on February 7, 2018 at the trial on the involuntary petitions, and the court was asked to consider his testimony again in connection with confirmation (he did not attend the confirmation hearing).  He is the General Counsel, Chief Legal Officer, and a Partner at Highland.  Mr. Ellington testified that the Debtor-Acis's name is "toxic" in the market place and that, due to the litigation with Mr. Terry and allegations in that litigation, "nothing can be associated with the Acis brand and be managed as a CLO or marketed as a CLO."[112]   Mr. Ellington elaborated that it had been determined in late 2016 or 2017 that re-sets or re-financings of the Acis CLOs were a prudent thing to pursue (in fact, there was indeed a trend of refinancings and resets for this vintage of CLOs in the market place) and, in connection with that, the Debtor-Acis's contracts and assets needed to be diverted to different, newly created entities because:  (a) the "Acis" name was toxic and underwriters and investors were not going to

---

[111] Transcript 12/11/18 (AM) [DE # 789], at pp. 72, 88-90; Transcript 12/12/18 (AM) [DE # 791], at p. 53.

[112] Exh. 23, p. 55 (line 17) through p. 56 (line 7); p. 98 (lines 8-12).

Appellee Appx. 00437
Appx. 00688
013250

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 04/25/25   Page 572 of 1017   PageID 14199
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 444 of 1803   PageID 11190
Case 18-30264-sgj11   Doc 392-3   Filed 01/31/19   Entered 01/31/19 15:14:04   Page 39 of 47

be interested in re-financings or resets for CLOs managed by the Debtor-Acis;[113] and (b) the new

Passive Investor wanted the Debtor-Acis out of the picture.[114]  Mr. Ellington further elaborated:

"The equity, you know, calls the tune, so to speak, in terms of the CLO . . .."[115]  In summary, an

overarching theme of Mr. Ellington's testimony was that the Debtor-Acis was tainted or toxic in

the marketplace and the Passive Investor wanted the Debtor-Acis out of the picture—thus, this

was the motivation for the prepetition transactions orchestrated by Highland prior to the

Bankruptcy Cases.  The problems with the Scott Ellington testimony were at least two-fold.

First, there is no credible evidence that the Debtor-Acis is/was toxic in the market place.  In fact,

in April 2017 (well after the litigation with Mr. Terry commenced), the Debtor-Acis issued a

new CLO (CLO-7).  And in market publications as recently as August 21, 2017, Highland was

touting the *Acis* structure stating "our vehicle will allow us to issue between six and 12 CLOs

over the next few years."[116]  Second, the Passive Investor denies demanding that the Debtor-Acis

be removed as the CLO manager.  Term sheets as recent as August 21, 2017 contemplated the

Debtor-Acis as the continuing portfolio manager of CLOs, with apparently no protestations by

the Passive Investor.[117]

---

[113]  *E.g., Id.* at p. 177 (line 21) though p. 178 (line 12); p. 184 (lines 13-17) ("The underwriters in this case, Mizuho, Goldman, et al., the equity, they said we want every possible relation to anything that could be legacy Acis or Acis-related affiliates to be severed").

[114]  *Id.* at p. 202 (lines 11-13) ("we have third-party investors that said we don't want to be involved in this brand; and their equity is one of the reasons that new CLOs can be launched"); p. 203 (lines 7-8) ("It was call the deal and terminate the CMAs or transfer the CMAs"); p. 223 (lines 8-12) ("Because if the involuntary remains, and I'm just – I'm just being frank – we've already been told by equity holders, including the separate account, BBK, that you may have seen on some of the exhibits, they're pulling everything.").

[115]  *Id.* at p. 74 (lines 3-6).

[116]  Exh. 801, pp. 3 & 5.

[117]  Exh. 802, p.1.

Appellee Appx. 00438
Appx. 00689
013251

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 04/06/25   Page 573 of 1017   PageID 14200
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 445 of 1803   PageID 11191
Case 18-30264-sgj11   Doc 3927   Filed 01/31/19   Page 40 of 47

2. <u>Michael Pugatch: The Passive Investor Made Into a Scapegoat.</u>

The reality is that Highland, indeed, started working on the concept of doing resets of some of the older vintage Acis CLOs in at least early 2017 (and perhaps late 2016). Highland, in fact, completed a reset of one Acis CLO in April 2017 (with the Debtor-Acis still in place as the portfolio manager for that reset in April 2017). As part of that process of implementing resets for the Acis CLOs, Highland worked on bringing in a new investor or investors to have a share of the equity tranche of the Acis CLOs. Highland finally obtained the commitment of the Passive Investor in November 2017, after starting initial discussions with them in the second quarter of 2017.[118] A representative for the Passive Investor referred to itself as "passive" in a deposition.[119] Concepts and documentation for the Passive Investor's investment in the Acis CLOs were discussed for a while during 2017. As recently as August 2017, the negotiations with the Passive Investor appeared to contemplate the Debtor-Acis still as the portfolio manager for the CLOs.[120] Then the arbitration trial with Mr. Terry began in September 2017 and the Terry Arbitration Award was issued on October 20, 2017. Suddenly, it appears that the dismantling of the Debtor-Acis began with all deliberate speed. The court believes, based on the totality of the evidence, that it was Highland who did not want the Debtor-Acis as CLO manager going forward, so that Highland could keep reaping the benefits of the reset CLOs. Specifically, when deposed on the topic, a representative for the Passive Investor, Mr. Pugatch, denied the accuracy of Mr. Ellington's testimony, stating that the Passive Investor "viewed Acis and Highland as interchangeable from the perspective of the—you know, the actual investment

---

[118] *See* Exh. 720, Pugatch Deposition Transcript dated November 27, 2018, p. 18, lines 14-20.

[119] *Id.* at p. 22 (lines 2-3) ("we're you know, 49 percent sort of passive minority investor").

[120] Exh. 802, p. 1.

Appellee Appx. 00439
Appx. 00699
013252

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5-6    Filed 04/06/25    Page 574 of 1017    PageID 14201
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 446 of 1803    PageID 11192
Case 18-30264-sgj11    Doc 2392-5    Filed 01/31/19    Entered 01/31/19 15:12:04    Page 41 of 47

opportunity."[121]  When asked, "Are you aware that Scott Ellington, general counsel for HCM,

testified that [the Passive Investor] said with absolute certainty that they had no interest in doing

business with Acis because the Acis brand was purportedly toxic and, consequently, nothing

associated with Acis could be managed or marketed as a CLO?" Mr. Pugatch testified that he

had read that testimony and that the statement was not true.[122]  He further stated that "the

ultimate sort of name change did not come from [the Passive Investor]."[123]  In fact, when further

asked whether the Passive Investor knew why Acis CLO Funding Limited changed its name to

Highland CLO Funding Limited (*i.e.,* HCLOF Guernsey), Mr. Pugatch testified, "We were told

that it was a change in the brand or the name, as requested by Highland."[124]  And when asked

"Did [the Passive Investor] request that the name be changed?" he answered "No."[125]  When

asked whether the Passive Investor considered "Acis toxic in the industry?" Mr. Pugatch

answered:  "No. What I would say is, when the suggested name change did occur, there were

commercial reasons given to us as to why that would be beneficial in terms of the ongoing

management of those CLOs and the intended investment thesis around the investment that we

had made, which seemed to make commercial sense."[126]  When Mr. Pugatch was asked, "Those

reasons were given by Highland, correct?" he replied "Correct" and confirmed that they were not

demanded by the Passive Investor.[127]  Mr. Pugatch was emphatic that the Passive Investor was

---

[121] *Id.* at p. 30 (lines 19-20).

[122] *Id.* at p. 31 (lines 6-19).

[123] *Id.* (lines 24-25).

[124] *Id.* at p. 27 (lines 24-25).

[125] *Id.* at p. 28 (lines 1-3).

[126] *Id.* at p. 32 (lines 1-8).

[127] *Id.* at p. 32 (lines 9-12).

Appellee Appx. 00440
Appx. 00691
013253

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit    Filed 1406 of 25804    Page 575 of 1017    PageID 14202
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 447 of 1803    PageID 11193
Case 18-30264-sgj11    Doc 392755    Filed 01/31/19    Entered 01/31/19 15:43:04    Page 42 of 47
Case 19-1239CV    Document 1619    Filed 11/21/19    Page 430 of 49

just that—a passive investor—that did not have the ability to "start calling the shots" and dictate the terms of any reset transactions.[128]  When asked if the Passive Investor was concerned about the Terry Arbitration Award, Mr. Pugatch replied:  "The award itself, no.  I think the only thing we were concerned about or focused on was that vis-à-vis our equity investment in Highland CLO Funding Limited and, in turn, the equity that that vehicle held in the various CLOs was appropriately, you know, ring-fenced or not exposed to any potential damages or economic loss in value as a result of that arbitration award."[129]

The Passive Investor further testified that Brigade has "a fine reputation in the market" but that it had no interaction with them historically.[130]  The Passive Investor also testified that it was concerned about the cash buildups that had happened recently due to actions while Highland had still been the sub-advisor on the Acis CLOs.[131]

    3.  <u>The Seemingly Rehearsed Testimony of the Two HCLOF Guernsey Witnesses</u>.

The court was presented with video depositions of HCLOF Guernsey's two non-executive directors (*i.e.,* its only directors):  Mr. William Scott[132] and Ms. Heather Bestwick.[133]  It was very apparent to the court that HCLOF Guernsey is controlled by Highland in every way.  Putting things in the kindest way possible, Mr. Scott and Ms. Bestwick appear to be nominal figureheads who are paid to act like they are in charge, while they are not.  They are both

---

[128] *Id.* at p. 32 (lines 16-17); pp. 33-35.

[129] *Id.* at p. 43 (lines 3-9); p. 89.

[130] *Id.* at p. 68 (lines 11-13).

[131] *Id.* at p. 82, lines 9-24.

[132] *See* Exh. 721.

[133] *See* Exh. 719.

Appellee Appx. 00441
Appx. 00692
013254

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 04/06/25   Page 576 of 1017   PageID 14203
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 448 of 1803   PageID 11194
Case 18-30264-sgj11   Doc 3592-75   Filed 01/31/19   Entered 01/31/19 15:14:04   Page 43 of 47

basically professional directors-for-hire, for companies that choose to form/organize in the nation of Guernsey.

Ms. Bestwick testified that she is a nonexecutive director for six companies in Guernsey (none of the others are in the CLO business).[134]  She testified that she earned £35,000 per year to serve as a director of HCLOF Guernsey.[135]  She testified that she was selected by Highland[136] and that Highland also made the decision to hire HCLOF Guernsey's law firm in the Bankruptcy Cases.[137]  Ms. Bestwick, when questioned as to why the Equity/ALF PMA it had with the Debtor-Acis was terminated shortly after the Terry Arbitration Award was issued, testified that she was told it was "a condition precedent to the new Passive Investor" coming in and that she was told this by Highland.[138]  She also testified that she had never talked to the Passive Investor (who, of course, is a 49% owner of HCLOF Guernsey)[139] or Grant Scott (the trustee of the charitable organization that owns 49% of HCLOF Guernsey).[140]  She reiterated that she only talks to Highland employees.  She also was under the impression that terminating the Equity/ALF PMA would improve marketability of the CLOs going forward but that it was the same people and "business as usual for us."[141]  She testified that she learned of the Terry

---

[134] *Id.* at pp. 7-8; p. 21 (line 5) through p. 22 (line 20); p. 26 (lines 10-12).

[135] *Id.* at p. 43 (lines 18-19).

[136] *Id.* at p. 42 (lines 17-25).

[137] *Id.* at p. 53 (lines 7-20).

[138] *Id.* at p. 16 (line 13) through p. 17 (line 23); p. 58 (line 21) through p. 60 (line 17).

[139] *Id.* at p. 188 (lines 12-15).

[140] *Id.* at p. 188 (line 19) through p. 189 (line 9).

[141] *Id.* at p. 189 (lines 12-15); p. 200 (line 22).

Appellee Appx. 00442
Appx. 00693
013255

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-6   Filed 05/23/25   Page 577 of 1017   PageID 14204
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 449 of 1803   PageID 11195
Case 18-30264-sgj11   Doc 3927-5   Filed 01/31/19   Entered 01/31/19   Page 44 of 47

Arbitration Award in mid-April 2018 (some six months after the fact)[142] and "[y]ou'd have to

ask Highland"[143] why it did not inform her sooner.  Her testimony was clear that she defers to

Highland on everything, stating that as directors they were "heavily reliant on our service

providers, and that means Highland."[144]  With regard to a lawsuit that HCLOF Guernsey filed

against Mr. Terry in Guernsey during the Bankruptcy Cases, she testified that it was neither her

nor the other director, William Scott's, idea.

    Mr. Scott, the other HCLOF Guernsey director, is a "professional director" for 10-15

Guernsey companies[145]—all of which are "paying assignments."[146]  He became rather incensed

when testifying, at the suggestion that he and Ms. Bestwick were not in control of HCLOF

Guernsey, stating that board minutes and other documents would show that they took a great

level of interest in running the company.[147]  He testified that he earned £40,000 per year to serve

as a director of HCLOF Guernsey and that, due to the extra work of the Bankruptcy Cases, he

also was charging another £350 per hour, after the first 35 hours[148] (the court notes, anecdotally,

that it required participation in court hearings by a director of HCLOF Guernsey each time that

HCLOF Guernsey took a position in court).  Mr. Scott confirmed that he was not aware of the

litigation with Mr. Terry nor the Acis Bankruptcy Cases until April 2018.[149]  He also testified

---

[142] *Id.* at p. 61 (lines 3-19); p. 130 (line 14) through p. 136 (line 2).

[143] *Id.* at p. 137 (line 21).

[144] *Id.* at p. 152 (lines 18-19).

[145] *See* Exh. 721 at p 8 (line 9) through p. 9 (line 5); p. 79 (lines 20-25).

[146] *Id.* at p. 80 (lines 3-5).

[147] *Id.* at p. 13 (lines 1-12); p. 22 (line 23) through p. 23 (line 12).

[148] *Id.* at p. 80 (lines 6-18).

[149] *Id.* at p. 132 (line 20) through p. 135 (line 10).

Appellee Appx. 00443
Appx. 00694
013256

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document E15-b16   Filed45160025.804   Page 578 of 1017   PageID 14205
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 450 of 1803   PageID 11196
Case 18-3026sgj19-122392755ledDoc336619   Entered11/01/89/19 Page1464 Page 45 of 47

that Highland had proposed the legal counsel HCLOF Guernsey used in the Bankruptcy Cases and that he had never disagreed with Highland's advice.[150]  He confirmed that all investment decisions were made by Highland and that he and Ms. Bestwick's role was to "police" service providers.[151]  Like Ms. Bestwick, Mr. Scott testified that they were told that the Passive Investor had made it a condition precedent to their investment in HCLOF Guernsey that "Acis depart."[152] But he had not talked to the Passive Investor.[153]  As if all this deference to Highland were not enough, HCLOF Guernsey's lender is NexBank (an affiliate of Highland—which is based in Dallas, not Guernsey) and HCLOF Guernsey has given its actual equity notes to NexBank as security for its loans from NexBank.[154]  Also, interestingly, when asked about the adversary proceeding that HCLOF Guernsey filed against the Chapter 11 Trustee a few months ago in the Bankruptcy Cases (*i.e.,* the Highland Entities Adversary Proceeding—it was originally commenced by Highland and HCLOF Guernsey as Plaintiffs), Mr. Scott testified that "we haven't sued the trustee, he has sued us" but later acknowledged his mistake when corrected by counsel.

This court is not naïve—it realizes that so-called "fiduciary services firms" are apparently a typical thing in the world of off-shore jurisdictions that are large financial centers.[155]  Maybe

---

[150] *See generally id.* at pp. 277-280.

[151] *Id.* at p. 106 (lines 1-7).

[152] *Id.* at p. 254 (line 20) through p. 260.

[153] *Id.* at p. 155 (lines 2-25).

[154] *See* Exh. 719 at p. 213 (line 2-22); Exh. 721 at p. 129 (line 10) through p. 130 (line 13).

[155] During the testimony of both Ms. Bestwick and Mr. Scott, the court was reminded of an old TV commercial in which an actor states, "I am not a doctor, but I play one on TV."  The court could not help but conclude that these were not real directors but were playing them (when legally necessary).

Appellee Appx. 00444
Appx. 00695
0'13257

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 05/20/25    Page 579 of 1017    PageID 14206
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 451 of 1803    PageID 11197
Case 18-30264-sgj11    Doc 3392-5    Filed 11/01/19    Entered 11/01/19 15:17:04    Page 46 of 47

the system works, for the most part and in many business contexts. But not when trying to convince a bankruptcy court of the bona fides of transactions that look like attempts to denude another party of value and/or to thwart creditors. And not when accusations are made that you are the alter ego of the party (Highland) who orchestrated the company's creation. The evidence was overwhelming that: (a) the HCLOF Guernsey Directors do whatever they are told to do by Highland; (b) they do not talk to anyone else but Highland; (c) they have never challenged Highland; (d) they let Highland pick and consult with their lawyers; and (e) they were not made aware by Highland of the Terry Arbitration Award, the Terry Judgment, the involuntary bankruptcy petitions, or pleadings that lawyers filed in the Bankruptcy Cases on HCLOF Guernsey's behalf.

In summary, the testimony of these two HCLOF Guernsey Directors was of little or no value in convincing the court that the Objector, HCLOF Guernsey, has valid concerns of its own (separate from Highland's) with regard to the bona fides of the Plan.

**VII.**   **Conclusion**.

This Bench Ruling and Memorandum Opinion is intended to address some of the most pertinent facts and issues raised in connection with confirmation of the Plan. Among other things, the court believed it was necessary to stress, in a separate ruling: (a) *the unique status of the Objectors* (they are "insiders" as defined in the Bankruptcy Code whose prepetition actions suggest unclean hands—this seems highly relevant to consider, when there are no non-insider creditors or other relevant parties objecting to the Plan); (b) *the appropriateness and legality of the proposed Plan Injunction* that would temporarily prevent nonconsensual redemptions/liquidations (it is in all ways justified given the allegations in the Highland Entities Adversary Proceeding and under the traditional four-prong test for preliminary injunctions); and

Appellee Appx. 00445

Appx. 00696
013258

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 05/05/25    Page 580 of 1017    PageID 14207
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 452 of 1803    PageID 11198
Case 18-30264-sgj11    Doc 3927-5    Filed 01/31/19    Entered 01/31/19 15:14:04    Page 47 of 47

(c) *the feasibility of the Plan* (Mr. Terry and Brigade are well qualified to perform their contemplated roles).

The court will separately sign the Findings of Fact, Conclusions of Law and Order Confirming Plan submitted by the Chapter 11 Trustee to address all other relevant issues.

**#### End of Bench Ruling and Memorandum Opinion ####**

**Appellee Appx. 00446**

**Appx. 00687**

**013259**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 04/25/04    Page 581 of 1017    PageID 14208
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 453 of 1803    PageID 11199
Case 19-12239-CSS    Doc 86-3    Filed 11/01/19    Page 1 of 54

**Exhibit C**

**Acis Involuntary Opinion**

ACTIVE 250501748

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S      Document 15-186    Filed 05/02/25    Page 582 of 1017      PageID 14209
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 454 of 1803    PageID 11200
Case 18-30264-sgj11    Doc 133    Filed 04/13/18    Entered 04/13/18 12:58:54    Page 1 of 53



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed April 13, 2018

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-SGJ-7 |
| | § | |
| Alleged Debtor. | § | |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT GP, | § | CASE NO. 18-30265-SGJ-7 |
| L.L.C., | § | |
| | § | |
| Alleged Debtor. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ORDERS FOR RELIEF ISSUED AFTER TRIAL ON CONTESTED INVOLUNTARY BANKRUPTCY PETITIONS

Joshua N. Terry (the "Petitioning Creditor" or "Mr. Terry") filed involuntary bankruptcy

petitions (the "Involuntary Petitions") against each of the two above-referenced related

Appellee Appx. 00448
Appx. 00699
013261

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Exhibit   Page 456 of 521 804   Page 583 of 1017   PageID 14210
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 455 of 1803   PageID 11201
Case 18-30264-sgj11   Doc 239   Filed 04/13/18   Entered 04/13/18 16:36:54   Page 2 of 53

companies (the "Alleged Debtors") on January 30, 2018.[1]  The Involuntary Petitions were

contested, and the court held a multi-day trial (the "Trial") spanning March 21, 22, 23, 27, and

March 29, 2018.[2]  This constitutes the court's findings of fact, conclusions of law and ruling,

pursuant to Fed. Rs. Bankr. Proc. 7052 and 9014.[3]  As explained below, the court has decided

that Orders for Relief are legally required and appropriate as to each of the Alleged Debtors.

## I.   FINDINGS OF FACT

### A.   Introduction.

1.      The Alleged Debtors—Acis Capital Management, L.P. ("Acis LP"), a Delaware

limited partnership, and ACIS Capital Management GP, L.L.C. ("Acis GP/LLC"), a Delaware

limited liability company—are two entities in the mega-organizational structure of a company

that is known as Highland Capital Management, L.P. ("Highland").

2.      Highland is a Dallas, Texas-based company that is a Registered Investment

Advisor.  Highland was founded in 1993 (changing its original name from "Protective Asset

Management" to Highland in 1997) by James D. Dondero ("Mr. Dondero"), originally with a

---

[1] Exhs. 50 & 51.

[2] Shortly after the Involuntary Petitions were filed, the court held hearings on February 6-7, 2018, on the Petitioning Creditor's Emergency Motion to Abrogate or Modify 11 U.S.C. § 303(f), Prohibit Transfer of Assets, and Import, Inter Alia, 11 U.S.C. § 363 [DE # 3] (the "303(f) Motion") and the Alleged Debtors' Emergency Motion to Seek Emergency Hearing on the Alleged Debtors' Motion to Dismiss Involuntary Petitions and Request for Award of Fees, Costs, and Damages [DE # 9] (the "Emergency Motion to Set Hearing on Motion to Dismiss").  The court ultimately granted the 303(f) Motion and denied the Emergency Motion to Set Hearing on Motion to Dismiss. Both the Petitioning Creditor and the Alleged Debtors have proposed that the court should consider the evidence it heard at the hearings held on February 6-7, 2018, in determining whether it should enter orders for relief.  The court has, accordingly, considered such evidence in this ruling.

[3] Bankruptcy subject matter jurisdiction exists in this contested matter, pursuant to 28 U.S.C. § 1334(b). This is a core proceeding over which the bankruptcy court may exercise subject matter jurisdiction, pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. This bankruptcy court has Constitutional authority to issue a final order or judgment in this matter, as it arises under a bankruptcy statute— 11 U.S.C. § 303. Venue is proper in this district, pursuant to 28 U.S.C. § 1409(a), as the Alleged Debtors have their business headquarters in this district.

Appellee Appx. 00449
Appx. 00509
013262

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 14 of 604 2/1804    Page 584 of 1017    PageID 14211
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 456 of 1803    PageID 11202
Case 18-3026 sgj11  Doc 391 Filed 04/18/18  Entered 04/19/18 Page 34:58 Page 3 of 53

75% ownership interest, and Mark K. Akada ("Mr. Akada"), originally with a 25% ownership interest.[4]

3.    Both Mr. Dondero and Mr. Akada provided witness testimony at the Trial on the Involuntary Petitions, and their names are mentioned numerous times herein—since they were generally the subject of significant evidence and argument presented at the Trial.  Mr. Dondero is the chief executive officer for Highland and Mr. Akada is the chief investment officer.  Mr. Dondero is also the president of each of the two Alleged Debtors.

4.    Highland, through its organizational structure of approximately 2,000 separate business entities, manages approximately $14-$15 billion of investor capital in vehicles ranging from:  collateral loan obligation funds ("CLOs"); private equity funds; and mutual funds.

5.    Highland's CLO business was front-and-center at the Trial on the Involuntary Petitions.  The Alleged Debtor, Acis LP, for approximately the past seven years, has been the vehicle through which Highland's CLO business has been managed.

6.    The Petitioning Creditor, Mr. Terry, became an employee of Highland in the year 2005, starting as a portfolio analyst, promoting to a loan trader, then ultimately becoming the portfolio manager for (and 25% limited partner in) Highland's CLO business—specifically, Mr. Terry was the human being who was acting for the CLO manager, Acis LP.

7.    Mr. Terry was highly successful in his role in the CLO business, managing billions of dollars of assets during his tenure, but Mr. Terry and Mr. Dondero had a bitter parting of ways on June 9, 2016.  Specifically, Mr. Terry's employment was terminated on that date (for

---

[4] Mr. Dondero testified at the Trial that, three years ago, Messrs. Dondero and Akada sold their interests in Highland to a charitable remainder trust in exchange for a 15 year note receivable.

Appellee Appx. 00450
Appx. 00701
013263

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1    Filed 05/23/25    Page 585 of 1017    PageID 14212
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 457 of 1803    PageID 11203
Case 18-30264-sgj11    Doc 1991-1    Filed 04/13/18    Entered 04/13/18 16:35:58    Page 4 of 53

reasons that have been highly disputed) and his 25% limited partnership interest in Acis LP was deemed forfeited without any payment of consideration to him.

8.    In September 2016, Highland sued Mr. Terry in the 162nd Judicial District Court of Dallas County, Texas ("State Court 1") for breach of fiduciary duty/self-dealing, disparagement, breach of contract, and various other causes of action and theories.  Mr. Terry asserted his own claims against Highland, and also claims against the two Alleged Debtors, Mr. Dondero, and others and demanded arbitration.  On September 28, 2016, State Court 1 stayed the litigation and ordered the parties to arbitrate.  The parties participated in ten days of arbitration in September 2017 before JAMS.  On October 20, 2017, Mr. Terry obtained an Arbitration Award (herein so called),[5] jointly and severally against both of the Alleged Debtors in the amount of $7,949,749.15, plus post-award interest at the legal rate, which was based on theories of breach of contract and breach of fiduciary duties.

9.    There are still claims pending between and among the Petitioning Creditor, Highland, and others (not including the Alleged Debtors) in State Court 1.

10.    A Final Judgment (herein so called) confirming the Arbitration Award was entered by the 44th Judicial District Court of Dallas County, Texas ("State Court 2") on December 18, 2017, in the same amount as that contained in the Arbitration Award— $7,949,749.15.[6]

11.    Mr. Terry began pursuing post-judgment discovery soon after obtaining his Arbitration Award and even more so after entry of the Final Judgment.  Mr. Terry undertook a UCC search on November 8, 2017, to investigate whether there were any liens on the Alleged

_____

[5] Exh. 1.

[6] Exh. 105.

Appellee Appx. 00451
Appx. 00702
013264

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 459 of 1804   Page 586 of 1017   PageID 14213
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 458 of 1803   PageID 11204
Case 18-30264-sgj11   Doc 239-1   Filed 04/13/18   Entered 04/13/18 16:54   Page 5 of 53

Debtors' assets (none appeared).[7]  Mr. Terry also pursued a garnishment of an Acis LP bank

account (at a time when there was only around $2,000 in the account).  Mr. Terry's counsel

deposed Highland's General Counsel Scott Ellington (who sat for the deposition as a

representative of Acis, LP) on January 26, 2018, and asked numerous questions about: (a) how

many creditors the Alleged Debtors had,[8] and (b) whether Acis LP was able to pay its debts as

they became due,[9] but did not receive meaningful answers.

12.     Mr. Terry requested a temporary restraining order ("TRO") from State Court 2, on

January 24, 2018, after discovering certain transactions and transfers involving Acis LP's

interests, that he believed were pursued without any legitimate business purpose and with the

purpose of denuding Acis LP of its assets and to make it judgment proof.  Most particularly, it

appeared as though Highland was engaged in a scheme to transfer certain fee-generating CLO

management contracts of Acis LP away from it and into a Cayman Island affiliate of Highland.[10]

At a January 24, 2018 hearing on the request for a TRO, Acis LP agreed and State Court 2

ordered that, between that hearing and a later hearing on a request for a temporary injunction, no

CLO management contracts would be transferred away from Acis LP and that no monies would

be diverted from it.[11]

13.     Then, on January 29, 2018, the Controller of and CPA for Highland  (David Klos)

submitted a Declaration to State Court 2 concerning the net worth of the Alleged Debtors, stating

---

[7] Exh. 84.

[8] Exh. 25, pp. 7-9.

[9] *Id.* at pp. 102-04.

[10] Exh. 27.

[11] Exh. 28.

Appellee Appx. 00452
Appx. 00793
013265

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/25/2804    Page 587 of 1017    PageID 14214
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 459 of 1803    PageID 11205
Case 18-30264-sgj11    Doc 391-6    Filed 04/13/18    Entered 04/13/18 23:34:58    Page 6 of 53

that Acis GP/LLC had a net worth of $0 and that Acis LP might have a net worth, at best, of $990,141.[12]  Mr. Terry thought this was preposterous—given the management fees that Acis LP was entitled to and the receivables that should be owing to it.  Mr. Terry believes that the collateral management agreements on which Acis LP receives management fees have a present value of $30 million (about $6 million for each of the five CLOs which Acis LP has been managing).

14.    On January 29, 2018, the Alleged Debtors filed a motion for leave to post a supersedeas bond in the amount of **$495,070.50** with State Court 2 (purportedly half of the net worth of the two Alleged Debtors—as stated in the David Klos Declaration), so that they could suspend enforcement of the Final Judgment while they appealed it.[13]  Although there is a very stringent standard for appealing an Arbitration Award, the Alleged Debtors apparently believe they have an argument that State Court 2 lacked the subject matter jurisdiction to confirm the Arbitration Award (a motion to vacate the Final Judgment based on this argument has previously been denied by State Court 2).[14]

15.    Meanwhile, Mr. Terry was learning of more transactions and transfers involving Acis LP's assets and interests.  On January 29, 2018, Mr. Terry filed supplemental pleadings with State Court 2, alleging that further shenanigans (*i.e.,* transfers and transactions that would amount to fraudulent transfers) were underway at Acis LP and seeking a receiver.[15]  Also, at

---

[12] Exh. 26.

[13] Exh. 73.

[14] *See* DE # 35, in Case No. 18-30264 and DE # 34 in Case No. 18-30265.  Unless otherwise noted, references to "DE #" herein refer to the docket entry number at which a pleading appears in the docket maintained with the Bankruptcy Clerk in the Acis Capital Management L.P. bankruptcy case (Case No. 18-30264).

[15] Exhs. 28-31.

Appellee Appx. 00453
Appx. 00784
013266

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 460 of 1804    Page 588 of 1017    PageID 14215
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 460 of 1803    PageID 11206
Case 18-30264-sgj11    Doc 391835    Filed 04/13/18    Entered 04/13/18 16:38:58    Page 7 of 53

some point, in the weeks leading up to this, an Acis LP lawyer represented to Mr. Terry's counsel that the Alleged Debtors were "judgment proof."[16]

16.    At approximately 11:57 p.m. on January 30, 2018 (on the evening before a scheduled temporary injunction hearing in State Court 2—at which time State Court 2 presumably might have considered the Alleged Debtors' request to post the $495,070.50 supersedeas bond to stay enforcement of the Final Judgment), Mr. Terry filed the Involuntary Petitions, as a sole petitioning creditor, against both Acis LP and Acis GP/LLC.

17.    For purposes of this Trial (and this Trial only), the Alleged Debtors do not dispute that Mr. Terry has standing to be a petitioning creditor pursuant to Bankruptcy Code section 303(b)—in other words, they do not dispute that Mr. Terry is a holder of a claim against the Alleged Debtors that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount and that aggregates at least $15,775 in unsecured amount.  However, the Alleged Debtors argue that:  (a) the Alleged Debtors have *12 or more creditors* and, thus, three or more petitioning creditors were required to prosecute the Involuntary Petitions pursuant to Bankruptcy Code section 303(b)(1); (b) the Petitioning Creditor did not establish, pursuant to Bankruptcy Code section 303(h)(1), that the Alleged Debtors are not *generally paying their debts as such debts become due* unless such debts are the subject of a bona fide dispute as to liability or amount; (c) regardless of whether the Petitioning Creditor has met the statutory tests in sections 303(b)(1) and (h)(1), the Petitioning Creditor has acted in *bad faith*—which serves as an equitable basis for dismissal of the Involuntary Petitions; and (d) if the court disagrees with the Alleged Debtors and determines that the section 303(b) and (h) statutory tests are met, and also determines that the Petitioning Creditor has not acted in bad faith, the court should

---

[16] Exh. 27 (exhibit 3 thereto).

Appellee Appx. 00454
Appx. 00705
013267

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-116    Filed 06/20/25    Page 589 of 1017    PageID 14216
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 461 of 1803    PageID 11207
Case 18-3026    Case 19-12239-LSS    Filed 04/13/18    Entered 04/13/18 09:53:54    Page 8 of 53

nevertheless *abstain* in this matter, pursuant to Bankruptcy Code *section 305*, since this is essentially a two-party dispute and the interests of creditors and the debtor would be better served by dismissal.

18.    The Petitioning Creditor argues that he has met the statutory tests of sections 303(b) and (h) but, even if he has not, there is a *"special circumstances"* exception to the section 303 statutory requirements, whenever a petitioning creditor establishes fraud, trick, scheme, artifice or the like on the part of an alleged debtor—which "special circumstances," Mr. Terry alleges, have been established here.  Moreover, the Petitioning Creditor argues that the facts here *do not warrant section 305 abstention* because the interests of creditors and the Alleged Debtors would not be better served by dismissal.

19.    As further explained below, the court finds and concludes that the Petitioning Creditor has met his burden of proving by a preponderance of the evidence that the statutory tests of sections 303(b) and (h) are met here.  Thus, the court does not need to reach the question of whether there is a *"special circumstances"* exception to the section 303 statutory requirements, whenever a petitioning creditor establishes fraud, trick, scheme, artifice or the like on the part of an alleged debtor, and—if so—whether the exception is applicable here.[17]

20.    Moreover, the Alleged Debtors have not shown by a preponderance of the evidence that the Petitioning Creditor acted in bad faith, such that the Involuntary Petitions should be dismissed.

---

[17] *See e.g., In re Norriss Bros. Lumber Co.*, 133 B.R. 599 (Bankr. N.D. Tex. 1991); *In re Moss*, 249 B.R. 411 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222 (Bankr. N.D. Tex. 2009).

Appellee Appx. 00455
Appx. 00796
013268

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1    Filed 04/16/25    Page 590 of 1017    PageID 14217
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 462 of 1803    PageID 11208
Case 18-30264-sgj11    Doc 1089-5    Filed 04/08/18    Entered 04/13/18 Page 3453 54 Page 9 of 53

21.     Finally, the Alleged Debtors also have ***not shown facts here that warrant section***

***305 abstention*** because they have not shown that the interests of creditors and the Alleged

Debtors would be better served by dismissal.

**B.     The CLO Business:  Understanding the Alleged Debtors' Business
Operations, Structure, and What Creditors and Interest Holders They
Actually Have.**

22.     Highland set up its first CLO in the year 1996.  Highland was one of the early

participants in the CLO industry.

23.     The Alleged Debtors were formed in 2011 to be the new "brand" or face of the

Highland CLO business, after Highland's name had suffered some negative publicity in the

marketplace.

24.     Acis LP has acted as the portfolio manager of Highland's CLOs since 2011.  Acis

LP currently has a contractual right to CLO portfolio management fees on five CLOs[18] which

were referred to at the Trial as CLO 2013-1; CLO 2014-3; CLO 2014-4; CLO 2014-5; and CLO

2016-6.  CLOs typically have an 8-12 year life.  Thus, there are still several years of life left on

these CLOs (since the oldest one was established in the year 2013).

25.     The key "players" in and features with regard to the Highland CLOs, during the

time period relevant to the issues adjudicated at the Trial, have been:

(a)     The CLO manager.  As mentioned earlier, the CLO manager is the Alleged

        Debtor, Acis LP.  Acis LP, has collateral management agreements (hereinafter,

        the "CLO Collateral Management Agreements") with the CLOs (which CLOs

        were set up as special purpose entities) and, pursuant thereto, receives

---

[18] There is still another Highland CLO (CLO 2017-7, set up in April 2017, as to which Acis LP's
contractual right to manage was terminated shortly before the Petition Date, as will be further described herein.

**Appellee Appx. 00456**
**Appx. 00707**
**013269**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Page 464 of 1804   Page 591 of 1017   PageID 14218
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 463 of 1803   PageID 11209
Case 18-30264-sgj11   Doc 1385   Filed 04/13/18   Entered 04/13/18 14:58:57   Page 10 of 53

management fees[19] from the CLOs in exchange for managing the pool of assets within the CLOs and communicating with investors in the CLOs.[20]  As mentioned earlier, Mr. Terry was the human being that performed the management function at Acis LP until Highland fired him on June 9, 2016 and also terminated his limited partnership interest in Acis LP.  Mr. Terry, and all employees who have ever provided services to the CLO manager, are Highland employees—which were provided to Acis LP through shared and sub-advisory services agreements—as further explained below.  Thus, to be clear, Acis LP has always essentially subcontracted its CLO managerial function out to Highland.

(b)   The pool of assets. Within each CLO that the CLO manager manages is a basket of loans that the CLO manager purchases.  The basket of loans typically consists of approximately 200 loans-payable (or portions of loans payable), on which large well-known companies typically are the makers/obligors (and which loans, collectively, provide a variable rate of interest).[21]  The CLO manager can typically decide to buy and sell different loans to go into the pool of assets, with certain restrictions, during a four or five year reinvestment time period.

---

[19] These fees typically include "senior fees" (*e.g.,* 15 basis points); additional "subordinate fees" (*e.g.,* 25 basis points) if the CLOs are passing certain tests; and perhaps even an "incentive fee" beyond a certain hurdle rate (*e.g.,* after the equity in the CLO received an internal rate of return of 10%, the CLO manager would get 15% of the excess).  Exh. 82, p. 59, lines 14-25.

[20] *See*, as an example, Exh. 3 (the collateral management agreement between Acis LP and CLO 2014-3).  Note that the document is entitled "Portfolio Management Agreement" but, to avoid confusion with other similarly titled documents and to highlight the true nature of the agreement, the court uses the defined term "CLO Collateral Management Agreement," which terminology the lawyers also sometimes used at the Trial.

[21] Exh. 8.

Appellee Appx. 00457
Appx. 06708
013270

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1    Exhibit    Page 465 of 521    Page 592 of 1017    PageID 14219
Page 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 464 of 1803    PageID 11210
Case 18-3026    Case 19-12391-BLS    Filed 04/13/18    Entered 04/13/18 12:35:13    Page 11 of 53
Document 133-13    Page 425 of 53

(c)     <u>The CLO investors</u> (*i.e.,* CLO note holders).  These may be any number of persons or entities, including pension funds, life insurance companies, or others who decide to invest in the CLOs and contribute capital to fund the purchase of a CLO's loan pool, and, in return, receive fixed rate notes payable—the ratings on which can range anywhere from Triple-A to Single-B, depending upon the risk option the investor chooses.  There are typically five or six traunches of notes issued by the CLO (with the top AAA-rated traunche being the least risky and the bottom traunche being the most risky) and—to be clear—the CLO itself (again, in each case, the CLO is a special purpose vehicle) is the obligor.  As the CLO manager receives income from the pool of loans in the CLO, he distributes that income to the CLO investors, in accordance with their note indentures,[22] starting with the top traunche of notes and then down to the other traunches.  The top traunche of notes (AAA-rated) is considered the "controlling" class and a majority of holders in this class can terminate the CLO manager (*i.e.,* Acis LP) for cause on 45 days' notice, although all parties seem to agree this would be a rare event.

(d)     <u>The CLO equity holder</u>.  The CLO equity holder actually is a holder of subordinated notes issued by the CLOs (*i.e.,* the bottom traunche of notes on which the CLO special purpose entity is obligated), and has voting rights and is itself a capital provider, but it takes the most risk and receives the very last cash

---

[22] The indenture trustee on the CLO notes may actually operate as a payment agent in some cases, for purposes of making the quarterly note payments to holders.

11

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16    Filed 06/25/804    Page 593 of 1017    PageID 14220
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 465 of 1803    PageID 11211
Case 18-3026... Case 19-1239 1855 Filed 04/13/... Filed 04/13/18 Page 458 of 5 Page 12 of 53

flow from the CLOs.  It, in certain ways, controls the CLO vehicle[23]—for example, by virtue of having the ability to make a redemption call after a certain "no-call" period—which would force a liquidation of the basket of loans in the CLO, with the proceeds paying down the traunches of notes, starting at the top with the Triple A's.  Note that, until recently, a separate entity known as Acis Loan Funding, Ltd. ("ALF"), which was incorporated under the laws of the island nation of Guernsey,[24] was the CLO equity holder.  To be clear, ***ALF was essentially the equity owner in the CLO special purpose entities—not the equity owner of Acis LP***.  Acis LP was a party to a separate portfolio management agreement with ALF (hereinafter, the "ALF Portfolio Management Agreement"— not to be confused with the CLO Collateral Management Agreements that Acis LP separately has with the special purpose CLOs).  No fees were paid from ALF to Acis LP pursuant to the ALF Portfolio Management Agreement (rather, fees are only paid to Acis LP on the CLO Collateral Management Agreements).  The complicated structure of the CLO business—all parties seemed to agree—has been developed, among other reasons, to comply with "risk-retention requirements" imposed by the U.S. Congress's massive Dodd-Frank financial reform legislation[25] enacted in year 2010, in response to the financial crisis and recession that first began in 2008.

---

[23] The top tranche of AAA notes also has certain control—such as the ability to terminate the portfolio manager for cause, on notice.

[24] Guernsey is located in the English Channel.  ALF was created in August 2015.

[25] Simply put, one of the results of the Dodd-Frank legislation (*i.e.*, the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, H.R. 4173, 124 Stat. 1376-2223, 111th Congress, effective July 21, 2010), which was implemented over a period of several years, was that, ***subsequent to December 2016***, managers of securitizations needed to retain at least a 5% interest in that securitization.  Thus, if a $400 million CLO were to be

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/06/25   Page 594 of 1017   PageID 14221
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 466 of 1803   PageID 11212
Case 18-30264-sgj11   Doc 1895   Filed 04/13/18   Entered 04/13/18 21:58:37   Page 13 of 53

(e)    The Equity Owners of ALF.  Until recently (*i.e.,* until October 24, 2017—four

days after the Arbitration Award), Acis LP itself, as required for a CLO manager,

had a 15% indirect ownership in ALF, in order to be regulatory compliant.[26]  The

parties sometimes refer to ALF (and the web of ownership between it and Acis

LP) as the "risk retention structure."[27]  The evidence at the Trial revealed that

ALF (which has recently been renamed), now, has three equity owners:  (i) a 49%

equity owner that is a charitable fund (*i.e.,* a donor advised fund or "DAF") that

was seeded with contributions from Highland, is managed/advised by Highland,

and whose independent trustee is a long-time friend of Highland's chief executive

officer, Mr. Dondero; (ii) 2% is owned by Highland employees; and (iii) finally,

ALF *may* be 49% owned by a third-party institutional investor based in Boston

that Highland believed it was required to keep anonymous at the Trial.  Not only

is the court unaware of who this independent third-party is, but the evidence

seems to suggest that it may have acquired its interest fairly recently or may have

simply committed to invest recently.[28]

---

issued, the CLO manager would need to retain at least 5% or $20 million of the assets in the CLO (which 5% could be either all at the equity level or vertically, up and down the note tranches).  There are multiple ways to accomplish this 5% retention (*i.e.,* with either the CLO manager directly investing in at least 5% of the CLO or doing it through a controlled subsidiary).  This particular rule was announced in *December 2014* and the SEC thereafter issued a no action letter stating that *if a CLO was issued prior to December 2014*, then any refinancing of such CLO that happens within four years can be done without risk retention in place.  Resets of any CLO (*i.e.,* changes in terms and maturity—as opposed to mere changes in interest rates), on the other hand, must have risk retention in place.  *Four of Acis LP's current CLOs were issued prior to December 2014.*  Thus, these four CLOs are still technically able to do a refinancing without a risk retention structure in place.  In any event, by early-to-middle 2017, Acis LP was risk retention compliant.  Exh. 82, pp. 65-69 & 75.  That was recently changed—on October 24, 2017—four days after the Arbitration Award—as later explained herein.

[26] *See* n.23, *supra*.

[27] *See* Demonstrative Aid No. 3.

[28] *See* Exh. 173, which seems to suggest that the only equity owners of ALF just prior to October 24, 2017 were Acis LP and the DAF, until Acis LP's interest in ALF was sold back to ALF on October 24, 2017.  *See also* Exh. 82, p. 162, lines 2-7.

Appellee Appx. 00460
Appx. 00711
013273

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-6   Exhibit E Page 595 of 1017   PageID 14222
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 467 of 1803   PageID 11213
Case 18-30264-sgj11   Doc 391-3   Filed 04/13/18   Entered 04/13/18 16:34:58   Page 14 of 53

(f)    <u>The underwriter for the CLO notes.</u>  As with any publicly traded notes, there is an underwriter for the CLO notes which solicits investors for the CLO notes (examples given at the Trial:  Mizuho Securities USA, LLC; Merrill Lynch; JP Morgan Chase).[29]  The CLO notes are traded on the Over-the-Counter Market.

(g)    <u>The independent indenture trustee for the CLO notes.</u>  As also with any issuance of publicly traded notes, there is an indenture trustee (example given at the Trial:  U.S. Bank).[30]

26.    Mr. Terry, the Petitioning Creditor, as earlier mentioned, began working for Highland in 2005 until his employment was terminated on June 9, 2016.

27.    Acis LP and Acis GP/LLC have never had any employees.  Rather, all employees that work for any of the Highland family of companies (including Mr. Terry) have, almost without exception, been employees of Highland itself.  Highland has approximately 150 employees in the United States.  Highland provides employees to entities in the organizational structure, such as Acis LP and Acis GP/LLC, through both the mechanism of:  (a) a Shared Services Agreement (herein so called),[31] which provides "back office" personnel—such as human resources, accounting, legal and information technology to the Highland family of companies; and (b) a Sub-Advisory Agreement (herein so called),[32] which provides "front office" personnel to entities—such as the managers of investments like Mr. Terry.  The evidence indicated that this is typical in the CLO industry to have such agreements.  The court notes that

[29] See Exh. 193.

[30] See Exh. 7.

[31] Exhs. 17, 99, 179 & 5.

[32] Exhs. 18, 178 & 4.

Appellee Appx. 00461
Appx. 00712
013274

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Page 469 of 1804   Page 596 of 1017   PageID 14223
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 468 of 1803   PageID 11214
Case 18-30264-sgj11   Doc 239-13   Filed 04/13/18   Entered 04/13/18 16:58:54   Page 15 of 53

all iterations of the Shared Services Agreements and Sub-Advisory Agreements between Acis LP

and Highland were signed by Mr. Dondero both as President of Acis LP and as President of the

General Partner of Highland.

28.      Because Acis LP essentially subcontracts out all of its functions to Highland

pursuant to the Shared Services Agreement and the Sub-Advisory Agreement, Acis LP has very

few vendors or creditors.  Rather Highland incurs expenses and essentially bills them to Acis LP

through these two agreements.[33]  In other words, Highland is one of Acis LP's largest and most

frequent creditor.

29.      The evidence reflected that at all times Mr. Dondero has been the President of

both of the Alleged Debtors, and there have been, at all times, very few, if any, other officers. It

appears that the only other officer of Acis GP/LLC that ever existed was Frank Waterhouse,

Treasurer.[34]  It also appears that the only other officer of Acis LP that ever existed was Frank

Waterhouse, Treasurer, Mr. Terry as Portfolio Manager, and someone named Patrick Boyce as

Secretary at one time.[35]

30.      Mr. Dondero testified that he has decision making authority for the Alleged

Debtors but usually delegates that authority to Highland's in-house lawyers, Scott Ellington

(General Counsel, Chief Legal Officer, and Partner of Highland) and Isaac Leventon (Assistant

General Counsel of Highland) and is rarely involved in "nitty gritty negotiations."   Sometimes

instructions will come to him from the compliance group headed up by Chief Compliance

Officer Thomas Surgent.  Additionally, he testified that he signs hundreds of documents per

---

[33] Exh. 83, pp. 228 (line 8)-230 (line 14).

[34] *See, e.g.*, Exh. 10 & Exh. 173, p.3

[35] Exhs. 14 & 15.

Appellee Appx. 00462
Appx. 06718
013275

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Page 470 of 804 Page 597 of 1017   PageID 14224
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 469 of 1803   PageID 11215
Case 18-30264-sgj11   Doc 3918-5 Filed 04/13/18   Entered 04/13/18 Page 458 of 54 Page 16 of 53

week, and much of what he signs is on advice of counsel and he sometimes even delegates to his

assistant the authority to sign his name.  As set forth above, Mr. Ellington (who **did *not*** testify at

the Trial)[36] and Mr. Leventon (who **did** testify at the Trial) are not officers, directors, or

employees of the Alleged Debtors.  Mr. Leventon is designated to be the representative for the

Alleged Debtors (and testified as a Rule 30(b)(6) witness during pre-Trial discovery)—he

explained that this representative-authority derives from the Shared Services Agreement.  Mr.

Leventon testified that he takes his instructions generally through his direct supervisor, Mr.

Ellington, although Highland partners can ask him to perform legal services for any of

Highland's 2,000 entities.

     **C.**     **Transfers and Transactions Involving the Alleged Debtors Since the
Litigation with Mr. Terry Commenced—and Especially After the
Arbitration Award.**

     31.     Below is a listing of some (but not necessarily all) of the transfers and

transactions that the Alleged Debtors, Highland, and related parties undertook ***after*** the litigation

with Mr. Terry commenced.

     (a)     <u>Acis LP's Sale to Highland of a "Participation Interest" in its CLO Cash Flow
Stream.</u>  On October 7, 2016 (approximately one month after the litigation arose

among Mr. Terry, Highland, and the Alleged Debtors), Acis LP sold to Highland

a participation interest in its expected future cash flow from the CLO Collateral

Management Agreements—specifically, it sold a portion of the cash flow it

expected to earn from November 2016 to August 2019 (not the full life of the

CLOs), for $666,655 cash, plus a $12,666,446 note payable from Highland to

---

[36] Mr. Ellington did testify at a hearing in the bankruptcy court on February 6, 2018—which the parties
asked this court to take judicial notice of—and also provided deposition testimony that was submitted into evidence.
*See* Exh. 25.

**Appellee Appx. 00463**

**Appx. 00714**

**013276**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/16/25   Page 598 of 1017   PageID 14225
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 470 of 1803   PageID 11216
Case 18-30264-sgj11   Doc 1875   Filed 04/13/18   Entered 04/13/18 14:58:54   Page 17 of 53

Acis LP (hereinafter, the "Acis LP Note Receivable from Highland"). Mr. Dondero signed the purchase and sale agreement for both purchaser and seller.[37] Mr. Dondero signed the Acis LP Note Receivable from Highland, which accrued interest at 3% per annum. It appears that the $666,665 cash down payment was actually paid, and a payment required on the Acis LP Note Receivable from Highland of $3,370,694 on May 31, 2017, was actually made. The Acis LP Note Receivable from Highland was payable in three installments, with a $5,286,243 payment required on May 31, 2018, and a $4,677,690 payment required on May 31, 2019. When viewed in complete isolation, this transaction does not necessarily appear problematic. Although there was evidence that Acis LP had been managing the five CLOs for about $10 million per year of fees, some of the recitals in the purchase and sale agreement suggest that there may have been a sound business reason for the transaction and the arbitration panel,[38] viewing this transaction in isolation, did not think it was necessarily problematic or actionable. In any event, Highland is adamant it was a net neutral transaction.

(b)   Transfer of Acis LP's interest in ALF. Recall that ALF was the entity that held equity (*i.e.,* the subordinated notes) in the CLO special purpose vehicles, and held voting rights and was a capital provider to the overall risk retention structure supporting the CLOs. And Acis LP, in turn, held a 15% indirect interest in ALF. On October 24, 2017 (**four days after the Arbitration Award**), Acis, LP entered into an agreement with ALF whereby ALF acquired back the shares that Acis LP

---

[37] Exhs. 14 & 15.

[38] Exh. 1, p. 18.

Appellee Appx. 00464
Appx. 00715
013277

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Page 470 of 1804   Page 599 of 1017   PageID 14226
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 471 of 1803   PageID 11217
Case 18-3026   Case 19-12391855   Filed 04/13/18   Entered 04/13/18   Page 3458 of 53   Page 18 of 53

indirectly held in ALF (966,679 shares) for the sum of $991,180.13.[39]   No

credible business justification was offered for this transaction, other than mostly

uncorroborated (and self-serving) statements from Highland witnesses that Acis

LP was "toxic" in the market place (due to the litigation with Mr. Terry) and this

was a step in the process of extricating Acis LP from the CLO business.[40]   The

court finds the testimony about Acis LP's toxicity in the marketplace to not be

credible or at all convincing.  For one thing, a new CLO (Acis CLO 2017-7, Ltd.)

was closed on April 10, 2017 with Acis LP as the portfolio manager.  Moreover,

Acis LP subcontracts all of its CLO management function to Highland—and there

was no evidence to suggest that anyone in the marketplace at this juncture

differentiates between Acis LP (whose president is Mr. Dondero) and Highland

(whose president is Mr. Dondero).  ***In any event, the October 24, 2017***

***transaction had the highly consequential effect of making Acis LP***

***"noncompliant" or unable to continue serving as a CLO manager for***

***regulatory purposes for any new CLOs or reset CLOs (or for a refinancing of***

***any of the Highland CLOs that had been created after December 2014)[41]***

***because aspects of the federal Dodd Frank legislation require CLO managers to***

***have "skin in the game" with regard to the CLOs they manage (i.e., they must***

***retain at least 5% of CLOs they manage).***  Mr. Akada, who testified that he had

been involved with the CLO business from the beginning and that the CLO team

---

[39] Exh. 173.

[40] There were also a few hearsay-laden emails offered, that the court did not find probative.  Exhs. 19-22.

[41] *See* n.23 *supra*.

Appellee Appx. 00465
Appx. 00716
013278

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Page 473 of 1804    Page 600 of 1017    PageID 14227
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 472 of 1803    PageID 11218
Case 18-3026 Case 19-12391855 Filed 04/18/18    Entered 04/13/18 Page 3 of 5 Page 19 of 53

reported to him (including Mr. Terry before his termination), testified that he had no knowledge of this particular transaction.  The document effectuating this transaction was signed by Frank Waterhouse, Treasurer for and on behalf of Acis LP, acting by its general partner, Acis GP/LLC.[42]

(c)    ALF Next Decides to Jettison Acis, LP as its Portfolio Manager and Replace it with a new Highland Cayman Island Entity.  On October 27, 2017 (seven days after the Arbitration Award), ALF—having purchased back the ownership interest that Acis LP had in it, just three days earlier—decided that it would no longer use Acis LP as its portfolio manager and entered into a new portfolio management agreement to supersede and replace the ALF Portfolio Management Agreement.  Specifically, on October 27, 2017, ALF entered into a new Portfolio Management Agreement with a Cayman Island entity called Highland HCF Advisor, Ltd., replacing Acis LP in its role with ALF.[43]  This agreement appears to have been further solidified in a second portfolio management agreement dated November 15, 2017.[44]

(d)    The Acis LP Note Receivable from Highland is Transferred from Acis LP to Yet Another Highland Cayman Island Entity.  On November 3, 2017 (10 days after the Arbitration Award), Acis LP assigned and transferred its interests in the Acis LP Note Receivable from Highland—which at that point had a balance owing of over $9.5 million—to a Highland Cayman Island entity known as Highland CLO

---

[42] Exh. 173, p. 3.

[43] Exh. 43.

[44] Exh. 168.

Appellee Appx. 00466
Appx. 00715
013279

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Page 1074 of 1804    Page 601 of 1017    PageID 14228
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 473 of 1803    PageID 11219
Case 18-3026-csgj11  Doc 391 13F5ledD4c13613  Entered 04/13/18 Page 250f 5 Page 20 of 53

Management Ltd. which apparently was created sometime recently to be the new

collateral manager of the CLOs (in other words, the new Acis LP).[45]  The

Assignment and Transfer Agreement memorializing this transaction is signed by

Mr. Dondero for Acis LP and Mr. Dondero for Highland and some

undecipherable name for Highland CLO Management Ltd.[46]  The document

recites that (i) Highland is no longer willing to continue providing support

services to Acis LP, (ii) Acis LP, therefore, can no longer fulfill its duties as a

collateral manager, and (iii) Highland CLO Management Ltd. agrees to step into

the collateral manager role if Acis  LP will assign to it the Acis LP Note

Receivable from Highland.   One more thing:  since Acis LP was expected to

potentially incur future legal and accounting/administrative fees, and might not

have the ability to pay them when due, ***Highland CLO Management Ltd.*** agreed

to reimburse Acis LP (or pays its vendors directly) up to $2 million of future legal

expenses and up to $1 million of future accounting/administrative expenses.[47]

(e)     <u>Various Additional Transactions that further Transitioned CLO Management and</u>

<u>Fees Away from Acis LP to Highland Cayman Island Entity.</u>  On December 19,

2017—just one day after the Arbitration Award was confirmed with the entry of

the Final Judgment—the vehicle that can most easily be described as the Acis LP

"risk retention structure" (necessitated by federal Dodd Frank law) was

transferred away from Acis LP and into the ownership of Highland CLO

---

[45] Exh. 16.

[46] *Id.* at p.6.

[47] *Id.* at pp. 1 & 2.

Appellee Appx. 00467
Appx. 00518
013280

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Page 475 of 1804   Page 602 of 1017   PageID 14229
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 474 of 1803   PageID 11220
Case 18-30264-sgj11   Document 355   Filed 04/13/18   Entered 04/13/18 15:32:50   Page 21 of 53

Holdings, Ltd. (yet another Cayman Island entity, incorporated on October 27, 2017[48]).

(f)   In addition to transferring Acis LP's interest in the Acis LP risk retention structure on December 19, 2017, Acis LP also transferred its contractual right to receive management fees for Acis CLO 2017-7, Ltd. (which had just closed April 10, 2017), which Mr. Terry credibly testified had a combined value of $5 million, to Highland CLO Holdings, Ltd., another Cayman entity, purportedly in exchange for forgiveness of a $2.8 million receivable that was owed to Highland under the most recent iteration of the Shared Services Agreement and Sub-Advisory Agreement for CLO-7.[49]   In conjunction with this transfer, Highland CLO Holdings, Ltd. then entered into new Shared Services and Sub-Advisory Agreements with Highland.[50]

(g)   Change of Equity Owners of the Alleged Debtors.  When Acis LP was first formed, it was owned by one general partner (Acis GP/LLC, with a .1% interest) and it had three limited partners:  (a) Dugaboy Investment Trust (a Dondero family trust of which either Mr. Dondero or his sister, Nancy Dondero, have been the Trustee at all relevant times) with a 59.9% interest; (b) Mr. Terry with a 25% interest; and (c) Mr. Akada with a 15% interest.   When Acis GP/LLC was formed

---

[48] Exh. 157.

[49] See Ex. 45 (the Transfer Document); see also Exh. 4 (the March 17, 2017 Third Amended and Restated Sub-Advisory Agreement between Acis LP and Highland); Exh. 5 (the March 17, 2017 4th Amended & Restated Shared Services Agreement between Acis LP and Highland); Exh. 165 (March 17, 2017 Staff and Services Agreement between Acis CLO Management, LLC and Acis LP); Exh. 166 (March 17, 2017 Master Sub-Advisory Agreement between Acis CLO Management, LLC and Acis LP).

[50] See Exhs. 161 & 162.

Appellee Appx. 00468
Appx. 00719
013281

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Page 476 of 1804    Page 603 of 1017    PageID 14230
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 475 of 1803    PageID 11221
Case 18-30264-sgj11    Doc 391-3    Filed 04/13/18    Entered 04/13/18 Page 325 of 5 Page 22 of 53

(*i.e.,* the .1% owner of Acis LP), its sole member was the Dugaboy Investment Trust.   After Mr. Terry was terminated by Highland, his 25% limited partnership interest in Acis LP was forfeited and divided among the two remaining limited partners: Mr. Akada (increasing his interest by 10% up to 25%), and Dugaboy Investment Trust (increasing its interest by 15% up to 74.9%).  But, more importantly, on the day after entry of Mr. Terry's Final Judgment (*i.e.,* on December 18, 2017), both Mr. Akada and Dugaboy Investment Trust conveyed their entire limited partnership interests in Acis LP—25% and 74.9%, respectively—to a Cayman Island entity called Neutra, Ltd., a Cayman Islands exempted company.   Dugaboy Investment Trust also conveyed its 100% membership interest in Acis GP/LLC to Neutra, Ltd.  Mr. Akada testified that he did this on advice of counsel.  He also did not dispute that he had made millions of dollars of equity dividends from his equity investment in Acis LP in recent years[51]—which he conveyed away for no consideration on December 18, 2017.

(h)    The Intended Reset of Acis CLO 2014-3.   With all of the above maneuverings having been accomplished, Highland was posed to do a reset on Acis CLO 2014-3 in February 2018 (until Mr. Terry filed the Involuntary Petitions).  The investment bank Mizuho Securities USA, LLC was engaged November 15, 2017[52] and a final offering circular was issued in January 2018[53]—contemplating a reset of Acis CLO 20-14-3 with the recently created Highland CLO Management Ltd.

---

[51] Exh. 23, p.3.

[52] Exh. 104.

[53] Exh. 31.

Appellee Appx. 00469
Appx. 00729
013282

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1 of 5 804   Page 604 of 1017   PageID 14231
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 476 of 1803   PageID 11222
Case 18-30264-sgj11   Doc 231-1   Filed 04/13/18   Entered 04/13/18 12:45:0   Page 23 of 53

Identified as the new portfolio manager, rather than Acis LP. The act of implementing a reset on the CLO was not in itself suspect. However, the reset would, of course, have the effect of depriving Acis LP from a valuable asset—an agreement that could realistically be expected to provide millions of dollars of future collateral management fees—coincidentally (or not) just after Mr. Terry obtained his large judgment.

**D.   Findings Regarding Credibility of Witnesses.**

32.     The court found the testimony of Mr. Terry to be very credible. He was very familiar with the financial condition of the Alleged Debtors, since he presided over the business of the Alleged Debtors from their inception until June 9, 2016, and has also closely followed publicly available information regarding the companies since his termination. Mr. Terry credibly testified that the Alleged Debtors have never had a significant number of creditors, since most of the Alleged Debtors' vendors are engaged by and send their invoices to Highland, and Highland simply obtains reimbursement from the Alleged Debtors (and other entities in the Highland family), as its in-house lawyers determine is appropriate, through the Shared Services Agreement and Sub-Advisory Agreement. Thus, Highland should at all times be the Alleged Debtors' main creditor. The court finds that Mr. Terry had a good faith belief that the Alleged Debtors had only a handful of creditors (maybe four or so) besides him and Highland. The court also finds that Mr. Terry—at the time he filed the Involuntary Petitions—had a good faith belief that the Alleged Debtors and those controlling them were engaged in an orchestrated, sophisticated effort to denude the Alleged Debtors of their assets and value (*i.e.*, transferring assets and rights for

Appellee Appx. 00470
Appx. 00521
013283

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Filed 07/06/25    Page 605 of 1017    PageID 14232
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 477 of 1803    PageID 11223
Case 18-30264-sgj11    Doc 1855    Filed 04/13/18    Entered 04/13/18 12:25:58    Page 24 of 53

less than reasonably equivalent value), which started with intensity after issuance of the

Arbitration Award (if not sooner).[54]

33.    The court found the testimony of almost all of the witnesses for the Alleged

Debtors to be of questionable reliability and, oftentimes, there seemed to be an effort to convey

plausible deniability.  For example, sometimes business decisions concerning the Alleged

Debtors were said to have been made by a "collective," and other times the in-house Highland

lawyers (who, of course, are not themselves officers or employees of Acis LP and Acis GP/LLC)

stressed that Mr. Dondero (the president and manager of the two entities) had ultimate decision

making authority for them.  Meanwhile, Mr. Dondero testified that, while he has decision

making authority at Acis LP, he usually delegates to Highland's in-house lawyers Scott Ellington

and Isaac Leventon.   He testified that he signs hundreds of documents per week and often must

rely on information of others when signing.  Additionally, Mr. Dondero (again, the President of

each of the Alleged Debtors) testified that he had never even read the Arbitration Award.  While

Mr. Dondero is the chief executive of a multi-billion dollar international investment company,

and naturally has widespread responsibilities and must delegate to and rely upon others including

lawyers, this court simply does not believe that he never read the Arbitration Award.  The court

perceived the animosity between Mr. Dondero and Mr. Terry to be rather enormous and Mr.

Dondero even testified (as did others) that the litigation with Mr. Terry was hurting Acis LP and

Highland in the CLO marketplace (*i.e.,* no investors or underwriters wanting to be associated

---

[54] The court also found that the deposition testimony of Brian Shaw and Rahkee Patel (counsel for Mr. Terry) was also credible and did not demonstrate any bad faith on their parts in filing the Involuntary Petitions on behalf of Mr. Terry.

Appellee Appx. 00471
Appx. 00722
013284

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/06/25   Page 606 of 1017   PageID 14233
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 478 of 1803   PageID 11224
Case 18-30264-sgj11   Doc 391   Filed 04/13/18   Entered 04/13/18 Page 25 of 53

with the Acis brand).[55]  If that were the case, it strains credulity to suggest Mr. Dondero never even read the Arbitration Award.

34.     As mentioned earlier, in December 2017, Acis GP/LLC became 100% owned by a Cayman Island entity known as Neutra, Ltd. (whose beneficial owner is a Dondero family trust) and Acis LP became 99.9% owned by Neutra, Ltd.  The directors of Acis GP/LLC and Acis LP are provided to it now by an entity known as "Maples Fiduciary Services"—another Cayman Island entity, but the Highland Assistant General Counsel could not remember the names of those directors provided to Acis GP/LLC and Acis LP, except for perhaps one.  Mr. Dondero, when questioned about some of the recent transactions pertaining to Acis LP, testified that there were tax reasons—tax lawyers recommended the recent transactions and transfers.  No tax lawyers testified.  Mr. Dondero also testified that certain transactions were at the directive of the Thomas Surgent group (the Highland chief compliance officer).  Neither Mr. Surgent nor anyone else from the compliance group testified.

35.     Meanwhile, Mr. Akada, who, while testifying, seemed like a generally lovely person and seemed as knowledgeable as a human being could possibly be on the topic of CLOs generally, had no idea if he was an officer or director of the Alleged Debtors, nor did he know whom its officers were.  He could not testify as to the meaning of certain transactions in which Acis LP had engaged in during recent weeks and said that he signed certain documents on advice of counsel.  He also could not even testify as to whether Highland was opposing the Involuntary Petitions.

36.     Again, there was a lot of plausible deniability at Trial as to the "whos" and "whys" for the recent maneuverings involving the Alleged Debtors assets and rights in the weeks

---

[55] No such investors or underwriters provided testimony.

Appellee Appx. 00472
Appx. 00723
013285

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/25/804    Page 607 of 1017    PageID 14234
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 479 of 1803    PageID 11225
Case 18-30264 Case 19-18239 1855ed 04/13/18    Entered 04/13/18 ag 327 of 54 Page 26 of 53

since the Arbitration Award.  The one thing that the court was wholly convinced of was that conflicts of interest among Highland and the Alleged Debtors abound, and no one is looking out for the interests of the Alleged Debtors as a fiduciary should.

**E.    Evidence Regarding the Number of Creditors of the Alleged Debtors.[56]**

37.    The Alleged Debtors do not dispute Mr. Terry's claim for the purposes of counting creditors under section 303(b) of the Bankruptcy Code.  However, Mr. Terry asserts that the Alleged Debtors have fewer than 12 creditors, and the Alleged Debtors dispute this fact. Specifically, the Alleged Debtors initially filed on January 31, 2018, a Notice of List of Creditors Pursuant to Fed. R. Bankr. P. 1003(b) signed by Mr. Dondero listing 18 creditors (the "Original Notice of Creditors").[57]  The Alleged Debtors subsequently filed on February 5, 2018, a First Amended Notice of List of Creditors Pursuant to Fed. R. Bankr. P. 1003(b) signed by Mr. Leventon listing 19 creditors (the "First Amended Notice of Creditors").[58]  Finally, the Alleged Debtors filed on March 6, 2018, a Second Amended Notice of List of Creditors Pursuant to Fed. R. Bank. P. 1003(b) signed by Mr. Leventon listing 20 creditors (the "Second Amended List of Creditors").[59]  The following chart summarizes the name, amount, and nature of the 20 creditors listed by the Alleged Debtors in their Second Amended List of Creditors.

---

[56] The court notes that neither Mr. Terry nor the Alleged Debtors attempted to differentiate between the creditors of Acis GP/LLC versus the creditors of Acis LP, but rather presented evidence regarding the collective number of creditors for both of the Alleged Debtors.  This seems legally appropriate, since Acis LP is the entity that incurred most of the debt, and ACIS GP/LLC would be liable on such debt as the general partner of Acis LP.

[57] *See* DE # 7 in Case No. 18-30264 & DE # 7 in Case No. 18-30265.

[58] *See* DE # 17 in Case No. 18-30264 & DE # 16 in Case No. 18-30265.

[59] *See* DE # 39 in Case No. 18-30264 & DE # 38 in Case No. 18-30265.

Appellee Appx. 00473
013286

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 480 of 1017   PageID 14235
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 480 of 1803   PageID 11226
Case 18-30264-sgj11   Doc 2391-3   Filed 04/13/18   Entered 04/13/18 13:32:58   Page 27 of 53

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness[60] |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| 2 | Case Anywhere, LLC | Law Firm Vendor | $417.20 |
| 3 | CSI Global Deposition Services | Law Firm Vendor | $38,452.56 |
| 4 | David Langford | Court Reporter/Law Firm Vendor | $550 |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| 6 | Elite Document Technology | Data Hosting/Law Firm Vendor | $199.72 |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| 8 | Highland Capital Management, L.P. | Advisory and Participation Fees | $2,770,731.00 |
| 9 | JAMS, Inc. | Law Firm Vendor | $1,352.27 |
| 10 | Jones Day | Legal Fees | $368.75 |
| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |
| 16 | Stanton Advisors LLC | Testifying Expert Fees/Law Firm Vendor | $10,000 |
| 17 | Stanton Law Firm | Legal Fees | $88,133.99 |
| 18 | The TASA Group. Inc. | Testifying Expert Fees/Law Firm Vendor | $14,530.54 |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

38.     First, the court believes it necessary to remove certain insider creditor claims, which are required not to be counted pursuant to section 303(b)(2) of the Bankruptcy Code.[61] This would clearly include Highland (the Alleged Debtors do not dispute this).

---

[60] The dollar amounts listed here are based upon the amounts listed in the Second Amended List of Creditors.

[61] *In re Moss*, 249 B.R. 411, 419 n. 6 (Bankr. N.D. Tex. 2000).

Appellee Appx. 00474

Appx. 00725

013287

39.    Additionally, there were certain creditors that filed sworn statements saying they
were not creditors of the Alleged Debtors or were subsequently removed from the creditor list by
agreement of the Alleged Debtors.  These creditors would include Case Anywhere, CSI Global
Deposition Services,[62] Elite Document Technology, JAMS, Inc.,[63] Stanton Advisors LLC,[64] and
the TASA Group, Inc..[65]  Thus, the updated chart now shows 13 creditors of the Alleged
Debtors.

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| ~~2~~ | ~~Case Anywhere, LLC~~ | ~~Law Firm Vendor~~ | ~~$417.20~~ |
| ~~3~~ | ~~CSI Global Deposition Services~~ | ~~Law Firm Vendor~~ | ~~$38,452.56~~ |
| 4 | David Langford | Court Reporter/Law Firm Vendor | $550 |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| ~~6~~ | ~~Elite Document Technology~~ | ~~Data Hosting/Law Firm Vendor~~ | ~~$199.72~~ |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| ~~8~~ | ~~Highland Capital Management, L.P.~~ | ~~Advisory and Participation Fees~~ | ~~$2,770,731.00~~ |
| ~~9~~ | ~~JAMS, Inc.~~ | ~~Law Firm Vendor~~ | ~~$1,352.27~~ |
| 10 | Jones Day | Legal Fees | $368.75 |
| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |

---

[62] CSI Global Deposition Services was removed as a creditor by the agreement of the Alleged Debtors.

[63] JAMS, Inc. was removed as a creditor by agreement of the Alleged Debtors.

[64] Stanton Advisors LLC was removed as a creditor by agreement of the Alleged Debtors.

[65] *See* Exh. 40B, Exh. 186, Exh. 92, and Exh. 94.

Appellee Appx. 00475

013288

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/25/804    Page 610 of 1017    PageID 14237
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 482 of 1803    PageID 11228
Case 18-30264-sgj11    Doc 2391-85    Filed 04/13/18    Entered 04/13/18 Page 30 of 57    Page 29 of 53

| 16 | Stanton Advisors LLC | Testifying Expert Fees/Law Firm Vendor | $10,000 |
| 17 | Stanton Law Firm | Legal Fees | $88,133.99 |
| 18 | The TASA Group. Inc. | Testifying Expert Fees/Law Firm Vendor | $14,530.54 |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

40.    Next, the court finds that there are certain creditors included in the "Law Firm Vendor" category (*e.g.*, experts, data hosting, document managers, court reporters) that are really creditors of the individual law firms and/or Highland, and that these law firm vendor creditors should not be considered creditors of the Alleged Debtors.  For these, there was no evidence of a direct contractual obligation on the part of either the Alleged Debtors or Highland—although the court certainly understands that, when the law firms would retain vendors, they would bill these to either the Alleged Debtors or Highland as an expense to be reimbursed.  Most of these were already eliminated with agreement of the Alleged Debtors but, from the remaining list of creditors, this would include David Langford (a Dallas County court reporter).[66]  To be clear, while the individual law firm creditors may ultimately have a right to reimbursement for these vendor expenses from Highland (who may then potentially have a right to reimbursement from the Alleged Debtors via the Shared Services and Sub-Advisory Agreements), the court does not find this vendor to have a claim **directly** against the Alleged Debtors for purposes of section 303(b) of the Bankruptcy Code.

---

[66] *See* Exh. 40D, Exh. 187, Exh. 40O.

Appellee Appx. 00476
Appx. 00727
013289

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 406 of 1804    Page 611 of 1017    PageID 14238
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 483 of 1803    PageID 11229
Case 18-30264-sgj11    Doc 398-3    Filed 04/13/18    Entered 04/13/18 16:34:58    Page 30 of 53

41.    Next, as to the Stanton Law Firm, the court finds that this creditor should also be removed from the pool of creditors that "count," for section 303(b) purposes, since this claim appears to be the subject of a "bona fide dispute as to liability or amount,"[67] based on the evidence presented at the Trial.  First, there was no engagement letter between either of the Alleged Debtors and the Stanton Law Firm produced.[68]  Second, the heavily redacted invoice of the Stanton Law Firm dated October 18, 2016 shows only that it was relating to the "Joshua Terry Matter" and that it was billed to Highland.[69]  Third, the Responses and Objections to Mr. Terry's Notice of Intention to Take Depositions by Written Questions sent to the Stanton Law Firm[70] provides the following responses:

> **Question No. 11**: What is the total amount of debt Acis Capital Management L.P. to the Firm. is liable to the Firm.
>
> **Answer**: Acis Capital Management L.P.'s debt to the Firm is unknown at this time.
>
> **Question No. 12**: What is the total amount of debt Acis Capital Management GP, LLC is liable for to the firm?
>
> **Answer**: Acis Capital Management GP, LLC to the Firm is unknown at this time.
>
> **Question No. 13**: Is any other party also liable for the debt of Acis Capital Management L.P. to the Firm? If so, please state the liable party and portion of Acis Capital Management L.P. debt the other party is liable for to the Firm.

---

[67] *See Credit Union Liquidity Servs., L.L.C. v. Green Hills Dev. Co., L.L.C. (In re Green Hills Dev. Co., L.L.C.)*, 741 F.3d 651, 655 (5th Cir. 2014) (a claimholder does not have standing to file a petition under section 303(b) if its claim is "the subject of a bona fide dispute as to liability or amount"); *In re Smith*, 415 B.R. 222, 237 (Bankr. N.D. Tex. 2009) (only "a holder of a claim ... that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount" is counted in determining the number of creditors necessary to file an involuntary petition).

[68] Rather, there is only an engagement letter between Lackey Hershman LLP (acting on behalf of its client, Highland) and Stanton Advisors LLC to act as an expert in the Terry litigation.  *See* Exh. 144.  As previously noted, the claim of Stanton Advisors LLC was removed from the creditor list by agreement of the Alleged Debtors.

[69] *See* Exh. 40R.

[70] The court notes that these responses were actually signed by James Michael Stanton, attorney for Stanton LLP.  *See* Exh. 139.

Appellee Appx. 00477
Appx. 00328
013290

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 04/05/25   Page 612 of 1017   PageID 14239
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 484 of 1803   PageID 11230
Case 18-30264-sgj11   Doc 3918-5   Filed 04/18/18   Entered 04/13/18   Page 32 of 53   Page 31 of 53

**Answer**: Whether any other party is also liable to the firm for the debt of Acis Capital Management, L.P. is unknown at this time.

**Question No**. **14**: Is any other party also liable for the debt of Acis Capital Management GP, LLC to Firm? If so, please state the liable party and portion of Acis Capital Management GP, LLC debt the other party is liable for to the Firm.

**Answer**: Whether any other party is also liable for the debt of Acis Capital Management GP, LLC is unknown at this time. . . .

**Question No. 21**: Does the Firm currently represent Acis Capital Management, L.P.? If so, please state the representation.

**Answer**: Based on Acis's assertion that this question calls for information protected by the attorney-client privilege, the Firm cannot answer this question at this time.

**Question No. 22**: Does the Firm currently represent Acis Capital Management GP, LLC? If so, please state the representation?

**Answer**: Based on Acis's assertion that this question calls for information protected by the attorney-client privilege, the Firm cannot answer this question at this time. . . .[71]

The court finds that this evidence demonstrates that the claim of the Stanton Law Firm is the subject of a bona fide dispute as to either liability or amount and should not be counted since there is no real way of even knowing who the Stanton Law Firm was engaged by and, thus, whether the Alleged Debtors are even responsible for these alleged legal fees. The court would also specifically refer to the testimony of Mr. Leventon, the in-house lawyer employed by Highland who was in charge of allocating all of the bills that came into Highland's legal invoicing system, where he described a process in which all legal bills relating to the "Terry Matter" would automatically be assigned to the Alleged Debtors, without any real regard to whether the particular law firm had even been engaged by the Alleged Debtors or if whether the

---

[71] *See* Exhibit 139.

Appellee Appx. 00478
Appx. 00529
013291

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-16 Filed 06/05/25 Page 613 of 1017 PageID 14240
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 485 of 1803 PageID 11231
Case 18-30264-sgj11 Doc 18-5 Filed 01/18 Entered 01/04/19 Page 32 of 53 Page 32 of 53

representation was actually relating to one of the other parties in the Terry litigation (*e.g.*, Highland, Mr. Dondero, etc.). Accordingly, the court finds that there is a bona fide dispute as to whether the Alleged Debtors are actually liable for the Stanton Law Firm legal fees and that they should not be counted as a creditor for purposes of section 303(b) of the Bankruptcy Code.[72]

42. Thus, it appears, at most, that there are 11 creditors[73] of the Alleged Debtors as set forth in the chart below:

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| ~~2~~ | ~~Case Anywhere, LLC~~ | ~~Law Firm Vendor~~ | ~~$417.20~~ |
| ~~3~~ | ~~CSI Global Deposition Services~~ | ~~Law Firm Vendor~~ | ~~$38,452.56~~ |
| ~~4~~ | ~~David Langford~~ | ~~Court Reporter/Law Firm Vendor~~ | ~~$550~~ |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| ~~6~~ | ~~Elite Document Technology~~ | ~~Data Hosting/Law Firm Vendor~~ | ~~$199.72~~ |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| ~~8~~ | ~~Highland Capital Management, L.P.~~ | ~~Advisory and Participation Fees~~ | ~~$2,770,731.00~~ |
| ~~9~~ | ~~JAMS, Inc.~~ | ~~Law Firm Vendor~~ | ~~$1,352.27~~ |
| 10 | Jones Day | Legal Fees | $368.75 |

---

[72] *See also In re CorrLine Int'l, LLC*, 516 B.R. 106, 152 (Bankr. S.D. Tex. 2014) (bankruptcy court found that creditors contained in the alleged debtor's list of creditors with uncertain or unknown amounts could not be counted towards the numerosity requirement of section 303(b)).

[73] The court notes that, in all likelihood, the list of creditors that should be tallied for purposes of section 303(b) may actually be less than 11, because certain of the remaining creditors (*i.e.*, Drexel Limited, Highfield Equities, Inc., Lackey Hershman LLP, and David Simek) received payments during the 90 days preceding the Petition Date—and, thus, arguably should not be counted as creditors pursuant to section 303(b) of the Bankruptcy Code (which instructs that transferees of voidable transfers should not be counted). *See, e.g.,* Exh. 124 & Exh. 131. Additionally, certain of the remaining law firm creditors that are owed legal fees are also creditors of Highland and Highland-affiliates, not just the Alleged Debtors. To elaborate, many of these law firm creditors were employed to represent not only the Alleged Debtors, but also Highland and Highland-affiliates, so there may be an actual dispute as to the allocation of these legal fees among Highland and the Alleged Debtors (thus there could be bona fide disputes as to the amounts allocated by Highland's in-house lawyers to the Alleged Debtors). *See, e.g.,* Ex. 123 (McKool Smith, P.C. engagement letter referencing representation of numerous parties) & Exhibit 90 (Reid Collins & Tsai's Answers and Objections to Mr. Terry's Deposition by Written Questions, questions 13 & 14, stating that based upon allocation determinations to be made by Highland, other individuals may be liable for the full amount of the debt including Acis LP, Highland, Mr. Dondero, and Mr. Okada).

Appellee Appx. 00479
Appx. 00739
013292

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-116   Filed 04/06/25   Page 614 of 1017   PageID 14241
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 486 of 1803   PageID 11232
Case 18-3026 Case 19-12391355 Filed 04/13/13   Entered 04/13/18 Page 33 of 53   Page 33 of 53

| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees[74] | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |
| ~~16~~ | ~~Stanton Advisors LLC~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$10,000~~ |
| ~~17~~ | ~~Stanton Law Firm~~ | ~~Legal Fees~~ | ~~$88,133.99~~ |
| ~~18~~ | ~~The TASA Group, Inc.~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$14,530.54~~ |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

43.     Finally, on the topic of creditor numerosity, the court further finds that the evidence
strongly suggested hurried manufacturing of creditors on the part of the Alleged Debtors and
Highland, in order to bolster an argument that having a sole petitioning creditor was legally
inadequate in this case.[75]  For example, the Klos Declaration and other information, that was
provided to State Court 2 and in discovery, only days before the Involuntary Petitions were filed,

---

[74] Mr. Terry has also argued that certain of the law firm creditors (McKool Smith, P.C., Lackey Hershman, LLP, and Reid Collins & Tsai) are "insiders" that must be excluded from the creditor list pursuant to section 303(b) of the Bankruptcy Code.  While there may be some support in case law for such an argument, Mr. Terry would ultimately need to show by a preponderance of the evidence that the law firms exercised such control or influence over the Alleged Debtors as to render their transactions not at arm's length.  *See In re CorrLine Intern., LLC*, 516 B.R. 106, 157-58 (Bankr. S.D. Tex. 2014) (citing *Kepler v. Schmalbach (In re Lemanski)*, 56 B.R. 981, 983 (Bankr.W.D.Wis.1986)).  *See also In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992) (in evaluating whether insider status existed for purposes of evaluating alleged fraudulent conveyance court considered  (1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length).  Because there was no evidence suggesting abuse or control by these law firm creditors, nor was there any evidence that would suggest that their dealings with the Alleged Debtors were anything but arm's length, the court finds that these law firm creditors should not be excluded from the creditor list as "insiders" pursuant to section 303(b) of the Bankruptcy Code.

[75] *See* the Original Notice of Creditors, the First Amended Notice of Creditors, and the Second Amended Notice of Creditors.

Appellee Appx. 00480
Appx. 00731
013293

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 08/05/25   Page 615 of 1017   PageID 14242
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 487 of 1803   PageID 11233
Case 18-3026   Case 19-1239-855   Filed 04/13/18   Entered 04/13/18   Page 34 of 53

seemed to show only a small number of creditors of Acis LP—Mr. Terry credibly testified that

he thought there were less than 12 creditors based on his review of such information, as well as

his understanding of the Alleged Debtors' business.  Yet, only a few days later, the Alleged

Debtors filed their Original Notice of Creditors, which showed 18 creditors, which was amended

twice to add another creditor and then yet another.  This simply does not jive in the court's mind

and supports this court's belief that the Alleged Debtors were scurrying to determine which

Highland creditors might cogently be painted as Acis LP creditors—so as to preclude Mr. Terry

from being able to file the Involuntary Petitions as the single, petitioning creditor.

      **F.**    **Evidence Regarding Whether the Alleged Debtors are Generally Not Paying Debts as They Become Due (Unless Such Debts are the Subject of a Bona Fide Dispute as to Liability or Amount).**

      44.     The evidence submitted reflects that, for the 11 creditors identified above, 9 out of

11 have unpaid invoices that were more than 90 days old.  The remaining 2 of the 11 were

McKool Smith, P.C. (current counsel for the Alleged Debtors) and the Petitioning Creditor.[76]

The court makes findings with regard to each of the 11 creditors below—focusing specifically on

whether the Alleged Debtors have been paying these creditors as their debts have become due.

      45.     First, with regard to Andrews Kurth & Kenyon ("AKK"), the evidence reflected

that out of the $211,088.13 allegedly owed by Acis LP to AKK, the great majority of it—

$173,448.42—was invoiced on November 16, 2016[77] (more than 14 months before the Petition

Date).  Other, smaller amounts were invoiced on a monthly basis in each of the months August

2017, September 2017, October 2017, November 2017, and December 2017.  Although

requested in discovery, no engagement letter for AKK was produced and AKK represented in

---

[76] Exhs. 40 & 54.

[77] Exh. 40.

Appellee Appx. 00481
Appx. 00732
013294

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Filed 06/25/13804 Page 616 of 1017    PageID 14243
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 488 of 1803    PageID 11234
Case 18-30264-sgj11 Doc 239-18 Filed 04/13/18    Entered 04/13/18 13:34:58 Page 35 of 53

written discovery that, to its knowledge, none existed.[78]  The court notes anecdotally that AKK's
invoices (although allegedly related to Acis LP legal matters) were addressed to Highland.[79]  In
any event, AKK represented that both the Alleged Debtors and Highland are jointly and
severally liable for the fees owed to it.[80]  AKK also represented that, to its knowledge, the
amounts owing to it by Acis LP and Highland are not disputed.[81]  AKK also represented that it
has not provided legal work on a contingency basis for the Alleged Debtors or Highland.[82]  The
court makes a logical inference that AKK expected timely payment of its invoices—the largest
of which was dated more than 14 months prior to the Petition Date—and, thus, it has generally
not been paid timely.

46.     Next, with regard to Drexel Limited, the Petitioning Creditor concedes that its
$6,359.96 indebtedness (which is a fee rebate owing to it) is not past-due.

47.     Next, with regard to Highfield Equities, Inc., the Petitioning Creditor concedes
that its $2,510.04 indebtedness (which is also a fee rebate owing to it) is not past-due.

48.     Next, with regard to the Jones Day law firm, the $368.75 indebtedness owed to it
is well more than 90 days old.  Specifically, there is a six-and-a-half-month old invoice dated
July 19, 2017 invoice in the amount of $118.75, and two five-month old invoices dated August
30, 2017 (both in the amount of $150).[83]  The court makes a logical inference that Jones Day

---

[78] Exh. 98, Requests 1-2.

[79] Exh. 98, pp. AKK000061-AKK000060.

[80] Exh. 98, Question 13.

[81] Exh. 98, Questions 52-55.

[82] Exh.  98, Questions 73-75.

[83] Exh. 40K.

Appellee Appx. 00482
Appx. 00733
013295

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/804 Page 617 of 1017   PageID 14244
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 489 of 1803   PageID 11235
Case 18-3026 Case 19-12391853 Filed 04/13618   Entered 04/13/18 Page 36 of 53   Page 36 of 53

expected timely payment of its invoices prior to the Petition Date and, thus, it has generally not been paid timely.

49.     Next with regard to the Petitioning Creditor, Mr. Terry, the court notes that his liquidated claim in the amount of $8,060,827.84 first arose with the final Arbitration Award on October 20, 2017 (although such award was not confirmed by State Court 2 until December 18, 2017).  The judgment was unstayed as of the January 30, 2018 Petition Date, although the Alleged Debtors state that they still desire to appeal it—as difficult as that is in the situation of an arbitration award.  The court makes a logical inference that the Alleged Debtors had, on the Petition Date, no intention of paying this claim any time soon based on their conduct after the Arbitration Award—although the Arbitration Award had only been in existence for three-and-a-half months as of the Petition Date. The cash in the Alleged Debtors' bank accounts is wholly insufficient to cover the Arbitration Award and, meanwhile, corporate transactions have been ongoing to ensure that no cash streams will be coming into Acis LP in the future in the same way that they have in the past.  Thus, this court finds that this large claim, as of the Petition Date, was not being paid timely.

50.     Next with regard to KPMG LLP, the $34,000 indebtedness owed to it was for the service of auditing Acis LP's financial statements, pursuant to an engagement letter with it dated March 1, 2017.[84]  KPMG's engagement letter reflected a $40,000 flat fee was agreed to by Acis LP for the service, of which 40% was due October 2017 (*i.e.,* $16,000), with another 45% was due in January 2018 ($18,000), and the remaining 15% would be due at the time that a final bill was sent.  Acis LP has only paid $6,000 of the agreed upon amount—meaning $28,000 was overdue as of the January 30, 2018 Petition Date (with $10,000 of that being four months past

---

[84] Exh. 40M.

Appellee Appx. 00483
Appx. 00734
013296

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 08/25/25    Page 618 of 1017    PageID 14245
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 490 of 1803    PageID 11236
Case 18-30264-sgj11    Doc 239    Filed 04/13/18    Entered 04/13/18 Page 37 of 53

due).  The court makes a logical inference that KPMG LLP expected payment of its audit fees in

accordance with its engagement letter and, thus, it has generally not been paid timely.

51.     Next with regard to Lackey Hershman LLP, the $236,977.54 indebtedness owed

to it was for legal services provided to the Alleged Debtors and Highland in connection with the

arbitration and litigation with Mr. Terry.  No engagement letter was provided, but the invoices

for their services are all directed to Highland.[85]  The evidence reflected that three invoices had

not been paid as of the Petition Date:  an October 31, 2017 invoice in the amount of $56,909.53;

a November 30, 2017 invoice setting forth new fees in the amount of $84,789.83; and a

December 31, 2017 invoice setting forth new fees in the amount of $95,278.18.[86]  The court

makes a logical inference that Lackey Hershman LLP expected prompt payment on its invoices

(if nothing else, the statement on its invoice indicating "Total now due")[87] and, thus, it has

generally not been paid timely.

52.     Next with regard to Reid Collins & Tsai LLP, the $17,383.75 indebtedness owed

to it was billed in an invoice dated August 31, 2017, indicating an August 31, 2017 "Due Date"

(five months before the Petition Date).[88] Although requested in discovery, no engagement letter

for this firm was produced and Reid Collins & Tsai LLP in fact represented in written discovery

that none existed.[89]  Moreover, written discovery propounded on the law firm indicated that,

while Acis LP was liable on this debt, other parties including Acis GP/LLC, Highland, Mr.

---

[85] Demonstrative Aid No. 1 (Lackey Hershman tab).

[86] Exh. 40, p. 3.

[87] Demonstrative Aid No. 1 (Lackey Hershman tab).

[88] Exh. 40P; Exh. 130, pp. 7-8.

[89] Exh. 90, Requests 1 & 2; Ex. 130, Requests 1 & 2.

Appellee Appx. 00484
013297
Appx. 00735

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1 Filed 04/20/25    Page 619 of 1017    PageID 14246
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 491 of 1803    PageID 11237
Case 18-30264-sgj11    Doc 391-35    Filed 04/13/18    Entered 04/13/18 16:34:50    Page 38 of 53

Dondero, the Dugaboy Trust, and Mr. Akada might also be liable for the full amount of the debt—subject to Highland's allocation determinations.[90]  Based on this evidence, the court makes a logical inference that Reid Collins & Tsai LLP generally has not been paid timely.

53.    Next with regard to CT Corporation and the $517.12 indebtedness that the Alleged Debtors represent is owed, CT Corporation asserts that $4,074.84 is, in fact, owed to it by Acis LP and Acis GP/LLC.[91]  CT Corporation also believes Highland has liability for the Alleged Debtors' indebtedness.[92]  CT Corporation also believes the amount owed to it is undisputed.[93]  CT Corporation further represents that its invoices are due upon receipt.[94] CT Corporation produced several invoices in discovery, all showing due upon receipt, and one was dated as far back as December 31, 2016 (in the amount of $932).[95]  Based on this evidence, the court makes a logical inference that CT Corporation expected prompt payment on its invoices and, thus, has not been paid timely.

54.    Next with regard to David Simek, the Petitioning Creditor concedes that his $1,233.19 indebtedness (which is apparently an expense reimbursement relating to some consulting) is not past-due.

---

[90] Exh. 90, Questions 13 & 14; Exh. 130, Questions 13-14.

[91] Exh. 143, Questions 12 & 13.

[92] *Id.* at Question 14.

[93] *Id.* at Questions 22 & 23.

[94] *Id.* at Question 30.

[95] *Id.* at p. 8; Exh. 40T.

Appellee Appx. 00485
013298

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document E5h1b6   Page 4936025 1804   Page 620 of 1017   PageID 14247
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 492 of 1803   PageID 11238
Case 18-30264sgj11-D3 3391855led04c13613   Entered 04/13/18 age 3450f 5Page 39 of 53

55.     In summary, the evidence reflects that the creditors of the Alleged Debtors are generally not being paid timely (except for perhaps four that are relatively insignificant and which may also be able to look to Highland for payment).[96]

56.     Further on the topic of timeliness, Mr. Leventon (Highland's in-house Assistant General Counsel) testified that 96% of bills submitted get paid more than 90 days after they are submitted, that approximately 70% of bills are later than 120 days after they are submitted, and some are even later than 150 days.  Mr. Leventon testified that this was a result of Acis LP receiving cash on a quarterly basis from the CLOs.  He further elaborated and testified that, for example, if Acis LP got cash on say February 1st, and it received a legal bill on that same day, that he would probably not approve it and allocate it until say February 8th.  By that time, Acis LP would have already used up all its cash, and that particular creditor would need to wait until the next quarterly payment was received in order to be paid.  He further testified that he explained this to law firms before their engagements and that, if they wanted the business, they would need to understand the process.  There are several things the court finds problematic about this testimony.  First, no testimony was offered showing that this was, in fact, the understanding of the law firms or other creditors, and, moreover, none of the engagement letters or invoices submitted into evidence reflect such payment terms.  Without this additional evidence, the court believes that the Alleged Debtors' testimony regarding how it paid invoices was mostly self-serving and did not support a finding that the Alleged Debtors were generally paying their debts

_____

[96] Courts have also held that a debtor is generally not paying its debts as they become due when a debtor is found to have been transferring assets so as to avoid paying creditors.  *See, e.g., In re Moss*, 249 B.R. 411, 423 (Bankr. N.D. Tex. 2000) (bankruptcy court determined that an alleged debtor was not paying its debts as they came due when the alleged debtor "attempted to delay creditors through the transfers of assets she has made," concluding that "[the alleged debtor's] overall conduct of her financial affairs has been poor").  This court has also found that there may have been significant transfers of the Alleged Debtors' assets prior to the filing of the Involuntary Petitions to potentially avoid paying creditors (*i.e.*, Mr. Terry) and this may provide further support for the court's finding that the Alleged Debtors are generally not paying their debts as they become due under section 303(h).

Appellee Appx. 00486
Appx. 00737
013299

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 186   Page 14946 021 804   Page 621 of 1017   PageID 14248
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 493 of 1803   PageID 11239
Case 18-30264-sgj11   Doc 1838355 Filed 04/13/18   Entered 04/13/18 18:34:58 Page 40 of 53

as they became due.[97]  Second, to the extent Mr. Leventon's testimony demonstrates that

creditors of the Alleged Debtors expected to be paid on a quarterly basis (at the latest), certain of

the remaining 11 creditors have debts that are significantly older than four months (*i.e.*, CT

Corporation, Jones Day, AKK, and possibly even Reid Collins & Tsai LLP).  Third, the

Financial Statements of Acis LP submitted into evidence do not support the notion that the cash

balances at Acis LP were only sufficient enough to pay vendors once every quarter.[98]  For

example, the balance sheet for January 31, 2017 shows a cash balance in Acis LP bank accounts

of $1,061,663.19; the balance sheet for February 28, 2017 shows a cash balance in Acis LP bank

accounts of $905,212.36; the balance sheet for March 31, 2017 shows a cash balance in Acis LP

bank accounts of $525,626.59; the balance sheet for April 30, 2017 shows a cash balance in Acis

LP bank accounts of $117,885.96; the balance sheet for May 31, 2017 shows a cash balance in

Acis LP bank accounts of $62,733.31; the balance sheet for June 30, 2017 shows a cash balance

in Acis LP bank accounts of $10,329.15; the balance sheet for July 31, 2017 shows a cash

balance in Acis LP bank accounts of $701,904.39; the balance sheet for August 31, 2017 shows a

cash balance in Acis LP bank accounts of $332,847.05.[99]  In summary, while there may be cash

fluctuations with Acis LP, there is not a clear pattern of Acis LP being only able to pay vendors

once every quarter.

---

[97] *See In re Trans-High Corp.*, 3 B.R. 1, 2-3 (Bankr. S.D.N.Y. 1980) (bankruptcy court found that evidence
showing that the petitioning creditor gave the debtor generous terms of payment (90 days) which were substantially
better than the terms set forth in the actual writings between the parties supported finding that the alleged debtors
were generally paying debts as they became due and that the involuntary petition must be dismissed).

[98] Exh. 147.

[99] *Id.*

Appellee Appx. 00487
Appx. 00738
013300

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 05/23/25   Page 622 of 1017   PageID 14249
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 494 of 1803   PageID 11240
Case 18-30264-sgj11   Doc 133-5   Filed 04/13/18   Entered 04/13/18 14:25:31   Page 41 of 53

## II.    Conclusions of Law

Section 303 of the Bankruptcy Code sets forth the various requirements for initiating an involuntary bankruptcy case.  First, pursuant to section 303(b) of the Bankruptcy Code, an involuntary case may be filed against a person by the filing with the bankruptcy court of a petition under Chapter 7—

> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount ... [that] aggregate at least $15,775 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

> (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $15,775 of such claims . . .[100]

Thus, if there are twelve or more eligible creditors holding qualified claims on the Petition Date, three or more entities must participate in the involuntary filing and must hold unsecured claims aggregating $15,775.00.  If there are less than twelve creditors, a single creditor with an unsecured claim of $15,775.00 may file the involuntary petition.  To the extent a bankruptcy court finds that the requisite number of petitioning creditors have commenced the involuntary case, the court shall order relief against the debtor under the chapter under which the petition was filed only if "the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount."[101]

Here, as noted earlier, the Alleged Debtors have made four arguments as to why an order for relief should not be entered against the Alleged Debtors: (1) the Alleged Debtors have 12 or

---

[100] 11 U.S.C.A § 303(b) (West 2018).

[101] 11 U.S.C.A § 303(h) (West 2018).

Appellee Appx. 00488
Appx. 00739
013301

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-116    Filed 06/25/1804    Page 623 of 1017    PageID 14250
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 495 of 1803    PageID 11241
Case 18-3026   Case 19-12391855 Filed 04/13/18   Entered 04/13/18 Page 345 of 53   Page 42 of 53

more creditors, and, thus, with Mr. Terry being the sole petitioning creditor, the Involuntary

Petitions were not commenced by the requisite number of creditors; (2) the Alleged Debtors are

generally paying their debts as they become due; (3) the Involuntary Petitions were filed in bad

faith by Mr. Terry; (4) the interests of creditors and the debtors would be better served by

dismissal and the court should abstain pursuant to section 305 of the Bankruptcy Code.

> **A.**    ***Have the Requisite Number of Creditors Commenced the Involuntary Proceedings?***

Pursuant to section 303(b)(2) of the Bankruptcy Code, a sole petitioning creditor holding

at least $15,775 in claims can initiate an involuntary bankruptcy case so long as the alleged

debtors have fewer than 12 creditors.  After the Second Amended List of Creditors was filed, Mr.

Terry had the burden, by a preponderance of the evidence, of showing that the Alleged Debtors

actually had less than 12 qualified creditors.[102]  Here, the court has found that the Alleged

Debtors have, ***at most***, 11 qualified creditors.[103]  Accordingly, Mr. Terry has met his burden of

showing that the Alleged Debtors have less than 12 creditors for section 303(b) purposes, and

that he, as the sole petitioning creditor, was permitted to file the Involuntary Petitions.  While

Mr. Terry has made additional arguments as to why certain of these 11 creditors should not be

counted as creditors for purposes of section 303(b) of the Bankruptcy Code, the court does not

believe it necessary to address these arguments at this time.[104]

---

[102] *See In re Moss*, 249 B.R. 411, 419 n. 6 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222, 229 (Bankr. N.D. Tex. 2009).

[103] To be clear, the court believes that even on these 11, there are likely bona fide disputes as to the liability or amount that ***Acis LP*** has—as opposed to the liability or amount that Highland or other insiders bear responsbility.

[104] Moreover, as previously stated, since the court has determined there are fewer than 12 creditors, the court need not address whether there is a "special circumstances" exception to the statutory requirements of section 303, in situations where an alleged debtor may have engaged in fraud, schemes, or artifice to thwart a creditor or creditors.  *See, e.g., In re Norriss Bros. Lumber Co.*, 133 B.R. 599 (Bankr. N.D. Tex. 1991); *In re Moss*, 249 B.R. 411 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222 (Bankr. N.D. Tex. 2009).

Appellee Appx. 00489
Appx. 00549
013302

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Page 496 of 1804   Page 624 of 1017   PageID 14251
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 496 of 1803   PageID 11242
Case 18-30264-sgj11   Doc 391-3   Filed 04/13/18   Entered 04/13/18 16:34:58   Page 43 of 53

### B.   Are the Alleged Debtors Generally Paying Their Debts as They Become Due?

Section 303(h) of the Bankruptcy Code requires that a court shall enter order for relief in an involuntary case "if … (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount . . . ."[105]  Again, the burden is on the Petitioning Creditor to prove this element by a preponderance of the evidence.[106]  The determination is made as of the filing date of the Involuntary Petitions.[107]  In determining whether an alleged debtor is generally paying its debts as they come due, courts typically look to four factors: (i) the number of unpaid claims; (ii) the amount of such claims; (iii) the materiality of the non-payments; and (iv) the nature of the debtor's overall conduct in its financial affairs.[108]  No one factor is more meritorious than another; what is most relevant depends on the facts of each case.[109]  Courts typically hold that "generally not paying debts" includes regularly missing a significant number of payments *or* regularly missing payments which are significant in amount in relation to the size of the debtor's operation.[110]

---

[105] 11 U.S.C.A § 303(h) (West 2018).

[106] *See Norris v. Johnson (In re Norris)*, No. 96-30146, 1997 WL 256808, at *3-*4 (5th Cir. Apr. 11, 1997) (unpublished).

[107] *Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 222 (5th Cir. 1993).

[108] *See, e.g., In re Moss*, 249 B.R. 411, 422 (Bankr. N.D. Tex. 2000) (citing *In re Norris*, 183 B.R. 437, 456-57 (Bankr. W.D. La. 1995)).

[109] *In re Bates*, 545 B.R. 183, 186 (Bankr. W.D. Tex. 2016) (also noting that petitioning creditors' counsel consistently argued that the final prong—overall conduct in financial affairs—should be afforded more weight than the other factors, and the court found no authority to support this assertion).

[110] *See, e.g., In re All Media Props., Inc.*, 5 B.R. 126, 143 (Bankr. S.D. Tex. 1980).  See also *Concrete Pumping Serv., Inc. v. King Constr. Co. (In re Concrete Pumping Serv., Inc.)*, 943 F.2d 627, 630 (6th Cir.1991) (a debtor was not paying his debts as they became due where the debtor was in default on 100% of its debt to only one creditor); *Knighthead Master Fund, L.P. v. Vitro Packaging, LLC (In re Vitro Asset Corp.)*, No. 3:11–CV–2603–D (N.D.Tex. Aug. 28, 2012) (district court found error in bankruptcy court ruling that the debtors were generally paying their debts as they became due, where bankruptcy court had relied on the fact that the alleged debtors had a significant number of third-party creditors/trade vendors, which had been continually paid, even though the unpaid debts to the petitioning creditors far exceeded the paid debts in terms of dollar amount; petitioning creditors were holders of promissory notes that were guaranteed by the alleged debtors, as to which the primary obligor and alleged

Appellee Appx. 00490
Appx. 00544
013303

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 04/25/25   Page 625 of 1017   PageID 14252
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 497 of 1803   PageID 11243
Case 18-30264-sgj11   Doc 2391-35   Filed 04/13/18   Entered 04/13/18   Page 44 of 53

Furthermore, any debt which the alleged debtor is not current on as of the petition date should be considered as a debt not being paid as it became due.[111]

Here, the court concludes that the creditors of the Alleged Debtors—what few there are— are generally not being paid as their debts have become due (except for perhaps four[112] that are relatively insignificant and which may also be able to look to Highland for payment). Mr. Terry has met his burden by a preponderance of the evidence as to section 303(h) of the Bankruptcy Code.

**C.**    ***With the Section 303 Statutory Requirements Being Met by the Petitioning Creditor, Should the Court, Nonetheless, Dismiss the Involuntary Petitions Because They Were Filed in Bad Faith?***

Despite Mr. Terry meeting the necessary statutory requirements for this court to enter orders for relief as to the Alleged Debtors pursuant to section 303 of the Bankruptcy Code, the Alleged Debtors have argued that the Involuntary Petitions must, nonetheless, be dismissed because they were filed in "bad faith" by Mr. Terry. As support for this argument, the Alleged Debtors rely primarily on the Third Circuit's decision in *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015). While the court certainly acknowledges that authority exists in other circuits that suggests that dismissal of an involuntary bankruptcy case may be appropriate—even when section 303's statutory requirements have been met—based upon an

---

debtors had ceased making interest payments; the unpaid debts represented 99.9% of the total dollar amount of debt of each of the alleged debtors); *Crown Heights Jewish Cmty. Council, Inc. v. Fischer (In re Fischer)*, 202 B.R. 341, 350–51 (E.D.N.Y. 1996) (even though the debtor only had two outstanding debts, the total dollar amount failed to establish that, in terms of dollar amounts, the debtor was paying anywhere close to 50% of his liabilities, so he was not generally paying his debts as they became due); *In re Smith*, 415 B.R. 222, 231 (Bankr. N.D. Tex. 2009) (while the debtor was paying small recurring debts, he was not paying 99 percent of his debts in the aggregate amount and thus was not generally paying his debts as they became due).

[111] *In re Bates*, 545 B.R. 183, 188 (Bankr. W.D. Tex. 2016).

[112] Those four are: Drexel Limited ($6,359.96); Highfield Equities ($2,510.04); David Simek ($1,233.19); and McKool Smith ($70,082.18).

Appellee Appx. 00491

Appx. 00542
013304

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 09/02/25    Page 626 of 1017    PageID 14253
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 498 of 1803    PageID 11244
Case 18-30264-sgj11    Doc 391-35    Filed 04/13/18    Entered 04/13/18 Page 45 of 53    Page 45 of 53

independent finding of "bad faith," the court need not ultimately decide the efficacy or applicability of such authority, because the court does not believe that the evidence demonstrated any "bad faith" on the part of Mr. Terry (or his counsel) in filing the Involuntary Petitions. Indeed, the evidence suggested that Mr. Terry and his counsel filed the Involuntary Petitions out of a legitimate concern that Highland was dismantling and denuding Acis LP of all of its assets and value and that a bankruptcy filing was the most effective and efficient way to preserve value for the Acis LP creditors. The court concludes that Mr. Terry was wholly justified in pursuing the Involuntary Petitions.

### D.    Should This Court, Nonetheless, Abstain and Dismiss the Involuntary Petitions Pursuant to Section 305 of the Bankruptcy Code?

Section 305(a)(1) of the Bankruptcy Code provides that:

> (a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—
>     (1) the interests of creditors and the debtor would be better served by such dismissal or suspension; . . .[113]

Courts construing section 305(a)(1) of the Bankruptcy Code have found that abstention in a properly filed bankruptcy case is an ***extraordinary remedy***.[114] Moreover, granting an abstention motion pursuant to section 305(a)(1) of the Bankruptcy Code requires more than a simple balancing of harm to the debtor and creditors; rather, the interests of ***both*** the ***debtor*** and its ***creditors*** must be served by granting the request to abstain.[115] The moving party bears the

---

[113] 11 U.S.C.A. § 305(a)(1) (West 2018).

[114] *In re AMC Investors, LLC*, 406 B.R. 478, 487 (Bankr. D. Del. 2009); *see also In re Compania de Alimentos Fargo, S.A.*, 376 B.R. 427, 434 (Bankr. S.D.N.Y. 2007); *In re 801 S. Wells St. Ltd. P'ship*, 192 B.R. 718, 726 (Bankr. N.D. Ill. 1996).

[115] *In re Smith*, 415 B.R. 222, 238-39 (Bankr. N.D. Tex. 2009) (citing *AMC Investors, LLC*, 406 B.R. at 488).

Appellee Appx. 00492
Appx. 00543
013305

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 05/06/25    Page 627 of 1017    PageID 14254
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 499 of 1803    PageID 11245
Case 18-3026-sgj11 Doc 391 Filed 04/13/18    Entered 04/13/18 17:43:58 Page 46 of 53

burden to demonstrate that dismissal benefits the debtor and its creditors.[116]  Courts must look to

the individual facts of each case to determine whether abstention is appropriate.[117]

Case law has set forth a litany of factors to be considered by the court to gauge the

overall best interests of the creditors and the debtor for section 305(a)(1) purposes:

> (1) the economy and efficiency of administration;
> (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;
> (3) whether federal proceedings are necessary to reach a just and equitable solution;
> (4) whether there is an alternative means of achieving an equitable distribution of assets;
> (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;
> (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and
> (7) the purpose for which bankruptcy jurisdiction has been sought.[118]

While all factors are considered, not all are given equal weight in every case and the court should

not conduct a strict balancing.[119]

> i.     *Factor 1: The Economy and Efficiency of Administration.*

---

[116] *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462-63 (Bankr. S.D.N.Y. 2008).

[117] *In re Spade*, 258 B.R. 221, 231 (Bankr. D. Colo. 2001).

[118] *Monitor Single Lift I, Ltd.*, 381 B.R. at 464-65 (citing to *In re Paper I Partners, L.P.*, 283 B.R. 661, 679 (Bankr. S.D.N.Y. 2002)); *see also Smith*, 415 B.R. at 239; *AMC Investors, LLC*, 406 B.R. at 488; *In re Euro-American Lodging Corp.*, 357 B.R. 700, 729 (Bankr. S.D.N.Y. 2007); *but see Spade*, 258 B.R. at 231-32 (Bankr. D. Colo. 2001) (applied a four criteria test in evaluating section 305 abstention which included:  (1) the motivation of the parties who sought bankruptcy jurisdiction; (2) whether another forum was available to protect the interests of both parties or there was already a pending proceeding in state court; (3) the economy and efficiency of administration; and (4) the prejudice to the parties).  The Alleged Debtors cite to the case of *In re Murray*, 543 B.R. 484 (Bankr. S.D.N.Y. 2016), in particular, as support for why this court should abstain under section 305(a) of the Bankruptcy Code and dismiss the Involuntary Petitions.  However, in *Murray*, Judge Gerber was analyzing dismissal of an involuntary proceeding pursuant to section 707 of the Bankruptcy Code, more specifically for "cause," and not based upon abstention under section 305(a) of the Bankruptcy Code.  Thus, the court is not convinced *Murray* is relevant to this court's section 305 abstention analysis.

[119] *In re TPG Troy, LLC*, 492 B.R. 150, 160 (Bankr. S.D.N.Y. 2013) (citing *Monitor Single Lift*, 381 B.R. at 464).

Appellee Appx. 00493
Appx. 00744
013306

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/07/25   Page 628 of 1017   PageID 14255
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 500 of 1803   PageID 11246
Case 18-30264-sgj11   Doc 391-3   Filed 04/13/18   Entered 04/13/18 16:34:58   Page 47 of 53

The economy and efficiency of administering a case in the bankruptcy court is routinely evaluated in considering abstention under section 305 of the Bankruptcy Code. Here, the evidence suggests that the most economical and efficient forum for these parties to resolve their disputes is the bankruptcy court. The court heard ample evidence that the Alleged Debtors are already, essentially, in the process of being liquidated by Highland. This is not a situation where an ably-functioning, going-concern business is being foisted in disruptive fashion into a bankruptcy.[120] Because of the fact that the Alleged Debtors are already in the process of being liquidated, the bankruptcy court (and not a state court) is the most efficient and economical forum to complete this liquidation and distribute whatever assets remain to creditors in accordance with the distribution scheme set forth in the Bankruptcy Code and with the oversight of a neutral third-party trustee. Thus, with the bankruptcy court being the more economic and efficient forum for administering this case, this factor goes against abstention.

> ii.   *Factors 2, 3, 4, 5, and 6: Whether Another Forum is Available to Protect the Interests of Both Parties or There is Already a Pending Proceeding in State Court; Whether Federal Proceedings are Necessary to Reach a Just and Equitable Solution; Whether There is an Alternative Means of Achieving an Equitable Distribution of Assets; Whether the Debtor and the Creditors are Able to Work Out a Less Expensive Out-of-Court Arrangement Which Better Serves All Interests in the Case; and Whether a Non-Federal Insolvency Has Proceeded so Far in Those Proceedings That it Would Be Costly and Time Consuming to Start Afresh With the Federal Bankruptcy Process.*

---

[120] *See, e.g., In re The Ceiling Fan Distrib., Inc.*, 37 B.R. 701 (Bankr. M.D. La. 1983) (noting that while the dissection of a living business may not properly be the business of a bankruptcy court, the division of a "carcass" and the reclamation of pre-petition gouging may well be); *In re Bos*, 561 B.R. 868, 898-99 (Bankr. N.D. Fla. 2016) (citing as one of the reasons to abstain under section 305 of the Bankruptcy Code the fact that entities and subsidiaries under the alleged debtor's umbrella were still operating successful businesses and had employed more than 500 people); *but see Remex Elecs. Ltd. v. Axl Indus., Inc. (In re Axl Indus., Inc.)*, 127 B.R. 482, 484-86 (S.D. Fla. 1991) (in affirming the bankruptcy court's decision to dismiss an involuntary bankruptcy case, the district court also found that "the interests of a defunct business enterprise would be little affected by the pendency of a bankruptcy proceeding," which the district court believed favored abstention).

Appellee Appx. 00494
Appx. 00545
013307

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1 86    Filed 05/26/25 1804    Page 629 of 1017    PageID 14256
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 501 of 1803    PageID 11247
Case 18-30264-sgj11    Doc 3918    Filed 04/13/18    Entered 04/13/18 13:49:58    Page 48 of 53

The court believes that factors 2-6 should be grouped together for purposes of its abstention analysis, since all of these factors specifically touch on the availability of an alternative forum to achieve an *equitable* distribution.[121]  By way of example, where bringing a case into the bankruptcy court would simply add an additional layer of expense to the resolution of a two-party dispute and another forum already provides a suitable place to resolve the dispute, some courts have found that abstention is the more appropriate choice since keeping the case would transform the bankruptcy process into a collection device.[122]  Here, the Alleged Debtors have repeatedly argued that, because there is already pending state court litigation involving Mr. Terry, Highland, and the Alleged Debtors, these cases should be dismissed and the parties should go back to state court to resolve their issues.  The court does not agree for several reasons.

First, it is worth noting that this court has already heard multiple days of evidence in this case (including almost five days just for the Trial) and would certainly not be "starting afresh" by any means if things go forward in the bankruptcy court.  Additionally, while the Alleged Debtors have argued that a significant amount of attorney's fees have already been spent litigating this case in state court (which they believe supports abstention), the court surmises that these fees have not been wasted dollars, as the money expended by the parties developed discovery of facts that could assist a bankruptcy trustee in pursuing avoidance actions that may be viable and might lead to value that could pay creditors' claims.[123]

---

[121] *See, e.g., In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 460-70 (Bankr. S.D.N.Y. 2008).

[122] *AMC Investors, LLC*, 406 B.R. at 488; *see also Axl Indus., Inc.*, 127 B.R. at 484-86.

[123] *See, e.g., The Ceiling Fan Distributor, Inc.*, 37 B.R. at 703 (the court noted that, despite there being significant legal expenses in the state court, such expenses were not wasted since the legal work done to date would be quite helpful to a trustee).

Appellee Appx. 00495
Appx. 00746
013308

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/30/25   Page 630 of 1017   PageID 14257
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 502 of 1803   PageID 11248
Case 18-30264-sgj11   Doc 239-13   Filed 04/13/18   Entered 04/13/18 10:55:53   Page 49 of 53

Second, this court heard considerable evidence involving potentially voidable transfers that may have occurred involving the Alleged Debtors and Highland/Highland-affiliates and, while the state court certainly provides a forum for eventually bringing fraudulent transfer claims, the court also heard evidence that none of these claims have actually been brought in the state court.[124]  Moreover, to the extent fraudulent transfer claims were to be pursued in state court and were successful, the state court would still need the ability to reach the assets of alleged fraudulent transfer recipients (which, in this situation, include certain Highland-affiliates located in the Cayman Islands).  The bankruptcy court has concerns whether a state court process could efficiently accomplish this task.[125]  Similarly, it is worth noting that, while a request for a receiver was filed in the state court by Mr. Terry, such request had not yet been heard and decided by the state court.  Thus, at the present time, it does not appear that there is an alternative forum to address the pertinent issues in this case, without the necessity of significant, additional steps being taken by the parties in the state court.

Third, this court believes that a federal bankruptcy proceeding is necessary in order to achieve an equitable result in this case.  Specifically, the court heard evidence from the Alleged Debtors that, if this court chose to abstain and dismiss the Involuntary Petitions, the Alleged Debtors would ultimately pay all of their creditors in full, except for Mr. Terry.  This clearly demonstrates how keeping the case in the bankruptcy court is necessary to allow an equitable

---

[124] *See, e.g., In re Texas EMC Mgmt., LLC*, Nos. 11-40008 & 11-40017, 2012 WL 627844, at *3 (Bankr. S.D. Tex. 2012) (noting that one of the reasons abstention was proper under section 305 of the Bankruptcy Code was because the issues to be litigated amongst the parties were already joined in the state court litigation); *Spade*, 258 B.R. at 236 (court held that one of the reasons abstention was warranted under section 305 of the Bankruptcy Code was because the petitioning creditors had already filed and had pending a "collection case" in the state court).

[125] *See, e.g., Smith*, 415 B.R. at 239 (the bankruptcy court held that there "are remedies under the Bankruptcy Code that are not available to Rhodes under state law, due to Mr. Smith's transfer of the majority of his assets to the Cook Island Trust," and "federal proceedings may be necessary to reach a just and equitable solution").

Appellee Appx. 00496
Appx. 00547
013309

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 07/16/25    Page 631 of 1017    PageID 14258
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 503 of 1803    PageID 11249
Case 18-30264-sgj11    Doc 239    Filed 04/13/18    Entered 04/13/18 13:55:59    Page 50 of 53

distribution to **all creditors**, including Mr. Terry.  Additionally, a federal bankruptcy court has certain tools available to it that are not available to a state court such as the ability to invalidate potential *ipso facto* clauses in contracts pursuant to section 365 of the Bankruptcy Code, sell assets free and clear of liens, claims and encumbrances pursuant to section 363 of the Bankruptcy Code, and impose the automatic stay pursuant to section 362 of the Bankruptcy Code.  These are all useful tools available to the Alleged Debtors in a bankruptcy case that would be lost if this court were to ultimately abstain.

Finally, there was more than enough evidence showing the acrimonious and bitter relationship that exists between Mr. Terry and Mr. Dondero.  Thus, the availability of an out-of-court arrangement being obtained in this case is, in this court's mind, slim to none.

In summation, the court finds that all of the factors above support this case staying with the bankruptcy court.

> iii.    *Factor 7: The Purpose for Which Bankruptcy Jurisdiction Has Been Sought.*

The Alleged Debtors have repeatedly argued that Mr. Terry filed this case in bad faith and as a litigation tactic to gain some sort of advantage in the state court proceedings.  The court has already found above that these cases were not filed in bad faith and that Mr. Terry has met the necessary statutory requirements of section 303 of the Bankruptcy Code.  Moreover, it is worth noting that at least one court has stated that the filing of an involuntary bankruptcy petition is always a "litigation tactic," but whether the filing is inappropriate for abstention purposes is a fact-dependent determination.[126]  Here, the facts show that there was no inappropriateness

---

[126] *In re Marciano*, 459 B.R. 27, 50 (B.A.P. 9th Cir. 2011) (noting that while the filing of the involuntary bankruptcy was a litigation tactic, the bankruptcy court did not abuse its discretion in denying the alleged debtor's motion to dismiss based upon the bankruptcy court's primary concern that the issue of equality of distribution would not effectively be dealt with in another forum).

Appellee Appx. 00497
Appx. 00748
013310

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/02/25   Page 632 of 1017   PageID 14259
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 504 of 1803   PageID 11250
Case 18-30264-sgj11   Doc 391-35   Filed 04/13/18   Entered 04/13/18 13:25:37   Page 51 of 53

behind Mr. Terry's decision to file the Involuntary Petitions. Specifically, Mr. Terry repeatedly and credibly testified that the purpose for filing the Involuntary Petitions was to ensure that creditors (including him) were treated fairly and received an equal distribution from the Alleged Debtors' assets, not to gain some sort of advantage in the state court. This testimony was absolutely consistent with additional evidence showing that, since the entry of the arbitration award, there has been a calculated effort (largely by Highland) to effectively liquidate the Alleged Debtors. Unlike the bankruptcy court in *In re Selectron Mgmt. Corp.*,[127] which had no evidence or "smoking gun" showing that steps were being taken by the alleged debtor to evade payment on the petitioning creditor's judgment, thereby necessitating abstention, this court has heard ample evidence showing that the Alleged Debtors, with the aid of Highland, were transferring assets away from the Alleged Debtors, so that Mr. Terry would have nowhere to look at the end of the day.

In light of the court's analysis of all the seven factors above, the Alleged Debtors have not credibly shown how both the Alleged Debtors and the creditors are better served outside of bankruptcy. If this matter were to remain outside of bankruptcy, there seems to be a legitimate prospect that the Alleged Debtors and Highland will continue dismantling the Alleged Debtors, to the detriment of Acis LP creditors. Abstention would fly in the face of fundamental fairness and the principles underlying the Bankruptcy Code.

Beyond just addressing the factors above, the Alleged Debtors have also argued that, if this court were to not abstain under section 305 of the Bankruptcy Code, there would be

---

[127] *In re Selectron Mgmt. Corp.*, No. 10-75320-DTE, 2010 WL 3811863, at *6-7 (Bankr. E.D.N.Y. Sept. 27, 2010); *see also In re White Nile Software, Inc.*, No. 08–33325–SGJ–11, 2008 WL 5213393, at *4 (Bankr. N.D. Tex. Sept. 16, 2008) (finding that where the filing of a voluntary chapter 11 did not appear to be about insuring a distribution to creditors or winding down or giving a soft landing to a business or avoiding dismantling and dissipation of valuable assets or preserving avoidance actions, but rather was about changing the forum of ongoing litigation between the parties, abstention under section 305 was proper).

Appellee Appx. 00498
Appx. 00740
013311

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 15/06/25 1804    Page 633 of 1017    PageID 14260
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 505 of 1803    PageID 11251
Case 18-30264-sgj11    Doc 239    Filed 04/13/18    Entered 04/13/18 16:35:58    Page 52 of 53

significant harm to the "equity" of the Alleged Debtors.  Specifically, the Alleged Debtors have

argued that, if this court were to enter orders for relief, the equity would be forced to "call" and

ultimately liquidate CLO 2014-3 (and perhaps all of the CLOs Acis LP manages), resulting in

substantial losses to the equity on their investments.  First, to be clear, the current equity of the

Alleged Debtors is being held by a Highland-affiliate called Neutra, Ltd., which actually only

became the equity of the Alleged Debtors on December 19, 2017.  But this is not the "equity"

being referred to by the Alleged Debtors in its argument.  Rather, the so-called "equity," about

which the Alleged Debtors seemed so concerned, is actually ***certain parties that own the equity***

***of the entity that owns the equity in the CLOs***—which includes (a) an unnamed third-party

investor out of Boston (49%),[128] (b) a charitable foundation managed by a Highland-affiliate

(49%), and (c) Highland employees (2%).  However, abstention under section 305 of the

Bankruptcy Code does not require this court to look at what is in the best interests of these third-

parties (who are not current creditors or interest holders of the Alleged Debtors), but rather what

is in the best interests of the Alleged Debtors and the creditors.  Accordingly, the Alleged

Debtors' effort to argue potential harm to these parties is misplaced for purposes of evaluating

abstention under section 305 of the Bankruptcy Code, and, if anything, further highlights who

the Alleged Debtors are really out to protect—Highland and Highland-affiliates.  Moreover, the

court would note that, even if there were to be a "call" and liquidation of CLO 2014-3, thereby

ending the Alleged Debtors' right to receive future management fees, there would still be

potential assets for a chapter 7 trustee to administer such as chapter 5 causes of action (which

include fraudulent transfers) as well as the Alleged Debtors' contingent claim for approximately

---

[128] Notably, this entity never appeared at the Trial or filed papers stating that it would be harmed by entry
of orders for relief in these cases.

Appellee Appx. 00499
Appx. 00759
013312

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Page 1507 of 1804    Page 634 of 1017    PageID 14261
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 506 of 1803    PageID 11252
Case 18-3026   Case 19-12391   Filed 04/13/18    Entered 04/13/18 Page 53 of 53

$3 million in expense reimbursement owing by Highland CLO Management Ltd., as part of the November 3, 2017 transfer of the Acis LP Note Receivable from Highland. Thus, even if the so-called doomsday scenario of an equity call on CLO 2014-3 (or other CLOs) were to happen, there is still a potential benefit to creditors if this court chooses not to abstain.

**III.    CONCLUSION**

In conclusion, these involuntary proceedings were appropriately filed under section 303, and orders for relief will be issued forthwith. This court declines to exercise its discretion to abstain, because a chapter 7 trustee appears necessary to halt the post-Arbitration Award transactions and transfers of value out of Acis LP, as discussed above. A chapter 7 trustee appears necessary to resolve the inherent conflicts of interest between the Alleged Debtors and Highland. A chapter 7 trustee will have tools available to preserve value that a state court receiver will not have. The bankruptcy court is single handedly the most efficient place to administer property of the estate for creditors. This is not just a two party dispute between Mr. Terry and the Alleged Debtors, and even if it were, dismissal or abstention is clearly not warranted.

**###END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW###**

Appellee Appx. 00500

Appx. 00751

013313

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 Filed 1086025 1804 Page 635 of 1017   PageID 14262
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 507 of 1803   PageID 11253
Case 19-12239-CSS   Doc 86-4   Filed 11/01/19   Page 1 of 31

**Exhibit D**

**Acis Arbitration Opinion**

ACTIVE 250501748

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 05/06/25   Page 636 of 1017   PageID 14263
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 508 of 1803   PageID 11254
Case 18-03078-sgj   Doc 239   Filed 04/16/19   Entered 04/16/19 Page 2 of 31   Page 1 of 30



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed April 16, 2019**

United States Bankruptcy Judge

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, GP, | § | CASE NO. 18-30265-SGJ-11 |
| LLC, | § | (Jointly Administered Under |
| Debtors. | § | Case No. 18-30264-SGJ-11) |
| _____ | § | (Chapter 11) |
| | § | |
| ROBIN PHELAN, CHAPTER 11 | § | |
| TRUSTEE, | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 18-03078-SGJ |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., HIGHLAND CLO FUNDING | § | |
| LTD, HIGHLAND HCF ADVISOR, LTD., | § | |
| HIGHLAND CLO MANAGEMENT, LTD., | § | |
| and HIGHLAND CLO HOLDINGS, LTD., | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER DENYING MOTION TO COMPEL
## ARBITRATION [DE # 102]

Page 1 of 30

Appellee Appx. 00502

Appx. 00755
013315

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 05/06/25    Page 637 of 1017    PageID 14264
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 509 of 1803    PageID 11255
Case 18-03078-sgj    Doc 396-50    Filed 04/06/19    Entered 04/16/19    Page 2 of 30    Page 2 of 30

## I.    Introduction.

Before this court is a Motion to Compel Arbitration (the "Arbitration Motion"),[1]

requesting that the bankruptcy court send to arbitration only a ***sub-set*** of claims asserted in the

above-referenced adversary proceeding (the "Adversary Proceeding").  Some procedural context

is crucial in analyzing the merits of the Arbitration Motion and, thus, is set forth immediately

below.

This Adversary Proceeding has morphed into a large, complex lawsuit—at this stage

primarily involving 35 claims, 20 of which are grounded in fraudulent transfer theories.[2]  The

Arbitration Motion, as explained below, seeks arbitration of ***eight*** of the 35 claims (*i.e.,* Counts

1-8).

The Arbitration Motion was filed by party Highland Capital Management, L.P.

("Highland").  Highland and a related company, Highland CLO Funding Ltd. ("HCLOF"), were

originally the plaintiffs in this Adversary Proceeding, suing the Chapter 11 Trustee for injunctive

relief (arguing early during the above-referenced Chapter 11 bankruptcy cases that the Chapter

11 Trustee was interfering with their business rights and decisions, essentially).  The Chapter 11

Trustee fired back with 35 counterclaims against Highland and HCLOF (adding three parties

related to Highland as third-party defendants with regard to some of those 35 counterclaims).

Notably, these 35 counterclaims—***as directed toward Highland***—were also alleged to be

objections to Highland's two $4,672,140.38 proofs of claim filed in the underlying bankruptcy

cases.[3]  In that regard, the Chapter 11 Trustee stated that his Answer and Counterclaims included

---

[1] DE # 102.

[2] There is also a preference count and a section 550 recovery count—thus, 22 out of the 35 claims are chapter 5 avoidance actions and recovery.  11 U.S.C. §§ 544, 547, 548 & 550.

[3] *See Defendant's Amended Answer, Counterclaims (Including Claim Objections) and Third-Party Claims* (DE # 84), filed November 13, 2018, in response to the *Original Complaint and Request for Preliminary Injunction of*

Appellee Appx. 00503
Appx. 00754
013316

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/04   Page 638 of 1017   PageID 14265
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 510 of 1803   PageID 11256
Case 18-03078-sgj   Doc 2396-6   Filed 04/06/94   Filed 04/16/19   Page 3 of 31   Page 3 of 30

"an objection to Highland Capital's proofs of claim pursuant to Federal Rule of Bankruptcy

Procedure 3007(b), and the counterclaims asserted herein shall constitute recoupment and/or

offset to such proofs of claim, to the extent such claims are otherwise allowed."[4]   In fact, after

the 35 counts were articulated in the Chapter 11 Trustee's Answer and Counterclaims, there were

20 paragraphs (¶¶ 252-271, pp. 70-77) solely articulating the Chapter 11 Trustee's objections to

Highland's proofs of claim.[5]   The Chapter 11 Trustee also filed yet a separate adversary

proceeding, Adv. Proc. No. 18-03212, seeking his own injunctive relief, which has recently been

consolidated with this Adversary Proceeding.[6]

     The Chapter 11 Trustee ultimately proposed and obtained confirmation of a Chapter 11

plan in the underlying bankruptcy cases, and the Reorganized Debtors, now under new

ownership and management, were vested in that plan with the counterclaims in this Adversary

Proceeding (among other rights and claims).  The injunctive relief initially sought by Highland

and HCLOF, as plaintiffs in the Adversary Proceeding, later became mooted by various orders in

---

*Highland CLO Funding, Ltd and Highland Capital Management Against Chapter 11 Trustee of Acis Capital
Management, L.P. and Acis Capital Management GP, LLC* (DE # 1), filed May 30, 2018, and also in response to the
proofs of claims filed by Highland Capital Management, L.P. (*see Proof of Claim No. 27,* filed in Case No. 18-
30264, and *Proof of Claim No. 13* filed in Case No. 18-30265, each in the amount of $4,672,140.38, with the basis
of each of the proofs of claim listed as "Sub-Advisory Services and Shared Services"; these proofs of claim are
virtually identical).

[4] DE # 84, ¶ 6.  The Chapter 11 Trustee has argued that the Highland proofs of claim should be disallowed under (i)
section 502(b)(1) of the Bankruptcy Code (in that the Highland proofs of claim are allegedly unenforceable against
the Debtors under the limited partnership agreement of Acis Capital Management, L.P. and applicable law); (ii)
section 502(b)(4) of the Bankruptcy Code (in that the proofs of claim are for services of an insider of the Debtors
and allegedly exceed the reasonable value of the services); and (iii) under section 502(d) of the Bankruptcy Code (in
that the Trustee has asserted avoidance actions against Highland).  Finally, to the extent allowed at all, the Trustee
has argued that the Highland proofs of claim should be equitably subordinated under section 510(c) of the
Bankruptcy Code.  In summary, pursuant to section 502(b) and (d) of the Bankruptcy Code and Federal Rule of
Bankruptcy Procedure 3007, the Trustee has sought entry of an order disallowing and expunging the Highland
proofs of claim from the Debtors' claims registers.  *See id.* at ¶¶ 251-272.

[5] *Id.*

[6] DE # 124.

Appellee Appx. 00504

Appx. 00755
013317

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 05/26/25    Page 639 of 1017    PageID 14266
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 511 of 1803    PageID 11257
Case 18-03078-sgj Doc 23 Filed 04/03/19 Entered 04/16/19 Page 328 of 3 Page 4 of 30

the bankruptcy cases and such claims were voluntarily dismissed without prejudice.[7]  Thus,

Highland, which is pursuing the Arbitration Motion, now wears the hat of only a defendant (and

proof of claimant), and the Reorganized Debtors are the plaintiffs asserting the 35 original

"counterclaims" asserted by the Chapter 11 Trustee against Highland (which 35 claims are also

objections to Highland's proof of claim).  The separate adversary proceeding that was filed by

the Chapter 11 Trustee seeking injunctive relief  (Adv. Proc. No 18-03212) was consolidated into

this Adversary Proceeding, and the style of this Adversary Proceeding was adjusted to reflect

that the Chapter 11 Trustee had become situated as plaintiff.[8]  But, to be clear, the Reorganized

Debtors are actually now plaintiffs in place of the Chapter 11 Trustee.  The Reorganized Debtors

are Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis

GP"), and they oppose the Arbitration Motion.[9]

Citing to the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 *et seq*., Highland argues

that the bankruptcy court must enter an order compelling arbitration as to counts 1-8 because:

(a) these eight counts revolve around the interpretation of certain prior versions of a Sub-

Advisory Agreement and Shared Services Agreement (later defined); and (b) the aforementioned

agreements contained binding arbitration clauses.  Highland also requests that the Adversary

Proceeding be stayed regarding counts 1-8, pending binding arbitration.  The Reorganized

Debtors dispute that there are binding arbitration clauses applicable to counts 1-8.  As explained

further below, the aforementioned agreements were amended many times and the arbitration

clauses were eventually eliminated in the last versions of the agreements.  The Reorganized

---

[7] DE # 79.

[8] DE # 124.

[9] DE # 123.

Appellee Appx. 00505
013318
Appx. 00756

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 06/25   Page 640 of 1017   PageID 14267
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 512 of 1803   PageID 11258
Case 18-03078-sgj11   Doc 396-1   Filed 04/08/19   Page 5 of 30

Debtors also urge that, even if there are applicable arbitration clauses, the court may and should exercise discretion and decline to order arbitration, since core bankruptcy matters are involved and arbitration would conflict with the purposes of the Bankruptcy Code.  For the reasons set forth below, the Arbitration Motion is denied.  This means that Counts 1-26 & 33-35 will go forward and be adjudicated in this Adversary Proceeding.[10]  But as will be explained in a separate order that is being issued shortly following this order, there are certain counts complaining of *postpetition* state law torts and breaches of contract in this Adversary Proceeding (Counts 27-32) that this court believes should be separated out into a different adversary proceeding and consolidated with a contested matter involving a Highland request for allowance of a postpetition administrative expense claim [DE # 772].

**II.    Background Facts.**

**A.    First, the Agreements Between the Parties.**

As this court has noted on various occasions, Acis LP was formed in the year 2011, and is primarily a CLO portfolio manager.[11]  Specifically, Acis LP provides fund management services to various special purpose entities that hold CLOs (which is an acronym for "collateralized loan obligations").  Acis LP was providing management services for five such special purpose entities (the "Acis CLOs") as of the time that it and its general partner were put into the above-referenced involuntary bankruptcy cases (the "Bankruptcy Cases").  The parties have informally referred to the special purpose entities themselves as the "CLO Issuers" or "CLO Co-Issuers" but, to be clear, these special purpose entities (hereinafter, the "CLO SPEs")

---

[10] The court notes that a Supplemental Motion to Withdraw the Reference in this Adversary Proceeding has recently been filed by Highland and HCLOF [DE # 134] and that motion will be addressed in due course hereafter.  The ruling herein with regard to the Arbitration Motion does not affect such motion and such motion will be separately addressed, after a status conference, and through a report and recommendation to the District Court.

[11] Acis LP has managed other funds, from time to time, besides CLOs.

Appellee Appx. 00506
Appx. 00755
013319

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/06/25   Page 641 of 1017   PageID 14268
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 513 of 1803   PageID 11259
Case 18-03078-sgj Doc 2396-3 Filed 04/03/94   Entered 04/11/19 Page 7 of 3 Page 6 of 30

are structured as follows: (a) on the asset side of their balance sheets, the entities own pieces of senior debt owed by large corporations and, therefore, earn revenue from the variable interest payments made by those corporations on such senior debt; and (b) on the liability side of their balance sheets, the entities have obligations in the form of notes (*i.e.,* tranches of fixed interest rate notes) on which the CLO SPEs themselves are obligated—the holders of which notes are mostly institutions and pension funds. The CLO SPEs make a profit, based on the spread or "delta" between: (a) the variable rates of interest paid on the assets that the CLO SPEs own (*i.e.,* the basket of senior notes); and (b) the fixed rates of interest that the CLO SPEs must pay on their own tranches of debt. At the bottom of the CLO SPEs' capital structure is their equity (sometimes referred to as "subordinated notes," but these "notes" are genuinely equity). As portfolio manager, Acis LP manages the CLO SPEs' pools of assets (by buying and selling senior loans to hold in the CLO SPEs' portfolios) and communicates with investors in the CLO SPEs. The CLO SPEs' tranches of notes are traded on the Over-the-Counter market.

To be perfectly clear, none of the CLO SPEs themselves have been in bankruptcy. Only Acis LP which **manages** the CLO business and its general partner, Acis GP, were put into bankruptcy.

Historically, Acis LP has had four main sets of contracts that were at the heart of its business and allowed it to function. They are described below. The second and third agreements set forth below are highly relevant to the Arbitration Motion before the court. The Chapter 11 Trustee, from time-to-time, credibly testified that these agreements collectively created an "eco-system" that allowed the Acis CLOs to be effectively and efficiently managed by Acis LP.

Appellee Appx. 00507
Appx. 00758
013320

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 05/21/25   Page 642 of 1017   PageID 14269
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 514 of 1803   PageID 11260
Case 18-03078-sgj   Doc 223-6   Filed 04/08/19   Entered 04/11/19 Page 826 of 31   Page 7 of 30

1.     <u>The PMAs with the CLO SPEs.</u>

First, Acis LP has various portfolio management agreements ("PMAs") ***with the CLO SPEs***, pursuant to which Acis LP earns management fees. The PMAs have been the primary "assets" (loosely speaking) of Acis LP. They are what generate revenue for Acis LP.

2.     <u>The Sub-Advisory Agreement with Highland.</u>

Second, Acis LP had a Sub-Advisory Agreement (herein so called) with ***Highland***. Pursuant to this agreement, Acis LP essentially sub-contracted for the use of Highland front-office personnel/advisors to perform management services for Acis LP (*i.e.,* so that Acis LP could fulfill its obligations to the CLO SPEs under the PMAs). Acis LP paid handsome fees to Highland pursuant to this agreement. This agreement was rejected (with bankruptcy court approval) by the Chapter 11 Trustee during the Bankruptcy Cases, when the Chapter 11 Trustee credibly represented that he had not only found resources to provide these services at a much lower cost to the estate, but he also had begun to believe that Highland was engaging in stealth efforts to liquidate the Acis CLOs, to the detriment of Acis LP's creditors.

***There were five iterations of the Sub-Advisory Agreement between the parties over time***: (a) the initial Sub-Advisory Agreement, "made effective January 1, 2011" (which had an arbitration clause at section 16(f));[12] (b) an Amended and Restated Sub-Advisory Agreement, "made" May 5, 2011, "to be effective January 1, 2011" (which also had an arbitration clause at section 16(f))[13]; (c) an Amendment to Amended and Restated Sub-Advisory Agreement "entered into as of" July 1, 2011 (which did not seem to affect in any way the aforementioned arbitration

---

[12] Exh. 1 to Arbitration Motion.

[13] Exh. 2 to Arbitration Motion.

Appellee Appx. 00508

Appx. 00759

013321

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/06/25   Page 643 of 1017   PageID 14270
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 515 of 1803   PageID 11261
Case 18-03078-sgj   Doc 396-6   Filed 04/16/19   Page 8 of 30   Page 8 of 30

clause);[14] (d) Second Amended and Restated Sub-Advisory Agreement "made" on July 29, 2016,

"to be effective January 1, 2016" (which had an arbitration clause at section 16(f));[15] and (e) the

Third Amended and Restated Sub-Advisory Agreement "dated as of March 17, 2017" (*which*

*suddenly contained no arbitration clause, with no explanation*).[16]

    3.    The Shared Services Agreement with Highland.

Third, Acis LP also had a Shared Services Agreement (herein so called) with Highland,

pursuant to which Acis LP essentially sub-contracted for the use of Highland's back-office

services (again, so that Acis LP could fulfill its obligations to the CLO SPEs under the PMAs).

To be clear, Acis LP had no employees of its own—only a couple of officers and members.  Acis

LP paid handsome fees to Highland for the personnel and back-office services that Highland

provided to Acis LP.  This agreement was also rejected by the Chapter 11 Trustee during the

Bankruptcy Cases (with Bankruptcy Court approval) for the same reasons that the Sub-Advisory

Agreement with Highland was rejected.

*There were five iterations of the Shared Services Agreement between the parties over*

*time*:  (a) the initial Shared  Services Agreement "effective as of January 1, 2011" (which had an

arbitration clause at section 9.14);[17] (b) an Amendment to Shared Services Agreement, "entered

into as of" July 1, 2011 (which did not seem to affect in any way the aforementioned arbitration

clause);[18] (c) a Second Amended and Restated Shared Services Agreement "dated effective

---

[14] Exh. 3 to Arbitration Motion.

[15] Exh. 4 to Arbitration Motion.

[16] Exh. 5 to Arbitration Motion.

[17] Exh. 6 to Arbitration Motion.

[18] Exh. 7 to Arbitration Motion.

Appellee Appx. 00509
Appx. 00509
013322

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 04/06/25    Page 644 of 1017    PageID 14271
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 516 of 1803    PageID 11262
Case 18-03078-sgj    Doc 233    Filed 04/16/19    Entered 04/16/19    Page 208 of 33    Page 9 of 30

January 1, 2015" (which had an arbitration clause at section 9.14);[19] (d) a Third Amended and
Restated Shared Services Agreement "dated effective as of January 1, 2016 (which had an
arbitration clause at section 9.14);[20] and (e) a Fourth Amended and Restated Shared Services
Agreement "dated as of March 17, 2017" (***which suddenly contained no arbitration clause, with
no explanation***).[21]

> 4.    The Equity/ALF-PMA.

Fourth, until a few weeks before the Bankruptcy Cases were filed, Acis LP also had yet
another portfolio management agreement (distinct from its PMAs with the CLO SPEs) whereby
Acis LP provided services not just to the CLO SPEs themselves, but separately to the equity
holder in the CLO SPEs.  This portfolio management agreement with the equity holder in the
CLO SPEs is sometimes referred to by the parties as the "ALF PMA," but it would probably be
easier to refer to it as the "Equity PMA"[22] (for ease of reference, the court will refer to it as the
"Equity/ALF PMA").  Acis LP did not earn a specific fee pursuant to the Equity/ALF PMA, but
the Chapter 11 Trustee and others credibly testified during the Bankruptcy Cases that Acis LP
considered the agreement valuable and very important, because it essentially gave Acis LP the
ability to control the whole Acis CLO eco-system—in other words, it gave Acis LP the ability to
make substantial decisions on behalf of the CLO SPEs' ***equity***—distinct from making decisions
for the CLO SPEs themselves pursuant to the PMAs.  In any event, shortly before the
Bankruptcy Cases were filed, agents of Highland and/or others controlling Acis LP:  (a) caused

---

[19] Exh. 8 to Arbitration Motion.

[20] Exh. 9 to Arbitration Motion.

[21] Exh. 10 to Arbitration Motion.

[22] There were actually different iterations of the Equity/ALF PMA including one dated August 10, 2015, and another
dated December 22, 2016.

Appellee Appx. 00510
Appx. 00701
013323

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 05/08/25   Page 645 of 1017   PageID 14272
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 517 of 1803   PageID 11263
Case 18-03078-sgj   Doc 238-58   Filed 04/03/19   Entered 04/11/19 15:23:28   Page 10 of 30

Acis LP to terminate this Equity/ALF PMA; and (b) then caused the equity owner to enter into a new Equity PMA with a newly formed offshore entity called Highland HCF Advisor, Ltd. (one of the Defendants in this Adversary Proceeding).

     5.     Limited Partnership Agreement of Acis LP.

There is actually a fifth agreement that should be mentioned. Although not as integral as the previous four agreements, there was a certain Amended and Restated Agreement of Limited Partnership of Acis Capital Management, L.P., dated to be effective as of January 1, 2011 (the "LPA"), entered into among the general partner and limited partners of Acis LP. Reorganized Acis has argued in the Adversary Proceeding that this LPA limited in some respects the compensation that could be paid to Highland under the Sub-Advisory Agreement and the Shared Services Agreement.

**B.**    **Next, the 35 Counts Asserted Against Highland in this Adversary Proceeding.**

The Adversary Proceeding, distilled to its essence—and as currently framed—is all about certain activities of Highland and some of its affiliates and actors who controlled it, which activities were allegedly aimed at ***denuding Acis LP of all of its value,*** at a time when the former portfolio manager for Acis LP was on the verge of obtaining a very large judgment claim against Acis LP. Specifically, these activities of Highland began soon after: (a) it terminated former Acis CLO manager Joshua Terry ("Terry") in June 2016; (b) it began litigating with him (which litigation was sent to arbitration) in September 2016; and (c) Terry obtained an approximately $8 million arbitration award against Acis LP in October 2017, which was confirmed by a judgment in December 2017. The activities and counts revolve around: (a) Highland's alleged overcharging of Acis LP by more than $7 million for fees/expenses under the Sub-Advisory and Shared Services Agreement, as limited by the LPA (Counts 1-4); (b) alleged fraudulent transfers

Appellee Appx. 00511
Appx. 00562
013324

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Filed 05/06/25    Page 646 of 1017    PageID 14273
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 518 of 1803    PageID 11264
Case 18-03078-sgj    Doc 73    Filed 04/16/19    Entered 04/16/19 Page 11 of Page 11 of 30

of value out of Acis LP, by virtue of various amendments and modifications of the Sub-Advisory and Shared Services Agreements (Counts 5-8); (c) an alleged fraudulent transfer as to the Equity/ALF PMA (Counts 9-12); (d) an alleged fraudulent transfer pertaining to Acis LP's conveyance away of its so-called ALF Equity (Counts 13-16); (e) an alleged fraudulent transfer of a $9.5 million note receivable Acis LP held (Counts 17-20); (f) various other fraudulent transfers (Counts 21-24); (g) preferences (Count 25); (h) assertion of a section 550 recovery remedy for the aforementioned avoidance actions (Count 26); and (i) requests for punitive damages, an alter ego/veil piercing remedy, and attorneys' fees (Counts 33-35).  There are also some counts complaining of postpetition state law torts and breaches of contract (Counts 27-32).

As mentioned earlier, Highland's Arbitration Motion only requests the court defer to arbitration Counts 1-8—that is the counts relating to:  (a) Highland's alleged overcharging of Acis LP  by more than $7 million for fees/expenses under the Sub-Advisory and Shared Services Agreement, as perhaps limited by the LPA (Counts 1-4); and (b) the alleged fraudulent transfers of value out of Acis LP, by virtue of various amendments and modifications of the Sub-Advisory and Shared Services Agreements (Counts 5-8).  Highland argues that, ***since all of these counts pertain to the Sub-Advisory Agreement and Shared Services Agreement*** between Acis LP and Highland, the arbitration clauses in those agreements dictate that the counts be carved out from this Adversary Proceeding and sent to binding arbitration.  Highland acknowledges that these two agreements were amended and restated numerous times, and that the last time they were amended (March 17, 2017) the arbitration clauses were eliminated, but Highland argues that, since all of the activity complained of in Counts 1-8 occurred ***prior*** to March 17, 2017, ***the older iterations of the Sub-Advisory and Shared Services Agreements, with arbitration clauses, govern***.  Highland zeroes in on the fact that Counts 1-4, at their essence, are assertions that the

Appellee Appx. 00512
Appx. 00593
013325

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25   Page 647 of 1017   PageID 14274
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 519 of 1803   PageID 11265
Case 18-03078-sgj   Doc 396-5   Filed 04/06/19   Page 12 of 30   Page 12 of 30

fees for services charged by Highland in the Sub-Advisory and Shared Services Agreements were excessive for the years 2013, 2014, 2015, and through May 2016 (all before the March 17, 2017 iteration of the agreements). And Counts 5-8, while articulated as fraudulent transfer claims, pertain to the modifications made to the Sub-Advisory and Shared Services Agreements at various stages up to the March 17, 2017 versions.

The Reorganized Debtors have argued that it is quite clear that the last iterations of the Sub-Advisory and Shared Services Agreements intended to supersede in every way the prior versions. That includes the provisions directing arbitration. And, they argue, it does not matter *when* the causes of action occurred/accrued or not. What matters is that the parties agreed at some point that their disputes would not be sent to arbitration and this was the last governing document.

**C.      The Relevant Language in the Sub-Advisory and Shared Services Agreements Pertaining to (i) Arbitration and (ii) Superseding of Prior Agreements.**

As mentioned earlier, there was an arbitration clause at Section 16(f) of the Sub-Advisory Agreement until the last March 17, 2017 version. The clause read as follows:

> [I]n the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act. . . .[23]

In the Shared Services Agreement, an arbitration clause appeared at Section 9.14, as follows:

> Notwithstanding anything contained in this Agreement or the Annexes hereto to the contrary, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act. . . .[24]

---

[23] Exh. 1 of Arbitration Motion, at 7-8.

[24] Exh. 6 of Arbitration Motion, at 9-10.

Appellee Appx. 00513
013326
Appx. 00504

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1186    Page152160251804  Page 648 of 1017    PageID 14275
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 520 of 1803    PageID 11266
Case 18-030738-sgj1111  Doc2396738d  0401063694    Filed1104116019 2Pag3128ofPage 13 of 30

As earlier mentioned, these two agreements were later amended and restated several times. The arbitration provisions remained identical until they were completely eliminated in March 2017.  The Reorganized Debtor argues that this is a short analysis:  there was no longer an operative arbitration provision as of March 17, 2017.

In the March 17, 2017 version of the Shared Services Agreement, the parties agreed "that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or noncontractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as 'Proceedings') may be brought in such courts."[25]

The same type language appeared in the March 17, 2017 version of the Sub-Advisory Agreement:  "The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby."[26]

More generally, the March 17, 2017 versions of the agreements each provided that they "amended, restated and replaced the existing agreements *in [their] entirety*."[27]  The March 17, 2017 agreements also each provided that they "supersede[d] all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter."[28]

---

[25] Exh. 10 of Arbitration Motion, § 8.04(b).

[26] Exh. 5 of Arbitration Motion, § 13.

[27] Exhs. 5 and 10 of Arbitration Motion, each at p. 1 (emphasis added).

[28] Exh. 5 of Arbitration Motion, ¶ 20; Exh.10 of Arbitration Motion, ¶ 8.14.

Appellee Appx. 00514
Appx. 00365
013327

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11 186   Filed 05/26/25 1804   Page 649 of 1017   PageID 14276
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 521 of 1803   PageID 11267
Case 18-03078-sgj11   Doc 2 396   Filed 04/06/19   Entered 04/06/19   Page 14 of 30

In summary, the Reorganized Debtors argue that, under Texas common law, basic principles of contract interpretation, and the plain language of the March 17, 2017 version of the agreements, there is no agreement to arbitrate. "A contract's plain language controls."[29] Because the prior versions of the agreements were "amended, restated and replaced in [their] entirety" with the March 17, 2017 agreements—which not only omit an arbitration provision, but also expressly provide for jurisdiction and venue in Texas state or federal courts—the Reorganized Debtors argue that there exists no valid agreement to arbitrate between Highland and Acis LP. The court's inquiry can and should end there. But, if the court concludes the arbitration clauses are still applicable, the Reorganized Debtors argue that the bankruptcy court has discretion *not* to compel arbitration when (a) bankruptcy core matters are involved, and (b) arbitration would conflict with the purposes of the Bankruptcy Code. Therefore, this is further reason why the Arbitration Motion should be denied.

## III.   Legal Analysis.

### A.     The Federal Arbitration Act and Arbitration Clauses Generally.

The FAA provides that arbitration agreements are always "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[30] Thus, the FAA reflects a liberal federal policy favoring arbitration, and requires arbitration agreements to be rigorously enforced according to their terms.[31] The FAA "expresses a strong national policy favoring arbitration of disputes, and all doubts concerning the

---

[29] *Great Am. Ins. Co. v. Primo,* 512 S.W.3d 890, 893 (Tex. 2017).

[30] 9 U.S.C. § 2.

[31] *See AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 339 (2011) (citations omitted).

Appellee Appx. 00515
Appx. 00706
013328

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Filed 05/30/25    Page 650 of 1017    PageID 14277
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 522 of 1803    PageID 11268
Case 18-03078-sgj Doc 22 396 Filed 04/06/94    Entered 04/16/19 Page 128 of Page 15 of 30

arbitrability of claims should be resolved in favor of arbitration."[32]  "There is a strong

presumption in favor of arbitration and the party seeking to invalidate an arbitration agreement

bears the burden of establishing its invalidity."[33]

When considering a motion to compel arbitration, the Fifth Circuit has held there are two

threshold questions:  (1) whether an arbitration agreement is valid; and (2) whether the dispute

falls within the scope of the agreement.[34]  To evaluate the enforceability of an arbitration

agreement, courts apply the contract law of the state that governs the agreement,[35] whereas the

scope of the agreement is a matter of federal substantive law.[36]

### B.    Is There a Valid Agreement to Arbitrate that Applies Here and is Still Enforceable?[37]

With respect to the first element—whether a valid agreement to arbitrate exists—federal

courts "apply ordinary state-law principles that govern the formation of contracts."[38]  Here, the

choice of law provisions of the Highland-Acis Agreements state:  "This Agreement shall be

---

[32] *Primerica Life Ins. Co. v. Brown,* 304 F.3d 469, 471 (5th Cir. 2002) (citing *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984)).

[33] *Carter v. Countrywide Credit Indus., Inc.,* 362 F.3d 294, 297 (5th Cir. 2004).

[34] *See Agere Sys. Inc. v. Samsung Elecs. Co. Ltd.*, 560 F.3d 337, 339 (5th Cir. 2009).

[35] *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004) (citation omitted).

[36] *Graves v. BP Am., Inc.,* 568 F.3d 221, 222-23 (5th Cir. 2009); *see also Neal v. Hardee's Food Sys., Inc.,* 918 F.2d 34, 37 (5th Cir. 1990) (under federal law, courts "resolve doubts concerning the scope of coverage of an arbitration clause in a contract in favor of arbitration," and arbitration should not be denied "unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue").

[37] The court is assuming, without analysis, that the Chapter 11 Trustee (and the Reorganized Debtors) are bound by the arbitration clauses, if Acis LP affirmatively agreed to be bound by them and would still be bound by them outside of bankruptcy.  Case law has stated that a bankruptcy trustee "stands in the shoes of the debtor for the purposes of [an] arbitration clause" and "the trustee-plaintiff is bound by the clause to the same extent as would the debtor." *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153 (3d Cir. 1989); *see also Janvey v. Alguire*, No. 3:09-CV-0724-N, 2014 WL 12654910 at *6 (N.D. Tex. July 30, 2014) (quoting *Hays*).

[38] *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Wash. Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004).

Appellee Appx. 00516
Appx. 00767
013329

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-11    Filed 05/26/25    Page 651 of 1017    PageID 14278
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 523 of 1803    PageID 11269
Case 18-03070-sgj11    Doc 239-5    Filed 04/06/19    Entered 04/06/19 15:27:09    Page 16 of 30

governed by the laws of Texas. . . ."[39]  "Under the Texas rules, in those contract cases in which

the parties have agreed to an enforceable choice of law clause, the law of the chosen state must

be applied."[40]  Accordingly, Texas law governs whether the parties are subject to an enforceable

agreement to arbitrate.

Here, obviously the parties entered into an agreement to arbitrate in both the Sub-

Advisory Agreement (Section 16(f))[41] and the Shared Services Agreement Section 9.14.[42]  And,

it would seem to be beyond peradventure that this was, at one time, enforceable between the

parties, with regard to any disputes that arose regarding the agreements.  The tricky conundrum

here is that those arbitration provisions were deleted in the most recent iterations of the

agreements—that is, the March 17, 2017 versions of the agreements.  Highland argues that, since

Counts 1-8 involve alleged overcharges under the agreements in years 2013-2016, and alleged

fraudulent transfers up to March 17, 2017 (such fraudulent transfers allegedly occurring by virtue

of modifications to the agreements that were made up to March 17, 2017), the pre-March 17,

2017 version of the agreements must be applied with respect to these Counts 1-8 and, thus, the

arbitration provisions apply.  In other words, what matters is when causes of action *accrue* not

when they are ultimately asserted.

The parties have cited a handful of cases to the court, but the one that the court believes is

most analogous is the *Coffman v. Provost * Umphrey Law Firm, L.L.P.* case.[43]  In the *Coffman* case,

---

[39] *See, e.g.,* Exh. 1 to Arbitration Motion, § 16(a); Exh. 5 to Arbitration Motion, § 13; Exh. 6 to Arbitration Motion, § 9.05; Exh. 10 to Arbitration Motion, § 8.04(a).

[40] *Resolution Trust Corp. v. Northpark Joint Venture*, 958 F.2d 1313, 1318 (5th Cir. 1992) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex. 1990)).

[41] Exhs. 1-4 of the Arbitration Motion.

[42] Exhs. 6-9 of the Arbitration Motion.

[43] *Coffman v. Provost * Umphrey Law Firm, L.L.P.*, 161 F. Supp. 2d 720 (E.D. Tex. 2001).

Appellee Appx. 00517
Appx. 00708
013330

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-6    Filed 05/06/25    Page 652 of 1017    PageID 14279
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 524 of 1803    PageID 11270
Case 18-03078-sgj Doc 233-6 Filed 04/03/19 Entered 04/03/19 Page 128 of Page 17 of 30

the plaintiff was a former non-equity partner of a law firm and brought a lawsuit against the firm

and its equity partners, alleging *inter alia*, breach of contract, breach of fiduciary duty, violations

of Title VII and/or the Texas Commission on Human Rights Act ("TCHRA"), and violations of

the Equal Pay Act.  The law firm filed a motion to compel arbitration with regard to all of these

claims.  The law firm's motion to compel was based upon various partnership agreements which

governed the law firm.  The original partnership agreement was first effective on August 26,

1986, and the plaintiff did not sign that agreement.  Subsequent to that time, however, the

original partnership agreement was amended and restated on several occasions.  The plaintiff

admitted that she signed four partnership agreement documents:  (1) a Restated Partnership

Agreement of Provost * Umphrey Law Firm, L.L.P.—Effective January 1, 1994 ("1994

Partnership Agreement"); (2) a Restated Partnership Agreement of Provost * Umphrey Law

Firm, L.L.P.—Effective January 1, 1996 ("1996 Partnership Agreement"); (3) an Amendment

No. 1 to the Restated Partnership Agreement of Provost * Umphrey Law Firm, L.L.P., Dated

January 1, 1996—Effective January 1, 1997 ("1996 Amendment No. 1"); and (4) a Partnership

Agreement of Provost * Umphrey Law Firm, L.L.P., As Restated —Effective January 1, 1998

("1998 Partnership Agreement").  The earlier two agreements—*i.e.,* the 1994 and 1996

Partnership Agreements—did **not** contain an arbitration clause. The 1996 Amendment No. 1 and

the 1998 Partnership Agreement, on the other hand, both contained an identical arbitration clause

as follows:

> Binding Arbitration. The equity partners and non-equity partners shall make a good
> faith effort to settle any dispute or claim arising under this partnership agreement.
> If the equity or non-equity partners fail to resolve a dispute or claim, such equity or
> non-equity partner shall submit the dispute or claim to binding arbitration under the
> rules of the American Arbitration Association then in effect. Judgment on
> arbitration awards may be entered by any court of competent jurisdiction.[44]

---

[44] *Id.* at 723.

Appellee Appx. 00518
Appx. 00769
013331

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 05/26/25   Page 653 of 1017   PageID 14280
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 525 of 1803   PageID 11271
Case 18-03078-sgj   Doc 23   Filed 04/08/19   Entered 04/16/19 Page 18 of 30

Additionally, all four of the above-referenced partnership agreements contained an integration clause stating that "[t]his agreement contains the entire agreement . . . and all prior agreements . . . are terminated."[45]

Interestingly, the plaintiff **conceded** that claims she asserted involving the 1996 Amendment No. 1 and the 1998 Partnership Agreement were required to go to arbitration (such claims requested determinations regarding:  (1) the enforceability of the 1996 Amendment No. 1 and the 1998 Partnership Agreement; (2) breach of the 1996 Amendment No. 1 and the 1998 Partnership Agreement; (3) repudiation; and (4) breach of the duty of good faith and fair dealing).  However, the plaintiff disagreed that her remaining claims were also required to go to arbitration and those were:  (a) breach of the 1994 and 1996 Partnership Agreements; (b) breach of fiduciary duty; (c) violations of Title VII and/or TCHRA; and (d) violations of the Equal Pay Act.  The district court granted in part and denied in part the motion to compel arbitration, holding that:  (1) the plaintiff's contract claims arising under **earlier** partnership agreements, which **did not** contain arbitration clauses, were **not arbitrable**; (2) a common law breach of fiduciary duty claim was arbitrable under the agreements (it appears that these claims arose after the 1996 Amendment No. 1 and 1998 Partnership Agreement); and (3) statutory sex-based discrimination claims were not arbitrable under the agreements.[46]

Relevant to the case at bar, the *Coffman* court noted, first, that the conduct underlying the alleged breaches of the 1994 and 1996 contracts occurred at a time when no arbitration clause was in effect.  The plaintiff's complaint specifically alleged that, during the time the four

---

[45] *Id.*

[46] *Id.* at 733.

Appellee Appx. 00519
Appx. 00579
013332

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 05/06/25    Page 654 of 1017    PageID 14281
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 526 of 1803   PageID 11272
Case 18-03078-sgj   Doc 239-63   Filed 04/03/19   Entered 04/16/19 Page 23 of Page 19 of 30

agreements were in effect, the law firm failed to properly calculate Plaintiff's compensation,
failed to promote her, and deprived her of benefits from a tobacco case.  The court noted that, if
the law firm did participate in such conduct during the time that the 1994 and 1996 Partnership
Agreements were in effect, such conduct could not have "arisen under" the 1996 Amendment
No. 1 or the 1998 Partnership Agreement *because those agreements did not even exist at that
time*.  But, to the extent that the conduct Plaintiff complained of occurred when the 1996
Amendment No. 1 and the 1998 Partnership Agreement were in effect, her claims would be
subject to arbitration.[47]

The court further noted that the arbitration clause should not be interpreted as covering
the plaintiff's claims for breach of the 1994 and 1996 Partnership Agreements because the plain
grammatical language of the arbitration clause gave no indication that it would apply
retroactively.  "To interpret the arbitration clause to apply retroactively would cause Plaintiff to
forego her vested right to litigate an accrued claim."[48]

---

[47] *Id.* at 726 (citing *Sec. Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 372 (6th Cir. 1999) (arbitration provision in 1994 shipping agreement did not cover conduct that occurred under prior shipping agreements); *Necchi S.p.A. v. Necchi Sewing Mach. Sales Corp.*, 348 F.2d 693, 698 (2d Cir. 1965) (action based on conduct which had arisen "prior to" effective date of arbitration clause was not within scope of arbitration agreement); *Hendrick v. Brown & Root, Inc.*, 50 F. Supp. 2d 527, 533-34 (E.D.Va. 1999) (arbitration clause in fourth contract did not cover conduct that occurred when third contract was in effect); *Connett v. Justus Enters. of Kansas, Inc.*, Civ. A. No. 87–1739–T, 1989 WL 47071, at *2 (D. Kan. March 21, 1989) (arbitration clause did not apply when alleged fraudulent conduct occurred before plaintiff executed contract with arbitration clause); *George Wash. Univ. v. Scott*, 711 A.2d 1257, 1260-61 (D.C. Ct. App. 1998) (conduct that occurred before arbitration clause took effect was not arbitrable).

[48] *Coffman*, 161 F. Supp. 2d at 726-27 (citing *Sec. Watch*, 176 F.3d at 372–73 (arbitration clause did not reach disputes arising under earlier agreements because it is "nonsensical to suggest that [the plaintiff] would abandon its established right to litigate disputes arising under the [prior] contracts"); *Choice Sec. Sys. v. AT&T Corp*, No. 97-1774, 1998 WL 153254, at *1 (1st Cir. Feb.25, 1998) (arbitration clause in 1994 contracts did not apply to pre–1994 contracts when the language of the arbitration clause did not indicate "that the parties ever contemplated so radical a retroactive renegotiation of their earlier agreements"); *Hendrick*, 50 F. Supp. 2d at 535 (arbitration clause was not retroactive when the text of the clause expressed no language providing that it "reache[d] back in time to require an employee to arbitrate a claim which had accrued before the contract was signed or the [arbitration clause] took effect"); *Connett*, 1989 WL 47071, at *2 (arbitration clause did not apply retroactively when it did not specify that it applied to past conduct); *Kenworth of Dothan, Inc. v. Bruner–Wells Trucking, Inc.*, 745 So.2d 271, 275-76 (Ala. 1999) (arbitration clause was not retroactive when language of the clause did not so state); *George Wash. Univ.*, 711 A.2d at 1261 (arbitration clause was not retroactive when "the arbitration clause itself contained no indication whatsoever that its terms would apply . . . before [its effective date]").

Appellee Appx. 00520
Appx. 00571
013333

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 156    Filed 02/25/1804    Page 655 of 1017    PageID 14282
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 527 of 1803    PageID 11273
Case 18-03078-sgj11 Doc 396-358 Filed 04/08/94    Entered 04/16/19 Page 22 of Page 20 of 30

Bottom line, the court in *Coffman* seemed to focus on **when each cause of action**

**accrued** and looked to the **agreement that governed at such time**.  This court agrees with that

reasoning and sees no reason why the result should be different in the case at bar, simply because

the arbitration clauses in the case at bar were in **earlier** versions of the Sub-Advisory and Shared

Services Agreements as opposed to being in the **later** versions of those agreements (in other

words, the opposite sequence as in the *Coffman* case).

The Reorganized Debtors have cited a couple of cases that they believe justify a

determination that there is no binding arbitration clause in the case at bar.  One is the case of

*Goss-Reid & Assocs. Inc. v. Tekniko Licensing Corp.*[49]  This case involved a motion to compel

arbitration that was denied (which denial was affirmed by the Fifth Circuit).  Like the case at bar,

it involved a situation where there had been a succession of agreements, with earlier agreements

containing arbitration provisions and the last agreement containing no arbitration clause.

Specifically, in the *Goss-Reid* case, there were three agreements that were relevant.  First, a

**Franchise Agreement** between a franchisor named Transformational Technologies, Inc. ("TTI")

and a party named Rittenhaus-Tate Organization ("RTO").  RTO was a business owned by Tracy

Goss and Sheila Reid.  The Franchise Agreement, among other things, provided that RTO's

owners Tracy Goss and Sheila Reid would be "licensed franchisees of TTI" and would have use

of certain of TTI's intellectual property.  During the term of the Franchise Agreement, Tracy

Goss and Sheila Reid developed certain consulting services technology they called "The

Winning Strategy" and it apparently was built off of TTI's intellectual property.  This first

agreement contained a mandatory arbitration provision.  Second, there was a **License**

---

[49] *Goss-Reid & Assocs. Inc. v. Tekniko Licensing Corp.*, 54 Fed. Appx. 405 (5th Cir. 2002) (per curium opinion which is designated as having no precedential effect).

Appellee Appx. 00521
Appx. 00572
013334

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 05/06/25    Page 656 of 1017    PageID 14283
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 528 of 1803    PageID 11274
Case 18-03078-sgj    Doc 23-6 Filed 04/08/19    Entered 04/16/19 Page 22 of Page 21 of 30

**Agreement** between the apparent successor-in-interest of TTI called Tekniko, Inc., on the one

hand, and Tracy Goss, Sheila Reid and Goss-Reid & Associates, Inc. (collectively, "Goss/Reid"),

on the other, pursuant to which Goss/Reid obtained a "a non-exclusive license to use the same

intellectual property covered by the Franchise Agreement." This second agreement also

contained a mandatory arbitration agreement. Third, there was a **Transfer Agreement** that

appears to have been entered into by the same parties as the second agreement (Tekniko, Inc. and

Goss/Reid). The Transfer Agreement "permanently transferred [to Goss/Reid] the non-exclusive

right to use the intellectual property that was the subject of the prior agreements in exchange for

a percentage of [Goss & Reid's] adjusted gross profits for that year." There was no arbitration

provision in this third agreement and the agreement did not adopt or refer to the arbitration

provisions contained in the earlier agreements. The third agreement stated that it constituted "an

amendment to the License Agreement . . . between you and this company ('TEKNIKO'),

supersedes all prior agreements between you and TEKNIKO and, except as provided below, will

terminate your rights and those of TEKNIKO under the License Agreement."

     At some subsequent time, Goss/Reid filed a lawsuit alleging improper use of "The

Winning Strategy" by the entities Tekniko Licensing Corporation and Landmark Education

Company. These Defendants (hereafter so called) asserted ownership themselves of "The

Winning Strategy" based on the Franchise Agreement. The Defendants—citing to the arbitration

clauses in both the Franchise Agreement and the License Agreement—filed a motion to compel

arbitration, which was denied at the district court level and also at the Fifth Circuit. The district

court determined that New York law applied (*i.e.,* the Transfer Agreement was governed by New

York law and apparently the parties agreed that New York law applied), and that the Transfer

Agreement constituted a novation and extinguished the arbitration provisions of the previous

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Page 15006 of 1804   Page 657 of 1017   PageID 14284
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 529 of 1803   PageID 11275
Case 18-03078-sgj   Doc 22-5   Filed 04/08/19   Entered 04/16/19   Page 22 of 30

agreements.  On appeal, the Fifth Circuit stated that the issue before it was "whether the arbitration provisions of the Franchise and License Agreements were superseded by the Transfer Agreement.  Thus, the question before us is one of contractual interpretation."[50]

The Fifth Circuit stated certain principles that apply under both New York and Texas law.  Among other principles, the Fifth Circuit noted that courts construing contracts "should strive to give effect to the intentions of the parties, as expressed in the terms of the contract."[51] The Transfer Agreement stated that "it supersedes all prior agreements" between Goss/Reid and the predecessor-in-interest of one of the Defendants, Tekniko Licensing Corporation.[52]  "This type of agreement clearly constitutes a novation under New York law."[53]  The court also noted that it was not appropriate to consider any extrinsic or parol evidence, since there was no ambiguity in the Transfer Agreement.  The court further stated that "[t]he only potential ambiguity raised by the Defendants is that the Transfer Agreement refers to itself as an 'amendment to the License Agreement.'  Read as a whole, however, the Transfer Agreement plainly manifests an intention to supersede all prior agreements between the parties and, except as specifically provided, to terminate all rights and obligations under the License Agreement."[54]

The other case that the Reorganized Debtors have significantly relied upon to justify a determination that there is no binding arbitration clause in the case at bar is *Valero Energy Corp. v. Teco Pipeline Co.*[55]  In *Valero*, there had been numerous agreements entered into over time

---

[50] *Id.* at *1.

[51] *Id.*

[52] *Id.*

[53] *Id.* (citing various New York state court cases).

[54] *Id.* at *2.

[55] *Valero Energy Corp. v. Teco Pipeline Co.,* 2 S.W.3d 576 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

Appellee Appx. 00523
Appx. 00774
013336

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-6   Filed 05/16/25   Page 658 of 1017   PageID 14285
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 530 of 1803   PageID 11276
Case 18-03078-sgj   Doc 396-58   Filed 04/03/19   Entered 04/16/19 15:28:28   Page 23 of 30

amongst the litigating parties, all of which involved gas pipelines and transportation rights, and those various agreements were not amendments or restatements of one initial agreement. Rather, there was an Operating Agreement, there were documents that were alleged to create a joint venture or partnership, a Purchase Agreement, an Ownership Agreement, a Transportation Agreement, and a couple of Settlement Agreements entered into later when various disputes arose. One of the key agreements, the so-called Operating Agreement, contained an arbitration clause. When party Teco Pipeline sued party Valero and other related parties, Valero moved to compel arbitration, arguing that the litigation was subject to the arbitration clause in the Operating Agreement. The trial court denied Valero's motion, but the court of appeals reversed.

Teco had argued that the claims it was asserting were not based on the Operating Agreement that contained the arbitration clause but, even if they were, a later Settlement Agreement essentially redefined the parties' relationship—essentially superseding the parties' relationship that had been set forth in the numerous prior agreements—and it did not have an arbitration clause. Rather the Settlement Agreement stated that:

> Each party irrevocably consents and agrees that any legal action, suit or proceeding against any of them with respect to their obligations, liabilities, or any other matter under or arising out of or in connection with this Agreement may be brought in the United States District Court for the Western District of Texas, San Antonio Division, or in the courts of the State of Texas, and hereby irrevocably accepts and submits to the jurisdiction of each of the aforesaid court in personam, generally and unconditionally with respect to any such action, suit or proceeding for itself and in respect of its properties, assets and revenues.[56]

Teco asserted that the quoted clause provided for the procedure to be used in future disputes, *i.e.,* that the parties would go through judicial channels, not arbitration. Teco also asserted that the intent to revoke the arbitration clause was signified by a typical merger clause contained in the

---

[56] *Id.* at 587.

Appellee Appx. 00524

013337

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 02/26/25   Page 659 of 1017   PageID 14286
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 531 of 1803   PageID 11277
Case 18-03078-sgj11   Doc 236   Filed 04/16/19   Entered 04/16/19 Page 23 of Page 24 of 30

Settlement Agreement.  The appeals court disagreed with Teco's argument and determined

arbitration was required.  First, the court determined that the provision regarding litigation

applied only to disputes arising under the Settlement Agreement not the previously executed

Operating Agreement, Purchase Agreement, Ownership Agreement, or Transportation

Agreements.  There was nothing to indicate that all the terms of those previous agreements had

been superseded by the Settlement Agreement.  In fact, it appeared that only select terms of the

earlier agreements were being modified.  Significantly, the Settlement Agreement referred to an

"Amendment No. 1" to the Operating Agreement being attached as an Exhibit D to the

Settlement Agreement—suggesting that it remained in intact (except for the amendment

attached).  Moreover, there was a post-Settlement Agreement letter submitted into evidence

stating that the prior Operating Agreement and arbitration provision were still in effect.  The

court addressed many other arguments made by Teco and, in the end, found nothing had

superseded or otherwise revoked the prior arbitration clause.

This bankruptcy court does not consider the *Valero* or *Goss-Reid* cases to be dispositive

of the situation in the case at bar.  Those cases clearly dealt with a myriad of agreements—for

example, in *Valero*, one key agreement had an arbitration clause, and an allegedly superseding

Settlement Agreement (with no arbitration clause) was determined not to have been intended to

supersede or replace the agreement with the arbitration clause.  In *Goss-Reid*, there were also a

myriad of agreements (*i.e.,* a franchise agreement, a license agreement and then a transfer

agreement), and the last one containing no arbitration clause was held to have been a novation of

the prior agreements.   In *Valero* and *Goss-Reid*, the various agreements were not amendments or

restatements of one initial agreement.  The case at bar is more analogous to the *Coffman* case

(involving amendments and restatements of an initial agreement) and the logic of that holding

Appellee Appx. 00525
Appx. 00576
013338

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 05/30/25    Page 660 of 1017    PageID 14287
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 532 of 1803    PageID 11278
Case 18-03078-sgj    Doc 139-5    Filed 04/06/19    Entered 04/06/19 15:28:28    Page 25 of 30

seems sound to apply here—especially given the fact that there is nothing in the March 17, 2017 version of the agreements that suggests that the agreement to submit disputes to litigation in Texas and the deletion of the arbitration clauses should be applied retroactively. The court believes it should look at when a cause of action accrued and determine if there was a binding arbitration clause between the parties at that time in the governing version of the agreement. Thus, the court determines that there were valid arbitration agreements that applied to all disputes arising out of the Sub-Advisory Agreement and Shared Services Agreement—to the extent that those disputes involved conduct prior to March 17, 2017. Since Counts 1-8 involve conduct prior to March 17, 2017, Counts 1-8 fall within the scope of the arbitration agreements in the Sub-Advisory Agreement and Shared Series Agreement.

**C.      But Wait, this is Bankruptcy and Core Matters and a Proof of Claim Objection are Involved.**

The analysis does not end here. Yes, there is an otherwise valid, binding arbitration clause that was contained in each of the Sub-Advisory and Shared Services Agreements (prior to March 17, 2017). And, yes, Counts 1-8 involve conduct and disputes arising under these pre-March 17, 2017 agreements. But what about the fact that these disputes arise in an adversary proceeding that involves mostly, if not entirely, "core" matters (*e.g.,* Counts 5-25 are all fraudulent transfers or preference claims under Section 544,[57] 547,[58] or 548;[59] Count 2 is a Section 542 turnover request;[60] Count 26 is a request for Section 550 recovery[61])? And what

---

[57] *See* 28 U.S.C. § 157(b)(2)(H).

[58] *See* 28 U.S.C. § 157(b)(2)(F).

[59] *See* 28 U.S.C. § 157(b)(2)(H).

[60] *See* 28 U.S.C. § 157(b)(2)(E).

[61] *See* 28 U.S.C. § 157(b)(2)(F) & (H).

Appellee Appx. 00526
Appx. 00577
013339

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Page 1524 of 1804   Page 661 of 1017   PageID 14288
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 533 of 1803   PageID 11279
Case 18-03078-sgj   Doc 239   Filed 04/03/19   Entered 04/11/19 Page 22 of   Page 26 of 30

about the fact that Highland (the counter-party to the Sub-Advisory and Shared Services
Agreement who has asked for enforcement of the arbitration clauses in those agreements) has
filed proofs of claim?[62]  And what about the fact that Counts 1-8 (as with every count in the
Adversary Proceeding) are all urged to be ***offsets*** to Highland's proofs of claim?[63]  Highland's
proofs of claim are based on the post-March 17, 2017 versions of the Sub-Advisory and Shared
Services Agreements (*i.e.,* the versions that have no arbitration clauses).  Highland has not
argued that its proofs of claim are subject to arbitration (likely because they are governed by the
post-March 17, 2017 versions of the Sub-Advisory and Shared Services Agreements).  But,
again, Highland argues that Counts 1-8 must be sent to arbitration, and the Reorganized Debtors
argue that each of these counts present potential offsets to Highlands' proofs of claim.  As a
reminder, these counts are:

**COUNT 1**:     Declaratory Judgment of Ultra Vires Acts by Acis LP in Violation of the LPA
(Highland allegedly overcharged expenses by $7M+ (*i.e.*, excessive fees) under
the Sub-Advisory and Shared Services Agreements).

**COUNT 2**:     Turnover of Property of the Estate Under § 542 for Unauthorized Overpayments
(turnover the $7M+ overcharged).

**COUNT 3**:     Money Had and Received for Overcharges and Unauthorized Overpayments
(again, seeking redress for the $7M+ overcharged—implicating the Sub-Advisory
Agreement and Shared Services Agreement).

**COUNT 4**:     Conversion for Unauthorized Overpayments (again, seeking redress for the $7M+
overcharged implicating the Sub-Advisory Agreement and Shared Services
Agreement).

**COUNT 5**:     Actual Fraudulent Transfer under § 548 related to the Sub-Advisory Agreement
(modifications to the Sub-Advisory Agreement in subsequent iterations were
allegedly fraudulent transfer, as were payments thereunder).

---

[62] *See* 28 U.S.C. § 157(b)(2)(B).

[63] *See* 28 U.S.C. § 157(b)(2)(C).

Appellee Appx. 00527
Appx. 00778
013340

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 05/05/25    Page 662 of 1017    PageID 14289
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 534 of 1803    PageID 11280
Case 18-03078-sgj11    Doc 139    Filed 04/16/19    Entered 04/16/19 12:23:22    Page 28 of 30

**COUNT 6**:     Actual Fraudulent Transfer Under TUFTA, § 24.005(a)(1) related to the Sub-Advisory Agreement (same theory as Count 5, asserted through section 544 of the Bankruptcy Code).

**COUNT 7**:     Constructive Fraudulent Transfer Under § 548(a)(1)(B) related to the Sub-Advisory Agreement (same facts as Count 5 only constructive not actual fraud).

**COUNT 8**:     Constructive Fraudulent Transfer Under TUFTA §§ 24.005(a)(2) and 24.006(a) related to the Sub-Advisory Agreement (same facts as Count 5, only constructive fraud under TUFTA, and asserted through section 544 of the Bankruptcy Code).

Thus, to recap, *five of the eight counts that Highland wants arbitrated* (Counts 2, and 5-8) clearly involve statutory core matters.[64] Moreover, *all* of the counts in the Adversary Proceeding are asserted *defensively* to two proofs of claim—meaning *all eight counts that Highland wants arbitrated* (even Counts 1, 3, and 4) have transformed into statutory core matters.[65] Does this matter? This court believes yes.

     The Fifth Circuit has shed some light on this topic in the cases of *In re Gandy* and *In re National Gypsum*.[66] In those cases, the Fifth Circuit instructed that a bankruptcy court may decline to enforce arbitration clauses when it finds: (a) the underlying nature of the proceeding

---

[64] *See* 28 U.S.C. § 157(b)(2)(E), (F), and (H).

[65] *See* 28 U.S.C. § 157(b)(2)(C). This court realizes that, from a *Stern v. Marshall* perspective, 131 S. Ct. 2594 (2011), being a *statutory* "core" matter does not necessarily mean a bankruptcy court has Constitutional authority to issue final orders or judgments in the matter. However, even if this *Stern* pronouncement has any relevance, when evaluating an arbitration clause/right, the court perceives that the various counterclaims here (*i.e.,* all 35 counts) are likely *inexplicably intertwined* with the Highland proofs of claim, such that the bankruptcy court would likely have Constitutional authority to adjudicate them. While Highland's proofs of claim merely seek payment for services under the post-March 17, 2017 versions of the agreements—which is *after* the time frame that Counts 1-8 implicate—it is not so simple as dividing claims and counterclaims into discreet time periods. For one thing, the Reorganized Debtors argue that modifications to the Sub-Advisory and Shared Services Agreements that increased fees that Highland could charge (and that Highland is now seeking in its proofs of claim) were tantamount to fraudulent transfers. Thus, how does one evaluate the proofs of claim separately from this argument? Additionally, Highland *has asserted unliquidated indemnification claims* in its proofs of claim that presumably reach back to earlier iterations of the Sub-Advisory and Shared Services Agreement (meaning that claims ultimately awarded to the Reorganized Debtors under earlier versions of the agreements might result in indemnification claims being asserted back against them by Highland relating to those very claims). The point being that all of Highland's assertions in its proofs of claim seem inextricably intertwined with all the Counts in the Adversary Proceeding.

[66] *Gandy v. Gandy (In re Gandy),* 299 F.3d 489 (5th Cir. 2002); *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.),* 118 F.3d 1056 (5th Cir. 1997).

Appellee Appx. 00528
Appx. 00779
013347

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1186    Filed 05/06/25    Page 663 of 1017    PageID 14290
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 535 of 1803    PageID 11281
Case 18-03078-sgj11    Doc 139    Filed 04/16/19    Entered 04/16/19 Page 28 of 30

derives from the provisions of the Bankruptcy Code; and (b) that enforcement of the arbitration

provision would conflict with the purposes/goals of the Bankruptcy Code.[67]  Some

purposes/goals of the Code that might support a denial of arbitration, include: (1) the equitable

and expeditious distribution of assets of the Debtor's estate; (2) centralized resolution of pure

bankruptcy issues; (3) protection of creditors and reorganizing debtors from piecemeal litigation,

and (4) the undisputed power of a bankruptcy court to enforce its orders.[68]

     The *In re Gandy* opinion from the Fifth Circuit is worthy of discussion here.  In *Gandy*,

an individual Chapter 11 debtor had first, prepetition, filed a state court lawsuit against various

business partners, asserting causes of action against them for making transfers out of a

partnership affecting her ownership interests, and the causes of action included breach of

contract, negligence, breach of fiduciary duty, fraud and constructive trust.  There was an

arbitration clause in the applicable partnership agreement and the state court granted a motion to

compel arbitration.  Then, the debtor filed a Chapter 11 case and removed the state court lawsuit

to the bankruptcy court and filed new claims under sections 544, 548, 550, civil "RICO," and

alter ego in a separate adversary proceeding, and requested substantive consolidation.  The

bankruptcy court granted consolidation of the two actions and then the defendants filed a motion

to compel arbitration.  The bankruptcy court denied the motion, after finding that the debtor was

essentially seeking avoidance of fraudulent transfers.  The Fifth Circuit affirmed the bankruptcy

court's refusal to enforce an arbitration clause contained in the underlying partnership

agreement.  The court agreed with the bankruptcy court that the complaint essentially—more

than anything else—sought avoidance of fraudulent transfers, and the court not only determined

---

[67] *Id.* at 1069.

[68] *Id.*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Ex 15-116    Filed 05/06/25    Page 664 of 1017    PageID 14291
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 536 of 1803    PageID 11282
Case 18-03078-sgj  Doc 239-6  Filed 04/06/19  Entered 04/16/19 Page 330 of Page 29 of 30

that such rights derived from the Bankruptcy Code (fully acknowledging the fact that there were

state law tort claims and breach of contract also asserted) but also—in looking at whether

enforcing the arbitration clause would conflict with the purposes of the Bankruptcy Code—noted

that one central purpose of the Bankruptcy Code is the expeditious and equitable distribution of

the assets of a debtor's estate.  The court thought the avoidance actions predominated over the

"peripheral" contract and tort claims and, in such a circumstance, "the importance of the federal

bankruptcy forum provided by the Code is at its zenith."[69]  The court stated that "[s]ome of the

purposes of the Code we mentioned in *National Gypsum*[70] as potentially conflicting with the

Arbitration Act include the goal of centralized resolution of purely bankruptcy issues, the need to

protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of

the bankruptcy court to enforce its own orders."[71]

        This court believes, like the court in *Gandy*, that this Adversary Proceeding—more than

anything else—seeks avoidance of fraudulent transfers.  Such avoidance theories derive from the

Bankruptcy Code.  Sections 542, 547, 548 and 550 of the Bankruptcy Code are front and center,

as are the "strong arm" powers of section 544(a).  Enforcing the arbitration clause here would

conflict with the purposes of the Bankruptcy Code—one of the central purposes of which is the

---

[69] *Gandy,* 299 F.3d at 497.

[70] In the *National Gypsum* case, an asbestos litigation trust created under a confirmed plan filed a post-confirmation adversary proceeding against debtor's liability insurer, seeking a declaratory judgment that the plan had discharged its obligations to the insurance company.  The insurance company, in response to the litigation, sought to exercise its rights to seek arbitration under a certain agreement.  The Fifth Circuit, in affirming the lower courts' refusal to compel arbitration, stated that, "We believe that nonenforcement of an otherwise applicable arbitration provision turns on the underlying nature of the proceeding, *i.e.*, whether the proceeding derives exclusively from the provisions of the Bankruptcy Code and, if so, whether arbitration of the proceeding would conflict with the purposes of the Code."  *Nat'l Gypsum Co.*, 118 F.3d at 1067.  Because the debtor sought to bar the insurance company's actions either by invoking section 524(a)'s discharge injunction or by invoking the terms of a confirmed plan, the proceeding derived entirely from the provisions of the Bankruptcy Code, and, hence, the *National Gypsum* court would not send the dispute to arbitration.

[71] *Gandy*, 299 F.3d at 500.

Appellee Appx. 00530
Appx. 00781
013343

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-116   Filed 05/06/25   Page 665 of 1017   PageID 14292
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 537 of 1803   PageID 11283
Case 18-03078-sgj   Doc 239-8   Filed 04/08/19   Entered 04/16/19 Page 32 of Page 30 of 30

expeditious and equitable distribution of the assets of a debtor's estate.  The avoidance actions in this Adversary Proceeding predominate over all other counts and, in such a circumstance, "the importance of the federal bankruptcy forum provided by the Code is at its zenith."  Arbitrating Counts 1-8 would seriously jeopardize the Adversary Proceeding because they are an integral part of determining Highland's proofs of claim and the other core counts in the Adversary Proceeding.  The bankruptcy court's quintessential duties are to adjudicate proofs of claim and to provide a central forum for litigation, whenever feasible and jurisdictionally sound.  Indeed, in *Gandy*, the Fifth Circuit noted that when a proof of claim is filed, one of the "peculiar powers" of the bankruptcy court has been invoked and the nature of estate claims becomes "different from [their] nature . . . following the filing of a proof of claim."[72]

In summary, this court believes it has discretion under established Fifth Circuit authority to decline to order arbitration here.[73]  It is, therefore,

**ORDERED** that the Arbitration Motion is **DENIED**.

**#### END OF MEMORANDUM OPINION AND ORDER####**

---

[72] *Id.* at 499 (citing *Wood v. Wood (In re Wood),* 825 F.2d 90, 97 (5th Cir. 1987)).

[73] *See also Anderson v. Credit One Bank, N.A. (In re Anderson)*, 884 F.3d 382, 389-90 (2d Cir. 2018) (in proceeding involving whether section 524 discharge was violated by credit card company whose agreement with debtor contained arbitration clause, Second Circuit held that bankruptcy court had discretion to decline to enforce the arbitration agreement; Second Circuit engaged in a particularized inquiry into the nature of the claim and the facts of the specific bankruptcy and determined that arbitrating claims for violations of the 524 injunction would "seriously jeopardize a particular core bankruptcy proceeding" because: "(1) the discharge injunction is integral to the bankruptcy court's ability to provide debtors with a fresh start, (2) the claim relates to an ongoing matter with continuing court supervision, and (3) the equitable powers of the court to enforce its own injunctions are central to the structure of the Code.").

Appellee Appx. 00531
Appx. 00782
013344

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 03/06/25    Page 666 of 1017    PageID 14293
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 538 of 1803    PageID 11284

## CERTIFICATE OF SERVICE

I, Elliot Bromagen, certify that I am not less than 18 years of age, and that service of the foregoing was caused to be made on November 1, 2019, in the manner indicated on the parties on the attached service list.

Date:  November 1, 2019                    */s/ Elliot Bromagen*
                                           Elliot Bromagen

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-11    Page 15 of 25 804 Page 667 of 1017    PageID 14294
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 539 of 1803    PageID 11285

Case 19-12239-CSS    Doc 86-5    Filed 11/01/19    Page 2 of 7

**HAND DELIVERY**
([Proposed] Counsel for the Debtor and
Debtor in Possession)
James O'Neill, Esquire
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19899 (Courier 19801)

**OVERNIGHT DELIVERY**
([Proposed] Counsel for the Debtor and
Debtor in Possession)
Richard M. Pachulski, Esquire
Jeffrey N. Pomerantz, Esquire
Ira D. Kharasch, Esquire
Maxim B. Litvak, Esquire
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA 90067

**HAND DELIVERY**
(United States Trustee)
Jane M. Leamy, Esquire
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801

**HAND DELIVERY**
(State Attorney General)
Kathy Jennings, Esquire
Delaware Department of Justice
Carvel State Office Building, 6th Floor
820 N. French Street
Wilmington, DE 19801

**HAND DELIVERY**
Zillah A. Frampton
Bankruptcy Administrator
Delaware Division of Revenue
Carvel State Office Building, 8th Floor
820 N. French Street
Wilmington, DE 19801

**HAND DELIVERY**
(United States Attorney)
David C. Weiss
c/o Ellen Slights
US Attorney's Office
District of Delaware
Hercules Building, Suite 400
1313 N. Market Street
Wilmington, DE 19801

**HAND DELIVERY**
(Top 20 Unsecured Creditor)
Ryan P. Newell, Esquire
Connolly Gallagher LLP
1201 N. Market Street, 20th Floor
Wilmington, DE 19801

**HAND DELIVERY**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Sean M. Beach, Esquire
Jaclyn C. Weissgerber, Esquire
Young Conaway Stargatt & Taylor, LLP
1000 North King Street, Rodney Square
Wilmington, DE 19801

**HAND DELIVERY**
(Counsel to the Redeemer Committee of the
Highland Crusader Fund)
Curtis S. Miller, Esquire
Morris, Nichols, Arsht & tunnel LLP
Kevin M. Coen, Esquire
1201 North Market Street, Suite 1600
Wilmington, DE 19801

**HAND DELIVERY**
(Counsel to Acis Capital Management GP
LLC and Acis Capital Management, L.P.)
John E. Lucian, Esquire
Josef W. Mintz, Esquire
Jose F. Bibiloni, Esquire
Blank Rome LLP
1201 N Market Street, Suite 800
Wilmington, DE 19801

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Page 540 of 1804   Page 668 of 1017   PageID 14295
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 540 of 1803   PageID 11286
Case 19-12239-CSS   Doc 86-5   Filed 11/01/19   Page 3 of 7

**HAND DELIVERY**
(Counsel to Patrick Daugherty)
Michael L. Vild, Esquire
Cross & Simon, LLC
1105 N. Market Street, Suite 901
Wilmington, DE  19801

**HAND DELIVERY**
(Counsel to Hunter Mountain Trust)
William A. Hazeltine, Esquire
Sullivan Hazeltine Allinson LLC
901 North Market Street, Suite 1300
Wilmington, DE  19801

**OVERNIGHT DELIVERY**
(Counsel to Acis Capital Management GP
LLC and Acis Capital Management, L.P.)
Rakhee V. Patel, Esquire
Phillip Lamberson, Esquire
Winstead PC
2728 N. Harwood Street, Suite 500
Dallas, TX  75201

**OVERNIGHT DELIVERY**
(United States Attorney General)
William Barr, Esquire
Office of the US Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW,
Room 4400
Washington, DC  20530-0001

**OVERNIGHT DELIVERY**
State of Delaware
Division of Corporations - Franchise Tax
PO Box 898
Dover, DE  19903

**OVERNIGHT DELIVERY**
Delaware Secretary of Treasury
820 Silver Lake Blvd, Suite 100
Dover, DE  19904

**OVERNIGHT DELIVERY**
Office of General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC  20220

**OVERNIGHT DELIVERY**
Office of General Counsel
Securities & Exchange Commission
100 F Street, NE
Washington, DC  20554

**OVERNIGHT DELIVERY**
Sharon Binger, Regional Director
Philadelphia Regional Office
Securities & Exchange Commission
One Penn Center, Suite 520
1617 JFK Boulevard
Philadelphia, PA  19103

**OVERNIGHT DELIVERY**
Andrew Calamari, Regional Director
New York Regional Office
Securities & Exchange Commission
Brookfield Place, Suite 400
200 Vesey Street
New York, NY  10281

**OVERNIGHT DELIVERY**
Office of the General Counsel
Michael I. Baird, Esquire
Pension Benefit Guaranty Corporation
1200 K Street, NW
Washington, DC  20005-4026

**OVERNIGHT DELIVERY**
Internal Revenue Service
Centralized Insolvency Operation
PO Box 7346
Philadelphia, PA  19101

Appellee Appx. 00534
Appx. 00785
013347

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1186   Filed 04/26/25   Page 669 of 1017   PageID 14296
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 541 of 1803   PageID 11287
Case 19-12239-CSS   Doc 86-5   Filed 11/01/19   Page 4 of 7

**OVERNIGHT DELIVERY**
BBVA
Michael Doran
8080 N. Central Expressway
Suite 1500
Dallas, TX  75206

**OVERNIGHT DELIVERY**
NexBank
John Danilowicz
2515 McKinney Avenue
Suite 1100
Dallas, TX 75201

**OVERNIGHT DELIVERY**
KeyBank National Association
as Administrative Agent
225 Franklin Street, 18th Floor
Boston, MA 02110

**OVERNIGHT DELIVERY**
KeyBank National Association
as Agent
127 Public Square
Cleveland, OH 44114

**OVERNIGHT DELIVERY**
Prime Brokerage Services
Jefferies LLC
520 Madison Avenue
New York, NY 10022

**OVERNIGHT DELIVERY**
Office of the General Counsel
Re: Prime Brokerage Services
Jefferies LLC
520 Madison Avenue, 16th Floor
New York, NY 10022

**OVERNIGHT DELIVERY**
Director of Compliance
Re: Prime Brokerage Services
Jefferies LLC
520 Madison Avenue, 16th Floor
New York, NY 10022

**OVERNIGHT DELIVERY**
Frontier State Bank
Attn:  Steve Elliot
5100 South I-35 Service Road
Oklahoma City, OK 73129

**OVERNIGHT DELIVERY**
Strand Advisors, Inc.
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
The Dugaboy Investment Trust
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
Mark K. Okada
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
The Mark and Pamela Okada Family
Trust – Exempt Trust #1
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
The Mark and Pamela Okada Family
Trust – Exempt Trust #2
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
Hunter Mountain Investment Trust
c/o Rand Advisors LLC
John Honis
87 Railroad Place Ste 403
Saratoga Springs, NY 12866

3

Appellee Appx. 00535
Appx. 00786
013348

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/25   Page 670 of 1017   PageID 14297
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 542 of 1803   PageID 11288
Case 19-12239-CSS   Doc 86-5   Filed 11/01/19   Page 5 of 7

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Acis Capital Management, L.P.
  and Acis Capital Management GP, LLC
c/o Brian P. Shaw, Esquire
Rogge Dunn Group, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
American Arbitration Association
Elizabeth Robertson, Esquire
120 Broadway, 21st Floor,
New York, NY 10271

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Andrews Kurth LLP
Scott A. Brister, Esquire
111 Congress Avenue, Ste 1700
Austin, TX 78701

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Bates White, LLC
Karen Goldberg, Esquire
2001 K Street NW
North Bldg Suite 500
Washington, DC 20006

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
CLO Holdco, Ltd.
Grant Scott, Esquire
Myers Bigel Sibley & Sajovec, P.A.
4140 Park Lake Ave, Ste 600
Raleigh, NC 27612

**OVERNIGHT DELIVERY**
Cole, Schotz, Meisel, Forman & Leonard,
P.A.
Michael D. Warner, Esquire
301 Commerce Street, Suite 1700
Fort Worth, TX 76102

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Debevoise & Plimpton LLP
Michael Harrell, Esquire
c/o Accounting Dept 28th Floor
919 Third Avenue
New York, NY 10022

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
DLA Piper LLP (US)
Marc D. Katz, Esquire
1900 N Pearl St, Suite 2200
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Duff & Phelps, LLC
c/o David Landman
Benesch, Friedlander, Coplan & Aronoff
LLP
200 Public Square, Suite 2300
Cleveland, OH 44114-2378

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Foley Gardere
Holly O'Neil, Esquire
Foley & Lardner LLP
2021 McKinney Avenue Suite 1600
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Joshua & Jennifer Terry
c/o Brian P. Shaw, Esquire
Rogge Dunn Group, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201

Appellee Appx. 00536
Appx. 00785
013349

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 04/25/25   Page 671 of 1017   PageID 14298
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 543 of 1803   PageID 11289
Case 19-12239-CSS   Doc 86-5   Filed 11/01/19   Page 6 of 7

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Lackey Hershman LLP
Paul Lackey, Esquire
Stinson LLP
3102 Oak Lawn Avenue, Ste 777
Dallas, TX 75219

**OVERNIGHT DELIVERY**
Lynn Pinker Cox & Hurst, L.L.P.
Michael K. Hurst, Esquire
2100 Ross Avenue, Ste 2700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
McKool Smith, P.C.
(Top 20 Unsecured Creditor)
Gary Cruciani, Esquire
300 Crescent Court, Suite 1500
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Meta-e Discovery LLC
Paul McVoy
Six Landmark Square, 4th Floor
Stamford, CT 6901

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
NWCC, LLC
c/o of Michael A. Battle, Esquire
Barnes & Thornburg, LLP
1717 Pennsylvania Ave N.W. Ste 500
Washington, DC 20006-4623

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Patrick Daugherty
c/o Thomas A. Uebler, Esquire
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Rd #401
Wilmington, DE 19808

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Redeemer Committee of the Highland
Crusader Fund
c/o Terri Mascherin, Esquire
Jenner & Block
353 N. Clark Street
Chicago, IL 60654-3456

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Reid Collins & Tsai LLP
William T. Reid, Esquire
810 Seventh Avenue, Ste 410
New York, NY 10019

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
UBS AG, London Branch and UBS
Securities LLC
c/o Andrew Clubock, Esquire
Latham & Watkins LLP
555 Eleventh Street  NW Suite 1000
Washington, DC 20004-130

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Scott E. Gant, Esquire
Boies, Schiller & Flexner LLP
1401 New York Avenue, NW
Washington, DC  20005

**OVERNIGHT DELIVERY**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Marshall R. King, Esquire
Michael A. Rosenthal, Esquire
Alan Moskowitz, Esquire
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10066

5

**Appellee Appx. 00537**

**013350**

Appx. 00788

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 05/05/25   Page 672 of 1017   PageID 14299
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 544 of 1803   PageID 11290
Case 19-12239-CSS   Doc 86-5   Filed 11/01/19   Page 7 of 7

**OVERNIGHT DELIVERY**
(Counsel to California Public Employees'
Retirement System ("CalPERS")
Louis J. Cisz, III, Esquire
Nixon Peabody LLP
One Embarcadero Center, 32nd Floor
San Francisco, CA 94111

**OVERNIGHT DELIVERY**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Matthew G. Bouslog, Esquire
Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, CA 92612

**OVERNIGHT DELIVERY**
(Counsel to Redeemer Committee of the
Highland Crusader Fund)
Marc B. Hankin, Esquire
Richard Levin, Esquire
Jenner & Block LLP
919 Third Avenue
New York, New York 10022-3908

**OVERNIGHT DELIVERY**
(Counsel to Coleman County TAD, et al.)
Elizabeth Weller, Esquire
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons Freeway, Suite 1000
Dallas, TX 75207

**OVERNIGHT DELIVERY**
(Counsel to Jefferies)
Patrick Maxcy, Esq.
Dentons US LLP
233 South Wacker Drive Suite 5900
Chicago, Illinois 60606-6361

**OVERNIGHT DELIVERY**
(Proposed Official Committee of Unsecured
Creditors)
Bojan Guzina, Esquire
Matthew Clemente, Esquire
Alyssa Russell, Esquire
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

**OVERNIGHT DELIVERY**
(Proposed Official Committee of Unsecured
Creditors)
Jessica Boelter, Esquire
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019

**OVERNIGHT DELIVERY**
(Proposed Official Committee of Unsecured
Creditors)
Penny P. Reid, Esquire
Paige Holden Montgomery, Esquire
Sidley Austin LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201

Appellee Appx. 00538
Appx. 00789
013351

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1 6    Filed 05/06/25 1804    Page 673 of 1017    PageID 14300
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 545 of 1803    PageID 11291

# APPENDIX  7

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 54/06/25 804   Page 674 of 1017   PageID 14301
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 546 of 1803   PageID 11292
Case 18-30264-sgj11 Doc 75 Filed 03/20/18   Entered 03/20/18 17:26:53   Page 1 of 4





CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 20, 2018**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-SGJ-7 |
| | § | |
| Alleged Debtor. | § | |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT GP, L.P., | § | CASE NO. 18-30265-SGJ-7 |
| | § | |
| | § | |
| Alleged Debtor. | § | |

## ORDER DENYING ALLEGED DEBTORS' JOINT MOTION TO DISMISS THE INVOLUNTARY PETITIONS FILED BY JOSHUA N. TERRY FOR LACK OF SUBJECT MATTER JURISDICTION OR, ALTERNATIVELY, TO COMPEL ARBITRATION[1] [DE ## 72 & 73]

_____

[1] DE ## 72 & 73 in Case No. 18-30264; DE ## 69 & 70 in Case No. 18-30265.

1

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 05/06/25   Page 675 of 1017   PageID 14302
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 547 of 1803   PageID 11293
Case 18-30264-sgj11 Doc 75 Filed 03/20/18   Entered 03/20/18 17:26:53   Page 2 of 4

Late at night on March 19, 2018—on the day before a long-scheduled Trial of an Involuntary Bankruptcy Petition filed against the above-referenced Alleged Debtors—and despite the provisions of an Agreed Scheduling Order dated February 26, 2018 (which clearly contemplated that motions to dismiss, supplements, and other pleadings would have been filed significantly prior to March 19, 2018)—the Alleged Debtors filed a Joint Motion to Dismiss the Involuntary Petitions filed by Joshua N. Terry for Lack of Subject Matter Jurisdiction or, Alternatively, Motion to Compel Arbitration (the "Motions to Dismiss/Compel"),[2] and a supplement thereto on March 20, 2018.[3]  The Motions to Dismiss/Compel argue a lack of subject matter jurisdiction, with regard to this court's ability to adjudicate the Involuntary Bankruptcy Petitions, because allegedly Petitioning Creditor Joshua Terry (the "Petitioning Creditor") lacked standing to file the Involuntary Bankruptcy Petitions because of an arbitration clause in an Amended and Restated Agreement of Limited Partnership of ACIS Capital Management, L.P. (the "Partnership Agreement") dated January 21, 2011, which required parties to the Partnership Agreement to arbitrate disputes.  The arbitration clause at issue is found at Section 6.12 of the Partnership Agreement.  The Motions to Dismiss/Compel alternatively argue that this court should enforce/recognize the arbitration clause and order the parties to arbitrate whether the above-referenced Alleged Debtors should be in bankruptcy.  The Motions to Dismiss/Compel are **DENIED** for the following reasons:

---

[2] DE # 74 in Case No. 18-30264; DE # 71 in Case No. 18-30265.

[3] The court will presume that the Alleged Debtors thought that a subject matter jurisdiction argument—and the fact that courts can consider their subject matter jurisdiction at all times during litigation—warranted their blatant violation of the Agreed Scheduling Order.  The court will expect a good explanation in court as to why this subject matter jurisdiction argument was made 47 days after the case was filed, and after a previous answer and motion to dismiss were filed by the Alleged Debtor, and, of course, in violation of a court order.

Appellee Appx. 00541
Appx. 00792
013354

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 04/06/25   Page 676 of 1017   PageID 14303
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 548 of 1803   PageID 11294
Case 18-30264-sgj11 Doc 75 Filed 03/20/18   Entered 03/20/18 17:26:53   Page 3 of 4

(1) The parties involved here have already arbitrated prepetition.  In fact, it is undisputed that the Petitioning Creditor obtained an arbitration award that was confirmed with a judgment in state court.

(2) Section 6.12 of the Partnership Agreement is not applicable because filing an involuntary bankruptcy case is a *collection remedy* available to creditors with unsecured claims that are not the subject of a bona fide dispute and whose claims aggregate at least $15,775 in amount.  It is not a *claim* or *controversy* in and of itself, and is certainly not a claim or controversy "arising of, relating to or in connection with the [Partnership] Agreement."

(3) Even if Section 6.12 of the Partnership Agreement is applicable, the filing of an involuntary bankruptcy case, such as in the case at bar, presents a "core" bankruptcy proceeding and a bankruptcy court has discretion to decline to stay its proceedings in deference to arbitration where the underlying nature derives exclusively from the Bankruptcy Code (*i.e.,* is "core") and arbitration conflicts with the purposes of the Code. Arbitration in the case at bar would irreconcilably conflict with the purposes and goals of the Bankruptcy Code (including, but not limited to, the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and debtors from piecemeal litigation, and the expeditious and equitable distribution of assets of a debtor's estate). *See In re Nat'l Gypsum Co.*, 118 F.3d 1056, 1069-70 (5th Cir. 1997) (a bankruptcy court can deny enforcement of arbitration provisions when it finds either: (1) that enforcement of the provision would irreconcilably conflict with the Code; or (2) in exercising its discretion in a core case where the only rights at issue were created by the Code rather than inherited from pre-petition property of the debtors); *In re Gandy*, 299 F.3d 489, 499-500 (5th Cir. 2002) (same).

3

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 05/06/25   Page 677 of 1017   PageID 14304
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 549 of 1803   PageID 11295
Case 18-30264-sgj11 Doc 75 Filed 03/20/18   Entered 03/20/18 17:26:53   Page 4 of 4

**WHEREFORE** the Motions to Dismiss/Compel are **DENIED.**

**###END OF ORDER###**

Appellee Appx. 00543

Appx. 00794

013356

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S     Document 15-16   Filed 10/16/25   Page 678 of 1017     PageID 14305
Exhibit 6     Page 551 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 550 of 1803   PageID 11296

# APPENDIX 8

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11  Exhibit  Page 552 of 804  Page 679 of 1017   PageID 14306
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 551 of 1803   PageID 11297
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 1 of 229





CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 31, 2019**

_____
**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 18-30264-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P., | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | |
| | § | (Jointly Administered Under Case |
| DEBTORS. | § | No. 18-30264-SGJ-11) |
| | § | |
| | § | Chapter 11 |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER GRANTING FINAL
APPROVAL OF DISCLOSURE STATEMENT AND CONFIRMING THE THIRD AMENDED
JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL
MANAGEMENT GP, LLC, AS MODIFIED**

On December 11, 12 and 13, 2018, the Court held a hearing (the "Combined Hearing")

to consider (a) final approval of the *Disclosure Statement Pursuant to Section 1125 of the*

*United States Bankruptcy Code with Respect to the Third Amended Joint Plan for Acis Capital*

*Management, L.P. and Acis Capital Management GP, LLC* (the "Disclosure Statement") [Docket

No. 661] and (b) confirmation of the *Third Amended Joint Plan for Acis Capital Management,*

*L.P. and Acis Capital Management GP, LLC* (the "Third Amended Plan") [Docket No. 660], a

**Appellee Appx. 00545**
Appx. 00796
**013358**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/30/25   Page 680 of 1017   PageID 14307
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 552 of 1803   PageID 11298
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 2 of 229

copy of which is attached hereto as **Exhibit "1,"** as modified by (i) the *First Modification to the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* (the "First Modification") [Docket No. 693], a copy of which is attached hereto as **Exhibit "2,"** and (ii) the *Second Modification to the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* (the "Second Modification") [Docket No. 702], a copy of which is attached hereto as **Exhibit "3,"** as supplemented by the *Supplement to Second Modification to the Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC* [Docket No. 769], a copy of which is attached hereto as **Exhibit "4,"** filed by Robin Phelan (the "Chapter 11 Trustee"), as Chapter 11 Trustee for Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," and together with Acis LP, the "Debtors"). The Third Amended Plan, as modified by the First Modification and Second Modification (as supplemented), is hereafter referred to as the "Plan;" *provided that*, as provided in the last sentence of paragraph 13 of this Order, the schedule of assumed executory contracts attached hereto as Exhibit 5 to this Order replaces, is substituted for, and supersedes Exhibit B to the Third Amended Plan. Capitalized terms used in this Order, unless otherwise specifically defined herein, shall be given the same meaning as in the Plan and/or the Disclosure Statement.

The Combined Hearing was commenced at the time and date scheduled. Based on the testimony, evidence admitted, judicial notice of the records of the Chapter 11 Cases, and the arguments of counsel, the Court makes this *Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified* ("Order").

ACCORDINGLY, IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED AND ORDERED THAT:

**Appellee Appx. 00546**

**Appx. 00787**

**013359**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 05/16/25   Page 681 of 1017   PageID 14308
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 553 of 1803   PageID 11299
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 3 of 229

A.      *Findings and Conclusions*.  All findings of fact or conclusions of law made by the
Court on the record at the Combined Hearing are hereby incorporated in their entirety into this
Order.  All findings of fact contained in the Court's *Findings of Fact and Conclusions of Law in
Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petitions*
entered on April 13, 2018 [Docket No. 118] are hereby incorporated in their entirety into this
Order.  The findings and conclusions set forth herein and in the record of the Combined Hearing
constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052
as made applicable herein by Bankruptcy Rule 9014.  To the extent any of the following findings
of fact constitute conclusions of law, they are adopted as such.  To the extent any of the
following conclusions of law constitute findings of fact, they are adopted as such.

B.      *Jurisdiction; Venue; Core Proceeding*.  The Court has jurisdiction over these
bankruptcy cases pursuant to 28 U.S.C. sections 157(b) and 1334.  Venue is proper before this
Court pursuant to 28 U.S.C. sections 1408 and 1409.  Final approval of the Disclosure
Statement and confirmation of the Plan are core proceedings pursuant to 28 U.S.C. section
157(b)(2)(A), (L) and (O) over which the Court has exclusive jurisdiction and full constitutional
jurisdiction and authority to enter final orders with respect thereto.

C.      *Eligibility for Relief*.  The Debtors were and are eligible for relief under section
109 of the Bankruptcy Code.[1]

D.      *Commencement and Joint Administration of the Debtors' Cases*.  On January 30,
2018, Joshua N. Terry ("Terry") filed involuntary petitions under chapter 7 of the Bankruptcy
Code against both of the Debtors in the United States Bankruptcy Court for the Northern District
of Texas, Dallas Division (the "Court").  Acis LP's bankruptcy case was assigned Case No. 18-
30264, and Acis GP's bankruptcy case was assigned Case No. 18-30265.  The involuntary
petitions were contested and the Court held a multi-day trial spanning March 21, 22, 23, 27 and

---

[1] Unless otherwise indicated, section references are to the Bankruptcy Code.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 05/30/25    Page 682 of 1017    PageID 14309
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 554 of 1803    PageID 11300
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 4 of 229

29, 2018.  On April 13, 2018, the Court entered an *Order for Relief in an Involuntary Case* in both cases [Docket No. 119 in Case No. 18-30264 and Docket No. 114 in Case No. 18-30265]. Diane G. Reed (the "Chapter 7 Trustee") was appointed Chapter 7 Trustee in both cases.  On motion of the Chapter 7 Trustee, the Court entered an *Order Directing Joint Administration* [Docket No. 137],[2] which provides for the joint administration of the Debtors' respective bankruptcy cases under Case No. 18-30264.

   E. *Conversion of the Debtors' Cases and Appointment of the Chapter 11 Trustee*. On motion of the Chapter 7 Trustee, the Court entered an *Order Granting Trustee's Expedited Motion to Convert Cases to Chapter 11* [Docket No. 205] on May 11, 2018, converting the Debtors' bankruptcy cases to cases under chapter 11 of the Bankruptcy Code.  On motion of Terry, the Court entered an *Order Granting Emergency Motion for an Order Appointing A Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(A)* [Docket No. 206] on May 11, 2018, directing the United States Trustee (the "U.S. Trustee") to appoint a Chapter 11 Trustee in the Chapter 11 Cases.  The U.S. Trustee appointed Robin Phelan as Chapter 11 Trustee in the Chapter 11 Cases.  Mr. Phelan's appointment as Chapter 11 Trustee in Acis LP's case was approved pursuant to an *Order Approving Appointment of Chapter 11 Trustee* [Docket No. 221] entered by the Court on May 17, 2018 and his appointment as Chapter 11 Trustee in Acis GP's case was approved pursuant to an *Order Approving Appointment of Chapter 11 Trustee* [Docket No. 184 in Case No. 18-30265] entered by the Court on June 12, 2018.

   F. *No Official Committee of Unsecured Creditors*.  The U.S. Trustee has not appointed an official committee of unsecured creditors in the Chapter 11 Cases.

   G. *Claims Bar Date*.   October 15, 2018 was originally fixed as the deadline for all holders of alleged Claims (except for governmental units) to file proofs of Claim.  However, on

---

[2] Unless otherwise indicated, all references to the "Docket" refer to the Docket in Case No. 18-30264.

Appellee Appx. 00548
Appx. 00599
013361

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Page 1556 of 1804   Page 683 of 1017   PageID 14310
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 555 of 1803   PageID 11301
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 5 of 229

motion of the Chapter 11 Trustee, the Court entered the Bar Date Order on July 9, 2018 [Docket

No. 387].  Pursuant to the Bar Date Order, August 1, 2018 was established as the deadline for

all holders of alleged Claims (except for governmental units) to file proofs of Claim and October

10, 2018 was established as the deadline for governmental units to file proofs of Claim.

       H.       *Adequacy of Disclosure Statement*.  The Disclosure Statement contains

"adequate information," as that term is defined in section 1125 of the Bankruptcy Code and

satisfies all requirements of section 1125 of the Bankruptcy Code.

       I.       *Solicitation Order Compliance*.  On October 3, 2018, the Chapter 11 Trustee filed

his *Chapter 11 Trustee's Amended Motion for Entry of Order (A) Conditionally Approving*

*Disclosure Statement; (B) Scheduling Combined Hearing on Final Approval of Disclosure*

*Statement and Confirmation of Second Amended Joint Plan, and Setting Related Deadlines; (C)*

*Approving Forms for Voting and Notice; and (D) Granting Related Relief* (the "Conditional

Approval Motion") [Docket No. 622].  The Chapter 11 Trustee filed a *Supplement to Amended*

*Motion for Entry of Order (A) Conditionally Approving Disclosure Statement; (B) Scheduling*

*Combined Hearing on Final Approval of Disclosure Statement and Confirmation of Second*

*Amended Joint Plan, and Setting Related Deadlines; (C) Approving Forms for Voting and*

*Notice; and (D) Granting Related Relief* (the "Supplement to Conditional Approval Motion")

[Docket No. 646] on October 19, 2018.  The Court conducted a hearing on the Conditional

Approval Motion, as supplemented, on October 24, 2018.  On October 25, 2018, the Court

entered an *Order (I) Conditionally Approving Disclosure Statement, (II) Scheduling Combined*

*Hearing on Final Approval of Disclosure Statement and Confirmation of Second Amended Joint*

*Plan, and Setting Related Deadlines, (III) Approving Forms for Voting and Notice, and (IV)*

*Approving Related Matters* (the "Solicitation Order") [Docket No. 659] granting the Conditional

Approval Motion.  The Conditional Approval Motion was filed in connection with a second

amended plan of reorganization and disclosure statement with respect thereto.  However, for

convenience and ease of review, the modifications to the second amended plan and disclosure

**Appellee Appx. 00549**
**Appx. 00809**
**013362**

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-16 Filed 07/02/25 Page 684 of 1017 PageID 14311
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 556 of 1803 PageID 11302
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 6 of 229

statement with respect thereto, including modifications discussed at the October 24, 2018

hearing, were incorporated into the Third Amended Plan and Disclosure Statement filed on

October 25, 2018. Consequently, the Solicitation Order approved solicitation of votes on the

Third Amended Plan and distribution of the Disclosure Statement in connection with solicitation

of votes on the Third Amended Plan. Pursuant to the Solicitation Order, the Court, among other

things: (a) conditionally approved the Disclosure Statement for use in soliciting votes on the

Third Amended Plan; (b) established procedures and deadlines for the solicitation and

submission of votes to accept or reject the Third Amended Plan (the "Solicitation Procedures");

(c) fixed deadlines for objections to final approval of the Disclosure Statement and/or

confirmation of the Third Amended Plan and related briefing deadlines; (d) fixed a deadline for

serving notice of the Combined Hearing; and (e) set the Combined Hearing to commence on

December 11, 2018, at 9:30 a.m., Central Time. The Solicitation Order approved the following

documents (collectively the "Solicitation Materials") to be served on Creditors entitled to vote on

the Third Amended Plan:

> (i)     the Third Amended Plan;
>
> (ii)    the Disclosure Statement;
>
> (iii)   the Ballots for voting on the Third Amended Plan;
>
> (iv)    the Solicitation Order;
>
> (v)     a Notice (the "Combined Hearing Notice") [Docket No. 667] reflecting the deadlines and other information relating to the Combined Hearing; and,
>
> (vi)    a letter (the "Transmittal Letter") from counsel for the Chapter 11 Trustee.

The Solicitation Order directed the Chapter 11 Trustee to serve the Solicitation Materials on

holders of Claims in Classes 2 and 3 and Subclasses 4A and 4B under the Third Amended

Plan. The Solicitation Order also authorized the tabulation of Ballots on a consolidated basis.

The Solicitation Order further directed the Chapter 11 Trustee to serve on various parties

defined in the Supplement to Conditional Approval Motion as the "Noteholders," "Highlands" and

---

**Appellee Appx. 00550**
**Appx. 00801**
**013363**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 156    Filed 05/06/25    Page 685 of 1017    PageID 14312
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 557 of 1803    PageID 11303
Case 18-30264-sgj11  Doc 829  Filed 01/31/19    Entered 01/31/19 17:34:06    Page 7 of 229

"Notice Parties" certain notices and copies of the following documents (the "Notice-Only Materials"):  the Disclosure Statement, the Third Amended Plan, the Solicitation Order and the Combined Hearing Notice.  The Chapter 11 Trustee has complied with the Solicitation Order, including the Solicitation Procedures contained therein, in all respects.

J.      *Transmittal and Mailing of Solicitation Materials; Notice*.  Due, adequate, and sufficient notice of the Third Amended Plan, Disclosure Statement and Combined Hearing, together with all deadlines for voting on the Third Amended Plan and for objecting to final approval of the Disclosure Statement and/or confirmation of the Third Amended Plan, has been given to known holders of Claims and Interests and, to the extent required, to all other known parties-in-interest, in compliance with the applicable Bankruptcy Rules and the Solicitation Order, as evidenced by the: (i) Combined Hearing Notice (and Certificate of Service included therewith) filed at Docket No. 667; (ii) *Notice of Solicitation of Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Noteholders* (and Certificate of Service included therewith) filed at Docket No. 664; (iii) *Notice of Solicitation of Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Highland Entities* (and Certificate of Service included therewith) filed at Docket No. 665; (iv) *Notice of Solicitation of Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Notice Parties* (and Certificate of Service included therewith) filed at Docket No. 666; and (v) *Certificate of Service* filed at Docket No. 676.  The packages containing the Solicitation Materials, the packages containing the Notice-Only Materials, and all other materials relating in any way to the solicitation process were transmitted and served in substantial compliance with the Solicitation Order and in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Solicitation Procedures set forth in the Solicitation Order, and all other applicable rules, laws and regulations.

K.      *Adequacy of Solicitation*.  The Chapter 11 Trustee distributed packages containing the Solicitation Materials to the holders of Claims entitled to vote on the Third

Appellee Appx. 00551
Appx. 00802
013364

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/30/25   Page 686 of 1017   PageID 14313
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 558 of 1803   PageID 11304
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 8 of 229

Amended Plan and sufficient time was prescribed for such holders of Claims to vote on the Third Amended Plan in substantial compliance with the Solicitation Order and the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Solicitation Procedures set forth in the Solicitation Order, and all other applicable rules, laws and regulations.  Transmittal and service were adequate and sufficient, and no further notice is or shall be required.  In addition, holders of Claims not entitled to vote on the Amended Plan, and certain other parties-in-interest, were provided with certain non-voting materials approved by the Court in compliance with the Solicitation Order.  All procedures used to distribute the Solicitation Materials to holders of Claims entitled to vote on the Third Amended Plan were fair and conducted in good faith and in accordance with the Bankruptcy Code, Bankruptcy Rules, the Solicitation Procedures contained in the Solicitation Order, and all other applicable rules, laws and regulations.

L.     _Good Faith Solicitation – Section 1125(e)_.  Based on the Record, the Chapter 11 Trustee and Estate Professionals have acted in good faith within the meaning of sections 1125(e) and 1129(a)(3), and in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Order, in connection with all of their respective activities relating to the solicitation of acceptances of the Third Amended Plan and their participation in the activities described in section 1125, and are entitled to the protections afforded by section 1125(e).

M.     _Voting Tabulation_.  In accordance with the Solicitation Order, on December 3, 2018 the _Tabulation of Ballots in Connection with Confirmation of the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC_ (the "Ballot Tabulation") [Docket No. 746] was filed and served on all parties that filed a timely objection to confirmation of the Plan.  All procedures used to tabulate the Ballots (which were tabulated on a consolidated basis) were fair and conducted in accordance with the Solicitation Order, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws and regulations.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11 Page 16 of 1017 PageID 14314
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 559 of 1803   PageID 11305
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 9 of 229

N.      _Classes Deemed to Have Accepted or Rejected the Third Amended Plan_.  As

set forth in the Third Amended Plan and Disclosure Statement: (i) Class 1 is unimpaired and is

conclusively deemed to have accepted the Third Amended Plan pursuant to section 1126(f),

and (ii) Class 5, consisting of Interests in the Debtors, is Impaired, but because the Third

Amended Plan provides that holders of Class 5 Interests shall not receive or retain any property

on account of their Interests, Class 5 is conclusively deemed to have rejected the Third

Amended Plan pursuant to section 1126(g).

O.      _Impaired Classes of Creditors Voting to Accept or Reject the Third Amended_

_Plan_.  Based upon the Ballot Tabulation, the Court finds that the following Impaired Classes

have voted on the Third Amended Plan as follows:

(i)      Class 2 (the Terry Partially Secured Claim) voted to accept the Third

Amended Plan as follows:

| Ballots Accepting | | Ballots Rejecting | |
|---|---|---|---|
| Amount | Number | Amount | Number |
| $8,060,827.84 100% | 1 100% | $0.00 0.00% | 0 0.00% |

Two Ballots were submitted by Terry in Class 2.  One of the Ballots was based on a proof of

Claim recorded in the Claims Register for Case No. 18-30264 as Claim No. 26-1 and filed by

Terry for the benefit of his IRAs ("Claim No. 26").  Highland filed an objection [Docket No. 522]

on August 17, 2018 seeking an order disallowing Claim No. 26 and striking any vote (on a prior

plan of reorganization) by Terry on account of Claim No. 26.  Although the Ballot Tabulation

reflects the Ballot submitted by Terry on account of Claim No. 26, the Court disregards that

Ballot and does not take it into account in its determination regarding acceptance of the Third

Amended Plan.  The other Ballot submitted by Terry accepted the Third Amended Plan.

(ii)      Class 3 (General Unsecured Claims) voted to accept the Third Amended

Plan as follows:

---

**Appellee Appx. 00553**
**013366**
**Appx. 00804**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 06/02/25    Page 688 of 1017    PageID 14315
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 560 of 1803    PageID 11306
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 10 of 229

| Ballots Accepting | | Ballots Rejecting | |
|---|---|---|---|
| Amount | Number | Amount | Number |
| $667,550.00 100% | 2 100% | $0.00 0.00% | 0 0.00% |

Three Ballots were submitted in Class 3.  One of the Ballots was submitted by Jennifer G. Terry.

Such Ballot is based on a proof of Claim recorded in the Claims Register for Case No. 18-30264

as Claim No. 25-1 and filed by Jennifer G. Terry for the benefit of her IRAs and 401k ("Claim

No. 25").  Highland filed an objection [Docket No. 521] on August 17, 2018 seeking an order

disallowing Claim No. 25 and striking any vote (on a prior plan of reorganization) by Jennifer G.

Terry on account of Claim No. 25.  Although the Ballot Tabulation reflects the Ballot submitted

by Jennifer G. Terry on account of Claim No. 25, the Court disregards that Ballot and does not

take it into account in its determination regarding acceptance of the Plan.  The other two Ballots

submitted in Class 3 accepted the Third Amended Plan.

(iii)    Class 4 (Insider Claims) voted to reject the Third Amended Plan as

follows:

| Ballots Accepting | | Ballots Rejecting | |
|---|---|---|---|
| Amount | Number | Amount | Number |
| $0.00 0.00% | 0 0.00% | $4,172,140.38 100% | 1 100% |

Based on the foregoing, and as evidenced by the Ballot Tabulation, at least one

Impaired Class of Claims (excluding the acceptance by any Insiders of the Debtors) has voted

to accept the Third Amended Plan in accordance with the requirements of sections 1124 and

1126 of the Bankruptcy Code.

P.    _Modifications to the Third Amended Plan_.  The modifications to the Third

Amended Plan set forth in the First Modification, the Second Modification (as supplemented),

and as set forth in this Order constitute non-material or technical changes and do not materially

or adversely affect or change the treatment of any Claims against or Interests in the Debtors

---

Appellee Appx. 00554
Appx. 00805
013367

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/25/25    Page 689 of 1017    PageID 14316
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 561 of 1803    PageID 11307
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 11 of 229

under the Third Amended Plan (the "Non-Material Modifications").  The filing of the First

Modification on November 8, 2018 constitutes due and sufficient notice thereof under the

circumstances of these Chapter 11 Cases.  The filing of the Second Modification on November

16, 2018 (as supplemented on December 10, 2018) constitutes due and sufficient notice thereof

under the circumstances of these Chapter 11 Cases.  The Non-Material Modifications neither

require additional disclosure under section 1125 of the Bankruptcy Code nor re-solicitation of

votes on the Plan under section 1126 of the Bankruptcy Code and Bankruptcy Rules 3018 and

3019.  In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all

holders of Claims against the Debtors who voted to accept the Third Amended Plan are hereby

deemed to have accepted the Third Amended Plan as modified consistent with the Non-Material

Modifications.  No Holder of a Claim against the Debtors who has voted to accept the Third

Amended Plan shall be permitted to change its acceptance to a rejection as a consequence of

the Non-Material Modifications.  The Non-Material Modifications incorporated in the Plan comply

with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

Q.    _Bankruptcy Rule 3016_.  The Plan is dated and identifies the Chapter 11 Trustee

as the Person submitting it, thereby satisfying Bankruptcy Rule 3016(a).  The filing of the

Disclosure Statement satisfied Bankruptcy Rule 3016(b).  The Plan provides for the Temporary

Plan Injunction (as defined herein), which constitutes an injunction against conduct not

otherwise enjoined under the Bankruptcy Code.  The Plan and Disclosure Statement both

describe in specific and conspicuous language all acts to be enjoined and identify the entities

subject to the Temporary Plan Injunction.  Therefore, the Plan and Disclosure Statement satisfy

the requirements of Bankruptcy Rule 3016(c).

R.    _Bankruptcy Rule 3017_.  The Chapter 11 Trustee has given notice of the

Combined Hearing as required by the applicable provisions of Bankruptcy Rule 3017 and the

Solicitation Order.  The materials transmitted and notice given by the Chapter 11 Trustee to

holders of Claims entitled to vote on the Third Amended Plan and the materials transmitted by

Appellee Appx. 00555
Appx. 00806
013368

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 03/21/804   Page 690 of 1017   PageID 14317
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 562 of 1803   PageID 11308
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 12 of 229

the Chapter 11 Trustee to holders of Interests and other parties-in-interest satisfy the applicable provisions of Bankruptcy Rules 3017(d)-(f) and the Solicitation Order.  Therefore, the requirements of Bankruptcy Rule 3017 have been satisfied.

S.     *Bankruptcy Rule 3018*.  The solicitation of votes to accept or reject the Third Amended Plan satisfies Bankruptcy Rule 3018.  The Third Amended Plan was transmitted to all holders of Claims entitled to vote, sufficient time was prescribed for such parties to accept or reject the Third Amended Plan, and the Solicitation Materials used and Solicitation Procedures followed comply with sections 1125 and 1126, thereby satisfying the requirements of Bankruptcy Rule 3018.  Further, the Chapter 11 Trustee filed the Ballot Tabulation in accordance with the provisions of the Solicitation Order.

T.     *Burden of Proof*.  The Chapter 11 Trustee, as proponent of the Plan, has the burden of proving the elements of sections 1122, 1123 and 1129 of the Bankruptcy Code by a preponderance of the evidence.  The Court finds that the Chapter 11 Trustee has met each element of such burden with respect to the Plan.

U.     *Judicial Notice*.  The Court takes judicial notice of the entire record of proceedings in the Chapter 11 Cases and related adversary proceedings, including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Court during the Chapter 11 Cases and related adversary proceedings, including, without limitation, the Combined Hearing.  Any resolutions of objections to final approval of the Disclosure Statement or confirmation of the Plan explained on the record at the Combined Hearing are hereby incorporated by reference.

V.     *The Record*.  The record established at the Combined Hearing (the "Record") to support final approval of the Disclosure Statement and confirmation of the Plan includes:

(i)     All documents identified by the Chapter 11 Trustee at the Combined Hearing and all exhibits admitted into evidence at the Combined Hearing, including but not limited to admitted exhibits which are listed on the *Joint*

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-6   Filed 05/06/25   Page 691 of 1017   PageID 14318
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 563 of 1803   PageID 11309
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 13 of 229

> *Witness and Exhibit List* [Docket No. 767] filed jointly by the Chapter 11 Trustee, Highland and HCLOF with the Court on December 7, 2018;

(ii)   The Ballot Tabulation;

(iii)   The testimony of witnesses; and

(iv)   The statements and arguments of counsel.

W.   <u>Objections to Final Approval of Disclosure Statement and Confirmation of Plan</u>.

The Solicitation Order established November 26, 2018 as the deadline for filing objections to final approval of the Disclosure Statement and/or confirmation of the Plan. The following objections to final approval of the Disclosure Statement and/or confirmation of the Plan (the "<u>Objections</u>") were timely filed in accordance with the Solicitation Order:

(i)   *Objection by Stinson Leonard Street LLP to Debtors' Second Modification to the Third Amended Joint Plan* [Docket No. 720];

(ii)   *Joint Objection of Highland Capital Management, L.P. and Highland CLO Funding, Ltd. to Final Approval of Disclosure Statement and to Confirmation of the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* [Docket no. 722]; and

(iii)   *Objection of Neutra Ltd. to Final Approval of Disclosure Statement and to Confirmation of the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* [Docket No. 723].

X.   <u>Transfer and Vesting of Assets</u>. Pursuant to Article VI of the Plan, all Assets shall be transferred to and vested in the Reorganized Debtor as of the Effective Date. The transfer of the Assets to the Reorganized Debtor pursuant to the Plan is consistent with, and authorized by, section 1123(a)(5)(B) of the Bankruptcy Code and will be fully effectuated through this Order as of the Effective Date without the necessity of any other or further assignment or transfer.

Y.   <u>Claim Objections and Resolutions</u>. Pursuant to the Plan, the Reorganized Debtor has the sole power and exclusive standing and authority to object to any Claim. Without limiting the generality of the foregoing, the Reorganized Debtor shall have the power: (i) to

---

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit    Filed 05/05/25    Page 692 of 1017    PageID 14319
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 564 of 1803    PageID 11310
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 14 of 229

object to any Claim on any legal or equitable basis; (ii) to seek subordination of any Claim on any legal or equitable basis; (iii) to assert any right of setoff or recoupment, including without limitation, any such right pursuant to section 553 of the Bankruptcy Code; (iv) to assert any and all Estate Defenses to any Claim, whether legal or equitable, including any affirmative defenses or any right of setoff; (v) to assert all Estate Claims as a counterclaim against any Claim, whether arising out of the same or different transactions, both for an affirmative recovery and as an offset against any such Claim; and (vi) to object to any Claims on the basis of section 502(d). Vesting such exclusive power and standing in the Reorganized Debtor is reasonable and appropriate, and is authorized by, and in compliance with, section 1123(b)(3) of the Bankruptcy Code.

Z.    _Compliance with the Requirements of Section 1129 of the Bankruptcy Code_. The Plan complies with the applicable provisions of the Bankruptcy Code, as follows:

(i)    _Section 1129(a)(1) – Compliance of the Plan with the Applicable Provisions of the Bankruptcy Code_.  The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123.

(a)    _Sections 1122 and 1123(a)(1) – Proper Classification_.  The classification of Claims and Interests in the Plan is proper under the Bankruptcy Code. Pursuant to sections 1122(a) and 1123(a)(1), the Plan provides for the separate classification of Claims and Interests into six (6) Classes (Class 1, Class 2, Class 3, Subclass 4A, Subclass 4B and Class 5), based on differences in the legal nature and priority of such Claims and Interests (other than Claims for Administrative Expenses, Priority Tax Claims and U.S. Trustee's quarterly fees, which are not required to be designated as separate Classes pursuant to section 1123(a)(1)).  Based upon the Record, valid business, factual and legal reasons exist for the separate classification of the various Classes of Claims and Interests created under the Plan, the classifications were not created for any improper purpose and the creation of such Classes

Appellee Appx. 00558
Appx. 00800
013371

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit   Filed 06/23 1804   Page 693 of 1017   PageID 14320
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 565 of 1803   PageID 11311
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 15 of 229

does not unfairly discriminate between or among holders of Claims or Interests. In accordance with section 1122(a), each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class. Accordingly, the requirements of sections 1122(a) and 1123(a)(1) of the Bankruptcy Code have been satisfied.

(b)      _Section 1123(a)(2) – Specification of Unimpaired Classes_. The Plan specifies that Claims in Class 1 are unimpaired under the Plan. Therefore, the requirements of section 1123(a)(2) of the Bankruptcy Code have been satisfied.

(c)      _Section 1123(a)(3) – Specification of Treatment of Impaired Classes_. Other than Class 1, all Classes of Claims and Interests (Class 2, Class 3, Subclass 4A, Subclass 4B and Class 5) are Impaired under the Plan. The Plan specifies the treatment of each Impaired Class of Claims and Interests under the Plan. The treatment of Impaired Classes of Claims and Interests is specified in Article IV of the Plan. Therefore, the requirements of section 1123(a)(3) of the Bankruptcy Code have been satisfied.

(d)      _Section 1123(a)(4) – No Discrimination_. The Plan provides for the same treatment for each Claim or Interest in each respective Class unless the holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest. Therefore, the requirements of section 1123(a)(4) of the Bankruptcy Code have been satisfied.

(e)      _Section 1123(a)(5) – Adequate Means for Plan Implementation_. The Plan provides for adequate and proper means for the Plan's implementation. This includes means for implementation set forth in Article VI of the Plan. Therefore, the requirements of section 1123(a)(5) of the Bankruptcy Code have been satisfied.

(f)      _Section 1123(a)(6) – Prohibition on Issuance of Non-Voting Securities_. The Debtors are not corporations. Therefore, section 1123(a)(6) of the Bankruptcy Code is inapplicable.

(g)      _Section 1123(a)(7) – Selection of Officers, Directors and Trustees_. Under the Plan, Terry shall receive 100% of the equity interests in the Reorganized Debtor. The

Appellee Appx. 00559
Appx. 00559
013372

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1567 of 1804   Page 694 of 1017   PageID 14321
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 566 of 1803   PageID 11312
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 16 of 229

Plan does not provide for the selection or appointment of any officers or directors of the Reorganized Debtor as of the Effective Date and Terry, as the sole owner of the Reorganized Debtor, shall be free to structure the Reorganized Debtor's management as he wishes. Therefore, to the extent section 1123(a)(7) of the Bankruptcy Code is applicable to the Plan, its requirements have been satisfied.

    (h)    *Section 1123(a)(8) – Payment of Individual Debtor's Earnings*. The Debtors are not individuals. Therefore, section 1123(a)(8) of the Bankruptcy Code is inapplicable.

    (i)    *Section 1123(b) – Discretionary Contents of the Plan*. The Plan contains various provisions that are properly construed as discretionary and not required for confirmation of the Plan under the Bankruptcy Code. As set forth below, all such discretionary provisions comply with section 1123(b) of the Bankruptcy Code, are not inconsistent with the applicable provisions of the Bankruptcy Code and are hereby approved. Therefore, section 1123(b) of the Bankruptcy Code has been satisfied.

    (1)    *Section 1123(b)(1) – Impairment / Unimpairment of Claims and Interests*. The Plan impairs or leaves unimpaired each Class of Claims and Interests. Therefore, the Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

    (2)    *Section 1123(b)(2) – Assumption / Rejection of Executory Contracts and Unexpired Leases*. Article XI of the Plan provides that all of the Debtors' Executory Contracts and Unexpired Leases shall be deemed rejected upon the Effective Date unless an Executory Contract or Unexpired Lease (a) has been previously assumed or rejected pursuant to an order of the Court, (b) is identified in **Exhibit 5** to this Order to be (i) assumed or (ii) assumed and assigned, or (c) is the subject of a motion to assume filed on or before the Confirmation Date. Therefore, the Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-11b6    Filed 05/06/25 1804    Page 695 of 1017    PageID 14322
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 567 of 1803    PageID 11313
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 17 of 229

(3)    _Section 1123(b)(3) – Settlement / Retention of Claims and Causes of Action_.  The Chapter 11 Trustee has delineated the Estate Claims and Estate Defenses to be retained in the Plan.  The terms "Estate Claims" and "Estate Defenses" are defined in sections 1.55 and 1.56 of the Plan, respectively, and together include all claims, causes of action, defenses, affirmative defenses, counterclaims, or offsets held by the Debtors' Estate.  The identification and retention of the Estate Claims and Estate Defenses in the Plan is reasonable and appropriate and reflects a proper exercise of the good faith business judgment of the Chapter 11 Trustee.  Articles VI and IX of the Plan, including Exhibit A to the Plan, contain a specific and unequivocal reservation of Estate Claims and Estate Defenses as required under applicable Fifth Circuit authority.  The Estate Claims and Estate Defenses are expressly, specifically, and unequivocally retained and reserved pursuant to Articles VI and IX of the Plan (including Exhibit A to the Plan) in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.  Unless otherwise expressly stated in the Plan or this Order, all Estate Claims and Estate Defenses are hereby reserved for the benefit of the Reorganized Debtor and the Reorganized Debtor shall be entitled to file, prosecute and/or settle each of the Estate Claims so reserved in accordance with the terms of the Plan.  The provisions of the Plan regarding reservation of Estate Claims and Estate Defenses are appropriate and in the best interests of the Debtors, the Estate, and holders of Claims and Interests.

(4)    _Section 1123(b)(5) – Modification of Creditors' Rights_.  With the exception of holders of Class 1 Claims, which are unimpaired, the Plan modifies the rights of all holders of Claims against the Debtors.  Accordingly, the Plan is consistent with section 1123(b)(5) of the Bankruptcy Code.

(ii)    _Section 1129(a)(2) – Compliance of the Chapter 11 Trustee with the Applicable Provisions of the Bankruptcy Code_.  The Chapter 11 Trustee, as proponent of the Plan, has complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, 1127 and

Appellee Appx. 00561
Appx. 00812
013374

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/25/24    Page 696 of 1017    PageID 14323
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 568 of 1803    PageID 11314
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 18 of 229

1128 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018 and 3019.  Votes to accept or reject the Third Amended Plan were solicited after the Court conditionally approved the adequacy of the Disclosure Statement.  The Chapter 11 Trustee and his present and former representatives, advisors, attorneys, professionals and agents have solicited and tabulated the votes on the Third Amended Plan and have participated in the activities described in section 1125 of the Bankruptcy Code fairly and in good faith within the meaning of section 1125(e) of the Bankruptcy Code, and in a manner consistent with the applicable provisions of the Solicitation Order, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws and regulations, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.  The Chapter 11 Trustee and his present and former representatives, advisors, attorneys, professionals and agents have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with respect to the offering, issuance and distribution of recoveries under the Plan and, therefore, are not (and on account of such distributions, will not be) liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Third Amended Plan or distributions made pursuant to the Plan, so long as distributions are made consistent with and pursuant to the Plan.

(iii)    *Section 1129(a)(3) – Proposal of the Plan in Good Faith*.  The Chapter 11 Trustee has proposed the Plan (and all other agreements, documents and instruments necessary to effectuate the Plan) in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  In determining that the Plan has been proposed in good faith, the Court has examined and considered the totality of the circumstances surrounding the formulation of the Plan, including both the Record at the Combined Hearing and the record of the Chapter 11 Cases.  The Chapter 11 Trustee's good faith is evident from the facts and Record of the Combined Hearing.  The Chapter 11 Trustee proposed the Plan for legitimate and honest purposes.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/06/25   Page 697 of 1017   PageID 14324
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 569 of 1803   PageID 11315
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 19 of 229

(iv)     _Section 1129(a)(4) – Court Approval of Certain Payments as Reasonable_.
All payments made or to be made by the Reorganized Debtor for services or for costs and
expenses in or in connection with the Chapter 11 Cases or in connection with the Plan and
incident to the Chapter 11 Cases, have either been approved by, or are subject to final approval
of, the Court as reasonable.  Notwithstanding anything to the contrary in the Plan, the provisions
of section 3.01(e) of the Plan governing the filing of final fee applications by Estate
Professionals and allowance of Administrative Expense Claims of Estate Professionals apply to
the Chapter 11 Trustee.  Compensation sought by the Chapter 11 Trustee through a final fee
application shall be subject to final approval of the Court as reasonable in accordance with
section 330(a)(3) of the Bankruptcy Code.  Therefore, the requirements of section 1129(a)(4) of
the Bankruptcy Code are satisfied.

(v)      _Section 1129(a)(5) – Disclosure of Identity of Proposed Management,_
_Compensation of Insiders and Consistency of Management Proposals with the Interests of_
_Creditors and Public Policy_.  Under the Plan, Terry, who does not constitute an Insider, shall
receive 100% of the equity interests in the Reorganized Debtor.  The Plan does not provide for
appointment of any officers or directors of the Reorganized Debtor as of the Effective Date and
Terry, as the sole owner of the Reorganized Debtor, shall be free to structure the Reorganized
Debtor's management as he wishes.  Terry's identity and affiliations have been fully disclosed
and, to the extent that Terry serves as an officer of the Reorganized Debtor after confirmation of
the Plan, Terry's appointment to any such role is consistent with the interests of Creditors,
holders of Interests and public policy.  Therefore, the requirements of section 1129(a)(5) of the
Bankruptcy Code are satisfied.

(vi)     _Section 1129(a)(6) – No Rate Changes_.  The Plan does not contain any
rate changes subject to the jurisdiction of any governmental regulatory commissions and will not
require governmental regulatory approval.  Therefore, section 1129(a)(6) is not applicable to the
Chapter 11 Cases.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/02/25   Page 698 of 1017   PageID 14325
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 570 of 1803   PageID 11316
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 20 of 229

(vii)     _Section 1129(a)(7) – Best Interest of Creditors Test_.  The Plan satisfies section 1129(a)(7).  The Liquidation Analysis attached as Exhibit 4 to the Disclosure Statement and the other exhibits and evidence proffered or adduced at the Combined Hearing related thereto: (a) are persuasive and credible; (b) have not been controverted by other evidence; (c) are based upon sound methodology; and (d) conclusively establish that each holder of an Impaired Claim or Interest either (1) has accepted the Plan, or (2) will receive or retain under the Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

(viii)     _Section 1128(a)(8) – Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of Plan by Each Impaired Class_.  Class 1 is unimpaired under the Plan and is conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Classes 2 and 3 are Impaired under the Plan and have voted to accept the Plan.  Class 4 is Impaired under the Plan and voted to reject the Plan.  Class 5 is Impaired under the Plan.  Holders of Class 5 Interests will not receive or retain any property on account of their Interests under the Plan and are therefore conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Notwithstanding the fact that the Plan was not accepted by all Classes of Impaired Claims and Interests, the Plan is confirmable because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

(ix)     _Section 1129(a)(9) – Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code_.  The treatment of Allowed Claims for Administrative Expenses and Priority Tax Claims under Article III of the Plan satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.  Accordingly, the requirements of section 1129(a)(9) are satisfied.

(x)     _Section 1129(a)(10) – Acceptance by at Least One Impaired Class_.  As set forth in the Ballot Tabulation and in this Order, Classes 2 and 3 voted to accept the Plan.  As

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 56-6    Filed 07/26/25    Page 699 of 1017    PageID 14326
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 571 of 1803    PageID 11317
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 21 of 229

such, at least one Class of Claims that is Impaired under the Plan has accepted the Plan without including the acceptance of the Plan by any Insider.  Therefore, the requirements of section 1129(a)(10) of the Bankruptcy Code have been satisfied.

      (xi)     _Section 1129(a)(11) – Feasibility of the Plan_.  The evidence submitted at the Combined Hearing regarding feasibility, together with all evidence proffered or advanced at or prior to the Combined Hearing, (a) is persuasive and credible, (b) has not been controverted by other evidence, and (c) establishes that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Reorganized Debtor.  Accordingly, the requirements of section 1129(a)(11) of the Bankruptcy Code have been satisfied.

      (xii)     _Section 1129(a)(12) – Payment of Bankruptcy Fees_.  The Plan provides that all fees due and payable under 28 U.S.C. section 1930 as of the Confirmation Date will be paid in full on the Effective Date or as soon thereafter as is practicable, thus satisfying the requirements of section 1129(a)(12) of the Bankruptcy Code.

      (xiii)     _Section 1129(a)(13), (14), (15) and (16) – Non-Applicability_.  The Debtors do not provide any retiree benefits within the meaning of section 1114, do not owe any domestic support obligations, are not individuals, and are not non-profit corporations.  Thus, sections 1129(a)(13), 1129(a)(14), 1129(a)(15) and 1129(a)(16) do not apply to the Chapter 11 Cases.

      (xiv)     _Section 1129(b) – Confirmation of the Plan Over Non-Acceptance of Impaired Classes_.  Class 4 is Impaired under the Plan and voted to reject the Plan.  Holders of Class 5 Interests are deemed to have rejected the Plan.  Nevertheless, the Plan may be confirmed pursuant to section 1129(b) of the Bankruptcy Code notwithstanding that the requirements of section 1129(a)(8) have not been met because the Chapter 11 Trustee has demonstrated by a preponderance of the evidence that the Plan (a) satisfies all of the other requirements of section 1129(a) of the Bankruptcy Code and (b) does not "discriminate unfairly" and is "fair and equitable" as to each Impaired Class which has not voted to accept (or is

**Appellee Appx. 00565**

**013378**

Appx. 00816

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 07/30/25    Page 700 of 1017    PageID 14327
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 572 of 1803    PageID 11318
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 22 of 229

deemed to reject) the Plan.  The Plan therefore satisfies the requirements of section 1129(b) of the Bankruptcy Code and may be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

(xv)    *Section 1129(c) – Only One Plan*.  Other than the Plan (including previous versions thereof), no other plan has been filed in the Chapter 11 Cases.  Accordingly, the requirements of section 1129(c) of the Bankruptcy Code are satisfied.

(xvi)    *Section 1129(d) – Principal Purpose of the Plan is Not the Avoidance of Taxes*.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of application of Section 5 of the Securities Act of 1933 and there has been no filing by a Governmental Unit asserting any such attempted avoidance.  Therefore, the requirements of section 1129(d) of the Bankruptcy Code are satisfied.

(xvii)    *Section 1129(e) – Small Business Case*.  Neither of the Chapter 11 Cases is a "small business case," as that term is defined in the Bankruptcy Code and, accordingly, section 1129(e) is inapplicable to the Chapter 11 Cases.

AA.    *Executory Contracts and Unexpired Leases*.  The Chapter 11 Trustee has satisfied the provisions of section 365 of the Bankruptcy Code with respect to the assumption and rejection of the Executory Contracts and Unexpired Leases pursuant the Plan.  The Chapter 11 Trustee has exercised reasonable business judgment prior to the Combined Hearing in determining whether to assume or reject each of the Executory Contracts and Unexpired Leases as set forth in Article XI of the Plan, **Exhibit "5"** to this Order, or otherwise.  Each assumption or rejection of an Executory Contract or Unexpired Lease pursuant to this Order and in accordance with Article XI of the Plan, or otherwise by order of this Court, shall be valid, legal, and binding upon the applicable Debtor, Reorganized Debtor, Estate, and all non-Debtor persons or entities party to such Executory Contract or Unexpired Lease.  Executory Contracts and Unexpired Leases not previously assumed by order of this Court and which the Chapter 11 Trustee has determined to assume are identified in **Exhibit "5"** to this Order.

Appellee Appx. 00566
Appx. 06817
013379

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 574 of 1804   Page 701 of 1017   PageID 14328
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 573 of 1803   PageID 11319
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 23 of 229

Because no defaults exist under the Executory Contracts and Unexpired Leases identified in

**Exhibit "5"** to this Order, the Chapter 11 Trustee is not required to make any cure payments,

provide any other compensation, cure any nonmonetary defaults, or provide adequate

assurance of future performance under section 365(b) of the Bankruptcy Code as a condition to

the assumption of such Executory Contracts and Unexpired Leases.

BB.    *Compromise and Settlement*.  The Court finds and concludes that, pursuant to

section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration of

the Distributions and other benefits provided under the Plan, the provisions of the Plan

constitute a good faith compromise and settlement of all Impaired Claims and Interests.  Such

settlement and compromise, which was made at arms'-length in exchange for good and

valuable consideration, is in the best interests of the holders of Impaired Claims and Interests, is

within the range of possible litigation outcomes, and is fair, equitable, and reasonable.  Each

element of the compromise and settlement reflected in the Plan is integrated and inexorably

linked.

CC.    *Plan Injunction*.  The Plan Injunction is necessary and appropriate to facilitate the

transactions and distributions to Creditors pursuant to the Plan.  The Plan Injunction constitutes

an essential and integral part of the Plan without which the holders of Claims against the

Debtors could potentially interfere with implementation and performance of the Plan.  The Plan

Injunction protects the best interests of the holders of Allowed Claims and facilitates the efficient

performance of the Plan.  Consequently, the Plan Injunction is appropriate pursuant to sections

105(a) and 1123(a)(5) of the Bankruptcy Code.

DD.    *Temporary Plan Injunction*.  The Temporary Plan Injunction (as defined herein) is

a temporary injunction which provides for the continuation, after the Effective Date, of injunctive

relief the Court previously granted in its *Preliminary Injunction Order* (the "Preliminary

Injunction") [Docket No. 21 in Adversary No. 18-03212-sgj] entered on July 10, 2018 in the

Trustee's Adversary.  The Preliminary Injunction was originally set to expire by its own terms

---

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/02/25   Page 702 of 1017   PageID 14329
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 574 of 1803   PageID 11320
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 24 of 229

upon confirmation of the Plan, but is extended by this Order through the Effective Date of the Plan. Based on the record of prior proceedings in the Chapter 11 Cases, including in the Trustee's Adversary, and the Record at the Combined Hearing, no grounds have been shown to give the Court reason to reconsider any findings supporting its prior Preliminary Injunction. Furthermore, as set forth below, the Record at the Combined Hearing demonstrates that the four elements required for issuance of injunctive relief are present, the Temporary Plan Injunction is necessary and appropriate in all respects, and it complies with the applicable requirements of the Bankruptcy Rules.

(i)     *Substantial Likelihood of Success on the Merits*.  In the Highland Adversary, the Chapter 11 Trustee has asserted a counterclaim seeking to avoid the prepetition transfer of Acis LP's rights under the ALF PMA (the "ALF PMA Transfer") as a fraudulent transfer under the Bankruptcy Code and the Texas Uniform Fraudulent Transfer Act.  Such fraudulent transfer actions seek an equitable remedy and involve claims to specific assets of Highland HCF.  But for the ALF PMA Transfer, HCLOF could not have attempted to direct and effectuate an optional redemption of the Acis CLOs (which it has twice attempted to do postpetition in the Chapter 11 Cases).  The rights transferred in the ALF PMA Transfer appear to have been fraudulently transferred for no apparent value.  The Court found in the Preliminary Injunction, and the Court finds again for purposes of this Order, that the Chapter 11 Trustee has demonstrated a substantial likelihood of success on the merits of his claim to avoid the ALF PMA Transfer as a fraudulent transfer.

(ii)     *Irreparable Harm*.  Revenue to be generated by the Reorganized Debtor under the PMAs is a primary source of funding Distributions to Creditors under the Plan.  Absent the Temporary Plan Injunction, HCLOF will be free to direct an optional redemption before this Court can adjudicate the fraudulent transfer actions with respect to the ALF PMA Transfer. Such an optional redemption – or similar call or liquidation of the Acis CLOs – would not only render such fraudulent transfer actions moot, but would effectively terminate and destroy all

Appellee Appx. 00568
Appx. 00819
013381

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit    Page 576 of 1804    Page 703 of 1017    PageID 14330
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 575 of 1803    PageID 11321
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 25 of 229

value in the PMAs.  This would, in turn, effectively destroy the Reorganized Debtor's ability to perform under the Plan to the detriment of the Reorganized Debtor, Creditors and other parties-in-interest.  Consequently, the Reorganized Debtor faces immediate and irreparable harm if the Temporary Plan Injunction is not issued.

      (iii)    *Balance of Harms*.  The balance of harms weighs in favor of issuing the Temporary Plan Injunction because any alleged harm to HCLOF, Highland or their affiliates is substantially outweighed by the imminent and irreparable harm that would be suffered by the Reorganized Debtor, Creditors and other parties-in-interest if the Temporary Plan Injunction is not issued and an optional redemption, call or other liquidation of the Acis CLOs follows.  At a minimum, the Temporary Plan Injunction is appropriate to maintain the status quo pending adjudication of the fraudulent transfer actions with respect to the ALF PMA Transfer.  Highland, HCLOF and their affiliates will not suffer any material, recognizable harm if temporarily enjoined from pursuing an optional redemption, call or other liquidation of the Acis CLOs before the Court adjudicates the fraudulent transfer actions concerning the ALF PMA Transfer and thereby determines whether HCLOF has any legitimate right to direct an optional redemption, call or other liquidation of the Acis CLOs in the first instance.

      (iv)    *Public Policy*.  Public policy favors maximization of a debtor's assets and successful reorganization.  Because an optional redemption, call or other liquidation of the Acis CLOs would destroy the value of the PMAs and the Reorganized Debtor's ability to perform under the Plan, issuance of the Temporary Plan Injunction is consistent with public policy.  Furthermore, public policy favors disposition of cases on their merits.  Absent the Temporary Plan Injunction, HCLOF could be expected to immediately direct an optional redemption, call or other liquidation of the Acis CLOs following confirmation of the Plan, thus rendering the fraudulent transfer actions concerning the ALF PMA Transfer moot.  Issuance of the Temporary Plan Injunction will avoid the potential for such fraudulent transfer actions being mooted prior to adjudication of such actions on their merits and is consistent with public policy.

Appellee Appx. 00569
Appx. 00829
013382

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-116   Page 576 of 1804   Page 704 of 1017   PageID 14331
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 576 of 1803   PageID 11322
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 26 of 229

(v)      _Section 105(a)_.  Section 105(a) empowers this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).  The Temporary Plan Injunction is essential to the Reorganized Debtor's ability to perform the Plan and to maintain the status quo during prosecution of the fraudulent transfer actions concerning the ALF PMA Transfer.  The Temporary Plan Injunction is therefore both necessary and appropriate to carry out the provisions of the Bankruptcy Code in the Chapter 11 Cases.

(vi)     _Compliance with Technical Requirements_.  Bankruptcy Rule 3020(c) requires that the Temporary Plan Injunction (a) describe the acts enjoined in reasonable detail; (b) be specific in its terms with regard to the injunction; and (c) identify the entities subject thereto.  The Temporary Plan Injunction satisfies each of these requirements.  The description of acts enjoined is specific and particular and the language of the Temporary Plan Injunction is therefore reasonably detailed.  The Temporary Plan Injunction is also specific in its terms, as its language clearly describes the condition triggering the injunction and the specific events which will serve to terminate it.  The Temporary Plan Injunction also specifically identifies the entities subject to its terms.  Federal Rule of Civil Procedure 65(d)(1), made applicable by Bankruptcy Rule 7065, also requires that the Temporary Plan Injunction be specific in its terms and describe the enjoined acts in reasonable detail.  Federal Rule of Civil Procedure 65(d)(1) further requires that the reasons for issuance of the Temporary Plan Injunction are stated.  The reasons for this Court's issuance of the Temporary Plan Injunction are stated herein.  Therefore, the Temporary Plan Injunction satisfies all requirements of the applicable Bankruptcy Rules.

EE.     _Substantive Consolidation of the Debtors_.  The Court finds and concludes that the substantive consolidation of the Debtors for the purpose of implementing the Plan, including for purposes of distributions under the Plan, is in the best interests of the Debtors, the Estate, and holders of Claims and Interests.  Substantive consolidation recognizes the Debtors' common business purpose and the fact that Acis GP's liability is derived from the liabilities of

Appellee Appx. 00570
Appx. 00821
013383

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/03/25   Page 705 of 1017   PageID 14332
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 577 of 1803   PageID 11323
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 27 of 229

Acis LP based on Acis GP's status as general partner of Acis LP.  The Court further finds that substantive consolidation of the Debtors constitutes an integral part of the Plan.

FF.     *Retention of Jurisdiction*.  This Court finds and concludes that this Court's retention of jurisdiction as set forth herein and in the Plan comports with 28 U.S.C. sections 157 and 1334.  Consequently, the Court may properly retain jurisdiction over the matters set forth in Article XV of the Plan.

GG.     *Implementation of Other Necessary Documents and Agreements*.  All documents and agreements necessary to implement the Plan are essential elements of the Plan and entry into and consummation of the transactions contemplated by each of such documents and agreements is in the best interests of the Debtors, the Estate, and holders of Claims and Interests.  The Chapter 11 Trustee has exercised reasonable business judgment in determining which agreements to enter into and has provided sufficient and adequate notice of such documents and agreements.  The terms and conditions of such documents and agreements have been negotiated in good faith, at arm's length, are fair and reasonable, and are reaffirmed and approved.

HH.     *Conditions Precedent to the Effective Date*.  Each of the conditions precedent to the Effective Date, as set forth in Article XIII of the Plan, has been satisfied or waived in accordance with the provisions of the Plan, or is reasonably likely to be satisfied or waived.

II.     *Satisfaction of Confirmation Requirements*.  Based upon the foregoing, all other filed pleadings, exhibits and documents filed in connection with confirmation of the Plan and all evidence and arguments made, proffered, or adduced at the Combined Hearing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

## ORDER

Based on the foregoing, it is hereby ORDERED:

1.     Findings of Fact and Conclusions of Law.  The above-referenced findings of fact and conclusions of law are incorporated by reference as though fully set forth herein.  To the

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/06/25   Page 706 of 1017   PageID 14333
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 578 of 1803   PageID 11324
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 28 of 229

extent any of the prior findings of fact or conclusions of law constitutes an order of this Court, they are adopted as such.

2.    <u>Objections to Final Approval of Disclosure Statement and Confirmation of Plan</u>. To the extent that any of the Objections have not been resolved, withdrawn, waived or settled prior to entry of this Order or otherwise resolved as stated on the Record of the Combined Hearing or as set forth in this Order, they are hereby overruled on their merits.

3.    <u>Final Approval of Disclosure Statement</u>. The Disclosure Statement is hereby approved on a final basis as containing adequate information as required by section 1125 of the Bankruptcy Code.

4.    <u>Confirmation of Plan</u>. All requirements for confirmation of the Plan have been satisfied. The Third Amended Plan, as modified by the First Modification and Second Modification (as supplemented) and as modified herein, is hereby CONFIRMED in accordance with section 1129 of the Bankruptcy Code, and all terms and conditions set forth in the Plan are hereby APPROVED. The terms of the Plan are incorporated by reference into, and as an integral part of, this Order.

5.    <u>Solicitation and Notice</u>. Notice of the Combined Hearing complied with the terms of the Solicitation Order, was appropriate and satisfactory based on the circumstances of the Chapter 11 Cases and was in compliance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules. The solicitation of votes on the Third Amended Plan and the Solicitation Materials complied with the Solicitation Procedures, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and was in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

6.    <u>Plan Classification Controlling</u>. The terms of the Plan shall solely govern the classification of Claims and Interests for purposes of distributions to be made thereunder. The classifications set forth on the Ballots tendered to or returned by the Holders of Claims in connection with voting on the Plan: (a) were set forth thereon solely for purposes of voting to

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/25   Page 707 of 1017   PageID 14334
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 579 of 1803   PageID 11325
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 29 of 229

accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims under the Plan for distribution purposes; (c) may not be relied upon by any holder of a Claim as representing the actual classification of such Claim under the Plan for distribution purposes; and (d) shall not be binding upon the Debtors and the Reorganized Debtor except for voting purposes.

7.    <u>Resolution of Stinson Objection</u>.   Stinson Leonard Street LLP ("<u>Stinson</u>") has asserted a Claim against the Debtors for $158,552.98.  On July 31, 2018, Stinson initially asserted its Claim as an unsecured Claim by filing proof of Claim number 12 in the Acis LP case and proof of claim number 2 in the Acis GP case.  Those Claims represent a single Claim for satisfaction of a total alleged debt of $158,552.89.  All proofs of Claim filed by Stinson will be referred to collectively as the "<u>Stinson Claim</u>."  The Stinson Claim is treated as part of Class 3 under the Plan.  On November 9, 2018, Stinson amended the Stinson Claim to assert a secured Claim based on a possessory lien on legal files belonging to the Debtors.  The Chapter 11 Trustee currently intends to object to the Stinson Claim, including Stinson's claim to secured status.  Stinson filed an Objection to the Plan on November 26, 2018 [Docket No. 720] which was subsequently withdrawn based on this proposed paragraph being included in any Order confirming the Plan.  This paragraph resolves Stinson's Objection as follows:  Notwithstanding any contrary provision of the Plan or this Order, the Stinson Claim, to the extent it is Allowed by a Final Order of the Bankruptcy Court as a Secured Claim, shall be considered a separate class under the Plan and paid by the Reorganized Debtor within thirty (30) days after entry of such Final Order.  To the extent it is an Allowed Secured Claim, the Stinson Claim will be removed from Class 3.  To the extent it is an Allowed General Unsecured Claim, the Stinson Claim will remain a Class 3 Claim.  This recognizes that the Stinson Claim may be allowed as partly secured (*i.e.* only secured to the extent of the value of its collateral) and be paid accordingly. The Chapter 11 Trustee reserves all rights to object to Stinson's proofs of Claim, and Stinson reserves all rights to defend its proofs of Claim.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/02/25   Page 708 of 1017   PageID 14335
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 580 of 1803   PageID 11326
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 30 of 229

8.      <u>Plan Implementation</u>.  Upon the Effective Date of the Plan, the Chapter 11

Trustee and the Reorganized Debtor are hereby authorized and directed to take all actions

necessary or appropriate to implement, effectuate or consummate the Plan, the terms of this

Order and the transactions respectively contemplated therein, and to otherwise fully perform

and execute their duties under the Plan or this Order.  Without limiting the generality of the

foregoing, pursuant to section 1142(b) of the Bankruptcy Code, each and every Person

(including, without limitation, the Chapter 11 Trustee, HCLOF, Highland, any and all affiliates of

HCLOF and Highland, the Issuers and Co-Issuers, and the Indenture Trustee), to the extent

necessary, is hereby directed to execute or deliver, or to join in the execution or delivery of, any

instrument required to effect the transfers of property dealt with under the Plan and this Order,

and to perform all other acts necessary for the consummation of the Plan.  Further pursuant to

section 1142(b) of the Bankruptcy Code, to the extent that any Person fails to execute or deliver

any instrument required to effect the transfers of property pursuant to the Plan and this Order,

the Chapter 11 Trustee is hereby authorized to execute and deliver on behalf of any such

Person (including, without limitation, HCLOF, Highland, and any and all affiliates of HCLOF and

Highland) any instrument required to effect the transfers of property pursuant to the Plan and

this Order.  In the event of an appeal of this Order, the Chapter 11 Trustee and the Reorganized

Debtor are hereby authorized and directed to take all steps necessary to make the Plan

effective and, from and after the Effective Date, execute their duties, responsibilities and

obligations under the Plan, this Order and the Plan Documents unless and until this Order is

stayed by order of a court of appropriate jurisdiction.

9.      <u>Restructuring Transactions</u>.  On the Effective Date or as soon as reasonably

practicable thereafter, the Reorganized Debtor may take all actions as may be necessary or

appropriate to effect any transaction described in, approved by, contemplated by, or necessary

to effectuate the Plan; <u>provided</u>, <u>however</u>, that no such restructuring transactions may violate

the terms of any assumed Executory Contract or Unexpired Lease.

Appellee Appx. 00574
Appx. 00625
013387

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/26/25   Page 709 of 1017   PageID 14336
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 581 of 1803   PageID 11327
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 31 of 229

10.     Approval of Plan Documents.  The form and substance of the Plan Documents
are all hereby APPROVED.  The Chapter 11 Trustee is authorized and directed, without the
need for further corporate or other organizational action by or on behalf of the Debtors or further
order or authorization of this Court, to take such actions and do all things as may be necessary
or required to implement and effectuate the Plan Documents and to make the Plan effective.

11.     Transfer and Vesting of Assets; Assumption of Obligations.  On the Effective
Date, without the execution of any other or further document or any further order by the Court,
all Assets shall be deemed as fully, completely and irrevocably transferred to, and vested in, the
Reorganized Debtor in accordance with the Plan.  All transfers of Assets to the Reorganized
Debtor shall be free and clear of all Liens, Claims, rights, Interests and charges, except as
otherwise expressly provided in the Plan or any agreement, instrument, or other document
incorporated therein, or this Order.  Upon the Effective Date, the Reorganized Debtor shall be
deemed to have assumed the obligations to make all Distributions pursuant to the Plan and this
Order.

12.     Estate Claims and Estate Defenses.  Upon the Effective Date, without the
necessity of the execution of any further documents or further order of the Court, all Estate
Claims and Estate Defenses, including without limitation all Estate Claims and Estate Defenses
identified in Exhibit A to the Plan, shall be deemed as fully, completely and irrevocably
transferred to, and vested in, the Reorganized Debtor.  From and after the Effective Date, the
Reorganized Debtor shall have the exclusive standing and authority to assert, prosecute,
collect, compromise and settle all Estate Claims and Estate Defenses pursuant to the terms of
the Plan.

13.     Treatment of Executory Contracts and Unexpired Leases.  The Executory
Contract and Unexpired Lease provisions of Article XI of the Plan, as modified herein, are
hereby approved in their entirety.  The assumption of Executory Contracts and Unexpired
Leases as set forth in the Plan, this Order, and **Exhibit "5"** to this Order are hereby approved.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1    Filed 03/07/25    Page 710 of 1017    PageID 14337
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 582 of 1803    PageID 11328
Case 18-30264-sgj11  Doc 829  Filed 01/31/19    Entered 01/31/19 17:34:06    Page 32 of 229

Because no defaults exist under the Executory Contracts and Unexpired Leases identified in

**Exhibit "5"** to this Order, the Chapter 11 Trustee is not required to make any cure payments,

provide any other compensation, cure any nonmonetary defaults, or provide adequate

assurance of future performance under section 365(b) of the Bankruptcy Code as a condition to

the assumption of such Executory Contracts and Unexpired Leases.  All other Executory

Contracts and Unexpired Leases that have not been previously assumed or rejected shall be

deemed as rejected as of the Effective Date in accordance with the terms of the Plan.  All

Rejection Claims must be filed within the time specified in section 11.03 of the Plan, failing

which any such Rejection Claim shall be forever barred and precluded from receiving any

Distribution pursuant to the Plan.  Notwithstanding anything to the contrary herein or in the Plan,

Exhibit 5 to this Order hereby replaces, is substituted for, and supersedes Exhibit B to the Third

Amended Plan and any explicit or inferred references herein or in the Plan to Exhibit B to the

Third Amended Plan shall refer to Exhibit 5 to this Order.

14.    Executory Contracts with Issuers and Co-Issuers.  Pursuant to the Plan and as

provided in this Order, the Debtors are authorized to assume executory contracts that include as

a party ACIS CLO 2014-3 Ltd., ACIS CLO 2014-4 Ltd., ACIS CLO 2014-5 Ltd., ACIS CLO 2015-

6 Ltd., ACIS CLO 2014-3 LLC, ACIS CLO 2014-4 LLC, ACIS CLO 2014-5 LLC, and/or ACIS

CLO 2015-6 LLC solely if and to the extent that one or more of the Debtors is a signatory to

each such executory contract.

15.    Approval of Brigade as Sub-Advisor and Shared Services Provider.  Pursuant to

an *Order Granting Emergency Motion to Approve Replacement Sub-Advisory and Shared*

*Services Providers, Brigade Capital Management, LP and Cortland Capital Markets Services*

*LLC* [Docket No. 464] entered on August 1, 2018, the Court authorized the Chapter 11 Trustee

to engage Brigade Capital Management, LP ("Brigade") and Cortland Capital Markets Services

LLC to perform the services previously provided by Highland under the Sub-Advisory

Agreement and Shared Services Agreement, on an interim basis.  The Chapter 11 Trustee

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 05/06/25    Page 711 of 1017    PageID 14338
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 583 of 1803    PageID 11329
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 33 of 229

selected Brigade as the party to provide both sub-advisory and shared services to the

Reorganized Debtor.  Based on the record of prior proceedings in the Chapter 11 Cases and

the Record at the Combined Hearing, the Chapter 11 Trustee has demonstrated that Brigade is

fully qualified to perform such services, and that the Chapter 11 Trustee's selection of Brigade is

an exercise of his sound business judgment.  Furthermore, adequate assurance of future

performance by Brigade has been shown.  Therefore, the selection of Brigade as the provider to

the Reorganized Debtor of the sub-advisory and shared services previously provided by

Highland under the Sub-Advisory Agreement and Shared Services Agreement is hereby

approved in all respects.

16.    Substantive Consolidation.  The substantive consolidation of the Debtors for

purposes of implementation of and distributions under the Plan is hereby approved as of the

Effective Date such that on the Effective Date:  (a) all assets and liabilities of the Debtors will be

deemed merged; (b) all guaranties by one Debtor of the obligations of the other Debtor will be

deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed

by the other Debtor and any joint or several liability of the Debtors will be deemed to be one

obligation of the consolidated Debtors; and (c) each and every Claim filed or to be filed in the

case of either of the Debtors will be deemed filed against the consolidated Debtors and will be

deemed one Claim against and a single obligation of the consolidated Debtors.

17.    Compromise and Settlement.  Pursuant to section 363 of the Bankruptcy Code

and Bankruptcy Rule 9019, and in consideration of the classification, potential Distributions and

other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith

compromise and settlement of all Claims, Interests and controversies subject to, or dealt with,

under the Plan, including, without limitation, all Claims against the Debtors or Estate arising

prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or

unasserted, fixed or contingent, arising out of, relating to or in connection with the business or

affairs of, or transactions with, the Debtors or the Estate.  The entry of this Order constitutes the

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 05/01/25    Page 712 of 1017    PageID 14339
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 584 of 1803    PageID 11330
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 34 of 229

Court's approval of each of the foregoing compromises or settlements embodied in the Plan, and all other compromises and settlements provided for in the Plan, as well as a finding by the Court that such compromises and settlements are in the best interest of the Debtors, the Estate, holders of Claims and Interests, and other parties-in-interest, and are fair, equitable and within the range of reasonableness. The rights afforded in the Plan and the treatment of all Claims and Interests therein are in exchange for, and in complete satisfaction and release of, all Claims and Interests of any nature whatsoever against and in the Debtors, the Estate, and the Assets. Except as otherwise provided in the Plan or this Order, all Persons shall be precluded and forever barred by the Plan Injunction from asserting against the Debtors and their affiliates, successors, assigns, the Reorganized Debtor or the Reorganized Debtor's assets, the Estate, or the Assets, any event, occurrence, condition, thing, or other or further Claims or causes of action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

18.    Discharge. Except for the obligations expressly set forth in the Plan or this Order, on the Effective Date, the Debtors, the Reorganized Debtor and their successors in interest and assigns shall be deemed and they each are discharged and released to the fullest extent permitted by applicable law, including pursuant to section 1141(d)(1) of the Bankruptcy Code, from any and all Claims, Interests, demands, debts and liabilities that arose before the Effective Date. Without limiting the generality of the foregoing, the discharge shall apply to and cover both known and unknown Claims although the Court makes no determination in this Order as to which Creditors may constitute holders of unknown Claims. In addition, all such discharged Claims, both known and unknown, shall be subject to the Plan Injunction.

19.    Injunctions. The following injunction provisions set forth in Article XIV of the Plan are hereby approved and authorized in their entirety:

    (a)    **Permanent General Plan Injunction:**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Exhibit Page 586 of 1804   Page 713 of 1017   PageID 14340
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 585 of 1803   PageID 11331
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 35 of 229

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, AS OF THE EFFECTIVE DATE ALL HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE ESTATE OR ANY OF THE ASSETS THAT AROSE PRIOR TO THE EFFECTIVE DATE ARE HEREBY PERMANENTLY ENJOINED AND PROHIBITED FROM THE FOLLOWING:  (a) THE COMMENCING OR CONTINUATION IN ANY MANNER, DIRECTLY OR INDIRECTLY, OF ANY ACTION, CASE, LAWSUIT OR OTHER PROCEEDING OF ANY TYPE OR NATURE AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS WITH RESPECT TO ANY SUCH CLAIM OR INTEREST ARISING OR ACCRUING BEFORE THE EFFECTIVE DATE, INCLUDING WITHOUT LIMITATION THE ENTRY OR ENFORCEMENT OF ANY JUDGMENT, OR ANY OTHER ACT FOR THE COLLECTION, EITHER DIRECTLY OR INDIRECTLY, OF ANY CLAIM OR INTEREST AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS; (b) THE CREATION, PERFECTION OR ENFORCEMENT OF ANY LIEN, SECURITY INTEREST, ENCUMBRANCE, RIGHT OR BURDEN, EITHER DIRECTLY OR INDIRECTLY, AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, OR (c) TAKING ANY ACTION IN RELATION TO THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, EITHER DIRECTLY OR INDIRECTLY, WHICH VIOLATES OR DOES NOT CONFORM OR COMPLY WITH THE PROVISIONS OF THE PLAN APPLICABLE TO SUCH CLAIM OR INTEREST.**

The above injunction is an integral term of this Order and shall be fully binding upon, and enforceable against, all Persons through and as a part of this Order.  Furthermore, notwithstanding anything to the contrary in the Plan or this Order, the above injunction is permanent and shall not expire upon the occurrence of any event that causes the Temporary Plan Injunction to expire.

(b)     Temporary Injunction Against the Liquidation of the Acis CLOs and Related Actions (the "Temporary Plan Injunction"):

**EXCEPT TO THE EXTENT NECESSARY TO ALLOW HCLOF, THE REORGANIZED DEBTOR AND BRIGADE TO EFFECTUATE THE RESET OF ONE OR MORE OF THE ACIS CLOS IN ACCORDANCE WITH SECTION 6.08 OF THE PLAN, PURSUANT TO SECTIONS 105(a), 1123(a)(5), 1123(b)(6), AND 1142(b) OF THE BANKRUPTCY CODE, THE ENJOINED PARTIES (DEFINED BELOW) ARE HEREBY ENJOINED FROM: (a) PROCEEDING WITH, EFFECTUATING, OR OTHERWISE TAKING (i) ANY ACTION IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS PREVIOUSLY OR CURRENTLY ISSUED BY ANY SUCH PARTIES, AND (ii) ANY OTHER ATTEMPT TO LIQUIDATE THE ACIS CLOS BY ANY MEANS, (b) TRADING ANY ACIS CLO COLLATERAL IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, (c) EXERCISING ANY RIGHTS TO ASK OR DIRECT THE ISSUERS, CO-ISSUERS OR INDENTURE TRUSTEE TO PERFORM ANY ACTION IN RELATION TO THE ACIS CLOS THAT THE ENJOINED PARTIES ARE PROHIBITED FROM TAKING UNDER THE TERMS OF THE PLAN INJUNCTION, (d) INTERFERING IN ANY WAY WITH THE CAPITAL MARKETS PROCESS OF RESETTING ANY ACIS CLO, AND (e) SENDING, MAILING, OR OTHERWISE DISTRIBUTING ANY NOTICE TO THE HOLDERS OF**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1567 of 1804    Page 714 of 1017    PageID 14341
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 586 of 1803    PageID 11332
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 36 of 229

**THE NOTES IN THE ACIS CLOS IN CONNECTION WITH THE EFFECTUATION OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, UNTIL THE EARLIER TO OCCUR OF: (w) THE DATE UPON WHICH A FINAL ORDER IS ENTERED RESOLVING THE ESTATE'S AVOIDANCE CLAIMS AGAINST ALL ENJOINED PARTIES RELATING TO ACIS LP'S RIGHTS UNDER THE ALF PMA; (x) THE DATE UPON WHICH ALL ALLOWED CLAIMS AGAINST THE DEBTORS HAVE BEEN PAID IN FULL, (y) THE ENTRY OF AN ORDER BY THE BANKRUPTCY COURT FINDING THAT A MATERIAL DEFAULT HAS OCCURRED UNDER THE TERMS OF THE PLAN, OR (z) THE ENTRY OF A SUBSEQUENT ORDER BY THE BANKRUPTCY COURT PROVIDING OTHERWISE WITH RESPECT TO ONE OR MORE OF THE ACIS CLOS. FOR PURPOSES OF THIS PARAGRAPH, THE TERM "<u>ENJOINED PARTIES</u>" SHALL INCLUDE HIGHLAND, HCLOF, CLO HOLDCO, NEUTRA, HIGHLAND HCF, HIGHLAND CLOM, ANY AFFILIATES OF HIGHLAND, AND THEIR RESPECTIVE EMPLOYEES, AGENTS, REPRESENTATIVES, TRANSFEREES, ASSIGNS, AND SUCCESSORS. FOR PURPOSES OF CLARIFICATION AND AVOIDANCE OF DOUBT, NOTHING IN THIS PARAGRAPH SHALL PRECLUDE ORDINARY DAY-TO-DAY TRADING OF THE COLLATERAL IN THE ACIS CLOS BY THE REORGANIZED DEBTOR.**

The above Temporary Plan Injunction is an integral term of this Order and the Temporary Plan Injunction shall be fully binding upon, and enforceable against, the Enjoined Parties through and as a part of this Order. For the avoidance of doubt, the occurrence of any event specified in the Temporary Plan Injunction that results in expiration of the Temporary Plan Injunction shall not cause any of the other injunctive relief set forth in the first paragraph of section 14.03 of the Plan and paragraph 18(a) of this Order to expire, such other injunctive relief being permanent.

20.     Notwithstanding anything to the contrary in the Plan or this Order, nothing in the Plan or in this Order shall discharge, release, enjoin or otherwise bar (a) any liability of the Debtors, the Estate, the Reorganized Debtor, or the Reorganized Debtor's assets ("<u>Released Parties</u>") to a Governmental Unit arising on or after the Confirmation Date with respect to events occurring after the Confirmation Date, provided that the Released Parties reserve the right to assert that any such liability is a Claim that arose on or prior to the Confirmation Date and constitutes a Claim that is subject to the deadlines for filing proofs of Claim, (b) any liability to a Governmental Unit that is not a Claim subject to the deadlines for filing proofs of Claim, (c) any valid right of setoff or recoupment of a Governmental Unit, and (d) any police or regulatory action by a Governmental Unit. In addition, nothing in the Plan or this Order discharges, releases, precludes or enjoins any environmental liability to any Governmental Unit that any

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit   Page 1508 of 1804   Page 715 of 1017   PageID 14342
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 587 of 1803   PageID 11333
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 37 of 229

Person other than the Released Parties would be subject to as the owner or operator of the property after the Effective Date.  For the avoidance of any doubt, nothing in this paragraph shall be construed to limit the application of the Plan Injunction to any Claim which was subject to any bar date applicable to such Claim.

21.    <u>Extension of the Preliminary Injunction</u>.  Notwithstanding anything to the contrary in the terms of the Preliminary Injunction entered in the Trustee's Adversary, the Preliminary Injunction shall not expire upon confirmation of the Plan.  The Preliminary Injunction is hereby extended to and through the Effective Date of the Plan and shall remain in full force and effect until the Effective Date of the Plan.

22.    <u>Exculpation</u>.  The exculpation provisions set forth in section 16.06 of the Plan are hereby approved in all respects.

23.    <u>Priority and Secured Tax Claims</u>.  The treatment of Priority Tax Claims and Secured Tax Claims is specified in the Plan.  Nothing in the Plan or this Order shall modify or affect the Lien rights of a Taxing Authority under applicable non-bankruptcy law.  In the event of a default on the payment of a Priority Tax Claim or Secured Tax Claim under the Plan, the Taxing Authority to which the payment is owed may pursue all administrative and judicial remedies under applicable law to collect the unpaid Priority Tax Claim or Secured Tax Claim.

24.    <u>Injunctions and Automatic Stay</u>.  Except as otherwise provided in the Plan or this Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or this Order shall remain in full force and effect in accordance with their terms.

25.    <u>Setoffs</u>.  Except as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the holder of a Claim, the Reorganized Debtor may set off

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 06/25/25   Page 716 of 1017   PageID 14343
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 588 of 1803   PageID 11334
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 38 of 229

against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of

such Allowed Claim (before such Distribution is made), any Claims, rights, Estate Claims and

Estate Defenses of any nature that the Debtors may hold against the holder of such Allowed

Claim, to the extent such Claims, rights, Estate Claims and Estate Defenses against such

holder have not been otherwise compromised or settled on or prior to the Effective Date

(whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect

such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a

waiver or release of any such Claims, rights, Estate Claims and Estate Defenses that the Estate

may possess against such Claimant.  In no event shall any Claimant or Interest holder be

entitled to setoff any Claim or Interest against any Claim, right, or Estate Claim of the Debtors

without the consent of the Debtors or the Reorganized Debtor unless such holder files a motion

with the Court requesting the authority to perform such setoff notwithstanding any indication in

any proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of

setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

26.     Recoupment.  Except as otherwise expressly provided for in the Plan, in no event

shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any

Claim, right, account receivable, or Estate Claim of the Debtors or the Reorganized Debtor

unless (a) such holder actually provides notice thereof in writing to the Debtors or the

Reorganized Debtor of its intent to perform a recoupment; (b) such notice includes the amount

to be recouped by the holder of the Claim or Interest and a specific description of the basis for

the recoupment, and (c) the Debtors or the Reorganized Debtor have provided a written

response to such Claim or Interest holder, stating unequivocally that the Debtors or the

Reorganized Debtor consents to the requested recoupment.  The Debtors and the Reorganized

Debtor shall have the right, but not the obligation, to seek an order of the Court allowing any or

all of the proposed recoupment.  In the absence of a written response from the Debtors or the

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/06/25   Page 717 of 1017   PageID 14344
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 589 of 1803   PageID 11335
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 39 of 229

Reorganized Debtor consenting to a recoupment or an order of the Court authorizing a

recoupment, no recoupment by the holder of a Claim or Interest shall be allowed.

      27.   <u>Preservation of Causes of Action</u>.  Articles VI and IX of the Plan, including Exhibit

A to the Plan, contain a specific and unequivocal reservation of Estate Claims and Estate

Defenses as required under applicable Fifth Circuit authority.  The Estate Claims and Estate

Defenses are expressly, specifically, and unequivocally retained and reserved pursuant to

Articles VI and IX of the Plan (including Exhibit A to the Plan) in accordance with section

1123(b)(3)(B) of the Bankruptcy Code.  Such reservation of the Estate Claims and Estate

Defenses is hereby approved.  **No person may rely on the absence of a specific reference**

**in the Plan or the Disclosure Statement to any cause of action against them as any**

**indication that the Debtors or the Reorganized Debtor will not pursue any and all**

**available causes of action (including all Estate Claims, Estate Defenses and Avoidance**

**Actions) against any Person, <u>except</u> as otherwise provided in the Plan.**  Unless any

causes of action against a Person are expressly waived, relinquished, exculpated, released,

compromised or settled in the Plan or a Final Order, such causes of action are hereby expressly

reserved (including all Estate Claims, Estate Defenses and Avoidance Actions) for later

adjudication and, therefore, no preclusion doctrine, <u>including without limitation</u>, the doctrines of

res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable

or otherwise) or laches, shall apply to such causes of action upon or after the confirmation or

consummation of the Plan.

      28.   Unless otherwise expressly stated in the Plan or this Order, all Estate Claims and

Estate Defenses are hereby reserved for the benefit of the Reorganized Debtor notwithstanding

the occurrence of the Effective Date or the rejection or repudiation of any Executory Contract or

Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  All such reserved

Estate Claims and Estate Defenses shall be vested with the Reorganized Debtor and the

Reorganized Debtor shall have the exclusive right, authority and standing to assert, file,

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Filed 05/16/25    Page 718 of 1017    PageID 14345
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 590 of 1803    PageID 11336
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 40 of 229

prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment each of the Estate Claims and Estate Defenses so reserved in accordance with the terms of the Plan without the consent or approval of any third party or further notice to or action, order or approval of the Court.

29.    <u>Subordinated Claims</u>.  The allowance, classification and treatment of all Allowed Claims and Interests and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtor reserves the right to seek to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

30.    <u>Release of Liens</u>.  Except as otherwise provided in the Plan, this Order, or in any contract, instrument, or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date all Liens against any Assets transferred to and vested in the Reorganized Debtor are hereby deemed to be released, terminated and nullified without the necessity of further order of this Court.

31.    <u>Provisions Governing Distributions</u>.  The distribution provisions of Articles VII and VIII of the Plan shall be, and hereby are, approved in their entirety; provided, however, that notwithstanding anything to the contrary set forth in Section 7.02 of the Plan, the Reorganized Debtor may, but shall not be required to, reserve for Distributions to holders of Allowed Subclass 4B Claims.  The Reorganized Debtor shall make all Distributions required under the Plan.

32.    <u>Procedures for Resolving Contested and Contingent Claims</u>.  The Claims resolution procedures contained in Article X of the Plan are hereby approved.

---

Appellee Appx. 00584
Appx. 00835
013397

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/25/24    Page 719 of 1017    PageID 14346
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 591 of 1803    PageID 11337
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 41 of 229

33.    <u>Section 1145 Exemption</u>.  The solicitation of acceptances and rejections of the Plan was exempt from the registration requirements of the Securities Act of 1933 and applicable state securities laws, and no other nonbankruptcy law applies to the solicitation.

34.    <u>Exemption from Certain Transfer Taxes and Recording Fees</u>.  Section 1146(a) shall apply to the transfers of Assets pursuant to the Plan and, therefore, such transfers may not be taxed under any law imposing a stamp tax or similar tax.

35.    <u>Governmental Approvals Not Required</u>.  This Order shall constitute all approvals and consents required, if any, by the laws, rules or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan, the Disclosure Statement and any documents, instruments or agreements, and any amendments or modifications thereto.

36.    <u>Allowance and Payment of Certain Administrative Expense Claims</u>

(a)    <u>Administrative Expense Claims (Generally)</u>.  The holder of a Claim for an Administrative Expense, other than (i) such a Claim by an Estate Professional, (ii) an Ordinary Course Claim, (iii) a Claim for U.S. Trustee fees under 28 U.S.C. § 1930, or (iv) an Allowed Administrative Expense, must file with the Court and serve upon the Reorganized Debtor and its counsel, as set forth in the Plan, a written notice of such Claim for an Administrative Expense within thirty (30) days after the Effective Date (the "<u>Administrative Bar Date</u>").  Such notice of Claim for an Administrative Expense shall include at a minimum: (i) the name, address, telephone number and fax number (if applicable) or email address of the holder of such Claim, (ii) the amount of such Claim, and (iii) the basis of such Claim.  ***The failure to timely and properly file and serve a notice of Claim for an Administrative Expense on or before the Administrative Bar Date shall result in such Claim for an Administrative Expense being forever barred and discharged without further order of the Court and the holder thereof shall be barred from receiving any Distribution from the Reorganized Debtor on account***

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11-36   Filed 05/36/25-1804   Page 720 of 1017   PageID 14347
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 592 of 1803   PageID 11338
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 42 of 229

*of such Claim for an Administrative Expense.* A Claim for an Administrative Expense with respect to which a notice of Claim for an Administrative Expense has been timely and properly filed and served shall become an Allowed Administrative Expense if no objection is filed within thirty (30) days after the date of filing and service of the applicable notice of Claim for an Administrative Expense, or such later date as may be approved by the Court on motion of a party in interest, without notice or a hearing. If an objection is filed within such 30-day period (or any extension thereof), the Claim for an Administrative Expense shall become an Allowed Administrative Expense only to the extent allowed by a Final Order.

(b)     Estate Professional Compensation. All final requests for compensation or reimbursement by any Estate Professional shall be filed no later than sixty (60) days after the Effective Date in accordance with the Plan. A Claim for an Administrative Expense by an Estate Professional in respect of which a final fee application has been properly filed shall become an Allowed Administrative Expense only to the extent allowed by Final Order and, if so Allowed, shall be paid in accordance with the terms of the Plan. Notwithstanding anything to the contrary in the Plan, the provisions of the Plan governing the filing of final fee applications by Estate Professionals and allowance of Administrative Expense Claims of Estate Professionals apply to the Chapter 11 Trustee. Compensation or reimbursement sought by the Chapter 11 Trustee through a final fee application shall be subject to final approval of the Court as reasonable in accordance with section 330(a)(3) of the Bankruptcy Code.

(c)     U.S. Trustee Fees. Any U.S. Trustee fees incurred pursuant to 28 U.S.C. § 1930 which are past due as of the Confirmation Date shall be paid in full by the Chapter 11 Trustee on or before the earlier of (i) December 21, 2018, or (ii) that day which is ten (10) days after the Confirmation Date. After the Confirmation Date, the Reorganized Debtor shall continue to pay U.S. Trustee fees as they accrue until a final decree is entered and the Chapter 11 Cases are closed.

Appellee Appx. 00586
Appx. 00637
013399

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1    Filed 05/06/25    Page 721 of 1017    PageID 14348
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 593 of 1803    PageID 11339
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 43 of 229

37.    <u>Effectuating Documents and Further Transactions</u>.  The Chapter 11 Trustee and the Reorganized Debtor, and their respective representatives, agents and attorneys, may take all actions to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant hereto.  This Order shall constitute all approvals and consents required, if any, by the laws, rules and regulations of all states and any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, agreements, any amendments or modifications thereto and any other acts and transactions referred to in or contemplated by the Plan, the Plan Documents, the Disclosure Statement, and any documents, instruments, and agreements and any amendments or modifications thereto.

38.    <u>Filing and Recording</u>.  This Order is and shall be binding upon and shall govern the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any document or instruments. Each and every federal, state and local government agency is hereby directed to accept any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Plan and this Order.

39.    <u>Inconsistency between Documents</u>.  In the event of an inconsistency between the terms of the Plan and the terms of the Disclosure Statement, the Plan shall control.  In the event of any inconsistency between the terms of the Plan or the terms of the Disclosure Statement and the terms of this Order, this Order shall control.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-116   Filed 05/05/25   Page 722 of 1017   PageID 14349
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 594 of 1803   PageID 11340
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 44 of 229

40.     <u>References to Plan Provisions</u>.  The failure specifically to include or to refer to any particular article, section, or provision of the Plan or any related document in this Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Court that the Plan and any related documents be confirmed in their entirety.

41.     <u>Applicable Nonbankruptcy Law.</u>  Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of the Plan and this Order shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

42.     <u>Notice of Entry of the Confirmation Order</u>.  No later than the third Business Day after the entry of this Order, the Chapter 11 Trustee shall serve a copy of this Order pursuant to Bankruptcy Rules 2002(f)(7), 2002(k) and 3020(c) on all holders of Claims and Interests, the U.S. Trustee, the Persons specifically identified in the Temporary Plan Injunction as subject thereto, and all other known parties-in-interest.

43.     <u>Notice of the Effective Date</u>.  No later than the third Business Day after the occurrence of the Effective Date, the Reorganized Debtor shall file a notice of occurrence of the Effective Date with the Clerk of the Court and shall serve a copy on all holders of Claims and Interests, the U.S. Trustee, the Persons specifically identified in the Temporary Plan Injunction as subject thereto, and all other known parties-in-interest.  Such notice shall include notice of (a) the Administrative Bar Date, (b) the deadline for filing Rejection Claims set forth in section 11.03 of the Plan, and (c) the deadline for filing final requests for compensation and reimbursement by Estate Professionals.  The filing of such notice shall conclusively establish that all conditions precedent have been satisfied or waived and shall constitute adequate and sufficient notice to all parties entitled thereto of the occurrence of the Effective Date.

44.     <u>Retention of Jurisdiction</u>.  The Court may properly, and upon the Effective Date shall, to the full extent set forth in the Plan, retain jurisdiction over all matters arising in, arising under, and related to, the Chapter 11 Cases, including the matters set forth in Article XV of the Plan and section 1142 of the Bankruptcy Code.  Without limitation as to the generality of the

Appellee Appx. 00588
Appx. 00639
013401

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/06/25   Page 723 of 1017   PageID 14350
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 595 of 1803   PageID 11341
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 45 of 229

preceding sentence, the Court retains exclusive jurisdiction (a) to interpret and enforce this Order and the Plan; (b) to enforce the provisions of this Order and the Plan; (c) to resolve any disputes arising under or related to this Order or the Plan; and (d) over all transactions contemplated in this Order and the Plan.  All Persons are hereby forever prohibited and enjoined from taking any action (including, without limitation, legal action) that would adversely affect or interfere with the ability of any Person to complete any of the transfers of property contemplated by this Order and the Plan other than in this Court or in connection with any appeals from this Court.

45.     Headings.  Paragraph headings contained in this Order are for convenience of reference only and shall not affect the meaning or interpretation of this Order.

46.     Final Order.  This Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

47.     Appeal or Motion for Reconsideration; Reversal.  In the event this Order is appealed or a motion for reconsideration is filed, the Chapter 11 Trustee and the Reorganized Debtor, and their respective representatives, agents and attorneys, are all hereby authorized to proceed with the consummation and performance of the Plan unless and until this Order is stayed, reversed or modified by a court of competent jurisdiction.  If any or all of the provisions of this Order are hereafter reversed, modified, or vacated by subsequent order of this Court or any other court of competent jurisdiction, such reversal, modification, or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Chapter 11 Trustee's or Reorganized Debtor's receipt of written notice of any such order.  Notwithstanding any such reversal, modification, or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Order and the Plan (including the Plan Documents) and any amendments or modifications thereto.

Appellee Appx. 00589
Appx. 00849
013402

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 09/06/25    Page 724 of 1017    PageID 14351
Exhibit    Page 597 of 804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 596 of 1803    PageID 11342
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 46 of 229

### END OF ORDER ###

Appellee Appx. 00590
Appx. 00641
013403

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 05/06/25    Page 725 of 1017    PageID 14352
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 597 of 1803    PageID 11343
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 47 of 229

**SUBMITTED BY:**

/s/  Jeff P. Prostok
Jeff P. Prostok
State Bar No. 16352500
J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
Matthew G. Maben
State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

-and-

Rakhee V. Patel
State Bar No. 00797213
Phillip Lamberson
State Bar No. 00794134
Joe Wielebinski
State Bar No. 21432400
Annmarie Chiarello
State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5400 (Phone)
(214) 745-5390 (Facsimile)
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Confirmation Order (3rd Amended Plan) 1.31.18.docx

**Appellee Appx. 00591**
**Appx. 06542**
**013404**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 09/05/25    Page 726 of 1017    PageID 14353
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 598 of 1803    PageID 11344
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 48 of 229

# EXHIBIT "1"

**[Third Amended Joint Plan for Acis Capital Management, L.P.
and Acis Capital Management GP, LLC – Dkt. No. 660]**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Page 600 of 1804    Page 727 of 1017    PageID 14354
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 599 of 1803    PageID 11345
Case 18-30264-sgj11 Doc 680 Filed 10/25/18    Entered 10/25/18 18:42:06    Page 1 of 229

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | **Case No. 18-30264-SGJ-11** |
| | § | **Case No. 18-30265-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP, LLC,** | § | **(Jointly Administered Under Case** |
| | § | **No. 18-30264-SGJ-11)** |
| **DEBTORS.** | § | |
| | § | **Chapter 11** |

**THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, L.P. AND**
**ACIS CAPITAL MANAGEMENT GP, LLC**

Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,**
**CHAPTER 11 TRUSTEE**

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN PHELAN,**
**CHAPTER 11 TRUSTEE**

DATED:        October 25, 2018
                    Dallas, Texas

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/06/25    Page 728 of 1017    PageID 14355
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 600 of 1803    PageID 11346
Case 18-30264-sgj11    Doc 880    Filed 01/31/19    Entered 01/31/19 17:34:06    Page 50 of 229

## ARTICLE I.
## DEFINITIONS

A.    <u>Defined Terms</u>. In addition to such other terms as are defined in other sections of the Plan, the following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural, masculine and feminine forms of the terms defined).

1.01.    "<u>Acis CLOs</u>" refers collectively to CLO-3, CLO-4, CLO-5, and CLO-6.

1.02.    "<u>Acis GP</u>" means Acis Capital Management, GP, LLC, one of the Debtors in the above-referenced Chapter 11 Cases.

1.03.    "<u>Acis LP</u>" means Acis Capital Management, LP, one of the Debtors in the above-referenced Chapter 11 Cases.

1.04.    "<u>Administrative Bar Date</u>" means the deadline to file Claims for Allowance as an Administrative Expense set forth in section 3.01(c) of the Plan.

1.05.    "<u>Administrative Expense</u>" means any cost or expense of administration of the Chapter 11 Cases allowed under subsections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the Estate of the Debtors, any actual and necessary expenses of operating the business of the Debtors, all compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the estates of the Debtors under section 1930, chapter 123 of title 28 of the United States Code.

1.06.    "<u>Affiliate</u>" has the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

1.07.    "<u>ALF PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and Acis Loan Funding, Ltd. dated December 22, 2016.

1.08.    "<u>Allowed</u>," when used with respect to a Claim (other than an Administrative Expense), means a Claim (a) to the extent it is not Contested; or (b) a Contested Claim, proof of which was filed timely with the Bankruptcy Court, and (i) as to which no Objection was filed by the Objection Deadline, or (ii) as to which an Objection was filed by the Objection Deadline, to the extent, if any, such Claim is ultimately allowed by a Final Order; *provided, however*, if a Claim is to be determined in a forum other than the Bankruptcy Court, such Claim shall not become Allowed until determined by Final Order of such other forum and allowed by Final Order of the Bankruptcy Court. "<u>Allowed</u>," when used with respect to an Administrative Expense, shall mean an Administrative Expense approved by application to the Bankruptcy Court.

1.09.    "<u>Assets</u>" includes all right, title, and interest in and to all property of every type or nature owned or claimed by the Debtors as of the Petition Date, together with all such property of every type or nature subsequently acquired by the Debtors through the Effective Date, whether real or personal, tangible or intangible, and wherever located, and including, but not limited to, property as defined in section 541 of the Bankruptcy Code.  Without limiting the foregoing, this shall include all

Appellee Appx. 00594

Appx. 00845

013407

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/26/25    Page 729 of 1017    PageID 14356
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 601 of 1803    PageID 11347
Case 18-30264-sgj11    Doc 860    Filed 01/31/19    Entered 01/31/19 17:34:06    Page 51 of 229

1.10.    "Available Cash" means any Cash over and above the amount needed for the Reorganized Debtor to maintain business operations and pursue the Estate Claims, as determined in the sole discretion of the Reorganized Debtor.

1.11.    "Avoidance Action" means a cause of action assertable by the Debtors pursuant to Chapter 5 of the Bankruptcy Code, including without limitation, actions brought or which may be brought under sections 542, 543, 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code. Such causes of action may be asserted to recover, among other things, the transfers listed in the Debtors' respective Schedules, including in response to Question 3 of the statements of financial affairs.

1.12.    "Ballot" means the form of ballot provided to holders of Claims or Interests entitled to vote pursuant to Bankruptcy Rule 3017(d), by which each such holder may accept or reject the Plan.

1.13.    "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended and codified at Title 11 of the United States Code.

1.14.    "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or such other court having jurisdiction over all or any part of the Chapter 11 Cases.

1.15.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, including applicable local rules of the Bankruptcy Court.

1.16.    "Brigade" means Brigade Capital Management, LP.

1.17.    "Business Day" means any day other than Saturday, Sunday, a legal holiday, or a day on which national banking institutions in Texas are authorized or obligated by law or executive order to close.

1.18.    "Cash" means legal tender of the United States of America, cash equivalents and other readily marketable securities or instruments, including, but not limited to, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks or commercial paper.

1.19.    "Chapter 11 Cases" refers collectively to the Acis LP bankruptcy case, Case No. 18-30264-sgj11, and the Acis GP bankruptcy case, Case No. 18-30265-sgj11, which are being jointly administered under Case No. 18-30264-sgj11.

1.20.    "Chapter 11 Trustee" refers to Robin Phelan, the chapter 11 trustee for the Debtors.

1.21.    "Claim" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, legal, equitable, secured or unsecured, or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, secured or unsecured.

Appellee Appx. 00595
Appx. 00846
013408

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/16/25   Page 730 of 1017   PageID 14357
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 602 of 1803   PageID 11348
Case 18-30264-sgj11   Doc 860   Filed 10/25/18   Entered 10/25/18 18:23:08   Page 54 of 229

1.22.   "<u>Claimant</u>" means the holder of a Claim.

1.23.   "<u>Class</u>" means a class of Claims or Interests as described in the Plan.

1.24.   "<u>CLO</u>" means collateralized loan obligations.

1.25.   "<u>CLO-1</u>" means Acis CLO 2013-1 LTD.

1.26.   "<u>CLO-1 Indenture</u>" means that certain Indenture, dated as of March 18, 2013, issued by CLO-1, as issuer, Acis CLO 2013-1 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.27.   "<u>CLO-1 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-1, dated March 18, 2013.

1.28.   "<u>CLO-3</u>" means Acis CLO 2014-3 LTD.

1.29.   "<u>CLO-3 Indenture</u>" means that certain Indenture, dated as of February 25, 2014, issued by CLO-3, as issuer, Acis CLO 2014-3 LLC, as co-Issuer and US Bank, as Indenture Trustee

1.30.   "<u>CLO-3 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-3, dated February 25, 2014.

1.31.   "<u>CLO-4</u>" means Acis CLO 2014-4 LTD.

1.32.   "<u>CLO-4 Indenture</u>" means that certain Indenture, dated as of June 5, 2014, issued by CLO-4, as issuer, Acis CLO 2014-4 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.33.   "<u>CLO-4 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-4, dated June 5, 2014.

1.34.   "<u>CLO-5</u>" means Acis CLO 2014-5 LTD.

1.35.   "<u>CLO-5 Indenture</u>" means that certain Indenture, dated as of November 18, 2014, issued by CLO-5, as issuer, Acis CLO 2014-5 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.36.   "<u>CLO-5 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-5, dated November 18, 2014.

1.37.   "<u>CLO-6</u>" means Acis CLO 2015-6 LTD.

1.38.   "<u>CLO-6 Indenture</u>" means that certain Indenture, dated as of April 16, 2015, issued by CLO-6, as issuer, Acis CLO 2015-6 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.39.   "<u>CLO-6 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-6, dated April 16, 2015.

1.40.   "<u>CLO Holdco</u>" means CLO Holdco, Ltd.

1.41.   "<u>Collateral</u>" means any Asset subject to a valid and enforceable Lien to secure payment of a Claim.

Appellee Appx. 00596

Appx. 00867

013409

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11 Page 166 of 25 1804   Page 731 of 1017   PageID 14358
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 603 of 1803   PageID 11349
Case 18-30264-sgj11   Doc 680   Filed 10/25/18   Entered 10/25/18 18:23:06   Page 58 of 229

1.42.   "<u>Confirmation Date</u>" means the date of entry of the Confirmation Order.

1.43.   "<u>Confirmation Hearing</u>" means the hearing conducted by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3020(b) to consider confirmation of the Plan, as such hearing may be continued from time to time.

1.44.   "<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.45.   "<u>Contested</u>," when used with respect to a Claim, means a Claim against the Debtors that is listed in the Debtors' Schedules as disputed, contingent, or unliquidated; that is listed in the Debtors' Schedules as undisputed, liquidated, and not contingent and as to which a proof of Claim has been filed with the Bankruptcy Court, to the extent the proof of Claim amount exceeds the scheduled amount; that is not listed in the Debtors' Schedules, but as to which a proof of Claim has been filed with the Bankruptcy Court; or as to which an objection has been or may be timely filed and has not been denied by Final Order. To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Contested Claim only to the extent of the objection.

1.46.   "<u>Creditor</u>" means a "creditor," as defined in section 101(10) of the Bankruptcy Code.

1.47.   "<u>Cure Claim</u>" means the payment or other performance required to cure any existing default under an Executory Contract or Unexpired Lease.

1.48.   "<u>Debtors</u>" means, collectively, Acis GP and Acis LP, the debtors in the above-captioned Chapter 11 Cases.

1.49.   "<u>Disallowed</u>," when used with respect to all or any part of a Claim or Interest, means that portion of a Claim or Interest to which an objection or motion to disallow has been sustained by a Final Order.

1.50.   "<u>Disclosure Statement</u>" means the Disclosure Statement filed with respect to the Plan, as it may be amended, modified, or supplemented from time to time.

1.51.   "<u>Distribution</u>" means any payment or other disbursement of property pursuant to the Plan.

1.52.   "<u>Effective Date</u>" means the first Business Day which is fourteen (14) days after the Confirmation Date if the Confirmation Order is not stayed or, if the Confirmation Order is stayed, the first Business Day following the lifting, dissolution, or removal of such stay which is at least fourteen (14) Business Days after the Confirmation Date, and upon which all conditions to the effectiveness of the Plan set forth in Article XIII below are satisfied.

1.53.   "<u>Estate</u>" shall collectively refer to the bankruptcy estates of the Debtors in the Chapter 11 Cases.

1.54.   "<u>Estate Accounts Receivable</u>" shall include all accounts receivable of the Estate, including from all sums payable to the Debtors on account of goods or services provided by the Debtors.

Appellee Appx. 00597
Appx. 00848
013410

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 605 of 1804    Page 732 of 1017    PageID 14359
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 604 of 1803    PageID 11350
Case 19-30964-sgj11    Doc 990    Filed 10/25/19    Entered 10/25/19 18:23:08    Page 54 of 229

1.55.   "Estate Claims" shall include all claims and causes of action held by the Debtors' Estate, including, without limitation, the Estate Claims listed on the attached **Exhibit A** and all Avoidance Actions.

1.56.   ""Estate Defenses" means all defenses, affirmative defenses, counterclaims, or offsets by the Debtors' Estate against any Person, including but not limited to any Creditor.

1.57.   "Estate Insurance" means any insurance policy or interest in an insurance policy in which the Estate has an interest or rights.

1.58.   "Estate Professionals" means those Persons employed pursuant to an order of the Bankruptcy Court in accordance with sections 327, 328, and 1103 of the Bankruptcy Code or who are entitled to compensation or reimbursement pursuant to sections 503(b)(3)(D) or 506(b) of the Bankruptcy Code.

1.59.   "Executory Contract" means any executory contract which is subject to section 365 of the Bankruptcy Code and which is not an Unexpired Lease.

1.60.   "Final Order" means an order or judgment of the Bankruptcy Court or any other court or adjudicative body, as to which the time to appeal or seek rehearing or petition for certiorari shall have expired or which order or judgment shall no longer be subject to appeal, rehearing, or certiorari proceeding and with respect to which no appeal, motion for rehearing, or certiorari proceeding or stay shall then be pending.

1.61.   "General Unsecured Claim" means any Claim against the Debtors that is not an Administrative Expense, Priority Tax Claim, Priority Non-Tax Claim, Secured Tax Claim, Secured Claim, or Insider Claim, but includes any Rejection Claims pursuant to section 502(g) of the Bankruptcy Code.

1.62.   "Governmental Unit" means a "governmental unit" as such term is defined in section 101(27) of the Bankruptcy Code.

1.63.   "HCLOF" means Highland CLO Funding, Ltd.

1.64.   "Highland" means Highland Capital Management, L.P.

1.65.   "Highland Adversary" means Adversary Proceeding No. 18-03078-sgj.

1.66.   "Highland Claim" means all Claims asserted by Highland or any Affiliates of Highland against the Debtors, including any Claim resulting from the termination of the Sub-Advisory Agreement and Shared Services Agreement.

1.67.   "Highland CLOM" means Highland CLO Management, Ltd.

1.68.   "Highland HCF" means Highland HCF Advisors, Ltd.

1.69.   "Impaired" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.70.   "Indentures" refers collectively to the CLO-1 Indenture, the CLO-3 Indenture, the CLO-4 Indenture, the CLO-5 Indenture, and the CLO-6 Indenture.

Appellee Appx. 00598
Appx. 00840
013411

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/05/25   Page 733 of 1017   PageID 14360
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 605 of 1803   PageID 11351
Case 18-30264-sgj11   Doc 860   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 55 of 229

1.71.   "Indenture Trustee" refers to US Bank solely in its capacity as Indenture Trustee under the CLO-1 Indenture, the CLO-3 Indenture, the CLO-4 Indenture, the CLO-5 Indenture and the CLO-6 Indenture, as applicable

1.72.   "Initial Distribution Date," when used with respect to any Contested Claim or Rejection Claim, shall mean the later of (i) the first Business Day at least thirty (30) days after the date on which any such Contested Claim or Rejection Claim becomes an Allowed Claim, or (ii) if the payment terms of Article IV of this Plan applicable to each such Claim specify a different date, then the date as calculated pursuant to the terms of Article IV of this Plan applicable to each such Claim.  The Initial Distribution Date shall be separately determined with respect to each Contested Claim or Rejection Claim based upon the date each such Claim becomes an Allowed Claim.

1.73.   "Insider" means a Person described in section 101(31) of the Bankruptcy Code.

1.74.   "Insider Claim" means any Claim asserted by Insiders of the Debtors, including but not limited to any Claim asserted by Highland or any Affiliate thereof, unless otherwise indicated in the Plan.

1.75.   "Interests" means any equity or stock ownership interest in the Debtors.

1.76.   "Issuers and Co-Issuers" means CLO-1, CLO-3, CLO-4, CLO-5, CLO-6, Acis CLO 2013-1, Acis CLO-2014-3, LLC, Acis CLO 2014-4, LLC, Acis CLO 2014-5, LLC, and Acis 2015-6, LLC.

1.77.   "Lien" means any mortgage, lien, charge, security interest, encumbrance, or other security device of any kind affecting any asset or property of the Debtors contemplated by section 101(37) of the Bankruptcy Code.

1.78.   "Management Fees" shall, when used in relation to any of the Acis CLOs, have the meaning set forth in the applicable Indenture.

1.79.   "Neutra" means Neutra, Ltd.

1.80.   "Objection" means (a) an objection to the allowance of a Claim interposed by any party entitled to do so within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, and (b) as to any Taxing Authority, a proceeding commenced under section 505 of the Bankruptcy Code to determine the legality or amount of any tax.

1.81.   "Objection Deadline" shall mean the later of (a) ninety (90) days following the Effective Date, unless otherwise extended by order of the Bankruptcy Court, or (b) as to any Rejection Claim filed after the Effective Date, ninety (90) days after the date on which the proof of Claim reflecting the Rejection Claim is filed.

1.82.   "Optional Redemption" shall, when used in relation to any of the Acis CLOs, have the meaning set forth in the applicable Indenture.

1.83.   "Person" means any individual, corporation, general partnership, limited partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, government, or any political subdivision thereof or other entity.

Appellee Appx. 00599
Appx. 00850
013412

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 06/06/25   Page 734 of 1017   PageID 14361
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 606 of 1803   PageID 11352
Case 18-30264-sgj11   Doc 880   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 56 of 229

1.84.   "Petition Date" means January 30, 2018.

1.85.   "Plan" means this Third Amended Joint Chapter 11 plan, either in its present form or as it may be altered, amended, or modified from time to time.

1.86.   "Plan Documents" means the documents that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court.

1.87.   "Plan Rate" means a rate of interest of five percent (5%) per annum.

1.88.   "PMAs" refers collectively to the CLO-1 PMA, CLO-3 PMA, CLO-4 PMA, CLO-5 PMA, and CLO-6 PMA.

1.89.   "Priority Claim" means a Claim (other than a Claim for an Administrative Expense) to the extent that it is entitled to priority in payment under section 507(a) of the Bankruptcy Code.

1.90.   "Priority Non-Tax Claim" means a Priority Claim other than a Priority Tax Claim.

1.91.   "Priority Tax Claim" means a Claim of a Governmental Unit of the kind specified in subsection 507(a)(8) of the Bankruptcy Code.

1.92.   "Professional" means those persons retained pursuant to an order of the Bankruptcy Court in accordance with sections 327 and 1103 of the Bankruptcy Code.

1.93.   "Pro Rata Distribution" means an optional Distribution made in accordance with section 4.03(c), 4.04(e), or 4.04(i) of the Plan.  Each Creditor entitled to receive a portion of a Pro Rata Distribution shall receive such Creditor's Pro Rata Share of such Distribution.

1.94.   "Pro Rata Share' means, as to the holder of a specific Claim, the ratio that the amount of such holder's Claim bears to the aggregate amount of all Claims included in the particular Class or category in which such holder's Claim is included.

1.95.   "Refinancing Proceeds" shall, when used in relation to any of the Acis CLOs, have the meaning set forth in the applicable Indenture.

1.96.   "Rejection Claim" means a Claim arising under section 502(g) of the Bankruptcy Code as a consequence of the rejection of any Executory Contract or Unexpired Lease.

1.97.   "Reorganized Debtor" refers collectively to the Debtors, as reorganized, acting from and after the Effective Date if the Plan is confirmed based on the terms and provisions herein.

1.98.   "Reserve" or "Reserves" means any reserves set aside by the Reorganized Debtor pursuant to this Plan, including reserves set aside to fund any Distributions, make payments pursuant to the Plan, or pursue the Estate Claims.

1.99.   "Schedules" means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules or statements have been or may be subsequently amended.

1.100.   "Secured Claim" means (a) a Claim secured by a lien on any Assets, which lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law, and which is duly Allowed, but only to the

Appellee Appx. 00600

Appx. 00851

013413

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/06/25   Page 735 of 1017   PageID 14362
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 607 of 1803   PageID 11353
Case 18-30264-sgj11   Doc 880   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 57 of 229

extent of the value of the holder's interest in the Collateral that secures payment of the Claim; (b) a Claim against the Debtors that is subject to a valid right of recoupment or setoff under section 553 of the Bankruptcy Code, but only to the extent of the Allowed amount subject to recoupment or setoff as provided in section 506(a) of the Bankruptcy Code; and (c) a Claim deemed or treated under the Plan as a Secured Claim; provided, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as a General Unsecured Claim unless, in any such case the Class of which the Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent Allowed.

1.101.  "Secured Tax Claim" means any ad valorem tax Claim that arises or is deemed to have arisen on or before the Petition Date, irrespective of the date on which such Claim is assessed or due.

1.102.  "Shared Services Agreement" means that certain Fourth Amended and Restated Shared Services Agreement by and between Acis LP and Highland dated March 17, 2017.

1.103.  "Sub-Advisory Agreement" means that certain Third Amended and Restated Sub-Advisory Agreement by and between Acis LP and Highland dated March 17, 2017

1.104.  "Subordinated Notes" means the subordinated notes in the Acis CLOs held by HCLOF, and expressly does not include any subordinated notes in the Acis CLOs held by any other party.

1.105.  "Substantial Consummation" means the day on which a Creditor first receives a Distribution of any kind under the terms and provisions of the Plan.

1.106.  "Taxing Authority" shall include the State of Texas or any subdivision thereof, including without limitation any political subdivision of the State of Texas assessing ad valorem taxes against any of the Assets.

1.107.  "Terry" means Joshua N. Terry.

1.108.  "Terry Partially Secured Claim" means any Claim asserted against the Debtors by Terry, including as asserted in Proof of Claim No. 1 in both Chapter 11 Cases and Proof of Claim No. 26 against Acis LP.

1.109.  "Unclaimed Property" means any cash, Distribution, or any other property of the Debtors unclaimed for a period of one (1) year after the applicable Initial Distribution Date.

1.110.  "Unexpired Lease" means any unexpired lease or agreement which is subject to section 365 of the Bankruptcy Code and which is not an Executory Contract.

1.111.  "US Bank" means U.S. Bank National Association.

1.112.  "Other Acis-Managed Funds" refers collectively to CLO-1, Acis CLO 2013-2, Ltd., Hewitt's Island CLO 1-R, Ltd, and BayVK R2 Lux S.A., SICAV-FIS.

      B.    Interpretation. Unless otherwise specified, all section, article and exhibit references in the Plan are to the respective section in, article of, or exhibit to, the Plan, as the

Appellee Appx. 00601
Appx. 00852
013414

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/25/25    Page 736 of 1017    PageID 14363
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 608 of 1803    PageID 11354
Case 18-30264-sgj11    Doc 830    Filed 10/23/18    Entered 10/23/18 16:23:06    Page 58 of 229

same may be amended, waived, or modified from time to time. The headings in the Plan are for convenience and reference only and shall not limit or otherwise affect the provisions hereof. The rules of construction set forth in section 102 of the Bankruptcy Code, other than section 102(5) of the Bankruptcy Code, apply to construction of the Plan. For the purposes of construction of the Plan, "or" is disjunctive.

       C.    <u>Other Terms</u>. The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. References herein to "after notice and hearing" or other similar language shall have the same meaning as in section 102(1) of the Bankruptcy Code. Otherwise, a term used herein that is not specifically defined herein shall have the meaning ascribed to that term, if any, in the Bankruptcy Code.

       D.    <u>Exhibits and Plan Documents</u>. All Exhibits to the Plan and all Plan Documents are incorporated into the Plan by this reference and are a part of the Plan as if set forth in full herein. Any Plan Documents may be filed with the Clerk of the Bankruptcy Court prior to the commencement of the Confirmation Hearing. Holders of Claims and Interests may obtain a copy of the Plan Documents, once filed, by a written request sent to the following address: Forshey & Prostok, LLP, 777 Main Street, Suite 1290, Fort Worth, Texas 76102, Attention: Linda Breedlove; Fax number (817) 877-4151; email: lbreedlove@forsheyprostok.com.

**ARTICLE II.**
**<u>CLASSIFICATION OF CLAIMS AND INTERESTS</u>**

2.01.    The following is a designation of the Classes of Claims and Interests under the Plan. Administrative Expenses, Priority Claims of the kinds specified in sections 507(a)(2) and 507(a)(3) of the Bankruptcy Code and Priority Tax Claims have not been classified, are excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code, and their treatment is set forth in Article III of the Plan.  A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class.  A Claim is included in a particular Class only to the extent that the Claim is an Allowed Claim in that Class.

Class 1 – Secured Tax Claims
Class 2 – Terry Partially Secured Claim
Class 3 – General Unsecured Claims
Class 4 – Insider Claims
Class 5 – Interests

2.02.    <u>Impaired Classes of Claims and Interests</u>.  Class 1 is unimpaired.  Classes 2 through 5 are Impaired.

2.03.    <u>Impairment or Classification Controversies</u>. If a controversy arises as to the classification of any Claim or Interest, or as to whether any Class of Claims or Interests is Impaired under the Plan, the Bankruptcy Court shall determine such controversy as a part of the confirmation process.

**ARTICLE III.**
**<u>TREATMENT OF UNCLASSIFIED CLAIMS</u>**

3.01.    <u>Administrative Expenses</u>.

10

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/05/25   Page 737 of 1017   PageID 14364
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 609 of 1803   PageID 11355
Case 19-30264-sgj11   Doc 830   Filed 01/23/19   Entered 01/23/19 17:34:06   Page 59 of 229

(a)    The Reorganized Debtor shall pay, in accordance with the ordinary business terms applicable to each such expense or cost, the reasonable and ordinary expenses incurred in operating the Debtors' businesses or administering the Estate before the Effective Date ("Ordinary Course Claims"). The remaining provisions of this section 3.01 shall not apply to the Ordinary Course Claims, except that if there is a dispute relating to any such Ordinary Course Claim, the Reorganized Debtor may move the Bankruptcy Court to apply the provisions of Article III below relating to Contested Claims and require the holder of the Contested Ordinary Course Claim to assert such Claim through the Chapter 11 Cases.

(b)    Each holder of an Allowed Administrative Expense (other than Ordinary Course Claims and Administrative Expense Claims by Estate Professionals), shall receive (i) the amount of such holder's Allowed Administrative Expense in one Cash payment on the later of the Effective Date or the tenth (10th) Business Day after such Administrative Expense becomes an Allowed Administrative Expense, or (ii) such other treatment as may be agreed to in writing by such Administrative Expense Creditor and the Reorganized Debtor, or as otherwise ordered by the Bankruptcy Court.

(c)    Unless the Bankruptcy Court orders to the contrary or the Reorganized Debtor agrees to the contrary in writing, the holder of a Claim for an Administrative Expense, other than such a Claim by an Estate Professional, an Ordinary Course Claim, or an Administrative Expense which is already Allowed, shall file with the Bankruptcy Court and serve upon the Reorganized Debtor and its counsel a written notice of such Claim for an Administrative Expense within thirty (30) days after the Effective Date. This deadline is the "Administrative Bar Date." Such notice shall include at a minimum: (i) the name, address, telephone number and fax number (if applicable) or email address of the holder of such Claim, (ii) the amount of such Claim, and (iii) the basis of such Claim. **Failure to timely and properly file and serve such notice by the Administrative Bar Date shall result in such Claim for an Administrative Expense being forever barred and discharged and the holder thereof shall be barred from receiving any Distribution from the Reorganized Debtor on account of such Claim for an Administrative Expense**.

(d)    A Claim for an Administrative Expense, for which a proper notice was filed and served under subsection 3.01(c) above, shall become an Allowed Administrative Expense if no Objection is filed within thirty (30) days of the filing and service of such notice. If a timely Objection is filed, the Claim shall become an Allowed Administrative Expense only to the extent allowed by a Final Order.

(e)    The procedures contained in subsections 3.01(a), (c) and (d) above shall not apply to Administrative Expense Claims asserted by Estate Professionals, who shall each file and submit an appropriate final fee application to the Bankruptcy Court no later than sixty (60) days after the Effective Date. A Claim for an Administrative Expense by an Estate Professional in respect of which a final fee application has been properly filed and served shall become an Allowed Administrative Expense only to the extent Allowed by order of the Bankruptcy Court and, if so Allowed, shall be paid in accordance with subsection 3.01(b) above. Professional fees and expenses to any Estate Professional incurred on or after the Effective Date may be paid by the Reorganized Debtor without necessity of application to or order by the Bankruptcy Court.

(f)    If the Reorganized Debtor asserts any Estate Claims as counterclaims or defenses to a Claim for Administrative Expense, the Administrative Expense Claim shall be determined through an adversary proceeding before the Bankruptcy Court. The Bankruptcy

11

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/06/25    Page 738 of 1017    PageID 14365
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 610 of 1803    PageID 11356
Case 18-30264-sgj11    Doc 829    Filed 01/28/19    Entered 01/28/19 17:34:06    Page 60 of 229

Court shall have exclusive jurisdiction to adjudicate and Allow all Claims for any Administrative Expense.

3.02.    Priority Non-Tax Claims.  Each holder of an Allowed Priority Non-Tax Claim shall receive (i) the amount of such holder's Allowed Priority Non-Tax Payment in one Cash payment on the later of the Effective Date or the tenth (10th) Business Day after such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim and a determination has been made that such Allowed Priority Non-Tax Claim is not subject to equitable subordination under section 510(c) of the Bankruptcy Code, or (ii) such other treatment as may be agreed to in writing by such Administrative Expense Creditor and the Reorganized Debtor, or as otherwise ordered by the Bankruptcy Court.

3.03.    Priority Tax Claims. Each holder of an Allowed Priority Tax Claim shall receive (a) one Cash payment in an amount equal to the principal amount of such Allowed Priority Tax Claim, plus interest at the rate and in the manner prescribed by applicable state law from the later of the Petition Date or the first day after the last day on which such Priority Tax Claim may be paid without penalty, no later than sixty (60) days after each such Claim becomes an Allowed Claim, or (b) such other treatment as may be agreed to in writing by the holder of the Priority Tax Claim and the Reorganized Debtor.

3.04.    U.S. Trustee's Fees. The Reorganized Debtor shall pay the U.S. Trustee's quarterly fees incurred pursuant to 28 U.S.C. § 1930(a)(6) which are due as of the Confirmation Date in full on the Effective Date or as soon thereafter as is practicable.  After the Confirmation Date, the Reorganized Debtor shall continue to pay quarterly fees as they accrue until a final decree is entered and the Chapter 11 Cases are closed.  The Reorganized Debtor shall file with the Bankruptcy Court and serve on the U.S. Trustee quarterly financial reports for each quarter, or portion thereof, that the Chapter 11 Cases remain open.

## ARTICLE IV.
## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

4.01.    Class 1 – Secured Tax Claims. Each holder of an Allowed Secured Tax Claim shall receive (a) one Cash payment in an amount equal to the principal amount of such Allowed Secured Tax Claim, plus interest at the rate and in the manner prescribed by applicable state law from the later of the Petition Date or the first day after the last day on which such Secured Tax Claim may be paid without penalty, on the Initial Distribution Date, or (b) such other treatment as may be agreed to in writing by the holder of the Secured Tax Claim and the Reorganized Debtor.  The Liens securing such Secured Tax Claims shall remain unimpaired and unaffected until each such Class 1 Claim is paid in full.  All Distributions on account of Allowed Class 1 Claims shall be made by the Reorganized Debtor.  Class 1 is unimpaired. Holders of Class 1 Claims are conclusively presumed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

4.02.    Class 2 – Terry Partially Secured Claim.  In exchange for a one million dollar ($1,000,000.00) reduction in the amount of the Terry Partially Secured Claim, Terry shall receive one hundred percent (100%) of the equity interests in the Reorganized Debtor as of the Effective Date.  The remaining balance of any Allowed Terry Partially Secured Claim shall be treated and paid as a Class 3 General Unsecured Claim.  Class 2 is Impaired.  The Holder of the Class 2 Terry Partially Secured Claim is entitled to vote on the Plan.

4.03.    Class 3 – General Unsecured Claims.

Appellee Appx. 00604

Appx. 00855

013417

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 06/26/25   Page 739 of 1017   PageID 14366
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 611 of 1803   PageID 11357
Case 19-30264-sgj11   Doc 830   Filed 01/23/19   Entered 01/23/19 17:34:06   Page 61 of 229

(a)      Each holder of an Allowed General Unsecured Claim shall receive a promissory note issued by the Reorganized Debtor (each an "Unsecured Cash Flow Note") on the later of (a) that date that is as soon as practicable after the Effective Date, or (b) that date that is as soon as practicable after such holder's General Unsecured Claim becomes an Allowed Class 3 Claim.  Each Unsecured Cash Flow Note shall be dated as of the Effective Date, bear interest at the Plan Rate and shall mature on that date that is the three (3) years after the Effective Date.

(b)      To the extent of Available Cash, the Reorganized Debtor shall make substantially equal quarterly Distributions of principal and accrued interest to each holder of an Unsecured Cash Flow Note, with the first such quarterly Distribution being due and payable on the 180th day after the Effective Date.  Thereafter, like Distributions shall be made each quarter by the Reorganized Debtor until the Unsecured Cash Flow Note is paid in full.  Notwithstanding the foregoing, in the event that an Unsecured Cash Flow Note is first issued more than one hundred eighty (180) days after the Effective Date, the first Distribution made on account of such Unsecured Cash Flow Note shall be made upon the date that the next Distribution would otherwise be due, but such first Distribution shall also include amounts that would have been distributed to the holder of such Unsecured Cash Flow Note had such Unsecured Cash Flow Note been issued prior to ninety (90) days after the Effective Date, such that the first Distribution shall bring all payments current on account of such Unsecured Cash Flow Note.  If on any date on which a quarterly Distribution is due to the holder of an Unsecured Cash Flow Note the remaining principal and accrued interest owing on account of such Unsecured Cash Flow Note is less than the regular quarterly Distribution amount, the Reorganized Debtor shall make a Distribution to the holder of such Unsecured Cash Flow Note in an amount sufficient to fully satisfy the remaining principal and accrued interest owed, but no more.  Nothing contained herein shall preclude the Reorganized Debtor from prepaying any Unsecured Cash Flow Note.

(c)      If the Reorganized Debtor obtains additional Cash, through litigation recoveries or otherwise, and the Reorganized Debtor determines, in its sole discretion, that the Reorganized Debtor holds Available Cash sufficient to allow one or more Pro Rata Distributions to be made to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims, the Reorganized Debtor may, but shall not be required to, make one or more Pro Rata Distributions to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims.  The amount of the Pro Rata Distribution made to each such holder shall be determined as if Class 3 and Subclass 4A constituted a single Class.  Any such additional Distributions shall be applied to reduce the outstanding balance of each holder's Unsecured Cash Flow Note.

(d)      Class 3 is Impaired.  Holders of Class 3 Claims are entitled to vote on the Plan.

4.04.   Class 4 – Insider Claims.  Holders of Class 4 Insider Claims shall be treated as follows:

(a)      Class 4 Claims shall be divided into two (2) subclasses.  Subclass 4A shall consist of all Allowed Class 4 claims which are not subject to equitable subordination.  Subclass 4B shall consist of all Class 4 claims which are determined by the Bankruptcy Court to be subject to equitable subordination.  If only a part of a Class 4 Claim is subject to equitable subordination, then the portion of such claim subject to equitable subordination shall be included in Subclass 4B and the remainder not subject to equitable subordination shall be included in Subclass 4A.  Subclass 4A and Subclass 4B will vote separately on the Plan, although Subclass 4B is currently an empty class.

Appellee Appx. 00605

Appx. 00856

013418

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/04   Page 740 of 1017   PageID 14367
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 612 of 1803   PageID 11358
Case 19-30264-sgj11   Doc 830   Filed 01/28/19   Entered 01/28/19 17:34:06   Page 62 of 229

(b)     All Class 4 Claims (regardless of which subclass) shall be and remain subject to all Estate Defenses and all Estate Claims, including any rights of offset, recoupment, and/or to an affirmative recovery against the Holder of any Class 4 Claim.

(c)     Each holder of an Allowed Subclass 4A Claim shall receive an Unsecured Cash Flow Note on the later of (a) that date that is as soon as practicable after the Effective Date, or (b) that date that is as soon as practicable after such holder's Subclass 4A Claim becomes an Allowed Subclass 4A Claim.  Each Unsecured Cash Flow Note shall be dated as of the Effective Date, bear interest at the Plan Rate and shall mature on that date that is the three (3) years after the Effective Date.

(d)     To the extent of Available Cash, the Reorganized Debtor shall make substantially equal quarterly Distributions of principal and accrued interest to each holder of an Unsecured Cash Flow Note, with the first quarterly Distribution being due and payable on the 180th day after the Effective Date.  Thereafter, like Distributions shall be made each quarter by the Reorganized Debtor until the Unsecured Cash Flow Note is paid in full.  Notwithstanding the foregoing, in the event that an Unsecured Cash Flow Note is first issued more than one hundred eighty (180) days after the Effective Date, the first Distribution made on account of such Unsecured Cash Flow Note shall be made upon the date that the next Distribution would otherwise be due, but such first Distribution shall also include amounts that would have been distributed to the holder of such Unsecured Cash Flow Note had such Unsecured Cash Flow Note been issued prior to ninety (90) days after the Effective Date, such that the first Distribution shall bring all payments current on account of such Unsecured Cash Flow Note.  If on any date on which a quarterly Distribution is due to the holder of an Unsecured Cash Flow Note the remaining principal and accrued interest owing on account of such Unsecured Cash Flow Note is less than the regular quarterly Distribution amount, the Reorganized Debtor shall make a Distribution to the holder of such Unsecured Cash Flow Note in an amount sufficient to fully satisfy the remaining principal and accrued interest owed, but no more.  Nothing contained herein shall preclude the Reorganized Debtor from prepaying any Unsecured Cash Flow Note.

(e)     If the Reorganized Debtor obtains additional Cash, through litigation recoveries or otherwise, and the Reorganized Debtor determines, in its sole discretion, that the Reorganized Debtor holds Available Cash sufficient to allow one or more Pro Rata Distributions to be made to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims, the Reorganized Debtor may, but shall not be required to, make one or more Pro Rata Distributions to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims.  The amount of the Pro Rata Distribution made to each such holder shall be determined as if Class 3 and Subclass 4A constituted a single Class.  Any such additional Distributions shall be applied to reduce the outstanding balance of each holder's Unsecured Cash Flow Note.

(f)     Unless otherwise provided by Order of the Bankruptcy Court, holders of Allowed Subclass 4B claims shall not be entitled to any Distribution from the Reorganized Debtor until all Allowed Claims included in Classes 1 through 3 and Subclass 4A, including all Unsecured Cash Flow Notes, have been paid in full.

(g)     Holders of Allowed Subclass 4B Claims shall receive a subordinated promissory note issued by the Reorganized Debtor ("Subordinated Unsecured Cash Flow Note") on the later of (a) that date that is as soon as practicable after the Effective Date, or (b) that date that is as soon as practicable after such holder's Subclass 4A Claim becomes an Allowed Subclass 4A Claim.  Each Subordinated Unsecured Cash Flow Note shall be dated as of the Effective Date, bear interest at the Plan Rate and shall mature on the earlier to occur of (i) the date that is two

14

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 06/25/04025 1804   Page 741 of 1017   PageID 14368
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 613 of 1803   PageID 11359
Case 19-30264-sgj11   Doc 839   Filed 01/28/19   Entered 01/28/19 17:34:06   Page 63 of 229

(2) years after the date all Unsecured Cash Flow Notes have been paid in full, or (ii) five (5) years after the Effective Date.

(h)     To the extent of Available Cash, the Reorganized Debtor shall make substantially equal quarterly Distributions of principal and accrued interest to each holder of a Subordinated Unsecured Cash Flow Note, with the first such quarterly Distribution being due and payable on the 90th day after the payment in full of the Unsecured Cash Flow Notes.  Thereafter, like Distributions shall be made each quarter by the Reorganized Debtor until the Subordinated Unsecured Cash Flow Note is paid in full.  Notwithstanding the foregoing, in the event that a Subordinated Unsecured Cash Flow Note is first issued after payments have been made on one or more other Subordinated Unsecured Cash Flow Notes, the first Distribution made on account of such Subordinated Unsecured Cash Flow Note shall be made upon the date that the next Distribution would otherwise be due, but such first Distribution shall also include amounts that would have been distributed to the holder of such Subordinated Unsecured Cash Flow Note had such Subordinated Unsecured Cash Flow Note been issued at the time the first payment on any Subordinated Unsecured Cash Flow Note was made, such that the first Distribution shall bring all payments current on account of such Subordinated Unsecured Cash Flow Note.  If on any date on which a quarterly Distribution is due to the holder of a Subordinated Unsecured Cash Flow Note the remaining principal and accrued interest owing on account of such Subordinated Unsecured Cash Flow Note is less than the regular quarterly Distribution amount, the Reorganized Debtor shall make a Distribution to the holder of such Subordinated Unsecured Cash Flow Note in an amount sufficient to fully satisfy the remaining principal and accrued interest owed, but no more.  Nothing contained herein shall preclude the Reorganized Debtor from prepaying any Subordinated Unsecured Cash Flow Note.

(i)     Subject to section 4.04(f) above, if the Reorganized Debtor obtains additional Cash, through litigation recoveries or otherwise, and the Reorganized Debtor determines, in its sole discretion, that the Reorganized Debtor holds Available Cash sufficient to allow one or more Pro Rata Distributions to be made to holders of Allowed Subclass 4B Claims, the Reorganized Debtor may, but shall not be required to, make one or more Pro Rata Distributions to holders of Allowed Subclass 4B Claims.  Any such additional Distributions shall be applied to reduce the outstanding balance of each holder's Subordinated Unsecured Cash Flow Note.

(j)     The Reorganized Debtor may establish appropriate Reserves as to any Contested Claim included in Class 4.

(k)     Class 4 is Impaired.  Holders of Class 4 Claims are entitled to vote on the Plan.

4.05.   Class 5 – Interests.  All Interests in the Debtors shall be extinguished and shall cease to exist as of the Effective Date. The holders of such Interests shall not receive or retain any property on account of such Interests under the Plan.  Class 5 is Impaired.  Holders of Class 5 Interests are conclusively presumed to have rejected the Plan and, accordingly, are not entitled to vote on the Plan.

## ARTICLE V.
## ACCEPTANCE OR REJECTION OF THE PLAN

5.01.   Classes Entitled to Vote.  Creditors in Classes 2 through 4 are entitled to vote and shall vote separately to accept or reject the Plan.  Any unimpaired Class shall not be entitled to vote to accept or reject the Plan.  Any unimpaired Class is deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

Appellee Appx. 00607
Appx. 00858
013420

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 06/05/25    Page 742 of 1017    PageID 14369
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 614 of 1803    PageID 11360
Case 18-30264-sgj11    Doc 830    Filed 10/24/19    Entered 10/24/19 17:34:06    Page 16 of 229

5.02.   <u>Class Acceptance Requirement</u>. A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan.

5.03.   <u>Cramdown</u>. This section shall constitute the request by the Plan proponent, pursuant to section 1129(b) of the Bankruptcy Code, that the Bankruptcy Court confirm the Plan notwithstanding the fact that the requirements of section 1129(a)(8) of the Bankruptcy Code have not been met.

### ARTICLE VI.
### MEANS FOR IMPLEMENTATION OF THE PLAN

6.01.   <u>Vesting of Assets</u>. As of the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets, including the PMAs, all Cash, Estate Accounts Receivable, Estate Insurance, Estate Claims and Estate Defenses, shall be transferred from the Estate to, and vested in, the Reorganized Debtor, free and clear of all rights, title, interests, claims, liens, encumbrances and charges, except as expressly set forth in the Plan.  On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for all fees, disbursements, expenses or related support services of Professionals (including fees relating to the preparation of professional fee applications) without application to, or approval of, the Bankruptcy Court.

6.02.   <u>Continued Existence of the Debtors</u>.  The Debtors shall continue to exist after the Effective Date, with all the powers available to such legal entities, in accordance with applicable law and pursuant to their constituent documents.  On or after the Effective Date, each Reorganized Debtor may, within its sole and exclusive discretion, take such action as permitted by applicable law and its constituent documents as it determines is reasonable and appropriate.

6.03.   <u>Retention and Assertion of Causes of Action and Defenses</u>.

(a)      Except as expressly set forth in this Plan, all causes of action, claims, counterclaims, defenses and rights of offset or recoupment (including but not limited to all Estate Claims, Estate Defenses and Avoidance Actions) belonging to the Debtors (collectively, the "<u>Retained Causes of Action</u>") shall, upon the occurrence of the Effective Date, be reserved, retained and preserved for, and transferred to, received by and vested, in the Reorganized Debtor for the benefit of the Debtors and the Debtors' estates.  Without limitation, the Retained Causes of Action include the claims and causes of action described on **Exhibit A** attached hereto.

(b)      Except as expressly set forth in this Plan, the rights of the Reorganized Debtor to commence, prosecute or settle the Retained Causes of Action shall be retained, reserved, and preserved notwithstanding the occurrence of the Effective Date. **No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any cause of action against them as any indication that the Debtors or the Reorganized Debtor will not pursue any and all available causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) against them. The Debtors and their Estate expressly reserve all rights to prosecute any and all of the Retained Causes of Action (including all**

Appellee Appx. 00608

Appx. 00859
013421

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1136   Filed 06/25/804   Page 743 of 1017   PageID 14370
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 615 of 1803   PageID 11361
Case 18-302264-sgj11   Doc 830   Filed 10/24/18   Entered 10/24/18 17:34:08   Page 65 of 229

**Estate Claims, Estate Defenses and Avoidance Actions) against any Person, <u>except</u> as
otherwise provided in this Plan**. Unless any causes of action against a Person are expressly
waived, relinquished, exculpated, released, compromised or settled in this Plan or a Final Order,
the Debtors expressly reserve all causes of action (including all Estate Claims, Estate Defenses
and Avoidance Actions) for later adjudication, and, therefore, no preclusion doctrine, <u>including</u>
without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim
preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such causes of
action upon or after the confirmation or consummation of the Plan. The Debtors and the
Reorganized Debtor may also assert Estate Defenses as a defense to the allowance of any
Claim not otherwise Allowed.

6.04.   <u>Assumption of Obligations to Make Distributions</u>.  The Reorganized Debtor shall be
deemed to have assumed the obligations to make all Distributions pursuant to this Plan.

6.05.   <u>Actions by the Debtors and the Reorganized Debtor to Implement Plan</u>.  The entry of the
Confirmation Order shall constitute all necessary authorization for the Debtors and the
Reorganized Debtor to take or cause to be taken all actions necessary or appropriate to
consummate, implement or perform all provisions of this Plan on and after the Effective Date,
and all such actions taken or caused to be taken shall be deemed to have been authorized and
approved by the Bankruptcy Court without further approval, act or action under any applicable
law, order, rule or regulation, including without limitation, (a) all transfers of Assets, including to
the Reorganized Debtor, that are to occur pursuant to the Plan; (b) the cancellation of Interests
and issuance of 100% of the equity interests in the Reorganized Debtor to Terry; (c) the
performance of the terms of the Plan and the making of all Distributions required under the Plan;
and (d) subject to the terms of the Plan, entering into any and all transactions, contracts, or
arrangements permitted by applicable law, order, rule or regulation.

6.06.   <u>Termination of Highland as Shared Services Provider and Sub-Advisor</u>.  The Bankruptcy
Court authorized the Chapter 11 Trustee to terminate the Shared Services Agreement and Sub-
Advisory Agreement and engage Brigade to perform the services previously provided by
Highland.  The Shared Services Agreement and Sub-Advisory Agreement were terminated by
the Chapter 11 Trustee on or about August 1, 2018, and the services previously performed by
Highland were transitioned to Brigade on an interim basis.  Brigade has agreed to continue to
provide shared services and sub-advisory services to the Reorganized Debtor with respect to
the Acis CLOs and the Other Acis-Managed Funds (and any reset Acis CLOs) subject to a
minimum two (2) year term unless otherwise agreed as between the Reorganized Debtor and
Brigade.  Consequently, any agreement between the Reorganized Debtor and Brigade shall
provide that Brigade cannot be removed without cause for a period of two (2) years except as
may be otherwise agreed as between the Reorganized Debtor and Brigade.

6.07.   <u>Continued Portfolio Management by the Reorganized Debtor</u>.  The PMAs and any other
Executory Contracts and Unexpired Leases identified on Exhibit B to the Plan or in the
Confirmation Order shall be assumed and the Reorganized Debtor shall, from an after the
Effective Date, serve as the portfolio manager with respect to the Acis CLOs and the Other
Acis-Managed Funds (and any reset Acis CLOs).  Consistent with Section 15 of the PMAs, the
Reorganized Debtor may only be removed as portfolio manager under the assumed PMAs for
cause as set forth in the PMAs.

6.08.   <u>Reset of the Acis CLOs</u>.  HCLOF has maintained that it desires to reset the Acis CLOs.
The Reorganized Debtor, with the assistance of Brigade as its shared services provider and
sub-advisor, is prepared to promptly seek to perform such reset transactions as set forth herein.

Appellee Appx. 00609
Appx. 00869
013422

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/03/25   Page 744 of 1017   PageID 14371
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 616 of 1803   PageID 11362
Case 19-30264-sgj11   Doc 830   Filed 01/28/19   Entered 01/28/19 17:34:06   Page 68 of 229

HCLOF shall have the right to submit one or more notice(s) of Optional Redemption solely for the purpose of effectuating a reset of one or more of the Acis CLOs under this section 6.08 of the Plan utilizing Refinancing Proceeds (a "Reset Optional Redemption") for each of the Acis CLOs.  If HCLOF requests a Reset Optional Redemption of an Acis CLO, the Reorganized Debtor, with the assistance of Brigade, shall thereafter seek to reset the Acis CLOs, either consecutively or simultaneously, in its good faith business judgment and consistent with then-prevailing market terms; *provided, however*, (i) the Management Fees to be charged by the Reorganized Debtor to any reset Acis CLOs shall remain the same going forward and shall not be increased, and no transaction fee shall be charged by the Reorganized Debtor (other than, for avoidance of doubt, transaction expense reimbursements consistent with market standards), and (ii) HCLOF shall be granted a right of first refusal for any funding of debt or equity required to effectuate a reset of each of the Acis CLOs.  The terms of the Indentures shall control any Reset Optional Redemption.  If HCLOF elects not to reset one or more of the Acis CLOs, then the Acis CLOs will continue to be managed in accordance with market standards.

6.09.    Post-Effective Date Service List.  Pleadings filed by any party-in-interest with the Bankruptcy Court after the Effective Date shall be served on the following Persons (collectively the "Service List"): (a) any Person directly affected by the relief sought in the pleading, (b) the U.S. Trustee, (c) parties which have filed a Notice of Appearance in the Chapter 11 Cases, and (d) the Reorganized Debtor.

6.10.    Section 505 Powers.  All rights and powers pursuant to section 505 of the Bankruptcy Code are hereby reserved to the Estate and shall be transferred to, and vested in, the Reorganized Debtor as of the Effective Date.

6.11.    Section 510(c) Powers.  All rights and powers to seek or exercise any right or remedy of equitable subordination are hereby reserved to the Estate and shall be transferred to, and vested in, the Reorganized Debtor as of the Effective Date as an Estate Defense.

6.12.    Section 506(c) Powers.  The Estate hereby reserves all rights and powers pursuant to section 506(c) of the Bankruptcy Code, and all such rights shall be specifically transferred to, and vested in, the Reorganized Debtor.

6.13.    Plan Injunction.  The Reorganized Debtor shall each have full power, standing and authority to enforce the Plan Injunction against any Person, either through an action before the Bankruptcy Court or any other tribunal having appropriate jurisdiction.

6.14.    Cancellation of Interests.  Except as otherwise specifically provided herein, upon the Effective Date of the Plan: (a) all Interests in the Debtors shall be cancelled; and (b) all obligations or debts of, or Claims against, the Debtors on account of, or based upon, the Interests shall be deemed as cancelled, released and discharged, including all obligations or duties by the Debtors relating to the Interests in any of their respective formation documents, including Acis LP's limited partnership agreement and bylaws, Acis GP's articles of formation and company agreement, or any similar formation or governing documents.

### ARTICLE VII.
### PROVISIONS GOVERNING DISTRIBUTION

7.01.    Distributions from Reorganized Debtor.  The Reorganized Debtor shall be responsible for making Distributions to holders of Allowed Claims only to the extent this Plan requires Distributions to be made by the Reorganized Debtor.  The priority of Distributions from the

Appellee Appx. 00610
Appx. 00861
013423

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Page 16 of 25   Page 745 of 1017   PageID 14372
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 617 of 1803   PageID 11363
Case 18-30264-sgj11   Doc 830   Filed 10/26/18   Entered 10/26/18 17:34:06   Page 67 of 229

Reorganized Debtor shall be in accordance with the terms of this Plan and the Confirmation Order as follows:

(a)     First, to satisfy Allowed Class 1 Secured Tax Claims;

(b)     Second, to satisfy Allowed Administrative Expenses and Allowed Priority Claims in accordance with Article III above, including all U.S. Trustee quarterly fees due and owing as of the Effective Date;

(c)     Third, to make Distributions to holders of any Allowed Class 3 General Unsecured Claims and Allowed Subclass 4A Claims; and

(e)     Fourth, to make Distributions to holders of any Allowed Subclass 4B Claims

7.02.     Reserves.  The Reorganized Debtor may estimate, create and set aside Reserves as may be necessary or appropriate, including without limitation, Reserves on account of Contested Claims.  The Reorganized Debtor may, but shall not be required to, move the Bankruptcy Court to approve: (a) the amount of, and terms on which, such Reserves shall be held, maintained and disbursed, or (b) the amount and timing of any proposed interim Distribution to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims.  The Reorganized Debtor may elect to seek approval by the Bankruptcy Court for the creation and amount of any Reserves or regarding the amount or timing of any Distribution on account of any Allowed Claims.  Except as otherwise expressly provided herein, the Reorganized Debtor, in the exercise of its good faith business judgment, may transfer funds out of any of the Reserves as necessary or appropriate.  However, the Reorganized Debtor shall not be required to create separate accounts for such Reserves which may be created and memorialized by entries or other accounting methodologies, which may be revised from time-to-time, to enable the Reorganized Debtor to determine the amount of Cash available for Distributions under the Plan.  Subject to any specific deadlines set forth herein, the Reorganized Debtor, shall determine, from time-to-time, in the exercise of the Reorganized Debtor's good faith business judgment: (x) the amount of Cash available for Distribution, (y) the timing of any Distributions, and (z) the amount and creation of any Reserves for Contested Claims.  The Reorganized Debtor shall not be entitled to reserve for, and this section 7.02 does not apply to, Distributions to holders of Allowed Subclass 4B Claims.

7.03.     Prosecution and Settlement of Estate Claims.  Upon the Effective Date, the Reorganized Debtor (a) shall automatically be substituted in place of the Chapter 11 Trustee as the party representing the Estate in respect of any pending lawsuit, motion or other pleading pending before the Bankruptcy Court or any other tribunal, and (b) is authorized to file a notice on the docket of each adversary proceeding or the Chapter 11 Cases regarding such substitution.  The Reorganized Debtor shall have exclusive standing and authority to prosecute, settle or compromise Estate Claims for the benefit of the Estate in the manner set forth in this Plan.

7.04.     Plan Injunction.  The Reorganized Debtor shall be entitled to the full protection and benefit of the Plan Injunction and shall have standing to bring any action or proceeding necessary to enforce the Plan Injunction against any Person.

7.05.     Relief from the Bankruptcy Court.  The Reorganized Debtor shall be authorized to seek relief from the Bankruptcy Court or any other tribunal having jurisdiction as to any matter relating or pertaining to the consummation, administration or performance of this Plan, including without

Appellee Appx. 00611
Appx. 00862
013424

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/06/25   Page 746 of 1017   PageID 14373
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 618 of 1803   PageID 11364
Case 18-30264-sgj11   Doc 830   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 68 of 229

limitation seeking any relief from the Bankruptcy Court which the Reorganized Debtor deems necessary or appropriate to the performance of its duties or the administration of this Plan.

## ARTICLE VIII.
## SOURCE OF DISTRIBUTIONS

8.01.   Source of Distributions.  All Distributions under this Plan shall be made by the Reorganized Debtor in the manner provided in this Plan and the Confirmation Order.

8.02.   Timing and Amount of Distributions.  No Distribution shall be made on account of any Claim until such Claim is Allowed, except as otherwise set forth in this Plan or otherwise ordered by the Bankruptcy Court.  No Distribution shall be made on account of any Contested Claim until such Claim is Allowed.  Except as expressly set forth in the Plan or in the Confirmation Order, the Reorganized Debtor shall, in the exercise of its good faith business judgment, determine the timing and amount of all Distributions which are required to be made under the Plan, consistent with the goal of making such Distributions as expeditiously as reasonably possible.  The Reorganized Debtor may, but shall not be required to, seek approval of, or any other appropriate relief from, the Bankruptcy Court with respect to any of such Distributions.  Any Unclaimed Property may be paid into the registry of the Bankruptcy Court or otherwise distributed in accordance with the orders of the Bankruptcy Court.

8.03.   Means of Cash Payment.  Cash payments pursuant to this Plan shall be made by check drawn on, or by wire transfer from, a domestic bank, or by other means agreed to by the payor and payee.

8.04.   Record Date for Distributions.  As of the close of business on the Effective Date (the "Distribution Record Date"), the register for Claims will be closed, and there shall be no further changes in the holders of record of any Claims.  Although there is no prohibition against the transfer of any Claim by any Creditor, the Reorganized Debtor shall have no obligation to recognize any transfer of a Claim occurring after the Distribution Record Date, and the Reorganized Debtor shall instead be authorized and entitled to recognize and deal for all purposes under this Plan, including for the purpose of making all Distributions, with only those holders of Claims so reflected as of the Distribution Record Date.  However, the Reorganized Debtor may, in the exercise of its good faith business judgment, agree to recognize transfers of Claims after the Distribution Record Date, but shall have no obligation to do so.

8.05.   Delivery of Distributions.  All Distributions, deliveries and payments to the holders of any Allowed Claims shall be made to the addresses set forth on the respective proofs of Claim filed in the Chapter 11 Cases by such Claimants or, if the Distribution is to be made based on a Claim reflected as Allowed in the Schedules, at the address reflected in the Schedules.  Any such Distribution, delivery or payment shall be deemed as made for all purposes relating to this Plan when deposited in the United States Mail, postage prepaid, addressed as required in the preceding sentence.  If any Distribution is returned as undeliverable, no further Distribution shall be made on account of such Allowed Claim unless and until the Reorganized Debtor is notified of such holder's then current address, at which time all missed Distributions shall be made to the holder of such Allowed Claim.  However, all notices to the Reorganized Debtor reflecting new or updated addresses for undeliverable Distributions shall be made on or before one hundred twenty (120) days after the date of the attempted Distribution or such longer period as the Reorganized Debtor may fix in the exercise of its sole discretion.  After such date, all Unclaimed Property shall revert to the Reorganized Debtor and the Claim of any holder with respect to such property shall be discharged and forever barred.

Appellee Appx. 00612
Appx. 00603
013425

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 06/05/25   Page 747 of 1017   PageID 14374
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 619 of 1803   PageID 11365
Case 18-30264-sgj11   Doc 830   Filed 01/23/19   Entered 01/23/19 18:34:08   Page 69 of 229

8.06.   <u>W-9 Forms</u>.  Each holder of an Allowed Claim must provide a W-9 form or other such necessary information to comply with any withholding requirements of any Governmental Unit (collectively the "<u>W-9 Form</u>") to the Reorganized Debtor prior to receiving any Distribution from the Reorganized Debtor.  In the event a holder of an Allowed Claim does not provide a W-9 Form to the Reorganized Debtor within thirty (30) days of the Effective Date, the Reorganized Debtor shall, at an appropriate time, issue a written request to each holder of an Allowed Claim that has not previously provided a W-9 Form to the Reorganized Debtor.  The request shall be in writing and shall be delivered to the last address known to the Debtors or Reorganized Debtor, as appropriate.  The request shall conspicuously advise and disclose that failure to provide a W-9 Form to the Reorganized Debtor within thirty (30) days shall result in a waiver of any right or rights to a Distribution from the Reorganized Debtor.  In the event any holder of an Allowed Claim fails to provide the Reorganized Debtor with a W-9 Form within thirty (30) days after the date of written request described herein, then the holder of such Allowed Claim shall be deemed to have waived the right to receive any Distribution whatsoever from the Reorganized Debtor.

8.07.   <u>Time Bar to Cash Payments</u>.  Checks issued in respect of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the issuer of the check by the holder of the Allowed Claim with respect to which such check originally was issued.  Any Claim in respect of such a voided check shall be made on or before one hundred twenty (120) days after the date of issuance of such check or such longer period as the Reorganized Debtor may fix.  After such date, all Claims in respect of void checks shall be discharged and forever barred.

8.08.   <u>Cure Period</u>.  Except as otherwise set forth herein, the failure by the Reorganized Debtor to timely perform any term, provision or covenant contained in this Plan, or to make any payment or Distribution required by this Plan to any Creditor, or the failure to make any payment or perform any covenant on any note, instrument or document issued pursuant to this Plan, shall not constitute an event of default unless and until the Reorganized Debtor has been given thirty (30) days written notice of such alleged default in the manner provided in this Plan, and provided an opportunity to cure such alleged default.  Until the expiration of such thirty (30) day cure period, the Reorganized Debtor shall not be in default, and performance during such thirty (30) day cure period shall be deemed as timely for all purposes.  Such written notice and passage of the thirty (30) day cure period shall constitute conditions precedent to declaring or claiming any default under this Plan or bringing any action or legal proceeding by any Person to enforce any right granted under this Plan.

8.09.   <u>Pre-Payment of Claims</u>.  Unless the Plan expressly prohibits or conditions the pre-payment of an Allowed Claim, the Reorganized Debtor may pre-pay any Allowed Claim in whole or in part at any time and may do so without penalty.

8.10.   <u>Distributions after Substantial Consummation</u>.  All Distributions of any kind made to any Creditor after Substantial Consummation and any and all other actions taken under this Plan after Substantial Consummation shall not be subject to relief, reversal or modification by any court unless the implementation of the Confirmation Order is stayed by an order granted under Bankruptcy Rule 8005.

Appellee Appx. 00613
Appx. 00804
013426

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 02/06/25   Page 748 of 1017   PageID 14375
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 620 of 1803   PageID 11366
Case 18-30264-sgj11   Doc 830   Filed 01/23/19   Entered 01/23/19 17:34:06   Page 72 of 229

## ARTICLE IX.
## RETENTION OF ESTATE CLAIMS AND ESTATE DEFENSES.

9.01.   Retention of Estate Claims.  Except as otherwise specifically provided in this Plan, pursuant to section 1123(b)(3) of the Bankruptcy Code, all Estate Claims shall be transferred to, and vested in, the Reorganized Debtor, both for purposes of seeking an affirmative recovery against any Person and for the purposes of offset, recoupment or defense against any Claim asserted against the Estate or Reorganized Debtor.  All Estate Claims shall be deemed to have been transferred to, and vested in, the Reorganized Debtor as of the Effective Date based on the entry of the Confirmation Order.

Without limiting the effectiveness or generality of the foregoing reservation, out of an abundance of caution, the Debtors and the Estate hereby specifically reserves, retains, and preserves the Estate Claims reflected in the attached **Exhibit A**.  Reference is here made to **Exhibit A** which constitutes an integral part of this Plan.  The provisions of this Article of the Plan, as well as the descriptions and disclosures relating to the Estate Claims in the Disclosure Statement, are provided in the interest of providing maximum disclosure of the Estate Claims of which Debtors are presently aware and shall not act as a limitation on the potential Estate Claims that may exist.  It is the specific intention of this Plan that all Avoidance Actions and all associated remedies, and any other Estate Claims, whether arising before or after the Petition Date, and whether arising under the Bankruptcy Code or applicable state or federal non-bankruptcy laws, shall all be reserved, retained and preserved under this Plan to be transferred to, and vested in, the Reorganized Debtor.  All Estate Claims are reserved, retained and preserved both as causes of action for an affirmative recovery and as counterclaims and for the purposes of offset or recoupment against any Claims asserted against the Estate.

9.02.   Retention of Estate Defenses.  Except as otherwise specifically provided in this Plan, pursuant to section 1123(b)(3) of the Bankruptcy Code, all Estate Defenses shall be transferred to, and vested in, the Reorganized Debtor.  For this purpose, all Estate Defenses are hereby reserved, retained and preserved by the Debtors and the Estate, including without limitation all such Estate Defenses available to the Estate pursuant to section 558 of the Bankruptcy Code, and shall be deemed as transferred to, and vested in, the Reorganized Debtor as of the Effective Date based on the entry of the Confirmation Order.

9.03.   Assertion of Estate Claims and Estate Defenses.  The Reorganized Debtor shall have, and be vested with, the exclusive right, authority and standing to assert all Estate Claims and Estate Defenses for the benefit of the Reorganized Debtor.

## ARTICLE X.
## PROCEDURES FOR RESOLVING AND TREATING
## CONTESTED AND CONTINGENT CLAIMS

10.01.   Claims Listed in Schedules as Disputed.  Any General Unsecured Claim which is listed in the Schedules as unliquidated, contingent or disputed, and for which no proof of Claim has been timely filed, shall be considered as Disallowed as of the Effective Date without the necessity of any further action by the Reorganized Debtor or further order of the Bankruptcy Court other than the entry of the Confirmation Order.

10.02.   Responsibility for Objecting to Claims and Settlement of Claims.  The Reorganized Debtor shall have the exclusive standing and authority to either object to any Claim or settle and compromise any Objection to any Claim, including as follows:

Appellee Appx. 00614
Appx. 00865
013427

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 55-16   Page 162 of 1804   Page 749 of 1017   PageID 14376
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 621 of 1803   PageID 11367
Case 19-30264-sgj11   Doc 820   Filed 01/23/19   Entered 01/23/19 17:34:06   Page 71 of 229
Case 19-30264-sgj11   Doc 830   Filed 01/23/19   Entered 01/23/19 16:25:08   Page 23 of 32

(a)     From and after the Effective Date, the Reorganized Debtor shall have the sole and exclusive right to (i) file, settle, or litigate to Final Order any Objections to any Claims; and (ii) seek to subordinate any Claim.  Any Contested Claim may be litigated to Final Order by the Reorganized Debtor; and

(b)     From and after the Effective Date, the Reorganized Debtor shall have the sole and exclusive right to settle, compromise or otherwise resolve any Contested Claim without the necessity of any further notice or approval of the Bankruptcy Court.  Bankruptcy Rule 9019 shall not apply to any settlement or compromise of a Contested Claim after the Effective Date.

10.03.  Objection Deadline.  All Objections to Claims shall be served and filed by the Objection Deadline; provided, however, the Objection Deadline shall not apply to Claims which are not reflected in the claims register, including any alleged informal proofs of Claim.  The Reorganized Debtor may seek to extend the Objection Deadline pursuant to a motion filed on or before the then applicable Objection Deadline with respect to any Claim.  Any such motion may be granted without notice or a hearing.  In the event that the Reorganized Debtor files such a motion and the Bankruptcy Court denies such motion, the Objection Deadline shall nevertheless be automatically extended to that date which is ten (10) Business Days after the date of entry of the Bankruptcy Court's order denying such motion.  Any proof of Claim other than one based upon a Rejection Claim and which is filed more than thirty (30) days after the Effective Date shall be of no force and effect and need not be objected to by the Reorganized Debtor.  Nothing contained herein shall limit the right of the Reorganized Debtor to object to Claims, if any, filed or amended after the Objection Deadline.

10.04.  Response to Claim Objection.  If the Reorganized Debtor files an Objection to any Claim, then the holder of such Claim shall file a written response to such Objection within twenty-four (24) days after the filing and service of the Objection upon the holder of the Contested Claim.  Each such Objection shall contain appropriate negative notice advising the Creditor whose Claim is subject to the Objection of the requirement and time period to file a response to such Objection and that, if no response is timely filed to the Objection, the Bankruptcy Court may enter an order that such Claim is Disallowed without further notice or hearing.  The negative notice language in the Objection shall satisfy the notice requirement in section 3007(a) of the Bankruptcy Rules, and the Reorganized Debtor shall not be required to send a separate notice of the Objection to the Creditor whose Claim is subject to the Objection.

10.05.   Distributions on Account of Contested Claims.  If a Claim is Contested, then the dates for any Distributions as to such Contested Claim shall be determined based upon its date of Allowance, and thereafter Distribution shall be made on account of such Allowed Claim pursuant to the provisions of the Plan.  No Distribution shall be made on account of a Contested Claim until Allowed.  Until such time as a contingent Claim becomes fixed and absolute by a Final Order Allowing such Claim, such Claim shall be treated as a Contested Claim for purposes of estimates, allocations, and Distributions under the Plan.  Any contingent right to contribution or reimbursement shall continue to be subject to section 502(e) of the Bankruptcy Code.

10.06.  No Waiver of Right to Object.  Except as expressly provided in this Plan, nothing contained in the Disclosure Statement, this Plan, or the Confirmation Order shall waive, relinquish, release or impair the Reorganized Debtor's right to object to any Claim.

10.07.  Offsets and Defenses.  The Reorganized Debtor shall be vested with and retain all Estate Claims and Estate Defenses, including without limitation all rights of offset or recoupment and all counterclaims against any Claimant holding a Claim.  Assertion of counterclaims by the

23

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 06/26/25   Page 750 of 1017   PageID 14377
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 622 of 1803   PageID 11368
Case 19-30264-sgj11   Doc 830   Filed 10/24/19   Entered 10/24/19 17:34:06   Page 72 of 229

Reorganized Debtor against any Claim asserted against the Estate or Reorganized Debtor shall constitute "core" proceedings.

10.08.  Claims Paid or Reduced Prior to Effective Date.  Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by the Debtors prior to the Effective Date, including pursuant to orders of the Bankruptcy Court.  To the extent such payments are not reflected in the Schedules, such Schedules will be deemed amended and reduced to reflect that such payments were made.  Nothing in the Plan shall preclude the Debtors or the Reorganized Debtor from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

## ARTICLE XI.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

11.01.  Assumption and Rejection of Executory Contracts.  All Executory Contracts and Unexpired Leases of the Debtors shall be deemed rejected by the Debtors upon the Effective Date unless an Executory Contract or Unexpired Lease (a) has been previously assumed or rejected pursuant to an order of the Bankruptcy Court, (b) is identified in **Exhibit B** to this Plan and/or the Confirmation Order to be (i) assumed or (ii) assumed and assigned, or (c) is the subject of a motion to assume filed on or before the Confirmation Date. The Plan shall constitute a motion to reject all Executory Contracts and Unexpired Leases except as stated in this paragraph.  However, the Debtors may file a separate motion for the assumption or rejection of any Executory Contract or Unexpired Lease at any time through the Confirmation Date.

11.02.  Cure Payments.  All payments that may be required by section 365(b)(1) of the Bankruptcy Code to satisfy any Cure Claim shall be made by the Reorganized Debtor as soon as reasonably practical after the Effective Date or upon such terms as may be otherwise agreed between the Reorganized Debtor and the holder of such Cure Claim; *provided, however*, in the event of a dispute regarding the amount of any Cure Claim, the cure of any other defaults, or any other matter pertaining to assumption or assignment of an Executory Contract, the Reorganized Debtor shall make such cure payments and cure such other defaults, all as may be required by section 365(b)(1) of the Bankruptcy Code, following the entry of a Final Order by the Bankruptcy Court resolving such dispute.

11.03.  Bar to Rejection Claims.  Except as otherwise ordered by the Bankruptcy Court, any Rejection Claim based on the rejection of an Executory Contract or Unexpired Lease shall be forever barred and shall not be enforceable against the Reorganized Debtor or the Reorganized Debtor's assets unless a proof of Claim is filed with the Bankruptcy Court and served upon the Reorganized Debtor and its counsel by the earlier of thirty (30) days after the Effective Date or thirty (30) days after entry of the Final Order approving rejection of such Executory Contract or Unexpired Lease.

11.04.  Rejection Claims.  Any Rejection Claim not barred by section 11.03 of the Plan shall be classified as a Class 3 General Unsecured Claim subject to the provisions of sections 502(b)(6) and 502(g) of the Bankruptcy Code; *provided, however*, that any Rejection Claim by a lessor based upon the rejection of an unexpired lease of real property, either prior to the Confirmation Date, upon the entry of the Confirmation Order, or upon the Effective Date, shall be limited in accordance with section 502(b)(6) of the Bankruptcy Code and state law mitigation requirements.  All Rejection Claims shall be deemed as Contested Claims until Allowed. Nothing contained herein shall be deemed an admission by the Debtors or the Reorganized

Appellee Appx. 00616
Appx. 00607
013429

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 06/26/25   Page 751 of 1017   PageID 14378
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 623 of 1803   PageID 11369
Case 18-30264-sgj11   Doc 830   Filed 01/24/19   Entered 01/24/19 17:34:06   Page 73 of 229

Debtor that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Debtors or the Reorganized Debtor of any objections or defenses to any such Rejection Claim if asserted.

11.05.  Reservation of Rights.  Nothing contained in the Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtor have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Reorganized Debtor shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

## ARTICLE XII.
## SUBSTANTIVE CONSOLIDATION OF THE DEBTORS

12.01.  Pursuant to the Confirmation Order, the Bankruptcy Court shall approve the substantive consolidation of the Debtors for the sole purposes of implementing the Plan, including for purposes of voting and Distributions to be made under the Plan.  Pursuant to such order:  (a) all assets and liabilities of the Debtors will be deemed merged; (b) all guarantees by one Debtor of the obligations of the other Debtor will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by the other Debtor and any joint or several liability of the Debtors will be deemed to be one obligation of the consolidated Debtors; and (c) each and every Claim filed or to be filed in the Chapter 11 Case of either Debtor will be deemed filed against the consolidated Debtors and will be deemed one Claim against and a single obligation of the consolidated Debtors.

## ARTICLE XIII.
## CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF PLAN

13.01.  Conditions to Confirmation and Effectiveness of Plan.  The Plan shall not become effective until the following conditions shall have been satisfied and which may occur concurrently with the Effective Date:  (a) the Confirmation Order shall have been entered, in form and substance acceptable to the Chapter 11 Trustee; (b) the necessary Plan Documents have been executed and delivered, and (c) all other conditions specified by the Chapter 11 Trustee have been satisfied.  Any or all of the above conditions other than (a) may be waived at any time by the Chapter 11 Trustee.

13.02.  Notice of the Effective Date.  On or as soon as reasonably practical after the occurrence of the Effective Date, the Reorganized Debtor shall cause a notice of the Effective Date to be filed with the Bankruptcy Court and served on all Creditors and parties-in-interest.

13.03.  Revocation of Plan.  The Chapter 11 Trustee may revoke and withdraw the Plan at any time before the Effective Date.  If the Chapter 11 Trustee revokes or withdraws the Plan, or if confirmation of the Plan does not occur, then this Plan shall be deemed null and void and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtors, as the case may be, or any other Person, or to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors.

Appellee Appx. 00617
Appx. 00868
013430

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-6   Filed 05/20/25   Page 752 of 1017   PageID 14379
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 624 of 1803   PageID 11370
Case 18-30264-sgj11   Doc 830   Filed 01/23/19   Entered 01/23/19 17:34:06   Page 26 of 229

**ARTICLE XIV.**
**EFFECT OF THE PLAN ON CLAIMS AND INTERESTS**

14.01.  Compromise and Settlement

(a)     Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the classification, potential Distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies subject to, or dealt with, under this Plan, including, without limitation, all Claims against the Debtors or Estate arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, fixed or contingent, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtors or the Estate.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements embodied in this Plan, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interest of the Debtors, the Estate, Creditors and other parties-in-interest, and are fair, equitable and within the range of reasonableness.  The rights afforded in the Plan and the treatment of all Claims and Interests herein shall be in exchange for, and in complete satisfaction and release of, all Claims and Interests of any nature whatsoever against and in the Debtors, the Estate, and the Assets.  Except as otherwise provided herein, all Persons shall be precluded and forever barred by the Plan Injunction from asserting against the Debtors and their affiliates, successors, assigns, the Reorganized Debtor or the Reorganized Debtor's Assets, or the Estate, any event, occurrence, condition, thing, or other or further Claims or causes of action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

(b)     It is not the intent of this Plan that confirmation of the Plan shall in any manner alter or amend any settlement and compromise (including those contained in agreed orders) between the Debtors and any Person that has been previously approved by the Bankruptcy Court (each, a "Prior Settlement").  To the extent of any conflict between the terms of the Plan and the terms of any Prior Settlement, the terms of the Prior Settlement shall control and such Prior Settlement shall be enforceable according to its terms.

14.02.  Discharge.  The Debtors and their successors in interest and assigns shall be deemed discharged and released pursuant to section 1141(d)(1) of the Bankruptcy Code from any and all Claims provided for in the Plan.

14.03.  **PLAN INJUNCTION.**

**THIS SECTION IS REFERRED TO HEREIN AS THE "PLAN INJUNCTION." EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, AS OF THE EFFECTIVE DATE ALL HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE ESTATE OR ANY OF THE ASSETS THAT AROSE PRIOR TO THE EFFECTIVE DATE ARE HEREBY PERMANENTLY ENJOINED AND PROHIBITED FROM THE FOLLOWING:  (a) THE COMMENCING OR CONTINUATION IN ANY MANNER, DIRECTLY OR INDIRECTLY, OF ANY ACTION, CASE, LAWSUIT OR OTHER PROCEEDING OF ANY TYPE OR NATURE AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS WITH RESPECT TO**

Appellee Appx. 00618
Appx. 00860
013431

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/02/25   Page 753 of 1017   PageID 14380
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 625 of 1803   PageID 11371
Case 19-30264-sgj11   Doc 830   Filed 01/28/19   Entered 01/28/19 17:34:06   Page 75 of 229

ANY SUCH CLAIM OR INTEREST ARISING OR ACCRUING BEFORE THE EFFECTIVE DATE, INCLUDING WITHOUT LIMITATION THE ENTRY OR ENFORCEMENT OF ANY JUDGMENT, OR ANY OTHER ACT FOR THE COLLECTION, EITHER DIRECTLY OR INDIRECTLY, OF ANY CLAIM OR INTEREST AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS; (b) THE CREATION, PERFECTION OR ENFORCEMENT OF ANY LIEN, SECURITY INTEREST, ENCUMBRANCE, RIGHT OR BURDEN, EITHER DIRECTLY OR INDIRECTLY, AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, OR (c) TAKING ANY ACTION IN RELATION TO THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, EITHER DIRECTLY OR INDIRECTLY, WHICH VIOLATES OR DOES NOT CONFORM OR COMPLY WITH THE PROVISIONS OF THIS PLAN APPLICABLE TO SUCH CLAIM OR INTEREST. THE PLAN INJUNCTION SHALL ALSO BE INCORPORATED INTO THE CONFIRMATION ORDER.

IN ADDITION TO THE FOREGOING, EXCEPT TO THE EXTENT NECESSARY TO ALLOW HCLOF, THE REORGANIZED DEBTOR AND BRIGADE TO EFFECTUATE THE RESET OF ONE OR MORE OF THE ACIS CLOS IN ACCORDANCE WITH SECTION 6.08 OF THE PLAN, PURSUANT TO SECTIONS 105(a), 1123(a)(5), 1123(b)(6), AND 1142(b) OF THE BANKRUPTCY CODE, THE ENJOINED PARTIES (DEFINED BELOW) ARE HEREBY ENJOINED FROM: (a) PROCEEDING WITH, EFFECTUATING, OR OTHERWISE TAKING (i) ANY ACTION IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS PREVIOUSLY OR CURRENTLY ISSUED BY ANY SUCH PARTIES, AND (ii) ANY OTHER ATTEMPT TO LIQUIDATE THE ACIS CLOS BY ANY MEANS, (b) TRADING ANY ACIS CLO COLLATERAL IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, (c) EXERCISING ANY RIGHTS TO ASK OR DIRECT THE ISSUERS, CO-ISSUERS OR INDENTURE TRUSTEE TO PERFORM ANY ACTION IN RELATION TO THE ACIS CLOS THAT THE ENJOINED PARTIES ARE PROHIBITED FROM TAKING UNDER THE TERMS OF THE PLAN INJUNCTION, (d) INTERFERING IN ANY WAY WITH THE CAPITAL MARKETS PROCESS OF RESETTING ANY ACIS CLO, AND (e) SENDING, MAILING, OR OTHERWISE DISTRIBUTING ANY NOTICE TO THE HOLDERS OF THE NOTES IN THE ACIS CLOS IN CONNECTION WITH THE EFFECTUATION OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, UNTIL THE EARLIER TO OCCUR OF: (w) THE DATE UPON WHICH A FINAL ORDER IS ENTERED RESOLVING THE ESTATE'S AVOIDANCE CLAIMS AGAINST ALL ENJOINED PARTIES RELATING TO ACIS LP'S RIGHTS UNDER THE ALF PMA; (x) THE DATE UPON WHICH ALL ALLOWED CLAIMS AGAINST THE DEBTORS HAVE BEEN PAID IN FULL, (y) THE ENTRY OF AN ORDER BY THE BANKRUPTCY COURT FINDING THAT A MATERIAL DEFAULT HAS OCCURRED UNDER THE TERMS OF THE PLAN, OR (z) THE ENTRY OF A SUBSEQUENT ORDER BY THE BANKRUPTCY COURT PROVIDING OTHERWISE WITH RESPECT TO ONE OR MORE OF THE ACIS CLOS. FOR PURPOSES OF THIS PARAGRAPH, THE TERM "<u>ENJOINED PARTIES</u>" SHALL INCLUDE HIGHLAND, HCLOF, CLO HOLDCO, NEUTRA, HIGHLAND HCF, HIGHLAND CLOM, ANY AFFILIATES OF

Appellee Appx. 00619
Appx. 00879
013432

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 06/06/25   Page 754 of 1017   PageID 14381
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 626 of 1803   PageID 11372
Case 19-30264-sgj11   Doc 830   Filed 01/28/19   Entered 01/28/19 17:34:06   Page 28 of 229

**HIGHLAND, AND THEIR RESPECTIVE EMPLOYEES, AGENTS, REPRESENTATIVES, TRANSFEREES, ASSIGNS, AND SUCCESSORS. FOR PURPOSES OF CLARIFICATION AND AVOIDANCE OF DOUBT, NOTHING IN THIS PARAGRAPH SHALL PRECLUDE ORDINARY DAY-TO-DAY TRADING OF THE COLLATERAL IN THE ACIS CLOS BY THE REORGANIZED DEBTOR.**

Notwithstanding anything to the contrary in the Plan: (a) third-party professionals employed by the Reorganized Debtor shall not be released or exculpated from any losses, claims, damages, liabilities, or expenses arising from their duties and services provided to the Reorganized Debtor; and (b) any third-party professionals employed by the Reorganized Debtor shall only be entitled to be indemnified by the Reorganized Debtor to the extent provided by applicable law.

Notwithstanding anything to the contrary in the Plan or Confirmation Order, nothing in the Plan or in the Confirmation Order shall discharge, release, enjoin or otherwise bar (i) any liability of the Debtors, the Estate, the Reorganized Debtor, or the Reorganized Debtor's assets ("Released Parties") to a Governmental Unit arising on or after the Confirmation Date with respect to events occurring after the Confirmation Date, provided that the Released Parties reserve the right to assert that any such liability is a Claim that arose on or prior to the Confirmation Date and constitutes a Claim that is subject to the deadlines for filing proofs of claim, (ii) any liability to a Governmental Unit that is not a Claim subject to the deadlines for filing proofs of Claim, (iii) any valid right of setoff or recoupment of a Governmental Unit, and (iv) any police or regulatory action by a Governmental Unit. In addition, nothing in the Plan or Confirmation Order discharges, releases, precludes or enjoins any environmental liability to any Governmental Unit that any Person other than the Released Parties would be subject to as the owner or operator of the property after the Effective Date. For the avoidance of any doubt, nothing in this paragraph shall be construed to limit the application of the Plan Injunction to any Claim which was subject to any bar date applicable to such Claim.

14.04. <u>Setoffs</u>. Except as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the holder of a Claim, the Reorganized Debtor may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim (before such Distribution is made), any Claims, rights, Estate Claims and Estate Defenses of any nature that the Debtors may hold against the holder of such Allowed Claim, to the extent such Claims, rights, Estate Claims and Estate Defenses against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); <u>provided, however</u>, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release of any such Claims, rights, Estate Claims and Estate Defenses that the Estate may possess against such Claimant. In no event shall any Claimant or Interest holder be entitled to setoff any Claim or Interest against any Claim, right, or Estate Claim of the Debtors without the consent of the Debtors or the Reorganized Debtor unless such holder files a motion with the Bankruptcy Court requesting the authority to perform such setoff notwithstanding any indication in any proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

14.05. <u>Recoupment.</u> Except as otherwise expressly provided for in the Plan, in no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, account receivable, or Estate Claim of the Debtors or the Reorganized Debtor unless (a) such holder actually provides notice thereof in writing to the Debtors or the Reorganized Debtor of its intent to perform a recoupment; (b) such notice includes the amount to be

Appellee Appx. 00620

Appx. 00871
013433

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-116   Filed 06/25/25   Page 755 of 1017   PageID 14382
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 627 of 1803   PageID 11373
Case 19-30264-sgj11   Doc 830   Filed 01/28/19   Entered 01/28/19 18:34:06   Page 79 of 229

recouped by the holder of the Claim or Interest and a specific description of the basis for the recoupment, and (c) the Debtors or the Reorganized Debtor have provided a written response to such Claim or Interest holder, stating unequivocally that the Debtors or the Reorganized Debtor consents to the requested recoupment. The Debtors and the Reorganized Debtor shall have the right, but not the obligation, to seek an order of the Bankruptcy Court allowing any or all of the proposed recoupment. In the absence of a written response from the Debtors or the Reorganized Debtor consenting to a recoupment or an order of the Bankruptcy Court authorizing a recoupment, no recoupment by the holder of a Claim or Interest shall be allowed.

14.06.  Turnover.  On the Effective Date, any rights of the Estate to compel turnover of Assets under applicable nonbankruptcy law and pursuant to section 542 or 543 of the Bankruptcy Code shall be deemed transferred to and vested in the Reorganized Debtor.

14.07.  Automatic Stay.  The automatic stay pursuant to section 362 of the Bankruptcy Code, except as previously modified by the Bankruptcy Court, shall remain in effect until the Effective Date of the Plan as to the Debtors, the Estate and all Assets.  As of the Effective Date, the automatic stay shall be replaced by the Plan Injunction.

**ARTICLE XV.**
**JURISDICTION OF COURTS AND MODIFICATIONS TO THE PLAN**

15.01.  Retention of Jurisdiction.  Pursuant to sections 1334 and 157 of title 28 of the United States Code, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising in, arising under, and related to the Chapter 11 Cases and the Plan, to the full extent allowed or permitted by applicable law, including without limitation for the purposes of invoking sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

(a)  To hear and determine any and all objections to, or applications or motions concerning, the allowance of Claims or the allowance, classification, priority, compromise, estimation, or payment of any Administrative Expense;

(b)  To hear and determine any and all applications for payment of fees and expenses pursuant to this Plan to any Estate Professional pursuant to sections 330 or 503 of the Bankruptcy Code, or for payment of any other fees or expenses authorized to be paid or reimbursed under this Plan, and any and all objections thereto;

(c)  To hear and determine pending applications for the rejection, assumption, or assumption and assignment of Executory Contracts and Unexpired Leases and the allowance of Claims resulting therefrom, and to determine the rights of any party in respect to the assumption or rejection of any Executory Contract or Unexpired Lease;

(d)  To hear and determine any and all adversary proceedings, applications, or contested matters, including relating to the allowance of any Claim;

(e)  To hear and determine all controversies, disputes, and suits which may arise in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan or in connection with the enforcement of any remedies made available under the Plan, including without limitation, (i) adjudication of all rights, interests or disputes relating to any of the Assets, (ii) the valuation of all Collateral, (iii) the determination of the validity of any Lien or claimed right of offset or recoupment; and (iv) determinations of Objections to Contested Claims;

Appellee Appx. 00621
Appx. 00872
013434

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/25/25    Page 756 of 1017    PageID 14383
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 628 of 1803    PageID 11374
Case 19-30264-sgj11    Doc 830    Filed 10/28/19    Entered 10/28/19 16:23:08    Page 30 of 229

(f)     To liquidate and administer any disputed, contingent, or unliquidated Claims, including the Allowance of all Contested Claims;

(g)     To administer Distributions to holders of Allowed Claims as provided herein;

(h)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(i)     To enable the Reorganized Debtor to prosecute any and all proceedings which may be brought to set aside transfers, Liens or encumbrances and to recover any transfers, Assets, properties or damages to which the Reorganized Debtor may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws, including causes of action, controversies, disputes and conflicts between the Reorganized Debtor and any other party, including but not limited to, any causes of action or Objections to Claims, preferences or fraudulent transfers and obligations or equitable subordination;

(j)     To consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation the Confirmation Order;

(k)     To enforce the discharge and Plan Injunction against any Person;

(l)     To enter and implement all such orders as may be necessary or appropriate to execute, interpret, construe, implement, consummate, or enforce the terms and conditions of this Plan and the transactions required or contemplated pursuant thereto;

(m)     To hear and determine any motion or application which the Reorganized Debtor is required or allowed to commence before the Bankruptcy Court pursuant to this Plan;

(n)     To hear and determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan;

(o)     To determine proceedings pursuant to section 505 of the Bankruptcy Code;

(p)     To enter a final decree closing the Chapter 11 Cases; and

(q)     To determine any other matter or dispute relating to the Estate, the Estate Claims, the Estate Defenses, the Assets, or the Distributions by the Reorganized Debtor.

15.02.  Abstention and Other Courts.  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of or relating to the Chapter 11 Cases, this Article of the Plan shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

15.03.  Non-Material Modifications.  The Reorganized Debtor may, with the approval of the Bankruptcy Court and without notice to all holders of Claims and Interests, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable.  The Reorganized Debtor may undertake such nonmaterial modification pursuant

30

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 25-16   Filed 06/25/25   Page 757 of 1017   PageID 14384
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 629 of 1803   PageID 11375
Case 18-30264-sgj11   Doc 830   Filed 01/28/19   Entered 01/28/19 17:34:06   Page 79 of 229

to this section insofar as it does not adversely change the treatment of the Claim of any Creditor or the Interest of any Interest holder who has not accepted in writing the modification.

15.04.  Material Modifications.  Modifications of this Plan may be proposed in writing by the Chapter 11 Trustee at any time before confirmation, provided that this Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Chapter 11 Trustee shall have complied with section 1125 of the Bankruptcy Code.  This Plan may be modified at any time after confirmation and before its Substantial Consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modification. A holder of a Claim or Interest that has accepted or rejected this Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such holder changes its previous acceptance or rejection.

## ARTICLE XVI.
## MISCELLANEOUS PROVISIONS

16.01.  Severability.  Should the Bankruptcy Court determine any provision of the Plan is unenforceable either on its face or as applied to any Claim or Interest or transaction, the Reorganized Debtor may modify the Plan so that any such provision shall not be applicable to the holder of any Claim or Interest.  Such a determination of unenforceability shall not (a) limit or affect the enforceability and operative effect of any other provision of the Plan or (b) require the resolicitation of any acceptance or rejection of the Plan.

16.02.  Oral Agreements; Modification of Plan; Oral Representations or Inducements.  The terms of the Plan, Disclosure Statement and Confirmation Order may only be amended in writing and may not be changed, contradicted or varied by any oral statement, agreement, warranty or representation.  None of the Debtors, any representative of the Estate, including Robin Phelan in his capacity as Chapter 11 Trustee, nor their attorneys have made any representation, warranty, promise or inducement relating to the Plan or its confirmation except as expressly set forth in this Plan, the Disclosure Statement, or the Confirmation Order or other order of the Bankruptcy Court.

16.03.  Waiver.  The Reorganized Debtor shall not be deemed to have waived any right, power or privilege pursuant to the Plan unless the waiver is in writing and signed by the Reorganized Debtor.  There shall be no waiver by implication, course of conduct or dealing, or through any delay or inaction by the Reorganized Debtor, of any right pursuant to the Plan, including the provisions of this anti-waiver section.  The waiver of any right under the Plan shall not act as a waiver of any other or subsequent right, power or privilege.

16.04.  Notice.  Any notice or communication required or permitted by the Plan shall be given, made or sent as follows:

      (a)     If to a Creditor, notice may be given as follows: (i) if the Creditor has not filed a proof of Claim, then to the address reflected in the Schedules, or (ii) if the Creditor has filed a proof of Claim, then to the address reflected in the proof of Claim.

      (b)     If to the Reorganized Debtor, notice shall be sent to the following addresses:

Appellee Appx. 00623
Appx. 00874
013436

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/16/25   Page 758 of 1017   PageID 14385
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 630 of 1803   PageID 11376
Case 18-30264-sgj11   Doc 830   Filed 01/23/19   Entered 01/23/19 17:34:08   Page 82 of 229

Jeff P. Prostok                    Josh Terry
Suzanne K. Rosen                   c/o Brian P. Shaw
Forshey Prostok LLP                Rogge Dunn Group, PC
777 Main Street, Suite 1290        1201 Elm Street, Suite 5200
Fort Worth, Texas 76102            Dallas, Texas 75270

(c)     Any Creditor desiring to change its address for the purpose of notice may do so by giving notice to the Reorganized Debtor of its new address in accordance with the terms of this section.

(d)     Any notice given, made or sent as set forth above shall be effective upon being (i) deposited in the United States Mail, postage prepaid, addressed to the addressee at the address as set forth above; (ii) delivered by hand or messenger to the addressee at the address set forth above; (iii) telecopied to the addressee as set forth above, with a hard confirmation copy being immediately sent through the United States Mail; or (iv) delivered for transmission to an expedited or overnight delivery service such as FedEx.

16.05.  Compliance with All Applicable Laws.  If notified by any governmental authority that it is in violation of any applicable law, rule, regulation, or order of such governmental authority relating to its business, the Reorganized Debtor shall comply with such law, rule, regulation, or order; provided, however, that nothing contained herein shall require such compliance if the legality or applicability of any such requirement is being contested in good faith in appropriate proceedings and, if appropriate, an adequate Reserve has been set aside on the books of the Reorganized Debtor.

16.06.  Duties to Creditors; Exculpation.  Neither the Chapter 11 Trustee nor any agent, representative, accountant, financial advisor, attorney, shareholder, officer, affiliate, member or employee of the Chapter 11 Trustee or the Debtors, including but not limited to Estate Professionals (collectively, the "Exculpated Parties"), shall ever owe any duty to any Person (including any Creditor) other than the duties owed to the Debtors' bankruptcy Estate, for any act, omission, or event in connection with, or arising out of, or relating to, any of the following: (a) the Debtors' Chapter 11 Cases, including all matters or actions in connection with or relating to the administration of the Estate, (b) the Plan, including the proposal, negotiation, confirmation and consummation of the Plan, or (c) any act or omission relating to the administration of the Plan after the Effective Date.  All such Exculpated Parties shall be fully exculpated and released from any and all claims and causes of action by any Person, known or unknown, in connection with, or arising out of, or relating to, any of the following: (x) the Debtors' Chapter 11 Cases, including all matters or actions in connection with or relating to the administration of the Estate, (y) the Plan, including the proposal, negotiation, confirmation and consummation of the Plan, or (z) any act or omission relating to the administration of the Plan after the Effective Date, except for claims and causes of action arising out of such Exculpated Party's gross negligence or willful misconduct.

16.07.  Binding Effect.  The Plan shall be binding upon, and shall inure to the benefit of, the Reorganized Debtor, the holders of the Claims or Liens, and their respective successors-in-interest and assigns.

16.08.  Governing Law, Interpretation.  Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, the internal laws of the State of Texas shall govern the construction and implementation of the Plan and any Plan

32

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-116   Filed 06/26/25   Page 759 of 1017   PageID 14386
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 631 of 1803   PageID 11377
Case 18-30264-sgj11   Doc 830   Filed 10/23/18   Entered 10/23/18 17:34:06   Page 83 of 229

Documents without regard to conflicts of law.  The Plan shall control any inconsistent term or provision of any other Plan Documents.

16.09.  <u>Payment of Statutory Fees</u>.  All accrued U.S. Trustee Fees as of the Confirmation Date shall be paid by the Reorganized Debtor on or as soon as practicable after the Effective Date, and thereafter shall be paid by the Reorganized Debtor as such statutory fees become due and payable.

16.10.  <u>Filing of Additional Documents</u>.  On or before Substantial Consummation of the Plan, the Reorganized Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

16.11.  <u>Computation of Time</u>.  Bankruptcy Rule 9006 shall apply to the calculation of all time periods pursuant to this Plan.  If the final day for any Distribution, performance, act or event under the Plan is not a Business Day, then the time for making or performing such Distribution, performance, act or event shall be extended to the next Business Day.  Any payment or Distribution required to be made hereunder on a day other than a Business Day shall be due and payable on the next succeeding Business Day.

16.12.  <u>Elections by the Reorganized Debtor</u>.  Any right of election or choice granted to the Reorganized Debtor under this Plan may be exercised, at the Reorganized Debtor's election, separately as to each Claim, Creditor or Person.

16.13.  <u>Release of Liens</u>.  Except as otherwise expressly provided in this Plan or the Confirmation Order, all Liens against any of the Assets transferred to and vested in the Reorganized Debtor shall be deemed to be released, terminated and nullified without the necessity of any order by the Bankruptcy Court other than the Confirmation Order.

16.14.  <u>Rates</u>.  The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

16.15.  <u>Compliance with Tax Requirements</u>.  In connection with the Plan, the Reorganized Debtor shall comply with all withholding and reporting requirements imposed by federal, state and local Taxing Authorities and all Distributions under the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution under the Plan.

16.16.  <u>Notice of Occurrence of the Effective Date</u>. Promptly after occurrence of the Effective Date, the Reorganized Debtor, as directed by the Bankruptcy Court, shall serve on all known parties-in-interest and holders of Claims and Interests, notice of the occurrence of the Effective Date.

16.17.  <u>Notice of Entry of Confirmation Order</u>.  Promptly after entry of the Confirmation Order, the Chapter 11 Trustee, as directed by the Bankruptcy Court in the Confirmation Order, shall serve on all known parties-in-interest and holders of Claims and Interests, notice of entry of the Confirmation Order.

Appellee Appx. 00625
Appx. 00876
013438

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Exhibit 6   Page 636 of 1804   Page 760 of 1017   PageID 14387
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 632 of 1803   PageID 11378
Case 18-30264-sgj11   Doc 830   Filed 10/25/18   Entered 10/25/18 16:34:06   Page 82 of 229

Dated:  October 25, 2018.

Respectfully submitted,

ACIS CAPITAL MANAGEMENT, L.P.

By:  /s/ *Robin Phelan*
     Robin Phelan
     Chapter 11 Trustee

ACIS CAPITAL MANAGMENET GP, LLC

By:/s/ *Robin Phelan*
     Robin Phelan
     Chapter 11 Trustee

APPROVED:

/s/ *Jeff P. Prostok*
Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

APPROVED:

/s/ *Rahkee V. Patel*
Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Third Amended Joint Plan 10.25.18.docx

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/05/25   Page 761 of 1017   PageID 14388
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 633 of 1803   PageID 11379
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 83 of 229

# EXHIBIT A

## TO THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

**[ESTATE CLAIMS]**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/05/25    Page 762 of 1017    PageID 14389
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 634 of 1803    PageID 11380
Case 18-30264-sgj11 Doc 830 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 84 of 229

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.    <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.    <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.    <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

        (a)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

        (b)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

        (c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

**Appellee Appx. 00628**
**Appx. 00879**
**013441**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-11    Page 10/36 025 1804    Page 763 of 1017    PageID 14390
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 635 of 1803    PageID 11381
Case 18-30264-sgj11 Doc 839 Filed 10/24/18    Entered 10/24/18 18:34:06    Page 85 of 229

(d)    All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)    All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)    All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)    All Claims for breach of the PMAs or the Indentures;

(h)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)    All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)    All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)    All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)    All Claims based on alter ego or rights to pierce the corporate veil of Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 06/06/25   Page 764 of 1017   PageID 14391
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 636 of 1803   PageID 11382
Case 18-30264-sgj11   Doc 830   Filed 10/31/18   Entered 10/31/18 17:34:06   Page 86 of 229

control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 06/06/25   Page 765 of 1017   PageID 14392
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 637 of 1803   PageID 11383
Case 18-30264-sgj11 Doc 829 Filed 10/24/18   Entered 10/24/18 17:34:06   Page 89 of 229

HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.     <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland HCF;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or Estate;

Appellee Appx. 00631
Appx. 00882
013444

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1186   Filed 06/25/25804 Page 766 of 1017   PageID 14393
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 638 of 1803   PageID 11384
Case 18-30264-sgj11  Doc 830 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 86 of 229

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.      Highland CLO Management, Ltd. Claims.  All Estate Claims against Highland CLO Management, Ltd. ("Highland CLOM") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Highland CLOM;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or

Appellee Appx. 00632
Appx. 00883
013445

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/804   Page 767 of 1017   PageID 14394
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 639 of 1803   PageID 11385
Case 18-30264-sgj11   Doc 829   Filed 10/25/18   Entered 10/25/18 17:34:06   Page 89 of 229

Estate;

(k)   All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)   All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.   <u>CLO Holdco, Ltd. Claims</u>.  All Estate Claims against CLO Holdco, Ltd. ("<u>CLO Holdco</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)   All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)   All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)   All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)   All Avoidance Actions against CLO Holdco;

(e)   All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)   All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)   All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)   All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)   All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

---

Appellee Appx. 00633
Appx. 00884
013446

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 04/16/25   Page 768 of 1017   PageID 14395
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 640 of 1803   PageID 11386
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 90 of 229

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.     <u>Neutra, Ltd. Claims</u>.  All Estate Claims against Neutra, Ltd. ("<u>Neutra</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Neutra;

(e)     All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Neutra for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appellee Appx. 00634
Appx. 00885
013447

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 04/25/25   Page 769 of 1017   PageID 14396
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 641 of 1803   PageID 11387
Case 18-30264-sgj11   Doc 839   Filed 10/31/19   Entered 10/31/19 17:34:06   Page 91 of 229

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)      All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.      Claims against Issuers, Co-Issuers and Indenture Trustee.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "Issuers"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "Co-Issuers"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)      All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

Exhibit "A" to Second Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC

Page 8

Appellee Appx. 00635

Appx. 00886

013448

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-11    Page 643 of 1804    Page 770 of 1017    PageID 14397
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 642 of 1803    PageID 11388
Case 18-30264-sgj11 Doc 829 Filed 01/23/19    Entered 01/23/19 17:33:06    Page 92 of 229
Case 18-30264-sgj11 Doc 830 Filed 10/25/18    Entered 10/25/18 18:32:08    Page 94 of 232

(i)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.    <u>Highland Affiliate Claims</u>.  All Estate Claims against any Affiliates of Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against any Affiliates of Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against any Highland Affiliate;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against any Highland Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets

Appellee Appx. 00636
Appx. 00887
013449

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 06/06/25   Page 771 of 1017   PageID 14398
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 643 of 1803   PageID 11389
Case 18-30264-sgj11   Doc 830   Filed 10/23/19   Entered 10/23/19 17:34:06   Page 93 of 229

owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against any Highland Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Highland Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, Neutra, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of any Highland Affiliate as to any Person, including as against any other Affiliates of Highland or any officers, directors, equity interest holders, or Persons otherwise in control of any Highland Affiliates; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.     <u>Dondero Claims</u>.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.     <u>Okada Claims</u>.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 06/25/25   Page 772 of 1017   PageID 14399
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 644 of 1803   PageID 11390
Case 18-30264-sgj11   Doc 820   Filed 10/25/18   Entered 10/25/18 17:34:06   Page 94 of 229

unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.  Preference Claims.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.  Claims Against Officers, Managers and Members.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.  Retention of Claims Against Specific Persons or Categories of Persons.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:

(a)  William Scott;

(b)  Heather Bestwick;

(c)  Any other Person who may be so named at a later date by the Reorganized Debtor.

---

**Appellee Appx. 00638**

**Appx. 00689**

**013451**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 04/06/25   Page 773 of 1017   PageID 14400
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 645 of 1803   PageID 11391
Case 18-30264-sgj11 Doc 830 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 95 of 229

16. <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

17. <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

18. <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

19. <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

20. <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

21. <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate.  Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Appellee Appx. 00639
Appx. 00899
013452

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-6   Filed 04/06/25   Page 774 of 1017   PageID 14401
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 646 of 1803   PageID 11392
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 96 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18 Entered 10/25/18 18:23:08   Page 48 of 62

Schedule 1 to Exhibit A to

Second Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Payments within 90 Days of Petition Date | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| Payments to Insiders within One Year of Petition Date | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/25   Page 775 of 1017   PageID 14402
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 647 of 1803   PageID 11393
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 97 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 49 of 62
Schedule 1 to Exhibit A to
Second Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 06/25/04   Page 776 of 1017   PageID 14403
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 648 of 1803   PageID 11394
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 98 of 229

# EXHIBIT B

## TO THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

### [EXECUTORY CONTRACTS ASSUMED UNDER THE PLAN]

Appellee Appx. 00642

Appx. 00893

013455

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/03/25   Page 777 of 1017   PageID 14404
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 649 of 1803   PageID 11395
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 99 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2013-1 Chemical Holdings, LLC 1209 Orange Street Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2013-1, Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2013-1 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | March 18, 2013 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2013-1 | Collateral Administration Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Indenture | March 18, 2013 | $0 |
| Acis CLO 2013-1 LLC 850 Library Ave., Suite 204 Newark, DE 19711 | Indenture | March 18, 2013 | $0 |

1

Appellee Appx. 00643
Appx. 00894
013456

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10    Filed 05/16/25    Page 778 of 1017    PageID 14405
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 650 of 1803    PageID 11396
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 100 of 229
Case 18-30264-sgj11 Doc 660 Filed 10/25/18    Entered 10/25/18 18:23:08    Page 52 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2013-1 | Indenture | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Supplemental Indenture | February 26, 2014 | $0 |
| Acis CLO 2013-1 LLC 850 Library Ave., Suite 204 Newark, DE 19711 | Supplemental Indenture | February 26, 2014 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2013-1 | Supplemental Indenture | February 26, 2014 | $0 |
| Acis CLO 2013-1 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Governing Documents (Requested from HCM) | -- | $0 |
| Acis CLO 2013-2 Chemical Holdings, LLC 1209 Orange Street Wilmington, DE 19801 | Limited Liability Company Agreement (requested from HCM) | -- | $0 |
| Acis CLO 2013-2 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Limited Liability Company Agreement (requested from HCM) | -- | $0 |

2

Appellee Appx. 00644
Appx. 00895
013457

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-1   Filed 06/26/25   Page 779 of 1017   PageID 14406
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 651 of 1803   PageID 11397
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 101 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | October 3, 2013 | $0 |
| The Bank of New York Mellon Trust Co., N.A.<br>601 Travis Street, 16th Floor<br>Houston, Texas 77002<br>Attn: Global Corporate Trust –<br>Acis CLO 2013-2 | Collateral Administration Agreement | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Indenture | October 3, 2013 | $0 |
| Acis CLO 2013-2 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Indenture | October 3, 2013 | $0 |
| The Bank of New York Mellon Trust Co., N.A.<br>601 Travis Street, 16th Floor<br>Houston, Texas 77002<br>Attn: Global Corporate Trust –<br>Acis CLO 2013-2 | Indenture | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Governing Document<br>(requested from HCM) | -- | $0 |

3

Appellee Appx. 00645
Appx. 00896
013458

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Filed 06/03/25    Page 780 of 1017    PageID 14407
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 652 of 1803    PageID 11398
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 102 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2014-3 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | February 25, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-3 | Collateral Administration Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Indenture | February 25, 2014 | $0 |
| Acis CLO 2014-3 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Indenture | February 25, 2014 | $0 |

4

Appellee Appx. 00646
Appx. 00887
013459

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-1 Page 165 of 801 Page 781 of 1017 PageID 14408
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 653 of 1803 PageID 11399
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 103 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-3 | Indenture | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1 -1102 | Memorandum and Articles of Association<br>of Acis CLO 2014-3 Ltd. | December 24, 2013 | $0 |
| Acis CLO 2014-4 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1 -1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1 -1102 | Collateral Administration Agreement | June 5, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-4 | Collateral Administration Agreement | June 5, 2014 | $0 |
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1 -1102 | Portfolio Management Agreement | June 5, 2014 | $0 |

5

Appellee Appx. 00647
Appx. 00898
013460

Case 18-30264-sgj11 Doc 660 Filed 10/25/18    Entered 10/25/18 18:23:08    Page 56 of 62

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-11    Filed 06/25/25    Page 782 of 1017    PageID 14409
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 654 of 1803    PageID 11400
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 104 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Indenture | June 5, 2014 | $0 |
| Acis CLO 2014-4 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Indenture | June 5, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-4 | Indenture | June 5, 2014 | $0 |
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Island KY1-1102 | Memorandum and Articles of Association<br>of Acis CLO 2014-4 Ltd. | April 1, 2014 | $0 |
| Acis CLO 2014-5 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | November 18, 2014 | $0 |

6

Appellee Appx. 00648

Appx. 00899

013461

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-16 Filed 06/25/24 Page 783 of 1017 PageID 14410
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 655 of 1803 PageID 11401
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 105 of 229
Case 18-30264-sgj11 Doc 660 Filed 10/25/18 Entered 10/25/18 18:23:08 Page 57 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-5 | Collateral Administration Agreement | November 18, 2014 | $0 |
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | November 18, 2014 | $0 |
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Indenture | November 18, 2014 | $0 |
| Acis CLO 2014-5 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Indenture | November 18, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-5 | Indenture | November 18, 2014 | $0 |
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1 -1102 | Memorandum and Articles of Association<br>of Acis CLO 2014-5 Ltd. | August 21, 2014 | $0 |
| Acis CLO 2015-6 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |

7

Appellee Appx. 00649
Appx. 00900
013462

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/06/25   Page 784 of 1017   PageID 14411
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 656 of 1803   PageID 11402
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 106 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | April 16, 2015 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2015-6 | Collateral Administration Agreement | April 16, 2015 | $0 |
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | April 16, 2015 | $0 |
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Indenture | April 16, 2015 | $0 |
| Acis CLO 2015-6 LLC 850 Library Ave., Suite 204 Newark, DE 19711 | Indenture | April 16, 2015 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2015-6 | Indenture | April 16, 2015 | $0 |

8

Appellee Appx. 00650
Appx. 00991
013463

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-186 Filed 05/30/25 Page 785 of 1017 PageID 14412
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 657 of 1803 PageID 11403
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 107 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2015-6 Ltd.<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, KY1-1102, Cayman Islands | Memorandum and Articles of Association of Acis CLO 2015-6 Ltd. | February 11, 2015 | $0 |
| Acis CLO Value Fund II (Cayman), LP.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II GP, LLC<br>P.O. Box. 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II, LP.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value GP, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | July 19, 2010 | $0 |
| Acis CLO Value Master Fund II, LP.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II (Cayman), L.P.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis CLO Value Master Fund II, L.P.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis Loan Funding, Ltd.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |

9

Appellee Appx. 00651
Appx. 02902
013464

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-10   Filed 06/25/25   Page 786 of 1017   PageID 14413
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 658 of 1803   PageID 11404
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 108 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 60 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| BayVK R2 Lux S.A., SICAV FIS<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Agreement for the Outsourcing of the Asset Management of BayVK R2 Lux S.A., SICAV-FIS | February 27, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |
| BNP Paribas Securities Services<br>Luxembourg Branch<br>60 Avenue John F. Kennedy<br>1855 Luxembourg | Power of Attorney<br>86578 | February 20, 2015 | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Confidentiality Agreement | April 11, 2011 | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Governing Documents<br>(Requested from HCM) | -- | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Management Agreement | July 18, 2011 | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement<br>(Requested from HCM) | November 20, 2007 | $0 |

10

Appellee Appx. 00652
Appx. 00905
013465

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-136   Filed 06/25/25   Page 787 of 1017   PageID 14414
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 659 of 1803   PageID 11405
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 109 of 229
Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 61 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Hewett's Island CLO 1-R, Ltd.<br>*c/o* Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Indenture | November 20, 2007 | $0 |
| Deutsche Bank Trust Company Americas<br>1761 East St. Andrew Place<br>Santa Ana, CA 92705<br>Attn: CDO Business Unit – Hewett's Island<br>CLO 1-R | Indenture | November 20, 2007 | $0 |
| State Street (Guernsey Limited)<br>First Floor, Dorey Court, Admiral Park,<br>St. Peter Port, Guernsey | FATCA and Non-FATCA Services<br>Agreement | June 23, 2017 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2015-6 | Confidentiality Agreement | March 5, 2014 | $0 |
| Universal-Investment-Luxembourg S.A.<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Agreement for the Outsourcing of the<br>Asset Management of BayVK R2 Lux<br>S.A., SICAV-FIS | February 27, 2015 | $0 |
| Universal-Investment-Luxembourg S.A.<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| Universal-Investment-Luxembourg S.A.<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |
| Acis Loan Funding, Ltd.<br>First Floor, Dorey Court<br>St. Peter Port, Guernsey GY1 6HJ<br>Channel Islands | Portfolio Management Agreement | December 22, 2016 | $0 |

11

Appellee Appx. 00653
Appx. 00994
013466

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/20/25   Page 788 of 1017   PageID 14415
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 660 of 1803   PageID 11406
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 110 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 62 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis Capital Management, LP c/o *PHELANLAW* 4214 Woodfin Drive Dallas, Texas 75220 | Amended and Restated Agreement of Limited Partnership | January 21, 2011 | $0 |
| Acis Capital Management GP, LLC c/o *PHELANLAW* 4214 Woodfin Drive Dallas, Texas 75220 | Amended and Restated Limited Liability Company Agreement | January 21, 2011 | $0 |

For the avoidance of doubt, to the extent not otherwise included above, the Trustee intends to assume any additional executory contracts that relate to the funds set forth below as may be necessary or beneficial to the Reorganized Debtor under the Plan:

1. Acis CLO 2013-1, Ltd.
2. Acis CLO 2013-2, Ltd.
3. Acis CLO 2014-3, Ltd.
4. Acis CLO 2014-4, Ltd.
5. Acis CLO 2014-5, Ltd.
6. Acis CLO 2015-6, Ltd.
7. Acis CLO Value Fund II, L.P.
8. Acis CLO Value Fund II (Cayman), L.P.
9. Acis CLO Master Fund II, L.P.
10. BayVK R2 Lux S.A., SICAV FIS
11. Hewitt's Island CLO 1-R, Ltd.
12. Acis Loan Funding, Ltd.

The Trustee reserves the right to amend or supplement this Exhibit B.

12

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-16 Filed 06/26/25 Page 789 of 1017 PageID 14416
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 661 of 1803 PageID 11407
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 111 of 229

# EXHIBIT "2"

**[First Modification to the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC – Dkt. No. 693]**

**Appellee Appx. 00655**

**Appx. 00906**

013468

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/26/25    Page 790 of 1017    PageID 14417
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 662 of 1803    PageID 11408
Case 18-30264-sgj11    Doc 829    Filed 01/31/19    Entered 01/31/19 13:14:00    Page 112 of 229

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR**
**ROBIN PHELAN, CHAPTER 11 TRUSTEE**

Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,**
**CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § § § | CHAPTER 11 CASES |
| ACIS CAPITAL MANAGEMENT, L.P., ACIS CAPITAL MANAGEMENT GP, LLC, | § § § | CASE NO. 18-30264-sgj11 (Jointly Administered) |
| Debtors. | § § | |

### FIRST MODIFICATION TO THE THIRD AMENDED JOINT PLAN FOR
### ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

Robin Phelan ("Trustee"), the Chapter 11 Trustee for Acis Capital Management, LP and

Acis Capital Management, GP, LLC (the "Debtors"), files this First Modification (the "First

Modification") to the *Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP*

*and Acis Capital Management GP, LLC* [Docket No. 660] (the "Plan").

1.    Reference is here made to the Plan for all purposes.  This First Modification

modifies the Plan.

2.    **Modification to Section 1.09.**  Section 1.09 of the Plan is hereby modified to read

Appellee Appx. 00656
Appx. 00907
013469

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 06/16/25   Page 791 of 1017   PageID 14418
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 663 of 1803   PageID 11409
Case 19-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 13 of 29

as follows:

> 1.09 "Assets" includes all right, title, and interest in and to all property of every type or nature owned or claimed by the Debtors as of the Petition Date, together with all such property of every type or nature subsequently acquired by the Debtors through the Effective Date, whether real or personal, tangible or intangible, and wherever located, and including, but not limited to, property as defined in section 541 of the Bankruptcy Code.

3.     The change to section 1.09 above merely corrects a typographical error in the definition of the term "Assets." Specifically, the revised definition removes the incomplete phrase "Without limiting the foregoing, this shall include all" from the end of the definition of Assets.

4.     **Modification to Exhibit "A".** The copy of the Exhibit "A" reflecting Estate Claims is hereby deleted in its entirety and replaced with the version of the "Exhibit A" attached hereto as **Exhibit "1."**

5.     A copy of the document reflecting the modifications to Exhibit A to the Plan in redline format is attached hereto as **Exhibit "2."**

6.     This First Modification is a non-material change. It merely corrects a typographical error and revises the Estate Claims being reserved, retained and preserved under the Plan. Further, even if this First Modification were deemed material, it does not adversely affect any creditor because no ballots have yet been received in relation to the Plan and this First Modification is being sent to all creditors and parties in interest eighteen (18) days in advance of the deadline for parties to submit ballots and any objections to the Plan. Consequently, creditors and parties in interest will have an adequate opportunity to evaluate this modification prior to voting on the Plan.

Dated: November 8, 2018.          Respectfully submitted,

ACIS CAPITAL MANAGEMENT, L.P.

By:  /s/ Robin Phelan
       Robin Phelan
       Chapter 11 Trustee

Appellee Appx. 00657
Appx. 06908
013470

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Filed 06/30/25    Page 792 of 1017    PageID 14419
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 664 of 1803    PageID 11410
Case 18-30264-sgj11    Doc 829    Filed 11/30/18    Entered 11/30/18 17:34:00    Page 3 of 43

ACIS CAPITAL MANAGMENET GP, LLC

By:  /s/ *Robin Phelan*
       Robin Phelan
       Chapter 11 Trustee

APPROVED:

/s/ *Jeff P. Prostok*
Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

APPROVED:

/s/ *Rahkee V. Patel*
Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello –State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL  COUNSEL  FOR  ROBIN
PHELAN, CHAPTER 11 TRUSTEE**

## CERTIFICATE OF SERVICE

     I hereby certify that a true and correct copy of the foregoing document and the attached exhibits were served electronically via the Court's Electronic Court Filing (ECF) notification system and via U.S. Mail, postage prepaid (and via Express Mail to out of country recipients) on the parties on the service lists attached as **Exhibit "3"** hereto on November 8, 2018.

                             /s/ *Jeff P. Prostok*
                             Jeff P. Prostok

\L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\First Modification to Third Amended Plan 11.8.18.docx

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Page 1666 of 1804    Page 793 of 1017    PageID 14420
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 665 of 1803    PageID 11411
Case 18-30264-sgj11    Doc 829    Filed 01/31/19    Entered 01/31/19 17:34:00    Page 4 of 43

# Exhibit "1"

## [Revised Exhibit "A" to the Third Amended Joint Plan]

**Appellee Appx. 00659**

**Appx. 06919**

013472

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-116   Filed 06/02/25   Page 794 of 1017   PageID 14421
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 666 of 1803   PageID 11412
Case 18-30264-sgj11   Doc 829   Filed 01/31/18   Entered 01/31/18 17:34:00   Page 116 of 229
Case 18-30264-sgj11   Doc 835   Filed 01/31/18   Entered 01/31/18 17:34:00   Page 5 of 43

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.   <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.   <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.   <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)   All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)   All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)   All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

Appellee Appx. 00660
Appx. 00911
013473

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-6   Filed 06/06/25   Page 795 of 1017   PageID 14422
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 667 of 1803   PageID 11413
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:00   Page 117 of 229
Case 18-30264-sgj11   Doc 395   Filed 11/30/18   Entered 11/30/18 13:09:00   Page 6 of 43

Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)     All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)     All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)     All Claims for breach of the PMAs or the Indentures;

(h)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)     All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)     All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)     All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)     All Claims based on alter ego or rights to pierce the corporate veil of

Appellee Appx. 00661
Appx. 06912
013474

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/25   Page 796 of 1017   PageID 14423
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 668 of 1803   PageID 11414
Case 18-30264-sgj11   Doc 839   Filed 01/13/18   Entered 01/13/18 17:34:00   Page 118 of 229

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Appellee Appx. 00662
Appx. 06913
013475

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/02/25   Page 797 of 1017   PageID 14424
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 669 of 1803   PageID 11415
Case 18-30864-sgj11   Doc 829   Filed 01/31/18   Entered 01/31/18 17:34:00   Page 119 of 229

(l)      All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.      <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Highland HCF;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Filed 07/06/25    Page 798 of 1017    PageID 14425
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 670 of 1803    PageID 11416
Case 18-30264-sgj11    Doc 829    Filed 01/31/18    Entered 01/31/18 17:34:06    Page 120 of 229
Case 18-30264-sgj11    Doc 829    Filed 01/31/18    Entered 01/31/18 17:34:00    Page 20 of 43

Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.      <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Highland CLOM;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/26/25   Page 799 of 1017   PageID 14426
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 671 of 1803   PageID 11417
Case 18-30064-sgj11   Doc 893   Filed 01/30/19   Entered 01/30/19 17:34:00   Page 120 of 289

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.     CLO Holdco, Ltd. Claims.  All Estate Claims against CLO Holdco, Ltd. ("CLO Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against CLO Holdco;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

**Appellee Appx. 00665**

**013478**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/06/25   Page 800 of 1017   PageID 14427
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 672 of 1803   PageID 11418
Case 18-30064-sgj11   Doc 693   Filed 01/04/19   Entered 01/04/19 17:34:06   Page 122 of 289

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.     Neutra, Ltd. Claims.  All Estate Claims against Neutra, Ltd. ("Neutra") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Neutra;

(e)     All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Neutra for the unauthorized use of Estate Assets

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/16/25   Page 801 of 1017   PageID 14428
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 673 of 1803   PageID 11419
Case 18-30064-sgj11   Doc 893   Filed 01/04/19   Entered 01/04/19 17:34:00   Page 23 of 28

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.     <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)     All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-116   Filed 07/30/25   Page 802 of 1017   PageID 14429
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 674 of 1803   PageID 11420
Case 18-30664-sgj11   Doc 893   Filed 01/04/19   Entered 01/04/19 17:34:06   Page 123 of 229

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.     <u>Highland Affiliate Claims</u>.  All Estate Claims against any Affiliates of Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against any Affiliates of Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against any Highland Affiliate;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

Appellee Appx. 00668
Appx. 00919
013481

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 07/06/25   Page 803 of 1017   PageID 14430
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 675 of 1803   PageID 11421
Case 18-30264-sgj11   Doc 893   Filed 01/30/19   Entered 01/30/19 17:36:00   Page 25 of 29

(h)     All Claims against any Highland Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against any Highland Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Highland Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, Neutra, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of any Highland Affiliate as to any Person, including as against any other Affiliates of Highland or any officers, directors, equity interest holders, or Persons otherwise in control of any Highland Affiliates; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.     Dondero Claims.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.     Okada Claims.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/06/25   Page 804 of 1017   PageID 14431
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 676 of 1803   PageID 11422
Case 18-30064-sgj11   Doc 893   Filed 11/30/18   Entered 11/30/18 13:06:00   Page 26 of 29

Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.   Preference Claims.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.   Claims Against Officers, Managers and Members.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.   Claims Against Former Attorneys and Law Firms.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/804   Page 805 of 1017   PageID 14432
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 677 of 1803   PageID 11423
Case 18-30864-sgj11   Doc 693   Filed 01/30/19   Entered 01/30/19 17:34:00   Page 127 of 289

(a)   Cole Schotz, P.C.

(b)   Michael D. Warner

(c)   Jacob Frumkin

(d)   Warren A. Usatine

(e)   McKool Smith

(f)   Gary Cruciani

(g)   Michael Fritz

(h)   Carson Young

(i)   Lackey Hershman, LLP

(j)   Stinson Leonard Street LLP

(k)   Paul Lackey, Esq.

(l)   Michael Aigen, Esq.

(m)   Abrams & Bayliss, LLP

(n)   Kevin G. Abrams

(o)   A. Thompson Bayliss

(p)   Jones Day

(q)   Hilda C. Galvan

(r)   Michael Weinberg

(s)   Reid Collins & Tsai, LLP

(t)   Lisa Tsai

(u)   Stanton, LLP

(v)   James M. Stanton

(w)   Hunton Andrews Kurth

(x)   Marc Katz

(y)   Greg Waller

(z)   any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

---

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/30/25   Page 806 of 1017   PageID 14433
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 678 of 1803   PageID 11424
Case 18-30064-sgj11   Doc 693   Filed 11/30/18   Entered 11/30/18 17:36:00   Page 129 of 289

16.     <u>Retention of Claims Against Specific Persons or Categories of Persons</u>.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:

(a)     William Scott;

(b)     Heather Bestwick;

(c)     Any other Person who may be so named at a later date by the Reorganized Debtor.

17.     <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.     <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.     <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.     <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.     <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Page 1680 of 1804   Page 807 of 1017      PageID 14434
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 679 of 1803   PageID 11425
Case 18-30864-sgj11   Doc 893   Filed 01/30/19   Entered 01/30/19 17:34:06   Page 129 of 289

      22.   <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Appellee Appx. 00673
Appx. 00924
013486

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-136   Filed 06/06/25   Page 808 of 1017   PageID 14435
Exhibit 1 to Exhibit "A" Page 166 of 251 804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 680 of 1803   PageID 11426
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 130 of 229

Case 18-30264-sgj11 Doc 693 Filed 11/08/18 Entered 11/08/18 13:03:00 Page 19 of 45

Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| **Payments within 90 Days of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| **Payments to Insiders within One Year of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-116   Filed 06/20/25   Page 809 of 1017   PageID 14436
Exhibit 1 to Exhibit "A" to
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 681 of 1803   PageID 11427
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 131 of 229

Case 18-30264-sgj11 Doc 693 Filed 11/08/18 Entered 11/08/18 13:03:00 Page 20 of 45

Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

Schedule 1 to Exhibit A

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|------|---------|-----------------|----------------|----------------------------------|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25   Page 810 of 1017   PageID 14437
Exhibit   Page 163 of 204
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 682 of 1803   PageID 11428
Case 18-30264-sgj11 Doc 829 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 132 of 229
Case 18-9066-sgj11 Doc 893 Filed 11/06/18   Entered 11/06/18 13:43:00   Page 31 of 25

# Exhibit "2"
## [Redline – Plan Exhibit "A"]

Appellee Appx. 00676

Appx. 00927

013489

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 25-6   Filed 06/25/25   Page 811 of 1017   PageID 14438
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 683 of 1803   PageID 11429
Case 18-30264-sgj11   Doc 829   Filed 01/30/19   Entered 01/30/19 17:34:06   Page 33 of 289
Case 18-30264-sgj11   Doc 693   Filed 01/30/18   Entered 01/30/18 13:38:00   Page 33 of 289

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.     Defined Terms.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.     Estate Claims Reserved, Retained and Preserved.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "Estate Claims," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.     Highland Claims.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "Highland Adversary") and Adversary Proceeding No. 18-03212-sgj (the "Trustee's Adversary").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

Appellee Appx. 00677
Appx. 00928
013490

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-16   Filed 06/25/25   Page 812 of 1017   PageID 14439
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 684 of 1803   PageID 11430
Case 18-30064-sgj11   Doc 893   Filed 11/30/18   Entered 11/30/18 17:34:00   Page 34 of 289

Chapter 11 Trustee or Estate;

(d)   All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)   All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)   All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)   All Claims for breach of the PMAs or the Indentures;

(h)   All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)   All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)   All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)   all claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)   All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)   All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)   All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)   All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)   All Claims based on alter ego or rights to pierce the corporate veil of

Appellee Appx. 00678
Appx. 00939
013491

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/25   Page 813 of 1017   PageID 14440
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 685 of 1803   PageID 11431
Case 18-30664-sgj11   Doc 829   Filed 11/06/18   Entered 11/06/18 13:09:00   Page 135 of 289

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

**Appellee Appx. 00679**

**Appx. 00930**

**013492**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 06/20/25   Page 814 of 1017   PageID 14441
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 686 of 1803   PageID 11432
Case 18-30064-sgj11   Doc 829   Filed 11/30/18   Entered 11/30/18 17:34:06   Page 36 of 289

(l) All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m) All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.   Highland HCF Advisor, Ltd. Claims.  All Estate Claims against Highland HCF Advisor, Ltd. ("Highland HCF") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a) All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b) All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c) All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d) All Avoidance Actions against Highland HCF;

(e) All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f) All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g) All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h) All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i) All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j) All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Exhibit "A" to Second Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                    Page 4

**Appellee Appx. 00680**
**Appx. 00931**
**013493**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 08/05/25   Page 815 of 1017   PageID 14442
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 687 of 1803   PageID 11433
Case 18-30664-sgj11   Doc 693   Filed 11/04/18   Entered 11/04/18 17:34:06   Page 137 of 229

Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.      <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Highland CLOM;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                     Page 5

**Appellee Appx. 00681**

**Appx. 00932**

**013494**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Page 1804   Page 816 of 1017   PageID 14443
Exhibit Page 826 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 688 of 1803   PageID 11434
Case 18-30264-sgj11   Doc 693   Filed 01/04/19   Entered 01/04/19 17:34:00   Page 138 of 289
Case 18-30064-sgj11   Doc 693   Filed 01/04/19   Entered 01/04/19 17:34:00   Page 37 of 289

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.      <u>CLO Holdco, Ltd. Claims</u>.  All Estate Claims against CLO Holdco, Ltd. ("<u>CLO Holdco</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against CLO Holdco;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 65-6   Filed 06/02/25   Page 817 of 1017   PageID 14444
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 689 of 1803   PageID 11435
Case 18-30264-sgj11   Doc 893   Filed 01/30/19   Entered 01/30/19 17:34:06   Page 130 of 289

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.    Neutra, Ltd. Claims.  All Estate Claims against Neutra, Ltd. ("Neutra") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against Neutra;

(e)    All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against Neutra for the unauthorized use of Estate Assets

Appellee Appx. 00683
Appx. 00934
013496

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 06/16/25   Page 818 of 1017   PageID 14445
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 690 of 1803   PageID 11436
Case 18-30864-sgj11   Doc 893   Filed 01/30/18   Entered 01/30/18 13:02:00   Page 29 of 43

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.     <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)     All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                    Page 8

Appellee Appx. 00684
Appx. 00935
013497

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/26/25    Page 819 of 1017    PageID 14446
Exhibit Page 692 of 804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 691 of 1803    PageID 11437
Case 18-30064-sgj11    Doc 693 Filed 11/06/18    Entered 01/30/19 17:34:06    Page 141 of 289
Case 18-30064-sgj11    Doc 329 Filed 11/06/18    Entered 01/30/19 17:34:06    Page 40 of 49

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.    <u>Highland Affiliate Claims</u>.  All Estate Claims against any Affiliates of Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against any Affiliates of Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against any Highland Affiliate;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                                                  Page 9

**Appellee Appx. 00685**

**013498**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/26/25   Page 820 of 1017   PageID 14447
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 692 of 1803   PageID 11438
Case 18-30264-sgj11   Doc 893   Filed 01/30/19   Entered 01/30/19 17:34:06   Page 42 of 49

(h)     All Claims against any Highland Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against any Highland Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Highland Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, Neutra, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of any Highland Affiliate as to any Person, including as against any other Affiliates of Highland or any officers, directors, equity interest holders, or Persons otherwise in control of any Highland Affiliates; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.     <u>Dondero Claims</u>.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.     <u>Okada Claims</u>.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all

Appellee Appx. 00686
013499

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/16/25    Page 821 of 1017    PageID 14448
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 693 of 1803    PageID 11439
Case 18-30264-sgj11    Doc 893    Filed 11/30/18    Entered 11/30/18 17:34:00    Page 43 of 89

Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.    <u>Preference Claims</u>.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.    <u>Claims Against Officers, Managers and Members</u>.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.    <u>Claims Against Former Attorneys and Law Firms</u>.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                    Page 11

**Appellee Appx. 00687**
**Appx. 00938**
**013500**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-116   Filed 06/05/25   Page 822 of 1017   PageID 14449
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 694 of 1803   PageID 11440
Case 18-30664-sgj11   Doc 693   Filed 01/30/19   Entered 01/30/19 17:34:06   Page 144 of 289

(a)     Cole Schotz, P.C.

(b)     Michael D. Warner

(c)     Jacob Frumkin

(d)     Warren A. Usatine

(e)     McKool Smith

(f)     Gary Cruciani

(g)     Michael Fritz

(h)     Carson Young

(i)     Lackey Hershman, LLP

(j)     Stinson Leonard Street LLP

(k)     Paul Lackey, Esq.

(l)     Michael Aigen, Esq.

(m)     Abrams & Bayliss, LLP

(n)     Kevin G. Abrams

(o)     A. Thompson Bayliss

(p)     Jones Day

(q)     Hilda C. Galvan

(r)     Michael Weinberg

(s)     Reid Collins & Tsai, LLP

(t)     Lisa Tsai

(u)     Stanton, LLP

(v)     James M. Stanton

(w)     Hunton Andrews Kurth

(x)     Marc Katz

(y)     Greg Waller

(z)     any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

Appellee Appx. 00688
013501
Appx. 00939

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/02/25   Page 823 of 1017   PageID 14450
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 695 of 1803   PageID 11441
Case 18-30664-sgj11   Doc 693   Filed 11/06/18   Entered 11/06/18 13:06:50   Page 45 of 289

15.16.  Retention of Claims Against Specific Persons or Categories of Persons.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:

        (a)    William Scott;

        (b)    Heather Bestwick;

        (c)    Any other Person who may be so named at a later date by the Reorganized Debtor.

16.17.  Counterclaims.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

17.18.  Piercing the Corporate Veil.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

18.19.  Avoidance Actions.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

19.20.  Estate Defenses.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

20.21.  Equitable Subordination.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity

Appellee Appx. 00689
013502
Appx. 00949

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/24   Page 824 of 1017   PageID 14451
Exhibit 6   Page 697 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 696 of 1803   PageID 11442
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 146 of 229
Case 18-90064-sgj11   Doc 693   Filed 11/06/18   Entered 11/06/18 13:03:50   Page 46 of 49

interest owners of the Debtors, Highland, or any Affiliates thereof.

21. 22.  Recharacterization.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Appellee Appx. 00690
Appx. 00941
013503

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-116   Filed 09/08/25   Page 825 of 1017   PageID 14452
Exhibit A to Schedule 1   Page 36 of 45
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 697 of 1803   PageID 11443
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 147 of 229
Case 18-30264-sgj11 Doc 693 Filed 11/08/18   Entered 11/08/18 13:03:00   Page 36 of 45

Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| **Payments within 90 Days of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| **Payments to Insiders within One Year of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Filed 10/06/25    Page 826 of 1017    PageID 14453
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 698 of 1803    PageID 11444
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 148 of 229

Case 18-30264-sgj11 Doc 693 Filed 11/08/18    Entered 11/08/18 13:03:00    Page 37 of 45

**Schedule 1 to Exhibit "A" to**

**Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/06/25   Page 827 of 1017   PageID 14454
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 699 of 1803   PageID 11445
Case 18-30264-sgj11   Doc 829   Filed 01/30/19   Entered 01/30/19 17:34:06   Page 149 of 229

# Exhibit "3"

## [Service Lists]

Appellee Appx. 00693
013506

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/00/25   Page 828 of 1017   PageID 14455
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 700 of 1803   PageID 11446
Case 18-30264-sgj11 Doc 829 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 50 of 29

## Notice Service List
## Acis Capital Mgmt./Phelan
## #5980

**BNP Paribas Securities Services**
**Luxembourg Branch**
**60 Avenue John F. Kennedy**
**1855 Luxembourg**

Dallas County
c/o Laurie Spindler
Linebarger, Goggan, Blair & Sampson LLP
2777 N Stemmons Frwy, No 1000
Dallas, TX 75207-2328

Acis CLO Management, LLC
Acis CLO Value GP, LLC
1209 Orange Street
Wilmington, DE 19801-1120

**Acis Funding GP, Ltd.**
**Acis Funding L.P.**
**c/o Maples Corporate Services Limited**
**P0 Box 309, Ugland House**
**Grand Cayman, Cayman Islands KY1 -1104**

Mizuho Securities USA Inc.
320 Park Ave., 12th Floor
New York, NY 10022-6848

US Bank National Association
c/o Daniel P. Novakov
Frost Brown Todd LLC
100 Crescent Court, Suite 350
Dallas, TX 75201-2348

Robin Phelan, Chapter 11 Trustee
Phelenlaw
4214 Woodfin Drive
Dallas, TX 75220-6416

Texas Comptroller of Public Accounts
c/o John M. Stern, Asst. Attorney General
Bankruptcy & Collection Div. MC 008
PO Box 12548
Austin, TX 78711-2548

Office of the United States Attorney
3rd Floor, 1100 Commerce Street
Dallas, Texas 75242-1699

United States Trustee
Lisa Lambert
1100 Commerce St., Room 976
Dallas, TX 75242

Dallas County
c/o Sherrel K Knighton
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons Frwy Ste 1000
Dallas, TX 75207-2328

**Acis CLO Value Fund II (Cayman), L.P.**
**Acis CLO Value Fund II GP, LLC**
**Acis CLO Value Master Fund II, L.P.**
**PO Box 309, Ugland House**
**Grand Cayman, Cayman Islands KY1-1104**

**CLO Holdco, Ltd.**
**c/o Intertrust Corp. Srvs. (Cayman) Ltd.**
**190 Elgin Ave., George Town**
**Grand Cayman, Cayman Islands KY1-9005**

U. S. Bank National Association
Attn: Michael Zak
60 Livingston Ave., EP-MN-WS3D
Saint Paul, MN 55107-2292

US Bank National Association
c/o Mark D. Kotwick, Arlene Alves
Seward & Kissell LLP
One Battery Park Plaza
New York, NY 10004-1405

Acis Capital Management, LP
c/o Warren A. Usatine
Cole Schotz P.C.
25 Main Street
Hackensack, NJ 07601-7189

Securities and Exchange Commission
801 Cherry Street, Suite 1900, Unit 18
Fort Worth, TX 76102

Office of the Attorney General
Main Justice Building, Room 5111
10th & Constitution Avenue, N.W.
Washington, D.C. 20530

Acis CLO 2013-1 Chemical Holdings, LLC
Acis CLO 2013-2 Chemical Holdings, LLC
Acis CLO 2014-3 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO 2014-4 Chemical Holdings, LLC
Acis CLO 2014-5 Chemical Holdings, LLC
Acis CLO 2015-6 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO Value Fund II, L.P.
Acis Loan Funding, Ltd.
Acis Capital Management GP, LLC
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

**State Street (Guernsey) Limited**
**First Floor Dorey Court**
**Admiral Park, St. Peter Port, Guernsey**

The Dugaboy Investment Trust
300 Crescent Court, Suite700
Dallas, TX 75201-1876

Acis Capital Management, LP
c/o Michael D. Warner
Cole Schotz P.C.
1700 City Center Tower II
301 Commerce St.
Fort Worth, TX 76102-4140

The Bank of N.Y. Mellon Trust Co., N.A.
225 Liberty Street
New York, NY 10286-0001

**BayVK R2 Lux S.A., SICAV-FIS**
**15 Rue de Flaxweiler**
**L-6776 Grevenmacher**
**Luxembourg**

Internal Revenue Service
Special Procedures – Insolvency
P.O. Box 7346
Philadelphia, PA 1901-7346

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-16 Filed 07/26/25 Page 829 of 1017 PageID 14456
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 701 of 1803 PageID 11447
Case 18-30264-sgj11 Doc 893 Filed 01/30/19 Entered 01/30/19 17:34:06 Page 50 of 289

US Bank
PO Box 5229
Cincinnati, OH 45201-5229

**Universal-Investment-Luxembourg S.A.**
**15 Rue de Flaxweiler**
**L-6776 Grevenmacher**
**Luxembourg**

Universal-Inv.-Luxembourg SA/BayVK R2 Lux
c/o Andrew Zollinger
DLA Piper LLP
1717 Main St., Suite 4600
Dallas, TX 75201-4629

Diane G. Reed
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

**Hewett's Island CLO I-R, Ltd.**
**c/o Maples Finance Limited**
**PO Box 1093, Queensgate House**
**South Church St., George Town**
**Grand Cayman, Cayman Island KY1-1102**

Universal-Inv.-Luxembourg SA/BayVK R2 Lux
c/o Thomas Califano/Shmuel Klahr
DLA Piper LLP
1251 Avenue of the Americas
New York, NY 10020-1104

Diane G. Reed
c/o David W. Elmquist
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

**Highland HCF Advisor, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

**Highland CLO Management, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc., Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**Acis CLO 2013-1 Ltd.**
**Acis CLO 2013-2**
**c/o Estera Trust (f/k/a Appleby Trust)**
**Clifton House 75 Fort St., P.O. Box 1350**
**Grand Cayman, Cayman Islands KY 1-1108**

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2013-1 and 2013-2190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

Acis CLO 2013-1 LLC
Acis CLO 2013-2 LLC
850 Library Ave., Suite 204
Newark, DE 19711

**Acis CLO 2014-3 Ltd.**
**Acis CLO 2014-4 Ltd.**
**c/o MaplesFS Limited**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102**

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-3 and 2014-4190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

Acis CLO 2014-3 LLC
Acis CLO 2014-4
850 Library Ave., Suite 204
Newark, DE 19711

**Acis CLO 2014-5 Ltd.**
**Acis CLO 2015-6 Ltd.**
**c/o MaplesFS Limited**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102**

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-5 and Acis CLO 2015-6190 S.
LaSalle Street, 8th Floor
Chicago, IL 60603

Acis CLO 2014-5 LLC
Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

**Acis CLO 2015-6 Ltd.**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, KY1-1102, Cayman Islands**

Deutsche Bank Trust Company Americas
Attn: CDO Business Unit – Hewett's
Island CLO 1-R
1761 East St. Andrew Place
Santa Ana, CA 92705

**Acis Loan Funding, Ltd.**
**First Floor, Dorey Court**
**St. Peter Port, Guernsey GYI 6HJ**
**Channel Islands**

Acis CLO 2017-7 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1 -1102

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-1    Filed 06/23/25    Page 830 of 1017    PageID 14457
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 702 of 1803    PageID 11448
Case 18-30264-sgj11 Doc 829 Filed 01/04/19    Entered 01/04/19 17:34:00    Page 52 of 68

*Highlands Service List*
*ACIS #5980*

Highland CLO Funding Ltd.
c/o Mark M. Maloney/W. Austin Jowers
King & Spalding LLP
1180 Peachtree Street NE
Atlanta, GA 30309

**Highland CLO Funding, Ltd.**
**First Floor, Dorey Court**
**Admiral Park, St. Peter Port**
**Guernsey GY1 6HJ, Channel Islands**

**Highland CLO Management, Ltd.**
**P.O. Box 309 Ugland House**
**South Church Street**
**George Town, Grand Cayman KY1-1004**

**Highland HCF Advisor, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

Neutra, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

**CLO Holdco, Ltd.**
**c/o Intertrust Corp. Srvs. (Cayman) Ltd.**
**190 Elgin Ave., George Town**
**Grand Cayman, Cayman Islands KY1-9005**

The Dugaboy Investment Trust
300 Crescent Court, Suite700
Dallas, TX 75201-1876

Highland CLO Funding, Ltd.
c/o Paul R. Bessette/Rebecca Matsumura
King & Spalding LLP
500 West 2nd St., Suite 1800
Austin, TX 78701-4684

Highland CLO Funding, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**P.O. Box 32311**
**Grand Cayman, KY1-1209**
**Cayman Islands**

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

CLO Holdco, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

**Highland CLO Management, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**Suite #4-210 Governor's Square**
**23 Lime Tree Bay Avenue**
**Grand Cayman, Cayman Islands**

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

CLO Holdco, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-186 Filed 07/16/25 Page 831 of 1017 PageID 14458
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 703 of 1803 PageID 11449
Case 18-30264-sgj11 Doc 829 Filed 01/30/19 Entered 01/30/19 17:34:06 Page 153 of 229
Case 18-30264-sgj11 Doc 693 Filed 11/06/18 Entered 11/06/18 13:42:00 Page 43 of 48

**Noteholders List**

**[Confidential]**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 07/06/25    Page 832 of 1017    PageID 14459
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 704 of 1803    PageID 11450
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 154 of 289

## Creditors Service List
### Acis Capital Mgmt./Phelan
### #5980

## Class 2

Joshua N. Terry
25 Highland Park Village
Suite 100-848
Dallas, TX 75205-2726

Joshua N. Terry
c/o Brian P. Shaw/John M. Lynch
Rogge Dunn Group, PC
1201 Elm St., Suite 5200
Dallas, TX 75270

Joshua N. Terry
350 9 Princeton Ave.
Dallas, TX 75205-3246

## Class 3

Andrews Kurth Kenyon LLP
600 Travis, Suite 4200
Houston, TX 77002-2929

CSI Global Deposition Services
4950 N. O'Connor Road, Suite 152
Irving, TX 75062 - 2778

CT Corporation
P0 Box 4349
Carol Stream, IL 60197-4349

Case Anywhere LLC
21860 Burbank Blvd., Suite 125
Woodland Hills, CA 91367-7447

David Langford
1321 Indian Creek
DeSoto, TX 75115-3652

David Simek
31 Woodacres Road
Brookville, NY 11545-2911

Drexel Limited
309 23rd Street, #340
Miami Beach, FL 33139-1700

Elite Document Technology
400 N. Saint Paul St., Suite 1300
Dallas, TX 75201-6881

Highfield Equities, Inc.
3131 McKinney Ave., Suite 215
Dallas, TX 75204-2421

JAMS, Inc.
18881 Von Karman Ave., Suite 350
Irvine, CA 92612-6589

Jones Day
2727 N. Harwood Street
Dallas, TX 75201-1568

Lackey Hershman LLP
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219-4259

KPMG LLP (USA)
Two Financial Center
60 South Street
Boston, MA 02111-2759

KPMG LLP
2323 Ross Ave., Suite 1400
Dallas, TX 75201-2721

KPMG LLP
Aon Center
200 E. Randolph St., Suite 5500
Chicago, IL 60601-6607

McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201-6970

Reid Collins & Tsai, LLP
Building C, Suite 300
1301 S. Capital of Texas Highway
Austin, TX 78746-6550

Stanton Advisors LLC
300 Coles St., Apt. 802
Jersey City, NJ 07310-1047

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 186   Filed 07/06/25 804   Page 833 of 1017   PageID 14460
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 705 of 1803   PageID 11451
Case 18-30864-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:36   Page 155 of 238

Stanton Law Firm
9400 North Central Expwy., Suite 1304
Dallas, TX 75231-5047

The TASA Group, Inc.
1166 DeKalb Pike
Blue Bell, PA 19422- 1853

Acis CLO 2013-1, Ltd., et al.
c/o David Neier
Winston & Strawn LLP
200 Park Ave.
New York, NY 10166-4193

Acis CLO 2013-1 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-3 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-4 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-5 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Directors - Acis CLO 2013-1 Ltd.
75 Fort St., Clifton House
PO Box 1350
George Town, Grand Cayman
Cayman Island, KY1-1108

Directors - Acis CLO 2014-3 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman

Directors - Acis CLO 2014-4 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman

Directors - Acis CLO 2014-5 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman

Directors - Acis CLO 2015-6 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman

Acis CLO 2013-1, Ltd.
c/o Appleby Trust, Attn: Directors
Clifton House 75 Fort St., P0 Box 13
Grand Cayman, Cayman Islands KY1-1108

Acis CLO 2013-2 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2014-3 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2014-4 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2014-5 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2015-6 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1 -1102

Acis CLO 2017-7 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1 -1102

Acis CLO 2013-1, Ltd., et al.
c/o Thomas Melsheimer/Lane Webster
Winston & Strawn LLP
2501 N. Harwood St., 17th Floor
Dallas, TX 75201

Jennifer G. Terry
25 Highland Park Village, Suite 100-848
Dallas, TX 75205

Hunton Andrews Kurth LLP
c/o M. Christine Klein, Dep. Gen. Counsel
Riverfront Plaza, East Tower
951 East Byrd St.
Richmond, VA 23219

Patrick H. Daugherty
3621 Cornell Ave.
Dallas, TX 75250

Stinson Leonard Street LLP
Attn: Paul Lackey
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Filed 07/06/25    Page 834 of 1017    PageID 14461
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 706 of 1803    PageID 11452
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 156 of 229
Case 18-30264-sgj11 Doc 693 Filed 11/30/18    Entered 11/30/18 13:43:06    Page 56 of 28

## Class 4

Highland Capital Management, LP
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

Highland Capital Management, LP
1209 Orange Street
Wilmington, DE 19801-1120

Highland Capital Management, LP
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland Capital Management, LP, Highland
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-116    Filed 07/08/25    Page 835 of 1017    PageID 14462
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 707 of 1803    PageID 11453
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 157 of 229

# EXHIBIT "3"

**[Second Modification to the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC – Dkt. No. 702]**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-116   Filed 07/09/25   Page 836 of 1017   PageID 14463
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 708 of 1803   PageID 11454
Case 19-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 158 of 229

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR
ROBIN PHELAN, CHAPTER 11 TRUSTEE**

Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 0078518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § § § | CHAPTER 11 CASES |
| ACIS CAPITAL MANAGEMENT, L.P., ACIS CAPITAL MANAGEMENT GP, LLC, | § § § § | CASE NO. 18-30264-sgj11 (Jointly Administered) |
| Debtors. | § | |

## SECOND MODIFICATION TO THE THIRD AMENDED JOINT PLAN FOR
## ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

Robin Phelan ("Trustee"), the Chapter 11 Trustee for Acis Capital Management, LP and

Acis Capital Management GP, LLC (the "Debtors"), files this Second Modification (the "First

Modification") to the *Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP

and Acis Capital Management GP, LLC* [Docket No. 660], as modified by the *First Modification

to the Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP and Acis Capital

Management GP, LLC* [Docket No. 693] (together, the "Plan").

1.    Reference is here made to the Plan for all purposes.  This Second Modification

Appellee Appx. 00702
Appx. 60953
013515

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 10/06/25   Page 837 of 1017   PageID 14464
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 709 of 1803   PageID 11455
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 159 of 229

modifies the Plan.

      2.    **Modification to Exhibit "A".**  The copy of the Exhibit "A" reflecting Estate Claims is hereby deleted in its entirety and replaced with the version of the "Exhibit A" attached hereto as **Exhibit "1."**

      3.    A copy of the document reflecting the modifications to Exhibit A to the Plan in redline format is attached hereto as **Exhibit "2."**

      4.    This Second Modification is a non-material change.  It merely revises the Estate Claims being reserved, retained and preserved under the Plan.  Further, even if this First Modification were deemed material, it is being sent to all creditors and parties in interest ten (10) days in advance of the deadline for parties to submit ballots and any objections to the Plan. Consequently, creditors and parties in interest will have an adequate opportunity to evaluate this modification prior to voting on the Plan or to change their previous acceptance or rejection upon consideration of the modification.

Dated:  November 16, 2018.      Respectfully submitted,

                            ACIS CAPITAL MANAGEMENT, L.P.

                            By:  /s/ *Robin Phelan*
                                    Robin Phelan
                                    Chapter 11 Trustee

                            ACIS CAPITAL MANAGMENET GP, LLC

                            By:  /s/ *Robin Phelan*
                                    Robin Phelan
                                    Chapter 11 Trustee

Appellee Appx. 00703

Appx. 00954

013516

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 07/16/25   Page 838 of 1017   PageID 14465
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 710 of 1803   PageID 11456
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06   Page 160 of 229
Case 18-30264-sgj11 Doc 829-2 Filed 11/16/18   Entered 11/16/18 17:30:35   Page 5 of 42

APPROVED:

/s/ Jeff P. Prostok
Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

APPROVED:

/s/ Rakhee V. Patel
Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello –State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL    COUNSEL    FOR    ROBIN
PHELAN, CHAPTER 11 TRUSTEE**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing document and the attached exhibits were served electronically via the Court's Electronic Court Filing (ECF) notification system and via U.S. Mail, postage prepaid (and via Express Mail to out of country recipients) on the parties on the service lists attached as **Exhibit "3"** hereto on November 16, 2018.

/s/ Jeff P. Prostok
Jeff P. Prostok

\L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Second Modification to Third Amended Plan 11.16.18.docx

Appellee Appx. 00704
Appx. 00955
013517

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Page 1026 of 1804   Page 839 of 1017   PageID 14466
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 711 of 1803   PageID 11457
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 161 of 229

# Exhibit "1"

[Revised Exhibit "A" to the Third Amended Joint Plan]

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-116   Filed 03/03/25   Page 840 of 1017   PageID 14467
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 712 of 1803   PageID 11458
Case 19-30265-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 162 of 229

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.   <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.   <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.   <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)   All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)   All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)   All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

Appellee Appx. 00706
Appx. 00957
013519

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Page 1046 of 1804   Page 841 of 1017   PageID 14468
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 713 of 1803   PageID 11459
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 163 of 229

Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)    All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)    All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)    All Claims for breach of the PMAs or the Indentures;

(h)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)    All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)    All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)    All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)    All Claims based on alter ego or rights to pierce the corporate veil of

Appellee Appx. 00707
Appx. 00958
013320

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/25   Page 842 of 1017   PageID 14469
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 714 of 1803   PageID 11460
Case 18-30264-sgj11   Doc 829   Filed 01/31/18   Entered 01/31/18 17:34:05   Page 164 of 229

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

**Appellee Appx. 00708**

**Appx. 00959**

**013521**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-1   Exhibit 6   Filed 06/25/25   Page 843 of 1017   PageID 14470
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 715 of 1803   PageID 11461
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 165 of 229

(l)     All Claims based on alter ego or rights to pierce the corporate veil of
HCLOF as to any Person, including as against Affiliates of HCLOF or Highland, William
Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons
otherwise in control of HCLOF; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or
abetting any such unlawful act, or assisting, encouraging, and/or participating in any such
unlawful act.

5.     <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF
Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate
and Reorganized Debtor, including without limitation all such Estate Claims asserted by the
Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall
include all Estate Claims set forth in paragraph 2 above, including without limitation, the
following:

(a)     All such Claims against Highland HCF asserted by the Chapter 11
Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in,
the Highland Adversary;

(b)     All such Claims against Highland HCF asserted by the Chapter 11
Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in,
the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or
Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or
transactions alleged in any other adversary proceedings or Claim Objections filed by the
Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland HCF;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed
to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of
duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of
the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland HCF for the turnover of Estate Assets,
including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363
of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets
owned by the Debtors or Estate, as well as the turnover of any books, documents, records and
papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland HCF for the unauthorized use of Estate
Assets including, without limitation, any intellectual property rights or Assets owned by the
Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or
Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-16   Page 1070 of 1804   Page 844 of 1017   PageID 14471
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 716 of 1803   PageID 11462
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:05   Page 166 of 229

Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.     <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland CLOM;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appellee Appx. 00710
Appx. 00901
013523

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 86   Filed 07/08/25 04 Page 845 of 1017   PageID 14472
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 717 of 1803   PageID 11463
Case 18-30264-sgj11   Doc 792   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 167 of 229

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.      CLO Holdco, Ltd. Claims.  All Estate Claims against CLO Holdco, Ltd. ("CLO Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against CLO Holdco;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-116    Filed 07/09/25    Page 846 of 1017    PageID 14473
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 718 of 1803   PageID 11464
Case 18-30264-sgj11   Doc 792   Filed 01/16/19   Entered 01/16/19 17:34:06   Page 168 of 209

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.     <u>Neutra, Ltd. Claims</u>.  All Estate Claims against Neutra, Ltd. ("<u>Neutra</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Neutra;

(e)     All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Neutra for the unauthorized use of Estate Assets

**Appellee Appx. 00712**

**Appx. 00903**

**013525**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/02/25   Page 847 of 1017   PageID 14474
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 719 of 1803   PageID 11465
Case 18-30264-sgj11   Doc 879   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 69 of 209

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)   All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)   All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)   All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)   All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.   <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)   All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)   All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)   All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)   All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)   All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)   All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)   All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 02/26/25   Page 848 of 1017   PageID 14475
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 720 of 1803   PageID 11466
Case 18-30664-sgj11   Doc 792   Filed 01/16/19   Entered 01/16/19 17:34:06   Page 170 of 229

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.    <u>Claims Against Any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates</u>.  All Estate Claims against any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates (collectively, the "<u>Affiliates</u>" and each, an "<u>Affiliate</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against such Affiliates shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against any Affiliate;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of

Appellee Appx. 00714
Appx. 00965
013527

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/22/25   Page 849 of 1017   PageID 14476
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 721 of 1803   PageID 11467
Case 18-30264-sgj11   Doc 292   Filed 01/31/98   Entered 01/31/98 17:31:06   Page 71 of 209

the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against any Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against any Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of any Affiliate as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any officers, directors, equity interest holders, or Persons otherwise in control of any Affiliates; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.     <u>Dondero Claims</u>.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.     <u>Okada Claims</u>.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-6   Filed 07/26/25   Page 850 of 1017   PageID 14477
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 722 of 1803   PageID 11468
Case 18-30264-sgj11 Doc 820-7 Filed 01/31/19   Entered 01/31/19 17:34:05   Page 72 of 209

Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.   <u>Preference Claims</u>.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.   <u>Claims Against Officers, Managers and Members</u>.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.   <u>Claims Against Former Attorneys and Law Firms</u>.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which

**Appellee Appx. 00716**
**Appx. 00907**
**013529**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 07/06/25    Page 851 of 1017    PageID 14478
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 723 of 1803    PageID 11469
Case 18-30264-sgj11 Doc 792 Filed 11/16/18    Entered 11/16/18 17:34:06    Page 173 of 209

rendered legal services to the Debtors on a prepetition basis including, but not limited to, the
following:

       (a)    Cole Schotz, P.C.

       (b)    Michael D. Warner

       (c)    Jacob Frumkin

       (d)    Warren A. Usatine

       (e)    McKool Smith

       (f)    Gary Cruciani

       (g)    Michael P. Fritz

       (h)    Carson D. Young

       (i)    Nicholas Matthews

       (j)    Lackey Hershman, LLP

       (k)    Stinson Leonard Street LLP

       (l)    Jamie R. Welton

       (m)    Paul B. Lackey

       (n)    Michael Aigen

       (o)    Roger L. Mandel

       (p)    Abrams & Bayliss, LLP

       (q)    Kevin G. Abrams

       (r)    A. Thompson Bayliss

       (s)    Jones Day

       (t)    Hilda C. Galvan

       (u)    Michael Weinberg

       (v)    Reid Collins & Tsai, LLP

       (w)    Lisa Tsai

       (x)    Stanton, LLP

       (y)    James M. Stanton

Appellee Appx. 00717
013530

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Filed 07/25/25    Page 852 of 1017    PageID 14479
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 724 of 1803    PageID 11470
Case 18-30264-sgj11 Doc 792 Filed 01/16/18    Entered 01/16/18 17:34:06    Page 74 of 209

(z)    Hunton Andrews Kurth

(aa)    Marc Katz

(bb)    Greg Waller

(cc)    any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

16.    <u>Claims Against Officers, Directors, Employees, Members, and Managers, of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates</u>.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates, including all such Estate Causes of Action based on fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act.  Such present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates include, but are not limited to, the following Persons:

(a)    William Scott;

(b)    Heather Bestwick;

(c)    Scott Ellington

(d)    Isaac Leventon

(e)    Jean Paul Sevilla

(f)    Hunter Covitz

(g)    The Dugaboy Investment Trust

(h)    Nancy Dondero, Trustee of the Dugaboy Trust

(i)    Grant Scott

(j)    Any other Person who may be so named at a later date by the Reorganized Debtor.

---

Exhibit "A" to Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                        Page 13

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/24   Page 853 of 1017   PageID 14480
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 725 of 1803   PageID 11471
Case 18-30264-sgj11   Doc 792   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 15 of 29

17.     <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.     <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.     <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.     <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.     <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

22.     <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate.  Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

**Appellee Appx. 00719**
**Appx. 00979**
**013332**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/06/25   Page 854 of 1017   PageID 14481
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 726 of 1803   PageID 11472
Case 18-30264-sgj11   Doc 829-2   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 176 of 209

# Exhibit "2"
## [Redline – Plan Exhibit "A"]

Appellee Appx. 00720

013533

Appx. 00971

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1186   Filed 07/28/25   Page 855 of 1017   PageID 14482
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 727 of 1803   PageID 11473
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 177 of 229
Case 18-30264-sgj11 Doc 870 Filed 11/16/18   Entered 11/16/18 17:34:05   Page 10 of 40

EXHIBIT "A"
to
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.   <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.   <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.   <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)   All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)   All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)   All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/09/25   Page 856 of 1017   PageID 14483
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 728 of 1803   PageID 11474
Case 18-30264-sgj11 Doc 879 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 178 of 229
Case 18-30264-sgj11 Doc 792 Filed 11/16/18   Entered 11/16/18 17:34:05   Page 28 of 49

Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)      All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)      All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)      All Claims for breach of the PMAs or the Indentures;

(h)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)      All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)      All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)      All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)      All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)      All Claims based on alter ego or rights to pierce the corporate veil of

Appellee Appx. 00722
Appx. 00975
013535

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Filed 07/06/25    Page 857 of 1017    PageID 14484
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 729 of 1803    PageID 11475
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 179 of 229
Case 18-30264-sgj11 Doc 792 Filed 12/16/18    Entered 12/16/18 17:34:05    Page 73 of 229

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Appellee Appx. 00723
013336
Appx. 00974

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Page 101 of 251804   Page 858 of 1017   PageID 14485
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 730 of 1803   PageID 11476

Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 180 of 229
Case 18-30264-sgj11 Doc 782 Filed 12/16/18   Entered 12/16/18 17:34:05   Page 59 of 229

(l)     All Claims based on alter ego or rights to pierce the corporate veil of
HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William
Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons
otherwise in control of HCLOF; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or
abetting any such unlawful act, or assisting, encouraging, and/or participating in any such
unlawful act.

5.      <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF
Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate
and Reorganized Debtor, including without limitation all such Estate Claims asserted by the
Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall
include all Estate Claims set forth in paragraph 2 above, including without limitation, the
following:

(a)     All such Claims against Highland HCF asserted by the Chapter 11
Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in,
the Highland Adversary;

(b)     All such Claims against Highland HCF asserted by the Chapter 11
Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in,
the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or
Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or
transactions alleged in any other adversary proceedings or Claim Objections filed by the
Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland HCF;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed
to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of
duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of
the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland HCF for the turnover of Estate Assets,
including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363
of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets
owned by the Debtors or Estate, as well as the turnover of any books, documents, records and
papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland HCF for the unauthorized use of Estate
Assets including, without limitation, any intellectual property rights or Assets owned by the
Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or
Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Appellee Appx. 00724
Appx. 00975
013537

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 10/26/25   Page 859 of 1017   PageID 14486
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 731 of 1803   PageID 11477
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 181 of 229
Case 18-30264-sgj11 Doc 792 Filed 12/16/18   Entered 12/16/18 17:34:05   Page 84 of 229

Estate;

    (k)    All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

    (l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.    <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("Highland CLOM") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

    (a)    All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

    (b)    All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

    (c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

    (d)    All Avoidance Actions against Highland CLOM;

    (e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

    (f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

    (g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

    (h)    All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

    (i)    All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Page 1736 of 1804   Page 860 of 1017   PageID 14487
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 732 of 1803   PageID 11478

Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 182 of 229
Case 18-30264-sgj11 Doc 792 Filed 12/16/18   Entered 12/16/18 17:34:05   Page 36 of 49

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.      CLO Holdco, Ltd. Claims.  All Estate Claims against CLO Holdco, Ltd. ("CLO Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against CLO Holdco;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appellee Appx. 00726
Appx. 00977
013539

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-6   Filed 07/06/25   Page 861 of 1017   PageID 14488
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 733 of 1803   PageID 11479
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 182 of 229
Case 18-30264-sgj11 Doc 792 Filed 12/16/18   Entered 12/16/18 17:34:05   Page 36 of 40

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.      Neutra, Ltd. Claims.  All Estate Claims against Neutra, Ltd. ("Neutra") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Neutra;

(e)      All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Neutra for the unauthorized use of Estate Assets

Appellee Appx. 00727
Appx. 00978
013540

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 06/25/25   Page 862 of 1017   PageID 14489
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 734 of 1803   PageID 11480
Case 18-30264-sgj11 Doc 879 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 184 of 229
Case 18-30264-sgj11 Doc 792 Filed 12/16/18   Entered 12/16/18 17:34:05   Page 84 of 229

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)   All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)   All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)   All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)   All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.   <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)   All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)   All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)   All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)   All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)   All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)   All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)   All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Appellee Appx. 00728
Appx. 00729
013541

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 10/06/25 804 Page 863 of 1017   PageID 14490
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 735 of 1803   PageID 11481

Case 18-30264-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 185 of 229
Case 18-30264-sgj11 Doc 792 Filed 01/16/19   Entered 01/16/19 17:34:05   Page 25 of 40

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.     Highland Affiliate Claims Against Any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates. All Estate Claims against any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates (collectively, the "Affiliates" and each, an "Affiliate") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary. The Estate Claims against any such Affiliates of Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against any Highland Affiliate;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Appellee Appx. 00729
Appx. 00989
013542

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 07/06/25   Page 864 of 1017   PageID 14491
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 736 of 1803   PageID 11482
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 186 of 229
Case 18-30264-sgj11 Doc 781 Filed 01/16/19   Entered 01/16/19 17:34:05   Page 20 of 40

(g)   All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)   All Claims against any ~~Highland~~ Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)   All Claims against any ~~Highland~~ Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)   All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any ~~Highland~~ Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)   All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, ~~or any the~~ Affiliates ~~thereof~~, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)   All Claims based on alter ego or rights to pierce the corporate veil of any ~~Highland~~ Affiliate as to any Person, including as against ~~any other~~ Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates ~~of Highland~~, James D. Dondero, Mark K. Okada, or any officers, directors, equity interest holders, or Persons otherwise in control of any ~~Highland~~ Affiliates; and,

(m)   All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.   <u>Dondero Claims</u>.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.   <u>Okada Claims</u>.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit    Page 1708 of 1804    Page 865 of 1017    PageID 14492
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 737 of 1803    PageID 11483

Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 187 of 229
Case 18-30264-sgj11 Doc 879-1 Filed 03/16/18    Entered 03/16/18 17:34:05    Page 90 of 109

care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.   Preference Claims.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved, retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.   Claims Against Officers, Managers and Members.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.   Claims Against Former Attorneys and Law Firms.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims

**Appellee Appx. 00731**

**Appx. 00982**
**013344**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/09/25   Page 866 of 1017   PageID 14493
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 738 of 1803   PageID 11484
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 182 of 229
Case 18-30264-sgj11 Doc 782 Filed 11/16/18   Entered 11/16/18 17:34:05   Page 98 of 109

for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:

     (a)    Cole Schotz, P.C.

     (b)    Michael D. Warner

     (c)    Jacob Frumkin

     (d)    Warren A. Usatine

     (e)    McKool Smith

     (f)    Gary Cruciani

     (g)    Michael P. Fritz

     (h)    Carson D. Young

     (i)    Nicholas Matthews

     (i)(j)    Lackey Hershman, LLP

     (j)(k)    Stinson Leonard Street LLP

     (l)    Jamie R. Welton

     (k)(m)    Paul B. Lackey, Esq.

     (l)(n)    Michael Aigen, Esq.

     (o)    Roger L. Mandel

     (m)(p)    Abrams & Bayliss, LLP

     (n)(q)    Kevin G. Abrams

     (o)(r)    A. Thompson Bayliss

     (p)(s)    Jones Day

     (q)(t)    Hilda C. Galvan

     (r)(u)    Michael Weinberg

     (s)(v)    Reid Collins & Tsai, LLP

     (t)(w)    Lisa Tsai

     (u)(x)    Stanton, LLP

Appellee Appx. 00732

Appx. 00985
013545

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 04/03/25   Page 867 of 1017   PageID 14494
Exhibit 86   Page 740 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 739 of 1803   PageID 11485
Case 18-30264-sgj11   Doc 878-2 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 189 of 209
Case 18-30264-sgj11 Doc 791 Filed 11/16/18   Entered 11/16/18 17:34:05   Page 92 of 109

(v)(y)  James M. Stanton

(w)(z)  Hunton Andrews Kurth

(x)(aa)  Marc Katz

(y)(bb)  Greg Waller

(z)(cc)  any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

~~16.     Retention of Claims Against Specific Persons or Categories of Persons.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:~~

16.     <u>Claims Against Officers, Directors, Employees, Members, and Managers, of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates, including all such Estate Causes of Action based on fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act.  Such present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates include, but are not limited to, the following Persons:</u>

(a)     William Scott;

(b)     Heather Bestwick;

(c)     <u>Scott Ellington</u>

(d)     <u>Isaac Leventon</u>

(e)     <u>Jean Paul Sevilla</u>

(f)     <u>Hunter Covitz</u>

(g)     <u>The Dugaboy Investment Trust</u>

(h)     <u>Nancy Dondero, Trustee of the Dugaboy Trust</u>

(i)     <u>Grant Scott</u>

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 04/06/25   Page 868 of 1017   PageID 14495
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 740 of 1803   PageID 11486
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 199 of 229
Case 18-30264-sgj11 Doc 782 Filed 11/16/18   Entered 11/16/18 17:34:05   Page 99 of 129

(j)    Any other Person who may be so named at a later date by the Reorganized Debtor.

(c)

17.    Counterclaims. All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.    Piercing the Corporate Veil. With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor. Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.    Avoidance Actions. All Avoidance Actions are hereby reserved, retained and preserved as to all Persons. The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.    Estate Defenses. All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate. This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate. All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.    Equitable Subordination. All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code. Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

22.    Recharacterization. All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

**Formatted:** Indent: Left: 1", No bullets or numbering

Appellee Appx. 00734
Appx. 00885
013547

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/25    Page 869 of 1017    PageID 14496
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 741 of 1803    PageID 11487
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 191 of 209

# Exhibit "3"

## [Service Lists]

Appellee Appx. 00735
013548
Appx. 00086

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-116   Filed 04/06/25   Page 870 of 1017   PageID 14497
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 742 of 1803   PageID 11488
Case 18-30264-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 98 of 229

## Notice Service List
## Acis Capital Mgmt./Phelan
## #5980

**BNP Paribas Securities Services**
**Luxembourg Branch**
**60 Avenue John F. Kennedy**
**1855 Luxembourg**

Dallas County
c/o Laurie Spindler
Linebarger, Goggan, Blair & Sampson LLP
2777 N Stemmons Frwy, No 1000
Dallas, TX 75207-2328

Acis CLO Management, LLC
Acis CLO Value GP, LLC
1209 Orange Street
Wilmington, DE 19801-1120

**Acis Funding GP, Ltd.**
**Acis Funding L.P.**
**c/o Maples Corporate Services Limited**
**P0 Box 309, Ugland House**
**Grand Cayman, Cayman Islands KY1 -1104**

Mizuho Securities USA Inc.
320 Park Ave., 12th Floor
New York, NY 10022-6848

US Bank National Association
c/o Daniel P. Novakov
Frost Brown Todd LLC
100 Crescent Court, Suite 350
Dallas, TX 75201-2348

Robin Phelan, Chapter 11 Trustee
Phelenlaw
4214 Woodfin Drive
Dallas, TX 75220-6416

Texas Comptroller of Public Accounts
c/o John M. Stern, Asst. Attorney General
Bankruptcy & Collection Div. MC 008
PO Box 12548
Austin, TX 78711-2548

Office of the United States Attorney
3rd Floor, 1100 Commerce Street
Dallas, Texas 75242-1699

United States Trustee
Lisa Lambert
1100 Commerce St., Room 976
Dallas, TX 75242

Dallas County
c/o Sherrel K Knighton
Linebarger, Goggan, Blair & Sampson, LLP
2777 N. Stemmons Frwy Ste 1000
Dallas, TX 75207-2328

**Acis CLO Value Fund II (Cayman), L.P.**
**Acis CLO Value Fund II GP, LLC**
**Acis CLO Value Master Fund II, L.P.**
**PO Box 309, Ugland House**
**Grand Cayman, Cayman Islands KY1-1104**

U. S. Bank National Association
Attn: Michael Zak
60 Livingston Ave., EP-MN-WS3D
Saint Paul, MN 55107-2292

US Bank National Association
c/o Mark D. Kotwick, Arlene Alves
Seward & Kissell LLP
One Battery Park Plaza
New York, NY 10004-1405

Acis Capital Management, LP
c/o Warren A. Usatine
Cole Schotz P.C.
25 Main Street
Hackensack, NJ 07601-7189

Securities and Exchange Commission
801 Cherry Street, Suite 1900, Unit 18
Fort Worth, TX  76102

Office of the Attorney General
Main Justice Building, Room 5111
10th & Constitution Avenue, N.W.
Washington, D.C.  20530

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc., Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Acis CLO 2013-1 Chemical Holdings, LLC
Acis CLO 2013-2 Chemical Holdings, LLC
Acis CLO 2014-3 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO 2014-4 Chemical Holdings, LLC
Acis CLO 2014-5 Chemical Holdings, LLC
Acis CLO 2015-6 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO Value Fund II, L.P.
Acis Loan Funding, Ltd.
Acis Capital Management GP, LLC
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

**State Street (Guernsey) Limited**
**First Floor Dorey Court**
**Admiral Park, St. Peter Port, Guernsey**
**Channel Islands GYI 6HJ**

Acis Capital Management, LP
c/o Michael D. Warner
Cole Schotz P.C.
1700 City Center Tower II
301 Commerce St.
Fort Worth, TX 76102-4140

The Bank of N.Y. Mellon Trust Co., N.A.
225 Liberty Street
New York, NY 10286-0001

**Acis Loan Funding, Ltd.**
**First Floor, Dorey Court**
**St. Peter Port, Guernsey**

Acis CLO 2013-1 LLC
Acis CLO 2013-2 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Internal Revenue Service
Special Procedures – Insolvency
P.O. Box 7346
Philadelphia, PA  1901-7346

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 04/05/2025 1804   Page 871 of 1017   PageID 14498
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 743 of 1803   PageID 11489
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:05 Page 92 of 229

US Bank
PO Box 5229
Cincinnati, OH 45201-5229

Diane G. Reed
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

Diane G. Reed
c/o David W. Elmquist
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

**Highland CLO Management, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

**Acis CLO 2013-1 Ltd.**
**Acis CLO 2013-2**
**c/o Estera Trust (f/k/a Appleby Trust)**
**Clifton House 75 Port St., P.O. Box 1350**
**Grand Cayman, Cayman Islands KY 1-1108**

**Acis CLO 2014-3 Ltd.**
**Acis CLO 2014-4 Ltd.**
**c/o MaplesFS Limited**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-5 Ltd.**
**Acis CLO 2015-6 Ltd.**
**c/o MaplesFS Limited**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102**

**Hewett's Island CLO I-R, Ltd.**
**c/o Maples Finance Limited**
**PO Box 1093, Queensgate House**
**South Church St., George Town**
**Grand Cayman, Cayman Island KY1-1102**

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2013-1 and 2013-2190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-3 and 2014-4190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-5 and Acis CLO 2015-6190 S.
LaSalle Street, 8th Floor
Chicago, IL 60603

Deutsche Bank Trust Company Americas
Attn: CDO Business Unit – Hewett's
Island CLO 1-R
1761 East St. Andrew Place
Santa Ana, CA 92705

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**Acis CLO 2015-6 Ltd.**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102,**

Acis CLO 2014-3 LLC
Acis CLO 2014-4
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-5 LLC
Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

**Acis CLO 2017-7 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1 -1102**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 86   Filed 07/15/25   Page 872 of 1017   PageID 14499
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 744 of 1803   PageID 11490
Case 18-30264-sgj11   Doc 879   Filed 01/31/19   Entered 01/31/19 17:34:05   Page 94 of 229

*Highlands Service List*
*ACIS #5980*

Highland CLO Funding Ltd.
c/o Mark M. Maloney/W. Austin Jowers
King & Spalding LLP
1180 Peachtree Street NE
Atlanta, GA 30309

**Highland CLO Funding, Ltd.**
**First Floor, Dorey Court**
**Admiral Park, St. Peter Port**
**Guernsey GY1 6HJ, Channel Islands**

**Highland CLO Management, Ltd.**
**P.O. Box 309 Ugland House**
**South Church Street**
**George Town, Grand Cayman KY1-1004**

**Highland HCF Advisor, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

Neutra, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

**CLO Holdco, Ltd.**
**c/o Intertrust Corp. Srvs. (Cayman) Ltd.**
**190 Elgin Ave., George Town**
**Grand Cayman, Cayman Islands KY1-9005**

The Dugaboy Investment Trust
300 Crescent Court, Suite700
Dallas, TX 75201-1876

Highland CLO Funding, Ltd.
c/o Paul R. Bessette/Rebecca Matsumura
King & Spalding LLP
500 West 2nd St., Suite 1800
Austin, TX 78701-4684

Highland CLO Funding, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**P.O. Box 32311**
**Grand Cayman, KY1-1209**
**Cayman Islands**

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

CLO Holdco, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

**Highland CLO Management, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**Suite #4-210 Governor's Square**
**23 Lime Tree Bay Avenue**
**Grand Cayman, Cayman Islands**

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

CLO Holdco, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-16 Filed 04/06/25 Page 873 of 1017 PageID 14500
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 745 of 1803 PageID 11491
Case 18-30264-sgj11 Doc 820 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 195 of 229
Case 18-30264-sgj11 Doc 792 Filed 01/16/18 Entered 01/16/18 17:34:05 Page 95 of 229

## Creditors Service List
### Acis Capital Mgmt./Phelan
### #5980

### Class 2

Joshua N. Terry
25 Highland Park Village
Suite 100-848
Dallas, TX 75205-2726

Joshua N. Terry
c/o Brian P. Shaw/John M. Lynch
Rogge Dunn Group, PC
1201 Elm St., Suite 5200
Dallas, TX 75270

Joshua N. Terry
350 9 Princeton Ave.
Dallas, TX 75205-3246

### Class 3

Andrews Kurth Kenyon LLP
600 Travis, Suite 4200
Houston, TX 77002-2929

CSI Global Deposition Services
4950 N. O'Connor Road, Suite 152
Irving, TX 75062 - 2778

CT Corporation
P0 Box 4349
Carol Stream, IL 60197-4349

Case Anywhere LLC
21860 Burbank Blvd., Suite 125
Woodland Hills, CA 91367-7447

David Langford
1321 Indian Creek
DeSoto, TX 75115-3652

David Simek
31 Woodacres Road
Brookville, NY 11545-2911

Drexel Limited
309 23rd Street, #340
Miami Beach, FL 33139-1700

Elite Document Technology
400 N. Saint Paul St., Suite 1300
Dallas, TX 75201-6881

Highfield Equities, Inc.
3131 McKinney Ave., Suite 215
Dallas, TX 75204-2421

JAMS, Inc.
18881 Von Karman Ave., Suite 350
Irvine, CA 92612-6589

Jones Day
2727 N. Harwood Street
Dallas, TX 75201-1568

Lackey Hershman LLP
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219-4259

KPMG LLP (USA)
Two Financial Center
60 South Street
Boston, MA 02111-2759

KPMG LLP
2323 Ross Ave., Suite 1400
Dallas, TX 75201-2721

KPMG LLP
Aon Center
200 E. Randolph St., Suite 5500
Chicago, IL 60601-6607

McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201-6970

Reid Collins & Tsai, LLP
Building C, Suite 300
1301 S. Capital of Texas Highway
Austin, TX 78746-6550

Stanton Advisors LLC
300 Coles St., Apt. 802
Jersey City, NJ 07310-1047

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 04/01/25   Page 874 of 1017   PageID 14501
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 746 of 1803   PageID 11492
Case 18-30264-sgj11  Doc 879  Filed 01/31/19  Entered 01/31/19 17:34:06  Page 96 of 229

Stanton Law Firm
9400 North Central Expwy., Suite 1304
Dallas, TX 75231-5047

The TASA Group, Inc.
1166 DeKalb Pike
Blue Bell, PA 19422- 1853

Acis CLO 2013-1, Ltd., et al.
c/o David Neier
Winston & Strawn LLP
200 Park Ave.
New York, NY 10166-4193

Acis CLO 2013-1 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-3 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-4 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-5 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Directors – Acis CLO 2013-1 Ltd.
75 Fort St., Clifton House
PO Box 1350
George Town, Grand Cayman
Cayman Island, KY1-1108

Directors – Acis CLO 2014-3 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman

Directors – Acis CLO 2014-4 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman

Directors – Acis CLO 2014-5 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman

Directors – Acis CLO 2015-6 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman

Acis CLO 2013-1, Ltd.
c/o Appleby Trust, Attn: Directors
Clifton House 75 Fort St., P0 Box 13
Grand Cayman, Cayman Islands KY1-1108

Acis CLO 2013-2 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2014-3 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2014-4 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2014-5 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2015-6 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1 -1102

Acis CLO 2017-7 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1 -1102

Acis CLO 2013-1, Ltd., et al.
c/o Thomas Melsheimer/Lane Webster
Winston & Strawn LLP
2501 N. Harwood St., 17th Floor
Dallas, TX 75201

Jennifer G. Terry
25 Highland Park Village, Suite 100-848
Dallas, TX 75205

Hunton Andrews Kurth LLP
c/o M. Christine Klein, Dep. Gen. Counsel
Riverfront Plaza, East Tower
951 East Byrd St.
Richmond, VA 23219

Patrick H. Daugherty
3621 Cornell Ave.
Dallas, TX 75250

Stinson Leonard Street LLP
Attn:  Paul Lackey
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Filed 04/06/25    Page 875 of 1017    PageID 14502
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 747 of 1803    PageID 11493
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 197 of 229
Case 18-30264-sgj11 Doc 792 Filed 01/16/18    Entered 01/16/18 17:34:05    Page 47 of 229

**Class 4**

Highland Capital Management, LP
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

Highland Capital Management, LP
1209 Orange Street
Wilmington, DE 19801-1120

Highland Capital Management, LP
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland Capital Management, LP, Highland
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 09/25/1804    Page 876 of 1017    PageID 14503
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 748 of 1803    PageID 11494
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 198 of 229

# EXHIBIT "4"

**[Supplement to Second Modification to the Third Amended
Joint Plan for Acis Capital Management, L.P. and Acis Capital
Management GP, LLC – Dkt. No. 769]**

**Appellee Appx. 00742**
**Appx. 00993**
013555

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 07/30/25    Page 877 of 1017    PageID 14504
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 749 of 1803    PageID 11495
Case 18-30264-sgj11    Doc 829    Filed 01/31/19    Entered 01/31/19 17:34:06    Page 199 of 229

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR
ROBIN PHELAN, CHAPTER 11 TRUSTEE**

Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § § § | CHAPTER 11 CASES |
| ACIS CAPITAL MANAGEMENT, L.P., ACIS CAPITAL MANAGEMENT GP, LLC, | § § § § | CASE NO. 18-30264-sgj11 (Jointly Administered) |
| Debtors. | § | |

## SUPPLEMENT TO SECOND MODIFICATION TO THE THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

Robin Phelan ("Trustee"), the Chapter 11 Trustee for Acis Capital Management, LP and Acis Capital Management GP, LLC (the "Debtors"), files this Supplement to the Second Modification (the "Second Modification") to the *Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC* [Docket No. 660], as modified by the *First Modification to the Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC* [Docket No. 693] (together, the "Plan").

Appellee Appx. 00743
Appx. 00994
013556

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 07/16/25   Page 878 of 1017   PageID 14505
Exhibit 6   Page 751 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 750 of 1803   PageID 11496
Case 18-30264-sgj11   Doc 765   Filed 12/10/18   Entered 12/10/18 17:34:06   Page 200 of 229

1.        On November 16, 2018, the Trustee filed the Second Modification.  The Second Modification modified the Plan to replace the Exhibit "A," reflecting Estate Claims, with a revised version of Exhibit A.  The Schedule "1" to Exhibit A, which reflects the Estate's Preference Claims, was not changed from the version attached to the Plan but was inadvertently omitted from the Second Modification.  For completeness and to avoid any confusion regarding the Preference Claims being reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, the Second Modification is hereby supplemented with the Schedule "1" to Exhibit "A" to the Plan.

2.        A copy of the Schedule "1" is attached hereto as **Exhibit 1**.

3.        A copy of the complete Exhibit "A" to the Plan, including Schedule "1," is attached hereto as **Exhibit "2."**

4.        A redline is not necessary because the attached Schedule "1" is unchanged from the version attached to the Plan and included in the Trustee's solicitation materials.

Dated:  December 10, 2018.           Respectfully submitted,

ACIS CAPITAL MANAGEMENT, L.P.

By:  /s/ *Robin Phelan*
      Robin Phelan
      Chapter 11 Trustee

ACIS CAPITAL MANAGMENET GP, LLC

By:  /s/ *Robin Phelan*
      Robin Phelan
      Chapter 11 Trustee

Appellee Appx. 00744

Appx. 00995

013557

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-11    Filed 07/26/2025    Page 879 of 1017    PageID 14506
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 751 of 1803   PageID 11497
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 201 of 229
Case 18-30264-sgj11 Doc 765 Filed 12/10/18 Entered 12/10/18 18:40:10 Page 3 of 23

APPROVED:

/s/ Jeff P. Prostok
Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

APPROVED:

/s/ Rakhee V. Patel
Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello –State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL    COUNSEL    FOR    ROBIN
PHELAN, CHAPTER 11 TRUSTEE**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document and the attached exhibits were served electronically via the Court's Electronic Court Filing (ECF) notification system on December 10, 2018.

/s/ Jeff P. Prostok
Jeff P. Prostok

\L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Supplement to Second Modification to Third Amended Plan 12.10.18.docx

Appellee Appx. 00745
Appx. 00996
013558

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 07/30/25    Page 880 of 1017    PageID 14507
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 752 of 1803    PageID 11498
Case 19-30264-sgj11 Doc 829-5 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 202 of 229
Case 19-30264-sgj11 Doc 795 Filed 12/10/18 Entered 12/10/18 19:40:10 Page 2 of 23

# EXHIBIT "1"

## Schedule "1" to Exhibit "A" to
## Third Amended Plan

Appellee Appx. 00746
Appx. 00887
013559

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 07/16/25   Page 881 of 1017   PageID 14508
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 753 of 1803   PageID 11499
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 203 of 229

Case 18-30264-sgj11 Doc 769 Filed 12/10/18   Entered 12/10/18 15:10:10   Page 5 of 23

Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

Schedule 1 to Exhibit "A" to

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| **Payments within 90 Days of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| **Payments to Insiders within One Year of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 10/55/25 21:04   Page 882 of 1017   PageID 14509
Schedule 1 to Exhibit "A" to
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 754 of 1803   PageID 11500
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 204 of 229

Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

Page 6 of 23

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25   Page 883 of 1017   PageID 14510
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 755 of 1803   PageID 11501
Case 19-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 205 of 229

# EXHIBIT "2"

## [Exhibit "A" to Third Amended Plan as Supplemented]

Appellee Appx. 00749
013562

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/06/25   Page 884 of 1017   PageID 14511
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 756 of 1803   PageID 11502
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:54:10   Page 206 of 229

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

    1.    <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

    2.    <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

    3.    <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

        (a)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

        (b)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

        (c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

Appellee Appx. 00750
Appx. 01001
013563

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-6   Filed 07/08/25   Page 885 of 1017   PageID 14512
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 757 of 1803   PageID 11503
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 207 of 229

Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)    All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)    All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)    All Claims for breach of the PMAs or the Indentures;

(h)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)    All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)    All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)    All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)    All Claims based on alter ego or rights to pierce the corporate veil of

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/804   Page 886 of 1017   PageID 14513
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 758 of 1803   PageID 11504
Case 18-30064-sgj11   Doc 820   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 208 of 229

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.    <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against HCLOF;

(e)    All Claims for breach of the PMAs or the Indentures;

(f)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1     Filed 06/02/25     Page 887 of 1017     PageID 14514
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 759 of 1803    PageID 11505
Case 18-30064-sgj11 Doc 828-5 Filed 12/31/19  Entered 12/31/19 17:34:06  Page 209 of 229

     (l)    All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

     (m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

    5.    <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

     (a)    All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

     (b)    All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

     (c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

     (d)    All Avoidance Actions against Highland HCF;

     (e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

     (f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

     (g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

     (h)    All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

     (i)    All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

     (j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 25-186   Filed 06/09/25   Page 888 of 1017   PageID 14515
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 760 of 1803   PageID 11506
Case 18-30664-sgj11   Doc 789   Filed 12/31/18   Entered 12/31/18 15:40:20   Page 210 of 229

Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.     <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland CLOM;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appellee Appx. 00754
Appx. 01005
013567

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/05/25   Page 889 of 1017   PageID 14516
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 761 of 1803   PageID 11507
Case 18-30264-sgj11   Doc 795   Filed 12/10/18   Entered 12/10/18 15:40:50   Page 211 of 229

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.      CLO Holdco, Ltd. Claims.  All Estate Claims against CLO Holdco, Ltd. ("CLO Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against CLO Holdco;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appellee Appx. 00755
Appx. 01996
013568

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/25   Page 890 of 1017   PageID 14517
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 762 of 1803   PageID 11508
Case 18-30264-sgj11   Doc 789   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 212 of 229

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.      Neutra, Ltd. Claims.  All Estate Claims against Neutra, Ltd. ("Neutra") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Neutra;

(e)      All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Neutra for the unauthorized use of Estate Assets

Appellee Appx. 00756
Appx. 01985
013569

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/04/25   Page 891 of 1017   PageID 14518
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 763 of 1803   PageID 11509
Case 18-30064-sgj11   Doc 789   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 218 of 229

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.     <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "Issuers"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "Co-Issuers"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)     All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/25   Page 892 of 1017   PageID 14519
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 764 of 1803   PageID 11510
Case 18-30264-sgj11   Doc 783   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 214 of 229

      (h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

      (i)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

      (j)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

      (k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

      (l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

      10.    <u>Claims Against Any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates</u>.  All Estate Claims against any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates (collectively, the "<u>Affiliates</u>" and each, an "<u>Affiliate</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against such Affiliates shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

      (a)    All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

      (b)    All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

      (c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

      (d)    All Avoidance Actions against any Affiliate;

      (e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

      (f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

      (g)    All Clams for usurpation of a corporate opportunity belonging to either of

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/25/25    Page 893 of 1017    PageID 14520
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 765 of 1803    PageID 11511
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 215 of 229

the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against any Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against any Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)    All Claims based on alter ego or rights to pierce the corporate veil of any Affiliate as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any officers, directors, equity interest holders, or Persons otherwise in control of any Affiliates; and,

(m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.    <u>Dondero Claims</u>.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.    <u>Okada Claims</u>.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-86   Filed 06/06/25   Page 894 of 1017   PageID 14521
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 766 of 1803   PageID 11512
Case 18-30864-sgj11   Doc 789   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 216 of 229

Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.    <u>Preference Claims</u>.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved, retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

        **Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.    <u>Claims Against Officers, Managers and Members</u>.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.    <u>Claims Against Former Attorneys and Law Firms</u>.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-11    Filed 07/08/25    Page 895 of 1017    PageID 14522
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 767 of 1803    PageID 11513
Case 18-30264-sgj11    Doc 789    Filed 12/10/18    Entered 12/10/18 15:40:20    Page 213 of 229

rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:

(a)    Cole Schotz, P.C.

(b)    Michael D. Warner

(c)    Jacob Frumkin

(d)    Warren A. Usatine

(e)    McKool Smith

(f)    Gary Cruciani

(g)    Michael P. Fritz

(h)    Carson D. Young

(i)    Nicholas Matthews

(j)    Lackey Hershman, LLP

(k)    Stinson Leonard Street LLP

(l)    Jamie R. Welton

(m)    Paul B. Lackey

(n)    Michael Aigen

(o)    Roger L. Mandel

(p)    Abrams & Bayliss, LLP

(q)    Kevin G. Abrams

(r)    A. Thompson Bayliss

(s)    Jones Day

(t)    Hilda C. Galvan

(u)    Michael Weinberg

(v)    Reid Collins & Tsai, LLP

(w)    Lisa Tsai

(x)    Stanton, LLP

(y)    James M. Stanton

Appellee Appx. 00761
013574

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 07/09/25   Page 896 of 1017   PageID 14523
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 768 of 1803   PageID 11514
Case 18-30064-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 218 of 229

(z)     Hunton Andrews Kurth

(aa)    Marc Katz

(bb)    Greg Waller

(cc)    any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

16.     <u>Claims Against Officers, Directors, Employees, Members, and Managers, of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates</u>.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates, including all such Estate Causes of Action based on fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act.  Such present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates include, but are not limited to, the following Persons:

(a)     William Scott;

(b)     Heather Bestwick;

(c)     Scott Ellington

(d)     Isaac Leventon

(e)     Jean Paul Sevilla

(f)     Hunter Covitz

(g)     The Dugaboy Investment Trust

(h)     Nancy Dondero, Trustee of the Dugaboy Trust

(i)     Grant Scott

(j)     Any other Person who may be so named at a later date by the Reorganized Debtor.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/02/25   Page 897 of 1017   PageID 14524
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 769 of 1803   PageID 11515
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 219 of 229

17.    <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.    <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.    <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.    <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.    <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

22.    <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate.  Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

---

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 07/06/25   Page 898 of 1017   PageID 14525
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 770 of 1803   PageID 11516
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 220 of 229

Case 18-30264-sgj11 Doc 769 Filed 12/10/18   Entered 12/10/18 15:10:10   Page 22 of 23

Schedule 1 to Exhibit "A" to

Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| **Payments within 90 Days of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| **Payments to Insiders within One Year of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 07/26/2025   Page 899 of 1017   PageID 14526
Exhibit 1 to Exhibit "A" to
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 771 of 1803   PageID 11517
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 221 of 229

Case 18-30264-sgj11 Doc 769 Filed 12/10/18 Entered 12/10/18 15:10:10 Page 23 of 23
Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 07/06/25    Page 900 of 1017    PageID 14527
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 772 of 1803    PageID 11518
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 222 of 229

# EXHIBIT "5"

**[Executory Contracts and Unexpired Leases to be Assumed by the Trustee]**

Appellee Appx. 00766

013379

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-136   Filed 07/46/25 1804  Page 901 of 1017   PageID 14528
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 773 of 1803   PageID 11519
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 223 of 229

EXHIBIT "5"
Executory Contracts and Unexpired Leases
to Be Assumed by the Trustee

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2013-1 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | March 18, 2013 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2013-1 | Collateral Administration Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-2 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | October 3, 2013 | $0 |
| The Bank of New York Mellon Trust Co., N.A. 601 Travis Street, 16th Floor Houston, Texas 77002 Attn:  Global Corporate Trust – Acis CLO 2013-2 | Collateral Administration Agreement | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | October 3, 2013 | $0 |
| Acis CLO 2014-3 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | February 25, 2014 | $0 |

1

Appellee Appx. 00767
Appx. 01918
013580

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/56/25   Page 902 of 1017   PageID 14529
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 774 of 1803   PageID 11520
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 224 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-3 | Collateral Administration Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-4 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | June 5, 2014 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-4 | Collateral Administration Agreement | June 5, 2014 | $0 |
| Acis CLO 2014-4 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | June 5, 2014 | $0 |
| Acis CLO 2014-5 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | November 18, 2014 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-5 | Collateral Administration Agreement | November 18, 2014 | $0 |

2

Appellee Appx. 00768
Appx. 01010
013581

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 07/06/25   Page 903 of 1017   PageID 14530
Exhibit 186   Page 776 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 775 of 1803   PageID 11521
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 225 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | November 18, 2014 | $0 |
| Acis CLO 2015-6 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | April 16, 2015 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2015-6 | Collateral Administration Agreement | April 16, 2015 | $0 |
| Acis CLO 2015-6 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | April 16, 2015 | $0 |
| Acis CLO Value Fund II (Cayman), LP.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II GP, LLC<br>P.O. Box. 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II, LP.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value GP, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | July 19, 2010 | $0 |

3

Appellee Appx. 00769
Appx. 01920
013582

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1186   Filed 07/06/25   Page 904 of 1017   PageID 14531
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 776 of 1803   PageID 11522
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 226 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO Value Master Fund II, LP.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II (Cayman), L.P.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis CLO Value Master Fund II, L.P.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis Loan Funding, Ltd.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |
| BayVK R2 Lux S.A., SICAV FIS<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Agreement for the Outsourcing of the Asset Management of BayVK R2 Lux S.A., SICAV-FIS | February 27, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |
| BNP Paribas Securities Services<br>Luxembourg Branch<br>60 Avenue John F. Kennedy<br>1855 Luxembourg | Power of Attorney<br>86578 | February 20, 2015 | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Confidentiality Agreement | April 11, 2011 | $0 |

4

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-186 Filed 07/06/25 Page 905 of 1017 PageID 14532
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 777 of 1803 PageID 11523
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 227 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Hewett's Island CLO 1-R, Ltd. *clo* Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Governing Documents (Requested from HCM) | -- | $0 |
| Hewett's Island CLO 1-R, Ltd. *clo* Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Management Agreement | July 18, 2011 | $0 |
| Hewett's Island CLO 1-R, Ltd. *clo* Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement (Requested from HCM) | November 20, 2007 | $0 |
| State Street (Guernsey Limited) First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2015-6 | Confidentiality Agreement | March 5, 2014 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Agreement for the Outsourcing of the Asset Management of BayVK R2 Lux S.A., SICAV-FIS | February 27, 2015 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |

5

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 07/06/25    Page 906 of 1017    PageID 14533
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 778 of 1803    PageID 11524
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 228 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis Loan Funding, Ltd.<br>First Floor, Dorey Court<br>St. Peter Port, Guernsey GY1 6HJ<br>Channel Islands | Portfolio Management Agreement | December 22, 2016 | $0 |
| Acis Capital Management, LP<br>c/o *PHELANLAW*<br>4214 Woodfin Drive<br>Dallas, Texas 75220 | Amended and Restated Agreement of Limited Partnership | January 21, 2011 | $0 |
| Acis Capital Management GP, LLC<br>c/o *PHELANLAW*<br>4214 Woodfin Drive<br>Dallas, Texas 75220 | Amended and Restated Limited Liability Company Agreement | January 21, 2011 | $0 |

For the avoidance of doubt, to the extent not otherwise included above, the Trustee intends to assume any additional executory contracts that relate to the funds set forth below as may be necessary or beneficial to the Reorganized Debtor under the Plan:

1.  Acis CLO 2013-1, Ltd.
2.  Acis CLO 2013-2, Ltd.
3.  Acis CLO 2014-3, Ltd.
4.  Acis CLO 2014-4, Ltd.
5.  Acis CLO 2014-5, Ltd.
6.  Acis CLO 2015-6, Ltd.
7.  Acis CLO Value Fund II, L.P.
8.  Acis CLO Value Fund II (Cayman), L.P.
9.  Acis CLO Master Fund II, L.P.
10. BayVK R2 Lux S.A., SICAV FIS

6

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/25/1804    Page 907 of 1017    PageID 14534
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 779 of 1803    PageID 11525

Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 229 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

11.    Hewitt's Island CLO 1-R, Ltd.

12.    Acis Loan Funding, Ltd.

The Trustee reserves the right to amend or supplement this Exhibit 5.

7

Appellee Appx. 00773

013586

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Filed 10/16/25    Page 908 of 1017    PageID 14535
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 780 of 1803    PageID 11526

# APPENDIX 9

Appellee Appx. 00774

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 08/26/25   Page 909 of 1017   PageID 14536
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 781 of 1803   PageID 11527

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE ACIS CAPITAL MANAGEMENT, L.P., et al., | § § § | |
| Debtors. | § § | |
| NEUTRA, LTD., et al., | § § § | Civil Action No. 3:18-CV-1056-D (Consolidated with Civil Action Nos. 3:18-CV-1057-D, 3:18-CV-1073-D, |
| Appellants, | § § | and 3:18-CV-1084-D) |
| VS. | § § | (Bank. Ct. Nos. 18-30264-SGJ-7; 18-30265-SGJ-7) |
| JOSHUA N. TERRY, et al., | § § | |
| Appellees. | § § | |
| IN RE ACIS CAPITAL MANAGEMENT, L.P., et al., | § § § | |
| Debtors. | § § | |
| HIGHLAND CLO FUNDING, LTD., et al., | § § § | Civil Action No. 3:18-CV-1822-D (Bank. Ct. Nos. 18-30264-SGJ-11 and 18-30265-SGJ-11) |
| Appellants, | § § | |
| VS. | § § | |
| ROBIN PHELAN, CHAPTER 11 TRUSTEE, et al., | § § § | |
| Appellees. | § § | |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 08/06/25   Page 910 of 1017   PageID 14537
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 782 of 1803   PageID 11528
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 2 of 84   PageID 97995

IN RE ACIS CAPITAL                    §
MANAGEMENT, L.P., et al.,             §
                                      §
        Debtors.                      §
                                      §    Civil Action No. 3:19-CV-0291-D
                                      §    (Bank. Ct. Nos. 18-30264-SGJ-11 and
HIGHLAND CAPITAL                      §    18-30265-SGJ-11)
MANAGEMENT, L.P., et al.,             §
                                      §
        Appellants,                   §
                                      §
VS.                                   §
                                      §
ROBIN PHELAN, CHAPTER 11              §
TRUSTEE, et al.,                      §
                                      §
        Appellees.                    §

_____

APPEALS FROM THE
UNITED STATES BANKRUPTCY COURT
<u>FOR THE NORTHERN DISTRICT OF TEXAS</u>

FITZWATER, Senior Judge:

        In multiple appeals taken from two involuntary bankruptcy cases, the principal

questions presented are whether the bankruptcy court erred by issuing orders for relief and

denying the debtors' motion to dismiss or compel arbitration; whether the bankruptcy court

erred by approving a seven-figure break-up fee in favor of a potential transaction partner; and

whether the bankruptcy court erred by confirming a reorganization plan ("the Plan") that

enjoins a non-debtor, non-creditor entity from exercising certain contractual rights.  The

court must also decide questions of the bankruptcy court's subject matter jurisdiction and of

one appellant's standing to appeal.  For the reasons that follow, the court DISMISSES the

appeal from the orders for relief, AFFIRMS the break-up fee order, and AFFIRMS the order

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1006 of 1804   Page 911 of 1017   PageID 14538
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 783 of 1803   PageID 11529
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 3 of 84   PageID 97996

approving the Plan.  The court need not address the bankruptcy court's denial of the motion to dismiss.

I

The following factual summary is based on the bankruptcy court's findings of fact in support of the orders for relief and the Plan confirmation order.  *See In re Acis Capital Mgmt., L.P.* (*Acis II*), 2019 WL 417149, at *2-7 (Bankr. N.D. Tex. Jan. 31, 2019) (Jernigan, J.) (confirmation order); *In re Acis Capital Mgmt., L.P.* (*Acis I*), 584 B.R. 115, 119-42 (Bankr. N.D. Tex. 2018) (Jernigan, J.) (orders for relief).[1]

A

Appellant Highland Capital Management, L.P. ("Highland") is a Dallas-based registered investment advisor that manages nearly $15 billion of assets through an organizational structure comprised of roughly 2,000 different entities.  Its investment vehicles include mutual funds, private equity funds, and (relevant here) collateralized loan obligation funds ("CLOs").  Highland conducted its CLO business through an entity called Acis Capital Management, L.P. ("Acis LP") and Acis LP's general partner, Acis Capital Management GP, L.L.C. ("Acis GP") (collectively, "Acis," unless otherwise indicated), both debtors in these appeals.

In 2005 Highland hired appellee Joshua Terry ("Terry") as a portfolio analyst.  Terry

---

[1]"The court reviews the bankruptcy court's . . . fact findings only for clear error."  *In re Nary*, 253 B.R. 752, 756 (N.D. Tex. 2000) (Fitzwater, J.) (quoting *In re ICH Corp.*, 230 B.R. 88, 91 n.10 (N.D. Tex. 1999) (Fitzwater, J.)).

- 3 -

Appellee Appx. 00777
013590

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 07/05/25   Page 912 of 1017   PageID 14539
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 784 of 1803   PageID 11530
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 4 of 84   PageID 97997

rose through the ranks at Highland until he became the portfolio manager for Highland's CLO business, and, in turn, received a 25% limited partnership interest in Acis LP. Terry successfully managed billions of dollars of assets on Highland's behalf until June 2016, when Highland terminated him. The reason for Terry's termination is disputed.[2] As a result of the termination, Terry's partnership interest in Acis LP was deemed forfeited without compensation.

In September 2016 Highland sued Terry in the 162nd Judicial District Court of Dallas County, seeking to recover, *inter alia*, on theories of breach of fiduciary duty, disparagement, and breach of contract. Terry asserted counterclaims against Highland, Acis, and others, and demanded arbitration. The state court stayed the proceeding and ordered arbitration, and in October 2017 the arbitration panel rendered an award in Terry's favor for $7,949,749.15, plus post-judgment interest, against Acis ("the Award"). Terry sought and obtained confirmation of the Award in the 44th Judicial District Court of Dallas County.

After the Award was confirmed, Terry began conducting post-judgment discovery, which revealed some transactions that appeared suspicious to Terry. Terry thought that Highland was denuding Acis of assets in an effort to make Acis judgment-proof. At a January 24, 2018 hearing, Terry requested a temporary restraining order ("TRO") to restrain

---

[2]According to the bankruptcy court, "[t]he arbitration panel that issued the Arbitration Award found that Mr. Terry was terminated for essentially doing the right thing for investors." *Acis II*, 2019 WL 417149, at *14; *see also* P. 1st Supp. to Pet. to Confirm Arbitration Award Exh. 1, No. DC-17-15244 (44th Dist. Ct., Dall. Cty., Tex. filed Nov. 13, 2017).

- 4 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/25/24    Page 913 of 1017    PageID 14540
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 785 of 1803    PageID 11531
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 5 of 84    PageID 97998

Acis LP from transferring any more assets pending a January 31 temporary injunction hearing. Acis LP agreed to the request, and the court issued a TRO. Five days later, Terry filed supplemental pleadings alleging that Acis LP was engaging in more wrongdoing, and requested appointment of a receiver. Instead of proceeding with the January 31 state-court hearing, however, Terry took a different tack. At 11:57 p.m. the night before the hearing, Terry filed involuntary bankruptcy petitions against both Acis LP and Acis GP.[3]

B

To comprehend some of the key issues in these appeals, it is helpful to recount some of the fundamentals of CLOs and how Highland structured its CLO business.

At the most basic level, a CLO is a "basket of loans." *Acis I*, 584 B.R. at 123. A special-purpose CLO entity ("CLO-SPE") purchases variable-rate commercial loans at the direction of the CLO manager, and collects them into a pool of loans. The obligors of the loans are usually large, well-known companies. Investors, such as pension funds, life insurance companies, and others, buy into the CLO by purchasing fixed-rate, secured notes on which the CLO-SPE itself is the obligor. These notes are typically sold in tranches representing different levels of risk. The CLO-SPE pays its obligations on the secured notes using the income it receives from its pool of loans, starting with the top tranche of notes and then proceeding through the lower tranches. These payments are made according to the terms of certain indenture agreements between the CLO-SPE and the indenture trustee (here,

---

[3] The bankruptcy court administratively consolidated the two cases, appointed a single trustee, and ultimately confirmed one Plan applicable to both alleged debtors.

- 5 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1006 of 1804   Page 914 of 1017   PageID 14541
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 786 of 1803   PageID 11532
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 6 of 84   PageID 97999

U.S. Bank, N.A.) to whom the CLO-SPE pledges collateral to secure the notes.

The last investor to be paid is the "equity" holder, who does not own actual equity but instead holds a subordinated, unsecured note.  The equity investor earns money when the variable interest rates paid to the CLO-SPE on the commercial loans exceed the fixed interest rates that the CLO-SPE must pay to the secured note holders.  Although the equity investor assumes the most risk, it also possesses certain rights that allow it to control the CLO—most significantly, the right to call for an optional redemption of the CLO.[4]  When an optional redemption is effected, the CLO's pool of loans is liquidated and the resulting cash is used to pay back the outstanding secured notes, beginning with the top tranche and proceeding downward.[5]

In the present cases, Acis LP acts as the portfolio manager—*not* as the equity holder—of four CLO-SPEs, and is contractually entitled to receive portfolio management fees from them.  Appellant Highland CLO Funding, Ltd. ("HCLOF"), a Guernsey[6] entity formerly known as Acis Loan Funding, Ltd.,[7] is the primary equity investor in the CLOs.

---

[4]It is disputed whether the equity holder in this case had the right to compel Acis LP to effect an optional redemption of the relevant CLOs against Acis LP's will.  The court need not resolve this dispute and therefore suggests no view on this question.

[5]The holders of the top tranche of secured notes also have special rights—namely, the right to terminate the CLO manager for cause on 45 days' notice.  The note holders in these cases have so far not exercised that right.

[6]Guernsey is a small island nation located in the English Channel.

[7]For clarity, the court will refer to this entity as HCLOF, even when describing events that occurred before the entity changed its name.

- 6 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-116    Filed 07/06/25    Page 915 of 1017    PageID 14542
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 787 of 1803    PageID 11533
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 7 of 84    PageID 98000

HCLOF does not own Acis; to the contrary, Acis LP once owned an indirect 15% stake in HCLOF for regulatory compliance reasons. Acis itself has never had any employees. Instead, it subcontracts all front office advising and back office support services to another entity. Highland was originally Acis LP's subcontractor, but, under the Plan, an entity called Brigade Capital Management, L.P. ("Brigade") fills that role (for a much lower cost).

Historically, all of these entities—Acis LP, Highland, HCLOF, and the CLO-SPEs—operated within an ecosystem of contracts that allowed Acis to manage the CLOs effectively. First, Acis LP had various fee-generating portfolio management agreements ("PMAs") with the CLO-SPEs . These contracts remain in place under the Plan. Second, Acis LP and Highland had a sub-advisory agreement, which obligated Highland to provide advisory and management services in exchange for substantial fees. Third, Acis LP and Highland had a shared services agreement, through which Highland provided back office services to Acis for a significant fee. And, fourth, Acis LP had a separate PMA with HCLOF ("the Equity PMA"). While the parties dispute the exact effect of the Equity PMA—i.e., to whom it gave power over whom—it is undisputed that Acis LP earned no fees from this contract.

C

Circumstances changed after the state-court litigation between Highland and Terry began. As noted above, Highland and Acis LP engaged in numerous transactions that caused Terry to believe "that Highland was dismantling and denuding Acis LP of all of its assets and value." *Acis I*, 584 B.R. at 144. In October 2017, four days after Terry obtained the Award,

- 7 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1009 of 1804   Page 916 of 1017   PageID 14543
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 788 of 1803   PageID 11534
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 8 of 84   PageID 98001

Acis LP sold its stake in HCLOF back to HCLOF in exchange for about $990,000 in cash.
As a result, Acis LP could no longer lawfully manage any new CLOs under the applicable
regulatory scheme.  Three days later, HCLOF entered into a new PMA—a replacement for
the Equity PMA—with a recently-formed Cayman Islands entity called Highland HCF
Advisor, Ltd.  At around the same time, Acis LP terminated the original Equity PMA.  In
early November 2017, Acis LP transferred one of its most significant assets—a $9.5 million
note receivable that Highland owed to it—to another Cayman Islands entity,  Highland CLO
Management, Ltd. ("Highland Management").  Acis LP transferred the note pursuant to a
contract that provided that Highland Management would step into Acis LP's shoes as the
portfolio manager for the CLOs.  Highland Management also promised to reimburse Acis LP
for up to $2 million of future legal fees and up to $1 million of future administrative
expenses.  One day after the Award was confirmed, Acis LP transferred away "the vehicle
that can most easily be described as the Acis LP 'risk retention structure' (necessitated by
[the] federal Dodd Frank law)" to Highland CLO Holdings Ltd., yet another Cayman Islands
entity.  *Acis I*, 584 B.R. at 129.  That same day, Acis LP conveyed to the same Cayman
Islands entity its contractual right to receive management fees from a particular CLO-SPE.
This contractual right was worth $5 million, but all Acis LP received in return was
forgiveness of a $2.8 million receivable that it owed to Highland.

On the day after Terry obtained his final judgment in the 44th Judicial District Court
of Dallas County, Acis LP underwent a sudden change in ownership.  Previously, Acis LP's
limited partners were Mark Okada ("Okada"), Highland's chief investment officer, and the

Appellee Appx. 00782
Appx. 01933
013595

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 07/06/25   Page 917 of 1017   PageID 14544
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 789 of 1803   PageID 11535
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 9 of 84   PageID 98002

Dugaboy Investment Trust, a family trust of Highland's CEO, James Dondero.  But on
December 18, 2017 Okada and the Dugaboy Investment Trust both conveyed their interests
in Acis LP to appellant Neutra, Ltd. ("Neutra"), a Cayman Islands exempted company.  The
Dugaboy Investment Trust also conveyed its 100% ownership interest in Acis GP to Neutra.
Thus Neutra became Acis' sole equity owner.

Highland asserts that these transactions were part of a market-driven restructuring, or
"reset," of Highland's CLOs.  According to Highland's witnesses, Acis LP had become
"'toxic' in the market place" due to the litigation with Terry, and had to be excised from
Highland's CLO business. *Acis I*, 584 B.R. at 128; *accord Acis II*, 2019 WL 417149, at *11.
HCLOF also has an anonymous, third-party institutional investor ("the Passive Investor")
who purportedly demanded that Acis LP be removed as Highland's CLO manager.  But the
Passive Investor's representative testified at a hearing that the Passive Investor had made no
such demand, and the bankruptcy court found that Highland's testimony about Acis'
supposed toxicity was not credible.  According to the bankruptcy court, Highland's
explanations for the transfers described above were "a seemingly manufactured narrative to
justify prior actions." *Acis II*, 2019 WL 417149, at *16 (capitalization omitted).  The
bankruptcy court rejected this narrative, finding that "[t]he evidence established
overwhelmingly that there is a substantial likelihood that the transfers were part of an
intentional scheme to keep assets away from Mr. Terry as a creditor." *Id.* at *12.

- 9 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document E1hibit6    Filed 07/16/25804    Page 918 of 1017    PageID 14545
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 790 of 1803    PageID 11536
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 10 of 84    PageID 98003

D

Terry filed the involuntary petitions against Acis LP and Acis GP in order to stop the apparent transfer of assets away from Acis LP. *See Acis I*, 584 B.R. at 144. Fast-paced litigation followed.

On March 19, 2018—two days before the scheduled trial on the involuntary petitions—Acis filed a motion to dismiss for lack of subject matter jurisdiction, or, in the alternative, to compel arbitration ("the Arbitration Motion"). The bankruptcy court's decision to deny this motion is at issue in all three of the instant appeals. The Arbitration Motion was based on the Acis LP limited partnership agreement ("the Acis LPA"), which governed the relationship between Terry and Acis. The Acis LPA provides a dispute resolution procedure for "any controversy or claim . . . arising out of, relating to or in connection with the [Acis LPA] or otherwise involving the Partnership, its Partners and/or any GP Party." Third Appeal R. 4504 (brackets in original). Under this dispute resolution procedure, the parties must first attempt to mediate any dispute; only after mediating may they resort to binding arbitration. Any party who fails to mediate a claim, or who files a judicial lawsuit, ostensibly waives that claim. Acis argued in the Arbitration Motion that the Acis LPA's dispute resolution provisions applied to the involuntary petitions, and that because Terry failed to comply with those provisions, the bankruptcy court lacked subject matter jurisdiction over the controversy. The bankruptcy court denied the Arbitration Motion on the eve of trial.

In the early morning hours of the day the trial was scheduled to begin (at 2:33 a.m.),

Appellee Appx. 00784
Appx. 01935
013597

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 6   Filed 07/26/25   Page 919 of 1017   PageID 14546
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 791 of 1803   PageID 11537
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 11 of 84   PageID 98004

several Highland-related entities—including Neutra and HCLOF—filed a motion to intervene. They sought intervention as of right under Fed. R. Bankr. P. 7024, or, alternatively, permissive intervention under Rule 2018.[8] The putative intervenors did not, however, intend to participate in the trial; they sought only to preserve their right to appeal any adverse ruling. The bankruptcy court denied the motion.

The trial of the involuntary petitions began as scheduled on March 21, 2018, and spanned five days. On the first day of trial, the putative intervenors informed the bankruptcy court of their objection to the involuntary petitions, and they appeared via counsel during each day of the trial. Following the trial, the bankruptcy court ruled in favor of Terry as the petitioning creditor, concluding that Acis had fewer than 12 eligible creditors; Acis was not generally paying its debts as they came due; Terry filed the involuntary petitions in good faith; and abstention under 11 U.S.C. § 305 was not warranted. The bankruptcy court issued orders for relief on April 13, 2018.

E

Highland and its related entities continued to participate in the bankruptcy court proceedings after the orders for relief were issued. The bankruptcy court, after finding that a "trustee appears necessary to halt the post-Arbitration Award transactions and transfers of value out of Acis LP . . . [and] to resolve the inherent conflicts of interest between [Acis] and Highland," appointed Robin Phelan ("the Trustee") as trustee. *See Acis I*, 584 B.R. at 149-

---

[8]Unless otherwise indicated, all citations in this opinion to a "Rule" are to the Federal Rules of Bankruptcy Procedure.

- 11 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 07/09/25   Page 920 of 1017   PageID 14547
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 792 of 1803   PageID 11538
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 12 of 84   PageID 98005

50. On April 30, 2018 HCLOF—acting in its capacity as the equity note holder—sent five notices to Acis LP directing it to effect an optional redemption of the Acis CLOs on June 14, 2018. The Trustee analyzed the notices and concluded that they were defective.

Highland and HCLOF responded by filing an adversary proceeding against the Trustee, seeking to compel the Trustee to effect a redemption.[9]  The bankruptcy court *sua sponte* issued a TRO forbidding all relevant parties (including HCLOF) from taking any action in furtherance of an optional redemption of the CLOs.  HCLOF then informed the bankruptcy court at a June 14, 2018 hearing that it had withdrawn the optional redemption notices.  Because of HCLOF's representation, the Trustee did not seek to extend the TRO. The next day, HCLOF sent a *second* set of notices to Acis LP, again demanding that Acis LP effect an optional redemption of the CLOs.  The Trustee then filed his own adversary proceeding ("the Trustee Adversary") against Highland, HCLOF, and others, seeking a *second* TRO.[10]  The bankruptcy court granted the TRO, and, after an evidentiary hearing, converted the TRO into a preliminary injunction.

While these adversary proceedings were taking place, the Trustee was preparing a chapter 11 reorganization plan for Acis.[11]  The Trustee initially proposed three plans: Plan A, Plan B, and Plan C.  Under Plan A, the Trustee—using the doctrine of equitable

_____

[9]Adversary Proceeding No. 18-03078-SGJ.

[10]Adversary Proceeding No. 18-03212-SGJ.

[11]When the bankruptcy court issued the orders for relief, the cases were under chapter 7 of the Bankruptcy Code.  The bankruptcy court later converted the cases to chapter 11 cases.

- 12 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 07/06/25   Page 921 of 1017   PageID 14548
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 793 of 1803   PageID 11539
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 13 of 84   PageID 98006

subrogation—would have transferred HCLOF's subordinated equity notes to a third party—Oaktree Capital Management LP ("Oaktree")—in exchange for a $100 million payment to HCLOF, and would have paid off Acis' other creditors with additional funds provided by Oaktree. Plans B and C would have amended the indenture agreements to prohibit any redemption right from being exercised until all allowed claims were paid in full. The purpose of Plans B and C was to prevent HCLOF from calling for an optional redemption of the CLOs, which would have rendered Acis LP's fee-paying PMAs worthless. The bankruptcy court ultimately held that all three of these proposed plans were unconfirmable.

Before proposing Plans A, B, and C, the Trustee asked the bankruptcy court to approve the payment of a $2.5 million break-up fee ("the Break-Up Fee") to Oaktree if Plan A was not confirmed within a certain time period. This Break-Up Fee was a small percentage of the total value of the Plan A transaction—which was roughly $108 million—but represented a large percentage of the $8.6 million that Acis LP would retain after HCLOF was compensated for its subordinated notes. The Trustee's motion also sought to substitute Oaktree for Highland as Acis LP's investment advisor and service provider. The Trustee also requested that Oaktree be reimbursed for any reasonable expenses it might incur in connection with the proposed transaction ("the Expense Reimbursement"). The bankruptcy court granted the motion with minor modifications.[12]

———————————————

[12]Brigade—not Oaktree—now provides advisory and back office services to Acis.

- 13 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 07/05/25   Page 922 of 1017   PageID 14549
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 794 of 1803   PageID 11540
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 14 of 84   PageID 98007

After the bankruptcy court rejected Plans A, B, and C, the Trustee proposed—and the bankruptcy court confirmed—Plan D.  Under the confirmed Plan, Terry received full equity ownership of Acis in exchange for a $1 million reduction in the value of his claim.  Acis LP continues to serve as the portfolio manager for the Acis CLOs and continues to earn management fees.  The cash flow resulting from Terry's operation of Acis will be used to pay the claims of Acis' creditors, including Terry.  To prevent Highland and HCLOF from disrupting this cash flow, the bankruptcy court entered an injunction ("the Temporary Injunction")[13] prohibiting various parties and non-parties—including HCLOF—from taking any steps to effect an optional redemption or liquidation of the Acis CLOs.  The Temporary Injunction is actually an extension of the preliminary injunction that the bankruptcy court issued in the Trustee Adversary.  It is set to expire upon the earlier of the following: (1) the entry of a final order in the Trustee Adversary; (2) the satisfaction of all allowed claims against Acis; (3) the bankruptcy court's entry of an order finding that a material default has occurred under the Plan; or (4) any subsequent order of the bankruptcy court providing otherwise as to one or more of the CLOs.

F

Three appeals (the first consisting of four consolidated appeals)[14] taken from the

_____

[13]Because the briefing refers to the plan injunction as a "temporary" injunction rather than a "preliminary" injunction, which is the federal nomenclature, the court will do so as well.

[14]The First Appeal consists of four consolidated appeals.  No. 3:18-CV-1056-D is an appeal of the order denying Neutra the right to intervene in the involuntary proceeding

- 14 -

Appellee Appx. 00788
Appx. 01039
013601

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 10/06/25   Page 923 of 1017   PageID 14550
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 795 of 1803   PageID 11541
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 15 of 84   PageID 98008

bankruptcy court's rulings are now before this court.  For clarity, the court will refer to the

appeals as the First, Second, and Third Appeals.

In the First Appeal (No. 3:18-CV-1056-D), appellant Neutra[15] contends that the

bankruptcy court erred by denying the Arbitration Motion,[16] failing to dismiss the involuntary

petitions on the ground that they were filed in bad faith, and declining to abstain under 11

U.S.C. § 305.

---

against Acis GP.  No. 3:18-CV-1073-D is an appeal of the order for relief as to Acis LP.  No.
3:18-CV-1084-D is an appeal of the order denying Neutra the right to intervene in the
involuntary proceeding against Acis LP.

No. 3:18-CV-1057-D is *supposed* to be an appeal of the order for relief as to Acis GP,
but, due to a filing error, the notice of appeal actually challenges the order denying
intervention as to Acis GP—the same order at issue in 3:18-CV-1056-D.  Neutra attempted
to remedy this mistake by filing a second amended notice of appeal in the bankruptcy court,
but that notice was erroneously transmitted to the docket of 3:18-CV-1084-D instead of 3:18-
CV-1057-D.  Because these are ministerial errors that do not affect the court's jurisdiction,
the court will correct them at the conclusion of this opinion.  *See, e.g., In re Smith*, 133 B.R.
800, 804 (N.D. Tex. 1991) (Fitzwater, J.) ("In contrast to the failure properly to designate an
appellant, which is a jurisdictional defect, the failure to specify the correct judgment is
irrelevant where it is clear which judgment the appellant is appealing." (citations omitted)).

[15]HCLOF and an entity called CLO Holdco Ltd. are also named as appellants in the
First Appeal.  Neutra is the only appellant, however, who has submitted briefing.

[16]Neutra did not file a separate notice of appeal with respect to the order denying the
Arbitration Motion.  Instead, it contends that this order is an interlocutory order that merged
into the orders for relief, which are final orders for the purposes of 28 U.S.C. § 158(a)(1).
*See In re Manuel Mediavilla, Inc.*, 568 B.R. 551, 566 (B.A.P. 1st Cir. 2017); *In re Marciano*,
459 B.R. 27, 36 (B.A.P. 9th Cir. 2011).  Terry does not contest this assertion.  Neutra also
maintains that mandatory arbitration agreements implicate subject matter jurisdiction, which
any party can raise at any time.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 07/06/25   Page 924 of 1017   PageID 14551
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 796 of 1803   PageID 11542
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 16 of 84   PageID 98009

In the Second Appeal (No. 3:18-CV-1822-D), appellant Highland[17] contends that the bankruptcy court erred by denying the Arbitration Motion and approving the Break-Up Fee and Expense Reimbursement.[18]

In the Third Appeal (No. 3:19-CV-0291-D), appellants Highland and Neutra contend that the bankruptcy court erred by denying the Arbitration Motion; confirming the Plan while the appeal of the orders for relief was still pending; confirming the Plan even though the statutory requirements of 11 U.S.C. § 1129 were not met; and entering the Temporary Injunction.  HCLOF submitted a separate brief in the Third Appeal, arguing that the Temporary Injunction is beyond the constitutional authority of the bankruptcy court, is overbroad, and is not supportable under the four-part preliminary-injunction test.

On April 12, 2019 Acis filed a motion to substitute itself as the appellee in the Third Appeal.

The appeals and Acis' motion are before the court for decision.

## II

"The court reviews the bankruptcy court's conclusions of law *de novo*, but reviews its fact findings only for clear error."  *In re Nary*, 253 B.R. 752, 756 (N.D. Tex. 2000)

---

[17]HCLOF is also named as an appellant in the Second Appeal, but it did not submit or join in any briefing.

[18]The notice of appeal in the Second Appeal also challenges the bankruptcy court's decisions to deny a preliminary injunction requested by HCLOF and to grant the Trustee's request for a preliminary injunction in the Trustee Adversary.  These appeals were separately docketed and subsequently dismissed.

- 16 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 08/25/25   Page 925 of 1017   PageID 14552
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 797 of 1803   PageID 11543
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 17 of 84   PageID 98010

(Fitzwater, J.) (quoting *In re ICH Corp.*, 230 B.R. 88, 91 n.10 (N.D. Tex. 1999) (Fitzwater, J.)). "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *In re Johnson Sw., Inc.*, 205 B.R. 823, 827 (N.D. Tex. 1997) (Fitzwater, J.) (quoting *In re Placid Oil Co.*, 158 B.R. 404, 412 (N.D. Tex. 1993) (Fitzwater, J.)). "If the trier of fact's account of the evidence is plausible in light of the record viewed in its entirety, the appellate court may not reverse it." *Id.* (quoting *Placid Oil Co.*, 158 B.R. at 412). "[T]his court does not find facts. Neither is it free to view the evidence differently as a matter of choice." *Id.* (alteration in original) (quoting *Placid Oil Co.*, 158 B.R. at 412). "The bankruptcy judge's unique perspective to evaluate the witnesses and to consider the entire context of the evidence must be respected." *Id.* (quoting *Placid Oil Co.*, 158 B.R. at 412) (internal quotation marks omitted).

In reviewing matters committed to the bankruptcy court's discretion—such as whether to approve a break-up fee and expense reimbursement—the court applies an abuse of discretion standard. *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 205 (3d Cir. 2010). "To constitute an abuse of discretion, the [bankruptcy] court's decision must be either premised on an application of the law that is erroneous, or on an assessment of the evidence that is clearly erroneous." *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000).

Appellee Appx. 00791
Appx. 01042
013604

### III

In the First Appeal, appellee Terry contends that appellant Neutra lacks standing to appeal the orders for relief.[19]

### A

### 1

"Bankruptcy courts are not authorized by Article III of the Constitution, and as such are not presumptively bound by traditional rules of judicial standing." *In re Coho Energy Inc.*, 395 F.3d 198, 202 (5th Cir. 2004) (citing *Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 210 n.18 (5th Cir. 1994)). But there are still limits on who may appeal a bankruptcy court order. *See In re Technicool Sys., Inc.*, 896 F.3d 382, 385 (5th Cir. 2018). Before 1978, those limits were provided by the Bankruptcy Act, which granted appellate standing only to "person[s] aggrieved" by a bankruptcy court order. *Coho Energy*, 395 F.3d at 202 (quoting 11 U.S.C. § 67(c) (1976)). Congress repealed the relevant statutory provision when it passed the Bankruptcy Reform Act of 1978, but courts—including the Fifth Circuit—nonetheless still apply the person aggrieved test to bankruptcy appeals. *See id.* Because "[b]ankruptcy cases often involve numerous parties with conflicting and overlapping interests," and "[a]llowing each and every party to appeal each and every order

---

[19]The other appellants in the First Appeal have not briefed the issue of standing. They have therefore failed to meet their burden to assert that they have standing. *See Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 208 (5th Cir. 1994) ("[T]he putative appellant shoulders the burden of alleging facts sufficient to demonstrate that it is a proper party to appeal.").

Appellee Appx. 00792

Appx. 01943

013605

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Page 1800 of 1804   Page 927 of 1017   PageID 14554
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 799 of 1803   PageID 11545
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 19 of 84   PageID 98012

would clog up the system and bog down the courts," it is necessary for courts to limit who may appeal any given order. *Technicool Sys.*, 896 F.3d at 385.

The person aggrieved test "is 'more exacting' than the test for Article III standing." *Id.* (quoting *In re Delta Produce, L.P.*, 845 F.3d 609, 619 (5th Cir. 2016)). "Rather than showing the customary 'fairly traceable' causal connection, a bankruptcy appellant must instead show that he was 'directly and adversely affected pecuniarily by the order of the bankruptcy court.'" *Id.* (footnotes omitted) (first quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), then quoting *Fortune Nat. Res. Corp. v. U.S. Dep't of Interior*, 806 F.3d 363, 366 (5th Cir. 2015)).[20]

2

Equally important to deciding whether Neutra has standing is the "shareholder standing rule," which is "a longstanding equitable restriction that generally prohibits shareholders from initiating actions to enforce the rights of the corporation" absent special circumstances. *Franchise Tax Bd. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990). The doctrine derives from the third-party standing rule: "the plaintiff generally must assert his

---

[20]Some courts have imposed an additional prerequisite: that the appellant have attended and objected at the underlying bankruptcy proceedings. *See, e.g., In re Palmaz Sci., Inc.*, 262 F.Supp.3d 428, 435 (W.D. Tex. 2017); *In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 693-94 (Bankr. W.D. Tex. 2011) (quoting *In re Ray*, 597 F.3d 871, 874 (7th Cir. 2010)). But other courts have held that appearance and objection are not indispensable to appellate standing. *See In re Point Ctr. Fin., Inc.*, 890 F.3d 1188, 1192-93 (9th Cir. 2018); *In re Urban Broad. Corp.*, 401 F.3d 236, 244 (4th Cir. 2005). The Fifth Circuit has not yet decided the question. *See Palmaz*, 262 F.Supp.3d at 434. This court need not decide the issue because it disposes of the question of Neutra's standing on other grounds.

- 19 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/05/25   Page 928 of 1017   PageID 14555
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 800 of 1803   PageID 11546
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 20 of 84   PageID 98013

own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); *see In re Troutman Enters., Inc.*, 286 F.3d 359, 364 (6th Cir. 2002). This court has recognized that "[u]nder federal common law [and] Texas law . . . only a corporation and not its shareholders, not even sole shareholders, can complain of an injury sustained by, or a wrong done to, the corporation." *Rigco, Inc. v. Rauscher Pierce Refsnes, Inc.*, 110 F.R.D. 180, 183 (N.D. Tex. 1986) (Fitzwater, J.). Although the rule is phrased in terms of corporations and shareholders, it applies with equal force to limited partnerships like Acis LP. *See CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 122-23 (2d Cir. 2013) (applying federal common law); *7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 220-22 (5th Cir. 1994) (applying Texas law); *see also In re A.S. Acquisition Corp.*, 56 Fed. Appx. 415, 416 (9th Cir. 2003) (memorandum) (holding that limited partner lacked standing to appeal bankruptcy court order that affected partnership property). It also applies to limited liability companies like Acis GP. *See Heyer v. Schwartz & Assocs. PLLC*, 319 F.Supp.3d 299, 304-05 (D.D.C. 2018) (applying federal common law); *Schoen v. Underwood*, 2012 WL 13029591, at *4 (W.D. Tex. May 15, 2012) (applying Texas law).

The Supreme Court has "treated standing as consisting of two related components: the constitutional requirements of Article III and nonconstitutional prudential considerations." *Franchise Tax Bd.*, 493 U.S. at 335. The shareholder standing rule falls within the latter category, and thus can operate to bar a lawsuit even if Article III standing is satisfied. *See id.* at 336. Recently, the Supreme Court called into question the continuing vitality of

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit Filed 07/26/25 Page 929 of 1017 PageID 14556
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 801 of 1803 PageID 11547
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 21 of 84 PageID 98014

prudential standing, observing that it is in tension with the principle that "a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)) (internal quotation marks omitted); *see also Excel Willowbrook, L.L.C. v. JP Morgan Chase Bank, Nat'l Ass'n*, 758 F.3d 592, 603 n.34 (5th Cir. 2014) ("[T]he continued vitality of prudential 'standing' is now uncertain in the wake of the Supreme Court's recent decision in *Lexmark*[.]"). But the Fifth Circuit has since reaffirmed the third-party standing doctrine in particular. *See Superior MRI Servs., Inc. v. All. Healthcare Servs., Inc.*, 778 F.3d 502, 506 (5th Cir. 2015). The doctrine therefore remains binding in this circuit.

The court is aware of no binding precedent requiring it to apply the shareholder standing rule in the context of a bankruptcy appeal, but other courts have done so. *See, e.g., In re Heyl*, 770 F.3d 729, 730 (8th Cir. 2014) (per curiam); *In re AFY*, 734 F.3d 810, 822-23 (8th Cir. 2013); *A.S. Acquisition Corp.*, 56 Fed. Appx. at 416; *In re Troutman Enters.*, 286 F.3d at 365; *In re Dein Host, Inc.*, 835 F.2d 402, 404-06 (1st Cir. 1987); *Rose v. Logan*, 2014 WL 1236008, at *5-7 (D. Md. Mar. 25, 2014). This court concludes that it should do so as well, for at least two reasons.

First, the person aggrieved test already includes a version of the third-party standing rule. It requires that the appellant be "*directly* and adversely affected pecuniarily by the order of the bankruptcy court." *Technicool Sys.*, 896 F.3d at 385 (emphasis added) (quoting *Fortune Nat. Res. Corp.*, 806 F.3d at 366). "An 'indirect financial stake' in another's claims

Appellee Appx. 00795
Appx. 01046
013608

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 08/06/25    Page 930 of 1017    PageID 14557
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 802 of 1803    PageID 11548
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 22 of 84    PageID 98015

is insufficient for standing." *In re The Watch Ltd.*, 257 Fed. Appx. 748, 749 (5th Cir. 2007) (per curiam) (quoting *Rohm*, 32 F.3d at 208).

Second, the person aggrieved doctrine is itself a creature of prudential standing—it is distinct from, and narrower than, constitutional standing, and it is justified by practical considerations. *See Coho Energy*, 395 F.3d at 202 ("To prevent unreasonable delay, courts have created an *additional* prudential standing requirement in bankruptcy cases: The appellant must be a 'person aggrieved' by the bankruptcy court's order." (quoting *In re P.R.T.C., Inc.*, 177 F.3d 774, 777 (9th Cir. 1999))); *see also Technicool Sys.*, 896 F.3d at 384-86 (distinguishing constitutional standing from bankruptcy standing, and offering prudential justifications for the latter). The policy underlying the person aggrieved doctrine would be well-served by including within it a third-party standing or shareholder standing rule. Without such a limitation, any one of a debtor's numerous shareholders could separately appeal bankruptcy court orders affecting the value of the debtor—thus resulting in "umpteen appeals raising umpteen issues." *Technicool Sys.*, 896 F.3d at 384. Neutra does not argue that the shareholder standing rule is inapplicable to bankruptcy appeals generally. Instead, Neutra maintains that it is asserting a direct, rather than a derivative, interest in the orders for relief. The court therefore holds that the shareholder standing rule applies in the context of bankruptcy appeals.

Although no party cites it, the court is aware of one Fifth Circuit decision that allowed a debtor's majority shareholder to appeal an order of the bankruptcy court. In *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir. 1977), *superseded by statute on other*

- 22 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 07/06/25   Page 931 of 1017   PageID 14558
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 803 of 1803   PageID 11549
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 23 of 84   PageID 98016

*grounds as recognized by In re Woerner*, 783 F.3d 266, 274 (5th Cir. 2015) (en banc),[21] the

Fifth Circuit authorized a debtor's majority shareholder to appeal an order awarding

attorney's fees to the trustee's attorneys (one of whom was himself the trustee). But as the

*First Colonial* panel was careful to point out, the case involved unique circumstances. *See*

*id.* at 1297 ("Although the attorneys and the trustee are correct in stating that in the usual

case the bankrupt and its shareholders do not have an interest in the disposition of the assets

of the estate . . . this is hardly the usual case."). The appeal involved an issue on which the

interests of the trustee and the debtor diverged, because "[w]here the trustee serves as his

own attorney there is no disinterested trustee to ensure that the attorney is paid only for

professional services necessary to the administration of the estate." *Id.* Thus the panel made

an exception: it allowed the shareholder to appeal, thereby "refusing to permit [the trustee]

to use his position as trustee to prevent [the shareholder] from contesting the size of his

attorneys' fee." *Id.* There are no such circumstances present here: the Trustee lacks a

similarly-direct "personal financial stake" in the orders for relief, and he is not using his

special position to insulate a favorable order from review. *Cf. AFY*, 734 F.3d at 823

(distinguishing *First Colonial* because trustee lacked personal financial stake in outcome of

appealed orders). *First Colonial* therefore does not prevent this court from applying the

shareholder standing rule to a bankruptcy appeal.

---

[21]Although *First Colonial* was decided before the passage of the Bankruptcy Reform
Act of 1978, the "person aggrieved" test applied by the courts post-1978 was taken directly
from pre-1978 jurisprudence. *See Coho Energy*, 395 F.3d at 202. *First Colonial*'s analysis
is therefore still relevant.

- 23 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 05/02/25   Page 932 of 1017   PageID 14559
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 804 of 1803   PageID 11550
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 24 of 84   PageID 98017

B

Neutra asserts four different interests in the orders for relief.  None of these interests suffices to give Neutra standing to appeal.

Neutra contends that it "is watching its interest in Acis being decimated by administrative expenses."  Neutra First Appeal Br. 19.  In other words, Neutra's ownership interest in Acis is losing value as a result of the inherent expenses of bankruptcy.  Under the shareholder standing rule, however, this interest is quintessentially derivative of Acis' own interests, and therefore cannot confer standing.  *See, e.g., Stevens v. Lowder*, 643 F.2d 1078, 1080 (5th Cir. Unit B Apr. 1981) ("Plaintiffs' individual injury arises only from the loss in value of their stock as a result of injury to the corporation.  Under these circumstances, plaintiffs have no independent cause of action.").  The First Circuit rejected a nearly-identical argument in *Dein Host*, 835 F.2d 402.  It held that an appellant lacked standing where his only interest in the bankruptcy court order was "that his beneficial interest in [another entity]—his stock—[was] in jeopardy and subject to shrinkage."  *Id.* at 405.  In so concluding, the court relied on the principle that "[t]he fact that the injury may indirectly harm a stockholder by diminishing the value of his corporate shares does not bestow upon him a right to sue on his own behalf."  *Id.* at 405-06 (quoting *Papilsky v. Berndt*, 466 F.2d 251, 255 (2d Cir. 1972)).  Thus even if Acis loses value as a result of its plunge into bankruptcy, Neutra cannot appeal on this basis.

Neutra also posits that it "has lost its right to protect its interest [in Acis] via control of [Acis]."  Neutra First Appeal Br. 19.  This interest is insufficient to confer standing

- 24 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 08/06/25    Page 933 of 1017    PageID 14560
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 805 of 1803    PageID 11551
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 25 of 84    PageID 98018

because losing control over an entity is not, in itself, a *pecuniary* injury.  *See Technicool Sys.*,
896 F.3d at 385 (requiring that appellant be "directly and adversely affected *pecuniarily* by
the order of the bankruptcy court" (emphasis added)); *see also Rose*, 2014 WL 1236008, at
*5-7 (holding that shareholder standing rule applies with full force to entity's *sole* equity
owner).  Control rights may enhance the value of Neutra's ownership interest, or may allow
Neutra to protect the value of that interest via advantageous business decisions.  But, as the
court has already discussed, any diminishment in the value of Neutra's interest in Acis does
not confer standing on Neutra.

Neutra also asserted, at the time it filed its briefing in the First Appeal, that it would
soon "be forced to partner with Oaktree against its wishes, and may be completely divested
from its equity interests without its consent."  Neutra First Appeal Br. 19-20.  But this
outcome was by no means an inevitable result of the *orders for relief*.  The person aggrieved
test does not take into account every injury caused by the bankruptcy case as a whole, but
instead asks whether "the *order* of the bankruptcy court . . . directly and adversely affect[s]
the appellant pecuniarily."  *Fortune Nat. Res. Corp.*, 806 F.3d at 367.  And "bankruptcy
standing requires 'a higher causal nexus between act and injury'" than does traditional
Article III standing.  *Technicool Sys.*, 896 F.3d at 385-86 (quoting *Fortune Nat. Res. Corp.*,
806 F.3d at 366).  Thus although the orders for relief created the possibility that Neutra might
suffer harm in the future, Neutra was not aggrieved by them for standing purposes because
"[the] speculative prospect of harm is far from a direct, adverse, pecuniary hit."  *Id.* at 386;
*see also id.* at 384-86 (concluding that equity owner was not aggrieved by order allowing

- 25 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 07/06/25    Page 934 of 1017    PageID 14561
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 806 of 1803    PageID 11552
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 26 of 84    PageID 98019

trustee to employ special counsel, even though special counsel's purpose was to pierce the corporate veil to reach equity owner's other companies and assets).

Of course, the future harms identified by Neutra in the First Appeal did actually come to pass: the bankruptcy court appointed first Oaktree, and then Brigade, as the new service provider for Acis, and later divested Neutra of its equity interest in Acis. But this court cannot take these events into account in its analysis of the First Appeal. A district court hearing a bankruptcy appeal may only consider information if it is "part of the record before the bankruptcy court" or if it "meets the narrow purpose of judicial notice." *In re SI Restructuring Inc.*, 480 Fed. Appx. 327, 329 (5th Cir. 2012) (per curiam). The subsequent events that are asserted to have injured Neutra are not part of the record in the First Appeal. No party has asked this court to take judicial notice of any subsequent bankruptcy court orders in the First Appeal, and the court has no duty to do so *sua sponte*.[22] Moreover, Neutra would lack standing even if the court *did* take these events into account. That a once-speculative harm actually came to pass does not mean that the harm was initially *likely* to happen—so Neutra would still fail to show the "higher causal nexus between act and injury" that the person aggrieved test demands. *Technicool Sys.*, 896 F.3d at 385-86 (quoting *Fortune Nat. Res. Corp.*, 806 F.3d at 366); *cf. Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 101 (N.Y. 1928) (finding no liability for negligence where, *ex ante*, "there was nothing in the

---

[22]The Fifth Circuit has indicated that when no party asks the district court to take judicial notice of a fact, and the district court does not do so *sua sponte*, the Fifth Circuit is unlikely to do so for the first time on appeal. *See United States v. Herrera-Ochoa*, 245 F.3d 495, 502 & n.6 (5th Cir. 2001) (citing cases).

Appellee Appx. 00800
013613

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit   Page 1803 of 1804   Page 935 of 1017   PageID 14562
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 807 of 1803   PageID 11553
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 27 of 84   PageID 98020

situation to suggest to the most cautious mind" that defendant's actions would result in harm to plaintiff, even though harm actually occurred).

The court therefore dismisses the First Appeal, i.e., all the appeals of the orders for relief.

C

The court's conclusion that Neutra lacks standing[23] is buttressed by the fact that the bankruptcy court properly denied Neutra's motion to intervene.[24]

1

Neither Neutra nor Terry has substantially briefed the question whether the bankruptcy court erred by denying Neutra's motion to intervene. Neutra contends that the ruling on its motion to intervene has no bearing on whether it can appeal as a person

---

[23]This conclusion does not mean that *no one* has standing to appeal. The Trustee likely could have appealed the orders for relief on Acis' behalf had he believed the orders were not in the best interests of the estates. *See In re C.W. Mining Co.*, 636 F.3d 1257, 1261-66 (10th Cir. 2011); *see also* 11 U.S.C. § 323(a) ("The trustee in a case under this title is the representative of the estate.").

[24]The parties agree that this court has jurisdiction over the orders denying intervention because they are interlocutory orders that merged into the orders for relief, which are final for the purposes of 28 U.S.C. § 158(a)(1). *See In re Manuel Mediavilla, Inc.*, 568 B.R. 551, 566 (B.A.P. 1st Cir. 2017); *In re Marciano*, 459 B.R. 27, 36 (B.A.P. 9th Cir. 2011). Neutra only asserts that it has standing to appeal the orders for relief; it does not contend that it has standing to appeal independently the orders denying intervention. *Cf. Rohm*, 32 F.3d at 208 ("[T]he putative appellant shoulders the burden of alleging facts sufficient to demonstrate that it is a proper party to appeal."). Thus even though the court concludes—in the context of this standing analysis—that the orders denying intervention were correctly decided, it does not affirm them. Instead, it dismisses the entire First Appeal for lack of standing.

- 27 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/09/25   Page 936 of 1017   PageID 14563
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 808 of 1803   PageID 11554
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 28 of 84   PageID 98021

aggrieved; Terry, meanwhile, maintains that the bankruptcy court's decision was correct, but also contends that any error was harmless because Neutra had no intention of participating in the trial on the involuntary petitions. The court is not persuaded, however, that the question is irrelevant.

Some courts have suggested that the bankruptcy court's proper denial of a motion to intervene is dispositive of the movant's right to appeal. *See, e.g., In re Living Hope Sw. Med. Servs., LLC*, 598 Fed. Appx. 467, 467 (8th Cir. 2015) (per curiam) (concluding that appellant lacked standing because bankruptcy court correctly denied his motion to intervene); *In re Thompson*, 965 F.2d 1136, 1140-46 & n.9 (1st Cir. 1992) (equating person aggrieved test with the test for intervention under Rule 7024, and concluding that because bankruptcy court properly denied motion to intervene in adversary proceeding, appellant lacked standing to appeal judgment); *In re S. State St. Bldg. Corp.*, 140 F.2d 363, 367 (7th Cir. 1943) ("If one who has a right to intervene, but does not, has no standing to appeal, a fortiori, one who has no right to intervene, and does not, has no standing to appeal."); *see also In re Blair*, 2016 WL 8608454, at *5 (D. Colo. Aug. 24, 2016) ("One might expect that [the person aggrieved] doctrine would not apply to a party that sought and was denied intervention. Or, at a minimum, it seems incongruous to permit a party to file an unsuccessful motion to intervene and nonetheless be permitted to appeal under the persons aggrieved doctrine and immediately attack the Bankruptcy Court's substantive rulings, rather than first challenging the denial of intervention."). Other courts disagree. *See Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 747 (2d Cir. 1991) (holding that "[Rule 2018,] governing permissive

- 28 -

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-116 Filed 06/25/8410 Page 937 of 1017 PageID 14564
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 809 of 1803 PageID 11555
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 29 of 84 PageID 98022

intervention, does not limit the rights of a 'person aggrieved' to be heard" on appeal).

It is also possible that, had Neutra been allowed to intervene, it would have had standing to appeal by virtue of its intervention alone. *See First Colonial*, 544 F.2d at 1296-98 (finding that appellant was a person aggrieved, and then adding, as alternative ground for its holding, that "[appellant] has standing to appeal from all of the fee awards because the bankruptcy judge granted its motion to intervene [under what is now Rule 7024] without qualifying its right to participate in the proceeding"); *see also Int'l Trade Admin.*, 936 F.2d at 747 (stating that permissive intervention under Rule 2018 "provides a formal mechanism that expands the right to be heard to a wider class than those who qualify under the 'person aggrieved' standard"). *But see Troutman Enters.*, 286 F.3d at 363-64 (holding that parties who were permitted to intervene in bankruptcy proceeding nonetheless lacked appellate standing because they were not persons aggrieved).

Because the bankruptcy court's decision to deny intervention could affect Neutra's standing to bring the present appeal, the court will consider the merits of Neutra's appeal of that decision.

2

"A ruling denying intervention of right is reviewed *de novo*." *St. Bernard Par. v. Lafarge N. Am., Inc.*, 914 F.3d 969, 973 (5th Cir. 2019) (quoting *Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir. 1996) (en banc)). Although generally "the timeliness of an intervention motion is reviewed for abuse of discretion," if the bankruptcy court did not explain its ruling on timeliness, review is *de novo*. *See id.* (citing *Sommers v. Bank of Am.,*

Appellee Appx. 00803
Appx. 01054
013616

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 01/06/25    Page 938 of 1017    PageID 14565
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 810 of 1803    PageID 11556
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 30 of 84    PageID 98023

*N.A.*, 835 F.3d 509, 513 (5th Cir. 2016)).  The court reviews the denial of a motion for permissive intervention for "clear abuse of discretion," and will disturb the bankruptcy court's ruling "only under extraordinary circumstances." *Id.* (quoting *Edwards*, 78 F.3d at 995).

Neutra sought intervention as of right under Rule 1018, which provides that Rule 7024 applies in proceedings to contest an involuntary petition.  Rule 7024, in turn, states that "[Fed. R. Civ. P. 24] applies in adversary proceedings."

> A party is entitled to an intervention of right under Rule 24(a)(2) if (1) the motion to intervene is timely, (2) the interest asserted by the potential intervenor is related to the action, (3) that interest may be impaired or impeded by the action, and (4) that interest is not adequately represented by the existing parties.

*Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 2012 WL 2133667, at *1 (N.D. Tex. June 12, 2012) (Fitzwater, C.J.) (citing *In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 247 (5th Cir. 2009); *Sierra Club v. Espy*, 18 F.3d 1202, 1204-05 (5th Cir. 1994)), *rev'd on other grounds*, 747 F.3d 275 (5th Cir. 2014), *aff'd*, ___ U.S. ___, 135 S. Ct. 2507 (2015).  "Failure to satisfy any one requirement precludes intervention of right."  *Haspel & Davis Milling & Planting Co. v. Bd. of Levee Comm'rs*, 493 F.3d 570, 578 (5th Cir. 2007).

Neutra also sought permissive intervention under Rule 2018.  That rule provides that "after hearing on such notice as the court directs and for cause shown, the court may permit any interested entity to intervene generally or with respect to any specified matter."  Rule 2018(a).

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 02/26/25   Page 939 of 1017   PageID 14566
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 811 of 1803   PageID 11557
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 31 of 84   PageID 98024

> In deciding whether to permit intervention under Rule 2018(a), courts look to various factors, including (1) whether the moving party has an economic or similar interest in the matter; (2) whether the interest of the moving party [is] adequately represented by the existing parties; [(3)] whether the intervention will cause undue delay to the proceedings; and (4) whether the denial of the movant's request will adversely affect their interest.

*Pasternak & Fidis, P.C. v. Wilson*, 2014 WL 4826109, at *6 (D. Md. Sept. 23, 2014) (collecting cases). Thus "[t]he standards under Rule 2018 and [Rule] 24 overlap." *In re Adilace Holdings, Inc.*, 548 B.R. 458, 462 (Bankr. W.D. Tex. 2016). "The decision whether to allow intervention is wholly discretionary under Rule 2018 . . . even where each required element is met." *Id.* at 463 (citing *Staley v. Harris County*, 160 Fed. Appx. 410, 414 (5th Cir. 2005) (per curiam); *In re Durango Ga. Paper Co.*, 336 B.R. 594, 596 (Bankr. S.D. Ga. 2005)).

3

Neutra was not entitled to intervention of right in the trial of the involuntary petitions because it did not have a sufficiently direct interest in the proceedings. The only interest that Neutra asserted was its property interest in Acis. But in the intervention context, "[t]he term 'interest' is narrowly read to mean a *direct* and substantial interest in the proceedings . . . that the substantive law recognizes as belonging to or being owned by *the party seeking intervention*." *Rigco*, 110 F.R.D. at 183 (emphasis added). Accordingly, the shareholder standing rule applies to Rule 24(a) motions to intervene. *See id.* at 183-84. Neutra's property interest in the alleged debtors therefore could not support Neutra's claimed right to

- 31 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 03/21/25   Page 940 of 1017   PageID 14567
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 812 of 1803   PageID 11558
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 32 of 84   PageID 98025

intervene in the trial on the involuntary petitions.  *See supra* § III(B).  Because one of the four Rule 24(a) factors was not met, the bankruptcy court did not err by denying Neutra's motion to intervene as of right.  *See Haspel*, 493 F.3d at 578.

For similar reasons, the bankruptcy court did not abuse its discretion by denying Neutra permissive intervention under Rule 2018.  This is because Neutra lacked a sufficiently direct interest in the proceedings.  And even if Neutra had such an interest, this court still would not disturb the bankruptcy court's ruling.  This court reviews the bankruptcy court's denial of a Rule 2018 motion under a deferential standard—the bankruptcy court has discretion to deny such a motion even if all four factors are met.  *See Adilace Holdings*, 548 B.R. at 463; *see also St. Bernard*, 914 F.3d at 973 (providing that orders as to permissive intervention are reviewed for clear abuse of discretion).  Neutra offers no argument on appeal that the bankruptcy court committed a clear abuse of its discretion by denying its motion.  *Cf. Brinkmann v. Dall. Cty. Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987) (holding that arguments not briefed on appeal are deemed abandoned).  In the absence of such an argument, the court will not disturb the bankruptcy court's ruling.

IV

Neutra argues in the First Appeal that, regardless whether it has standing to appeal the orders for relief, it can challenge the bankruptcy court's denial of the Arbitration Motion because mandatory arbitration agreements implicate the court's subject matter jurisdiction.  The appellants in the Second Appeal and Third Appeal make the same argument, and contend that every subsequent order entered by the bankruptcy court is void for lack of

- 32 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11 86   Filed 10/06/25 804   Page 941 of 1017   PageID 14568
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 813 of 1803   PageID 11559
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 33 of 84   PageID 98026

subject matter jurisdiction.

The Fifth Circuit recently reiterated that it has not yet decided the question whether a dismissal based on an arbitration provision is a dismissal for lack of subject matter jurisdiction. *See McDonnel Grp., L.L.C. v. Great Lakes Ins. SE, UK Branch*, 923 F.3d 427, 430 n.5 (5th Cir. 2019); *see also McGee v. W. Express, Inc.*, 2016 WL 1622632, at *2 (N.D. Tex. Apr. 5, 2016) (Horan, J.) (explaining that the Fifth Circuit has not yet decided the issue), *rec. adopted*, 2016 WL 1627662, at *1 (N.D. Tex. Apr. 22, 2016) (Kinkeade, J.).   Neutra relies, however, on another Fifth Circuit opinion, *Gilbert v. Donahoe*, 751 F.3d 303 (5th Cir. 2014), in which the panel stated: "We have held that a district court lacks subject matter jurisdiction over a case and should dismiss it pursuant to Federal Rule of Civil Procedure 12(b)(1) when the parties' dispute is subject to binding arbitration." *Id.* at 306.  The *Gilbert* panel cited two supporting cases in a footnote: *Ballew v. Continental Airlines, Inc.*, 668 F.3d 777 (5th Cir. 2012), and *Omni Pinnacle, LLC v. ECC Operating Services, Inc.*, 255 Fed. Appx. 24 (5th Cir. 2007) (per curiam).  In both of these supporting cases the Fifth Circuit affirmed a district court's dismissal of a case under Rule 12(b)(1) pursuant to an arbitration agreement.  The *Gilbert* opinion also acknowledged precedent indicating that the issue was previously unsettled.  *See Gilbert*, 751 F.3d at 306 n.1 (citing *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 472 n.3 (5th Cir. 2010) ("Our court has not previously definitively decided whether Rule 12(b)(1) or Rule 12(b)(3) is the proper rule for motions to dismiss based on an arbitration or forum-selection clause.")).  Thus *Gilbert*—if read in a vacuum—appears to settle the issue in a precedential decision.

- 33 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1186    Filed 06/25/25804    Page 942 of 1017    PageID 14569
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 814 of 1803    PageID 11560
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 34 of 84    PageID 98027

But in *Ruiz v. Donahoe*, 784 F.3d 247 (5th Cir. 2015) (on petition for rehearing), Judge Owen—who authored *Gilbert* just one year before—wrote for the panel that "[a]lthough in *Gilbert* we spoke in terms of subject-matter jurisdiction, we used the term imprecisely." *Id.* at 249. The *Ruiz* panel observed that whereas subject matter jurisdiction can be raised at any time and cannot be waived by the parties, a party *can* waive its right to compel arbitration. *See id.* And "[i]f a dispute is subject to mandatory grievance and arbitration procedures, then the proper course of action is usually to stay the proceedings pending arbitration." *Id.* Thus "agreements to arbitrate implicate forum selection and claims-processing rules *not subject matter jurisdiction*." *Id.* at 250 (emphasis added).

This court is persuaded by the reasoning of *Ruiz* and follows *Ruiz*'s explanation that the *Gilbert* panel was imprecise when it spoke in terms of subject matter jurisdiction. It is well-established in the Fifth Circuit that a party can waive its right to compel arbitration. *See, e.g., Petroleum Pipe Ams. Corp. v. Jindal Saw, Ltd.*, 575 F.3d 476, 480 (5th Cir. 2009); *Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 577 (5th Cir. 1991); *Tenneco Resins, Inc. v. Davy Int'l, AG*, 770 F.2d 416, 420 (5th Cir. 1985). It is equally well-established that a party *cannot* waive challenges to the court's subject matter jurisdiction; the issue can be raised at any time by any party or by the court *sua sponte*. *See, e.g., Simon v. Wal-Mart Stores, Inc.*, 193 F.3d 848, 850 (5th Cir. 1999). Moreover, in the Fifth Circuit a court may order a stay pending arbitration instead of dismissing a case outright. *See, e.g., Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656, 662 (5th Cir. 1995); *see also* 9 U.S.C. § 3 (authorizing courts to grant stays pending arbitration). But when a court lacks subject matter jurisdiction over a

Appellee Appx. 00808
Appx. 01959
013621

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-116 Filed 06/25/1804 Page 943 of 1017 PageID 14570
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 815 of 1803 PageID 11561
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 35 of 84 PageID 98028

controversy, it cannot enter a stay order—or *any* order besides an order dismissing the case. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 434 (2007) ("[O]nce a court determines that jurisdiction is lacking, it can proceed no further and must dismiss the case on that account."). Thus if the *Gilbert* panel actually held that a dismissal based on an arbitration clause is jurisdictional, then it impliedly overruled many years of precedent set by many prior panels. Under the Fifth Circuit's rule of orderliness, however, the *Gilbert* panel lacked the power to do so. *See, e.g., Odle v. Flores*, 683 Fed. Appx. 288, 289 (5th Cir. 2017) (per curiam) ("[U]nder the rule of orderliness, to the extent that a more recent case contradicts an older case, the newer language has no effect." (alteration in original) (quoting *Arnold v. U.S. Dep't of Interior*, 213 F.3d 193, 196 n.4 (5th Cir. 2000))). Fifth Circuit precedent instead supports the conclusion that a dismissal based on an arbitration agreement does *not* implicate the court's subject matter jurisdiction.

Indeed, it would be strange if parties by contract could divest a federal court of subject matter jurisdiction or confer such jurisdiction. "Only Congress may determine a lower federal court's subject-matter jurisdiction." *Kontrick v. Ryan*, 540 U.S. 443, 452 (2004) (citing U.S. Const. art. III, § 1). "[N]o action of the parties can confer subject-matter jurisdiction upon a federal court" if such jurisdiction is otherwise lacking. *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). And federal courts have long resisted attempts by private parties to manipulate their jurisdiction—including attempts to deprive courts of removal jurisdiction where that jurisdiction properly exists. *See, e.g., Smallwood v. Ill. Cent. R.R. Co.*, 385 U.S. 568, 576 (5th Cir. 2004) (en banc) ("The

- 35 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1186    Filed 10/06/25 1804    Page 944 of 1017    PageID 14571
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 816 of 1803    PageID 11562
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 36 of 84    PageID 98029

doctrine of improper joinder implements our duty to not allow manipulation of our jurisdiction."). It follows that "if a court has jurisdiction of an action, the parties cannot deprive the court thereof by contract." 17A C.J.S. *Contracts* § 309 (2019). Parties may not, in the course of ordering their private affairs, enlarge *or shrink* Article III or the federal statutes governing subject matter jurisdiction.[25]

Nor does the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-14, mandate that a dismissal based on an arbitration agreement is a dismissal for lack of subject matter jurisdiction. The Supreme Court has urged caution in interpreting statutory provisions to be jurisdictional. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006) ("'Jurisdiction,' this Court has observed, 'is a word of many, too many, meanings.' This Court, no less than other courts, has sometimes been profligate in its use of the term." (citation omitted) (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 90 (1998))). This is because calling an issue "jurisdictional" has profound consequences. If an issue implicates the court's subject matter jurisdiction, then it cannot be waived or forfeited, and the court has a duty to raise the issue on its own; the trial judge (instead of a jury) can resolve factual disputes underlying the issue; and if subject matter jurisdiction is lacking, the court must dismiss the entire complaint. *See id.* at 514-15. The Supreme Court has therefore established clear interpretive rules on the subject:

---

[25]For similar reasons, the waiver clause in the Acis LPA does not divest this court or the bankruptcy court of subject matter jurisdiction.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 86    Filed 08/25/804    Page 945 of 1017    PageID 14572
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 817 of 1803    PageID 11563
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 37 of 84    PageID 98030

> [i]f the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.

*Id.* at 515-16 (footnote and citation omitted).

Nothing in the FAA indicates that Congress intended arbitration agreements to divest federal courts of subject matter jurisdiction. To the contrary, the FAA authorizes courts to issue orders that would be beyond the power of a court that lacks jurisdiction. *See Sinochem Int'l*, 549 U.S. at 434. For instance, courts must, in certain circumstances, issue orders staying their proceedings pending arbitration, *see* 9 U.S.C. § 3; orders compelling recalcitrant parties to submit to arbitration, *see id.* § 4; orders appointing an arbitrator, *see id.* § 5; and orders compelling witnesses to appear before an arbitrator, *see id.* § 7. Thus the text of the FAA—far from containing a clear statement that arbitration agreements are jurisdictional—suggests instead that the opposite is true. The court therefore concludes that Congress did not intend for dismissals based on arbitration agreements to be dismissals for lack of subject matter jurisdiction.[26]

---

[26]Neutra contends in the First Appeal that the Acis LPA's arbitration clause deprived Terry of *standing*, and that a creditor who lacks *standing* cannot confer subject matter jurisdiction on the bankruptcy court by filing an involuntary petition. But "[s]tanding is a species of subject matter jurisdiction." *In re Rhinesmith*, 450 B.R. 630, 631 (Bankr. W.D. Tex. 2011) (citing *Cadle Co. v. Neubauer*, 562 F.3d 369, 371 (5th Cir. 2009)). To conclude that arbitration agreements do not implicate a court's subject matter jurisdiction is also to conclude that they do not implicate standing. Thus Neutra's circuitous logic does not allow it to escape the court's conclusion on this issue.

- 37 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1186   Filed 09/25/2804   Page 946 of 1017   PageID 14573
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 818 of 1803   PageID 11564
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 38 of 84   PageID 98031

Because the bankruptcy court's order denying the Arbitration Motion does not implicate subject matter jurisdiction, it can only be challenged by a party with standing. Neutra lacks standing to do so in the First Appeal. *See supra* § III. In the Second and Third Appeals, the appellants who challenge the order do not contend that they have standing to do so; instead, they rely on what they maintain is the jurisdictional nature of the order. They have therefore failed to carry their burden to establish standing. *See Rohm*, 32 F.3d at 208. Thus the court will not consider the merits of appellants' challenges to the bankruptcy court's order denying the Arbitration Motion.

V

Highland argues in the Second Appeal that the Break-Up Fee does not satisfy the requirements of 11 U.S.C. § 503, which governs administrative expenses; the Break-Up Fee is unreasonably large; and the Expense Reimbursement was not a reasonable exercise of the Trustee's business judgment under 11 U.S.C. § 363(b).[27]

A

The court first considers whether the bankruptcy court abused its discretion by finding that the Break-Up Fee satisfies § 503(b)(1)(A).[28]

---

[27]As a creditor of the estates, Highland has standing to appeal the order approving the Break-Up Fee and Expense Reimbursement because that order disposes of estate assets. *See, e.g., In re Gucci*, 126 F.3d 380, 388 (2d Cir. 1997). Neither Oaktree nor the Trustee contends otherwise.

[28]The parties do not dispute that § 503 applies to the bankruptcy court's decision to approve a break-up fee. *See In re ASARCO, L.L.C.*, 650 F.3d 593, 602 (5th Cir. 2011) (suggesting, in *dicta*, that § 503 is "the proper channel for requesting payment" of a break-up

- 38 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-11    Filed 06/25 1804    Page 947 of 1017    PageID 14574
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 819 of 1803    PageID 11565
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 39 of 84    PageID 98032

In bankruptcy, administrative expenses—such as the "actual and necessary costs and expenses of preserving the estate"—are given priority over other non-secured claims in the distribution of the estate. *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir. 2001). "In order to qualify as an 'actual and necessary cost' under section 503(b)(1)(A), a claim against the estate must have arisen post-petition and as a result of actions taken by the trustee that benefi[t]ed the estate." *Id.* (citing *In re TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992)). Such claims "generally stem from voluntary transactions with third parties who lend goods or services necessary to the successful reorganization of the debtor's estate." *Id.* "Crucial to satisfying the § 503 test is that the estate receive a 'discernible benefit' as a result of the expenditure." *In re ASARCO LLC*, 441 B.R. 813, 824 (S.D. Tex. 2010) (quoting *Jack/Wade Drilling*, 258 F.3d at 387), *aff'd*, 650 F.3d 593 (5th Cir. 2011); *see also In re DeSardi*, 340 B.R. 790, 799 (Bankr. S.D. Tex. 2006) ("The court's administrative expense inquiry centers upon whether the estate has received an *actual benefit, as opposed to the loss a creditor might experience*[.]" (quoting *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 866 (4th Cir. 1994))). The claimant bears the burden of proving by a preponderance of the evidence that its claim qualifies as an administrative expense. *See TransAmerican*, 978 F.2d at 1416. Once the claimant has established a prima facie case, the burden of production shifts to the objector—but the burden of persuasion remains at all times upon the claimant. *See id.*

---

fee).

- 39 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Filed 10/06/25   Page 948 of 1017   PageID 14575
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 820 of 1803   PageID 11566
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 40 of 84   PageID 98033

The bankruptcy court did not abuse its discretion by concluding that the Break-Up Fee was an actual and necessary expense that conferred a discernible benefit upon the debtors' estates. Courts have recognized that a break-up fee can confer a benefit on the estate even though the contemplated transaction with the claimant was not consummated. *See, e.g., In re Energy Future Holdings Corp.*, 904 F.3d 298, 313-14 (3d Cir. 2018) (recognizing that break-up fee can benefit estate if, *inter alia*, the "assurance of a break-up fee promote[s] more competitive bidding," or the fee "induce[s] a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely"); *In re Lamb*, 2002 WL 31508913, at *1 (Bankr. D. Md. Oct. 11, 2002) (recognizing that break-up fees are appropriate where they incentivize a "stalking horse" bidder).

Here, the primary benefit identified by the bankruptcy court was that the Break-Up Fee facilitated the plan confirmation process. Without the Break-Up Fee, the Trustee would have had no ready, willing, and able partner for the proposed Plan A transaction, because Oaktree would not have made an offer or undertaken the expense and effort of preparing for the contemplated transaction. In this respect, the present case is similar to a traditional "stalking horse" situation, where a break-up fee induces a bidder to research a potential transaction and make an initial bid. *See, e.g., Energy Future Holdings*, 904 F.3d at 313-14. Without Plan A, the bankruptcy court faced the possible "doomsday" scenario, Second Appeal R. 78, of Acis' fee-generating PMAs being rendered worthless by HCLOF's exercise of its optional redemption right. The bankruptcy court did not abuse its discretion by recognizing these benefits.

- 40 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 06/25/25   Page 949 of 1017   PageID 14576
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 821 of 1803   PageID 11567
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 41 of 84   PageID 98034

The record also reflects that the Break-Up Fee conferred other benefits on the estates, although the bankruptcy court did not expressly acknowledge them. Oaktree's initial bid was meant to start a public sale process. *Cf. Energy Future Holdings*, 904 F.3d at 313-14 (citing *In re O'Brien Envt'l Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999)) (acknowledging that break-up fees can benefit estate by initiating a public bidding process, even where claimant was eventually outbid). And the Break-Up Fee was part of a transaction by which Oaktree agreed to step into Highland's shoes as Acis LP's sub-advisory and shared services provider, for a significantly lower price than what Highland was charging.

Of course, the Break-Up Fee is unique in one significant respect: it was expressly conditioned on the bankruptcy court's approval of Plan A. Plan A was based on the doctrine of equitable subrogation, "the legal fiction through which a person or entity, the subrogee, is substituted, or subrogated, to the rights and remedies of another by virtue of having fulfilled an obligation for which the other was responsible." *Gen. Star Indem. Co. v. Vesta Fire Ins. Corp.*, 173 F.3d 946, 949-50 (5th Cir. 1999). Under the Trustee's theory, HCLOF was to be treated as a creditor of the estates on the basis of its adversary claim against the Trustee seeking specific performance of its optional redemption right. The Trustee proposed to monetize HCLOF's claim, and to satisfy that claim by paying HCLOF the sum of $100 million (provided by Oaktree). The Trustee would then, as subrogee, substitute himself as the holder of HCLOF's rights in the subordinated CLO notes. Finally, the Trustee would use his position as subrogee to transfer HCLOF's interest in the subordinated notes to Oaktree. The bankruptcy court acknowledged that "[t]he legal theories [underpinning Plan A] are not

- 41 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 03/25/804   Page 950 of 1017   PageID 14577
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 822 of 1803   PageID 11568
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 42 of 84   PageID 98035

at all clear cut and are likely to be hotly contested by [HCLOF] and Highland."  Second Appeal R. at 78.  Despite this uncertainty, the bankruptcy court approved the Break-Up Fee.[29]

Break-up fees are by nature contingent upon uncertain future events.  If a transaction were sure to happen, there would be no need for a break-up fee.  Highland essentially contends that there was *too much* uncertainty here—that the bankruptcy court abused its discretion by approving the Break-Up Fee "in the face of [a] huge execution risk and the substantial legal authority that the Trustee's proposed transaction with Oaktree could not be approved."  Highland Second Appeal Br. 31.  But Highland overstates the degree to which the Trustee's theory was foreclosed by existing law.  The bankruptcy court was aware of authority suggesting that, in some circumstances, an entity's claim for specific performance may be treated as a monetary claim against the bankruptcy estate under 11 U.S.C. § 101(5). *See In re Davis*, 3 F.3d 113, 116 (5th Cir. 1993).  And under New York law, which ostensibly governs the PMAs between Acis and the CLO-SPEs, the doctrine of equitable subrogation is interpreted

> broad[ly] enough to include every instance in which one party pays a debt for which another is primarily answerable and which in equity and good conscience should have been discharged by the latter, so long as the payment was made either under compulsion or for the protection of some interest of the party

---

[29]The bankruptcy court later decided that Plan A was unconfirmable because the Trustee could not be subrogated to the rights of an entity that did not hold a claim against the estates.  The bankruptcy court concluded that HCLOF did not hold such a claim because the Equity PMA was not then in effect, and HCLOF could not sue to enforce the PMAs between Acis and the CLO-SPEs because HCLOF was not a party to, or a third-party beneficiary of, those PMAs.  This decision is not part of the record in the Second Appeal.

- 42 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 04/06/25    Page 951 of 1017    PageID 14578
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 823 of 1803    PageID 11569
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 43 of 84    PageID 98036

making the payment, and in discharge of an existing liability.

*Hamlet at Willow Creek Dev. Co. v. Ne. Land Dev. Corp.*, 878 N.Y.S.2d 97, 112 (N.Y. App.

Div. 2009) (quoting *Gerseta Corp. v. Equitable Tr. Co. of N.Y.*, 150 N.E. 501, 504 (N.Y.

1926)).  The bankruptcy court was thus within its discretion to conclude that the Trustee's

theory was at least colorable.

More important, whether the benefits of the Break-Up Fee outweighed the risks is not

for this court to decide.  Unless the bankruptcy court committed a clear error of fact or

incorrectly applied the law, this court cannot disturb its decision.  *See Grigson*, 210 F.3d at

528.  There is no indication that the bankruptcy court committed such an error here.  The

bankruptcy court recognized the potential benefits *and* the potential risks of approving the

Break-Up Fee, and it properly applied the correct legal test—the § 503(b)(1)(A) standard—in

coming to its conclusion that the Break-Up Fee benefited the estate.

The principal authority on which Highland relies, *Energy Future Holdings*, is not to

the contrary.  In that case, the Third Circuit affirmed the bankruptcy court's reconsideration

of its own decision to authorize a break-up fee.  *See Energy Future Holdings*, 904 F.3d at

301.  The bankruptcy court originally approved the break-up fee on the premise that the fee

would not be paid if a certain regulatory body did not permit the proposed transaction to go

forward.  *See id.* at 304.  When the bankruptcy court learned that this premise was incorrect,

it reconsidered the order and came to a different conclusion.  *See id.* at 307.  The Third

Circuit, in affirming the bankruptcy court, *deferred to the bankruptcy court's discretion* to

weigh the potential risks and benefits of allowing the fee:

Appellee Appx. 00817
Appx. 01908
013630

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 05/23/25   Page 952 of 1017   PageID 14579
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 824 of 1803   PageID 11570
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 44 of 84   PageID 98037

> In sum, the Termination Fee provision had the potential of providing a large benefit to the estates, but it also had the possibility to be disastrous. Once it had a complete understanding, the Bankruptcy Court properly weighed the various considerations and determined that the potential benefit was outweighed by the harm that would result under predictable circumstances. In other words, the risk was so great that the Fee was not necessary to preserve the value of Debtors' estates. Having made such a determination, the Bankruptcy Court did not abuse its discretion in denying the Fee in part.

*Id.* at 315 (footnote omitted). Likewise, the bankruptcy court in the present appeal was within its discretion to conclude that the benefits of the Break-Up Fee outweighed the risks, despite the uncertainty of the Trustee's legal theory.

B

The court considers next whether the Break-Up Fee was so large as to be unreasonable.

Highland cites no binding authority for the proposition that a break-up fee that meets the requirements of § 503(b)(1)(A) must be rejected if it is "unreasonable," nor does Highland explain what test a break-up fee must pass in order to be "reasonable." *See* Highland Second Appeal Br. 32-33. Assuming *arguendo* that it would be error to approve an "unreasonable" break-up fee, the court concludes that the bankruptcy court did not err in this respect. The bankruptcy court found that the Break-Up Fee constituted roughly 2.3% of the total price that Oaktree would pay under the terms of the proposed transaction. This amount is in line with break-up fees authorized by other courts. *See, e.g., In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("Except in extremely large transactions,

- 44 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1826 of 1804    Page 953 of 1017    PageID 14580
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 825 of 1803    PageID 11571
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 45 of 84    PageID 98038

break-up fees ranging from one to two percent of the purchase price have been authorized

by some courts."); *see also Samjens Partners I v. Burlington Indus., Inc.*, 663 F. Supp. 614,

625 (S.D.N.Y. 1987) (approving 2% break-up fee); *In re Sea Island Co.*, 2010 WL 4393269,

at *3 (Bankr. S.D. Ga. Sept. 15, 2010) (approving 3% break-up fee).

Highland contends that the relevant benchmark is not the total transaction price, but

is instead the amount of money that Acis LP would retain after the transaction was complete.

Applying Highland's logic, the Break-Up Fee is actually *26%* of the transaction's value. But

Highland's logic does not stand up in light of the legal theory proposed by the Trustee in

support of the transaction.    Under Plan A, Oaktree was not purchasing HCLOF's

subordinated notes outright.    Rather, it was funding the proposed plan so that Acis could

satisfy all of its creditors' claims—including HCLOF's liquidated claim for specific

performance—in exchange for the Trustee's promise to use the doctrine of equitable

subrogation to transfer the subordinated notes to Oaktree.   There is no principled reason to

compare the Break-Up Fee to the amount of money retained by Acis *after* paying off

HCLOF's claim, but *before* paying off any other creditor's claim.    Highland's

unreasonableness argument lacks merit.

C

Finally, the court considers whether the bankruptcy court abused its discretion by

concluding that the Expense Reimbursement was a proper exercise of the Trustee's business

judgment.

Expense reimbursements are governed by 11 U.S.C. § 363(b), which incorporates a

- 45 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1   Page 1 of 6   Filed 07/08/25   Page 954 of 1017   PageID 14581
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 826 of 1803   PageID 11572
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 46 of 84   PageID 98039

business judgment standard.  *See ASARCO*, 650 F.3d at 601-03.  Section 363(b) permits a trustee, after notice and a hearing, to use, sell, or lease estate property other than in the ordinary course of business.  *See id.* at 601.  "In such circumstances, 'for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.'"  *Id.* (quoting *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986)).  "The business judgment standard in section 363 is flexible and encourages discretion."  *Id.*; *see also GBL Holding Co. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (N.D. Tex. 2005) (Lynn, J.) ("Great judicial deference is given to the Trustee's exercise of business judgment.").

The bankruptcy court acknowledged that "Oaktree has spent significant time and expense related to the [Plan A] Transaction," and that "[i]t is reasonable to anticipate that Oaktree will continue to incur additional significant time and expense."  Second Appeal R. 78.  The bankruptcy court found that the Expense Reimbursement, along with the Break-Up Fee, was an "essential inducement[]" for Oaktree's continuing commitment to the Plan A transaction.  *Id.*  Oaktree's commitment to the proposed transaction was beneficial to the estates for the reasons explained *supra* at § V(A).  Thus the bankruptcy court concluded that "the Trustee has established, in his business judgment, that the Expense Reimbursement is necessary here."  *Id.* at 77.  The bankruptcy court did not abuse its discretion.

Highland's arguments to the contrary are unavailing.  Highland contends that the Trustee lacked any reasonable business justification for allowing the Expense

- 46 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1106   Filed 06/25/804   Page 955 of 1017   PageID 14582
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 827 of 1803   PageID 11573
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 47 of 84   PageID 98040

Reimbursement because he knew in advance that Plan A was unconfirmable, as evidenced by his proposing Plans B and C at the same time. The court disagrees. If the Trustee knew that Plan A could not be confirmed, then he would have had *no reason* to propose it in the first place—let alone any reason to go through the effort and expense of negotiating with Oaktree. Highland also argues that Oaktree "assume[d] the risk" of losing any money it spent in relation to the Plan A transaction, because Oaktree was experienced enough to know that Plan A could not be approved. Highland Second Appeal Reply 16. But the question is not whether Oaktree assumed any particular risk; the question is whether the Trustee had an "articulated business justification for" the Expense Reimbursement. *ASARCO*, 650 F.3d at 601 (quoting *Cont'l Air Lines*, 780 F.2d at 1226). The bankruptcy court did not abuse its discretion by concluding that he did.

The court therefore affirms the bankruptcy court's order approving the Break-Up Fee and Expense Reimbursement.

## VI

In the Third Appeal, Highland and Neutra contend that the filing of the First Appeal divested the bankruptcy court of subject matter jurisdiction to confirm the Plan.

## A

"It is a fundamental tenet of federal civil procedure that—subject to certain, defined exceptions—the filing of a notice of appeal from the final judgment of a trial court divests the trial court of jurisdiction and confers jurisdiction upon the appellate court." *In re Transtexas Gas Corp.*, 303 F.3d 571, 578-79 (5th Cir. 2002) (citing *Griggs v. Provident*

Appellee Appx. 00821
Appx. 01072
013634

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S     Document Exhibit 6   Filed 18/30/25 1804   Page 956 of 1017     PageID 14583
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 828 of 1803   PageID 11574
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 48 of 84   PageID 98041

*Consumer Co.*, 459 U.S. 56, 58 (1982)).  "This rule applies with equal force to bankruptcy cases."  *Id.* at 579.  Thus while an appeal is pending, the bankruptcy court cannot exercise control over "those aspects of the case involved in the appeal."  *In re Scopac*, 624 F.3d 274, 280 (5th Cir. 2010) (quoting *Griggs*, 459 U.S. at 58), *modified on denial of reh'g*, 649 F.3d 320 (5th Cir. 2011)*.*

But "the bankruptcy court retains jurisdiction to address elements of the bankruptcy proceeding that are not the subject of that appeal."  *Transtexas*, 303 F.3d at 580 n.2.  The Fifth Circuit "has specifically rejected 'the broad rule that a bankruptcy court may not consider any request which either directly or indirectly touches upon the issues involved in a pending appeal and may not do anything which has any impact on the order on appeal.'"  *Scopac*, 624 F.3d at 280 (quoting *In re Sullivan Cent. Plaza I, Ltd.*, 935 F.2d 723, 727 (5th Cir. 1991)).  Instead, the Fifth Circuit has adopted a "functional test: 'once an appeal is pending, it is imperative that a lower court not exercise jurisdiction over those issues which, although not themselves expressly on appeal, nevertheless so impact the appeal so as to interfere with or effectively circumvent the appeal process.'"  *Id.* (quoting *In re Whispering Pines Estates, Inc.*, 369 B.R. 752, 759 (B.A.P. 1st Cir. 2007)).

Where courts have held that a bankruptcy court was divested of jurisdiction to enter a subsequent order, it is usually because the subsequent order would have modified, or would have been inconsistent with, an order pending on appeal.  *See, e.g., Transtexas*, 303 F.3d at 574, 582 (holding that bankruptcy court was divested of jurisdiction to supplement plan confirmation order that was then pending on appeal); *Whispering Pines*, 369 B.R. at 760

- 48 -

(concluding that bankruptcy court could not issue stay relief order that essentially modified confirmed plan while plan confirmation order was pending on appeal); *In re BNP Petroleum Corp.*, 2012 WL 7620694, at *3 (S.D. Tex. Feb. 27, 2012) (observing that bankruptcy court can consider motion to set aside sale agreement, and can deny that motion, but cannot *grant* it while the order approving the sale agreement is pending on appeal); *In re Southold Dev. Corp.*, 129 B.R. 18, 19, 21 (E.D.N.Y. 1991) (invalidating order that modified reorganization plan, where plan confirmation order was already pending on appeal); *In re 710 Long Ridge Rd. Operating Co., II, LLC*, 2014 WL 1648725, at *1, *3-6 (Bankr. D.N.J. Apr. 24, 2014) (refusing to consider motion to clarify plan confirmation order that was pending on appeal, because a court "cannot take action that will alter or modify its prior order while that order is pending on appeal"); *In re New Century TRS Holdings, Inc.*, 2012 WL 2064500, at *1-3 (Bankr. D. Del. June 7, 2012) (dismissing motion for sanctions where motion essentially repackaged issues and arguments then pending in appeal of motion for reconsideration); *In re Wallace's Bookstores, Inc.*, 330 B.R. 193, 195 (Bankr. E.D. Ky. 2005) (denying adversary plaintiff's motion to dismiss claims whose resolution was then pending on appeal); *see also Wireless Agents, LLC v. Sony Ericsson Mobile Comms. AB*, 2006 WL 1189687, at *3 (N.D. Tex. May 3, 2006) (Fitzwater, J.) ("Because Wireless has appealed the court's denial of a preliminary injunction, the Federal Circuit has exclusive jurisdiction over the preliminary injunction motion, and this court cannot modify its preliminary findings of fact and conclusions of law during the pendency of the appeal."). Attempting to modify an order pending on appeal, or issuing a subsequent order that is inconsistent with the order being

Appellee Appx. 00823

Appx. 01974

013636

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 06/25/24    Page 958 of 1017    PageID 14585
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 830 of 1803    PageID 11576
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 50 of 84    PageID 98043

appealed, circumvents the appellate process. *Cf. Scopac*, 624 F.3d at 280 (holding that a bankruptcy court cannot "interfere with or effectively circumvent the appeal process").

B

Neutra identifies three issues on appeal in the First Appeal that supposedly divested the bankruptcy court of jurisdiction to confirm the Plan: (1) whether the bankruptcy court erred by denying the Arbitration Motion; (2) whether the bankruptcy erred by not abstaining under 11 U.S.C. § 305; and (3) whether Terry filed the involuntary petitions in good faith.

The appeal of the bankruptcy court's denial of the Arbitration Motion did not divest the bankruptcy court of jurisdiction to issue further orders. In *Weingarten Realty Investors v. Miller*, 661 F.3d 904 (5th Cir. 2011), the Fifth Circuit held that the appeal of an order denying a motion to compel arbitration does not divest a district court of jurisdiction to decide the merits of a case, even though a motion to compel arbitration—if granted—would effectively end the case. *See id.* at 907-10. The *Weingarten* panel interpreted the divestiture doctrine "narrowly." *See id.* at 908-09. It reasoned that, because the denial of a motion to compel arbitration does not, as a matter of law, determine the merits of the case, the merits question is not an "aspect[] of the case involved in the appeal," and the district court may decide it. *See id.* at 909 (alteration in original) (quoting *Griggs*, 459 U.S. at 58). The Fifth Circuit rejected the Seventh Circuit's reasoning that the appeal of a motion to compel arbitration—much like the appeal of a motion to dismiss based on double jeopardy, sovereign immunity, or qualified immunity—results in an automatic stay of the proceedings below because "the appeal is to determine whether the matter should be litigated in the district court

- 50 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-116   Filed 03/26/25   Page 959 of 1017   PageID 14586
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 831 of 1803   PageID 11577
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 51 of 84   PageID 98044

at all." *Id.* at 908 (citing *Bradford-Scott Data Corp. v. Physician Comput. Network*, 128 F.3d 504, 505-06 (7th Cir. 1997)). Under *Weingarten*, because the bankruptcy court's ruling on the Arbitration Motion is separate from the merits of Plan confirmation, the appeal of that prior ruling did not divest the bankruptcy court of jurisdiction to confirm the Plan.

The reasoning of *Weingarten* applies with full force to the § 305 abstention issue. Highland and Neutra have not shown that there is any overlap, as a matter of law, between the bankruptcy court's decision to confirm the Plan and its decision not to abstain from ruling on the involuntary petitions. Thus even though the bankruptcy court's abstention decision "determine[d] whether the matter should be litigated in the [bankruptcy] court at all," *id.* at 908, the appeal of that decision did not divest the bankruptcy court of jurisdiction to confirm the Plan.

The issue of Terry's good faith in filing the involuntary petitions presents a closer question. For the bankruptcy court to confirm a plan, it must find, *inter alia*, that the plan was "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The Eleventh Circuit has held that where an involuntary petition is filed in bad faith, any subsequently-proposed reorganization plan is *necessarily* proposed in bad faith and cannot be confirmed. *See In re Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987); *but see In re Landing Assocs., Ltd.*, 157 B.R. 791, 812 (Bankr. W.D. Tex. 1993) ("Bank United relies on the legal standard established in several bad-faith filing cases for this proposition. However, a different legal standard is employed when evaluating good faith for plan confirmation purposes under [11 U.S.C.] § 1129(a)(3)." (citations omitted)). Under the

- 51 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 02/05/25   Page 960 of 1017   PageID 14587
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 832 of 1803   PageID 11578
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 52 of 84   PageID 98045

Eleventh Circuit's rule, the bankruptcy court's ruling that Terry filed the involuntary petitions in good faith has some bearing on its decision to confirm the Plan.

But even assuming that the Eleventh Circuit's rule applies, the court is not convinced that, under these circumstances, the First Appeal divested the bankruptcy court of jurisdiction to confirm the Plan. In issuing the confirmation order, the bankruptcy court did not directly exercise jurisdiction over the question of Terry's good faith in filing the involuntary petitions—it did not revisit, comment upon, or supplement its earlier decision. *See In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 680 (Bankr. S.D.N.Y. 2016) ("[A] confirmation order does not 'tamper' with prior rulings in the case; rather, to state the obvious, it confirms a plan of reorganization."); *cf. Transtexas*, 303 F.3d at 574, 582 (holding that bankruptcy court lacked jurisdiction to supplement plan confirmation order that was then pending on appeal); *Southold Dev. Corp.*, 129 B.R. at 18, 21 (vacating order that modified reorganization plan that was pending on appeal); *710 Long Ridge, II, LLC*, 2014 WL 1648725, at *1, *3-6 (refusing to consider motion to clarify plan confirmation order that was pending on appeal). Nor did the bankruptcy court issue any order that was inconsistent with, or that implicitly modified, its previous ruling. *Cf. Whispering Pines*, 369 B.R. at 760 (concluding that bankruptcy court could not issue stay relief order that was inconsistent with confirmed plan while plan confirmation order was pending on appeal). Instead, the bankruptcy court proceeded in accordance with that ruling. It was entitled to do so—just as it was entitled to carry out the confirmed Plan in the absence of a stay order, even while the Plan confirmation order was pending on appeal. *See In re Prudential Lines, Inc.*, 170 B.R. 222, 243-44

Appellee Appx. 00826
013639

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-6    Filed 04/25/25    Page 961 of 1017    PageID 14588
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 833 of 1803    PageID 11579
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 53 of 84    PageID 98046

(S.D.N.Y. 1994). If the bankruptcy court had instead *denied* plan confirmation on the ground that Terry filed the involuntary petitions in *bad faith*, the divestiture analysis might be different. *Cf. BNP Petroleum*, 2012 WL 7620694, at *3 (observing that bankruptcy court can deny motion to set aside sale agreement, but cannot grant it while the order approving the sale agreement is pending on appeal). As it is, however, the bankruptcy court's Plan confirmation order did not in any way interfere with, or circumvent, this court's consideration of the First Appeal.

Moreover, to conclude that Neutra's appeal of the orders for relief divested the bankruptcy court of jurisdiction to confirm the Plan would be to hold that whenever an order for relief is entered, any disappointed litigant—even a litigant who *lacks standing to appeal*—can bring the bankruptcy case grinding to a halt. But the divestiture doctrine is not intended to "cede control of the conduct of a chapter 11 case to disappointed litigants. This cannot be, and is not, the law." *Sabine*, 548 B.R. at 680. And such a decision would be contrary to Fifth Circuit precedent indicating that "a narrow interpretation [of divestiture doctrine] is normally appropriate." *See Weingarten*, 661 F.3d at 908. The court thus concludes that the First Appeal did not divest the bankruptcy court of jurisdiction to confirm the Plan.

VII

The court now turns to the contention of HCLOF (joined by Highland and Neutra) in the Third Appeal that the bankruptcy court erred by confirming the Plan because the Temporary Injunction—a crucial part of the Plan—is unlawful.

- 53 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 03/25/25   Page 962 of 1017   PageID 14589
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 834 of 1803   PageID 11580
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 54 of 84   PageID 98047

A

The bankruptcy court had authority to enter the Temporary Injunction under 11 U.S.C.

§§ 105(a) and 1123(b)(6), and had jurisdiction to do so under 28 U.S.C. § 157(b)(2)(L).

Section 157(b)(2)(L) grants the bankruptcy court jurisdiction to enter final orders concerning

the confirmation of plans.[30]  Section 1123(b)(6) gives bankruptcy courts residual authority

to include in a plan "any other appropriate provision not inconsistent with the applicable

provisions of this title."  11 U.S.C. § 1126(b)(6).  The bankruptcy court can exercise its

residual authority via § 105(a), which provides that "[t]he court may issue any order, process,

or judgment that is necessary or appropriate to carry out the provisions of this title."  11

U.S.C. § 105(a).

Section 105(a) permits a bankruptcy court "to fashion such orders as are necessary to

further the substantive provisions of the Bankruptcy Code."  *In re Sadkin*, 36 F.3d 473, 478

(5th Cir. 1994) (per curiam) (quoting *In re Oxford Mgmt. Inc.*, 4 F.3d 1329, 1333 (5th Cir.

1993)).  But the bankruptcy court's § 105(a) powers are not unlimited: the statute "does not

authorize the bankruptcy courts to create substantive rights that are otherwise unavailable

---

[30]To the extent that a temporary plan injunction restrains a third-party *lawsuit*, the bankruptcy court must have statutory "related to" jurisdiction over that lawsuit per 28 U.S.C. § 157(a).  *See In re Seatco, Inc.*, 257 B.R. 469, 475-76 (Bankr. N.D. Tex.) (Houser, J.), *modified on reh'g by* 259 B.R. 279 (Bankr. N.D. Tex. 2001) (Houser, J.).  For the reasons discussed *infra* at note 34, the bankruptcy court has statutory "related to" jurisdiction over all lawsuits potentially restrained by the Temporary Injunction.  For the reasons discussed *infra* at § VII(B), the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011), does not affect the bankruptcy court's statutory jurisdiction to issue a temporary plan injunction.

- 54 -

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 6 Filed 06/25/25 Page 963 of 1017 PageID 14590
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 835 of 1803 PageID 11581
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 55 of 84 PageID 98048

under applicable law, or constitute a roving commission to do equity." *Id.* (quoting *Oxford Mgmt.*, 4 F.3d at 1333). The Trustee[31] contends that the bankruptcy court's § 105(a) powers are broad enough to allow it to temporarily enjoin a non-debtor, non-creditor entity—HCLOF—from attempting to assert certain contractual rights, at least where such an injunction is necessary to the debtors' successful reorganization.[32]

Fifth Circuit precedent indicates that § 105(a) *does*, under some circumstances, permit a bankruptcy court to enjoin a non-debtor, non-creditor entity from taking particular actions. *In re Zale Corp.*, 62 F.3d 746 (5th Cir. 1995), involved a challenge to a § 105(a) injunction that prohibited certain nonparties from filing lawsuits against certain other nonparties. *See id.* at 750-51. The Fifth Circuit—citing 11 U.S.C. § 524, which forbids the discharge of the debts of nondebtors—invalidated the injunction insofar as it constituted a *permanent* release of the nonparties' claims. *See id.* at 760-61. But the court noted that "[t]he impropriety of a permanent injunction does not necessarily extend to a temporary injunction of third-party actions." *Id.* at 761. The court provided a non-exhaustive list of "unusual circumstances" that might justify such an injunction: "1) when the nondebtor and the debtor enjoy such an identity of interests that the suit against the nondebtor is essentially a suit against the debtor, and 2) when the third-party action will have an adverse impact on the debtor's ability to

---

[31]On April 12, 2019 Acis filed a motion to substitute itself as the appellee in the Third Appeal, arguing that once the Plan took effect, Acis became the Trustee's successor-in-interest. The court addresses this motion *infra* at § XI.

[32]The court expresses no opinion on the question whether the Equity PMA or any other contract presently entitles HCLOF to demand an optional redemption of the CLOs.

- 55 -

accomplish reorganization." *Id.* Bankruptcy judges in this district have approved temporary injunctions under *Zale* multiple times. *See In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109, 117 (Bankr. N.D. Tex. 2002) (Hale, J.); *In re Seatco, Inc.*, 257 B.R. 469, 476-78 (Bankr. N.D. Tex.) (Houser, J.), *modified on reh'g by* 259 B.R. 279 (Bankr. N.D. Tex. 2001) (Houser, J.); *see also In re Couture Hotel Corp.*, 536 B.R. 712, 749-53 (Bankr. N.D. Tex. 2015) (Houser, J.) (applying *Zale* unusual-circumstances test and declining to issue injunction). As discussed below, the second unusual circumstance described in *Zale* is present here.[33]

The court recognizes that the bankruptcy court did not rely on this rationale. Instead, it based the Temporary Injunction on its ostensible authority over the Trustee Adversary. The bankruptcy court described the Trustee Adversary as "a somewhat significant part of the Plan; it is what justifies the temporary injunction that is a critical part of the Plan." *Acis II*, 2019 WL 417149, at *8. It conducted its four-prong preliminary-injunction analysis in the context of, and based on the likelihood of success of, the Trustee Adversary. *See id.* at *10-12. This court, of course, can affirm the bankruptcy court on alternative grounds. *See, e.g.*, *Cimmaron Oil Co. v. Cameron Consultants, Inc.*, 71 B.R. 1005, 1011 (N.D. Tex. 1987)

---

[33]The *Zale* panel ultimately vacated the temporary injunction because it was not issued after an adversary proceeding, as required at the time by Rule 7001(7). *See Zale*, 62 F.3d at 764-65. But Rule 7001(7) was amended in 1999 so that it does not apply where, as here, "a . . . chapter 11 . . . plan provides for the [injunctive] relief." Rule 7001(7); *see* Rule 7001 advisory committee's note (1999 amendments). And HCLOF, unlike the objectors in *Zale*, had a full and fair opportunity to present its objections to the bankruptcy court. *Cf. Zale*, 62 F.3d at 763-64.

Appellee Appx. 00830

Appx. 01081

013643

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 08/25/25   Page 965 of 1017   PageID 14592
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 837 of 1803   PageID 11583
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 57 of 84   PageID 98050

(Fitzwater, J.) ("[T]his court may affirm a correct judgment for reasons not given by the court below or advanced to it.").  But here, the bankruptcy court's rationale is significant because "[i]f the bankruptcy court does not determine that unusual circumstances exist, the court may not enter an injunction of the third-party actions."  *Zale*, 62 F.3d at 761.

The bankruptcy court's factual findings are nonetheless sufficient to satisfy the "unusual circumstances" requirement.  The bankruptcy court expressly found that the Temporary Injunction is a "critical component of the Plan," *Acis II*, 2019 WL 417149, at *10, and that "[t]he Temporary Plan Injunction is essential to [Acis'] ability to perform the Plan," *In re Acis Capital Mgmt., L.P.*, 2019 WL 406137, at *14 (Bankr. N.D. Tex. Jan. 31, 2019) (Jernigan, J.).  HCLOF has twice demanded that Acis effect an optional redemption of the CLOs, and its directors testified that it will do so again if given the chance.  *See Acis II*, 2019 WL 417149, at *10.  The bankruptcy court found that an optional redemption would be an economically "[ir]rational" transaction that would serve as the last step in Highland's "intentional scheme to keep assets away from Mr. Terry as a creditor."  *Id.* at *12.  It further found that if HCLOF succeeds in forcing an optional redemption, Acis "[will] have no going concern value," and "Terry will be precluded from reorganizing the business and paying creditors" in accordance with the Plan.  *Id.* at *10.  Thus the Temporary Injunction enjoins third-party conduct that would adversely impact the ability of Acis to reorganize.  These are unusual circumstances that justify the bankruptcy court's Temporary Injunction.  *Cf. Zale*, 62 F.3d at 762 ("We hold that [the bankruptcy court's] language satisfies the 'unusual circumstances' requirement because it clearly identifies the settlement as providing

Appellee Appx. 00831
Appx. 01082
013644

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 03/06/25   Page 966 of 1017   PageID 14593
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 838 of 1803   PageID 11584
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 58 of 84   PageID 98051

'substantial consideration' to the estate and constituting part of a 'key provision' of the plan.").[34]

B

HCLOF argues that the Trustee cannot invoke § 105(a) to support an injunction that is prohibited under *Stern v. Marshall*, 564 U.S. 462 (2011). In *Stern* the Supreme Court concluded that certain claims and controversies must, as a constitutional matter, be resolved by an Article III court, even if they are statutorily committed to the jurisdiction of the bankruptcy court. *See id.* at 482. HCLOF contends that the Trustee Adversary, which "is

---

[34]The Fifth Circuit's recent decision in *SEC v. Stanford International Bank, Ltd.*, 927 F.3d 830, ___, 2019 WL 2496901, at *5-7 (5th Cir. June 17, 2019), is not to the contrary. The *Stanford* panel interpreted *Zale*'s discussion of certain limits on a bankruptcy court's statutory "related to" jurisdiction to be a broad "maxim of law" that applies to all receiverships, regardless of the statutory basis of jurisdiction. *See id.* at ___, 2019 WL 2496901, at *6. *Zale* and *Stanford* thus stand for the proposition that a court overseeing a receivership lacks jurisdiction to enjoin third-party lawsuits whose resolution would have no effect on the *res* of the estate. *See id.* at ___, 2019 WL 2496901, at *7 (stating that courts lack jurisdiction "to permanently bar and extinguish independent, non-derivative third-party claims that do not affect the *res* of the receivership estate"); *Zale*, 62 F.3d at 752 ("Those cases in which courts have upheld 'related to' jurisdiction over third-party actions do so because the subject of the third-party dispute is property of the estate, or because the dispute over the asset would have an effect on the estate." (footnotes omitted)); *see also In re FoodServiceWarehouse.com, LLC*, 601 B.R. 396, ___, 2019 WL 1877006, at *10 (E.D. La. Apr. 26, 2019) ("If the outcome of a proceeding could conceivably have *any effect* on the estate being administered in bankruptcy, then 'related to' jurisdiction will generally exist." (citing *Zale*, 62 F.3d at 755)). The Temporary Injunction, however, enjoins certain acts that *would* affect the *res* of the bankruptcy estate. The bankruptcy court found that after an optional redemption, Acis "would have no going-concern value" because it would no longer receive any management fees with which to pay creditors. *Acis II*, 2019 WL 417149, at *10. Thus the equitable principles endorsed by *Stanford* do not prevent the bankruptcy court from issuing the Temporary Injunction pursuant to § 157(b)(2)(L)'s conferral of subject matter jurisdiction.

- 58 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11 Filed 04/05/25   Page 967 of 1017   PageID 14594
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 839 of 1803   PageID 11585
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 59 of 84   PageID 98052

essentially a multi-faceted fraudulent transfer action," *Acis II*, 2019 WL 417149, at *8, involves such a claim. Thus, according to HCLOF, the bankruptcy court lacks authority to grant final relief in the Trustee Adversary, and where a court lacks the power to grant a litigant *final* relief, it cannot grant *preliminary* relief. *See* HCLOF Third Appeal Br. 22 (citing *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 561-62 (5th Cir. 1987)). HCLOF maintains that, because *Stern* prohibits the bankruptcy court from issuing the Temporary Injunction in the context of the Trustee Adversary, the bankruptcy court cannot issue the Temporary Injunction as part of the confirmed Plan.

Assuming *arguendo* that a fraudulent transfer claim brought by a bankruptcy trustee against a non-creditor is a *Stern* claim—i.e., "a claim designated for final adjudication in the bankruptcy court as a statutory matter, but prohibited from proceeding in that way as a constitutional matter," *Executive Benefits Insurance Agency v. Arkison*, 573 U.S. 25, 30-31 (2014)—the court disagrees with HCLOF's contention. Whatever the precise contours of *Stern*, it only concerns the power of a bankruptcy court to enter a "final judgment" on certain causes of action. *See Stern*, 564 U.S. at 503 ("The Bankruptcy Court below lacked the constitutional authority to enter a *final judgment* on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." (emphasis added)). When the bankruptcy court exercises powers that are *independent of* its authority to enter a final judgment on a claim—e.g., when it makes use of its authority under § 105(a) to issue a temporary plan injunction—*Stern* simply does not apply. *See, e.g., In re Yellowstone Mountain Club, LLC*, 646 Fed. Appx. 558, 558-59 (9th Cir. 2016) (per curiam) (holding that

Appellee Appx. 00833
Appx. 01084
013646

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit6   Page 84060251804   Page 968 of 1017    PageID 14595
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 840 of 1803   PageID 11586
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 60 of 84   PageID 98053

*Stern* did not apply because "the bankruptcy court issued a preliminary injunction [pursuant to § 105(a)], not a final judgment"); *In re Quigley Co.*, 676 F.3d 45, 52 (2d Cir. 2012) ("[A]t issue here [is] the stay of litigation during the pendency of [debtor's] bankruptcy, rather than the entry of final judgment on a common law claim.").

This conclusion is consistent with the Article III concerns underlying *Stern*. According to *Stern*, Article III creates an independent judiciary by guaranteeing federal judges life tenure and an irreducible salary. *See Stern*, 564 U.S. at 483-84. But "Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III." *Id.* at 484. Thus, as a general rule, "Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty,'" and place that matter within the authority of an Article I bankruptcy court. *Id.* (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1856)).

The Temporary Injunction does not "withdraw from judicial cognizance any matter" of any kind whatsoever. *Id.* (quoting *Murray's Lessee*, 59 U.S. (18 How.) at 284). Instead, it *temporarily* enjoins a number of parties and non-parties from taking any action—including, presumably, pursuing a lawsuit—in furtherance of an optional redemption or liquidation of the Acis CLOs. To the extent that the Temporary Injunction affects any legal claims, it does not prevent an Article III court from entering a final judgment on those claims after the Temporary Injunction is lifted. In other words, it has no *res judicata* effect on those claims.

- 60 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-11    Filed 04/26/25    Page 969 of 1017    PageID 14596
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 841 of 1803    PageID 11587
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 61 of 84    PageID 98054

*Cf.* 43A C.J.S. *Injunctions* § 378 (2019) ("A temporary or preliminary injunction does not adjudicate the ultimate rights in controversy and it is not conclusive on the court on a subsequent hearing."). In this respect, the Temporary Injunction is similar to other mine-run, temporary bankruptcy injunctions—including the automatic stay, a hallmark of bankruptcy law that bars creditors from commencing or continuing any judicial action to recover a debt from the debtor after a bankruptcy petition is filed. *See* 11 U.S.C. § 362(a); *see also In re Quigley*, 676 F.3d at 52 ("Enjoining litigation to protect bankruptcy estates during the pendency of bankruptcy proceedings, unlike the entry of the final tort judgment at issue in *Stern*, has historically been the province of the bankruptcy courts."). Thus even if *Stern* prevents the bankruptcy court from entering a final judgment in the Trustee Adversary, it has no bearing on whether the bankruptcy court can issue the Temporary Injunction as part of the confirmed Plan.[35]

C

When a bankruptcy court issues a temporary injunction under § 105(a) as part of a confirmed plan, the bankruptcy court must still consider the four-prong preliminary injunction test. *See, e.g., Seatco*, 257 B.R. at 477 (applying traditional preliminary-injunction factors in approving a temporary plan injunction under *Zale*). The factors are (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury

---

[35]The present appeal does not involve, and the court does not address, the propriety of a plan provision that finally adjudicates a *Stern* claim. Nor does the court decide whether a bankruptcy court can grant preliminary relief on a *Stern* claim outside the context of a plan confirmation order.

- 61 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Page 1843 of 1804    Page 970 of 1017    PageID 14597
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 842 of 1803    PageID 11588
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 62 of 84    PageID 98055

if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *See, e.g., Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

The first factor, when applied to a temporary plan injunction, turns on whether the reorganization plan is likely to succeed. *See Seatco*, 257 B.R. at 477. In support of the Temporary Injunction, the bankruptcy court evaluated the likelihood of success of the Trustee Adversary, not the likelihood of success of the Plan. *See Acis II*, 2019 WL 417149, at *11-12. But the bankruptcy court separately determined that the Plan is feasible, *see id.* at *14, and its factual findings in that context support the conclusion that the Plan is substantially likely to succeed. The bankruptcy court found that Terry has an excellent track record as a portfolio manager; that Terry will be able to generate new business for Acis; and that Brigade is qualified to serve as the sub-advisor to Acis. *See id.* Thus in the absence of an optional redemption, it is substantially likely that the reorganized Acis will be able to satisfy its creditors' claims and emerge from bankruptcy.

The bankruptcy court did not clearly err in finding that, without the Temporary Injunction, Acis faces a substantial threat of irreparable injury: specifically, "evisceration of the Acis CLOs, by parties with unclean hands." *Id.* at *10. The bankruptcy court found that an optional redemption would leave Acis with nothing to manage, and thus no going-concern value and no means of satisfying its creditors' claims. *See id.* Highland and Neutra argue that Acis has an adequate remedy at law because all it stands to lose is money—i.e., the

- 62 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 04/25/04    Page 971 of 1017    PageID 14598
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 843 of 1803    PageID 11589
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 63 of 84    PageID 98056

management fees generated by the PMAs—and it can recover that money via a final judgment in the Trustee Adversary. But there is more at stake here than money. Without the Temporary Injunction, Acis will have no opportunity to *reorganize* instead of *liquidate*—and, "[a]s the Code contemplates, the Debtor should be given the opportunity to successfully reorganize." *Seatco*, 257 B.R. at 477. To deny Acis the chance to reorganize would be to subject it to a substantial threat of irreparable injury.

The bankruptcy court likewise did not clearly err in finding that the risk of harm to Acis in the absence of an injunction outweighs any potential harm to HCLOF. Indeed, the bankruptcy court found that there *is* no potential harm to HCLOF because "a rational investor would not want to liquidate the Acis CLOs, but rather would acquire them to do a reset under the Plan." *Acis II*, 2019 WL 417149, at *12. The Plan allows for just such a reset.[36] Thus HCLOF's complaint that it is losing money on the CLOs as they are currently structured lacks force.

Finally, the bankruptcy court did not clearly err in finding that the public interest favors an injunction. The public has an interest in allowing businesses to reorganize instead of liquidate. And, more important, there is a strong public interest *against* "allowing potential wrongdoers to complete the last step in what appears likely to have been a scheme

---

[36]HCLOF contends that a reset is impossible under the terms of an offering memorandum that it issued in November 2017—i.e., within a month after Terry's arbitration award was issued—but the bankruptcy court did not find this contention to be credible, and this court will not disturb the bankruptcy court's credibility findings in the absence of clear error.

Appellee Appx. 00837
013650

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/29/25   Page 972 of 1017   PageID 14599
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 844 of 1803   PageID 11590
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 64 of 84   PageID 98057

to strip [Acis] of its assets, steal its business, and leave it unable to pay creditors." *Id.* The

bankruptcy court therefore did not err by concluding that the four-part preliminary injunction

test supports the Temporary Injunction.

VIII

Highland and Neutra argue that the Trustee proposed the Plan in bad faith, contrary

to 11 U.S.C. § 1129(a)(3).

A

The first contention that Highland and Neutra advance is that Terry filed the

involuntary petitions in bad faith per 11 U.S.C. § 303(i)(2), and, as a result, any

subsequently-proposed plan was necessarily proposed in bad faith. Highland and Neutra

base their argument on *Natural Land Corp.*, 825 F.2d 296, in which the Eleventh Circuit held

that "the taint of a petition filed in bad faith must naturally extend to any subsequent

reorganization proposal." *Id.* at 298. It is not clear that this rule applies in the Fifth Circuit,

and at least one bankruptcy court has declined to apply it. *See Landing Assocs.*, 157 B.R. at

812. But assuming *arguendo* that *Natural Land Corp.* does apply, Highland and Neutra have

nonetheless failed to establish that Terry filed the involuntary petitions in bad faith.

1

The first question the court must resolve is what standard of review to apply. In their

briefing in the First Appeal, Neutra and Terry agreed that the question whether Terry filed

the involuntary petitions in good faith is a factual determination governed by the clear error

standard. At oral argument, however, Neutra challenged whether this is the correct standard

- 64 -

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-16 Filed 06/05/25 Page 973 of 1017 PageID 14600
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 845 of 1803 PageID 11591
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 65 of 84 PageID 98058

of review. But case law supports applying the clear error standard to the question of the petitioner's good faith. *See, e.g., In re Macke Int'l Trade, Inc.*, 370 B.R. 236, 245 (B.A.P. 9th Cir. 2007) ("The bankruptcy court's finding of the absence of bad faith is reviewed under the clearly erroneous standard."); *In re Funnel Sci. Internet Mktg., LLC*, 551 B.R. 262, 269 (E.D. Tex. 2016) ("The Court reviews the Bankruptcy Court's determination of bad faith for clear error as a finding of fact."); *Forever Green Athletic Fields, Inc. v. Dawson*, 514 B.R. 768, 785 (E.D. Pa. 2014) ("'Proving an involuntary petition was filed in bad faith requires an inquiry into the creditor's knowledge,' a factual question that is reviewed for clear error." (quoting *In re Bock Transp., Inc.*, 327 B.R. 378, 381 (B.A.P. 8th Cir. 2005))), *aff'd sub nom. In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015). Moreover, Fifth Circuit case law provides that, post-filing, "[a] bankruptcy court's determination that a debtor has acted in bad faith is a finding of fact reviewed for clear error." *In re Jacobsen*, 609 F.3d 647, 652 (5th Cir. 2010). The parties do not cite any cases suggesting that *de novo* review would apply; nor would it make sense to conduct a *de novo* review of what is, in large part, a question of the petitioner's intentions. The court will therefore apply the clear error standard.[37]

---

[37]There is some case law suggesting that, where a bankruptcy court dismisses an involuntary petition on the ground that the petitioner filed it in bad faith, the *dismissal* is reviewed for abuse of discretion. *See, e.g., Forever Green*, 804 F.3d at 335. But even then, the bankruptcy court's finding that the petitioner acted in bad faith is reviewed for clear error. *See In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007); *see also Jacobsen*, 609 F.3d at 652 (observing that "[a] bankruptcy court's determination that a debtor has acted in bad faith is a finding of fact reviewed for clear error," even while "[t]he decision to convert a Chapter 13 case to Chapter 7" on that ground "is reviewed for abuse of discretion").

Appellee Appx. 00839
Appx. 01890
013652

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-186    Filed 06/25/ 804    Page 974 of 1017    PageID 14601
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 846 of 1803    PageID 11592
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 66 of 84    PageID 98059

2

The court next considers what legal test governs a determination of bad faith. This is not a clear-cut or easy question: courts have developed a "dizzying array of standards" that can be applied to the issue. *Forever Green*, 804 F.3d at 335. Some of these tests include:

> (1) the "improper use" test, which finds bad faith when a petitioning creditor uses involuntary bankruptcy proceedings in an attempt to obtain a disproportionate advantage for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interests in a different forum[;]
>
> (2) the "improper purpose" test, which finds bad faith based upon the petitioner's improper motivation for filing the petition. Cases under this line of reasoning have emphasized that the petition was motivated by ill will, malice or for the purpose of harassing the debtor[;]
>
> (3) the "objective test," which essentially asks the question whether or not a reasonable person would have filed the involuntary petition under the same circumstances;
>
> (4) the "subjective test" which is almost identical to the "improper purpose" test in that they both look to the subjective motivation of the petitioning creditor for the filing; and
>
> (5) the "combined" or "two part" test which finds bad faith based upon consideration of both the subjective motivation and the objective reasonableness of the petitioning creditor(s).[38]

---

[38] The "combined test" is often guided by principles from Rule 9011, which mirrors Fed. R. Civ. P. 11. *See In re Landmark Distribs., Inc.*, 189 B.R. 290, 310 n.24 (Bankr. D.N.J. 1995). The Second and Eleventh Circuits have likewise observed that "a number of courts have sought to model the bad faith inquiry on the standards set forth in Bankruptcy Rule 9011." *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 106 (2d Cir. 2000) (citing *Gen. Trading, Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1501-02 (11th Cir. 1997)).

Appellee Appx. 00840
Appx. 01091
013653

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 18/06/25 804    Page 975 of 1017    PageID 14602
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 847 of 1803    PageID 11593
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 67 of 84    PageID 98060

*In re Landmark Distribs., Inc.*, 189 B.R. 290, 309-10 (Bankr. D.N.J. 1995) (citations and footnotes omitted).  Courts have also applied a "totality of circumstances" test, which essentially combines the improper use, improper purpose, and objective tests.  *See, e.g., Forever Green*, 804 F.3d at 336 (citing *In re John Richards Homes Bldg. Co.*, 439 F.3d 248, 255 n.2 (6th Cir. 2006)).  This test has been used by at least one bankruptcy court in this circuit.  *See In re TRED Holdings, L.P.*, 2010 WL 3516171, at *7 (Bankr. E.D. Tex. Sept. 3, 2010).

The Fifth Circuit has not expressly endorsed any particular standard, but it has considered both objective and subjective factors in deciding whether an involuntary petition was filed in bad faith.  *See In re Sims*, 994 F.2d 210, 222 (5th Cir. 1993) (considering whether "the filing of the petitions was 'motivated by ill will, malice or for the purpose of embarrassing or harassing the debtor[s],'" and whether petitioners "conducted a reasonable inquiry into the facts and the law prior to filing the petitions, as required by Bankruptcy Rule 9011" (alteration in original) (quoting *In re W. Side Cmty. Hosp., Inc.*, 112 B.R. 243, 258 (Bankr. N.D. Ill. 1990))).  Any test that considers *only* subjective or objective factors thus cannot be correct.  The court will therefore apply a totality of circumstances or combined test in analyzing Terry's good faith.

3

Applying the above principles, the court concludes that the bankruptcy court did not clearly err by holding that Terry filed the involuntary petitions in good faith.

On the question of Terry's alleged bad faith, the bankruptcy court found:

- 67 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-116   Filed 06/25/24   Page 976 of 1017   PageID 14603
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 848 of 1803   PageID 11594
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 68 of 84   PageID 98061

> the evidence suggested that Mr. Terry and his counsel filed the
> Involuntary Petitions out of a legitimate concern that Highland
> was dismantling and denuding Acis LP of all of its assets and
> value and that a bankruptcy filing was the most effective and
> efficient way to preserve value for the Acis LP creditors.

*Acis I*, 584 B.R. at 144. This finding is not clearly erroneous. The record before the

bankruptcy court showed that Acis and Highland had engaged in numerous transactions that

stripped Acis of much of its value, and that Terry only filed the involuntary petitions after

learning about these transactions during post-judgment discovery. *See supra* § I(C). Terry

testified that he believed bankruptcy was the best way to stop Acis from making further

fraudulent transfers, so that the entire community of Acis' creditors could receive an

equitable distribution of assets. The bankruptcy court was entitled to credit this testimony.

Terry also took the objectively reasonable step of consulting with bankruptcy counsel, albeit

briefly, before making the filing. He reasonably believed that Acis had fewer than 12

creditors based on a net-worth affidavit he received during post-judgment discovery in the

44th Judicial District Court of Dallas County. As for whether Acis was paying its debts as

they came due, Terry was aware of a number of accruing debts that Acis owed—including

his own judgment against Acis. He also reasonably concluded that if Acis were stripped of

its assets, then *no* creditor would be paid. The bankruptcy court did not clearly err by finding

that Terry filed the petitions based on a legitimate, good-faith belief that Acis was

fraudulently transferring assets to the detriment of all creditors.

Terry's motive, as characterized by the bankruptcy court, is a proper bankruptcy

purpose. The Third Circuit, in a case relied upon by Neutra, describes "protect[ing] against

- 68 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-11   Filed 05/02/25   Page 977 of 1017    PageID 14604
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 849 of 1803    PageID 11595
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 69 of 84    PageID 98062

the preferential treatment of other creditors or the dissipation of the debtor's assets" as legitimate purposes of an involuntary petition. *Forever Green*, 804 F.3d at 335.  An additional "purpose of an involuntary procedure is to provide a method for creditors to protect their rights against debtors who are not meeting their debts" by "forc[ing] [them] to submit to the jurisdiction of the bankruptcy court." *In re All Media Props., Inc.*, 5 B.R. 126, 137 (Bankr. S.D. Tex. 1980), *aff'd*, 646 F.2d 193 (5th Cir. Unit A May 1981) (adopting opinion of bankruptcy court).  The bankruptcy court's characterization of Terry's "concern that Highland was dismantling and denuding Acis LP of all of its assets and value," to the detriment of all of Acis' creditors, fits comfortably into the bankruptcy purposes described above.  *See Acis I*, 584 B.R. at 144.

Neutra argues that the timing of Terry's petitions reveals that he was not actually concerned about fraudulent asset transfers.  Neutra points out that Terry filed the involuntary petitions mere hours before a scheduled temporary injunction hearing in Texas state court, and following a single meeting with bankruptcy counsel.  According to Neutra, Terry's real motive was to collect his judgment in a more favorable forum.  But Neutra's argument constitutes, at best, a plausible alternative view of the evidence.  On appellate review, this court may not substitute its own interpretation of the evidence for that of the bankruptcy court in the absence of clear error.  *See Johnson Sw.*, 205 B.R. at 827.  Because the bankruptcy court did not commit clear error, its pertinent factual findings must be affirmed. *See id.*

Neutra cites a number of cases for the proposition that when an involuntary petition

- 69 -

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 6 Filed 85/16/25 1804 Page 978 of 1017 PageID 14605
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 850 of 1803 PageID 11596
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 70 of 84 PageID 98063

is filed as a collection remedy in what is essentially a two-party dispute, the petition is necessarily filed in bad faith. But Neutra's cases are distinguishable.

In *In re Smith*, 243 B.R. 169 (Bankr. N.D. Ga. 1999), the court found bad faith using a combined subjective and objective test where: (1) the petitioning creditor based its petition on the claim that the alleged debtor was fraudulently transferring assets, but had no evidence of any such transfers; (2) the case involved essentially a two-party dispute, and the petitioning creditor had sufficient remedies under state law; (3) the evidence showed that the petitioning creditor was motivated by a desire to shut down the debtor's business operations and to have the debtor criminally prosecuted; (4) the petitioning creditor failed to conduct critical research before filing its petition; and (5) the petitioning creditor failed to disclose the existence of additional creditors. *See id.* at 195-201. Here, by contrast, there *is* evidence that Highland was denuding Acis of assets; the bankruptcy court found that this is not a two-party dispute and that Terry's remedies under state law were insufficient; Terry conducted sufficient research before filing; and the bankruptcy court did not find that Terry was motivated by ill will or malice toward the debtor.

In *In re Frailey*, 144 B.R. 972 (Bankr. W.D. Pa. 1992), the court stated that "[a] bankruptcy court should refuse to enter an order for relief where petitioning creditors can go into state court to satisfy a debt." *Id.* at 977-78. But the cases cited by the *Frailey* court indicate that it did not make this statement in the context of a bad-faith filing analysis. *See id.* (citing *In re Cent. Hobron Assocs.*, 41 B.R. 444, 451 (D. Haw. 1984) (applying balancing test to exclude unpaid debt from "not generally paying" determination); *In re Kass*, 114 B.R.

Appellee Appx. 00844
Appx. 01895
013657

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-116   Filed 05/26/25   Page 979 of 1017   PageID 14606
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 851 of 1803   PageID 11597
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 71 of 84   PageID 98064

308, 309 (Bankr. S.D. Fla. 1990) (conducting abstention analysis under 11 U.S.C. § 305)).

Indeed, the court in *Frailey* declined (on other grounds) to award the alleged debtor damages

under § 303(i). *See id.* at 978. The case is therefore inapposite.[39]

*In re Tichy Elec. Co.*, 332 B.R. 364 (Bankr. N.D. Iowa 2005), states: "[t]he power of

an involuntary petition must be exercised for the good of the entire creditor body and for

legitimate bankruptcy purposes. It is not intended to be used in an exclusively self-serving

manner as a collection device." *Id.* at 376. But in the present case, the bankruptcy court

found that Terry acted out of concern for the entire body of Acis' creditors. And the

petitioning creditors in *Tichy* did not actually intend to liquidate or reorganize the debtor.

Rather, "[t]hey understood that after filing, some negotiations would occur, payments would

be made, and the case dismissed." *Id.* In other words, the petitioning creditor intended to

use the threat of bankruptcy as leverage to negotiate a settlement with the debtor. That does

not appear to be the case here. Finally, unlike the present appeals, there is no indication in

*Tichy* that the alleged debtor was fraudulently transferring assets in order to frustrate

collection efforts. *See generally id.*

---

[39]Similarly, *In re Tarletz*, 27 B.R. 787 (Bankr. D. Colo. 1983), states that "it is obvious that the use of the bankruptcy court as a routine collection device would quickly paralyze this Court." *Id.* at 794. But this was in the context of 11 U.S.C. § 305 abstention, *not* a bad-faith filing analysis. *See id.* at 793. And *In re Spade*, 258 B.R. 221 (Bankr. D. Colo. 2001), holds that where a petitioning creditor seeks only to gain a litigation advantage over the debtor, and does not seek the orderly distribution of the debtor's assets to all creditors, § 305 abstention is appropriate. *See id.* at 233. Not only does *Spade* not involve a § 303(i) bad-faith analysis, it is also factually inapposite: the bankruptcy court here found that Terry *was* motivated by concern for all of Acis' creditors.

Appellee Appx. 00845
Appx. 01896
013658

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Page 1853 of 1804 Page 980 of 1017   PageID 14607
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 852 of 1803   PageID 11598
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 72 of 84   PageID 98065

In sum, because the bankruptcy court did not commit clear error in determining that Terry filed the involuntary petitions in good faith, its relevant findings on this issue must be affirmed. Neutra and Highland's argument that the proposed Plan was tainted by Terry's bad-faith filing therefore fails to establish that the bankruptcy court committed reversible error.

B

Highland and Neutra maintain that the Plan fails to satisfy § 1129(a)(3) because it effects an unlawful result: allowing a portfolio manager to veto the wishes of the portfolio's owner. They cite *In re Noll*, 172 B.R. 122 (Bankr. M.D. Fla. 1994), for the premise that a reorganization plan cannot be proposed in order to obtain a result that would be unobtainable in state court. Highland and Neutra's reliance on *Noll* is misplaced. *Noll* is, by its own terms, of limited instructive value—it states that "one cannot define [bad faith] but will readily recognize it when one sees it." *Id.* at 124. The case is factually distinguishable because it involves a proposed plan that, in essence, would have constituted self-dealing by the plan proponent (who was not a disinterested trustee). *See id.* And it is difficult to square Highland and Neutra's characterization of the holding of *Noll*—that a reorganization plan cannot be used to obtain results that are unobtainable in state court—with Neutra's argument in the bad-faith filing context that filing involuntary petitions is *only* appropriate when the petitioner lacks adequate remedies in state court.

Highland and Neutra argue that the Plan is unlawful because it contains an overbroad release. They complain about language "vesting assets in the reorganized debtor 'free and

- 72 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 08/26/25    Page 981 of 1017    PageID 14608
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 853 of 1803    PageID 11599
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 73 of 84    PageID 98066

clear of all right, title, interests, claims, liens, encumbrances and charges'; purporting to compromise all claims against the estates; preserving estates' right of setoff and recoupment; and enjoining the 'continuation' of lawsuits against the debtors."  Highland & Neutra Third Appeal Br. 30.  But this language merely effects the express terms of 11 U.S.C. §§ 524(a) and 1141(c).  *See* 11 U.S.C. § 524(a) ("A discharge in a case under this title . . . operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor[.]"); 11 U.S.C. § 1141(c) ("[A]fter confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor."); *see also In re Coho Res., Inc.*, 345 F.3d 338, 343 (5th Cir. 2003) ("11 U.S.C. § 524(a) operates as an injunction against actions against a debtor subsequent to a discharge of a debt.  The bankruptcy discharge and § 524 injunction serve to give the debtor a financial fresh start." (internal quotation marks, emphasis, and footnote omitted)).  The challenged language does not render the Plan unlawful.[40]  Highland and Neutra have failed to demonstrate reversible error much less any error.

IX

The court now considers the argument of Highland and Neutra that the Plan fails to meet the requirements of 11 U.S.C. § 1129(a)(5).

---

[40]Highland and Neutra also cite several cases for the proposition that a plan is proposed in bad faith when it seeks merely to delay or frustrate the efforts of a secured creditor.  But Highland and Neutra are not secured creditors.

- 73 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1 86   Page 1855 of 1804   Page 982 of 1017   PageID 14609
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 854 of 1803   PageID 11600
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 74 of 84   PageID 98067

A

Section 1129(a)(5) provides that a plan may only be confirmed if:

> (A)(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

> (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

> (B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

*Id.* Neutra and Highland contend that the Plan is deficient because Terry is actually a non-statutory insider, and because Terry's ownership of Acis is not in the best interests of creditors, Acis' investors, or public policy.[41]

B

The court affirms the bankruptcy court's conclusion that Terry is not an insider.

---

[41]Neutra and Highland also contend that § 1129(a)(5)(A)(i) requires disclosure of the corporate structure of the reorganized debtor, and that the confirmed Plan is deficient because it merely states that Terry will have control over the structure of Acis instead of defining that structure in advance. In support of this argument, Neutra and Highland cite *In re GAC Storage El Monte, LLC*, 489 B.R. 747, 765-66 (Bankr. N.D. Ill. 2013). But the plan in *GAC Storage* did not fail because it left the management structure of the reorganized debtor undefined; rather, it failed because it did not disclose that the reorganized debtor's sole owner "intend[ed] to bring on either himself or another entity which he would control as the manager of [the debtor] and that the manager would have a 1% ownership interest in [the debtor]." *Id.* at 766. Thus *GAC Storage* is not controlling.

Appellee Appx. 00848
Appx. 01990
013661

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Page 1856 of 1804   Page 983 of 1017   PageID 14610
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 855 of 1803   PageID 11601
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 75 of 84   PageID 98068

11 U.S.C. § 101(31) provides a list of persons who are considered to be "insiders" of the debtor based on their relationship with the debtor. A person not included in the statutory list can nonetheless qualify as a "non-statutory insider" under certain circumstances. In deciding whether a person is a non-statutory insider, the court considers two factors: "(1) the closeness of the relationship between the [putative insider] and the debtor; and (2) whether the transactions between the [putative insider] and the debtor were conducted at arm's length." *In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992); *accord In re A. Tarricone, Inc.*, 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002). Highland and Neutra contend that a person can be a non-statutory insider based on his relationship with a statutory insider of the debtor, regardless of his relationship with the debtor itself. *See A. Tarricone*, 286 B.R. at 263-64. They then assert that the Trustee, as a person in control of the debtor, is a statutory insider. *See In re GSC, Inc.*, 453 B.R. 132, 158 n.31 (Bankr. S.D.N.Y. 2011). The court will assume *arguendo* that these legal assertions are correct. Highland, Neutra, and the Trustee agree that the bankruptcy court's determination of insider status is a question of fact that is reviewed for clear error. *See U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, ___ U.S. ___, 138 S. Ct. 960, 966 (2018).

Highland and Neutra posit that the relationship between the Trustee and Terry is unusually close. The controlling question under the first factor is whether the relationship is close enough for the alleged insider to gain advantage due to affinity. *See In re Rexford Props., LLC*, 557 B.R. 788, 797 (Bankr. C.D. Cal. 2016). Among the indicators of closeness cited by Highland and Neutra are: that the lawyers who represented Terry in the filing of the

Appellee Appx. 00849
Appx. 01109
013662

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1857 of 1804    Page 984 of 1017    PageID 14611
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 856 of 1803    PageID 11602
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 76 of 84    PageID 98069

involuntary petitions now represent the Trustee; that the Trustee relied on Terry's financial advice for a period of time after the Trustee's appointment; that Terry's expert witness in the arbitration was engaged by the Trustee to testify at the confirmation hearings; that Terry's counsel in related litigation in Guernsey testified as an expert at the confirmation hearings; and that Terry introduced Oaktree to the Trustee's predecessor. As for whether the Plan was negotiated at arm's length, Highland and Neutra point out that the Trustee did not solicit competing bids for Acis' equity, and that there was essentially no negotiation between the Trustee and Terry regarding that price.

But after reviewing the record, the court is not "left with the definite and firm conviction that a mistake has been committed." *Johnson Sw.*, 205 B.R. at 827 (quoting *Placid Oil*, 158 B.R. at 412). The Trustee testified that, before the bankruptcy cases, he had no relationship with Terry—and after he was appointed, his relationship with Terry was typical of that between a trustee and the debtor's largest creditor. He relied on Terry's financial advice for a brief time out of necessity, not affinity. Terry appears to have been represented by independent counsel in his dealings with the Trustee. The lack of an auction can be explained by the Trustee's assertion—credited by the bankruptcy court—that no other creditor was a logical choice to be Acis' equity owner. And the record indicates that there was at least some negotiation between Terry and the Trustee regarding the amount of the reduction of Terry's claim against the estates. Indeed, according to the Trustee's testimony, Terry thought the price for Neutra's equity was *too high*, but the Trustee held firm and Terry gave in. These facts plausibly support the findings that Terry and the Trustee were not so

- 76 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 05/21/804   Page 985 of 1017   PageID 14612
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 857 of 1803   PageID 11603
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 77 of 84   PageID 98070

close as to give Terry an advantage based on affinity, and that the Plan was negotiated at arm's length.  The bankruptcy court thus did not commit clear error by finding that Terry was not an insider.[42]

C

Highland and Neutra's remaining § 1129(a)(5) arguments—that Terry's appointment as Acis' new equity owner is contrary to the interests of creditors, investors, and the public—are unavailing.

Highland and Neutra first contend that "[c]onfirmation of a Chapter 11 plan of reorganization that was designed to allow an *insider* to obtain ownership of the reorganized debtor for an improper purpose is against public policy."  Highland & Neutra Third Appeal Br. 43 (emphasis added) (citing *In re S. Beach Sec., Inc.*, 606 F.3d 366, 371 (7th Cir. 2010)). But Terry is not an insider, and—as discussed *supra* at § VIII(A)(3)—he pursued Acis' involuntary bankruptcy in good faith and for a proper bankruptcy purpose.

Highland and Neutra also assert that "a bankruptcy court must, by considering the broader public policy interests, prevent the appointment of a proposed leader who has a conflict of interest or other financial or personal affiliation that would make his or her control inappropriate."  Highland & Neutra Third Appeal Br. 44.  They note that Terry is embroiled in a battle with HCLOF over control of the subordinated notes, and with Highland itself over

---

[42]As an additional ground for finding that Terry is an insider, Highland and Neutra assert that Terry had access to voluminous insider information during the pendency of these cases.  But they cite no evidence in the record on appeal in support of this assertion.

- 77 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 08/25/25   Page 986 of 1017   PageID 14613
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 858 of 1803   PageID 11604
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 78 of 84   PageID 98071

myriad issues in state court. But this assertion is not entirely accurate: it is *Acis*, not Terry, who is battling with HCLOF over the subordinated notes. And even if Terry has disagreements with Highland in state court, this fact is not necessarily dispositive of whether the Plan is in the public interest. According to case law cited by Highland and Neutra, there are numerous factors to consider in deciding whether a proposed plan is in the public interest, and the weight given to each factor varies depending on the circumstances of the case. *See In re Digerati Techs., Inc.*, 2014 WL 2203895, at *5 (Bankr. S.D. Tex. May 27, 2014). Relevant factors include whether the appointment "perpetuate[s] incompetence, lack of direction, [or] inexperience," and whether "the individual [is] capable and competent to serve in the proposed capacity assigned to him." *Id.* The bankruptcy court found that Terry is "well qualified to reorganize" Acis and that his new role "will be similar to the role he very successfully performed for" Acis. *Acis II*, 2019 WL 417149, at *14. Giving appropriate weight to all of the public policy factors in the context of this case—particularly in light of the bankruptcy court's finding that Highland has "unclean hands," *id.* at *10—the court concludes that the bankruptcy court did not clearly err by finding that confirmation of the Plan was consistent with public policy.

X

Finally, the court considers the contention of Highland and Neutra that the Plan does not satisfy the cram-down requirements of 11 U.S.C. § 1129(b).

It is familiar jurisprudence that the acceptance of all impaired classes of claims or interests required by § 1129(a)(8) is not necessary for plan confirmation when § 1129(b) is

- 78 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-116    Filed 06/25/1804    Page 987 of 1017    PageID 14614
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 859 of 1803    PageID 11605
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 79 of 84    PageID 98072

satisfied.  Section 1129(b) permits confirmation when all other requirements of § 1129(a) are met and "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." § 1129(b)(1).  The court reviews the bankruptcy court's finding that the cram-down requirements are met for clear error.  *See In re Block Shim Dev. Co.-Irving*, 118 B.R. 450, 452 (N.D. Tex. 1990) (Fitzwater, J.).

Highland and Neutra challenge the bankruptcy court's finding that the Plan meets these requirements, contending the Plan is neither fair nor equitable to them, in violation of § 1129(b)(1).[43]  More specifically, Highland and Neutra assert that the Plan violates the absolute priority rule and its corollaries.

Under the absolute priority rule, "fairness and equity require[] that 'the creditors . . . be paid before the stockholders [can] retain [equity interests] for any purpose whatever.'" *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle Street P'ship*, 526 U.S. 434, 444 (1999) (last alteration in original) (quoting *N. Pac. R.R. Co. v. Boyd*, 228 U.S. 482, 508 (1913)). The reason for the rule is "the danger inherent in any reorganization plan proposed by a debtor . . . that the plan will simply turn out to be too good a deal for the debtor's owners." *Id.*  The rule is embodied in § 1129(b)(2)(B)(ii).  *See LaSalle*, 526 U.S. at 449.  The debtor's old equity owners *can* retain their interest in the debtor if they contribute new value to the bankruptcy estate, and this new value "makes the senior creditors (and the estate as a whole)

---

[43]Highland and Neutra also argue that the requirements of § 1129(a)(3) are not met. For the reasons discussed *supra* at § VIII, the court rejects this argument.

- 79 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-186   Filed 06/02/25   Page 988 of 1017   PageID 14615
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 860 of 1803   PageID 11606
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 80 of 84   PageID 98073

better off." *In re Castleton Plaza, LP*, 707 F.3d 821, 821 (7th Cir. 2013). The way to assess whether the value contributed by the old equity owners makes the senior creditors better off is to allow for a market valuation of the debtor's equity. *See LaSalle*, 526 U.S. at 454-58.

Highland and Neutra contend that the Plan violates the absolute priority rule because there was no market test to assess the value of Acis' equity—instead, the Trustee unilaterally selected the $1 million number without soliciting competing bids. But the absolute priority rule, by its own terms, only applies when the debtor's old equity owners will retain their equity interest after bankruptcy. *See LaSalle*, 526 U.S. at 444. Where, as here, a non-insider creditor becomes the debtor's new owner, there is no "danger . . . that the plan will simply turn out to be too good a deal for the debtor's [old] owners." *Id.* Whatever the significance of the Trustee's failure to solicit competing bids, it does not violate the absolute priority rule in this instance.

Highland and Neutra also argue that the Plan violates a corollary of the absolute priority rule: "that a senior class cannot receive more than full compensation for its claims." *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) (quoting *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612 (Bankr. D. Del. 2001)). They assert that "to obtain confirmation of a reorganization plan that completely extinguishes equity interests, the plan's proponent must prove that there is no value left once the creditors have had their turn." Highland & Neutra Third Appeal Br. 47 (quoting *In re Dave's Detailing, Inc.*, 2015 WL 4601726, at *16 (Bankr. S.D. Ind. July 30, 2015)). This, in turn, requires a showing that no creditor is paid more than in full. *See In re MCorp Fin., Inc.*, 137 B.R. 219, 235 (Bankr. S.D.

- 80 -

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/25   Page 989 of 1017   PageID 14616
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 861 of 1803   PageID 11607
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 81 of 84   PageID 98074

Tex. 1992), *abrogated on other grounds by In re Briscoe Ents., Ltd., II*, 994 F.2d 1160, 1164 n.11 (5th Cir. 1993).  Highland and Neutra maintain that the Plan violates this rule in two ways.

First, they contend that the bankruptcy court wrongly inflated the value of the secured portion of Terry's partially-secured claim from approximately $634,000 to $1 million.  This argument rests on an erroneous understanding of the Plan.  The Plan reduces the *total* value of Terry's partially-secured claim—i.e., the sum of both the secured and unsecured portions of his claim—by $1 million, and then treats the remaining *total* balance of Terry's claim as a general unsecured claim.  The Plan does not inflate the value of his secured claim.

Second, Highland and Neutra argue that, without a market test of Acis' value, the bankruptcy court could not have determined whether Terry was overcompensated when he received Acis' equity in exchange for a $1 million reduction in his claim.  But there *was* a market valuation in the present case.  In *LaSalle* the Supreme Court suggested (but did not decide) that the termination of exclusivity—i.e., allowing any interested person to submit a competing reorganization plan—can constitute a sufficient market test of a debtor's value.  *See LaSalle*, 526 U.S. at 458.  Since then, courts have concluded in a number of cases that opening the bankruptcy process to competing plan proposals is a valid market test.  *See H.G. Roebuck & Son, Inc. v. Alter Commc'ns, Inc.*, 2011 WL 2261483, at *7 (D. Md. June 3, 2011) ("Indeed, if the Bankruptcy Court simply allowed Roebuck to file a competing plan, and the creditors found that plan to be inferior, they could still vote for Alter's original plan, and [*LaSalle*] would have been satisfied."); *Dave's Detailing*, 2015 WL 4601726, at *18

Appellee Appx. 00855

Appx. 04106
013668

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-11    Filed 06/25/804    Page 990 of 1017    PageID 14617
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 862 of 1803    PageID 11608
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 82 of 84    PageID 98075

("The termination of exclusivity provides an open market for competition in the form of competing plans."); *In re Situation Mgmt. Sys., Inc.*, 252 B.R. 859, 866 (Bankr. D. Mass. 2000) ("[T]he competing plan approach provides for a more informed process for creditors and to interested bidders than an auction of equity interests in the context of a Debtor's plan."); *In re Homestead Partners, Ltd.*, 197 B.R. 706, 716-17 (Bankr. N.D. Ga. 1996) ("Competing plans certainly would foster alternate bids for control of the reorganized debtor, and would thereby dispel any concerns regarding the necessity and value of the shareholder's offer."); *In re SM 104 Ltd.*, 160 B.R. 202, 227 (Bankr. S.D. Fla. 1993) ("[A]t least in all but the largest bankruptcy cases, the disclosure and confirmation procedures provided by Chapter 11 offer an acceptable alternative for marketing the ownership interests of the reorganized debtor.").[44]

No party in the present case held the exclusive right to propose a reorganization plan. Highland and Neutra could have proposed a competing plan if they believed that the Trustee's plan undervalued Acis' equity. They did not do so. Thus the bankruptcy court did not err by approving a Plan that valued Acis' equity at $1 million.

---

[44]Highland and Neutra's argument to the contrary, based on the Seventh Circuit's opinion in *Castleton*, 707 F.3d 821, is unpersuasive. The court in *Castleton* concluded that the termination of exclusivity was insufficient to constitute a market test in the context of the absolute priority rule. *See id.* at 823-24. The court applied that rule because the person receiving the debtor's equity under the plan was an insider. *See id.* In contrast, Terry is not an insider, and the absolute priority rule does not apply in the present case. *See Dave's Detailing*, 2015 WL 4601726, at *18 ("The holding in *Castleton Plaza* applies to shareholders or insiders—not to non-insider third parties—obtaining equity in a reorganized debtor.").

- 82 -

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 151-16    Page 1864 of 1804    Page 991 of 1017    PageID 14618
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 863 of 1803    PageID 11609
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 83 of 84    PageID 98076

XI

On April 12, 2019 Acis filed a motion to substitute itself as the appellee in the Third

Appeal. It maintains that, once the Plan took effect, Acis became the Trustee's successor-in-

interest. But as Acis recognizes, "the Federal Rules of Bankruptcy Procedure applicable to

this case, those numbered 8001-8028, do not provide a specific rule governing substitution

of parties in bankruptcy appeals to the district court." Acis Mot. Substitute 3. Acis also fails

to cite, and the court has not found, any case in which a district court allowed such party

substitution while an appeal was pending. Accordingly, the court in its discretion denies

Acis' motion. *Cf. Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 743 (7th

Cir. 1985) (holding that substitution of parties under an analogous rule, Fed. R. Civ. P. 25(c),

is within court's discretion). If Acis wishes to take the place of the Trustee in any further

appeal to the Fifth Circuit, it may make a request under the procedure prescribed by Fed. R.

App. P. 43.

\*    \*    \*

In the First Appeal, the clerk is directed to strike ECF Doc. No. 2 from the docket of

No. 3:18-CV-1084-D and to refile that document in No. 3:18-CV-1057-D with a filing date

of April 27, 2018.

The court DISMISSES the appeals of the orders denying intervention in Nos. 3:18-

CV-1056-D and 3:18-CV-1084-D, and DISMISSES the appeals of the orders for relief in

Nos. 3:18-CV-1057-D and 3:18-CV-1073-D.

The court AFFIRMS the Break-Up Fee and Expense Reimbursement order at issue

Appellee Appx. 00857
Appx. 01198
013670

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Page 1865 of 1804    Page 992 of 1017    PageID 14619
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 864 of 1803    PageID 11610
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 84 of 84    PageID 98077

in the Second Appeal, No. 3:18-CV-1822-D.

In the Third Appeal, No. 3:19-CV-0291-D, the court AFFIRMS the bankruptcy court's order confirming the Plan and approving the disclosure statement.

The court DENIES Acis' April 12, 2019 motion to substitute party.

AFFIRMED in part; DISMISSED in part.

July 18, 2019.

_____
SIDNEY A. FITZWATER
SENIOR JUDGE

Appellee Appx. 00858
013671

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/1804   Page 993 of 1017   PageID 14620
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 865 of 1803   PageID 11611

# APPENDIX 10

Appellee Appx. 00859

Appx. 01119
013672

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 07/06/25 1804    Page 994 of 1017    PageID 14621
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 866 of 1803    PageID 11612

Case: 19-10847    Document: 00515903826    Page: 1    Date Filed: 06/17/2021

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 17, 2021

Lyle W. Cayce
Clerk

No. 19-10847

IN THE MATTER OF: ACIS CAPITAL MANAGEMENT, L.P.,

*Debtor*,

------------------------------

NEUTRA LIMITED;

*Appellant*,

*versus*

ROBIN E. PHELAN, CHAPTER 11 TRUSTEE,

*Appellee*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CV-291

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/804 Page 995 of 1017   PageID 14622
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 867 of 1803   PageID 11613
Case: 19-10847   Document: 00515903826   Page: 2   Date Filed: 06/17/2021

No. 19-10847

Before SMITH, HO, and OLDHAM, *Circuit Judges*.

PER CURIAM:*

Having thoroughly reviewed the parties' briefs and arguments, we conclude the district court's judgment affirming the bankruptcy court's order confirming the Chapter 11 plan must be AFFIRMED. We further conclude the appeal of the district court's plan injunction is moot and must be DISMISSED.

---

* Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

Appellee Appx. 00861

Appx. 01112

013674

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-11    Filed 05/30/25    Page 996 of 1017    PageID 14623
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 868 of 1803    PageID 11614
Case: 19-10847    Document: 00515903827    Page: 1    Date Filed: 06/17/2021

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

June 17, 2021

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW

Regarding:  Fifth Circuit Statement on Petitions for Rehearing
            or Rehearing En Banc

            No. 19-10847    Neutra v. Phelan
                            USDC No. 3:19-CV-291

Enclosed is a copy of the court's decision.  The court has entered
judgment under Fed. R. App. P. 36.  (However, the opinion may yet
contain typographical or printing errors which are subject to
correction.)

Fed. R. App. P. 39 through 41, and 5th Cir. R. 35, 39, and 41
govern costs, rehearings, and mandates.  **5th Cir. R. 35 and 40
require you to attach to your petition for panel rehearing or
rehearing en banc an unmarked copy of the court's opinion or order.**
Please read carefully the Internal Operating Procedures (IOP's)
following Fed. R. App. P. 40 and 5th Cir. R. 35 for a discussion
of when a rehearing may be appropriate, the legal standards applied
and sanctions which may be imposed if you make a nonmeritorious
petition for rehearing en banc.

Direct Criminal Appeals.  5th Cir. R. 41 provides that a motion
for a stay of mandate under Fed. R. App. P. 41 will not be granted
simply upon request.  The petition must set forth good cause for
a stay or clearly demonstrate that a substantial question will be
presented to the Supreme Court.  Otherwise, this court may deny
the motion and issue the mandate immediately.

Pro Se Cases.  If you were unsuccessful in the district court
and/or on appeal, and are considering filing a petition for
certiorari in the United States Supreme Court, you do not need to
file a motion for stay of mandate under Fed. R. App. P. 41.  The
issuance of the mandate does not affect the time, or your right,
to file with the Supreme Court.

Court Appointed Counsel.  Court appointed counsel is responsible
for filing petition(s) for rehearing(s) (panel and/or en banc) and
writ(s) of certiorari to the U.S. Supreme Court, unless relieved
of your obligation by court order.  If it is your intention to
file a motion to withdraw as counsel, you should notify your client
promptly, **and advise them of the time limits for filing for
rehearing and certiorari**.  Additionally, you MUST confirm that
this information was given to your client, within the body of your
motion to withdraw as counsel.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 07/06/25   Page 997 of 1017   PageID 14624
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 869 of 1803   PageID 11615

Case: 19-10847    Document: 00515903827    Page: 2    Date Filed: 06/17/2021

The judgment entered provides that appellant pay to appellee the
costs on appeal.  A bill of cost form is available on the court's
website www.ca5.uscourts.gov.

                              Sincerely,

                              LYLE W. CAYCE, Clerk

                              *Charles Whitney*

                              By: _____
                              Charles B. Whitney, Deputy Clerk

Enclosure(s)

Ms. Annmarie Antoniette Chiarello
Mr. Phillip Lewis Lamberson
Mr. Jeffrey Scott Levinger
Mrs. Rakhee V. Patel

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-1186   Filed 07/06/25   Page 998 of 1017   PageID 14625
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 870 of 1803   PageID 11616

# APPENDIX 11

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-1186   Filed 05/26/25   Page 999 of 1017    PageID 14626
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 871 of 1803   PageID 11617

Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 1 of 27

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) **Related to Docket No. 86** |
| | ) |

**OBJECTION OF THE DEBTOR TO MOTION OF
OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO TRANSFER VENUE OF THIS CASE TO THE UNITED STATES
BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS**

The above-captioned debtor and debtor in possession (the "Debtor") hereby

objects to the motion to transfer venue of this case [Docket No. 86] (the "Motion to Transfer") to

the Northern District of Texas (the "Texas Bankruptcy Court"), filed by the Official Committee

of Unsecured Creditors (the "Committee").

In support of this objection, the Debtor respectfully states as follows:

**Preliminary Statement**

1.       The Debtor owns and manages a sophisticated financial services and

money management business that has assets and interests all over the world.  The amounts at

stake in this case involve hundreds of millions of dollars in terms of asset values and asserted

liabilities.  The Debtor's creditors are sophisticated parties who are either represented by highly

qualified counsel or are attorneys themselves.  The top 20 unsecured creditors in this case consist

almost entirely of litigation claimants and law firms.  There are no "mom and pop" creditors who

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Appellee Appx. 00865
Appx. 01116
013678

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 08/06/25 1804   Page 1000 of 1017   PageID 14627
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 872 of 1803   PageID 11618
Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 2 of 27

would be prejudiced if they were not provided with ready access to a local bankruptcy court.

          2.       Further, the Texas Bankruptcy Court has no special familiarity with the Debtor or its current management. The Debtor's restructuring efforts are now led by Bradley Sharp as Chief Restructuring Officer (the "CRO") who has had no prior involvement with either Acis (as defined below) or the Texas Bankruptcy Court with respect to this matter. The Texas Bankruptcy Court also knows little about the Debtor's business or financial affairs, aside from its prior relationship with Acis. The Debtor is no longer affiliated with Acis and, in fact, is directly adverse to Acis, which now asserts various contested litigation claims against the Debtor. Hence, the Committee's opening position that this case should be transferred to the Texas Bankruptcy Court is little more than a litigation ploy. The Committee has decided, based on prior rulings of the Texas Bankruptcy Court in the Acis cases, that such forum would be more advantageous from a litigation perspective *vis-à-vis* the Debtor. That is not an appropriate basis to transfer venue.

          3.       The fact that the Debtor is headquartered in Dallas, Texas also does not mean that this case should be transferred there. The Debtor's assets, interests, and contractual entanglements are dispersed throughout this country and the world. As an example, the Debtor has assets under management, including its own proprietary assets and those of its clients, through various related parties in Asia, South America, and Europe. The Debtor has already brought a motion in this case to appoint a foreign representative in order to manage its various foreign interests [Docket No. 68], including those in pending proceedings in Bermuda and the Cayman Islands. The Debtor's principal assets in the United States consist of custodial and non-custodial interests in investments located all over the country. The Debtor's primary brokerage

2

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-18 6   Filed 08/04/25 1804   Page 1001 of 1017   PageID 14628
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 873 of 1803   PageID 11619

Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 3 of 27

accounts that hold the bulk of the Debtor's liquid and illiquid securities are located in New York

City with Jefferies, LLC ("Jefferies"). The Debtor is also the subject of two pending lawsuits in

the Delaware Chancery Court, one of which involves claims brought by the Redeemer

Committee of the Highland Crusader Fund (the "Redeemer Committee"), a member of the

Committee. Another member of the Committee, UBS Securities LLC and UBS AG London

Branch ("UBS"), has longstanding litigation pending against the Debtor in New York state court

(not Texas). Predictably, the Debtor's professionals and those of its creditors are located around

the country. Given the amounts at stake in this case and the complexity of the Debtor's assets

and liabilities, venue should not be determined by how many miles the Debtor's employees or

professionals or those of its creditors are located from the courthouse. All parties reside at

various commercial centers around this country and can easily travel wherever necessary in order

to handle the important matters in this case.

        4.     Further, the pendency of the involuntary bankruptcy cases of Acis Capital

Management, L.P. and Acis Capital Management GP, LLP (together, "Acis") in Dallas, Texas

does not make the Texas Bankruptcy Court a preferable forum for this case. Acis's involuntary

cases were commenced by Joshua Terry ("Terry"), who now owns and manages Acis and

represents that entity on the Committee. Terry assumed ownership of Acis by virtue of a

contested plan of reorganization that was confirmed by the Texas Bankruptcy Court and which is

now the subject of a pending appeal.[2] ***The interests of Acis are directly adverse to those of this***

---

[2] Although a stay of the confirmation order was sought, no stay was granted despite the ongoing appeal of that
order. The Texas Bankruptcy Court thus has limited ongoing jurisdiction at this juncture.

DOCS_SF:102198.7 36027/002

Appellee Appx. 00867
Appx 01118
013680

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 08/26/25 1804   Page 1002 of 1017   PageID 14629
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 874 of 1803   PageID 11620

Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 4 of 27

*estate.*[3]  The Debtor and Acis have been, and continue to be, involved in highly contentious litigation, including matters that are the subject of multiple appeals from decisions of the Texas Bankruptcy Court and pending fraudulent transfer claims brought by Acis against the Debtor in the Texas Bankruptcy Court.  The Debtor and Acis assert various substantial disputed and unliquidated claims against each other.  Further, ***the Debtor's current business is unrelated to Acis***, which is focused on managing certain collateralized loan obligations (or CLOs) in which the Debtor no longer has any direct interest.  The Committee also does not establish how the prior testimony of the Debtor's representatives in the Acis bankruptcy is relevant to the instant chapter 11 case.[4]  Aside from the Debtor's prior relationship with Acis, the Texas Bankruptcy Court is not familiar with the Debtor's business and assets or the Debtor's liabilities that need to be restructured in this case.  ***The Debtor's restructuring efforts are now managed by an independent and highly qualified CRO*** who has had no prior involvement with Acis or its bankruptcy proceedings.  Hence, while it may be in the interests of ***the Acis estate*** for this matter to be transferred to the Texas Bankruptcy Court, it is certainly not in the best interests of ***the Debtor's estate*** or the parties to these proceedings, which is the only thing that matters.

5.      As the Committee admits, the Debtor is entitled to substantial deference with respect to its choice of forum for its bankruptcy case.  This Court is indisputably a legally proper forum given that the Debtor is a Delaware limited partnership.  This Court also presents a convenient forum given that the Debtor's assets are so widely dispersed and there has been

---

[3]  Terry, in his personal capacity and on behalf of his spouse, also purports to hold an unsecured claim against the Debtor's estate in the amount of $425,000, which the Debtor has designated as contingent, unliquidated, and disputed.
[4]  Presumably, senior management personnel of the Debtor have provided all manner of testimony in the various pending litigation matters around the country involving or otherwise implicating the Debtor.

4

Appellee Appx. 00868
Appx 013681
013681

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 08/06/25 1804    Page 1003 of 1017    PageID 14630
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 875 of 1803    PageID 11621

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 5 of 27

extensive ongoing litigation against the Debtor in the Delaware Chancery Court, including

litigation commenced by the Redeemer Committee, a member of the Committee.  In sum, aside

from the Committee's perceived litigation advantage before the Texas Bankruptcy Court, there is

no credible, let alone valid, basis for this case to be transferred to the Texas Bankruptcy Court

where an adverse proceeding is pending when this Court presents a perfectly appropriate forum

for effectuating a successful reorganization of the Debtor's affairs.  The Debtor therefore urges

this Court to deny the Motion to Transfer filed by the Committee.

## Background

### A.    The Debtor's Bankruptcy Filing

6.    On October 16, 2019 (the "Petition Date"), the Debtor commenced this

case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The

factual background regarding the Debtor, including its current and historical business operations

and the events precipitating the chapter 11 filing, is set forth in detail in the *Declaration of Frank*

*Waterhouse in Support of First Day Motions*, which is incorporated herein by reference.

7.    The Debtor continues in the possession of its property and continues to

operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108

of the Bankruptcy Code.

8.    No trustee or examiner has been appointed in the Debtor's chapter 11

case.

9.    On October 29, 2019, the United States Trustee appointed the Committee,

which consists of four members:  (1) the Redeemer Committee; (2) UBS; (3) Acis; and (4) Meta-

e Discovery.  The Committee is represented by Sidley & Austin, with one of its lead attorneys

DOCS_SF:102198.7 36027/002

Appellee Appx. 00869

Appx 01120
013682

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 08/06/25 1804   Page 1004 of 1017   PageID 14631
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 876 of 1803   PageID 11622
Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 6 of 27

based in New York City. Since retaining counsel, the Committee's first order of business was to file the Motion to Transfer.

**B.    The Debtor's Organizational Structure and Governance**

10.    The Debtor is a Delaware limited partnership. Its limited partnership interests are owned as follows: (a) 99.5% by Hunter Mountain Trust, a Delaware statutory trust based in New York, (b) 0.1866% by Dugaboy Investment Trust, a Delaware trust, (c) 0.0627% by Mark Okada, personally and through family trusts, and (d) 0.25% by Strand Advisors, Inc., a Delaware corporation. In sum, 99.94% of the Debtor's partnership interests are held through Delaware entities. Strand Advisors, Inc. also owns 100% of Debtor's general partnership interest. This Delaware entity, through its principal James Dondero, ultimately controlled the Debtor as of the Petition Date.

11.    There is now new governance in place. On October 29, 2019, the Debtor filed its motion to retain Bradley Sharp as the CRO [Docket No. 75] (the "CRO Motion"). Pursuant to the CRO Motion, the Debtor seeks to retain the CRO with certain independent and exclusive powers and significant restrictions on termination. Specifically, the CRO will have sole authority over claims and transactions involving insiders. The CRO was previously appointed chief restructuring officer in Delaware cases such as *Variant Holding Company LLC* before Judge Brendan Shannon and *Woodbridge Group of Companies LLC* before Judge Kevin Carey (retired). The CRO Motion is set for hearing on November 19, 2019, the same date as the Motion to Transfer.[5]

---

[5] In an apparent effort to prevent this Court from considering the CRO Motion, the Committee sought to have the Motion to Transfer set for hearing on shortened notice for November 7, but this Court denied that request before the Debtor filed its response.

6

Appellee Appx. 00870
Appx. 01121
013683

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 08/26/25 1804   Page 1005 of 1017   PageID 14632
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 877 of 1803   PageID 11623
Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 7 of 27

12.     Also on October 29, 2019, the Debtor filed its motion for approval of certain protocols with respect to ordinary course transactions [Docket No. 77] (the "Protocols Motion"). Pursuant to the Protocols Motion, the Debtor seeks approval of certain protocols to allow the Debtor to conduct ordinary course business in an uninterrupted and transparent manner, both for the benefit of the Debtor's estate and its creditors and for the investors to whom the Debtor provides services. The Protocols Motion also is set for hearing on November 19.

13.     The CRO Motion and the Protocols Motion are intended to bring independence and clarity to the Debtor's governance structure. Based on these motions, there should be no doubt that qualified, independent management is in place with the Debtor and will be operating under a specified set of protocols and procedures to ensure that estate assets are properly preserved.

**C.     The Debtor's Business, Assets, and Creditor Relationships are Complex and International in Scope**

14.     The Debtor is a multibillion-dollar global alternative investment manager. The Debtor operates a diverse investment platform, serving both institutional and retail investors worldwide. In addition to high-yield credit, the Debtor's investment capabilities include public equities, real estate, private equity and special situations, structured credit, and sector- and region-specific verticals built around specialized teams. The Debtor also provides shared services to its affiliated registered investment advisors.

15.     Pursuant to various contractual arrangements, the Debtor provides money management and advisory services for approximately $2.5 billion of assets under management. Separately, the Debtor provides shared services for approximately $7.5 billion of assets managed

7

Appellee Appx. 00871
Appx 01122
013684

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 09/25/1804   Page 1006 of 1017   PageID 14633
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 878 of 1803   PageID 11624
Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 8 of 27

by a variety of affiliated and unaffiliated entities, including other affiliated registered investment advisors.

16.     Although the Debtor is headquartered in Dallas, Texas, and most of its employees are based there, the Debtor's affiliates and related entities maintain offices in many international locales, including in Buenos Aires, Rio de Janeiro, Singapore, and Seoul. The Debtor primarily generates revenue from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates. These funds have investments all over the world. Specifically, the Debtor has its own proprietary investment assets and those of its clients held through various affiliates in Asia, South America, and Europe.

17.     On October 29, 2019, the Debtor filed a motion to appoint a foreign representative in order to manage its various foreign interests [Docket No. 68] (the "Foreign Representative Motion"), including those in pending proceedings filed by the Redeemer Committee in Bermuda and the Cayman Islands.

18.     The Debtor's principal assets in the United States consist of custodial and non-custodial interests in investments located all over the country. The Debtor has brokerage accounts at Jefferies in New York City that hold the bulk of the Debtor's liquid and illiquid securities. As of the Petition Date, the Debtor owed Jefferies approximately $30 million on account of margin borrowings. The Debtor's other principal secured creditor, Frontier State Bank, is based in Oklahoma City and is owed approximately $5.2 million as of the Petition Date.

8

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 55-6    Filed 06/25/804Page 1007 of 1017    PageID 14634
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 879 of 1803    PageID 11625

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 9 of 27

**D.**    **The Debtor Has Litigation Pending in Delaware Chancery Court and New York**

19.    Aside from Acis, no Committee members are based in Dallas and two of them have litigation pending against the Debtor outside of Texas. As discussed further below, the Redeemer Committee commenced litigation against the Debtor in the Delaware Chancery Court and UBS commenced litigation against the Debtor in New York state court. The chairman and the majority of the members of the Redeemer Committee are located in Chicago. UBS's business representatives are based in or around New York City. The only trade vendor on the Committee, Meta-e Discovery, is based in Connecticut. Yet another allegedly substantial creditor of the Debtor, Patrick Daugherty ("Daugherty"), also has litigation pending against the Debtor in Delaware Chancery Court, including a matter that went to trial on October 14, 2019, just prior to the Petition Date, before it was stayed.

20.    *Redeemer Committee Litigation: Delaware Chancery Court and New York Arbitration.* The Debtor's bankruptcy filing was precipitated by an arbitration award in favor of the Redeemer Committee (the "Award") initially issued against the Debtor in March 2019 by a panel of the American Arbitration Association based in New York City. The Debtor was formerly the investment manager for the Highland Crusader Fund (the "Crusader Fund"), which was based in Bermuda and the subject of insolvency proceedings there. On July 5, 2016, the Redeemer Committee (a) terminated and replaced the Debtor as investment manager of the Crusader Fund, (b) commenced an arbitration against the Debtor in New York City, and (c) commenced litigation against the Debtor in Delaware Chancery Court. In September 2018, the Debtor and the Redeemer Committee participated in a multi-day evidentiary hearing in New York City. In March 2019, following post-trial briefing, the arbitration panel issued its Award

9

Appellee Appx. 00873
Appx. 01124
013686

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 51-8 Exhibit 6 Filed 08/05/25 1804 Page 1008 of 1017    PageID 14635
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 880 of 1803    PageID 11626
Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 10 of 27

finding in favor of the Redeemer Committee on a variety of claims and requiring the Debtor to

pay a gross amount of $189 million, subject to certain offsets and deductions.  The Redeemer

Committee set a hearing in the Delaware Chancery Court for October 8, 2019, in order to seek

entry of a judgment with respect to the Award.  The hearing was subsequently continued to

October 16, 2019.  The Debtor filed this case just prior to that hearing.  The Redeemer

Committee is represented by Jenner & Block attorneys based in Chicago, Illinois.

21.    *UBS Litigation:  New York State Court.*  The Debtor and UBS are parties

to a long-running litigation originally filed by UBS in February 2009 in the New York Supreme

Court, County of New York.  At bottom, UBS alleges that the Debtor and certain funds

fraudulently induced UBS to restructure a transaction at the expense of UBS and then these

parties and other entities fraudulently diverted certain assets to prevent UBS from obtaining a

recovery on its claims.  There have been numerous prejudgment motions and appeals in this

case.  The claims that remain consist primarily of breach of contract, fraudulent inducement and

alter ego claims against certain defendants, a breach of implied covenant of good faith and fair

dealing claim against the Debtor, and fraudulent conveyance claims against all defendants.  UBS

has asserted damages in excess of $686 million in the litigation, which the Debtor and the other

defendants continue to vigorously dispute.  The case was bifurcated, and the contract claims

against certain fund defendants as well as the Debtor's counterclaim were addressed at a bench

trial in July 2018.  The court has not yet ruled on phase one of the trial.  If the court finds a

breach of contract occurred and awards damages against the fund defendants, then the remaining

claims will be tried in a second phase of the trial.  While awaiting a decision on phase one, the

defendants filed a motion for judgment before trial with respect to the fraudulent transfer claims

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 08/05/25 1804   Page 1009 of 1017   PageID 14636
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 881 of 1803   PageID 11627

Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 11 of 27

based on the fact that UBS is not a creditor of the parties who made the alleged fraudulent

transfers. The motion was withdrawn due to its timing without prejudice to defendants' right to

refile the motion after a decision has been made on phase one of the trial. UBS is represented by

Latham & Watkins attorneys based in Washington, DC.

      22.   *Daugherty Litigation: Delaware Chancery Court.* Another allegedly

substantial creditor of the Debtor who is not on the Committee, Daugherty, also commenced

litigation against the Debtor in Delaware Chancery Court. Daugherty appears on the top 20 list

in this case in the amount of $11.7 million, scheduled as contingent, unliquidated, and disputed.

Daugherty is a former senior management employee of the Debtor. Among other matters,

Daugherty sued the Debtor and certain of its affiliates in Delaware Chancery Court in July 2017

arising from his separation from the Debtor. In June 2018, the Delaware Chancery Court

dismissed many of the claims asserted by Daugherty in the litigation. The remaining counts

went to trial just prior to the Petition Date and have since been stayed by virtue of the Debtor's

bankruptcy filing. Daugherty is represented by Delaware counsel.

**E.**     **The Debtor's Relationship with Acis and Ongoing Adverse Claims and Litigation**

      23.   The Debtor previously provided sub-manager and sub-advisory services to

Acis pursuant to certain contractual agreements that were terminated during the course of the

Acis bankruptcy in or around August 2018. Since that time, the Debtor has not had, and does not

currently have, any direct business dealings with respect to Acis or the CLO assets for which

Acis serves as the CLO portfolio manager.[6]

---

[6] The Debtor, through an affiliate, manages a client account that owns a notional value of approximately $150 million in securities issued by Acis CLOs. All of the Debtor's affiliated CLOs are currently in wind-down, meaning that they are not making any new investments.

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16   Filed 08/05/25   Page 1010 of 1017   PageID 14637
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 882 of 1803   PageID 11628
Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 12 of 27

24. Prior to his termination in June 2016, Terry was one of the Debtor's senior management employees who handled Acis and also had a partnership interest in Acis. After Terry was discovered surreptitiously tape recording internal meetings and conversations with numerous Highland personnel, he was terminated by the Debtor and subsequently asserted claims against Acis that went to arbitration. Terry ultimately obtained an arbitration award against Acis is the approximate amount of $8 million. Notably, although Terry asserted claims against the Debtor and other persons at Highland, the arbitration panel did not find liability against any party besides Acis.

25. Terry commenced involuntary chapter 7 bankruptcy cases against Acis in the Texas Bankruptcy Court in January 2018 on his own behalf. No other creditors joined in the petitions, which Terry asserted was appropriate on the basis that Acis had fewer than 12 creditors. The Debtor is a major prepetition creditor of Acis, owed in excess of $8 million for various contractual services provided to Acis before and after the Acis bankruptcy filings. Acis, the alleged debtor in those matters, objected to the involuntary bankruptcy filings and presented evidence from certain of the Debtor's employees relating to whether the technical requirements for involuntary bankruptcy filings were met. These objections were ultimately overruled by the Texas Bankruptcy Court, which decision remains on appeal. Acis's bankruptcy cases were later converted to chapter 11 and a chapter 11 trustee (Robin Phelan) (the "Acis Trustee") was appointed in May 2018. No Chief Restructuring Officer was ever appointed in the Acis cases, much less a CRO with expanded powers.

26. Subsequently, the Debtor and two of its related, affected parties in interest objected to the confirmation of a chapter 11 plan proposed by the Acis Trustee (and supported by

12

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 116   Filed 06/06/25   Page 1011 of 1017   PageID 14638
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 883 of 1803   PageID 11629
Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 13 of 27

Terry) for a multitude of reasons, including that certain injunctive provisions were
inappropriately targeted at the Debtor and related parties. The Texas Bankruptcy Court
ultimately overruled all objections and confirmed the plan in January 2019, which decision
remains on appeal. During the course of the Acis bankruptcy cases, the Texas Bankruptcy Court
heard no material evidence from the Debtor's employees about the details of its business, assets,
or liabilities, aside from its prior involvement with Acis. The Committee does not establish how
the prior testimony of the Debtor's representatives in the Acis bankruptcy is relevant to the
instant chapter 11 case. Hence, the Texas Bankruptcy Court has no specialized knowledge with
respect to the Debtor generally or the issues that will be relevant in this chapter 11 case.

27.    Pursuant to the Acis Trustee's confirmed chapter 11 plan, Terry is Acis's
sole equity holder and controls and manages that entity. The Acis Trustee had previously
commenced litigation in the Texas Bankruptcy Court against the Debtor and other parties for
breach of contract, breach of fiduciary duties, fraudulent transfers, and conspiracy, and has
sought to offset and/or subordinate the Debtor's claims against Acis. In a nutshell, the causes of
action in that lawsuit revolve around the hotly contested allegations that the Debtor conspired to
strip Acis of its assets at Terry's expense. Through his ownership and control of Acis pursuant
to the Acis Trustee's confirmed plan, Terry now controls these claims against the Debtor, which
remain at an early stage in the Texas Bankruptcy Court and have been stayed as to the Debtor.[7]

---

[7] The defendants have filed motions to withdraw the reference as well as motions to dismiss. The Texas
Bankruptcy Court held a status conference on the motions to withdraw the reference on September 4, 2019 and was
required to submit a "Report and Recommendation" to the United States District Court for the Northern District of
Texas. As of the Petition Date, the Texas Bankruptcy Court had not issued its Report and Recommendation. This
adversary proceeding is now subject to the automatic stay of 11 U.S.C. §362(a). This proceeding has yet to reach
the procedural stage where any of the defendants have had to file their answers.

DOCS_SF:102198.7 36027/002

Appellee Appx. 00877
013690

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 16 Filed 06/05/1804 Page 1012 of 1017 PageID 14639
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 884 of 1803 PageID 11630
Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 14 of 27

28.     The respective bankruptcy estates of Acis and the Debtor are adverse to each other. Acis has claims and pending litigation against the Debtor and the Debtor has outstanding claims against Acis that total no less than $8 million for services rendered. The various litigation claims of Acis against the Debtor are prepetition claims that have been stayed.

29.     The Committee now seeks to move the Debtor's bankruptcy case to the Texas Bankruptcy Court -- Acis's "home court" -- in order to obtain some perceived litigation advantage. The Debtor objects to the Motion to Transfer as completely contrary to the interests of this estate.

### Legal Basis for Objection to Motion to Transfer

**A.    The Debtor's Case is Properly Venued in This District Because the Debtor is Organized in the State of Delaware**

30.     The Debtor is a limited partnership formed under the laws of Delaware. Consequently, venue of this case is proper in Delaware as a matter of law under 28 U.S.C. § 1408. *See, e.g., In re Restaurants Acquisition I, LLC*, 2016 Bankr. LEXIS 684, at *6 (Bankr. D. Del. Mar. 4, 2016) ("Because the Debtor is organized under the laws of Delaware, this forum is proper under the statute."); *In re Innovative Communication Co., LLC*, 358 B.R. 120, 125 (Bankr. D. Del. 2006) ("Venue is appropriate in the state of incorporation, 28 U.S.C. § 1408(1), so venue is proper in Delaware with respect to the corporate Debtors."). The Committee does not (and cannot) challenge this point.

**B.    The Debtor's Choice of Forum in Delaware is Entitled to Substantial Weight and Should Not Be Disturbed**

31.     Given that venue in this District is legally proper, the Debtor's choice of this forum is entitled to great weight. *See, e.g., Restaurants Acquisition*, 2016 Bankr. LEXIS at

14

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 08/05/1804    Page 1013 of 1017    PageID 14640
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 885 of 1803    PageID 11631

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 15 of 27

*7 ("movant bears the burden of demonstrating that the factors strongly weigh in favor of a transfer as courts will generally grant substantial deference to a debtor's choice of forum"); *In re Ocean Properties of Delaware, Inc.*, 95 B.R. 304, 305 (Bankr. D. Del. 1988) (same). Therefore, a court considering a venue transfer motion "should exercise its power to transfer cautiously, and the party moving for the transfer must show by a preponderance of the evidence that the case should be transferred." *In re Commonwealth Oil Refining Co., Inc. (Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co., Inc.)*, 596 F.2d 1239, 1241 (5th Cir. 1979), *cert. denied*, 444 U.S. 1045 (1980) ("*CORCO*") (internal citations omitted); *accord In re Fairfield Puerto Rico, Inc.*, 333 F. Supp. 1187, 1989 (D. Del. 1971) ("This Court should not freely abandon to any other district its duty to determine a matter clearly within its jurisdiction."); *In re Rehoboth Hospitality, LP*, 2011 WL 5024267, at *3 (Bankr. D. Del. 2011) ("The burden of proof is on the moving party requesting transfer.").

        32.     These principles apply with even greater force in a case such as this where a Delaware-organized partnership seeks the protection of Delaware courts. As noted above, over 99% of the Debtor's limited interests and 100% of its general partnership interests are held by Delaware entities. There is a "fundamental legal tenet that every citizen of a state is entitled to take advantage of the state and federal judicial process available in that state." *In re PWS Holdings*, 1998 Bankr. LEXIS 549, at *14 (Bankr. D. Del. Apr. 28, 1998). Further, "Delaware has an interest in protecting the rights of its citizens," and correspondingly, change of venue can only be granted upon a strong showing of equities favoring the transfer. *Intel Corp. v. Broadcom Corp.*, 167 F. Supp. 2d 692, 706 (D. Del. 2001).

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 08/05/1804    Page 1014 of 1017    PageID 14641
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 886 of 1803    PageID 11632
Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 16 of 27

33.     Given the strong presumption that a debtor's choice of forum should not be disturbed, courts rarely grant such relief.  In those few cases where venue has been transferred, there was generally some unique compelling factor that justified transfer, such as the debtor's consent, the matter was a single asset real estate case, or there was non-stayed litigation that warranted consolidation of cases before a single court or judge.  None of these factors are present here.

34.     In fact, the various adversary claims pending against the Debtor that currently linger in the Texas Bankruptcy Court weigh strongly *against* a transfer of venue there. The claims asserted by Acis against the Debtor are prepetition claims that are stayed.  Whether those claims are ever unstayed, they are clearly adverse to the interests of the Debtor's estate, particularly where Acis is asserting such claims as a basis to offset and/or subordinate the large claims that the Debtor holds against Acis.  Notably, Acis is no longer affiliated with the Debtor. It is merely a litigation claimant.  Yet, the Committee chose to file the Motion to Transfer to the Texas Bankruptcy Court in order to achieve a litigation advantage at the expense of this estate. The Debtor urges the Court to see through this blatant litigation tactic which fails to come close to overcoming the strong presumption in favor of the Debtor's proper choice of venue in Delaware.

C.     **The Convenience of the Parties Weighs in Favor of Retaining Venue in Delaware**

35.     When a bankruptcy court is asked to transfer an entire bankruptcy case to another bankruptcy court, it must examine whether the transfer would be (a) in the interest of justice, or (b) the convenience of the parties.  28 U.S.C. § 1412.  In considering the "convenience

16

Appellee Appx. 00880
Appx. 01131
013693

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 08/26/25 04   Page 1015 of 1017   PageID 14642
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 887 of 1803   PageID 11633

Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 17 of 27

of the parties," courts have identified six factors, among others, to help guide their discretion.

These six factors are:

    i.  the economic administration of the estate;

    ii.  the location of the assets;

    iii.  the proximity of creditors of every kind to the court;

    iv.  the proximity of the debtor to the court;

    v.  the proximity of the witnesses necessary to the administration of the estate; and

    vi.  the necessity for ancillary administration if liquidation should result.

*See, e.g., CORCO*, 596 F.2d at 1247; *Restaurants Acquisition*, 2016 Bankr. LEXIS at *7 (applying *CORCO* factors); *Innovative*, 358 B.R. at 125 (citing *CORCO* factors and other private and public interests that may be relevant). As discussed herein, the Committee has failed to meet its "heavy burden of proof . . . to demonstrate that the balance of convenience weighs in [its] favor." *Lionel Leisure, Inc. v. Trans Cleveland Warehouses, Inc. (In re Lionel Corp.)*, 24 B.R. 141, 142 (Bankr. S.D.N.Y. 1982). Consequently, the Motion to Transfer must be denied.

### *i.  The Economic Administration of the Estate*

36.     The economic and efficient administration of the estate is the most important factor when considering a motion to transfer venue. *CORCO*, 596 F.2d at 1247; *In re Caesars Entertainment Operating Co.*, 2015 Bankr. LEXIS 314, at *22 (Bankr. D. Del. Feb. 2, 2015); *In re Industrial Pollution Control, Inc.*, 137 B.R. 176, 182 (Bankr. W.D. Pa. 1992). Despite the importance of this factor, however, the Committee makes little effort to explain why

17

**Appellee Appx. 00881**
Appx. 01132
013694

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 08/05/1804 Page 1016 of 1017    PageID 14643
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 888 of 1803    PageID 11634
Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 18 of 27

the economic administration of the estate would be improved if this case was transferred, other than to argue that the Texas Bankruptcy Court heard days of evidence in an unrelated matter of questionable relevance to the chapter 11 proceedings at hand. *See* Motion to Transfer at ¶¶11 – 13, 29 – 31. The pendency of the Acis bankruptcy in the Texas Bankruptcy Court should not form a basis for transferring venue for the following six (6) reasons.

37.    First, the Debtor is now managed by the CRO, who is charged with administering the restructuring efforts of the Debtors in this case and has independent authority as to insider claims and insider transactions. Whatever may have been said by the Debtor's management in the context of the Acis bankruptcy is irrelevant to the tasks at hand in this case that will be carried out by the CRO, an independent and highly qualified professional who has had no involvement in the Acis cases.

38.    Second, the evidence presented by the Debtor's employees in the Acis bankruptcy cases is irrelevant to the case at hand. Their testimony generally focused on (a) whether Terry satisfied the legal requirements to file involuntary cases against Acis and (b) the structure of actively managed CLOs. None of this testimony by the Debtor's employees is relevant to the Debtor's present chapter 11 case. Acis was the sole branch of the Debtor's affiliated structure that managed active CLOs. As a result of the confirmed chapter 11 plan in the Acis cases, Acis is no longer part of the Debtor's organizational structure. The Debtor owns no equity in Acis. The Debtor no longer advises or sub-advises any active CLOs. The Debtor only has CLOs that are in liquidation -- monetizing their underlying assets and paying off their remaining investors. While the Texas Bankruptcy Court learned much about the complexities of managing active CLOs, that information is irrelevant to this Debtor.

18

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Filed 08/06/25 1804   Page 1017 of 1017   PageID 14644
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 889 of 1803   PageID 11635
Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 19 of 27

39.    <u>Third</u>, the core issue in the reorganization of Acis was maintaining the cash flows from Acis's managed CLOs.  However, the CLOs currently managed by the Debtor provide just 10% of the Debtor's revenue, and that number will shrink over time as the CLOs liquidate.  The Debtor derives the other 90% of its revenue from managing asset classes that were never implicated in the Acis proceeding, including private equity, mutual funds, open-ended retail funds, hedge funds, and real estate funds.

40.    <u>Fourth</u>, the Committee neither attaches evidence demonstrating what relevant facts the Texas Bankruptcy Court learned about the Debtor, nor explains how any such evidence could possibly implicate an insurmountable "learning curve" for this Court.  *See* Motion to Transfer at ¶31.  The Committee does not attach any of the 700 allegedly relevant exhibits or any of the testimony from the Acis proceeding.  The Committee references three published opinions of the Texas Bankruptcy Court from the Acis proceeding, but provides no reasoning or even citations demonstrating how these opinions evidence the Texas Bankruptcy Court's purportedly extensive knowledge of the Debtor's current structure and management.

41.    <u>Fifth</u>, even assuming it learned anything relevant about the Debtor's corporate structure, the Texas Bankruptcy Court knows little about the details of the Debtor's business, assets, or liabilities, or its restructuring efforts.  To the extent it addressed the Debtor's business, the evidence in the Acis proceeding focused on a CLO business that the Debtor no longer operates nor manages in any way.  The evidence in the Acis proceeding never focused on the Debtor's assets and liabilities.  Even at this early stage of the Debtor's chapter 11 case, this Court is already more familiar with the Debtor than the Texas Bankruptcy Court, which is appropriately charged with overseeing the Acis proceeding and not this one.

DOCS_SF:102198.7 36027/002

Appellee Appx. 00883
Appx. 01134
013696