**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re: Highland Capital Management, L.P.**

|  |  |
|---|---|
| | § |
| | §    Case No. **19-34054-sgj11** |
| **The Dugaboy Investment Trust et al- Appellant** | |
| | § |
| vs. | § |
| | |
| **Highland Capital Management, L.P.** | |
| **Et al-** Appellee | |
| | §         **3:25-cv-02072-S** |
| | § |

   **[4333]**   Memorandum of Opinion and Order Regarding Stay Requests (Addressing DE #4326 and 4308) entered on 7/21/25

# Volume 19

# APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | |

*INDEX*

## APPELLANT THE DUGABOY INVESTMENT TRUST'S STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL FROM THE BANKRUPTCY COURT'S ORDER REGARDING STAY REQUESTS [ADDRESSING DE ## 4326 & 4308]

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4353] on August 4, 2025 in the above-captioned case from the Bankruptcy Court's July 21, 2025 *Memorandum Order and Opinion Regarding Stay Requests [Addressing DE ## 4326 & 4308]*[Docket No. 4333], hereby submits this *Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1. **Did the Bankruptcy Court err in faulting Dugaboy's Stay Request because Dugaboy did not make a "standard" request for a stay pending appeal pursuant to Federal Bankruptcy Rule 8007?**

2. **Did the Bankruptcy Court err in determining that the Bankruptcy Rule 9019 settlement proceeding was not "a proceeding involving a charitable trust"?**

3. **Did the Bankruptcy Court err in concluding there was insufficient evidence connecting Mark Patrick's involvement in this Court's Rule 9019 settlement proceedings to the allegations of wrongdoing against Patrick in the Cayman Islands proceeding?**

4. **Did the Bankruptcy Court err in failing to recognize that the new evidence of Mark Patrick's misconduct exposed in the Cayman Islands proceeding fatally undermines the 9019 settlement by establishing that Patrick lacked authority to enter into the settlement?**

5. **Did the Bankruptcy Court err in concluding that a stay was unnecessary because Dugaboy could still pursue remedies against Mark Patrick in the Cayman Islands proceeding?**

6. **Did the Bankruptcy Court err in failing to recuse itself under 28 U.S.C. § 455 due to the appearance of partiality created by the presiding judge's authorship of novels that bear striking factual and thematic similarities to the Highland Capital Management bankruptcy proceedings and portray hedge fund principals in an overtly negative**

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow.

1

light, thereby depriving Dugaboy of an impartial judge with respect to the stay motion?

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

*Vol. 1*

*000001*

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4353] filed by Appellant;

*000023*

2. Bankruptcy Court's *Memorandum Opinion and Order Regarding Stay Requests [Addressing DE ## 4236 & 4308* [Docket No. 4333];

*000039*

3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June 25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

*Vol. 2*

*000569*

*000730*

*000734*

*Vol. 3*

*000771*
*Thru Vol. 5*

*Vol 5*
*003493*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 3/18/2021 | 2060 | Motion to recuse Judge Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| 3/18/2021 | 2061 | Brief in support filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/18/2021 | 2062 | Support/supplemental document Appendix to Motion to Recuse filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/23/2021 | 2083 | Order denying motion to recuse (related document #2060) Entered on 3/23/2021. (Okafor, M.) |

2

| | | | |
|---|---|---|---|
| *Vol. 5*<br>00 3504 | 4/6/2021 | 2169 | Amended notice of appeal filed by Interested Party James Dondero (RE: related document(s)2149 Notice of appeal). (Lang, Michael) |
| 00 3519 | 4/15/2022 | 2205 | Statement of issues on appeal, filed by Interested Party James Dondero (RE: related document(s)2083 Order on motion to recuse Judge). (Lang, Michael) |
| 00 3521 | 4/15/2021 | 2206 | Appellant designation of contents for inclusion in record on appeal filed by Interested Party James Dondero (RE: related document(s)2169 Amended notice of appeal). Appellee designation due by 04/29/2021. (Lang, Michael) |
| 00 3530 | 2/9/2022 | 3264 | DISTRICT COURT MEMORANDUM OPINION AND ORDER - The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292 (a) and the Court is without jurisdiction over this appeal of the Bankruptcy Court's Recusal Order. The Court further denies Appellants leave to appeal the Recusal Order under § 1292 (b), denies Appellants' request to withdraw the reference of their motion to recuse, and denies Appellants' request to construe their appeal as a petition for writ of mandamus. Accordingly, the Court dismisses this appeal for lack of jurisdiction. (Ordered by Judge Ed Kinkeade on 2/9/2022). Civil Action number:3:21-cv-00879-K, DISMISSED for lack of jurisdiction (RE: related document(s)2083 Order on motion to recuse Judge). Entered on 2/9/2022 (Whitaker, Sheniqua) Modified on 2/25/2022 (Whitaker, Sheniqua). (Entered: 02/25/2022) |
| *Vol 6*<br>00 3544 | 7/20/2022 | 3406 | Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: #1 Appendix Appendix (Lang, Michael) Modified text on 7/21/2022 (Ecker, C.). |
| 00 3909 | 8/1/2022 | 3422 | Notice of hearing on Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.).). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3406, (Lang, Michael) |

| | | | |
|---|---|---|---|
| Vol 6<br><br>003912 | 8/15/2022 | 3444 | Response opposed to (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Attachments: #1 Exhibit  A (Annable, Zachery) |
| Vol. 7<br><br>003936<br>Thru END of Vol 14 | 8/15/2022 | 3445 | Exhibit List (Appendix in Support of Highland Capital Management, L.P.'s Objection to Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 USC 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3444 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Index 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 (Annable, Zachery) |
| Vol 15<br><br>011840 | 8/15/2022 | 3446 | Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

| | | | |
|---|---|---|---|
| *vol. 15* | | | Depositions) Filed by Debtor Highland Capital Management, L.P. (Annable, Zachery) |
| *011855* | 8/15/2022 | 3447 | Declaration re: (Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi). (Annable, Zachery) |
| *011864* | 8/17/2022 | 3456 | Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.)). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3446 and for 3449, (Annable, Zachery) |
| *011869* | 8/22/2022 | 3463 | Reply to (related document(s): 3444 Response filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. (Lang, Michael) |
| *011874* | 8/24/2022 | 3466 | Amended Notice of hearing filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.)., 3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

Vol 15

| | 8/26/2022 | | Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.), 3462 Order converting the August 31, 2022 at 9:30 AM Hearing on (A) The motion for final appealable order and supplement to motion to recuse and (B) related motions to strike and compel to a preliminary status/scheduling conference (RE: related document(s)3406 Motion for leave filed by Interested Party James Dondero, 3446 Motion to strike document filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel filed by Debtor Highland Capital Management, L.P.). Entered on 8/19/2022 (Ecker, C.)). Status Conference to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga. (Lang, Michael) |
|---|---|---|---|
| 011877 | 8/26/2022 | 3470 | Amended motion for final appealable order and proposed supplement to the record filed by Interested Party James Dondero (RE: related document(s)3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support). (Attachments: #1 Appendix (Lang, Michael) MODIFIED text to match PDF on 9/1/2022 (Ecker, C.). |
| 012039 | 8/26/2022 | 3471 | Stipulation by James Dondero and Highland Capital Management, L.P.. filed by Interested Party James Dondero (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi, 3449 Motion to compel Lawyers' Depositions.). (Lang, Michael) |
| N/A NO PDF AVAILABLE | 8/31/2022 | 3478 | 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.) (Edmond, Michael) |
| 012047 | 9/1/2022 | 3479 | Order denying amended motion of James Dondero, Highland Capital Management Fund Advisors, L.P., Nexpoint Advisors, |

*Vol. 15*

*012050*

| | | | |
|---|---|---|---|
| | | | L.P. The Dugaboy Investment Trust Get Good Trust and, Nexpoint Real Estate Partners, LLC, F/K/A HCRE Partners, A Delaware Limited Liability Company for final appealable order and supplement to motion to recuse pursuant to 28 U.S.C. Section 455 (RE: related document(s)3470 Brief filed by Interested Party James Dondero). Entered on 9/1/2022 (Okafor, Marcey) |
| | 9/1/2022 | 3480 | Transcript regarding Hearing Held 08/31/2022 (27 pages) RE: Status Conference Re: Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 (#3406). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 11/30/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.)). Transcript to be made available to the public on 11/30/2022. (Rehling, Kathy) |
| | 9/27/2022 | 3541 | Motion to recuse Judge Stacey G. C. Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| | 9/72/2022 | 3542 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3541 Motion to recuse Judge Stacey G. C. Jernigan). (Attachments: #1 Appendix (Lang, Michael) |
| | 10/14/2022 | 3567 | Agreed Scheduling Order on renewed motion to recuse (related document #3541) Entered on 10/14/2022. (Okafor, Marcey) |

*012077*
*Vol. 16*
*012079*
*012357*

*Vol. 16*
*012361*

*Vol. 17*
*012363*

*012641*

*Vol. 18*

*012697*
*Thru End of Vol. 21*

*Vol. 22*
*016732*

*016737*

*016773*

*016809*

| | Date | No. | Description |
|---|---|---|---|
| | 10/17/2022 | 3570 | Motion to recuse Judge Stacey G. C. Jernigan - AMENDED Filed by Interested Party James Dondero (Lang, Michael) |
| | 10/17/2022 | 3571 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Attachments: #1 Appendix (Lang, Michael) |
| | 10/31/2022 | 3595 | Response opposed to (related document(s): 3541 Motion to recuse Judge Stacey G. C. Jernigan filed by Interested Party James Dondero, 3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| | 10/31/2022 | 3596 | Support/supplemental document (Appendix in Support of Highland's Objection to Renewed Motion to Recuse Pursuant to 28 U.S.C. 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3595 Response). (Attachments: #1 Exhibit 1, #2 Exhibit 2, #3 Exhibit 3, #4 Exhibit 4, #5 Exhibit 5, #6 Exhibit 6, #7 Exhibit 7, #8 Exhibit 8, #9 Exhibit 9, #10 Exhibit 10, #11 Exhibit 11, #12 Exhibit 12, #13 Exhibit 13, #14 Exhibit 14, #15 Exhibit 15, #16 Exhibit 16, #17 Exhibit 17, #18 Exhibit 18, #19 Exhibit 19, #20 Exhibit 20, #21 Exhibit 21, #22 Exhibit 22, #23 Exhibit 23, #24 Exhibit 24, #25 Exhibit 25, #26 Exhibit 26, #27 Exhibit 27, #28 Exhibit 28, #29 Exhibit 29, #30 Exhibit 30, #31 Exhibit 31, #32 Exhibit 32, #33 Exhibit 33, #34 Exhibit 34, #35 Exhibit 35, #36 Exhibit 36 (Annable, Zachery) |
| | 3/3/2023 | 3673 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Lang, Michael) |
| | 3/6/2023 | 3675 | Memorandum of Opinion and Order Denying Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. Section 455 (RE: related document(s)3570 Motion to recuse Judge filed by Interested Party James Dondero). Entered on 3/6/2023 (Okafor, Marcey) |
| | 3/6/2023 | 3676 | Order Denying Amended Renewed Motion to Recuse Pursuant to U.S.C. Section 455 (related document #3570) Entered on 3/6/2023. (Okafor, Marcey) |
| | 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland |

| | | | |
|---|---|---|---|
| *Vol. 22* | | | Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| *016827* | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery) |
| *016830* | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| *016855* | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| *016863* | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *016865* | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *Vol. 23* *016867* *Thru end of Vol. 25* | 6/20/2025 | 4255 *(to be submitted to Clerk on flash drive)* | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 |

| | | | |
|---|---|---|---|
| | | | Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |
| | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent |

*Vol. 26*

*019524*

*019527*

| | | | |
|---|---|---|---|
| | | | Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart, #3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
| *Vol. 27*<br>*019847* | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Professional Highland Litigation Sub-Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| *019871* | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| *019998* | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| *Vol. 28*<br>*020013* | 6/23/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| *020230* | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 (Deitsch-Perez, Deborah) |
| *020241* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic). (Attachments: #1 Exhibit 126 (Annable, Zachery) |

| | | | |
|---|---|---|---|
| VOL. 28<br><br>020266 | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| VOL. 29<br><br>020267 | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| 020271 | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust. Entered on 6/27/2025 (Okafor, M.) |
| 020282 | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| 020289 | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |

| Vol. 29 | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| | 7/10/2025 | 4308 | Notice Letter from the Office of the Texas Attorney General Requesting a Stay filed by Interested Party State of Texas. (Stone, Johnathan) |
| | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| Vol. 30 | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related |

Handwritten: 020296, 020298, 020300, 020309, 020311, 020407

|  |  |  | document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
|---|---|---|---|
| *Vol. 31* *020686* | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| *020696* | 7/21/2025 | 4334 | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M.) |
| *020808* | 8/4/2025 | 4353 | Notice of appeal. Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A) (Harper, Geoffrey) |
| *020830* | 8/5/2025 | 4359 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| *020837* | 8/15/2025 | 4372 | Motion to recuse Judge Filed by Interested Parties James Dondero, NexPoint Advisors, L.P., NexPoint Asset Management, L.P., NexPoint Real Estate Advisors, L.P., The Dugaboy Investment Trust, The Get Good Non Exempt Trust No 2 (Attachments: #1 Proposed Order (Harper, Geoffrey) |

Dated: August 18, 2025             Respectfully submitted,

**WINSTON & STRAWN LLP**

By: */s/ Geoffrey S. Harper*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

14

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**CRAWFORD, WISHNEW & LANG PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 18, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-16    Page 890 of 25804    Page 18 of 1017    PageID 14662
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 890 of 1803    PageID 11636

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 20 of 27

42.    <u>Sixth</u>, the level of conflicts between the Debtor and Acis make the

economic and fair administration of this case in the Texas Bankruptcy Court highly problematic.

There is a pending adversary proceeding by Acis against the Debtor, which proceeding has been

stayed.  The Committee does not explain how the Texas Bankruptcy Court is supposed to preside

over the Debtor's estate and the pending adversary proceeding in the Acis case concurrently.[8]

Indeed, the only reason for the Committee to seek a transfer of venue to the Texas Bankruptcy

Court in the first place is to obtain some perceived litigation advantage *vis-à-vis* the Debtor's

estate, which is not a proper basis to transfer venue.[9]  Given the substantial adverse interests that

exist between the Debtor and Acis, the Debtor submits that this chapter 11 case can be much

more effectively administered by this Court.

### ii.    *The Location of the Assets*

43.    Although the Debtor's headquarters is located in Dallas, Texas and most

of its employees are based there, the Debtor's assets are widely dispersed all over the world.  The

Debtor has over $2.5 billion of assets under management and receives management and advisory

fees from a multitude of sources around the world.  The Debtor also provides shared services for

approximately $7.5 billion of assets managed by a variety of affiliated and unaffiliated entities,

including other affiliated registered investment advisors.  The Debtor's affiliates and related

parties maintain offices in many international locales, including Buenos Aires, Rio de Janeiro,

---

[8]  *See supra* n. 8.
[9]  As part of this ongoing litigation strategy, Acis has objected to the Debtor retaining Foley & Lardner LLP
("<u>Foley</u>") and Lynn, Pinker, Cox, & Hurst LLP ("<u>Lynn Pinker</u>") as counsel to pursue the Debtor's claims against
Acis and to defend the Debtor and certain of its wholly owned subsidiaries against Acis's claims. *See* Dkt. 116.
Acis's objection to Foley and Lynn Pinker's retention does not even attempt to explain the benefit to the Debtor's
estate of stripping the Debtor of its counsel litigating both affirmative and defensive claims against Acis.  This
highlights the conflict that the Texas Bankruptcy Court would face in handling both the Acis and Highland matters.

DOCS_SF:102198.7 36027/002

Appellee Appx. 00884
Appx. 01195
013697

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 16-15   Page 892 of 2804 Page 19 of 1017    PageID 14663
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 891 of 1803   PageID 11637
Case 19-12239-CSS    Doc 118   Filed 11/12/19   Page 21 of 27

Singapore, and Seoul.  And the Debtor has its own proprietary investment assets and those of its

clients held through various affiliates in Asia, South America, and Europe.  The Debtor has

already filed the Foreign Representative Motion in order to assist the Debtor in managing its

various foreign interests.

44.     Similarly, the Debtor's principal assets in the United States consist of

custodial and non-custodial interests in investments located across the country.  The Debtor has

brokerage accounts at Jefferies in New York City that hold the bulk of the Debtor's liquid and

illiquid securities.  As of the Petition Date, the Debtor owed Jefferies approximately $30 million

on account of margin borrowings.  The Debtor's other principal secured creditor, Frontier State

Bank, is based in Oklahoma City and is owed approximately $5.2 million as of the Petition Date.

Relatively speaking, the Debtor has minimal assets in Texas.

45.     Nonetheless, even if most of the Debtor's assets were construed to be

located in Texas (which they are not), numerous courts have found that the location of assets is

not a significant factor in deciding whether venue should be transferred unless the case involves

liquidation as opposed to rehabilitation or is a single asset real estate case.  *See Restaurants*

*Acquisition*, 2016 Bankr. LEXIS at *12 ("the location of a company's assets is not as crucial to

the analysis where the ultimate goal is rehabilitation rather than liquidation"); *In re Safety-Kleen*

*Corp.*, 2001 Bankr. LEXIS 1296, at *10 (Bankr. D. Del. Aug. 27, 2001) ("location of assets is

generally only significant in a single asset real estate case or liquidation"); *see also In re Enron*

*Corp.*, 274 B.R. 327, 348 (Bankr. S.D.N.Y. 2002) ("[W]hile a debtor's location and the location

of its assets are often important considerations in single asset real estate cases, these factors take

on less importance in a case where a debtor has assets in various locations.").

21

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 893 of 1804 Page 20 of 1017     PageID 14664
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 892 of 1803   PageID 11638
Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 22 of 27

46.     The outcome of this case will not turn on the day-to-day management of
the Debtor's assets, but instead will be driven by the Debtor's ability to restructure its balance
sheet and maximize the value of its assets, many of which are illiquid.  This Court will be
focused on matters such as plan confirmation and governance, which the Debtor proposes to
place into the capable hands of the CRO pursuant to the terms of the pending CRO Motion and
subject to the guidelines set forth in the Protocols Motion.  Most of the objections to the key
issues that will arise in this case will be grounded in the Bankruptcy Code and not based on any
particular facts or circumstances unique to the Debtor's assets wherever located.  However, to
the extent this Court gives weight to the location of the Debtor's assets, this factor weighs in
favor of denying the Motion to Transfer because the Debtor's interests and assets are widely
dispersed throughout the country and the world.

### iii.     The Proximity of Creditors of Every Kind

47.     The Committee spends a substantial portion of the Motion to Transfer
evaluating the location of the Debtor's creditors and their professionals, and the relative amount
of time that it takes to travel to this Court as compared to the Texas Bankruptcy Court.  This
analysis is misguided and irrelevant under the circumstances of this case.  The Debtor does not
have thousands of small or unsophisticated creditors who cannot navigate their way to Delaware.
The creditors here are generally litigants or attorneys.  They are located in commercial centers all
over the country.  The amounts at stake total hundreds of millions of dollars.  It is of no
consequence whether a creditor or an attorney is based in Chicago, New York, or Los Angeles.
The creditors and professionals involved in this case will travel wherever necessary in order to
advocate their respective positions, and Delaware is certainly just as convenient as Dallas.

22

DOCS_SF:102198.7 36027/002

Appellee Appx. 00886
013699

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 96   Page 894 of 25804   Page 21 of 1017   PageID 14665
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 893 of 1803   PageID 11639

Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 23 of 27

*Caesars*, 2015 Bankr. LEXIS 314, at *23 ("in this day of law firms with multiple offices across the nation, convenient and accessible airports, electronic access to information and court dockets at every lawyer's fingertips, it is fair to say that both this [Delaware Bankruptcy] Court and the Illinois Court are convenient forums for purposes of the *CORCO* analysis.").

48.    Further, one of the Committee members and the Debtor's largest creditor, the Redeemer Committee, has commenced litigation that is pending in the Delaware Chancery Court.  In fact, the main trigger for the Debtor's bankruptcy filing was a hearing set by the Redeemer Committee in the Delaware Chancery Court to obtain a judgment on a $189 million Award.  If Delaware is convenient enough for the Redeemer Committee, it is certainly an appropriate forum for this case.  Daugherty is another allegedly significant creditor of the Debtor who chose to commence litigation in Delaware Chancery Court, which matter commenced trial just prior to the Petition Date.  UBS, another member of the Committee, has litigation pending against the Debtor in New York.

49.    The bottom line is that in a case of the size and complexity of this one, involving highly sophisticated and well-represented creditors, there is absolutely no reason to transfer venue on the basis of the proximity of creditors to the Texas Bankruptcy Court.

### iv. *The Proximity of the Debtor and Witnesses Necessary to the Administration of the Estate*

50.    As discussed in *CORCO*, the Court's consideration of the location of the Debtor should focus on the proximity to the Court of the Debtor's employees and representatives who must appear in court, not with the employees who conduct the day-to-day business activities of the Debtor.  *CORCO*, 596 F.2d at 1248; *see also Restaurants Acquisition*, 2016 Bankr. LEXIS

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 16-16 Exhibit 6 Page 895 of 1804 Page 22 of 1017 PageID 14666
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 894 of 1803 PageID 11640
Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 24 of 27

at *11 ("Courts have noted the inquiry should focus primarily on the location of parties that must appear in court.").

51.     In this case, the CRO is expected to take the lead in managing the Debtor's restructuring efforts and testifying on behalf of the Debtor. The CRO is a highly accomplished and independent professional based in Los Angeles who regularly appears in this Court and was previously chief restructuring officer in Delaware cases such as *Variant Holding Company LLC* before Judge Brendan Shannon and *Woodbridge Group of Companies LLC* before Judge Kevin Carey (retired). Few Debtor employees should be required to testify in this case on a going forward basis and, even if they were, travel to this Court is easily accomplished and consistent with the many prior trips required of such employees by the Redeemer Committee and Daugherty in choosing to commence litigation in Delaware Chancery Court. The Debtor's bankruptcy counsel also has an office in Delaware and has no need to hire local counsel here, whereas in Dallas, local counsel would need to be retained.

52.     Given what is at stake, the Debtor and its employees, including the CRO, are conveniently located within sufficient proximity of this Court such that this factor does not weigh in favor of a venue transfer to the Texas Bankruptcy Court.

### v.  *The Necessity for Ancillary Administration if Liquidation Should Result*

53.     The final factor relates to the necessity for ancillary administration if liquidation should result. As the courts in *CORCO*, *Enron* and *Fairfield Puerto Rico* recognized, "anticipation of the failure of the [Chapter 11] proceeding is an illogical basis upon which to predicate a transfer." *CORCO*, 596 F.2d at 1248; *see also Enron*, 274 B.R. at 349; *In re Fairfield Puerto Rico, Inc.*, 333 F. Supp. at 1191. Indeed, "[t]his factor is often discounted by

**Appellee Appx. 00888**
**Appx. 01130**
**013701**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-5    Page 896 of 25804 Page 23 of 1017      PageID 14667
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 895 of 1803    PageID 11641

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 25 of 27

courts." *Enron*, 274 B.R. at 343, n. 11. The Debtor's focus in this case is to propose a chapter

11 plan that will maximize value for all constituents, and the Committee offers no factual basis

for this Court to contemplate the failure of the Debtor's chapter 11 case. *See In re Fairfield*

*Puerto Rico, Inc.*, 333 F. Supp. at 1191. Accordingly, this factor does not favor transfer of

venue.

**D.**     **The Interest of Justice is Not Served By Transferring Venue**

54.     In determining whether a transfer would be "in the interest of justice," the

court should consider "whether transfer of venue will promote the efficient administration of the

estate, judicial economy, timeliness, and fairness." *Enron,* 274 B.R. at 387. These factors have

generally been discussed above and support keeping this case in Delaware. Additional concerns

that would speak to the "interest of justice" include facts such as the importance of a debtor to

the welfare and economic stability of a jurisdiction, and are not present in this case. *See*

*CORCO,* 596 F.2d at 1248 (even though the importance of the debtor, a major supplier of

petroleum to Puerto Rico, to the welfare and economic stability of Puerto Rico implicated

"interest of justice" considerations, the court determined not to transfer venue to Puerto Rico).

55.     As noted above, venue is legally proper in this Court and the Debtor is

entitled to substantial deference as to its choice of forum. But even if the Court considered the

interests of justice and the convenience of the parties, there is no legitimate basis to transfer this

case to the Texas Bankruptcy Court given the sophistication, complexity, and scope of the

Debtors' business, domestic and foreign assets, and creditor constituents, and pendency of

creditor actions in the Delaware Chancery Court and New York.

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-6   Page 3970 of 5804 Page 24 of 1017   PageID 14668
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 896 of 1803   PageID 11642

Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 26 of 27

56.     The Texas Bankruptcy Court is also the venue where the unaffiliated and adverse bankruptcy case of Acis has been pending.  Acis has asserted fraudulent transfer and other disputed claims against the Debtor, which claims are all prepetition in nature.  The Debtor, in turn, has contract claims against Acis totaling in excess of $8 million.  The efficient administration of this estate, judicial economy, timeliness, and fairness would not be served by having the Texas Bankruptcy Court adjudicate these countervailing claims and interests.  The interests of justice also would not be served by transferring venue in order for the Committee to realize a tactical litigation advantage before the Texas Bankruptcy Court.

57.     For all these reasons, the Debtor urges this Court to maintain venue of this case in Delaware.

WHEREFORE, the Debtor respectfully requests that this Court enter an order denying the Motion to Transfer and granting such other and further relief as this Court deems appropriate.

DOCS_SF:102198.7 36027/002

Appellee Appx. 00890
013703

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-6    Page 898 of 1804 Page 25 of 1017    PageID 14669
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 897 of 1803    PageID 11643

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 27 of 27

Dated:  November 12, 2019                PACHULSKI STANG ZIEHL & JONES LLP

                                        /s/ James E. O'Neill
                                        Richard M. Pachulski (CA Bar No. 62337)
                                        Jeffrey N. Pomerantz (CA Bar No.143717)
                                        Ira D. Kharasch (CA Bar No. 109084)
                                        Maxim B. Litvak (CA Bar No. 215852)
                                        James E. O'Neill (DE Bar No. 4042)
                                        919 North Market Street, 17th Floor
                                        Wilmington, DE 19899 (Courier 19801)
                                        Telephone: (302) 652-4100
                                        Facsimile:  (302) 652-4400
                                        E-mail:    rpachulski@pszjlaw.com
                                                   jpomerantz@pszjlaw.com
                                                   ikharasch@pszjlaw.com
                                                   mlitvak@pszjlaw.com
                                                   joneill@pszjlaw.com

                                        *Proposed Counsel for the Debtor*
                                        *and Debtor in Possession*

DOCS_SF:102198.7 36027/002

Appellee Appx. 00891
Appx. 01142
013704

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S      Document 16-9      Page 899 of 25804 Page 26 of 1017      PageID 14670
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 898 of 1803   PageID 11644

# APPENDIX 12

Appellee Appx. 00892

013705

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 300 of 2304   Page 27 of 1017   PageID 14671
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 899 of 1803   PageID 11645
Case 19-34054-sgj11 Doc 281 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 1 of 18

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachary Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel and Proposed Counsel for the Debtor and Debtor in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |

## MOTION OF THE DEBTOR FOR APPROVAL OF SETTLEMENT
## WITH THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS REGARDING
## GOVERNANCE OF THE DEBTOR AND
## PROCEDURES FOR OPERATIONS IN THE ORDINARY COURSE

The above-captioned debtor and debtor in possession (the "Debtor") files this

motion (the "Motion") for the entry of an order (the "Order") approving the terms of a settlement

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 05/06/25    Page 28 of 1017    PageID 14672
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 900 of 1803    PageID 11646
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 2 of 18

between the Debtor and the Committee (as defined below) regarding governance of the Debtor

and procedures for operations in the ordinary course of business, as embodied in the term sheet

attached hereto as **Exhibit A** (the "Term Sheet").  In support of this Motion, the Debtor respectfully

represents as follows:

### Preliminary Statement

1.      Following weeks of negotiations, the Debtor and the Committee have

reached a proposed settlement, which contemplates the creation of a new independent board of

directors (the "Independent Directors") at Strand Advisors, Inc. ("Strand"), the Debtor's general

partner and ultimate party in control, and the implementation of certain protocols governing the

operation of the Debtor's business in the ordinary course.  The Independent Directors will consist

of the following three highly qualified and independent individuals:  James Seery, John Dubel,

and a third director to be selected by or otherwise acceptable to the Committee.[2]  Two of the

Independent Directors were chosen by the Committee and the third Independent Director will be

selected by or otherwise acceptable to the Committee.  Background information for each of the

Independent Directors is attached hereto as **Exhibit B**.

2.      Pursuant to the Term Sheet, and effective upon entry of the Order, James

Dondero will no longer be a director, officer, managing member, or employee of the Debtor or

Strand and will have no authority, directly or indirectly, to act on the Debtor's behalf.  Going

forward, the Independent Directors, through Strand, will have sole and exclusive management and

control of the Debtor.  The Independent Directors will have the discretion to appoint an interim

---

[2] The Committee's agreement to the Term Sheet in its entirety is contingent upon the selection of a third
Independent Director acceptable to the Committee.  In the event the Committee and the Debtor cannot reach an
agreement on an acceptable Independent Director to fill the third seat of the Board of Directors, the Term Sheet shall
be null and void.

DOCS_NY:39973.7 36027/002

Appellee Appx. 00894
Appx. 01145
013707

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 302 of 1804   Page 29 of 1017   PageID 14673
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 901 of 1803   PageID 11647
Case 19-34054-sgj11 Doc 281 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 3 of 18

Chief Executive Officer (the "CEO") who will manage the Debtor's day-to-day business operations.  Subject to Court approval, the Debtor still intends to retain Development Specialists, Inc. ("DSI") to provide a Chief Restructuring Officer (the "CRO") that will serve at the direction of the Independent Directors (or CEO, if appointed).

3.       It bears emphasis that the Independent Directors will not be mere figureheads.  The Debtor and the Committee envision that the Independent Directors will be actively involved and intimately familiar with all material aspects of the Debtor's business and restructuring efforts.  Moreover, with guidance of the CRO and CEO (if appointed), the Independent Directors will endeavor to prevent any negative influence Mr. Dondero or any of his affiliates or agents may have on the Debtor and its employees.  Further, as part of the Term Sheet, the Committee will be granted standing to pursue estate claims against Mr. Dondero and other former insiders of the Debtor who were not employed by the Debtor as of the execution of the Term Sheet.  The Committee will also retain the right to move for a chapter 11 trustee.

4.       In sum, the Term Sheet resolves months of litigation between the Debtor and the Committee over the Debtor's governance structure and operating protocols, allowing all parties to refocus on a path forward for this chapter 11 case.  With the Independent Directors in place, the Debtor can move forward expeditiously, efficiently, and effectively with the substantive aspects of this case and consider any available restructuring options that will maximize value for all constituents.  The Debtor therefore urges the Court to approve the Term Sheet and allow the key economic interest holders to proceed with a productive restructuring effort.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-16    Page 30 of 1017    PageID 14674
Exhibit 6    Page 903 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 902 of 1803    PageID 11648
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 4 of 18

## Jurisdiction and Venue

5.      The United States Bankruptcy Court for the District of Northern District of

Texas, Dallas Division (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory bases for the relief requested herein are sections 105(a) and

363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").

## Background

8.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District

of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

9.      To assist and coordinate the restructuring process, the Debtor retained DSI

and Bradley D. Sharp to serve as the CRO on October 7, 2019.  On October 29, 2019, the Debtor

filed the *Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain*

*Development Specialists, Inc. to Provide a Chief Restructuring Officer, Additional Personnel, and*

*Financial Advisory and Restructuring Related Services, Nunc Pro Tunc as of the Petition Date*

[Docket No. 74] (the "CRO Motion") seeking to formally retain the CRO.  The CRO Motion

remains pending, and the Debtor is filing a supplement to the CRO Motion concurrently herewith.

10.      On October 29, 2019, the Official Committee of Unsecured Creditors (the

"Committee") was appointed by the U.S. Trustee in the Delaware Court.  On November 12, 2019,

the Committee filed an omnibus objection to the CRO Motion, cash management motion, and

DOCS_NY:39973.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-19    Page 30 of 25804 Page 31 of 1017    PageID 14675
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 903 of 1803    PageID 11649
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 5 of 18

motion for approval of ordinary course protocols [Docket No. 130] (the "Committee Objection"),

raising various concerns regarding the Debtor's governance and business practices.

11.    On December 4, 2019, the Delaware Court entered an order transferring

venue of the Debtor's bankruptcy case to this Court [Docket No. 186].[3]  The Debtor has continued

in the possession of its property and has continued to operate and manage its business as a debtor

in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or

examiner has been appointed in this chapter 11 case.

12.    On December 23, 2019, the U.S. Trustee filed a motion in this Court to

appoint a chapter 11 trustee for the Debtor [Docket No. 271] (the "Trustee Motion").  Although

the Debtor will be filing a separate response to the Trustee Motion, it suffices to say that the Trustee

Motion (filed without even considering the proposed Term Sheet) completely lacks merit given

the governance changes and other resolutions encompassed in the Term Sheet agreed to by the

Committee, as the representative of the primary economic stakeholders here.

**Terms of the Proposed Settlement**

13.    Pursuant to the Term Sheet, the Debtor and the Committee have agreed to:

(a) implement certain changes to the Debtor's governance, including the appointment of the

Independent Directors; (b) provide the Committee with additional transparency into the operation

of the Debtor's business; (c) retain the CRO on updated terms; and (d) implement certain protocols

governing the ordinary course business operations of the Debtor.  The terms of this agreement are

contained in the Term Sheet.[4]  A summary of the Term Sheet is as follows:

---

[3] All docket numbers refer to the docket maintained by this Court.

[4] In the event of any inconsistency between the summary of the Term Sheet contained herein and the Term Sheet, the
Term Sheet will govern.

DOCS_NY:39973.7 36027/002

Appellee Appx. 00897
Appx. 01448
013710

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-1   Exhibit 6   Page 905 of 1804 Page 32 of 1017   PageID 14676
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 904 of 1803   PageID 11650
Case 19-34054-sgj11 Doc 281 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 6 of 18

**Independent Directors**

The Debtor's general partner, Strand will appoint the following three (3) Independent Directors: James Seery, John Dubel, and a third director to be selected by or otherwise acceptable to the Committee. The Independent Directors will be granted exclusive control over the Debtor and its operations. Among other things, the Independent Directors shall conduct a review of all current employees as soon as practicable following the Independent Directors' appointment, determine whether and which employees should be subject to a key employee retention plan and/or key employee incentive plan and, if applicable, propose plan(s) covering such employees. The appointment and powers of the Independent Directors and the corporate governance structure shall be pursuant to the documents attached to the Term Sheet (the "<u>Governing Documents</u>"), which documents shall be satisfactory to the Committee. Once appointed, the Independent Directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the Independent Directors, to object to such removal and replacement).

The Independent Directors shall be compensated in a manner to be determined, with an understanding that the source of funding, whether directly or via reimbursement, will be the Debtor.

As soon as practicable after their appointments, the Independent Directors shall, in consultation with the Committee, determine whether a CEO should be appointed for the Debtor. If the Independent Directors determine that appointment of a CEO is appropriate, the Independent Directors shall appoint a CEO acceptable to the Committee as soon as practicable, which may be one of the Independent Directors. Once appointed, the CEO cannot be removed without the Committee's written consent or Order of the Court.

The Committee shall have regular, direct access to the Independent Directors, <u>provided</u>, <u>however</u> that (1) if the communications include FTI Consulting Inc. ("<u>FTI</u>"), Development Specialists Inc. ("<u>DSI</u>") shall also

DOCS_NY:39973.7 36027/002

Appellee Appx. 00898
Appx. 01140
013711

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-16   Exhibit 6   Page 306 of 2804 Page 33 of 1017   PageID 14677
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 905 of 1803   PageID 11651
Case 19-34054-sgj11 Doc 281 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 7 of 18

|  | participate in such communications; and (2) if the communications include counsel, then either Debtor's counsel or, if retained, counsel to the Independent Directors shall also participate in such communications. |
|---|---|
| **Role of Mr. James Dondero** | Upon approval of the Term Sheet by the Bankruptcy Court, Mr. Dondero will (1) resign from his position as a Board of Director of Strand Advisors, Inc., (2) resign as an officer of Strand Advisors, Inc., and (3) resign as an employee of the Debtor. |
| **CRO** | Bradley Sharp and DSI shall, subject to approval of the Court, be retained as the CRO to the Debtor and report to and be directed by the Independent Directors and, if and once appointed, the CEO.   Mr. Sharp's and DSI's retention is subject to this Court's approval.  The Debtor has filed the CRO Motion, as supplemented as of the date hereof, which requests authority to retain Mr. Sharp and DSI.[5] |
|  | DSI and all other Debtor professionals shall serve at the direction of the CEO, if any, and the Independent Directors. |
| **Estate Claims** | The Committee is granted standing to pursue any and all estate claims and causes of action against Mr. Dondero, Mr. Mark Okada, other insiders of the Debtor, and each of the Related Entities, including any promissory notes held by any of the foregoing (collectively, the "Estate Claims"); provided, however, that the term Estate Claims will not include any estate claim or cause of action against any then-current employee of the Debtor. |
| **Document Management, Preservation, and Production** | The Debtor shall be subject to and comply with the document management, preservation, and production requirements attached to the Term Sheet, which requirements cannot be modified without the consent of the Committee or Court order (the "Document Production Protocol"). |
|  | Solely with respect to the investigation and pursuit of Estate Claims, the document production protocol will acknowledge that the Committee will have access to the privileged documents and communications that are |

---

[5] For the avoidance of doubt, the Debtor is not seeking retention of the CRO pursuant to this Motion.  The Debtor is seeking such relief pursuant to the CRO Motion (as supplemented).

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-16   Filed 07/06/25   Page 34 of 1017    PageID 14678
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 906 of 1803   PageID 11652
Case 19-34054-sgj11  Doc 281  Filed 12/27/19   Entered 12/27/19 21:33:05   Page 8 of 18

within the Debtor's possession, custody, or control ("Shared Privilege").

With respect to determining if any particular document is subject to the Shared Privilege, the following process shall be followed: (i) the Committee will request documents from the Debtor, (ii) the Debtor shall log all documents requested but withheld on the basis of privilege, (iii) the Debtor shall not withhold documents it understands to be subject to the Shared Privilege; (iv) the Committee will identify each additional document on the log that the Committee believes is subject to the Shared Privilege, and (v) a special master or other third party neutral agreed to by the Committee and the Debtor shall make a determination if such documents are subject to the Shared Privilege.  The Committee further agrees that the production of any particular document by the Debtor under this process will not be used as a basis for a claim of subject matter waiver.

**Reporting Requirements**

The Debtor shall be subject to and comply with the reporting requirements attached to the Term Sheet, which reporting requirements cannot be modified without the consent of the Committee or Court order (the "Reporting Requirements").

**Plan Exclusivity**

The Independent Directors may elect to waive the Debtor's exclusive right to file a plan under section 1121 of the Bankruptcy Code.

**Operating Protocols**

The Debtor shall comply with the operating protocols attached to the Term Sheet, regarding the Debtor's operation in the ordinary course of business, which protocols cannot be modified without the consent of the Committee or Court order (the "Operating Protocols" and, together with the Reporting Requirements, the "Protocols").

14.     By this Motion, the Debtor is seeking the Court's approval of the Term Sheet, the terms contained therein, and the exhibits attached thereto.  For the avoidance of doubt, approval of the Term Sheet includes the approval of the following:

DOCS_NY:39973.7 36027/002

Appellee Appx. 00900
Appx. 013713

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Filed 08/26/25    Page 35 of 1017    PageID 14679
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 907 of 1803    PageID 11653
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 9 of 18

- Independent Directors: The appointment of James Seery, John Dubel, and a third director to be selected by or otherwise acceptable to the Committee as the Independent Directors of Strand, the Debtor's general partner, with power to oversee the operations of the Debtor as set forth in the Term Sheet. Mr. Seery and Mr. Dubel were selected by the Committee, and the Debtor agreed to their appointment as Independent Directors. The Debtor is also seeking approval of the Governing Documents appointing the Independent Directors, to the extent required, and the authority to compensate the Independent Directors either directly from the assets of the Debtor or via the reimbursement of Strand of any compensation paid to the Independent Directors.

- Document Management and Preservation: The implementation of the Document Production Protocol, which will govern how the Debtor retains and produces documents and information to the Committee during the pendency of its bankruptcy case. The Debtor is also agreeing to the allow the Committee to access certain documents that are otherwise subject to the Shared Privilege to assist the Debtor in investigating the Estate Claims.

- Estate Claims. The Debtor has agreed to grant the Committee standing to pursue any Estate Claims. Estate Claims do not include claims or causes of action against any current employees of the Debtor; however, if any employee ceases to be employed by the Debtor, the Committee will have standing to pursue claims against such former employee.

- Reporting Requirements and Operating Protocols: The Debtor has agreed to provide certain reporting to the Committee and to operate under certain protocols, which set forth the parameters of how the Debtor can conduct its business without the requirement of Court approval. The Protocols provide, in certain circumstances, how the CRO and the Independent Directors will oversee the Debtor's operations. The purpose of the Protocols is to allow the Debtor to function in the ordinary course of its business while providing transparency to the Committee.

15.    The Debtor believes that appointing the Independent Directors and otherwise effectuating the terms of the Term Sheet is in the best interests of the Debtor, its estate, and its creditors. The Term Sheet will allow the Debtor to proceed with a productive reorganization effort that will maximize value for all constituents. Accordingly, the Debtor seeks approval of the Term Sheet.

## Relief Requested

16.    By this Motion, the Debtor seeks entry of an order pursuant to sections 105(a), 363(b)(1), and 363(c)(1) of the Bankruptcy Code and Bankruptcy Rule 9019: (a) approving the Debtor's settlement with the Committee as set forth in the Term Sheet and outlined herein; (b)

DOCS_NY:39973.7 36027/002

Appellee Appx. 00901
Appx. 01152
013714

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Page 909 of 1804 Page 36 of 1017    PageID 14680
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 908 of 1803    PageID 11654
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 10 of 18

authorizing the Debtor to take any action as may be reasonably required to effectuate the terms of the Term Sheet, including entering into the Governing Documents and compensating – either directly or through reimbursement – the Independent Directors; (c) granting the Committee standing to pursue the Estate Claims; and (d) granting related relief.

<u>**Authority for the Relief Requested**</u>

**A.**    **Section 363(c)(1) of the Bankruptcy Code Authorizes the Debtor to Enter <u>Into Certain Aspects of the Term Sheet in the Ordinary Course</u>**

17.    Because the Debtor is not settling any claims or causes of action through the Term Sheet or otherwise expending estate resources, the Debtor believes that it has the authority to effectuate the majority of the transactions and compromises set forth in the Term Sheet without Court approval under section 363(c)(1) of the Bankruptcy Code.  Specifically, section 363(c)(1) provides:

> [i]f the business of the debtor is authorized to be operated under section. . . 1108. . . of this title. . . the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  As such, a debtor may engage in postpetition actions if the debtor is authorized to operate its business under section 1108 and such transactions are "in the ordinary course of business."

18.    An activity is "ordinary course" if it satisfies both the "horizontal test" and the "vertical test."  *See, e.g., Denton Cty. Elec. Coop. v. Eldorado Ranch, Ltd.* (*In re Denton Cty. Elec. Coop.*), 281 B.R. 876, 882 n.12 (Bankr. N.D. Tex. 2002); *see also In re Roth American, Inc.*, 975 F.2d 949, 952 (3d Cir. 1992).  The vertical test looks to "whether the transaction subjects a

Appellee Appx. 00902
Appx. 01455
013715

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 68-15    Filed 04/06/25    Page 37 of 1017    PageID 14681
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 909 of 1803   PageID 11655
Case 19-34054-sgj11  Doc 281  Filed 12/27/19   Entered 12/27/19 21:33:05    Page 11 of 18

hypothetical creditor to a different economic risk than existed when the creditor originally extended credit." *In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr. W.D. Tex. 2013). The horizontal test considers "whether the transaction was of the sort commonly undertaken by companies in the industry." *Id.* Here, both the vertical test and horizontal test are satisfied.

19.     Under the Term Sheet, the Debtor is seeking authority to (a) appoint the Independent Directors at Strand (a non-debtor entity), (b) have Mr. Dondero removed from his role at the Debtor and Strand; (c) agree to seek the retention of the CRO under a revised engagement letter that provides that the CRO will report to the Independent Directors; (d) grant the Committee standing to pursue the Estate Claims; (e) enter into and implement the Document Production Protocols; (f) grant the Independent Directors the exclusive right to determine whether to waive exclusivity; and (g) enter into and implement the Protocols.  Only the compensation of the Independent Directors, the entrance into the Protocols (which provide the Committee with certain right to object to the Debtor engaging in a "Transaction" (as defined in the Protocols) and allow the Debtor to seek a hearing before this Court on an expedited basis), and the grant of standing to the Committee to pursue Estate Claims could be construed as outside of the ordinary course of business.  The balance of the terms of the Term Sheet either involve non-debtors[6] or will be the subject of separate motions seeking Court approval at the appropriate time.

**B.     The Court Should Approve the Term Sheet Under
        <u>Rule 9019 of the Bankruptcy Code</u>**

20.     Although the Debtor believes that it has authority to implement the majority of the Term Sheet in the ordinary course of its business under section 363(c), the Debtor is seeking

---

[6] With respect to the Independent Directors, they are being appointed to a new independent board of Strand, the Debtor's general partner, and Strand is not a debtor in this case or subject to this Court's jurisdiction.

DOCS_NY:39973.7 36027/002

Appellee Appx. 00903
Appx. 01454
013716

Case 19-34054-sgj11  Doc 3596-6  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:25-cv-02072-S  Document 6-96  Exhibit 96  Filed 01/06/25804 Page 38 of 1017  PageID 14682
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 910 of 1803  PageID 11656
Case 19-34054-sgj11 Doc 281 Filed 12/27/19  Entered 12/27/19 21:33:05  Page 12 of 18

this Court's approval of the Term Sheet under section 105 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules out of an abundance of caution.  Section 105(a) of the Bankruptcy Code provides in relevant part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 105(a) has been interpreted to expressly empower bankruptcy courts with broad equitable powers to "craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain."  *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (en banc); *see also Southmark Corp. v. Grosz* (*In re Southmark Corp.*), 49 F.3d 1111, 1116 (5th Cir. 1995) (stating that section 105(a) of the Bankruptcy Code "authorizes bankruptcy courts to fashion such orders as are necessary to further the substantive provisions of the Code").

21.  Bankruptcy Rule 9019 governs the procedural prerequisites to approval of a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

22.  Settlements in bankruptcy are favored as a means of minimizing litigation, expediting the administration of the bankruptcy estate, and providing for the efficient resolution of bankruptcy cases.  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *see also Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980).  Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve

DOCS_NY:39973.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-1   Page 91 of 25 804   Page 39 of 1017   PageID 14683
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 911 of 1803   PageID 11657
Case 19-34054-sgj11 Doc 281 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 13 of 18

a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interest of the estate.  *See In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, "approval of a compromise is within the sound discretion of the bankruptcy court."  *See United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

23.     In making this determination, the United States Court of Appeals for the Fifth Circuit applies a three-party test, "with a focus on comparing 'the terms of the compromise with the rewards of litigation.'" *Official Committee of Unsecured Creditors v. Cajun Elec. Power Coop. by & through Mabey (In re Cajun Elec. Power Coop.)*, 119 F. 3d 349, 356 (5th Cir. 1997) (citing *Jackson Brewing*, 624 F.2d at 602).  The Fifth Circuit has instructed courts to consider the following factors:  "(1) The probability of success in the litigation, with due consideration for the uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *Id.*

24.     Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.; Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995).  Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; Foster Mortg. Corp., 68 F.3d at 918 (citations omitted).

DOCS_NY:39973.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-9    Filed 03/06/25    Page 40 of 1017    PageID 14684
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 912 of 1803    PageID 11658
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 14 of 18

25.     Here, the Debtor submits that effectuating the transactions set forth in the Term Sheet satisfies the Fifth Circuit's three-part test. The settlement embodied in the Term Sheet was driven in large part by the Debtor's creditors and has the support of the Committee, which consists of the Debtor's principal creditors. The Term Sheet was negotiated at arm's length, and there was no fraud or collusion in its negotiation. The settlement is also fair and reasonable and in the best interests of the Debtor's estate and also resolves the open disputes regarding the CRO Motion, the *Motion of Debtor for Interim and Final Orders Authorizing (A) Continuance of Existing Cash Management System, (B) Continued Use of the Prime Account, (C) Limited Waiver*, as supplemented [Docket Nos. 51 & 259], and *Precautionary Motion of the Debtor for Order Approving Protocols for the Debtor to Implement Certain Transactions in the Ordinary Course of Business* [Docket No. 76].

26.     The Debtor and members of the Committee have been entangled in highly contentious litigation that has spanned many years and multiple venues. As evidenced by the brief history of the Debtor's bankruptcy case,[7] that contention and mistrust has carried over into this proceeding and could derail any chance that the Debtor has to successfully reorganize and structure a plan to pay its creditors. The governance and operational changes set forth in the Term Sheet, will provide greater transparency to the Committee and start the process of rebuilding the trust necessary to negotiate a successful resolution of this case. Without the Term Sheet, the Debtor

---

[7] *See, e.g., Declaration of Frank Waterhouse in Support of First Day Motions* [Docket No. 11], *Motion of the Official Committee of Unsecured Creditors for an Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas* [Docket No. 85], *Omnibus Objection of the Official Committee of Unsecured Creditors to the Debtor's (I) Motion for Final Order Authorizing Continuance of the Existing Cash Management System, (II) Motion to Employ and Retain Development Specialists, Inc. to Provide a Chief Restructuring Officers, and (III) Precautionary Motion for Approval of Protocol for "Ordinary Course" Transactions* [Docket No. 130], and *United States Trustee's Motion for an Order Directing the Appointment of a Chapter 11 Trustee* [Docket No. 271].

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-96    Filed 04/06/25    Page 41 of 1017    PageID 14685
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 913 of 1803    PageID 11659
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 15 of 18

anticipates that the Committee would move to appoint a chapter 11 trustee and the U.S. Trustee

has already done so (without even seeing the Term Sheet).  The Debtor will contest such motions

because the appointment of a chapter 11 trustee could gravely harm the Debtor's business.  The

implementation of the Term Sheet will head off any potential issues that could arise, eliminate

costly, time consuming and uncertain litigation, and give the Debtor sufficient breathing room to

work towards rebuilding trust with its creditor body and allow the Debtor to exit bankruptcy and

preserve the value of its business.  The Debtor's bankruptcy case has been pending for over two

and a half months, and it is time for the parties to put the acrimony that marked the initial stages

of this case behind them and to move forward in a productive manner – precisely what the Term

Sheet seeks to accomplish.

C.    **Consummating the Settlement Agreement**
      **is a Sound Exercise of the Debtors' Business Judgment.**

27.    Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession

to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after

notice and a hearing.  It is well established in this jurisdiction that a debtor may use property of

the estate outside the ordinary course of business under this provision if there is a good business

reason for doing so.  *See, e.g., ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d

593, 601 (5th Cir. 2011) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to

the debtor, creditors, and equity holders, there must be some articulated business justification for

using, selling, or leasing the property outside the ordinary course of business.") (*quoting In re*

*Cont'l Air Lines, Inc.*, 780 F.3d 1223, 1226 (5th Cir. 1986)); 441 B.R. 813, 830 (Bankr. S.D. Tex.

DOCS_NY:39973.7 36027/002

Appellee Appx. 00907
Appx. 01158
013720

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-1   Exhibit 6   Page 31 of 25804   Page 42 of 1017   PageID 14686
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 914 of 1803   PageID 11660
Case 19-34054-sgj11  Doc 281  Filed 12/27/19   Entered 12/27/19 21:33:05   Page 16 of 18

2010); *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005).

28.     The transactions contemplated by the Term Sheet are within the sound business judgment of the Debtor.  The Term Sheet resolves potentially costly and protracted litigation with the Committee over the Debtor's corporate governance and will give the Debtor the breathing room necessary to negotiate and effectuate the terms of a plan acceptable to the Debtor's creditors.  Further, providing standing to the Committee to investigate Estate Claims and the payment of the Independent Directors from the assets of the estate are each necessary components of the Term Sheet.  The Committee would not have agreed to the Term Sheet without the grant of standing to investigate Estate Claims.  Moreover, Strand, a non-debtor, is unable to cover the costs of the Independent Directors.  As such, there is a good business reason for the Debtor's payment of the Independent Directors' compensation: the Term Sheet and the appointment of the Independent Directors would not have been agreed to or possible without that condition.[8]  The foregoing is sufficient grounds to approve the Term Sheet and authorize the Debtor to effectuate the terms of the Term Sheet under Section 363(b)(1).

### No Prior Request

29.     No previous request for the relief sought herein has been made to this, or any other, Court.

---

[8] Further, although the Debtor seeks to reimburse Strand for the cost of the Independent Directors, the Debtor is otherwise obligated to reimburse Strand for any costs or expenses incurred by Strand in its management of the Debtor. *See* Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., § 3.10(b).

DOCS_NY:39973.7 36027/002

Appellee Appx. 00908
Appx. 01150
013721

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S      Document 16-15      Page 91 of 1803    Page 43 of 1017      PageID 14687
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 915 of 1803    PageID 11661
Case 19-34054-sgj11  Doc 281  Filed 12/27/19    Entered 12/27/19 21:33:05    Page 17 of 18

## Notice

30.    Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) the Office of the United States Attorney for the Northern District of Texas; (c) the Debtor's principal secured parties; (d) counsel to the Committee; and (e) parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that the Court enter an Order, substantially in the form attached hereto as **Exhibit C**, (a) approving the Debtor's settlement with the Committee as set forth in the Term Sheet and outlined herein; (b) authorizing the Debtor to take any action as may be reasonably required to effectuate the terms of the Term Sheet, including entering into the Governing Documents and compensating – either directly or through reimbursement – the Independent Directors; and (c) granting related relief.

DOCS_NY:39973.7 36027/002

Appellee Appx. 00909
013722

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-1    Page 91/00/25804 Page 44 of 1017    PageID 14688
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 916 of 1803    PageID 11662
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 18 of 18

Dated:  December 27, 2019                   PACHULSKI STANG ZIEHL & JONES LLP
                                            Jeffrey N. Pomerantz (CA Bar No.143717)
                                            (*admitted pro hac vice*)
                                            Ira D. Kharasch (CA Bar No. 109084)
                                            (*admitted pro hac vice*)
                                            Maxim B. Litvak (Texas Bar No. 24002482)
                                            Gregory V. Demo (NY Bar No. 5371992)
                                            (*admitted pro hac vice*)
                                            10100 Santa Monica Blvd., 13th Floor
                                            Los Angeles, CA 90067
                                            Telephone: (310) 277-6910
                                            Facsimile: (310) 201-0760
                                            E-mail:    jpomerantz@pszjlaw.com
                                                       ikharasch@pcszjlaw.com
                                                       mlitvak@pszjlaw.com
                                                       gdemo@pszjlaw.com

                                            -and-

                                            */s/ Melissa S. Hayward*
                                            HAYWARD & ASSOCIATES PLLC
                                            Melissa S. Hayward
                                            Texas Bar No. 24044908
                                            MHayward@HaywardFirm.com
                                            Zachary Z. Annable
                                            Texas Bar No. 24053075
                                            ZAnnable@HaywardFirm.com
                                            10501 N. Central Expy, Ste. 106
                                            Dallas, Texas 75231
                                            Tel: (972) 755-7100
                                            Fax: (972) 755-7110

                                            *Counsel and Proposed Counsel for the Debtor and
                                            Debtor in Possession*

DOCS_NY:39973.7 36027/002

Appellee Appx. 00910
Appx. 91101
013723

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Filed 06/25/504 Page 45 of 1017   PageID 14689
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 917 of 1803   PageID 11663
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 1 of 61

## Highland Capital Management, L.P.

### Preliminary Term Sheet

  This term sheet ("Term Sheet") outlines the principal terms of a proposed settlement between Highland Capital Management, L.P. (the "Debtor") and the Official Committee of Unsecured Creditors (the "Committee") in the chapter 11 case captioned In re Highland Capital Mgm't, L.P, Case No. 19-34054 (SGJ) (the "Chapter 11 Case"), pending in the Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"), to resolve a good faith dispute between the parties related to the Debtor's corporate governance, and specifically, the Committee's various objections to certain relief being sought by the Debtors in the Chapter 11 Case [Del. Docket No. 125].  This Term Sheet shall be subject to approval by the Bankruptcy Court.

| Topic | Proposed Terms |
|---|---|
| **Parties** | Highland Capital Management, L.P. (the "Debtor").<br><br>The Official Committee of Unsecured Creditors of Highland Capital Management, L.P. (the "Committee"). |
| **Independent Directors** | The Debtor's general partner, Strand Advisors, Inc., will appoint the following three (3) independent directors (the "Independent Directors"): James Seery, John Dubel, and a third director to be selected by or otherwise acceptable to the Committee.  The Independent Directors will be granted exclusive control over the Debtor and its operations.  Among other things, the Independent Directors shall conduct a review of all current employees as soon as practicable following the Independent Directors' appointment, determine whether and which employees should be subject to a key employee retention plan and/or key employee incentive plan and, if applicable, propose plan(s) covering such employees. The appointment and powers of the Independent Directors and the corporate governance structure shall be pursuant to the documents attached hereto as **Exhibit A**, which documents shall be satisfactory to the Committee. Once appointed, the Independent Directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the Independent Directors, to object to such removal and replacement).<br><br>The Independent Directors shall be compensated in a manner to be determined with an understanding that the |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-16   Page 91 of 258 Page 46 of 1017   PageID 14690
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 918 of 1803   PageID 11664
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 2 of 61

| | |
|---|---|
| | source of funding, whether directly or via reimbursement, will be the Debtor.

As soon as practicable after their appointments, the Independent Directors shall, in consultation with the Committee, determine whether an interim Chief Executive Officer (the "CEO") should be appointed for the Debtor.  If the Independent Directors determine that appointment of a CEO is appropriate, the Independent Directors shall appoint a CEO acceptable to the Committee as soon as practicable, which may be one of the Independent Directors.  Once appointed, the CEO cannot be removed without the Committee's written consent or Order of the Court.

The Committee shall have regular, direct access to the Independent Directors, provided, however that (1) if the communications include FTI Consulting Inc. ("FTI"), Development Specialists Inc. ("DSI") shall also participate in such communications; and (2) if the communications include counsel, then either Debtor's counsel or, if retained, counsel to the Independent Directors shall also participate in such communications. |
| **Role of Mr. James Dondero** | Upon approval of this Term Sheet by the Bankruptcy Court, Mr. Dondero will (1) resign from his position as a Board of Director of Strand Advisors, Inc., (2) resign as an officer of Strand Advisors, Inc., and (3) resign as an employee of the Debtor. |
| **CRO** | DSI shall, subject to approval of the Bankruptcy Court, be retained as chief restructuring officer ("CRO") to the Debtor and report to and be directed by the Independent Directors and, if and once appointed, the CEO.  The retention and scope of duties of DSI shall be pursuant to the Further Amended Retention Agreement, attached hereto as **Exhibit B**.

DSI and all other Debtor professionals shall serve at the direction of the CEO, if any, and the Independent Directors. |
| **Estate Claims** | The Committee is granted standing to pursue any and all estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor, and each of the Related Entities, including any promissory notes held by any of the foregoing (collectively, the "Estate Claims"); provided, however, that the term Estate Claims will not |

Appellee Appx. 00912
Appx. 01105
013725

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-6   Page 920 of 25804   Page 47 of 1017   PageID 14691
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 919 of 1803   PageID 11665
Case 19-34054-sgj11  Doc 281-1  Filed 12/27/19   Entered 12/27/19 21:33:05   Page 3 of 61

| | include any estate claim or cause of action against any then-current employee of the Debtor. |
|---|---|
| **Document Management, Preservation, and Production** | The Debtor shall be subject to and comply with the document management, preservation, and production requirements attached hereto as **Exhibit C**, which requirements cannot be modified without the consent of the Committee or Court order (the "Document Production Protocol").<br><br>Solely with respect to the investigation and pursuit of Estate Claims, the document production protocol will acknowledge that the Committee will have access to the privileged documents and communications that are within the Debtor's possession, custody, or control ("Shared Privilege").<br><br>With respect to determining if any particular document is subject to the Shared Privilege, the following process shall be followed: (i) the Committee will request documents from the Debtor, (ii) the Debtor shall log all documents requested but withheld on the basis of privilege, (iii) the Debtor shall not withhold documents it understands to be subject to the Shared Privilege; (iv) the Committee will identify each additional document on the log that the Committee believes is subject to the Shared Privilege, and (v) a special master or other third party neutral agreed to by the Committee and the Debtor shall make a determination if such documents are subject to the Shared Privilege.  The Committee further agrees that the production of any particular document by the Debtor under this process will not be used as a basis for a claim of subject matter waiver. |
| **Reporting Requirements** | The Debtor shall be subject to and comply with the reporting requirements attached hereto as **Exhibit D**, which reporting requirements cannot be modified without the consent of the Committee or Court order (the "Reporting Requirements"). |
| **Plan Exclusivity** | The Independent Directors may elect to waive the Debtor's exclusive right to file a plan under section 1121 of the Bankruptcy Code. |
| **Operating Protocols** | The Debtor shall comply with the operating protocols set forth in **Exhibit D** hereto, regarding the Debtor's operation in the ordinary course of business, which protocols cannot be modified without the consent of the Committee or Court order. |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S      Document 16-9      Filed 09/06/25    Page 48 of 1017      PageID 14692
Exhibit 6    Page 920 of 25804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 920 of 1803    PageID 11666
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 4 of 61

| Reservation of Rights | This agreement is without prejudice to the Committee's rights to, among other things, seek the appointment of a trustee or examiner at a later date.  Nothing herein shall constitute or be construed as a waiver of any right of the Debtor or any other party in interest to contest the appointment of a trustee or examiner, and all such rights are expressly reserved. |
|---|---|

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S     Document 16-15   Page 220 of 504   Page 49 of 1017     PageID 14693
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 921 of 1803   PageID 11667
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 5 of 61

## Exhibit A

**Debtor's Corporate Governance Documents**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S     Document 16-19     Page 923 of 1804  Page 50 of 1017     PageID 14694
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 922 of 1803   PageID 11668
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 6 of 61

**<u>Exhibit B</u>**

**Amended DSI Retention Letter**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S      Document 16-15      Page 9240 of 25304 Page 51 of 1017      PageID 14695
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 923 of 1803    PageID 11669
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 7 of 61

**Exhibit C**

**Document Production Protocol**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-9    Filed 05/05/25    Page 52 of 1017    PageID 14696
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 924 of 1803    PageID 11670
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 8 of 61

*PSZJ Revisions 12/23/19*
*Privileged & Confidential*
*Subject to FRE 408*

## Exhibit D

**Reporting Requirements**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6-8    Exhibit 6    Page 926 of 2804  Page 53 of 1017    PageID 14697
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 925 of 1803    PageID 11671
Case 19-34054-sgj11  Doc 281-1  Filed 12/27/19    Entered 12/27/19 21:33:05    Page 9 of 61

**WRITTEN CONSENT OF SOLE STOCKHOLDER AND DIRECTOR**

**OF**

**STRAND ADVISORS, INC.**

**[ _____ ]**

Pursuant to the provisions of the General Corporation Law of the State of Delaware (the "DGCL") and consistent with the provisions of the Certificate of Incorporation (the "Certificate") and Bylaws (the "Bylaws") of Strand Advisors, Inc., a Delaware corporation (the "Company"), the undersigned, being the holder of all of the issued and outstanding shares of common stock, par value $0.01 per share, of the Company and the sole director of the Company (the "Stockholder"), acting by written consent without a meeting pursuant to Section 228 of the DGCL and Article IV, Section 6, and Article XII of the Bylaws, does hereby consent to the adoption of the following resolutions and to the taking of the actions contemplated thereby, in each case with the same force and effect as if presented to and adopted at a meeting of the stockholders:

I.    **AMENDMENT OF BYLAWS**

**WHEREAS**, it is acknowledged that the Board of Directors of the Company (the "Board") has heretofore been fixed at one (1) and that the Board currently consists of James Dondero;

**WHEREAS,** pursuant to Article XII of the Bylaws, the Stockholder wishes to amend the Bylaws in the manner set forth on **Appendix A** hereto (the "Bylaws Amendment") to increase the size of the Board from one (1) to three (3) directors; and

**NOW, THEREFORE, BE IT RESOLVED,** that the Bylaws Amendment is hereby authorized and approved and the Board is increased from one (1) to three (3) directors;

**RESOLVED FURTHER,** that any officer of the Company is authorized to take any such actions as may be required to effectuate the Bylaws Amendment; and

**RESOLVED FURTHER,** that any action taken by any officer of the Company on or prior to the date hereof to effectuate such Bylaws Amendment is hereby authorized and affirmed.

II.    **ELECTION OF DIRECTORS**

**WHEREAS**, the Stockholder desires to appoint James Seery, John Dubel, and _____ to the Board and desires that such individuals constitute the whole Board;

**NOW, THEREFORE, BE IT RESOLVED,** that James Seery, John Dubel, and _____, having consented to act as such, be, and each of them hereby is, appointed as a director, to serve as a director of the Company and to hold such office until such director's respective successor shall have been duly elected or appointed and shall qualify, or until such director's death, resignation or removal;

**RESOLVED FURTHER,** that any officer of the Company is authorized to take any such actions as

DOCS_DE:227001.2 36027/002

Exhibit A
**Appellee Appx. 00919**
Appx. 01179
**013732**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-6   Exhibit 6   Page 92 of 25804   Page 54 of 1017   PageID 14698
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 926 of 1803   PageID 11672
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 10 of 61

may be required to effectuate the appointment of the foregoing directors, including executing an indemnification agreement in favor of such directors in substantially the form attached hereto as **Appendix B** (each, an "Indemnification Agreement");

**RESOLVED FURTHER,** that any action taken by any officer of the Company on or prior to the date hereof to effectuate the appointment of such directors, including the execution of an Indemnification Agreement, is hereby authorized and affirmed.

**RESOLVED FURTHER,** that James Dondero and any other directors of the Company are hereby removed as directors of the Company;

**RESOLVED FURTHER,** that the directors appointed pursuant to these resolutions shall, pursuant to the terms of the Bylaws, appoint a Chairman of the Board.

### III.   STIPULATION WITH THE BANKRUPTCY COURT

**WHEREAS,** on October 16, 2019, Highland Capital Management, L.P. ("HCMLP") filed for chapter 11 bankruptcy protection in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Bankruptcy Case");

**WHEREAS,** the Company is the general partner for HCMLP;

**WHEREAS,** the Bankruptcy Case was transferred to the Bankruptcy Court for the Northern District of Texas, Case No. 19-34054-sgj11 (the "Texas Court") by order of the Bankruptcy Court for the District of Delaware on December 4, 2019;

**WHEREAS,** the Company and the Stockholder wish to enter into a stipulation with HCMLP and the Official Unsecured Creditors Committee appointed in the Bankruptcy Case (the "Committee"), such stipulation to be approved by the Texas Court, whereby the Stockholder will agree (a) not to transfer or assign his shares in the Company or exercise the voting power of such shares to remove any member of the Board appointed pursuant to these resolutions or further change the authorized number of directors from three (3) directors; (b) to exercise the voting power of his shares so as to cause each member of the Board appointed by this resolutions to be re-elected at upon the expiration of his or her term; and (c) upon the death, disability, or resignation of _____, will exercise the voting power of such shares so as to cause the resulting vacancy to be filled by a successor that is both independent and acceptable to the Stockholder and the Committee (the "Stipulation");

**WHEREAS,** for purposes of the Stipulation, "independent" would exclude the Stockholder, any affiliate of the Stockholder, and any member of management of the Company; and

**WHEREAS,** it is in the intent of the parties that the Stipulation will no longer be effective or bind Strand or the Stockholder following the termination of the Bankruptcy Case.

**NOW, THEREFORE, BE IT RESOLVED,** that the Company is authorized to take such actions as may be necessary to enter into and effectuate the Stipulation in the manner and on the terms set forth above, including, but not limited to, further amending the Certificate, Bylaws, or any other corporate governance documents; and

**RESOLVED FURTHER,** that Scott Ellington, as an officer of the Company, is authorized to take any such actions as may be required to enter into and effectuate the Stipulation in the manner set forth herein; and

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S      Document 15-9      Exhibit 6      Page 928 of 1804 Page 55 of 1017      PageID 14699
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 927 of 1803    PageID 11673
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 11 of 61

**RESOLVED FURTHER,** that any action taken by Scott Ellington or any other officer of the Company on or prior to the date hereof to effectuate such Stipulation is hereby authorized and affirmed.

*[Signature pages follow.]*

Appellee Appx. 00921
013734
Appx. 01172

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S      Document 16-9      Page 929 of 1804 Page 56 of 1017      PageID 14700
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 928 of 1803    PageID 11674
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 12 of 61

**IN WITNESS WHEREOF,** the undersigned has executed this Written Consent as of the respective date and year first appearing above.

**STOCKHOLDER:**

_____
James Dondero

*[Signature Page to Written Consent of Sole Stockholder of Strand Advisors, Inc.]*

Appellee Appx. 00922
013735
Appx. 01173

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 16-16    Filed 03/06/25    Page 57 of 1017    PageID 14701
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 929 of 1803   PageID 11675
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 13 of 61

**First Amendment to Bylaws of
Strand Advisors, Inc.**

Strand Advisors, Inc. (the "Company"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, does hereby certify that the Company's sole stockholder, acting by written consent without a meeting, resolved to amend the Company's Bylaws (the "Bylaws") as follows:

**1.**    Article III, Section 2, of the Bylaws is hereby deleted in its entirety and replaced with the following:

Section 2. Number of Directors. The number of directors which shall constitute the whole Board shall be three (3).

**2.**    The following shall be added as Section 6 to Article III of the Bylaws:

Section 6. Director Qualifications. Each director appointed to serve on the Board shall (A) (i) be an independent director, (ii) not be affiliated with the corporation's stockholders, and (iii) not be an officer of the corporation; and (B) have been (x) nominated by the stockholders, (y) a retired bankruptcy judge and nominated jointly by the stockholders and any official committee of unsecured creditors in the chapter 11 bankruptcy of Highland Capital Management, L.P. (the "Committee") currently pending in the Bankruptcy Court for the Northern District of Texas (the "Court"), Case No. 19-34054-sgj11; or (z) nominated by the Committee and reasonably acceptable to the stockholders.

**3.**    The following shall be added as Section 7 to Article III of the Bylaws:

Section 7. Removal of Directors.  Once appointed, the Independent Directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the Independent Directors, to object to such removal and replacement).

Except as expressly amended hereby, the terms of the Company's Bylaws shall remain in full force and effect.

*[Signature Page Follows]*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S      Document 16-9      Page 930 of 25804  Page 58 of 1017      PageID 14702
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 930 of 1803    PageID 11676
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 14 of 61

**IN WITNESS WHEREOF,** the Company has caused this amendment to be signed this [ __ ]
day of [ __ ], 20__.

<div style="text-align:center">

**STRAND ADVISORS, INC.**

</div>

_____

By: Scott Ellington
Its: Secretary

Appellee Appx. 00924
Appx. 01175
013737

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-5    Page 932 of 18304 Page 59 of 1017    PageID 14703
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 931 of 1803    PageID 11677
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 15 of 61

## INSERT STRAND ADVISORS, INC. LETTERHEAD

[ _____ ]

[NAME]
[ADDRESS]
[ADDRESS]
[ADDRESS]

**Re:**    **Strand Advisors, Inc. – Director Agreement**

Dear [ _____ ]:

On behalf of Strand Advisors, Inc. (the "Company"), I am pleased to have you join the Company's Board of Directors. This letter sets forth the terms of the Director Agreement (the "Agreement") that the Company is offering to you.

1.    **APPOINTMENT TO THE BOARD OF DIRECTORS.**

a.    Title, Term and Responsibilities.

i.    Subject to terms set forth herein, the Company agrees to appoint you to serve as a Director on the Company's Board of Directors (the "Board"), and you hereby accept such appointment the date you sign this Agreement (the "Effective Date"). You will serve as a Director of the Board from the Effective Date until you voluntarily resign, are removed from the Board, or are not re-elected (the "Term"). Your rights, duties and obligations as a Director shall be governed by the Certificate of Incorporation and Bylaws of the Company, each as amended from time to time (collectively, the "Governing Documents"), except that where the Governing Documents conflict with this Agreement, this Agreement shall control.

ii.    You acknowledge and understand that the Company is the general partner of Highland Capital Management, L.P. ("HCMLP") and that HCMLP is currently the debtor in possession in a chapter 11 bankruptcy proceeding pending in the Northern District of Texas (the "Bankruptcy"). Your rights, duties, and obligations may in certain instances require your involvement, either directly or indirectly, in the Bankruptcy and such rights, duties, and obligations may be impacted in whole or in part by the Bankruptcy.

b.    Mandatory Board Meeting Attendance. As a Director, you agree to apply all reasonable efforts to attend each regular meeting of the Board and no fewer than fifty percent (50%) of these meetings of the Board in person, and no more than fifty percent (50%) of such meetings by telephone or teleconference. You also agree to devote sufficient time to matters that may arise at the Company from time to time that require your attention as a Director.

c.    Independent Contractor. Under this Agreement, your relationship with the Company will be that of an independent contractor as you will not be an employee of the Company nor eligible to participate in regular employee benefit and compensation plans of the Company.

d.    Information Provided by the Companies. The Company shall: (i) provide you with reasonable access to management and other representatives of the Company, except to the extent that any such access may impair any attorney client privilege to which the Company may be entitled; and (ii) furnish all data, material, and other information concerning the business, assets, liabilities, operations, cash flows,

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 933 of 1804   Page 60 of 1017   PageID 14704
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 932 of 1803   PageID 11678
Case 19-34054-sgj11   Doc 281-1   Filed 12/27/19   Entered 12/27/19 21:33:05   Page 16 of 61

properties, financial condition and prospects of the Company that you reasonably request in connection with the services to be provided to the Company. You will rely, without further independent verification, on the accuracy and completeness of all publicly available information and information that is furnished by or on behalf of the Company and otherwise reviewed by you in connection with the services performed for the Company. The Company acknowledges and agrees that you are not responsible for the accuracy or completeness of such information and shall not be responsible for any inaccuracies or omissions therein, provided that if you become aware of material inaccuracies or errors in any such information you shall promptly notify the Board of such errors, inaccuracies or concerns. You are under no obligation to update data submitted to you or to review any other information unless specifically requested by the Board to do so.

2.   **COMPENSATION AND BENEFITS.**

a.   Retainer. The Company will pay you a retainer for each month you serve on the Board (the "Retainer") to be paid in monthly installments of $[TBD]. The Company's obligation to pay the Retainer will cease upon the termination of the Term.

b.   Expense Reimbursement. The Company will reimburse you for all reasonable travel or other expenses, including expenses of counsel, incurred by you in connection with your services hereunder, in accordance with the Company's expense reimbursement policy as in effect from time to time.

c.   Invoices; Payment.

i.   In order to receive the compensation and reimbursement set forth in this Section 2, you are required to send to the Company regular monthly invoices indicating your fees, costs, and expenses incurred. Payment will be due to you within 10 business days after receipt of each such invoice, subject to the Company's receipt of appropriate documentation required by the Company's expenses reimbursement policy.

ii.   You further agree that the Company's obligation to pay the compensation and reimbursement set forth in this Section 2 is conditioned in all respects on the entry of a final order in the court overseeing the Bankruptcy that authorizes and requires HCMLP to reimburse the Company for all such payments to you.

d.   Indemnification; D&O Insurance. You will receive indemnification as a Director of the Company on the terms set forth in that certain Indemnification Agreement, dated December 5, 2019, a copy of which is attached hereto as **Appendix A** (the "Indemnification Agreement"). You will also be provided coverage under the Company's directors' and officers' insurance policy as set forth in the Indemnification Agreement.

e.   Tax Indemnification. You acknowledge that the Company will not be responsible for the payment of any federal or state taxes that might be assessed with respect to the Retainer and you agree to be responsible for all such taxes.

3.   **PROPRIETARY INFORMATION OBLIGATIONS.**

a.   Proprietary Information. You agree that during the Term and thereafter that you will take all steps reasonably necessary to hold all information of the Company, its affiliates, and related entities, which a reasonable person would believe to be confidential or proprietary information, in trust and confidence, and not disclose any such confidential or proprietary information to any third party without first obtaining the Company's express written consent on a case-by-case basis.

Appellee Appx. 00926
Appx. 013739

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-16   Page 934 of 25804 Page 61 of 1017   PageID 14705
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 933 of 1803   PageID 11679
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 17 of 61

b.     <u>Third Party Information</u>. The Company has received and will in the future receive from third parties confidential or proprietary information ("<u>Third Party Information</u>") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. You agree to hold such Third Party Information in confidence and not to disclose itto anyone (other than Company personnel who need to know such information in connection with their work for Company) or to use, except in connection with your services for Company under this Agreement, Third Party Information unless expressly authorized in writing by the Company.

c.     <u>Return of Company Property</u>. Upon the end of the Term or upon the Company's earlier request, you agree to deliver to the Company any and all notes, materials and documents, together with any copies thereof, which contain or disclose any confidential or proprietary information or Third Party Information.

### 4.     OUTSIDE ACTIVITIES.

a.     <u>Investments and Interests</u>. Except as permitted by Section 4(b), you agree not to participate in, directly or indirectly, any position or investment known by you to be materially adverse to the Company or any of its affiliates or related entities.

b.     <u>Activities</u>. Except with the prior written consent of the Board, you will not during your tenure as a member of the Company's Board undertake or engage in any other directorship, employment or business enterprise in direct competition with the Company or any of its affiliates or related entities, other than ones in which you are a passive investor or other activities in which you were a participant prior to your appointment to the Board as disclosed to the Company.

c.     <u>Other Agreements</u>. You agree that you will not disclose to the Company or use on behalf of the Company any confidential information governed by any agreement between you and any third party except in accordance with such agreement.

### 5.     TERMINATION OF DIRECTORSHIP.

a.     <u>Voluntary Resignation, Removal Pursuant to Bylaws and Stockholder Action</u>. You may resign from the Board at any time with or without advance notice, with or without reason. Subject to any orders or agreements entered into in connection with the Bankruptcy, you may be removed from the Board at any time, for any reason, in any manner provided by the Governing Documents and applicable law or by an affirmative vote of a majority of the stockholders of the Company.

b.     <u>Continuation</u>. The provisions of this Agreement that give the parties rights or obligations beyond the termination of this Agreement will survive and continue to bind the parties.

c.     <u>Payment of Fees; Reimbursement</u>. Following termination of this Agreement, any undisputed fees and expenses due to you will be remitted promptly following receipt by the Company of any outstanding invoices.

### 6.     GENERAL PROVISIONS.

a.     <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. If any provision of this Agreement is held to be invalid, illegal or unenforceable such provision will be reformed, construed and enforced to render it valid, legal, and enforceable consistent with the intent of the parties insofar as possible.

Appellee Appx. 00927
Appx. 01478
013740

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-9    Exhibit 6    Page 935 of 1804    Page 62 of 1017    PageID 14706
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 934 of 1803    PageID 11680
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 18 of 61

       b.      <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between you and the Company with respect to your service as a Director and supersedes any prior agreement, promise, representation or statement written between you and the Company with regard to this subject matter. It is entered into without reliance on any promise, representation, statement or agreement other than those expressly contained or incorporated herein, and it cannot be modified or amended except in a writing signed by the party or parties affected by such modification or amendment.

       c.      <u>Successors and Assigns</u>. This Agreement is intended to bind and inure to the benefit of and be enforceable by you and the Company and our respective successors, assigns, heirs, executors and administrators, except that you may not assign any of your rights or duties hereunder without the written consent of the Company.

       d.      <u>Governing Law</u>. This Agreement will be governed by the law of the State of Delaware as applied to contracts made and performed entirely within Delaware.

We are all delighted to be able to extend you this offer and look forward to working with you. To indicate your acceptance of the Company's offer, please sign and date this Agreement below.

Sincerely,

**STRAND ADVISORS, INC.**

By: Scott Ellington
Its: Secretary

*[Signature Page Follows]*

Appellee Appx. 00928
Appx. 01479
013741

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-1    Page 936 of 1804    Page 63 of 1017    PageID 14707
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 935 of 1803    PageID 11681
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 19 of 61

**ACCEPTED AND AGREED:**

_____
[NAME]
Date: _____

Appellee Appx. 00929
Appx. 01180
013742

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 16-15   Page 937 of 1804   Page 64 of 1017    PageID 14708
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 936 of 1803   PageID 11682
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05    Page 20 of 61

## INDEMNIFICATION AGREEMENT

This Indemnification Agreement ("**Agreement**"), dated as of [ _____ ], is by and between STRAND ADVISORS, INC., a Delaware corporation (the "**Company**"), and [_____] (the "**Indemnitee**").

WHEREAS, Indemnitee has agreed to serve as a member of the Company's board of directors (the "**Board**") effective as of the date hereof;

WHEREAS, the Board has determined that enhancing the ability of the Company to retain and attract as directors the most capable Persons is in the best interests of the Company and that the Company therefore should seek to assure such Persons that indemnification and insurance coverage is available; and

WHEREAS, in recognition of the need to provide Indemnitee with protection against personal liability, in order to procure Indemnitee's service as a director of the Company, in order to enhance Indemnitee's ability to serve the Company in an effective manner and in order to provide such protection pursuant to express contract rights (intended to be enforceable irrespective of, among other things, any amendment to the Company's Bylaws (as may be amended further from time to time, the "**Bylaws**"), any change in the composition of the Board or any change in control, business combination or similar transaction relating to the Company), the Company wishes to provide in this Agreement for the indemnification of, and the advancement of Expenses (as defined in <u>Section 1(g)</u> below) to, Indemnitee as set forth in this Agreement and for the coverage of Indemnitee under the Company's directors' and officers' liability or similar insurance policies ("**D&O Insurance**").

NOW, THEREFORE, in consideration of the foregoing and the Indemnitee's agreement to provide services to the Company, the parties agree as follows:

1.     <u>Definitions</u>. For purposes of this Agreement, the following terms shall have the following meanings:

(a)     "**Change in Control**" means the occurrence of any of the following: (i) the direct or indirect sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions (including any merger or consolidation or whether by operation of law or otherwise), of all or substantially all of the properties or assets of the Company and its subsidiaries, to a third party purchaser (or group of affiliated third party purchasers) or (ii) the consummation of any transaction (including any merger or consolidation or whether by operation of law or otherwise), the result of which is that a third party purchaser (or group of affiliated third party purchasers) becomes the beneficial owner, directly or indirectly, of more than fifty percent (50%) of the then outstanding Shares or of the surviving entity of any such merger or consolidation.

(b)     "**Claim**" means:

(i)     any threatened, pending or completed action, suit, claim, demand, arbitration, inquiry, hearing, proceeding or alternative dispute resolution mechanism, or

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Page 938 of 2804 Page 65 of 1017    PageID 14709
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 937 of 1803    PageID 11683
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 21 of 61

any actual, threatened or completed proceeding, including any and all appeals, in each case, whether brought by or in the right of the Company or otherwise, whether civil, criminal, administrative, arbitrative, investigative or other, whether formal or informal, and whether made pursuant to federal, state, local, foreign or other law, and whether or not commenced prior to the date of this Agreement, in which Indemnitee was, is or will be involved as a party or otherwise, by reason of or relating to either (a) any action or alleged action taken by Indemnitee (or failure or alleged failure to act) or of any action or alleged action (or failure or alleged failure to act) on Indemnitee's part, while acting in his or her Corporate Status or (b) the fact that Indemnitee is or was serving at the request of the Company or any subsidiary of the Company as director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise, in each case, whether or not serving in such capacity at the time any Loss or Expense is paid or incurred for which indemnification or advancement of Expenses can be provided under this Agreement, except one initiated by Indemnitee to enforce his or her rights under this Agreement; or

(ii)    any inquiry, hearing or investigation that the Indemnitee determines might lead to the institution of any such action, suit, proceeding or alternative dispute resolution mechanism.

(c)    "**Controlled Entity**" means any corporation, limited liability company, partnership, joint venture, trust or other Enterprise, whether or not for profit, that is, directly or indirectly, controlled by the Company. For purposes of this definition, the term "control" means the possession, directly or indirectly, of the power to direct, or cause the direction of, the management or policies of an Enterprise, whether through the ownership of voting securities, through other voting rights, by contract or otherwise.

(d)    "**Corporate Status**" means the status of a Person who is or was a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of the Company or of any other Enterprise which such Person is or was serving at the request of the Company or any subsidiary of the Company. In addition to any service at the actual request of the Company, Indemnitee will be deemed, for purposes of this Agreement, to be serving or to have served at the request of the Company or any subsidiary of the Company as a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise if Indemnitee is or was serving as a director, officer, employee, partner, member, manager, fiduciary, trustee or agent of such Enterprise and (i) such Enterprise is or at the time of such service was a Controlled Entity, (ii) such Enterprise is or at the time of such service was an employee benefit plan (or related trust) sponsored or maintained by the Company or a Controlled Entity or (iii) the Company or a Controlled Entity, directly or indirectly, caused Indemnitee to be nominated, elected, appointed, designated, employed, engaged or selected to serve in such capacity.

(e)    "**Disinterested Director**" means a director of the Company who is not and was not a party to the Claim in respect of which indemnification is sought by Indemnitee. Under no circumstances will James Dondero be considered a Disinterested Director.

(f)    "**Enterprise**" means the Company or any subsidiary of the Company or any other corporation, partnership, limited liability company, joint venture, employee benefit

2

Appellee Appx. 00931
Appx. 01482
013744

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-16   Page 966 of 1804   Page 66 of 1017   PageID 14710
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 938 of 1803   PageID 11684
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 22 of 61

plan, trust or other entity or other enterprise of which Indemnitee is or was serving at the request of the Company or any subsidiary of the Company in a Corporate Status.

(g)     "**Expenses**" means any and all expenses, fees, including attorneys', witnesses' and experts' fees, disbursements and retainers, court costs, transcript costs, travel expenses, duplicating, printing and binding costs, telephone charges, postage, fax transmission charges, secretarial services, delivery services fees, and all other fees, costs, disbursements and expenses paid or incurred in connection with investigating, defending, prosecuting, being a witness in or participating in (including on appeal), or preparing to defend, prosecute, be a witness or participate in, any Claim. Expenses also shall include (i) Expenses paid or incurred in connection with any appeal resulting from any Claim, including, without limitation, the premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent, and (ii) for purposes of Section 4 only, Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement, by litigation or otherwise. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(h)     "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any successor statute thereto, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

(i)     "**Expense Advance**" means any payment of Expenses advanced to Indemnitee by the Company pursuant to Section 4 or Section 5 hereof.

(j)     "**Indemnifiable Event**" means any event or occurrence, whether occurring before, on or after the date of this Agreement, related to the fact that Indemnitee is or was a manager, director, officer, employee or agent of the Company or any subsidiary of the Company, or is or was serving at the request of the Company or any subsidiary of the Company as a manager, director, officer, employee, member, manager, trustee or agent of any other Enterprise or by reason of an action or inaction by Indemnitee in any such capacity (whether or not serving in such capacity at the time any Loss is incurred for which indemnification can be provided under this Agreement).

(k)     "**Independent Counsel**" means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently performs, nor in the past three (3) years has performed, services for any of: (i) James Dondero, (ii) the Company or Indemnitee (other than in connection with matters concerning Indemnitee under this Agreement or of other indemnitees under similar agreements), or (iii) any other party to the Claim giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any Person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(l)     "**Losses**" means any and all Expenses, damages, losses, liabilities, judgments, fines (including excise taxes and penalties assessed with respect to employee

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 65-9   Exhibit 6   Page 940 of 1258   Page 67 of 1017   PageID 14711
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 939 of 1803   PageID 11685
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 23 of 61

benefit plans and ERISA excise taxes), penalties (whether civil, criminal or other), amounts paid or payable in settlement, including any interest, assessments, any federal, state, local or foreign taxes imposed as a result of the actual or deemed receipt of any payments under this Agreement and all other charges paid or payable in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness or participate in, any Claim.

(m)    "**Person**" means any individual, corporation, firm, partnership, joint venture, limited liability company, estate, trust, business association, organization, governmental entity or other entity and includes the meaning set forth in Sections 13(d) and 14(d) of the Exchange Act.

(n)    "**Shares**" means an ownership interest of a member in the Company, including each of the common shares of the Company or any other class or series of Shares designated by the Board.

(o)    References to "**serving at the request of the Company**" include any service as a director, manager, officer, employee, representative or agent of the Company which imposes duties on, or involves services by, such director, manager, officer, employee or agent, including but not limited to any employee benefit plan, its participants or beneficiaries; and a Person who acted in good faith and in a manner he or she reasonably believed to be in and not opposed to the best interests of the Company in Indemnitee's capacity as a director, manager, officer, employee, representative or agent of the Company, including but not limited to acting in the best interest of participants and beneficiaries of an employee benefit plan will be deemed to have acted in a manner "**not opposed to the best interests of the Company**" as referred to under applicable law or in this Agreement.

2.    <u>Indemnification</u>.

(a)    Subject to <u>Section 9</u> and <u>Section 10</u> of this Agreement, the Company shall indemnify and hold Indemnitee harmless, to the fullest extent permitted by the laws of the State of Delaware in effect on the date hereof, or as such laws may from time to time hereafter be amended to increase the scope of such permitted indemnification, against any and all Losses and Expenses if Indemnitee was or is or becomes a party to or participant in, or is threatened to be made a party to or participant in, any Claim by reason of or arising in part out of an Indemnifiable Event, including, without limitation, Claims brought by or in the right of the Company, Claims brought by third parties, and Claims in which the Indemnitee is solely a witness.

(b)    For the avoidance of doubt, the indemnification rights and obligations contained herein shall also extend to any Claim in which the Indemnitee was or is a party to, was or is threatened to be made a party to or was or is otherwise involved in any capacity in by reason of Indemnitee's Corporate Status as a fiduciary capacity with respect to an employee benefit plan. In connection therewith, if the Indemnitee has acted in good faith and in a manner which appeared to be consistent with the best interests of the participants and beneficiaries of an employee benefit plan and not opposed thereto, the Indemnitee shall be deemed to have acted in a manner not opposed to the best interests of the Company.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-6 Filed 94/06/25 Page 68 of 1017   PageID 14712
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 940 of 1803   PageID 11686
Case 19-34054-sgj11  Doc 281-1  Filed 12/27/19   Entered 12/27/19 21:33:05   Page 24 of 61

3.     Contribution.

(a)     Whether or not the indemnification provided in Section 2 is available, if, for any reason, Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any Claim in which the Company is jointly liable with Indemnitee (or would be if joined in such Claim), the Company shall contribute to the amount of Losses paid or payable by Indemnitee in proportion to the relative benefits received by the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, from the transaction or events from which such Claim arose; provided, however, that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of the Company and all officers, directors, managers or employees of the Company other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, in connection with the transaction or events that resulted in such Losses, as well as any other equitable considerations which applicable law may require to be considered. The relative fault of the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

(b)     The Company hereby agrees to fully indemnify and hold Indemnitee harmless from any claims of contribution which may be brought by officers, directors, managers or employees of the Company, other than Indemnitee, who may be jointly liable with Indemnitee.

(c)     To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement and/or for Expenses, in connection with any Claim relating to an Indemnifiable Event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Claim in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Claim; and/or (ii) the relative fault of the Company (and its directors, managers, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s).

4.     Advancement of Expenses. The Company shall, if requested by Indemnitee, advance, to the fullest extent permitted by law, to Indemnitee (an "**Expense Advance**") any and all Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any Claim arising out of an Indemnifiable Event (whether prior to or after its final disposition). Indemnitee's right to such advancement is not subject to the satisfaction of any standard of conduct. Without limiting the generality or effect of

DOCS_NY:39915.4 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 94 of 2804   Page 69 of 1017   PageID 14713
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 941 of 1803   PageID 11687
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 25 of 61

the foregoing, within thirty (30) business days after any request by Indemnitee, the Company shall, in accordance with such request, (a) pay such Expenses on behalf of Indemnitee, (b) advance to Indemnitee funds in an amount sufficient to pay such Expenses, or (c) reimburse Indemnitee for such Expenses. In connection with any request for Expense Advances, Indemnitee shall not be required to provide any documentation or information to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Execution and delivery to the Company of this Agreement by Indemnitee constitutes an undertaking by the Indemnitee to repay any amounts paid, advanced or reimbursed by the Company pursuant to this Section 4, the final sentence of Section 9(b), or Section 11(b) in respect of Expenses relating to, arising out of or resulting from any Claim in respect of which it shall be determined, pursuant to Section 9, following the final disposition of such Claim, that Indemnitee is not entitled to indemnification hereunder. No other form of undertaking shall be required other than the execution of this Agreement. Each Expense Advance will be unsecured and interest free and will be made by the Company without regard to Indemnitee's ability to repay the Expense Advance.

5.      Indemnification for Expenses in Enforcing Rights. To the fullest extent allowable under applicable law, the Company shall also indemnify against, and, if requested by Indemnitee, shall advance to Indemnitee subject to and in accordance with Section 4, any Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any action or proceeding by Indemnitee for (a) indemnification or reimbursement or advance payment of Expenses by the Company under any provision of this Agreement, or under any other agreement or provision of the Bylaws now or hereafter in effect relating to Claims relating to Indemnifiable Events, and/or (b) recovery under any D&O Insurance maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification or insurance recovery, as the case may be. Indemnitee shall be required to reimburse the Company in the event that a final judicial determination is made that such action brought by Indemnitee was frivolous or not made in good faith.

6.      Partial Indemnity. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for a portion of any Losses in respect of a Claim related to an Indemnifiable Event but not for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion thereof to which Indemnitee is entitled.

7.      Notification and Defense of Claims.

        (a)     Notification of Claims. Indemnitee shall notify the Company in writing as soon as reasonably practicable of any Claim which could relate to an Indemnifiable Event or for which Indemnitee could seek Expense Advances, including a brief description (based upon information then available to Indemnitee) of the nature of, and the facts underlying, such Claim, to the extent then known. The failure by Indemnitee to timely notify the Company hereunder shall not relieve the Company from any liability hereunder except to the extent the Company's ability to participate in the defense of such claim was materially and adversely affected by such failure. If at the time of the receipt of such notice, the Company has D&O Insurance or any other insurance in effect under which coverage for Claims related to Indemnifiable Events is potentially available, the Company shall give

DOCS_NY:39915.4 36027/002

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 16-15 Filed 06/23/25 Page 70 of 1017 PageID 14714
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 942 of 1803 PageID 11688
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 26 of 61

prompt written notice to the applicable insurers in accordance with the procedures, provisions, and terms set forth in the applicable policies. The Company shall provide to Indemnitee a copy of such notice delivered to the applicable insurers, and copies of all subsequent correspondence between the Company and such insurers regarding the Claim, in each case substantially concurrently with the delivery or receipt thereof by the Company.

(b)     Defense of Claims. The Company shall be entitled to participate in the defense of any Claim relating to an Indemnifiable Event at its own expense and, except as otherwise provided below, to the extent the Company so wishes, it may assume the defense thereof with counsel reasonably satisfactory to Indemnitee. After notice from the Company to Indemnitee of its election to assume the defense of any such Claim, the Company shall not be liable to Indemnitee under this Agreement or otherwise for any Expenses subsequently directly incurred by Indemnitee in connection with Indemnitee's defense of such Claim other than reasonable costs of investigation or as otherwise provided below. Indemnitee shall have the right to employ its own legal counsel in such Claim, but all Expenses related to such counsel incurred after notice from the Company of its assumption of the defense shall be at Indemnitee's own expense; provided, however, that if (i) Indemnitee's employment of its own legal counsel has been authorized by the Company, (ii) Indemnitee has reasonably determined that there may be a conflict of interest between Indemnitee and the Company in the defense of such Claim, (iii) after a Change in Control, Indemnitee's employment of its own counsel has been approved by the Independent Counsel or (iv) the Company shall not in fact have employed counsel to assume the defense of such Claim, then Indemnitee shall be entitled to retain its own separate counsel (but not more than one law firm plus, if applicable, local counsel in respect of any such Claim) and all Expenses related to such separate counsel shall be borne by the Company.

8.     Procedure upon Application for Indemnification. In order to obtain indemnification pursuant to this Agreement, Indemnitee shall submit to the Company a written request therefor, including in such request such documentation and information as is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of the Claim, provided that documentation and information need not be so provided to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Indemnification shall be made insofar as the Company determines Indemnitee is entitled to indemnification in accordance with Section 9 below.

9.     Determination of Right to Indemnification.

(a)     Mandatory Indemnification; Indemnification as a Witness.

(i)     To the extent that Indemnitee shall have been successful on the merits or otherwise in defense of any Claim relating to an Indemnifiable Event or any portion thereof or in defense of any issue or matter therein, including without limitation dismissal without prejudice, Indemnitee shall be indemnified against all Losses relating to such Claim in accordance with Section 2, and no Standard of Conduct Determination (as defined in Section 9(b)) shall be required.

7

Appellee Appx. 00936
Appx. 01487
013749

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-9   Filed 04/06/25   Page 71 of 1017   PageID 14715
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 943 of 1803   PageID 11689
Case 19-34054-sgj11  Doc 281-1  Filed 12/27/19   Entered 12/27/19 21:33:05   Page 27 of 61

(ii)     To the extent that Indemnitee's involvement in a Claim relating to an Indemnifiable Event is to prepare to serve and serve as a witness, and not as a party, the Indemnitee shall be indemnified against all Losses incurred in connection therewith to the fullest extent allowable by law and no Standard of Conduct Determination (as defined in Section 9(b)) shall be required.

(b)     Standard of Conduct. To the extent that the provisions of Section 9(a) are inapplicable to a Claim related to an Indemnifiable Event that shall have been finally disposed of, any determination of whether Indemnitee has satisfied any applicable standard of conduct under Delaware law that is a legally required condition to indemnification of Indemnitee hereunder against Losses relating to such Claim and any determination that Expense Advances must be repaid to the Company (a "**Standard of Conduct Determination**") shall be made as follows:

(i)     if no Change in Control has occurred, (A) by a majority vote of the Disinterested Directors, even if less than a quorum of the Board, (B) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum or (C) if there are no such Disinterested Directors, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee; and

(ii)     if a Change in Control shall have occurred, (A) if the Indemnitee so requests in writing, by a majority vote of the Disinterested Directors, even if less than a quorum of the Board or (B) otherwise, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee.

Subject to Section 4, the Company shall indemnify and hold Indemnitee harmless against and, if requested by Indemnitee, shall reimburse Indemnitee for, or advance to Indemnitee, within thirty (30) business days of such request, any and all Expenses incurred by Indemnitee in cooperating with the Person or Persons making such Standard of Conduct Determination.

(c)     Making the Standard of Conduct Determination. The Company shall use its reasonable best efforts to cause any Standard of Conduct Determination required under Section 9(b) to be made as promptly as practicable. If the Person or Persons designated to make the Standard of Conduct Determination under Section 9(b) shall not have made a determination within ninety (90) days after the later of (A) receipt by the Company of a written request from Indemnitee for indemnification pursuant to Section 8 (the date of such receipt being the "**Notification Date**") and (B) the selection of an Independent Counsel, if such determination is to be made by Independent Counsel, then Indemnitee shall be deemed to have satisfied the applicable standard of conduct; provided that such 90-day period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the Person or Persons making such determination in good faith requires such additional time to obtain or evaluate information relating thereto. Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement of Indemnitee to indemnification under this Agreement shall be required to be made prior to the final disposition of any Claim.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 160   Exhibit 6   Page 945 of 1804   Page 72 of 1017   PageID 14716
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 944 of 1803   PageID 11690
Case 19-34054-sgj11  Doc 281-1  Filed 12/27/19   Entered 12/27/19 21:33:05   Page 28 of 61

(d)     <u>Payment of Indemnification</u>. If, in regard to any Losses:

(i)     Indemnitee shall be entitled to indemnification pursuant to <u>Section 9(a)</u>;

(ii)    no Standard of Conduct Determination is legally required as a condition to indemnification of Indemnitee hereunder; or

(iii)   Indemnitee has been determined or deemed pursuant to <u>Section 9(b)</u> or <u>Section 9(c)</u> to have satisfied the Standard of Conduct Determination,

then the Company shall pay to Indemnitee, within thirty (30) business days after the later of (A) the Notification Date or (B) the earliest date on which the applicable criterion specified in clause (i), (ii) or (iii) is satisfied, an amount equal to such Losses.

(e)     <u>Selection of Independent Counsel for Standard of Conduct Determination</u>. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to <u>Section 9(b)(i)</u>, the Independent Counsel shall be selected by the Board and the Company shall give written notice to Indemnitee advising him of the identity of the Independent Counsel so selected. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to <u>Section 9(b)(ii)</u>, the Independent Counsel shall be selected by Indemnitee, and Indemnitee shall give written notice to the Company advising it of the identity of the Independent Counsel so selected. In either case, Indemnitee or the Company, as applicable, may, within thirty (3) business days after receiving written notice of selection from the other, deliver to the other a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not satisfy the criteria set forth in the definition of "Independent Counsel" in <u>Section 1(k)</u>, and the objection shall set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the Person or firm so selected shall act as Independent Counsel. If such written objection is properly and timely made and substantiated, (i) the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit; and (ii) the non-objecting party may, at its option, select an alternative Independent Counsel and give written notice to the other party advising such other party of the identity of the alternative Independent Counsel so selected, in which case the provisions of the two immediately preceding sentences, the introductory clause of this sentence and numbered clause (i) of this sentence shall apply to such subsequent selection and notice. If applicable, the provisions of clause (ii) of the immediately preceding sentence shall apply to successive alternative selections. If no Independent Counsel that is permitted under the foregoing provisions of this <u>Section 9(e)</u> to make the Standard of Conduct Determination shall have been selected within twenty (20) days after the Company gives its initial notice pursuant to the first sentence of this <u>Section 9(e)</u> or Indemnitee gives its initial notice pursuant to the second sentence of this <u>Section 9(e)</u>, as the case may be, either the Company or Indemnitee may petition the Court of Chancery of the State of Delaware ("**Delaware Court**") to resolve any objection which shall have been made by the Company or Indemnitee to the other's selection of Independent Counsel and/or to appoint as Independent Counsel a Person to be selected by the Court or such other Person as the Court

<center>9</center>

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 16-15    Filed 04/10/25    Page 73 of 1017    PageID 14717
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 945 of 1803   PageID 11691
Case 19-34054-sgj11  Doc 281-1  Filed 12/27/19   Entered 12/27/19 21:33:05   Page 29 of 61

shall designate, and the Person or firm with respect to whom all objections are so resolved or the Person or firm so appointed will act as Independent Counsel. In all events, the Company shall pay all of the reasonable fees and expenses of the Independent Counsel incurred in connection with the Independent Counsel's determination pursuant to <u>Section 9(b)</u>.

(f)   <u>Presumptions and Defenses</u>.

(i)   <u>Indemnitee's Entitlement to Indemnification</u>. In making any Standard of Conduct Determination, the Person or Persons making such determination shall presume that Indemnitee has satisfied the applicable standard of conduct and is entitled to indemnification, and the Company shall have the burden of proof to overcome that presumption and establish that Indemnitee is not so entitled. Any Standard of Conduct Determination that is adverse to Indemnitee may be challenged by the Indemnitee in the Delaware Court. No determination by the Company (including by its Board or any Independent Counsel) that Indemnitee has not satisfied any applicable standard of conduct may be used as a defense to enforcement by Indemnitee of Indemnitee's rights of indemnification or reimbursement or advance of payment of Expenses by the Company hereunder or create a presumption that Indemnitee has not met any applicable standard of conduct.

(ii)   <u>Reliance as a Safe Harbor</u>. For purposes of this Agreement, and without creating any presumption as to a lack of good faith if the following circumstances do not exist, Indemnitee shall be deemed to have acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company if Indemnitee's actions or omissions to act are taken in good faith reliance upon the records of the Company, including its financial statements, or upon information, opinions, reports or statements furnished to Indemnitee by the officers or employees of the Company or any of its subsidiaries in the course of their duties, or by committees of the Board or by any other Person (including legal counsel, accountants and financial advisors) as to matters Indemnitee reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company. In addition, the knowledge and/or actions, or failures to act, of any director, manager, officer, agent or employee of the Company (other than Indemnitee) shall not be imputed to Indemnitee for purposes of determining the right to indemnity hereunder.

(iii)   <u>Defense to Indemnification and Burden of Proof</u>. It shall be a defense to any action brought by Indemnitee against the Company to enforce this Agreement (other than an action brought to enforce a claim for Losses incurred in defending against a Claim related to an Indemnifiable Event in advance of its final disposition) that it is not permissible under applicable law for the Company to indemnify Indemnitee for the amount claimed. In connection with any such action or any related Standard of Conduct Determination, the burden of proving such a defense or that the Indemnitee did not satisfy the applicable standard of conduct shall be on the Company.

10.   <u>Exclusions from Indemnification</u>. Notwithstanding anything in this Agreement to the contrary, the Company shall not be obligated to:

<div align="center">10</div>

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 94 of 258   Page 74 of 1017   PageID 14718
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 946 of 1803   PageID 11692
Case 19-34054-sgj11   Doc 281-1   Filed 12/27/19   Entered 12/27/19 21:33:05   Page 30 of 61

(a)      indemnify or advance funds to Indemnitee for Losses with respect to proceedings initiated by Indemnitee, including any proceedings against the Company or its managers, officers, employees or other indemnitees and not by way of defense, except:

(i)      proceedings referenced in Section 4 above (unless a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such proceeding was not made in good faith or was frivolous); or

(ii)      where the Company has joined in or the Board has consented to the initiation of such proceedings.

(b)      indemnify Indemnitee if a final decision by a court of competent jurisdiction determines that such indemnification is prohibited by applicable law.

(c)      indemnify Indemnitee for the disgorgement of profits arising from the purchase or sale by Indemnitee of securities of the Company in violation of Section 16(b) of the Exchange Act, or any similar successor statute.

11.      Remedies of Indemnitee.

(a)      In the event that (i) a determination is made pursuant to Section 9 that Indemnitee is not entitled to indemnification under this Agreement, (ii) an Expense Advance is not timely made pursuant to Section 4, (iii) no determination of entitlement to indemnification is made pursuant to Section 9 within 90 days after receipt by the Company of the request for indemnification, or (iv) payment of indemnification is not made pursuant Section 9(d), Indemnitee shall be entitled to an adjudication in a Delaware Court, or in any other court of competent jurisdiction, of Indemnitee's entitlement to such indemnification. Indemnitee shall commence such proceeding seeking an adjudication within 180 days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this Section 11(a). The Company shall not oppose Indemnitee's right to seek any such adjudication.

(b)      In the event that Indemnitee, pursuant to this Section 11, seeks a judicial adjudication or arbitration of his or her rights under, or to recover damages for breach of, this Agreement, any other agreement for indemnification, payment of Expenses in advance or contribution hereunder or to recover under any director, manager, and officer liability insurance policies or any other insurance policies maintained by the Company, the Company will, to the fullest extent permitted by law and subject to Section 4, indemnify and hold harmless Indemnitee against any and all Expenses which are paid or incurred by Indemnitee in connection with such judicial adjudication or arbitration, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, payment of Expenses in advance or contribution or insurance recovery. In addition, if requested by Indemnitee, subject to Section 4 the Company will (within thirty (30) days after receipt by the Company of the written request therefor), pay as an Expense Advance such Expenses, to the fullest extent permitted by law.

(c)      In the event that a determination shall have been made pursuant to Section 9 that Indemnitee is not entitled to indemnification, any judicial proceeding commenced

DOCS_NY:39915.4 36027/002

Appellee Appx. 00940
Appx. 01191
013753

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 94 of 258   Page 75 of 1017   PageID 14719
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 947 of 1803   PageID 11693
Case 19-34054-sgj11   Doc 281-1   Filed 12/27/19   Entered 12/27/19 21:33:05   Page 31 of 61

pursuant to this Section 11 shall be conducted in all respects as a de novo trial on the merits, and Indemnitee shall not be prejudiced by reason of the adverse determination under Section 9.

(d)     If a determination shall have been made pursuant to Section 9 that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding commenced pursuant to this Section 11, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's misstatement not materially misleading in connection with the application for indemnification, or (ii) a prohibition of such indemnification under applicable law.

12.     Settlement of Claims. The Company shall not be liable to Indemnitee under this Agreement for any amounts paid in settlement of any threatened or pending Claim related to an Indemnifiable Event effected without the Company's prior written consent, which shall not be unreasonably withheld; provided, however, that if a Change in Control has occurred, the Company shall be liable for indemnification of the Indemnitee for amounts paid in settlement if an Independent Counsel (which, for purposes of this Section 12, shall be selected by the Company with the prior consent of the Indemnitee, such consent not to be unreasonably withheld or delayed) has approved the settlement. The Company shall not settle any Claim related to an Indemnifiable Event in any manner that would impose any Losses on the Indemnitee without the Indemnitee's prior written consent.

13.     Duration. All agreements and obligations of the Company contained herein shall continue during the period that Indemnitee is a manager of the Company (or is serving at the request of the Company as a director, manager, officer, employee, member, trustee or agent of another Enterprise) and shall continue thereafter (i) so long as Indemnitee may be subject to any possible Claim relating to an Indemnifiable Event (including any rights of appeal thereto) and (ii) throughout the pendency of any proceeding (including any rights of appeal thereto) commenced by Indemnitee to enforce or interpret his or her rights under this Agreement, even if, in either case, he or she may have ceased to serve in such capacity at the time of any such Claim or proceeding.

14.     Other Indemnitors. The Company hereby acknowledges that Indemnitee may have certain rights to indemnification, advancement of Expenses and/or insurance provided by certain private equity funds, hedge funds or other investment vehicles or management companies and/or certain of their affiliates and by personal policies (collectively, the "**Other Indemnitors**"). The Company hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to Indemnitee are primary and any obligation of the Other Indemnitors to advance Expenses or to provide indemnification for the same Expenses or liabilities incurred by Indemnitee are secondary), (ii) that it shall be required to advance the full amount of Expenses incurred by Indemnitee and shall be liable for the full amount of all Expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement and the Bylaws (or any other agreement between the Company and Indemnitee), without regard to any rights Indemnitee may have against the Other Indemnitors, and, (iii) that it irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other

DOCS_NY:39915.4 36027/002

Appellee Appx. 00941
Appx. 01192
013754

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Page 94 of 2304 Page 76 of 1017    PageID 14720
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 948 of 1803    PageID 11694
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 32 of 61

Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Other Indemnitors on behalf of Indemnitee with respect to any claim for which Indemnitee has sought indemnification from the Company shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of Indemnitee against the Company. The Company and Indemnitee agree that the Other Indemnitors are express third party beneficiaries of the terms of this <u>Section 14</u>.

15.    <u>Non-Exclusivity</u>. The rights of Indemnitee hereunder will be in addition to any other rights Indemnitee may have under the Bylaws, the General Corporation Law of the State of Delaware (as may be amended from time to time, the "**DGCL**"), any other contract, in law or in equity, and under the laws of any state, territory, or jurisdiction, or otherwise (collectively, "**Other Indemnity Provisions**"). The Company will not adopt any amendment to its Bylaws the effect of which would be to deny, diminish, encumber or limit Indemnitee's right to indemnification under this Agreement or any Other Indemnity Provision.

16.    <u>Liability Insurance</u>. For the duration of Indemnitee's service as a director of the Company, and thereafter for so long as Indemnitee shall be subject to any pending Claim relating to an Indemnifiable Event, the Company shall use best efforts to continue to maintain in effect policies of D&O Insurance providing coverage that is at least substantially comparable in scope and amount to that provided by similarly situated companies. In all policies of D&O Insurance maintained by the Company, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee the same rights and benefits as are provided to the most favorably insured of the Company's directors. Upon request, the Company will provide to Indemnitee copies of all D&O Insurance applications, binders, policies, declarations, endorsements and other related materials.

17.    <u>No Duplication of Payments</u>. The Company shall not be liable under this Agreement to make any payment to Indemnitee in respect of any Losses to the extent Indemnitee has otherwise received payment under any insurance policy, any Other Indemnity Provisions or otherwise of the amounts otherwise indemnifiable by the Company hereunder.

18.    <u>Subrogation</u>. In the event of payment to Indemnitee under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee. Indemnitee shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

19.    <u>Indemnitee Consent.</u> The Company will not, without the prior written consent of Indemnitee, consent to the entry of any judgment against Indemnitee or enter into any settlement or compromise which (a) includes an admission of fault of Indemnitee, any non-monetary remedy imposed on Indemnitee or a Loss for which Indemnitee is not wholly indemnified hereunder or (b) with respect to any Claim with respect to which Indemnitee may be or is made a party or a participant or may be or is otherwise entitled to seek

13

Appellee Appx. 00942
Appx. 01195
013755

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6516   Exhibit 6   Page 95 of 625804   Page 77 of 1017   PageID 14721
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 949 of 1803   PageID 11695
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 33 of 61

indemnification hereunder, does not include, as an unconditional term thereof, the full release of Indemnitee from all liability in respect of such Claim, which release will be in form and substance reasonably satisfactory to Indemnitee. Neither the Company nor Indemnitee will unreasonably withhold its consent to any proposed settlement; provided, however, Indemnitee may withhold consent to any settlement that does not provide a full and unconditional release of Indemnitee from all liability in respect of such Claim.

20.    Amendments. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be binding unless in the form of a writing signed by the party against whom enforcement of the waiver is sought, and no such waiver shall operate as a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver. Except as specifically provided herein, no failure to exercise or any delay in exercising any right or remedy hereunder shall constitute a waiver thereof.

21.    Binding Effect. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company), assigns, spouses, heirs and personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all or a substantial part of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

22.    Severability. Each provision of this Agreement shall be considered severable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid, unenforceable or contrary to the DGCL or existing or future applicable law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those provisions of this Agreement which are valid, enforceable and legal. In that case, this Agreement shall be construed so as to limit any term or provision so as to make it valid, enforceable and legal within the requirements of any applicable law, and in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid, unenforceable or illegal provisions.

23.    Notices. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand, against receipt, or mailed, by postage prepaid, certified or registered mail:

(a)    if to Indemnitee, to the address set forth on the signature page hereto.

(b)    if to the Company, to:

Strand Advisors, Inc.
Attention:    Isaac Leventon

14

Appellee Appx. 00943
Appx. 01194
013756

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 16-15    Filed 05/06/25    Page 78 of 1017    PageID 14722
Exhibit 6    Page 35 of 253
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 950 of 1803   PageID 11696
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 34 of 61

| | |
|---|---|
| Address: | 300 Crescent Court, Suite 700 |
| | Dallas, Texas 75201 |
| Email: | ileventon@highlandcapital.com |

Notice of change of address shall be effective only when given in accordance with this Section 23. All notices complying with this Section 23 shall be deemed to have been received on the date of hand delivery or on the third business day after mailing.

24.     Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE (OTHER THAN ITS RULES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY).

25.     Jurisdiction. The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.

26.     Enforcement.

(a)     Without limiting Section 15, this Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

(b)     The Company shall not seek from a court, or agree to, a "bar order" which would have the effect of prohibiting or limiting the Indemnitee's rights to receive advancement of Expenses under this Agreement other than in accordance with this Agreement.

27.     Headings and Captions. All headings and captions contained in this Agreement and the table of contents hereto are inserted for convenience only and shall not be deemed a part of this Agreement.

28.     Counterparts. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one and the

DOCS_NY:39915.4 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-9   Page 955 of 28304   Page 79 of 1017   PageID 14723
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 951 of 1803   PageID 11697
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 35 of 61

same agreement. Facsimile counterpart signatures to this Agreement shall be binding and
enforceable.

DOCS_NY:39915.4 36027/002

Appellee Appx. 00945

013758

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-11   Exhibit 6   Page 953 of 2804   Page 80 of 1017   PageID 14724
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 952 of 1803   PageID 11698
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 36 of 61

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

STRAND ADVISORS, INC.

By: _____
Name:
Title:

[SIGNATURE PAGE – INDEMNIFICATION AGREEMENT]

DOCS_LA:316796.3
DOCS_NY:39915.4 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-9    Page 954 of 1804    Page 81 of 1017    PageID 14725
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 953 of 1803    PageID 11699
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 37 of 61

INDEMNITEE:

_____

Name:        [ _____ ]
Address:    _____
                 _____
                 _____

Email:

[SIGNATURE PAGE – INDEMNIFICATION AGREEMENT]

DOCS_LA:316796.3
DOCS_NY:39915.4 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Filed 09/09/25    Page 82 of 1017    PageID 14726
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 954 of 1803    PageID 11700
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 38 of 61

December ___, 2019

Attn:  Independent Directors
Highland Capital Management, LP
300 Crescent Court, Ste. 700
Dallas, TX  75201

       Re:    Development Specialists, Inc. ("DSI")
              Retention and Letter of Engagement

Dear Members of the Board:

Please accept this letter as our firm's formal written agreement (the "Agreement") to provide restructuring support services to Highland Capital Management, L.P. (the "Company").  This Agreement replaces and supersedes in all respects the letter agreement between DSI and the Company, dated October 7, 2019, as amended and revised by the letter agreement dated October 29, 2019.  However, all fees and expenses incurred by DSI prior to the date hereof in accordance with such prior letter agreements will be paid by the Company, subject to allowance of such fees and expenses by the U.S. Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court").  The Agreement will become effective upon execution by duly authorized representatives of the respective parties and approval of the Bankruptcy Court.

Section 1 – Scope of Work

DSI will provide the following services (the "Services") to the Company:

1.  Bradley D. Sharp will act as the Company's Chief Restructuring Officer ("CRO") with other DSI personnel to assist Mr. Sharp in carrying out those duties and responsibilities.
2.  Subject to the terms of this Agreement, as CRO, Mr. Sharp will assume control of the Company's restructuring and direct the Company with respect to its bankruptcy filed on October 16, 2019 (the "Chapter 11 Case"), which Chapter 11 Case has now been transferred to the Bankruptcy Court.
3.  Subject to the terms of this Agreement, Mr. Sharp will report to the Independent Directors and, if appointed, the Chief Executive Officer of the Company ("CEO") and will comply with the Company's corporate governance requirements.
4.  As directed by the Independent Directors and/or CEO, the CRO will be responsible for the implementation and prosecution of the Chapter 11 Case, including negotiations with creditors, reconciliation of claims, and confirmation of a plan or plans of reorganization.
5.  Provide other personnel of DSI ("Additional Personnel") to provide restructuring support services as requested or required to the Company, which may include but are not limited to:

**Exhibit B**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-19   Exhibit 6   Page 35 of 258   Page 83 of 1017   PageID 14727
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 955 of 1803   PageID 11701
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 39 of 61

Highland Capital Management, LP
December ____, 2019
Page 2

    a.   assisting the Company in the preparation of financial disclosures required by the Bankruptcy Code, including the Schedules of Assets and Liabilities, the Statements of Financial Affairs and Monthly Operating Reports;

    b.   advising and assisting the Company, the Company's legal counsel, and other professionals in responding to third party requests;

    c.   attending meetings and assisting in communications with parties in interest and their professionals, including the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case;

    d.   providing litigation advisory services with respect to accounting matters, along with expert witness testimony on case related issues; and

    e.   rendering such other general business consulting services or other assistance as the Company may deem necessary and which are consistent with the role of a financial advisor and not duplicative of services provided by other professionals in this case.

DSI's ability to adequately perform the Services is dependent upon the Company timely providing reliable, accurate, and complete necessary information. The Company agrees that CRO will have (i) access to and the ability to communicate with any employee of the Company or any affiliate of the Company and (ii) access to any information, including documents, relating to the Company or any Company affiliate, including, but not limited to, information concerning collections and disbursements. The Company acknowledges that DSI or CRO are not responsible for independently verifying the veracity, completeness, or accuracy of any information supplied to us by or on behalf of the Company.

DSI will submit its evaluations and analyses pursuant to this Agreement in periodic oral and written reports. Such reports are intended to and shall constitute privileged and confidential information, and shall constitute the Company's property.

Although we do not predict or warrant the outcome of any particular matter or issue, and our fees are not dependent upon such outcomes, we will perform the Services with reasonable care and in a diligent and competent manner.

Section 2 – Rates, Invoicing and Retainer

DSI will be compensated at a rate of $100,000 per month, plus expenses (capped at $10,000 per month), for the services of Bradley D. Sharp as CRO and such DSI personnel (including Fred Caruso) as are required to fulfill Mr. Sharp's responsibilities as CRO; provided that if any single expense exceeds $1,000, DSI will provide reasonable documentation and will obtain the Company's prior written approval.

A number of DSI's personnel have experience in providing restructuring support services and may be utilized as Additional Personnel in this representation. Although others of our staff may

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-9   Page 85 of 1804   Page 84 of 1017   PageID 14728
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 956 of 1803   PageID 11702
Case 19-34054-sgj11   Doc 281-1   Filed 12/27/19   Entered 12/27/19 21:33:05   Page 40 of 61

Highland Capital Management, LP
December ___, 2019
Page 3

also be involved, we have listed below certain of the DSI personnel (along with their corresponding billing rates) who would likely constitute the Additional Personnel.  The individuals are:

| | |
|---|---|
| R. Brian Calvert | $640.00/hr. |
| Thomas P. Jeremiassen | $575.00/hr. |
| Eric J. Held | $495.00/hr. |
| Nicholas R. Troszak | $485.00/hr. |
| Spencer G. Ferrero | $350.00/hr. |
| Tom Frey | $325.00/hr. |

The above rates are adjusted as of January 1 of each year to reflect advancing experience, capabilities, and seniority of our professionals as well as general economic factors.

We acknowledge receipt of a retainer of $250,000 from the Company.  The purpose of the retainer is to secure a portion of our fees and expenses and to retain our status as a non-creditor should such be required for DSI to continue to provide the Services.  As such, should a need arise to increase this retainer due to the level of Services DSI is providing or projected to provide, we will send the Company a supplement to this Agreement requesting the necessary increases and discuss with the Company the amount and timing of providing such increase to the retainer.

This retainer will be applied to our final invoice.  If the retainer exceeds the amount of our final invoice, we will refund the difference to the Company at that time.  In the event that periodic invoices are not paid timely, we will apply the retainer to the amounts owing on such invoices and, if applicable, any related late charges, and we will stop work until the retainer is replenished to the full amount required.  If the retainer is not replenished within ten (10) days after the application of the retainer to unpaid balances, we reserve the right to terminate this Agreement in accordance with the provisions of Section 3 of this Agreement.

DSI also will be entitled to reimbursement for its reasonable costs and expenses. Such costs and expenses may include, among others, charges for messenger services, photocopying, travel expenses, long distance telephone charges, postage and other charges customarily invoiced by consulting firms. Airfare for international flights will be charged at the business class fare; provided that if any single expense exceeds $1,000, DSI will provide reasonable documentation and will obtain the Company's prior written approval.

This Agreement shall be presented to the Bankruptcy Court for approval and continuation, pursuant to Bankruptcy Code Section 363 and DSI's then-prospective obligations shall be contingent upon such approval.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-6   Exhibit 6   Page 85 of 1017   PageID 14729
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 957 of 1803   PageID 11703
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 41 of 61

Highland Capital Management, LP
December ___, 2019
Page 4

Section 3 – Termination

Either the Company or DSI may terminate this Agreement for any reason with ten (10) business
days' written notice.  Notwithstanding anything to the contrary contained herein, the Company
shall be obligated, in accordance with any orders of or procedures established by the Court, to
pay and/or reimburse DSI all fees and expenses accrued under this Agreement as of the effective
date of the termination.

Section 4 – Relationship of the Parties, Confidentiality

DSI will provide the Services to and for the Company, with select members of DSI assigned to
specific roles for the benefit of the Company. These members will remain as DSI employees
during the pendency of this case. Specifically, the parties intend that an independent contractor
relationship will be created by this Agreement. Employees of DSI are not to be considered
employees of the Company and are not entitled to any of the benefits that the Company provides
for the Company's employees.

The Company acknowledges that all advice (written or oral) given by DSI to the Company in
connection with DSI's engagement is intended solely for the benefit and use of the Company in
considering the transaction to which it relates, and that no third party is entitled to rely on any
such advice or communication.  DSI will in no way be deemed to be providing services for any
person not a party to this Agreement.

DSI agrees that all information not publicly available that is received by DSI from the Company
in connection with this Agreement or that is developed pursuant to this Agreement, will be
treated as confidential and will not be disclosed by DSI, except as required by Court order, or
other legal process, or as may be authorized by the Company.  DSI shall not be required to
defend any action to obtain an order requiring disclosure of such information, but shall instead
give prompt notice of any such action to the Company so that it may seek appropriate remedies,
including a protective order. The Company shall reimburse DSI for all costs and fees (including
reasonable attorney's fees) incurred by DSI relating to responding to (whether by objecting to or
complying with) any subpoenas or requests for production of information or documents.

Section 5 – Indemnity

The Company shall name Bradley D. Sharp as its Chief Restructuring Officer and shall
indemnify him on the same terms as provided to the Company's other officers and directors
under the Company partnership agreement or other governing document and applicable state
law.  Mr. Sharp shall be included as an insured under any insurance policies or coverage
available to officers and directors of the Company.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 95 of 238   Page 86 of 1017   PageID 14730
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 958 of 1803   PageID 11704
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 42 of 61

Highland Capital Management, LP
December ___, 2019
Page 5

The Company shall additionally indemnify those persons, and only those persons, serving as
executive officers on the same terms as provided to the Company's other officers and directors
under the Company's partnership agreement or other governing document and applicable state
law, along with insurance coverage under the Company's D&O policies.  Any such indemnity
shall survive the expiration or termination by either party of this Agreement.  Except as provided
in this Section and in Section 4, there shall be no indemnification of DSI, its affiliates or the
Additional Personnel.

Each and every one of the personnel employed by DSI who works on this particular project, as
well as DSI officers, directors, employees and agents (the "DSI Parties") shall not be liable to the
Company, or any party asserting claims on behalf of the Company, except for direct damages
found in a final determination (not subject to further appeal) by a court of competent jurisdiction
to be the direct result of the bad faith, self-dealing or intentional misconduct or gross negligence
of DSI.

Section 6 – Conflicts

DSI has made diligent inquiries to determine whether it or any of its professionals have any
connections with the Company, its creditors, or other parties in interest in the Chapter 11 Case.
Based on that review, the review of DSI's conflict files and responses to inquiries from DSI's
professional staff, neither DSI nor its professionals have any known conflicts with the parties in
this case.  DSI will separately provide its connections to parties in this case and/or their
professionals.

Section 7 – No Audit

The Company acknowledges that it is hiring DSI to assist and advise the Company in business
planning and operations.  DSI's engagement shall not constitute an audit, review or compilation,
or any other type of financial statement reporting engagement that is subject to the rules of
AICPA or other such state and national professional bodies.

Section 8 – Non-Solicitation

The Company agrees not to solicit, recruit or hire any employees or agents of DSI for a period of
one year subsequent to the completion and/or termination of this Agreement; provided that the
Company shall not be prohibited from (x) making general advertisements for employment not
specifically directed at employees of DSI or (y) employees of DSI responding to unsolicited
requests for employment.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6b19    Page 360 of 2380 Page 87 of 1017    PageID 14731
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 959 of 1803    PageID 11705
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 43 of 61

Highland Capital Management, LP
December ____, 2019
Page 6


Section 9 – Survival

The provisions of this Agreement relating to indemnification, the non-solicitation or hiring of
DSI employees, and all other provisions necessary to the enforcement of the intent of this
Agreement will survive the termination or expiration of this Agreement.

Section 10 – Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the State of
Delaware without regard to conflicts of law principles.

Section 11 – Entire Agreement, Amendment

This Agreement contains the entire understanding of the parties relating to the subject matter of
this Agreement and supersedes and is intended to nullify any other agreements, understandings
or representations relating to the subject of this Agreement. This Agreement may not be
amended or modified except in a writing signed by the parties.

If you are in agreement with the foregoing terms and conditions please indicate your acceptance
by signing an original copy of this Agreement on the signature lines below, then returning one
fully-executed Agreement to DSI's office. The Agreement will become effective upon execution
by duly authorized representatives of the respective parties.


Very truly yours,

Bradley Sharp
Development Specialists, Inc.



AGREED AND ACKNOWLEDGED:


Highland Capital Management, L.P.
By: Strand Advisors, Inc., its general partner



_____
By: _____, Independent Director
Date: _____

Appellee Appx. 00953
Appx. 01204
013766

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 68-15    Page 96 of 25804   Page 88 of 1017    PageID 14732
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 960 of 1803   PageID 11706
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 44 of 61

**A. Definitions**

    a.  Electronically stored information" or "ESI" shall include all electronic files, documents, data, and information covered under the Federal Rules of Civil Procedure.

**B. Preservation of ESI - Generally**

    a.  Debtor acknowledges that they should take reasonable and proportional steps to preserve discoverable information in the party's possession, custody or control. This includes notifying employees possessing relevant information of their obligation to preserve such data.

**C. Preservation of ESI – Specific Forms**

    a.  For email, Debtor uses Outlook Email on an Exchange server.  Veritas Enterprise Vault is used to archive emails.  Journaling is and has been in active use since 2007, and all inbound, outbound, and in-system email .communications have been preserved and are not at risk of deletion due to normal document retention practices.  Out of an abundance of caution, a copy of the latest email back-up, which was performed two months ago, shall be copied and stored at a secured location.

    b.  The file server used by Debtor was backed up approximately one week ago.  A copy of this backup shall be created and stored on a portable hard drive at a secured location.

    c.  The Sharepoint server used by Debtor was backed up approximately one week ago.  A copy of this backup shall be created in a format that maintains all potentially relevant information and stored at a secured location.

    d.  The Oracle E-Business Suite (EBS) server used by Debtor was backed up one week ago.  A copy of this backup shall be created in a format and stored at a secured location.

    e.  The Advent Geneva accounting system used by Debtor was backed up approximately one week ago.  Upon reasonable notice, the Committee may submit search criteria to Debtor to run searches in Advent Geneva.  Subject to Debtor's rights to assert objections as provided by Part G herein, Debtor will provide the data resulting from such agreed searches pursuant to Part F herein..

    f.  The Siepe Database (data warehouse) used by Debtor was backed up approximately one week ago.  A copy of this backup shall be created in a format and stored at a secured location.

    g.  For the Box account used by Debtor, to the extent routine data retention practices may result in file deletion, they shall be suspended pending further discussion with the Committee concerning the relevance of such data.  Users of the Box account who have the ability to delete files shall be notified of the obligation to suspend deletion of any data stored in Box.

    h.  Bloomberg data is archived for five years.  Debtor shall work with Bloomberg client services to preserve a copy of all such archived material, which shall be stored at a secured location, or otherwise extend the backup window in which Bloomberg preserves the data by reasonable time to be agreed by the parties.

ACTIVE 252191584

Exhibit C

**Appellee Appx. 00954**

**Appx. 013265**

**013767**

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 16-15 Page 962 of 2804 Page 89 of 1017 PageID 14733
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 961 of 1803 PageID 11707
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 45 of 61

     i.   Files may be saved locally on laptops/work computers used by employees of Debtor. This practice is discouraged, but may result in the creation of relevant ESI on local systems in a manner that will not be replicated elsewhere. Debtor shall therefore cease the deletion of data (*i.e.*, wiping) of any employee-assigned computer hard drives, such as for departing employees. Debtor shall furthermore instruct current employees not to delete files stored locally on their assigned computers.

**D. Not Reasonably Accessible Documents**

    a.   Absent an order from the Court upon a showing of good cause, a Party from whom ESI has been requested shall not be required to search for responsive ESI from sources that are not reasonably accessible without undue burden or cost. The following types of data stores are presumed to be inaccessible and are not subject to discovery, and need not be collected or preserved, absent a particularized need for the data as established by the facts and legal issues of the case:

        i.   Deleted, slack, fragmented, or other data only accessible by forensics;

       ii.   Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system; and

      iii.   On-line access data such as temporary internet files, history, cache, cookies, and the like.

    b.   To conduct collections in a focused and efficient manner, the Parties also agree to exclude the following file types from collection: Standard system file extensions including, but not limited to, BIN, CAB, CHK, CLASS, COD, COM, DLL DRV, EXE, INF, INI, JAVA, LIB, LOG, SYS and TMP and other file extensions and directories that likely do not contain user generated content such as files identified by hash value when compared to the National Software Reference Library reference data set (RDS Hash), a sub-project of the National Institute of Standards and Technology ("NIST"), of known traceable system and application files. This process is commonly referred to as "De-NISTing."

**E. Collection and Search Methodology**

    a.   Searches for emails in Debtor's custody shall be conducted by DSI on Debtor's Veritas Enterprise Vault storage using an unrestricted account at the earliest opportunity, but in no event later than [date]. DSI shall use an add-on component called Discovery Assistant, which enables searches based on email properties, such as senders, recipients, and dates. Discovery Assistant also permits text searching of email contents and the contents of electronic file attachments, although not pictures of text (*e.g.*, scanned PDFs). Debtor did not employ employee message or file encryption that would prevent reasonable operation of the Discovery Assistant search capabilities.

    b.   The results of email searches shall be produced to the Committee pursuant to Part F below, subject to completion of any review for privilege or other purposes contemplated by this Agreement.

    c.   A snapshot copy of Debtor databases (Oracle, Siepe) shall be created in a format to be specified later by agreement with the Committee per Part (C)(d), (f), above.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Filed 06/30/25   Page 90 of 1017   PageID 14734
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 962 of 1803   PageID 11708
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 46 of 61

Prior to any production of responsive data from such a structured database Debtor will first identify the database type and version number, provide the vendor-originated database dictionary, if any, (identifying all tables in the database, their fields, the meaning of those fields, and any interrelation among fields) and any user manuals, or any other documentation describing the structure and/or content of the database, and a list of all reports that can be generated from the database. The list of reports shall be provided in native Excel (.xis or .xlsx) format.

d. The Geneva system is highly proprietary and shall not be collected, but the Committee will be given reasonable access to that system per Part C(e), above.

e. Debtor and Committee will meet and confer to discuss the scope of any necessary searches on the Box account.

f. Debtor file server contents, where requested by the Committee, shall be produced pursuant to Part F below.

g. Debtor shall propose a format for producing Sharepoint data. The Committee agrees that it is not necessary to reproduce the interface used by Debtor in the ordinary course of business for Sharepoint.

**F.   Format of Documents Produced**

a. Non-database ESI shall be produced as black and white Group 4 TIFF files, with a resolution of 300 DPI. Page size shall be 8.5 x 11 inches unless, in the reasonable judgment of the Producing Party, a particular item requires a different page size, and original document orientation shall be maintained (i.e., portrait to portrait and landscape to landscape). A Requesting Party may, in good faith and reasonable judgment, request a color copy of a production document if it is necessary to convey the relevant and responsive information. Such color copies may be produced as single page JPG (JPEG) image files. The Requesting Party will bear the costs for color images.

b. The files shall be accompanied by a metadata load file, in a single standard format to be requested by the Receiving Party prior to any production (e.g., Opticon, Summation DII, or the like) showing the Bates number of each page, the appropriate unitization of the documents, and the entire family range. The Parties agree to meet and confer regarding the requested standard format prior to production.

c. The files shall be accompanied by a .DAT text file including the delimited fields identified in the Metadata List (below). No Party will have any obligation to manually generate information to provide the fields identified in the Metadata List.

d. The Producing Party reserves the right to make hard copy documents available for inspection and copying pursuant to Federal Rule of Civil Procedure 34.

e. In the event that a Party identifies hard copy documents for production, hard copy paper documents shall be scanned and will include, to the extent feasible, the following fields in the .DAT text file: PRODBEG, PRODEND, PAGECOUNT, FULLTEXT, and CUSTODIAN. The Parties agree to share equally in the cost of scanning hard copy documents.

f. For any documents that were scanned from hard copy paper documents, the Parties will produce images of hard copy documents unitized to the extent the

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 65-96   Page 96 of 1804   Page 91 of 1017   PageID 14735
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 963 of 1803   PageID 11709
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 47 of 61

original documents appeared to be units in physical form, with attachments following parents, and with information that identifies the holder (or container) structure, to the extent such structure exists and it is reasonable to do so. The Producing Party is not required to OCR (Optical Character Recognition) hard copy documents. If the Receiving Party requests that hard copy documents be OCR'ed, the Receiving Party shall bear the cost of such request, unless the Parties agree to split the cost so that each has an OCR'ed copy of the documents.

g.   For ESI that the Producing Party produces in TIFF or JPEG format, the Producing Party shall electronically "burn" a legible, unique Bates number onto each page. The Bates number shall, to the extent reasonably possible: (1) identify the Producing Party; (2) maintain a constant length of nine numeric digits (including 0-padding) across the entire production; (3) contain only alphanumeric characters, no special characters or embedded spaces; and (4) be sequential within a given document. If the Bates number conceals, interferes with, or otherwise obscures any information from the source document, the Producing Party, at the request of the Receiving Party, shall produce a copy that is not obscured.

h.   For ESI that the Producing Party produces in TIFF format, if the Producing Party is producing the ESI subject to a claim that it is protected from disclosure under any confidentiality order entered in this matter, the Producing Party shall electronically "burn" the appropriate confidentiality designation onto each page of the document. If the designation conceals, interferes with, or otherwise obscures any information from the source document, the Producing Party, at the request of the Receiving Party, shall produce a copy that is not obscured.

i.   The Parties agree to produce e-mail families intact absent a privilege or work product claim, so long as each document contains responsive information; for all documents that contain a responsive, non-privileged attachment, the following fields will be produced (if available) as part of the metadata load file to indicate the parent child or parent/sibling relationship:

  i.  Production Bates begin
  ii. Production Bates end
  iii. Production Bates begin attachment
  iv. Production Bates end attachment

Notwithstanding the aforementioned, all parties acknowledge that Debtor's. Veritas Enterprise Vault system does not have the ability to search for the family members of responsive documents, and that Debtor does not have an obligation to manually search for non-responsive family members of otherwise responsive documents.

j.   Unless otherwise agreed, all dynamic date and time fields, where such fields are processed to contain a value, and all metadata pertaining to dates and times, will be standardized to Universal Coordinated Time (UTC) or Universal Coordinated Time + 1 (UTC+1) **[TBD]**. The Parties understand and acknowledge that such standardization affects only dynamic fields and metadata values and does not affect, among other things, dates and times that are hard-coded text within a file. Dates and times that are hard-coded text within a file (for example, in an email thread, dates and times of earlier messages that were converted to body text when subsequently replied to or forwarded; and in any file type, dates and times that are

Appellee Appx. 00957
Appx. 01208
013770

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-16    Page 92 of 1017    PageID 14736
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 964 of 1803    PageID 11710
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 48 of 61

typed as such by users) will be produced as part of the document text in accordance with the provisions herein.

k.  Exceptions to the Production Format

l.  Excel spreadsheets shall be produced in native application format, unless redactions are required. The Producing Party will make reasonable efforts to provide a TIFF image of a slip sheet with the Bates number of documents produced natively in its production. The corresponding native file shall be named by using the same Bates number identified on the placeholder TIFF image. Any Excel spreadsheet that requires redaction will be produced in TIFF format only. Certain types of databases are dynamic in nature and may contain information that is irrelevant. These files are sometimes large and would, if rendered to TIFF images completely, produce thousands of pages that would have little utility to a reviewer without the associated database.

m.  To the extent information from a structured data repository, such as a database, is requested, responsive information will be produced via a report or export of such data to an appropriate program that is agreeable to the requesting Party. The Parties agree to meet and confer before such data is exported.

**G.  Production Format Shall Not Alter Authenticity, Admissibility, or Privilege Status**

a.  No Party shall object that ESI produced pursuant to this Protocol is not authentic by virtue of the ESI having been converted to TIFF. The Parties otherwise reserve all rights regarding their ability to object to the authenticity of documents.

b.  Nothing in this Protocol shall be construed to affect in any way the rights of any Party to make any objection as to the production, discoverability, admissibility, or confidentiality of documents and ESI.

c.  Nothing in this Protocol shall constitute a waiver by any Party of any claim or privilege or other protection from discovery.

d.  Nothing in this Protocol shall be interpreted to in any way limit a Producing Parties right and ability to review documents for responsiveness prior to production.

e.  Nothing in the Protocol shall require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity.

**Metadata List**

| File Name | Field Description | Sample Values |
|---|---|---|
| BegBates | Bates number for the first page of the document | ABC-0000001 |
| EndBates | Bates number for the last page of the document | ABC-0000002 |
| BegAttach | Bates number for the first page of parent document | ABC-0000001 |
| EndAttach | Bates number for the last page of last attachment | ABC-0000005 |
| Pages | Number of printed pages of the document | 2 |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Page 93 of 1017    PageID 14737
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 965 of 1803    PageID 11711
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 49 of 61

| Global Custodian | Custodian name produced in format: Lastname, Firstname. | Smith, Jane; Taylor, Michael |
|---|---|---|
| Confidentiality | Indicates if the document has been designated as "Confidential" or "Highly Confidential" pursuant to the applicable Protective Order | Confidential; Highly Confidential |
| Redacted | Descriptor for documents that have been redacted: "Yes" for redacted documents; "No" for non-redacted documents | Yes |
| Email Subject | Subject line of Email or | Text of the subject line |
| Document Subject | Subject value of documents | Text of the subject line |
| Date Sent | Date email sent | mm/dd/yyyy |
| Time Sent | Time email sent | hh:mm:ss AM |
| Date Last Modified | Date document was last modified | mm/dd/yyyy |
| Time Last Modified | Time document was last modified | hh:mm:ss AM |
| Date Created | Date document was first created | mm/dd/yyyy |
| To | All SMTP address of email recipients, separated by a semi-colon | Larry.murphy@email.com |
| From | All SMTP address of email author | Bart.cole@email.com |
| CC | All SMTP address of email "CC" recipients, separated by a semi-colon | Jim.James@gmail.com; bjones@yahoo.com |
| BCC | All SMTP address of email "BCC" recipients, separated by a semi-colon | mjones@gmail.com |
| Attach | The file name(s) of the documents attached to emails or embedded in files. Multiple files should be delimited by a semicolon | Filename.doc; filename2.doc |
| Title | The Title property of a file. | Title |
| Author | The Author property of a file | John Doe |
| MessageID | The email message ID | |
| FILENAME | The original name of the file excluding the path | C:\My Documents\letter.doc |
| DocType | Email, letter, memo, invoice, etc., if available | |
| Extension | The file extension | .doc |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-16   Page 96 of 25304 Page 94 of 1017   PageID 14738
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 966 of 1803   PageID 11712
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 50 of 61

| | | |
|---|---|---|
| FileType | The actual file type of the document (Word, Excel, etc.) regardless of the file extension | |
| HashValue | MD5 Hash value of original file | |
| FilePath | The directory structure of the original file. | C:\My Documents\ letter.doc |
| PathToNative | The relative path to a produced native document | C:\VOL001\BATES000000001.xls |
| PathToText | The relative path to the accompanying text file | C:\VOL001\BATES000000001.txt |
| Volume | The production number or reference from the production | |
| Other Custodian | To the extent global deduplication is used, the field indicates the other custodians who also were in possession of the document at the time of collection | |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-1   Page 368 of 1304   Page 95 of 1017   PageID 14739
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 967 of 1803   PageID 11713
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 51 of 61

I. **Definitions**

A. "<u>Court</u>" means the United States Bankruptcy Court for the Northern District of Texas.

B. "<u>NAV</u>" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

C. "<u>Non-Discretionary Account</u>" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

D. "<u>Related Entity</u>" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or  Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "<u>Related Entities Listing</u>"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

E. "<u>Stage 1</u>" means the time period from the date of execution of a term sheet incorporating the protocols contained below (the "<u>Term Sheet</u>") by all applicable parties until approval of the Term Sheet by the Court.

F. "<u>Stage 2</u>" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

G. "<u>Stage 3</u>" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

H. "<u>Transaction</u>" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

Exhibit D
**Appellee Appx. 00961**
Appx. 013774

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-16   Page 96 of 1804 Page 96 of 1017   PageID 14740
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 968 of 1803   PageID 11714
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 52 of 61

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.  "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.  "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

II. **Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners**

A.  **Covered Entities**: N/A (See entities above).

B.  **Operating Requirements**

1.  Ordinary Course Transactions do not require Court approval (All Stages).

    a)  Stage 1 and Stage 2:  ordinary course determined by the CRO.

    b)  Stage 3: ordinary course determined by the Debtor.

2.  Related Entity Transactions

    a)  Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)  Stage 3:

        (1)  Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        (2)  Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.  Third Party Transactions (All Stages)

    a)  Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the

Appellee Appx. 00962
Appx. 013775
013775

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-16    Page 97 of 1017    PageID 14741
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 969 of 1803    PageID 11715
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 53 of 61

Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)  The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  Redemption requests payable to Related Entities will be held in escrow and will not prevent the winding up or liquidation of any fund or entity.

c)  The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.  **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

III.  **Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

A.  **Covered Entities**: See **Schedule A** hereto.  **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B.  **Operating Requirements**

1.  Ordinary Course Transactions do not require Court approval (All Stages).

a)  Stage 1 and Stage 2: ordinary course determined by the CRO.

b)  Stage 3: ordinary course determined by the Debtor.

2.  Related Entity Transactions

a)  Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)  Stage 3:

(1)  Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Appellee Appx. 00963
Appx. 01214
013776

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-1   Exhibit 6   Page 97 of 1804 Page 98 of 1017   PageID 14742
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 970 of 1803   PageID 11716
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 54 of 61

(2) Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3. Third Party Transactions (All Stages)

a) Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c) The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**IV.** **Transactions involving entities that the Debtor manages but in which the Debtor does <u>not hold a direct or indirect interest</u>**

A. **Covered Entities**: See **<u>Schedule A</u>** hereto.  **<u>Schedule A</u>** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

B. **Operating Requirements**

1. Ordinary Course Transactions do not require Court approval (All Stages).

a) <u>Stage 1 and Stage 2</u>: ordinary course determined by the CRO.

b) <u>Stage 3</u>: ordinary course determined by the Debtor.

2. Related Entity Transactions

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

4

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-16   Exhibit 6   Page 97 of 253804 Page 99 of 1017   PageID 14743
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 971 of 1803   PageID 11717
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 55 of 61

a)  <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)  <u>Stage 3</u>:

   (1)  Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

   (2)  Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.  Third Party Transactions (All Stages):

   a)  Except as set forth in (b) and (c) below, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

   b)  The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

   c)  The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties.  The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C.  **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-10 Filed 06/25/25 Page 100 of 1017 PageID 14744
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 972 of 1803 PageID 11718
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 56 of 61

**V.** **Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VI.** **Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII.** **Transactions involving Non-Discretionary Accounts**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all non-discretionary accounts.[5]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Appellee Appx. 00966
Appx. 01217
013779

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-11 96    Filed 03/06/25 1804    Page 101 of 1017    PageID 14745
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 973 of 1803    PageID 11719
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 57 of 61

**VIII.**    **Additional Reporting Requirements – All Stages (to the extent applicable)**

A.    DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

B.    The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

IX.    **Shared Services**

A.    The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

B.    The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

**X.**    **Representations and Warranties**

A.    The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

B.    The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

C.    The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

Appellee Appx. 00967
Appx. 01348
013780

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1 of 196    Filed 09/05/25    Page 102 of 1017    PageID 14746
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 974 of 1803    PageID 11720
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 58 of 61

*PSZJ Draft 12/27/19*

### Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD:  Schedule A is work in process and may be supplemented or amended.

**Appellee Appx. 00968**
**Appx. 013781**
013781

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Filed 06/25/24   Page 103 of 1017   PageID 14747
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 975 of 1803   PageID 11721
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 59 of 61

*PSZJ Draft 12/27/19*

8.  Highland Socially Responsible Equity Fund
9.  Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

<u>Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest</u>

1.  The Dugaboy Investment Trust
2.  NexPoint Capital LLC
3.  NexPoint Capital, Inc.
4.  Highland IBoxx Senior Loan ETF
5.  Highland Long/Short Equity Fund
6.  Highland Energy MLP Fund
7.  Highland Fixed Income Fund
8.  Highland Total Return Fund
9.  NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

<u>Transactions involving Non-Discretionary Accounts</u>

1.  NexBank SSB Account
2.  Charitable DAF Fund LP

Appellee Appx. 00969
Appx. 01320
013782

Case 19-34054-sgj11  Doc 3596-6  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:25-cv-02072-S  Document 15-196  Filed 07/06/25  Page 104 of 1017  PageID 14748
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 976 of 1803  PageID 11722
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19  Entered 12/27/19 21:33:05  Page 60 of 61

*PSZJ Draft 12/27/19*

## Schedule B

**Related Entities Listing (other than natural persons)**

DOCS_NY:39943.14 36027/002

Appellee Appx. 00970
Appx. 01321
013783

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 07/06/25    Page 105 of 1017    PageID 14749
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 977 of 1803    PageID 11723
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 61 of 61

*PSZJ Draft 12/27/19*

### Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

DOCS_NY:39943.14 36027/002

Appellee Appx. 00971
Appx. 01322
013784

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit    Filed 09/06/25    Page 106 of 1017    PageID 14750
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 978 of 1803    PageID 11724
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 1 of 19

November 2019

**James P. Seery, Jr.**

New York, NY



James P. Seery, Jr. is a high yield and distressed investing professional who was most recently a Senior Managing Director and co-Head of Credit at Guggenheim Securities LLC, where he is responsible for helping direct the development of a leveraged finance and credit distribution business.  Prior to joining Guggenheim, Mr. Seery was the President and a senior investing partner of River Birch Capital, LLC, a $1.3bn global credit fund manager.  In that role, he developed and led many of the firm's most profitable credit investments.  Mr. Seery is a licensed attorney and was formerly a partner and co-Head of the Sidley Austin LLP New York Corporate Reorganization and Bankruptcy Group, and he also recently served as a Commissioner on The American Bankruptcy Institute's Commission to Study the Reform of Chapter 11.

Before his joining Sidley Austin, Mr. Seery was a Managing Director and the Global Head of Lehman Brothers' Fixed Income Loan business. In that position, he was responsible for managing the Lehman Brothers' Fixed Income investment grade and high yield loan businesses, including underwriting commitments, distribution, hedging, trading and sales (including CLO manager relationships), portfolio management, and restructuring. Mr. Seery was also a member of the Lehman Brothers' Fixed Income Operating Committee and Global Credit Products Operating Committee as well as the High Yield Commitment and New Business Committees.  From 2000 to 2004, Mr. Seery ran Lehman Brothers' restructuring and workout businesses with responsibility for management of distressed corporate debt investments, and in 2008 he was a key member of the small team that successfully sold Lehman to Barclays.

Mr. Seery was selected as one of the Top Restructuring Lawyers in the U.S. Under 40 by *Turnarounds and Workouts* in 1999. Mr. Seery graduated in 1990 from New York Law School, *magna cum laude*, where he was an editor of the Law Review and Colgate University in 1984. He was a member of the Board of Directors of the Loan Syndications and Trading Association from 2006 to 2008 and a member of the INSOL International Lenders Group from 2016-2017.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-106   Filed 06/25/804   Page 107 of 1017   PageID 14751
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 979 of 1803   PageID 11725

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 2 of 19

# JAMES P. SEERY, JR.

795 Columbus Ave., 12A
New York, New York 10025
631-804-2049 · jpseeryjr@gmail.com

## Experience

**Guggenheim Securities LLC,** New York, New York                          Aug. 2017-Nov. 2019
Senior Managing Director, Co-Head Credit
- Responsible for developing leveraged finance and credit portfolio advisory businesses
- Management of teams of leveraged finance bankers and trading and sales professionals

**River Birch Capital, LLC**, New York, New York                          April 2012-July 2017
President, River Birch Capital, LLC
- President and senior investing partner at New York based $1.3bn global long-short credit fund focused on corporate credit from investment grade to distressed
- Responsible for originating, executing and managing stressed and distressed credit investments with a team of 6 investing partners and 5 analysts and traders
- Led finance and operations team with CFO/CCO; firm grew from approx. $200mm in 2012 to $1.3bn in 2017

**Sidley Austin LLP**, New York, New York                          May 2009-April 2012
Co-head New York Corporate and Reorganization Group
- Built and managed a creditor focused restructuring group as part of an international company side practice in a nearly 2000 attorney firm
- Represented banks, corporations, hedge funds, and structured investment vehicles in a variety of restructuring, financing and litigation matters

**Lehman Brothers**, New York, New York                          April 1999-May 2009
Global Head Fixed Income Loans
- Managing Director responsible for managing the global fixed income loan business, including investment grade and high yield commitments, global distribution, hedging, trading and sales, CLO origination, portfolio management, and restructuring; managed underwritten loan commitments and teams of credit sales and trading professionals as well as structuring, portfolio management and work-out specialists
- Member Fixed Income Operating Committee, Global Credit Products Operating Committee, and High Yield Commitment and New Business Committees
- Responsible for originating, structuring and managing proprietary distressed debt investments, rescue financings, and restructurings 1999-2004
- Key member of team that negotiated and completed the sale of Lehman Brothers to Barclays Sept. 2008; remained at Barclays through April 2009

**Phillips Nizer**, Garden City, New York                          May 1995-April 1999
- Senior Associate in corporate reorganization group of boutique New York City law firm

**Cadwalader, Wickersham & Taft**, New York, New York                          May 1989-May 1995
- Associate in corporate reorganization group of New York City based international law firm

## Education

New York Law School, New York, New York, J.D., *magna cum laude*, Editor Law Review          1990
Colgate University, Hamilton, New York, B.A. History          1984

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 06/06/25    Page 108 of 1017    PageID 14752
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 980 of 1803    PageID 11726

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 3 of 19

**Experience**

| | |
|---|---|
| Director, River Birch International, Ltd.  Board | 2015-2017 |
| Director, Camphill Foundation Board | 2017-2019 |
| Member, INSOL International Lenders Group Board | 2016-2017 |
| Commissioner, ABI Commission to Study Reform of Ch. 11 | 2012-2015 |
| Director, Loan Syndications and Trading Association | 2006-2008 |

**Selected River Birch Sample Investments**

Cash America International *5.75% Senior Unsecured Notes due 2018 and Litigation Claim – Developed and led execution of successful note purchase and make-whole litigation strategy based on company's improper spin of payday lending business; U.S. District Court published decision in note holders' favor led to settlement*

Chesapeake Energy Corp *6.775% Senior Notes due 2019 Litigation Claims – Developed and led execution of successful note purchase and make-whole litigation strategy based on company's improper call of notes; ultimately prevailed in $450mm judgment discussed in published Second Circuit and U.S. District Court decisions*

Caesars Entertainment Resort Properties *8% 1st Lien Notes due 2020; 11% 2d Lien Notes due 2021 – Developed and led (with senior investment analyst partner) execution of successful bankruptcy investment strategy focused on lower beta part of the capital structure of bankrupt casino operator; investment designed for high return with significant downside protection*

Intelsat Jackson Holdings *9.5% Senior Secured Notes due 2022 – Developed and led (with senior investment analyst partner) execution of successful new issue stressed secured note investment strategy; responsible for structuring and tightening covenant package and increasing size of offering after determining that potential litigation threat was low risk; responsible for recommending ICF 12.5% note investment in the low 80s in February 2018*

Motors Liquidation Company *GUC Trust Publicly Traded Units – Developed and led successful investment strategy in publicly traded bankruptcy liquidation units (GM); took the opposite side of sell-side analyst recommendations and engineered a successful settlement in high return/low downside position*

Hypo Alpe Adria Bank (Hetar) *Senior Guaranteed Notes – Developed and led (with senior investment analyst partner) execution of successful investment strategy in insolvent Austrian bank with notes guaranteed by an Austrian State*

Presidio Inc. *10.25% Senior Notes due 2023 – Developed and led execution of successful investment strategy to purchase newly developed mezzanine part of the capital structure on struggling new issue deal; ultimately sponsor purchased the mezzanine but aggressive structuring and bidding for the mezzanine tranche led to outsized allocation of new notes*

Nortel Networks Ltd. *6.875% Senior Notes due 2023 – Developed and led (with senior investment analyst partner) execution of bankruptcy liquidation strategy based on litigation and ultimate leverage of Canadian liquidating estate*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10    Filed 06/26/25    Page 109 of 1017    PageID 14753
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 981 of 1803    PageID 11727

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 4 of 19

**Selected Speaking Engagements**

American Law Institute/ NYU Law – Credit Markets and Corporate Reorganization, New York City, April 2017
Moderator, *Auctions and Asset Sales In and Out of Bankruptcy*

University of Texas Law/American Bankruptcy Institute -- Emerging Valuation Issues in Bankruptcy, Las Vegas, March 2017
Panelist, *Determining Valuation and the Fulcrum Security*
Panelist, *Distressed Investments Strategies*

NYU Law – Claim Priority Roundtable, New York City, September 2016
Panelist, *Allocating Value in and Out of Bankruptcy*

University of Texas Law/ABI – Emerging Valuation Issues in Bankruptcy, Las Vegas, March 2016
Panelist, *ABI Commission Report Proposed Amendments and Their Impact on Valuation*

The M&A Advisor – Distressed Investing Summit, Palm Beach, January 2016
Panelist, *Using Options to Bridge Value Gaps*

NYU Law – Seligman Bankruptcy and Business Reorganization Workshop, New York City, September 2015
Panelist, *Valuation Approaches and Methodologies*

Skadden Arps/Colgate University – Law and Finance Summit, New York City, November 2014
Presenter, *Recent Developments in Bankruptcy and Distressed Debt*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10    Filed 10/06/25    Page 110 of 1017    PageID 14754
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 982 of 1803    PageID 11728

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 5 of 19

Appellee Appx. 00976
Appx. 91327
013789

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-106   Filed 07/02/25   Page 111 of 1017   PageID 14755
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 983 of 1803   PageID 11729
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 6 of 19

**Dubel & Associates, L.L.C.**

# John S. Dubel
## Board of Directors Experience

- **Purdue Pharma Inc. – July 2019 to Present  -** Independent Board Member and Chair of the Special Committee of Directors

  In addition to being a member of the Board of Directors of Purdue Pharma Inc., I am the Chair of the Special Committee of Independent Directors charged with overseeing the investigation of relationships between Purdue and Purdue owners, the Sackler family.

- **WMC Mortgage, LLC – Indirect Subsidiary GE – July 2018 to December 2019  -** Independent Board Member and Chair of the Special Independent Committee of Directors

  WMC's chapter 11 plan was recently confirmed and WMC will emerge from Chapter 11 in early December 2019. I am the Chair of the Special Independent Committee of Independent Directors for this indirect subsidiary of GE. The Special Committee was tasked with reviewing the relationship between the insolvent WMC and GE and resolving its insolvency issues through a court supervised chapter 11 proceeding. I was the lead person responsible for negotiations with the parent concerning the level of support that the parent was required to provide and worked with our creditors to negotiate a resolution amongst all parties.

- **Werner Co.** – January 2013 to Present – Sole Independent Director

  Werner is a global leader in access equipment, secure storage, light duty construction and fall protection products with operations across all geographies. A consortium of private equity investors bought the assets out of a bankruptcy proceeding in 2007. I was asked to serve on the Board as the sole Independent Director by the largest shareholder. Werner more than doubled the size of its business, diversified its product offering and substantially improved its EBITDA prior to its sale in July 2017. As an independent director, working with one other director, we lead the effort in the sale process that achieved an additional $180 million increase in the sale price of the company for its distressed investors.  I am currently the lead director responsible for the resolution of post-sale purchase price adjustments.

- **Old PSG f/k/a Performance Sports Group** – August 2017 to December 2017

  Asked to serve on the Board, by the Official Equity Committee, after the sale of Performance Sports Group's assets. My role was to oversee the plan of reorganization process to drive to a smooth confirmation.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-116    Filed 06/25/1804    Page 112 of 1017    PageID 14756
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 984 of 1803    PageID 11730
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 7 of 19

## Dubel & Associates, L.L.C.

- **FXI Holdings** – September 2010 to October 2017 – Independent Director

  FXI is a leading producer of engineered polyurethane foam solutions serving the largest customers in the largest markets. It has the broadest customer and consumer reach of any North American foam producer. FXI's assets where purchased during a bankruptcy proceeding in 2009. I was asked to serve on the board of directors by one of the two private equity firms that owned FXI. Shortly after joining the Board, I was asked to Chair a Special Committee of the Board to manage certain litigation and government investigations related to alleged anti-trust infractions. FXI was the subject of over 50 different class action and individual litigations alleging damages in excess of $3 billion. Over a period of several years, FXI was able to settle all of its litigation for a minor fraction of the alleged damages and all investigations by the government were dropped. During this time, the company's performance improved in a consistent manner with EBITDA more than doubling. Once these litigations were settled, the company was marketed and ultimately sold in October 2017.

- **ResCap Liquidating Trust** – December 2013 to March 2017 – Chairman of the Board - December 2013 to late 2015

  After the ResCap chapter 11 plan was confirmed, I served on the Board of the ResCap Liquidating Trust, as FGIC's representative, to guide the wind down of the remaining assets and prosecute claims in excess of $4 billion against institutions that caused harm to ResCap. During this time, I also served as Liquidating Trustee while we brought on board a new in-house lawyer to prosecute these claims and transitioned this individual into the permanent Liquidating Trustee role.

- **FGIC Corporation and FGIC** - December 2008 to April 2014 – Chairman of the Board during various parts of that time frame – while serving as CEO

- **Barneys New York** – February 2012 to May 2012 – Sole Independent Director

  After Barneys' 2007 sale to Istithmar World, the Government of Dubai's private investment fund, Barneys was impacted by the recession in the late 2000's. I was brought in to serve as the sole independent director during the out of court restructuring process which resulted in a consensual change of control for Barneys to its distressed investor creditors.

- **The Leslie Fay Companies** – April 1993 to May 1996 – while serving as the EVP of Restructuring and CFO

- Mr. Dubel has also served as a member and chairperson of various ad hoc and official creditor committees.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Filed 06/25/804    Page 113 of 1017    PageID 14757
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 985 of 1803    PageID 11731
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 8 of 19

**Dubel & Associates, L.L.C.**

# John S. Dubel
# Key Management Experience

- **Noble Environmental Power –** Restructuring Advisor to the Company - 2018

  Noble was the owner of two utility scale wind power plants in upstate New York which were in default on their debt instruments. Working closely with Noble's investment bankers we were able to complete a sale of these plants while keeping the companies out of chapter 11 and returning net sale proceeds to its shareholders.

- **SunEdison, Inc.** – Chief Executive Officer and Chief Restructuring Officer – 2016-2017

  SunEdison was the largest global renewable energy development company prior to its filing for chapter 11 in April 2016. SunEdison had over $10 billion of liabilities and 4,500 employees spread across operations in over 50 countries on 6 continents. A decline in energy prices along with loss of faith in management by investors and numerous litigations filed against the company caused the closing of the capital markets for SunEdison which led to its filing for chapter 11. I was brought in as a requirement of the DIP agreement. SunEdison's assets were sold in a manner to preserve the greatest value for its creditors. I am currently assisting the wind down SunEdison entity as requested.

- **Financial Guaranty Insurance Company** – Chairman and Chief Executive Officer – 2008-2014

  FGIC was the third largest monoline bond insurer, insuring in excess of $300 billion of public finance instruments, RMBS securitizations and CDS contracts with over $4 billion of capital. After the collapse of the residential mortgage market in the 2007/08 timeframe, FGIC lost its AAA ratings and experienced tremendous losses on its insurance contracts. This led to an insolvency proceeding under NY State insurance law with an innovative resolution through a pre-arranged rehabilitation plan. This enabled it to continue to pay its policy holders in a timely manner.

- **Residential Capital** – Co-Chairman of the Official Creditors Committee – 2012-2013

  ResCap, a wholly owned subsidiary of Ally Financial, was one of the largest mortgage originators in the US. FGIC was its 2nd largest creditor and after its chapter 11 filing in May of 2012, I was appointed as the Co-Chair of ResCap's Official Unsecured Creditors Committee. As the lead negotiator for the UCC, the UCC was able to negotiate an increase in the contribution to the plan of reorganization by the parent, Ally, from approximately $650 million to $2.1 billion. This contribution settled all of the litigation between Ally and Rescap and enabled ResCap to emerge from chapter 11.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-196   Filed 06/25/1804   Page 114 of 1017   PageID 14758
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 986 of 1803   PageID 11732
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 9 of 19

## Dubel & Associates, L.L.C.

- **Anchor Glass Container Corporation** – Chief Restructuring Officer – 2005-2006

  Anchor Glass was the 3rd largest manufacturer of glass containers in the US, with Anheuser Busch and Snapple as its largest customers, where it provided "just in time" deliveries to enable its customers plants to operate 24/7. Its third trip through chapter 11 resulted from poor contract pricing and high legacy costs. I worked closely with the CEO to renegotiate these contracts and reduce the cost structure which enabled it to emerge from chapter 11 as a viable business which continues to operate today.

- **RCN Corporation** – President and Chief Operating Officer - 2004

  RCN was a Bundled 3-product cable provider offering integrated voice, video and data products in the US Northeast, Midwest and West Coast markets with over $1.7 billion of debt incurred during its build out period. Working with the Lead Director, a pre-arranged chapter 11 plan was negotiated with all of its creditor constituencies to enable it to emerge as a profitable business in its markets where it continues to operate today.

- **Cable & Wireless America** – Chief Executive Officer – 2003-2004

  C&W America was a premier hosting business with 14% share of the US market and world class a Tier 1 IP Network. When its British parent company experienced financial difficulties, they attempted to abandon C&W America which caused stress for its major customers, including Yahoo, Google and others. A plan was put in place, though a chapter 11 process, to dramatically reduce its daily cash burn and sell the entity while maintaining its customer base.

- **Acterna Corporation** – Chief Restructuring Officer  - 2003

  Acterna was a multi-national manufacturer of telecommunications and cable equipment with revenues of approximately $1.7 billion  and debt of $1 billion prior to the industry down turn. I worked closely with the CEO to stabilize the operations and avoid a fire sale of the business. A quick turn through chapter 11 enabled it to emerge as a viable business, where upon the CEO was able to regrow the business and position it for a successful sale to an industry player 18 months later.

- **WorldCom, Inc.** – Chief Financial Officer – 2002, Advisor – 2003

  WorldCom was one of the largest telecommunication companies with assets of over $107 billion and operations across the globe. It filed for chapter 11 during 2002 due to a massive fraud which covered up the significant operational deficiencies and losses it was experiencing. I was brought in as a condition of the DIP agreement and worked closely with the CEO and other members of the senior management to stabilize the company, restructure the operations to reduce opex, provide stability to the international operations and assist with the plan of reorganization negotiations and confirmation.

**Appellee Appx. 00980**

**Appx. 31331**
013793

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-196    Filed 06/25/804    Page 115 of 1017    PageID 14759
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 987 of 1803    PageID 11733

## Dubel & Associates, L.L.C.

- **CellNet Data Systems, Inc.** – Chief Restructuring Officer – 1999-2001

  CellNet was a startup technology company that provided smart grid and smart metering and billing solutions for the utility industry. After burning through in excess of $600 million of initial funding it was not able to access the capital markets to continue to build out its platform and realize the cost synergies across contracts that would make it profitable. Working closely with the new CEO, we reduced the cost structure and sold the company to one of its meter suppliers enabling it to continue to operate in a successful manner.

- **Barneys New York** – Chief Financial Officer – 1996-1999

  Barneys was, at this time, a family owned high end retail store chain operating with over 30 stores and international affiliations in Asia. After an uncontrolled growth plan and management that did not understand its cost structure, it filed for chapter 11. I was brought in a the request of the DIP lender to oversee the family's management, to control its costs, close unprofitable locations, renegotiate store leases and work out a consensual chapter 11 plan that included its largest creditors providing financing through a rights offering to enable Barneys to successfully emerge from chapter 11 as a profitable retailer.

- **The Leslie Fay Companies** – EVP Restructuring and Chief Financial Officer – 1993-1995

  Leslie Fay was one of the larger designer and manufacturer of ladies dresses, sportwear and suits in the US. A public company, it was the victim of fraud by its financial management team to hide the true cost of operations and manufacturing of its products. This led to a chapter 11 filing. I worked closely with the CEO and President to stabilize its financial management team, reduce costs and position it for an emergence from chapter 11.

- **Robert Maxwell Group** – Head of US Private Companies – 1991-1993

  Robert Maxwell was a British entrepreneur who invested heavily in the publishing space. After financial improprieties were uncovered and his subsequent suicide, I was appointed by the UK Administrators to run all of his US operations, which included over 40 private companies. I worked closely with the UK administers to realize value through sales of these US operations and turn those proceeds over to the UK Administrators.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10    Filed 09/06/25    Page 116 of 1017    PageID 14760
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 988 of 1803    PageID 11734

## Dubel & Associates, L.L.C.

Mr. Dubel is a past board member and officer of the Association of Insolvency and
Reorganization Advisors, a Certified Insolvency and Reorganization Advisor and is
a member of the Turnaround Management Association and the American
Bankruptcy Institute. Mr. Dubel received a Bachelor in Business Administration
degree from the College of William and Mary.

Appellee Appx. 00982
Appx. 01338
013795

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 990 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 989 of 1803    PageID 11735

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 12 of 19

# Dubel & Associates, LLC

# Selected Case Studies

Appellee Appx. 00983
Appx. 01324
013796

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 991 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 990 of 1803    PageID 11736

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 13 of 19

## SunEdison, Inc.
### John Dubel – Chief Executive Officer and Chief Restructuring Officer

| Situation | Actions Taken | Results |
|---|---|---|
| ‣ SunEdison (SUNE) was the largest global renewable energy development company prior to its filing for chapter 11 in April 2016. SUNE had over $10 billion of liabilities and 4,500 employees spread across operations in over 50 countries on 6 continents | ‣ Hired initially as CRO with a clear mandate to take on CEO responsibilities | ‣ Took on CEO role after a short transition with the former CEO |
| | ‣ An immediate assessment of the opportunity to maintain a going concern was initiated. | ‣ Reorganization of key personnel functions including the hiring of a new CFO and Controller provided stability in the Finance functions for the company to operate within the limits of the DIP agreement. |
| ‣ Continued downward pressure on energy prices caused renewable energy projects to experience stress. Lack of proper integration of acquisitions and overpayment on other acquisitions caused a liquidity crisis. Public spin-offs of profitable yieldco assets cut off cash flow that was needed to run the operations. | ‣ Programs were put in place to plug the employee exodus that SUNE was experiencing | |
| | ‣ In consultation with our lenders made the determination that an orderly sale of assets was the best path to optimum value realization | ‣ Executed a global marketing process which resulted in over 60 asset sales with approximately $1.5 billion of gross proceeds |
| ‣ Senior management control of the Yieldcos enabled borrowings from the Yieldcos which could not be repaid | ‣ Maintained an open line of communication with the DIP, 1L and 2 L lenders to build back trust in the company | ‣ Executed a plan which resulted in the transition of administrative and operational functions from SUNE to the Yieldcos which helped stabilize the value of our ownership stake in these entities |
| | ‣ Engaged with the Board of the Yieldcos, TERP and GLBL, to work towards a resolution of the disputes between the Yieldcos and SUNE | |

**Appellee Appx. 00984**
Appx. 01355
013797

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 992 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 991 of 1803    PageID 11737

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 14 of 19

## SunEdison, Inc. (continued)
### John Dubel – Chief Executive Officer and Chief Restructuring Officer

| Situation | Actions Taken | Results |
|---|---|---|
| ‣ Class and individual litigation against SUNE and the Yieldcos related to these control issues ensued. | ‣ Engaged with the Board and management of the Yieldcos, TERP and GLBL, to start to work towards a resolution of the disputes between the Yieldcos and SUNE | ‣ Drove a plan, through a directed litigation strategy, to force a resolution of the over $3 billion of claims brought against SUNE by the Yieldcos which resulted in a cooperative sale of the Yieldcos netting SUNE approximately $825 million |
| ‣ Shortly after a Feb 2016 2L financing the company has exhausted those funds and was out of available funds to operate the business. | ‣ Put in place a path to seek resolution of all of the Class Action and individual shareholder litigations by seeking a mediation in the District Court and Bankruptcy Court litigation related to both SUNE and the Yieldcos | ‣ A replacement DIP agreement was put in place to eliminate certain concerned creditors and align the interests of the DIP lenders and the prepetition secured creditors. |
| ‣ Additional litigation commenced related to cancelled acquisitions. | | |
| ‣ During this timeframe, the creditors lost faith in the CEO and CFO. | ‣ Commenced negotiations to settle the various litigations amongst SUNE's creditor groups and between SUNE and its Yieldcos | ‣ Settlements of the vast majority of class and individual shareholders were negotiated |
| ‣ SUNE filed for chapter 11 in late April 2016 funded by a DIP provided by the 1L and 2L creditors. | ‣ Worked closely with Chief Judge Morris, the mediator appointed in the case, to craft a resolution to all intercreditor disputes | ‣ A mediated resolution amongst SUNE's creditor resulted in a successful chapter plan of reorg funded by a rights offering led by SUNE's 2L creditors |

Appellee Appx. 00985
Appx. 01336
013798

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 993 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 992 of 1803    PageID 11738

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 15 of 19

## Financial Guaranty Insurance Company
### John Dubel – Chief Executive Officer and member of the Board of Directors

| Situation | Actions Taken | Results |
|---|---|---|
| ‣ FGIC was the third largest monoline bond insurer, insuring in excess of $300 billion of public finance instruments, RMBS securitizations and CDS contracts | ‣ Raised capital surplus by $830 million through reinsurance agreements and preferred stock | ‣ Planned and executed an orderly Rehabilitation Plan process which resulted in an innovative and precedent setting proceeding for FGIC's policyholders |
| ‣ At the start of 2008, FGIC was at risk of losing its AAA ratings | ‣ Negotiated settlements of CDS contracts | ‣ Managed down the overall exposure from $312 billion to under $30 billion |
| ‣ The residential real estate meltdown caused FGIC to face billions of dollars of claims from CDS and RMBS contracts it had insured | ‣ Managed the workout of multiple public finance insurance contracts | ‣ Settled parent/subsidiary issues without litigation |
| ‣ In addition, several of FGIC's largest public finance deals were on the cusp of defaulting | ‣ Managed affirmative litigation actions to recover from parties that harmed FGIC's insurance contracts | ‣ Recovered in excess of $1.25 billion for policyholders from parties that harmed FGIC's contracts |
| ‣ In late 2009, FGIC's statutory capital went negative and was subject to immediate takeover by the NYS Department of Financial Services | ‣ Developed an innovative restructuring plan to allow FGIC to file a pre-arranged rehabilitation plan in NYS Court | ‣ All of these results were accomplished while maintaining an independent view towards protecting all policyholders interests |
| | ‣ Positioned the company to be able to operate in the post rehabilitation environment to pay claims to policyholders in a timely manner | |

Appellee Appx. 00986
Appx. 21369
013799

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 994 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 993 of 1803    PageID 11739

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 16 of 19

## RCN Corporation – Integrated Triple Play Service Provider
### John Dubel – President and Chief Operating Officer

| Situation | Actions Taken | Results |
|---|---|---|
| ‣ Bundled 3-product cable provider offering integrated voice, video and data products in the US Northeast, Midwest and West Coast markets | ‣ Hired as President and CRO to lead RCN during this crisis. | ‣ Streamlined operations and reduced breakeven costs achieving positive cash flow and EBITDA |
| ‣ Revenues of approximately $500 million | ‣ Implemented reorganization of operating costs achieving positive EBITDA and cash flow | ‣ Reduced annualized SG&A costs by 20% |
| ‣ Over 1 million connections | ‣ Actions included: | ‣ Reduced headcount by 25% |
| ‣ $1.7 BN of debt in default | – Rationalized customer base | ‣ Improved Customer Service quality |
| ‣ Secured creditors pushing the Company to a forced liquidation | – Segmented Customer Service activity and automated where possible | ‣ Company emerged with over $125 million of cash in hand |
| ‣ Lack of confidence in management's business plan and ability to rationalize the business | – Consolidated Network Operations to drive efficiency | ‣ Instituted rigorous cost reduction procedures within the company |
| ‣ Company lacked adequate liquidity to maintain operations | – Reduced IT functions | ‣ Positioned the company for future positive growth |
| | – Reduced customer service call volume through web-based solutions | |
| | – Simplified product offering | |
| | – Generated Tech Operations savings | |

Appellee Appx. 00987
Appx. 013328
013800

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 995 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 994 of 1803    PageID 11740

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 17 of 19

## Cable & Wireless America – Successfully Positioned the Company for a Sale
### John Dubel – Chief Executive Officer

### Situation

- Premier hosting business with 14% share of the US market by revenue and World Class Tier 1 IP Network

- Parent company's announcement of intention to exit the US market created uncertainty for customers, suppliers, and employees

- Daily cash burn estimated at $2M

- Need to stabilize standalone operations and facilitate a sale transaction

### Actions Taken

- Negotiated terms of separation from parent company and obtained ongoing funding commitment

- Stabilized skittish customer base

- Took control of cash management and forecasting process

- Implemented cost cutting strategy to achieve cash flow breakeven within 9 months

- Managed extensive due diligence process by multiple bidders

### Results

- Reduced daily cash burn to $0.7M

- Planned and executed orderly Chapter 11 filing with the support of a "stalking horse" bidder to facilitate a 363 sale

- Active auction process resulted in total bid consideration of $167.5M, a threefold increase over the stalking horse bid value

Appellee Appx. 00988
Appx. 01339
013801

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 996 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 995 of 1803    PageID 11741

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 18 of 19

## Acterna – Reduced Costs, Drove a Successful Turnaround
### John Dubel – Chief Restructuring Officer

| Situation | Actions Taken | Results |
|---|---|---|
| ‣ Leading Telecom Network equipment supplier with worldwide operations that was facing a severe liquidity crisis | ‣ Assumed role of CRO to lead company through Chapter 11 | ‣ Acterna emerged from Chapter 11 with 80% less debt and a reduction of 85% of interest costs in less than 6 months |
| | ‣ Restructured $1.0 BN of debt | |
| ‣ Test equipment market was crippled by the drought of capital spending from Telecom Network companies | ‣ Preserved non-domestic assets across 30 countries necessary to a successful reorganization. | ‣ Improved international cash liquidity sufficiently for non-US operations to become self funding |
| | ‣ Focused sales activity on core markets | ‣ Cash at emergence was over $60 million |
| ‣ Debt levels were not sustainable in then current market conditions | ‣ Worked with management to reduce SG&A costs | ‣ Reduced operating cash costs so the company was self funding and the DIP was never used to operate the company |
| | ‣ Rationalized headcount through centralization of manufacturing activity | |
| | ‣ Managed the subsidiary divestiture program | ‣ 18 months after C-11, Acterna announced a sale to JDS Uniphase, for a three fold increase in value. |
| | ‣ Integrated worldwide cash control procedures improving liquidity | |

Appellee Appx. 00989
Appx. 013349
013802

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 997 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 996 of 1803    PageID 11742

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 19 of 19

## WorldCom – Stabilized Operations and Finance Function
### John Dubel – Chief Financial Officer

| Situation | Actions Taken | Results |
|---|---|---|
| ‣ A massive fraud which masked operational, financial and reporting issues crippled the company's credibility | ‣ Assumed role Chief Financial Officer until a permanent management team could be put in place then worked as financial advisor for pendency of Chapter 11 case | ‣ Achieved $2 BN of operational savings |
| ‣ WorldCom suffered from excess debt with declining value of assets, financial fraud issues, contentious relationship with creditors, and a substantial cash burn | ‣ Put turnaround teams, operational restructuring plans, and cash management plans in place | ‣ Increased cash flow by more than $100M in international operations and avoided bankruptcy in many jurisdictions |
| ‣ Significant negative cash flow from international operations | ‣ Led the international restructuring efforts | ‣ Worked with all stakeholders to reach consensus on a plan of reorganization |
| ‣ WorldCom filed for bankruptcy in July of 2002, becoming the largest bankruptcy filing in history at the time | ‣ Assisted in negotiations with creditors | ‣ Successfully restructured the balance sheet |
| | ‣ Implemented an achievable 2003 business plan, facilitated several cost reduction initiatives, and managed the 13-week cash flow forecast | |
| | ‣ Reduced capital spending | |

Appellee Appx. 00990
Appx. 013803
013803

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Page 125 of 1017    PageID 14769
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 997 of 1803    PageID 11743
Case 19-34054-sgj11 Doc 281-3 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 1 of 2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

---

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § Case No. 19-34054-sgj11 |
| | § |
| Debtor. | § Related to Docket Nos. 7 & 259 |

**ORDER APPROVING SETTLEMENT WITH OFFICIAL COMMITTEE OF**
**UNSECURED CREDITORS REGARDING GOVERNANCE OF THE DEBTOR**
**AND PROCEDURES FOR OPERATIONS IN THE ORDINARY COURSE**

Upon the *Motion of the Debtor to Approve Settlement with Official Committee of*

*Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the*

*Ordinary Course* (the "Motion"),[2] filed by the above-captioned debtor and debtor in possession

(the "Debtor"); the Court having reviewed the Motion, and finding that (a) the Court has

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Appellee Appx. 00991
Appx. 01342
013804

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-6   Filed 09/02/25   Page 126 of 1017   PageID 14770
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 998 of 1803   PageID 11744
Case 19-34054-sgj11 Doc 281-3 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 2 of 2

jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), and (c) notice of this Motion having been sufficient under the circumstances and no other or further notice is required; and having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and having determined that the relief sought in the Motion is in the best interests of the Debtor and its estate; and after due deliberation and sufficient cause appearing therefore,

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED on the terms and conditions set forth herein.

2.      The Term Sheet is approved and the Debtor is authorized to take such steps as may be necessary to effectuate the settlement contained in the Term Sheet, including, but not limited to: (i) entering into the Governing Documents and compensating the Independent Directors for their services either directly or by reimbursing Strand for any costs incurred in connection with the appointment and compensation of the Debtor; (ii) implementing the Document Production Protocol; and (ii) implementing the Protocols.

3.      Subject to the Protocols and the Term Sheet, the Debtor is authorized to continue operations in the ordinary course of its business.

4.      Notwithstanding any stay under applicable Bankruptcy Rules, this Order shall be effective immediately upon entry.

5.      The Court shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order, including matters related to the Committee's approval rights over the appointment and removal of the Independent Directors.

## END OF ORDER ##

DOCS_NY:39973.7 36027/002

Appellee Appx. 00992

013805

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-16   Page 1006 of 1804   Page 127 of 1017   PageID 14771
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 999 of 1803   PageID 11745

# APPENDIX 13

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 16   Page 1005/251804   Page 128 of 1017    PageID 14772
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1000 of 1803   PageID 11746
Case 19-12239-CSS    Doc 159    Filed 11/21/19    Page 1 of 16

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | **Related to Docket Nos. 69, 70, 116, and 120** |
| | ) | |

**DEBTOR'S OMNIBUS REPLY IN SUPPORT OF (I) APPLICATION FOR AN
ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF FOLEY
GARDERE, FOLEY & LARDNER LLP AS SPECIAL TEXAS COUNSEL, *NUNC
PRO TUNC* TO THE PETITION DATE; AND (II) APPLICATION FOR AN ORDER
AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER
COX & HURST LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO
TUNC* TO THE PETITION DATE**

The above-captioned debtor and debtor in possession (the "Debtor") hereby

submits this reply (the "Reply") in support of its (i) *Application for an Order Authorizing the*

*Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel,*

*Nunc Pro Tunc to the Petition Date* [Docket No. 69] (the "Foley Application"); and (ii)

*Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox &*

*Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* [Docket No.

70] (the "Lynn Pinker Application," and together with the Foley Application, the

"Applications").

In further support of the Applications, the Debtor respectfully states as follows:

**Preliminary Statement**

1.      As set forth in the Applications, and as discussed more fully below, Foley

Gardere, Foley & Lardner, LLP ("Foley") and Lynn Pinker Cox & Hurst LLP ("Lynn Pinker")

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Appellee Appx. 00994
013807
Appx. 01245

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-6   Page 1002 of 1804   Page 129 of 1017   PageID 14773
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1001 of 1803   PageID 11747
Case 19-12239-CSS   Doc 159   Filed 11/21/19   Page 2 of 16

have represented the Debtor and certain of its affiliates and related entities in highly-contested, prepetition litigation against Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," and together with Acis LP, "Acis").  Lynn Pinker also represented the Debtor in litigation concerning Joshua Terry – Acis's sole owner[2] – and Mr. Terry's wife, Jennifer Terry.  In the Applications, the Debtor seeks authority to retain Foley and Lynn Pinker on a postpetition basis to continue the defense of the Debtor and related entities as described herein and the prosecution of the Debtor's rights against Acis and Mr. Terry.

2.      Two objections to the Applications were filed:  (i) *Limited Objection of the Official Committee of Unsecured Creditors to the Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner, LLP and Lynn Pinker Cox & Hurst as Special Texas Counsel and Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 120] (the "Committee Objection") and (ii) *Limited Objection to the Debtor's: (I) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner, LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date; and (II) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 116] (the "Acis Objection").

3.      The Committee Objection, filed by the Official Unsecured Creditors Committee (the "Committee"), seeks certain additional disclosures concerning the services to be provided by Foley and Lynn Pinker and the entities to which those services will be provided.

---

[2] Mr. Terry obtained 100% of the equity in the Acis entities through the confirmation of Acis's bankruptcy plan. The Debtor is currently appealing that confirmation order as discussed herein.

Appellee Appx. 00995
Appx. 013808

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1003 of 1804   Page 130 of 1017   PageID 14774
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1002 of 1803   PageID 11748
Case 19-12239-CSS   Doc 159   Filed 11/21/19   Page 3 of 16

The Committee Objection also seeks additional disclosure concerning how the Debtor will pay for those services and their benefit to the Debtor's estate.  The Debtor has endeavored to provide the additional disclosures requested by the Committee as set forth herein and in the Supplemental Declaration of Michael Hurst (the "Hurst Declaration") attached hereto as **Exhibit A**, the Supplemental Declaration of Holland O'Neil (the "O'Neil Declaration") attached hereto as **Exhibit B**, and the Declaration of Bradley Sharp (the "Sharp Declaration," and together with the Hurst Declaration and the O'Neil Declaration, the "Declarations") attached hereto as **Exhibit C**.

4.      In contrast, the Acis Objection, filed by Acis LP and Acis GP, seeks to import the highly acrimonious and contentious nature of the Debtor's ongoing litigation with Acis and Acis's counsel, Winstead PC ("Winstead"), into this Court and to use the retention process to secure a litigation advantage in its ongoing dispute with the Debtor in Texas.  In short, Acis is seeking to disqualify the Debtor's chosen law firms – law firms that have represented the Debtor for the past twenty (20) months specifically in connection with the Acis and Terry Litigation – from continuing to represent the Debtor in matters adverse to Acis.  That tactic is improper and an abuse of the bankruptcy process.  Regardless, the Debtor has endeavored to be transparent and to respond to Acis's requests for additional disclosures herein and in the Declarations.  Although not relevant to the Applications, the Debtor has also responded to Acis's improper accusations concerning the Acis Litigation.

## Reply

5.      In the Committee Objection, the Committee lists two objections to the Applications.  The first, and the Committee's "principal concern," is "the lack of clear delineation of [Foley's and Lynn Pinker's] proposed engagements and representations, and the

Appellee Appx. 00996

013809

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-5   Page 1004/251804   Page 131 of 1017   PageID 14775
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1003 of 1803   PageID 11749
Case 19-12239-CSS   Doc 159   Filed 11/21/19   Page 4 of 16

Debtor's obligation to pay for the same." (Committee Objection, ¶ 3.)  The second is that "the

Applications do not provide for an allocation of attorneys' fees and expenses among the Debtor

and non-debtor defendants."  (*Id.*, ¶ 4.)  Parsing the vitriol in the Acis Objection, it is apparent

that Acis is generally asserting the same two objections as the Committee.  (Acis Objection, ¶¶ 5;

8.)  These two concerns are addressed below.

     **I.**     <u>**Foley's and Lynn Pinker's Proposed Engagements**</u>

            6.     Prior to the Petition Date, the Debtor was represented by both Foley and

Lynn Pinker acting as co-counsel.  Lynn Pinker is a highly- regarded litigation boutique based in

Dallas, Texas, but does not have bankruptcy attorneys on staff.  Conversely, Foley has a large

and well-established bankruptcy practice.  Because each of the matters set forth below includes

both a bankruptcy and litigation component, the Debtor utilized the services of both Foley and

Lynn Pinker.  Foley provided the bankruptcy expertise – but, in light of the Debtor's retention of

Lynn Pinker, does not have litigators staffed on the matters – and Lynn Pinker primarily handled

litigation strategy but deferred to Foley on the bankruptcy components.  As such, despite both

Lynn Pinker and Foley being retained, there was limited overlap in the services they provided to

the Debtor other than the overlap necessary to collaborate on overall progress and strategy.

            7.     The following are the matters in which Foley and Lynn Pinker represented

the Debtor prepetition (collectively, the "<u>Acis Litigation</u>").  The list also includes entities related

to the Debtor which were also represented by Foley and/or Lynn Pinker and whose legal fees

were paid – prepetition – by the Debtor (as discussed below).  The Debtor believes that one of

these matters, the Adversary Proceeding (as defined below), has been stayed as a result of the

Debtor's bankruptcy filing, and that there will only be de minimis, if any, legal work required on

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15   Page 1005 of 1804   Page 132 of 1017   PageID 14776
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1004 of 1803   PageID 11750
Case 19-12239-CSS   Doc 159   Filed 11/21/19   Page 5 of 16

such matter during the Debtor's bankruptcy.[3]  As set forth below, the Debtor is only seeking to

retain Foley and Lynn Pinker with respect to the Acis Bankruptcy, Neutra Appeal, Debtor

Appeal, and the Winstead Matter (each as defined below) at this time.

| Matter | Clients | Case Summary | Procedural Posture |
|---|---|---|---|
| *In re Acis Capital Management, L.P.*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. 2018) & *In re Acis Capital Management GP, L.L.C.*), Case No. 18-30265-SGJ-11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy") | Debtor<br><br>Neutra Limited[4] (Foley client only) | Acis involuntary bankruptcy proceeding initiated by Mr. Terry.  The Debtor has a claim in excess of $8 million for pre- and post-petition services provided to Acis.[5]  Neutra is nominally involved in the Acis Bankruptcy as a party in interest.  Other than Mr. Terry, the Debtor is Acis's only material creditor. | The Debtor's claims in the Acis Bankruptcy have been consolidated with the Adversary Proceeding (defined below). |
| *Acis Capital Management GP, LLC. and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al*, Adv. Proc. No. 18-03078 (Bankr. N.D. Tex. 2018) & *Acis Capital Management, L.P. and Acis Capital Management GP, LLC v. Highland Capital Management, L.P., et al.*, Adv. Proc. No. 18-03212 (Bankr. N.D. Tex. 2018) (collectively, the "Adversary Proceeding") | Debtor<br><br>Highland HCF Advisors, Ltd.<br><br>Highland CLO Management, LLC<br><br>Highland CLO Holdings, Ltd. | The Debtor is currently a defendant in the Adversary Proceeding.  The bankruptcy court consolidated resolution of the Debtor's claims with this Adversary Proceeding.  The defendants have filed a motion to withdraw the reference, which has been argued to the bankruptcy court and is pending.  The bankruptcy court has not yet produced its Report and Recommendation to the District Court as to whether to withdraw the reference. | The Debtor believes this matter is stayed as to the Debtor and the other defendants, and will likely remain so for the foreseeable future due to the nature of the action. |
| *Neutra Limited v. Josh Terry (In re Acis Capital Management, L.P.)*, Case No. 19-10846 (5th Cir. 2019) (the "Neutra Appeal") | Neutra (Foley client only) | Neutra is appealing the involuntary order for relief entered in the Acis Bankruptcy.  If successful, certain CLO management agreements may revert to the Debtor.  The Debtor previously received in excess of $12 million annually under those agreements.[6] | The Neutra Appeal is not stayed and is proceeding.  Neutra filed its reply brief on November 20, 2019. |
| *In re Matter of Acis Management GP, LLC and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al, v. Robin Phelan, Chapter 11 Trustee*, Case No. 19-10847 (5th Cir. 2019) (the "Debtor Appeal") | Debtor<br><br>Neutra (Foley client only) | The Debtor and Neutra are appealing entry of the confirmation order in the Acis Bankruptcy. | This appeal is not stayed, and the Debtor's reply brief is due December 16, 2019. |

---

[3] If circumstances change, the Debtor proposes to return to this Court to discuss the changed circumstances and to update the Applications if necessary.

[4] The economic interests in Neutra Limited ("Neutra") are owned, indirectly, 25% by Mark Okada and 75% by James Dondero.  Prior to the confirmation of the contested plan in the Acis Bankruptcy, Neutra owned 100% of the limited partnership interests in Acis LP and 100% of the membership interests in Acis GP.  In his deposition, Mr. Sharp stated that Lynn Pinker represented Neutra; however, Neutra is represented by Foley.

[5] *See* Highland Capital Management, L.P. Proof of Claim #27 in the Acis LP case and Proof of Claim # 13 in the Acis GP case, attached hereto as Exhibit D and E, respectively,  and Highland Capital Management, L.P.'s Application for Administrative Expense Claim Pursuant to 11 U.S.C. §503(b), Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. Dec. 11, 2018) [Docket No. 772], attached hereto as Exhibit F.

[6] *See* Acis LP's Statement of Financial Affairs, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. April 30, 2018) [Docket No. 165], relevant excerpts of which are attached hereto as Exhibit G.

Appellee Appx. 00998
Appx. 01240
013811

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 61-5   Page 1006/351804 Page 133 of 1017   PageID 14777
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1005 of 1803   PageID 11751
Case 19-12239-CSS   Doc 159   Filed 11/21/19   Page 6 of 16

| | | | |
|---|---|---|---|
| *Highland Capital Management, L.P. v. Robin Phelan, Chapter 11 Trustee*, Case No. 3:19-cv-1477D (N.D. Tex. 2019) (the "Winstead Matter") | Debtor | The Debtor is appealing a ruling allowing Winstead to represent both Acis's chapter 11 trustee and Mr. Terry, individually and as a creditor of Acis, to the District Court.  If successful, Winstead will be required to disgorge fees and expenses improperly billed to Acis's estate.[7] | The "Record of Appeal" has not yet been docketed and no briefing schedule has been set.  This matter will proceed once docketed. |

8.       In addition, Lynn Pinker represented the Debtor and certain of the

Debtor's officers in the following prepetition matter in which Foley was not involved:

| Matter | Clients | Case Summary | Procedural Posture |
|---|---|---|---|
| *Joshua N. Terry, Individually and on Behalf of IRAs #146771 and 1467721, and Jennifer G. Terry, on Behalf of IRAs #1467511 and 1467521 and as the Trustee of the Terry Family 401-K Plan v. Highland Capital Management, L.P., et al*, Case No. DC-16-11396 (162nd Judicial District Court of Dallas County, Texas) (the "Terry Litigation") | Debtor<br><br>J. Dondero<br><br>T. Surgent | The Debtor, Mr. Dondero, and Mr. Surgent are currently defendants in this matter and are facing claims for breach of contract, conversion, violation of Texas Theft Liability Act, and related civil conspiracy claims.  Mr. Dondero is individually facing a claim for defamation. | Currently stayed as to the Debtor. |

9.       As set forth above, the Debtor believes that the Terry Litigation and the

Adversary Proceeding are stayed.  At this time, the Debtor only intends to continue Foley's and

Lynn Pinker's representations post-petition with respect to the Acis Bankruptcy, the Neutra

Appeal, the Debtor Appeal, and the Winstead Matter.  However, the Debtor reserves the right to

supplement the Applications to the extent that Foley and Lynn Pinker's services are needed in

the Adversary Proceeding and the Terry Litigation.   Further, in light of the allegations being

asserted by the Committee in the *Motion of the Official Committee of Unsecured Creditors for*

*an Order Transferring Venue of this Case to the United States Bankruptcy Court for the*

*Northern District of Texas* [Docket No. 86] (the "Venue Motion"), as well as the joinder thereto

by Acis [Docket No. 122], the Debtor's bankruptcy professionals have sought input from these

---

[7] *See* Statement of Issues by Appellant Highland Capital Management, L.P., Case No. 18-30264-SGJ-11 (Bankr. N.D. Texas July 1, 2019) [Docket No. 1058], attached hereto as Exhibit H.

DOCS_NY:39826.11 36027/002

Appellee Appx. 00999
Appx. 01259
013812

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-15   Page 100 of 251804   Page 134 of 1017   PageID 14778
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1006 of 1803   PageID 11752
Case 19-12239-CSS   Doc 159   Filed 11/21/19   Page 7 of 16

firms due to their significant history and familiarity with the Acis Litigation.

10.     The Debtor believes that the continued retention of Foley and Lynn Pinker

in the Acis Bankruptcy, the Neutra Appeal, the Debtor Appeal, and the Winstead Matter will

provide a substantial benefit to the estate.  The Debtor has significant claims against Acis, and

Foley and Lynn Pinker are an integral part of that litigation.  As discussed above, the Debtor has

a claim in the Acis Bankruptcy in excess of $8 million, and, if the Neutra Appeal is successful,

the Debtor will be in a position to once again receive the benefit of the CLO management

agreements, which historically have provided the Debtor with annual revenues in excess of $12

million.  If the Debtor Appeal is successful, Neutra will regain its interests in Acis and will be

able to reinstate the Debtor to resume providing management services to certain collateralized

loan obligations.  Finally, if the Debtor is successful in the Winstead Matter, Winstead will be

required to disgorge its fees and expenses charged to the Acis estate.  The Debtor believes such

amounts are currently in excess of $2 million.[8]  As such, there is substantial benefit to the

Debtor's estate in the Debtor continuing to protect its rights in the Acis Bankruptcy, the Neutra

Appeal, the Debtor Appeal, and the Winstead Matter.

11.     Conversely, any delay in the retention of Foley and Lynn Pinker will have

a substantial and negative impact on the Debtor's estate and the value of its claims in its

litigation with Acis.  If the Debtor is not allowed to continue with the engagement of Foley and

Lynn Pinker, the Debtor would be severely disadvantaged by the loss of critical knowledge and

expertise these law firms have devoted to this representation over the course of the past twenty

---

[8] For the avoidance of doubt, any of Winstead's fees and expenses that are disgorged will not flow directly to the
Debtor but will instead be returned to the Acis estate for distribution to Acis's creditors of which the Debtor is now
the largest.

DOCS_NY:39826.11 36027/002

Appellee Appx. 01000
Appx. 01251
013813

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-6   Filed 06/05/25   Page 135 of 1017   PageID 14779
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1007 of 1803   PageID 11753
Case 19-12239-CSS   Doc 159   Filed 11/21/19   Page 8 of 16

(20) months.  Further, the costs to replace these firms would be substantial, and the risk of loss of

important tactical litigation strategy would be detrimental to the Debtor.

### II.   Prepetition Allocation of Attorneys' Fees and Expenses

12.   Prior to the Petition Date, legal fees incurred by Foley and Lynn Pinker for

their representations of the Debtor and non-Debtor parties in the Acis Litigation and the Terry

Litigation were paid by either (i) the Debtor or by (2) Highland CLO Funding, Ltd. ("HCLOF")

via an indemnification obligation to the Debtor.  *See* ¶17 *infra*.

### The Acis Litigation:

13.   The Debtor paid for Foley and Lynn Pinker's services in the Acis

Litigation for non-Debtor entities.  However, with the exception of Neutra, each such non-Debtor

entity  (i) is either directly or indirectly 100% owned by the Debtor; (ii) has no assets; (iii) is

only involved in the Acis Litigation because Acis alleged that the Debtor caused such entities to

engage in certain acts that harmed Acis; and (iv) is subject to the exact same claims as the

Debtor.  Additionally, absent funding by the Debtor, the non-Debtor defendants that are wholly

owned by the Debtor would be have no way to defend against Acis's claims.  Any attempt to

collect on those claims from such non-Debtor entities would also lead back to their general

partners or members, which are the Debtor.  As such, the Debtor believed and believes such

entities are only nominal parties to the Acis Litigation and that Foley's and Lynn Pinker's

defense of such parties is part and parcel of the Debtor's defense of itself and its assets.

14.   The Debtor historically paid Foley's fees and expenses incurred by

Neutra.  As disclosed above, the economic interests in Neutra are owned, indirectly, 25% by Mr.

Okada and 75% by Mr. Dondero.  As a special purpose entity, Neutra, however, has no assets,

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 33-5    Filed 06/05/25    Page 136 of 1017    PageID 14780
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1008 of 1803   PageID 11754
Case 19-12239-CSS   Doc 159   Filed 11/21/19   Page 9 of 16

and had no assets prior to the Acis Bankruptcy except for its interests in Acis. Although the Debtor is not a direct appellant in the Neutra Appeal,[9] if Neutra is successful in the Neutra Appeal, Neutra will regain its interests in Acis and intends to cause certain services and advisory agreements to revert back to the Debtor. The Debtor then would be in a position to earn revenue from those agreements, as it did prior to the filing of the involuntary bankruptcy petitions against Acis LP and Acis GP and prior to its contracts being terminated in the Acis Bankruptcy. By way of example, in the one year period prior to the filing of the involuntary petitions, Acis LP compensated the Debtor more than $12 million for its services.

15.     Although the economic interests in Neutra are indirectly owned by Mr. Dondero and Mr. Okada, Mr. Dondero and Mr. Okada will likely not see a return on their equity for some time. If the Neutra Appeal is successful, Neutra will regain its interest in Acis and Acis will also be required to pay the Debtor (i) approximately 85% of its revenue for services provided under the services agreements and (ii) for its claims against Acis for pre- and postpetition services rendered, which are currently in excess of $8 million. As such, it is estimated that Acis would owe approximately four years of revenue to the Debtor, including payment of services and pay down of the $8 million previously accrued and unpaid.

16.     For the foregoing reasons, the Debtor has agreed to pay Neutra's fees in the Neutra Appeal, the Acis Bankruptcy, and the Debtor Appeal. Paying those fees makes economic sense for the Debtor, but does not make sense for Mr. Dondero, Mr. Okada, or any other party[10] as they would not see a return on that investment for a significant amount of time.

---

[9] Under the "person aggrieved" standing for purposes of appeal, Neutra was the proper appellant.
[10] As previously stated, as a special purpose entity, Neutra has no assets other than its prior ownership of the equity in Acis.

DOCS_NY:39826.11 36027/002

Appellee Appx. 01002
Appx. 01253
013815

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 1006/251804   Page 137 of 1017   PageID 14781
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1009 of 1803   PageID 11755
Case 19-12239-CSS   Doc 159   Filed 11/21/19   Page 10 of 16

17.     Finally, although the Debtor has agreed to pay Foley and Lynn Pinker for the services provided to the Debtor and the non-Debtors set forth above in the Acis Litigation, the majority of those fees and expenses actually were paid by a non-Debtor entity, HCLOF.[11] The Debtor owns less than 1% of the economic interest in HCLOF.  As part of HCLOF's agreement with the Debtor, HCLOF indemnifies the Debtor if the Debtor incurs any legal fees on HCLOF's behalf.  Pursuant to that indemnification, HCLOF, prior to the Petition Date, either paid directly or reimbursed the Debtor for the majority of Foley's and Lynn Pinker's fees and expenses incurred in the matters set forth above.

**The Terry Litigation:**

18.     The Debtor historically paid all of Lynn Pinker's fees and expenses with respect to their representation of the Debtor, Mr. Dondero, and Mr. Surgent in the Terry Litigation.  The Debtor paid Mr. Dondero's and Mr. Surgent's legal fees in this matter as Mr. Dondero and Mr. Surgent were entitled to indemnification under the Debtor's limited partnership agreement.  (Exh G., § 4.1(h).)

**III.     Postpetition Allocation of Fees**

19.     As set forth above, the Debtor believes that all matters except for the Acis Bankruptcy, the Neutra Appeal, the Debtor Appeal, and the Winstead Matter are stayed and will remain stayed during the pendency of the Debtor's case.  The Debtor is the only party in the Winstead Matter.  The Debtor, for the reasons set forth above, intends to compensate Foley for its representation of Neutra – the only non-Debtor party – in the Acis Bankruptcy, the Neutra

---

[11] HCLOF is a party to the Acis Bankruptcy, the Debtor Appeal, and the Adversary Proceeding.  HCLOF is represented by the law firm, King & Spalding, and is not represented by Foley or Lynn Pinker.  HCLOF pays King & Spalding's fees and expenses directly.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 10 of 16   Page 138 of 1017   PageID 14782
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1010 of 1803   PageID 11756
Case 19-12239-CSS   Doc 159   Filed 11/21/19   Page 11 of 16

Appeal, and the Debtor Appeal, subject to this Court's order.[12]  The Debtor believes that if

Neutra is successful in the Neutra Appeal, the Debtor and its estate will be a significant

beneficiary of such an outcome and will receive a direct and substantial benefit.  In the Acis

Bankruptcy and the Debtor Appeal, Neutra is only a nominal party, and the Debtor is receiving

the primary benefit of Foley's legal services in those matters.  Further, a substantial portion of

Foley's and Lynn Pinker's fees and expenses may continue to be reimbursed by HCLOF

although the exact amount of such reimbursement is not yet known.

　　　　20.　　To the extent that the other matters set forth above are not stayed, as to

any party, the Debtor intends to supplement the Applications to seek authority to pay the costs of

the non-Debtor parties represented by Foley and Lynn Pinker.

### IV.　　Additional Issues Raised in the Acis Objection

　　　　21.　　The balance of the issues raised in the Acis Objection are irrelevant or

misleading and in all cases constitute an inappropriate attempt by Acis to use this Court's

authority and the Bankruptcy Code to secure a litigation advantage against the Debtor.

Consequently, the Debtor is compelled to respond to each point.

　　　　22.　　**Rule 2017(a) of the Federal Rules of Bankruptcy Procedure**:  Acis has

reserved its right "to compel disclosure" of information relating to the amounts billed by Foley

and Lynn Pinker prior to the Petition Date pursuant to Rule 2017(a).[13]  (Acis Objection, ¶ 5.)  By

---

[12] The Debtor and Neutra currently contemplate entering into an agreement pursuant to which Neutra will repay the Debtor for Foley's fees and expenses incurred on Neutra's behalf.  Under the proposed agreement, Neutra would reimburse the Debtor from any net proceeds it receives as a result of the transactions discussed herein and would also agree not to make any equity distributions or similar payments to any of Neutra's shareholders, Mr. Dondero, Mr. Okada, or any of their affiliates until after the Debtor is repaid for Foley's legal fees and expenses incurred on Neutra's behalf.

[13] Acis has also stated that Foley and Lynn Pinker should disclose payments made to them pursuant to Rule 2017(b), which requires disclosure of fees incurred after a petition is filed.  As set forth in the Applications, Foley and Lynn Pinker intend to comply with Rule 2017(b) – and their other obligations to this Court – and to file fee applications

Appellee Appx. 01004
Appx. 01255
013817

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S     Document Exhibits     Page 100/25/1804 Page 139 of 1017     PageID 14783
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1011 of 1803   PageID 11757
Case 19-12239-CSS   Doc 159   Filed 11/21/19   Page 12 of 16

its terms, Rule 2017(a) only applies to payments "in contemplation of the filing of a petition

under the Code by or against the debtor. . . ." FRBP 2017(a).  As set forth in the Declarations,

neither Foley nor Lynn Pinker received payments in contemplation of the bankruptcy.  However,

Acis's reservation of rights is noted, and the Debtor anticipates Acis will continue its attempts to

use this proceeding to influence the Acis Litigation by objecting to Foley's and Lynn Pinker's

fees.  The Debtor will respond appropriately if and when such objections are filed.

23.    **HRA Holdings, LLC**:  Foley initially sought a conflict waiver with

respect to HRA Holdings, LLC, when it entered into its engagement letter with the Debtor in

April 2018.  At that time, the Debtor was contemplating a potential investment in HRA

Holdings, LLC, another Foley client.  However, that investment never occurred, and thus no

conflict ever arose.

24.    **Lynn Pinker Engagement Letter:**  As set forth in the Hurst Declaration,

Lynn Pinker does not have an engagement letter with the Debtor and consequently could not

attach an engagement letter to its retention application.  The terms of Lynn Pinker's engagement

were previously disclosed and are re-disclosed in the Hurst Declaration.

25.    **Expert Retention of Scott Ellington**:  In 2018, Lynn Pinker and the Pettit

Law Firm retained Scott Ellington, the Debtor's general counsel, as an expert witness in *Robert*

*A. Imel v. Legacy Texas Bank, N.A. and Energy Reserves Group, LLC*, Cause No. DC-16-01372

(134th Judicial District Court of Dallas County, Texas).  The *Imel* litigation was wholly

unrelated to the Debtor and did not involve the Debtor or any entities affiliated or related to the

---

subject to appropriate review following their retention.  If any of Foley's or Lynn Pinker's fees or expenses are
thought to be excessive or inappropriate, parties in interests are entitled to object at the time the fee application is
filed, not before.

DOCS_NY:39826.11 36027/002

**Appellee Appx. 01005**
**Appx. 01256**
013818

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 5-19    Filed 10/03/25    Page 140 of 1017    PageID 14784
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1012 of 1803   PageID 11758
Case 19-12239-CSS   Doc 159   Filed 11/21/19   Page 13 of 16

Debtor, James, Dondero, or Mark Okada.  (Hurst Decl, ¶ 5.)  Mr. Ellington's retention in the

*Imel* litigation was in Mr. Ellington's individual capacity, not in his capacity as the Debtor's

general counsel, and was limited to Mr. Ellington preparing a six page expert report and offering

his deposition and trial testimony.  As such, Mr. Ellington's retention by Lynn Pinker was not a

representation by Lynn Pinker of the Debtor or any of the Debtor's interested parties.  The *Imel*

litigation concluded in 2018.

26.     **Charitable Donor Advised Fund, L.P. ("Charitable DAF"):**  Despite

Acis's attempts to kick up mud, Lynn Pinker's representation of Charitable DAF is *not* related to

the Debtor's bankruptcy.  Charitable DAF is proceeding against U.S. Bank, N.A., and U.S. Bank,

N.A., is not a party in interest in this case.[14]  Further, Acis admits that Lynn Pinker's

representation of Charitable DAF is at best a step removed from even the Acis Litigation.  Acis

has not alleged that Charitable DAF's proceedings are connected to the Debtor's bankruptcy

proceedings.

27.     **CLO Holdco, Ltd.:**  As disclosed in the O'Neil Affidavit, Foley has not

represented CLO Holdco, Ltd., since approximately May 2018, and, on information and belief,

CLO Holdco, Ltd. has retained separate counsel to represent it in the Debtor's bankruptcy.

28.     **Foley and Lynn Pinker's Prepetition Claims:**  Acis alleges that Foley's

and Lynn Pinker's prepetition claims render them adverse to the Debtor.  While this could be

true with respect to professionals engaged under 11 U.S.C. § 327(a),[15] it is not true with respect

---

[14] As disclosed in the Hurst Declaration, Lynn Pinker also represents NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund in confidential matters unrelated to the Debtor's bankruptcy.

[15] *See, e.g., Staiano v. Pillowtex (In re Pillowtex, Inc.)*, 304 F.3d 246 (3rd Cir. 2002).

DOCS_NY:39826.11 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15   Page 141 of 1017   PageID 14785
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1013 of 1803   PageID 11759
Case 19-12239-CSS   Doc 159   Filed 11/21/19   Page 14 of 16

to professionals, like Foley and Lynn Pinker, seeking retention under 11 U.S.C. § 327(e).

Instead, Section 327(e) contemplates professionals having and retaining prepetition claims

against a debtor so long as they do not "hold any interest adverse to the debtor or to the estate

***with respect to the matter on which such attorney is to be employed***." 11 U.S.C. § 327(e)

(emphasis added); *see also* Colliers on Bankruptcy, 16th ed., ¶327.04[0]. Consequently, Foley

and Lynn Pinker would be disqualified from representing the Debtor under Section 327(e) in the

Acis Litigation and Terry Litigation only if they had a conflict with respect to those specific

matters. They do not, and Acis's allegation of a debilitating conflict on account of their

prepetition claims is not well founded.

29.     **Winstead's Conflict of Interest:** Unlike Acis and its counsel, the Debtor

does not wish to litigate in this Court matters properly before another court. However, to clarify

the record, the Debtor believes that it is important to distinguish Foley and Lynn Pinker's

representation of the Debtor in the Acis Litigation from Winstead's representation of both Acis's

Chapter 11 Trustee and Mr. Terry in the Acis Bankruptcy. This matter is currently being

litigated and is referred to as the Winstead Matter above.

30.     Mr. Terry was, and currently is, a creditor of Acis, and he was, and

currently is, represented by Winstead in the filing of his involuntary petitions against Acis.

Concurrently with its representation of Mr. Terry as a substantial creditor of Acis (and while the

orders for relief were on appeal), Winstead sought and was retained by the Chapter 11 trustee in

Acis's bankruptcy under 11 U.S.C. § 327(a).[16] Consequently, Winstead represented both Acis's

---

[16] *See Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. May 30, 2018) [Docket No. 246], attached hereto as Exhibit I, and *Order (I) Approving the Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee and (II) Denying the Motion to*

DOCS_NY:39826.11 36027/002

Appellee Appx. 01007
Appx. 01358
013820

Case 19-34054-sgj11  Doc 3596-6  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:25-cv-02072-S  Document 68-16  Page 1005/251804  Page 142 of 1017  PageID 14786
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1014 of 1803  PageID 11760
Case 19-12239-CSS  Doc 159  Filed 11/21/19  Page 15 of 16

Chapter 11 trustee and one of Acis's largest creditors at the same time despite being opposed to

Acis in the prosecution of the involuntary petitions.  Further, both the approval of the involuntary

petition and the confirmation of Acis's chapter 11 plan, respectively, are actively being appealed.

Winstead is thus representing Mr. Terry in his action to put Acis into bankruptcy while also

representing Acis's Chapter 11 trustee in the confirmation of Acis's bankruptcy plan.

31.  Winstead's situation in the Acis Bankruptcy is thus wildly different from

Foley and Lynn Pinker's in the Debtor's bankruptcy.  Neither Foley nor Lynn Pinker have a

conflict of interest with respect to their representation of the Debtor in the Acis and Terry

Litigation.  Unlike Winstead, they have also never been directly or indirectly adverse to their

clients.  In addition, Foley and Lynn Pinker are being retained under 11 U.S.C. § 327(e) in the

Debtor's bankruptcy as special litigation counsel; they are not being retained as the Debtor's

bankruptcy counsel under Section 327(a).

*[Remainder of Page Intentionally Blank]*

---

*Disqualify Winstead PC as Proposed Special Counsel to Robin Phelan, Chapter 11 Trustee*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. June 21, 2018) [Docket No. 313], attached hereto as Exhibit J.

Appellee Appx. 01008

013821

Appx. 01350

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1006 of 1804    Page 143 of 1017    PageID 14787
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1015 of 1803    PageID 11761
Case 19-12239-CSS    Doc 159    Filed 11/21/19    Page 16 of 16

WHEREFORE, for the reasons set forth above, the Debtor's proposed retention of

(i) Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, and (ii) Lynn Pinker Cox &

Hurst LLP as Special Texas Litigation Counsel are in the best interests of the Debtor's estate and

should be approved on the terms set forth in the Applications.


Dated:  November 21, 2019                PACHULSKI STANG ZIEHL & JONES LLP


                                         /s/ James E. O'Neill
                                         Richard M. Pachulski (CA Bar No. 62337)
                                         Jeffrey N. Pomerantz (CA Bar No.143717)
                                         Ira D. Kharasch (CA Bar No. 109084)
                                         Maxim B. Litvak (CA Bar No. 215852)
                                         James E. O'Neill (DE Bar No. 4042)
                                         919 North Market Street, 17th Floor
                                         Wilmington, DE 19899 (Courier 19801)
                                         Telephone: (302) 652-4100
                                         Facsimile:  (302) 652-4400
                                         E-mail:    rpachulski@pszjlaw.com
                                                    jpomerantz@pszjlaw.com
                                                    ikharasch@pszjlaw.com
                                                    mlitvak@pszjlaw.com
                                                    joneill@pszjlaw.com


                                         *Proposed Counsel for the Debtor
                                         and Debtor in Possession*

DOCS_NY:39826.11 36027/002

Appellee Appx. 01009
013822

Case 19-34054-sgj11  Doc 3596-6  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:25-cv-02072-S  Document 63-9  Page 1076 of 1804  Page 144 of 1017  PageID 14788
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1016 of 1803  PageID 11762

# Exhibit A

**Supplemental Hurst Declaration**

**Appellee Appx. 01010**

013823

Appx. 01301

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-5    Page 116/851804    Page 145 of 1017    PageID 14789
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1017 of 1803    PageID 11763
Case 19-12239-CSS    Doc 159-1    Filed 11/21/19    Page 2 of 5

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | |

**SUPPLEMENTAL DECLARATION OF MICHAEL K. HURST IN SUPPORT OF
DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND
EMPLOYMENT OF LYNN PINKER COX & HURST, LLP AS SPECIAL TEXAS
LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE**

I, Michael K. Hurst, declare under penalty of perjury as follows:

1.      I am a partner with the law firm of Lynn Pinker Cox & Hurst LLP (the

"Firm" or "LPCH"), located in Dallas, Texas. I am submitting this supplemental declaration

("Declaration") in further support of the *Debtor's Application for an Order Authorizing the*

*Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel,*

*Nunc Pro Tunc to the Petition Date* (the "Application").[2]

2.      In the *Declaration of Michael K. Hurst in Support of Debtor's Application*

*for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst, LLP, as*

*Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, dated October 29, 2019

[Docket No. 70-2], I disclosed, that the Firm has represented (a) the Debtor since March 2016; (b)

certain other entities related to the Debtor, including the Cayman Defendants in the Pending Acis

Proceedings and the defendants in the Texas Lawsuit who are executives of the Debtor; and (c)

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

**Appellee Appx. 01011**
**013824**
Appx. 01362

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 3.5 6   Page 10 09 05 1804 Page 146 of 1017   PageID 14790
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1018 of 1803   PageID 11764
Case 19-12239-CSS   Doc 159-1   Filed 11/21/19   Page 3 of 5

the Charitable DAF (the Charitable Donor Advised Fund, L.P.) in a case unrelated to the Debtor

pending before the Southern District of New York, case number 1:19-cv-09857-NRB.

       3.      To supplement that prior disclosure, as of the Petition Date, the Firm

specifically represented the Debtor and the following entities related to the Debtor in the following

matters:

| Matter | Clients |
|---|---|
| *In re Acis Capital Management, L.P.*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. 2018) & *In re Acis Capital Management GP, L.L.C.)*, Case No. 18-30265-SGJ-11 (Bankr. N.D. Tex. 2018) | Debtor |
| *Acis Capital Management GP, LLC. and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al*, Adv. Proc. No. 18-03078 (Bankr. N.D. Tex. 2018) & *Acis Capital Management, L.P. and Acis Capital Management GP, LLC v. Highland Capital Management, L.P., et al.*, Adv. Proc. No. 18-03212 (Bankr. N.D. Tex. 2018) | Debtor<br><br>Highland HCF Advisors, Ltd.,<br><br>Highland CLO Management, LLC<br><br>Highland CLO Holdings, Ltd. |
| *In re Matter of Acis Management GP, LLC and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al, v. Robin Phelan, Chapter 11 Trustee*, Case No. 19-10847 (5th Cir. 2019) | Debtor |
| *Highland Capital Management, L.P. v. Robin Phelan, Chapter 11 Trustee*, Case No. 3:19-cv-1477D (N.D. Tex. 2019) | Debtor |
| *Joshua N. Terry, Individually and on Behalf of IRAs #146771 and 1467721, and Jennifer G. Terry, on Behalf of IRAs #1467511 and 1467521 and as the Trustee of the Terry Family 401-K Plan v. Highland Capital Management, L.P., et al*, Case No. DC-16-11396 (162nd Judicial District Court of Dallas County, Texas) | Debtor<br><br>J. Dondero<br><br>T. Surgent |
| *The Charitable Donor Advised Fund, L.P. v. U.S. Bank National Association*, Case No. 1:19-cv-09857-NRB (S.D.N.Y. 2019) | Charitable DAF |

       4.      In addition, the Firm represents the following entities related to the Debtor

in a non-public matter:  (i) NexPoint Strategic Opportunities Fund, (ii) Highland Global Allocation

Fund, and (iii) Highland Income Fund.   The Firm inadvertently failed to disclose this

representation as the representation is limited and involves a non-public matter not related to the

Debtor's bankruptcy.

       5.      Additionally, in 2018, the Firm, along with the Pettit Law Firm, retained

Scott Ellington, the Debtor's general counsel, to act as an expert witness in *Robert A. Imel v.*

*Legacy Texas Bank, N.A. and Energy Reserves Group, LLC*, Cause No. DC-16-01372 (134th

<div align="center">1</div>

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Page 1026 of 1804   Page 147 of 1017   PageID 14791
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1019 of 1803   PageID 11765
Case 19-12239-CSS   Doc 159-1   Filed 11/21/19   Page 4 of 5

Judicial District Court of Dallas County, Texas). The *Imel* litigation was wholly unrelated to the Debtor and did not involve the Debtor or any entities affiliated or related to the Debtor, James, Dondero, or Mark Okada. Mr. Ellington's retention in the *Imel* litigation was in Mr. Ellington's individual capacity, not in his capacity as the Debtor's general counsel, and was limited to Mr. Ellington preparing a six page expert report and offering his deposition and trial testimony. Mr. Ellington was retained by the Firm and the Pettit Law Firm in the *Imel* litigation. The Firm's retention of Mr. Ellington was not previously disclosed as the Firm was not retained to provide legal services to Mr. Ellington. The *Imel* litigation concluded in 2018.

6.     The Firm, as a matter of practice, does not have an engagement letter with the Debtor or any entities related to the Debtor that it represents. However, as previously disclosed, with respect to all matters, the Debtor has (subject to Court approval) agreed to compensate the Firm on an hourly basis at rates that do not (and will not) exceed the rates that the Firm customarily charges to its other clients for work of this type. As of the Petition Date, the applicable hourly rates for timekeepers for the matters that the Firm is engaged to perform legal services ranged from $365 to $800 for attorneys and $180 to $235 for paraprofessionals. The Firm will also charge the Debtor for certain expenses incurred in connection with providing services to the Debtor, including, without limitation, travel, lodging, vendor charges, delivery services and other expenses incurred in providing professional service, and for other services actually provided, including word processing and other charges, excluding secretarial overtime.

7.     The Firm did not bill the Debtor any amounts prior to the Petition Date in contemplation of the Debtor's bankruptcy filing. Any amounts billed and paid prior to the Petition Date by the Debtor were in connection with the matters set forth above.

DOCS_NY:39835.3 36027/002

Appellee Appx. 01013
Appx. 01384
013826

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-9    Page 1026/51804 Page 148 of 1017    PageID 14792
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1020 of 1803    PageID 11766
Case 19-12239-CSS    Doc 159-1    Filed 11/21/19    Page 5 of 5

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct.

Dated:  November 21, 2019

/s/ Michael K. Hurst
Michael K. Hurst, Partner

DOCS_NY:39835.3 36027/002

Appellee Appx. 01014
013827
Appx. 01365

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Page 1022 of 1804   Page 149 of 1017   PageID 14793
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1021 of 1803   PageID 11767

# Exhibit B

**Supplemental O'Neil Declaration**

Appellee Appx. 01015

013828

Appx. 01306

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-9   Page 1023 of 1804   Page 150 of 1017   PageID 14794
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1022 of 1803   PageID 11768
Case 19-12239-CSS   Doc 159-2   Filed 11/21/19   Page 2 of 4

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | |

**SUPPLEMENTAL DECLARATION OF HOLLAND N. O'NEIL IN SUPPORT OF DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF FOLEY GARDERE, FOLEY & LARDNER LLP AS SPECIAL TEXAS COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE**

I, Holland N. O'Neil, declare under penalty of perjury as follows:

1.      I am a partner with the law firm of Foley Gardere, Foley & Lardner LLP (the "Firm"), and I maintain my office in Dallas, Texas.[2]  I am submitting this supplemental declaration ("Declaration") in further support of the *Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* (the "Application").[3]

2.      In the *Declaration of Holland N. O'Neil in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date*, dated October 29, 2019 [Docket No. 69-2] (the "Initial Declaration"), I disclosed that the Firm has represented the Debtor and

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] The Firm has offices in Austin, Boston, Chicago, Dallas, Denver, Detroit, Houston, Jacksonville, Los Angeles, Madison, Mexico City, Miami, Milwaukee, New York, Orlando, Sacramento, San Diego, San Francisco, Silicon Valley, Tallahassee, Tampa, Washington, D.C., Brussels and Tokyo.

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

4850-8126-8394.6

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6015   Page 1074/851804   Page 151 of 1017   PageID 14795
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1023 of 1803   PageID 11769
Case 19-12239-CSS   Doc 159-2   Filed 11/21/19   Page 3 of 4

certain other related entities, including Neutra, HCLOF and the Cayman Defendants since April 2018 in the Acis Proceedings.

    3.    To supplement that prior disclosure, as of the Petition Date, the Firm specifically represents the Debtor and the following entities related to the Debtor in the following matters:

| Matter | Clients |
|---|---|
| *In re Acis Capital Management, L.P.*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. 2018) & *In re Acis Capital Management GP, L.L.C.)*, Case No. 18-30265-SGJ-11 (Bankr. N.D. Tex. 2018) | Debtor<br><br>Neutra Limited |
| *Acis Capital Management GP, LLC. and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al*, Adv. Proc. No. 18-03078 (Bankr. N.D. Tex. 2018) & *Acis Capital Management, L.P. and Acis Capital Management GP, LLC v. Highland Capital Management, L.P., et al.,* Adv. Proc. No. 18-03212 (Bankr. N.D. Tex. 2018) | Debtor<br><br>Highland HCF Advisors, Ltd.,<br><br>Highland CLO Management, LLC<br><br>Highland CLO Holdings, Ltd. |
| *Neutra Limited v. Josh Terry (In re Acis Capital Management, L.P.)*, Case No. 19-10846 (5th Cir. 2019) | Neutra Limited |
| *In re Matter of Acis Management GP, LLC and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al, v. Robin Phelan, Chapter 11 Trustee*, Case No. 19-10847 (5th Cir. 2019) | Debtor<br><br>Neutra Limited |
| *Highland Capital Management, L.P. v. Robin Phelan, Chapter 11 Trustee*, Case No. 3:19-cv-1477D (N.D. Tex. 2019) | Debtor |

    4.    As disclosed in the Firm's engagement letter attached to the Initial Declaration, the Firm initially sought a conflict waiver with respect to HRA Holdings, LLC, when it entered into that engagement letter. At that time, the Debtor was contemplating a potential investment in HRA Holdings, LLC, another Foley client. That investment never occurred, and the Firm does not believe that a conflict ever arose.

    5.    The Firm previously represented CLO Holdco, Ltd., in matters unrelated to the Debtor's bankruptcy. Since approximately May 2018, the Firm has not represented CLO Holdco, Ltd.

1

Appellee Appx. 01017
Appx. 01268
013830

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-15   Page 1025 of 1804   Page 152 of 1017   PageID 14796
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1024 of 1803   PageID 11770
Case 19-12239-CSS   Doc 159-2   Filed 11/21/19   Page 4 of 4

6.      The Firm did not bill the Debtor any amounts prior to the Petition Date in contemplation of the Debtor's bankruptcy filing.  Any amounts billed and paid prior to the Petition Date by the Debtor were in connection with the matters set forth above.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 21, 2019

/s/ Holland N. O'Neil
_____
Holland N. O'Neil, Partner

4850-8126-8394.6

Appellee Appx. 01018

013831
Appx. 01360

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-9   Page 1026 of 1804 Page 153 of 1017   PageID 14797
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1025 of 1803   PageID 11771

Case 19-12239-CSS   Doc 159-3   Filed 11/21/19   Page 1 of 6

# EXHIBIT C

Appellee Appx. 01019

Appx. 01379

013832

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-9   Page 1027 of 1804   Page 154 of 1017   PageID 14798
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1026 of 1803   PageID 11772
Case 19-12239-CSS   Doc 159-3   Filed 11/21/19   Page 2 of 6

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) |

### DECLARATION OF BRADLEY SHARP IN SUPPORT OF DEBTOR'S APPLICATIONS (I) FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF FOLEY GARDERE, FOLEY & LARDNER LLP AS SPECIAL TEXAS COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE, AND (II) FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST, LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE

I, Bradley Sharp, hereby declare under penalty of perjury:

1.      I am the proposed Chief Restructuring Officer of Highland Capital Management, L.P., the above-captioned debtor and debtor in possession (the "Debtor").

2.      I submit this declaration (the "Declaration") in support of the *Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* (the "Foley Application") and *Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst, LLP, as Special Texas Litigation Counsel, Nunc Pro Turn to the Petition Date* (the "Lynn Pinker Application," and together with the Foley Application, the "Applications").[2] Except as otherwise noted, I have personal knowledge of the matters set forth herein.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Applications.

Appellee Appx. 01020
013833
Appx. 01271

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-5   Exhibit 6   Page 155 of 1017   PageID 14799
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1027 of 1803   PageID 11773

Case 19-12239-CSS   Doc 159-3   Filed 11/21/19   Page 3 of 6

3.      This Declaration is being submitted to supplement the (i) *Declaration of Frank Waterhouse in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner, LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 69-6], and (ii) *Declaration of Frank Waterhouse in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst, LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 70-5].

4.      Prior to the Petition Date, Foley and/or Lynn Pinker represented the Debtor and certain the Debtor's related entities in the following matters:

| Matter | Clients |
|---|---|
| *In re Acis Capital Management, L.P.*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. 2018) & *In re Acis Capital Management GP, L.L.C.)*, Case No. 18-30265-SGJ-11 (Bankr. N.D. Tex. 2018) (the "Acis Bankruptcy") | Debtor (Foley/Lynn Pinker)<br><br>Neutra Limited (Foley) |
| *Acis Capital Management GP, LLC. and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al,* Adv. Proc. No. 18-03078 (Bankr. N.D. Tex. 2018) & *Acis Capital Management, L.P. and Acis Capital Management GP, LLC v. Highland Capital Management, L.P., et al.,* Adv. Proc. No. 18-03212 (Bankr. N.D. Tex. 2018) ("Adversary Proceeding") | Debtor (Foley/Lynn Pinker)<br><br>Highland HCF Advisors, Ltd. (Foley/Lynn Pinker)<br><br>Highland CLO Management, LLC (Foley/Lynn Pinker)<br><br>Highland CLO Holdings, Ltd. (Foley/Lynn Pinker) |
| *Neutra Limited v. Josh Terry (In re Acis Capital Management, L.P.)*, Case No. 19-10846 (5th Cir. 2019) ("Neutra Appeal") | Neutra (Foley) |
| *In re Matter of Acis Management GP, LLC and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al, v. Robin Phelan, Chapter 11 Trustee*, Case No. 19-10847 (5th Cir. 2019) ("Debtor Appeal") | Debtor (Foley/Lynn Pinker)<br><br>Neutra (Foley) |
| *Highland Capital Management, L.P. v. Robin Phelan, Chapter 11 Trustee*, Case No. 3:19-cv-1477D (N.D. Tex. 2019) ("Winstead Matter") | Debtor (Foley/Lynn Pinker) |
| *Joshua N. Terry, Individually and on Behalf of IRAs #146711 and 1467721, and Jennifer G. Terry, on Behalf of IRAs #1467511 and 1467521 and as the Trustee of the Terry Family 401-K Plan v. Highland Capital Management, L.P., et al*, Case No. DC-16-11396 (162nd Judicial District Court of Dallas County, Texas) (the "Terry Litigation") | Debtor (Lynn Pinker)<br><br>J. Dondero (Lynn Pinker)<br><br>T. Surgent (Lynn Pinker) |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 1029/051804 Page 156 of 1017   PageID 14800
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1028 of 1803   PageID 11774

Case 19-12239-CSS   Doc 159-3   Filed 11/21/19   Page 4 of 6

5.      Prior to the Petition Date, the Debtor paid Foley's and/or Lynn Pinker's legal fees and expenses with respect to the Debtor and all the Debtor's related entities in the foregoing matters.

6.      On advice of counsel, I understand that all matters except for the Acis Bankruptcy, the Neutra Appeal, the Debtor Appeal, and the Winstead Matter are stayed and will remain stayed during the pendency of the Debtor's case.

7.      I believe that it is in the best interests of its estate to continue paying the legal fees incurred by the Debtor's related entities in the Acis Bankruptcy, the Neutra Appeal, the Debtor Appeal, and the Winstead Matter during the pendency of this bankruptcy case for the following reasons:

8.      Neutra Appeal:  The economic interests in Neutra are owned, indirectly, 25% by Mr. Okada and 75% by Mr. Dondero.  As a special purpose entity, Neutra, however, has no assets, and had no assets prior to the Acis Bankruptcy except for its interests in Acis. Although the Debtor is not a direct appellant in the Neutra Appeal, if Neutra is successful in the Neutra Appeal, I believe that Neutra will regain its interests in Acis and that Neutra intends to cause certain services and advisory agreements to revert back to the Debtor.  The Debtor then would be in a position to earn revenue from those agreements, as it did prior to the filing of the involuntary bankruptcy petitions against Acis LP and Acis GP and prior to its contracts being terminated in the Acis Bankruptcy.  By way of example, in the one year period prior to the filing of the involuntary petitions, Acis LP compensated the Debtor more than $12 million for its services.

9.      If the Neutra Appeal is successful, I believe that Neutra will regain its interest in Acis and Acis will also be required to pay the Debtor (i) approximately 85% of its

Appellee Appx. 01022

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5   Page 1036 of 1804   Page 157 of 1017   PageID 14801
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1029 of 1803   PageID 11775
Case 19-12239-CSS   Doc 159-3   Filed 11/21/19   Page 5 of 6

revenue for services provided under the services agreements and (ii) for its claims against Acis

for pre- and postpetition services rendered, which are currently in excess of $8 million.  As such,

it is estimated that Acis would owe approximately four years of revenue to the Debtor, including

payment of services and pay down of the $8 million previously accrued and unpaid.  For that

reason, I also believe that Mr. Dondero and Mr. Okada, as the holders of the economic interests

in Neutra, will likely not see a return on their equity for some time.

10.     For the foregoing reasons, I believe paying Neutra's fees in the Neutra

Appeal, the Acis Bankruptcy, and the Debtor Appeal makes economic sense for the Debtor, but

does not make sense for Mr. Dondero, Mr. Okada, or any other party as they would not see a

return on that investment for a significant amount of time.

11.     <u>Acis Bankruptcy and Debtor Appeal</u>:  In addition to paying the Debtor's

legal fees and expenses, the Debtor historically paid Foley's fees for Neutra, a non-Debtor, in the

Acis Bankruptcy and the Debtor Appeal as, discussed above, Neutra's economic interests are

owned, indirectly, 25% by Mark Okada and 75% by James Dondero.  As a special purpose

entity, Neutra has no assets.

12.     <u>Winstead Matter</u>:  The Debtor is the only party to the Winstead Matter,

and the Debtor intends to continue paying Lynn Pinker's and Foley's fees for the Debtor subject

to this Court's approval.

13.     Prior to the Petition Date, the majority of Foley's and Lynn Pinker's fees

and expenses were paid by a non-Debtor entity, Highland CLO Funding, Ltd. ("<u>HCLOF</u>").[3]  The

Debtor owns less than 1% of the economic interest in HCLOF.  As part of HCLOF's agreement

with the Debtor, HCLOF indemnifies the Debtor if the Debtor incurs any legal fees on HCLOF's

---

[3] HCLOF is represented by the law firm, King & Spalding, and is not represented by Foley or Lynn Pinker.  HCLOF pays King & Spalding's fees and expenses directly.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1036 of 1804    Page 158 of 1017    PageID 14802
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1030 of 1803    PageID 11776

behalf.  Pursuant to that indemnification, HCLOF, prior to the Petition Date, either paid directly or reimbursed the Debtor for the majority of Foley's and Lynn Pinker's fees and expenses incurred in the matters set forth above.  I understand, based on the advice of counsel, that a substantial portion of Foley's and Lynn Pinker's fees and expenses may continue to be reimbursed by HCLOF following the Petition Date but that the exact amount of such reimbursement is not yet known.

14.    Although the Debtor has paid certain of Lynn Pinker's and Foley's invoices for the services it provided in the matters set forth above, all prepetition payments to such firms were made in connection with the matters set forth above and not in contemplation of the Debtor's bankruptcy filing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:    November 21, 2019

HIGHLAND CAPITAL MANAGEMENT, L.P.

/s/ Bradley Sharp
Bradley Sharp
Proposed Chief Restructuring Officer

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-1   Page 1032 of 1804   Page 159 of 1017   PageID 14803
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1031 of 1803   PageID 11777

Case 19-12239-CSS   Doc 159-4   Filed 11/21/19   Page 1 of 54

# EXHIBIT D

Appellee Appx. 01025

Appx. 01276

013838

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1036/05 1804 Page 160 of 1017    PageID 14804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1032 of 1803    PageID 11778
Case 18-30264-sgj11 Doc 1223 Filed 09/01/18 Entered 09/01/18 Main Document Page 2 of 54 Page 1 of 3

**Fill in this information to identify the case:**

Debtor 1    Acis Capital Management, L.P.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:  Northern District of Texas

Case number  18-30264-sgj11

Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:    Identify the Claim

| | |
|---|---|
| 1. Who is the current creditor? | Highland Capital Management, L.P. |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor _____ |
| 2. Has this claim been acquired from someone else? | ☑ No<br>☐ Yes. From whom? _____ |

| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|---|
| | Holland O'Neil, Foley Gardere, Foley & Lardner<br>Name | Scott Ellington, Highland Capital Management<br>Name |
| | 2021 McKinney Ave, Suite 1600<br>Number    Street | 300 Crescent Court, Suite 700<br>Number    Street |
| | Dallas                TX        75201<br>City          State      ZIP Code | Dallas          TX        75201<br>City          State      ZIP Code |
| | Contact phone 214-999-3000 | Contact phone _____ |
| | Contact email honeil@foley.com | Contact email _____ |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one)<br>_____ | |

| 4. Does this claim amend one already filed? | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____    Filed on ____ / ____ / ____<br>                                                                MM  / DD  / YYYY |
|---|---|
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

Appellee Appx. 01026
Appx. 013839
013839

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1034/25/18 04   Page 161 of 1017   PageID 14805
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1033 of 1803   PageID 11779
Case 18-30264-sgj11 1123 in CS7   Filed 09/01/18 Filed 15/2 Main Document 3 of 54 Page 2 of 3

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ _____4,672,140.38_____ . Does this amount include interest or other charges?

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Sub-Advisory Services and Shared Services

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

Basis for perfection: _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:                                $ _____

Amount of the claim that is secured:     $ _____

Amount of the claim that is unsecured: $ _____   (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:   $ _____

Annual Interest Rate (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.   $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

---

Official Form 410                    Proof of Claim                    page 2

Appellee Appx. 01027
Appx. 01278
013840

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 100/35/25 1804 Page 162 of 1017   PageID 14806
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1034 of 1803   PageID 11780

Case 18-30264-sgj11-123a-CS7   Filed 09/01/18 Filed 11/21/18 Main Document 4 of 54 Page 3 of 3

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☐ No | |
|---|---|---|
| | ☑ Yes. *Check one:* | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☑ Other. Specify subsection of 11 U.S.C. § 507(a)(__3__) that applies. | $ 2,049,564.35 |

*Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:   Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   08/01/2018
                    MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Scott | | Ellington |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | General Counsel | | |
| Company | Highland Capital Management, L.P. | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 300 Crescent Court, Suite 700 | | |
| | Number        Street | | |
| | Dallas | TX | 75201 |
| | City | State | ZIP Code |
| Contact phone | | Email | |

Appellee Appx. 01028

Appx. 01279
013841

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-5   Page 163 of 1017   PageID 14807
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1035 of 1803   PageID 11781
Case 18-30264-sgj11   Doc 27   Filed 03/01/18   Desc Page 5 of 54   Page 1 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

## EXHIBIT A TO PROOF OF CLAIM

1.    <u>Claimant</u>: Highland Capital Management, L.P. ("**Highland**") maintains its

business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. Highland files its proof of claim

(the "**Claim**") pursuant to 11 U.S.C. §§ 105(a), 501, and 502(f) and the Federal Rules of

Bankruptcy Procedure 3002 and 3003. Prior to the Involuntary Petition Date (defined below),

Highland provided sub-advisory and shared services to the Debtors (defined below). Highland

has provided portfolio management and advisory services to the Debtors pursuant to that certain

Third Amended and Restated Sub-Advisory Agreement by and between the Debtors and

Highland dated March 17, 2017 ("**Sub-Advisory Agreement**") (**Exhibit 1**). Specifically,

Highland has acted as an investment manager and has identified, evaluated, and recommended

investments to investment vehicles advised or sub-advised by the Debtors.  Highland has also

provided the Debtors with back and middle office services pursuant to that certain Fourth

Amended and Restated Shared Services Agreement by and between the Debtors and Highland

dated March 17, 2017 ("**Shared Services Agreement**") (**Exhibit 2**). Highland has provided the

Debtors with all of the employees and staff necessary to manage the portfolios.  Highland

continued to provide the same sub-advisory and shared services to the Debtors throughout the

Gap Period (defined below). To date, Highland continues to provide such services.

2.    <u>Debtors</u>: Acis Capital Management, L.P. and Acis Capital Management, G.P. (the

"**Debtors**"). The Debtors' cases have been consolidated under case number 18-30264 in the

United States Bankruptcy Court for the Northern District of Texas. Highland provides the service

at the following address:  300 Crescent Court, Suite 700, Dallas, Texas 75201.

EXHIBIT A to Proofs of Claim of Highland
4820-3752-6894.1

Appellee Appx. 01029
Appx. 01280
013842

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-15    Page 1036 of 1804    Page 164 of 1017    PageID 14808
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1036 of 1803    PageID 11782
Case 18-30264-sgj11    Doc 1289-6    Part 2    Filed 08/01/21    Desc    Exhibit A    Page 2 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

3.  <u>Indebtedness</u>: Because the Debtors were put into bankruptcy involuntarily, the amount included in the proof of claim accounts for pre-petition claims as well as Gap Claims (defined below).

a.  <u>Pre-Petition</u>: Joshua Terry, the petitioning creditor, filed the involuntary petition on January 30, 2018 (the "**Petition Date**"). As of the Petition Date, the outstanding indebtedness owing from the Debtors to Highland was as set forth below by account number:

| Invoice | Type | Balance |
|---|---|---|
| A1-A7; BVK[1] | Sub-Advisory | $1,605,362.41 |
| A1-A7; BVK | Shared Services | $1,017,213.62 |
| | **Totals** | **$2,622,576.03** |

b.  <u>Gap Period</u>: When a debtor files bankruptcy, the order for relief is typically entered on the date the petition is filed. However, an involuntary bankruptcy case diverges from the simultaneous entry of an order for relief in that an order for relief is entered at a later date than when a petition is filed. This creates a period of time, referred to as the "gap period", where the debtor may accrue post-petition but pre-order for relief debt. Pursuant to Section 502(f) of the Bankruptcy Code:

> In an involuntary case, a claim arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee and order for relief shall be determined as of the date such claim arises, and shall be allowed under subsection (a), (b), or (c) of this section…the same as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. 502(f).

---

[1] A1-A7 and BVK account for the following vehicles: Acis CLO 2013-1, Ltd.; Acis CLO 2013-2, Ltd.; Acis CLO 2014-3, Ltd.; Acis CLO 2014-4, Ltd.; Acis CLO 2014-5, Ltd.; Acis CLO 2015-6, Ltd.; Acis CLO 2017-7, Ltd.; BayVK R2 Lux S.A., SICAV-FIS.

PAGE 2 OF 5

EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND
4820-3752-6894.1

Appellee Appx. 01030
Appx. 01281
013843

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 166/251804Page 165 of 1017   PageID 14809
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1037 of 1803   PageID 11783
Case 18-30264-sgj11   Doc 37   Part 2   Filed 08/01/18   Desc   Exhibit A   Page 3 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

Claims arising during the gap period are entitled to priority treatment under section 507(a)(3). The Court entered the Order for Relief on April 13, 2018 ("**Order for Relief Date**"). Highland continued to provide services to the Debtors from January 30, 2018 to April 13, 2018 ("**Gap Period**"). The outstanding balance owed from the Debtors to Highland for the sub-advisory and shared services during the Gap Period is set forth below (and shall be referred to as the "**Gap Claim**"):

| Account No. | Type | Balance |
|---|---|---|
| A1-A7; BVK | Sub-Advisory | $1,170,147.06 |
| A1-A7; BVK | Shared Services | $879,417.29 |
| | **Totals** | **$2,049,564.35** |

c.      Reservation of Rights as to Administrative Claim: Highland has provided uninterrupted sub-advisory and shared services since the Order for Relief Date. Highland reserves its rights to seek allowance of its administrative claims.

d.      Indemnity Claims: Highland has contingent claims for indemnification pursuant to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement.  According to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement,  "the Management Company [Debtors] hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless Covered Person [Highland and its representatives] from…any and all claims, demands, liabilities, costs…suits, proceedings, judgments, assessments, actions…of whatever nature, known or unknown, liquidated, or unliquidated...arising out of the investment or other activities of the Management Company." Highland reserves such contractual indemnification right.

EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND
4820-3752-6894.1

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1036/351804   Page 166 of 1017   PageID 14810
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1038 of 1803   PageID 11784
Case 18-30265-sgj11   Claim 159-1   Part 2   Filed 08/01/21   Desc Exhibit A   Page 4 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

      4.    <u>Reservation of Rights; Other Rights</u>: The Claims described in this Attachment are legal, binding, enforceable, allowed, and not subject to any offset, defense, claim, counterclaim or any other diminution of any type, kind or nature, whatsoever; provided, however, the Chapter 11 Trustee alleges that he may offset Highland's Claims and recover from Highland through his current adversary proceeding against Highland (Adversary Proceeding 18-03212). Highland disputes such contention, and believes all Claims sought herein are recoverable despite the Chapter 11 Trustee's allegations. No portion of the Claims or any funds previously paid to Highland are subject to impairment, avoidance, subordination, or disallowance pursuant to the Bankruptcy Code (including, without limitation, Bankruptcy Code § 502) or applicable non-bankruptcy law. Highland expressly reserves the right in the future to assert any and all claims that it may have, including, without limitation, imposition of a constructive trust, equitable lien, security interest, subrogation, marshaling, or other legal or equitable remedies to which it may be entitled. The filing of this proof of claim is not to be construed as an election of remedies. Highland further reserves the rights (a) to amend, modify or supplement this proof of claim, including any exhibit, schedule or annex, or to file an amended proof of claim for the purpose of modifying or liquidating the amount of any interest, fees, costs and expenses accrued or incurred subsequent to the Petition Date or any contingent or unliquidated claims or rights of Highland set forth herein; (b) file additional proofs of claim; and (c) against third parties.

      5.    <u>Notices</u>: All notices to Highland are to be sent to:

      Highland Capital Management, L.P.
      Attn: David Klos
      300 Crescent Court
      Suite 700
      Dallas, Texas 75201

      *with copies to:*

EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND
4820-3752-6894.1

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Page 10406/351804  Page 167 of 1017    PageID 14811
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1039 of 1803    PageID 11785
Case 18-30264-sgj11    Doc 237    Part 2.59  Filed 08/01/18    Desc Exhibit A 54  Page 5 of 5

*In re Acis Capital Management, L.P.*- **Case No. 18-30264**
*In re Acis Capital Management, G.P.*- **Case No. 18-30265**
**United States Bankruptcy Court for the Northern District of Texas**

Foley Gardere
Foley & Lardner, LLP
c/o Holland O'Neil
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201

6.      <u>Payments</u>:  All payments and distributions to Highland with respect to this proof

of claim are to be made as follows:

Highland Capital Management, L.P.
Attn: David Klos
300 Crescent Court
Suite 700
Dallas, Texas 75201
Re: *In re Acis Capital Management, L.P.*

7.      <u>Miscellaneous</u>:  This proof of claim is filed under compulsion of the bar date

established in this bankruptcy case solely out of an abundance of caution to protect Highland

from forfeiture of its claim within this bankruptcy proceeding. The amounts set forth in this

proof of claim shall not be construed as an admission by Highland as to the amounts due and

owing outside of this bankruptcy proceeding. The filing of this proof of claim is **<u>not:</u>**  (a) a

waiver or release of and/or Highland's rights or remedies against any person, entity or property;

(b) a consent by Highland to entry of final judgment by this Court in any core proceeding

commenced in this bankruptcy case, consistent with the United States Supreme Court's holding

in *Stern v. Marshall*, 131 S. Ct. 2594 (2011); (c) a waiver of the right to move to withdraw the

reference or otherwise challenge the jurisdiction of this Court; (d) a waiver of the right to a jury

trial; (e) an election of a remedy which waives or otherwise affects any other remedy; or (f) a

waiver of the right to assert a different or enhanced classification of priority for its Claim in

respect of the other claims asserted in this bankruptcy case.

EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND
4820-3752-6894.1

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-15    Filed 10/06/25    Page 168 of 1017    PageID 14812
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1040 of 1803    PageID 11786

**EXECUTION VERSION**

**THIRD AMENDED AND RESTATED SUB-ADVISORY AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

**Appellee Appx. 01034**

**Appx. 01285**

013847

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6   Page 1043/051804 Page 169 of 1017   PageID 14813
Exhibit 5   Page 10 of 51
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1041 of 1803   PageID 11787
Case 18-30264-sgj11   Doc 3527   Filed 08/01/21   Desc Exhibit 1   Page 2 of 21

## TABLE OF CONTENTS

                                                                                        Page

1.    Appointment; Limited Scope of Services ................................................................ 1

2.    Compensation ......................................................................................................... 3

3.    Representations and Warranties.............................................................................. 3

4.    Standard of Care; Liability; Indemnification. ........................................................ 4

5.    Limitations on Employment of the Sub-Advisor; Conflicts of Interest. ................ 7

6.    Termination; Survival ............................................................................................ 8

7.    Cooperation with Management Company .............................................................. 8

8.    Management Agreements and Related Agreements ............................................... 8

9.    Amendments; Assignments .................................................................................... 9

10.   Advisory Restrictions............................................................................................. 9

11.   Records; Confidentiality. ..................................................................................... 10

12.   Notice .................................................................................................................... 11

13.   Governing Law ..................................................................................................... 11

14.   WAIVER OF JURY TRIAL .................................................................................. 11

15.   Severability .......................................................................................................... 11

16.   No Waiver ............................................................................................................. 11

17.   Counterparts ......................................................................................................... 12

18.   Third Party Beneficiaries ..................................................................................... 12

19.   No Partnership or Joint Venture ........................................................................... 12

20.   Entire Agreement .................................................................................................. 12

Appellee Appx. 01035

Appx. 01286

013848

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63   Exhibit 5   Page 1043 of 1804   Page 170 of 1017   PageID 14814
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1042 of 1803   PageID 11788
Case 18-30264-sgj11   Doc 1239-06   Filed 09/27   Doc 159-4   Filed 08/01/18   Desc Exhibit 21   Page 3 of 21

**THIRD AMENDED AND RESTATED**
**SUB-ADVISORY AGREEMENT**

This Third Amended and Restated Sub-Advisory Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the sub-advisor hereunder (in such capacity, the "Sub-Advisor" and together with the Management Company, the "Parties").

**R E C I T A L S**

WHEREAS, the Parties entered into that certain Second Amended and Restated Sub-Advisory Agreement dated July 29, 2016 to be effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Management Company from time to time has entered and will enter into portfolio management agreements, investment management agreements and/or similar agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Management Agreement") and related indentures, credit agreements, collateral administration agreements, service agreements or other agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Related Agreement"), in each case as set forth on Appendix A hereto, as amended from time to time, pursuant to which the Management Company has agreed to provide portfolio and/or investment management services to certain funds and accounts and to certain collateralized loan obligation issuers and to borrowers in certain short-term or long-term warehouse or repurchase facilities in connection therewith (any such transaction, a "Transaction", any fund, account, issuer, warehouse borrower or repurchase agreement seller in respect of any such Transaction, an "Account", and the assets collateralizing each such Transaction and/or comprising the portfolio of such Account, a "Portfolio");

WHEREAS, the Management Company and the Sub-Advisor desire to enter into this Agreement in order to permit the Sub-Advisor to provide certain limited services to assist the Management Company in performing certain obligations under the Management Agreements and Related Agreements;

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, and the receipt of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

1.      Appointment; Limited Scope of Services.

(a)      Highland is hereby appointed as Sub-Advisor to the Management Company for the purpose of assisting the Management Company in managing the Portfolios of each Account

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5   Page 10/46/251804   Page 171 of 1017   PageID 14815
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1043 of 1803   PageID 11789
Case 18-30262-sgj11   Doc 557   Filed 08/01/21   Desc Exhibit 3   Page 4 of 21

pursuant to the related Management Agreement and Related Agreements, in each case that have been included in the scope of this Agreement pursuant to the provisions of <u>Section 8</u>, subject to the terms set forth herein and subject to the supervision of the Management Company, and Highland hereby accepts such appointment.

(b)     Without limiting the generality of the foregoing, the Sub-Advisor shall, during the term and subject to the provisions of this Agreement:

(i)     make recommendations to the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account as to the general composition and allocation of the Portfolio with respect to such Account among various types of securities, the nature and timing of the changes therein and the manner of implementing such changes, including recommendations as to the specific loans and other assets to be purchased, retained or sold by any such Account;

(ii)     place orders with respect to, and arrange for, any investment by or on behalf of such Account (including executing and delivering all documents relating to such Account's investments on behalf of such Account or the Management Company, as applicable), upon receiving a proper instruction from the Management Company;

(iii)     identify, evaluate, recommend to the Management Company, in its capacity as portfolio manager for such Account, and, if applicable, negotiate the structure and/or terms of investment opportunities within the specific investment strategy of the Management Company for such Account;

(iv)     assist the Management Company in its capacity as portfolio manager for such Account in performing due diligence on prospective Portfolio investments by such Account;

(v)     provide information to the Management Company in its capacity as portfolio manager for such Account regarding any investments to facilitate the monitoring and servicing of such investments and, if requested by the Management Company, provide information to assist in monitoring and servicing other investments by such Account

(vi)     assist and advise the Management Company in its capacity as portfolio manager for such Account with respect to credit functions including, but not limited to, credit analysis and market research and analysis; and

(vii)     assist the Management Company in performing any of its other obligations or duties as portfolio manager for such Account.

The foregoing responsibilities and obligations are collectively referred to herein as the "<u>Services</u>."

Notwithstanding the foregoing, all investment decisions will ultimately be the responsibility of, and will be made by and at the sole discretion of, the Management Company.  Furthermore, the

Appellee Appx. 01037
Appx. 01288
013850

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1044 of 1804    Page 172 of 1017    PageID 14816
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1044 of 1803   PageID 11790
Case 18-30264-sgj11  Doc 39-6  Filed 08/01/18  Desc Exhibit 4  Page 5 of 21

parties acknowledge and agree that the Sub-Advisor shall be required to provide only the services expressly described in this Section 1(b), and shall have no responsibility hereunder to provide any other services to the Management Company or any Transaction, including, but not limited to, administrative, management or similar services.

(c)     The Sub-Advisor agrees during the term hereof to furnish the Services on the terms and conditions set forth herein and subject to the limitations contained herein. The Sub-Advisor agrees that, in performing the Services, it will comply with all applicable obligations of the Management Company set forth in the Management Agreements and the Related Agreements. In addition, with respect to any obligation that would be part of the Services but for the fact that the relevant Management Agreement or Related Agreement does not permit such obligation to be delegated by the Management Company to the Sub-Advisor, the Sub-Advisor, upon request in writing by the Management Company, shall work in good faith with the Management Company and shall use commercially reasonable efforts to assist the Management Company in satisfying all such obligations.

2.     Compensation.

(a)     As compensation for its performance of its obligations as Sub-Advisor under this Agreement in respect of any Transaction, the Sub-Advisor will be entitled to receive the Sub-Advisory Fee payable thereto. The "Sub-Advisory Fee" shall be payable in accordance with Appendix A attached hereto, as such appendix may be amended by the Parties from time to time.

(b)     Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Sub-Advisor for any and all costs and expenses that are properly Company Expenses or that may be borne by the Management Company under the Management Company LLC Agreement.

(c)     Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any and all amounts payable to the Sub-Advisor pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

(d)     From time to time, the Management Company may enter into sub-advisory agreements with certain management companies on similar terms to this Agreement. Promptly following the receipt of any fees pursuant to such sub-advisory agreements, the Management Company shall pay 100% of such fees to the Sub-Advisor.

3.     Representations and Warranties.

(a)     Each of the Management Company and the Sub-Advisor represents and warrants, as to itself only, that:

(i)     it has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

Appellee Appx. 01038
Appx. 01289
013851

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Filed 10/06/25   Page 173 of 1017   PageID 14817
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1045 of 1803   PageID 11791
Case 18-30264-sgj11   Doc 327-4   Filed 08/01/21   Desc Exhibit 15   Page 6 of 21

(ii)   this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(iii)   no consent, approval, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other person or entity is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(iv)   neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (A) its constituting and organizational documents; (B) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound; (C) any statute applicable to it; or (D) any law, decree, order, rule or regulation applicable to it of any court or regulatory, administrative or governmental agency, body of authority or arbitration having or asserting jurisdiction over it or its properties, which, in the case of clauses (B) through (D) above, would have a material adverse effect upon the performance of its duties hereunder.

(b)   The Sub-Advisor represents and warrants to the Management Company that it is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

(c)   The Management Company acknowledges that it has received Part 2 of Highland Capital Management, L.P.'s Form ADV filed with the Securities and Exchange Commission.  The Sub-Advisor will provide to the Management Company an updated copy of Part 2 of its Form ADV promptly upon any amendment to such Form ADV being filed with the Securities and Exchange Commission.

4.   Standard of Care; Liability; Indemnification.

(a)   Sub-Advisor Standard of Care.  Subject to the terms and provisions of this Agreement, the Management Agreements and/or the Related Agreements, as applicable, the Sub-Advisor will perform its obligations hereunder and under the Management Agreements and/or the Related Agreements in good faith with reasonable care using a degree of skill and attention no less than that which the Sub-Advisor uses with respect to comparable assets that it manages for others and, without limiting the foregoing, in a manner which the Sub-Advisor reasonably believes to be consistent with the practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Portfolios, in each case except as expressly provided otherwise under this Agreement, the Management Agreements and/or the

4

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Exhibit 6    Page 1047/251804    Page 174 of 1017    PageID 14818
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1046 of 1803    PageID 11792
Case 18-30264-sgj11    Doc 627    Part 3-5    Filed 08/01/18    Desc Exhibit 6    Page 7 of 21

Related Agreements.  To the extent not inconsistent with the foregoing, the Sub-Advisor will follow its customary standards, policies and procedures in performing its duties hereunder, under the Management Agreements and/or under the Related Agreements.

(b)          Exculpation.  To the fullest extent permitted by law, none of the Sub-Advisor, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)) (each a "Covered Person") will be liable to the Management Company, any Member, any shareholder, partner or member thereof, any Account (or any other adviser, agent or representative thereof), or to any holder of notes, securities or other indebtedness issued by any Account (collectively, the "Management Company Related Parties"), for (i) any acts or omissions by such Covered Person arising out of or in connection with the provision of the Services hereunder, for any losses that may be sustained in the purchase, holding or sale of any security or debt obligation by any Account, or as a result of any activities of the Sub-Advisor, the Management Company or any other adviser to or agent of the Account or any other sub-advisor appointed by the Management Company to provide portfolio management services to any other delegatee of the Management Company or any other person or entity, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of the Sub-Advisor, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of the Sub-Advisor with reasonable care, or (iii) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to any Management Company Related Party, no Covered Person acting under this Agreement shall be liable to such Management Company Related Party for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to any Management Company Related Party solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to any such Management Company Related Party, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to any Management Company Related Party in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care

Appellee Appx. 01040
Appx. 01291
013853

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibits    Page 10/48/251804    Page 175 of 1017    PageID 14819
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1047 of 1803    PageID 11793
Case 18-30264-sgj11 23-0627    Doc 3-5    Filed 08/01/21/De    Exhibit 17 1 of 5 Page 8 of 21

(c)  <u>Indemnification</u>.  The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the Services, the activities of the Management Company Related Parties, or activities undertaken in connection with the Management Company Related Parties, or otherwise relating to or arising out of this Agreement, any Management Agreement and/or the Related Documents, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "<u>Proceeding</u>"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "<u>Damages</u>"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person.  The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder.  The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives.  Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this <u>Section 4(c)</u> shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this <u>Section 4(c)</u> to the fullest extent permitted by law

(d)  <u>Other Sources of Recovery etc</u>.  The indemnification rights set forth in <u>Section 4(c)</u> are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled.  If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or

6

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-5   Page 10/09/2518042   Page 176 of 1017   PageID 14820
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1048 of 1803   PageID 11794
Case 18-30264-sgj11   Doc 22-39-A-6-27   Part 3-59-Filed 08/01/18/21/Desc Exhibit 18 of 52   Page 9 of 21

indemnification from any Person in which any of the Transactions has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained

(e)     Rights of Heirs, Successors and Assigns.   The indemnification rights provided by Section 4(c) shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person

(f)     Reliance.   A Covered Person shall incur no liability to any Management Company Related Party in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

(g)     Rights Under Management Agreements and Related Agreements.   The Management Company will ensure that the Sub-Advisor is provided substantially similar indemnification and exculpation rights as are afforded to the Management Company in its role as portfolio manager under any future Management Agreement or Related Agreement encompassed within the Services hereunder, and it is expressly acknowledged by the Parties that the Sub-Advisor may not consent to including a Management Agreement and the related Transaction and Related Agreements within the scope of this Agreement pursuant to Section 8 if such indemnification and exculpation rights are not reasonably acceptable to it.

5.     Limitations on Employment of the Sub-Advisor; Conflicts of Interest.

(a)     The services of the Sub-Advisor to the Management Company are not exclusive, and the Sub-Advisor may engage in any other business or render similar or different services to others including, without limitation, the direct or indirect sponsorship or management of other Transactions, investment-based accounts or commingled pools of capital, however structured, having investment objectives similar to those of the Management Company or the Accounts. Moreover, nothing in this Agreement shall limit or restrict the right of any manager, partner, officer or employee of the Sub-Advisor to engage in any other business or to devote his or her time and attention in part to any other business, whether of a similar or dissimilar nature to the Management Company or any Account, or to receive any fees or compensation in connection therewith.

(b)     So long as this Agreement or any extension, renewal or amendment of this Agreement remains in effect, the Sub-Advisor shall be the only portfolio management sub-advisor for the Management Company.  The Sub-Advisor assumes no responsibility under this Agreement other than to render the services called for hereunder.  It is understood that directors, officers, employees, members and managers of the Management Company are or may become interested in the Sub-Advisor and its Affiliates as directors, officers, employees, partners, stockholders, members, managers or otherwise, and that the Sub-Advisor and directors, officers, employees,

Appellee Appx. 01042
Appx. 01293
013855

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 38-15    Page 1050/26/1804    Page 177 of 1017    PageID 14821
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1049 of 1803    PageID 11795
Case 18-30264-sgj11    Doc 1338-27    Filed 08/01/21    Desc Exhibit 19    Page 10 of
21

partners, stockholders, members and managers of the Sub-Advisor and its Affiliates are or may become similarly interested in the Management Company as members or otherwise.

(c)     The Management Company acknowledges that various potential and actual conflicts of interest may exist with respect to the Sub-Advisor as described in the Sub-Advisor's Form ADV Part 2A and as described in Appendix B hereto, and the Management Company expressly acknowledges and agrees to the provisions contained in such Appendix B, as amended from time to time with mutual consent of the Parties.

6.     Termination; Survival.

(a)     This Agreement may be terminated, in its entirety or with respect to any Management Agreement, at any time without payment of penalty, by the Management Company upon 30 days' prior written notice to the Sub-Advisor.

(b)     This Agreement shall terminate automatically with respect to any Management Agreement on the date on which (i) such Management Agreement has been terminated (and, if required thereunder, a successor portfolio manager has been appointed and accepted) or discharged; or (ii) the Management Company is no longer acting as portfolio manager, investment manager or in a similar capacity (whether due to removal, resignation or assignment) under such Management Agreement and the Related Agreements. Upon the termination of this Agreement with respect to any Management Agreement the Management Company shall provide prompt notice thereof to the Sub-Advisor, and Appendix A hereto shall be deemed to be amended by deleting such Management Agreement and the Related Agreements related thereto.

(c)     All accrued and unpaid financial and indemnification obligations with respect to any conduct or events occurring prior to the effective date of the termination of this Agreement shall survive the termination of this Agreement.

7.     Cooperation with Management Company.  The Sub-Advisor shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Sub-Advisor. Specifically, the Sub-Advisor agrees that it will provide the Management Company with reasonable access to information relating to the performance of Sub-Advisor's obligations under this Agreement.

8.     Management Agreements and Related Agreements.  The Sub-Advisor's duty to provide Services in connection with any Management Agreement shall not commence until (a) Appendix A to this Agreement has been amended by mutual agreement of the Parties to include such Management Agreement and the related Account, fund and/or account and Related Agreements and (b) the Sub-Advisor acknowledges receipt of such Management Agreement and each Related Agreement. The Sub-Advisor shall not be bound to comply with any amendment, modification, supplement or waiver to any Management Agreement or any Related Agreement until it has received a copy thereof from the Management Company. No amendment, modification, supplement or waiver to any Management Agreement or Related Agreement that, when applied to the obligations and rights of the Management Company under such Management Agreement or Related Agreement, affects (i) the obligations or rights of the Sub-Advisor hereunder; (ii) the amount of priority of any fees or other amounts payable to the Sub-Advisor hereunder; or (iii) any

Appellee Appx. 01043
Appx. 01294
013856

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16   Exhibit 6   Page 178 of 1017   PageID 14822
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1050 of 1803   PageID 11796
Case 18-30264-sgj11   Doc 659-6   Filed 01/11/19   Desc Exhibit   Page 11 of 21   Doc 27 Part 159   Filed 08/01/18   Page 11 of 54

definitions relating to the matters covered in clause (i) or (ii) above, will apply to the Sub-Advisor under this Agreement unless in each such case the Sub-Advisor has consented thereto in writing (such consent not to be unreasonably withheld or delayed unless the Sub-Advisor determines in its reasonable judgment that such amendment, modification, supplement or waiver could have a material adverse effect on the Sub-Advisor).

9. <u>Amendments; Assignments</u>.

(a) Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in <u>clauses (b)</u> and <u>(c)</u> of this <u>Section 9</u>, without the prior written consent of the other Party and (ii) in accordance with the Advisers Act and other applicable law.

(b) Except as otherwise provided in this <u>Section 9</u>, the Sub-Advisor may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with the Advisers Act and other applicable law.

(c) The Sub-Advisor may, without satisfying any of the conditions of <u>Section 9(a)</u> other than clause (ii) thereof (so long as such assignment does not constitute an assignment within the meaning of Section 202(a)(1) of the Advisers Act), (1) assign any of its rights or obligations under this Agreement to an affiliate; *provided* that such affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Sub-Advisor pursuant to this Agreement and (ii) has the legal right and capacity to act as Sub-Advisor under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Sub-Advisor under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Sub-Advisor in another corporate or similar form and has substantially the same staff; provided, further, that the Sub-Advisor shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Sub-Advisor will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

10. <u>Advisory Restrictions</u>. This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any Management Agreement or any part thereof. It is the express intention of the parties hereto that (i) the Services are limited in scope; and (ii) this Agreement complies in all respects with all applicable (A) contractual provisions and restrictions contained in each Management Agreement and each Related Agreement and (B) laws, rules and regulations (collectively, the "<u>Advisory Restrictions</u>"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the Services to be provided under this Agreement shall automatically without action by any person or entity be limited, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Appellee Appx. 01044
Appx. 01295
013857

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16    Page 1052/25 180 4 Page 179 of 1017    PageID 14823
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1051 of 1803    PageID 11797
Case 18-30264-sgj11    Doc 27    Filed 02/01/19    Page 12 of 21

11.    <u>Records; Confidentiality</u>.

(a)    The Sub-Advisor shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; provided, that the Sub-Advisor shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

(b)    The Sub-Advisor shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Sub-Advisor hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued in connection with a Transaction or supplying credit estimates on any obligation included in the Portfolios, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Account for which the Management Company serves as portfolio manager, (iv) as required by (A) applicable law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Sub-Advisor or any of its affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Sub-Advisor on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Sub-Advisor may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Transaction, or (ix) information relating to performance of the Portfolios as may be used by the Sub-Advisor in the ordinary course of its business.  Notwithstanding the foregoing, it is agreed that the Sub-Advisor may disclose without the consent of any Person (1) that it is serving as Sub-Advisor to the Management Company and each Account, (2) the nature, aggregate principal amount and overall performance of the Portfolios, (3) the amount of earnings on the Portfolios, (4) such other information about the Management Company, the Portfolios and the Transactions as is customarily disclosed by Sub-Advisors to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Sub-Advisor, the Management Company, the Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

Appellee Appx. 01045
Appx. 01296
013858

12.   <u>Notice</u>.  Any notice or demand to any party to this Agreement to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail, facsimile or email transmission or by delivering it by hand as follows (or to such other address, email address or facsimile number as shall have been notified to the other parties hereto):

      (a)   If to the Management Company:

      Acis Capital Management, L.P.
      300 Crescent Court
      Suite 700
      Dallas, TX 75201

      (b)   If to the Sub-Advisor:

      Highland Capital Management, L.P.
      300 Crescent Court
      Suite 700
      Dallas, TX 75201

13.   <u>Governing Law</u>.   This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.  The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

14.   <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

15.   <u>Severability</u>.  The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties.

16.   <u>No Waiver</u>.  The performance of any condition or obligation imposed upon any party hereunder may be waived only upon the written consent of the parties hereto.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other party under this Agreement.  Any failure by any party to this Agreement to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Appellee Appx. 01046

013859
Appx. 01297

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 1056/251804    Page 181 of 1017    PageID 14825
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1053 of 1803    PageID 11799
Case 18-30264-sgj11    Doc 659-7    Filed 08/01/18    Desc Exhibit 23 of 54    Page 14 of
21

17.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.   This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

18.    <u>Third Party Beneficiaries</u>.  Nothing in this Agreement will be construed to give any person or entity other than the parties to this Agreement, the Accounts and any person or entity with indemnification rights hereunder any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.  Except as provided in the foregoing sentence, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

19.    <u>No Partnership or Joint Venture</u>.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the parties.  Except as expressly provided herein or in any other written agreement between the parties, no party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other party.

20.    <u>Entire Agreement</u>.  This Agreement, together with each Management Agreement and Related Agreement, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter.

[Remainder of Page Intentionally Left Blank]

Appellee Appx. 01047
Appx. 01298
013860

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S      Document Exhibit 6      Page 1055/251804 Page 182 of 1017      PageID 14826
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1054 of 1803   PageID 11800
Case 18-30264-sgj11 23 Class 27 Doc 159-4 Filed 02/01/21/19 DesPage 24 of 54 Page 15 of
21

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By: _____
Name: James Dondero
Title:   President


**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By: _____
Name: James Dondero
Title:  President

*Signature Page to Third Amended and Restated Sub-Advisory Agreement*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 83-15    Filed 06/25/25    Page 183 of 1017    PageID 14827
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1055 of 1803    PageID 11801

**Appendix A**

      The Management Company shall pay to the Sub-Advisor a Sub-Advisory Fee for the Services for the Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table.  Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder.  Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

*[Remainder of Page Intentionally Left Blank]*

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 1057 of 1804   Page 184 of 1017   PageID 14828
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1056 of 1803   PageID 11802
Case 18-30264-sgj11   Doc 1239-6   S27   Part 159   Filed 01/11/21   Desc Exhibit 26 of 54   Page 17 of 21

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Sub-Advisory Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 20 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 20 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 20 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | February 25, 2014 | 20 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | June 5, 2014 | 20 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | November 18, 2014 | 20 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | April 16, 2015 | 20 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 20 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

2

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-5   Filed 03/25/25   Page 185 of 1017   PageID 14829
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1057 of 1803   PageID 11803
Case 18-30264-sgj11   Doc 2328-6   Part 3   Doc 159   Filed 02/01/21   Desc Exhibit 27 of 54   Page 18 of
21

## **APPENDIX B**

Purchase and Sale Transactions; Brokerage

The Management Company acknowledges and agrees that the Sub-Advisor or any of its affiliates may acquire or sell obligations or securities, for its own account or for the accounts of its customers, without either requiring or precluding the acquisition or sale of such obligations or securities for the account of any Account.  Such investments may be the same or different from those made by or on behalf of the Management Company or the Accounts.

Additional Activities of the Sub-Advisor

Nothing herein shall prevent the Sub-Advisor or any of its clients, its partners, its members, funds or other investment accounts managed by it or any of its affiliates, or their employees and their affiliates (collectively, the "Related Entities"), from engaging in other businesses, or from rendering services of any kind to the Management Company, its affiliates, any Account or any other Person or entity regardless of whether such business is in competition with the Management Company, its affiliates, such Account or otherwise.  Without limiting the generality of the Sub-Advisor and its Related Entities may:

(a)     serve as managers or directors (whether supervisory or managing), officers, employees, partners, agents, nominees or signatories for the Management Company or any affiliate thereof, or for any obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof, to the extent permitted by their respective organizational documents and underlying instruments, as from time to time amended, or by any resolutions duly adopted by the Management Company, any Account, their respective affiliates or any obligor or issuer in respect of any of the Portfolio Assets (or any affiliate thereof) pursuant to their respective organizational documents;

(b)     receive fees for services of whatever nature rendered to the obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof;

(c)     be retained to provide services unrelated to this Agreement to the Management Company, any Account or their respective affiliates and be paid therefor, on an arm's-length basis;

(d)     be a secured or unsecured creditor of, or hold a debt obligation of or equity interest in, the Management Company, any Account or any affiliate thereof or any obligor or issuer of any Portfolio Asset or any affiliate thereof;

(e)     sell any Portfolio Asset to, or purchase or acquire any Portfolio Asset from, any Account while acting in the capacity of principal or agent; *provided, however*, that any such sale or purchase effected by the Sub-Advisor shall be subject to applicable law and any applicable provisions of this Agreement, the related Management Agreement and Related Agreements, as applicable;

(f)     underwrite, arrange, structure, originate, syndicate, act as a distributor of or make a market in any Portfolio Asset;

Appellee Appx. 01051
Appx. 01302
013864

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6-16    Page 1056 of 1804    Page 186 of 1017    PageID 14830
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1058 of 1803    PageID 11804
Case 18-30264-sgj11    Doc 659-6    Filed 05/01/21    Desc Exhibit 21    Page 19 of
21

(g)    serve as a member of any "creditors' board", "creditors' committee" or similar creditor group with respect to any Portfolio Asset; or

(h)    act as portfolio manager, portfolio manager, investment manager and/or investment adviser or sub-advisor in collateralized bond obligation vehicles, collateralized loan obligation vehicles and other similar warehousing, financing or other investment vehicles.

As a result, such individuals may possess information relating to obligors and issuers of Portfolio Assets that is (a) not known to or (b) known but restricted as to its use by the individuals at the Sub-Advisor responsible for monitoring the Portfolio Assets and performing the Services under this Agreement. Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Management Company and/or any Account and otherwise create conflicts of interest for the Management Company and/or any Account. The Management Company acknowledges and agrees that, in all such instances, the Sub-Advisor and its affiliates may in their discretion make investment recommendations and decisions that may be the same as or different from those made by the Management Company with respect to the investments of any Account and they have no duty, in making or managing such investments, to act in a way that is favorable to any Account.

The Management Company acknowledges that there are generally no ethical screens or information barriers between the Sub-Advisor and certain of its affiliates of the type that many firms implement to separate Persons who make investment decisions from others who might possess applicable material, non-public information that could influence such decisions. The officers or affiliates of the Sub-Advisor may possess information relating to obligors or issuers of Portfolio Assets that is not known to the individuals at the Sub-Advisor responsible for providing the Services under this Agreement. As a result, the Sub-Advisor may from time to time come into possession of material nonpublic information that limits the ability of the Sub-Advisor to effect a transaction for the Management Company and/or any Account, and the Management Company and/or such Account's investments may be constrained as a consequence of the Sub-Advisor's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Management Company and/or such Account.

Unless the Sub-Advisor determines in its sole discretion that such Transaction complies with the conflicts of interest provisions set forth in the applicable Management Agreement and Related Agreements, he Sub-Advisor will not direct any Account to acquire or sell loans or securities entered into or issued by (i) Persons of which the Sub-Advisor, any of its affiliates or any of its officers, directors or employees are directors or officers, (ii) Persons of which the Sub-Advisor or any of its respective affiliates act as principal or (iii) Persons about which the Sub-Advisor or any of its affiliates have material non-public information which the Sub-Advisor deems would prohibit it from advising as to the trading of such securities in accordance with applicable law.

It is understood that the Sub-Advisor and any of its affiliates may engage in any other business and furnish investment management and advisory services to others, including Persons which may have investment policies similar to those followed by the Management Company with respect to the Portfolio Assets and which may own securities or obligations of the same class, or which are of the same type, as the Portfolio Assets or other securities or obligations of the obligors or issuers of the Portfolio Assets. The Sub-Advisor and its affiliates will be free, in their sole discretion, to

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibits 6   Page 106 of 251804   Page 187 of 1017   PageID 14831
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1059 of 1803   PageID 11805
Case 18-30264-sgj11   Doc 827   Part 159   Filed 08/01/21   Desc Page 20 of 21

make recommendations to others, or effect transactions on behalf of themselves or for others, which may be the same as or different from those effected with respect to the Collateral. Nothing in this Agreement, in the Management Agreements or in the Related Agreements shall prevent the Sub-Advisor or any of its affiliates, acting either as principal or agent on behalf of others, from buying or selling, or from recommending to or directing any other account to buy or sell, at any time, securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same obligor or issuer, as those directed by the Sub-Advisor to be purchased or sold on behalf of an Account. It is understood that, to the extent permitted by applicable law, the Sub-Advisor, its Related Entities, or any of their owners, directors, managers, officers, stockholders, members, partners, partnership committee members, employees, agents or affiliates or the other Covered Persons or any member of their families or a Person or entity advised by the Sub-Advisor may have an interest in a particular transaction or in securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same issuer, as those that may be owned or acquired by an Account. The Management Company agrees that, in the course of providing the Services, the Sub-Advisor may consider its relationships with other clients (including obligors and issuers) and its affiliates.

The Management Company agrees that neither the Sub-Advisor nor any of its affiliates is under any obligation to offer any investment opportunity of which they become aware to the Management Company or any Account or to account to the Management Company or any Account for (or share with the Management Company or any Account or inform the Management Company or any Account of) any such transaction or any benefit received by them from any such transaction. The Management Company understands that the Sub-Advisor and/or its affiliates may have, for their own accounts or for the accounts of others, portfolios with substantially the same portfolio criteria as are applicable to the Accounts. Furthermore, the Sub-Advisor and/or its affiliates may make an investment on behalf of any client or on their own behalf without offering the investment opportunity or making any investment on behalf of the Management Company or any Account and, accordingly, investment opportunities may not be allocated among all such clients. The Management Company acknowledges that affirmative obligations may arise in the future, whereby the Sub-Advisor and/or its affiliates are obligated to offer certain investments to clients before or without the Sub-Advisor offering those investments to the Management Company or any Account.

The Management Company acknowledges that the Sub-Advisor and its affiliates may make and/or hold investments in an obligor's or issuer's obligations or securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's obligations or securities made and/or held by the Management Company or any Account, or in which partners, security holders, members, officers, directors, agents or employees of the Sub-Advisor and its affiliates serve on boards of directors, or otherwise have ongoing relationships or otherwise have interests different from or adverse to those of the Management Company and the Accounts.

<u>Defined Terms</u>

For purposes of this <u>Appendix B</u>, the following defined terms shall have the meanings set forth below:

"<u>Portfolio</u>" shall mean, with respect to any Account and/or Transaction, the assets held by or in the name of the Account or any subsidiary of the Account in respect of such Transaction,

Appellee Appx. 01053
Appx. 013804
013866

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-5    Page 1066/251804    Page 188 of 1017    PageID 14832
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1060 of 1803    PageID 11806
Case 18-30264-sgj11    Doc 559    Filed 08/01/21    Des    Page 30 of 54    Page 21 of
21

whether or not for the benefit of the related secured parties, securing the obligations of such Account.

"Portfolio Asset" shall mean any loan, eligible investment or other asset contained in the Portfolio.

"Transaction" shall mean any action taken by the Sub-Advisor on behalf of any Account with respect to the Portfolio, including, without limitation, (i) selecting the Portfolio Assets to be acquired by the Account, (ii) investing and reinvesting the Portfolio, (iii) amending, waiving and/or taking any other action commensurate with managing the Portfolio and (iv) instructing the Account with respect to any acquisition, disposition or tender of a Portfolio Asset or other assets received in respect thereof in the open market or otherwise by the Account.

Appellee Appx. 01054

013867

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-9   Page 1062/251804   Page 189 of 1017   PageID 14833
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1061 of 1803   PageID 11807

**EXECUTION VERSION**

**FOURTH AMENDED AND RESTATED SHARED SERVICES AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

Appellee Appx. 01055

013868

Appx. 01396

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Exhibit 6   Page 1063 of 1804   Page 190 of 1017   PageID 14834
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1062 of 1803   PageID 11808
Case 18-30264-sgj11   Doc 6-37   Part 4   Filed 02/11/21   Desc Exhibit 2   Page 2 of 24

## TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ............................................................................ 2

    Section 1.01    Certain Defined Terms ................................................. 2

    Section 1.02    Interpretation .............................................................. 3

ARTICLE II SERVICES ................................................................................ 4

    Section 2.01    General Authority. ...................................................... 4

    Section 2.02    Provision of Services. ................................................. 4

    Section 2.03    Shared Employees. ...................................................... 6

    Section 2.04    Applicable Asset Criteria and Concentrations. ........... 8

    Section 2.05    Compliance with Management Company Policies and
                           Procedures. ................................................................. 8

    Section 2.06    Authority. ................................................................... 8

    Section 2.07    Third Parties. .............................................................. 9

    Section 2.08    Management Company to Cooperate with the Staff and
                           Services Provider. ...................................................... 9

    Section 2.09    Power of Attorney. ..................................................... 9

ARTICLE III CONSIDERATION AND EXPENSES ................................... 9

    Section 3.01    Consideration ............................................................. 9

    Section 3.02    Costs and Expenses .................................................. 10

    Section 3.03    Deferral .................................................................... 10

ARTICLE IV REPRESENTATIONS AND COVENANTS ........................ 10

    Section 4.01    Representations ......................................................... 10

ARTICLE V COVENANTS .......................................................................... 10

    Section 5.01    Compliance; Advisory Restrictions. ........................ 10

    Section 5.02    Records; Confidentiality. .......................................... 11

ARTICLE VI EXCULPATION AND INDEMNIFICATION ..................... 12

    Section 6.01    Standard of Care ...................................................... 12

    Section 6.02    Exculpation. ............................................................. 12

    Section 6.03    Indemnification by the Management Company. ........ 13

    Section 6.04    Other Sources of Recovery etc .................................. 14

    Section 6.05    Rights of Heirs, Successors and Assigns .................. 14

    Section 6.06    Reliance. ................................................................... 14

i

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-9   Page 1064 of 1804   Page 191 of 1017   PageID 14835
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1063 of 1803   PageID 11809
Case 18-30264-sgj11   Doc 1237-6   Part 4   Filed 06/11/21   Desc Exhibit 3-2   Page 3 of 24

# TABLE OF CONTENTS
(continued)

Page

ARTICLE VII TERMINATION ........................................................ 14

    Section 7.01     Termination........................................................... 14

ARTICLE VIII MISCELLANEOUS .................................................. 15

    Section 8.01     Amendments ...................................................... 15

    Section 8.02     Assignment and Delegation. ............................... 15

    Section 8.03     Non-Recourse; Non-Petition.............................. 15

    Section 8.04     Governing Law. ................................................. 16

    Section 8.05     WAIVER OF JURY TRIAL.............................. 17

    Section 8.06     Severability ....................................................... 17

    Section 8.07     No Waiver ......................................................... 17

    Section 8.08     Counterparts ...................................................... 17

    Section 8.09     Third Party Beneficiaries .................................. 17

    Section 8.10     No Partnership or Joint Venture ........................ 17

    Section 8.11     Independent Contractor ..................................... 17

    Section 8.12     Written Disclosure Statement ........................... 18

    Section 8.13     Headings ........................................................... 18

    Section 8.14     Entire Agreement .............................................. 18

    Section 8.15     Notices .............................................................. 18

Appellee Appx. 01057

013870

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 18-15    Page 1065/251804    Page 192 of 1017    PageID 14836
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1064 of 1803    PageID 11810

Case 18-30264-sgj11    Doc 1223-6 CS-27    Filed 11/01/18/11/21/19    Desc Exhibit 342 of 54    Page 4 of 24

## FOURTH AMENDED AND RESTATED
## SHARED SERVICES AGREEMENT

This Fourth Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

### R E C I T A L S

WHEREAS, the Parties entered into that certain Third Amended and Restated Shared Services Agreement dated effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company on the terms and conditions hereof;

WHEREAS, the Management Company  may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company;

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee") is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time); and

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 1066/251804   Page 193 of 1017   PageID 14837
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1065 of 1803   PageID 11811
Case 18-30256-sgj11   Doc 2639-6   Part 4   Filed 08/01/21   Desc Exhibit 352   Page 5 of 24

## ARTICLE I

## DEFINITIONS

Section 1.01    Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"Advisers Act" shall have the meaning set forth in the Recitals to this Agreement.

"Advisory Restriction" shall have the meaning set forth in Section 5.01(b).

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.  The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Agreement" shall have the meaning set forth in the Preamble to this Agreement.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more CLOs or Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof, including the Risk Retention Rules, of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"CLO or Account" shall mean a collateralized loan obligation transaction, including any type of short-term or long-term warehouse or repurchase facility in connection therewith, or a fund or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission,

Appellee Appx. 01059

013872

Appx 01310

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1066 of 1804    Page 194 of 1017    PageID 14838
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1066 of 1803    PageID 11812
Case 18-30264-sgj11 2239-6 Doc 4159-4 Filed 08/01/21/19 Desc Exhibit 862 of 54 Page 6 of 24

corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Highland" shall have the meaning set forth in the preamble to this Agreement.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) with respect to the Management Company, all indebtedness relating to the acquisition by the EU Originator Series of a collateral obligation that failed to settle (including any ineligible or defaulted collateral obligation) into a CLO; (e) all capital lease obligations; (f) all indebtedness guaranteed by such Person or any of its subsidiaries; (g) all capital lease obligations; (h) all indebtedness guaranteed by such Person or any of its subsidiaries.

"Management Company" shall have the meaning set forth in the preamble to this Agreement.

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a CLO or Account.

"Parties" shall have the meaning set forth in the preamble to this Agreement.

"Portfolio" means the Management Company's portfolio of collateral loan obligations, debt securities (including equity investments or subordinated securities in a CLO such as a Retention Interest), other similar obligations, preferred return notes, financial instruments, securities or other assets held directly or indirectly by, or on behalf of, the Management Company from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Staff and Services Fee" shall have the meaning set forth in Section 3.01 of this Agreement.

"Staff and Services Provider" shall have the meaning set forth in the preamble to this Agreement.

"Shared Employee" shall have the meaning set forth in the Recitals to this Agreement.

Section 1.02    Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are

Appellee Appx. 01060
Appx. 01131
013873

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Exhibit 6    Page 106 of 251804    Page 195 of 1017    PageID 14839
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1067 of 1803    PageID 11813
Case 18-30264-sgj11    Doc 1739-6    Part 4    Filed 08/11/21    Desc    Exhibit 372    Page 7 of 24

not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01    General Authority.   Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.   The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02    Provision of Services.   Without limiting the generality of Section 2.1 and subject to Section 2.4 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)    *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, accounting, payments, operations, technology and finance;

(b)    *Legal/Compliance/Risk Analysis*.   Assistance and advice with respect to legal issues, compliance support and implementation and general risk analysis;

(c)    *Management of Collateral Obligations and CLOs and Accounts*. Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any CLO or Account from time to time.

(d)    *Valuation*.   Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such

4

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1069/25/804 Page 196 of 1017    PageID 14840
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1068 of 1803    PageID 11814
Case 18-30264-sgj11 22239-06.27 Part 459 Filed 08/01/21 Desc Exhibit 382 Page 8 of 24

valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(e)    *Execution and Documentation.*  Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a CLO or Account managed by the Management Company, CLO transactions involving the Management Company, and any other rights and obligations of the Management Company;

(f)    *Marketing.*  Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified CLOs or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(g)    *Reporting.*  Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any CLO or Account, including reports relating to (i) purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

(h)    *Administrative Services*.  The provision of office space, information technology services and equipment, infrastructure and other related services requested or utilized by the Management Company from time to time;

(i)    *Shared Employees*.  The provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of <u>Section 2.03</u> hereof;

(j)    *Ancillary Services*.  Assistance and advice on all things ancillary or incidental to the foregoing; and

(k)    *Other.*  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any CLO or Account or similar securitization, (c) the substantive investment management decisions with respect to any CLO or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Appellee Appx. 01062
Appx. 01313
013875

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1076/251804    Page 197 of 1017    PageID 14841
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1069 of 1803    PageID 11815
Case 18-30264-sgj11    Doc 2289-6    Filed 08/01/21    Desc Exhibit 392    Page 9 of 24

Section 2.03    <u>Shared Employees</u>.

(a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  The name, location and such other matters as the Parties desire to reflect with respect to each Shared Employee shall be identified on the books and records of each of the Management Company and the Staff and Services Provider, which may be amended in writing from time to time by the Parties to add or remove any Shared Employee to reflect the employment (or lack thereof) of such employee.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  If at any time any Shared Employee (or any other person employed by the Staff and Services provider who also provides services to the Management Company) shall be terminated from employment with the Staff and Services Provider or otherwise resigns or is removed from employment with the Staff and Services Provider, then such person may only serve as a separate direct employee of the Management Company upon the approval of the Management Company.  The Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

(b)    Notwithstanding that the Shared Employees shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)    To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)    Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate

Appellee Appx. 01063
Appx. 013876
013876

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibits    Page 198 of 1017    PageID 14842
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1070 of 1803    PageID 11816
Case 18-30264-sgj11    Doc 527    Filed 08/01/18    Desc    Page 10 of 24

with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)    Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)    The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)    The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any CLO or Account, and regulators, as applicable.    To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)    The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

(i)    The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)    The Staff and Services Provider shall require that each Shared Employee:

(i)    certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)    be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)    provide services hereunder and take actions hereunder only as approved by the Management Company;

Appellee Appx. 01064
Appx. 013877
013877

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1072/25/1804    Page 199 of 1017    PageID 14843
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1071 of 1803    PageID 11817
Case 18-30264-sgj11    Doc 6827    Filed 09/01/21    Desc Exhibit Page 11 of 24

(iv)     provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)     to the extent authorized to transact on behalf of the Management Company or a CLO or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)     act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a CLO or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)     Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04    <u>Applicable Asset Criteria and Concentrations</u>.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with <u>Section 2.2</u> above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05    <u>Compliance with Management Company Policies and Procedures</u>.  The Management Company will from time to time provide the Staff and Services Provider and the Shared Employees with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06    <u>Authority</u>.  The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement.  The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party.  Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time.  The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Appellee Appx. 01065
Appx. 01316
013878

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Exhibit 6    Page 1076 of 1804    Page 200 of 1017    PageID 14844
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1072 of 1803    PageID 11818
Case 18-30264-sgj11    Doc 27    Filed 01/11/21    Desc    Exhibit 6    Page 12 of 54    Page 12 of 24

Section 2.07    <u>Third Parties</u>.

(a)    The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)    In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a CLO or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08    <u>Management Company to Cooperate with the Staff and Services Provider</u>. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09    <u>Power of Attorney</u>.  If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments).  Any such power shall be revocable in the sole discretion of the Management Company.

# ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01    <u>Consideration</u>.  As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive the Staff and Services Fee payable thereto.  The "<u>Staff and Services Fee</u>" shall be payable in accordance with <u>Appendix A</u> attached hereto, as such appendix may be amended by the Parties from time to time.

From time to time, the Management Company may enter into shared services agreements with certain management companies on similar terms to this Agreement.  Promptly following the receipt of any fees pursuant to such shared services agreements, the Management Company shall pay 100% of such fees to the Staff and Services Provider.

**Appellee Appx. 01066**

**Appx 013879**

**013879**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6-15    Page 1074/651804    Page 201 of 1017    PageID 14845
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1073 of 1803    PageID 11819
Case 18-30264-sgj11    Doc 1637    Filed 08/01/19    Desc Exhibit 2    Page 13 of 24

Section 3.03    <u>Costs and Expenses</u>.  Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.04    <u>Deferral</u>.  Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01    <u>Representations</u>.  Each of the Parties hereto represents and warrants that:

(a)    It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)    no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01    <u>Compliance; Advisory Restrictions</u>.

(a)    The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider.  Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable

Appellee Appx. 01067

Appx 01318
013880

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-16    Page 1075/251804    Page 202 of 1017    PageID 14846
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1074 of 1803    PageID 11820
Case 18-30264-sgj11    Doc 827    Part 459    Filed 08/01/21    Desc Exhibit 2    Page 14 of 24

access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)    This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof.  It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions").  If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02    Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; provided that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any CLO or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such

Appellee Appx. 01068

Appx. 01319
013881

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 61-15   Page 1076/651804   Page 203 of 1017   PageID 14847
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1075 of 1803   PageID 11821
Case 18-30264-sgj11   Doc 27   Part 159   Filed 08/01/18   Desc Exhibit 2   Page 15 of
24

information as is routinely disclosed to the trustee, custodian or collateral administrator of any CLO or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such CLO or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the CLOs or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Management Vehicles, the CLOs or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01    Standard of Care.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder.  No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account.  Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

Section 6.02    Exculpation.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To

Appellee Appx. 01069
Appx. 01329
013882

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 18-15    Page 1076/251804    Page 204 of 1017    PageID 14848
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1076 of 1803    PageID 11822
Case 18-30264-sgj11 23-03067    Doc 159-6 27    Filed 08/11/21/19    Desc Exhibit 40 of 54 Page 16 of
24

the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03    Indemnification by the Management Company.    The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be

Appellee Appx. 01070
Appx. 01321
013883

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 1076/251804 Page 205 of 1017   PageID 14849
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1077 of 1803   PageID 11823
Case 18-30264-sgj11   Doc 827-4   Filed 09/01/21   Desc Exhibit 2   Page 17 of
24

determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder.  The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives.  Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04   Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled.  If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the CLOs or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Section 6.05   Rights of Heirs, Successors and Assigns. The indemnification rights provided by Section 6.03 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06   Reliance. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01   Termination. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

Appellee Appx. 01071
Appx. 01322
013884

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 1075 of 1804   Page 206 of 1017   PageID 14850
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1078 of 1803   PageID 11824
Case 18-30264-sgj11   Doc 8527-1 Part 459   Filed 01/11/21   Desc Exhibit 2-4 Page 18 of 24

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01    <u>Amendments</u>.  This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02    <u>Assignment and Delegation</u>.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)    Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)    The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    <u>Non-Recourse; Non-Petition</u>.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations

Appellee Appx. 01072
013885

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Filed 06/05/25   Page 207 of 1017   PageID 14851
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1079 of 1803   PageID 11825
Case 18-30264-sgj11   Doc 827   Part 459   Filed 03/01/19   Desc Exhibit 4   Page 19 of 24

and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)    Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)    The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)    The provisions of this <u>Section 8.03</u> shall survive termination of this Agreement for any reason whatsoever.

Section 8.04    <u>Governing Law</u>.

(a)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)    The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "<u>Proceedings</u>") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-15   Exhibit 6   Page 1086/651804   Page 208 of 1017   PageID 14852
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1080 of 1803   PageID 11826
Case 18-30264-sgj11   Doc 1239-15   Filed 08/01/18   Doc 459 Filed 06/01/21   Des   Page 50 of 54   Page 20 of 24

and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05   <u>WAIVER OF JURY TRIAL</u>.   EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06   <u>Severability</u>.   The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07   <u>No Waiver</u>.   The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08   <u>Counterparts</u>.   This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Section 8.09   <u>Third Party Beneficiaries</u>.   This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, CLO or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10   <u>No Partnership or Joint Venture</u>.   Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties. Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11   <u>Independent Contractor</u>.   Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as

Appellee Appx. 01074
Appx. 01325
013887

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 1082/251804   Page 209 of 1017   PageID 14853
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1081 of 1803   PageID 11827
Case 18-30264-sgj11   Doc 663-27   Part 459   Filed 08/01/18   Desc Exhibit 2   Page 21 of 24

expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12   <u>Written Disclosure Statement</u>.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13   <u>Headings</u>.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14   <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15   <u>Notices</u>.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

(a)   If to the Management Company:

Acis Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

(b)   If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

Appellee Appx. 01075
Appx. 01326
013888

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1086 of 1804    Page 210 of 1017    PageID 14854
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1082 of 1803    PageID 11828
Case 18-30264-sgj11 23 Class 27 Doc 159-4 Filed 01/11/19 Desc Exhibit 2 of 54 Page 22 of
24

　IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By: _____
Name: James Dondero
Title:   President

**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By: _____
Name: James Dondero
Title:  President

*Signature Page to Fourth Amended and Restated Shared Services Agreement*

**Appellee Appx. 01076**

**Appx. 01327**
**013889**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-9    Page 1084/251804    Page 211 of 1017    PageID 14855
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1083 of 1803    PageID 11829

## Appendix A

The Management Company shall pay to the Staff and Services Provider a Staff and Services Fee for the services for the CLOs or Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such CLOs or Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such CLOs or Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table.  Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such CLOs or Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such CLOs or Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder.  Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

*[Remainder of Page Intentionally Left Blank.]*

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 68-15 Page 1085 of 1804 Page 212 of 1017 PageID 14856
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1084 of 1803 PageID 11830

Case 18-30264-sgj11 Doc 1239 Class 27 Part 59 Filed 08/01/18 Desc Exhibit 54 Page 24 of 24

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Staff and Services Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 15 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 15 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 15 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | February 25, 2014 | 15 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | June 5, 2014 | 15 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | November 18, 2014 | 15 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | April 16, 2015 | 15 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 15 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-15   Page 1086 of 1804   Page 213 of 1017   PageID 14857
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1085 of 1803   PageID 11831

Case 19-12239-CSS   Doc 159-5   Filed 11/21/19   Page 1 of 54

# EXHIBIT E

Appellee Appx. 01079

013892

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibits 6   Page 1087/dd/251804 Page 214 of 1017   PageID 14858
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1086 of 1803   PageID 11832
Case 18-30265-sgj11-12239-CLS   Filed 09/01/18 Filed 12/21/18 Main Document Page 2 of 54 Page 1 of 3

**Fill in this information to identify the case:**

Debtor 1    Acis Capital Management, G.P.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:  Northern District of Texas

Case number   18-30265-sgj11

Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Highland Capital Management, L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Holland O'Neil, Foley Gardere, Foley & Lardner
Name

2021 McKinney Ave, Suite 1600
Number        Street

Dallas          TX          75201
City             State       ZIP Code

Contact phone  214-999-3000

Contact email  honeil@foley.com

Where should payments to the creditor be sent? (if different)

Scott Ellington, Highland Capital Management
Name

300 Crescent Court, Suite 700
Number        Street

Dallas          TX          75201
City             State       ZIP Code

Contact phone

Contact email

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

Official Form 410              Proof of Claim              page 1

Appellee Appx. 01080
Appx. 01931
013893

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Page 1086/251804    Page 215 of 1017    PageID 14859
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1087 of 1803    PageID 11833
Case 18-30265-sgj11-1223ai-CS3    Filed 09/01/18 Filed 15/21/18 Main Document Page 8 of 54 Page 2 of 3

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

| 6. | Do you have any number you use to identify the debtor? | ☑ No ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___  ___ ___ |
|---|---|---|

| 7. | How much is the claim? | $        4,672,140.38    Does this amount include interest or other charges?<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
|---|---|---|

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Sub-Advisory Services and Shared Services

9. **Is all or part of the claim secured?**

☑ No
☐ Yes.   The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:    $_____
Amount of the claim that is secured:    $_____

Amount of the claim that is unsecured: $_____    (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:    $_____

Annual Interest Rate (when case was filed)_____%
☐ Fixed
☐ Variable

| 10. | Is this claim based on a lease? | ☑ No<br>☐ Yes. Amount necessary to cure any default as of the date of the petition.    $_____ |
|---|---|---|

| 11. | Is this claim subject to a right of setoff? | ☑ No<br>☐ Yes. Identify the property: _____ |
|---|---|---|

Appellee Appx. 01081
Appx. 01832
013894

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 18-16   Page 1089/251804 Page 216 of 1017   PageID 14860
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1088 of 1803   PageID 11834
Case 18-30265-sgj11-12239-CSS   Filed 09/01/18/19 Filed 15/21 Main Document 4 of 54 Page 3 of 3

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☐ No | | |
|---|---|---|---|
| | ☑ **Yes.** *Check one:* | | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $_____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $_____ |
| | ☑ Other. Specify subsection of 11 U.S.C. § 507(a)(_3_) that applies. | | $ 2,049,564.35 |

*Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   08/01/2018
                   MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Scott Ellington | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | General Counsel | | |
| Company | Highland Capital Management, L.P. | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 300 Crescent Court, Suite 700 | | |
| | Number          Street | | |
| | Dallas | TX | 75201 |
| | City | State | ZIP Code |
| Contact phone | | Email | |

Appellee Appx. 01082
Appx. 01325
013895

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 16-5 Page 10.90 of 180 Page 217 of 1017 PageID 14861
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1089 of 1803 PageID 11835
Case 18-30265-sgj11 Claim 3 Part 2-59 Filed 08/01/18 Desc Exhibit A Page 1 of 5

*In re Acis Capital Management, L.P.* - Case No. 18-30264
*In re Acis Capital Management, G.P.* - Case No. 18-30265
**United States Bankruptcy Court for the Northern District of Texas**

## EXHIBIT A TO PROOF OF CLAIM

1.      <u>Claimant</u>: Highland Capital Management, L.P. ("**Highland**") maintains its business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. Highland files its proof of claim (the "**Claim**") pursuant to 11 U.S.C. §§ 105(a), 501, and 502(f) and the Federal Rules of Bankruptcy Procedure 3002 and 3003. Prior to the Involuntary Petition Date (defined below), Highland provided sub-advisory and shared services to the Debtors (defined below). Highland has provided portfolio management and advisory services to the Debtors pursuant to that certain Third Amended and Restated Sub-Advisory Agreement by and between the Debtors and Highland dated March 17, 2017 ("**Sub-Advisory Agreement**") (**Exhibit 1**). Specifically, Highland has acted as an investment manager and has identified, evaluated, and recommended investments to investment vehicles advised or sub-advised by the Debtors. Highland has also provided the Debtors with back and middle office services pursuant to that certain Fourth Amended and Restated Shared Services Agreement by and between the Debtors and Highland dated March 17, 2017 ("**Shared Services Agreement**") (**Exhibit 2**). Highland has provided the Debtors with all of the employees and staff necessary to manage the portfolios. Highland continued to provide the same sub-advisory and shared services to the Debtors throughout the Gap Period (defined below). To date, Highland continues to provide such services.

2.      <u>Debtors</u>: Acis Capital Management, L.P. and Acis Capital Management, G.P. (the "**Debtors**"). The Debtors' cases have been consolidated under case number 18-30264 in the United States Bankruptcy Court for the Northern District of Texas. Highland provides the service at the following address: 300 Crescent Court, Suite 700, Dallas, Texas 75201.

**Appellee Appx. 01083**
**Appx. 01324**
013896

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Exhibit 6   Page 1096/251804   Page 218 of 1017   PageID 14862
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1090 of 1803   PageID 11836
Case 18-30265-sgj11   Doc 1539-1   Filed 08/01/21   Desc Exhibit A   Page 2 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

3.      Indebtedness: Because the Debtors were put into bankruptcy involuntarily, the

amount included in the proof of claim accounts for pre-petition claims as well as Gap Claims

(defined below).

a.      Pre-Petition: Joshua Terry, the petitioning creditor, filed the involuntary

petition on January 30, 2018 (the "**Petition Date**"). As of the Petition Date, the

outstanding indebtedness owing from the Debtors to Highland was as set forth below by

account number:

| Invoice | Type | Balance |
|---|---|---|
| A1-A7; BVK[1] | Sub-Advisory | $1,605,362.41 |
| A1-A7; BVK | Shared Services | $1,017,213.62 |
| | **Totals** | **$2,622,576.03** |

b.      Gap Period: When a debtor files bankruptcy, the order for relief is

typically entered on the date the petition is filed. However, an involuntary bankruptcy

case diverges from the simultaneous entry of an order for relief in that an order for relief

is entered at a later date than when a petition is filed. This creates a period of time,

referred to as the "gap period", where the debtor may accrue post-petition but pre-order

for relief debt. Pursuant to Section 502(f) of the Bankruptcy Code:

> In an involuntary case, a claim arising in the ordinary course of the
> debtor's business or financial affairs after the commencement of
> the case but before the earlier of the appointment of a trustee and
> order for relief shall be determined as of the date such claim arises,
> and shall be allowed under subsection (a), (b), or (c) of this
> section…the same as if such claim had arisen before the date of the
> filing of the petition.

11 U.S.C. 502(f).

---

[1] A1-A7 and BVK account for the following vehicles: Acis CLO 2013-1, Ltd.; Acis CLO 2013-2, Ltd.; Acis CLO 2014-3, Ltd.; Acis CLO 2014-4, Ltd.; Acis CLO 2014-5, Ltd.; Acis CLO 2015-6, Ltd.; Acis CLO 2017-7, Ltd.; BayVK R2 Lux S.A., SICAV-FIS.

EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND
4820-3752-6894.1

Appellee Appx. 01084
Appx. 01335
013897

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-6    Exhibit 6    Page 1092/651804 Page 219 of 1017    PageID 14863
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1091 of 1803    PageID 11837
Case 18-30265-sgj11    Doc 2155-3    Part 2    Filed 08/01/21    Desc Exhibit A 54  Page 3 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

Claims arising during the gap period are entitled to priority treatment under section 507(a)(3). The Court entered the Order for Relief on April 13, 2018 ("**Order for Relief Date**"). Highland continued to provide services to the Debtors from January 30, 2018 to April 13, 2018 ("**Gap Period**"). The outstanding balance owed from the Debtors to Highland for the sub-advisory and shared services during the Gap Period is set forth below (and shall be referred to as the "**Gap Claim**"):

| Account No. | Type | Balance |
|---|---|---|
| A1-A7; BVK | Sub-Advisory | $1,170,147.06 |
| A1-A7; BVK | Shared Services | $879,417.29 |
| | **Totals** | **$2,049,564.35** |

c.    <u>Reservation of Rights as to Administrative Claim</u>: Highland has provided uninterrupted sub-advisory and shared services since the Order for Relief Date. Highland reserves its rights to seek allowance of its administrative claims.

d.    <u>Indemnity Claims</u>: Highland has contingent claims for indemnification pursuant to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement.  According to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement,  "the Management Company [Debtors] hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless Covered Person [Highland and its representatives] from…any and all claims, demands, liabilities, costs…suits, proceedings, judgments, assessments, actions…of whatever nature, known or unknown, liquidated, or unliquidated...arising out of the investment or other activities of the Management Company." Highland reserves such contractual indemnification right.

EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND
4820-3752-6894.1

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 16-9   Page 10-98/251804   Page 220 of 1017    PageID 14864
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1092 of 1803   PageID 11838
Case 18-30265-sgj11   Doc 2159-3   Part 2   Filed 08/01/21   Desc Exhibit A   Page 4 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

    4.    <u>Reservation of Rights; Other Rights</u>: The Claims described in this Attachment are legal, binding, enforceable, allowed, and not subject to any offset, defense, claim, counterclaim or any other diminution of any type, kind or nature, whatsoever; provided, however, the Chapter 11 Trustee alleges that he may offset Highland's Claims and recover from Highland through his current adversary proceeding against Highland (Adversary Proceeding 18-03212). Highland disputes such contention, and believes all Claims sought herein are recoverable despite the Chapter 11 Trustee's allegations. No portion of the Claims or any funds previously paid to Highland are subject to impairment, avoidance, subordination, or disallowance pursuant to the Bankruptcy Code (including, without limitation, Bankruptcy Code § 502) or applicable non-bankruptcy law. Highland expressly reserves the right in the future to assert any and all claims that it may have, including, without limitation, imposition of a constructive trust, equitable lien, security interest, subrogation, marshaling, or other legal or equitable remedies to which it may be entitled. The filing of this proof of claim is not to be construed as an election of remedies. Highland further reserves the rights (a) to amend, modify or supplement this proof of claim, including any exhibit, schedule or annex, or to file an amended proof of claim for the purpose of modifying or liquidating the amount of any interest, fees, costs and expenses accrued or incurred subsequent to the Petition Date or any contingent or unliquidated claims or rights of Highland set forth herein; (b) file additional proofs of claim; and (c) against third parties.

    5.    <u>Notices</u>: All notices to Highland are to be sent to:

    Highland Capital Management, L.P.
    Attn: David Klos
    300 Crescent Court
    Suite 700
    Dallas, Texas 75201

    *with copies to:*

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15   Exhibit 6   Page 1094/051804   Page 221 of 1017   PageID 14865
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1093 of 1803   PageID 11839
Case 18-30265-sgj11   Doc 53   Part 2-5   Filed 08/01/18   Desc Exhibit A   Page 5 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

Foley Gardere
Foley & Lardner, LLP
c/o Holland O'Neil
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201

6.   Payments:  All payments and distributions to Highland with respect to this proof

of claim are to be made as follows:

Highland Capital Management, L.P.
Attn: David Klos
300 Crescent Court
Suite 700
Dallas, Texas 75201
Re: *In re Acis Capital Management, L.P.*

7.   Miscellaneous:  This proof of claim is filed under compulsion of the bar date

established in this bankruptcy case solely out of an abundance of caution to protect Highland

from forfeiture of its claim within this bankruptcy proceeding. The amounts set forth in this

proof of claim shall not be construed as an admission by Highland as to the amounts due and

owing outside of this bankruptcy proceeding. The filing of this proof of claim is **not:**  (a) a

waiver or release of and/or Highland's rights or remedies against any person, entity or property;

(b) a consent by Highland to entry of final judgment by this Court in any core proceeding

commenced in this bankruptcy case, consistent with the United States Supreme Court's holding

in *Stern v. Marshall*, 131 S. Ct. 2594 (2011); (c) a waiver of the right to move to withdraw the

reference or otherwise challenge the jurisdiction of this Court; (d) a waiver of the right to a jury

trial; (e) an election of a remedy which waives or otherwise affects any other remedy; or (f) a

waiver of the right to assert a different or enhanced classification of priority for its Claim in

respect of the other claims asserted in this bankruptcy case.

EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND
4820-3752-6894.1

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 1095/051804 Page 222 of 1017    PageID 14866
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1094 of 1803   PageID 11840

**EXECUTION VERSION**

**THIRD AMENDED AND RESTATED SUB-ADVISORY AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

**Appellee Appx. 01088**

**Appx. 01539**
013901

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 1096/251804   Page 223 of 1017   PageID 14867
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1095 of 1803   PageID 11841
Case 18-30265-sgj11   Doc 359-3   Filed 08/01/21   Desc Exhibit 1   Page 2 of 21

# TABLE OF CONTENTS

                                                                                    Page

1.    Appointment; Limited Scope of Services .......................................................... 1

2.    Compensation .......................................................................................................... 3

3.    Representations and Warranties............................................................................ 3

4.    Standard of Care; Liability; Indemnification. ..................................................... 4

5.    Limitations on Employment of the Sub-Advisor; Conflicts of Interest. ............ 7

6.    Termination; Survival ............................................................................................ 8

7.    Cooperation with Management Company ............................................................. 8

8.    Management Agreements and Related Agreements ............................................ 8

9.    Amendments; Assignments .................................................................................... 9

10.   Advisory Restrictions.............................................................................................. 9

11.   Records; Confidentiality. ...................................................................................... 10

12.   Notice ...................................................................................................................... 11

13.   Governing Law ...................................................................................................... 11

14.   WAIVER OF JURY TRIAL .................................................................................. 11

15.   Severability ............................................................................................................ 11

16.   No Waiver .............................................................................................................. 11

17.   Counterparts........................................................................................................... 12

18.   Third Party Beneficiaries .................................................................................... 12

19.   No Partnership or Joint Venture ......................................................................... 12

20.   Entire Agreement .................................................................................................. 12

Appellee Appx. 01089
013902

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1096 of 1804    Page 224 of 1017    PageID 14868
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1096 of 1803    PageID 11842
Case 18-30265-sgj11    Doc 3-3    Filed 08/01/21    Desc Exhibit 21    Page 3 of 21

**THIRD AMENDED AND RESTATED
SUB-ADVISORY AGREEMENT**

This Third Amended and Restated Sub-Advisory Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the sub-advisor hereunder (in such capacity, the "Sub-Advisor" and together with the Management Company, the "Parties").

**R E C I T A L S**

WHEREAS, the Parties entered into that certain Second Amended and Restated Sub-Advisory Agreement dated July 29, 2016 to be effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Management Company from time to time has entered and will enter into portfolio management agreements, investment management agreements and/or similar agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Management Agreement") and related indentures, credit agreements, collateral administration agreements, service agreements or other agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Related Agreement"), in each case as set forth on Appendix A hereto, as amended from time to time, pursuant to which the Management Company has agreed to provide portfolio and/or investment management services to certain funds and accounts and to certain collateralized loan obligation issuers and to borrowers in certain short-term or long-term warehouse or repurchase facilities in connection therewith (any such transaction, a "Transaction", any fund, account, issuer, warehouse borrower or repurchase agreement seller in respect of any such Transaction, an "Account", and the assets collateralizing each such Transaction and/or comprising the portfolio of such Account, a "Portfolio");

WHEREAS, the Management Company and the Sub-Advisor desire to enter into this Agreement in order to permit the Sub-Advisor to provide certain limited services to assist the Management Company in performing certain obligations under the Management Agreements and Related Agreements;

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, and the receipt of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

1.    Appointment; Limited Scope of Services.

(a)    Highland is hereby appointed as Sub-Advisor to the Management Company for the purpose of assisting the Management Company in managing the Portfolios of each Account

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1096/251804    Page 225 of 1017    PageID 14869
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1097 of 1803    PageID 11843
Case 18-30264-sgj11    Doc 813    Part 3 59    Filed 08/01/11/21/De    Schedul 183 of 5    Page 4 of 21

pursuant to the related Management Agreement and Related Agreements, in each case that have been included in the scope of this Agreement pursuant to the provisions of Section 8, subject to the terms set forth herein and subject to the supervision of the Management Company, and Highland hereby accepts such appointment.

(b)    Without limiting the generality of the foregoing, the Sub-Advisor shall, during the term and subject to the provisions of this Agreement:

(i)    make recommendations to the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account as to the general composition and allocation of the Portfolio with respect to such Account among various types of securities, the nature and timing of the changes therein and the manner of implementing such changes, including recommendations as to the specific loans and other assets to be purchased, retained or sold by any such Account;

(ii)    place orders with respect to, and arrange for, any investment by or on behalf of such Account (including executing and delivering all documents relating to such Account's investments on behalf of such Account or the Management Company, as applicable), upon receiving a proper instruction from the Management Company;

(iii)    identify, evaluate, recommend to the Management Company, in its capacity as portfolio manager for such Account, and, if applicable, negotiate the structure and/or terms of investment opportunities within the specific investment strategy of the Management Company for such Account;

(iv)    assist the Management Company in its capacity as portfolio manager for such Account in performing due diligence on prospective Portfolio investments by such Account;

(v)    provide information to the Management Company in its capacity as portfolio manager for such Account regarding any investments to facilitate the monitoring and servicing of such investments and, if requested by the Management Company, provide information to assist in monitoring and servicing other investments by such Account

(vi)    assist and advise the Management Company in its capacity as portfolio manager for such Account with respect to credit functions including, but not limited to, credit analysis and market research and analysis; and

(vii)    assist the Management Company in performing any of its other obligations or duties as portfolio manager for such Account.

The foregoing responsibilities and obligations are collectively referred to herein as the "Services."

Notwithstanding the foregoing, all investment decisions will ultimately be the responsibility of, and will be made by and at the sole discretion of, the Management Company.  Furthermore, the

Appellee Appx. 01091
Appx. 013904
013904

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-5   Exhibit 6   Page 1099/351804   Page 226 of 1017   PageID 14870
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1098 of 1803   PageID 11844
Case 18-30264-sgj11   Doc 3113-3   Part 3   Filed 08/01/18   Desc Exhibit 14   Page 5 of 21

parties acknowledge and agree that the Sub-Advisor shall be required to provide only the services expressly described in this Section 1(b), and shall have no responsibility hereunder to provide any other services to the Management Company or any Transaction, including, but not limited to, administrative, management or similar services.

(c)     The Sub-Advisor agrees during the term hereof to furnish the Services on the terms and conditions set forth herein and subject to the limitations contained herein. The Sub-Advisor agrees that, in performing the Services, it will comply with all applicable obligations of the Management Company set forth in the Management Agreements and the Related Agreements. In addition, with respect to any obligation that would be part of the Services but for the fact that the relevant Management Agreement or Related Agreement does not permit such obligation to be delegated by the Management Company to the Sub-Advisor, the Sub-Advisor, upon request in writing by the Management Company, shall work in good faith with the Management Company and shall use commercially reasonable efforts to assist the Management Company in satisfying all such obligations.

2.     <u>Compensation</u>.

(a)     As compensation for its performance of its obligations as Sub-Advisor under this Agreement in respect of any Transaction, the Sub-Advisor will be entitled to receive the Sub-Advisory Fee payable thereto. The "<u>Sub-Advisory Fee</u>" shall be payable in accordance with <u>Appendix A</u> attached hereto, as such appendix may be amended by the Parties from time to time.

(b)     Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Sub-Advisor for any and all costs and expenses that are properly Company Expenses or that may be borne by the Management Company under the Management Company LLC Agreement.

(c)     Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any and all amounts payable to the Sub-Advisor pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

(d)     From time to time, the Management Company may enter into sub-advisory agreements with certain management companies on similar terms to this Agreement. Promptly following the receipt of any fees pursuant to such sub-advisory agreements, the Management Company shall pay 100% of such fees to the Sub-Advisor.

3.     <u>Representations and Warranties</u>.

(a)     Each of the Management Company and the Sub-Advisor represents and warrants, as to itself only, that:

(i)     it has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

Appellee Appx. 01092
Appx. 01145
013905

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 110 of 1804    Page 227 of 1017    PageID 14871
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1099 of 1803    PageID 11845
Case 18-30264-sgj11    Doc 3-5    Filed 08/01/21    Desc Exhibit 5    Page 6 of 21

(ii)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(iii)    no consent, approval, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other person or entity is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(iv)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (A) its constituting and organizational documents; (B) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound; (C) any statute applicable to it; or (D) any law, decree, order, rule or regulation applicable to it of any court or regulatory, administrative or governmental agency, body of authority or arbitration having or asserting jurisdiction over it or its properties, which, in the case of clauses (B) through (D) above, would have a material adverse effect upon the performance of its duties hereunder.

(b)    The Sub-Advisor represents and warrants to the Management Company that it is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

(c)    The Management Company acknowledges that it has received Part 2 of Highland Capital Management, L.P.'s Form ADV filed with the Securities and Exchange Commission. The Sub-Advisor will provide to the Management Company an updated copy of Part 2 of its Form ADV promptly upon any amendment to such Form ADV being filed with the Securities and Exchange Commission.

4.    Standard of Care; Liability; Indemnification.

(a)    Sub-Advisor Standard of Care. Subject to the terms and provisions of this Agreement, the Management Agreements and/or the Related Agreements, as applicable, the Sub-Advisor will perform its obligations hereunder and under the Management Agreements and/or the Related Agreements in good faith with reasonable care using a degree of skill and attention no less than that which the Sub-Advisor uses with respect to comparable assets that it manages for others and, without limiting the foregoing, in a manner which the Sub-Advisor reasonably believes to be consistent with the practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Portfolios, in each case except as expressly provided otherwise under this Agreement, the Management Agreements and/or the

4

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 11/06/251804    Page 228 of 1017    PageID 14872
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1100 of 1803    PageID 11846
Case 18-30268-sgj11    Doc 3596-6    Filed 08/01/21    Desc Exhibit 6    Page 7 of 21

Related Agreements. To the extent not inconsistent with the foregoing, the Sub-Advisor will follow its customary standards, policies and procedures in performing its duties hereunder, under the Management Agreements and/or under the Related Agreements.

(b)        Exculpation. To the fullest extent permitted by law, none of the Sub-Advisor, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)) (each a "Covered Person") will be liable to the Management Company, any Member, any shareholder, partner or member thereof, any Account (or any other adviser, agent or representative thereof), or to any holder of notes, securities or other indebtedness issued by any Account (collectively, the "Management Company Related Parties"), for (i) any acts or omissions by such Covered Person arising out of or in connection with the provision of the Services hereunder, for any losses that may be sustained in the purchase, holding or sale of any security or debt obligation by any Account, or as a result of any activities of the Sub-Advisor, the Management Company or any other adviser to or agent of the Account or any other sub-advisor appointed by the Management Company to provide portfolio management services to any other delegatee of the Management Company or any other person or entity, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of the Sub-Advisor, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of the Sub-Advisor with reasonable care, or (iii) any consequential (including loss of profit), indirect, special or punitive damages. To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to any Management Company Related Party, no Covered Person acting under this Agreement shall be liable to such Management Company Related Party for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to any Management Company Related Party solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to any such Management Company Related Party, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to any Management Company Related Party in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care

Appellee Appx. 01094
Appx. 013907

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16   Filed 11/08/25   Page 229 of 1017   PageID 14873
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1101 of 1803   PageID 11847
Case 18-30264-sgj11   Doc 813   Part 3   Filed 08/01/18   Desc Exhibit 17   Page 8 of 21

(c)    <u>Indemnification</u>.  The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the Services, the activities of the Management Company Related Parties, or activities undertaken in connection with the Management Company Related Parties, or otherwise relating to or arising out of this Agreement, any Management Agreement and/or the Related Documents, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "<u>Proceeding</u>"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "<u>Damages</u>"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person.  The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder.  The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives.  Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this <u>Section 4(c)</u> shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this <u>Section 4(c)</u> to the fullest extent permitted by law

(d)    <u>Other Sources of Recovery etc</u>.  The indemnification rights set forth in <u>Section 4(c)</u> are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled.  If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 11/08/25 1804   Page 230 of 1017   PageID 14874
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1102 of 1803   PageID 11848
Case 18-30264-sgj11   Doc 513   Part 3 59 Filed 08/01/21   Desc Exhibit 18 of 54   Page 9 of 21

indemnification from any Person in which any of the Transactions has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained

(e)     <u>Rights of Heirs, Successors and Assigns</u>.   The indemnification rights provided by <u>Section 4(c)</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person

(f)     <u>Reliance</u>.   A Covered Person shall incur no liability to any Management Company Related Party in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge.   Each Covered Person may act directly or through his, her or its agents or attorneys.

(g)     <u>Rights Under Management Agreements and Related Agreements</u>.   The Management Company will ensure that the Sub-Advisor is provided substantially similar indemnification and exculpation rights as are afforded to the Management Company in its role as portfolio manager under any future Management Agreement or Related Agreement encompassed within the Services hereunder, and it is expressly acknowledged by the Parties that the Sub-Advisor may not consent to including a Management Agreement and the related Transaction and Related Agreements within the scope of this Agreement pursuant to <u>Section 8</u> if such indemnification and exculpation rights are not reasonably acceptable to it.

5.     <u>Limitations on Employment of the Sub-Advisor; Conflicts of Interest</u>.

(a)     The services of the Sub-Advisor to the Management Company are not exclusive, and the Sub-Advisor may engage in any other business or render similar or different services to others including, without limitation, the direct or indirect sponsorship or management of other Transactions, investment-based accounts or commingled pools of capital, however structured, having investment objectives similar to those of the Management Company or the Accounts. Moreover, nothing in this Agreement shall limit or restrict the right of any manager, partner, officer or employee of the Sub-Advisor to engage in any other business or to devote his or her time and attention in part to any other business, whether of a similar or dissimilar nature to the Management Company or any Account, or to receive any fees or compensation in connection therewith.

(b)     So long as this Agreement or any extension, renewal or amendment of this Agreement remains in effect, the Sub-Advisor shall be the only portfolio management sub-advisor for the Management Company.  The Sub-Advisor assumes no responsibility under this Agreement other than to render the services called for hereunder.  It is understood that directors, officers, employees, members and managers of the Management Company are or may become interested in the Sub-Advisor and its Affiliates as directors, officers, employees, partners, stockholders, members, managers or otherwise, and that the Sub-Advisor and directors, officers, employees,

7

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16    Exhibit 6    Page 11/06/25 1804    Page 231 of 1017    PageID 14875
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1103 of 1803    PageID 11849
Case 18-30265-sgj11 1239-68 13 Part 159 Filed 02/01/21 Desc Exhibit 10 of 54 Page 10 of
21

partners, stockholders, members and managers of the Sub-Advisor and its Affiliates are or may become similarly interested in the Management Company as members or otherwise.

(c)    The Management Company acknowledges that various potential and actual conflicts of interest may exist with respect to the Sub-Advisor as described in the Sub-Advisor's Form ADV Part 2A and as described in <u>Appendix B</u> hereto, and the Management Company expressly acknowledges and agrees to the provisions contained in such <u>Appendix B</u>, as amended from time to time with mutual consent of the Parties.

6.    <u>Termination; Survival</u>.

(a)    This Agreement may be terminated, in its entirety or with respect to any Management Agreement, at any time without payment of penalty, by the Management Company upon 30 days' prior written notice to the Sub-Advisor.

(b)    This Agreement shall terminate automatically with respect to any Management Agreement on the date on which (i) such Management Agreement has been terminated (and, if required thereunder, a successor portfolio manager has been appointed and accepted) or discharged; or (ii) the Management Company is no longer acting as portfolio manager, investment manager or in a similar capacity (whether due to removal, resignation or assignment) under such Management Agreement and the Related Agreements.  Upon the termination of this Agreement with respect to any Management Agreement the Management Company shall provide prompt notice thereof to the Sub-Advisor, and <u>Appendix A</u> hereto shall be deemed to be amended by deleting such Management Agreement and the Related Agreements related thereto.

(c)    All accrued and unpaid financial and indemnification obligations with respect to any conduct or events occurring prior to the effective date of the termination of this Agreement shall survive the termination of this Agreement.

7.    <u>Cooperation with Management Company</u>.  The Sub-Advisor shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Sub-Advisor.  Specifically, the Sub-Advisor agrees that it will provide the Management Company with reasonable access to information relating to the performance of Sub-Advisor's obligations under this Agreement.

8.    <u>Management Agreements and Related Agreements</u>.  The Sub-Advisor's duty to provide Services in connection with any Management Agreement shall not commence until (a) Appendix A to this Agreement has been amended by mutual agreement of the Parties to include such Management Agreement and the related Account, fund and/or account and Related Agreements and (b) the Sub-Advisor acknowledges receipt of such Management Agreement and each Related Agreement.  The Sub-Advisor shall not be bound to comply with any amendment, modification, supplement or waiver to any Management Agreement or any Related Agreement until it has received a copy thereof from the Management Company.  No amendment, modification, supplement or waiver to any Management Agreement or Related Agreement that, when applied to the obligations and rights of the Management Company under such Management Agreement or Related Agreement, affects (i) the obligations or rights of the Sub-Advisor hereunder; (ii) the amount of priority of any fees or other amounts payable to the Sub-Advisor hereunder; or (iii) any

Appellee Appx. 01097
013910

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 11/05/251804    Page 232 of 1017    PageID 14876
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1104 of 1803    PageID 11850
Case 18-30265-sgj11  Doc 613  Part 159-5 Filed 08/01/21/19 Desc Page 20 of 54 Page 11 of
21

definitions relating to the matters covered in clause (i) or (ii) above, will apply to the Sub-Advisor under this Agreement unless in each such case the Sub-Advisor has consented thereto in writing (such consent not to be unreasonably withheld or delayed unless the Sub-Advisor determines in its reasonable judgment that such amendment, modification, supplement or waiver could have a material adverse effect on the Sub-Advisor).

9.    <u>Amendments; Assignments</u>.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in <u>clauses (b)</u> and <u>(c)</u> of this <u>Section 9</u>, without the prior written consent of the other Party and (ii) in accordance with the Advisers Act and other applicable law.

(b)    Except as otherwise provided in this <u>Section 9</u>, the Sub-Advisor may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with the Advisers Act and other applicable law.

(c)    The Sub-Advisor may, without satisfying any of the conditions of <u>Section 9(a)</u> other than clause (ii) thereof (so long as such assignment does not constitute an assignment within the meaning of Section 202(a)(1) of the Advisers Act), (1) assign any of its rights or obligations under this Agreement to an affiliate; *provided* that such affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Sub-Advisor pursuant to this Agreement and (ii) has the legal right and capacity to act as Sub-Advisor under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Sub-Advisor under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Sub-Advisor in another corporate or similar form and has substantially the same staff; provided, further, that the Sub-Advisor shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Sub-Advisor will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

10.    <u>Advisory Restrictions</u>.  This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any Management Agreement or any part thereof.  It is the express intention of the parties hereto that (i) the Services are limited in scope; and (ii) this Agreement complies in all respects with all applicable (A) contractual provisions and restrictions contained in each Management Agreement and each Related Agreement and (B) laws, rules and regulations (collectively, the "<u>Advisory Restrictions</u>").  If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the Services to be provided under this Agreement shall automatically without action by any person or entity be limited, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Appellee Appx. 01098
Appx. 01840
013911

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 106/06/251804   Page 233 of 1017   PageID 14877
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1105 of 1803   PageID 11851
Case 18-30265-sgj11   Doc 13   Part 159   Filed 09/01/18   Desc Exhibit 11-4   Page 12 of
21

11. <u>Records; Confidentiality</u>.

(a)     The Sub-Advisor shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; provided, that the Sub-Advisor shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

(b)     The Sub-Advisor shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Sub-Advisor hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued in connection with a Transaction or supplying credit estimates on any obligation included in the Portfolios, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Account for which the Management Company serves as portfolio manager, (iv) as required by (A) applicable law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Sub-Advisor or any of its affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Sub-Advisor on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Sub-Advisor may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Transaction, or (ix) information relating to performance of the Portfolios as may be used by the Sub-Advisor in the ordinary course of its business.  Notwithstanding the foregoing, it is agreed that the Sub-Advisor may disclose without the consent of any Person (1) that it is serving as Sub-Advisor to the Management Company and each Account, (2) the nature, aggregate principal amount and overall performance of the Portfolios, (3) the amount of earnings on the Portfolios, (4) such other information about the Management Company, the Portfolios and the Transactions as is customarily disclosed by Sub-Advisors to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Sub-Advisor, the Management Company, the Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 16-15    Filed 11/07/25    Page 234 of 1017    PageID 14878
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1106 of 1803   PageID 11852
Case 18-30265-sgj11   Doc 659-5   Filed 08/01/21   Desc Exhibit 22   Page 13 of 21

12.    <u>Notice</u>.  Any notice or demand to any party to this Agreement to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail, facsimile or email transmission or by delivering it by hand as follows (or to such other address, email address or facsimile number as shall have been notified to the other parties hereto):

       (a)    If to the Management Company:

         Acis Capital Management, L.P.
         300 Crescent Court
         Suite 700
         Dallas, TX 75201

       (b)    If to the Sub-Advisor:

         Highland Capital Management, L.P.
         300 Crescent Court
         Suite 700
         Dallas, TX 75201

13.    <u>Governing Law</u>.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.  The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

14.    <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

15.    <u>Severability</u>.  The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties.

16.    <u>No Waiver</u>.  The performance of any condition or obligation imposed upon any party hereunder may be waived only upon the written consent of the parties hereto.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other party under this Agreement.  Any failure by any party to this Agreement to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Appellee Appx. 01100
Appx. 01851
013913

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-16    Page 11/08/25 1804    Page 235 of 1017    PageID 14879
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1107 of 1803    PageID 11853
Case 18-30265-sgj11 Doc 2239-6 Part 59-5 Filed 08/01/21 Desc Exhibit 20 of 54 Page 14 of
21

17.     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

18.     <u>Third Party Beneficiaries</u>.  Nothing in this Agreement will be construed to give any person or entity other than the parties to this Agreement, the Accounts and any person or entity with indemnification rights hereunder any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.  Except as provided in the foregoing sentence, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

19.     <u>No Partnership or Joint Venture</u>.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the parties.  Except as expressly provided herein or in any other written agreement between the parties, no party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other party.

20.     <u>Entire Agreement</u>.  This Agreement, together with each Management Agreement and Related Agreement, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter.

[Remainder of Page Intentionally Left Blank]

Appellee Appx. 01101

013914

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-9   Filed 11/06/25   Page 236 of 1017   PageID 14880
Exhibit 6   Page 1109 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1108 of 1803   PageID 11854
Case 18-30264-sgj11   Doc 1239-13   Part 3   Filed 02/01/21   Desc Exhibit 24 of 54   Page 15 of
21

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By: _____

Name: James Dondero

Title:   President

**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By: _____

Name: James Dondero

Title:  President

*Signature Page to Third Amended and Restated Sub-Advisory Agreement*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 59-6    Page 11/06/25 1804 Page 237 of 1017    PageID 14881
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1109 of 1803    PageID 11855

## Appendix A

The Management Company shall pay to the Sub-Advisor a Sub-Advisory Fee for the
Services for the Accounts in an amount equal to the aggregate management fees that would be
received by the Management Company for such Accounts if such management fees were
calculated in exact conformity with the calculation of management fees for such Accounts, except
that the management fee rates applied in such calculation were replaced by the fee rate set forth in
the following table. Such fees shall be payable promptly (or at such time as is otherwise agreed
by the parties) following the Management Company's receipt of management fees for such
Accounts, it being understood that none of the foregoing shall prohibit the Management Company
from waiving or entering into side letters with respect to management fees for such Accounts;
provided that any such waived or reduced amounts shall not be recognized for purposes of
calculating the fees payable by the Management Company hereunder. Notwithstanding the
foregoing, the parties may agree to a different allocation from that set forth during any period in
order to reflect the then current fair market value of the Services rendered.


[*Remainder of Page Intentionally Left Blank*]

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 18-15   Page 11/06/251804   Page 238 of 1017   PageID 14882
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1110 of 1803   PageID 11856
Case 18-30265-sgj11   Doc 1239-6   Filed 01/11/21   Desc Exhibit D Part 3   Page 26 of 54   Page 17 of 21

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Sub-Advisory Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 20 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 20 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 20 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | February 25, 2014 | 20 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | June 5, 2014 | 20 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | November 18, 2014 | 20 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | April 16, 2015 | 20 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 20 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

Appellee Appx. 01104

013917
Appx. 01855

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Exhibits   Page 11/08/25   Page 239 of 1017   PageID 14883
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1111 of 1803   PageID 11857
Case 18-30265-sgj11   Doc 3513   Part 359   Filed 02/01/21   Desc Exhibit 27   Page 18 of
21

## APPENDIX B

<u>Purchase and Sale Transactions; Brokerage</u>

The Management Company acknowledges and agrees that the Sub-Advisor or any of its affiliates may acquire or sell obligations or securities, for its own account or for the accounts of its customers, without either requiring or precluding the acquisition or sale of such obligations or securities for the account of any Account. Such investments may be the same or different from those made by or on behalf of the Management Company or the Accounts.

<u>Additional Activities of the Sub-Advisor</u>

Nothing herein shall prevent the Sub-Advisor or any of its clients, its partners, its members, funds or other investment accounts managed by it or any of its affiliates, or their employees and their affiliates (collectively, the "<u>Related Entities</u>"), from engaging in other businesses, or from rendering services of any kind to the Management Company, its affiliates, any Account or any other Person or entity regardless of whether such business is in competition with the Management Company, its affiliates, such Account or otherwise. Without limiting the generality of the Sub-Advisor and its Related Entities may:

(a)    serve as managers or directors (whether supervisory or managing), officers, employees, partners, agents, nominees or signatories for the Management Company or any affiliate thereof, or for any obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof, to the extent permitted by their respective organizational documents and underlying instruments, as from time to time amended, or by any resolutions duly adopted by the Management Company, any Account, their respective affiliates or any obligor or issuer in respect of any of the Portfolio Assets (or any affiliate thereof) pursuant to their respective organizational documents;

(b)    receive fees for services of whatever nature rendered to the obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof;

(c)    be retained to provide services unrelated to this Agreement to the Management Company, any Account or their respective affiliates and be paid therefor, on an arm's-length basis;

(d)    be a secured or unsecured creditor of, or hold a debt obligation of or equity interest in, the Management Company, any Account or any affiliate thereof or any obligor or issuer of any Portfolio Asset or any affiliate thereof;

(e)    sell any Portfolio Asset to, or purchase or acquire any Portfolio Asset from, any Account while acting in the capacity of principal or agent; *provided, however*, that any such sale or purchase effected by the Sub-Advisor shall be subject to applicable law and any applicable provisions of this Agreement, the related Management Agreement and Related Agreements, as applicable;

(f)    underwrite, arrange, structure, originate, syndicate, act as a distributor of or make a market in any Portfolio Asset;

Appellee Appx. 01105
Appx. 01856
013918

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Exhibit 6    Page 11/08/25 1804   Page 240 of 1017    PageID 14884
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21      Page 1112 of 1803   PageID 11858
Case 18-30265-sgj11   Doc 3-13   Part 159   Filed 01/11/21   Desc Exhibit A   Page 19 of
21

(g)      serve as a member of any "creditors' board", "creditors' committee" or similar creditor group with respect to any Portfolio Asset; or

(h)      act as portfolio manager, portfolio manager, investment manager and/or investment adviser or sub-advisor in collateralized bond obligation vehicles, collateralized loan obligation vehicles and other similar warehousing, financing or other investment vehicles.

As a result, such individuals may possess information relating to obligors and issuers of Portfolio Assets that is (a) not known to or (b) known but restricted as to its use by the individuals at the Sub-Advisor responsible for monitoring the Portfolio Assets and performing the Services under this Agreement. Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Management Company and/or any Account and otherwise create conflicts of interest for the Management Company and/or any Account. The Management Company acknowledges and agrees that, in all such instances, the Sub-Advisor and its affiliates may in their discretion make investment recommendations and decisions that may be the same as or different from those made by the Management Company with respect to the investments of any Account and they have no duty, in making or managing such investments, to act in a way that is favorable to any Account.

The Management Company acknowledges that there are generally no ethical screens or information barriers between the Sub-Advisor and certain of its affiliates of the type that many firms implement to separate Persons who make investment decisions from others who might possess applicable material, non-public information that could influence such decisions. The officers or affiliates of the Sub-Advisor may possess information relating to obligors or issuers of Portfolio Assets that is not known to the individuals at the Sub-Advisor responsible for providing the Services under this Agreement. As a result, the Sub-Advisor may from time to time come into possession of material nonpublic information that limits the ability of the Sub-Advisor to effect a transaction for the Management Company and/or any Account, and the Management Company and/or such Account's investments may be constrained as a consequence of the Sub-Advisor's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Management Company and/or such Account.

Unless the Sub-Advisor determines in its sole discretion that such Transaction complies with the conflicts of interest provisions set forth in the applicable Management Agreement and Related Agreements, he Sub-Advisor will not direct any Account to acquire or sell loans or securities entered into or issued by (i) Persons of which the Sub-Advisor, any of its affiliates or any of its officers, directors or employees are directors or officers, (ii) Persons of which the Sub-Advisor or any of its respective affiliates act as principal or (iii) Persons about which the Sub-Advisor or any of its affiliates have material non-public information which the Sub-Advisor deems would prohibit it from advising as to the trading of such securities in accordance with applicable law.

It is understood that the Sub-Advisor and any of its affiliates may engage in any other business and furnish investment management and advisory services to others, including Persons which may have investment policies similar to those followed by the Management Company with respect to the Portfolio Assets and which may own securities or obligations of the same class, or which are of the same type, as the Portfolio Assets or other securities or obligations of the obligors or issuers of the Portfolio Assets. The Sub-Advisor and its affiliates will be free, in their sole discretion, to

Appellee Appx. 01106
Appx. 01857
013919

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 11/04/251804  Page 241 of 1017    PageID 14885
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1113 of 1803    PageID 11859
Case 18-30265-sgj11 23-03163 Doc 159-5 Filed 08/01/21 Desc 1/19 Exhibit 20 of 54 Page 20 of
21

make recommendations to others, or effect transactions on behalf of themselves or for others, which may be the same as or different from those effected with respect to the Collateral. Nothing in this Agreement, in the Management Agreements or in the Related Agreements shall prevent the Sub-Advisor or any of its affiliates, acting either as principal or agent on behalf of others, from buying or selling, or from recommending to or directing any other account to buy or sell, at any time, securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same obligor or issuer, as those directed by the Sub-Advisor to be purchased or sold on behalf of an Account. It is understood that, to the extent permitted by applicable law, the Sub-Advisor, its Related Entities, or any of their owners, directors, managers, officers, stockholders, members, partners, partnership committee members, employees, agents or affiliates or the other Covered Persons or any member of their families or a Person or entity advised by the Sub-Advisor may have an interest in a particular transaction or in securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same issuer, as those that may be owned or acquired by an Account. The Management Company agrees that, in the course of providing the Services, the Sub-Advisor may consider its relationships with other clients (including obligors and issuers) and its affiliates.

The Management Company agrees that neither the Sub-Advisor nor any of its affiliates is under any obligation to offer any investment opportunity of which they become aware to the Management Company or any Account or to account to the Management Company or any Account for (or share with the Management Company or any Account or inform the Management Company or any Account of) any such transaction or any benefit received by them from any such transaction. The Management Company understands that the Sub-Advisor and/or its affiliates may have, for their own accounts or for the accounts of others, portfolios with substantially the same portfolio criteria as are applicable to the Accounts. Furthermore, the Sub-Advisor and/or its affiliates may make an investment on behalf of any client or on their own behalf without offering the investment opportunity or making any investment on behalf of the Management Company or any Account and, accordingly, investment opportunities may not be allocated among all such clients. The Management Company acknowledges that affirmative obligations may arise in the future, whereby the Sub-Advisor and/or its affiliates are obligated to offer certain investments to clients before or without the Sub-Advisor offering those investments to the Management Company or any Account.

The Management Company acknowledges that the Sub-Advisor and its affiliates may make and/or hold investments in an obligor's or issuer's obligations or securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's obligations or securities made and/or held by the Management Company or any Account, or in which partners, security holders, members, officers, directors, agents or employees of the Sub-Advisor and its affiliates serve on boards of directors, or otherwise have ongoing relationships or otherwise have interests different from or adverse to those of the Management Company and the Accounts.

<u>Defined Terms</u>

For purposes of this <u>Appendix B</u>, the following defined terms shall have the meanings set forth below:

"<u>Portfolio</u>" shall mean, with respect to any Account and/or Transaction, the assets held by or in the name of the Account or any subsidiary of the Account in respect of such Transaction,

Appellee Appx. 01107
Appx. 01358
013920

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Exhibit 6   Page 11/05/05 1804   Page 242 of 1017   PageID 14886
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1114 of 1803   PageID 11860
Case 18-30265-sgj11   Doc 1239-59   Filed 08/01/19   Desc Exhibit 59   Part 559 Page 80 of 54   Page 21 of 21

whether or not for the benefit of the related secured parties, securing the obligations of such Account.

"Portfolio Asset" shall mean any loan, eligible investment or other asset contained in the Portfolio.

"Transaction" shall mean any action taken by the Sub-Advisor on behalf of any Account with respect to the Portfolio, including, without limitation, (i) selecting the Portfolio Assets to be acquired by the Account, (ii) investing and reinvesting the Portfolio, (iii) amending, waiving and/or taking any other action commensurate with managing the Portfolio and (iv) instructing the Account with respect to any acquisition, disposition or tender of a Portfolio Asset or other assets received in respect thereof in the open market or otherwise by the Account.

Appellee Appx. 01108
Appx. 01350
013921

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-9    Page 11/06/25 1804    Page 243 of 1017    PageID 14887
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1115 of 1803   PageID 11861

**EXECUTION VERSION**

**FOURTH AMENDED AND RESTATED SHARED SERVICES AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 11/06/25 1804    Page 244 of 1017    PageID 14888
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1116 of 1803    PageID 11862
Case 18-30265-sgj11    Doc 513    Part 459    Filed 08/01/21    Desc Exhibit 22 of 54    Page 2 of 24

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ................................................................................ 2

    Section 1.01    Certain Defined Terms .................................................... 2

    Section 1.02    Interpretation ................................................................ 3

ARTICLE II SERVICES ................................................................................... 4

    Section 2.01    General Authority. ......................................................... 4

    Section 2.02    Provision of Services. .................................................... 4

    Section 2.03    Shared Employees. ........................................................ 6

    Section 2.04    Applicable Asset Criteria and Concentrations. ................. 8

    Section 2.05    Compliance with Management Company Policies and
                      Procedures. .................................................................. 8

    Section 2.06    Authority. .................................................................... 8

    Section 2.07    Third Parties. ................................................................ 9

    Section 2.08    Management Company to Cooperate with the Staff and
                      Services Provider. ......................................................... 9

    Section 2.09    Power of Attorney. ........................................................ 9

ARTICLE III CONSIDERATION AND EXPENSES ............................................. 9

    Section 3.01    Consideration ................................................................ 9

    Section 3.02    Costs and Expenses ..................................................... 10

    Section 3.03    Deferral ..................................................................... 10

ARTICLE IV REPRESENTATIONS AND COVENANTS ..................................... 10

    Section 4.01    Representations ........................................................... 10

ARTICLE V COVENANTS .............................................................................. 10

    Section 5.01    Compliance; Advisory Restrictions. ............................... 10

    Section 5.02    Records; Confidentiality. .............................................. 11

ARTICLE VI EXCULPATION AND INDEMNIFICATION .................................... 12

    Section 6.01    Standard of Care ......................................................... 12

    Section 6.02    Exculpation. ............................................................... 12

    Section 6.03    Indemnification by the Management Company. ............... 13

    Section 6.04    Other Sources of Recovery etc .................................... 14

    Section 6.05    Rights of Heirs, Successors and Assigns .......................... 14

    Section 6.06    Reliance. .................................................................... 14

Appellee Appx. 01110

013923

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-9   Page 11/08/251804   Page 245 of 1017   PageID 14889
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1117 of 1803   PageID 11863
Case 18-30265-sgj11   Doc 653   Part 459   Filed 06/11/21   Desc Exhibit 2 of 54   Page 3 of 24

**TABLE OF CONTENTS**
(continued)

<div align="right">**Page**</div>

ARTICLE VII TERMINATION ................................................................................ 14

    Section 7.01    Termination ......................................................................... 14

ARTICLE VIII MISCELLANEOUS ........................................................................ 15

    Section 8.01    Amendments ........................................................................ 15

    Section 8.02    Assignment and Delegation. ............................................... 15

    Section 8.03    Non-Recourse; Non-Petition ............................................... 15

    Section 8.04    Governing Law. ................................................................... 16

    Section 8.05    WAIVER OF JURY TRIAL ................................................ 17

    Section 8.06    Severability ......................................................................... 17

    Section 8.07    No Waiver ........................................................................... 17

    Section 8.08    Counterparts ........................................................................ 17

    Section 8.09    Third Party Beneficiaries ................................................... 17

    Section 8.10    No Partnership or Joint Venture ......................................... 17

    Section 8.11    Independent Contractor ...................................................... 17

    Section 8.12    Written Disclosure Statement ............................................. 18

    Section 8.13    Headings ............................................................................. 18

    Section 8.14    Entire Agreement ................................................................ 18

    Section 8.15    Notices ................................................................................ 18

Appellee Appx. 01111

013924

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 11/09/25 1804    Page 246 of 1017    PageID 14890
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1118 of 1803    PageID 11864

Case 18-30265-sgj11 23-03533 Doc 459 Filed 08/01/21 Desc Page 842 of 52 Page 4 of 24

## FOURTH AMENDED AND RESTATED
## SHARED SERVICES AGREEMENT

This Fourth Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Parties entered into that certain Third Amended and Restated Shared Services Agreement dated effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company on the terms and conditions hereof;

WHEREAS, the Management Company  may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company;

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee") is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time); and

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 10/26/251804    Page 247 of 1017    PageID 14891
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1119 of 1803    PageID 11865
Case 18-30265-sgj11    Doc 459-3    Filed 08/01/21    Desc Exhibit 5    Page 5 of 24

**ARTICLE I**

**DEFINITIONS**

Section 1.01    Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"Advisers Act" shall have the meaning set forth in the Recitals to this Agreement.

"Advisory Restriction" shall have the meaning set forth in Section 5.01(b).

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.  The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Agreement" shall have the meaning set forth in the Preamble to this Agreement.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more CLOs or Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof, including the Risk Retention Rules, of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"CLO or Account" shall mean a collateralized loan obligation transaction, including any type of short-term or long-term warehouse or repurchase facility in connection therewith, or a fund or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission,

Appellee Appx. 01113
Appx. 013924
013926

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6-15    Exhibit 6    Page 11/26/25 180-4    Page 248 of 1017    PageID 14892
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1120 of 1803    PageID 11866
Case 18-30265-sgj11    Doc 13    Part 459    Filed 08/01/18    Desc Exhibit 362 of 574    Page 6 of 24

corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Highland" shall have the meaning set forth in the preamble to this Agreement.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) with respect to the Management Company, all indebtedness relating to the acquisition by the EU Originator Series of a collateral obligation that failed to settle (including any ineligible or defaulted collateral obligation) into a CLO; (e) all capital lease obligations; (f) all indebtedness guaranteed by such Person or any of its subsidiaries; (g) all capital lease obligations; (h) all indebtedness guaranteed by such Person or any of its subsidiaries.

"Management Company" shall have the meaning set forth in the preamble to this Agreement.

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a CLO or Account.

"Parties" shall have the meaning set forth in the preamble to this Agreement.

"Portfolio" means the Management Company's portfolio of collateral loan obligations, debt securities (including equity investments or subordinated securities in a CLO such as a Retention Interest), other similar obligations, preferred return notes, financial instruments, securities or other assets held directly or indirectly by, or on behalf of, the Management Company from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Staff and Services Fee" shall have the meaning set forth in Section 3.01 of this Agreement.

"Staff and Services Provider" shall have the meaning set forth in the preamble to this Agreement.

"Shared Employee" shall have the meaning set forth in the Recitals to this Agreement.

Section 1.02    Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are

Appellee Appx. 01114
Appx. 01365
013927

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 10/26/251804   Page 249 of 1017   PageID 14893
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1121 of 1803   PageID 11867
Case 18-30264-sgj11 2239-06 13 Part 4 59 Filed 08/11/21 Desc Exhibit 2 of 54 Page 7 of 24

not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01   _General Authority_.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02   _Provision of Services_.  Without limiting the generality of Section 2.1 and subject to Section 2.4 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)   _Back- and Middle-Office_: Assistance and advice with respect to back- and middle-office functions including, but not limited to, accounting, payments, operations, technology and finance;

(b)   _Legal/Compliance/Risk Analysis_.  Assistance and advice with respect to legal issues, compliance support and implementation and general risk analysis;

(c)   _Management of Collateral Obligations and CLOs and Accounts_.  Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any CLO or Account from time to time.

(d)   _Valuation_.  Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such

Appellee Appx. 01115
Appx. 01306
013928

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6315    Page 11/28/25 1804    Page 250 of 1017    PageID 14894
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1122 of 1803    PageID 11868
Case 18-30268-sgj11 22-03 Doc 459 Filed 08/01/21 Desc Exhibit 8-2 Page 8 of 24

valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(e)    *Execution and Documentation.*  Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a CLO or Account managed by the Management Company, CLO transactions involving the Management Company, and any other rights and obligations of the Management Company;

(f)    *Marketing.*  Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified CLOs or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(g)    *Reporting.*  Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any CLO or Account, including reports relating to (i) purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

(h)    *Administrative Services*.  The provision of office space, information technology services and equipment, infrastructure and other related services requested or utilized by the Management Company from time to time;

(i)    *Shared Employees*.  The provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of <u>Section 2.03</u> hereof;

(j)    *Ancillary Services*.  Assistance and advice on all things ancillary or incidental to the foregoing; and

(k)    *Other.*  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any CLO or Account or similar securitization, (c) the substantive investment management decisions with respect to any CLO or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Appellee Appx. 01116
Appx. 01507
013929

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Filed 11/26/25    Page 251 of 1017    PageID 14895
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1123 of 1803    PageID 11869
Case 18-30264-sgj11    Doc 33    Part 4    Filed 08/01/21    Desc    Exhibit 892    Page 9 of 24

Section 2.03    <u>Shared Employees</u>.

(a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  The name, location and such other matters as the Parties desire to reflect with respect to each Shared Employee shall be identified on the books and records of each of the Management Company and the Staff and Services Provider, which may be amended in writing from time to time by the Parties to add or remove any Shared Employee to reflect the employment (or lack thereof) of such employee.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  If at any time any Shared Employee (or any other person employed by the Staff and Services provider who also provides services to the Management Company) shall be terminated from employment with the Staff and Services Provider or otherwise resigns or is removed from employment with the Staff and Services Provider, then such person may only serve as a separate direct employee of the Management Company upon the approval of the Management Company.  The Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

(b)    Notwithstanding that the Shared Employees shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)    To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)    Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate

6

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 11/26/25 1804  Page 252 of 1017    PageID 14896
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1124 of 1803    PageID 11870
Case 18-30265-sgj11 229 CGS13 Doc 159-5 Filed 08/01/21/19 Desc Exhibit 2 of 54 Page 10 of
24

with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)    Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)    The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)    The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any CLO or Account, and regulators, as applicable.   To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)    The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

(i)    The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)    The Staff and Services Provider shall require that each Shared Employee:

(i)    certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)    be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)    provide services hereunder and take actions hereunder only as approved by the Management Company;

Appellee Appx. 01118
Appx. 01369
013931

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Exhibit 6   Page 11/26/25 1804   Page 253 of 1017   PageID 14897
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1125 of 1803   PageID 11871
Case 18-30265-sgj11   Doc 53   Part 459   Filed 08/01/18   Desc Exhibit 6   Page 11 of
24

    (iv) provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

    (v) to the extent authorized to transact on behalf of the Management Company or a CLO or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

    (vi) act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a CLO or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

   (k) Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

  Section 2.04 <u>Applicable Asset Criteria and Concentrations</u>. The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with <u>Section 2.2</u> above and any other assistance or advice provided in accordance with this Agreement.

  Section 2.05 <u>Compliance with Management Company Policies and Procedures</u>. The Management Company will from time to time provide the Staff and Services Provider and the Shared Employees with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

  Section 2.06 <u>Authority</u>. The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement. The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party. Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time. The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Appellee Appx. 01119
Appx. 01379
013932

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Page 11/26/251804   Page 254 of 1017   PageID 14898
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1126 of 1803   PageID 11872
Case 18-30258-sgj11   Doc 613   Part 459   Filed 08/01/21   Desc Exhibit 2   Page 12 of
24

Section 2.07    Third Parties.

    (a)    The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

    (b)    In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a CLO or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08    Management Company to Cooperate with the Staff and Services Provider. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09    Power of Attorney. If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments).    Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

### CONSIDERATION AND EXPENSES

Section 3.01    Consideration.  As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive the Staff and Services Fee payable thereto.  The "Staff and Services Fee" shall be payable in accordance with Appendix A attached hereto, as such appendix may be amended by the Parties from time to time.

From time to time, the Management Company may enter into shared services agreements with certain management companies on similar terms to this Agreement.  Promptly following the receipt of any fees pursuant to such shared services agreements, the Management Company shall pay 100% of such fees to the Staff and Services Provider.

Appellee Appx. 01120

Appx. 01137
013933

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6.15   Page 11/28/05 1804 Page 255 of 1017   PageID 14899
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1127 of 1803   PageID 11873
Case 18-30265-sgj11 Doc 3596-6 Part 459 Filed 08/01/21/19 Desc Exhibit C of 54 Page 13 of
24

Section 3.03   <u>Costs and Expenses</u>.  Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.04   <u>Deferral</u>.  Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01   <u>Representations</u>.  Each of the Parties hereto represents and warrants that:

(a)   It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)   this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)   no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)   neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01   <u>Compliance; Advisory Restrictions</u>.

(a)   The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider.  Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable

Appellee Appx. 01121
Appx. 01372
013934

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Filed 11/26/25    Page 256 of 1017    PageID 14900
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1128 of 1803    PageID 11874
Case 18-30264-sgj11    Doc 1123-13    Part 4    Filed 08/01/21    Desc Exhibit 4    Page 14 of
24

access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)    This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof.  It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions").  If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02    Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any CLO or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such

Appellee Appx. 01122
Appx. 01375
013935

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 61-5    Page 10/30/251804    Page 257 of 1017    PageID 14901
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1129 of 1803    PageID 11875
Case 18-30235-sgj11    Doc 859-6    Document 459    Filed 02/01/21/19    Desc Exhibit 6    Page 15 of
24

information as is routinely disclosed to the trustee, custodian or collateral administrator of any CLO or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such CLO or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the CLOs or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Management Vehicles, the CLOs or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01   Standard of Care.   Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder. No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account. Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

Section 6.02   Exculpation.   To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages. To

Appellee Appx. 01123
Appx. 01374
013936

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 61-5    Exhibit 6    Page 1136/251804    Page 258 of 1017    PageID 14902
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1130 of 1803    PageID 11876
Case 18-30265-sgj11    Doc 13    Part 59    Filed 02/01/18    Entered 02/01/19    Desc    Page 16 of
24

the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and
liabilities relating thereto to the Management Company or any Member, no Covered Person acting
under this Agreement shall be liable to the Management Company or to any such Member for its
good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability
to the Management Company or any Member solely by reason of any change in U.S. federal, state
or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management
Company or the Members, whether the change occurs through legislative, judicial or
administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel,
accountants or other advisers selected by it, and any act or omission taken, or made in good faith
by such Person on behalf of the Management Company or in furtherance of the business of the
Management Company in good-faith reliance on and in accordance with the advice of such
counsel, accountants or other advisers shall be full justification for the act or omission, and to the
fullest extent permitted by applicable law, no Covered Person shall be liable to the Management
Company or any Member in so acting or omitting to act if such counsel, accountants or other
advisers were selected, engaged or retained with reasonable care.

Section 6.03    <u>Indemnification by the Management Company</u>.    The Management
Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and
hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs,
expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other
liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known
or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any
Covered Person, or in which any Covered Person may become involved, as a party or otherwise,
or with which any Covered Person may be threatened, relating to or arising out of the investment
or other activities of the Management Company or its General Partner, or activities undertaken in
connection with the Management Company or its General Partner, or otherwise relating to or
arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise
or as fines or penalties, and attorneys' fees and expenses incurred in connection with the
preparation for or defense or disposition of any investigation, action, suit, arbitration or other
proceeding (a "<u>Proceeding</u>"), whether civil or criminal (all of such Claims, amounts and expenses
referred to therein are referred to collectively as "<u>Damages</u>"), except to the extent that it shall have
been determined ultimately by a court of competent jurisdiction, in a final nonappealable
judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person.
The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of
nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating
to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or
otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered
Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement
of any Claim that may be subject to a right of indemnification hereunder may be advanced by the
Management Company prior to the final disposition thereof upon receipt of a written undertaking
by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be

Appellee Appx. 01124
Appx. 01375
013937

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 10/30/25 1804    Page 259 of 1017    PageID 14903
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1131 of 1803    PageID 11877
Case 18-30264-sgj11 Doc 1239-6 Clas 13 Part 159 Filed 08/01/18 Desc Exhibit 7 Part 2 Page 17 of
24

determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder.  The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives.  Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04    Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled.  If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the CLOs or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Section 6.05    Rights of Heirs, Successors and Assigns. The indemnification rights provided by Section 6.03 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06    Reliance. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01    Termination.  Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

Appellee Appx. 01125
Appx. 01376
013938

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-9   Page 103/86/251804 Page 260 of 1017   PageID 14904
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1132 of 1803   PageID 11878
Case 18-30264-sgj11 2239CaSS13 Dcot 459-5iledFiRdd01121/1DesPAgehit 21 Page 18 of
24

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01   Amendments.  This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02   Assignment and Delegation.

(a)   Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this Section 8.02, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)   Except as otherwise provided in this Section 8.02, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)   The Staff and Services Provider may, without satisfying any of the conditions of Section 8.02(a) other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03   Non-Recourse; Non-Petition.

(a)   The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)   Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations

Appellee Appx. 01126
Appx. 01375
013939

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 10/36/251804    Page 261 of 1017    PageID 14905
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1133 of 1803    PageID 11879
Case 18-30265-sgj11    Doc 13    Part 159-Filed 03/01/21    Desc Exhibit 2    Page 19 of
24

and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)    Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)    The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)    The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

Section 8.04    Governing Law.

(a)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)    The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "Proceedings") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum

Appellee Appx. 01127
Appx. 01878
013940

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Filed 10/85/25 1804    Page 262 of 1017    PageID 14906
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1134 of 1803    PageID 11880
Case 18-30265-19j11 2239c6&13Part 459-Filed 02/01/121/19esPe&en50 2f 54Page 20 of 24

and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05    WAIVER OF JURY TRIAL.    EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.    EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06    Severability.    The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.    Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07    No Waiver.    The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties.    Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party.    Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08    Counterparts.    This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument.    This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Section 8.09    Third Party Beneficiaries.    This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, CLO or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10    No Partnership or Joint Venture.    Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.    Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11    Independent Contractor.    Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as

Appellee Appx. 01128
Appx 013870
013941

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 10/86/251804    Page 263 of 1017    PageID 14907
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1135 of 1803    PageID 11881
Case 18-30265-sgj11 239 CBS 13 Part 459 Filed 02/01/21 19 Desc Exhibit 2 Page 21 of
24

expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12    <u>Written Disclosure Statement</u>.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13    <u>Headings</u>.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15    <u>Notices</u>.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

(a)    If to the Management Company:

Acis Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201


(b)    If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.


*[The remainder of this page intentionally left blank.]*

Appellee Appx. 01129
Appx. 01889
013942

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1136/35180 4 Page 264 of 1017    PageID 14908
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1136 of 1803    PageID 11882
Case 18-30265-sgj11 Doc 1239 Class 13 Part 159-5 Filed 08/01/21 Desc Exhibit 2 of 54 Page 22 of 24

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By: Strand Advisors, Inc., its General Partner

By: _____
Name: James Dondero
Title:   President

**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By: _____
Name: James Dondero
Title:   President

*Signature Page to Fourth Amended and Restated Shared Services Agreement*

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Exhibit 6   Page 1137 of 1803   Page 265 of 1017   PageID 14909
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1137 of 1803   PageID 11883

## Appendix A

The Management Company shall pay to the Staff and Services Provider a Staff and Services Fee for the services for the CLOs or Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such CLOs or Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such CLOs or Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table.  Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such CLOs or Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such CLOs or Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder.  Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

[*Remainder of Page Intentionally Left Blank.*]

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-5   Page 10/36/251804 Page 266 of 1017   PageID 14910
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1138 of 1803   PageID 11884

Case 18-30265-sgj11 Doc 1239 Class 13 Part 159 Filed 08/01/18 Desc Exhibit C Page 24 of 24

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Staff and Services Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 15 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 15 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 15 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | February 25, 2014 | 15 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | June 5, 2014 | 15 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | November 18, 2014 | 15 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | April 16, 2015 | 15 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 15 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-16    Page 1046 of 1804 Page 267 of 1017    PageID 14911
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1139 of 1803   PageID 11885

# EXHIBIT F

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 69-15    Filed 11/06/25    Page 268 of 1017    PageID 14912
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1140 of 1803   PageID 11886
Case 18-30264-sgj11   Doc 159-8   Filed 11/21/18   Page 1 of 12

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT, L.P.**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P. and | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered Under Case No. |
| | § | 18-30264-SGJ-11) |
| | § | |
| Debtors. | § | Chapter 11 |

### HIGHLAND CAPITAL MANAGEMENT, L.P.'s APPLICATION FOR
### ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO 11 U.S.C. § 503(b)

Highland Capital Management, L.P. ("**Highland**"), hereby files this *Application for Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)* (the "**Application**") and requests this Court's approval of an administrative expense claim for the actual and necessary costs and expenses for services to Acis Capital Management, LP and Acis Capital Management GP, LLC (the "**Debtors**") rendered post-petition in the current known amount of **$3,554,224.29**, as well as such other amounts that may arise, as referenced herein, related to Highland's indemnity rights and other potential claims that may be asserted against the estates, as applicable. In support of the Application, Highland respectfully states as follows:

### JURISDICTION & VENUE

1. This Court has jurisdiction over the subject matter of this Application pursuant to 28 U.S.C. §§ 157 and 1334. The subject matter of this Application is a core proceeding within

**PAGE 1**

4817-3498-0226.1

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 10/02/051804    Page 269 of 1017    PageID 14913
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1141 of 1803    PageID 11887
Case 18-30264-sgj11    Doc 2089-72    Filed 12/15/18    Entered 11/21/19 15:29:31    Page 2 of 12

the meaning of 28 U.S.C. § 157(b)(2)(A) and (B).  Venue is proper in this Court pursuant to 28

U.S.C. § 1409(a).

## BACKGROUND

**A.    The Contracts**

2.    Debtor Acis Capital Management, L.P. ("**Acis LP**") was formed in 2011 as an

affiliated investment advisor to manage Highland's collateralized loan obligations.  Acis LP and

Highland are parties to a number of different agreements.  Debtor Acis Capital Management GP,

LLC ("**Acis GP**") is the general partner of Acis LP.

*(a)    The PMAs and the CLOs*

3.    Prior to the Petition Date (defined below), Acis LP had contractual obligations to

provide portfolio management services to five collateralized loan obligation entities known as

Acis CLO 2013-1 Ltd., Acis CLO 2014-3 Ltd., Acis CLO 2014-4 Ltd., Acis CLO 2014-5 Ltd.,

and Acis CLO 2015-6 Ltd. (the "**CLOs**") through certain portfolio management agreements (the

"**PMAs**") with the CLOs.   For those services, Acis LP was entitled to certain portfolio

management fees pursuant to the PMAs.

4.    Each CLO holds a portfolio of diversified syndicated leveraged commercial loans

through the private placement of rated secured notes (the "**Secured Notes**") and unsecured

subordinated securities (the "**Equity Notes**," together with the Secured Notes, the "**Notes**").

Highland CLO Funding, Ltd. ("**HCLOF**") is the holder of the Equity Notes.  Each Note is

subject to an indenture (the "**Indenture**") that establishes the rights of the noteholders and

indenture trustee investment criteria.  Neither of the Debtors are a party to any of the Indentures.

Rather, the Indentures are between each CLO entity, as issuer, and U.S. Bank, N.A. as indenture

trustee (the "**Indenture Trustee**").

**PAGE 2**

4817-3498-0226.1

**Appellee Appx. 01135**

**Appx. 01886**

013948

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Exhibit 6   Page 1/48/25 1804   Page 270 of 1017   PageID 14914
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1142 of 1803   PageID 11888
Case 18-30264-sgj11   Doc 91-4   Filed 12/15/18   Entered 11/21/19 18:09:29:31 of 76   Page 3 of 12

5.      Pursuant to the Indentures, the CLOs can redeem the Secured Notes under certain conditions, including at the written direction of 66 2/3% of the aggregate outstanding amount of the Equity Notes.  Through this right of redemption, the Equity Noteholders can restructure the CLOs when they no longer meet their investment objectives.  Because changes in interest rates affect the return on the CLOs' investments, HCLOF has the contractual right to "reset" the CLOs, which is a process of refinancing the existing collateral loan obligations.

### (b)      The Outsourcing Agreement

6.      Also prior to the Petition Date, Acis LP was party to an Agreement for the Outsourcing of the Asset Management (the "**Outsourcing Agreement**") with Universal-Investment-Luxembourg S.A. ("**Universal**") whereby Universal outsourced to Acis LP the asset management of an entity called BAYVK R2 Lux S.A., SICAV-FS – Highland (the "**Sub-Fund**"), which is a sub-fund of an entity called BAYVK R2 Lux S.A., SICAV-FIS.  A copy of the Outsourcing Agreement is attached hereto as **Exhibit A**.   In return for Acis LP's management services, Universal paid Acis LP management fees, which were ultimately charged to the Sub-Fund, as provided by section 5.3 of the Outsourcing Agreement.  Section 2.6 of the Outsourcing Agreement provided that, subject to the prior consent of Universal, Acis LP was permitted to utilize the asset management services of third parties.  Pursuant to that provision, Acis LP engaged Highland to provide sub-advisory services with respect to the management of the Sub-Fund.[1]

7.      Acis LP does not have, nor has it ever had, any employees.  All employees who have ever provided services to Acis LP were Highland employees, which were provided to Acis LP through shared and sub-advisory services agreements.  Acis LP has always essentially

---

[1] The Sub-Fund is funded indirectly by an entity called Bayerische Versogungskammer ("**BVK**").  In the case, the term "BVK" has been used by the parties as shorthand to refer to the Sub-Fund arrangement under the Outsourcing Agreement.

4817-3498-0226.1

**Appellee Appx. 01136**

**013949**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 53-15    Page 271 of 1017    PageID 14915
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1143 of 1803    PageID 11889
Case 18-30264-sgj11    Doc 879-2    Filed 02/15/18    Entered 11/21/18 09:25:31 of 76    Page 4 of 12

subcontracted its CLO managerial function out to Highland.  As a result, independently, Acis LP was not able to provide the services necessary to fulfill the contractual obligations under the PMAs or the Outsourcing Agreement.  Since the inception of Acis LP until August 2, 2018, Highland provided all front, middle, and back-office services to Acis LP through sub-advisory and shared services agreements.

### *(c)    The Shared Services Agreement*

8.    Prior to being replaced on August 2, 2018 (as described below), Highland provided back- and middle-office services to Acis LP pursuant to the Fourth Amended and Restated Shared Services Agreement, executed on March 17, 2017, (as amended and restated from time to time, the "**Shared Services Agreement**").  A copy of the Shared Services Agreement is attached hereto as **Exhibit B** and incorporated herein by reference.  The multitude of services provided by Highland are set forth in Article II of the Shared Services Agreement.

9.    Highland provided these shared services in exchange for management fees, currently averaging 15 basis points ("**bps**") of the total balances of the CLO accounts.  *See* Exhibit 1 at Section 3.01 and Appendix A. The management fees were due to be paid to Highland approximately every quarter.

### *(d)    The Sub-Advisory Agreement*

10.    Highland also provided front-office services to Acis LP pursuant to the Third Amended and Restated Sub-Advisory Agreement, executed March 17, 2017 (as amended and restated from time to time, the "**Sub-Advisory Agreement**," collectively with the Shared Services Agreement, the "**Contracts**").  A copy of the Sub-Advisory Agreement is attached hereto as **Exhibit C** and incorporated herein by reference.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Exhibit 6    Page 104/05/05/1804    Page 272 of 1017    PageID 14916
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1144 of 1803    PageID 11890
Case 18-3025-sgj11    Doc 397-2    Filed 02/15/18    Entered 01/21/19 19:29:33    Page 5 of 12

11.    The Sub-Advisory Agreement appointed Highland "as Sub-Advisor to the Management Company [Acis LP] for the purpose of assisting the Management Company [Acis LP] in managing the Portfolios of each Account . . . ." *See* Sub-Advisory Agreement at Section 1(a)). The Sub-Advisory Agreement directs Highland to perform a multitude of investment advisory services set forth in Section 1(b) of the agreement.

12.    Highland was the sole provider of these services to Acis LP. *See id* at § 5(6) ("So long as this [Sub-Advisory] Agreement or any extension, renewal or amendment of this [Sub-Advisory] Agreement remains in effect, the Sub-Advisor shall be the only portfolio management sub-advisor for the Management Company."). Given that Acis LP has no employees, Highland therefore was the sole provider of these services to the CLOs and the BVK Sub-Fund.

13.    For these investment advisory services, Highland received a sub-advisory fee that averaged 20 bps of the total average 40 bps Acis LP received as portfolio manager. *See id.* at § 2(a) and Appendix A. The sub-advisory fees were due to be paid to Highland approximately every quarter. Acis LP has not made a payment to Highland for sub-advisory services since November of 2017.

**B.    The Bankruptcy Cases**

14.    On January 30, 2018 (the "**Petition Date**"), Joshua N. Terry ("**Terry**") filed involuntary petitions (the "**Involuntary Petitions**") for relief under Chapter 7, Title 11 of the United States Code (the "**Bankruptcy Code**") against Acis LP and Acis Capital Management GP, LLC (the "**Debtors**").

15.    The Debtors filed answers to the Involuntary Petitions and moved to dismiss the petitions, asserting among other defenses that the Court lacked subject matter jurisdiction.

**Appellee Appx. 01138**

**01̇3951**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 10/46/25 1804   Page 273 of 1017   PageID 14917
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1145 of 1803   PageID 11891
Case 18-30264-sgj11   Doc 897-23   Filed 12/15/18   Entered 11/21/19 18:29:31   Page 6 of 12

16.    A five-day contested trial on the Involuntary Petitions was held in late March 2018.  On April 13, 2018, the Court entered orders for relief (the "**Orders for Relief**").  Diane Reed was thereafter appointed as the Chapter 7 trustee (the "**Chapter 7 Trustee**").

17.    On April 17, 2018, the Chapter 7 Trustee filed her Expedited Motion to Operate the Debtors' Business in Chapter 7 [Doc. No. 127] (the "**Motion to Operate**").  By the Motion to Operate, the Chapter 7 Trustee determined there was "an immediate need to obtain authorization to continue the business operations of the Debtors by the [Chapter 7] Trustee continuing Acis LP's performance of the Sub-Advisory Agreement and the Shared Services Agreement."  Motion to Operate at ¶ 5.

18.    During this time period, HCLOF evaluated the situation and determined that having a bankrupt portfolio manager was an untenable situation.  HCLOF therefore decided to take action related to redeeming the CLOs.  Accordingly, on April 30, 2018, HCLOF instructed the Indenture Trustee and Acis LP to initiate an optional redemption (the "**Optional Redemption Notices**").  Pursuant to the terms of the Indentures, there was a 45-day notice period prior to the occurrence of the redemption.  Thus, the redemption was scheduled to occur on June 14, 2018.

19.    Highland, which had related responsibilities as sub-manager, was well-aware of the timeline related to the Optional Redemption Notices and was operating under the assumption that the Debtors would no longer be operating as of June 14, 2018.  As such, on May 3, 2018, Highland filed its *Motion of Highland Capital Management, L.P. for Order Compelling Chapter 7 Trustee to Reject Certain Executory Contracts* [Doc. No. 169] ("**Motion to Reject**").  By the Motion to Reject, Highland sought an order compelling the Debtors to reject the Contracts. Highland's intention was to file the Motion to Reject on a timeline such that any order granting

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S     Document 68-15     Filed 04/25/25     Page 274 of 1017     PageID 14918
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1146 of 1803   PageID 11892
Case 18-30264-sgj11   Doc 1189-7   Filed 11/21/18   Entered 11/21/18 09:23:31   Page 7 of 12

the Motion to Reject would be on or about the same time as the optional redemption on June 14, 2018.

20.    On May 4, 2018, the Chapter 7 trustee filed an *Expedited Motion to Convert Cases to Chapter 11* [Doc. No. 171] (the "**Motion to Convert**").  Also on May 4, 2018, Terry filed an *Emergency Motion for an Order Appointing Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Doc. No. 173] (the "**Motion to Appoint Chapter 11 Trustee**").

21.    On May 6, 2018, following an expedited hearing on the matter, the Court entered an order granting the Motion to Operate [Doc. No. 178] (the "**Operation Order**").[2]  The Operation Order authorized the Chapter 7 Trustee to operate the Debtors, explicitly pursuant to the terms of the Contracts with Highland.  The Operations Order did not contemplate long-term operations of the Debtors as illustrated by the fact that the Court set a further status conference for June 25, 2018 to "consider the status of the cases and any modifications to the relief granted" in the Operations Order.  *See* Operations Order at p. 3.

22.    Thereafter, on May 11, 2018, after a hearing on the matter, the Court entered orders granting the Motion to Convert [Doc. No. 205] and the Motion to Appoint Chapter 11 Trustee [Doc. No. 206]. On May 17, 2018, the Court entered an order granting appointment of Robin Phelan as Chapter 11 Trustee (the "**Chapter 11 Trustee**").

23.    The Chapter 11 Trustee refused to authorize the process to allow Highland, as sub-manager, to take the actions necessary to effectuate the noticed optional redemptions.  The Chapter 11 Trustee, Highland, and HCLOF exchanged a number of letters related to that issue in late May 2018.

---

[2] The Operations Order was preceded by an interim order entered by the Court on April 18, 2018 [Doc. No. 130] pending a hearing on the Motion to Operate.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6-15    Exhibits 6    Page 11/46/25 1804    Page 275 of 1017    PageID 14919
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1147 of 1803    PageID 11893
Case 18-30264-sgj11    Doc 289-7    Filed 12/159-6    Entered 11/21/19 18:09:29 31 76    Page 8 of 12

24.     On May 24, 2018, the Chapter 11 Trustee filed his *Objection to the Motion of Highland Capital Management, L.P. for Order Compelling Chapter 7 Trustee to Reject Certain Executory Contracts and Request for Expedited Hearing* [Doc. 237] ("**Trustee's Objection**"). By the Trustee's Objection, the Chapter 11 Trustee argued that rejection of the Contracts was premature, given the conversion of the cases to Chapter 11.  The Chapter 11 Trustee made clear his intention to continue to bind Highland to the terms of the Contracts, and to enjoy the services provided by Highland that made Acis LP's operations possible.

25.     On May 31, 2018, the Court held a status conference and entered a *sua sponte* temporary restraining order (the "**TRO**") staying the optional redemption process.    In recognition of this fact, HCLOF subsequently withdrew the Optional Redemption Notices.

26.      On June 11, 2018, Highland filed a withdrawal [Doc. No. 273] of its Motion to Reject.  The conversion of the case and the entry of the TRO made it perfectly clear that the Debtors' business would continue to operate past the late June time period Highland originally contemplated when it filed the Motion to Reject.  Thus, Highland continued to perform the sub-advisory and shared services it provided the Debtors pre-petition, throughout the involuntary, and post-petition pursuant to the terms of the Contracts.

27.     On July 30, 2018, less than a month after the Chapter 11 Trustee complained about Highland's attempts to free itself of the obligations under the Contracts, the Chapter 11 Trustee filed his *Emergency Motion to Approve Replacement Sub-Advisory and Shared Services Providers, Brigade Capital Management, LP and Cortland Capital Markets Services LLC* [Doc. No. 448] (the "**Replacement Motion**").  By the Replacement Motion, the Chapter 11 Trustee sought to replace Highland with Brigade Capital Management, LP ("**Brigade**") based on vague

4817-3498-0226.1

**Appellee Appx. 01141**
Appx 01392
013954

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 18-15   Page 11/46/35 1804   Page 276 of 1017   PageID 14920
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1148 of 1803   PageID 11894
Case 18-30264-sgj11   Doc 723   Filed 12/15/18   Entered 12/11/18 09:29:03   Page 9 of 12

allegations by the Chapter 11 Trustee that Highland was "mismanaging" and "overcharging" the Debtors.

28.     The Court held a hearing on the Replacement Motion on August 1, 2018.  At the hearing, counsel for the Chapter 11 Trustee stated that the issue of mismanagement was "not the issue" for the hearing and reserved rights.[3]  Rather, the issue related solely to whether the Chapter 11 Trustee's business judgment supported the relief sought in the Replacement Motion. As such, the Court never took up the mismanagement issue.

29.     On August 1, 2018, the Court entered an order [Doc. 464] granting the Chapter 11 Trustee's Replacement Motion, thereby replacing Highland with Brigade Capital Management, LP as service provider to Acis LP.  Highland provided transitional services through August 2, 2018.

## C.     Highland's Post-Petition Services Under the Contracts

30.     Highland provided Acis LP with uninterrupted services during three legally-distinct time periods: (i) the period prior to the filing of the Involuntary Petitions; (ii) the "gap" period between the filing of Involuntary Petitions and the entry of the Orders for Relief; and (iii) the post-petition period following the entry of the Orders for Relief until Highland's replacement on August 2, 2018 (the "**Post-Petition Period**").  Highland has filed a proof of claim asserting its pre-petition unsecured claim and its priority gap claim pursuant to Bankruptcy Code section 507(a)(3).[4]  This Application seeks an administrative expense claim relating solely to the Post-Petition Period and Highland reserves all rights related to any other period.

---

[3] See Hr'g Tr (Aug. 1, 2018) at 154:17-24 (MS. PATEL: "And with respect to these – to issues surrounding mismanagement, et cetera, as I said sort of at the opportunity to cross-examine Mr. Covitz, it's just not an issue today.  That's why we would want to reserve our rights at a later date to the extent that that is an actual material issue in dispute.  That's when that needs to be brought up, but that's it.  We reserve our rights, Your Honor.  It's just not an issue for today.  Thank you."
[4] See Proof of Claim [No. 27] filed on August 1, 2018 (the "**Proof of Claim**") whereby Highland asserts an unsecured claim in the amount of $4,672,140.38, constituting $2,622,576.03 for the pre-petition period and

**PAGE 9**

**Appellee Appx. 01142**
Appx. 01393
013955

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Page 10 of 35804   Page 277 of 1017   PageID 14921
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1149 of 1803   PageID 11895
Case 18-30235-sgj11   Doc 897-2   Filed 12/19/18   Entered 11/21/19 09:13:31   Page 10 of 12

## RELIEF REQUESTED

31.     By this Application, Highland seeks allowance of an administrative expense claim for services rendered under the Contracts during the Post-Petition Period.  The total accrued amount for such services is $3,554,224.29, as set forth in the summary attached hereto as **Exhibit D**, composed of $3,007,678.41 for sub-servicing and sub-advisory fees and $543,545.88 for expenses.

32.     Section 503(b) provides for an administrative expense claim for "the actual, necessary costs and expenses of preserving the estate" as well as "the actual, necessary expenses" incurred by a creditor "in making a substantial contribution" in a Chapter 11 case.  *See* 11 U.S.C. §§ 503(b)(1); *see also In re ASARCO, LLC*, 650 F.3d 593, 601 (5th Cir. 2011) (providing that administrative expense claims under 503 "generally stem from voluntary transactions with third parties who lend goods or services necessary to the successful reorganization of the debtor's estate.") (internal citation omitted). "A prima facie case under section 503(b)(1) may be established by evidence that (1) the claim arises from a transaction with the [debtor]; and (2) the goods or services supplied enhanced the ability of the [debtor's] business to function as a going concern." *Matter of TransAmerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992).  The burden then shifts to the objector to put on sufficient evidence to rebut the movant's prima facie case. *Id.*  Mere allegations, unsupported by evidence, are insufficient to rebut the movant's prima face case.  *Id.*

33.     It is undisputed that Highland provided services under the Contracts during the Post-Petition Period and that Highland has not been paid for such services.  Because Acis LP has

---

$2,049,564.35 for the gap period.  In the Proof of Claim, Highland specifically reserves its right to seek an administrative expense claim, and also related to contingent claims for indemnification pursuant to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement.  *See id.* at Proof of Claim Exhibit A.

4817-3498-0226.1

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 11/56/2518043   Page 278 of 1017   PageID 14922
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1150 of 1803   PageID 11896
Case 18-30278-sgj11   Doc 897-2   Filed 02/15/18   Entered 11/21/19   Page 11 of Page 11 of 12

no employees, it is self-evident that Highland's services benefited the estates because, absent such services, Acis LP would have been completely incapable of operating.  In addition, while the Chapter 11 Trustee apparently has furthered a theory that Highland overcharged the Debtors (despite the fact that the terms of the Contracts are not in dispute), the Chapter 11 Trustee is required to provide evidence, not simply allegations, to rebut the prima facie case that Highland is entitled to an administrative expense claim.  To date, the Chapter 11 Trustee has provided no such evidence.  Rather, the Contracts speak for themselves and are the best evidence of the validity of the claim asserted by Highland.

34.     In addition, Highland reserves all indemnity rights against the Debtors pursuant to section 6.03 of the Shared Services Agreement and section 4(c) of the Sub-Advisory Agreement. This includes, but is not limited to, in relation to the thirty-for (34) causes of action (the "**Causes of Action**") asserted against Highland by the Chapter 11 Trustee in the *Amended Answer, Counterclaims (Including Claims Objections) and Third Party Claims* filed by the Chapter 11 Trustee on November 13, 2018 in Adversary Proceeding No. 18-03078 [Adv. Proc. Doc. No. 84].  Many – if not all – of such Causes of Action appear to arguably fall within the coverage of the applicable indemnity provisions of the Contracts.

WHEREFORE, Highland respectfully requests that the Court enter an order: (i) awarding it an administrative expense claim at least in the amount of $3,554,224.29; (ii) awarding an administrative expense for any indemnity claims payable to Highland under the Contracts; and (iii) providing any such other relief the Court deems just and proper.

**PAGE 11**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 11/58/25 1804    Page 279 of 1017    PageID 14923
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1151 of 1803    PageID 11897
Case 18-30264-sgj11 Doc 9773-25 Filed 12/11/18    Entered 12/11/18 Page 13 of 78 Page 12 of 12

Dated:  December 11, 2018

Respectfully submitted,

*/s/ Jason B. Binford*
Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas  75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com
jbinford@foley.com
sbeck@foley.com
mbales@foley.com

and

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com
bbarnes@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT, L.P.**

## CERTIFICATE OF SERVICE

This is to certify that on December 11, 2018, a true and correct copy of the foregoing was served electronically via the Court's ECF system on those parties registered to receive such service.

*/s/ Jason B. Binford*
Jason B. Binford

4817-3498-0226.1

**Appellee Appx. 01145**
**Appx. 01386**
**013958**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-9    Page 1153 of 1804  Page 280 of 1017    PageID 14924
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1152 of 1803   PageID 11898

Case 18-30264-sgj11 Doc 2397-2 Filed 12/19/18  Entered 12/19/18 09:29:31  Page 1 of 14

# EXHIBIT A

Appellee Appx. 01146
013959

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 10/56/251804 Page 281 of 1017    PageID 14925
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1153 of 1803    PageID 11899
Case 18-30264-sgj11 Doc 1239-7 Filed 02/19/18 Entered 02/19/18 21:35:31 Page 2 of 14

**Agreement**
**for the Outsourcing of the Asset Management (the**
**"Agreement") of**

**BayVK R2 Lux S.A., SICAV-FIS (the "Fund")**

entered into between

Universal-Investment-Luxembourg S.A.,

with registered office at 15, rue de Flaxweiler, L-6776 Grevenmacher and registered with the
Luxembourg Trade and Companies Register under number B75014

(hereinafter referred to as "**Management Company**")

and

**Acis Capital Management, L.P.**

**with its principal office at 300 Crescent Court, Suite 700, Dallas, Texas, 75201**

(hereinafter referred to as "**Acis**" or "**Asset Manager**")

– referred to individually as the "Party" and jointly as the "Parties" –

## RECITALS

(1)   Universal-Investment-Luxembourg S.A. is a management company within the
meaning of Chapter 15 of the Luxembourg Law of 17 December 2010 on
undertakings for collective investment, as amended (hereinafter the "**Law of 2010**")
which manages, amongst others, investment funds according to part I and part II of
the Law of 2010 and specialised investment funds according to the Luxembourg law
of 13 February 2007 on specialised investment funds (hereinafter the "**Law of 2007**")
as last amended by the Law of 12 July 2013 on alternative investment fund
managers.

(2)   Acis is an investment advisor registered with the U.S. Securities and Exchange
Commission.

1



UNIVERSAL
INVESTMENT
LUXEMBOURG



**Appellee Appx. 01147**
Appx. 01398
013960

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1055 of 1804   Page 282 of 1017   PageID 14926
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1154 of 1803   PageID 11900
Case 18-30264-sgj11   Doc 397-25   Filed 12/19/18   Entered 12/19/18 23:31:76   Page 3 of 14

(3)    Under an agreement dated 8 October 2014 (the "**Fund Management Agreement**"), the Fund has appointed the Management Company as its management company in accordance with the Law of 2010 and the Law of 2007. Under the Fund Management Agreement, the Management Company is, among other things, responsible for the asset management of the Fund. Under the Fund Management Agreement, the Management Company may, under its own responsibility and supervision, delegate its functions to third parties.

(4)    By virtue of this Agreement, the asset management of the sub-Fund(s) specified in **ANNEX A** (hereinafter referred to as the "**Sub-Funds**") is to be outsourced by the Management Company to Acis in accordance with Luxembourg legislation, the issuing document of the Fund, as amended from time to time (the "**Issuing Document**"), the articles of association of the Fund, as amended from time to time (the "**Articles**"), attached hereto as **ANNEX B1**, as well as directions by the regulatory authority in Luxembourg, the *Commission de Surveillance du Secteur Financier* (hereinafter referred to as "**CSSF**"). Additional Sub-Funds may be included herein provided that the attached **ANNEXES** (if and to the extent necessary) are amended and signed by both parties and **ANNEX A** is supplemented accordingly.

(5)    In view of the Asset Manager's skills and abilities in asset management and the representations made and obligations assumed by it hereunder, the Management Company intends to engage the Asset Manager for the management of the Sub-Funds listed in **ANNEX A**.

(6)    Therefore, the Parties agree to the following:

<div align="center">

**Section 1**
**Appointment of the Asset Manager**

</div>

1.    The Management Company hereby appoints the Asset Manager to perform the asset management of the Sub-Funds upon the terms hereinafter contained and in accordance with the applicable laws and regulations, the Articles, the Issuing Document or as otherwise determined by the Management Company in accordance with Article 42ter lit. g) of the Law of 2007 from time to time. The Asset Manager hereby accepts its appointment and agrees to assume the obligations set forth herein.

2.    The Asset Manager represents and warrants that it is duly authorised to carry out the activities stipulated in this Agreement and that due to its professional infrastructure and human resources it is capable of providing its services on a secure and permanent basis. Furthermore it represents and warrants that it is familiar with the statutory investment restrictions as well as any other requirements relating to the management of funds in general and in particular with the requirements of the Luxembourg Law of 2007, the relevant circulars issued by the CSSF and all other applicable Luxembourg legislation. The Asset Manager represents and warrants that adequate risk management procedures have been put in place for the management of the relevant Sub-Funds. The Asset Manager will keep itself continuously informed about any amendments or changes in the statutory investment restrictions or other requirements. In particular, the Asset Manager will ensure sufficient professional competence of those employees who are entrusted with the performance of the Asset Manager's duties according to this Agreement, as well as establish and continuously maintain, at

<div align="center">

2

</div>



Appellee Appx. 01148
Appx. 07399
013961


Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 10/56/51804    Page 283 of 1017    PageID 14927
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1155 of 1803    PageID 11901
Case 18-3028-sgj11 Doc 97-2 Filed 12/19/18    Entered 12/19/18 09:37:31 Page 4 of 14

least for the term of this Agreement, the necessary infrastructure, especially for the purpose of monitoring compliance with investment restrictions.

3.      Neither the regulatory and supervisory responsibility of the Management Company nor the liability of the Management Company under civil law towards the shareholders of the respective Sub-Funds will be affected by the appointment of the Asset Manager.

4.      This Agreement shall not confer any right on the part of the Asset Manager to conduct advertising or distribution activities of any kind.

5.      The appointment of the Asset Manager does not create any legal relationship between the Asset Manager and the shareholders of the Fund, but between the Parties only.

6.      The Asset Manager may provide similar asset management services to other clients and may execute transactions which differ from the transactions executed hereunder.

## Section 2
## Duties of the Asset Manager

1.      The Asset Manager will make all asset management decisions on behalf of the Sub-Funds. The Asset Manager shall be entitled and obligated to perform the asset management services of the respective Sub-Funds listed in **ANNEX A** (subject to the approval and supervision of the Management Company).

2.      Management tasks include, where applicable, purchasing and selling of assets, securities transactions, futures transactions, entering into and closing out of derivative positions both for investment and hedging purposes, managing cash and implementing corporate actions in accordance with the Issuing Document and the Articles and as applicable to one or more Sub-Funds (please refer to **ANNEX B1**).

However, these tasks do not include the exercise of any proxy voting rights attached to securities contained in the Sub-Funds, which is reserved to the Management Company itself. Business days in the sense of this Agreement are defined as stock exchange days on which banks would be open for general business in Luxembourg and Frankfurt am Main.

3.      When performing its management tasks, the Asset Manager will duly observe the provisions of the Law of 2007, the Issuing Document and the Articles, as well as specific instructions/investment guidelines of the Management Company, if any, attached hereto in **ANNEX B2**. The Management Company is obligated to inform the Asset Manager of changes in the investment limits and rules as contained in the **ANNEX B1 and ANNEX B2**.

When rendering management services, the Asset Manager will observe the principle of risk spreading as defined by the Law of 2007, the statutory investment restrictions, the provisions of the code of conduct, conflict of interest, organisational measures and the prohibition of insider trading according to the applicable law, the administrative customs of relevant supervisory authorities and their directives and circulars, as set out in the valid version of the Issuing Document and the Articles as attached hereto as **ANNEX B1**.


UNIVERSAL
INVESTMENT
LUXEMBOURG

4R

Appellee Appx. 01149
Appx. 013962
013962


Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1056 of 1804    Page 284 of 1017    PageID 14928
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1156 of 1803    PageID 11902
Case 18-30264-sgj11    Doc 3597-2    Filed 12/19/18    Entered 12/19/18 09:28:31    Page 5 of 14

The Management Company reserves the right to give comprehensive instructions to the Asset Manager and any sub-manager, if applicable, in connection with the management of the Sub-Funds, as far as legally required.

4.   Brokers and counterparties will be selected by the Asset Manager at its sole discretion, taking into account all laws and regulations applicable to the Asset Manager and always in accordance with the Asset Manager's best execution policy, which has been communicated to, and is hereby approved by, the Management Company and which is attached hereto as **ANNEX H**. However, the Asset Manager's right to select brokers and counterparties at its sole discretion is limited to the list of brokers and the list of counterparties respectively attached hereto as **ANNEX C**. The Management Company's prior consent has to be obtained for the selection of brokers or counterparties not included in **ANNEX C**. The Asset Manager will issue at all times prompt and complete instructions to the Fund's custodian bank (hereinafter referred to as "**Custodian Bank**") to enable the Custodian Bank to settle transactions with brokers and counterparties. In this regard the Asset Manager is responsible for the careful choice, instruction and monitoring of the brokers or other counterparties.

5.   The Asset Manager may provide similar asset management services to other customers and may effect transactions which differ from the transactions executed hereunder. Furthermore the Asset Manager may consolidate portfolio management measures hereunder with asset or portfolio management measures to be taken on behalf of other customers and aggregate customer orders without prior communication with the Management Company if and to the extent that this is consistent with the fiduciary duties imposed upon it under applicable law and this Agreement as well as the Asset Manager's conflicts of interests policy (the "**Conflicts of Interest Policy**"), which has been communicated to, and is hereby approved by, the Management Company and which is attached hereto as **ANNEX G**.

6.   When fulfilling its obligations hereunder, the Asset Manager may contract the services of third parties if and to the extent that this is permitted under applicable law, particularly in accordance with the Law of 2007. Principally the Asset Manager is entitled to sub-delegate portions of its asset management function to an affiliate of the Asset Manager which consent shall also extend specifically to the modalities of the sub-delegation as defined in a separate sub-delegation agreement. For the avoidance of doubt, the Management Company's prior consent must be obtained for the sub-delegation of asset management services, which will not be unreasonably withheld. The Asset Manager will ensure that any sub-delegation will be in accordance with this Agreement and in particular with Law of 2007. In any case of sub-delegation to third parties the Asset Manager remains the sole party responsible to the Management Company for compliance with the duties pursuant to this Agreement.

7.   The Asset Manager does not guarantee and the Management Company acknowledges and agrees that the Asset Manager does not guarantee, the future performance or any specific level of performance for the Sub-Funds, the success of any investment decision or strategy that the Asset Manager may use, or the success of the Asset Manager's overall management of the Sub-Funds. The Management Company understands that investment decisions made for the Sub-Funds by the Asset Manager are subject to various risks, including but not limited to, market, interest rate, foreign currency, equity, credit, counterparty, economic, political, legal and operational risks and that investment decisions will not always be profitable and may result in significant loss or depreciation in the value of the Sub-Funds.

8.   The Asset Manager shall provide for adequate arrangements for the handling of both avoidable and unavoidable conflicts of interest. The Asset Manager shall be obliged to



UNIVERSAL
INVESTMENT
LUXEMBOURG

Appellee Appx. 01150

Appx. 01401
013963

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 10/56/85180 of Page 285 of 1017   PageID 14929
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1157 of 1803   PageID 11903
Case 18-30264-sgj11-12397-CSS Filed 02/59/68 Entered 12/91/18 09:29:31 76 Page 6 of 14

identify conflicts of interest in conjunction with the asset management services and to establish, respect and maintain a conflict of interest policy. This policy has to take into consideration conflicts of interest which may arise between the Asset Manager, including its employees and the Management Company and the persons who are directly or indirectly linked with the Asset Manager and its clients or between its clients. The Asset Manager further undertakes to make its conflict of interest policy available to the Management Company. The Asset Manager shall review its conflict of interest policy on an on-going basis, however at least in yearly intervals, and inform the Management Company of material changes to the policy as soon as reasonably practicable.

To the extent that the organisational arrangements of the Asset Manager are not suitable for the prevention of conflicts of interest, the Asset Manager shall be obliged to document the general nature and source of the remaining conflicts of interest, to promptly disclose these conflicts of interest to the Management Company and to initiate corrective measures in consultation with the Management Company.

9.   The Asset Manager has, as of the date hereof, and shall maintain for the term of this Agreement, insurance; the relevant documents have been provided to the Management Company within the due-diligence process. .

10.  The Asset Manager shall at all times observe and comply with the applicable laws and regulations, the Articles and with the applicable provisions of the Issuing Document or any such document relating to the Fund and its Sub-Funds distributed from time to time on behalf of the Fund and all lawful resolutions of the Management Company and other lawful orders and directions given to it from time to time by the Management Company. All activities engaged in by the Asset Manager shall at all times be subject to the control, approval and review by the Management Company.

### Section 3
### Own dispositions of the Management Company, Authorisations

1.   To avoid contradicting dispositions with respect to the Sub-Funds' assets, the Management Company will refrain from any direct dispositions of the Sub-Funds' assets without prior consultation with the Asset Manager. This applies in particular to the cash management required to meet liabilities incurred by the Asset Manager on behalf of the Management Company for the account of the respective Sub-Funds. However, if it is deemed imperative by the Management Company, in its sole discretion and under own responsibility, to take its own management measures to protect the shareholders of the Sub-Funds, the Management Company reserves the right to immediately implement its own measures without prior notification of the Asset Manager. In this case the Management Company has to fully inform the Asset Manager either in advance or, as soon as reasonably possible after execution of the relevant management measure.

2.   For the purpose of the asset management of the Sub-Funds, the Management Company will grant the Asset Manager all authorisations as required, in particular, the power to instruct the respective Custodian Bank to settle and accept settlement of transactions for the respective Sub-Fund. These authorisations are restricted to the accounts opened for the respective Sub-Fund. They do not include the Asset Manager's right to debit its remuneration or eventual expenses directly to the Sub-Fund concerned.

5



42

Appellee Appx. 01151
Appx. 013964

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-15   Filed 10/59/25 1804   Page 286 of 1017   PageID 14930
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1158 of 1803   PageID 11904
Case 18-30264-sgj11   Doc 397-2   Filed 12/19/18   Entered 12/19/18 20:31:76   Page 7 of 14

### Section 4
### Reporting

1. The Asset Manager will report to the Management Company each transaction concluded by the Asset Manager on the trading day or in the case of transactions executed after the Management Company's business hours on the following business day to enable the Management Company to duly include the relevant transaction in its Fund accounts.

2. The Asset Manager will ensure that the Custodian Bank will receive settlement instructions for all transactions according to the Custodian Bank's deadlines. The Asset Manager will also ensure that the Custodian Bank for the relevant Sub-Fund is informed of trades in financial instruments not being settled through a stock exchange or a recognised organised market.

3. The Asset Manager will inform the Management Company as soon as reasonably practicable after becoming aware of any determined breaches of investment restrictions, whether caused actively or passively, and communicate all essential information and data relating thereto to the Management Company.

### Section 5
### Fees and Reimbursement of Expenses

1. The Asset Manager is entitled to receive a fee for its services rendered under this Agreement which is set out in the fee schedule attached as **ANNEX D**. The Asset Manager's fee is understood as inclusive any statutory VAT or other duties and taxes where applicable.

2. The Asset Manager is not entitled to reimbursement of any expenses incurred in connection with the performance of its obligations hereunder unless any such reimbursement of expenses has been agreed upon with the Management Company in advance in writing or is stated in the Issuing Document of the Fund.

3. The Asset Manager's fees will be paid by the Management Company and ultimately charged to the respective Sub-Fund.

### Section 6
### Liability and Risk Considerations

1. The Asset Manager shall act in compliance with the duties stated in this Agreement and in the relevant Service Level Agreement attached hereto as **ANNEX I** and shall be liable for the violation of investment restrictions and the conduct of unpermitted transactions caused by wilful misconduct, bad faith or negligence of the Asset Manager and shall compensate the Management Company for any losses or damages accordingly. The Asset Manager will not be liable for any action taken, omitted or suffered to be taken by it in its reasonable judgment, in good faith and believed by it to be authorised or within the discretion or rights or powers conferred upon it by this Agreement, or in accordance with (or in the absence of) specific directions or instructions from the Management Company. Notwithstanding anything to the contrary

6



UNIVERSAL
INVESTMENT
LUXEMBOURG

Appellee Appx. 01152



013965

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Exhibit 6    Page 100 of 1804    Page 287 of 1017    PageID 14931
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1159 of 1803    PageID 11905
Case 18-30262-sgj11    Doc 1223-7    Filed 12/15/18    Entered 12/19/18 20:31:76    Page 8 of 14

contained herein, the Asset Manager shall not be liable to the Management Company, the Sub-Fund or any other party for any losses due to the performance of the Sub-Fund's investments so long as the Asset Manager acted in accordance with the investment guidelines contained in Annex B2.

The Asset Manager is liable in the same manner for its agents of vicarious liability including commissioned third parties. If a transaction executed by the Asset Manager is, at the time of that transaction, in conflict with the provisions hereof, the Asset Manager will, upon the Management Company's request, arrange for the Management Company or the relevant Sub-Fund or the shareholder to be in a position as if, on demand of the Management Company, the transaction had not been executed for the relevant Sub-Fund or alternatively been concluded in accordance with this Agreement.

2.  The Asset Manager shall not be liable for losses and/or financial damages arising from transactions initiated by the Management Company (in particular pursuant to Section 3.1) with regard to the assets of the Sub-Funds and/or from transactions executed in accordance with instructions of the Management Company except in case (and to the extent) the Asset Manager materially breached this Agreement and (i) the transactions so initiated and/or instructions given by the Management Company were required and suitable to correct such material breach, and (ii) the Management Company acted with due care and diligence when initiating such transactions and/or giving or implementing such instructions.

3.  The Management Company shall indemnify the Asset Manager against any loss sustained or incurred by the Asset Manager in connection with the performance of its duties under this Agreement except to the extent that such losses are due to the wilful misconduct, bad faith or negligence of the Asset Manager.

4.  The Asset Manager is expressly authorized to rely upon any and all instructions, approvals and notices given on behalf of the Management Company by any one or more of those persons designated as representatives of the Management Company whose names, titles and specimen signatures appear in ANNEX E attached hereto and incorporated herein by reference.

5.  It is mutually understood and agreed that in providing services pursuant to this Agreement, the Asset Manager is at all times performing services as an independent contractor and its employees are at all times performing services as independent contractors and not as agents or employees of Management Company. Nothing contained in this Agreement is intended nor shall be construed to create an employer/employee relationship or to allow Management Company to exercise control or direction over the manner or method by which the Asset Manager performs services which are the subject matter of this Agreement; provided, however that the services to be rendered hereunder shall be rendered in a manner consistent with the standards governing such services, the provisions of this Agreement and all applicable provisions of law and other rules and regulations of any and all governmental authorities relating thereto.

6.  Statutory or contractual examination duties of the Management Company or the Custodian Bank do not diminish the Asset Manager's duties of due care.


UNIVERSAL
INVESTMENT
LUXEMBOURG

42

Appellee Appx. 01153
Appx. 01494
013966

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 106 of 1804 Page 288 of 1017    PageID 14932
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1160 of 1803    PageID 11906
Case 18-30264-sgj11    Doc 397-2    Filed 12/19/18    Entered 12/19/18 22:31:76 Page 9 of 14

7.  Force majeure, as such term is interpreted by Luxembourg courts, which seriously impedes or renders temporarily impossible delivery or performance for one of the parties prolongs the time for fulfilment of the duties by the duration of the impediment and the time necessary to restore normal working conditions. Force majeure is among others defined as lawful labour dispute measures, emergency measures taken by the state or other circumstances for which the affected party is not responsible.

## Section 7
## Confidentiality

1.  It is understood by the parties that - except as otherwise provided in this Section 7 - the conditions hereof must neither be disclosed nor notified to any third parties. For the avoidance of doubt, the Fund shall not be considered as being a third party. This Section 7 does not apply to any legally required disclosure of information or the disclosure of information to shareholder(s) of the Fund, relevant governmental or regulatory authorities, the employees of the parties (on a need-to-know-basis), independent auditors and independent legal advisors. Entities and persons that are affiliated with or a contractual partner of the Asset Manager in accordance with this Agreement for the purpose of performing its obligations hereunder, are not deemed to be third parties within the meaning of this Section 7.

2.  In the event that submission of any information relating to this Agreement, including its **ANNEXES**, is requested by a supervisory authority or other governmental or regulatory authority, the party to which the respective request is addressed shall, to the extent practicable, notify the other party thereof prior to submitting any such information unless the party to which the request is addressed is prohibited to notify the other party thereof under any applicable statutory or administrative regulations or in accordance with any instructions contained in the request of the respective supervisory authority.

3.  Each party undertakes to keep confidential any and all information in its possession which relates to data processing systems and know-how of the other party as well as any and all general information relating to the affairs of the other party and its clients which is not publicly known; in addition, each party agrees to neither use nor disclose any such data except for the purposes hereof, subject to the prior written consent of the other party, or if and to the extent that it is subject to a statutory, regulatory or legal disclosure obligation.

4.  The Asset Manager undertakes to observe the confidentiality rules owed by the Management Company with regard to all data relating to customers of the Management Company; the Management Company will inform the Asset Manager of such confidentiality rules in advance and the Management Company undertakes to only convey data to the Asset Manager which it may lawfully convey under such confidentiality rules; moreover, the Asset Manager agrees to make available any such data in connection herewith only to those employees of the Asset Manager or a sub-manager who are subject to comparable rules of confidentiality owed by the Management Company or any data protection obligations, and to do so only to the extent as is absolutely necessary to perform the management tasks in accordance herewith.



UNIVERSAL
INVESTMENT
LUXEMBOURG

42

Appellee Appx. 01154
Appx. 01465
013967

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Filed 11/03/25    Page 289 of 1017    PageID 14933
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1161 of 1803    PageID 11907
Case 18-30264-sgj11    Doc 397-2    Filed 12/19/18    Entered 12/19/18 23:31:76    Page 10 of 14

5.  The Asset Manager will take technical, personnel-related and organisational measures so as to ensure that the confidentiality of all confidential information of the Management Company and the Fund is maintained as provided in Section 7 hereof not only towards any third parties, but also between various other outsourcing institutions on behalf of which the Asset Manager is acting as a service provider and other clients of the Asset Manager.

### Section 8
#### Notices and Instructions

1.  All notices and instructions are only binding upon the receiving party if given by representatives of the performing units, whose names and specimen signatures are listed in the attached **ANNEX E** hereto. The parties will inform the respective other party immediately of any changes in the list. Each party shall appoint a head co-ordinator for all service areas.

2.  Notices and instructions given by telephone must be confirmed in writing or by fax as soon as practical.

3.  The parties may record all telephone calls between the Asset Manager and the Management Company. Both parties hereby agree to the recording and storage of such conversations and will inform their employees hereof.

### Section 9
#### Duration

1.  This Agreement is concluded for an indefinite period of time. It may be terminated (i) by the Management Company – in respect of one or more of the Sub-Funds – at any time upon providing written notice to the Asset Manager whereupon notwithstanding Section 10 (3) the asset management authorisation is immediately revoked for the relevant Sub-Fund(s) or (ii) by the Asset Manager upon providing 30 (thirty) calendar days' notice to expire at the end of a calendar quarter.

2.  The right to terminate this Agreement immediately for cause is given if

    a)  the other party seriously violates its duties pursuant hereto and such a violation – insofar as it can be remedied or reversed – is not remedied or reversed within 10 (ten) calendar days following receipt of written notice hereof from the respective other party;

    b)  the other party has become the subject of insolvency proceedings opened against it, or said party has applied for insolvency or composition proceedings, or if the opening of insolvency proceedings is refused due to lack of assets sufficient to cover the costs of such proceedings;

    c)  the CSSF orders or demands the ending of this Agreement;

    d)  the other party discontinues its main business operation, pursues liquidation or is dissolved;

    e)  the CSSF or a court of law orders the appointment of an administrator or liquidator or a supervisor for a party;


UNIVERSAL INVESTMENT
LUXEMBOURG

Appellee Appx. 01155

013968

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Exhibit 6    Page 11/68/25 1804    Page 290 of 1017    PageID 14934
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1162 of 1803    PageID 11908
Case 18-30264-sgj11    Doc 2397-2    Filed 12/19/18    Entered 12/19/18 09:29:43    Page 11 of 14

    f)  a significant change of the participation or control circumstances occurs at the other party (except as a result of restructuring for economic reasons within the corporate group and which does not foresee distribution or other pay-outs of the company capital to shareholders, unit holders, partners, creditors, or a capital decrease).

3.    In case of a notice of termination of this Agreement (a "**Termination Notice**") being served for whatever reason, all acts, deeds and dealings carried out or instructed prior to the date of receipt of the Termination Notice (the "Notice Date") shall be valid and legally binding upon the parties. Transactions instructed by the Asset Manager after the Notice Date must be settled according to the instructions of the Management Company. The parties will co-operate to ensure an orderly transition to another asset manager or to enable the Management Company to take over the asset management itself. The Asset Manager will continue to perform the asset management tasks until the transition is completed regardless of termination of this Agreement. Such a transition must be accomplished within an appropriate timeframe and may not be impeded or postponed without cause. So long as the Asset Manager conducts asset management activities it is entitled to the fee according to this Agreement. This notwithstanding, the Management Company is entitled at any time to terminate the Asset Manager's assignment with immediate effect and without awaiting conclusion of the transition.

4.    If a Sub-Fund under this Agreement is transferred to another management company or is dissolved, the Management Company's contractual relationship under this Agreement in respect of this relevant Sub-Fund shall terminate as per the date of the transfer or dissolution of this Sub-Fund. There is no requirement for a separate notice of termination, but the Management Company is obliged to inform the Asset Manager within a reasonable time frame before such transfer or dissolution of a Sub-Fund.

5.    Section 6 and Section 7 shall survive termination hereof.

### Section 10
### Miscellaneous

1.    This Agreement shall be governed by Luxembourg law. Exclusive place of jurisdiction for any disputes arising from or in connection with this Agreement shall be Luxembourg, Grand Duchy of Luxembourg.

2.    No rights under this Agreement shall be assigned by either party to any third parties in whole or in part without the prior written consent of the other party.

3.    In the event that, for whatever reason, any provision hereof is ineffective, unlawful or impracticable, any such ineffectiveness, unlawfulness or impracticability shall not affect the remaining provisions hereof. Any such ineffective, unlawful or impracticable provision shall be replaced by an effective, lawful and practicable provision corresponding to the economic interests of the parties. The same shall apply for any gaps in this Agreement.



UNIVERSAL
INVESTMENT
LUXEMBOURG

Appellee Appx. 01156
Appx. 013969

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 11/64/251804   Page 291 of 1017   PageID 14935
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1163 of 1803   PageID 11909
Case 18-30264-sgj11   Doc 3972-3   Filed 02/15/18   Entered 12/11/19   Page 2531 of 76   Page 12 of 14

4.   The **ANNEXES** in their current versions are each an integral part of this Agreement. These contain any and all agreements between the parties concerning the services to be performed according to this Agreement.

5.   Any amendment hereto, including to this Section 10 (5), must be made in writing.

6.   Executed in duplicate. This Agreement will come into effect on 27 February 2015.

*(Signature page follows)*

UNIVERSAL
INVESTMENT
LUXEMBOURG



Appellee Appx. 01157
Appx. 01498
013970

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 65-6    Page 1165/251804    Page 292 of 1017    PageID 14936
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1164 of 1803    PageID 11910
Case 18-30264-sgj11    Doc 397-2    Filed 12/13/18    Entered 12/13/18 Page 2361 of 76    Page 13 of 14

Grevenmacher, _26 February 2015_    Dallas, _3 March 2015_

**Universal-Investment-Luxembourg S.A.**        **Acis Capital Management, L.P.**

By:                                            By:

Name: Rainer Krenz    Dirk Schmidt            Name: Joshua N Terry

Title:  Senior Manager  Authorized Signatory    Title:  Portfolio Manager

12

UNIVERSAL
INVESTMENT
LUXEMBOURG

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-9    Exhibits    Page 1166 of 1804    Page 293 of 1017    PageID 14937
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1165 of 1803    PageID 11911
Case 18-30264-sgj11-DC2397-CSS-Filed Doc 2159-18    Filed 01/22/19 /18 age 2973 of 76    Page 14 of 14

## ANNEXES

A:  List of Sub-Funds
B:  B1: Issuing Document and articles of incorporation of the Fund
    B2: Investment Guidelines
C:  Lists of Brokers and Counterparties
D:  Fee Schedule
E:  Lists of Authorised Signatories
F:  intentionally omitted
G:  Conflicts of interest policy of the Asset Manager
H:  Best execution policy of the Asset Manager
I:  Operating Memorandum / Service Level Agreement

UNIVERSAL
INVESTMENT
LUXEMBOURG



Appellee Appx. 01159
013972

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-6    Page 1167 of 1804    Page 294 of 1017    PageID 14938
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1166 of 1803    PageID 11912

Case 18-3026Case 19-13397 Doc 59-68    Filed 12/19/18    Entered 12/19/18 Page 29376 Page 1 of 25

# EXHIBIT B

Appellee Appx. 01160

013973

Appx. 01141

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-6    Page 1168 of 1804    Page 295 of 1017    PageID 14939
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1167 of 1803    PageID 11913

**EXECUTION VERSION**

# FOURTH AMENDED AND RESTATED SHARED SERVICES AGREEMENT

by and between

## ACIS CAPITAL MANAGEMENT, L.P.

and

## HIGHLAND CAPITAL MANAGEMENT, L.P.

Dated March 17, 2017

**Appellee Appx. 01161**

013974

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-9   Page 11/69/251804   Page 296 of 1017   PageID 14940
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1168 of 1803   PageID 11914
Case 18-30264-sgj11  Doc 3972-2  Filed 12/19/18   Entered 12/19/18 20:31:76  Page 3 of 25

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ........................................................... 2
    Section 1.01    Certain Defined Terms............................... 2
    Section 1.02    Interpretation........................................ 3
ARTICLE II SERVICES ............................................................ 4
    Section 2.01    General Authority. ................................ 4
    Section 2.02    Provision of Services. .......................... 4
    Section 2.03    Shared Employees................................ 6
    Section 2.04    Applicable Asset Criteria and Concentrations. .......... 8
    Section 2.05    Compliance with Management Company Policies and Procedures. .... 8
    Section 2.06    Authority. ...................................... 8
    Section 2.07    Third Parties. ................................... 9
    Section 2.08    Management Company to Cooperate with the Staff and Services Provider. .... 9
    Section 2.09    Power of Attorney................................ 9
ARTICLE III CONSIDERATION AND EXPENSES .......................... 9
    Section 3.01    Consideration ................................... 9
    Section 3.02    Costs and Expenses............................. 10
    Section 3.03    Deferral ....................................... 10
ARTICLE IV REPRESENTATIONS AND COVENANTS ................... 10
    Section 4.01    Representations ................................. 10
ARTICLE V COVENANTS......................................................... 10
    Section 5.01    Compliance; Advisory Restrictions. .............. 10
    Section 5.02    Records; Confidentiality. ........................ 11
ARTICLE VI EXCULPATION AND INDEMNIFICATION .................. 12
    Section 6.01    Standard of Care ............................... 12
    Section 6.02    Exculpation. ................................... 12
    Section 6.03    Indemnification by the Management Company............... 13
    Section 6.04    Other Sources of Recovery etc .................. 14
    Section 6.05    Rights of Heirs, Successors and Assigns ......... 14
    Section 6.06    Reliance....................................... 14

i

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-9   Page 11/06/25 1804   Page 297 of 1017   PageID 14941
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1169 of 1803   PageID 11915
Case 18-30264-sgj11   Doc 1239-2   Filed 12/19/18   Entered 12/19/18 09:33:76   Page 4 of 25

# TABLE OF CONTENTS
(continued)

**Page**

ARTICLE VII TERMINATION .................................................................................... 14

    Section 7.01    Termination ....................................................................................... 14

ARTICLE VIII MISCELLANEOUS ............................................................................. 15

    Section 8.01    Amendments .................................................................................. 15

    Section 8.02    Assignment and Delegation. ......................................................... 15

    Section 8.03    Non-Recourse; Non-Petition ......................................................... 15

    Section 8.04    Governing Law. ............................................................................ 16

    Section 8.05    WAIVER OF JURY TRIAL ......................................................... 17

    Section 8.06    Severability .................................................................................. 17

    Section 8.07    No Waiver ..................................................................................... 17

    Section 8.08    Counterparts ................................................................................. 17

    Section 8.09    Third Party Beneficiaries ............................................................. 17

    Section 8.10    No Partnership or Joint Venture ................................................... 17

    Section 8.11    Independent Contractor ................................................................ 17

    Section 8.12    Written Disclosure Statement ...................................................... 18

    Section 8.13    Headings ....................................................................................... 18

    Section 8.14    Entire Agreement ......................................................................... 18

    Section 8.15    Notices ......................................................................................... 18

Appellee Appx. 01163

013976

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 10/16/25 1804 Page 298 of 1017   PageID 14942
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1170 of 1803   PageID 11916

Case 18-30264-sgj11 Doc 1397-25 Filed 12/19/18   Entered 12/19/18 Page 22 of 176 Page 5 of 25

# FOURTH AMENDED AND RESTATED
# SHARED SERVICES AGREEMENT

This Fourth Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Parties entered into that certain Third Amended and Restated Shared Services Agreement dated effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company on the terms and conditions hereof;

WHEREAS, the Management Company  may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company;

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee") is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time); and

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 110 of 251804   Page 299 of 1017   PageID 14943
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1171 of 1803   PageID 11917
Case 18-30264-sgj11   Doc 1239-2   Filed 12/19/18   Entered 12/19/18 23:31:76   Page 6 of 25

# ARTICLE I

# DEFINITIONS

Section 1.01   <u>Certain Defined Terms</u>.  As used in this Agreement, the following terms shall have the following meanings:

"<u>Advisers Act</u>" shall have the meaning set forth in the Recitals to this Agreement.

"<u>Advisory Restriction</u>" shall have the meaning set forth in <u>Section 5.01(b)</u>.

"<u>Affiliate</u>" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.  The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"<u>Agreement</u>" shall have the meaning set forth in the Preamble to this Agreement.

"<u>Applicable Asset Criteria and Concentrations</u>" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more CLOs or Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"<u>Applicable Law</u>" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof, including the Risk Retention Rules, of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"<u>CLO or Account</u>" shall mean a collateralized loan obligation transaction, including any type of short-term or long-term warehouse or repurchase facility in connection therewith, or a fund or account advised by the Management Company, as applicable.

"<u>Covered Person</u>" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"<u>Governmental Authority</u>" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission,

2

Appellee Appx. 01165
Appx. 01416
013978

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 11/06/25 1804   Page 300 of 1017   PageID 14944
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1172 of 1803   PageID 11918
Case 18-30264-sgj11   Doc 3972-3   Filed 12/59/68   Entered 12/01/18 23:31:76   Page 7 of 25

corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"<u>Highland</u>" shall have the meaning set forth in the preamble to this Agreement.

"<u>Indebtedness</u>" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) with respect to the Management Company, all indebtedness relating to the acquisition by the EU Originator Series of a collateral obligation that failed to settle (including any ineligible or defaulted collateral obligation) into a CLO; (e) all capital lease obligations; (f) all indebtedness guaranteed by such Person or any of its subsidiaries; (g) all capital lease obligations; (h) all indebtedness guaranteed by such Person or any of its subsidiaries.

"<u>Management Company</u>" shall have the meaning set forth in the <u>preamble</u> to this Agreement.

"<u>Operating Guidelines</u>" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a CLO or Account.

"<u>Parties</u>" shall have the meaning set forth in the <u>preamble</u> to this Agreement.

"<u>Portfolio</u>" means the Management Company's portfolio of collateral loan obligations, debt securities (including equity investments or subordinated securities in a CLO such as a Retention Interest), other similar obligations, preferred return notes, financial instruments, securities or other assets held directly or indirectly by, or on behalf of, the Management Company from time to time;

"<u>Securities Act</u>" shall mean the Securities Act of 1933, as amended.

"<u>Staff and Services Fee</u>" shall have the meaning set forth in <u>Section 3.01</u> of this Agreement.

"<u>Staff and Services Provider</u>" shall have the meaning set forth in the <u>preamble</u> to this Agreement.

"<u>Shared Employee</u>" shall have the meaning set forth in the <u>Recitals</u> to this Agreement.

Section 1.02   <u>Interpretation</u>.   The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are

Appellee Appx. 01166
Appx. 01415
013979

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 11/04/25 1804   Page 301 of 1017   PageID 14945
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1173 of 1803   PageID 11919
Case 18-30264-sgj11   Doc 1397-23   Filed 12/19/18   Entered 12/19/18 22:35:31   Page 8 of 25

not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

### SERVICES

Section 2.01   General Authority.   Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.   The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02   Provision of Services.   Without limiting the generality of Section 2.1 and subject to Section 2.4 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)   *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, accounting, payments, operations, technology and finance;

(b)   *Legal/Compliance/Risk Analysis*.   Assistance and advice with respect to legal issues, compliance support and implementation and general risk analysis;

(c)   *Management of Collateral Obligations and CLOs and Accounts*.   Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any CLO or Account from time to time.

(d)   *Valuation*.   Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such

Appellee Appx. 01167
Appx. 01418
013980

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1175/85/1804    Page 302 of 1017    PageID 14946
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1174 of 1803    PageID 11920
Case 18-30264-sgj11    Doc 3972-25    Filed 12/59/68    Entered 12/91/18 09:26:31 76    Page 9 of 25

valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(e)    *Execution and Documentation.*  Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a CLO or Account managed by the Management Company, CLO transactions involving the Management Company, and any other rights and obligations of the Management Company;

(f)    *Marketing.*  Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified CLOs or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(g)    *Reporting.*  Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any CLO or Account, including reports relating to (i) purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

(h)    *Administrative Services.*  The provision of office space, information technology services and equipment, infrastructure and other related services requested or utilized by the Management Company from time to time;

(i)    *Shared Employees.*  The provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of Section 2.03 hereof;

(j)    *Ancillary Services.*  Assistance and advice on all things ancillary or incidental to the foregoing; and

(k)    *Other.*  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any CLO or Account or similar securitization, (c) the substantive investment management decisions with respect to any CLO or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Appellee Appx. 01168
Appx. 01119
013981

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 18-15   Page 10/06/25 1804  Page 303 of 1017   PageID 14947
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1175 of 1803   PageID 11921
Case 18-30264  Case 19-12297-CSS  Filed 02/15/18   Entered 02/11/19  Page 29731 of 76  Page 10 of 25

Section 2.03   <u>Shared Employees</u>.

(a)   The Staff and Services Provider hereby agrees and consents that each Shared Employee shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  The name, location and such other matters as the Parties desire to reflect with respect to each Shared Employee shall be identified on the books and records of each of the Management Company and the Staff and Services Provider, which may be amended in writing from time to time by the Parties to add or remove any Shared Employee to reflect the employment (or lack thereof) of such employee.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  If at any time any Shared Employee (or any other person employed by the Staff and Services provider who also provides services to the Management Company) shall be terminated from employment with the Staff and Services Provider or otherwise resigns or is removed from employment with the Staff and Services Provider, then such person may only serve as a separate direct employee of the Management Company upon the approval of the Management Company.  The Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

(b)   Notwithstanding that the Shared Employees shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)   To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)   Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate

Appellee Appx. 01169
Appx. 01429
013982

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 18-15    Exhibit 6    Page 11/07/05 1804    Page 304 of 1017    PageID 14948
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1176 of 1803    PageID 11922
Case 18-3026    Case 19-12397-CSS    Filed 11/21/18    Document 1159-6    Entered 11/21/19    Page 29 of 76    Page 11 of 25

with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)    Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)    The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)    The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any CLO or Account, and regulators, as applicable.    To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)    The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

(i)    The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)    The Staff and Services Provider shall require that each Shared Employee:

(i)    certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)    be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)    provide services hereunder and take actions hereunder only as approved by the Management Company;

Appellee Appx. 01170
Appx. 01121
013983

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 63-15    Filed 07/08/25    Page 305 of 1017    PageID 14949
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1177 of 1803   PageID 11923
Case 18-30262   Case 19-1222-CS   Doc 215-43   Filed 01/21/19   Page 2931 of 76   Page 12 of 25

(iv)    provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)    to the extent authorized to transact on behalf of the Management Company or a CLO or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)    act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a CLO or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)    Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04    Applicable Asset Criteria and Concentrations.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.2 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05    Compliance with Management Company Policies and Procedures.  The Management Company will from time to time provide the Staff and Services Provider and the Shared Employees with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06    Authority.  The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement.  The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party.  Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time.  The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Appellee Appx. 01171
Appx. 01422
013984

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Page 1176/251804   Page 306 of 1017   PageID 14950
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1178 of 1803   PageID 11924
Case 18-30264 Case 19-02372-S Filed 12/15/18   Entered 12/19/18 Page 24 of 76   Page 13 of 25

Section 2.07   <u>Third Parties</u>.

(a)   The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)   In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a CLO or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08   <u>Management Company to Cooperate with the Staff and Services Provider</u>. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09   <u>Power of Attorney</u>.   If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments).   Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01   <u>Consideration</u>.   As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive the Staff and Services Fee payable thereto.   The "<u>Staff and Services Fee</u>" shall be payable in accordance with <u>Appendix A</u> attached hereto, as such appendix may be amended by the Parties from time to time.

From time to time, the Management Company may enter into shared services agreements with certain management companies on similar terms to this Agreement.   Promptly following the receipt of any fees pursuant to such shared services agreements, the Management Company shall pay 100% of such fees to the Staff and Services Provider.

Appellee Appx. 01172

Appx. 01423

013985

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibits 6    Page 11/86/2518044 Page 307 of 1017    PageID 14951
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1179 of 1803    PageID 11925
Case 18-30264 Case 19-1023972-S Filed 1215963    Entered 12/11/18 09:24:131 of 76 Page 14 of 25

Section 3.03    <u>Costs and Expenses</u>.  Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.04    <u>Deferral</u>.  Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01    <u>Representations</u>.  Each of the Parties hereto represents and warrants that:

(a)    It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)    no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01    <u>Compliance; Advisory Restrictions</u>.

(a)    The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider.  Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable

Appellee Appx. 01173
013986

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 61-15    Exhibit 6    Page 11/36/251804    Page 308 of 1017    PageID 14952
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1180 of 1803    PageID 11926
Case 18-3026    Case 19-D02397-2-S    Doc: 21-5918    Filed 12/19/18    Entered 12/19/18 Page 2423 of 76    Page 15 of 25

access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)    This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof.  It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions").  If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02    Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any CLO or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such

Appellee Appx. 01174
Appx. 01425
013987

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Filed 07/03/25   Page 309 of 1017   PageID 14953
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1181 of 1803   PageID 11927
Case 18-3026   Case 19-12239-CSS   Doc 21-58   Filed 11/21/19   Page 24 of 76   Page 16 of 25

information as is routinely disclosed to the trustee, custodian or collateral administrator of any CLO or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such CLO or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the CLOs or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Management Vehicles, the CLOs or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01    Standard of Care.   Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder.  No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account.  Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

Section 6.02    Exculpation.   To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To

12

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 16-15 Exhibit 6 Page 11/36/1251804 Page 310 of 1017 PageID 14954
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1182 of 1803 PageID 11928
Case 18-30264 Case 19-02379-2-S Filed Doc 21-15/46 Entered 12/09/18 Page 29431 of 76 Page 17 of 25

the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03    Indemnification by the Management Company.    The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be

Appellee Appx. 01176

013989

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 61-15    Exhibit 6    Page 1184 of 1804    Page 311 of 1017    PageID 14955
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1183 of 1803    PageID 11929
Case 18-30264    Case 19-D-2379-0-25    Filed 12/15/18    Entered 12/19/18    Page 24531 of 76    Page 18 of 25

determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder.  The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives.  Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04    Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled.  If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the CLOs or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Section 6.05    Rights of Heirs, Successors and Assigns. The indemnification rights provided by Section 6.03 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06    Reliance. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01    Termination. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

Appellee Appx. 01177
Appx. 01426
013990

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Page 11/85/651804   Page 312 of 1017   PageID 14956
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1184 of 1803   PageID 11930
Case 18-30264 Case 19-D2397-23 File Doc 215048   Filed 11/212/19 1/P1age 2631 of 76 Page 19 of 25

# ARTICLE VIII

## MISCELLANEOUS

Section 8.01   <u>Amendments</u>.  This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02   <u>Assignment and Delegation</u>.

(a)   Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)   Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)   The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03   <u>Non-Recourse; Non-Petition</u>.

(a)   The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)   Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations

Appellee Appx. 01178
Appx. 013929
013991

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibits    Page 1186/251804    Page 313 of 1017    PageID 14957
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1185 of 1803    PageID 11931
Case 18-3026 Case 19-D2397-2-2 SFile Doc 215 9 18    Filed 11/21/01/19/18 Page 2473 of 76 Page 20 of 25

and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)    Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)    The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)    The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

Section 8.04    Governing Law.

(a)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)    The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "Proceedings") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum

Appellee Appx. 01179
Appx. 01129
013992

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 1187 of 1804    Page 314 of 1017    PageID 14958
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1186 of 1803    PageID 11932
Case 18-30264    Case 19-12379-CSS    Filed 12/21/18    Entered 12/21/18 Page 2430 of 76    Page 21 of 25

and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05   <u>WAIVER OF JURY TRIAL</u>.   EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06   <u>Severability</u>.   The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07   <u>No Waiver</u>.   The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party.  Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08   <u>Counterparts</u>.   This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Section 8.09   <u>Third Party Beneficiaries</u>.   This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, CLO or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10   <u>No Partnership or Joint Venture</u>.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.  Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11   <u>Independent Contractor</u>.  Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 11/86/051804   Page 315 of 1017   PageID 14959
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1187 of 1803   PageID 11933
Case 18-3026   Case 19-D2239-2-25-Filed-Doc-215D-48   Filed-11/21/19   Page 24931 76 Page 22 of 25

expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12  <u>Written Disclosure Statement</u>.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13  <u>Headings</u>.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14  <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15  <u>Notices</u>.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

(a)     If to the Management Company:

Acis Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

(b)     If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

**Appellee Appx. 01181**
**Appx. 01132**
013994

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Exhibit 5   Page 1186 of 1804   Page 316 of 1017   PageID 14960
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1188 of 1803   PageID 11934
Case 18-30264-sgj11   Doc 2397-2   Filed 12/31/18   Entered 12/31/18 09:25:01   Page 23 of 25
Case 19-12379-CSS   Doc 215-46   Filed 11/21/19   Page 2031 of 76

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By: _____
Name: James Dondero
Title:   President


**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By: _____
Name: James Dondero
Title:   President

*Signature Page to Fourth Amended and Restated Shared Services Agreement*

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Exhibit 6   Page 11/06/251804   Page 317 of 1017   PageID 14961
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1189 of 1803   PageID 11935

Case 18-30264-sgj11   Doc 2397-2   Filed 12/19/18   Entered 12/19/18 09:25:10   Page 24 of 25

## **Appendix A**

      The Management Company shall pay to the Staff and Services Provider a Staff and Services Fee for the services for the CLOs or Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such CLOs or Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such CLOs or Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table.  Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such CLOs or Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such CLOs or Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder.  Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

*[Remainder of Page Intentionally Left Blank.]*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-15    Filed 11/06/25    Page 318 of 1017    PageID 14962
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1190 of 1803    PageID 11936

Case 18-30264-sgj11    Doc 2397-2    Filed 12/19/18    Entered 12/19/18 09:52:31    Page 25 of 76    Page 25 of 25

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Staff and Services Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 15 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 15 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 15 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | February 25, 2014 | 15 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | June 5, 2014 | 15 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | November 18, 2014 | 15 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | April 16, 2015 | 15 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 15 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

Appellee Appx. 01184

Appx. 01485

013997

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-9   Filed 06/05/25   Page 319 of 1017   PageID 14963
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1191 of 1803   PageID 11937

Case 18-30264-sgj11   Doc 1239-2   Filed 12/19/18   Entered 12/19/18 23:31:16   Page 1 of 22

# EXHIBIT C

Appellee Appx. 01185
Appx. 01426
013998

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Page 11/98/2518-04Page 320 of 1017   PageID 14964
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1192 of 1803   PageID 11938

**EXECUTION VERSION**

**THIRD AMENDED AND RESTATED SUB-ADVISORY AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

**Appellee Appx. 01186**

013999

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 10/96/25 1804   Page 321 of 1017   PageID 14965
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1193 of 1803   PageID 11939
Case 18-30264-sgj11   Doc 3972-3   Filed 12/19/18   Entered 12/19/18 09:53:16   Page 3 of 22

## TABLE OF CONTENTS

Page

1.  Appointment; Limited Scope of Services ................................................................. 1

2.  Compensation .......................................................................................................... 3

3.  Representations and Warranties............................................................................... 3

4.  Standard of Care; Liability; Indemnification. .......................................................... 4

5.  Limitations on Employment of the Sub-Advisor; Conflicts of Interest. .................. 7

6.  Termination; Survival .............................................................................................. 8

7.  Cooperation with Management Company ............................................................... 8

8.  Management Agreements and Related Agreements ................................................. 8

9.  Amendments; Assignments ..................................................................................... 9

10. Advisory Restrictions............................................................................................... 9

11. Records; Confidentiality. ....................................................................................... 10

12. Notice ..................................................................................................................... 11

13. Governing Law ....................................................................................................... 11

14. WAIVER OF JURY TRIAL .................................................................................... 11

15. Severability ............................................................................................................. 11

16. No Waiver ............................................................................................................... 11

17. Counterparts ........................................................................................................... 12

18. Third Party Beneficiaries ....................................................................................... 12

19. No Partnership or Joint Venture ............................................................................ 12

20. Entire Agreement ................................................................................................... 12

Appellee Appx. 01187
0140000

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 10/95/251804   Page 322 of 1017   PageID 14966
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1194 of 1803   PageID 11940
Case 18-30264-sgj11   Doc 1229-73   Filed 12/19/18   Entered 12/19/18   Page 296 of 176   Page 4 of 22

**THIRD AMENDED AND RESTATED**
**SUB-ADVISORY AGREEMENT**

This Third Amended and Restated Sub-Advisory Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "<u>Agreement</u>"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "<u>Management Company</u>"), and Highland Capital Management, L.P., a Delaware limited partnership ("<u>Highland</u>"), as the sub-advisor hereunder (in such capacity, the "<u>Sub-Advisor</u>" and together with the Management Company, the "<u>Parties</u>").

<u>**R E C I T A L S**</u>

WHEREAS, the Parties entered into that certain Second Amended and Restated Sub-Advisory Agreement dated July 29, 2016 to be effective January 1, 2016 (the "<u>Existing Agreement</u>");

WHEREAS, the Management Company from time to time has entered and will enter into portfolio management agreements, investment management agreements and/or similar agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of <u>Section 8</u>, a "<u>Management Agreement</u>") and related indentures, credit agreements, collateral administration agreements, service agreements or other agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of <u>Section 8</u>, a "<u>Related Agreement</u>"), in each case as set forth on Appendix A hereto, as amended from time to time, pursuant to which the Management Company has agreed to provide portfolio and/or investment management services to certain funds and accounts and to certain collateralized loan obligation issuers and to borrowers in certain short-term or long-term warehouse or repurchase facilities in connection therewith (any such transaction, a "<u>Transaction</u>", any fund, account, issuer, warehouse borrower or repurchase agreement seller in respect of any such Transaction, an "<u>Account</u>", and the assets collateralizing each such Transaction and/or comprising the portfolio of such Account, a "<u>Portfolio</u>");

WHEREAS, the Management Company and the Sub-Advisor desire to enter into this Agreement in order to permit the Sub-Advisor to provide certain limited services to assist the Management Company in performing certain obligations under the Management Agreements and Related Agreements;

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, and the receipt of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

1.  <u>Appointment; Limited Scope of Services</u>.

(a)  Highland is hereby appointed as Sub-Advisor to the Management Company for the purpose of assisting the Management Company in managing the Portfolios of each Account

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1196 of 1804   Page 323 of 1017   PageID 14967
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1195 of 1803   PageID 11941
Case 18-30264-sgj11   Doc 39-72   Filed 12/59/68   Entered 12/11/91   Page 29:31:76   Page 5 of 22

pursuant to the related Management Agreement and Related Agreements, in each case that have been included in the scope of this Agreement pursuant to the provisions of <u>Section 8</u>, subject to the terms set forth herein and subject to the supervision of the Management Company, and Highland hereby accepts such appointment.

       (b)    Without limiting the generality of the foregoing, the Sub-Advisor shall, during the term and subject to the provisions of this Agreement:

       (i)    make recommendations to the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account as to the general composition and allocation of the Portfolio with respect to such Account among various types of securities, the nature and timing of the changes therein and the manner of implementing such changes, including recommendations as to the specific loans and other assets to be purchased, retained or sold by any such Account;

       (ii)    place orders with respect to, and arrange for, any investment by or on behalf of such Account (including executing and delivering all documents relating to such Account's investments on behalf of such Account or the Management Company, as applicable), upon receiving a proper instruction from the Management Company;

       (iii)    identify, evaluate, recommend to the Management Company, in its capacity as portfolio manager for such Account, and, if applicable, negotiate the structure and/or terms of investment opportunities within the specific investment strategy of the Management Company for such Account;

       (iv)    assist the Management Company in its capacity as portfolio manager for such Account in performing due diligence on prospective Portfolio investments by such Account;

       (v)    provide information to the Management Company in its capacity as portfolio manager for such Account regarding any investments to facilitate the monitoring and servicing of such investments and, if requested by the Management Company, provide information to assist in monitoring and servicing other investments by such Account

       (vi)    assist and advise the Management Company in its capacity as portfolio manager for such Account with respect to credit functions including, but not limited to, credit analysis and market research and analysis; and

       (vii)    assist the Management Company in performing any of its other obligations or duties as portfolio manager for such Account.

The foregoing responsibilities and obligations are collectively referred to herein as the "<u>Services</u>."

Notwithstanding the foregoing, all investment decisions will ultimately be the responsibility of, and will be made by and at the sole discretion of, the Management Company. Furthermore, the

Appellee Appx. 01189
Appx. 01449
014002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 16-15    Page 10 of 22   Page 324 of 1017    PageID 14968
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1196 of 1803   PageID 11942
Case 18-30264-sgj11   Doc 2397-2   Filed 12/19/18   Entered 12/19/18 23:31:76   Page 6 of 22

parties acknowledge and agree that the Sub-Advisor shall be required to provide only the services expressly described in this Section 1(b), and shall have no responsibility hereunder to provide any other services to the Management Company or any Transaction, including, but not limited to, administrative, management or similar services.

(c)     The Sub-Advisor agrees during the term hereof to furnish the Services on the terms and conditions set forth herein and subject to the limitations contained herein. The Sub-Advisor agrees that, in performing the Services, it will comply with all applicable obligations of the Management Company set forth in the Management Agreements and the Related Agreements. In addition, with respect to any obligation that would be part of the Services but for the fact that the relevant Management Agreement or Related Agreement does not permit such obligation to be delegated by the Management Company to the Sub-Advisor, the Sub-Advisor, upon request in writing by the Management Company, shall work in good faith with the Management Company and shall use commercially reasonable efforts to assist the Management Company in satisfying all such obligations.

2.     Compensation.

(a)     As compensation for its performance of its obligations as Sub-Advisor under this Agreement in respect of any Transaction, the Sub-Advisor will be entitled to receive the Sub-Advisory Fee payable thereto. The "Sub-Advisory Fee" shall be payable in accordance with Appendix A attached hereto, as such appendix may be amended by the Parties from time to time.

(b)     Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Sub-Advisor for any and all costs and expenses that are properly Company Expenses or that may be borne by the Management Company under the Management Company LLC Agreement.

(c)     Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any and all amounts payable to the Sub-Advisor pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

(d)     From time to time, the Management Company may enter into sub-advisory agreements with certain management companies on similar terms to this Agreement. Promptly following the receipt of any fees pursuant to such sub-advisory agreements, the Management Company shall pay 100% of such fees to the Sub-Advisor.

3.     Representations and Warranties.

(a)     Each of the Management Company and the Sub-Advisor represents and warrants, as to itself only, that:

(i)     it has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

Appellee Appx. 01190
Appx. 01141
01 4003

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Exhibit 6    Page 10/98/25 1804    Page 325 of 1017    PageID 14969
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1197 of 1803    PageID 11943
Case 18-30264-sgj11    Doc 1372-2    Filed 12/59/68    Entered 12/11/91/18    Page 59 31 76    Page 7 of 22

(ii)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(iii)    no consent, approval, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other person or entity is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(iv)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (A) its constituting and organizational documents; (B) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound; (C) any statute applicable to it; or (D) any law, decree, order, rule or regulation applicable to it of any court or regulatory, administrative or governmental agency, body of authority or arbitration having or asserting jurisdiction over it or its properties, which, in the case of clauses (B) through (D) above, would have a material adverse effect upon the performance of its duties hereunder.

(b)    The Sub-Advisor represents and warrants to the Management Company that it is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

(c)    The Management Company acknowledges that it has received Part 2 of Highland Capital Management, L.P.'s Form ADV filed with the Securities and Exchange Commission. The Sub-Advisor will provide to the Management Company an updated copy of Part 2 of its Form ADV promptly upon any amendment to such Form ADV being filed with the Securities and Exchange Commission.

4.    Standard of Care; Liability; Indemnification.

(a)    Sub-Advisor Standard of Care. Subject to the terms and provisions of this Agreement, the Management Agreements and/or the Related Agreements, as applicable, the Sub-Advisor will perform its obligations hereunder and under the Management Agreements and/or the Related Agreements in good faith with reasonable care using a degree of skill and attention no less than that which the Sub-Advisor uses with respect to comparable assets that it manages for others and, without limiting the foregoing, in a manner which the Sub-Advisor reasonably believes to be consistent with the practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Portfolios, in each case except as expressly provided otherwise under this Agreement, the Management Agreements and/or the

4

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6    Exhibit 6    Page 1109/1751804    Page 326 of 1017    PageID 14970
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1198 of 1803    PageID 11944
Case 18-30264-sgj11    Doc 1239-72    Filed 12/19/18    Entered 12/19/18 20:31:76    Page 8 of 22

Related Agreements. To the extent not inconsistent with the foregoing, the Sub-Advisor will follow its customary standards, policies and procedures in performing its duties hereunder, under the Management Agreements and/or under the Related Agreements.

(b)    Exculpation. To the fullest extent permitted by law, none of the Sub-Advisor, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)) (each a "Covered Person") will be liable to the Management Company, any Member, any shareholder, partner or member thereof, any Account (or any other adviser, agent or representative thereof), or to any holder of notes, securities or other indebtedness issued by any Account (collectively, the "Management Company Related Parties"), for (i) any acts or omissions by such Covered Person arising out of or in connection with the provision of the Services hereunder, for any losses that may be sustained in the purchase, holding or sale of any security or debt obligation by any Account, or as a result of any activities of the Sub-Advisor, the Management Company or any other adviser to or agent of the Account or any other sub-advisor appointed by the Management Company to provide portfolio management services to any other delegatee of the Management Company or any other person or entity, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of the Sub-Advisor, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of the Sub-Advisor with reasonable care, or (iii) any consequential (including loss of profit), indirect, special or punitive damages. To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to any Management Company Related Party, no Covered Person acting under this Agreement shall be liable to such Management Company Related Party for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to any Management Company Related Party solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to any such Management Company Related Party, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to any Management Company Related Party in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care

Appellee Appx. 01192
Appx. 01145
0140005

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 1206/251804   Page 327 of 1017   PageID 14971
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1199 of 1803   PageID 11945
Case 18-30264-sgj11   Doc 3972-5   Filed 12/19/18   Entered 12/19/18   Page 9 of 22

   (c) <u>Indemnification</u>. The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the Services, the activities of the Management Company Related Parties, or activities undertaken in connection with the Management Company Related Parties, or otherwise relating to or arising out of this Agreement, any Management Agreement and/or the Related Documents, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "<u>Proceeding</u>"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "<u>Damages</u>"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

   Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

   Notwithstanding any provision of this Agreement to the contrary, the provisions of this <u>Section 4(c)</u> shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this <u>Section 4(c)</u> to the fullest extent permitted by law

   (d) <u>Other Sources of Recovery etc</u>. The indemnification rights set forth in <u>Section 4(c)</u> are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Page 120 of 251804   Page 328 of 1017   PageID 14972
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1200 of 1803   PageID 11946
Case 18-30264   Case 19-03379-SJ   Filed 02/15/18   Entered 02/15/18   Page 2621 of 76   Page 10 of 22

indemnification from any Person in which any of the Transactions has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained

(e)     Rights of Heirs, Successors and Assigns.  The indemnification rights provided by Section 4(c) shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person

(f)     Reliance.  A Covered Person shall incur no liability to any Management Company Related Party in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge.  Each Covered Person may act directly or through his, her or its agents or attorneys.

(g)     Rights Under Management Agreements and Related Agreements.  The Management Company will ensure that the Sub-Advisor is provided substantially similar indemnification and exculpation rights as are afforded to the Management Company in its role as portfolio manager under any future Management Agreement or Related Agreement encompassed within the Services hereunder, and it is expressly acknowledged by the Parties that the Sub-Advisor may not consent to including a Management Agreement and the related Transaction and Related Agreements within the scope of this Agreement pursuant to Section 8 if such indemnification and exculpation rights are not reasonably acceptable to it.

5.     Limitations on Employment of the Sub-Advisor; Conflicts of Interest.

(a)     The services of the Sub-Advisor to the Management Company are not exclusive, and the Sub-Advisor may engage in any other business or render similar or different services to others including, without limitation, the direct or indirect sponsorship or management of other Transactions, investment-based accounts or commingled pools of capital, however structured, having investment objectives similar to those of the Management Company or the Accounts. Moreover, nothing in this Agreement shall limit or restrict the right of any manager, partner, officer or employee of the Sub-Advisor to engage in any other business or to devote his or her time and attention in part to any other business, whether of a similar or dissimilar nature to the Management Company or any Account, or to receive any fees or compensation in connection therewith.

(b)     So long as this Agreement or any extension, renewal or amendment of this Agreement remains in effect, the Sub-Advisor shall be the only portfolio management sub-advisor for the Management Company.  The Sub-Advisor assumes no responsibility under this Agreement other than to render the services called for hereunder.  It is understood that directors, officers, employees, members and managers of the Management Company are or may become interested in the Sub-Advisor and its Affiliates as directors, officers, employees, partners, stockholders, members, managers or otherwise, and that the Sub-Advisor and directors, officers, employees,

Appellee Appx. 01194
Appx. 01145
014007

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Filed 03/05/25    Page 329 of 1017    PageID 14973
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1201 of 1803    PageID 11947
Case 18-3026    Case 19-1229 C SS    Filed 01/21/19 18    Filed 01/21/19    Page 2631 of 76    Page 11 of 22

partners, stockholders, members and managers of the Sub-Advisor and its Affiliates are or may become similarly interested in the Management Company as members or otherwise.

(c)    The Management Company acknowledges that various potential and actual conflicts of interest may exist with respect to the Sub-Advisor as described in the Sub-Advisor's Form ADV Part 2A and as described in Appendix B hereto, and the Management Company expressly acknowledges and agrees to the provisions contained in such Appendix B, as amended from time to time with mutual consent of the Parties.

6.    Termination; Survival.

(a)    This Agreement may be terminated, in its entirety or with respect to any Management Agreement, at any time without payment of penalty, by the Management Company upon 30 days' prior written notice to the Sub-Advisor.

(b)    This Agreement shall terminate automatically with respect to any Management Agreement on the date on which (i) such Management Agreement has been terminated (and, if required thereunder, a successor portfolio manager has been appointed and accepted) or discharged; or (ii) the Management Company is no longer acting as portfolio manager, investment manager or in a similar capacity (whether due to removal, resignation or assignment) under such Management Agreement and the Related Agreements.  Upon the termination of this Agreement with respect to any Management Agreement the Management Company shall provide prompt notice thereof to the Sub-Advisor, and Appendix A hereto shall be deemed to be amended by deleting such Management Agreement and the Related Agreements related thereto.

(c)    All accrued and unpaid financial and indemnification obligations with respect to any conduct or events occurring prior to the effective date of the termination of this Agreement shall survive the termination of this Agreement.

7.    Cooperation with Management Company.  The Sub-Advisor shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Sub-Advisor.  Specifically, the Sub-Advisor agrees that it will provide the Management Company with reasonable access to information relating to the performance of Sub-Advisor's obligations under this Agreement.

8.    Management Agreements and Related Agreements.  The Sub-Advisor's duty to provide Services in connection with any Management Agreement shall not commence until (a) Appendix A to this Agreement has been amended by mutual agreement of the Parties to include such Management Agreement and the related Account, fund and/or account and Related Agreements and (b) the Sub-Advisor acknowledges receipt of such Management Agreement and each Related Agreement.  The Sub-Advisor shall not be bound to comply with any amendment, modification, supplement or waiver to any Management Agreement or any Related Agreement until it has received a copy thereof from the Management Company.  No amendment, modification, supplement or waiver to any Management Agreement or Related Agreement that, when applied to the obligations and rights of the Management Company under such Management Agreement or Related Agreement, affects (i) the obligations or rights of the Sub-Advisor hereunder; (ii) the amount of priority of any fees or other amounts payable to the Sub-Advisor hereunder; or (iii) any

8

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 16-15    Filed 12/08/25   Page 330 of 1017    PageID 14974
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1202 of 1803   PageID 11948
Case 18-30264   Case 19-D23972-S   Filed 12/51/18   Filed 12/17/19   Page 29431 of 76   Page 12 of 22

definitions relating to the matters covered in clause (i) or (ii) above, will apply to the Sub-Advisor under this Agreement unless in each such case the Sub-Advisor has consented thereto in writing (such consent not to be unreasonably withheld or delayed unless the Sub-Advisor determines in its reasonable judgment that such amendment, modification, supplement or waiver could have a material adverse effect on the Sub-Advisor).

      9.    <u>Amendments; Assignments</u>.

      (a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in <u>clauses (b)</u> and <u>(c)</u> of this <u>Section 9</u>, without the prior written consent of the other Party and (ii) in accordance with the Advisers Act and other applicable law.

      (b)    Except as otherwise provided in this <u>Section 9</u>, the Sub-Advisor may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with the Advisers Act and other applicable law.

      (c)    The Sub-Advisor may, without satisfying any of the conditions of <u>Section 9(a)</u> other than clause (ii) thereof (so long as such assignment does not constitute an assignment within the meaning of Section 202(a)(1) of the Advisers Act), (1) assign any of its rights or obligations under this Agreement to an affiliate; *provided* that such affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Sub-Advisor pursuant to this Agreement and (ii) has the legal right and capacity to act as Sub-Advisor under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Sub-Advisor under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Sub-Advisor in another corporate or similar form and has substantially the same staff; provided, further, that the Sub-Advisor shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Sub-Advisor will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

      10.    <u>Advisory Restrictions</u>. This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any Management Agreement or any part thereof. It is the express intention of the parties hereto that (i) the Services are limited in scope; and (ii) this Agreement complies in all respects with all applicable (A) contractual provisions and restrictions contained in each Management Agreement and each Related Agreement and (B) laws, rules and regulations (collectively, the "<u>Advisory Restrictions</u>"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the Services to be provided under this Agreement shall automatically without action by any person or entity be limited, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

<center>9</center>

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1204/651804    Page 331 of 1017    PageID 14975
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1203 of 1803    PageID 11949
Case 18-30264  Case 19-02272-SS  Filed  Doc 2159-18    Entered 12/01/19  Page 2931 of 76  Page 13 of 22

11.    <u>Records; Confidentiality</u>.

(a)    The Sub-Advisor shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; provided, that the Sub-Advisor shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

(b)    The Sub-Advisor shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Sub-Advisor hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued in connection with a Transaction or supplying credit estimates on any obligation included in the Portfolios, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Account for which the Management Company serves as portfolio manager, (iv) as required by (A) applicable law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Sub-Advisor or any of its affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Sub-Advisor on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Sub-Advisor may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Transaction, or (ix) information relating to performance of the Portfolios as may be used by the Sub-Advisor in the ordinary course of its business.  Notwithstanding the foregoing, it is agreed that the Sub-Advisor may disclose without the consent of any Person (1) that it is serving as Sub-Advisor to the Management Company and each Account, (2) the nature, aggregate principal amount and overall performance of the Portfolios, (3) the amount of earnings on the Portfolios, (4) such other information about the Management Company, the Portfolios and the Transactions as is customarily disclosed by Sub-Advisors to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Sub-Advisor, the Management Company, the Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

Appellee Appx. 01197
Appx. 01448
014010

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Filed 12/05/25   Page 332 of 1017   PageID 14976
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1204 of 1803   PageID 11950
Case 18-30264   Case 19-12397-CSS   Doc 2159-8   Filed 12/31/19   Page 14 of 22

12.    <u>Notice</u>.  Any notice or demand to any party to this Agreement to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail, facsimile or email transmission or by delivering it by hand as follows (or to such other address, email address or facsimile number as shall have been notified to the other parties hereto):

      (a)    If to the Management Company:

           Acis Capital Management, L.P.
           300 Crescent Court
           Suite 700
           Dallas, TX 75201

      (b)    If to the Sub-Advisor:

           Highland Capital Management, L.P.
           300 Crescent Court
           Suite 700
           Dallas, TX 75201

13.    <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.  The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

14.    <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

15.    <u>Severability</u>.  The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties.

16.    <u>No Waiver</u>.  The performance of any condition or obligation imposed upon any party hereunder may be waived only upon the written consent of the parties hereto.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other party under this Agreement.  Any failure by any party to this Agreement to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Appellee Appx. 01198
Appx. 01140
014011

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 53-6   Page 1206 of 1804   Page 333 of 1017   PageID 14977
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1205 of 1803   PageID 11951
Case 18-30264-sgj11   Doc 2397-2   Filed 12/11/18   Entered 12/11/18   Page 2973 of 76   Page 15 of 22

17.  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

18.  <u>Third Party Beneficiaries</u>.  Nothing in this Agreement will be construed to give any person or entity other than the parties to this Agreement, the Accounts and any person or entity with indemnification rights hereunder any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.  Except as provided in the foregoing sentence, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

19.  <u>No Partnership or Joint Venture</u>.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the parties.  Except as expressly provided herein or in any other written agreement between the parties, no party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other party.

20.  <u>Entire Agreement</u>.  This Agreement, together with each Management Agreement and Related Agreement, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter.

[Remainder of Page Intentionally Left Blank]

Appellee Appx. 01199
014012

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-5    Page 1206 of 1804    Page 334 of 1017    PageID 14978
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1206 of 1803    PageID 11952
Case 18-30264-sgj11-DC-3972-3-SS-Filed Doc 2150-16    Filed 01/17/19/18 09-29831 76 Page 16 of 22

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By: Strand Advisors, Inc., its General Partner

By: _____
Name: James Dondero
Title:  President


**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By: _____
Name: James Dondero
Title:  President

*Signature Page to Third Amended and Restated Sub-Advisory Agreement*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Exhibit 6    Page 1206 of 1804    Filed 08/05/25    Page 335 of 1017    PageID 14979
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1207 of 1803    PageID 11953

### **Appendix A**

      The Management Company shall pay to the Sub-Advisor a Sub-Advisory Fee for the Services for the Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table.  Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder.  Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

      [*Remainder of Page Intentionally Left Blank*]

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 63-15 Page 1209 of 1804 Page 336 of 1017 PageID 14980
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1208 of 1803 PageID 11954
Case 18-3026 Case 19-D2397-CSSFiled Doc 2159-18 Filed 12/09/18 Page 2003 of 76 Page 18 of 22

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Sub-Advisory Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 20 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 20 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 20 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | February 25, 2014 | 20 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | June 5, 2014 | 20 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | November 18, 2014 | 20 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | April 16, 2015 | 20 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 20 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

2

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-5   Page 12/06/25 1804   Page 337 of 1017   PageID 14981
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1209 of 1803   PageID 11955
Case 18-30258-sgj11   Doc 2397-3   Filed 12/09/18   Page 2031 of 76   Page 19 of 22

**APPENDIX B**

Purchase and Sale Transactions; Brokerage

The Management Company acknowledges and agrees that the Sub-Advisor or any of its affiliates may acquire or sell obligations or securities, for its own account or for the accounts of its customers, without either requiring or precluding the acquisition or sale of such obligations or securities for the account of any Account. Such investments may be the same or different from those made by or on behalf of the Management Company or the Accounts.

Additional Activities of the Sub-Advisor

Nothing herein shall prevent the Sub-Advisor or any of its clients, its partners, its members, funds or other investment accounts managed by it or any of its affiliates, or their employees and their affiliates (collectively, the "Related Entities"), from engaging in other businesses, or from rendering services of any kind to the Management Company, its affiliates, any Account or any other Person or entity regardless of whether such business is in competition with the Management Company, its affiliates, such Account or otherwise. Without limiting the generality of the Sub-Advisor and its Related Entities may:

(a) serve as managers or directors (whether supervisory or managing), officers, employees, partners, agents, nominees or signatories for the Management Company or any affiliate thereof, or for any obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof, to the extent permitted by their respective organizational documents and underlying instruments, as from time to time amended, or by any resolutions duly adopted by the Management Company, any Account, their respective affiliates or any obligor or issuer in respect of any of the Portfolio Assets (or any affiliate thereof) pursuant to their respective organizational documents;

(b) receive fees for services of whatever nature rendered to the obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof;

(c) be retained to provide services unrelated to this Agreement to the Management Company, any Account or their respective affiliates and be paid therefor, on an arm's-length basis;

(d) be a secured or unsecured creditor of, or hold a debt obligation of or equity interest in, the Management Company, any Account or any affiliate thereof or any obligor or issuer of any Portfolio Asset or any affiliate thereof;

(e) sell any Portfolio Asset to, or purchase or acquire any Portfolio Asset from, any Account while acting in the capacity of principal or agent; *provided, however*, that any such sale or purchase effected by the Sub-Advisor shall be subject to applicable law and any applicable provisions of this Agreement, the related Management Agreement and Related Agreements, as applicable;

(f) underwrite, arrange, structure, originate, syndicate, act as a distributor of or make a market in any Portfolio Asset;

Appellee Appx. 01203
Appx. 01454
014016

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Exhibit 6    Page 12/06/251804    Page 338 of 1017    PageID 14982
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1210 of 1803    PageID 11956
Case 18-30264 Case 19-1223792-SS Filed 12/05/18    Entered 12/11/18 age 2023 of 76 Page 20 of 22

(g)     serve as a member of any "creditors' board", "creditors' committee" or similar creditor group with respect to any Portfolio Asset; or

(h)     act as portfolio manager, portfolio manager, investment manager and/or investment adviser or sub-advisor in collateralized bond obligation vehicles, collateralized loan obligation vehicles and other similar warehousing, financing or other investment vehicles.

As a result, such individuals may possess information relating to obligors and issuers of Portfolio Assets that is (a) not known to or (b) known but restricted as to its use by the individuals at the Sub-Advisor responsible for monitoring the Portfolio Assets and performing the Services under this Agreement.  Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Management Company and/or any Account and otherwise create conflicts of interest for the Management Company and/or any Account.  The Management Company acknowledges and agrees that, in all such instances, the Sub-Advisor and its affiliates may in their discretion make investment recommendations and decisions that may be the same as or different from those made by the Management Company with respect to the investments of any Account and they have no duty, in making or managing such investments, to act in a way that is favorable to any Account.

The Management Company acknowledges that there are generally no ethical screens or information barriers between the Sub-Advisor and certain of its affiliates of the type that many firms implement to separate Persons who make investment decisions from others who might possess applicable material, non-public information that could influence such decisions.  The officers or affiliates of the Sub-Advisor may possess information relating to obligors or issuers of Portfolio Assets that is not known to the individuals at the Sub-Advisor responsible for providing the Services under this Agreement.  As a result, the Sub-Advisor may from time to time come into possession of material nonpublic information that limits the ability of the Sub-Advisor to effect a transaction for the Management Company and/or any Account, and the Management Company and/or such Account's investments may be constrained as a consequence of the Sub-Advisor's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Management Company and/or such Account.

Unless the Sub-Advisor determines in its sole discretion that such Transaction complies with the conflicts of interest provisions set forth in the applicable Management Agreement and Related Agreements, he Sub-Advisor will not direct any Account to acquire or sell loans or securities entered into or issued by (i) Persons of which the Sub-Advisor, any of its affiliates or any of its officers, directors or employees are directors or officers, (ii) Persons of which the Sub-Advisor or any of its respective affiliates act as principal or (iii) Persons about which the Sub-Advisor or any of its affiliates have material non-public information which the Sub-Advisor deems would prohibit it from advising as to the trading of such securities in accordance with applicable law.

It is understood that the Sub-Advisor and any of its affiliates may engage in any other business and furnish investment management and advisory services to others, including Persons which may have investment policies similar to those followed by the Management Company with respect to the Portfolio Assets and which may own securities or obligations of the same class, or which are of the same type, as the Portfolio Assets or other securities or obligations of the obligors or issuers of the Portfolio Assets. The Sub-Advisor and its affiliates will be free, in their sole discretion, to

Appellee Appx. 01204

Appx. 01455
01479017

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15   Exhibit 6   Page 12/03/2024   Page 339 of 1017   PageID 14983
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1211 of 1803   PageID 11957
Case 18-30264   Case 19-03072-SS   Doc 2159-18   Filed 12/21/19   Page 2733 of 76   Page 21 of 22

make recommendations to others, or effect transactions on behalf of themselves or for others, which may be the same as or different from those effected with respect to the Collateral. Nothing in this Agreement, in the Management Agreements or in the Related Agreements shall prevent the Sub-Advisor or any of its affiliates, acting either as principal or agent on behalf of others, from buying or selling, or from recommending to or directing any other account to buy or sell, at any time, securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same obligor or issuer, as those directed by the Sub-Advisor to be purchased or sold on behalf of an Account. It is understood that, to the extent permitted by applicable law, the Sub-Advisor, its Related Entities, or any of their owners, directors, managers, officers, stockholders, members, partners, partnership committee members, employees, agents or affiliates or the other Covered Persons or any member of their families or a Person or entity advised by the Sub-Advisor may have an interest in a particular transaction or in securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same issuer, as those that may be owned or acquired by an Account. The Management Company agrees that, in the course of providing the Services, the Sub-Advisor may consider its relationships with other clients (including obligors and issuers) and its affiliates.

The Management Company agrees that neither the Sub-Advisor nor any of its affiliates is under any obligation to offer any investment opportunity of which they become aware to the Management Company or any Account or to account to the Management Company or any Account for (or share with the Management Company or any Account or inform the Management Company or any Account of) any such transaction or any benefit received by them from any such transaction. The Management Company understands that the Sub-Advisor and/or its affiliates may have, for their own accounts or for the accounts of others, portfolios with substantially the same portfolio criteria as are applicable to the Accounts. Furthermore, the Sub-Advisor and/or its affiliates may make an investment on behalf of any client or on their own behalf without offering the investment opportunity or making any investment on behalf of the Management Company or any Account and, accordingly, investment opportunities may not be allocated among all such clients. The Management Company acknowledges that affirmative obligations may arise in the future, whereby the Sub-Advisor and/or its affiliates are obligated to offer certain investments to clients before or without the Sub-Advisor offering those investments to the Management Company or any Account.

The Management Company acknowledges that the Sub-Advisor and its affiliates may make and/or hold investments in an obligor's or issuer's obligations or securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's obligations or securities made and/or held by the Management Company or any Account, or in which partners, security holders, members, officers, directors, agents or employees of the Sub-Advisor and its affiliates serve on boards of directors, or otherwise have ongoing relationships or otherwise have interests different from or adverse to those of the Management Company and the Accounts.

<u>Defined Terms</u>

For purposes of this <u>Appendix B</u>, the following defined terms shall have the meanings set forth below:

"<u>Portfolio</u>" shall mean, with respect to any Account and/or Transaction, the assets held by or in the name of the Account or any subsidiary of the Account in respect of such Transaction,

Appellee Appx. 01205
Appx. 01456
014018

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-5    Page 1218 of 1804    Page 340 of 1017    PageID 14984
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1212 of 1803    PageID 11958
Case 18-30264-sgj11    Doc 2397-2    Filed 12/19/18    Entered 12/19/18 Page 22 of 22

whether or not for the benefit of the related secured parties, securing the obligations of such Account.

"Portfolio Asset" shall mean any loan, eligible investment or other asset contained in the Portfolio.

"Transaction" shall mean any action taken by the Sub-Advisor on behalf of any Account with respect to the Portfolio, including, without limitation, (i) selecting the Portfolio Assets to be acquired by the Account, (ii) investing and reinvesting the Portfolio, (iii) amending, waiving and/or taking any other action commensurate with managing the Portfolio and (iv) instructing the Account with respect to any acquisition, disposition or tender of a Portfolio Asset or other assets received in respect thereof in the open market or otherwise by the Account.

Appellee Appx. 01206
Appx. 01457
014019

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-9    Page 1204/0251804    Page 341 of 1017    PageID 14985
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1213 of 1803    PageID 11959

# EXHIBIT D

**Appellee Appx. 01207**

**Appx. 01458**

014020

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 12/05/25 1804   Page 342 of 1017   PageID 14986
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1214 of 1803   PageID 11960
Case 18-30264-sgj11   Doc 297-CSS   Filed 12/11/18   Entered 12/11/21/19 09:29:31   Page 2 of 2

**HIGHLAND CAPITAL MANAGEMENT, LP**
**POST-PETITION FEE ACCRUAL UNDER THE**
**SUB-ADVISORY AND SHARED SERVCIES AGREEMENTS**

Period:  April 13, 2018 to August 2, 2018

| Management Contact | Sub-Advisory Agreement | Shared Services Agreement | Expense Reimbursement | Subtotal |
|---|---|---|---|---|
| Acis CLO 2013-1, Ltd. | $196,144.32 | $147,108.24 | $62,252.97 | $405,505.53 |
| Acis CLO 2014-3, Ltd. | $238,710.43 | $179,032.82 | $81,545.25 | $499,288.50 |
| Acis CLO 2014-4, Ltd. | $290,184.32 | $217,638.24 | $101,087.78 | $608,910.34 |
| Acis CLO 2014-5, Ltd. | $299,518.82 | $224,639.11 | $107,246.57 | $631,404.50 |
| Acis CLO 2015-6, Ltd. | $340,546.52 | $255,409.89 | $125,264.41 | $721,220.82 |
| BVK | 353,568.97 | $265,176.73 | $66,148.90 | $684,894.60 |
| | | | | |
| TOTAL | | | | $3,551,224.29 |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-9   Page 12/06/25 1804   Page 343 of 1017   PageID 14987
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1215 of 1803   PageID 11961

# EXHIBIT G

Appellee Appx. 01209

Appx. 01480

014022

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 12 of 05 1804   Page 344 of 1017   PageID 14988
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1216 of 1803   PageID 11962
Case 18-30264-sgj7   Doc 396-5   Filed 04/30/18   Entered 04/30/18 Page 2 of 13   Page 2 of 13

| Debtor | Acis Capital Management, L.P. | Case number (if known) | 18-30264 |

3. **Certain payments or transfers to creditors within 90 days before filing this case**
   List payments or transfers--including expense reimbursements--to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $6,425. (This amount may be adjusted on 4/01/19 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

☐ None.

| | Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer<br>Check all that apply |
|---|---|---|---|---|
| 3.1. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75208 | 11/2/2017 | $234,013.63 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |
| 3.2. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75208 | 11/3/2017 | $941,958.57 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |
| 3.3. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75208 | 12/8/2017 | $89,655.14 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |
| 3.4. | David Simek<br>31 Woodacres Road<br>Brookville, NY 11545 | 11/15/2017 | $2,068.13 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |
| 3.5. | David Simek<br>31 Woodacres Road<br>Brookville, NY 11545 | 11/30/2017 | $24,266.71 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |
| 3.6. | David Simek<br>31 Woodacres Road<br>Brookville, NY 11545 | 12/12/2017 | $1,718.79 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |
| 3.7. | David Simek<br>31 Woodacres Road<br>Brookville, NY 11545 | 12/29/2017 | $25,000.00 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |

Appellee Appx. 01210
Appx. 01101
014023

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 346 of 1804 Page 345 of 1017   PageID 14989
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1217 of 1803   PageID 11963
Case 18-30264-sgj11   Doc 285   Filed 02/01/19   Entered 11/30/18   Page 18 of 13   Page 3 of 13

| Debtor | Acis Capital Management, L.P. | | Case number *(if known)* 18-30264 | |
|---|---|---|---|---|

| | Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer<br>*Check all that apply* |
|---|---|---|---|---|
| 3.8. | FINRA<br>1735 K Street, NW<br>Washington, DC 20006 | 11/22/2017 | $70.00 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>■ Suppliers or vendors<br>☐ Services<br>☐ Other__ |
| 3.9. | Highland CLO Management, Ltd.<br>PO Box 309, Ugland House<br>Grand Cayman, KY1-1104, Cayman<br>Islands | 12/19/2017 | $2,830,459.22 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other__ |

4. **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**
List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $6,425. (This amount may be adjusted on 4/01/19 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☐ None.

| | Insider's name and address<br>Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|---|
| 4.1. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 2/1/2017 | $976,688.47 | Contractual payment |
| 4.2. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 2/1/2017 | $1,096,033.37 | Services |
| 4.3. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 2/2/2017 | $3,574.80 | Expense reimbursement |
| 4.4. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 2/14/2017 | $67.44 | Expense reimbursement |
| 4.5. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 4/17/2017 | $315,574.30 | Services |
| 4.6. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 4/18/2017 | $438,497.51 | Services |
| 4.7. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 4/18/2017 | $375,955.81 | Contractual payment |

Appellee Appx. 01211
Appx. 01162
014024

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5    Page 1/2/10 25 1804 Page 346 of 1017    PageID 14990
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1218 of 1803    PageID 11964
Case 18-30264-sgj11    Doc 396 3 Filed Doc 306 87    Entered 10/31/2018 Page 4 of 5 Page 4 of 13

| Debtor | Acis Capital Management, L.P. | | | Case number *(if known)* | 18-30264 |

| Insider's name and address Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|
| 4.8. Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 4/19/2017 | $330,249.69 | Services |
| 4.9. Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 5/1/2017 | $974,426.41 | Services |
| 4.10 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 5/1/2017 | $974,426.41 | Contractual Payment |
| 4.11 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments incl interest |
| 4.12 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 5/31/2017 | $581,036.15 | Services |
| 4.13 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 7/18/2017 | $373,167.08 | Contractual payment |
| 4.14 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 8/1/2017 | $971,603.02 | Contractual payment |
| 4.15 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 8/7/2017 | $1,339,422.12 | Services |
| 4.16 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 8/16/2017 | $53.41 | Expense reimbursement |
| 4.17 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 10/18/2017 | $372,872.82 | Contractual payment |
| 4.18 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 10/18/2017 | $728,702.25 | Services |
| 4.19 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |

Appellee Appx. 01212
Appx. 01103
014025

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 18-15    Page 1226/05/1804    Page 347 of 1017    PageID 14991
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1219 of 1803    PageID 11965
Case 18-30264-sgj7    Doc 365-53    Filed 04/30/18    Entered 04/30/18 17:14:18    Page 5 of 5    Page 5 of 13

| Debtor | Acis Capital Management, L.P. | | Case number (if known) | 18-30264 |

| | Insider's name and address Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|---|
| 4.20 | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 10/25/2017 | $46,648.82 | Expense reimbursement |
| 4.21 | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 10/25/2017 | $67,966.85 | Expense reimbursement |
| 4.22 | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 11/1/2017 | $967,223.91 | Contractual payment |

5. **Repossessions, foreclosures, and returns**
   List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

   ☑ None

| Creditor's name and address | Describe of the Property | Date | Value of property |
|---|---|---|---|

6. **Setoffs**
   List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

   ☑ None

| Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|

**Part 3:    Legal Actions or Assignments**

7. **Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**
   List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

   ☐ None.

| | Case title Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| 7.1. | Joshua N. Terry v. Acis Capital Management, L.P. and Acis Capital Management GP, LLC DC-17-15244 | Petition to confirm arbitration award | 44th District Court Hon. Bonnie Lee Goldstein, Presiding George L. Allen, Sr. Courts Building 600 Commerce Street, 5th Floor New Tower Dallas, TX 75202 | ☐ Pending ☑ On appeal ☐ Concluded |

Appellee Appx. 01213
Appx. 01484
014026

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-16    Page 1226 of 1804 Page 348 of 1017    PageID 14992
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1220 of 1803    PageID 11966

# EXHIBIT H

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16   Exhibit 6   Page 1222/05/1804   Page 349 of 1017   PageID 14993
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1221 of 1803   PageID 11967
Case 18-30264-sgj11   Doc 838-5   Filed 07/05/19   Entered 07/09/19 00:48:05   Page 1 of 4

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Melina N. Bales (TX 24106851)
FOLEY GARDERE
FOLEY & LARDNER LLP
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Tel:  214.999.3000
Fax: 214.999.4667
honeil@foley.com

Michael K. Hurst (TX 10316310)
David S. Coale (TX 00787255)
Ruben A. Garcia (TX 24101787)
LYNN PINKER COX & HURST, LLP
2100 Ross, Suite 2700
Dallas, Texas 75201
Tel:  214.981.3800
Fax: 214.981.3839
mhurst@lynnllp.com

CO-COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT, L.P.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 18-30264-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P., and | § | Case No. 18-30265-SGJ-11 |
| | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly administered under |
| | § | Case No. 18-30264-SGJ-11) |
| Debtors. | § | |
| | § | Chapter 11 |

---

**STATEMENT OF ISSUES BY APPELLANT
HIGHLAND CAPITAL MANAGEMENT, L.P.**

---

Appellant Highland Capital Management, L.P. states the following issues for the

appeal of the *Order (I) Approving the Application to Employ Winstead PC as Special*

*Counsel to the Chapter 11 Trustee and (II) Denying the Motion to Disqualify Winstead*

*PC as Proposed Special Counsel to Robin Phelan, Chapter 11 Trustee* [Doc. No. 313];

*Order Approving in Part and Denying in Part the Supplemental Application Regarding*

*the Scope of Winstead PC's Retention as Special Counsel to the Chapter 11 Trustee*

Appellee Appx. 01215
Appx. 01186
014028

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 61-5   Exhibit 6   Page 1222/4/635 1804   Page 350 of 1017   PageID 14994
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1222 of 1803   PageID 11968
Case 18-30264-sgj11   Doc 2390   Filed 07/09/19   Entered 12/07/09/19 09:48:05   Page 2 of 4

[Doc. No. 703]*; and Findings of Fact, Conclusions of Law, and Order Granting*

*Winstead PC's Fee Application for Compensation and for Reimbursement of Expenses*

[Doc. No. 999]:

1. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's appointment as special counsel, given that Winstead represents interests adverse to the estates and is not "disinterested," as required by the Bankruptcy Code?

2. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's appointment as special counsel, given that Winstead PC has an actual conflict of interest?

3. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's appointment as special counsel, given the broad scope of Winstead PC's actual representation in the case?

4. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's expanded scope of representation as special counsel?

5. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's final fee application given the impropriety of its appointment as special counsel?

6. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's final fee application given the lack of benefit to the estates?

7. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's final fee application given the duplication of effort between Winstead PC and Forshey & Prostok LLP?

8. Did the bankruptcy court commit any error or any abuse of discretion in granting the amount of fees as reasonable in Winstead PC's final fee application given that the fees were disproportionate to the size of the bankruptcy case?

9. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's final fee application, even if retention of Winstead PC was otherwise proper?

10. Were fact findings supporting these rulings clearly erroneous?

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-16    Page 1224/2651804 Page 351 of 1017    PageID 14995
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1223 of 1803    PageID 11969
Case 18-30264-sgj11 Doc 3905 Filed 07/03/19    Entered 07/03/19 09:46:05    Page 3 of 4

Respectfully submitted,

/s/ Jason B. Binford
Holland N. O'Neil
Texas Bar No. 14864700
Jason B. Binford
Texas Bar No. 24045499
Melina N. Bales
Texas Bar No. 24106851
Foley Gardere
Foley & Lardner LLP
2021 McKinney, Suite 1600
Dallas, Texas 75201
Tel:  214.999.3000
Fax: 214.999.4667
honeil@foley.com
jbinford@foley.com
mbales@foley.com

/s/ Michael K. Hurst
Michael K. Hurst
Texas Bar No. 10316310
David S. Coale
Texas Bar No. 00787255
Ruben A. Garcia
Texas Bar No. 24101787
Lynn Pinker Cox & Hurst LLP
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Tel:  214.981.3800
Fax: 214.981.3839
mhurst@lynnllp.com

**Co-Counsel for:**
**Highland Capital Management, L.P.**

**Appellee Appx. 01217**
014030

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-6    Exhibit 6    Page 12/26/05180 Page 352 of 1017    PageID 14996
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1224 of 1803    PageID 11970
Case 18-30264-sgj11-1233905585 FileDoc 07/15919    Filed 11/07/09/19 Pg 45:405    Page 4 of 4

## CERTIFICATE OF SERVICE

I certify that on July 1, 2019, a copy of this document was served through the court's ECF system on all counsel and on all others who registered for electronic notice.

*/s/ Jason B. Binford*
Jason B. Binford

4818-4512-8603.2

Appellee Appx. 01218
Appx. 01460
014031

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-6   Page 1226 of 1804 Page 353 of 1017   PageID 14997
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1225 of 1803   PageID 11971

# EXHIBIT I

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 68-15 Page 127 of 1804 Page 354 of 1017 PageID 14998
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1226 of 1803 PageID 11972
Case 18-30264-sgj11 Doc 246 Filed 05/30/18 Page 1 of 16 Entered 05/30/18 Page 1 of 16

Rakhee V. Patel – SBT #00797213
Phillip Lamberson – SBT #00794134
Joe Wielebinski – SBT #21432400
Annmarie Chiarello – SBT #24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
Email: rpatel@winstead.com
Email: achiarello@winstead.com
Email: plamberson@winstead.com
Email: jwielebinski@winstead.com

**PROPOSED SPECIAL COUNSEL FOR
ROBIN PHELAN, CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 18-30264-SGJ-11** |
| | § | **Case No. 18-30265-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | **(Jointly Administered Under Case** |
| **LLC,** | § | **No. 18-30264-SGJ-11)** |
| | § | |
| Debtors. | § | **Chapter 11** |

### APPLICATION TO EMPLOY WINSTEAD PC
### AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE

TO THE HONORABLE STACEY G. C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

Robin Phelan (the "Trustee"), the Chapter 11 trustee of Acis Capital Management, L.P.

("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," and together with Acis LP, the

"Debtors" or "Acis"), the debtors in the above styled and numbered bankruptcy cases (the

"Cases"), files this his *Application to Employ Winstead PC as Special Counsel to the Chapter 11

Trustee* (the "Application"), and in support thereof, respectfully states as follows:

---

APPLICATION TO EMPLOY WINSTEAD PC
AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE

Page 1 of 16
**Appellee Appx. 01220**
**Appx. 01471**
**014033**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Filed 12/26/25    Page 355 of 1017    PageID 14999
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1227 of 1803    PageID 11973
Case 18-30264-sgj11    Doc 246-5    Filed 05/30/19    Entered 05/30/18 18:07:16    Page 2 of 16

## I.    JURISDICTION, VENUE, AND STATUTORY PREDICATE

1.    This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334.  This Application constitutes a "core" proceeding within the meaning of the provisions of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are §§ 105, 327, and 328 of title 11 of the United States Code, § 101 *et seq.* (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), as well as Rule 2014-1 of the Local Rules of Bankruptcy Procedure for the Northern District of Texas ("Local Rules").

## II.    RELEVANT PROCEDURAL BACKGROUND

2.    On January 30, 2018 (the "Petition Date"), Joshua N. Terry ("Mr. Terry"), as petitioning creditor, filed the *Involuntary Petition Against a Non-Individual* [Case No. 18-30264, Docket No. 1] (the "Acis LP Petition"), thereby initiating the Acis LP bankruptcy case.

3.    On the Petition Date, Mr. Terry, as petitioning creditor, also filed the *Involuntary Petition Against a Non-Individual* [Case No. 18-30265, Docket No. 1] (the "Acis GP Petition," together with the Acis LP Petition, the "Involuntary Petitions"), thereby initiating the Acis GP bankruptcy case.

4.    On April 13, 2018, after six days of testimony and argument, this Court entered its *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Involuntary Bankruptcy Petition* [Case No. 18-30264, Docket No. 118 & Case No. 18-30265, Docket No. 113] and the *Order for Relief in an Involuntary Case* [Case No. 18-30264, Docket No. 119 & Case No. 18-30265, Docket No. 114] (the "Order for Relief").

5.    Also on April 13, 2018, Diane Reed was appointed as interim Chapter 7 trustee (the "Chapter 7 Trustee") for the Debtors' bankruptcy estates (the "Estates").  *See* Case No. 18-30264, Docket No. 120 & Case No. 18-30265, Docket No. 115.

---

APPLICATION TO EMPLOY WINSTEAD PC
AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 63-15 Filed 12/26/25 Page 356 of 1017 PageID 15000
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1228 of 1803 PageID 11974
Case 18-30264-sgj11 Doc 2465 Filed 06/30/19 Entered 11/25/30/18 Page 7 of 34 Page 3 of 16

6.     On April 18, 2018, this Court entered its *Order Directing Joint Administration* [Docket No. 137],[1] ordering that the Cases be jointly administered under Case No. 18-30264.

7.     On May 4, 2018, the Chapter 7 Trustee filed the *Trustee's Expedited Motion to Convert Cases to Chapter 11* [Docket No. 171].

8.     Also on May 4, 2018, Mr. Terry filed his *Emergency Motion for an Order Appointing a Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Docket No. 173] (the "Trustee Motion").

9.     On May 11, 2018, this Court entered the *Order Granting Trustee's Expedited Motion to Convert Cases to Chapter 11* [Docket No. 205] (the "Conversion Order"), which converted these Cases to Cases under Chapter 11 of the Bankruptcy Code.

10.     Also on May 11, 2018, this Court entered the *Order Granting the Emergency Motion for an Order Appointing a Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Docket No. 206] (the "Trustee Order").

11.     On May 14, 2018, the United States Trustee filed the *Chapter 11 Notice of Appointment of Trustee and of Amount of Bond* [Docket No. 213] (the "Trustee Notice"), which provided notice to the Trustee of his appointment as Chapter 11 Trustee of Acis LP.

12.     On May 16, 2018, this Court entered the *Order Supplementing Order Granting the Emergency Motion for an Order Appointing a Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Docket No. 219] (the "Supplemental Trustee Order"), by which the Court

---

[1] Hereinafter, unless otherwise specified, any docket numbers referenced are under Case No. 18-30264.

**APPLICATION TO EMPLOY WINSTEAD PC**
**AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**                    **Page 3 of 16**
**Appellee Appx. 01222**

**0114035**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15    Page 12/36/251804 Page 357 of 1017    PageID 15001
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1229 of 1803    PageID 11975
Case 18-30265-sgj11    Doc 240-5    Filed 06/16/18    Entered 06/16/18 07:51:34    Page 4 of 16

directed that the United States Trustee "appoint only one Chapter 11 Trustee for the Debtors' estates[.]"

13.     Also on May 16, 2018, the United States Trustee filed the *Application of the United States Trustee to Approve the Appointment of Trustee* [Docket No. 220] (the "<u>Trustee Application</u>"), requesting the Court's approval of the Trustee's appointment as Chapter 11 Trustee of Acis LP.

14.     On May 17, 2018, this Court entered its *Order Approving Appointment of Chapter 11 Trustee* [Docket No. 221], thereby approving of the Trustee's appointment as Chapter 11 Trustee of Acis LP.

15.     Also on May 17, 2018, the Trustee filed his *Application for Order Authorizing the Employment and Retention of Forshey & Prostok, LLP as Counsel to the Chapter 11 Trustee* [Docket No. 222] (the "<u>F&P Application</u>"), requesting authority to retain Forshey & Prostok, LLP ("<u>Forshey & Prostok</u>") as general counsel to the Trustee.

16.     On May 29, 2018, the United States Trustee filed the *Chapter 11 Notice of Appointment of Trustee and of Amount of Bond* [Case No. 18-30265, Docket No. 182] (the "<u>Second Trustee Notice</u>"), which provided notice to the Trustee of his appointment as Chapter 11 Trustee of Acis GP.

17.     On May 30, 2018, the United States Trustee filed the *Application of the United States Trustee to Approve the Appointment of Trustee* [Case No. 18-30265, Docket No. 183] (the "<u>Second Trustee Application</u>"), requesting the Court's approval of the Trustee's appointment as Chapter 11 Trustee of Acis GP.

### III.     <u>RELIEF REQUESTED</u>

18.     By this Application, the Trustee seeks to employ and retain Winstead PC ("<u>Winstead</u>") as his special counsel to perform certain legal services during the course of the

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1236/251804  Page 358 of 1017    PageID 15002
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1230 of 1803   PageID 11976
Case 18-30264-sgj11   Doc 2465   Filed 06/36/19   Entered 11/25/30/18 Page 7 of 34   Page 5 of 16

Cases. Accordingly, the Trustee requests the entry of an order, pursuant to § 327(a) and (c) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure, permitting him to employ and retain Winstead as his special counsel for the limited purposed described below.[2]

**A.    Basis for Selection of Counsel**

19.    As the Court knows, Winstead represented Mr. Terry in connection with the trial on the Involuntary Petitions.  Indeed, the Trustee's selection of Winstead is based, in part, upon the fact that Winstead has gained significant familiarity with, and considerable knowledge of, the unique factual circumstances and complex legal issues in the Cases through its representation of Mr. Terry.  In addition, due to the need for the Trustee to take immediate action on a variety of fronts after his appointment, as well as the substantial fees that new counsel would incur to familiarize itself with the intricate and impending legal issues in the Cases, the Trustee believes that his engagement of Winstead for the limited purposes described below would lead to efficiencies that would be lost if the Trustee were forced to employ different counsel.

20.    The Trustee has also selected Winstead as special counsel because of Winstead's extensive experience and knowledge in the field of debtor and creditor rights and business reorganizations under Chapter 11 of the Bankruptcy Code, as well as Winstead's experience and expertise in providing legal services related to all aspects of the investment management and private funds industry, including formation, advisor/manager mergers and acquisitions, portfolio transactions, and regulatory and compliance matters.  Accordingly, the Trustee believes that his retention of Winstead as special counsel for the limited purposes described below is in the best interests of the Estates and their creditors.

---

[2] To the extent, however, that the Court finds Winstead's proposed retention more appropriate under section 327(e) of the Bankruptcy Code, the Trustee reserves its rights to seek approval for such retention under section 327(e).

**APPLICATION TO EMPLOY WINSTEAD PC
AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 12/32/25 1804   Page 359 of 1017   PageID 15003
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1231 of 1803   PageID 11977
Case 18-30264-sgj11 Doc 2-465 Filed 06/369-9   Entered 11/25/30 18 Page 8716 34 Page 6 of 16

21.     Importantly, upon the Trustee's retention of Winstead as set forth in this Application, Winstead has advised Mr. Terry that Winstead may represent Mr. Terry only in connection with the pending appeals related to the Involuntary Petitions (the "Appeals") and that Mr. Terry would have to retain new counsel for representation in these Cases.[3]  Mr. Terry has consented to such limited representation by Winstead.  Further, both the Trustee and Winstead believe that such limited representation of Mr. Terry by Winstead in these Cases—only in connection with the pending Appeals—is entirely consistent with the Trustee's interests and would eliminate potential conflicts of interest presented by the Trustee's retention of Winstead as special counsel.

22.     The Trustee believes the employment of Winstead is appropriate and necessary to enable the Trustee to execute faithfully his duties under the Bankruptcy Code, and the Trustee further believes that Winstead and its attorneys are fully qualified to perform the specified legal services referenced below.

23.     Winstead maintains its principal offices at 2728 N. Harwood Street, Suite 500, Dallas, Texas 75201; Telephone: (214) 745-5400; Facsimile: (214) 745-5390.  The Trustee and Winstead have designated Rakhee Patel, a shareholder of Winstead who offices in Winstead's Dallas office, to serve as the attorney in charge with respect to the representation.

24.     In support of this Application, the Declaration of Rakhee V. Patel (the "Declaration") is attached hereto as Exhibit "A" and is incorporated herein for all purposes.

---

[3] The Trustee has been advised that Brian Shaw of Rogge Dunn Group, PC will represent Mr. Terry in these Cases. Also disclosed later in this Application, Winstead continues to represent Mr. Terry in connection with governmental investigations of certain non-debtor parties-in-interest; however, such representation is not adverse to the Debtors or their Estates.

---

**APPLICATION TO EMPLOY WINSTEAD PC**
**AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16    Page 360 of 1017    PageID 15004
Exhibit 6    Page 1236/351804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1232 of 1803    PageID 11978
Case 18-30264-sgj11    Doc 82-6    Filed 05/30/18    Entered 05/30/18 Page 18 of 34    Page 7 of 16
Case 19-11396-CSS    Doc 369-3    Filed 11/25/19    Page 8 of 16

**B.**    <u>**Services to be Rendered**</u>

25.    The Trustee has requested that Winstead provide legal services to the Trustee for matters specifically involving the:

  a)  management, liquidation, disposition, and monetization of the CLO assets;

  b)  Investment Advisers Act;

  c)  operation of the portfolio management agreements and the indentures, issues arising therefrom, and, specifically including, litigation related thereto or arising therefrom; and

  d)  certain other litigation matters related to or arising in these Cases, as requested by the Trustee.

26.    Subject to this Court's approval of the Application, Winstead is willing to serve as the Trustee's special counsel in the Cases to perform the services described above.

27.    Further, Winstead will confer with the Trustee and Forshey & Prostok on a regular basis to ensure that the services provided by Winstead do not overlap with, and are not otherwise duplicative of, services provided by Forshey & Prostok, as proposed general counsel, to the Trustee.

**C.**    <u>**Compensation and Reimbursement**</u>

28.    The Trustee proposes to retain Winstead on a customary hourly rate basis, subject in all respects to this Court's authorization for payment.  Winstead's customary hourly rates of attorneys and paralegals for a representation of this nature are presently in a range up to: $785 for shareholders, $485 for associates, and $290 for paralegals.

29.    Winstead's rates are adjusted on a periodic basis.  Winstead will not charge the Trustee at a rate for its services greater than the standard rates Winstead charges to its clients, generally, for similar engagements.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 1236/251804 Page 361 of 1017   PageID 15005
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1233 of 1803   PageID 11979
Case 18-30262-sgj11 Case 19-12089-CSS Filed Doc 369-9   Entered 11/05/30/18 Page 87 of 34 Page 8 of 16

30.     Winstead's billing rates are consistent with rates charged by other professionals in the Northern District of Texas with similar experience.  These rates are set at a level designed to compensate Winstead for the work of its attorneys and paralegals and to cover fixed and routine overhead expenses.  Winstead's hourly rates for the attorneys who it anticipates will most likely be working on the Cases are:

| | |
|---|---|
| Rakhee Patel, Shareholder | $585.00 per hour |
| Philip Lamberson, Shareholder | $655.00 per hour |
| Joseph Wielebinski, Shareholder | $655.00 per hour |
| Toby Galloway, Shareholder | $550.00 per hour |
| Andrew Rosell, Shareholder | $585.00 per hour |
| Annmarie Chiarello, Associate | $380.00 per hour |
| Jason Enright, Associate | $390.00 per hour |
| Courtney Mitchell, Associate | $485.00 per hour |
| Laura Thetford, Associate | $385.00 per hour |

31.     The attorneys who will provide services to the Trustee are duly licensed to practice in the State of Texas and are admitted to practice law in the Northern District of Texas. As necessary, certain other attorneys and/or paraprofessionals may provide services in connection with the engagement.

32.     Subject to this Court's approval, the Trustee has also agreed to the reimbursement of Winstead for all out-of-pocket expenses incurred by Winstead. These expenses include, but are not limited to, costs for long-distance telephone charges, facsimile charges, photocopying, travel, parking, business meals, computerized research, UCC searches, messengers, couriers, postage, filing fees and other fees related to trials and hearings. Winstead will charge for all such actual and necessary expenses in a manner and at rates consistent with charges made generally to Winstead's other clients and consistent with the applicable Local Rules of the Court.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-5   Exhibit 6   Page 12/35/25 1804   Page 362 of 1017   PageID 15006
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1234 of 1803   PageID 11980
Case 18-30264-sgj11   Doc 246   Filed 05/30/18   Entered 11/25/19   Page 10 of 37   Page 9 of 16

33.    Winstead will apply to the Court for compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code and the Local Rules of this District and Court.

34.    As set forth in the Declaration: (i) Winstead has no agreement with any other entity to share any compensation received and no such agreement will be made, except as permitted under section 504(b)(1) of the Bankruptcy Code; and (ii) no attorney at Winstead is related to any United States Bankruptcy Judge or United States District Court Judge for the Northern District of Texas or to the United States Trustee.  Winstead has received no prior consideration to act as special counsel for the Trustee.

35.    Winstead has not received a retainer in connection with this engagement.

**D.    <u>Disinterestedness of Winstead</u>**

36.    To the best of Winstead's knowledge, other than as set out below, the shareholders and associates of Winstead: (i) do not have any connection with the Trustee, the Debtors, their creditors, or any other party-in-interest or their respective attorneys and accountants; (ii) do not have any connection with the United States Trustee or any person employed in the Office of the United States Trustee; (iii) are "disinterested persons," pursuant to §§ 101(14) and 327(c) of the Bankruptcy Code; and (iv) do not hold or represent any interest adverse to the Estates:

| Party-In-Interest | Relationship to Debtors | Relationship to Winstead |
|---|---|---|
| Joshua N. Terry | Creditor | Winstead previously represented Mr. Terry in connection with the Involuntary Petitions and in connection with governmental investigations of certain non-debtor parties; as of May 14, 2018, Winstead represents Mr. Terry in connection with only the appeals related to the Involuntary Petitions and, as necessary, in connection with governmental investigations of certain non-debtor |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-5    Exhibit 6    Filed 12/06/25    Page 363 of 1017    PageID 15007
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1235 of 1803    PageID 11981
Case 18-30264-sgj11    Doc 2406-5    Filed 06/06/19    Entered 06/06/19 18:15:30    Page 113 of 32    Page 10 of 16

| Party-In-Interest | Relationship to Debtors | Relationship to Winstead |
|---|---|---|
| | | parties-in-interest; such current representations are not adverse to the Debtors or their Estates.[4] |
| U.S. Bank National Association | Counter-party to executory contract | Winstead represents this entity in matters unrelated to the Debtors. |
| BNP Paribas | Affiliate of counter-party to executory contract | Winstead represents this entity in matters unrelated to the Debtors. |
| The Bank of New York Mellon Trust Co., N.A. | Counter-party to executory contract | Winstead previously represented this entity in matters unrelated to the Debtors. |
| Andrews & Kurth LLP | Creditor | Winstead previously represented this entity in matters unrelated to the Debtors. |
| Highland Capital Management, L.P. | Creditor/Affiliate | Winstead is a party to certain litigation, which is wholly unrelated to these Cases, styled *NexBank SSB and Highland Capital Management, L.P. v. Winstead PC*, DC-15-01816, in the 193rd Judicial District Court of Dallas County, Texas, stemming from Winstead's prior representation of Highland Capital Management, L.P., in connection with a foreclosure. |

37.    As set forth in the herein, Winstead may have rendered, or may now be rendering, legal services to certain creditors or other parties-in-interest, or may have been, or may now be involved, in projects in which attorneys or accountants for these creditors or parties-in-interest were involved and in matters unrelated to the Debtors and the Trustee.  Except as otherwise indicated herein, none of the services provided include any matters related to the Cases and none constitute an interest materially adverse to the Trustee. Accordingly, Winstead does not hold an adverse interest to the Debtors or their Estates.  Moreover, as part of its practice, Winstead appears in cases, proceedings, and transactions involving many different attorneys, accountants,

---

[4] With respect to Winstead's representation of Mr. Terry in connection with such governmental investigations, Winstead is engaged pursuant to a hybrid fee arrangement.

---

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 61-5    Exhibit 6    Page 12/36/25 1804    Page 364 of 1017    PageID 15008
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1236 of 1803    PageID 11982
Case 18-30264-sgj11 Doc 92-6 Filed 05/31/19    Entered 05/31/18 Page 87:23 of 34    Page 11 of 16

financial consultants, and investment bankers, some of whom now, or may in the future, represent creditors and parties-in-interest in the Cases. Winstead will not represent any such entities in the Cases.

38.    As set forth in the Declaration, Winstead has conducted a comprehensive conflict search regarding the creditors and parties-in-interest as provided by the Debtors on their schedules and disclosures. Winstead will supplement its conflicts check as additional creditors are disclosed and shall promptly disclose to the Court any other connections that Winstead discovers it has or has had with any such creditors of the estate pursuant thereto.

39.    Winstead began performing services for the Trustee on May 14, 2018, when he agreed to retain Winstead, subject to the Court's approval, as his special counsel. Accordingly, the Trustee respectfully requests that the approval of this Application be effective as of May 14, 2018. As set forth in Local Rule 2014-1(b)(1), such timing renders this Application contemporaneous with the initiation of services.

## IV.    <u>AUTHORITIES</u>

40.    Under the Bankruptcy Code, "the trustee with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties[.]" 11 U.S.C. § 327(a).

41.    Further, a "disinterested person" is defined under the Bankruptcy Code as a person who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor." *Id.* § 101(14)(C).

42.    The Fifth Circuit has commented that the phrases under sections 101(14)(C) and 327(a) of the Bankruptcy Code, regarding whether a party has an "adverse interest," are "nearly

---

**APPLICATION TO EMPLOY WINSTEAD PC**
**AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**

Appellee Appx. 01230
Appx. 01481
014043

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S      Document 68-15      Filed 12/36/25      Page 365 of 1017      PageID 15009
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1237 of 1803   PageID 11983
Case 18-30278-sgj11   Doc 2465   Filed 05/30/19   Entered 05/30/19 Page 733 of 3   Page 12 of 16

identical." *I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)*, 432 F.3d 347, 356 (5th Cir.

2005)**.** Thus, "with an eye to the specific facts of each case," to determine whether a proposed

professional holds an adverse interest under section 327(a), the Fifth Circuit examines whether

they:

> (1) [] possess or assert any economic interest that would tend to lessen the value
> of the bankruptcy estate or that would create either an actual or potential dispute
> in which the estate is a rival claimant; or
>
> (2) [] possess a predisposition under circumstances that render such a bias against
> the estate.

*Id.*; *accord Waldron v. Adams & Reese, L.L.P. (In re Am. Int'l Refinery, Inc.)*, 676 F.3d 455, 461-

62 (5th Cir. 2012).

43.     Still, in these Cases, "a person is not disqualified for employment under [section

327] solely because of such person's employment by or representation of a creditor, unless there

is objection by another creditor or the United States trustee, in which case the court shall

disapprove such employment if there is an *actual conflict of interest*." 11 U.S.C. § 327(c)

(emphasis added).

44.     To determine whether a proposed professional should be disqualified pursuant to

sections 327(a) and (c), courts look to the nature of any purported conflict of interest: (i) if there

is an *actual* conflict, the professional is *per se* disqualified; (ii) if there is a *potential* conflict, the

court may use its discretion to determine whether the professional should be disqualified; and

(iii) if there is only an *appearance* of a conflict, the court may not disqualify the professional. *In

re AGE Ref., Inc.*, 447 B.R. 786, 802-06 (Bankr. W.D. Tex. 2011) (citing *In re Marvel Entm't

Grp., Inc.*, 140 F.3d 463, 476 (3rd Cir. 1998)).

---

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 126/65-1804    Page 366 of 1017    PageID 15010
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1238 of 1803    PageID 11984
Case 18-30264-sgj11 Case 19-1229-465 Filed 05/365/19    Entered 11/05/30/18 Page 87 143 of 34 Page 13 of 16

45.     In evaluating whether an "actual conflict" exists, courts examine the specific circumstances of the proposed retention and whether there would be a direct conflict between the interests of estate and the creditor that was previously represented by proposed counsel:

> Generally, when an actual conflict exists there is "active competition between two interests, in which one interest can only be served at the expense of another." Actual conflicts arise when (1) the interests of the trustee and the creditor are in direct conflict or (2) the creditor is receiving a preference denied to the other creditors. The conflict must be direct and actual; a court should not disqualify an attorney solely because there is an appearance of a conflict. The burden of proving an actual conflict lies on the objecting party.

*In re Hanckel*, 517 B.R. 609, 614 (Bankr. D.S.C. 2014) (internal citations omitted); *see also In re Humble Place Joint Venture*, 936 F.2d 814, 819 (5th Cir. 1991) (finding an actual conflict when "counsel's loyalty to . . . the debtor's estate would be tested at every turn by the very real, continuing interest of his client [in the prior representation]").

46.     Additionally, to determine whether Winstead has an adverse interest under section 327(a), the Court should examine whether Winstead has such an adverse interest "with respect to the specific [services] for which the Trustee seeks to hire the firm." *In re AGE Ref., Inc.*, 447 B.R. at 802; *see also Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 621-30 (2d Cir. 1999) (holding that, under sections 327(a) and (c), proposed special counsel was not disqualified from representing the trustee for limited purposes, including to pursue Chapter 5 claims against a certain creditor, when proposed counsel had previously represented another creditor).

47.     Here, the issue is whether Winstead's prior representation of Mr. Terry should preclude the Trustee from retaining Winstead as special counsel for the limited purposes set forth herein.  With Winstead's ongoing representation of Mr. Terry related to these Cases being limited only to his representation in connection with the Appeals, the Trustee believes Winstead

---

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 6-15    Filed 12/06/25    Page 367 of 1017    PageID 15011
Exhibit 6    Page 14 of 16    Page 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1239 of 1803   PageID 11985
Case 18-30264-sgj11   Doc 2468-5   Filed 06/15/19   Entered 01/25/19 18:07:53   Page 14 of 16

has no *actual* conflict of interest with the Estates as a result of such representation. Further, as a result of Winstead's limited representation of Mr. Terry, the Trustee believes Winstead does not possess any economic interest that would tend to lessen the value of the Estates or that would create either an actual or potential dispute in which either Estate is a rival claimant. *See W. Delta Oil Co.*, 432 F.3d at 356. Moreover, Winstead has no bias against the Estates due to its representation of Mr. Terry. *See id.* Indeed, the Trustee submits that Mr. Terry's interests and the Estate's interests are aligned with the Trustee's goal of maximizing the value of the Estates, which inures to the benefit of all creditors, including Mr. Terry.

48.     As set forth above, the Trustee requests to employ Winstead to provide legal services only regarding matters involving the (i) management, liquidation, disposition, and monetization of the CLO assets; (ii) Investment Advisers Act; and (iii) operation of the portfolio management agreement and the indentures, issues arising therefrom, and, specifically including, litigation related thereto or arising therefrom; and (iv) certain other litigation matters related to or arising in these Cases, as requested by the Trustee. With respect to these specified purposes, the Trustee submits that Winstead's representation will not conflict with Forshey & Prostok's role as general counsel to the Trustee in the Cases, and Winstead will confer regularly with the Trustee and Forshey & Prostok to ensure the same.  Accordingly, except to the extent necessary to effectuate the specific services outlined above, Winstead will not represent the Trustee with respect to plan negotiations or formulation; business or bankruptcy restructuring or reorganization; or otherwise in matters arising purely under the Bankruptcy Code.  With respect to the various Appeals, the underlying issues are discrete, and will not affect Winstead's representation of the Trustee in the Cases.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-5   Exhibit 6   Page 1240 of 1017   Page 368 of 1017   PageID 15012
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1240 of 1803   PageID 11986
Case 18-30264-sgj11   Doc 2465-5   Filed 05/30/19   Entered 05/30/18 17:53:13   Page 15 of 16

49.     In sum, based on Winstead's familiarity with the unique factual circumstances and complex legal issues in the Cases (particularly with respect to the CLO assets, the portfolio management agreement, indentures, and related structures), Winstead's bankruptcy expertise and considerable experience and knowledge in handling such matters, the need for immediate action by the Trustee on a variety of fronts related to these specific matters, as well as the substantial expense the Estates would incur as a result of new counsel needing to familiarize itself with the intricate and impending legal issues in the Cases, the Trustee believes that Winstead's engagement as special counsel for the limited purposes described herein in is in the best interests of the Estates and their creditors.

50.     In accordance with section 327(c) of the Bankruptcy Code, the Trustee submits that Winstead has no actual conflict of interest in these Cases resulting from Winstead's prior representation of Mr. Terry or from Winstead's limited representation of Mr. Terry in connection with the Appeals.

51.     Therefore, the Trustee submits that the employment of Winstead as special counsel is permissible under section 327(a) of the Bankruptcy Code, is advisable, and is in the best interests of the Estates and their creditors.

52.     In addition, Winstead's fees and expenses incurred as special counsel to the Trustee would be subject to such interim and final fee applications as are otherwise appropriate under sections 330 and 331 of the Bankruptcy Code, and under applicable local rules and standing orders.

## V.     **PRAYER**

WHEREFORE, the Trustee respectfully requests that the Court enter an order: (i) approving this Application; (ii) authorizing the Trustee's retention of Winstead as special counsel in accordance with this Application, effective as of May 14, 2018; (iii) providing for the

---

**APPLICATION TO EMPLOY WINSTEAD PC
AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 12/02/22 of 180 4    Page 369 of 1017    PageID 15013
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1241 of 1803    PageID 11987
Case 18-30265-sgj11    Doc 1893-3    Filed 05/30/18    Entered 05/30/18 Page 1713 of 34    Page 16 of 16

compensation of Winstead pursuant to sections 330 and 331 of the Bankruptcy Code; and (iv)

granting the Trustee such other and further relief to which he may be entitled.

**DATED: May 30, 2018**

Respectfully submitted,

_/s/ Robin Phelan_
Robin Phelan, Chapter 11 Trustee
SBT #15903000
PHELANLAW
4214 Woodfin Drive
Dallas, Texas 75220
Phone: (214) 704-0222

**ROBIN PHELAN, CHAPTER 11 TRUSTEE**
**FOR ACIS CAPITAL MANAGEMENT L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 30th day of May, 2018, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, and that, additionally, on the same date he caused true and correct copies of this document to be served by U.S. first class mail, postage prepaid, on the parties listed on the Service List attached hereto.

_/s/ Jason A. Enright_
One of Counsel

**Appellee Appx. 01235**
**Appx. 01486**
**014048**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-9    Page 1243/651804 Page 370 of 1017    PageID 15014
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1242 of 1803    PageID 11988

Case 18-30264-sgj11 Doc 324 Filed 05/30/18 Entered 05/30/18 23:03:34 Page 1 of 11

EXHIBIT "A"

Appellee Appx. 01236

Appx. 01485

014049

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-16   Filed 12/04/25   Page 371 of 1017   PageID 15015
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1243 of 1803   PageID 11989
Case 18-30264-sgj11   Doc 1246-5   Filed 05/30/18   Entered 05/30/18 17:03   Page 2 of 11

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 18-30264-SGJ-11** |
| | § | **Case No. 18-30265-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | **(Jointly Administered Under Case** |
| **LLC,** | § | **No. 18-30264-SGJ-11)** |
| | § | |
| **Debtors.** | § | **Chapter 11** |

## DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION TO EMPLOY WINSTEAD PC AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE

I, Rakhee V. Patel, hereby declare the following and hereby certify, under penalty of perjury pursuant to 28 U.S.C. § 1746, that it is true and correct to the best of my knowledge and belief:

1.     "My name is Rakhee V. Patel, I am over the age of 18 years, and I am competent and otherwise qualified to make this Declaration.  I am a shareholder in the law firm of Winstead PC ("Winstead"), proposed special counsel for Robin Phelan, Chapter 11 trustee (the "Trustee") of Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," and together with Acis LP, the "Debtors" or "Acis"), the debtors in the above styled and numbered bankruptcy cases (the "Cases").[1]  I submit this Declaration (the "Declaration") in support of the *Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* (the "Application") for the purposes of making all of the required disclosures pursuant to 11 U.S.C. §§ 327 and 328, and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure, and to advise this Court of Winstead's qualifications.

2.     "I have personal knowledge of each of the facts stated in this Declaration, except for those facts stated on information and belief, and, as to those facts, I am informed and I

---

[1] Any capitalized term not otherwise defined herein shall have the meaning ascribed to it in the Application.

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION**
**TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**          **Page 1 of 10**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6-15    Exhibit 6    Page 12/45/251804   Page 372 of 1017    PageID 15016
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1244 of 1803    PageID 11990
Case 18-3026 asgj19-1203245SSFileD05/39/98    FEndet1c205/90/Page27cb34 Page 3 of 11

believe them to be true.  If called as a witness, I would testify as to the matters set forth below based upon my personal knowledge, except where otherwise indicated below.  To the extent that I obtain additional information, which requires further disclosure or modification of the Application or this Declaration, a supplemental declaration will be submitted to this Court.

3.      "I am admitted and in good standing to practice before the State Courts of the State of Texas, the United States District and Bankruptcy Courts for the Northern, Eastern, Southern and Western Districts of Texas, and the Fifth Circuit Court of Appeals. The other attorneys of Winstead who are designated as most likely to appear in this representation are also admitted to practice in the State of Texas and are admitted to the U.S. District Court for the Northern District of Texas.

4.      "My office address is 2728 N. Harwood Street, Suite 500, Dallas, Texas 75201; Telephone: (214) 745-5400; Facsimile: (214) 745-5390.

## QUALIFICATIONS OF COUNSEL

5.      "As set forth in the Application, on May 14, 2018, the Trustee requested to retain Winstead, subject to the Court's approval, as his special counsel in these Cases.  Winstead immediately began rendering services to and for the Trustee for the limited purposes set forth in the Application.

6.      "Winstead maintains offices in Dallas, Fort Worth, Austin, San Antonio, The Woodlands, and Houston, Texas, as well as in Charlotte, North Carolina.  Winstead currently has approximately three-hundred fifty (350) lawyers, and its client base includes many public and private corporations, partnerships, governmental entities, banks, insurance companies, non-profit organizations, and individuals.  Winstead has expertise in many fields of law including bankruptcy, business reorganization, restructuring, complex litigation, and creditors' rights, as

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Exhibit 6   Page 12/46/251804   Page 373 of 1017   PageID 15017
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1245 of 1803   PageID 11991
Case 18-30264-sgj11   Doc 2245-1   Filed 05/30/18   Entered 05/30/18 17:37:18   Page 4 of 11

well as in the investment management and private funds industry, including with respect to fund formation, advisor/manager mergers and acquisitions, portfolio transactions, and regulatory and compliance matters.

7.      "Winstead has substantial experience in Chapter 11 bankruptcy cases and trustee representations.   I and other attorneys at Winstead have represented debtors, committees, trustees, secured and unsecured creditors, and significant stakeholders in numerous other bankruptcy cases, locally and nationally.  I and other attorneys at Winstead have received various awards and recognition for our reorganization services, have published numerous scholarly reorganization articles, and have spoken at multiple professional seminars.

8.      "In addition, the Trustee's selection of Winstead is based, in part, upon the fact that Winstead has gained significant familiarity with, and considerable knowledge of, the unique factual circumstances and complex legal issues in the Cases through its representation of Mr. Terry in connection with the trial on the Involuntary Petitions.  Once the Court entered orders for relief in the Cases, and the Trustee was appointed, there was an immediate need for the Trustee to seek counsel and advice regarding the various intricate issues impending in the Cases related to the business of the Debtors, for which the Trustee needed to take action. If the Trustee were to retain new counsel for the purposes set forth below, the Estates would incur substantial fees as new counsel would need to familiarize itself with such factual background and legal issues in the Cases, with which Winstead is already familiar. Thus, the engagement of Winstead for the limited purposes described below would lead to efficiencies that would be lost if the Trustee were forced to employ different counsel.

9.      "Importantly, upon the Trustee's retention of Winstead as set forth in the Application, Winstead has advised Mr. Terry that Winstead may represent Mr. Terry only in

---

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION**
**TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**      Page 3 of 10

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 18-15 Exhibit 6 Page 12/07/25 Page 374 of 1017 PageID 15018
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1246 of 1803 PageID 11992
Case 18-30264-sgj11 Doc 2245-5 Filed 05/30/18 Entered 05/30/18 22:01:34 Page 5 of 11

connection with the pending appeals related to the Involuntary Petitions (the "Appeals"), and that

Mr. Terry would have to retain new counsel for representation in these Cases.[2]  Mr. Terry has

consented to such limited representation by Winstead.  Further, such limited representation of

Mr. Terry by Winstead in these Cases—only in connection with the pending Appeals—is

entirely consistent with the Trustee's interests and would eliminate potential conflicts of interest

presented by the Trustee's retention of Winstead as special counsel.

10.     "Accordingly, I believe the employment of Winstead is appropriate and necessary

to enable the Trustee to execute faithfully his duties under the Bankruptcy Code and that

Winstead and its attorneys are fully qualified to perform the specified legal services referenced

below.

### SERVICES TO BE RENDERED

11.     "The Trustee has requested that Winstead provide special counsel services to the

Trustee for matters specifically involving the:

  a)  management, liquidation, disposition, and monetization of the CLO assets;

  b)  Investment Advisers Act;

  c)  operation of the portfolio management agreements and the indentures, issues
      arising therefrom, and, specifically including, litigation related thereto or
      arising therefrom; and

  d)  certain other litigation matters related to or arising in these Cases, as requested
      by the Trustee.

12.     "Subject to this Court's approval of the Application, Winstead is willing to serve

as the Trustee's special counsel in the Cases to perform the services described above.

---

[2] The Trustee has been advised that Brian Shaw of Rogge Dunn Group, PC will represent Mr. Terry in these Cases. Also disclosed later in this Declaration, Winstead continues to represent Mr. Terry in connection with governmental investigations of certain non-debtor parties-in-interest; however, such representation is not adverse to the Debtors or their Estates.

---

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION**
**TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**          **Page 4 of 10**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Filed 12/46/251804Page 375 of 1017    PageID 15019
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1247 of 1803    PageID 11993
Case 18-30264-sgj11-D23245SSFileoco05/39/98    Enter1ec2d5/90/1Rag2e:273:b34Page 6 of 11

13.    "Further, Winstead will confer with the Trustee and Forshey & Prostok on a regular basis to ensure that the services provided by Winstead do not overlap with, and are not otherwise duplicative of, services provided by Forshey & Prostok, as proposed general counsel, to the Trustee.

14.    "With respect to these specified purposes, Winstead's representation will not conflict with Forshey & Prostok's role as general counsel to the Trustee in the Cases, and Winstead will confer regularly with the Trustee and Forshey & Prostok to ensure the same. Accordingly, except to the extent necessary to effectuate the specific services outlined above, Winstead will not represent the Trustee with respect to plan negotiations or formulation; business or bankruptcy restructuring or reorganization; or otherwise in matters arising purely under the Bankruptcy Code.  With respect to the various Appeals, the underlying issues are discrete, and will not affect Winstead's representation of the Trustee in the Cases.

## COMPENSATION AND REIMBURSEMENT

15.    "Winstead has agreed to perform such legal services on an hourly fee basis at its customary hourly rates for cases of the size and complexity as these Cases.  Winstead's customary hourly rates of attorneys and paralegals for a representation of this nature are presently in a range up to: $785 for shareholders, $485 for associates, and $290 for paralegals.

16.    "Winstead's rates are adjusted on a periodic basis.  Winstead will not charge the Trustee at a rate for its services greater than the standard rates Winstead charges to its clients, generally, for similar engagements.

17.    "Winstead's billing rates are consistent with rates charged by other professionals in the Northern District of Texas with similar experience.  These rates are set at a level designed to compensate Winstead for the work of its attorneys and paralegals and to cover fixed and

---

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION**
**TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**        **Page 5 of 10**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-5    Exhibit 6    Page 1of1    Page 376 of 1017    PageID 15020
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1248 of 1803    PageID 11994
Case 18-30264-sgj11    Doc 2245    Filed 05/30/18    Entered 05/30/18 21:10:34    Page 7 of 11

routine overhead expenses. Winstead's hourly rates for the attorneys who it anticipates will most

likely be working on the Cases are:

| | |
|---|---|
| Rakhee Patel, Shareholder | $585.00 per hour |
| Philip Lamberson, Shareholder | $655.00 per hour |
| Joseph Wielebinski, Shareholder | $655.00 per hour |
| Toby Galloway, Shareholder | $550.00 per hour |
| Andrew Rosell, Shareholder | $585.00 per hour |
| Annmarie Chiarello, Associate | $380.00 per hour |
| Jason Enright, Associate | $390.00 per hour |
| Courtney Mitchell, Associate | $485.00 per hour |
| Laura Thetford, Associate | $385.00 per hour |

18.    "Winstead will maintain detailed, contemporaneous records of time and any

actual and necessary expenses incurred in connection with the rendering of the legal services for

the Trustee as described in the Application and in accordance with the rules of this Court.

19.    "Subject to this Court's approval, the Trustee has also agreed to the

reimbursement of Winstead for all out-of-pocket expenses incurred by Winstead. These expenses

include, but are not limited to, costs for long-distance telephone charges, facsimile charges,

photocopying, travel, parking, business meals, computerized research, UCC searches,

messengers, couriers, postage, filing fees and other fees related to trials and hearings. Winstead

will charge for all such actual and necessary expenses in a manner and at rates consistent with

charges made generally to Winstead's other clients and consistent with the applicable Local

Rules of the Court.

20.    "Winstead will apply to the Court for compensation and reimbursement of

expenses in accordance with the applicable provisions of the Bankruptcy Code and the Local

Rules of this District and Court.

21.    "Winstead has no agreement with any other entity to share any compensation

received and no such agreement will be made, except as permitted under section 504(b)(1) of the

Appellee Appx. 01242
Appx. 01493
014055

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 69-9 Page 1256/251804 Page 377 of 1017 PageID 15021
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1249 of 1803 PageID 11995
Case 18-3026-sgj11 Doc 3245 Filed 05/30/18 Entered 05/30/18 Page 25 of 34 Page 8 of 11

Bankruptcy Code; and no attorney at Winstead is related to any United States Bankruptcy Judge or United States District Court Judge for the Northern District of Texas or to the United States Trustee. Winstead has received no prior consideration to act as special counsel for the Trustee.

22.     "Winstead has not received a retainer in connection with this engagement.

## DISINTERESTEDNESS OF PROFESSIONALS

23.     "To the best of my knowledge, other than as set out below, the shareholders and associates of Winstead: (i) do not have any connection with the Trustee, the Debtors, their creditors, or any other party-in-interest or their respective attorneys and accountants; (ii) do not have any connection with the United States Trustee or any person employed in the Office of the United States Trustee; (iii) are "disinterested persons," pursuant to §§ 101(14) and 327(c) of the Bankruptcy Code; and (iv) do not hold or represent any interest adverse to the Estates:

| Party-In-Interest | Relationship to Debtors | Relationship to Winstead |
|---|---|---|
| Joshua N. Terry | Creditor | Winstead previously represented Mr. Terry in connection with the Involuntary Petitions and in connection with governmental investigations of certain non-debtor parties; as of May 14, 2018, Winstead represents Mr. Terry in connection with only the appeals related to the Involuntary Petitions and, as necessary, in connection with governmental investigations of certain non-debtor parties-in-interest; such current representations are not adverse to the Debtors or their Estates.[3] |
| U.S. Bank National Association | Counter-party to executory contract | Winstead represents this entity in matters unrelated to the Debtors. |
| BNP Paribas | Affiliate of counter-party to executory contract | Winstead represents this entity in matters unrelated to the Debtors. |

---

[3] With respect to Winstead's representation of Mr. Terry in connection with such governmental investigations, Winstead is engaged pursuant to a hybrid fee arrangement.

---

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION
TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**     Page 7 of 10

**Appellee Appx. 01243**

**014056**
Appx. 01494

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Exhibit 6    Page 125 of 651 804    Page 378 of 1017    PageID 15022
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1250 of 1803    PageID 11996
Case 18-30264-sgj11-12...3245SSFiled 06/30/98    Entered 05/90/18... 26:13 34Page 9 of 11

| Party-In-Interest | Relationship to Debtors | Relationship to Winstead |
|---|---|---|
| The Bank of New York Mellon Trust Co., N.A. | Counter-party to executory contract | Winstead previously represented this entity in matters unrelated to the Debtors. |
| Andrews & Kurth LLP | Creditor | Winstead previously represented this entity in matters unrelated to the Debtors. |
| Highland Capital Management, L.P. | Creditor/Affiliate | Winstead is a party to certain litigation, which is wholly unrelated to these Cases, styled *NexBank SSB and Highland Capital Management, L.P. v. Winstead PC*, DC-15-01816, in the 193rd Judicial District Court of Dallas County, Texas, stemming from Winstead's prior representation of Highland Capital Management, L.P., in connection with a foreclosure. |

24.    "Due to the diversity of Winstead's practice areas, Winstead may have rendered, or may now be rendering, legal services to certain creditors or other parties-in-interest, or may have been, or may now be involved, in projects in which attorneys or accountants for these creditors or parties-in-interest were involved and in matters unrelated to the Debtors and the Trustee.  Except as otherwise indicated herein, none of the services provided include any matters related to the Cases and none constitute an interest materially adverse to the Trustee. Accordingly, I believe that Winstead does not hold an adverse interest to the Debtors or their Estates. Moreover, as part of its practice, Winstead appears in cases, proceedings, and transactions involving many different attorneys, accountants, financial consultants, and investment bankers, some of whom now, or may in the future, represent creditors and parties-in-interest in the Cases.  Winstead will not represent any such entities in the Cases.

25.    "Importantly, upon the Trustee's retention of Winstead as set forth in the Application, Winstead has advised Mr. Terry that Winstead may represent Mr. Terry only in connection with the pending appeals related to the Involuntary Petitions (the "Appeals") and that

DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION
TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE            Page 8 of 10

Appellee Appx. 01244
Appx. 01495
014057

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1252 of 1804    Page 379 of 1017    PageID 15023
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1251 of 1803    PageID 11997
Case 18-30264-sgj11    Doc 2346-15    Filed 05/30/18    Entered 05/30/18 20:37:16    Page 10 of 11

Mr. Terry would have to retain new counsel for representation in these Cases.[4]  Mr. Terry has

consented to such limited representation by Winstead.  Further, I believe that such limited

representation of Mr. Terry by Winstead in these Cases—only in connection with the pending

Appeals—is entirely consistent with the Trustee's interests and would eliminate potential

conflicts of interest presented by the Trustee's retention of Winstead as special counsel.

26.     "In addition, with Winstead's ongoing representation of Mr. Terry related to these

Cases being limited only to his representation in connection with the Appeals, I believe Winstead

has no *actual* conflict of interest with the Estates as a result of such representation. Further, as a

result of Winstead's limited representation of Mr. Terry, Winstead does not possess any

economic interest that would tend to lessen the value of the Estates or that would create either an

actual or potential dispute in which either Estate is a rival claimant. Moreover, Winstead has no

bias against the Estates due to its representation of Mr. Terry. Indeed, I believe that Mr. Terry's

interests and the Estate's interests are aligned with the Trustee's goal of maximizing the value of

the Estates, which inures to the benefit of all creditors, including Mr. Terry.

27.     "Winstead has conducted a comprehensive conflict search regarding the creditors

and parties-in-interest as provided by the Debtors on their schedules and disclosures.  Winstead

will supplement its conflicts check as additional creditors are disclosed and shall promptly

disclose to the Court any other connections that Winstead discovers it has or has had with any

such creditors of the Estates pursuant thereto.

28.     "I have reviewed the results of the foregoing efforts of Winstead to determine the

existence of any interests adverse to the Trustee or which would otherwise create a conflict of

interest in connection with its engagement in this matter.  Based on this review, I believe

---

[4] The Trustee has been advised that Brian Shaw of Rogge Dunn Group, PC will represent Mr. Terry in these Cases. Also disclosed above, Winstead continues to represent Mr. Terry in connection with governmental investigations of certain non-debtor parties-in-interest; however, such representation is not adverse to the Debtors or their Estates.

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION
TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**          Page 9 of 10

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1253 of 1804    Page 380 of 1017    PageID 15024
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1252 of 1803    PageID 11998
Case 18-30264-sgj11    Doc 2394-15    Filed 05/30/18    Entered 05/30/18 Page 3281 of 34    Page 11 of 11

Winstead does not have any interest adverse to the Trustee or which would otherwise create a conflict of interest in connection with its limited engagement in this matter.

29.    "In sum, based on Winstead's familiarity with the unique factual circumstances and complex legal issues in the Cases (particularly with respect to the CLO assets, the portfolio management agreement, indentures, and related structures), Winstead's bankruptcy expertise and considerable experience and knowledge in handling such matters, the need for immediate action by the Trustee on a variety of fronts related to these specific matters, as well as the substantial expense the Estates would incur as a result of new counsel needing to familiarize itself with the intricate and impending legal issues in the Cases, I believes that Winstead's engagement as special counsel for the limited purposes described herein in is in the best interests of the Estates and their creditors.

30.    "In light of the foregoing, I believe that the employment of Winstead as counsel for the Trustee is appropriate and in the best interests of the Estates, pursuant to sections 327 and 328 of the Bankruptcy Code, and should be approved.

31.    "I reserve the right to supplement this Declaration.

DECLARED under penalty of perjury this 30th day of May, 2018.


/s/ *Rakhee V. Patel*
Rakhee V. Patel

---

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION
TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**        **Page 10 of 10**
4813-4254-0390v.2 61588-3

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 68-9    Exhibit 6    Page 1054 of 1804    Page 381 of 1017    PageID 15025
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1253 of 1803   PageID 11999
Case 18-30264-sgj11   Doc 920-53 Filed 05/30/18   Entered 05/30/18   Page 1 of 3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 18-30264-SGJ-11** |
| | § | **Case No. 18-30265-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | **(Jointly Administered Under Case** |
| **LLC,** | § | **No. 18-30264-SGJ-11)** |
| | § | |
| **Debtors.** | § | **Chapter 11** |

**ORDER APPROVING THE APPLICATION TO EMPLOY
WINSTEAD PC AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**

Came on for consideration the *Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* (the "Application"), filed by Robin Phelan, Chapter 11 trustee (the "Trustee") of Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," and together with Acis LP, the "Debtors" or "Acis"), the debtors in the above styled and numbered bankruptcy cases (the "Cases"),[1] and having considered the Application, the Declaration of Rakhee V. Patel in support of the Application, arguments of counsel, and any

---

[1] Any capitalized term not otherwise defined herein shall have the meaning ascribed to it in the Application.

---

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 1255/265/1804    Page 382 of 1017    PageID 15026
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1254 of 1803    PageID 12000
Case 18-30264-sgj11    Doc 692-53    Filed 05/30/18    Entered 05/30/18 07:30:1334    Page 2 of 3

timely filed objections to the Application, the Court finds that (a) the proposed employment of Winstead PC ("Winstead") as special counsel for the Trustee, for the limited purposes set forth in the Application, is appropriate and in the best interest of the Debtors' Estates and creditors, (b) the Trustee and Winstead have represented to the Court that Winstead and its shareholders and associates do not represent or hold any interest adverse to the Debtors' Estates such that Winstead would be disqualified from representing the Trustee in these Cases, and (c) the Trustee and Winstead have represented to the Court that Winstead and each of its shareholders and associates is a "disinterested person" pursuant to 11 U.S.C. §§ 101(14) and 327(c).  Accordingly, the Court finds that the Application should be approved.  Therefore, pursuant to 11 U.S.C. § 327(a) and (c), it is hereby:

ORDERED that the Application is **APPROVED**.  It is further

ORDERED that the Trustee is authorized to retain and employ Winstead as his special counsel, effective as of May 14, 2018, to perform the services more particularly set forth in the Application.  It is further

ORDERED that Winstead shall be compensated for services rendered and for expenses incurred, subject to the Court's interim and final approval and in accordance with the provisions of sections 330 and 331 of the Bankruptcy Code, the applicable Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules, and such other procedures as may be fixed by order of this Court.

ORDERED that that this Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this order.

**# # # END OF ORDER # # #**

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 68-9 Page 1256 of 1804 Page 383 of 1017 PageID 15027
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1255 of 1803 PageID 12001
Case 18-30264-sgj11 Doc 2653 Filed 05/30/18 Entered 05/30/18 Page 37 of 34 Page 3 of 3

**SUBMITTED BY**:

Rakhee V. Patel – SBT #00797213
Phillip Lamberson – SBT #00794134
Joe Wielebinski – SBT #21432400
Annmarie Chiarello – SBT #24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
Email: rpatel@winstead.com
Email: achiarello@winstead.com
Email: plamberson@winstead.com
Email: jwielebinski@winstead.com

*PROPOSED SPECIAL COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE*

---

**ORDER APPROVING APPLICATION TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE** **Page 3 of 3**
4812-2677-1046v.1

61588-3 5/30/2018

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-19    Page 1257/251804  Page 384 of 1017    PageID 15028
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1256 of 1803    PageID 12002
Case 18-30226-sgj11 Doc 9240 CS    Filed 05/30/18 Entered 05/30/18 21:37:13 34 Page 1 of 3

SERVICE

| | | |
|---|---|---|
| Acis Capital Management Gp, LLC<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201-7849 | Acis Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201-7849 | Acis CLO 2013- 1, Ltd.<br>c/o Appleby Trust<br>Attn : The Directors Clifton House 75 Fort St.,<br>P. 0. Box 13<br>Grand Cayman, Cayman Islands KY1-1108 |
| Acis CLO 2013-1 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801-1120 | Acis CLO 2013-2 Ltd.<br>c/o MaplesFS Limited, Attn: Directors<br>P.O. Box 1093<br>Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Acis CLO 2014- 3 Ltd.<br>c/o MapleFS Limited<br>Attn: The Directors<br>P.O. Box 1093<br>Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 |
| Acis CLO 2014-3 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801-1120 | Acis CLO 2014-4 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801-1120 | Acis CLO 2014-4 Ltd .<br>c/o MapleFS Limited<br>Attn : The Director<br>P.O. Box 1093<br>Boundary Hall, Cricket Sq.<br>Grand Cayman, Cayman Islands KY1-1102 |
| Acis CLO 2014-5 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801-1120 | Acis CLO 2014-5 Ltd.<br>c/o MapleFS Limited<br>Attn: The Directors<br>P.O. Box 1093<br>Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Acis CLO 2015-6 Ltd .<br>c/o MapleFS Limited<br>Attn: The Directors<br>P.O. Box 1093<br>Boundary Hall, Cricket Sq<br>Grand Cayman , Cayman Islands KY1 -1102 |
| Acis CLO 2015-6<br>Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington , DE 19801-1120 | Acis CLO 2017-7 Ltd.<br>c/o MapleFS Limited<br>Attn: The Directors<br>PO Box 1093<br>Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Acis CLO Management, LLC<br>1209 Orange Street<br>Wilmington, DE 19801-1120 |
| Acis CLO Value Fund II (Cayman), L.P.<br>P.O. Box 309<br>Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Acis CLO Value Fund II GP, LLC<br>P.O. Box 309<br>Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Acis CLO Value Fund II, L.P.<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201-7849 |
| Acis CLO Value GP, LLC<br>1209 Orange Street<br>Wilmington, DE 19801-1120 | Acis CLO Value Master Fund II, L.P.<br>P.O. Box 309<br>Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Acis Funding GP, Ltd.<br>c/o Maples Corporate Service Limited<br>P.O. Box 309<br>Ugland House<br>Grand Cayman, Cayman Islands FY1-1104 |
| Acis Funding L.P.<br>c/o Maples Corporate Services Limited<br>P.O. Box 309<br>Ugland House<br>Grand Cayman, Cayman Islands KY1-1101 | Acis Loan Funding, Ltd.<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201-7849 | Andrews Kurth Kenyon LLP<br>600 Travis, Suite 4200<br>Houston, TX 77002-2929 |
| BayVK R2 Lux S.A.,<br>SICAV-FIS<br>15 Rue de Flaxweiler<br>L-6776 Grevenmacher<br>Luxembourg | BNP Paribas Securities Services<br>Luxembourg Branch<br>60 Avenue John F. Kennedy<br>1855 Luxembourg | Case Anywhere LLC<br>218 60 Burbank Boulevard, Suite 125<br>Woodland Hills, CA 91367-7447 |
| CLO Holdco, Ltd.<br>c/o Intertrust Corp. Srvs. (Cayman) Ltd.<br>190 Elgin Ave, George Town<br>Grand Cayman, Cayman Islands KY1-9005 | CLO Holdco, Ltd.<br>Scott R. Larson<br>BELL NUNNALLY & MARTIN LLP<br>3232 McKinney Ave., #1400<br>Dallas, TX 75204-7422 | CSI Global Deposition Services<br>4950 N. O'Connor Road, Suite 152<br>Irving, TX 75062- 2778 |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 51-5    Exhibit 6    Page 1258/251804    Page 385 of 1017    PageID 15029
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1257 of 1803    PageID 12003
Case 18-30264-sgj11    Doc 2265    Filed 05/30/18    Entered 05/30/18 15:31:34    Page 2 of 3

| | | |
|---|---|---|
| CT Corporation<br>P. O. Box 4 34 9<br>Carol Stream, IL 60197-4349 | Dallas County<br>Linbarger, Goggan, Blair & Sampson LLP<br>c/o Laurie Spindler<br>2777 N Stemmons Frwy, No 1000<br>Dallas, TX 75207-2328 | Dallas County<br>Linebarger Goggan Blair & Sampson, LLP<br>c/o Sherrel K Knighton<br>2777 N. Stemmons Frwy Ste 1000<br>Dallas, TX 75207-2328 |
| David Langford<br>1321 Indian Creek<br>DeSoto, TX 75115-3652 | David Simek<br>31 Woodacres Road<br>Brookville, NY 11545-2911 | Diane G. Reed<br>Reed & Elmquist, P.C.<br>501 N. College Street<br>Waxahachie, TX 75165-3361 |
| Drexel Limited<br>309 23rd Street 340<br>Miami Beach, FL  33139-1700 | Elite Document Technology<br>4 00 N. Saint Paul Street Suite 1300<br>Dallas, TX 75201-6881 | Highfield Equities, Inc.<br>3131 McKinney Avenue, Suite 215<br>Dallas, TX 75204-2421 |
| Highland Capital Management, L. P.<br>1209 Orange Street<br>Wilmington, DE 19801-1120 | Highland Capital Management, L.P.<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201-7849 | Highland Capital Management, L.P.<br>c/o Foley Gardere<br>Holland O'Neil, Jason Binford<br>2021 McKinney Avenue, Ste. 1600<br>Dallas, TX 75201-3340 |
| Highland CLO Funding<br>Scott R. Larson<br>BELL NUNNALLY & MARTIN LLP<br>3232 McKinney Ave., #1400<br>Dallas, TX 75204-7422 | Highland CLO Funding<br>Scott R. Larson<br>BELL NUNNALLY & MARTIN LLP<br>3232 McKinney Ave, #1400 | JAMS, Inc.<br>18881 Von Karman Avenue, Suite 350<br>Irvine, CA  92612-6589 |
| Jones Day<br>2727 N. Harwood Street<br>Dallas, TX  75201-1568 | Joshua N. Terry<br>25 Highland Park Village, Suite 100- 848<br>Dallas, TX 75205-2726 | Joshua N. Terry<br>350 9 Princeton Ave<br>Dallas, TX  75205-3246 |
| Joshua N. Terry<br>c/o Winstead PC<br>Attn: Rakhee V. Patel<br>500 Winstead Building<br>2728 N. Harwood Street<br>Dallas, Texas 75201-1516 | Joshua Terry<br>25 Highland Park Village<br>Suite 100-848<br>Dallas, TX 75205-2789 | KPMG LLP (USA)<br>Two Financial Center<br>60 South Street<br>Boston, MA 02111-2759 |
| KPMG LLP<br>2323 Ross Avenue, Suite 1400<br>Dallas, TX 75201-2721 | KPMG LLP<br>Aon Center<br>200 E. Randolph Street, Suite 5500<br>Chicago, IL  60601-6607 | Lackey Hershman LLP<br>3102 Oak Lawn Avenue, Suite 777<br>Dallas, TX  75219-4259 |
| McKool Smith, P.C.<br>300 Crescent Court, Suite 1500<br>Dallas, TX  75201-6970 | Michael D. Warner<br>Cole Schotz P.C.<br>1700 City Center Tower II<br>301 Commerce St.<br>Fort Worth, TX 76102-4140 | Mizuho Securities USA Inc.<br>320 Park Avenue<br>12th Floor<br>New York, NY 10022-6848 |
| Neutra, Ltd.<br>Scott R. Larson<br>BELL NUNNALLY & MARTIN LLP<br>3232 McKinney Ave., #1400<br>Dallas, TX 75204-7422 | O. S. Bank National Association<br>Attn: Michael Zak<br>60 Livingston Avenue<br>EP-MN-WS3D<br>Saint Paul, MN 55107-2292 | Rakhee V. Patel<br>WINSTEAD PC<br>2728 N. Harwood Street<br>Suite 500<br>Dallas, TX 75201-1743 |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-16    Page 1258 of 1804 Page 386 of 1017    PageID 15030
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1258 of 1803    PageID 12004

Case 18-30264-sgj11    Doc 922-2    Filed 05/30/18    Entered 05/30/18 Page 37 of 34    Page 3 of 3

Reid Collins & Tsai, LLP
1301 S. Capital of Texas Highway
Building C, Suite 300
Austin, TX  78746-6500

Robin Phelan
4214 Woodfin Drive
Dallas, TX 75220-6416

Robin Phelan
Chapter 11 Trustee
c/o Matthias Kleinsasser
Forshey & Prostok, LLP
777 Main St., Suite 1290
Fort Worth, TX 76102-5316

Robin Phelan, Chapter 11 Trustee
c/o Suzanne K. Rosen
Forshey & Prostok, LLP
777 Main St., Suite 1290
Fort Worth, TX 76102-5316

Stanton Advisors LLC
300 Coles Street Apartment 802
Jersey City, NJ 07310-1047

Stanton Law Firm
9400 North Central Expressway
Suite 1304
Dallas, TX 75231-5047

State Street (Guernsey) Limited
First Floor Dorey Court
Admiral Park
St. Peter Port, Guernsey
The Bank of N.Y. Mellon Trust Co., N.A.
225 Liberty Street New York, NY 10286-0001

Texas Comptroller of Public Accounts
John Stern
1100 Commerce Street Room 1254
Dallas, TX 75242-1305

Texas Comptroller of Public Accounts
John Stern
1100 Commerce Street Room 1254
Dallas, TX 75242-1305

Texas Comptroller of Public Accounts
John Stern
P.O. Box 12548
Austin, TX 78711-2548

The Dugaboy Investment Trust
300 Crescent Court, Suite700
Dallas, TX 75201-1876

The TASA Group, Inc.
1166 DeKalb Pike
Blue Bell, PA 19422- 1853

U.S. Attorney General
Department of Justice
Washington, DC 20001

U.S. Attorney
1100 Commerce, 3rd Floor
Dallas, TX 75242-1074

United States Trustee
1100 Commerce Street, Room 976
Dallas, TX 75242-0996

Universal-Investment-Luxembourg S.A.
15, rue de Flaxweiler
L-6776 Grevenmacher
Luxembourg

US Bank National Association
Daniel P. Novakov
Frost Brown Todd LLC
100 Crescent Court. Ste 350
Dallas, TX 75201-2348

US Bank National Association
Mark D. Kotwick
One Battery Park Plaza
New York, New York 10004-1405

US Bank
P. O. Box 5229
Cincinnati, OH 45201-5229

Warren A. Usatine
Cole Schotz P.C.
25 Main Street
Hackensack, NJ 07601-7189

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-9   Page 1260 of 1804 Page 387 of 1017   PageID 15031
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1259 of 1803   PageID 12005

# EXHIBIT J

Appellee Appx. 01253

Appx. 01594

0'14066

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 65-15    Filed 06/25/25    Page 388 of 1017    PageID 15032
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1260 of 1803   PageID 12006
Case 18-30264-sgj11   Doc 288   Filed 06/25/18   Entered 06/21/18 Page 1 of 6   Page 1 of 5



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 21, 2018**

**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 18-30264-SGJ-11** |
| | § | **Case No. 18-30265-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | **(Jointly Administered Under Case** |
| **LLC,** | § | **No. 18-30264-SGJ-11)** |
| | § | |
| Debtors. | § | **Chapter 11** |

### ORDER (I) APPROVING THE APPLICATION TO EMPLOY
### WINSTEAD PC AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE
### AND (II) DENYING THE MOTION TO DISQUALIFY WINSTEAD PC AS
### PROPOSED SPECIAL COUNSEL TO ROBIN PHELAN, CHAPTER 11 TRUSTEE

On June 14, 2018, the Court heard: (1) the *Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* [Docket No. 246] (the "Application"), filed by Robin Phelan, Chapter 11 trustee (the "Trustee") of Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," and together with Acis LP, the "Debtors" or "Acis"), the debtors in the above captioned and jointly administered bankruptcy cases (the

---

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Filed 12/02/25    Page 389 of 1017    PageID 15033
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1261 of 1803    PageID 12007
Case 18-30264-sgj11    Doc 2893-3    Filed 06/25/18    Entered 06/21/18 Page 3 of 6 Page 2 of 5

"Cases")[1] and (2) the *Motion to Disqualify Winstead P.C. as Proposed Special Counsel to Robin Phelan, Chapter 11 Trustee* (the "Motion to Disqualify") [Docket No. 244]. Having considered the Application, the *Supplement to Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* (the "Supplement") [Docket No. 266], Rakhee V. Patel's Declaration and Supplemental Declaration in support of the Application, the Motion to Disqualify, the *Objection of Highland Capital Management, L.P. to Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* [Docket No. 267], the *United States Trustee's Objection to Application to Employ Winstead as Special Counsel to the Chapter 11 Trustee* [Docket No. 279], the arguments of counsel and evidence admitted at the hearing on the Application and the Motion to Disqualify, the Court read its findings of fact and conclusions of law into the record in accordance with Fed. R. Bankr. P. 7052(a).  For the reasons stated, the Court, pursuant to 11 U.S.C. § 327(a) and (c), **ORDERS AS FOLLOWS:**

1.    The Motion to Disqualify is **DENIED**.

2.    The Application is **APPROVED** to the extent set forth herein.

3.    The Trustee is authorized to retain and employ Winstead as his special counsel, effective as of May 14, 2018, to provide legal services to the Trustee for matters specifically involving:

    a)  management, liquidation, disposition, and monetization of the CLO assets;

    b)  the Investment Advisers Act of 1940, as amended; and

    c)  operation of the portfolio management agreements and the indentures, issues arising therefrom,[2] and, specifically including, litigation related thereto or arising therefrom.

---

[1] Any capitalized term not otherwise defined herein shall have the meaning ascribed to it in the Application or the Supplement, as applicable.

[2] For the avoidance of doubt, such issues may include issues related to securities laws, including the Securities Act of 1933, as amended, and the Securities Exchange Act of 1934, as amended.

---

**ORDER APPROVING APPLICATION TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**                                                                                        **Page 2 of 5**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Filed 06/05/25   Page 390 of 1017   PageID 15034
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1262 of 1803   PageID 12008
Case 18-30264-sgj11   Doc 2393   Filed 06/29/18   Entered 06/29/18 Page 3 of 5Page 3 of 5

4.     If the Trustee wishes to retain Winstead to provide legal services in any capacity other than in the three items identified in paragraph 2, the Trustee must obtain Court approval by application with the Court.

5.     Winstead may not provide legal services to Joshua Terry or to the Trustee in connection with the preparation or defense of, or any objection to, Joshua Terry's proofs of claim,[3] or such claims as may be amended.

6.     Winstead will establish an ethical wall between any of Winstead's attorneys engaged in these Cases and those of Winstead's attorneys involved in that certain litigation styled *NexBank SSB and Highland Capital Management, L.P. v. Winstead PC*, DC-15-01816, pending in the 193rd Judicial District Court of Dallas County, Texas. Notwithstanding the foregoing, the Winstead attorneys engaged in these Cases may seek counsel from Don Campbell, in his capacity as Winstead's general counsel, as they deem necessary regarding issues related to any potential conflicts or other ethics issues that may arise during these Cases.

7.     With respect to those certain Appeals pending in the District Court for the Northern District of Texas, specifically under case numbers 3:18-cv-01056-D, 3:18-cv-01057-D, 3:18-cv-01073-D, and 3:18-cv-01084-D, any parties to such Appeals may not seek agreed dismissal of any such Appeals by compromise or settlement without providing proper notice to parties-in-interest in these Cases, as required under the Federal Rules of Bankruptcy Procedure or as otherwise required under applicable law.

8. Winstead shall be compensated for services rendered and for expenses incurred, subject to the Court's interim and final approval and in accordance with the provisions of sections 330 and 331 of the Bankruptcy Code, the applicable Federal Rules of Bankruptcy

---

[3] Joshua Terry has filed two claims in these Cases: Claim No. 1 in the Claims Register for Case No. 18-30264 and Claim No. 1 in the Claims Register for Case No. 18-30265.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1264 of 1804    Page 391 of 1017    PageID 15035
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1263 of 1803    PageID 12009
Case 18-30264-sgj11 Doc 2393 Filed 06/29/18    Entered 11/31/18 Page 4 5 of 6 Page 4 of 5

Procedure, the Local Bankruptcy Rules, and such other procedures as may be fixed by order of this Court.

9.    This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this order.

**# # # END OF ORDER # # #**

Appellee Appx. 01257
014070

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Page 1265 of 1804   Page 392 of 1017   PageID 15036
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1264 of 1803   PageID 12010
Case 18-30264-sgj11   Doc 2893   Filed 06/15/18   Entered 06/15/18 Page 450 of 6 Page 5 of 5

**SUBMITTED BY:**

Rakhee V. Patel – SBT #00797213
Phillip Lamberson – SBT #00794134
Joe Wielebinski – SBT #21432400
Annmarie Chiarello – SBT #24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
Email: rpatel@winstead.com
Email: achiarello@winstead.com
Email: plamberson@winstead.com
Email: jwielebinski@winstead.com

*SPECIAL COUNSEL FOR ROBIN PHELAN,*
*CHAPTER 11 TRUSTEE*

---

**ORDER APPROVING APPLICATION TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE**                                                     **Page 5 of 5**
4846-6789-0026v.2

62112-1 6/15/2018

**Appellee Appx. 01258**

**Appx. 01509**

**014071**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 33-16    Page 1266 of 1804   Page 393 of 1017    PageID 15037
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1265 of 1803  PageID 12011

# APPENDIX 14

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibits    Page 12/67 251804Page 394 of 1017    PageID 15038
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1266 of 1803    PageID 12012

Case 19-12239-CSS    Doc 70    Filed 10/29/19    Page 1 of 10

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | |

**Objection Deadline: November 12, 2019 at 4:00 p.m. (Eastern time)**
**Hearing Date: November 19, 2019 at 12:00 p.m. (Eastern time)**

## DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE

Highland Capital Management, L.P., the debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), files this application (the "Application"), pursuant to section 327(e) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order authorizing the Debtor to retain and employ Lynn Pinker Cox & Hurst LLP (the "Firm" or "LPCH") as Special Texas Litigation Counsel in this Chapter 11 Case, *nunc pro tunc* to the Petition Date (defined below). In support of the Application, the Debtor relies upon and incorporates by reference the Declaration of Michael K. Hurst the ("Hurst Declaration"), a copy of which is attached hereto as **Exhibit A**. In further support of the Application, the Debtor respectfully states as follows:

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**Appellee Appx. 01260**
Appx. 01511
014073

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibits   Page 1126 of 1804 Page 395 of 1017   PageID 15039
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1267 of 1803   PageID 12013
Case 19-12239-CSS   Doc 70   Filed 10/29/19   Page 2 of 10

### Jurisdiction

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 327(e) and 328 of the Bankruptcy Code, Bankruptcy Rule 2014(a), and Local Rule 2014-1.

### Background

4.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Petition").  The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this Chapter 11 Case.

5.      As of the date of the filing of this Application, the Office of the United States Trustee (the "U.S. Trustee") has yet to appoint an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code.

6.      A more detailed description of the business and operations of the Debtor, and the events leading to the commencement of this chapter 11 case, is provided in the *Declaration of Frank Waterhouse in Support of First Day Motion*, [Docket No. 9] (the "First Day Declaration") and incorporated herein by reference.[2]

---

[2]  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Declaration.

2

Appellee Appx. 01261
Appx. 01512
014074

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 12/60/251804   Page 396 of 1017   PageID 15040
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1268 of 1803   PageID 12014
Case 19-12239-CSS   Doc 70   Filed 10/29/19   Page 3 of 10

### Relief Requested

7.      By this Application, the Debtor seeks entry of an order authorizing the employment

of the Firm as its Special Texas Litigation Counsel, *nunc pro tunc* to the Petition Date. The Debtor

requests that the Firm be retained to perform the services described in this Application.

### Basis for Relief

8.      Section 327(e) of the Bankruptcy Code authorizes a debtor, with court approval, to

retain

> for a specified special purpose, other than to represent the trustee in
> conducting the case, an attorney that has represented the debtor, if
> in the best interest of the estate, and if such attorney does not
> represent or hold any interest adverse to the debtor or to the estate
> with respect to the matter on which such attorney is to be employed.

11 U.S.C. § 327(e).

9.      Section 327(e) of the Bankruptcy Code authorizes the retention of an attorney who

represented a debtor prior to the bankruptcy petition date, provided: (a) such retention is for a

special purpose; (b) the purpose of the retention is not to conduct the case; (c) the retention is in

the best interests of the estate; and (d) the attorney does not hold any interest adverse to the debtor

with respect to the subject of its retention. The Firm's retention as the Debtor's Special Texas

Litigation Counsel falls within the scope of section 327(e) of the Bankruptcy Code.

### The Firm's Qualifications

10.      The Debtor believes that the attorneys at the Firm are well qualified to act as Special

Texas Litigation Counsel on behalf of the Debtor in this Chapter 11 Case. The Firm is a boutique

trial litigation firm and the specific attorneys engaged to represent the Debtor have substantial

experience and expertise in trial litigation, including in complex commercial bankruptcy cases

such as this case.

DOCS_NY:39760.1 36027/002

Appellee Appx. 01262
Appx. 01513
014075

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 1276 of 1804   Page 397 of 1017   PageID 15041
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1269 of 1803   PageID 12015

Case 19-12239-CSS   Doc 70   Filed 10/29/19   Page 4 of 10

11.     The Firm has provided legal services to the Debtor in at least six separate matters since March 2016.  In particular, and in regard to active litigation, the Firm acts as trial litigation counsel to the Debtor as it relates to the lawsuit captioned *In re Acis Capital Management, L.P. and Acis Capital Management GP, LLC*, jointly administered under Case No. 18-30264-SGJ-11 pending in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, and various appeals related thereto (the "Pending Acis Proceedings").  The Debtor expects that the Firm, in its role as Special Texas Litigation Counsel, will continue to provide services to the Debtor with regard to matters that were handled by the Firm before the Petition Date. The Firm also represents entities related to the Debtor in the Pending Acis Proceedings including Highland HCF Advisor, Ltd., Highland CLO Management, Ltd., Highland CLO Holdings, Ltd. (collectively, the "Cayman Defendants").

12.     The Firm also acts as trial litigation counsel to the Debtor in a Texas State court litigation captioned *Joshua N. Terry, Individually and on Behalf of IRAs #1467711 and 1467721, and Jennifer G. Terry, on Behalf of IRAs #1467511 and 1467521 and as the Trustee of the Terry Family 401-K Plan v. Highland Capital Management, L.P., James D. Dondero, and Thomas J. Surgent* Cause No. DC-16-11396 (the "Texas Lawsuit"). In the Petition, the Debtor identified an unsecured claim arising from the Texas Lawsuit. Certain disputed matters in the Texas Lawsuit were scheduled to proceed for resolution in a bench trial, scheduled to occur in November 2019. The Firm continues to represent the Debtor in the Texas Lawsuit, albeit that proceeding is currently subject to the automatic stay as to the Debtor.[3]

---

[3] The Firm also represents a related entity, the Charitable Donor Advised Fund, L.P. ("the Charitable DAF"), in a separate lawsuit in the Southern District of New York, case number 1:19-cv-09857-NRB, which is unrelated to the Debtor and this Chapter 11 Case, and unrelated to the Texas Lawsuit and the Pending Acis Proceedings. *See* Hurst Declaration.

DOCS_NY:39760.1 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6 Filed 12/06/25 Page 398 of 1017   PageID 15042
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1270 of 1803   PageID 12016

Case 19-12239-CSS   Doc 70   Filed 10/29/19   Page 5 of 10

13.     Among other services provided to the Debtor in the Texas Lawsuit and/or in the Pending Acis Proceedings, the Firm counsels the Debtor on trial strategy, general litigation strategy, represents the Debtor at oral argument in various hearings, conducts research, conducts motion practice, and during discovery, manages discovery efforts when ongoing.

14.     The Firm's partners Mr. Hurst and Mr. David Coale both provide services to the Debtor in the above-referenced matters. Mr. Hurst, lead counsel for the Debtor within the Firm, is Board Certified in Civil Trial Law by the Texas Board of Legal Specialization. Mr. Coale, lead appellate counsel for the Debtor within the Firm, is Board Certified in Civil Appellate Law by the Texas Board of Legal Specialization.

15.     For these reasons, the Debtor believes that the Firm possesses the requisite expertise to serve as Special Texas Litigation Counsel in this case, and can do so in an efficient and cost-effective manner.

16.     In light of the Firm's relationship with the Debtor and the extensive work it has performed for the Debtor prior to the Petition Date, the Debtor believes that the Firm's retention is in the best interests of its estate and creditors.  Since its engagement, the Firm has become intimately familiar with the Debtor's business and operations as they pertain to the Pending Acis Proceedings and to the Texas Lawsuit, and to obtain new counsel now would result in the additional and unnecessary expenditure of both time and money.  For example, the Firm represents the Debtor in an appeal that is pending at the Fifth Circuit Court of Appeals and another appeal that is pending at the District Court in the Northern District of Texas.  The Firm continues to represent the Debtor in a pending adversary proceeding in the Pending Acis Proceedings, albeit that proceeding is currently subject to the automatic stay as to the Debtor.  The Firm, and co-

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibits 6   Page 1273/25 1804 Page 399 of 1017    PageID 15043
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1271 of 1803   PageID 12017

Case 19-12239-CSS   Doc 70   Filed 10/29/19   Page 6 of 10

litigation counsel, Foley Gardere, Foley & Lardner LLP ("<u>Foley Gardere</u>")[4] have worked cooperatively on the Pending Acis Proceedings and have endeavored to avoid unnecessary duplication of services to the Debtor.  The Firm is uniquely qualified to handle the representation in a most efficient and timely manner.  As such, the Firm should be retained as the Debtor's Special Texas Litigation Counsel.

### Services to Be Provided By the Firm

17.      The Firm's proposed retention pursuant to section 327(e) of the Bankruptcy Code is for the limited purpose of representing the Debtor as Special Texas Litigation Counsel.  Subject to approval by the Bankruptcy Court, the services that the Debtor proposes that the Firm render, and the Firm has agreed to provide, include advising the Debtor in connection with all aspects of the Pending Acis Proceedings and the Texas Lawsuit, and performing the range of services normally associated with matters such as this as the Debtor's Special Texas Litigation Counsel, which the Firm is in a position to provide in connection with the matter referred to above.

18.      The Firm's proposed retention is for the discrete matters referenced above, and the Firm will not be rendering services typically performed by a debtor's bankruptcy counsel.  Among other things, the Firm ordinarily will not be involved in interfacing with this Court or be primarily responsible for the Debtor's general restructuring efforts.  By delineating the Firm's role, the Debtor has ensured there will be no duplication of services.

### Compensation and Fee Applications

19.      As required by Bankruptcy Code section 329 and Bankruptcy Rule 2016, the Hurst Declaration discloses that, in the one year period preceding the Petition Date, the Firm received payments from the Debtor totaling $1,110,508.49 (the "<u>Prepetition Payments</u>") with respect to

---

[4] The Debtor is simultaneously filing a request to employ the Foley Gardere firm as Special Texas Counsel.

DOCS_NY:39760.1 36027/002

Appellee Appx. 01265
Appx. 01516
014078

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibits   Page 1273/03/251804 Page 400 of 1017    PageID 15044
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1272 of 1803   PageID 12018
Case 19-12239-CSS    Doc 70   Filed 10/29/19   Page 7 of 10

services rendered to the Debtor. The Prepetition Payments were paid by, and the sources of such funds were, the Debtor. According to the Hurst Declaration, as of September 30, 2019,[5] the Firm submits that it has earned fees and incurred reimbursable expenses on account of its services to Debtor in the amount of $1,419,928.07 (the "Aggregate Amounts"). As of September 30, 2019, approximately $319,419.58 of the Aggregate Amounts was outstanding and unpaid.

20.     The Firm intends to apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and the guidelines promulgated by the United States Trustee, and pursuant to any additional procedures that may be established by the Court in this Chapter 11 Case. The Firm's fees for professional services are based upon its hourly rates, which are periodically adjusted. The hourly rates are currently $365 to $800 for attorneys and $180 to $235 for paraprofessionals.

21.     The Firm will maintain records in support of any actual and necessary costs and expenses incurred in connection with the rendering of its services in this Chapter 11 Case. Subject to application for and allowance by the Court, the Firm will receive reimbursement for reasonable and documented out-of-pocket expenses incurred in connection with the services rendered to the Debtor.

22.     All compensation and expenses will be sought in accordance with section 328(a) of the Bankruptcy Code, as incorporated in sections 329 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and orders of the Court.

---

[5] Due to the timing of the bankruptcy filing, fees and expenses for October 2019 were not fully reflected in LPCH's accounting system. The Firm will supplement the Hurst Declaration with those additional sums once available.

DOCS_NY:39760.1 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibits    Page 1076/051804    Page 401 of 1017    PageID 15045
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1273 of 1803    PageID 12019

Case 19-12239-CSS    Doc 70    Filed 10/29/19    Page 8 of 10

23.     The Debtor believes that the compensation arrangements with the Firm are reasonable and at market rates, and similar to the rates charged to other clients in similar circumstances.

### Disinterestedness and Disclosure of Connections

24.     To check and clear potential conflicts of interest in this Chapter 11 Case, the Firm researched its client database to determine whether it had any relationships with the following entities in its engagement as Special Texas Litigation Counsel (collectively, the "Interested Parties"):

    a.    the Debtor and its non-debtor affiliates;

    b.    the Debtor's secured creditors;

    c.    the Debtor's directors, officers and board members;

    d.    the Debtor's equity security holders;

    e.    the creditors of the Debtor holding the 20 largest unsecured claims; and

    f.    any person employed in the office of the U.S. Trustee or any Bankruptcy Judge currently serving on the United States Bankruptcy Court for the District of Delaware.

25.     To the extent that the Firm's research of its relationships with the Interested Parties indicates that the Firm has represented, or currently represents any of these entities in matters *unrelated* to this Chapter 11 Case, the identities of such entities and, for current clients, a brief description of the type of work performed by the Firm for these clients are set forth in Schedule 1 to the Hurst Declaration.

26.     In reliance on the Hurst Declaration, the Debtor believes that (a) the Firm has no connection with the Debtor, its creditors, the U.S. Trustee, any person employed in the office of

8

Appellee Appx. 01267
Appx. 01518
014080

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1275 of 1804    Page 402 of 1017    PageID 15046
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1274 of 1803    PageID 12020

Case 19-12239-CSS    Doc 70    Filed 10/29/19    Page 9 of 10

the U.S. Trustee or any Bankruptcy Judge currently serving on the United States Bankruptcy Court for the District of Delaware, or any other party with an actual or potential interest in this Chapter 11 Case or their respective attorneys or accountants, except as set forth in the Hurst Declaration; (a) the Firm is not and has not been an investment banker for any outstanding securities of the Debtor; and (b) the Firm neither holds nor represents any interest adverse to the Debtor or its estate with respect to the matter on which the Firm is to be employed.  Accordingly, the Debtor believes that the Firm's representation of the Debtor is permissible under section 327(e) of the Bankruptcy Code and is in the best interest of the Debtor's estate.

27.    Where, as here, there is no conflict concerning the subject matter of the proposed special engagement, an application to employ Special Texas Litigation Counsel should be granted. "[Section] 327(e) bars engagement of special counsel only in the presence of an actual conflict of interest concerning the subject matter of the engagement." *In re Carla Leather, Inc.*, 44 B.R. 457, 474 (Bankr. S.D.N.Y. 1984), *aff'd*, 50 B.R. 764 (S.D.N.Y. 1985) (citations omitted); *see also In re Polaroid Corp.*, 424 B.R. 446, 453 (Bankr. D. Minn. 2010) (section 327(e) only disqualifies counsel when they have conflicts related to the matter on which the attorney is to be employed); *In re J.S. II, LLC*, 371 B.R. 311 (Bankr. N.D. Ill. 2007) (section 327(e) has more relaxed conflict of interest standard than section 327(a)); *In re EBW Laser, Inc.*, 333 B.R. 351, 359 (Bankr. M.D.N.C. 2005) (counsel not disqualified under section 327(e) because it holds prepetition claim).

28.    Finally, the Debtor notes that the Firm will have no involvement with respect to actually conducting the Debtor's Chapter 11 Case.  The Debtor has filed an application to retain Pachulski Stang Ziehl & Jones LLP ("PSZ&J") as bankruptcy counsel.  The Debtor is specifically retaining PSZ&J, subject to court approval, to conduct its Chapter 11 Case.  Although PSZ&J and

9

Appellee Appx. 01268
Appx. 01519
01408

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6.16.15    Page 1276/351804    Page 403 of 1017    PageID 15047
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1275 of 1803    PageID 12021
Case 19-12239-CSS    Doc 70    Filed 10/29/19    Page 10 of 10

the Firm may coordinate on matters that generally concern the Debtor, the Firm will not conduct the Debtor's bankruptcy case.

### Notice

29.    Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) the Office of the United States Attorney for the District of Delaware; (c) the Debtor's principal secured parties; (d) counsel to any statutory committee appointed in the case; and (e) parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

30.    No prior application or motion for the relief requested herein has been made to this Court or any other court.

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto as Exhibit B, granting the relief requested herein and granting such other and further relief as is just and proper.

Dated:    October 29, 2019          HIGHLAND CAPITAL MANAGEMENT, L.P.

/s/ Frank Waterhouse
By Strand Advisors, Inc., its Sole General Partner
Frank Waterhouse, Treasurer

DOCS_NY:39760.1 36027/002

Appellee Appx. 01269
Appx. 01529
014082

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 65-16   Page 1276 of 1804   Page 404 of 1017   PageID 15048
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1276 of 1803   PageID 12022

Case 19-12239-CSS   Doc 70-1   Filed 10/29/19   Page 1 of 3

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

Objection Deadline: November 12, 2019 at 4:00 p.m. (ET)
Hearing Date: November 19, 2019 at 12:00 p.m. (ET)

### NOTICE OF DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE

TO:    (a) the Office of the United States Trustee; (b) the Office of the United States Attorney for the District of Delaware; (c) the Debtor's principal secured parties; (d) counsel to any statutory committee appointed in the case; and (e) any party that has requested notice pursuant to Bankruptcy Rule 2002.

**PLEASE TAKE FURTHER NOTICE** that on October 29, 2019, the above-captioned debtor and debtor in possession (collectively, the "Debtor"), filed the *Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Application") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 (the "Bankruptcy Court"). A copy of the Application is attached hereto.

**PLEASE TAKE FURTHER NOTICE** that any response or objection to the Application must be filed with the Bankruptcy Court on or before **November 12, 2019 at 4:00 p.m. (Eastern Time)**.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_DE:226022.1 36027/002

**Appellee Appx. 01270**
Appx. 01521
014083

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Page 1276 of 1804    Page 405 of 1017    PageID 15049
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1277 of 1803    PageID 12023
Case 19-12239-CSS    Doc 70-1    Filed 10/29/19    Page 2 of 3

**PLEASE TAKE FURTHER NOTICE** that at the same time, you must also serve a copy of the response or objection upon: (i) proposed counsel for the Debtor: Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, DE 19801, Attn: James E. O'Neill, Esq. (joneill@pszjlaw.com) and Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA 90067, Attn: Jeffrey N. Pomerantz, Esq. (jpomerantz@pszjlaw.com); and (ii) the Office of the United States Trustee: 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Jane M. Leamy, Esq. (jane.m.leamy@usdoj.gov).

**PLEASE TAKE FURTHER NOTICE** THAT IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE APPLICATION WITHOUT FURTHER NOTICE OR HEARING.

**PLEASE TAKE FURTHER NOTICE** THAT A HEARING TO CONSIDER THE RELIEF SOUGHT IN THE APPLICATION WILL BE HELD ON **NOVEMBER 19, 2019 AT 12:00 P.M. (EASTERN TIME)** BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI, CHIEF UNITED STATES BANKRUPTCY COURT JUDGE, AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, 5TH FLOOR, COURTROOM NO. 6, WILMINGTON, DELAWARE 19801.

DOCS_DE:226022.1 36027/002

Appellee Appx. 01271
Appx. 01522
014084

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1279 of 1804 Page 406 of 1017    PageID 15050
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1278 of 1803    PageID 12024

Case 19-12239-CSS    Doc 70-1    Filed 10/29/19    Page 3 of 3

Dated: October 29, 2019                    PACHULSKI STANG ZIEHL & JONES LLP

                                           _/s/ James E. O'Neill_____
                                           Richard M. Pachulski (CA Bar No. 62337)
                                           Jeffrey N. Pomerantz (CA Bar No.143717)
                                           Ira D. Kharasch (CA Bar No. 109084)
                                           Maxim B. Litvak (CA Bar No. 215852)
                                           James E. O'Neill (DE Bar No. 4042)
                                           919 North Market Street, 17th Floor
                                           P.O. Box 8705
                                           Wilmington, DE  19899-8705 (Courier 19801)
                                           Telephone: (302) 652-4100
                                           Facsimile:  (302) 652-4400
                                           E-mail:    rpachulski@pszjlaw.com
                                                      jpomerantz@pszjlaw.com
                                                      ikharasch@pszjlaw.com
                                                      mlitvak@pszjlaw.com
                                                      joneill@pszjlaw.com

                                           Proposed Counsel for the Debtor and Debtor in
                                           Possession

DOCS_DE:226022.1 36027/002

Appellee Appx. 01272
Appx. 01523
014085

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1280 of 1804   Page 407 of 1017    PageID 15051
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1279 of 1803   PageID 12025

Case 19-12239-CSS   Doc 70-2   Filed 10/29/19   Page 1 of 7

# EXHIBIT A

## Hurst Declaration

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibits   Page 126 of 251804 Page 408 of 1017   PageID 15052
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1280 of 1803   PageID 12026

Case 19-12239-CSS   Doc 70-2   Filed 10/29/19   Page 2 of 7

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | |

**DECLARATION OF MICHAEL K. HURST IN SUPPORT OF DEBTOR'S
APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND
EMPLOYMENT OF LYNN PINKER COX & HURST, LLP AS SPECIAL TEXAS
LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE**

I, Michael K. Hurst, declare under penalty of perjury as follows:

1.      I am a partner with the law firm of Lynn Pinker Cox & Hurst LLP (the "Firm" or "LPCH"), located in Dallas, Texas. I am submitting this declaration ("Declaration") in support of the *Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Application").[2]

2.      Neither I, the Firm, nor any partner, of counsel or associate thereof, insofar as I have been able to ascertain, has any connection with Highland Capital Management, L.P., the above-captioned debtor (the "Debtor" or "Highland"), its creditors or any other parties in interest herein, or their respective attorneys, except as set forth below.

3.      The Firm has represented the Debtor since March 2016. Since that time, the Firm has also represented certain other entities related to the Debtor, including the Cayman Defendants in the Pending Acis Proceedings, the defendants in the Texas Lawsuit who are executives of the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

Appellee Appx. 01274
Appx. 01525
014087

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16   Page 12/82/051804  Page 409 of 1017   PageID 15053
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1281 of 1803   PageID 12027
Case 19-12239-CSS   Doc 70-2   Filed 10/29/19   Page 3 of 7

Debtor. The Firm also represents the Charitable DAF in case pending before the Southern District of New York, case number 1:19-cv-09857-NRB, a case that is unrelated to the Debtor, this Chapter 11 Case, the Texas Lawsuit, and the Pending Acis Proceedings.

4.      The Firm has, as of September 30, 2019, received $1,110,508.49 in payments from Highland during the year before the Petition Date.

5.      With respect to all matters, the Debtor has, subject to Court approval, agreed to compensate the Firm on an hourly basis at rates that do not (and will not) exceed the rates that the Firm customarily charges to its other clients for work of this type.  As of the Petition Date, the applicable hourly rates for timekeepers for the matters that the Firm is engaged to perform legal services ranged from $365 to $800 for attorneys and $180 to $235 for paraprofessionals.

6.      It is the Firm's policy to charge its clients for certain expenses incurred in connection with providing certain client services, including, without limitation, travel, lodging, vendor charges, delivery services and other expenses incurred in providing professional service, and for other services actually provided, including word processing and other charges, excluding secretarial overtime.

### Disclosures

7.      The Firm maintains a database containing the name of each current and former client of the Firm, the name of the parties who are or were related or adverse to such client, and the names of the Firm personnel who are or were responsible for the matters.  The Firm has searched its database to determine potential conflicts with the Debtor and its non-debtor affiliates, the Debtor's secured creditors, the Debtor's directors, officers and board members, the Debtor's equity security holders, the creditors of the Debtor holding the 20 largest unsecured claims, and any person employed in the office of the U.S. Trustee or any Bankruptcy Judge currently serving

2

**Appellee Appx. 01275**
**Appx. 01526**
**014088**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1288/25/1804   Page 410 of 1017   PageID 15054
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1282 of 1803   PageID 12028
Case 19-12239-CSS   Doc 70-2   Filed 10/29/19   Page 4 of 7

on the United States Bankruptcy Court for the District of Delaware relating to its limited

engagement by Debtor as Special Texas Litigation Counsel (collectively, the "Searched Parties").

Using such database, the Firm assessed the Searched Parties to ascertain the Firm's current

relationship with parties that may be adverse to the Debtor in this Chapter 11 Case.

      8.    Except as disclosed herein or in the attached Schedule 1, the Firm does not represent

the Searched Parties or any other known creditor or party-in-interest of the Debtor with respect to

the matters for which the Debtor seeks to retain the Firm pursuant to the Application and, therefore

the Firm holds no material adverse interest to the Debtor or the Debtor's estate.  Accordingly, the

Firm is eligible for retention.

      9.    The Firm may have performed services in the past, may currently perform services,

and may perform services in the future, in matters unrelated to this Chapter 11 Case, for persons

that are parties-in-interest in the Debtor's Chapter 11 Case.  Except as set forth herein, I am not

aware of the Firm performing any services for any such person or entity in connection with this

case, or having any relationship with any such person or entity, their attorneys or accountants that

we understand are adverse to the Debtor or its estate.

      10.    From time to time, the Firm may have provided, and/or may currently provide,

services to certain other parties-in-interest, or affiliates thereof, in all instances on matters in which

such party does not or did not hold or represent an interest adverse to the Debtor or its estate with

respect to the services for which the Firm is being retained.

      11.    That said, the Debtor has and will retain various professionals during the pendency

of this Chapter 11 Case.  The Firm has previously worked with and will continue to work with

these professionals on various representations.  Further, the Firm and certain of its partners, of

counsel, and associates may have in the past represented, may currently represent, and may in the

3

Appellee Appx. 01276
Appx. 01525
014089

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibits 6    Page 1284 of 1804 Page 411 of 1017    PageID 15055
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1283 of 1803    PageID 12029
Case 19-12239-CSS    Doc 70-2    Filed 10/29/19    Page 5 of 7

future represent stockholders and creditors of the Debtor and other parties of interest in connection with matters unrelated to the Debtor and this Chapter 11 Case. At this time, the Firm is not aware of such representations except as noted above. If the Firm identifies any further such representations, the Firm shall make further disclosures as may be appropriate at that time.

12.     To my knowledge, neither the Firm nor any of its members have any connections with the United States Trustee or any person employed in the Office of the United States Trustee and/or the U.S. Bankruptcy Court for the District Of Delaware.

13.     The Firm intends to apply for compensation for professional services rendered and associated costs in connection with this Chapter 11 Case, subject to approval of this Court and compliance with applicable provisions of the Bankruptcy Code, as set forth in the Application.

14.     Pursuant to the Appendix B Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under United States Code by Attorneys in Larger Chapter 11 Case (the "2013 UST Guidelines"), the Firm makes certain disclosures herein.

15.     Pursuant to Part D1 of the 2013 UST Guidelines, the Firm is seeking employment as Special Texas Litigation Counsel for the Debtor under section 327 of the Bankruptcy Code and it hereby provides the following responses set forth below:

| Questions required by Part D1 of 2013 UST Guidelines: | Answer: | Further explanation: |
| --- | --- | --- |
| Did you agree to any variations from, or alternatives to, your standard or customary billing arrangements for this engagement? | No | N/A |
| Do any of the professionals included in this engagement vary their rate based on the geographic location of the bankruptcy case? | No | N/A |

4

Appellee Appx. 01277
Appx. 01528
014090

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 18-15    Page 12/85/25 1804  Page 412 of 1017    PageID 15056
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1284 of 1803    PageID 12030

Case 19-12239-CSS    Doc 70-2    Filed 10/29/19    Page 6 of 7

| If you represented the client in the 12 months prepetition, disclose your billing rates and material financial terms for the prepetition engagement, including any adjustments during the 12 months prepetition.  If your billing rates and material financial terms have changed postpetition, explain the difference and reasons for the difference. | LPCH's rates are adjusted on an annual basis within the ranges previously disclosed. | Standard annual hourly rate adjustments. |
| Has your client approved your respective budget and staffing plan, and, if so, for what budget period? | The Debtor and the Firm expect to develop a prospective budget and staffing plan. | In accordance with the 2013 UST Guidelines, the budget may be amended as necessary to reflect changed circumstances or unanticipated developments. |

16.    No promises have been received by the Firm or by any member, of counsel, or associate thereof as to compensation in connection with this case other than in accordance with the provisions of the Bankruptcy Code.  The Firm has no agreement with any other entity to share with such entity any compensation received by the Firm in connection with this Chapter 11 Case, except among the members, of counsel, and associates of the Firm.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 29, 2019

_____
Michael K. Hurst, Partner

DOCS_NY:39760.1 36027/002

Appellee Appx. 01278
Appx. 01529
01479091

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-5    Exhibit 5    Page 12/86/251804  Page 413 of 1017    PageID 15057
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1285 of 1803    PageID 12031
Case 19-12239-CSS    Doc 70-2    Filed 10/29/19    Page 7 of 7

## SCHEDULE 1

**Disclosures**

**None**

Appellee Appx. 01279

Appx. 01529

014092

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-5    Page 1286/251804 Page 414 of 1017    PageID 15058
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1286 of 1803    PageID 12032
Case 19-12239-CSS    Doc 70-3    Filed 10/29/19    Page 1 of 4

**<u>EXHIBIT B</u>**

**Proposed Order**

DOCS_NY:39760.1 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S     Document Exhibit 6   Page 1286/85/1804 Page 415 of 1017   PageID 15059
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1287 of 1803   PageID 12033

Case 19-12239-CSS   Doc 70-3   Filed 10/29/19   Page 2 of 4

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | **Re docket No. ___** |

**ORDER AUTHORIZING THE RETENTION AND
EMPLOYMENT OF LYNN PINKER COX & HURST LLP AS SPECIAL TEXAS
LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE**

Upon consideration of the application (the "Application")[2] of Highland Capital
Management, L.P., debtor and debtor in possession (the "Debtor") in the above-captioned chapter
11 case (the "Chapter 11 Case") for entry of an order (this "Order"), authorizing the Debtor to
retain and employ Lynn Pinker Cox & Hurst LLP (the "Firm") as Special Texas Litigation Counsel
in this Chapter 11 Case; and upon the *Statement Under Rule 2016 of the Federal Rules of
Bankruptcy Procedure* (the "Statement"), the *Declaration of Michael K. Hurst in Support of
Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox
& Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Hurst
Declaration"), and the *Declaration of Frank Waterhouse in Support of Debtor's Application for
an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special
Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Waterhouse Declaration") that
were submitted concurrently with the Application; and the Court being satisfied based on the
representations made in the Application, the Statement, the Hurst Declaration, and the Waterhouse

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address
for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms, unless otherwise defined herein, shall have the meanings ascribed to them in the Application.

**Appellee Appx. 01281**
**Appx. 01532**
**014094**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1286/251804    Page 416 of 1017    PageID 15060
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1288 of 1803    PageID 12034
Case 19-12239-CSS    Doc 70-3    Filed 10/29/19    Page 3 of 4

Declaration that the Firm holds no interest materially adverse to the Debtor or the Debtor's estate with respect to the matters upon which it is to be engaged, and that the employment of the Firm as Special Texas Litigation Counsel to the Debtor is necessary and in the best interests of the Debtor and its estate; and it appearing that the Court has jurisdiction to consider the Application; and it appearing that due notice of the Application has been given and no further notice need be given; and upon the proceedings before the Court; and after due deliberation and good and sufficient cause appearing; it is hereby ORDERED that:

7.    The Application is GRANTED as set forth herein.

8.    Pursuant to section 327(e) of the Bankruptcy Code, the Debtor is authorized to retain and employ the Firm as Special Texas in this Chapter 11 Case, *nunc pro tunc* to the Petition Date, pursuant to the terms set forth in the Application.

9.    The Firm shall apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with the Debtor's Chapter 11 Case in compliance with sections 330 and 331 of the Bankruptcy Code and applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any other applicable procedures and orders of the Court.  The Firm also intends to make a reasonable effort to comply with the U.S. Trustee's requests for information and additional disclosures as set forth in the Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases Effective as of November 1, 2013 (the "Revised UST Guidelines"), both in connection with this Application and any interim and final fee application to be filed by the Firm in these Chapter 11 Case.

10.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

1

Appellee Appx. 01282
Appx. 01523
01479⑤

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1296/351804 Page 417 of 1017    PageID 15061
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1289 of 1803    PageID 12035
Case 19-12239-CSS    Doc 70-3    Filed 10/29/19    Page 4 of 4

Dated: _____, 2019

_____
CHIEF JUDGE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

DOCS_NY:39760.1 36027/002

Appellee Appx. 01283

Appx. 01524

014096

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibits   Page 1296/25180 4 Page 418 of 1017   PageID 15062
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1290 of 1803   PageID 12036

Case 19-12239-CSS   Doc 70-4   Filed 10/29/19   Page 1 of 2

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
|  | ) |  |
| Debtor. | ) |  |

## STATEMENT UNDER RULE 2016 OF THE
## FEDERAL RULES OF BANKRUPTCY PROCEDURE

Lynn Pinker Cox & Hurst LLP (the "Firm" or "LPCH"), pursuant to Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and section 329 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), hereby makes this statement in support of the *Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP, as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Application").[2]

1.     The Debtor has agreed to pay the Firm for the legal services rendered or to be rendered by its various attorneys and paralegals, and to reimburse the Firm for its actual and necessary expenses in connection with the matters described in the Application.

2.     In the one year period preceding the Petition Date, the Firm received payments from the Debtor totaling $1,110,508.49 (the "Prepetition Payments") with respect to services rendered to the Debtor.  As of September 30, 2019,[3] the Firm submits that it has earned fees and incurred reimbursable expenses on account of its services to the Debtor in the amount of $1,419,928.07 (the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.
[3] Due to the timing of the bankruptcy filing, fees and expenses for October 2019 were not fully reflected in LPCH's accounting system.  The Firm will supplement the Hurst Declaration with those additional sums once available.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S      Document 55-9    Page 1293 of 1804    Page 419 of 1017      PageID 15063
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1291 of 1803    PageID 12037

Case 19-12239-CSS    Doc 70-4    Filed 10/29/19    Page 2 of 2

"Aggregate Amounts"). As of September 30, 2019, approximately $319,419.58 of the Aggregate Amounts was outstanding and unpaid on account of services rendered. The Prepetition Payments were paid by, and the source of such funds were, the Debtor.

3.    The Firm will seek approval of the payment of compensation for its hourly services and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of the United States Bankruptcy Court for the District of Delaware, and orders of this Court.

4.    The Firm further states that it has neither shared nor agreed to share (a) any compensation it has received or may receive with another party or person, other than with the members, of counsel and associates of the Firm, or (b) any compensation another person or party has received or may receive.

Dated: October 29, 2019

_____
Michael K. Hurst, Partner

DOCS_NY:39760.1 36027/002

Appellee Appx. 01285
014098

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibits 5   Page 1298/251804 Page 420 of 1017   PageID 15064
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1292 of 1803   PageID 12038

Case 19-12239-CSS   Doc 70-5   Filed 10/29/19   Page 1 of 4

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) |

### DECLARATION OF FRANK WATERHOUSE IN SUPPORT OF DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE

I, Frank Waterhouse, hereby declare under penalty of perjury:

1.      I am the Treasurer of Strand Advisors, Inc., the sole General Partner of Highland Capital Management, L.P., the above-captioned debtor and debtor in possession (the "Debtor").

2.      I submit this declaration (the "Declaration") in support of the *Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Application").[2] Except as otherwise noted, I have personal knowledge of the matters set forth herein.

### The Debtor's Selection of the Firm as Special Texas Litigation Counsel

3.      Lynn Pinker Cox & Hurst LLP (the "Firm" or "LPCH") began representing the Debtor in March 2016.   The Firm has provided legal services related to the bankruptcy proceedings, *In re Acis Capital Management, L.P. and Acis Capital Management GP, LLC*, jointly administered under Case No. 18-30264-SGJ-11 in the United States Bankruptcy Court for the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Application.

Appellee Appx. 01286
Appx. 01523
014099

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 35-15   Page 1296 of 1804   Page 421 of 1017   PageID 15065
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1293 of 1803   PageID 12039
Case 19-12239-CSS   Doc 70-5   Filed 10/29/19   Page 2 of 4

Northern District of Texas, Dallas Division, and various appeals related thereto. Ultimately, the Debtor retained the Firm because of its extensive experience trial litigation in such proceedings and its prepetition representation of the Debtor. Thus, I believe that the Firm is well qualified to represent the Debtor in this Chapter 11 Case as Special Texas Litigation Counsel in an efficient and timely manner.

### Rate Structure

4.     In my capacity as Chief Financial Officer of the Debtor and Treasurer of the General Partner of the Debtor, I am involved in supervising outside counsel retained by the Debtor in the ordinary course of business along with other executives of the Debtor. The Firm has informed the Debtor that its rates listed in the Application are comparable to non-bankruptcy representations. As discussed below, I am also responsible for reviewing the invoices regularly submitted by the Firm, and can confirm that the rates the Firm charged the Debtor in the prepetition period are the same as the rates the Firm charged the Debtor in the post-petition period. The Firm has informed the Debtor that the Firm's standard hourly rates are subject to periodic adjustment in accordance with the Firm's practice.

### Cost Supervision

5.     The Debtor and the Firm expects to develop a prospective budget and staffing plan, recognizing that in the course of a large chapter 11 case like this Chapter 11 Case, it is possible that there may be a number of unforeseen fees and expenses that will need to be addressed by the Debtor and the Firm. The Debtor recognizes that it is its responsibility to closely monitor the billing practices of its counsel to ensure the fees and expenses paid by the estate remain consistent with the Debtor's expectations and the exigencies of the Chapter 11 Case. The Debtor will

2

DOCS_NY:39760.1 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1295/1804    Page 422 of 1017    PageID 15066
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1294 of 1803    PageID 12040
Case 19-12239-CSS    Doc 70-5    Filed 10/29/19    Page 3 of 4

continue to timely review the invoices that the Firm regularly submits, and periodically amend the budget and staffing plans, as the case develops.

6.    While every chapter 11 case is unique, the budgets will provide guidance on the periods of time involved and the level of the attorneys and professionals that will work on various matters, as well as projections of average hourly rates for the attorneys and professionals for various matters.

*[remainder of page intentionally left blank]*

DOCS_NY:39760.1 36027/002

Appellee Appx. 01288
Appx. 01539
014101

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-15    Page 1296/351804    Page 423 of 1017    PageID 15067
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1295 of 1803    PageID 12041

Case 19-12239-CSS    Doc 70-5    Filed 10/29/19    Page 4 of 4

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is

true and correct to the best of my knowledge and belief.

Dated:    October 29, 2019

<div style="margin-left:40%">

*/s/ Frank Waterhouse*
_____

Frank Waterhouse

</div>

DOCS_NY:39760.1 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 19-6   Page 1296 of 1804   Page 424 of 1017   PageID 15068
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1296 of 1803   PageID 12042

Case 19-12239-CSS   Doc 70-6   Filed 10/29/19   Page 1 of 7

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## **CERTIFICATE OF SERVICE**

I, James E. O'Neill, hereby certify that on the 29th day of October, 2019, I caused

a copy of the following document(s) to be served on the individual(s) on the attached service

list(s) in the manner indicated:

> **Notice of Debtor's Application for an Order Authorizing the Retention and
> Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation
> Counsel, *Nunc Pro Tunc* to the Petition Date**
>
> **Debtor's Application for an Order Authorizing the Retention and
> Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation
> Counsel, *Nunc Pro Tunc* to the Petition Date**
>
> **Statement Under Rule 2016 of the Federal Rules of Bankruptcy Procedure**
>
> **Declaration of Frank Waterhouse in Support of Debtor's Application for an
> Order Authorizing the Retention and Employment of Lynn Pinker Cox &
> Hurst LLP as Special Texas Litigation Counsel, *Nunc Pro Tunc* to the
> Petition Date**

                                */s/ James E. O'Neill*
                                James E. O'Neill (Bar No. 4042)

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_DE:226022.1 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1298/651804 Page 425 of 1017   PageID 15069
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1297 of 1803   PageID 12043

Case 19-12239-CSS   Doc 70-6   Filed 10/29/19   Page 2 of 7

Highland Capital 2002 Service List FCM
Case No. 19-12239 (CSS)
Document No. 225797
01 – Interoffice Mail
09 – Hand Delivery
51 – First Class Mail

*([Proposed] Counsel for the Debtor and Debtor in Possession*)
James O'Neill, Esquire
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Wilmington, DE  19899 (Courier 19801)

**INTEROFFICE MAIL**
*([Proposed] Counsel for the Debtor and Debtor in Possession*)
Richard M. Pachulski, Esquire
Jeffrey N. Pomerantz, Esquire
Ira D. Kharasch, Esquire
Maxim B. Litvak, Esquire
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA  90067

**HAND DELIVERY**
(United States Trustee)
Jane M. Leamy, Esquire
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801

**HAND DELIVERY**
(State Attorney General)
Kathy Jennings, Esquire
Delaware Department of Justice
Carvel State Office Building, 6th Floor
820 N. French Street
Wilmington, DE  19801

**HAND DELIVERY**
Zillah A. Frampton
Bankruptcy Administrator
Delaware Division of Revenue
Carvel State Office Building, 8th Floor
820 N. French Street
Wilmington, DE  19801

**HAND DELIVERY**
(United States Attorney)
David C. Weiss
c/o Ellen Slights
US Attorney's Office
District of Delaware
Hercules Building, Suite 400
1313 N. Market Street
Wilmington, DE  19801

**HAND DELIVERY**
(Top 20 Unsecured Creditor)
Ryan P. Newell, Esquire
Connolly Gallagher LLP
1201 N. Market Street, 20th Floor
Wilmington, DE  19801

**HAND DELIVERY**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Sean M. Beach, Esquire
Jaclyn C. Weissgerber, Esquire
Young Conaway Stargatt & Taylor, LLP
1000 North King Street, Rodney Square
Wilmington, DE  19801

**HAND DELIVERY**
(Counsel to the Redeemer Committee of the
Highland Crusader Fund)
Curtis S. Miller, Esquire
Morris, Nichols, Arsht & tunnel LLP
Kevin M. Coen, Esquire
1201 North Market Street, Suite 1600
Wilmington, DE 19801

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1296 of 1804   Page 426 of 1017   PageID 15070
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1298 of 1803   PageID 12044

Case 19-12239-CSS   Doc 70-6   Filed 10/29/19   Page 3 of 7

**HAND DELIVERY**
(Counsel to Acis Capital Management GP
LLC and Acis Capital Management, L.P.)
John E. Lucian, Esquire
Josef W. Mintz, Esquire
Blank Rome LLP
1201 N Market Street, Suite 800
Wilmington, DE  19801

**HAND DELIVERY**
(Counsel to Patrick Daugherty)
Michael L. Vild, Esquire
Cross & Simon, LLC
1105 N. Market Street, Suite 901
Wilmington, DE  19801

**FIRST CLASS MAIL**
(Counsel to Acis Capital Management GP
LLC and Acis Capital Management, L.P.)
Rakhee V. Patel, Esquire
Phillip Lamberson, Esquire
Winstead PC
2728 N. Harwood Street, Suite 500
Dallas, TX  75201

**FIRST CLASS MAIL**
(United States Attorney General)
William Barr, Esquire
Office of the US Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW,
Room 4400
Washington, DC  20530-0001

**FIRST CLASS MAIL**
State of Delaware
Division of Corporations - Franchise Tax
PO Box 898
Dover, DE  19903

**FIRST CLASS MAIL**
Delaware Secretary of Treasury
820 Silver Lake Blvd, Suite 100
Dover, DE  19904

**FIRST CLASS MAIL**
Office of General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC  20220

**FIRST CLASS MAIL**
Office of General Counsel
Securities & Exchange Commission
100 F Street, NE
Washington, DC  20554

**FIRST CLASS MAIL**
Sharon Binger, Regional Director
Philadelphia Regional Office
Securities & Exchange Commission
One Penn Center, Suite 520
1617 JFK Boulevard
Philadelphia, PA  19103

**FIRST CLASS MAIL**
Andrew Calamari, Regional Director
New York Regional Office
Securities & Exchange Commission
Brookfield Place, Suite 400
200 Vesey Street
New York, NY  10281

**FIRST CLASS MAIL**
Office of the General Counsel
Michael I. Baird, Esquire
Pension Benefit Guaranty Corporation
1200 K Street, NW
Washington, DC  20005-4026

**FIRST CLASS MAIL**
Internal Revenue Service
Centralized Insolvency Operation
PO Box 7346
Philadelphia, PA  19101

Appellee Appx. 01292
Appx. 01543
014105

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1300 of 1804 Page 427 of 1017    PageID 15071
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1299 of 1803    PageID 12045

Case 19-12239-CSS    Doc 70-6    Filed 10/29/19    Page 4 of 7

**FIRST CLASS MAIL**
BBVA
Michael Doran
8080 N. Central Expressway
Suite 1500
Dallas, TX  75206

**FIRST CLASS MAIL**
NexBank
John Danilowicz
2515 McKinney Avenue
Suite 1100
Dallas, TX 75201

**FIRST CLASS MAIL**
KeyBank National Association
as Administrative Agent
225 Franklin Street, 18th Floor
Boston, MA 02110

**FIRST CLASS MAIL**
KeyBank National Association
as Agent
127 Public Square
Cleveland, OH 44114

**FIRST CLASS MAIL**
Prime Brokerage Services
Jefferies LLC
520 Madison Avenue
New York, NY 10022

**FIRST CLASS MAIL**
Office of the General Counsel
Re: Prime Brokerage Services
Jefferies LLC
520 Madison Avenue, 16th Floor
New York, NY 10022

**FIRST CLASS MAIL**
Director of Compliance
Re: Prime Brokerage Services
Jefferies LLC
520 Madison Avenue, 16th Floor
New York, NY 10022

**FIRST CLASS MAIL**
Frontier State Bank
Attn:  Steve Elliot
5100 South I-35 Service Road
Oklahoma City, OK 73129

**FIRST CLASS MAIL**
Strand Advisors, Inc.
300 Crescent Court
Suite 700
Dallas, TX 75201

**FIRST CLASS MAIL**
The Dugaboy Investment Trust
300 Crescent Court
Suite 700
Dallas, TX 75201

**FIRST CLASS MAIL**
Mark K. Okada
300 Crescent Court
Suite 700
Dallas, TX 75201

**FIRST CLASS MAIL**
The Mark and Pamela Okada Family
Trust – Exempt Trust #1
300 Crescent Court
Suite 700
Dallas, TX 75201

**FIRST CLASS MAIL**
The Mark and Pamela Okada Family
Trust – Exempt Trust #2
300 Crescent Court
Suite 700
Dallas, TX 75201

**FIRST CLASS MAIL**
Hunter Mountain Investment Trust
c/o Rand Advisors LLC
John Honis
87 Railroad Place Ste 403
Saratoga Springs, NY 12866

Appellee Appx. 01293

Appx. 01544

014106

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibits    Page 1306 of 1804    Page 428 of 1017    PageID 15072
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1300 of 1803    PageID 12046

Case 19-12239-CSS    Doc 70-6    Filed 10/29/19    Page 5 of 7

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Acis Capital Management, L.P.
  and Acis Capital Management GP, LLC
c/o Brian P. Shaw, Esquire
Rogge Dunn Group, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
American Arbitration Association
Elizabeth Robertson, Esquire
120 Broadway, 21st Floor,
New York, NY 10271

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Andrews Kurth LLP
Scott A. Brister, Esquire
111 Congress Avenue, Ste 1700
Austin, TX 78701

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Bates White, LLC
Karen Goldberg, Esquire
2001 K Street NW
North Bldg Suite 500
Washington, DC 20006

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
CLO Holdco, Ltd.
Grant Scott, Esquire
Myers Bigel Sibley & Sajovec, P.A.
4140 Park Lake Ave, Ste 600
Raleigh, NC 27612

**FIRST CLASS MAIL**
Cole, Schotz, Meisel, Forman & Leonard,
P.A.
Michael D. Warner, Esquire
301 Commerce Street, Suite 1700
Fort Worth, TX 76102

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Debevoise & Plimpton LLP
Michael Harrell, Esquire
c/o Accounting Dept 28th Floor
919 Third Avenue
New York, NY 10022

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
DLA Piper LLP (US)
Marc D. Katz, Esquire
1900 N Pearl St, Suite 2200
Dallas, TX 75201

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Duff & Phelps, LLC
c/o David Landman
Benesch, Friedlander, Coplan & Aronoff
LLP
200 Public Square, Suite 2300
Cleveland, OH 44114-2378

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Foley Gardere
Holly O'Neil, Esquire
Foley & Lardner LLP
2021 McKinney Avenue Suite 1600
Dallas, TX 75201

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Joshua & Jennifer Terry
c/o Brian P. Shaw, Esquire
Rogge Dunn Group, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201

Appellee Appx. 01294
0141107
Appx. 01545

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibits 6   Page 1308 of 1804   Page 429 of 1017   PageID 15073
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1301 of 1803   PageID 12047

Case 19-12239-CSS   Doc 70-6   Filed 10/29/19   Page 6 of 7

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
Lackey Hershman LLP
Paul Lackey, Esquire
Stinson LLP
3102 Oak Lawn Avenue, Ste 777
Dallas, TX 75219

FIRST CLASS MAIL
Lynn Pinker Cox & Hurst, L.L.P.
Michael K. Hurst, Esquire
2100 Ross Avenue, Ste 2700
Dallas, TX 75201

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
McKool Smith, P.C.
(Top 20 Unsecured Creditor)
Gary Cruciani, Esquire
300 Crescent Court, Suite 1500
Dallas, TX 75201

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
Meta-e Discovery LLC
Paul McVoy
Six Landmark Square, 4th Floor
Stamford, CT 6901

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
NWCC, LLC
c/o of Michael A. Battle, Esquire
Barnes & Thornburg, LLP
1717 Pennsylvania Ave N.W. Ste 500
Washington, DC 20006-4623

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
Patrick Daugherty
c/o Thomas A. Uebler, Esquire
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Rd #401
Wilmington, DE 19808

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
Redeemer Committee of the Highland
Crusader Fund
c/o Terri Mascherin, Esquire
Jenner & Block
353 N. Clark Street
Chicago, IL 60654-3456

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
Reid Collins & Tsai LLP
William T. Reid, Esquire
810 Seventh Avenue, Ste 410
New York, NY 10019

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
UBS AG, London Branch and UBS
Securities LLC
c/o Andrew Clubock, Esquire
Latham & Watkins LLP
555 Eleventh Street  NW Suite 1000
Washington, DC 20004-130

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
Scott E. Gant, Esquire
Boies, Schiller & Flexner LLP
1401 New York Avenue, NW
Washington, DC  20005

FIRST CLASS MAIL
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Marshall R. King, Esquire
Michael A. Rosenthal, Esquire
Alan Moskowitz, Esquire
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10066

Appellee Appx. 01295
0141108

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibits   Page 130 of 251804   Page 430 of 1017   PageID 15074
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1302 of 1803   PageID 12048

Case 19-12239-CSS   Doc 70-6   Filed 10/29/19   Page 7 of 7

**FIRST CLASS MAIL**
(Counsel to California Public Employees'
Retirement System ("CalPERS")
Louis J. Cisz, III, Esquire
Nixon Peabody LLP
One Embarcadero Center, 32nd Floor
San Francisco, CA 94111

**FIRST CLASS MAIL**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Matthew G. Bouslog, Esquire
Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, CA 92612

**FIRST CLASS MAIL**
(Counsel to Redeemer Committee of the
Highland Crusader Fund)
Marc B. Hankin, Esquire
Richard Levin, Esquire
Jenner & Block LLP
919 Third Avenue
New York, New York 10022-3908

**FIRST CLASS MAIL**
(Counsel to Coleman County TAD, et al.)
Elizabeth Weller, Esquire
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons Freeway, Suite 1000
Dallas, TX 75207

**FIRST CLASS MAIL**
(Counsel to Jefferies)
Lee S. Attanasio, Esq.
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019

**Appellee Appx. 01296**

**014109**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-6    Page 1306 of 1804    Page 431 of 1017    PageID 15075
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1303 of 1803    PageID 12049

# APPENDIX 15

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 1305 of 1804    Page 432 of 1017    PageID 15076
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1304 of 1803    PageID 12050
Case 19-12239-CSS    Doc 116    Filed 11/12/19    Page 1 of 9

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | § | Case No. 19-12239 (CSS) |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Chapter 11 |
| LP,[1] | § | |
| | § | **Re: Docket Nos. 69, 70** |
| Debtor. | § | |

**Objection Deadline: November 12, 2019 at 4:00 p.m. (Eastern time)
Hearing Date: November 19, 2019 at 12:00 p.m. (Eastern time)**

**LIMITED OBJECTION TO THE DEBTOR'S: (I) APPLICATION FOR
AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF
FOLEY GARDERE, FOLEY & LARDNER LLP AS SPECIAL TEXAS
COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE; AND
(II) APPLICATION FOR AN ORDER AUTHORIZING THE
RETENTION AND EMPLOYMENT OF LYNN PINKER COX &
HURST LLP AS SPECIAL TEXAS LITIGATION COUNSEL,
*NUNC PRO TUNC* TO THE PETITION DATE**

Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC

(collectively "Acis"), creditors and parties-in-interest, object on a limited basis to the Debtor's:

(i) *Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley*

*& Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 69]

(the "Foley Application"); and (ii) *Application for an Order Authorizing the Retention and*

*Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro*

*Tunc to the Petition Date* [Docket No. 70] (the "Lynn Pinker Application" and together with the

Foley Application, the "Applications").

**Statement of Facts**

1.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition

for relief under Chapter 11 of the Bankruptcy Code.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address
for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**Appellee Appx. 01298**
Appx. 01649
014111

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-16   Filed 11/06/25   Page 433 of 1017   PageID 15077
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1305 of 1803   PageID 12051
Case 19-12239-CSS   Doc 116   Filed 11/12/19   Page 2 of 9

2.      On October 29, 2019, the Debtor filed the Foley Application, seeking to employ

the law firm of Foley Gardere, Foley & Lardner LLP ("<u>Foley</u>") as special Texas litigation

counsel pursuant to 11 U.S.C. §327(e).

3.      Also on October 29, 2019, the Debtor filed the Lynn Pinker Application, seeking

to employ the law firm of Lynn Pinker Cox & Hurst LLP ("<u>Lynn Pinker</u>") as special Texas

litigation counsel pursuant to 11 U.S.C. § 327(e).

4.      Foley and Lynn Pinker are both being hired to represent the Debtor in connection

with Acis' post-confirmation bankruptcy case (the "<u>Acis Bankruptcy Case</u>"),[2] two appeals from

the Acis Bankruptcy Case (both initiated by the Debtor as an appellant)[3] and an adversary

proceeding pending in the Acis Bankruptcy Case.[4]

<div align="center"><u>Objection</u></div>

**A.      <u>The Applications Lack Important Disclosures.</u>**

5.      The Applications disclose that Foley and Lynn Pinker represent and have

performed work in the Acis Bankruptcy Case for clients related to the Debtor – clients they

identify as Neutra and the Cayman Defendants.  The Foley Application also admits that, before

the Petition Date, Foley billed the Debtor for work performed for Neutra and the Cayman

Defendants.[5]  There is no disclosure from Lynn Pinker on this point, but presumably its payment

arrangements were similar because Lynn Pinker represents many, if not all, of the same clients as

---

[2] Jointly administered Case Nos. 18-30264 and 18-30265 in the United States Bankruptcy Court for the Northern District of Texas.

[3] *Highland Cap. Mgmt, L.P. v. Phelan*, Case No. 19-10847 in the United States Court of Appeals for the Fifth Circuit; *Highland Cap. Mgmt, L.P. v. Winstead PC*, Case No. 3:19-cv-01477-D in the United States District Court for the Northern District of Texas

[4] Adversary No. 18-03078 in the United States Bankruptcy Court for the Northern District of Texas.

[5] See ¶ 3 of Declaration of Holland O'Neil attached as Exhibit A to the Foley Application [Docket No. 69-2] ("The Firm billed Highland for all services as to the related other parties since there was significant overlap among legal issues for Highland, Neutra and the Cayman Defendants.").

<div align="center">2</div>

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6t8t65   Page 13076/251804   Page 434 of 1017   PageID 15078
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1306 of 1803   PageID 12052
Case 19-12239-CSS   Doc 116   Filed 11/12/19   Page 3 of 9

Foley in the Acis Bankruptcy Case. While the Applications disclose the amounts paid by the Debtor to each of Foley and Lynn Pinker during the year prior to the Petition Date, the Applications do not disclose the proportionate amounts billed to and paid by the Debtor for work performed for Neutra and the Cayman Defendants. Acis reserves its rights to compel disclosure of this information including under Fed. R. Bankr. P. 2017(a).[6]

6.      This structure creates significant fraudulent transfer concerns and highlights the multifarious nature of the Debtor's operations including its pervasive use of offshore shadow companies controlled by James Dondero. As both District Judge Sidney Fitzwater and Bankruptcy Judge Stacey Jernigan found in published opinions arising from the Acis Bankruptcy Case, Neutra and the Cayman Defendants are actually offshore companies that were created around the time Joshua Terry obtained a judgment against Acis in order receive transfers of Acis' assets and Acis' equity. *Neutra, Ltd. v. Terry (In re Acis Cap. Mgmt. L.P.)*, 604 B.R. 484, 501-02 (N.D. Tex. 2019); *In re Acis Cap. Mgmt. L.P.*, 584 B.R. 115, 127-31 (Bankr. N.D. Tex. 2018). Even more, the business justification proffered by the Debtor for these transfers from Acis was found to be "a seemingly manufactured narrative to justify prior actions" and that "the evidence established overwhelmingly that there is a substantial likelihood that the transfers were part of an intentional scheme to keep assets away from [Terry]." *Neutra,* 604 B.R. at 502 *(*citing *In re Acis Cap. Mgmt. L.P.*, 2019 Bankr. Lexis 292 (Bankr. N.D. Tex. January 31, 2019)). It was clear to everyone in the Acis Bankruptcy Case that Neutra and the Cayman Defendants were simply fronts for Dondero's machinations.

_____

[6] Fed. R. Bankr. P. 2017(a) provides: "Payment or Transfer to Attorney Before Order for Relief. On motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property by the debtor, made directly or indirectly and in contemplation of the filing of a petition under the Code by or against the debtor or before entry of the order for relief in an involuntary case, to an attorney for services rendered or to be rendered is excessive."

Appellee Appx. 01300
Appx. 01551
014113

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-15    Page 1306 of 1804  Page 435 of 1017    PageID 15079
Case 3:21-cv-00879-K   Document 21    Filed 07/28/21      Page 1307 of 1803   PageID 12053
Case 19-12239-CSS    Doc 116    Filed 11/12/19    Page 4 of 9

7.      The Debtor's Schedules and Statement of Financial Affairs will not be filed by
the time parties must object to the Foley Application and Lynn Pinker Application, or by the
time the Court will hold a hearing on the Applications.[7]  Thus, the scope of these payments and
liabilities (or other connections) will not be disclosed until well after the engagement of Foley
and Lynn Pinker.

8.      The Applications also do not disclose whether the Debtor intends to continue to
be billed and pay Foley and Lynn Pinker for work performed for Neutra and the Cayman
Defendants once Foley and Lynn Pinker are engaged by the Debtor pursuant to the Applications.
If this is the Debtor's intent, it should be specifically disclosed and approval of such employment
should be requested in accordance with the Bankruptcy Code and the applicable rules.  For
example, Bankruptcy Rule 2017(b) specifically requires disclosure of payments made by a
debtor to *any attorney* for services *in any way related to the case.*  Fed. R. Bankr. P. 2017(b).[8]  In
any event, if the Debtor does intend to pay Neutra and the Cayman Defendants' legal expenses,
Acis would oppose this relief.  The fact that Neutra and the Cayman Defendants are sham
entities created only to receive fraudulent transfers and, thus, have no substance does not change,
and in fact compels, this result.[9]

---

[7] The Debtor has requested an additional 30-day extension of time to file its Schedules and Statement of Financial
Affairs [Docket No. 4].  If granted, this would make such disclosures due December 13, 2019.

[8] For example, Fed R. Bankr. P. 2017(b) provides: "Payment or Transfer to Attorney After Order for Relief.  On
motion by the debtor, the United States trustee, or on the court's own initiative, the court after notice and a hearing
may determine whether any payment of money or any transfer of property, or any agreement therefor, by the debtor
to an attorney after entry of an order for relief in a case under the Code is excessive, whether the payment or transfer
is made or is to be made directly or indirectly, if the payment, transfer, or agreement therefor is for services in any
way related to the case."

[9] To be clear, Neutra and the Cayman Defendants' are entitled to hire counsel to represent them and Dondero or
some other non-debtor entity that he controls are certainly welcome to pay the litigation costs.  But this is not a cost
the Debtor should bear.

Appellee Appx. 01301
Appx. 01552
014114

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 65   Page 1309 of 1804   Page 436 of 1017   PageID 15080
Exhibit 6   Page 1309 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1308 of 1803   PageID 12054
Case 19-12239-CSS   Doc 116   Filed 11/12/19   Page 5 of 9

9.      Further, the Foley engagement letter[10] discloses a conflict with Foley's representation of HRA Holdings, LLC that required the consent of the parties in order for Foley to proceed with its initial representation of the Debtor.  This conflict, or potential conflict, is not disclosed or discussed anywhere in the Foley Application or the various disclosure affidavits that accompany it.  Thus, the nature of the conflict is unclear, and it is unknown how it might limit Foley's representation of the Debtor.

10.     The Debtor did not attach Lynn Pinker's engagement letter to the Lynn Pinker Application, so this Court and the creditors in this case do not know the full terms of the Lynn Pinker engagement.  However, Acis is aware of various connections between Lynn Pinker and the Debtor and its related parties that are not disclosed or are only partially disclosed in the Lynn Pinker Application.  For example, Lynn Pinker hired the Debtor's General Counsel, Scott Ellington, as an expert witness in a case tried in Dallas just last year.[11]  It is unclear if this is a regular occurrence or what compensation Mr. Ellington receives for providing these services to Lynn Pinker and its clients.

11.     Further, in a footnote the Lynn Pinker Application discloses that it represents the Charitable Donor Advised Fund, L.P. (the "DAF") in "unrelated" litigation.  However, this is only the tip of the iceberg in describing this allegedly "unrelated" litigation.

12.     On August 6, 2019, Lynn Pinker, at that time representing NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund and Highland Income Fund (collectively, the "Highland Retail Funds"),[12] sent nearly identical letters to Moody's Investor Services and

---

[10] Attached as Exhibit B to the Foley Application [Docket No. 69-3].

[11] See attached **Exhibit A** found at https://www.pettitfirm.com/legacytexas.  Highlighting has been added to some exhibits.

[12] The Highland Retail Funds are affiliates of, or are managed by affiliates of, the Debtor and Dondero. *See* attached **Exhibits B, C** and **D** found at https://www.highlandcapital.com/nexpoint-strategic-opportunities-fund-announces-the-regular-monthly-dividend-2/ (NexPoint Strategic Opportunities Fund); https://www.highlandfunds.com/global-

Appellee Appx. 01302
Appx. 01553
014115

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1306 of 1804   Page 437 of 1017   PageID 15081
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1309 of 1803   PageID 12055
Case 19-12239-CSS   Doc 116   Filed 11/12/19   Page 6 of 9

S&P Global.[13]  In essence, these letters request a ratings downgrade or withdrawal on certain Acis CLO securities which the Highland Retail Funds purport to own.  Obviously, it is highly unusual for an investor to request a ratings downgrade for its own investment.  Curiously, when Lynn Pinker filed the litigation it threatened in these letters, Lynn Pinker no longer represented the Highland Retail Funds, but now represented the DAF.[14]

13.    In its current form, the DAF litigation seeks: (i) damages from US Bank, as indenture trustee for various Acis CLOs, for failing to take what the DAF believes was appropriate action in the Acis Bankruptcy Case and otherwise failing to perform its obligations as indenture trustee; and (ii) damages from Moody's for refusing to downgrade the Acis CLO securities or withdraw the ratings altogether as demanded in Lynn Pinker's letters.[15]  A downgrade or ratings withdrawal in the Acis CLO securities or the resignation of US Bank as indenture trustee may precipitate liquidation of the Acis CLOs, which would violate the plan injunction entered as part of Acis's bankruptcy plan since it was clearly procured by the Debtor and its affiliates (and their proposed counsel).[16]  None of this tangled web is disclosed in the Lynn Pinker Application, rather it is simply written off in a footnote as "unrelated."

---

allocation-fund/ (Highland Global Allocation Fund); https://www.highlandfunds.com/income-fund/ (Highland Income Fund).

[13] Copies of these letters are attached hereto as **Exhibits E** and **F**.  Other letters were later sent to Moody's and S&P, but Acis does not have copies of these later letters.

[14] The Highland Retail Funds are publicly traded closed end funds.  Further, one of the Highland Retail Funds, Highland Global Allocation Fund, and its advisors are already being sued by an investor for self-dealing and conflicts of interest with other funds affiliated with the Debtor.  *See Lanotte v. Highland Capital Mgt. Fund Adv., L.P., et al.*, Case No. 18-cv-02360, in the United States District Court for the Northern District of Texas.  Thus, the Highland Retail Funds may have realized that publicly acknowledging that they inexplicably requested a ratings downgrade or withdrawal for their own investment is not a helpful fact in this or future litigation, and Dondero and Lynn Pinker then simply donned another hat to file the lawsuit.

[15] Amended Complaint attached hereto as **Exhibit G**.

[16] *In re Acis Cap. Mgmt., L.P.*, 2019 Bankr. LEXIS 292 * 30-32 (Bankr. N.D. Tex., Jan. 31, 2019) (confirmation opinion from Acis Bankruptcy Case); *In re Acis Cap. Mgmt., L.P.*, 2019 Bankr. LEXIS 294 * 59-62 (Bankr. N.D. Tex., Jan. 31, 2019) (confirmation order and confirmed plan from Acis Bankruptcy Case).  Acis reserves all rights in this regard and obviously has been monitoring the situation.

Appellee Appx. 01303
Appx. 01554
014116

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 18 of 25 1804   Page 438 of 1017   PageID 15082
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1310 of 1803   PageID 12056
Case 19-12239-CSS   Doc 116   Filed 11/12/19   Page 7 of 9

**B.  Acis Reserves the Right to Seek Disqualification and Disgorgement of Foley and Lynn Pinker Based on Conflict Of Interest Allegations the Debtor Made and is Appealing in the Acis Bankruptcy Case.**

14.     In the Acis Bankruptcy Case, the Debtor has alleged an actual conflict of interest prohibiting employment of special counsel for Acis' Chapter 11 trustee (Winstead) and requiring disgorgement of all fees paid to counsel.  The Debtor's objection to counsel's employment and payment has been rejected and overruled multiple times.  The issue is currently being appealed in the Northern District of Texas, and this is one of the matters for which Foley and Lynn Pinker are to be engaged.

15.     The alleged conflict is based on Winstead's engagement as special counsel by the Chapter 11 trustee for Acis (then a debtor in the Acis Bankruptcy Case) when Winstead represented a creditor of Acis (Josh Terry) and Winstead was retained to be adverse to another creditor of Acis (the Debtor).[17]  Per the Debtor's argument, engagement as counsel to be adverse to a creditor while concurrently representing a different creditor creates a *per se* actual conflict of interest under 11 U.S.C. § 327(c).[18]  Indisputably, Foley represents CLO Holdco, Ltd., which is one of the Debtor's largest creditors.[19]  And in fact, Foley is *itself* one of the Debtor's ten largest creditors, and Lynn Pinker is likewise a significant creditor of the Debtor.[20]  Foley and Lynn Pinker will also be engaged as special counsel to litigate with (and be adverse to) Acis and Mr.

[17] *See* ¶ 24 and 25 of Objection of Highland Capital Management, L.P. to Supplemental Application Regarding the Scope of Winstead PC's Retention as Special Counsel to the Chapter 11 Trustee filed in the Acis Bankruptcy Case and attached hereto as **Exhibit H**.

[18] Although neither the Foley Application nor the Lynn Pinker Application reference § 327(c), that section is clearly applicable to their retention. As outlined below, the Foley and Lynn Pinker attorneys that will be engaged by the Debtor are employed by creditors of the Debtor and represent at least one known creditor of the Debtor.

[19] *See* Notice of Appearance filed by Foley in the Acis Bankruptcy Case and attached hereto as **Exhibit I**; *see also* Foley engagement letter attached as Exhibit B to the Foley Application [Docket No. 69-3].

[20] *See* Docket No. 1 disclosing that Foley is owed $1,398,432.44 by the Debtor.  Although it is not listed on the top 20 creditor list, according to its Rule 2016 statement Lynn Pinker is owed $319,419.58 by the Debtor.  *See* Docket No. 70-4.

7

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1302 of 1804    Page 439 of 1017    PageID 15083
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1311 of 1803    PageID 12057
Case 19-12239-CSS    Doc 116    Filed 11/12/19    Page 8 of 9

Terry, also creditors of the Debtor.  Thus, Foley and Lynn Pinker now have the exact "conflict"
that they alleged disqualified Winstead and required disgorgement from Winstead in the Acis
Bankruptcy Case.

16.    All rights are reserved to raise this as an issue for disqualification and
disgorgement of fees by Foley and Lynn Pinker if the Debtor prevails on its argument on
appeal.[21]

*[Remainder of page intentionally left blank]*

---

[21] To be clear, Acis believes this argument and related appeal are frivolous, and all rights are reserved to seek
sanctions against the Debtor, Foley and Lynn Pinker in the appropriate forum.

Appellee Appx. 01305
Appx. 01556
014118

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-5    Page 103 of 180    Page 440 of 1017    PageID 15084
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1312 of 1803    PageID 12058
Case 19-12239-CSS    Doc 116    Filed 11/12/19    Page 9 of 9

WHEREFORE, Acis respectfully (i) requests Foley and Lynn Pinker provide full and complete disclosure of all connections with the Debtor as required under the Bankruptcy Code, Bankruptcy Rules and Local Rules in order to assess their employment Applications; (ii) objects to the employment of Foley and Lynn Pinker to the extent that the Debtor intends to be responsible for fees and expenses incurred by other Foley and Lynn Pinker clients, including the Cayman Defendants and Neutra; (iii) reserves all rights to seek disqualification and disgorgement of fees from Foley and Lynn Pinker based on conflicts of interest that may become apparent as this case moves forward; and (iv) requests such other further relief as is just and proper.

<div align="right">

**BLANK ROME LLP**

Dated: November 12, 2019          _/s/ Josef W. Mintz_
Wilmington, Delaware                  John E. Lucian (*pro hac vice*)
                                      Josef W. Mintz (DE No. 5644)
                                      1201 N. Market Street, Suite 800
                                      Wilmington, Delaware 19801
                                      Telephone:  (302) 425-6400
                                      Facsimile:  (302) 425-6464
                                      Email:      lucian@blankrome.com
                                                  mintz@blankrome.com

                                      **WINSTEAD PC**
                                      Rakhee V. Patel (*pro hac vice*)
                                      Phillip Lamberson (*pro hac vice*)
                                      Annmarie Chiarello (pro hac pending)
                                      2728 N. Harwood Street, Suite 500
                                      Dallas, Texas 75201
                                      Telephone:  (713) 650-8400
                                      Facsimile:  (713) 650-2400
                                      Email:      rpatel@winstead.com
                                                  plamberson@winstead.com
                                                  achiarello@winstead.com

                                      *Attorneys for Acis Capital Management GP*
                                      *LLC and Acis Capital Management, L.P.*

</div>

Appellee Appx. 01306
Appx. 01557
014119

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 1306 of 1804    Page 441 of 1017    PageID 15085
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1313 of 1803    PageID 12059

**Exhibit A**

Press Release re: Scott Eillington

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Exhibit 6    Page 1315 of 1804
Case 3:25-cv-02072-S    Document 15-19    Filed 10/08/25    Page 442 of 1017    PageID 15086
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1314 of 1803   PageID 12060
Victory Against LegacyTexas Law Firm   Case 19-12239-CSS   Doc 116-1   Filed 11/12/19   Page 2 of 3   Page 1 of 4



HOME    FIRM    SERVICES    NEWS    TESTIMONIALS    CONTACT US



LEGACYTEXAS™

## The Pettit Law Firm and Lynn Pinker Cox Hurst Secure a $4.2 Million Fraud and Breach of Fiduciary Duty Judgment Against LegacyTexas Bank

**December 28, 2018**

The judgment was signed on December 28, 2018 following a 2-week trial earlier this fall before Judge Dale Tillery in the 134th District Court in Dallas County, Texas.

Co-lead counsel Julie Pettit and Michael K. Hurst represent Plaintiff Robert Imel, an oil and gas entrepreneur in a suit against LegacyTexas bank for fraud, breach of fiduciary duty, declaratory judgment, conspiracy, and breach of contract.

LegacyTexas Bank, through its head of energy finance, Chris Parada, represented to Imel that it would release Imel from a personal guaranty related to his oil and gas company's financing agreement if certain oil and gas assets were sold and a loan by LegacyTexas was paid off by a time certain. LegacyTexas then acted as a broker and persuaded Imel to negotiate the sale of the assets to Energy Reserves Group, LLC ("ERG"). Meanwhile, LegacyTexas Bank and ERG secretly negotiated a sale of the note and Imel's personal guaranty to ERG so that ERG could pursue Imel under the guaranty and force Imel to surrender the assets as well as valuable non-collateral oil and gas assets.

The Court found Legacy liable for its tortious conduct for $3.6 million in actual damages and over $636,000 in attorneys' fees.  The Court also found ERG liable in the amount of $159,000 in attorneys' fees.

"We are pleased with the decision," said Julie Pettit, co-lead counsel for Imel.  "The judgment affirms our position regarding LegacyTexas' misrepresentations and fraudulent conduct toward its own borrower."

"This important judgment underscores that in business, no one has a license to hide the truth, steal and double deal– especially from those who they are entrusted to protect," said Michael K. Hurst, co-lead counsel for Imel.

Along with Pettit and Hurst, the trial team included David Urteago and Jane Cherry of The Pettit Law Firm.

Trial Days:  10

Settlement Negotiations:  Nothing meaningful

Expert for Imel:  Scott Ellington, Chief Legal Officer, General Counsel and Secretary, Highland Capital Management L.P.

The case is Robert A. Imel v. LegacyTexas Bank and Energy Reserves Group, case number DC-16-01372, in the 134th District Court in Dallas County, Texas. LegacyTexas was represented by John Leininger, Steve Shapiro, and Alexis Reller of Shapiro Bieging Barber Otteson LLP. ERG was represented by Marty Brimmage, Molly Whitman, and Keertan Chauhan of Akin Gump Strauss Hauer & Feld LLP.

A copy of the judgment can be found here.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1316 of 1804
Case 3:25-cv-02072-S    Document 15-19    Filed 10/08/25    Page 443 of 1017    PageID 15087
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1315 of 1803    PageID 12061
Case 19-12239-CSS    Doc 116-1    Filed 11/12/19    Page 3 of 3    Page 2 of 4

Victory Against Legacy Texas - The Pettit Law Firm



Verdicts and results can be found here.

HOME    FIRM    SERVICES    NEWS    TESTIMONIALS    CONTACT US

## CONTACT US

The Pettit Law Firm
2101 Cedar Springs Rd, Suite 1540
Dallas, TX 75201
Phone: 214.329.0151
Fax: 214.329.4076

Name *

Email *

Subject

Message

Send

© 2019 by The Pettit Law Firm.

The principal offices of Pettit Rice PC dba The Pettit Law Firm are located in Dallas, Texas. Attorney responsible for the content of this homepage: Julie Pettit. Pettit Rice PC Phone: 214.329.0151 All Rights Reserved. Member of the Texas State Bar.

Appellee Appx. 01309
Appx. 01509
014122

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-15    Page 1307 of 1804    Page 444 of 1017    PageID 15088
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1316 of 1803    PageID 12062

Case 19-12239-CSS    Doc 116-2    Filed 11/12/19    Page 1 of 5

**Exhibit B**

NexPoint Strategic Opportunities Fund

Appellee Appx. 01310

014123

Appx. 01501

HIGHLAND CAPITAL MANAGEMENT
EXPERIENCED. DISCIPLINED. BOLD.

# NexPoint Strategic Opportunities Fund Announces the Regular Monthly Dividend

July 3, 2018 Nexpoint Advisors, Nexpoint Funds, Sites

DALLAS, July 2, 2018 /PRNewswire/ — NexPoint Strategic Opportunities Fund (NYSE: NHF) ("NHF" or the "Fund") today announced its regular monthly dividend on its common stock of **$.20** per share. The dividend will be payable on July 31, 2018 to shareholders of record at the close of business July 23, 2018.

The Fund is a closed-end fund managed by NexPoint Advisors, L.P. (the "Manager"), an affiliated adviser of Highland Capital Management, L.P. The Fund invests primarily in below investment grade debt, equity securities and real estate and has the ability to hedge risk. The Manager attempts to deliver consistent returns in excess of the Dow Jones Credit Suisse Hedge Fund and the HFRX Global Hedge Fund indices in a transparent, registered fund format consistent with monthly dividends.

| Total Returns as of 06/30/18 | 1-year | 3-year | 5-year | 10-year | Since Inception (6/29/06) |
|---|---|---|---|---|---|
| NexPoint Strategic Opportunities Fund (NAV) | 13.63% | 4.71% | 15.21% | 7.07% | 5.17% |
| NexPoint Strategic Opportunities Fund (Market Price) | 16.06% | 4.60% | 14.76% | 6.72% | 3.80% |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Exhibit 6   Page 1319 of 1804
Case 3:25-cv-02072-S   Document 15-19   Filed 10/06/25   Page 446 of 1017   PageID 15090
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1318 of 1803   PageID 12064

NexPoint Strategic Opportunities Fund Announces the Regular Monthly Dividend of Sal... Page 2 of 6

| Total Returns as of 03/31/18 | 1-year | 3-year | 5-year | 10-year | Since Inception (6/29/06) |
|---|---|---|---|---|---|
| NexPoint Strategic Opportunities Fund (NAV) | 17.20% | 3.65% | 16.21% | 7.19% | 5.13% |
| NexPoint Strategic Opportunities Fund (Market Price) | 14.95% | 3.97% | 15.30% | 7.16% | 3.72% |

Total operating expenses as of the most recent fund annual report are 2.21%. Performance data represents past performance, which does not guarantee future results. Current performance may be higher or lower than the figures shown. Investment return and principal value will fluctuate with market conditions, and you may have a gain or loss when you sell your shares. For most recent month-end performance please visit www.nexpointadvisors.com or call 866-351-4440.

**Investors should consider the investment objectives, risks, charges and expenses of the NexPoint Strategic Opportunities Fund carefully before investing. This and other information can be found in the Fund's prospectus, which may be obtained by calling 1-866-351-4440 or visiting www.nexpointadvisors.com. Please read the prospectus carefully before you invest.**

**Interest Rate Risk.** Interest rate risk is the risk that debt securities, and the Fund's net assets, may decline in value because of changes in interest rates. Generally, fixed rate debt securities will decrease in value when interest rates rise and increase in value when interest rates decline.

**Leverage Risk.** The Fund uses leverage through borrowings from notes and a credit facility, and may also use leverage through the issuances of preferred shares. The use of leverage magnifies both the favorable and unfavorable effects of price movements in the investments made by the Fund. Insofar as the Fund employs leverage in its investment operations, the Fund will be subject to substantial risks of loss.

Appellee Appx. 01312
Appx. 01563
014125

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1320 of 1804
Case 3:25-cv-02072-S    Document 15-19    Filed 10/06/25    Page 447 of 1017    PageID 15091
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1319 of 1803    PageID 12065

NexPoint StrategCase 19-12239-CSSAnnounce Doc 116-2 Regular Mithly Diridend Originl... Page 3 of 6

**Closed-End Fund Risk.** The Fund is a closed-end investment company designed primarily for long-term investors and not as a trading vehicle.  No assurance can be given that a shareholder will be able to sell his or her shares on the NYSE when he or she chooses to do so, and no _____ ch any such sale may be effected.

_____ st invest at least 25% of the value of its total assets at the time of purchase in securities of issuers conducting their principal business activities in the real estate industry.  The Fund may be subject to greater market fluctuations than a fund that does not concentrate its investments in a particular industry.  Financial, economic, business, and other developments affecting issuers in the real estate industry will have a greater effect on the Fund, and if securities of the real estate industry fall out of favor, the Fund could underperform, or its NAV may be more volatile than, funds that have greater industry diversification.

**Credit Risk.** Investments rated below investment grade are commonly referred to as high-yield, high risk or "junk debt." They are regarded as predominantly speculative with respect to the issuing company's continuing ability to meet principal and/ or interest payments. Non-payment of scheduled interest and/or principal would result in a reduction of income to the Fund, a reduction in the value of the asset experiencing non-payment and a potential decrease in NAV of the Fund.

**Illiquidity of Investments Risk.** The investments made by the Fund may be illiquid, and consequently the Fund may not be able to sell such investments at prices that reflect the Investment Adviser's assessment of their value or the amount originally paid for such investments by the Fund.

### About NexPoint Strategic Opportunities Fund

NexPoint Strategic Opportunities Fund (formerly known as NexPoint Credit Strategies Fund) is a closed-end fund managed by NexPoint Advisors, L.P. The Fund's investment objectives are to provide both current income and capital appreciation. The Fund is invested primarily in below investment grade debt, equity securities and real estate and has the ability to hedge risk. The Fund's investment adviser attempts to deliver consistent returns in excess of the Dow Jones Credit Suisse Hedge Fund and the HFRX Global Hedge Fund indices in a transparent, registered fund format consistent with monthly dividends. No assurance can be given that the Fund will achieve its investment objectives.

Shares of closed-end investment companies frequently trade at a discount to net asset value. The price of the Fund's shares is determined by a number of factors, several of which are

Appellee Appx. 01313
Appx. 01504
014126

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1321 of 1804
Case 3:25-cv-02072-S    Document 15-19    Filed 10/06/25    Page 448 of 1017    PageID 15092
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1320 of 1803    PageID 12066

NexPoint Strateg Case 19-12239-CSS An Doc 116-2 Filed 11/12/19 Di Page 5 of 5 nl...    Page 4 of 6

beyond the control of the Fund. Therefore, the Fund cannot predict whether its shares will trade at, below or above net asset value. Past performance does not guarantee future results.



+1 (972) 419-2555

Recent Posts

Adviser on Highland Capital Management Investment Platform Plans Reorganization, Initiates Voluntary Bankruptcy Proceedings October 16, 2019

CNBC | FA 100: CNBC ranks the top-rated financial advisory firms of 2019 October 10, 2019

Mark Okada to Retire from Highland Capital Management September 30, 2019

NexPoint Selects IHG® as Operator for New InterContinental® Hotel at Cityplace Tower August 14, 2019

Appellee Appx. 01314
Appx. 01505
014127

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-15   Page 1326 of 1804   Page 449 of 1017   PageID 15093
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1321 of 1803   PageID 12067

**Exhibit C**

Highland Global Allocation Fund

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1323 of 1804
Case 3:25-cv-02072-S    Document 15-19    Filed 10/08/25    Page 450 of 1017    PageID 15094
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1322 of 1803    PageID 12068
Global Allocation Fund - Highland Funds    Doc 116-3    Filed 11/12/19    Page 2 of 11    Page 1 of 7



HIGHLAND CAPITAL    HIGHLAND FUNDS    AFFILIATES    FINRA'S BROKERCHECK    LOG IN

# HIGHLAND CAPITAL
## MANAGEMENT

HOME    ABOUT    FUNDS    ETF    RESOURCE LIBRARY    NEWS CENTER

# Global Allocation Fund

### PORTFOLIO MANAGER



JAMES DONDERO, CFA
Co-Founder,
President

BIO >

### FACTS

## Fund Overview

https://www.highlandfunds.com/global-allocation-fund/                11/8/2019

Appellee Appx. 01316
Appx. 01587
014129

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-19    Filed 10/06/25 1804 Page 451 of 1017    PageID 15095
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1323 of 1803    PageID 12069

Global Allocation Fund Highland Funds Doc 116-3    Filed 11/12/19    Page 3 of 11    Page 2 of 7

### Investment Objective

The Global Allocation Fund, managed by James Dondero, invests primarily in U.S. and foreign equity and debt securities that the portfolio manager considers to be undervalued by the market but have solid growth prospects. Undervalued securities are those securities that are undervalued relative to the market, their peers, their historical valuation or their growth rate.

### Low Correlation to Domestic Equity Markets

The Fund seeks above-average risk-adjusted total returns by investing in U.S. and foreign equities and fixed income securities, along with select alternative investments in the pursuit of long-term capital growth and future income.

- Rigorous top down allocation process
- Collaborative management structure where highly experienced portfolio managers in six disciplines bring their best ideas to the fund
- Global thematic investment style
- Extensive analytical support
- Relative value discipline
- May complement a portfolio of only U.S. securities as well as one of only stocks or fixed income

**Fund NAV** (As of Nov 07, 2019)

| SYMBOL | NAV |
|--------|-----|
| HGLB | $12.03 |

**Fund AUM** (As of Nov 07, 2019)

| | AUM |
|---|-----|
| Total Net Assets | $271.77 M |

VIEW FULL PERFORMANCE

| Symbol | HGLB |
|--------|------|

Appellee Appx. 01317
Appx. 01508
014130

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1325 of 1804
Case 3:25-cv-02072-S    Document 15-19    Filed 10/08/25    Page 452 of 1017    PageID 15096
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1324 of 1803    PageID 12070

Global Allocation Case 19-12239-CSS Doc 116-3    Filed 11/12/19    Page 4 of 11    Page 3 of 7

| | |
|---|---|
| Inception | 01/05/98 |
| Gross Expense Ratio | 2.67% |
| Net Expense Ratio[1] | 2.67% |

## PERFORMANCE

## LITERATURE

## INSIGHTS

The performance data quoted here represents past performance and is no guarantee of future results. Investment returns and principal value will fluctuate so that an investor's shares when redeemed may be worth more or less than their original cost. Current performance may be lower or higher than performance data quoted.

Note: Effective April 9, 2013, Highland Core America Equity Fund was renamed Highland Global Allocation Fund. At the same time, Highland Capital Management Fund Advisors, L.P. became the sole Adviser to the Fund and the Fund no longer utilizes a sub-adviser. In addition to these changes, the Fund's investment strategies were revised and the Fund will no longer invest at least 80% of its assets in domestic equity securities. For more information, please view the Fund's prospectus which can be found under the "Literature" tab above or by calling 877-665-1287.

Please consider the investment objectives, risks, charges and expenses of Highland Funds carefully before investing. A prospectus with this and other information about Highland's mutual funds can be found on the Literature tab above. You may also obtain a prospectus for our mutual funds by calling 877-665-1287. Please read the prospectus carefully before investing.

Appellee Appx. 01318
Appx. 01560
014131

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-19   Filed 10/06/25   Page 453 of 1017   PageID 15097
Exhibit 6   Page 1326 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1325 of 1803   PageID 12071

Global Allocation Fund – Highland Funds   Case 19-12239-CSS   Doc 116-3   Filed 11/12/19   Page 5 of 11   Page 4 of 7

1. Performance results reflect the contractual waivers and/or reimbursements of fund expenses by the Advisor. Absent this limitation, performance results would have been lower. The Advisor has contractually agreed to limit the total annual operating expenses through at least January 31, 2019.

*The maximum sales charge for Class A shares is 5.75%.

**Securities Market Risk.** The value of the securities may go up or down, sometimes rapidly or unpredictably, due to factors affecting particular companies or the securities market generally. A general downturn in the securities market may cause multiple asset classes to decline in value simultaneously, although equity securities generally have greater price volatility than fixed income securities.

**Illiquid and Restricted Securities Risk.** Certain investments made by the Funds are, and others may be, illiquid, and consequently the Funds may not be able to sell such investments at prices that reflect the Investment Adviser's assessment of their value or the amount originally paid for such investments by the Funds. Illiquidity may result from the absence of an established market for the investments as well as legal, contractual or other restrictions on their resale and other factors. Furthermore, the nature of the Funds' investments, especially those in financially distressed companies, may require a long holding period prior to profitability. Restricted securities (i.e., securities acquired in private placement transactions) and illiquid securities may offer higher yields than comparable publicly traded securities. The Funds, however, may not be able to sell these securities when the Investment Adviser considers it desirable to do so or, to the extent they are sold privately, may have to sell them at less than the price of otherwise comparable securities. Restricted securities are subject to limitations on resale which can have an adverse effect on the price obtainable for such securities. Also, if in order to permit resale the securities are registered under the Securities Act at a Fund's expense, the Fund's expenses would be increased. A high percentage of illiquid securities in a Fund creates risk that such a Fund may not be able to redeem its shares without causing significant dilution to remaining shareholders.

**Focused Investment Risk** is the risk that although the Fund is a diversified fund, it may invest in securities of a limited number of issuers in an effort to achieve a potentially greater investment return than a fund that invests in a larger number of issuers. As a result, price movements of a single issuer's securities will have a

Appellee Appx. 01319
Appx. 01579
014132

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-19    Filed 10/06/25    Page 454 of 1017    PageID 15098
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1326 of 1803    PageID 12072
Global Allocation and Highland Funds    Doc 116-3    Filed 11/12/19    Page 6 of 11    Page 5 of 7

greater impact on the Fund's net asset value, causing it to fluctuate more than that of a more widely diversified fund.

**MLP Risk** is the risk of investing in MLP units, which involves some risks that differ from an investment in the equity securities of a company. The Fund currently holds and may in the future hold a significant investment in MLP units. Holders of MLP units have limited control and voting rights on matters affecting the partnership. Holders of units issued by an MLP are exposed to a remote possibility of liability for all of the obligations of that MLP in the event that a court determines that the rights of the holders of MLP units to vote to remove or replace the general partner of that MLP, to approve amendments to that MLP's partnership agreement, or to take other action under the partnership agreement of that MLP would constitute "control" of the business of that MLP, or a court or governmental agency determines that the MLP is conducting business in a state without complying with the partnership statute of that state. Holders of MLP units are also exposed to the risk that they will be required to repay amounts to the MLP that are wrongfully distributed to them. Additionally: • A sustained reduced demand for crude oil, natural gas and refined petroleum products could adversely affect MLP revenues and cash flows. • Changes in the regulatory environment could adversely affect the profitability of MLPs. Investments in MLP units also present special tax risks. See "MLP Tax Risk" in the prospectus.

**Value Investing Risk.** The risk of investing in undervalued stocks that may not realize their perceived value for extended periods of time or may never realize their perceived value.  Value stocks may respond differently to market and other developments than other types of stocks.

**Foreign Investment Risk.** The risk that investing in foreign (non-U.S.) securities may result in the Fund experiencing more rapid and extreme changes in value than a fund that invests exclusively in securities of U.S. companies, due to smaller markets, differing reporting, accounting and auditing standards, nationalization, expropriation or confiscatory taxation, currency blockages and political changes of diplomatic developments. The cost of investing in many foreign markets are higher than the U.S. and investments may be less liquid.

**Currency Risk.** The risk that the values of foreign investments may be affected by changes in the currency rates or exchange control regulations. If a foreign currency

Appellee Appx. 01320
Appx. 01571
014133

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-19    Filed 10/06/25    Page 455 of 1017    PageID 15099
Exhibit 6    Page 1328 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1327 of 1803    PageID 12073

Global Allocation Fund - Highland Funds    Case 19-12239-CSS    Doc 116-3    Filed 11/12/19    Page 7 of 11    Page 6 of 7

weakens against the U.S. dollar, the value of a foreign investment denominated in that currency would also decline in dollar terms.

**Credit Risk.** The risk that the Fund could lose money if the issuer or guarantor of a fixed income security, or the counterparty of a derivatives contract or repurchase agreement, is unable or unwilling (or is perceived to be unable or unwilling) to make a timely payment of principal and/or interest, or to otherwise honor its obligations.

**Interest Rate Risk.** The risk that fixed income securities will decline in value because of changes in interest rates. A fund with a longer average portfolio duration will be more sensitive to changes in interest rates than a fund with a shorter average portfolio duration.

**Derivatives Risk.** The risk that an investment in derivatives may not correlate completely to the performance of underlying securities and may be volatile, and may result in a loss greater than the principal amount invested. Equity derivatives may also be subject to liquidity risk as well as the risk the derivative may be different than what would be produced through the use of another methodology or if it had been priced using market quotations.

**Glossary:** Click for important terms and definitions

Source: State Street Bank and Trust Company

Highland Funds' mutual funds are distributed by Highland Capital Funds Distributor

FUND DOWNLOADS

Fund Fact Sheet

Appellee Appx. 01321
Appx. 01572
014134

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-19    Filed 10/08/25    Page 456 of 1017    PageID 15100
Exhibit 6    Page 1329 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1328 of 1803    PageID 12074

Global Allocation Case 19-12239-CSS Funds Doc 116-3    Filed 11/12/19    Page 8 of 11    Page 7 of 7



Summary Prospectus

Annual Report




View all Literature & Forms

© 2018 Highland Capital Management, LP. | All Rights Reserved

Disclosure Statement

Privacy - Terms

https://www.highlandfunds.com/global-allocation-fund/                    11/8/2019

Appellee Appx. 01322
Appx. 01573
014135

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-19    Filed 10/06/25    Page 457 of 1017    PageID 15101
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1329 of 1803    PageID 12075

# Highland Global Allocation Fund Completes Conversion from Open-End Fund to Closed-End Fund



NEWS PROVIDED BY
**Highland Capital Management Fund Advisors, L.P.** →
Feb 13, 2019, 19:26 ET

DALLAS, Feb. 13, 2019 /PRNewswire/ -- Highland Capital Management Fund Advisors, L.P. (together with its affiliates "Highland") announced today that the Highland Global Allocation Fund, a series of Highland Funds II (the "Fund") successfully converted from an open-end fund to a closed-end fund (the "Conversion"). The Conversion was approved by shareholders during the November 8, 2018 special meeting. The Fund expects to list its shares for trading on the New York Stock Exchange (the "NYSE") on or about February 19, 2019.

As a result of the Conversion, the Fund will effect a reverse stock split of Class A, Class C and Class Y shares of the Fund and will combine such shares into a single class of common shares under the CUSIP 43010T104 with an initial net asset value of $15.00 per share.

Conversion ratios will be available on February 14, 2019.

**Appellee Appx. 01323**
Appx. 01574
**014136**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-19    Filed 10/06/25    Page 458 of 1017    PageID 15102
Exhibit 6    Page 1331 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1330 of 1803    PageID 12076

Highland Global... Case 19-12239-CSS    Doc 116-3    Filed 10/12/19 ... and Page 10 of 11 ...    Page 2 of 3

Shareholders will not receive fractional shares because of the Conversion, but instead will receive a number of shares, rounded down to a whole number. Shareholders will receive a cash-in-lieu check related to the fractional portion of their shares shortly after the Conversion.

The shares will be listed under the ticker "HGLB" and at an initial listing price of $15.00. Any shareholder seeking to move shares to a brokerage account will need an adviser or broker dealer to transfer the shares through the Depository Trust Company's ("DTC") Profile System. Shares of the Fund are DTC Eligible.

Effective February 14, 2019, American Stock Transfer & Trust Company, LLC ("AST") will serve as the Fund's transfer agent and dividend disbursing agent. All shareholder records have been transferred to AST. Shareholders may obtain more information on the shareholder services to be offered to the converted Fund by calling AST at the Fund's dedicated toll free number 1-800-357-9167.

Additional details regarding the Conversion are available on the Fund's website at www.highlandfunds.com/global-allocation-fund/.

**About Highland Capital Management Fund Advisors, L.P.**

Highland Capital Management Fund Advisors, L.P. is the retail arm of Highland Capital Management, L.P., a multibillion-dollar global alternative investment manager founded in 1993 by Jim Dondero and Mark Okada. A pioneer in the leveraged loan market, the firm has evolved over 25 years, building on its credit expertise and value-based approach to expand into other asset classes. Today, Highland operates a diverse investment platform, serving both institutional and retail investors worldwide. In addition to high yield credit, Highland's investment capabilities include public equities, real estate, private equity and special situations, structured credit, and sector- and region-specific verticals built round

**Appellee Appx. 01324**
Appx. 01575
014137

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-19    Filed 10/06/25    Page 459 of 1017    PageID 15103
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1331 of 1803    PageID 12077
Highland Global Allocation Fund Completes Conversion to Closed-End Fund Closed...    Page 3 of 3

specialized teams. Highland is headquartered in Dallas, Texas and maintains offices in New York, Buenos Aires, Rio de Janeiro, Singapore, and Seoul. For more information visit www.highlandfunds.com.

*Before investing, you should carefully consider the Fund's investment objectives, risks, charges and expenses. For a copy of a prospectus or summary prospectus, which contains this and other information, please visit our website at www.high-landfunds.com or call 1-877-665-1287. Please read the fund prospectus carefully before investing.*

### CONTACTS

**Media Relations:**
Lucy Bannon
lbannon@highlandcapital.com
1-972-419-6272

**Fund Transfer Agent:**
American Stock Transfer & Trust Company, LLC
1-800-357-9167

SOURCE Highland Capital Management Fund Advisors, L.P

Related Links

https://www.highlandfunds.com

Appellee Appx. 01325
Appx. 01576
014138

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6-15    Page 1333 of 1804    Page 460 of 1017    PageID 15104
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1332 of 1803    PageID 12078

**Exhibit D**

Highland Income Fund



HIGHLAND CAPITAL    HIGHLAND FUNDS    AFFILIATES    FINRA'S BROKERCHECK    LOG IN

# HIGHLAND CAPITAL
# MANAGEMENT

HOME    ABOUT    FUNDS    ETF    RESOURCE LIBRARY    NEWS CENTER

# Income Fund



### JAMES DONDERO, CFA
Co-Founder, President

Bio »



### JON POGLITSCH, CFA
Head of Credit Research

Bio »

Appellee Appx. 01327
Appx. 01578
014140

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-19   Filed 10/08/25   Page 462 of 1017   PageID 15106
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1334 of 1803   PageID 12080

Income Fund | Highland Funds   Case 19-12239-CSS   Doc 116-4   Filed 11/12/19   Page 3 of 9   Page 2 of 8

## Oct. 4, 2019 - Update on the Claymore Holdings LLC v. Credit Suisse AG Case Related to the Highland Income Fund

October 4, 2019 – The Texas Supreme Court released an order today on the case against Credit Suisse, AG, Cayman Islands Branch, and Credit Suisse Securities (USA), LLC ("Credit Suisse"), which granted a hearing of the case. The case was filed in 2013 by Claymore Holdings LLC, the Highland and NexPoint affiliate (together "Highland") that pursued the collective claims on behalf of the Highland Income Fund (formerly, Highland Floating Rate Opportunities Fund) (NYSE:HFRO) ("HFRO") and the NexPoint Strategic Opportunities Fund (NYSE:NHF) ("NHF") (together the "Funds").

Per the order, the Texas Supreme Court will review the case at a hearing scheduled for January 8, 2020. While this prolongs the legal process, it does not affect Highland's conviction in our claims against Credit Suisse or our commitment to recovering damages for investors.

The total aggregate award stands at $393.2 million today; it is comprised of the $287.5 million judgment initially awarded by the trial court and now twice confirmed on appeal, plus $105.7 million in accrued interest. The award will continue to accrue interest in the event that the judgment becomes final.

Any final judgment amount would be reduced by attorney's fees and other litigation-related expenses. The net proceeds would then be allocated to the Funds based on respective damages (approximately 82% to HFRO and 18% to NHF).

We do not know the exact timing of the Texas Supreme Court's decision following the January hearing; however, the decision should be issued by the end of the Court's term in June 2020 at the latest.

We knew this would be a long process but have been committed to recovering damages for our investors since day one.

Appellee Appx. 01328
Appx. 01479

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 136 of 1804
Case 3:25-cv-02072-S    Document 15-19    Filed 10/06/25    Page 463 of 1017    PageID 15107
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1335 of 1803    PageID 12081
Income Fund | Highland Funds    Case 19-12239-CSS    Doc 116-4    Filed 11/12/19    Page 4 of 9    Page 3 of 8

## FACTS

**Effective May 20, 2019, the Highland Floating Rate Opportunities Fund is named the Highland Income Fund. For more information, please read the** press release **from March 20, 2019.**

## Fund Overview

### Investment Objective

The investment objective of the closed-end Highland Floating Rate Opportunities Fund is to provide a high level of current income, consistent with the preservation of capital.

### Attractive Alternatives for Income-Oriented Investors

- High income potential in all markets
- Yields that reset when short-term interest rates move, which may mitigate price declines in a rising short-term interest rate environment
- Low correlation to other asset classes
- Access to one of the largest and most experienced senior loan managers
- Most fixed rate securities experience price declines when interest rates rise. Floating Rate Senior loans are different.

They are short-duration, floating-rate securities. So, as interest rates rise, yields on bank loans increase, while their short duration helps keep prices relatively stable.

**Fund NAV** (As of Nov 07, 2019)

| SYMBOL | NAV |
|---|---|
| HFRO | $13.65 |

**Fund AUM** (As of Nov 07, 2019)

| | AUM |
|---|---|
| Total Net Assets | $982.33 M |

Appellee Appx. 01329
Appx. 01589
014142

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1337 of 1804
Case 3:25-cv-02072-S    Document 15-19    Filed 10/06/25    Page 464 of 1017    PageID 15108
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1336 of 1803    PageID 12082
Income Fund | Hi    Case 19-12239-CSS    Doc 116-4    Filed 11/12/19    Page 5 of 9    Page 4 of 8

**Fund AUM** (As of Nov 07, 2019)

AUM

VIEW FULL PERFORMANCE

| Symbol | HFRO |
| --- | --- |
| Inception | 01/13/00 |
| Gross Expense Ratio | 1.26% |
| Net Expense Ratio[1] | 1.26% |

PERFORMANCE

LITERATURE

THOMSON REUTERS

Lipper Award Winner - Loan Participation Funds

2014 Best Fund Over 3 Years
2015 Best Fund Over 3 Years
2015 Best Fund Over 5 Years
2016 Best Fund Over 3 Years

Appellee Appx. 01330
Appx. 01581
014143

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-19    Filed 10/08/25    Page 465 of 1017    PageID 15109
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1337 of 1803    PageID 12083
Income Fund | Highland Fun... Case 19-12239-CSS    Doc 116-4    Filed 11/12/19    Page 6 of 9    Page 5 of 8

The performance data quoted here represents past performance and is no guarantee of future results. Investment returns and principal value will fluctuate so that an investor's shares when redeemed may be worth more or less than their original cost. Current performance may be lower or higher than performance data quoted.

Effective shortly after close of business on November 3, 2017, the Highland Floating Rate Fund converted from an open-end fund to a closed-end fund, and began trading on the NYSE under the symbol HFRO on November 6, 2017. The performance data presented above reflects that of Class Z shares of the Fund when it was an open-end fund, HFRZX. The closed-end Fund pursues the same investment objective and strategy as it did before its conversion.

¹ The expense ratio shown is reported in the Fund's Semi-annual Report dated December 31, 2017.

Closed-end funds, unlike open-end funds, are not continuously offered. There is a one-time public offering and once issued, shares of closed-end funds are sold in the open market through a stock exchange and frequently trade at prices lower than their net asset value, which may increase an investor's risk of loss. Net Asset Value (NAV) is total assets less total liabilities, which includes preferred shares, divided by the number of common shares outstanding. At the time of sale, your shares may have a market price that is above or below NAV, and may be worth more or less than your original investment. For additional information, please contact your investment adviser or visit our website www.highlandfunds.com.

Please consider the investment objectives, risks, charges and expenses of Highland Floating Rate Opportunities Fund carefully before investing. A prospectus with this and other information about Highland Floating Rate Opportunities Fund can be found on the Literature tab above.

**Closed-End Fund Risk.** The Fund is a closed-end investment company designed primarily for long-term investors and not as a trading vehicle. No assurance can be given that a shareholder will be able to sell his or her shares on the NYSE when he or she chooses to do so, and no assurance can be given as to the price at which any such sale may be effected.

**Non-Payment Risk.** Senior Loans, like other corporate debt obligations, are subject to the risk of non-payment of scheduled interest and/or principal. Non-payment

Appellee Appx. 01331
Appx. 01582
014144

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-19    Filed 10/06/25-1804    Page 466 of 1017    PageID 15110
Exhibit 6    Page 1339 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1338 of 1803    PageID 12084
Income Fund | Highland Funds    Case 19-12239-CSS    Doc 116-4    Filed 11/12/19    Page 7 of 9    Page 6 of 8

would result in a reduction of income to the Fund, a reduction in the value of the Senior Loan experiencing non-payment and a potential decrease in the NAV of the Fund.

**Credit Risk.** The Fund may invest all or substantially all of its assets in Senior Loans or other securities that are rated below investment grade and unrated Senior Loans deemed by Highland to be of comparable quality. Securities rated below investment grade are commonly referred to as "high yield securities" or "junk securities." They are regarded as predominantly speculative with respect to the issuing company's continuing ability to meet principal and interest payments. Non-payment of scheduled interest and/or principal would result in a reduction of income to the Fund, a reduction in the value of the Senior Loan experiencing non-payment and a potential decrease in the NAV of the Fund. Investments in high yield Senior Loans and other securities may result in greater NAV fluctuation than if the Fund did not make such investments.

**Senior Loans Risk.** The risks associated with senior loans are similar to the risks of below investment grade securities in that they are considered speculative. In addition, as with any debt instrument, senior loans are also generally subject to the risk of price declines and to increases in prevailing interest rates. Senior loans are also subject to the risk that, as interest rates rise, the cost of borrowing increases, which may also increase the risk and rate of default. In addition, the interest rates of floating rate loans typically only adjust to changes in short-term interest rates; long term interest rates can vary dramatically from short term interest rates. Therefore, senior loans may not mitigate price declines in a rising long-term interest rate environment.

**Illiquidity of Investment Risk.** The investments made by the Fund may be illiquid, and consequently the Fund may not be able to sell such investments at prices that reflect the Investment Adviser's assessment of their value or the amount originally paid for such investments by the Fund.

**Ongoing Monitoring Risk.** On behalf of the several Lenders, the Agent generally will be required to administer and manage the Senior Loans and, with respect to collateralized Senior Loans, to service or monitor the collateral. Financial diffiulties of Agents can pose a risk to the Fund.

**Glossary:** Click for important terms and definitions

Appellee Appx. 01332
Appx. 01593
014145

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-19    Filed 10/00/25-1804    Page 467 of 1017    PageID 15111
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1339 of 1803    PageID 12085

Income Fund | Highland Fun...    Case 19-12239-CSS    Doc 116-4    Filed 11/12/19    Page 8 of 9    Page 7 of 8

Source: State Street Bank and Trust Company

## FUND DOWNLOADS

Fund Fact Sheet



Summary Prospectus

Annual Report



Fund Commentary



📁  View all Literature & Forms                                                    ⌃

Appellee Appx. 01333
014146
Appx. 01584

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1341 of 1804
Case 3:25-cv-02072-S    Document 15-19    Filed 10/06/25    Page 468 of 1017    PageID 15112
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1340 of 1803    PageID 12086
Income Fund | Highland Funds    Case 19-12239-CSS    Doc 116-4    Filed 11/12/19    Page 9 of 9    Page 8 of 8

© 2018 Highland Capital Management, LP. | All Rights Reserved

Disclosure Statement



Appellee Appx. 01334
Appx. 01585
014147

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-5    Page 1342 of 1804    Page 469 of 1017    PageID 15113
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1341 of 1803    PageID 12087

Case 19-12239-CSS    Doc 116-5    Filed 11/12/19    Page 1 of 9

**Exhibit E**

Letter to Moody's re U.S. Bank

Appellee Appx. 01335

Appx. 01586

014148

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S      Document 18-15      Page 1348 of 1804 Page 470 of 1017      PageID 15114
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1342 of 1803    PageID 12088

Case 19-12239-CSS    Doc 116-5    Filed 11/12/19    Page 2 of 9

# LYNN PINKER COX HURST

MICHAEL K. HURST
*Partner*
*Board Certified – Civil Trial Law*
*Texas Board of Legal Specialization*

D 214 981 3838
F 214 981 3839

mhurst@lynnllp.com

Lynn Pinker Cox & Hurst, LLP
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
lynnllp.com

August 6, 2019

**VIA EMAIL:** Shana.Sethi@moodys.com
Shana Sethi
Vice President- Senior Credit Officer
Moody's Investors Service

**Re:** **Mismanagement of the Acis CLOs, in violation of the rights of Secured Note Holders NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund.**

Dear Ms. Sethi:

My Firm represents NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund (collectively, the "Highland Retail Funds"), in connection with the enforcement and protection of their rights as Holders of Secured Notes under certain Acis Indentures dated as of February 25, 2014, June 5, 2014, November 18, 2014, and April 16, 2015 (collectively, the "Acis Indentures").[1]

For your reference, enclosed to this correspondence is a copy of the demand letter served by the Highland Retail Funds on August 6, 2019 to U.S. Bank National Association, the Trustee of the Acis Indentures. The demand letter puts U.S. Bank on notice of its material violations of the terms of the Acis Indentures, by among others, mismanaging and allowing the impermissible gaming of the Acis Indentures by the portfolio manager thereof, and failing to perform required tasks with due care. The Highland Retail Funds are prepared to take all actions necessary to protect their rights from further deterioration.

Representatives of the Highland Retail Funds are available to meet with Moody's to discuss whether U.S. Bank's wrongful conduct has caused a default, such that the ratings on some or all rated tranches should be reconsidered or withdrawn.

---

[1] The Acis Indentures collectively include: that certain Indenture dated as of February 25, 2014 issued by ACIS CLO-2014-3 Ltd. as Issuer, ACIS CLO 2014-3 LLC as Co-Issuer, and US Bank as Indenture Trustee; that certain Indenture dated as of June 5, 2014 issued by ACIS CLO-2014-4 Ltd. as Issuer, ACIS CLO 2014-4 LLC as Co-Issuer, and US Bank as Indenture Trustee; that certain Indenture dated as of November 18, 2014 issued by ACIS CLO-2014-5 Ltd. as Issuer, ACIS CLO 2014-5 LLC as Co-Issuer, and US Bank as Indenture Trustee, and; that certain Indenture dated as of April 16, 2015 issued by ACIS CLO-2015-6 Ltd. as Issuer, ACIS CLO 2015-6 LLC as Co-Issuer, and US Bank as Indenture Trustee.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-16    Page 1344 of 1804    Page 471 of 1017    PageID 15115
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1343 of 1803    PageID 12089

Ms. Sethi
Moody's Investors Service
August 6, 2019
Page 2


We look forward to engaging with you on this serious matter.


Yours very truly,


Michael K. Hurst

MKH/ceb

Enclosure

cc:    David Coale (*of the Firm*)
       Chisara Ezie-Boncoeur (*of the Firm*)

Appellee Appx. 01337
Appx. 01588
014150

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 13/45 of 51804 Page 472 of 1017    PageID 15116
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1344 of 1803    PageID 12090

Case 19-12239-CSS    Doc 116-5    Filed 11/12/19    Page 4 of 9

# LYNN PINKER COX HURST

MICHAEL K. HURST
*Partner*
*Board Certified – Civil Trial Law*
*Texas Board of Legal Specialization*

D 214 981 3838
F 214 981 3839

mhurst@lynnllp.com

Lynn Pinker Cox & Hurst, LLP
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
lynnllp.com

August 6, 2019

**Via Email: dnovakov@fbtlaw.com**
Daniel P. Novakov
Frost Brown Todd LLC
100 Crescent Court, Suite 350
Dallas, Texas 75201
Tel: (214) 580-5840
Fax: (214) 545-3473

Re:    US Bank's mismanagement of the Acis Indentures, in violation of the rights of Secured
       Note Holders NexPoint Strategic Opportunities Fund, Highland Global Allocation
       Fund, and Highland Income Fund.

Dear Mr. Novakov:

My Firm represents NexPoint Strategic Opportunities Fund, Highland Global Allocation
Fund, and Highland Income Fund (collectively, the "Highland Retail Funds"), in connection with
the enforcement and protection of their rights as Holders of Secured Notes under certain Acis
CLOs dated as of February 25, 2014, June 5, 2014, November 18, 2014, and April 16, 2015
(collectively, the "Acis Indentures").[1]

This letter provides formal notice that your client, U.S. Bank National Association ("US
Bank" or "Indenture Trustee"), has: (1) materially violated the terms of the Acis Indentures, and
(2) failed to perform all basic, non-discretionary, ministerial tasks under the Acis Indentures with
due care. US Bank's wrongful conduct is actionable under New York law, and has caused the
Highland Retail Funds to sustain significant damages, discussed below.

---

[1] The Acis Indentures are abbreviated herein as follows: "Indenture 3" means that certain Indenture dated
as of February 25, 2014 issued by ACIS CLO-2014-3 Ltd. as Issuer, ACIS CLO 2014-3 LLC as Co-Issuer, and
US Bank as Indenture Trustee; "Indenture 4" means that certain Indenture dated as of June 5, 2014 issued
by ACIS CLO-2014-4 Ltd. as Issuer, ACIS CLO 2014-4 LLC as Co-Issuer, and US Bank as Indenture Trustee;
"Indenture 5" means that certain Indenture dated as of November 18, 2014 issued by ACIS CLO-2014-5
Ltd. as Issuer, ACIS CLO 2014-5 LLC as Co-Issuer, and US Bank as Indenture Trustee, and; "Indenture 6"
means that certain Indenture dated as of April 16, 2015 issued by ACIS CLO-2015-6 Ltd. as Issuer, ACIS
CLO 2015-6 LLC as Co-Issuer, and US Bank as Indenture Trustee. Together, such CLOs are referred to "Acis
CLOs" and each, an "Acis CLO" or "CLO" herein.

**Appellee Appx. 01338**
Appx. 01589
**014151**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 68-15    Filed 03/06/25    Page 473 of 1017    PageID 15117
Exhibit 5    Page 1346 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1345 of 1803   PageID 12091
Case 19-12239-CSS    Doc 116-5   Filed 11/12/19   Page 5 of 9

US Bank
August 6, 2019
Page 2

I.   **US Bank's allowance of continued failure of the collateral quality test, as well as rampant portfolio mismanagement, violates the Acis Indentures.**

Every purchase or sale made under the Acis Indentures must satisfy the collateral quality test imposed by each Acis Indenture.[2] As such, US Bank is required to ensure that every purchase or sale made under the Acis Indentures maintains or improves any failing collateral quality test. US Bank failed to satisfy this requirement by, among others, allowing transactions to be effectuated that do not maintain or improve the failing Weighted Average Life Test ("WAL") for trades made under the Acis Indentures.

*First*, US Bank violated its obligation to seek best execution on trades reasonably available to the Acis CLOs. By allowing multiple same day trades, US Bank has disregarded the obligation in the Acis Indentures requiring maintenance or improvement of the collateral quality test in each respective Acis CLO for each individual trade made. US Bank has allowed a circumvention of these collateral quality requirements by allowing the consolidation of the weighted average maturity date of such same-day trades, in so doing, creating the false appearance of a maintained or improved WAL test. But, absent consolidation, the same-day purchases allowed by US Bank cannot maintain or improve the WAL test on an individual basis. US Bank cannot perform its duties by allowing such Acis CLOs to act as a market taker, nor by engaging in a practice of buying long collateral that is improper under the Acis Indentures. Indeed, the value destruction of this forced "bunched trading" is clear when prices at trade date vs. prices on the day before trade date are compared. For example:

| CLO | Trade | Issuer | Commitment | Date | Trade Px | Day Before | Close Mid Price | 2 Day Before | Close Mid Price | Change | P&L |
|-----|-------|--------|-----------|------|----------|-----------|-----------------|--------------|-----------------|--------|-----|
| CLO 4 | Purchase | Diebold Inc - Diebold DD T/L A | 2,430,000.00 | 3/15/2019 | 98.00 | 3/14/2019 | 94.50 | 3/13/2019 | 94.5 | -3.50 | (85,050.00) |
| CLO 6 | Purchase | Diebold Inc - Diebold DD T/L A | 1,578,541.42 | 3/26/2019 | 99.00 | 3/25/2019 | 95.50 | 3/22/2019 | 95.5 | -3.50 | (55,248.95) |
| CLO 4 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 5 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 4 | Purchase | Air Medical Group Holdings Inc - Air Medical T/L B | 2,200,000.00 | 1/8/2019 | 96.50 | 1/7/2019 | 94.45 | 1/4/2019 | 93.839 | -2.05 | (45,177.00) |
| CLO 3 | Purchase | MA FinanceCo LLC - MA FinanceCo T/L B2 | 2,000,000.00 | 1/7/2019 | 98.50 | 1/4/2019 | 96.63 | 1/3/2019 | 96 | -1.88 | (37,500.00) |
| CLO 6 | Purchase | Team Health Holdings Inc - Team Health Holdings T/L | 1,279,236.64 | 3/26/2019 | 88.50 | 3/25/2019 | 86.13 | 3/22/2019 | 86.9375 | -2.38 | (30,381.87) |

---

[2] *See e.g.*, Indenture 3 at p. 16 (*see* definition of "Collateral Quality Test"), p. 37 (*see* definition of "Market Value"), and §§ 1.2, 7.17, and 12; Indenture 4 at p. 15 (*see* definition of "Collateral Quality Test"), p. 37 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 5 at p. 14 (*see* definition of "Collateral Quality Test"), p. 36 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 5 at p. 14 (*see* definition of "Collateral Quality Test"), p. 36 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 6 at p. 14 (*see* definition of "Collateral Quality Test"), p. 35 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-6    Page 1347 of 1804    Page 474 of 1017    PageID 15118
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1346 of 1803    PageID 12092
Case 19-12239-CSS    Doc 116-5    Filed 11/12/19    Page 6 of 9

US Bank
August 6, 2019
Page 3

What's more, this artificial trading philosophy, disguised as "responsible management", has resulted in myriad poorly conceived and timed buys, which positions have plummeted, destroying value for the investors. For example:

| Issuer | Buy/Sell | Row Labels | Sum of 8/2/19 P&L | Cost | 8/2/19 Mark |
|---|---|---|---|---|---|
| Lumileds Holding | Buy | LX171142 | (3,603,604.17) | 99.00 | 61.60 |
| Libbey Glass | Buy | LX136370 | (2,773,860.00) | 99.29 | 77.40 |
| KCA Deutag UK Finance PL | Buy | LX172320 | (1,172,068.16) | 84.89 | 69.58 |
| Doncasters | Buy | LX128948 | (1,532,695.82) | 95.51 | 75.00 |
| Envision Healthcare | Buy | LX175867 | (1,172,343.58) | 94.14 | 85.30 |

Tellingly, the transaction history authorized by US Bank makes clear that it appreciates the import of trading on specific days. In connection with Indenture 5, US Bank allowed the sale of varying amounts of the same term loan, Doncasters, over three different days: June 28, 2019, July 3, 2019, and July 8, 2019. US Bank allowed this because these selected dates positively impacted the collateral quality of the term loan sold. However, US Bank cannot ensure that the Acis CLOs enjoy best execution on purchases under the Acis Indentures if it turns a blind eye to the date on which purchases are made.

An analysis of the individual trades made under US Bank's approval further underscores the Trustee's failure to adhere to the respective indenture's collateral quality requirements. On July 12, 2019, in connection with Indenture 5, US Bank authorized the purchase of a term loan in Capital Automotive 1st Lien with a maturity date of March 25, 2024. But, to maintain or improve the WAL test for Indenture 5, US Bank should have required the CLOs to purchase assets with a maturity date of April 4, 2023 or earlier. US Bank facilitated similar misconduct across the Acis Indentures.

*Second*, the Weighted Average Rating Factor ("WARF") of each of the Acis CLO's portfolios has steadily increased this year, further demonstrating US Bank's facilitating the mismanagement of the Acis Indentures' collateral. On January 31, 2019, in a consolidated adversary proceeding involving the Acis CLOs, the United States Bankruptcy Court for the Northern District of Texas entered a Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC ("Plan D"). Plan D approved Brigade Capital Management, LP ("Brigade") to perform certain services related to the Acis Indentures, previously provided by Highland Capital Management.[3] Since the entry of Plan D, and Brigade's "management" of the Acis Indentures, US Bank allowed the collective WARF of the Acis CLO's portfolios to change from one of the cleanest pools in the market, to one of the dirtiest pools in

---

[3] *See* Case No. 18-30264-SGJ-11 and Case No. 18-30265-SGJ-1, Jointly Administered Under Case No. 18-30264-SGJ-11), referred to herein as the Adversary Proceeding.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Exhibits 5    Page 1340/251804    Page 475 of 1017    PageID 15119
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1347 of 1803    PageID 12093
Case 19-12239-CSS    Doc 116-5    Filed 11/12/19    Page 7 of 9

US Bank
August 6, 2019
Page 4

the market in a matter of months. As of August 2019, since Brigade's involvement with the Acis Indentures, the WARF of each Acis CLO has dramatically increased, as follows:

CLO 3: 2522 ⟶ 2678
CLO 4: 2680 ⟶ 2941
CLO 5: 2673 ⟶ 3004
CLO 6: 2627 ⟶ 2917

*Third*, US Bank failed to protect the cash flow levels of its equity holders. Since the entry of Brigade, equity holders under Indentures 3-5 have received a total of <u>zero</u> cash flows. This damage has metastasized into the secured tranches of the CLOs and created direct harm to the Highland Retail Funds. The value decline of the equity positions is obvious:

| ACIS Equity Positions | CUSIP | 1/31/2019 | 2/28/2019 | 3/31/2019 | 4/30/2019 | 5/31/2019 | 6/30/2019 |
|---|---|---|---|---|---|---|---|
| ACIS 2014-3A 0.0000% - 2/2026 - SUB - 00100GAE3 @0.0000 02/01/2026 | 00100GAE3 | 14.5000 | 16.5000 | 17.3333 | 15.8333 | 13.0000 | 11.8333 |
| ACIS 2014-4A 0.0000% - 5/2026 - SUB - 00100HAE1 @0.0000 05/01/2026 | 00100HAE1 | 24.8333 | 22.1667 | 22.0000 | 22.1667 | 21.0000 | 19.8333 |
| ACIS 2014-5A 0.0000% - 11/2026 - SUB - 00101WAC1 @0.0000 11/01/2026 | 00101WAC1 | 34.2500 | 33.2500 | 32.7500 | 31.7500 | 31.0000 | 30.0000 |
| ACIS 2015-6A Zero Coupon - 05/2027 - SUB - 004524AD6 @ Zero Coupon 0.0000 5/1/2027 | 004524AD6 | 36.5000 | 36.5000 | 35.6667 | 35.0000 | 33.6667 | 32.0000 |

*Fourth*, US Bank has allowed the Acis CLOs to incur exorbitant expenses under its watch, at levels which exceed market standards.

In sum, US Bank's facilitation and approval of extensive portfolio mismanagement, and failure to require trades in accordance with industry standards and contrary to the best interests of its investors, violates the express terms of the Acis Indentures. US Bank's wrongful conduct has diluted the value of the Highland Retail Funds' Secured Notes and deteriorated the credit profile of the Acis CLOs. The Highland Retail Funds cannot allow US Bank to shirk its contractual obligations under the Acis Indentures. As Holders of Secured Notes, the Highland Retail Funds negotiated for superior rights under the Acis Indentures with the expectation that at a minimum, their collateral would remain protected in accordance with industry standards. *Indeed, US Bank must explain how this blatant gaming and chicanery in the name of artificially maximizing management fees is not a default under the Acis Indentures or a clear, actionable conflict of interest.*

**II.  US Bank Failed to reserve rights, or otherwise protect the Highland Retail Funds' rights affected by Plan D.**

The Acis Indentures do not permit US Bank to "authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, **any plan** of reorganization, arrangement, adjustment or composition **affecting the Secured Notes or any Holder thereof**, or to authorize the Trustee to vote in respect of the claim of any Secured Noteholders, as applicable, in any such

**Appellee Appx. 01341**
Appx. 01592
014154

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16    Page 1349/151804    Page 476 of 1017    PageID 15120
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1348 of 1803    PageID 12094
Case 19-12239-CSS    Doc 116-5    Filed 11/12/19    Page 8 of 9

US Bank
August 6, 2019
Page 5

Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar person." (emphasis added).[4] Despite these express terms, US Bank tacitly accepted or adopted the entry of Plan D, which contains provisions that directly affect the Secured Notes that the Highland Retail Funds hold. Among others, Plan D imposes an injunction that adversely affects the Highland Retail Funds' rights by prohibiting beneficial trading activity that would serve to protect Noteholder interests. In addition to other restrictions, Plan D impedes the ability of Noteholders under the Acis Indentures to make optional redemptions, which restriction has decimated the value of such investments across the capital stack of each Acis CLO.[5]

US Bank did not reserve any Noteholders' rights, or otherwise object to the entry of Plan D. US Bank's election to take no action regarding the entry of Plan D amplified the exposure, and overall risk that the Highland Retail Funds face during the pendency of the Plan D injunction. In fact, the Bankruptcy Court set a deadline for all parties, including US Bank, to submit any objections to the final approval of the Disclosure Statement and/or confirmation of Plan D.[6] As recognized by the Bankruptcy Court, US Bank failed to file objections to Plan D.[7] In fact, the Bankruptcy Court explicitly identified US Bank's failure to oppose the Plan in its opinion, making clear that notably, "[t]he indenture trustee has retained and appeared through its own separate counsel during the Chapter 11 Bankruptcy Cases and is not currently objecting to the Plan."[8] What's more, US Bank previously filed prior reservations of rights and/or objections in the Adversary Proceeding.[9] In relation to Plan B and Plan C (previously implemented as part of the Chapter 11 Trustee's First Amended Joint Plan), which each proposed re-writing the Acis Indentures to protect Acis' management fee stream for several years, US Bank acknowledged that the Plans "adversely affect[ed] the rights of Noteholders."[10] The same holds true for Plan D. US Bank is not excused from failing to protect the Highland Retail Funds' rights affected by Plan D, and the Adversary Proceeding.

---

[4] *See e.g.,* Indenture 3 at § 5.3; Indenture 4 at § 5.3; Indenture 5 at § 5.3; Indenture 6 at § 5.3.

[5] *See e.g.,* the Adversary Proceeding at Dkt. No. 830 p. 75, Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified Findings of Fact and Conclusions of Law.

[6] *See e.g.,* the Adversary Proceeding at Dkt. No. 829 ¶ W ("The following objections to final approval of the Disclosure Statement and/or confirmation of the Plan (the "Objections") were timely filed in accordance with the Solicitation Order [identifying three Objections filed, none of which filed by US Bank].) (emphasis original).

[7] *See id.*

[8] *See e.g.,* the Adversary Proceeding at Dkt. No. 827 p. 5.

[9] *See e.g.,* the Adversary Proceeding at Dkt. Nos. 499-505.

[10] *See e.g.,* the Adversary Proceeding at Dkt. No. 505 ¶ 3.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Exhibits    Page 1350/351804    Page 477 of 1017    PageID 15121
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1349 of 1803    PageID 12095
Case 19-12239-CSS    Doc 116-5    Filed 11/12/19    Page 9 of 9

US Bank
August 6, 2019
Page 6

    **III.    The Highland Retail Funds are not limited to filing contract claims against US Bank.**

    In addition to contract claims based on US Bank's violations of the Acis Indentures, US Bank's failure to perform all basic, non-discretionary, ministerial tasks under the Acis Indentures with due care subjects it to additional tort liability. *See e.g.*, *Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 597 (S.D.N.Y. 2015) ("Prior to an Event of Default, an indenture trustee's duty is governed solely by the terms of the indenture, with two exceptions: **a trustee must still** '(1) avoid conflicts of interest, and (2) **perform all basic, non-discretionary, ministerial tasks with due care**.'") (emphasis added). And, consistent with the Trust Indenture Act, US Bank is not relieved "from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct…"[11] Succinctly, US Bank appears unwilling or unable to fulfill its duties to the Noteholders. The four corners of each Indenture create a framework of Noteholder protections, and such investors deserve an Indenture Trustee that will enforce the spirit and the letter of the Indentures. If US Bank cannot do its duty, it should resign as Indenture Trustee.

    The Highland Retail Funds are prepared to take all action necessary to preserve their rights, and remedy their losses sustained to date due to US Bank's misconduct. The Highland Retail Funds demand that US Bank provide written assurances by **August 15, 2019** detailing: (1) the specific measures that US Bank will take, effective immediately, to remediate the wrongful conduct described herein, and (2) US Bank's offer to resolve this matter and make the Highland Retail Funds whole.

    You are advised to review this letter carefully. Nothing in this letter shall constitute a waiver of any of the Highland Retail Funds' rights and/or remedies at law and at equity, all of which they expressly reserve should this matter proceed to litigation.

    Your immediate attention to this matter is appreciated.

    Sincerely,

    Michael K. Hurst

MKH/sb

cc:    David Coale (*of the Firm*)
        Chisara Ezie-Boncoeur (*of the Firm*)

---

[11] *Compare* Indenture 3 at § 6.1(c), Indenture 4 at § 6.1(c), Indenture 5 at § 6.1(c), and Indenture 6 at § 6.1(c) with 15 U.S.C. § 77ooo (d).

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 8-15    Page 1350 of 1804    Page 478 of 1017    PageID 15122
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1350 of 1803    PageID 12096

Case 19-12239-CSS    Doc 116-6    Filed 11/12/19    Page 1 of 9

**Exhibit F**

Letter to S&P Global re U.S. Bank

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 1352 of 1804    Page 479 of 1017    PageID 15123
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1351 of 1803   PageID 12097

Case 19-12239-CSS    Doc 116-6    Filed 11/12/19   Page 2 of 9

# LYNN PINKER COX HURST

MICHAEL K. HURST
*Partner*
*Board Certified – Civil Trial Law*
*Texas Board of Legal Specialization*

D 214 981 3838
F 214 981 3839

mhurst@lynnllp.com

Lynn Pinker Cox & Hurst, LLP
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
lynnllp.com

August 6, 2019

**Via Email: lauren.fastiggi@spglobal.com**

Lauren Fastiggi

Director and Lead Analyst

S&P Global

**Re:    Mismanagement of the Acis CLOs, in violation of the rights of Secured Note Holders NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund.**

Dear Ms. Fastiggi:

My Firm represents NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund (collectively, the "Highland Retail Funds"), in connection with the enforcement and protection of their rights as Holders of Secured Notes under certain Acis Indentures dated as of February 25, 2014, June 5, 2014, November 18, 2014, and April 16, 2015 (collectively, the "Acis Indentures").[1]

For your reference, enclosed to this correspondence is a copy of the demand letter served by the Highland Retail Funds on August 6, 2019 to U.S. Bank National Association, the Trustee of the Acis Indentures. The demand letter puts U.S. Bank on notice of its material violations of the terms of the Acis Indentures, by among others, mismanaging and allowing the impermissible gaming of the Acis Indentures by the portfolio manager thereof, and failing to perform required tasks with due care. The Highland Retail Funds are prepared to take all actions necessary to protect their rights from further deterioration.

Representatives of the Highland Retail Funds are available to meet with S&P Global to discuss whether U.S. Bank's wrongful conduct has caused a default, such that the ratings on some or all rated tranches should be reconsidered or withdrawn.

---

[1] The Acis Indentures collectively include: that certain Indenture dated as of February 25, 2014 issued by ACIS CLO-2014-3 Ltd. as Issuer, ACIS CLO 2014-3 LLC as Co-Issuer, and US Bank as Indenture Trustee; that certain Indenture dated as of June 5, 2014 issued by ACIS CLO-2014-4 Ltd. as Issuer, ACIS CLO 2014-4 LLC as Co-Issuer, and US Bank as Indenture Trustee; that certain Indenture dated as of November 18, 2014 issued by ACIS CLO-2014-5 Ltd. as Issuer, ACIS CLO 2014-5 LLC as Co-Issuer, and US Bank as Indenture Trustee, and; that certain Indenture dated as of April 16, 2015 issued by ACIS CLO-2015-6 Ltd. as Issuer, ACIS CLO 2015-6 LLC as Co-Issuer, and US Bank as Indenture Trustee.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-6   Page 1353 of 1804   Page 480 of 1017   PageID 15124
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1352 of 1803   PageID 12098

Ms. Fastiggi
S&P Global
August 6, 2019
Page 2


We look forward to engaging with you on this serious matter.


Yours very truly,


Michael K. Hurst

MKH/ceb

Enclosure

cc:     David Coale (*of the Firm*)
        Chisara Ezie-Boncoeur (*of the Firm*)

Appellee Appx. 01346
Appx. 01587
014159

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 1354 of 1804   Page 481 of 1017   PageID 15125
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1353 of 1803   PageID 12099

Case 19-12239-CSS   Doc 116-6   Filed 11/12/19   Page 4 of 9

# LYNN PINKER COX HURST

MICHAEL K. HURST
*Partner*
*Board Certified – Civil Trial Law*
*Texas Board of Legal Specialization*

D 214 981 3838
F 214 981 3839

mhurst@lynnllp.com

Lynn Pinker Cox & Hurst, LLP
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
lynnllp.com

August 6, 2019

**VIA EMAIL: dnovakov@fbtlaw.com**
Daniel P. Novakov
FROST BROWN TODD LLC
100 Crescent Court, Suite 350
Dallas, Texas 75201
Tel: (214) 580-5840
Fax: (214) 545-3473

**Re:     US Bank's mismanagement of the Acis Indentures, in violation of the rights of Secured Note Holders NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund.**

Dear Mr. Novakov:

My Firm represents NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund (collectively, the "Highland Retail Funds"), in connection with the enforcement and protection of their rights as Holders of Secured Notes under certain Acis CLOs dated as of February 25, 2014, June 5, 2014, November 18, 2014, and April 16, 2015 (collectively, the "Acis Indentures").[1]

This letter provides formal notice that your client, U.S. Bank National Association ("US Bank" or "Indenture Trustee"), has: (1) materially violated the terms of the Acis Indentures, and (2) failed to perform all basic, non-discretionary, ministerial tasks under the Acis Indentures with due care. US Bank's wrongful conduct is actionable under New York law, and has caused the Highland Retail Funds to sustain significant damages, discussed below.

---

[1] The Acis Indentures are abbreviated herein as follows: "Indenture 3" means that certain Indenture dated as of February 25, 2014 issued by ACIS CLO-2014-3 Ltd. as Issuer, ACIS CLO 2014-3 LLC as Co-Issuer, and US Bank as Indenture Trustee; "Indenture 4" means that certain Indenture dated as of June 5, 2014 issued by ACIS CLO-2014-4 Ltd. as Issuer, ACIS CLO 2014-4 LLC as Co-Issuer, and US Bank as Indenture Trustee; "Indenture 5" means that certain Indenture dated as of November 18, 2014 issued by ACIS CLO 2014-5 Ltd. as Issuer, ACIS CLO 2014-5 LLC as Co-Issuer, and US Bank as Indenture Trustee, and; "Indenture 6" means that certain Indenture dated as of April 16, 2015 issued by ACIS CLO-2015-6 Ltd. as Issuer, ACIS CLO 2015-6 LLC as Co-Issuer, and US Bank as Indenture Trustee. Together, such CLOs are referred to "Acis CLOs" and each, an "Acis CLO" or "CLO" herein.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Exhibit 6    Page 1355 of 1804    Page 482 of 1017    PageID 15126
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1354 of 1803    PageID 12100
Case 19-12239-CSS    Doc 116-6    Filed 11/12/19    Page 5 of 9

US Bank
August 6, 2019
Page 2

**I.    US Bank's allowance of continued failure of the collateral quality test, as well as rampant portfolio mismanagement, violates the Acis Indentures.**

Every purchase or sale made under the Acis Indentures must satisfy the collateral quality test imposed by each Acis Indenture.[2] As such, US Bank is required to ensure that every purchase or sale made under the Acis Indentures maintains or improves any failing collateral quality test. US Bank failed to satisfy this requirement by, among others, allowing transactions to be effectuated that do not maintain or improve the failing Weighted Average Life Test ("WAL") for trades made under the Acis Indentures.

*First*, US Bank violated its obligation to seek best execution on trades reasonably available to the Acis CLOs. By allowing multiple same day trades, US Bank has disregarded the obligation in the Acis Indentures requiring maintenance or improvement of the collateral quality test in each respective Acis CLO for each individual trade made. US Bank has allowed a circumvention of these collateral quality requirements by allowing the consolidation of the weighted average maturity date of such same-day trades, in so doing, creating the false appearance of a maintained or improved WAL test. But, absent consolidation, the same-day purchases allowed by US Bank cannot maintain or improve the WAL test on an individual basis. US Bank cannot perform its duties by allowing such Acis CLOs to act as a market taker, nor by engaging in a practice of buying long collateral that is improper under the Acis Indentures. Indeed, the value destruction of this forced "bunched trading" is clear when prices at trade date vs. prices on the day before trade date are compared. For example:

| CLO | Trade | Issuer | Commitment | Date | Trade Px | Day Before | Close Mid Price | 2 Day Before | Close Mid Price | Change | P&L |
|-----|-------|--------|-----------|------|----------|------------|-----------------|--------------|-----------------|--------|-----|
| CLO 4 | Purchase | Diebold Inc - Diebold DD T/L A | 2,430,000.00 | 3/15/2019 | 98.00 | 3/14/2019 | 94.50 | 3/13/2019 | 94.5 | -3.50 | (85,050.00) |
| CLO 6 | Purchase | Diebold Inc - Diebold DD T/L A | 1,578,541.42 | 3/26/2019 | 99.00 | 3/25/2019 | 95.50 | 3/22/2019 | 95.5 | -3.50 | (55,248.95) |
| CLO 4 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 5 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 4 | Purchase | Air Medical Group Holdings Inc - Air Medical T/L B | 2,200,000.00 | 1/8/2019 | 96.50 | 1/7/2019 | 94.45 | 1/4/2019 | 93.839 | -2.05 | (45,177.00) |
| CLO 3 | Purchase | MA FinanceCo LLC - MA FinanceCo T/L B2 | 2,000,000.00 | 1/7/2019 | 98.50 | 1/4/2019 | 96.63 | 1/3/2019 | 96 | -1.88 | (37,500.00) |
| CLO 6 | Purchase | Team Health Holdings Inc - Team Health Holdings T/L | 1,279,236.64 | 3/26/2019 | 88.50 | 3/25/2019 | 86.13 | 3/22/2019 | 86.9375 | -2.38 | (30,381.87) |

---

[2] *See e.g.*, Indenture 3 at p. 16 (*see* definition of "Collateral Quality Test"), p. 37 (*see* definition of "Market Value"), and §§ 1.2, 7.17, and 12; Indenture 4 at p. 15 (*see* definition of "Collateral Quality Test"), p. 37 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 5 at p. 14 (*see* definition of "Collateral Quality Test"), p. 36 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 5 at p. 14 (*see* definition of "Collateral Quality Test"), p. 36 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 6 at p. 14 (*see* definition of "Collateral Quality Test"), p. 35 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1356/251804  Page 483 of 1017    PageID 15127
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1355 of 1803    PageID 12101
Case 19-12239-CSS    Doc 116-6    Filed 11/12/19    Page 6 of 9

US Bank
August 6, 2019
Page 3

What's more, this artificial trading philosophy, disguised as "responsible management", has resulted in myriad poorly conceived and timed buys, which positions have plummeted, destroying value for the investors. For example:

| Issuer | Buy/Sell | Row Labels | Sum of 8/2/19 P&L | Cost | 8/2/19 Mark |
|---|---|---|---|---|---|
| Lumileds Holding | Buy | LX171142 | (3,603,604.17) | 99.00 | 61.60 |
| Libbey Glass | Buy | LX136370 | (2,773,860.00) | 99.29 | 77.40 |
| KCA Deutag UK Finance PL | Buy | LX172320 | (1,172,068.16) | 84.89 | 69.58 |
| Doncasters | Buy | LX128948 | (1,532,695.82) | 95.51 | 75.00 |
| Envision Healthcare | Buy | LX175867 | (1,172,343.58) | 94.14 | 85.30 |

Tellingly, the transaction history authorized by US Bank makes clear that it appreciates the import of trading on specific days. In connection with Indenture 5, US Bank allowed the sale of varying amounts of the same term loan, Doncasters, over three different days: June 28, 2019, July 3, 2019, and July 8, 2019. US Bank allowed this because these selected dates positively impacted the collateral quality of the term loan sold. However, US Bank cannot ensure that the Acis CLOs enjoy best execution on purchases under the Acis Indentures if it turns a blind eye to the date on which purchases are made.

An analysis of the individual trades made under US Bank's approval further underscores the Trustee's failure to adhere to the respective indenture's collateral quality requirements. On July 12, 2019, in connection with Indenture 5, US Bank authorized the purchase of a term loan in Capital Automotive 1st Lien with a maturity date of March 25, 2024. But, to maintain or improve the WAL test for Indenture 5, US Bank should have required the CLOs to purchase assets with a maturity date of April 4, 2023 or earlier. US Bank facilitated similar misconduct across the Acis Indentures.

**Second**, the Weighted Average Rating Factor ("WARF") of each of the Acis CLO's portfolios has steadily increased this year, further demonstrating US Bank's facilitating the mismanagement of the Acis Indentures' collateral. On January 31, 2019, in a consolidated adversary proceeding involving the Acis CLOs, the United States Bankruptcy Court for the Northern District of Texas entered a Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC ("Plan D"). Plan D approved Brigade Capital Management, LP ("Brigade") to perform certain services related to the Acis Indentures, previously provided by Highland Capital Management.[3] Since the entry of Plan D, and Brigade's "management" of the Acis Indentures, US Bank allowed the collective WARF of the Acis CLO's portfolios to change from one of the cleanest pools in the market, to one of the dirtiest pools in

---

[3] *See* Case No. 18-30264-SGJ-11 and Case No. 18-30265-SGJ-1, Jointly Administered Under Case No. 18-30264-SGJ-11), referred to herein as the Adversary Proceeding.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Page 1357 of 1804   Page 484 of 1017   PageID 15128
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1356 of 1803   PageID 12102
Case 19-12239-CSS   Doc 116-6   Filed 11/12/19   Page 7 of 9

US Bank
August 6, 2019
Page 4

the market in a matter of months. As of August 2019, since Brigade's involvement with the Acis Indentures, the WARF of each Acis CLO has dramatically increased, as follows:

CLO 3: 2522 ⟶ 2678
CLO 4: 2680 ⟶ 2941
CLO 5: 2673 ⟶ 3004
CLO 6: 2627 ⟶ 2917

*Third*, US Bank failed to protect the cash flow levels of its equity holders. Since the entry of Brigade, equity holders under Indentures 3-5 have received a total of <u>zero</u> cash flows. This damage has metastasized into the secured tranches of the CLOs and created direct harm to the Highland Retail Funds. The value decline of the equity positions is obvious:

| ACIS Equity Positions | CUSIP | 1/31/2019 | 2/28/2019 | 3/31/2019 | 4/30/2019 | 5/31/2019 | 6/30/2019 |
|---|---|---|---|---|---|---|---|
| ACIS 2014-3A 0.0000% - 2/2026 - SUB - 00100GAE3 @0.0000 02/01/2026 | 00100GAE3 | 14.5000 | 16.5000 | 17.3333 | 15.8333 | 13.0000 | 11.8333 |
| ACIS 2014-4A 0.0000% - 5/2026 - SUB - 00100HAE1 @0.0000 05/01/2026 | 00100HAE1 | 24.8333 | 22.1667 | 22.0000 | 22.1667 | 21.0000 | 19.8333 |
| ACIS 2014-5A 0.0000% - 11/2026 - SUB - 00101WAC1 @0.0000 11/01/2026 | 00101WAC1 | 34.2500 | 33.2500 | 32.7500 | 31.7500 | 31.0000 | 30.0000 |
| ACIS 2015-6A Zero Coupon - 05/2027 - SUB - 004524AD6 @ Zero Coupon 0.0000 5/1/2027 | 004524AD6 | 36.5000 | 36.5000 | 35.6667 | 35.0000 | 33.6667 | 32.0000 |

*Fourth*, US Bank has allowed the Acis CLOs to incur exorbitant expenses under its watch, at levels which exceed market standards.

In sum, US Bank's facilitation and approval of extensive portfolio mismanagement, and failure to require trades in accordance with industry standards and contrary to the best interests of its investors, violates the express terms of the Acis Indentures. US Bank's wrongful conduct has diluted the value of the Highland Retail Funds' Secured Notes and deteriorated the credit profile of the Acis CLOs. The Highland Retail Funds cannot allow US Bank to shirk its contractual obligations under the Acis Indentures. As Holders of Secured Notes, the Highland Retail Funds negotiated for superior rights under the Acis Indentures with the expectation that at a minimum, their collateral would remain protected in accordance with industry standards. *Indeed, US Bank must explain how this blatant gaming and chicanery in the name of artificially maximizing management fees is not a default under the Acis Indentures or a clear, actionable conflict of interest.*

## II.   US Bank Failed to reserve rights, or otherwise protect the Highland Retail Funds' rights affected by Plan D.

The Acis Indentures do not permit US Bank to "authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, **any plan** of reorganization, arrangement, adjustment or composition **affecting the Secured Notes or any Holder thereof**, or to authorize the Trustee to vote in respect of the claim of any Secured Noteholders, as applicable, in any such

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 53-6 Page 1358/251804 Page 485 of 1017 PageID 15129
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1357 of 1803 PageID 12103
Case 19-12239-CSS Doc 116-6 Filed 11/12/19 Page 8 of 9

US Bank
August 6, 2019
Page 5

Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar person." (emphasis added).[4] Despite these express terms, US Bank tacitly accepted or adopted the entry of Plan D, which contains provisions that directly affect the Secured Notes that the Highland Retail Funds hold. Among others, Plan D imposes an injunction that adversely affects the Highland Retail Funds' rights by prohibiting beneficial trading activity that would serve to protect Noteholder interests. In addition to other restrictions, Plan D impedes the ability of Noteholders under the Acis Indentures to make optional redemptions, which restriction has decimated the value of such investments across the capital stack of each Acis CLO.[5]

US Bank did not reserve any Noteholders' rights, or otherwise object to the entry of Plan D. US Bank's election to take no action regarding the entry of Plan D amplified the exposure, and overall risk that the Highland Retail Funds face during the pendency of the Plan D injunction. In fact, the Bankruptcy Court set a deadline for all parties, including US Bank, to submit any objections to the final approval of the Disclosure Statement and/or confirmation of Plan D.[6] As recognized by the Bankruptcy Court, US Bank failed to file objections to Plan D.[7] In fact, the Bankruptcy Court explicitly identified US Bank's failure to oppose the Plan in its opinion, making clear that notably, "[t]he indenture trustee has retained and appeared through its own separate counsel during the Chapter 11 Bankruptcy Cases and is not currently objecting to the Plan."[8] What's more, US Bank previously filed prior reservations of rights and/or objections in the Adversary Proceeding.[9] In relation to Plan B and Plan C (previously implemented as part of the Chapter 11 Trustee's First Amended Joint Plan), which each proposed re-writing the Acis Indentures to protect Acis' management fee stream for several years, US Bank acknowledged that the Plans "adversely affect[ed] the rights of Noteholders."[10] The same holds true for Plan D. US Bank is not excused from failing to protect the Highland Retail Funds' rights affected by Plan D, and the Adversary Proceeding.

---

[4] See e.g., Indenture 3 at § 5.3; Indenture 4 at § 5.3; Indenture 5 at § 5.3; Indenture 6 at § 5.3.

[5] See e.g., the Adversary Proceeding at Dkt. No. 830 p. 75, Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified Findings of Fact and Conclusions of Law.

[6] See e.g., the Adversary Proceeding at Dkt. No. 829 ¶ W ("The following objections to final approval of the Disclosure Statement and/or confirmation of the Plan (the "Objections") were timely filed in accordance with the Solicitation Order [identifying three Objections filed, none of which filed by US Bank].) (emphasis original).

[7] See id.

[8] See e.g., the Adversary Proceeding at Dkt. No. 827 p. 5.

[9] See e.g., the Adversary Proceeding at Dkt. Nos. 499-505.

[10] See e.g., the Adversary Proceeding at Dkt. No. 505 ¶ 3.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Exhibit 6    Page 1357 of 1804    Page 486 of 1017    PageID 15130
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1358 of 1803    PageID 12104
Case 19-12239-CSS    Doc 116-6    Filed 11/12/19    Page 9 of 9

US Bank
August 6, 2019
Page 6

    **III.**    **The Highland Retail Funds are not limited to filing contract claims against US Bank.**

    In addition to contract claims based on US Bank's violations of the Acis Indentures, US Bank's failure to perform all basic, non-discretionary, ministerial tasks under the Acis Indentures with due care subjects it to additional tort liability. *See e.g.*, *Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 597 (S.D.N.Y. 2015) ("Prior to an Event of Default, an indenture trustee's duty is governed solely by the terms of the indenture, with two exceptions: **a trustee must still** '(1) avoid conflicts of interest, and (2) **perform all basic, non-discretionary, ministerial tasks with due care**.'") (emphasis added). And, consistent with the Trust Indenture Act, US Bank is not relieved "from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct…"[11] Succinctly, US Bank appears unwilling or unable to fulfill its duties to the Noteholders. The four corners of each Indenture create a framework of Noteholder protections, and such investors deserve an Indenture Trustee that will enforce the spirit and the letter of the Indentures. If US Bank cannot do its duty, it  should resign as Indenture Trustee.

    The Highland Retail Funds are prepared to take all action necessary to preserve their rights, and remedy their losses sustained to date due to US Bank's misconduct. The Highland Retail Funds demand that US Bank provide written assurances by **<u>August 15, 2019</u>** detailing: (1) the specific measures that US Bank will take, effective immediately, to remediate  the wrongful conduct described herein, and (2) US Bank's offer to resolve this matter and make the Highland Retail Funds whole.

    You are advised to review this letter carefully.  Nothing in this letter shall constitute a waiver of any of the Highland Retail Funds' rights and/or remedies at law and at equity, all of which they expressly reserve should this matter proceed to litigation.

    Your immediate attention to this matter is appreciated.

        Sincerely,

        Michael K. Hurst

MKH/sb

cc:    David Coale (*of the Firm*)
       Chisara Ezie-Boncoeur (*of the Firm*)

---

[11] *Compare* Indenture 3 at § 6.1(c), Indenture 4 at § 6.1(c), Indenture 5 at § 6.1(c), and Indenture 6 at § 6.1(c) with 15 U.S.C. § 77ooo (d).

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit G   Page 1360 of 1804   Page 487 of 1017    PageID 15131
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1359 of 1803   PageID 12105
Case 19-12239-CSS    Doc 116-7   Filed 11/12/19   Page 1 of 18

**Exhibit G**

Complaint, *The Charitable Donor Advised Fund, L.P. v. U.S. Bank National Association, et al.*

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-15   Filed 06/25/1804   Page 488 of 1017   PageID 15132
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1360 of 1803   PageID 12106
Case 1:19-cv-09857-CSS-RBD Document 16-7   Filed 11/12/19   Page 2 of 18

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **THE CHARITABLE DONOR ADVISED FUND, L.P.,** | |
| *Plaintiff,* | **CASE NO.: 1:19-CV-09857-NRB** |
| **v.** | |
| **U.S. BANK NATIONAL ASSOCIATION and MOODY'S INVESTORS SERVICE, INC.,** | **PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND** |
| *Defendants.* | |

TO THE HONORABLE COURT:

Plaintiff The Charitable Donor Advised Fund, L.P. ("The Charitable DAF"), by and through its attorneys of record, files this First Amended Complaint against Defendants U.S. Bank National Association ("U.S. Bank") and Moody's Investors Service, Inc. ("Moody's"), and in support thereof, respectfully states and alleges as follows:

### NATURE OF LAWSUIT

The Charitable DAF files this lawsuit to enforce and protect its rights. U.S. Bank, which serves as Trustee of certain indentures, has severely compromised The Charitable DAF's rights thereunder through its misconduct and failure to act. The Charitable DAF, a Holder of Secured Notes under those ACIS indentures, possesses beneficial interests in the collateral that U.S. Bank has mismanaged and failed to protect. U.S. Bank's wrongful and negligent conduct has diluted the value of The Charitable DAF's Secured Notes, deteriorated the credit profile of the collateralized loan obligations ("CLOs"), and caused The Charitable DAF to incur other direct damages. To protect its rights, The Charitable DAF seeks two things through this lawsuit.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Page 1362/251804   Page 489 of 1017    PageID 15133
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1361 of 1803    PageID 12107
Case 19-12395-CSS-RBD Document 16-7 Filed 11/12/19 Page 3 of 18

*First*, it seeks to recover the losses it sustained in connection with U.S. Bank's negligence and breach of its extra-contractual duties to The Charitable DAF, including the duties to perform all basic, non-discretionary, ministerial tasks with due care, and to avoid conflicts of interest.

*Second*, The Charitable DAF seeks judicial intervention to protect its interests before U.S. Bank commits or facilitates any further wrongful conduct. The Charitable DAF cannot allow U.S. Bank to continue to shirk its duties as indenture Trustee.

## PARTIES

1.     Plaintiff The Charitable Donor Advised Fund, L.P. is a limited partnership, with its principal place of business at Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands.

2.     Defendant U.S. Bank National Association is a national banking association that is Trustee of the ACIS Indentures, as defined further herein. Pursuant to the ACIS Indentures, Defendant U.S. Bank may be served at its corporate office located at 190 South LaSalle Street, 8th Floor, Chicago, Illinois 60603.

3.     Defendant Moody's Investors Service, Inc., is a Delaware corporation registered to do business in New York State. Moody's may be served through its registered agent CT Corporation System, located at 28 Liberty Street, New York, New York 10005. Moody's is a nationally recognized statistical rating organization ("NRSRO").

## JURISDICTION AND VENUE

4.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between a citizen of a State and a citizen of a foreign state.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1363/25:1804    Page 490 of 1017    PageID 15134
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1362 of 1803    PageID 12108
Case 1:19-cv-12395-CSS-RBD Document 16-7 Filed 11/12/19 Page 4 of 18

5.    Jurisdiction and venue over Moody's are proper in this District because Moody's is registered to do business in New York, and the transactions and occurrences that are the subject of The Charitable DAF's claims against Moody's took place in New York, New York.

6.    Jurisdiction and venue over US Bank are proper in this District because, pursuant to Section 14.10 of the ACIS Indentures, as defined further herein, each party to such indentures, including U.S. Bank:

> [H]ereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of . . . the United States District Court of the Southern District of New York . . . in any action or proceeding arising out of or relating to the notes or th[ese] indenture[s] . . .

7.    Venue is also proper because U.S. Bank waived any objection to venue in this District under the ACIS Indentures, as defined further herein.  Section 14.10 specifically provides that:

> Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to th[ese] indenture[s] in any court referred to in the previous paragraph.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

8.    New York law governs the claims in this lawsuit.

## STATEMENT OF FACTS

### A.  U.S. Bank is Trustee of certain ACIS collateralized loan obligations.

9.    Between 2014 and 2015, U.S. Bank agreed to serve as the Trustee of three indentures governing CLOs to which The Charitable DAF holds beneficial interests as a Holder of Secured Notes, including: (i) the Indenture dated June 5, 2014 among ACIS CLO 2014-4 LTD., as Issuer, ACIS CLO 2014-4 LLC, as Co-Issuer, and U.S. Bank as Trustee ("Indenture 4"); (ii) the Indenture dated November 18, 2014 among ACIS CLO 2014-5 LTD., as Issuer, ACIS CLO 2014-5

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibits    Page 1364 of 1804 Page 491 of 1017    PageID 15135
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1363 of 1803    PageID 12109
Case 19-12399-CSS RBD Document 16-7 Filed 11/12/19 Page 5 of 18

LLC, as Co-Issuer, and U.S. Bank as Trustee ("Indenture 5"); and (iii) the Indenture dated

April 16, 2015 among ACIS CLO 2015-6 LTD., as Issuer, ACIS CLO 2015-6 LLC as Co-Issuer,

and U.S. Bank as Trustee ("Indenture 6", and together with Indenture 4 and Indenture 5, the "ACIS

Indentures"). The ACIS Indentures impose a number of obligations on U.S. Bank in connection

with its role as Trustee.

      10.    ***First,*** the ACIS Indentures provide that U.S. Bank shall hold in trust, for the

"benefit and security" of the noteholders, all "Collateral Obligations" that secure the Co-Issuers'

financial obligations to the noteholders. In connection therewith, the ACIS Indentures also provide

that, for future purchases and sales of collateral obligations, the Trustee shall only consummate

these transactions where certain investment criteria are satisfied. One such criterion is that, for all

purchases, "either (A) each requirement . . . of the . . . Collateral Quality Test will be satisfied or

(B) if any such requirement or test was not satisfied immediately prior to such reinvestment, such

requirement or test will be maintained or improved after giving effect to the reinvestment." *See,*

*e.g.*, Indenture 4 § 12.2(a)(iv). The ACIS Indentures define "Collateral Quality Test" as:

> A test satisfied if, as of any date of determination . . . in the
> aggregate, the Collateral Obligations owned (or, for purposes of *pro*
> *forma* calculations in relation to a proposed purchase of a Collateral
> Obligation, proposed to be owned) by the Issuer satisfy . . . the
> Maximum Moody's Rating Factor Test . . . [and the] Weighted
> Average Life Test.

*Id.* at 15.

      11.    These tests are defined, in turn, as follows:

> "Maximum Moody's Rating Factor Test": The test that will be
> satisfied on any date of determination if the Weighted Average
> Adjusted Moody's Rating Factor[1] of the Collateral Obligations is

---

[1] "Weighted Average Adjusted Moody's Rating Factor" means "[a]s of any date of determination, a number equal to the Weighted Average Moody's Rating Factor determined in the following manner: for purposes of this definition, the last paragraph of the definition of "Moody's Default Probability Rating," the second to last paragraph of the definition of "Moody's Rating" and the last paragraph of the definition of "Moody's Derived Rating" will be disregarded, and instead each applicable rating on credit watch by Moody's that is on (a) positive watch will be treated

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Page 1365/251804 Page 492 of 1017    PageID 15136
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1364 of 1803    PageID 12110
Case 19-12239-CSS RBD Document 116-7 Filed 11/12/19 Page 6 of 18

less than or equal to the number set forth in the column entitled "Maximum Weighted Average Moody's Rating Factor" in the Moody's Asset Quality Matrix, based upon the applicable "row/column combination" chosen by the Portfolio Manager with notice to the Collateral Administrator . . . plus the Rating Factor Adjustment Amount.

"<u>Weighted Average Life Test</u>": A test that is satisfied if the Aggregate Weighted Average Life[2] on such date of determination is not later than June 5, 2022.

*See, e.g.*, Indenture 4 at 37-38, 66.

12.     These provisions seek to maintain the integrity of the collateral securing the Co-Issuers' obligations by requiring certain parties, including the Trustee, to ensure that any purchase or sale of such collateral complies with detailed, industry-recognized, and bargained-for tests.

13.     ***Second***, the ACIS Indentures provide that, in performing its duties as Trustee, U.S. Bank may not "authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, any plan of reorganization, arrangement, adjustment or composition affecting the Secured Notes or any Holder thereof". Like the provisions concerning collateral quality, these provisions also seek to ensure that the Trustee does not prejudice the rights of any secured noteholder under the ACIS Indentures, like The Charitable DAF.

---

as having been updated by one rating subcategory, (b) negative watch will be treated as having been downgraded by two rating subcategories and (c) negative outlook will be treated as having been downgraded by one rating subcategory. *See, e.g.*, Indenture 4 at 66.

"Weighted Average Moody's Rating Factor" means "[t]he number (rounded up to the nearest whole number) equal to: (i) the sum of the products of (a) the Principal Balance of each Collateral Obligation (excluding Equity Securities) multiplied by (b) the Moody's Rating Factor of such Collateral Obligation, divided by (ii) the Aggregate Principal Balance of all such Collateral Obligations." *Id.*

[2] "Aggregate Weighted Average Life" means "[w]ith respect to all Collateral Obligations as of any date of determination is a date equal to (a) the number of years following such date obtained by (i) *summing* the products obtained by *multiplying* the Weighted Average Life at such time of each Collateral Obligation *by* the Principal Balance at such time of such Collateral Obligation and (ii) *dividing* such sum *by* the Aggregate Principal Balance at such tie of all Collateral Obligations *plus* (B) such date of determination. *Id.* at 6.

---

Appellee Appx. 01358
Appx. 01809
01417

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibits   Page 1366 of 1804   Page 493 of 1017   PageID 15137
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1365 of 1803   PageID 12111
Case 19-12239-CSS   RBDocument Filed 11/12/19   Page 7 of 817

14.     The ACIS Indentures do more than require that U.S. Bank observe certain safeguards – they also grant U.S. Bank the broad power to "execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, nominees, custodians, or attorneys".

### ii.     U.S. Bank must also satisfy extra-contractual obligations owed to The Charitable DAF.

15.     U.S. Bank must satisfy certain extra-contractual obligations in connection with its role as Trustee, and the broad powers associated therewith.  These pre-default extra-contractual obligations include the duty to perform all basic, non-discretionary, ministerial tasks with due care, and to avoid conflicts of interest.

16.     For example, U.S. Bank was required to perform all basic, non-discretionary, ministerial tasks with due care, including, but not limited to, the following extra-contractual tasks: reserving noteholder rights impacted by active litigation, such as bankruptcy proceedings; exercising due care in connection with the payment of expenses; collecting and distributing the interest and dividends due on the portfolio securities; and  providing noteholders with periodic reports concerning the interest received, amounts distributed and securities in the portfolio.

17.     Notably, no provisions of the ACIS Indentures "shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct".

### B.     U.S. Bank fails to reserve or otherwise protect The Charitable DAF's rights in connection with bankruptcy proceedings.

18.     The Charitable DAF's rights as a secured noteholder under the ACIS Indentures have been compromised by certain proceedings and judicial rulings in a consolidated Chapter 11 bankruptcy proceeding, and related adversary proceeding, pending before the United States

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 1367/251804    Page 494 of 1017    PageID 15138
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1366 of 1803    PageID 12112
Case 19-12299-CSS-RBD Document 16-7 Filed 11/12/19 Page 8 of 18

Bankruptcy Court for the Northern District of Texas, jointly administered under case number 18-30264-SGJ-11 (the "Bankruptcy Proceeding").[3]

19.     On July 29, 2018, the Chapter 11 Trustee in the Bankruptcy Proceeding filed a First Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management, GP, LLC (the "First Amended Plan").

20.     The First Amended Plan provided for certain amendments to the ACIS Indentures that would be effected through a certain Plan B and Plan C.  These proposals concerned, among other things, re-writing the ACIS Indentures to protect Acis' management fee stream for several years.

21.     In full recognition that the First Amended Plan encroached on the rights of noteholders under the ACIS Indentures like The Charitable DAF, the Trustee filed a Reservation of Rights and Limited Objections to the First Amended Plan in the Bankruptcy Proceeding. The Trustee took prompt measures to protect noteholder rights, filing these pleadings only fifteen days after the filing of the First Amended Plan.

22.     Among other infringements on the rights of noteholders under the ACIS Indentures, the Trustee explained that: "In other words, both Plan B and Plan C purport to ignore the express terms of the Indenture and the rights of the Noteholders with respect to amending the Indenture."[4]

23.     On January 31, 2019, a Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC was entered in the Bankruptcy Proceeding ("Plan D").

---

[3] The two case numbers in the consolidated Bankruptcy Proceeding include case numbers 18-30264-SGJ-11 and 18-30265-SGJ-11.

[4] *See* Bankruptcy Proceeding, case number 18-30264-SGJ-11 at Dkt. Nos. 500, 501, and 500; *see id.* at Dkt. No. 505.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1368 of 1804 Page 495 of 1017    PageID 15139
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1367 of 1803    PageID 12113
Case 19-12395-CSS-RBD Document 16-7 Filed 11/12/19 Page 9 of 18

24.    Like Plan B and C, Plan D also substantially impacted the rights of noteholders under the ACIS Indentures, including The Charitable DAF.

25.    Among other infringements, Plan D imposes an injunction that adversely affects The Charitable DAF's rights by prohibiting beneficial trading activity that would serve to protect noteholder interests.

26.    In addition to other restrictions, Plan D impedes the ability of noteholders under the ACIS Indentures to make optional redemptions, which restriction has decimated the value of such investments across the capital stack of each CLO covered by the ACIS Indentures.

27.    Moreover, Plan D conflicts with the express terms of the ACIS Indentures. Specifically, the ACIS Indentures do not permit U.S. Bank to "authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, **any plan** of reorganization, arrangement, adjustment or composition **affecting the Secured Notes or any Holder thereof**". (emphases added).

28.    Tellingly, in its Reservation of Rights filed in 2018, U.S. Bank acknowledged that the specific plans "adversely affect[ed] the rights of Noteholders."[5]  The same holds true for Plan D.

29.    Notwithstanding its ability to do so, U.S. Bank did not reserve any noteholders' rights, or otherwise object to the entry of Plan D.

30.    Instead, as noted by the court's ruling approving confirmation of Plan D on January 31, 2019, "[t]he indenture trustee has retained and appeared through its own separate counsel during the Chapter 11 Bankruptcy Cases **and is not currently objecting to the Plan**."[6] (emphasis added).

---

[5] *See e.g.,* Bankruptcy Proceeding at Dkt. No. 505 ¶ 3; *see also,* Bankruptcy Proceeding at Dkt. Nos. 499-505
[6] *See e.g.,* Bankruptcy Proceeding, case number 18-30264-SGJ-11 at Dkt. No. 827 p. 5.

Appellee Appx. 01361
Appx. 01812
014174

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5    Page 1366/15/804 Page 496 of 1017    PageID 15140
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1368 of 1803    PageID 12114
Case 19-12239-CSS RE Doc 116-7 Entered Filed 11/12/19 Page 10 of 17

31.     U.S. Bank's election to take no action regarding the entry of Plan D amplified the exposure of The Charitable DAF and the overall risk that it faces during the pendency of the Plan D injunction. Though U.S. Bank has a duty to avoid conflicts of interest, its election to take no action regarding the entry of Plan D underscores the Trustee's self-serving conduct.

### C. U.S. Bank fails to ensure that certain transactions satisfy the collateral quality tests.

32.     As set forth above, U.S. Bank must ensure that every purchase made under the ACIS Indentures satisfies the collateral quality tests, including the Weighted Average Life Test ("WAL test") and the Minimum Weighted Average Moody's Recovery Rate Test ("WAM test"), or maintains or improves any failing collateral quality tests.  U.S. Bank failed to satisfy these obligations in at least two ways.

33.     *First*, U.S. Bank allowed the "Portfolio Manager" under the ACIS Indentures to effectuate certain transactions that did not satisfy the WAL test or maintain or improve such failing WAL test.  Specifically, U.S. Bank allowed the Portfolio Manager to make multiple same-day trades and to consolidate the weighted average maturity date for these trades.  In so doing, U.S. Bank permitted the Portfolio Manager to create the false appearance of a maintained or improved WAL test.  Absent this consolidation, the same-day purchases could not have maintained or improved the failing WAL tests on individual bases.

34.     The value destruction of this forced "bunched trading" is clear when one compares the prices at trade date against the prices from the previous day.  For example:

| CLO | Trade | Issuer | Commitment | Date | Trade Px | Day Before | Close Mid Price | 2 Day Before | Close Mid Price | Change | P&L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CLO 4 | Purchase | Diebold Inc - Diebold DD T/L A | 2,430,000.00 | 3/15/2019 | 98.00 | 3/14/2019 | 94.50 | 3/13/2019 | 94.5 | -3.50 | (85,050.00) |
| CLO 6 | Purchase | Diebold Inc - Diebold DD T/L A | 1,578,541.42 | 3/26/2019 | 99.00 | 3/25/2019 | 95.50 | 3/22/2019 | 95.5 | -3.50 | (55,248.95) |
| CLO 4 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 5 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 4 | Purchase | Air Medical Group Holdings Inc - Air Medical T/L B | 2,200,000.00 | 1/8/2019 | 96.50 | 1/7/2019 | 94.45 | 1/4/2019 | 93.839 | -2.05 | (45,177.00) |

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 63-9 Page 1876 of 1804 Page 497 of 1017 PageID 15141
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1369 of 1803 PageID 12115
Case 19-12239-CSS RBD Document 11-7 Filed 11/12/19 Page 11 of 18

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CLO 3 | Purchase | MA FinanceCo LLC - MA FinanceCo T/L B2 | 2,000,000.00 | 1/7/2019 | 98.50 | 1/4/2019 | 96.63 | 1/3/2019 | 96 | -1.88 | (37,500.00) |
| CLO 6 | Purchase | Team Health Holdings Inc - Team Health Holdings T/L | 1,279,236.64 | 3/26/2019 | 88.50 | 3/25/2019 | 86.13 | 3/22/2019 | 86.9375 | -2.38 | (30,381.87) |

35.     What is more, this artificial trading philosophy, disguised as "responsible management," has resulted in myriad poorly conceived and timed buys, which positions have plummeted, destroying value for the investors.  For example:

| Issuer | Buy/Sell | Row Labels | Sum of 8/2/19 P&L | Cost | 8/2/19 Mark |
|---|---|---|---|---|---|
| Lumileds Holding | Buy | LX171142 | (3,603,604.17) | 99.00 | 61.60 |
| Libbey Glass | Buy | LX136370 | (2,773,860.00) | 99.29 | 77.40 |
| KCA Deutag UK Finance PL | Buy | LX172320 | (1,172,068.16) | 84.89 | 69.58 |
| Doncasters | Buy | LX128948 | (1,532,695.82) | 95.51 | 75.00 |
| Envision Healthcare | Buy | LX175867 | (1,172,343.58) | 94.14 | 85.30 |

36.     The transaction history of the ACIS Indentures makes clear that U.S. Bank appreciates the import of trading on specific days.  In connection with one such indenture, U.S. Bank authorized the purchase of a term loan in Capital Automotive 1st Lien with a maturity date of March 25, 2024.  But, to maintain or improve the WAL test for this indenture, U.S. Bank should have required the CLOs to purchase assets with a maturity date of April 4, 2023 or earlier. U.S. Bank facilitated similar misconduct across the ACIS Indentures.

37.     *Second*, the Weighted Average Moody's Rating Factor" ("WARF") a factor on which the WAM test turns, has steadily increased this year for each portfolio of the ACIS Indentures.

38.     U.S. Bank turned a blind eye to The Charitable DAF's collateral quality, which has suffered under Plan D's new management. Plan D, which was implemented in the Bankruptcy Proceeding on January 31, 2019, appointed Brigade Capital Management, LP ("Brigade") to

---

Appellee Appx. 01363
Appx. 01814
014176

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Page 1376/251804   Page 498 of 1017   PageID 15142
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1370 of 1803   PageID 12116
Case 19-12395-CSS   RBDocument 116-7   Filed 11/12/19   Page 21 of 48

perform certain services related to the ACIS Indentures, previously performed by Highland Capital

Management, L.P.[7]

39.     Since the entry of Plan D, and Brigade's "management" of the ACIS Indentures,

U.S. Bank has allowed the collective Weighted Average Moody's Rating Factor" ("WARF") of

the portfolios to become one of the dirtiest pools in the market in a matter of months. As of October

2019, and since Brigade's involvement with the ACIS Indentures, the WARF of each such

indenture has dramatically increased, as follows:

| | | |
|---|---|---|
| CLO 4: | ~~2680~~ | 2941 |
| CLO 5: | ~~2673~~ | 3004 |
| CLO 6: | ~~2627~~ | 2917 |

40.     U.S. Bank is not excused from failing to protect The Charitable DAF's rights

affected by Plan D or by the Bankruptcy Proceeding generally.

**D.  U.S. Bank's conduct has damaged The Charitable DAF substantially.**

41.     U.S. Bank's conduct, described herein, has resulted in myriad damage to The

Charitable DAF, including, but not limited to, the following.

42.     U.S. Bank's failure to ensure that transactions under the ACIS Indentures comply

with the collateral quality tests set forth therein constitute violations of U.S. Bank's contractual

and extra-contractual obligations to The Charitable DAF. By facilitating extensive portfolio

mismanagement, U.S. Bank has further violated its contractual and extra-contractual obligations

to The Charitable DAF.    These violations have compromised, among other things, the credit

profile of the ACIS Indentures and the value of The Charitable DAF's secured notes thereunder.

43.     Under its watch, since the appointment of Brigade, U.S. Bank has allowed the ACIS

Indentures to incur exorbitant fees which have diminished the equity that The Charitable DAF

---

[7] *See* Case No. 18-30264-SGJ-11 and Case No. 18-30265-SGJ-1, Jointly Administered Under Case No. 18-30264-SGJ-11), referred to herein as the Adversary Proceeding.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 18-15    Page 1370 of 1804   Page 499 of 1017    PageID 15143
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1371 of 1803    PageID 12117
Case 19-12395-CSS RBD Document 116-7    Filed 11/12/19    Page 13 of 18

owns indirectly pursuant to the ACIS Indentures. Specifically, because of the payment of uncharacteristically high fees, equity holders under certain ACIS Indentures have received **zero** cash flows.

44.    Further, as Trustee, U.S. Bank owed a duty to The Charitable DAF to avoid conflicts of interest. It shirked this duty by, among other things, facilitating trades that did not comply with the collateral test in order to artificially maximize certain management fees. Likewise, despite U.S. Bank's duty to avoid conflicts of interest, in failing to object or otherwise reserve **any** noteholder rights impacted by Plan D, U.S. Bank further demonstrated its inability to prioritize or protect the rights of noteholder The Charitable DAF.

### E.    Moody's knowingly or recklessly published false ratings of the ACIS Indentures.

45.    Moody's is a nationally recognized statistical rating organization ("NRSRO").  As an NRSRO, Moody's "evaluate[s] a debt offering based on public, and sometimes nonpublic, information regarding the assets of an issuer and assign[s] the debt offering a rating to convey information to a potential creditor/investor about the creditworthiness of the issuer's debt."  *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 164 (S.D.N.Y. 2009). This rating is important to issuers and investors because, among other things, a "[debt offering]'s success depends on the credit quality of the [underlying] assets," and "[i]f stable [assets] comprise the [debt offering], then []investors are much less likely to suffer a loss."  *Id.* at 165; *see also In re Fitch, Inc*., 330 F.3d 104, 106 (2d Cir. 2003) ("[Moody's] endorsement of a given security has regulatory significance, as many regulated institutional investors are limited in what types of securities they may invest based on the securities' NRSRO ratings.")

46.    Between June and November 2014, Moody's gave both Indenture 4 and Indenture 5 a AAA rating.  This is a top rating, and the "same as those usually assigned by the Rating

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1378 of 1804    Page 500 of 1017    PageID 15144
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1372 of 1803    PageID 12118
Case 19-12239-CSS-RBD    Document 16-7    Filed 11/12/19    Page 410 of 1817

Agencies to bonds backed by the full faith and credit of the United States Government, such as Treasury Bills." *Abu Dhabi Commercial Bank*, 651 F. Supp. 2d at 165. The rating is "commonly understood in the marketplace to [indicate an investment is] stable, secure, and safe." *Id.*

47.     Still, depending upon the circumstances, an NRSRO like Moody's can downgrade a particular rating to reflect new information. To that end, on August 6, 2019, certain ACIS noteholders provided Moody's with written notice of U.S. Bank's misconduct, including its practice of bunched trading under the ACIS Indentures by effectuating multiple same day transactions that did not satisfy the WAL test or maintain or improve such failing WAL test.

48.     The same noteholders provided Moody's with a supplemental notice of U.S. Bank's trading misconduct on September 13, 2019.

49.     Nevertheless, and since that time, Moody's has continued to publish false ratings of those assets. Indeed, Moody's has continued to rate Indenture 4 and Indenture 5 as AAA investments, notwithstanding its notice of the facts set forth in more detail above.

50.     This, in turn, has allowed U.S. Bank and the portfolio manager to continue disregarding their obligations under the ACIS Indentures, further compromising the value of the assets securing the Co-Issuers' obligations thereunder. Moody's wrongful conduct has therefore diminished the equity that The Charitable DAF owns indirectly pursuant to the ACIS Indentures.

## <u>COUNT I: BREACH OF THE DUTY TO PERFORM ALL BASIC, NON-DISCRETIONARY, MINISTERIAL TASKS WITH DUE CARE</u>

51.     The Charitable DAF hereby alleges and incorporates the preceding allegations as if fully set forth herein.

52.     As Trustee, U.S. Bank has an extra-contractual duty to perform all basic, non-discretionary, ministerial tasks under the ACIS Indentures with due care. This duty subjects U.S. Bank to tort liability.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 18-15   Page 1374/251804 Page 501 of 1017   PageID 15145
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1373 of 1803   PageID 12119
Case 19-12395-CSS RBDocument Filed 11/12/19 Page 15 of 18

53. U.S. Bank breached this duty in at least two ways.

54. First, it breached this duty by permitting the ACIS Indentures to incur exorbitant expenses, which have diminished the equity that The Charitable DAF owns indirectly pursuant to the ACIS Indentures.

55. Second, U.S. Bank breached its duty by negligently failing to act, and by accepting the entry of "Plan D" in the Bankruptcy Proceeding, which directly affects the secured noteholders. Among other things, Plan D adversely impacts the rights of The Charitable DAF by imposing an injunction that prohibits beneficial trading activity, and impeding the ability of noteholders to make optional redemptions.

56. U.S. Bank's omission to act was not in good faith. In 2018, U.S. Bank filed multiple pleadings in the Bankruptcy Proceeding, including, but not limited to, a Reservation of Rights, and Limited Objections to the entry of the predecessor plans to Plan D. U.S. Bank failed to take any action whatsoever in regard to Plan D.

57. These breaches were the proximate cause of damages to Charitable DAF.

58. Based on investigation to date, such damages include, but are not limited to, The Charitable DAF's inability to make certain trades or redemptions, which restriction has decreased the value of The Charitable DAF's investment across the capital stack of each contract. They also include the diminished value of the collateral securing the issuer and co-issuer's financial obligations to The Charitable DAF. U.S. Bank's failure to reserve or otherwise protect The Charitable DAF's rights impacted by the Bankruptcy Proceeding has caused it to suffer damages.

## COUNT II: BREACH OF THE DUTY TO AVOID CONFLICTS OF INTEREST

59. The Charitable DAF hereby alleges and incorporates the preceding allegations as if fully set forth herein.

Appellee Appx. 01367
Appx. 01518
014180

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-5   Page 1375/251804 Page 502 of 1017   PageID 15146
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1374 of 1803   PageID 12120
Case 19-12395-CSS   RBD Document 116-7   Filed 11/12/19   Page 16 of 18

60.     As Trustee, U.S. Bank has an extra-contractual duty to avoid conflicts of interest. This duty subjects U.S. Bank to tort liability.

61.     Under this duty, U.S. Bank is prohibited from advancing its own interests at the expense of The Charitable DAF.

62.     U.S. Bank breached this duty by, among other things, facilitating extensive portfolio mismanagement and failing to ensure compliance with the collateral quality tests in order to artificially maximize management fees. Such facilitation of noncompliant trades gives rise to an inference of bad faith.

63.     U.S. Bank also breached this duty by allowing the ACIS Indentures to incur exorbitant fees which have diminished the equity that The Charitable DAF owns indirectly pursuant to the ACIS Indentures.

64.     U.S. Bank's breaches were the proximate cause of damages to The Charitable DAF.

65.     These breaches were the proximate cause of damages to Charitable DAF.

66.     Based on investigation to date, such damages include, but are not limited to, the diminished value of the collateral securing the issuer and co-issuer's financial obligations to Charitable DAF.

67.     U.S. Bank's breaches, set forth herein, have damaged The Charitable DAF in not less than $5,000,000.00.

## COUNT III: DEFAMATION (AGAINST MOODY'S)

68.     The Charitable DAF hereby alleges and incorporates the preceding allegations as if fully set forth herein.

69.     On August 6, 2019, certain ACIS noteholders provided Moody's with credible information regarding U.S. Bank's wrongful trading conduct and portfolio mismanagement, as

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-5    Page 1376 of 1804    Page 503 of 1017    PageID 15147
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1375 of 1803    PageID 12121
Case 19-12339-CSS-RBD Doc 116-7    Filed 11/12/19    Page 17 of 18

described in more detail above. Since that date, Moody's has had actual or constructive notice of
US Bank's wrongful trading conduct.

70.     Notwithstanding such notice, Moody's has continued to publish a false rating of
AAA for Indenture 4 and Indenture 5 to investors.

71.     Moody's published these ratings with knowledge of their falsity or with reckless
disregard thereto.

72.     In so doing, Moody's has caused The Charitable DAF to suffer special damages.
Specifically, by continuing to provide an AAA rating for Indenture 4 and Indenture 5, Moody's
has enabled U.S. Bank and the portfolio manager to compromise the value of the assets securing
the Co-Issuer's obligations under the ACIS Indentures.  Since August 2019, when Moody's first
learned of U.S. Bank's misconduct, these assets have continued to decrease in value.

## CONDITIONS PRECEDENT

73.     Pursuant to Federal Rule of Civil Procedure 9(c), Charitable DAF hereby pleads
that all conditions precedent have occurred or been performed.  Although the ACIS Indentures
contain "no-action" clauses that require certain noteholders to make written request to U.S. Bank
to institute any judicial proceedings in its own name, the Second Circuit has held that
noncompliance with a no-action provision is excused in a suit against the indenture trustee.  *See
Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992) ("The district court held that the
'no action' clause applied only to the debenture holder suits against [the issuer], not the Indenture
Trustees . . . This construction of [the limitation on suits provision] obviously is correct, as it would
be absurd to require the debenture holders to ask the Trustee to sue itself.").

Appellee Appx. 01369
Appx. 01529
014182

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 1376 of 1804    Page 504 of 1017    PageID 15148
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1376 of 1803    PageID 12122
Case 19-12239-CSS-RBD Document 116-7    Filed 11/12/19    Page 18 of 18

## DEMAND FOR ATTORNEYS' FEES

74.    Pursuant to Section 5.15 of the ACIS Indentures, Charitable DAF hereby makes a demand for the attorneys' fees and court costs it has sustained in bringing this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff The Charitable Donor Advised Fund, L.P. respectfully requests that judgment be entered in its favor and against Defendants U.S. Bank and Moody's as follows:

A.    An award of damages sustained as a result of U.S. Bank National Association's activities in not less than $5,000,000.00;

B.    An award of damages sustained as a result of Moody's conduct in an amount to be determined at trial;

C.    An award of reasonable attorneys' fees and court costs;

D.    An award of pre-judgment and post-judgment interest on all sums awarded; and

E.    For such other and further relief as the Court may deem just, equitable and appropriate.

DATED: November 1, 2019                    Respectfully submitted,

/s/ V. Chisara Ezie-Boncoeur
Michael K. Hurst (*pro hac admission pending*)
Texas State Bar No. 10316310
*mhurst@lynnllp.com*
V. Chisara Ezie-Boncoeur
New York Bar No. 5333224
*cezie-boncoeur@lynnllp.com*
John R. Christian (*pro hac admission pending*)
Texas State Bar No. 24109727
*jchristian@lynnllp.com*
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
214-981-3800 – Telephone
214-981-3839 – Facsimile
**ATTORNEYS FOR THE CHARITABLE
DONOR ADVISED FUND, L.P.**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 1378 of 1804   Page 505 of 1017   PageID 15149
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1377 of 1803   PageID 12123

**Exhibit H**

Highland Objection to Supplemental Application re Winstead PC's Retention

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 68-15    Filed 07/03/25    Page 506 of 1017    PageID 15150
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1378 of 1803   PageID 12124
Case 18-30264-sgj11   Doc 963   Filed 11/05/18   Entered 11/05/18 13:25:59   Page 1 of 15

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT, L.P.**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P. and | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered Under Case No. |
| | § | 18-30264-SGJ-11) |
| | § | |
| Debtors. | § | Chapter 11 |

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL
APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS
SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**

Highland Capital Management, L.P., party-in-interest and creditor ("Highland") to Acis

Capital Management, L.P. and Acis Capital Management GP, LLC (collectively the "Debtors"),

files this objection (the "Objection") to the *Supplemental Application Regarding the Scope of*

*Winstead PC's Retention as Special Counsel to the Chapter 11 Trustee* [Docket No. 669] (the

"Supplemental Application").  In support of the Objection, Highland states as follows:

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 1**

**Appellee Appx. 01372**
Appx. 01623
014185

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S     Document 68-15     Filed 03/25/24   Page 507 of 1017   PageID 15151
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1379 of 1803   PageID 12125
Case 18-30264-sgj11   Doc 3585-5   Filed 11/05/18   Entered 11/05/18 Page 3 of 16 Page 2 of 15

## BACKGROUND

**A.     The Bankruptcy Case and the Winstead Application**

1.      On May 30, 2018, after weeks of protesting Winstead's purported representation of the Chapter 11 Trustee in light of Winstead's ongoing representation of Josh Terry – the sole involuntary petitioning creditor who forced the Debtors into bankruptcy – Highland filed the *Motion to Disqualify Winstead PC as Proposed Special Counsel to Robin Phelan, Chapter 11 Trustee* (the "Motion to Disqualify") [Doc. No. 244].

2.      After the Motion to Disqualify was filed to compel the conflict issues to be brought before the Court, later that evening on May 30, 2018, the Chapter 11 Trustee filed the *Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* [Doc. No. 246] (the "Winstead Application"). The Chapter 11 Trustee had already sought the employment of Forshey & Prostok, LLC ("Forshey & Prostok") to serve as counsel to the estates pursuant to 11 U.S.C. § 327(a), via the *Application for Order Authorizing the Employment and Retention of Forshey & Prostok, LLP as Counsel to the Chapter 11 Trustee* [Doc. No. 222] (the "Forshey & Prostok Application"). The Forshey & Prostok Application was later approved on June 18, 2018 without contest. *See Order Granting Application for Order Authorizing the Employment and Retention of Forshey & Prostok, LLP as Counsel to the Chapter 11 Trustee* [Doc No. 296] (the "Forshey & Prostock Retention Order"). Notably, the Forshey & Prostok Application sought the firm's representation for, among other things, "[p]reparing on behalf of the Trustee all necessary and appropriate motions, pleadings, proposed orders, and other documents that are necessary in connection with these chapter 11 cases, including in connection with any adversary proceedings or appeals associated therewith," and "[i]nvestigating and prosecuting chapter 5 causes of action and other potential litigation that may be brought by the Trustee." *See* Forshey & Prostock

OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 2

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 13/36/25 1804   Page 508 of 1017   PageID 15152
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1380 of 1803   PageID 12126
Case 18-30264-sgj11   Doc 865-5   Filed 12/05/18   Entered 11/12/05/18 Page 3459 16   Page 3 of 15

Application at ¶¶ 9(b), (c) (emphasis added). The Forshey & Prostock Retention Order so provided. *See* Forshey & Prostok Retention Order at ¶ 2 (granting the Forshey & Prostok Application "on the terms and conditions, set forth in the Application.").

3.   By the Winstead Application, the Chapter 11 Trustee sought to distinguish his retention of Winstead from that of Forshey & Prostok by presenting them as special counsel under 11 U.S.C. § 327(a) and (c)[1] to provide legal services for the following "limited" purposes:

    a.   Management, liquidation, disposition, and monetization of the CLO assets;

    b.   Investment Advisors Act;

    c.   Operation of the portfolio management agreements and the indentures, issues arising therefrom, and, specifically including, litigation related thereto or arising therefrom; and

    d.   <u>Certain other litigation matters related to or arising in these Chapter 11 cases, as requested by the Chapter 11 Trustee</u> (emphasis added).

*See* Winstead Application at ¶ 25(d). The Winstead Application was supported by the *Declaration of Rakhee Patel in Support of Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* (the "Patel Declaration").

4.   Notably, the Patel Declaration stated:

> Further, Winstead will confer with the Trustee and Forshey & Prostok on a regular basis to ensure that the services provided by Winstead do not overlap with, and are not otherwise duplicative of, services provided by Forshey & Prostok, as proposed general counsel, to the Trustee.
>
> With respect to these specified purposes, Winstead's representation will not conflict with Forshey & Prostok's role as general counsel to the Trustee in the Cases, and Winstead will confer regularly with the Trustee and Forshey & Prostok to ensure the same. Accordingly, except to the extent necessary to effectuate the specific services outlined above,

---

[1] The Winstead Application also provided that the Trustee "reserves its rights to seek approval for such retention under Section 327(e)." Winstead Application at fn. 2.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 3**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 1382 of 1804   Page 509 of 1017   PageID 15153
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1381 of 1803   PageID 12127
Case 18-30264-sgj11   Doc 896-8   Filed 12/05/18   Entered 12/05/18 Page 359   Page 4 of 15

Winstead will not represent the Trustee with respect to plan negotiations or formulation; business or bankruptcy restructuring or reorganization; or otherwise in matters arising purely under the Bankruptcy Code.  With respect to the various Appeals, the underlying issues are discrete, and will not affect Winstead's representation of the Trustee in the Cases.

5.      On June 9, 2018, the Trustee filed the *Supplement to Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* [Doc. No. 266] (the "Supplement"). The Supplement acknowledged that Winstead would continue to represent Josh Terry, but asserted that the representation did not conflict with Winstead's representation of the Trustee. The Supplement was supported by the *Supplemental Declaration of Rakhee Patel in Support of the Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* (the "Supplemental Patel Declaration").    Again, the Supplement and the Supplemental Patel Declaration reiterated that "Winstead will not represent the estate with respect to plan negotiations or formulation; business or bankruptcy restructuring or reorganization; or otherwise in matters purely under the Bankruptcy Code."  *See* Supplement at ¶ 6; Supplemental Patel Declaration at ¶ 14.

6.      In addition to its pending Motion to Disqualify, on June 11, 2018, Highland filed its objection to the Winstead Application [Doc. No. 267] (the "Highland Objection").  By the Highland Objection, Highland asserted that retention of Winstead as special counsel was impermissible and inappropriate because: (1) the delineated services proposed to encompass the scope of services operated as Winstead's *de facto* general representation of the Trustee; (2) retention under Bankruptcy Code section 327(a) was improper because Winstead was not disinterested; and (3) Winstead had an actual conflict of interest relating to certain state court litigation with Highland (the "Winstead Litigation").

OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 4

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1386 of 1804   Page 510 of 1017    PageID 15154
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1382 of 1803   PageID 12128
Case 18-30264-sgj11   Doc 3065-6   Filed 11/05/18   Entered 11/05/18   Page 5 of 16   Page 5 of 15

7.     Likewise, on June 11, 2018, the Office of the United States Trustee filed its objection to the Winstead Application [Doc. No. 279] (the "U.S. Trustee Objection").  By the U.S. Trustee Objection, the U.S. Trustee asserted substantively similar objections as in the Highland Objection, including that the relief sought in ¶ 12(d) of the Winstead Application was "too broad a delegation of the Court's retention authority" and that "given Winstead's prior retention of Terry, any employment should be cabined and specifically defined, with any necessary supplemental disclosures."  U.S. Trustee Objection at ¶ 23.

8.     The Court held a hearing on the Winstead Application on June 14, 2018.  The following representations were made by the Trustee:

> Winstead is going to do a lot of the CLO stuff.  But Forshey & Prostok, he's doing the real bankruptcy stuff.  For example, they're drafting the plan.  They're doing the turnover stuff.  They will do the claim objections. . . . They're doing the bankruptcy stuff in this Chapter 11 case, but they aren't CLO experts, they'll readily admit that.[2]

9.     After considering the arguments of counsel for Highland and the U.S. Trustee, the Court approved the Winstead Application, in part, but not without materially paring back the scope.  Specifically, the Court did not authorize part (d) of the proposed scope of services, thus rejecting Winstead's employment by the Trustee as to "[c]ertain other litigation matters related to or arising in these Chapter 11 cases, as requested by the Chapter 11 Trustee."  The Court stated:

> We're going to scratch D, Certain Other Litigation Matters.  Anything beyond those three tasks [A, B, and C], Mr. Phelan, you'll have to file another application on notice to creditors and parties in interest, and we'll have a hearing deciding whether an expanded scope is appropriate or not.[3]

---

[2] June 14, 2018 Hr'g Tr. at 63:11-19 (testimony of Trustee, emphasis added).  Excerpts of the hearing transcript are attached hereto as **Exhibit A**.
[3] *Id.* at 68:16-21.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 5**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Exhibit 6   Page 1384 of 1804   Page 511 of 1017   PageID 15155
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1383 of 1803   PageID 12129
Case 18-30264-sgj11   Doc 385   Filed 11/05/18   Entered 11/05/18 11:37:59   Page 6 of 15

10.     On June 21, 2018, the Court entered its order consistent with its ruling [Doc. No. 313] (the "Winstead Employment Order").[4]

**B.     The Court's Limitations Have Been Ignored**

11.     From the inception of these bankruptcy cases and despite the Court's limitations on the scope of Winstead's employment (and Winstead's own representations in the Winstead Application and the Supplement), Winstead has appeared on every pleading filed by the Trustee, appeared at every hearing in this case, and has *de facto* served as lead counsel to the Trustee. The Court need only review the record in this case as evidence that Winstead has ignored the limits of the Court's ruling.  In short, it has proceeded in these cases unrestrained.

12.     As an example, representation of the Trustee during the prior failed Plan process was dominated by Winstead.[5]  In addition, Winstead has taken the lead role in the Adversary Proceedings and in every one of the Appeals, each as defined and described below.

13.     As the Court is aware, the Trustee is currently in the process of seeking confirmation of "Plan D."  Once again, any reasonable review of Winstead's role in the plan process to-date demonstrates that neither Winstead nor the Trustee are taking seriously their responsibility to adhere to the Court's limits on Winstead's role.

**C.     The Adversary Proceedings**

14.     There are currently two adversary proceedings pending in this case that involve Highland and Highland related entities: Adversary Case No. 18-03078, and Adversary Case No.

---

[4] Highland sought leave to appeal this interlocutory order to the District Court, but was denied leave to appeal. Highland reserves the rights to appeal and, at this time, intends to pursue the appeal of the Trustee's retention of Winstead when the matter is otherwise deemed final and appealable.
[5] Winstead attorney Rakhee Patel examined Trustee witness Zach Alpern and cross examined witnesses Daniel Castro, Hunter Covitz and Isaac Leventon.  Winstead attorney Joseph Wielebinski examined Trustee witness Richard Klein.  Winstead attorney Rakhee Patel was the only Trustee attorney to make closing arguments.  Notably, no fee applications reflecting time expended in the failed Plan endeavor have been filed.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 6**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 18-15   Page 1385/251804 Page 512 of 1017   PageID 15156
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1384 of 1803   PageID 12130
Case 18-30264-sgj11 Doc 2086 Filed 12/05/18   Entered 12/05/18 Page 359 16 Page 7 of 15

18-03212 (collectively referred to herein as the "Adversary Proceedings").  Adversary Case No.
18-03078 was originally filed by Highland and HCLOF against the Trustee, seeking an
injunction related to a June 14, 2018 optional redemption.  The Trustee thereafter filed
counterclaims and third party claims against Highland and HCLOF, including a fraudulent
transfer claim that the Trustee has alleged is fundamental to this bankruptcy case.

15.     Given the passage of time and circumstances that mooted the original relief
sought by Highland and HCLOF, the parties in case no. 18-03078 agreed to the form of agreed
order dismissing Highland and HCLOF's claims without prejudice and allowing the Trustee to
amend his answer.  The order was entered on November 1, 2018.

16.     Adversary Case No. 18-03212 was brought by the Trustee against Highland,
HCLOF, Neutra, Ltd. and the CLOs seeking a temporary restraining order and preliminary
injunction preventing optional redemptions and also seeking related declaratory judgments.

17.     In both Adversary Proceedings, Winstead has taken a lead role, despite the limits
of the Court's Order.[6]

18.     Discovery in the Adversary Proceedings and in the bankruptcy case is governed
by an *Agreed Protective Order* entered by this Court on August 21, 2018 [Doc. No. 535] (the
"Protective Order").

**D.     The Appeals**

19.     There are a number of appeals to the District Court currently pending in relation
to this bankruptcy case and the Adversary Proceedings (the "Appeals").  Once again, despite the

---

[6] The Court need only consider one of the most recent hearings on the adversaries held October 9, 2018, where
Winstead attorney Phil Lamberson presented all of the arguments on behalf of the Trustee.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 7**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 66-15   Page 1386 of 1804   Page 513 of 1017   PageID 15157
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1385 of 1803   PageID 12131
Case 18-30265-sgj11   Doc 886-5   Filed 11/05/18   Entered 11/05/18 Page 359 16   Page 8 of 15

limits of this Court's Order, Winstead has consistently taken the lead in such "other litigation matters related to or arising in these Chapter 11 cases."[7]

**E.     The Supplemental Application**

20.     After almost 4½ months of ignoring the limitations prescribed by the Court's ruling (and contradicting prior representations to the Court), on October 28, 2018, the Trustee filed the Supplemental Application.  The basis provided for expanding the scope of Winstead's retention includes:

> a.     The need of Winstead to "reference . . . and [have] a comprehensive understanding of <u>all agreements and documents underlying Acis's business</u> . . . ."  Application at ¶ 2 and ¶ 11 (emphasis added).
>
> b.     The need for Winstead to continue "evaluating the estates' numerous claims, counterclaims, third-party claims and defenses . . . ."  Application at ¶ 9.

21.     The Trustee is seeking to employ Winstead in relation to "[a]ny litigation against Highland Capital and/or any of its affiliates, including Highland CLO Funding, Ltd., Highland CLO Management, Ltd. and Highland CLO Holdings, Ltd."  Application at ¶ 13(a).  The Supplemental Application also identifies the pending Adversary Proceedings and appeals involving Highland and Highland-related entities.  Application at ¶ 13(b) and (c).  But, practically speaking, the all-inclusive scope of "any litigation" in Application paragraph 13(a) would make paragraphs 13(b) and (c) superfluous.

---

[7] *See, e.g., Robin Phelan, Chapter 11 Trustee's Response to Emergency Motion of Appellants Highland and HCLOF to Consolidated Appeals and Expedited Briefing and Brief in Support, filed by Winstead* (signed by Rahkee Patel) on behalf of the Trustee on July 30, 2018 in District Court Case No. 3:18-cv-01822 (Highland CLO Funding Ltd. v. Robin Phelan, Chapter 11 Trustee, et al.); *see also Notice of Appearance and Designation of <u>Lead Counsel</u>* (emphasis added, each signed by Rahkee Patel) in Case Nos. 3:18-cv-01822-B, 3:18-cv-01810-S, and 3:18-cv-01817-G.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 8**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1386 of 1804   Page 514 of 1017   PageID 15158
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1386 of 1803   PageID 12132
Case 18-30264-sgj11   Doc 1236-6   Filed 11/05/18   Entered 11/05/18   Page 1356 of 1   Page 9 of 15

22.    On October 29, 2018, the Trustee filed a motion seeking to expedite the hearing on the Supplemental Application [Doc. No. 672] (the "Motion to Expedite"). The Trustee stated in the Motion to Expedite that the hearing on the Application will be "merely a rehashing of the hearing on the [original] Application." Motion to Expedite at ¶ 4. Whether or not that is the case, it would be for good reason, since the Trustee and Winstead have demonstrably ignored the Court's Order.

## OBJECTION

### A.    The Circumstance of the Case Clearly Demonstrate that Winstead Has a Conflict of Interest

23.    As noted above, Highland's appeal of the Order was dismissed by the District Court as interlocutory. As such, there is nothing preventing the Court at this point from reconsidering issues that were previously asserted by the parties in this matter. Both Highland and the U.S. Trustee asserted that Bankruptcy Code section 327(c) prohibited Winstead's retention because it has an actual conflict of interest related to the Winstead Litigation and related to Winstead's on-going representation of Terry. As to the Winstead Litigation, the Court ordered Winstead to erect an ethical wall.[8]

24.    The issue of Winstead's representation of Terry, however, remains and constitutes an unwaivable, actual conflict of interest. At the June 14, 2018 hearing on the Application, both Highland and the U.S. Trustee expressed concerns to the Court of various ways Winstead's concurrent representation was problematic. Subsequent events have proven the point. The lead law firm in the Adversary Proceedings (Winstead) currently represents Highland's principal adversary (Terry). The parties are currently engaged in discovery related to the Adversary

---

[8] June 14, 2018 Hr'g Tr. at 71:19-25.

OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 9

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1386/3 of 1804    Page 515 of 1017    PageID 15159
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1387 of 1803    PageID 12133
Case 18-30264-sgj11    Doc 858-55    Filed 01/05/18    Entered 11/12/05/18 Page 359 of 18    Page 10 of 15

Proceedings and Highland has designated certain of the documents "Confidential," and a much smaller portion of the documents "Attorneys Eyes Only," as is permitted under the Protective Order.  Notably, the Trustee has directed Winstead to handle the recent discovery, including documents currently in the process of being produced by Highland to Winstead.  One of Highland's principal concerns is that sensitive documents or information dealing with Highland's business operations will fall into the hands of Terry, who is a current adversary and a potential future competitor.[9]  It simply has to be the case that some of the attorneys at Winstead who are reviewing the produced documents will be the very same attorneys advising Terry in the related appeals.  What if certain Confidential Information reviewed by Winstead has nothing to do with maximizing value for the estate, but would be helpful for Terry to compete against Highland and/or to advance his appeal?  As it stands, Winstead will be under Court order not to discuss or otherwise reveal that information.  Winstead attorneys are in the impossible positon of parsing every piece of information to determine whether it falls under the Trustee's duty to maximize value, as opposed to merely being useful information for an adversary and competitor of Highland.  Furthermore, Winstead attorneys must keep track of exactly where they obtained every piece of information they discuss with their client Terry when prosecuting his appeal.  For that reason alone, it is not possible for Winstead to simultaneously maintain confidences for both the Trustee and Terry.  In addition, Winstead's duty of loyalty is being violated because Winstead is in the position of affirmatively protecting Confidential Information available to one client (the Trustee) against the other client (Terry).

---

[9] The prior Plans attempted, and the current Plan D is attempting again, to put into place a mechanism where Terry will be a direct competitor of Highland.  Terry thus is not motivated simply to recover on his claim.  Terry has a non-creditor interest that is furthered by learning as much non-public information about Highland's recent actions and investment activities as possible.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 10**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1386/251804 Page 516 of 1017    PageID 15160
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1388 of 1803   PageID 12134
Case 18-30264-sgj11 Doc 956-3 Filed 11/05/18   Entered 11/05/18 13:29:03 Page 11 of 15

25.     This is untenable situation and there is no good reason to permit it.  As previously stated in this matter by the U.S. Trustee, these circumstances directly challenge Winstead's ethical duty of loyalty and duty to maintain confidences.  *See* U.S. Trustee Objection at ¶ 15 (citing *In re American Airlines*, 972 F.2d 605, 618 (5th Cir. 1992) and *Humble Place Joint Venture v. Fory (In re Fory)*, 936 F.2d 814, 819 (5th Cir. 1991)).   Winstead is conflicted and Bankruptcy Code section 327(c) prohibits its retention in this case.

**B.     Winstead Cannot Maintain the Façade: It Has Represented, and is Seeking to Represent, the Chapter 11 Trustee Without Any Meaningful Limitation**

26.     This Court chose to limit the scope of Winstead's retention to exclude the broadly-worded "certain other litigation matters."   The Court did that to put into place "prophylactic measures" to ensure that the Trustee's goal of maximizing value lines up with Terry's goal of recovering as a creditor in the case.[10]  The Court recognized that the Application, as originally requested, was not tied in any way to Winstead's alleged CLO expertise and giving Winstead free reign to litigate such matters could create problems relating to changing "bedfellows" and "crossway" motivations.[11]

27.     Since the entry of the Order, a critical point seems to have gotten lost in the various litigation fronts among the parties: Winstead was retained as special counsel based on the Trustee's assertion that Winstead had unique expertise related to CLOs.  The hearing on the Supplemental Application provides the Court with an opportunity to address whether Winstead and the Trustee actually complied with the limitation imposed by the Court.  To that end, at hearing on this matter, the Court should: (1) review the evidence related to the scope of Winstead's representation since being retained, and (2) consider whether the role Winstead

---

[10] June 14, 2018 Hr'g Tr. at 68:4-6.
[11] *Id.*

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 11**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-15   Exhibit 5   Page 1390 of 1804   Page 517 of 1017   PageID 15161
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1389 of 1803   PageID 12135
Case 18-30264-sgj11   Doc 968-5   Filed 11/05/18   Entered 11/05/18 13:59:19   Page 12 of 15

proposes going forward has any realistic tie to the concept of "special counsel." To the first point, as noted above, Winstead clearly did not limit its role to CLO related matters following its retention. There was absolutely no meaningful distinction between Winstead and Forshey & Prostok during the failed contested Plan process. Moreover, any assertion by Winstead that it worked to limit duplication of effort with Forshey & Prostok is not relevant to the scope of employment point before the Court. *See In re Polaroid Corp.*, 424 B.R. 446, 452 (Bankr. D. Minn. 2010) (holding that special counsel should not provide general advice to a debtor); *see also In re Abrass*, 250 B.R. 432, 455 (Bankr. M.D. Fla. 2000); *In re Running Horse, L.L.C.*, 371 B.R. 446, 452 (Bankr. E.D. Cal. 2007). Special counsel requires retention based on specialized knowledge and, naturally, the firm should limit itself to matters involving such knowledge. Winstead's demonstrated track record fails that test. This is especially problematic given that every representation by the Trustee and Winstead to this Court was that Winstead would be taking on such a limited role.

28.     On the second point, after months of violating the Court's Order requiring limitations on its representation, Winstead has now explicitly dispensed with any pretense of special counsel and is requesting to be involved in any litigation involving Highland and to allow Winstead to review and provide analysis on any agreement and document of the Debtors. Any pretext that Winstead is in this case because of its CLO expertise has been cast aside.

29.     The Trustee has also chosen to challenge Highland's motivations related to this Objection. Specifically, the Trustee suggests improper motive in the Supplemental Application by stating that Highland and HCLOF opposed the original Application because they were "highly motivated to attempt to hamstring and otherwise limit the Trustee's ability to litigate effectively with them." Supplemental Application at ¶ 6. This is simply inaccurate. Highland is

OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 12

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 1396 of 1804   Page 518 of 1017   PageID 15162
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1390 of 1803   PageID 12136
Case 18-30264-sgj11   Doc 868-55   Filed 11/05/18   Entered 11/05/18 15:39:18   Page 13 of 15

one of the largest creditors in this case and it has valid concerns that enforcing no meaningful

limits on purported special counsel is an impermissible use of estate funds.  The Trustee and

Winstead have ignored the limitations put into place by this Court.  The Court should refuse to

grant the Supplemental Application.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 13**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-19    Filed 03/25/25    Page 519 of 1017    PageID 15163
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1391 of 1803    PageID 12137
Case 18-30241-sgj11    Doc 968-5    Filed 11/05/18    Entered 11/05/18 13:59:18    Page 14 of 15

**WHEREFORE**, Highland respectfully requests that the Court deny the relief sought in the Supplemental Application and provide such other and further relief that this Court deems just and proper.

Dated:  November 5, 2018                          Respectfully submitted,

                                    /s/ Jason B. Binford
                                    Holland N. O'Neil (TX 14864700)
                                    Jason B. Binford (TX 24045499)
                                    Shiva D. Beck (TX 24086882)
                                    Melina N. Bales (TX 24106851)
                                    **FOLEY GARDERE**
                                    **FOLEY & LARDNER LLP**
                                    2021 McKinney Avenue, Ste. 1600
                                    Dallas, Texas  75201
                                    Telephone:  (214) 999.3000
                                    Facsimile:  (214) 999.4667
                                    honeil@foley.com
                                    jbinford@foley.com
                                    sbeck@foley.com
                                    mbales@foley.com

                                    and

                                    Michael K. Hurst (TX 10316310)
                                    Ben A. Barnes (TX 24092085)
                                    **LYNN PINKER COX & HURST, LLP**
                                    2100 Ross Avenue, Ste. 2700
                                    Dallas, Texas 75201
                                    Telephone: (214) 981.3800
                                    Facsimile: (214) 981.3839
                                    mhurst@lynnllp.com
                                    bbarnes@lynnllp.com

                                    **COUNSEL FOR HIGHLAND CAPITAL**
                                    **MANAGEMENT, L.P.**

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 14**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Exhibit 6    Page 1393 of 1804    Page 520 of 1017    PageID 15164
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1392 of 1803    PageID 12138
Case 18-30264-sgj11    Doc 956-8    Filed 11/05/18    Entered 11/05/18 12:31:59    Page 15 of 15

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on November 5, 2018, a true and correct copy of the foregoing was served electronically via the Court's ECF system on those parties registered to receive such service.

<div align="right">

*/s/ Jason B. Binford*          
Jason B. Binford

</div>

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 15**

Appellee Appx. 01386

Appx. 01627

014199

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S     Document 16-15     Filed 12/06/24     Page 521 of 1017     PageID 15165
Exhibit 5     Page 1394 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1393 of 1803   PageID 12139

**Exhibit I**

Foley Notice of Appearance for Highland CLO Funding, Ltd.,
CLO Holdco, Ltd. and Neutra, Ltd.

Appellee Appx. 01387

0142000
Appx. 01628

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 6-15 Exhibit 6 Page 1395 of 1804 Page 522 of 1017 PageID 15166
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1394 of 1803 PageID 12140
Case 18-30264-sgj11 Doc 21 Filed 04/18/18 Entered 04/18/18 Page 2 of 4 Page 1 of 3

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com

**COUNSEL FOR HIGHLAND CLO FUNDING,
LTD., CLO HOLDCO, LTD. AND NEUTRA, LTD.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 18-30264-SGJ7** |
| | § | |
| **Alleged Debtor.** | § | |

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| | § | |
| **ACIS CAPITAL MANAGEMENT, GP, L.L.C.,** | § | **Case No. 18-30265-SGJ7** |
| | § | |
| **Alleged Debtor.** | § | |

## NOTICE OF APPEARANCE AND
## REQUEST FOR SERVICE OF PAPERS

PLEASE TAKE NOTICE that Holland N. O'Neil, Jason B. Binford, Shiva D. Beck, Melina N. Bales and the law firm of Foley Gardere, Foley & Lardner LLP, attorneys for Highland CLO Funding, Ltd., CLO Holdco, Ltd. and Neutra, Ltd. (collectively, the "**Equity Holders**"), parties-in-interest in the above-referenced matter, and pursuant to Rules 2002, 3017, and 9010 of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. § 1109(b), request that all notices given or required to be given in this case and all papers served or required to be served in this case be given to and served upon them at the following address:

NOTICE OF APPEARANCE AND REQUEST FOR SERVICE OF PAPERS  Page 1
4840-5970-3906.1

Appellee Appx. 01388
Appx. 01639
014201

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6 Filed 1396/851804 Page 523 of 1017   PageID 15167
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1395 of 1803   PageID 12141
Case 18-3025 sgj11 2089-855 Filed 04/18/19   Entered 04/18/18 Page 2 of 4 Page 2 of 3

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
FOLEY GARDERE
FOLEY & LARDNER LLP
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com
jbinford@foley.com
sbeck@foley.com
mbales@foley.com

Please take further notice that the foregoing request includes notices and papers referred to in the Federal Rules of Bankruptcy Procedure and includes, without limitation, any plans of reorganization, objections, notices of hearings, orders, pleadings, motions, applications, complaints, demands, requests, petitions, disclosure statements, memoranda, briefs and any other documents brought before this Court with respect to these proceedings, whether formal or informal, whether written or oral, whether transmitted or conveyed by mail, hand delivery, telephone, telecopier, telegraph, or telex.

This Notice of Appearance and Request for Notices shall not be deemed or construed to be a waiver of the rights of the Equity Holders (i) to have final orders in non-core matters entered only after de novo review by a District Judge, (ii) to trial by jury in any proceeding so triable in this case or any case, controversy, or proceeding related to this case, (iii) to have a District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal, (iv) respecting in personam jurisdiction, or (v) any other rights, claims, actions, setoffs, or recoupments to which the Equity Holders are or may be entitled, in law or in equity, all of which rights, claims, actions, defenses, setoffs, and recoupments are expressly reserved.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 1397 of 1804   Page 524 of 1017   PageID 15168
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1396 of 1803   PageID 12142
Case 18-30264-sgj11   Doc 1091-855   Filed 04/18/18   Entered 04/18/18 Page 2940 of 4 Page 3 of 3

Dated:  April 18, 2018

Respectfully submitted,

*/s/ Holland N. O'Neil*
Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina Bales (TX 24106851)
FOLEY GARDERE
FOLEY & LARDNER LLP
2021 McKinney Avenue, Ste. 1600
Dallas, Texas  75201
Telephone:  (214) 999.3000
Facsimile:  (214) 999.4667
honeil@foley.com
jbinford@foley.com
sbeck@foley.com
mbales@foley.com

**COUNSEL FOR HIGHLAND CLO FUNDING, LTD., CLO HOLDCO, LTD. AND NEUTRA, LTD.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Notice of Appearance and Request for Service of Papers was served electronically by the Court's PACER system on April 18, 2018.

*/s/Melina N. Bales*
Melina N. Bales

**Appellee Appx. 01390**
**Appx. 01641**
**014203**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 1398/651804   Page 525 of 1017   PageID 15169
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1397 of 1803   PageID 12143
Case 19-12239-CSS   Doc 116-10   Filed 11/12/19   Page 1 of 1

## <u>CERTIFICATE OF SERVICE</u>

I, Josef W. Mintz, hereby certify that on November 12, 2019, I served or caused to be served the *Limited Objection to Debtor's: (I) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel,* Nunc Pro Tunc *to the Petition Date; and (II) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel,* Nunc Pro Tunc *to the Petition Date* upon the following persons listed in the manner indicated and upon all subscribed parties via CM/ECF.


Via Email and Hand Delivery:

      Pachulski Stang Ziehl &Jones LLP
      919 N. Market Street, 17th Floor
      Wilmington, DE 19801
      Attn: James E. O'Neill, Esq.
      joneill@pszjlaw.com

      Office of the United States Trustee
      844 King Street, Suite 2207, Lockbox 35
      Wilmington, DE 19801
      Attn: Jane M. Leamy, Esq.
      jane.m.leamy@usdoj.gov

Via Email and First Class Mail:

      Pachulski Stang Ziehl &Jones LLP
      10100 Santa Monica Blvd., 13th Floor
      Los Angeles, CA 90067
      Attn: Jeffrey N. Pomerantz, Esq.
      jpomerantz@pszjlaw.com


                                          */s/Josef W. Mintz*
                                          Josef W. Mintz (DE No. 5644)

**Appellee Appx. 01391**
**Appx. 014204**
014204

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-6    Page 1396 of 1804    Page 526 of 1017    PageID 15170
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1398 of 1803    PageID 12144

# APPENDIX 16

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Exhibit 6   Page 1406/25/1804   Page 527 of 1017   PageID 15171
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1399 of 1803   PageID 12145
Case 19-12239-CSS   Doc 120   Filed 11/12/19   Page 1 of 6

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) )  Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | )  Case No. 19-12239 (CSS) ) |
| Debtor. | )  **Hearing Date:  Nov. 19, 2019, at 12:00 p.m. (ET)** )  **Obj. Deadline: Nov. 12, 2019, at 4:00 p.m. (ET)** ) )  **Docket Ref. Nos.  69 & 70** |

**LIMITED OBJECTION OF THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS TO THE DEBTOR'S
APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION
AND EMPLOYMENT OF FOLEY GARDERE, FOLEY & LARDNER LLP AND
LYNN PINKER COX & HURST AS SPECIAL TEXAS COUNSEL AND SPECIAL
TEXAS LITIGATION COUNSEL, _NUNC PRO TUNC_ TO THE PETITION DATE**

The official committee of unsecured creditors (the "Committee") of Highland Capital

Management, L.P. (the "Debtor" or "Highland"), hereby submits this limited objection (this

"Limited Objection") to the Debtors' applications, pursuant to Sections 327(e), 328(a), and 330

of the Bankruptcy Code, for entry of orders authorizing the retention and employment of Foley

Gardere, Foley & Lardner LLP ("Foley") and Lynn Pinker Cox & Hurst LLP ("Lynn Pinker,"

and together with Foley, the "Proposed Special Counsel") as Special Texas Litigation Counsel

and Special Texas Litigation Counsel, respectively, _nunc pro tunc_ to the Petition Date

(collectively, the "Applications") [Docket Nos. 69 & 70].[2]  In support of this Objection, the

Committee respectfully states as follows:

---

[1]     The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2]     Citations to "Foley Application" are to Docket No. 69 and citations to "Lynn Pinker Application" are to Docket
No. 70.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms
in the Applications.

**Appellee Appx. 01393**
**Appx. 01644**
**014206**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 1406/851804   Page 528 of 1017   PageID 15172
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1400 of 1803   PageID 12146
Case 19-12239-CSS   Doc 120   Filed 11/12/19   Page 2 of 6

## INTRODUCTION

1.      Proposed Special Counsel have represented the both the Debtor and non-debtor

defendants – including Mr. James Dondero, the founder of the Debtor – in various matters since

2016.[3]  The Committee was formed two weeks ago, on October 29, 2019,[4] and is in the process

of gathering information and familiarizing itself with the Debtor's opaque and complex

organizational structure, business operations, and assets under management.  Importantly, the

Committee has requested relevant information, but as of yet has not been able to fully familiarize

itself with the Debtor's web of contractual relationships and transaction histories with its many

non-debtor affiliates.[5]  Without the benefit of a full understanding of the Debtor's relationships

and prepetition transactions with its affiliates, the Committee is unable to determine the

appropriateness of Proposed Special Counsel representing both the Debtor and non-debtors in

matters going forward, and whether it is appropriate for the costs of such non-debtor

representation, especially in matters wholly unrelated to the Debtor, to be borne by the Debtor.[6]

2.      The Committee recognizes that Proposed Special Counsel have developed

knowledge and expertise from their pre-petition representation of the Debtor.  The Committee

---

[3]      See Lynn Pinker Application Ex. A ¶ 3.

[4]      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief commencing this
chapter 11 case, and the United States Trustee appointed the Committee nearly two weeks later on October 29,
2019 [Docket No. 65].  The Committee moved quickly following its appointment to bring in Sidley Austin LLP
("Sidley") as its proposed counsel on October 30, 2019 and FTI Consulting Inc. ("FTI") as its proposed
financial advisor on November 6, 2019.  Sidley and FTI quickly engaged the Debtor's advisors to get up to
speed on this chapter 11 case, but there has not yet been sufficient time for the Committee to even familiarize
itself with the Debtor's prepetition transactions.

[5]      The Committee and its advisors intend to closely scrutinize all prepetition transactions involving the Debtor to
determine whether any are avoidable and/or give rise to claims against affiliated entities.

[6]      Relatedly, both the Foley Application and the Lynn Pinker Applications disclose large sums of unpaid fees and
expenses that have been billed to the Debtor but remain unpaid as of the Petition Date.  See Foley Application
¶ 16; Lynn Pinker Application ¶ 19.  The Committee is uncertain whether such amounts should be borne by the
Debtor and reserves the right to challenge such unsecured claims at the appropriate time.

Appellee Appx. 01394
Appx. 01645
014207

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-9   Filed 04/02/25   Page 529 of 1017   PageID 15173
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1401 of 1803   PageID 12147
Case 19-12239-CSS   Doc 120   Filed 11/12/19   Page 3 of 6

therefore has no objection to the Proposed Special Counsel continuing to represent the Debtor in matters which provide a benefit to the Debtor's estate.  The Committee does object, however, to any continuation of Proposed Special Counsels' joint representation of Debtor and non-debtor defendants without certainty of reimbursement for such fees and costs and with no justifying benefit to the Debtor's estate.

## OBJECTION

3.      The principal concern the Committee has with respect to the Applications is the lack of clear delineation of the Proposed Special Counsel's proposed engagements and representation, and the Debtor's obligation to pay for the same.  For example, the Hurst Declaration discloses Lynn Pinker's representation of Mr. Dondero in the Texas Lawsuit,[7] and within the application itself describes the services to be provided by Lynn Pinker as "Subject to approval by the Bankruptcy Court, the services that the Debtor proposes that the Firm render, and the Firm has agreed to provide, include advising the Debtor in connection with all aspects of the Pending Acis Proceedings and the Texas Lawsuit, and performing the range of services normally associated with matters such as this as the Debtor's Special Texas Litigation Counsel, which the Firm is in a position to provide in connection with the matter referred to above."[8]  It is unclear whether Lynn Pinker's proposed retention is limited to representing the Debtor, or includes representation of non-debtors, including Mr. Dondero.  It is also unclear if Lynn Pinker will be limited to representing the Debtor (and others) in connection with the Acis Proceedings and the Texas Lawsuit, or if these are just two matters which have been mentioned in the Lynn

---

[7] *See* Lynn Pinker Application Ex. A ¶ 3.

[8] *See* Lynn Pinker Application ¶ 17

25579780.1

3

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 1403 of 1804   Page 530 of 1017   PageID 15174
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1402 of 1803   PageID 12148
Case 19-12239-CSS   Doc 120   Filed 11/12/19   Page 4 of 6

Pinker Application.[9]  As the proposed order approving the Lynn Pinker Application merely approves the retention of Lynn Parker as Special Texas Litigation Counsel "pursuant to the terms set forth in the Application,"[10]  the Committee is unsure which parties Lynn Pinker proposes to represent, and in what matters, and whether the Debtor has agreed to pay for such representations.

4.    The Committee also notes that the Applications do not provide for an allocation of attorneys' fees and expenses among the Debtor and non-debtor defendants.[11]  The Committee is concerned that the Debtor may be bearing the cost for representations of non-debtors without any justifiable benefit to the Debtor's estate, and without any regard for whether such representations may cause a conflict of interest.  Courts have found that such arrangements where the Debtor pays all fees of non-debtor defendants without explicitly justifying such arrangement in the application are improper under Section 327(e).  *See In re Perez*, 389 B.R. 180, 184 (Bankr. D. Colo. 2008) (denying application pursuant to Section 327(e) where bankruptcy estate alone was to pay attorneys' fees of special counsel representing debtor and non-debtor co-defendants in appeal of a state court judgment; that "arrangement *may* have been benign enough and 'all in the family' before the Debtor's bankruptcy was filed, but once the bankruptcy case was filed, things changed" and "Debtor became a fiduciary and others had a stake") (emphasis in original).

---

[9] The Lynn Pinker Application also mentions representation of non-debtor related entity Charitable Donor Advised Fund, L.P. in an unrelated matter.

[10] *See* Lynn Pinker Application Ex. B ¶ 8.

[11]  The absence of such an allocation is alone grounds to deny any fee request submitted by Proposed Special Counsel.  *See In re B.E.S. Concrete Prods., Inc.*, 93 B.R. 228, 234 (Bankr. E.D. Cal. 1988) (finding proposed special counsel under Section 327(e) retained to represent debtors and non-debtors in lawsuit not entitled to recovery of fees because "[t]here [was] no allocation of the bill among the various clients" and "[s]ome services were rendered for the ultimate benefit of persons other than the debtor").  In the event this Court authorizes the retention of Proposed Special Counsel to represent Debtor and non-debtor defendants, the Committee reserves its right to contest fee applications for failure to properly allocate fees and expenses among clients.

25579780.1

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1404 of 1804    Page 531 of 1017    PageID 15175
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1403 of 1803    PageID 12149
Case 19-12239-CSS    Doc 120    Filed 11/12/19    Page 5 of 6

5.      Without greater clarity into the proposed representations included in the Applications, the Committee must request that the Court reject the Applications to the extent that they seek authorization for the Proposed Special Counsel to represent both the Debtor and non-debtor parties and, to the extent the Court is otherwise inclined to approve the Applications, the Court should require the non-debtor entities to deposit on a monthly basis the highest amount incurred in a single month in the prior 12 months to ensure the Debtor's estate will be reimbursed for the fees and costs incurred in connection with the representation of the non-debtor entities.

*      *      *      *      *

*[Remainder of Page Intentionally Left Blank]*

25579780.1

5

Appellee Appx. 01397

014210

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1405 of 1804    Page 532 of 1017    PageID 15176
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1404 of 1803    PageID 12150
Case 19-12239-CSS    Doc 120    Filed 11/12/19    Page 6 of 6

WHEREFORE, the Committee respectfully requests that the Court deny the relief requested in the Applications to the extent they seek authorization for the Proposed Special Counsel to represent both the Debtor and non-debtor parties and provide such other and any further relief as the Court may deem just and proper.

Date:  November 12, 2019
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Jaclyn C. Weissgerber*
Michael R. Nestor (No. 3526)
Edmon L. Morton (No. 3856)
Sean M. Beach, Esq. (No. 4070)
Jaclyn C. Weissgerber, Esq. (No. 6477)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone:  (302) 571-6600

-and-

SIDLEY AUSTIN LLP

Bojan Guzina, Esq. (*admitted pro hac vice*)
Matthew Clemente, Esq. (*admitted pro hac vice*)
Alyssa Russell, Esq. (*admitted pro hac vice*)
One South Dearborn Street
Chicago, IL 60603
Telephone:  (312) 853-7000

- and –

Jessica Boelter, Esq.
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 839-5300

- and –

Penny P. Reid, Esq. (*admitted pro hac vice*)
Paige Holden Montgomery, Esq. (*admitted pro hac vice*)
2021 McKinney Avenue, Suite 2000
Dallas, TX 74201
Telephone: (214) 981-3300

*Proposed Counsel for the Official Committee of Unsecured Creditors*

25579780.1

6

Appellee Appx. 01398
Appx. 01640
014211

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-9    Page 1406/251804    Page 533 of 1017    PageID 15177
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1405 of 1803    PageID 12151

# APPENDIX 17

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Exhibit 6    Page 1407 of 1804    Page 534 of 1017    PageID 15178
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1406 of 1803    PageID 12152
Case 19-34054-sgj11 Doc 2590 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 1 of 2

Docket #2590  Date Filed: 07/20/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |

## DECLARATION OF JOHN A. MORRIS IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT PURSUANT TO BANKRUPTCY RULE 9019 AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_NY:43685.1 36027/002


1934054210720000000000003

Appellee Appx. 01400
Appx. 01651
014213

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-5   Page 14/08/25 1804   Page 535 of 1017   PageID 15179
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1407 of 1803   PageID 12153
Case 19-34054-sgj11 Doc 2590 Filed 07/20/21   Entered 07/20/21 14:01:55   Page 2 of 2

I, John A. Morris, pursuant to 28 U.S.C. § 1746(a), under penalty of perjury, declare as follows:

1       I am an attorney in the law firm of Pachulski, Stang, Ziehl & Jones LLP (the "Firm"), counsel to the above-referenced Debtor, and I submit this Declaration in support of the *Debtor's Motion for Entry of an Order Approving Settlement Pursuant to Bankruptcy Rule 9019 and Authorizing Actions Consistent Therewith* (the "Motion").   Unless stated otherwise, this Declaration is based on my personal knowledge and review of the documents listed below.

2       Attached as **Exhibit 1** is a true and correct copy of that certain Settlement Agreement dated as of July 16, 2021 (the "Settlement Agreement"), by and among the Parties (as that term is defined in the Settlement Agreement).

Dated: July 20, 2021.

*/s/ John A. Morris*
John A. Morris

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-9   Page 1409 of 1804   Page 536 of 1017   PageID 15180
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1408 of 1803   PageID 12154

Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21   Entered 07/20/21 14:01:55   Page 1 of 20

# **EXHIBIT 1**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-15    Page 14/06/251804    Page 537 of 1017    PageID 15181
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1409 of 1803   PageID 12155
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 2 of 20

## SETTLEMENT AGREEMENT

This settlement agreement (the "Agreement") by and between Highland Capital Management, L.P., as debtor-in-possession (the "Debtor"), on the one hand, and Highland Capital Management Fund Advisors, L.P. ("HCMFA"), NexPoint Advisors, L.P. ("NPA" and together with HCMFA, the "Advisors"), Highland Income Fund ("HIF"), NexPoint Strategic Opportunities Fund ("NSOF"), and NexPoint Capital, Inc. ("NCI" and together with HIF and NSOF, the "Funds," and together with the Advisors, the "Defendants," and the Defendants and the Debtor, together the "Parties"), on the other hand.

## RECITALS

WHEREAS, on October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code"). The Debtor is managing and operating its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Debtor's chapter 11 case is pending in the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court");

WHEREAS, the Debtor manages certain collateralized loan obligations ("CLOs") pursuant to the terms of certain portfolio management and servicing agreements (collectively, the "CLO Management Agreements");[1]

WHEREAS, on January 6, 2021, the Debtor commenced an adversary proceeding (the

---

[1] The CLOs managed by the Debtor include ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Jasper CLO, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., and Valhalla CLO, Ltd.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 116 of 180   Page 538 of 1017   PageID 15182
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1410 of 1803   PageID 12156
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21   Entered 07/20/21 14:01:55   Page 3 of 20

"Adversary Proceeding") against Defendants by filing its complaint (the "Complaint") [Docket No. 1][2] (the "Complaint");

WHEREAS, on January 8, 2021, the Court issued its *Order Regarding Adversary Proceedings Trial Setting and Alternative Scheduling Order* [Docket No. 12] (the "Alternative Scheduling Order");

WHEREAS, on January 13, 2021, the Court entered that certain *Agreed Order Granting Defendant's Motion for a Temporary Restraining Order Against Certain Entities Owned and/or Controlled by Mr. James Dondero* [Docket No. 20] (the "Consensual TRO");

WHEREAS, on January 24, 2021, the Advisors and Funds moved to dismiss the Complaint [Docket No. 43] (the "Motion to Dismiss");

WHEREAS, on January 26, 2021, the Debtor and CLO Holdco, Ltd. filed that certain *Notice of Settlement* pursuant to which the Debtor and CLO Holdco, Ltd. resolved their disputes and CLO Holdco, Ltd. was dismissed from this Adversary Proceeding [Docket No. 50];

WHEREAS, on January 26, 2021, the Court held an evidentiary hearing on the Debtor's motion for a preliminary injunction (the "Preliminary Injunction Hearing"), and such hearing has been continued;

WHEREAS, on February 10, 2021, the Court entered that certain *Agreed Order Extending Temporary Restraining Order* [Docket No. 64], pursuant to which the Consensual TRO was extended;

WHEREAS, on February 24, 2021, the Court entered that certain *Agreed Order Further Extending Temporary Restraining Order* [Docket No. 76], pursuant to which the Consensual TRO was further extended;

WHEREAS, on March 1, 2021, the Debtor filed its opposition to the Motion to Dismiss

---

[2] Refers to the docket number maintained in the above-captioned Adversary Proceeding.

Appellee Appx. 01404
Appx. 01655
014217

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 6-15 Page 14/03/8151804 Page 539 of 1017 PageID 15183
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1411 of 1803 PageID 12157
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21 Entered 07/20/21 14:01:55 Page 4 of 20

and a memorandum of law in support thereof [Docket Nos. 79, 80] (the "Debtor's Opposition");

WHEREAS, on March 17, 2021, the Defendants filed their reply to the Debtor's Opposition [Docket No. 85];

WHEREAS, on April 21, 2021, the Parties entered into that certain *Stipulation Regarding Agreed (I) Scheduling Order and (II) Order Further Extending Temporary Restraining Order* [Docket No. 91] (the "Scheduling Stipulation") pursuant to which, among other things, the Parties agreed to: (a) dispense with the completion of the Preliminary Injunction Hearing and move to the trial on the merits, (b) hold a single trial on all of the Debtor's claims asserted in this Adversary Proceeding, including the claim for a permanent injunction, (c) entered into a schedule set forth therein, and (d) continued the Consensual TRO until the Court enters an order determining the Debtor's claim for permanent injunctive relief against the Defendants;

WHEREAS, on June 29, 2021, the Parties entered into that certain *Stipulation Converting Trial Dates to Status Conference* [Docket No. 101] ("Second Stipulation") which the Court adopted by its *Order Approving Stipulation Converting Trial Dates to Status Conference* {Docket No. 102] on June 30, 2021;

WHEREAS, the Parties have agreed to settle and resolve all claims and disputes that were brought or that could have been brought in the Adversary Proceeding on the terms set forth in the Second Stipulation as memorialized herein:

## AGREEMENT

**NOW, THEREFORE**, after good faith, arms-length negotiations, in consideration of the foregoing, it is hereby stipulated and agreed that:

1.  Restrictions and Limitations on Termination of CLO Management Agreements.

    a.  Each of the Funds agrees that no action will be taken to terminate any CLO Management Agreement to which the Debtor is a party or to remove the

Appellee Appx. 01405
Appx. 01656
014218

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6 Exhibit 6   Page 11/08/25 1804 Page 540 of 1017   PageID 15184
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1412 of 1803   PageID 12158
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21   Entered 07/20/21 14:01:55   Page 5 of 20

portfolio manager thereunder where termination or removal is permissible on a "no cause" basis[3] for a period of twelve (12) months beginning June 1, 2021 and ending May 31, 2022.

b. Each of the Funds agrees that no action will be taken to terminate any CLO Management Agreement to which the Debtor is a party or to remove the portfolio manager thereunder where termination or removal is only permitted on a "for cause" basis,[4] except that a Fund may seek termination or removal by moving for a determination from the Bankruptcy Court that such claim "for cause" is colorable (which means proving to the Bankruptcy Court by a preponderance of the evidence that it has a good faith basis to assert that "cause" exists for termination or removal) for a period that ends on the later of (i) May 31, 2022 or (ii) a decision by the Fifth Circuit Court of Appeals reversing the confirmation order, confirming of the Debtor's Plan of Reorganization, or otherwise eliminating the Gatekeeper provision from the Plan.

2.   Representations and Warranties.

a. To the best of their knowledge after due inquiry, including inquiring of the Advisors, each of the Funds represents and warrants that (i) their ownership interests in any CLO managed by the Debtor as of December 1, 2020, is as set forth on **Exhibit A** hereto, and none of the Funds owned any other interests in

---

[3] The CLOs in which termination is arguably permissible on a "no cause" basis are Liberty CLO, Ltd., Southfork CLO Ltd., Gleneagles CLO, Ltd., Highland Legacy Limited, Jasper CLO, Ltd., Valhalla CLO, Ltd., and ACIS CLO 2017-7 Ltd.

[4] The CLOs in which termination is arguably only permitted on a "for cause" basis are Aberdeen Loan Funding, Ltd., Brentwood CLO, Ltd., Westchester CLO, Ltd., Grayson CLO, Ltd., Stratford CLO Ltd., Greenbriar CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Eastland CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Red River CLO, Ltd., PamCo Cayman Ltd.,

Appellee Appx. 01406
Appx. 01657
014219

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-9   Exhibits   Page 14 of 25   Page 541 of 1017   PageID 15185
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1413 of 1803   PageID 12159
Case 19-34054-sgj11  Doc 2590-1  Filed 07/20/21   Entered 07/20/21 14:01:55   Page 6 of 20

any CLO managed by the Debtor as of that date, (ii) they have not sold, transferred, participated, or assigned any ownership interest in any CLO managed by the Debtor since December 1, 2020, and (iii) their respective percentage ownership interests in the CLOs managed by the Debtor are as set forth on **Exhibit B** hereto on the date of the execution of this Agreement and none of the Funds own any other interests in any CLO managed by the Debtor on the date of the execution of this Agreement.

b.  Each of the Funds represents and agrees that it will not transfer any interest in any CLO identified on Exhibits A and B ("Debtor-Managed CLO" or together, "Debtor Managed CLOs") to any current or former Debtor employee or any entity in which any current or former Debtor employee has any direct or indirect interest whatsoever, including, without limitation, (i) a direct or indirect ownership interest (regardless of whether such interest is passive, provides a control right, or is de minimis), (ii) a board seat or management position (regardless of whether such board seat or management position is at the entity, a direct or indirect parent of the entity, or a beneficial owner of such entity), and (iii) any other interest that confers upon such current or former Debtor employee any right to control or the ability to influence management of such entity (collectively, "Prohibited Transferee").  For the avoidance of doubt, Prohibited Transferee includes the Charitable Donor Advised Fund, L.P. and any of its direct and indirect parents and subsidiaries, including CLO Holdco, Ltd. Notwithstanding the foregoing, each of the Funds may transfer (a "Permitted Transfer") any interest in a Debtor-Managed CLO

5

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 14/05/251804    Page 542 of 1017    PageID 15186
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1414 of 1803    PageID 12160
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 7 of 20

where no change in beneficial ownership would result from such transfer (such as a transfer between a Fund and its subsidiary or among a Fund's subsidiaries) or where a transfer occurs between the Funds (such as resulting from a Fund merger, reorganization, or similar transaction, to the extent permitted by applicable law) (the recipient of a Permitted Transfer, a "Permitted Transferee").

Further, and notwithstanding the foregoing, each of the Funds may transfer and shall not be prohibited from transferring any interest in any of the Debtor-Managed CLOs to a Prohibited Transferee if such transfer is necessary for a Fund's compliance with tax or other applicable regulatory needs (any such transfer, a "Subject Transfer").

Notwithstanding anything else contained herein, in the event of a Permitted Transfer or a Subject Transfer, the Fund shall (a) notify the Debtor of such Transfer and the Permitted Transferee or Prohibited Transferee, as applicable, shall agree to be bound by the terms of Paragraph 1 and this Paragraph 2(b) of this Agreement by executing an undertaking in the form set forth on **Exhibit C** to this Agreement (the "Undertaking") and (b) deliver the Undertaking to the Debtor before the Transfer becomes effective.

c.  Each of the Advisors represents and warrants that it is (a) controlled by James Dondero, and (b) is a "Related Entity" (as that term is defined in section I.D(ii) of Exhibit D to the *Preliminary Term Sheet* (filed at Docket No. 354-1)) for purposes of paragraph 9 of the January 9, 2020 Order (Docket No. 339).

Appellee Appx. 01408
Appx. 01559
014221

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Filed 04/06/25   Page 543 of 1017   PageID 15187
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1415 of 1803   PageID 12161
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21   Entered 07/20/21 14:01:55   Page 8 of 20

3.      This Agreement shall become binding and effective on the date an order approving this Agreement pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "9019 Order") is entered by the United States Bankruptcy Court for the Northern District of Texas (the "Agreement Effective Date"), irrespective of whether the 9019 Order is subject to appeal.   If no appeal of the 9019 Order is timely filed in accordance with Bankruptcy Rule 8002, then the Parties shall thereafter cooperate to take all steps reasonably necessary to dismiss the Adversary Proceeding with prejudice with all Parties bearing their own costs.

4.      Except for the representations and warranties set forth in Section 2 hereof, which shall bind each of the Parties hereto, this Agreement is without prejudice to the Parties' respective positions in connection with all pending appeals arising out of the Bankruptcy Case and each party hereby reserves any and all rights, positions, arguments, claims and defenses in connection with all such appeals, including without limitation, the Defendants' respective appeals of the Confirmation Order and requests for stay pending appeal of the Confirmation Order.

5.      This Agreement contains the entire agreement between the Parties as to its subject matter and supersedes and replaces any and all prior agreements and undertakings between the Parties relating thereto.

6.      This Agreement may not be modified other than by a signed writing executed by the Parties.

7.      Each person who executes this Agreement represents that he or she is duly authorized to do so on behalf of the respective Party and that each Party has full knowledge and has consented to this Agreement.

8.      To the extent a notice is required or appropriate under this Agreement such

Appellee Appx. 01409
Appx. 01569
014222

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-5    Page 1476 of 1804    Page 544 of 1017    PageID 15188
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1416 of 1803    PageID 12162
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 9 of 20

notice shall be deemed delivered upon the following business day if sent via email as follows:

<u>If to the Debtor:</u>  By email to James P. Seery, Jr, the Debtor's Chief Executive officer, at

jpseeryjr@gmail.com    with    a    copy    to    Jeffrey    N.    Pomerantz    via    email    at

Jpomerantz@pszjlaw.com.

<u>If to the Advisor:</u> By email to legalnotices@nexpoint.com with a copy to DC Sauter by

email    at    DSauter@Nexpoint.com    and    Davor    Rukavina    by    email    at

drukavina@munsch.com.

<u>If  to  the  Funds:</u>  By  email  to  legalnotices@nexpoint.com    with  a  copy  to  A.  Lee

Hogewood III via email at  lee.hogewood@klgates.com.

9.    This Agreement may be executed in counterparts, each of which will be deemed

an original but all of which together constitute one and the same instrument, and it constitutes

sufficient proof of this Agreement to present any copy, copies, or faxes signed by the Parties to

be charged.

10.    This Agreement will be exclusively governed by and construed and enforced in

accordance with the laws of the State of Texas without regard to its conflicts of law principles,

and  all  claims  relating  to  or  arising  out  of  this  Agreement,  or  the  breach  thereof,  whether

sounding in contract, tort, or otherwise, will likewise be governed by the laws of the State of

Texas, excluding Texas conflicts of law principles.

11.    The Court shall retain exclusive jurisdiction over all disputes arising out of or

otherwise concerning the interpretation and enforcement of this Agreement.


[*Remainder of Page Intentionally Blank*]

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibits   Page 14/08/251804   Page 545 of 1017   PageID 15189
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1417 of 1803   PageID 12163
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21   Entered 07/20/21 14:01:55   Page 10 of
20

Dated: July 16, 2021

AGREED TO AND EXECUTED AS OF THE DATE ABOVE:


**HIGHLAND CAPITAL MANAGEMENT, L.P.,** as debtor-in-possession,

By: _____

Its: General Partner

By: _____

James P. Seery


**HIGHLAND CAPITAL
MANAGEMENT FUND
ADVISORS, L.P.**
By: Strand Advisors XVI, Inc., its
general partner

By:       _____
Name:   Frank Waterhouse
Title:    Treasurer

**NEXPOINT ADVISORS, L.P.**
By: NexPoint Advisors GP, LLC, its
general partner


By:       _____
Name:    Frank Waterhouse

Title:    Treasurer, Principal
          Accounting Officer &
          Principal Financial Officer



**HIGHLAND INCOME FUND**

By: _____
      Name: Dustin Norris
      Title:  Executive Vice President

Appellee Appx. 01411
014224
Appx. 01562

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 14 of 25 1804   Page 546 of 1017   PageID 15190
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1418 of 1803   PageID 12164
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21   Entered 07/20/21 14:01:55   Page 11 of
20

Dated: July 16, 2021

AGREED TO AND EXECUTED AS OF THE DATE ABOVE:


**HIGHLAND  CAPITAL MANAGEMENT, L.P.,**  as debtor-in-possession,

By: _____
   Its: General Partner
By: _____
   James P. Seery


**HIGHLAND CAPITAL
MANAGEMENT FUND
ADVISORS, L.P.**
By: Strand Advisors XVI, Inc., its
general partner

By: _____
Name:   Dustin Norris
Title:    Executive Vice President

**NEXPOINT ADVISORS, L.P.**
By: NexPoint Advisors GP, LLC, its
general partner


By: _____
Name:   James Dondero
Title:    President




**HIGHLAND INCOME FUND**

By: _____
   Name:  Dustin Norris
   Title:   Executive Vice President

Appellee Appx. 01412
Appx. 01593
014225

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 14/20/22 15 Page 547 of 1017    PageID 15191
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1419 of 1803    PageID 12165
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 12 of
20

Dated: July 16, 2021

AGREED TO AND EXECUTED AS OF THE DATE ABOVE:

**HIGHLAND  CAPITAL MANAGEMENT, L.P.,** as debtor-in-possession,

By: _____

    Its: General Partner

By: _____

    James P. Seery

**HIGHLAND CAPITAL
MANAGEMENT FUND
ADVISORS, L.P.**

By: Strand Advisors XVI, Inc., its
general partner

By: _____

Name:   Dustin Norris

Title:    Executive Vice President

**NEXPOINT ADVISORS, L.P.**

By: NexPoint Advisors GP, LLC, its
general partner

By: _____

Name:   James Dondero

Title:   President

**HIGHLAND INCOME FUND**

By: _____

    Name: Dustin Norris

    Title:  Executive Vice President

Appellee Appx. 01413

014226
Appx. 01584

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 14/26/25 1804 Page 548 of 1017   PageID 15192
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1420 of 1803   PageID 12166
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21   Entered 07/20/21 14:01:55   Page 13 of 20

NEXPOINT STRATEGIC
OPPORTUNITIES FUND

By:

Name:   James Dondero
Title:   President and
         Principal Executive Officer

NEXPOINT CAPITAL, INC.

By:

Name:  James Dondero
Title:   President and
         Principal Executive Officer

APPROVED AS TO FORM BY COUNSEL DESIGNATED BELOW:

MUNSCH HARDT KOPF & HARR, P.C.

Davor Rukavina
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile:  (214) 855-7584
E-mail: drukavina@munsch.com

*Counsel for Highland Capital Management Fund
Advisors, L.P. and NexPoint Advisors, L.P.*

K&L GATES LLP

A. Lee Hogewood III (w/ permission)
4350 Lassiter at North Hills Ave.
Suite 300
Raleigh, NC 27609
Telephone: (919) 743-7306

Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Telephone: (214) 939-5659

*Counsel for Highland Income Fund, NexPoint Strategic
Opportunities Fund, Highland Global Allocation Fund,
and NexPoint Capital, Inc.*

10

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 18-15 Page 14/26/251804 Page 549 of 1017 PageID 15193
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1421 of 1803 PageID 12167
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21 Entered 07/20/21 14:01:55 Page 14 of 20

- and -

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569) 10100 Santa
Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
E-mail: jpomerantz@pszjlaw.com ikharasch@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com

- and -

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908 MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075 ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile:  (972) 755-7110


*Counsel for Highland Capital Management, L.P.*

11

**Appellee Appx. 01415**
**Appx. 01506**
**014228**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 1423 of 1804 Page 550 of 1017   PageID 15194
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1422 of 1803   PageID 12168

## EXHIBIT A

**FUNDS' INTERESTS IN DEBTOR-MANAGED CLOS
AS OF DECEMBER 1, 2020**

Appellee Appx. 01416

Appx. 01507

0'14229

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1424 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1423 of 1803    PageID 12169

Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 16 of
20

**Exhibit A to Settlement Agreement**

**CLO Equity as of December 1, 2020**

| **CLO** | **Global Equity** | **CLO Equity Held by NexPoint Strategic Opportunities Fund** | **CLO Equity Held by Highland Income Fund** | **CLO Equity Held by NexPoint Capital, Inc.** | **Total** | **Ownership %** |
|---|---|---|---|---|---|---|
| Aberdeen | 48,000,000 | 14,500,000 | - | | 14,500,000 | 30.2% |
| Brentwood | 71,400,000 | 28,600,000 | - | | 28,600,000 | 40.1% |
| Eastland | 123,500,000 | 13,006,000 | 38,480,000 | | 51,486,000 | 41.7% |
| Grayson | 127,500,000 | 13,700,000 | 62,600,000 | 800,000 | 77,100,000 | 60.5% |
| Greenbriar | 80,000,000 | 42,750,000 | - | | 42,750,000 | 53.4% |
| Red River | 81,000,000 | 8,500,000 | - | | 8,500,000 | 10.5% |
| Stratford | 63,000,000 | 43,500,000 | - | | 43,500,000 | 69.0% |
| Westchester | 80,000,000 | 35,507,000 | - | | 35,507,000 | 44.4% |
| Rockwall | 78,600,000 | 10,500,000 | - | | 10,500,000 | 13.4% |
| Rockwall 2 | 86,200,000 | 4,871,000 | 12,553,000 | | 17,424,000 | 20.2% |
| Gleneagles | 91,000,000 | 7,750,000 | 8,860,000 | | 16,610,000 | 18.3% |
| Jasper | 70,000,000 | 5,000,000 | - | | 5,000,000 | 7.1% |
| Liberty | 94,000,000 | 10,000,000 | - | | 10,000,000 | 10.6% |
| Southfork | 82,000,000 | 6,000,000 | - | | 6,000,000 | 7.3% |
| Valhalla | 82,000,000 | 1,500,000 | - | - | 1,500,000 | 1.8% |
| | | | | | | |
| **TOTALS** | 1,258,200,000 | 245,684,000 | 122,493,000 | 800,000 | | |

Appellee Appx. 01417
Appx 01568
014230

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 68-5    Page 10/26/3518 04   Page 552 of 1017    PageID 15196
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1424 of 1803   PageID 12170

Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 17 of 20

## EXHIBIT B

**FUNDS' INTERESTS IN DEBTOR-MANAGED CLOS**
**AS OF THE DATE OF THIS AGREEMENT**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1426 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1425 of 1803   PageID 12171

Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21   Entered 07/20/21 14:01:55    Page 18 of
20

**Exhibit B to Settlement Agreement**

**CLO Equity as of Date of Settlement Agreement**

| CLO | Global Equity | CLO Equity Held by NexPoint Strategic Opportunities Fund | CLO Equity Held by Highland Income Fund | CLO Equity Held by NexPoint Capital, Inc. | Total | Ownership % |
|---|---|---|---|---|---|---|
| Aberdeen | 48,000,000 | 14,500,000 | - | | 14,500,000 | 30.2% |
| Brentwood | 71,400,000 | 28,600,000 | - | | 28,600,000 | 40.1% |
| Eastland | 123,500,000 | 13,006,000 | 38,480,000 | | 51,486,000 | 41.7% |
| Grayson | 127,500,000 | 13,700,000 | 62,600,000 | 800,000 | 77,100,000 | 60.5% |
| Greenbriar | 80,000,000 | 42,750,000 | - | | 42,750,000 | 53.4% |
| Red River | 81,000,000 | 8,500,000 | - | | 8,500,000 | 10.5% |
| Stratford | 63,000,000 | 43,500,000 | - | | 43,500,000 | 69.0% |
| Westchester | 80,000,000 | 35,507,000 | - | | 35,507,000 | 44.4% |
| Rockwall | 78,600,000 | 10,500,000 | - | | 10,500,000 | 13.4% |
| Rockwall 2 | 86,200,000 | 4,871,000 | 12,553,000 | | 17,424,000 | 20.2% |
| Gleneagles | 91,000,000 | 7,750,000 | 8,860,000 | | 16,610,000 | 18.3% |
| Jasper | 70,000,000 | 5,000,000 | - | | 5,000,000 | 7.1% |
| Liberty | 94,000,000 | 10,000,000 | - | | 10,000,000 | 10.6% |
| Southfork | 82,000,000 | 6,000,000 | - | | 6,000,000 | 7.3% |
| Valhalla | 82,000,000 | 1,500,000 | - | - | 1,500,000 | 1.8% |
| | | | | | | |
| **TOTALS** | 1,258,200,000 | 245,684,000 | 122,493,000 | 800,000 | | |

Appellee Appx. 01419
Appx. 01579
014232

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-16    Page 1476 of 1804    Page 554 of 1017    PageID 15198
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1426 of 1803   PageID 12172

**<u>EXHIBIT C</u>**

**PROHIBITED TRANSFEREE UNDERTAKING**

Appellee Appx. 01420
014233
Appx. 01571

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-6    Page 14/26/85 180-4 Page 555 of 1017    PageID 15199
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1427 of 1803    PageID 12173

**<u>Exhibit C to Settlement Agreement</u>**

**UNDERTAKING TO BE BOUND TO PARAGRAPH 1 AND PARAGRAPH 2(b) OF SETTLEMENT AGREEMENT DATED JULY 16, 2021 ("Agreement")**

**[Prohibited Transferee], upon receipt of a transfer of an interest in one of the Debtor-Managed CLOs (as defined in the Agreement) from one of the Funds (as defined in the Agreement), is and shall forever be bound by the terms of Paragraph 1 and Paragraph 2(b) of the Agreement.**

**This __ day of _____ 202_**

**[Prohibited Transferee]**
**By:  [Authorized signatory]**

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 58-15 Page 1429 of 1804 Page 556 of 1017 PageID 15200
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1428 of 1803 PageID 12174

# APPENDIX 18

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16    Page 1436 of 1804    Page 557 of 1017    PageID 15201
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1429 of 1803    PageID 12175
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21    Entered 01/05/21 14:24:09    Page 1 of 8

Docket #1661  Date Filed: 01/05/2021

D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
Joshua N. Eppich
State Bar I.D. No. 24050567
J. Robertson Clarke
State Bar I.D. No. 24108098
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

ATTORNEYS FOR JAMES DONDERO

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **Case No. 19-34054** |
| **L.P.,** | § | |
| | § | |
| Debtor. | § | **Chapter 11** |

### JAMES DONDERO'S OBJECTION TO FIFTH AMENDED PLAN OF
### REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.

James Dondero ("Respondent"), a creditor, indirect equity security holder, and party in

interest in the above-captioned bankruptcy case, hereby files this objection (the "Objection") to

the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "Plan").[1]

In support thereof, Respondent respectfully represents as follows:

### PRELIMINARY STATEMENT

1.    On October 16, 2019, Highland Capital Management, L.P. ("Highland" or the

"Debtor") initiated a Chapter 11 proceeding in the United States Bankruptcy Court for the District

of Delaware. The Chapter 11 Case was subsequently transferred to this Court. The case was

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Plan.

1934054210105000000000007

Appellee Appx. 01423

014236

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Filed 04/36/25 1804   Page 558 of 1017   PageID 15202
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1430 of 1803   PageID 12176
Case 19-34054-sgj11   Doc 1661   Filed 01/05/21   Entered 01/05/21 14:24:09   Page 2 of 8

commenced with the expectation that Highland would emerge from Chapter 11 as a going concern. However, during the case and leading up to the confirmation hearing on the Plan, Highland's assets have been liquidated at below value prices. Under the Plan, Highland's assets will continue to be liquidated for less than optimal prices, with a view to ultimately terminating Highland's existence.

2.    Confirmation of the Plan should be denied due to numerous deficiencies and improprieties. The problems with the Plan as drafted include, but are not limited to, exculpation and injunction provisions that extend far beyond permissible limits, a lack of transparency following confirmation, inappropriate post-confirmation jurisdictional terms, and the wrongfully obtained votes of certain affiliates of HarbourVest Partners, LLC (collectively, "HarbourVest"). The Plan severs Respondent's rights and fails to comply with the Bankruptcy Code and applicable case law. Therefore, confirmation of the Plan should be denied.

## OBJECTION

**I.    Both the Exculpation and Injunction Sections Violate Fifth Circuit Precedent.**

3.    The proposed exculpatory and injunction provisions are simply impermissible. Both contravene established case law in the Fifth Circuit regarding the proper boundaries of such provisions and merit denial of Plan confirmation.

4.    First, Article IX.D proposes to exculpate each and every "Exculpated Party" for all post-petition liability relating to the Debtor's bankruptcy case. The term "Exculpated Party" includes not just the Debtor but also, among others, the Debtor's Employees, the Independent Directors, the CEO/CRO, and the Related Persons of such parties. These exculpations in favor of the Exculpated Parties are prohibited under Fifth Circuit precedent. *See, e.g., In re Pacific Lumber, Co.*, 584 F.3d 229 (5th Cir. 2009); *Dropbox Inc. v. Thru Inc.*, Case No. 17-1958-G, 2018 U.S. Dist.

Appellee Appx. 01424
014237
Appx. 01575

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6 Filed 14/32/25 1804 Page 559 of 1017   PageID 15203
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1431 of 1803   PageID 12177
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21   Entered 01/05/21 14:24:09   Page 3 of 8

LEXIS 179769 * 66-68 (N.D. Tex. Oct. 19, 2018) (finding that the scope of an exculpation clause provided insulation to nondebtor third parties in contravention of Fifth Circuit law).

5.     In *Pacific Lumber*, the Fifth Circuit made clear that section 524(e) prohibits the exoneration of nondebtors such as a debtor's management and professionals, but excluding official committees and their members acting within the scope of their official duties, from negligence during the course of their participation in the bankruptcy. The Fifth Circuit in *Pacific Lumber* stated: "[T]he essential function of the exculpation clause proposed here is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose." *Pacific Lumber*, 584 F.2d at 252. Despite these clear limits, the exculpation provisions in the Plan go far beyond what is permissible through the Bankruptcy Code's intended "fresh start" to encompass virtually all acts or omissions taken in connection with the Debtor's bankruptcy case by a wide range of parties, thus effectively exculpating an unknown number of individuals.

6.     Second, Article IX.F creates a channeling injunction with respect to certain "Protected Parties." The injunction requires Bankruptcy Court approval to pursue any claims related to the Debtor brought by any entity, including claims arising from a Protected Party's post-confirmation conduct. Much like the overbroad definition of "Exculpated Parties", the definition for "Protected Parties" includes a wide swath of individuals and entities beyond simply the Debtor. As a result, the channeling injunction would bring into the Bankruptcy Court all claims against such Exculpated Parties by any party who happens to have a claim or interest in the Debtor. The proposed injunction is effectively a non-consensual third-party release, which is expressly prohibited. *See Dropbox*, 2018 U.S. Dist. LEXIS 179769 * at 65 (disallowing similar injunction). Moreover, the Fifth Circuit has held that a permanent injunction cannot be justified under the broad

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 1488 of 1804 Page 560 of 1017   PageID 15204
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1432 of 1803   PageID 12178
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21   Entered 01/05/21 14:24:09   Page 4 of 8

equity powers of Bankruptcy Code section 105 "if it effectively discharges a nondebtor." *Feld v. Zale Corporation (In re Zale Corporation)*, 62 F.3d 746, 760 (5th Cir. 1995) (overturning permanent injunction effectively discharging a nondebtor because such an injunction violates section 524 of the Bankruptcy Code, which was designed only to discharge the debtor, not nondebtor parties).

7.      Furthermore, the channeling injunction in Article IX.F limits the jurisdiction to hear claims against Protected Parties to only the Bankruptcy Court. In doing so, the Plan would improperly disregard parties' rights to bring claims even in courts with exclusive jurisdiction and would ignore those courts with specialized jurisdiction to hear certain types of cases. Respondent therefore objects to isolating (and potentially even providing) jurisdiction of any and all claims against Protected Parties in the Bankruptcy Court through this channeling injunction.

8.      In addition, the proposed injunction in Article IX.F is impermissibly vague and broad and, as noted, applies to post-confirmation conduct and claims.

9.      FED. R. BANKR. P. 3016(c) requires that, "[i]f a plan provides for an injunction against conduct not otherwise enjoined under the Code, the plan and disclosure statement shall describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction." The Debtor fails to provide such "specific and conspicuous language" about the proposed injunction here. The Plan instead issues a blanket prohibition on entities from:

> (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the

---

**Appellee Appx. 01426**

**Appx. 01577**

**014239**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 124/36/25804   Page 561 of 1017   PageID 15205
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1433 of 1803   PageID 12179
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21   Entered 01/05/21 14:24:09   Page 5 of 8

> Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, . . . ; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

Plan at IX.F. Much like the overbroad exculpation and channeling injunction provisions, this vague and potentially limitless injunction is improper. As a result, the Plan should not be confirmed.

**II.      The Plan Fails to Meet Section 1129(a)(7) due to Lack of Appropriate Sale Procedures for Post-Confirmation Operations.**

10.      The Plan envisions the liquidation of the Debtor's assets by the Reorganized Debtor and the Claimant Trust. This wind down, however, is subject to no oversight or predetermined procedures to ensure that the process is both value-maximizing and transparent. This is critically important because, during the course of the Debtor's bankruptcy case, Respondent would allege on information and belief that the Debtor has sold a number of assets of significant value outside the ordinary course of the Debtor's business as it was conducted prepetition without notice to parties in interest or a complete marketing plan.

11.      The proposed Plan's lack of appropriate marketing and the resulting dampening of competitive bidding requirements for the Reorganized Debtor's assets indicates that the Debtor's creditors and equity holders could receive a higher recovery from the liquidation of the Debtor under Chapter 7 of the Bankruptcy Code in which sales procedures are governed by the Bankruptcy Court to ensure maximization of value through auction or other market-testing means. As it is, for the Debtor to meet its burden to establish all elements of 11 U.S.C. § 1129, specifically including the best interest test of section 1129(a)(7), the Debtor must detail why the proposed liquidation process will test the market as fully as would be the case in Chapter 7.

12.      Moreover, Respondent believes that notice and an opportunity for other potential bidders to come forward will not only provide transparency to the process but also will result in

**Appellee Appx. 01427**
**0 1 4 2 40**
Appx. 01678

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S      Document 6-15      Page 1436 of 1804   Page 562 of 1017      PageID 15206
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21      Page 1434 of 1803   PageID 12180
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21   Entered 01/05/21 14:24:09   Page 6 of 8

competitive bidding, increasing the value received by the beneficiaries of the Debtor's liquidation. An asset sale without transparency, on the other hand, will presumptively be done without comprehensive market exposure. Courts have long recognized the need for competitive bidding when approving sales. *In re Muscongus Bay Company,* 597 F.2d 11 (1st Cir. 1979); *In re Alves,* 52 B.R. 353 (Bankr. D. R.I. 1985); *In re Dartmouth Audio Inc.,* 42 B.R. 871, 874 (Bankr. D. N.H. 1984). Competitive bidding yields higher offers and thus benefits the estate. The objective is "to maximize the bidding, not to restrict it." *In re The Ohio Corrugating Company,* 59 B.R. 11, 13 (Bankr. N.D. Ohio 1985) (quoting *In re Beck Industries Inc.,* 605 F.2d 624, 637 (2d Cir. 1979)). Additionally, because the Plan states that equity will receive some recovery under the Plan— Article III.F states that there are no Classes deemed to reject the Plan or being excluded from recovery—equity holders as well as all creditors should receive, *inter alia,* notice and an opportunity to be heard on all significant liquidations and other transactions performed by the Reorganized Debtor.

### III.   Post-Confirmation Jurisdiction under the Plan is Improper.

13.     The various jurisdictional provisions of the Plan are overbroad and mandate that the Bankruptcy Court hear any matter involving the Debtor or its operations post-Effective Date. First, as noted above, the injunction with respect to "Protected Parties" requires that "the Bankruptcy Court will have sole jurisdiction to adjudicate any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted." Plan at Art. IX.F. There is no legal basis for barring recourse to other courts with exclusive jurisdiction—possibly providing the Bankruptcy Court with jurisdiction it does not legally have, especially post-confirmation. *See, e.g., Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.),* 266 F.3d 388, 390 (5th Cir. 2001) ("After a debtor's reorganization plan has been confirmed, the debtor's estate, and

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 14/36/251804Page 563 of 1017    PageID 15207
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1435 of 1803    PageID 12181
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21    Entered 01/05/21 14:24:09    Page 7 of 8

thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan."). Second, the Bankruptcy Court's jurisdiction should not encompass claims and causes of action arising from the Reorganized Debtor's post-confirmation operations.

**IV.    The Subordination Provisions are Improper.**

14.    The elimination of vacant Classes pursuant to Article IV.I would potentially eliminate certain Classes on the Effective Date and any recovery for such Classes, including Class 9 for Subordinated Claims (assuming the HarbourVest claim in Class 9 is disallowed), despite the later re-allocation of claims into such eliminated Classes.

15.    The Plan contemplates subordination of Claims and Equity Interests yet provides no mechanism, hearing requirement, or deadlines for such subordination. Instead, the Debtor reserves in Article III.J the right to subordinate any Claim and the Claimant's resulting Plan treatment apparently without hearing.

**V.    Any Acceptance of the Plan by HarbourVest Should be Disallowed.**

16.    HarbourVest agreed to accept the Plan pursuant to the settlement with the Debtor submitted to the Court pursuant to FED. R. BANK. P. 9019. If that settlement is approved by the Court, HarbourVest will have, under the Plan, a Class 8 claim of $45 million and a Class 9 claim of $35 million. Respondent would allege on information and belief that the Debtor's CEO/CRO has stated on multiple occasions that HarbourVest has no valid claim against the Debtor and that its dispute with the Debtor could be settled for $5 million or less.

17.    By including in the settlement agreement the requirement that HarbourVest vote both its Class 8 and Class 9 claim to accept the Plan, the settlement agreement, on its face, reflects the exchange of HarbourVest's acceptance of the Plan for the vastly inflated claims agreed to by

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 14/37/25 1804 Page 564 of 1017   PageID 15208
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1436 of 1803   PageID 12182
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21   Entered 01/05/21 14:24:09   Page 8 of 8

the Debtor. In other words, the Debtor **purchased** HarbourVest's acceptance. This constitutes a violation of Bankruptcy Code section 1129(a)(3) in that HarbourVest's acceptance and the payment for it were not in good faith.

## CONCLUSION

For the foregoing reasons, Respondent respectfully requests that the Bankruptcy Court enter an order (i) denying confirmation of the Plan, and (ii) granting Respondent such other and further relief to which he may be justly entitled.

Dated: January 5, 2021                    Respectfully submitted,

                                          */s/ D. Michael Lynn*
                                          D. Michael Lynn
                                          State Bar I.D. No. 12736500
                                          John Y. Bonds, III
                                          State Bar I.D. No. 02589100
                                          Joshua N. Eppich
                                          State Bar I.D. No. 24050567
                                          J. Robertson Clarke
                                          State Bar I.D. No. 24108098
                                          BONDS ELLIS EPPICH SCHAFER JONES LLP
                                          420 Throckmorton Street, Suite 1000
                                          Fort Worth, Texas 76102
                                          (817) 405-6900 telephone
                                          (817) 405-6902 facsimile
                                          Email: michael.lynn@bondsellis.com
                                          Email: john@bondsellis.com
                                          Email: joshua@bondsellis.com
                                          Email: robbie.clarke@bondsellis.com

                                          ATTORNEYS FOR JAMES DONDERO

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on January 5, 2021, a true and correct copy of the foregoing document was served via the Bankruptcy Court's CM/ECF system on counsel for the Debtor and on all other parties requesting or consenting to such service in this case.

                                          */s/ J. Robertson Clarke*
                                          J. Robertson Clarke

---

JAMES DONDERO'S OBJECTION TO PLAN CONFIRMATION                              PAGE 8

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 1486 of 1804   Page 565 of 1017   PageID 15209
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1437 of 1803   PageID 12183

# APPENDIX 19

Appellee Appx. 01431

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 14/87 of 1804    Page 566 of 1017    PageID 15210
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1438 of 1803    PageID 12184
Case 19-34054-sgj11  Doc 1667  Filed 01/05/21    Entered 01/05/21 16:22:08    Page 1 of 34

Docket #1667  Date Filed: 01/05/2021

Douglas S. Draper, LA Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust and Get Good Trust*

UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | |
| | * | Case No. 19-34054sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | * | |
| | * | |
| Debtor | * | |

**OBJECTION TO CONFIRMATION OF THE
DEBTOR'S FIFTH AMENDED PLAN OF REORGANIZATION**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

The Dugaboy Investment Trust and Get Good Trust (jointly, "Movants"), submit this

Objection for the purpose of objecting to the *Fifth Amended Plan of Reorganization of Highland*

*Capital Management, L.P.* [Dkt. 1472] (the "Plan") submitted by Highland Capital Management,

L.P. ("Debtor").  The Dugaboy Investment Trust is an equity owner of the Debtor and has filed

proofs of claim.  See Claim Numbers 131 and 177. The Get Good Trust has filed proofs of claim

in this case.  See Claim Numbers 120, 128 and 129.  If the Claims[1] filed by Movants are allowed,

---

[1] Capitalized terms not defined in this Objection are taken from the Plan and shall have the meanings given to them
in the Plan.

{00374857-13}                                  1

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 1046 of 1804   Page 567 of 1017   PageID 15211
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1439 of 1803   PageID 12185
Case 19-34054-sgj11   Doc 1667   Filed 01/05/21   Entered 01/05/21 16:22:08   Page 2 of 34

Claimants possess claims in Class 7 or 8.  The Dugaboy Investment Trust is a member of Class 11 of the Plan.

Movants assert that the Plan does not meet the requirements contained in the Bankruptcy Code, Rules, and applicable case law to be confirmed.

### The Plan Violates 11 U.S.C. § 1129(a)(1)

In order to confirm a plan, the plan must meet the requirements set forth in 11 U.S.C. §§ 1122, 1123 and 1129.  The Plan proposed by the Debtor fails to meet the requirements set forth in the Bankruptcy Code and, as such, confirmation of the Plan must be denied.  11 USC § 1129(a) (1) requires that the Plan comply with the applicable provisions of this title.  The cases interpreting this section have held that a plan must meet the requirements of 11 U.S.C. §§ 1122 and 1123.  See *In re Star Ambulance Service*, 540 B.R. 251, 260 (N.D.Tex. 2015); *In re Save Our Springs,* 632 F.3d 168 174 5th Cir. 2011); *In Re Counsel of Unit Owners of 100 Harborview Drive Condo*, 572 B.R. 131, 137-139 (Bankr.D.Md. 2017).

### The Plan Contains an Impermissible Claim Subordination Provision

Article III.J of the Plan contains the following provision:

Under section 510 of the Bankruptcy Code, upon written notice, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or seek to subordinate, any Claim. . . .

The section gives the named parties the discretion upon "notice" to either subordinate a Claim or re-characterize a Claim whether or not a legal basis exists to either re-characterize the Claim or subordinate it.  The term "notice" is nowhere defined, and any time the Bankruptcy Code uses the term notice, it is always accompanied by the words "and a hearing". 11 U.S.C. §§ 1112, 707 and 554 are examples of Bankruptcy Code sections that require both notice and a hearing prior to a party obtaining the relief sought in a pleading.  Nowhere in the Bankruptcy

{00374857-13}                                        2

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 16-15    Filed 04/05/25    Page 568 of 1017    PageID 15212
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1440 of 1803   PageID 12186
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 3 of 34

Code can a debtor obtain relief without affording the parties affected by the requested relief an opportunity for a hearing.

Under Bankruptcy Rule 7001(8), the subordination of a claim, as a general rule, requires the filing of an adversary proceeding.  However, an exception to the rule is that a subordination of a claim can occur through a Plan.  The Plan provision, as written, allows the designated parties the ability to subordinate a claim or re-characterize a claim merely by sending a letter.

The Plan, Plan Supplements and Disclosure Statement do not identify any specific Claim for which subordination is sought.  Rather, in the recent Plan Supplement that was filed on January 4th (Dkt. No. 1656), retained claims are lumped in with all other possible claims and a laundry list of possible targets.   (See Plan Supplement Dkt. No. 1656-1 Exhibit L.) Notwithstanding the conflicting 5th circuit case law concerning the necessary designation for the retention of claims (See *In re SI Restructuring*, 714 F.3d 860 (5th Cir. 2013) and *In re Texas Wyoming Drilling*, 647 F.3d 547, 549 and 551 (5th Cir 2011) and *In re United Operating*, LLC, 540 F.3d 351 (5th Cir. 2008), the cases do require some notice to the creditor of the potential for the subordination of such creditor's claim.  Bankruptcy Rule 7001 (8) cannot be read to allow a complex "equitable subordination claim" that requires evidence and findings consistent with *In Re Mobile Steel*, 563 F.2d 692 (5th Cir. 1977) to occur with only written notice immediately prior to a confirmation hearing.   The  provision, as written, does not provide any party subject to the so-called notice with due process and violates 11 U.S.C. § 1129(a)(1).

**The Plan is Not Final and Contains an Impermissible Plan Modification Provision**

In addition to the Plan, the Debtor must file a Plan Supplement which will include various documents that will 1) govern the operations of the Highland Claimant Trust and the

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Filed 04/08/25   Page 569 of 1017   PageID 15213
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1441 of 1803   PageID 12187
Case 19-34054-sgj11   Doc 1667   Filed 01/05/21   Entered 01/05/21 16:22:08   Page 4 of 34

Litigation Trust, 2) identify retained causes of action; and 3) list the executory contracts and leases that will be assumed by the Debtor and Plan Documents.

The problem with the Plan Supplement is that, as of the writing of this Objection and possibly even after the hearing on the confirmation of the Debtor's Plan, parties in interest will not have seen the documents that will become an essential part of the Plan.   Article IV.J on page 36 of the Plan states:

> The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the Order Directing Mediation entered on August 3, 2020 [D.I. 912].

It is clear that no requirement exists in the Plan that the Plan Documents be finalized prior to hearing on the confirmation of the Debtor's Plan so that creditors can object if any terms of the Plan Documents filed in the Plan Supplement adversely impact a creditor's rights or are inconsistent with the Bankruptcy Code and Rules.

The Plan contains a provision allowing modification of the Plan.  It is not clear from the language of the modification section the extent of judicial oversight that exists with respect to a Plan modification and whether this Court will have the ability to determine if the proposed plan modification is material or an immaterial.  Article XII.B (p. 55) of the Plan provides that the Debtor reserves the right in accordance with the Bankruptcy Code and Rules to amend or modify the Plan prior to the entry of the Confirmation Order with the "consent" of the Committee.  The provision does not require compliance with 11 U.S.C. § 1127(a) which specifically provides that the proposed modification prior to confirmation must meet the requirements of 11 U.S.C. §1122 and 11 U.S.C. §1123.  In contrast to the Plan provision concerning modification prior the entry of the Confirmation Order, Article XII.B of the Plan does recognize that any modification after the entry of the Confirmation Order must meet the requirements set forth in 11 U.S.C. §§

Appellee Appx. 01435
Appx. 01686
014248

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6a13bit 6   Pagei 14/08/251804age 570 of 1017   PageID 15214
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1442 of 1803   PageID 12188
Case 19-34054-sgj11   Doc 1667   Filed 01/05/21   Entered 01/05/21 16:22:08   Page 5 of 34

1127(b).  From a textual point of view, modifications of the Plan both before and after the entry of the Confirmation Order must meet the requirements of 11 U.S.C. §§ 1122 and 1123.

**The Plan violates 11 U.S.C. § 1129(a)(7)**

Under 11 U.S.C. § 1129(a)(7), in order for a plan to be confirmed, each creditor as of the effective date of the plan will receive or retain under the plan on account of claim or interest an amount that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7.

While the Debtor's Plan is a liquidation plan, creditors from a valuation point of view are receiving an amount less than they would receive if the Debtor were liquidated under chapter 7. The amount received by creditors under the Debtor's Plan cannot be viewed solely in the dollars they receive but, rather, the amount actually received must be discounted by two provisions in the Debtor's Plan that reduce the present value of the creditors' recovery under the Plan.  The two discounting factors are the following provisions in the Highland Claimant Trust:

a)  The Reorganized Debtor has no affirmative obligation to report any activity or results to the holders of beneficial interests in the Claimant Trust or potential holders of beneficial interests; and

b)  The holders of beneficial interests in the Claimant Trust are required to agree to a standard of liability for the Claimant Trustee that only allows claims against the Claimant Trustee for acts that constitute "fraud, willful misconduct or gross negligence" (See Article 8 of the Highland Claimant Trust).  A notable omission from the standard of liability is a breach of fiduciary duty.  This omission is contrary to the statement contained in the Plan "In all circumstances, the Claimant Trustee shall act in the best interests of the Claimant Trust Beneficiaries and with the same fiduciary duty as a Chapter 7 trustee." (See Plan Page 28)

{00374857-13}                                        5

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6-15    Page 11/04/25 1804  Page 571 of 1017    PageID 15215
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1443 of 1803   PageID 12189
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 6 of 34

c)    A Chapter 7 trustee, if it attempted to sell assets, would have to obtain Court

authority for the sale and would provide Notice to creditors of the sale.  Under the

Plan no such requirement exists.

**The Plan And Related Documentation Provide For Impermissible Non-debtor Exculpation, Releases and Injunctions That Are Not Allowed Under Applicable 5th Circuit Case Law**

   **A.  Exculpation and Releases**

Article IX of the Plan contains extensive exculpation and release provisions that far

exceed those allowed in the Fifth Circuit.

Article IX.C (the "Exculpation Clause") exculpates each "Exculpated Party" from, *inter*

*alia*, any liability for conduct occurring **on** or after the Petition Date in connection with or arising

out of the filing and administration of the case, the funding, consummation and implementation

of the Plan, and any negotiations, transactions and documents pertaining to same that could be

asserted in their own name or on behalf of any holder of a claim or interest excluding acts

constituting bad faith, fraud, gross negligence, criminal misconduct or willful misconduct.

The term "Exculpated Parties" is defined[2] in Article I.B.61 of the Plan to include:

1.  The Debtor and its successors and assigns, direct and indirect majority-owned

   subsidiaries, and the "Managed Funds," which is defined in Article I.B.83 of the Plan

   to include Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital

   Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to

   the executory contracts assumed under the Plan;

2.  Strand Advisors, Inc., the Debtor's general partner ("Strand");

---

[2] The definition of "Exculpated Parties" includes references to numerous other defined terms that also are defined in Article I.B, some of which are summarized here.  For the sake of brevity, the definition of each defined term contained in the definition of Exculpated Parties is not reproduced here *verbatim*.

{00374857-13}                                    6

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 12/45/351804   Page 572 of 1017   PageID 15216
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1444 of 1803   PageID 12190
Case 19-34054-sgj11  Doc 1667  Filed 01/05/21   Entered 01/05/21 16:22:08   Page 7 of 34

3. John S. Dubel, James P. Seery, Jr. and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors appointed between then and the effective date of the Plan (collectively, the "Independent Directors");

4. The Official Committee of Unsecured Creditors appointed in the case (the "Committee");

5. The members of the Committee in their official capacities;

6. Professionals retained by the Debtor and the Committee in the case (the "Professionals");

7. James P. Seery, Jr., the Debtor's chief executive office and chief restructuring officer (the "CEO/CRO"); and

8. "Related Persons" of the Independent Directors, the Committee, the members of the Committee, the Professionals and the CEO/CRO, which is defined to include, *inter alia*, predecessors, successors, assigns, officers, directors, employees, managers, attorneys, consultants, subsidiaries thereof.

The definition does expressly exclude from the definition certain named individuals and entities.

In addition to Article IX of the Plan, the Claimant Trust Agreement [Dkt. 1656-2, Exhibit M] for which approval is sought as part of the Plan confirmation, also provides in Section 8.1 for a reduced standard of care by the parties described therein as the Claimant Trustee, the Delaware Trustee, and the Oversight Board, any individual member thereof, by limiting their liability to that for fraud, willful misconduct, or gross negligence.[3]

---
[3] With respect to the Claimant Trustee, this appears to contradict Plan Article IV.B.5 (p. 28), which provides: "In all circumstances, the Claimant Trustee shall act in the best interests of the Claimant Trust Beneficiaries and with the same fiduciary duties as a chapter 7 trustee."

{00374857-13}                    7

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 6-15 Page 10/16/251804 Page 573 of 1017 PageID 15217
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1445 of 1803 PageID 12191
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 8 of 34

The scope of the Exculpation Clause is ambiguous because it does not specify a time frame to which the exculpation applies. Rather than stating that it applies for actions during a definite time period, such as occurring between the petition date and the effective date of the plan, it runs from the petition date through "implementation of the Plan." The word "implementation" is not defined, which leaves the term subject to interpretation. Does it mean the execution of documents to be executed pursuant to the Plan or the actual implementation of the Plan through administration of assets and payment of claims? The ambiguity is exacerbated by the introduction to the Exculpation Clause, which provides for its effect "to the maximum extent permitted by applicable law". Thus, one could expect that Debtor intends the Exculpation Clause to apply to actions of exculpated parties for actions taken far into the future.

Article IX.D (the "Release Clause") provides that each Released Party is deemed released by the Debtor and the Estate, including the trusts created by the Plan (the Claimant Trust and Litigation Sub-Trust) release each Released Party from, *inter alia*, any and all Causes of Action that the Debtor or its estate could legally assert, except for obligations of the party under the Plan certain other agreements, confidentiality and noncompetition agreements, avoidance actions, or acts constituting bad faith, fraud, gross negligence, criminal misconduct or willful misconduct.[4]

The term "Released Parties" is defined in Article I.B.111 of the Plan to include:

1. The Independent Directors

2. Strand, solely from the date of the appointment of the Independent Directors through the effective date of the Plan;

3. The CEO/CRO;

4. The Committee;

5. The members of the Committee;

---

[4] There are some additional limitations specific to "Senior Employees."

Appellee Appx. 01439
014252
Appx. 01690

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-9   Page 14/07/25 1804   Page 574 of 1017   PageID 15218
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1446 of 1803   PageID 12192
Case 19-34054-sgj11   Doc 1667   Filed 01/05/21   Entered 01/05/21 16:22:08   Page 9 of 34

6. The Professionals; and

7. The "Employees," which is defined as the employees of the Debtor set forth in the plan supplement.

The term "Causes of Action" is an 18 line definition in Article I.B.19 to include just about any type of cause of action, whether arising before or after the commencement of the bankruptcy case.

The Release Clause applies to causes of action having no relationship to the case. The Release Clause also waives claims of the newly created Claimant Trust and Litigation Sub-Trust "existing or hereafter arising," which means that these entities, which have conducted no business as of the confirmation of the Plan, are releasing future, unknown claims against the Released Parties, such as a future negligent breach of fiduciary duty claim.

The Exculpation Clause, the Release Clause and the Claimant Trust Agreement clearly bestow protection from liability upon numerous non-debtor parties. Some of the parties covered by the Exculpation Clause as Exculpated Parties, namely Managed Funds Highland Multi-Strategy Credit Fund, L.P. and Highland Restoration Capital Partners, L.P., and possibly by the use of "catch-all phrasing, SSPI Holdings, Inc., recently were argued to be outside the scope of this Court's oversight but for an agreement reached by the Debtor with the Committee allowing for some notice protocols. *See* Debtor's Response to Mr. James Dondero's Motion For Entry of An Order Requiring Notice And Hearing For Future Estate Transactions Occurring Outside The Ordinary Course Of Business [Dkt. 1546]¶ 12

The Fifth Circuit decision in *In re Pacific Lumber Co*. 584 F.3d 229 (5th Cir. 2009) is dispositive. In that case, the plan proposed to release the plan proponents and post-reorganization owners of the reorganized debtor, the two new entities created by the plan, and

Appellee Appx. 01440
014253
Appx. 01591

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15   Exhibit 6   Page 14/06/25 1804   Page 575 of 1017   PageID 15219
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1447 of 1803   PageID 12193
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 10 of 34

the creditor's committee (and their personnel) from liability—other than for willfulness and gross negligence—related to proposing, implementing and administering the plan. *Pacific*, 584 F.3d at 251. This language is similar to the language of the Exculpation Clause. The *Pacific* court cited the principle of 11 U.S.C. § 524(e), which states that "discharge of a debt of the debtor does not affect the liability of any other entity on . . . such debt." *Id.* The court noted that: "We see little equitable about protecting the released non-debtors from negligence suits arising out of the reorganization." Pacific, 584 F.3d at 252. It went on to cite other Fifth Circuit authority establishing that 11 U.S.C. 524(e) only releases the debtor, not co-liable third parties, and that the cases seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions. *Pacific*, 584 F.3d at 252, citing *In re Coho Resources, Inc.,* 345 F.3d 338, 342 (5th Cir. 2003); *Hall v. National Gypsum Co.,* 105 F.3d 225, 229 (5th Cir. 1997); *Matter of Edgeworth*, 993 F.2d 51, 53-54 (5th Cir. 1993), *Feld v. Zale Corporation*, 62 F.3d 746 (5th Cir. 1995). Finally, the court stated:

> There are no allegations in this record that either [plan proponents/owners of reorganized debtors] or their or the Debtors' officers or directors were jointly liable for any of [debtors'] pre-petition debt. They are not guarantors or sureties, nor are they insurers. Instead, the essential function of the exculpation clause proposed here is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose.

*Pacific,* 584 F.3d at 252-253.

The *Pacific* court struck down all of the non-debtor releases except those in favor of the creditor's committee and its members. The rationale for allowing the exculpation of the creditor's committee and its members is that the law effectively grants them qualified immunity for actions within the scope of their duties. *Pacific*, 584 F.3d at 253. The court also noted that the creditor's committee and its members were the only disinterested volunteers among those among the parties sought to be released, and reasoned that it would be extremely difficult to find

Appellee Appx. 01441
Appx. 01892
014254

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Filed 04/08/25   Page 576 of 1017   PageID 15220
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1448 of 1803   PageID 12194
Case 19-34054-sgj11   Doc 1667   Filed 01/05/21   Entered 01/05/21 16:22:08   Page 11 of 34

members to serve on the committee if they can be sued by persons unhappy with the committee's performance or the outcome of the case. *Id.*

The Fifth Circuit noted the continuing viability of the rule of *Pacific* in *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1059 (5th Cir. 2012) (". . . a non-consensual, non-debtor release through a bankruptcy proceeding, is generally not available under United States law. Indeed, this court has explicitly prohibited such relief," citing *Pacific.)*  Lower courts from within the Fifth Circuit have strictly followed the precedent and struck down various plan clauses dealing with releases and exculpation. *See In re Thru, Inc.*, 2018 WL 5113124, *22 (D.C.N.D.Tex 2018), affirmed 782 Fed.Appx. 339 (5th Cir. 2019) (exculpation provision and injunction); *In re CJ Holding Co.*, 597 B.R. 597, 608 (S.D. Tex. 2019) ("The Fifth Circuit has concluded that a bankruptcy court may not confirm a plan that provides "non-consensual non-debtor releases."); *In re National Truck Funding LLC*, 588 B.R. 175, 177 (Bankr. S.D. Miss. 2018) ("At hearing, the parties agreed that the Release and Exculpation . . . of the Plan . . . will be further amended by language protecting only the Official Committee of Unsecured Creditors and its representatives, as the Court has previously approved."); *In re LMCHH PCP LLC*, 2017 WL 4408162, at *16 (Bankr. E.D. La. Oct. 2, 2017) ("The modification [to the plan] filed was done to ensure that the exculpation provision complied with [*Pacific*] which held that a plan could not exculpate outside of the Debtors, the Official Unsecured Creditors Committee, and those who act for them, where 'the essential function of the exculpation clause . . . is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy.'"); *In re Patriot Place, Ltd.*, 486 B.R. 773, 823–24 (Bankr. W.D. Tex. 2013) (Non-debtor releases and exculpation clauses struck down as violative of Fifth Circuit precedent and render the plan unconfirmable.).

{00374857-13}

11

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 10/56/2518-04 Page 577 of 1017   PageID 15221
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1449 of 1803   PageID 12195
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 12 of 34

All parties exculpated and released other than the Debtor, the Reorganized Debtor, the Committee and its members should be removed from the Plan and the Claimant Trust Agreement, or the Plan is not confirmable.

**B. Injunction Provisions**

Article IX.F of the Plan contains extensive injunction provisions (the "Injunction Provisions") that far exceed those allowed in the Fifth Circuit. Although not broken down into sections, the Article contains multiple separate and distinct provisions, as follows:

1. The first paragraph enjoins claimants and equity holders from interfering with plan implementation of consummation;

2. The second paragraph **permanently** enjoins entities with claims or equity interests and their related persons from, with respect to such interests, *inter alia*, commencing actions, enforcing judgments, creating or enforcing encumbrances, setting off against or affecting the Debtor, the Independent Directors, the Reorganized Debtor created by the Plan or the Claimant Trust created by the Plan, except as otherwise provided by the Plan or other order of this Court;

3. The third paragraph extends the injunctions of the Article to any successors of the Debtor, the Reorganized Debtor and the Claimant Trust and their respective property and interests in property; and

4. The fourth paragraph provides that no "Entity[5]" may commence or pursue a claim or cause of action against a "Protected Party[6]" that arose from or is related to the

---

[5] Defined as any "entity" as defined in 11 U.S.C. § 101(15) and also includes any "Person" or any other entity.
[6] The Plan does not define the term "Protected Party." It defines "Protected Parties" as follows:
"*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the

Appellee Appx. 01443
Appx. 01594
014256

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1456 of 1804   Page 578 of 1017   PageID 15222
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1450 of 1803   PageID 12196
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 13 of 34

bankruptcy case, the negotiation of the Plan, the administration of the Plan, the wind down of the business, the administration of the Claimant Trust, or transactions in furtherance of the foregoing, without this Court first finding that the claim or cause of action represents a colorable claim of bad faith, criminal misconduct, fraud or gross negligence against the Protected Party, and specifically authorizes such Entity to bring a claim against the Protected Party.[7]  It further provides that this Court has the sole jurisdiction to adjudicate any such claim for which approval to pursue the claim has been granted.

Even the most cursory reading of the language of Article IX.F, especially the fourth paragraph, reveals that it goes farther than the exculpation and release provisions in terms of the parties protected by the permanent injunctions.

Although the Court in *Pacific* did not appear to expressly deal with an injunction, as noted above the court concluded that its own cases ". . . seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions." *Pacific*, 584 F.3d at 252. In addition, the Fifth Circuit in *Vitro*, *supra*, construed *Pacific* as denying a non-debtor permanent injunction, wherein it cited *Pacific* and added: "(discharge of debtor's debt does not affect liability of other entities on such debt and denying non-debtor release and permanent injunction.)"  *Vitro*, 701 F.3d at 1059.  The logic for applying the same principle to both releases/exculpations and injunctions is simple to understand—if a non-debtor cannot be released from claims but

---

Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."
[7] The provision is expressly limited as to Strand and Employees to the period from the date of appointment to the effective date of the Plan.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-15   Page 1452 of 1804   Page 579 of 1017   PageID 15223
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1451 of 1803   PageID 12197
Case 19-34054-sgj11   Doc 1667   Filed 01/05/21   Entered 01/05/21 16:22:08   Page 14 of 34

claimants can be enjoined by the bankruptcy court from prosecuting them against the non-debtor,

the exclusion of a release *ab initio* or the striking of a release from a plan is meaningless. For

example, the fourth paragraph effectively releases from negligence claims a broad category of

persons and entities not entitled to exculpation or releases under *Pacific,* because the paragraph

only allows an aggrieved party to proceed after this court has determined that their allegations

represent a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud or gross

negligence. As noted by the Fifth Circuit in *Zale, supra,* "Accordingly, we must overturn a § 105

injunction if it effectively discharges a nondebtor." *Zale,* 62 F.3d at 760, citing *In re Vitek,* 51

F.3d 530, 536, n. 27, as follows: "('[N]on-debtor property thus should not ordinarily be shielded

by the powers of the bankruptcy court.')" *Id. See also In re Thru, Inc.,* 2018 WL 5113124, *21-

22 (striking down a plan injunction that "would effectively discharge numerous non-debtor third

parties").

All parties protected by the Injunction Provisions other than the Debtor, the Reorganized

Debtor, the Committee and its members should be removed or the Plan is not confirmable.

### C. The Claims Released Do Not Meet the Few Exceptions Allowing Release or Injunctions in Favor of Third Parties

There are a few situations where it may be *possible* to argue that third party releases are

permissible within the Fifth Circuit, but none are applicable here.   The *Pacific* court

distinguished one set of cases cited by the plan proponents by saying that they concerned global

settlements of mass claims.   *Pacific,* 584 F.3d at 252.   Another has cited *Pacific* for the

proposition that, absent a **meaningful** contribution by the released party, the release would

probably be invalid under *Pacific. In re Texas Rangers Baseball Partners,* 431 B.R. 706, 717

FN 29 (Bankr. N.D. Tex. 2010); *See also Zale,* 62 F.3d at 762 (holding that one plan provision

temporarily enjoining certain contract claims was valid as an unusual circumstance because it

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 1453 of 1804   Page 580 of 1017   PageID 15224
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1452 of 1803   PageID 12198
Case 19-34054-sgj11   Doc 1667   Filed 01/05/21   Entered 01/05/21 16:22:08   Page 15 of 34

involved a settlement providing substantial consideration being paid into to the estate). Another referred to a narrowly tailored release of the type found in § 363(f) sales of property free and clear of liens. _In re Patriot Place, Ltd.,_ 486 B.R. 773, 821-822 (Bankr. W.D. Tex. 2013). Such releases and injunctions are entered to ensure that the purchaser of the debtor's property (as well as the debtor's property being sold) is insulated from claims that creditors might have against the debtor and the property being sold by the debtor to the purchaser. _Id_.

The court in _Zale_ indicated that a **temporary** injunction **may** be proper when unusual circumstances exist. _Zale_, 62 F.3d at 761. These conditions are when the non-debtor and the debtor party enjoy such an identity of interests that the suit against the non-debtor is essentially a suit against the debtor and when the third party action will have an adverse impact upon the debtor's ability to accomplish reorganization. _Id._ Even in such cases, neither of which is applicable here, an injunction would not be permanent, but would only delay the actions.

None of the foregoing exceptions are applicable in the instant case.

**D. Jurisdiction**

Even if the Bankruptcy Code were to permit some exculpation, releases and injunctions protecting non-debtor parties, this Court does not have the power to retain exclusive, indefinite, post-confirmation jurisdiction to determine whether actions against Protected Parties may proceed or, thereafter, to adjudicate claims pertaining thereto.

The fourth paragraph of the Injunction Provisions prohibits the commencement of certain actions against any Protected Party with respect to claims or causes of action that arose from or are related to the case, administration of the case, the wind down of the business of the Debtor or Reorganized Debtor, and the administration of the Claimant Trust. It also channels claims by requiring that any such claims or causes of action be first brought to this Court to determine that

Appellee Appx. 01446
014259

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Filed 12/04/25   Page 581 of 1017   PageID 15225
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1453 of 1803   PageID 12199
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 16 of 34

the claims are outside the scope of protection granted a Protected Party, and to obtain an express authorization from this Court allowing the action to proceed.  It then provides that this Court has sole jurisdiction to adjudicate the claim. Because the Reorganized Debtor and the Claimant Trust have engaged in no activity as of the confirmation of the Plan, this provision clearly is intended to extend to unknown, future conduct by Protected Parties in addition to pre-confirmation Protected Parties.

As noted by the Fifth Circuit in *Bank of Louisiana v. Craig's Stores of Texas, Inc. (In re Craig's Stores)*, 266 F.3d 388, 389 (5th Cir. 2001), bankruptcy court jurisdiction does not last forever.  Under 28 U.S.C. § 1334, a federal district court has original jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." *In re Superior Air Parts, Inc.*, 516 B.R. 85, 92 (Bankr.N.D.Tex. 2014). The district court is authorized under 28 U.S.C. § 157 to refer to the bankruptcy court "any or all proceedings arising under title 11 or arising in or related to a case under title 11." *Id.*  By virtue of an order adopted on August 3, 1984, this Court has jurisdiction over any or all proceedings arising under title 11 or arising in or related to a case under title 11.  *Id.*

"Arising Under" jurisdiction involves causes of action "created or determined by a statutory provision of title 11."  *Wood v. Wood (Matter of Wood)*, 825 F.2d 90, 96 (5th Cir. 1987); *Superior*, 516 B.R. at 93.  Nothing involved in the exculpations, releases or injunctions on non-debtor parties involves such a cause of action.  By their nature, negligence claims and intentional tort claims arise by operation of law generally applicable to all persons and entities regardless of whether or not they are in bankruptcy.  They could exist totally outside a bankruptcy context.

Appellee Appx. 01447
Appx. 01598
014260

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 18-15   Exhibit 6   Page 104 of 251804   Page 582 of 1017   PageID 15226
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1454 of 1803   PageID 12200
Case 19-34054-sgj11   Doc 1667   Filed 01/05/21   Entered 01/05/21 16:22:08   Page 17 of 34

"Arising in" jurisdiction involves those actions "not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." *Wood*, 825 F.2d at 97; *Faulkner v. Eagle View Capital Mgmt. (In re Heritage Org., LLC)*, 454 B.R. 353, 360 (Bankr.N.D.Tex. 2011); *Superior*, 516 B.R. at 94-95.  The example given the by the *Wood* court is "'administrative' matters that arise *only* in bankruptcy cases." *Wood*, 825 F.2d at 97 (emphasis supplied by the court).  Again, negligence claims and intentional torts against non-debtors obviously do not meet these criteria.

The final category, "related to" jurisdiction, involves the issue of "'whether the outcome of that proceeding could *conceivably* have any effect on the estate being administered in bankruptcy.'" *Wood*, 825 F.2d at 93, citing *Pacor v. Higgins*, 743 F.2d 984 (3d Cir. 1984) (emphasis supplied by the court).  Because it is obvious that the non-debtor claims being released, exculpated and enjoined do not "arise under" or "arise in" a bankruptcy case, the only possibly arguable basis for jurisdiction is "related to" jurisdiction.  The fourth paragraph of the Injunction Provisions contemplates application to any claim or cause of action "that arose from or is related" to the case.

Initially, it should be noted that there simply is no way that even a massive judgment against the non-debtors could have any impact whatsoever on the estate.  Considering that there will be no **estate** being administered **in bankruptcy** post-confirmation, it is inconceivable how releases of non-debtor parties could possibly impact the administration of a now defunct bankruptcy estate of the Debtor.  The court in *Craig's* appeared to recognize this principle when it adopted the view that confirmation of a plan changes bankruptcy court jurisdiction. *Craig's*, 266 F.3d at 390.  Expansive bankruptcy court jurisdiction is no longer "required to facilitate 'administration' of the debtor's estate, for there is no estate left to reorganize." *Id.*

{00374857-13}                                            17

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 68-15    Page 14/56/251804   Page 583 of 1017    PageID 15227
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1455 of 1803   PageID 12201
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 18 of 34

In *Craig's,* the Fifth Circuit was dealing with a fact pattern that differs from the instant case in two ways. First, the case involved a dispute between the aggrieved party and the reorganized debtor, not totally non-debtor parties. Second, it only partially involved the fact pattern of the instant case, because it only dealt with claims characterized as post-confirmation rather than the mix of pre- and post-confirmation claims against the non-debtor parties protected by the Exculpation Clause, Release Clause and Injunction Provisions. The case involved a pre-confirmation contract that had been assumed, and a post-confirmation dispute involving state law for damages that at least partially arose post-confirmation.[8] The court held that there was no jurisdiction over a claim that "principally dealt with post-confirmation relations between the parties." *Craig's*, 266 F.3d at 390.

The later Fifth Circuit case of *Newby v. Enron Corp. (In re Enron Corp. Securities)*, 535 F.3d 325 (5th Cir. 2008) also involved the issue of post-confirmation jurisdiction.[9] The court summarized the *Craig's* decision as one dealing with the post-confirmation relations between the parties, where there was no antagonism between the parties as of the date of the reorganization, and no facts or law deriving from the plan were necessary to the claim. *Enron*, 535 F.3d at 335.

Under the general principles of *Craig's*, there should be not "related to" jurisdiction involving the claims involved in this case, which purely involve non-debtor parties and non-bankruptcy related claims with no potential impact upon the pre- or post-confirmation estates.

---

[8] The facts are not totally clear. They indicate that the plan was confirmed in December 1994, and that the claims for damages arose in 1994 and 1995. *Craig's*, 266 F.3d at 389. Therefore, at least the 1995 claims arose post-confirmation.

[9] The *Enron* case involved lawsuits against non-debtors that had been removed prior to the commencement of the case, that were dismissed with prejudice after the confirmation of the plan. *Enron*, 535 F.3d at 333. The plaintiffs alleged that there was no jurisdiction to dismiss the case because "related to" jurisdiction had ceased after the plan was confirmed. 535 F.3d at 334. However, the parties did not dispute whether the federal courts had "related to" bankruptcy jurisdiction over the cases at the time of removal, so the court framed the question as whether the court, after confirming Enron's plan, maintained "related to" jurisdiction. 535 F.3d at 334-335. Therefore, the case stands for the proposition of whether "related to" jurisdiction, once conferred, continues post-confirmation. 535 F.3d at 335-336.

{00374857-13}                                    18

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15   Page 104/576/25 1804   Page 584 of 1017   PageID 15228
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1456 of 1803   PageID 12202
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 19 of 34

This is especially true with respect to post-confirmation future releases of non-debtor parties involved with as yet uncreated entities.

The case of *Stern v. Marshall*, 564 U.S. 462, 131 S.Ct. 2594 (2011), decided after *Wood*, *Craig's* and *Enron*, adds additional jurisdictional barriers to confirmation of a Plan containing the language of Article IX.(C), (D) and (F).   In *Stern*, Pierce had filed a proof of claim in Marshall's bankruptcy proceedings, alleging a right to recover damages as a result of alleged defamation on the part of Marshall.   *Stern*, 131 S.Ct. at 2601. Marshall filed a counterclaim against Pierce alleging tortious interference with a gift that Marshall had expected to receive from her husband, who was Pierce's father.   *Id.* The claim was classified by the Supreme Court as a common law tort claim.   *Id.* The Supreme Court found that Pierce had consented to resolution of the counterclaim by the Bankruptcy Court.   131 S.Ct. at 2606.   After being cast in judgment by the Bankruptcy Court in the amount of over $425 Million, Pierce argued that the Bankruptcy Court did not have jurisdiction over the counterclaim.   131 S.Ct. at 2601.   The Supreme Court agreed with Pierce, holding that Article III of the U.S. Constitution did not permit the Bankruptcy Court to enter a final judgement on Marshall's counterclaim.   131 S.Ct. at 2608.

Some claims involved in the instant case are simple tort claims against non-debtors. They occupy the same category as the defamation suit in *Stern*.   Movants are entitled to an actual adjudication of their claims, which would mean an adjudication by a state court or an Article III federal court of competent jurisdiction and venue.   This Court's submission of a report and recommendation on confirmation to the District Court would not constitute an actual adjudication. Because the Plan provision at issue provides that this Court will **actually adjudicate** the claims, it runs afoul of *Stern* on its face.   Similarly, the provision literally would

Appellee Appx. 01450
Appx. 01501
014263

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1458 of 1804    Page 585 of 1017    PageID 15229
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1457 of 1803    PageID 12203
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 20 of 34

preclude Movants from seeking to withdraw the reference to have the case actually decided by an Article III court.  Because this Court could not adjudicate the case, the Plan's attempt to grant to this Court sole jurisdiction to adjudicate the claims renders the Plan nonconfirmable.

Even if jurisdiction *could* exist for the purpose of determining whether a claim could go forward against a Protected Party, it does not follow that this Court would have jurisdiction to adjudicate the claim.  At the point at which this Court determines that a claim could proceed, the action no longer involves any interpretation of either bankruptcy law or the Plan, nor could it have any impact upon the pre- or post-confirmation estate.[10]

### The Plan Prohibits Claimants From Asserting Rights Under The Plan Rendering the Plan Not Confirmable

Aside from protecting parties not entitled to protection, the Exculpation, Release Injunction Provisions contain provisions that far exceed the scope permitted by bankruptcy law.

The second paragraph of the Injunction Provisions is broad enough to permanently preclude claimants from pursing their rights under the Plan against the Reorganized Debtor and the Claimant Trust because it precludes any attempt to enforce rights, many of which are created pursuant to the Plan, and the third paragraph of the Injunction Provisions goes even farther by extending the injunctions to any successors of the Reorganized Debtor and the Claimant Trust. Under the Plan, the Class 2 claimant is to be given a new promissory in treatment for its claim, the Class 3 claimants have the option to retain collateral, and Class 5 claims are reinstated.  If the Reorganized Debtor defaults under any of its obligations, the Injunction Provisions literally prevent any attempt to enforce their rights under the Plan.

---

[10] Movants are aware of *In re Pilgrim's Pride*, 2010 WL 200000 (Bankr.,N.D.Tex 2010) and *In re Camp Arrowhead, Ltd.*, (Bankr.W.D.Tex 2011).  Movants believe that these cases blatantly disregard the letter and spirit of *Pacific* and are, therefore, wrongfully decided.  In addition, they were decided before *Stern v. Marshall*.

Appellee Appx. 01451
Appx. 01702
014264

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 18-15   Page 14/56/651804 Page 586 of 1017   PageID 15230
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1458 of 1803   PageID 12204
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 21 of 34

The best way to demonstrate this issue is to cite a different plan.  Although the injunction in *In re Thru, Inc.*, *supra*, was struck down on the basis that it impermissibly released third parties, the injunction contained language that the second paragraph in the instant case is missing.  It starts out:

> Except as otherwise expressly provided in this Plan or in the Confirmation Order **and except in connection with the enforcement of the terms of this Plan (including the payment of Distributions hereunder) or any documents provided for or contemplated in this Plan**, all entities . . . are permanently enjoined from. . . .

> *Thru*, 2018 WL 5113124, *21

Compare this language to the second paragraph of the Injunction Provisions, which provides:

> Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Entities . . . are permanently enjoined. . . .

The Plan literally would require a claimant to come back to this Court for an order if the Reorganized Debtor or the Plan-created trusts default.  This goes against the concept espoused by the Fifth Circuit in *Craig's*, indicating that confirmation allows the debtor to go about its business without further supervision or approval, but also without the protection of the bankruptcy court.  *Craig's*, 266 F.3d at 390, citing *Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir. 1991).

**The Plan Contains a DeFacto Channeling Injunction**

As noted earlier, paragraph 4 of the Injunction Provisions in the Plan provide that no Entity may commence or pursue a claim or cause of action against a Protected Party without this Court:

> (i) first determining, after notice, that such claim or cause of action represents a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Entity to bring such claim against any such Protected Party; . . . .

Appellee Appx. 01452
014265

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 14/06/251804    Page 587 of 1017    PageID 15231
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1459 of 1803    PageID 12205
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 22 of 34

Plan, Article IX.F, fourth unnumbered paragraph.

Thereafter, the Plan provides that this Court retains sole jurisdiction to adjudicate the claim.  *Id.*

The above provisions have the effect of channeling all post-petition claims against the Reorganized Debtor, the Creditor Trust and others into the Bankruptcy Court to determine whether a claim can be asserted and then as the forum with the "exclusive jurisdiction" to adjudicate the claim.  The provisions are not authorized under the Bankruptcy Code.

Congress, when it enacted 11 U.S.C. § 524(g), provided a limited channeling injunction for asbestos and in some mass tort cases.  Section 524(g) was not created to shield parties that are liquidating a debtor and its reach does not extend to garden variety unsecured creditors or serve as a barrier to claims that arose after the Effective Date of the Plan.  The impact of Section 524(g) is to address pre-petition claims and future claims arising out of pre-petition activity where the claims have yet to manifest.

In addition, 11 USC 524 § (g) is only applicable to a Debtor that obtains a discharge pursuant to 11 USC § 1141.  The Debtor in its approved Disclosure Statement [See DKT 1473, pp. 8-9] classifies the Debtor's post confirmation activities as one of "wind down" of the Managed Funds as well as the monetization of the balance of the Reorganized Debtor Assets.  In addition, the Claimant Trust formed pursuant to the Plan is a "liquidation trust" [See DKT 1656-2 section 2.2], which makes the Plan a Plan that " liquidates all or substantially all of the property of the estate".  Pursuant to 11 U.S.C. § 1141(d)(3), a Debtor whose Plan is none that liquidates all or substantially all of the property of the estate is not eligible for a discharge.  11 U.S.C. § 524(g) cannot authorize any channeling injunction for the Debtor in its Plan.

**Conclusion**

For the reasons set forth herein, confirmation of the Plan must be denied.

**Appellee Appx. 01453**
**014266**
Appx. 01794

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 114/65/251804 Page 588 of 1017   PageID 15232
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1460 of 1803   PageID 12206
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 23 of 34

January 5, 2021

Respectfully submitted,

*/s/Douglas S. Draper.*
Douglas S. Draper, LA Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust*
*and Get Good Trust*

## CERTIFICATE OF SERVICE

I do hereby certify that on the 5th day of January, 2021, a copy of the above and foregoing *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* has been served electronically to all parties entitled to receive electronic notice in this matter through the Court's ECF system as follows:

- David G. Adams     david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Amy K. Anderson     aanderson@joneswalker.com, lfields@joneswalker.com,kjohnson@joneswalker.com,sbuchanan@joneswalker.com
- Zachery Z. Annable     zannable@haywardfirm.com
- Bryan C. Assink     bryan.assink@bondsellis.com
- Asif Attarwala     asif.attarwala@lw.com
- Joseph E. Bain     JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird     baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach     bankfilings@ycst.com, sbeach@ycst.com
- Paul Richard Bessette     pbessette@KSLAW.com, ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com;rmatsumura@kslaw.com
- John Y. Bonds     john@bondsellis.com, joyce.rehill@bondsellis.com

Appellee Appx. 01454
Appx. 01565
014267

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Page 14/62/251804    Page 589 of 1017    PageID 15233
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1461 of 1803    PageID 12207
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 24 of 34

- Larry R. Boyd    lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner    jbrookner@grayreed.com,
  lwebb@grayreed.com;acarson@grayreed.com
- Greta M. Brouphy    gbrouphy@hellerdraper.com,
  dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- M. David Bryant    dbryant@dykema.com, csmith@dykema.com
- Candice Marie Carson    Candice.Carson@butlersnow.com
- Annmarie Antoniette Chiarello    achiarello@winstead.com
- Shawn M. Christianson    schristianson@buchalter.com, cmcintire@buchalter.com
- Matthew A. Clemente    mclemente@sidley.com, matthew-clemente-
  8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russel
  l@sidley.com;dtwomey@sidley.com
- Megan F. Clontz    mclontz@spencerfane.com,
  gpronske@spencerfane.com;jkathman@spencerfane.com;lvargas@spencerfane.com
- Andrew Clubok    andrew.clubok@lw.com
- Leslie A. Collins    lcollins@hellerdraper.com
- David Grant Crooks    dcrooks@foxrothschild.com,
  etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfr
  ey@foxrothschild.com
- Gregory V. Demo    gdemo@pszjlaw.com,
  jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com
  ;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjla
  w.com
- Casey William Doherty    casey.doherty@dentons.com,
  dawn.brown@dentons.com;Docket.General.Lit.DAL@dentons.com;Melinda.sanchez@d
  entons.com
- Douglas S. Draper    ddraper@hellerdraper.com,
  dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- Lauren Kessler Drawhorn    lauren.drawhorn@wickphillips.com,
  samantha.tandy@wickphillips.com
- Vickie L. Driver    Vickie.Driver@crowedunlevy.com,
  crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@cr
  owedunlevy.com;ecf@crowedunlevy.com
- Jonathan T. Edwards    jonathan.edwards@alston.com
- Jason Alexander Enright    jenright@winstead.com
- Robert Joel Feinstein    rfeinstein@pszjlaw.com
- Matthew Gold    courts@argopartners.net
- Bojan Guzina    bguzina@sidley.com
- Thomas G. Haskins    thaskins@btlaw.com
- Melissa S. Hayward    MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held    mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse    ghesse@HuntonAK.com,
  amckenzie@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman    jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-
  hoffman-8287@ecf.pacerpro.com

{00374857-13}

Appellee Appx. 01455
Appx. 01706
014268

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 5-15    Page 14/63/25 1804    Page 590 of 1017    PageID 15234
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1462 of 1803    PageID 12208
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 25 of 34

- A. Lee Hogewood    lee.hogewood@klgates.com,
  haley.fields@klgates.com;matthew.houston@klgates.com;courtney.ritter@klgates.com;m
  ary-beth.pearson@klgates.com
- John J. Kane    jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman    jkathman@spencerfane.com,
  gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer    pkeiffer@romclaw.com, bwallace@romclaw.com
- Jeffrey Kurtzman    kurtzman@kurtzmansteady.com
- Phillip L. Lamberson    plamberson@winstead.com
- Lisa L. Lambert    lisa.l.lambert@usdoj.gov
- Paul M. Lopez    bankruptcy@abernathy-law.com
- Faheem A. Mahmooth    mahmooth.faheem@pbgc.gov, efile@pbgc.gov
- Ryan E. Manns    ryan.manns@nortonrosefulbright.com
- Thomas M. Melsheimer    tmelsheimer@winston.com, tom-melsheimer-
  7823@ecf.pacerpro.com
- Paige Holden Montgomery    pmontgomery@sidley.com,
  txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com
- J. Seth Moore    smoore@ctstlaw.com, jstele@ctstlaw.com
- John A. Morris    jmorris@pszjlaw.com
- Edmon L. Morton    emorton@ycst.com
- David Neier    dneier@winston.com, dcunsolo@winston.com;david-neier-
  0903@ecf.pacerpro.com
- Holland N. O'Neil    honeil@foley.com, jcharrison@foley.com;acordero@foley.com
- Rakhee V. Patel    rpatel@winstead.com,
  dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons    cpersons@sidley.com
- Mark A. Platt    mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz    jpomerantz@pszjlaw.com
- Kimberly A. Posin    kim.posin@lw.com, colleen.rico@lw.com
- Linda D. Reece    lreece@pbfcm.com
- Penny Packard Reid    preid@sidley.com, txefilingnotice@sidley.com;penny-reid-
  4098@ecf.pacerpro.com;ncade@sidley.com
- Amanda Melanie Rush    asrush@jonesday.com
- Alyssa Russell    alyssa.russell@sidley.com
- Douglas J. Schneller    douglas.schneller@rimonlaw.com
- Brian Patrick Shaw    shaw@roggedunngroup.com,
  cashion@roggedunngroup.com;jones@roggedunngroup.com
- Michelle E. Shriro    mshriro@singerlevick.com,
  scotton@singerlevick.com;tguillory@singerlevick.com
- Nicole Skolnekovich    nskolnekovich@hunton.com,
  plozano@huntonak.com;astowe@huntonak.com;creeves@huntonak.com
- Jared M. Slade    jared.slade@alston.com
- Frances Anne Smith    frances.smith@judithwross.com,
  michael.coulombe@judithwross.com
- Eric A. Soderlund    eric.soderlund@judithwross.com

Appellee Appx. 01456
Appx. 01705
014269

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 12 of 251804   Page 591 of 1017   PageID 15235
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1463 of 1803   PageID 12209
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 26 of 34

- Martin A. Sosland    martin.sosland@butlersnow.com,
  ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com
- Laurie A. Spindler    Laurie.Spindler@lgbs.com, Dora.Casiano-Perez@lgbs.com
- Jonathan D. Sundheimer    jsundhimer@btlaw.com
- Kesha Tanabe    kesha@tanabelaw.com
- Chad D. Timmons    bankruptcy@abernathy-law.com
- Dennis M. Twomey    dtwomey@sidley.com
- Basil A. Umari    BUmari@dykema.com, pelliott@dykema.com
- United States Trustee    ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz    artoush.varshosaz@klgates.com, Julie.garrett@klgates.com
- Donna K. Webb    donna.webb@usdoj.gov,
  brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber    bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller    dallas.bankruptcy@publicans.com, dora.casiano-
  perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka    danw@lfdslaw.com,
  craigs@lfdslaw.com,dawnw@lfdslaw.com,ivys@lfdslaw.com
- Hayley R. Winograd    hwinograd@pszjlaw.com
- Megan Young-John    myoung-john@porterhedges.com

I also caused same to be served on January 5, 2021, by Docusource via U.S. First Class Mail, postage prepaid upon the following parties who are **not** on the list to receive email notice/service for this case (who therefore require manual noticing/service):

Paul N. Adkins
11 Mount Emily Road #07-27
Singapore, 228493

American Express National Bank
c/o Becket and Lee LLP
PO Box 3001
Malvern, PA 19355-0701

James T. Bentley
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

James T. Bentley
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

Jeffrey E. Bjork
LATHAM & WATKINS LLP
355 South Grand Avenue, Ste. 100

{00374857-13}                                26

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 14/65/251804   Page 592 of 1017   PageID 15236
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1464 of 1803   PageID 12210
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 27 of 34

Los Angeles, CA 90071

Jessica Boelter
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019

Matthew G. Bouslog
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612

William P. Bowden
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899

Candace C. Carlyon
CARLYON CICA CHTD.
265 e. Warm Springs Road., Ste 107
Las Vegas, NV 89119

Joseph L. Christensen
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Road, Suite 401
Wilmington, DE 19808

Louis J. Cisz
Nixon Peabody LLP
One Embarcadero Center, 32nd Fl
San Francisco, CA 94111

Kevin M. Coen
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, Suite 1600
1000 North King Street
Wilmington, DE 19801

Debra A. Dandeneau
Baker & McKenzie LLP
425 5th Ave.
New York, NY 10018

Deloitte Tax LLP
1111 Bagby Street, Ste. 4500

{00374857-13}                               27

Appx. 01709

014271

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 14/66/251804    Page 593 of 1017    PageID 15237
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1465 of 1803    PageID 12211
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 28 of 34

Houston, TX 77002

Mark. L. Desgrosseilliers
Chipman, Brown, Cicero & Cole, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE 19801

Development Specialists, Inc.
333 South Grand Ave., Ste. 4070
Los Angeles, CA 90071

Fair Harbor Capital, LLC
Ansonia Finance Station
PO Box 237037
New York, NY 10023

Bojan Guzina
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

Emily M. Hahn
Abernathy, Roeder, Boyd & Hullett, P.C.
1700 Redbud Blvd. Ste. 300
McKinney, TX 75069

Hain Capital Group, LLC
301 Route 17, 6th Floor
Rutherford, NJ 07070

Marc B. Hankin
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3098

Michelle Hartman
Baker & McKenzie LLP
1900 N. Pearl, Ste. 1500
Dallas, TX 75201

Hayward & Associates PLLC
10501 N. Central Expwy., Ste 106
Dallas, TX 75231

William A. Hazeltine

{00374857-13}                                28

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 53-6   Filed 04/07/25   Page 594 of 1017   PageID 15238
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1466 of 1803   PageID 12212
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 29 of 34

Sullivan Hazeltine Allinson LLC
901 North Market Street
Suite 1300
Wilmington, DE 19801

Kuan Huang
Latham & Watkins LLP
855 Third Avenue
New York, NY 10022

Ira D Kharasch
10100 Santa Monica Boulevard
13th Floor
Los Angeles, CA 90067

Marshall R. King
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
Suite 1400
New York, NY 10066

Alan J. Kornfeld
Pachulski Stang Ziehl & Jones LLPL
10100 Santa Monica Blvd., 13 Fl
Los Angeles, CA 90067

Kurtzman Carson Consultants LLC
Attn: Drake Foster
222 N. Pacific Coast Highway, 3rd Floor
El Segundo, CA 90245

Kurtzman Carson Consultants, LLC
222 N. Pacific Coast Highway, Ste. 300
El Segundo, CA 90245

M. Natasha Labovitz
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Richard B. Levin
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3098

Maxim B Litvak

{00374857-13}                              29

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16   Page 1046/651804 Page 595 of 1017   PageID 15239
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1467 of 1803   PageID 12213
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 30 of 34

Pachulski Stang Ziehl & Jones LLP
150 California Street
15th Floor
San Francisco, CA 94111

John E. Lucian
Blank Rome LLP
1201 N. Market Street, Sutie 800
1000 North King Street
Wilmington, DE 19801

Lauren Macksoud
1221 Avenue of the Americas
New York, NY 10020-1089

Mark M. Maloney
King & Spalding LLP
191 Peachtree St.
Suite 4900
Atlanta, GA 30303-1763
mmaloney@kslaw.com, pwhite@kslaw.com

Mark M. Maloney
King & Spalding LLP
1180 Peachtree Steet, NE
Atlanta, GA 30309

Terri L. Mascherin
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456

Patrick C. Maxcy
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361

R. Stephen McNeill
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Fl
Wilmington, DE 19801

Mercer (US) Inc.
155 N. Wacker Drive, Ste. 1500
Chicago, IL 60606

Appellee Appx. 01461
014274

Case 19-34054-sgj11  Doc 3596-6  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:25-cv-02072-S  Document Exhibits  Page 1468 of 1804  Page 596 of 1017  PageID 15240
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1468 of 1803  PageID 12214
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21  Entered 01/05/21 16:22:08  Page 31 of 34

Michael J. Merchant
RICHARDS, LAYTON & FINGER, P.A.
one Rodney Square
920 North King Street
Wilmington, DE 19801

Curtis S. Miller
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, Suite 1600
1000 North King Street
Wilmington, DE 19801

Josef W. Mintz
Blank Rome LLP
1201 Market Street, Suite 800
1000 North King Street
Wilmington, DE 19801

Joseph T. Moldovan
MORRISON COHEN LLP
909 Third Avenue
New York, NY 10022

Alan A. Moskowitz
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10066

Michael R. Nestor
YOUNG CONAWAY STARGATT & TAYLOR, LL
Rodney Square
1000 North King Street
Wilmington, DE 19801

James E. O'Neill
Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Fl.
Wilmington, DE 19801

Tracy M. O'Steen
CARLYON CICA CHTD.
265 E. Warm Springs Road., Ste 107
Las Vegas, NV 89119

Jeffrey N. Pomerantz
Pachulski Stang Ziehl & Jones LLP

{00374857-13}                    31

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 14/06/051804 Page 597 of 1017    PageID 15241
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1469 of 1803    PageID 12215
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 32 of 34

10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Jeffrey N. Pomerantz
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Kathleen Preston
Winston & Strawn LLP
800 Capitol Street, Ste. 2400
Houston, TX 77002

Michael A. Rosenthal - DO NOT USE
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10066

Jeremy W. Ryan
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Fl
Wilmington, DE 19801

James P. Seery
795 Columbus Ave., 12A
New York, NY 10025

Sally T. Siconolfi
MORRISON COHEN LLP
909 Third Avenue
New York, NY 10022

Sarah E. Silveira
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

D. Ryan Slaugh
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Fl
Wilmington, DE 19801

Tracy K. Stratford
Jones Day
North Point

Appellee Appx. 01463
014276

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-9   Exhibit 6   Page 14/05/21804   Page 598 of 1017   PageID 15242
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1470 of 1803   PageID 12216
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 33 of 34

901 Lakeside Ave.
Cleveland, OH 44114

Daniel E. Stroik
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Sarah A. Tomkowiak
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304

Stephen G. Topetzes
K&L Gates LLP
1601 King St., N.W.
Washington, DC 20006

Thomas A. Uebler
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Road, Suite 401
Wilmington, DE 19808

Michael L. Vild
CROSS & SIMON, LLC
1105 N. Market Street, Suite 901
1000 North King Street
Wilmington, DE 19801

Elissa A. Wagner
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003

Erica S. Weisgerber
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109

James A. Wright
K&L Gates LLP

{00374857-13}                    33

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-9    Page 10/03/05/804 Page 599 of 1017    PageID 15243
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1471 of 1803   PageID 12217
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 34 of 34

State Street Financial Center
One Lincoln St.
Boston, MA 02111

Sean M. Young Conway Stargatt & Taylor, LLP
Young Conway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801


*/s/Douglas S. Draper*
Douglas S. Draper, LA Bar No. 5073

Appellee Appx. 01465
Appx. 01716
014278

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1473/25 1804    Page 600 of 1017    PageID 15244
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1472 of 1803    PageID 12218

# APPENDIX 20

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 104 of 1804    Page 601 of 1017    PageID 15245
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1473 of 1803    PageID 12219
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 1 of 42

Docket #1670 Date Filed: 01/05/2021

| | |
|---|---|
| K&L GATES LLP<br>Artoush Varshosaz (TX Bar No. 24066234)<br>1717 Main Street, Suite 2800<br>Dallas, TX 75201<br>Tel: (214) 939-5659<br>artoush.varshosaz@klgates.com<br><br>Stephen G. Topetzes (*pro hac vice*)<br>1601 K Street, NW<br>Washington, DC 20006-1600<br>Tel: (202) 778-9328<br>stephen.topetzes@klgates.com<br><br>A. Lee Hogewood, III (*pro hac vice*)<br>4350 Lassiter at North Hills Ave., Suite 300<br>Raleigh, NC 27609<br>Tel: (919) 743-7306<br>Lee.hogewood@klgates.com<br><br>*Counsel for Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Funds I and its series Highland Healthcare Opportunities Fund, Highland/iBoxx Senior Loan ETF, Highland Opportunistic Credit Fund, and Highland Merger Arbitrage Fund, Highland Funds II and its series Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Fixed Income Fund, and Highland Total Return Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, Highland Income Fund, Highland Global Allocation Fund, and NexPoint Real Estate Strategies Fund, and NexPoint Latin America Opportunities Fund* | Davor Rukavina, Esq.<br>Texas Bar No. 24030781<br>Julian P. Vasek, Esq.<br>Texas Bar No. 24070790<br>MUNSCH HARDT KOPF & HARR, P.C.<br>3800 Ross Tower<br>500 N. Akard Street<br>Dallas, Texas 75202-2790<br>Telephone: (214) 855-7500<br>Facsimile: (214) 978-4375<br><br>*Counsel for Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Funds I and its series Highland Healthcare Opportunities Fund, Highland/iBoxx Senior Loan ETF, Highland Opportunistic Credit Fund, and Highland Merger Arbitrage Fund, Highland Funds II and its series Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Fixed Income Fund, and Highland Total Return Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, Highland Income Fund, Highland Global Allocation Fund, and NexPoint Real Estate Strategies Fund, and NexPoint Latin America Opportunities Fund* |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
| | ) | |
| Debtor. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

## OBJECTION TO CONFIRMATION OF FIFTH AMENDED PLAN OF
## REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.



1934054210105000000000016

Appellee Appx. 01467
Appx. 01478
014280

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 6.5-9    Page 10/15/25 804 Page 602 of 1017    PageID 15246
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1474 of 1803   PageID 12220
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 2 of 42

Highland Capital Management Fund Advisors, L.P., and NexPoint Advisors, L.P. (each, an "**Advisor**," and collectively, the "**Advisors**"), Highland Funds I and its series Highland Healthcare Opportunities Fund, Highland/iBoxx Senior Loan ETF, Highland Opportunistic Credit Fund, and Highland Merger Arbitrage Fund, Highland Funds II and its series Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Fixed Income Fund, and Highland Total Return Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, Highland Income Fund, Highland Global Allocation Fund, NexPoint Real Estate Strategies Fund, and NexPoint Latin America Opportunities Fund (each, a "**Fund**," and collectively, the "**Funds**," and together with the Advisors, the "**Funds and Advisors**" or "**Objectors**"), by and through their undersigned counsel, hereby submit this objection (the "**Objection**") to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. No. 1472], together with that certain Plan Supplement [Dkt. No. 1648] filed December 30, 2020 (the "**Fifth Amended Plan**").[1]  In support of the Objection, the Funds[2] and Advisors respectfully submit to the Court as follows:

## SUMMARY OF OBJECTION

The Debtor owes strict statutory and contractual fiduciary obligations to manage the billions of dollars of other peoples' money that it manages.  No actual or hypothetical conflict of interest is allowed.   Yet, the Fifth Amended Plan, by purporting to assume various agreements pursuant to which the Debtor manages portfolios of assets, places the interests of the Debtor's creditors ahead of the interests of the beneficial interest holders in those portfolios,

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[2] The Funds are investment companies and a business development company registered under the Investment Company Act of 1940 as open-end or "mutual" funds, closed end funds or a business development company. None of the Funds are private or hedge funds.

Appellee Appx. 01468
Appx. 01479
014281

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 61-6    Page 14/06/2618049    Page 603 of 1017    PageID 15247
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1475 of 1803    PageID 12221
Case 19-34054-sgj11    Doc 1670    Filed 01/05/21    Entered 01/05/21 16:42:55    Page 3 of 42

thereby representing a clear conflict of interest and breach of fiduciary duty in violation of the Advisers Act (defined below) and the 1940 Act (defined below).

This is because the Plan provides for the assumption of numerous management agreements in connection with, among other investments, interests in collateralized loan obligations ("**CLOs**") owned in part by the Funds and/or Advisors, together with other investors.  In some cases, either the Funds, the Advisors or these entities in conjunction with other objecting creditor(s) own or manage a majority of the remaining beneficial interests in such CLOs.  To be clear, the CLO -- not the Funds nor the Advisors nor the Debtor -- is the issuer of these interests.  Nevertheless, it is the Funds and Advisors who hold the beneficial and economic interests and who, pursuant to the underlying agreements, in many instances have the ability to control who the servicer or manager of the portfolios is.  However, the Plan reveals that the Debtor intends to dismiss its investment management employees by the end of January 2021 and to employ a subagent to perform its current portfolio manager/servicer role.  The Debtor intends to effectively wind-down and liquidate the CLOs' assets within two years—an arbitrary proposition having nothing to do with what is in the best interests of the CLOs.  The Debtor also intends to strip the Funds and the Advisors of their contractual and statutory rights, and to improperly insulate itself from potential future liabilities that it may incur on account of its portfolio management.

The Plan cannot be confirmed so long as it provides for the assumption of these agreements. First, these agreements cannot be assigned under the Advisers Act or the 1940 Act, meaning that they cannot be assumed pursuant to section 365(c) of the Bankruptcy Code. Second, these agreements cannot be assumed under section 365(b) of the Bankruptcy Code because the Debtor cannot adequately assure its future performance under the agreements.

Appellee Appx. 01469
014282

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 14/76/851804 Page 604 of 1017   PageID 15248
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1476 of 1803   PageID 12222
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 4 of 42

Third, these agreements cannot be assumed if the Plan purports to change their provisions or relieve the Debtor from its fiduciary obligations and resulting potential liabilities. Fourth, the Plan is not feasible and is illusory so long as it depends on future income from these non-assumable agreements. Fifth, the Plan fails to comply with applicable law by seeking to relieve the Debtor of the strict duties imposed on it by the Advisers Act and 1940 Act. Indeed, the Plan is an invitation for future litigation against the Debtor for future breaches by the Debtor of its contractual obligations and violations by the Debtor of federal law.

The Plan is not merely a disagreement between the Debtor, on the one hand, and the Funds and Advisers, on the other hand, as to how to manage the CLOs. The Plan instead represents an attempt by the Debtor to strip beneficial interest holders of their contractual and statutory rights, to improperly insulate itself against its future actions and liabilities, to avoid the dictates of the Advisers Act, and to use assets that it manages—assets that do not belong to the Debtor—to benefit the Debtor's creditors at the expense of the actual owners of those assets. It is one thing for the Debtor to liquidate and to seek to repay its creditors, but it is another thing entirely for the Debtor to do this on the backs, and at the expense, of those investors whose interests the Debtor is charged with serving first.

For these and other reasons argued below, the Objectors object to the confirmation of the Plan.

The purported contract assumption is also illusory in that the Debtor's plan is premised upon the liquidation of assets in which the Debtor has no interest and which a majority of the beneficial owners has expressed, and continue to express, a desire for a different portfolio management strategy than the one the Debtor intends to continue to employ. The contracts the Debtor proposes to assume contain provisions requiring the maximization of the return to or

Appellee Appx. 01470

014283

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 6-15 Page 1478/851804 Page 605 of 1017 PageID 15249
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1477 of 1803 PageID 12223
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 5 of 42

preservation of the value of the collateral for the preference shareholders; these parties prefer that the assets not be liquidated, but maximized or preserved. Moreover, the Advisers Act[3] requires the Debtor to comply with the portfolio management contracts for the protection of the investors in the Funds, CLOs and other products. The Debtor's purported assumption of these agreements, while other provisions of the Fifth Amended Plan make clear key provisions of the assumed contracts will be ignored and rejected in this context, is a similar form of "cherry picking" that section 365 does not countenance.[4]

## BACKGROUND

### A. *General Background on Funds and Advisors*

1.     Each Advisor is registered with the U.S. Securities and Exchange Commission ("**SEC**") as an investment adviser under the Investment Advisers Act of 1940, as amended, 15 U.S.C. § 80b-1 *et. seq.* (the "**Advisers Act**").

2.     Each of the Funds is a registered investment company or business development company under the Investment Company Act of 1940, as amended, 15 U.S.C. § 80a-1, *et. seq.* (the "**1940 Act**") and is advised by one of the Advisors.

3.     As an investment company or business development company, each Fund is managed by an independent board of trustees subject to 1940 Act requirements. That board determines and contracts with one of the Advisors for each Fund. As is typical for nearly all

---

[3] The Advisers Act and the 1940 Act (defined in numbered paragraph 2 below) are two separate acts, both adopted in 1940, and provide the essential statutory and regulatory structure for the Debtor's business, as well as the Advisors and the Funds, to operate legally and transparently for the benefit of the public.

[4] The Funds and Advisors are aware that the Court has heard and rejected a form of this argument in a different context. By raising the point here, we mean no disrespect to the Court or the prior ruling. However, we contend that the issue is appropriately joined in connection with confirmation of a plan containing proposed contract assumptions that simply are not contract assumptions, fairly construed. Moreover, at the time of the Motion that was denied, only the Funds and Advisors took a position on the issues; now, other parties, on information and belief, will object or have objected on a similar basis.

Appellee Appx. 01471
Appx. 01722
014284

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 33-5   Filed 04/09/25   Page 606 of 1017   PageID 15250
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1478 of 1803   PageID 12224
Case 19-34054-sgj11   Doc 1670   Filed 01/05/21   Entered 01/05/21 16:42:55   Page 6 of 42

investment companies, the Funds do not have employees. Instead, pursuant to the 1940 Act, each Fund's board oversees the Advisor and the Advisor, acting pursuant to the advisory agreements, provides the services necessary to the Fund's operations.[5]  The Funds are each managed by one of the two Advisors.  The Advisors have some employees, but they also rely heavily on the Debtor to provide a variety of services.  Further, certain individuals employed or affiliated with the Debtor also hold roles for the Advisors and/or the Funds, and some of these roles are fiduciary in nature (the "**Fiduciaries**"). The Fiduciaries are privy to confidential commercial information about the Funds and Advisors, including data relating to the Funds' investment holdings and investment strategies.

        **B.**     **_Shared Services and Payroll Reimbursement Agreements with the Debtor_**

       4.      Each Advisor is party with the Debtor to a shared services agreement. Specifically, NexPoint Advisors, L.P. ("**NexPoint**") and the Debtor are parties to an Amended and Restated Shared Services Agreement dated January 1, 2018 (as amended, the "**NexPoint SSA**"), and Highland Capital Management Fund Advisors, L.P. ("**HCMFA**") and the Debtor are parties to a Second Amended and Restated Shared Services Agreement dated February 8, 2013 (as amended, the "**HCMFA SSA**," and collectively with the NexPoint SSA, the "**Shared Services Agreements**").[6]

       5.      Under the Shared Services Agreements, the Debtor provides a variety of services, including operational, financial and accounting, human resources, information technology, legal, tax, and compliance services, to the Advisors.  As part of its provision of

---

[5] Each of the Funds' respective boards meets quarterly and, consistent with statutory requirements, each is advised by independent counsel.

[6] Copies of the Shared Services Agreements and the Payroll Reimbursement Agreements (as defined below) are attached to the proofs of claim filed by the Advisors at Claim Nos. 95, 104, 108 and 119.

Appellee Appx. 01472
Appx. 01725
014285

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1486 of 1804   Page 607 of 1017   PageID 15251
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1479 of 1803   PageID 12225
Case 19-34054-sgj11   Doc 1670   Filed 01/05/21   Entered 01/05/21 16:42:55   Page 7 of 42

services, the Debtor maintains books and records (the "**Books and Records**") on behalf of the Advisors.

6.      Under the HCMFA SSA, the costs of the Debtor's services are allocated on a percentage of use basis.  The Debtor submits quarterly expense statements to HCMFA to reconcile amounts due to the Debtor.  In addition, with respect to certain taxes related to the Shared Services, the Debtor collects those taxes from HCMFA on the same basis as with the Debtor's other customers.  To the extent of a related tax refund, the Debtor is obligated to submit the refund to HCMFA.

7.      Under the NexPoint SSA, NexPoint pays the Debtor a fixed monthly fee for the provision of services.

8.      The Advisors and the Debtor are also parties to separate payroll reimbursement agreements (as amended, the "**Payroll Reimbursement Agreements**").  The Payroll Reimbursement Agreements address the splitting of costs for certain employees that are "dual employees" of the Debtor and an Advisor and who provide advice to funds, such as the Funds, advised by the Advisors.  The Payroll Reimbursement Agreements provide for the subject Advisor to reimburse the Debtor at a set cost.

9.      The Advisors also participate in the Debtor's self-insured healthcare plan (the "**Self-Insured Plan**"), which provides employee healthcare coverage.  Depending on the contributions made and the claims submitted to the Self-Insured Plan at any given time, an Advisor may be owed money by, or owe additional contributions to, the Self-Insured Plan.

10.     The Plan proposes to reject those executory contracts [Fifth Am. Plan, Dkt. No. 1472 at p. 37] that are not otherwise listed for assumption in a plan supplement.  The Debtor has filed its Plan Supplement listing executory contracts to be assumed [Dkt. No. 1648], which

Appellee Appx. 01473

Appx. 01724

014286

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibits    Page 14/36/251804    Page 608 of 1017    PageID 15252
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1480 of 1803    PageID 12226
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 8 of 42

Plan Supplement does not include the foregoing executory contracts. Accordingly, it appears that the Plan proposes to reject the Shared Services Agreements, the Payroll Reimbursement Agreements, and the Self-Insured Plan. The Advisors will therefore have potentially sizable rejection damages claims, on account of which they are preparing to file corresponding proofs of claim.

### C.    *The CLOs*

11.    The Funds also have economic interests in certain collateralized loan obligations (the "**CLOs**") (the Fifth Amended Plan refers to the CLOs as "Issuers"), for which the Debtor serves as portfolio manager.

12.    The CLOs are Aberdeen Loan Funding, Ltd., Brentwood CLO, Ltd., Eastland CLO, Ltd., Gleneagles CLO, Ltd., Grayson CLO, Ltd., Greenbriar CLO, Ltd., Jasper CLO Ltd., Red River CLO, Ltd., Rockwall CDO, Ltd., Rockwall CDO II Ltd., Southfork CLO, Ltd., Stratford CLO Ltd., Loan Funding VII, LLC,[7] and Westchester CLO, Ltd.

13.    The CLOs are securitization vehicles that were formed to acquire and hold pools of debt obligations. They also issued various tranches of notes and preferred shares, which are intended to be repaid from proceeds of the subject CLO's pool of debt obligations. The notes issued by the CLOs are paid according to a contractual priority of payments, or waterfall, with the value remaining in the CLO after the notes are fully paid flowing to the holders of the preferred shares.

14.    The CLOs were created many years ago. Most of the CLOs have, at this point, paid off all the tranches of notes or all but the last tranche. Accordingly, most of the economic value remaining in the CLOs, and all of the upside, belongs to the holders of the preferred

---

[7] The portfolio management agreements with Loan Funding VII, LLC is not proposed to be assumed.

Appellee Appx. 01474
Appx. 01725
014287

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6-15    Page 104/82/251804  Page 609 of 1017    PageID 15253
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1481 of 1803    PageID 12227
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 9 of 42

shares.

15.    Further, such ownerships represent in many cases the total remaining outstanding interests in such CLOs, the noteholders otherwise having been paid.  In others, the remaining noteholders represent a small percentage only of remaining interests. Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco represent a majority of the investors in the CLOs as follows:

   a. CLOs in which NexPoint or HCMFA manage owners of a majority of the preference shares:  Stratford CLO, Ltd. 69.05%, Grayson CLO, Ltd. 60.47% and Greenbriar CLO, Ltd. 53.44%.

   b. CLOs in which a combination of NexPoint and HCMFA managed funds and CLO Holdco hold all, a supermajority or majority of preference shares:  Liberty CLO, Ltd. 70.43%, Stratford CLO, Ltd. 69.05%*[8], Aberdeen Loan Funding, Ltd. 64.58%, Grayson CLO, Ltd. 61.65%*, Westchester CLO, Ltd. 58.13%, Rockwall CDO, Ltd. 55.75%, Brentwood CLO, Ltd. 55.74%, Greenbriar CLO, Ltd. 53.44%*

16.    The issuer of each CLO has separately contracted with the Debtor for the Debtor to serve as the CLO's portfolio manager or servicer (the "**Servicing Agreements**").[9]  In this capacity, the Debtor is responsible for, among other things, making decisions to buy or sell the CLOs' assets in accordance with the indenture and its obligations under the Servicing Agreements.  Although the Servicing Agreements vary, they generally impose a duty on the

---

[8] CLOs marked with an asterisk (*) appear in the foregoing list as well.

[9] The title given to the Debtor by the CLOs varies from CLO to CLO based on the relevant agreements, but the Debtor has the same general rights and obligations for each CLO. In this Objection, the Funds and Advisors have used the term "portfolio manager" when referring to the Debtor's role for each CLO regardless of the precise title in the underlying documents.

Appellee Appx. 01475
Appx. 01526
014288

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 14 of 25 04   Page 610 of 1017   PageID 15254
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1482 of 1803   PageID 12228
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 10 of 42

Debtor when acting as portfolio manager to maximize the value of the CLOs' assets for the benefit of the CLOs' noteholders and preferred shareholders.   In particular, the Servicing Agreements contain language providing for the maximization or preservation of value for the benefit of the preference shares as shown in the following examples:

> In performing its duties hereunder, the Portfolio Manager shall seek to maximize the value of the Collateral for the benefit of the Noteholders and the Holders of the Preference Shares taking into account the investment criteria and limitations set forth herein and in the Indenture and the Portfolio Manager shall use reasonable efforts to manage the Collateral in such a way that will (i) permit a timely performance of all payment obligations by the Issuer under the Indenture and (ii) subject to such objective, maximize the return to the Holders of the Preference Shares; provided, that the Portfolio Manager shall not be responsible if such objectives are not achieved so long as the Portfolio Manager performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Portfolio Manager with respect to the Notes or the Preference Shares.

Liberty Portfolio Management Agreement, Sec. 2(b) containing language above.

> In performing its duties hereunder, the Servicer shall seek to preserve the value of the Collateral for the benefit of the Holders of the Securities taking into account the Collateral criteria and limitations set forth herein and in the Indenture and the Servicer shall use reasonable efforts to select and service the Collateral in such a way that will permit a timely performance of all payment obligations by the Issuer under the Indenture; provided, that the Servicer shall not be responsible if such objectives are not achieved so long as the Servicer performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Servicer with respect to the Notes or the Preference Shares. The Servicer and the Issuer shall take such other action, and furnish such certificates, opinions and other documents, as may be reasonably requested by the other party hereto in order to effectuate the purposes of this Agreement and to facilitate compliance with applicable laws and regulations and the terms of this Agreement.

Aberdeen Servicing Agreement, Sec. 2(b).

Appellee Appx. 01476

014289

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 35-15    Page 10/84/05 1804    Page 611 of 1017    PageID 15255
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1483 of 1803    PageID 12229
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 11 of 42

17.     Moreover, each of the Servicing Agreements contain express language that the portfolio manager's obligations thereunder are for the benefit of and "shall be enforceable at the instance of the Issuer, the Trustee, on behalf of the Noteholders, or the requisite percentage of Noteholders or Holders of Preference Shares, as applicable, as provided in the Indenture of the Preference Share Paying Agency Agreement, as applicable."  Servicing Agreement Sec. 9.

18.     The Servicing Agreements also generally allow the holders of preference shares to remove the portfolio manager for cause, while their affirmative consent is required to an assignment of the agreements.  Cause includes the anticipated "ipso facto" provisions related to insolvency and bankruptcy, but cause is not so limited and includes material breach of the Servicing Agreement which would clearly include the failure to maximize value or the failure to preserve collateral. Servicing Agreement, Sec. 14.  However, certain Servicing Agreements provide for a certain percentage of holders of preference shares to remove the portfolio manager without cause.  *See, e.g.*, Gleneagles CLO , Ltd., Portfolio Management Agreement, Sec. 12(c).

      **E.**     ***The Fifth Amended Plan and Disclosure Statement***

19.     On November 24, 2020, the Debtor filed the Fifth Amended Plan and the Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. No. 1473] (the "**Disclosure Statement**").

**Appellee Appx. 01477**
**014290**
Appx. 01529

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 14/85/251804    Page 612 of 1017    PageID 15256
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1484 of 1803    PageID 12230
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 12 of 42

20.    The Fifth Amended Plan provides for the transfer of the majority of the Debtor's assets to a Claimant Trust that will be established for the benefit of the Claimant Trust Beneficiaries.   The Debtor's rights to manage investment vehicles managed by the Debtor pursuant to executory contracts that are assumed pursuant to the Fifth Amended Plan, defined as the "Managed Funds," are to remain with the Reorganized Debtor, which, in turn, is to be managed by New GP LLC, a wholly-owned subsidiary of the Claimant Trust.   The Disclosure Statement states that "[t]his structure will allow for continuity in the Managed Funds and an orderly and efficient monetization of the Debtor's Assets."  Dkt. No. 1473 at 11.   Ultimately, however, the Claimant Trust and the Reorganized Debtor will "sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets."   *Id.*   More specifically, the Reorganized Debtor will manage the wind down of the Managed Funds in addition to any other remaining Assets.   Moreover, the Financial Projections attached as Exhibit C to the Disclosure Statement make clear that, assuming confirmation of the Plan in its current form, the Debtor intends to liquidate its remaining assets and the assets within the Managed Funds over the next two years, concluding in December 2022.

21.    The Disclosure Statement further states that the Debtor does not anticipate either the Reorganized Debtor or the Claimant Trust assuming or assuming and assigning the contracts between the Debtor and certain of its Related Entities[10] pursuant to which the Debtor provides shared services and sub-advisory services relating to such Related Entities.  Dkt. No. 1473 at 42.  Accordingly, it appears that the Debtor's intent is to reject the Shared Services Agreements, the Payroll Reimbursement Agreements, and the Self-Insured Plan.

---

[10] Footnote 10 to the Disclosure Statement clarifies that the Debtor does not consider any of the Issuers to be a Related Entity.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 14/86/851804   Page 613 of 1017   PageID 15257
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1485 of 1803   PageID 12231
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 13 of 42

22.     With respect to the Shared Services Agreements, the Disclosure Statement provides that the cost of staffing to fulfil the agreements has historically resulted in a net loss to the Debtor and is not beneficial to the estate.  The Disclosure Statement further states that the agreements contain anti-assignment provisions which it believes to be enforceable under section 365(c) of the Bankruptcy Code, and moreover, are terminable at will by either party.  In light of these considerations, the Debtor apparently does not believe that the agreements may be assumed or assumed and assigned, and even if they could, there would not be any corresponding benefit to the estate.  Notwithstanding the foregoing, the Disclosure Statement indicates that the Debtor is still assessing whether to assume and assign the agreements with a Related Entity. Dkt. No. 1473 at 42.

23.     The Disclosure Statement also discusses the Debtor's role as portfolio manager for the CLOs (which the Disclosure Statement defines as "Issuers") in Article II(U) (pg. 32). After explaining the Debtor's role and noting some proofs of claim filed by the CLOs, the Disclosure Statement states as follows:

> The Issuers have taken the position that the rejection of the Portfolio Management Agreements (including any ancillary documents) would result in material rejection damages and have encouraged the Debtor to assume such agreements. Nonetheless, the Issuers and the Debtor are working in good faith to address any outstanding issues regarding such assumption. The Portfolio Management Agreements may be assumed either pursuant to the Plan or by separate motion filed with the Bankruptcy Court.
>
> The Debtor is still assessing its options with respect to the Portfolio Management Agreements, including whether to assume the Portfolio Management Agreements.

24.     The Debtor's Supplement to the Plan, filed on December 30, 2020 at Dkt. No. 1648, indicates that the Debtor intends to assume the Servicing Agreements with all of the CLOs except Loan Funding VII, LLC.  *See* Dkt. No. 1648, Sched. A.

**Appellee Appx. 01479**
**Appx. 01739**
**014292**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6 Exhibit 6    Filed 14/87/25 1804    Page 614 of 1017    PageID 15258
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1486 of 1803    PageID 12232
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 14 of 42

## OBJECTION

**A.**    ***The Debtor Cannot Assume the Servicing Agreements Pursuant to Section 365(c)(1) of the Bankruptcy Code***

25.    The Objectors object to the assumption of the Servicing Agreements for the fundamental reason that the Debtor will not manage the CLOs' assets appropriately in order to maximize value for the CLOs and the Objectors, but will instead breach its fiduciary duties by managing a winding-down those CLOs and assets in order to provide a recovery for its creditors, in what is an obvious and irreconcilable conflict of interest.

26.    As explained below, the Debtor and the Servicing Agreements which it seeks to assume are subject to the Advisers Act. As the Supreme Court has repeatedly held, it is a fundamental purpose of the Advisers Act to impose strict fiduciary duties on investment advisors and to "eliminate conflicts of interest between the investment adviser and the clients." *SEC v. Capital Gains Research Bureau Inc.*, 375 U.S. 180, 191 (1963). This extends to any "conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested." *Id.* "[T]he Act's legislative history leaves no doubt that Congress intended to impose enforceable fiduciary obligations." *Transamerica Mort. Advisors v. Lewis*, 444 U.S. 11, 17 (1979).

27.    Under the Plan, the Debtor would be owned by its creditors. The Debtor and the Claimant Trust would be managed by a person holding fiduciary duties to the Debtor's creditors. The Debtor would manage and presumably wind-down and liquidate the assets of the CLOs within a span of two years, not for the benefit of the CLOs and their beneficial interest holders, but for the benefit of the Debtor's creditors. And, it would do this without employees or resources, or by impermissibly delegating its duties to yet a different party—something that it is not permitted to do under applicable law and the governing contracts. In sum, the Debtor

Appellee Appx. 01480

Appx. 01731

014293

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-5   Page 14/83 05/21804   Page 615 of 1017   PageID 15259
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1487 of 1803   PageID 12233
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 15 of 42

would manage the CLOs and their assets for the benefit of the Debtor's creditors, which it is fundamentally impossible to do without simultaneously violating the Debtor's strict fiduciary duties to others and which represents a clear conflict of interest under the Advisers Act.

28.     This inescapable conclusion is precisely why the Bankruptcy Code prohibits an assumption of personal service contracts like the Servicing Agreements.  The Bankruptcy Code provides that:

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
>
> (1) (A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and (B) such party does not consent to such assumption or assignment.

11 U.S.C. § 365(c)(1).

29.     The first question is whether "applicable law" excuses the counterparties to the Servicing Agreements from accepting performance from the Debtor.  In this respect, both the Advisers Act and the 1940 Act represent "applicable law" that provides for precisely that.

30.     The Advisers Act governs "investment advisors."  The Advisers Act defines an investment advisor as:

> any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

15 U.S.C. § 80b-2(a)(11).

31.     There is no question that the Debtor receives compensation under the Servicing Agreements.  The only question is whether, under the Servicing Agreements, and in connection

15

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5   Page 14/86 of 1804   Page 616 of 1017   PageID 15260
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1488 of 1803   PageID 12234
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 16 of 42

with managing the investments and securities of the CLOs, the Debtor satisfies the remaining element(s).   Case law confirms that, in providing investment services and investment management under the Servicing Agreements, is acting as an "investment advisor" under the Advisers Act.   The Second Circuit authoritatively considered and decided the issue of whether a portfolio manager is an investment advisor in *Abrahamson v. Fleschner*, 568 F.2d 862 (2d Cir. 1977).   The case concerned general partners who managed various investments on behalf of limited partners.   *See id*. at 866.   Regarding whether the general partners were investment advisors on account of managing the investments, the court concluded that they were "on two independent grounds":

> First, the monthly reports which contained the alleged fraudulent representations were reports which provided investment advice to the limited partners.   The general partners' compensation depended in part upon the firm's net profits and capital gains.   These in turn were affected by the size of the total funds under their control.   The monthly reports were an integral part of the general partners' business of managing the limited partners' funds.   In deciding whether or not to withdraw their funds from the pool, the limited partners necessarily relied heavily on the reports they received from the general partners.

> Second, wholly aside from the monthly reports, we believe that the general partners as persons who managed the funds of others for compensation are 'investment advisers' within the meaning of the statute.   This is borne out by the plain language of Section 202(a)(11) and its related provisions, by evidence of legislative intent and by the broad remedial purposes of the Act.

*Id*. at 870.   Thus, by virtue of managing the underlying investments and related activities, the general partners were providing investment advice and were therefore investment advisors subject to the Advisers Act.

32.     The court in *SEC v. Smith*, 1995 U.S. Dist. LEXIS 22352 (E.D. Mich. 1995), considered a similar issue.   In that case, the SEC sought summary judgment that the defendant was an investment adviser under the Advisers Act.   The defendant argued that he was not an investment adviser merely by virtue of managing a portfolio of accounts on behalf of third

16

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 14/96/251804    Page 617 of 1017    PageID 15261
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1489 of 1803    PageID 12235
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 17 of 42

parties. *See id*. at *12-*13. Specifically, the defendant argued that he was not giving investment advice, but that he was instead "a professional trustee who exercises sole discretionary control over trust investments. . . I am the trustee. I have absolute full power and authority to make all buy, hold and sell decisions. And, therefore, I am the one that receives information and research and I make the decisions." *Id*. at *13. In other words, because he had sole discretion and control over how to manage the invested assets, he was not giving "advice" within the meaning of the Advisers Act. The court rejected this argument: "Smith is clearly an investment advisor under the Advisers Act." *Id*. at *15.

33.    The court in *SEC v. Saltzman*, 127 F. Supp. 2d 660 (E.D. Pa. 2000) reached the same conclusion with respect to a portfolio manager:

> Saltzman maintained exclusive control over the investment portfolio, brokerage accounts, and bank account of Saltzman Partners, L.P. He made all investment decisions for the portfolio. As the Act intended to embrace those who wield power over their clients' money, as Saltzman did over the investments of the limited partners, the facts alleged qualify Saltzman as an investment adviser.

*Id*. at 669. Therefore, the Debtor, by virtue of managing the CLO assets, and even though it has the sole control and authority over that management, is providing investment advice and is therefore an investment advisor with respect to the Servicing Agreement.

34.    More particularly, the Servicing Agreements, because they provide for investment advice, are "Investment Advisory Contracts" under the Advisers Act. This is further confirmed by the language of the Advisers Act with respect to the definition of Investment Advisory Contract:

> any contract or agreement whereby a person agrees to act as investment adviser to <u>or to manage any investment</u> or trading account <u>of another person</u> other than an investment company registered under title I of this Act.

15 U.S.C. § 80b-5(d) (emphasis added). Managing the investments of others is of course

Appellee Appx. 01483

014296

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 10/96-6    Page 618 of 1017    PageID 15262
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1490 of 1803    PageID 12236
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 18 of 42

precisely what the Debtor does under the Servicing Agreements.

35.    There should therefore be no question that the Servicing Agreements are "investment advisory contracts" subject to the Advisers Act.  Should there be any doubt, the Servicing Agreements in multiple places reference the Advisers Act and subject the agreements to the requirements of the Advisers Act.

36.    The Advisers Act prohibits an assignment of an investment advisory contract without consent.  The Advisers Act defines "assignment" as including "any direct or indirect transfer or hypothecation of an investment advisory contract."  15 U.S.C. § 80b-2(a)(1).  With respect to an assignment, the Advisers Act provides as follows:

> No investment adviser registered or required to be registered with the Commission shall enter into, extend, or renew any investment advisory contract, or in any way perform any investment advisory contract entered into, extended, or renewed on or after the effective date of this title, if such contract—
>
> (2) fails to provide, in substance, that no assignment of such contract shall be made by the investment adviser without the consent of the other party to the contract.

15 U.S.C. § 80b-5(a)(2).

37.    Each of the Servicing Agreements contain substantially similar provisions related to any assignment:

> any assignment of this Agreement to any Person, in whole or in part, by the Servicer shall be deemed null and void unless (i) such assignment is consented to in writing by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares.

38.    Accordingly, the Advisers Act represents "applicable law" under section 365(c)(1) that excuses the counterparty to an investment advisory contract from accepting performance from an assignee.  As such, because the agreement cannot be assigned, it cannot

Appellee Appx. 01484
Appx. 01735
014297

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 149 of 1804 Page 619 of 1017   PageID 15263
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1491 of 1803   PageID 12237
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 19 of 42

be assumed by the Debtor without consent.

39.     It is true that courts in this District construe section 365(c)(1) such that, where the applicable law is merely a general prohibition on assignment, the section does not prevent an assumption. *See, e.g., In re Lil' Things*, 220 B.R. 583, 590-91 (Bankr. N.D. Tex. 1998). Here, however, the Advisers Act is not a general law that would prohibit an assignment; it is a very specific law, applicable to a very narrow set of persons, and one which prohibits only the assignment of an investment advisory agreement.

40.     Even so, this District recognizes that section 365(c)(1) becomes paramount "where the identity of the party rendering performance under the contract is material to the contract, and the contract is non-delegable under applicable non-bankruptcy law." *Id*. at 591. This is certainly true where, as here, a party has contracted with someone to manage that party's property and investments: that is a fiduciary relationship of the highest trust where the identity of the person providing the services is absolutely paramount.  The Fifth Circuit recognized this fundamental principle the highly analogous situation of an attorney retention agreement: the contract was not assumable under otherwise applicable law because the contract was a highly personal one involving elements of trust, legal, and ethical considerations. *See In re Tonry*, 724 F.2d 467, 468-69 (5th Cir. 1984).

41.     In *In re Mirant Corp.*, 303 B.R. 319 (Bankr. N.D. Tex. 2003), this Court concluded that the debtor-in-possession may assume a contract even if section 365(c) would prevent a trustee from being able to assume the contract.  In large part, the Court construed the addition, in 1984, of the term "debtor-in-possession" into the statute as evidence that Congress intended for a debtor-in-possession to be able to assume its contracts even if section 365(c) would otherwise prohibit a trustee from assuming the contract. *See id*. at 333.  "The specific

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5   Page 11/93 of 151804   Page 620 of 1017   PageID 15264
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1492 of 1803   PageID 12238
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 20 of 42

use of the words 'the debtor or the debtor in possession' leads the court to conclude that a contract to be performed by a debtor or debtor in possession (as opposed to a trustee) is subject to assumption whether or not applicable law limits its assignability. *Id*. However, the Fifth Circuit has not adopted this view and the logic of *In re Mirant Corp.* is not correct.

42.     The statute begins by providing that the "trustee may not assume or assign any executory contract . . ." 11 U.S.C. § 365(c)(1). That "trustee" must include a debtor-in-possession, for it is the same "trustee" as in section 365(a) which provides that a "trustee . . . may assume or reject any executory contract." *Id*. at § 365(a). Thus, the section 365(c)(1) prohibition on a trustee must also extend to a "debtor-in-possession," unless the Court concludes that the use of the word "trustee" in the same statute means two different things. Rather, what *In re Mirant Corp.* was referring to was the following language in section 365(c)(1):

> applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession.

*Id*. at § 365(c)(1).

43.     The addition of the term "debtor-in-possession" to this statute does not change the result; *i.e.* it does not mean that a debtor-in-possession, unlike a trustee, may assume, but not assign, its own contracts. The question is whether applicable law excuses a party from accepting performance from an entity other than the debtor-in-possession. The Debtor is a debtor-in-possession and, if the counterparty is excused by applicable law from accepting performance from anyone else, then the contract may not be assumed by the Debtor. *In re Mirant Corp.* was simply wrong in concluding that the 1984 amendment somehow excepted a debtor-in-possession's assumption of its own contracts from the operation of section 365(c)(1).

44.     The Fifth Circuit's opinion in *Strumpf v. McGee (In re O'Connor)*, 258 F.3d 392

Appellee Appx. 01486
Appx. 01737
014299

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1/496/251804    Page 621 of 1017    PageID 15265
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1493 of 1803    PageID 12239
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 21 of 42

(5th Cir. 2001) is on point.  That opinion was rendered after the 1984 amendment at issue in

*Mirant*, and that opinion concerned a Chapter 11 debtor.  The question was whether a non-

assignable partnership agreement could be assumed under section 365(c)(1).  The Fifth Circuit

held that "the agreement was *not* assumable under § 365(c)(1)."  *Id*. at 402 (emphasis in

original).  And, as here, the confirmed plan provided for a postconfirmation liquidating trust.

*See id*. at 396.  The only difference was that, in *In re O'Connor*, a Chapter 11 trustee proposed

the confirmed plan.  This difference does not matter because the Fifth Circuit held that the

agreement itself was not assumable; not that one person may assume it while a second not.  *See*

*id*. at 402 and 404 (twice holding that the "agreement is *not* assumable" (emphasis in

original)).[11]  Only one person may assume an executory contract, and that person is the trustee,

even if the debtor-in-possession is exercising the powers of a trustee.  Thus, if the contract itself

is not assumable, then it is not assumable period.  This difference also does not matter because

the identity of the plan proponent is immaterial: the question is still whether it is the debtor-in-

possession, or the estate, that can assume the executory contract.

45.    The Debtor will respond that the Fifth Circuit, in *In re Mirant Corp.*, 440 F.3d

238 (5th Cir. 2006), rejected the so-called "hypothetical test" and adopted instead the "actual

test" regarding the assignment of an executory contract or lease.  In *Mirant*, the issue concerned

section 365(e)(2) of the Bankruptcy Code and whether an *ipso facto* clause was enforceable

against a debtor-in-possession because the executory contract was not assignable.  The

---

[11] In *Strumpf*, the Fifth Circuit held that, because the agreement was not assumable, it passed through the Chapter
11 unaffected.  However, *Strumpf* itself concluded that this "pass-through" principle does not apply in a liquidating
plan, as further confirmed by *In re Tex. Rangers Baseball Partners*, 521 B.R. 134,183 (Bankr. N.D. Tex. 2014).
Even if the agreements could pass through unaffected to the reorganized debtor, even though it is liquidating, the
Plan cannot limit the ability to terminate the agreements in the future based on the change in control and other facts
that are present.  Otherwise, the agreements would be affected by the Plan, meaning that they would have to first
be assumed, as recognized in *Strumpf* by holding that a plan effect on the executory contract means that it cannot
pass through bankruptcy unaffected.  *Strumpf,* 258 F.3d at 405.

Appellee Appx. 01487
Appx. 01738
014300

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 14/95/251804    Page 622 of 1017    PageID 15266
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1494 of 1803    PageID 12240
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 22 of 42

"hypothetical test" required a court to review whether a hypothetical assignment was prohibited by applicable law; if it was, then the *ipso facto* clause could be enforced even though no assignment was proposed.  *See id*. at 246-47.  The Fifth Circuit rejected this approach and instead applied the "actual test," which looked at whether an assignment was actually being proposed. *See id*. at 249-50.  The Debtor will argue that this same logic should apply to section 365(c)(1) such that, when no actual assignment is being proposed, the section is not implicated.

46.    *Mirant* and its logic, however, do not apply to section 365(c)(1).  First, and most obviously, the Fifth Circuit stated that "[a]lthough this Circuit has addressed § 365(c)(1), we have yet to address § 365(e)," and then it cited to its *In re O'Connor* and *In re Braniff Airways* precedent.  *See id*. at 248-49.  The circuit, in analysing this prior precedent, noted that it was the contract itself that was not assumable ("declaring the contract unassumable," *id*.) and reaffirmed the holdings of both prior opinions notwithstanding the change in the language of section 365(c)(1).  Thus, and having been afforded the opportunity to revisit its prior precedent or to find that the added "debtor-in-possession" language to section 365(c)(1) compelled a different result, the circuit instead reaffirmed its prior precedent holding that the contract itself was not assumable.  More precisely, the "actual test" cannot apply to section 365(c)(1) because that section provides that a trustee may not "assume or assign" an executory contract.  If the test were an actual one, *i.e.* whether an actual assignment was being proposed, then the section would simply provide that the trustee may not "assume and assign" the executory contract.  But, in preventing an assumption even without a proposed assignment, section 365(c)(1) necessarily applies the "hypothetical test" such that, even though no assignment is proposed, if an assignment is prohibited then so is an assumption.

47.    Thus, were the Fifth Circuit presented with the precise issue with respect to

Appellee Appx. 01488
Appx. 01739
014301

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Filed 12/06/25   Page 623 of 1017   PageID 15267
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1495 of 1803   PageID 12241
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 23 of 42

section 365(c)(1), to the extent it was not in *In re O'Connor*, the Objectors submit that the Fifth

Circuit would join its sister circuits in concluding that, so long as even a hypothetical

assignment would be prohibited, so too is an assumption, whether by a trustee, debtor, or debtor-

in-possession.  *See In re Catapult Entertainment*, 165 F.3d 747, 750 (9th Cir. 1999) ("a debtor

in possession may not assume an executory contract . . . if applicable law would bar assignment

to a hypothetical third party, even where the debtor in possession has no intention of assigning

the contract in question to any such third party"); *In re James Cable Partners L.P.)*, 27 F.3d

534, 537 (11th Cir. 1994); (holding that debtor-in-possession may not assume executory

contract under section 365(c)(1) notwithstanding that no assignment was proposed); *In re

Catron*, 1994 U.S. App. LEXIS 14585 (4th Cir. 1994) (affirming holding that "agreement was

the type of executory contract that could not be assumed by Catron, a debtor-in-possession,

absent consent of the nondebtor parties as required by § 365(c)(1)(B)"); *In re West Electronics

Inc.*, 852 F.2d 79, 83 (3d Cir. 1988) ("the relevant inquiry is not whether [applicable law] would

preclude an assignment from West as a debtor to West as a debtor in possession, but whether it

would foreclose an assignment by West to another defense contractor");[12] *but see Institut

Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489 (1st Cir. 1997).

48.     The result may not be to the liking of the Debtor and, in other circumstances, the

result may be harsh on a debtor-in-possession.  But this case aptly demonstrates why the section

---

[12] In fact, as recognized in *West*, the addition of the term "debtor-in-possession" into section 365(c)(1)
demonstrates Congress's intent to prevent a debtor-in-possession from assuming its own personal services
contracts:

> We think that by including the words "or the debtor in possession" in 11 U.S.C. § 365(c)(1)
> Congress anticipated an argument like the one here made and wanted that section to reflect its
> judgment that in the context of the assumption and assignment of executory contracts, a solvent
> contractor and an insolvent debtor in possession going through bankruptcy are materially distinct
> entities.

*In re West Electronics*, 852 F.2d at 83.

Appellee Appx. 01489
Appx. 01749
014302

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Page 104 of 1804   Page 624 of 1017   PageID 15268
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1496 of 1803   PageID 12242
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 24 of 42

exists and why the result is fair.  Many innocent parties have entrusted billions of dollars of their property to the Debtor to manage, for their benefit.  Now, the Debtor wants to manage that property for the benefit of its creditors, and with insufficient experience, resources, and employees at that.  This is not a case where the debtor is a person, who holds investment management contracts.  That person is the same before, during, and after a Chapter 11 case.  But here the Debtor is the same entity in name only: no reasonable fund would contract with the postconfirmation Debtor here to manage a penny, let alone life savings and the investments of many.  That is the whole point of why personal services contracts cannot be assumed without consent.

49.     Moreover, the Court should not permit the Debtor to place form over substance, especially when the rights of innocent, third party funds and investors are concerned.  While technically the post-confirmation Debtor will still be the same corporate shell, it will have been gutted of everything that made the Debtor the Debtor.  It is in substance and in every real and practical consideration an assignment of the contracts.  Indeed, it appears that the only reason why the Debtor will even maintain a corporate existence after confirmation is an attempt to obviate the prohibition on assumption under section 365(c)(1), as all other property of the Debtor is transferred to the Claimant Trust.  On this point, the Plan expressly provides that the "Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees."  Plan at p. 32-33.  If the intent of this provision is to provide services required by the Servicing Agreements, then this is a blatant violation of the Servicing Agreements' and the Advisers Act's anti-assignment and anti-delegation provisions.  In other words, this admission in the Plan may well be precisely the type of assignment, or subsequent assignment, that would be prohibited by section 365(c)(1) regardless of any

Appellee Appx. 01490
Appx. 01341
014303

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-16   Page 14/98/251804   Page 625 of 1017   PageID 15269
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1497 of 1803   PageID 12243
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 25 of 42

discussion between the "hypothetical test" and the "actual test."

50.   Separate and apart from the above discussion, and understand that there is uncertainty in the law as to the interplay between sections 365(f) and 365(c)(1), it is clear that a "personal services contract" falls squarely within the protection of section 365(c)(1).  As the Fifth Circuit has held, a personal services contract is subject to section 365(c)(1): "Congress' enactment of § 365(c) was to preserve the pre-Code rule that 'applicable law' precluding assignment of personal service contracts is operative in bankruptcy." *In re Braniff Airways Inc.*, 700 F.2d 935, 943 (5th Cir. 1983).  A personal services contract is one which "involves a matter of personal trust and confidence between the original contracting parties."  *In re Grove Rich Realty Corp.*, 200 B.R. 502, 510 (Bankr. E.D.N.Y. 1996).  "A personal services contract has been defined as a contract which contemplates the performance of personal services involving the exercise of special knowledge, judgment, taste, skill, or ability." *In re Wofford*, 608 B.R. 494, 496 (Bankr. E.D. Tex. 2019) (internal quotation omitted).

> It is well settled that when an executory contract is of such a nature as to be based upon personal services or skills, or upon personal trust or confidence, the debtor-in-possession or trustee is unable to assume or assign the rights of the bankrupt in such contract.

*In re Grove Rich Realty Corp.*, 200 B.R. 502, 510 (Bankr. E.D.N.Y. 1996) (emphasis added).

51.   The Service Agreements are clearly personal service contracts: the Debtor's position is one of trust and that of a fiduciary, the Debtor's performance requires personal confidence and high skill and knowledge, the agreements provide that the Debtor's duties are not delegable, and no person entrusting another with managing billions of dollars in assets would want the underlying contract to be assumable by a trustee or a liquidating debtor.  Indeed, the Supreme Court has recognized the "personalized character of the services of investment advisors."  *SEC v. Capital Gains Research Bureau Inc.*, 375 U.S. 180, 191 (1963).  This Court

Appellee Appx. 01491
Appx. 01542
014304

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 14/96 of 1804   Page 626 of 1017   PageID 15270
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1498 of 1803   PageID 12244
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 26 of 42

has characterized financial advisory and brokerage contracts as personal services contracts.  *See In re Consolidated Capital Equities Corp.*, 157 B.R. 280, 283 (Bankr. N.D. Tex. 1993).  Other courts have held that the Investors Act imposes a trust relationship.  *See e.g. In re Peterson*, 96 B.R. 314, 323 (Bankr. D. Colo. 1988).  The strict fiduciary and anti-assignment provisions of the Advisor Act and the 1940 Act further confirm Congress' strong view that these contracts are in the nature of personal service contracts.

52.     Even if the Court is inclined to adopt the "actual test" under section 365(c)(1) such that an assumption is possible where there is no assignment, and recognizing that section 365(c)(1) is broader in application than to only personal services contracts, the law overwhelmingly confirms that a personal services contract is not assumable in the first instance.  *See, e.g., In re Braniff Airways Inc.*, 700 F.2d 935, 943 (5th Cir. 1983).

53.     The final issue concerning section 365(c)(1) is consent.  Assuming that the CLOs do not object to the assumption of the Servicing Agreements, the statute requires affirmative consent to the assumption.  The statute prohibits the assumption if "such party does not consent to such assumption."  11 U.S.C. § 365(c)(1)(B).  The plain meaning of this language is that consent is required, as opposed to merely the absence of an objection.  In *Strumpf v. McGee (In re O'Connor)*, 258 F.3d 392 (5th Cir. 2001), the issue concerned an executory contract that was neither expressly assumed nor assigned under a Chapter 11 plan.  The Fifth Circuit held that the contract was not assumable under section 365(c)(1) and concluded that the counterparty "did not consent" to an assumption.  *See id.* at 402.  If the absence of an objection was all that was required, then the Fifth Circuit would not have so held.  In fact, the Fifth Circuit expressly rejected the argument that the "Appellees consented to the assumption by failing to object to the Plan."  *Id.* at 400.  This is in line with the case law, which requires affirmative, or actual,

Appellee Appx. 01492
Appx. 01745
014305

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 1506/05/1804   Page 627 of 1017   PageID 15271
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1499 of 1803   PageID 12245
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 27 of 42

consent to the assumption. *See In re Allentown Ambassadors Inc.*, 361 B.R. 422, 448 n. 60 (Bankr. E.D. Pa. 2007).

54.     Finally, there is the issue of the Objectors' standing to make the foregoing arguments. The Objectors have standing for at least four reasons. First, as creditors and parties in interest,[13] they have the right to object to the Plan. 11 U.S.C. § 1109(b). Insofar as it is the Fifth Amended Plan that provides for assumption of the Servicing Agreements, the Objectors may object to said assumption, especially because assumption of the Servicing Agreements and future performance thereunder affect the feasibility of the Plan as a whole. Second, the Objectors have standing and the right to object to confirmation of the Fifth Amended Plan under sections 1129(a)(1), (a)(2), and (a)(3) of the Bankruptcy Code. Insofar as the Fifth Amended Plan and the Debtor propose to impermissibly assume the Servicing Agreements in violation of the law, the Objectors may object to such assumption on those bases. Third, in several of the Servicing Agreements, the Objectors have the right to remove the Debtor or to control who the servicer under the agreements is. They have similar rights under the Indentures with respect to assignment or modification of the Servicing Agreements. Insofar as the Fifth Amended Plan purports to limit or to take those rights away from them, and to change their rights, the Objectors have standing to object to their rights being limited or eliminated. Likewise, under the 1940 Act, an investment adviser must be approved by a majority of the voting securities, and the Servicing Agreements cannot continue in effect for more than two years without the consent of either the CLOs' boards of directors or a majority of the outstanding voting securities--i.e., the Objectors. 15 U.S.C. § 80a-15(a)(2). Insofar as the Fifth Amended Plan purports to limit the

---

[13] "The term 'party in interest' is not defined in the Bankruptcy Code." *Khan v. Xenon Health, LLC (In re Xenon Anesthesia of Tex., PLLC)*, 698 Fed. Appx. 793, 794 (5th Cir. 2017) (quoting *In re Megrelis*, No. 13-35704-H3-7, 2014 Bankr. LEXIS 3905, at *2 (Bankr. S.D. Tex. Sept. 12, 2014)). "It generally 'means anyone who has a legally protected interest that could be affected by the bankruptcy case.'" *Id.*

Appellee Appx. 01493
Appx. 01744
014306

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 5    Page 1506/051804 Page 628 of 1017    PageID 15272
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1500 of 1803    PageID 12246
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 28 of 42

Objectors' right to withhold their consent or influence the CLOs' boards of directors, the Objectors have standing to challenge any modification of those rights. Fourth, in several of the Servicing Agreements, it is not just the CLO that must approve an assignment, but also the Objectors. The Objectors have similar rights under the Indentures. Insofar as the test under section 365(c)(1) is a hypothetical assignment, and the Objectors have the right to approve or not approve that assignment under applicable law and the agreements, that right should extend to consent under section 365(c)(1)(B) as well, as the CLOs' consent is not possible without a concurring consent by the Objectors.

55.    The Fifth Amended Plan does not comply with section 1129(a)(1) of the Bankruptcy Code because it violates a fundamental principal of contract assumption under section 365 of the Bankruptcy Code. Contracts must be assumed or rejected; there is no such thing as a partial assumption. *In re Nat'l Gypsum Co.*, 208 F.3d 498, 506 (5th Cir. 2000) ("Where the debtor assumes an executory contract, it must assume the entire contract, *cum onere*--the debtor accepts both the obligations and the benefits of the executory contract."); *In re Rigg*, 198 B.R. 681, 685 (Bankr. N.D. Tex. 1996) ("An executory contract cannot be rejected in part and assumed in part; the debtor must assume both the benefits and the burdens on the contract.").

56.    The Fifth Amended Plan contravenes established law with respect to the proposed treatment of the CLOs and the Debtor's obligations under the portfolio management agreements.

57.    First, the Fifth Amended Plan reveals that the Debtor, while claiming to assume the various Servicing Agreements, also intends to deprive the counterparties to those agreements from exercising their rights to change management.

Appellee Appx. 01494
Appx. 01745
014307

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 1502 of 1804   Page 629 of 1017   PageID 15273
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1501 of 1803   PageID 12247
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 29 of 42

58.     Under the Servicing Agreements at issue, either a majority, or in some cases, a
supermajority of owners may initiate a change in management.  See attached Exhibit A.

59.     The Debtor's Plan makes clear, however, that it intends to engage a subagent to
perform the management and servicing function and, implicitly to deprive the CLOs as issuers
from exercising contractual rights with respect to making a change in management.

60.     Second, the Debtor's duties under the Servicing Agreements, which themselves
have been adopted under the Advisers Act, subject to Rule 206(4)-8 thereunder as noted below,
are owed to, and provide the rights of, the preference shareholders under the portfolio
management agreements.  The Debtor's proposed liquidation of Managed Assets (which it does
not own) is contrary to the performance of its contractual and statutory duties under the portfolio
management agreements.

61.     The preference shareholders, as the only remaining owners of the Managed
Assets of many of the CLOs, contend that the Debtor's (i) sales of  Managed Assets and  (ii)
continued management of the Managed Assets, notwithstanding the Debtor's stated intention
to wind down and liquidate all assets, violates the provisions of Section 2(b) of the portfolio
management agreements.

62.     These violations are detrimental to the counterparties to the assumed contracts
because:

  a.  liquidation sales of Managed Assets the Debtor does not own are unlikely
      to maximize the value of the Managed Assets when compared to the long
      term investment horizon of the beneficial owners of the Managed Assets;

  b.   liquidation sales of Managed Assets are likely to subtract value when
      duress sales occur based on the short term horizon and liquidation

Appellee Appx. 01495
Appx. 01746
014308

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibits    Page 1508 of 1804    Page 630 of 1017    PageID 15274
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1502 of 1803    PageID 12248
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 30 of 42

strategy of the Debtor;

c.   the Debtor has announced the termination of its personnel, resulting in
loss of knowledgeable portfolio managers; and

d.   any potential consultant engaged by the Debtor in the absence of its
terminated personnel will be subservient to the Debtor's short-term
objective of liquidation in violation of the assumed contracts and
applicable securities law.

63.   Manifestly, where the investors in a pooled vehicle state to the manager both
that their objectives and desires differ from those of the portfolio manager, and that the portfolio
manager's actions are contrary to the manager's duties to maximize returns for the benefit of
the investors established under the agreement, that portfolio manager is not acting reasonably
under or in accordance with its agreement.  The owners of the Managed Assets, in requisite
majority or supermajority,[14] have expressly requested that the Managed Assets not be liquidated
as contemplated by the Debtor's business plan.  In that context, the Debtor is unreasonably
acting contrary to the required contractual objective and therefore statutory obligation to
maximize value for the preference shareholders.   In implementing the Fifth Amended Plan, the
Debtor is likely to violate its duty of reasonableness under Section 2(b) under these
circumstances, because the Debtor is not "perform[ing] its duties under
[the] Agreement in the manner provided for" in the Agreement.

64.   As the Debtor is an investment management firm familiar with established
securities laws, the Fifth Amended Plan's violations of such laws is blatant and should not be
permitted.

---

[14] Objectors acknowledge that they do not hold a majority in all of the CLOs, for example, Jasper.

Appellee Appx. 01496
Appx. 014309

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Filed 05/06/25   Page 631 of 1017   PageID 15275
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1503 of 1803   PageID 12249
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 31 of 42

65.   Based upon the Fifth Amended Plan's attempt to assume contracts partially, and not fully, the Court should find that the Fifth Amended Plan fails to satisfy section 1129(a)(1) of the Bankruptcy Code and cannot be confirmed

66.   Moreover, as discussed below, with respect to the injunction and release provisions of the Fifth Amended Plan, the Plan purports to release the Debtor from its contractual and statutory obligations with respect to the Servicing Agreements.  As explained above, those agreements require the Debtor to preserve and to maximize the value of the CLOs assets, for the benefit of the CLOs and the holders of beneficial interests in them.  The Advisers Act requires the same.  The Fifth Amended Plan purports to enjoin parties from "taking any actions to interfere with the implementation or consummation of this Plan."  Plan at p. 50.  This is an unprecedented, overbroad injunction that does not comport with fundamental due process, as what "interference," "implementation," or "consummation" mean is not specified.  Are the Objectors to be enjoined from enforcing future rights under the Servicing Agreements even if the Debtor commits future malfeasance?

67.   The Fifth Amended Plan likewise enjoins all creditors and other parties, and their "Related Persons" (who may not even have notice of the injunction) from "commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor."  Plan at p. 51.  Read literally, this means that the Objectors and the CLOs will not be able to assert any claims, or seek any relief, against the Debtor or Reorganized Debtor for any present or future actionable wrongs under the Servicing Agreements and the Advisers Act.  Again, so broad an injunction, not limited in time, is unprecedented, legally impermissible, violates due

Appellee Appx. 01497
014310

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1505/651804    Page 632 of 1017    PageID 15276
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1504 of 1803    PageID 12250
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 32 of 42

process, and seeks to strip parties of their contractual and Advisers Act rights—even as the Debtor purports to assume the Servicing Agreements which, as is black letter law, means that the Debtor is requiring to provide full future performance (and suffer potential future obligations and liabilities).

68.     The balance of the Plan injunction is equally fatally defective.  If there are future obligations and defaults, and even if there are present ones, under the Servicing Agreements and applicable law, affected parties have to have the right to seek legal redress, enforce awards and injunctions, and assert setoff rights.  On this last basis in particular, if there are setoff rights under the CLOs or other agreements, those rights cannot be permanently enjoined.  And, the same injunction applies to any "successors" of the Debtor and its property interests, meaning that, if the Debtor assigns or delegates its duties under the Servicing Agreements, some future and unknown party may claim protections under these injunctions without any protection to the Objectors or the CLOs.

69.     The Plan's channeling injunction is similarly improper and defective, at least with respect to post-confirmation actions.  *See* Plan at p. 51.  That injunction requires *anyone* with any complaint against a "Protected Party" that is "related to the Chapter 11 Case," or to the "wind down of the business of the Debtor or the Reorganized Debtor," to first seek relief from this Court, including by proving that a colourable claim exists and obtaining leave.  The same section then purports to grant "sole jurisdiction" to this Court to "adjudicate" any such dispute.  Read literally, this means that the Objectors and the CLOs will have to first seek leave from this Court before enforcing any right under the Servicing Agreements and the Advisers Act, which is unprecedented and is incompatible with respect to the assumption of those agreements for post-assumption claims, and then this Court would adjudicate the claims.  This

Appellee Appx. 01498
Appx. 01749
014311

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 1506/251804   Page 633 of 1017   PageID 15277
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1505 of 1803   PageID 12251
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 33 of 42

Court will have no jurisdiction to adjudicate such post-confirmation claims, however, and the channeling injunction is am impermissible attempt to confer such jurisdiction where none exists.

70.    All of the foregoing affects, limits, and eviscerates future rights under the assumed Servicing Agreements—something that defeats the whole purpose of an assumption of an executory contract and that contradicts the established law that an executory contract, and its future obligations, must be assumed *in toto*.

### B.    *Other objections to the Fifth Amended Plan*

The Debtor's Fifth Amended Plan is objectionable for other reasons as well.  Those Objections are discussed briefly below.  The Funds and Advisors reserve the right to object upon any appropriate basis under Sections 1129(a) and (b) and other applicable provisions of the Bankruptcy Code. The Funds and Advisors also reserve the right to join in and support the objections asserted by other parties at the Confirmation Hearing.

### *Section 1129(a)(5)*

71.    In order to be confirmed, the Debtor must satisfy the following non-waiveable requirements:

> (i) the proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

> (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy.

11 U.S.C. § 1129(a)(5).

72.    This is of particular importance here, where the Debtor proposes to manage billions of dollars of other entities' assets, and ties in as well to section 362(b)'s requirement of

Appellee Appx. 01499
014312
Appx. 01759

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 1507 of 1804   Page 634 of 1017   PageID 15278
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1506 of 1803   PageID 12252
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 34 of 42

demonstrating adequate assurance of future performance.  Yet, the Debtor fails completely with respect to even an attempt to satisfy these requirements.

73.    In this respect, the sole disclosure in the Plan and Disclosure Statement with respect to who will manage these billions of dollars in assets is as follows:

> Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

Plan at p. 32-33.

74.    Neither the identity nor the compensation of the people who will control and manage the Reorganized Debtor is provided, much less as to who may be a Sub-Servicer.  While Mr. Seery is disclosed as the Claimant Trustee who will be responsible for "winding down the Reorganized Debtor's business operations," this is insufficient.  All the more so because, without additional disclosures and facts, not only can adequate assurance of future performance not be proven, but the Debtor cannot prove that the employment and compensation of these unnamed officers and managers of the Reorganized Debtor is "is consistent with the interests of creditors and equity security holders and with public policy."  Public policy in particular, given the dictates of the Advisers Act, is implicated.

Accordingly, the Plan is fatally defective with respect to section 1129(a)(5) and cannot be confirmed on that basis alone.

### *The Fifth Amended Plan is not feasible*

75.    Section 1129(a)(11) requires that confirmation of a plan not be likely to be followed by liquidation or the need for further reorganization.  "Establishing a likelihood that a plan itself will be successful is a question of feasibility."  *In re Dernick*, Case No. 18-32417,

Appellee Appx. 01500
Appx. 01751
014313

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 1508/251804   Page 635 of 1017   PageID 15279
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1507 of 1803   PageID 12253
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 35 of 42

2020 WL 6833833, at *17 (Bankr. S.D. Tex. Nov. 20, 2020).  Feasibility contemplates whether the plan is workable and offers a reasonable assurance of success.  *Id.*; *see also In re Frascella Enters., Inc.*, 360 B.R. 435, 453 (Bankr. E.D. Pa. 2007).  "An obvious illegality . . . exposes the plan on feasibility grounds."  *In re Food City*, 110 B.R. at 813 n. 12; *see also In re McGinnis*, 453 B.R. at 773 (chapter 13 plan premised on illegal activity could not be confirmed); *In re Frascella*, 360 B.R. at 445, 456 (citing *Food City*, 110 B.R. at 812 n. 10) (debtor failed to establish plan was feasible where it rested on questionable legal basis).

76.     As discussed above, the proposed treatment with respect to the portfolio management agreements and the CLOs contravenes section 365 of the Bankruptcy Code and the Adviser Act.  This illegality hampers the feasibility of the Fifth Amended Plan, and accordingly, the Court should find that it is not feasible and deny confirmation.

### ***The Debtor's proposed assumption of the Servicing Agreements is improper under section 365 because there is no adequate assurance of future performance***

77.     Under section 365(b) of the Bankruptcy Code, an executory contract may only be assumed if the Debtor "provides adequate assurance of future performance under such contract[.]" 11 U.S.C. § 365(b)(1)(C).

78.     Although the Fifth Amended Plan provides for the assumption of the Servicing Agreements with many of the CLOs, it does not offer any assurance with respect to the Debtor's ability to perform under such agreements.  Indeed, given the Debtor's plan to wind down and liquidate its remaining assets, and in light of the contractual and statutory breaches discussed above, the Debtor cannot possibly provide such assurance.  Furthermore, it is uncertain whether sufficient employees will be retained by the Debtor to fulfil its obligations under the portfolio management agreements, even its most significant duties are delegated to a Sub-Advisor.  Accordingly, assumption is improper and must be disallowed under section 365(b).

Appellee Appx. 01501
Appx. 01752
014314

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 1509 of 1804   Page 636 of 1017   PageID 15280
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1508 of 1803   PageID 12254
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 36 of 42

79.     Equally important, the Debtor's failure to offer or provide adequate assurance is intensified because the purported assumption is, in reality, a *sub rosa* assumption *and assignment* to an as yet unnamed third party.  This unidentified third party has also not offered adequate assurance of future performance as required in the context of such assignments.

### *The Release and Exculpation Provisions of the Fifth Amended Plan are overly broad and extend beyond the Effective Date*

80.     In the Fifth Circuit, permanent injunctions against nondebtors are not permissible.  *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 761 (5th Cir. 1995).  In fact, and quite to the contrary, the case law "seem[s] broadly to foreclose non-consensual non-debtor releases and permanent injunctions."  *Bank of N.Y. Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009).  Such permanent injunctions would "improperly insulate nondebtors in violation of section 524(e)," and "without any countervailing justification of debtor protection."  *Id.* at 760 (quoting *Landsing Diversified Props. v. First Nat'l Bank & Trust Co. (In re W. Real Estate Fund, Inc.)*, 922 F.2d 592, 601-02 (10th Cir. 1990)); *see also In re Pac. Lumber*, 584 F.2d at 252 (noting that costs that the released parties might incur defending against suits are unlikely to swamp such parties or the reorganization).

81.     Indeed, courts within this District have found that injunctions and release provisions substantively identical to that proposed in Fifth Amended Plan, and which purport to release causes of action against non-debtor third parties, violate Fifth Circuit precedent and are impermissible.  *Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, Civil Action No. 3:17-CV-1958-G, 2018 WL 5113124, at *21 (N.D. Tex. Oct. 19, 2018) (finding that bankruptcy court erred by approving injunction that would have effectively discharged non-debtor third parties); *In re Pac. Lumber*, 584 F.3d at 251-53 (striking release provision purporting to release non-

Appellee Appx. 01502
014315

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6-15    Page 15 of 35 1804    Page 637 of 1017    PageID 15281
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1509 of 1803    PageID 12255
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 37 of 42

debtor third parties from liability relating to the proposal, implementation, and administration of the plan).

82.    The injunction contained in Article XI.F of the Fifth Amended Plan is almost identical to that struck down in *In re Thru*. Like the injunction provision in *In re Thru*, the Debtor's proposed injunction would bar the Debtor's creditors "from pursuing causes of action against a number of non-debtor third parties, if those causes of action relate to the creditors' claims against the debtor." 2018 WL 5113124, at *21. The Fifth Amended Plan purports to release creditors' claims against not only the Debtor, but also the Independent Directors. Dkt. No. 1472 at 56-57. Not only that, but the Fifth Amended Plan purports to release creditors' claims stemming from the bankruptcy case, as well as the negotiation, administration and implementation of the Plan, as against many of the specific third parties that the courts in this Circuit have found to be impermissible, including, but not limited to, employees, officers and directors, and professionals retained by the Debtor, among others. *Id.*; *In re Thru*, 2018 WL 5113124, at *21 (concluding it was "clearly erroneous" for the bankruptcy court to approve an injunction covering causes of action against such parties); *In re Pac. Lumber*, 584 F.3d at 252-53.

83.    Furthermore, the exculpation provision contained in Article XI.C of the Fifth Amended Plan is incompatible with Fifth Circuit precedent, as explained by the court in *In re Thru*. The court in *In re Thru* found that it was clear error for the bankruptcy court to approve an exculpation provision that exculpated non-debtor third parties, including the debtor's employees, officers, directors, advisors, affiliates and professionals, from liability in connection with formulating, implementing, and consummating the plan of reorganization. 2018 WL 5113124, at *22. The exculpation provision in the Fifth Amended Plan provides the "same

Appellee Appx. 01503
Appx. 01754
014316

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15   Filed 05/06/25   Page 638 of 1017   PageID 15282
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1510 of 1803   PageID 12256
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 38 of 42

insulation" as the impermissible provision in the *In re Thru* plan, and as such, it cannot be approved. *See also In re Pac. Lumber*, 584 F.3d at 252 ("We see little equitable [sic] about protecting the released non-debtors from negligence suits arising out of the reorganization.").

84.   In sum, the Fifth Amended Plan impermissibly seeks to exculpate certain non-debtor third parties from a broad array of claims relating to such entities' pre- and post-petition conduct.  The Funds and Advisors submit there is no authority that would permit such broad exculpatory and/or injunctive language in favor of third parties.

### *The Fifth Amended Plan appears to eliminate the right of setoff*

85.   The Funds and Advisors object to the extent that the Plan purports to divest them of their rights of setoff against the Debtor.

### *The Fifth Amended Plan violates section 365(d)(2) by impermissibly allowing the Debtor to assume or reject executory contracts and unexpired leases after confirmation*

86.   Section 365(d)(2) of the Bankruptcy Code provides that, in a case under chapter 11, the debtor may assume or reject an executory contract or unexpired lease "at any time *before confirmation of a plan* . . . ."  11 U.S.C. § 365(d)(2) (emphasis added).

87.   Notwithstanding this clear language, the Fifth Amended Plan authorizes the Debtor to amend the Plan Supplement by adding or removing a contract or lease from the list of contracts to be assumed, or assign an Executory Contract or Unexpired Lease, at any time up until the Effective Date.  Dkt. No. 1472 at 43.  Further, the Disclosure Statement indicates that the Debtor is still evaluating whether to assume and assign the Shared Services Agreements. This is contrary to the explicit language of the Bankruptcy Code.

88.   Accordingly, the Advisors object to the Fifth Amended Plan to the extent that it purports to reserve the Debtor's right and ability to assume or assume and assign the Shared

38

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 10702/25/1804   Page 639 of 1017   PageID 15283
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1511 of 1803   PageID 12257
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 39 of 42

Services Agreements or the Payroll Reimbursement Agreements post-confirmation. Furthermore, the Funds object to the Fifth Amended Plan to the extent it purports to reserve the Debtor's right and ability to alter the proposed treatment of the Servicing Agreements.

### *The Debtor is not entitled to a discharge*

89.     Although section 1141(d) of the Bankruptcy Code discharges a debtor from most pre-confirmation debt, it expressly <u>does not</u> discharge a debtor if:

> (A) the plan provides for the liquidation of all or substantially all of the property of the estate;
> (B) the debtor does not engage in business after consummation of the plan; and
> (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

11 U.S.C. § 1141(d)(3).

90.     Here, the Plan provides for liquidation of all of the Debtor's property over a period of time. Although the Debtor may technically continue business for a brief period of time, its ultimate goal is liquidation. Further, the Debtor would be denied a discharge under section 727(a)(1) because it is not an individual. Accordingly, the Court should find that the Debtor is not entitled to a discharge under section 1141 of the Bankruptcy Code.

### *The Fifth Amended Plan may violate the absolute priority rule*

91.     Section 1129(b)(2)(B)(ii) provides that the holder of any claim or interest that is junior to the claims of unsecured creditors may not retain any property unless general unsecured creditors are paid in full. 11 U.S.C. § 1129(b)(2)(B)(ii). The "absolute priority rule is a bedrock principle of chapter 11 practice." *In re Texas Star Refreshments, LLC*, 494 B.R. 684, 703 (Bankr. N.D. Tex. 2013). "Under this rule, unsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated." *In re SeaQuest Diving, LP*, 579 F.3d 411, 420 n.5 (5th Cir. 2009) (comparing subordination

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Page 1518/05/1804    Page 640 of 1017    PageID 15284
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1512 of 1803   PageID 12258
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 40 of 42

under section 510 to absolute priority rule) (quoting *In re Geneva Steel Co.*, 281 F.3d 1173, 1180 n.4 (10th Cir. 2002)).

92.    In the event the unsecured creditor classes (Class 7 and 8) vote against the Fifth Amended Plan, the absolute priority rule prohibits the retention of equity in the Reorganized Debtor by existing equity holders in the absence of a new investment and opportunity for competitive bidding for that investment opportunity.

## CONCLUSION

93.    For the reasons set forth above, the Funds and Advisors respectfully request that the Court deny confirmation of the Fifth Amended Plan and grant such other and further relief as the Court deems just and proper.

Dated:    January 5, 2020

**MUNSCH HARDT KOPF & HARR, P.C.**

By:  /s/ Davor Rukavina
     Davor Rukavina, Esq.
     Texas Bar No. 24030781
     Julian P. Vasek, Esq.
     Texas Bar No. 24070790
     3800 Ross Tower
     500 N. Akard Street
     Dallas, Texas  75201-6659
     Telephone: (214) 855-7500
     Facsimile: (214) 855-7584
     Email:      drukavina@munsch.com

     - and -

     K&L GATES LLP

     Artoush Varshosaz (TX Bar No. 24066234)
     1717 Main Street, Suite 2800
     Dallas, TX 75201
     Tel: (214) 939-5659
     artoush.varshosaz@klgates.com

     Stephen G. Topetzes (*pro hac vice*)
     1601 K Street, NW
     Washington, DC 20006-1600

**Appellee Appx. 01506**
Appx. 01755
014319

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-16    Page 15/06/051804 Page 641 of 1017    PageID 15285
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1513 of 1803    PageID 12259
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 41 of 42

Tel: (202) 778-9328
stephen.topetzes@klgates.com

A. Lee Hogewood, III (*pro hac vice*)
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Tel: (919) 743-7306
Lee.hogewood@klgates.com

*Counsel for Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Funds I and its series Highland Healthcare Opportunities Fund, Highland/iBoxx Senior Loan ETF, Highland Opportunistic Credit Fund, and Highland Merger Arbitrage Fund, Highland Funds II and its series Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Fixed Income Fund, and Highland Total Return Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, Highland Income Fund, Highland Global Allocation Fund, and NexPoint Real Estate Strategies Fund, and NexPoint Latin America Opportunities Fund*

Appellee Appx. 01507
Appx. 01758
014320

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 15/05/851804 of 1017   PageID 15286
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1514 of 1803   PageID 12260

Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 42 of 42

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 5th day of January, 2021, and in addition to electronic service on parties entitled to notice thereon through the Court's ECF system, the undersigned caused the foregoing document to be served, by U.S. first class mail, postage prepaid, on the following:

Pachulski Stang Ziehl & Jones LLP
Attn: Jeffrey N. Pomerantz, Ira D. Kharasch, and Gregory V. Demo
10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067

Hayward & Associates PLLC
Attn: Melissa S. Hayward and Zachery Z. Annable
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231

Sidley Austin LLP
Attn: Matthew A. Clemente and Alyssa Russell
One South Dearborn Street
Chicago, Illinois 60603

Office of the United States Trustee
U.S. Department of Justice, Region 6: Northern District of Texas
1100 Commerce Street, Room 976
Dallas, TX 75242

and, on the same day, by e-mail, on the following:

jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
gdemo@pszjlaw.com
MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com
mclemente@sidley.com
Alyssa.russell@sidley.com
Lisa.L.Lambert@usdoj.gov

/s/  Davor Rukavina
Davor Rukavina

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1516 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1515 of 1803    PageID 12261
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 1 of 8

**Highland Capital Management Fund Advisors, L.P.**

**CLOs Review**

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Aberdeen Loan Funding, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Shares Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Trustee, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |
| **Brentwood CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

1

308393059.4

Exhibit A

**Appellee Appx. 01509**

Appx. 01509

014322

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1517 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1516 of 1803    PageID 12262
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 2 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Eastland CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |
| **Gleneagles CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Preference Share Paying Agency Agreement. PMA § 9. | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Preference Shares holders. PMA § 2(b). | Removal without cause permitted by 66 2/3% of Preference Shares Holders (excluding Preference Shares held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice.  PMA § 12(c).<br><br>The Portfolio Manager may avoid removal by purchasing all Preference Shares voting for removal (and Preference Shares not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 12% IRR since the Closing Date).  PMA § 12(c).<br><br>For cause removal may be effected in connection with the Portfolio Manager | 66 2/3% of Preference Shares Holders. PMA § 12(c). |

2

308393059.4

Appellee Appx. 01510
Appx. 01510
014323

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1518 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1517 of 1803    PageID 12263
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 3 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | | | breaching the portfolio management agreement by not maximizing the value of the Collateral.  PMA § 2(b). | |
| **Grayson CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |
| **Greenbriar CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture.  SA § 9.  The Indenture references a Preference Shares Paying Agency Agreement.  Indenture § 1.1 (Definitions-- Preference Share Documents). | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Trustee, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

3

Appellee Appx. 01511
Appx. 01766
014324

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1519 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1518 of 1803    PageID 12264
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 4 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Jasper CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Preference Share Paying Agency Agreement. PMA § 9. | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Preference Shares holders. PMA § 2(b). | Removal without cause permitted by 66 2/3% of Preference Shares Holders (excluding Preference Shares held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice.  PMA § 12(a).<br><br>The Portfolio Manager may avoid removal by purchasing all Preference Shares voting for removal (and Preference Shares not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 15% IRR since the Closing Date).  PMA § 12(a).<br><br>For cause removal may be effected in connection with the Portfolio Manager breaching the portfolio management agreement by not maximizing the value of the Collateral.  PMA § 2(b). | 66 2/3% of Preference Shares Holders. PMA § 12(a). |
| **Liberty CLO, Ltd.** | Requisite percentage of Class E Certificates Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Class E | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Class E Certificates holders. PMA § 2(b). | Removal without cause permitted by 66 2/3% of Class E Certificates Holders (excluding Class E Certificates held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice.  PMA § 12(c). | 66 2/3% of Class E Certificates Holders. PMA § 12(c). |

4

308393059.4

Appellee Appx. 01512
Appx. 014325
014325

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1520 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1519 of 1803    PageID 12265
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 5 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | Certificates Paying Agency Agreement. PMA § 9. | | The Portfolio Manager may avoid removal by purchasing all Class E Certificates voting for removal (and Class E Certificates not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 12% IRR since the Closing Date). PMA § 12(c).<br><br>For cause removal may be effected in connection with the Portfolio Manager breaching the portfolio management agreement by not maximizing the value of the Collateral. PMA § 2(b). | |
| **Red River CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders. SA § 2(b). | No removal without cause. Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice. SA § 14. For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

5

308393059.4

Appellee Appx. 01513
Appx. 014584
014326

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1521 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1520 of 1803    PageID 12266
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 6 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Rockwall CDO Ltd.** | Requisite percentage of Preferred Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by 66 2/3% of Preferred Shares Holders (excluding Preferred Shares held by the Servicer and affiliates, or for which they have discretionary voting authority, but HFP may vote Preferred Shares it owns up to the Original HFP Share Amount) directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | 66 2/3% of Voting Preference Share Holders. SA § 14. |
| **Rockwall CDO II Ltd.** | Requisite percentage of Preferred Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by 66 2/3% of Preferred Shares Holders (excluding Preferred Shares held by the Servicer and affiliates, or for which they have discretionary voting authority, but HFP may vote Preferred Shares it owns up to the Original HFP Share Amount) directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | 66 2/3% of Voting Preference Share Holders. SA § 14. |

6

308393059.4

Appellee Appx. 01514
Appx. 01765
014327

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1522 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1521 of 1803    PageID 12267
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 7 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | | | | |
| Southfork CLO, Ltd. | Requisite percentage of Preference Shares Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Preference Share Paying Agency Agreement. PMA § 9. | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Preference Shares holders. PMA § 2(b). | Removal without cause permitted by 63% of Preference Shares Holders (excluding Preference Shares held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice.  PMA § 12(c). The Portfolio Manager may avoid removal by purchasing all Preference Shares voting for removal (and Preference Shares not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 12% IRR since the Closing Date).  PMA § 12(c). For cause removal may be effected upon the Portfolio Manager authorizing or filing a voluntary petition in connection with the Portfolio Manager breaching the portfolio management agreement by not maximizing the value of the Collateral.  PMA § 2(b). | 63% of Preference Shares Holders. PMA § 12(c). |
| Stratford CLO Ltd. | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by 66 2/3% of Preference Shares Holders (excluding Preference Shares held by the Servicer | 66 2/3% of Preference Shares Holders. SA § 14. |

308393059.4

Appellee Appx. 01515
Appx. 01506
014328

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1523 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1522 of 1803    PageID 12268
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 8 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | Servicer, as provided in the Indenture.  SA § 9.  The Indenture references a Preference Shares Paying Agency Agreement.  Indenture § 1.1 (Definitions-- Preference Share Documents). | | and affiliates, or for which they have discretionary voting authority, but HFP may vote Preference Shares it owns up to the Original HFP Share Amount) directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | |
| **Valhalla CLO, Ltd.** | [No Preference Shares or Class E Certificates.] | [No Preference Shares or Class E Certificates.] | [No Preference Shares or Class E Certificates.] | |
| **Westchester CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

308393059.4

Appellee Appx. 01516

Appx. 01793

014329

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-6   Page 1524 of 1804   Page 651 of 1017   PageID 15295
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1523 of 1803   PageID 12269

# APPENDIX 21

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-9   Exhibit 6   Page 1 of 1526/25/1804   Page 652 of 1017   PageID 15296
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1524 of 1803   PageID 12270
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21   Entered 01/05/21 16:48:48   Page 1 of 7

Docket #1673  Date Filed: 01/05/2021

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR NEXPOINT REAL ESTATE PARTNERS, LLC**
**F/K/A HCRE PARTNERS, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Case No.: 19-34054-sgj11** |
| | § | |
| **Debtor.** | § | |

## NEXPOINT REAL ESTATE PARTNERS LLC'S OBJECTION
## TO DEBTOR'S FIFTH AMENDED PLAN OF REORGANIZATION

NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC ("NREP") files this Objection to the Debtor's Fifth Amended Plan of Reorganization (the "Objection") and respectfully states as follows:

### I. INTRODUCTION

1.     On November 24, 2020, the Debtor filed the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 1472] and Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 1473] (the "Disclosure Statement"). On November 13, 2020, the Debtor filed its Initial Plan Supplement [Docket No. 1389], on December 18, 2020, the Debtor filed its Second Plan Supplement [Docket No. 1606] and on January 4, 2021, the Debtor filed its Third Plan Supplement [Docket No. 1656]

1934054210105000000000020

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 13-15    Page 1526 of 1804    Page 653 of 1017    PageID 15297
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1525 of 1803    PageID 12271
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21    Entered 01/05/21 16:48:48    Page 2 of 7

(together with the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P., the "Fifth Amended Plan").

2.      The hearing on confirmation of the Fifth Amended Plan is scheduled for January 13, 2021 at 9:30 a.m. (the "Confirmation Hearing") and the deadline to file any objections to confirmation of the Fifth Amended Plan is January 5, 2021. *See* Docket No. 1476.

3.      The Fifth Amended Plan provides for the transfer of the majority of the Debtor's assets to a Claimant Trust that will be established for the benefit of the Claimant Trust Beneficiaries. However, ultimately, the Claimant Trust and the Reorganized Debtor will "sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets." *See* Disclosure Statement, p. 11. Based on the Financial Projections attached as Exhibit C to the Disclosure Statement, the Debtor intends to liquidate its remaining assets and the assets within the Managed Funds over the next two years, concluding in December 2022.

4.      NREP filed a proof of claim in this case. *See* Claim Number 146. The Debtor has objected to NREP's claim. If NREP's claim is allowed, NREP possesses a claim in Class 7 or Class 8 under the Fifth Amended Plan.

5.      The Fifth Amended Plan also contains provisions to subordinate unidentified claims, a seemingly unfettered ability to set-off claims, and extremely broad exculpation, injunction, and release provisions, all of which fail to comply with the Bankruptcy Code. For the reasons set forth in detail below, NREP respectfully requests the Court deny confirmation of the Fifth Amended Plan.

## II. OBJECTIONS

6.      A debtor in bankruptcy bears the burden of proving every element of Bankruptcy Code Section 1129(a) by a preponderance of the evidence in order to attain confirmation of its

---

Appellee Appx. 01519
014332

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 157 of 281804    Page 654 of 1017    PageID 15298
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1526 of 1803    PageID 12272
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21    Entered 01/05/21 16:48:48    Page 3 of 7

plan. *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters.* (*In re Briscoe Enters.*), 994 F.2d 1160

(5th Cir. 1993); *In re Barnes*, 309 B.R. 888, 895 (Bankr. N.D. Tex. 2004) (citing *In re T-H New

Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997)). In addition, a court has a mandatory duty

to determine whether a plan has met all the requirements for confirmation, whether specifically

raised by dissenting parties in interest or not. *Williams v. Hibernia Nat'l Bank*, 850 F.2d 250, 253

(5th Cir. 1988). The Debtor in this case is unable to meet its burden for confirmation.

**A.    The Fifth Amended Plan provides for the improper subordination of unidentified claims.**

7.    The Fifth Amended Plan provides for a class of subordinated claims, which claims

may be subordinated to the general unsecured claims or both the general unsecured claims and

convenience class. The Fifth Amended Plan then provides that

> Under section 510 of the Bankruptcy Code, upon written notice, the
> Debtor, the Reorganized Debtor, and the Claimant Trustee reserve
> the right to re-classify, or to seek to subordinate, any Claim in
> accordance with any contractual, legal, or equitable subordination
> relating thereto, and the treatment afforded any Claim under the Plan
> that becomes a subordinated Claim at any time shall be modified to
> reflect such subordination.

*See* Fifth Amended Plan, Article III(J).

8.    In the Fifth Circuit, equitable subordination is appropriate when (i) the claimant

engaged in inequitable conduct; (ii) the misconduct resulted in harm to the debtor's other creditors

or conferred an unfair advantage on the claimant; and (iii) equitable subordination is not

inconsistent with the Bankruptcy Code. *See In re Life Partners Holdings, Inc.*, 926 F.3d 103, 121

(5th Cir. 2019). Further, a claim should only be subordinated to the extent necessary to offset the

harm which the creditors have suffered as a result of the inequitable conduct. *Id.*

9.    However, section 510 of the Bankruptcy Code only allows equitable subordination

of claims "after notice and a hearing." 11 U.S.C. § 510(c). Equitable subordination generally

---

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-5    Page 155/28/251804 Page 655 of 1017    PageID 15299
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1527 of 1803    PageID 12273
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21    Entered 01/05/21 16:48:48    Page 4 of 7

requires an adversary proceeding and while it may be satisfied through a chapter 11 plan, the debtor

must at least satisfy its burden of demonstrating such claim should be subordinated under equitable

subordination principles. Fed. R. Bankr. P. 7001(8).

10.     Here, the Fifth Amended Plan does not provide for the subordination of any specific

claims but, instead, provides for a procedure to subordinate claims that fails to comply with the

statutory requirements under section 510 of the Bankruptcy Code or applicable case law. The Fifth

Amended Plan provides no notice of the potential targets of such subordination, the basis upon

which such subordination of claims may be justified, or any evidence supporting equitable

subordination principles. Nor does the Fifth Amended Plan provide any means for due process,

adequate notice, or opportunity to oppose such unidentified subordinations. Instead, the Fifth

Amended Plan attempts to provide a means by which the Debtor, Reorganized Debtor, and

Claimant Trustee can escape the "notice and hearing" requirements of section 510. This does not

comply with the provisions of the Bankruptcy Code. As a result, the Fifth Amended Plan fails to

satisfy 1129(a)(1) and confirmation should be denied.

**B.     The Fifth Amended Plan provides for the improper set-off of unidentified claims against the Debtor.**

11.     Similarly, the Fifth Amended Plan also provides the Distribution Agent unfettered

set-off rights in violation of section 553 of the Bankruptcy Code. The Fifth Amended Plan provides

that:

> The Distribution Agent may, to the extent permitted under
> applicable law, set off against any Allowed Claim and any
> distributions to be made pursuant to this Plan on account of such
> Allowed Claim, the claims, rights and causes of action of any nature
> that the Debtor, the Reorganized Debtor, or the Distribution Agent
> may hold against the Holder of such Allowed Claim…. Any Holder
> of an Allowed Claim subject to such setoff reserves the right to
> challenge any such setoff in the Bankruptcy Court or any other court
> with jurisdiction with respect to such challenge.

---

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-15    Filed 05/26/25    Page 656 of 1017    PageID 15300
Exhibit 6    Page 1529 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1528 of 1803    PageID 12274
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21    Entered 01/05/21 16:48:48    Page 5 of 7

*See* Fifth Amended Plan, Article VI(M). Thus, under the Fifth Amended Plan, the Distribution Agent may setoff the distribution amount on account of any Allowed Claim, without otherwise providing notice to the Holder of such Allowed Claim and without providing any support for or evidence that such setoff is justified. Instead, after the Distribution Agent arbitrarily determines a setoff is appropriate, the Holder of the Allowed Claim must initiate a proceeding challenging such setoff and seeking its full distribution under the Fifth Amended Plan. In addition, under the Fifth Amended Plan, the Distribution may setoff a pre-petition Allowed Claim on account of not only pre-petition claims but also post-petition claims of the Reorganized Debtor and/or Distribution Agent.

12.    However, setoff is only available in bankruptcy when the opposing obligations arise on the same side of the bankruptcy date—*i.e.,* both had arisen prior to the petition date or both subsequent to the petition date. *In re Thomas*, 529 B.R. 628, 637 n.2 (Bankr. W.D. Pa. 2015); *In re Univ. Med. Center*, 973 F.2d 1065, 1079 (3d Cir. 1992). A creditor's pre-petition claims against the debtor cannot be set off against post-petition debts owed to the debtor. *In re Univ. Med. Center*, 973 F.2d at 1079. In addition, the burden of proof is on the party asserting the right to setoff. *In re Garden Ridge Corp.*, 338 B.R. 627, 632 (Bankr. D. Del. 2006). The party seeking to enforce a setoff right must establish (i) it has a right to setoff under nonbankruptcy law; and (ii) this right should be preserved in bankruptcy under section 553. *Id*.

13.    Here, contrary to the provisions in section 553 of the Bankruptcy Code, the Fifth Amended Plan attempts to both expand the right to setoff by allowing post-petition claims be setoff against pre-petition Allowed Claims and transfer the burden of proof to the Holder of such Allowed Claim, requiring such Holder disprove the Distribution Agent's right to setoff. This does not

---

Appellee Appx. 01522

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-15    Filed 05/30/25    Page 657 of 1017    PageID 15301
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1529 of 1803    PageID 12275
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21    Entered 01/05/21 16:48:48    Page 6 of 7

comply with the provisions of the Bankruptcy Code. As a result, the Fifth Amended Plan fails to satisfy 1129(a)(1) and confirmation should be denied.

**C.    The Fifth Amended Plan provides for improper and overly broad injunctions, releases and exculpation.**

14.    In addition, the Fifth Amended Plan provides for broad releases and permanent injunctions against nondebtors. *See* Article IX(F). However, permanent injunctions against nondebtors are not permissible in the Fifth Circuit because such a permanent injunction would "improperly insulate nondebtors in violation of section 524(e)…without any countervailing justification of debtor protection." *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760-61 (5th Cir. 1995) (quoting *Landsing Diversified Props. v. First Nat'l Bank & Trust Co.* (*In re W. Real Estate Fund, Inc.*), 922 F.2d 592, 601-02 (10th Cir. 1990)). Contrary to such prohibition, the Fifth Amended Plan seeks to exculpate certain "Exculpated Parties" and "Protected Parties" from a broad array of claims relating to such entities' post-petition conduct and would bar creditors from pursing claims against various non-debtor parties if such claims relate to their claims against the Debtor. In addition, the language purports to release creditors' claims arising not only from the bankruptcy case but also the administration and implementation of the Fifth Amended Plan and the period of time covered by the release and exculpation provisions extend beyond the effective date and purport to cover post-effective date conduct. Neither the Bankruptcy Code nor applicable case law permits such broad exculpatory and/or injunctive language in favor of third parties. *See In re Zale Corp.*, 62 F.3d at 761, *Bank of N.Y. Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252-253 (5th Cir. 2009). The injunction, release, and exculpation provisions in the Fifth Amended Plan do not comply with section 524(e) of the Bankruptcy Code or applicable case law and the Court should deny confirmation.

---

Appellee Appx. 01523

014336

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16   Page 1535/251804   Page 658 of 1017   PageID 15302
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1530 of 1803   PageID 12276
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21   Entered 01/05/21 16:48:48   Page 7 of 7

**D.      Reservation of Rights**

15.      NREP reserves the right to amend or supplement this Objection to add any
appropriate basis under Sections 1129(a) and (b) and other applicable provisions of the Bankruptcy
Code. In addition, NREP reserves the right to join in and support the objections asserted by other
parties at the Confirmation Hearing.

### III.  CONCLUSION

For these reasons, the NREP respectfully requests that the Court deny confirmation of the
Fifth Amended Plan and grant NREP such other relief at law or in equity to which it may be
entitled.

Respectfully submitted,

/s/ Lauren K. Drawhorn
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
          lauren.drawhorn@wickphillips.com

**COUNSEL FOR NEXPOINT REAL ESTATE
PARTNERS, LLC F/K/A HCRE PARTNERS, LLC**

### CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2021, a true and correct copy of the foregoing Joinder
was served via the Court's CM/ECF system upon counsel for the Debtor and all other parties
requesting or consenting to such service in this bankruptcy case.

/s/ Lauren K. Drawhorn
Lauren K. Drawhorn

---

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-6    Page 1532 of 1804    Page 659 of 1017    PageID 15303
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1531 of 1803   PageID 12277

# APPENDIX 22

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1533 of 1804   Page 660 of 1017   PageID 15304
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1532 of 1803   PageID 12278
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21   Entered 01/05/21 16:46:20   Page 1 of 6

Docket #1671  Date Filed: 01/05/2021

United States Department of Justice
Office of the United States Trustee
1100 Commerce St.  Room 976
Dallas, Texas  75242
(202) 834-4233

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Case No. 19-34054** |
| | § | |
| | § | |
| | § | |
| **Debtors-in-Possession.** | § | |

---

## United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization (Docket Entry No. 1472)

---

**To the Honorable Stacey J. Jernigan,**
**United States Bankruptcy Judge:**

The United States Trustee for Region 6 files this Limited Objection (the "**Objection**") to the Debtor's Fifth Amended Plan of Reorganization (the "Plan" -- docket entry [D.E.] 1472, filed 11/24/2020).  In support of the relief requested, the United States Trustee respectfully submits as follows:

### Summary

The United States Trustee objects to confirmation of the Plan because the releases exceed the scope permitted by Fifth Circuit precedent.  The United States Trustee has resolved other objections with the Debtors, and these resolutions will be announced and incorporated in the confirmation order.

**United States Trustee's Confirmation Objection**

1934054210105000000000017

Appellee Appx. 01526

Appx. 01479

014339

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 661 of 1017   PageID 15305
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1533 of 1803   PageID 12279
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21   Entered 01/05/21 16:46:20   Page 2 of 6

## Facts: Relevant Plan Provisions

**Salient Definitions:**

1.      The Plan defines exculpated and released parties as follows:

a.   "Exculpated Parties" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); provided, however, that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

b.   "Released Parties" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

Plan, D.E. 1472; definitions 61, 111, p. 16.

**Releasing Third Parties:**

2.      The Plan releases third parties who would share liability with the Debtor:

**Appellee Appx. 01527**
**Appx. 01778**
014340

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5   Page 1536/851804 Page 662 of 1017   PageID 15306
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1534 of 1803   PageID 12280
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21   Entered 01/05/21 16:46:20   Page 3 of 6

"[E]ach Released Party is deemed to be, hereby conclusively, absolutely, unconditionally,

irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on

behalf of themselves and their respective successors, assigns, and representatives, including,

but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of

Action, including any derivative claims, asserted on behalf of the Debtor, whether known or

unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law,

equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally

entitled to assert in their own right (whether individually or collectively) or on behalf of the

holder of any Claim against, or Interest in, a Debtor or other Person.

Plan, D.E. 1472, p. 48.

3.      The releases for Released Parties exclude "any Causes of Action arising from

willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released

Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction."

Plan, D.E. 1472, pp. 48-49.

4.      The Plan releases do not contemplate any type of channeling injunction.

**Exculpating Third Parties:**

5.      The exculpation provisions broadly cover third parties:

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted

by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is

hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt,

right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the

Petition Date in connection with or arising out of (i) the filing and administration of the

Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or

the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or

consummation of the Plan (including the Plan Supplement) or any related agreements,

**United States Trustee's Confirmation Objection**                                    **Page 3 of 6**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 1536 of 1804   Page 663 of 1017   PageID 15307
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1535 of 1803   PageID 12281
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21   Entered 01/05/21 16:46:20   Page 4 of 6

instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v); provided, however, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

### Argument and Authority

**Plan Contains Non-Consensual Third-Party Releases and Exculpation in Contravention of Fifth Circuit Precedent.**

6.      The Plan contains non-consensual third-party releases that should be stricken under Fifth Circuit precedent.

7.      The Plan's exculpation provisions are similarly overbroad.

8.      While the Plan specifies that the releases and exculpation are allowed to "the maximum extent allowed by law," the law in the Fifth Circuit is that they are not allowed.

9.      Like the Highland Capital Plan, the *Pacific Lumber* plan contained exculpation and release provisions that carved out willful or intentional conduct. *Scotia Pacific Co., LLC v. Official Unsecured Creditors' Committee (In re Pacific Lumber Co.),* 584 F.3d 229

**United States Trustee's Confirmation Objection**                                    **Page 4 of 6**

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 63-15 Page 1537 of 1804 Page 664 of 1017 PageID 15308
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1536 of 1803 PageID 12282
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21 Entered 01/05/21 16:46:20 Page 5 of 6

(5th Cir. 2009). Reviewing four prior Fifth Circuit bankruptcy cases, the *Pacific Lumber* court concluded these cases "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions." *Id.* at 252 (citations omitted). The Fifth Circuit struck these non-consensual provisions as to parties who were co-liable with the debtor but noted that committee members and committee professionals received qualified immunity. *Id.*

10. The *Pacific Lumber* court disallowed the exculpation and releases of the debtors' officers, directors, and professionals because there was no evidence that they "were jointly liable for any . . . pre-petition debt. They are not guarantors or sureties, nor are they insurers. Instead, the essential function of the exculpation clause . . . is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose." *Id.* at 252-53.

11. Bankruptcy Courts in the Northern District of Texas have resolved objections to exculpation or release provisions by replacing such provisions with channeling injunctions. *See* Memorandum Opinion and Order, Docket Entry No. 4614, *In re Pilgrim's Pride Corporation, et al.*, Case No. 08-45664-DML-11 (January 14, 2010); Fourth Amended Joint Chapter 11 Plan of CHC Group Ltd. and its Affiliated Debtors (Section 10.8), Docket Entry No. 1701, *In re CHC Group, Ltd.*, Case No. 16-31854-BJH-11, United States Bankruptcy Court for the Northern District of Texas, Dallas Division (February 16, 2017).

12. The Plan release and exculpation provisions should be limited. Unless they exclude the Debtors' professionals, the Debtors' officers and directors, and others not protected by quasi-immunity, confirmation should be denied.

**United States Trustee's Confirmation Objection**                                        **Page 5 of 6**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-6   Page 1536 of 1804   Page 665 of 1017   PageID 15309
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1537 of 1803   PageID 12283
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21   Entered 01/05/21 16:46:20   Page 6 of 6

## Conclusion

Wherefore, the United States Trustee requests that the Court deny approval of the Plan and grant to the United States Trustee such other and further relief as is just and proper.

DATED: January 5, 2021          Respectfully submitted,

                                WILLIAM T. NEARY
                                UNITED STATES TRUSTEE

                                */s/ Lisa L. Lambert*
                                Lisa L. Lambert
                                Asst. U.S. Trustee, TX 11844250
                                Office of the United States Trustee
                                1100 Commerce Street, Room 976
                                Dallas, Texas  75242
                                (202) 834-4233

## Certificate of Service

There undersigned hereby certifies that on January 5, 2020, a copy of the foregoing pleading was served via ECF to parties requesting notice via ECF.

                                */s/  Lisa L. Lambert*
                                Lisa L. Lambert

**Appellee Appx. 01531**
**Appx. 01782**
**014344**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1536/251804 Page 666 of 1017    PageID 15310
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1538 of 1803   PageID 12284

# APPENDIX 23

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 15406/25 1804   Page 667 of 1017   PageID 15311
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1539 of 1803   PageID 12285
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 1 of 68

Docket #1814  Date Filed: 01/22/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

<div align="center">

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

</div>

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054 |
| | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |

<div align="center">

**DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION
OF THE FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF
HIGHLAND CAPITAL MANAGEMENT L.P.**

</div>

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_SF:104703.16 36027/002



1934054210122000000000019

Appellee Appx. 01533
Appx. 01784
014346

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69   Exhibit 6   Page 15 of 65 1804   Page 668 of 1017   PageID 15312
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1540 of 1803   PageID 12286
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 2 of 68

## TABLE OF CONTENTS

<div align="right">Page</div>

Preliminary Statement................................................................................................. 1

Background ................................................................................................................. 4

    I.      Procedural Background.................................................................... 4

    II.     Solicitation and Notification Process................................................. 6

Argument .................................................................................................................. 13

    III.    The Plan Satisfies Each Requirement for Confirmation...................... 13

        A.     The Plan Complies with the Applicable Provisions of the
Bankruptcy Code (Section 1129(a)(1))....................................... 13

        B.     The Debtor Has Complied with the Applicable Provisions  of the
Bankruptcy Code (Section 1129(a)(2))....................................... 23

        C.     The Debtor Proposed the Plan in Good Faith and Not by Any
Means Forbidden by Law (Section 1129(a)(3))............................ 26

        D.     The Debtor is Seeking to Pay Certain Professional Fees and
Expenses Subject to Bankruptcy Court Approval (Section
1129(a)(4)). ............................................................................ 28

        E.     The Debtor Has Complied with the Bankruptcy Code's
Governance Disclosure Requirement (Section 1129(a)(5))............. 29

        F.     The Plan Does Not Require Government Regulatory Approval of
Rate Changes (Section 1129(a)(6)).......................................... 34

        G.     The Plan Is in the Best Interests of Holders of Claims and Interests
(Section 1129(a)(7))................................................................ 34

        H.     The Plan Complies with the Requirements of Section 1129(a)(8) of
the Bankruptcy Code............................................................... 40

        I.     The Plan Complies With Statutorily Mandated Treatment of
Administrative and Priority Tax Claims (Section 1129(a)(9)). ........ 40

        J.     At Least One Impaired Class of Claims Has Accepted the Plan,
Excluding the Acceptances of Insiders (Section 1129(a)(10)). ........ 42

Appellee Appx. 01534

Appx. 01785

014347

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1540 of 1804    Page 669 of 1017    PageID 15313
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1541 of 1803    PageID 12287
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 3 of 68

K.    The Plan Is Feasible and Is Not Likely to Be Followed by the Need for Further Financial Reorganization (Section 1129(a)(11)). .................. 43

L.    The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)). ....................................................... 44

M.    The Plan Complies with Section 1129(a)(13) of the Bankruptcy Code. ................................................................................. 44

N.    Sections 1129(a)(14) through Sections 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan. ........................................... 45

O.    The Plan Satisfies the Cramdown Requirements (Section 1129(b)). ...... 45

P.    The Plan satisfies the "Cramdown" Requirements of the Bankruptcy Code. .................................................................... 48

Q.    The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)-(e)). .......................................... 51

IV.    The Plan's Release, Exculpation, and Injunction Provisions Are Appropriate and Comply with the Bankruptcy Code for the Reasons Articulated in the Omnibus Reply. ......................................................... 51

A.    The Debtor Complied with Section 1129(d) of the Bankruptcy Code. ................................................................................. 52

B.    Modifications to the Plan. ......................................................... 52

Conclusion ....................................................................................................... 56

DOCS_SF:104703.16 36027/002

Appellee Appx. 01535

014348

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5   Page 1540/03/251804 Page 670 of 1017   PageID 15314
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1542 of 1803   PageID 12288
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 4 of 68

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 n.13 (1999)..................................................................................... 34, 46, 48

*Boullion v. McClanahan*,
  639 F.2d 213 (5th Cir. 1981) ................................................................................. 39

*In re Acis Capital Management*,
  2019 Bankr. LEXIS 294, *116 (Bankr. N.D. Tex. January 31, 2019) ..................... 38

*In re Ambanc La Mesa Ltd. P'ship*,
  115 F.3d 650 (9th Cir. 1997) ................................................................................. 47, 48

*In re American Solar King Corp.*,
  90 B.R. 808 (Bankr. W.D. Tex. 1988)..................................................................... 53

*In re Aztec Co.*,
  107 B.R. 585 (Bankr. M.D. Tenn. 1989).................................................................. 47

*In re Block Shim Dev. Company-Irving*,
  939 F.2d 289 (5th Cir. 1991) ................................................................................. 26

*In re Bowles*,
  48 B.R. 502 (Bankr. E.D. Va. 1985)....................................................................... 47

*In re Cypresswood Land Partners, I*,
  409 B.R. 396 (Bankr. S.D. Tex. 2009) ........................................................ 13, 23, 26

*In re Freymiller Trucking, Inc.*,
  190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................................. 47

*In re Friendship Dairies*,
  2012 Bankr. LEXIS 13, **22-23 (Bankr. N.D. Tex. Jan. 3, 2014) ......................... 54

*In re Global Safety Textiles Holdings LLC*,
  No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009)..................... 53

*In re J T Thorpe Co.*,
  308 B.R. 782 (Bankr. S.D. Tex. 2003) ................................................................... 13

*In re Johns-Manville Corp.*,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986)....................................................................... 47

*In re Joint E. & S. Dist. Asbestos Litig.*,
  982 F.2d 721 (2d Cir. 1992) ................................................................................. 18

*In re Kolton*,
  No. 89-53425-C, 1990 WL 87007 at *5 (Bankr. W.D. Tex. Apr. 4, 1990)................. 47

*In re Landing Assocs., Ltd.*,
  157 B.R. 791 (Bankr. W.D. Tex. 1993).............................................................. 29, 43

*In re Lason, Inc.*,
  300 B.R. 227 (Bankr. D. Del. 2003) ....................................................................... 40

iii

Appellee Appx. 01536
Appx. 01785
014349

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 18-15 Exhibit 6 Page 1546/251804Page 671 of 1017 PageID 15315
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1543 of 1803 PageID 12289
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 5 of 68

*In re Mirant Corp.*,
348 B.R. 725 (Bankr. N.D. Tex. 2006) ............................................................... 46

*In re Neff*,
60 B.R. 448 (Bankr. N.D. Tex. 1985) ................................................................. 40

*In re Quigley Co., Inc.*,
377 B.R. 110 (Bankr. S.D.N.Y. 2007) ................................................................ 18

*In re Sentry Operating Co. of Tex., Inc.*,
264 B.R. 850 (Bankr. S.D. Tex. 2001) ............................................................... 14

*In re Sentry Operating Co. of Texas, Inc.*,
264 B.R. 850 (Bankr. S.D. Tex. 2001) ............................................................... 53

*In re Star Ambulance Service, LLC*,
540 B.R. 251 (Bankr. S.D. Tex. 2015) ............................................................... 43

*In re Sun Country Dev., Inc.*,
764 F.2d 406 (5th Cir. 1985) .............................................................................. 26

*In re Tex. Extrusion Corp.*,
844 F.2d 1142 n. 23 (5th Cir. 1988) ................................................................... 34

*In re T-H New Orleans Ltd. P'ship*,
116 F.3d 790 (5th Cir. 1997) .............................................................................. 43

*In re W.R. Grace & Co.*,
729 F.3d 311 (3d. Cir 2013) ............................................................................... 18

*In re Wilson Metal Fabricators*,
No. 19-31452,**9-10 (Bankr. N.D. Tex. SGJ May 18, 2020) ................................ 38

*John Hancock*,
987 F.2d at 157 n.5 ............................................................................................. 48

*Kane v. Johns-Manville Corp.*,
843 F.2d 636 (2d Cir. 1988) ............................................................................... 47

*Mabey v. Sw. Elec. Power Co.*
*(In re Cajun Elec. Power Coop., Inc.)*,
150 F.3d 503 (5th Cir. 1998) .............................................................................. 28

*Matter of Cajun Elec. Power Co-op., Inc.*,
150 F.3d 503 (5th Cir. 1998) .............................................................................. 24

*Paradigm Air Carriers, Inc. v. Tex. Rangers Baseball Partners*
*(In re Tex. Rangers Baseball Partners)*,
521 B.R. 134 (Bankr. N.D. Tex 2014) ................................................................. 54

*Pub. Fin. Corp. v. Freeman*,
712 F.2d 219 (5th Cir. 1983) .............................................................................. 26

## STATUTES

11 U.S.C. § 101 .................................................................................. 22, 51

11 U.S.C. § 1114 ...................................................................................... 44

11 U.S.C. § 1123 .......................................................................... 17, 21, 23, 51

iv

Appellee Appx. 01537
Appx. 01788
014350

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibits   Page 1545 of 1804   Page 672 of 1017   PageID 15316
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1544 of 1803   PageID 12290
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 6 of 68

11 U.S.C. § 1125 ................................................................................................................. 23
11 U.S.C. § 1126 ............................................................................................................. 6, 25
11 U.S.C. § 1129 ........................................................................................................... passim

### OTHER AUTHORITIES

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977),
    *reprinted in* 1978 U.S.C.C.A.N. 5936, 6368 ........................................................... 13
S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978),
    *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 ........................................................... 13

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11  Doc 3596-6  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:25-cv-02072-S    Document 68-5    Filed 05/46/25    Page 673 of 1017    PageID 15317
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1545 of 1803  PageID 12291
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21  Entered 01/22/21 19:25:01  Page 7 of 68

The above-captioned debtor and debtor in possession (the "<u>Debtor</u>") files this memorandum of law (this "<u>Memorandum</u>") in support of confirmation of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as Modified) (the "<u>Plan</u>").[2] Concurrently herewith, the Debtor has filed its *Omnibus Reply to Objections to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management L.P.* (the "<u>Omnibus Reply</u>"), which addresses and responds to the each of objections to confirmation of the Plan.[3]

### **Preliminary Statement**

1.      After fourteen long months in a chapter 11 process that has often times been contentious between the Debtor, the Committee, and the estate's largest creditors, the Debtor seeks confirmation of its Plan that enjoys the support of the Committee and virtually all of its non-affiliated creditors.  As the Debtor told the Court when it approved the installation of the Independent Board on January 9, 2020, the new Board intended to change the culture of litigation that was the Debtor's trademark prepetition.  While the negotiations have been difficult and testy at times, the Debtor successfully resolved its disputes with the Redeemer Committee, Acis and HarbourVest and has reached settlements in principal with UBS—an accomplishment that seemed impossible a few months ago.  In fact, the Plan is supported by the holders of approximately 95% of creditors who collectively hold $345 million in claims against the estate that voted on the Plan.  In accomplishing these goals, the Independent Board has resolved litigation that has been pending in some cases for over a decade and in several courts, including

---

[2] Unless otherwise noted, capitalized terms used in this Memorandum have the meanings ascribed in the Plan.

[3] To the extent that a party has raised a specific objection to the statutory provisions set forth in 1123 and 1129 of the Bankruptcy Code, those objections are addressed herein as part of the Debtor's *prima facie* showing that it has satisfied the statutory requirements to confirm the Plan.

Appellee Appx. 01539
Appx. 01799
014352

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 6 Page 1546 of 1804 Page 674 of 1017 PageID 15318
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1546 of 1803 PageID 12292
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 8 of 68

this Court in the Acis bankruptcy case, has positioned the Debtor to be able to put contentious litigation with legitimate creditors behind it and promptly monetize its assets and make distributions to general unsecured creditors. The Debtor worked extremely hard during the bankruptcy case to develop a "grand bargain" plan that would achieve a global resolution of all disputes between the Debtor, its creditors and Mr. Dondero. Unfortunately, such a plan was not attainable.

2. What stands in the Debtor's way to confirmation of the Plan is a series of objections filed by Mr. Dondero and entities owned and/or controlled by him (collectively, the "Dondero Entities") and certain of the Debtor's current and ex-employees, two of whom the Debtor recently terminated for cause and others whose blind fealty to Mr. Dondero led them to vote against the Plan for no apparent economic reason. The common theme in all of the objections is not a desire for better treatment of creditors, which is not surprising since the objectors' economic interests in the Debtor are tenuous at best. Rather, the focus of the objections are challenges to Plan provisions, including the injunction, release and exculpation provisions, which will limit the Dondero Entities' ability to continue their litigation crusade against anyone who dared stand in Mr. Dondero's way long after the Plan has been confirmed. As the Court is aware from its experience, according to Mr. Dondero, no claim is too frivolous to be brought, no appeal too impossible to succeed and no court too far away in which to commence litigation. As will be discussed herein, the Court has the authority and jurisdiction to approve provisions in the Plan which will minimize the Dondero Entities' ability to harass parties with vindictive litigation designed to interfere with post-confirmation efforts. For the

Appellee Appx. 01540

014353

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-15    Page 1548/351804    Page 675 of 1017    PageID 15319
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1547 of 1803    PageID 12293
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 9 of 68

Court's convenience, attached as **Exhibit A** hereto is a chart that sets for the relationships between the various Dondero Entities.

3.      As more fully set forth in the Omnibus Reply, and as summarized on **Exhibit B** hereto, the Dondero Entities' interests in this case arise primarily from their direct and indirect equity interests in the Debtor.  While certain of the Dondero Entities assert claims against the Debtor, those claims either arise out of their equity interests that the Debtor will seek to subordinate under Section 510 of the Bankruptcy Code or are frivolous claims that target certain conduct of the Independent Directors.  Other Dondero Entities object to the Debtor's attempt to assume certain executory contracts to which they are not a party and lack standing to do so.  Accordingly any objections to the Plan based upon the treatment of claims or the manner in which assets are proposed to be monetized post-confirmation are a smokescreen.

4.      Moreover, any argument that the Dondero Entities are seeking to protect the value of their equity interests is specious.  Mr. Dondero has told the Court on numerous occasions that his so-called "pot plan" proposal to acquire substantially all of the assets of the Debtor for $160 million (which is really $130 million because the proposal acquires approximately $30 million of the Debtor's cash) fairly values the Debtor's assets.  Accordingly, under Mr. Dondero's own assumptions, equity is out of the money as the total amount of allowed claims in this case exceeds Mr. Dondero's valuation by a factor of more than two.  The only way creditors in the Debtor's estate will receive full payment on account of their claims—a prerequisite to any distributions to the Dondero Entities' indirect equity interests and related claims arising from such interests—would be for the Estate to monetize its multiple claims against the Dondero

DOCS_SF:104703.16 36027/002

Appellee Appx. 01541
Appx. 01792
014354

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 5 Filed 15/09/25 1804 Page 676 of 1017    PageID 15320
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1548 of 1803    PageID 12294
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 10 of 68

Entities for well in excess of $100 million.  It is through this lens that the Court should view the Dondero Entities' confirmation objections.

5.       The hard-fought victories obtained by the Debtor in negotiating the settlement of substantially all of the litigation that has plagued it for years should not be singularly undone by the Dondero Entities and his army of loyal employees and ex-employees.  Mr. Dondero should not be allowed to use this Court and his frivolous litigation to upend the settlements achieved to date by the Debtor.  The Plan should be confirmed to allow the Reorganized Debtor and the Claimant Trustee to complete the process of winding down the Debtor's assets, satisfying creditor claims, and implementing the other wind-down provisions of the Plan without interference by the Dondero Entities.

## **Background**

### I. **Procedural Background**

6.       On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

7.       On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

8.       On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's bankruptcy case to this Court [Docket No. 186].[4]

---

[4] All docket numbers refer to the docket maintained by this Court.

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 677 of 1017   PageID 15321
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1549 of 1803   PageID 12295
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 11 of 68

9.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.  However, on January 9, 2020, the Court entered its *Order Approving Settlement With Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [D.I. 339] pursuant to which the Court approved the appointment of an Independent Board of Directors for Strand Advisors, Inc., the general partner of the Debtor (the "Settlement Order").  On July 16, 2020, the Court entered its *Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(A) and 363(B) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [D.I. 854], pursuant to which James Seery, Jr., was approved as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative.

10.     On November 24, 2020, the Bankruptcy Court entered the *Order (A) Approving the Adequacy of the Disclosure Statement, (B) Scheduling a Hearing to Confirm the Fifth Amended Plan of Reorganization; (C) Establishing Deadline for Filing Objections to Confirmation of Plan; (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures; And (E) Approving Form and Manner of Notice* [D.I. No. 1476] (the "Disclosure Statement Order").  The Disclosure Statement Order approved the Disclosure Statement as containing "adequate information" within the meaning of section 1125 of the Bankruptcy Code

DOCS_SF:104703.16 36027/002

Appellee Appx. 01543
Appx. 01794
014356

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-9   Page 1556/2851804   Page 678 of 1017   PageID 15322
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1550 of 1803   PageID 12296
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 12 of 68

and also approved, among other things, the proposed procedures for solicitation of the Plan and related notices, forms, and ballots (collectively, the "Solicitation Packages").

11.    The deadline for all Holders of Claims and Equity Interests entitled to vote on the Plan to cast their ballots and the deadline to file objections to confirmation of the Plan was January 5, 2021, at 5:00 p.m. (prevailing Central Time) subject to extension by the Debtor, in its discretion (the "Voting Deadline").  On January 19, 2021, the Debtor filed the Voting Report, which is summarized below.  The hearing on confirmation of the Plan (the "Confirmation Hearing") is scheduled for January 26, 2021, at 9:30 a.m. (prevailing Central Time).[5]

**II. Solicitation and Notification Process.**

12.    In compliance with the Bankruptcy Code and the Disclosure Statement Order, only Holders of Claims and Equity Interests in Impaired Classes receiving or retaining property on account of such Claims or Equity Interests were entitled to vote to accept or reject the Plan.[6] Holders of Claims and Equity Interests were not entitled to vote if their rights are Unimpaired under the Plan (in which case such Holders were conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code).[7]  The voting results, as reflected in the Voting Report, are summarized as follows:

---

[5] The Confirmation Hearing was initially scheduled to take place on January 13, 2021, but was continued by the Bankruptcy Court at the Debtor's request.

[6] *See* 11 U.S.C. § 1126.

[7] There were no Impaired Classes of Claims or Equity Interests conclusively deemed to reject the Plan pursuant section 1126(g) of the Bankruptcy Code.

DOCS_SF:104703.16 36027/002

**Appellee Appx. 01544**

**014357**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 18-15   Page 1553/651804   Page 679 of 1017   PageID 15323
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1551 of 1803   PageID 12297
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 13 of 68

| CLASSES | TOTAL BALLOTS RECEIVED | | | |
| | Accept | | Reject | |
| | AMOUNT (% of Amount/Shares Voting) | NUMBER (% of Number Voting) | AMOUNT (% of Amount/Shares Voting) | NUMBER (% of Number Voting) |
|---|---|---|---|---|
| Class 2 Frontier Secured Claim | $5,209,963.62 (100%) | 1 (100%) | $0 (0%) | 0 (0%) |
| Class 7 Convenience Claims | $2,765,906.51 (100%) | 14 (100%) | $0 (0%) | 0 (0%) |
| Class 8 General Unsecured Claims[8] | $301,826,418.36 (93.54%) | 12 (27.9%) | $20,833,059.67 (6.46%) | 31 (72.10%) |
| Class 9 Subordinated Claims | $35,000,000 (100%) | 6 (100%) | $0 (0%) | 0 (0%) |
| Class 10 B/C Limited Partnership Interests | None | None | None | None |
| Class 11 Class A Limited Partnership Interests | 0% | 0% | $100% | 100% |

13.  <u>Class 2</u>.  Class 2 consists of one member (Frontier Secured Claim) and this creditor voted to accept the Plan.

14.  <u>Class 7</u>.  Class 7 consists of the Convenience Claims.  100% of the fourteen valid members of Class 7 each voted to accept the Plan.[9]  The votes of the Senior Employees—Mr. Ellington and  Mr. Leventon—who attempted to partially vote certain Claims in Class 7 and

---

[8] The Debtor recently settled the objections filed by Senior Employees Thomas Surgent and Frank Waterhouse, who previously were included in the Senior Employee Objection. Mssrs. Surgent and Waterhouse have each agreed to execute the Senior Employee Stipulation and to vote their Class 7 and Class 8 Claims to accept the Plan. This chart reflects the results of the voting report filed with Court on January 19, 2021 [D.I. 1772] and does not reflect the subsequent settlements with Mssrs. Surgent and Waterhouse and their acceptance of the Plan.

[9] In accordance with the Voting Procedures Order, the Debtor accepted the late vote of Siepe Systems (which was cast on the Voting Deadline, but after the 5:00 Central Time cut off). The Debtor also accepted the late votes of each of: (i) Stinson Leonard Street, who also voted to accept the Plan on January 14, 2021, and (ii) the HarbourVest entities, who were entitled to both Class 8 General Unsecured Claims and Class 9 Subordinated Claims pursuant to the Court's allowance of these claims at a hearing conducted on January 14, 2021 [D.I. 1788] with respect to the compromise of HarbourVest's claims against the Debtor, as explained below.

Appellee Appx. 01545
Appx. 01796
014358

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-15   Filed 05/05/25   Page 680 of 1017   PageID 15324
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1552 of 1803   PageID 12298
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 14 of 68

other Claims in Class 8—should be disallowed for the reasons more specifically addressed in the Omnibus Reply.  However, regardless of the invalid votes cast by the Senior Employees are counted, Class 7 Convenience Claims have accepted the Plan in both requisite dollar amount and voting number.  First, each of these two "Senior Employees"[10] filed unliquidated proofs of claim with the Bankruptcy Court, yet are attempting to split their claims between Class 7 and Class 8 without having executed the Senior Employee Stipulation and in violation of the Plan, the Voting Procedures Order, and applicable law.  Second, even if the Senior Employees were deemed to hold separate, liquidated claims on account of their asserted annual bonus and deferred compensation claims that could be split from their Class 8 Claims, the Plan's Convenience Class Election does not morph a Class 8 Claim into a Class 7 Claim for voting purposes.  A valid election of the Convenience Class Election would only entitle the electing creditor to receive the treatment under Class 7, not to vote its claim in that class.  *See* Plan, §1.B.43.

15.    Class 8.  Over 93% of the dollar amount of Class 8 Claims voted to accept the Plan.  However, more than 50% of the holders of Class 8 Claims did not accept the Plan as a result of the votes cast by approximately 27 employees holding contingent claims (including the split Class votes cast by Mssrs. Ellington and Leventon[11]) to reject the Plan.  The contingent claims of the Debtor's other employees that voted against the Plan are (i) in respect to the

---

[10] As the Court is aware, the Debtor terminated the employment of both Mssrs. Ellington and Leventon on January 5, 2021 and these individuals are no longer employees of the Debtor.

[11] As noted above, the Debtor has agreed to a settlement of the Senior Employee Objection with respect to Mr. Surgent and Mr. Waterhouse, each of whom will vote their claims to accept the Plan.

DOCS_SF:104703.16 36027/002

**Appellee Appx. 01546**

**014359**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 61-15   Page 1554/251804 Page 681 of 1017   PageID 15325
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1553 of 1803   PageID 12299
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 15 of 68

unvested claims under the Debtor's deferred compensation bonus plan[12] for amounts that would not be payable, if at all, until May 2021 and May 2022 and would only be payable if such employees were employed as of those vesting dates, which they will not be; and (ii) PTO Claims, which are unimpaired and treated by either Class 4 (PTO Claim) or Class 6 (Priority Non-Tax Claims).

16.    Class 9.    Class 9 consists of the subordinated claims of HarbourVest that were allowed pursuant to the Court's granting of the *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Motion") at a hearing conducted on January 14, 2021, pursuant to which HarbourVest was granted both allowed Class 9 Claims in the aggregate amount of $35 million and Allowed Class 8 Claims in the amount of $45 million with respect to the claims filed by HarbourVest.[13]    The HarbourVest Subordinated Claims are the only current members of Class 9.    Although Class 9 has unanimously accepted the Plan, the Debtor is not asserting that Class 9 constitutes the accepting impaired class of claims,

---

[12] On January 14, 2021, the Debtor terminated its annual bonus plan.  The Debtor's employees previously held contingent claims under the annual bonus plan for amounts that would have vested in February 2021 and August 2021 (subject to the employee remaining employed as of those dates and other conditions) and replaced it with a proposed retention plan that is subject of the Debtor's *Motion of the Debtor for Entry of an Order Authorizing the Debtor to Implement a Key Employee Retention Plan with Non-Insider Employees and Granting Related Relief* filed on January 20, 2021.  These employees (except for Mssrs. Surgent, Waterhouse, Ellington and Leventon, who were not paid any postpetition amounts with respect to either bonus plan) were paid the vested amounts owed to them under the annual bonus plan and deferred bonus plan, as applicable, in the ordinary course of business and in accordance with the *Order Authorizing the Debtor to Pay and Honor Ordinary Course Obligations Under Employee Bonus Plans and Granting Related relief* [D.I. 380] entered on January 22, 2020.  Thus, the Debtor's non-Senior Employees no longer have any contingent claims under the now-terminated annual bonus plan because they have already been paid their vested amounts.

[13] The $345 million claims estimate includes the claim of UBS Securities, LLC which has been allowed in the amount of $94,761,076 for voting purposes only.  As the Debtor has informed the Court, the Debtor has reached an agreement in principal with UBS to resolve its claims which agreement is subject to internal approvals at UBS and documentation.

Appellee Appx. 01547
Appx. 01598
014360

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 1555 of 1804   Page 682 of 1017   PageID 15326
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1554 of 1803   PageID 12300
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 16 of 68

exclusive of insiders, required to cram down the Plan pursuant to section 1129(b) of the Bankruptcy Code, as discussed below in the cramdown section of the Memorandum.

17.     Several objections address the mechanics of how Class 9 Claims may be subordinated and the scope of any such subordination.  Mr. Dondero, Dugaboy, NexBank, and NexPoint each argue that section III.J of the Plan provides "no mechanism, hearing requirement or deadline" to subordinate claims.  Dondero Objection, at IV; NexPoint Objection, at 7; NexBank Objection at II.A.

18.     Section III.J of the Plan does not categorically subordinate claims.  Rather, Class 9 provides that holders of Subordinated Claims will receive the treatment provided to General Unsecured Claims unless they are subordinated either pursuant to an order of the Court upon notice to the relevant party or otherwise consensually.  In other words, the Debtor, Reorganized Debtor or Claimant Trustee must obtain an order from the Bankruptcy Court subordinating the subject Claim.  To the extent the Bankruptcy Court orders subordination of the Claim, it will receive the treatment provided for Class 9 Subordinated Claims.  If no subordination order is obtained, then the Claim will receive the treatment afforded to Class 8 General Unsecured Claims.  To illustrate this point, the vote cast by Raymond Joseph Dougherty as a Class 9 Subordinated Claim should be tabulated in Class 8 because there is no order or agreement with this creditor to subordinate his claims to those of Class 8 General Unsecured Claims.  As discussed below, the Plan is being amended to clarify this treatment.   Thus, the Plan does not afford the Debtor (or any other party) with the discretion to subordinate claims on their own. This determination will be made by the Court.

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15   Exhibit 6   Page 1556/251804   Page 683 of 1017   PageID 15327
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1555 of 1803   PageID 12301
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 17 of 68

19.   In order to clarify the treatment and procedure to subordinate claims, the Debtor

has made the following amendments to the Plan.  Section III.J of the Plan has been amended

with the bolded language below to clarify the requirement of an opportunity for a hearing with

respect to any proceeding to subordinate any claims:

> Under section 510 of the Bankruptcy Code, upon written notice **and
> hearing,** the Debtor the Reorganized Debtor, and the Claimant Trustee
> reserve the right to ~~seek entry of an order by the Bankruptcy Court~~ to
> re-classify or to ~~seek to~~ subordinate any Claim in accordance with any
> contractual, legal, or equitable subordination relating thereto, and the
> treatment afforded any Claim under the Plan.

20.   In addition, the Debtor has amended the treatment of Subordinated Claims in

Section III.H.9 of the Plan to only treat claims that are or have been subordinated under section

510 of the Bankruptcy Court order entered by the Bankruptcy Court and which fall within the

Plan definition of Subordinated Claims:

> *Treatment*:  On the Effective Date, Holders of Subordinated Claims shall
> receive either (i) their Pro Rata share of the Subordinated Claimant Trust
> Interests or, (ii) such other less favorable treatment as to which such Holder
> and the Claimant Trustee may agree upon in writing.
>
> ~~*Treatment*:  On or as soon as reasonably practicable after the Effective Date,
> each Holder of an Allowed Class 9 Claim, in full satisfaction, settlement,
> discharge and release of, and in exchange for, such Claim shall receive either
> (i) the treatment provided to Allowed Class 8 Claims or (ii) if such Allowed
> Class 9 Claim is subordinated to the Convenience Claims and General
> Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the
> Bankruptcy Court, its Pro Rata share of the Subordinated Claimant Trust
> Interests or (ii) such other less favorable treatment as to which such Holder
> and the Claimant Trustee shall have agreed upon in writing.~~

21.   In response to Mr. Dondero's objection asserting the lack of a time period to

commence proceedings to subordinate Claims, the Debtor has amended the Plan to clarify that

the timing by which parties in interest may object to the allowance of a potentially Subordinated

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 36-15   Page 1557 of 1804   Page 684 of 1017   PageID 15328
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1556 of 1803   PageID 12302
Case 19-34054-sgj11   Doc 1814   Filed 01/22/21   Entered 01/22/21 19:25:01   Page 18 of 68

Claim and seek to have the claim treated as a Class 9 Subordinated Claim is now included in the

Claims Objection Deadline by the addition of the bolded language to Section VII.B of the Plan.

> Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, **request the Bankruptcy Court subordinate any Claims to Subordinated Claims**, or any other appropriate motion or adversary proceeding with respect ~~thereto which shall be litigated to Final Order~~ **to the foregoing by the Claims Objection Deadline**, or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court…

22.     Finally, the limited objection to the Plan filed by Jack Yang and Brad Borud [D.I.

1666] and joined by Deadman, Travers and Kaufmann [D.I. 1674, 1679] also objects to the Plan

definition of "Subordinated Claims" and asserts that the Plan is not permissible under

Bankruptcy Code section 510 to the extent it intends to subordinate any and all claims of partners

of the Debtor, including claims "solely in respect of compensation owed to such person for their

services as an employee."  The Plan does not intend to categorically subordinate these claims or

expand the reach of section 510 of the Bankruptcy Code.  However, in order to clarify this

treatment and address the concerns raised by these individuals, the Plan has been amended as set

forth below.

> "Subordinated Claim" means any claim that ~~(i)~~ is ~~or may be~~ subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or order entered by ~~Final Order of~~ the Bankruptcy Court ~~or (ii) arises from a Class A Limited Partnership Interest or a Class B/C Limited Partnership Interest~~.

23.     <u>Class 10 and Class 11</u>.  Class 10 and 11 consist of the separate classes of Equity

Interests in the Debtor owned by affiliates of Mr. Dondero.  Class 10 did not cast a vote to accept

or reject the Plan.  Class 11 voted to reject the Plan.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01550
Appx. 01801
014363

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 68-15 Page 1558/251804 Page 685 of 1017 PageID 15329
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1557 of 1803 PageID 12303
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 19 of 68

24.     As explained more fully below, the Debtor may confirm the Plan pursuant to the cram down provisions of 1129(b) of the Bankruptcy Code notwithstanding the rejection and/or non-acceptance of the Plan by Classes 8, 10 and 11.

<u>**Argument**</u>

25.     To confirm the Plan, the Bankruptcy Court must find that the Debtor has satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[14]  As described in detail below, the Plan complies with all relevant provisions of the Bankruptcy Code and all other applicable law.  The Plan is supported by voting creditors holding $345 million in claims consisting of approximately 95% of the claims in this case.  As set forth in this Memorandum and based upon the evidence that will be presented at the Confirmation Hearing, the Debtor will satisfy the evidentiary requirements necessary to confirm the Plan.  The Debtor thus respectfully requests that the Bankruptcy Court confirm the Plan.

**III.    The Plan Satisfies Each Requirement for Confirmation.**

**A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).**

26.     Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code.[15]  The principal goal of this provision is to ensure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization.[16]  Accordingly, the determination of

---

[14] *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009); *In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003).

[15] 11 U.S.C. § 1129(a)(1).

[16] *See* S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5936, 6368.

Appellee Appx. 01551
Appx. 01802
014364

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1556 of 1804 Page 686 of 1017    PageID 15330
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1558 of 1803   PageID 12304
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01    Page 20 of 68

whether the Plan complies with section 1129(a)(1) of the Bankruptcy Code requires an analysis of sections 1122 and 1123 of the Bankruptcy Code.

### 1. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

27. Section 1122 of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  Because claims only need to be "substantially" similar to be placed in the same class, plan proponents have broad discretion in determining how to classify claims.[17]

28. The Plan's classification of Claims and Equity Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Equity Interests into a number of separate Classes, with each Class differing from the Claims and Equity Interests in each other Class in a legal or factual nature or based on other relevant criteria.[18]  Specifically, the Plan provides for the separate classification of Claims and Equity Interests into the following Classes:

> Class 1: Jefferies Secured Claim;
>
> Class 2: Frontier Secured Claim
>
> Class 3: Other Secured Claims;
>
> Class 4: Priority Non-Tax Claims;

---

[17] *See In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 860 (Bankr. S.D. Tex. 2001) (recognizing that section 1122 is broadly permissive of any classification scheme that is not specifically proscribed, and that substantially similar claims may be separately classified where separate classification has a basis independent of the plan proponent's efforts to secure a class of claims that will accept the plan).

[18] Plan, Art. III.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01552
014365

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 18-15    Page 1560 of 1804    Page 687 of 1017    PageID 15331
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1559 of 1803    PageID 12305
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 21 of 68

Class 5: Retained Employee Claims;

Class 6: PTO Claims;

Class 7: Convenience Claims;

Class 8: General Unsecured Claims;

Class 9: Subordinated Claims;

Class 10: Class B/C Limited Partnership Interests; and

Class 11: Class A Limited Partnership Interests.

29.     Claims and Equity Interests assigned to each particular Class described above are substantially similar to the other Claims or Equity Interests in such Class.  Valid business, legal, and factual reasons justify the separate classification of the particular Claims or Equity Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Equity Interests.  For example, the PTO Claims in Class 6 relate solely to claims of the Debtor's employees for unpaid paid time off in excess of the $13,650 statutory cap amount under sections 507(a)(4) and (a)(5) of the Bankruptcy Code and are dissimilar from other unsecured claims.  The treatment of the unsecured Convenience Claims in Class 7 is to allow holders of eligible and liquidated claims (below a certain threshold dollar amount) to receive a cash payout of the lesser of 85% of the Allowed amount of the creditor's claim or such holders *pro rata* share of the Convenience Claims Cash Pool.  The Plan also provides for reciprocal "opt out" mechanisms to allow holders of Class 7 Claims to elect to receive the treatment for Class 8 Claims.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01553
Appx. 01894
014366

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 15/65 251804    Page 688 of 1017    PageID 15332
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1560 of 1803    PageID 12306
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 22 of 68

30.    Section III.C of the Plan provides for the elimination of classes that do not have a least one holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for purposes "of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class." Plan, § III.D.  The purpose of this provision is to provide that a Class that does not have voting members shall not be included in the tabulation of whether that Class has accepted or rejected the Plan.

31.    Mr. Dondero objects to the elimination of the "vacant" Class provision in Article III.C because such elimination would not provide for treatment of a Claim that may be later classified in vacant class.  Dondero Objection, at IV.14.  However, the reference to vacant Classes in Article III.C refers only to the tabulation of votes cast to accept or reject the Plan, not to the treatment of claims that may later be classified in a class even if there were no voting members as of the Confirmation Hearing.  For example, Class 5 (Retained Employee Claims) does not have any voting members because the existence of any Claims in this Class would not arise except for any current employees of the Debtor who will be employed on the Effective Date.  Plan, § I.B.116.  Thus, Class 5 is disregarded solely for purposes of determining whether or not the Plan has been accepted or rejected under Section 1129(a)(8) of the Bankruptcy Code because there are no current members in that Class.  However, the Plan may treat Claims that may eventually become members of Class 5 post-confirmation.

32.    The Debtor submits that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code.  Each of these categories of Claims and Equity Interests have distinct

DOCS_SF:104703.16 36027/002

Appellee Appx. 01554
Appx. 01805
014367

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-15   Filed 05/02/25   Page 689 of 1017   PageID 15333
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1561 of 1803   PageID 12307
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 23 of 68

rights under the Plan (and applicable non-bankruptcy law), and the Debtor has a valid business justification for the respective treatments of the Classes of Claims and Equity Interests. The Plan's classifications not only serve the purpose of facilitating ease of distributions on the Effective Date but also acknowledge the fundamental differences between those types of Claims and Equity Interests. For the foregoing reasons, the Plan satisfies section 1122 of the Bankruptcy Code.

### 2. The Plan Satisfies the Seven Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.

33.    The applicable requirements of section 1123(a) of the Bankruptcy Code generally relate to the specification of claims treatment and classification, the equal treatment of claims within classes, and the mechanics of implementing a plan. The Plan satisfies each of these requirements.

34.    <u>Specification of Classes, Impairment, and Treatment</u>. The first three requirements of section 1123(a) are that a plan specify (a) the classification of claims and interests, (b) whether such claims and interests are impaired or unimpaired, and (c) the precise nature of their treatment under the plan.[19] The Plan sets forth these specifications in detail in satisfaction of these three requirements in Article III.[20]

35.    <u>Equal Treatment</u>. The fourth requirement of section 1123(a) is that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment." The Plan meets this

---

[19] 11 U.S.C. § 1123(a)(1)-(3).

[20] Plan, Art. III.A–B.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01555
Appx. 01806
014368

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 8-15   Filed 05/06/25   Page 690 of 1017   PageID 15334
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1562 of 1803   PageID 12308
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 24 of 68

requirement because Holders of Allowed Claims or Equity Interests in each Class will receive the same rights and treatment as other Holders of Allowed Claims or Equity Interests within such Holders' respective Class. Thus, the Plan satisfies section 1123(a)(4).[21]

36.     Mr. Daugherty and the Senior Employees each argue that the Plan does not satisfy Bankruptcy Code section 1123(a)(4). Mr. Daugherty asserts that the Plan provides for different treatment of Disputed Claims versus Allowed Claims, and therefore provides disparate treatment in violation of Section 1123(a)(4) of the Bankruptcy Code. This is not correct because the Plan provides for the same <u>treatment</u> of claims within a particular class. The Disputed Claims Reserve shall reserve funds for the potential allowance of Claims that are not allowed at the time the Claimant Trustee makes distributions.[22] The Disputed Claims Reserve also does not allow the Debtor to unilaterally determine the amount of any reserve; that will be decided by the Bankruptcy Court absent agreement by the relevant parties. The Debtor—or any holder of a Disputed Claim—may file a motion with the Bankruptcy Court and request that the Claimant Trustee set aside a specific amount in the Disputed Claims Reserve pending the ultimate allowance/disallowance of the Claim.

---

[21]   *See In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) ("[s]ection 1123(a)(4) does not require precise equality, only approximate equality"; and"); *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d. Cir 2013) (same); *see also In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 749 (2d Cir. 1992) ("[T]he 'same treatment' standard of section 1123(a)(4) does not require that all claimants within a class receive the same amount of money.").

[22]   The Plan provides that the Disputed Claims Reserve amount is either (1) the amount set forth on either the Schedules or applicable Proof of Claim; (2) the amount agreed by the Holder of the Disputed Claim and the Reorganized Debtor or Claimant Trustee; (3) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim, or (4) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim. *See* Plan, § 1.B.49.

18

Appellee Appx. 01556
Appx. 01807
014369

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Filed 05/06/25    Page 691 of 1017    PageID 15335
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1563 of 1803    PageID 12309
Case 19-34054-sgj11  Doc 1814  Filed 01/22/21    Entered 01/22/21 19:25:01    Page 25 of 68

37.    Mr. Daugherty's suggestion that the Bankruptcy Court's estimation of disputed claims for purposes of establishing a Disputed Claims Reserve somehow constitutes disparate treatment of similarly classified claims is also devoid of merit.  Mr. Daugherty's argument would effectively mean that the Debtor would have to set aside the asserted amount of any Disputed Claim, regardless of how specious it may be, until the claim is ultimately resolved pursuant to a final order.  Such a requirement would essentially provide a creditor with a stay pending appeal of the ultimate of allowance of the claim.  Moreover, such a requirement would effectively prevent the Debtor from distributing any portion of the reserved funds to holders of Allowed Claims until the Disputed Claim is litigated to final order of the Supreme Court or such other applicable court of last resort—a process that could take years, and as evidenced by the length of time of the pending litigation in this case already waged by Mr. Daugherty, Mr. Dondero and others.  If Mr. Daugherty—or any creditor—believes the Debtor's proposed estimate for its Disputed Claim is insufficient, Mr. Daugherty has an adequate remedy under the Plan and can request that the Bankruptcy Court estimate a sufficient amount for deposit into the Disputed Claims Reserve to satisfy his Claim to the extent it is ultimately Allowed.

38.    The Senior Employees argue that the Plan violates section 1123(a)(4) because the Senior Employees are treated differently than other employees in that they are required to sign the Senior Employee Stipulation in order to obtain the benefit of the Debtor's release provided in Section IX.D.  This assertion is patently false and conflates treatment of claims within a Class with the Debtor's voluntary release of its own claims and causes of action.  First, the treatment of all Class 8 Claims for the Debtor's employees is the same and nothing in the Plan provides for

DOCS_SF:104703.16 36027/002

Appellee Appx. 01557

014370

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1565 of 1804   Page 692 of 1017   PageID 15336
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1564 of 1803   PageID 12310
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 26 of 68

any disparate or different treatment. Any affirmative claims that belong to the Debtor against the Senior Employees (and other parties) are irrelevant to the claims held by creditors against the Debtor and treated by the Plan. The Plan provides that in order to obtain the benefit of the Debtor release, the Debtor's employees must provide sufficient consideration to obtain this release. They do not get it for free—this issue was substantially argued before this Court at prior hearings.[23] One of the conditions of obtaining the Debtor release for the Senior Employees is that they would be required to execute the Senior Employee Stipulation (in addition to the fulfilling the other Plan requirements of the Debtor's release of employee claims) to provide consideration for the release of claims against these high level Senior Employees, two of whom were recently terminated for cause. As the Debtor's counsel explained at the Disclosure Statement Hearing conducted on November 23, 2020, the decision to purchase the Debtor release and execute the Senior Employee Stipulation (or not) rested with each Senior Employee, but has no nexus to the treatment of claims of the Senior Employee against the Debtor.[24]

---

[23] The limitations on the release of all Employees (including the Senior Employees) is also intended to address the Bankruptcy Court's concerns on this issue articulated at the first Disclosure Statement Hearing on October 27, 2020, and at a hearing held on October 28, 2020.

"With regard to these releases—and they are, I'll just be clear, Debtor releases, not third parties releasing third parties. But nevertheless, you know, I think there's an issue thereof they would need to be fair and equitable, in the best interest of creditors, and in the paramount interest of creditors would be something the Court would focus on there . . . This is not your normal case where this is the type of provision you see in many, many, many Chapter 11 plans." Transcript of Proceedings Conducted on October 27, 2020; pg 32, lines 10-20.

[24] As explained at the Disclosure Statement Hearing by Debtor's counsel:

"With respect to senior employees—who include Scott Ellington, Isaac Leventon, Frank Waterhouse, and Thomas Surgent—if they want to obtain a release, and there's no requirement that they agree, they must also execute what we refer to as the Senior Employee Stipulation, which is included in the supplement, in order to receive their release. If they execute that stipulation, they would receive their release. If they don't execute that stipulation, they wouldn't." Transcript of Proceedings Conducted on November 23, 2021, pg 9, lines 12-19.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01558
Appx. 01809
01437

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 6 Page 1566 of 1804 Page 693 of 1017 PageID 15337
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1565 of 1803 PageID 12311
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 27 of 68

39.     Thus, there is no disparate treatment of Claims within each Class and the Plan does not violate section 1123(a)(4) of the Bankruptcy Code.

40.     <u>Adequate Means for Implementation</u>.  The fifth requirement of section 1123(a) is that a plan must provide adequate means for its implementation.[25]  The Plan, together with the documents and forms of agreement included in the Plan Supplements, provides a detailed blueprint for the transactions contemplated by the Plan.  Essentially, the Plan's various mechanisms provide for the Debtor's continued operation after the Effective Date, the monetization of the Debtor's remaining assets, and payment of the Claims of the Debtor's creditors.  Upon full payment of Allowed Claims, any residual value would then flow to the Debtor's equity security holders in accordance with the Bankruptcy Code's priority scheme.

41.     Article IV of the Plan, in particular, sets forth the means for implementation of the Plan with the establishment of:  (i) the Claimant Trust, (ii) the Litigation Sub-Trust; and (iii) the Reorganized Debtor.  The Claimant Trust Agreement provides for the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC (a wholly-owned subsidiary of the Claimant Trust and which will manage the Reorganized Debtor).[26]  The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets and the management of the

---

[25] 11 U.S.C. § 1123(a)(5). Section 1123(a)(5) specifies that adequate means for implementation of a plan may include: retention by the debtor of all or part of its property; the transfer of property of the estate to one or more entities; cancellation or modification of any indenture; curing or waiving of any default; amendment of the debtor's charter; or issuance of securities for cash, for property, for existing securities, in exchange for claims or interests or for any other appropriate purpose. *Id.*

As Mr. Ellington and Mr. Leventon are no longer employed by the Debtor they are no longer eligible to execute the Senior Employee Stipulation.

[26] For the avoidance of doubt, the Reorganized Debtor's general partner will not be named "New GP LLC."  That name is simply a placeholder.

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibits    Page 15067/251804    Page 694 of 1017    PageID 15338
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1566 of 1803    PageID 12312
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 28 of 68

Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will all be managed and overseen by the Claimant Trust Oversight Committee.

42.    The Claimant Trust will administer the Claimant Trust Assets as provided under the Plan and the Claimant Trust Agreement contained in the Plan Supplements.  The Litigation Trustee is charged with pursuing any Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan.  Finally, the Reorganized Debtor will administer the Reorganized Debtor Assets, which includes managing the wind down of the Managed Funds.  The precise terms governing the execution of these transactions are set forth in greater detail in the applicable definitive documents included in the Plan Supplements, including the Claimant Trust Agreement, the Litigation Sub Trust Agreement, and the Schedule of Retained Causes of Action.[27]  Thus, the Plan satisfies section 1123(a)(5).

43.    <u>Non-Voting Stock</u>.  The sixth requirement of section 1123(a) is that, with respect to a corporate debtor, a plan must contemplate a provision in the reorganized debtor's corporate charter that prohibits the issuance of non-voting equity securities or, with respect to preferred stock, adequate provisions for the election of directors upon an event of default.  The Debtor is a limited partnership and there not a corporation.[28]

44.    <u>Selection of Officers and Directors</u>.  Finally, section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity

---

[27] *See* Notices of Filing Plan Supplements [Docket Nos. 1389, 1606, 1656 and on January 22, 2021] (as modified, amended, or supplemented from time to time, the "<u>Plan Supplements</u>").

[28] *See* 11 U.S.C. § 101(9) (B) ("The term 'corporation' . . . does not include limited partnerships").

Appellee Appx. 01560
Appx. 01481
014373

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 1568/251804    Page 695 of 1017    PageID 15339
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1567 of 1803    PageID 12313
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 29 of 68

security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."[29]  The disclosure of the individuals to provide services to the Reorganized Debtor and entities created under the Plan and qualifications of these individuals is discussed below in section I.E of this Memorandum in conjunction with the Debtor's satisfaction of the provisions of section 1125(a)(5) of the Bankruptcy Code which overlap and address similar issues.

**B.      The Debtor Has Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).**

45.      Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code. Case law and legislative history indicate this section principally reflects the disclosure and solicitation requirements of section 1125 of the Bankruptcy Code,[30] which prohibits the solicitation of plan votes without a court-approved disclosure statement.[31]

**1.      The Debtor Complied with Section 1125 of the Bankruptcy Code.**

46.      Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[32]  Section

---

[29] 11 U.S.C. § 1123(a)(7).

[30] *See Cypresswood*, 409 B.R. at 424 ("Bankruptcy courts limit their inquiry under § 1129(a)(2) to ensuring that the plan proponent has complied with the solicitation and disclosure requirements of § 1125.").

[31] 11 U.S.C. § 1125(b).

[32] *Id.*

DOCS_SF:104703.16 36027/002

Appellee Appx. 01561
Appx. 01812
014374

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1563/251804    Page 696 of 1017    PageID 15340
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1568 of 1803    PageID 12314
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 30 of 68

1125 of the Bankruptcy Code ensures that parties in interest are fully informed regarding the debtor's condition so they may make an informed decision whether to approve or reject a plan.[33]

47.    Section 1125 of the Bankruptcy Code is satisfied here.    Before the Debtor solicited votes on the Plan, the Bankruptcy Court entered the Disclosure Statement Order.[34]    The Bankruptcy Court also approved the contents of the Solicitation Packages provided to Holders of Claims and Equity Interests entitled to vote on the Plan, the notices provided to parties not entitled to vote on the Plan, and the deadlines for voting on and objecting to the Plan.[35]    The Debtor, through the Solicitation Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.    The Debtor also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class.    The Debtor caused the same Disclosure Statement to be transmitted to all holders of Claims and Equity Interests entitled to vote on the Plan.[36]

48.    Based on the foregoing, the Debtor has complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order.

---

[33] *See Matter of Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 518 (5th Cir. 1998) (finding that section 1125 of the Bankruptcy Code obliges a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[34] *See* Disclosure Statement Order [Docket No. 576].

[35] *See id.*

[36] *See id.*

DOCS_SF:104703.16 36027/002

Appellee Appx. 01562
014375

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15    Page 1576/25/180f Page 697 of 1017    PageID 15341
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1569 of 1803    PageID 12315
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 31 of 68

## 2.    The Debtor Complied with Section 1126 of the Bankruptcy Code.

49.    Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan.[37]    Accordingly, the Debtor did not solicit votes on the Plan from the following Classes:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claims | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |

50.    The Debtor solicited votes only from Holders of Allowed Claims in Classes 2, 7, 8 and 9 and Equity Interests in Classes 10 and 11 (collectively, the "Voting Classes") because each of these Classes is Impaired and entitled to vote to accept or reject the Plan.[38]    The Voting Report reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.[39]    Based on the foregoing, the Debtor has satisfied the requirements of section 1129(a)(2).

---

[37] See 11 U.S.C. § 1126.

[38] See Plan, Art. III. A–B.

[39] A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of section 1126, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of section 1126, that have accepted or rejected such plan. 11 U.S.C. § 1126(c).  A class of interests has accepted a plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.  11 U.S.C. §1126(d).

DOCS_SF:104703.16 36027/002

Appellee Appx. 01563
Appx. 01814
014376

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 1576 of 1804   Page 698 of 1017   PageID 15342
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1570 of 1803   PageID 12316
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 32 of 68

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 2 | Frontier Secured Claim | Impaired | Entitled To Vote |
| 7 | Convenience Claims | Impaired | Entitled To Vote |
| 8 | General Unsecured Claims | Impaired | Entitled To Vote |
| 9 | Subordinated Claims | Impaired | Entitled To Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled To Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled To Vote |

**C.    The Debtor Proposed the Plan in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).**

51.    Section 1129(a)(3) of the Bankruptcy Code requires that the proponent of a plan propose the plan "in good faith and not by any means forbidden by law."[40]  In assessing the good faith standard, courts in the Fifth Circuit consider whether the plan was proposed with "the legitimate and honest purpose to reorganize and has a reasonable hope of success."[41]  A plan must also achieve a result consistent with the Bankruptcy Code.[42]  The purpose of chapter 11 is to enable a distressed business to reorganize and achieve a fresh start.[43]  Whether a plan is proposed in good faith must be determined in light of the totality of the circumstances of the case.[44]

52.    During the last several months, the Debtor has negotiated extensively with the Committee regarding all aspects of the Plan.  Such negotiations have been hard fought and intense. As the Court will recall, the Committee objected to approval of the Disclosure Statement

---

[40] 11 U.S.C. § 1129(a)(3).

[41] See In re Sun Country Dev., Inc., 764 F.2d 406, 408 (5th Cir. 1985).

[42] See In re Block Shim Dev. Company-Irving, 939 F.2d 289, 292 (5th Cir. 1991).

[43] See Sun Country Dev., 764 F.2d at 408 ("The requirement of good faith must be viewed in light of the totality of circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code to give debtors a reasonable opportunity to make a fresh start.").

[44] See id.; see also Pub. Fin. Corp. v. Freeman, 712 F.2d 219 (5th Cir. 1983); Cypresswood, 409 B.R. at 425.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01564
Appx. 01815
014377

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6-15    Exhibit 6    Page 1572 of 1804    Page 699 of 1017    PageID 15343
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1571 of 1803    PageID 12317
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 33 of 68

at the initial Disclosure Statement hearing which objection resulted in a continuance of that hearing.  In the subsequent weeks the Debtor and the Committee continued their negotiations and ultimately reached substantial agreement on the terms of the Plan prior to the November 23, 2020 Disclosure Statement hearing. The parties continued their negotiations over the subsequent weeks which resulted in the Plan currently before the Court for confirmation.  This history conclusively demonstrates that the Plan is being proposed in good faith within the meaning of Section 1129(a)(3).

53.     Moreover, the mechanical distributions contemplated under the Plan were proposed in good faith, are not prohibited by applicable law, and were crafted to efficiently monetize the Debtor's assets and pursue Causes of Action while bestowing the Claimant Trustee Oversight Committee with ultimate oversight over this process.  The Plan provides for the transfer of the majority of the Debtor's Assets to the Claimant Trust. The balance of the Debtor's Assets, including the management of the Managed Funds, will remain with the Reorganized Debtor.   The Reorganized Debtor will be managed by New GP LLC—a wholly-owned subsidiary of the Claimant Trust.  This structure will allow for continuity in the Managed Funds and an orderly and efficient monetization of the Debtor's Assets.   The Claimant Trust, the Litigation Sub-Trust, or the Reorganized Debtor, as applicable, will institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action without any further order of the Bankruptcy Court, and the Claimant Trust and Reorganized Debtor, as applicable, will sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets and resolve all Claims, except as otherwise provided in the Plan, the Claimant

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15   Exhibits   Page 1573 of 1804 Page 700 of 1017   PageID 15344
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1572 of 1803   PageID 12318
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 34 of 68

Trust Agreement, or the Reorganized Limited Partnership Agreement. The Plan also provides for the reconciliation and potential objection to Claims filed against the Debtor and a procedure to administer Disputed Claims. Thus, the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.

### D.   The Debtor is Seeking to Pay Certain Professional Fees and Expenses Subject to Bankruptcy Court Approval (Section 1129(a)(4)).

54.   Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be approved by the Bankruptcy Court as reasonable or subject to approval by the Bankruptcy Court as reasonable. The Fifth Circuit has held this is a "relatively open-ended standard" that involves a case-by-case inquiry and, under appropriate circumstances, does not necessarily require that a bankruptcy court review the amount charged.[45] As to routine legal fees and expenses that have been approved as reasonable in the first instance, "the court will ordinarily have little reason to inquire further with respect to the amount charged."[46]

55.   In general, the Plan provides that the Claims held by professionals retained by the Debtor or the Committee (the "Professionals") for their services and related expenses are subject to prior Court approval and the reasonableness requirements under sections 328 or 330 of the Bankruptcy Code. Moreover, Article II.B of the Plan provides that Professionals shall file all final requests for payment of Professional Fee Claims no later than 60 days after the Effective

---

[45] *See Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 517-18 (5th Cir. 1998) ("What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate.").

[46] *Id.* at 517.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01566
Appx. 01566
014379

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 1574 of 1804   Page 701 of 1017   PageID 15345
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1573 of 1803   PageID 12319
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 35 of 68

Date, thereby providing an adequate period of time for interested parties to review such Professional Fee Claims.[47]  The Plan also provides for the establishment of the Professional Fee Escrow Account by the Claimant Trustee to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.  Plan, § I.B.101.  For the foregoing reasons, the Debtor submits that the Plan complies with section 1129(a)(4) of the Bankruptcy Code.

> ### E.      The Debtor Has Complied with the Bankruptcy Code's Governance Disclosure Requirement (Section 1129(a)(5)).

56.      The Bankruptcy Code requires the proponent of a plan to disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan.[48]  It further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[49]  Lastly, it requires that the plan proponent has disclosed the identity of insiders to be retained by the reorganized debtor and the nature of any compensation for such insider.[50]  Courts have held that these provisions ensure that the post-confirmation governance of a reorganized debtor is in "good hands."[51]

57.      The Plan provides that James P. Seery, Jr., the Debtor's current Chief Executive Officer, Chief Financial Officer and Foreign Representative, shall serve as the Claimant Trustee

---

[47] Plan. Art. II.B.

[48] 11 U.S.C. § 1129(a) (5)(A)(i).

[49] 11 U.S.C. § 1129(a)(5)(A)(ii).

[50] 11 U.S.C. § 1129(a)(5)(B).

[51] *See In re Landing Assocs., Ltd.*, 157 B.R. 791, 817 (Bankr. W.D. Tex. 1993) ("In order to lodge a valid objection under § 1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of this management post-confirmation will prejudice the creditors").

DOCS_SF:104703.16 36027/002

Appellee Appx. 01567
014380

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1575 of 1804   Page 702 of 1017   PageID 15346
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1574 of 1803   PageID 12320
Case 19-34054-sgj11   Doc 1814   Filed 01/22/21   Entered 01/22/21 19:25:01   Page 36 of 68

and Marc S. Kirschner shall serve as the Litigation Trustee. *See* Plan Supplement at Exhibits M and O. Mr. Seery currently serves as the Debtor's Chief Executive Officer and Chief Restructuring Officer and also serves as one of the Independent Directors. Mr. Seery shall be paid $150,000 per month, for services rendered after the Effective Date and for his services as Claimant Trustee, plus a success fee that shall be the subject of negotiation between him and the Claimant Trust Oversight Committee post-Effective Date, which negotiation shall take place within forty-five (45) days after the Effective Date. Finally, the Claimant Trust Agreement discloses the five members of the Claimant Trust Oversight Committee, which consists of: (1) Eric Felton, as representative of the Redeemer Committee; (2) Josh Terry, as representative of Acis; (3) Elizabeth Kozlowski, as representative of UBS; (4) Paul McVoy, as representative of Meta-e Discovery; and (5) David Pauker. *See* Plan Supplement at Exhibits A, M, and N.

58. HCMFA's objection asserts that "neither the identity nor the compensation of the people who control and manage the Reorganized Debtor is provided, much less as to who may be a Sub-Servicer." HCMFA Objection ¶ 74. The identity of the individuals who will manage the Reorganized Debtor, the Claimant Trust, and Litigation Sub-Trust are set forth above, along with the proposed compensation for any insider. Moreover, the Claimant Trust Agreement provides that the Claimant Trustee "shall engage professionals from time to time in conjunction with the services provided hereunder. Claimant Trustee's engagement of such professionals shall be approved by a majority of the Oversight Committee as set forth in Section 3.3(b) [of the Claimant Trust Agreement]." Claimant Trust Agreement, § 3.13(b).

Appellee Appx. 01568
Appx. 01819
014381

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Page 1576/651804   Page 703 of 1017   PageID 15347
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1575 of 1803   PageID 12321
Case 19-34054-sgj11   Doc 1814   Filed 01/22/21   Entered 01/22/21 19:25:01   Page 37 of 68

59.     In addition to satisfying the disclosure requirements of Bankruptcy Code section

1125(a)(5), the appointment of Messrs. Seery, Kirschner and the members of the Claimant Trust

Oversight Committee is consistent with the interests of creditors and equity security holders and

with public policy pursuant to section 1123(a)(7) of the Bankruptcy Code.  As noted above, Mr.

Seery has served as an Independent Board member since January 2020, and as the Chief

Executive Officer and Chief Restructuring Officer since July 2020.  As set forth in the

CEO/CRO Motion, Mr. Seery has extensive management and restructuring experience.  Mr.

Seery recently served as a Senior Managing Director at Guggenheim Securities, LLC, where he

was responsible for helping direct the development of a credit business.  Prior to joining

Guggenheim, Mr. Seery was the President and a senior investing partner of River Birch Capital,

LLC, where he was responsible for originating, executing, and managing stressed and distressed

credit investments.  Mr. Seery is also a long-time attorney licensed to practice in New York who

has run corporate reorganization groups and numerous restructuring matters.  He also served as a

Commissioner of the *American Bankruptcy Institute's Commission to Study the Reform of

Chapter 11*.  Mr. Seery was also a Managing Director and the Global Head of Lehman Brothers'

Fixed Income Loan business where he was responsible for managing the firm's investment grade

and high yield loans business, including underwriting commitments, distribution, hedging,

trading and sales (including CLO manager relationships), portfolio management and

restructuring.  From 2000 to 2004, Mr. Seery ran Lehman Brothers' restructuring and workout

businesses with responsibility for the management of distressed corporate debt investments and

was a key member of the small team that successfully sold Lehman Brothers to Barclays in 2008.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01569
Appx. 01829
014382

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 18-15   Filed 05/05/25   Page 704 of 1017   PageID 15348
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1576 of 1803   PageID 12322
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 38 of 68

60.     In addition to his ample qualifications, as the Court is aware from the numerous times Mr. Seery has testified before the Court, Mr. Seery has made substantial demonstrative contributions to the success of this chapter 11 case through both the resolution of the Debtor's pending litigation claims and the development of the Plan.  In his roles with the Debtor, he is familiar with the Debtor's operations and its business as well as the Claims that will be treated under the Plan.  Accordingly, it is reasonable to continue his employment post-emergence as the Claimant Trustee, subject to the supervision of the Claimant Trust Oversight Committee, which is comprised of several of the largest creditors of the Debtor, including UBS, Redeemer Committee and Acis, as well as Meta-e, all of whom currently serve on the Committee.

61.     Mr. Kirschner has been practicing law since 1967 and has substantial experience in bankruptcy litigation matters, particular with respect to his prior experience as a litigation trustee.  He serves as the trustee for:  the Tribune Litigation Trust; Millennium Health Corporate Claim and Lender Claims Trusts; and the Nine West Trust.  He is currently a Senior Managing Director at Goldin Associates, LLC specializing, among other things in, restructuring advisory, valuation, solvency/fraudulent conveyance issues.  He is also a member of the American College of Bankruptcy.  Mr. Kirschner was also a partner and the former head of the New York Restructuring of the global law firm of Jones Day.  Mr. Kirschner shall be paid $40,000 per month for the first three months and $20,000 per month thereafter.[52]  In addition, Mr. Kirchner

---

[52] Mr. Kirschner will receive support services from his consulting firm, Teneo.  Teneo will provide services at a 10% discount from their rates. Teneo has agreed to freeze their rates in effect for 2021 through the end of 2022. Teneo shall also be entitled to reimbursement of expenses.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01570
Appx. 01821
014383

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Filed 05/08/25   Page 705 of 1017   PageID 15349
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1577 of 1803   PageID 12323
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 39 of 68

will receive a 1.50% fee of any "Net Litigation Trust Proceeds"[53] up to $100 million, and an additional 2% fee of any Net Litigation Trust Proceeds in excess of $100 million.

62.      As noted above, four of the members of the Claimant Trust Oversight Committee are the holders of most of the largest Claims against the Debtor and current members of the Committee.  Each of these creditors have actively participated in the Debtor's case both through their roles as Committee members and in their separate capacities as individual creditors. They are therefore familiar with the Debtor, its operations and assets.

63.      The fifth member of the Clamant Trustee Oversight Committee, David Pauker, is a restructuring advisor and turnaround manager with more than 25 years of experienced advising public and private companies and their investors.  Mr. Pauker is a fellow of the American College of Bankruptcy.   Mr. Pauker has substantial experience overseeing, advising or investigating troubled companies in the financial services industry and has advised or managed such companies on behalf of boards or directors, court-appointed trustees, examiners and special masters, government agencies and private investor parties, including Lehman Brothers, Monarch Capital, Government Development Bank Debt Recovery Authority of Puerto Rico, MCorp, Refco, and Residential Capital.  Mr. Pauker, who will be the only paid member of the initial Claimant Trust Oversight Board, will be paid $250,000 for the first year of his service and $150,000 per year thereafter.  The Plan therefore satisfies the requirements of Bankruptcy Code

---

[53] Net Litigation Trust Proceeds is defined as gross Litigation Trust proceeds, less Teneo and Litigation Trust counsel hourly fees, expert witness, e-discovery, court and discovery expenses.  Gross recoveries are not to be reduced by the cost of insurance, tax accounting work which would be outsourced, potential contingency fees, or litigation funding financing and/or related contingent fee charges.

Appellee Appx. 01571
Appx. 01822
014384

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-5   Page 1579 of 1804   Page 706 of 1017   PageID 15350
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1578 of 1803   PageID 12324
Case 19-34054-sgj11  Doc 1814  Filed 01/22/21   Entered 01/22/21 19:25:01   Page 40 of 68

sections 1129(a)(5) and 1123(a)(7) with respect to the individuals responsible for the post-confirmation administration and oversight of the Reorganized Debtor.

**F.   The Plan Does Not Require Government Regulatory Approval of Rate Changes (Section 1129(a)(6)).**

64.     Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the Plan.  No such rate changes are provided for in the Plan.  Thus, section 1129(a)(6) of the Bankruptcy Code is inapplicable to this chapter 11 case.

**G.   The Plan Is in the Best Interests of Holders of Claims and Interests (Section 1129(a)(7)).**

65.     The best interests of creditors test requires that, "[w]ith respect to each impaired class of claims or interests," members of such class that have not accepted the plan will receive at least as much as they would in a hypothetical chapter 7 liquidation.[54]  The best interests test applies to each non-consenting member of an impaired class, and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[55]

66.     As demonstrated in the liquidation analysis and financial projections attached to the Disclosure Statement as Exhibit C (the "Liquidation Analysis"), which was prepared by the

---

[54] 11 U.S.C. § 1129(a) (7).

[55] *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1159 n. 23 (5th Cir. 1988) (stating that under section 1129(a)(7) of the Bankruptcy Code a bankruptcy court was required to determine whether impaired claims would receive no less under a reorganization than through a liquidation).

DOCS_SF:104703.16 36027/002

Appellee Appx. 01572
Appx. 01825
014385

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Filed 05/30/25    Page 707 of 1017    PageID 15351
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1579 of 1803    PageID 12325
Case 19-34054-sgj11    Doc 1814    Filed 01/22/21    Entered 01/22/21 19:25:01    Page 41 of 68

Debtor with the assistance of its advisors, all Holders of Claims and Equity Interests in all Impaired Classes will recover at least as much under the Plan as they would in a hypothetical chapter 7 liquidation.[56]  Specifically, the projected recoveries under the Plan and the results of the Liquidation Analysis for Holders of Claims estimates a 92.51% distribution to holders of general unsecured claims under the Plan compared to an estimated 66.14% distribution under a hypothetical liquidation of the Debtor.[57]

67.    Mr. Dondero argues that the Plan fails to satisfy the requirements of Bankruptcy Code section 1129(a)(7) due to "lack of appropriate sale procedures for post-confirmation operations" and because there is no oversight or predetermined procedures to ensure that the liquidation of the Debtor's assets is both value maximizing and transparent.  *See* Dondero Objection, ¶10.  Dugaboy—Mr. Dondero's family trust—filed a similar objection and asserts that the absence of reporting requirements to the beneficial holders of Claimant Trust, lack of oversight on the Claimant Trustee's ability to liquidate assets violates section 1129(a)(7) and that a chapter 7 trustee would require to obtain court approval to effect the same sales.  Dugaboy also argues that the Claimant Trustee's limitation of liability only applies to gross negligence and willful misconduct, so that the Claimant Trustee cannot be held liable for breach of fiduciary duty and, therefore, derives great protections than a hypothetical chapter 7 trustee would have.

---

[56] *See* Disclosure Statement Ex. C.

[57] *See* Disclosure Statement Ex C.  With respect to the other impaired classes of Claims and Equity Interests, the Liquidation Analysis projects a 100% distribution on account of the Class 2 Frontier Secured Claim under either scenario and projects no distributions holders of Class 9 Subordinated Claims, Class 10 Class B/C Limited Partnership Interests and Class 11 Class A Limited Partnership Interests either under the Plan or under a hypothetical liquidation of the Debtor.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01573

014386

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6819    Page 1586/251804    Page 708 of 1017    PageID 15352
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1580 of 1803    PageID 12326
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 42 of 68

68.     This objection is being made by parties with virtually no economic interest in the Debtor.  Neither Dugaboy nor Mr. Dondero have any legitimate claims against the Debtor and based upon Mr. Dondero's "pot plan" proposal their equity is completely out of the money. Moreover, as discussed below, the argument that increased reporting obligations to creditor beneficiaries (who they are not), a requirement to seek Court approval of sales and the establishment of a standard of care for the Claimant Trustee somehow translates into creditors doing better in a chapter 7 makes no sense, and, in any event, is not an argument supported by any creditor not related to Mr. Dondero..

69.     As set forth above, the Liquidation Analysis filed with the Disclosure Statement provides a side by side comparison of distributions to creditors under a hypothetical chapter 7 liquidation and under the Plan and clearly demonstrates that creditors will receive at least as much under the Plan as they would in a chapter 7 proceeding.  None of the objectors provide any arguments to refute the analysis in the Liquidation Analysis or how a hypothetical chapter 7 trustee would liquidate the Debtor's remaining assets that would definitively provide a greater distribution to creditors in chapter 7 liquidation rather than in chapter 11. To the contrary, Mr. Dondero suggests (without any factual basis) that the Debtor's creditors and equity holders "could receive a higher recovery from the liquidation of the Debtor under Chapter 7 of the Bankruptcy Code in which sale procedures are governed by the Bankruptcy Court to ensure maximization or value through auction or other market-testing means."  Dondero Objection ¶ 11.

70.     Nothing in the opposition suggests that the Claimant Trustee (subject to supervision by the Claimant Trust Oversight Committee) will not undertake the same value

Appellee Appx. 01574
Appx. 01825
014387

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-5    Page 1583 of 1804    Page 709 of 1017    PageID 15353
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1581 of 1803    PageID 12327
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 43 of 68

maximizing measures suggested by Mr. Dondero in order to maximize the value of the Reorganized Debtor's assets.  The only difference is that the Claimant Trustee would be able to consummate these sales in the ordinary course of business compared to a trustee, who would have to negotiate (and presumably discount) every sale with the caveat that it is subject to court approval and a period of time by which parties, such as Mr. Dondero has throughout this case, can object and potentially frustrate any proposed sale.  Mr. Dondero also assumes that the chapter 7 trustee could operate the Debtor's business in chapter 7.[58]  Aside from the complete lack of institutional knowledge of the Debtor and its business, it is doubtful that a chapter 7 trustee would be able to operate the Debtor's business without the benefit of the executory contracts and unexpired leases that the Reorganized Debtor seeks to assume in order to monetize the remaining assets.  There is no factual basis to conclude that a hypothetical chapter 7 trustee could monetize the Debtor's remaining assets any better than the Claimant Trustee, who has both the expertise and institutional knowledge of the Debtor and who is subject to an oversight committee consisting of the largest creditors in the Debtor's case.

71.    Second, it is standard for a chapter 11 plan to allow the post confirmation administrators (in this case, the Claimant Trustee, the Litigation Trustee, and Reorganized Debtor) to monetize a debtor's assets without having to first obtain court approval or otherwise condition any sales on the consent to the holders of claims or interests.  It is neither novel nor unusual for chapter 11 plans to allow the post-confirmation vehicle to sell assets, compromise

---

[58] Even if a hypothetical trustee were appointed under Mr. Dondero's argument, the trustee would be subject to election pursuant 11 U.S.C. § 702.  The largest creditors of the Debtor (most of whom are serving on the Claimant Trust Oversight Committee) would control the selection of the trustee of the Debtor after conversion.  Yet these creditors support confirmation of the Plan and the structure by which they, as members of the Claimant Trust Oversight Committee, will oversee the Claimant Trustee's monetization of assets.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01575
Appx. 01826
014388

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Page 1583/251804   Page 710 of 1017   PageID 15354
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1582 of 1803   PageID 12328
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 44 of 68

controversies and employ professionals without mandatory application to the Court to approve these standard post-confirmation transactions, including chapter 11 cases confirmed by this Court. *See, e.g. In re Acis Capital Management*, 2019 Bankr. LEXIS 294, *116 (Bankr. N.D. Tex. January 31, 2019) (plan providing "[o]n and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order."); *In re Wilson Metal Fabricators,* No. 19-31452,**9-10 (Bankr. N.D. Tex. SGJ May 18, 2020), ECF No. 92 (Order confirming plan providing that reorganized debtor "may deal with its assets and property and conduct its affairs without any supervision by, or permission from, the Court or the Office of the United States Trustee, and free of any restriction imposed on the Debtor by the Bankruptcy Code or by the Court during the case.").

72.     Finally, Dugaboy's argument that the standard of liability for the Claimant Trustee provided in the Claimant Trust Agreement is not appropriate and confers greater protections those applicable to a chapter 7 trustee is wrong.  This objection is yet another example of the Dondero Entities' efforts to place as many roadblocks as possible to halt post-confirmation asset sales and maintain the ability to litigate (or threaten to litigate) against the entities charged with implementing the monetization of assets required under the Plan.

73.     The standard of liability imposed on the Claimant Trustee pursuant to the Clamant Trust Agreement is appropriately limited to gross negligence and willful misconduct and Dugaboy and the Dondero Entities do not describe how the standard of liability has any impact

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15   Page 1584 of 1804   Page 711 of 1017   PageID 15355
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1583 of 1803   PageID 12329
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 45 of 68

on the distributions creditors will receive under the Plan.  First, the Claimant Trustee does have fiduciaries duties to the trust beneficiaries under the terms of the Claimant Trust Agreement, but claims against the Claimant Trustee are limited to acts of gross negligence and willful misconduct.[59]   Second, Dugaboy misstates the standard of liability that would otherwise be imposed on a chapter 7 trustee.   A chapter 7 trustee would actually have a more relaxed standard of liability than that imposed on the Claimant Trustee because it is well established that trustees have qualified immunity for acts taken within the scope of their appointment.   *Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981) ("The question in this case is whether a trustee acting at the direction of a bankruptcy judge is clothed with absolute immunity against tort actions grounded on his conduct as trustee .... In the instant case, the court-approved trustee was acting under the supervision and subject to the orders of the bankruptcy judge.  We hold that since [the trustee], as an arm of the Court, sought and obtained court approval of his actions, he is entitled to derived immunity.")   Thus, a chapter 7 trustee's qualified immunity would protect it from heightened negligent breach of fiduciary duty claims whereas the Claimant Trust Agreement provides that the Claimant Trustee is only protected from simple negligent breach of fiduciary claims.

---

[59] *See, e.g.* Claimant Trust Agreement Section 2.3(b)(vii).  "The  Claimant Trust shall be administered by the Claimant Trustee, in accordance with this Agreement, for the following purpose …  (viii) to oversee the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement, in its capacity as the sole member and manager of New GP LLC pursuant to the terms of the New GP LLC Documents, all with a view toward maximizing value in a reasonable time in a manner consistent with the Reorganized Debtor's fiduciary duties as investment adviser to the Managed Funds.  The Debtor has amended the Plan to conform with the Claimant Trust Agreement.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01577
Appx. 01628
014390

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 1585 of 1804   Page 712 of 1017   PageID 15356
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1584 of 1803   PageID 12330
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 46 of 68

74.     Accordingly, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test.[60]

### H.     The Plan Complies with the Requirements of Section 1129(a)(8) of the Bankruptcy Code.

75.     The Bankruptcy Code generally requires that each class of claims or interests must either accept the plan or be unimpaired under the plan.[61]   Each of the non-Voting Classes that were not entitled to vote on the Plan are Unimpaired and conclusively deemed to accept the Plan.

### I.     The Plan Complies With Statutorily Mandated Treatment of Administrative and Priority Tax Claims (Section 1129(a)(9)).

76.     Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.   In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.   Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—which generally include domestic support obligations, wage, employee benefit, and deposit claims entitled to priority—must

---

[60] *See In re Neff*, 60 B.R. 448, 452 (Bankr. N.D. Tex. 1985) aff'd, 785 F.2d 1033 (5th Cir. 1986) (stating that "best interests" of creditors means "creditors must receive distributions under the Chapter 11 plan with a present value at least equal to what they would have received in a Chapter 7 liquidation of the Debtor as of the effective date of the Plan"); *In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'") (internal citations omitted).

[61] 11 U.S.C. § 1129(a) (8).

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-6   Page 1586/251804   Page 713 of 1017   PageID 15357
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1585 of 1803   PageID 12331
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 47 of 68

receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan). Finally, section 1129(a)(9)(C) provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—i.e., priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim

77.     The Plan satisfies section 1129(a)(9) of the Bankruptcy Code. First, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each Holder of an Allowed Administrative Claim will receive Cash equal to the amount of such Allowed Administrative Claim on the Effective Date, or as soon as reasonably practicable thereafter, or at such other time as defined in Article II.A of the Plan. Second, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan.[62]  Finally, Article II.C of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it specifically provides that each Holder of an Allowed Priority Tax Claim shall receive payment in an amount equal to the amount of the Allowed Priority Tax Claim unless otherwise agreed between such holder and the Debtor. .[63]  Thus, the Plan satisfies each of the requirements set forth in section 1129(a)(9) of the Bankruptcy Code.

---

[62] See Plan, Art. III.B.

[63] As noted below in the discussion on Plan modifications, the Debtor has clarified the treatment of priority tax claims in accordance with 11 U.S.C. §1129(a)(9)(C) pursuant to the objection raised on this point by the Internal Revenue Service ("IRS").

41

DOCS_SF:104703.16 36027/002

Appellee Appx. 01579
Appx. 01639
014392

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-15    Page 1586 of 1804    Page 714 of 1017    PageID 15358
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1586 of 1803    PageID 12332
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 48 of 68

78.    The IRS and certain Texas taxing authorities (the "Texas Taxing Authorities")
each filed objections to the Plan.   The Debtor is in the process of negotiating "neutrality"
language with the Texas Taxing Authorities concerning the application of the Plan injunction
and other provisions to the claims asserted by this creditor. The Debtor expects to consensually
resolve the Texas Taxing Authorities' objection with agreeable language in the Confirmation
Order.  As more fully explained in the Omnibus Reply in response to the IRS's plan objection,
the IRS has rejected the Debtor's Plan neutrality language and is insisting on the modification of
the Plan to contain litany of provisions that are ambiguous, overbroad and, most importantly,
attempt to pre-determine the IRS's rights and remedies as opposed to having these issues
determined in accordance with nonbankruptcy law with each parties' rights and defenses
preserved.

**J.    At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptances of Insiders (Section 1129(a)(10)).**

79.    Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is
an impaired class of claims, at least one impaired class of claims must accept the plan "without
including any acceptance of the plan by any insider."  As detailed herein and in the Voting
Report, Class 2 (Frontier Secured Claim) and Class 7 (Convenience Claims) are impaired classes
of claims and each voted to accept the Plan, exclusive of any acceptances by insiders.
Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.
However, as explained below, even though not all of the Voting Classes accepted the Plan, the
Plan may still be confirmed by cram down because the requirements of section 1129(b) are
satisfied.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01580
Appx. 01581
014393

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 68-15 Page 1586/251804 Page 715 of 1017 PageID 15359
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1587 of 1803 PageID 12333
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 49 of 68

**K.** **The Plan Is Feasible and Is Not Likely to Be Followed by the Need for Further Financial Reorganization (Section 1129(a)(11)).**

80. Feasibility refers to the Bankruptcy Code's requirement that plan confirmation must not be "likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . unless such liquidation or reorganization is proposed in the plan."[64] To satisfy this standard, the Fifth Circuit has held that a plan need only have a "reasonable probability of success."[65] Indeed, a relatively low threshold of proof will satisfy section 1129(a)(11) so long as adequate evidence supports a finding of feasibility.[66] In particular, according to Fifth Circuit law, "[w]here the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive, the court may find the plan feasible."[67]

81. The Plan provides for the Reorganized Debtor to manage the wind down of the Managed Funds as well as the monetization of the balance of the Reorganized Debtor Assets. As set forth in the Liquidation Analysis, the projections prepared by the Debtor show that it will be able to meet its obligations under the Plan. The Plan also does not provide any guaranty as to what holders of Class 8 General Unsecured Claims will receive; they will receive their *pro rata* payment of whatever net funds realized from the asset monetization process reflected in the projections. Therefore, the Plan is feasible. Thus, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code under Fifth Circuit law.

---

[64] 11 U.S.C. § 1129(a) (11).

[65] *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997) (quoting *In re Landing Assocs., Ltd.*, 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993)).

[66] *In re Star Ambulance Service, LLC*, 540 B.R. 251, 266 (Bankr. S.D. Tex. 2015).

[67] *T-H New Orleans*, 116 F.3d at 802.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1586 of 1804    Page 716 of 1017    PageID 15360
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1588 of 1803    PageID 12334
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 50 of 68

**L.    The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).**

82.    The Bankruptcy Code requires the payment of all fees payable under 28 U.S.C. § 1930.[68]    The Plan includes an express provision requiring payment of all such fees.[69]    In addition, at the request of the United States Trustee, the Debtor has added language to the Confirmation Order that makes the Reorganized Debtor, the Claimant Trustee and Litigation Trustee jointly and severally liable for payment of statutory fees owed to the United States Trustee.  The Plan, therefore, complies with section 1129(a)(12) of the Bankruptcy Code.

**M.    The Plan Complies with Section 1129(a)(13) of the Bankruptcy Code.**

83.    The Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.  Section 1114(a) of the Bankruptcy Code defines retiree benefits as medical benefits.[70]    Article IV.K of the Plan provides for the assumption of the Pension Plan (to the extent that this plan is governed under section 1114 of the Bankruptcy Code) as well as additional language requested by the Pension Benefits Guaranty Corporation.    Accordingly, the Plan complies with section 1129(a)(13) of the Bankruptcy Code.

---

[68] 11 U.S.C. § 1129(a) (12).

[69] Plan, Art. XIII.D.

[70] Section 1114(a) defines "retiree benefits" as: ". . . payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained in whole or in part by the debtor prior to filing a petition commencing a case under this title."  11 U.S.C. § 1114(e) (emphasis added).

DOCS_SF:104703.16 36027/002

Appellee Appx. 01582
Appx. 01583
014395

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-16    Filed 05/06/25    Page 717 of 1017    PageID 15361
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1589 of 1803    PageID 12335
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 51 of 68

**N.    Sections 1129(a)(14) through Sections 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.**

84.    A number of the Bankruptcy Code's confirmation requirements are inapplicable to the Plan. Section 1129(a)(14) of the Bankruptcy Code does not apply because the Debtor is not subject to any domestic support obligations.[71]  Section 1129(a)(15) of the Bankruptcy Code is inapplicable because the Debtor is not an "individual" as defined in the Bankruptcy Code.[72] Section 1129(a)(16) of the Bankruptcy Code is inapposite because the Plan does not provide for any property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.[73]

**O.    The Plan Satisfies the Cramdown Requirements (Section 1129(b)).**

85.    If an impaired class has not voted to accept the plan, the plan must be "fair and equitable" and not "unfairly discriminate" with respect to that class.[74]  The Plan has been accepted by Voting Classes 2, 7, and 9.[75]  Voting Classes 8 (General Unsecured Claims) and Class 11 (Class A Limited Partnership Interests) voted to reject the Plan and Class 10 (Class B/C Limited Partnership Interests), did not vote.  However, the Plan still satisfies the "cramdown" requirements with respect to non-accepting Classes of Claims and Equity Interests.

---

[71] *See* 11 U.S.C. § 1129(a) (14).

[72] *See* 11 U.S.C. § 1129(a)(15).

[73] *See* 11 U.S.C. § 1129(a)(16).

[74] *See* 11 U.S.C. § 1129(b)(1).

[75] As noted below, Class 9 has also accepted the Plan, but the Debtor is not including Class 9 as one of the accepting impaired classes to satisfy the cram down requirements of section 1129(b)(1) of the Bankruptcy Code.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01583

Appx. 01624

014396

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibits 6    Page 1596/251804    Page 718 of 1017    PageID 15362
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1590 of 1803    PageID 12336
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 52 of 68

### 3.    The Plan Is Fair and Equitable.

86.    A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects the plan (or is deemed to reject the plan) if it follows the "absolute priority rule."[76]  This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired rejecting class not receive any distribution under a plan on account of its junior claim or interest.[77]  The Plan satisfies section 1129(b) of the Bankruptcy Code.  The objecting parties' arguments that the Plan is not "fair and equitable" ignore this standard.

87.    As explained earlier, all similarly situated holders of Claims and Equity Interests will receive substantially similar treatment and the Plan's classification mechanics rests on a legally acceptable rationale.  To the extent any impaired rejecting class of claims or interests is not paid in full, no class junior to the impaired rejecting class will receive any distribution under the Plan on account of its junior claim or interest.  Therefore, the Plan satisfies the "fair and equitable" requirement.

### 4.    The Plan Does Not Unfairly Discriminate Against the Rejecting Classes.

88.    The Bankruptcy Code does not provide a standard for determining "unfair discrimination."  Rather, courts typically examine the facts and circumstances of the particular

---

[76] *Bank of Am. Nat'l Tr. & Savings Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441-42 (1999) ; *In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006).

[77] *Id.*

DOCS_SF:104703.16 36027/002

Appellee Appx. 01584

014397

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1592 of 1804   Page 719 of 1017   PageID 15363
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1591 of 1803   PageID 12337
Case 19-34054-sgj11   Doc 1814   Filed 01/22/21   Entered 01/22/21 19:25:01   Page 53 of 68

case to determine whether unfair discrimination exists.[78]   At a minimum, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so.[79]   The unfair discrimination requirement, which involves a comparison of classes, is distinct from the equal treatment requirement of section 1123(a)(4), which involves a comparison of the treatment of claims within a particular class.   A plan does not unfairly discriminate where it provides different treatment to two or more classes which are comprised of dissimilar claims or interests.[80]   Likewise, there is no unfair discrimination if, taking into account the particular facts and circumstances of the case, there is a reasonable basis for the disparate treatment.[81]

89.   The Plan's treatment of these Classes is proper because all similarly situated holders of Claims and Equity Interests will receive substantially similar treatment and the Plan's classification scheme rests on a legally acceptable rationale.   Accordingly, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code.

---

[78] *See In re Kolton*, No. 89-53425-C, 1990 WL 87007 at *5 (Bankr. W.D. Tex. Apr. 4, 1990) (quoting *In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis . . . ")); *see also In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[79] *See Idearc Inc.*, 423 B.R. at 171, ("[T]he unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so."); *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 655 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[80] *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 655 (9th Cir. 1997) ; *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987); *aff'd sub nom., Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[81] *Aztec Co.*, 107 B.R. at 590.

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1593 of 1804    Page 720 of 1017    PageID 15364
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1592 of 1803    PageID 12338
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 54 of 68

**P.    The Plan satisfies the "Cramdown" Requirements of the Bankruptcy Code.**

90.    Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[82]

91.    A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[83]  This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[84]  The Debtor submits that the Plan satisfies the "fair and equitable" requirement notwithstanding the non-acceptance of the Plan by Classes 8, 10 and 11.

92.    With respect to Class 8 General Unsecured Claims, there is no Class of equal priority receiving more favorable treatment and no classes that are junior to Class 8 will receive or retain any property under the Plan unless Class 8 creditors receive or retain, on account of

---

[82] *See John Hancock*, 987 F.2d at 157 n.5; *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997)  ("the [p]lan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan.").

[83] *See Bank of Amer.*, 526 U.S. at 441-42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).  That latter condition is the core of what is known as the 'absolute priority rule.'").

[84] *See id.*

48

Appellee Appx. 01586
Appx. 01587
014399

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1594 of 1804    Page 721 of 1017    PageID 15365
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1593 of 1803    PageID 12339
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 55 of 68

their claims, a value as of the Effective Date equal to the amount of such Claim, plus interest as provided under the Plan. Thus, Holders of Class 9 Subordinated Claims will not receive any distributions unless and until Class 8 Claims are fully paid pursuant to section 1129(b)(2)(B) of the Bankruptcy Code. Holders of Equity Interests in Class 10 and 11 will not receive any distributions absent full payment to holders of Allowed Class 8 General Unsecured Claims and Allowed Class 9 Subordinated Claims. There are no Claims or Equity Interests junior to the Equity Interests in Class 10 and Class 11. Therefore, the Plan is fair and equitable as to Equity Interests in Class 10 and 11 because no class junior to equity will receive or retain any property under the Plan. 11 U.S.C. § 1129(b)(2)(C).

93.    Moreover, while Class 8 did not accept the Plan, requiring the Debtor to resort to "cram down" under Section 1129(b), over 93% of the dollar amount of claims in Class 8 voted to accept the Plan. Those votes included the votes of Redeemer, Acis, UBS, and the HarbourVest entities. Similarly, the Committee, as the fiduciary for all Class 8 General Unsecured Claims, also enthusiastically supports the Plan. As discussed above, the only reason Class 8 General Unsecured Claims voted to reject the Plan was because of (i) 24 employees holding contingent $1.00 claims with respect to unvested amounts under the Debtor's deferred compensation program voted against the Plan;[85] yet these employees ultimately will not have any General Unsecured Claims because the Debtor will terminate their employment before their entitlement to such amounts will vest, thereby eliminating the contingent claims and (ii) certain other employees, including Scott Ellington and Isaac Leventon who are loyal to Mr. Dondero and who

---

[85] As noted above, the Debtor resolved the confirmation objection of Mr. Surgent and Mr. Waterhouse, each of whom voted to reject (Waterhouse) or voted to abstain (Surgent) with respect to the Plan.

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1595 of 1804    Page 722 of 1017    PageID 15366
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1594 of 1803    PageID 12340
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 56 of 68

also rejected the Plan. Based upon the foregoing, the Plan may satisfy the cram down requirements and can be confirmed notwithstanding the non-acceptance of the Plan by Class 8, Class 10 and Class 11.

94.    NPA argues that Plan violates the absolute priority rule with respect to unsecured creditors to the extent that it provides equity in the Reorganized Debtor to existing equity holders. NPA Objection, ¶ 92. This assertion is incorrect. As explained above, Equity Interests in Class 10 and 11 will neither receive nor retain any property under the Plan until Allowed Claims in Class 8 and Class 9 are paid in full (with appropriate interest) pursuant to the terms of the Plan. The Contingent Claimant Trust Interests granted to Equity Interests in Classes 10 and 11 will not vest unless and until the Claimant Trustee files a certification that all Holders of Allowed unsecured claims have been indefeasibly paid, inclusive of interest. *See* Plan, § I.B.44. Thus, the absolute priority rule is not violated by because the treatment of Class 8 and Class 9 Claims satisfies section 1129(b)(2)(B).[86] Indeed, the failure to provide a mechanism for the potential distribution of Equity Security Interests after payment of all senior Claims would violate the treatment of the equity security interests in the Debtor because such senior Claims would be receiving more than the full amount of their Claims. *See* 11 U.S. § 1129(b) (2)(C)(i).

---

[86] The absolute priority rule is also satisfied with respect to Class 7 Convenience Claims. First, Class 7 has accepted the Plan. Second, even if Class 7 were not to have accepted the Plan, the members of Class 7 were afforded the option on their ballots to accept the treatment provided under Class 8 if they so elected.

Appellee Appx. 01588

014401
Appx. 01639

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 6 Page 1596 of 1804 Page 723 of 1017 PageID 15367
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1595 of 1803 PageID 12341
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 57 of 68

Q.  **The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)-(e)).**

95.     The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code. Section 1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple plans, is not implicated because there is only one proposed Plan.[87]

96.     The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933. Moreover, no governmental unit or any other party has requested that the Bankruptcy Court decline to confirm the Plan on such grounds. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

97.     Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because the Debtor's chapter 11 case is not a "small business case."[88]

98.     In sum, the Plan satisfies all of the Bankruptcy Code's mandatory chapter 11 plan confirmation requirements.

IV.  **The Plan's Release, Exculpation, and Injunction Provisions Are Appropriate and Comply with the Bankruptcy Code for the Reasons Articulated in the Omnibus Reply.**

99.     The Bankruptcy Code identifies various additional provisions that may be incorporated into a chapter 11 plan, including "any other appropriate provision not inconsistent with the applicable provisions of this title."[89] Among other discretionary provisions, the Plan contains certain Debtor releases,[90] an exculpation provision, and an injunction provision.[91]

---

[87] 11 U.S.C. § 1129(c).

[88] 11 U.S.C. § 1129(e). A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,000,000 (excluding debt owed to 1 or more affiliates or insiders)." 11 U.S.C. § 101 (51D)(B)(i).

[89] 11 U.S.C. § 1123 (b)(1)-(6).

[90] Plan, Art. IX

DOCS_SF:104703.16 36027/002

Appellee Appx. 01589
014402

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-5   Page 1596 of 1804   Page 724 of 1017   PageID 15368
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1596 of 1803   PageID 12342
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 58 of 68

Notably, the Plan does <u>not</u> contain a mechanism typically included in chapter 11 plans, which contain broad third party releases by creditors or other parties in interest, unless they opt out of the release.  While certain objectors argue that the Plan nonetheless contains inappropriate third party releases in disguise, such arguments lack merit as set forth in the Omnibus Reply.  These provisions are the product of extensive good faith, arms'-length negotiations and comply with the Bankruptcy Code and prevailing law.  The Debtor has separately responded to the objections filed by certain parties to these provisions in the Omnibus Reply, which also addresses the proposed modifications made to the Plan injunction provision.  Accordingly, the Debtor respectfully requests that the Bankruptcy Court approve the Plan's Debtor release, exculpation, and injunction provisions for the reasons set forth in the Omnibus Reply.

### A.   The Debtor Complied with Section 1129(d) of the Bankruptcy Code.

100.   The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code, and no party has asserted otherwise.

### B.   Modifications to the Plan.

101.   Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan. Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed

---

[91] *Id.*

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-9   Page 1598/651804   Page 725 of 1017   PageID 15369
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1597 of 1803   PageID 12343
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 59 of 68

accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.[92]

102.   The Senior Employees argue that the Debtor and the Committee seek "carte blanche to make amendments to the Plan post-confirmation without complying with § 1127 of the Bankruptcy Code." Senior Employee Objection, at p. 15.

103.   These arguments are baseless and are contradicted by Article XII of the Plan, which explicitly requires that modifications to the Plan be in compliance with section 1127.

> After the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

Plan, Art. XII.B.

104.   Dugaboy objects that the Plan does not comply with section 1127(a) of the Bankruptcy Code and asserts that the Plan is not "final" and "as of the writing of this Objection and possibly even after the hearing on confirmation of the Debtor's Plan, parties in interest will not have seen the documents that will become an essential part of the Plan." Dugaboy Objection, page 4.

---

[92] *See, e.g., In re American Solar King Corp.*, 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988) (finding that nonmaterial modifications that do not adversely impact parties who have previously voted on the plan do not require additional disclosure or resolicitation); *In re Sentry Operating Co. of Texas, Inc.*, 264 B.R. 850, 857 (Bankr. S.D. Tex. 2001) (same). *See also In re Global Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation).

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1596 of 1804   Page 726 of 1017   PageID 15370
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1598 of 1803   PageID 12344
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 60 of 68

105.    As noted earlier in the Memorandum, the Debtor has already filed three Plan

Supplements and will file a fourth Plan Supplement prior to the Confirmation Hearing.  The Plan

Supplements filed to date already contain the Retained Causes of Action, the Claimant Trust

Agreement, the Litigation Trust Agreement that Dugaboy complains are lacking.  The Debtor

has also filed three notices of executory contracts and unexpired leases to be assumed under the

Plan.   Thus, the Plan will be "final" will contain final version of all of the post-confirmation

documents and executory contracts to be assumed in advance of the Confirmation Hearing, in

compliance with section 1127(a) of the Bankruptcy Code.  *See, e.g., In re Friendship Dairies*,

2012 Bankr. LEXIS 13, **22-23 (Bankr. N.D. Tex. Jan. 3, 2014) ("Section 1127(a) of the Code

allows a plan proponent, the Debtor here, to modify its plan at any time before confirmation. In

addition, '[a]fter the proponent of a plan files a modification of such plan with the court, the plan

as modified becomes *the plan*.'") (quoting 11 U.S.C. §1127(a) emphasis in original); *Paradigm*

*Air Carriers, Inc. v. Tex. Rangers Baseball Partners (In re Tex. Rangers Baseball Partners*), 521

B.R. 134, 176 (Bankr. N.D. Tex 2014) ("As a modified plan becomes the confirmed plan

pursuant to section 1127(a) of the Bankruptcy Code, this maxim applies equally to plans as

modified").   As Dugaboy concedes, the Plan appropriately restates the standards for post-

confirmation plan modifications under section 1127(b), which would require notice and a

hearing, among other requirements.  *See* Plan, §XII.B.

106.    As noted in this Memorandum, the Debtor has made certain modifications to the

Plan in order to both (1) clarify language in response to certain of the objections raised by the

Objectors and (2) additional modifications to the Plan.  These modifications comply with section

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Exhibit 6   Page 1600/251804   Page 727 of 1017   PageID 15371
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1599 of 1803   PageID 12345
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 61 of 68

1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019.    A summary of the Plan

modifications is set forth in the chart below:

| **Plan Modification and Applicable Plan Section** |
|---|
| Treatment of Subordinated Claims Treatment Procedural Requirements.    Modifications that are responsive to the objections to the definition and treatment of Subordinated Claims, including (1) the definition of Subordinated Claims to eliminate categorical subordination of claims relating to limited partnership interests and replacement of Final Order to order entered by the Bankruptcy Court (Section I.B.129); (2) the classification and treatment of Subordinated Claims in Class 9 is only to the extent an order subordinating the claim is entered (Section III.H.9); (3) the addition of requirement of a  hearing, in addition to notice, with respect to any subordination proceeding and subject to entry of order of the Bankruptcy Court (Section III.J); and (4) a requirement to bring subordination proceedings by Claims Objection Deadline and the ability to request that the Bankruptcy Court subordinate claims by the Claims Objection Deadline (Section VII.B). |
| Priority Tax Claims.    Modification in response to IRS Objection to provide that the payment of Allowed Priority Tax Claims to be in accordance with section 1129(a)(9)(C) unless such Allowed Claim is either paid in full on the Initial Distribution Date or otherwise agreed by the parties (Section II.C). |
| Assumption/Rejection of Executory Contracts.    Modifications in response to objections to require assumption/rejection of contracts to be determined by Confirmation Hearing, rather than the Effective Date (Section V.A-C). |
| Claimant Trust and Related Provisions.  Modification to permit Claimant Trustee to set aside a reserve for potential indemnification claims (Section IV.B.5); modification to conform Claimant Trustee's fiduciary duties to Claimant Trust Agreement (Section IV.B.5). |
| Issuance of New Partnership Interests.   Clarifications that Reorganized Limited Partnership Agreement not providing indemnification obligations (Section IV.C.3). |
| Conditions to Effective Date.  Modifications to conditions to effectiveness of Plan to require (1) Confirmation Order must be become a Final Order; (2) obtaining acceptable directors and officers insurance coverage which coverage is acceptable to the Debtor, Committee, the Oversight Committee Board, Claimant Trustee, and Litigation  Trustee (Section VIII.A); (3) deletion of section VIII.C of Plan regarding effect of non-occurrence of conditions to effectiveness. |
| Retention of Jurisdiction.  Modification in response to objections to clarify existing language that provides that the Bankruptcy Court shall retain jurisdiction "to the maximum extent" legally permissible (Section XI). |
| Injunction and Related Provisions.  Modifications to the Plan injunction, term of injunction and continuance of January 9 Order provisions (Sections IX.F, G and H). Inclusion of additional Plan |

DOCS_SF:104703.16 36027/002

Appellee Appx. 01593
Appx. 01644
014406

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 1606 of 1804    Page 728 of 1017    PageID 15372
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1600 of 1803    PageID 12346
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 62 of 68

definitional changes/additions for "Affiliate" (Section I.B.5, "Enjoined Parties" (Section I.B.56) and "Related Entity" (Section I.B.110); "Related Entity List" (Section I.B.111) and "Related Persons" (Section I.B.112).  Also, Injunction language highlighted pursuant to Bankruptcy Rule 3016 (Section IX.F).

107.    Accordingly, the Debtor submits that no additional solicitation or disclosure is required on account of the Plan modifications, and that such modifications should be deemed accepted by all creditors that previously accepted the Plan.

## **Conclusion**

108.    For the reasons set forth herein, the Debtor respectfully requests that the Bankruptcy Court confirm the Plan and enter the Confirmation Order.

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-15   Filed 16/02/25 1804   Page 729 of 1017   PageID 15373
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1601 of 1803   PageID 12347
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 63 of 68

Dated:  January 22, 2021    PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail: jpomerantz@pszjlaw.com
    ikharasch@pszjlaw.com
    gdemo@pszjlaw.com

  -and-

*/s/ Zachery Z. Annable*
HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_SF:104703.16 36027/002

Appellee Appx. 01595
014408

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 1003 of 1804   Page 730 of 1017   PageID 15374
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1602 of 1803   PageID 12348
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 64 of 68

**EXHIBIT A**

Case 19-34054-sgj11     Doc 3596-6     Filed 10/31/22     Entered 10/31/22 15:27:09     Desc
Exhibit 6     Page 1604 of 1804
Case 3:21-cv-00879-K     Document 21     Filed 07/28/21     Page 1603 of 1803     PageID 12349

Case 19-34054-sgj11 Doc 1814 Filed 01/22/21     Entered 01/22/21 19:25:01     Page 65 of 68

# Plan Objections from Dondero-Related Entities: Organizational Charts



[1] CLO Holdco, Ltd., is a wholly-owned subsidiary of the Charitable Donor Advised Fund, L.P. (the "DAF"). HCMLP has terminated its shared services agreement with the DAF. The DAF owes HCMLP past due fees and expenses.
[2] Amounts owed as of November 30, 2020.

Appellee Appx. 01597
Appx. 014410

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1605/25/1804   Page 732 of 1017   PageID 15376
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1604 of 1803   PageID 12350
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 66 of 68

**EXHIBIT B**

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 1606 of 1804   Page 733 of 1017   PageID 15377
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1605 of 1803   PageID 12351
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 67 of 68

| Objector | Objection | Claim | Status |
|---|---|---|---|
| James Dondero | D.I. 1661 | Claim No. 138 | Withdrawn with prejudice [D.I. 1510] |
| | | Claim No. 141 | Arises from equity; subject to subordination |
| | | Claim No. 142 | Arises from equity; subject to subordination |
| | | Claim No. 145 | Arises from equity; subject to subordination |
| | | Claim No. 188 | Withdrawn with prejudice [D.I. 1510] |
| | | Indirect Equity Interest | Represents an indirect interest in Class A interests.  Subordinated to Class B/C. Structurally subordinate.  Represents 0.25% of total equity. |
| Get Good Trust | D.I. 1667 | Claim No. 120 | Arises from equity; subject to subordination |
| | | Claim No. 128 | Arises from equity; subject to subordination |
| | | Claim No. 129 | Arises from equity; subject to subordination |
| Dugaboy Investment Trust | D.I. 1667 | Claim No. 113 | Arises from equity; subject to subordination |
| | | Claim No. 131 | Objection filed and in litigation.  Seeks to pierce the veil and hold the Debtor liable for subsidiary debts.  Debtor believes claim is frivolous. |
| | | Claim No. 177 | Objection filed and in litigation.  Seeks damages for postpetition management of estate.  Debtor believes claim is frivolous. |
| | | Class A Interests | Subordinated to Class B/C.  Represents 0.1866% of total equity. |
| Highland Capital Management Fund Advisors, L.P. | D.I. 1676 | Claim No. 95 | Expunged [D.I. 1233] |
| | | Claim No. 119 | Expunged [D.I. 1233] |
| Highland Fixed Income Fund | D.I. 1676 | Claim No. 109 | Expunged [D.I. 1233] |
| Highland Funds I and its series | D.I. 1676 | Claim No. 106 | Expunged [D.I. 1233] |
| Highland Funds II and its series | D.I. 1676 | Claim No. 114 | Expunged [D.I. 1233] |
| Highland Global Allocation Fund | D.I. 1676 | Claim No. 98 | Expunged [D.I. 1233] |
| Highland Healthcare Opportunities Fund | D.I. 1676 | Claim No. 116 | Expunged [D.I. 1233] |
| Highland Income Fund | D.I. 1676 | Claim No. 105 | Expunged [D.I. 1233] |
| Highland Merger Arbitrate Fund | D.I. 1676 | Claim No. 132 | Expunged [D.I. 1233] |
| Highland Opportunistic Credit Fund | D.I. 1676 | Claim No. 100 | Expunged [D.I. 1233] |
| Highland Small-Cap Equity Fund | D.I. 1676 | Claim No. 127 | Expunged [D.I. 1233] |
| Highland Socially Responsible Equity Fund | D.I. 1676 | Claim No. 115 | Expunged [D.I. 1233] |
| Highland Total Return Fund | D.I. 1676 | Claim No. 126 | Expunged [D.I. 1233] |
| Highland/iBoxx Senior Loan ETF | D.I. 1676 | Claim No. 122 | Expunged [D.I. 1233] |
| NexPoint Advisors, L.P. | D.I. 1676 | Claim No. 104 | Expunged [D.I. 1233] |
| | | Claim No. 108 | Expunged [D.I. 1233] |
| NexPoint Capital, Inc. | D.I. 1676 | Claim No. 107 | Expunged [D.I. 1233] |
| | | Claim No. 140 | Expunged [D.I. 1233] |
| NexPoint Real Estate Strategies Fund | D.I. 1676 | Claim No. 118 | Expunged [D.I. 1233] |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 19-15    Page 1607 of 1804    Page 734 of 1017    PageID 15378
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1606 of 1803    PageID 12352
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 68 of 68

| NexPoint Strategic Opportunities Fund | D.I. 1676 | Claim No. 103 | Expunged [D.I. 1233] |
|---|---|---|---|
| CLO Holdco, Ltd. | D.I. 1675 | Claim No. 133 | Claim voluntarily reduced to $0.00 |
| | | Claim No. 198 | Claim voluntarily reduced to $0.00 |
| NexBank Title, Inc. | D.I. 1676 | None | N/A |
| NexBank Securities, Inc. | D.I. 1676 | None | N/A |
| NexBank Capital, Inc. | D.I. 1676 | None | N/A |
| NexBank | D.I. 1676 | Claim No. 178 | Expunged [D.I. 1155] |
| NexPoint Real Estate Finance Inc. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Capital, LLC | D.I. 1677 | None | N/A |
| NexPoint Residential Trust, Inc. | D.I. 1677 | None | N/A |
| NexPoint Hospitality Trust | D.I. 1677 | None | N/A |
| NexPoint Real Estate Partners, LLC | D.I. 1677 | None | N/A |
| NexPoint Multifamily Capital Trust, Inc. | D.I. 1677 | None | N/A |
| VineBrook Homes Trust, Inc. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors II, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors III, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors IV, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors V, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors VI, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors VII, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors VIII, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC | D.I. 1673 | Claim No. 146 | Objection filed and in litigation. Debtor believes claim is frivolous. |
| Scott Ellington | D.I. 1669 | Claim No. 187 | Terminated for cause. Debtor exploring options. |
| | | Claim No. 192 | Terminated for cause. Debtor exploring options. |
| Isaac Leventon | D.I. 1669 | Claim No. 184 | Terminated for cause. Debtor exploring options. |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-9    Page 1608 of 1804    Page 735 of 1017    PageID 15379
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1607 of 1803    PageID 12353

# APPENDIX 24

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-15   Exhibit 6   Page 10 of 1017   PageID 15380   Page 736 of 1017
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1608 of 1803   PageID 12354
Case 19-34054-sgj11   Doc 1807   Filed 01/22/21   Entered 01/22/21 18:52:03   Page 1 of 106

Docket #1807  Date Filed: 01/22/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054 |
| | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |

**DEBTOR'S OMNIBUS REPLY TO OBJECTIONS
TO CONFIRMATION OF THE FIFTH AMENDED PLAN OF
REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT L.P. (WITH
TECHNICAL MODIFICATIONS)**

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210122000000000012

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 16006 of 1804    Page 737 of 1017    PageID 15381
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1609 of 1803    PageID 12355
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 2 of 106

## TABLE OF CONTENTS

|  | Page |
|---|---|

INTRODUCTION ............................................................................................................... 1

OBJECTIONS ..................................................................................................................... 3

I.     Objections Addressed in the Memorandum .................................................. 3

II.    The Plan Impermissibly Allows for Set Off ............................................... 4

III.   The Plan Impermissibly Allows Assumption or Rejection After
Confirmation .................................................................................................. 6

IV.   The Attack on the Plan's Release Is Baseless. ............................................. 6

      A.   Debtor Release Provisions ................................................................. 6

      B.   Objections and Responses .................................................................. 7

V.    The Court Has Already Exculpated the Independent Directors and their
agents For Negligence Pursuant to the January 9, 2020 Settlement Order
and, to the Extent Not Covered Therein, the Plan's Exculpation Provisions
Effectuate Essential Protections for Estate Fiduciaries and their agents,
and Are Fully Supported by the Bankruptcy Code and Applicable Law. ........... 11

      A.   The Settlement Order Already Exculpates the Independent
Directors and Their Agents from Claims of Negligence and Those
Protections Should Be Continued Post-Confirmation ............................. 12

      B.   Plan Exculpation Provisions ...................................................... 14

      C.   Pacific Lumber .................................................................... 16

      D.   Exculpation of the Exculpated Parties Is Permissible and Not
Prohibited by *Pacific Lumber*. ................................................... 19

      E.   Approval of the Exculpation Provisions Is a Legitimate Exercise of
the Court's Powers and Follows Directly from the Findings and
Conclusions the Court Must Make to Confirm a Plan ............................ 24

VI.   The Plan Injunction Is Appropriate and is Narrowly Tailored to Effectuate
the Plan and related provisions of the bankruptcy code. .................................... 28

      A.   Plan Injunction Provisions ........................................................ 29

      B.   Objections .......................................................................... 32

      C.   An Injunction against Interfering with the Implementation and
Consummation of the Plan Is Both Common and Appropriate. ................. 33

      D.   The Injunction Is Not a Disguised Non-Debtor Third-Party
Release. ............................................................................. 35

**Appellee Appx. 01603**

**Appx. 01854**

# 014416

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1606 of 1804    Page 738 of 1017    PageID 15382
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1610 of 1803    PageID 12356
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 3 of 106

E.      The Injunction Does Not Prevent the Holders of Claims or Equity
        Interests from Enforcing Rights Arising under the Plan or
        Confirmation Order .................................................................................. 37

VII.    The Gatekeeper Provision Is Necessary and Appropriate, and Supported
        by Applicable Law. ............................................................................................. 38

        A.      The Gatekeeper Provision ........................................................................ 38

        B.      The Gatekeeper Provision Is Permissible under Sections 105,
                1123(b)(6), and 1141(a), (b) and (c) of the Bankruptcy Code. ............... 39

        C.      The Gatekeeper Provision Is not an Impermissible Extension of the
                Post-Confirmation Jurisdiction of the Bankruptcy Court. ....................... 44

        D.      The Gatekeeper Provision Is Consistent with the Barton Doctrine. ........ 51

        E.      The Gatekeeper Provision Is a Necessary and Appropriate Shield
                against the Actions of Dondero and his Related Entities ......................... 54

VIII.   the exception to discharge does not apply ........................................................... 55

IX.     The Senior Employee Objection ......................................................................... 57

        A.      The Senior Employee Objection Should Be Overruled ........................... 57

        B.      Background Related to Senior Employees ............................................... 58

        C.      Treatment of Senior Employee Claims Under Plan ................................. 62

        D.      Plan Solicitation ...................................................................................... 63

        E.      The Plan Does Not Violate Section 1123(a)(4) ...................................... 64

        F.      The Senior Employees Are Not Permitted to Make Convenience
                Class Election ........................................................................................... 66

        G.      Convenience Class Election Is Unavailable Because Senior
                Employee's GUC Claims Cannot Be Split Under Applicable
                Bankruptcy Law ....................................................................................... 66

        H.      Convenience Class Election Is Unavailable Because Senior
                Employee's GUC Claims Cannot Be Split Under Disclosure
                Statement Order for Voting Purposes ...................................................... 68

        I.      Even if Convenience Claim Election Were Available, Convenience
                Claim Election Does Not Impact Voting .................................................. 69

X.      The HCMFA/NPA Gates Objection .................................................................... 70

        A.      The HMCFA/NPA Objection, the CLO Holdco Objection, and
                NREP Joinder Should Be Overruled ........................................................ 72

        B.      The CLO Objectors Cannot Override the CLOs' Consent to
                Assumption ............................................................................................... 74

        C.      The CLO Objectors Lack Standing to Object to the Plan ......................... 76

Appellee Appx. 01604
Appx. 01855
014417

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-6    Page 1608 of 1804    Page 739 of 1017    PageID 15383
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1611 of 1803    PageID 12357
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 4 of 106

| | D. | Even if the CLO Objectors Had Standing and the Management Contracts Were Not Assignable, the Debtor Could Assume Them Because the *Actual Test* Applies in the Fifth Circuit | 82 |
|---|---|---|---|
| | E. | Even if the CLO Objectors Have Standing and the *Hypothetical Test* Applies, the Management Agreements Are Assignable | 86 |
| | F. | The Inadequate Assurance of Future Performance Objection is Meritless | 90 |
| | G. | The "Impermissible Partial Assignment" Objection is Meritless | 92 |
| XI. | | State Taxing Authority Objection | 92 |
| XII. | | IRS Objection | 93 |
| CONCLUSION | | | 99 |

DOCS_SF:104855.7 36027/002

Appellee Appx. 01605
01441̄8
Appx. 01856

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 16/08/251804Page 740 of 1017    PageID 15384
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1612 of 1803    PageID 12358
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 5 of 106

**TABLE OF AUTHORITIES**

<div align="right">

**Page(s)**

</div>

**CASES**

*Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp.*
 (*In re Peabody Energy Corp.*),
 933 F.3d 918 (8th Cir. 2019) ................................................................... 65

*Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm.*
 (*In re Pac. Lumber Co.*),
 584 F.3d 229 (5th Cir. 2009) ................................................................... 64

*Bonneville Power Admin. v. Mirant Corp.*
 (*In re Mirant Corp.*),
 440 F.3d 238 (5th Cir. 2006) ................................................................... 83

*Cajun Elec. Members Comm. v. Mabey*
 (*In re Cajun Elec. Power Coop., Inc.*),
 230 B.R. 693 (Bankr. M.D. La. 1999) ............................................... 84, 85

*Cargill, Inc. v. Nelson (In re LGX, LLC)*,
 2005 Bankr. LEXIS 2072 (10th Cir. Oct. 31, 2005) ............................... 75

*Concord Square Apartments v. Ottawa Properties*
 (*In re Concord Square Apartments*),
 174 B.R. 71 (Bankr. S.D. Ohio 1994) ...................................................... 67

*CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC*,
 2018 U.S. Dist. LEXIS 90174, at *12 (S.D.N.Y. May 23, 2018) ............ 88

*Figter Ltd. v. Teachers Ins. Annuity Ass'n  (In re Figter Ltd.)*,
 118 F.3d 635, 640-641 (9th Cir. 1997) .................................................... 67

*Goldstein v. SEC*,
 451 F.3d 873 (D.C. Cir. 2006) ................................................................. 71

*Hertz Corp. v. ANC Rental Corp.*
 (*In re ANC Rental Corp.*),
 278 B.R. 714 (Bankr. D. Del. 2002) ......................................... 74, 75, 80

*Hertz Corp. v. ANC Rental Corp.*
 (*In Re ANC Rental Corp.*),
 280 B.R. 808 (D. Del. 2002) .................................................................... 75

*In re Acequia, Inc.*,
 787 F.2d 1352 (9th Cir. 1986) ................................................................. 65

*In re ANC Rental Corp.*,
 277 B.R. 226 (Bankr. D. Del. 2002) ........................................................ 89

*In re Gilbert*,
 104 B.R. 206 (Bankr. W.D. Mo. 1989) .................................................... 67

*In re Hartec Enters., Inc.*,
 117 B.R. 865 (Bankr. W.D. Tex. 1990) .................................................... 85

DOCS_SF:104855.7 36027/002

**Appellee Appx. 01606**

**014419**

Appx. 01857

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 65   Exhibit 6   Page 16 of 106/251804   Page 741 of 1017   PageID 15385
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1613 of 1803   PageID 12359
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 6 of 106

*In re Irwin Yacht Sales, Inc.*,
  164 B.R. 678 (Bankr. M.D. Fla. 1994) ................................................................. 75

*In re Jacobsen*,
  465 B.R. 102 (Bankr. N.D. Miss. 2011) ............................................................... 84

*In re Jones*,
  2012 Bankr. LEXIS 1076, *7 (Bankr. M.D. Ga. 2012) ......................................... 67

*In re Latham Lithographic Corp.*,
  107 F.2d 749 (2d Cir. 1939) ................................................................................. 67

*In re Lil' Things, Inc.*,
  220 B.R. 583 (Bankr. N.D. Tex. 1998) ................................................................. 84

*In re Lindell Drop Forge Co.*,
  111 B.R. 137 (Bankr. W.D. Mich. 1990) ............................................................. 66

*In re Riverside Nursing Home*,
  43 B.R. 682 (Bankr. S.D.N.Y. 1984) .................................................................... 75

*In re Virgin Offshore USA, Inc.*,
  No. 13-79, 2013 U.S. Dist. LEXIS 128995, at *15 (E.D. La. Sep. 10, 2013) ......... 84

*In re Visser*,
  232 B.R. 362 (Bankr. N.D. Tex. 1999) ................................................................. 66

*Mabey v. Sw. Elec. Power Co.*
  *(In re Cajun Elec. Power Coop., Inc.)*,
  150 F.3d 503 (5th Cir. 1998) ................................................................................ 65

*Riemer & Braunstein LLP v. DeGiacomo*
  *(A & E 128 North Corp.)*,
  528 B.R. 190, 199 (1st Cir. B.A.P. 2015) ............................................................ 66

*Texaco Inc. v. Louisiana Land & Exploration Co.*,
  136 B.R. 658 (Bankr. M.D. La.1992) ............................................................. 84, 85

## STATUTES

11 U.S.C. § 365 .......................................................................................................... 83, 86

## OTHER AUTHORITIES

*American Century Companies, Inc./JP Morgan & Co. Incorporated*, Staff No-Action Letter
  (12/23/1997) .......................................................................................................... 89

Investment Management Staff Issues of Interest,
  http://www.sec.gov/divisions/investment/issues-of-interest.shtml [June 5, 2012] ................... 89

v

Appellee Appx. 01607

Appx. 01558

014420

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 16 of 1804   Page 742 of 1017   PageID 15386
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1614 of 1803   PageID 12360
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 7 of 106

The above-captioned debtor and debtor-in-possession (the "<u>Debtor</u>") files this omnibus reply to the objections (this "<u>Reply</u>") to the Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with technical modifications)*[2] (as modified, amended, or supplemented from time to time, the "<u>Plan</u>"). Concurrently herewith, the Debtor has filed its *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management L.P.* (the "<u>Memorandum</u>"). To the extent the Debtor is unable to consensually resolve the Objections, the Debtor respectfully requests that the Bankruptcy Court overrule any remaining or pending Objections as of the Confirmation Hearing and confirm the Plan.

## INTRODUCTION

1.      The Debtor received twelve objections to confirmation of the Plan, inclusive of joinders (collectively, the "<u>Objections</u>" and each objecting party, an "<u>Objector</u>"). As discussed in greater detail in the Memorandum, seven of the twelve objections were filed by Mr. Dondero either individually or via his related entities (collectively, the "<u>Dondero Entities</u>"). **Exhibit A** lists the Dondero Entities and their relationships to each other.[3] The following are the Objections filed by the Dondero Entities:

- *James Dondero's Objection to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1661];

- *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization (filed by Get Good Trust, The Dugaboy Investment Trust)* [Docket No. 1667] (the "<u>Dugaboy Objection</u>");

---

[2] Unless otherwise noted, capitalized terms used in this Reply have the meanings ascribed in the Plan.

[3] As set forth in the Memorandum, none of the Dondero Entities, including the NexPoint RE Entities (defined below), has an actual economic interest in the Estate.

Appellee Appx. 01608
Appx. 01650
014421

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Page 1606 of 1804    Page 743 of 1017    PageID 15387
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1615 of 1803    PageID 12361
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 8 of 106

- *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669] (the "Senior Employee Objection");[4]

- *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670] (the "NPA/HCMFA Objection");[5]

- *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673] (the "NREP Objection");

- *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675] (the "CLOH Objection"); and

- *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676] (the "NexBank Objection").

2.    That leaves the following as the only non-Dondero related Objections:

- *Objection of Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1662] (the "State Taxing Authority Objection");

---

[4] Subsequent to the filing of the Senior Employee Objection, Mr. Waterhouse and Mr. Surgent reached an agreement with the Debtor and will withdraw their objections to the Plan.

[5] The NPA/HCMFA Objection is joined (1) by CLO Holdco, Ltd., through the CLOH Objection, and (2) by the following Dondero-controlled entities: NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by the foregoing (collectively, the "NexPoint RE Entities") [Docket No. 1677] (the "NPRE Joinder").

Appellee Appx. 01609
Appx. 01609
014422

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1607 of 1804    Page 744 of 1017    PageID 15388
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1616 of 1803    PageID 12362
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 9 of 106

- *Limited Objection of Jack Yang and Brad Borud to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1666];

- *United States' (IRS) Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1668] (the "IRS Objection");

- *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1671] (the "UST Objection"); and

- *Patrick Hagaman Daugherty's Objection to Confirmation of Fifth Amended Plan of Reorganization* [Docket No. 1678].

As of the date hereof, the Date is working to resolve certain of the non-Dondero related Objections.

3.     To avoid duplication, this Reply does not address each objection individually. Rather, it is organized by substantive objection where possible because of the cross-over in the issues raised in the Objections.  Also, as discussed below, where the Debtor has addressed an Objection in the Memorandum, the response is not repeated here.  However, parts of the Senior Employee Objection, the NPA/HCMFA Objection, State Taxing Authority Objection, and the IRS Objection, are addressed individually below.  A summary chart addressing each Objection and the Debtor's response thereto is attached as **Exhibit B**.

## OBJECTIONS

**I.     OBJECTIONS ADDRESSED IN THE MEMORANDUM**

4.     The Memorandum addresses the Debtor's compliance with the statutory requirements of sections 1123 and 1129 of the Bankruptcy Code.  As part of the analysis in the Memorandum, the Debtor addresses the portions of the Objections alleging that the Debtor failed to comply with and/or violated the statutory provisions set forth in sections 1123 and 1129 of the Bankruptcy Code.  Specifically, the Debtor addresses the arguments that (i) the Plan provides for

3

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-15    Page 16/08/251804    Page 745 of 1017    PageID 15389
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1617 of 1803    PageID 12363
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 10 of 106

improper subordination; (ii) the Disputed Claims Reserve violates due process; (iii) the Plan does

not satisfy the "best interests test;" (iv) the Plan impermissibly provides no Bankruptcy Court

oversight of post-effective date transactions; (v) the elimination of vacant classes does not allow

for post-Effective Date reclassification of Claims; (vi) the Plan violates the absolute priority rule;

(vii) the Plan does not disclose the insiders or the compensation of insiders retained post-

Effective Date; (viii) the Plan impermissibly allows modifications to the Plan without

Bankruptcy Court approval; and (ix) the Plan is not final because the Plan Supplement is not

final.

## II.    THE PLAN IMPERMISSIBLY ALLOWS FOR SET OFF

5.    The NREP Objection and the NexBank Objection erroneously contend that

Article VI.M of the Fifth Amended Plan provides for "improper set-off of unidentified claims."

NREP Obj. ¶¶ 11-13; NexBank Obj. ¶¶ 10-12.  The challenged language in the NREP Objection

and the NexBank Objection is as follows:

> The Distribution Agent may, to the extent permitted under applicable law, set off
> against any Allowed Claim and any distributions to be made pursuant to this Plan
> on account of such Allowed Claim, the claims, rights and causes of action of any
> nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may
> hold against the Holder of such Allowed Claim….   Any Holder of an Allowed
> Claim subject to such setoff reserves the right to challenge any such setoff in the
> Bankruptcy Court or any other court with jurisdiction with respect to such
> challenge.

Plan, Art. VI.M.

6.    Article VI.M of the Plan accords with Bankruptcy Code section 558 (formerly

section 541(e)), which provides that "[t]he estate shall have the benefit of any defense available

to the debtor as against any entity other than the estate, including statutes of limitation, statutes

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 33-15   Page 16 of 25 Page 746 of 1017   PageID 15390
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1618 of 1803   PageID 12364
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 11 of 106

of frauds, usury, and other personal defenses." 11 U.S.C. § 558; *see In re Braniff Airways, Inc.*,

42 B.R. 443, 447 (Bankr. N.D. Tex. 1984) (a debtor in possession may exercise setoff rights

pursuant to Bankruptcy Code section 558 (then section 541(e)); *In re Circuit City Stores, Inc.*,

2009 Bankr. LEXIS 4011 (Bankr. E.D. Va. Dec. 3, 2009) (same); *In re Women First Healthcare,

Inc.*, 345 B.R. 131, 135 (Bankr. D. Del. 2006) (same); *In re PSA, Inc.*, 277 B.R. 51, 53 (Bankr.

D. Del. 2002) (same); *Second Pa. Real Estate Corp. v. Papercraft Corp. (In re Papercraft

Corp.)*, 127 B.R. 346, 350 (Bankr. W.D. Pa. 1991) (same).

7.       In support of the argument that the provision is improper, the NREP Objection

and the NexBank Objection contend that Bankruptcy Code section 553 and cases construing that

provision limit parties' right of setoff in bankruptcy only to prepetition claims.  NREP Obj. ¶¶

11-13; NexBank Obj. ¶¶ 10-12.  However, the issue of the scope of the Distribution Agent's

setoff rights and the application of section 553 is not even adjudicated by the Plan.[6]  Rather, on

its face, the Plan states that the Distribution Agent may exercise setoff rights only "to the extent

permitted by law."  Thus, it does not purport to expand setoff rights of the Distribution Agent

beyond what is permitted by the Bankruptcy Code but only preserves whatever setoff rights the

estate has – no more and no less.  Moreover, as quoted above, it expressly preserves the right of

creditors to challenge any setoff that the Distribution Agent seeks to take.

8.       Accordingly, whether the Distribution Agent may take any specific setoffs is

reserved by the Plan for another day.  The NREP Objection and the NexBank Objections on this

issue are not well-taken, and both such objections should be overruled.

---

[6] The Debtor reserves its rights with respect to the applicability of section 553 to the Distribution Agent's preserved
rights of setoff, if any.

Appellee Appx. 01612
Appx. 01905
014425

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 16/26/25 1804   Page 747 of 1017   PageID 15391
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1619 of 1803   PageID 12365
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 12 of 106

### III.   THE PLAN IMPERMISSIBLY ALLOWS ASSUMPTION OR REJECTION AFTER CONFIRMATION

9.    The NPA/HCMFA Objection contends that the Plan violates section 365(d)(2) because it allows the Debtor to assume or rejection executory contracts or unexpired leases on or prior to the Effective Date.  While the Debtor believes that the original language in the Plan is defensible, the Debtor has elected to amend the Plan to clarify that all executory contracts and leases must be assumed or rejected on or prior to the Confirmation Date.

### IV.   THE ATTACK ON THE PLAN'S RELEASE IS BASELESS.

#### A.   Debtor Release Provisions

10.    Article IX of the Plan provides for releases only by the Debtor, its Estate, and the Reorganized Debtor (including their successors, the Claimant Trust and the Litigation Sub-Trust) of any and all Causes of Action, including any derivative claims that might be asserted on behalf of, or in the name of, the Debtor, that the Debtor or the Estate could otherwise assert against the Released Parties[7] (the "<u>Debtor Release</u>").  The Debtor Release is the product of extensive good faith, arm's-length negotiations and complies fully with the Bankruptcy Code and prevailing law. The Debtor Release provides:

> On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged ***by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust*** from any and all Causes of Action, including any derivative claims, ***asserted on behalf of the Debtor,*** whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise,

---

[7] The "Released Parties" under the Plan are: (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities); (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.  Plan, Art. I.B., Def. 111.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01613
014426

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5   Filed 10/26/25   Page 748 of 1017   PageID 15392
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1620 of 1803   PageID 12366
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 13 of 106

*that the Debtor or the Estate would have been legally entitled to assert in their own right* (whether individually or collectively) *or on behalf of* the holder of any Claim against, or Interest in, a Debtor or other Person.

Plan, Art. IX.D (emphasis added.)

11.     The Debtor Release releases, among others, the Independent Directors (each of whom was appointed by the Bankruptcy Court post-petition), Strand (solely from January 9, 2020, the date of the appointment of the Independent Directors, through the Effective Date), the CEO/CRO (who is also an Independent Director and whose role was expanded to include the CEO/CRO role on July 16, 2020), the Committee and its members in their official capacities, the Professionals retained with this Court's approval by the Debtor or by the Committee and, to a more limited extent, the Employees.[8]

12.     The Debtor Release is a release of the Released Parties by the Debtor, the Estate and their successors on account of Causes of Action that belong to the Debtor or the Estate, whether directly or derivatively.  *The Debtor Release does not release any Causes of Action of any person other than the Debtor, the Estate and their successors and does not release any claims that could not have been asserted by the Debtor or the Estate prior to the Effective Date.*

### B.     Objections and Responses

13.     Three parties in interest have objected to the Debtor Release.  The Dugaboy Objection objects to the Debtor Release under the mistaken view that the Claimant Trust and Litigation Sub-Trust are (in Dugaboy's view) granting releases of claims that have not yet arisen,

---

[8] The Debtor Release contains restrictions on the releases of the Employees, as may be determined by the Claimant Trust Oversight Committee.  Plan, Art. IX.D.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01614
Appx. 01865
014427

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-19    Page 10/25/2004 Page 749 of 1017    PageID 15393
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1621 of 1803    PageID 12367
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 14 of 106

*i.e.,* causes of action of the Claimant Trust and Litigation Sub-Trust that arise after the Effective Date against the Released Parties. *See Dugaboy Objection* at p. 9. The U.S. Trustee Objection erroneously argues the Debtor Release is an impermissible non-consensual third-party release. *See UST Objection* at pp. 2-3. The Senior Employee Objection objects to the Debtor Release because the Senior Employees believe that the Debtor should not be able to condition a release of the Senior Employees on concessions not required of other Employees obtaining a release. *See Senior Employee Objections* at p. 3.

14. Both Dugaboy and the U.S. Trustee misread the Debtor Release provision. The Claimant Trust and Litigation Sub-Trust are included solely in their capacity as "successors, assigns and representatives" of the Debtor and the Estate, and the Debtor Release applies solely to Causes of Action that ***the Debtor or the Estate*** themselves would have against the Released Parties (whether a direct claim or a derivative claim, but in either case, only Causes of Action owned by the Debtor or the Estate). By its express terms, the Debtor Release does not apply to any future claims or Causes of Action that the Claimant Trust or the Litigation Sub-Trust would have in its own right, based on post-Effective Date acts or omissions, rather than as a successor to or assignee of Causes of Action of the Debtor and the Estate.

15. The U.S. Trustee's contention that the Debtor Release provision includes a third-party release is incorrect. The Debtor Release applies only to claims held by the Debtor and the Estate, on behalf of themselves and each of their successors, assigns and representatives in favor of the Released Parties. Any direct claims and causes of action owned by any other person are not released by the Debtor Release, and nothing in the language of the provision implicates any

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Page 1673/451804 Page 750 of 1017    PageID 15394
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1622 of 1803    PageID 12368
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 15 of 106

non-derivative claims or causes of action that any third party might have against any of the
Released Parties.

16.    The Senior Employees' objection to the proposed Debtor Release also is devoid
of merit.  As discussed at length, in Section IX, herein, Employees are not entitled, either
contractually or legally, to any release.  Nor does a release given to one Employee entitle any
other employee to a similar release.  Releases are discretionary and can be provided, in an
exercise of discretion, to persons who have provided consideration to the Debtor and the Estate.
Unlike the other Released Parties, the Senior Employees have not yet fully provided that
consideration.  As the Court is aware, the Committee and the Court have consistently voiced
concerns regarding the potential release of the Employees, and specifically, the Senior
Employees.  The Plan resolves these concerns by imposing significant restrictions and
affirmative requirements for any Employee to obtain the benefit of the Debtor Release and
additional requirements for the Senior Employees to do so.  *See* Plan, Art. IX.D.

17.    The Bankruptcy Code explicitly provides for and sanctions the inclusion of debtor
releases in plans.  Section 1123(b)(3)(A) of the Bankruptcy Code states clearly that a chapter 11
plan may provide for "the settlement or adjustment of any claim or interest belonging to the
debtor or to the estate."  The Debtor Release is an essential *quid pro quo* for the Released
Parties' significant contributions to the Debtor's restructuring, which has been highly complex
and contentious.  There are multiple precedents in which courts have approved releases by a
debtor's estate of its own claims against a far more extensive group of persons than those

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Page 1624/251804 Page 751 of 1017    PageID 15395
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1623 of 1803    PageID 12369
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 16 of 106

included here.[9]  The Committee and its members (who are Released Parties), who have had over

a year to investigate potential claims against the Employees, among others, fully support the

Debtor Release as to the other identified Released Parties.

18.    It is also important to bear in mind that the Debtor Release applies to claims ***of***

***the Debtor or the Estate*** against the Released Parties that others might purport to assert

derivatively on behalf of the Debtor or the Estate.  To the extent that Released Parties have

indemnification rights against the Debtor, the assertion of such derivative claims – no matter

how specious – would trigger claims for indemnification that would deplete the assets available

for distribution to creditors. Moreover, regardless of such rights of indemnification, the assertion

of such purported derivative claims on behalf of the Debtor would subject the Debtor to the costs

– both economic, in terms of legal fees, and of the time and distraction of personnel – that would

result from becoming embroiled in such derivative litigation – again, no matter how specious the

claim.

19.    Both the U.S. Trustee and Dugaboy erroneously cite *Pacific Lumber*[10] for the

proposition that releases of third parties – even by the debtor – are always impermissible.

*Pacific Lumber*, however, did not involve the release of claims by a debtor.  The issue addressed

in *Pacific Lumber* was whether a bankruptcy court could approve injunction and exculpation

provisions in a plan that effectively mandated that ***holders of claims*** release, or be precluded

---

[9] *See, e.g., In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (plan release provisions were acceptable settlement under § 1123(b)(3) because the debtors and the estate were releasing claims that were property of the estate); *In re Heritage Org., LLC*, 375 B.R. 230, 259 (Bankr. N.D. Tex. 2007); *In re Mirant Corp.*, 348 B.R. 725, 737-39 (Bankr. N.D. Tex. 2006); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991).
[10] *Bank of New York Trust Co., NA v. Official Unsecured Creditors' Committee (In re Pacific Lumber Co.)*, 584 F.3d 229, 251-253 (5th Cir. 2009) ("*Pacific Lumber*")

DOCS_SF:104855.7 36027/002

Appellee Appx. 01617
Appx. 01808
014430

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-9   Page 126 of 1804   Page 752 of 1017   PageID 15396
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1624 of 1803   PageID 12370
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 17 of 106

from imposing liability on, **non-debtor third parties**.  Nothing in *Pacific Lumber* prevents a debtor or its estate on its own behalf and on behalf of assignees and successors created pursuant to a plan, from releasing its own claims against third parties.  Indeed, any such ruling would be directly contrary to the express provisions of section 1123(b)(3)(A).

20.     The Debtor Release is a customary plan provision consistent with the business judgement rule, is fair and equitable and in the best interest of the Estate and its creditors and should be approved.  No party that has objected to it has cited any case or statutory basis for preventing a debtor and its successors from releasing the debtor's own claims against third parties, or has demonstrated any basis for believing that any claims of the Debtor or the Estate even exist against the Released Parties.

## V.     THE COURT HAS ALREADY EXCULPATED THE INDEPENDENT DIRECTORS AND THEIR AGENTS FOR NEGLIGENCE PURSUANT TO THE JANUARY 9, 2020 SETTLEMENT ORDER AND, TO THE EXTENT NOT COVERED THEREIN, THE PLAN'S EXCULPATION PROVISIONS EFFECTUATE ESSENTIAL PROTECTIONS FOR ESTATE FIDUCIARIES AND THEIR AGENTS, AND ARE FULLY SUPPORTED BY THE BANKRUPTCY CODE AND APPLICABLE LAW.

21.     Exculpation provisions effectuate the entitlement of court-supervised fiduciaries to qualified immunity for their actions.  *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000); *In re A.P.I., Inc.*, 331 B.R. 828, 868 (Bankr. D. Minn. 2005), *aff'd sub nom., OneBeacon Am. Ins. Co. v. A.P.I., Inc.*, No. CIV. 06-167 (JNE), 2006 U.S. Dist. LEXIS 34297 (D. Minn. May 25, 2006); *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 514 (S.D.N.Y. 1994).  Such provisions also allow the parties to a chapter 11 case "to engage in the give-and-take of the bankruptcy proceeding without fear of subsequent litigation over any

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1626/251804    Page 753 of 1017    PageID 15397
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1625 of 1803    PageID 12371
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 18 of 106

potentially negligent actions in those proceedings" and, on that rationale, have even been approved when necessary to protect non-fiduciary participants in the chapter 11 process. *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084 (9th Cir. 2020).

22.    As discussed in detail below, the Settlement Order[11] previously entered by this Court has already exculpated the Independent Directors and their agents from potential negligence claims. Accordingly, as it relates to the Independent Directors and their agents, the Plan's Exculpation Provisions simply respect the integrity of the Settlement Order.  Moreover, it would be a mistake to construe *Pacific Lumber as* categorically prohibiting exculpation provisions.  In fact, *Pacific Lumber* itself expressly endorsed a plan provision exculpating the committee and its members.  For the reasons set forth below, exculpating the Exculpated Parties in respect of their post-petition services for the Estate is entirely consistent with *Pacific Lumber*, other applicable law, and the purposes and policies of chapter 11.  Exculpation is particularly appropriate in this case to stem the tide of frivolous and vexatious litigation against the Exculpated Parties which Dondero and his Related Entities are seeking so desperately to continue to pursue.

A.    **The Settlement Order Already Exculpates the Independent Directors and Their Agents from Claims of Negligence and Those Protections Should Be Continued Post-Confirmation**

23.    The Objectors challenge the Exculpation Provisions on the grounds that they constitute an impermissible third-party release that is prohibited by *Pacific Lumber*.  What the

---

[11] *See, Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* entered January 9, 2020 [D.I. 339] (the "Settlement Order") and *Order Approving Debtor's Motion under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc To March 15, 2020* entered July 16, 2020 [D.I. 854].

DOCS_SF:104855.7 36027/002

Appellee Appx. 01619
**014432**
Appx. 01879

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 63-15    Filed 06/27/25    Page 754 of 1017    PageID 15398
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1626 of 1803   PageID 12372
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 19 of 106

Objectors ignore, however, is that this Court has *already* exculpated the Independent Directors and their agents for negligence pursuant to the terms of the Settlement Order – a final order to which Dondero agreed as a means of avoiding the appointment of a chapter 11 trustee, and which has been in place for over a year and was never appealed by any of the Objectors, all of whom had notice of it.[12]  Accordingly, the Court should reject Objectors challenge to exculpation of the Independent Directors and their agents as a collateral attack on the Settlement Order which is indisputably a final order of this Court.[13]

    24.    Paragraph 10 of the Settlement Order expressly provides:

> *No entity may commence or pursue a claim or cause of action of any kind* against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of <u>wi</u>llful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

Settlement Order, ¶ 10 (emphasis added).  Thus, as to the Independent Directors and their agents, they have already been exculpated for negligence, and the Plan Exculpation Provisions simply preserve the necessary protections and standard of liability already established by the Court for these court-appointed fiduciaries by final order which continues in effect pursuant to the plan.[14]

---

[12] *See Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987) (*res judicata* barred a debtor from bringing a claim that was specifically and expressly released by a confirmed reorganization plan because the debtor failed to object to the release at confirmation and was now collaterally attacking the release).

[13] *See Miller v. Meinhard-Commercial Corp*., 462 F.2d 358, 360 (5th Cir. 1972) ("[e]ven though an action has an independent purpose and contemplates some other relief, it is a collateral attack if it must in some fashion overrule a previous judgment.").

[14] *See* Plan, Art. IX.H (Paragraphs 9 and 10 of the Settlement Order remain in effect post-Confirmation).

DOCS_SF:104855.7 36027/002

Appellee Appx. 01620
Appx. 01971
014433

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6335   Page 1026/351804   Page 755 of 1017   PageID 15399
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1627 of 1803   PageID 12373
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 20 of 106

25.     Unlike in *Pacific Lumber*, the Independent Directors (which include the CEO/CRO) are not prepetition officers and directors of the Debtor.  The Independent Directors were appointed post-petition by the Court pursuant to the Settlement Order as an urgent measure to address serious concerns raised by the Committee as to extensive breaches of fiduciary duty and lack of disinterestedness by the Debtor's prepetition management.  In recognition of the extraordinarily complex, litigious and volatile situation the Independent Directors were getting into, the Court expressly exculpated the Independent Directors (including the CEO/CRO) and their agents from claims for negligence in connection with their actions in the case.

### B.     Plan Exculpation Provisions

26.     Article IX.C of the Plan addresses the exculpation of certain Exculpated Parties[15] and provides that each Exculpated Party shall be exculpated from any Cause of Action arising out of acts or omissions in connection with this chapter 11 case and certain related transactions, except for any acts or omissions that are determined by Final Order to have constituted bad faith, fraud, willful misconduct, criminal misconduct, or gross negligence (the "Exculpation Provisions").  Although the Exculpation Provisions apply to Strand and certain Employees, the Exculpation Provisions apply solely with respect to actions taken by Strand and such Employees

---

[15] The Plan defines the "Exculpated Parties" as: (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO, and (ix) the Related Persons of each of the parties listed in (iv) through (viii); provided, however, that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

Appellee Appx. 01621
Appx. 01872
014434

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 106/26/25 1804   Page 756 of 1017   PageID 15400
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1628 of 1803   PageID 12374
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 21 of 106

from and after the date of the post-petition appointment of the Independent Directors, through

the Effective Date of the Plan, and expressly exclude James Dondero and a number of other

specified entities.[16]   The provision provides:

> Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent
> permitted by applicable law, no Exculpated Party will have or incur, and each
> Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment,
> damage, demand, debt, right, Cause of Action, remedy, loss, and liability for
> conduct occurring on or after the Petition Date in connection with or arising out of
> (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and
> pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or
> confirmation of, the Plan; (iii) the funding or consummation of the Plan
> (including the Plan Supplement) or any related agreements, instruments, or other
> documents, the solicitation of votes on the Plan, the offer, issuance, and Plan
> Distribution of any securities issued or to be issued pursuant to the Plan, including
> the Claimant Trust Interests, whether or not such Plan Distributions occur
> following the Effective Date; (iv) the implementation of the Plan; and (v) any
> negotiations, transactions, and documentation in connection with the foregoing
> clauses (i)-(v); *provided*, *however,* the foregoing will not apply to (a) any acts or
> omissions of an Exculpated Party arising out of or related to acts or omissions that
> constitute bad faith, fraud, gross negligence, criminal misconduct, or willful
> misconduct or (b) Strand or any Employee other than with respect to actions taken
> by such Entities from the date of appointment of the Independent Directors
> through the Effective Date. This exculpation shall be in addition to, and not in
> limitation of, all other releases, indemnities, exculpations, any other applicable
> law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2,
> protecting such Exculpated Parties from liability.

27.     An exculpation provision differs from a release.[17]   An exculpation provision sets a

standard of liability that absolves a person from liability for ordinary negligence, but not from

liability for more egregious conduct.   In this respect, it is consistent with the duty of care and

duty of loyalty standards of the business judgment rule that protects business entities and

---

[16] To the extent there is any conflict between the descriptions of the Exculpation Provisions herein and the Plan, the Plan shall control.

[17] *See In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans," does not affect the liability of these parties, but rather states the standard of liability under the Code, and as it exculpated the named parties for actions during the course of the case did not implicate section 524(e).)

15

Appellee Appx. 01622
Appx. 01573
014435

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 63-5 Page 1636 of 1804 Page 757 of 1017 PageID 15401
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1629 of 1803 PageID 12375
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 22 of 106

individual fiduciaries from liability when their actions are taken within their authority and good faith.[18]

28.     Various objections have been raised to the inclusion of the Exculpation Provisions in the Plan.  Each of the Objectors argues that, except with regard to the Committee and its Professionals, the Exculpation Provisions are impermissible based upon their misunderstanding and overly-broad reading of the opinion of the Fifth Circuit in *Pacific Lumber*.[19]

### C.     Pacific Lumber

29.     Because every argument relied upon by the Objectors as to the permissibility of the Exculpation Provisions is premised on *Pacific Lumber*, it is important to analyze exactly what the Fifth Circuit actually held based on the appeal and the briefing before it.  The portion of the *Pacific Lumber* opinion addressing non-debtor exculpation and releases is less than two pages long and, when appropriately construed, is inapposite to this case, except insofar as it approved the exculpation of the creditors' committee and its members.

30.     In *Pacific Lumber*, a prepetition secured creditor joined with a competitor of one of the debtors to propose a chapter 11 plan (the "MRC/Marathon Plan").  The MRC/Marathon Plan included a provision that exculpated the plan proponents, the reorganized debtors, the unsecured creditors' committee and each of their respective professionals, officers and directors from liability (other than for willful misconduct and gross negligence) relating to proposing, implementing and administering the chapter 11 plan.  The bankruptcy court approved the

---

[18] *See* Bernard S. Sharfman, *Importance of the Business Judgement Rule*, Harvard Law School Forum on Corporate Governance, posted at https://corpgov.law.harvard.edu/2017/01/19/the-importance-of-the-business-judgment-rule/

[19] The Objectors acknowledge the Fifth Circuit expressly held that the exculpation of the unsecured creditors' committee and its members and professionals was appropriate.  Therefore, the Exculpation Provisions as applied to these parties will not be discussed further herein.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-9   Page 1036 of 1804   Page 758 of 1017   PageID 15402
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1630 of 1803   PageID 12376
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 23 of 106

discharges, releases, exculpations and injunctions pursuant to sections 105, 524, 1123(a)(5) and 1129.

31.     The appellants were an indenture trustee and certain bondholders who had voted against the MRC/Marathon Plan and were the unsuccessful proponents of a competing plan which, incidentally, contained non-debtor third-party releases and exculpation provisions identical in scope to those in the MRC/Marathon Plan.[20] On appeal, the Fifth Circuit either affirmed or dismissed on mootness grounds in respect of every issue raised on appeal, other than the release and exculpation provisions. While the issues on appeal had been broadly worded,[21] the only issue in respect of the release and exculpation provisions actually briefed by the appellants was the impropriety of the release and exculpation provisions for the benefit of the non-debtor plan proponents and the committee.[22]

32.     The Fifth Circuit relied ***exclusively*** on section 524(e) of the Bankruptcy Code for its observation that non-consensual releases or exculpations of non-debtors are not allowed, even for actions taken during the case. *Id.* at 252-3. Section 524 is entitled "Effect of discharge" and subsection 524(e) provides that a "discharge of a debt of a debtor does not affect the liability of

---

[20] *See First Amended Chapter 11 Plan for Scotia Pacific Company LLC proposed by the Bank of New York Trust Company, N.A., as Indenture Trustee for the Timber Notes (as modified on April 28, 2008)* [*In re: Scotia Development LLC, et al.*, Case No. 07-20027, U.S. Bankruptcy Court for the S.D. Tex., D.I. 2774], Sections 10.1, 10.3 and 10.4.

[21] *See The Indenture Trustee's Statement of Issues on Appeal of the Order Confirming the MRC/Marathon Plan* [*In re: Scotia Development LLC, et al.*, Case No. 07-20027, U.S. Bankruptcy Court for the S.D. Tex., D.I. 3431] at p. 4, Issue No. 18.

[22] *See Brief of Appellants* [*Bank of New York Trust Co., NA v. Official Unsecured Creditors' Committee,* Case No.08-40746, U.S. Court of Appeals for the Fifth Circuit, August 25, 2008], at pp. 55-56 ("The Plan contains an expansive "Exculpation Clause" which purports to release claims of non-consenting creditors against numerous non-debtors, including "officers, directors, professionals, members, agents and employees" of MRC, Marathon and the Committee. . . . ***Having obtained confirmation of the Plan through the erroneous means set forth above, the Plan Proponents propose to use this overbroad release language to exonerate*** themselves.") (emphasis added; record cites omitted)

**Appellee Appx. 01624**
Appx. 01875
**014437**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 18-15    Page 1632 of 1804    Page 759 of 1017    PageID 15403
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1631 of 1803    PageID 12377
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 24 of 106

any other entity on . . . such debt." Thus, on its face, section 524(e), only prohibits a plan from discharging obligations of third parties who are liable with the debtor on its debts. The Fifth Circuit focused on co-liability for "pre-petition debts,"[23] yet applied the prohibition to causes of action for "any negligent conduct that occurred during the course of the bankruptcy."[24]

33.    Notably, the briefing on the issue presented to the Fifth Circuit had dealt with the impropriety of the exculpation of the non-debtor plan proponents and the committee, but not with the officers and directors of the Debtor. Thus, to the extent the Fifth Circuit included the debtor's officers and directors in its discussion, that discussion constituted mere *dicta*.

34.    Although the Fifth Circuit ruled that section 524(e) did not support exculpation for certain persons, such as the non-debtor plan proponents in that case, the Court did not treat section 524(e) as an absolute bar to exculpation provisions in a plan that were supportable by other sections of the Bankruptcy Code, by other applicable law or by legitimate policy considerations relating to the chapter 11 process. In approving the exculpation as to the committee and its members, the court cited to the qualified immunity of committees under section 1103(c) of the Bankruptcy Code and to an important policy concern regarding the effect of denying exculpation on the chapter 11 process: "actions 'against committee members in their capacity as such should be discouraged. If members of the committee can be sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case, it will be extremely difficult to find members to serve on an official committee.' The

---

[23] *Id.* at 252.
[24] *Id.*

18

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 1638 of 1804   Page 760 of 1017   PageID 15404
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1632 of 1803   PageID 12378
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 25 of 106

Creditors' Committee and its members are the only disinterested volunteers among the parties sought to be released here." *Id.,* at 252 (cites omitted).

35.    The Debtor is, of course, not asking this court to override the Fifth Circuit's holding in *Pacific Lumber*. Rather, as discussed below, the facts of this case are such that the rationale applied by the Fifth Circuit to permit exculpation of the committee and its members fully supports the Plan Exculpation Provisions. The need for exculpation has already been recognized by this Court in the Settlement Order. Furthermore, as the *Pacific Lumber* ruling was based solely on section 524(e), nothing in that opinion precludes approval of the Exculpation Provisions pursuant to other provisions of the Bankruptcy Code or other applicable law.

**D.    Exculpation of the Exculpated Parties Is Permissible and Not Prohibited by *Pacific Lumber*.**

36.    The propriety of the Plan Exculpation Provisions should be considered as they apply to each respective Exculpated Party.

37.    <u>The Debtor</u>. The Debtor and its successors and assigns are entitled to the relief embodied in the Exculpation Provision. With exceptions not applicable here, the Debtor, as debtor in possession, has all the rights and powers of a trustee. 11 U.S.C. § 1107(a). Accordingly, the Debtor's right to qualified immunity is co-extensive with that of a trustee. Moreover, granting the Debtor such relief falls squarely within the "fresh start" principles underlying the Bankruptcy Code. *See* 11 U.S.C. §§ 524 and 1141. The Claimant Trust and Litigation Sub-Trust are successors to and assigns of the Debtor, and thus, to the extent applicable to the scope of the Exculpation Provisions, should be similarly protected. In the context of this Plan, the Claimant Trust and Litigation Sub-Trust are court-approved fiduciaries

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-6   Page 1634 of 1804   Page 761 of 1017   PageID 15405
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1633 of 1803   PageID 12379
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 26 of 106

whose sole purpose is to operate the Debtor's business for a limited period of time to effectuate an orderly monetization of the Debtor's assets and pay the claims of creditors. Post-Confirmation, the Debtor and its successors are entitled to exculpation.

38.   <u>The Independent Directors</u>.   Even if the Settlement Order did not plainly provide the Independent Directors with exculpation, in the context of this case, the Independent Directors are akin to committee members and the same rationale the Fifth Circuit used in *Pacific Lumber* to uphold the exculpation of committee members applies to the Independent Directors. The use of independent directors has become commonplace in large complex commercial cases, both on the eve of bankruptcy[25] and post-petition,[26] especially where there are allegations of mismanagement, breaches of fiduciary duty or other conflicts that cast shadows on the relationship between the debtor in possession and its creditors, who question whether existing officers and directors can faithfully perform their fiduciary duties as the face of the debtor in possession.[27]   Independent directors tend to be either experienced restructuring professionals

---

[25] Some examples of major bankruptcy cases in which independent directors have been appointed just prior to bankruptcy, usually due to accounting  irregularities and other events that resulted in distrust of management by major creditor constituencies, include: *Neiman Marcus Group, Inc.* (S.D. Tex); *WorldCom* (S.D. N.Y.); *Sears* (S.D. N.Y.); *California Pizza Kitchen* (S.D. Tex.); *PG&E Corp.* (N.D. Cal.); *Adelphia Communication Corp.* (S.D. N.Y.); Station Casinos (D. Nev.); and *Cengage Learning Centers* (E.D. N.Y.).

[26] *See* Regina Kelbon and Michael DeBaecke, *Appointment of Independent Directors on the Eve of Bankruptcy: Why the Growing Trend*, paper prepared for the Penn. Bar Institute 19th Annual Bankruptcy Institute, June 27, 2014, at pp. 17-23, available at
https://www.blankrome.com/siteFiles/publications//B3795676DF921A7E3BED8A9F15E7FDF3.pdf (discussing use of independent directors both pre- and post-petition and certain cases utilizing same).

[27] *See, e.g., In re Natrol, Inc*., Case No. 14-22446 (Bankr. D. Del.) Motion and Order Appointing Independent Directors [Docket Nos. 248 and 305] (independent directors appointed to settle motion for appointment of trustee by large creditor); *In re 4 West Holdings, Inc.,* Case No. 18-30777 (Bankr. N.D. Tex) Motion and Order Appointing Independent Directors [Docket Nos. 311 and 383] (independent director appointed to review propriety of certain settlements and business and marketing plan); *In re Synergy Pharmaceuticals, Inc*., Case No. 18-14010 (Bankr. S.D.N.Y.) Motion and Stipulation and Order Appointing Independent Directors [Docket Nos. 373 and 553] (independent directors appointed because of pending shareholder derivative actions against prepetition board members); *In re Zohar III, Corp.*, Case No. 18-10512 (Bankr. D. Del.) Order Appointing Independent Director [Docket No. 267] (independent director appointed as part of a mediated settlement over sale of a portfolio of financial services entity debtor]; *In re Interlogic Outsourcing, Inc.*, Case No. 19-31444 (Bankr. N.D. Ind.) Motion

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 65-6 Filed 06/25/1804 Page 762 of 1017 PageID 15406
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1634 of 1803 PageID 12380
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 27 of 106

(attorneys or financial advisors) or seasoned industry professionals with immaculate corporate records. Reliance on the use of independent directors has thus become a critical tool in proper corporate governance and restoring creditor confidence in management in modern day corporate restructurings. Failure to protect independent directors from claims of ordinary negligence will discourage sophisticated restructuring personnel from accepting appointment to such roles and will have a substantial negative effect on the efficacy of the chapter 11 process and the efficient realization of its purposes and goals.

39. The Independent Directors appointed in this case are persons of such stature, as they include a former bankruptcy judge, former commercial bankruptcy practitioners and a person with expertise in hedge fund operations. As indicated by the Fifth Circuit in *Pacific Lumber*, if estate fiduciaries who are "disinterested volunteers" can be sued for actions taken during the course of a case pursuant to the Bankruptcy Code and under judicial supervision, qualified people would not serve, and the integrity of the chapter 11 process would be compromised. This policy concern is particularly acute where, as here, the Independent Directors undertook their duties in the midst of a highly contentious and litigious case.

40. In this case, the Independent Directors also are analogous to bankruptcy trustees. Section 1107(a) of the Bankruptcy Code provides that a debtor in possession has all of the rights and powers, and substantially all of the duties, of a bankruptcy trustee, and the case law makes it clear that the debtor in possession and its officers and directors serve in the same fiduciary capacity as a trustee. The Independent Directors were approved by the court to serve as post-

---

and Order Appointing Independent Directors [Docket Nos. 198 and 394] (independent director appointed for general corporate oversight).

Appellee Appx. 01628
Appx. 01879
0144411

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Filed 10/06/25    Page 763 of 1017    PageID 15407
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1635 of 1803    PageID 12381
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 28 of 106

petition fiduciaries in this case in order to resolve insistent and urgent demands for the appointment of a trustee to supplant the prepetition directors and senior officers. In fact, the Court denied the U.S. Trustee's motion seeking appointment of a chapter 11 trustee based primarily on its approval of the Independent Directors to act as court-supervised fiduciaries for the Debtor and the Estate – the functional equivalent of a chapter 11 trustee. It is well established that trustees have qualified immunity for acts taken within the scope of their appointment. *Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981). Like trustees, the Independent Directors are estate fiduciaries. *In re Houston Regional Sports Network, L.P.*, 505 B.R. 468, 481-82 (Bankr. S.D. Tex. 2014) (directors of a non-debtor general partner owe fiduciary duties to the estate of a debtor limited partnership and the fiduciary duties to the estate are paramount.)

41.    For the same reasons that the Fifth Circuit upheld the exculpation of committee members in *Pacific Lumber*, and <u>pursuant</u> to sections 105, 1106, 1107, 1123, and 1129 of the Bankruptcy Code and the related applicable non-bankruptcy law governing the immunity and exculpation of fiduciaries, none of which were actually addressed in *Pacific Lumber*, the Exculpation Provisions should be approved as to the Independent Directors and CEO/CRO.

42.    <u>Professionals.</u>  The Debtor's Professionals are entitled to exculpation. *See, In re Ondova Ltd. Co. v. Sherman*, 914 F.3d 990 (5th Cir. 2019) (protecting counsel for trustee from suit when acting pursuant to direction of its client within the scope of its employment); *Harris v. Wittman (In re Harris),* 590 F.3d 730 (9th Cir. 2009)(same). There is no distinction in the Bankruptcy Code between counsel for a trustee and counsel for a debtor in possession – both are

Appellee Appx. 01629
Appx. 01889
014442

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 10/31/25 1804   Page 764 of 1017   PageID 15408
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1636 of 1803   PageID 12382
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 29 of 106

subject to court approval of their retention, both serve as counsel to estate fiduciaries and both are subject to their actions and compensation being reviewed and approved by the Court.[28]

43.    Additionally, under applicable Texas law, attorneys are immune from civil liability to non-clients for actions taken in connection with representing a client in litigation. *See Cantey Hanger, LLP v. Byrd, 467 S.W.3d 477, 481* (Tex. 2015); *see also Troice v. Proskauer Rose, L.L.P.,* 816 F.3d 341 (5th Cir. 2016) (dismissing securities fraud litigation brought by third parties against counsel for certain companies related to Ponzi scheme perpetrator Allen Stanford).

44.    <u>Strand.</u>  It is appropriate to include Strand in the Exculpation Provisions.  Strand is the Debtor's general partner, and the Independent Directors are the directors of Strand.  Strand should be protected to the same extent as the Debtor and the Independent Directors, and for the same reasons.  *See In re Houston Reg'l Sports Network, L.P.,* (directors of a non-debtor general partner owe fiduciary duties to the estate of a debtor limited partnership and the fiduciary duties to the estate are paramount.)  In regard to Strand, the Exculpation Provisions apply solely with respect to actions taken by Strand from and after the date of the post-petition appointment of the Independent Directors, through the Effective Date of the Plan.

45.    <u>Employees.</u>  The Employees, as agents of the Independent Directors, are already covered by the Settlement Order's exculpation provision for acts taken in furtherance of and

---

[28] *See Osherow v. Ernst & Young, LLP (In re Intelogic Trace, Inc.),* 200 F.3d 382  (5th Cir. 2000) (order approving final fee application of court-appointed professional was *res judicata* in respect of subsequent lawsuit by trustee alleging malpractice and negligence where potential claims were known to trustee at the time of final fee hearing.).  *See also, Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.),* 163 F.3d 925 at 931 (5th Cir.), *cert. denied,* 527 U.S. 1004 (1999) (judgment in bankruptcy court lawsuit brought by reorganized debtor seeking fee disgorgement against accountant for debtor for failure to disclose relationship with potential litigant was *res judicata* in respect of subsequent state court lawsuit by debtor for malpractice).

DOCS_SF:104855.7 36027/002

Appellee Appx. 01630
Appx. 01881
014443

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15    Filed 10/06/25    Page 765 of 1017    PageID 15409
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1637 of 1803    PageID 12383
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 30 of 106

under the direction and supervision of the Independent Directors in administering, managing and
operating the Debtors.  However, even if the Employees were not already covered by the
Settlement Order, it would be appropriate to include the Employees in the Exculpation
Provisions.  The Exculpation Provisions apply to the Employees solely with respect to actions
taken by the Employees from and after the date of the post-petition appointment of the
Independent Directors, through the Effective Date of the Plan.

      **E.**      **Approval of the Exculpation Provisions Is a Legitimate Exercise of the Court's Powers and Follows Directly from the Findings and Conclusions the Court Must Make to Confirm a Plan**

46.      The Debtor is seeking approval of the Exculpation Provisions in its Plan pursuant
to sections 105, 1106, 1107, 1123, and 1129 of the Bankruptcy Code; the qualified immunity of
bankruptcy trustees and their agents, and the correlative qualified immunity of debtors in
possession; the related applicable non-bankruptcy law on immunity and exculpation of
fiduciaries; and the strong policy reasons offered by the Fifth Circuit as to committee members,
which apply to the Independent Directors in the same way as the Fifth Circuit applied them to
committee members.  The Bankruptcy Code makes it clear that "any appropriate provision not
inconsistent with the applicable provisions of this title" may be included in a chapter 11
plan.[29]

47.      The Fifth Circuit's *Pacific Lumber* ruling denying exculpation to certain parties
was based on section 524(e).  Some recent court decisions approving exculpation provisions
have held, however, that in dealing with complex and litigious bankruptcy cases, section 524(e)

---

[29] 11 U.S.C. § 1123(b)(6).

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibits   Page 1636/25 1804   Page 766 of 1017   PageID 15410
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1638 of 1803   PageID 12384
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 31 of 106

is not a bar to setting a standard of liability that limits liability for negligence for acts taken during the course of the case in furtherance of the purpose of chapter 11.  For example, in *Blixseth*,[30] the Ninth Circuit (which generally does not permit third-party releases in plans) determined that the exculpation clause at issue did not implicate section 524(e) because it related to post-petition actions that occurred during the bankruptcy process, and did not implicate any potential liability on prepetition debts of the debtor.  The Court further explained that, despite prior Ninth Circuit decisions disproving third-party releases relating to such prepetition debts of the debtor, exculpation provisions with third-party releases are permissible because chapter 11 cases are often "highly litigious" where "oxes [sic] are gored" and such releases limited in time and scope "allow the settling parties. . . to engage in the give-and-take of the bankruptcy proceeding without fear of subsequent litigation over any potentially negligent actions in those proceedings." *Id*. at 1084.  Finally, the court held, as many of its sister circuits have held, that under sections 105(a) and 1123 "the bankruptcy court here had the authority to approve an exculpation clause intended to trim subsequent litigation over acts taken during the bankruptcy proceedings and so render the Plan viable." *Id*.  Significantly, the creditor whose exculpation was at issue in *Blixseth* was not even an estate fiduciary.  *Id*. at 1081.

48.     Another court recently dealing with exculpation issues discussed the need for an appropriately-constructed exculpation of estate fiduciaries and exculpation relating to court approved transactions in order to preserve the basic integrity of the chapter 11 process.  In *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y 2019), the bankruptcy

---

[30] 961 F.3d 1074 (9th Cir. 2020)

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 1640 of 1804   Page 767 of 1017   PageID 15411
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1639 of 1803   PageID 12385
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 32 of 106

court was presented with a broad exculpation clause in a plan that protected not only court-supervised fiduciaries, but also entities such as the acquirer, the acquirer's professionals, the pre- and post-petition lenders and the indenture trustees.  As here, the exculpation provision pertained to acts and omissions taken in connection with and during the bankruptcy case, but excluded acts of fraud, willful misconduct or gross negligence.

49.      The court declined to approve the exculpation provision as written, holding that it was overly broad, but nevertheless provided significant guidance on what an appropriate exculpation provision should provide:

> **I think that a proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions.**  If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should be not be subject to claims that effectively seek to undermine or second-guess this Court's determinations.  In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do.  *Cf. Airadigm Commc'ns., Inc. v. FCC (In Re Airadigm Communs., Inc.)*, 519 F.3d 640, 655-57 (7th Cir. 2008) (approving a plan provision that exculpated an entity that funded a plan from liability arising out of or in connection with the confirmation of the Plan, except for willful misconduct); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation provision that was limited to conduct during the bankruptcy case and noting that the effect of the provision is to require "that any claims in connection with the bankruptcy case be raised in the case and not be saved for future litigation.").

599 B.R. at 720-721 (emphasis added).   The Exculpation Provisions in the Plan here are consistent with the policy-based and chapter 11 process-based guidelines provided by Judge Wiles in *Aegean Marine*, in that they apply to court-supervised fiduciaries and transactions entered into under the auspices of the court.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 10of 251804   Page 768 of 1017   PageID 15412
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1640 of 1803   PageID 12386
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 33 of 106

50.     Additionally, the bankruptcy court's power to approve an exculpation provision in a chapter 11 plan flows naturally from the fact that it cannot confirm a chapter 11 plan unless it finds that the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code and the plan has been proposed in good faith.[31]   The plan is the culmination of the chapter 11 case.   By confirming a plan and making the "good faith" finding, the court is determining that the plan proponent (usually, the debtor) and its officers and directors have acted appropriately throughout the case, consistent with their fiduciary duties and have been administering, managing and operating the debtor in accordance with the provisions of the Bankruptcy Code and applicable law.[32]   Once the court makes its good faith finding, it is appropriate to set the standard of liability of the fiduciaries (and, as in *Blixseth*, other parties) involved in the formulation of that chapter 11 plan.[33]

51.     An exculpation provision appropriately prevents future collateral attacks against fiduciaries of the debtor's estate.   Here, the Exculpation Provisions are appropriate because they provide protection to those parties who served as post-petition court-approved fiduciaries during the restructuring process – relief that in this litigious case, as all participants are painfully aware, is indispensable.   The Exculpation Provisions are in consideration for services rendered, hard work, and perseverance in the face of threats to professional reputation and bodily harm.   The Exculpation Provisions should be approved, and the objections, asserted for the most part by the

---

[31] *See* 11 U.S.C. § 1129(a)(2) and (3).

[32] *See* 11 U.S.C. § 1129(a).

[33] *See PWS*, 228 F.3d at 246-247 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties . . . .").

DOCS_SF:104855.7 36027/002

Appellee Appx. 01634
Appx. 01885
0144447

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 769 of 1017   PageID 15413
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1641 of 1803   PageID 12387
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 34 of 106

very individual and entities that have created the need for such provisions by turning this case into a war zone, should be overruled.

VI.   **THE PLAN INJUNCTION IS APPROPRIATE AND IS NARROWLY TAILORED TO EFFECTUATE THE PLAN AND RELATED PROVISIONS OF THE BANKRUPTCY CODE.**

52.   The Court should approve the injunction provisions (the "Injunction" or "Injunction Provisions"), set forth in Article IX.F of the Plan.  This is because the Injunction Provisions are necessary and appropriate to enable the Debtor and its successors to carry out, and obtain the benefits of, the provisions of the Bankruptcy Code relating to the Plan and the proper implementation and consummation of the Plan.  Approval of the requested Injunction Provisions is well within this Court's powers.

53.   The Objectors have objected to the Injunction Provisions on several grounds.  The Debtor has reviewed the Injunction Provisions and revised them to address certain of the Objectors' concerns as follows:

- The Injunction and Gatekeeper Provisions have been narrowed to apply only to Enjoined Parties.[34]

- The Independent Directors are no longer included in the second paragraph of the Injunction.

- The Reorganized Debtor and the Claimant Trust have been deleted from the second paragraph of the Injunction in order to eliminate any potential confusion that they were included in any capacity other than as successors to the Debtor, which is now clarified in the third paragraph of the Injunction.

---

[34] "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.  Plan, Art. I.B., Def. 56 (new definition in the Plan (as amended)).

DOCS_SF:104855.7 36027/002

Appellee Appx. 01635
Appx. 01886
014448

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-5   Page 1640 of 1804   Page 770 of 1017   PageID 15414
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1642 of 1803   PageID 12388
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 35 of 106

- The Injunction is subject to parties' rights to set off to the extent permitted post-confirmation under sections 553 and 1141 of the Bankruptcy Code.

- The Gatekeeper Provision has been amended to clarify the actions for which parties must first seek the approval of the Bankruptcy Court to pursue.

- The grant of exclusive jurisdiction over the merits previously contained in the Gatekeeper Provision has been removed, and the Gatekeeper Provision has been modified to provide that if the Bankruptcy Court, as gatekeeper, decides an action can be brought, the Bankruptcy Court will adjudicate that action on the merits *only* to the extent the court has jurisdiction to do so.

- Articles IX.G and H of the Plan have been modified to clarify the duration of the automatic stay and other injunctions which are either currently in effect or contained in the Plan.

54.     The Injunction Provision, as modified, merely implement and enforce the Plan's discharge, release, and Exculpation Provisions and related provisions of the Bankruptcy Code and enjoin the Enjoined Parties from commencing or maintaining actions to interfere with the implementation or consummation of the Plan.  The Injunction Provisions are a necessary part of the Plan because they protect the Plan implementation provisions required to monetize the Debtor's assets and pursue the Causes of Action, all of which has been vociferously and continually opposed and litigated by Dondero and his numerous Related Entities, with such vexatious opposition likely to continue post-confirmation.  Several parties – principally Dondero, Dugaboy and his Related Entities – have objected to the Injunction, which is not surprising because Dondero and his Related Entities undoubtedly intend to continue their litigation crusade against the Debtor and its successors after confirmation of the Plan.

### A.     Plan Injunction Provisions

55.     Section IX.F of the Plan is entitled "Injunction" and applies post-Effective Date. The Injunction contains three distinct provisions:

Appellee Appx. 01636
Appx. 01885
014449

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Page 16 of 251804  Page 771 of 1017    PageID 15415
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1643 of 1803    PageID 12389
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 36 of 106

56.    Paragraph 1, as amended, provides:

**Upon entry of the Confirmation Order, all** ~~holders of Claims and Equity Interests and other parties in interest, along with their respective Related Persons,~~ **Enjoined Parties are and shall be** permanently **enjoined,** on and after the Effective Date, **from taking any actions to interfere with the implementation or consummation of the Plan.**

57.    As revised, paragraphs 2 and 3 provide:

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all** ~~Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether proof of such Claims or Equity Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan)~~ ~~and other parties in interest, along with their respective Related Persons, are~~ **Enjoined Parties are and shall be** permanently enjoined, **on and after the Effective Date, with respect to** ~~such~~ any **Claims and Equity Interests, from** directly or indirectly **(i) commencing, conducting, or continuing in any manner** ~~directly or indirectly~~ **any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or the property of** ~~any of~~ **the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~, **(ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering,** enforcing, or attempting to recover or enforce, **by any manner or means** ~~whether directly or indirectly~~, **any judgment, award, decree, or order against the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or the property of** ~~any of~~ **the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~, **(iii) creating, perfecting, or otherwise enforcing in any manner,** ~~directly or indirectly~~, **any** security interest, lien or **encumbrance of any kind against the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or the property of** ~~any of~~ **the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~, **(iv) asserting any right of setoff, directly or indirectly, against any obligation due** ~~from~~ to **the Debtor** ~~Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or against property or interests in property of** ~~any of the Debtor, Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, **and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions set forth herein shall extend to**, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding

DOCS_SF:104855.7 36027/002

Appellee Appx. 01637
Appx. 01888
014450

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 16-15    Page 16 of 251804 Page 772 of 1017    PageID 15416
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1644 of 1803   PageID 12390
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 37 of 106

> **paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.**

Plan, Art. IX.F.

58.     As amended, paragraph 4 of Section IX.F contains a gatekeeper provision (the "Gatekeeper Provision") which provides:

> **Subject in all respects to ARTICLE XII.D, no ~~Entity~~ Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of ~~this~~ the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such ~~Entity~~ Enjoined Party to bring such claim or cause of action against any such Protected Party; provided, however, the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such ~~Entities~~ Employee from the date of appointment of the Independent Directors through the Effective Date. ~~As set forth in ARTICLE XI, the~~ The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate ~~any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted the underlying colorable claim or cause of action.~~**

Plan, Art. IX.F.

59.     To the extent an Enjoined Party believes it has any claims against a Protected Party, such Enjoined Party must first seek permission of the Bankruptcy Court to file such action and demonstrate that the claims it seeks to assert are colorable claims.  Subject to certain carve outs, Protected Parties are defined collectively as:

31

Appellee Appx. 01638

Appx. 01889

01**4451**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 53-15    Page 146 of 251804 Page 773 of 1017    PageID 15417
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1645 of 1803    PageID 12391
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 38 of 106

(i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); . . . .

Plan, Art. I.B. Def. 105.    If the Bankruptcy Court determines a claim is colorable, the Bankruptcy Court will make a separate determination as to whether it has jurisdiction to adjudicate such claim on its merits in accordance with the terms of the Plan and applicable law.

**B.    Objections**

60.    A number of parties, including Dondero and many of his affiliated, controlled or influenced entities, object to the Injunction Provisions (as identified in the chart of objections attached as Exhibit B).  The Objectors all raise similar arguments and allege:

- The Injunction is ambiguous and overly-broad because the meaning of the phrase "implementation and consummation of the plan" is unclear.

- The Injunction operates post-effective date and enjoins post-confirmation claims against non-debtor third parties for post confirmation conduct.

- The Injunction is a disguised non-debtor third party release.

- The Injunction Provisions prevent holders of Claims and Equity Interests from enforcing rights created by the Plan after the Effective Date.

- The Gatekeeper Provision effectuates an impermissible extension of the jurisdiction of the Bankruptcy Court.

61.    As summarized above and discussed more fully below, the Injunction Provisions, as amended, have addressed certain of these arguments.  The remaining objections, however,

DOCS_SF:104855.7 36027/002

Appellee Appx. 01639

Appx. 01899

014452

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 104/06/251804 Page 774 of 1017   PageID 15418
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1646 of 1803   PageID 12392
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 39 of 106

lack merit and are based on either a misreading of the actual Injunction Provisions or a misstatement of applicable law.  Each objection will be addressed below.

### C.   An Injunction against Interfering with the Implementation and Consummation of the Plan Is Both Common and Appropriate.

62.     Certain objectors argue that the first paragraph of the Plan Injunction, which enjoins all holders of Claims or Equity Interests and other parties in interest, along with their Related Persons, from taking any action to interfere with the "implementation or consummation of the Plan," is overly-broad and ambiguous because the meaning of the phrase "implementation and consummation of the plan" is somehow unclear.  These objections are specious.

63.     An injunction in aid of the effectuation of a confirmed plan is typically included in a plan and confirmation order to prevent actions to impede or frustrate the plan proponent's necessary and appropriate actions after confirmation to effectuate the plan and carry out the court's confirmation order.  The Injunction is supported by the express provisions of sections 1123(a)(5), 1123(b)(6), 1141(a), 1141(c), and 1142.  The Injunction effectuates the purposes of plan confirmation and chapter 11 and preserves and protects the integrity of the chapter 11 process and the court's orders.

64.     The terms "implementation" and "consummation" are neither vague nor overly-broad; they are both terms found in the text of chapter 11 of the Bankruptcy Code and are well understood – and injunctions against interfering with them are common features of plans confirmed throughout the country, including in this District.[35]  Section 1123(a)(5) expressly

---

[35] *See, e.g., In re Tuesday Morning Corp.* (Case No. 20-31476, Bankr. N.D. Tex.) *Debtor's Second Amended Plan of Reorganization* [D.I. 1913-1] attached to *Order Confirming the Revised Second Amended Joint Plan of Reorganization,* at pp. 90-91/137; *In re CHC Group, Ltd.* (Case No. 16-31854, Bankr. N.D. Tex.) *Debtors' Fourth Amended Joint Amended Chapter 11 Plan of Reorganization Pursuant to Chapter 11 of the United States*

DOCS_SF:104855.7 36027/002

Appellee Appx. 01640
Appx. 01891
014453

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 1048 of 1804   Page 775 of 1017   PageID 15419
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1647 of 1803   PageID 12393
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 40 of 106

mandates that "a plan shall . . . provide adequate means for the plan's implementation" (emphasis added) and contains a non-exclusive list of what means that could include.  In compliance with section 1123(a)(5), this Plan expressly sets out the means for its "implementation."  *See* Plan, Article IV: Implementation of Plan.  *See also* 11 U.S.C. § 1142. The Injunction would enjoin any interference with these implementation steps.

65.    The word "consummation" is also found in the Bankruptcy Code and has been discussed by numerous courts.   For example, section 1101(2) defines "substantial consummation" of a plan to be (A) the transfer of the assets to be transferred under the plan; (B) the assumption by the debtor or the successor to the debtor of the management of all of the property dealt with by the plan; and (C) commencement of distribution under the plan.  Of course, the term "consummation," without the qualifier "substantial," is more expansive and would extend, for example, to the completion of distributions under the Plan and the disposition of all of the property dealt with by the Plan.  *See, e.g., United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 305 (5th Cir. 2002) (distinguishing "substantial consummation" of a plan from final consummation of a plan, which occurs after the effective date when the plan distributions are concluded.)

66.    This portion of the Injunction merely prevents holders of Claims or Equity Interests and other Enjoined Parties from interfering with the actions the Debtor, and its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust must take

---

*Bankruptcy Code* [D.I. 1671-1, attached to *Findings of Fact and Conclusions of Law, and Order Confirming the Debtors' Fourth Amended Joint Amended Chapter 11 Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code*, Sec. 10.5.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01641
Appx. 01892
014454

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-9   Filed 06/05/18104   Page 776 of 1017   PageID 15420
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1648 of 1803   PageID 12394
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 41 of 106

to effectuate the terms of the Plan after the Plan is confirmed by the Court.  There is nothing nefarious or unusual about this provision and it should be approved.

### D.     The Injunction Is Not a Disguised Non-Debtor Third-Party Release.

67.     The Injunction does not contain a non-debtor third-party release.  As set forth in the Plan, as amended, the Debtor has provided clarification to address the concerns of the Objectors who interpreted the prior provision to effectuate a non-debtor third-party release.  The amended second and third paragraphs of the Injunction prevent the Enjoined Parties from taking the enumerated actions on or after the Effective Date against the Debtor or its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust, or against the property of the Debtor, or its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust, except as set forth in the Plan or in the Confirmation Order.  The Debtor has eliminated the Independent Directors from these provisions of the Injunction.  As revised, nothing in this section of the Injunction does anything more than prevent the Enjoined Parties from taking actions that do not comply with or conform to the provisions of the Plan, and limit holders of Claims and Equity Interests with respect to such Claims and Equity Interests to the recoveries provided under the Plan, all as contemplated by sections 1123(b)(6) and 1141 in respect of claims or interests arising either prepetition or post-petition.  The ultimate goal of a chapter 11 case is for a debtor to confirm a plan which, after confirmation, effectively channels all claims and interests of creditors and interest holders to the treatment provided for the pre- and post-petition claims and interests under the plan, and limits the liability of the debtor (including the

DOCS_SF:104855.7 36027/002

Appellee Appx. 01642
Appx. 01893
014455

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6815    Page 1656/25/804    Page 777 of 1017    PageID 15421
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1649 of 1803    PageID 12395
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 42 of 106

"reorganized debtor") and any successor that receives property of the debtor dealt with by the plan (such as a plan trust) to the liability imposed by that treatment.

68.    Sections 1123 and 1129 of the Bankruptcy Code require a plan to describe how it will treat the claims of creditors and the interests of equity holders, both those that existed prepetition and those that arise during the course of a case.  The purpose of the Injunction is to protect the Debtor and its successors under the Plan – the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust –against litigation to pursue the very same prepetition and post-petition claims and interests that are being treated under the Plan.  As described below, providing the protection of the Injunction to all of such entities is both legal and appropriate.

69.    As to the Debtor, the Injunction is appropriate, because it implements the injunctive relief the Bankruptcy Code affords the Debtor, whether or not it gets a discharge, as a result of plan confirmation.  If the Debtor is entitled to the discharge as contemplated by the Plan, then it is accorded the injunction provided by sections 1141(d) and 524(a).  But even if the Debtor does not receive a discharge then, pursuant to section 362(c)(2)(A), the automatic stay will remain in effect until the case is closed, and the Injunction is in aid of that stay.  Moreover, pursuant to section 1141(c) of the Bankruptcy Code, because *all* of the Debtor's property is "dealt with by the plan," all of that property will be "free and clear of all claims and interests . . . .," both as to property retained by the Debtor, and property transferred to its successors.  Accordingly, the Injunction is an appropriate means of enforcing section 1141(c).

70.    Nothing in the Injunction effectuates a third-party release in contravention of section 524(e) of the Bankruptcy Code.  As to the "Reorganized Debtor," this term simply means

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 33-6    Filed 06/05/25    Page 778 of 1017    PageID 15422
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1650 of 1803    PageID 12396
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 43 of 106

the Debtor on and after the Effective Date.  *See* Plan, Art. I.B., Definition 112.  The Reorganized Debtor, therefore, should be entitled to the same injunctive relief as the Debtor.  To hold otherwise would be illogical.

71.     The Claimant Trust and Litigation Sub-Trust are successors to the Debtor – both in structure and in assets.  Neither the Claimant Trust nor the Litigation Sub-Trust come into existence until the Effective Date, and thus, the only liability they could have to the holders of Claims and Equity Interests would be the liability to treat such Claims and Equity Interests as set forth in the Plan.  All of the property of the Claimant Trust and Litigation Sub-Trust is property of the Debtor and the Estate that these Trusts will receive from the Debtor and the Estate pursuant to the Plan on the Effective Date and is "dealt with" by the Plan.  Accordingly, under section 1141(c), that property will be received and held by the Claimant Trust and the Litigation Sub-Trust "free and clear of all claims and interests of creditors and equity security holders."  Paragraph 2 of the Injunction is in aid of this provision and, in the words of section 105, is "necessary or appropriate to carry out the provisions of" the Bankruptcy Code, *i.e.,* section 1141(c).

   E.     **The Injunction Does Not Prevent the Holders of Claims or Equity Interests from Enforcing Rights Arising under the Plan or Confirmation Order.**

72.     The Injunction does not prevent holders of Claims or Equity Interests from enforcing, after the Effective Date, rights arising under the Plan or the Confirmation Order.  The scope of the Injunction is specifically subject to the Plan, the Confirmation Order and any other order of the Court.  Thus, the right of the holder of a Claim or Equity Interest to receive its plan distributions, as set out in the Plan, is not impacted – such persons are merely enjoined from

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 6 Filed 06/26/25 Page 779 of 1017 PageID 15423
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1651 of 1803 PageID 12397
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 44 of 106

taking the enumerated actions to enforce their Claims or Equity Interests outside of the Plan process and treatment. If, for example, the Claimant Trust made distributions to certain creditors but not others, those who did not receive their distribution, would be free to enforce the provisions of the Plan contract. This is clear from the language of the Injunction, which begins "[e]xcept as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court. . . ." Plan, Art. IX.F.

73.     The Injunction is not a third-party release, does not prevent enforcement of the provisions of the Plan itself, and is neither vague nor overly-broad. The Court should overrule the objections and approve the Injunction in aid of the consummation and administration of the Plan as appropriate and consistent with sections 362, 1123 and 1141 of the Bankruptcy Code.

## VII. THE GATEKEEPER PROVISION IS NECESSARY AND APPROPRIATE, AND SUPPORTED BY APPLICABLE LAW.

### A. The Gatekeeper Provision

74.     Paragraph 4 of Section IX.F contains neither a release nor an injunction. Rather, Paragraph 4 contains a provision that requires any Enjoined Party that believes it has any claims against a Protected Party "**that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing**" to first seek leave from the Bankruptcy Court to pursue such alleged claims and present evidence as to why it believes it has a colorable claim against the

DOCS_SF:104855.7 36027/002

Appellee Appx. 01645
Appx. 01896
014458

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 65-15    Filed 06/25/2804    Page 780 of 1017    PageID 15424
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1652 of 1803   PageID 12398
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 45 of 106

Protected Person.  As discussed below, provisions such as this one, which have been referred to as "gatekeeper" or "channeling" provisions, are neither uncommon nor impermissible.

75.     It should come as no surprise that Dondero and his cohorts are the only ones who object to the Gatekeeper Provision.  The last thing they want is for a court that has had the misfortune of familiarizing itself with their antics to pass on the *bona fides* of any new tactics and lawsuits they may conjure up to stymie this case. However, as set forth below, their challenges to this Court's power and jurisdiction to pre-screen if their new lawsuits are colorable represent wishful thinking.

### B.     The Gatekeeper Provision Is Permissible under Sections 105, 1123(b)(6), and 1141(a), (b) and (c) of the Bankruptcy Code.

76.     The Gatekeeper Provision is a legitimate exercise of this Court's powers under sections 105,[36] 1123(b)(6),[37] and 1141(a), (b) and (c).[38]  The Bankruptcy Court serves as the literal guardian at the gate – determining whether a litigant has a colorable claim and may pass

---

[36] Section 105 is entitled "Power of court" and provides: (a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

[37] Section 1123(b)(6) provides: (b) Subject to subsection (a) of this section, a plan may— (6) include any other appropriate provision not inconsistent with the applicable provisions of this title.

[38] Section 1141 is entitled "Effect of confirmation" and provides, in relevant part:

(a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

(b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

(c) Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01646

014459

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 1654 of 1804    Page 781 of 1017    PageID 15425
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1653 of 1803    PageID 12399
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 46 of 106

through the gate to the applicable clerk of court and file a lawsuit. The Debtor recognizes that a Gatekeeper Provision is not found in every chapter 11 plan. However, this case is not a typical case. Indeed, recognizing the need for, and importance of, this role under the facts of this case, the Court previously entered the Settlement Order (agreed to by Dondero) which itself contains a gatekeeper provision protecting the Independent Directors. The purpose of the Gatekeeper Provision in the Plan is to insulate the Protected Persons, many of whom will be either successors to the Debtor or the fiduciaries charged with continuing the administration of the Debtor's property and causes of action post-Effective Date (which essentially involves the wind-down of the business, the monetization of the Debtor's assets and the distribution of the proceeds of same to pay the Claims of legitimate creditors), from non-stop, vexatious litigation in multiple jurisdictions over every conceivable action they take to implement and consummate the Plan.

77.    Based upon the history and record of this case – including increased activity during the past several weeks – this Court is well aware of the reality of that threat and risk in this case. During the course of this case, many of the significant actions taken by the Independent Directors have been challenged, litigated and appealed. Moreover, Dondero has interfered with the Debtor's business operations, resulting in the Court's entry of a Temporary Restraining Order and Preliminary Injunction against him.[39] A hearing on the Debtor's Motion to Hold Dondero in Contempt is scheduled for February 5, 2021. The Independent Directors, CEO/CRO, Employees, Committee and its members, and the Professionals of the Debtor and the

---

[39] *Highland Capital Management, L.P. v. James D. Dondero (In re Highland Capital Management, L.P)*, Adv. No. 20-03190 (Bankr. N.D. Tex), December 10, 2020 *Order Granting Debtor's Motion for Temporary Restraining Order against James D. Dondero* [D.I. 10] and January 11, 2021 *Order Granting Debtor's Motion for Preliminary Injunction against James D. Dondero* [D.I. 59].

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 8-15   Page 1655 of 1804   Page 782 of 1017   PageID 15426
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1654 of 1803   PageID 12400
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 47 of 106

Committee have been harassed and threatened by Dondero and his Related Entities.  There is no reason to believe these litigious tactics, threats and intimidation will cease post-Confirmation and post-Effective Date; and their unchecked continuance will seriously impair the ability of the Claimant Trust and the Litigation Sub-Trust to implement and effectuate the Plan and carry out the orders of this Court.  The Gatekeeper Provision is essential to the confirmation of this Plan and the efficient effectuation and consummation of the Plan post-Effective Date.

78.     The need for the Gatekeeper Provision is illustrated by the fact that the Independent Directors would not have been able to obtain Directors' & Officers' insurance coverage, upon their appointment, in the absence of the Settlement Order.  Insurers were unwilling to underwrite coverage without a broad exclusion restricting any type of coverage for the Independent Directors if the Settlement Order did not contain the exculpation and gatekeeper provision found in Paragraph 10 of the Settlement Order.  Similarly, the Claimant Trustee, the Litigation Trustee and the Claimant Trust Oversight Board will not be able to obtain coverage for the period of time after the Effective Date without a similar gatekeeper provision.  Accordingly, the failure to approve the Gatekeeper Provision as part of the Plan will completely frustrate the Debtor's ability to carry out the Plan and Confirmation Order.

79.     Gatekeeper provisions are not some new creative attempt to circumvent limitations on bankruptcy court jurisdiction or restrictions on non-consensual third-party releases.  They are utilized by many courts to provide a single clearing court to determine whether a claim is colorable or appropriate under the applicable facts of the main case.  For example, in the *Madoff* cases, the bankruptcy court has served as the gatekeeper for determining

DOCS_SF:104855.7 36027/002

Appellee Appx. 01648

Appx. 01899

014461

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1656 of 1804    Page 783 of 1017    PageID 15427
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1655 of 1803    PageID 12401
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 48 of 106

whether claims of certain creditors against certain Madoff feeder funds are direct claims (claims which may be brought by the creditor) or derivative claims (claims which either can only be brought by the Madoff post-confirmation liquidating trust or have already been settled by the trust.)[40] In the *General Motors* cases, certain issues arose post-effective date in regard to defects in ignition switches. Questions arose as to whether the causes of action arising from those defects were such that "New GM" had liability for them, notwithstanding that it had purchased the assets of the debtor "Old GM" free and clear. The bankruptcy court serves as a gatekeeper for this litigation, determining whether a lawsuit can go forward against New GM or is more properly dealt with as a claim against Old GM.[41]

80.    Gatekeeper or channeling provisions similar to this one, and in some instances, more extensive than the proposed Gatekeeper Provision in this Plan, have been approved by other courts in this district. In *In re Pilgrim's Pride Corp.*, 2010 Bankr. LEXIS 72 (Bankr. N.D. Tex. January 14, 2010), Judge Lynn, after concluding that *Pacific Lumber* precluded the court from granting certain requested releases and exculpations, determined that nothing in *Pacific Lumber* prevented the court from retaining exclusive jurisdiction over some of the suits against third parties which might otherwise have been covered by the third party protections. *Id.* at *16-17. Judge Lynn then expressly held that the bankruptcy court would "channel to itself any claims that may be asserted against Debtors' management (including their boards of directors and Chief Restructuring Officer) and the professionals based upon their conduct in pursuit of

---

[40] *See, e.g., Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 546 B.R. 284 (Bankr. S.D.N.Y. 2016) (discussion of court's gatekeeper function).
[41] *See, e.g., In re Motors Liquidation Co.*, 541 B.R. 104 (Bankr. S.D.N.Y. 2015) (discussing court's gatekeeper function); *In re Motors Liquidation Co.*, 568 B.R. 217 (Bankr. S.D.N.Y. 2017) (same).

DOCS_SF:104855.7 36027/002

Appellee Appx. 01649
Appx. 01909
014462

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 1656/251804   Page 784 of 1017   PageID 15428
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1656 of 1803   PageID 12402
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 49 of 106

their responsibilities during the Chapter 11 Cases." *Id.* at *18, 20-21.  In furtherance of this, the confirmation order provided that the court "shall retain ***exclusive*** jurisdiction over any suit brought on any claim or causes of action related to the Chapter 11 Cases that exists as of the Effective Date against a Committee; any member of a Committee; any Committee's Professionals; Debtors; Reorganized Debtors; or any Protected Person for conduct pertaining to Debtors during the Chapter 11 Cases, and that any entity wishing to bring such suit shall do so in this court;" *Id.* (emphasis added).  Thus, in *Pilgrim's Pride*, the court approved a broad retention of exclusive jurisdiction to adjudicate the ultimate merits of certain types of suits against protected parties, rather than merely a gatekeeper provision.

81.     Other courts in this district have agreed with Judge Lynn and ordered similarly. *See, e.g., In re CHC Group, Ltd.* (Case No. 16-31854, Bankr. N.D. Tex.) *Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization* [D.I. 1671-1, attached to *Findings of Fact and Conclusions of Law, and Order Confirming the Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization*], Section 10.8(b) at p. 57 (court retained ***exclusive*** jurisdiction to hear claims against any "Protected Party," including any claims "in connection with or arising out of . . . the administration of this Plan or the property to be distributed under this Plan, . . . or the transactions in furtherance of the foregoing, . . . .") (emphasis added).

82.     In regard to the Independent Directors, the proposed Gatekeeper Provision is a continuation of the provision set forth in Paragraph 10 of the Settlement Order, which, by its terms never expires and is expressly to remain in effect after the Effective Date under the Plan. Moreover, because of the Independent Directors' rights of indemnification against the Debtor,

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 65-15    Filed 06/25/18044    Page 785 of 1017    PageID 15429
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1657 of 1803   PageID 12403
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03    Page 50 of 106

the Gatekeeper Provision serves the important function of protecting assets that would otherwise be available for distribution to creditors from being depleted by indemnification claims resulting from the assertion of frivolous claims against the Independent Directors.

83.       As to the remaining Protected Parties, the Gatekeeper Provision is a valid exercise of the Court's authority under sections 105 and 1123(b)(6) to prevent the Protected Parties from being embroiled in frivolous litigation designed to derail implementation of the Plan. Importantly, if, in the exercise of its gatekeeper role, the Bankruptcy Court were to determine that a colorable claim exists, then it would allow the prosecution of such claim and the filing of the lawsuit in the court with applicable jurisdiction.[42]

### C.       The Gatekeeper Provision Is not an Impermissible Extension of the Post-Confirmation Jurisdiction of the Bankruptcy Court.

84.       Nor is the Gatekeeper Provision an impermissible extension of the post-confirmation jurisdiction of the bankruptcy court.  As discussed above, the Debtor modified the Gatekeeper Provision to eliminate the provision that granted the Bankruptcy Court exclusive jurisdiction to hear any claim that the Court allows to pass through the gate.  The Gatekeeper Provision requires a putative plaintiff to obtain Bankruptcy Court approval prior to bringing an action and is in aid of the Court's enforcement of the Confirmation Order and the Plan.  It is supported by sections 1141(a), (b) and (c), and thus, by section 105.  As amended, nothing in the Gatekeeper Provision is determinative of the jurisdiction of the Court over any particular claim or cause of action.  The Gatekeeper Provision only requires the court to determine <u>if a claim is</u>

---

[42] *Texas & P. R. Co. v. Gulf, C. & S. F. R. Co*., 270 U.S. 266, 274 (1926) (Court always has jurisdiction to determine its own jurisdiction).

DOCS_SF:104855.7 36027/002

Appellee Appx. 01651
Appx. 01902
014464

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-5    Filed 10/53/25 1804    Page 786 of 1017    PageID 15430
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1658 of 1803    PageID 12404
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 51 of 106

colorable.   This is a determination commonly made by bankruptcy courts in the analogous context of determining whether a creditors' committee should be granted standing to file litigation on behalf of a recalcitrant debtor.   *See, e.g., Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233 (5th Cir. 1988) (court must determine that claim is colorable before authorizing a committee to sue in the stead of the debtor).   Thus, the Bankruptcy Court has the jurisdiction to determine if a claim is colorable.

85.    Section 1142(b) provides that post-confirmation, the bankruptcy court may direct any parties to "perform any act" necessary for the consummation of the plan).   *See United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 305 (5th Cir. 2002) (holding that bankruptcy court had jurisdiction to determine whether arbitration could be used to liquidate claims post-effective date; while the plan had been substantially consummated, it had not been fully consummated, the dispute related directly to the plan, the outcome would affect the parties' post confirmation rights and responsibilities and the proceeding would impact compliance with, or completion of the plan; specifically referencing section 1142(b)).

86.    Several objectors attempt to rely on *Bank of La. v. Craig's Stores of Texas, Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir.   2001) to argue that the bankruptcy court cannot exercise a gatekeeper role and adjudicate matters related to the administration of the case and the plan.   In fact the opposite is true.   In *Craig's Stores*, the Fifth Circuit expressly recognized that post-confirmation bankruptcy jurisdiction ***continues to exist for "matters pertaining to the implementation or execution of the plan*.**"   *Id.* at 390 (*citing In re*

Appellee Appx. 01652
Appx. 01993
014465

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 53-15    Page 1660 of 1804    Page 787 of 1017    PageID 15431
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1659 of 1803    PageID 12405
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 52 of 106

*Fairfield Communities, Inc.*, 142 F.3d 1093, 1095 (8th Cir. 1998); *In re Johns-Manville Corp.*, 7

F.3d 32, 34 (2d Cir. 1993) (emphasis added).

87.     *Craig's Stores* did not involve a gatekeeper provision necessary to enable the

debtor to implement its plan.[43]  In contrast to *Craig's Stores*, the Plan provision that Dondero and

other Objectors are challenging pertains to the Court's jurisdiction over matters specifically in

aid of the implementation and effectuation of the Plan – acting as gatekeeper – and does not

implicate an improper extension of bankruptcy court jurisdiction.  As previously explained, the

Gatekeeper Provision is necessary to obtain insurance coverage for the Claimant Trustee, the

Litigation Trustee, and the members of the Claimant Trust Oversight Board – all of whom will

play critical roles in the implementation of the Plan.  Moreover, unchecked rampant litigation

against the Protected Persons, many of whom have indemnification rights against the Debtor,

Reorganized Debtor or Claimant Trust would predictably engulf the Reorganized Debtor and

Claimant Trust negatively impacting their ability to effectuate and implement the Plan and

wasting valuable resources.  *See, In re Farmland Industries, Inc.,* 567 F.3d 1010, 1020 (8th Cir.

2010) (bankruptcy court had "related to" jurisdiction over a claim by a disgruntled bidder against

the post-effective date liquidating trustee because the estate was actually paying legal fees of the

non-debtor defendants under the estate's indemnification obligations.); *see also Buffets, Inc. v.*

---

[43] In *Craig's Stores*, the issue was whether the court could hear a post-confirmation action brought by the debtor for
damages against a bank that was administering the debtor's post-confirmation private label credit card program
under an agreement that had been assumed by the debtor in its chapter 11 plan.  On appeal, the Fifth Circuit held
that the bankruptcy court did not have jurisdiction to hear the dispute, reasoning that (1) the debtor's claim
principally dealt with post-confirmation relations between the parties, (2) no facts or law derived from the
reorganization or the plan were necessary to the claim, and (3) the claim did not bear on the interpretation or
execution of the debtor's plan.  *Id.* at 391.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01653
Appx. 01994
014466

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Filed 06/25/15804    Page 788 of 1017    PageID 15432
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1660 of 1803    PageID 12406
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 53 of 106

*Leischow*, 732 F.3d 889 (8th Cir. 2013) (related-to jurisdiction existed where bankruptcy estate was obligated to indemnify non-debtor defendants for attorney's fees and other amounts).

88.    In addition, *Craig's* Stores did not involve a liquidating chapter 11 plan, and this case does involve such a plan.  There is persuasive case law, including this Court's decision in *TMXS Real Estate* (discussed below) and circuit-level authority, holding that the scope of the bankruptcy court's post-confirmation jurisdiction in the case of a liquidating chapter 11 plan is broader than that in the case of a chapter 11 plan that is not a liquidating plan.

89.    In *Boston Regional Med. Ctr., Inc. v. Reynolds (In re Boston Regional Med. Ctr., Inc.)*, 410 F.3d 100 (1st Cir. 2005), the debtor, a charitable hospital, brought an adversary proceeding against a testator trust, seeking to compel payment from the trust of an amount allegedly due to the hospital as a residual beneficiary under the trust.  The testator had died prepetition, but before the estate's assets were distributed, and the litigation was filed after confirmation of the debtor's liquidating plan of reorganization because the hospital had been unaware it was a beneficiary under the trust.  The trustee had argued that the bankruptcy court had no residual jurisdiction over the debtor's lawsuit against the trustee because the plan had been confirmed, but the bankruptcy court found it had "related to" jurisdiction.

90.    The First Circuit first analyzed the long line of cases (including *Craig's Stores*) which hold that after a debtor emerges from bankruptcy, it enters the marketplace and is no longer under the aegis of the bankruptcy court.  *Id.* at 106-107.  The court did not end its analysis there, however, but dug deeper into the significant distinctions between a liquidating plan and a true reorganization.    Under a liquidating plan, the debtor is not really re-entering the

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 160 of 251804    Page 789 of 1017    PageID 15433
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1661 of 1803    PageID 12407
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 54 of 106

marketplace; rather its "sole purpose is to wind up its affairs, convert its assets to cash, and pay creditors a pro rata dividend." *Id.* at 107. Thus, while a reorganized debtor may have litigation that clearly is outside the scope of its prior bankruptcy proceeding, that is generally not the case with a liquidating debtor. The court determined that 28 U.S.C. § 1334 had to be applied in conjunction with the applicable facts of the case, and jurisdiction was appropriate. *Id.* A "liquidating debtor exists for the singular purpose of executing an order of the bankruptcy court. Any litigation involving such a debtor thus relates much more directly to a proceeding under title 11." *Id.*

91.     This Court has also recognized the jurisdictional distinction between liquidating plans and operational reorganizations. In *TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Ctrs., LLC)*, 2020 Bankr. LEXIS 3205 (Bankr. N.D. Tex. Nov. 12, 2020), this Court held it had jurisdiction to hear a post-confirmation dispute concerning the ability of a liquidating trust, which had been formed pursuant to the plan, to liquidate the stock of the reorganized debtor it received under the plan which involved the issue of whether such action would effectuate a "change in control" that would constitute a default under a lease that had been assumed by the reorganized debtor pursuant to the plan. This Court held that (i) the liquidating trust had been formed for the purpose of liquidating the assets transferred to it pursuant to the plan and distributing the proceeds of those assets to creditors; (ii) the litigation at issue was an attempt to limit the ability of the liquidating trust to effectuate the very purpose for which it had been formed and had to be resolved prior to full consummation of the plan; (iii) resolution of the dispute would require the review of the plan, the confirmation order and possibly other orders of

Appellee Appx. 01655
Appx. 01996
014468

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-19    Page 1663 of 1804    Page 790 of 1017    PageID 15434
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1662 of 1803    PageID 12408
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 55 of 106

the court; (iv) the litigation would impact compliance with, or completion of the plan; and (v) the litigation directly related to the plan's implementation or execution.  *Id.* at *21-23.

92.    Just as in the *TXMS Real Estate* and *Boston Regional* cases, the Claimant Trust, Litigation Sub-Trust and Reorganized Debtor exist solely for the purpose of operating the Debtor's business and properties to monetize its assets and pay creditors.    Any "post-confirmation operations" of the Reorganized Debtor will, therefore, be directed towards that monetization process and, furthermore, properly subject to the Court's purview to ensure consummation of the Plan and creditor distributions pursuant to section 1142 of the Bankruptcy Code.    Any prospective, but baseless, litigation over the acts taken by these entities in effectuating the Plan will have a significantly negative impact on the ability of the Claimant Trust, Litigation Sub-Trust and Reorganized Debtor to effectuate the Plan and will deplete the assets otherwise available for distribution to creditors.    The Gatekeeper Provision simply ensures that any such prospective litigation is colorable before it can be filed.

93.    The Fifth Circuit's decision in *EOP-Colonnade of Dallas Ltd. P'ship v. Faulkner (In re Stonebridge Techs., Inc.)*, 430 F.3d 260, 266-67 (5th Cir. 2005), is instructive.    In *Stonebridge*, the liquidating trustee under a confirmed chapter 11 plan sued a landlord in connection with the landlord's draw on a letter of credit that had been provided as security in connection with a real property lease the debtor had rejected during its bankruptcy case, where the trustee was assigned the issuing bank's claim against the landlord for alleged misrepresentation.    Although the Fifth Circuit had concerns over jurisdiction of the bank's assigned claim to the trustee, the court went on to opine that "[u]pon closer review, however,

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1664/251804    Page 791 of 1017    PageID 15435
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1663 of 1803    PageID 12409
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 56 of 106

additional effects on the estate are evident: a claim by the Bank against [the landlord] affects the need for the Bank to seek reimbursement from Stonebridge's bankruptcy estate. [The landlord's] draw on the Letter of Credit triggered [the debtor's] contractual responsibility to reimburse the Bank for the draw on the Letter of Credit. . . . If the Bank is successful against [the landlord] on its negligent misrepresentation claims, the need for reimbursement from [the bankruptcy] estate is alleviated." *Id.* at 266-267. Accordingly, the court held that the negligent misrepresentation claims of the bank against the landlord fell within bankruptcy jurisdiction.  The court noted other cases that involved litigation between third parties that have been found to have an effect on the administration of the bankruptcy estate, including suits by creditors against guarantors and a suit by creditors of a debtor against defendants that allegedly perpetrated a fraud. *Id.* at 267 (*citing* 3 *Collier on Bankruptcy* ¶ 3.01 (15th ed. rev. 2005)).

94.    Based on the reasoning of *Stonebridge*, other courts, including this Court, have held that contingent indemnification rights trigger "related to" subject-matter jurisdiction of state law disputes between two non-debtors in the pre-confirmation context.  *See, e.g.*, Principal *Life Ins. Co. v. JP Morgan Chase Bank, N.A. (In re Brook Mays Music Co.)*, 363 B.R. 801 (Bankr. N.D. Tex. 2007) (contingent right of indemnity in pre-confirmation litigation between two non-debtors triggers bankruptcy court's pre-confirmation "related to" jurisdiction (*citing Stonebridge*)).  In *In re Farmland Industries, Inc.*, the Eighth Circuit has similarly held that it had post-confirmation subject-matter jurisdiction over state law claims between non-debtors where the liquidating trustee was paying the legal fees incurred to defend individuals (former officers and directors) in the dispute.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01657
Appx. 01908
014470

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 18-15   Page 1665 of 1804   Page 792 of 1017   PageID 15436
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1664 of 1803   PageID 12410
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 57 of 106

95.    In sum, in light of the proposed amendments to the Plan and under the circumstances here, Dondero's objection to this Court's jurisdiction to serve as a gatekeeper is not well-taken and should be overruled.  The retention of the *de minimis* jurisdiction to perform the gatekeeper function is clearly supported by Fifth Circuit law.

**D.    The Gatekeeper Provision Is Consistent with the Barton Doctrine.**

96.    Support for the Gatekeeper Provision can be found in the Barton Doctrine, which by analogy, should be applied to many of the Protected Parties identified in the Gatekeeper Provision.  The Barton Doctrine is based on the U.S. Supreme Court case, *Barton v. Barbour*, 104 U.S. 126, 26 L. Ed. 672 (1881) dealing with receivers.  As this Court has recognized, the Barton Doctrine:

> provides that, as a general rule, before a suit may be brought against a trustee, leave of the appointing court (*i.e.*, the bankruptcy court) must be obtained. The *Barton* doctrine is *not* an immunity doctrine but – strange as this may sound – has been held to be a *jurisdictional* provision (in other words, a court will not have subject matter jurisdiction to adjudicate a suit against a trustee *unless and until* the bankruptcy court has granted leave for the lawsuit to be filed).

Baron v. Sherman (In re Ondova Ltd. Co.), 2017 Bankr. LEXIS 325, *29 (Bankr. N.D. Tex. February 1, 2017); report and recommendation adopted, Baron v. Sherman (In re Ondova Co.), 2018 U.S. Dist. LEXIS 13439 (N.D. Tex., Jan. 26, 2018), aff'd., In re Ondova Ltd., 2019 U.S. App. LEXIS 3493 (5th Cir. Tex., Feb. 4, 2019).  The Barton Doctrine originated as a protection for federal receivers, but courts have applied the concept to various court-appointed and court-approved fiduciaries and their agents in bankruptcy cases, including trustees,[44] debtors in

------

[44] *Id.*

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 6    Page 166 of 258 804    Page 793 of 1017    PageID 15437
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1665 of 1803    PageID 12411
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 58 of 106

possession,[45] officers and directors of a debtor,[46] the general partner of the debtor,[47] employees,[48] and attorneys retained by debtors and trustees.[49]   The Barton Doctrine has also been applied to non-court appointed agents who are retained by the trustee for purposes relating to the administration of the estate.[50]   The Barton Doctrine continues to protect those who are within its scope post-Confirmation and post-Effective Date.[51]

97.     The Fifth Circuit has expressly recognized the continuing viability of the Barton Doctrine, notwithstanding the jurisdictional issues raised by *Stern v. Marshall*.[52]   Since the Barton Doctrine is jurisdictional only as to the ability of the prospective plaintiff to file the lawsuit, it does not implicate the issue of expansive post-effective date bankruptcy court jurisdiction as to the actual underlying lawsuit.   Thus, the gatekeeper court can determine if a

---

[45] *Helmer v. Pogue*, 212 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying Barton Doctrine to debtor in possession); *see also*, 11 U.S.C §§ 1107(a) of the Bankruptcy Code, providing that a debtor in possession has all the rights and duties of a trustee and serves in the same fiduciary capacity.

[46] *See Carter v. Rodgers*, 220 F.3d 1249, 1252 and n.4 (11th Cir. 2000) (debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer for acts done in the actor's official capacity, and finding no distinction between a "bankruptcy-court-appointed officer" and officers who are "approved" by the court.); *Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*, 167 B.R. 389 (Bankr. D. Md. 1994) (president of debtor).

[47] *Gordon v. Nick*, 1998 U.S. App. LEXIS 21519 (4th Cir. 1998) (managing partner of debtor).

[48] *Lawrence v. Goldberg*, 573 F.3d 1265, 1270 (11th Cir. 2009) (affirming dismissal of lawsuit under the Barton Doctrine due to the plaintiff's failure to seek leave in the bankruptcy court to file an action against the trustee and other parties assisting the trustee in carrying out his official duties).

[49] *Lowenbraun v. Canary (In re Lowenbraun)*, 453 F.3d 314, 321 (6th Cir. 2006) (trustees' counsel).

[50] *See, e.g., Wells Fargo Fin. Leasing, Inc. v. Jones*, 2015 WL 1393257, at *3-*5 (W.D. Ky. Mar. 25, 2015) (holding that because defendant acted as bankruptcy trustee's agent in performing duties at the direction of and in furtherance of the trustee's responsibilities, claims asserted against defendant were essentially clams against trustee, and court lacked jurisdiction over the claims under *Barton* Doctrine); *Ariel Preferred Retail Group, LLC v. CWCapital Asset Mgmt.*, 883 F. Supp. 2d 797, 817 (E.D. Mo. 2012) (property management company engaged by receiver).

[51] *Helmer v. Pogue* at *15, *citing Carter*, 220 F.3d at 1252-53.  *See also, Beck v. Fort James Corp. (In re Crown Vantage, Inc.)*, 421 F.3d 963, 972-73 (9th Cir. 2005) (Barton Doctrine applies to trustee of a post-confirmation liquidating trust formed pursuant to a plan of liquidation); *Muratore v. Darr*, 375 F.3d 140, 147 (1st Cir. 2004) (doctrine serves additional purposes even after the bankruptcy case has been closed and the assets are no longer in the trustee's hands; suit was for malfeasance of trustee in performing his duties filed after estate was closed.)

[52] *See Villegas v. Schmidt*, 788 F.3d 156, 158-59 (5th Cir. 2015) (holding that a litigant must still seek authority from the bankruptcy court that appointed the trustee before filing suit even if the bankruptcy court might not have jurisdiction over the suit itself.)

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-15   Page 10667/251804   Page 794 of 1017   PageID 15438
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1666 of 1803   PageID 12412
Case 19-34054-sgj11   Doc 1807   Filed 01/22/21   Entered 01/22/21 18:52:03   Page 59 of 106

proposed lawsuit asserts colorable claims, and, if it does, the gatekeeper court can then turn to the separate issue of whether it has jurisdiction over the merits of the lawsuit.

98.     The Barton Doctrine requires a litigant to obtain approval of the appointing or approving court before commencing a suit against court-appointed or court approved officers and their agents – which arguably encompasses most, if not all, of the Protected Parties.  The Gatekeeper Provision preserves the integrity of the process, and prevents valuable estate resources from being spent on specious litigation, without impairing the rights of legitimate prospective litigants with potentially valid causes of action.  The Gatekeeper Provision is not only a prudent use of the Court's authority under section 105 and is within the spirit of the protections afforded fiduciaries and their agents under the Barton Doctrine – it is also critical to ensuring the success of the Plan.

99.     The Gatekeeper Provision does not effectuate a non-consensual third-party release.  It merely requires potential litigants to first vet their alleged causes of action with a single court – the bankruptcy court – before they can be prosecuted.  If there has ever been a case where a Gatekeeper Provision is appropriate it is this case.  As the Court is well aware, Dondero appears to thrive on litigation.  This Court has remarked on many occasions during this case that prepetition, the Debtor operated under a culture of litigation under the control of Dondero.  It was the years of sharp practices by the Debtor and an avalanche of litigation against it that resulted in the Debtor commencing a chapter 11 case and the ultimate appointment of the Independent Directors.  Faced with impending confirmation and the loss of his company forever, Dondero has turned the tables and the Debtor and the Protected Parties have become his target

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 5 Page 1668 of 1804 Page 795 of 1017 PageID 15439
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1667 of 1803 PageID 12413
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 60 of 106

for litigation. Left unchecked, there is no doubt that Dondero will continue his litigation crusade after the Effective Date and attempt to thwart implementation of the Plan at every turn by commencing baseless lawsuits. Requiring this Court, which approved the appointment of the Independent Directors and has extensive familiarity with the Debtor and this case to first determine whether alleged claims are colorable is prudent and within this Court's authority. Moreover, centralizing the gatekeeper function in one court puts that court in a unique position to ascertain whether there is a pattern of spurious litigation by certain entities and their related parties.

### E. The Gatekeeper Provision Is a Necessary and Appropriate Shield against the Actions of Dondero and his Related Entities.

100. The Fifth Circuit has recognized that in appropriate circumstances, a federal court can enjoin or issue other appropriate sanctions against vexatious litigants – persons who have a history of filing repetitive and spurious litigation for the purposes of harassment and intimidation. *See* All Writs Act, 28 U.S.C. §1651. In *Caroll v. Abide (In re Carroll)*, 850 F.3d 811 (5th Cir. 2017), the Fifth Circuit held that a bankruptcy court could properly sanction certain debtors as vexatious litigants when the debtors and their various family members continually filed litigation to prevent the bankruptcy trustee from performing his duties. When considering whether to enjoin future filings, the court must consider the circumstances of the case, including four factors:

> (1) the party's history of litigation, in particular whether he has filed vexatious, harassing, or duplicative lawsuits; (2) whether the party had a good faith basis for pursuing the litigation, or simply intended to harass; (3) the extent of the burden on the courts and other parties resulting from the party's filings; and (4) the adequacy of alternative sanctions.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1669 of 1804   Page 796 of 1017   PageID 15440
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1668 of 1803   PageID 12414
Case 19-34054-sgj11   Doc 1807   Filed 01/22/21   Entered 01/22/21 18:52:03   Page 61 of 106

*Id.* at 815, *citing Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008) (*quoting*

*Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 818 (4th Cir. 2004)).

101.    In some circumstances where courts feel that enjoining all future litigation by a

vexatious litigant may be too difficult to articulate or have potential due process implications,

courts essentially issue a gatekeeper injunction.  *See, e.g., Baum v. Blue Moon Ventures, LLC,*

513 F.3d at 189 (after the bankruptcy court and district court were able to piece together that the

Baums interjected themselves in various bankruptcy proceedings by filing vexatious, abusive and

harassing litigation, an injunction was entered preventing the Baums from filing litigation

without the consent of the district court judge.); *Safir v. United States Lines, Inc.,* 792 F.2d 19,

25 (2d Cir. 1986) (Second Circuit agreed the litigant's conduct warranted a pre-filing injunction,

but narrowed the scope such that the litigant had to seek permission from the district court before

filing certain types of additional actions.)

102.    Dondero and his Related Entities are the quintessential vexatious litigants, and the

Gatekeeper Provision is a legitimate tool for the Bankruptcy Court, properly within the

jurisdiction of the Bankruptcy Court, and less burdensome on Dondero and his Related Entities

than a full injunction – which the Debtor believes would be justified in seeking in this case.

## VIII.   THE EXCEPTION TO DISCHARGE DOES NOT APPLY

103.    The exception to discharge contained in 11 U.S.C. § 1141(d)(3) does not apply.

Section 1141(d)(3) provides that:

> Confirmation of a plan does not discharge a debtor if --
>
> > (A) The plan provides for the liquidation of all or substantially all
> > of the property estate;

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 1670 of 1804    Page 797 of 1017    PageID 15441
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1669 of 1803    PageID 12415
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 62 of 106

(B) The debtor does not engage in business after consummation of the plan; and

(C) The debtor would be denied a discharge under section 727(a) of this title if the case were a case under Chapter 7 of this title.

*See* 11 U.S.C. § 1141(d)(3).

104.    Since the provisions of § 1141(d)(3) are in the conjunctive, if any one of the three prongs of the test is lacking, confirmation of a plan results in the discharge of debt. House Rep. No. 95-595, 95th Cong. 1st Sess. 418-19 (1977), *reprinted in*, 1978 U.S.C.C.A.N. 5963, 6374-75 ("if all or substantially all of the distribution under the plan is of all or substantially all of the property of the estate or the proceeds of it, if the business, if any, of the debtor does not continue, *and* if the debtor would be denied a discharge under section 727 … then the Chapter 11 discharge is not granted.") (emphasis added); *Financial Sec. Assur. v. T-H New Orleans Lt. Pshp. (In re T-H New Orleans Lt. Pshp.)*, 116 F.3d 790, 804 (5th Cir. 1997) ("[T]his section requires that all three requirements be present in order to deny the debtor a discharge."); *In re River Capital Corp.*, 155 B.R. 382, 387 (Bankr. E.D. Va. 1991) (the provisions of § 1141(d)(3) are in the conjunctive).

105.    Here, only subpart C of § 1141(d)(3) clearly applies.[53]  With respect to the subpart A of § 1141(d)(3), here, the Plan clearly provides for a gradual liquidation of all or substantially all the estate's assets.  However, a discharge is nonetheless appropriate because an orderly wind down is anticipated to last for up to two years, and the Reorganized Debtor will continue to manage various funds during that period.  Under similar circumstances, at least one court has suggested that the plan would fall outside the policies of § 1141(d)(3)(A).  *In re Enron Corp.*,

---

[53] As a corporate debtor, the Debtor would not receive a discharge under section 727(a) in a Chapter 7.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 1676/251804   Page 798 of 1017   PageID 15442
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1670 of 1803   PageID 12416
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 63 of 106

2004 Bankr. LEXIS 2549, \**215-17 (Bankr. S.D.N.Y. July 15, 2004) ("[T]the indeterminate period of retention of the assets after the Effective Date and the clear need for ongoing business operations to maximum value for all creditors in liquidating the assets necessitates the application of the section 1141 discharge to the Reorganized Debtors.").  Moreover, even if subpart A of § 1141(d)(3) is met, subpart B of § 1141(d)(3) – engaging in business – is lacking.  *T-H New Orleans Lt. Pshp.*, 116 F.3d at 804, n. 15 (holding that the reorganized entity's likelihood of conducting business for two years following plan confirmation satisfies § 1141(d)(3)(B)); *In re River Capital Corp.*, 155 B.R. at 387 (discharge warranted where current management stated its intention to continue to engage in business after consummation of the plan).

### IX.   THE SENIOR EMPLOYEE OBJECTION

#### A.   The Senior Employee Objection Should Be Overruled

106.   Scott Ellington, Isaac Leventon, Frank Waterhouse, and Thomas Surgent (collectively, the "Senior Employees")[54] filed the Senior Employee Objection.  Subsequent to its filing, Mr. Waterhouse and Mr. Surgent executed a Senior Employee Stipulation (as discussed below) and will withdraw their support of the Senior Employee Objection.  The only remaining Senior Employees objecting to the Plan are Mr. Ellington and Mr. Leventon.  Mr. Ellington and Mr. Leventon argue, among other previously addressed objections, that the Plan is not confirmable because (1) the Plan violates section 1123(a)(4)'s requirement that claims in the same class be treated the same, and (2) the Debtor has prevented the Senior Employees from

---

[54] Although Mr. Ellington and Mr. Leventon are included in the definition of Senior Employees, they were both terminated for cause and are no longer employees of the Debtor.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5   Page 16/18 of 151804   Page 799 of 1017   PageID 15443
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1671 of 1803   PageID 12417
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 64 of 106

making the Convenience Class Election. These objections are meritless, and the Senior Employee Objection should be overruled.

### B.   Background Related to Senior Employees

107.   The Debtor's employees, including the four Senior Employees, were eligible to receive compensation under two separate bonus plans: an annual bonus plan and deferred compensation plan. Both of these plans required the employee to remain employed as of the applicable vesting date to receive the bonus. On December 4, 2019, the Debtor filed a motion seeking authorization to pay bonuses under these plans, to which the Committee objected to the inclusion of the Senior Employees. At a hearing on the motion, the Debtor agreed to remove the Senior Employees (*see* 1/21/2019 Hearing Tr., Docket No. 393 at 119:21-22), and the motion was granted as presented at the hearing [Docket No. 380]. Accordingly, the rank and file employees were paid on account of their bonuses that vested in 2020, with the exception of the Senior Employees who have vested bonus claims.

108.   On May 26, 2020, each of the Senior Employees filed a single proof of claim against the Debtor in an unliquidated amount.[55] *See* Proof of Claim Nos. 192 (claim of Ellington claiming "not less than $7,604,375"); 184 (claim of Leventon claiming "not less than $1,342,379.68"); (collectively, the "Proofs of Claim"). The Proofs of Claim did not provide any calculations or breakdown of amounts to support the minimum claimed.

---

[55] An amended proof of claim was filed by Mr. Ellington on July 16, 2020. Each Senior Employee asserted that a portion thereof, in a liquidated amount pursuant to the statutory cap of section of section 507(a)(4), is entitled to priority under the Bankruptcy Code. In addition, the portion of the claim related to PTO was classified in Class 6 under the Plan.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/06/25   Page 800 of 1017   PageID 15444
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1672 of 1803   PageID 12418
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 65 of 106

109.   Each Proof of Claim sets forth the following with respect to "compensation" owed:

> Claimant is owed compensation for his services, including, without limitation, (i) all salaries and wages; benefits; (ii) bonuses (including performance bonuses, retention bonuses, and similar awards), (iii) vacation and paid time off, and (iv) retirement contributions, pensions and deferred compensation.  The amount of the Claim for such compensation includes both liquidated and unliquidated amounts.

*See* Claim Nos. 192, 182, 184, 183, each at Attachment ¶3.

110.   The official claims register maintained by KCC lists the general unsecured claim amount for each Senior Employee as "UNLIQUIDATED."  The claim of each Senior Employee not requiring separate classification under the Plan (*i.e.*, the priority and PTO portions), was classified as a General Unsecured Claim in Class 8 (each, a "GUC Claim").

111.   On October 27, 2020, during a hearing on the Debtor's then-existing disclosure statement, this Court and the Committee were highly critical of the proposed plan provisions concerning employee releases and strongly suggested that the plan was unlikely to be confirmed as drafted.  As a result, the Debtor began negotiating with the Committee concerning the terms on which Senior Employees would be permitted to obtain a release.  Ultimately, the Debtor and the Committee agreed that the Senior Employee would be required to execute a stipulation with the Debtor providing for the resolution and payment of deferred compensation at reduced rates and other consideration in exchange for a Plan release.  Specifically, the Senior Employee Stipulation, if approved by this Court and signed by the Senior Employee, would allow the "Earned Bonus" (as defined in the Senior Employee Stipulation) portion of the Senior Employees' to be treated as a separate Convenience Claim (subject to reduction as set forth in

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 13-15    Page 1 of 251804    Page 801 of 1017    PageID 15445
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1673 of 1803    PageID 12419
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 66 of 106

the Senior Employee Stipulation). In exchange for this reduction, and together with the Senior Employee's agreement to (a) cooperate with the Claimant Trustee and Reorganized Debtor, (b) refrain from taking certain actions against those parties, and (c) support and vote in favor of the Plan, the Senior Employee would receive a Plan release and the treatment provided with respect to the "Earned Bonus" in the Plan and Senior Employee Stipulation.

112. As part of its settlement discussions with the Senior Employees, the Debtor provided the Senior Employees with a chart outlining how the reduction of the "Earned Bonus" would work if the Senior Employees executed the Senior Employee Stipulation. This chart was the same chart provided to the Committee in connection with the negotiation of the Senior Employee Stipulation. This chart was never publicly-filed and did not contain "representations" or promises. It was a chart provided to the Senior Employees to illustrate how a portion of the Senior Employees' total claims would be treated if they signed the Senior Employee Stipulation and to describe the consideration that the Senior Employee would provide in exchange for the release contained in the Plan. Notably, the Disclosure Statement included the same calculation that was set forth in the chart provided to the Senior Employees.[56]

113. In no world was the chart – provided in settlement discussions and for substantive purposes – a promise to pay.

---

[56] *See* Disclosure Statement, page 71, which states:

> In addition to the obligations set forth in Article IX.D. of the Plan, as additional consideration for the foregoing releases, the Senior Employees will waive their rights to certain deferred compensation owed to them by the Debtor. As of the date hereof, the total deferred compensation owed to the Senior Employees was approximately $3.9 million, which will be reduced by approximately $2.2 million to approximately $1.7 million. That reduction is composed of a reduction of (i) approximately $560,000 in the aggregate in order to qualify as Convenience Claims, (ii) approximately $510,000 in the aggregate to reflect the Convenience Claims treatment of 85% (and may be lower depending on the number of Convenience Claims), and (iii) of approximately $1.15 million in the aggregate to reflect an additional reduction of 40%.

Appellee Appx. 01667
Appx. 01918
014480

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1675 of 1804   Page 802 of 1017   PageID 15446
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1674 of 1803   PageID 12420
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 67 of 106

114.    Despite this, the Senior Employee Objection argues that such chart "shows the recovery to the Senior Employees if they do not sign the Senior Employee Stipulation but make the Convenience Class Election, and it separately shows the reduced recovery" if they sign the Senior Employee Stipulation.  The Senior Employees further argue that the chart evidences the Debtor's intent that the Senior Employees could elect Convenience Class treatment of their "Earned Bonus" whether or not they executed the Senior Employee Stipulation.  As set forth above, nothing in the chart supports that argument.  The chart was simply a illustration of how the Senior Employee Stipulation would work if executed and the consideration that would be given by each Senior Employee for the release.[57]

115.    Finally, the Senior Employees' comments were solicited on all but the economic terms of the Senior Employee Stipulation.  The Senior Employees were also encouraged to raise any issues they had with the Senior Employee Stipulation to the Committee and/or this Court.  The Senior Employees' counsel at Winston & Straw provided comments on the Senior Employee Stipulation, which both the Debtor and the Committee accepted.  The Senior Employees themselves, however, refused to comment despite having the opportunity to do so and instead demanded that the Debtor retract the Senior Employee Stipulation because it did not reflect an agreement between the Senior Employees and the Debtor. On information and belief,

---

[57] As part of the Plan negotiations, Mr. Seery engaged in multiple conversations with all or some of the Senior Employees. Some of these conversations were with counsel; some were not. In each case, however, the conversations were part of a broader settlement discussion. During these discussions, the Senior Employees asked questions about how the Senior Employee Stipulation would work but also made blatant threats about how they would react if they were not treated in the manner they deemed appropriate.  Mr. Seery made no promises to the Senior Employees during these conversations.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01668
Appx. 01919
014481

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 63-19 Page 1676 of 1804 Page 803 of 1017 PageID 15447
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1675 of 1803 PageID 12421
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 68 of 106

the Senior Employees never approached the Committee to discuss the Senior Employee Stipulation. The only communication with this Court has been the Senior Employee Objection.

116. None of the Senior Employees elected to sign the Senior Employee Stipulation. Subsequent to the filing of the Senior Employee Objection, Mr. Seery discussed with Mr. Waterhouse and Mr. Surgent the possibility of signing the Senior Employee Stipulation, and Mr. Waterhouse and Mr. Surgent elected to sign the Senior Employee Stipulation (with certain revisions). However, as Mr. Ellington and Mr. Leventon are not currently employed by the Debtor, they are no longer eligible to sign the Senior Employee Stipulation.

**C.    Treatment of Senior Employee Claims Under Plan**

117. The Plan provides the following treatment to the Class 8 GUC Claims of the Senior Employees:

> Treatment: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

Plan, III.H.8.

118. The Plan provides that a Holder of a General Unsecured Claim may make a "Convenience Class Election" as follows:

> "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim *that is a liquidated Claim as of the Confirmation Date on their Ballot* to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.[58]

---

[58] A "Convenience Claim" is defined as:

DOCS_SF:104855.7 36027/002

Appellee Appx. 01669

014482

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 1676 of 1804   Page 804 of 1017   PageID 15448
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1676 of 1803   PageID 12422
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 69 of 106

Plan, I.B.43 (emphasis added).

119.     As discussed above, the Senior Employees' claims are unliquidated and were disclosed as unliquidated on the official claims register maintained by KCC. As unliquidated and unsecured claims, the Senior Employees' claims are, in each case, Class 8 (General Unsecured Claims), and, as holders of unliquidated GUC Claims, none of the Senior Employees were entitled to make the Convenience Class Election.

120.     Irrespective of their claims, the Senior Employees are not entitled to a release under of the Plan unless they execute a Senior Employee Stipulation. *See* Article IX.D.

**D.      Plan Solicitation**

121.     Although each of the Senior Employee's GUC Claim was classified *in toto* as Class 8 (General Unsecured Claims), the Senior Employees erroneously received both a Class 7 (Convenience Class) and Class 8 (General Unsecured) Ballot.  Except for Mr. Surgent, each of the Senior Employees voted their Class 8 (General Unsecured Claim) ballot to reject the Plan, and each of the Senior Employees voted their erroneously Class 7 (Convenience Class) ballot to reject the Plan.  Mr. Surgent abstained from voting on the Plan.  Because they have now executed the Senior Employee Stipulation, Mr. Waterhouse and Mr. Surgent's votes will be cast to accept the Plan.

---

any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election.  For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.
Plan, I.B.41.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibits   Page 16/08/25 1804   Page 805 of 1017   PageID 15449
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1677 of 1803   PageID 12423
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 70 of 106

### E.     The Plan Does Not Violate Section 1123(a)(4)

122.    Section 1123(a)(4) requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4).

123.    The Senior Employees argue that the Plan does not treat them the same as other Employees in the same class because the Senior Employees are not automatically being granted a release under the Plan, whereas other Employees are being granted a release automatically upon confirmation.  However, the Senior Employees conflate treatment of their claims with the decision not to automatically provide them a release.  The treatment of claims in either Class 7 or Class 8 solely consists of distributions on account of the allowed amounts of such claims, and there is no difference in treatment among members of either class in terms of the distribution scheme provided.  The releases under the plan are not part of the "treatment" of Class 7 or Class 8 claims.

124.    Indeed, the releases granted under the Plan are part of an entirely different section of the Plan (Article IX).  Debtors are not required to grant releases to anyone nor are they required to grant releases to all employees equally, especially here, where there are allegations of material misconduct against some, but not all, of the employees.[59]  Nonetheless, the Debtor, after extensive negotiations with the Committee (which did not want to provide *any* release to the Senior Employees) presented the Senior Employees with a mechanism by which the Senior Employees could obtain a release *if* they agreed to the conditions of the Senior Employee

---

[59] Indeed, the grant of third party releases is heavily scrutinized and could not be granted to all general unsecured creditors across the board as part of the Plan's treatment of general unsecured claims. *See Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009).

Appellee Appx. 01671

Appx. 01922

014484

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5   Page 10/6/251804   Page 806 of 1017   PageID 15450
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1678 of 1803   PageID 12424
Case 19-34054-sgj11   Doc 1807   Filed 01/22/21   Entered 01/22/21 18:52:03   Page 71 of 106

Stipulation.[60]  But just as the Senior Employees were not required to sign the stipulation,[61] the Debtor cannot be forced to provide a release to each Senior Employee just because it has provided releases to other Employees.  Nor would this Court or the Committee have allowed the Debtor to provide releases to the Senior Employees without those Senior Employees providing additional consideration to the Debtor's estate.  As the Court will recall, at the October 28, 2020, the Court specifically told the Debtor that it would be hard-pressed to approve releases to certain of the Debtor's employees if such employees did not provide consideration for the releases.[62] The Senior Employee Stipulation was crafted to address the Court's concerns by conditioning the release of *certain* of the Debtor's employees on the provision of other consideration.

125.    Finally, the Senior Employees devote considerable time arguing that the proposed Senior Employee Stipulation suffers from numerous defects and that the terms are too harsh.  But

---

[60]As Mr. Ellington and Mr. Leventon are no longer employed by the Debtor, they are not eligible to sign the Senior Employee Stipulation.  Accordingly, they are not entitled to a release regardless of the Senior Employee Stipulation.

[61] While voluntary agreement is expressly excepted from section 1123(a)(4) anyway, debtors are permitted to treat one set of claim holders more favorably than another so long as the treatment is not on account of the claim but for distinct, legitimate rights or contributions from the disparately-treated group separate from the claim.  *Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.)*, 933 F.3d 918, 925 (8th Cir. 2019).  The Ninth Circuit, for instance, upheld a plan that provided preferential treatment to one of a debtor's shareholders apparently because the preferential treatment was tied to the shareholder's service to the debtor as a director and officer of the debtor, not to the shareholder's ownership interest.  *See In re Acequia, Inc*., 787 F.2d 1352, 1362-63 (9th Cir. 1986) ("[The shareholder's] position as director and officer of the Debtor is separate from her position as an equity security holder."); *see also Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 518-19 (5th Cir. 1998) (plan proponent's payments to certain members of power cooperative did not violate § 1123(a)(4) because the payments were "reimbursement for plan and litigation expenses," not payments "made in satisfaction of the [members'] claims against [the debtor]").  Here, too, the release consideration required from the Senior Employees *solely in order for the Senior Employees' to obtain a release* relates to their positions as senior employees rather than their position as general unsecured creditors.

[62] *See* Hearing Transcript, Oct. 28, 2020, at 30:17-22:

> So, and I'll just throw in one last bit of food for thought. . . the Debtor has had a year now, close to a year now, to knock some of these out, you know, maybe reach some compromises with some of the related Highland parties and officers, to maybe participate in the plan with some sort of contribution, and it's just not happening. It's not happening. . . . So, at this point, I would be hard-pressed to protect any nondebtor defendants who aren't ponying up something to the whole plan reorganization process.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01672
Appx. 01925
014485

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 18-15    Page 1080 of 1804    Page 807 of 1017    PageID 15451
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1679 of 1803    PageID 12425
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 72 of 106

those objections are irrelevant to confirmation.  If the Senior Employees believed that the cost of the release was too high, they had no obligation to sign the Senior Employee Stipulation.

**F.      The Senior Employees Are Not Permitted to Make Convenience Class Election**

126.    The Senior Employees next argue that the Debtor has improperly prevented the Senior Employees from electing Convenience Class treatment for a portion of their Claims. Under applicable bankruptcy law, the Plan, and the Disclosure Statement Order, the Senior Employees are not entitled to split their claims to create a liquidated claim for which Convenience Class Election would even be possible.[63]    Further, even if the Senior Employees were entitled to elect a Convenience Class Election for a *portion* of their Class 8 Claims for distribution purposes, as discussed below, their Claims are only entitled to be voted in Class 8 for voting and numerosity purposes.

**G.      Convenience Class Election Is Unavailable Because Senior Employee's GUC Claims Cannot Be Split Under Applicable Bankruptcy Law**

127.    The Senior Employees argue that the "Earned Bonus" portion of each GUC Claim is "liquidated"[64] and therefore eligible for the Convenience Class Election.[65]    The "Earned

---

[63] The Senior Employees claim the Debtor's statements contradict the plan; however, any purported contradiction stems from the Senior Employees' misstatement of the Debtor's position.  Indeed, even if the Debtor had made contradictory statements, it is irrelevant.  The Plan says what it says and the Debtor cannot unilaterally change the terms of the Plan with respect to a select group of creditors.  While a Class 7 Ballot was mistakenly sent to the Senior Employees, the Senior Employees cannot make the Convenience Class Election under the Plan because they each hold a single, unliquidated Class 8 Claim.

[64] The Plan did not need to define the term "liquidated."  Generally, a debt is liquidated if the amount due and the date on which it was due are fixed or certain, or when they are ascertainable by reference to (1) an agreement or (2) to a simple mathematical formula.  *In re Visser*, 232 B.R. 362, 364-65 (Bankr. N.D. Tex. 1999).  However, even if the Earned Bonus *portion* is liquidated in that the amount is capable of being ascertained, it is not considered liquidated for purposes of voting where the amount owed or formula for calculation are missing from the proof of claim.  *See In re Lindell Drop Forge Co.*, 111 B.R. 137, 142-43 (Bankr. W.D. Mich. 1990); *see also Riemer & Braunstein LLP v. DeGiacomo (A & E 128 North Corp.)*, 528 B.R. 190, 199 (1st Cir. B.A.P. 2015) (court looks to proof of claim forms to determine if they sufficiently demonstrate liquidated claims).

[65] None of the Senior Employees' Proofs of Claim contains any liquidated amount with respect to any component of

DOCS_SF:104855.7 36027/002

Appellee Appx. 01673
Appx. 01924
014486

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 16 of 251804   Page 808 of 1017   PageID 15452
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1680 of 1803   PageID 12426
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 73 of 106

Bonus" portion, even if liquidated, is not a standalone claim entitled to make a Convenience

Class Election, nor can the Senior Employees split their GUC Claim after filing a single proof of

claim. The Senior Employees do not cite any law to support their contention that claims of a

single creditor in a given class, set forth in a single proof of claim, may be split into multiple

claims.[66] Indeed, case law holds the opposite. Courts have found that where a claimant files a

single proof of claim, even if it covers multiple debts, he is not entitled to split his claims. *In re

Jones*, 2012 Bankr. LEXIS 1076, *7 (Bankr. M.D. Ga. 2012) (noting that the creditor could have

filed multiple proofs of claim to avoid the issue); *see also In re Latham Lithographic Corp*., 107

F.2d 749 (2d Cir. 1939) (claimant cannot split claim into multiple claims for the purpose of

creating multiple creditors who could vote in a trustee election). The Senior Employees each

filed a single proof of claim: they cannot split their GUC Claim in order to make the

Convenience Class Election under the Plan and applicable bankruptcy law. And the Plan is clear

on this; no other Holder of an unliquidated or partially liquidated Class 8 claim attempted to split

its claim or make the Convenience Class Election.

---

the GUC Claim, including the "Earned Bonus." The Senior Employees appear to make the stunning assertion that the Debtors' books and records establish whether a claim is liquidated and the amount of such claim, even when the proof of claim lists no such amounts. There is no proof of claim on file listing a liquidated amount, no executed stipulation agreeing on a liquidated amount, and no order of the Court setting a liquidated amount. The Senior Employees' assertion that any portion of their GUC Claims is liquidated is untenable.

[66] The cases the Senior Employees cite only support that separate claims, each covered by a separate proof of claim, ***purchased*** from other creditors, are entitled to be counted as separate claims. *See Figter Ltd. v. Teachers Ins. Annuity Ass'n (In re Figter Ltd.)*, 118 F.3d 635, 640-641 (9th Cir. 1997) (claimant entitled to vote multiple claims where it "purchased a number of separately incurred and separately approved claims (each of which carried one vote) from different creditors"); *Concord Square Apartments v. Ottawa Properties (In re Concord Square Apartments)*, 174 B.R. 71, 74 (Bankr. S.D. Ohio 1994) ("purchaser of claims is entitled to a vote for each separate claim it holds"); *In re Gilbert*, 104 B.R. 206, 211 (Bankr. W.D. Mo. 1989) (purchased claim arose out of a separate transaction, evidencing a separate obligation for which a separate proof of claim was filed). Notably, in each of these cases a separate proof of claim had been filed for each separate claim, evidencing an entirely separate obligation, and owed to a different party. Here in contrast, each single Senior Employee filed a single proof of claim, and the "Earned Bonus" is a mere *component* of an overall compensation claim stemming from obligations under an employment contract.

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 1682 of 1804   Page 809 of 1017   PageID 15453
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1681 of 1803   PageID 12427
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 74 of 106

H.     **Convenience Class Election Is Unavailable Because Senior Employee's GUC Claims Cannot Be Split Under Disclosure Statement Order for Voting Purposes**

128.    Even if splitting claims contained in a single proof of claim were allowed under applicable case law (which it is not) and the Senior Employees were entitled to make the Convenience Claim Election with respect to a portion of their GUC Claim, this Court's Disclosure Statement Order prohibits the splitting of claims within a given class for voting purposes:

> Claims or interests shall not be split for purposes of voting; thus, each creditor and equity security interest holder shall be deemed to have voted the full amount of its claim and interest either to accept or reject the Plan;

Disclosure Statement Order ¶ 25.b.

129.    Similarly, paragraph 23 provides:

> For purposes of the numerosity requirement of section 1126(c), separate claims held by a single creditor in a particular Class shall be aggregated as if such creditor held one claim against the Debtor in such Class, and the votes related to such claims shall be treated as a single vote to accept or reject the Plan;

*Id*. ¶ 23.h.

130.    Read together, these provisions clearly establish that there can be no claim splitting within a class, and no claim splitting between Class 7 and Class 8.  Accordingly, even if claims classified in a given class set forth in a single proof of claim could be split and the Senior Employee were entitled to make the Convenience Class Election, the Disclosure Statement Order precludes the Senior Employees from splitting their claims for voting purposes.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibits   Page 1683 of 1804   Page 810 of 1017   PageID 15454
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1682 of 1803   PageID 12428
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 75 of 106

**I.      Even if Convenience Claim Election Were Available, Convenience Claim Election Does Not Impact Voting**

131.    Even if the Senior Employees were deemed to hold separate, liquidated claims on account of their "Earned Bonuses" that could be split from the remainder of their GUC Claims, a Convenience Class Election does not morph a Class 8 Claim into a Class 7 Claim *for voting purposes*.    Specifically, the Class 8 Ballot, approved by the Disclosure Statement Order, provides:

> If you check the box below and elect to have your Class 8 General Unsecured Claim treated as a Class 7 Convenience Claim; *(i) your vote on this Ballot to accept or reject the Plan will still be tabulated as a vote in Class 8 with respect to the Plan, but your Claim (as reduced) will receive the treatment afforded to Class 7 Convenience Claims;*

Disclosure Statement Order, Exhibit A at 26 (emphasis added).[67]    Accordingly, at most, the Convenience Class Election only impacts the Senior Employees' treatment for distribution purposes.    Moreover, even if the Court finds that Mr. Leventon has a liquidated claim that was entitled to be classified in Class 7 and vote in that class, Mr. Ellington's claim, which exceeds $1 million could not vote in Class 7.    Mr. Ellington would only be entitled to reduce his Class 8 Claim and elect treatment in Class 7 but his claim would otherwise be included in Class 8 for voting purposes.

132.    For each of the foregoing, independent reasons, each Senior Employee holds a single, unliquidated claim in Class 8.    No Senior Employee is entitled to split his GUC Claim under applicable bankruptcy law, and such an action is further prohibited by the Disclosure Statement Order.    Even if any GUC Claim could be split and the Convenience Class Election

---

[67] The Plan itself is also clear that the Convenience Class Election only impacts *treatment*, and does not impact *voting*.  *See* Plan, I.B.43; III.H.8.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01676

Appx. 01925

014489

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 1684 of 1804    Page 811 of 1017    PageID 15455
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1683 of 1803    PageID 12429
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 76 of 106

was made, the Convenience Class Election only impacts treatment but does not impact voting.
Finally, the Senior Employees' argument that their entitlement to make the Convenience Class
Election stems from an erroneously mailed ballot is misplaced. As set forth above, the mailing
of the Class 7 Ballot was an administrative error and cannot entitle the Senior Employees to
rights that contradict the Plan and the Disclosure Statement Order.

## X.    THE HCMFA/NPA GATES OBJECTION

133.    The Debtor manages fifteen collateralized loan obligations ("CLOs") pursuant to
certain agreements, which are referred to sometimes as portfolio management agreements and
sometimes as servicer agreements (the "Management Agreements"). Each CLO is a Cayman-
domiciled entity that owns a portfolio of loans. They are passive single purpose entities with no
ability to self-manage. The CLOs have no employees; however, they do have Cayman-based
boards of directors, which have limited duties under Cayman law and which do not actively
manage the CLOs. Each CLO contracted with the Debtor as a third-party "Portfolio Manager" to
manage the loan portfolio pursuant to the terms of the various Management Agreements. As
discussed below, the only parties to the Management Agreements are the Debtor and the
respective CLO.

134.    To finance its acquisition of the loans, each CLO issued notes to third party
investors. Those notes come in different tranches with different payment priorities. The lowest
in priority are called "preference shares," which receive the available residual cash flow after the
CLO has made the required payments on the notes. Although called equity, the preference
shares are not common equity. The CLOs themselves are purely creatures of contract, and

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6815    Page 1685 of 1804    Page 812 of 1017    PageID 15456
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1684 of 1803    PageID 12430
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 77 of 106

investor rights are governed by the terms of the indentures governing the CLOs (collectively, the "<u>Indentures</u>"), the preference share paying agency agreements, and in certain cases the Management Agreements.[68]  The Indentures define the procedures for buying, managing, and selling the CLOs' assets.  *See generally* Indenture § 12.1; Management Agreement § 2.  Fiduciary duties under the Investment Advisers Act of 1940 (the "<u>Advisers Act</u>") are owed solely to the CLOs and not their investors.[69]   Nothing in the Indentures or the Management Agreements gives any investor in the CLOs the right to block, interfere with, influence, control, or otherwise direct the asset sale process.  The Management Agreements set forth the Portfolio Manager's duties and obligations and the requirements for removing the Portfolio Manager if investors are not satisfied.

135.    By agreement with CLOs, which are the sole counterparties to the Management Agreements, the Debtor will assume the Management Agreements pursuant to the Plan.  The Debtor and the CLOs have agreed, in summary, that in full satisfaction of the Debtor's cure obligations under section 365(b)(1) of the Bankruptcy Code, the CLOs will receive a total of $525,000, comprising $200,000 within five days of the Effective Date and $325,000 in four equal quarterly payments of $81,250, and that the Debtor and the CLOs will exchange mutual releases.  The Debtor and the CLOs agreed to seek approval of this compromise by adding

---

[68] The Debtor's role is referred to as either the Servicer or Portfolio Manager.  All of the Management Agreements and Indentures are governed by New York law, and the relevant provisions of those agreements are identical in all material respects across the CLOs at issue.

[69] The Debtor's fiduciary duties under the Advisers Act are owed to the CLO, not to its investors.  *Goldstein v. SEC*, 451 F.3d 873, 881-82 (D.C. Cir. 2006) (under Section 206 of the Investment Advisers Act of 1940 and other provisions "[t]he adviser owes fiduciary duties only to the fund, not to the fund's investors. . . If the investors are owed fiduciary duty and the entity is also owed a fiduciary duty, then the adviser will inevitably face conflicts of interest.").  The Debtor's duties, as Portfolio Manager, to the underlying investors in the CLO, if any, are prescribed by contract.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 1686/251804 Page 813 of 1017   PageID 15457
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1685 of 1803   PageID 12431
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 78 of 106

language to the Confirmation Order.  A copy of that language is attached hereto as Exhibit C and will be included in the Confirmation Order.

**A.      The HMCFA/NPA Objection, the CLO Holdco Objection, and NREP Joinder Should Be Overruled**

136.    As the Court is well aware, Highland Capital Management Fund Advisors, L.P. ("HCMFA") and NexPoint Advisors, L.P. ("NPA" and, together with HCMFA, the "Advisors"), are controlled by Mr. James Dondero.  Mr. Dondero is also the portfolio manager of each of the investment funds objecting to the Debtor's assumption of the Management Agreements (the "Funds").[70]  The Advisors and three of the Funds have actively interfered in the Debtor's management of the CLOs and sought to exercise management authority over the CLOs.  This Court ruled on these issues in connection with the Advisors and Funds' *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [Docket No. 1528] (the "CLO Motion").

137.    Now, the Funds and Advisors have objected to confirmation of the Plan and are joined only in their objection by other Dondero-controlled entities –the NexPoint RE Partners and CLO Holdco, Ltd. ("CLO Holdco" and, together with the Funds and the Advisors, the "CLO Objectors").  Although the NPA/HCMFA Objection makes different arguments than those contained in the CLO Motion, the goal of the NPA/HCMFA Objection is the same.  It seeks to use this Court to transfer control of the CLOs away from the Debtor and back to Mr. Dondero.

---

[70] The Funds are Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01679
Appx. 01939
014492

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15   Page 1687/251804   Page 814 of 1017   PageID 15458
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1686 of 1803   PageID 12432
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 79 of 106

138.    The CLO Objectors contend that the Advisers Act prohibits assignment of the Management Agreements and/or that they are non-assignable personal service contracts.  From this, the CLO Objectors argue that the Management Agreements may not be assumed by the Debtor under Section 365(c) because the "*hypothetical test*" applies in the Fifth Circuit.  They also contend that there is inadequate assurance of future performance because of staff reductions and that the contracts are being modified and thus are being only partially (and so impermissibly) assumed.  The CLO Objectors also speculate that they may be harmed by future investment decisions made by the Debtor because the time-frame contemplated by the Plan for disposition of assets may be shorter than what they believe is optimal to maximize the value of the preference shares.  The objections should be overruled on several grounds:

- The contract counterparties – the CLOs – consent to assumption and will release the Debtor from all claims.

- The CLO Objectors are non-contracting parties with no standing to object on behalf of the CLOs and have pointed to no contractual basis for their assertion of management authority over the CLOs.

- The CLO Objectors cannot create standing by asserting they are creditors of the estate.  Each CLO Objector agreed to the expungement of its claims or has no claims.

- Even if the CLO Objectors were creditors, their standing to object to assumption would be limited to whether it benefits the Estate, and they would *still* lack standing to assert rights belonging to the contracting parties.

- Even if the CLO Objectors had the right to object to assignment, that does not give them the standing to object to the Debtor's assumption of the Management Agreements.

- Even if the Management Agreements were non-assignable, the Debtor could still assume the Management Agreements without consent because the *actual test* applies in the Fifth Circuit.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 65   Page 1683 of 1804   Page 815 of 1017   PageID 15459
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1687 of 1803   PageID 12433
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 80 of 106

- Even if the *hypothetical test* applies, "applicable law" does not prevent assignment of the Management Agreements.

- There is no detriment to the Estate in assuming the Management Agreements, and there is no mismatch in investing timelines between the Debtor and the CLOs' investors.

### B. The CLO Objectors Cannot Override the CLOs' Consent to Assumption

139. The Debtor and its counterparties (the CLOs) agreed to the assumption of the Management Agreements. Any objections were waived. Hence the CLO Objectors' argument is *not* that there is no consent to assume the Management Agreements; it is that the *correct* party has not consented. In other words, the CLO Objectors are arguing that the CLO Objectors (and therefore Mr. Dondero) have the authority and prerogative to dictate the actions of the CLOs and whether the CLOs should consent to assumption. This has to be the CLO Objectors' argument because unless the CLO Objectors have such right, they have no standing as non-contracting parties to object under section 365 to the assumption of the Management Agreements.

140. Only parties to contracts have standing to object to assumption, even when the objector claims that assumption will result in a breach of that contract or violate the law. *See Hertz Corp. v. ANC Rental Corp. (In re ANC Rental Corp.)*, 278 B.R. 714, 718-19 (Bankr. D. Del. 2002), *aff'd*, 280 B.R. 808 (D. Del. 2002), 57 F. App'x 912 (3d Cir. 2003). As the district court explained:

> The language of section 365 is clearly intended to protect the rights of those persons or entities who share contractual relationships with the debtors. In other words, in order to invoke the protections provided in section 365, an entity must be a party to a contract with the debtor.

> * * *

> Although section 365 does confer the right to refuse assignment where excused by applicable law, that right is nevertheless conferred only upon parties to the

74

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 53-15   Filed 06/25/1804 Page 816 of 1017   PageID 15460
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1688 of 1803   PageID 12434
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 81 of 106

> contracts at issue. It creates no separate right of enforcement for other creditors
> of the estate who are not parties to the contract. Therefore, even if the appellants
> feel that the alleged violation of the law may effect them, they have not
> demonstrated that they have the legal right to enjoin such a violation.

*Hertz Corp. v. ANC Rental Corp. (In Re ANC Rental Corp.)*, 280 B.R. 808, 817-18 (D. Del.

2002); *see also Cargill, Inc. v. Nelson (In re LGX, LLC)*, 2005 Bankr. LEXIS 2072 (10th Cir.

Oct. 31, 2005) (creditor had standing on whether court should approve settlement between

trustee and another creditor, but no standing under § 365 on whether quitclaim license from

trustee to that creditor violated applicable patent law because it was not party to contract); *In re*

*Riverside Nursing Home*, 43 B.R. 682, 685 (Bankr. S.D.N.Y. 1984) (assignee of rents is not

"party to such contract or lease" so as to confer standing under section 365); *In re Irwin Yacht*

*Sales, Inc*., 164 B.R. 678 (Bankr. M.D. Fla. 1994) (denying standing to co-owner

notwithstanding her economic interest since she was not party to the lease); *see also ANC Rental*,

57 F. App'x at 916 (citations omitted) ("Third-party standing is of special concern in the

bankruptcy context where, as here, one constituency before the court seeks to disturb a plan of

reorganization based on the rights of third parties who apparently favor the plan. In this context,

the courts have been understandably skeptical of the litigant's motives and have often denied

standing as to any claim that asserts only third-party rights.")

141.    The only parties to the Management Agreements are the Debtor and the respective

CLOs. Consequently, the CLO Objectors are effectively asking the Court to treat them as the

contracting parties, so that they, rather than the CLOs, may decide whether to oppose

assumption. But an adjudication of the CLO Objectors' rights vis-à-vis the CLOs is not before

the Court. Regardless, this assertion of management authority over the CLOs was already

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5   Page 1696 of 1804   Page 817 of 1017   PageID 15461
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1689 of 1803   PageID 12435
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 82 of 106

rejected by Court as "almost Rule 11 frivolous."  In the CLO Motion, the movants sought to restrict sales of the CLOs' assets on terms that they believed might be disadvantageous to the holders of preference shares, but they could not substantiate any contractual basis for the exercise of such management authority.[71]

142.    The only acknowledgement of this Court's ruling in the NPA/HCMFA Objection is offered in a footnote, in which the CLO Objectors suggest that the issues are different "in connection with confirmation of a plan containing proposed contract assumptions that simply are not contract assumptions, fairly construed."[72]  In all honesty, the Debtor has no idea what the Objector's statement means, but whatever it means, the underlying issue and rationale are the same here as in the CLO Motion.  As before, the issue is who has the right to make business decisions for the CLOs, and in both the CLO Motion and here, the proffered justification is a nonspecific risk that investment decisions may be made with which the CLO Objectors disagree.

C.      **The CLO Objectors Lack Standing to Object to the Plan**

1.      **The CLO Objectors Rights Under the Management Agreements Are Not Affected by the Plan**

---

[71] 12/16/20 Tr. of Proceedings at 64:1-10.

This is almost Rule 11 frivolous to me. You know, we're -- we didn't have a Rule 11 motion filed, and, you know, I guess, frankly, I'm glad that a week before the holidays begin we don't have that, but that's how bad I think it was, Mr. Wright [of K&L Gates] and Mr. Norris. This is a very, very frivolous motion. Again, no statutory basis for it. No contractual basis. You know, you didn't even walk me through the provisions of the contracts. I guess that would have been fruitless. But you haven't even shown something resembling, some lack of reasonable business judgment.

[72] The CLO Objectors state: "The Funds and Advisors are aware that the Court has heard and rejected a form of this argument in a different context. By raising the point here, we mean no disrespect to the Court or the prior ruling. However, we contend that the issue is appropriately joined in connection with confirmation of a plan containing proposed contract assumptions that simply are not contract assumptions, fairly construed. Moreover, at the time of the Motion that was denied, only the Funds and Advisors took a position on the issues; now, other parties, on information and belief, will object or have objected on a similar basis."  Obj. at 5, n. 4.

76

**Appellee Appx. 01683**
**Appx. 01924**
**014496**

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 63-15 Page 1695/251804 Page 818 of 1017 PageID 15462
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1690 of 1803 PageID 12436
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 83 of 106

143. The CLO Objectors offer four bases for standing in the Objection. The first is that "in several of the Servicing Agreements, the CLO Objectors have the right to remove the Debtor or to control who the servicer under the agreements is. They have similar rights under the Indentures with respect to assignment or modification of the Servicing Agreements. Insofar as the Fifth Amended Plan purports to limit or to take those rights away from them, and to change their rights, the CLO Objectors have standing to object to their rights being limited or eliminated." Obj. at 27. Elsewhere they state that the Management Agreements "generally allow the holders of preference shares to remove the portfolio manager for cause" and may provide for a certain percentage of holders of Preference Shares to remove a manager without cause. Obj. at 11.

144. As an initial matter, nowhere in the NREP Joinder do any of the NexPoint RE Partners allege or state that they have any interest in the CLOs. Without an interest in the CLOs, the NexPoint RE Partners cannot allege that any of their rights are affected. Further, nowhere in the NPA/HCMFA Objection is there any attempt to establish any basis on which the CLO Objectors are presently entitled to replace the Debtor as the Portfolio Manager or authorized to decide for the CLOs whether the CLOs should consent to the Debtor's assumption of the Management Agreements. This is telling.

145. As set forth in the Management Agreements, the Debtor can only be removed as Portfolio Manager *for cause* by a majority of the preference shares that are *not* held by affiliates of the Debtor. By the CLO Objectors own admission, they only hold a majority of the preference shares in eight of the fifteen CLOs at issue. That means that the CLO Objectors have

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 6 Page 1693 of 1804 Page 819 of 1017 PageID 15463
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1691 of 1803 PageID 12437
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 84 of 106

*no* right to remove the Portfolio Manager in approximately half of the Management Agreements. However, even with respect to the CLOs in which they hold a majority of the preference shares, the CLO Objectors cannot remove the Debtor unless cause exists – and cause does not exist. Moreover, the CLO Objectors, under the Management Agreements, are prohibited from replacing the Debtor because each of the CLO Objectors should be considered an affiliate of the Debtor for purposes of the Management Agreements and therefore be prohibited from exercising removal rights. Finally, on January 9, 2020, this Court entered an order (the "January Order"), which, in pertinent part, stated that "Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor." [Docket No. 339] It is beyond dispute that each of the CLO Objectors is for all intents and purposes Mr. Dondero, and Mr. Dondero should not be allowed to do by proxy what he was prohibited by this Court from doing directly.

146.    However, whether the CLO Objectors have the right to remove and replace the Debtor as Portfolio Manager is not a question that will be decided by the Plan nor will the CLO Objectors' rights to remove the Debtor – whatever they are – be impacted by the Plan. On January 6, 2021, the Debtor filed that certain *Debtor's Memorandum of Law in Support of Its Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero*, Adv. Proc. No. 20-03000-sgj, Docket No. 6] (the "Adversary Complaint"). In the Adversary Complaint, the Debtor seeks a declaratory judgment that the CLO Objectors have no right to replace the Debtor under the Management Agreements for the reasons set forth above, among others. The CLO Objectors should assert their rights, if any, at the hearing on the Adversary Complaint, not through an objection to

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-15    Page 1693 of 1804    Page 820 of 1017    PageID 15464
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1692 of 1803    PageID 12438
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 85 of 106

assumption.  Consequently, the CLO Objectors' rights, if any, under the Management Agreement will be determined by this Court in a separate hearing, and will not be impacted by the Plan.

### 2.    The CLO Objectors Lack Standing to Object to Assumption as Creditors or Parties in Interest

147.    Two of the CLO Objectors' four claimed bases for standing are that they are creditors, or at least parties in interest, and as such have standing to object to assumption of the Management Agreements "especially because assumption of the Servicing Agreements and future performance thereunder affect the feasibility of the Plan as a whole," and under sections 1129(a)(1)-(3) because assumption of the Management Agreements purportedly violates the law. Obj. at 27.  These arguments fail for numerous reasons.

148.    First, these arguments for standing are circular.  If a party lacks standing to object to assumption of a contract because it has no protected interest in the contract under section 365, it cannot argue that a plan should not be confirmed because of the assumption of such contract. A party cannot use an objection to a plan to create standing under section 365.

149.    Second, the CLO Objectors are not creditors.  As set forth in the Memorandum, each of the Advisors, the Funds, and CLO Holdco filed claims in this Case; however, each of those parties voluntarily agreed to have their Claims expunged or reduced to $0.00.  None of the NexPoint RE Entities filed claims.  As such, the CLO Objectors are barred from asserting that they have prepetition claims against the Debtor or its Estate.  The CLO Objectors also cannot create claims by asserting that they will have claims arising from the rejection of the shared services agreements with the Debtor.  *None* of the shared services agreements are being rejected. Each of the shared services agreements is freely terminable.  In November 2020, the Debtor

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15   Filed 06/25/24   Page 821 of 1017   PageID 15465
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1693 of 1803   PageID 12439
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 86 of 106

provided notice that the shared services and other agreements were being terminated.   Such agreements will terminate no later than January 31, 2021, which is prior to the anticipated Effective Date of the Plan.  Because none of the shared services agreements are being rejected, none of the CLO Objectors will have a rejection damages claim.

150.     Third, *even if* any of the CLO Objectors were creditors: "[E]ven creditors do not have standing to raise the rights of a landlord or contract party under section 365. . . While section 1109 allows a creditor to be heard on any issue in a bankruptcy case, it does not change the general principle of standing that a party may assert only its own legal interests and not the interests of another."   *In re ANC Rental*, 278 B.R. at 718-19 (citations omitted).   As the bankruptcy court held in *ANC Rental*, the CLO Objectors cannot usurp the CLO's standing to object to assumption.

151.     Fourth, as set forth below, there is no "applicable law" prohibiting assumption and/or assignment for purposes of Section 365(c) and therefore no argument under section 1129(a).  Each of the Management Agreements can be assumed and could be assigned without the consent of any party (although the CLOs have consented to assignment).  Therefore, there is no violation of law.

152.     Finally, the CLO Objectors cannot boot strap into standing by arguing that the assumption of the Management Agreements will not benefit the estate.  First, it is anticipated that the Debtor's chief executive officer and chief restructuring officer will testify as to how assumption benefits the estate.   Second, granting the relief requested by the CLO Objectors would be catastrophic to the Debtor's estate.  The Debtor's inability to assume the Management

DOCS_SF:104855.7 36027/002

Appellee Appx. 01687
Appx. 01928
0114300

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 63-15 Filed 06/05/25 Page 822 of 1017 PageID 15466
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1694 of 1803 PageID 12440
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 87 of 106

Agreements does not mean that the CLO Objectors will be magically installed as Portfolio Manager. It means that the Management Agreements will be rejected and that *none* of the CLOs will have a Portfolio Manager following the Confirmation Date. Any damage to the CLOs will presumably be part of the claims asserted by the CLOs against the Debtor in connection with that rejection. Those claims are currently incalculable. The Debtor also has exposure to each of the CLOs and any loss in value caused by having no Portfolio Manager would directly impact the Reorganized Debtor's and Claimant Trust's assets. Even assuming the CLO Objectors can appoint themselves Portfolio Manager in the CLOs in which they hold a majority of the preference shares (which is contested and which in no event would happen by the Confirmation Date), that still leaves approximately half of the CLOs without a manager. It is beyond disingenuous for the CLO Objectors to argue that there is no benefit to the estate in assuming the Management Agreements while at the same time arguing that those same agreements should be rejected with the Debtor suffering the consequences.

### 3. The Contractual Right to Object to Assignment of the Management Agreements Does Not Create Standing to Object to Their Assumption

153.    The fourth and final basis for standing is: "[I]n several of the Servicing Agreements, it is not just the CLO that must approve an assignment, but also the CLO Objectors. The CLO Objectors have similar rights under the Indentures. Insofar as the test under section 365(c)(1) is a hypothetical assignment, and the CLO Objectors have the right to approve or not approve that assignment under applicable law and the agreements, that right should extend to consent under section 365(c)(1)(B) as well, as the CLOs' consent is not possible without a concurring consent by the CLO Objectors." Obj. at 28.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Exhibit 6   Page 1696 of 1804   Page 823 of 1017   PageID 15467
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1695 of 1803   PageID 12441
Case 19-34054-sgj11   Doc 1807   Filed 01/22/21   Entered 01/22/21 18:52:03   Page 88 of 106

154.     For purposes of standing, the CLO Objectors asserted contractual right to object to assignment of the Management Agreements is irrelevant, for three reasons.  First, there is no assignment here.  The Debtor is assuming the Management Agreements with the consent of the CLOs.  Second, even if it were correct that (a) the CLO Objectors have a contractual right to object to assignment, and (b) the *hypothetical test* applies, they still have no interest in the contract that would permit them to enforce section 365's protections for their benefit in derogation of the rights of the actual contracting parties.  Third, as discussed immediately below, the *actual test* applies in the Fifth Circuit, and thus the Management Agreements would be assumable even if they were not assignable.

### D.     Even if the CLO Objectors Had Standing and the Management Contracts Were Not Assignable, the Debtor Could Assume Them Because the *Actual Test* Applies in the Fifth Circuit

155.     As the CLO Objectors recognize, there is a split of authority among the circuits regarding the appropriate test to apply to determine whether:

- a contract that is otherwise non-assignable under applicable non-bankruptcy law  can be assumed by a debtor  under Bankruptcy Code section 365(c)(1); and

- whether the same contract can be terminated if it contains an "ipso facto" clause pursuant to Bankruptcy Code section 365(e)(2)(A).

The Fifth Circuit has ordered lower courts to apply the so-called *actual test* in considering whether an ipso facto termination clause can be enforced under Bankruptcy Code section 365(e)(2)(A).  For the reasons set forth below, even though the Fifth Circuit has not ruled on the issue directly, the *actual test* has been applied by every bankruptcy court that has considered the issue in the Fifth Circuit to assumption of contracts under Bankruptcy Code section 365(c)(1).

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-15   Page 1696/651804   Page 824 of 1017   PageID 15468
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1696 of 1803   PageID 12442
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 89 of 106

Accordingly, the *actual test* should be applied in this Case to conclude that the Management Contracts can be assumed by the Reorganized Debtor without the consent of any party.

156.    The Fifth Circuit's decision in *Bonneville Power Administration v. Mirant Corporation* applied the *actual test* to a determination of whether a contract can be terminated as a result of the filing of a bankruptcy case under Bankruptcy Code section 365(e)(2). *Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.),* 440 F.3d 238 (5th Cir. 2006). The reasoning in *Mirant* also supports application of the *actual test* to Bankruptcy Code section 365(c)(1). Specifically, in *Mirant,* a non-debtor counterparty sought to terminate its executory contract with the chapter 11 debtor based on an ipso facto clause after the debtor filed for bankruptcy. In support of its argument, the non-debtor counterparty relied on section 365(e)(2)(A) and asserted that, under applicable law, the Anti-Assignment Act, 41 U.S.C. § 15 (which generally prohibits the transfer of contracts to which the United States is a party), it was excused from accepting performance from or rendering performance to the trustee or an assignee. Critically, in reaching its conclusion that the *actual test* applied, the Fifth Circuit relied on cases analyzing section 365(c)(1).

157.    While the CLO Objectors would like this Court to believe there is some risk that if faced with the direct question of whether the *actual* test also applies under section 365(c)(1), the Fifth Circuit would reach a different result, that argument strains credibility. Notwithstanding the technical language differences[73] between the two statutes, the same test

---

[73] Subsection (e)(2) provides that the invalidation of ipso facto clauses does not apply to an executory contract where "applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to the trustee or to an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties[.]" 11 U.S.C. § 365(e)(2). This language is very similar—but not identical—to the language employed by subsection (c)(1), which speaks to excusing

Appellee Appx. 01690
Appx. 01941
014503

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 10098/251804 Page 825 of 1017   PageID 15469
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1697 of 1803   PageID 12443
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 90 of 106

must apply to both the assumption of a contract under section 365(c)(1) and the termination of a

contract under section 365(e)(2)(A).  There is no logical reading of these two subsections that

would support application of different tests.  The language of section 365(e)(2)(A) is intended to

allow the counterparty to a contract that cannot be assumed or assigned to enforce its remedy of

termination so that it is not in limbo while the bankruptcy case proceeds.  Section 365(c) cannot

be read in isolation from the other subsections.  It would make no sense for a court to hold that a

contract cannot be assumed because the *hypothetical test* applies, but nonetheless cannot be

terminated because the *actual test* applies.  For this reason, every lower court in the Fifth Circuit

that has considered the issue has held that the *actual test* applies to a debtor's assumption of

contracts under section 365(c).  *See In re Virgin Offshore USA, Inc.*, No. 13-79, 2013 U.S. Dist.

LEXIS 128995, at *15 (E.D. La. Sep. 10, 2013):

> Though the *Mirant* court used the actual test in the context of § 365(e), which was
> not amended in the same way as § 365(c) and thus is not subject to the same
> circuit split, the Court nonetheless finds this decision to be an indicator of the way
> that the Fifth Circuit would undertake an analysis under § 365(c).  Further, in *In
> re O'Connor*, the Fifth Circuit appears to have applied an actual test to determine
> that a partnership interest was strictly personal under Louisiana law, thus not
> assumable under § 365(c).  The court did not expressly adopt the actual test
> because, regardless of the test applied, the partnership interest would have been
> unassumable under § 365(c); however, the language used in the opinion indicated
> a predilection for the actual test.

*See also In re Jacobsen*, 465 B.R. 102, 105-06 (Bankr. N.D. Miss. 2011); *Cajun Elec. Members

Comm. v. Mabey (In re Cajun Elec. Power Coop., Inc.)*, 230 B.R. 693, 705 (Bankr. M.D. La.

1999); *In re Lil' Things, Inc.,* 220 B.R. 583, 587 (Bankr. N.D. Tex. 1998); *Texaco Inc. v.

Louisiana Land & Exploration Co.,* 136 B.R. 658, 669 (Bankr. M.D. La.1992); *In re Hartec*

---

performance from, or rendering performance to, "an entity other than the debtor or the debtor in possession" as
opposed to just "the trustee or [] an assignee." Compare *id*. § 365(c)(1) with § 365(e)(2).

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1099 of 1804   Page 826 of 1017   PageID 15470
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1698 of 1803   PageID 12444
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 91 of 106

*Enters., Inc.,* 117 B.R. 865, 871 (Bankr. W.D. Tex. 1990), *vacated by settlement,* 130 B.R. 929

(W.D.Tex. 1991).

158.    Moreover, other bankruptcy courts within the Fifth Circuit have expressly

rejected the *hypothetical test*, concluding that:

> If the court were to adopt the [hypothetical test] and focus primarily upon
> assignability, a chapter [sic] 11 filing would have the virtual effect of rejecting
> executory contracts covered by section 365(f). As suggested by the court in
> *Texaco,* this analysis would extend section "365(c) beyond its fair meaning and
> intended purpose, contrary to the ultimate goal of rehabilitation of the debtor's
> enterprise."

*Cajun Elec.,* 230 B.R.at 705 (Bankr. M.D. La. 1999)  (quoting *Texaco,* 136 B.R. at 670).

159.    The CLO Objectors prediction that the Fifth Circuit would apply a different test

under subsection 365(c) than it does under 365(e) is based solely on the use of the word "or"

rather than "and" in subsection 365(c).  However, the language cited by the CLO Objectors in

the statute is the same language that was considered by each of the lower courts in the Fifth

Circuit; each of those courts nonetheless applied the *actual test*.  The CLO Objectors reading is

overly simplistic and imposes a literal reading that, as noted by the *Cajun Electric* Court above,

is "beyond its fair meaning and intended purpose, contrary to the ultimate goal of rehabilitation

of the debtor's enterprise."  *Id.*  Accordingly, the argument that assumption of the Management

Contracts must be evaluated using the *hypothetical test* is unavailing and contrary to this

Circuit's case law.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01692
Appx. 01945
0114305

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 1706 of 1804    Page 827 of 1017    PageID 15471
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1699 of 1803    PageID 12445
Case 19-34054-sgj11  Doc 1807  Filed 01/22/21    Entered 01/22/21 18:52:03    Page 92 of 106

E.  **Even if the CLO Objectors Have Standing and the *Hypothetical Test* Applies, the Management Agreements Are Assignable**

160.  The CLO Objectors, assuming the *hypothetical test* applies, contend the Management Agreements cannot be assigned or assumed under section 365(c)(1) without the consent of the contracting party because they are non-assignable personal services contracts and because Section 205(a)(2) of the Advisers Act proscribes assignment of such contracts without consent.  Under these circumstances, the CLO Objectors argue that "applicable law excuses a party, other than the debtor, to such contract . . . from accepting performance from . . . an entity other than the debtor. . . ."  11 U.S.C. § 365(c)(1)(A).

161.  This Court has previously (and correctly) rejected both of these arguments – at that time made by the Debtor under the control of Mr. Dondero – in *In re Acis Capital Management, L.P., et al*, Case No. 18-30264-sgj, Docket No. 549 (Bankr. N.D. Tex. Aug. 30, 2018) (the "<u>Acis Order</u>").  In the Acis Order, this Court held that: (a) the portfolio management agreements at issue were not personal services contracts; and (b) Section 205(a)(2) of the Advisers Act is not "applicable law" precluding assignment under section 365.  Specifically, this Court ruled as follows:

> The court overrules any objection that there is some applicable law that excuses the counterparties to the PMAs [portfolio management agreements] (i.e., the CLO Issuers) from accepting performance from a party other than the debtor. First, these are not personal services contracts. . . . [I]n order to determine whether the PMAs are personal service contracts, the court must assess the particular circumstances in the case, the nature of the services provided by Acis under the PMAs, and whether such services are nondelegable. Highland contends that because the PMAs "depend on the skill and reputation of the performing party," the PMAs are personal service contracts, and thus unassignable. If this were the standard, the exception would swallow the rule – any prudent party contracting for another's services considers the other party's skill, expertise, and reputation – and any contract for services premised on the skill and reputation of the party providing services would be a personal service contract. It is not whether the party

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16   Page 1 of 11   Exhibit 5   Page 828 of 1017   PageID 15472
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1700 of 1803   PageID 12446
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 93 of 106

providing services is skilled and reputable – it is whether such services are unique in nature. *See Compass Van & Storage Corp.*, 65 B.R. at 1011. . . . Here. . . [p]ursuant to the Shared Services Agreement and Sub-Advisory Agreement, Acis LP delegated certain of its responsibilities under the PMAs to Highland. Accordingly, the personal qualities of Acis LP were not essential to performance under the PMAs.  While the expertise of Acis LP was relevant to its selection as portfolio manager, such expertise is not unique – as demonstrated by the expertise and reputation of Oaktree, Brigade, and others who act as CLO portfolio managers.  Also, importantly, the PMAs themselves provide that Acis may delegate the performance of its duties under the PMAs to third parties: "In providing services hereunder, the Portfolio Manager may employ third parties, including its Affiliates, to render advice (including investment advice), to provide services to arrange for trade execution and otherwise provide assistance to the Issuer, and to perform any of the Portfolio Manager's duties under this Agreement; provided that the Portfolio Manager shall not be relieved of any of its duties hereunder regardless of the performance of any services by third parties." 2014-3 PMA § 3(h)(iii).  And although section 14 the PMAs requires consent for assignment, section 14 contemplates that an Affiliate assignee "has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to this Agreement." *Id.* § 14(a).  Further, sections 14 and 32 of the PMAs provide for merger, consolidation, or amalgamation of Acis with another company, where the resulting entity succeeds "to all or substantially all of the collateral management business of the Portfolio Manager."  Pursuant to the terms of the PMAs themselves, the duties of Acis were not "so unique that the dut[ies were] thereby rendered nondelegable." . . .  As such, unlike personal service contracts, the PMAs do not "synthesize into those consensual agreements . . . distinctive characteristics that commit to a special knowledge, unique skill or talent, singular judgment and taste." . . .  Accordingly, because the duties of Acis LP under the PMAs are delegable (and were delegated) and are not unique, the PMAs cannot be personal service contracts that fall within the narrow exception of section 365(c)(1).

Additionally, Section 205(a)(2) of the Investment Advisors Act of 1940 ("IAA") is not a nonbankruptcy law that precludes assumption and assignment of the PMAs. Section 205(a)(2) of the IAA provides that a registered investment adviser (such as Acis) cannot enter into an investment advisory contract unless such contract provides "that no assignment of such contract shall be made by the investment adviser without the consent of the other party to the contract[.]" 15 U.S.C. § 80b-5(a)(2).

Thus, this provision of the IAA merely requires that the PMAs contain an anti-assignment provision – the IAA is not "applicable law" that prohibits assumption or assignment without consent of the counterparties to the PMAs.  Indeed, in the Southern District of New York, the court held:

"Section 205(a)(2) of the [IAA] . . . does not . . . prohibit an

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5   Page 10/02/25 1804   Page 829 of 1017   PageID 15473
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1701 of 1803   PageID 12447
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 94 of 106

> investment adviser's assignment of an investment advisory contract
> without client consent. The section merely provides that the
> contract must contain the specified provision. Thus, the
> assignment of a non-investment company advisory contract,
> without obtaining client consent, could constitute a breach of the
> advisory contract, but not a violation of Section 205(a)(2)."

*CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC*, 2018 U.S. Dist. LEXIS 90174, at *12

(S.D.N.Y. May 23, 2018). Assignment of the PMAs without consent of the counterparties simply

constitutes breach of the PMAs, but the IAA is not "applicable law" that excuses the

counterparties to the PMAs from accepting or rendering performance without such consent.

162.    For the exact reasons found by this Court in the Acis Order, the CLO Objectors'

argument that "applicable law" prevents assignment under 11 U.S.C. § 365(c) should be

overruled. First, the Management Agreements are on all fours with the management agreements

discussed in the Acis Order. The Management Agreements have the same delegation provisions,

the same assignment provisions, and the same provisions on merger, consolidation, and

amalgamation.[74] The Court has already ruled on these exact agreements and found that they

preclude a finding that the Management Agreements are personal services contracts.

---

[74] *See, e.g.,* Servicing Agreement, dated as of November 30, 2006, by and among Grayson CLO Ltd., and Highland
Capital Management, L.P. ("Grayson Agreement"):

> In providing services hereunder the Servicer may employ third parties including its Affiliates to
> render advice including advice with respect to the servicing of the Collateral and assistance
> provided however that the Servicer shall not be relieved of any of its duties or liabilities hereunder
> regardless of the performance of any services by third parties.

(*Id.*, § 2(d))

> In addition any successor Servicer must be an established institution which has demonstrated an
> ability to professionally and competently perform duties similar to those imposed upon the
> Servicer hereunder

(*Id.*, § 12(e))

> Any corporation partnership or limited liability company into which the Servicer may be merged
> or converted or with which it may be consolidated or any corporation partnership or limited
> liability company resulting from any merger conversion or consolidation to which the Servicer
> shall be party or any corporation partnership or limited liability company succeeding to all or
> substantially all of the servicing and collateral management business of the Servicer shall be the
> successor to the Servicer without any further action by the Servicer the Co-Issuers the Trustee the

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 6Exhibit5 Page 10/708/251804 Page 830 of 1017 PageID 15474
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1702 of 1803 PageID 12448
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 95 of 106

163.    Second, as this Court ruled, the Advisers Act does not prohibit assignment without consent.  It simply requires that an advisory agreement contain certain language and that any failure to obtain consent is a breach, not a nullification of the assignment.  If the CLO Objectors had done their diligence, they would have realized that the Acis Order is not unique. The SEC has expressly stated that:

> Section 205(a)(2) does not prohibit an adviser's assignment of an investment advisory contract without client consent. The section merely provides that the contract must contain the specified provision. Thus, the assignment of a non-investment company advisory contract, without obtaining client consent, could constitute a breach of the advisory contract, but not a violation of Section 205(a)(2).

*American Century Companies, Inc./JP Morgan & Co. Incorporated*, Staff No-Action Letter (12/23/1997);  *see also*  Investment Management Staff Issues of Interest, http://www.sec.gov/divisions/investment/issues-of-interest.shtml [June 5, 2012] ("In particular, the staff previously has clarified that Section 205(a)(2) does not prohibit an adviser's assignment of an investment advisory contract without client consent.  The section merely provides that the contract must contain the specified provision.").

164.    As such, there is no applicable law prohibiting the assignment – let alone the assumption – of the Management Agreements.  "[F]or section 365(c)(1) to apply, the applicable law must specifically state that the contracting party is excused from accepting performance from a third party under circumstances where it is clear from the statute that the identity of the contracting party is crucial to the contract or public safety is at issue."  *In re ANC Rental Corp.*, 277 B.R. 226, 236 (Bankr. D. Del. 2002).

---

Noteholders or any other person or entity
(*Id.*, § 31)

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 1704 of 1804   Page 831 of 1017   PageID 15475
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1703 of 1803   PageID 12449
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 96 of 106

**F.     The Inadequate Assurance of Future Performance Objection is Meritless**

165.    The CLO Objectors contend that the reorganized Debtor will have inadequate resources to perform its obligations under the Management Agreements, and so has not given adequate assurance of future performance.   The CLO Objectors also allege that there is a mismatch between the Debtor's investment timeline and the timeline expected by the investors in the CLOs.  Both of those arguments fail.  First, assurance of future performance is a protection conferred by section 365 on contracting parties, which the CLO Objectors are not.  They lack standing to invoke it when the actual contracting parties – the CLOs – are satisfied.  Second, even if they had standing, the objection is without merit.  The CLO Objectors argue (i) because the Debtor is terminating all of its employees, it will not be able to manage the CLOs post-Effective Date and (ii) the Debtor cannot hire a Sub-Servicer to manage the CLOs without violating the Management Agreements.  As an initial matter, the Debtor is not retaining a Sub-Servicer to manage the CLOs, and, although the Debtor will terminate a number of employees, it will retain sufficient and appropriate staff to manage the CLOs post-Effective Date.  However, even if the Debtor were terminating all employees, the Management Agreements *expressly* allow the Debtor to retain a Sub-Servicer to manage the CLOs.[75]

166.    Similarly, the CLO Objectors' contention that the Debtor's timeline for monetizing the assets in the CLOs is contrary to the timeline expected by the CLOs' investors also ignores the facts.  As disclosed in the CLOs' offering memoranda, the notes and preference shares issued by the CLOs have come due or will, with two exceptions, come due shortly.

---

[75] *See* Grayson Agreement, § 2(d) ("In providing services hereunder **the Servicer may employ third parties** including its Affiliates **to render advice including advice with respect to the servicing of the Collateral and assistance** provided however that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties.") (emphasis added).

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 1705/51804   Page 832 of 1017   PageID 15476
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1704 of 1803   PageID 12450
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 97 of 106

| CLO | Note Maturity | Preference Share Redemption |
|---|---|---|
| Aberdeen | November 2018 | November 2018 |
| Brentwood | February 2022 | February 2022 |
| Eastwood | May 2022 | May 2022 |
| Gleneagles | November 2017 | November 2017 |
| Grayson | November 2021 | November 2021 |
| Greenbriar | November 2021 | November 2021 |
| Highland Legacy Limited | June 2011 | N/A |
| Highland Loan Funding V | August 2014 | August 2014 |
| Highland Park CDO I | November 2051 | November 2051 |
| Jasper | August 2017 | August 2017 |
| Pam Capital | May 2010 | N/A |
| PamCo | August 2009 | N/A |
| Red River | July 2018 | July 2018 |
| Rockwall | August 2021 | N/A |
| Rockwall II | August 2021 | N/A |
| Southfork | February 2017 | February 2017 |
| Stratford | November 2021 | November 2021 |
| Valhalla | April 2038 | April 2038 |
| Westchester | August 2022 | August 2022 |

As such, there is no mismatch between the expectations of the CLOs' investors and the Debtor.
With the exception of the CLO Objectors who presumably want the CLOs to stay extant forever,
the expectations of the CLOs' investors are set by the offering memoranda, which clearly
disclose the expected timeline for the CLOs.

167.    Finally, the disingenuousness of the CLO Objectors' arguments on future
performance cannot be overstated.  The CLO Objectors are arguing that the Debtor must *reject*
the Management Agreements because – in their estimation – the Reorganized Debtor will not be
able to satisfactorily manage the CLOs.  The CLO Objectors' argument is therefore that it is

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Filed 07/06/25    Page 833 of 1017    PageID 15477
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1705 of 1803    PageID 12451
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 98 of 106

better for the CLOs to have no manager at all.  The CLO Objectors arguments are an abject danger to the Estate and could create potential liability in the millions of dollars.

### G.    The "Impermissible Partial Assignment" Objection is Meritless

168.    The CLO Objectors contend that their rights are being modified by the Debtor's assumption of the Management Agreements, effectively resulting in an impermissible "partial assumption" of the contracts.  Once again, they are not contracting parties with standing to object on this basis.  But even if they were, the factual predicate is missing.  The Management Agreements are being assumed *in toto*.  There is no modification of any contract rights of the CLO Objectors.  And, as set forth above, the Debtor filed the Adversary Complaint in which it sought a declaratory judgment on the CLO Objectors' rights to replace the Debtor as Portfolio Manager under the Management Agreements.  Regardless of whether the Plan is confirmed, the CLO Objectors will have their rights under the Management Agreements as those rights are determined by this Court in connection with the adjudication of the Adversary Complaint.

### XI.    STATE TAXING AUTHORITY OBJECTION

169.    Following the filing of the State Taxing Authority Objection, the Debtor reached out to Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County (collectively, the "State Authorities") to see whether the State Taxing Authority Objection could be resolved consensually.  Although the Debtor and the State Taxing Authority have not yet reached resolution, the Debtor is optimistic that the State Taxing Authority Objection will be resolved and will continue working with the State Authorities.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-9    Page 107 of 251804    Page 834 of 1017    PageID 15478
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1706 of 1803    PageID 12452
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 99 of 106

### XII.    IRS OBJECTION

170.    The Internal Revenue Service ("IRS") raises three objections to the Plan in the IRS Objection, two of which are not controversial, and the Debtor has amended the plan to address these points.

171.    First, in paragraph 1 of the IRS Objection, the IRS requests that the Debtor provide it with interest on account of its Allowed Claim as required under 11 U.S.C. 1129(a)(9)(C).  The Plan previously provided for payment of the full amount of the Allowed Priority Tax Claims (which would include any applicable interest on account of such Allowed Claim) on the Initial Distribution Date in order to fully satisfy these tax claims and avoid the incurrence of any unnecessary interest.  To clarify this issue and resolve this first objection, the Debtor has amended the Plan to provide for an additional treatment mechanism that provides that Allowed Claims shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code in the event the entirety of the IRS's Allowed Claims (inclusive of any interest pursuant to which such claims are entitled to) are not paid on the Initial Distribution Date, as provided in section II.C of the Plan.

172.    Second, in paragraph 3 of the IRS Objection, the IRS argues that its claims should not be "fixed" unless and until any required tax returns are filed.  The Debtor does not dispute this contention and believes that the proposed language that was provided to the IRS and reprinted below addresses this concern because it provides that the IRS's claims shall survive the bankruptcy as if the cases had not yet been filed, which is standard in chapter 11 confirmation orders.  Further, the Debtor believes that it has filed all applicable returns but, in an effort to resolve the IRS Objection, proposes the language below.

93

Appellee Appx. 01700
Appx. 01951
014513

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Page 1708 of 1804   Page 835 of 1017   PageID 15479
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1707 of 1803   PageID 12453
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 100 of
106

173.    In paragraph 2 of the IRS Objection, the IRS asserts that it has no record of the
Debtor having filed its Form 720 with respect to its self-insured health plan for the June 30,
2014, June 30, 2016 and June 30, 2018 tax periods.  Because of this alleged non-compliance, the
IRS proposes certain default provisions detailed in the chart below (the "Default Provisions").
The Debtor asserts that the Default Provisions are not warranted because that Debtor has filed all
applicable tax returns.  Specifically, with respect to Form 720, on April 22, 2020, the Debtor
responded to an IRS inquiry about the forms and provided an explanation about forms which
were not required and provided the IRS with Form 720 for the 2015, 2016 and 2017 tax periods.
Further the Default Provisions are not warranted because the IRS has adequate collection and
enforcement remedies available through applicable law and should not be granted additional
remedies through the Plan.  Finally, the Default Provisions are vague and contain undefined
terms which will result in confusion if enforcement is ever attempted.  Certain examples of these
problems are discussed below.

174.    Default Provision (1) provides certain remedies to the IRS in the event of certain
failures to pay taxes or timely file returns by the Debtor, the Reorganized Debtor or any
successor in interest.  The Debtor asserts that the Default Provisions are unnecessary since the
Debtor has provided all applicable returns.  Default Provisions (2) and (3) are not needed and are
problematic because of their vagueness.  The Debtor would agree to Default Provision (1)
provided that it is clarified to state that nothing contained in the Plan or the Confirmation Order
shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of
setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that

94

Appellee Appx. 01701
Appx. 01952
014314

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Exhibits    Page 10709 of 251804    Page 836 of 1017    PageID 15480
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1708 of 1803    PageID 12454
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 101 of
106

the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim,

liability or cause of action of the United States.

175.    Default Provision (2), presumably intended to provide remedies in addition to

those provided under Default Provision (1), would allow the IRS to declare the Debtor to be in

**"default"** if the certain failures were not cured within fourteen (14) days and then the **"entire**

**imposed liability, together with any unpaid current liabilities, shall become due and**

**payable immediately upon written demand to the Debtor, Reorganized Debtor, an/or any**

**successor in interest."**  The term **"entire imposed liability"** is not defined in the proposed

Default Provision.  The ability of the IRS to unilaterally declare the Debtor to be in default and

the imposition of a fourteen (14) day deadline is inappropriate and the IRS should rely on

applicable law without imposing additional requirements through the confirmation process.

Further, if this provision is intended to cut off the Debtor's right to challenge any obligation that

is asserted against it by the IRS, it goes beyond applicable law and would deprive the Debtor of

valuable rights to legitimately challenge such asserted amounts, including applicable appeal

rights.  Further, to the extent that the Debtor may legitimately dispute certain tax obligations,

acceleration of payment of other tax obligations is not appropriate and not in accordance with

applicable law.

176.    Default Provision (3) requires full payment of the entire imposed liability,

together with an unpaid current liabilities within fourteen (14) days of demand and also purports

to extend the collection statute expiration date again attempting to augment remedies available to

the IRS.  Such remedies are not warranted.  Again, the IRS has adequate remedies available to it

DOCS_SF:104855.7 36027/002

Appellee Appx. 01702
Appx. 01953
0114315

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-5    Page 100 of 1804    Page 837 of 1017    PageID 15481
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1709 of 1803    PageID 12455
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 102 of
106

under applicable law and should not seek to augment them through the bankruptcy plan confirmation process.

177. Aside from the fact that the pre-determination of the parties' applicable rights and defenses under applicable non-bankruptcy law does not belong in a chapter 11 plan or confirmation order, the IRS's language is problematic for another reason. By grafting these requirements to a chapter 11 plan and or a court order, the IRS is creating additional remedies that it would otherwise not be entitled to under non-bankruptcy law because it could then use the Confirmation Order to hold the Debtor in contempt, and potentially foreclose any applicable defenses or other substantive rights in a later proceeding that contravene the IRS's Court-ordered default language.

178. The Debtor has proposed (and the IRS has rejected) the standard "neutrality" language that protects the parties' respective rights and defenses and places them in the "the administrative or judicial tribunals in which such rights or claims would have been resolved or adjudicated if the bankruptcy case had not been commenced" which is where they belong.

179. The Debtor believes that the Court should not pre-adjudicate either the Debtor's or the IRS's applicable rights and remedies with respect to any unfiled tax returns or claims asserted by the IRS and these issues should be preserved for adjudication in the appropriate forums post-confirmation. The Debtor believes that its neutrality language initially proposed is consistent with language approved by this Court and in other cases without pre-adjudicating the parties' substantive rights. While the Debtor does not believe that any of the proposed Default Provisions are warranted because it has complied with applicable filing requirements, the Debtor

Appellee Appx. 01703

Appx. 01954

014316

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 18-15   Exhibit 6   Page 107/06/25 1804   Page 838 of 1017   PageID 15482
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1710 of 1803   PageID 12456
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 103 of
106

would agree to include Default Provision (1) as modified below.  The Debtor believes that the language proposed to the IRS for insertion to the Confirmation Order[76] preserves each party's respective rights and defenses and adequately protects the IRS form enforcing any statutory claims or rights it may possess.

| | |
|---|---|
| **Proposed Resolution of Objection of United States of America**.<br><br>**Default Provision - IRS**.  Notwithstanding any other provision or term of this Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the IRS Claim):<br><br>(1) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of said notice and demand, then the following shall apply to the IRS:<br><br>    (A) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code;<br><br>    (B) The automatic stay of 11 U.S.C. § 362 and any injunction of this Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Court, and the entire | **Default Provision - IRS**.  Notwithstanding any other provision or term of this Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the IRS Claim):<br><br>(1) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of said notice and demand, then the following shall apply to the IRS:<br><br>    (A) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code;<br><br>    (B) The automatic stay of 11 U.S.C. § 362 and any injunction of this Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Court, and the entire imposed liability owed to the IRS, together with any unpaid current liabilities, may |

---

[76] The Debtor discussed its concerns with IRS counsel provided it with certain neutrality language to resolve the IRS objection.  The IRS responded that it could not agree to such language and would stand on its objection and its requested default language

97

Appellee Appx. 01704
Appx. 01955
0143177

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Page 117 of 251804   Page 839 of 1017   PageID 15483
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1711 of 1803   PageID 12457
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 104 of 106

imposed liability owed to the IRS, together with any unpaid current liabilities, may become due and payable immediately; and

(C) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed; and

(3) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service;

(4) Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States; and

(5) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

become due and payable immediately; and

(C) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

(2) If the IRS declares the Debtor, the Reorganized Debtor, or any successor in interest to be in default of the Debtor's, the Reorganized Debtor's and/or any successor in interest's obligations under the Plan, then the entire imposed liability, together with any unpaid current liabilities, **shall become due and payable immediately upon written demand to the Debtor, Reorganized Debtor, and/or any successor in interest**. Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(3) **If full payment is not made within fourteen (14) days of such demand**, then the Internal Revenue Service may collect any unpaid liabilities through the administrative collection provisions of the Internal Revenue Code. **The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default the IRS shall be entitled to proceed as set out in paragraphs (A), (B), and/or (C) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel. The collection statute expiration date will be extended from the Petition Date until substantial default under the Plan.**

(4) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(5) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and

DOCS_SF:104855.7 36027/002

Appellee Appx. 01705

Appx. 01956

014518

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 107/08/05 1804    Page 840 of 1017    PageID 15484
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1712 of 1803    PageID 12458
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 105 of
106

| | after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. |
|---|---|

## **CONCLUSION**

For the reasons set forth herein and in the Memorandum, the Debtor respectfully requests

that the Bankruptcy Court overrule the Objections for the reasons set forth herein and confirm

the Plan as requested by the Debtor.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01706
Appx. 01957
014319

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-15    Page 106/151804    Page 841 of 1017    PageID 15485
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1713 of 1803    PageID 12459
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 106 of
106

Dated:  January 22, 2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            gdemo@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*
HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_SF:104855.7 36027/002

Appellee Appx. 01707
Appx. 01958
014320

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 63-6    Page 10/05/251804 Page 842 of 1017    PageID 15486
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1714 of 1803    PageID 12460

Case 19-34054-sgj11 Doc 1807-1 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 1 of 2

# **EXHIBIT A**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1716 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1715 of 1803    PageID 12461
Case 19-34054-sgj11 Doc 1807-1 Filed 01/22/21    Entered 01/22/21 19:52:03    Page 2 of 2

# Plan Objections from Dondero-Related Entities: Organizational Charts



[1] CLO Holdco, Ltd., is a wholly-owned subsidiary of the Charitable Donor Advised Fund, L.P. (the "DAF"). HCMLP has terminated its shared services agreement with the DAF. The DAF owes HCMLP past due fees and expenses.
[2] Amounts owed as of November 30, 2020.

Appellee Appx. 01709
Appx. 014909
014322

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Page 107/06/251804Page 844 of 1017   PageID 15488
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1716 of 1803   PageID 12462

Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 1 of 14

# **EXHIBIT B**

Appellee Appx. 01710
Appx. 01901
014323

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1718 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1717 of 1803    PageID 12463
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 2 of 14

**OBJECTION SUMMARY[1]**

| Objecting Party | Objection | Response |
|---|---|---|
| U.S. Trustee | The release is overbroad and releases non-debtors in violation of Pacific Lumber | The Debtor Release is not overly broad and only releases claims owned (either directly or derivatively) by the Debtor and the Estate on behalf of the Debtor and its successors, which include the CT and LST only in their capacity as successors.  No third party is implicated by the Debtor Release and Pacific Lumber is inapplicable.  Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. |
| | The exculpation is overbroad and releases non-debtors in violation of Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| Internal Revenue Service | Plan does not state that the Debtor will pay IRS priority tax claims on the Effective Date. | The Plan provides that Allowed Priority Claims would be paid on the Initial Distribution Date.  In response to this objection, the Plan has been amended to provide for treatment of priority claims in accordance with 1129(a)(9)(C) |
| | The plan does not provide for statutory interest on the IRS claims under Section 511 | Plan has been amended to provide for treatment of priority claims in accordance with 1129(a)(9)(C) |
| | The IRS asserts that the Debtor failed to file tax Form 720 returns related to its self-insured health plan for 2014, 2016, and 2017 and requests that the Plan be amended to include certain "Default Provisions" that, among other things, allow the IRS to declare defaults, demand that the "entire imposed liability" become due and payable, and the ability to collect unpaid liabilities upon 14 days' notice of demand for payment | The Debtor has provided all applicable tax forms and the proposed Default Provisions are unwarranted.  The Debtor would agree, however, to modified Default Provisions.

The IRS' proposed Default Provisions graft the IRS' potential non-bankruptcy and arguably additional rights and remedies into the Plan, including the IRS' unilateral rights to declare defaults, impose successor liability, and to require payments of "entire imposed liabilities" upon 14 days' notice of demand.  The Debtor does not think it is appropriate for the Plan or Confirmation Order to dictate these rights and they should be determined under applicable non bankruptcy law. |

---

[1] The following are summaries only.  Parties should read the entirety of the Debtor's Reply.

**Appellee Appx. 01711**

**Appx. 01962**

014324

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1719 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1718 of 1803    PageID 12464
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 3 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County | Plan does not appropriately apply for treatment of postpetition and effective date interest on tax claims, Plan does not provide for continued security interest and Plan does not provide that failure to pay tax claims is a default under the plan | The Debtor is currently negotiating language with these taxing authorities to resolve the issues raised in their objection through insertion of language in the Confirmation Order in order to consensually resolve this objection. |
| Jack Yang and Brad Borud (joined by Deadman, Travers, Kauffman [D.I. 1674; 1679]) | Subordinated Claims are defined overly broad as not just claims subordinated under § 510 but also claims arising from Class A/B/C Limited Partnership interests in a way that impermissibly broadens § 510(b) | The Plan has been amended to clarify that it does not provide for categorical subordination of claims relating to partnership interests to address this objection |
| Patrick Daugherty | The Disputed Claims Reserve allows the Debtor to estimate claims for distribution, which provides for impermissible disparate treatment under § 1123(a)(4) | The Plan does not provide for disparate treatment of claims.  The Plan provides for a mechanism for the Debtor or Mr. Daugherty (or any creditor) to file a motion to estimate any Disputed Claim for purposes of establishing the amount of the Disputed Claims Reserve pending the allowance or disallowance of his claim.  Neither Daugherty or any other creditor is entitled to a reserve for the full amount of a disputed claim.  This procedure does not constitute disparate treatment of claims under section 1123(a)(4) |
| Dugaboy Investment Trust and Get Good Investment Trust | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | Section III.J of the Plan has been amended to clarify that subordination will occur after notice and a hearing and any order by the Bankruptcy Court. |
| | The Plan is not complete as it doesn't list final documents governing the claimant trust/litigation trust/reorg debtor, retained causes of action, executory contracts | Dugaboy's reference to documents still under negotiation with the Committee was a vestige from a prior draft.  Three Plan Supplements have been filed that contain these documents.  An additional Plan Supplement is being filed concurrently herewith. |
| | Plan violates 1129(a)(7) because it doesn't provide the value that would be received in a chapter 7 liquidation because:  (i) Reorg Debtor has no affirmative obligation to report to holders of beneficial interests in the Claimant Trust, (ii) Claimant Trustee is only liable for fraud, willful misconduct, or gross negligence and not breach of fiduciary duty; and (iii) a chapter 7 trustee would need to get court authority to sell assets and no such requirement exists for Claimant Trustee [ | The Liquidation Analysis provides that creditors will receive distributions under the Plan that are not less than the value they would receive under a hypothetical distribution under chapter 7.  This objection does not contest the conclusions set forth in the Liquidation Analysis.  The Plan, consistent with other plans including ones confirmed in this court, properly allows the Claimant Trustee and Reorganized Debtor to sell assets post-confirmation without the need for court approval. The standard of liability is also appropriate and consistent with confirmed chapter 11 plans.  Moreover, a chapter 7 trustee would enjoy qualified immunity for its actions. |

Appellee Appx. 01712
Appx. 014325
014325

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1720 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1719 of 1803    PageID 12465
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 4 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | Exculpation provisions are overbroad as (i) they do not relate to a specific time period (just apply from Petition Date through implementation), especially when read in connection with the exculpation provision in the Claimant Trust Agreement, (ii) cover non-Debtors, and (iii) violates Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. The CTA includes standard language limiting liability and is not an improper exculpation. |
| | Release provision (i) is overbroad and releases claims not related to the BK; (ii) waives future claims of the Claimant Trust | The Debtor Release is not overly broad and only releases claims owned (either directly or derivatively) by the Debtor and the Estate on behalf of the Debtor and its successors, which include the CT and the LST only as successors to the Debtor, not any claims the CT or LST might subsequently have of their own. No third party is implicated by the Debtor Release and Pacific Lumber is inapplicable. Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. |
| | The injunction provisions in Article IX.F are overbroad and arguably violates Pacific Lumber as an improper release and In re Zale and Thru, which prevents a non-debtor injunction if it effectively discharges a no debtor | The Injunction Provisions have been modified to address these concerns. The Injunction Provision, as modified, merely implements the Plan's discharge, release, and Exculpation Provisions by enjoining the Enjoined Parties from commencing or maintaining any actions to interfere with the implementation or consummation of the Plan. Implementation and consummation are words used in the Code and have meanings known by practitioners and the Court. The injunction is only applicable to the Debtor and its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust, or against the property of the Debtor, and its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust – none of whom are non-debtor third parties as the debtor has eliminated the Independent Directors from these provisions. |
| | The release provided to released parties does not meet the standards for a release as there is no meaningful contribution to the BK and is not necessary to protect non-debtor entities that are essentially the debtor | Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. The consideration provided by the Released Parties will be presented. The Released Parties are only being released by the Debtor and its successors. |

Appellee Appx. 01713
Appx. 01964
014326

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1721 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1720 of 1803    PageID 12466
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 5 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | The "channeling injunction" and retention of jurisdiction is improper because it expands the BK court's jurisdiction to actions not arising under, related to, or arising in the BK.  This is especially so since there is no post-effective date Reorganized Debtor | The Gatekeeper Provision is a legitimate exercise of the Court's jurisdiction, does not (as modified) implicate the Court's post-effective date jurisdiction as the Court will initially, only be determining if a claim is colorable.  Furthermore, as a liquidating plan, the court has – under applicable law – jurisdiction because all acts taken by the trust are related to implementing and effectuating the Plan.  Furthermore, the Gatekeeper Provision is supported by the Barton Doctrine (which requires that claims against court-appointed and court-approved fiduciaries be sanctioned by the approving or appointing court) and by the All Writs Act, which permits courts to place limits on the ability of vexatious litigants to continue to file litigation. |
| | The injunction prevents parties from enforcing the rights created by the plan post-effective date | Art. IX.F starts with "Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court. . . . "  It does not prevent enforcement of rights created under the Plan |
| | The "channeling injunction" is not a proper channeling injunction under Section 524(j) and even if it were, 524(j) only applies to debtors that are eligible for a discharge under 1141 and HCMLP is not eligible for a discharge because it is a liquidation plan. | The Gatekeeper Provision has nothing to do with Section 524(j).  Although the Debtor will be engaging in a long term liquidation given the nature of its assets, during that same time period the Debtor will be engaging in business to maximize such liquidation, including by continuing to manage non-debtor funds. |
| James Dondero | The exculpation provision in IX.D is overbroad as it relates to non-debtors under Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| | The "channeling injunction" in Article IX.F includes post-confirmation conduct and non-debtors and is effectively a third party release prohibited under Dropbox. | The Gatekeeper Provision is a legitimate exercise of the Court's jurisdiction, does not (as modified) implicate the Court's post-effective date jurisdiction as the court will initially, only be determining if a claim is colorable.  Furthermore, as a liquidating plan, the Court has – under applicable law – jurisdiction because all acts taken by the trust are related to implementing and effectuating the Plan.  Furthermore, the Gatekeeper Provision is supported by the Barton Doctrine (which requires that claims against court-appointed |

4

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Exhibit 6   Page 1722 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1721 of 1803   PageID 12467
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 6 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | | and court-approved fiduciaries be sanctioned by the approving or appointing court) and by the All Writs Act, which permits courts to place limits on the ability of vexatious litigants to continue to file litigation.  There is no "release" in the Gatekeeper Provision as it does not prevent claims from being brought – it merely requires that the Bankruptcy Court determine the claim is colorable before it can be brought. |
| | The "channeling injunction" limits jurisdiction to the Bankruptcy Court and ignores other courts with exclusive jurisdiction and specialized jurisdiction | The Gatekeeper Provision has been modified to eliminate the exclusive jurisdiction of the Bankruptcy Court to hear permitted claims on the merits unless it determines it has jurisdiction to do so after determining if a claim is colorable. |
| | The "channeling injunction" is impermissibly vague under FRBP 3016(c) | The Gatekeeper Provision is not vague and, to the extent FRBP 3016(c) is applicable, expressly complies with the rule in that the Gatekeeper Provision describes in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identifies the entities that would be subject to the injunction |
| | The Plan does not provide appropriate mechanisms for oversight of post-confirmation sales and would allow impermissible sales similar to that which occurred during the BK | This is the same objection filed by other Dondero Entities to prevent the post-confirmation monetization of assets.  The Plan, consistent with other plans including ones confirmed in this Court, properly allows the Claimant Trustee and Reorganized Debtor to sell assets post-confirmation without the need for court approval. The standard of liability is also appropriate and consistent with confirmed chapter 11 plans. |
| | The jurisdictional provisions are overbroad and would require all claims to be heard in the BK without regard to whether they arise in connection with implementation of the plan or otherwise | The Gatekeeper Provision has been modified to eliminate the exclusive jurisdiction of the Bankruptcy Court to hear permitted claims on the merits unless it determines it has jurisdiction to do so after determining if a claim is colorable.  The Bankruptcy Court has jurisdiction to determine if a claim is colorable |
| | The elimination of vacant classes on the effective date would impermissibly limited later re-allocation of claims | The elimination of the only vacant class (Class 5 (Retained Employees)) is for voting tabulation purposes only.  This provision permissibly provides for the treatment of any claims that may arise or become Allowed as a Class 5 Claim post-confirmation. |
| | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | Section III.J of the Plan has been amended to clarify that subordination will occur after notice and a hearing and any order by the Bankruptcy Court. |
| NexPoint Real Estate Partners LLC, f/k/a HCRE Partners, LLC | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | Section III.J of the Plan has been amended to clarify that subordination will occur after notice and a hearing and any order by the Bankruptcy Court. |

DOCS_LA:335197.6 36027/002                                                        5

Appx. 01986
014528

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1723 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1722 of 1803    PageID 12468
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 7 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | Plan allows Distribution Agent to setoff amounts owed to the Debtor against amounts owed to a creditor in violation of s. 553 and impermissibly shifts burden of proving setoff was improper to the creditor | Creditors have the right to challenge set off in an appropriate manner. The Plan has been amended to clarify this language. |
| | The "channeling injunction" improperly insulates non-debtors under s. 524(e). | The Gatekeeper Provisions do not implicate section 524(e). There is no insulation of any non-debtor. The Gatekeeper Provision simply requires the Bankruptcy Court to determine if a claim is colorable before it can be brought. |
| | The exculpation and release provision release claims not related to the BK but also the administration and implementation of the plan | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| | Period of time covered by the release and exculpation provisions impermissibly extends post-effective date. Cf. Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| NexPoint Advisors, Highland Capital Management Fund Advisors, and related funds<br><br>(joined by CLO Holdco)<br><br>(joined by NexPoint RE Entities [D.I. 1677] | Investment Advisers Act is "applicable law" that prohibits assumption/assignment of the Portfolio Management Agreements ("PMAs") under 365(c) | As this Court has ruled in Acis, and as SEC No Action Letters advise, the Investment Advisers Act does not prohibit assignment. The "actual test" applies and thus even if the PMAs were nonassignable, they would still be assumable. |
| | PMAs are "personal services contracts" and cannot be assigned under 365(c) | As this Court ruled in Acis, the PMAs are not nonassignable personal services contracts. Further, the counterparties have consented, and under the "actual test" the PMAs would be assumable even if nonassignable. |

Appellee Appx. 01716

Appx. 014329

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1724 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1723 of 1803    PageID 12469
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 8 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | Fifth Circuit applies the hypothetical test under Section 365(c), not the actual test | Fifth Circuit has applied the actual test under §365(e) and lower courts within the Fifth Circuit have applied the actual test to §365(c). |
| | Even if "actual" test applies, the Reorg Debtor is not the Debtor because of slimmed down staff and use of subservicers | The objectors lack standing to object. As this Court held in Acis, services under the PMAs are delegable and the Debtor is entitled to use a servicer. However, the Reorganized Debtor will have sufficient employees and resources to manage the CLOs post-Confirmation Date. This is an adequate assurance issue, and the contract counterparties have consented. |
| | There is no consent to assumption under 365(c) | CLO issuers are the counterparties and they consent. The objectors have no contract right to object to assumption. |
| | The objectors have standing because they have claims against the estate or will have large rejection claims under shared services agreements. | The Funds, Advisors and CLO Holdco are not creditors and will not be creditors. They agreed to expungement of their claims or reduction to zero. There will be no rejection damages because the contracts are freely terminable upon notice and are being terminated, not rejected. Even if objectors were creditors, that would give them standing only as to whether assumption benefits the estate, not their particular interests. |
| | The objectors have standing because the plan violates 1129 because it provides for assumption of contracts in violation of law. | The objectors have no standing as creditors, they have no standing to object to assumption of contracts to which they are not parties and to which the counterparties have consented, and assumption of the PMAs does not violate any law. |
| | The objectors have standing because the plan seeks to limit their right to remove the manager | The Plan does not limit their removal rights. |
| | Debtor should take direction from the majority of the preference shareholders in the CLOs | The objectors have no contractual right to control the management of the CLOs. |
| | The injunction and release provisions are overbroad because they do not appropriately define their scope and prevent the movants from suing for future malfeasance | The Debtor Release is not overly broad and only releases claims owned (either directly or derivatively) by the Debtor and the Estate on behalf of the Debtor and its successors, which include the CT and LST only in their capacity as successors. No third party is implicated by the Debtor Release and Pacific Lumber is inapplicable. Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan and attempts to collect the claims and interests dealt with by the Plan. |
| | The injunction prevents the objectors and the CLOs from seeking relief against the | The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan |

7

Case 19-34054-sgj11     Doc 3596-6     Filed 10/31/22     Entered 10/31/22 15:27:09     Desc
Exhibit 6     Page 1725 of 1804
Case 3:21-cv-00879-K     Document 21     Filed 07/28/21     Page 1724 of 1803     PageID 12470
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21     Entered 01/22/21 18:52:03     Page 9 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | debtor/reorg debtor from any present or future actionable wrongs under the servicing agreements and advisers act | and attempts to collect the claims and interests dealt with by the Plan. |
| | Injunction prevents set off or other damages under the servicing agreements and to seek legal redress | The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan and attempts to collect the claims and interests dealt with by the Plan. |
| | "Channeling Injunction" is defective with respect to post-confirmation actions and is overly broad | The Gatekeeper Provision has been modified to eliminate the exclusive jurisdiction of the Bankruptcy Court to hear permitted claims on the merits unless it determines it has jurisdiction to so after determining if a claim is colorable.  The Bankruptcy Court has jurisdiction to determine if a claim is colorable. |
| | Plan does not disclose who will be operating the reorganized debtor and claimant trust or their comp as required under s 1123(a)(7) or insider compensation under 1129(a)(5) | The Plan Supplement discloses the identity of the Claimant Trustee, Litigation Trustee and Oversight Committee members. The Debtor discloses in the Confirmation Brief the compensation of insiders pursuant 1129(a)(5) under the Plan who will serve post-confirmation in their Confirmation Brief |
| | The plan is not feasible because the treatment of the CLO management agreements is illegal and violates s. 365 | The Plan does not impact any party's rights under the CLO management agreements, and applicable law does not prohibit the Debtor's assumption of the CLO management agreements. |
| | The plan does not provide assurance of future performance with respect to the assumption of the CLO management agreement as required by 365(b) | The objectors lack standing to object.  As this Court held in Acis, services under the PMAs are delegable and the Debtor is entitled to use a servicer.  However, the Reorganized Debtor will have sufficient employees and resources to manage the CLOs post-Confirmation Date.  This is an adequate assurance issue, and the contract counterparties have consented. |
| | Release and injunction provisions are overbroad under Pacific Lumber because they release third parties | Neither the Release nor the Injunction Provisions release non-debtor third parties. |
| | Exculpation provisions are overbroad under Thru | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |

Appellee Appx. 01718

Appx. 014531

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1726 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1725 of 1803    PageID 12471
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 10 of
14

| Objecting Party | Objection | Response |
|---|---|---|
| | The plan divests movants from their set off rights | Creditors have the right to challenge set off in an appropriate manner. The Plan has been amended to clarify this language. |
| | The plan provides that contracts can be assumed until the Effective Date in violation of 365(d)(2) | The Plan has been amended to address this objection. |
| | Debtor is not entitled to a discharge under 1141 because it's a liquidating plan | Although the Debtor will be engaging in a long term liquidation given the nature of its assets, during that same time period the Debtor will be engaging in business to maximize such liquidation, including by continuing to manage non-debtor funds |
| | The plan violates the absolute priority rule because equity gets to keep assets while senior creditors may not be paid in full | This assertion is false. Equity Interests will not receive any property on account of the their interests pursuant to the Plan unless and until the claims of creditors are full paid, inclusive of interests, as provided in the Plan. |
| CLO Holdco Ltd. | CLO Holdco has standing to object because of its interests in the CLOs | As set forth above, CLO Holdco has no standing to assert the rights of the contracting parties to the PMAs. It is also not a creditor, having reduced its claim to zero and having no rejection claim. Even if it was a creditor it would not have standing to object to assumption on the basis of rights held by contracting parties. |
| | Joined NPA/HCMFA objection | NPA/HCMFA objection responses are set forth above. |
| | Plan provides for impermissible "partial assumption" because it cherry picks provisions of the CLO management agreements that are going to be assumed by preventing removal of the CLO manager by the preference shares | For the reasons set forth above, CLO Holdco has no standing to assert objections to assumption held by contracting parties, who consent to assumption. Further, the Plan does not deprive preference shareholders of removal rights. |
| | Injunction and exculpation prohibits creditors from interfering with implementation or consummation of the plan and would prevent the movants from removing the Debtor as the CLO manager | The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan and attempts to collect the claims and interests dealt with by the Plan. |
| | The plan impermissibly modifies the movants' rights under the CLO management agreements without their consent | The Plan does not modify CLO Holdco's rights under the PMAs |
| | Exculpation and indemnification provisions are third party releases in violation of applicable law under Pacific Lumber | The Plan does not contain an" indemnification provision." The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity |

9

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1727 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1726 of 1803    PageID 12472
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 11 of
14

| Objecting Party | Objection | Response |
|---|---|---|
| | | of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| NexBank Capital, Inc., NexBank Securities, Inc., NexBank Title, Inc., and NexBank | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | The Debtor amended Plan section III.J of the Plan to provide for "notice and a hearing" with respect to any subordination proceeding and corresponding changes to the definition of "Subordinated Claim" and the treatment of any claims that may, potentially, be subordinated after notice and a hearing and any order by the Bankruptcy Court. |
| | Plan allows Distribution Agent to setoff amounts owed to the Debtor against amounts owed to a creditor in violation of s. 553 and impermissibly shifts burden of proving setoff was improper to the creditor | Creditors have the right to challenge set off in an appropriate manner.  The Plan has been amended to clarify this language. |
| | The exculpation and release provision release claims not related to the BK but also the administration and implementation of the plan | |
| | The exculpation and release provisions violate Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees.  The Release is only a release of claims owned by the Debtor and its estate and does not implicate Pacific Lumber which had nothing to do with debtor released which are permitted under section 1123(b)(3). |
| Senior Employees | The Plan violates § 1123(a)(4) because it treats the Senior Employees differently than similarly situated employees by requiring the Senior Employees to sign a Senior Employee Stipulation and reduce a portion of their claim to obtain a release. | The treatment of claims in either Class 7 or Class 8 solely consists of distributions on account of the allowed amounts of such claims, and there is no difference in treatment among members of either class in terms of the distribution scheme provided.  The potential Debtor release of its own claims against employees or ex-employees under the Plan does not constitute "treatment" of Class 7 or Class 8 claims. |

Appellee Appx. 01720
Appx. 014533
014533

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1728 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1727 of 1803    PageID 12473
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 12 of
14

| Objecting Party | Objection | Response |
|---|---|---|
| | The Senior Employee Stipulation was not approved by the Senior Employees and contains material problems. | Whether or not the Senior Employees voluntary elect to sign the Senior Employee Stipulation does not constitute a valid basis to object to Plan confirmation.  The voluntary decision to execute the Senior Employee Stipulation was at the option of the employee. Moreover, the Debtor has settled this objection with respect to Mr. Surgent and Mr. Waterhouse. |
| | The Debtor has improperly prevented the Senior Employees from making the Convenience Class Election because, as reflected in the chart prepared by the Debtor, the Senior Employees have liquidated claims which are not in dispute. | Under applicable bankruptcy law, the Plan and the Disclosure Statement Order, the Senior Employees are not entitled to split their claims to create a liquidated claim for which Convenience Class Election would even be possible.<br><br>Each Senior Employee filed a single proof of claim and the Senior Employees have not cited any authority supporting the proposition that a claimant may split claims listed in a single proof of claim; to the contrary, courts have stated that claim splitting is impermissible when covered by a single proof of claim.  Further, the Plan and Disclosure Statement Order prohibit claim splitting for voting purposes.  Finally, as explicitly set forth on the ballots approved by the Disclosure Statement Order, even if a Senior Employee could split his claims in order to elect Convenience Class treatment, the Convenience Class Election only impacts *treatment*, and explicitly does not impact voting. |
| | The Plan provides that a Class 8 Creditor can make the Convenience Class Election for a liquidated claim.  Since a portion of each Senior Employee's claim is liquidated, the Senior Employees have a right to make the Convenience Class Election under the Plan.<br><br>The Debtor has contradicted the Plan in how in its conversations with the Senior Employees. Each Senior Employee received two ballots (one Class 7 and one Class 8) and this confusion justifies the Senior Employees review of the Plan.<br><br>The fact that the Plan splits employee claims into PTO claims and other claims is evidence that the Plan allows Claim splitting.  The | As set forth directly above, each Senior Employee would have to split his claim in order to also retain the remainder of his Class 8 claim.  This is impermissible under applicable case law and the Plan.<br><br>The Debtor's statements have been consistent with the Plan.  In any event, the Plan governs.  The Senior Employee's receipt of two ballots was an administrative error and cannot override the express terms of the Plan and Disclosure Statement Order.<br><br>As to the PTO Claims, those were separately classified *by the Plan*. The Senior Employees seek to split claims *within the same class*.  It is splitting claims within the same class that is prohibited by applicable case law and the Plan and Disclosure Statement Order. |

**Appellee Appx. 01721**
Appx. 01974
014534

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1729 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1728 of 1803    PageID 12474
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 13 of
14

| Objecting Party | Objection | Response |
|---|---|---|
| | exhibit is a representation that the Senior Employee claims have the right to a split claim because it discusses a Convenience Class claim. | |
| | The Plan identifies no basis for disparate and unfair treatment of the Senior Employees. | Debtors are not required to grant releases to anyone nor are their required to grant releases to all employees equally, especially here, where there are allegations of material misconduct against some, but not all, of the employees. |
| | The Plan appears to impermissibly grant the Debtor, the Reorganized Debtor, and the Claimant Trustee the unfettered power to "reclassify" any claim as a Subordinated Claim. | Section III.J of the Plan has been amended to provide for "notice and a hearing" with respect to any subordination proceeding and corresponding changes to the definition of "Subordinated Claim" and the treatment of any claims that may, potentially, be subordinated after notice and a hearing and any order by the Bankruptcy Court. |
| | The Plan allows the Debtor to make changes to the Plan without Court approval, including changes to the plan supplement documents. | To the contrary, Article XII of the Plan explicitly requires that modifications to the Plan be in compliance with section 1127. |

12

Appellee Appx. 01722

Appx. 01973

014535

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1730 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1729 of 1803    PageID 12475
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 14 of
14

DOCS_LA:335197.6 36027/002                         13

Appellee Appx. 01723
Appx. 01974
014536

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-15   Page 1036 of 1804   Page 858 of 1017   PageID 15502
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1730 of 1803   PageID 12476

Case 19-34054-sgj11 Doc 1807-3 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 1 of 3

# **EXHIBIT C**

Appellee Appx. 01724
Appx. 01975
0114537

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Exhibit 6   Page 1 of 3804   Page 859 of 1017   PageID 15503
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1731 of 1803   PageID 12477
Case 19-34054-sgj11 Doc 1807-3 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 2 of 3

On the Effective Date, the Debtor will assume the agreements set forth on Appendix [_] hereto (collectively, the "Issuer Executory Contracts") pursuant to section 365 of the Bankruptcy Code and Article V of the Plan. In full and complete satisfaction of its obligation to cure outstanding defaults under section 365(b)(1) of the Bankruptcy Code, the Debtor or, as applicable, any successor manager under the Issuer Executory Contracts (collectively, the "Portfolio Manager") will pay to the Issuers[1] a cumulative amount of $525,000 (the "Cure Amount") as follows:

- $200,000 in cash on the date that is five business days from the Effective Date, with such payment paid directly to Schulte Roth & Zabel LLP ("SRZ") in the amount of $85,714.29, Jones Walker LLP ("JW") in the amount of $72,380.95, and Maples Group ("Maples" and collectively with SRZ and JW, the "Issuers' Counsel") in the amount of $41,904.76 as reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case; and

- $325,000 in four equal quarterly payments of $81,250.00 (each, a "Payment"), which amounts shall be paid to SRZ in the amount of $34,821.43, JW in the amount of $29,404.76, and Maples in the amount of $17,023.81 as additional reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case (i) from any management fees actually paid to the Portfolio Manager under the Issuer Executory Contracts (the "Management Fees"), and (ii) on the date(s) Management Fees are required to be paid under the Issuer Executory Contracts (the "Payment Dates"), and such obligation shall be considered an irrevocable direction from the Debtor and this Court to the relevant CLO Trustee to pay, on each Payment Date, the Payment to Issuers' Counsel, allocated in the proportion set forth in such agreement; *provided, however,* that (x) if the Management Fees are insufficient to make any Payment in full on a Payment Date, such shortfall, in addition to any other amounts due hereunder, shall be paid out of the Management Fees owed on the following Payment Date, and (y) nothing herein shall limit either Debtor's liability to pay the amounts set forth herein, nor the recourse of the Issuers or Issuers' Counsel to the Debtor, in the event of any failure to make any Payment.

Effective as of the Effective Date, and to the maximum extent permitted by law, each Issuer on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (i) the Debtor and (ii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, the Independent Directors, the CEO/CRO, and with respect to the Persons listed in this subsection (ii), such Person's Related Persons (collectively, the

---

[1] The "Issuers" are: Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 6 Page 10/33/51804 Page 860 of 1017 PageID 15504
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1732 of 1803 PageID 12478
Case 19-34054-sgj11 Doc 1807-3 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 3 of 3

"Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Issuer Released Claims").

Effective as of the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each Issuer and (ii) Wendy Ebanks, (iii) Yun Zheng, (iv) Laura Chisholm, (v) Mora Goddard, (vi) Stacy Bodden, (vii) Suzan Merren (viii) Scott Dakers, (ix) Samit Ghosh, (x) Inderjit Singh, (xi) Ellen Christian, (xii) Andrew Dean, (xiii) Betsy Mortel, (xiv) David Hogan, (xv) Cleveland Stewart, (xvi) Rachael Rankin, (xvii) Otelia Scott, (xviii) Martin Couch, (xx) Ferona Bartley-Davis, (xxi) Charlotte Cloete, (xxii) Christina McLean, (xxiii) Karen Ellerbe, (xxiv) Gennie Kay Bigord, (xxv) Evert Brunekreef, (xxvii) Evan Charles Burtton (collectively, the "Issuer Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained herein will apply to the Issuer Released Parties set forth in subsection (ii) above only with respect to Debtor Released Claims arising from or relating to the Issuer Executory Contracts.

Notwithstanding anything in this Order to the contrary, the releases set forth in paragraphs [__] hereof will not apply with respect to the duties, rights, or obligations of the Debtor or any Issuer hereunder.

Appellee Appx. 01726
Appx. 01977
014339

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-6   Page 1736 of 1804   Page 861 of 1017   PageID 15505
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1733 of 1803   PageID 12479

# APPENDIX 25

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-15   Page 107/35/05180/4 Page 862 of 1017   PageID 15506
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1734 of 1803   PageID 12480
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 1 of 13

Docket #1822  Date Filed: 1/22/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**DEBTOR'S WITNESS AND EXHIBIT LIST WITH RESPECT TO
<u>CONFIRMATION HEARING TO BE HELD ON JANUARY 26, 2021</u>**

Highland Capital Management, L.P. (the "<u>Debtor</u>") submits the following witness and

exhibit list with respect to the hearing to confirm the *Fifth Amended Plan of Reorganization of*

*Highland Capital Management, L.P.* [Docket No. 1472] which the Court has set for hearing at

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210122000000000028

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Filed 07/36/25 1804   Page 863 of 1017   PageID 15507
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1735 of 1803   PageID 12481
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 2 of 13

9:30 a.m. (Central Time) on January 26, 2021 (the "Hearing") in the above-styled bankruptcy case (the "Bankruptcy Case").

**A.**     **Witnesses:**

1. James P. Seery, Jr.;

2. John S. Dubel;

3. James Dondero;

4. Marc Tauber, a representative of Aon plc;

5. Patrick M. Leathem (by certification filed at Docket No. 1772);

6. Any witness identified by or called by any other party; and

7. Any witness necessary for rebuttal.

**B.**     **Exhibits:**

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| A. | Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [Docket No. 1528] | | |
| B. | Transcript of 12/16/20 Hearing | | |
| C. | Order Denying Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [dkt 1605] | | |
| D. | Email from James Romey dated September 29, 2020 | | |
| E. | Structural and Steel Products UCC Presentation dated September 29, 2020 | | |
| F. | Aberdeen Loan Funding Offering Memorandum dated as of March 27, 2008 | | |
| G. | Aberdeen Loan Funding Indenture dated as of March 27, 2008 | | |
| H. | Aberdeen Loan Funding Supplemental Indenture No. 1 dated as of March 27, 2008 | | |

Appellee Appx. 01729
014342

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-9    Page 107 of 251804 Page 864 of 1017    PageID 15508
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1736 of 1803    PageID 12482
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 3 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| I. | Aberdeen Loan Funding Preference Shares Paying Agency Agreement dated as of March 27, 2008 | | |
| J. | Aberdeen Loan Funding Servicing Agreement dated as of March 27, 2008 | | |
| K. | Brentwood CLO Offering Memorandum dated as of December 18, 2006 | | |
| L. | Brentwood CLO Indenture dated as of December 21, 2006 | | |
| M. | Brentwood CLO Preference Shares Paying Agency Agreement Dated as of December 21, 2006 | | |
| N. | Brentwood CLO Servicing Agreement dated as of December 21, 2006 | | |
| O. | Eastland CLO Offering Memorandum dated as of March 13, 2007 | | |
| P. | Eastland CLO Indenture dated as of March 13, 2007 | | |
| Q. | Eastland CLO Preference Shares Paying Agency Agreement Dated as of March 13 2007 | | |
| R. | Eastland CLO Servicing Agreement dated as of March 13, 2007 | | |
| S. | Gleneagles CLO Offering Memorandum dated as of October 7, 2005 | | |
| T. | Gleneagles CLO Indenture dated as of October 13, 2005 | | |
| U. | Gleneagles CLO Portfolio Management Agreement dated as of October 13, 2005 | | |
| V. | Gleneagles CLO Preference Shares Paying Agency Agreement Dated as of October 13, 2005 | | |
| W. | Grayson CLO Offering Memorandum dated as of November 28, 2006 | | |
| X. | Grayson CLO Indenture dated as of November 30, 2006 | | |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Page 1076/851804   Page 865 of 1017   PageID 15509
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1737 of 1803   PageID 12483
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 4 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| Y. | Grayson CLO Preference Shares Paying Agency Agreement dated as of November 30, 2006 | | |
| Z. | Grayson CLO Servicing Agreement dated as of November 30, 2006 | | |
| AA. | Grayson CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| BB. | Greenbriar CLO Offering Memorandum dated as of December 18, 2007 | | |
| CC. | Greenbriar CLO Indenture dated as of December 20, 2007 | | |
| DD. | Greenbriar CLO Preference Shares Paying Agency Agreement Dated as of December 20, 2007 | | |
| EE. | Greenbriar CLO Servicing Agreement dated as of December 20, 2007 | | |
| FF. | Jasper CLO Offering Memorandum dated as of June 27, 2005 | | |
| GG. | Jasper CLO Amended and Restated Portfolio Management Agreement dated as of November 30, 2005 | | |
| HH. | Jasper CLO Indenture dated as of June 29, 2005 | | |
| II. | Jasper CLO Preference Shares Paying Agency Agreement dated as of June 29,2005 | | |
| JJ. | Liberty CLO Offering Memorandum dated as of December 7, 2005 | | |
| KK. | Liberty CLO Indenture dated as of December 8, 2005 | | |
| LL. | Liberty CLO Class E Certificate Paying Agency Agreement dated as of December 8, 2005 | | |
| MM. | Liberty CLO Portfolio Management Agreement dated as of December 8, 2005 | | |
| NN. | Red River CLO Offering Memorandum dated as of July 31, 2006 | | |

Appellee Appx. 01731
Appx. 01882
014344

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 10/86 of 1804   Page 866 of 1017   PageID 15510
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1738 of 1803   PageID 12484
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 5 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| OO. | Red River CLO Indenture dated as of August 3, 2006 | | |
| PP. | Red River CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| QQ. | Red River CLO Preference Shares Paying Agency Agreement dated as of August 3, 2006 | | |
| RR. | Red River CLO Servicing Agreement dated as of August 3, 2006 | | |
| SS. | Red River CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| TT. | Rockwall CLO Offering Circular (Notes) dated May 8, 2006 | | |
| UU. | Rockwall CLO Offering Circular (Preferred Share) dated May 8, 2006 | | |
| VV. | Rockwall CLO Indenture dated as of May 10, 2006 | | |
| WW. | Rockwall CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| XX. | Rockwall CLO Preference Shares Paying and Agency Agreement dated as of May 10, 2006 | | |
| YY. | Rockwall CLO Servicing Agreement dated as of May 10, 2006 | | |
| ZZ. | Rockwall CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| AAA. | Rockwall CLO II Offering Circular (Notes) dated May 8, 2007 | | |
| BBB. | Rockwall CLO II Offering Circular (Preferred Share) dated May 8, 2007 | | |
| CCC. | Rockwall CLO II Indenture dated as of May 9, 2007 | | |
| DDD. | Rockwall CLO II Preference Shares Paying and Agency Agreement dated as of May 9, 2007 | | |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Filed 07/46/25 1804 Page 867 of 1017   PageID 15511
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1739 of 1803   PageID 12485
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 6 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| EEE. | Rockwall CLO II Servicing Agreement dated as of May 9, 2007 | | |
| FFF. | Southfork CLO Offering Memorandum dated as of March 9, 2005 | | |
| GGG. | Southfork CLO Indenture dated as of March 15, 2005 | | |
| HHH. | Southfork CLO Portfolio Management Agreement dated as of March 15, 2005 | | |
| III. | Southfork CLO Preference Shares Paying Agency Agreement dated as of March 15, 2005 | | |
| JJJ. | Stratford CLO Offering Memorandum dated as of October 22, 2007 | | |
| KKK. | Stratford CLO Indenture dated as of October 25, 2007 | | |
| LLL. | Stratford CLO Preference Shares Paying and Agency Agreement dated as of October 25, 2007 | | |
| MMM. | Stratford CLO Servicing Agreement dated as of October 25, 2007 | | |
| NNN. | Valhalla CLO Offering Circular dated as of August 17, 2004 | | |
| OOO. | Valhalla CLO Indenture dated as of August 18, 2004 | | |
| PPP. | Valhalla CLO Supplemental Indenture dated as of July 25, 2016 | | |
| QQQ. | Valhalla CLO Reference Portfolio Management Agreement dated as of August 1, 2016 | | |
| RRR. | Westchester CLO Offering Memorandum dated as of May 30, 2007 | | |
| SSS. | Westchester CLO Indenture dated as of May 31, 2007 | | |
| TTT. | Westchester CLO Preference Shares Paying Agency Agreement dated as of May31,2007 | | |

Appellee Appx. 01733
Appx. 01884
014346

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15   Exhibit 6   Page 107 of 251804   Page 868 of 1017   PageID 15512
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1740 of 1803   PageID 12486
Case 19-34054-sgj11   Doc 1822   Filed 01/22/21   Entered 01/22/21 21:50:07   Page 7 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| UUU. | Westchester CLO Servicing Agreement dated as of May 31, 2007 | | |
| VVV. | NexPoint Strategic Opportunities Fund, Form N-2 Registration Statement, filed August 27, 2019 | | |
| WWW. | NexPoint Strategic Opportunities Fund, Form DEF-14A Proxy Statement, filed July 10, 2020 | | |
| XXX. | NexPoint Capital, Inc., Form 497 Prospectus Supplement, filed March 14, 2018 | | |
| YYY. | NexPoint Capital, Inc. Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| ZZZ. | Highland Income Fund, Form 497 Prospectus Supplement, filed July 29, 2019 | | |
| AAAA. | Highland Income Fund, Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| BBBB. | Written Consent of the General Partner of Highland Capital Management, L.P., Effective September 21, 2020 | | |
| CCCC. | List of Board Memberships | | |
| DDDD. | Response to K&L Gates LLP dated December 22, 2020 [Dondero Deposition Exhibit 12] | | |
| EEEE. | Response to K&L Gates LLP dated December 23, 2020 [Dondero Deposition Exhibit 13] | | |
| FFFF. | Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| GGGG. | Response to Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| HHHH. | Highland CLO Funding Articles of Incorporation [**TO BE OFFERED UNDER SEAL**] | | |
| IIII. | Highland CLO Funding Members Agreement [**TO BE OFFERED UNDER SEAL**] | | |
| JJJJ. | Highland CLO Funding Offering Memorandum [**TO BE OFFERED UNDER SEAL**] | | |

Appellee Appx. 01734
Appx. 01985
0149347

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Filed 10/02/25   Page 869 of 1017   PageID 15513
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1741 of 1803   PageID 12487
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 8 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| KKKK. | Highland CLO Funding Portfolio Management Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| LLLL. | Highland CLO Funding Subscription and Transfer Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| MMMM. | Liquidation Analysis [Docket No. 1473] | | |
| NNNN. | AVYA Stock Price Data | | |
| OOOO. | SKY Stock Price Data | | |
| PPPP. | HCMLP - Previous Day Trades 01/29/20 | | |
| QQQQ. | HCMLP - Previous Day Trades 02/10/20 | | |
| RRRR. | HCMLP - Previous Day Trades 02/14/20 | | |
| SSSS. | HCMLP - Previous Day Trades 04/15/20 | | |
| TTTT. | HCMLP - Previous Day Trades 04/17/20 | | |
| UUUU. | HCMLP - Previous Day Trades 08/27/20 | | |
| VVVV. | HCMLP - Previous Day Trades 09/02/20 | | |
| WWWW. | HCMLP - Previous Day Trades 10/07/20 | | |
| XXXX. | HCMLP - Previous Day Trades 10/08/20 | | |
| YYYY. | HCMLP - Previous Day Trades 10/09/20 | | |
| ZZZZ. | HCMLP - Previous Day Trades 11/24/20 | | |

Appellee Appx. 01735
Appx. 01986
0114348

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-5   Page 1048/51804   Page 870 of 1017   PageID 15514
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1742 of 1803   PageID 12488
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 9 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| AAAAA. | Jefferies Trade Confirmations 12/18/20 | | |
| BBBBB. | Jefferies Trade Confirmations 12/21/20 | | |
| CCCCC. | Jefferies Trade Confirmations 12/22/20 | | |
| DDDDD. | Jefferies Trade Confirmations 12/30/20 | | |
| EEEEE. | Jefferies Trade Confirmations 12/31/20 | | |
| FFFFF. | Strand Advisors Bylaws | | |
| GGGGG. | Strand Advisors First Amendment to Bylaws | | |
| HHHHH. | Strand Advisors Certificate of Ownership | | |
| IIIII. | Strand Advisors Written Consent | | |
| JJJJJ. | Strand Advisors Stock Certificate No. 1 | | |
| KKKKK. | Strand Advisors Broker/Agent's Letter of Authorization | | |
| LLLLL. | Strand Advisors – James Seery Director Agreement | | |
| MMMMM. | Strand Advisors – John Dubel Director Agreement | | |
| NNNNN. | Strand Advisors – Hon Russell Nelms Director Agreement | | |
| OOOOO. | Final Operating Protocols [Docket No. 354-1] | | |
| PPPPP. | Article: Highland Capital Says Ch. 11 Trustee Worst Possible Option (Law360 January 16, 2020) | | |

Appellee Appx. 01736
Appx. 01985
014349

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 18-15   Page 10/46/251804   Page 871 of 1017   PageID 15515
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1743 of 1803   PageID 12489
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 10 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| QQQQQ. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 339] | | |
| RRRRR. | Acis Capital Management , L.P. - Court's Ruling on Plan Confirmation (August 30, 2018) | | |
| SSSSS. | Highland – Dondero Related Entities Demonstrative | | |
| TTTTT. | Schedule of receivables for the identified objecting entities (as of 11.30.20) | | |
| UUUUU. | Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| VVVVV. | Notice of Termination of Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| WWWWW. | NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| XXXXX. | Notice of Termination of NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| YYYYY. | NexBank Third Amended and Restated Shared Services Agreement | | |
| ZZZZZ. | Notice of Termination of NexBank Third Amended and Restated Shared Services Agreement | | |
| AAAAAA. | NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| BBBBBB. | Notice of Termination of NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| CCCCCC. | Notice of Termination of NexBank Sub-servicing Agreement | | |
| DDDDDD. | Legal Entities List | | |
| EEEEE. | Highland - Demonstrative on Post-Effective Date Org Chart | | |
| FFFFFF. | HCMLP Deferred Bonus Plan | | |

Appellee Appx. 01737
Appx. 01988
014550

Case 19-34054-sgj11  Doc 3596-6  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:25-cv-02072-S  Document Exhibit 6  Page 10/45/851804 Page 872 of 1017  PageID 15516
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1744 of 1803  PageID 12490
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21  Entered 01/22/21 21:50:07  Page 11 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| GGGGGG. | HCMLP Template agreement for awards under the plan | | |
| HHHHHH. | HCMLP Annual Bonus Plan | | |
| IIIIII. | Seery Handwritten Note | | |
| JJJJJJ. | Marketing Summary | | |
| KKKKKK. | Strand D&O Proposal | | |
| LLLLLL. | Disclosure Statement Order [Docket No. 1476] | | |
| MMMMMM. | Order Appointing James Seery as CEO [Docket No. 854] | | |
| NNNNNN. | Voting Certification [Docket No. 1772] | | |
| OOOOOO. | Plan Supplement [Docket Nos. 1389, 1606, 1656] | | |
| PPPPPP. | Motion to Appoint Trustee [Docket No. 271] | | |
| QQQQQQ. | Order Denying Motion to Appoint Trustee [Docket No. 428] | | |
| RRRRRR. | Transcript of 01/09/20 Hearing | | |
| SSSSSS. | Transcript of 10/27/20 Hearing | | |
| TTTTTT. | Transcript of 10/28/20 Hearing | | |
| UUUUUU. | Transcript of 12/10/20 Hearing | | |
| VVVVVV. | Isaac D. Leventon Proof of Claim No. 184 | | |

Appellee Appx. 01738

014551

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-9    Page 1046 of 1804    Page 873 of 1017    PageID 15517
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1745 of 1803    PageID 12491
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 12 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| WWWWWW. | Scott B. Ellington Proof of Claim No. 192 | | |
| XXXXXX. | James P Seery Curriculum Vitae [Docket No. 281-2] | | |
| YYYYYY. | John Dubel Curriculum Vitae [Docket No. 281-2] | | |
| ZZZZZZ. | Hon Russell Nelms Resume | | |
| AAAAAAA. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| BBBBBBB. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |
| CCCCCCC. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| DDDDDDD. | All exhibits identified by or offered by any other party at the Hearing | | |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 5-15    Page 1007/06/25 1804    Page 874 of 1017    PageID 15518
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1746 of 1803    PageID 12492
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 13 of 13

Dated:  January 22, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
          ikharasch@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Appellee Appx. 01740
Appx. 01991
014353

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-15   Page 1046 of 1804   Page 875 of 1017   PageID 15519
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1747 of 1803   PageID 12493

# APPENDIX 26

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16    Filed 10/09/25    Page 876 of 1017    PageID 15520
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1748 of 1803    PageID 12494
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21    Entered 01/29/21 18:30:16    Page 1 of 13

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

<div align="center">

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

</div>

| | | |
|---|---|---|
| ------------------------------------------- | § | |
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| ------------------------------------------- | § | |

<div align="center">

**DEBTOR'S AMENDED WITNESS AND EXHIBIT LIST WITH RESPECT TO
CONFIRMATION HEARING TO BE HELD ON FEBRUARY 2, 2021**

</div>

Highland Capital Management, L.P. (the "<u>Debtor</u>") submits the following amended

witness and exhibit list with respect to the hearing to confirm the *Fifth Amended Plan of*

*Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] which the Court has

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210129000000000012

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 5   Page 10/56/051804   Page 877 of 1017   PageID 15521
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1749 of 1803   PageID 12495
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 2 of 13

set for hearing at 9:30 a.m. (Central Time) on February 2, 2021 (the "<u>Hearing</u>") in the above-

styled bankruptcy case (the "<u>Bankruptcy Case</u>").

    **A.**     <u>Witnesses</u>:

      1.     James P. Seery, Jr.

      2.     John S. Dubel

      3.     James Dondero

      4.     Marc Tauber, a representative of Aon plc

      5.     Patrick M. Leathem (by certification filed at Docket No. 1772)

      6.     Any witness identified by or called by any other party; and

      7.     Any witness necessary for rebuttal.

    **B.**     <u>Exhibits</u>:

| Letter | Exhibit | Offered | Admitted |
|:---:|:---|:---:|:---:|
| A. | Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [Docket No. 1528] | | |
| B. | Transcript of 12/16/20 Hearing | | |
| C. | Order Denying Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [dkt 1605] | | |
| D. | Email from James Romey dated September 29, 2020 | | |
| E. | Structural and Steel Products UCC Presentation dated September 29, 2020 | | |
| F. | Aberdeen Loan Funding Offering Memorandum dated as of March 27, 2008 | | |
| G. | Aberdeen Loan Funding Indenture dated as of March 27, 2008 | | |
| H. | Aberdeen Loan Funding Supplemental Indenture No. 1 dated as of March 27, 2008 | | |

Appellee Appx. 01743

014356

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-5    Exhibit 6    Page 10/56/251804    Page 878 of 1017    PageID 15522
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1750 of 1803    PageID 12496
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21    Entered 01/29/21 18:30:16    Page 3 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| I. | Aberdeen Loan Funding Preference Shares Paying Agency Agreement dated as of March 27, 2008 | | |
| J. | Aberdeen Loan Funding Servicing Agreement dated as of March 27, 2008 | | |
| K. | Brentwood CLO Offering Memorandum dated as of December 18, 2006 | | |
| L. | Brentwood CLO Indenture dated as of December 21, 2006 | | |
| M. | Brentwood CLO Preference Shares Paying Agency Agreement Dated as of December 21, 2006 | | |
| N. | Brentwood CLO Servicing Agreement dated as of December 21, 2006 | | |
| O. | Eastland CLO Offering Memorandum dated as of March 13, 2007 | | |
| P. | Eastland CLO Indenture dated as of March 13, 2007 | | |
| Q. | Eastland CLO Preference Shares Paying Agency Agreement Dated as of March 13 2007 | | |
| R. | Eastland CLO Servicing Agreement dated as of March 13, 2007 | | |
| S. | Gleneagles CLO Offering Memorandum dated as of October 7, 2005 | | |
| T. | Gleneagles CLO Indenture dated as of October 13, 2005 | | |
| U. | Gleneagles CLO Portfolio Management Agreement dated as of October 13, 2005 | | |
| V. | Gleneagles CLO Preference Shares Paying Agency Agreement Dated as of October 13, 2005 | | |
| W. | Grayson CLO Offering Memorandum dated as of November 28, 2006 | | |
| X. | Grayson CLO Indenture dated as of November 30, 2006 | | |

Appellee Appx. 01744

Appx. 01995

014557

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 5    Exhibit 6    Page 10/52/851804    Page 879 of 1017    PageID 15523
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1751 of 1803    PageID 12497
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21    Entered 01/29/21 18:30:16    Page 4 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| Y. | Grayson CLO Preference Shares Paying Agency Agreement dated as of November 30, 2006 | | |
| Z. | Grayson CLO Servicing Agreement dated as of November 30, 2006 | | |
| AA. | Grayson CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| BB. | Greenbriar CLO Offering Memorandum dated as of December 18, 2007 | | |
| CC. | Greenbriar CLO Indenture dated as of December 20, 2007 | | |
| DD. | Greenbriar CLO Preference Shares Paying Agency Agreement Dated as of December 20, 2007 | | |
| EE. | Greenbriar CLO Servicing Agreement dated as of December 20, 2007 | | |
| FF. | Jasper CLO Offering Memorandum dated as of June 27, 2005 | | |
| GG. | Jasper CLO Amended and Restated Portfolio Management Agreement dated as of November 30, 2005 | | |
| HH. | Jasper CLO Indenture dated as of June 29, 2005 | | |
| II. | Jasper CLO Preference Shares Paying Agency Agreement dated as of June 29,2005 | | |
| JJ. | Liberty CLO Offering Memorandum dated as of December 7, 2005 | | |
| KK. | Liberty CLO Indenture dated as of December 8, 2005 | | |
| LL. | Liberty CLO Class E Certificate Paying Agency Agreement dated as of December 8, 2005 | | |
| MM. | Liberty CLO Portfolio Management Agreement dated as of December 8, 2005 | | |
| NN. | Red River CLO Offering Memorandum dated as of July 31, 2006 | | |

Appellee Appx. 01745
Appx. 01396
014558

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-9   Filed 07/03/25   Page 880 of 1017   PageID 15524
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1752 of 1803   PageID 12498
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 5 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| OO. | Red River CLO Indenture dated as of August 3, 2006 | | |
| PP. | Red River CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| QQ. | Red River CLO Preference Shares Paying Agency Agreement dated as of August 3, 2006 | | |
| RR. | Red River CLO Servicing Agreement dated as of August 3, 2006 | | |
| SS. | Red River CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| TT. | Rockwall CLO Offering Circular (Notes) dated May 8, 2006 | | |
| UU. | Rockwall CLO Offering Circular (Preferred Share) dated May 8, 2006 | | |
| VV. | Rockwall CLO Indenture dated as of May 10, 2006 | | |
| WW. | Rockwall CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| XX. | Rockwall CLO Preference Shares Paying and Agency Agreement dated as of May 10, 2006 | | |
| YY. | Rockwall CLO Servicing Agreement dated as of May 10, 2006 | | |
| ZZ. | Rockwall CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| AAA. | Rockwall CLO II Offering Circular (Notes) dated May 8, 2007 | | |
| BBB. | Rockwall CLO II Offering Circular (Preferred Share) dated May 8, 2007 | | |
| CCC. | Rockwall CLO II Indenture dated as of May 9, 2007 | | |
| DDD. | Rockwall CLO II Preference Shares Paying and Agency Agreement dated as of May 9, 2007 | | |

Appellee Appx. 01746
Appx. 01385
014359

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-16   Filed 07/04/25   Page 881 of 1017   PageID 15525
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1753 of 1803   PageID 12499
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 6 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| EEE. | Rockwall CLO II Servicing Agreement dated as of May 9, 2007 | | |
| FFF. | Southfork CLO Offering Memorandum dated as of March 9, 2005 | | |
| GGG. | Southfork CLO Indenture dated as of March 15, 2005 | | |
| HHH. | Southfork CLO Portfolio Management Agreement dated as of March 15, 2005 | | |
| III. | Southfork CLO Preference Shares Paying Agency Agreement dated as of March 15, 2005 | | |
| JJJ. | Stratford CLO Offering Memorandum dated as of October 22, 2007 | | |
| KKK. | Stratford CLO Indenture dated as of October 25, 2007 | | |
| LLL. | Stratford CLO Preference Shares Paying and Agency Agreement dated as of October 25, 2007 | | |
| MMM. | Stratford CLO Servicing Agreement dated as of October 25, 2007 | | |
| NNN. | Valhalla CLO Offering Circular dated as of August 17, 2004 | | |
| OOO. | Valhalla CLO Indenture dated as of August 18, 2004 | | |
| PPP. | Valhalla CLO Supplemental Indenture dated as of July 25, 2016 | | |
| QQQ. | Valhalla CLO Reference Portfolio Management Agreement dated as of August 1, 2016 | | |
| RRR. | Westchester CLO Offering Memorandum dated as of May 30, 2007 | | |
| SSS. | Westchester CLO Indenture dated as of May 31, 2007 | | |
| TTT. | Westchester CLO Preference Shares Paying Agency Agreement dated as of May31,2007 | | |

Appellee Appx. 01747
Appx. 01398
014360

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15   Exhibit 6   Page 1055/251804   Page 882 of 1017   PageID 15526
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1754 of 1803   PageID 12500
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 7 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| UUU. | Westchester CLO Servicing Agreement dated as of May 31, 2007 | | |
| VVV. | NexPoint Strategic Opportunities Fund, Form N-2 Registration Statement, filed August 27, 2019 | | |
| WWW. | NexPoint Strategic Opportunities Fund, Form DEF-14A Proxy Statement, filed July 10, 2020 | | |
| XXX. | NexPoint Capital, Inc., Form 497 Prospectus Supplement, filed March 14, 2018 | | |
| YYY. | NexPoint Capital, Inc. Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| ZZZ. | Highland Income Fund, Form 497 Prospectus Supplement, filed July 29, 2019 | | |
| AAAA. | Highland Income Fund, Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| BBBB. | Written Consent of the General Partner of Highland Capital Management, L.P., Effective September 21, 2020 | | |
| CCCC. | List of Board Memberships | | |
| DDDD. | Response to K&L Gates LLP dated December 22, 2020 [Dondero Deposition Exhibit 12] | | |
| EEEE. | Response to K&L Gates LLP dated December 23, 2020 [Dondero Deposition Exhibit 13] | | |
| FFFF. | Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| GGGG. | Response to Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| HHHH. | Highland CLO Funding Articles of Incorporation **[TO BE OFFERED UNDER SEAL]** | | |
| IIII. | Highland CLO Funding Members Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| JJJJ. | Highland CLO Funding Offering Memorandum **[TO BE OFFERED UNDER SEAL]** | | |

Appellee Appx. 01748

Appx. 01999

014361

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 6   Page 1756 of 1804   Page 883 of 1017   PageID 15527
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1755 of 1803   PageID 12501
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 8 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| KKKK. | Highland CLO Funding Portfolio Management Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| LLLL. | Highland CLO Funding Subscription and Transfer Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| MMMM. | Liquidation Analysis [Docket No. 1473] | | |
| NNNN. | AVYA Stock Price Data | | |
| OOOO. | SKY Stock Price Data | | |
| PPPP. | HCMLP - Previous Day Trades 01/29/20 **[REDACTED]** | | |
| QQQQ. | HCMLP - Previous Day Trades 02/10/20 **[REDACTED]** | | |
| RRRR. | HCMLP - Previous Day Trades 02/14/20 **[REDACTED]** | | |
| SSSS. | HCMLP - Previous Day Trades 04/15/20 **[REDACTED]** | | |
| TTTT. | HCMLP - Previous Day Trades 04/17/20 **[REDACTED]** | | |
| UUUU. | HCMLP - Previous Day Trades 08/27/20 **[REDACTED]** | | |
| VVVV. | HCMLP - Previous Day Trades 09/02/20 **[REDACTED]** | | |
| WWWW. | HCMLP - Previous Day Trades 10/07/20 **[REDACTED]** | | |
| XXXX. | HCMLP - Previous Day Trades 10/08/20 **[REDACTED]** | | |
| YYYY. | HCMLP - Previous Day Trades 10/09/20 **[REDACTED]** | | |
| ZZZZ. | HCMLP - Previous Day Trades 11/24/20 **[REDACTED]** | | |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15   Exhibit 6   Page 105/07/051804   Page 884 of 1017   PageID 15528
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1756 of 1803   PageID 12502
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 9 of 13

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| AAAAA. | Jefferies Trade Confirmations 12/18/20 | | |
| BBBBB. | Jefferies Trade Confirmations 12/21/20 | | |
| CCCCC. | Jefferies Trade Confirmations 12/22/20 | | |
| DDDDD. | Jefferies Trade Confirmations 12/30/20 | | |
| EEEEE. | Jefferies Trade Confirmations 12/31/20 | | |
| FFFFF. | Strand Advisors Bylaws | | |
| GGGGG. | Strand Advisors First Amendment to Bylaws | | |
| HHHHH. | Strand Advisors Certificate of Ownership | | |
| IIIII. | Strand Advisors Written Consent | | |
| JJJJJ. | Strand Advisors Stock Certificate No. 1 | | |
| KKKKK. | Strand Advisors Broker/Agent's Letter of Authorization | | |
| LLLLL. | Strand Advisors – James Seery Director Agreement | | |
| MMMMM. | Strand Advisors – John Dubel Director Agreement | | |
| NNNNN. | Strand Advisors – Hon Russell Nelms Director Agreement | | |
| OOOOO. | Final Operating Protocols [Docket No. 354-1] | | |
| PPPPP. | Article: Highland Capital Says Ch. 11 Trustee Worst Possible Option (Law360 January 16, 2020) | | |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Exhibit 6   Page 1058 of 1804   Page 885 of 1017   PageID 15529
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1757 of 1803   PageID 12503
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 10 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| QQQQQ. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 339] | | |
| RRRRR. | Acis Capital Management , L.P. - Court's Ruling on Plan Confirmation (August 30, 2018) | | |
| SSSSS. | Highland – Dondero Related Entities Demonstrative | | |
| TTTTT. | Schedule of receivables for the identified objecting entities (as of 11.30.20) | | |
| UUUUU. | Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| VVVVV. | Notice of Termination of Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| WWWWW. | NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| XXXXX. | Notice of Termination of NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| YYYYY. | NexBank Third Amended and Restated Shared Services Agreement | | |
| ZZZZZ. | Notice of Termination of NexBank Third Amended and Restated Shared Services Agreement | | |
| AAAAAA. | NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| BBBBBB. | Notice of Termination of NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| CCCCCC. | Notice of Termination of NexBank Sub-servicing Agreement | | |
| DDDDDD. | Legal Entities List (Q2 2020) **[REDACTED]** | | |
| EEEEE. | Highland - Demonstrative on Post-Effective Date Org Chart | | |
| FFFFFF. | HCMLP Deferred Bonus Plan | | |

Appellee Appx. 01751

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Exhibit 6   Page 10/59/251804   Page 886 of 1017   PageID 15530
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1758 of 1803   PageID 12504
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 11 of 13

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| GGGGGG. | HCMLP Template agreement for awards under the plan | | |
| HHHHHH. | HCMLP Annual Bonus Plan | | |
| IIIIII. | Seery Handwritten Note | | |
| JJJJJJ. | Marketing Summary | | |
| KKKKKK. | Strand D&O Proposal | | |
| LLLLLL. | Disclosure Statement Order [Docket No. 1476] | | |
| MMMMMM. | Order Appointing James Seery as CEO [Docket No. 854] | | |
| NNNNNN. | Voting Certification [Docket No. 1772] | | |
| OOOOOO. | Plan Supplement [Docket Nos. 1389, 1606, 1656] | | |
| PPPPPP. | Motion to Appoint Trustee [Docket No. 271] | | |
| QQQQQQ. | Order Denying Motion to Appoint Trustee [Docket No. 428] | | |
| RRRRRR. | Transcript of 01/09/20 Hearing | | |
| SSSSSS. | Transcript of 10/27/20 Hearing | | |
| TTTTTT. | Transcript of 10/28/20 Hearing | | |
| UUUUUU. | Transcript of 12/10/20 Hearing | | |
| VVVVVV. | Isaac D. Leventon Proof of Claim No. 184 | | |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 10/66/251804    Page 887 of 1017    PageID 15531
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1759 of 1803    PageID 12505
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21    Entered 01/29/21 18:30:16    Page 12 of 13

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| WWWWWW. | Scott B. Ellington Proof of Claim No. 192 | | |
| XXXXXX. | James P Seery Curriculum Vitae [Docket No. 281-2] | | |
| YYYYYY. | John Dubel Curriculum Vitae [Docket No. 281-2] | | |
| ZZZZZZ. | Hon Russell Nelms Resume | | |
| AAAAAAA. | Highland Multi Strategy Credit Fund, Ltd. Statement of Value and Activity (10.01.20 – 10.31.20) **[REDACTED]** | | |
| BBBBBBB. | Highland Income Fund Semi-Annual Report (06.30.20) | | |
| CCCCCCC. | Legal Entities List (12.24.19) **[REDACTED]** | | |
| DDDDDDD. | Plan Projections | | |
| EEEEEEE. | Plan Analysis | | |
| FFFFFFF. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| GGGGGGG. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |
| HHHHHHH. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| IIIIIII. | All exhibits identified by or offered by any other party at the Hearing | | |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 59-6   Filed 06/25/1804   Page 888 of 1017   PageID 15532
Exhibit 6   Page 1066 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1760 of 1803   PageID 12506
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 13 of 13

Dated: January 29, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:  jpomerantz@pszjlaw.com
         ikharasch@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Case 19-34054-sgj11 Doc 3596-6 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 69-6 Page 1062 of 1804 Page 889 of 1017 PageID 15533
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1761 of 1803 PageID 12507

# APPENDIX 27

Appellee Appx. 01755
Appx. 02006

0114568

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-6   Page 1076 of 1804   Page 890 of 1017   PageID 15534
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1762 of 1803   PageID 12508
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21   Entered 02/01/21 18:22:33   Page 1 of 14

Docket #1877  Date Filed: 02/01/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

### DEBTOR'S SECOND AMENDED WITNESS AND EXHIBIT LIST WITH RESPECT
### TO CONFIRMATION HEARING TO BE HELD ON FEBRUARY 2, 2021

Highland Capital Management, L.P. (the "<u>Debtor</u>") submits the following second

amended witness and exhibit list with respect to the hearing to confirm the *Fifth Amended Plan*

*of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] which the Court

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210201000000000011

Appellee Appx. 01756
Appx. 02007
0714569

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Filed 10/04/25   Page 891 of 1017   PageID 15535
Exhibit 15   Page 1764 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1763 of 1803   PageID 12509
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21   Entered 02/01/21 18:22:33   Page 2 of 14

has set for hearing at 9:30 a.m. (Central Time) on February 2, 2021 (the "Hearing") in the above-

styled bankruptcy case (the "Bankruptcy Case").

> **A.** **Witnesses:**

>> 1. James P. Seery, Jr.;

>> 2. John S. Dubel;

>> 3. James Dondero;

>> 4. Marc Tauber, a representative of Aon plc;

>> 5. Patrick M. Leathem (by certification filed at Docket No. 1772);

>> 6. Any witness identified by or called by any other party; and

>> 7. Any witness necessary for rebuttal.

> **B.** **Exhibits:**

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| A. | Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [Docket No. 1528] | | |
| B. | Transcript of 12/16/20 Hearing | | |
| C. | Order Denying Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [dkt 1605] | | |
| D. | Email from James Romey dated September 29, 2020 | | |
| E. | Structural and Steel Products UCC Presentation dated September 29, 2020 | | |
| F. | Aberdeen Loan Funding Offering Memorandum dated as of March 27, 2008 | | |
| G. | Aberdeen Loan Funding Indenture dated as of March 27, 2008 | | |
| H. | Aberdeen Loan Funding Supplemental Indenture No. 1 dated as of March 27, 2008 | | |

Appellee Appx. 01757
014370

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Page 10/65/251804   Page 892 of 1017   PageID 15536
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1764 of 1803   PageID 12510
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21   Entered 02/01/21 18:22:33   Page 3 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| I. | Aberdeen Loan Funding Preference Shares Paying Agency Agreement dated as of March 27, 2008 | | |
| J. | Aberdeen Loan Funding Servicing Agreement dated as of March 27, 2008 | | |
| K. | Brentwood CLO Offering Memorandum dated as of December 18, 2006 | | |
| L. | Brentwood CLO Indenture dated as of December 21, 2006 | | |
| M. | Brentwood CLO Preference Shares Paying Agency Agreement Dated as of December 21, 2006 | | |
| N. | Brentwood CLO Servicing Agreement dated as of December 21, 2006 | | |
| O. | Eastland CLO Offering Memorandum dated as of March 13, 2007 | | |
| P. | Eastland CLO Indenture dated as of March 13, 2007 | | |
| Q. | Eastland CLO Preference Shares Paying Agency Agreement Dated as of March 13 2007 | | |
| R. | Eastland CLO Servicing Agreement dated as of March 13, 2007 | | |
| S. | Gleneagles CLO Offering Memorandum dated as of October 7, 2005 | | |
| T. | Gleneagles CLO Indenture dated as of October 13, 2005 | | |
| U. | Gleneagles CLO Portfolio Management Agreement dated as of October 13, 2005 | | |
| V. | Gleneagles CLO Preference Shares Paying Agency Agreement Dated as of October 13, 2005 | | |
| W. | Grayson CLO Offering Memorandum dated as of November 28, 2006 | | |
| X. | Grayson CLO Indenture dated as of November 30, 2006 | | |

Appellee Appx. 01758
Appx. 02900
01479

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-15   Filed 07/16/25   Page 893 of 1017   PageID 15537
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1765 of 1803   PageID 12511
Case 19-34054-sgj11   Doc 1877   Filed 02/01/21   Entered 02/01/21 18:22:33   Page 4 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| Y. | Grayson CLO Preference Shares Paying Agency Agreement dated as of November 30, 2006 | | |
| Z. | Grayson CLO Servicing Agreement dated as of November 30, 2006 | | |
| AA. | Grayson CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| BB. | Greenbriar CLO Offering Memorandum dated as of December 18, 2007 | | |
| CC. | Greenbriar CLO Indenture dated as of December 20, 2007 | | |
| DD. | Greenbriar CLO Preference Shares Paying Agency Agreement Dated as of December 20, 2007 | | |
| EE. | Greenbriar CLO Servicing Agreement dated as of December 20, 2007 | | |
| FF. | Jasper CLO Offering Memorandum dated as of June 27, 2005 | | |
| GG. | Jasper CLO Amended and Restated Portfolio Management Agreement dated as of November 30, 2005 | | |
| HH. | Jasper CLO Indenture dated as of June 29, 2005 | | |
| II. | Jasper CLO Preference Shares Paying Agency Agreement dated as of June 29,2005 | | |
| JJ. | Liberty CLO Offering Memorandum dated as of December 7, 2005 | | |
| KK. | Liberty CLO Indenture dated as of December 8, 2005 | | |
| LL. | Liberty CLO Class E Certificate Paying Agency Agreement dated as of December 8, 2005 | | |
| MM. | Liberty CLO Portfolio Management Agreement dated as of December 8, 2005 | | |
| NN. | Red River CLO Offering Memorandum dated as of July 31, 2006 | | |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-15   Exhibit 5   Page 107 of 251   Page 894 of 1017   PageID 15538
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1766 of 1803   PageID 12512
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21   Entered 02/01/21 18:22:33   Page 5 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| OO. | Red River CLO Indenture dated as of August 3, 2006 | | |
| PP. | Red River CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| QQ. | Red River CLO Preference Shares Paying Agency Agreement dated as of August 3, 2006 | | |
| RR. | Red River CLO Servicing Agreement dated as of August 3, 2006 | | |
| SS. | Red River CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| TT. | Rockwall CLO Offering Circular (Notes) dated May 8, 2006 | | |
| UU. | Rockwall CLO Offering Circular (Preferred Share) dated May 8, 2006 | | |
| VV. | Rockwall CLO Indenture dated as of May 10, 2006 | | |
| WW. | Rockwall CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| XX. | Rockwall CLO Preference Shares Paying and Agency Agreement dated as of May 10, 2006 | | |
| YY. | Rockwall CLO Servicing Agreement dated as of May 10, 2006 | | |
| ZZ. | Rockwall CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| AAA. | Rockwall CLO II Offering Circular (Notes) dated May 8, 2007 | | |
| BBB. | Rockwall CLO II Offering Circular (Preferred Share) dated May 8, 2007 | | |
| CCC. | Rockwall CLO II Indenture dated as of May 9, 2007 | | |
| DDD. | Rockwall CLO II Preference Shares Paying and Agency Agreement dated as of May 9, 2007 | | |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Page 10/68/25180-4Page 895 of 1017    PageID 15539
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1767 of 1803    PageID 12513
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21    Entered 02/01/21 18:22:33    Page 6 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| EEE. | Rockwall CLO II Servicing Agreement dated as of May 9, 2007 | | |
| FFF. | Southfork CLO Offering Memorandum dated as of March 9, 2005 | | |
| GGG. | Southfork CLO Indenture dated as of March 15, 2005 | | |
| HHH. | Southfork CLO Portfolio Management Agreement dated as of March 15, 2005 | | |
| III. | Southfork CLO Preference Shares Paying Agency Agreement dated as of March 15, 2005 | | |
| JJJ. | Stratford CLO Offering Memorandum dated as of October 22, 2007 | | |
| KKK. | Stratford CLO Indenture dated as of October 25, 2007 | | |
| LLL. | Stratford CLO Preference Shares Paying and Agency Agreement dated as of October 25, 2007 | | |
| MMM. | Stratford CLO Servicing Agreement dated as of October 25, 2007 | | |
| NNN. | Valhalla CLO Offering Circular dated as of August 17, 2004 | | |
| OOO. | Valhalla CLO Indenture dated as of August 18, 2004 | | |
| PPP. | Valhalla CLO Supplemental Indenture dated as of July 25, 2016 | | |
| QQQ. | Valhalla CLO Reference Portfolio Management Agreement dated as of August 1, 2016 | | |
| RRR. | Westchester CLO Offering Memorandum dated as of May 30, 2007 | | |
| SSS. | Westchester CLO Indenture dated as of May 31, 2007 | | |
| TTT. | Westchester CLO Preference Shares Paying Agency Agreement dated as of May31,2007 | | |

Appellee Appx. 01761
Appx. 03912
014374

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6115    Page 10/66/25 1804    Page 896 of 1017    PageID 15540
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1768 of 1803    PageID 12514
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21    Entered 02/01/21 18:22:33    Page 7 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| UUU. | Westchester CLO Servicing Agreement dated as of May 31, 2007 | | |
| VVV. | NexPoint Strategic Opportunities Fund, Form N-2 Registration Statement, filed August 27, 2019 | | |
| WWW. | NexPoint Strategic Opportunities Fund, Form DEF-14A Proxy Statement, filed July 10, 2020 | | |
| XXX. | NexPoint Capital, Inc., Form 497 Prospectus Supplement, filed March 14, 2018 | | |
| YYY. | NexPoint Capital, Inc. Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| ZZZ. | Highland Income Fund, Form 497 Prospectus Supplement, filed July 29, 2019 | | |
| AAAA. | Highland Income Fund, Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| BBBB. | Written Consent of the General Partner of Highland Capital Management, L.P., Effective September 21, 2020 | | |
| CCCC. | List of Board Memberships | | |
| DDDD. | Response to K&L Gates LLP dated December 22, 2020 [Dondero Deposition Exhibit 12] | | |
| EEEE. | Response to K&L Gates LLP dated December 23, 2020 [Dondero Deposition Exhibit 13] | | |
| FFFF. | Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| GGGG. | Response to Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| HHHH. | Highland CLO Funding Articles of Incorporation **[TO BE OFFERED UNDER SEAL]** | | |
| IIII. | Highland CLO Funding Members Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| JJJJ. | Highland CLO Funding Offering Memorandum **[TO BE OFFERED UNDER SEAL]** | | |

Appellee Appx. 01762
Appx. 02013
014575

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Filed 07/06/25   Page 897 of 1017   PageID 15541
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1769 of 1803   PageID 12515
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21   Entered 02/01/21 18:22:33   Page 8 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| KKKK. | Highland CLO Funding Portfolio Management Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| LLLL. | Highland CLO Funding Subscription and Transfer Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| MMMM. | Liquidation Analysis [Docket No. 1473] | | |
| NNNN. | AVYA Stock Price Data | | |
| OOOO. | SKY Stock Price Data | | |
| PPPP. | HCMLP - Previous Day Trades 01/29/20 **[REDACTED]** | | |
| QQQQ. | HCMLP - Previous Day Trades 02/10/20 **[REDACTED]** | | |
| RRRR. | HCMLP - Previous Day Trades 02/14/20 **[REDACTED]** | | |
| SSSS. | HCMLP - Previous Day Trades 04/15/20 **[REDACTED]** | | |
| TTTT. | HCMLP - Previous Day Trades 04/17/20 **[REDACTED]** | | |
| UUUU. | HCMLP - Previous Day Trades 08/27/20 **[REDACTED]** | | |
| VVVV. | HCMLP - Previous Day Trades 09/02/20 **[REDACTED]** | | |
| WWWW. | HCMLP - Previous Day Trades 10/07/20 **[REDACTED]** | | |
| XXXX. | HCMLP - Previous Day Trades 10/08/20 **[REDACTED]** | | |
| YYYY. | HCMLP - Previous Day Trades 10/09/20 **[REDACTED]** | | |
| ZZZZ. | HCMLP - Previous Day Trades 11/24/20 **[REDACTED]** | | |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 107/06/251804   Page 898 of 1017   PageID 15542
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1770 of 1803   PageID 12516
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21   Entered 02/01/21 18:22:33   Page 9 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| AAAAA. | Jefferies Trade Confirmations 12/18/20 | | |
| BBBBB. | Jefferies Trade Confirmations 12/21/20 | | |
| CCCCC. | Jefferies Trade Confirmations 12/22/20 | | |
| DDDDD. | Jefferies Trade Confirmations 12/30/20 | | |
| EEEEE. | Jefferies Trade Confirmations 12/31/20 | | |
| FFFFF. | Strand Advisors Bylaws | | |
| GGGGG. | Strand Advisors First Amendment to Bylaws | | |
| HHHHH. | Strand Advisors Certificate of Ownership | | |
| IIIII. | Strand Advisors Written Consent | | |
| JJJJJ. | Strand Advisors Stock Certificate No. 1 | | |
| KKKKK. | Strand Advisors Broker/Agent's Letter of Authorization | | |
| LLLLL. | Strand Advisors – James Seery Director Agreement | | |
| MMMMM. | Strand Advisors – John Dubel Director Agreement | | |
| NNNNN. | Strand Advisors – Hon Russell Nelms Director Agreement | | |
| OOOOO. | Final Operating Protocols [Docket No. 354-1] | | |
| PPPPP. | Article: Highland Capital Says Ch. 11 Trustee Worst Possible Option (Law360 January 16, 2020) | | |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-15   Filed 07/03/25   Page 899 of 1017   PageID 15543
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1771 of 1803   PageID 12517
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21   Entered 02/01/21 18:22:33   Page 10 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| QQQQQ. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 339] | | |
| RRRRR. | Acis Capital Management , L.P. - Court's Ruling on Plan Confirmation (August 30, 2018) | | |
| SSSSS. | Highland – Dondero Related Entities Demonstrative | | |
| TTTTT. | Schedule of receivables for the identified objecting entities (as of 11.30.20) | | |
| UUUUU. | Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| VVVVV. | Notice of Termination of Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| WWWWW. | NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| XXXXX. | Notice of Termination of NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| YYYYY. | NexBank Third Amended and Restated Shared Services Agreement | | |
| ZZZZZ. | Notice of Termination of NexBank Third Amended and Restated Shared Services Agreement | | |
| AAAAAA. | NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| BBBBBB. | Notice of Termination of NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| CCCCCC. | Notice of Termination of NexBank Sub-servicing Agreement | | |
| DDDDDD. | Legal Entities List (Q2 2020) **[REDACTED]** | | |
| EEEEE. | Highland - Demonstrative on Post-Effective Date Org Chart | | |
| FFFFFF. | HCMLP Deferred Bonus Plan | | |

Appellee Appx. 01765
Appx. 02916
014578

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 16-5    Page 1773 of 1804    Page 900 of 1017    PageID 15544
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1772 of 1803    PageID 12518
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21    Entered 02/01/21 18:22:33    Page 11 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| GGGGGG. | HCMLP Template agreement for awards under the plan | | |
| HHHHHH. | HCMLP Annual Bonus Plan | | |
| IIIIII. | Seery Handwritten Note | | |
| JJJJJJ. | Marketing Summary | | |
| KKKKKK. | Strand D&O Proposal | | |
| LLLLLL. | Disclosure Statement Order [Docket No. 1476] | | |
| MMMMMM. | Order Appointing James Seery as CEO [Docket No. 854] | | |
| NNNNNN. | Voting Certification [Docket No. 1772] | | |
| OOOOOO. | Plan Supplement [Docket Nos. 1389, 1606, 1656] | | |
| PPPPPP. | Motion to Appoint Trustee [Docket No. 271] | | |
| QQQQQQ. | Order Denying Motion to Appoint Trustee [Docket No. 428] | | |
| RRRRRR. | Transcript of 01/09/20 Hearing | | |
| SSSSSS. | Transcript of 10/27/20 Hearing | | |
| TTTTTT. | Transcript of 10/28/20 Hearing | | |
| UUUUUU. | Transcript of 12/10/20 Hearing | | |
| VVVVVV. | Isaac D. Leventon Proof of Claim No. 184 | | |

Appellee Appx. 01766
Appx. 02905
014379

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Filed 07/06/25   Page 901 of 1017   PageID 15545
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1773 of 1803   PageID 12519
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21   Entered 02/01/21 18:22:33   Page 12 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| WWWWWW. | Scott B. Ellington Proof of Claim No. 192 | | |
| XXXXXX. | James P Seery Curriculum Vitae [Docket No. 281-2] | | |
| YYYYYY. | John Dubel Curriculum Vitae [Docket No. 281-2] | | |
| ZZZZZZ. | Hon Russell Nelms Resume | | |
| AAAAAAA. | Highland Multi Strategy Credit Fund, Ltd. Statement of Value and Activity (10.01.20 – 10.31.20) **[REDACTED]** | | |
| BBBBBBB. | Highland Income Fund Semi-Annual Report (06.30.20) | | |
| CCCCCCC. | Legal Entities List (12.24.19) **[REDACTED]** | | |
| DDDDDDD. | Plan Projections | | |
| EEEEEEE. | Plan Analysis | | |
| FFFFFFF. | Docket, *Joshua and Jennifer Terry v. Highland Capital Management, L.P., James Dondero and Thomas Surgent* (Case No. DC- 16-11396) | | |
| GGGGGGG. | Docket, *NWCC, LLC v. Highland CLO Management, LLC, et al.*, Index No. 654195/2018 (N.Y. Sup. Ct. 2018) | | |
| HHHHHHH. | Docket, *In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex.) | | |
| IIIIIII. | Docket, *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex.) | | |
| JJJJJJJ. | Docket*, In re Highland Capital Management, L.P.,* Case No. 19-34054-sgj11 (Bankr. N.D. Tex.) | | |
| KKKKKKK. | Docket, *UBS Securities vs. Highland Capital Management, L.P.*, Index No. 0650097/2009 | | |
| LLLLLLL. | Docket, *UBS Securities vs. Highland Capital Management, L.P.*, Index No. 0650752/2010 | | |

Appellee Appx. 01767
Appx. 02018
014580

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-9   Page 1075 of 1804   Page 902 of 1017   PageID 15546
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1774 of 1803   PageID 12520
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21   Entered 02/01/21 18:22:33   Page 13 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| MMMMMMM. | Docket, *Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P.* (Chancery Court, Delaware, C.A. No. 12533-VCG) | | |
| NNNNNNN. | Docket, *Daugherty v. Highland Capital Management, L.P.* (Chancery Court, Delaware, C.A. No. 2017-0488-MTZ) | | |
| OOOOOOO. | Court Admitted Exhibits for January 21, 2020 Hearing | | |
| PPPPPPP. | Amended Liquidation Analysis/Financial Projections [Docket No. 1875-1] | | |
| QQQQQQQ. | Stipulation in Support of Settlement with Committee Regarding Governance and Procedures [Docket No. 383] | | |
| RRRRRRR. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| SSSSSSS. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |
| TTTTTTT. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| UUUUUUU. | All exhibits identified by or offered by any other party at the Hearing | | |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-9    Page 107 of 151804    Page 903 of 1017    PageID 15547
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1775 of 1803    PageID 12521
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21    Entered 02/01/21 18:22:33    Page 14 of 14

Dated:  February 1, 2021.
                                    **PACHULSKI STANG ZIEHL & JONES LLP**

                                    _____
                                    Jeffrey N. Pomerantz (CA Bar No.143717)
                                    Ira D. Kharasch (CA Bar No. 109084)
                                    John A. Morris (NY Bar No. 2405397)
                                    Gregory V. Demo (NY Bar 5371992)
                                    Hayley R. Winograd (NY Bar No. 5612569)
                                    10100 Santa Monica Blvd., 13th Floor
                                    Los Angeles, CA 90067
                                    Telephone: (310) 277-6910
                                    Facsimile: (310) 201-0760
                                    E-mail:    jpomerantz@pszjlaw.com
                                               ikharasch@pszjlaw.com
                                               jmorris@pszjlaw.com
                                               gdemo@pszjlaw.com


                                    -and-

                                    **HAYWARD PLLC**

                                    _/s/ Zachery Z. Annable_
                                    Melissa S. Hayward
                                    Texas Bar No. 24044908
                                    MHayward@HaywardFirm.com
                                    Zachery Z. Annable
                                    Texas Bar No. 24053075
                                    ZAnnable@HaywardFirm.com
                                    10501 N. Central Expy, Ste. 106
                                    Dallas, Texas 75231
                                    Tel: (972) 755-7100
                                    Fax: (972) 755-7110

                                    _Counsel for Highland Capital Management, L.P._

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 69-15    Page 1076 of 1804    Page 904 of 1017    PageID 15548
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1776 of 1803    PageID 12522

# APPENDIX 28

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6-15    Page 10/08/25 1804 Page 905 of 1017    PageID 15549
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1777 of 1803    PageID 12523
Case 19-34054-sgj11    Doc 1895    Filed 02/04/21    Entered 02/04/21 13:25:35    Page 1 of 14

Docket #1895  Date Filed: 02/04/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |

## DEBTOR'S THIRD AMENDED WITNESS AND EXHIBIT LIST WITH
## RESPECT TO CONFIRMATION HEARING HELD ON FEBRUARY 3, 2021

Highland Capital Management, L.P. (the "Debtor") submits the following third amended

witness and exhibit list with respect to the hearing to confirm the *Fifth Amended Plan of*

*Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] which was set for

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210204000000000004
Appellee Appx. 01771
Appx. 02922
014584

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 65-15   Filed 10/03/25   Page 906 of 1017   PageID 15550
Exhibit 6   Page 1079 of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1778 of 1803   PageID 12524
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21   Entered 02/04/21 13:25:35   Page 2 of 14

hearing at 9:30 a.m. (Central Time) on February 3, 2021 (the "Hearing") in the above-styled

bankruptcy case (the "Bankruptcy Case").

     A.    <u>**Witnesses:**</u>

        1.    James P. Seery, Jr.;

        2.    John S. Dubel;

        3.    James Dondero;

        4.    Marc Tauber, a representative of Aon plc;

        5.    Patrick M. Leathem (by certification filed at Docket No. 1772);

        6.    Any witness identified by or called by any other party; and

        7.    Any witness necessary for rebuttal.

     B.    <u>**Exhibits:**</u>

| Letter | Exhibit | Offered | Admitted |
|:---:|:---|:---:|:---:|
| A. | Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [Docket No. 1528] | | |
| B. | Transcript of 12/16/20 Hearing | | |
| C. | Order Denying Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [dkt 1605] | | |
| D. | Email from James Romey dated September 29, 2020 | | |
| E. | Structural and Steel Products UCC Presentation dated September 29, 2020 | | |
| F. | Aberdeen Loan Funding Offering Memorandum dated as of March 27, 2008 | | |
| G. | Aberdeen Loan Funding Indenture dated as of March 27, 2008 | | |
| H. | Aberdeen Loan Funding Supplemental Indenture No. 1 dated as of March 27, 2008 | | |

**Appellee Appx. 01772**
**014585**
**Appx. 02925**

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-15    Filed 07/06/25    Page 907 of 1017    PageID 15551
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1779 of 1803    PageID 12525
Case 19-34054-sgj11    Doc 1895    Filed 02/04/21    Entered 02/04/21 13:25:35    Page 3 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| I. | Aberdeen Loan Funding Preference Shares Paying Agency Agreement dated as of March 27, 2008 | | |
| J. | Aberdeen Loan Funding Servicing Agreement dated as of March 27, 2008 | | |
| K. | Brentwood CLO Offering Memorandum dated as of December 18, 2006 | | |
| L. | Brentwood CLO Indenture dated as of December 21, 2006 | | |
| M. | Brentwood CLO Preference Shares Paying Agency Agreement Dated as of December 21, 2006 | | |
| N. | Brentwood CLO Servicing Agreement dated as of December 21, 2006 | | |
| O. | Eastland CLO Offering Memorandum dated as of March 13, 2007 | | |
| P. | Eastland CLO Indenture dated as of March 13, 2007 | | |
| Q. | Eastland CLO Preference Shares Paying Agency Agreement Dated as of March 13 2007 | | |
| R. | Eastland CLO Servicing Agreement dated as of March 13, 2007 | | |
| S. | Gleneagles CLO Offering Memorandum dated as of October 7, 2005 | | |
| T. | Gleneagles CLO Indenture dated as of October 13, 2005 | | |
| U. | Gleneagles CLO Portfolio Management Agreement dated as of October 13, 2005 | | |
| V. | Gleneagles CLO Preference Shares Paying Agency Agreement Dated as of October 13, 2005 | | |
| W. | Grayson CLO Offering Memorandum dated as of November 28, 2006 | | |
| X. | Grayson CLO Indenture dated as of November 30, 2006 | | |

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 6 5    Page 10/86/25 1804    Page 908 of 1017    PageID 15552
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1780 of 1803    PageID 12526
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21    Entered 02/04/21 13:25:35    Page 4 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| Y. | Grayson CLO Preference Shares Paying Agency Agreement dated as of November 30, 2006 | | |
| Z. | Grayson CLO Servicing Agreement dated as of November 30, 2006 | | |
| AA. | Grayson CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| BB. | Greenbriar CLO Offering Memorandum dated as of December 18, 2007 | | |
| CC. | Greenbriar CLO Indenture dated as of December 20, 2007 | | |
| DD. | Greenbriar CLO Preference Shares Paying Agency Agreement Dated as of December 20, 2007 | | |
| EE. | Greenbriar CLO Servicing Agreement dated as of December 20, 2007 | | |
| FF. | Jasper CLO Offering Memorandum dated as of June 27, 2005 | | |
| GG. | Jasper CLO Amended and Restated Portfolio Management Agreement dated as of November 30, 2005 | | |
| HH. | Jasper CLO Indenture dated as of June 29, 2005 | | |
| II. | Jasper CLO Preference Shares Paying Agency Agreement dated as of June 29,2005 | | |
| JJ. | Liberty CLO Offering Memorandum dated as of December 7, 2005 | | |
| KK. | Liberty CLO Indenture dated as of December 8, 2005 | | |
| LL. | Liberty CLO Class E Certificate Paying Agency Agreement dated as of December 8, 2005 | | |
| MM. | Liberty CLO Portfolio Management Agreement dated as of December 8, 2005 | | |
| NN. | Red River CLO Offering Memorandum dated as of July 31, 2006 | | |

Appellee Appx. 01774
Appx. 02925
0114587

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 18-15   Page 10/82/051804   Page 909 of 1017   PageID 15553
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1781 of 1803   PageID 12527
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21   Entered 02/04/21 13:25:35   Page 5 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| OO. | Red River CLO Indenture dated as of August 3, 2006 | | |
| PP. | Red River CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| QQ. | Red River CLO Preference Shares Paying Agency Agreement dated as of August 3, 2006 | | |
| RR. | Red River CLO Servicing Agreement dated as of August 3, 2006 | | |
| SS. | Red River CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| TT. | Rockwall CLO Offering Circular (Notes) dated May 8, 2006 | | |
| UU. | Rockwall CLO Offering Circular (Preferred Share) dated May 8, 2006 | | |
| VV. | Rockwall CLO Indenture dated as of May 10, 2006 | | |
| WW. | Rockwall CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| XX. | Rockwall CLO Preference Shares Paying and Agency Agreement dated as of May 10, 2006 | | |
| YY. | Rockwall CLO Servicing Agreement dated as of May 10, 2006 | | |
| ZZ. | Rockwall CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| AAA. | Rockwall CLO II Offering Circular (Notes) dated May 8, 2007 | | |
| BBB. | Rockwall CLO II Offering Circular (Preferred Share) dated May 8, 2007 | | |
| CCC. | Rockwall CLO II Indenture dated as of May 9, 2007 | | |
| DDD. | Rockwall CLO II Preference Shares Paying and Agency Agreement dated as of May 9, 2007 | | |

Appellee Appx. 01775
Appx. 02926
0114588

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibits 6   Page 107/83/251804 Page 910 of 1017   PageID 15554
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1782 of 1803   PageID 12528
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21   Entered 02/04/21 13:25:35   Page 6 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| EEE. | Rockwall CLO II Servicing Agreement dated as of May 9, 2007 | | |
| FFF. | Southfork CLO Offering Memorandum dated as of March 9, 2005 | | |
| GGG. | Southfork CLO Indenture dated as of March 15, 2005 | | |
| HHH. | Southfork CLO Portfolio Management Agreement dated as of March 15, 2005 | | |
| III. | Southfork CLO Preference Shares Paying Agency Agreement dated as of March 15, 2005 | | |
| JJJ. | Stratford CLO Offering Memorandum dated as of October 22, 2007 | | |
| KKK. | Stratford CLO Indenture dated as of October 25, 2007 | | |
| LLL. | Stratford CLO Preference Shares Paying and Agency Agreement dated as of October 25, 2007 | | |
| MMM. | Stratford CLO Servicing Agreement dated as of October 25, 2007 | | |
| NNN. | Valhalla CLO Offering Circular dated as of August 17, 2004 | | |
| OOO. | Valhalla CLO Indenture dated as of August 18, 2004 | | |
| PPP. | Valhalla CLO Supplemental Indenture dated as of July 25, 2016 | | |
| QQQ. | Valhalla CLO Reference Portfolio Management Agreement dated as of August 1, 2016 | | |
| RRR. | Westchester CLO Offering Memorandum dated as of May 30, 2007 | | |
| SSS. | Westchester CLO Indenture dated as of May 31, 2007 | | |
| TTT. | Westchester CLO Preference Shares Paying Agency Agreement dated as of May31,2007 | | |

Appellee Appx. 01776
Appx. 02037
014589

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 1076/251804   Page 911 of 1017   PageID 15555
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1783 of 1803   PageID 12529
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21   Entered 02/04/21 13:25:35   Page 7 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| UUU. | Westchester CLO Servicing Agreement dated as of May 31, 2007 | | |
| VVV. | NexPoint Strategic Opportunities Fund, Form N-2 Registration Statement, filed August 27, 2019 | | |
| WWW. | NexPoint Strategic Opportunities Fund, Form DEF-14A Proxy Statement, filed July 10, 2020 | | |
| XXX. | NexPoint Capital, Inc., Form 497 Prospectus Supplement, filed March 14, 2018 | | |
| YYY. | NexPoint Capital, Inc. Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| ZZZ. | Highland Income Fund, Form 497 Prospectus Supplement, filed July 29, 2019 | | |
| AAAA. | Highland Income Fund, Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| BBBB. | Written Consent of the General Partner of Highland Capital Management, L.P., Effective September 21, 2020 | | |
| CCCC. | List of Board Memberships | | |
| DDDD. | Response to K&L Gates LLP dated December 22, 2020 [Dondero Deposition Exhibit 12] | | |
| EEEE. | Response to K&L Gates LLP dated December 23, 2020 [Dondero Deposition Exhibit 13] | | |
| FFFF. | Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| GGGG. | Response to Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| HHHH. | Highland CLO Funding Articles of Incorporation [**TO BE OFFERED UNDER SEAL**] | | |
| IIII. | Highland CLO Funding Members Agreement [**TO BE OFFERED UNDER SEAL**] | | |
| JJJJ. | Highland CLO Funding Offering Memorandum [**TO BE OFFERED UNDER SEAL**] | | |

Appellee Appx. 01777
Appx. 02028
014590

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Page 107/85/2518044   Page 912 of 1017   PageID 15556
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1784 of 1803   PageID 12530
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21   Entered 02/04/21 13:25:35   Page 8 of 14

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| KKKK. | Highland CLO Funding Portfolio Management Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| LLLL. | Highland CLO Funding Subscription and Transfer Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| MMMM. | Liquidation Analysis [Docket No. 1473] | | |
| NNNN. | AVYA Stock Price Data | | |
| OOOO. | SKY Stock Price Data | | |
| PPPP. | HCMLP - Previous Day Trades 01/29/20 **[REDACTED]** | | |
| QQQQ. | HCMLP - Previous Day Trades 02/10/20 **[REDACTED]** | | |
| RRRR. | HCMLP - Previous Day Trades 02/14/20 **[REDACTED]** | | |
| SSSS. | HCMLP - Previous Day Trades 04/15/20 **[REDACTED]** | | |
| TTTT. | HCMLP - Previous Day Trades 04/17/20 **[REDACTED]** | | |
| UUUU. | HCMLP - Previous Day Trades 08/27/20 **[REDACTED]** | | |
| VVVV. | HCMLP - Previous Day Trades 09/02/20 **[REDACTED]** | | |
| WWWW. | HCMLP - Previous Day Trades 10/07/20 **[REDACTED]** | | |
| XXXX. | HCMLP - Previous Day Trades 10/08/20 **[REDACTED]** | | |
| YYYY. | HCMLP - Previous Day Trades 10/09/20 **[REDACTED]** | | |
| ZZZZ. | HCMLP - Previous Day Trades 11/24/20 **[REDACTED]** | | |

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 61-5   Page 107/86/051804   Page 913 of 1017   PageID 15557
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1785 of 1803   PageID 12531
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21   Entered 02/04/21 13:25:35   Page 9 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| AAAAA. | Jefferies Trade Confirmations 12/18/20 | | |
| BBBBB. | Jefferies Trade Confirmations 12/21/20 | | |
| CCCCC. | Jefferies Trade Confirmations 12/22/20 | | |
| DDDDD. | Jefferies Trade Confirmations 12/30/20 | | |
| EEEEE. | Jefferies Trade Confirmations 12/31/20 | | |
| FFFFF. | Strand Advisors Bylaws | | |
| GGGGG. | Strand Advisors First Amendment to Bylaws | | |
| HHHHH. | Strand Advisors Certificate of Ownership | | |
| IIIII. | Strand Advisors Written Consent | | |
| JJJJJ. | Strand Advisors Stock Certificate No. 1 | | |
| KKKKK. | Strand Advisors Broker/Agent's Letter of Authorization | | |
| LLLLL. | Strand Advisors – James Seery Director Agreement | | |
| MMMMM. | Strand Advisors – John Dubel Director Agreement | | |
| NNNNN. | Strand Advisors – Hon Russell Nelms Director Agreement | | |
| OOOOO. | Final Operating Protocols [Docket No. 354-1] | | |
| PPPPP. | Article: Highland Capital Says Ch. 11 Trustee Worst Possible Option (Law360 January 16, 2020) | | |

Appellee Appx. 01779

Appx. 02030

014592

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-5   Exhibits   Page 107/6/251804   Page 914 of 1017   PageID 15558
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1786 of 1803   PageID 12532
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21   Entered 02/04/21 13:25:35   Page 10 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| QQQQQ. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 339] | | |
| RRRRR. | Acis Capital Management , L.P. - Court's Ruling on Plan Confirmation (August 30, 2018) | | |
| SSSSS. | Highland – Dondero Related Entities Demonstrative | | |
| TTTTT. | Schedule of receivables for the identified objecting entities (as of 11.30.20) | | |
| UUUUU. | Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| VVVVV. | Notice of Termination of Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| WWWWW. | NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| XXXXX. | Notice of Termination of NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| YYYYY. | NexBank Third Amended and Restated Shared Services Agreement | | |
| ZZZZZ. | Notice of Termination of NexBank Third Amended and Restated Shared Services Agreement | | |
| AAAAAA. | NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| BBBBBB. | Notice of Termination of NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| CCCCCC. | Notice of Termination of NexBank Sub-servicing Agreement | | |
| DDDDDD. | Legal Entities List (Q2 2020) **[REDACTED]** | | |
| EEEEE. | Highland - Demonstrative on Post-Effective Date Org Chart | | |
| FFFFFF. | HCMLP Deferred Bonus Plan | | |

Appellee Appx. 01780
Appx. 02091
014593

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 68-5   Page 1086/151804   Page 915 of 1017   PageID 15559
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1787 of 1803   PageID 12533
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21   Entered 02/04/21 13:25:35   Page 11 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| GGGGGG. | HCMLP Template agreement for awards under the plan | | |
| HHHHHH. | HCMLP Annual Bonus Plan | | |
| IIIIII. | Seery Handwritten Note | | |
| JJJJJJ. | Marketing Summary | | |
| KKKKKK. | Strand D&O Proposal | | |
| LLLLLL. | Disclosure Statement Order [Docket No. 1476] | | |
| MMMMMM. | Order Appointing James Seery as CEO [Docket No. 854] | | |
| NNNNNN. | Voting Certification [Docket No. 1772] | | |
| OOOOOO. | Plan Supplement [Docket Nos. 1389, 1606, 1656] | | |
| PPPPPP. | Motion to Appoint Trustee [Docket No. 271] | | |
| QQQQQQ. | Order Denying Motion to Appoint Trustee [Docket No. 428] | | |
| RRRRRR. | Transcript of 01/09/20 Hearing | | |
| SSSSSS. | Transcript of 10/27/20 Hearing | | |
| TTTTTT. | Transcript of 10/28/20 Hearing | | |
| UUUUUU. | Transcript of 12/10/20 Hearing | | |
| VVVVVV. | Isaac D. Leventon Proof of Claim No. 184 | | |

Appellee Appx. 01781
Appx. 02032
014594

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibits    Page 107/86/251804    Page 916 of 1017    PageID 15560
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1788 of 1803    PageID 12534
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21    Entered 02/04/21 13:25:35    Page 12 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| WWWWWW. | Scott B. Ellington Proof of Claim No. 192 | | |
| XXXXXX. | James P Seery Curriculum Vitae [Docket No. 281-2] | | |
| YYYYYY. | John Dubel Curriculum Vitae [Docket No. 281-2] | | |
| ZZZZZZ. | Hon Russell Nelms Resume | | |
| AAAAAAA. | Highland Multi Strategy Credit Fund, Ltd. Statement of Value and Activity (10.01.20 – 10.31.20) **[REDACTED]** | | |
| BBBBBBB. | Highland Income Fund Semi-Annual Report (06.30.20) | | |
| CCCCCCC. | Legal Entities List (12.24.19) **[REDACTED]** | | |
| DDDDDDD. | Plan Projections | | |
| EEEEEEE. | Plan Analysis | | |
| FFFFFFF. | Docket, *Joshua and Jennifer Terry v. Highland Capital Management, L.P., James Dondero and Thomas Surgent* (Case No. DC- 16-11396) | | |
| GGGGGGG. | Docket, *NWCC, LLC v. Highland CLO Management, LLC, et al.*, Index No. 654195/2018 (N.Y. Sup. Ct. 2018) | | |
| HHHHHHH. | Docket, *In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex.) | | |
| IIIIIII. | Docket, *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex.) | | |
| JJJJJJJ. | Docket*, In re Highland Capital Management, L.P.,* Case No. 19-34054-sgj11 (Bankr. N.D. Tex.) | | |
| KKKKKKK. | Docket, *UBS Securities vs. Highland Capital Management, L.P.*, Index No. 0650097/2009 | | |
| LLLLLLL. | Docket, *UBS Securities vs. Highland Capital Management, L.P.*, Index No. 0650752/2010 | | |

Appellee Appx. 01782

Appx. 02035

014595

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-5   Page 1790/25/1804   Page 917 of 1017   PageID 15561
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1789 of 1803   PageID 12535
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21   Entered 02/04/21 13:25:35   Page 13 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| MMMMMMM. | Docket, *Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P.* (Chancery Court, Delaware, C.A. No. 12533-VCG) | | |
| NNNNNNN. | Docket, *Daugherty v. Highland Capital Management, L.P.* (Chancery Court, Delaware, C.A. No. 2017-0488-MTZ) | | |
| OOOOOOO. | Court Admitted Exhibits for January 21, 2020 Hearing | | |
| PPPPPPP. | Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) [Docket No. 1875] | | |
| QQQQQQQ. | Stipulation in Support of Settlement with Committee Regarding Governance and Procedures [Docket No. 338] | | |
| RRRRRRR. | Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management L.P. (With Technical Modifications) [Docket No. 1807] | | |
| SSSSSSS. | Email exchange between Gregory Demo, Amy Anderson, and Joseph Bain re HCM Issuers  **[REDACTED]** | | |
| TTTTTTT. | Statement of Financial Affairs, with any amendments, filed in 19-34054 [Docket No. 248] | | |
| UUUUUUU. | Schedules filed in 19-34054, with any amendments [Docket No. 247] | | |
| VVVVVVV. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| WWWWWWW. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |
| XXXXXXX. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| YYYYYYY. | All exhibits identified by or offered by any other party at the Hearing | | |

Appellee Appx. 01783
Appx. 02924
014596

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 6-15   Exhibit 6   Page 10 of 1017   Page 918 of 1017   PageID 15562
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1790 of 1803   PageID 12536
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21   Entered 02/04/21 13:25:35   Page 14 of 14

Dated:  February 4, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Appellee Appx. 01784
Appx. 02035
014597

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 69-15   Page 1792 of 1804   Page 919 of 1017   PageID 15563
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1791 of 1803   PageID 12537

# APPENDIX 29

Case 19-34054-sgj11   Doc 3596-6   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 63-15   Page 1096 of 1804   Page 920 of 1017   PageID 15564
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1792 of 1803   PageID 12538
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 546 of 852   PageID 2451

# EXHIBIT 5

Appellee Appx. 01786
Appx. 02037
014599

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1794 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1793 of 1803    PageID 12539
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 547 of 852    PageID 2452

**UPDATED SUMMARY OF DONDERO AND RELATED ENTITY LITIGATION\***

*In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (Bankr. N.D. Tex.)

| 9/23/20 | *Debtor's Motion for Entry of an Order Approving Settlement with (a) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (b) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (c) Acis Capital Management, L.P. (Claim No. 159) and Authorizing Actions Consistent Therewith [D.I. 1087]* | | | |
|---|---|---|---|---|
| | **Objectors:** | Dondero [D.I. 1121] | Acis filed a claim for at least $75 million. Acis claim was the result of an involuntary bankruptcy initiated when the Debtor refused to pay an arbitration award and instead transferred assets to become judgment proof. Debtor settled claim for an allowed Class 8 claim of $23 million and approximately $1 million in cash payments. Dondero objected to the settlement alleging that it was unreasonable and constituted vote buying. | The Acis Settlement Motion was approved and Dondero's objection was overruled [D.I. 1302]. | Dondero appealed [D.I. 1347]. The appeal is being briefed. |
| 11/18/20 | *Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreements [D.I. 1424]* | | | |
| | **Objectors:** | Dondero [D.I. 1447] | The Debtor filed a motion seeking to retain a sub-servicer to assist in its reorganization consistent with the proposed plan. Dondero alleged that the sub-servicer was not needed; was too expensive; and would not be subject to Bankruptcy Court jurisdiction [D.I. 1447]. | Dondero withdrew his objection [D.I. 1460] after forcing the Debtor to incur costs responding [D.I. 1459] | N/A |
| 11/19/20 | *James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside of the Ordinary Course [D.I. 1439]* | | | |
| | **Movant:** | Dondero | Dondero alleged the Debtor sold significant assets in violation of 11 U.S.C. § 363 and without providing Dondero a chance to bid. Dondero requested an emergency hearing on this motion [D.I. 1443]. Dondero filed this motion despite having agreed to the Protocols governing such sales. | Dondero withdrew this motion [D.I. 1622] after the Debtor and the Committee were forced to incur costs responding and preparing for trial [D.I. 1546, 1551]. | N/A |
| 12/8/20 | *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [D.I. 1522]* | | | |
| | **Movants:** | Advisors Funds | Movants argued that the Debtor should be precluded from causing the CLOs to sell assets without Movants' consent. Movants provided no support for this position which directly contradicted the terms of the CLO Agreements; and was filed notwithstanding the Protocols which governed such sales. Movants requested an emergency hearing on this motion [D.I. 1523]. | The motion was denied [D.I. 1605] and was characterized as "frivolous." | N/A |

**\* The following is by way of summary only and does not include discovery disputes or similar matters. Nothing herein shall be deemed or considered a waiver of any rights or an admission of fact. The Debtor reserves all rights that it may have whether in law or in equity.**

Appellee Appx. 01787

Appx. 02928

014600

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1795 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1794 of 1803    PageID 12540
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 548 of 852    PageID 2453

| | | | | |
|---|---|---|---|---|
| 12/23/20 | **_Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 150, 153, 154) and Authorizing Actions Consistent Therewith [D.I. 1625]_** | | | |
| | **Objectors:** Dondero [D.I. 1697] Trusts [D.I. 1706] CLOH [D.I. 1707] | The HarbourVest Entities asserted claims in excess of $300 million in connection with an investment in a fund indirectly managed by the Debtor for, among other things, fraud and fraudulent inducement, concealment, and misrepresentation. Debtor settled for an allowed Class 8 claim of $45 million and an allowed Class 9 claim of $35 million. Dondero and the Trusts alleged that the settlement was unreasonable; was a windfall to the HarbourVest Entities; and constituted vote buying. CLOH argued that the settlement could not be effectuated under the operative documents. | CLOH withdrew its objection at the hearing. The settlement was approved and the remaining objections were overruled [D.I. 1788]. | The Trusts appealed [D.I. 1870], and the appeal is being briefed. CLOH recently filed a complaint alleging, among other things, that the settlement was a breach of fiduciary duty and a RICO violation. |
| 1/14/21 | **_Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c) [D.I. 1752]_** | | | |
| | **Movants:** Trusts Dondero [D.I. 1756] | Movants sought the appointment of an examiner 14 months after the Petition Date and commencement of Plan solicitation to assess the legitimacy of the claims against the various Dondero Entities and to avoid litigation. Movants requested an emergency hearing on this motion [D.I. 1748]. | The motion was denied [D.I. 1960]. | N/A |
| 1/20/21 | **_James Dondero's Objection to Debtor's Proposed Assumption of Executory Contracts and Cure Amounts Proposed in Connection Therewith [D.I. 1784]_** | | | |
| | **Objector:** Dondero | Dondero objected to the Debtor's proposed assumption of the limited partnership agreement governing the Debtor and MSCF [D.I. 1719]. | Dondero withdrew his objection [D.I. 1876] after forcing the Debtor to incur the expense of responding (which included a statement that the Debtor limited partnership agreement was not being assumed). | N/A |

000545

**Appellee Appx. 01788**

**Appx. 02039**

01460T

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1796 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1795 of 1803    PageID 12541
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 549 of 852    PageID 2454

| 1/22/20 | *Objections to Fifth Amended Plan of Reorganization* [D.I. 1472] | | | |
|---|---|---|---|---|
| | **Objectors:**[1] | | | |
| | Dondero [D.I. 1661] | Trusts [D.I. 1667] | All objections to the Plan were consensually resolved prior to the confirmation hearing except for the objections of the Dondero Entities and the U.S. Trustee. The U.S. Trustee did not press its objection at confirmation. | All objections were overruled and the Confirmation Order was entered. The Confirmation Order specifically found that Mr. Dondero would "burn the place down" if his case resolution plan was not accepted. | Dondero, the Trusts, the Advisors, and the Funds appealed [D.I. 1957, 1966, 1970, 1972]. The appeal is being briefed. |
| | Advisors & Funds[2] [D.I. 1670] | Senior Employees [D.I. 1669] | | | |
| | HCRE [D.I. 1673] | CLOH [D.I. 1675] | | | |
| | NexBank Entities [D.I. 1676] | | | | |
| 1/24/21 | *Application for Allowance of Administrative Expense Claim* [D.I. 1826] | | | |
| | **Movants:** | Advisors | The Advisors seek an administrative expense claim for approximately $14 million they allege they overpaid to the Debtor during the bankruptcy case under the Shared Services Agreement. Notably, the Advisors have not paid $14 million to the Debtor during the bankruptcy. | This matter is currently being litigated. | N/A |
| 2/3/21 | *NexBank's Application for Allowance of Administrative Expense Claim* [D.I. 1888] | | | |
| | **Movant:** | NexBank | NexBank seeks an administrative expense claim for reimbursement of $2.5 million paid to the Debtor under its Shared Services Agreement and investment advisory agreement. NexBank alleges that it did not receive the services. | This matter is currently being litigated. | N/A |

---

[1] In addition to the Dondero Entities' objections, the following objections were filed: State Taxing Authorities [D.I. 1662]; Former Employees [D.I. 1666]; IRS [D.I. 1668]; US Trustee [D.I. 1671]; Daugherty [D.I. 1678]. These objections were either resolved prior to confirmation or not pressed at confirmation.

[2] In addition to the Funds, this objection was joined by: Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Healthcare Opportunities Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Real Estate Strategies Fund, NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., and NexPoint Real Estate Advisors VIII, L.P. [D.I. 1677].

000546

Appellee Appx. 01789
Appx. 02049
014602

Case 19-34054-sgj11     Doc 3596-6     Filed 10/31/22     Entered 10/31/22 15:27:09     Desc
Exhibit 6     Page 1797 of 1804
Case 3:21-cv-00879-K     Document 21     Filed 07/28/21     Page 1796 of 1803     PageID 12542
Case 3:21-cv-00842-B     Document 43     Filed 07/13/21     Page 550 of 852     PageID 2455

| | | | | |
|---|---|---|---|---|
| 2/8/21 | *James Dondero Motion for Status Conference* **[D.I. 1914]** | | | |
| | **Movant:** Dondero | Dondero requested a chambers conference to convince the Court to delay confirmation of the Plan to allow for continued negotiation of the "pot plan." | The request was denied [D.I. 1929] after the Debtor and Committee informally objected. | N/A. |
| 2/28/21 | *Motions for Stay Pending Appeal* | | | |
| | **Movants:** Dondero [D.I. 1973]   Advisors [D.I. 1955]   Funds [D.I. 1967]   Trusts [D.I. 1971] | The only parties requesting a stay pending appeal were the Dondero Entities.  They alleged a number of potential harms to the Dondero Entities if a stay was not granted and offered to post a $1 million bond. | Relief was denied [D.I. 2084, 2095] and a number of the Movants' arguments were found to be frivolous. | Movants sought a stay pending appeal from this Court. |
| 3/18/21 | *James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Motion to Recuse Pursuant to 28 U.S.C. § 455* **[D.I. 2060]** | | | |
| | **Movants:** Dondero   Advisors   Trusts   HCRE | Dondero argued that Judge Jernigan should recuse herself as her rulings against him and his related entities were evidence of her bias. | Judge Jernigan denied the motion without briefing from any other party on March 23, 2021 [D.I. 2083]. | The Movants appealed [D.I. 2149]. |
| 4/15/21 | *Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* **[D.I. 2199]** | | | |
| | **Movants:** Debtor | UBS Securities LLC and UBS AG London Branch (collectively, "UBS") asserted claims against the Debtor in excess of $1 billion arising from two Debtor-managed funds' breach of contract in 2008.  The settlement resolved ten plus years of litigation but had to be renegotiated when the Debtor discovered that the Dondero-controlled Debtor had caused the funds to transfer cash and securities with a face amount of over $300 million to a Cayman-based Dondero controlled entity in 2017, presumably to thwart UBS's ability to collect on its judgment. | The only parties to object were Dondero [D.I. 2295] and Dugaboy [D.I. 2268, 2293]. The Debtor filed an omnibus reply on May 14, 2021 [D.I. 2308]. UBS also filed a reply [D.I. 2310].  The UBS settlement was approved on May 24, 2021 [D.I. 2389]. | The objectors have until June 7 to appeal. |

4

Appellee Appx. 01790

Appx. 02041

014603

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1798 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1797 of 1803    PageID 12543
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 551 of 852    PageID 2456

| 4/23/21 | *Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* **[D.I. 2247]** | | | |
|---|---|---|---|---|
| **Movants**: | Debtor | Debtor filed a motion seeking an order to show cause as to why Dondero, CLOH, DAF, and their counsel should not be held in contempt of court for willingly violating two final Bankruptcy Court orders.  The Bankruptcy Court entered an order to show cause on April 29, 2021 [D.I. 2255] and set an in-person hearing for June 8, 2021. | Dondero, CLOH, the DAF, Mark Patrick (allegedly the person in control of the DAF), and their counsel filed responses to the order to show cause on May 14, 2021 [D.I. 2309, 2312, 2313]. The Debtor filed its reply on May 21, 2021 [D.I. 2350]. | A hearing was held on June 8, 2021. The Court stated that she would find contempt but no formal order has been entered. |
| 4/23/21 | *Motion for Modification of Order Authorizing Appointment of James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction* **[D.I. 2242]** | | | |
| **Movants**: | Debtor | DAF and CLOH filed a motion asking the Bankruptcy Court to modify the July 16, 2020, order appointing Seery as the Debtor's CEO/CRO alleging the Bankruptcy Court lacked subject matter jurisdiction. | On May 14, 2021, the Debtor filed a response [D.I. 2311] stating that DAF and CLOH's motion was a collateral attack and barred by res judicata, among other things. The Committee joined in the Debtor's response [D.I. 2315]. DAF and CLOH filed their reply on May 21, 2021 [D.I. 2347]. The Motion was denied on June 25, 2021 [D.I. 2506] | The Court denied DAF and CLOH have appealed. [D.I. 2513] |
| 4/20/21 | *Debtor's Motion for Entry of an Order (i) Authorizing the Debtor to (a) Enter into Exit Financing Agreement in Aid of Confirmed Chapter 11 Plan and (b) Incur and Pay Related Fees and Expenses and (ii) Granting Related Relief* **[D.I. 2229]** | | | |
| **Movants**: | Debtor | The Debtor filed a motion seeking authority to enter into an exit financing facility.  The facility was required, in part, to fund the increased costs to the estate from Dondero's litigiousness.  Dugaboy filed two objections to the motion alleging, among other things, that there was no basis for the financing [D.I. 2403; 2467] | The motion was granted on June 30 [D.I. 2503] | N/A |

000548

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1799 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1798 of 1803    PageID 12544
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 552 of 852    PageID 2457

| 4/29/21 | _Motion to Compel Compliance with Bankruptcy Rule 2015.3 [D.I. 2256]_ | | | |
|---|---|---|---|---|
| Movants: | Trusts | The Trusts filed a motion on negative notice seeking to compel the Debtor to file certain reports under Rule 2015.3 [D.I. 2256]. The Debtor opposed that motion on May 20, 2021 [D.I. 2341], which was joined by the Committee [D.I. 2343]. The Trusts filed their reply on June 8, 2021 [D.I. 2424] | A hearing was held on June 10, 2021 [D.I. 2442] and the motion was adjourned. | N/A |

**_Highland Capital Management, L.P. v. James D. Dondero_, Adv. Proc. No. 20-03190-sgj (Bankr. N.D. Tex.)**

| 12/7/20 | _Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero [D.I. 2]_ | | | |
|---|---|---|---|---|
| Movant: | Debtor | The Debtor commenced an adversary proceeding seeking an injunction against Dondero. Dondero actively interfered with the management of the estate. Seery had instructed Debtor employees to sell certain securities on behalf of the CLOs. Dondero disagreed with Seery's direction and intervened to prevent these sales from being executed. Dondero also threatened Seery via text message and sent threatening emails to other Debtor employees. | A TRO was entered on December 10 [D.I. 10], which prohibited Dondero from, among other things, interfering with the Debtor's estate and communicating with Debtor employees unless it related to the Shared Services Agreements. A preliminary injunction was entered on January 12 after an exhaustive evidentiary hearing [D.I. 59]. This matter was resolved consensually by order entered May 18, 2021 [D.I. 182], which enjoined Dondero from certain conduct until the close of the Bankruptcy Case. | Dondero appealed to the District Court, which declined to hear the interlocutory appeal. Dondero is seeking a writ of mandamus from the Fifth Circuit. The writ of mandamus was withdrawn as part of the settlement. |

Appellee Appx. 01792

Appx. 02045

014605

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1799 of 1803    PageID 12545
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 553 of 852    PageID 2458

| | | | | |
|---|---|---|---|---|
| 1/7/21 | *Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* **[D.I. 48]** | | | |
| | Movant: | Debtor | In late December, the Debtor discovered that Dondero had violated the TRO in multiple ways, including by destroying his cell phone, his text messages, and conspiring with the Debtor's then general counsel and assistant general counsel[3] to coordinate offensive litigation against the Debtor. The hearing on this matter was delayed and there was litigation on evidentiary issues, among other things. An extensive evidentiary hearing was held on March 22. | The Court entered an order finding Mr. Dondero in contempt of court on June 7, 2021 [D.I. 190] | Mr. Dondero has appealed [D.I. 212] |

**Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, NexPoint Capital, Inc., and CLO Holdco, Ltd., Adv. Proc. No. 21-03000-sgj (Bankr. N.D. Tex.)**

| | | | | |
|---|---|---|---|---|
| 1/6/21 | *Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero* **[D.I. 2]** | | | |
| | Movant: | Debtor | In late December, the Debtor received a number of threatening letters from the Funds, the Advisors, and CLOH regarding the Debtor's management of the CLOs. These letters reiterated the arguments made by these parties in their motion filed on December 8, which the Court concluded were "frivolous." The relief requested by the Debtor was necessary to prevent the Funds, Advisors, and CLOH's improper interference in the Debtor's management of its estate. | The parties agreed to the entry of a temporary restraining order on January 13 [D.I. 20]. A hearing on a preliminary injunction began on January 26 and was continued to May 7. The TRO was further extended with the parties' consent [D.I. 64]. The Debtor reached an agreement with CLOH and dismissed CLOH from the adversary proceeding. The Debtor believes it has reached an agreement in principle with the Funds and Advisors that will settle this matter. | N/A |

---

[3] As a result of this conduct, among other things, the Debtor terminated its general counsel and assistant general counsel for cause on January 5, 2021.

000550

Appellee Appx. 01793
Appx. 020044
014606

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1801 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1800 of 1803    PageID 12546
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 554 of 852    PageID 2459

***Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P.***, Adv.
**Proc. No. 21-03010-sgj (Bankr. N.D. Tex.)**

| 2/17/21 | *Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021* [D.I. 2] | | | |
|---|---|---|---|---|
| **Movant**: | Debtor | The Debtor's Plan called for a substantial reduction in its work force. As part of this process, the Debtor terminated the Shared Services Agreements and began negotiating a transition plan with the Advisors that would enable them to continue providing services to the retail funds they managed without interruption. The Debtor was led to believe that without the Debtor's assistance the Advisors would not be able to provide services to their retail funds, and, although the Debtor had proceed appropriately, the Debtor was concerned it would be brought into any action brought by the SEC against the Advisors if they could not service the funds. The Debtor brought this action to force the Advisors to formulate a transition plan and to avoid exposure to the SEC, among others. | At a daylong hearing, the Advisors testified that they had a transition plan in place. An order was entered on February 24 [D.I. 25] making factual findings and ruling that the action was moot. | N/A |

***Highland Capital Management, L.P. v. James Dondero***, Adv. Proc. No. 21-03003-sgj (Bankr. N.D. Tex.)

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | |
|---|---|---|---|---|
| **Movant**: | Debtor | Dondero borrowed $8.825 million from Debtor pursuant to a demand note. Dondero did not pay when the note was called and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 4/15/21 | *James Dondero's Motion and Memorandum of Law in Support to Withdraw the Reference* [D.I. 21] | | | |
| **Movant**: | Dondero | Three months after the complaint was filed Dondero filed a motion to withdraw the bankruptcy reference and a motion to stay the adversary pending resolution of his motion [D.I. 22]. | A hearing was held on May 25, 2021, and a stay was granted until mid-July 2021. The Court transmitted a report and recommendation on July 7 [D.I. 69]. | N/A |

8

Appellee Appx. 01794

Appx. 02045

014607

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1802 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1801 of 1803    PageID 12547
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 555 of 852    PageID 2460

***Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P.***, **Adv. Proc. No. 21-03004-sgj (Bankr. N.D. Tex.)**

| 1/22/21 | ***Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate [D.I. 1]*** | | | | |
|---|---|---|---|---|---|
| | **Movant**: | Debtor | HCMFA borrowed $7.4 million from Debtor pursuant to a demand note. Dondero did not pay when the note was called and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 4/13/21 | ***Defendants Motion to Withdraw the Reference [D.I. 20]*** | | | | |
| | **Movant**: | HCMFA | Three months after the complaint was filed HCMFA filed a motion to withdraw the bankruptcy reference. | A hearing was held on May 25, 2021. The Court transmitted a report and recommendation on July 9 [D.I. 52]. | N/A |

***Highland Capital Management, L.P. v. NexPoint Advisors, L.P.***, **Adv. Proc. No. 21-03005-sgj (Bankr. N.D. Tex.)**

| 1/22/21 | ***Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate [D.I. 1]*** | | | | |
|---|---|---|---|---|---|
| | **Movant**: | Debtor | NPA borrowed approximately $30.75 million under an installment note. NPA did not pay the note when due and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 4/13/21 | ***Defendants Motion to Withdraw the Reference [D.I. 19]*** | | | | |
| | **Movant**: | NPA | Three months after the complaint was filed HCMFA filed a motion to withdraw the bankruptcy reference. | A hearing was held on May 25, 2021. The Court transmitted a report and recommendation on July 9 [D.I. 42].. | N/A |

***Highland Capital Management, L.P. v. Highland Capital Management Services, Inc.***, **Adv. Proc. No. 21-03006-sgj (Bankr. N.D. Tex.)**

| 1/22/21 | ***Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate [D.I. 1]*** | | | | |
|---|---|---|---|---|---|
| | **Movant**: | Debtor | Highland Capital Management Services, Inc. ("HCMS"), borrowed $900,000 in demand notes and approximately $20.5 million in installment notes. HCMS did not pay the notes when due and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 6/3/21 | ***Defendants Motion to Withdraw the Reference [D.I. 19]*** | | | | |
| | **Movant** | HCMS | Five months after the complaint was filed HCMS filed a motion to withdraw the reference. | A hearing was held on July 8, 2021. The Court is preparing a report and recommendation on the motion to withdraw. | |

000552

Appellee Appx. 01795
Appx. 02045
014608

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1803 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1802 of 1803    PageID 12548
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 556 of 852    PageID 2461

**_Highland Capital Management, L.P. v. HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)_**, Adv. Proc. No. 21-03007-sgj (Bankr. N.D. Tex.)

| 1/22/21 | _Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate_ [D.I. 1] | | |
|---|---|---|---|
| **Movant** | Debtor | HCRE borrowed $4.25 million in demand notes and approximately $6.05 million in installment notes. HCRE did not pay the notes when due and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 6/3/21 | _Defendants Motion to Withdraw the Reference_ [D.I. 20] | | |
| **Movant** | HCMS | Five months after the complaint was filed HCMS filed a motion to withdraw the reference. | A hearing was held on July 8, 2021. The Court is preparing a report and recommendation on the motion to withdraw. | |

**_Charitable DAF Fund, L.P., and CLO Holdco, Ltd., v. Highland Capital Management, L.P., Highland HCF Advisor, Ltd., and Highland CLO Funding, Ltd._**, Case No. 21-cv-00842-B (N.D. Tex. April 12, 2021)

| 4/12/21 | _Original Complaint_ | | |
|---|---|---|---|
| **Movants**: | DAF<br><br>CLOH | Movants allege that the Debtor and Seery violated SEC rules, breached fiduciary duties, engaged in self-dealing, and violated RICO in connection with its settlement with the HarbourVest Entities. The Movants brought this complaint despite CLOH having objected to the HarbourVest settlement; never raised this issue; and withdrawn its objection. The Debtor believes the complaint is frivolous and represents a collateral attack on the order approving the HarbourVest settlement. The Debtor will take all appropriate actions. | On May 19, the Debtor filed a motion to enforce the order of reference seeking to have the case referred to the Bankruptcy Court [D.I. 22]. On May 27, 2019, the Debtor filed a motion to dismiss the complaint [D.I. 26] | N/A |
| 4/19/21 | _Plaintiff's Motion for Leave to File First Amended Complaint in the District Court_ | | |
| **Movants**: | DAF<br><br>CLOH | Movants filed a motion seeking leave from this Court to add Seery as a defendant and to seek, in this Court, a reconsideration of two final Bankruptcy Court orders. | This Court denied the motion but with leave to refile. | N/A |

10

Appellee Appx. 01796
Appx. 02045
014809

Case 19-34054-sgj11    Doc 3596-6    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Exhibit 6    Page 1804 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1803 of 1803    PageID 12549
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 557 of 852    PageID 2462

***PCMG Trading Partners XXIII, L.P. v. Highland Capital Management, L.P.***, **Case No. 21-cv-01169-N (N.D. Tex. May 21, 2021)**

4/12/21        *Original Complaint*

| Movants: | PCMG Trading Partners XXIII, L.P. | Movants allege that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. The Movant is an entity owned and controlled by Dondero, which had less than a 0.05% interest in the investment vehicle at issue and is no longer an investor. The Debtor believes the complaint is frivolous. The Debtor will take all appropriate actions. | The Complaint was recently filed and is currently in litigation. | N/A |

***The Dugaboy Investment Trust v. Highland Capital Management, L.P.***, **Case No. 21-cv-01479-S (N.D. Tex. June 23, 2021)**

4/12/21        *Original Complaint*

| Movants: | Dugaboy | Dugaboy alleges that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. Dugaboy is Dondero's family trust with less than a 2% interest in the vehicle. Dugaboy's allegations in the complaint are duplicative of allegations it made in proofs of claim filed in the Bankruptcy Court. | The Complaint was withdrawn after the Debtor informed the Bankruptcy Court of the filing. | N/A |

000554

Appellee Appx. 01797
Appx. 020048
014810

# EXHIBIT 7

Appx 02040

014611

Case 19-34054-sgj11   Doc 3596-7   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-6bit 7 Filed Page 00/316   Page 933 of 1017    PageID 15577
Case 3:21-cv-00879-K   Document 5   Filed 05/17/21   Page 1 of 10   PageID 108
Docket #0005  Date Filed: 5/17/2021

**IN THE UNITED STATES DISTICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| In re: | § | |
| | § | |
| JAMES DONDERO, *et al*., | § | |
| | § | |
| Appellants, | § | |
| | § | |
| v. | § | Case No. 3:21-cv-00879-K |
| | § | |
| HON. STACEY G. C. JERNIGAN, | § | |
| | § | |
| Appellee. | § | |

**APPELLANTS' RESPONSE TO DEBTOR'S MOTION FOR LEAVE TO INTERVENE
IN APPEAL OF RECUSAL ORDER**

James Dondero ("Mr. Dondero"), Highland Capital Management Fund Advisors, L.P.,
NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real
Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company
(collectively, "Appellants") file this *Response* (the "*Response*") to Highland Capital Management,
L.P.'s ( "Debtor") *Motion for Leave to Intervene in Appeal of Recusal Order* (the "*Motion to
Intervene*").[1] Appellants respectfully state as follows:

## I.   BACKGROUND

**A. Procedural Background**

1.      On October 16, 2019, Debtor filed a voluntary petition for relief under chapter 11 of the
Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the

---

[1] Dkt 2.



Appx. 02050

014612

Case 19-34054-sgj11   Doc 3596-7   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15   Exhibit 7   Filed 03/03/25   Page 934 of 1017   PageID 15578
Case 3:21-cv-00879-K   Document 5   Filed 05/17/21   Page 2 of 10   PageID 109

"Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

2.    On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official
Committee of Unsecured Creditors (the "Committee"). The Committee then moved to transfer the
Highland Bankruptcy Case to the United States Bankruptcy Court for the Northern District of
Texas, Dallas Division (the "Bankruptcy Court").

3.    At the hearing on the Committee's Motion to Transfer, the Pachulski firm, counsel for
Debtor, expressly acknowledged that the Committee's motive in seeking transfer of the Highland
Bankruptcy Case to the Bankruptcy Court was to take advantage of the Bankruptcy Court's
preexisting negative views of Debtor's management, including, notably, Mr. Dondero:

> However -- Your Honor pointed to this at the beginning, in mentioning comments
> about forum-shopping -- the committee and Acis are really being disingenuous, and
> they have not told you the real reason that they want the case before Judge
> Jernigan.[7] … And it's not because she's familiar with this debtor's business, this
> debtor's assets, or this debtor's liabilities, because she generally is not. ***It is because
> she formed negative views regarding certain members of the debtor's
> management that the committee and Acis hope will carry over to this case***.[2]
>
> ****
> The debtor filed the case in this district because it wanted a judge to preside over
> this case that would look at what's going on with this debtor, with this debtor's
> management, this debtor's post-petition conduct, ***without the baggage of what
> happened in a previous case***, which contrary to what Acis and the committee says
> [*sic*], has very little to do with this debtor.[3]

4.    On December 4, 2019, the Delaware Court entered an order transferring venue of the
Highland Bankruptcy Case to the Bankruptcy Court.[4]

## B.   The *Motion to Recuse*

5.    As the Bankruptcy Court has essentially acknowledged, the Bankruptcy Court carried

---

[2] *See* B.R. Dkt. 2062, the *Appendix to the Motion to Recuse* at Exhibit 1 at 77:18-78:8 [App. 0077-0078] (emphasis added).
[3] *Id.* at 79:14-20 [App. 0079] (emphasis added).
[4] *See* B.R. Dkt. 186.

---

**014613**

Case 19-34054-sgj11    Doc 3596-7    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-6 bit 7 Filed 06/25/16    Page 935 of 1017    PageID 15579
Case 3:21-cv-00879-K    Document 5    Filed 05/17/21    Page 3 of 10    PageID 110

negative opinions of Mr. Dondero into the Highland Bankruptcy Case that it cannot extricate from its mind.

6.    Moreover, the record in the Highland Bankruptcy Case reflects that these negative opinions have resulted in, if not actual bias against Mr. Dondero (as well as any entity the Bankruptcy Court deems connected to him or under his control (collectively, the "Affected Entities")):[5] (a) the undeniable **perception** of bias against Mr. Dondero and the Affected Entities; and (b) distinct and regular favoritism toward Debtor and other parties (or, at a minimum, the undeniable **perception** of such favoritism).

7.    Specifically, among other things, the record in the Highland Bankruptcy Case reflects that the Bankruptcy Court's bias began to manifest itself in late 2020 and early 2021 as the Bankruptcy Court:

(a)    Repeatedly made statements demonstrating its unfavorable opinions about Mr. Dondero;

(b)    Declared that Mr. Dondero (and, by implication, the Affected Entities and each of their licensed attorneys) are vexatious litigants based on Mr. Dondero and the Affected Entities actions in: (i) defending lawsuits and motions filed against them; (ii) asserting valid legal positions; and/or (iii) preserving legal rights, including on appeal;

(c)    Reasonably appears to have prejudged an issue of fact in the Adversary Proceedings (defined below) by concluding that any entity connected to Mr. Dondero (*i.e.*, the Affected Entities) is essentially Mr. Dondero himself, without evidence being introduced that support disregarding the corporate status of these entities;

(d)    Summarily and/or preemptively disregarded the testimony of any witness who would testify in favor of Appellants, without evidentiary support, as "under [Mr. Dondero's] control" and, if the witness has any connection to Mr. Dondero, *per se* not credible; and

(e)    Entered findings of fact and granted remedies against Appellants that the

---

[5] The term "Affected Entities" should be understood to include Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc.

---

Appx. 02052
014614

Case 19-34054-sgj11 Doc 3596-7 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-6 Exhibit 7 Page 560-516 Page 936 of 1017 PageID 15580
Case 3:21-cv-00879-K Document 5 Filed 05/17/21 Page 4 of 10 PageID 111

opposing party did not seek, thus depriving Appellants of due process rights.

8.    This bias (or equally problematic perception of bias) has and will continue to impair the ability of Appellants to adequately preserve and protect their legal rights and interests.

9.    Consequently, on March 18, 2021, Appellants moved to recuse Presiding Judge Jernigan (the "*Motion to Recuse*")[6] from the below adversary proceedings (the "Adversary Proceedings"):

| Adversary Proceeding | File Date |
|---|---|
| *UCC v. CLO Holdco Ltd., et al.; Adversary No. 20-03195* | 12/17/2020 |
| *HCMLP v. NexPoint Advisors, L.P., et al.; Adversary No. 21-03000* | 1/6/2021 |
| *HCMLP v. Dondero; Adversary No. 21-03003* | 1/22/2021 |
| *HCMLP v. HCMFA; Adversary No. 21-03004* | 1/22/2021 |
| *HCMLP v. NexPoint Advisors, L.P.; Adversary No. 21-03005* | 1/22/2021 |
| *HCMLP v. HCM; Adversary No. 21-03006* | 1/22/2021 |
| *HCMLP v. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC; Adversary No. 21-03007* | 1/22/2021 |
| *HCMLP v. HCMFA; Adversary No. 21-03010* | 2/17/2021 |
| *HCMLP v. Dondero; Adversary No. 20-03190* | 12/7/2020 |

10.    Notably, while the Bankruptcy Court had presided over many issues in the Highland Bankruptcy Case at the time of the *Motion to Recuse*, Appellants' *Motion to Recuse* sought relief related to recently filed and future, stand-alone Adversary Proceedings, *i.e.*, **proceedings in which institutional knowledge is not required**. Indeed, as shown above, before the Bankruptcy Court's "institutional knowledge" became advantageous for Debtor, Debtor aptly referred to it as "baggage."

11.    Moreover, the Bankruptcy Court has not made any substantive rulings in those Adversary Proceedings, and the defendants therein have moved to withdraw the reference in most, if not all,

---

[6] *See* B.R. Dkt. 2060-2062.

Case 19-34054-sgj11   Doc 3596-7   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15   Exhibit 7   Filed 06/25/16   Page 937 of 1017   PageID 15581
Case 3:21-cv-00879-K   Document 5   Filed 05/17/21   Page 5 of 10   PageID 112

of those cases on the grounds that most of the claims are based on state law.

## C.  The *Recusal Order* and Debtor's Intentional Inaction

12.     On March 19, 2021, the morning after Appellants filed the *Motion to Recuse*, the Bankruptcy Court acknowledged receiving the *Motion to Recuse* in a hearing on a separate issue and stated to all present (which included Debtor) that it would review the *Motion to Recuse* and let the parties know whether responsive pleadings would be necessary.[7]

13.     The Bankruptcy Court's statements that morning clearly indicated that it would likely deny the *Motion to Recuse sua sponte*. Nonetheless, no party, including Debtor, sought to oppose the *Motion to Recuse*; or request time to file a response; or indicate that they, in any way, objected to the foreshadowed ruling without the opportunity to advocate for their interest and create a record. This silence continued in the days following the hearing.

14.     On March 23, 2021, the Bankruptcy Court, as it indicated it would, *sue sponte* denied Appellants' *Motion to Recuse* on three grounds (the "*Recusal Order*"): (a) the *Motion to Recuse* was untimely;[8] (b) the Bankruptcy Court's subjective belief that it was not biased ("[t]he Presiding Judge does not believe she harbors, or has shown, any personal bias or prejudice against the Movants");[9] and (c) criticism of counsel (which was not a ground that Appellants asserted in the *Motion to Recuse*) did not justify recusal.[10]

15.     Appellants timely filed a *Notice of Appeal* of the *Recusal Order* and, since no other party

---

[7] *See* an excerpted copy of the Transcript from March 19, 2021 hearing at 78:3-12 ("All right. Okay. And then there's -- I don't know if the apparently new counsel who has filed a motion of recusal is on the line, but I'll just tell people I will let you all know by the end of today if I think I need a hearing on that or I think I need to give other parties in interest the opportunity to weigh in on that. But I don't think it's going to stop me from going forward, just based on the very quick summary I got from one of my law clerks this morning. But I'll let you know by the end of the day today if I think I need to set that for hearing or need responsive pleadings."), a true and correct copy of which is attached hereto as **Exhibit 1 to this *Response*** and incorporated herein by reference.
[8] B.R. Dkt. 2883 at p. 7.
[9] B.R. Dkt. 2883 at p. 10.
[10] *Id.*

---

**014616**

Case 19-34054-sgj11   Doc 3596-7   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15   Exhibit 7   Filed 06/02/25   Page 938 of 1017   PageID 15582
Case 3:21-cv-00879-K   Document 5   Filed 05/17/21   Page 6 of 10   PageID 113

had filed any response to the *Motion to Recuse* (or indicated any position in favor or opposing the *Motion to Recuse*), Appellants listed the Bankruptcy Court as the interested party to the appeal and Debtor (and others) as "Notice Parties."[11] Then, after discussions with the Clerk for the Bankruptcy Court, who had filed correspondence in the Bankruptcy Case requesting Appellants amend their *Notice of Appeal* to add an Appellee, Appellants named the Bankruptcy Court as "Appellee" in an *Amended Notice of Appeal*.[12]

## II.     RESPONSE TO DEBTOR'S *MOTION TO INTERVENE*

16.     In a footnote (fn. 2) to the *Motion to Intervene*, Debtor overstates that Appellants are unopposed to its *Motion to Intervene*.

17.     When counsel for Debtor conferred with counsel for Appellants, counsel for Appellants indicated Appellants would not be opposed to Debtor **seeking intervention** in this appeal of the *Recusal Order*. Specifically, what counsel for Appellants did not oppose was Debtor's request to intervene and defend the *Recusal Oder* against appeal **on the grounds stated by the Bankruptcy Court in the Recusal Order**.

18.     Counsel for Appellants did not indicate that Appellants were unopposed to Debtor using intervention as a back-door attempt to make arguments that Debtor knowingly and intentionally refused to make in response to the *Motion to Recuse* in the Bankruptcy Court.

19.     Regardless, Debtor, as shown herein, has failed to show that intervention is necessary, and Debtor should not be allowed to, through intervention, raise new arguments that it did not previously present to the Bankruptcy Court (or offer new grounds for denying the *Motion to Recuse* that were not raised by the Bankruptcy Court in its own *Recusal Order*).

20.     **First**, Debtor asserts that it "would face substantial adverse consequences if the Recusal

---

[11] B.R. Dkt. 2149.
[12] *See* B.R. Dkt. 2169; Dkt. 1-1.

014617

Appx. 02055

Case 19-34054-sgj11   Doc 3596-7   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-16   Exhibit 7 Page 086216   Page 939 of 1017   PageID 15583
Case 3:21-cv-00879-K   Document 5   Filed 05/17/21   Page 7 of 10   PageID 114

Order is overturned on appeal and Judge Jernigan is removed from the Bankruptcy Case."[13] In support of this statement, Debtor asserts that the Bankruptcy Court has issued 2,500 opinions and orders in the Highland Bankruptcy Case (and its various contested matters) and makes the conclusory statement that recusing Judge Jernigan from the Adversary Proceedings would somehow jeopardize the "successful implementation" of Debtor's reorganization plan. However, none of the Bankruptcy Court's institutional knowledge affects the trial of the pending and future Adversary Proceedings referenced above, which can and should stand alone and be determined on a case-by-new-case basis.

21.     More importantly, the core issues on appeal here are: (a) whether "a reasonable man, cognizant of the relevant circumstances surrounding [the Bankruptcy Court's] failure to recuse, would harbor legitimate doubts about that judge's impartiality;"[14] and (b) whether the Bankruptcy Court should be recused from sitting as the judge and jury in the various Adversary Proceedings listed above. Respectfully, Appellants, like every litigant, are entitled to a full and fair opportunity to make their case in a fair and impartial forum.[15]

22.     Under § 455(a), this Court must objectively address the requirements of § 455(a) and, if after such an objective analysis, this Court determines that a reasonable person would question the Bankruptcy Court's impartiality, then recusal is mandatory. Indeed, Debtor's insistence that the Bankruptcy Court's "institutional knowledge" (the same knowledge Debtor previously admitted was biased "baggage") is *required* for the Adversary Proceedings only further supports the positions taken by Appellants in the *Motion to Recuse*.

23.     *Second*, while Debtor contends that its interest will not be adequately protected if it is not

---

[13] Dkt. 2 at ¶ 18.
[14] *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir.1999).
[15] *Miller v. Sam Houston State Univ.*, 986 F.3d 880, 893 (5th Cir. 2021).

---

Case 19-34054-sgj11    Doc 3596-7    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-6    Exhibit 7 Filed 06/23/6    Page 940 of 1017    PageID 15584
Case 3:21-cv-00879-K    Document 5    Filed 05/17/21    Page 8 of 10    PageID 115

permitted to intervene, ***Debtor, as shown above, made no attempt to oppose the Motion to Recuse or to represent Debtor's interests in the Bankruptcy Court***—including when the Bankruptcy Court specifically raised the *Motion to Recuse* at a hearing involving Debtor and indicated the likely reality that the Bankruptcy Court would reject the motion without hearing or responsive pleadings.

24.     Moreover, Debtor's claim that this appeal will go unopposed absent its intervention as an "appellant"[16] also lacks merit. Appellants have the burden irrespective of any intervention. As stated above, if a reasonable person would question the Bankruptcy Court's impartiality, then recusal is mandatory.

25.     ***Third***, in the *Motion to Intervene*, Debtor provides only conclusory statements as to why participating in this appeal as an *amicus curiae* would be inadequate. Debtor does not explain how filing an amicus brief enabling this Court to view the matter from Debtor's perspective would be insufficient. On the contrary, numerous cases support the proposition that allowing a proposed intervenor to file an amicus brief is an adequate alternative to permissive intervention.[17]

26.     Instead, Debtor states that "although intervention was not sought in the Bankruptcy Court, the Debtor seeks intervention in this Appeal in order to bring relevant issues and facts from the record to the District Court's attention."[18] Notably, as stated above, Debtor never requested that the Bankruptcy Court permit Debtor to respond to the *Motion to Recuse* before ruling, despite the Court's clear indication that it was going to rule on the *Motion to Recuse*. Moreover, Debtor never filed a notice of appeal, and it did not file or intervene to designate the record. In short, Debtor has

---

[16] Dkt. 2 at ¶ 23 ("Based on the foregoing, the Debtor respectfully requests that this Court grant leave for the Debtor to intervene in the instate Appeal, that it be given reasonable opportunity to supplement the record, and that it otherwise ***be treated as an "Appellant" for all purposes***, as if originally named as such in the Notice of Appeal.").

[17] *See McHenry v. Comm'r*, 677 F.3d 214, 227 (4th Cir. 2012); *Ruthardt v. United States*, 303 F.3d 375, 386 (1st Cir.2002); *Mumford Cove Ass'n v. Town of Groton*, 786 F.2d 530, 535 (2d Cir.1986); *Bush v. Viterna*, 740 F.2d 350, 359 (5th Cir.1984); *Brewer v. Republic Steel Corp.*, 513 F.2d 1222, 1225 (6th Cir.1975).

[18] Dkt. 2 at ¶21.

---

**014619**

Case 19-34054-sgj11    Doc 3596-7    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 7 Filed 06/06/25    Page 941 of 1017    PageID 15585
Case 3:21-cv-00879-K    Document 5    Filed 05/17/21    Page 9 of 10    PageID 116

provided no justification for the arguments contained or the relief requested in the *Motion to Intervene*.

27.    Nonetheless, weeks after making no effort to "advocate for its own interests" in the Bankruptcy Court, it now appears that Debtor is seeking intervention in order to create new arguments it declined to make to the Bankruptcy Court. Debtor cannot use the intervention process this way. To the extent Debtor intervenes, it is stepping into the shoes of the Bankruptcy Court, and it is bound by the Bankruptcy Court's analysis, the Bankruptcy Court's basis, and the Bankruptcy Court's reasoning as stated in the *Recusal Order* denying the *Motion to Recuse*.

28.    As a result, Debtor has failed to satisfy the requirements for intervention.

29.    Moreover, while Appellants do not oppose Debtor filing a brief as an amicus to give this Court Debtor's perspective, Debtor should not be allowed to assert, for the first time on appeal, new arguments that Debtor did not present to the Bankruptcy Court and that the Bankruptcy Court did not raise in its *Recusal Order*. This Court cannot consider such additional grounds to determine whether the Bankruptcy Court abused its discretion in denying Appellants' *Motion to Recuse*.

### III.    <u>CONCLUSION</u>

FOR THE FOREGOING REASONS, Appellants respectfully request the Court deny the relief requested in the *Motion to Intervene* or, alternatively, limit Debtor's intervention to defending the Bankruptcy Court's *Recusal Order* on the grounds stated and the basis set forth in that order.

---

Appx. 02958

014620

Case 19-34054-sgj11    Doc 3596-7    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 7 Filed 06/06/2516    Page 942 of 1017    PageID 15586
Case 3:21-cv-00879-K    Document 5    Filed 05/17/21    Page 10 of 10    PageID 117

Dated: May 17, 2021                          Respectfully submitted,


                                             By: */s/ Michael J. Lang*
                                             Michael J. Lang
                                             Texas State Bar No. 24036944
                                             mlang@cwl.law
                                             CRAWFORD, WISHNEW & LANG PLLC
                                             1700 Pacific Ave, Suite 2390
                                             Dallas, Texas 75201
                                             Telephone: (214) 817-4500
                                             *Counsel for Appellants*



                              **CERTIFICATE OF SERVICE**


      The undersigned certifies that, on May 17, 2021, a true and correct copy of the above and

foregoing document was served on all parties and counsel of record via the Court's e-filing

system.


                                             */s/ Michael J. Lang*
                                             Michael J. Lang


---

APPELLANTS' RESPONSE TO DEBTOR'S MOTION TO INTERVENE                    PAGE 10

014621

# EXHIBIT 1

```
 1                  IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
 2                            DALLAS DIVISION

 3                              )     Case No. 19-34054-sgj-11
     In Re:                     )     Chapter 11
                                )
 4   HIGHLAND CAPITAL           )     Dallas, Texas
     MANAGEMENT, L.P.,          )     Friday, March 19, 2021
 5                              )     9:30 a.m. Docket
                                )
 6            Debtor.           )
                                )     MOTIONS TO STAY
 7                              )     PENDING APPEAL
     _____)

 8                      TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
 9                UNITED STATES BANKRUPTCY JUDGE.

10   WEBEX APPEARANCES:

11   For the Debtor:            Jeffrey Nathan Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
12                              10100 Santa Monica Blvd.,
                                 13th Floor
13                              Los Angeles, CA  90067-4003
                                (310) 277-6910
14
     For the Debtor:            John A. Morris
15                              PACHULSKI STANG ZIEHL & JONES, LLP
                                780 Third Avenue, 34th Floor
16                              New York, NY  10017-2024
                                (212) 561-7700
17
     For the Official Committee Matthew A. Clemente
18   of Unsecured Creditors:    SIDLEY AUSTIN, LLP
                                One South Dearborn Street
19                              Chicago, IL  60603
                                (312) 853-7539
20
     For James Dondero:         Clay M. Taylor
21                              BONDS ELLIS EPPICH SCHAFER
                                 JONES, LLP
22                              420 Throckmorton Street,
                                 Suite 1000
23                              Fort Worth, TX  76102
                                (817) 405-6900
24

25
```

Case 19-34054-sgj11 Doc 3596-7 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-10 Filed 03/03/25 Page 944 of 1017 PageID 15588

Case 3:21-cv-00879-K Document 5-1 Filed 05/17/21 Page 2 of 5 PageID 119

2

```
 1   APPEARANCES, cont'd.:

 2   For Get Good Trust and      Douglas S. Draper
     Dugaboy Investment Trust:   HELLER, DRAPER & HORN, LLC
 3                               650 Poydras Street, Suite 2500
                                 New Orleans, LA  70130
 4                               (504) 299-3300

 5   For Certain Funds and       Davor Rukavina
     Advisors:                   MUNSCH, HARDT, KOPF & HARR
 6                               500 N. Akard Street, Suite 3800
                                 Dallas, TX  75201-6659
 7                               (214) 855-7587

 8   For Certain Funds and       A. Lee Hogewood, III
     Advisors:                   K&L GATES, LLP
 9                               4350 Lassiter at North Hills
                                  Avenue, Suite 300
10                               Raleigh, NC  27609
                                 (919) 743-7306
11

12   Recorded by:               Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
13                               1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
14                               (214) 753-2062

15   Transcribed by:            Kathy Rehling
                                 311 Paradise Cove
16                               Shady Shores, TX  76208
                                 (972) 786-3063

17

18

19

20

21

22

23

24           Proceedings recorded by electronic sound recording;
               transcript produced by transcription service.
25
```

```
 1   9:30 unless someone notifies my courtroom deputy over the
 2   weekend that the Fifth Circuit has said stop, you can't.
 3        All right.  Okay.  And then there's -- I don't know if the
 4   apparently new counsel who has filed a motion of recusal is on
 5   the line, but I'll just tell people I will let you all know by
 6   the end of today if I think I need a hearing on that or I
 7   think I need to give other parties in interest the opportunity
 8   to weigh in on that.  But I don't think it's going to stop me
 9   from going forward, just based on the very quick summary I got
10   from one of my law clerks this morning.  But I'll let you know
11   by the end of the day today if I think I need to set that for
12   hearing or need responsive pleadings.
13        All right.  The last thing before I'm late for my
14   engagement is, Mr. Pomerantz, at some point -- no, this is the
15   next-to-last thing.  At some point, you said we have a hearing
16   next week on a preliminary injunction adversary as to the
17   Funds.  Is that next week?
18             MR. POMERANTZ:  Your Honor, I may have misspoke.  I
19   think it's the 29th.
20             THE COURT:  Okay.
21             MR. POMERANTZ:  I could be corrected if I'm wrong.
22   So, --
23             THE COURT:  Okay.  So, with that, I'm going to offer
24   you this.  Traci, correct me if I'm wrong:  I don't think we
25   have anything set right now on Wednesday of next week,
```

Case 19-34054-sgj11   Doc 3596-7   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 7 Filed 05/05/16   Page 946 of 1017   PageID 15590

Case 3:21-cv-00879-K   Document 5-1   Filed 05/17/21   Page 4 of 5   PageID 121

81

1   by today and then their exhibits by 3:00 p.m. Central Tuesday,

2   along with any briefs.

3           THE COURT:  Okay.  So that sounds reasonable.  By the

4   end of today, the witness and exhibit list, or did we just

5   want to say witness --

6           MR. POMERANTZ:  The witness list by the end of today.

7           THE COURT:  Just the witness list.

8           MR. POMERANTZ:  Just the witness list.

9           THE COURT:  3:00 p.m. Central time Tuesday for the

10  exhibit list, with exhibits filed, and any briefing.  Anyone

11  have any contrary views?

12      Okay.  That will be the ruling, then.  And I'll see you

13  Monday, I guess.  We're adjourned.

14          THE CLERK:  All rise.

15          MR. POMERANTZ:  Thank you, Your Honor.

16          MR. RUKAVINA:  Thank you.

17      (Proceedings concluded at 12:20 p.m.)

18                          --oOo--

19

20                       CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                        03/19/2021

24  _____      _____

    Kathy Rehling, CETD-444                      Date
25  Certified Electronic Court Transcriber

**014625**

Case 19-34054-sgj11   Doc 3596-7   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   7   Filed 06/06/25   Page 947 of 1017   PageID 15591
Case 3:21-cv-00879-K   Document 5-1   Filed 05/17/21   Page 5 of 5   PageID 122

82

INDEX

PROCEEDINGS                                              3

OPENING STATEMENTS

- By Mr. Hogewood                                        6
- By Mr. Rukavina                                       11
- By Mr. Taylor                                         16
- By Mr. Draper                                         18
- By Mr. Pomerantz                                      19
- By Mr. Clemente                                       54

WITNESSES

-none-

EXHIBITS

Movants' Exhibits' A through M                Received 20
Debtor's Exhibits 1 through 33                Received 21

RULINGS                                                 66

    Motion to Stay Pending Appeal filed by Interested
    Party Highland Capital Management Fund Advisors, LP,
    Interested Party NexPoint Advisors, LP (1955) - *Denied*

    Motion to Stay Pending Appeal filed by Interested Party
    Highland Global Allocation Fund, Interested Party
    Highland Income Fund, Interested Party NexPoint Capital,
    Inc., Interested Party NexPoint Strategic Opportunities
    Fund (1967) - *Denied*

    Joinder by James Dondero to Highland Capital Management
    Fund Advisors, LP and NexPoint Advisors, LP's Motion for
    Stay Pending Appeal (1973) - *Denied*

    Joinder by Creditor Get Good Trust, Creditor The Dugaboy
    Investment Trust to Motions for Stay Pending Appeal of
    the Court's Order Confirming the Debtor's Fifth
    Amended Plan (1971) - *Denied*

END OF PROCEEDINGS                                       81

INDEX                                                    82

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

014626

# EXHIBIT 8

Appx 02065
014627

Case 19-34054-sgj11    Doc 3596-8    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15    Exhibit 8 Page 02/054    Page 949 of 1017    PageID 15593
Case 3:21-cv-00879-K    Document 10    Filed 06/10/21    Page 1 of 3    PageID 9524
Docket #0010  Date Filed: 6/10/2021

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | § |
| HIGHLAND CAPITAL | § |
| MANAGEMENT, L.P. | § |
| | § |
| | |
| In re: | § |
| | § |
| JAMES DONDERO, *et al.*, | § |
| | § |
| Appellants, | § |
| | § |
| v. | §  Civil Action No. 3:21-CV-0879-K |
| | § |
| HON. STACEY G. C. JERNIGAN, | § |
| | § |
| Appellee. | § |

## ORDER

Before the Court is Debtor Highland Capital Management, L.P.'s Motion for Leave to Intervene in Appeal of Recusal Order ("Motion") (Doc. No. 2). The Court has considered the Motion, the Response, the Reply, the supporting documentation, and the applicable law. The Court **GRANTS** Debtor Highland Capital Management, L.P.'s Motion.

On March 18, 2021, Appellants James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get

ORDER – PAGE 1

Case 19-34054-sgj11   Doc 3596-8   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15   Exhibit File Page 08 of 54   Page 950 of 1017   PageID 15594
Case 3:21-cv-00879-K   Document 10   Filed 06/10/21   Page 2 of 3   PageID 9525

Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC (collectively, "Appellants") filed a Motion to Recuse Pursuant to 28 U.S.C. § 455 ("Motion to Recuse"). R. on Appeal, Volume 10 (Doc. No. 9-10) at 2338. On March 22, 2021, United States Bankruptcy Judge Stacey G. C. Jernigan issued an order denying the Motion to Recuse ("Order"). *Id.*, Volume 1 (Doc. No. 9-1) at 31. Appellants filed their Notice of Appeal as to Judge Jernigan's Order on April 1, 2021, and their Amended Notice of Appeal on April 6, 2021. *Id.* at 1, 16. In their Notices of Appeal, Appellants named Judge Jernigan as the Appellee. *See id.* Debtor filed the instant Motion for Leave to Intervene seeking leave to intervene and to be treated as "Appellee" and also that Debtor be allowed to supplement the appellate record. Appellants filed a Response (Doc. No. 5), opposing Debtor's request to intervene and, alternatively, asking the Court to limit any permitted intervention to defending those reasons stated in the Order. Debtor then filed a Reply (Doc. No. 6).

Federal Rule of Bankruptcy Procedure 8013 addresses, in relevant part, intervening in a bankruptcy appeal. FED. R. BANKR. P. 8013. Rule 8013(g) provides:

> Unless a statute provides otherwise, an entity that seeks to intervene in an appeal pending in the district court or BAP must move for leave to intervene and serve a copy of the motion on the parties to the appeal. The motion or other notice of intervention authorized by statute must be filed within 30 days after the appeal is docketed. It must concisely state the movant's interest, the grounds for intervention, whether intervention was sought in the bankruptcy court, why intervention is being sought at this stage of the

ORDER – PAGE 2

Case 19-34054-sgj11    Doc 3596-8    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15   Exhibit 8 Filed 04/25   Page 951 of 1017    PageID 15595
Case 3:21-cv-00879-K   Document 10   Filed 06/10/21   Page 3 of 3   PageID 9526

proceeding, and why participating in an amicus curiae would not be adequate.

FED. R. BANKR. P. 8013(g).  Section 1109 of the Bankruptcy Code permits a "party of interest, including the debtor," to raise and appear and "be heard on any issue in a case under this chapter."  11 U.S.C. § 1109.

The Court finds that Debtor has established the requirements for intervening in this bankruptcy appeal.  *See* Fed. R. Bankr. P. 8013(g).  Therefore, the Court **grants** Debtor leave to intervene.  Intervenor-Debtor may file a responsive brief, as accorded to an Appellee under the Bankruptcy Rules, in response to any appellate brief on the merits that Appellants may file.  *See* Fed. R. Bank. P. 8018.  Intervenor-Debtor may also designate additional items to be included in the appellate record.  Intervenor-Debtor **must supplement the record within 14 days from the date of this Order**.

The Court **denies** all other relief.

**SO ORDERED.**

Signed June 10th, 2021.

*Ed Kinkeade*

ED KINKEADE
UNITED STATES DISTRICT JUDGE

ORDER – PAGE 3

014630

Appx. 02908

# EXHIBIT 9

Case 19-34054-sgj11   Doc 3596-9   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15 Exhibit Filed Page 02/25   Page 953 of 1017   PageID 15597
Case 3:21-cv-00879-K   Document 28   Filed 12/10/21   Page 1 of 4   PageID 12588

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In Re: HIGHLAND CAPITAL MANAGEMENT, L.P., Debtor | § § § § | |
| _____ | § | |
| JAMES DONDERO, *et al.*, | § § | |
| Appellants, | § § | |
| v. | § § | Civil Action No. 3:21-CV-0879-K |
| HON. STACEY G. C. JERNIGAN, | § § | |
| Appellee. | § | |

## MEMORANDUM OPINION AND ORDER

Appellants James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC. f/k/a HCRE Partners, LLC's (collectively "Appellants") Notice of Appeal  was filed in this Court on April 18, 2021.  *See* Doc. No. 1.  Appellants appeal an order of the Bankruptcy Court denying Appellants' motion to recuse.  *See generally* Am. Notice of Appeal (Doc. No. 1-1); Appellants' Br. (Doc. No. 16).  Intervenor/Debtor Highland Capital Management, L.P. filed its Appellee's Brief in response (Doc. No. 20), and Appellants filed their Reply Brief (Doc. No. 23).

ORDER – PAGE 1

Case 19-34054-sgj11   Doc 3596-9   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15 Exhibit 9 Filed 03/06/25   Page 954 of 1017   PageID 15598
Case 3:21-cv-00879-K   Document 28   Filed 12/10/21   Page 2 of 4   PageID 12589

Until a final judgment is issued, the bankruptcy court's denial of the motion to recuse "is not an appealable order, not subject to the collateral order doctrine, and is not an appealable interlocutory order under 28 U.S.C. § 1292(a)." *In re Dorsey*, 489 F. App'x 763, 764 (5th Cir. 2012) (citing *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 86 & n.3 (5th Cir. 1992) ("We decline to review the court's denial of the City's motion to recuse, however, because the judge's decision is not an appealable interlocutory order . . . . the City must await a final judgment to appeal the judge's refusal to recuse himself.")); *accord Willis v. Kroger*, 263 F.3d 163, 163 (5th Cir. 2001) ("The denial of a recusal motion is not an appealable interlocutory order or an appealable collateral order."); *see also United States v. Henthorn*, 68 F.3d 465, 465 (5th Cir. 1995) ("An order denying a motion for the recusal of a district judge is not immediately appealable."). Moreover, "despite the more flexible definitions of finality accorded to bankruptcy orders, denial of a motion to disqualify is not recognized as an exception to the rule requiring finality of judgment of appeal." *In re Global Marine, Inc.*, 108 B.R. 1007, 1008 (S.D. Tex. 1988) (citing *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368 (1981); *In re Delta Servs. Indus., Etc.*, 782 F.2d 1267 (5th Cir. 1986)).

The bankruptcy court's ruling on a motion to recuse must "conclusively and permanently decide the existence of a conflict of interest" for it to come within the collateral doctrine exception. *In re Global Marine*, 108 B.R. at 1008. In this case, the

ORDER – PAGE 2

Case 19-34054-sgj11    Doc 3596-9    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18ibit 9iled 04/04/25    Page 955 of 1017    PageID 15599
Case 3:21-cv-00879-K    Document 28    Filed 12/10/21    Page 3 of 4    PageID 12590

Bankruptcy Court expressly "reserve[d] the right to supplement or amend this ruling" in the Order Denying Motion to Recuse Pursuant to 28 U.S.C. § 455 ("Recusal Order").  R. on Appeal, Vol. 1 (Doc. No. 9-1) at 42; *see In re Global Marine*, 108 B.R. at 1008 ("Rather, the Bankruptcy Court reserved the right to review the issue should a conflict appear to arise in the future.").  If the bankruptcy court's order denying recusal is "not a final order appealable by right," leave of the district court is required to bring an interlocutory appeal.  28 U.S.C. § 158(a); *cf. In re Hallwood Energy, L.P.*, Civ. Action No. 3:12-CV-1902-G, 2013 WL 524418, at *2 (N.D. Tex. Feb. 11, 2013)(Fish, SJ.) ("Generally, interlocutory appeals are 'sparingly granted' and reserved for 'exceptional' cases.").

In this appeal, it is not apparent from the Bankruptcy Court Record on Appeal that jurisdiction lies over this appeal, nor have Appellants clearly established this Court's jurisdiction over the appeal of this order.  Accordingly, the Court **ORDERS** Appellants to file a brief on this discrete issue of the Court's appellate jurisdiction.  This jurisdictional brief shall be no more than ten (10) pages in length and may cite only to the Bankruptcy Court Record on Appeal already transmitted in this case.  **The brief must be filed on or before December 15, 2021**.  Appellee may file a responsive brief, no more than ten (10) pages in length, **on or before December 20, 2021**. There shall be no reply brief unless otherwise ordered by the Court.

ORDER – PAGE 3

Case 19-34054-sgj11    Doc 3596-9    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15    Exhibit 9    Filed 06/05/25    Page 956 of 1017    PageID 15600
Case 3:21-cv-00879-K    Document 28    Filed 12/10/21    Page 4 of 4    PageID 12591

Appellants' failure to timely file this jurisdictional brief will result in the immediate dismissal of this appeal without further notice.

**SO ORDERED.**

Signed December 10th, 2021.

_____

ED KINKEADE
UNITED STATES DISTRICT JUDGE

ORDER – PAGE 4

014635

# EXHIBIT 10

014636

Case 19-34054-sgj11   Doc 3596-10   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 10 Page 2 of 11   Page 958 of 1017   PageID 15602
Case 3:21-cv-00879-K   Document 29   Filed 12/15/21   Page 1 of 10   PageID 12592

**IN THE UNITED STATES DISTICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| In re: | § | |
| | § | |
| JAMES DONDERO, *et al.*, | § | |
| | § | |
| Appellants, | § | |
| | § | |
| v. | § | Case No. 3:21-cv-00879-K |
| | § | |
| HON. STACEY G. C. JERNIGAN, | § | |
| | § | |
| Appellee. | § | |

**APPELLANTS' RESPONSE TO THE COURT'S DECEMBER 10, 2021**
**MEMORANDUM OPINION AND ORDER**

James Dondero ("Mr. Dondero"), Highland Capital Management Fund Advisors, L.P.,
NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real
Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company
(collectively, "Appellants") file this Response to the Court's December 10, 2021 Memorandum
Opinion and Order [Dkt. 28]:

1.    Appellants recognize that, ordinarily, an order denying recusal is not a final,
appealable order in civil litigation under 28 U.S.C. § 1291 and 1292, at least in the District Court,
until "completion of the entire case, *i.e.*, when the decision terminates the action or ends the
litigation on the merits and leaves nothing for the court to do but execute the judgment."[1]

---

[1] *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 586 (2020) (In civil litigation generally, 28 U.S.C. §
1291 governs appeals from "final decisions." Under that provision, a party may appeal to a court of appeals as of right
from "final decisions of the district courts." The provision on appeals to U. S. district courts from decisions of

Page 1

Appx 02975

014637

Case 19-34054-sgj11    Doc 3596-10    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 06/03/25    Page 959 of 1017    PageID 15603
Case 3:21-cv-00879-K    Document 29    Filed 12/15/21    Page 2 of 10    PageID 12593

2.      However, "[a] bankruptcy case embraces an aggregation of individual controversies," and "[o]rders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete disputes within the overarching bankruptcy case."[2] It is therefore common for a bankruptcy court to resolve discrete disputes, thereby allowing separate appeals "from discrete, controversy-resolving decisions," even "while the umbrella bankruptcy case remains pending."[3]

3.      In other words, bankruptcy is not one dispute susceptible to one final judgment, but rather a series of discrete disputes. When a bankruptcy order puts a discrete dispute to rest, it is therefore a final order for appellate purposes.  Accordingly:

> This circuit has long rejected adoption of a rigid rule that a bankruptcy case can only be appealed as a single judicial unit at the end of the entire bankruptcy proceeding.  Instead, an appealed bankruptcy order must constitute either a 'final determination of the rights of the parties to secure the relief they seek,' or a final disposition 'of a discrete dispute within the larger bankruptcy case for the order to be considered final.'[4]

4.      This standard is "a lower threshold" for meeting the finality requirement than that which is ordinary applicable to District Court practice.[5]  Thus, the rule for bankruptcy finality is considered "more liberally or flexibly."[6]

5.      The reasoning for a more flexible finality standard in bankruptcy is demonstrated by the facts of this case: if the Court must await the Final Decree in a Chapter 11 case (the technical instrument that closes a Chapter 11 case) to determine an appeal of an order denying recusal, and the appeal is determined in favor of the appellants, then each and every subset of the Chapter 11

---

bankruptcy courts is 28 U.S.C. § 158(a). Under that provision, an appeal of right lies from "final judgments, orders, and decrees" entered by bankruptcy courts "in cases and proceedings." By providing for appeals from final decisions in bankruptcy "proceedings," as distinguished from bankruptcy "cases," Congress made "orders in bankruptcy cases ... immediately appeal[able] if they finally dispose of discrete disputes within the larger [bankruptcy] case.").

[2] *Id.*

[3] *Ritzen Grp.*, 140 S. Ct. at 586–87.

[4] *In re Bartree*, 212 F.3d 277, 282 (5th Cir. 2000) (internal quotations and citations omitted).

[5] *See In re Orr*, 180 F.3d 656, 659 (5th Cir. 1999).

[6] *In re Bartree*, 212 F.3d at 282.

Appx. 02976
014638

Case 19-34054-sgj11    Doc 3596-10    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 06/04/25    Page 960 of 1017    PageID 15604
Case 3:21-cv-00879-K    Document 29    Filed 12/15/21    Page 3 of 10    PageID 12594

proceeding will be subject to reversal. This could cause massive uncertainty and burden on

bankruptcy courts and the parties.  As the Fifth Circuit has explained:

> a determination that appellate jurisdiction arises only when the bankruptcy judge
> enters an order which ends the entire bankruptcy case, leaving nothing for the court
> to do but execute the judgment, would substantially frustrate the bankruptcy
> system. This is so particularly when, as here, one independent decision materially
> affects the rest of the bankruptcy proceedings.  Separate and discrete orders in many
> bankruptcy proceedings determine the extent of the bankruptcy estate and influence
> creditors to expend or not to expend effort to recover monies due them. The reversal
> of such an order would waste exorbitant amounts of time, money, and labor and
> would likely require parties to start the entire bankruptcy process anew. This
> potential waste of judicial and other resources has influenced this Court and other
> courts of appeals to view finality in bankruptcy proceedings in a more practical and
> less technical light.[7]

6.      Consequently, the question is whether the Bankruptcy Court's Recusal Order is a

"final determination of the rights of the parties to secure the relief they seek,' or a final disposition

'of a discrete dispute within the larger bankruptcy case.'"[8]  The United States Supreme Court has

held that bankruptcy court rulings are final if the motion was: (1) a distinct proceeding which the

bankruptcy court fully and unequivocally disposed of all issues and relief requested; and (2)

separate from the adversary claims-adjudication process.[9]

7.      Here, both elements are met.  **First**, Appellants moved to recuse. The Bankruptcy

Court denied Appellants' motion and the requested relief in its entirety.[10]  There is nothing left for

the Bankruptcy Court to do or to consider on the issue. Instead, there is a final disposition of the

recusal dispute. Stated differently, the Recusal Order is "an order which ends a discrete judicial

unit in the larger case concludes a bankruptcy proceeding and is a final judgment."[11]  **Second**, the

Motion to Recuse was separate from the adversary claims-adjudication process. As a result, the

---

[7] *In re England*, 975 F.2d 1168, 1171 (5th Cir. 1992).
[8] *In re Bartree*, 212 F.3d at 282.
[9] *Ritzen Grp., Inc.*, 140 S. Ct. at 586.
[10] R 31.
[11] *In re England*, 975 F.2d at 1172.

Appx. 02077

014639

Case 19-34054-sgj11    Doc 3596-10    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 10 Filed 06/05/25    Page 961 of 1017    PageID 15605
Case 3:21-cv-00879-K    Document 29    Filed 12/15/21    Page 4 of 10    PageID 12595

Recusal Order is final and appealable, and this Court has jurisdiction.

8.      Moreover, the Bankruptcy Court's reservation in the Recusal Order to supplement or amend its ruling does not change this conclusion.  Similar to *Ritzen*, the Recusal Order "ended the [motion to recuse adjudication] and left nothing more for the Bankruptcy Court to do in that proceeding",[12] and "conclusively resolved the movant's entitlement to the requested relief."[13] Importantly, allowing catch-all reservation language in an order that conclusively ended the recusal adjudication to prevent finality would unnecessarily delay the appeal of a fully adjudicated issue. This is especially true here, where it is undisputed that the Recusal Order fully resolved all issues presented and relief requested in the Motion to Recuse.

9.      In fact, the Recusal Order itself suggests an expectation that Appellants would immediately appeal it (…"*if a movant appeals a decision not to disqualify and the district court finds the record and documents submitted to be inadequate for a determination, it may remand and direct another judge to conduct an evidentiary hearing to enlarge the record*.").[14]   This indicates that the Bankruptcy Court intended for the Recusal Order to be a final order and, perhaps, included its catch-all reservation language in the event of remand (since the Bankruptcy Court did not conduct a hearing on the recusal motion).

10.     Moreover, there is a question as to the Bankruptcy Court's ability to amend the Recusal Order after this appeal was perfected, since "the filing of a notice of appeal is an event of jurisdictional significance –it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."[15]  In a similar bankruptcy

---

[12] *Ritzen Grp., Inc.*, 140 S. Ct. at 592.
[13] *Id.* at 591.
[14] R 37 (Recusal Order at p. 7).
[15] *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). As the Fifth Circuit has held, "[t]his rule applies with equal force to bankruptcy cases."  *In re Transtexas Gas Corp.*, 303 F.3d 571, 579 (5th Cir. 2002).

Appx 02078
014640

Case 19-34054-sgj11    Doc 3596-10    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 10  Filed 06/05/11    Page 962 of 1017    PageID 15606
Case 3:21-cv-00879-K    Document 29    Filed 12/15/21    Page 5 of 10    PageID 12596

appeal, this Court concluded that the Bankruptcy Court lacked jurisdiction to enter supplemental
findings of fact and conclusions of law after the appeal of the underlying order had been perfected,
holding: "[a]s a timely notice of appeal from the sanctions order had been filed, Judge Tillman was
powerless—after December 1, 1987—to supplement, amend, or modify his November 17
sanctions order with additional findings of fact or conclusions of law."[16] Thus, if the Bankruptcy
Court's reservation language had any application before this appeal, it no longer does, since the
Bankruptcy Court is now without jurisdiction to supplement or amend the Recusal Order.

11.    The cases cited in the December 10, 2021 Memorandum Order and Opinion do not
change this analysis. For example, *In re Global Marine Inc.* involved a dispute regarding whether
a debtor's counsel had a conflict of interest warranting a denial of interim compensation.[17] In that
case, the bankruptcy court denied the motion to disqualify the law firm because: (1) it found that,
at that time, there was not yet a conflict of interest (but reserved the right to review the issue should
a conflict appear to arise in the future); and (2) the interim orders on professional compensation
were subject to full review in the context of a final order awarding or denying compensation.[18]
The *Global Marine* court effectively denied the motion to disqualify without prejudice.

12.    Here, unlike in *Global Marine*, the Recusal Order is not an "interim" recusal ruling
that is subject to a "final recusal application." While the Bankruptcy Court reserved the right to
"supplement and amend" the Recusal Order, there are no adjustments of future awards,
amendments, or anything for the court to supplement with respect to any relief requested in the
Motion to Recuse.

13.    The case *In re Dorsey*, which was also cited in the Recusal Order, involved an

---

[16] *Midwest Props. No. Two v. Big Hill Inv. Co.*, 93 B.R. 357, 360 (N.D. Tex. 1988).
[17] *In re Global Marine, Inc.*, 108 B.R. 1007 (S.D. Tex. 1988).
[18] *See id*. at 1008.  *See also In re Teraforce Tech. Corp.*, 347 B.R. 838, 850 (Bankr. N.D. Tex. 2006) ("an interim fee
award is interlocutory in nature and can be reexamined and adjusted by the awarding court").

Appx. 02079

014641

Case 19-34054-sgj11    Doc 3596-10    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 10  Filed 07/06/25 511    Page 963 of 1017    PageID 15607
Case 3:21-cv-00879-K    Document 29    Filed 12/15/21    Page 6 of 10    PageID 12597

appeal from the district court to the Fifth Circuit Court of Appeals under 28 U.S.C. § 1291.[19]  In

that case, the bankruptcy court denied a motion to recuse.[20] The order denying the recusal was

appealed to the district court, which found error and remanded the case back to the bankruptcy

court.[21] On remand, the bankruptcy court again denied the motion to recuse, and another appeal

followed.[22] The district court dismissed the appeal as moot because, at that time, the judge at issue

no longer presided over the bankruptcy. However, the district court did not rule on a separate

appeal of a "gatekeeper" injunction, which remained pending in the district court.[23] The district

court's dismissal of the appeal on the motion to recuse was appealed to the Fifth Circuit. The Fifth

Circuit expressly considered the "final order" requirement under 28 U.S.C. § 1291 and *not* the

bankruptcy appellate statute of 28 U.S.C. § 158(a), which applies the more liberal and flexible

standard discussed above.[24]   Because the proceeding before the district court had not been

concluded, the Fifth Circuit found that it lacked jurisdiction over the recusal decision under section

1291.[25]

　　　14.　　In *Dorsey* or elsewhere, the Fifth Circuit has not addressed the question of the

finality of an order denying recusal under the bankruptcy appellate statutes, *i.e.*, 28 U.S.C. § 158(a)

(applicable to the district courts) or § 158(d) (applicable to the courts of appeal).  The general rule

for finality in the bankruptcy context should therefore control, especially considering the

---

[19] *In re Dorsey*, 489 Fed. Appx. 763 (5th Cir. 2012).

[20] *Id.* at 763-64 ("In a lengthy order from the bench, Judge Hunter denied the motion to disqualify without hearing any evidence. He then orally ruled on the § 727 objection and the injunction, leaving his previous decision on those issues unchanged. Friendly Finance appealed the decision on the injunction and § 727 objection and moved for rehearing of the motion to disqualify. After Judge Hunter denied rehearing, Friendly Finance appealed that decision as well. On appeal, Judge Robert G. James ruled that Judge Hunter erred in failing to give Friendly Finance an opportunity to present evidence to support its motion to disqualify. As a result, Judge James vacated Judge Hunter's order on disqualification and remanded the case for reconsideration.").

[21] *Id.*

[22] *Id.* at 764.

[23] *Id.*

[24] *Id.*

[25] *Id.*

Appx. 02089

014642

Case 19-34054-sgj11    Doc 3596-10    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 10 Page 08/2511    Page 964 of 1017    PageID 15608
Case 3:21-cv-00879-K    Document 29    Filed 12/15/21    Page 7 of 10    PageID 12598

potentially drastic consequences for all involved, including Debtor, if Appellants prevailed on appeal *after* the close of the bankruptcy case.[26] As the Supreme Court noted in *Ritzen*, the appropriate "judicial unit" in a bankruptcy case is not the overall case but the discrete issue.[27]

15.    Alternatively, if the Recusal Order is not a final order, then the collateral order doctrine should apply. Under that doctrine, appellate jurisdiction lies "when an order: (1) conclusively determined the disputed question; (2) resolved an important issue separate from the merits of the case; and (3) is effectively unreviewable on appeal from a final judgment."[28] The collateral order doctrine has been applied to bankruptcy appeals,[29] and the elements of this doctrine, which are similar to the elements governing the finality of bankruptcy orders, are met here. ***First***, the Recusal Order fully determined the disputed question of recusal. ***Second***, the issue of a court's impartiality is certainly an important one and is separate from the merits of the underlying disputes. ***Third***, if the Recusal Order cannot be reviewed until the bankruptcy case itself is final and closed, the appeal might be years in the future. At that time, Debtor and others are certain to argue the doctrine of equitable mootness bars appellate review, as the Debtor will have already implemented its plan, paid its creditors, etc. (the estate being fully administered being the standard for the entry of a final decree).[30]

16.    If the Court disagrees with the foregoing arguments and concludes that the Recusal

---

[26] *See In re England*, 975 F.2d at 1171; *see also Ritzen Grp., Inc.*, 140 S. Ct. at 591 ("Finally, Ritzen protests that the rule we adopt will encourage piecemeal appeals and unduly disrupt the efficiency of the bankruptcy process. As we see it, classifying as final all orders conclusively resolving stay-relief motions will avoid, rather than cause, 'delays and inefficiencies.' Immediate appeal, if successful, will permit creditors to establish their rights expeditiously outside the bankruptcy process, affecting the relief sought and awarded later in the bankruptcy case. The rule Ritzen urges 'would force creditors who lose stay-relief motions to fully litigate their claims in bankruptcy court and then, after the bankruptcy case is over, appeal and seek to redo the litigation all over again in the original court.'").

[27] *Ritzen Grp., Inc.*, 140 S. Ct. at 586.

[28] *In re Deepwater Horizon*, 793 F.3d 479, 484 (5th Cir. 2015).

[29] *See, e.g., In re Tullius*, 500 Fed. Appx. 286, 291-92 (5th Cir. 2012) (applying collateral order doctrine to bankruptcy order, but denying application of the doctrine under the facts of the appeal).

[30] *See* FED. R. BANKR. P. 3022.


014643

Case 19-34054-sgj11   Doc 3596-10   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 10 Filed 06/09/25   Page 965 of 1017   PageID 15609
Case 3:21-cv-00879-K   Document 29   Filed 12/15/21   Page 8 of 10   PageID 12599

Order is an interlocutory order, then the Court nevertheless can and should review the Recusal Order either: (1) pursuant to its original jurisdiction (by withdrawing the reference of the recusal motion *sua sponte*);[31] (2) by granting a permissive appeal; or (3) by treating the appeal as a petition for a writ of mandamus.[32] The factors normally applicable to a permissive withdraw of the reference include: "the goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditors' resources, and expediting the bankruptcy process."[33] These factors support a withdrawal of the reference here. Appellants are not forum shopping. Appellants are seeking this Court's review of the Recusal Order. In addition, a prompt review of the Recusal Order would conserve the parties' and the bankruptcy court's resources and expedite the bankruptcy process, as opposed to the inevitable future proceedings that would occur if Appellants were forced to wait to appeal until the conclusion of the bankruptcy case.

17.     With respect to a permissive appeal, this Court may treat Appellants' Notice of Appeal as a motion for leave to appeal.[34] Permissive appeals generally involve the following factors: "(1) a controlling issue of law must be involved; (2) the question must be one where there is substantial ground for difference of opinion; and (3) an immediate appeal must materially advance the ultimate termination of the litigation."[35] Here, while not be a controlling issue of law in the traditional sense, judicial disqualification is solely an issue of law.[36] And, when a recusal

---

[31] *Maddox v. Cockrell*, 2003 U.S. App. LEXIS 28958 *2 (5th Cir. 2003) (*sua sponte* vacating judgment and ordering recusal and reassignment).

[32] *In re City of Houston*, 745 F.2d 925, 927 (5th Cir. 1984) (The question of disqualification is reviewable on a petition for writ of mandamus, but a writ will not lie in the absence of exceptional circumstances.).

[33] *Holland America Ins. Co. v. Succession of Roy*, 777 F.2d 992, 999 (5th Cir. 1985).

[34] *See, e.g., Midwest Props. No. Two v. Big Hill Inv. Co.*, 93 B.R. 357, 359-60 (N.D. Tex. 1988) (treating notice of appeal of interlocutory order as a motion for permissive appeal and granting same). *See also* FED. R. BANKR. P. 8003(a)(2).

[35] *In re Ichinose*, 946 F.2d 1169, 1177 (5th Cir. 1991).

[36] *Njie v. Lubbock County, Tex.*, 999 F.Supp. 858, 860 (N.D. Tex. 1998)

Appx. 02082
014644

Case 19-34054-sgj11   Doc 3596-10   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 10   Filed Page 966 of 1017   Page 966 of 1017   PageID 15610
Case 3:21-cv-00879-K   Document 29   Filed 12/15/21   Page 9 of 10   PageID 12600

motion is based upon section 455 (as here), a failure to disqualify is reviewed by looking to whether it was an "abuse of sound judicial discretion."[37]   A litigant's right to an impartial judge is fundamental. Here, there appears to be grounds for difference of opinion, and an immediate appeal will advance the ultimate termination of this discrete dispute. Indeed, there is nothing else that can.

18.   With respect to a writ of mandamus, Appellants have presented the Court with a substantial case for recusal of the Bankruptcy Court.  At present, the Bankruptcy Court is presiding over a dozen or more proceedings in which Debtor and a post-confirmation trustee are seeking hundreds of millions of dollars from Appellants and entities related to Mr. Dondero.  As set forth above and in *Ritzen*, the inefficiencies that would result if Appellants prevailed on appeal *after* the close of the bankruptcy case create exceptional circumstances that warrant mandamus.[38]

19.   Issues and concerns of such magnitude, made in good faith and with an extensive evidentiary record, merit this Court's review through whatever process is appropriate and available—and there are several. This review is not only to protect Appellants but to protect the integrity of this Court, whose jurisdiction its adjunct exercises.

### CONCLUSION

FOR THE FOREGOING REASONS, Appellants respectfully request the Court determine that the Recusal Order is a final and appealable order; reverse the Bankruptcy Court's order denying the motion to recuse; order that the Bankruptcy Court is recused from the Adversary Proceedings and any future contested matters involving Appellants or any entity connected to Mr.

---

[37] *Id.* at 861.
[38] *See In re England*, 975 F.2d at 1171; *see also Ritzen Grp., Inc.*, 140 S. Ct. at 591 ("Finally, Ritzen protests that the rule we adopt will encourage piecemeal appeals and unduly disrupt the efficiency of the bankruptcy process. As we see it, classifying as final all orders conclusively resolving stay-relief motions will avoid, rather than cause, 'delays and inefficiencies.' Immediate appeal, if successful, will permit creditors to establish their rights expeditiously outside the bankruptcy process, affecting the relief sought and awarded later in the bankruptcy case. The rule Ritzen urges 'would force creditors who lose stay-relief motions to fully litigate their claims in bankruptcy court and then, after the bankruptcy case is over, appeal and seek to redo the litigation all over again in the original court.'").

Appx. 02095
0114645

Case 19-34054-sgj11    Doc 3596-10    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 10 Filed 06/06/25 11 Page 967 of 1017    PageID 15611
Case 3:21-cv-00879-K    Document 29    Filed 12/15/21    Page 10 of 10    PageID 12601

Dondero; and grant Appellants all other further relief, at law or equity, to which they are justly

entitled.

Dated: December 15, 2021                              Respectfully submitted,


                                                     By: */s/ Michael J. Lang*
                                                     Michael J. Lang
                                                     Texas State Bar No. 24036944
                                                     mlang@cwl.law
                                                     CRAWFORD, WISHNEW & LANG PLLC
                                                     1700 Pacific Ave, Suite 2390
                                                     Dallas, Texas 75201
                                                     Telephone: (214) 817-4500

                                                     *Counsel for Appellants*

### CERTIFICATE OF SERVICE

        The undersigned certifies that on December 15, 2021, a true and correct copy of the above

and foregoing document was served on all parties of record via the Court's e-filing system.


                                                     */s/ Michael J. Lang*
                                                     Michael J. Lang

Appx. 02084
0`14646

# EXHIBIT 11

Appx. 02085

0146647

Case 19-34054-sgj11   Doc 3596-11   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 11 Filed 06/03/25   Page 969 of 1017    PageID 15613
Case 3:21-cv-00879-K   Document 31   Filed 12/20/21   Page 1 of 12   PageID 12608

Case No. 3:21-cv-00879-K

---

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

---

### JAMES DONDERO, et al.,

### Appellants,

### v.

### HON. STACEY G. C. JERNIGAN,

### Appellee.

---

### On Appeal from the United States Bankruptcy Court
### Northern District of Texas, Dallas Division
### The Honorable Stacey G. C. Jernigan, United States Bankruptcy Court

### In re: Highland Capital Management, L.P.
### Case No. 19-34054

---

## DEBTOR'S RESPONSE TO APPELLANTS' BRIEF REGARDING THE COURT'S DECEMBER 10, 2021 MEMORANDUM OPINION AND ORDER

---

Appx. 02086

014648

Case 19-34054-sgj11 Doc 3596-11 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-18 Filed 08/05/13 Page 970 of 1017 PageID 15614
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 2 of 12 PageID 12609

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
       jmorris@pszjlaw.com
       gdemo@pszjlaw.com
       hwinograd@pszjlaw.com


-and-

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Appellee*

Appx. 02085
014649

Case 19-34054-sgj11    Doc 3596-11    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 11-10 iFiled 06/06/25513    Page 971 of 1017    PageID 15615
Case 3:21-cv-00879-K    Document 31    Filed 12/20/21    Page 3 of 12    PageID 12610

Highland Capital Management, L.P., the reorganized debtor (the "<u>Debtor</u>" or "<u>HCMLP</u>")[1]

in the above-captioned chapter 11 case and intervenor in this appeal (the "<u>Appeal</u>") from an order

of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the

"<u>Bankruptcy Court</u>"), by and through its undersigned counsel, hereby files this response to the

*Appellants' Response to the Court's December 10, 2021 Memorandum Opinion and Order* filed

on December 15, 2021 [Docket No. 29] (the "<u>Appellants' Brief</u>") pursuant to this Court's

*Memorandum Opinion and Order* [Docket No. 28] (the "<u>Memorandum Opinion</u>")[2] issued on

December 12, 2021.  In support of this response, the Debtor respectfully states as follows:

**A.      The Recusal Order Is Not an Appealable Interlocutory
         Order under Controlling Fifth Circuit Law**

1.      The Memorandum Opinion correctly sets forth the long-standing rule in the Fifth

Circuit that "the denial of a recusal motion is not an appealable interlocutory order or appealable

collateral order."   *Willis v. Kroger*, 2001 U.S. App LEXIS 31841 (5th Cir. June 13, 2001)

(unpublished); *United States v. Henthorn*, 1995 US. App LEXIS 42268 (5th Cir. Aug. 23, 1995)

(unpublished); *Nobby Lobby, Inc. v. Dallas*, 970 F.2d. 82, 86 n.3 (5th Cir. 1992) ("We decline to

review the court's denial of the City's motion to recuse, however, because the judge's opinion is

not an appealable interlocutory order under 28. U.S.C. § 1292(a)"); *Friendly Fin. Serv. - Eastgate

Inc. v Dorsey (In re Dorsey)*, 489 F. App'x 763 (5th Cir. Oct. 12, 2012) ("The denial of a motion

to disqualify is not an appealable final order under 28 U.S.C. § 1291, is not subject to the collateral

order doctrine, and is not an appealable interlocutory order under 28 U.S.C. § 1292(a)."); *Steering*

---

[1] On February 22, 2021, the Bankruptcy Court entered the *Order (i) Confirming the Fifth Amended Plan of
Reorganization (as Modified) and (ii) Granting Related Relief* [Bankr. Docket No. 1943], which confirmed the *Fifth
Amended Plan of Reorganization of Highland Capital Management, L.P.*, as modified (the "<u>Plan</u>").  The Plan became
effective on August 11, 2021.

[2] Unless otherwise noted, (i) capitalized terms used herein have the same meanings ascribed in the Memorandum
Opinion, and (ii) statutory references herein refer to title 28 of the United States Code.

Case 19-34054-sgj11 Doc 3596-11 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-11 Exhibit 11 Page 905 of 513 Page 972 of 1017 PageID 15616
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 4 of 12 PageID 12611

*Comm. v Mead Corp. (In re Corrugated Container Antitrust Litig.)*, 614 F.2d 958, 960-61 (5th Cir. 1980) ("Disqualification questions are fully reviewable on appeal from final judgment"); *In re Schweitzer*, 2007 Bankr. LEXIS 75033, *2 (E.D. La. Oct.9, 2007) ("the law is quite clear that an order denying disqualification of a judge is an interlocutory order for which no appeal lies prior to final judgment in the case"); *Moerbe v. U.S. Horticultural Supply, Inc. (In re Moerbe)*, 2005 U.S. Dist. LEXIS 32468, *8 (W.D. Tex. September 1, 2005) ("Because an 'order denying a motion to recuse or disqualify a judge is interlocutory, not final, and is not immediately appealable,' it would seem to follow that the order in this case granting the recusal but denying its permanency is likewise interlocutory") (quoting *In re Am. Ready Mix*, 14 F.3d 1497, 1499 (10th Cir. 1994)). Thus, the rule in the Fifth Circuit is crystal clear: denial of a recusal motion is not an appealable interlocutory order or an appealable collateral order.

2.     Appellants do not dispute these holdings. Rather, Appellants urge the Court to simply disregard the long line of Fifth Circuit authority holding that orders denying a judge's recusal are interlocutory orders. Instead, Appellants propose that the Court apply section 158(a) and then determine that the Recusal Order is a final order because the rule for bankruptcy finality should be "considered more liberally or flexibly."[3] This argument should be rejected. First, as noted above, the law in the Fifth Circuit is clear that appeals of orders denying recusal orders are *interlocutory orders*. Those decisions apply to the recusal of both bankruptcy and district court judges, as section 455(a) applies to "justices, judges, and magistrate judges."[4] Therefore, section

---

[3] Appellants' Brief ¶ 4.

[4] Section 455(a) does not distinguish between bankruptcy judges, district court judges, or appellate judges and broadly states that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality may be questioned." 28 U.S.C. § 455(a). Appellants acknowledge that section 455(a) applies to bankruptcy judges because they characterize the issues on appeal as "[w]hether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 USC. § 455 as untimely" and "[w]hether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 on the merits." *Appellants' Brief* [Docket 16] at 1 ("Appellants' Opening Brief").

Appx 02680
014651

Case 19-34054-sgj11   Doc 3596-11   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 11 Filed 06/06/25   Page 973 of 1017   PageID 15617
Case 3:21-cv-00879-K   Document 31   Filed 12/20/21   Page 5 of 12   PageID 12612

158(a)(1) (which grants district courts appellate jurisdiction over final judgments, orders, and decrees)[5] and section 1291(a) (which grants courts of appeals jurisdiction over final orders of district courts) are completely inapplicable to the issues raised in the Memorandum Opinion. Appellants' references to the finality of orders under either section 158(a)(1) or section 1291 are irrelevant because those statutes do not apply to interlocutory orders.  The only available avenues to appeal the interlocutory Recusal Order are if it:  (1) falls into any of the enumerated subsections of section 1292(a)[6] allowing for appellate jurisdiction over certain categories of interlocutory appeals (which it does not); (2) falls within the collateral order exception doctrine articulated by the Supreme Court[7] (which it does not, for the reasons discussed below); or (3) if this Court, in its discretion, finds that the appeal should be granted by leave only if Appellants can satisfy the applicable stringent standards for discretionary appeals (which they do not, as discussed below).

       3.      Appellants acknowledge that the Fifth Circuit has not addressed the finality of an order denying a recusal order under section 158(a), as they request this Court to do.[8]  Appellants primarily rely on two cases to support their attempted end-run around applicable Fifth Circuit law

---

[5] Section 158(a)(1) provides that "[t]he district courts of the United States shall have jurisdiction to hear appeals . . . from final judgements, orders and decrees . . . ." 28 U.S.C. § 158(a)(1).

[6] Section 1292(a) governs the court's jurisdiction of appeals from interlocutory orders and provides as follows:

    (a)  Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

        (1)  Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

        (2)  Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

        (3)  Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

28 U.S.C. § 1292(a).

[7] *See Cohen v. Beneficial Indus. Loan Corp.*, 69 S. Ct. 1221 (1949).

[8] Appellants' Brief ¶ 14.

Appx 02899
014652

Case 19-34054-sgj11   Doc 3596-11   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-10 Filed 04/07/25   Page 974 of 1017   PageID 15618
Case 3:21-cv-00879-K   Document 31   Filed 12/20/21   Page 6 of 12   PageID 12613

but neither even addresses the issue of recusal. The narrow issue in *Bartee v Tara Colony Homeowners Ass'n (In re Bartee)*[9] was an appeal of an order sustaining a creditor's objection to a chapter 13 bankruptcy plan.[10] The Fifth Circuit prefaced its analysis by noting "[s]ince this case *does not involve interlocutory orders*, injunctions, or any other orders specified in § 1292, we have jurisdiction over this case only to the extent that the judgments below are considered 'final' within the meaning of § 158 or § 1291."[11] Yet this Appeal *does* involve an interlocutory order, so *Bartee* is inapplicable (in addition to being factually inapposite because it addressed the finality of a chapter 13 plan).

4.      Appellants also heavily rely on *Ritzen Grp. v. Jackson Masonry, LLC*, 140 S. Ct. 582 (2020). However, *Ritzen* is also legally and factually inapposite to the instant Appeal. *Ritzen* addressed another narrow issue regarding the finality of a bankruptcy court's order denying a creditor's request for relief from the automatic stay.[12] The Supreme Court held that the adjudication of a motion for relief from stay "forms a discrete procedural unit within the embracive bankruptcy case. That unit yields a final, appealable order when the bankruptcy court *unreservedly* grants or denies relief."[13] The Supreme Court therefore relied on the bankruptcy court's order "conclusively denying that the motion is 'final' and that the "order ended the stay relief adjudication and left nothing more for the Bankruptcy Court to do in that proceeding."[14]

---

[9] 212 F.3d 277 (5th Cir. 2000).

[10] *Id.* at 280.

[11] *Id.* at 282 (emphasis added).

[12] *Ritzen*, 140 S. Ct. at 586 ("The precise issue the Court today decides: Does a creditor's motion for relief from the automatic stay initiate a distinct proceeding in a final appealable order when the bankruptcy court rules dispositively on the motion?")

[13] *Id.* (emphasis added).

[14] *Id.* at 592.

Appx. 02091
014653

Case 19-34054-sgj11    Doc 3596-11    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10xhibit 11Fil@dg@8/0813    Page 975 of 1017    PageID 15619
Case 3:21-cv-00879-K    Document 31    Filed 12/20/21    Page 7 of 12    PageID 12614

5.      *Ritzen* is not applicable to the case *sub judice* for several reasons.  **First**, even in the limited context of the appeal of a relief-from-stay order that *Ritzen* addressed, the Supreme Court held that the order had to "conclusively" deny the motion as "final" in order for it to be immediately appealable.  On this critical issue, the Supreme Court stated it did "not decide whether finality would attach to an order denying stay relief if the bankruptcy court enters it 'without prejudice' because further developments might change the stay calculus"[15]  This is precisely the issue identified by this Court in the Memorandum Opinion by which Judge Jernigan "reserve[d] the right to supplement or amend this ruling" in the Recusal Order.[16]  The Recusal Order is not final because, as noted in *Ritzen*, Judge Jernigan's potential future supplementation or amendment of the Recusal Order "might change the calculus" of the order.

6.      **Second**, the Supreme Court expressly limited its decision to the issue of whether the conclusive denial of a motion for relief from the automatic stay was a final order capable of immediate appeal.  *Ritzen* does not address the standard for the appeal of recusal orders, which are interlocutory orders in this Circuit.[17]

7.      **Third**, Appellants' attempt to equate a court's final adjudication of a relief-from-stay order with the denial of a recusal motion misstates the holding of *Ritzen*.  Unlike a relief-from-stay order, recusal of a judge is not a "procedural unit" separate from the remaining case.[18]  A relief-from-stay proceeding constitutes a discrete dispute within the larger context of the general bankruptcy case.  The basis for the *Ritzen* holding is that the adjudication of the stay-relief motion "determines whether a creditor can isolate its claim from those of other creditors and go it alone

---

[15] *Id.* n.4.

[16] ROA Vol.1 (Doc No. 9-1) at 42.

[17] *See supra* n.5.

[18] *Ritzen*, 140 S. Ct. at 591.

App. 02092
014654

Case 19-34054-sgj11   Doc 3596-11   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 11 Page 976 of 1017   Page 976 of 1017   PageID 15620
Case 3:21-cv-00879-K   Document 31   Filed 12/20/21   Page 8 of 12   PageID 12615

outside of bankruptcy."[19]   However, the Recusal Order is not a discrete issue within the larger case.  It affects the entire case as Appellants seek to recuse Judge Jernigan from presiding over all matters arising under the chapter 11 case, including the more than fifteen pending adversary proceedings that are currently before her.

8.     None of the cases cited by Appellants rebut the authorities cited in the Memorandum Opinion demonstrating that the Recusal Order is interlocutory.  Appellants' attempt to evade the Fifth Circuit law holding that orders denying recusal are interlocutory should be rejected.

**B.     Fifth Circuit Law Provides that Recusal Orders Do Not Fall Within the Collateral Order Doctrine**

9.     Appellants next argue that if the Recusal Order is not a final order (which it is not), the collateral-order doctrine should apply.[20]  But as noted above, the Fifth Circuit has already ruled that orders denying recusal motions are not appealable collateral orders.[21]   In addition, the bankruptcy court's ruling on a motion to recuse must "conclusively and clearly decide the existence of a conflict of interest" for the collateral-doctrine exception to apply.[22]  The Recusal Order does not conclusively and clearly decide this issue because Judge Jernigan reserved the right to supplement or amend the Recusal Order.  Finally, the collateral-order doctrine does not apply to this Appeal because the Recusal Order is not "effectively unreviewable on appeal."  As the Fifth Circuit explained, "[d]isqualification questions are *fully reviewable on appeal from final judgment*.

---

[19] *Id.* at 590.

[20] To fall within *Cohen's* collateral order doctrine, an "order must (1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) be effectively unreviewable on appeal from a final judgment."  *Henry v. Lake Charles Am. Press LLC*, 566 F.3d 164, 171 (5th Cir. 2009).

[21] *Willis*, 2021 U.S. App. LEXIS 31841, at *1 (citing *Nobby Lobby*, 970 F.2d at 85-86 & n.3); *Bank of Am. v. Weil Gotshal & Manges (In re Global Marine)*, 108 B.R. 1007, 1008 (S.D. Tex. 1988); *Dorsey*, 489 F. App'x 763 (denial of a motion to disqualify is not subject to the collateral-order doctrine).

[22] *Global Marine*, 108 B.R. at 1008.

Case 19-34054-sgj11   Doc 3596-11   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 11 Filed 06/25/13   Page 977 of 1017   PageID 15621
Case 3:21-cv-00879-K   Document 31   Filed 12/20/21   Page 9 of 12   PageID 12616

Precisely because disqualification issues are reviewable following entry of judgment, as a threshold matter the *Cohen* doctrine is unavailing."[23]  Therefore, the collateral-order doctrine is not applicable to the Appeal.

**C.     Appellants Never Filed a Motion for Leave to Appeal the Recusal Order as an Interlocutory Order and Have Not Satisfied the Standards for Discretionary Appeal**

10.     Appellants' final argument is that the Recusal Order may be immediately appealable as an interlocutory order through leave of this Court pursuant to section 1292(b).[24] Interlocutory appeals are, as noted by Judge Fish, "'sparingly granted' and reserved for 'exceptional cases.'"[25]  Appellants have never moved for an interlocutory appeal as required under Rule 8004(a) of the Federal Rules of Bankruptcy Procedure.  Even if the Court were willing to treat the notice of appeal as a motion for leave to appeal, the standards governing interlocutory appeals cited in Appellants' Brief are not satisfied in this case.  First, there is no "controlling issue of law involved" here.  Appellants want Judge Jernigan recused because they allege her to have an "undeniable animus against Mr. Dondero and the resulting prejudicial effect that animus has on the due process rights of Mr. Dondero, the Trusts and the Affected Entities."[26]  This Appeal therefore does not involve any controlling issue of law.  Second, there is no substantial ground for difference of opinion in this Appeal.  A substantial ground for difference of opinion exists when "'a trial court rules in manner which appears contrary to the rulings of all Court of Appeals which

---

[23] *Corrugated Container*, 614 F.2d at 960-61 (emphasis added; citations omitted).

[24] The determination of whether to grant leave to appeal an interlocutory order from a bankruptcy court is the standard used under section 1292(b).  *In re Bernardi & Assocs. v. I. Kunik Co. (In re Delta Produce)*, 2013 U.S. Dist. LEXIS 91579 (W.D. Tex. June 28, 2013).  The standard consists of the following elements: (1) a controlling issue of law must be involved; (2) the question must be one where there is substantial ground for difference of opinion; and (3) an immediate appeal must materially advance the ultimate termination of litigation.  *Id*. at \*\*5-6.

[25] *Balestri v. Hunton & Williams LLP (In re Hallwood Energy)*, 2013 U.S. Dist. LEXIS 18165 at \*6 (N.D. Tex. Feb. 11, 2013).

[26] *See* Appellants' Opening Brief ¶ 31.

**014656**

Case 19-34054-sgj11   Doc 3596-11   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 11   Filed 06/26   Page 978 of 1017   PageID 15622
Case 3:21-cv-00879-K   Document 31   Filed 12/20/21   Page 10 of 12   PageID 12617

have reached the issue.'"[27] There is nothing in the record of this Appeal that demonstrates that the Recusal Order is contrary to the rulings of the Fifth Circuit. Rather, the Recusal Order extensively cites controlling authorities in the Fifth Circuit governing a motion to recuse.[28] As to the third factor, immediate appeal will not advance the ultimate termination of litigation. Appellants, along with their related entities, have filed several civil actions and appeals of orders of the Bankruptcy Court, including an appeal of the order confirming the Debtor's Plan which is currently pending before the Fifth Circuit. The resolution of this Appeal will (unfortunately) not advance the termination of the morass of litigation that has enveloped the Debtor's chapter 11 case, which litigation addresses many substantive issues unrelated to Appellants' request to recuse Judge Jernigan from the bankruptcy case.[29]

## Conclusion

For the reasons set forth herein and in the Memorandum Opinion, Appellants have not established that the Court has appellate jurisdiction to directly review the Recusal Order because it is an interlocutory order, the collateral doctrine exception is not applicable to this case, and Appellants cannot satisfy the standards for a discretionary appeal to the extent that the Court is even willing to consider that relief.

---

[27] *Bernardi*, 2013 U.S. Dist. LEXIS 91579 at *10 (quoting *In re Cent. Grain Co-op*, 489 B.R. 403, 412 (Bankr. M.D. La. 2013)).

[28] ROA Vol.1 (Doc No. 9-1) at 5-10 (Judge Jernigan's reliance on among other cases, *United States v. Jordan*, 49 F.3d 152 (5th Cir. 1995); *Davis v. Board of School Comm'rs*, 517 F.2d 1044 (5th Cir. 1975); and *Chitmacha Tribe of La. v. Harry L. Laws Co*, 690 F.2d 1157 (5th Cir. 1982), with respect to standards governing recusal).

[29] Appellants also request that the Court treat the Appeal as a petition for a writ of mandamus. The Memorandum Opinion required briefing "on the discrete issue of the Court's appellate jurisdiction." The Debtor submits this request is not appropriate under the terms of the Memorandum Opinion, should be denied, and in any event, is not appropriate for the reasons articulated herein. *See In re City of Houst*on, 745 F.2d 925, 927 (5th Cir. 1984) (petition for writ of mandamus will not lie in the absence of extraordinary circumstances with respect to appeal of denial of recusal motion); *Corrugated Container Antitrust Litig.*, 614 F.2d at 961 ("In addition to their claim that the decision of the district court is immediately appealable . . . defendants 'out of an abundance of caution' also petition for a writ of mandamus. The contention does not merit extended discussion. We refuse issuance of the writ").

Appx. 02895
014637

Case 19-34054-sgj11    Doc 3596-11    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 11 Filed 06/26/25    Page 979 of 1017    PageID 15623
Case 3:21-cv-00879-K    Document 31    Filed 12/20/21    Page 11 of 12    PageID 12618

Dated:  December 20, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Appx 02896
014658

Case 19-34054-sgj11   Doc 3596-11   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S     Document 31-11 Exhibit 11 Filed 06/25 Page 13 Page 980 of 1017     PageID 15624
Case 3:21-cv-00879-K   Document 31   Filed 12/20/21   Page 12 of 12   PageID 12619

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that, on December 20, 2021, a true and correct copy of the foregoing response was served electronically upon all parties registered to receive electronic notice in this case via the Court's CM/ECF system.

<div align="right">

*/s/ Zachery Z. Annable*
Zachery Z. Annable

</div>

Appx. 02897

014639

# EXHIBIT 12

Appx 02998
014660

Case 19-34054-sgj11   Doc 3596-12   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-18   Filed 08/08/25   Page 982 of 1017    PageID 15626
Case 3:21-cv-00879-K   Document 39   Filed 02/09/22   Page 1 of 14   PageID 12647

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In Re: HIGHLAND CAPITAL MANAGEMENT, L.P., Debtor | § § § § | |
| JAMES DONDERO, *et al.*, Appellants, v. HON. STACEY G. C. JERNIGAN, Appellee. | § § § § § § § § § § | Civil Action No. 3:21-CV-0879-K |

## MEMORANDUM OPINION AND ORDER

Appellants James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC. f/k/a HCRE Partners, LLC's (collectively "Appellants") appeal the Bankruptcy Court's Order Denying [Appellants'] Motion to Recuse Pursuant to 28 U.S.C. § 455 which was entered March 23, 2021. *See generally* Am. Notice of Appeal (Doc. No. 1-1); Appellants' Br. (Doc. No. 16). Because the Court lacks jurisdiction over this appeal, the Court hereby **dismisses** this appeal.

ORDER – PAGE 1

014661
Appx. 02090

Case 19-34054-sgj11    Doc 3596-12    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10    Exhibit 12    Page 08/05/15    Page 983 of 1017    PageID 15627
Case 3:21-cv-00879-K    Document 39    Filed 02/09/22    Page 2 of 14    PageID 12648

## I.    Relevant Background

Appellants filed a Motion to Recuse under § 455 with the Bankruptcy Court, asking United States Bankruptcy Judge Stacey G. C. Jernigan (the "Bankruptcy Judge") to recuse herself from presiding over the bankruptcy proceeding of Debtor Highland Capital Management, L.P.  In an 11-page Order Denying Motion to Recuse Pursuant to 28 U.S.C. § 455 ("Recusal Order"), the Bankruptcy Judge denied the Motion while also reserving the right to supplement or amend the ruling.  *See* Am. Notice of Appeal (Doc. No. 1-1) at 5-15.  The Bankruptcy Court entered the Recusal Order on March 23, 2021.  *See id.*; Appellants' Br. (Doc. No. 16).  On April 18, 2021, the Clerk of the Bankruptcy Court transmitted the Notice of Appeal filed by Appellants on April 6, 2021.  *See generally* Doc. No. 1.  It is the Recusal Order that forms the basis of this appeal.  *See id.*  Appellants designated the Bankruptcy Judge as "Appellee".  *See id.*

Before appellate briefing began, Debtor Highland Capital Management, L.P. moved the Court for leave to intervene in this appeal.  *See* Mot. to Intervene (Doc. No. 2).  Debtor Highland Capital Management, L.P. argued that it is the real party-in-interest, not the Bankruptcy Judge.  Mot. to Intervene at 3.  After the Motion to Intervene was fully briefed and ripe, the Court granted the Motion and allowed Debtor Highland Capital Management, L.P. ("Debtor/Intervenor") to file a responsive brief as accorded to an appellee under the bankruptcy rules.  *See generally* Order (Doc. No. 10).

ORDER – PAGE 2

014662

Case 19-34054-sgj11    Doc 3596-12    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10 12 FilePage 046 of 515    Page 984 of 1017    PageID 15628
Case 3:21-cv-00879-K    Document 39    Filed 02/09/22    Page 3 of 14    PageID 12649

Appellants then filed their Appellants' Brief identifying and arguing two issues on appeal:  (1) whether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 as untimely; and (2) whether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 on the merits.    Appellants' Br. at 1. Intervenor/Debtor filed an Appellee's Brief in response (Doc. No. 20), and Appellants filed their Reply Brief (Doc. No. 23).  The Bankruptcy Record on Appeal does not reflect that a final judgment has been entered by the Bankruptcy Court in this matter.

Upon an initial review of the appellate briefing, the Court *sua sponte* questioned its jurisdiction over this appeal.  *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990); *see also Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) ("[S]ubject-matter delineations must be policed by the courts on their own initiative even at the highest level.").  The Court issued an Order (Doc. No. 28) directing the parties to file briefs, respectively, addressing this Court's jurisdiction over an appeal of the Bankruptcy Judge's order denying a motion to recuse when final judgment has not yet been entered.  The parties timely filed their respective jurisdictional briefs, and the Court has carefully considered the arguments, the applicable and binding law, and relevant portions of the record.  The Court turns now to this threshold jurisdictional issue.

ORDER – PAGE 3

Case 19-34054-sgj11    Doc 3596-12    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 12iled Page 05/0515    Page 985 of 1017    PageID 15629
Case 3:21-cv-00879-K    Document 39    Filed 02/09/22    Page 4 of 14    PageID 12650

## II.    Applicable Law

Section 455 of Chapter 28 of the United States Code provides, in relevant part, that:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
> (b) He shall also disqualify himself in the following circumstances:
>     (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings.

28 U.S.C. § 455(a) & (b)(1).  Bankruptcy Rule 5004(a) provides that "A bankruptcy judge shall be governed by 28 U.S.C. § 455, and disqualified from presiding over the proceeding or contested matter in which the disqualifying circumstances arises or, if appropriate, shall be disqualified from presiding over the case."  FED. R. BANKR. P. 5004(a).

District courts have jurisdiction over appeals from the following entered by a bankruptcy judge:

> (1) from final judgments, orders, and decrees;
> (2) from interlocutory orders and decrees under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and
> (3) with leave of the court , from other interlocutory orders and decrees.

28 U.S.C. § 158(a).

ORDER – PAGE 4

Appx 02102
014664

Case 19-34054-sgj11 Doc 3596-12 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-10 Filed 06/26/25 Page 986 of 1017 PageID 15630
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 5 of 14 PageID 12651

### III. Analysis

### A. Recusal Order is an Interlocutory Order and Not Immediately Appealable as a Matter of Right

It is well-established law in the Fifth Circuit that a court's order denying a recusal motion is not a final order, is not an appealable interlocutory order, and is not an appealable collateral order, therefore it is reviewable on appeal only from final judgment. *Willis v. Kroger*, 263 F.3d 163, 163 (5th Cir. 2001); *United States v. Henthorn*, 68 F.3d 465, 465 (5th Cir. 1995); *Chitimacha Tribe of La. v. Harry L. Laws Co., Inc.*, 690 F.2d 1157, 1164 n.3 (5th Cir. 1982); *In re Corrugated Container Antitrust Litig.*, 614 F.2d 958, 960 (5th Cir. 1980); *Martin v. Driskell*, 2021 WL 4784756, at *1 (5th Cir. July 12, 2021); *In re Gordon*, 2019 WL 11816606, at *1 (5th Cir. Apr. 10, 2019); *Stancu v. Hyatt Corp./Hyatt Regency Dallas*, Civ. Action No. 3:18-CV-1737-E-BN, 2020 WL 853859, at *2 (N.D. Tex. Jan. 30, 2020), *adopted by* 2020 WL 833645 (Feb. 20, 2020)(Brown, J.); *Prather v. Dudley*, Civ. Action No. 9:06cv100, 2006 WL 3317124, at *2 (E.D. Tex. Oct. 18, 2006); *Hardy v. Fed. Express Corp.*, No. Civ.A 97-1620, 1998 WL 104686, at *1 (E.D. La. Mar. 6, 1998). Moreover, both the Fifth Circuit and district courts in this Circuit have applied this very clear, decades-old law in appeals taken from a bankruptcy court's order denying a motion to recuse. *In re Dorsey*, 489 F. App'x 763, 764 (5th Cir. 2012); *In re Schweitzer*, Civ. Action No. 07-4036, 2007 WL

ORDER – PAGE 5

Appx 02103
014665

Case 19-34054-sgj11    Doc 3596-12    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 12 Filed 06/06/25    Page 987 of 1017    PageID 15631
Case 3:21-cv-00879-K    Document 39    Filed 02/09/22    Page 6 of 14    PageID 12652

2965045, at *1 (E.D. La. Oct. 9, 2007); *In re Moerbe*, No. 03-57260-LMC/04-5043-

LMC/SA-04-CA-801-FB, 2005 WL 3337634, at *3 (W.D. Tex. Sept. 1, 2005).

In this case, the Bankruptcy Record on Appeal does not establish that a final

judgment has been entered.  The law in the Fifth Circuit specifies that a court's order

on a motion to disqualify the judge "is not an appealable final order" and "a party 'must

await final judgment to appeal [a] judge's refusal to recuse.'"  *In re Dorsey*, 489 F. App'x

at 764 (holding court was without jurisdiction to review bankruptcy court's decision

on motion to recuse because, although final judgment had been entered, the appeal of

it had not yet been resolved).  Appellants attempt to get around this law by arguing

that the courts have considered the "finality" of an order on a motion to recuse only

under 28 U.S.C. § 1291 (which applies to jurisdiction of courts of appeals over appeals

from final orders of district courts) and not § 158(a) (which applies to jurisdiction of

district court over appeals from bankruptcy court orders).  Appellants contend this is

crucial because the bankruptcy appellate statute, § 158(a), applies here and that statute

contemplates the more liberal and flexible "finality" standard accorded to bankruptcy

courts, rather than the finality standard under § 1291 pertaining to district court

orders.  Resp. Br. (Doc. No. 31) at 2-7.

The Court rejects Appellants' suggestion that the Court should or even can

construe this Recusal Order under a different "finality" standard mere because the

Appx 02104
014666

Case 19-34054-sgj11   Doc 3596-12   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-10   Filed 06/06/25   Page 988 of 1017   PageID 15632
Case 3:21-cv-00879-K   Document 39   Filed 02/09/22   Page 7 of 14   PageID 12653

Bankruptcy Court entered it.  There is nothing in the Court's own research, nor anything provided by Appellants, to suggest that the Court should ignore this binding precedent and apply a more liberal and flexible "finality" standard to this appeal of the Recusal Order merely because it is an order of the Bankruptcy Court.  Indeed, courts in this Circuit have not hesitated in applying this well-settled law to an appeal of a bankruptcy court order on a motion to recuse.  *See, e.g., In re Schweitzer*, 2007 WL 2965045, at *1 (court found jurisdiction lacking over appeal from bankruptcy court's order denying motion to recuse because "the law is quite clear that an order denying a motion to disqualify a judge is an interlocutory order from which no appeal lies prior to final judgment in the case."); *In re Moerbe*, 2005 WL 3337634, at *3 ("Because an order denying a motion to recuse or disqualify a judge is interlocutory, not final, and is not immediately appealable, it would seem to follow that the [the bankruptcy court's] order in this case granting recusal but denying its permanency is likewise interlocutory.").  The Court finds no justification for straying from the well-settled law in the Fifth Circuit and finds that the Bankruptcy Court's Recusal Order is not a final appealable order.

The Court also finds that the Recusal Order is not subject to the collateral order doctrine and it is not an interlocutory order that is not immediately appealable. Appellants ask the Court to treat the Recusal Order as subject to the collateral order

ORDER – PAGE 7

Appx 02185
014667

Case 19-34054-sgj11 Doc 3596-12 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-10 Filed 09/08/25 Page 989 of 1017 PageID 15633
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 8 of 14 PageID 12654

doctrine. The Court rejects this request as there is no legal basis for doing so. Appellants again ignore very clear Fifth Circuit law that a court order denying a recusal motion is not an appealable collateral order. *Willis*, 263 F.3d at 163 (citing *Nobby Lobby*, 970 F.2d at 85-86 & n.3); *Henthorn*, 68 F.3d at 465; *Chitimacha Tribe of La.*, 690 F.2d at 1164 n.3; *In re Corrugated Container Antitrust Litig.*, 614 F.2d at 960; *In re Dorsey*, 489 F. App'x at 764; *Martin*, 2021 WL 4784756, at *1; *In re Gordon*, 2019 WL 11816606, at *1. There is no justification to stray from this well-settled law. Moreover, the Recusal Order is not an appealable interlocutory order under § 1292(a). *Nobby Lobby*, 970 F.2d at 85-86 & n.3; *In re Dorsey*, 489 F. App'x at 764.

For these reasons, the Court finds, as it must, that the Recusal Order is an interlocutory order from which no appeal lies prior to the Bankruptcy Court entering a final judgment. *See Willis*, 263 F.3d at 163; *Nobby Lobby*, 970 F.2d at 85-86 & n.3; *In re Corrugated Container Antitrust Litig.*, 614 F.2d at 960. Therefore, the Court lacks jurisdiction over this appeal.

## B. Leave to Bring an Interlocutory Appeal

Appellants' last hope for their appeal is securing leave of this Court to bring an interlocutory appeal of the Recusal Order. 28 U.S.C. § 158(a)(3) (district courts may hear appeals "with leave of the court, from other interlocutory orders" of the bankruptcy court). Appellants were required to file a motion for leave to appeal

Case 19-34054-sgj11    Doc 3596-12    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 12 Filed 06/06/25    Page 990 of 1017    PageID 15634
Case 3:21-cv-00879-K    Document 39    Filed 02/09/22    Page 9 of 14    PageID 12655

contemporaneously with their notice of appeal. FED. R. BANKR. P. 8004(a).   The

motion for leave to appeal must also include certain contents.   *Id.* 8004(b).   Despite

these unambiguous requirements of the Bankruptcy Rules, Appellants did not comply

with them.   Their failure, however, does not foreclose the appeal entirely because

Bankruptcy Rule 8004(d) permits the Court to "treat the notice of appeal as a motion

for leave and either grant it or deny it."   FED. R. BANKR. P. 8004(c).   In their

jurisdictional brief, Appellants ask the Court to treat their Notice of Appeal as a motion

for leave to appeal should the Court find the Recusal Order is an interlocutory order.

Appellants' Resp. (Doc. No. 29) at 8.   The Court turns now to this analysis.

Section 158(a)(3) does not articulate the standard a district court must use in

deciding whether to grant leave in its discretion, but "[c]ourts in the Fifth Circuit . . .

have applied 28 U.S.C. § 1292(b), the standard governing interlocutory appeals

generally."   *In re Hallwood Energy, L.P.*, Civ. Action No. 3:12-CV-1902-G, 2013 WL

524418, at *2 (N.D. Tex. Feb. 11, 2013)(Fish, SJ) (citing *In re Ichinose*, 946 F.2d 1169,

1177 (5th Cir. 1991); *Panda Energy Int'l, Inc. v. Factory Mut. Ins.*, 2011 WL 610016, at

*3 (N.D. Tex. Feb. 14, 2011)(Kinkeade, J.)); *accord Rivas v. Weishart*, 2019 WL

5579726, at *2 (E.D. Tex. Oct. 28, 2019); *Celadon Trucking Servs., Inc. v. Moser*, 2019

WL 4226854, at *2 (E.D. Tex. Sept. 4, 2019).   There are three elements of the

§ 1292(b) standard: "(1) a controlling issue of law must be involved; (2) the question

ORDER – PAGE 9

Case 19-34054-sgj11   Doc 3596-12   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 12 Filed 06/06/25   Page 991 of 1017   PageID 15635
Case 3:21-cv-00879-K   Document 39   Filed 02/09/22   Page 10 of 14   PageID 12656

must be one where there is substantial ground for difference of opinion; and (3) an immediate appeal must materially advance the ultimate termination of the litigation." *In re Ichinose*, 946 F.2d at 1177. An appeal of an interlocutory order is appropriate only where all three elements are satisfied. *See In re Genter*, Civ. Action No. 3:19-CV-1951-E, 2020 WL 3129637, at *2 (N.D. Tex. June 12, 2020)(Brown, J.) (citing *Arparicio v. Swan Lake*, 643 F.2d 1109, 1110 n.2 (5th Cir. 1981)). "The Fifth Circuit disfavors interlocutory appeals and leave to appeal is sparingly granted." *Id.* (internal citations omitted); *In re Hallwood Energy,* 2013 WL 524418, at *2 ("[I]nterlocutory appeals are 'sparingly granted' and reserved for 'exceptional' cases.") (internal citations omitted). The decision whether to grant an interlocutory appeal is firmly within the district court's discretion. *Panda Energy Int'l*, 2011 WL 610016, at *3.

In this case, there is no controlling question of law with substantial grounds for disagreement for which resolution would materially advance the end of the bankruptcy litigation. It is well-settled that a recusal motion under § 455 is left to the sound discretion of the judge. *Chitimacha Tribe of La. v. Harry L. Laws Co.*, 690 F.2d 1157, 1166 (5th Cir. 1982); *see In re Pendergraft*, 745 F. App'x 517, 520 (5th Cir. 2018) (citing *Trevino v. Johnson*, 168 F.3d 173, 178 (5th Cir. 1999)). "[C]ontrolling issue of law is one that has 'the potential for substantially accelerating the disposition of the litigation' and does not concern 'matters that are entrusted to the discretion of the bankruptcy

Appx 02408
014670

Case 19-34054-sgj11   Doc 3596-12   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 12 Filed 06/26/25   Page 992 of 1017   PageID 15636
Case 3:21-cv-00879-K   Document 39   Filed 02/09/22   Page 11 of 14   PageID 12657

court.'" *In re Moerbe*, 2005 WL 3337634, at *4 (W.D. Tex. Sept. 1, 2005) (quoting *In re Aquatic Dev. Group, Inc.*, 196 B.R. 666, 669 (S.D.N.Y. 1996)).  The Recusal Order was an exercise of the Bankruptcy Judge's discretion, so there is no controlling issue of law presented.  *Cf. In re Tullius*, 2011 WL 5006673, at *3 (W.D. Tex. Oct. 20, 2011).  Appellants also cannot satisfy the second factor because the Court cannot find there exists substantial ground for difference of opinion as to the Recusal Motion.

> [C]ourts have found substantial ground for difference of opinion where a trial court rules in a manner which appears contrary to the rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the question and the Court of Appeals of the circuit has not yet spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented.

*Ryan v. Flowserve Corp.*, 444 F.Supp.2d 718, 723-24 (N.D. Tex. 2006)(Boyle, J.) (internal citation omitted).  The Recusal Order does not fall within any of those categories.  Simply because Appellants believe the Bankruptcy Court ruled incorrectly does not demonstrate substantial ground for disagreement.  *Id.* at 724.  Finally, the third element eludes Appellants as well.  An interlocutory appeal of the Recusal Order will in no way materially advance the ultimate end to this bankruptcy matter.

The Fifth Circuit strongly disfavors interlocutory appeals and, accordingly, they are rarely granted and reserved for "exceptional cases".  *See, e.g., In re Genter*, 2020 WL 3129637, at *2.  Appellants failed to satisfy any of the three § 1292(b) criteria.  *Id.*

ORDER – PAGE 11

Case 19-34054-sgj11   Doc 3596-12   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 12   Filed 06/26/15   Page 993 of 1017   PageID 15637
Case 3:21-cv-00879-K   Document 39   Filed 02/09/22   Page 12 of 14   PageID 12658

Therefore, in its discretion, the Court **denies** Appellants leave to take an interlocutory appeal of the Bankruptcy Court's Recusal Order.

Finally, the Court turns to the remaining arguments Appellants assert. First, the Court declines to *sua sponte* withdraw the reference of Appellants' motion for the bankruptcy judge to recuse herself. The case Appellants cite in support of this suggestion is inapposite here. In the unpublished Fifth Circuit opinion, *Maddox v. Cockrell*, 2003 U.S. App. LEXIS 28958 (5th Cir. 2003), the appellant sought leave to appeal the dismissal of his 28 U.S.C. § 2254 petition. *See generally Maddox v. Cockrell*, 2003 U.S. App. LEXIS 28958. The magistrate judge recommended dismissal the § 2254 petition and the district judge adopted the recommendation and dismissed the petition. *See id.* at *1-2. The Fifth Circuit did not address the merits of the dismissal, but, instead, *sua sponte* vacated the district court's final judgment and remanded with instructions to assign the case to a different district judge. *Id.* at *2. The Fifth Circuit's reasoning—the district judge was the spouse of the magistrate judge and the *pro se* prisoner likely did not know nor could he have reasonably known this. *Id.* Unlike the unusual and exceptional facts in *Maddox*, the Court does not find this appeal to justify *sua sponte* withdrawing the reference of and ruling on Appellants' motion to recuse.

The Court also finds no justification for treating Appellants' notice of appeal as a petition for writ of mandamus, which Appellants also request. A question of recusal

ORDER – PAGE 12

014672

Case 19-34054-sgj11    Doc 3596-12    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 12 Filed 06/26/15    Page 994 of 1017    PageID 15638
Case 3:21-cv-00879-K    Document 39    Filed 02/09/22    Page 13 of 14    PageID 12659

is reviewable on a petition for writ of mandamus. *United States v. Gregory*, 656 F.2d 1132, 1136 (5th Cir. 1981); *In re Placid Oil Co.*, 802 F.2d 783, 786 (5th Cir. 1986); *In re Cameron Int'l Corp.*, 393 F. App'x 133, 134-35 (5th Cir. 2010). "However, the writ will not lie in the absence of exceptional circumstances, and the party seeking the writ has the burden of proving a clear and indisputable right to it." *In re Placid Oil Co.*, 802 F.2d at 786 (citing *Gregory*, 656 F.2d at 1136); *accord In re Cameron Int'l Corp.*, 393 F. App'x at 134-35. Appellants fail to make the required showing. The Court refuses to construe Appellants' appeal as a petition for writ of mandamus.

C.    **Conclusion**

The well-established precedent in the Fifth Circuit is that no jurisdiction lies over an appeal of a motion to recuse until final judgment has been entered. Appellants make arguments about potential inefficiency and wasted resources if they must wait to appeal the Recusal Order until the final judgment has been entered. But these arguments are not novel. The Court is certain those same arguments have been advanced in other courts considering this same issue and those courts have rejected them, as this Court does here. Appellants would have this Court carve out an exception to the well-settled law for them without any justifiable basis other than because they think the Bankruptcy Judge was wrong. Appellants must await final judgment, or other

ORDER – PAGE 13

Case 19-34054-sgj11    Doc 3596-12    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 12 Filed 06/26/25    Page 995 of 1017    PageID 15639
Case 3:21-cv-00879-K    Document 39    Filed 02/09/22    Page 14 of 14    PageID 12660

final resolution, of their bankruptcy proceeding in order to appeal the Recusal Order.

This Court has no jurisdiction to hear this appeal.

## IV.    Conclusion

The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292(a) and the Court is **without jurisdiction** over this appeal of the Bankruptcy Court's Recusal Order.  The Court further **denies** Appellants leave to appeal the Recusal Order under § 1292(b), **denies** Appellants' request to withdraw the reference of their motion to recuse, and **denies** Appellants' request to construe their appeal as a petition for writ of mandamus.  Accordingly, the Court **dismisses** this appeal for lack of jurisdiction.

**SO ORDERED.**

Signed February 9th, 2022.

*Ed Kinkeade*

ED KINKEADE
UNITED STATES DISTRICT JUDGE

ORDER – PAGE 14

014674

App. 02112

# EXHIBIT 13

Appx 02413
014675

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND,

                    Claimant,

v.                                          Case No. 01-16-0002-6927

HIGHLAND CAPITAL MANAGEMENT, L.P.,

                    Respondent.

**PARTIAL FINAL AWARD**

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with Section 9.03 of the Joint Plan of Distribution, and the Scheme of Arrangement, both entered into between the above-named parties and adopted in July 2011, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby, AWARD, as follows:

I.    Introduction
      A.    The Parties
            1.    Claimant is a Committee of Redeemers in the Highland Crusader Fund (the "Committee"). Pursuant to the Joint Plan of Distribution of the Crusader Funds ("the Plan") and the Scheme of Arrangement between Highland Crusader Fund and its Scheme Creditors ("the Scheme")1, HC300, the Committee was elected from among the investors in the Crusader Fund to oversee the management of the Crusader Fund by Highland Capital Management, L.P. (Highland Capital). The Plan and the Scheme are the governing documents which contain the arbitration agreements giving rise to this arbitration. The Committee is represented by Terri Mascherin, Andrew Vail, and Shaun Van Horn of Jenner & Block LLP.

            2.    Respondent, or Highland, is an investment manager and, until July 2016, served as such for the Highland Crusader Funds ("Crusader Funds" or the "Funds") that were formed between 2000 and 2002. The Funds consisted of one "Onshore Fund" and two "Offshore Funds," and the capital that was raised through these entities was pooled into a "Master

---

1 The Plan was implemented with respect to Highland Crusader Offshore Funds by a "Scheme of Arrangement" ("Scheme") sanctioned by the Supreme Court of Bermuda. The Scheme incorporates the Plan and, unless otherwise noted, the Plan and Scheme contain effectively identical provisions. Unless the context requires otherwise, we will refer primarily to the Plan.

Appx. 02114
014676

Fund." The capital was invested primarily in "undervalued senior secured loans and other securities of financially troubled firms" among other asset types. HC-17, at HC-117.0010[2]. Highland is represented by Gary Cruciani, Travis DeArmand, Michael Fritz of McKool Smith, LLP.

B.    The Arbitrators
1.    The three arbitrators, whose appointment was formalized by the International Center for Dispute Resolution ("ICDR"), a division of the American Arbitration Association ("AAA"), were David M. Brodsky, Chair, John S. Martin, Jr., and Michael D. Young.

II.    Background of the Dispute
A.    The 2008 Financial Crisis
1.    From 2000 until 2007, the Crusader Funds had double-digit annual returns, but in September and October 2008, as the financial markets in the United States began to fail, Highland Capital was flooded with redemption requests from Crusader Fund investors, as the Crusader Funds' assets lost significant value.

2.    On October 15, 2008, Highland Capital placed the Crusader Funds in wind-down, "compulsorily redeeming" Crusader Fund's limited partnership interests. Highland Capital also declared that it would liquidate the remaining assets and distribute the proceeds to investors. However, disputes over the appropriate distribution of the assets arose between those investors who had voluntarily redeemed their interests earlier in 2008 but had not yet been paid their redemption amount ("Prior Redeemers") and those who were compulsorily redeemed in October 2008 ("Compulsory Redeemers") (collectively, the "Redeemers").

B.    The Plan and Scheme
1.    At about the same time, an investor raised allegations of misconduct by Highland Capital and filed a wind-up petition in the Supreme Court of Bermuda. In 2011, after several years of negotiations among the Prior Redeemers, Compulsory Redeemers, and Highland, the Plan and Scheme were adopted and became effective in August 2011. The adoption of the Scheme and Plan was to "enable the orderly management, sale, and distribution of the assets" by Highland and the right of the Redeemers Committee to oversee Highland's services. HC-300 at 300.017.

---

[2] There are three sets of exhibits that will be referred to herein, Joint Exhibits (referred to as JX- —), Redeemer Committee Exhibits (RC- —), and Highland Capital Exhibits (HC- __).

Appx. 02415
014677

2.      Central to the Scheme and Plan was the role of the Redeemer Committee, which was created so as to allow the investors in the Funds to have a greater level of influence over the affairs of Highland Capital than an ordinary creditors' committee would have in the liquidation of the Fund; that increased "level of influence" was particularly manifest in the Committee's ability to approve or disapprove of actions that Highland was contemplating taking, right of first refusal on other activities Highland wished to engage in, and the Committee's ability to terminate the services of Highland on 30 days' notice "with or without Cause." HC-300 at 300.016. Thus, the relationship between the Redeemer Committee and Highland, although grounded in contract, was designed to become one of mutual cooperation and confidence.

3.      Pursuant to §2.04 of the Plan, a ten-person committee of Crusader Fund investors, composed of five representatives of the Prior Redeemers and five representatives of the Compulsory Redeemers, was created. HC-300, § 2.04. As part of the Plan and Scheme, Highland Capital continued to serve as the investment manager for the Crusader Funds. As part of its duties as investment manager, Highland Capital was to liquidate fund assets and distribute the proceeds to the Crusader Fund investors pursuant to an agreed 43-month distribution schedule. In addition, as an incentive to Highland in its liquidation of assets, the Scheme and Plan provided that the Deferred Fees would be paid to Highland if it completed the full liquidation.

4.      It is not disputed that, between October 2011 and January 2013, Highland Capital distributed in excess of $1.2 billion to the Crusader Fund investors. It is also not disputed that the Crusader Funds were not completely liquidated when Highland paid itself the Deferred Fees in January and April 2016 and the Funds remain unliquidated as of the time of these hearings.

C.      The Arbitration Agreement

1.      Sections 2.09 and 9.03 set forth the terms and conditions by which these disputes are to be resolved in arbitration. Section 2.09 provides, in relevant part, that "in the event of a dispute between the Crusader Funds or the Redeemer Committee and HCMLP, ... the applicable representatives shall confer in god faith in an attempt to resolve the dispute...If the dispute cannot be resolved by mediation it will be referred to arbitration in accordance with Section 9.03."

2.      Section 9.03 provides, in relevant part, that "Any dispute referred to in Section 2.09...shall be subject to and decided by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof pursuant to applicable law. Arbitration shall be conducted in New York, New York."

D.      Termination of Highland Capital and Ensuing Litigation

3

1.      For reasons set forth below, disputes began to arise between the Redeemer Committee and Highland Capital, culminating in the termination of Highland Capital as investment manager by letter and notice dated July 5, 2016, for cause and without cause, with termination being effective on August 4, 2016, RC-318. Highland Capital was replaced as investment manager by Alvarez & Marsal CRT Management, LLC ("A&M"). JX-31.

2.      On July 5, 2016, the Committee filed a Notice of Claim before the AAA, commencing an arbitration against Highland, RC-319, and also commenced litigation in Delaware Chancery Court, inter alia, to obtain a status quo order in aid of the arbitration. On July 8, 2016, a Vice Chancellor entered an oral status quo order in aid of this arbitration, pending the adjudication of the Committee's request for interim relief by an AAA arbitrator on an emergency basis pursuant to AAA Rule 38. On August 2, 2016, an Emergency Interim Order was entered by an Emergency Arbitrator appointed by the ICDR, which order replicated the oral status quo order entered in Delaware Chancery Court.

3.      On July 21, 2016, Highland filed its Answering Statement, denying the claims and asserting affirmative defenses.

E.    The Arbitration

1.      This Tribunal was established as of October 31, 2016. The parties consented to the appointment of the Tribunal.

2.      On October 14, 2016, Claimant filed an Amended Notice of Claim, seeking specific performance, injunctive relief, declaratory relief, money damages, and disgorgement arising out of the allegedly willful misconduct and violations of fiduciary and contractual duties by Highland Capital as investment manager of the Highland Crusader Fund. Claimant sought four species of relief: (a) an award requiring Highland Capital to provide to the Committee all information about the Fund and its assets as required by Section 2.05 of the Plan and Section 4.6 of the Scheme; (b) an award of money damages, including disgorgement, for Highland Capital's allegedly willful misconduct and breaches of its fiduciary and contractual duties, and for any unjust enrichment; (c) an injunction requiring Highland to return the so-called Deferred Fees and Distribution Fees to the Crusader Fund; and (d) declarations that the Consenting Compulsory Redeemers are entitled to payment of the Deferred Fee Account, and that Highland is not entitled to advancement of expenses and legal fees.

4

3.      On December 14, 2016, Respondent filed a motion for partial summary adjudication, seeking dismissal of those claims seeking monetary damages, seeking relief as both breaches of contract and of fiduciary duties, and seeking relief barred by the applicable Statute of Limitations; by Order of March 1, 2017, we denied such motions without prejudice to their being renewed upon the development of a fuller record.

4.      On February 16, 2017, Claimant filed a motion for partial summary adjudication, seeking an order compelling Highland to comply with its alleged contractual obligation under the Plan and Scheme to provide the Committee with the Crusader Fund's books, records and other information from 2011 to 2016. By Order, dated April 21, 2017, we entered a Partial Final Award, granting the relief sought by Claimant, and ordering Highland, inter alia, to produce non-privileged documents, as described in the Order.

5.      On April 11, 2017, Respondent moved for Summary Adjudication of its counterclaim for advancement to defend against the claims brought by the Claimant in the Arbitration and in the parallel Delaware action, Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P., C.A. No. 12533-VCG (Del. Ch.) (the "Delaware Action").  Respondent sought a mandatory injunction requiring the Fund to escrow and segregate Crusader Fund assets to cover its indemnification and advancement rights.  By Order and Partial Final Award in favor of Claimant, dated July 20, 2017, we denied Highland's motions for advancement in this Arbitration and in the parallel Delaware Action and for the mandatory injunction, on the ground that the "inter-party indemnification exception" applies.

6.      On December 8, 2017, Highland moved to amend its Counterclaims against the Redeemer Committee of the Highland Crusader Fund and for leave to file a third party demand for arbitration against Alvarez & Marsal CRF Management, LLC ("A&M CRF"), Alvarez & Marsal North America, LLC ("A&M NA"), and House Hanover, LLC ("House Hanover").  On January 11, 2018, following a pre-hearing conference call, Respondent filed a revised proposed amended Counterclaim against the Committee alone, raising counterclaims of breach of the covenant of good faith and fair dealing in the its performance and enforcement of the Plan, breach of its fiduciary duty, and aiding and abetting the breach of fiduciary duty by A&M CRF, A&M NA and House Hanover.

5

014680

7.      By Order dated January 25, 2018, we granted the motion to amend Highland's counterclaims that raised direct claims of breach of fiduciary duty, breach of contract, and breach of the covenant of good faith and fair dealing arising out of the so-called Deferred Fees allegedly owed to Highland, and denied the balance of Highland's request for leave to file Counterclaims and Third Party Claims.

8.      On February 1, 2018, Respondent filed an Amended Answer and Counterclaims, seeking an order that the Committee account to Highland as an investor therein for all payments, gains, profits, and advantages obtained as a result of the Committee's alleged wrongful actions; that the Committee pay money damages, disgorge, and make restitution to Highland for damages arising from the Committee's alleged breaches of contract, breaches of the covenant of good faith and fair dealing, and breaches of fiduciary duty, including by awarding Highland the Deferred Fees allegedly improperly withheld, as well as an award of Highland's fees and expenses, including reasonable attorneys' fees incurred in this action; and such other relief as the Panel deems fair and equitable.

9.      On February 15, 2018, Claimant moved to strike portions of the Counterclaims on the grounds that certain of the new pleadings went beyond the limitations set by the Panel in the January 25 Order by including allegations that relate directly to claims the Panel had ordered not be included in the revised Counterclaim.  By Order dated April 1, 2018, we granted the motion of the Claimant to strike portions of the Counterclaim and directed Respondent to submit a revised Counterclaim to Claimant and the Panel.

10.     By Order dated March 19, 2018, we directed that "any party wishing to make a motion shall write a letter to the Panel, with copy to opposing counsel, seeking permission to make such motion..."

11.     By letter dated March 28, 2018, Highland requested permission to file a motion for partial summary adjudication with respect to the Committee's breach of fiduciary duty claims that accrued before July 5, 2013, which Highland contends are barred by the statute of limitations.  By Order dated April 5, 2018, relying upon AAA Commercial Arbitration Rule 33, we denied Highland's application to make a motion for partial summary adjudication, without prejudice to their doing so at the close of the Committee's main case at the hearing, if such factual and legal issues were briefed in the Pre-Hearing Briefs.

12.     On April 5, 2018, Respondent filed its revised Amended Counterclaims, seeking relief, as earlier, for alleged breaches of contract, of fiduciary duty, and of the covenant of good faith and fair dealing.

6

13.     On July 12, 2018, Highland moved to strike what it characterized as a new claim by the Committee.  The Committee opposed the motion. By Order dated July 22, 2018, the motion to strike was denied.

14.     On August 19, 2018, after a series of discovery motions were decided, the Parties entered into a Joint Proposed Pre-Hearing Consent Order, which was So Ordered by the Panel.

F.     Hearing Dates and Witnesses

1.     An evidentiary hearing was held in New York, N. Y. on September 12-14, 17-18, 20-21, and 24-25, 2018.

2.     Claimant presented the oral testimony of Eric Felton, Burke Montgomery, David Morehead, and Brian Zambie, all Members of the Redeemer Committee; Steven Varner, Alvarez & Marsal ("A&M"); Robert Collins, PriceWaterhouseCoopers; and two experts, Scott Meadow, Analysis Group; and Basil Imburgia, FTI Consulting.

3.     Respondent presented the oral testimony of Isaac Leventon, Esq., Highland internal counsel; Brant Behr, Redeemer Committee Member; Matt Jameson, formerly employed by Highland Capital; Scott Ellington, General Counsel, Highland Capital; the deposition testimony of Thomas Sargent, the Compliance Officer of Highland; and two experts, James Finkel, Duff and Phelps, and Karl Snow, Bates and White.

G.     Post-Hearing

1.     On October 24, 2018, Claimant filed its Post-Hearing Memorandum on its Claims and Respondent filed its Post-Hearing Memorandum on its Counterclaim.

2.     On November 17, 2018, Claimant filed its Reply to Respondent's Post-Hearing Memorandum and Respondent filed its Reply to Claimant's Post-Hearing Memorandum.

3.     On November 30, 2018, the Panel heard closing arguments from counsel to the Parties.

4.     On December 10, 2018, the Parties filed Supplemental Post-Trial Memoranda, dealing with questions asked by the Panel during closing arguments.

5.     On December 12, 2018, the record was declared closed.

Appx. 02120
014682

6.    On January 5, 2019, at the request of the Panel, the Parties consented to the adjournment of the timing of the award from January 11, 2019 to February 28, 2019. On February 25, at the request of the Panel, the Parties consented to the extension of the deadline to March 7, 2019.

H.    Issues to be Determined

1.    Claimant has pleaded four claims of breaches of fiduciary duty and of breaches of contract, arising out of similar fact patterns, as follows:

   a)    The taking of the Deferred Fees;

   b)    The payment of Distribution Fees;

   c)    The purchase of Plan claims without Redeemer Committee approval; and

   d)    The transfer of Barclays' Fund interests without Redeemer Committee approval.

2.    Separately, Claimant has pleaded claims of breach of fiduciary duty, as follows:

   a)    Engaging in related party transactions without Redeemer Committee approval

   b)    Refusing to settle claims brought by Credit Suisse;

   c)    Refusing to resolve the claims brought by UBS, which included a Temporary Restraining Order ("TRO"); and

   d)    Failing to make a good faith effort to sell the Cornerstone asset.

3.    In addition, Claimant seeks a declaratory judgment that there should be an immediate distribution of the Deferred Fee Account to the Consenting Compulsory Redeemers.

4.    Respondent has pleaded one counterclaim against the Redeemer Committee, alleging that the Committee breached its contractual and fiduciary duties by delaying liquidation of the Fund's assets after July 2016, and depriving Respondent of its right to receive the remaining funds in the Deferred Fees account payable upon complete liquidation of the Fund.

8

014683

5.      Both Claimant and Respondent have also made claims for the recovery of their attorneys' fees and costs.

I.      Applicable Law

1.      At the outset, we address which law applies to which claims.  It is not in dispute that Claimant's breach of contract claims are governed by the law of New York State.  However, Claimant contends that the law of New York State also applies to the breach of fiduciary duty claims, as the breaches are claimed to arise from Highland's relationship with the Fund and its investors under the Plan, which provides for New York law. Respondent argues that any fiduciary duties owed by Highland arise under its services as investment manager of the Crusader Fund, and, thus, are governed by the law governing the Fund's Governing Documents, the state of Delaware.

2.      Although there are few, if any, significant differences between New York and Delaware regarding fiduciary duties of entities in the position of Highland vis-a-vis its investors and the Committee, we find that the governing law on the breach of fiduciary duty claims is most appropriately that of New York, the state whose law governs regarding the Plan and rights of the parties under the Plan.

III.    Discussion of The Issues

A.      We recognize and appreciate the exemplary efforts by counsel for each Party. The results set forth herein are not a reflection of any difference in the quality of those presentations, but of our review of the evidentiary record and of the relevant law.

B.      Taking of Deferred Fees

1.      When the Plan and Scheme were adopted, a prominent feature was the creation of a Deferred Fee Account which was designed to provide an incentive to Highland to liquidate expeditiously the Crusader Fund of its assets. Deferred Fees were annual performance fees payable to Highland but deferred until, as, and when there would be a "complete liquidation" of the Crusader Funds' assets," Scheme §1.5.2, Plan §2.02, HC-300.

9

2.      The evidence is uncontested that, as of the close of the hearing record in this matter, the Crusader Funds have not been completely liquidated. It is also uncontested that, on January 21 and April 6, 2016, Highland distributed to itself a total of $32,313,000 in Deferred Fees. JX-25 at 14; JX-26 at 13.  Highland's stated rationale, or "position," for making the payment without there first having been complete liquidation was set forth in the financial statements of the Funds for the year-end 2015, issued on April 22, 2016: the UBS TRO "prevented the full liquidation" and that Highland "would have received the Deferred Fees…but-for the impact of the restraining order still in place." Thus, Highland "believe[d] its right to receive the [Deferred Fees] crystalized as of the date the [TRO] was lifted," or January 21, 2016, JX-025.0010.

3.      The core of Highland's position was that, in January 2016, it sought, received, and relied on the advice of its outside counsel Akin Gump that the UBS TRO created an impossibility for it to have earned the Deferred Fees, thus allowing the self-payment. However, based upon the evidence heard, we do not find that Highland relied upon any such advice in executing its plan to take the Deferred Fees.

4.      We find that in January 2016, Highland's CEO James Dondero raised the possibility of taking the Deferred Fees before complete liquidation with Thomas Surgent, a Deputy General Counsel and Chief Compliance Officer at Highland, who then discussed the idea with Highland's General Counsel, Scott Ellington. Surgent Dep. 133:4-19.  Mr. Ellington testified that, in January 2016, he and others spoke on several occasions with lawyers from Akin Gump regarding the premature taking of the Deferred Fees, and that he received the advice that "the deferred fees could be taken under the circumstances," that it was a "calculated risk," and that, if successfully challenged, Highland would owe only "nominal interest." Tr. 10 167:14-168:25; 167:14-168:25.

5.      However, Mr. Ellington's testimony is not supported by the hourly billing records of Akin Gump, which do not show any time being billed in January 2016 for anything having to do with this or any other Highland-related issue. RC-523; Tr. 11 136:9-14. Furthermore, Highland's Assistant General Counsel, Isaac Leventon, testified that neither he, nor, he was certain, anyone else at Highland, consulted with outside counsel in January 2016 regarding taking the Deferred Fees.  Tr. 7 236:11-24.  When Highland executed on its "position" by paying itself the Deferred Fees in January and again in early April, Highland did not disclose the self-payment to its independent auditor or the Redeemer Committee.

10

6.    It was not until April 11, 2016, almost a week after it took the second tranche of Deferred Fees that Highland belatedly informed its independent auditor, PriceWaterhouse Coopers (PwC), of what it had done by sending it draft financial statements for the year ending December 31, 2015, in which Highland disclosed, without explanation, a "change ... related to how [they were] ... treating the deferred fee distribution." RC-288. On April 12, a meeting was held between Highland and PwC, at which PwC sought an explanation from Highland for the change in position and asked for a memorandum from Highland's counsel and a "copy of the letter that was sent [to the Redeemers Committee] notifying them of the position," JX-28.

7.    On April 12, Highland proceeded to have, apparently for the first time in 2016, discussions with Akin Gump about a justification for its taking the Deferred Fees prior to "complete liquidation." According to Akin Gump's billable time records, on April 12, there was a telephone "call with Thomas Surgent regarding interpretation of distribution plan and charging of fees during period of TRO." Following that call, on April 19, there was another call with Mr. Surgent and Mr. Leventon "regarding audit disclosures with respect to legal doctrine applicable to fee dispute…," following which an Akin Gump attorney started to draft a memo on the "impossibility" issue. After further calls and discussions regarding the drafting of the disclosure to the auditor, a memorandum was finalized and sent to PwC on April 22, 2016, the day that the financials were issued. See RC-523; Tr. 11 136:9-14.)

8.    Although Mr. Ellington testified the Akin Gump memo was "entirely generated by Akin Gump," without any participation by anyone from Highland, Tr. 10 189:14-21, there is contrary and indisputable evidence that, in fact, someone at Highland drafted footnotes to the financials that were then provided to Akin Gump and appear in the Akin Gump memo, see Tr. 7 283:19-284:9; compare RC-289 with HC-277.  Further, Mr. Leventon exchanged with Akin Gump and commented upon at least four separate drafts of the Akin Gump memo before it was finalized. RC-291; RC-295; -RC300; RC-302; JX-29; Tr. 7 291:4-295:19.

9.    We find that Highland made a deliberate and calculated decision to make no disclosure to the Committee of the actual taking of the Deferred Fees until the issuance of the 2015 financial statements on April 22, 2016, but that, in the course of communicating with PwC about its "position," Highland allowed PwC to conclude that it had informed the Redeemer Committee of its position regarding the payment of the Deferred Fees, and did not correct the misimpression. RC-441. It did so to induce PwC to provide the opinion Highland needed to have clean financials.

Appx. 02124
014686

10.     This was not the first time that Highland had sought to use the so-called "impossibility defense" as a basis for suspending its obligations under the Plan. In 2013, Highland had proposed to use the doctrine in an attempt to avoid making distributions pursuant to the Realization Schedule, attached to the Plan and Scheme. Highland's then-outside counsel, Christopher Panos, now a federal bankruptcy judge, was asked to provide an opinion to allow such action but he expressed strong reservations about the use of that doctrine in an affirmative context, RC-153.

11.     Thereafter, Highland tried to secure another opinion that would be more supportive of its position and received a PowerPoint presentation from Akin Gump in November 2014, HC-356, that provided some additional arguments but, ultimately, focused on the doctrine being able to be used only as a defense, see, e.g., HC-356 at 16.

12.     Finally, when in early 2015, Highland asserted to Committee counsel that, by reason of the UBS TRO, "all applicable distribution dates, distribution thresholds and fees payable" were tolled, by reason of the UBS TRO, JX-22, Committee counsel had strongly rejected such use of the TRO to attempt to justify Highland's failure to meet "either the Realisation Schedule or the distribution threshold for the Deferred Fee Account." RC-219.

13.     Notwithstanding two prior and unsuccessful attempts to use the doctrine to evade its obligations, Highland was not deterred and in late 2015 and early 2016, with the assistance of its inside counsel, but not on the advice of Akin Gump,planned for and then executed on the strategy to take the Deferred Fees.

14.     Under New York law, the doctrine of impossibility does not create an affirmative right to engage in any conduct; rather, under certain circumstances, it acts as a defense to claims of breach of contract. When an unforeseeable event, such as an injunction, occurs, and the actions of the non-performing contract party have not contributed to the occurrence, and the occurrence renders the performance of a contractual obligation objectively impossible, a party's contractual obligation can be excused. Kel Kim Corp. v. Cent. Mkts., Inc., 70 N.Y.2d 900, 902 (1987) ("While such defenses [as impossibility] have been recognized in the common law, they have been applied narrowly, due in part to judicial recognition that the purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances"); JJ. Cassone Bakery, Inc. v. Consolidated Edison Co. of New York, Inc., 168 Misc.2d 272, 278, 638 N.Y.S.2d 898 (N.Y. Sup. 1996), rev'd in part on other grounds, 240 A.D.2d 634, 659 N.Y.S.2d 293 (2d Dept. 1997).  Absent such factors, the doctrine of impossibility is not available to excuse a party's performance and cannot be used to justify affirmative conduct.

15.    Highland attempts to squeeze itself into the four conditions, but its effort fails.  First, Highland argues that it is defending itself against accusations of breach of contract by invoking, defensively, the impossibility defense.  But it is Highland's illegitimate use of the impossibility defense to justify an affirmative act — the taking of the Deferred Fees — that is under attack, not its citation of the impossibility defense in 2018 as a defense to its breach of contract in 2016.

16.    Highland also argues that the TRO "rendered the complete liquidation of the Fund under the Plan's Realization Schedule objectively impossible." Closing Brief at 61. But Highland confuses the Realization Schedule which deals with timely distributions with the Deferred Fees which come into play only upon complete liquidation of the Fund with no deadline. Plan §2.02; Scheme §1.5.2.  In any case, when the UBS TRO was dissolved on January 21, 2016, there was nothing that prevented Highland from completing the liquidation.

13

014688

17.     None of the factors allowing the doctrine of impossibility apply to the taking of the Deferred Fees.  Indeed, we find that Highland — and its inside counsel —knew none of the factors were applicable when Highland asserted the defense. First, the UBS TRO was not unforeseeable; in fact, as Mr. Panos had advised his client in 2013, "UBS had already filed suit and was threatening to get an injunction at the time of the approval of the Scheme."  Second, Highland's own acts gave rise to the UBS TRO, as it was UBS's accusation of Highland's fraudulent transfer of assets that gave rise to the TRO, as Mr. Panos again had advised Highland.  Third, as Mr. Leventon himself testified at the hearings, "the TRO did not do away with Highland's obligation to complete liquidation of the fund." Tr. 7 262:6-10. Finally, the doctrine of impossibility gives rise to no affirmative rights to take action in violation of a contract. Once again, Mr. Panos had given this critical advice to Highland in 2013.

18.     We have considered the other elements of Highland's defense to this claim and find them similarly wanting. We find that Highland's paying itself the Deferred Fees in 2016 constituted a breach of both the Scheme and Plan.  Given that finding, we need not reach the issue of whether the self-payment also constituted a breach of fiduciary duty by Highland to the Committee.

19.     As to remedy, under New York law, damages may be awarded for a breach of contract based upon the damages suffered by the claimant. Here, the damage suffered is the full amount of the Deferred Fees prematurely taken, plus prejudgment interest from the date of the taking.  "Prejudgment interest is generally granted 'in order to compensate the injured party for the loss, over a period of time, of the use of the property to which it was entitled.'" Panix Prods., Ltd v. Lewis, 2003 WL 21659370, at *2 (S.D.N.Y. 2003)(citing Lewis v. S.L. & E., Inc. 831 F.2d 37, 40 (2d Cir.1987)).  Although Respondent has raised good arguments as to why the interest rate should be nominal at best, we exercise our discretion to award statutory pre-judgment interest at 9% from the date of the taking, so as to measure as accurately as possible the totality of the damage that we perceive the Fund suffered by reason of the Deferred Fees being taken prematurely.

20.     Respondent also argues that the Tribunal lacks the authority to order a return of the moneys taken.  But measuring the damages suffered by the Fund by referencing the full amount of the Deferred Fees taken is not the same as literally ordering a return of the moneys. It is an appropriate measure of the damages because the Fees were to have stayed within the Fund until they were appropriately earned, and while in the Fund, they were to serve as a protection and cushion against creditors. In addition, very importantly, keeping the Deferred Fees was to have acted as an incentive to Highland to complete liquidation of the portfolio, an event that had not occurred when Highland was terminated and still has not occurred. Taking the Deferred Fees deprived the investors of all of those benefits. The Deferred Fees in the amount of $33,313,000 should be returned in full, and with full statutory interest of 9% from the dates of taking in January and April 2016 through the date of this Partial Final Award.

14

C.   Distribution Fees

1.   Under the Plan, Highland was to receive fees in the amount of 125 basis points based on "all amounts actually Distributed to Redeemers during each quarter following the
Effective Date . . . provided that assets equal to or in excess of the amount scheduled in the Realisation Schedule have been distributed to Redeemers during such quarter (with amounts distributed to Redeemers in excess of scheduled distributions for prior quarters being carried over.)" (Emphasis added) (Plan §2.01; Scheme §4.4.)

2.   Claimant alleges that Highland breached the provisions of the Plan by paying itself distribution fees totaling $14.5 million despite not having "actually" distributed to the Redeemers each quarter the minimum required to have been paid by the Realisation Schedule (Plan Appx. A).  The Committee alleges that Highland paid itself distribution fees eight times, but that the only time Highland met or exceeded the goals set by the Realization Schedule was in the quarters ending January 31, 2013, and April 30, 2013. Other than those two quarters, Claimant contends that Highland missed the target in every other time period.  Claimant also charged Highland with a breach of fiduciary duty, arising out of similar facts.

3.   The Committee alleges that six of the distribution fee payments were improper because Highland improperly calculated the amount paid to the Redeemers in one or more of the following ways: (1) in treating Deferred Fees as Distributions; (2) in withholding tax obligations from payments to Redeemers, but counted them for purposes of qualifying for its fee; (3) in improperly including amounts that it reserved to pay Barclays, amounts used to pay the Barclays settlement, and amounts paid to its affiliate Eames in its calculation of Distributions; and (4) in borrowing on margin and improperly treating such borrowings as "excess cash" under the Plan and, therefore, as Distributions.

4.   In addition, Claimant argues that if Highland missed any quarterly hurdle set in the Realisation Schedule, its deficiency would carry over to the next quarter, giving Highland an accordingly higher hurdle, or watermark, to meet in that next quarter.  In other words, Claimant urges that the Realisation Schedule was intended to be cumulative.

5.   Cumulative Quarterly Hurdles

a)   Starting with the last issue first, the language in the Plan in question is as follows: "HCMLP will receive fees in cash ... (b) provided that assets equal to or in excess of the amount scheduled in the Realisation Schedule have been distributed to Redeemers during such quarter (with amounts distributed to Redeemers in excess of scheduled distributions for prior quarters being carried over)." HC-300 at 74 (emphasis added). Plan §2.01.

15



b)    Claimant argues that, although the foregoing language is not explicit regarding both the positive and negative cumulative nature of the Realisation Schedule, there is evidence sufficient to establish that requirement from the text itself and from the testimony of those who negotiated the clause in the Plan, citing the testimony of Mr. Montgomery ("The Realisation Schedule was a cumulative concept. 100 million during one period, 100 million to the next, 200 million during the next. . . . it was designed to be cumulative. It was a stack.") Tr. 3 307:5-19.  The Committee also points out that Highland kept internal accounting schedules that treated the Schedule as cumulative, including RC-364 at pp. 10, 23, 36, 49, 62, 75, 88, 101, 114, 127, 140; see also Tr. 4 196:17-197:19; Tr. 9 256:14-259.

c)    Finally, the Committee urges that there would be "perverse incentives" if Highland were allowed to treat the Schedule as cumulative if it got ahead of the distribution schedule but not if it fell behind, because if Highland knew it could not make a quarterly target, it would have the incentive to skip that quarter and wait until the next quarter where it would meet the Realisation Schedule for only that quarter. This would have the undesirable effect of delaying liquidation but not adversely affecting Highland's receipt of incentive fees.

d)    Highland strongly urges that the clause in question is unambiguous in requiring only a positive carry-forward, with no hint that a failure to meet a quarterly hurdle imposed an obligation to reach a high water mark that would meet both the prior hurdle and the present quarterly hurdle. In addition, Highland argues that, as Mr. Montgomery conceded on cross-examination, the Plan could have contained a cumulative shortfall provision, but that the inclusion of such language was never discussed with Highland, Tr. 3 at 308:7-13, and such could have been incorporated into the Plan had that been the Parties' intent.

e)    Highland also criticizes the Committee's "perverse incentive" argument, arguing, first, that Highland was highly incentivized to liquidate as quickly as possible so it could receive Distribution Fees during the pendency of the 36-month Realisation Schedule (§2.02) and obtain the $10 million Deferred Fee by distributing $1.7 billion within 43 months of the Plan's Effective Date (§6.02); and, secondly, "if Highland fell too far behind," it would lose its incentive to continue expeditious liquidation of the Fund's assets. Respondent's Post-Hearing Brief at 57. See Tr. Day 12 at 169:3-18 (Snow).

16

    f)      In interpreting the section of the Plan, it is significant that the language regarding a positive carry-forward appears in a parenthetical phrase, not in the main operative text. Without considering the parenthetical, we read the main operative text as setting a test that Highland has to meet — each quarter, assets "equal to or in excess of the amount scheduled in the Realisation Schedule" must be distributed to Redeemers, or else Highland will not "receive fees in cash" that quarter.  Thus, each separate quarter, Highland has to make a required distribution or will not be paid fees.  But if each quarter there is a test that Highland has to meet, it would defeat the purpose of the quarterly test for Highland to be able to garner fees by just meeting the goal for one particular quarter without regard to how it had performed the prior quarter. Without a reward or a penalty each quarter dependent upon whether it met (or exceeded) the goal, Highland could undermine the objective of the clause. The supplemental parenthetical phrase simply makes explicit one benefit to Highland of overachieving such quarterly goal. We conclude that §2.01 requires both a positive and negative cumulative process.

    g)      To read it otherwise would create a perverse incentive of encouraging Highland to skip quarters. The contrary is not true: by having both a positive and negative cumulative obligation, Highland loses no incentive to continue to liquidate, perhaps at a faster pace than it in fact adopted, if it were to fall behind.

    h)      Though we reach our conclusion without need to rely on extrinsic evidence, we note that our interpretation is supported by Mr. Montgomery's testimony regarding Highland's request to include a parenthetical to make clear that it would not lose the benefit of an over-distribution and could carry it forward. See JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009).

D.    Deferred Fees as Distributions

1.    With respect to Highland's treating Deferred Fees as Distributions, the Committee urges that Deferred Fees being reserved in an account for possible later distribution were not amounts "actually Distributed" or the kind of Distributions made to Redeemers as part of the return to them of their investment.

2.    Highland defends on the basis that the Committee's position that Deferred Fees should not be included in calculating Distribution Fees is inconsistent with the parties' course of performance. From the outset, Highland argues that it included Deferred Fees in its calculation of Distribution Fees and gave written notice of its inclusion to the Committee on at least four occasions. HC-552; HC-591; HC-592; HC-593. However, Highland is not making the argument that the Plan was amended by what it says was its known conduct.

<div align="center">17</div>

3.      Highland also argues that its successor, A&M, also included Deferred Fees in its calculation of Distribution Fees based upon the substantively identical language in the A&M investment management agreement, HC-56 at 6, and received a Distribution Fee based on that calculation in October 2016.

4.      We find that whether Highland's conduct was disclosed to the Committee or whatever A&M may have done are both irrelevant to the issue in this case, because, as we analyze the evidence adduced, the only relevant issue is whether including Deferred Fees in the calculation of Distribution Fees is authorized by the language of the Plan, and we find that it is not.

5.      The Plan sets forth a program of fees capable of being paid to Highland: if Highland met certain quarterly goals of distributions made to Redeemers, as set forth in the Realisation Schedule, it was entitled to receipt of certain Distribution Fees; if it distributed at least $1.7 billion to the Redeemers prior to the 43d month following the Effective Date, it was entitled to receive payment of the fees in the Deferred Fee Account in accordance with Section 2.02 of the Plan.

6.      The Plan distinguished what Highland had to do to qualify to receive each category of Fees. With respect to Deferred Fees, the Plan provides that "Highland shall not be deemed to be a Redeemer in respect of the deferred fees." We read that sentence as making clear that Highland's setting aside of Deferred Fees into a account that it might eventually be able to draw upon should not be construed as a form of distribution such that, if it were a Redeemer, it could be construed as an "actual" distribution.  Because Highland is not "deemed to be a Redeemer," its payment to a fund is not equivalent to a Distribution to an investor.

7.      We find that this language is not ambiguous and does not allow for the practice used by Highland to beef up the amount of Distribution Fees it received.

Appx 02131
014693

E.    Withholding Taxes as Distributions

1.    The evidence at the hearing was that, as required in the Plan, HC-300 at 80, Highland took into account the amount of taxes that should be withheld and paid those amounts to the appropriate taxing authorities; however, Highland also included those withheld amounts in the calculation of amounts "actually" distributed to Redeemers.  The Committee contends that such withheld amounts were not "actually Distributed to Redeemers," and points out that, in fact, only a subset of Redeemers — the Offshore Fund investors —  were subject to tax withholding, RC-62; Tr. 9 275:5-23, while some investors were nonprofits that did not pay taxes at all,  Tr. 12 167:5-24.  The Committee also points out that, when first informed in 2012 that Highland had counted tax withholdings toward the May 1, 2012 Distribution, the Committee objected, demanding successfully that Highland make up that shortfall. RC-68; Tr. 3 301:6-12; Tr. 9 278:4-279:16.

2.    Highland makes two points in its defense: first, tax withholdings made on behalf of an employee are considered "compensation," so tax withholdings for Crusader investors should also be treated in a "common-sense manner" as "distributions" to those investors; and second, Highland disclosed its methodology in at least one monthly report in November 2013, HC-591 at 14 (Nov. 2013 Summary Report), to which the Committee never objected.

3.    We need not consider either of these defenses because we find the language of the Plan supports the treatment by Highland of these amounts. As stated above, "Distributions" is defined as "Amounts to be paid to Redeemers under the Plan, including amounts to be paid to Redeemers under the Scheme…" §1.01. The operative language regarding withholding for taxes is as follows: "In connection with … all Distributions to be made hereunder, the Crusader Funds shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any … taxing authority, and all Distributions hereunder shall be subject to any such withholding … requirements. The Crusader Funds are hereby authorized to take any and all actions that may be necessary or appropriate to comply with any such requirements."

4.    Read together, we find that "the amounts paid to Redeemers" were "subject to … withholding requirements" and thus, were appropriately included within the calculation of amounts distributed to Redeemers, even if, in fact, it was an indirect payment. We find for Highland on this branch of the Committee's claim.

Appx. 02132
014694

F.      Payments to Barclays and Eames as Distributions
        1.      In 2006 and 2007, Barclays and a Highland affiliate entered into two securities
transactions — a prepaid forward transaction and an accreting strike option transaction.  In
connection with those two transactions, Barclays became an investor in the Highland Funds.
JX-5. In late 2008, Barclays submitted redemptions for its full interests in the Highland
Funds, which Highland did not honor. Litigation between Barclays and Highland entities
ensued. When the Plan and Scheme were adopted, Barclays did not consent and became
what it is referred to as a Non-Consenting Redeemer. HC-300, at HC-300.0075.

        2.      Thereafter, when Fund assets were disposed of and amounts distributed to
Redeemers, no amounts were actually paid to Barclays; instead, amounts equivalent to those
that Barclays would have received if it was a Consenting Redeemer were paid into the
Redeemer Trust Account. That Account was set up for the purpose of segregating the
deposited funds so they could be "used to pay all costs of HCM-Related Parties and the
Redeemer Committee to defend, respond to, settle and satisfy any Claims by Crusader Fund
Redeemers excluding Plan Claims ("Redeemer Claims") and ... to defend, respond to, settle
and satisfy any such Redeemer Claims in advance of any amounts otherwise properly
available for such purposes out of the assets of the Crusader Funds."  Plan 6.01.

        3.      Notwithstanding such amounts remained in a designated account at a major financial
institution, Highland treated such reserves as "actual" Distributions and paid itself fees based
on the amounts reserved. The Committee argues that amounts reserved in the Redeemer
Trust Account were not "actually Distributed" and that fees taken by Highland for such
deposits were taken in breach of the Plan.

        4.      We find that Highland's treatment of the reserves as Distributions violated the terms
of the Plan.

        5.      In July 2012, Highland, Barclays, and other entities entered into a settlement
agreement, resolving all of the claims between and among them. JX-5. As part of the
settlement, Barclays received both the cash reserved since August 2011 and several
additional cash distributions expected between July and December 2012, essentially the exact
distribution amounts that it was entitled to as a Consenting Redeemer. Tr. Day 9 at 146:12-19
(Palmer); HC-275; HC Demo 10 at 4.  Pursuant to the settlement, Barclays became a
Consenting Redeemer, see JX-5 at 12 (§ 11.3). Highland treated such portion of the
settlement payments as "Distributions" and paid itself the fees associated with that amount of
Distributions. The Committee contends that any payments to Barclays were in settlement of
various claims, in exchange for which there was a "relinquishment and/or abandonment" of
all of Barclays' rights and interests in the Highland Funds, JX-5 at 3, and, thus, such
payments were not Distributions.

20

6.      Finally, as part of the settlement, the two limited partner interests that Barclays had in the Funds were transferred to a newly-formed and wholly-owned affiliate of Highland, Eames; amounts equivalent to what Barclays would have received as an investor after the settlement were paid to Eames, totaling $35.1 million, and Highland treated such amounts as Distributions and paid itself the appropriate fees.  The Committee urges that the transfer of LP interests was in violation of Section 2.05(f) which gives that the Committee "the authority to approve or disapprove the assignment or transfer of interests in the Feeder Funds or Plan Claims," HC-300, and that the transfer was explicitly disapproved, RC-79 ("The Crusader Redeemer Committee does not believe that Highland has the right to take assignment of Barclays' interest in the Crusader Fund. The Committee believes its approval is required for any such assignment under the Plan/Scheme, and the Committee is not willing to approve that assignment."). Furthermore, the Barclays Settlement Agreement provided that the settlement was subject to Highland's receiving all necessary approvals under the Crusader Plan of Liquidation, which the Committee contends Highland did not receive. HC-330, §12.3.2, at HC-330.0014.

7.      Highland argues, first, that the Committee's right to approve or disapprove of the transfer of interests under Section 2.05(f) is not applicable because under Section 2.05(g)[3], the Barclays settlement did not give Barclays more than it would have received as a Consenting Compulsory Redeemer; that, in any case, 2.05(f) is subject to the "reasonableness" test under Section 2.07[4]; and, finally, that it was entitled to keep the LP interests because the LP interests were in the Redeemer Trust account, citing to HC-275. We find that Highland breached the Plan and Scheme by transferring the LP interests to a wholly-controlled affiliate after the Committee had specifically disapproved of the transfer. Its rejection was reasonable in that it was acting in the best interests of the other investors to have a smaller investment base that would have a greater portion of the asset distributions. The accounting ledger maintained by Highland, which created much confusion at the hearing, was not evidence that the LP interests were in the Redeemer Trust account; we agree with the Committee that the spreadsheet was an accounting convenience for Highland.

8.      We also find that Highland breached the Plan by taking fees in connection with amounts reserved in the Redeemer Trust Account; by no stretch of the imagination could one reasonably conclude — or argue — that an amount reserved in an account that was available to settle and pay costs in connection with all forms of Redeemer Claims could be considered as amounts "actually Distributed" to Redeemers. In any case, with respect to the amounts reserved, no Redeemer received any Distribution in the quarters when Highland claimed fees.

---

[3] "The Redeemer Committee will have, subject to the execution and delivery of customary and reasonable confidentiality agreements:... (g) the authority to approve or disapprove any settlement by the Crusader Funds with Barclays that would be in excess of what Barclays would receive as a Consenting Compulsory Redeemer..."

[4] "The approval of the Redeemer Committee with respect to any matter submitted for approval under Sections 2.05 or 2.06 shall not be unreasonably withheld."

21

Appx 02134
014696