UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF
TEXAS, DALLAS DIVISION

In Re: Highland Capital Management, L.P.

|  |  |
|---|---|
| | § |
| | § Case No. **19-34054-sgj11** |
| **The Dugaboy Investment Trust et al- Appellant** | |
| | § |
| vs. | § |
| | |
| **Highland Capital Management, L.P.** | |
| **Et al- Appellee** | |
| | §       **3:25-cv-02072-S** |
| | § |

   **[4333]  Memorandum of Opinion and Order Regarding Stay Requests (Addressing DE #4326 and 4308) entered on 7/21/25**

# Volume 20

# APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | |

*INDEX*

## APPELLANT THE DUGABOY INVESTMENT TRUST'S STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL FROM THE BANKRUPTCY COURT'S ORDER REGARDING STAY REQUESTS [ADDRESSING DE ## 4326 & 4308]

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4353] on August 4, 2025 in the above-captioned case from the Bankruptcy Court's July 21, 2025 *Memorandum Order and Opinion Regarding Stay Requests [Addressing DE ## 4326 & 4308]*[Docket No. 4333], hereby submits this *Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1.   **Did the Bankruptcy Court err in faulting Dugaboy's Stay Request because Dugaboy did not make a "standard" request for a stay pending appeal pursuant to Federal Bankruptcy Rule 8007?**

2.   **Did the Bankruptcy Court err in determining that the Bankruptcy Rule 9019 settlement proceeding was not "a proceeding involving a charitable trust"?**

3.   **Did the Bankruptcy Court err in concluding there was insufficient evidence connecting Mark Patrick's involvement in this Court's Rule 9019 settlement proceedings to the allegations of wrongdoing against Patrick in the Cayman Islands proceeding?**

4.   **Did the Bankruptcy Court err in failing to recognize that the new evidence of Mark Patrick's misconduct exposed in the Cayman Islands proceeding fatally undermines the 9019 settlement by establishing that Patrick lacked authority to enter into the settlement?**

5.   **Did the Bankruptcy Court err in concluding that a stay was unnecessary because Dugaboy could still pursue remedies against Mark Patrick in the Cayman Islands proceeding?**

6.   **Did the Bankruptcy Court err in failing to recuse itself under 28 U.S.C. § 455 due to the appearance of partiality created by the presiding judge's authorship of novels that bear striking factual and thematic similarities to the Highland Capital Management bankruptcy proceedings and portray hedge fund principals in an overtly negative**

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow.

1

light, thereby depriving Dugaboy of an impartial judge with respect to the stay
motion?

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

*Vol. 1*

*000001*

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4353] filed by
   Appellant;

*0000 23* 2. Bankruptcy Court's *Memorandum Opinion and Order Regarding Stay Requests*
   *[Addressing DE ## 4236 & 4308* [Docket No. 4333];

*0000 39* 3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the
   issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June
   25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an
   Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 3/18/2021 | 2060 | Motion to recuse Judge Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| 3/18/2021 | 2061 | Brief in support filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/18/2021 | 2062 | Support/supplemental document Appendix to Motion to Recuse filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/23/2021 | 2083 | Order denying motion to recuse (related document #2060) Entered on 3/23/2021. (Okafor, M.) |

*Vol. 2*

*000569*

*000730*

*000734*

*Vol. 3*

*000771*
*Thru vol. 5*

*Vol 5*
*00 3493*

2

| | | | |
|---|---|---|---|
| *Vol. 5*<br>00 3504 | 4/6/2021 | 2169 | Amended notice of appeal filed by Interested Party James Dondero (RE: related document(s)2149 Notice of appeal). (Lang, Michael) |
| 00 3519 | 4/15/2022 | 2205 | Statement of issues on appeal, filed by Interested Party James Dondero (RE: related document(s)2083 Order on motion to recuse Judge). (Lang, Michael) |
| 00 3521 | 4/15/2021 | 2206 | Appellant designation of contents for inclusion in record on appeal filed by Interested Party James Dondero (RE: related document(s)2169 Amended notice of appeal). Appellee designation due by 04/29/2021. (Lang, Michael) |
| 00 3530 | 2/9/2022 | 3264 | DISTRICT COURT MEMORANDUM OPINION AND ORDER - The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292 (a) and the Court is without jurisdiction over this appeal of the Bankruptcy Court's Recusal Order. The Court further denies Appellants leave to appeal the Recusal Order under § 1292 (b), denies Appellants' request to withdraw the reference of their motion to recuse, and denies Appellants' request to construe their appeal as a petition for writ of mandamus. Accordingly, the Court dismisses this appeal for lack of jurisdiction. (Ordered by Judge Ed Kinkeade on 2/9/2022). Civil Action number:3:21-cv-00879-K, DISMISSED for lack of jurisdiction (RE: related document(s)2083 Order on motion to recuse Judge). Entered on 2/9/2022 (Whitaker, Sheniqua) Modified on 2/25/2022 (Whitaker, Sheniqua). (Entered: 02/25/2022) |
| *Vol 6*<br>00 3544 | 7/20/2022 | 3406 | Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: #1 Appendix Appendix (Lang, Michael) Modified text on 7/21/2022 (Ecker, C.). |
| 00 3909 | 8/1/2022 | 3422 | Notice of hearing on Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.).). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3406, (Lang, Michael) |

| | | | |
|---|---|---|---|
| *Vol 6*<br><br>*003912* | 8/15/2022 | 3444 | Response opposed to (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Attachments: #1 Exhibit A (Annable, Zachery) |
| *Vol. 7*<br><br>*003936*<br>*Thru END of Vol 14* | 8/15/2022 | 3445 | Exhibit List (Appendix in Support of Highland Capital Management, L.P.'s Objection to Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 USC 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3444 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Index 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 (Annable, Zachery) |
| *Vol 15*<br><br>*011840* | 8/15/2022 | 3446 | Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

| | | | Depositions) Filed by Debtor Highland Capital Management, L.P. (Annable, Zachery) |
|---|---|---|---|
| Vol. 15 011855 | 8/15/2022 | 3447 | Declaration re: (Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi). (Annable, Zachery) |
| 011864 | 8/17/2022 | 3456 | Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.)). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3446 and for 3449, (Annable, Zachery) |
| 011869 | 8/22/2022 | 3463 | Reply to (related document(s): 3444 Response filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. (Lang, Michael) |
| 011874 | 8/24/2022 | 3466 | Amended Notice of hearing filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.)., 3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

Vol 15

| | | | |
|---|---|---|---|
| | | | Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.), 3462 Order converting the August 31, 2022 at 9:30 AM Hearing on (A) The motion for final appealable order and supplement to motion to recuse and (B) related motions to strike and compel to a preliminary status/scheduling conference (RE: related document(s)3406 Motion for leave filed by Interested Party James Dondero, 3446 Motion to strike document filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel filed by Debtor Highland Capital Management, L.P.). Entered on 8/19/2022 (Ecker, C.)). Status Conference to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga. (Lang, Michael) |
| | 8/26/2022 | 3470 | Amended motion for final appealable order and proposed supplement to the record filed by Interested Party James Dondero (RE: related document(s)3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support). (Attachments: #1 Appendix (Lang, Michael) MODIFIED text to match PDF on 9/1/2022 (Ecker, C.). |
| | 8/26/2022 | 3471 | Stipulation by James Dondero and Highland Capital Management, L.P.. filed by Interested Party James Dondero (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi, 3449 Motion to compel Lawyers' Depositions.). (Lang, Michael) |
| | 8/31/2022 | 3478 | 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.) (Edmond, Michael) |
| | 9/1/2022 | 3479 | Order denying amended motion of James Dondero, Highland Capital Management Fund Advisors, L.P., Nexpoint Advisors, |

011877

012039

3478
N/A
NO PDF
AVAilable

012047

6

*Vol. 15*

| | | | |
|---|---|---|---|
| | | | L.P. The Dugaboy Investment Trust Get Good Trust and, Nexpoint Real Estate Partners, LLC, F/K/A HCRE Partners, A Delaware Limited Liability Company for final appealable order and supplement to motion to recuse pursuant to 28 U.S.C. Section 455 (RE: related document(s)3470 Brief filed by Interested Party James Dondero). Entered on 9/1/2022 (Okafor, Marcey) |
| | 9/1/2022 | 3480 | Transcript regarding Hearing Held 08/31/2022 (27 pages) RE: Status Conference Re: Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 (#3406). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 11/30/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.)). Transcript to be made available to the public on 11/30/2022. (Rehling, Kathy) |
| | 9/27/2022 | 3541 | Motion to recuse Judge Stacey G. C. Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| | 9/72/2022 | 3542 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3541 Motion to recuse Judge Stacey G. C. Jernigan). (Attachments: #1 Appendix (Lang, Michael) |
| | 10/14/2022 | 3567 | Agreed Scheduling Order on renewed motion to recuse (related document #3541) Entered on 10/14/2022. (Okafor, Marcey) |

*012050*

*012077*
*Vol. 16*
*012079*

*012357*

| | | | |
|---|---|---|---|
| *Vol. 16* *012361* | 10/17/2022 | 3570 | Motion to recuse Judge Stacey G. C. Jernigan - AMENDED Filed by Interested Party James Dondero (Lang, Michael) |
| *Vol. 17* *012363* | 10/17/2022 | 3571 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Attachments: #1 Appendix (Lang, Michael) |
| *012641* | 10/31/2022 | 3595 | Response opposed to (related document(s): 3541 Motion to recuse Judge Stacey G. C. Jernigan filed by Interested Party James Dondero, 3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| *Vol. 18* *012697* *Thru End of Vol. 21* | 10/31/2022 | 3596 | Support/supplemental document (Appendix in Support of Highland's Objection to Renewed Motion to Recuse Pursuant to 28 U.S.C. 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3595 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 (Annable, Zachery) |
| *Vol. 22* *016732* | 3/3/2023 | 3673 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Lang, Michael) |
| *016737* | 3/6/2023 | 3675 | Memorandum of Opinion and Order Denying Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. Section 455 (RE: related document(s)3570 Motion to recuse Judge filed by Interested Party James Dondero). Entered on 3/6/2023 (Okafor, Marcey) |
| *016773* | 3/6/2023 | 3676 | Order Denying Amended Renewed Motion to Recuse Pursuant to U.S.C. Section 455 (related document #3570) Entered on 3/6/2023. (Okafor, Marcey) |
| *016809* | 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland |

| | | | |
|---|---|---|---|
| *Vol. 22* | | | Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| *016827* | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery) |
| *016830* | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| *016855* | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| *016863* | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *016865* | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *Vol. 23* *016867* *Thru end of Vol. 25* | 6/20/2025 | 4255 **(to be submitted to Clerk on flash drive)** | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 |

| | | | |
|---|---|---|---|
| | | | Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |
| | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent |

*Vol. 26*

*019524*

*019527*

| | | | |
|---|---|---|---|
| | | | Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart, #3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
| *Vol. 27* *019847* | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| *019871* | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| *019998* | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| *Vol. 28* *020013* | 6/23/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| *020230* | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 (Deitsch-Perez, Deborah) |
| *020241* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 126 (Annable, Zachery) |

| | | | |
|---|---|---|---|
| *VOL 28*<br><br>*020266* | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| *VOL 29*<br><br>*020267* | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| *020271* | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust. Entered on 6/27/2025 (Okafor, M.) |
| *020282* | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| *020289* | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |

| | | | |
|---|---|---|---|
| *Vol. 29*<br><br>*020296* | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| *020298* | 7/10/2025 | 4308 | Notice Letter from the Office of the Texas Attorney General Requesting a Stay filed by Interested Party State of Texas. (Stone, Johnathan) |
| *020300* | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| *020309* | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *020311* | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| *Vol. 30*<br><br>*020407* | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related |

| | | | |
|---|---|---|---|
| | | | document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| | 7/21/2025 | 4334 | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M.) |
| | 8/4/2025 | 4353 | Notice of appeal. Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A) (Harper, Geoffrey) |
| | 8/5/2025 | 4359 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| | 8/15/2025 | 4372 | Motion to recuse Judge Filed by Interested Parties James Dondero, NexPoint Advisors, L.P., NexPoint Asset Management, L.P., NexPoint Real Estate Advisors, L.P., The Dugaboy Investment Trust, The Get Good Non Exempt Trust No 2 (Attachments: #1 Proposed Order (Harper, Geoffrey) |

Dated: August 18, 2025                    Respectfully submitted,

                                          WINSTON & STRAWN LLP

                                          By: /s/ Geoffrey S. Harper

                                          Geoffrey S. Harper
                                          Texas Bar No. 00795408
                                          gharper@winston.com
                                          John Michael Gaddis
                                          Texas Bar No. 24069747
                                          mgaddis@winston.com
                                          2121 N. Pearl Street, Suite 900
                                          Dallas, TX 75201
                                          (214) 453-6500
                                          (214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**CRAWFORD, WISHNEW & LANG PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 18, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

9.      We also find that Highland breached the Plan by taking fees in connection with amounts reserved in the Redeemer Trust Account; by no stretch of the imagination could one reasonably conclude — or argue — that an amount reserved in an account that was available to settle and pay costs in connection with all forms of Redeemer Claims could be considered as amounts "actually Distributed" to Redeemers. In any case, with respect to the amounts reserved, no Redeemer received any Distribution in the quarters when Highland claimed fees.

10.     Finally, we find that when Barclays received the amounts, as part of the Settlement Agreement, that had been set aside in 2012 as if Barclays was then a Consenting Redeemer, it did not receive such amounts as Distributions "actually" paid to a Redeemer but rather as part of the Settlement amount. Although Barclays was "deemed" to have become a "Consenting Redeemer," it had that status only for the moment in time sufficient to transfer its LP interests to Eames. As the Settlement Agreement noted, "certain payments will be made by the Highland Entities to Barclays … in consideration of the settlement of the Claims hereunder and the assignment, relinquishment and/or abandonment by Barclays of all rights and interests it had in the Fund Interests…" HC-330 at HC-330.0003. Highland breached the Plan by treating the amounts paid to Barclays as if they had been received as a Consenting Compulsory Redeemer as Distributions.

11.     We conclude that it was improper for Highland to include in the calculation of the amounts distributed to the Redeemers:

a)      The Distribution Fee attributable to the amounts reserved in the Redeemer Trust Account;

b)      The Distribution Fee attributable to the amounts paid in settlement of the Barclays claims; and

c)      The Distribution Fee attributable to the value of the LP interests and amounts transferred to Eames.

22

G.    Margin Borrowings as Distributions

1.    In January and April 2012, Highland caused the Fund to borrow $60 million from its Jefferies brokerage account to distribute to Redeemers. The Committee contends that it did so because Highland had not liquidated enough assets to meet the Realisation Schedule. After learning about the loans in September 2012, the Committee protested and directed Mr. Dondero at the September 2012 meeting to take no further margin loans without its consent. Tr. 2 353:2-22; RC-85; JX-8. The Committee contends that Highland's taking such margin loans to reach the Realisation Schedule and then paying itself Distribution Fees based on having reached the quarterly goal with the assistance of the margin borrowing breached the Plan because the margin borrowing did not constitute Excess Cash resulting from the liquidation of assets from which Distributions must come. Plan §§1.01, 3.01; Scheme §§2.4.1, 2.4.2.

2.    Highland maintains that, as it was authorized under the Plan, to engage in margin borrowing, and that amounts were actually distributed to the Redeemers, such payments to the Redeemers were appropriately treated as Distributions qualifying it to receive Distribution Fees.

3.    We find that such margin borrowings, which were authorized under the Plan, did not qualify as the type of Distribution that would entitle Highland to receive a Distribution Fee. The plain language of the Plan requires that any Distribution Fee be paid to Highland only upon the appropriate amount of Excess Cash having been accumulated from the sale of "assets equal to or in excess of the amount scheduled in the Realisation Schedule…" The "assets" referred to are the "assets, respectively, of the Onshore Fund, Offshore Fund I and Offshore Fund II…" §2.01. No such assets were sold and therefore no Excess Cash was accumulated to be distributed to the Redeemers.

Appx 02136
014698

4.      The Committees expert, Mr. Imburgia, determined that the result of Highland's including the above improper items in the calculation of Distributions to Redeemers in calculating its entitlement to Distribution Fees, resulted in Highland paying itself Distribution Fees to which it was not entitled by an overpayment of $14,452,275 in Distribution Fees. The Committee is entitled to judgment in that amount plus interest at the rate of 9% from the date of each improper fee. RX 408, Schedule 2.1

H.      Purchase of Plan Claims[5]

1.      From December 2013 through January 2016, Highland purchased twenty-seven Plan Claims from Crusader investors for itself, without the approval of the Committee [ Tr. 5 50:5-8.] The Committee contends that such purchases breached the Plan, because if it had known that the Plan Claims were available for sale, it would have exercised its ROFR.  Tr. 3 163:11-24; Tr. 4 389:3-390.23. The Committee urges that the UBS TRO, said by Highland to block any purchases by the Fund during its pendency, does not in fact bar such purchases; in any event, the Committee points out that it is conceded that the Fund had assets other than the allegedly restrained assets with which to make purchases outside of the restrained assets. The Committee seeks damages equivalent to the value of the Claims at the time they were sold, any profits or benefits realized by Highland, and pre-judgment interest at 9%, for a total of $8,897,899 plus interest.

2.      Highland raises a number of defenses. First, it argues that, during the period that the TRO was in effect, the Committee agreed with the advice given by the Fund's (and Highland's) counsel in the UBS case, Lackey Hershman, that the TRO, at minimum, prevented the Fund from spending cash to buy-out other investors before UBS's claims were resolved. See Tr. Day 7 at 319:17-332:3. Thus, Highland contends that the Committee cannot prove it would have purchased the Claims had they been offered to it.

---

[5] Plan §1.01: "Plan Claim. The claim of a Redeemer to payment of, or based upon, the Redemption Amount relating to the redemption of its shares or withdrawal of its capital account balance, as the case may be, in the Crusader Funds as detailed in Section 4.01."

Appx 02127
014699

3.      But the record doesn't support that interpretation. First, refuting the idea that the
Committee agreed with the advice being relayed to them is the exchange of correspondence
between counsel for the Committee counsel and Highland set forth in RC-360, in which
Committee counsel rejected the advice said to have been received from outside counsel, and
stated how the Plan Claims should be dealt with if Highland were to persist in asserting that
the TRO so blocked the Committee's exercise of its ROFR: "the Committee does not agree
with Highland's interpretation of the UBS TRO because the expenditure of money to redeem
interests is not a "Distribution" and, in any event, if Highland feels strongly that it cannot use
the Funds' assets in this way, any acquisition of the interests by Highland or an affiliate is
subject to the Committee's exercising its rights under Section 5.04 when the TRO is lifted or
when the interests can, in Highland's opinion, be acquired by the Fund consistent with the
UBS TRO. Otherwise, the Committee did not approve of the transfer of the Scheme Claims."
RC-360 at 87-88.

4.      Furthermore, before the TRO, when presented with the opportunity to purchase Plan
Claims, the Committee exercised its right of first refusal (ROFR) on five occasions, see RC-
358. During the pendency of the TRO, the Committee was informed about only five of
twenty-eight Plan Claims purchases and disapproved each of the purchases by Highland, but
the disapprovals were ignored. The Committee informed Highland that it disagreed about
the scope of the TRO but that if Highland, as Fund Manager believed the TRO prevented the
Fund from purchasing the Plan Claims, then it would be consistent with the Committee's
ROFR for the right to be exercised when the TRO was lifted. HC-580.

5.      We find that the Committee would have exercised its ROFR if it had been given full
information and had not Highland been preventing the exercise of the ROFR by invoking
the TRO and misrepresenting to buyers that it had the ROFR.

Appx. 02138
014700

6.      As a second defense, Highland contends that during the period that the UBS TRO was in effect, it relied on advice of counsel that the TRO prevented the Crusader Fund from acquiring any Plan Claims, thus opening the door for Highland to purchase the Plan Claims that would otherwise have been subject to the Committee's ROFR under §§2.05(f)[6] and 5.04[7] of the Plan.

7.      Mr. Leventon testified that the TRO was obtained by UBS in response to UBS's allegation that Crusader Funds had participated in a fraudulent transfer of assets from a UBS debtor; the TRO restricted transfer of assets but because those assets had been acquired about four years previously and disposed of in the ordinary course of business, "the UBS TRO was essentially designed to 'collateralize' UBS against the March 25, 2009 asset transfer. And if they couldn't be collateralized with those exact assets and the exact actual cash ... or cash equivalent, then it had to be collateralized with something else. And that something else was the assets of the fund." Day 7 at 328:12-20.  That testimony would suggest that from the moment that the TRO went into effect, the Fund was under constraints not to purchase any Plan Claims or other assets.

8.      But this explanation is not convincing.  Regarding the advice received from Lackey Hershman, Mr. Leventon testified that the majority of the advice received was orally and over time, and that the advice was "an evolving interpretation" that "crystallized...in the first quarter of 2014." Id. at 330:9-17.  The advice consisted of "a bunch of verbal conversations, but a lot of that advice is embodied in that memo [HC259] that Lackey wrote to the Crusader Fund. Because we wanted the Committee to understand our quandary."  Day 7 at 319:17-332:3 (Emphasis added).

---

[6] Plan §2.07(f): "The Redeemer Committee shall have ... the authority to approve or disapprove the assignment or transfer of interests in the Feeder Funds or Plan Claims; provided that such proposed assignment or transfer shall be deemed to be rejected if not affirmatively approved in writing within 30 days of submission to the Redeemer Committee..."

[7] Plan § 5.04: "No assignment or transfer of a Plan Claim after the Effective Date may be purchased by [Highland] or its affiliates without such Plan Claim first being offered to, and rejected by, the Crusader Funds."

26

014701

9.      The Lackey Hershman memo, dated July 23, 2014, HC-259, deals only with the practical consequences of seeking an amendment to the UBS TRO while an appeal was pending, and does not provide any advice regarding the scope or interpretation of the UBS TRO.[8] Notably, there is no other document from Lackey Hershman presented at the hearing, even including emails, that supports Mr. Leventon's explanation.

10.      Perhaps in recognition of the thin basis for its claim that it relied on the advice of counsel, Highland requests that the Panel draw no inferences from the "relatively few written communications on this issue," because there was, Highland contends, "unrebutted testimony" of the "contemporaneous advice of counsel." Highland points to a letter from an internal counsel at Highland to the Committee that cites advice from outside counsel regarding the effect of the TRO on the Committee's ability to purchase Plan Claims, RC-360 ("outside counsel to HCMLP has advised that the temporary restraining order which has been imposed by the Court in UBS Securities LLC et al. v. Highland Capital Management, L.P. prohibits the Crusader Funds from purchasing the Scheme Claims using assets of the Crusader Funds").

11.      The statement by internal counsel is the type of hearsay that was received in evidence only because this was an arbitration but to which, under the circumstances, we accord little substantive weight. We find more persuasive the absence of any writing, even an e-mail, directly from the law firm regarding the scope of the TRO and restrictions against the Fund using its assets to purchase Plan Claims or similar items.

12.      Further, we find that, even before the TRO went into effect, and thus well before any advice from counsel would have been received, Highland was laying the groundwork for purchasing the Plan Claims for itself and bypassing the Committee's ROFR.

---

[8] On questioning by members of the Panel, Mr. Leventon referred to the Lackey Hershman memo in broad terms:

"As set forth in the Lackey memorandum, which we all have, Lackey reported that UBS said that, Crusader and Highland Credit Strategies could neither distribute cash to anybody, nor sell assets, nor make any payments outside of the normal course of business...ARBITRATOR BRODSKY: Is the Lackey Hershman memo you're referring to the one that is HC-259, dated July 23, 2014? THE WITNESS: I believe that's correct. ARBITRATOR BRODSKY: I don't see any reference to conversations relayed to you by counsel about what UBS said. I see a sentence on page RC-3208 at the top, it says, 'UBS counsel stated that they're not willing to enter into such a stipulation unless Crusader provided detailed discovery of its cash and asset holdings," et cetera, et cetera. Is that what you were referring to? THE WITNESS: Yes. They were not willing to modify the TRO in order to permit the sale of assets unless Credit Strategies, Crusader and other defendants handed over detailed financial information that they would not otherwise be entitled to in discovery. And we were advised that that was a prohibitive risk."

Day 8 170:10-17, 173:4-174:7.

13.    On May 29, 2013, Highland caused the Board of the Master Fund, which it controlled, to adopt a resolution, as follows:  "Whereas, ... (2) certain investors from time-to-time desire to sell their interests as redeemed, unpaid shareholders, in the Company ... (any such shares, 'Offered Shares'); (3) one or more principal accounts (the "Related Accounts') in which James Dondero ... and/or Highland ... have material, direct and indirect, financial and ownership interests, have enters a bid to purchase certain of Offered Shares; (4) the bid of the Related Account(s) is equal to or greater than the highest bid; ...Now Therefore Resolved That (1) the undersigned Directors hereby consent to the Proposed Transaction and any future transfers of Offered Shares to the Related Account(s)..." RC-276 at 5; Tr. 7 63:25-68:14.

14.    This pre-approval of transfers of interests in the Fund to Mr. Dondero, Highland, or its affiliates does not reference the Committee's ROFR, but it enabled Highland, falsely, to claim that it had a ROFR.  Using that Resolution, Mr. Leventon informed multiple investors interested in possible transfers of their interests, that Highland had a ROFR to purchase any Plan Claims, never mentioning the Committee's prior and superior ROFR. RC276[9]; RC280; RC434. This conduct alone constituted a breach of the Plan, because it deprived the Committee from having any insight into the transactions as to which the Plan gave them rights to purchase the underlying interests.

15.    Furthermore, by the time Highland received the Lackey Hershman memo in July 23, 2014, Highland had purchased fourteen Plan Claims, nine of which were not disclosed to the Committee. Thereafter, Highland purchased another thirteen Plan Claims without any disclosure to the Committee. Mr. Leventon testified that the only reason for Highland not to consult the Committee about the 27 purchases in 2013, 2014, and 2015 was its interpretation of the TRO. Day 7, 172:2-10.

16.    Additional actions by Highland further demonstrate that the reliance on the TRO was a facade, designed to enable Highland to attempt to purchase a majority interest in the Fund without the Committee's knowledge. In May 2014 and again in January 2016, Highland hired a broker to solicit all Fund investors, except those who were on the Committee, to buy their interests at half or approximately half of the NAV that Highland had itself set. RC417; Tr. 7 95:8-20, 96:8-23; RC425.

---

[9] "By way of Written Resolution, the Board of Directors of [the Fund] determined that if the Investment Manager or an affiliate offers to purchase the shares in the Fund, then that bid shall be accepted if it is the highest bid. See Written Resolution of the Directors of the Fund dated May 29, 2013. The Board may, in its absolute discretion, approve transfers. ... Accordingly, the Investment Manager, as authorized by the applicable documents, hereby bids 60.25 cents of NAV for purchase of 100% of Crown Alpha's capital balance as of the November 2015 NAV date"

17.     The broker, Wake2O, used talking points drafted by Highland that misrepresented on whose behalf Wake2O was acting, represented, without apparent foundation, that the offering price of 50% or 55% of NAV was "[t]he current best market bid" and that price would go down in the future, and, finally, that the TRO prevented the Fund from making distributions and that the Fund held many illiquid assets. RC420; Tr. 7 101:4-11 ("Q: And so one of the things that Highland wanted Wake to convey to investors was, hey, you might want to sell your interest in Crusader because right now there's this TRO and you're not going to be able to get any distributions, right?  A. · · That's probably a fair paraphrasing.").

18.     Throughout Wake2O's engagements, it was under pressure from Highland's CEO to pursue investors so that Highland could obtain a greater share of the Fund. See, e.g., RC-250 ("[K]eep pushing as much and many as quickly as possible....")(August 2015); and RC-426 ("Our CEO is keen on starting the process as soon as possible. Please let us know if we can start Monday.") (January 2016); Tr. 7 135:6-137:18.

19.     It was also in this period that Highland undertook a renewed effort to keep the Redeemers Committee in the dark about their purchasing activities. Mr. Leventon was significantly involved in providing direction, as well as drafting talking points, to Wake2O to "reach out to all non-committee members,"  (emphasis added); Tr. 7 146:16-149:7.  Highland offered Wake2O an incentive fee to acquire interests representing $200 million of NAV, but made clear to Wake2O that they should try to achieve that goal without contacting members of the Redeemer Committee. Tr. 7 157:13-161:2. The amount of $200 million was not an accidental target; it was just $4 million of NAV more than what the Redeemer Committee held, Tr. 7 155:15-23.  Wake2O's efforts resulted in the acquisition by Highland of a significant number of Plan Claims, amounting to just shy of $200 million, RC418; RC360; RC419; RC422; RC423; RC424.

29

20.    Finally, Highland continued misrepresenting to investors that it had a ROFR and never mentioned in its communications that the Committee was the entity actually possessing that right.  Mr. Leventon was the principal instrument through which this misrepresentation and omission were communicated, Tr. 55:19-25 ("Q. Mr. Leventon, have you ever sent an e-mail to an investor telling the investor that Highland Capital has a right of first refusal in the event the investor wants to sell its interest in the fund? A. With respect to the Crusader Fund, I don't recall having done so."); but see RC-276; RC-280; RC434; Tr. 7 74:22-76:23.)[10]

21.    Based upon the testimony at the hearing, we have serious doubts about the scope of the advice given, if any.  In addition, as now conceded, there were adequate untainted funds under the control of the Crusader Funds to have enabled the Committee to exercise its ROFR as to the Plain Claims, had they been informed in a timely way, as mandated by the Plan. 10/24/18 Highland Ltr. to Panel at 2; RC-408 at 37.

22.    Further, from our examination of the language[11] in the TRO, we conclude that the restrained assets were narrowly circumscribed, and the broad position taken by Highland was not well-grounded. The TRO restrained the Crusader Fund only from transferring or disposing of property received, or its cash equivalent, in March 2009 "from Highland Financial Partners, L.P. in connection with the Termination, Settlement and Release Agreement, dated March 20, 2009." JX13; RC134. The TRO did not preclude the Fund's sale of unrestricted assets or use of a significant amount of cash in the Fund. JX13.

23.    We also find that Highland's reliance on the UBS TRO was pretextual to support Highland's true goal of benefiting itself over the interests of the Fund and the Committee. We find that Highland breached the Plan and Scheme by its actions and injured the Committee by its breach. We also found that Highland breached its fiduciary duty to the Committee by so acting.

---

[10] It appears that Mr. Leventon was also involved in a misrepresentation to the Committee about the purchase of a Plan Claim after the TRO had expired. In June 2016, he requested the Committee's approval for the purchase of a Plan Claim by an entity he described as a third party that was not affiliated with Highland. But in the course of soliciting the sale of the Plan Claim, Mr. Leventon represented that Highland was exercising a ROFR on behalf of itself or its affiliates. Tr. 7 87:6-89:11; RC-434. In fact, we find that the third party, Charitable DAF Fund, L.P. ("DAF"), was an affiliate of Highland. RC-435; Tr. 7 82:1384:21.  Based on what Mr. Leventon stated, the Committee approved the transfer. RC-316.

[11] "ORDERED, that pending the hearing on this motion, Defendants Highland Crusader Offshore Partners, L.P., and Highland Credit Strategies Master Fund, L.P., are temporarily restrained from transferring or otherwise disposing of property received (or if property has already been transferred or disposed to, the cash equivalent) in March 2009 from Highland Financial Partner,s L.P. in connection with the Termination, Settlement and Release Agreement, dated March 20, 2009."

30

24.     In the calculation of damages owed to the Redeemer Committee by Highland, we have assumed that any Plan or Scheme Claims purchased by Highland would have been purchased at the same discounted price as Highland did. However, the damages methodology used by the Committee's expert witness on damages makes the assumption that the fair market value of each of the Plan Claims was the NAV that Highland had established in each of the relevant months. We do not adopt this methodology because of the uncertainty as to whether a discount should be applied to the NAV in calculating the appropriate fair market value.

25.     Rather, we adopt the alternative approach suggested by the Committee, which is rescission.  We order Highland to transfer the 28 Plan or Scheme Claims to the Redeemer Committee, to pay to the Committee whatever financial benefits Highland received from the 28 transactions, less what Highland paid for the Plan Claims, plus interest at the rate of 9%, from the date of each purchase. We will leave the hearing open until the parties have worked out the exact financial details to comply with this order.

I.     Related Party Transactions

1.     The Committee contends that Highland breached its fiduciary duties by engaging in multiple related-party transactions without seeking or gaining the approval of the Committee  The Plan provision in questions requires the Committee's approval of "all transactions between the Crusader Funds and any other HCM-Related Party, while it serves as investment manager of the Crusader Funds, including any 'cross trade' between the Crusader Funds and any other account managed or advised by HCMLP," Plan §2.06; Scheme §4.7.1 (emphasis added).

2.     First, we must resolve the interpretation question left open by the Order of March 1, 2017, denying Respondent's motion for partial summary adjudication regarding these claims. We found that the language cited above was ambiguous because while Respondent argued that "Crusader Funds" is defined as meaning only four entities, the Master Fund, Onshore Fund, Offshore Fund I and Offshore Fund II, Id., § 1.01, and does not include Crusader Fund "portfolio companies" and other affiliated "entities," Claimant argued that if Crusader Fund meant only those four entities, there would be no meaning to the "including 'cross trades' language of §2.06, because none of the four entities directly owns assets and thus could not engage in cross trades with each other or with any other account managed by Highland. Thus, the language 'including "cross trades" must refer to entities broader than just the defined entities within Crusader Funds, or else that portion of §2.06(a) prohibiting cross trades would be read out of the Plan. Accordingly, we denied without prejudice the motion to dismiss the breach of contract and fiduciary duty claims based on the so-called affiliate transactions until after the record has been more fully developed.

31

3.      At the hearing, testimony was taken from two Redeemer Committee members, Messrs. Montgomery and Behr, regarding the drafting of the section in question. Mr. Montgomery testified that he negotiated the terms of the Plan with Michael Colvin, who was then Highland's General Counsel, telling him that the Committee "needed a related-party transaction prohibition, and he agreed to that. And the understanding was that it included everything on the Highland side and everything on the Crusader side… we thought there was agreement that it was including everything on the Highland side and everything on the Crusader side…" Tr. 2, 234:2-6, 235:2-5. Although in response to a question from a member of the Panel, Mr. Montgomery could not recall the specific language he and Mr. Colvin used to convey this understanding, and on cross-examination, he could not provide a reason for how the specific clause was drafted on this point, we credit Mr. Montgomery's testimony on this point.

4.      Although of limited evidentiary significance, Mr. Behr's testimony that before the adoption of the Plan and Scheme he had had discussions with someone at Highland, whom he recalled was Mr. Colvin, about concerns regarding Highland expensing board fees paid to its portfolio companies, Tr. 9 76:17-25, 77:2, supported Mr. Montgomery's testimony, cited above, that the subject of prohibiting certain related party transactions was part of the negotiations over the Plan. His recollection was supported in part by his contemporaneous notes of having raised that subject in the negotiations. HC508 at 142.

Appx. 02145
014707

5.      In addition, the Committee makes the point that the occasional course of conduct between the parties before the relationship between the parties became a matter of some dispute reflected the belief that the Plan and Scheme required that Highland seek the Committee's approval before engaging in transactions that involved entities other than the four specific Crusader Fund entities in the definition. See, e.g., Tr. 4 213:6-9.[12] Under the established law relating to contract interpretation, "How the parties perform a contract necessarily is manifested after execution of the contract, but their performance is highly probative of their state of mind at the time the contract was signed." Gulf Ins. Co. v. Transatlantic Reinsurance Co., 886 N.Y.S.2d 133, 143 (First Dept. 2009); "[T]he parties' course of performance under the contract is considered to be the 'most persuasive evidence of the agreed intention of the parties.' … 'Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.'" Federal Ins. Co. v. Americas Ins. Co., 691 N.Y.S.2d 508, 512 (First Dept. 1999).

6.      Based on the foregoing evidence, we resolve the ambiguity in favor of a broad definition of the term "Crusader Funds" to include not only the four specific entities named in §2.06 but also the Crusader Fund "portfolio companies" and other affiliated "entities. The Committee contends that Highland engaged in two types of transactions that required but did not receive its consent: (1) transactions between Highland affiliates and Fund portfolio companies, and (2) transactions directly between Highland affiliates and the Fund entities.

J.      Related Party Transactions with Portfolio Companies.
1.      The Committee contends that Highland breached §2.06 by causing Fund portfolio companies to pay board fees, advisory fees and D&O insurance premiums.

2.      Highland responds that transactions between Highland affiliates and Fund portfolio companies were expressly disclosed to the Fund's investors, see HC-230 at 34-36, and that the investors specifically agreed such transactions were permissible, see HC-118 at 7. Accordingly, Highland urges that there can be no fiduciary duty breaches.

3.      Furthermore, Highland urges that the claims arose in 2011 or 2012, and in any case were disclosed to Highland counsel by April 6, 2013, JX-12, and, thus, would be barred by the three-year statute of limitations. Highland characterizes the proof regarding such claims as failing to establish more than the occurrence of "isolated or sporadic acts."

---

[12] We note that one of Highland's outside counsel also occasionally used the term "Crusader Funds" or "Crusader" when describing transactions between portfolio companies and Highland affiliates, RC83 at 2-3; see JX12; JX10.

33

4.      The Committee claims that the statute of limitations should be tolled under the "continuing violation doctrine," which applies where "separate violations of the same type, or character, are repeated over time," and not where the claims are "based on a single decision that results in lasting negative effects." Moses v. Revlon, 2016 U.S. Dist. LEXIS 106431, *18 (S.D.N.Y. 2016).  Under prevailing New York law, "The continuing violations doctrine 'will toll the limitations period to the date of the commission of the last wrongful act where there is a series of continuing wrongs.' Shelton v. Elite Model Mgt., 11 Misc.3d 345, 361 (Sup Ct, New York County 2005); 78/79 York Assoc. v. Rand, 175 Misc.2d 960, 966 (Civ Ct, New York County 1998) … However, 'it will only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct.' Selkirk v. State of New York, 249 A.D.2d 818, 819 (3d Dept 1998)." Pankin v. Perlongo, 2012 WL 7868667, at *2 (Sup. Ct. N.Y. Cnty. 2012).

5.      The evidence brought forth by the Committee failed to show that the payments made by Highland for insurance premiums or for advisory fees were parts of a series of continuing wrongs. Rather, there appear to have been a series of discrete payments made in no regular or consistent pattern and in no similar amounts.13 Under the circumstances, we find in favor of Highland on these claims. We do not reach the issue of whether disclosure to investors would bar a claim for breach of fiduciary duty.

K.      Related Party Transactions with Highland Affiliates

1.      The Committee contends that in 2013 and 2014, without seeking its permission as required under §2.06, Highland sold shares in four CLO assets held by the Master Fund, known as Eastland CLO, Ltd., Grayson CLO, Ltd., Greenbriar CLO, Ltd., and Stratford CLO, Ltd. (the "CLOs"), in what it characterizes as "pre-approved" transactions to Highland affiliates, without seeking the Committee's approval, as required by §2.06(a), which, as noted above, prohibits "any 'cross-trades' between the Crusader Funds and any other account managed or advised by HCMLP."

2.      The proof at the hearing showed that, with no disclosure to the Committee, Highland sold CLOs to brokers it used for other securities transactions who, within a very short time of purchasing the CLOs, sold some or all of the CLOs to Highland affiliates.14 The Committee urges that such sales were breaches of fiduciary duty as well as breaches of the Plan.

---

13 Insurance premiums were paid on behalf of four entities (American Home Patient, Inc., Cornerstone Healthcare, Nex-Tech Aerospace, and Trussway Holdings) in 2011 and 2012; no payment to any of the entities was the same as to any other entity. RC355, Schedule 6.1. As to the portfolio company advisory fees, various fees were paid over varying years between 2011 and 2016 by six different portfolio entities to Barrier or NexBank as advisors; with the exception of two years for one of the entities, each payment of an advisory fee was of a different amount.

14 As set forth in the Expert Report of Basil Imburgia, RC408, Highland engaged in the following transactions:

- It sold 32,500 shares of Grayson CLO at a settlement amounts of $560 and $570 per share, of which $25,500 were sold to NexPoint, with a reported value of $570 per share, Table 19;
- It sold 32,250 shares of Eastland CLO at settlement amounts of $611.40 and $613.90, of which 25,250 were sold to NexPoint, with a reported value of $730 and $670, Table 20;

34

3.      Highland contends that the sales in question were not cross trades but were rather "market-bearing transactions" between Highland and an independent financial institution, which then sold to a Highland affiliate. But this contention is belied by the fact that the transactions bore all of the hallmarks of pre-arranged trades, designed to avoid obtaining the consent of the Committee. See JX-30 at 3 ("Trading assets between two affiliated accounts through a broker may be considered a Cross Trade…"). Indeed, Mr. Dondero, the Chief Executive Officer, is heard on a tape made by then-Chief Portfolio Manager Joshua Terry, suggesting "run[ning a CLO trade] through some broker," RC-263A. By using a middleman between itself and its affiliate, Highland sought to avoid the description of a "cross trade," but the reality is that the transactions were effectively cross trades and we will treat them as such.

4.      That said, however, the substance of the transaction, arguably, benefitted the Committee, because assets of the Fund were liquidated, which was a principal goal of the Plan and Scheme.  Yet the problem with these transactions is that Highland had a perfectly clear path to effectuate these trades without any question being raised as to their bona fides – it could have sought the consent of the Committee under §2.06, which consent could not be unreasonably withheld under §2.07, HC-300. We find that Highland's failure to do so constitutes a breach of the Plan.

5.      We are left with the question of whether Highland's roundabout trading method caused any damage to the Fund.  It appears Highland sold the CLOs to a broker for one value and then the broker turned around and sold the CLOs to the Highland affiliate for a higher value. Thus, the Fund received less than it was entitled to receive had the transaction been done without the middleman, and the damage to the Fund is the difference in the two values. While the Committee's expert Basil Imburgia did not use that methodology to calculate the damages associated with these trades, the information on the price paid to the funds and the price paid to the broker is set forth in the expert report of Highland's expert, Mr. Snow, HC-526 at 41.  The Committee contends that the difference is approximately $450,000. The Committee is entitled to judgment for the amount of the difference with interest from the date of the sale from the funds, Since none of the experts did the appropriate calculation, as with other items, we leave it for the parties to confer and agree upon the total amount of damages including 9% interest and we will leave the record open to resolve that amount.

---

- It sold 31,000 shares of Greenbriar at settlement amounts of $713.60 and $665.00, of which all of the shares were sold to NexPoint at reported values of $730.00 and $670.00, Table 21; and
- It sold 31,500 shares of Stratford at settlement amounts of $661.70 and $660.00, of which 25,500 were sold to NexPoint at reported values of $724.49 and $665.00, Schedule 22.

L.      Failure to Settle Credit Suisse Trades/Litigation

1.      The Committee contends that Highland committed willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors, both by failing to settle two trades Highland made on behalf of the Fund in September 2008 with Credit Suisse (relating to the purchase from Credit Suisse of syndicated loans in the amount of $23.5/9 for properties known as Goldfield and Westgate) and by failing to settle the litigation initiated by Credit Suisse in July 2013 regarding the same trades. The Committee asserts that, despite clear legal authority requiring that Highland settle the trades and the subsequent litigation, Highland refused to do so because it sought to use its refusal to settle the trades and litigation as leverage against Credit Suisse with respect to other claims not involving the Fund that Highland had against Credit Suisse. Thus, the Committee contends Highland put its own interests ahead of the interests of the Fund. Consequently, the Committee further alleges, that by its delaying the settlement of the trades and then of the litigation, Highland caused the Fund to incur seven-plus years of statutory interest that could have been avoided but which the Fund had to pay in January 2016 when the trades and the litigation were ultimately settled.

2.      Highland poses multiple defenses to the Committee contentions. First, Highland argues that the Committee's claim first accrued in 2008 when it allegedly failed to settle the trades and therefore was released by Section 7.01 of the Plan,[15] releasing Highland from all claims, known or unknown, "from the beginning of the world to the Effective Date" of the Plan in August 2011. Second, Highland contends that even if this claim was resurrected after the effective date of the Plan and Scheme, said claim would have arisen in 2011 and was thus barred by the three years statute of limitations for breach of fiduciary duty claims. Third, Highland argues that it did not breach its fiduciary duty as it was only exercising its legitimate business judgment in not settling the trades or the litigation and that the Committee has otherwise failed to show that Highland committed willful misconduct in this regard. Finally, Highland asserts that if the Tribunal finds that it breached its fiduciary duty, any damages that might be owing should be at a reduced amount from what the Committee claims.

---

[15] Section 7.01 provides, as follows: "Section7.01. Upon the Effective Date, each of the Consenting Redeemers, for themselves and on behalf of any of their respective officers, directors, shareholders, partners, members, employees, affiliates, investors, agents and representatives and any other person or entity entitled to assert a Claim (defined below) by, through, under, or on behalf of any Consenting Redeemer, hereby releases each of the HCM-Related Parties and each of the other Consenting Redeemers, from any and all accounts, actions, agreements, causes of action, claims, contracts, covenants, controversies, damages, debts, demands, executions, expenses, judgments, liabilities, obligations, omissions, promises, representations, and fights to payment, and all other liabilities of every kind, nature and description whatsoever, liquidated and unliquidated, fixed and contingent, matured and unmatured, disputed and undisputed, legal and equitable, state and federal, secured and unsecured, accrued and unaccrued, known and unknown, choate and inchoate (each, a "Claim"), which each Consenting Redeemer has, may have or ever had against any or all of the HCM-Related Parties and the other Consenting Redeemers from the beginning of the world to the Effective Date related to each of the Crusader

Appx. 02140
014711

Funds, including without limitation its administration and wind-down; provided, however, that such release shall not operate to release any claims arising from this Plan or based on larceny within the meaning of Section 155.05 of the New York Penal Code ("Larceny Claims"), provided that such exception shall not apply to Larceny Claims within the scope of knowledge of the releasing party as of the Effective Date. The benefit of the release in this Section 7.01, as it related to the HCM-Related Parties, is held in trust by the Crusader Funds for the HCM-Related Parties, and the Crusader Funds hereby assign the benefit of the release in this Section 7.01 in their favor."

37

3.      With respect to the issue of the release, the Tribunal concludes that Section 7.01 releases any claims that the Committee might have with respect to the failure by Highland to settle the Credit Suisse trades through the Effective Date of the Plan, but the Committee has not released any claims that arose after the Effective Date of the Plan. The Tribunal need not decide whether the continuous post-August 2011 failure to settle the trades automatically gives rise to new post-Effective Date claims; once Credit Suisse commenced litigation in July 2013 and the Committee renewed its demand that Highland settle the trades and the litigation, and once Highland again failed to do so, a new claim arose, at least as of that point in time. This new claim would not be released under Section 7.01 since it arose after the Effective Date of the Plan. Accordingly, Tribunal views Highland's continuous failure to settle the trades and litigation after July 2013 (until January 2016, and subject to the temporary withdrawal by the Committee of its demand that Highland settle the trades and litigation in September of 2013, as discussed below) as the potentially actionable conduct that the Tribunal will analyze below.

4.      As to the statute of limitations issue, the Tribunal agrees with Highland that a three years statute of limitations applies to breach of fiduciary duty claims and therefore any conduct outside the three years limitations period is not actionable.  The Committee filed in this Arbitration its breach of fiduciary claim with respect to the unsettled Credit Suisse trades and litigation on July 5, 2016. Consequently, given the application of the statute of limitations, any claim for relief for any period prior to July 5, 2013 is barred by the statute of limitations and the Tribunal will not consider conduct prior to this date to be actionable nor will it consider any claim for damages for the period prior to July 5, 2013.

5.      The Tribunal finds that Highland committed willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors, by failing to settle the two subject trades with Credit Suisse. The Tribunal finds that, whatever strategy Highland intended or whatever judgment calls it made, or purported to make, with respect to the settlement of these trades, it was under a clear legal obligation to settle the trades but failed to do so.

Appx. 02151
014713

6.      Highland's then General Counsel admitted to at least a general awareness of the legal obligation under the LSTA regime to settle trades promptly (and to litigate later if there is a dispute regarding same). Tr. 10 288:2-12, 290:13-22, 291:15-20; and there is other evidence to the same effect. See, e.g., JX-12 at RC00100770-771. Despite this clear legal obligation, and despite Committee requests that it do so, Highland refused to settle the trades in order to provide itself with leverage vis-a-vis Credit Suisse on another dispute. Even if, as argued by Highland, its prevailing on this other dispute would advantage the Fund, once the Committee demanded that Highland settle the trades, as it first did during the limitations period on August 7, 2013, Highland should have done so given both the acknowledged weakness in its defenses and that its purported goal in not doing so at least primarily advantaged itself and not the Fund (even if the Fund might have gained some marginal potential advantage if Highland prevailed in the other dispute). In light of the preceding, Highland's refusal to settle the trades constitutes willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors.

7.      The Tribunal finds that the actionable willful misconduct by Highland for which damages will be due occurred during the period September 8, 2014 through January 14, 2016. The reason for the end date is clear and undisputed: on that date, Highland caused the Fund to pay for the trades and the interest due. As for the start date, the earliest possible start date, in light of the above analysis, is August 7, 2013 which is when the Committee first demanded during the limitations period that the trades be settled. But, in September 2013, counsel for the parties interacted and the Committee withdrew its demand that Highland settle the trades. HC-476a. The Committee argues that it was not apprised by Highland of relevant information at the time, and therefore the Fund should not be bound by its agent's withdrawal of the demand, but the Tribunal concludes that, notwithstanding Highland's failure to provide this information, the Committee's counsel independently analyzed the relevant issues and the Committee is responsible for the decisions flowing from that analysis. On or around September 8, 2014, after the trial court entered summary judgment in favor of Credit Suisse in the litigation, the Committee reinstated its demand that Highland settle the trades; since Highland did not do so until January 14, 2016, it is, under our analysis above, responsible for damages accruing during the period from September 8, 2014 through January 14, 2016.

39

8.      The Tribunal adopts the damages theory advanced by the Committee: the pre-judgment interest that the Fund had to pay during September 8, 2014 through January 14, 2016, minus the gain it achieved during the same period by virtue of having the use of the subject $23.5 million. However, neither party presented a damages analysis consistent with the preceding parameter. Accordingly, the Tribunal directs that the Parties jointly confer to calculate an amount of damages that takes into account the following parameters: (i) the damages period is between September 8, 2014 and January 14 , 2016; (ii) the 9% statutory interest (ordered by the New York State Supreme Court in September 2014) is to be applied on a simple basis to the total principal amount due ($23.5 million); (iii) the amount of the "off-set" is to be calculated using the factor utilized by Claimant's expert – the Treasury Yield Rates for the damages periods specified in (i); and (iv) 9% statutory, pre-judgment interest is to be applied on a simple basis to the result of the calculations in (i) – (iii) from January 14, 2016 to the date of this Partial Final Award.

M.      The Delay in Settling the UBS Litigation

1.      As noted above, Highland, Crusader and Credit Strategies were parties to an action commenced by UBS which alleged that certain securities had been fraudulently transferred by Highland to the funds. As a result, the funds were enjoined from transferring the subject assets during the course of the litigation.

2.      In May 2015, UBS, Highland, Crusader and Credit Strategies reached an agreement in principle to settle the litigation. Under the terms of that agreement Crusader was to pay UBS $25 million and Highland was to pay $35.75 million. A separate agreement between the Committee and Highland provided that, no sooner than December 30, 2016, Highland could recapture $33.75 million through incentive fees that could be generated through the liquidation of Crusader assets. RC-227.

3.      The settlement agreement was to be finalized on May 30, 2015, but Highland refused to go through with the settlement because Credit Strategies would not release claims against Highland. Tr. 3 21:10-22:3; Tr. 3 24:16-25:6; Tr. 10 316:20-317:23. Ultimately the Committee negotiated a its own settlement, pursuant to which Crusader paid UBS $25 million on July 1, 2015, and an additional amount of $30 million on December 29, 2015.

4.      The Committee argues that, had Highland not blown up the original settlement, it would not have had to pay the $30 million to UBS on December 29, 2015, and it would have retained those funds at least until December 30, 2016, when that amount might have been transferred to Highland if it had earned that amount in incentive fees. The Committee, therefore, seeks as damages 9% interest on the $30 million from December 29, 2015 to December 30, 2016, which its expert calculated to be $2,041,664.

40

5.    Highland denies that it has any liability and asserts that is protected by the business judgment rule. It also argues that 9% interest is not appropriate. Further, Highland urges that the Committee's expert did not otherwise account for the fact that Highland might have earned $33.75 million in incentive compensation and, therefore, there was a net benefit to the fund.

6.    There is no basis for Highland's claim that its conduct is protected by the business judgment rule. In deciding whether or not to settle the UBS litigation, Highland was acting as a fiduciary with respect to Crusader and had a fiduciary duty not to place its own interests above that of Crusader. As the New York Court of Appeals stated in Birnbaum v. Birnbaum, 73 N.Y. 461, 466 (1989):"It is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interest the fiduciary is to protect . . . . This is a sensitive and ' inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a  fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty. (Citations omitted.)"

7.    Thus, Highland was not free to place its own interests above that of Crusader and had an obligation to settle UBS's claims against Crusader regardless of its concerns about possible claims against it by Credit Strategies.

8.    There can be no question that Highland's action in refusing to settle with UBS resulted in Crusader being deprived the use of $30 million in cash between July 1, 2015 and December 30, 2016, the first day on which Highland would have been entitled to receive any of the incentive fees. Here, as with the Deferred Fees, it is appropriate to award interest on that amount at the rate of 9% to compensate Crusader for that loss.

41

9.    The problem with Highland's claim that it might have earned an incentive fees of $33.75 million is that Highland offered no evidence that would suggest that its incentives fees would ever have reached even the $30 million amount that the Committee is willing to concede might have been reached. Since the original settlement agreement was negotiated at a time when there was no plan in place to terminate Highland as the fund manager, the incentive fee structure was based on events that would ultimately occur in periods after the Committee terminated Highland. Since neither party made any effort at the hearing to calculate incentive fees, it seems apparent that such a calculation was not possible. In these circumstances, the Committee's assumption that Highland would have earned $30 million in incentive fees by December 29, 2016 is generous and there is no basis for a finding that Highland would have earned more than that in incentive fees.

10.    We award Claimant as damages 9% interest on the $30 million from December 29, 2015 to December 30, 2016, which its expert calculated to be $2,041,664.

N.    Cornerstone

1.    Highland Cornerstone Healthcare Group ("Cornerstone") is a company that owns Long Term Acute Care (LTAC) hospitals in which the Fund owns a minority equity interest. At the time of the adoption of the Plan and Scheme, Highland owned or controlled 100% of the shares of Cornerstone. Two groups of funds, Crusader Funds and Highland Credit Strategies Fund ("Credit Strat"), owned more than 50% of the shares of Cornerstone. Between 2011 and 2013, Highland was secretly engaged in the process of valuing and, eventually, selling the interest held by Credit Strat in Cornerstone. In September 2013, after a process in which the Credit Strat Redeemer Committee was kept completely in the dark as to the sales process that was underway, and which was later found to be unfair to the investors in Credit Strat, see RC-306, Highland arranged for the purchase of Credit Strat's interest by Cornerstone itself at the price of $2,956.03 per share, see JX-16. This price was below the most recent mark set by Highland, and below the value of between $3,424 and $4,434 per share that Highland's investment bankers, Houlihan Lokey, found to be fair for the purchase of the minority interest, see HC-431.

42

2.      Following the purchase of the Credit Strat interest, the Crusader Funds owned 41.8% of Cornerstone, see RC-138 at 7. The Crusader Funds learned of the sale and made known their interest to Highland in having their interest in Cornerstone sold.  But when Highland offered to buy their interest for the same price of $2,956.03 per share as the Credit Strat interest, the Committee engaged Ernst & Young ("E&Y") as its advisor to analyze the offer and prepare a response. E&Y prepared two analyses of the value of the Cornerstone asset. The first, HC-577, found that, as of the fall of 2013, "Cornerstone's offer to purchase Crusader's share for $43.8 mm is below Crusader's current carrying value and at the low end of the range of values developed in this Report" and that "based on information provided and reviewed to date it would appear that the lower end of the range is more reasonable to expect that (sic) the higher end of the range," Id. at 5.

3.      The Committee then requested that E&Y prepare a supplemental report, and, in January 2014, E&Y rendered a second report, finding that Cornerstone underperformed expectations for 2013 and that the changes occurring in the healthcare field were creating uncertainty in the industry in which Cornerstone operated.  HC-577 at 19. E&Y reduced its range to $44 million to $63 million, by imposing a discount from its prior range as of year-end 2013 by 10% to 25%. In discussions with counsel to the Committee, E&Y suggested countering with a purchase price in the range of $50 million to $54 million "for negotiation purposes." Id.

4.      Thereafter, on March 28, 2014, after the Committee had considered its options, it made a counter-offer within the range suggested by E&Y at $52,342,188, or $3,529 per share, plus a 50% recapture provision in the event of a sale within three years. JX-18.  The counter-offer was at the 2013 year-end market value, as calculated by Highland. Id. Highland never responded to this counter-offer despite repeated overtures to Highland by the Committee, and despite the desire of the Claimant Redeemer Committee and the mandate of the Scheme and Plan to liquidate all of the assets of the Crusader Fund, the interest in Cornerstone held by the Crusader Funds has not been sold.

5.      Claimant contends that the failure of Highland, during the period it was the investment manager of the Funds, to make any good faith effort to sell the Funds' shares in Cornerstone, constituted a breach of fiduciary duty.

6.      As part of its claim of breach of fiduciary duty, the Committee urges that Highland is collaterally estopped from denying the findings of the arbitration tribunal in the arbitration brought by the Redeemer Committee of Credit Strat arbitration tribunal regarding, inter alia, the Cornerstone transaction. RC-306 (4/6/16 Credit Strategies Fund Final Award).

43

7.      In particular, as it bears on this dispute, the Committee contends that Highland is estopped from denying the following findings: (1) Highland controlled Cornerstone; (2) the per share price at which Highland sold Credit Strat's interest was unfair; and (3) a price of $3,929 per share was a fair price, based upon the Houlihan Lokey valuation.

8.      Highland contends that the Credit Strat Tribunal's findings do not bind Highland in this proceeding, because the two arbitration proceedings deal with "fundamentally different" issues, such that collateral estoppel does not apply.

9.      First, Highland urges that the Credit Strat Tribunal was dealing with the ramifications of a consummated sale, where it found that Highland controlled both Cornerstone's offer and Credit Strat's acceptance. HC-220 at 8, 30, whereas in this proceeding, the evidence is that Cornerstone made an offer to the Committee, but Highland had no role in the Crusader Fund's evaluation of or counter to that offer and no sale occurred.

10.     Secondly, Highland points out that in Credit Strat, the retention of Houlihan Lokey and the entire process that Houlihan Lokey engaged in was a secret that the Credit Strat Committee was unaware of, whereas, in this proceeding, the Houlihan report as well as other financial information was made available to the Crusader Committee, HC-577 at 577.0002, Tr. Day 5 at 114:12-117:18 (Zambie).

11.     The doctrine of collateral estoppel requires that an issue being litigated in the second case be the same as was fully litigated by the same party in the first action. Fuchsberg & Fuchsberg v. Galizia, 300 F.3d 105, 109 (2d Cir. 2002) ("[C]ollateral estoppel prevents a party from relitigating an issue decided against that party in a prior adjudication. It may be invoked to preclude a party from raising an issue (1) identical to an issue already decided (2) in a previous proceeding in which that party had a full and fair opportunity to litigate.") (internal quotations and citations omitted).

12.     Although there are differences in the way in which the sale process took place, we do not find that such differences obscure the fact that some issues are substantially identical in both proceedings.

44

Appx. 32157
014719

13.    The principal finding that we think is binding on Highland in this proceeding is that the price of $3,929 per share, based upon Houlihan Lokey's valuation, was a fair price. Claimant also argues that Respondent is bound by the finding that the offering price Highland made for the Credit Strat position, which was the same price as offered to the Redeemers Committee here, was unfair. But we think that finding would fly in the face of Claimant's own adviser, E&Y, who found that such a price was at the low end of a fair range. Accordingly, we do not think it appropriate to adopt such a finding as binding in this proceeding.

14.    Highland also contends that, with respect to the possible sale of the Cornerstone interest, it was not in a fiduciary relationship with the Committee, which was relying on EY for negotiating assistance, not on Highland, as Highland was sitting opposite to the Committee in the negotiation.  Tr. Day 5 at 116:10-117:18 (Zambie).

15.    While the Committee was not relying on Highland for financial advice or guidance with respect to Cornerstone in the period between the Fall of 2013, when an offer of $2,956.03 per share was made, and the early Spring of 2014, when the counter-proposal were made, the Committee did rely on Highland, in its role as investment manager, both before and after those dates, to liquidate the Fund as rapidly as possible.

16.    But by Highland's choosing to have the Crusader Funds, along with several other entities controlled by Highland, invest in Cornerstone, Highland voluntarily placed itself in a conflict position: it owed fiduciary obligations to the Crusader Funds to maximize the liquidation process, while being the control person of Cornerstone whose own interests were to have any purchase price be as low as possible. As investment manager, Highland was obligated to be fully responsible to the Committee, but could not do so as long as it also continued to play an active role as controlling party of Cornerstone with respect to the Committee's desire to sell.

17.    The hearing record is that, other than making the offer in September 2013, Highland took no steps to market or sell the Fund's interest in Cornerstone. Tr. 1 347:16-349:2; 364:12-22.  At meetings held with representatives of the Committee, the Committee asked about plans to sell assets and Highland never discussed, or appeared to have a plan by which it proposed to sell the Cornerstone asset. Tr. 1 349:4-22; 365:13-17; Tr. 4 55:14-20; RC-317 at 2("Mr. Jameson noted that for the remainder of the portfolio, formal strategies for disposition are not in place.").  When Committee representatives met periodically with Jim Dondero, the CEO, he made it clear that he ran the sales operation completely and did not wish to be questioned or have the portfolio managers questioned as to the timing of any particular sale.

45

18.    We find that Highland had a fiduciary duty not to place its own interests above that of Crusader, Birnbaum v. Birnbaum, 73 N.Y. at 466 (1989), but rather to subordinate its own economic interests behind its fiduciary obligation to the Crusader Funds. Guth v. Loft, 5 A.2d 503, 510 (Del. 1939) ("The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest."); Weinberger v. UOP, Inc., 457 A.2d 701, 710 (Del.1983) ("There is no dilution of [fiduciary] obligation where one holds dual or multiple directorships."); see also Carsanaro v. Bloodhound Technologies, Inc., 65 A.3d 618 (Del. 2013).  Highland's failure to subordinate its own interests to those of the Committee led directly to its failure to engage in a fair negotiating process with the Committee. By failing to do so, Highland breached its fiduciary duty to the Fund.   Caruso v. Metex Corp., 1992 WL 237299, at *16 (E.D.N.Y. July 30, 1992), People ex rel. Spitzer v. Grasso, 50 A.D.3d 535, 546 (1st Dep't 2008). That breach of fiduciary duty was a continuing offense through the period of time that Highland was the investment manager of the Crusader Fund, as Highland never itself took, or authorized Cornerstone to take, any action in response to the counter-offer that was made in February 2014.

19.    Highland argues that the Committee must overcome the business judgment rule that "the defendant [fiduciaries] have acted on an informed basis and in the honest belief they acted in the best interest of the [client]," citing CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd., No. 03 CIV. 7936 (DAB), 2007 WL 2915181, at *4 (S.D.N.Y. Oct. 4, 2007), in turn citing Aronson v. Lewis, 473 A.2d 805, 812 (Del.1984)("While each director must meet this obligation, a decision made by the board of directors will be presumed, under the business judgment rule, to have been made 'on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company,' unless the plaintiff shows that the presumption does not apply.").

20.    But here, we find that Highland's decisions regarding the purchase of the Cornerstone shares from the Crusader Funds — from the offer to purchase, the ignoring of the counteroffer, and the failure to engage in or authorize a negotiation process — were made with the willful intent to benefit itself and not the Crusader Funds investors. See JX-19; Tr. 1 379:17-380:8.  The Business Judgment Rule does not protect Highland or its officers from scrutiny for alleged breaches of fiduciary duty under these circumstances.

46

21.    The question then is what is the appropriate price at which the sale should take place. "[I]n determining whether a fiduciary has acted prudently, a court may examine a fiduciary's conduct throughout the entire period during which the investment at issue was held. The court may then determine, within that period, the 'reasonable time' within which divesture of the imprudently held investment should have occurred. What constitutes a reasonable time will vary from case to case and is not fixed or arbitrary. The test remains 'the diligence and prudence of prudent and intelligent [persons] in the management of their own affairs' (id., at 511 [citations omitted])." Matter of Estate of Janes, 90 N.Y.2d 4, 54 (1997); Public Service Co. of Colorado v. Chase Manhattan Bank, N.A., 577 F.Supp. 92, 107 (S.D.N.Y.1983) (Lumbard, CJ, sitting by designation)("where there is no sale, it is impossible to fix exactly the moment by which the loan should have been sold or the amount that could have been obtained; "[p]robably the only rule is that the court will use its common sense and determine what under all the circumstances it is fair to say that the trustee ought to have received if he had done his duty in selling the property within a reasonable time," (quoting Scott on Trusts)).

22.    To satisfy its obligation under the Plan to liquidate the Fund's assets as rapidly and as fairly as possible, Highland did not have "to cause Cornerstone to purchase the Fund's Cornerstone shares for a specific price and at the specific time demanded by the Committee…," Highland Post-Hearing Brief at 11, but it did have a duty to place the Funds' interest above its own and to obtain the best price possible for the Funds' Cornerstone interest. Thus, when it decided it wished to make an offer to purchase the Funds' Cornerstone shares, it was obligated to do so at the fair market value and not to attempt to take advantage of the fact that it had placed the funds in a position where it was the only available buyer.

23.    Highland argues that it makes no sense to assess damages based upon a hypothetical sale of the Cornerstone asset, because, first, since the shares have never been sold, there is no realized loss; and, second, "other than Cornerstone's $43.8 million offer, there is no evidence of any other willing buyer for Cornerstone's assets at any price."

24.    We reject the first argument because it ignores what we have found to be the breach of fiduciary duty —the obligation to pursue and consummate a sale at a fair and reasonable price. The Fund was damaged by reason of Highland's failure to fulfill that obligation.

25.    As to the second argument, Highland defeats its own argument by pointing out that, in the real world, there is only Cornerstone available as a buyer.  But, because of Highland's own financial objectives, there has been no indication since April 2014 when it failed to authorize a counteroffer that Highland was interested in directing Cornerstone, which it controlled, to make an offer to purchase the shares at anything other than a bargain basement and unfair price.

26.    Using our equitable powers, we believe that a fair price can be derived by using the fair market value of the shares of $3,929 per share, based upon Houlihan's valuation prepared on July 15, 2013, adjusted downward by 10-25% by the year-end discount caused by several factors cited by E&Y. The average of that discount results in a fair market valuation of $3,241.43, which amount is what we find should have been offered to pay for the Cornerstone shares.

27.    We order that Highland pay to the Committee $3,241.43 per share, or $48,070,407, and order that the Committee simultaneously cause the Crusader Fund to surrender its interest in Cornerstone to Highland.

28.    With respect to an award of pre-judgment interest, "[a]lthough an action for breach of fiduciary duty is generally considered of an equitable nature, '[e]ven on [such] a claim with equitable underpinnings ... prejudgment interest [is] mandatory where the only relief sought was compensatory damages.' Lewis v. S.L. & E., Inc. 831 F.2d 37, 39 (2d Cir.1987) (citing Spector v. Mermelstein, 485 F.2d 474, 481 (2d Cir.1973))(emphasis added).

29.    Regarding the rate of pre-judgment interest to be applied, Claimant argues for the application of New York's statutory rate of interest of 9% as most appropriate. Under CPLR §5001(a), "in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion." See  212 Inv. Corp. v. Kaplan, 16 Misc. 3d 1125(A), at *9 (Sup. Ct. N.Y. Cnty. 2007); Panix Prods., Ltd v. Lewis, id; Summa Corp. v. Trans World Airlines, 540 A.2d 403, 409 (Del. 1988).

30.    Under CPLR §5004, New York applies pre-judgment interest at 9%, simple annual interest. Under the circumstances here, where the breach of fiduciary duty deprived the investors of the Crusader Funds of a significant distribution and partial return of their equity, we exercise our "broad discretion, subject to principles of fairness, in fixing the rate to be applied," Summa Corp. v. Trans World Airlines, Inc., id., and we award interest at the statutory rate of 9%, simple annual interest, pursuant to New York law, from April 15, 2014, through the date of this Partial Final Award. We pick this date as it is the date by which we believe Highland and/or Cornerstone (as controlled by Highland) should have responded to the Committee offer.

IV.    The Return of the Deferred Fees

48

A.      Under §§2.02 and 6.02 of the Plan, if Highland distributed $1.7 billion within 43 months of the Plan's Effective Date, Highland could obtain $10 million in Deferred Fees that had been placed in the special account at the outset to incentivize Highland's rapid liquidation.  There is no question that Highland did not meet that goal by the 43rd month and, thus, in Count Three of its Amended Demand, the Committee seeks the immediate return to the Fund of those proceeds by a declaration that the Fund should distribute the right to receive payment in respect of the funds in the Deferred Fee Account to the Consenting Compulsory Redeemers.

B.      Highland objects on the ground that the UBS TRO eliminated the 47-month schedule applicable to the Deferred Fee Account, invoking the Impossibility Doctrine, discussed in detail above, and argues that, upon the eventual complete liquidation of the Fund, it will be entitled to the $10 million in the Deferred Fee Account.

C.      For reasons set forth earlier, we reject the argument that, under the Impossibility Doctrine, Highland was relieved of the requirement that it achieve complete liquidation of the Fund within 43 months, and, thus, is entitled to the $10 million in Deferred Fees upon complete liquidation. Highland had the opportunity to achieve the complete liquidation despite the duration of the UBS TRO, but chose, for its own reasons, not to do so. The Impossibility Doctrine does not provide a basis for granting Highland affirmative relief.

D.      We order the return to the Crusader Fund the $10 million in the Deferred Fee Account.

V.    Counterclaims

A.      Respondent has brought two principal counterclaims: first, it seeks to recover the remainder of Deferred Fees to which it says it is entitled now because Claimant should have completed the complete liquidation of the Fund's assets by December 31, 2017, at the latest; and, second, it seeks damages against the Committee for breach of the Plan and of its fiduciary duties to Highland by failing to oversee A&M's liquidation of Fund assets and for approving, without adequate, if any, scrutiny, A&M's fees, said to be exorbitant.

B.      As to the breach of fiduciary duty claim, the fiduciary duty relation is said to arise from Highland's status as an investor in the Crusader Funds.  Highland's Post-Hearing Brief at 3-5. However, we have previously stricken those portions of Highland's Amended Counterclaim that alleged it was suing as an investor. Panel Order, April 1, 2018, at 4. Furthermore, even assuming that, as an investor, Highland had standing to bring a claim for breach of fiduciary duty, as stated below, we find that no breach of duty has been proved with respect to any of the allegations in Respondent's Amended Counterclaim.

Appx. 02162
014724

C.    Specifically, we have examined the record thoroughly and, aside from the testimony of
Highland's expert, James Finkel, and its former portfolio manager, Mr. Jameson, there is insufficient
evidence of a purposeful and wrongful delay in liquidation or a failure by the Committee to oversee
and scrutinize A&M's performance, nor any activity of A&M that the Committee aided and abetted
that was proved wrongful.

D.    Mr. Finkel had a distinguished thirty-plus year career in capital markets, investment
banking, and investment advisory work, including as a liquidator of the assets of alternative
investment funds. But his opinion that Highland or any reasonable manager or liquidator would
have completed liquidation by the end of 2017, at the latest, was not based on anything more than
his unverified judgment, and not on a close examination of the facts in this record. For example, he
conceded that, in reaching his opinions, he didn't consider the amount of information A&M
provided to investors, didn't review A&M's time records or evaluate the quality of the work
performed by A&M, and didn't consider the consequences of the lack of cooperation of Highland
with A&M, among other critical deficiencies. Tr.10 367:10-372:3. Similarly, his opinion that,
because of what he regarded as a flawed compensation structure, A&M's primary focus was on the
time it spent on projects, rather than on results achieved, was based on one assumption that time-
based work is, inevitably, less likely to be focused, an assumption that we reject as a sound basis of
criticism of A&M's contribution. We find that Mr. Finkel's opinions were not soundly based and
we reject them.

50

Appx. 02103
014725

E.      Mr. Jameson worked for Highland for almost seven years as co-head of Private Equity, responsible for sourcing and executing private equity investments and monetizing existing portfolio companies. He testified that he was aware of the UBS TRO and had been advised that he could not sell assets during its pendency. He was aware that Cornerstone did not comply with requests by A&M for information but did not think he had the power to direct Cornerstone to do so Tr 10 28:18-30:3. He also testified that, had Highland remained as its investment manager, it would have sold the Cornerstone asset by December 31, 2017, and that Highland Capital's purchase of Cornerstone from the Crusader Fund at a negotiated price around the mark set by Highland would have been logical. Tr. 10 30:4-35:23. He also testified, in response to questioning by the Tribunal, that little, if anything, would have changed in Highland's ability to negotiate a sale with the Committee when it was replaced by A&M as its investment manager, Tr. 10 119:8-121:23.  On balance, despite Mr. Jameson's on-the-ground role as portfolio manager, his testimony did not support the allegations of Highland in its counterclaims; if anything, his intimate understanding of the Cornerstone asset and how Highland controlled the process by which Cornerstone was or wasn't being marketed supported the Committee's contentions that Highland could have negotiated a fair disposition of the Cornerstone asset had it chosen to do so.

F.      As to an alleged delay in the liquidation of the Fund's assets, the weight of the credible evidence is that Highland, not A&M, was responsible for any delay in liquidating the balance of the assets in the Crusader Fund after Highland was discharged and A&M was retained.

        1.      We note that we have previously found that Highland, after refusing to respond to numerous requests by the Committee for books and records, should make a thorough search of its books and records and produce all non-privileged documents in its possession, custody, or control on certain relevant topics. Thus, we rejected several arguments put up by Highland to prevent the Committee and A&M from gaining access to critical books and records. Order and Partial Award, April 21, 2017.

Appx. 02104
014726

2.      But, even when ordered to do so, Highland again refused to produce documents on at
least two other occasions, requiring additional motions addressed to this Tribunal, Order,
June 20, 2017; Order, October 21, 2017.

3.      In addition, there was unrebutted testimony that Highland produced "hundreds of
thousands" of documents in single-page PDF format, requiring the better part of three or
more months of A&M's time to correlate and organize. Tr. 6 25:4-19.

4.      By contrast, other than Mr. Finkel's testimony, there was little or no evidence of
A&M's procrastinating or proceeding with deliberate slowness or that the Committee failed
in its oversight of A&M.

5.      We have considered all of the other factual and legal arguments made by Highland in
support of its counterclaims and conclude that Highland is not entitled to recover the
remaining Deferred Fees being held in the Fund's cash account and that the Committee did
not breach Sections 2.02 of the Plan and 1.5.2 of the Scheme, the covenant of good faith and
fair dealing, or its fiduciary duties to Highland and other investors. We dismiss Highland's
counterclaims in their entirety.

VI.    Attorneys' Fees and Other Costs

A.      Both parties have requested attorneys' fees relating to all claims asserted in the Amended
Demand, Highland's Answer, Highland's Amended Counterclaims, and Claimant's Answer to the
Counterclaims. Am. Dem. at 53-54; Highland Answer, October 16, 2016, at 21-22; Highland Am.
Counterclaim, April 15, 2018; Committee Answer to Counterclaims. Under AAA Commercial
Arbitration Rules, Rule 47(d)(ii), those mutual demands for attorneys' fees submitted the issue to
arbitration and gave this Panel the authority to award attorneys' fees, in its discretion. AAA Rule
47(d)(ii). "[M]utual demands for counsel fees in an arbitration proceeding constitute, in effect, an
agreement to submit the issue to arbitration, with the resultant award being valid and enforceable."
R.F. Lafferty & Co., Inc. v. Winter, 161 A.D.3d 535, 536 (1st Dep't 2018) (internal quotation marks
and citations omitted).

B.      The Committee urges that an award of attorneys' fees to it is justified by Highland's having
"acted in bad faith, vexatiously, wantonly, or for oppressive reasons," InterChem 59 Asia 2000 Pte.
Ltd. v. Oceana Petrochem. AG, 373 F. Supp. 2d 340, 355 (S.D.N.Y. 2005) (citation omitted), and that
the record shows numerous examples of Highland acting in bad faith.

52

C.      Highland acknowledges the Tribunal's discretion to order an award of attorneys' fees but
opposes an imposition of attorneys' fees here. First, Highland argues that denying the Committee's
request for attorneys' fees would be consistent with Section 9.02 of the Plan which provides that
"each of the Crusader Funds retains obligations it has to pay . . . legal fees." HC-300 at 86. But this
section of the Plan does not deal with the issue of fee-shifting being ordered by an arbitral tribunal.
Nor, given Rule 47(d)(ii), would an order of this Tribunal shifting the responsibility of fees from one
party to another be contrary to the so-called American rule, as both parties have sought this relief
which is authorized under the prevailing rules of this Tribunal.

D.      Second, Highland urges that the only basis upon which the Committee is seeking an award is
that Highland allegedly engaged in bad faith and vexatious conduct, citing only InterChem Asia
2000 Pte. Ltd. v. Oceana Petrochem. AG, 373 F. Supp. 2d 340, 355 (S.D.N.Y. 2005). Highland points
out that the Court in InterChem Asia justified an arbitrator's imposition of an award of attorneys'
fees because of one party's "bad faith" conduct during the arbitration, principally concerning
discovery issues. Here, the Committee cites seven examples of alleged bad faith, but only one dealt
with such conduct during the arbitration, "failing to provide the Committee with the books and
records of the Fund, resulting in an extensive discovery process, producing records as single-paged
TIFs, and resulting in a Panel ruling against them," citing the Tribunal's Panel Opinion and Final
Partial Award, dated April 17, 2017.

E.      We are exercising our discretion to grant Claimant's request for attorneys' fees and costs and
to deny Respondent's request for the same relief. We do not base our award on any concern of bad
faith or oppressive conduct by Highland's able trial counsel, who acted professionally throughout
these proceedings. However, with respect to each of the claims on which we have determined that
the Committee is entitled to prevail, we have noted above the many occasions where, during the
time it was investment manager and thereafter, Highland engaged in conduct that breached the
Plan, breached fiduciary duties, involved secrecy, misrepresentations, and false statements by the
most senior executives, and constituted willful misconduct. Furthermore, large portions of the
defense set forth by Highland's witnesses were unworthy of belief and reflect the fact that Highland
knew that it had no legitimate defense to many of the Committee's claims. Accordingly, in our
discretion, based on the foregoing, we award Claimant its legal fees and costs for the litigation of
this arbitration.

VII.    CONCLUSION AND AWARD

A.      With respect to the claims below for which we find liability and direct the payment of
damages and interest, if the Parties are not able to agree on the amount of damages or interest, we
direct them to submit simultaneous briefs to the Panel on the issues within thirty (30) days of the
date of this Partial Final Award; there will be no reply briefs unless otherwise directed.

B.      We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on the breach
of contract claims as follows:

1.      The taking of the Deferred Fees: We order that, within twenty (20) days of the date of
this Partial Final Award, Respondent, Highland Capital Management, pay to the Claimant
the Deferred Fees in the amount of $33,313,000, with statutory interest of 9%, calculated on
a simple basis, from the dates of taking in January and April 2016 through the date of this
Partial Final Award.

2.      The payment of Distribution Fees: As found above, with respect to each of the
following categories, we find that the Respondent is liable for damages in the amount set
forth in the Expert Report of Claimant's damages expert, Basil Imburgia, $14,452,275, plus
9% interest, calculated on a simple basis, from the respective dates such Fees were taken:

       a)      The Distribution Fees attributable to the payment of Deferred Fees;

       b)      The Distribution Fee attributable to the amounts reserved in the Redeemer
Trust Account;

       c)      The Distribution Fee attributable to the amounts paid in settlement of the
Barclays claims;

       d)      The Distribution Fee attributable to the value of the LP interests and amounts
transferred to Eames;

       e)      The Distribution Fees attributable to the amount of margin borrowings; and

       f)      The Distribution Fees attributable to the cumulative nature of the calculation,
as discussed above.

Appx. 02107
014729

C.      We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on the breach of fiduciary duty claims as follows:

      1.      Engaging in related party transactions without Redeemer Committee approval:

      2.      Purchase of Plan claims without Redeemer Committee approval: Within twenty (20) days of the date of this Partial Final Award, we order Respondent, Highland Capital Management, to transfer the 28 Plan or Scheme Claims to the Redeemer Committee, to pay to the Committee whatever financial benefits Highland received from the 28 transactions, less what Highland paid for the Plan Claims, plus interest at the rate of 9%, from the date of each purchase, calculated on a simple basis;

      3.      Sale of CLO interests - The Committee is entitled to judgment for the amount of the difference between the sale and repurchase prices with interest from the date of the sale from the funds. We direct the Parties promptly to confer and agree upon the total amount of damages including 9% interest, calculated on a simple basis; if the Parties are not able to agree on the amount of damages, we direct the Parties to submit briefs to the Panel on the issues within thirty (30) days of the date of this Partial Final Award;

      4.      Failure to settle Credit Suisse claims: We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on this claim and direct the Parties promptly to confer to calculate an amount of damages that takes into account the parameters set forth in the body of this Award; if the Parties are not able to agree on the amount of damages, we direct the Parties to submit briefs to the Panel on the issues within thirty (30) days of the date of this Partial Final Award;

      5.      The UBS litigation: We find in favor of Claimant, Redeemers Committee of the Highland Crusader Fund, and award damages in the amount of 9% simple interest on $30 million from December 29, 2015 to December 30, 2016, which shall be paid to the Redeemer Committee by Highland Capital Management within twenty (20) days of the date of this Partial Final Award; and

      6.      The Cornerstone Asset: We find in favor of Claimant and direct Highland Capital Management, within twenty (20) days of the date of this Partial Final Award, to pay the Redeemer Committee the amount of $48,070,407, plus interest at 9%, on simple basis, in return for which the Fund will transfer title to the shares to Highland.

D.      We grant Claimant's request for a declaratory judgment, seeking the immediate distribution of the Deferred Fee Account, and order the payment of the $10 million in the Account to the Committee for disbursal to the Consenting Compulsory Redeemers within twenty (20) days of the date of this Partial Final Award.

014730
Appx. 02108

E.      We find against Respondent on its counterclaim and dismiss the counterclaim with prejudice.

F.      We grant Claimant's request for reasonable attorneys' fees and costs and deny Respondent's request for an award of attorneys' fees and costs. With respect to the amount of fees and expenses that Claimant seeks, the parties should promptly confer to determine whether they can agree on an amount. If the parties can not agree, Claimant shall file an affidavit or petition setting out its claim with appropriate documentation within fifteen (15) days of the date of this Award, unless counsel agree otherwise. Respondent shall respond within fifteen (15) days thereafter, unless counsel agree otherwise. There will be no reply opportunity absent leave of the Tribunal.

G.      We will leave the hearing open until all issues set forth above have been agreed upon by the Parties or decided by the Tribunal.

Appx. 02160
014731

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019

_____
David M. Brodsky, Chair

_____
John S. Martin, Jr.

_____
Michael D. Young

54

Appx 02170

014732

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019

_____

David M. Brodsky, Chair

_____

John S. Martin, Jr.

_____

Michael D. Young

014733

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019

_____

David M. Brodsky, Chair

_____

John S. Martin, Jr.

_____

Michael D. Young

State of NEW YORK                    )

                                     )   SS:

County of NEW YORK                   )

I, David M. Brodsky, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.

_____3/6/19_____          _____
Date                                David M. Brodsky, Chairperson


State of NEW YORK                    )

                                     )   SS:

County of NEW YORK                   )

On this __6__ day of MARCH, 2019, before me personally came and appeared David M. Brodsky, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

MEENA M. GULATI
Notary Public, State of New York
No. 01GU5015872
Qualified in New York County
Commission Expires August 2, 2021

Appx. 02173
014735

State of FLORIDA                    )

                                   )    SS:

County of LEE                      )

I, JOHN S. MARTIN, JR., do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.

_____

Date  March 5, 2019                    _____
                                            John S. Martin, Jr.


State of Florida                   )

                                   )    SS:

County of Lee                          )

On this 5th day of MARCH, 2019, before me personally came and appeared John S. Martin, Jr.,, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

> ROBIN A. YEOMANS
> MY COMMISSION # GG 121122
> EXPIRES: November 3, 2021
> Bonded Thru Notary Public Underwriters

1

State of NEW YORK                )

                                 )    SS:

County of NEW YORK               )

I, Michael D. Young, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.


_3-5-19_                         _Michael Young_
Date                             Michael D. Young


State of NEW YORK                )

                                 )    SS:

County of NEW YORK               )

On this _5_ day of MARCH, 2019, before me personally came and appeared Michael D. Young, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.


_Vickie L. Johnston_
Notary Public
VICKIE L. JOHNSTON
Notary Public - State of New York
No. 01JO6113098
Qualified in Queens County
My Commission Expires July 19, 20 20

1

# EXHIBIT 14

014738

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND,

                        Claimant,

v.                                              Case No. 01-16-0002-6927

HIGHLAND CAPITAL MANAGEMENT, L.P.,

                        Respondent.

## FINAL AWARD

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with
Section 9.03 of the Joint Plan of Distribution, and the Scheme of Arrangement, both entered into
between the above-named parties and adopted in July 2011, and having been duly sworn, and
having duly heard the proofs and allegations of the parties, do hereby, AWARD, as follows:

A. On March 6, 2019, we issued a Partial Final Award, finding Respondent Highland
   Capital Management, L.P. ("Respondent") liable in a number of respects and awarding
   damages, interest, attorneys' fees, and costs to Claimant Redeemer Committee of the
   Highland Crusader Fund ("Claimant"), as described, in relevant part, below. We "le[ft]
   the hearing open until all issues set forth ... have been agreed upon by the Parties or
   decided by the Tribunal."

B. In response to an email from Claimant, dated March 7, 2019, seeking clarification on an
   apparent omission from the Partial Final Award, we issued a Disposition of Application
   for Modification of Award dated March 14, 2019 ("Modification of Award").[1]

C. This Final Award incorporates the Partial Final Award and the Modification of Award
   (together, the "Partial Award"). We re-adopt all prior findings and conclusions of the
   Partial Award, except as specifically modified hereinafter.

D. We have before us the following:

---

[1] The Modification of Award referred to Rule R-46 of the AAA Commercial Arbitration Rules, instead of
Rule R-50, as the basis for the modification of a clerical error, relying upon the predecessor version of
Rule R-50. The substantive text of old Rule R-46 and present Rule R-50 are the same.

Appx 02175
014739

a. Respondent's Memorandum, dated March 17, 2019, requesting that (1) the Panel withdraw its Modification of Award entered on March 16, 2019; (2) cease any further attempts to award additional damages, attorneys' fees, or costs that are not expressly set forth in the Partial Award; and (3) reconfirm that the hearing and all evidence is closed and the Panel is not empowered to take any further action beyond the issuance of its Partial Award ("Respondent's March 17 Memorandum").

b. Claimant's Submission Regarding Fees and Costs, dated March 21, 2019, made pursuant to Rules R-28, R-47, R-53, R-54, and R-55, AAA Commercial Arbitration Rules, seeking an award of $11,865,181.28 in attorneys' fees and costs, including Claimant's attorneys' fees, AAA administrative fees, arbitration expenses, fees incurred by A&M, expert fees, and Panel compensation paid by the Respondent Highland on behalf of the Committee in this arbitration ("Claimant's Fee Submission").

c. Claimant's Application, dated March 25, 2019, made pursuant to Rule 50, AAA Commercial Arbitration Rules, to modify the Partial Award, issued by this Panel on March 6, 2019 (Claimant's March 25 Application").

d. Claimant's and Respondent's Joint Submission on Damages dated April 5, 2019, in which the Parties agreed on the mathematical calculation of the amount of damages and interest contained in the Partial Award and Modification of Award, subject to Highland's objections to the inclusion of any damages awards that were not specified in the Partial Award and subject to objections on two specific issues: (1) whether the Eames residual LP interests would be extinguished; and (2) whether prejudgment interest awarded by the Panel will continue to run after March 6, 2019 until the earlier of the date the amount awarded is paid to the Committee for the benefit of the Fund, or the date on which a Final Judgment is issued on the Award ("Joint Submission").

e. Respondent's Memorandum dated April 5, 2019 opposing the motion to modify the Partial Award; and opposing any award for damages, attorneys' fees, or costs ("Respondent's April 5 Memorandum").

f. Claimant's Memorandum dated April 5, 2019 arguing that (1) the Panel should award further damages in connection with the Barclays claim measured by the Fund's loss of the residual value of the Eames LP interests, either by extinguishing the former Barclays LP interests, or alternatively, by awarding an appropriate amount of damages to compensate the Fund for loss of the value of those interests, which the Committee puts at $11,589,474; and (2) the Panel should award prejudgment interest through the date the Award is paid or final judgment is entered ("Claimant's April 5 Memorandum").

g. On April 10, 2019, Respondent sought leave, which we granted on consent, to file an additional Memorandum on two issues raised by Claimant in its April 5

2

014740

Memorandum, namely, that Claimant adds a new and improper request that interest after March 6, 2019 be compound, and not simple, interest by applying an additional 9% statutory interest to both (a) the damages awarded and (b) the interest accrued through March 6, 2019; and that Claimant has provided a new and improper damages calculation relating to the extinguishment of the Eames LP interests.

    h.  Having reopened the record on March 6, 2019, for additional submissions, as described above, we deem the record closed as of April 10, 2019.

E.  Issues

    a.  Fees and costs

        1.  In the Partial Award, we evaluated the competing claims made by Claimant and Respondent regarding an award of fees, which both sides had sought in their pleadings. As we noted in the Partial Award, ¶VI.A, 52, AAA Commercial Arbitration Rule R-47 (d)(ii) authorizes the Arbitrator to award attorneys' fees if, as here, "all parties have requested such an award . . . " "[M]utual demands for counsel fees in an arbitration proceeding constitute, in effect, an agreement to submit the issue to arbitration, with the resultant award being valid and enforceable." *R.F. Lafferty & Co., Inc. v. Winter*, 161 A.D.3d 535, 536 (1st Dep't 2018) (internal quotation marks and citations omitted); *In re U.S. Offshore, Inc. and Seabulk Offshore Ltd.*, 753 F. Supp. 86, 92 (S.D.N.Y. 1990) ("If both parties sought attorney's fees, . . . then both parties agreed *pro tanto* to submit that issue to arbitration, and the arbitrators had jurisdiction to consider that issue and to award them.")."

        2.  During closing oral arguments, Respondent did not mention its own request for an award of fees, but "*acknowledge[d] the Tribunal's discretion* to order an award of attorneys' fees…" Indeed, Respondent made oral and written closing arguments that conceded that it was "*not disputing the discretion that the Panel has* [to award fees]." Tr. 13 444:2-3 (emphasis added). In its closing slides, Respondent also urged that "The Panel *should exercise its discretion in applying the American Rule*." Respondent Closing Slides at 261 (emphasis added).

        3.  Respondent also argued that denying the Claimant's request for attorneys' fees would be consistent with Section 9.02 of the Plan which provides that "each of the Crusader Funds retains obligations it has to pay . . . legal fees." Second, Respondent urged that the only basis upon which Claimant is seeking an award is that Respondent allegedly engaged in bad faith and vexatious conduct.

3

4. Respondent now chooses to oppose the grant of fees on grounds distinctly different from those set forth above. It belatedly argues an alleged lack of proof and the Panel's being *functus officio* to award fees.

   1. Respondent argues that the Panel "found that the evidence in the record was insufficient to determine many of the Committee's claims for damages, as well as its claims for costs and fees." Resp. April 5 Mem. 14.

   2. But that is incorrect; we did not find any insufficiency; instead, with no objection, we adopted a well-recognized method of dealing with attorneys' fees and costs by deciding entitlement before amount. See *Franco v. Dweck*, 87 N.Y.S.3d 5 (2018) ("Contrary to respondents' contention, the final award did not run afoul of the doctrine of *functus officio*, which precludes an arbitrator from altering in substance a prior award (see *Matter of Wolff & Munier [Diesel Constr. Co.]*, 41 A.D.2d 618, 340 N.Y.S.2d 455 [1st Dept. 1973] ). As the partial final award *expressly reserved* the issue of attorneys' fees, it cannot bar a *subsequent* award of those fees (see *Shimon v. Silberman*, 26 Misc.3d 910, 914–915, 891 N.Y.S.2d 891 [Sup. Ct., Kings County 2009] )."

5. Accordingly, we reject Respondent's new positions. From at least the time the pre-hearing briefs, witness lists, and list of exhibits were mutually filed, it was clear that whichever side that was going to seek attorneys' fees if it prevailed was reserving on the specific rates and amounts of legal fees, as well as costs and expenses, many of which had not yet been incurred. To do otherwise would be a waste of resources. Not once did Respondent ever raise the question of proof regarding attorneys' fees and costs; by its silence and conduct, Respondent consented to the process regarding proof of attorneys' fees that the Panel was following, see CCA Guide to Best Practices in Commercial Arbitration (3d edition), 246.

6. Second, we explicitly denominated the award of March 6 as a "Partial Final Award," making clear to the Parties that the arbitral proceeding was still ongoing. We also explicitly left the hearing open so that the Parties could meet and confer or make submissions, including providing additional evidence, "until *all issues* set forth ... have been agreed upon by the Parties or decided by the Tribunal." Under these circumstances, the doctrine of *functus officio* does not apply. *Kennecott Utah Copper Corp. V. Becker*, 186 F.3d 1261, 1270-71 & n.4 (10th Cir. 1999) (*Functus*

Appx. 32189
014742

*officio* provides that, "once an arbitrator has issued a *final* award and thus discharged his or her office, that arbitrator lacks any continuing power to revise the award or issue a new one.")(emphasis added).

i. Accordingly, we turn to an examination of the application for attorneys' fees and costs, sought by Claimant:

    a. Claimant seeks the following in fees and costs:
        i. Jenner & Block Fees - $9,278,248.99
            1. In support of its fee application, Claimant has provided detailed time records, billing records, and a declaration of Andrew Vail, a partner of Jenner & Block, that establishes that records were maintained on a contemporaneous basis, that time billed on duplicative, inefficient, or extraneous to the arbitral proceeding was excluded from the application, and that hourly rates, and a fixed-fee discount, where applicable, were discounted by 15%. Vail Declaration ¶¶13-18. The hourly rates are shown to be comparable to rates charged by other similar firms and consistent with prevailing market rates for attorneys of similar high levels of expertise and experience. We note that Respondent does not object to the amount sought, except on the bases previously discussed. We find the request for legal fees to be reasonable, especially given the complex factual and legal setting, and grant Claimant's application.

        ii. FTI Expert Fees - $1,274,853.26; and A&M Arbitration Fees - $655,160.00
            1. In support of the FTI fees, Claimant submitted a declaration, with supporting exhibits, of Mr. Vail, who affirmed that the fees reflected "services that were necessary for the Committee to prosecute its claims against [Respondent] and to defend against [Respondent's] counterclaims, and … the amounts charged for such services were reasonable given the necessity of those services." Vail Declaration ¶26.

2. In support of the A&M Arbitration Fees, Claimant has provided the declaration of Steven Varner, a Managing Director of A&M, who affirms that A&M maintained billing records on a contemporaneous basis for its services throughout the course of this arbitration, but did not keep detailed descriptions of its billed time for specific matters within that engagement. He further affirmed that he and another managing director compiled a "conservative estimate of the time that A&M personnel spent on matters that were specifically required in connection with HCMLP's failure to timely provide A&M with books and records relating to the Fund." That work totaled approximately $655,160.00, after discounts were applied to their normal billing rates. Varner Declaration ¶¶6, 7, and 10.

3. Claimant is not seeking recovery for over $140,000 in attorneys' fees and costs for A&M's counsel to pursue information from Cornerstone pursuant to Del. Code Ann. tit. 8 § 220. Varner Declaration ¶8.

4. Respondent principally opposes the fees of FTI and A&M on the grounds that "while the AAA Rules permit the award of certain expenses (e.g. administrative costs and Panel compensation), they are much more restrictive when it comes to witness costs for the parties. In fact, Rule 54 expressly divides expenses into two categories: (i) witness expenses—which are to be borne by the party presenting the witness; and (ii) '[a]ll other expenses'—which may be apportioned by the arbitrator(s)."

5. While acknowledging some dispute among the courts as to whether Rule R-54 permits a prevailing party to recover its expert witness fees, Claimant urges that the weight of authority provides that both consulting and testifying witness fees are recoverable under the AAA's rules, citing *Dealer Comp*.

6

*Servs., Inc. v. Hammonasset Ford Lincoln-Mercury, Inc.*, 2008 WL 5378065, at *2, *4 (S.D. Tex. Dec. 22, 2008) (confirming final arbitration award that included expert witness fees); *In re Pos'tive Produc, Inc. v Thermal C/M Services, Inc.*, 2011 WL 13220365, at *4 (N.Y. Sup. Ct. Nov. 18, 2011) (confirming award that included "expert fees and costs"); and *Cardno Int'l Pty, Ltd. v. Merino*, 2017 WL 6034172 (S.D. Fla. Oct. 30, 2017).

6. Rule 47(a) gives the Tribunal the power to "grant any remedy or relief that the arbitrator deems *just and equitable* and within the scope of the agreement of the parties…", while Rule 47(c) provides that "In the final award, the arbitrator *shall* assess the fees, expenses, and compensation provided in Sections R-53, R-54, and R-55. The arbitrator *may apportion* such fees, expenses, and compensation among the parties in such amounts *as the arbitrator determines is appropriate*." (Emphasis added.) Parsing these sections in conjunction with R-54 leads us to conclude that we have the power to award the expenses of the arbitration, including expert fees, as we deem just, equitable, and appropriate. *White Springs Agric. Chemicals, Inc. v. Glawson Investments Corp.*, No. 3:07-CV-752-J-25JRK, 2010 WL 11507082, at *4 (M.D. Fla. Sept. 13, 2010) (confirming award where tribunal awarded prevailing party its expert fees), *aff'd*, 660 F.3d 1277 (11th Cir. 2011).

7. Under the complex circumstances presented here, we find that the experts were essential to the prosecution of the Claimant's case and that their services, and consequent fees, were a necessary obligation the Claimant was bound to its members to undertake in its pursuit of the claims against Respondent.

Appx-2183
014745

8. We note, specifically with respect to the A&M fees, that a large portion of the fees appear to relate to "time spent organizing the tens of thousands of individual page PDF files that HCMLP provided as books and records instead of complete documents." Varner Declaration ¶7.

9. From our observations at the hearing and our review of the reported rates and fees of FTI and A&M, we conclude that such fees were fair and reasonable and we find that it would be "just and equitable" and "appropriate" relief to award Claimant all of the expert fees it seeks, and we do so.

   iii. Respondent does not object to the following categories of fees sought by Claimant:

1. AAA Administrative Costs - $64,750.00;
2. Court Reporter Hr'g Costs - $114,697.77;
3. Court Reporter Dep. Costs - $28,890.04; and
4. AAA Panel Compensation - $448,581.22 (to date).

  b. Accordingly, in our discretion, we award Claimant the total sought in fees, costs, and expenses, as detailed and updated in section F. below.

b. Claimant's Motion for Modification of the Partial Final Award

   i. On March 25, 2019, Claimant moved, pursuant to AAA Rule 50, to modify the Partial Final Award in several respects.

1. First, with respect to the Partial Final Award regarding the finding of liability of Respondent with respect to the Barclays LP interests, Claimant moved to correct a clerical error that resulted in the omission of a Barclays damages paragraph from the Partial Final Award by modifying that Award to include the paragraph set forth in the Panel's March 14, 2019 Modification of Award.

2. Second, also pursuant to Rule 50, Claimant moved that the Panel modify the award to address other clerical, typographical, and computational errors in the Partial Final Award.

3. AAA Rule 50 provides in relevant part, as follows: "R-50. Modification of Award. Within 20 calendar days after the

8

transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already decided. The other parties shall be given 10 calendar days to respond to the request. The arbitrator shall dispose of the request within 20 calendar days after transmittal by the AAA to the arbitrator of the request and any response thereto."

4. With respect to the Barclays issues, Respondent contends both that Rule 50 does not apply and that the doctrine of *functus officio* divests the Panel of the power to modify the Partial Final Award, as the Panel would be adding an "additional award" that "represents an entirely new award of $34 million in damages not included in the [Partial Final Award] ... constitut[ing] a material revision of the award."(Respondent's April 5 Memorandum at 5).

5. First, we are not adding an "additional award," as it is clear from the structure of the Partial Final Award that a paragraph was missing from the damages portion; all other findings of liability were accompanied by a section delineating the applicable damages except for the finding of a breach of the Plan and Scheme by reason of the transfer of LP interests to Eames. In other words, we found liability in two respects but omitted a paragraph regarding the remedy for Respondent's breach of the Plan and Scheme that we had found with respect to the transfer, without the required Committee approval, of Barclays' fund interests to itself through entities it controlled as part of the settlement. That omission is a classic example of a clerical error.

6. Second, although the effect of the Modification was to add additional damages to the award against the Respondent, the Panel did not "materially revise" the Partial Final Award since liability had already been found.

7. In addition, as previously discussed, the doctrine of *functus officio* "provides that, *while an arbitrator may correct clerical, typographical, or computational errors in a final award, he has no power to revisit the merits of the award after it has issued...*" *Int'l Broth. Of Elec. Workers, Local Union 824 v. Verizon Florida, LLC,* 803 F.3d 1241, 1250 (11th Cir. 2015). However, we did not issue a final award; it was explicitly labeled a Partial Final Award and was explicitly subject to being supplemented by subsequent presentations of damages analyses by both Parties.

9

8.  Finally, there is ample case law for the proposition that the Panel is
    not divested of power, even when issuing a final award, from
    correcting clerical, typographical, or computational errors. See
    *Rain CII Carbon, LLC v. ConocoPhillips Co.*, 674 F.3d 469, 472-
    73 (5th Cir. 2012); *E. Seaboard Const. Co., Inc. v. Gray Const.,
    Inc.*, 553 F.3d 1, 5-6 (1st Cir. 2008).

9.  Respondent also argues that the Panel is barred from correcting the
    Partial Final Award by AAA Rule 45, which provides that "The
    award shall be made ... no later than 30 calendar days from the date
    of closing the hearing..." Respondent urges that "the parties agreed
    that the final award would be made on or before March 7, 2019.
    Accordingly, any award made after that date is untimely and
    beyond the scope of the Panel's authority." (Resp. April 5 Mem. at
    7). But, once again, this argument ignores the explicit nature of
    the March 6 Partial Final Award, which "le[ft] the hearing open
    until all issues set forth above have been agreed upon by the
    Parties or decided by the Tribunal."

10. Respondent also argues that we are "reopening" the record in
    violation of AAA Rule 40. That rule provides, in relevant part, as
    follows: "The hearing may be reopened on the arbitrator's
    initiative, or by the direction of the arbitrator upon application of a
    party, at any time before the award is made. If reopening the
    hearing would prevent the making of the award within the specific
    time agreed to by the parties in the arbitration agreement, the
    matter may not be reopened unless the parties agree to an
    extension of time. When no specific date is fixed by agreement of
    the parties, the arbitrator shall have 30 calendar days from the
    closing of the reopened hearing within which to make an award..."

11. We acknowledge that a communication from the AAA, dated
    December 12, 2018, stated that the "no additional evidence is to be
    submitted and that the hearings are declared closed as of December
    12, 2018," but this statement was subsequently withdrawn by the
    previously-quoted language of the Partial Final Award where we
    explicitly left the record open "until all issues set forth ... have
    been agreed upon by the Parties or decided by the Tribunal."

12. That language is equivalent to the language that "we will reopen
    the hearing." *Int'l Bhd. of Teamsters Local 959 v. Horizon Lines of
    Alaska, LLC*, 22 F. Supp. 3d 1005, 1007–08 (D. Alaska 2014)
    ("Where an arbitrator specifically retains jurisdiction to resolve
    disputes regarding damages, that indicates that the arbitrator did
    not intend the award to be Final. Put simply, an arbitration award
    that postpones the determination of a remedy should not constitute

10

a final and binding award"); *Golden v. Lim*, 2016 WL 520302, at *3, *9 (E.D. Mich. Feb. 10, 2016)(holding that the arbitrator had the authority under the AAA Rules to reopen the hearing to accept further submissions on attorneys' fees).

13. Second, even if the relief sought required a reopening of the record, Rule 40 authorizes the Panel to do so "upon the application of a party," so long as doing so did not violate "the specific time agreed to by the parties in the arbitration agreement" for the making of the award. No such time period is set forth in the arbitration agreement. Finally, we interpret Rule 40 to be speaking to the instance of reopening the hearing after the final award is made, which is, again, not the situation we are in.

ii. We grant Claimant's application under AAA Rule 50[2] and formally correct the clerical error by re-adopting the additional paragraph, previously included in the Panel's March 16 Modification of Award, as follows:

1. "Insert the following paragraph at page 54, immediately after VII.B.2.f: "3. The transfer of Barclays Fund interests: By transferring, without the required Committee approval, Barclays' fund interests to itself through entities it controlled as part of the settlement, Highland breached the Plan and Scheme. We award the Committee damages measured by the benefits Highland received in excess of the amount it would have been entitled to receive from the Redeemer Trust Account because Barclays claim was settled for less than its value. In Table 11, Version 2, Claimant's damages expert, Basil Imburgia, calculated that such an amount totaled $34,661,749. RC-522. As with other amounts awarded, the Parties are to confer to determine the actual amount of damages including the 9% interest to date."

iii. Claimant also moves under Rule 50 to correct four other clerical errors, set forth below, as to which Respondent does not object. The motion is granted; the clerical errors are set forth below and corrected as noted:

1. The Partial Final Award reference to the amount of Deferred Fees improperly taken from the Fund by Highland as "$33,313,000" (Partial Final Award at 14, 54) is corrected to read "$32,313,000."

---

[2] We acknowledge Respondent's interesting linguistic analysis of the differences between ICDR Article 33 and AAA Rule 50, see Respondent April 5 Memorandum at 5-6, but we deny the underlying premise that what we are being asked to do is to make an "additional award as to claims, counterclaims, or setoffs presented but omitted from the award." We had found liability as to two claims involving the Barclays LP interests but omitted the damages component of one of the two liability findings. That does not constitute an award as to a claim argued by Claimant but omitted from the partial final award.

Appx. 2187
014749

2.  The Partial Final Award reference to the amount of improper Distribution Fees calculated by Mr. Imburgia as $14,452,275 (Partial Final Award at 24, 54) is corrected to read "$14,457,275."

3.  The Partial Final Award reference to the amount of "$23.5/9" and "$23.5 million" (Partial Final Award at 36, 40) is corrected to read "$23,938,568."

4.  The Partial Final Award reference to the incentive period as ending on "December 30, 2016" (Partial Final Award at 40, 41, 42, 55) is corrected to read "September 30, 2016."

iv.  Eames

1.  In the March 6 Partial Final Award, as modified herein, we found Respondent liable for having transferred the Barclays LP interests to an entity which it wholly controlled, Eames [LLC].[3] We awarded damages "measured by the benefits Highland received in excess of the amount it would have been entitled to receive from the Redeemer Trust Account because Barclays claim was settled for less than its value." We estimated — but did not find — that amount by referring to a damages calculation by Claimant's damages expert, Basil Imburgia, who "calculated that such an amount totaled $34,661,749. RC-522." "As with other amounts awarded," we directed "the Parties ... to confer to determine the actual amount of damages including the 9% interest to date."

2.  The Parties have conferred and disagree as to the appropriate amount of damages for Respondent's breach of the Plan and Scheme. Claimant asserts that the appropriate amount of damages is $29,609,015, which is lower than the amount estimated by its expert and cited in the Partial Final Award, because "the value of the Barclays interests which [Respondent] now controls through Eames is expressly excluded, as it would be extinguished and that value would be spread amongst the remaining Fund investors." Claimant April 5 Memorandum, 5.

3.  Thus, Claimant urges that "the Panel should either (1) award $29,609,015 and order the extinguishment of the Barclays LP interests owned and controlled by Highland, or (2) award $29,609,015 plus the current value of those LP interests, which its

---

[3] We found, and it is not disputed, that Highland controls Eames through an entity, Hockney, Ltd., that Highland wholly owns, and which, along with Eames, was created solely for the purpose of holding the Barclays LP interests for Highland's financial benefit. JX24; Tr. Day 8 83:21-86:13; Tr. Day 9 144:21-25, 220:18-25.)

Appx. 02188
014750

damages expert estimates to be $11,589,474. Claimant April 5 Mem. at 10; Imburgia April 5 Declaration, ¶15.

4.  Respondent urges that the "March 16 Modification contains specific language awarding the Committee a specific amount of monetary damages." However, as discussed above, that is not what the Panel did. We directed the Parties to confer on the exact amount to be awarded and to come to the Panel if they could not agree.

5.  Respondent further argues that nowhere in the March 6 Partial Final Award or the March 16 Modification did the Panel award Claimant equitable relief concerning the Barclays Claim, and that had the Panel wanted to do so, it knew how to do so.

6.  Respondent goes on to argue that Eames is not a party to this arbitration, and, therefore, the Panel lacks the authority to issue an award determining Eames' legal rights and obligations." Even if the Panel determines that the remaining equity interest should have been extinguished at the time of the 2012 settlement, "the fact remains that the equity interest was transferred to—and is still held by—Eames." Respondent April 5 Memorandum, 21-22.

7.  Finally, in its April 10 submission, Respondent objects to the Claimant's calculation of interest on any award regarding Barclays or the other claims, to wit, Claimant's April 5 Request adds an improper request that interest after March 6, 2019 be compound, and not simple, interest by applying an additional 9% statutory interest to both (a) the damages awarded and (b) the interest accrued through March 6, 2019.

8.  We disagree with Respondent's arguments except as relating to the compounding of interest sought by Claimant, which we discuss more fully below. First, when we found that "Highland breached the Plan and Scheme by transferring the LP interests to a wholly-controlled affiliate after the Committee had specifically disapproved of the transfer," we sought a remedy to deprive Respondent of the benefits that it had received illegitimately, or, in other words, to void the Eames transaction and put the parties back into the position they should have been in. Respondent may not benefit in the future by its breach of the Plan and Scheme, and the illegitimate transaction it engaged in, by forfeiting some, but receiving future, benefits through its absolute control of the entity it created, Eames.

13

9.  Second, although Eames is not a party in this proceeding, that is irrelevant to the relief we grant. The operating party throughout all of the machinations that resulted in the transfer of Barclays' LP interests to an entity it created solely for the purpose of holding such interests was, and remains, Respondent. It is completely within its power to unwind the transfer and re-transfer those interests back to the Fund for the benefit of its investors, as we now order.

10. Regarding the appropriate amount upon which to award interest, for reasons set forth below, we reject Claimant's argument that $29,609,015 is the appropriate amount upon which to award interest, as to do so would be to violated well-settled law in New York regarding pre-judgment interest, CPLR §§5003-5004.

11. We award Claimant monetary damages against Respondent in the amount of $21,768,743, plus 9% simple prejudgment interest from the date of the breach until the earlier of either (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

12. We further order that Respondent take all necessary steps to cause the improperly taken Fund LP interests currently owned and controlled by Respondent through Eames, Ltd to be returned to Claimant within sixty (60) days from the date of transmittal of this Final Award to the Parties.

v. Interest

1.  In the March 6 Partial Final Award, we awarded damages and interest through the date of that award, but then, as already referred to, directed the Parties to confer regarding all damages and interest issues. Claimant now urges that we award 9% prejudgment interest on the damage amounts awarded until the earlier of: (1) the date on which the amounts due are paid to the Committee for the benefit of the Fund; or (2) the date on which a court of competent jurisdiction enters a final judgment on the Final Award.

2.  However, as Respondent points out, Claimant is, in effect, arguing for a compounding of interest upon interest. We agree. The effect of Claimant's interest calculations would violate New York law, as an award of 9% interest post-March 6 on an amount that already includes 9% interest from the breach through March 6, would amount to compound interest after March 6, 2019. "[T]he statutory

14

scheme [in New York] for awarding …, where applicable, prejudgment interest, does not provide for compound interest." *520 East 81st Street Associates* v. *State of New York*, 19 AD3d 24 (2005).

3. Respondent also contends that the March 6 Partial Final Award contained specific language awarding interest "through the date of this Partial Final Award"— i.e., March 6, 2019, and that awarding interest through any other date would constitute an untimely modification of the Partial Final Award.

4. We disagree with Respondent that changing the termination date of prejudgment interest would constitute an untimely modification. Although the Partial Final Award did use the date of March 6 as a reference point for calculation of interest, that fact is not determinative of this issue. We also explicitly left open calculations of damages and interest until the Parties had fully conferred on the extremely complex financial calculations that had to be made. Among the calculations was a further calculation of interest.  It is not an unlawful modification of the Partial Final Award to make, as we do here, a final award on all damages and interest issues based upon a final record.

5. Furthermore, failing to continue the running of interest through payment or entry of a final judgment could well, under the circumstances presented here, result in Fund investors with no compensation for their documented losses during that time, as well as provide an incentive to Respondent to prolong the confirmation process. We have already had occasion to comment on Respondent's tactics of putting forth witnesses who were "unworthy of belief" and an "[il]legitimate defense to many of the Committee's claims." Partial Award ¶VI(E). We will not adopt a result that would allow Respondent to impose more hardships on the Fund Investors.

6. We award Claimant 9% prejudgment simple interest on all sums awarded from the dates of each breach through the earlier of the date paid or the entry of a final judgment.

F.  FINAL AWARD

a. We reaffirm the findings of fact, conclusions of law, and findings of liability as set forth in the March 6 Partial Award, and make the following awards with respect to such findings and conclusions:

15

014753

i.   Claimant's Application to modify the Partial Final Award is granted
     pursuant to the Disposition of Application for Modification dated March
     14, 2019.

ii.  Claimant's Motion to Correct Errors is granted, on consent; the clerical
     errors are set forth below and corrected as noted:

     1.  The Partial Final Award reference to the amount of Deferred Fees
         improperly taken from the Fund by Highland as "$33,313,000"
         (Partial Final Award at 14, 54) is corrected to read "$32,313,000."

     2.  The Partial Final Award reference to the amount of improper
         Distribution Fees calculated by Mr. Imburgia as $14,452,275
         (Partial Final Award at 24, 54) is corrected to read "$14,457,275."

     3.  The Partial Final Award reference to the amount of "$23.5/9" and
         "$23.5 million"  (Partial Final Award at 36, 40) is corrected to read
         "$23,938,568."

     4.  The Partial Final Award reference to the incentive period as ending
         on "December 30, 2016" (Partial Final Award at 40, 41, 42, 55) is
         corrected to read "September 30, 2016."

     5.  In all other respects, the Partial Final Award dated March 6, 2019
         and the Disposition of Application for Modification dated March
         14, 2019 are reaffirmed and incorporated by reference.

iii. For the Deferred Fee Claim, the Panel awards the following relief: the
     Panel orders Respondent to pay to the Claimant, on or before May 21,
     2019, the Deferred Fees in the amount of $32,313,000 as directed in the
     Partial Final Award, plus prejudgment interest at the New York statutory
     rate of 9% simple applied to that sum from the dates of the breaches and
     continuing until the earlier of: (1) the date the amount awarded is paid to
     Claimant for the benefit of the Fund, or (2) the date on which a court of
     competent jurisdiction enters a final judgment upon this Award.

iv.  For the Distribution Fee Claim, the Panel awards the following relief: the
     Panel orders Respondent to pay to the Claimant, on or before May 21,
     2019, the amount of $14,457,275, plus prejudgment interest at the New
     York statutory rate of 9% simple applied to that sum from the dates of
     breach and continuing until the earlier of: (1) the date the amount awarded
     is paid to Claimant for the benefit of the Fund, or (2) the date on which a
     court of competent jurisdiction enters a final judgment upon this Award.

v.   For the Taking of Plan Claims, the Panel awards the following relief: the
     Panel orders Respondent to pay to the Claimant, on or before May 21,

16

2019, the amount of $3,106,414. The Panel further orders that LP interests identified in RC411 be transferred to Claimant for the benefit of the Crusader Fund or that Claimant cause the Fund to extinguish those claims. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to $3,106,414 beginning on March 7, 2019 and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

vi.   For the CLO Trades Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $449,375.00. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple, from the dates of the breaches and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

vii.   For the Credit Suisse Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $2,735,411. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple on that sum, from the date of the breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

viii.   For the UBS Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $2,041,664. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the date of breach until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

ix.   For the Cornerstone Claim, the Panel awards the following relief: the Panel orders Respondent to pay to Claimant, on or before May 21, 2019, the amount of $48,070,407 for the sale of the Crusader Fund's shares in Cornerstone. The Panel also awards pre-prejudgment interest at the New York statutory rate of 9% simple on that sum from the date of breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award. When the amount awarded for the Cornerstone claim is paid by Respondent, Claimant shall cause the Crusader Fund to tender its Cornerstone shares to Respondent.

Appx. 92193
014755

x.  For the Barclays Claim, the Panel awards the following relief:

1.  The Panel orders Respondent to pay to Claimant, on or before May 21, 2019, the amount of $21,768,743. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the date of the breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

2.  Further to the Barclays Claim, the Panel orders that Respondent take all necessary steps to cause the improperly taken Fund LP interests currently owned and controlled by Respondent through Eames, Ltd to be transferred to Claimant for the benefit of the Crusader Fund within sixty (60) days from the date of transmittal of this Final Award to the Parties, or, alternatively, that Claimant cause the Fund to extinguish those interests.

xi.  For Claimant's Application for Legal Fees, Costs, and Expenses, we award Claimant $11,351,850.06 in fees, costs, and expenses as per the following:

1.  Jenner & Block Fees - $9,278,248.99;
2.  FTI Expert Fees - $1,274,853.26;
3.  A&M Arbitration Fees - $655,160.00;
4.  Court Reporter Hr'g Costs - $114,697.77;
5.  Court Reporter Dep. Costs - $28,890.04

xii.  The administrative fees and expenses of the International Centre for Dispute Resolution (ICDR) totaling US$94,693.88 and the compensation and expenses of the Tribunal totaling US$887,427.89 shall be borne by Respondent. Therefore, Respondent shall reimburse Claimant the additional sum of US$514,163.97, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Claimant.

G.  We have carefully considered, although not discussed in their entirety herein, all arguments made by Claimant and Respondent. Any other claims or requests for relief, made by either Party, are denied.

Appx. 22194
014756

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, USA.

Date: April 29, 2019

_____
David M. Brodsky, Chair

_____
John S. Martin, Jr.

_____
Michael D. Young

19

014757

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, USA.

Date: April 29, 2019

_____
    David M. Brodsky, Chair

_____
    John S. Martin, Jr.

_____
    Michael D. Young

Appx 02196
014758

State of New York      )
                           )   SS:

County of New York    )

I, David M. Brodsky, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

_____5/9/19_____
Date

_____
David M. Brodsky, Chairperson

State of New York      )
                           )   SS:

County of New York    )

On this __9__ day of May, 2019, before me personally came and appeared David M. Brodsky, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

ISAIAS MATEO
NOTARY PUBLIC-STATE OF NEW YORK
No. 01MA6274151
Qualified in New York County
My Commission Expires 12-31-2020

20

Appx 02187
014759

State of Florida    )
                    )    SS:
County of Lee       )


I, John S. Martin, Jr., do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our            Final Award.

_Date April 29,2019

John S. Martin, Jr., Arbitrator


State of Florida        )
                        )    SS:
County of  Lee          )


On this 29th day of April, 2019, before me personally came and appeared John S. Martin, Jr., to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

Notary Public

ROBIN A. YEOMANS
MY COMMISSION # GG 121122
EXPIRES: November 3, 2021
Bonded Thru Notary Public Underwriters

Appx 02198
014760

State of New York      )
                        )   SS:
County of New York  )

I, Michael D. Young, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our       Final Award.

_____4/29/19_____                     _____
Date                                      Michael D. Young, Arbitrator


State of New York      )
                        )   SS:
County of New York  )

On this 29 day of April, 2019, before me personally came and appeared Michael D. Young, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

VICKIE L. JOHNSTON
Notary Public - State of New York
No. 01JO6113098
Qualified in Queens County
My Commission Expires July 19, 20 20

22

# EXHIBIT 15

Appx 92300

014762

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PATRICK DAUGHERTY,                        :
                                          :
                  Plaintiff,              :
                                          :
         v                                :    C. A. No.
                                          :    2017-0488-MTZ
HIGHLAND CAPITAL MANAGEMENT, L.P.,        :
HIGHLAND EMPLOYEE RETENTION ASSETS        :
LLC, HIGHLAND ERA MANAGEMENT LLC, and     :
JAMES DONDERO,                            :
                                          :
                  Defendants,             :
                                          :
         and                              :
                                          :
HIGHLAND EMPLOYEE RETENTION ASSETS        :
LLC,                                      :
                                          :
                  Nominal Defendant.      :

                      - - -

                  Chancery Courtroom No. 12D
                  Leonard L. Williams Justice Center
                  500 North King Street
                  Wilmington, Delaware
                  Friday, May 17, 2019
                  1:30 p.m.

                      - - -

BEFORE:  HON. MORGAN T. ZURN, Vice Chancellor

                      - - -

RULINGS OF THE COURT ON PLAINTIFF'S MOTION TO COMPEL
         AND MOTIONS FOR COMMISSIONS
ORAL ARGUMENT AND RULINGS OF THE COURT ON PLAINTIFF'S
MOTION FOR STATUS QUO ORDER AND DEFENDANTS' MOTION TO
DISMISS COUNT IX OF SECOND AMENDED VERIFIED COMPLAINT
-------------------------------------------------------
              CHANCERY COURT REPORTERS
         Leonard L. Williams Justice Center
         500 North King Street - Suite 11400
              Wilmington, Delaware 19801
                  (302) 255-0533

2

```
1    APPEARANCES:

2        THOMAS A. UEBLER, ESQ.
         JOSEPH L. CHRISTENSEN, ESQ.
3        McCollom D'Emilio Smith Uebler LLC
           for Plaintiff
4

5        JOHN L. REED, ESQ.
         DLA Piper LLP (US)
6             -and-
         MARC D. KATZ, ESQ.
7        of the Texas Bar
         DLA Piper LLP (US)
8          for Defendants

9

10                            - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

014764

Appx 02302

3

1                    THE COURT:  Good afternoon.  Please be

2        seated.

3                    First I wanted to acknowledge, we have

4        an honored guest with us today.  We have the Honorable

5        Essam Yahyaoui, who is a judge from Tunisia.  He

6        presides over the commercial chamber of Tunisia's

7        First Instance Court.  So he's here to observe with

8        his colleagues.

9                    Welcome, sir.

10                   All right.  I'm going to start with

11       the motion to compel, and then we'll move on to the

12       motion for commission.  And then there may be

13       questions, and maybe take a break and regroup and we

14       can move on with the other motions.

15                   I'm going to grant Daugherty's motion

16       to compel in part.  For simplicity, I'm going to refer

17       to Abrams & Bayliss as A&B.  And I see four categories

18       of documents at issue here.  The first is regarding

19       the initiation, negotiation, and establishment of A&B

20       as Highland's escrow agent.  The second is regarding

21       A&B's legal work during the pendency of the Texas

22       action to determine whether and how Daugherty might

23       access the escrowed assets.  The third is A&B's work

24       responding to the Texas subpoena.  And the fourth is

4

1    documents regarding A&B's resignation as Highland's

2    escrow agent.

3              I grant the motion to compel as to

4    Categories 1, 2, and 4 for one of two reasons.

5              The first reason is unfortunately my

6    *in camera* review confirmed Daugherty's fear that

7    Highland is improperly withholding documents in

8    Categories 1 and 4 illustrating A&B's service and

9    resignation as escrow agent, which are nonprivileged

10   materials.

11             In a hearing on September 18, 2018,

12   concerning an earlier subpoena, Vice Chancellor

13   Glasscock stated that "... information regarding the

14   actions of Abrams & Bayliss in connection with its

15   operation of the escrow as agents of Highland, HERA,

16   those documents, that information is relevant, and it

17   doesn't appear to me to be generally privileged."

18   That's a quote from the transcript.

19             Highland has been adamant that it was

20   only withholding documents that implicated its role as

21   legal counsel, and not in its role as escrow agent.

22   For example, on page 28 of the transcript from the

23   April 12th argument, Highland's counsel stated that,

24   "We do not assert any privilege based solely on Abrams

CHANCERY COURT REPORTERS

5

1   & Bayliss's roles as escrow agents.  It's purely

2   because they have the dual roles both as escrow agents

3   and also legal counsel, that when they were in the

4   capacity of legal counsel, those communications were

5   privileged."

6            At that argument, I requested the

7   documents and stated I would review them *in camera*.  I

8   expressed my frustration that I had already given

9   Highland multiple chances, and invited it to redo its

10  privilege log for a final time.

11           In reviewing the documents, I

12  concluded that more than 70 documents that were

13  withheld based on claims of privilege or work product

14  protection were improperly withheld.  Those documents

15  were Privilege Log No. 1 through 25, 27 through 29,

16  35, 36, 41, 54, 56, 62, 85 through 87, and 336 through

17  372.

18           This represents nearly 20 percent of

19  the 372 documents in the log.  But even that doesn't

20  tell the full story, because more than 200 of the

21  listed documents were simply attachments to e-mails

22  collecting documents in response to the Texas

23  subpoena.  Excluding those, more than 50 percent of

24  the documents listed were improperly withheld as

Appx 92205
014767

6

1   privileged.

2                    Documents regarding A&B's nonlegal

3   work and resignation as escrow agent are not

4   privileged or work product because when A&B agreed to

5   be an escrow agent, it stepped into a nonlegal role

6   despite its status as a law firm.

7                    The cases are clear on that point.

8   *Northeast Credit Union v. CUMIS*: "It is well

9   understood ... that the services of an escrow agent,

10  even when that escrow agent is an attorney, are not

11  legal services."  *CCS Associates v. Altman*: "[C]ourts

12  have specifically held that an attorney in the role of

13  escrow agent does not transform communications

14  pertaining to the administration of the escrow account

15  into privileged documents."  The first case is from

16  the District of New Hampshire, and the second one is

17  from the Eastern District of Pennsylvania.

18                    These non-Delaware decisions more

19  specifically enunciate a principle common in our own

20  law.  Including an attorney, or having an attorney

21  perform nonlegal work, does not attach the privilege

22  to the communications or the work.  That is because

23  "... the attorney-client privilege protects legal

24  advice only, [and] not business or personal advice."

Appx. 02206
014768

7

1  That's a quote from *MPEG v. Dell* from this court in

2  2013.

3              And as Vice Chancellor Laster said in

4  the *Facebook Class C Reclassification* litigation,

5  "Making the lawyer the point person creates a pretext

6  for invoking the attorney-client privilege, but it is

7  only a pretext."  That's from his December 12th, 2016

8  order in Case No. 12286-VCL.

9              Categories 1 and 4 reflect

10 communications between A&B and Highland concerning the

11 start of the escrow relationship, or A&B resigning as

12 escrow agent.  To be sure, there were legal

13 ramifications and issues regarding the work A&B was

14 doing in setting up and then ending the escrow

15 relationship.  But any legal component of A&B's

16 escrow-related work was secondary to the role as

17 escrow agent.  A&B was a contractual counterparty with

18 Highland under the escrow agreement, and each had

19 obligations under that agreement.

20             A&B did perform legal work on the

21 escrow issue.  For example, A&B attorneys analyzed

22 what document 351 on the log calls the "HERA

23 Strategy."  But that legal advice was not for the

24 benefit of Highland, who was A&B's contractual

CHANCERY COURT REPORTERS

8

1   counterparty.  A&B could potentially claim that its

2   attorneys were providing legal services to A&B as

3   escrow agent.  But that is not what is before me; A&B

4   has claimed no privilege.  The only issue is whether

5   Highland can claim a privilege and withhold the

6   communications containing A&B's legal analysis

7   regarding its service as escrow agent.

8                I think an example here might be

9   helpful.  If Highland had retained a bank or other

10  repository to act as escrow agent rather than a law

11  firm, the result would be more clear.  If the

12  employees of that non-law firm escrow agent

13  communicated internally about the relationship or the

14  contract, it would not be privileged.

15                If those employees received legal

16  advice from attorneys about how to structure the

17  escrow, what the terms of the escrow agreement meant,

18  or how it could fulfill Highland's request to unwind

19  the escrow and transfer the assets back, Highland

20  could not claim that the in-house or outside counsel

21  retained by the escrow agent was providing legal

22  advice for Highland's benefit.  It would be much

23  clearer that the attorneys were providing legal advice

24  to, and for the benefit of, the escrow agent, not its

Appx. 92298
014770

9

1    contractual counterparty, Highland.

2                    The facts here are more muddied

3    because there are only lawyers involved because

4    Highland selected a law firm, that otherwise

5    represented Highland, to act as escrow agent.  But the

6    result should be the same.  A&B's privilege over its

7    in-house advice regarding its conduct under the escrow

8    agreement does not belong to Highland just because A&B

9    is itself Highland's attorney.

10                   The next question is one of remedy for

11   improperly withholding so many of the documents as

12   privileged.  Waiver "... has been characterized as a

13   'harsh result' typically only justified 'in cases of

14   the most egregious conduct by the party claiming the

15   privilege.'"  That's from *TCV v. TradingScreen*.

16                   "If a party falls substantially short

17   of the well-established requirements, then waiver is

18   an appropriate consequence that helps dissuade parties

19   from engaging in dilatory tactics."  That's from

20   *Mechel Bluestone v. James C. Justice Companies.*

21                   Daugherty has been dogged in his

22   pursuit of these documents, and Highland was just as

23   resolute in refusing to produce them.  Vice Chancellor

24   Glasscock said last September these types of documents

Appx. 92200

014771

10

1   are not privileged.  I gave Highland multiple

2   opportunities to address this.  Because Highland stuck

3   by its position and continued to assert such a large

4   percentage of improper privilege assertions while

5   claiming it was producing documents concerning A&B's

6   role as escrow agent, any privilege related to that

7   topic is waived, and a full waiver of Highland's

8   privilege could be an appropriate consequence.

9                   But I am reluctant to go that far

10  because Categories 2 and 3 were properly withheld and

11  logged adequately.  Category 2 relates to a memorandum

12  A&B prepared analyzing avenues available for Daugherty

13  to pursue the escrowed assets.  This work started in

14  February 2014.  Category 3 relates to efforts to

15  collect documents in response to the subpoena for the

16  Texas case.  I conclude Highland's unjustified

17  withholding of other documents related to the escrow

18  was not so egregious as to waive any privilege over

19  these two sets of documents.

20                  This brings me to the crime-fraud

21  exception.  If Categories 1 and 4 were privileged, I

22  would conclude that the crime-fraud exception applies

23  and so A&B should produce those documents regardless.

24  I reach the same conclusion for Category 2, the subset

Appx. 02210
014772

11

1  of documents related to A&B's 2014 memorandum that

2  were privileged and properly logged.

3          Rule of Evidence 502(d)(1) says that

4  "There is no privilege ... If the services of the

5  lawyer were sought or obtained to enable or aid anyone

6  to commit or plan to commit what the client knew or

7  reasonably should have known to be a crime or fraud."

8          To fall within this exception, "... a

9  mere allegation of fraud is not sufficient; there must

10  be a prima facie showing that a reasonable basis

11  exists to believe a fraud has been perpetrated or

12  attempted."  That's from *Princeton Insurance Company*

13  *v. Vergano.*  That case also explains that "... when a

14  client seeks out an attorney for the purpose of

15  obtaining advice that will aid the client in carrying

16  out a crime or a fraudulent scheme, the client has

17  abused the attorney-client relationship and stripped

18  that relationship of its confidential status."

19          The client must intend the

20  communications to be used as a bases for the fraud.

21  "The advice must advance, or the client must intend

22  the advice to advance the client's ... fraudulent

23  purpose."  That's from *Buttonwood Tree Partners v.*

24  *R.L. Polk.*

12

1           As Chief Justice Strine wrote while

2     Vice Chancellor in *Princeton Insurance v. Vergano*,

3     "The quintessential circumstance [when this exception

4     applies] is when the client obtains the advice of the

5     lawyer in order to help shape a future course of

6     criminal or fraudulent activity.  This is the classic

7     situation when the privilege gives way, as the

8     societal purpose of the confidential relationship has

9     been entirely subverted, with the client seeking the

10    expertise of someone learned in the law not so as to

11    comply with the law or mitigate legitimately the

12    consequences of his prior behavior, but to craft a

13    course of future unlawful behavior in the most

14    insidiously effective manner."

15          Here, there is a reasonable basis to

16    believe a fraud has been perpetrated.  Daugherty's

17    claim for fraudulent conveyance survived a motion to

18    dismiss, and I will refer the parties to Vice

19    Chancellor Glasscock's January 16, 2018 opinion on

20    that point.

21          The question is whether Highland

22    sought the services of attorneys to enable or aid it

23    in furtherance of that fraud.  I believe there is a

24    reasonable basis to believe that as well.  Highland's

Appx. 92212
014774

13

1    attorney at Andrews Kurth contacted A&B almost

2    immediately after the Texas judgment became final and

3    nonappealable.  That's at Exhibit K.

4              Highland claims A&B then provided it

5    legal advice interpreting the escrow agreement, and

6    A&B resigned as escrow agent intending to cause, and

7    in fact causing, the assets to return to

8    Highland/HERA.  That is the transfer that Daugherty

9    claims was fraudulent.

10             This was not the first legal work A&B

11   performed in pursuit of keeping the escrowed assets

12   from Daugherty.  Starting in February 2014, it

13   analyzed Daugherty's ability to get at the assets

14   while the appeal was pending.  Because that appears to

15   be the beginning of the efforts that culminated in the

16   allegedly fraudulent acts, the crime-fraud exception

17   strips the privilege from these documents.

18             Daugherty has made a *prima facie*

19   showing that a reasonable basis exists to believe that

20   a fraud has been perpetrated, and that Highland sought

21   A&B to serve as escrow agent and to provide legal

22   analysis in furtherance of that fraud; specifically,

23   to protect the escrowed assets from Daugherty while

24   the Texas case was pending, and then to transfer them

Appx. 02213
014775

14

1    back to Highland after the Texas verdict was

2    finalized.  I conclude any privilege Highland claims

3    over A&B's legal advice regarding the escrow

4    arrangement and A&B's resignation has been stripped

5    under the crime-fraud exception.

6              I want to be clear on what I am not

7    saying.  I am not saying that a fraud claim merely

8    surviving a motion to dismiss permits the supposed

9    victim to invade the defendant's privilege for any

10   legal advice the defendant received in regards to the

11   underlying transaction or act.  This is a unique case

12   in which it presently appears that the law firm that

13   provided the legal advice, one, was a contractual

14   counterparty to the defendant in the very contract

15   under which the fraudulent transfer was allegedly

16   made; two, provided legal advice interpreting that

17   agreement and charting the course for the transfer;

18   and, three, implemented its own advice to effectuate

19   the transfer.

20             On these allegations, which are

21   supported by the documents I have reviewed, it appears

22   the defendant sought the firm's legal advice to

23   further the alleged fraud based on the terms of the

24   contract to which the defendant and the firm were

Appx. 92214
014776

15

1    parties.  Based on these uncommon facts, the

2    crime-fraud exception applies here.

3                    Accordingly, the privilege is either

4    nonexistent or waived as I just described for

5    Categories 1, 2, 4; in other words, all documents

6    regarding A&B's service as escrow agent.  The

7    crime-fraud exception also applies to documents in

8    these categories designated as work product, under

9    *Playtex v. Columbia* out of the Superior Court.

10                   I find that Category 3, regarding the

11   Texas subpoena, was properly logged as privileged, and

12   that the crime-fraud exception does not reach those

13   documents.  Daugherty has not alleged that the

14   subpoena response was in furtherance of the fraud.

15   Category 3 comprises the families associated with

16   lines 91 through 327, which are the parent e-mails

17   attaching documents collected in response to a

18   subpoena.

19                   Mr. Katz, is any of that unclear?

20                   MR. KATZ:  No, Your Honor.  It's

21   clear.

22                   THE COURT:  Mr. Uebler, any questions?

23                   MR. UEBLER:  No questions, Your Honor.

24   Thank you.

Appx. 02215
014777

16

1                    THE COURT:  Thank you.

2                    We'll turn to the motion for

3        commissions.

4                    Daugherty seeks commissions to take

5        the depositions of James C. Bookhout and Marc D. Katz,

6        both of DLA Piper.  I will refer to Mr. Bookhout and

7        Mr. Katz collectively as "the requested deponents."

8        Both requested deponents represented Highland in its

9        dispute with Daugherty in Texas, beginning in 2012,

10        and Mr. Katz and his colleagues at DLA represent

11        Highland in this action as well.  Daugherty seeks fact

12        testimony from the requested deponents on five topics,

13        all pertaining to the events surrounding the escrow as

14        alleged in Daugherty's operative complaint.

15                    The discovery Daugherty seeks is

16        clearly within the bounds of Court of Chancery

17        Rule 26.  And, based on the privilege log Highland

18        produced for the escrow-related documents, the

19        requested deponents have personal knowledge of at

20        least some of the escrow events.

21                    The parties disagree on the threshold

22        standard for evaluating whether counsel can be

23        deposed.  Highland contends this court has adopted the

24        *Shelton* test, while Daugherty points to a series of

Appx. 93216
014778

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 15   Filed 06/26/25   Page 100 of 1017   PageID 15761

17

1  standards from *Rainbow Navigation, Sealy Mattress,*

2  *Kaplan & Wyatt*, and *Dart*.

3                    I note that in a transcript ruling

4  from 2018 in *LendUS, LLC v. Goede*, Vice Chancellor

5  Glasscock considered in the first instance whether it

6  was necessary to gather the evidence sought from

7  counsel, given the risk of disqualification.  I agree

8  this is a threshold consideration present in all the

9  cases the parties have cited.  And I conclude, like

10  Vice Chancellor Glasscock did in *LendUS*, that

11  Daugherty has not made a sufficient showing that he

12  needs to depose Mr. Bookhout and Mr. Katz at this

13  juncture.

14                    As I just explained in my ruling on

15  Daugherty's motion to compel, Daugherty will receive

16  A&B's documents regarding the escrow.  Daugherty can

17  also depose the escrow agents.  He can depose the

18  Highland principals who were involved.  And I do not

19  see that any of this has happened yet.  He should

20  pursue those avenues before pursuing one that

21  jeopardizes Highland's choice of counsel.  His motions

22  for commission for the proposed deponents are denied

23  without prejudice.

24                    I am mindful that trial is scheduled

Appx. 02217
014779

18

1    for September, and that -- if Daugherty renews his

2    motions after taking the rest of the fact discovery --

3    the risk of disqualification carries more prejudice to

4    Highland the closer we get to trial.  I also note that

5    the discovery cutoff in this case is June 28, 2019.  I

6    am, therefore, interspersing an intermediate discovery

7    cutoff.

8               Escrow discovery, including

9    depositions of fact witnesses other than the requested

10   deponents, must be complete by June 14th, 2019, and

11   Daugherty must make any renewed motion for commission

12   by June 17, 2019, with briefing on that motion to be

13   expedited.

14              The burden this timeframe places on

15   both parties I think is appropriate in light of the

16   requested deponents' apparent knowledge of significant

17   aspects of Daugherty's allegations, and in light of

18   the desire to protect Highland's choice of counsel.

19   Any renewed motion by Daugherty must demonstrate what

20   gaps in the record he needs to fill, and why he

21   believes the requested deponents can fill those gaps.

22              Mr. Uebler, is any of that unclear?

23              MR. UEBLER:  Your Honor, nothing is

24   unclear about that ruling, but I do have a question

Appx 02318
014780

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 15    Filed 06/20/25    Page 102 of 1017    PageID 15763

19

1  about the escrow agent depositions.  Can the parties

2  assume that the ruling that the Court has made with

3  respect to the documents will also apply to deposition

4  testimony? in other words, categories that may be

5  subject to privilege such as the subpoena response,

6  but all other escrow-related categories would

7  presumably be fair game and not subject to privilege

8  in a deposition?

9              THE COURT:  That's correct, at least

10 as to A&B.  I note that we haven't really tested the

11 boundaries of where my ruling might go with regard to

12 DLA.  And I think that's probably another conversation

13 we would need to have.

14             MR. UEBLER:  Understood.  Thank you.

15             THE COURT:  Thank you.

16             Mr. Katz, is any of that unclear?

17             MR. KATZ:  No, Your Honor.  That's

18 clear.

19             THE COURT:  I'll give you-all maybe

20 ten minutes to kind of regroup a little bit, and then

21 I'll hear the motion for status quo order first.

22             We're in recess.

23        (Recess taken from 1:53 p.m. until 2:00 p.m.)

24             THE COURT:  Mr. Uebler?

20

1              MR. UEBLER:  Your Honor, my colleague,

2    Mr. Christensen, is going to argue the status quo

3    motion.  But I'd just like to point out, we had an

4    issue with our File & Serve converting Word documents

5    to pdf, and it would drop the occasional citation in

6    footnotes.  I don't know if it's our system or theirs.

7    But, in any event, we've brought revised copies of our

8    papers with all the citations for the Court.

9              THE COURT:  Thank you.

10             MR. UEBLER:  You're welcome.

11             MR. CHRISTENSEN:  Good afternoon, Your

12   Honor.  Joseph Christensen from McCollom D'Emilio for

13   the plaintiff, Pat Daugherty.

14             I just want to start very briefly with

15   how we got here.  Your Honor is familiar with the

16   facts, so I won't go over that in too much detail.

17   But I do want to highlight some of the additional

18   points that we included in our briefing related to

19   what Highland was saying about these assets during the

20   Texas action.

21             So Thomas Surgent, during the Texas

22   action, he was the chief compliance officer of

23   Highland.  During the Texas action, he testified that

24   the assets listed in the escrow agreement were being

Appx. 02329
014782

1  held for Pat's benefit for his interest in HERA.

2  These are all from Exhibit V.  That one is at page 15

3  of 53.

4              Jim Dondero, the head of Highland,

5  testified that Pat's share of all the assets,

6  including the cash, is in escrow.  He also testified

7  that Pat's *pro rata* share of all the assets, including

8  the cash, are all sitting in escrow.  There's been

9  nothing deducted or removed from Pat's account.  And

10  he also said that the escrow agreement was to protect

11  Pat Daugherty.

12              The point of all these statements was

13  to convince everybody who would listen that these

14  assets were being held for Pat Daugherty, and that if

15  he prevailed in the Texas action, he would obtain

16  those assets.  And we haven't done anything with them.

17  We haven't offset any legal expenses, which is also

18  noted in our reply brief.

19              Coupled with the statements that Pat

20  continued to hold the HERA units, this was a clear

21  expression that Highland was trying to convince people

22  that they intended to hold onto these assets but give

23  them to Pat if he prevailed in the Texas action.

24              In HERA's closing argument its counsel

22

1   said, "If Pat Daugherty happens to prevail in his

2   lawsuit against Lane, Patrick and HERA you heard Jim

3   Dondero testify he gets his interest, which is

4   currently escrowed in the third-party escrow account,

5   all of it."

6              And the jury clearly believed that the

7   escrow meant to preserve Daugherty's interest.  One of

8   the questions the jury sent back to the judge in the

9   Texas action referred to his -- that is Pat's -- HERA

10  units currently in escrow.  That's the third to the

11  last page in Exhibit U.

12             The defendants now say, "Well, sure,

13  Pat continued to be an owner of HERA, but there was

14  never anything in HERA, at least during the Texas

15  action and before the Texas action."  Which reminds me

16  of a scene from my life at a movie theater with my two

17  sons, where the younger one was complaining that his

18  brother wouldn't give him the box of candy.  He asked

19  me to intervene, and I told him to give him the box of

20  candy, at which point the older brother emptied the

21  candy into his popcorn and gave him the empty box.

22             That's exactly what happened here.

23  When they told everyone they were holding assets for

24  Pat's benefit, they would now have you believe that

Appx. 92322
014784

23

1   what they really meant was that he was just entitled

2   to an empty box, and they had no intention -- and Pat

3   should have known that they never had any intention of

4   ever letting him have them.

5              There are two possibilities to explain

6   the contrast between what they said during the Texas

7   action and what they're saying now.  One is that they

8   knew at the time that they were never going to give

9   them back.  The other is that they believed at the

10  time and were sincere in saying that they would give

11  them back, but they later changed their mind.

12             Under either of those circumstances,

13  Daugherty prevails on at least one of his claims.  If

14  they changed their mind but initially intended it, his

15  promissory estoppel claim is very strong.  If they

16  never intended from the beginning to give them to him,

17  then his fraud and unjust enrichment claims are

18  equally strong.  The status quo order should be

19  entered to make sure that they can't do either of

20  those things this time.

21             I think that's all the background we

22  need, except for a clarification on what Daugherty is

23  seeking.  He is seeking those assets.  His relief --

24  Your Honor will note that we did not include in our

CHANCERY COURT REPORTERS

24

1   briefing any discussion of our claims for

2   indemnification.  Our indemnification claim is

3   effectively a monetary relief sort of claim.  But we

4   did discuss promissory estoppel, unjust enrichment,

5   and fraudulent transfer.  Each one of those theories

6   includes potential relief divesting those assets from

7   whoever holds them, which brings me to the next point,

8   which is that we do not know where these assets are.

9          We have asked the defendants where

10   these assets are; were they ever transferred after

11   December 2016.  They told us they would not provide

12   any information on those requests.  And that's at our

13   Exhibit L, Request No. 8 and 11, and Exhibit W, our

14   Request No. 34 and 37.

15          THE COURT:  I'm certainly not inviting

16   more or different motions.  But isn't the remedy for

17   that a motion to compel instead of a motion for a

18   status quo order?

19          MR. CHRISTENSEN:  It would be.  And we

20   are not seeking through this status quo order

21   effectively a back door to answering these requests

22   for documents and interrogatories.  But the fact that

23   they will not tell us where these assets are is

24   consistent with the prior behavior in the Texas action

25

1  and gives us a lot of pause about waiting until the

2  end of this trial.

3           So we started out this case with -- I

4  guess I should first turn to the defendants' argument

5  that the Court doesn't have power to enter this status

6  quo order.  Clearly it does.  The kind of relief that

7  we're seeking is in aid of the ultimate relief that we

8  are seeking.  Because we are trying to obtain or move

9  particular assets, we are seeking the status quo order

10  to make sure those assets are still available for the

11  court to issue an effective ruling at the end of this

12  case.

13           THE COURT:  And how do you get around

14  the *Hillsboro* and *HEM* cases that discourage

15  intermediate injunctive relief for the purpose of

16  preserving assets?

17           MR. CHRISTENSEN:  Well, I think

18  generally the cases are referring to when you're

19  seeking monetary relief.  And that's not what we're

20  doing in this case.  And I think the history is

21  probably the most important point in this situation.

22           One simply cannot ignore that the very

23  assets and the very parties in this litigation -- the

24  reason we're here is because we were chasing after

Appx. 92325
014787

26

1    these assets that we believe we obtained the right to

2    in the previous action.  So it's a unique situation.

3    None of the cases involve the same parties and the

4    same assets.

5                And the cases -- even the cases that

6    have history as a basis for granting the status quo

7    order, none of them have this kind of sort of clear

8    evidence that there was a fraud and moving of assets

9    to defeat a judgment in an earlier iteration of the

10   dispute between the parties.

11               THE COURT:  And how does that sort of

12   long history or long series of allegations of fraud

13   and hiding assets, how does that square up with the

14   requirement that the harm to be prevented by the

15   status quo order be imminent?

16               MR. CHRISTENSEN:  The imminence, Your

17   Honor, to be frank, is probably the most difficult

18   aspect of our situation to square with the law.

19   Because -- in part because they haven't told us

20   whether things have been transferred, where things

21   are, we cannot give Your Honor very many facts about

22   some imminent action that is going to take place.

23               But at the same time, we -- again, we

24   started as a frog in a pot at a very high temperature

1    having come out of the experience in Texas.  Then

2    adding to that was the fact that they will not tell us

3    where these assets are.  They will not tell us whether

4    they are currently in a solvent entity or not.  They

5    will not really just come out and say whether those

6    assets are still in Highland or not.  There's a

7    suggestion in their brief that can be read as a

8    representation that they are in the Highland and never

9    have left, but they also make the argument in their

10   brief that the assets never went over to Abrams &

11   Bayliss; that during the whole time that Abrams &

12   Bayliss was holding the assets, that really Highland

13   held the assets, retained legal title, and Abrams &

14   Bayliss was simply holding onto them in trust.  We

15   don't know if something like that is happening in this

16   case either.

17              On top of that, we had -- and what

18   spurred us to action was the affidavit of Highland

19   saying that they did not have current assets to

20   satisfy the judgment in the *Crusader Redeemer* action.

21   So that's on the front end of that judgment.  We, at

22   this point, don't know what Highland is going to look

23   like from a solvency standpoint on the back end of

24   that after those assets have gone out the door, and so

Appx. 92327

014789

28

1   at some point we have to act.  We need to act before

2   the end of this case.

3              We didn't believe that we had enough

4   imminence at the beginning of this case that we would

5   get a status quo order or a preliminary injunction.

6   But when they filed that affidavit saying that in a

7   cash flow basis they were insolvent for purposes of

8   satisfying a judgment, against the backdrop of all the

9   history, it starts to look like we're doing a replay

10  of what happened in Texas.

11             Your Honor referred to, I think, a

12  memo from Abrams & Bayliss talking about the HERA

13  strategy.  And what we're afraid of is that there is a

14  HERA Strategy Version 2 that we do not know about

15  right now and they just won't tell us.  So at some

16  point, in order to avoid them doing the same thing

17  again, we have to act.  We can't, unfortunately,

18  identify when they're going to do that in the same

19  clean kind of way that one often can in a status quo

20  or preliminary injunction case.  But the danger, I

21  would submit, is just as high as in those cases.

22             I've talked some about the history.

23  And the defendants do talk about three of the cases

24  that we talked about regarding the history.  They

Appx. 02328
014790

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 15   Filed 08/25/25   Page 112 of 1017    PageID 15773

29

1  address the *Crusader Redeemer* action that Your Honor

2  is familiar with, the *UBS* litigation, and the *Acis*.

3  The ones that they don't mention are *Trussway*, for

4  example.

5              *Trussway*, in this court under Vice

6  Chancellor Glasscock, he actually already found that

7  the kind of history that one would have to establish

8  to obtain a status quo order was found with respect to

9  these principals.  He said he took into account the

10  "... prior history of the controllers of the entities

11  in examining equitable matters that come before us."

12  And true to the way he is, he said, "... I would just

13  as soon not list all the reasons I have that make me

14  suspicious that a remedy will not be available here

15  ...."  "But I think it suffices to say that I have

16  experience with other cases involving the principals

17  here."  And he went on.  That's from page 40 of

18  Exhibit S, which is the transcript in the *Trussway*

19  action.

20              On the next page he said that, "...

21  given ... some of the factors that I've mentioned,

22  including the Acis bankruptcy and my other experiences

23  with the principals here ... there is a reasonable

24  probability that without some action, any victory will

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 15 Filed 03/25   Page 113 of 1017   PageID 15774

30

1   be a Pyrrhic victory."

2                    THE COURT:  It sounds like what you're

3   suggesting is that given the track record of Highland

4   in this action and in other actions, that you're

5   suggesting that the imminence requirements be

6   dispensed with because of what's going on here.

7                    MR. CHRISTENSEN:  I don't think I

8   would say that, Your Honor.  I would say that given

9   the caginess on discovery, we are not able to identify

10  the moment of imminence.  But we are, through the

11  history, able to establish the same point as

12  imminence.

13                   Imminence is this -- the point of

14  addressing imminence is that if you don't address

15  this, it is going to happen, and it's going to happen

16  very soon.  We can't tell you that it's going to

17  happen very soon, but we can tell you that there's

18  every reason to believe that it will happen before the

19  end of this trial.

20                   THE COURT:  But what about the -- I

21  think many times when one is considering imminence,

22  there's sort of a *laches*-esque element that comes into

23  it.  And this case was filed in 2017.  So this "it"

24  that we're discussing very well may have already

1   happened.

2                       And so I wonder what the justification

3   is for sort of after the fact -- maybe, I don't

4   know -- after the fact then seizing up Highland simply

5   based on the way that things have played out in other

6   cases.

7                       MR. CHRISTENSEN:  So I think I can

8   explain why we didn't act earlier, and why it wouldn't

9   have been justified to act earlier, and so why we

10  shouldn't be subject to *laches* on this argument.

11                      When we started, we had no reason to

12  believe that those assets had gone anywhere other than

13  Highland.  Then the Acis bankruptcy discussed that

14  Dondero was moving out tens of millions of dollars to

15  his charitable foundation.  That was another brick in

16  the wall.  Then we got the discovery responses that

17  were not responsive.

18                      And to be clear, we have not given up

19  on that.  We had a meet-and-confer as recently as this

20  morning, and one on Friday of last week, in which we

21  are trying to get these documents.  It doesn't appear

22  that we're going to have much success on our own.  But

23  we are absolutely pursuing that and have pursued those

24  documents as vigorously as we pursued the Abrams &

Appx. 02331

014793

32

1    Bayliss documents.

2                    To mix the metaphors, the straw that

3    broke the camel's back was the *Crusader Redeemer*

4    action where Highland said:  We cannot pay this

5    judgment right now.  We have more assets than

6    liabilities, but we cannot pay this right now.

7                    And it's also important to remember

8    that it's not just large judgments that Highland has a

9    history of not paying, and it's not only Daugherty's

10   relatively small judgment that they refused to pay.

11   But in the Acis bankruptcy, it was an $8 million claim

12   at issue, and they made him go through -- or are still

13   going through involuntary bankruptcy.

14                   So I think we acted when it was

15   prudent to act.  And before that occurred, I don't

16   think any member of this court would have been likely

17   to give us relief without something to point to, a

18   reason to believe that Highland wouldn't pay apart

19   from the history.

20                   THE COURT:  And the reason is that

21   affidavit in the *Redeemer* case stating that Highland

22   doesn't have the liquid assets to pay the $175 million

23   judgment?  That's what you're interpreting to say that

24   they will not pay or will somehow manage to avoid

Appx. 92332
014794

33

1   paying Mr. Daugherty's -- what is allegedly owed to

2   him?

3               MR. CHRISTENSEN:  We aren't sure about

4   the damages, but effectively, yes.  That Highland --

5   which is, we assume, the most solvent of any of the

6   entities -- now has a cash flow solvency issue.  And

7   so at that point we felt we needed to act.

8               THE COURT:  Understand.

9               MR. CHRISTENSEN:  The other thing that

10  I think Your Honor should consider, it doesn't fit

11  exactly within the three factors of a status quo or a

12  preliminary injunction standard; but I think Your

13  Honor should also take into account that it may not be

14  a question of whether or not Highland is able to

15  satisfy the judgment, but whether it will, even if it

16  is able.

17              THE COURT:  That's what I'm wondering.

18  That's the part that I'm wondering how that's being

19  derived from the affidavit in the *Redeemer* case, if

20  that's the precipitating factor.  Am I understanding

21  you to read that affidavit only to inform solvency and

22  not intent?

23              MR. CHRISTENSEN:  It is consistent

24  with an intent to make people work for their

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 31-20   Filed 03/25/25   Page 117 of 1017   PageID 15778
Exhibit 15   Page 35 of 98

34

1  judgments, but I mostly consider it separately.  And

2  what I'm really referring to, the short name for it is

3  spite.  It appears, if you look, not only at the

4  previous action in Texas, but also the Josh Terry

5  situation, that a major factor motivating whether or

6  not Highland pays judgments is how Highland feels or

7  how Jim Dondero feels about the people who are trying

8  to collect that judgment.

9             And so you have the court in the

10  bankruptcy case in *Acis* said that the expenditures

11  were out of whack versus what's at stake.  Or in the

12  *Credit Strategies Fund* case -- which the defendants

13  did not address -- the factual findings there refer to

14  some notes from a call between those parties and

15  Dondero.  Those notes read, "Dondero directly

16  threatens Concord and Brant personally.  We are very

17  good at being spiteful."

18             And so that spite doesn't -- it's not

19  one of the factors normally considered on a status quo

20  motion or a preliminary injunction.  I do think, as a

21  matter of equity, Your Honor ought to consider that.

22  And I think it's consistent with, and maybe grows out

23  of the kind of considerations that Vice Chancellor

24  Glasscock was taking into account in the *Trussway*

Appx. 02324
014796

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 33-20  15  Filed 06/25  Page 36 98  Page 118 of 1017    PageID 15779

35

1   action.

2                    I think I'll skip to likelihood of

3   success on the merits.  We do think the likelihood of

4   success on the merits prong of this analysis is fairly

5   straightforward.  At a big-picture level, Daugherty

6   had a claim on these assets, either directly or

7   through HERA.  He was entitled to that compensation,

8   he earned it, and it was taken from him after he

9   proved his entitlement not only to damages -- which he

10  received in the amount of 2.6 million and has never

11  seen, but also the underlying assets.

12                   So for fraudulent transfer purposes,

13  we think actual intent to hinder, delay, or defraud

14  based on the documents that we have seen so far is

15  compelling evidence that there was actual intent to

16  hinder, delay, or defraud.

17                   Your Honor only has to find that we

18  have a reasonable probability of success on one of our

19  claims.  You do not have to decide that we have a

20  reasonable probability of success on all of them.  And

21  that comes out of the *Destra Targeted Income* case.

22                   But we also think our other claims are

23  quite strong, the alternative bases under fraudulent

24  transfer law.  We do not believe that HERA got

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 15 Filed 06/25 98    Page 119 of 1017    PageID 15780

36

1    equivalent value, for example, in the transfer.

2    Unjust enrichment, it's an equitable doctrine, so in

3    some sense you back away and look at what really

4    happened, what's the substance.

5                    And again, what happened was Daugherty

6    earned compensation, he proved his entitlement to it,

7    and then it was taken from him.  That enriched

8    Highland; it impoverished Daugherty to the extent that

9    he was entitled to it.  There was obviously a

10   connection between those two results.

11                   And as far as their defense of

12   justification, the evidence doesn't seem to show that.

13   I take their justification argument to mean that they

14   were justified in taking the money because of the

15   legal expenses.  But the bills that we have seen so

16   far do not support that HERA was receiving the benefit

17   of those legal expenses.

18                   And just briefly on the promissory

19   estoppel claim -- I'm not going to spend much time on

20   that; you'll hear a lot about that in a minute.  But I

21   do want to refer to those quotations from the Texas

22   trial as additional reasons that support our

23   probability of success on the merits of that claim.

24   They demonstrate that throughout the trial, the

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-20    Filed 08/25    Page 120 of 1017    PageID 15781

37

1    strategy appears to have been to convince the jury

2    that Highland was the good guy because they were --

3    don't worry, they're going to hold on to the assets

4    for Pat.  Pat is going to get those assets if he

5    proves his entitlement to them.  But -- you know, so

6    don't think we're bad for taking them.  Tell us that

7    we win now and we don't have to give them to him.

8              The narrowest way to grant the motion,

9    I think, is based on probability of success of the

10   fraudulent transfer claim for actual intent to hinder,

11   delay, or defraud.  And Your Honor only needs to find

12   that to issue the status quo order.

13             On the balance of equities, also seems

14   very clear to us.  On the one hand, our client would

15   go through potentially another half a decade or decade

16   of litigation if he has to chase these assets again.

17   And it would be a real shame to have to do that twice.

18   On the other hand, the defendants, the harm that they

19   identify on their side is that it would lower the bar

20   for future plaintiffs against Highland that are

21   seeking monetary damages to obtain a status quo order.

22   And on that point, I just have to point out, again,

23   that it is not only monetary damages that we are

24   seeking, but seeking to move the escrow assets.

38

1          The other harm that they identify is

2    the harm to their reputation if they're required to

3    freeze these assets for what I take them to perceive

4    as a very small claim.  But again, we're not only

5    seeking monetary assets, so this is not just, as they

6    characterize it, a $3 million claim but a claim on

7    specific assets.  And their history of paying small

8    claims is not great.  So we think the balance of

9    equity also favors Daugherty.

10          Unless Your Honor has any other

11    questions, that's all I have.

12          THE COURT:  I don't.  Not at this

13    time.  Thank you.

14          MR. REED:  Good afternoon, Your Honor.

15    John Reed from DLA Piper for the defendants.

16          First of all, I want to apologize for

17    what happened at the last hearing.  We were only into

18    the case for like two days.  I had no idea that the

19    lawyer that was going to present was not going to be

20    able to answer Your Honor's questions.  I was not

21    happy about that, probably much more unhappy than the

22    Court was and the Court was very unhappy.

23          Mr. Katz is the lawyer most familiar

24    with everything in this case.  And he's here today to

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 15    Filed 04/25    Page 122 of 1017    PageID 15783

39

1  present the arguments and should be able to answer all

2  of Your Honor's questions.

3              THE COURT:  I appreciate your comment.

4  Thank you.

5              MR. KATZ:  Your Honor, may I approach?

6              THE COURT:  Yes.

7              MR. KATZ:  Thank you for letting me be

8  heard today.

9              And as Mr. Reed said, I echo his

10 apologies for the last hearing.  I apologize that I

11 was not able to be here at that last hearing.  But if

12 Your Honor does have questions about -- I understand

13 Your Honor's ruling, but if Your Honor does have

14 questions about any of those matters, I'm happy to

15 address those as well.

16             THE COURT:  Thank you.

17             MR. KATZ:  With respect to the status

18 quo motion.  Obviously, the Court is aware of the

19 legal standard.  I'm not going to go into that.  I

20 just want to address a few of the points that counsel

21 addressed.

22             And I'd like to start with the

23 irreparable harm element, which is one of the required

24 elements.  And counsel said a number of times that

Appx 02339
014801

40

1    they're seeking the assets, not just monetary relief.

2    And I presume that that argument is being proffered

3    because they recognize, otherwise, the issue with

4    irreparable harm component that they have to show.

5              And I note, just by way of background,

6    is that the Texas award was not in favor of

7    Mr. Daugherty vis-a-vis HERA.  It was not for specific

8    assets; it was a monetary award.  And, moreover,

9    Mr. Daugherty never had ownership of -- direct

10   ownership of any assets in HERA.  Mr. Daugherty was a

11   shareholder in an LLC and the LLC owned some assets.

12             So if their lawsuit is now seeking

13   recovery of specific assets as opposed to monetary

14   relief, I note that there's a host of procedural and

15   substantive issues with that which I think goes well

16   to the likelihood of success on the merits.

17             But the point for us today, Your

18   Honor, is that a monetary award would certainly be

19   sufficient to recompense Mr. Daugherty if he were to

20   prevail on any of his claims in this case.  And

21   there's no evidence -- and maybe more importantly,

22   there's no evidence that's been offered to the Court

23   in support of the status quo motion that would

24   demonstrate otherwise.  And when I say "demonstrate

41

1    otherwise," demonstrate that there are assets that

2    were in HERA that can't be valued, or some other basis

3    to show some sort of irreparable harm.  That issue is

4    not even addressed.

5              We're -- this is, I think, very

6    apparently a case that -- where there is no

7    irreparable harm.  And money can certainly compensate

8    for any harm that Mr. Daugherty may be able to prove

9    ultimately that he suffered.  The only evidence on

10   that issue, I think as Your Honor correctly pointed

11   out, was the affidavit of Scott Ellington.  And that

12   affidavit says to the contrary.  It says, "... the

13   value of Highland's assets exceed[s] the amount of the

14   ... Award."

15             There's absolutely no evidence in

16   connection with the status quo motion that would show

17   that there is irreparable harm or there is insolvency.

18   In fact, what a good counsel wants to do is make

19   allegations of what they believe is inappropriate

20   conduct some by Highland, some by Highland's

21   affiliates.  And I note that the conduct that they've

22   cited to in their motion are allegations taken from

23   pleadings in other cases, as opposed to direct

24   evidence of anything that has been done by Highland.

Appx 02341
014803

42

1   And most of it, again, is not directly Highland

2   allegations to any extent.

3                    There is -- and then also as Your

4   Honor appropriately, I believe, questioned counsel

5   about, there's no evidence of anything imminent on the

6   horizon that might give rise to any potential concern

7   that would support the status quo order.  And what

8   they're seeking is really, truly an extraordinary

9   remedy.  And I don't believe that they've pointed to

10  any concrete basis which they can meet the high

11  standard that they need to show to justify a status

12  quo order.

13                   THE COURT:  How do you justify the

14  situation here from the one in *Trussway*?

15                   MR. KATZ:  Well, I guess, Your Honor,

16  in two ways.  One, in *Trussway*, there's allegations of

17  specific conduct.  Where here, we've got -- there's no

18  allegations of any conduct that they believe is about

19  to occur or evidence to support that.

20                   THE COURT:  I suspect they would say

21  that's because you haven't answered their questions,

22  but I don't know.

23                   MR. KATZ:  Well, but, Your Honor, I

24  guess that it would also go back to the irreparable

Appx 02342
014804

43

1    harm issue that, you know, there's nothing that --

2    even the allegations, that if they were able to

3    provide some supportive allegations in this case as

4    opposed to relying on allegations in other cases,

5    there would still be -- they still have not shown that

6    there's any risk of insolvency or potential

7    irreparable harm.

8              And the *Mitsubishi* case that they

9    cited in their brief I think is very on point.  And on

10   this issue where they had -- the Court noted that

11   there was an allegation -- actually more than an

12   allegation -- there actually was a prior incident that

13   the Court had very serious concerns about but that on

14   its own wasn't enough.  It was -- the Court

15   specifically found that the defendant in that case was

16   insolvent.  And they also found that there was a sale

17   being negotiated, actual evidence of a sale, where the

18   assets were going to be transferred.  But we don't

19   have that type of evidence with us in this case, Your

20   Honor.

21             On the likelihood of success on the

22   merits, Counsel spent a little bit of time on that

23   issue.  But I think it's important, Your Honor, again,

24   that this is an extraordinary remedy they're seeking

Appx 02343
014805

44

that has a heightened standard.  And their motion on

the likelihood of success on the merits simply has

conclusory allegations, that they believe they're

going to be able to prevail on the merits without

addressing the specific elements and what evidence

they've got to show the specific elements.

                I note, you know, Counsel, in a number

of pleadings has -- and I know Your Honor has noted

this as well -- that Judge Glasscock had expressed his

skepticism about when he was trying to determine what

the nature of the escrow agreement was.  And I note

that Judge Glasscock, when he was doing that, also

when he was talking about the formation of the escrow

agreement, he was not talking about the resignation of

Abrams & Bayliss or the -- what happened to the assets

that formerly were held by HERA.

                And, in fact, even Judge Glasscock

indicated at that time that it may be that this

fraudulent transfer claim was appropriate for summary

judgment.  I think his direct quote -- I know I wrote

it down.  His direct quote was that it wasn't

prepared -- on page 79 and 80 of the transcript, that,

"It may be ... perfectly fit ... for a motion for

summary judgment.  I'm just not convinced I can get

Appx 02344
014806

45

1   rid of it on a motion to dismiss ...."  That was his

2   quote.

3              But I think that has been turned on

4   its head a little bit to say that because he didn't

5   understand the purpose of the escrow agreement and why

6   that was formed, that somehow that shows that the

7   fraudulent transfer claim is a sure-fire winner.  In

8   fact, I also note that Judge Glasscock dismissed the

9   same fraudulent transfer claim against Mr. Dondero in

10  the motion to dismiss.

11             So we think there's a number of

12  problems with each of the claims.  And I know we're

13  going to get to the promissory estoppel claim.  But I

14  think a couple of issues with that is that we've

15  got -- that claim is predicated on two statements that

16  were by individuals that I don't believe were clear

17  and unequivocal type of statements that could support

18  a promissory estoppel claim.  But moreover, they went

19  to the representation of what was in the terms of the

20  escrow agreement.

21             And I believe the law is fairly clear

22  that if there is a contract provision that addresses

23  the issue at hand, then you cannot have a promissory

24  estoppel claim based on a representation about that

46

1    contract claim.  And Mr. Daugherty is absolutely

2    seeking relief pursuant to the provisions in the

3    escrow agreement.  And that, in and of itself, would

4    knock out his promissory estoppel claim.

5              And then -- and maybe the biggest

6    problem -- I think he's got a number of problems with

7    the promissory estoppel claim, but maybe the biggest

8    one is reasonable reliance.  Again, Mr. Daugherty

9    hasn't even alleged that any of the statements were

10   made for the purpose of causing Mr. Daugherty to

11   reasonably -- to rely, and that it would be reasonable

12   to expect him to do so.

13             But Mr. Daugherty's conduct -- he

14   alleges that he would not have paid the judgment and

15   that he would have sought to invalidate the escrow

16   agreement at trial.  And I think both of those are --

17   they're also, again, conclusory allegations that he's

18   made without sufficient -- he has not made allegations

19   in his complaint in this action sufficient to

20   withstand, I believe, a motion to dismiss, and

21   certainly not to show a likelihood of success on the

22   merits for the status quo motion.

23             But what he's really said and what he

24   explained in the briefing that he meant by that is

Appx 02346
014808

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S     Document 15-20   Filed 08/26/25     Page 130 of 1017     PageID 15791
Exhibit 15    Page 48 of 98

47

1    that he would have sought offset.  The problem that

2    Mr. Daugherty has there is he -- offset is an

3    affirmative defense.

4              THE COURT:  I mean, we're all about to

5    get into that very deeply, so ...

6              MR. KATZ:  Okay, Your Honor.  Thank

7    you, I appreciate that.

8              But the likelihood of success on the

9    merits on the promissory estoppel claim, I think, is

10   very low.  He's got similar issues on the unjust

11   enrichment claim because of the representations and

12   because of the equivalent value that HERA received in

13   exchange for the assets.

14             On the fraudulent transfer claim, we

15   don't believe that there was a transfer and there's

16   been evidence of a transfer.  And Counsel may respond

17   to that and say, "Well, that's because Highland hasn't

18   shown where the assets are."  I'm anticipating that to

19   be their response on that.

20             But I think Your Honor identified the

21   point that that's not why you get a status quo motion.

22   If they think there's evidence that they need, you

23   know, there's a motion to compel.  But for purposes of

24   their motion, they have not produced any -- have not

Appx 02365
014809

1    cited to any evidence, have not even made the

2    allegation that -- other than a conclusory

3    allegation -- that they have a likelihood to succeed

4    on the merits.

5                    And then finally, Your Honor, I think

6    they have the same -- the last element, that with the

7    harm to him, the harm to Mr. Daugherty would outweigh

8    the harm to Highland.  They simply have a conclusory

9    allegation in their motion without providing any

10   support for that, Your Honor.

11                   And again, I just -- I'm happy to talk

12   about that issue further, but I think on a motion of

13   this seriousness with the heightened standard, that

14   they need to show that conclusory allegations are not

15   sufficient.

16                   THE COURT:  Thank you.

17                   MR. KATZ:  Thank you, Your Honor.

18                   MR. CHRISTENSEN:  Just briefly, Your

19   Honor.

20                   I suppose it's an interesting

21   philosophy of language, a question of what counts as

22   something being conclusory.  But we have certainly

23   done more than offer a conclusion.  We have laid out a

24   timeline of actual intent to delay or defraud with

014810

Appx 02248

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S     Document Exhibit 15   Filed 06/26/25   Page 132 of 1017     PageID 15793

49

1    respect to the fraudulent transfer claim.

2              And just the items that are attached

3    to our motion at Exhibit N, O, P, and Q, are a series

4    of e-mails and events that I think anybody bringing a

5    fraudulent transfer claim might characterize any one

6    of them as a smoking gun.  That is more than a

7    conclusion.  Our conclusion that this transfer was

8    done with actual intent to defraud is based on very

9    particular, very detailed, minute-by-minute documents.

10   So it is certainly not conclusory.  It's sort of

11   conclusory to call that conclusory.

12             And it's important, also, to remember

13   that when Vice Chancellor Glasscock suggested that

14   potentially the fraudulent transfer claim could be fit

15   for summary judgment disposition, he also said things

16   like "Maybe there's a perfectly reasonable explanation

17   for this."  I think discovery has shown that there is

18   not a perfectly reasonable explanation for this.  And

19   he did not have access to those documents, nor did we

20   at the time that he made that statement.

21             As far as seeking this relief rather

22   than simply monetary damages, that has been in our

23   complaint since the beginning.

24             THE COURT:  What is the -- can you

Appx 02240
014811

50

1    address the point that the Texas award is monetary and

2    not for the specific assets that are mentioned now in

3    your briefing?

4                      MR. CHRISTENSEN:  Sure.  I can.

5                      I'll address that by saying, quoting

6    again HERA's closing argument in the Texas trial.

7    "... [I]f Pat Daugherty happens to prevail in his

8    lawsuit against Lane, Patrick and HERA you heard Jim

9    Dondero testify, he gets his interest, which is

10   currently escrowed in the third-party escrow account,

11   all of it."

12                     We have made a claim for promissory

13   estoppel that statements like that with codefendants

14   show clear evidence of a promissory estoppel claim.

15   That kind of statement shows how the statement was

16   meant to be perceived, it shows how people did

17   perceive it.

18                     And I want to go to the jury question

19   because we actually have -- unlike many cases where

20   the idea of an objective standard, what would a

21   reasonable person do, is sort of an academic question.

22   But in this case we have a jury, which is sort of the

23   quintessential reasonable person, writing back to the

24   judge, "If we assign a dollar value to 'Fair Market

51

1   Value of Daugherty's HERA units' in Question 18" --

2   that's the question that awarded him $2.6 million --

3   "is this in exchange for his HERA units currently in

4   escrow, or in addition to them?"  The judge instructed

5   back, "Do not discuss or consider the effect your

6   answers will have."

7                   And then the final judgment made clear

8   that it was not in exchange for those assets in

9   escrow, that it was in addition to them.  And there

10  was appellate litigation about that issue, and it was

11  settled that it was not a replacement for those units.

12  But my point really is:  We have very clear evidence

13  that the Texas judgment and the people making the

14  Texas judgment believed that those assets were being

15  held in escrow for Pat Daugherty, which is exactly

16  what the defendants tried to tell the jury to believe

17  in their closing arguments.

18                   So the fact that the Texas judgment

19  was purely monetary is, A, not entirely true; and, B,

20  it's not -- does not defeat the promises that they

21  made throughout that trial, nor the fact that they

22  transferred the assets once the judgment came through.

23                   Let's see.  On the promissory estoppel

24  claim, it's just not what they said at trial, that Pat

52

1    Daugherty had an interest in this LLC but, by the way,

2    there's nothing in it.  So if you award him anything,

3    it's going to be completely valueless.

4                    I want to respond just briefly to the

5    point that these assets can be valued.  And they can

6    be.  This court is very experienced in appraisals.

7    But the easiest and most efficient way to deal with

8    this, the value, is to give the assets themselves

9    rather than require, effectively, a -- more than one

10   appraisal inside of this case, because there are

11   assets held by a private equity fund, and those assets

12   include private companies.  So we would have to have a

13   sort of quasi-appraisal action contained inside of

14   this, instead of doing what is much easier for the

15   parties and the Court and just addressing those assets

16   in an equitable manner and providing an equitable

17   remedy.

18                    The affidavit does say that they are

19   solvent.  I believe the affidavit was also given by

20   the same person that the -- it was either the

21   arbitration panel in *Credit Strategies Fund* or the

22   Bankruptcy Court in *Acis* said that Isaac Levinson's

23   statements were not credible and that his statements

24   contradicted documentary evidence in a clear way.

Appx 02252
014814

53

1              In addition, they don't say by how

2      much they are solvent.  It could be the case, based on

3      the face of that affidavit, that they are solvent by a

4      million dollars.  We simply don't know.  And again,

5      the question of solvency as it relates to irreparable

6      harm in most of these cases is in a sort of antiseptic

7      environment where it really is just a matter of:  Does

8      this party have sufficient assets?

9              And again, that's not the only

10     question in this case.  The question in this case is:

11     If the Court does nothing, what is the risk that

12     Highland will do exactly what it has done to these

13     assets vis-a-vis this litigant before?

14              That's all I have, Your Honor.

15              THE COURT:  Thank you.

16              My intention is to hear the status quo

17     order and the motion to dismiss and then take a break

18     and see if I can get something together to share my

19     thoughts.  So let's move on to the motion to dismiss,

20     unless folks want to take a short break.

21              MR. KATZ:  I'm prepared to proceed,

22     unless Counsel wants a break.

23              MR. UEBLER:  I'm prepared to go

24     forward.

Appx 02253
014815

54

1          THE COURT:  All right.  You may

2     proceed.

3          MR. KATZ:  Thank you, Your Honor.

4          So I won't belabor the procedural

5     background, because I know Your Honor is familiar with

6     it, other than to say that after Judge Glasscock had

7     dismissed a large number of Mr. Daugherty's claims,

8     there was -- a promissory estoppel claim was then

9     added.  And we filed the motion to dismiss as to that

10    claim, and that's the motion that we're here for

11    today.

12          To prevail on a promissory estoppel

13    claim, Mr. Daugherty has to allege a conceivable set

14    of circumstances that would allow a showing that there

15    was a promise that was made, that it was reasonable,

16    that the expectation of the promisor was to induce the

17    action of forbearance on the part of the promisee,

18    that the promisee reasonably relied on the promise and

19    took action to his detriment, and such promise is

20    binding because injustice can be avoided only by

21    enforcement of the promise.

22          And I do want to -- I will be

23    efficient, but I want to address each of these

24    elements, Your Honor.  And the -- I want to start with

55

1   the reasonable reliance.  As I mentioned a moment ago

2   in connection with the status quo order, that

3   Mr. Daugherty is really claiming that he would have

4   sought offset had Mr. Dondero -- actually, I

5   apologize, I want to take a quick step back.

6            Although Counsel's pointed to a

7   closing argument of HERA, that I believe he attributed

8   to Highland's counsel, I just want to be clear for the

9   record that the statement that Counsel just read from

10  the closing argument was for HERA, not for Highland,

11  and there was separate counsel.

12            THE COURT:  Hasn't there separately

13  been an assertion of a common interest?

14            MR. KATZ:  There was, Your Honor.  But

15  I just believe Counsel -- I'm sure it was

16  inadvertent -- said "Highland."  And I just want to be

17  clear for the record that that statement was on behalf

18  of HERA at closing argument.

19            But, more importantly, in the

20  complaint they only allege two statements: a statement

21  by Jim Dondero at trial and a statement by Mr. Klos in

22  a declaration made several months after the final

23  judgment.  And so when Mr. Daugherty claims that his

24  reasonable reliance was not seeking offset at the

Appx 02255
014817

56

1  trial, the second statement can't be a basis of that;

2  and the issue that Mr. Daugherty has, that there can't

3  be a reasonably conceivable set of circumstances to

4  show reasonable reliance for a couple of reasons.

5              One, the date that Mr. Daugherty filed

6  his counterclaims with his claims, he had -- the LLC

7  agreement with Highland's offset provision against the

8  value of HERA was in that document.  In fact, that was

9  the basis of one of Mr. Daugherty's claims, that there

10 was going to be -- there was the risk of this improper

11 offset.  He was challenging those provisions.

12             But yet he never pled offset as a

13 defense.  And it is a required affirmative defense

14 under Texas law.  And it is clear that when the final

15 judgment was entered, that's *res judicata*, that issue

16 was barred.

17             So Mr. Daugherty is saying that now

18 had Jim Dondero not testified as he did on the stand,

19 that he would have filed the declaratory judgment

20 action to offset the judgment that Highland obtained

21 against him from the judgment he obtained against HERA

22 cannot serve as the basis for a promissory estoppel

23 claim in this action because he would be barred as a

24 matter of law.

Appx 02256
014818

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S      Document Exhibit 15   Filed 06/26/98   Page 140 of 1017      PageID 15801

57

1              THE COURT:  Is that a little too

2    technical?  I mean, is the point a little more

3    abstract than that, which is that had Dondero not

4    testified as he did and assured everyone in the

5    courtroom that the escrow was there for Daugherty's

6    satisfaction down the road, that there are plenty of

7    different options he could have taken?  I mean, any

8    sort of resistance or leverage or anything like that

9    in regards to paying his own judgment, whether or not

10   a technical offset was procedurally available to him,

11   seems to be kind of reducing this a little bit too far

12   down into the technicalities.

13             MR. KATZ:  Well, I don't believe so,

14   for two reasons.  But the most important one being

15   there's no reasonably conceivable set of circumstances

16   where he could have taken action.  And I'll address

17   that momentarily.

18             But to the point, that was his

19   response.  That's what's in his pleading, both in his

20   complaint and in response to the motion to dismiss.

21   That's what he said he would have done.  And that

22   wasn't available to him.

23             And it wasn't just filing a

24   declaratory judgment action for offset that he would

58

1   have been barred from doing.  He had two years to

2   plead offset as a defense or to plead facts in the

3   Texas action that arguably could have given rise to

4   some reliance claim.

5             THE COURT:  It seems odd to claim that

6   there was no reliance because he didn't do something

7   before the act in question happened.

8             MR. KATZ:  Well, Your Honor, in fact,

9   quite the opposite.  As Mr. Daugherty said in his

10  reply brief to the status quo motion -- and this is on

11  page 2 and 3 of Daugherty's reply brief -- "In fact,

12  during the trial and before Daugherty won his

13  judgment, Defendants stressed that Daugherty was an

14  owner of HERA units."  Then he puts in a footnote, "At

15  the same time, Defendants took the position that

16  Daugherty held no economic interest in HERA.

17  Accordingly, Daugherty did not take the purported

18  admissions at face value and litigated for a judgment

19  that he retained his HERA units."

20            And the significance of that, Your

21  Honor -- it's the same significance as what I was

22  trying to say a moment ago and I probably did not say

23  it very clearly -- is from the moment he filed this

24  claim, he was aware that, as he says here, that his

Appx 02358
014820

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 15 Filed 06/26/98    Page 142 of 1017    PageID 15803

59

1  value -- the value of his shares in HERA were

2  valueless, as Highland was saying they were.  Because

3  that was one of his claims in the lawsuit.  And he did

4  not do anything to try to protect that vis-a-vis a

5  judgment that Highland might get against him at any

6  time during the trial.

7           So to think that, "Oh, well, he was

8  about to do it" after two years, knowing everything

9  that he knew, the LLC agreement allowing the offset,

10 Highland taking the position that his units were

11 valueless even though he was suing for it, that

12 somehow he was going to try to offset his claim

13 against HERA against Highland's claim against him, and

14 he just didn't do it because Jim made the statement he

15 did on the stand is not a reasonably credible

16 position.  It's not something that could have a -- or

17 there could be a reasonably conceivable set of

18 circumstances to show a reasonable and detrimental

19 reliance.

20          And I think -- and, Your Honor, if you

21 also look at the whole circumstances around

22 Mr. Dondero's statement on the stand, was not -- in

23 fact, the question -- it was by HERA's counsel that

24 was questioning him at the time.  And the question

60

1   was:  The assets that are being escrowed, or the money

2   that's being escrowed right now, what happens to them?

3   And I think it's significant for a couple of reasons.

4                One, right now they're talking about

5   the day that the question was asked.  They're not

6   talking about a day in the future.  And I think it's

7   also significant that that was --

8                THE COURT:  Maybe that was the

9   question, but the answer was, "In the future they will

10   go to him."

11                MR. KATZ:  That's -- Your Honor,

12   respectfully, that's not the way I read it.  But I

13   think the point is -- two points, Your Honor.  One,

14   that was a question by HERA's counsel; that was not a

15   question by Daugherty's counsel.

16                If this was so important that

17   Daugherty was going to forego seeking to invalidate

18   the escrow agreement or trying to do trial amendment

19   and get a new claim in, there was no action by his

20   counsel to follow up and say:  Let's be clear.  Let's

21   not talk about right now, let's talk about in the

22   future.  And again -- or ask about what about the

23   resignation provisions, what about the termination

24   provisions.

014822
Appx 02360

61

1          There's a whole host of conditional

2     circumstances that show that Mr. Daugherty,

3     purportedly relying on that statement to not try to

4     bring a declaratory judgment action for offset or to

5     seek to invalidate the escrow agreement would have

6     been reasonable reliance.  Again -- because, in fact,

7     up until that point, Mr. Daugherty not only waited two

8     years, he waited past the amended pleading deadlines.

9     In the face of what he says, I'm being told by

10    Highland that my assets are valueless.  You know, and

11    to the extent they say that I'm still owning HERA

12    units, I never believed that there was anything there.

13    But yet he didn't do anything about it before

14    Mr. Dondero made the statement to HERA's counsel.

15          So, again, all of those, all of that

16    goes to whether he could have -- show any circumstance

17    where he could have reasonably relied.

18          Similarly, I think if you look -- and

19    I bring in these things to show Your Honor what is not

20    in the complaint or not in the response to the motion

21    to dismiss.  After the judgment, he claims that he was

22    entitled to this offset, but yet he paid his full

23    judgment.  He could have just paid the difference in

24    the judgment.

Appx 02301
014823

62

1              THE COURT:  That's the point, is that

2    he paid the whole judgment; right?  Kind of chipperly

3    wrote the check and thought it was all going to work

4    out in the end.

5              MR. KATZ:  Right.  Well, without --

6    but with the whole circumstances and you look at his

7    allegations, if his allegations are to be believed,

8    it's not reasonable to believe that somebody who was

9    going to do what he did but for Jim Dondero's

10   statement would have, again, waited for two years, not

11   filed -- not done -- taken the legal actions that he's

12   now claiming he would have taken.

13             He did seek to amend his pleadings

14   right before trial.  These were not in there.  That

15   was, again, before these statements.  Again, it's not

16   credible to believe that he reasonably relied.  And he

17   hasn't alleged anything.

18             Again -- and so that was why I said

19   initially to Your Honor's question, there are two

20   points.  One, when you look at the totality of what he

21   didn't allege and what he didn't do, that there can be

22   no set of circumstances where he reasonably relied,

23   but then when you look at what he says he would have

24   done, which is the offset.  And he would have been

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 15    Filed 03/26/98    Page 146 of 1017    PageID 15807

63

1  legally barred from doing that because he waived it.

2  Also because -- and the law is cited in our motion,

3  that because Highland and HERA are separate entities,

4  there wouldn't have been an offset between those

5  judgments anyway.

6              So the two things he says that he

7  would have done was seek to invalidate the escrow;

8  which, again, he was aware of that escrow agreement

9  before trial.  He sought to amend his pleadings before

10 trial but did not address that escrow agreement at

11 all.

12             He has shown that he believes that

13 his -- before Mr. Dondero made that statement, he

14 didn't -- he thought his HERA units had been rendered

15 valueless and that's how he was litigating the case.

16 But he didn't try to "invalidate" the escrow

17 agreement.  He also doesn't explain or provide any

18 allegation of what that means, to invalidate the

19 escrow settlement.

20             He doesn't provide any legal theory or

21 allegation of evidence to support a legal theory that

22 would show that had he sought to invalidate the escrow

23 agreement that the court would have allowed that

24 amendment and it would have changed the outcome.

Appx. 02363
014825

64

1              The next element I want to talk about
2       was that a promise was made.  And, again, he's
3       identified two promises: one by David Klos, one by Jim
4       Dondero.  There's -- the one by Mr. Klos, again, was
5       done several months after trial.  The one by
6       Mr. Dondero is obviously during trial.  But both of
7       those statements, when you look at them, are not
8       unequivocal statements of -- there was no set of
9       circumstances where Mr. Daugherty will not be paid
10      this money on a final, nonappealable judgment.  And --
11      which is what --
12              THE COURT:  Why is that not exactly
13      what Mr. Dondero said?
14              MR. KATZ:  Well, Your Honor,
15      Mr. Dondero was being asked a question about the
16      language in the escrow agreement, that specific
17      provision.  And he was being asked based on
18      circumstances right now.  And perhaps if I give you an
19      analogy.  If I hire an employee and I'm paying the
20      employee $50,000 a year and they're an at-will
21      employee, and somebody asks me, "Well, how much does
22      that employee make?" I'm not likely going to say,
23      "Well, annually $50,000 a year, but I can terminate
24      them at any time."  Or "$50,000 a year, but less

Appx 02384
014826

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 13-20 15   Filed 06/25   Page 148 of 1017    PageID 15809

65

1    withholding," or other caveats.

2                    And the question that was asked to

3    Mr. Dondero is the -- right now the assets that are --

4    and I apologize, I don't -- I can grab the quotation.

5    I don't have it right in front of me.  But the key

6    part was that it was predicated on right now, what

7    happens right now if there's a final judgment.

8                    So -- and, again, this is Mr. Dondero

9    who's an individual defendant who is not being

10   questioned as a representative of Highland.  And what

11   they want to do is take that statement and say this is

12   an unequivocal statement that was binding Highland.

13   And it just doesn't rise to that level under the legal

14   standard.

15                   And, you know -- but, moreover --

16   again, because what -- Mr. Dondero was reading the

17   escrow agreement on the stand as a layman, but that's

18   really more significantly the point, is that if the

19   alleged promises are subject to termination by a

20   contract -- I know this is in our pleading, the

21   *TrueBlue HRS Holding* case -- promissory estoppel does

22   not apply where a fully integrated and enforceable

23   contract governs the promise at issue.

24                   And that's the issue, is the contract

66

1   is the contract; it means what it means.  And the --

2   unless there -- I don't believe, Your Honor, that they

3   even alleged that there is some promise, unequivocal

4   promise, that Mr. Dondero or Mr. Klos made that was

5   not subsumed by the escrow agreement.  And that's

6   really the basis of their claim here.

7                   They also have to show that the claim

8   is necessary to avoid injustice.  And obviously, they

9   have brought a fraudulent transfer claim and an unjust

10  enrichment claim arising out of the same course of

11  conduct, that they claim these representations are

12  related to those claims.  And I think the case law is

13  fairly clear on this, that this is exactly the type of

14  situation where a promissory estoppel claim is not

15  necessary to avoid injustice.

16                  THE COURT:  But is the conclusion to

17  be taken from your argument that nothing can ever be

18  pled in the alternative to a promissory estoppel

19  claim?

20                  MR. KATZ:  No, not at all.  But I

21  believe that you would have to have a set of

22  circumstances where there wasn't a fully integrated

23  enforceable contract, and that the underlying promises

24  weren't about the interpretation of that contract.

CHANCERY COURT REPORTERS

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-20   Exhibit 15   Filed 08/25   Page 150 of 1017   PageID 15811

67

```
 1              And then, finally, Your Honor, I'm
 2    going to use the word "conclusory" again, that they --
 3    well, actually not even conclusory, Your Honor.  They
 4    didn't even plead that Highland intended to induce
 5    reliance or that Highland should have reasonably
 6    expected to induce reliance by Mr. Daugherty.
 7              And I don't think that's necessarily
 8    an accident.  I think that's because the statements
 9    that they're relying on were not statements that were
10    made on behalf of Highland.  They're individual
11    statements.  And I think that it would be fairly
12    tortured to say otherwise.
13              So, Your Honor, again, for each of
14    those reasons, we don't think that they have pled any
15    reasonably conceivable set of circumstances that could
16    support the promissory estoppel claim.
17                   THE COURT:  Thank you.
18                   MR. KATZ:  Thank you, Your Honor.
19                   MR. UEBLER:  Good afternoon again,
20    Your Honor.
21                   THE COURT:  Good afternoon.
22                   MR. UEBLER:  I'll start with the
23    promise that was made.  And before I do, I think I
24    heard Mr. Katz talking about the standard to prevail
```

Appx 02307
014829

68

1    on a claim.  And I understand we're a little bit late

2    in the game of this lawsuit.  But this is a 12(b)(6)

3    motion and the standard is reasonably conceivable.

4              So I just want to reset where we are

5    on this motion and talk about the promise that was

6    made, briefly.  So what was the promise?  The promise

7    was Jim Dondero testifying at trial, under oath, that

8    Mr. Daugherty's assets would be held in escrow and

9    released to him through HERA if he won in Texas.  I

10   mean, it was as simple as that.

11             You may have been left with the

12   impression from Mr. Katz's presentation that the line

13   of questioning was about the terms of the escrow

14   agreement.  I can save all of us and just refer to the

15   pages of the testimony, or I'd be glad to read the

16   preceding three or four questions to set that up.  But

17   it was not interpreting the escrow agreement.  And

18   Mr. Katz didn't have the testimony on hand, but I do.

19   And the question was:

20             "Question:  Okay, so -- so if

21   Mr. Daugherty somehow prevails in his lawsuit against

22   Patrick Boyce and Lane Britian and HERA, what happens

23   to Mr. Daugherty's interest that's being escrowed

24   right now with a third-party escrow agent?

Appx 02308
014830

69

1                    "Answer:   They go to him.

2                    "Question:   I'm sorry?

3                    "Answer:   They go to him via to HERA

4    and then to him."

5                    Is that promise consistent with the

6    escrow agreement?  Yes.  Is that promise separate and

7    apart from the escrow agreement?  Yes.  Mr. Dondero

8    wasn't there interpreting a contract.  He was there

9    making a promise to Daugherty and to the jury.

10                   And just as we allege in paragraph 131

11   of our complaint, it was the reasonable expectation of

12   Highland, when that promise was made, that it was

13   going to be relied on.

14                   THE COURT:  Tell me more how the

15   statement was separate and apart from the contract.

16                   MR. UEBLER:  The statement is separate

17   and apart from the contract because I think --

18   Mr. Katz would be the first one to tell you that

19   Mr. Daugherty was not a party to the escrow agreement.

20   Mr. Daugherty, on the face of it, has no rights under

21   that escrow agreement.

22                   So this idea that Highland proposes

23   that because there's a contract out there that also

24   addresses the subject matter of the promise, the

Appx 02369
014831

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S     Document Exhibit 15 - Page 71 of 98   Page 153 of 1017     PageID 15814

70

1   promisee is, therefore, precluded from relying on that

2   promise, it just -- it doesn't hold water.  They

3   don't -- they didn't cite any cases.

4              We said it's not the law of Delaware

5   and never should be.  Highland shouldn't be allowed to

6   contract with Abrams & Bayliss and then use that

7   contract to say that a promise made to Daugherty that

8   Daugherty seeks to enforce, that is -- you know,

9   follows the terms of that contract but doesn't

10  expressly give any rights to Daugherty, that's just --

11  that's not an argument that the Court should accept,

12  in our view.  So that's why I say it's separate from

13  the contract.

14             And that also gets into the

15  alternative claim argument, too.  Are we entitled to

16  bring promissory estoppel and a fraudulent transfer

17  claim and an unjust enrichment claim?  I think the

18  *Chrysler* case in the Supreme Court settled that

19  question a long time ago.  And I think Rule 8 of this

20  court does, too.

21             So, of course, there's overlap in what

22  was promised and what's in the escrow.  Although, I

23  will point out, the escrow -- Mr. Katz said something

24  like -- he referred to a host of conditional

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 15    Filed 07/25/26    Page 154 of 1017    PageID 15815

71

1  circumstances in the escrow agreement.  And I think

2  his point was paragraph 5 and paragraph 10 that they

3  had relied on when Abrams & Bayliss resigned.  Well,

4  you won't find any of that in the promise that was

5  made by Jim Dondero under oath to Pat Daugherty and

6  the jury.  So whatever conditional circumstances may

7  be in that contract, they're not in that promise.

8          And the notion that Jim Dondero was

9  testifying in his individual capacity, I think we

10 debunked that in Exhibit A to our answering brief --

11 which was Highland's own witness list -- that provided

12 an entire paragraph of what Mr. Dondero would be

13 testifying about, including testimony in support of

14 Highland's and Cornerstone's claims against Daugherty

15 and the damages suffered and the third-party

16 defendants' defenses to claims asserted against them.

17         So Jim Dondero is Highland.  He is

18 HERA.  He's HERA ERA management.  He controls them

19 all.  Mr. Katz pointed out that the closing argument

20 by HERA's lawyer in Texas was just HERA's lawyer.

21 Well, Jim Dondero controls HERA, just as he controls

22 Highland.  So I view that as a distinction without a

23 difference.

24         But what that closing argument did was

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 15  Filed 03/25  Page 155 of 1017    PageID 15816

72

1   reaffirm the promise -- I thought I had it here.  So

2   what was said on closing argument by HERA's counsel,

3   just after Jim Dondero made the promise, was "... if

4   Pat Daugherty happens to prevail in his lawsuit

5   against Lane, Patrick and HERA you heard Jim Dondero

6   testify he gets his interest, which is currently

7   escrowed in the third-party escrow account, all of

8   it."

9           Then we had the other promise, which

10  was that September -- September of 2014, the Klos

11  affidavit.  It restated the promise.  This gets to the

12  reasonableness of the reliance of Daugherty's

13  promise -- the promise to Daugherty.  He kept hearing

14  this.

15          And the idea that Daugherty should

16  have somehow foreseen in either the six weeks between

17  when Highland sprung the escrow agreement on him

18  before trial or when Dondero testified or when Klos

19  submitted his affidavit -- by the way, as the senior

20  finance of Highland Capital -- that Daugherty should

21  have foreseen two years from now when he went to pay

22  the judgment that Highland was going to break that

23  promise.

24          So the idea that Daugherty should have

73

1    done something between December 2013 and December of

2    2016, I think entirely misses the point of our claim.

3    The reliance that we allege -- and it's paragraph 133

4    of our complaint -- is "In further reliance on the

5    promises of Highland Capital and its agents, on

6    December 14, 2016, nine days after Highland Capital

7    secretly obtained the Escrow funds, Daugherty wired

8    approximately $3.2 million in cash to Highland Capital

9    in satisfaction of its award of attorneys' fees in the

10   Texas Action."

11                 That was the reliance.  What could

12   have been done, other than a cash payment, Daugherty

13   could have just engaged in self-help.  He could have

14   paid the difference between the 2.6 and the 2.8 of the

15   judgments.  He could have not paid anything at all.

16   He at least should have had the chance to go to court

17   like the petitioner did in the *Bonham Bank* case that

18   we cite from Texas to explain to a judge why, under

19   these circumstances, even though there are three

20   different litigants involved, these claims should be

21   offset.  But he didn't even get that chance because he

22   relied on Highland's promises and he wired the full

23   amount.  They took away that chance from him.

24                 We don't have to prove today whether

1    he would have won on that setoff claim in Texas or

2    anywhere else.  We just have to prove that it's

3    reasonably conceivable that he was deprived of that

4    chance because he reasonably relied, to his detriment,

5    on a promise that was made under oath and repeated.

6                    In their opening brief, the defendants

7    stated that "Injustice can (and should) be avoided

8    through collection efforts in the Texas Action, which

9    Daugherty has not even attempted to pursue, making

10   this claim premature."

11                   I just wanted to point out, this was

12   in Exhibit B to Highland's own opening brief.  They

13   attached Mr. Daugherty's interrogatory responses.  And

14   if you look at Interrogatory 36 on page 25,

15   Mr. Daugherty stated that "... apart from filing this

16   action to collect his Texas judgment, he filed for a

17   writ of execution in Texas on July 7, 2017, which was

18   unsuccessful because Highland Capital claimed HERA had

19   no assets.  The return of service was dated

20   September 26, 2017."

21                   I think that's totally irrelevant to

22   the questions before the Court, but I wanted to point

23   out that Mr. Daugherty did, in fact, attempt some

24   collection efforts in Texas and those were

Appx 02374

014836

75

 1   unsuccessful.

 2              I'd also like to point out that in

 3   addition to being able to plead alternative claims,

 4   this is one of those cases where injustice can only be

 5   avoided through the enforcement of this promise,

 6   notwithstanding the other claims out there.  The

 7   injustice to be avoided is allowing Highland Capital

 8   to walk away with both judgments from the Texas

 9   action.  They got Daugherty's 3.2 million, and they

10   got his HERA assets.  And that's the injustice to be

11   avoided.

12              When you and Mr. Katz were discussing

13   this element, he referred to a fully integrated

14   contract.  Again, he would be the first to tell you,

15   I'm sure, that Daugherty has no rights under that

16   fully integrated contract.  So the fact that there is

17   a similar contract out there is not relevant to the

18   analysis.

19              That's all I have, Your Honor.

20              THE COURT:  Thank you.

21              MR. UEBLER:  Thank you.

22              MR. KATZ:  Your Honor, can I just

23   address a couple points?

24              THE COURT:  Yes.

Appx 02275
014837

76

1              MR. KATZ:  For clarity purposes,

2    Counsel -- this is the second time they've read the

3    statement from HERA's counsel during the closing

4    argument.  That was not part of the statements that

5    were alleged to be part of the detrimental reliance in

6    either the complaint or in the response to the motion

7    to dismiss.

8              And I think that's significant, again,

9    because Counsel is certainly correct that what they

10   say is that Daugherty would not have paid the judgment

11   against him by Highland.  But their explanation of

12   what that means is that he would have sought offset or

13   sought to invalidate the escrow agreement, both of

14   which could only have been done, been sought, during

15   trial.  I suspect that's why they are not relying on

16   the statement that was made at closing argument where

17   it would have been too late for them to make those

18   allegations.

19             Highland had a judgment, a fully

20   perfected final judgment, collectible judgment that

21   Mr. Daugherty paid.  And from the motion to dismiss

22   perspective, claiming that he would have filed either

23   or both of two things that were barred by *res judicata*

24   does not provide the basis to avoid -- where there's a

Appx 02276
014838

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 15   Filed 08/25   Page 160 of 1017    PageID 15821

77

1    reasonably conceivable set of circumstances that those

2    allegations could support to avoid a motion to

3    dismiss.

4              And, again, we're really just talking

5    about Jim Dondero's statement because, as Counsel

6    recognized, the Klos statement was made, I believe,

7    roughly five months after the -- four or five months

8    after the final judgment was entered.

9              And then, finally, lastly, I just want

10   to touch on the escrow agreement.  Of course we

11   recognize Mr. Daugherty is not a party to that

12   agreement.  But Mr. Daugherty's case is that he is

13   asserting rights under that escrow agreement.  He is

14   certainly saying that there was a transfer under that

15   agreement and that that agreement required the assets,

16   the money being held pursuant to that escrow

17   agreement, to go to HERA, which then Mr. Daugherty as

18   the shareholder of HERA would have had rights to.

19             And, you know, we disagree with some

20   of the underlying factual basis.  We don't agree that

21   there was a transfer.  But I think counsel for

22   Mr. Daugherty would certainly not say that there's not

23   a fully enforceable promise in that escrow agreement

24   that they are seeking relief under.

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 13-20    Filed 09/25    Page 161 of 1017    PageID 15822

78

1              And that's -- and just as importantly,

2    Mr. Dondero's statement was exclusively an

3    interpretation of that promise.  And that's why -- and

4    I think that's exactly what the *TrueBlue* case is

5    referring to.  And there's a fully integrated contract

6    that has the promise that legally and factually

7    determines what the rights under that contract are.

8              And Mr. Dondero's interpretation of

9    that contract -- even if it's the exact same as the

10   contract or even if it's different than the

11   contract -- doesn't change that the claim is pursuant

12   to the contract and not for promissory estoppel.

13             THE COURT:  What is your understanding

14   of Mr. Daugherty's ability to sue to enforce the

15   escrow agreement in a way that benefits him?

16             MR. KATZ:  Well, he is a shareholder

17   of HERA.  And as a shareholder of HERA -- I mean, I'd

18   have to think through all the *res judicata*, collateral

19   estoppel, statute of limitations issues that all have

20   come out about all the issues that have been

21   litigated.

22             THE COURT:  I just mean from the terms

23   of the contract.

24             MR. KATZ:  I don't believe that

CHANCERY COURT REPORTERS

79

1   Mr. Daugherty is a third-party beneficiary of the

2   contract, if that's Your Honor's question.  He's

3   certainly not a direct party to the contract, but he

4   is a shareholder of HERA.  And their allegations are

5   that Highland was contractually obligated to send

6   money to HERA under that agreement.

7                   I think there are potentially

8   technical legal issues under that.  That's, of course,

9   not the claim that Mr. Daugherty has brought.  And --

10  but if Mr. Daugherty had any rights, it would be

11  through HERA.

12                  THE COURT:  So is it your

13  understanding that the point of the doctrine that

14  you're relying on, that there can't be both a contract

15  and a claim for promissory estoppel, is that those

16  rights substantially overlap?

17                  MR. KATZ:  I would suspect that's

18  probably the policy reason behind those decisions.

19                  THE COURT:  So if Mr. Daugherty

20  doesn't have contractual rights under the escrow

21  agreement, why does that knock out his promissory

22  estoppel claim?

23                  MR. KATZ:  Because it's the same --

24  because whatever rights he has under the contract,

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 15    Filed 08/25/ Page 163 of 1017    PageID 15824

80

1    whether he has rights or not, are no different than

2    any rights he would have vis-a-vis Mr. Dondero's

3    interpretation of what that contract said, what that

4    contractual language says.

5              THE COURT:  Go ahead.

6              MR. KATZ:  I think that the policy is

7    is not to create quasi-contractual claims when there

8    is a contract, regardless of who's the party to the

9    contract.

10             And, actually, I think it's even --

11   there's no wiggle room around this situation because

12   it's not -- Mr. Dondero was -- I mean, I think the

13   quote was, "They go to Mr. Daugherty through HERA" is

14   the quote.  He wasn't saying something -- there's not

15   been an allegation, for example, that Mr. Dondero's

16   statement or Mr. Klos' statement created a separate

17   contract between Mr. Dondero or Mr. Daugherty.

18             I mean -- and that's not what -- I

19   mean, there hasn't been an allegation that that's what

20   they were saying -- that Mr. Dondero was saying that

21   or Mr. Klos was saying that.  The allegation is they

22   were saying that's what the contract, the escrow

23   agreement, means.  And that's why you can't have a

24   separate claim, because the contract means what it is

81

1   and the contract determines the rights.

2                    THE COURT:  I understand.

3                    MR. KATZ:  Thank you, Your Honor.

4                    THE COURT:  Thank you.

5                    MR. UEBLER:  May I, briefly?

6                    THE COURT:  Briefly.

7                    MR. UEBLER:  Just to be clear, Your

8   Honor, we very much rely on the Klos statement as a

9   separate promise on behalf of Highland in the

10  affidavit.  We think it also supports the

11  reasonableness of the reliance on Mr. Dondero's

12  promise on behalf of Highland.  But we view the Klos

13  affidavit as part of the promise generally.

14                   With respect to the closing argument

15  by HERA, we didn't use it sooner because we just --

16  actually, I have to give credit where credit is due --

17  my colleague, Mr. Christensen just found it.  We

18  didn't try the Texas case, so we did find it in the

19  record.

20                   And fortunately for us, Highland

21  agrees on pages 13 and 14 of their own motion to

22  dismiss that the Court can "[consider] additional

23  materials from related litigation that were not

24  attached to the complaint if the plaintiff relied on

014843

82

1    those materials in casting his complaint, as Daugherty

2    has done with regard to the Texas Action."

3                The last paragraph on page 14 goes on

4    to say, "To the extent the Court finds that the Texas

5    Action materials are not already subject to

6    consideration based on Daugherty's extensive reliance

7    on them, Defendants respectfully request that the

8    Court take judicial notice of the documents under

9    Delaware Rule of Evidence 202(d)(2)."

10               So we submit that the Court certainly

11   can consider the trial transcript from the Texas

12   action as further support for the reasonableness of

13   Mr. Daugherty's reliance.

14               And my final point with respect to the

15   escrow agreement and the notion -- I think that what

16   Mr. Katz said is that Daugherty, in his view, has no

17   direct rights under that agreement.  The only real

18   direct relevance of the escrow agreement with respect

19   to the promissory estoppel claim is that it's even

20   more evidence of the reasonableness of Mr. Daugherty's

21   reliance on the promise because it's consistent with

22   that promise.

23               Thank you, Your Honor.

24               THE COURT:  Thank you.

Appx 02282
014844

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 53-20   Exhibit 15   Filed 03/25   Page 166 of 1017   PageID 15827

83

1          Anything to -- Mr. Katz, I'll give you

2     the last word.

3               MR. KATZ:  No, Your Honor.

4               Just to address Counsel's last point

5     about just finding the statement.  You know, again, I

6     think that the issue is what did Mr. Daugherty

7     actually rely on.  Their claim is that when he wired

8     $3.2 million -- not what statements Counsel has found

9     in the record recently that could be retroactively

10    applied that way.

11              And Counsel's -- again, the complaint

12    that is in front of Your Honor that has the

13    allegations rely on the two statements and is very

14    clear that -- it is explained in their briefing --

15    that the remedies -- that the detrimental reliance was

16    forbearance from taking action in the Texas lawsuit.

17              So anything that occurred anytime

18    after they could raise issues in a Texas lawsuit could

19    not have been a basis for detrimental reliance.

20              THE COURT:  Thank you.

21              I'm going to take a recess.  It will

22    be at least 20 minutes.  So stretch your legs, do

23    whatever.  It'll probably be longer than that.  But --

24    thanks for your patience, but it's faster this way in

Appx 02283
014845

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 31-20    Filed 05/25    Page 167 of 1017    PageID 15828

84

1    the short term.

2                    So we are in recess.

3        (Recess taken from 3:35 p.m. until 4:18 p.m.)

4                    THE COURT:  Thank you for your

5    patience.

6                    I'm going to start with the motion for

7    a status quo order.  It is denied.  We have some time

8    constraints this afternoon, so I will cut to the

9    chase.  Daugherty has not established a threat of

10   imminent irreparable harm as he must.  It is clear

11   that Daugherty is pursuing this relief now based on

12   what happened in the *Redeemer* case.  This complaint

13   was filed in July 2017, and he did not seek the relief

14   that he's now seeking until after the papers on the

15   status quo order dispute were filed in the *Redeemer*

16   case.  And Daugherty cites Highland's submissions in

17   that case in his brief.

18                   I disagree with Daugherty's reading of

19   the *Redeemer* papers as indicating that Highland is in

20   "severe financial distress" and is "unable to satisfy"

21   the arbitration judgment at issue there.  And the

22   facts are very different as between the two cases.

23   Before going to arbitration, there were issues

24   involving control over assets that led to Highland

85

1    making representations to the Court in the *Redeemer*

2    case.    And in the more recent request for a status quo

3    order related to confirming an arbitration judgment,

4    there was no separate claim that this court needed to

5    adjudicate, like Daugherty's fraudulent transfer claim

6    here.

7                        And, finally, the *Redeemer* parties

8    ultimately stipulated to a status quo order.    So I

9    don't think that anything that this court did in

10   entering the agreed-upon status quo order is helpful

11   in deciding whether to issue one in this case.

12                        Daugherty says that Highland has a

13   pattern of avoiding judgments, but has given me no

14   reason to think that Highland is going to do something

15   between now and a post-trial opinion that would make

16   it incapable of satisfying a judgment, nor is there

17   anything in the *Redeemer* case that leads me to believe

18   that.

19                        Quite frankly, if Highland is as good

20   at avoiding judgments as Daugherty claims, Highland

21   would have already moved the assets.    Daugherty, in

22   his reply, touches on that point and raises concerns

23   about whether the assets have already been

24   transferred.    He used a metaphor about the straw

CHANCERY COURT REPORTERS

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 15 Filed 06/25/98    Page 169 of 1017    PageID 15830

86

1    breaking the camel's back.  I'm going to use a

2    different ungulate.  He's provided no reason to

3    believe the horse is not already out of the barn or

4    that the horse is going to imminently flee the barn.

5                     So I fully appreciate that Daugherty

6    says that this is what happened to him in Texas, and

7    I've indicated before that I agree with Vice

8    Chancellor Glasscock's sentiment that what happened

9    here fails more than the smell test.  But that doesn't

10   mean that there is a sufficient imminent threat that

11   it's going to happen here with Highland.

12                    I also distinguish this case from Vice

13   Chancellor Glasscock's entry of a status quo order in

14   the *Trussway* matter, which admittedly was, in part,

15   based on Highland's "prior history."  In that ruling,

16   Vice Chancellor Glasscock noted the unique appraisal

17   remedy that was at issue there, and distinguished that

18   property right -- which is meant to substitute for a

19   stockholder's ability to insist on unanimity in a

20   merger -- from recovery in a tort or contract case.

21   Daugherty is seeking the more common sort of recovery

22   here, so I do not find *Trussway* instructive.

23                    So, in sum, because Daugherty's motion

24   for a status quo order is based on a recent

CHANCERY COURT REPORTERS

87

1   development that does not support a conclusion that

2   Daugherty faces imminent irreparable harm, the motion

3   for a status quo order is denied.

4               Mr. Christensen, do you have any

5   questions about that?

6               MR. CHRISTENSEN:  No, I do not.

7               THE COURT:  Okay.  Anything from DLA?

8               MR. KATZ:  No, Your Honor.

9               THE COURT:  Thank you.

10              Moving on to the motion to dismiss.

11  Highland's motion to dismiss Count IX of the amended

12  complaint is denied.  Count IX is a claim for a

13  promissory estoppel.  And to state a claim for

14  promissory estoppel, a plaintiff must plead four

15  elements.

16              The first is that a promise was made.

17  The second is that it was the reasonable expectation

18  of the promisor to induce action or forbearance on the

19  part of the promisee.  The third is the promisee

20  reasonably relied on the promise and took action to

21  his detriment.  The fourth is that the promise is

22  binding because injustice can be avoided only by

23  enforcement of the promise.  That's all from the

24  *Chrysler* case out of the Supreme Court in 2003.

Appx 02287
014849

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 15   Filed 08/25/98   Page 171 of 1017   PageID 15832

88

1                On Highland's motion to dismiss, I

2       applied a reasonable conceivability standard of

3       Rule 12(b)(6).  Under that standard, I must accept all

4       well-pleaded factual allegations as true, accept even

5       vague allegations in the complaint as well-pleaded if

6       they provide the defendant notice, draw all reasonable

7       inferences in favor of the plaintiff, and deny the

8       motion unless the plaintiff could not recover under

9       any reasonably conceivable set of circumstances

10      susceptible of proof.  That familiar standard is from

11      *Century Mortgage Company v. Morgan Stanley*.

12                Applying this standard, plaintiff has

13      adequately pled the four elements.  First, Highland

14      made promises through representations it and its

15      agents made in the Texas action.  Highland, through

16      testimony, explained that Daugherty would receive the

17      escrowed assets upon a judgment being finalized.

18                Daugherty cites testimony from James

19      Dondero, Highland's cofounder and president.  On

20      direct examination, Dondero was asked what would

21      happen to Daugherty's interest that was being held in

22      escrow, and Dondero stated that it would go to

23      Daugherty via HERA if he won.  This testimony is cited

24      in paragraphs 43 and 129 of the complaint.

Appx 02288
014850

1           Highland tries to distance itself from

2    Dondero, but it cannot do so at this stage.  Highland

3    says Dondero was testifying in a personal capacity.

4    But the witness list Highland filed in the Texas

5    action shows that is not the case.  That is Exhibit A

6    to Daugherty's answering brief.  Highland had no

7    response to this in its reply brief, beyond

8    reiterating its original argument that Dondero was not

9    speaking on Highland's behalf.

10          Based on the allegations of the

11   complaint, including Dondero's role, it is reasonably

12   conceivable he was speaking on behalf of Highland.

13          Other support for the alleged promise

14   comes from an affidavit attached as Exhibit I to the

15   complaint from David Klos.  Klos submitted the

16   affidavit and stated he had "... personal knowledge of

17   the facts stated in this affidavit as the Senior

18   Manager of Finance for Highland Capital ..." and

19   because he oversaw accounting relating to HERA.  Klos

20   reiterated in his affidavit what the escrow agreement

21   says, and Dondero testified to, which is that after a

22   final nonappealable judgment, A&B, as the escrow

23   agent, would transfer the deposit assets to HERA.

24          Highland also tries to distance itself

Appx 02280

014851

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-20    Filed 09/15/25    Page 173 of 1017    PageID 15834

90

1    from Klos.  And it cannot do so, as the document

2    presented to the Texas court states Klos was providing

3    the affidavit in his capacity as Highland's Senior

4    Manager of Finance.  At this stage, that is

5    sufficient.

6                    Together, these allegations are

7    sufficient to establish that Highland made a promise

8    that the assets would be held in escrow and released

9    to Daugherty, via HERA, if Daugherty won in Texas.

10                    Second, the reasonable expectation of

11    Highland as the promisor was to induce action or

12    forbearance on the part of Daugherty as promisee.

13                    In briefing, Highland says the

14    statements were not directed to Daugherty, "... but

15    rather [to] the jury, the judge, legal counsel, the

16    public, and so forth."  That's a quote from page 20 of

17    Highland's reply.  It simply makes no sense to say

18    that the statements were directed to everyone else

19    involved in the legal proceeding -- indeed, in the

20    world by virtue of including "the public" -- but not

21    Daugherty, who had the greatest interest in that

22    proceeding.  It is reasonably conceivable the

23    reasonable expectation of someone discussing the

24    escrow agreement, as Highland did, would have been to

Appx 02299
014852

1    induce action or forbearance by their adversary in the

2    litigation.

3              Third, it is reasonably conceivable

4    that Daugherty reasonably relied on the promise and

5    took action to his detriment.

6              Daugherty could have pursued other

7    strategies if the escrow was not in place.  Daugherty

8    paid a judgment in the same case to Highland, which he

9    alleges was in the amount of $3.2 million.  If

10   Daugherty knew what would happen with the escrow, he

11   could have fought tooth and nail for an offset of the

12   judgment amounts.

13             Highland focuses on the availability

14   of a triangular offset in this situation, asserting

15   that even if HERA owed Daugherty money, Daugherty was

16   legally unable to offset the judgment he owed Highland

17   by what he was owed from HERA.  I think that misses

18   the point, which is that Daugherty forewent even

19   trying to obtain the offset, and bringing the issue to

20   the attention of the Texas court.

21             He could have argued for other

22   provisions in the final judgment, but he didn't.  He

23   paid his judgment and expected HERA and Highland would

24   do the same as set forth in the escrow agreement.

Appx. 02291

014853

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 15   Filed 03/25 98   Page 175 of 1017   PageID 15836

92

1            Other members of this court have

2    adopted a "no-chumps policy," meaning that good guys

3    should not feel like chumps for following the rules.

4    Daugherty played the game straight, and alleges

5    Highland and HERA didn't.  It is at least reasonably

6    conceivable that Daugherty pursued the strategy he did

7    because of the promises Highland made during the

8    course of the litigation.

9            And that reliance was reasonable.

10   Highland says Daugherty should have expected the worst

11   because the language of the escrow agreement allowed

12   the escrow agent to resign at any time, and so it was

13   never a sure thing that the assets would be available

14   to Daugherty.

15            In its reply, Highland says there was

16   never any promise "... that the Escrow Agreement would

17   never be terminated or that the Deposit Assets would

18   never be transferred back to Highland ...."  That

19   reflects a dim view of the world, the way adversaries

20   should evaluate the representations and promises made

21   during litigation, and how the people making those

22   promises should conduct themselves.  Daugherty has

23   adequately pled it was reasonable for him to rely on

24   the statements he's identified.

Appx 02292
014854

93

 1              Fourth and finally, it is reasonably

 2   conceivable that the promise is binding because

 3   injustice can be avoided only by enforcement of the

 4   promise.

 5              Daugherty has made the point that

 6   Highland walked away from the Texas litigation with

 7   the benefit of both judgments.  It received the assets

 8   supposedly held in escrow to satisfy the judgment for

 9   Daugherty, and it received payment from Daugherty to

10   satisfy the judgment against him.

11              Black's Law Dictionary defines

12   "injustice" as "an unjust state of affairs;

13   unfairness."  As myself and Vice Chancellor Glasscock

14   have indicated, Daugherty's allegations raise serious

15   concerns over the fairness of how things played out in

16   Texas.  It may be that the only way to avoid injustice

17   is to enforce the promises.

18              It is not fatal to Daugherty that he

19   has pled alternative theories of relief.  Our Rule 8

20   allows it, and our Supreme Court has blessed doing so

21   for promissory estoppel in the *Chrysler v. Chaplake*

22   *Holdings* case.  At the pleadings stage, those

23   alternative theories of relief can go forward.

24              Highland also claims promissory

Appx 02293

014855

94

1  estoppel is not needed to prevent injustice because

2  the alleged promises are incorporated within the

3  escrow agreement, an enforceable contract.  But

4  Daugherty is not a party or a third-party beneficiary,

5  and so cannot sue under the contract's terms.  For

6  those reasons, the motion to dismiss is denied.

7             Mr. Katz, any questions?

8             MR. KATZ:  No, Your Honor.

9             THE COURT:  Anything from you,

10 Mr. Uebler?

11            MR. UEBLER:  No, Your Honor.

12            THE COURT:  I'd like to, then, talk

13 about how we're going to get the summary judgment

14 briefing done in time for trial and in time for me to

15 have a minute to think about it.

16            MR. KATZ:  Your Honor, we conferred --

17 my colleague conferred with Mr. Uebler this morning.

18 I think we've worked out a schedule.

19            THE COURT:  How long does that

20 schedule leave me to think about it?

21            MR. UEBLER:  Let me take a stab at

22 this, Your Honor, and see if it makes any sense to

23 you.  So it's my understanding that the defendants are

24 going to cross-move, or Highland -- it's a claim

Case 19-34054-sgj11   Doc 3596-15   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 15   Filed 06/25/25   Page 178 of 1017   PageID 15839

95

1    against Highland.  Highland will cross-move for

2    summary judgment, and we will receive an answering

3    brief/opening brief by June 14th.  We'll reply by

4    June 28th.  And then looks like July 17th will be the

5    final brief.

6              And I'm sure I speak for all the

7    parties when I say we have no intention of imposing a

8    burden on the Court to resolve that motion prior to

9    trial.  I think -- at least my view, and Mr. Katz and

10   Mr. Reed can chime in -- we don't necessarily need to

11   resolve the summary judgment/indemnification claim

12   before trial because there's really not that much, if

13   any, issue of fact to try regarding indemnification.

14             I would propose that we resolve on the

15   papers, when the Court's able to do so, the issue of

16   entitlement.  And then, to the extent there's an issue

17   of allocation or reasonableness, we can get together

18   and propose something similar to Vice Chancellor

19   Laster's *Fitracks* opinion.  That was an advancement

20   case, but I would envision something similar here.

21             So we're working in parallel and not

22   burdening anybody prior to trial on those issues.

23             THE COURT:  Anything to add?

24             MR. KATZ:  No, Your Honor.

96

1                    THE COURT:  All right.  That works for
2    me, then, especially with the logical conclusion that
3    this can just kind of float in parallel to the real
4    merits issues to be handled at trial.
5                    Anything else that we need to discuss
6    today while we're all together?
7                    MR. KATZ:  Not from our side.
8                    THE COURT:  We pretty much handled
9    every aspect of the case today.  Thank you, all, for
10   your presentations, they were helpful.  And we'll be
11   in touch.
12                    We're adjourned.
13                    (Court adjourned at 4:33 p.m.)
14                        -  -  -
15
16
17
18
19
20
21
22
23
24

CHANCERY COURT REPORTERS

Case 19-34054-sgj11    Doc 3596-15    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 15    Filed 09/26/25    Page 180 of 1017    PageID 15841

97

1                        CERTIFICATE

2

3            I, KAREN L. SIEDLECKI, Official Court

4    Reporter for the Court of Chancery of the State of

5    Delaware, Registered Merit Reporter, and Certified

6    Realtime Reporter, do hereby certify that the

7    foregoing pages numbered 3 through 96 contain a true

8    and correct transcription of the proceedings as

9    stenographically reported by me at the hearing in the

10   above cause before the Vice Chancellor of the State of

11   Delaware, on the date therein indicated, except for

12   the rulings at pages 3 through 19 and 84 through 94

13   which were revised by the Vice Chancellor.

14            IN WITNESS WHEREOF I have hereunto set

15   my hand at Wilmington, this 22nd day of May, 2019.

16

17

18

19            /s/Karen L. Siedlecki

20   ------------------------------
              Karen L. Siedlecki
21           Official Court Reporter
             Registered Merit Reporter
22          Certified Realtime Reporter

23

24

                CHANCERY COURT REPORTERS

# EXHIBIT 16

Appx 02298

014860

EFiled: Jul 08 2019 04:21PM EDT
Transaction ID 63518449
Case No. 2017-0488-MTZ

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PATRICK DAUGHERTY,                          )
                                            )
            Plaintiff,                      )
                                            )
    v.                                      )          C.A. No. 2017-0488-MTZ
                                            )
HIGHLAND CAPITAL MANAGEMENT,                )
L.P., HIGHLAND EMPLOYEE                      )
RETENTION ASSETS LLC,                       )
HIGHLAND ERA MANAGEMENT LLC,                )
and JAMES DONDERO,                          )
                                            )
            Defendants,                     )
                                            )
        and                                 )
                                            )
HIGHLAND EMPLOYEE                           )
RETENTION ASSETS LLC,                       )
                                            )
        Nominal Defendant.                  )

## ORDER DENYING APPLICATION TO
## CERTIFY INTERLOCUTORY APPEAL

WHEREAS:

A.    Plaintiff Patrick Daugherty was a partner and senior executive of Defendant Highland Capital and certain of its affiliates from 1998 until his resignation in 2011.

B.    Highland sued Daugherty in Texas, and Daugherty countered with claims against Highland and Highland Employee Retention Assets LLC ("HERA") (the "Texas Action").

C.      During the course of the Texas Action, Defendants represented to the Texas court that Highland had placed Daugherty's HERA interests, worth approximately $3.1 million, in escrow with Abrams & Bayliss LLP as escrow agent.

D.      Highland received a judgment against Daugherty, and Daugherty received a judgment against HERA.  Daugherty paid the judgment against him. HERA did not pay the judgment against it.  The day after the Texas judgment became final and non-appealable, Abrams & Bayliss resigned as escrow agent and transferred the escrow assets it held back to Highland.  HERA claimed to have no assets to satisfy a judgment.

E.      Daugherty responded by filing his complaint in this action on July 6, 2017.  Vice Chancellor Glasscock, who previously presided over this case, dismissed some of Daugherty's claims.  Daugherty then filed his first amended complaint.  The case was reassigned to me in October 2018.  After Daugherty filed his second amended complaint, I denied a motion to dismiss.  The surviving claims are for fraudulent transfer, unjust enrichment, and indemnification.

F.      On February 2, 2018, Daugherty served a subpoena on Abrams & Bayliss.[1]  Defendants moved to quash the subpoena "in its entirety given the privileged and sensitive nature of the information requested and Daugherty's

_____

[1] D.I. 52.

2

Appx 02309
014862

failure to demonstrate relevance to this lawsuit."[2]   Vice Chancellor Glasscock

heard the motion to quash.   He started the argument by stating "general

principles":

> First, information regarding the actions of Abrams & Bayliss in
> connection with its operation of the escrow as agents of Highlands,
> HERA, those documents, that information is relevant, and it doesn't
> appear to me to be generally privileged. Second, to the extent the
> subpoena requests attorney client privilege material, I'm going to need
> a privilege log to decide issues of privilege, waiver, and common
> interest doctrine. Third, it is appropriate to seek discovery from the
> escrow agent as well as from the defendants.  Fourth, the subpoena in
> question is overbroad as it seeks information far beyond Abrams &
> Bayliss' documents as escrow agents, and I'm not going to require a
> third party to answer overbroad discovery requests that surely
> implicate attorney-client privilege.  Fifth, I am therefore disposed to
> quash the subpoena with leave to file a more narrow subpoena. And
> once that subpoena is issued, there needs to be a meaningful meet and
> confer as to what is producible and what is not so that the disputes that
> come to me are tailored to the discoverability of the documents and
> any privilege that may apply.[3]

G.      Daugherty again subpoenaed Abrams & Bayliss, which produced 285

documents.   Daugherty and Abrams & Bayliss met and conferred.   Defendants

asserted more than 300 documents were privileged.

H.      Daugherty challenged Defendants' privilege assertions by moving to

compel (the "Motion").   Daugherty challenged whether documents relating to

Abrams & Bayliss's work as escrow agent were properly withheld, and argued the

---

[2] D.I. 61 ¶ 2.

[3] D.I. 97 at 3-4.

App. 02801
014863

crime-fraud exception vitiated any proper assertion of privilege.  I heard argument

on April 12.[4]  The hearing was not productive as Defendants could not articulate

the scope of their claimed privilege.  I gave Highland yet another chance to defend

its privilege and reconsider its privilege log, and specifically requested Abrams &

Bayliss's engagement letter and billing records.  I also requested to review the

withheld documents *in camera*.[5]

I.      After receiving and reviewing the documents on the Defendants'

privilege log *in camera*, I granted the Motion (the "Motion to Compel Ruling").

The privilege log was organized chronologically, and the withheld documents fell

into four categories.  The first comprised documents regarding the initiation,

negotiation, and establishment of Abrams & Bayliss as Highland's escrow agent.

The second comprised Abrams & Bayliss's legal work during the pendency of the

Texas action to determine whether and how Daugherty might access the escrowed

assets.  The third category comprised Abrams & Bayliss's work responding to a

subpoena in Texas.  And the fourth comprised documents regarding Abrams &

Bayliss's resignation as Highland's escrow agent.

J.      For reasons set forth at length in the Motion to Compel Ruling, I

concluded that "unfortunately my *in camera* review confirmed Daugherty's fear

---

[4] D.I. 181.

[5] D.I. 181 at 37-38.

Appx 02302
014864

that Highland is improperly withholding documents in categories 1 and 4 illustrating A&B's service and resignation as escrow agent, which are nonprivileged materials."[6]   I decided any privilege related to the topics in categories 1 and 4 was waived, but stopped short of a broader waiver.[7] Additionally, I concluded that even assuming categories 1 and 4 were privileged, the crime fraud exception applied to categories 1, 2 and 4.[8]

K.    On May 24, 2019, Defendants moved for reargument.[9]   On June 3, Defendants moved to stay the implementation of the Ruling pending interlocutory appeal.   On June 17, I denied Defendants' motion for reargument and declined to stay the decision pending interlocutory appeal (the "Reargument Ruling" and together with the "Motion to Compel Ruling," the "Rulings").[10]   I ordered the parties to agree upon a framework under Delaware Rule of Evidence 510(f) to govern discovery under the Rulings, which was entered on June 27.

---

[6] D.I. 218 at 4.

[7] *Id*. at 10 ("Because Highland stuck by its position and continued to assert such a large percentage of improper privilege assertions while claiming it was producing documents concerning A&B's role as escrow agent, any privilege related to that topic is waived, and a full waiver of Highland's privilege could be an appropriate consequence. … I conclude Highland's unjustified withholding of other documents related to the escrow was not so egregious as to waive any privilege over these two sets of documents.").

[8] *Id*. at 10-15.

[9] D.I. 211.

[10] D.I. 253 (unredacted, filed under seal); D.I. 254 (redacted).

Appx 02303
014865

L.      On June 17, Defendants applied for certification of an interlocutory appeal of the Rulings (the "Application").[11]  Defendants identified three issues for certification:

> 1.   Can Delaware courts apply the crime-fraud exception to destroy both attorney-client privilege and work-product protection without sufficient prima facie evidence that a party committed or attempted a fraud?
>
> 2.   Can Delaware courts apply the crime-fraud exception to destroy both attorney-client privilege and work-product protection with respect to communications years before an alleged fraudulent transfer and without specific findings that each communication at issue was made in furtherance of the alleged fraud?
>
> 3.   Can the Court impose a waiver of privilege as punishment from a party's good faith, but ultimately incorrect, assertion of privilege?[12]

M.      Plaintiff filed his opposition to the Application on June 27.

N.      Under Supreme Court Rule 42(b), there are to be no interlocutory appeals "unless the order of the trial court decides a substantial issue of material importance that merits appellate review before a final judgment."[13]

O.      "If the 'substantial issue' requirement is met, this Court will then analyze whether 'there are substantial benefits that will outweigh the certain costs

---

[11] D.I. 231.

[12] D.I. 231 at 5.

[13] Supr. Ct. R. 42(b)(i).

Appx 02394
014866

that accompany an interlocutory appeal.'"[14]  Under Supreme Court Rule 42(b)(iii) the Court weighs the following factors along with "its own assessment of the most efficient and just schedule to resolve the case":

> (A) The interlocutory order involves a question of law resolved for the first time in this State; (B) The decisions of the trial courts are conflicting upon the question of law; (C) The question of law relates to the constitutionality, construction, or application of a statute of this State, which has not been, but should be, settled by this Court in advance of an appeal from a final order; (D) The interlocutory order has sustained the controverted jurisdiction of the trial court; (E) The interlocutory order has reversed or set aside a prior decision of the trial court, a jury, or an administrative agency from which an appeal was taken to the trial court which had decided a significant issue and a review of the interlocutory order may terminate the litigation, substantially reduce further litigation, or otherwise serve considerations of justice; (F) The interlocutory order has vacated or opened a judgment of the trial court; (G) Review of the interlocutory order may terminate the litigation; or (H) Review of the interlocutory order may serve considerations of justice.

P.     "If the balance is uncertain, the trial court should refuse to certify the interlocutory appeal."[15]

**IT IS ORDERED**, this 8th day of July, 2019, that the Application is DENIED based on the following:

1.     The Rulings did not decide "a substantial issue of material importance that merits appellate review before a final judgment."[16]  "The 'substantial issue'

---

[14] *Sider v. Hertz Glob. Hldgs., Inc.*, 2019 WL 2501481, at *4 (Del. Ch. June 17, 2019) (quoting Supr. Ct. R. 42(b)(ii)).

[15] Supr. Ct. R. 42(b)(iii).

7

requirement is met when an interlocutory order decides a main question of law which relates to the merits of the case, and not to collateral matters."[17]  "Generally speaking, the substantive element of the appealability of an interlocutory order must relate to the merits of the case, not to matters of discovery."[18]  That "proscription against interlocutory review of discovery rulings 'does not change merely because the discovery/disclosure order implicates the attorney-client privilege.'"[19]  The Rulings decided the application and waiver of the attorney-client and work product privileges, not a main issue on the merits.  The Rulings did not decide a substantial issue of material importance that warrants appellate review before a final judgment.

2.   Highland argues that it is not seeking "appellate review simply so that an appellate court can re-review each communication at issue and evaluate the privilege determinations made. . . . What [it] seeks is different.  It challenges the

---

[16] Supr. Ct. R. 42(b)(i).

[17] *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2861717, at *1 (Del. Ch. July 22, 2008).

[18] *In re Examworks Grp., Inc.*, 2018 WL 1672991, at *2 (Del. Ch. Apr. 05, 2018) (ORDER) (quoting *Castaldo v. Pittsburgh-Des Moines Steel Co.*, 301 A.2d 87, 87 (Del. 1973)); *accord Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 1993 WL 478084, at *1 (Del. Nov. 16, 1993) (ORDER); *see also Deloitte LLP v. Klig*, 2010 WL 3736141, at *1 (Del. Sept. 27, 2010) (ORDER) (refusing interlocutory appeal of order finding waiver of privilege).

[19] *Certain Underwriters at Lloyd's, London v. Monsanto Co.*, 1991 WL 134471, at *1 (Del. June 7, 1991) (ORDER) (citations omitted) (quoting *In re Rinehardt*, 575 A.2d 1079, 1081 (Del. 1990)).

Appx 02306
014868

Order's _legal conclusions_ that will reverberate throughout this action."[20]  This is a distinction without a difference.  Whether a party properly asserted a privilege, or whether an exception to the privilege applies, is a legal conclusion.  The question is whether it is the type of legal conclusion that warrants interlocutory review.  It is not.

3.      Turning to the factors underpinning whether there are substantial benefits that will outweigh the costs of interlocutory appeal, Highland identifies only Supreme Court Rule 42(b)(iii)(B) and (H) as favoring its Application.  I therefore "limit[] my review principally to those" issues.[21]  In short, the high costs of piecemeal litigation and interlocutory appeals outweigh the value of this Application.  This is particularly true here where trial will start on September 10 and there are other ongoing discovery disputes requiring the parties' attention.[22]

4.      The Rulings do not conflict with decisions of other trial courts.[23]  Defendants have not identified any Delaware decision at odds with the Rulings on the crime-fraud exception.  Defendants cite authorities, such as *Buttonwood Tree*

---

[20] D.I. 231 at 6 (emphasis in original).

[21] *Chemours Co. v. DowDuPont Inc.*, 2019 WL 2404817, at *3 (Del. Ch. June 7, 2019).

[22] On July 5, I attempted to quantify and remedy Defendants' other discovery shortcomings by appointing a third-party neutral to collect documents.  D.I. 255.  It is possible that trial will have to be postponed.  But this possibility, borne from Defendants' failure to collect their own documents, should not support the relief Defendants seek here.

[23] Supr. Ct. R. 42(b)(iii)(B).

App. 02307
014869

*Value Partners, L.P. v. R.L. Polk & Co.*,[24] and *Princeton Ins. Co. v. Vergano*,[25] discussed in the Rulings, and argue the Court erred in ruling Daugherty had made a *prima facie* showing of fraud.  Defendants do not dispute that Abrams & Bayliss assisted Highland in the transaction that Daugherty claims was fraudulent, but argue he "has not established through a prima facie showing [] that the transaction *was* fraudulent."[26]

5.    Distilled, Defendants' argument is that Daugherty has not shown sufficient evidence of fraud in Highland's "desire to avoid paying money to Daugherty."[27]    In arguing the Court applied a standard that was too low, Defendants advocate for a standard that is too high.  As explained in the Reargument Ruling, "the party opposing the privilege is not required to introduce evidence sufficient to support a verdict of crime or fraud or even to show that it is more likely than not that the crime or fraud occurred."[28]  Discovery to date, and *in camera* review, indicate that Defendants used Abrams & Bayliss as their escrow agent, made numerous representations to the Texas court and Daugherty that assets to satisfy any judgment were held in escrow, held the assets in escrow differently

---

[24] 2018 WL 346036 (Del. Ch. Jan. 10, 2018).

[25] 883 A.2d 44 (Del. Ch. 2005).

[26] D.I. 231 at 9 (emphasis in original).

[27] *Id*. at 9 n.2.

[28] D.I. 254 at 11 (quoting *Kickflip, Inc. v. Facebook, Inc.*, 2016 WL 5929003, at *5 (D. Del. Sept. 14, 2016)).

10

014870

than represented, and then at the end of it all directed Abrams & Bayliss to transfer assets from that same escrow to Highland to avoid satisfying the judgment to Daugherty.[29]  Daugherty met his burden of showing a *prima facie* case of fraud sufficient to warrant the crime-fraud exception.  Defendants cite no Delaware decisions that conflict with this analysis.  As a result, they have not shown interlocutory review is warranted to resolve conflicting decisions.

6.    Defendants also argue that the Court applied the crime-fraud exception too broadly and "did not make the factual finding needed to support its conclusion that each communication [] 'was made in furtherance of a fraud' and thus fell within the exception."[30]  In fact, *in camera* review showed that the documents in category 2 reflected "efforts that culminated in the allegedly fraudulent acts."[31]  The Court made the factual finding Defendants seek.  Again, Defendants cannot identify Delaware decisions that conflict with this analysis, and so have not shown interlocutory review is warranted.

7.    Finally, Defendants argue the Rulings conflict with precedent concerning the sanction of a punitive waiver.  Defendants have failed to present a conflict among trial court decisions that merits interlocutory review.  Waiver was

---

[29] I described specific documents in the Reargument Ruling, but sealed that portion of the transcript pending resolution of Defendants' Application and will not repeat that description here.  *See* D.I. 253 at 13-15.

[30] D.I. 231 at 10.

[31] D.I. 218 at 13.

11

Appx. 02300
014871

based on Defendants' persistence in claiming privilege over the work of their escrow agent, after Vice Chancellor Glasscock informed them that work was not privileged, and after they were given multiple opportunities to follow those instructions.[32]  The waiver component of the Rulings "applied settled principles of law" on the application and waiver of privilege.[33]  "An improperly asserted claim of privilege is no claim at all."[34]  Further, for reasons explained in the Reargument Ruling, Defendants misconstrued the Motion to Compel Ruling: I concluded categories 1 and 4 were not privileged, but went on to make the point that even if they were, that privilege would have been waived.  Defendants have not identified any documents or testimony that they assert are privileged but that they must produce as a result of the waiver.

8.    The second factor Defendants address is that interlocutory review may serve considerations of justice.[35]  Defendants seek interlocutory relief on the secondary holding that categories 1 and 4 would be waived if they were privileged, and on the crime-fraud exception, in pursuit of a different set of guideposts for the remainder of the case.  The Supreme Court has declined to intervene to move discovery guideposts, even where the attorney-client privilege (and any harm

---

[32] Ex. 254 at 19-22.

[33] *Klig v. Deloitte LLP*, 2010 WL 3489735, at *9 (Del. Ch. Sept. 7, 2010) (describing decisions applying principle).

[34] *Id*. at *4.

[35] Supr. Ct. R. 42(b)(iii)(H).

Appx. 02319
014872

flowing from disclosure) is at issue.[36]  This factor does not support interlocutory

appeal.

9.      Neither side argues any of the remaining factors set out in Supreme

Court Rule 42(b)(iii).  None of those factors apply here.

10.      In line with our State's general preference against interlocutory

appeals, I decline to certify the Rulings for interlocutory review.


                                                        _/s/ Morgan T. Zurn_____
                                                        Vice Chancellor Morgan T. Zurn

---

[36] *Supra* ¶ 1.

13

**014873**

Appx. 02311

# EXHIBIT 17

Case 19-34054-sgj11    Doc 3596-17    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-20  Exhibit 17 Filed Page 196 of 1017    Page 196 of 1017    PageID 15857
Case 18-30264-sgj11 Doc 75 Filed 03/20/18    Entered 03/20/18 17:26:53    Page 1 of 4





**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 20, 2018**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **CASE NO. 18-30264-SGJ-7** |
| | § | |
| Alleged Debtor. | § | |

---

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | **CASE NO. 18-30265-SGJ-7** |
| **L.P.,** | § | |
| | § | |
| Alleged Debtor. | § | |

### ORDER DENYING ALLEGED DEBTORS' JOINT MOTION TO DISMISS THE INVOLUNTARY PETITIONS FILED BY JOSHUA N. TERRY FOR LACK OF SUBJECT MATTER JURISDICTION OR, ALTERNATIVELY, TO COMPEL ARBITRATION[1] [DE ## 72 & 73]

---

[1] DE ## 72 & 73 in Case No. 18-30264; DE ## 69 & 70 in Case No. 18-30265.

1

Appx 02313

014875

Case 19-34054-sgj11    Doc 3596-17    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-20    Exhibit 17    Filed 10/03/25    Page 197 of 1017    PageID 15858
Case 18-30264-sgj11 Doc 75 Filed 03/20/18    Entered 03/20/18 17:26:53    Page 2 of 4

Late at night on March 19, 2018—on the day before a long-scheduled Trial of an

Involuntary Bankruptcy Petition filed against the above-referenced Alleged Debtors—and

despite the provisions of an Agreed Scheduling Order dated February 26, 2018 (which clearly

contemplated that motions to dismiss, supplements, and other pleadings would have been filed

significantly prior to March 19, 2018)—the Alleged Debtors filed a Joint Motion to Dismiss the

Involuntary Petitions filed by Joshua N. Terry for Lack of Subject Matter Jurisdiction or,

Alternatively, Motion to Compel Arbitration (the "Motions to Dismiss/Compel"),[2] and a

supplement thereto on March 20, 2018.[3]  The Motions to Dismiss/Compel argue a lack of subject

matter jurisdiction, with regard to this court's ability to adjudicate the Involuntary Bankruptcy

Petitions, because allegedly Petitioning Creditor Joshua Terry (the "Petitioning Creditor") lacked

standing to file the Involuntary Bankruptcy Petitions because of an arbitration clause in an

Amended and Restated Agreement of Limited Partnership of ACIS Capital Management, L.P.

(the "Partnership Agreement") dated January 21, 2011, which required parties to the Partnership

Agreement to arbitrate disputes.  The arbitration clause at issue is found at Section 6.12 of the

Partnership Agreement.  The Motions to Dismiss/Compel alternatively argue that this court

should enforce/recognize the arbitration clause and order the parties to arbitrate whether the

above-referenced Alleged Debtors should be in bankruptcy.  The Motions to Dismiss/Compel are

**DENIED** for the following reasons:

---

[2] DE # 74 in Case No. 18-30264; DE # 71 in Case No. 18-30265.

[3] The court will presume that the Alleged Debtors thought that a subject matter jurisdiction argument—and the fact that courts can consider their subject matter jurisdiction at all times during litigation—warranted their blatant violation of the Agreed Scheduling Order.  The court will expect a good explanation in court as to why this subject matter jurisdiction argument was made 47 days after the case was filed, and after a previous answer and motion to dismiss were filed by the Alleged Debtor, and, of course, in violation of a court order.

Appx 02314
014876

Case 19-34054-sgj11 Doc 3596-17 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-20 Filed 10/04/25 Page 198 of 1017 PageID 15859
Case 18-30264-sgj11 Doc 75 Filed 03/20/18 Entered 03/20/18 17:26:53 Page 3 of 4

(1) The parties involved here have already arbitrated prepetition. In fact, it is undisputed that the Petitioning Creditor obtained an arbitration award that was confirmed with a judgment in state court.

(2) Section 6.12 of the Partnership Agreement is not applicable because filing an involuntary bankruptcy case is a ***collection remedy*** available to creditors with unsecured claims that are not the subject of a bona fide dispute and whose claims aggregate at least $15,775 in amount. It is not a ***claim*** or ***controversy*** in and of itself, and is certainly not a claim or controversy "arising of, relating to or in connection with the [Partnership] Agreement."

(3) Even if Section 6.12 of the Partnership Agreement is applicable, the filing of an involuntary bankruptcy case, such as in the case at bar, presents a "core" bankruptcy proceeding and a bankruptcy court has discretion to decline to stay its proceedings in deference to arbitration where the underlying nature derives exclusively from the Bankruptcy Code (*i.e.,* is "core") and arbitration conflicts with the purposes of the Code. Arbitration in the case at bar would irreconcilably conflict with the purposes and goals of the Bankruptcy Code (including, but not limited to, the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and debtors from piecemeal litigation, and the expeditious and equitable distribution of assets of a debtor's estate). *See In re Nat'l Gypsum Co.*, 118 F.3d 1056, 1069-70 (5th Cir. 1997) (a bankruptcy court can deny enforcement of arbitration provisions when it finds either: (1) that enforcement of the provision would irreconcilably conflict with the Code; or (2) in exercising its discretion in a core case where the only rights at issue were created by the Code rather than inherited from pre-petition property of the debtors); *In re Gandy*, 299 F.3d 489, 499-500 (5th Cir. 2002) (same).

3

014877

Case 19-34054-sgj11    Doc 3596-17    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15×20bit 1Filed 106/05/265    Page 199 of 1017    PageID 15860
Case 18-30264-sgj11 Doc 75 Filed 03/20/18    Entered 03/20/18 17:26:53    Page 4 of 4

**WHEREFORE** the Motions to Dismiss/Compel are **DENIED.**

**###END OF ORDER###**

Appx 02316
014878

# EXHIBIT 18

Appx 02315
014879

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-20   18   Filed 06/02/25   Page 201 of 1017   PageID 15862
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 1 of 229



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 31, 2019**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 18-30264-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P., | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | |
| | § | (Jointly Administered Under Case |
| DEBTORS. | § | No. 18-30264-SGJ-11) |
| | § | |
| | § | Chapter 11 |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER GRANTING FINAL APPROVAL OF DISCLOSURE STATEMENT AND CONFIRMING THE THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC, AS MODIFIED

On December 11, 12 and 13, 2018, the Court held a hearing (the "Combined Hearing")

to consider (a) final approval of the *Disclosure Statement Pursuant to Section 1125 of the*

*United States Bankruptcy Code with Respect to the Third Amended Joint Plan for Acis Capital*

*Management, L.P. and Acis Capital Management GP, LLC* (the "Disclosure Statement") [Docket

No. 661] and (b) confirmation of the *Third Amended Joint Plan for Acis Capital Management,*

*L.P. and Acis Capital Management GP, LLC* (the "Third Amended Plan") [Docket No. 660], a

---

Appx. 02318

014880

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 18-20   Filed 06/02/25   Page 202 of 1017   PageID 15863
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 2 of 229

copy of which is attached hereto as **Exhibit "1,"** as modified by (i) the *First Modification to the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* (the "First Modification") [Docket No. 693], a copy of which is attached hereto as **Exhibit "2,"** and (ii) the *Second Modification to the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* (the "Second Modification") [Docket No. 702], a copy of which is attached hereto as **Exhibit "3,"** as supplemented by the *Supplement to Second Modification to the Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC* [Docket No. 769], a copy of which is attached hereto as **Exhibit "4,"** filed by Robin Phelan (the "Chapter 11 Trustee"), as Chapter 11 Trustee for Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," and together with Acis LP, the "Debtors").  The Third Amended Plan, as modified by the First Modification and Second Modification (as supplemented), is hereafter referred to as the "Plan;" *provided that*, as provided in the last sentence of paragraph 13 of this Order, the schedule of assumed executory contracts attached hereto as Exhibit 5 to this Order replaces, is substituted for, and supersedes Exhibit B to the Third Amended Plan.  Capitalized terms used in this Order, unless otherwise specifically defined herein, shall be given the same meaning as in the Plan and/or the Disclosure Statement.

The Combined Hearing was commenced at the time and date scheduled.  Based on the testimony, evidence admitted, judicial notice of the records of the Chapter 11 Cases, and the arguments of counsel, the Court makes this *Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified* ("Order").

ACCORDINGLY, IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED AND ORDERED THAT:

Appx. 02319
014881

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-201 18 Filed 06/11/25   Page 203 of 1017   PageID 15864
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 3 of 229

A.      _Findings and Conclusions_.  All findings of fact or conclusions of law made by the

Court on the record at the Combined Hearing are hereby incorporated in their entirety into this

Order.  All findings of fact contained in the Court's _Findings of Fact and Conclusions of Law in_

_Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petitions_

entered on April 13, 2018 [Docket No. 118] are hereby incorporated in their entirety into this

Order.  The findings and conclusions set forth herein and in the record of the Combined Hearing

constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052

as made applicable herein by Bankruptcy Rule 9014.  To the extent any of the following findings

of fact constitute conclusions of law, they are adopted as such.  To the extent any of the

following conclusions of law constitute findings of fact, they are adopted as such.

B.      _Jurisdiction; Venue; Core Proceeding_.  The Court has jurisdiction over these

bankruptcy cases pursuant to 28 U.S.C. sections 157(b) and 1334.  Venue is proper before this

Court pursuant to 28 U.S.C. sections 1408 and 1409.  Final approval of the Disclosure

Statement and confirmation of the Plan are core proceedings pursuant to 28 U.S.C. section

157(b)(2)(A), (L) and (O) over which the Court has exclusive jurisdiction and full constitutional

jurisdiction and authority to enter final orders with respect thereto.

C.      _Eligibility for Relief_.  The Debtors were and are eligible for relief under section

109 of the Bankruptcy Code.[1]

D.      _Commencement and Joint Administration of the Debtors' Cases_.  On January 30,

2018, Joshua N. Terry ("Terry") filed involuntary petitions under chapter 7 of the Bankruptcy

Code against both of the Debtors in the United States Bankruptcy Court for the Northern District

of Texas, Dallas Division (the "Court").  Acis LP's bankruptcy case was assigned Case No. 18-

30264, and Acis GP's bankruptcy case was assigned Case No. 18-30265.  The involuntary

petitions were contested and the Court held a multi-day trial spanning March 21, 22, 23, 27 and

---

[1] Unless otherwise indicated, section references are to the Bankruptcy Code.

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 18 Filed 06/02/25   Page 204 of 1017   PageID 15865
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 4 of 229

29, 2018.  On April 13, 2018, the Court entered an *Order for Relief in an Involuntary Case* in

both cases [Docket No. 119 in Case No. 18-30264 and Docket No. 114 in Case No. 18-30265].

Diane G. Reed (the "Chapter 7 Trustee") was appointed Chapter 7 Trustee in both cases.  On

motion of the Chapter 7 Trustee, the Court entered an *Order Directing Joint Administration*

[Docket No. 137],[2] which provides for the joint administration of the Debtors' respective

bankruptcy cases under Case No. 18-30264.

   E.  *Conversion of the Debtors' Cases and Appointment of the Chapter 11 Trustee*.

On motion of the Chapter 7 Trustee, the Court entered an *Order Granting Trustee's Expedited

Motion to Convert Cases to Chapter 11* [Docket No. 205] on May 11, 2018, converting the

Debtors' bankruptcy cases to cases under chapter 11 of the Bankruptcy Code.  On motion of

Terry, the Court entered an *Order Granting Emergency Motion for an Order Appointing A

Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital

Management GP, LLC Pursuant to Bankruptcy Code Section 1104(A)* [Docket No. 206] on May

11, 2018, directing the United States Trustee (the "U.S. Trustee") to appoint a Chapter 11

Trustee in the Chapter 11 Cases.  The U.S. Trustee appointed Robin Phelan as Chapter 11

Trustee in the Chapter 11 Cases.  Mr. Phelan's appointment as Chapter 11 Trustee in Acis LP's

case was approved pursuant to an *Order Approving Appointment of Chapter 11 Trustee* [Docket

No. 221] entered by the Court on May 17, 2018 and his appointment as Chapter 11 Trustee in

Acis GP's case was approved pursuant to an *Order Approving Appointment of Chapter 11

Trustee* [Docket No. 184 in Case No. 18-30265] entered by the Court on June 12, 2018.

   F.  *No Official Committee of Unsecured Creditors*.  The U.S. Trustee has not

appointed an official committee of unsecured creditors in the Chapter 11 Cases.

   G.  *Claims Bar Date*.   October 15, 2018 was originally fixed as the deadline for all

holders of alleged Claims (except for governmental units) to file proofs of Claim.  However, on

---

[2] Unless otherwise indicated, all references to the "Docket" refer to the Docket in Case No. 18-30264.

Appx. 02321
014883

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 18    Filed 06/06/25    Page 205 of 1017    PageID 15866
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 5 of 229

motion of the Chapter 11 Trustee, the Court entered the Bar Date Order on July 9, 2018 [Docket

No. 387].  Pursuant to the Bar Date Order, August 1, 2018 was established as the deadline for

all holders of alleged Claims (except for governmental units) to file proofs of Claim and October

10, 2018 was established as the deadline for governmental units to file proofs of Claim.

       H.     *Adequacy of Disclosure Statement*.  The Disclosure Statement contains

"adequate information," as that term is defined in section 1125 of the Bankruptcy Code and

satisfies all requirements of section 1125 of the Bankruptcy Code.

       I.     *Solicitation Order Compliance*.  On October 3, 2018, the Chapter 11 Trustee filed

his *Chapter 11 Trustee's Amended Motion for Entry of Order (A) Conditionally Approving*

*Disclosure Statement; (B) Scheduling Combined Hearing on Final Approval of Disclosure*

*Statement and Confirmation of Second Amended Joint Plan, and Setting Related Deadlines; (C)*

*Approving Forms for Voting and Notice; and (D) Granting Related Relief* (the "Conditional

Approval Motion") [Docket No. 622].  The Chapter 11 Trustee filed a *Supplement to Amended*

*Motion for Entry of Order (A) Conditionally Approving Disclosure Statement; (B) Scheduling*

*Combined Hearing on Final Approval of Disclosure Statement and Confirmation of Second*

*Amended Joint Plan, and Setting Related Deadlines; (C) Approving Forms for Voting and*

*Notice; and (D) Granting Related Relief* (the "Supplement to Conditional Approval Motion")

[Docket No. 646] on October 19, 2018.  The Court conducted a hearing on the Conditional

Approval Motion, as supplemented, on October 24, 2018.  On October 25, 2018, the Court

entered an *Order (I) Conditionally Approving Disclosure Statement, (II) Scheduling Combined*

*Hearing on Final Approval of Disclosure Statement and Confirmation of Second Amended Joint*

*Plan, and Setting Related Deadlines, (III) Approving Forms for Voting and Notice, and (IV)*

*Approving Related Matters* (the "Solicitation Order") [Docket No. 659] granting the Conditional

Approval Motion.  The Conditional Approval Motion was filed in connection with a second

amended plan of reorganization and disclosure statement with respect thereto.  However, for

convenience and ease of review, the modifications to the second amended plan and disclosure

Appx. 02322
014884

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-20   18   Filed 07/01/25   Page 206 of 1017   PageID 15867
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 6 of 229

statement with respect thereto, including modifications discussed at the October 24, 2018

hearing, were incorporated into the Third Amended Plan and Disclosure Statement filed on

October 25, 2018.  Consequently, the Solicitation Order approved solicitation of votes on the

Third Amended Plan and distribution of the Disclosure Statement in connection with solicitation

of votes on the Third Amended Plan.  Pursuant to the Solicitation Order, the Court, among other

things: (a) conditionally approved the Disclosure Statement for use in soliciting votes on the

Third Amended Plan; (b) established procedures and deadlines for the solicitation and

submission of votes to accept or reject the Third Amended Plan (the "Solicitation Procedures");

(c) fixed deadlines for objections to final approval of the Disclosure Statement and/or

confirmation of the Third Amended Plan and related briefing deadlines; (d) fixed a deadline for

serving notice of the Combined Hearing; and (e) set the Combined Hearing to commence on

December 11, 2018, at 9:30 a.m., Central Time.  The Solicitation Order approved the following

documents (collectively the "Solicitation Materials") to be served on Creditors entitled to vote on

the Third Amended Plan:

> (i)    the Third Amended Plan;
>
> (ii)   the Disclosure Statement;
>
> (iii)  the Ballots for voting on the Third Amended Plan;
>
> (iv)   the Solicitation Order;
>
> (v)    a Notice (the "Combined Hearing Notice") [Docket No. 667] reflecting the
>        deadlines and other information relating to the Combined Hearing; and,
>
> (vi)   a letter (the "Transmittal Letter") from counsel for the Chapter 11 Trustee.

The Solicitation Order directed the Chapter 11 Trustee to serve the Solicitation Materials on

holders of Claims in Classes 2 and 3 and Subclasses 4A and 4B under the Third Amended

Plan.  The Solicitation Order also authorized the tabulation of Ballots on a consolidated basis.

The Solicitation Order further directed the Chapter 11 Trustee to serve on various parties

defined in the Supplement to Conditional Approval Motion as the "Noteholders," "Highlands" and

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 18    Filed 08/01/25    Page 207 of 1017    PageID 15868
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 7 of 229

"Notice Parties" certain notices and copies of the following documents (the "Notice-Only Materials"):  the Disclosure Statement, the Third Amended Plan, the Solicitation Order and the Combined Hearing Notice.  The Chapter 11 Trustee has complied with the Solicitation Order, including the Solicitation Procedures contained therein, in all respects.

J.    *Transmittal and Mailing of Solicitation Materials; Notice*.  Due, adequate, and sufficient notice of the Third Amended Plan, Disclosure Statement and Combined Hearing, together with all deadlines for voting on the Third Amended Plan and for objecting to final approval of the Disclosure Statement and/or confirmation of the Third Amended Plan, has been given to known holders of Claims and Interests and, to the extent required, to all other known parties-in-interest, in compliance with the applicable Bankruptcy Rules and the Solicitation Order, as evidenced by the: (i) Combined Hearing Notice (and Certificate of Service included therewith) filed at Docket No. 667; (ii) *Notice of Solicitation of Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Noteholders* (and Certificate of Service included therewith) filed at Docket No. 664; (iii) *Notice of Solicitation of Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Highland Entities* (and Certificate of Service included therewith) filed at Docket No. 665; (iv) *Notice of Solicitation of Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Notice Parties* (and Certificate of Service included therewith) filed at Docket No. 666; and (v) *Certificate of Service* filed at Docket No. 676.  The packages containing the Solicitation Materials, the packages containing the Notice-Only Materials, and all other materials relating in any way to the solicitation process were transmitted and served in substantial compliance with the Solicitation Order and in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Solicitation Procedures set forth in the Solicitation Order, and all other applicable rules, laws and regulations.

K.    *Adequacy of Solicitation*.  The Chapter 11 Trustee distributed packages containing the Solicitation Materials to the holders of Claims entitled to vote on the Third


Appx 02324
014886

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 18    Filed 06/02/230    Page 208 of 1017    PageID 15869
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 8 of 229

Amended Plan and sufficient time was prescribed for such holders of Claims to vote on the

Third Amended Plan in substantial compliance with the Solicitation Order and the applicable

provisions of the Bankruptcy Code, the Bankruptcy Rules, the Solicitation Procedures set forth

in the Solicitation Order, and all other applicable rules, laws and regulations.  Transmittal and

service were adequate and sufficient, and no further notice is or shall be required.  In addition,

holders of Claims not entitled to vote on the Amended Plan, and certain other parties-in-interest,

were provided with certain non-voting materials approved by the Court in compliance with the

Solicitation Order.  All procedures used to distribute the Solicitation Materials to holders of

Claims entitled to vote on the Third Amended Plan were fair and conducted in good faith and in

accordance with the Bankruptcy Code, Bankruptcy Rules, the Solicitation Procedures contained

in the Solicitation Order, and all other applicable rules, laws and regulations.

   L. *Good Faith Solicitation – Section 1125(e)*.  Based on the Record, the Chapter 11

Trustee and Estate Professionals have acted in good faith within the meaning of sections

1125(e) and 1129(a)(3), and in compliance with the applicable provisions of the Bankruptcy

Code, the Bankruptcy Rules, and the Solicitation Order, in connection with all of their respective

activities relating to the solicitation of acceptances of the Third Amended Plan and their

participation in the activities described in section 1125, and are entitled to the protections

afforded by section 1125(e).

   M. *Voting Tabulation*.  In accordance with the Solicitation Order, on December 3,

2018 the *Tabulation of Ballots in Connection with Confirmation of the Third Amended Joint Plan

for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* (the "Ballot

Tabulation") [Docket No. 746] was filed and served on all parties that filed a timely objection to

confirmation of the Plan.  All procedures used to tabulate the Ballots (which were tabulated on a

consolidated basis) were fair and conducted in accordance with the Solicitation Order, the

Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws and regulations.

Appx. 02325
014887

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S     Document 15-30 18  Filed 00/05230 Page 209 of 1017     PageID 15870
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 9 of 229

N.       *Classes Deemed to Have Accepted or Rejected the Third Amended Plan*.  As

set forth in the Third Amended Plan and Disclosure Statement: (i) Class 1 is unimpaired and is

conclusively deemed to have accepted the Third Amended Plan pursuant to section 1126(f),

and (ii) Class 5, consisting of Interests in the Debtors, is Impaired, but because the Third

Amended Plan provides that holders of Class 5 Interests shall not receive or retain any property

on account of their Interests, Class 5 is conclusively deemed to have rejected the Third

Amended Plan pursuant to section 1126(g).

O.       *Impaired Classes of Creditors Voting to Accept or Reject the Third Amended*

*Plan*.  Based upon the Ballot Tabulation, the Court finds that the following Impaired Classes

have voted on the Third Amended Plan as follows:

(i)       Class 2 (the Terry Partially Secured Claim) voted to accept the Third

Amended Plan as follows:

| Ballots Accepting | | Ballots Rejecting | |
|---|---|---|---|
| Amount | Number | Amount | Number |
| $8,060,827.84<br>100% | 1<br>100% | $0.00<br>0.00% | 0<br>0.00% |

Two Ballots were submitted by Terry in Class 2.  One of the Ballots was based on a proof of

Claim recorded in the Claims Register for Case No. 18-30264 as Claim No. 26-1 and filed by

Terry for the benefit of his IRAs ("Claim No. 26").  Highland filed an objection [Docket No. 522]

on August 17, 2018 seeking an order disallowing Claim No. 26 and striking any vote (on a prior

plan of reorganization) by Terry on account of Claim No. 26.  Although the Ballot Tabulation

reflects the Ballot submitted by Terry on account of Claim No. 26, the Court disregards that

Ballot and does not take it into account in its determination regarding acceptance of the Third

Amended Plan.  The other Ballot submitted by Terry accepted the Third Amended Plan.

(ii)       Class 3 (General Unsecured Claims) voted to accept the Third Amended

Plan as follows:

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-30    Filed 06/05/25    Page 210 of 1017    PageID 15871
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 10 of 229

| Ballots Accepting | | Ballots Rejecting | |
|---|---|---|---|
| Amount | Number | Amount | Number |
| $667,550.00 100% | 2 100% | $0.00 0.00% | 0 0.00% |

Three Ballots were submitted in Class 3. One of the Ballots was submitted by Jennifer G. Terry.

Such Ballot is based on a proof of Claim recorded in the Claims Register for Case No. 18-30264

as Claim No. 25-1 and filed by Jennifer G. Terry for the benefit of her IRAs and 401k ("Claim

No. 25"). Highland filed an objection [Docket No. 521] on August 17, 2018 seeking an order

disallowing Claim No. 25 and striking any vote (on a prior plan of reorganization) by Jennifer G.

Terry on account of Claim No. 25. Although the Ballot Tabulation reflects the Ballot submitted

by Jennifer G. Terry on account of Claim No. 25, the Court disregards that Ballot and does not

take it into account in its determination regarding acceptance of the Plan. The other two Ballots

submitted in Class 3 accepted the Third Amended Plan.

             (iii)      Class 4 (Insider Claims) voted to reject the Third Amended Plan as

follows:

| Ballots Accepting | | Ballots Rejecting | |
|---|---|---|---|
| Amount | Number | Amount | Number |
| $0.00 0.00% | 0 0.00% | $4,172,140.38 100% | 1 100% |

      Based on the foregoing, and as evidenced by the Ballot Tabulation, at least one

Impaired Class of Claims (excluding the acceptance by any Insiders of the Debtors) has voted

to accept the Third Amended Plan in accordance with the requirements of sections 1124 and

1126 of the Bankruptcy Code.

      P.    *Modifications to the Third Amended Plan*. The modifications to the Third

Amended Plan set forth in the First Modification, the Second Modification (as supplemented),

and as set forth in this Order constitute non-material or technical changes and do not materially

or adversely affect or change the treatment of any Claims against or Interests in the Debtors

**014889**

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 45-20   Filed 07/03/25   Page 211 of 1017   PageID 15872
Exhibit 18   Page 10 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 11 of 229

under the Third Amended Plan (the "<u>Non-Material Modifications</u>").  The filing of the First

Modification on November 8, 2018 constitutes due and sufficient notice thereof under the

circumstances of these Chapter 11 Cases.  The filing of the Second Modification on November

16, 2018 (as supplemented on December 10, 2018) constitutes due and sufficient notice thereof

under the circumstances of these Chapter 11 Cases.  The Non-Material Modifications neither

require additional disclosure under section 1125 of the Bankruptcy Code nor re-solicitation of

votes on the Plan under section 1126 of the Bankruptcy Code and Bankruptcy Rules 3018 and

3019.  In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all

holders of Claims against the Debtors who voted to accept the Third Amended Plan are hereby

deemed to have accepted the Third Amended Plan as modified consistent with the Non-Material

Modifications.  No Holder of a Claim against the Debtors who has voted to accept the Third

Amended Plan shall be permitted to change its acceptance to a rejection as a consequence of

the Non-Material Modifications.  The Non-Material Modifications incorporated in the Plan comply

with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

Q.    *Bankruptcy Rule 3016*.  The Plan is dated and identifies the Chapter 11 Trustee

as the Person submitting it, thereby satisfying Bankruptcy Rule 3016(a).  The filing of the

Disclosure Statement satisfied Bankruptcy Rule 3016(b).  The Plan provides for the Temporary

Plan Injunction (as defined herein), which constitutes an injunction against conduct not

otherwise enjoined under the Bankruptcy Code.  The Plan and Disclosure Statement both

describe in specific and conspicuous language all acts to be enjoined and identify the entities

subject to the Temporary Plan Injunction.  Therefore, the Plan and Disclosure Statement satisfy

the requirements of Bankruptcy Rule 3016(c).

R.    *Bankruptcy Rule 3017*.  The Chapter 11 Trustee has given notice of the

Combined Hearing as required by the applicable provisions of Bankruptcy Rule 3017 and the

Solicitation Order.  The materials transmitted and notice given by the Chapter 11 Trustee to

holders of Claims entitled to vote on the Third Amended Plan and the materials transmitted by


Appx 02328
014890

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 18   Filed 06/06/25   Page 212 of 1017   PageID 15873
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 12 of 229

the Chapter 11 Trustee to holders of Interests and other parties-in-interest satisfy the applicable provisions of Bankruptcy Rules 3017(d)-(f) and the Solicitation Order.  Therefore, the requirements of Bankruptcy Rule 3017 have been satisfied.

S.      *Bankruptcy Rule 3018*.  The solicitation of votes to accept or reject the Third Amended Plan satisfies Bankruptcy Rule 3018.  The Third Amended Plan was transmitted to all holders of Claims entitled to vote, sufficient time was prescribed for such parties to accept or reject the Third Amended Plan, and the Solicitation Materials used and Solicitation Procedures followed comply with sections 1125 and 1126, thereby satisfying the requirements of Bankruptcy Rule 3018.  Further, the Chapter 11 Trustee filed the Ballot Tabulation in accordance with the provisions of the Solicitation Order.

T.      *Burden of Proof*.  The Chapter 11 Trustee, as proponent of the Plan, has the burden of proving the elements of sections 1122, 1123 and 1129 of the Bankruptcy Code by a preponderance of the evidence.  The Court finds that the Chapter 11 Trustee has met each element of such burden with respect to the Plan.

U.      *Judicial Notice*.  The Court takes judicial notice of the entire record of proceedings in the Chapter 11 Cases and related adversary proceedings, including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Court during the Chapter 11 Cases and related adversary proceedings, including, without limitation, the Combined Hearing.  Any resolutions of objections to final approval of the Disclosure Statement or confirmation of the Plan explained on the record at the Combined Hearing are hereby incorporated by reference.

V.      *The Record*.  The record established at the Combined Hearing (the "Record") to support final approval of the Disclosure Statement and confirmation of the Plan includes:

(i)      All documents identified by the Chapter 11 Trustee at the Combined Hearing and all exhibits admitted into evidence at the Combined Hearing, including but not limited to admitted exhibits which are listed on the *Joint*

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 18 Filed 04/05/230 Page 213 of 1017   PageID 15874
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 13 of 229

*Witness and Exhibit List* [Docket No. 767] filed jointly by the Chapter 11
Trustee, Highland and HCLOF with the Court on December 7, 2018;

(ii)     The Ballot Tabulation;

(iii)    The testimony of witnesses; and

(iv)     The statements and arguments of counsel.

W.     *Objections to Final Approval of Disclosure Statement and Confirmation of Plan*.

The Solicitation Order established November 26, 2018 as the deadline for filing objections to

final approval of the Disclosure Statement and/or confirmation of the Plan.  The following

objections to final approval of the Disclosure Statement and/or confirmation of the Plan (the

"Objections") were timely filed in accordance with the Solicitation Order:

(i)     *Objection by Stinson Leonard Street LLP to Debtors' Second Modification
to the Third Amended Joint Plan* [Docket No. 720];

(ii)    *Joint Objection of Highland Capital Management, L.P. and Highland CLO
Funding, Ltd. to Final Approval of Disclosure Statement and to
Confirmation of the Third Amended Joint Plan for Acis Capital
Management, L.P. and Acis Capital Management GP, LLC* [Docket no.
722]; and

(iii)   *Objection of Neutra Ltd. to Final Approval of Disclosure Statement and to
Confirmation of the Third Amended Joint Plan for Acis Capital
Management, L.P. and Acis Capital Management GP, LLC* [Docket No.
723].

X.     *Transfer and Vesting of Assets*.  Pursuant to Article VI of the Plan, all Assets

shall be transferred to and vested in the Reorganized Debtor as of the Effective Date.  The

transfer of the Assets to the Reorganized Debtor pursuant to the Plan is consistent with, and

authorized by, section 1123(a)(5)(B) of the Bankruptcy Code and will be fully effectuated

through this Order as of the Effective Date without the necessity of any other or further

assignment or transfer.

Y.     *Claim Objections and Resolutions*.  Pursuant to the Plan, the Reorganized

Debtor has the sole power and exclusive standing and authority to object to any Claim.  Without

limiting the generality of the foregoing, the Reorganized Debtor shall have the power:  (i) to

**014892**

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 45-30    Filed 05/05/25230    Page 214 of 1017    PageID 15875
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 14 of 229

object to any Claim on any legal or equitable basis; (ii) to seek subordination of any Claim on any legal or equitable basis; (iii) to assert any right of setoff or recoupment, including without limitation, any such right pursuant to section 553 of the Bankruptcy Code; (iv) to assert any and all Estate Defenses to any Claim, whether legal or equitable, including any affirmative defenses or any right of setoff; (v) to assert all Estate Claims as a counterclaim against any Claim, whether arising out of the same or different transactions, both for an affirmative recovery and as an offset against any such Claim; and (vi) to object to any Claims on the basis of section 502(d). Vesting such exclusive power and standing in the Reorganized Debtor is reasonable and appropriate, and is authorized by, and in compliance with, section 1123(b)(3) of the Bankruptcy Code.

Z.    _Compliance with the Requirements of Section 1129 of the Bankruptcy Code_. The Plan complies with the applicable provisions of the Bankruptcy Code, as follows:

(i)    _Section 1129(a)(1) – Compliance of the Plan with the Applicable Provisions of the Bankruptcy Code_.  The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123.

(a)    _Sections 1122 and 1123(a)(1) – Proper Classification_.  The classification of Claims and Interests in the Plan is proper under the Bankruptcy Code. Pursuant to sections 1122(a) and 1123(a)(1), the Plan provides for the separate classification of Claims and Interests into six (6) Classes (Class 1, Class 2, Class 3, Subclass 4A, Subclass 4B and Class 5), based on differences in the legal nature and priority of such Claims and Interests (other than Claims for Administrative Expenses, Priority Tax Claims and U.S. Trustee's quarterly fees, which are not required to be designated as separate Classes pursuant to section 1123(a)(1)).  Based upon the Record, valid business, factual and legal reasons exist for the separate classification of the various Classes of Claims and Interests created under the Plan, the classifications were not created for any improper purpose and the creation of such Classes

Appx. 02331
014893

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-30    Exhibit 18    Filed 06/05/25    Page 215 of 1017    PageID 15876
Case 18-30264-sgj11  Doc 829  Filed 01/31/19    Entered 01/31/19 17:34:06    Page 15 of 229

does not unfairly discriminate between or among holders of Claims or Interests.  In accordance with section 1122(a), each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.  Accordingly, the requirements of sections 1122(a) and 1123(a)(1) of the Bankruptcy Code have been satisfied.

    (b)  *Section 1123(a)(2) – Specification of Unimpaired Classes*.  The Plan specifies that Claims in Class 1 are unimpaired under the Plan.  Therefore, the requirements of section 1123(a)(2) of the Bankruptcy Code have been satisfied.

    (c)  *Section 1123(a)(3) – Specification of Treatment of Impaired Classes*.  Other than Class 1, all Classes of Claims and Interests (Class 2, Class 3, Subclass 4A, Subclass 4B and Class 5) are Impaired under the Plan.  The Plan specifies the treatment of each Impaired Class of Claims and Interests under the Plan.  The treatment of Impaired Classes of Claims and Interests is specified in Article IV of the Plan.  Therefore, the requirements of section 1123(a)(3) of the Bankruptcy Code have been satisfied.

    (d)  *Section 1123(a)(4) – No Discrimination*.  The Plan provides for the same treatment for each Claim or Interest in each respective Class unless the holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest.  Therefore, the requirements of section 1123(a)(4) of the Bankruptcy Code have been satisfied.

    (e)  *Section 1123(a)(5) – Adequate Means for Plan Implementation*.  The Plan provides for adequate and proper means for the Plan's implementation.  This includes means for implementation set forth in Article VI of the Plan.  Therefore, the requirements of section 1123(a)(5) of the Bankruptcy Code have been satisfied.

    (f)  *Section 1123(a)(6) – Prohibition on Issuance of Non-Voting Securities*.  The Debtors are not corporations.  Therefore, section 1123(a)(6) of the Bankruptcy Code is inapplicable.

    (g)  *Section 1123(a)(7) – Selection of Officers, Directors and Trustees*.  Under the Plan, Terry shall receive 100% of the equity interests in the Reorganized Debtor.  The

Appx. 02332
014894

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 18 Filed 06/05230 Page 216 of 1017    PageID 15877
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 16 of 229

Plan does not provide for the selection or appointment of any officers or directors of the

Reorganized Debtor as of the Effective Date and Terry, as the sole owner of the Reorganized

Debtor, shall be free to structure the Reorganized Debtor's management as he wishes.

Therefore, to the extent section 1123(a)(7) of the Bankruptcy Code is applicable to the Plan, its

requirements have been satisfied.

(h)     _Section 1123(a)(8) – Payment of Individual Debtor's Earnings_.
The Debtors are not individuals.  Therefore, section 1123(a)(8) of the Bankruptcy Code is

inapplicable.

(i)     _Section 1123(b) – Discretionary Contents of the Plan_.  The Plan

contains various provisions that are properly construed as discretionary and not required for

confirmation of the Plan under the Bankruptcy Code.  As set forth below, all such discretionary

provisions comply with section 1123(b) of the Bankruptcy Code, are not inconsistent with the

applicable provisions of the Bankruptcy Code and are hereby approved.  Therefore, section

1123(b) of the Bankruptcy Code has been satisfied.

(1)     _Section 1123(b)(1) – Impairment / Unimpairment of Claims
and Interests_.  The Plan impairs or leaves unimpaired each Class of Claims and Interests.

Therefore, the Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

(2)     _Section 1123(b)(2) – Assumption / Rejection of Executory
Contracts and Unexpired Leases_.  Article XI of the Plan provides that all of the Debtors'

Executory Contracts and Unexpired Leases shall be deemed rejected upon the Effective Date

unless an Executory Contract or Unexpired Lease (a) has been previously assumed or rejected

pursuant to an order of the Court, (b) is identified in **Exhibit 5** to this Order to be (i) assumed or

(ii) assumed and assigned, or (c) is the subject of a motion to assume filed on or before the

Confirmation Date.  Therefore, the Plan is consistent with section 1123(b)(2) of the Bankruptcy

Code.

Appx. 02335
014895

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 35-30 18 Filed 08/08/25 230 Page 217 of 1017 PageID 15878
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 17 of 229

(3)     *Section 1123(b)(3) – Settlement / Retention of Claims and Causes of Action*.  The Chapter 11 Trustee has delineated the Estate Claims and Estate Defenses to be retained in the Plan.  The terms "Estate Claims" and "Estate Defenses" are defined in sections 1.55 and 1.56 of the Plan, respectively, and together include all claims, causes of action, defenses, affirmative defenses, counterclaims, or offsets held by the Debtors' Estate.  The identification and retention of the Estate Claims and Estate Defenses in the Plan is reasonable and appropriate and reflects a proper exercise of the good faith business judgment of the Chapter 11 Trustee.  Articles VI and IX of the Plan, including Exhibit A to the Plan, contain a specific and unequivocal reservation of Estate Claims and Estate Defenses as required under applicable Fifth Circuit authority.  The Estate Claims and Estate Defenses are expressly, specifically, and unequivocally retained and reserved pursuant to Articles VI and IX of the Plan (including Exhibit A to the Plan) in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.  Unless otherwise expressly stated in the Plan or this Order, all Estate Claims and Estate Defenses are hereby reserved for the benefit of the Reorganized Debtor and the Reorganized Debtor shall be entitled to file, prosecute and/or settle each of the Estate Claims so reserved in accordance with the terms of the Plan.  The provisions of the Plan regarding reservation of Estate Claims and Estate Defenses are appropriate and in the best interests of the Debtors, the Estate, and holders of Claims and Interests.

(4)     *Section 1123(b)(5) – Modification of Creditors' Rights*. With the exception of holders of Class 1 Claims, which are unimpaired, the Plan modifies the rights of all holders of Claims against the Debtors.  Accordingly, the Plan is consistent with section 1123(b)(5) of the Bankruptcy Code.

(ii)     *Section 1129(a)(2) – Compliance of the Chapter 11 Trustee with the Applicable Provisions of the Bankruptcy Code*.  The Chapter 11 Trustee, as proponent of the Plan, has complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, 1127 and

Appx 02324

014896

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 35-20    Filed 09/05/25    Page 218 of 1017    PageID 15879
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 18 of 229

1128 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018 and 3019.  Votes to accept or

reject the Third Amended Plan were solicited after the Court conditionally approved the

adequacy of the Disclosure Statement.  The Chapter 11 Trustee and his present and former

representatives, advisors, attorneys, professionals and agents have solicited and tabulated the

votes on the Third Amended Plan and have participated in the activities described in section

1125 of the Bankruptcy Code fairly and in good faith within the meaning of section 1125(e) of

the Bankruptcy Code, and in a manner consistent with the applicable provisions of the

Solicitation Order, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules,

laws and regulations, and are entitled to the protections afforded by section 1125(e) of the

Bankruptcy Code.  The Chapter 11 Trustee and his present and former representatives,

advisors, attorneys, professionals and agents have participated in good faith and in compliance

with the applicable provisions of the Bankruptcy Code with respect to the offering, issuance and

distribution of recoveries under the Plan and, therefore, are not (and on account of such

distributions, will not be) liable at any time for the violation of any applicable law, rule, or

regulation governing the solicitation of acceptances or rejections of the Third Amended Plan or

distributions made pursuant to the Plan, so long as distributions are made consistent with and

pursuant to the Plan.

>        (iii)    _Section 1129(a)(3) – Proposal of the Plan in Good Faith_.  The Chapter 11

Trustee has proposed the Plan (and all other agreements, documents and instruments

necessary to effectuate the Plan) in good faith and not by any means forbidden by law, thereby

satisfying section 1129(a)(3) of the Bankruptcy Code.  In determining that the Plan has been

proposed in good faith, the Court has examined and considered the totality of the circumstances

surrounding the formulation of the Plan, including both the Record at the Combined Hearing and

the record of the Chapter 11 Cases.  The Chapter 11 Trustee's good faith is evident from the

facts and Record of the Combined Hearing.  The Chapter 11 Trustee proposed the Plan for

legitimate and honest purposes.

Appx. 02335
014897

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 35-20 18 Filed 06/20/25 230 Page 219 of 1017    PageID 15880
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 19 of 229

(iv)      _Section 1129(a)(4) – Court Approval of Certain Payments as Reasonable_.
All payments made or to be made by the Reorganized Debtor for services or for costs and
expenses in or in connection with the Chapter 11 Cases or in connection with the Plan and
incident to the Chapter 11 Cases, have either been approved by, or are subject to final approval
of, the Court as reasonable.  Notwithstanding anything to the contrary in the Plan, the provisions
of section 3.01(e) of the Plan governing the filing of final fee applications by Estate
Professionals and allowance of Administrative Expense Claims of Estate Professionals apply to
the Chapter 11 Trustee.  Compensation sought by the Chapter 11 Trustee through a final fee
application shall be subject to final approval of the Court as reasonable in accordance with
section 330(a)(3) of the Bankruptcy Code.  Therefore, the requirements of section 1129(a)(4) of
the Bankruptcy Code are satisfied.

(v)      _Section 1129(a)(5) – Disclosure of Identity of Proposed Management,_
_Compensation of Insiders and Consistency of Management Proposals with the Interests of_
_Creditors and Public Policy_.  Under the Plan, Terry, who does not constitute an Insider, shall
receive 100% of the equity interests in the Reorganized Debtor.  The Plan does not provide for
appointment of any officers or directors of the Reorganized Debtor as of the Effective Date and
Terry, as the sole owner of the Reorganized Debtor, shall be free to structure the Reorganized
Debtor's management as he wishes.  Terry's identity and affiliations have been fully disclosed
and, to the extent that Terry serves as an officer of the Reorganized Debtor after confirmation of
the Plan, Terry's appointment to any such role is consistent with the interests of Creditors,
holders of Interests and public policy.  Therefore, the requirements of section 1129(a)(5) of the
Bankruptcy Code are satisfied.

(vi)      _Section 1129(a)(6) – No Rate Changes_.  The Plan does not contain any
rate changes subject to the jurisdiction of any governmental regulatory commissions and will not
require governmental regulatory approval.  Therefore, section 1129(a)(6) is not applicable to the
Chapter 11 Cases.


Appx. 02326
014898

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 18    Filed 06/26/25    Page 220 of 1017    PageID 15881
Exhibit 18 Page 26 of 230
Case 18-30264-sgj11  Doc 829  Filed 01/31/19    Entered 01/31/19 17:34:06    Page 20 of 229

(vii)    *Section 1129(a)(7) – Best Interest of Creditors Test*.  The Plan satisfies

section 1129(a)(7).  The Liquidation Analysis attached as Exhibit 4 to the Disclosure Statement

and the other exhibits and evidence proffered or adduced at the Combined Hearing related

thereto: (a) are persuasive and credible; (b) have not been controverted by other evidence; (c)

are based upon sound methodology; and (d) conclusively establish that each holder of an

Impaired Claim or Interest either (1) has accepted the Plan, or (2) will receive or retain under the

Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date,

that is not less than the amount that such holder would receive or retain if the Debtors were

liquidated under chapter 7 of the Bankruptcy Code on such date.

(viii)    *Section 1128(a)(8) – Conclusive Presumption of Acceptance by*
*Unimpaired Classes; Acceptance of Plan by Each Impaired Class*.  Class 1 is unimpaired under

the Plan and is conclusively presumed to have accepted the Plan under section 1126(f) of the

Bankruptcy Code.  Classes 2 and 3 are Impaired under the Plan and have voted to accept the

Plan.  Class 4 is Impaired under the Plan and voted to reject the Plan.  Class 5 is Impaired

under the Plan.  Holders of Class 5 Interests will not receive or retain any property on account of

their Interests under the Plan and are therefore conclusively deemed to have rejected the Plan

under section 1126(g) of the Bankruptcy Code.  Notwithstanding the fact that the Plan was not

accepted by all Classes of Impaired Claims and Interests, the Plan is confirmable because it

satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

(ix)    *Section 1129(a)(9) – Treatment of Claims Entitled to Priority Pursuant to*
*Section 507(a) of the Bankruptcy Code*.  The treatment of Allowed Claims for Administrative

Expenses and Priority Tax Claims under Article III of the Plan satisfies the requirements of, and

complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.  Accordingly, the

requirements of section 1129(a)(9) are satisfied.

(x)    *Section 1129(a)(10) – Acceptance by at Least One Impaired Class*.  As

set forth in the Ballot Tabulation and in this Order, Classes 2 and 3 voted to accept the Plan.  As



Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 18    Filed 06/26/25    Page 221 of 1017    PageID 15882
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 21 of 229

such, at least one Class of Claims that is Impaired under the Plan has accepted the Plan

without including the acceptance of the Plan by any Insider.  Therefore, the requirements of

section 1129(a)(10) of the Bankruptcy Code have been satisfied.

(xi)    *Section 1129(a)(11) – Feasibility of the Plan*.  The evidence submitted at

the Combined Hearing regarding feasibility, together with all evidence proffered or advanced at

or prior to the Combined Hearing, (a) is persuasive and credible, (b) has not been controverted

by other evidence, and (c) establishes that confirmation of the Plan is not likely to be followed by

the liquidation or the need for further financial reorganization of the Reorganized Debtor.

Accordingly, the requirements of section 1129(a)(11) of the Bankruptcy Code have been

satisfied.

(xii)    *Section 1129(a)(12) – Payment of Bankruptcy Fees*.  The Plan provides

that all fees due and payable under 28 U.S.C. section 1930 as of the Confirmation Date will be

paid in full on the Effective Date or as soon thereafter as is practicable, thus satisfying the

requirements of section 1129(a)(12) of the Bankruptcy Code.

(xiii)    *Section 1129(a)(13), (14), (15) and (16) – Non-Applicability*.  The Debtors

do not provide any retiree benefits within the meaning of section 1114, do not owe any domestic

support obligations, are not individuals, and are not non-profit corporations.  Thus, sections

1129(a)(13), 1129(a)(14), 1129(a)(15) and 1129(a)(16) do not apply to the Chapter 11 Cases.

(xiv)    *Section 1129(b) – Confirmation of the Plan Over Non-Acceptance of*

*Impaired Classes*.  Class 4 is Impaired under the Plan and voted to reject the Plan.  Holders of

Class 5 Interests are deemed to have rejected the Plan.  Nevertheless, the Plan may be

confirmed pursuant to section 1129(b) of the Bankruptcy Code notwithstanding that the

requirements of section 1129(a)(8) have not been met because the Chapter 11 Trustee has

demonstrated by a preponderance of the evidence that the Plan (a) satisfies all of the other

requirements of section 1129(a) of the Bankruptcy Code and (b) does not "discriminate unfairly"

and is "fair and equitable" as to each Impaired Class which has not voted to accept (or is



Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 18 Filed 06/26/25230 Page 222 of 1017    PageID 15883
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 22 of 229

deemed to reject) the Plan.  The Plan therefore satisfies the requirements of section 1129(b) of the Bankruptcy Code and may be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

(xv)    *Section 1129(c) – Only One Plan*.  Other than the Plan (including previous versions thereof), no other plan has been filed in the Chapter 11 Cases.  Accordingly, the requirements of section 1129(c) of the Bankruptcy Code are satisfied.

(xvi)    *Section 1129(d) – Principal Purpose of the Plan is Not the Avoidance of Taxes*.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of application of Section 5 of the Securities Act of 1933 and there has been no filing by a Governmental Unit asserting any such attempted avoidance.  Therefore, the requirements of section 1129(d) of the Bankruptcy Code are satisfied.

(xvii)    *Section 1129(e) – Small Business Case*.  Neither of the Chapter 11 Cases is a "small business case," as that term is defined in the Bankruptcy Code and, accordingly, section 1129(e) is inapplicable to the Chapter 11 Cases.

AA.    *Executory Contracts and Unexpired Leases*.  The Chapter 11 Trustee has satisfied the provisions of section 365 of the Bankruptcy Code with respect to the assumption and rejection of the Executory Contracts and Unexpired Leases pursuant the Plan.  The Chapter 11 Trustee has exercised reasonable business judgment prior to the Combined Hearing in determining whether to assume or reject each of the Executory Contracts and Unexpired Leases as set forth in Article XI of the Plan, **Exhibit "5"** to this Order, or otherwise. Each assumption or rejection of an Executory Contract or Unexpired Lease pursuant to this Order and in accordance with Article XI of the Plan, or otherwise by order of this Court, shall be valid, legal, and binding upon the applicable Debtor, Reorganized Debtor, Estate, and all non-Debtor persons or entities party to such Executory Contract or Unexpired Lease.  Executory Contracts and Unexpired Leases not previously assumed by order of this Court and which the Chapter 11 Trustee has determined to assume are identified in **Exhibit "5"** to this Order.

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 18 Filed 04/25/230 Page 223 of 1017    PageID 15884
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 23 of 229

Because no defaults exist under the Executory Contracts and Unexpired Leases identified in

**Exhibit "5"** to this Order, the Chapter 11 Trustee is not required to make any cure payments,

provide any other compensation, cure any nonmonetary defaults, or provide adequate

assurance of future performance under section 365(b) of the Bankruptcy Code as a condition to

the assumption of such Executory Contracts and Unexpired Leases.

BB.    *Compromise and Settlement*.  The Court finds and concludes that, pursuant to

section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration of

the Distributions and other benefits provided under the Plan, the provisions of the Plan

constitute a good faith compromise and settlement of all Impaired Claims and Interests.  Such

settlement and compromise, which was made at arms'-length in exchange for good and

valuable consideration, is in the best interests of the holders of Impaired Claims and Interests, is

within the range of possible litigation outcomes, and is fair, equitable, and reasonable.  Each

element of the compromise and settlement reflected in the Plan is integrated and inexorably

linked.

CC.    *Plan Injunction*.  The Plan Injunction is necessary and appropriate to facilitate the

transactions and distributions to Creditors pursuant to the Plan.  The Plan Injunction constitutes

an essential and integral part of the Plan without which the holders of Claims against the

Debtors could potentially interfere with implementation and performance of the Plan.  The Plan

Injunction protects the best interests of the holders of Allowed Claims and facilitates the efficient

performance of the Plan.  Consequently, the Plan Injunction is appropriate pursuant to sections

105(a) and 1123(a)(5) of the Bankruptcy Code.

DD.    *Temporary Plan Injunction*.  The Temporary Plan Injunction (as defined herein) is

a temporary injunction which provides for the continuation, after the Effective Date, of injunctive

relief the Court previously granted in its *Preliminary Injunction Order* (the "Preliminary

Injunction") [Docket No. 21 in Adversary No. 18-03212-sgj] entered on July 10, 2018 in the

Trustee's Adversary.  The Preliminary Injunction was originally set to expire by its own terms

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 18 Filed 06/25/25230 Page 224 of 1017    PageID 15885
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 24 of 229

upon confirmation of the Plan, but is extended by this Order through the Effective Date of the
Plan.  Based on the record of prior proceedings in the Chapter 11 Cases, including in the
Trustee's Adversary, and the Record at the Combined Hearing, no grounds have been shown to
give the Court reason to reconsider any findings supporting its prior Preliminary Injunction.
Furthermore, as set forth below, the Record at the Combined Hearing demonstrates that the
four elements required for issuance of injunctive relief are present, the Temporary Plan
Injunction is necessary and appropriate in all respects, and it complies with the applicable
requirements of the Bankruptcy Rules.

        (i)     *Substantial Likelihood of Success on the Merits*.  In the Highland
Adversary, the Chapter 11 Trustee has asserted a counterclaim seeking to avoid the prepetition
transfer of Acis LP's rights under the ALF PMA (the "<u>ALF PMA Transfer</u>") as a fraudulent
transfer under the Bankruptcy Code and the Texas Uniform Fraudulent Transfer Act.  Such
fraudulent transfer actions seek an equitable remedy and involve claims to specific assets of
Highland HCF.  But for the ALF PMA Transfer, HCLOF could not have attempted to direct and
effectuate an optional redemption of the Acis CLOs (which it has twice attempted to do
postpetition in the Chapter 11 Cases).  The rights transferred in the ALF PMA Transfer appear
to have been fraudulently transferred for no apparent value.  The Court found in the Preliminary
Injunction, and the Court finds again for purposes of this Order, that the Chapter 11 Trustee has
demonstrated a substantial likelihood of success on the merits of his claim to avoid the ALF
PMA Transfer as a fraudulent transfer.

        (ii)     *Irreparable Harm*.  Revenue to be generated by the Reorganized Debtor
under the PMAs is a primary source of funding Distributions to Creditors under the Plan.  Absent
the Temporary Plan Injunction, HCLOF will be free to direct an optional redemption before this
Court can adjudicate the fraudulent transfer actions with respect to the ALF PMA Transfer.
Such an optional redemption – or similar call or liquidation of the Acis CLOs – would not only
render such fraudulent transfer actions moot, but would effectively terminate and destroy all



Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-20   Filed 06/26/25   Page 225 of 1017   PageID 15886
Case 18-30264-sgj11  Doc 829  Filed 01/31/19   Entered 01/31/19 17:34:06   Page 25 of 229

value in the PMAs.  This would, in turn, effectively destroy the Reorganized Debtor's ability to perform under the Plan to the detriment of the Reorganized Debtor, Creditors and other parties-in-interest.  Consequently, the Reorganized Debtor faces immediate and irreparable harm if the Temporary Plan Injunction is not issued.

(iii)     *Balance of Harms*.  The balance of harms weighs in favor of issuing the Temporary Plan Injunction because any alleged harm to HCLOF, Highland or their affiliates is substantially outweighed by the imminent and irreparable harm that would be suffered by the Reorganized Debtor, Creditors and other parties-in-interest if the Temporary Plan Injunction is not issued and an optional redemption, call or other liquidation of the Acis CLOs follows.  At a minimum, the Temporary Plan Injunction is appropriate to maintain the status quo pending adjudication of the fraudulent transfer actions with respect to the ALF PMA Transfer.  Highland, HCLOF and their affiliates will not suffer any material, recognizable harm if temporarily enjoined from pursuing an optional redemption, call or other liquidation of the Acis CLOs before the Court adjudicates the fraudulent transfer actions concerning the ALF PMA Transfer and thereby determines whether HCLOF has any legitimate right to direct an optional redemption, call or other liquidation of the Acis CLOs in the first instance.

(iv)     *Public Policy*.  Public policy favors maximization of a debtor's assets and successful reorganization.  Because an optional redemption, call or other liquidation of the Acis CLOs would destroy the value of the PMAs and the Reorganized Debtor's ability to perform under the Plan, issuance of the Temporary Plan Injunction is consistent with public policy. Furthermore, public policy favors disposition of cases on their merits.  Absent the Temporary Plan Injunction, HCLOF could be expected to immediately direct an optional redemption, call or other liquidation of the Acis CLOs following confirmation of the Plan, thus rendering the fraudulent transfer actions concerning the ALF PMA Transfer moot.  Issuance of the Temporary Plan Injunction will avoid the potential for such fraudulent transfer actions being mooted prior to adjudication of such actions on their merits and is consistent with public policy.

0'14904

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-20 Filed 06/26/25 Page 226 of 1017 PageID 15887
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 26 of 229

(v) *Section 105(a)*. Section 105(a) empowers this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a). The Temporary Plan Injunction is essential to the Reorganized Debtor's ability to perform the Plan and to maintain the status quo during prosecution of the fraudulent transfer actions concerning the ALF PMA Transfer. The Temporary Plan Injunction is therefore both necessary and appropriate to carry out the provisions of the Bankruptcy Code in the Chapter 11 Cases.

(vi) *Compliance with Technical Requirements*. Bankruptcy Rule 3020(c) requires that the Temporary Plan Injunction (a) describe the acts enjoined in reasonable detail; (b) be specific in its terms with regard to the injunction; and (c) identify the entities subject thereto. The Temporary Plan Injunction satisfies each of these requirements. The description of acts enjoined is specific and particular and the language of the Temporary Plan Injunction is therefore reasonably detailed. The Temporary Plan Injunction is also specific in its terms, as its language clearly describes the condition triggering the injunction and the specific events which will serve to terminate it. The Temporary Plan Injunction also specifically identifies the entities subject to its terms. Federal Rule of Civil Procedure 65(d)(1), made applicable by Bankruptcy Rule 7065, also requires that the Temporary Plan Injunction be specific in its terms and describe the enjoined acts in reasonable detail. Federal Rule of Civil Procedure 65(d)(1) further requires that the reasons for issuance of the Temporary Plan Injunction are stated. The reasons for this Court's issuance of the Temporary Plan Injunction are stated herein. Therefore, the Temporary Plan Injunction satisfies all requirements of the applicable Bankruptcy Rules.

EE. *Substantive Consolidation of the Debtors*. The Court finds and concludes that the substantive consolidation of the Debtors for the purpose of implementing the Plan, including for purposes of distributions under the Plan, is in the best interests of the Debtors, the Estate, and holders of Claims and Interests. Substantive consolidation recognizes the Debtors' common business purpose and the fact that Acis GP's liability is derived from the liabilities of



Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 35-20   Filed 06/26/25   Page 227 of 1017   PageID 15888
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 27 of 229

Acis LP based on Acis GP's status as general partner of Acis LP.  The Court further finds that substantive consolidation of the Debtors constitutes an integral part of the Plan.

FF.     *Retention of Jurisdiction*.  This Court finds and concludes that this Court's retention of jurisdiction as set forth herein and in the Plan comports with 28 U.S.C. sections 157 and 1334.  Consequently, the Court may properly retain jurisdiction over the matters set forth in Article XV of the Plan.

GG.     *Implementation of Other Necessary Documents and Agreements*.  All documents and agreements necessary to implement the Plan are essential elements of the Plan and entry into and consummation of the transactions contemplated by each of such documents and agreements is in the best interests of the Debtors, the Estate, and holders of Claims and Interests.  The Chapter 11 Trustee has exercised reasonable business judgment in determining which agreements to enter into and has provided sufficient and adequate notice of such documents and agreements.  The terms and conditions of such documents and agreements have been negotiated in good faith, at arm's length, are fair and reasonable, and are reaffirmed and approved.

HH.     *Conditions Precedent to the Effective Date*.  Each of the conditions precedent to the Effective Date, as set forth in Article XIII of the Plan, has been satisfied or waived in accordance with the provisions of the Plan, or is reasonably likely to be satisfied or waived.

II.     *Satisfaction of Confirmation Requirements*.  Based upon the foregoing, all other filed pleadings, exhibits and documents filed in connection with confirmation of the Plan and all evidence and arguments made, proffered, or adduced at the Combined Hearing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

## ORDER

Based on the foregoing, it is hereby ORDERED:

1.     Findings of Fact and Conclusions of Law.  The above-referenced findings of fact and conclusions of law are incorporated by reference as though fully set forth herein.  To the


Appx. 02844
014906

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 18 Filed 06/26/25230 Page 228 of 1017    PageID 15889
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 28 of 229

extent any of the prior findings of fact or conclusions of law constitutes an order of this Court, they are adopted as such.

2.    <u>Objections to Final Approval of Disclosure Statement and Confirmation of Plan</u>. To the extent that any of the Objections have not been resolved, withdrawn, waived or settled prior to entry of this Order or otherwise resolved as stated on the Record of the Combined Hearing or as set forth in this Order, they are hereby overruled on their merits.

3.    <u>Final Approval of Disclosure Statement</u>.  The Disclosure Statement is hereby approved on a final basis as containing adequate information as required by section 1125 of the Bankruptcy Code.

4.    <u>Confirmation of Plan</u>.  All requirements for confirmation of the Plan have been satisfied.  The Third Amended Plan, as modified by the First Modification and Second Modification (as supplemented) and as modified herein, is hereby CONFIRMED in accordance with section 1129 of the Bankruptcy Code, and all terms and conditions set forth in the Plan are hereby APPROVED.  The terms of the Plan are incorporated by reference into, and as an integral part of, this Order.

5.    <u>Solicitation and Notice</u>.  Notice of the Combined Hearing complied with the terms of the Solicitation Order, was appropriate and satisfactory based on the circumstances of the Chapter 11 Cases and was in compliance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.  The solicitation of votes on the Third Amended Plan and the Solicitation Materials complied with the Solicitation Procedures, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and was in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

6.    <u>Plan Classification Controlling</u>.  The terms of the Plan shall solely govern the classification of Claims and Interests for purposes of distributions to be made thereunder.  The classifications set forth on the Ballots tendered to or returned by the Holders of Claims in connection with voting on the Plan: (a) were set forth thereon solely for purposes of voting to

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-20 Filed 06/30/25 Page 229 of 1017 PageID 15890
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 29 of 229

accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims under the Plan for distribution purposes; (c) may not be relied upon by any holder of a Claim as representing the actual classification of such Claim under the Plan for distribution purposes; and (d) shall not be binding upon the Debtors and the Reorganized Debtor except for voting purposes.

7.     <u>Resolution of Stinson Objection</u>.  Stinson Leonard Street LLP ("<u>Stinson</u>") has asserted a Claim against the Debtors for $158,552.98.  On July 31, 2018, Stinson initially asserted its Claim as an unsecured Claim by filing proof of Claim number 12 in the Acis LP case and proof of claim number 2 in the Acis GP case.  Those Claims represent a single Claim for satisfaction of a total alleged debt of $158,552.89.  All proofs of Claim filed by Stinson will be referred to collectively as the "<u>Stinson Claim</u>."  The Stinson Claim is treated as part of Class 3 under the Plan.  On November 9, 2018, Stinson amended the Stinson Claim to assert a secured Claim based on a possessory lien on legal files belonging to the Debtors.  The Chapter 11 Trustee currently intends to object to the Stinson Claim, including Stinson's claim to secured status.  Stinson filed an Objection to the Plan on November 26, 2018 [Docket No. 720] which was subsequently withdrawn based on this proposed paragraph being included in any Order confirming the Plan.  This paragraph resolves Stinson's Objection as follows:  Notwithstanding any contrary provision of the Plan or this Order, the Stinson Claim, to the extent it is Allowed by a Final Order of the Bankruptcy Court as a Secured Claim, shall be considered a separate class under the Plan and paid by the Reorganized Debtor within thirty (30) days after entry of such Final Order.  To the extent it is an Allowed Secured Claim, the Stinson Claim will be removed from Class 3.  To the extent it is an Allowed General Unsecured Claim, the Stinson Claim will remain a Class 3 Claim.  This recognizes that the Stinson Claim may be allowed as partly secured (*i.e.* only secured to the extent of the value of its collateral) and be paid accordingly. The Chapter 11 Trustee reserves all rights to object to Stinson's proofs of Claim, and Stinson reserves all rights to defend its proofs of Claim.

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 35-30 18 Filed 06/35/25 230 Page 230 of 1017    PageID 15891
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 30 of 229

8.    <u>Plan Implementation</u>.  Upon the Effective Date of the Plan, the Chapter 11 Trustee and the Reorganized Debtor are hereby authorized and directed to take all actions necessary or appropriate to implement, effectuate or consummate the Plan, the terms of this Order and the transactions respectively contemplated therein, and to otherwise fully perform and execute their duties under the Plan or this Order.  Without limiting the generality of the foregoing, pursuant to section 1142(b) of the Bankruptcy Code, each and every Person (including, without limitation, the Chapter 11 Trustee, HCLOF, Highland, any and all affiliates of HCLOF and Highland, the Issuers and Co-Issuers, and the Indenture Trustee), to the extent necessary, is hereby directed to execute or deliver, or to join in the execution or delivery of, any instrument required to effect the transfers of property dealt with under the Plan and this Order, and to perform all other acts necessary for the consummation of the Plan.  Further pursuant to section 1142(b) of the Bankruptcy Code, to the extent that any Person fails to execute or deliver any instrument required to effect the transfers of property pursuant to the Plan and this Order, the Chapter 11 Trustee is hereby authorized to execute and deliver on behalf of any such Person (including, without limitation, HCLOF, Highland, and any and all affiliates of HCLOF and Highland) any instrument required to effect the transfers of property pursuant to the Plan and this Order.  In the event of an appeal of this Order, the Chapter 11 Trustee and the Reorganized Debtor are hereby authorized and directed to take all steps necessary to make the Plan effective and, from and after the Effective Date, execute their duties, responsibilities and obligations under the Plan, this Order and the Plan Documents unless and until this Order is stayed by order of a court of appropriate jurisdiction.

9.    <u>Restructuring Transactions</u>.  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtor may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan; <u>provided</u>, <u>however</u>, that no such restructuring transactions may violate the terms of any assumed Executory Contract or Unexpired Lease.


Appx. 02845
014909

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 18 Filed 08/06/25 230 Page 231 of 1017    PageID 15892
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 31 of 229

10.    <u>Approval of Plan Documents</u>.  The form and substance of the Plan Documents are all hereby APPROVED.  The Chapter 11 Trustee is authorized and directed, without the need for further corporate or other organizational action by or on behalf of the Debtors or further order or authorization of this Court, to take such actions and do all things as may be necessary or required to implement and effectuate the Plan Documents and to make the Plan effective.

11.    <u>Transfer and Vesting of Assets; Assumption of Obligations</u>.  On the Effective Date, without the execution of any other or further document or any further order by the Court, all Assets shall be deemed as fully, completely and irrevocably transferred to, and vested in, the Reorganized Debtor in accordance with the Plan.  All transfers of Assets to the Reorganized Debtor shall be free and clear of all Liens, Claims, rights, Interests and charges, except as otherwise expressly provided in the Plan or any agreement, instrument, or other document incorporated therein, or this Order.  Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the obligations to make all Distributions pursuant to the Plan and this Order.

12.    <u>Estate Claims and Estate Defenses</u>.  Upon the Effective Date, without the necessity of the execution of any further documents or further order of the Court, all Estate Claims and Estate Defenses, including without limitation all Estate Claims and Estate Defenses identified in Exhibit A to the Plan, shall be deemed as fully, completely and irrevocably transferred to, and vested in, the Reorganized Debtor.  From and after the Effective Date, the Reorganized Debtor shall have the exclusive standing and authority to assert, prosecute, collect, compromise and settle all Estate Claims and Estate Defenses pursuant to the terms of the Plan.

13.    <u>Treatment of Executory Contracts and Unexpired Leases</u>.  The Executory Contract and Unexpired Lease provisions of Article XI of the Plan, as modified herein**,** are hereby approved in their entirety.  The assumption of Executory Contracts and Unexpired Leases as set forth in the Plan, this Order, and **Exhibit "5"** to this Order are hereby approved.


Appx. 028 48
014910

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 51-30   Exhibit 18   Filed 08/05/25   Page 232 of 1017   PageID 15893
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 32 of 229

Because no defaults exist under the Executory Contracts and Unexpired Leases identified in

**Exhibit "5"** to this Order, the Chapter 11 Trustee is not required to make any cure payments,

provide any other compensation, cure any nonmonetary defaults, or provide adequate

assurance of future performance under section 365(b) of the Bankruptcy Code as a condition to

the assumption of such Executory Contracts and Unexpired Leases.  All other Executory

Contracts and Unexpired Leases that have not been previously assumed or rejected shall be

deemed as rejected as of the Effective Date in accordance with the terms of the Plan.  All

Rejection Claims must be filed within the time specified in section 11.03 of the Plan, failing

which any such Rejection Claim shall be forever barred and precluded from receiving any

Distribution pursuant to the Plan.  Notwithstanding anything to the contrary herein or in the Plan,

Exhibit 5 to this Order hereby replaces, is substituted for, and supersedes Exhibit B to the Third

Amended Plan and any explicit or inferred references herein or in the Plan to Exhibit B to the

Third Amended Plan shall refer to Exhibit 5 to this Order.

14.     <u>Executory Contracts with Issuers and Co-Issuers</u>.  Pursuant to the Plan and as

provided in this Order, the Debtors are authorized to assume executory contracts that include as

a party ACIS CLO 2014-3 Ltd., ACIS CLO 2014-4 Ltd., ACIS CLO 2014-5 Ltd., ACIS CLO 2015-

6 Ltd., ACIS CLO 2014-3 LLC, ACIS CLO 2014-4 LLC, ACIS CLO 2014-5 LLC, and/or ACIS

CLO 2015-6 LLC solely if and to the extent that one or more of the Debtors is a signatory to

each such executory contract.

15.     <u>Approval of Brigade as Sub-Advisor and Shared Services Provider</u>.  Pursuant to

an *Order Granting Emergency Motion to Approve Replacement Sub-Advisory and Shared*

*Services Providers, Brigade Capital Management, LP and Cortland Capital Markets Services*

*LLC* [Docket No. 464] entered on August 1, 2018, the Court authorized the Chapter 11 Trustee

to engage Brigade Capital Management, LP ("<u>Brigade</u>") and Cortland Capital Markets Services

LLC to perform the services previously provided by Highland under the Sub-Advisory

Agreement and Shared Services Agreement, on an interim basis.  The Chapter 11 Trustee

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 18   Filed 04/25/25 Page 233 of 1017   PageID 15894
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 33 of 229

selected Brigade as the party to provide both sub-advisory and shared services to the

Reorganized Debtor.  Based on the record of prior proceedings in the Chapter 11 Cases and

the Record at the Combined Hearing, the Chapter 11 Trustee has demonstrated that Brigade is

fully qualified to perform such services, and that the Chapter 11 Trustee's selection of Brigade is

an exercise of his sound business judgment.  Furthermore, adequate assurance of future

performance by Brigade has been shown.  Therefore, the selection of Brigade as the provider to

the Reorganized Debtor of the sub-advisory and shared services previously provided by

Highland under the Sub-Advisory Agreement and Shared Services Agreement is hereby

approved in all respects.

16.     <u>Substantive Consolidation</u>.  The substantive consolidation of the Debtors for

purposes of implementation of and distributions under the Plan is hereby approved as of the

Effective Date such that on the Effective Date:  (a) all assets and liabilities of the Debtors will be

deemed merged; (b) all guaranties by one Debtor of the obligations of the other Debtor will be

deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed

by the other Debtor and any joint or several liability of the Debtors will be deemed to be one

obligation of the consolidated Debtors; and (c) each and every Claim filed or to be filed in the

case of either of the Debtors will be deemed filed against the consolidated Debtors and will be

deemed one Claim against and a single obligation of the consolidated Debtors.

17.     <u>Compromise and Settlement</u>.  Pursuant to section 363 of the Bankruptcy Code

and Bankruptcy Rule 9019, and in consideration of the classification, potential Distributions and

other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith

compromise and settlement of all Claims, Interests and controversies subject to, or dealt with,

under the Plan, including, without limitation, all Claims against the Debtors or Estate arising

prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or

unasserted, fixed or contingent, arising out of, relating to or in connection with the business or

affairs of, or transactions with, the Debtors or the Estate.  The entry of this Order constitutes the

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-20    Filed 06/05/25230    Page 234 of 1017    PageID 15895
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 34 of 229

Court's approval of each of the foregoing compromises or settlements embodied in the Plan, and all other compromises and settlements provided for in the Plan, as well as a finding by the Court that such compromises and settlements are in the best interest of the Debtors, the Estate, holders of Claims and Interests, and other parties-in-interest, and are fair, equitable and within the range of reasonableness.  The rights afforded in the Plan and the treatment of all Claims and Interests therein are in exchange for, and in complete satisfaction and release of, all Claims and Interests of any nature whatsoever against and in the Debtors, the Estate, and the Assets.  Except as otherwise provided in the Plan or this Order, all Persons shall be precluded and forever barred by the Plan Injunction from asserting against the Debtors and their affiliates, successors, assigns, the Reorganized Debtor or the Reorganized Debtor's assets, the Estate, or the Assets, any event, occurrence, condition, thing, or other or further Claims or causes of action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

18.    <u>Discharge</u>.  Except for the obligations expressly set forth in the Plan or this Order, on the Effective Date, the Debtors, the Reorganized Debtor and their successors in interest and assigns shall be deemed and they each are discharged and released to the fullest extent permitted by applicable law, including pursuant to section 1141(d)(1) of the Bankruptcy Code, from any and all Claims, Interests, demands, debts and liabilities that arose before the Effective Date.  Without limiting the generality of the foregoing, the discharge shall apply to and cover both known and unknown Claims although the Court makes no determination in this Order as to which Creditors may constitute holders of unknown Claims.  In addition, all such discharged Claims, both known and unknown, shall be subject to the Plan Injunction.

19.    <u>Injunctions</u>.  The following injunction provisions set forth in Article XIV of the Plan are hereby approved and authorized in their entirety:

(a)    **Permanent General Plan Injunction:**

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-30 18 Filed 06/06/25 230   Page 235 of 1017   PageID 15896
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 35 of 229

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, AS OF THE EFFECTIVE DATE ALL HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE ESTATE OR ANY OF THE ASSETS THAT AROSE PRIOR TO THE EFFECTIVE DATE ARE HEREBY PERMANENTLY ENJOINED AND PROHIBITED FROM THE FOLLOWING: (a) THE COMMENCING OR CONTINUATION IN ANY MANNER, DIRECTLY OR INDIRECTLY, OF ANY ACTION, CASE, LAWSUIT OR OTHER PROCEEDING OF ANY TYPE OR NATURE AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS WITH RESPECT TO ANY SUCH CLAIM OR INTEREST ARISING OR ACCRUING BEFORE THE EFFECTIVE DATE, INCLUDING WITHOUT LIMITATION THE ENTRY OR ENFORCEMENT OF ANY JUDGMENT, OR ANY OTHER ACT FOR THE COLLECTION, EITHER DIRECTLY OR INDIRECTLY, OF ANY CLAIM OR INTEREST AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS; (b) THE CREATION, PERFECTION OR ENFORCEMENT OF ANY LIEN, SECURITY INTEREST, ENCUMBRANCE, RIGHT OR BURDEN, EITHER DIRECTLY OR INDIRECTLY, AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, OR (c) TAKING ANY ACTION IN RELATION TO THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, EITHER DIRECTLY OR INDIRECTLY, WHICH VIOLATES OR DOES NOT CONFORM OR COMPLY WITH THE PROVISIONS OF THE PLAN APPLICABLE TO SUCH CLAIM OR INTEREST.**

The above injunction is an integral term of this Order and shall be fully binding upon, and enforceable against, all Persons through and as a part of this Order. Furthermore, notwithstanding anything to the contrary in the Plan or this Order, the above injunction is permanent and shall not expire upon the occurrence of any event that causes the Temporary Plan Injunction to expire.

(b)     **Temporary Injunction Against the Liquidation of the Acis CLOs and Related Actions (the "Temporary Plan Injunction"):**

**EXCEPT TO THE EXTENT NECESSARY TO ALLOW HCLOF, THE REORGANIZED DEBTOR AND BRIGADE TO EFFECTUATE THE RESET OF ONE OR MORE OF THE ACIS CLOS IN ACCORDANCE WITH SECTION 6.08 OF THE PLAN, PURSUANT TO SECTIONS 105(a), 1123(a)(5), 1123(b)(6), AND 1142(b) OF THE BANKRUPTCY CODE, THE ENJOINED PARTIES (DEFINED BELOW) ARE HEREBY ENJOINED FROM: (a) PROCEEDING WITH, EFFECTUATING, OR OTHERWISE TAKING (i) ANY ACTION IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS PREVIOUSLY OR CURRENTLY ISSUED BY ANY SUCH PARTIES, AND (ii) ANY OTHER ATTEMPT TO LIQUIDATE THE ACIS CLOS BY ANY MEANS, (b) TRADING ANY ACIS CLO COLLATERAL IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, (c) EXERCISING ANY RIGHTS TO ASK OR DIRECT THE ISSUERS, CO-ISSUERS OR INDENTURE TRUSTEE TO PERFORM ANY ACTION IN RELATION TO THE ACIS CLOS THAT THE ENJOINED PARTIES ARE PROHIBITED FROM TAKING UNDER THE TERMS OF THE PLAN INJUNCTION, (d) INTERFERING IN ANY WAY WITH THE CAPITAL MARKETS PROCESS OF RESETTING ANY ACIS CLO, AND (e) SENDING, MAILING, OR OTHERWISE DISTRIBUTING ANY NOTICE TO THE HOLDERS OF**

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 35-30 18 Filed 07/36/25230 Page 236 of 1017 PageID 15897
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 36 of 229

**THE NOTES IN THE ACIS CLOS IN CONNECTION WITH THE EFFECTUATION OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, UNTIL THE EARLIER TO OCCUR OF: (w) THE DATE UPON WHICH A FINAL ORDER IS ENTERED RESOLVING THE ESTATE'S AVOIDANCE CLAIMS AGAINST ALL ENJOINED PARTIES RELATING TO ACIS LP'S RIGHTS UNDER THE ALF PMA; (x) THE DATE UPON WHICH ALL ALLOWED CLAIMS AGAINST THE DEBTORS HAVE BEEN PAID IN FULL, (y) THE ENTRY OF AN ORDER BY THE BANKRUPTCY COURT FINDING THAT A MATERIAL DEFAULT HAS OCCURRED UNDER THE TERMS OF THE PLAN, OR (z) THE ENTRY OF A SUBSEQUENT ORDER BY THE BANKRUPTCY COURT PROVIDING OTHERWISE WITH RESPECT TO ONE OR MORE OF THE ACIS CLOS. FOR PURPOSES OF THIS PARAGRAPH, THE TERM "ENJOINED PARTIES" SHALL INCLUDE HIGHLAND, HCLOF, CLO HOLDCO, NEUTRA, HIGHLAND HCF, HIGHLAND CLOM, ANY AFFILIATES OF HIGHLAND, AND THEIR RESPECTIVE EMPLOYEES, AGENTS, REPRESENTATIVES, TRANSFEREES, ASSIGNS, AND SUCCESSORS. FOR PURPOSES OF CLARIFICATION AND AVOIDANCE OF DOUBT, NOTHING IN THIS PARAGRAPH SHALL PRECLUDE ORDINARY DAY-TO-DAY TRADING OF THE COLLATERAL IN THE ACIS CLOS BY THE REORGANIZED DEBTOR.**

The above Temporary Plan Injunction is an integral term of this Order and the Temporary Plan Injunction shall be fully binding upon, and enforceable against, the Enjoined Parties through and as a part of this Order. For the avoidance of doubt, the occurrence of any event specified in the Temporary Plan Injunction that results in expiration of the Temporary Plan Injunction shall not cause any of the other injunctive relief set forth in the first paragraph of section 14.03 of the Plan and paragraph 18(a) of this Order to expire, such other injunctive relief being permanent.

20. Notwithstanding anything to the contrary in the Plan or this Order, nothing in the Plan or in this Order shall discharge, release, enjoin or otherwise bar (a) any liability of the Debtors, the Estate, the Reorganized Debtor, or the Reorganized Debtor's assets ("Released Parties") to a Governmental Unit arising on or after the Confirmation Date with respect to events occurring after the Confirmation Date, provided that the Released Parties reserve the right to assert that any such liability is a Claim that arose on or prior to the Confirmation Date and constitutes a Claim that is subject to the deadlines for filing proofs of Claim, (b) any liability to a Governmental Unit that is not a Claim subject to the deadlines for filing proofs of Claim, (c) any valid right of setoff or recoupment of a Governmental Unit, and (d) any police or regulatory action by a Governmental Unit. In addition, nothing in the Plan or this Order discharges, releases, precludes or enjoins any environmental liability to any Governmental Unit that any

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 18 Filed 06/06/25 Page 237 of 1017    PageID 15898
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 37 of 229

Person other than the Released Parties would be subject to as the owner or operator of the property after the Effective Date.  For the avoidance of any doubt, nothing in this paragraph shall be construed to limit the application of the Plan Injunction to any Claim which was subject to any bar date applicable to such Claim.

21.    <u>Extension of the Preliminary Injunction</u>.  Notwithstanding anything to the contrary in the terms of the Preliminary Injunction entered in the Trustee's Adversary, the Preliminary Injunction shall not expire upon confirmation of the Plan.  The Preliminary Injunction is hereby extended to and through the Effective Date of the Plan and shall remain in full force and effect until the Effective Date of the Plan.

22.    <u>Exculpation</u>.  The exculpation provisions set forth in section 16.06 of the Plan are hereby approved in all respects.

23.    <u>Priority and Secured Tax Claims</u>.  The treatment of Priority Tax Claims and Secured Tax Claims is specified in the Plan.  Nothing in the Plan or this Order shall modify or affect the Lien rights of a Taxing Authority under applicable non-bankruptcy law.  In the event of a default on the payment of a Priority Tax Claim or Secured Tax Claim under the Plan, the Taxing Authority to which the payment is owed may pursue all administrative and judicial remedies under applicable law to collect the unpaid Priority Tax Claim or Secured Tax Claim.

24.    <u>Injunctions and Automatic Stay</u>.  Except as otherwise provided in the Plan or this Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or this Order shall remain in full force and effect in accordance with their terms.

25.    <u>Setoffs</u>.  Except as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the holder of a Claim, the Reorganized Debtor may set off



Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 35-20  18  Filed 06/06/25  230  Page 238 of 1017    PageID 15899
Case 18-30264-sgj11  Doc 829  Filed 01/31/19    Entered 01/31/19 17:34:06    Page 38 of 229

against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of

such Allowed Claim (before such Distribution is made), any Claims, rights, Estate Claims and

Estate Defenses of any nature that the Debtors may hold against the holder of such Allowed

Claim, to the extent such Claims, rights, Estate Claims and Estate Defenses against such

holder have not been otherwise compromised or settled on or prior to the Effective Date

(whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect

such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a

waiver or release of any such Claims, rights, Estate Claims and Estate Defenses that the Estate

may possess against such Claimant.  In no event shall any Claimant or Interest holder be

entitled to setoff any Claim or Interest against any Claim, right, or Estate Claim of the Debtors

without the consent of the Debtors or the Reorganized Debtor unless such holder files a motion

with the Court requesting the authority to perform such setoff notwithstanding any indication in

any proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of

setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

      26.     Recoupment.  Except as otherwise expressly provided for in the Plan, in no event

shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any

Claim, right, account receivable, or Estate Claim of the Debtors or the Reorganized Debtor

unless (a) such holder actually provides notice thereof in writing to the Debtors or the

Reorganized Debtor of its intent to perform a recoupment; (b) such notice includes the amount

to be recouped by the holder of the Claim or Interest and a specific description of the basis for

the recoupment, and (c) the Debtors or the Reorganized Debtor have provided a written

response to such Claim or Interest holder, stating unequivocally that the Debtors or the

Reorganized Debtor consents to the requested recoupment.  The Debtors and the Reorganized

Debtor shall have the right, but not the obligation, to seek an order of the Court allowing any or

all of the proposed recoupment.  In the absence of a written response from the Debtors or the

014917

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 55-20 18 Filed 04/06/25230    Page 239 of 1017    PageID 15900
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 39 of 229

Reorganized Debtor consenting to a recoupment or an order of the Court authorizing a recoupment, no recoupment by the holder of a Claim or Interest shall be allowed.

27.    <u>Preservation of Causes of Action</u>.  Articles VI and IX of the Plan, including Exhibit A to the Plan, contain a specific and unequivocal reservation of Estate Claims and Estate Defenses as required under applicable Fifth Circuit authority.  The Estate Claims and Estate Defenses are expressly, specifically, and unequivocally retained and reserved pursuant to Articles VI and IX of the Plan (including Exhibit A to the Plan) in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.  Such reservation of the Estate Claims and Estate Defenses is hereby approved.  **No person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any cause of action against them as any indication that the Debtors or the Reorganized Debtor will not pursue any and all available causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) against any Person, <u>except</u> as otherwise provided in the Plan.**  Unless any causes of action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, such causes of action are hereby expressly reserved (including all Estate Claims, Estate Defenses and Avoidance Actions) for later adjudication and, therefore, no preclusion doctrine, <u>including without limitation</u>, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such causes of action upon or after the confirmation or consummation of the Plan.

28.    Unless otherwise expressly stated in the Plan or this Order, all Estate Claims and Estate Defenses are hereby reserved for the benefit of the Reorganized Debtor notwithstanding the occurrence of the Effective Date or the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  All such reserved Estate Claims and Estate Defenses shall be vested with the Reorganized Debtor and the Reorganized Debtor shall have the exclusive right, authority and standing to assert, file,


Appx. 02856

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-30 Exhibit 18 Filed 04/25/25 Page 46 of 230 Page 240 of 1017 PageID 15901
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 40 of 229

prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment each of the Estate Claims and Estate Defenses so reserved in accordance with the terms of the Plan without the consent or approval of any third party or further notice to or action, order or approval of the Court.

29.     Subordinated Claims.  The allowance, classification and treatment of all Allowed Claims and Interests and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtor reserves the right to seek to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

30.     Release of Liens.  Except as otherwise provided in the Plan, this Order, or in any contract, instrument, or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date all Liens against any Assets transferred to and vested in the Reorganized Debtor are hereby deemed to be released, terminated and nullified without the necessity of further order of this Court.

31.     Provisions Governing Distributions.  The distribution provisions of Articles VII and VIII of the Plan shall be, and hereby are, approved in their entirety; provided, however, that notwithstanding anything to the contrary set forth in Section 7.02 of the Plan, the Reorganized Debtor may, but shall not be required to, reserve for Distributions to holders of Allowed Subclass 4B Claims.  The Reorganized Debtor shall make all Distributions required under the Plan.

32.     Procedures for Resolving Contested and Contingent Claims.  The Claims resolution procedures contained in Article X of the Plan are hereby approved.



Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 13-30 Filed 08/05/25 Page 241 of 1017 PageID 15902
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 41 of 229

33.　　<u>Section 1145 Exemption</u>.  The solicitation of acceptances and rejections of the

Plan was exempt from the registration requirements of the Securities Act of 1933 and applicable

state securities laws, and no other nonbankruptcy law applies to the solicitation.

34.　　<u>Exemption from Certain Transfer Taxes and Recording Fees</u>.  Section 1146(a)

shall apply to the transfers of Assets pursuant to the Plan and, therefore, such transfers may not

be taxed under any law imposing a stamp tax or similar tax.

35.　　<u>Governmental Approvals Not Required</u>.  This Order shall constitute all approvals

and consents required, if any, by the laws, rules or regulations of any state or any other

governmental authority with respect to the implementation or consummation of the Plan and any

documents, instruments or agreements, and any amendments or modifications thereto, and any

other acts referred to in or contemplated by the Plan, the Disclosure Statement and any

documents, instruments or agreements, and any amendments or modifications thereto.

36.　　<u>Allowance and Payment of Certain Administrative Expense Claims</u>

(a)　　<u>Administrative Expense Claims (Generally)</u>.  The holder of a Claim for an

Administrative Expense, other than (i) such a Claim by an Estate Professional, (ii) an Ordinary

Course Claim, (iii) a Claim for U.S. Trustee fees under 28 U.S.C. § 1930, or (iv) an Allowed

Administrative Expense, must file with the Court and serve upon the Reorganized Debtor and its

counsel, as set forth in the Plan, a written notice of such Claim for an Administrative Expense

within thirty (30) days after the Effective Date (the "<u>Administrative Bar Date</u>").  Such notice of

Claim for an Administrative Expense shall include at a minimum: (i) the name, address,

telephone number and fax number (if applicable) or email address of the holder of such Claim,

(ii) the amount of such Claim, and (iii) the basis of such Claim.  ***<u>The failure to timely and</u>***

***<u>properly file and serve a notice of Claim for an Administrative Expense on or before the</u>***

***<u>Administrative Bar Date shall result in such Claim for an Administrative Expense being</u>***

***<u>forever barred and discharged without further order of the Court and the holder thereof</u>***

***<u>shall be barred from receiving any Distribution from the Reorganized Debtor on account</u>***

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 45-20    Filed 04/08/25    Page 242 of 1017    PageID 15903
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 42 of 229

***of such Claim for an Administrative Expense.***  A Claim for an Administrative Expense with

respect to which a notice of Claim for an Administrative Expense has been timely and properly

filed and served shall become an Allowed Administrative Expense if no objection is filed within

thirty (30) days after the date of filing and service of the applicable notice of Claim for an

Administrative Expense, or such later date as may be approved by the Court on motion of a

party in interest, without notice or a hearing.  If an objection is filed within such 30-day period (or

any extension thereof), the Claim for an Administrative Expense shall become an Allowed

Administrative Expense only to the extent allowed by a Final Order.

(b)     Estate Professional Compensation.  All final requests for compensation or

reimbursement by any Estate Professional shall be filed no later than sixty (60) days after the

Effective Date in accordance with the Plan.  A Claim for an Administrative Expense by an Estate

Professional in respect of which a final fee application has been properly filed shall become an

Allowed Administrative Expense only to the extent allowed by Final Order and, if so Allowed,

shall be paid in accordance with the terms of the Plan.  Notwithstanding anything to the contrary

in the Plan, the provisions of the Plan governing the filing of final fee applications by Estate

Professionals and allowance of Administrative Expense Claims of Estate Professionals apply to

the Chapter 11 Trustee.  Compensation or reimbursement sought by the Chapter 11 Trustee

through a final fee application shall be subject to final approval of the Court as reasonable in

accordance with section 330(a)(3) of the Bankruptcy Code.

(c)     U.S. Trustee Fees.  Any U.S. Trustee fees incurred pursuant to 28 U.S.C.

§ 1930 which are past due as of the Confirmation Date shall be paid in full by the Chapter 11

Trustee on or before the earlier of (i) December 21, 2018, or (ii) that day which is ten (10) days

after the Confirmation Date.  After the Confirmation Date, the Reorganized Debtor shall continue

to pay U.S. Trustee fees as they accrue until a final decree is entered and the Chapter 11

Cases are closed.

Appx. 02350

014921

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-20    Filed 04/05/25    Page 243 of 1017    PageID 15904
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 43 of 229

37.    <u>Effectuating Documents and Further Transactions</u>.  The Chapter 11 Trustee and

the Reorganized Debtor, and their respective representatives, agents and attorneys, may take

all actions to execute, deliver, file, or record such contracts, instruments, releases, and other

agreements or documents and take such actions as may be necessary or appropriate to

effectuate and implement the provisions of the Plan without the need for any approvals,

authorizations, actions, or consents except for those expressly required pursuant hereto.  This

Order shall constitute all approvals and consents required, if any, by the laws, rules and

regulations of all states and any other governmental authority with respect to the implementation

or consummation of the Plan and any documents, instruments, agreements, any amendments

or modifications thereto and any other acts and transactions referred to in or contemplated by

the Plan, the Plan Documents, the Disclosure Statement, and any documents, instruments, and

agreements and any amendments or modifications thereto.

38.    <u>Filing and Recording</u>.  This Order is and shall be binding upon and shall govern

the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title

companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative

agencies, governmental departments, secretaries of state, federal, state and local officials, and

all other persons and entities who may be required, by operation of law, the duties of their office,

or contract, to accept, file, register or otherwise record or release any document or instruments.

Each and every federal, state and local government agency is hereby directed to accept any

and all documents and instruments necessary, useful or appropriate to effectuate, implement

and consummate the transactions contemplated by the Plan and this Order.

39.    <u>Inconsistency between Documents</u>.  In the event of an inconsistency between

the terms of the Plan and the terms of the Disclosure Statement, the Plan shall control.  In the

event of any inconsistency between the terms of the Plan or the terms of the Disclosure

Statement and the terms of this Order, this Order shall control.

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 55-20    Filed 05/05/230    Page 244 of 1017    PageID 15905
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 44 of 229

40.    <u>References to Plan Provisions</u>.  The failure specifically to include or to refer to any particular article, section, or provision of the Plan or any related document in this Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Court that the Plan and any related documents be confirmed in their entirety.

41.    <u>Applicable Nonbankruptcy Law.</u>  Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of the Plan and this Order shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

42.    <u>Notice of Entry of the Confirmation Order</u>.  No later than the third Business Day after the entry of this Order, the Chapter 11 Trustee shall serve a copy of this Order pursuant to Bankruptcy Rules 2002(f)(7), 2002(k) and 3020(c) on all holders of Claims and Interests, the U.S. Trustee, the Persons specifically identified in the Temporary Plan Injunction as subject thereto, and all other known parties-in-interest.

43.    <u>Notice of the Effective Date</u>.  No later than the third Business Day after the occurrence of the Effective Date, the Reorganized Debtor shall file a notice of occurrence of the Effective Date with the Clerk of the Court and shall serve a copy on all holders of Claims and Interests, the U.S. Trustee, the Persons specifically identified in the Temporary Plan Injunction as subject thereto, and all other known parties-in-interest.  Such notice shall include notice of (a) the Administrative Bar Date, (b) the deadline for filing Rejection Claims set forth in section 11.03 of the Plan, and (c) the deadline for filing final requests for compensation and reimbursement by Estate Professionals.  The filing of such notice shall conclusively establish that all conditions precedent have been satisfied or waived and shall constitute adequate and sufficient notice to all parties entitled thereto of the occurrence of the Effective Date.

44.    <u>Retention of Jurisdiction</u>.  The Court may properly, and upon the Effective Date shall, to the full extent set forth in the Plan, retain jurisdiction over all matters arising in, arising under, and related to, the Chapter 11 Cases, including the matters set forth in Article XV of the Plan and section 1142 of the Bankruptcy Code.  Without limitation as to the generality of the

Appx. 02301
014923

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 35-20 18 Filed 06/06/25230 Page 245 of 1017    PageID 15906
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 45 of 229

preceding sentence, the Court retains exclusive jurisdiction (a) to interpret and enforce this
Order and the Plan; (b) to enforce the provisions of this Order and the Plan; (c) to resolve any
disputes arising under or related to this Order or the Plan; and (d) over all transactions
contemplated in this Order and the Plan.  All Persons are hereby forever prohibited and
enjoined from taking any action (including, without limitation, legal action) that would adversely
affect or interfere with the ability of any Person to complete any of the transfers of property
contemplated by this Order and the Plan other than in this Court or in connection with any
appeals from this Court.

45.     Headings.  Paragraph headings contained in this Order are for convenience of
reference only and shall not affect the meaning or interpretation of this Order.

46.     Final Order.  This Order is a final order and the period in which an appeal must
be filed shall commence upon the entry hereof.

47.     Appeal or Motion for Reconsideration; Reversal.  In the event this Order is
appealed or a motion for reconsideration is filed, the Chapter 11 Trustee and the Reorganized
Debtor, and their respective representatives, agents and attorneys, are all hereby authorized to
proceed with the consummation and performance of the Plan unless and until this Order is
stayed, reversed or modified by a court of competent jurisdiction.  If any or all of the provisions
of this Order are hereafter reversed, modified, or vacated by subsequent order of this Court or
any other court of competent jurisdiction, such reversal, modification, or vacatur shall not affect
the validity of the acts or obligations incurred or undertaken under or in connection with the Plan
prior to the Chapter 11 Trustee's or Reorganized Debtor's receipt of written notice of any such
order.  Notwithstanding any such reversal, modification, or vacatur of this Order, any such act or
obligation incurred or undertaken pursuant to, and in reliance on, this Order prior to the effective
date of such reversal, modification or vacatur shall be governed in all respects by the provisions
of this Order and the Plan (including the Plan Documents) and any amendments or
modifications thereto.

014924

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 35-30   Filed 04/25/230   Page 246 of 1017   PageID 15907
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 46 of 229

### END OF ORDER ###

Appx 02303
014925

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 5-30 18 Filed 08/25230 Page 247 of 1017 PageID 15908
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 47 of 229

**SUBMITTED BY:**

/s/ Jeff P. Prostok
Jeff P. Prostok
State Bar No. 16352500
J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
Matthew G. Maben
State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

-and-

Rakhee V. Patel
State Bar No. 00797213
Phillip Lamberson
State Bar No. 00794134
Joe Wielebinski
State Bar No. 21432400
Annmarie Chiarello
State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5400 (Phone)
(214) 745-5390 (Facsimile)
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Confirmation Order (3rd Amended Plan) 1.31.18.docx



Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 55-30 18 Filed 04/03/25 230 Page 248 of 1017    PageID 15909
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 48 of 229

# EXHIBIT "1"

**[Third Amended Joint Plan for Acis Capital Management, L.P.
and Acis Capital Management GP, LLC – Dkt. No. 660]**

Appx. 02365

014927

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 18 Filed 06/25230 Page 249 of 1017    PageID 15910

Case 18-30264-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 49 of 229
Case 18-30264-sgj11 Doc 680 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 1 of 62

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P., | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered Under Case |
| | § | No. 18-30264-SGJ-11) |
| DEBTORS. | § | |
| | § | Chapter 11 |

### THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC

Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

DATED:        October 25, 2018
             Dallas, Texas

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-30   18 Filed 06/05/25 230 Page 250 of 1017   PageID 15911
Case 18-30264-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 50 of 229

# ARTICLE I.
## DEFINITIONS

A.    <u>Defined Terms</u>. In addition to such other terms as are defined in other sections of the Plan, the following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural, masculine and feminine forms of the terms defined).

1.01.    "<u>Acis CLOs</u>" refers collectively to CLO-3, CLO-4, CLO-5, and CLO-6.

1.02.    "<u>Acis GP</u>" means Acis Capital Management, GP, LLC, one of the Debtors in the above-referenced Chapter 11 Cases.

1.03.    "<u>Acis LP</u>" means Acis Capital Management, LP, one of the Debtors in the above-referenced Chapter 11 Cases.

1.04.    "<u>Administrative Bar Date</u>" means the deadline to file Claims for Allowance as an Administrative Expense set forth in section 3.01(c) of the Plan.

1.05.    "<u>Administrative Expense</u>" means any cost or expense of administration of the Chapter 11 Cases allowed under subsections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the Estate of the Debtors, any actual and necessary expenses of operating the business of the Debtors, all compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the estates of the Debtors under section 1930, chapter 123 of title 28 of the United States Code.

1.06.    "<u>Affiliate</u>" has the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

1.07.    "<u>ALF PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and Acis Loan Funding, Ltd. dated December 22, 2016.

1.08.    "<u>Allowed</u>," when used with respect to a Claim (other than an Administrative Expense), means a Claim (a) to the extent it is not Contested; or (b) a Contested Claim, proof of which was filed timely with the Bankruptcy Court, and (i) as to which no Objection was filed by the Objection Deadline, or (ii) as to which an Objection was filed by the Objection Deadline, to the extent, if any, such Claim is ultimately allowed by a Final Order; *provided, however*, if a Claim is to be determined in a forum other than the Bankruptcy Court, such Claim shall not become Allowed until determined by Final Order of such other forum and allowed by Final Order of the Bankruptcy Court. "<u>Allowed</u>," when used with respect to an Administrative Expense, shall mean an Administrative Expense approved by application to the Bankruptcy Court.

1.09.    "<u>Assets</u>" includes all right, title, and interest in and to all property of every type or nature owned or claimed by the Debtors as of the Petition Date, together with all such property of every type or nature subsequently acquired by the Debtors through the Effective Date, whether real or personal, tangible or intangible, and wherever located, and including, but not limited to, property as defined in section 541 of the Bankruptcy Code.  Without limiting the foregoing, this shall include all

Appx. 02385
014929

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 18 Filed 05/25/230 Page 251 of 1017    PageID 15912
Case 18-30264-sgj11 Doc 680 Filed 01/31/18 Entered 01/31/18 17:42:08 Page 51 of 229

1.10.    "<u>Available Cash</u>" means any Cash over and above the amount needed for the Reorganized Debtor to maintain business operations and pursue the Estate Claims, as determined in the sole discretion of the Reorganized Debtor.

1.11.    "<u>Avoidance Action</u>" means a cause of action assertable by the Debtors pursuant to Chapter 5 of the Bankruptcy Code, including without limitation, actions brought or which may be brought under sections 542, 543, 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code. Such causes of action may be asserted to recover, among other things, the transfers listed in the Debtors' respective Schedules, including in response to Question 3 of the statements of financial affairs.

1.12.    "<u>Ballot</u>" means the form of ballot provided to holders of Claims or Interests entitled to vote pursuant to Bankruptcy Rule 3017(d), by which each such holder may accept or reject the Plan.

1.13.    "<u>Bankruptcy Code</u>" means the Bankruptcy Reform Act of 1978, as amended and codified at Title 11 of the United States Code.

1.14.    "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or such other court having jurisdiction over all or any part of the Chapter 11 Cases.

1.15.    "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, including applicable local rules of the Bankruptcy Court.

1.16.    "<u>Brigade</u>" means Brigade Capital Management, LP.

1.17.    "<u>Business Day</u>" means any day other than Saturday, Sunday, a legal holiday, or a day on which national banking institutions in Texas are authorized or obligated by law or executive order to close.

1.18.    "<u>Cash</u>" means legal tender of the United States of America, cash equivalents and other readily marketable securities or instruments, including, but not limited to, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks or commercial paper.

1.19.    "<u>Chapter 11 Cases</u>" refers collectively to the Acis LP bankruptcy case, Case No. 18-30264-sgj11, and the Acis GP bankruptcy case, Case No. 18-30265-sgj11, which are being jointly administered under Case No. 18-30264-sgj11.

1.20.    "<u>Chapter 11 Trustee</u>" refers to Robin Phelan, the chapter 11 trustee for the Debtors.

1.21.    "<u>Claim</u>" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, legal, equitable, secured or unsecured, or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, secured or unsecured.


Appx 02308
014930

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-30   18   Filed 06/25230   Page 252 of 1017      PageID 15913
Case 18-30264-sgj11   Doc 820   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 52 of 229
Case 18-30264-sgj11   Doc 680   Filed 10/25/18   Entered 10/25/18 18:42:08   Page 54 of 629

1.22.  "<u>Claimant</u>" means the holder of a Claim.

1.23.  "<u>Class</u>" means a class of Claims or Interests as described in the Plan.

1.24.  "<u>CLO</u>" means collateralized loan obligations.

1.25.  "<u>CLO-1</u>" means Acis CLO 2013-1 LTD.

1.26.  "<u>CLO-1 Indenture</u>" means that certain Indenture, dated as of March 18, 2013, issued by CLO-1, as issuer, Acis CLO 2013-1 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.27.  "<u>CLO-1 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-1, dated March 18, 2013.

1.28.  "<u>CLO-3</u>" means Acis CLO 2014-3 LTD.

1.29.  "<u>CLO-3 Indenture</u>" means that certain Indenture, dated as of February 25, 2014, issued by CLO-3, as issuer, Acis CLO 2014-3 LLC, as co-Issuer and US Bank, as Indenture Trustee

1.30.  "<u>CLO-3 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-3, dated February 25, 2014.

1.31.  "<u>CLO-4</u>" means Acis CLO 2014-4 LTD.

1.32.  "<u>CLO-4 Indenture</u>" means that certain Indenture, dated as of June 5, 2014, issued by CLO-4, as issuer, Acis CLO 2014-4 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.33.  "<u>CLO-4 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-4, dated June 5, 2014.

1.34.  "<u>CLO-5</u>" means Acis CLO 2014-5 LTD.

1.35.  "<u>CLO-5 Indenture</u>" means that certain Indenture, dated as of November 18, 2014, issued by CLO-5, as issuer, Acis CLO 2014-5 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.36.  "<u>CLO-5 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-5, dated November 18, 2014.

1.37.  "<u>CLO-6</u>" means Acis CLO 2015-6 LTD.

1.38.  "<u>CLO-6 Indenture</u>" means that certain Indenture, dated as of April 16, 2015, issued by CLO-6, as issuer, Acis CLO 2015-6 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.39.  "<u>CLO-6 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-6, dated April 16, 2015.

1.40.  "<u>CLO Holdco</u>" means CLO Holdco, Ltd.

1.41.  "<u>Collateral</u>" means any Asset subject to a valid and enforceable Lien to secure payment of a Claim.



Appx. 02369
014931

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-30   18 Filed 04/25/25   Page 253 of 1017   PageID 15914
Case 18-30864-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 53 of 229
Case 18-30264-sgj11 Doc 680 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 53 of 229

1.42.   "<u>Confirmation Date</u>" means the date of entry of the Confirmation Order.

1.43.   "<u>Confirmation Hearing</u>" means the hearing conducted by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3020(b) to consider confirmation of the Plan, as such hearing may be continued from time to time.

1.44.   "<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.45.   "<u>Contested</u>," when used with respect to a Claim, means a Claim against the Debtors that is listed in the Debtors' Schedules as disputed, contingent, or unliquidated; that is listed in the Debtors' Schedules as undisputed, liquidated, and not contingent and as to which a proof of Claim has been filed with the Bankruptcy Court, to the extent the proof of Claim amount exceeds the scheduled amount; that is not listed in the Debtors' Schedules, but as to which a proof of Claim has been filed with the Bankruptcy Court; or as to which an objection has been or may be timely filed and has not been denied by Final Order. To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Contested Claim only to the extent of the objection.

1.46.   "<u>Creditor</u>" means a "creditor," as defined in section 101(10) of the Bankruptcy Code.

1.47.   "<u>Cure Claim</u>" means the payment or other performance required to cure any existing default under an Executory Contract or Unexpired Lease.

1.48.   "<u>Debtors</u>" means, collectively, Acis GP and Acis LP, the debtors in the above-captioned Chapter 11 Cases.

1.49.   "<u>Disallowed</u>," when used with respect to all or any part of a Claim or Interest, means that portion of a Claim or Interest to which an objection or motion to disallow has been sustained by a Final Order.

1.50.   "<u>Disclosure Statement</u>" means the Disclosure Statement filed with respect to the Plan, as it may be amended, modified, or supplemented from time to time.

1.51.   "<u>Distribution</u>" means any payment or other disbursement of property pursuant to the Plan.

1.52.   "<u>Effective Date</u>" means the first Business Day which is fourteen (14) days after the Confirmation Date if the Confirmation Order is not stayed or, if the Confirmation Order is stayed, the first Business Day following the lifting, dissolution, or removal of such stay which is at least fourteen (14) Business Days after the Confirmation Date, and upon which all conditions to the effectiveness of the Plan set forth in Article XIII below are satisfied.

1.53.   "<u>Estate</u>" shall collectively refer to the bankruptcy estates of the Debtors in the Chapter 11 Cases.

1.54.   "<u>Estate Accounts Receivable</u>" shall include all accounts receivable of the Estate, including from all sums payable to the Debtors on account of goods or services provided by the Debtors.

Appx 02379
014932

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 18 Filed 06/05/25 Page 254 of 1017   PageID 15915
Case 18-30064-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 54 of 229
Case 18-30064-sgj11 Doc 680 Filed 10/25/18   Entered 10/25/18 18:43:08   Page 6 of 229

1.55.   "Estate Claims" shall include all claims and causes of action held by the Debtors' Estate, including, without limitation, the Estate Claims listed on the attached **Exhibit A** and all Avoidance Actions.

1.56.   ""Estate Defenses" means all defenses, affirmative defenses, counterclaims, or offsets by the Debtors' Estate against any Person, including but not limited to any Creditor.

1.57.   "Estate Insurance" means any insurance policy or interest in an insurance policy in which the Estate has an interest or rights.

1.58.   "Estate Professionals" means those Persons employed pursuant to an order of the Bankruptcy Court in accordance with sections 327, 328, and 1103 of the Bankruptcy Code or who are entitled to compensation or reimbursement pursuant to sections 503(b)(3)(D) or 506(b) of the Bankruptcy Code.

1.59.   "Executory Contract" means any executory contract which is subject to section 365 of the Bankruptcy Code and which is not an Unexpired Lease.

1.60.   "Final Order" means an order or judgment of the Bankruptcy Court or any other court or adjudicative body, as to which the time to appeal or seek rehearing or petition for certiorari shall have expired or which order or judgment shall no longer be subject to appeal, rehearing, or certiorari proceeding and with respect to which no appeal, motion for rehearing, or certiorari proceeding or stay shall then be pending.

1.61.   "General Unsecured Claim" means any Claim against the Debtors that is not an Administrative Expense, Priority Tax Claim, Priority Non-Tax Claim, Secured Tax Claim, Secured Claim, or Insider Claim, but includes any Rejection Claims pursuant to section 502(g) of the Bankruptcy Code.

1.62.   "Governmental Unit" means a "governmental unit" as such term is defined in section 101(27) of the Bankruptcy Code.

1.63.   "HCLOF" means Highland CLO Funding, Ltd.

1.64.   "Highland" means Highland Capital Management, L.P.

1.65.   "Highland Adversary" means Adversary Proceeding No. 18-03078-sgj.

1.66.   "Highland Claim" means all Claims asserted by Highland or any Affiliates of Highland against the Debtors, including any Claim resulting from the termination of the Sub-Advisory Agreement and Shared Services Agreement.

1.67.   "Highland CLOM" means Highland CLO Management, Ltd.

1.68.   "Highland HCF" means Highland HCF Advisors, Ltd.

1.69.   "Impaired" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.70.   "Indentures" refers collectively to the CLO-1 Indenture, the CLO-3 Indenture, the CLO-4 Indenture, the CLO-5 Indenture, and the CLO-6 Indenture.


Appx 02371
014933

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-30   18 Filed 10/56/25230 Page 255 of 1017   PageID 15916
Case 18-30064-sgj11 Doc 880 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 55 of 229

1.71.   "Indenture Trustee" refers to US Bank solely in its capacity as Indenture Trustee under the CLO-1 Indenture, the CLO-3 Indenture, the CLO-4 Indenture, the CLO-5 Indenture and the CLO-6 Indenture, as applicable

1.72.   "Initial Distribution Date," when used with respect to any Contested Claim or Rejection Claim, shall mean the later of (i) the first Business Day at least thirty (30) days after the date on which any such Contested Claim or Rejection Claim becomes an Allowed Claim, or (ii) if the payment terms of Article IV of this Plan applicable to each such Claim specify a different date, then the date as calculated pursuant to the terms of Article IV of this Plan applicable to each such Claim.  The Initial Distribution Date shall be separately determined with respect to each Contested Claim or Rejection Claim based upon the date each such Claim becomes an Allowed Claim.

1.73.   "Insider" means a Person described in section 101(31) of the Bankruptcy Code.

1.74.   "Insider Claim" means any Claim asserted by Insiders of the Debtors, including but not limited to any Claim asserted by Highland or any Affiliate thereof, unless otherwise indicated in the Plan.

1.75.   "Interests" means any equity or stock ownership interest in the Debtors.

1.76.   "Issuers and Co-Issuers" means CLO-1, CLO-3, CLO-4, CLO-5, CLO-6, Acis CLO 2013-1, Acis CLO-2014-3, LLC, Acis CLO 2014-4, LLC, Acis CLO 2014-5, LLC, and Acis 2015-6, LLC.

1.77.   "Lien" means any mortgage, lien, charge, security interest, encumbrance, or other security device of any kind affecting any asset or property of the Debtors contemplated by section 101(37) of the Bankruptcy Code.

1.78.   "Management Fees" shall, when used in relation to any of the Acis CLOs, have the meaning set forth in the applicable Indenture.

1.79.   "Neutra" means Neutra, Ltd.

1.80.   "Objection" means (a) an objection to the allowance of a Claim interposed by any party entitled to do so within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, and (b) as to any Taxing Authority, a proceeding commenced under section 505 of the Bankruptcy Code to determine the legality or amount of any tax.

1.81.   "Objection Deadline" shall mean the later of (a) ninety (90) days following the Effective Date, unless otherwise extended by order of the Bankruptcy Court, or (b) as to any Rejection Claim filed after the Effective Date, ninety (90) days after the date on which the proof of Claim reflecting the Rejection Claim is filed.

1.82.   "Optional Redemption" shall, when used in relation to any of the Acis CLOs, have the meaning set forth in the applicable Indenture.

1.83.   "Person" means any individual, corporation, general partnership, limited partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, government, or any political subdivision thereof or other entity.

Appx 02372
014934

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-30   Exhibit 18   Filed 05/05/25   Page 256 of 1017   PageID 15917
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 56 of 229
Case 18-30264-sgj11 Doc 680 Filed 10/25/18   Entered 10/25/18 18:42:08   Page 56 of 229

1.84.  "Petition Date" means January 30, 2018.

1.85.  "Plan" means this Third Amended Joint Chapter 11 plan, either in its present form or as it may be altered, amended, or modified from time to time.

1.86.  "Plan Documents" means the documents that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court.

1.87.  "Plan Rate" means a rate of interest of five percent (5%) per annum.

1.88.  "PMAs" refers collectively to the CLO-1 PMA, CLO-3 PMA, CLO-4 PMA, CLO-5 PMA, and CLO-6 PMA.

1.89.  "Priority Claim" means a Claim (other than a Claim for an Administrative Expense) to the extent that it is entitled to priority in payment under section 507(a) of the Bankruptcy Code.

1.90.  "Priority Non-Tax Claim" means a Priority Claim other than a Priority Tax Claim.

1.91.  "Priority Tax Claim" means a Claim of a Governmental Unit of the kind specified in subsection 507(a)(8) of the Bankruptcy Code.

1.92.  "Professional" means those persons retained pursuant to an order of the Bankruptcy Court in accordance with sections 327 and 1103 of the Bankruptcy Code.

1.93.  "Pro Rata Distribution" means an optional Distribution made in accordance with section 4.03(c), 4.04(e), or 4.04(i) of the Plan.  Each Creditor entitled to receive a portion of a Pro Rata Distribution shall receive such Creditor's Pro Rata Share of such Distribution.

1.94.  "Pro Rata Share' means, as to the holder of a specific Claim, the ratio that the amount of such holder's Claim bears to the aggregate amount of all Claims included in the particular Class or category in which such holder's Claim is included.

1.95.  "Refinancing Proceeds" shall, when used in relation to any of the Acis CLOs, have the meaning set forth in the applicable Indenture.

1.96.  "Rejection Claim" means a Claim arising under section 502(g) of the Bankruptcy Code as a consequence of the rejection of any Executory Contract or Unexpired Lease.

1.97.  "Reorganized Debtor" refers collectively to the Debtors, as reorganized, acting from and after the Effective Date if the Plan is confirmed based on the terms and provisions herein.

1.98.  "Reserve" or "Reserves" means any reserves set aside by the Reorganized Debtor pursuant to this Plan, including reserves set aside to fund any Distributions, make payments pursuant to the Plan, or pursue the Estate Claims.

1.99.  "Schedules" means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules or statements have been or may be subsequently amended.

1.100.  "Secured Claim" means (a) a Claim secured by a lien on any Assets, which lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law, and which is duly Allowed, but only to the

App. 02373
014935

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-30 18   Filed 06/05/25230 Page 257 of 1017   PageID 15918
Case 18-30264-sgj11   Doc 828 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 57 of 229
Case 18-30264-sgj11   Doc 680 Filed 10/25/18   Entered 10/25/18 18:42:08   Page 57 of 229

extent of the value of the holder's interest in the Collateral that secures payment of the Claim; (b) a Claim against the Debtors that is subject to a valid right of recoupment or setoff under section 553 of the Bankruptcy Code, but only to the extent of the Allowed amount subject to recoupment or setoff as provided in section 506(a) of the Bankruptcy Code; and (c) a Claim deemed or treated under the Plan as a Secured Claim; provided, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as a General Unsecured Claim unless, in any such case the Class of which the Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent Allowed.

1.101. "Secured Tax Claim" means any ad valorem tax Claim that arises or is deemed to have arisen on or before the Petition Date, irrespective of the date on which such Claim is assessed or due.

1.102. "Shared Services Agreement" means that certain Fourth Amended and Restated Shared Services Agreement by and between Acis LP and Highland dated March 17, 2017.

1.103. "Sub-Advisory Agreement" means that certain Third Amended and Restated Sub-Advisory Agreement by and between Acis LP and Highland dated March 17, 2017

1.104. "Subordinated Notes" means the subordinated notes in the Acis CLOs held by HCLOF, and expressly does not include any subordinated notes in the Acis CLOs held by any other party.

1.105. "Substantial Consummation" means the day on which a Creditor first receives a Distribution of any kind under the terms and provisions of the Plan.

1.106. "Taxing Authority" shall include the State of Texas or any subdivision thereof, including without limitation any political subdivision of the State of Texas assessing ad valorem taxes against any of the Assets.

1.107. "Terry" means Joshua N. Terry.

1.108. "Terry Partially Secured Claim" means any Claim asserted against the Debtors by Terry, including as asserted in Proof of Claim No. 1 in both Chapter 11 Cases and Proof of Claim No. 26 against Acis LP.

1.109. "Unclaimed Property" means any cash, Distribution, or any other property of the Debtors unclaimed for a period of one (1) year after the applicable Initial Distribution Date.

1.110. "Unexpired Lease" means any unexpired lease or agreement which is subject to section 365 of the Bankruptcy Code and which is not an Executory Contract.

1.111. "US Bank" means U.S. Bank National Association.

1.112. "Other Acis-Managed Funds" refers collectively to CLO-1, Acis CLO 2013-2, Ltd., Hewitt's Island CLO 1-R, Ltd, and BayVK R2 Lux S.A., SICAV-FIS.

      B.    Interpretation. Unless otherwise specified, all section, article and exhibit references in the Plan are to the respective section in, article of, or exhibit to, the Plan, as the

Appx 02374
014936


Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 18 Filed 05/05230 Page 258 of 1017    PageID 15919
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 50 of 229

same may be amended, waived, or modified from time to time. The headings in the Plan are for convenience and reference only and shall not limit or otherwise affect the provisions hereof. The rules of construction set forth in section 102 of the Bankruptcy Code, other than section 102(5) of the Bankruptcy Code, apply to construction of the Plan. For the purposes of construction of the Plan, "or" is disjunctive.

C.    <u>Other Terms</u>. The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. References herein to "after notice and hearing" or other similar language shall have the same meaning as in section 102(1) of the Bankruptcy Code. Otherwise, a term used herein that is not specifically defined herein shall have the meaning ascribed to that term, if any, in the Bankruptcy Code.

D.    <u>Exhibits and Plan Documents</u>. All Exhibits to the Plan and all Plan Documents are incorporated into the Plan by this reference and are a part of the Plan as if set forth in full herein. Any Plan Documents may be filed with the Clerk of the Bankruptcy Court prior to the commencement of the Confirmation Hearing. Holders of Claims and Interests may obtain a copy of the Plan Documents, once filed, by a written request sent to the following address: Forshey & Prostok, LLP, 777 Main Street, Suite 1290, Fort Worth, Texas 76102, Attention: Linda Breedlove; Fax number (817) 877-4151; email: lbreedlove@forsheyprostok.com.

## ARTICLE II.
## CLASSIFICATION OF CLAIMS AND INTERESTS

2.01.    The following is a designation of the Classes of Claims and Interests under the Plan. Administrative Expenses, Priority Claims of the kinds specified in sections 507(a)(2) and 507(a)(3) of the Bankruptcy Code and Priority Tax Claims have not been classified, are excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code, and their treatment is set forth in Article III of the Plan.  A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class.  A Claim is included in a particular Class only to the extent that the Claim is an Allowed Claim in that Class.

Class 1 – Secured Tax Claims
Class 2 – Terry Partially Secured Claim
Class 3 – General Unsecured Claims
Class 4 – Insider Claims
Class 5 – Interests

2.02.    <u>Impaired Classes of Claims and Interests</u>.  Class 1 is unimpaired.  Classes 2 through 5 are Impaired.

2.03.    <u>Impairment or Classification Controversies</u>. If a controversy arises as to the classification of any Claim or Interest, or as to whether any Class of Claims or Interests is Impaired under the Plan, the Bankruptcy Court shall determine such controversy as a part of the confirmation process.

## ARTICLE III.
## TREATMENT OF UNCLASSIFIED CLAIMS

3.01.    <u>Administrative Expenses</u>

Appx 02375
014937

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 31-20 18 Filed 06/06/25230 Page 259 of 1017   PageID 15920
Case 18-30264-sgj11 Doc 850 Filed 10/25/18   Entered 10/25/18 17:34:06   Page 59 of 229

(a)  The Reorganized Debtor shall pay, in accordance with the ordinary business terms applicable to each such expense or cost, the reasonable and ordinary expenses incurred in operating the Debtors' businesses or administering the Estate before the Effective Date ("Ordinary Course Claims").  The remaining provisions of this section 3.01 shall not apply to the Ordinary Course Claims, except that if there is a dispute relating to any such Ordinary Course Claim, the Reorganized Debtor may move the Bankruptcy Court to apply the provisions of Article III below relating to Contested Claims and require the holder of the Contested Ordinary Course Claim to assert such Claim through the Chapter 11 Cases.

(b)  Each holder of an Allowed Administrative Expense (other than Ordinary Course Claims and Administrative Expense Claims by Estate Professionals), shall receive (i) the amount of such holder's Allowed Administrative Expense in one Cash payment on the later of the Effective Date or the tenth (10th) Business Day after such Administrative Expense becomes an Allowed Administrative Expense, or (ii) such other treatment as may be agreed to in writing by such Administrative Expense Creditor and the Reorganized Debtor, or as otherwise ordered by the Bankruptcy Court.

(c)  Unless the Bankruptcy Court orders to the contrary or the Reorganized Debtor agrees to the contrary in writing, the holder of a Claim for an Administrative Expense, other than such a Claim by an Estate Professional, an Ordinary Course Claim, or an Administrative Expense which is already Allowed, shall file with the Bankruptcy Court and serve upon the Reorganized Debtor and its counsel a written notice of such Claim for an Administrative Expense within thirty (30) days after the Effective Date.  This deadline is the "Administrative Bar Date."  Such notice shall include at a minimum: (i) the name, address, telephone number and fax number (if applicable) or email address of the holder of such Claim, (ii) the amount of such Claim, and (iii) the basis of such Claim.  **Failure to timely and properly file and serve such notice by the Administrative Bar Date shall result in such Claim for an Administrative Expense being forever barred and discharged and the holder thereof shall be barred from receiving any Distribution from the Reorganized Debtor on account of such Claim for an Administrative Expense**.

(d)  A Claim for an Administrative Expense, for which a proper notice was filed and served under subsection 3.01(c) above, shall become an Allowed Administrative Expense if no Objection is filed within thirty (30) days of the filing and service of such notice.  If a timely Objection is filed, the Claim shall become an Allowed Administrative Expense only to the extent allowed by a Final Order.

(e)  The procedures contained in subsections 3.01(a), (c) and (d) above shall not apply to Administrative Expense Claims asserted by Estate Professionals, who shall each file and submit an appropriate final fee application to the Bankruptcy Court no later than sixty (60) days after the Effective Date.  A Claim for an Administrative Expense by an Estate Professional in respect of which a final fee application has been properly filed and served shall become an Allowed Administrative Expense only to the extent Allowed by order of the Bankruptcy Court and, if so Allowed, shall be paid in accordance with subsection 3.01(b) above.  Professional fees and expenses to any Estate Professional incurred on or after the Effective Date may be paid by the Reorganized Debtor without necessity of application to or order by the Bankruptcy Court.

(f)  If the Reorganized Debtor asserts any Estate Claims as counterclaims or defenses to a Claim for Administrative Expense, the Administrative Expense Claim shall be determined through an adversary proceeding before the Bankruptcy Court.  The Bankruptcy

11

014938

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-30 18 Filed 06/06/25 230 Page 260 of 1017   PageID 15921
Case 18-30264-sgj11   Doc 820   Filed 10/25/18   Entered 10/25/18 17:34:06   Page 60 of 229

Court shall have exclusive jurisdiction to adjudicate and Allow all Claims for any Administrative Expense.

3.02.   <u>Priority Non-Tax Claims</u>.  Each holder of an Allowed Priority Non-Tax Claim shall receive (i) the amount of such holder's Allowed Priority Non-Tax Payment in one Cash payment on the later of the Effective Date or the tenth (10th) Business Day after such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim and a determination has been made that such Allowed Priority Non-Tax Claim is not subject to equitable subordination under section 510(c) of the Bankruptcy Code, or (ii) such other treatment as may be agreed to in writing by such Administrative Expense Creditor and the Reorganized Debtor, or as otherwise ordered by the Bankruptcy Court.

3.03.   <u>Priority Tax Claims</u>. Each holder of an Allowed Priority Tax Claim shall receive (a) one Cash payment in an amount equal to the principal amount of such Allowed Priority Tax Claim, plus interest at the rate and in the manner prescribed by applicable state law from the later of the Petition Date or the first day after the last day on which such Priority Tax Claim may be paid without penalty, no later than sixty (60) days after each such Claim becomes an Allowed Claim, or (b) such other treatment as may be agreed to in writing by the holder of the Priority Tax Claim and the Reorganized Debtor.

3.04.   <u>U.S. Trustee's Fees</u>. The Reorganized Debtor shall pay the U.S. Trustee's quarterly fees incurred pursuant to 28 U.S.C. § 1930(a)(6) which are due as of the Confirmation Date in full on the Effective Date or as soon thereafter as is practicable.  After the Confirmation Date, the Reorganized Debtor shall continue to pay quarterly fees as they accrue until a final decree is entered and the Chapter 11 Cases are closed.  The Reorganized Debtor shall file with the Bankruptcy Court and serve on the U.S. Trustee quarterly financial reports for each quarter, or portion thereof, that the Chapter 11 Cases remain open.

**ARTICLE IV.**
**<u>TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS</u>**

4.01.   <u>Class 1 – Secured Tax Claims</u>. Each holder of an Allowed Secured Tax Claim shall receive (a) one Cash payment in an amount equal to the principal amount of such Allowed Secured Tax Claim, plus interest at the rate and in the manner prescribed by applicable state law from the later of the Petition Date or the first day after the last day on which such Secured Tax Claim may be paid without penalty, on the Initial Distribution Date, or (b) such other treatment as may be agreed to in writing by the holder of the Secured Tax Claim and the Reorganized Debtor.  The Liens securing such Secured Tax Claims shall remain unimpaired and unaffected until each such Class 1 Claim is paid in full.  All Distributions on account of Allowed Class 1 Claims shall be made by the Reorganized Debtor.  Class 1 is unimpaired.  Holders of Class 1 Claims are conclusively presumed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

4.02.   <u>Class 2 – Terry Partially Secured Claim</u>.  In exchange for a one million dollar ($1,000,000.00) reduction in the amount of the Terry Partially Secured Claim, Terry shall receive one hundred percent (100%) of the equity interests in the Reorganized Debtor as of the Effective Date.  The remaining balance of any Allowed Terry Partially Secured Claim shall be treated and paid as a Class 3 General Unsecured Claim.  Class 2 is Impaired.  The Holder of the Class 2 Terry Partially Secured Claim is entitled to vote on the Plan.

4.03.   <u>Class 3 – General Unsecured Claims</u>.

Appx 02377
014939

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-30 18 Filed 06/25/230 Page 261 of 1017 PageID 15922
Case 18-30264-sgj11 Doc 860 Filed 10/25/18 Entered 10/25/18 17:34:06 Page 61 of 229

(a)     Each holder of an Allowed General Unsecured Claim shall receive a promissory note issued by the Reorganized Debtor (each an "Unsecured Cash Flow Note") on the later of (a) that date that is as soon as practicable after the Effective Date, or (b) that date that is as soon as practicable after such holder's General Unsecured Claim becomes an Allowed Class 3 Claim.  Each Unsecured Cash Flow Note shall be dated as of the Effective Date, bear interest at the Plan Rate and shall mature on that date that is the three (3) years after the Effective Date.

(b)     To the extent of Available Cash, the Reorganized Debtor shall make substantially equal quarterly Distributions of principal and accrued interest to each holder of an Unsecured Cash Flow Note, with the first such quarterly Distribution being due and payable on the 180th day after the Effective Date.  Thereafter, like Distributions shall be made each quarter by the Reorganized Debtor until the Unsecured Cash Flow Note is paid in full.  Notwithstanding the foregoing, in the event that an Unsecured Cash Flow Note is first issued more than one hundred eighty (180) days after the Effective Date, the first Distribution made on account of such Unsecured Cash Flow Note shall be made upon the date that the next Distribution would otherwise be due, but such first Distribution shall also include amounts that would have been distributed to the holder of such Unsecured Cash Flow Note had such Unsecured Cash Flow Note been issued prior to ninety (90) days after the Effective Date, such that the first Distribution shall bring all payments current on account of such Unsecured Cash Flow Note.  If on any date on which a quarterly Distribution is due to the holder of an Unsecured Cash Flow Note the remaining principal and accrued interest owing on account of such Unsecured Cash Flow Note is less than the regular quarterly Distribution amount, the Reorganized Debtor shall make a Distribution to the holder of such Unsecured Cash Flow Note in an amount sufficient to fully satisfy the remaining principal and accrued interest owed, but no more.  Nothing contained herein shall preclude the Reorganized Debtor from prepaying any Unsecured Cash Flow Note.

(c)     If the Reorganized Debtor obtains additional Cash, through litigation recoveries or otherwise, and the Reorganized Debtor determines, in its sole discretion, that the Reorganized Debtor holds Available Cash sufficient to allow one or more Pro Rata Distributions to be made to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims, the Reorganized Debtor may, but shall not be required to, make one or more Pro Rata Distributions to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims.  The amount of the Pro Rata Distribution made to each such holder shall be determined as if Class 3 and Subclass 4A constituted a single Class.  Any such additional Distributions shall be applied to reduce the outstanding balance of each holder's Unsecured Cash Flow Note.

(d)     Class 3 is Impaired.  Holders of Class 3 Claims are entitled to vote on the Plan.

4.04.   Class 4 – Insider Claims.  Holders of Class 4 Insider Claims shall be treated as follows:

(a)     Class 4 Claims shall be divided into two (2) subclasses.  Subclass 4A shall consist of all Allowed Class 4 claims which are not subject to equitable subordination.  Subclass 4B shall consist of all Class 4 claims which are determined by the Bankruptcy Court to be subject to equitable subordination.  If only a part of a Class 4 Claim is subject to equitable subordination, then the portion of such claim subject to equitable subordination shall be included in Subclass 4B and the remainder not subject to equitable subordination shall be included in Subclass 4A.  Subclass 4A and Subclass 4B will vote separately on the Plan, although Subclass 4B is currently an empty class.

Appx. 02878
014940

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 18 Filed 06/25/30 Page 262 of 1017   PageID 15923
Case 18-30264-sgj11 Doc 820 Filed 01/21/19   Entered 01/21/19 17:34:06   Page 62 of 229

(b)     All Class 4 Claims (regardless of which subclass) shall be and remain subject to all Estate Defenses and all Estate Claims, including any rights of offset, recoupment, and/or to an affirmative recovery against the Holder of any Class 4 Claim.

(c)     Each holder of an Allowed Subclass 4A Claim shall receive an Unsecured Cash Flow Note on the later of (a) that date that is as soon as practicable after the Effective Date, or (b) that date that is as soon as practicable after such holder's Subclass 4A Claim becomes an Allowed Subclass 4A Claim.  Each Unsecured Cash Flow Note shall be dated as of the Effective Date, bear interest at the Plan Rate and shall mature on that date that is the three (3) years after the Effective Date.

(d)     To the extent of Available Cash, the Reorganized Debtor shall make substantially equal quarterly Distributions of principal and accrued interest to each holder of an Unsecured Cash Flow Note, with the first such quarterly Distribution being due and payable on the 180th day after the Effective Date.  Thereafter, like Distributions shall be made each quarter by the Reorganized Debtor until the Unsecured Cash Flow Note is paid in full.  Notwithstanding the foregoing, in the event that an Unsecured Cash Flow Note is first issued more than one hundred eighty (180) days after the Effective Date, the first Distribution made on account of such Unsecured Cash Flow Note shall be made upon the date that the next Distribution would otherwise be due, but such first Distribution shall also include amounts that would have been distributed to the holder of such Unsecured Cash Flow Note had such Unsecured Cash Flow Note been issued prior to ninety (90) days after the Effective Date, such that the first Distribution shall bring all payments current on account of such Unsecured Cash Flow Note.  If on any date on which a quarterly Distribution is due to the holder of an Unsecured Cash Flow Note the remaining principal and accrued interest owing on account of such Unsecured Cash Flow Note is less than the regular quarterly Distribution amount, the Reorganized Debtor shall make a Distribution to the holder of such Unsecured Cash Flow Note in an amount sufficient to fully satisfy the remaining principal and accrued interest owed, but no more.  Nothing contained herein shall preclude the Reorganized Debtor from prepaying any Unsecured Cash Flow Note.

(e)     If the Reorganized Debtor obtains additional Cash, through litigation recoveries or otherwise, and the Reorganized Debtor determines, in its sole discretion, that the Reorganized Debtor holds Available Cash sufficient to allow one or more Pro Rata Distributions to be made to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims, the Reorganized Debtor may, but shall not be required to, make one or more Pro Rata Distributions to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims.  The amount of the Pro Rata Distribution made to each such holder shall be determined as if Class 3 and Subclass 4A constituted a single Class.  Any such additional Distributions shall be applied to reduce the outstanding balance of each holder's Unsecured Cash Flow Note.

(f)     Unless otherwise provided by Order of the Bankruptcy Court, holders of Allowed Subclass 4B claims shall not be entitled to any Distribution from the Reorganized Debtor until all Allowed Claims included in Classes 1 through 3 and Subclass 4A, including all Unsecured Cash Flow Notes, have been paid in full.

(g)     Holders of Allowed Subclass 4B Claims shall receive a subordinated promissory note issued by the Reorganized Debtor ("Subordinated Unsecured Cash Flow Note") on the later of (a) that date that is as soon as practicable after the Effective Date, or (b) that date that is as soon as practicable after such holder's Subclass 4A Claim becomes an Allowed Subclass 4A Claim.  Each Subordinated Unsecured Cash Flow Note shall be dated as of the Effective Date, bear interest at the Plan Rate and shall mature on the earlier to occur of (i) the date that is two

0149941
Appx 02870

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 35-20   18   Filed 06/06/25   Page 263 of 1017   PageID 15924
Case 18-30264-sgj11   Doc 820   Filed 10/25/18   Entered 10/25/18 17:34:06   Page 63 of 229

(2) years after the date all Unsecured Cash Flow Notes have been paid in full, or (ii) five (5) years after the Effective Date.

(h)     To the extent of Available Cash, the Reorganized Debtor shall make substantially equal quarterly Distributions of principal and accrued interest to each holder of a Subordinated Unsecured Cash Flow Note, with the first such quarterly Distribution being due and payable on the 90th day after the payment in full of the Unsecured Cash Flow Notes.  Thereafter, like Distributions shall be made each quarter by the Reorganized Debtor until the Subordinated Unsecured Cash Flow Note is paid in full.  Notwithstanding the foregoing, in the event that a Subordinated Unsecured Cash Flow Note is first issued after payments have been made on one or more other Subordinated Unsecured Cash Flow Notes, the first Distribution made on account of such Subordinated Unsecured Cash Flow Note shall be made upon the date that the next Distribution would otherwise be due, but such first Distribution shall also include amounts that would have been distributed to the holder of such Subordinated Unsecured Cash Flow Note had such Subordinated Unsecured Cash Flow Note been issued at the time the first payment on any Subordinated Unsecured Cash Flow Note was made, such that the first Distribution shall bring all payments current on account of such Subordinated Unsecured Cash Flow Note.  If on any date on which a quarterly Distribution is due to the holder of a Subordinated Unsecured Cash Flow Note the remaining principal and accrued interest owing on account of such Subordinated Unsecured Cash Flow Note is less than the regular quarterly Distribution amount, the Reorganized Debtor shall make a Distribution to the holder of such Subordinated Unsecured Cash Flow Note in an amount sufficient to fully satisfy the remaining principal and accrued interest owed, but no more.  Nothing contained herein shall preclude the Reorganized Debtor from prepaying any Subordinated Unsecured Cash Flow Note.

(i)     Subject to section 4.04(f) above, if the Reorganized Debtor obtains additional Cash, through litigation recoveries or otherwise, and the Reorganized Debtor determines, in its sole discretion, that the Reorganized Debtor holds Available Cash sufficient to allow one or more Pro Rata Distributions to be made to holders of Allowed Subclass 4B Claims, the Reorganized Debtor may, but shall not be required to, make one or more Pro Rata Distributions to holders of Allowed Subclass 4B Claims.  Any such additional Distributions shall be applied to reduce the outstanding balance of each holder's Subordinated Unsecured Cash Flow Note.

(j)     The Reorganized Debtor may establish appropriate Reserves as to any Contested Claim included in Class 4.

(k)     Class 4 is Impaired.  Holders of Class 4 Claims are entitled to vote on the Plan.

4.05.   Class 5 – Interests.  All Interests in the Debtors shall be extinguished and shall cease to exist as of the Effective Date. The holders of such Interests shall not receive or retain any property on account of such Interests under the Plan.  Class 5 is Impaired.  Holders of Class 5 Interests are conclusively presumed to have rejected the Plan and, accordingly, are not entitled to vote on the Plan.

**ARTICLE V.**
**ACCEPTANCE OR REJECTION OF THE PLAN**

5.01.   Classes Entitled to Vote.  Creditors in Classes 2 through 4 are entitled to vote and shall vote separately to accept or reject the Plan.  Any unimpaired Class shall not be entitled to vote to accept or reject the Plan.  Any unimpaired Class is deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

Appx. 02880
014942

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 18   Filed 06/05/25   Page 264 of 1017   PageID 15925
Case 18-30264-sgj11   Doc 830   Filed 10/25/18   Entered 10/25/18 17:34:06   Page 64 of 229

5.02.   <u>Class Acceptance Requirement</u>. A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan.

5.03.   <u>Cramdown</u>. This section shall constitute the request by the Plan proponent, pursuant to section 1129(b) of the Bankruptcy Code, that the Bankruptcy Court confirm the Plan notwithstanding the fact that the requirements of section 1129(a)(8) of the Bankruptcy Code have not been met.

**ARTICLE VI.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

6.01.   <u>Vesting of Assets</u>. As of the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets, including the PMAs, all Cash, Estate Accounts Receivable, Estate Insurance, Estate Claims and Estate Defenses, shall be transferred from the Estate to, and vested in, the Reorganized Debtor, free and clear of all rights, title, interests, claims, liens, encumbrances and charges, except as expressly set forth in the Plan.  On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for all fees, disbursements, expenses or related support services of Professionals (including fees relating to the preparation of professional fee applications) without application to, or approval of, the Bankruptcy Court.

6.02.   <u>Continued Existence of the Debtors</u>.  The Debtors shall continue to exist after the Effective Date, with all the powers available to such legal entities, in accordance with applicable law and pursuant to their constituent documents.  On or after the Effective Date, each Reorganized Debtor may, within its sole and exclusive discretion, take such action as permitted by applicable law and its constituent documents as it determines is reasonable and appropriate.

6.03.   <u>Retention and Assertion of Causes of Action and Defenses</u>.

   (a)   Except as expressly set forth in this Plan, all causes of action, claims, counterclaims, defenses and rights of offset or recoupment (including but not limited to all Estate Claims, Estate Defenses and Avoidance Actions) belonging to the Debtors (collectively, the "<u>Retained Causes of Action</u>") shall, upon the occurrence of the Effective Date, be reserved, retained and preserved for, and transferred to, received by and vested, in the Reorganized Debtor for the benefit of the Debtors and the Debtors' estates.  Without limitation, the Retained Causes of Action include the claims and causes of action described on **Exhibit A** attached hereto.

   (b)   Except as expressly set forth in this Plan, the rights of the Reorganized Debtor to commence, prosecute or settle the Retained Causes of Action shall be retained, reserved, and preserved notwithstanding the occurrence of the Effective Date. **No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any cause of action against them as any indication that the Debtors or the Reorganized Debtor will not pursue any and all available causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) against them. The Debtors and their Estate expressly reserve all rights to prosecute any and all of the Retained Causes of Action (including all**

16

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 18   Filed 06/06/25   Page 265 of 1017   PageID 15926
Case 18-30264-sgj11   Doc 820   Filed 10/25/18   Entered 10/25/18 17:34:06   Page 65 of 229

**Estate Claims, Estate Defenses and Avoidance Actions) against any Person, except as otherwise provided in this Plan**. Unless any causes of action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in this Plan or a Final Order, the Debtors expressly reserve all causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) for later adjudication, and, therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such causes of action upon or after the confirmation or consummation of the Plan. The Debtors and the Reorganized Debtor may also assert Estate Defenses as a defense to the allowance of any Claim not otherwise Allowed.

6.04.    Assumption of Obligations to Make Distributions.  The Reorganized Debtor shall be deemed to have assumed the obligations to make all Distributions pursuant to this Plan.

6.05.    Actions by the Debtors and the Reorganized Debtor to Implement Plan.  The entry of the Confirmation Order shall constitute all necessary authorization for the Debtors and the Reorganized Debtor to take or cause to be taken all actions necessary or appropriate to consummate, implement or perform all provisions of this Plan on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including without limitation, (a) all transfers of Assets, including to the Reorganized Debtor, that are to occur pursuant to the Plan; (b) the cancellation of Interests and issuance of 100% of the equity interests in the Reorganized Debtor to Terry; (c) the performance of the terms of the Plan and the making of all Distributions required under the Plan; and (d) subject to the terms of the Plan, entering into any and all transactions, contracts, or arrangements permitted by applicable law, order, rule or regulation.

6.06.    Termination of Highland as Shared Services Provider and Sub-Advisor.  The Bankruptcy Court authorized the Chapter 11 Trustee to terminate the Shared Services Agreement and Sub-Advisory Agreement and engage Brigade to perform the services previously provided by Highland.  The Shared Services Agreement and Sub-Advisory Agreement were terminated by the Chapter 11 Trustee on or about August 1, 2018, and the services previously performed by Highland were transitioned to Brigade on an interim basis.  Brigade has agreed to continue to provide shared services and sub-advisory services to the Reorganized Debtor with respect to the Acis CLOs and the Other Acis-Managed Funds (and any reset Acis CLOs) subject to a minimum two (2) year term unless otherwise agreed as between the Reorganized Debtor and Brigade.  Consequently, any agreement between the Reorganized Debtor and Brigade shall provide that Brigade cannot be removed without cause for a period of two (2) years except as may be otherwise agreed as between the Reorganized Debtor and Brigade.

6.07.    Continued Portfolio Management by the Reorganized Debtor.  The PMAs and any other Executory Contracts and Unexpired Leases identified on Exhibit B to the Plan or in the Confirmation Order shall be assumed and the Reorganized Debtor shall, from an after the Effective Date, serve as the portfolio manager with respect to the Acis CLOs and the Other Acis-Managed Funds (and any reset Acis CLOs).  Consistent with Section 15 of the PMAs, the Reorganized Debtor may only be removed as portfolio manager under the assumed PMAs for cause as set forth in the PMAs.

6.08.    Reset of the Acis CLOs.  HCLOF has maintained that it desires to reset the Acis CLOs. The Reorganized Debtor, with the assistance of Brigade as its shared services provider and sub-advisor, is prepared to promptly seek to perform such reset transactions as set forth herein.

Appx. 02882
0714944

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-30   Exhibit 18   Filed 06/06/25   Page 266 of 1017   PageID 15927
Case 18-30264-sgj11   Doc 829   Filed 10/25/18   Entered 10/25/18 17:34:06   Page 66 of 229

HCLOF shall have the right to submit one or more notice(s) of Optional Redemption solely for the purpose of effectuating a reset of one or more of the Acis CLOs under this section 6.08 of the Plan utilizing Refinancing Proceeds (a "Reset Optional Redemption") for each of the Acis CLOs. If HCLOF requests a Reset Optional Redemption of an Acis CLO, the Reorganized Debtor, with the assistance of Brigade, shall thereafter seek to reset the Acis CLOs, either consecutively or simultaneously, in its good faith business judgment and consistent with then-prevailing market terms; *provided, however,* (i) the Management Fees to be charged by the Reorganized Debtor to any reset Acis CLOs shall remain the same going forward and shall not be increased, and no transaction fee shall be charged by the Reorganized Debtor (other than, for avoidance of doubt, transaction expense reimbursements consistent with market standards), and (ii) HCLOF shall be granted a right of first refusal for any funding of debt or equity required to effectuate a reset of each of the Acis CLOs. The terms of the Indentures shall control any Reset Optional Redemption. If HCLOF elects not to reset one or more of the Acis CLOs, then the Acis CLOs will continue to be managed in accordance with market standards.

6.09.   Post-Effective Date Service List. Pleadings filed by any party-in-interest with the Bankruptcy Court after the Effective Date shall be served on the following Persons (collectively the "Service List"): (a) any Person directly affected by the relief sought in the pleading, (b) the U.S. Trustee, (c) parties which have filed a Notice of Appearance in the Chapter 11 Cases, and (d) the Reorganized Debtor.

6.10.   Section 505 Powers. All rights and powers pursuant to section 505 of the Bankruptcy Code are hereby reserved to the Estate and shall be transferred to, and vested in, the Reorganized Debtor as of the Effective Date.

6.11.   Section 510(c) Powers. All rights and powers to seek or exercise any right or remedy of equitable subordination are hereby reserved to the Estate and shall be transferred to, and vested in, the Reorganized Debtor as of the Effective Date as an Estate Defense.

6.12.   Section 506(c) Powers. The Estate hereby reserves all rights and powers pursuant to section 506(c) of the Bankruptcy Code, and all such rights shall be specifically transferred to, and vested in, the Reorganized Debtor.

6.13.   Plan Injunction. The Reorganized Debtor shall each have full power, standing and authority to enforce the Plan Injunction against any Person, either through an action before the Bankruptcy Court or any other tribunal having appropriate jurisdiction.

6.14.   Cancellation of Interests. Except as otherwise specifically provided herein, upon the Effective Date of the Plan: (a) all Interests in the Debtors shall be cancelled; and (b) all obligations or debts of, or Claims against, the Debtors on account of, or based upon, the Interests shall be deemed as cancelled, released and discharged, including all obligations or duties by the Debtors relating to the Interests in any of their respective formation documents, including Acis LP's limited partnership agreement and bylaws, Acis GP's articles of formation and company agreement, or any similar formation or governing documents.

**ARTICLE VII.**
**PROVISIONS GOVERNING DISTRIBUTION**

7.01.   Distributions from Reorganized Debtor. The Reorganized Debtor shall be responsible for making Distributions to holders of Allowed Claims only to the extent this Plan requires Distributions to be made by the Reorganized Debtor. The priority of Distributions from the

Appx 02888
014945

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 18   Filed 06/06/25   Page 267 of 1017   PageID 15928
Case 18-30264-sgj11   Doc 820   Filed 10/25/18   Entered 10/25/18 17:34:06   Page 67 of 229

Reorganized Debtor shall be in accordance with the terms of this Plan and the Confirmation Order as follows:

      (a)    <u>First</u>, to satisfy Allowed Class 1 Secured Tax Claims;

      (b)    <u>Second</u>, to satisfy Allowed Administrative Expenses and Allowed Priority Claims in accordance with Article III above, including all U.S. Trustee quarterly fees due and owing as of the Effective Date;

      (c)    <u>Third</u>, to make Distributions to holders of any Allowed Class 3 General Unsecured Claims and Allowed Subclass 4A Claims; and

      (e)    <u>Fourth</u>, to make Distributions to holders of any Allowed Subclass 4B Claims

7.02.  <u>Reserves</u>.  The Reorganized Debtor may estimate, create and set aside Reserves as may be necessary or appropriate, including without limitation, Reserves on account of Contested Claims.  The Reorganized Debtor may, but shall not be required to, move the Bankruptcy Court to approve: (a) the amount of, and terms on which, such Reserves shall be held, maintained and disbursed, or (b) the amount and timing of any proposed interim Distribution to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims.  The Reorganized Debtor may elect to seek approval by the Bankruptcy Court for the creation and amount of any Reserves or regarding the amount or timing of any Distribution on account of any Allowed Claims.  Except as otherwise expressly provided herein, the Reorganized Debtor, in the exercise of its good faith business judgment, may transfer funds out of any of the Reserves as necessary or appropriate.  However, the Reorganized Debtor shall not be required to create separate accounts for such Reserves which may be created and memorialized by entries or other accounting methodologies, which may be revised from time-to-time, to enable the Reorganized Debtor to determine the amount of Cash available for Distributions under the Plan. Subject to any specific deadlines set forth herein, the Reorganized Debtor, shall determine, from time-to-time, in the exercise of the Reorganized Debtor's good faith business judgment: (x) the amount of Cash available for Distribution, (y) the timing of any Distributions, and (z) the amount and creation of any Reserves for Contested Claims.  The Reorganized Debtor shall not be entitled to reserve for, and this section 7.02 does not apply to, Distributions to holders of Allowed Subclass 4B Claims.

7.03.  <u>Prosecution and Settlement of Estate Claims</u>.  Upon the Effective Date, the Reorganized Debtor (a) shall automatically be substituted in place of the Chapter 11 Trustee as the party representing the Estate in respect of any pending lawsuit, motion or other pleading pending before the Bankruptcy Court or any other tribunal, and (b) is authorized to file a notice on the docket of each adversary proceeding or the Chapter 11 Cases regarding such substitution.  The Reorganized Debtor shall have exclusive standing and authority to prosecute, settle or compromise Estate Claims for the benefit of the Estate in the manner set forth in this Plan.

7.04.  <u>Plan Injunction</u>.  The Reorganized Debtor shall be entitled to the full protection and benefit of the Plan Injunction and shall have standing to bring any action or proceeding necessary to enforce the Plan Injunction against any Person.

7.05.  <u>Relief from the Bankruptcy Court</u>.  The Reorganized Debtor shall be authorized to seek relief from the Bankruptcy Court or any other tribunal having jurisdiction as to any matter relating or pertaining to the consummation, administration or performance of this Plan, including without

Appx 02884
0114946

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-20   Filed 06/05/25   Page 268 of 1017   PageID 15929
Case 18-30264-sgj11 Doc 820 Filed 10/25/18   Entered 10/25/18 17:34:06   Page 60 of 229

limitation seeking any relief from the Bankruptcy Court which the Reorganized Debtor deems necessary or appropriate to the performance of its duties or the administration of this Plan.

## ARTICLE VIII.
## SOURCE OF DISTRIBUTIONS

8.01.   <u>Source of Distributions</u>.  All Distributions under this Plan shall be made by the Reorganized Debtor in the manner provided in this Plan and the Confirmation Order.

8.02.   <u>Timing and Amount of Distributions</u>.  No Distribution shall be made on account of any Claim until such Claim is Allowed, except as otherwise set forth in this Plan or otherwise ordered by the Bankruptcy Court.  No Distribution shall be made on account of any Contested Claim until such Claim is Allowed.  Except as expressly set forth in the Plan or in the Confirmation Order, the Reorganized Debtor shall, in the exercise of its good faith business judgment, determine the timing and amount of all Distributions which are required to be made under the Plan, consistent with the goal of making such Distributions as expeditiously as reasonably possible.  The Reorganized Debtor may, but shall not be required to, seek approval of, or any other appropriate relief from, the Bankruptcy Court with respect to any of such Distributions.  Any Unclaimed Property may be paid into the registry of the Bankruptcy Court or otherwise distributed in accordance with the orders of the Bankruptcy Court.

8.03.   <u>Means of Cash Payment</u>.  Cash payments pursuant to this Plan shall be made by check drawn on, or by wire transfer from, a domestic bank, or by other means agreed to by the payor and payee.

8.04.   <u>Record Date for Distributions</u>.  As of the close of business on the Effective Date (the "<u>Distribution Record Date</u>"), the register for Claims will be closed, and there shall be no further changes in the holders of record of any Claims.  Although there is no prohibition against the transfer of any Claim by any Creditor, the Reorganized Debtor shall have no obligation to recognize any transfer of a Claim occurring after the Distribution Record Date, and the Reorganized Debtor shall instead be authorized and entitled to recognize and deal for all purposes under this Plan, including for the purpose of making all Distributions, with only those holders of Claims so reflected as of the Distribution Record Date.  However, the Reorganized Debtor may, in the exercise of its good faith business judgment, agree to recognize transfers of Claims after the Distribution Record Date, but shall have no obligation to do so.

8.05.   <u>Delivery of Distributions</u>.  All Distributions, deliveries and payments to the holders of any Allowed Claims shall be made to the addresses set forth on the respective proofs of Claim filed in the Chapter 11 Cases by such Claimants or, if the Distribution is to be made based on a Claim reflected as Allowed in the Schedules, at the address reflected in the Schedules.  Any such Distribution, delivery or payment shall be deemed as made for all purposes relating to this Plan when deposited in the United States Mail, postage prepaid, addressed as required in the preceding sentence.  If any Distribution is returned as undeliverable, no further Distribution shall be made on account of such Allowed Claim unless and until the Reorganized Debtor is notified of such holder's then current address, at which time all missed Distributions shall be made to the holder of such Allowed Claim.  However, all notices to the Reorganized Debtor reflecting new or updated addresses for undeliverable Distributions shall be made on or before one hundred twenty (120) days after the date of the attempted Distribution or such longer period as the Reorganized Debtor may fix in the exercise of its sole discretion.  After such date, all Unclaimed Property shall revert to the Reorganized Debtor and the Claim of any holder with respect to such property shall be discharged and forever barred.

Appx. 02885
0′14947

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 18   Filed 07/06/25   Page 269 of 1017   PageID 15930
Case 18-30264-sgj11   Doc 820   Filed 10/25/18   Entered 10/25/18 17:34:06   Page 69 of 229

8.06.   <u>W-9 Forms</u>.  Each holder of an Allowed Claim must provide a W-9 form or other such necessary information to comply with any withholding requirements of any Governmental Unit (collectively the "<u>W-9 Form</u>") to the Reorganized Debtor prior to receiving any Distribution from the Reorganized Debtor.  In the event a holder of an Allowed Claim does not provide a W-9 Form to the Reorganized Debtor within thirty (30) days of the Effective Date, the Reorganized Debtor shall, at an appropriate time, issue a written request to each holder of an Allowed Claim that has not previously provided a W-9 Form to the Reorganized Debtor.  The request shall be in writing and shall be delivered to the last address known to the Debtors or Reorganized Debtor, as appropriate.  The request shall conspicuously advise and disclose that failure to provide a W-9 Form to the Reorganized Debtor within thirty (30) days shall result in a waiver of any right or rights to a Distribution from the Reorganized Debtor.  In the event any holder of an Allowed Claim fails to provide the Reorganized Debtor with a W-9 Form within thirty (30) days after the date of written request described herein, then the holder of such Allowed Claim shall be deemed to have waived the right to receive any Distribution whatsoever from the Reorganized Debtor.

8.07.   <u>Time Bar to Cash Payments</u>.  Checks issued in respect of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the issuer of the check by the holder of the Allowed Claim with respect to which such check originally was issued.  Any Claim in respect of such a voided check shall be made on or before one hundred twenty (120) days after the date of issuance of such check or such longer period as the Reorganized Debtor may fix.  After such date, all Claims in respect of void checks shall be discharged and forever barred.

8.08.   <u>Cure Period</u>.  Except as otherwise set forth herein, the failure by the Reorganized Debtor to timely perform any term, provision or covenant contained in this Plan, or to make any payment or Distribution required by this Plan to any Creditor, or the failure to make any payment or perform any covenant on any note, instrument or document issued pursuant to this Plan, shall not constitute an event of default unless and until the Reorganized Debtor has been given thirty (30) days written notice of such alleged default in the manner provided in this Plan, and provided an opportunity to cure such alleged default.  Until the expiration of such thirty (30) day cure period, the Reorganized Debtor shall not be in default, and performance during such thirty (30) day cure period shall be deemed as timely for all purposes.  Such written notice and passage of the thirty (30) day cure period shall constitute conditions precedent to declaring or claiming any default under this Plan or bringing any action or legal proceeding by any Person to enforce any right granted under this Plan.

8.09.   <u>Pre-Payment of Claims</u>. Unless the Plan expressly prohibits or conditions the pre-payment of an Allowed Claim, the Reorganized Debtor may pre-pay any Allowed Claim in whole or in part at any time and may do so without penalty.

8.10.   <u>Distributions after Substantial Consummation</u>.  All Distributions of any kind made to any Creditor after Substantial Consummation and any and all other actions taken under this Plan after Substantial Consummation shall not be subject to relief, reversal or modification by any court unless the implementation of the Confirmation Order is stayed by an order granted under Bankruptcy Rule 8005.

Appx 02886
014948

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-30   18 Filed 07/05/25230   Page 270 of 1017   PageID 15931
Case 18-30264-sgj11   Doc 829   Filed 10/31/18   Entered 10/25/18 17:34:06   Page 72 of 229

## ARTICLE IX.
## <u>RETENTION OF ESTATE CLAIMS AND ESTATE DEFENSES.</u>

9.01.   <u>Retention of Estate Claims</u>.  Except as otherwise specifically provided in this Plan, pursuant to section 1123(b)(3) of the Bankruptcy Code, all Estate Claims shall be transferred to, and vested in, the Reorganized Debtor, both for purposes of seeking an affirmative recovery against any Person and for the purposes of offset, recoupment or defense against any Claim asserted against the Estate or Reorganized Debtor.  All Estate Claims shall be deemed to have been transferred to, and vested in, the Reorganized Debtor as of the Effective Date based on the entry of the Confirmation Order.

Without limiting the effectiveness or generality of the foregoing reservation, out of an abundance of caution, the Debtors and the Estate hereby specifically reserves, retains, and preserves the Estate Claims reflected in the attached **Exhibit A**.  Reference is here made to **Exhibit A** which constitutes an integral part of this Plan.  The provisions of this Article of the Plan, as well as the descriptions and disclosures relating to the Estate Claims in the Disclosure Statement, are provided in the interest of providing maximum disclosure of the Estate Claims of which Debtors are presently aware and shall not act as a limitation on the potential Estate Claims that may exist.  It is the specific intention of this Plan that all Avoidance Actions and all associated remedies, and any other Estate Claims, whether arising before or after the Petition Date, and whether arising under the Bankruptcy Code or applicable state or federal non-bankruptcy laws, shall all be reserved, retained and preserved under this Plan to be transferred to, and vested in, the Reorganized Debtor.  All Estate Claims are reserved, retained and preserved both as causes of action for an affirmative recovery and as counterclaims and for the purposes of offset or recoupment against any Claims asserted against the Estate.

9.02.   <u>Retention of Estate Defenses</u>.  Except as otherwise specifically provided in this Plan, pursuant to section 1123(b)(3) of the Bankruptcy Code, all Estate Defenses shall be transferred to, and vested in, the Reorganized Debtor.  For this purpose, all Estate Defenses are hereby reserved, retained and preserved by the Debtors and the Estate, including without limitation all such Estate Defenses available to the Estate pursuant to section 558 of the Bankruptcy Code, and shall be deemed as transferred to, and vested in, the Reorganized Debtor as of the Effective Date based on the entry of the Confirmation Order.

9.03.   <u>Assertion of Estate Claims and Estate Defenses</u>.  The Reorganized Debtor shall have, and be vested with, the exclusive right, authority and standing to assert all Estate Claims and Estate Defenses for the benefit of the Reorganized Debtor.

## ARTICLE X.
## <u>PROCEDURES FOR RESOLVING AND TREATING</u>
## <u>CONTESTED AND CONTINGENT CLAIMS</u>

10.01.  <u>Claims Listed in Schedules as Disputed</u>.  Any General Unsecured Claim which is listed in the Schedules as unliquidated, contingent or disputed, and for which no proof of Claim has been timely filed, shall be considered as Disallowed as of the Effective Date without the necessity of any further action by the Reorganized Debtor or further order of the Bankruptcy Court other than the entry of the Confirmation Order.

10.02.  <u>Responsibility for Objecting to Claims and Settlement of Claims</u>.  The Reorganized Debtor shall have the exclusive standing and authority to either object to any Claim or settle and compromise any Objection to any Claim, including as follows:

Appx. 02887
014949

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-30 18   Filed 07/03/25 230   Page 271 of 1017   PageID 15932
Case 18-30264-sgj11   Doc 820   Filed 10/25/18   Entered 10/25/18 17:34:06   Page 73 of 229

       (a)     From and after the Effective Date, the Reorganized Debtor shall have the sole and exclusive right to (i) file, settle, or litigate to Final Order any Objections to any Claims; and (ii) seek to subordinate any Claim.  Any Contested Claim may be litigated to Final Order by the Reorganized Debtor; and

       (b)     From and after the Effective Date, the Reorganized Debtor shall have the sole and exclusive right to settle, compromise or otherwise resolve any Contested Claim without the necessity of any further notice or approval of the Bankruptcy Court.  Bankruptcy Rule 9019 shall not apply to any settlement or compromise of a Contested Claim after the Effective Date.

10.03.  <u>Objection Deadline</u>.  All Objections to Claims shall be served and filed by the Objection Deadline; <u>provided, however</u>, the Objection Deadline shall not apply to Claims which are not reflected in the claims register, including any alleged informal proofs of Claim.  The Reorganized Debtor may seek to extend the Objection Deadline pursuant to a motion filed on or before the then applicable Objection Deadline with respect to any Claim.  Any such motion may be granted without notice or a hearing.  In the event that the Reorganized Debtor files such a motion and the Bankruptcy Court denies such motion, the Objection Deadline shall nevertheless be automatically extended to that date which is ten (10) Business Days after the date of entry of the Bankruptcy Court's order denying such motion.  Any proof of Claim other than one based upon a Rejection Claim and which is filed more than thirty (30) days after the Effective Date shall be of no force and effect and need not be objected to by the Reorganized Debtor.  Nothing contained herein shall limit the right of the Reorganized Debtor to object to Claims, if any, filed or amended after the Objection Deadline.

10.04.  <u>Response to Claim Objection</u>.  If the Reorganized Debtor files an Objection to any Claim, then the holder of such Claim shall file a written response to such Objection within twenty-four (24) days after the filing and service of the Objection upon the holder of the Contested Claim.  Each such Objection shall contain appropriate negative notice advising the Creditor whose Claim is subject to the Objection of the requirement and time period to file a response to such Objection and that, if no response is timely filed to the Objection, the Bankruptcy Court may enter an order that such Claim is Disallowed without further notice or hearing.  The negative notice language in the Objection shall satisfy the notice requirement in section 3007(a) of the Bankruptcy Rules, and the Reorganized Debtor shall not be required to send a separate notice of the Objection to the Creditor whose Claim is subject to the Objection.

10.05.  <u>Distributions on Account of Contested Claims</u>.  If a Claim is Contested, then the dates for any Distributions as to such Contested Claim shall be determined based upon its date of Allowance, and thereafter Distribution shall be made on account of such Allowed Claim pursuant to the provisions of the Plan.  No Distribution shall be made on account of a Contested Claim until Allowed.  Until such time as a contingent Claim becomes fixed and absolute by a Final Order Allowing such Claim, such Claim shall be treated as a Contested Claim for purposes of estimates, allocations, and Distributions under the Plan.  Any contingent right to contribution or reimbursement shall continue to be subject to section 502(e) of the Bankruptcy Code.

10.06.  <u>No Waiver of Right to Object</u>.  Except as expressly provided in this Plan, nothing contained in the Disclosure Statement, this Plan, or the Confirmation Order shall waive, relinquish, release or impair the Reorganized Debtor's right to object to any Claim.

10.07.  <u>Offsets and Defenses</u>.  The Reorganized Debtor shall be vested with and retain all Estate Claims and Estate Defenses, including without limitation all rights of offset or recoupment and all counterclaims against any Claimant holding a Claim.  Assertion of counterclaims by the


Appx 02388
014950

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-30   Filed 06/05/230   Page 272 of 1017   PageID 15933
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 72 of 229
Case 18-30264-sgj11   Doc 860   Filed 10/25/18   Entered 10/25/18 18:32:08   Page 24 of 422

Reorganized Debtor against any Claim asserted against the Estate or Reorganized Debtor shall constitute "core" proceedings.

10.08.  <u>Claims Paid or Reduced Prior to Effective Date</u>.  Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by the Debtors prior to the Effective Date, including pursuant to orders of the Bankruptcy Court.  To the extent such payments are not reflected in the Schedules, such Schedules will be deemed amended and reduced to reflect that such payments were made.  Nothing in the Plan shall preclude the Debtors or the Reorganized Debtor from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

### ARTICLE XI.
### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

11.01.  <u>Assumption and Rejection of Executory Contracts</u>.  All Executory Contracts and Unexpired Leases of the Debtors shall be deemed rejected by the Debtors upon the Effective Date unless an Executory Contract or Unexpired Lease (a) has been previously assumed or rejected pursuant to an order of the Bankruptcy Court, (b) is identified in **Exhibit B** to this Plan and/or the Confirmation Order to be (i) assumed or (ii) assumed and assigned, or (c) is the subject of a motion to assume filed on or before the Confirmation Date. The Plan shall constitute a motion to reject all Executory Contracts and Unexpired Leases except as stated in this paragraph.  However, the Debtors may file a separate motion for the assumption or rejection of any Executory Contract or Unexpired Lease at any time through the Confirmation Date.

11.02.  <u>Cure Payments</u>.  All payments that may be required by section 365(b)(1) of the Bankruptcy Code to satisfy any Cure Claim shall be made by the Reorganized Debtor as soon as reasonably practical after the Effective Date or upon such terms as may be otherwise agreed between the Reorganized Debtor and the holder of such Cure Claim; *provided, however*, in the event of a dispute regarding the amount of any Cure Claim, the cure of any other defaults, or any other matter pertaining to assumption or assignment of an Executory Contract, the Reorganized Debtor shall make such cure payments and cure such other defaults, all as may be required by section 365(b)(1) of the Bankruptcy Code, following the entry of a Final Order by the Bankruptcy Court resolving such dispute.

11.03.  <u>Bar to Rejection Claims</u>.  Except as otherwise ordered by the Bankruptcy Court, any Rejection Claim based on the rejection of an Executory Contract or Unexpired Lease shall be forever barred and shall not be enforceable against the Reorganized Debtor or the Reorganized Debtor's assets unless a proof of Claim is filed with the Bankruptcy Court and served upon the Reorganized Debtor and its counsel by the earlier of thirty (30) days after the Effective Date or thirty (30) days after entry of the Final Order approving rejection of such Executory Contract or Unexpired Lease.

11.04.  <u>Rejection Claims</u>.  Any Rejection Claim not barred by section 11.03 of the Plan shall be classified as a Class 3 General Unsecured Claim subject to the provisions of sections 502(b)(6) and 502(g) of the Bankruptcy Code; *provided, however*, that any Rejection Claim by a lessor based upon the rejection of an unexpired lease of real property, either prior to the Confirmation Date, upon the entry of the Confirmation Order, or upon the Effective Date, shall be limited in accordance with section 502(b)(6) of the Bankruptcy Code and state law mitigation requirements.  All Rejection Claims shall be deemed as Contested Claims until Allowed.  Nothing contained herein shall be deemed an admission by the Debtors or the Reorganized


App. 02389
014951

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-30    18 Filed 06/05/25230  Page 273 of 1017    PageID 15934
Case 18-30264-sgj11  Doc 829  Filed 01/31/19    Entered 01/31/19 17:34:06    Page 73 of 229

Debtor that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Debtors or the Reorganized Debtor of any objections or defenses to any such Rejection Claim if asserted.

11.05. <u>Reservation of Rights</u>.  Nothing contained in the Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtor have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Reorganized Debtor shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

## ARTICLE XII.
## SUBSTANTIVE CONSOLIDATION OF THE DEBTORS

12.01.  Pursuant to the Confirmation Order, the Bankruptcy Court shall approve the substantive consolidation of the Debtors for the sole purposes of implementing the Plan, including for purposes of voting and Distributions to be made under the Plan.  Pursuant to such order:  (a) all assets and liabilities of the Debtors will be deemed merged; (b) all guarantees by one Debtor of the obligations of the other Debtor will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by the other Debtor and any joint or several liability of the Debtors will be deemed to be one obligation of the consolidated Debtors; and (c) each and every Claim filed or to be filed in the Chapter 11 Case of either Debtor will be deemed filed against the consolidated Debtors and will be deemed one Claim against and a single obligation of the consolidated Debtors.

## ARTICLE XIII.
## CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF PLAN

13.01. <u>Conditions to Confirmation and Effectiveness of Plan</u>.  The Plan shall not become effective until the following conditions shall have been satisfied and which may occur concurrently with the Effective Date:  (a) the Confirmation Order shall have been entered, in form and substance acceptable to the Chapter 11 Trustee; (b) the necessary Plan Documents have been executed and delivered, and (c) all other conditions specified by the Chapter 11 Trustee have been satisfied.  Any or all of the above conditions other than (a) may be waived at any time by the Chapter 11 Trustee.

13.02. <u>Notice of the Effective Date</u>.  On or as soon as reasonably practical after the occurrence of the Effective Date, the Reorganized Debtor shall cause a notice of the Effective Date to be filed with the Bankruptcy Court and served on all Creditors and parties-in-interest.

13.03. <u>Revocation of Plan</u>.  The Chapter 11 Trustee may revoke and withdraw the Plan at any time before the Effective Date.  If the Chapter 11 Trustee revokes or withdraws the Plan, or if confirmation of the Plan does not occur, then this Plan shall be deemed null and void and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtors, as the case may be, or any other Person, or to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors.

Appx 02399
014952

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-30   18 Filed 07/05/25 Page 274 of 1017   PageID 15935
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 74 of 229

## ARTICLE XIV.
## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

14.01.  Compromise and Settlement

      (a)    Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the classification, potential Distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies subject to, or dealt with, under this Plan, including, without limitation, all Claims against the Debtors or Estate arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, fixed or contingent, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtors or the Estate.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements embodied in this Plan, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interest of the Debtors, the Estate, Creditors and other parties-in-interest, and are fair, equitable and within the range of reasonableness.  The rights afforded in the Plan and the treatment of all Claims and Interests herein shall be in exchange for, and in complete satisfaction and release of, all Claims and Interests of any nature whatsoever against and in the Debtors, the Estate, and the Assets.  Except as otherwise provided herein, all Persons shall be precluded and forever barred by the Plan Injunction from asserting against the Debtors and their affiliates, successors, assigns, the Reorganized Debtor or the Reorganized Debtor's Assets, or the Estate, any event, occurrence, condition, thing, or other or further Claims or causes of action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

      (b)    It is not the intent of this Plan that confirmation of the Plan shall in any manner alter or amend any settlement and compromise (including those contained in agreed orders) between the Debtors and any Person that has been previously approved by the Bankruptcy Court (each, a "Prior Settlement").  To the extent of any conflict between the terms of the Plan and the terms of any Prior Settlement, the terms of the Prior Settlement shall control and such Prior Settlement shall be enforceable according to its terms.

14.02.  Discharge.  The Debtors and their successors in interest and assigns shall be deemed discharged and released pursuant to section 1141(d)(1) of the Bankruptcy Code from any and all Claims provided for in the Plan.

14.03.  **PLAN INJUNCTION.**

      **THIS SECTION IS REFERRED TO HEREIN AS THE "PLAN INJUNCTION." EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, AS OF THE EFFECTIVE DATE ALL HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE ESTATE OR ANY OF THE ASSETS THAT AROSE PRIOR TO THE EFFECTIVE DATE ARE HEREBY PERMANENTLY ENJOINED AND PROHIBITED FROM THE FOLLOWING:  (a) THE COMMENCING OR CONTINUATION IN ANY MANNER, DIRECTLY OR INDIRECTLY, OF ANY ACTION, CASE, LAWSUIT OR OTHER PROCEEDING OF ANY TYPE OR NATURE AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS WITH RESPECT TO**

Appx. 02391
014953

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 35-20    18 Filed 07/05/25 230 Page 275 of 1017    PageID 15936
Case 18-30264-sgj11    Doc 820    Filed 10/31/18    Entered 10/31/18 17:34:06    Page 75 of 229

ANY SUCH CLAIM OR INTEREST ARISING OR ACCRUING BEFORE THE EFFECTIVE DATE, INCLUDING WITHOUT LIMITATION THE ENTRY OR ENFORCEMENT OF ANY JUDGMENT, OR ANY OTHER ACT FOR THE COLLECTION, EITHER DIRECTLY OR INDIRECTLY, OF ANY CLAIM OR INTEREST AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS; (b) THE CREATION, PERFECTION OR ENFORCEMENT OF ANY LIEN, SECURITY INTEREST, ENCUMBRANCE, RIGHT OR BURDEN, EITHER DIRECTLY OR INDIRECTLY, AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, OR (c) TAKING ANY ACTION IN RELATION TO THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, EITHER DIRECTLY OR INDIRECTLY, WHICH VIOLATES OR DOES NOT CONFORM OR COMPLY WITH THE PROVISIONS OF THIS PLAN APPLICABLE TO SUCH CLAIM OR INTEREST. THE PLAN INJUNCTION SHALL ALSO BE INCORPORATED INTO THE CONFIRMATION ORDER.

IN ADDITION TO THE FOREGOING, EXCEPT TO THE EXTENT NECESSARY TO ALLOW HCLOF, THE REORGANIZED DEBTOR AND BRIGADE TO EFFECTUATE THE RESET OF ONE OR MORE OF THE ACIS CLOS IN ACCORDANCE WITH SECTION 6.08 OF THE PLAN, PURSUANT TO SECTIONS 105(a), 1123(a)(5), 1123(b)(6), AND 1142(b) OF THE BANKRUPTCY CODE, THE ENJOINED PARTIES (DEFINED BELOW) ARE HEREBY ENJOINED FROM: (a) PROCEEDING WITH, EFFECTUATING, OR OTHERWISE TAKING (i) ANY ACTION IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS PREVIOUSLY OR CURRENTLY ISSUED BY ANY SUCH PARTIES, AND (ii) ANY OTHER ATTEMPT TO LIQUIDATE THE ACIS CLOS BY ANY MEANS, (b) TRADING ANY ACIS CLO COLLATERAL IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, (c) EXERCISING ANY RIGHTS TO ASK OR DIRECT THE ISSUERS, CO-ISSUERS OR INDENTURE TRUSTEE TO PERFORM ANY ACTION IN RELATION TO THE ACIS CLOS THAT THE ENJOINED PARTIES ARE PROHIBITED FROM TAKING UNDER THE TERMS OF THE PLAN INJUNCTION, (d) INTERFERING IN ANY WAY WITH THE CAPITAL MARKETS PROCESS OF RESETTING ANY ACIS CLO, AND (e) SENDING, MAILING, OR OTHERWISE DISTRIBUTING ANY NOTICE TO THE HOLDERS OF THE NOTES IN THE ACIS CLOS IN CONNECTION WITH THE EFFECTUATION OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, UNTIL THE EARLIER TO OCCUR OF: (w) THE DATE UPON WHICH A FINAL ORDER IS ENTERED RESOLVING THE ESTATE'S AVOIDANCE CLAIMS AGAINST ALL ENJOINED PARTIES RELATING TO ACIS LP'S RIGHTS UNDER THE ALF PMA; (x) THE DATE UPON WHICH ALL ALLOWED CLAIMS AGAINST THE DEBTORS HAVE BEEN PAID IN FULL, (y) THE ENTRY OF AN ORDER BY THE BANKRUPTCY COURT FINDING THAT A MATERIAL DEFAULT HAS OCCURRED UNDER THE TERMS OF THE PLAN, OR (z) THE ENTRY OF A SUBSEQUENT ORDER BY THE BANKRUPTCY COURT PROVIDING OTHERWISE WITH RESPECT TO ONE OR MORE OF THE ACIS CLOS. FOR PURPOSES OF THIS PARAGRAPH, THE TERM "__ENJOINED PARTIES__" SHALL INCLUDE HIGHLAND, HCLOF, CLO HOLDCO, NEUTRA, HIGHLAND HCF, HIGHLAND CLOM, ANY AFFILIATES OF

App. 02392
014954

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-30   18 Filed 07/05/230 Page 276 of 1017   PageID 15937
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:33:06   Page 76 of 229
Case 18-30264-sgj11 Doc 860 Filed 10/25/18   Entered 10/25/18 16:34:06   Page 28 of 229

**HIGHLAND, AND THEIR RESPECTIVE EMPLOYEES, AGENTS, REPRESENTATIVES, TRANSFEREES, ASSIGNS, AND SUCCESSORS. FOR PURPOSES OF CLARIFICATION AND AVOIDANCE OF DOUBT, NOTHING IN THIS PARAGRAPH SHALL PRECLUDE ORDINARY DAY-TO-DAY TRADING OF THE COLLATERAL IN THE ACIS CLOS BY THE REORGANIZED DEBTOR.**

Notwithstanding anything to the contrary in the Plan: (a) third-party professionals employed by the Reorganized Debtor shall not be released or exculpated from any losses, claims, damages, liabilities, or expenses arising from their duties and services provided to the Reorganized Debtor; and (b) any third-party professionals employed by the Reorganized Debtor shall only be entitled to be indemnified by the Reorganized Debtor to the extent provided by applicable law.

Notwithstanding anything to the contrary in the Plan or Confirmation Order, nothing in the Plan or in the Confirmation Order shall discharge, release, enjoin or otherwise bar (i) any liability of the Debtors, the Estate, the Reorganized Debtor, or the Reorganized Debtor's assets ("Released Parties") to a Governmental Unit arising on or after the Confirmation Date with respect to events occurring after the Confirmation Date, provided that the Released Parties reserve the right to assert that any such liability is a Claim that arose on or prior to the Confirmation Date and constitutes a Claim that is subject to the deadlines for filing proofs of claim, (ii) any liability to a Governmental Unit that is not a Claim subject to the deadlines for filing proofs of Claim, (iii) any valid right of setoff or recoupment of a Governmental Unit, and (iv) any police or regulatory action by a Governmental Unit. In addition, nothing in the Plan or Confirmation Order discharges, releases, precludes or enjoins any environmental liability to any Governmental Unit that any Person other than the Released Parties would be subject to as the owner or operator of the property after the Effective Date. For the avoidance of any doubt, nothing in this paragraph shall be construed to limit the application of the Plan Injunction to any Claim which was subject to any bar date applicable to such Claim.

14.04. <u>Setoffs</u>. Except as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the holder of a Claim, the Reorganized Debtor may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim (before such Distribution is made), any Claims, rights, Estate Claims and Estate Defenses of any nature that the Debtors may hold against the holder of such Allowed Claim, to the extent such Claims, rights, Estate Claims and Estate Defenses against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); <u>provided, however</u>, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release of any such Claims, rights, Estate Claims and Estate Defenses that the Estate may possess against such Claimant. In no event shall any Claimant or Interest holder be entitled to setoff any Claim or Interest against any Claim, right, or Estate Claim of the Debtors without the consent of the Debtors or the Reorganized Debtor unless such holder files a motion with the Bankruptcy Court requesting the authority to perform such setoff notwithstanding any indication in any proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

14.05. <u>Recoupment.</u> Except as otherwise expressly provided for in the Plan, in no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, account receivable, or Estate Claim of the Debtors or the Reorganized Debtor unless (a) such holder actually provides notice thereof in writing to the Debtors or the Reorganized Debtor of its intent to perform a recoupment; (b) such notice includes the amount to be


Appx 02398
014955

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 5-30  18  Filed 06/08/25  Page 277 of 1017    PageID 15938
Case 18-30264-sgj11    Doc 850  Filed 01/31/19    Entered 01/31/19 17:34:06    Page 77 of 229

recouped by the holder of the Claim or Interest and a specific description of the basis for the recoupment, and (c) the Debtors or the Reorganized Debtor have provided a written response to such Claim or Interest holder, stating unequivocally that the Debtors or the Reorganized Debtor consents to the requested recoupment. The Debtors and the Reorganized Debtor shall have the right, but not the obligation, to seek an order of the Bankruptcy Court allowing any or all of the proposed recoupment. In the absence of a written response from the Debtors or the Reorganized Debtor consenting to a recoupment or an order of the Bankruptcy Court authorizing a recoupment, no recoupment by the holder of a Claim or Interest shall be allowed.

14.06. <u>Turnover</u>. On the Effective Date, any rights of the Estate to compel turnover of Assets under applicable nonbankruptcy law and pursuant to section 542 or 543 of the Bankruptcy Code shall be deemed transferred to and vested in the Reorganized Debtor.

14.07. <u>Automatic Stay</u>. The automatic stay pursuant to section 362 of the Bankruptcy Code, except as previously modified by the Bankruptcy Court, shall remain in effect until the Effective Date of the Plan as to the Debtors, the Estate and all Assets. As of the Effective Date, the automatic stay shall be replaced by the Plan Injunction.

### ARTICLE XV.
### <u>JURISDICTION OF COURTS AND MODIFICATIONS TO THE PLAN</u>

15.01. <u>Retention of Jurisdiction</u>. Pursuant to sections 1334 and 157 of title 28 of the United States Code, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising in, arising under, and related to the Chapter 11 Cases and the Plan, to the full extent allowed or permitted by applicable law, including without limitation for the purposes of invoking sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

(a)     To hear and determine any and all objections to, or applications or motions concerning, the allowance of Claims or the allowance, classification, priority, compromise, estimation, or payment of any Administrative Expense;

(b)     To hear and determine any and all applications for payment of fees and expenses pursuant to this Plan to any Estate Professional pursuant to sections 330 or 503 of the Bankruptcy Code, or for payment of any other fees or expenses authorized to be paid or reimbursed under this Plan, and any and all objections thereto;

(c)     To hear and determine pending applications for the rejection, assumption, or assumption and assignment of Executory Contracts and Unexpired Leases and the allowance of Claims resulting therefrom, and to determine the rights of any party in respect to the assumption or rejection of any Executory Contract or Unexpired Lease;

(d)     To hear and determine any and all adversary proceedings, applications, or contested matters, including relating to the allowance of any Claim;

(e)     To hear and determine all controversies, disputes, and suits which may arise in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan or in connection with the enforcement of any remedies made available under the Plan, including without limitation, (i) adjudication of all rights, interests or disputes relating to any of the Assets, (ii) the valuation of all Collateral, (iii) the determination of the validity of any Lien or claimed right of offset or recoupment; and (iv) determinations of Objections to Contested Claims;



Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-30  18 Filed 07/03/25230 Page 278 of 1017    PageID 15939
Case 18-30264-sgj11  Doc 829  Filed 01/31/19    Entered 01/31/19 17:34:06    Page 30 of 229

(f)     To liquidate and administer any disputed, contingent, or unliquidated Claims, including the Allowance of all Contested Claims;

(g)     To administer Distributions to holders of Allowed Claims as provided herein;

(h)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(i)     To enable the Reorganized Debtor to prosecute any and all proceedings which may be brought to set aside transfers, Liens or encumbrances and to recover any transfers, Assets, properties or damages to which the Reorganized Debtor may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws, including causes of action, controversies, disputes and conflicts between the Reorganized Debtor and any other party, including but not limited to, any causes of action or Objections to Claims, preferences or fraudulent transfers and obligations or equitable subordination;

(j)     To consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation the Confirmation Order;

(k)     To enforce the discharge and Plan Injunction against any Person;

(l)     To enter and implement all such orders as may be necessary or appropriate to execute, interpret, construe, implement, consummate, or enforce the terms and conditions of this Plan and the transactions required or contemplated pursuant thereto;

(m)     To hear and determine any motion or application which the Reorganized Debtor is required or allowed to commence before the Bankruptcy Court pursuant to this Plan;

(n)     To hear and determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan;

(o)     To determine proceedings pursuant to section 505 of the Bankruptcy Code;

(p)     To enter a final decree closing the Chapter 11 Cases; and

(q)     To determine any other matter or dispute relating to the Estate, the Estate Claims, the Estate Defenses, the Assets, or the Distributions by the Reorganized Debtor.

15.02.  Abstention and Other Courts.  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of or relating to the Chapter 11 Cases, this Article of the Plan shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

15.03.  Non-Material Modifications.  The Reorganized Debtor may, with the approval of the Bankruptcy Court and without notice to all holders of Claims and Interests, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable.  The Reorganized Debtor may undertake such nonmaterial modification pursuant

Appx 02395

014957

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-10   Exhibit 18   Filed 08/06/25   Page 279 of 1017   PageID 15940
Case 18-30264-sgj11   Doc 820   Filed 10/25/18   Entered 10/25/18 17:33:06   Page 79 of 229

to this section insofar as it does not adversely change the treatment of the Claim of any Creditor or the Interest of any Interest holder who has not accepted in writing the modification.

15.04.  <u>Material Modifications</u>.  Modifications of this Plan may be proposed in writing by the Chapter 11 Trustee at any time before confirmation, provided that this Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Chapter 11 Trustee shall have complied with section 1125 of the Bankruptcy Code.  This Plan may be modified at any time after confirmation and before its Substantial Consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modification.  A holder of a Claim or Interest that has accepted or rejected this Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such holder changes its previous acceptance or rejection.

**ARTICLE XVI.**
**<u>MISCELLANEOUS PROVISIONS</u>**

16.01.  <u>Severability</u>.  Should the Bankruptcy Court determine any provision of the Plan is unenforceable either on its face or as applied to any Claim or Interest or transaction, the Reorganized Debtor may modify the Plan so that any such provision shall not be applicable to the holder of any Claim or Interest.  Such a determination of unenforceability shall not (a) limit or affect the enforceability and operative effect of any other provision of the Plan or (b) require the resolicitation of any acceptance or rejection of the Plan.

16.02.  <u>Oral Agreements; Modification of Plan; Oral Representations or Inducements</u>.  The terms of the Plan, Disclosure Statement and Confirmation Order may only be amended in writing and may not be changed, contradicted or varied by any oral statement, agreement, warranty or representation.  None of the Debtors, any representative of the Estate, including Robin Phelan in his capacity as Chapter 11 Trustee, nor their attorneys have made any representation, warranty, promise or inducement relating to the Plan or its confirmation except as expressly set forth in this Plan, the Disclosure Statement, or the Confirmation Order or other order of the Bankruptcy Court.

16.03.  <u>Waiver</u>.  The Reorganized Debtor shall not be deemed to have waived any right, power or privilege pursuant to the Plan unless the waiver is in writing and signed by the Reorganized Debtor.  There shall be no waiver by implication, course of conduct or dealing, or through any delay or inaction by the Reorganized Debtor, of any right pursuant to the Plan, including the provisions of this anti-waiver section.  The waiver of any right under the Plan shall not act as a waiver of any other or subsequent right, power or privilege.

16.04.  <u>Notice</u>.  Any notice or communication required or permitted by the Plan shall be given, made or sent as follows:

(a)     If to a Creditor, notice may be given as follows: (i) if the Creditor has not filed a proof of Claim, then to the address reflected in the Schedules, or (ii) if the Creditor has filed a proof of Claim, then to the address reflected in the proof of Claim.

(b)     If to the Reorganized Debtor, notice shall be sent to the following addresses:


Appx 02396
014958

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 35-20   Exhibit 18   Filed 06/05/25   Page 280 of 1017   PageID 15941
Case 18-30264-sgj11   Doc 830   Filed 10/25/18   Entered 10/25/18 17:34:06   Page 82 of 229

Jeff P. Prostok                    Josh Terry
Suzanne K. Rosen                   c/o Brian P. Shaw
Forshey Prostok LLP                Rogge Dunn Group, PC
777 Main Street, Suite 1290        1201 Elm Street, Suite 5200
Fort Worth, Texas 76102            Dallas, Texas 75270

     (c)     Any Creditor desiring to change its address for the purpose of notice may do so by giving notice to the Reorganized Debtor of its new address in accordance with the terms of this section.

     (d)     Any notice given, made or sent as set forth above shall be effective upon being (i) deposited in the United States Mail, postage prepaid, addressed to the addressee at the address as set forth above; (ii) delivered by hand or messenger to the addressee at the address set forth above; (iii) telecopied to the addressee as set forth above, with a hard confirmation copy being immediately sent through the United States Mail; or (iv) delivered for transmission to an expedited or overnight delivery service such as FedEx.

16.05.  <u>Compliance with All Applicable Laws</u>.  If notified by any governmental authority that it is in violation of any applicable law, rule, regulation, or order of such governmental authority relating to its business, the Reorganized Debtor shall comply with such law, rule, regulation, or order; <u>provided, however</u>, that nothing contained herein shall require such compliance if the legality or applicability of any such requirement is being contested in good faith in appropriate proceedings and, if appropriate, an adequate Reserve has been set aside on the books of the Reorganized Debtor.

16.06.  <u>Duties to Creditors; Exculpation</u>.  Neither the Chapter 11 Trustee nor any agent, representative, accountant, financial advisor, attorney, shareholder, officer, affiliate, member or employee of the Chapter 11 Trustee or the Debtors, including but not limited to Estate Professionals (collectively, the "<u>Exculpated Parties</u>"), shall ever owe any duty to any Person (including any Creditor) other than the duties owed to the Debtors' bankruptcy Estate, for any act, omission, or event in connection with, or arising out of, or relating to, any of the following: (a) the Debtors' Chapter 11 Cases, including all matters or actions in connection with or relating to the administration of the Estate, (b) the Plan, including the proposal, negotiation, confirmation and consummation of the Plan, or (c) any act or omission relating to the administration of the Plan after the Effective Date.  All such Exculpated Parties shall be fully exculpated and released from any and all claims and causes of action by any Person, known or unknown, in connection with, or arising out of, or relating to, any of the following:  (x) the Debtors' Chapter 11 Cases, including all matters or actions in connection with or relating to the administration of the Estate, (y) the Plan, including the proposal, negotiation, confirmation and consummation of the Plan, or (z) any act or omission relating to the administration of the Plan after the Effective Date, except for claims and causes of action arising out of such Exculpated Party's gross negligence or willful misconduct.

16.07.  <u>Binding Effect</u>.  The Plan shall be binding upon, and shall inure to the benefit of, the Reorganized Debtor, the holders of the Claims or Liens, and their respective successors-in-interest and assigns.

16.08.  <u>Governing Law, Interpretation</u>.  Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, the internal laws of the State of Texas shall govern the construction and implementation of the Plan and any Plan



Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 18-30 Exhibit 18 Filed 08/05/25 Page 281 of 1017 PageID 15942
Case 18-30264-sgj11 Doc 850 Filed 10/25/18 Entered 10/25/18 17:34:06 Page 83 of 229

Documents without regard to conflicts of law. The Plan shall control any inconsistent term or provision of any other Plan Documents.

16.09. <u>Payment of Statutory Fees</u>. All accrued U.S. Trustee Fees as of the Confirmation Date shall be paid by the Reorganized Debtor on or as soon as practicable after the Effective Date, and thereafter shall be paid by the Reorganized Debtor as such statutory fees become due and payable.

16.10. <u>Filing of Additional Documents</u>. On or before Substantial Consummation of the Plan, the Reorganized Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

16.11. <u>Computation of Time</u>. Bankruptcy Rule 9006 shall apply to the calculation of all time periods pursuant to this Plan. If the final day for any Distribution, performance, act or event under the Plan is not a Business Day, then the time for making or performing such Distribution, performance, act or event shall be extended to the next Business Day. Any payment or Distribution required to be made hereunder on a day other than a Business Day shall be due and payable on the next succeeding Business Day.

16.12. <u>Elections by the Reorganized Debtor</u>. Any right of election or choice granted to the Reorganized Debtor under this Plan may be exercised, at the Reorganized Debtor's election, separately as to each Claim, Creditor or Person.

16.13. <u>Release of Liens</u>. Except as otherwise expressly provided in this Plan or the Confirmation Order, all Liens against any of the Assets transferred to and vested in the Reorganized Debtor shall be deemed to be released, terminated and nullified without the necessity of any order by the Bankruptcy Court other than the Confirmation Order.

16.14. <u>Rates</u>. The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

16.15. <u>Compliance with Tax Requirements</u>. In connection with the Plan, the Reorganized Debtor shall comply with all withholding and reporting requirements imposed by federal, state and local Taxing Authorities and all Distributions under the Plan shall be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution under the Plan.

16.16. <u>Notice of Occurrence of the Effective Date</u>. Promptly after occurrence of the Effective Date, the Reorganized Debtor, as directed by the Bankruptcy Court, shall serve on all known parties-in-interest and holders of Claims and Interests, notice of the occurrence of the Effective Date.

16.17. <u>Notice of Entry of Confirmation Order</u>. Promptly after entry of the Confirmation Order, the Chapter 11 Trustee, as directed by the Bankruptcy Court in the Confirmation Order, shall serve on all known parties-in-interest and holders of Claims and Interests, notice of entry of the Confirmation Order.


Appx 02398
014960

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 5-30    Filed 08/05/230    Page 282 of 1017    PageID 15943
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 82 of 229
Case 18-30264-sgj11 Doc 860 Filed 10/25/18    Entered 10/25/18 16:32:08    Page 84 of 132

Dated:  October 25, 2018.

Respectfully submitted,

ACIS CAPITAL MANAGEMENT, L.P.

By:  /s/ Robin Phelan
    Robin Phelan
    Chapter 11 Trustee

ACIS CAPITAL MANAGMENET GP, LLC

By:/s/ Robin Phelan
    Robin Phelan
    Chapter 11 Trustee

APPROVED:

/s/ Jeff P. Prostok
Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

APPROVED:

/s/ Rahkee V. Patel
Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Third Amended Joint Plan 10.25.18.docx

Appx 02399


014961

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 85-30  18 Filed 06/86/25230 Page 283 of 1017    PageID 15944
Case 18-30264-sgj11  Doc 829  Filed 01/31/19    Entered 01/31/19 17:34:06    Page 83 of 229

# EXHIBIT A

## TO THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

### [ESTATE CLAIMS]

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-30   Exhibit 18   Filed 06/05/25   Page 284 of 1017   PageID 15945
Case 18-30264-sgj11   Doc 830   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 86 of 229

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.     <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.     <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.     <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

     (a)     All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

     (b)     All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

     (c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;



Appx. 02401
014963

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 18 Filed 08/25/230 Page 285 of 1017 PageID 15946
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 85 of 229

        (d)     All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

        (e)     All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

        (f)     All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

        (g)     All Claims for breach of the PMAs or the Indentures;

        (h)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

        (i)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

        (j)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

        (k)     All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

        (l)     All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

        (m)     All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

        (n)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

        (o)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

        (p)     All Claims based on alter ego or rights to pierce the corporate veil of Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in

Appx. 02402
014964

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 35-30   Filed 06/06/25   Page 286 of 1017   PageID 15947
Case 18-30264-sgj11 Doc 830 Filed 01/25/19   Entered 01/25/19 17:34:06   Page 86 of 229

control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of



Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 18 Filed 06/86/25230 Page 287 of 1017   PageID 15948
Case 18-30264-sgj11 Doc 830 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 87 of 229

HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.     <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("Highland HCF") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland HCF;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or Estate;



Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 18-30   18   Filed 08/05/25230  Page 288 of 1017    PageID 15949
Case 18-30264-sgj11  Doc 829  Filed 01/31/19    Entered 01/31/19 17:34:06    Page 86 of 229

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.      <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Highland CLOM;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or


Appx. 014967

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 35-30   Filed 06/05/25   Page 289 of 1017   PageID 15950
Case 18-30264-sgj11 Doc 830 Filed 10/25/18   Entered 10/25/18 17:34:06   Page 89 of 229

Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.     <u>CLO Holdco, Ltd. Claims</u>.  All Estate Claims against CLO Holdco, Ltd. ("<u>CLO Holdco</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against CLO Holdco;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;


Appx 02406
014968

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 18 Filed 06/05/25230 Page 290 of 1017    PageID 15951
Case 18-30264-sgj11 Doc 830 Filed 10/31/18    Entered 10/31/18 17:34:06    Page 90 of 229

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.      <u>Neutra, Ltd. Claims</u>.  All Estate Claims against Neutra, Ltd. ("<u>Neutra</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Neutra;

(e)      All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Neutra for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;


Appx 02405
014969

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 18 Filed 06/06/25230 Page 291 of 1017   PageID 15952
Case 18-30264-sgj11 Doc 830 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 91 of 229

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)      All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.      <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)      All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 18 Filed 09/05/230 Page 292 of 1017   PageID 15953
Case 18-30264-sgj11   Doc 830 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 92 of 229

(i)       All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)       All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)       All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)       All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.       <u>Highland Affiliate Claims</u>.  All Estate Claims against any Affiliates of Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against any Affiliates of Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)       All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)       All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)       All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)       All Avoidance Actions against any Highland Affiliate;

(e)       All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)       All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)       All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)       All Claims against any Highland Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets

014971

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 18 Filed 04/05/230 Page 293 of 1017   PageID 15954
Case 18-30264-sgj11 Doc 830 Filed 10/25/18   Entered 10/25/18 17:34:06   Page 93 of 229

owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i) All Claims against any Highland Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j) All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Highland Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k) All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, Neutra, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l) All Claims based on alter ego or rights to pierce the corporate veil of any Highland Affiliate as to any Person, including as against any other Affiliates of Highland or any officers, directors, equity interest holders, or Persons otherwise in control of any Highland Affiliates; and,

(m) All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.    Dondero Claims.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.    Okada Claims.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any

Appx. 02419
014972

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 18 Filed 06/05/25230 Page 294 of 1017    PageID 15955
Case 18-30264-sgj11 Doc 830 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 96 of 229

unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.    <u>Preference Claims</u>.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

        **Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.    <u>Claims Against Officers, Managers and Members</u>.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.    <u>Retention of Claims Against Specific Persons or Categories of Persons</u>.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:

        (a)    William Scott;

        (b)    Heather Bestwick;

        (c)    Any other Person who may be so named at a later date by the Reorganized Debtor.

Appx. 02411
014973

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-20    Filed 09/05/230    Page 295 of 1017    PageID 15956
Case 18-30264-sgj11 Doc 830 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 95 of 229

16.    <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

17.    <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

18.    <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

19.    <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

20.    <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

21.    <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate.  Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

App. 02412
0'14974

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-30 Exhibit 18 Filed 09/05/25 Page 296 of 1017   PageID 15957
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 96 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 48 of 62
Second Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC
Schedule 16 Exhibit "A" to

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Payments within 90 Days of Petition Date | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| Payments to Insiders within One Year of Petition Date | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 18 Filed 06/05/25   Page 297 of 1017   PageID 15958
Exhibit A to Schedule 1 Page 98 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 97 of 229
Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 49 of 62

Second Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|------|---------|-----------------|----------------|--------------------------------|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 55-20   Filed 06/05/25   Page 298 of 1017   PageID 15959
Case 18-30264-sgj11   Doc 839   Filed 10/25/18   Entered 10/25/18 18:23:08   Page 98 of 229

# EXHIBIT B

## TO THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

### [EXECUTORY CONTRACTS ASSUMED UNDER THE PLAN]

014977

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 51-18    Filed 01/06/25    Page 299 of 1017    PageID 15960
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 99 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18    Entered 10/25/18 18:23:08    Page 51 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2013-1 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2013-1, Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | March 18, 2013 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2013-1 | Collateral Administration Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Indenture | March 18, 2013 | $0 |
| Acis CLO 2013-1 LLC<br>850 Library Ave, Suite 204<br>Newark, DE 19711 | Indenture | March 18, 2013 | $0 |

1

Appx 02416
014978

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 01/06/25   Page 300 of 1017   PageID 15961
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 100 of 229
Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 52 of 62

**EXHIBIT B**

**Executory Contracts and Unexpired Leases to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2013-1 | Indenture | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Supplemental Indenture | February 26, 2014 | $0 |
| Acis CLO 2013-1 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Supplemental Indenture | February 26, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2013-1 | Supplemental Indenture | February 26, 2014 | $0 |
| Acis CLO 2013-1, Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Governing Documents<br>(Requested from HCM) | -- | $0 |
| Acis CLO 2013-2 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement<br>(requested from HCM) | -- | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Limited Liability Company Agreement<br>(requested from HCM) | -- | $0 |

2

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 51-18   Filed 01/02/25   Page 301 of 1017   PageID 15962
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 101 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | October 3, 2013 | $0 |
| The Bank of New York Mellon Trust Co., N.A.<br>601 Travis Street, 16th Floor<br>Houston, Texas 77002<br>Attn: Global Corporate Trust –<br>Acis CLO 2013-2 | Collateral Administration Agreement | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Indenture | October 3, 2013 | $0 |
| Acis CLO 2013-2 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Indenture | October 3, 2013 | $0 |
| The Bank of New York Mellon Trust Co., N.A.<br>601 Travis Street, 16th Floor<br>Houston, Texas 77002<br>Attn: Global Corporate Trust –<br>Acis CLO 2013-2 | Indenture | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Governing Document<br>(requested from HCM) | -- | $0 |

3

Appx 02418
014980

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 10/03/25   Page 302 of 1017   PageID 15963
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 102 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2014-3 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | February 25, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-3 | Collateral Administration Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Indenture | February 25, 2014 | $0 |
| Acis CLO 2014-3 LLC<br>850 Library Ave, Suite 204<br>Newark, DE 19711 | Indenture | February 25, 2014 | $0 |

4

Case 18-30264-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 18 Filed 10/14/25 Page 303 of 1017 PageID 15964
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 103 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-3 | Indenture | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Memorandum and Articles of Association of Acis CLO 2014-3 Ltd. | December 24, 2013 | $0 |
| Acis CLO 2014-4 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | June 5, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-4 | Collateral Administration Agreement | June 5, 2014 | $0 |
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | June 5, 2014 | $0 |

5

Appx 02420
014982

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 05/25   Page 304 of 1017   PageID 15965
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 104 of 229
Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 56 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Indenture | June 5, 2014 | $0 |
| Acis CLO 2014-4 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Indenture | June 5, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-4 | Indenture | June 5, 2014 | $0 |
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Island KY1-1102 | Memorandum and Articles of Association of Acis CLO 2014-4 Ltd. | April 1, 2014 | $0 |
| Acis CLO 2014-5 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | November 18, 2014 | $0 |

6

Appx. 02421
014983

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 01/06/25   Page 305 of 1017   PageID 15966
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 105 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 57 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-5 | Collateral Administration Agreement | November 18, 2014 | $0 |
| Acis CLO 2014-5 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | November 18, 2014 | $0 |
| Acis CLO 2014-5 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Indenture | November 18, 2014 | $0 |
| Acis CLO 2014-5 LLC 850 Library Ave., Suite 204 Newark, DE 19711 | Indenture | November 18, 2014 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-5 | Indenture | November 18, 2014 | $0 |
| Acis CLO 2014-5 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1 -1102 | Memorandum and Articles of Association of Acis CLO 2014-5 Ltd. | August 21, 2014 | $0 |
| Acis CLO 2015-6 Chemical Holdings, LLC 1209 Orange Street Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |

7

Appx 02422
014984

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 01/06/25    Page 306 of 1017    PageID 15967
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 106 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | April 16, 2015 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2015-6 | Collateral Administration Agreement | April 16, 2015 | $0 |
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | April 16, 2015 | $0 |
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Indenture | April 16, 2015 | $0 |
| Acis CLO 2015-6 LLC 850 Library Ave., Suite 204 Newark, DE 19711 | Indenture | April 16, 2015 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2015-6 | Indenture | April 16, 2015 | $0 |

8

Appx 02425
014985

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 51-18   Filed 01/08/25   Page 307 of 1017   PageID 15968
Exhibit 18   Page 108 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 107 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2015-6 Ltd. P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, KY1-1102, Cayman Islands | Memorandum and Articles of Association of Acis CLO 2015-6 Ltd. | February 11, 2015 | $0 |
| Acis CLO Value Fund II (Cayman), LP. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II GP, LLC P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II, LP. 300 Crescent Court Suite 700 Dallas, TX 75201 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value GP, LLC 1209 Orange Street Wilmington, DE 19801 | Limited Liability Company Agreement | July 19, 2010 | $0 |
| Acis CLO Value Master Fund II, LP. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II (Cayman), L.P. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis CLO Value Master Fund II, L.P. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis Loan Funding, Ltd. 300 Crescent Court Suite 700 Dallas, TX 75201 | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |

9

Appx. 02424
014986

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 01/05/25   Page 308 of 1017   PageID 15969
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 108 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| BayVK R2 Lux S.A., SICAV FIS<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Agreement for the Outsourcing of the Asset Management of BayVK R2 Lux S.A., SICAV-FIS | February 27, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |
| BNP Paribas Securities Services<br>Luxembourg Branch<br>60 Avenue John F. Kennedy<br>1855 Luxembourg | Power of Attorney<br>86578 | February 20, 2015 | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Confidentiality Agreement | April 11, 2011 | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Governing Documents (Requested from HCM) | -- | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Management Agreement | July 18, 2011 | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement (Requested from HCM) | November 20, 2007 | $0 |

10

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 51-18   Filed 01/06/25   Page 309 of 1017   PageID 15970
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 109 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18   Entered 10/25/18 18:23:08   Page 61 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Hewett's Island CLO 1-R, Ltd. *c/o* Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Indenture | November 20, 2007 | $0 |
| Deutsche Bank Trust Company Americas 1761 East St. Andrew Place Santa Ana, CA 92705 Attn: CDO Business Unit – Hewett's Island CLO 1-R | Indenture | November 20, 2007 | $0 |
| State Street (Guernsey Limited) First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2015-6 | Confidentiality Agreement | March 5, 2014 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Agreement for the Outsourcing of the Asset Management of BayVK R2 Lux S.A., SICAV-FIS | February 27, 2015 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |
| Acis Loan Funding, Ltd. First Floor, Dorey Court St. Peter Port, Guernsey GY1 6HJ Channel Islands | Portfolio Management Agreement | December 22, 2016 | $0 |

11

Appx 02426

014988

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-18 Filed 06/16/25 Page 310 of 1017 PageID 15971
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 110 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis Capital Management, LP c/o *PHELANLAW* 4214 Woodfin Drive Dallas, Texas 75220 | Amended and Restated Agreement of Limited Partnership | January 21, 2011 | $0 |
| Acis Capital Management GP, LLC c/o *PHELANLAW* 4214 Woodfin Drive Dallas, Texas 75220 | Amended and Restated Limited Liability Company Agreement | January 21, 2011 | $0 |

For the avoidance of doubt, to the extent not otherwise included above, the Trustee intends to assume any additional executory contracts that relate to the funds set forth below as may be necessary or beneficial to the Reorganized Debtor under the Plan:

1.  Acis CLO 2013-1, Ltd.
2.  Acis CLO 2013-2, Ltd.
3.  Acis CLO 2014-3, Ltd.
4.  Acis CLO 2014-4, Ltd.
5.  Acis CLO 2014-5, Ltd.
6.  Acis CLO 2015-6, Ltd.
7.  Acis CLO Value Fund II, L.P.
8.  Acis CLO Value Fund II (Cayman), L.P.
9.  Acis CLO Master Fund II, L.P.
10. BayVK R2 Lux S.A., SICAV FIS
11. Hewitt's Island CLO 1-R, Ltd.
12. Acis Loan Funding, Ltd.

The Trustee reserves the right to amend or supplement this Exhibit B.

12

Appx 02427
014989

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 51-18 Filed 06/26/25    Page 311 of 1017    PageID 15972
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 111 of 229

# EXHIBIT "2"

**[First Modification to the Third Amended Joint Plan for Acis
Capital Management, L.P. and Acis Capital Management GP,
LLC – Dkt. No. 693]**

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 06/03/25   Page 312 of 1017   PageID 15973
Exhibit 18   Page 116 of 230
Case 18-30264-sgj11   Doc 829   Filed 11/30/18   Entered 11/30/18 17:34:00   Page 112 of 229

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR**
**ROBIN PHELAN, CHAPTER 11 TRUSTEE**

Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,**
**CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 CASES |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-sgj11 |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered) |
| | § | |
| Debtors. | § | |

### FIRST MODIFICATION TO THE THIRD AMENDED JOINT PLAN FOR
### ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

Robin Phelan ("Trustee"), the Chapter 11 Trustee for Acis Capital Management, LP and

Acis Capital Management GP, LLC (the "Debtors"), files this First Modification (the "First

Modification") to the *Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP*

*and Acis Capital Management GP, LLC* [Docket No. 660] (the "Plan").

1.      Reference is here made to the Plan for all purposes.  This First Modification

modifies the Plan.

2.      **Modification to Section 1.09.**  Section 1.09 of the Plan is hereby modified to read

Appx. 02429
014991

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 01/14/25   Page 313 of 1017   PageID 15974
Case 19-30264-sgj11 Doc 839 Filed 01/13/19 Entered 01/13/19 17:34:00 Page 2 of 29

as follows:

> 1.09    "Assets" includes all right, title, and interest in and to all property of every type or nature owned or claimed by the Debtors as of the Petition Date, together with all such property of every type or nature subsequently acquired by the Debtors through the Effective Date, whether real or personal, tangible or intangible, and wherever located, and including, but not limited to, property as defined in section 541 of the Bankruptcy Code.

3.    The change to section 1.09 above merely corrects a typographical error in the definition of the term "Assets."  Specifically, the revised definition removes the incomplete phrase "Without limiting the foregoing, this shall include all" from the end of the definition of Assets.

4.    **Modification to Exhibit "A".**  The copy of the Exhibit "A" reflecting Estate Claims is hereby deleted in its entirety and replaced with the version of the "Exhibit A" attached hereto as **Exhibit "1."**

5.    A copy of the document reflecting the modifications to Exhibit A to the Plan in redline format is attached hereto as **Exhibit "2."**

6.    This First Modification is a non-material change.  It merely corrects a typographical error and revises the Estate Claims being reserved, retained and preserved under the Plan.  Further, even if this First Modification were deemed material, it does not adversely affect any creditor because no ballots have yet been received in relation to the Plan and this First Modification is being sent to all creditors and parties in interest eighteen (18) days in advance of the deadline for parties to submit ballots and any objections to the Plan.  Consequently, creditors and parties in interest will have an adequate opportunity to evaluate this modification prior to voting on the Plan.

Dated:  November 8, 2018.                    Respectfully submitted,

ACIS CAPITAL MANAGEMENT, L.P.

By:  /s/ *Robin Phelan*
       Robin Phelan
       Chapter 11 Trustee

App. 02439
014992

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18 Filed 01/15/25    Page 314 of 1017    PageID 15975
Case 18-30264-sgj11 Doc 8495 Filed 01/31/19 Entered 01/31/19 17:34:00 Page 14 of 229

ACIS CAPITAL MANAGMENET GP, LLC

By: /s/ *Robin Phelan*
    Robin Phelan
    Chapter 11 Trustee

APPROVED:

/s/ *Jeff P. Prostok*
Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

APPROVED:

/s/ *Rahkee V. Patel*
Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello –State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN
PHELAN, CHAPTER 11 TRUSTEE**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document and the attached exhibits were served electronically via the Court's Electronic Court Filing (ECF) notification system and via U.S. Mail, postage prepaid (and via Express Mail to out of country recipients) on the parties on the service lists attached as **Exhibit "3"** hereto on November 8, 2018.

/s/ *Jeff P. Prostok*
Jeff P. Prostok

\L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\First Modification to Third Amended Plan 11.8.18.docx

Appx. 02431
014993

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 51-2    Filed 01/16/25    Page 315 of 1017    PageID 15976
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 115 of 229
Case 18-30264-sgj11 Doc 895 Filed 01/30/18 Entered 01/30/18 17:34:09:00 Page 1 of 45

# Exhibit "1"

## [Revised Exhibit "A" to the Third Amended Joint Plan]

Appx 02432
014994

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 00/00/25   Page 316 of 1017   PageID 15977
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:00 Page 116 of 229

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.    <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.    <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.    <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the



Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 06/06/25   Page 317 of 1017   PageID 15978
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 17 of 29

Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)     All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)     All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)     All Claims for breach of the PMAs or the Indentures;

(h)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)     All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)     All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)     All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)     All Claims based on alter ego or rights to pierce the corporate veil of



Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 01/09/25    Page 318 of 1017    PageID 15979
Case 18-30264-sgj11    Doc 829    Filed 01/31/19    Entered 01/31/19 17:34:00    Page 18 of 45

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.      <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against HCLOF;

(e)      All Claims for breach of the PMAs or the Indentures;

(f)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)      All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)      All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

---

Appx. 02435
014997

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 01/20/25   Page 319 of 1017   PageID 15980
Case 18-30264-sgj11 Doc 8295 Filed 01/31/19 Entered 01/31/19 17:34:00 Page 19 of 229

       (l)     All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

       (m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

   5.   <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("Highland HCF") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

       (a)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

       (b)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

       (c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

       (d)     All Avoidance Actions against Highland HCF;

       (e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

       (f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

       (g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

       (h)     All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

       (i)     All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

       (j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or


APPX 014998

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-18 Filed 01/26/25 Page 320 of 1017 PageID 15981
Case 18-30264-sgj11 Doc 849-5 Filed 11/30/18 Entered 11/30/18 17:34:00 Page 20 of 29

Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.     <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland CLOM;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

---


Appx. 02425
014999

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-18 Filed 01/22/25 Page 321 of 1017 PageID 15982
Case 18-30264-sgj11 Doc 809 Filed 01/30/19 Entered 01/30/19 17:34:06 Page 10 of 29

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.     <u>CLO Holdco, Ltd. Claims</u>.  All Estate Claims against CLO Holdco, Ltd. ("CLO Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against CLO Holdco;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;



Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 01/23/25   Page 322 of 1017   PageID 15983
Case 18-30264-sgj11 Doc 829 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 12 of 29

        (j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

        (k)     All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

        (l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

    8.    <u>Neutra, Ltd. Claims</u>.  All Estate Claims against Neutra, Ltd. ("<u>Neutra</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

        (a)     All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

        (b)     All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

        (c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

        (d)     All Avoidance Actions against Neutra;

        (e)     All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

        (f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

        (g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

        (h)     All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

        (i)     All Claims against Neutra for the unauthorized use of Estate Assets

---


App. 02439
0015001

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 01/24/25   Page 323 of 1017   PageID 15984
Case 18-30264-sgj11 Doc 893 Filed 01/30/19 Entered 01/30/19 17:34:00 Page 23 of 28

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.     <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)     All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;



Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 01/25/25   Page 324 of 1017   PageID 15985
Case 18-30064-sgj11 Doc 829 Filed 01/30/18   Entered 01/30/18 17:34:00   Page 14 of 29

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.     <u>Highland Affiliate Claims</u>.  All Estate Claims against any Affiliates of Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against any Affiliates of Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against any Highland Affiliate;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;



Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 01/26/25   Page 325 of 1017   PageID 15986
Exhibit 18   Page 326 of 230
Case 18-30264-sgj11 Doc 893 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 25 of 29

(h)     All Claims against any Highland Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against any Highland Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Highland Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, Neutra, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of any Highland Affiliate as to any Person, including as against any other Affiliates of Highland or any officers, directors, equity interest holders, or Persons otherwise in control of any Highland Affiliates; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.     <u>Dondero Claims</u>.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.     <u>Okada Claims</u>.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all

App. 02142
015004

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 06/27/25    Page 326 of 1017    PageID 15987
Case 18-30264-sgj11 Doc 829 Filed 01/30/18 Entered 01/30/18 17:34:06 Page 26 of 29

Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.    Preference Claims.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

        **Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.    Claims Against Officers, Managers and Members.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.    Claims Against Former Attorneys and Law Firms.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal and professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:



Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 01/28/25    Page 327 of 1017    PageID 15988
Case 18-30264-sgj11 Doc 693 Filed 11/08/18    Entered 11/08/18 17:34:00    Page 12 of 29

 

 

| | | |
|---|---|---|
| (a) | Cole Schotz, P.C. |
| (b) | Michael D. Warner |
| (c) | Jacob Frumkin |
| (d) | Warren A. Usatine |
| (e) | McKool Smith |
| (f) | Gary Cruciani |
| (g) | Michael Fritz |
| (h) | Carson Young |
| (i) | Lackey Hershman, LLP |
| (j) | Stinson Leonard Street LLP |
| (k) | Paul Lackey, Esq. |
| (l) | Michael Aigen, Esq. |
| (m) | Abrams & Bayliss, LLP |
| (n) | Kevin G. Abrams |
| (o) | A. Thompson Bayliss |
| (p) | Jones Day |
| (q) | Hilda C. Galvan |
| (r) | Michael Weinberg |
| (s) | Reid Collins & Tsai, LLP |
| (t) | Lisa Tsai |
| (u) | Stanton, LLP |
| (v) | James M. Stanton |
| (w) | Hunton Andrews Kurth |
| (x) | Marc Katz |
| (y) | Greg Waller |

(z)     any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

015006

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 01/29/25   230 Page 328 of 1017   PageID 15989
Case 18-30264-sgj11 Doc 869 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 13 of 489

16.     <u>Retention of Claims Against Specific Persons or Categories of Persons</u>.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:

      (a)     William Scott;

      (b)     Heather Bestwick;

      (c)     Any other Person who may be so named at a later date by the Reorganized Debtor.

17.     <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.     <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.     <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.     <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.     <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Appx. 02145

015007

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-10   Filed 01/30/25   Page 329 of 1017   PageID 15990
Case 18-30264-sgj11 Doc 693 Filed 11/06/18   Entered 11/06/18 17:34:06   Page 129 of 289

22.     <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

App. 02146

015008

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 10/06/25    Page 330 of 1017    PageID 15991
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 130 of 229
Case 18-30264-sgj11 Doc 693 Filed 11/08/18    Entered 11/08/18 13:03:00    Page 19 of 45
Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| | | Payments within 90 Days of Petition Date | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| | | Payments to Insiders within One Year of Petition Date | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 51-18   Filed 03/26/25   Page 331 of 1017   PageID 15992
Exhibit 1 to Exhibit "A" to
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 131 of 229

Case 18-30264-sgj11 Doc 693 Filed 11/08/18   Entered 11/08/18 13:03:00   Page 20 of 45
Schedule 1 to Exhibit "A" to
**Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 51-18 Filed 03/25 Page 332 of 1017 PageID 15993
Case 18-30264-sgj11 Doc 893 Filed 01/30/19 Entered 01/30/19 17:34:06 Page 132 of 289

# Exhibit "2"

## [Redline – Plan Exhibit "A"]

Appx. 02149
015011

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-18 Filed 01/03/25 Page 333 of 1017 PageID 15994
Case 18-30864-sgj11 Doc 829-3 Filed 01/30/19 Entered 01/30/19 17:34:06 Page 133 of 289

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.     Defined Terms.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.     Estate Claims Reserved, Retained and Preserved.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "Estate Claims," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.     Highland Claims.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "Highland Adversary") and Adversary Proceeding No. 18-03212-sgj (the "Trustee's Adversary").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the



Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 03/25/230   Page 334 of 1017   PageID 15995
Case 18-30264-sgj11 Doc 8293 Filed 01/30/19 Entered 01/30/19 17:34:00 Page 34 of 48

Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)     All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)     All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)     All Claims for breach of the PMAs or the Indentures;

(h)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)     All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)     All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)     All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)     All Claims based on alter ego or rights to pierce the corporate veil of

---

Appx. 02451

015013

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 06/26/25   Page 335 of 1017   PageID 15996
Case 18-30264-sgj11 Doc 889-3 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 135 of 289

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

015014

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 06/06/25   Page 336 of 1017   PageID 15997
Case 18-30264-sgj11   Doc 829   Filed 01/30/19   Entered 01/30/19 17:34:06   Page 36 of 289

(l)     All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.     <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("Highland HCF") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland HCF;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Appx. 02453
015015

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 03/28/25    Page 337 of 1017    PageID 15998
Case 18-30264-sgj11 Doc 829 Filed 01/30/19 Entered 01/30/19 17:34:06 Page 137 of 289

Estate;

> (k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

> (l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.     <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

> (a)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

> (b)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

> (c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

> (d)     All Avoidance Actions against Highland CLOM;

> (e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

> (f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

> (g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

> (h)     All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

> (i)     All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

---


Appx. 02454
015016

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 03/25    Page 338 of 1017    PageID 15999
Case 18-30264-sgj11 Doc 829 Filed 01/30/19    Entered 01/30/19 17:34:06    Page 139 of 289

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.      <u>CLO Holdco, Ltd. Claims</u>.  All Estate Claims against CLO Holdco, Ltd. ("<u>CLO Holdco</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against CLO Holdco;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

015017
App. 02455

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-18   Filed 04/02/25   Page 339 of 1017    PageID 16000
Case 18-30864-sgj11 Doc 8293 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 139 of 289

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.    <u>Neutra, Ltd. Claims</u>.  All Estate Claims against Neutra, Ltd. ("<u>Neutra</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Neutra;

(e)     All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Neutra for the unauthorized use of Estate Assets

---

Appx. 02456
015018

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 04/04/25   Page 340 of 1017   PageID 16001
Case 18-30264-sgj11 Doc 829 Filed 01/30/19   Entered 01/30/19 17:34:00   Page 149 of 429

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.     <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "Issuers"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "Co-Issuers"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)     All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;



Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 04/25/25   Page 341 of 1017   PageID 16002
Exhibit 18 Page 146 of 230
Case 18-30264-sgj11 Doc 893 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 10 of 29

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.    <u>Highland Affiliate Claims</u>.  All Estate Claims against any Affiliates of Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against any Affiliates of Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against any Highland Affiliate;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

015020
Appx. 02458

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 04/23/25   Page 342 of 1017   PageID 16003
Case 18-30264-sgj11 Doc 829 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 142 of 229

(h)     All Claims against any Highland Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against any Highland Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Highland Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, Neutra, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of any Highland Affiliate as to any Person, including as against any other Affiliates of Highland or any officers, directors, equity interest holders, or Persons otherwise in control of any Highland Affiliates; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.     Dondero Claims.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.     Okada Claims.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all

0150021
APPX 02450

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18 Filed 04/25/25    Page 343 of 1017    PageID 16004
Exhibit 18    Page 143 of 230
Case 18-30264-sgj11 Doc 889-3 Filed 01/30/19    Entered 01/30/19 17:34:06    Page 42 of 289

Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.    <u>Preference Claims</u>.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.    <u>Claims Against Officers, Managers and Members</u>.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.    <u>Claims Against Former Attorneys and Law Firms</u>.  <u>All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:</u>

---

Appx. 02466
015022

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 04/25/25   Page 344 of 1017   PageID 16005
Case 18-30264-sgj11   Doc 893   Filed 11/06/18   Entered 11/06/18 13:03:00   Page 44 of 289

(a)      Cole Schotz, P.C.

(b)      Michael D. Warner

(c)      Jacob Frumkin

(d)      Warren A. Usatine

(e)      McKool Smith

(f)      Gary Cruciani

(g)      Michael Fritz

(h)      Carson Young

(i)      Lackey Hershman, LLP

(j)      Stinson Leonard Street LLP

(k)      Paul Lackey, Esq.

(l)      Michael Aigen, Esq.

(m)      Abrams & Bayliss, LLP

(n)      Kevin G. Abrams

(o)      A. Thompson Bayliss

(p)      Jones Day

(q)      Hilda C. Galvan

(r)      Michael Weinberg

(s)      Reid Collins & Tsai, LLP

(t)      Lisa Tsai

(u)      Stanton, LLP

(v)      James M. Stanton

(w)      Hunton Andrews Kurth

(x)      Marc Katz

(y)      Greg Waller

(z)      any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

015023

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 04/25/25   Page 345 of 1017   PageID 16006
Exhibit 18   Page 146 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/30/19   Entered 01/30/19 17:34:00   Page 45 of 48

    15. 16.  Retention of Claims Against Specific Persons or Categories of Persons.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:

        (a)    William Scott;

        (b)    Heather Bestwick;

        (c)    Any other Person who may be so named at a later date by the Reorganized Debtor.

    16. 17.  Counterclaims.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

    17. 18.  Piercing the Corporate Veil.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

    18. 19.  Avoidance Actions.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

    19. 20.  Estate Defenses.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate. All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

    20. 21.  Equitable Subordination.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-18 Filed 04/25 230 Page 346 of 1017 PageID 16007
Case 18-30264-sgj11 Doc 893 Filed 11/06/18 Entered 11/06/18 17:34:06 Page 46 of 289

interest owners of the Debtors, Highland, or any Affiliates thereof.

~~21.~~22. <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Appx. 02405
015025

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 04/28/25   Page 347 of 1017   PageID 16008
Exhibit 1 to Exhibit "A" to
Case 18-30264-sgj11 Doc 693 Filed 11/08/18   Entered 11/08/18 13:03:00   Page 36 of 45
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 147 of 229

Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| **Payments within 90 Days of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| **Payments to Insiders within One Year of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

**Schedule 1 to Exhibit "A" to**

**Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

# Exhibit "3"
## [Service Lists]

Appx. 02406

015028

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-10   Filed 05/15/25   Page 350 of 1017   PageID 16011
Case 18-30264-sgj11 Doc 829 Filed 01/30/18 Entered 01/30/18 13:36:00 Page 59 of 459

# Notice Service List
## Acis Capital Mgmt./Phelan
### #5980

**BNP Paribas Securities Services**
**Luxembourg Branch**
**60 Avenue John F. Kennedy**
**1855 Luxembourg**

Dallas County
c/o Laurie Spindler
Linebarger, Goggan, Blair & Sampson LLP
2777 N Stemmons Frwy, No 1000
Dallas, TX 75207-2328

Acis CLO Management, LLC
Acis CLO Value GP, LLC
1209 Orange Street
Wilmington, DE 19801-1120

**Acis Funding GP, Ltd.**
**Acis Funding L.P.**
**c/o Maples Corporate Services Limited**
**P0 Box 309, Ugland House**
**Grand Cayman, Cayman Islands KY1 -1104**

Mizuho Securities USA Inc.
320 Park Ave., 12th Floor
New York, NY 10022-6848

US Bank National Association
c/o Daniel P. Novakov
Frost Brown Todd LLC
100 Crescent Court, Suite 350
Dallas, TX 75201-2348

Robin Phelan, Chapter 11 Trustee
Phelenlaw
4214 Woodfin Drive
Dallas, TX 75220-6416

Texas Comptroller of Public Accounts
c/o John M. Stern, Asst. Attorney General
Bankruptcy & Collection Div. MC 008
PO Box 12548
Austin, TX 78711-2548

Office of the United States Attorney
3rd Floor, 1100 Commerce Street
Dallas, Texas 75242-1699

United States Trustee
Lisa Lambert
1100 Commerce St., Room 976
Dallas, TX 75242

Dallas County
c/o Sherrel K Knighton
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons Frwy Ste 1000
Dallas, TX 75207-2328

**Acis CLO Value Fund II (Cayman), L.P.**
**Acis CLO Value Fund II GP, LLC**
**Acis CLO Value Master Fund II, L.P.**
**PO Box 309, Ugland House**
**Grand Cayman, Cayman Islands KY1-1104**

**CLO Holdco, Ltd.**
**c/o Intertrust Corp. Srvs. (Cayman) Ltd.**
**190 Elgin Ave., George Town**
**Grand Cayman, Cayman Islands KY1-9005**

U. S. Bank National Association
Attn: Michael Zak
60 Livingston Ave., EP-MN-WS3D
Saint Paul, MN 55107-2292

US Bank National Association
c/o Mark D. Kotwick, Arlene Alves
Seward & Kissell LLP
One Battery Park Plaza
New York, NY 10004-1405

Acis Capital Management, LP
c/o Warren A. Usatine
Cole Schotz P.C.
25 Main Street
Hackensack, NJ 07601-7189

Securities and Exchange Commission
801 Cherry Street, Suite 1900, Unit 18
Fort Worth, TX 76102

Office of the Attorney General
Main Justice Building, Room 5111
10th & Constitution Avenue, N.W.
Washington, D.C. 20530

Acis CLO 2013-1 Chemical Holdings, LLC
Acis CLO 2013-2 Chemical Holdings, LLC
Acis CLO 2014-3 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO 2014-4 Chemical Holdings, LLC
Acis CLO 2014-5 Chemical Holdings, LLC
Acis CLO 2015-6 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO Value Fund II, L.P.
Acis Loan Funding, Ltd.
Acis Capital Management GP, LLC
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

**State Street (Guernsey) Limited**
**First Floor Dorey Court**
**Admiral Park, St. Peter Port, Guernsey**

The Dugaboy Investment Trust
300 Crescent Court, Suite700
Dallas, TX 75201-1876

Acis Capital Management, LP
c/o Michael D. Warner
Cole Schotz P.C.
1700 City Center Tower II
301 Commerce St.
Fort Worth, TX 76102-4140

The Bank of N.Y. Mellon Trust Co., N.A.
225 Liberty Street
New York, NY 10286-0001

**BayVK R2 Lux S.A., SICAV-FIS**
**15 Rue de Flaxweiler**
**L-6776 Grevenmacher**
**Luxembourg**

Internal Revenue Service
Special Procedures – Insolvency
P.O. Box 7346
Philadelphia, PA 1901-7346

015029

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10 18    Filed 05/22/25    Page 351 of 1017    PageID 16012
Case 18-30264-sgj11 Doc 829 Filed 01/30/18 Entered 01/30/18 17:34:06 Page 40 of 49

US Bank
PO Box 5229
Cincinnati, OH 45201-5229

**Universal-Investment-Luxembourg S.A.**
**15 Rue de Flaxweiler**
**L-6776 Grevenmacher**
**Luxembourg**

Universal-Inv.-Luxembourg SA/BayVK R2 Lux
c/o Andrew Zollinger
DLA Piper LLP
1717 Main St., Suite 4600
Dallas, TX 75201-4629

Diane G. Reed
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

**Hewett's Island CLO I-R, Ltd.**
**c/o Maples Finance Limited**
**PO Box 1093, Queensgate House**
**South Church St., George Town**
**Grand Cayman, Cayman Island KY1-1102**

Universal-Inv.-Luxembourg SA/BayVK R2 Lux
c/o Thomas Califano/Shmuel Klahr
DLA Piper LLP
1251 Avenue of the Americas
New York, NY 10020-1104

Diane G. Reed
c/o David W. Elmquist
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

**Highland HCF Advisor, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

**Highland CLO Management, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc., Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**Acis CLO 2013-1 Ltd.**
**Acis CLO 2013-2**
**c/o Estera Trust (f/k/a Appleby Trust)**
**Clifton House 75 Fort St., P.O. Box 1350**
**Grand Cayman, Cayman Islands KY 1-1108**

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2013-I and 2013-2190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

Acis CLO 2013-1 LLC
Acis CLO 2013-2 LLC
850 Library Ave., Suite 204
Newark, DE 19711

**Acis CLO 2014-3 Ltd.**
**Acis CLO 2014-4 Ltd.**
**c/o MaplesFS Limited**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102**

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-3 and 2014-4190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

Acis CLO 2014-3 LLC
Acis CLO 2014-4
850 Library Ave., Suite 204
Newark, DE 19711

**Acis CLO 2014-5 Ltd.**
**Acis CLO 2015-6 Ltd.**
**c/o MaplesFS Limited**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102**

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-5 and Acis CLO 2015-6190 S.
LaSalle Street, 8th Floor
Chicago, IL 60603

Acis CLO 2014-5 LLC
Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

**Acis CLO 2015-6 Ltd.**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, KY1-1102, Cayman Islands**

Deutsche Bank Trust Company Americas
Attn:  CDO Business Unit – Hewett's
Island CLO 1-R
1761 East St. Andrew Place
Santa Ana, CA 92705

**Acis Loan Funding, Ltd.**
**First Floor, Dorey Court**
**St. Peter Port, Guernsey GYI 6HJ**
**Channel Islands**

**Acis CLO 2017-7 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1 -1102**

**Highlands Service List**
*ACIS #5980*

| | | |
|---|---|---|
| | Highland CLO Funding, Ltd.<br>c/o Paul R. Bessette/Rebecca Matsumura<br>King & Spalding LLP<br>500 West 2nd St., Suite 1800<br>Austin, TX 78701-4684 | Highland CLO Funding, Ltd.<br>c/o Daniel Elms/Heather Jobe/Scott Larson<br>Bell Nunnally & Martin LLP<br>3232 McKinney Ave., Suite 1400<br>Dallas, TX 75204 |
| Highland CLO Funding Ltd.<br>c/o Mark M. Maloney/W. Austin Jowers<br>King & Spalding LLP<br>1180 Peachtree Street NE<br>Atlanta, GA 30309 | Highland CLO Funding, Ltd.<br>c/o Michael K. Hurst/Ben A. Barnes<br>Lynn Pinker Cox & Hurst LLP<br>2100 Ross Ave., Suite 2700<br>Dallas, TX 75201 | Highland CLO Funding, Ltd.<br>c/o H. O'Neil, J. Binford, S. Beck, M. Bales<br>Foley Gardere Foley & Lardner, LLP<br>2021 McKinney Ave., Suite 1600<br>Dallas, TX 75201 |
| **Highland CLO Funding, Ltd.**<br>**First Floor, Dorey Court**<br>**Admiral Park, St. Peter Port**<br>**Guernsey GY1 6HJ, Channel Islands** | Highland CLO Management, Ltd.<br>c/o Strand Advisors, Inc.<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, DE 19801 | **Highland CLO Management, Ltd.**<br>**c/o Maples Corporate Services, Ltd.**<br>**P.O. Box 309, Ugland House,**<br>**South Church Street, George Town**<br>**Grand Cayman, Cayman Island KY1-1004** |
| **Highland CLO Management, Ltd.**<br>**P.O. Box 309 Ugland House**<br>**South Church Street**<br>**George Town, Grand Cayman KY1-1004** | **Highland CLO Management, Ltd.**<br>**c/o Summit Management Ltd.**<br>**P.O. Box 32311**<br>**Grand Cayman, KY1-1209**<br>**Cayman Islands** | **Highland CLO Management, Ltd.**<br>**c/o Summit Management Ltd.**<br>**Suite #4-210 Governor's Square**<br>**23 Lime Tree Bay Avenue**<br>**Grand Cayman, Cayman Islands** |
| **Highland HCF Advisor, Ltd.**<br>**c/o Maples Corporate Services, Ltd.**<br>**P.O. Box 309, Ugland House,**<br>**South Church Street, George Town**<br>**Grand Cayman, Cayman Island KY1-1004** | Highland HCF Advisor, Ltd.<br>c/o James Dondero, President<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201 | Highland CLO Management, Ltd.<br>c/o Strand Advisors, Inc.<br>Attn. James Dondero<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201 |
| Neutra, Ltd.<br>c/o Daniel Elms/Heather Jobe/Scott Larson<br>Bell Nunnally & Martin LLP<br>3232 McKinney Ave., Suite 1400<br>Dallas, TX 75204 | Neutra, Ltd.<br>c/o Michael K. Hurst/Ben A. Barnes<br>Lynn Pinker Cox & Hurst LLP<br>2100 Ross Ave., Suite 2700<br>Dallas, TX 75201 | Neutra, Ltd.<br>c/o H. O'Neil, J. Binford, S. Beck, M. Bales<br>Foley Gardere Foley & Lardner, LLP<br>2021 McKinney Ave., Suite 1600<br>Dallas, TX 75201 |
| **CLO Holdco, Ltd.**<br>**c/o Intertrust Corp. Srvs. (Cayman) Ltd.**<br>**190 Elgin Ave., George Town**<br>**Grand Cayman, Cayman Islands KY1-9005** | CLO Holdco, Ltd.<br>c/o Daniel Elms/Heather Jobe/Scott Larson<br>Bell Nunnally & Martin LLP<br>3232 McKinney Ave., Suite 1400<br>Dallas, TX 75204 | CLO Holdco, Ltd.<br>c/o H. O'Neil, J. Binford, S. Beck, M. Bales<br>Foley Gardere Foley & Lardner, LLP<br>2021 McKinney Ave., Suite 1600<br>Dallas, TX 75201 |
| The Dugaboy Investment Trust<br>300 Crescent Court, Suite700<br>Dallas, TX 75201-1876 | | |

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-10   Filed 05/23/25   Page 353 of 1017   PageID 16014
Case 18-30864-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 153 of 229
Case 18-90064-sgj11 Doc 893 Filed 11/06/18   Entered 11/06/18 13:03:00   Page 42 of 45

# Noteholders List

# [Confidential]

Appx 02479
015032

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 05/05/25   Page 354 of 1017   PageID 16015
Exhibit 18   Page 155 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/30/18 Entered 01/30/18 17:34:06 Page 154 of 229

## Creditors Service List
### Acis Capital Mgmt./Phelan
### #5980

### Class 2

Joshua N. Terry
25 Highland Park Village
Suite 100-848
Dallas, TX 75205-2726

Joshua N. Terry
c/o Brian P. Shaw/John M. Lynch
Rogge Dunn Group, PC
1201 Elm St., Suite 5200
Dallas, TX 75270

Joshua N. Terry
350 9 Princeton Ave.
Dallas, TX 75205-3246

### Class 3

Andrews Kurth Kenyon LLP
600 Travis, Suite 4200
Houston, TX 77002-2929

CSI Global Deposition Services
4950 N. O'Connor Road, Suite 152
Irving, TX 75062 - 2778

CT Corporation
P0 Box 4349
Carol Stream, IL 60197-4349

Case Anywhere LLC
21860 Burbank Blvd., Suite 125
Woodland Hills, CA 91367-7447

David Langford
1321 Indian Creek
DeSoto, TX 75115-3652

David Simek
31 Woodacres Road
Brookville, NY 11545-2911

Drexel Limited
309 23rd Street, #340
Miami Beach, FL 33139-1700

Elite Document Technology
400 N. Saint Paul St., Suite 1300
Dallas, TX 75201-6881

Highfield Equities, Inc.
3131 McKinney Ave., Suite 215
Dallas, TX 75204-2421

JAMS, Inc.
18881 Von Karman Ave., Suite 350
Irvine, CA 92612-6589

Jones Day
2727 N. Harwood Street
Dallas, TX 75201-1568

Lackey Hershman LLP
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219-4259

KPMG LLP (USA)
Two Financial Center
60 South Street
Boston, MA 02111-2759

KPMG LLP
2323 Ross Ave., Suite 1400
Dallas, TX 75201-2721

KPMG LLP
Aon Center
200 E. Randolph St., Suite 5500
Chicago, IL 60601-6607

McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201-6970

Reid Collins & Tsai, LLP
Building C, Suite 300
1301 S. Capital of Texas Highway
Austin, TX 78746-6550

Stanton Advisors LLC
300 Coles St., Apt. 802
Jersey City, NJ 07310-1047

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 01/06/25   Page 355 of 1017   PageID 16016
Case 18-30264-sgj11 Doc 829-3 Filed 01/30/19   Entered 01/30/19 17:34:00   Page 55 of 229

Stanton Law Firm
9400 North Central Expwy., Suite 1304
Dallas, TX 75231-5047

The TASA Group, Inc.
1166 DeKalb Pike
Blue Bell, PA 19422- 1853

Acis CLO 2013-1, Ltd., et al.
c/o David Neier
Winston & Strawn LLP
200 Park Ave.
New York, NY 10166-4193

Acis CLO 2013-1 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-3 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-4 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-5 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

**Directors - Acis CLO 2013-1 Ltd.**
**75 Fort St., Clifton House**
**PO Box 1350**
**George Town, Grand Cayman**
**Cayman Island, KY1-1108**

**Directors - Acis CLO 2014-3 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Directors - Acis CLO 2014-4 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Directors - Acis CLO 2014-5 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Directors - Acis CLO 2015-6 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Acis CLO 2013-1, Ltd.**
**c/o Appleby Trust, Attn: Directors**
**Clifton House 75 Fort St., PO Box 13**
**Grand Cayman, Cayman Islands KY1-1108**

**Acis CLO 2013-2 Ltd.**
**c/o MaplesFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-3 Ltd.**
**c/o MaplesFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-4 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-5 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2015-6 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1 -1102**

**Acis CLO 2017-7 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1 -1102**

Acis CLO 2013-1, Ltd., et al.
c/o Thomas Melsheimer/Lane Webster
Winston & Strawn LLP
2501 N. Harwood St., 17th Floor
Dallas, TX 75201

Jennifer G. Terry
25 Highland Park Village, Suite 100-848
Dallas, TX 75205

Hunton Andrews Kurth LLP
c/o M. Christine Klein, Dep. Gen. Counsel
Riverfront Plaza, East Tower
951 East Byrd St.
Richmond, VA 23219

Patrick H. Daugherty
3621 Cornell Ave.
Dallas, TX 75250

Stinson Leonard Street LLP
Attn: Paul Lackey
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-10   Filed 01/06/25   Page 356 of 1017   PageID 16017
Case 19-34054-sgj11   Doc 893   Filed 01/30/19   Entered 01/30/19 17:34:06   Page 156 of 229

## Class 4

Highland Capital Management, LP
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

Highland Capital Management, LP
1209 Orange Street
Wilmington, DE 19801-1120

Highland Capital Management, LP
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland Capital Management, LP, Highland
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18 Filed 05/06/25    Page 357 of 1017    PageID 16018
Exhibit 18    Page 156 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 157 of 229

# EXHIBIT "3"

**[Second Modification to the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC – Dkt. No. 702]**

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Exhibit 18   Page 358 of 1017   PageID 16019
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:05   Page 1 of 3

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR
ROBIN PHELAN, CHAPTER 11 TRUSTEE**

Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 CASES |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-sgj11 |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered) |
| | § | |
| Debtors. | § | |

### SECOND MODIFICATION TO THE THIRD AMENDED JOINT PLAN FOR
### ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

Robin Phelan ("Trustee"), the Chapter 11 Trustee for Acis Capital Management, LP and

Acis Capital Management GP, LLC (the "Debtors"), files this Second Modification (the "First

Modification") to the *Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP

and Acis Capital Management GP, LLC* [Docket No. 660], as modified by the *First Modification

to the Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP and Acis Capital

Management GP, LLC* [Docket No. 693] (together, the "Plan").

1.     Reference is here made to the Plan for all purposes.  This Second Modification

Appx. 02475
015037

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-18   Filed 06/06/25   Page 359 of 1017   PageID 16020
Case 18-30264-sgj11 Doc 829 Filed 11/31/18 Entered 11/31/18 17:34:05 Page 159 of 229

modifies the Plan.

2.  **Modification to Exhibit "A".**  The copy of the Exhibit "A" reflecting Estate

Claims is hereby deleted in its entirety and replaced with the version of the "Exhibit A" attached

hereto as **Exhibit "1."**

3.  A copy of the document reflecting the modifications to Exhibit A to the Plan in

redline format is attached hereto as **Exhibit "2."**

4.  This Second Modification is a non-material change.  It merely revises the Estate

Claims being reserved, retained and preserved under the Plan.  Further, even if this First

Modification were deemed material, it is being sent to all creditors and parties in interest ten (10)

days in advance of the deadline for parties to submit ballots and any objections to the Plan.

Consequently, creditors and parties in interest will have an adequate opportunity to evaluate this

modification prior to voting on the Plan or to change their previous acceptance or rejection upon

consideration of the modification.

Dated:  November 16, 2018.           Respectfully submitted,

                                     ACIS CAPITAL MANAGEMENT, L.P.

                                     By:  /s/ *Robin Phelan*_____
                                          Robin Phelan
                                          Chapter 11 Trustee

                                     ACIS CAPITAL MANAGMENET GP, LLC

                                     By:  /s/ *Robin Phelan*_____
                                          Robin Phelan
                                          Chapter 11 Trustee

Appx. 02476
015038

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 06/25/25   Page 360 of 1017   PageID 16021
Case 18-30264-sgj11 Doc 829-2 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 160 of 229
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:35   Page 80 of 429

APPROVED:

*/s/ Jeff P. Prostok*
Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

APPROVED:

*/s/ Rahkee V. Patel*
Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello –State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL   COUNSEL   FOR   ROBIN
PHELAN, CHAPTER 11 TRUSTEE**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document and the attached exhibits were served electronically via the Court's Electronic Court Filing (ECF) notification system and via U.S. Mail, postage prepaid (and via Express Mail to out of country recipients) on the parties on the service lists attached as **Exhibit "3"** hereto on November 16, 2018.

*/s/ Jeff P. Prostok*
Jeff P. Prostok

\L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Second Modification to Third Amended Plan 11.16.18.docx

App. 02417
015039

# Exhibit "1"

## [Revised Exhibit "A" to the Third Amended Joint Plan]

Appx 02478

015040

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 06/23/25   Page 362 of 1017   PageID 16023
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:05   Page 162 of 229

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.      <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.      <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.      <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

Appx. 02479
015041

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 06/04/25   Page 363 of 1017   PageID 16024
Case 18-30264-sgj11   Doc 829-2   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 163 of 229

Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)     All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)     All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)     All Claims for breach of the PMAs or the Indentures;

(h)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)     All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)     All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)     All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)     All Claims based on alter ego or rights to pierce the corporate veil of

Appx. 02489

015042

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 05/25    Page 364 of 1017    PageID 16025
Case 18-30264-sgj11 Doc 829-2 Filed 01/31/19    Entered 01/31/19 17:34:05    Page 164 of 229

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Appx. 02481
015043

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 06/25   Page 365 of 1017   PageID 16026
Case 18-30264-sgj11 Doc 829-2 Filed 01/31/19   Entered 01/31/19 17:34:05   Page 165 of 229

(l)     All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.     <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("Highland HCF") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland HCF;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Appx. 02482
015044

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 06/25/25    Page 366 of 1017    PageID 16027
Case 18-30264-sgj11 Doc 829-02 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 66 of 229

Estate;

        (k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

        (l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

     6.    <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

        (a)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

        (b)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

        (c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

        (d)     All Avoidance Actions against Highland CLOM;

        (e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

        (f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

        (g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

        (h)     All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

        (i)     All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appx. 02483
015045

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 06/26/25   Page 367 of 1017   PageID 16028
Case 18-30264-sgj11 Doc 829-1 Filed 01/16/19   Entered 01/16/19 17:34:05   Page 67 of 209

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.      <u>CLO Holdco, Ltd. Claims</u>.  All Estate Claims against CLO Holdco, Ltd. ("<u>CLO Holdco</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against CLO Holdco;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

App. 02484
015046

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18 Filed 06/09/25    Page 368 of 1017    PageID 16029
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 68 of 209

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.      Neutra, Ltd. Claims.  All Estate Claims against Neutra, Ltd. ("Neutra") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Neutra;

(e)      All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Neutra for the unauthorized use of Estate Assets

Appx. 02485
015047

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-18 Filed 07/06/25 230 Page 369 of 1017 PageID 16030
Case 18-30264-sgj11 Doc 792 Filed 01/16/19 Entered 01/16/19 17:34:06 Page 69 of 409

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)      All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.      <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)      All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

APPX 02486

015048

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 07/07/25    Page 370 of 1017    PageID 16031
Case 18-30264-sgj11 Doc 820 Filed 01/31/19 Entered 01/31/19 17:34:05 Page 79 of 229

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.    Claims Against Any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates.  All Estate Claims against any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates (collectively, the "Affiliates" and each, an "Affiliate") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against such Affiliates shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against any Affiliate;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of

APP 02485
015049

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 07/25/25   Page 371 of 1017   PageID 16032
Case 18-30264-sgj11 Doc 802 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 11 of 20

the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

   (h) All Claims against any Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

   (i) All Claims against any Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

   (j) All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

   (k) All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

   (l) All Claims based on alter ego or rights to pierce the corporate veil of any Affiliate as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any officers, directors, equity interest holders, or Persons otherwise in control of any Affiliates; and,

   (m) All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

  11. <u>Dondero Claims</u>.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

  12. <u>Okada Claims</u>.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other

Exhibit "A" to Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC Page 10

Appx. 02488
015050

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 07/03/25   230   Page 372 of 1017   PageID 16033
Case 18-30264-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 12 of 20

Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.    <u>Preference Claims</u>.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.    <u>Claims Against Officers, Managers and Members</u>.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.    <u>Claims Against Former Attorneys and Law Firms</u>.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which



Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 07/25/25   Page 373 of 1017   PageID 16034
Case 18-30264-sgj11   Doc 792   Filed 01/31/19   Entered 01/31/19 17:34:05   Page 18 of 20

rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:

    (a)    Cole Schotz, P.C.

    (b)    Michael D. Warner

    (c)    Jacob Frumkin

    (d)    Warren A. Usatine

    (e)    McKool Smith

    (f)    Gary Cruciani

    (g)    Michael P. Fritz

    (h)    Carson D. Young

    (i)    Nicholas Matthews

    (j)    Lackey Hershman, LLP

    (k)    Stinson Leonard Street LLP

    (l)    Jamie R. Welton

    (m)    Paul B. Lackey

    (n)    Michael Aigen

    (o)    Roger L. Mandel

    (p)    Abrams & Bayliss, LLP

    (q)    Kevin G. Abrams

    (r)    A. Thompson Bayliss

    (s)    Jones Day

    (t)    Hilda C. Galvan

    (u)    Michael Weinberg

    (v)    Reid Collins & Tsai, LLP

    (w)    Lisa Tsai

    (x)    Stanton, LLP

    (y)    James M. Stanton

Appx. 02499
015052

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 07/15/25   Page 374 of 1017   PageID 16035
Case 18-30264-sgj11 Doc 820 Filed 01/16/19   Entered 01/16/19 17:34:06   Page 74 of 209

(z)   Hunton Andrews Kurth

(aa)   Marc Katz

(bb)   Greg Waller

(cc)   any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

16.   <u>Claims Against Officers, Directors, Employees, Members, and Managers, of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates</u>.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates, including all such Estate Causes of Action based on fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act.  Such present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates include, but are not limited to, the following Persons:

(a)   William Scott;

(b)   Heather Bestwick;

(c)   Scott Ellington

(d)   Isaac Leventon

(e)   Jean Paul Sevilla

(f)   Hunter Covitz

(g)   The Dugaboy Investment Trust

(h)   Nancy Dondero, Trustee of the Dugaboy Trust

(i)   Grant Scott

(j)   Any other Person who may be so named at a later date by the Reorganized Debtor.

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 07/06/25   Page 375 of 1017   PageID 16036
Exhibit 18   Page 176 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:05   Page 15 of 29

17.     Counterclaims.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.     Piercing the Corporate Veil.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.     Avoidance Actions.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.     Estate Defenses.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.     Equitable Subordination.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

22.     Recharacterization.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-18   Filed 07/25   Page 376 of 1017    PageID 16037
Exhibit 18   Page 107 of 230
Case 18-30264-sgj11 Doc 782 Filed 01/16/19   Entered 01/16/19 17:34:06   Page 176 of 209

# Exhibit "2"

## [Redline – Plan Exhibit "A"]

Appx. 02493

015055

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-10   Filed 07/8/25   Page 377 of 1017   PageID 16038
Exhibit 18   Page 178 of 230
Case 18-30264-sgj11   Doc 820   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 177 of 229
Case 18-30264-sgj11   Doc 701   Filed 12/16/18   Entered 12/16/18 17:34:35   Page 20 of 46

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.  Defined Terms.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.  Estate Claims Reserved, Retained and Preserved.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "Estate Claims," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.  Highland Claims.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "Highland Adversary") and Adversary Proceeding No. 18-03212-sgj (the "Trustee's Adversary").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)   All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)   All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)   All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

Appx. 02424
015056

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 5-18 Filed 07/09/25    Page 378 of 1017    PageID 16039
Case 18-30264-sgj11 Doc 829-2 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 178 of 229
Case 18-30264-sgj11 Doc 702 Filed 11/16/18    Entered 11/16/18 17:34:55    Page 79 of 40

Chapter 11 Trustee or Estate;

       (d)     All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

       (e)     All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

       (f)     All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

       (g)     All Claims for breach of the PMAs or the Indentures;

       (h)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

       (i)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

       (j)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

       (k)     All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

       (l)     All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

       (m)     All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

       (n)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

       (o)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

       (p)     All Claims based on alter ego or rights to pierce the corporate veil of

Appx. 02495
015057

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18 Filed 06/25 230 Page 379 of 1017    PageID 16040
Case 18-30264-sgj11 Doc 829 Filed 01/31/19  Entered 01/31/19 17:34:06  Page 179 of 229
Case 18-30264-sgj11 Doc 702 Filed 12/16/18  Entered 12/16/18 17:34:35  Page 72 of 40

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero,
Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in
control of Highland, and,

(q)    All Claims for conspiracy to commit any unlawful act, aiding and/or
abetting any such unlawful act, or assisting, encouraging, and/or participating in any such
unlawful act.

4.    <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and
preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all
such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the
Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth
in paragraph 2 above, including without limitation, the following:

(a)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or
Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland
Adversary;

(b)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or
Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's
Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or
Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or
transactions alleged in any other adversary proceedings or Claim Objections filed by the
Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against HCLOF;

(e)    All Claims for breach of the PMAs or the Indentures;

(f)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed
to the Debtors or Chapter 11 Trustee;

(g)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of
duty loyalty or due care, or any other unlawful act;

(h)    All Clams for usurpation of a corporate opportunity belonging to either of
the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against HCLOF for the turnover of Estate Assets, including
Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the
Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned
by the Debtors or Estate, as well as the turnover of any books, documents, records and papers
relating to the Debtors' property or financial affairs;

(j)    All Claims against HCLOF for the unauthorized use of Estate Assets
including, without limitation, any intellectual property rights or Assets owned by the Debtors or
Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or
Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Appx. 02496
015058

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10 18  Filed 08/07/25 230  Page 380 of 1017    PageID 16041

Case 18-30264-sgj11  Doc 829  Filed 01/31/19  Entered 01/31/19 17:34:06  Page 180 of 229
Case 18-30264-sgj11  Doc 702  Filed 12/16/18  Entered 12/16/18 17:34:35  Page 29 of 46

(l)     All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.    <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland HCF;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Appx. 02497
015059

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18 Filed 03/25/25    Page 381 of 1017    PageID 16042
Exhibit 18    Page 182 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 181 of 229
Case 18-30264-sgj11 Doc 792 Filed 11/16/18    Entered 11/16/18 17:34:55    Page 24 of 40

Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.    <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against Highland CLOM;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appx_02498
015060

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10 Filed 03/26    Page 183 of 230 Page 382 of 1017    PageID 16043

Case 18-30264-sgj11 Doc 820-2 Filed 01/31/19  Entered 01/31/19 17:34:06  Page 182 of 229
Case 18-90264-sgj11 Doc 702 Filed 11/16/18  Entered 11/16/18 17:34:95  Page 25 of 46

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.      <u>CLO Holdco, Ltd. Claims</u>.  All Estate Claims against CLO Holdco, Ltd. ("CLO Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against CLO Holdco;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appx. 02499
015061

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10 Filed 08/26/25    Page 383 of 1017    PageID 16044
Case 18-30264-sgj11 Doc 829-1 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 183 of 229
Case 18-30264-sgj11 Doc 702 Filed 11/16/18    Entered 11/16/18 17:34:05    Page 26 of 40

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.    Neutra, Ltd. Claims.  All Estate Claims against Neutra, Ltd. ("Neutra") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Neutra;

(e)      All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Neutra for the unauthorized use of Estate Assets

Appx. 02509

015062

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 08/25/25    Page 384 of 1017    PageID 16045
Case 18-30264-sgj11 Doc 820 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 184 of 229
Case 18-30264-sgj11 Doc 702 Filed 11/16/18    Entered 11/16/18 17:34:35    Page 27 of 40

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)    All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.    <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)    All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Appx. 02501
015063

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 06/25   Page 385 of 1017   PageID 16046
Case 18-30264-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 185 of 229
Case 18-30264-sgj11 Doc 702 Filed 11/16/18   Entered 11/16/18 17:34:05   Page 25 of 40

(h)      All Claims for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)      All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)      All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.      ~~Highland Affiliate Claims~~ Against Any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates.  All Estate Claims against any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates (collectively, the "Affiliates" and each, an "Affiliate") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against ~~any~~ such Affiliates ~~of Highland~~ shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against any ~~Highland~~ Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against any ~~Highland~~ Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against any ~~Highland~~ Affiliate;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Appx. 02502
015064

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18 Filed 06/06/25   Page 386 of 1017   PageID 16047

Case 18-30264-sgj11 Doc 829 Filed 01/31/19  Entered 01/31/19 17:34:06   Page 186 of 229
Case 18-30264-sgj11 Doc 702 Filed 11/16/18  Entered 11/16/18 17:34:55   Page 29 of 40

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against any ~~Highland~~ Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against any ~~Highland~~ Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any ~~Highland~~ Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, <u>HCLOF, Highland HCF, Highland CLOM, CLO Holdco,</u> Neutra, ~~or any~~<u>the</u> Affiliates ~~thereof~~, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of any ~~Highland~~ Affiliate as to any Person, including as against ~~any other~~<u>Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the</u> Affiliates ~~of Highland~~ , <u>James D. Dondero, Mark K. Okada,</u> or any officers, directors, equity interest holders, or Persons otherwise in control of any ~~Highland~~ Affiliates; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.     <u>Dondero Claims.</u>  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.     <u>Okada Claims.</u>  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due

Appx. 02503
015065

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1018    Filed 08/25    Page 387 of 1017    PageID 16048
Case 18-30264-sgj11 Doc 829-2 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 187 of 229
Case 18-30264-sgj11 Doc 792 Filed 01/16/18    Entered 01/16/18 17:34:05    Page 90 of 40

care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.    Preference Claims.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved, retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.    Claims Against Officers, Managers and Members.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.    Claims Against Former Attorneys and Law Firms.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims

Appx. 02594

015066

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10    Filed 08/25/25    Page 388 of 1017    PageID 16049
Exhibit 18    Page 189 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 188 of 229
Case 18-30264-sgj11 Doc 792 Filed 11/16/18    Entered 11/16/18 17:34:95    Page 91 of 40

for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit
of the Estate and Reorganized Debtor against all law firms and attorneys who and which
rendered legal services to the Debtors on a prepetition basis including, but not limited to, the
following:

    (a)    Cole Schotz, P.C.

    (b)    Michael D. Warner

    (c)    Jacob Frumkin

    (d)    Warren A. Usatine

    (e)    McKool Smith

    (f)    Gary Cruciani

    (g)    Michael P. Fritz

    (h)    Carson D. Young

    (i)    Nicholas Matthews

    (i)(j)    Lackey Hershman, LLP

    (j)(k)    Stinson Leonard Street LLP

    (l)    Jamie R. Welton

    (k)(m)    Paul B. Lackey, Esq.

    (l)(n)    Michael Aigen, Esq.

    (o)    Roger L. Mandel

    (m)(p)    Abrams & Bayliss, LLP

    (n)(q)    Kevin G. Abrams

    (o)(r)    A. Thompson Bayliss

    (p)(s)    Jones Day

    (q)(t)    Hilda C. Galvan

    (r)(u)    Michael Weinberg

    (s)(v)    Reid Collins & Tsai, LLP

    (t)(w)    Lisa Tsai

    (u)(x)    Stanton, LLP

Appx. 02505
015067

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 01/30/25    Page 389 of 1017    PageID 16050
Exhibit Filed Page 190 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 189 of 229
Case 18-30264-sgj11 Doc 702 Filed 11/16/18    Entered 11/16/18 17:34:55    Page 82 of 409

(v)(y)   James M. Stanton

(w)(z)   Hunton Andrews Kurth

(x)(aa)   Marc Katz

(y)(bb)   Greg Waller

(z)(cc)   any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

16.    Retention of Claims Against Specific Persons or Categories of Persons.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:

16.    Claims Against Officers, Directors, Employees, Members, and Managers, of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates, including all such Estate Causes of Action based on fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act.  Such present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates include, but are not limited to, the following Persons:

(a)    William Scott;

(b)    Heather Bestwick;

(c)    Scott Ellington

(d)    Isaac Leventon

(e)    Jean Paul Sevilla

(f)    Hunter Covitz

(g)    The Dugaboy Investment Trust

(h)    Nancy Dondero, Trustee of the Dugaboy Trust

(i)    Grant Scott


Appx. 02596
015068

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 151-10    Filed 09/26    Page 390 of 1017    PageID 16051
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 190 of 229
Case 18-30264-sgj11 Doc 702 Filed 11/16/18    Entered 11/16/18 17:34:55    Page 99 of 469

(j)_____ Any other Person who may be so named at a later date by the Reorganized Debtor.

(c)

Formatted: Indent: Left:  1",  No bullets or numbering

17.    Counterclaims.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.    Piercing the Corporate Veil.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.    Avoidance Actions.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.    Estate Defenses.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate. All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.    Equitable Subordination.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

22.    Recharacterization.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Appx 02507

015069

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-2018   Filed 09/26/25   Page 391 of 1017   PageID 16052
Case 18-30064-sgj11 Doc 820-2 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 91 of 209

# Exhibit "3"

## [Service Lists]

Appx. 02508

015070

## Notice Service List
## Acis Capital Mgmt./Phelan
## #5980

**BNP Paribas Securities Services**
**Luxembourg Branch**
**60 Avenue John F. Kennedy**
**1855 Luxembourg**

Dallas County
c/o Laurie Spindler
Linebarger, Goggan, Blair & Sampson LLP
2777 N Stemmons Frwy, No 1000
Dallas, TX 75207-2328

Acis CLO Management, LLC
Acis CLO Value GP, LLC
1209 Orange Street
Wilmington, DE 19801-1120

**Acis Funding GP, Ltd.**
**Acis Funding L.P.**
**c/o Maples Corporate Services Limited**
**P0 Box 309, Ugland House**
**Grand Cayman, Cayman Islands KY1 -1104**

Mizuho Securities USA Inc.
320 Park Ave., 12th Floor
New York, NY 10022-6848

US Bank National Association
c/o Daniel P. Novakov
Frost Brown Todd LLC
100 Crescent Court, Suite 350
Dallas, TX 75201-2348

Robin Phelan, Chapter 11 Trustee
Phelenlaw
4214 Woodfin Drive
Dallas, TX 75220-6416

Texas Comptroller of Public Accounts
c/o John M. Stern, Asst. Attorney General
Bankruptcy & Collection Div. MC 008
PO Box 12548
Austin, TX 78711-2548

Office of the United States Attorney
3rd Floor, 1100 Commerce Street
Dallas, Texas 75242-1699

United States Trustee
Lisa Lambert
1100 Commerce St., Room 976
Dallas, TX 75242

Dallas County
c/o Sherrel K Knighton
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons Frwy Ste 1000
Dallas, TX 75207-2328

**Acis CLO Value Fund II (Cayman), L.P.**
**Acis CLO Value Fund II GP, LLC**
**Acis CLO Value Master Fund II, L.P.**
**PO Box 309, Ugland House**
**Grand Cayman, Cayman Islands KY1-1104**

U. S. Bank National Association
Attn: Michael Zak
60 Livingston Ave., EP-MN-WS3D
Saint Paul, MN 55107-2292

US Bank National Association
c/o Mark D. Kotwick, Arlene Alves
Seward & Kissell LLP
One Battery Park Plaza
New York, NY 10004-1405

Acis Capital Management, LP
c/o Warren A. Usatine
Cole Schotz P.C.
25 Main Street
Hackensack, NJ 07601-7189

Securities and Exchange Commission
801 Cherry Street, Suite 1900, Unit 18
Fort Worth, TX  76102

Office of the Attorney General
Main Justice Building, Room 5111
10th & Constitution Avenue, N.W.
Washington, D.C.  20530

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc., Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Acis CLO 2013-1 Chemical Holdings, LLC
Acis CLO 2013-2 Chemical Holdings, LLC
Acis CLO 2014-3 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO 2014-4 Chemical Holdings, LLC
Acis CLO 2014-5 Chemical Holdings, LLC
Acis CLO 2015-6 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO Value Fund II, L.P.
Acis Loan Funding, Ltd.
Acis Capital Management GP, LLC
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

**State Street (Guernsey) Limited**
**First Floor Dorey Court**
**Admiral Park, St. Peter Port, Guernsey**
**Channel Islands GYI 6HJ**

Acis Capital Management, LP
c/o Michael D. Warner
Cole Schotz P.C.
1700 City Center Tower II
301 Commerce St.
Fort Worth, TX 76102-4140

The Bank of N.Y. Mellon Trust Co., N.A.
225 Liberty Street
New York, NY 10286-0001

**Acis Loan Funding, Ltd.**
**First Floor, Dorey Court**
**St. Peter Port, Guernsey**

Acis CLO 2013-1 LLC
Acis CLO 2013-2 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Internal Revenue Service
Special Procedures – Insolvency
P.O. Box 7346
Philadelphia, PA  1901-7346

Appx 02509

0150711

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 09/05/25   Page 393 of 1017   PageID 16054
Exhibit 18   Page 194 of 230

Case 18-30264-sgj11 Doc 829-2 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 93 of 229

US Bank
PO Box 5229
Cincinnati, OH 45201-5229

Diane G. Reed
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

Diane G. Reed
c/o David W. Elmquist
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

**Highland CLO Management, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

**Acis CLO 2013-1 Ltd.**
**Acis CLO 2013-2**
**c/o Estera Trust (f/k/a Appleby Trust)**
**Clifton House 75 Port St., P.O. Box 1350**
**Grand Cayman, Cayman Islands KY 1-1108**

**Acis CLO 2014-3 Ltd.**
**Acis CLO 2014-4 Ltd.**
**c/o MaplesFS Limited**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-5 Ltd.**
**Acis CLO 2015-6 Ltd.**
**c/o MaplesFS Limited**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102**

**Hewett's Island CLO I-R, Ltd.**
**c/o Maples Finance Limited**
**PO Box 1093, Queensgate House**
**South Church St., George Town**
**Grand Cayman, Cayman Island KY1-1102**

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2013-1 and 2013-2190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-3 and 2014-4190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-5 and Acis CLO 2015-6190 S.
LaSalle Street, 8th Floor
Chicago, IL 60603

Deutsche Bank Trust Company Americas
Attn:  CDO Business Unit – Hewett's
Island CLO 1-R
1761 East St. Andrew Place
Santa Ana, CA 92705

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**Acis CLO 2015-6 Ltd.**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102,**

Acis CLO 2014-3 LLC
Acis CLO 2014-4
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-5 LLC
Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

**Acis CLO 2017-7 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1 -1102**

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-18   Filed 01/15/25   Page 394 of 1017   PageID 16055
Exhibit 18   Page 195 of 230

Case 19-30264-sgj11 Doc 829-2 Filed 01/16/18 Entered 01/16/18 17:34:05 Page 94 of 209

*Highlands Service List*
*ACIS #5980*

Highland CLO Funding Ltd.
c/o Mark M. Maloney/W. Austin Jowers
King & Spalding LLP
1180 Peachtree Street NE
Atlanta, GA 30309

**Highland CLO Funding, Ltd.**
**First Floor, Dorey Court**
**Admiral Park, St. Peter Port**
**Guernsey GY1 6HJ, Channel Islands**

**Highland CLO Management, Ltd.**
**P.O. Box 309 Ugland House**
**South Church Street**
**George Town, Grand Cayman KY1-1004**

**Highland HCF Advisor, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

Neutra, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

**CLO Holdco, Ltd.**
**c/o Intertrust Corp. Srvs. (Cayman) Ltd.**
**190 Elgin Ave., George Town**
**Grand Cayman, Cayman Islands KY1-9005**

The Dugaboy Investment Trust
300 Crescent Court, Suite700
Dallas, TX 75201-1876

Highland CLO Funding, Ltd.
c/o Paul R. Bessette/Rebecca Matsumura
King & Spalding LLP
500 West 2nd St., Suite 1800
Austin, TX 78701-4684

Highland CLO Funding, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**P.O. Box 32311**
**Grand Cayman, KY1-1209**
**Cayman Islands**

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

CLO Holdco, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

**Highland CLO Management, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**Suite #4-210 Governor's Square**
**23 Lime Tree Bay Avenue**
**Grand Cayman, Cayman Islands**

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

CLO Holdco, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 06/06/25    Page 395 of 1017    PageID 16056
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:05    Page 95 of 289

## Creditors Service List
### Acis Capital Mgmt./Phelan
### #5980

### Class 2

Joshua N. Terry
25 Highland Park Village
Suite 100-848
Dallas, TX 75205-2726

Joshua N. Terry
c/o Brian P. Shaw/John M. Lynch
Rogge Dunn Group, PC
1201 Elm St., Suite 5200
Dallas, TX 75270

Joshua N. Terry
350 9 Princeton Ave.
Dallas, TX 75205-3246

### Class 3

Andrews Kurth Kenyon LLP
600 Travis, Suite 4200
Houston, TX 77002-2929

CSI Global Deposition Services
4950 N. O'Connor Road, Suite 152
Irving, TX 75062 - 2778

CT Corporation
PO Box 4349
Carol Stream, IL 60197-4349

Case Anywhere LLC
21860 Burbank Blvd., Suite 125
Woodland Hills, CA 91367-7447

David Langford
1321 Indian Creek
DeSoto, TX 75115-3652

David Simek
31 Woodacres Road
Brookville, NY 11545-2911

Drexel Limited
309 23rd Street, #340
Miami Beach, FL 33139-1700

Elite Document Technology
400 N. Saint Paul St., Suite 1300
Dallas, TX 75201-6881

Highfield Equities, Inc.
3131 McKinney Ave., Suite 215
Dallas, TX 75204-2421

JAMS, Inc.
18881 Von Karman Ave., Suite 350
Irvine, CA 92612-6589

Jones Day
2727 N. Harwood Street
Dallas, TX 75201-1568

Lackey Hershman LLP
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219-4259

KPMG LLP (USA)
Two Financial Center
60 South Street
Boston, MA 02111-2759

KPMG LLP
2323 Ross Ave., Suite 1400
Dallas, TX 75201-2721

KPMG LLP
Aon Center
200 E. Randolph St., Suite 5500
Chicago, IL 60601-6607

McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201-6970

Reid Collins & Tsai, LLP
Building C, Suite 300
1301 S. Capital of Texas Highway
Austin, TX 78746-6550

Stanton Advisors LLC
300 Coles St., Apt. 802
Jersey City, NJ 07310-1047

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 01/06/25   230   Page 396 of 1017   PageID 16057
Case 18-30264-sgj11 Doc 828 Filed 01/16/18   Entered 01/16/18 17:34:06   Page 96 of 289

Stanton Law Firm
9400 North Central Expwy., Suite 1304
Dallas, TX 75231-5047

The TASA Group, Inc.
1166 DeKalb Pike
Blue Bell, PA 19422- 1853

Acis CLO 2013-1, Ltd., et al.
c/o David Neier
Winston & Strawn LLP
200 Park Ave.
New York, NY 10166-4193

Acis CLO 2013-1 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-3 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-4 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-5 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

**Directors - Acis CLO 2013-1 Ltd.
75 Fort St., Clifton House
PO Box 1350
George Town, Grand Cayman
Cayman Island, KY1-1108**

**Directors - Acis CLO 2014-3 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman**

**Directors - Acis CLO 2014-4 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman**

**Directors - Acis CLO 2014-5 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman**

**Directors - Acis CLO 2015-6 Ltd.
PO Box 1093
KY1-1102, Cricket Square
Grand Cayman**

**Acis CLO 2013-1, Ltd.
c/o Appleby Trust, Attn: Directors
Clifton House 75 Fort St., P0 Box 13
Grand Cayman, Cayman Islands KY1-1108**

**Acis CLO 2013-2 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-3 Ltd.
c/o MaplesFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-4 Ltd.
c/o MapleFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-5 Ltd.
c/o MapleFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2015-6 Ltd.
c/o MapleFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1 -1102**

**Acis CLO 2017-7 Ltd.
c/o MapleFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1 -1102**

Acis CLO 2013-1, Ltd., et al.
c/o Thomas Melsheimer/Lane Webster
Winston & Strawn LLP
2501 N. Harwood St., 17th Floor
Dallas, TX 75201

Jennifer G. Terry
25 Highland Park Village, Suite 100-848
Dallas, TX 75205

Hunton Andrews Kurth LLP
c/o M. Christine Klein, Dep. Gen. Counsel
Riverfront Plaza, East Tower
951 East Byrd St.
Richmond, VA 23219

Patrick H. Daugherty
3621 Cornell Ave.
Dallas, TX 75250

Stinson Leonard Street LLP
Attn: Paul Lackey
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219

Case 19-34054-sgj11 Doc 3596-18 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-10 Filed 06/06/25 Page 397 of 1017 PageID 16058
Case 19-30964-sgj11 Doc 828-2 Filed 01/31/18 Entered 01/31/18 17:34:05 Page 40 of 289

## Class 4

Highland Capital Management, LP
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

Highland Capital Management, LP
1209 Orange Street
Wilmington, DE 19801-1120

Highland Capital Management, LP
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland Capital Management, LP, Highland
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

Appx. 02514
015076

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 51-18    Filed 09/25    Page 398 of 1017    PageID 16059
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 198 of 229

# EXHIBIT "4"

**[Supplement to Second Modification to the Third Amended
Joint Plan for Acis Capital Management, L.P. and Acis Capital
Management GP, LLC – Dkt. No. 769]**

Appx. 02515
015077

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18 Filed 06/06/25    Page 399 of 1017    PageID 16060
Case 18-30264-sgj11 Doc 826 Filed 01/31/19 Entered 01/31/19 18:34:06 Page 199 of 229

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone:  (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR**
**ROBIN PHELAN, CHAPTER 11 TRUSTEE**

Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,**
**CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 CASES |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-sgj11 |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered) |
| | § | |
| Debtors. | § | |

## SUPPLEMENT TO SECOND MODIFICATION TO THE THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

Robin Phelan ("Trustee"), the Chapter 11 Trustee for Acis Capital Management, LP and Acis Capital Management GP, LLC (the "Debtors"), files this Supplement to the Second Modification (the "Second Modification") to the *Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC* [Docket No. 660], as modified by the *First Modification to the Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC* [Docket No. 693] (together, the "Plan").

Appx. 02516
015078

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 00/03/25 230    Page 400 of 1017    PageID 16061
Case 18-30264-sgj11    Doc 828-5 Filed 01/31/09    Entered 01/31/09 17:34:06    Page 200 of 229

1.      On November 16, 2018, the Trustee filed the Second Modification.  The Second Modification modified the Plan to replace the Exhibit "A," reflecting Estate Claims, with a revised version of Exhibit A.  The Schedule "1" to Exhibit A, which reflects the Estate's Preference Claims, was not changed from the version attached to the Plan but was inadvertently omitted from the Second Modification.  For completeness and to avoid any confusion regarding the Preference Claims being reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, the Second Modification is hereby supplemented with the Schedule "1" to Exhibit "A" to the Plan.

2.      A copy of the Schedule "1" is attached hereto as **Exhibit 1**.

3.      A copy of the complete Exhibit "A" to the Plan, including Schedule "1," is attached hereto as **Exhibit "2."**

4.      A redline is not necessary because the attached Schedule "1" is unchanged from the version attached to the Plan and included in the Trustee's solicitation materials.

Dated:  December 10, 2018.            Respectfully submitted,

ACIS CAPITAL MANAGEMENT, L.P.

By:  /s/ *Robin Phelan*
        Robin Phelan
        Chapter 11 Trustee

ACIS CAPITAL MANAGMENET GP, LLC

By:  /s/ *Robin Phelan*
        Robin Phelan
        Chapter 11 Trustee

App. 02517
015079

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 02/26/25    Page 401 of 1017    PageID 16062
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:54:06    Page 201 of 229
Case 18-30264-sgj11 Doc 826 Filed 12/10/18    Entered 12/10/18 19:48:10    Page 3 of 229

APPROVED:

_/s/ Jeff P. Prostok_____
Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

APPROVED:

_/s/ Rahkee V. Patel_____
Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello –State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN
PHELAN, CHAPTER 11 TRUSTEE**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document and the attached exhibits were served electronically via the Court's Electronic Court Filing (ECF) notification system on December 10, 2018.

_/s/ Jeff P. Prostok_____
Jeff P. Prostok

\L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Supplement to Second Modification to Third Amended Plan 12.10.18.docx

Appx. 02518
015080

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 00/03/25    Page 402 of 1017    PageID 16063
Case 18-30264-sgj11 Doc 829-5 Filed 01/31/19  Entered 01/31/19 17:34:06  Page 202 of 229

# EXHIBIT "1"

Schedule "1" to Exhibit "A" to
Third Amended Plan

Appx. 02519
015081

Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

Case 18-30264-sgj11 Doc 769 Filed 12/10/18   Entered 12/10/18 15:10:10   Page 5 of 23
Schedule 1 to Exhibit A to

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| **Payments within 90 Days of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| **Payments to Insiders within One Year of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

015082

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 06/05/25   Page 404 of 1017   PageID 16065
Exhibit 18   Page 205 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 204 of 229

Case 18-30264-sgj11 Doc 769 Filed 12/10/18   Entered 12/10/18 15:10:10   Page 6 of 23
Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Appx. 02521
015083

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 51-18    Filed 06/25    Page 405 of 1017    PageID 16066
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 205 of 229

# EXHIBIT "2"

[Exhibit "A" to Third Amended Plan
as Supplemented]

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 02/07/25   Page 406 of 1017   PageID 16067
Case 18-30264-sgj11   Doc 828   Filed 01/31/19   Entered 01/31/19 17:34:00   Page 206 of 229

**EXHIBIT "A"**
to
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.  <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.  <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.  <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

   (a)  All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

   (b)  All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

   (c)  All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

---



Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 16-18 Filed 02/28/25   Page 407 of 1017   PageID 16068
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 207 of 229

Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)     All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)     All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)     All Claims for breach of the PMAs or the Indentures;

(h)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)     All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)     All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)     All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)     All Claims based on alter ego or rights to pierce the corporate veil of


Appx. 02524

015086

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 03/25/25    Page 408 of 1017    PageID 16069
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 20 of 229

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

---

Appx. 02525
015087

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Page 020 of 230   Page 409 of 1017   PageID 16070
Case 18-30264-sgj11 Doc 879 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 209 of 229

        (l)      All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

        (m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

    5.    <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

        (a)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

        (b)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

        (c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

        (d)     All Avoidance Actions against Highland HCF;

        (e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

        (f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

        (g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

        (h)     All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

        (i)     All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

        (j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or


Appx. 02526
015088

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-10   Filed 02/26/25   Page 410 of 1017   PageID 16071
Case 18-30264-sgj11 Doc 789 Filed 01/31/19   Entered 01/31/19 17:54:06   Page 10 of 29

Estate;

    (k)    All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

    (l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

    6.    <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

    (a)    All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

    (b)    All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

    (c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

    (d)    All Avoidance Actions against Highland CLOM;

    (e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

    (f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

    (g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

    (h)    All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

    (i)    All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

---



Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 02/06/25    Page 411 of 1017    PageID 16072
Case 18-30264-sgj11  Doc 789  Filed 01/31/19  Entered 01/31/19 17:34:06  Page 11 of 29

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.    <u>CLO Holdco, Ltd. Claims</u>.  All Estate Claims against CLO Holdco, Ltd. ("CLO Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against CLO Holdco;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;



Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-10   Page 0216 of 230   Page 412 of 1017   PageID 16073
Case 18-30064-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:05   Page 12 of 229

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.      <u>Neutra, Ltd. Claims</u>.  All Estate Claims against Neutra, Ltd. ("<u>Neutra</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Neutra;

(e)      All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Neutra for the unauthorized use of Estate Assets

Appx. 02529
015091

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 02/04/25   Page 413 of 1017   PageID 16074
Case 18-30264-sgj11 Doc 789 Filed 01/31/19   Entered 01/31/19 17:34:00   Page 18 of 22

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.     <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)     All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 02/15/25   Page 414 of 1017   PageID 16075
Case 18-30664-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 14 of 229

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.     Claims Against Any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates.  All Estate Claims against any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates (collectively, the "Affiliates" and each, an "Affiliate") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against such Affiliates shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against any Affiliate;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of



APPX 02531
015093

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 02/06/25   Page 415 of 1017   PageID 16076
Case 18-30264-sgj11 Doc 789 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 215 of 229

the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against any Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against any Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of any Affiliate as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any officers, directors, equity interest holders, or Persons otherwise in control of any Affiliates; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.     Dondero Claims.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.     Okada Claims.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other

APP 0532
015094

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 02/07/25    Page 416 of 1017    PageID 16077
Case 18-30264-sgj11 Doc 829 Filed 01/31/18    Entered 01/31/18 17:34:06    Page 16 of 229

Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.    Preference Claims.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved, retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.    Claims Against Officers, Managers and Members.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.    Claims Against Former Attorneys and Law Firms.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which

APPX 02528
015095

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 02/18/25    Page 417 of 1017    PageID 16078
Case 18-30264-sgj11 Doc 789 Filed 12/31/18    Entered 12/31/18 15:34:06    Page 17 of 229

rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:

    (a)    Cole Schotz, P.C.

    (b)    Michael D. Warner

    (c)    Jacob Frumkin

    (d)    Warren A. Usatine

    (e)    McKool Smith

    (f)    Gary Cruciani

    (g)    Michael P. Fritz

    (h)    Carson D. Young

    (i)    Nicholas Matthews

    (j)    Lackey Hershman, LLP

    (k)    Stinson Leonard Street LLP

    (l)    Jamie R. Welton

    (m)    Paul B. Lackey

    (n)    Michael Aigen

    (o)    Roger L. Mandel

    (p)    Abrams & Bayliss, LLP

    (q)    Kevin G. Abrams

    (r)    A. Thompson Bayliss

    (s)    Jones Day

    (t)    Hilda C. Galvan

    (u)    Michael Weinberg

    (v)    Reid Collins & Tsai, LLP

    (w)    Lisa Tsai

    (x)    Stanton, LLP

    (y)    James M. Stanton

Appx. 02524

015096

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 02/19/25   Page 418 of 1017   PageID 16079
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 20 of 29

(z)     Hunton Andrews Kurth

(aa)    Marc Katz

(bb)    Greg Waller

(cc)    any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

16.    <u>Claims Against Officers, Directors, Employees, Members, and Managers, of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates</u>.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates, including all such Estate Causes of Action based on fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act.  Such present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates include, but are not limited to, the following Persons:

(a)     William Scott;

(b)     Heather Bestwick;

(c)     Scott Ellington

(d)     Isaac Leventon

(e)     Jean Paul Sevilla

(f)     Hunter Covitz

(g)     The Dugaboy Investment Trust

(h)     Nancy Dondero, Trustee of the Dugaboy Trust

(i)     Grant Scott

(j)     Any other Person who may be so named at a later date by the Reorganized Debtor.

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 02/26/25   Page 419 of 1017   PageID 16080
Case 18-30664-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 219 of 229

17.     <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.     <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.     <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.     <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.     <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

22.     <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate.  Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

APP. 02536
015098

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-18   Filed 02/26/25   Page 420 of 1017   PageID 16081
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 220 of 229

Case 18-30264-sgj11 Doc 769 Filed 12/10/18   Entered 12/10/18 15:10:10   Page 22 of 23
Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| **Payments within 90 Days of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| **Payments to Insiders within One Year of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 51-18   Filed 02/22/26   Page 421 of 1017   PageID 16082
Case 18-30264-sgj11   Doc 829   Filed 01/31/19   Entered 01/31/19 17:34:06   Page 221 of 229

Case 18-30264-sgj11 Doc 769 Filed 12/10/18 Entered 12/10/18 15:10:10 Page 23 of 23

Schedule 1 to Exhibit "A" to

**Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|------|---------|-----------------|----------------|-------------------------------|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10    Filed 02/23/25    Page 422 of 1017    PageID 16083
Exhibit 18    Page 223 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 222 of 229

# EXHIBIT "5"

**[Executory Contracts and Unexpired Leases to be Assumed by the Trustee]**

Appx 02539
015101

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 02/24/25    Page 423 of 1017    PageID 16084
Exhibit 15-18    Page 229 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 223 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | March 18, 2013 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2013-1 | Collateral Administration Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | October 3, 2013 | $0 |
| The Bank of New York Mellon Trust Co., N.A.<br>601 Travis Street, 16th Floor<br>Houston, Texas 77002<br>Attn:  Global Corporate Trust –<br>Acis CLO 2013-2 | Collateral Administration Agreement | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | October 3, 2013 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | February 25, 2014 | $0 |

1

APPX 02549
015102

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 02/25/25    Page 424 of 1017    PageID 16085
Exhibit 18    Page 225 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 224 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-3 | Collateral Administration Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | June 5, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-4 | Collateral Administration Agreement | June 5, 2014 | $0 |
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | June 5, 2014 | $0 |
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | November 18, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-5 | Collateral Administration Agreement | November 18, 2014 | $0 |

2

Appx. 02541
015103

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 02/26/25    Page 425 of 1017    PageID 16086
Exhibit 15-18    Page 226 of 230
Case 18-30264-sgj11    Doc 829    Filed 01/31/19    Entered 01/31/19 17:34:06    Page 225 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2014-5 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | November 18, 2014 | $0 |
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | April 16, 2015 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2015-6 | Collateral Administration Agreement | April 16, 2015 | $0 |
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | April 16, 2015 | $0 |
| Acis CLO Value Fund II (Cayman), LP. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II GP, LLC P.O. Box. 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II, LP. 300 Crescent Court Suite 700 Dallas, TX 75201 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value GP, LLC 1209 Orange Street Wilmington, DE 19801 | Limited Liability Company Agreement | July 19, 2010 | $0 |

3

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10-18    Filed 07/25/230    Page 426 of 1017    PageID 16087
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 226 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO Value Master Fund II, LP. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II (Cayman), L.P. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis CLO Value Master Fund II, L.P. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis Loan Funding, Ltd. 300 Crescent Court Suite 700 Dallas, TX 75201 | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |
| BayVK R2 Lux S.A., SICAV FIS 15 rue de Flaxweiler L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS 15 rue de Flaxweiler L-6776 Grevenmacher | Agreement for the Outsourcing of the Asset Management of BayVK R2 Lux S.A., SICAV-FIS | February 27, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS 15 rue de Flaxweiler L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |
| BNP Paribas Securities Services Luxembourg Branch 60 Avenue John F. Kennedy 1855 Luxembourg | Power of Attorney 86578 | February 20, 2015 | $0 |
| Hewett's Island CLO 1-R, Ltd. c/o Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Confidentiality Agreement | April 11, 2011 | $0 |

4

Case 19-34054-sgj11    Doc 3596-18    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-18    Filed 02/28/25    Page 427 of 1017    PageID 16088
Exhibit 15-18    Page 228 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 227 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Hewett's Island CLO 1-R, Ltd. c/o Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Governing Documents (Requested from HCM) | -- | $0 |
| Hewett's Island CLO 1-R, Ltd. c/o Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Management Agreement | July 18, 2011 | $0 |
| Hewett's Island CLO 1-R, Ltd. c/o Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement (Requested from HCM) | November 20, 2007 | $0 |
| State Street (Guerney Limited) First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2015-6 | Confidentiality Agreement | March 5, 2014 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Agreement for the Outsourcing of the Asset Management of BayVK R2 Lux S.A., SICAV-FIS | February 27, 2015 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |

5

Case 19-34054-sgj11   Doc 3596-18   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 25-18   Filed 02/25/25   Page 428 of 1017   PageID 16089
Exhibit 18   Page 229 of 230
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 228 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis Loan Funding, Ltd.<br>First Floor, Dorey Court<br>St. Peter Port, Guernsey GY1 6HJ<br>Channel Islands | Portfolio Management Agreement | December 22, 2016 | $0 |
| Acis Capital Management, LP<br>c/o *PHELANLAW*<br>4214 Woodfin Drive<br>Dallas, Texas 75220 | Amended and Restated Agreement of Limited Partnership | January 21, 2011 | $0 |
| Acis Capital Management GP, LLC<br>c/o *PHELANLAW*<br>4214 Woodfin Drive<br>Dallas, Texas 75220 | Amended and Restated Limited Liability Company Agreement | January 21, 2011 | $0 |

For the avoidance of doubt, to the extent not otherwise included above, the Trustee intends to assume any additional executory contracts that relate to the funds set forth below as may be necessary or beneficial to the Reorganized Debtor under the Plan:

1.  Acis CLO 2013-1, Ltd.
2.  Acis CLO 2013-2, Ltd.
3.  Acis CLO 2014-3, Ltd.
4.  Acis CLO 2014-4, Ltd.
5.  Acis CLO 2014-5, Ltd.
6.  Acis CLO 2015-6, Ltd.
7.  Acis CLO Value Fund II, L.P.
8.  Acis CLO Value Fund II (Cayman), L.P.
9.  Acis CLO Master Fund II, L.P.
10. BayVK R2 Lux S.A., SICAV FIS

6

Appx. 02545
015107

# EXHIBIT "5"
## Executory Contracts and Unexpired Leases to Be Assumed by the Trustee

11.  Hewitt's Island CLO 1-R, Ltd.

12.  Acis Loan Funding, Ltd.

The Trustee reserves the right to amend or supplement this Exhibit 5.

7

# EXHIBIT 19

015109
Appx 02547

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE ACIS CAPITAL MANAGEMENT, L.P., et al., | § § § | |
| Debtors. | § § | |
| NEUTRA, LTD., et al., | § § § | Civil Action No. 3:18-CV-1056-D (Consolidated with Civil Action Nos. 3:18-CV-1057-D, 3:18-CV-1073-D, and 3:18-CV-1084-D) |
| Appellants, | § § | |
| VS. | § § | (Bank. Ct. Nos. 18-30264-SGJ-7; 18-30265-SGJ-7) |
| JOSHUA N. TERRY, et al., | § § | |
| Appellees. | § § | |
| IN RE ACIS CAPITAL MANAGEMENT, L.P., et al., | § § § | |
| Debtors. | § § | |
| HIGHLAND CLO FUNDING, LTD., et al., | § § § § | Civil Action No. 3:18-CV-1822-D (Bank. Ct. Nos. 18-30264-SGJ-11 and 18-30265-SGJ-11) |
| Appellants, | § § | |
| VS. | § § | |
| ROBIN PHELAN, CHAPTER 11 TRUSTEE, et al., | § § § | |
| Appellees. | § | |

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-30   19 Filed 03/05/85   Page 432 of 1017   PageID 16093

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 2 of 84   PageID 97995

IN RE ACIS CAPITAL                        §
MANAGEMENT, L.P., et al.,                 §
                                          §
                    Debtors.              §
                                          §    Civil Action No. 3:19-CV-0291-D
HIGHLAND CAPITAL                          §    (Bank. Ct. Nos. 18-30264-SGJ-11 and
MANAGEMENT, L.P., et al.,                 §    18-30265-SGJ-11)
                                          §
                    Appellants,           §
                                          §
VS.                                       §
                                          §
ROBIN PHELAN, CHAPTER 11                  §
TRUSTEE, et al.,                          §
                                          §
                    Appellees.            §

APPEALS FROM THE
UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS

FITZWATER, Senior Judge:

In multiple appeals taken from two involuntary bankruptcy cases, the principal

questions presented are whether the bankruptcy court erred by issuing orders for relief and

denying the debtors' motion to dismiss or compel arbitration; whether the bankruptcy court

erred by approving a seven-figure break-up fee in favor of a potential transaction partner; and

whether the bankruptcy court erred by confirming a reorganization plan ("the Plan") that

enjoins a non-debtor, non-creditor entity from exercising certain contractual rights.  The

court must also decide questions of the bankruptcy court's subject matter jurisdiction and of

one appellant's standing to appeal.  For the reasons that follow, the court DISMISSES the

appeal from the orders for relief, AFFIRMS the break-up fee order, and AFFIRMS the order

Appx 02540

015111

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-30    19 File Page 44 of 85    Page 433 of 1017    PageID 16094
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 3 of 84    PageID 97996

approving the Plan.  The court need not address the bankruptcy court's denial of the motion
to dismiss.

I

The following factual summary is based on the bankruptcy court's findings of fact in
support of the orders for relief and the Plan confirmation order.  *See In re Acis Capital
Mgmt., L.P.* (*Acis II*), 2019 WL 417149, at *2-7 (Bankr. N.D. Tex. Jan. 31, 2019) (Jernigan,
J.) (confirmation order); *In re Acis Capital Mgmt., L.P.* (*Acis I*), 584 B.R. 115, 119-42
(Bankr. N.D. Tex. 2018) (Jernigan, J.) (orders for relief).[1]

A

Appellant Highland Capital Management, L.P. ("Highland") is a Dallas-based
registered investment advisor that manages nearly $15 billion of assets through an
organizational structure comprised of roughly 2,000 different entities.  Its investment
vehicles include mutual funds, private equity funds, and (relevant here) collateralized loan
obligation funds ("CLOs").  Highland conducted its CLO business through an entity called
Acis Capital Management, L.P. ("Acis LP") and Acis LP's general partner, Acis Capital
Management GP, L.L.C. ("Acis GP") (collectively, "Acis," unless otherwise indicated), both
debtors in these appeals.

In 2005 Highland hired appellee Joshua Terry ("Terry") as a portfolio analyst.  Terry

---

[1]"The court reviews the bankruptcy court's . . . fact findings only for clear error."  *In
re Nary*, 253 B.R. 752, 756 (N.D. Tex. 2000) (Fitzwater, J.) (quoting *In re ICH Corp.*, 230
B.R. 88, 91 n.10 (N.D. Tex. 1999) (Fitzwater, J.)).

- 3 -

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-20    Filed 05/06/25    Page 434 of 1017    PageID 16095
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 4 of 84    PageID 97997

rose through the ranks at Highland until he became the portfolio manager for Highland's

CLO business, and, in turn, received a 25% limited partnership interest in Acis LP. Terry

successfully managed billions of dollars of assets on Highland's behalf until June 2016, when

Highland terminated him. The reason for Terry's termination is disputed.[2] As a result of the

termination, Terry's partnership interest in Acis LP was deemed forfeited without

compensation.

In September 2016 Highland sued Terry in the 162nd Judicial District Court of Dallas

County, seeking to recover, *inter alia*, on theories of breach of fiduciary duty, disparagement,

and breach of contract. Terry asserted counterclaims against Highland, Acis, and others, and

demanded arbitration. The state court stayed the proceeding and ordered arbitration, and in

October 2017 the arbitration panel rendered an award in Terry's favor for $7,949,749.15,

plus post-judgment interest, against Acis ("the Award"). Terry sought and obtained

confirmation of the Award in the 44th Judicial District Court of Dallas County.

After the Award was confirmed, Terry began conducting post-judgment discovery,

which revealed some transactions that appeared suspicious to Terry. Terry thought that

Highland was denuding Acis of assets in an effort to make Acis judgment-proof. At a

January 24, 2018 hearing, Terry requested a temporary restraining order ("TRO") to restrain

---

[2]According to the bankruptcy court, "[t]he arbitration panel that issued the Arbitration Award found that Mr. Terry was terminated for essentially doing the right thing for investors." *Acis II*, 2019 WL 417149, at *14; *see also* P. 1st Supp. to Pet. to Confirm Arbitration Award Exh. 1, No. DC-17-15244 (44th Dist. Ct., Dall. Cty., Tex. filed Nov. 13, 2017).

App. 02551
015113

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-30   Filed 06/06/25   Page 435 of 1017   PageID 16096
Exhibit 19 Page 6 of 85

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 5 of 84   PageID 97998

Acis LP from transferring any more assets pending a January 31 temporary injunction
hearing. Acis LP agreed to the request, and the court issued a TRO. Five days later, Terry
filed supplemental pleadings alleging that Acis LP was engaging in more wrongdoing, and
requested appointment of a receiver. Instead of proceeding with the January 31 state-court
hearing, however, Terry took a different tack. At 11:57 p.m. the night before the hearing,
Terry filed involuntary bankruptcy petitions against both Acis LP and Acis GP.[3]

B

To comprehend some of the key issues in these appeals, it is helpful to recount some
of the fundamentals of CLOs and how Highland structured its CLO business.

At the most basic level, a CLO is a "basket of loans." *Acis I*, 584 B.R. at 123. A
special-purpose CLO entity ("CLO-SPE") purchases variable-rate commercial loans at the
direction of the CLO manager, and collects them into a pool of loans. The obligors of the
loans are usually large, well-known companies. Investors, such as pension funds, life
insurance companies, and others, buy into the CLO by purchasing fixed-rate, secured notes
on which the CLO-SPE itself is the obligor. These notes are typically sold in tranches
representing different levels of risk. The CLO-SPE pays its obligations on the secured notes
using the income it receives from its pool of loans, starting with the top tranche of notes and
then proceeding through the lower tranches. These payments are made according to the
terms of certain indenture agreements between the CLO-SPE and the indenture trustee (here,

---

[3]The bankruptcy court administratively consolidated the two cases, appointed a single
trustee, and ultimately confirmed one Plan applicable to both alleged debtors.

- 5 -

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-30   19-3 Page 06/25 Page 436 of 1017   PageID 16097
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 6 of 84   PageID 97999

U.S. Bank, N.A.) to whom the CLO-SPE pledges collateral to secure the notes.

The last investor to be paid is the "equity" holder, who does not own actual equity but instead holds a subordinated, unsecured note. The equity investor earns money when the variable interest rates paid to the CLO-SPE on the commercial loans exceed the fixed interest rates that the CLO-SPE must pay to the secured note holders. Although the equity investor assumes the most risk, it also possesses certain rights that allow it to control the CLO—most significantly, the right to call for an optional redemption of the CLO.[4] When an optional redemption is effected, the CLO's pool of loans is liquidated and the resulting cash is used to pay back the outstanding secured notes, beginning with the top tranche and proceeding downward.[5]

In the present cases, Acis LP acts as the portfolio manager—*not* as the equity holder—of four CLO-SPEs, and is contractually entitled to receive portfolio management fees from them. Appellant Highland CLO Funding, Ltd. ("HCLOF"), a Guernsey[6] entity formerly known as Acis Loan Funding, Ltd.,[7] is the primary equity investor in the CLOs.

---

[4]It is disputed whether the equity holder in this case had the right to compel Acis LP to effect an optional redemption of the relevant CLOs against Acis LP's will. The court need not resolve this dispute and therefore suggests no view on this question.

[5]The holders of the top tranche of secured notes also have special rights—namely, the right to terminate the CLO manager for cause on 45 days' notice. The note holders in these cases have so far not exercised that right.

[6]Guernsey is a small island nation located in the English Channel.

[7]For clarity, the court will refer to this entity as HCLOF, even when describing events that occurred before the entity changed its name.

App. 02553
015115

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-30   Filed 08/25/25   Page 437 of 1017   PageID 16098
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 7 of 84   PageID 98000

HCLOF does not own Acis; to the contrary, Acis LP once owned an indirect 15% stake in HCLOF for regulatory compliance reasons.  Acis itself has never had any employees. Instead, it subcontracts all front office advising and back office support services to another entity. Highland was originally Acis LP's subcontractor, but, under the Plan, an entity called Brigade Capital Management, L.P. ("Brigade") fills that role (for a much lower cost).

Historically, all of these entities—Acis LP, Highland, HCLOF, and the CLO-SPEs—operated within an ecosystem of contracts that allowed Acis to manage the CLOs effectively.  First, Acis LP had various fee-generating portfolio management agreements ("PMAs") with the CLO-SPEs .  These contracts remain in place under the Plan.  Second, Acis LP and Highland had a sub-advisory agreement, which obligated Highland to provide advisory and management services in exchange for substantial fees.  Third, Acis LP and Highland had a shared services agreement, through which Highland provided back office services to Acis for a significant fee. And, fourth, Acis LP had a separate PMA with HCLOF ("the Equity PMA").  While the parties dispute the exact effect of the Equity PMA—i.e., to whom it gave power over whom—it is undisputed that Acis LP earned no fees from this contract.

C

Circumstances changed after the state-court litigation between Highland and Terry began.  As noted above, Highland and Acis LP engaged in numerous transactions that caused Terry to believe "that Highland was dismantling and denuding Acis LP of all of its assets and value."  *Acis I*, 584 B.R. at 144.  In October 2017, four days after Terry obtained the Award,

015116
Appx 02554

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-30   Filed 09/05/25   Page 438 of 1017   PageID 16099
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 8 of 84   PageID 98001

Acis LP sold its stake in HCLOF back to HCLOF in exchange for about $990,000 in cash.

As a result, Acis LP could no longer lawfully manage any new CLOs under the applicable

regulatory scheme.  Three days later, HCLOF entered into a new PMA—a replacement for

the Equity PMA—with a recently-formed Cayman Islands entity called Highland HCF

Advisor, Ltd.  At around the same time, Acis LP terminated the original Equity PMA.  In

early November 2017, Acis LP transferred one of its most significant assets—a $9.5 million

note receivable that Highland owed to it—to another Cayman Islands entity, Highland CLO

Management, Ltd. ("Highland Management").  Acis LP transferred the note pursuant to a

contract that provided that Highland Management would step into Acis LP's shoes as the

portfolio manager for the CLOs.  Highland Management also promised to reimburse Acis LP

for up to $2 million of future legal fees and up to $1 million of future administrative

expenses.  One day after the Award was confirmed, Acis LP transferred away "the vehicle

that can most easily be described as the Acis LP 'risk retention structure' (necessitated by

[the] federal Dodd Frank law)" to Highland CLO Holdings Ltd., yet another Cayman Islands

entity.  *Acis I*, 584 B.R. at 129.  That same day, Acis LP conveyed to the same Cayman

Islands entity its contractual right to receive management fees from a particular CLO-SPE.

This contractual right was worth $5 million, but all Acis LP received in return was

forgiveness of a $2.8 million receivable that it owed to Highland.

On the day after Terry obtained his final judgment in the 44th Judicial District Court

of Dallas County, Acis LP underwent a sudden change in ownership.  Previously, Acis LP's

limited partners were Mark Okada ("Okada"), Highland's chief investment officer, and the

Appx. 02655
015117

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 19   Filed 10/26   Page 439 of 1017    PageID 16100

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 9 of 84   PageID 98002

Dugaboy Investment Trust, a family trust of Highland's CEO, James Dondero.  But on December 18, 2017 Okada and the Dugaboy Investment Trust both conveyed their interests in Acis LP to appellant Neutra, Ltd. ("Neutra"), a Cayman Islands exempted company.  The Dugaboy Investment Trust also conveyed its 100% ownership interest in Acis GP to Neutra. Thus Neutra became Acis' sole equity owner.

Highland asserts that these transactions were part of a market-driven restructuring, or "reset," of Highland's CLOs.  According to Highland's witnesses, Acis LP had become "'toxic' in the market place" due to the litigation with Terry, and had to be excised from Highland's CLO business.  *Acis I*, 584 B.R. at 128; *accord Acis II*, 2019 WL 417149, at *11. HCLOF also has an anonymous, third-party institutional investor ("the Passive Investor") who purportedly demanded that Acis LP be removed as Highland's CLO manager.  But the Passive Investor's representative testified at a hearing that the Passive Investor had made no such demand, and the bankruptcy court found that Highland's testimony about Acis' supposed toxicity was not credible.  According to the bankruptcy court, Highland's explanations for the transfers described above were "a seemingly manufactured narrative to justify prior actions."  *Acis II*, 2019 WL 417149, at *16 (capitalization omitted).  The bankruptcy court rejected this narrative, finding that "[t]he evidence established overwhelmingly that there is a substantial likelihood that the transfers were part of an intentional scheme to keep assets away from Mr. Terry as a creditor."  *Id.* at *12.

Appx 02556
015118

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19 Filed 06/16/25 85    Page 440 of 1017    PageID 16101
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 10 of 84    PageID 98003

D

Terry filed the involuntary petitions against Acis LP and Acis GP in order to stop the apparent transfer of assets away from Acis LP.  *See Acis I*, 584 B.R. at 144.  Fast-paced litigation followed.

On March 19, 2018—two days before the scheduled trial on the involuntary petitions—Acis filed a motion to dismiss for lack of subject matter jurisdiction, or, in the alternative, to compel arbitration ("the Arbitration Motion").  The bankruptcy court's decision to deny this motion is at issue in all three of the instant appeals.  The Arbitration Motion was based on the Acis LP limited partnership agreement ("the Acis LPA"), which governed the relationship between Terry and Acis.  The Acis LPA provides a dispute resolution procedure for "any controversy or claim . . . arising out of, relating to or in connection with the [Acis LPA] or otherwise involving the Partnership, its Partners and/or any GP Party."  Third Appeal R. 4504 (brackets in original).  Under this dispute resolution procedure, the parties must first attempt to mediate any dispute; only after mediating may they resort to binding arbitration.  Any party who fails to mediate a claim, or who files a judicial lawsuit, ostensibly waives that claim.  Acis argued in the Arbitration Motion that the Acis LPA's dispute resolution provisions applied to the involuntary petitions, and that because Terry failed to comply with those provisions, the bankruptcy court lacked subject matter jurisdiction over the controversy.  The bankruptcy court denied the Arbitration Motion on the eve of trial.

In the early morning hours of the day the trial was scheduled to begin (at 2:33 a.m.),

015119
App. 02557

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19 Filed 02/26/85    Page 441 of 1017    PageID 16102

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 11 of 84    PageID 98004

several Highland-related entities—including Neutra and HCLOF—filed a motion to intervene. They sought intervention as of right under Fed. R. Bankr. P. 7024, or, alternatively, permissive intervention under Rule 2018.[8] The putative intervenors did not, however, intend to participate in the trial; they sought only to preserve their right to appeal any adverse ruling. The bankruptcy court denied the motion.

The trial of the involuntary petitions began as scheduled on March 21, 2018, and spanned five days. On the first day of trial, the putative intervenors informed the bankruptcy court of their objection to the involuntary petitions, and they appeared via counsel during each day of the trial. Following the trial, the bankruptcy court ruled in favor of Terry as the petitioning creditor, concluding that Acis had fewer than 12 eligible creditors; Acis was not generally paying its debts as they came due; Terry filed the involuntary petitions in good faith; and abstention under 11 U.S.C. § 305 was not warranted. The bankruptcy court issued orders for relief on April 13, 2018.

E

Highland and its related entities continued to participate in the bankruptcy court proceedings after the orders for relief were issued. The bankruptcy court, after finding that a "trustee appears necessary to halt the post-Arbitration Award transactions and transfers of value out of Acis LP . . . [and] to resolve the inherent conflicts of interest between [Acis] and Highland," appointed Robin Phelan ("the Trustee") as trustee. *See Acis I*, 584 B.R. at 149-

---

[8]Unless otherwise indicated, all citations in this opinion to a "Rule" are to the Federal Rules of Bankruptcy Procedure.

App. 02558
015120

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19 Filed 06/03/25   Page 442 of 1017   PageID 16103
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 12 of 84   PageID 98005

50.  On April 30, 2018 HCLOF—acting in its capacity as the equity note holder—sent five notices to Acis LP directing it to effect an optional redemption of the Acis CLOs on June 14, 2018.  The Trustee analyzed the notices and concluded that they were defective.

Highland and HCLOF responded by filing an adversary proceeding against the Trustee, seeking to compel the Trustee to effect a redemption.[9]  The bankruptcy court *sua sponte* issued a TRO forbidding all relevant parties (including HCLOF) from taking any action in furtherance of an optional redemption of the CLOs.  HCLOF then informed the bankruptcy court at a June 14, 2018 hearing that it had withdrawn the optional redemption notices.  Because of HCLOF's representation, the Trustee did not seek to extend the TRO. The next day, HCLOF sent a *second* set of notices to Acis LP, again demanding that Acis LP effect an optional redemption of the CLOs.  The Trustee then filed his own adversary proceeding ("the Trustee Adversary") against Highland, HCLOF, and others, seeking a *second* TRO.[10]  The bankruptcy court granted the TRO, and, after an evidentiary hearing, converted the TRO into a preliminary injunction.

While these adversary proceedings were taking place, the Trustee was preparing a chapter 11 reorganization plan for Acis.[11]  The Trustee initially proposed three plans: Plan A, Plan B, and Plan C.  Under Plan A, the Trustee—using the doctrine of equitable

---

[9]Adversary Proceeding No. 18-03078-SGJ.

[10]Adversary Proceeding No. 18-03212-SGJ.

[11]When the bankruptcy court issued the orders for relief, the cases were under chapter 7 of the Bankruptcy Code.  The bankruptcy court later converted the cases to chapter 11 cases.

Appx 02559
015121

subrogation—would have transferred HCLOF's subordinated equity notes to a third party—Oaktree Capital Management LP ("Oaktree")—in exchange for a $100 million payment to HCLOF, and would have paid off Acis' other creditors with additional funds provided by Oaktree. Plans B and C would have amended the indenture agreements to prohibit any redemption right from being exercised until all allowed claims were paid in full. The purpose of Plans B and C was to prevent HCLOF from calling for an optional redemption of the CLOs, which would have rendered Acis LP's fee-paying PMAs worthless. The bankruptcy court ultimately held that all three of these proposed plans were unconfirmable.

Before proposing Plans A, B, and C, the Trustee asked the bankruptcy court to approve the payment of a $2.5 million break-up fee ("the Break-Up Fee") to Oaktree if Plan A was not confirmed within a certain time period. This Break-Up Fee was a small percentage of the total value of the Plan A transaction—which was roughly $108 million—but represented a large percentage of the $8.6 million that Acis LP would retain after HCLOF was compensated for its subordinated notes. The Trustee's motion also sought to substitute Oaktree for Highland as Acis LP's investment advisor and service provider. The Trustee also requested that Oaktree be reimbursed for any reasonable expenses it might incur in connection with the proposed transaction ("the Expense Reimbursement"). The bankruptcy court granted the motion with minor modifications.[12]

_____

[12]Brigade—not Oaktree—now provides advisory and back office services to Acis.

App. 02569

015122

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19 Filed 05/26/25    Page 444 of 1017    PageID 16105

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 14 of 84    PageID 98007

After the bankruptcy court rejected Plans A, B, and C, the Trustee proposed—and the bankruptcy court confirmed—Plan D.  Under the confirmed Plan, Terry received full equity ownership of Acis in exchange for a $1 million reduction in the value of his claim.  Acis LP continues to serve as the portfolio manager for the Acis CLOs and continues to earn management fees.  The cash flow resulting from Terry's operation of Acis will be used to pay the claims of Acis' creditors, including Terry.  To prevent Highland and HCLOF from disrupting this cash flow, the bankruptcy court entered an injunction ("the Temporary Injunction")[13] prohibiting various parties and non-parties—including HCLOF—from taking any steps to effect an optional redemption or liquidation of the Acis CLOs.  The Temporary Injunction is actually an extension of the preliminary injunction that the bankruptcy court issued in the Trustee Adversary.  It is set to expire upon the earlier of the following: (1) the entry of a final order in the Trustee Adversary; (2) the satisfaction of all allowed claims against Acis; (3) the bankruptcy court's entry of an order finding that a material default has occurred under the Plan; or (4) any subsequent order of the bankruptcy court providing otherwise as to one or more of the CLOs.

F

Three appeals (the first consisting of four consolidated appeals)[14] taken from the

---

[13]Because the briefing refers to the plan injunction as a "temporary" injunction rather than a "preliminary" injunction, which is the federal nomenclature, the court will do so as well.

[14]The First Appeal consists of four consolidated appeals.  No. 3:18-CV-1056-D is an appeal of the order denying Neutra the right to intervene in the involuntary proceeding

Appx. 02561
015123

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19 Filed 06/06/25   Page 445 of 1017   PageID 16106

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 15 of 84   PageID 98008

bankruptcy court's rulings are now before this court.  For clarity, the court will refer to the

appeals as the First, Second, and Third Appeals.

In the First Appeal (No. 3:18-CV-1056-D), appellant Neutra[15] contends that the

bankruptcy court erred by denying the Arbitration Motion,[16] failing to dismiss the involuntary

petitions on the ground that they were filed in bad faith, and declining to abstain under 11

U.S.C. § 305.

---

against Acis GP.  No. 3:18-CV-1073-D is an appeal of the order for relief as to Acis LP.  No.
3:18-CV-1084-D is an appeal of the order denying Neutra the right to intervene in the
involuntary proceeding against Acis LP.

No. 3:18-CV-1057-D is *supposed* to be an appeal of the order for relief as to Acis GP,
but, due to a filing error, the notice of appeal actually challenges the order denying
intervention as to Acis GP—the same order at issue in 3:18-CV-1056-D.  Neutra attempted
to remedy this mistake by filing a second amended notice of appeal in the bankruptcy court,
but that notice was erroneously transmitted to the docket of 3:18-CV-1084-D instead of 3:18-
CV-1057-D.  Because these are ministerial errors that do not affect the court's jurisdiction,
the court will correct them at the conclusion of this opinion.  *See, e.g., In re Smith*, 133 B.R.
800, 804 (N.D. Tex. 1991) (Fitzwater, J.) ("In contrast to the failure properly to designate an
appellant, which is a jurisdictional defect, the failure to specify the correct judgment is
irrelevant where it is clear which judgment the appellant is appealing." (citations omitted)).

[15]HCLOF and an entity called CLO Holdco Ltd. are also named as appellants in the
First Appeal.  Neutra is the only appellant, however, who has submitted briefing.

[16]Neutra did not file a separate notice of appeal with respect to the order denying the
Arbitration Motion.  Instead, it contends that this order is an interlocutory order that merged
into the orders for relief, which are final orders for the purposes of 28 U.S.C. § 158(a)(1).
*See In re Manuel Mediavilla, Inc.*, 568 B.R. 551, 566 (B.A.P. 1st Cir. 2017); *In re Marciano*,
459 B.R. 27, 36 (B.A.P. 9th Cir. 2011).  Terry does not contest this assertion.  Neutra also
maintains that mandatory arbitration agreements implicate subject matter jurisdiction, which
any party can raise at any time.

- 15 -

Case 19-34054-sgj11 Doc 3596-19 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 19 Filed 06/26/25 Page 446 of 1017 PageID 16107
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 16 of 84 PageID 98009

In the Second Appeal (No. 3:18-CV-1822-D), appellant Highland[17] contends that the bankruptcy court erred by denying the Arbitration Motion and approving the Break-Up Fee and Expense Reimbursement.[18]

In the Third Appeal (No. 3:19-CV-0291-D), appellants Highland and Neutra contend that the bankruptcy court erred by denying the Arbitration Motion; confirming the Plan while the appeal of the orders for relief was still pending; confirming the Plan even though the statutory requirements of 11 U.S.C. § 1129 were not met; and entering the Temporary Injunction. HCLOF submitted a separate brief in the Third Appeal, arguing that the Temporary Injunction is beyond the constitutional authority of the bankruptcy court, is overbroad, and is not supportable under the four-part preliminary-injunction test.

On April 12, 2019 Acis filed a motion to substitute itself as the appellee in the Third Appeal.

The appeals and Acis' motion are before the court for decision.

II

"The court reviews the bankruptcy court's conclusions of law *de novo*, but reviews its fact findings only for clear error." *In re Nary*, 253 B.R. 752, 756 (N.D. Tex. 2000)

---

[17]HCLOF is also named as an appellant in the Second Appeal, but it did not submit or join in any briefing.

[18]The notice of appeal in the Second Appeal also challenges the bankruptcy court's decisions to deny a preliminary injunction requested by HCLOF and to grant the Trustee's request for a preliminary injunction in the Trustee Adversary. These appeals were separately docketed and subsequently dismissed.

Appx. 02583
015125

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19   Filed 06/26   Page 447 of 1017   PageID 16108
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 17 of 84   PageID 98010

(Fitzwater, J.) (quoting *In re ICH Corp.*, 230 B.R. 88, 91 n.10 (N.D. Tex. 1999) (Fitzwater,

J.)).  "A finding of fact is clearly erroneous when, although there is evidence to support it,

the reviewing court is left with the definite and firm conviction that a mistake has been

committed."  *In re Johnson Sw., Inc.*, 205 B.R. 823, 827 (N.D. Tex. 1997) (Fitzwater, J.)

(quoting *In re Placid Oil Co.*, 158 B.R. 404, 412 (N.D. Tex. 1993) (Fitzwater, J.)).  "If the

trier of fact's account of the evidence is plausible in light of the record viewed in its entirety,

the appellate court may not reverse it."  *Id.* (quoting *Placid Oil Co.*, 158 B.R. at 412).

"[T]his court does not find facts.  Neither is it free to view the evidence differently as a

matter of choice."  *Id.* (alteration in original) (quoting *Placid Oil Co.*, 158 B.R. at 412). "The

bankruptcy judge's unique perspective to evaluate the witnesses and to consider the entire

context of the evidence must be respected."  *Id.* (quoting *Placid Oil Co.*, 158 B.R. at 412)

(internal quotation marks omitted).

      In reviewing matters committed to the bankruptcy court's discretion—such as whether

to approve a break-up fee and expense reimbursement—the court applies an abuse of

discretion standard.  *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 205 (3d Cir.

2010).  "To constitute an abuse of discretion, the [bankruptcy] court's decision must be either

premised on an application of the law that is erroneous, or on an assessment of the evidence

that is clearly erroneous." *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th

Cir. 2000).

App. 02564
015126

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19 Filed 09/25 85    Page 448 of 1017    PageID 16109
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 18 of 84    PageID 98011

III

In the First Appeal, appellee Terry contends that appellant Neutra lacks standing to appeal the orders for relief.[19]

A

1

"Bankruptcy courts are not authorized by Article III of the Constitution, and as such are not presumptively bound by traditional rules of judicial standing." *In re Coho Energy Inc.*, 395 F.3d 198, 202 (5th Cir. 2004) (citing *Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 210 n.18 (5th Cir. 1994)). But there are still limits on who may appeal a bankruptcy court order. *See In re Technicool Sys., Inc.*, 896 F.3d 382, 385 (5th Cir. 2018). Before 1978, those limits were provided by the Bankruptcy Act, which granted appellate standing only to "person[s] aggrieved" by a bankruptcy court order. *Coho Energy*, 395 F.3d at 202 (quoting 11 U.S.C. § 67(c) (1976)). Congress repealed the relevant statutory provision when it passed the Bankruptcy Reform Act of 1978, but courts—including the Fifth Circuit—nonetheless still apply the person aggrieved test to bankruptcy appeals. *See id.* Because "[b]ankruptcy cases often involve numerous parties with conflicting and overlapping interests," and "[a]llowing each and every party to appeal each and every order

---

[19]The other appellants in the First Appeal have not briefed the issue of standing. They have therefore failed to meet their burden to assert that they have standing. *See Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.,* 32 F.3d 205, 208 (5th Cir. 1994) ("[T]he putative appellant shoulders the burden of alleging facts sufficient to demonstrate that it is a proper party to appeal.").

APPX 02565
015127

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19 Filed 06/20/25   Page 449 of 1017   PageID 16110

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 19 of 84   PageID 98012

would clog up the system and bog down the courts," it is necessary for courts to limit who

may appeal any given order. *Technicool Sys.*, 896 F.3d at 385.

   The person aggrieved test "is 'more exacting' than the test for Article III standing."

*Id.* (quoting *In re Delta Produce, L.P.*, 845 F.3d 609, 619 (5th Cir. 2016)). "Rather than

showing the customary 'fairly traceable' causal connection, a bankruptcy appellant must

instead show that he was 'directly and adversely affected pecuniarily by the order of the

bankruptcy court.'" *Id.* (footnotes omitted) (first quoting *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560-61 (1992), then quoting *Fortune Nat. Res. Corp. v. U.S. Dep't of Interior*, 806

F.3d 363, 366 (5th Cir. 2015)).[20]

2

   Equally important to deciding whether Neutra has standing is the "shareholder

standing rule," which is "a longstanding equitable restriction that generally prohibits

shareholders from initiating actions to enforce the rights of the corporation" absent special

circumstances. *Franchise Tax Bd. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990). The

doctrine derives from the third-party standing rule: "the plaintiff generally must assert his

---

   [20]Some courts have imposed an additional prerequisite: that the appellant have
attended and objected at the underlying bankruptcy proceedings. *See, e.g., In re Palmaz Sci.,
Inc.*, 262 F.Supp.3d 428, 435 (W.D. Tex. 2017); *In re Camp Arrowhead, Ltd.*, 451 B.R. 678,
693-94 (Bankr. W.D. Tex. 2011) (quoting *In re Ray*, 597 F.3d 871, 874 (7th Cir. 2010)). But
other courts have held that appearance and objection are not indispensable to appellate
standing. *See In re Point Ctr. Fin., Inc.*, 890 F.3d 1188, 1192-93 (9th Cir. 2018); *In re
Urban Broad. Corp.*, 401 F.3d 236, 244 (4th Cir. 2005). The Fifth Circuit has not yet
decided the question. *See Palmaz*, 262 F.Supp.3d at 434. This court need not decide the
issue because it disposes of the question of Neutra's standing on other grounds.

- 19 -

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19    Filed 08/21/25    Page 450 of 1017    PageID 16111

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 20 of 84    PageID 98013

own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); *see In re Troutman Enters., Inc.*, 286 F.3d 359, 364 (6th Cir. 2002). This court has recognized that "[u]nder federal common law [and] Texas law . . . only a corporation and not its shareholders, not even sole shareholders, can complain of an injury sustained by, or a wrong done to, the corporation." *Rigco, Inc. v. Rauscher Pierce Refsnes, Inc.*, 110 F.R.D. 180, 183 (N.D. Tex. 1986) (Fitzwater, J.). Although the rule is phrased in terms of corporations and shareholders, it applies with equal force to limited partnerships like Acis LP. *See CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 122-23 (2d Cir. 2013) (applying federal common law); *7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 220-22 (5th Cir. 1994) (applying Texas law); *see also In re A.S. Acquisition Corp.*, 56 Fed. Appx. 415, 416 (9th Cir. 2003) (memorandum) (holding that limited partner lacked standing to appeal bankruptcy court order that affected partnership property). It also applies to limited liability companies like Acis GP. *See Heyer v. Schwartz & Assocs. PLLC*, 319 F.Supp.3d 299, 304-05 (D.D.C. 2018) (applying federal common law); *Schoen v. Underwood*, 2012 WL 13029591, at *4 (W.D. Tex. May 15, 2012) (applying Texas law).

The Supreme Court has "treated standing as consisting of two related components: the constitutional requirements of Article III and nonconstitutional prudential considerations." *Franchise Tax Bd.*, 493 U.S. at 335. The shareholder standing rule falls within the latter category, and thus can operate to bar a lawsuit even if Article III standing is satisfied. *See id.* at 336. Recently, the Supreme Court called into question the continuing vitality of

APPX 02587
015129

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19   Filed 06/26/25   Page 451 of 1017   PageID 16112
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 21 of 84   PageID 98014

prudential standing, observing that it is in tension with the principle that "a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)) (internal quotation marks omitted); *see also Excel Willowbrook, L.L.C. v. JP Morgan Chase Bank, Nat'l Ass'n*, 758 F.3d 592, 603 n.34 (5th Cir. 2014) ("[T]he continued vitality of prudential 'standing' is now uncertain in the wake of the Supreme Court's recent decision in *Lexmark*[.]"). But the Fifth Circuit has since reaffirmed the third-party standing doctrine in particular. *See Superior MRI Servs., Inc. v. All. Healthcare Servs., Inc.*, 778 F.3d 502, 506 (5th Cir. 2015). The doctrine therefore remains binding in this circuit.

The court is aware of no binding precedent requiring it to apply the shareholder standing rule in the context of a bankruptcy appeal, but other courts have done so. *See, e.g., In re Heyl*, 770 F.3d 729, 730 (8th Cir. 2014) (per curiam); *In re AFY*, 734 F.3d 810, 822-23 (8th Cir. 2013); *A.S. Acquisition Corp.*, 56 Fed. Appx. at 416; *In re Troutman Enters.*, 286 F.3d at 365; *In re Dein Host, Inc.*, 835 F.2d 402, 404-06 (1st Cir. 1987); *Rose v. Logan*, 2014 WL 1236008, at *5-7 (D. Md. Mar. 25, 2014). This court concludes that it should do so as well, for at least two reasons.

First, the person aggrieved test already includes a version of the third-party standing rule. It requires that the appellant be "*directly* and adversely affected pecuniarily by the order of the bankruptcy court." *Technicool Sys.*, 896 F.3d at 385 (emphasis added) (quoting *Fortune Nat. Res. Corp.*, 806 F.3d at 366). "An 'indirect financial stake' in another's claims

App. 02508
015130

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19 Filed Page 06/23/85   Page 452 of 1017   PageID 16113
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 22 of 84   PageID 98015

is insufficient for standing." *In re The Watch Ltd.*, 257 Fed. Appx. 748, 749 (5th Cir. 2007) (per curiam) (quoting *Rohm*, 32 F.3d at 208).

Second, the person aggrieved doctrine is itself a creature of prudential standing—it is distinct from, and narrower than, constitutional standing, and it is justified by practical considerations. *See Coho Energy*, 395 F.3d at 202 ("To prevent unreasonable delay, courts have created an *additional* prudential standing requirement in bankruptcy cases: The appellant must be a 'person aggrieved' by the bankruptcy court's order." (quoting *In re P.R.T.C., Inc.*, 177 F.3d 774, 777 (9th Cir. 1999))); *see also Technicool Sys.*, 896 F.3d at 384-86 (distinguishing constitutional standing from bankruptcy standing, and offering prudential justifications for the latter). The policy underlying the person aggrieved doctrine would be well-served by including within it a third-party standing or shareholder standing rule. Without such a limitation, any one of a debtor's numerous shareholders could separately appeal bankruptcy court orders affecting the value of the debtor—thus resulting in "umpteen appeals raising umpteen issues." *Technicool Sys.*, 896 F.3d at 384. Neutra does not argue that the shareholder standing rule is inapplicable to bankruptcy appeals generally. Instead, Neutra maintains that it is asserting a direct, rather than a derivative, interest in the orders for relief. The court therefore holds that the shareholder standing rule applies in the context of bankruptcy appeals.

Although no party cites it, the court is aware of one Fifth Circuit decision that allowed a debtor's majority shareholder to appeal an order of the bankruptcy court. In *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir. 1977), *superseded by statute on other*

App. 02569
015131

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19    Filed 04/25/25    Page 453 of 1017    PageID 16114

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 23 of 84    PageID 98016

*grounds as recognized by In re Woerner*, 783 F.3d 266, 274 (5th Cir. 2015) (en banc),[21] the

Fifth Circuit authorized a debtor's majority shareholder to appeal an order awarding

attorney's fees to the trustee's attorneys (one of whom was himself the trustee).  But as the

*First Colonial* panel was careful to point out, the case involved unique circumstances.  *See*

*id.* at 1297 ("Although the attorneys and the trustee are correct in stating that in the usual

case the bankrupt and its shareholders do not have an interest in the disposition of the assets

of the estate . . . this is hardly the usual case.").  The appeal involved an issue on which the

interests of the trustee and the debtor diverged, because "[w]here the trustee serves as his

own attorney there is no disinterested trustee to ensure that the attorney is paid only for

professional services necessary to the administration of the estate." *Id.*  Thus the panel made

an exception: it allowed the shareholder to appeal, thereby "refusing to permit [the trustee]

to use his position as trustee to prevent [the shareholder] from contesting the size of his

attorneys' fee." *Id.*  There are no such circumstances present here: the Trustee lacks a

similarly-direct "personal financial stake" in the orders for relief, and he is not using his

special position to insulate a favorable order from review.  *Cf. AFY*, 734 F.3d at 823

(distinguishing *First Colonial* because trustee lacked personal financial stake in outcome of

appealed orders).  *First Colonial* therefore does not prevent this court from applying the

shareholder standing rule to a bankruptcy appeal.

---

[21]Although *First Colonial* was decided before the passage of the Bankruptcy Reform
Act of 1978, the "person aggrieved" test applied by the courts post-1978 was taken directly
from pre-1978 jurisprudence. *See Coho Energy*, 395 F.3d at 202. *First Colonial*'s analysis
is therefore still relevant.

Appx 02579
015132

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-20   Filed 05/25/25   Page 454 of 1017   PageID 16115
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 24 of 84   PageID 98017

B

Neutra asserts four different interests in the orders for relief.  None of these interests suffices to give Neutra standing to appeal.

Neutra contends that it "is watching its interest in Acis being decimated by administrative expenses."  Neutra First Appeal Br. 19.  In other words, Neutra's ownership interest in Acis is losing value as a result of the inherent expenses of bankruptcy.  Under the shareholder standing rule, however, this interest is quintessentially derivative of Acis' own interests, and therefore cannot confer standing.  *See, e.g., Stevens v. Lowder*, 643 F.2d 1078, 1080 (5th Cir. Unit B Apr. 1981) ("Plaintiffs' individual injury arises only from the loss in value of their stock as a result of injury to the corporation.  Under these circumstances, plaintiffs have no independent cause of action.").  The First Circuit rejected a nearly-identical argument in *Dein Host*, 835 F.2d 402.  It held that an appellant lacked standing where his only interest in the bankruptcy court order was "that his beneficial interest in [another entity]—his stock—[was] in jeopardy and subject to shrinkage."  *Id.* at 405.  In so concluding, the court relied on the principle that "[t]he fact that the injury may indirectly harm a stockholder by diminishing the value of his corporate shares does not bestow upon him a right to sue on his own behalf."  *Id.* at 405-06 (quoting *Papilsky v. Berndt*, 466 F.2d 251, 255 (2d Cir. 1972)).  Thus even if Acis loses value as a result of its plunge into bankruptcy, Neutra cannot appeal on this basis.

Neutra also posits that it "has lost its right to protect its interest [in Acis] via control of [Acis]."  Neutra First Appeal Br. 19.  This interest is insufficient to confer standing

- 24 -

APPX 02571
015133

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19   Filed 06/25/25   Page 455 of 1017   PageID 16116
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 25 of 84   PageID 98018

because losing control over an entity is not, in itself, a *pecuniary* injury. *See Technicool Sys.*, 896 F.3d at 385 (requiring that appellant be "directly and adversely affected *pecuniarily* by the order of the bankruptcy court" (emphasis added)); *see also Rose*, 2014 WL 1236008, at *5-7 (holding that shareholder standing rule applies with full force to entity's *sole* equity owner). Control rights may enhance the value of Neutra's ownership interest, or may allow Neutra to protect the value of that interest via advantageous business decisions. But, as the court has already discussed, any diminishment in the value of Neutra's interest in Acis does not confer standing on Neutra.

Neutra also asserted, at the time it filed its briefing in the First Appeal, that it would soon "be forced to partner with Oaktree against its wishes, and may be completely divested from its equity interests without its consent." Neutra First Appeal Br. 19-20. But this outcome was by no means an inevitable result of the *orders for relief*. The person aggrieved test does not take into account every injury caused by the bankruptcy case as a whole, but instead asks whether "the *order* of the bankruptcy court . . . directly and adversely affect[s] the appellant pecuniarily." *Fortune Nat. Res. Corp.*, 806 F.3d at 367. And "bankruptcy standing requires 'a higher causal nexus between act and injury'" than does traditional Article III standing. *Technicool Sys.*, 896 F.3d at 385-86 (quoting *Fortune Nat. Res. Corp.*, 806 F.3d at 366). Thus although the orders for relief created the possibility that Neutra might suffer harm in the future, Neutra was not aggrieved by them for standing purposes because "[the] speculative prospect of harm is far from a direct, adverse, pecuniary hit." *Id.* at 386; *see also id.* at 384-86 (concluding that equity owner was not aggrieved by order allowing

App. 02572
015134

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 53-20   Filed 06/26/25   Page 456 of 1017   PageID 16117
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 26 of 84   PageID 98019

trustee to employ special counsel, even though special counsel's purpose was to pierce the corporate veil to reach equity owner's other companies and assets).

Of course, the future harms identified by Neutra in the First Appeal did actually come to pass: the bankruptcy court appointed first Oaktree, and then Brigade, as the new service provider for Acis, and later divested Neutra of its equity interest in Acis. But this court cannot take these events into account in its analysis of the First Appeal. A district court hearing a bankruptcy appeal may only consider information if it is "part of the record before the bankruptcy court" or if it "meets the narrow purpose of judicial notice." *In re SI Restructuring Inc.*, 480 Fed. Appx. 327, 329 (5th Cir. 2012) (per curiam). The subsequent events that are asserted to have injured Neutra are not part of the record in the First Appeal. No party has asked this court to take judicial notice of any subsequent bankruptcy court orders in the First Appeal, and the court has no duty to do so *sua sponte*.[22] Moreover, Neutra would lack standing even if the court *did* take these events into account. That a once-speculative harm actually came to pass does not mean that the harm was initially *likely* to happen—so Neutra would still fail to show the "higher causal nexus between act and injury" that the person aggrieved test demands. *Technicool Sys.*, 896 F.3d at 385-86 (quoting *Fortune Nat. Res. Corp.*, 806 F.3d at 366); *cf. Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 101 (N.Y. 1928) (finding no liability for negligence where, *ex ante*, "there was nothing in the

---

[22]The Fifth Circuit has indicated that when no party asks the district court to take judicial notice of a fact, and the district court does not do so *sua sponte*, the Fifth Circuit is unlikely to do so for the first time on appeal. *See United States v. Herrera-Ochoa*, 245 F.3d 495, 502 & n.6 (5th Cir. 2001) (citing cases).

Appx. 02573
015135

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19    Filed 02/28/25    Page 457 of 1017    PageID 16118

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 27 of 84    PageID 98020

situation to suggest to the most cautious mind" that defendant's actions would result in harm to plaintiff, even though harm actually occurred).

The court therefore dismisses the First Appeal, i.e., all the appeals of the orders for relief.

C

The court's conclusion that Neutra lacks standing[23] is buttressed by the fact that the bankruptcy court properly denied Neutra's motion to intervene.[24]

1

Neither Neutra nor Terry has substantially briefed the question whether the bankruptcy court erred by denying Neutra's motion to intervene. Neutra contends that the ruling on its motion to intervene has no bearing on whether it can appeal as a person

---

[23]This conclusion does not mean that *no one* has standing to appeal. The Trustee likely could have appealed the orders for relief on Acis' behalf had he believed the orders were not in the best interests of the estates. *See In re C.W. Mining Co.*, 636 F.3d 1257, 1261-66 (10th Cir. 2011); *see also* 11 U.S.C. § 323(a) ("The trustee in a case under this title is the representative of the estate.").

[24]The parties agree that this court has jurisdiction over the orders denying intervention because they are interlocutory orders that merged into the orders for relief, which are final orders for the purposes of 28 U.S.C. § 158(a)(1). *See In re Manuel Mediavilla, Inc.*, 568 B.R. 551, 566 (B.A.P. 1st Cir. 2017); *In re Marciano*, 459 B.R. 27, 36 (B.A.P. 9th Cir. 2011). Neutra only asserts that it has standing to appeal the orders for relief; it does not contend that it has standing to appeal independently the orders denying intervention. *Cf. Rohm*, 32 F.3d at 208 ("[T]he putative appellant shoulders the burden of alleging facts sufficient to demonstrate that it is a proper party to appeal."). Thus even though the court concludes—in the context of this standing analysis—that the orders denying intervention were correctly decided, it does not affirm them. Instead, it dismisses the entire First Appeal for lack of standing.

- 27 -

Case 19-34054-sgj11 Doc 3596-19 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 19 Filed 04/29/25 Page 458 of 1017 PageID 16119
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 28 of 84 PageID 98021

aggrieved; Terry, meanwhile, maintains that the bankruptcy court's decision was correct, but also contends that any error was harmless because Neutra had no intention of participating in the trial on the involuntary petitions. The court is not persuaded, however, that the question is irrelevant.

Some courts have suggested that the bankruptcy court's proper denial of a motion to intervene is dispositive of the movant's right to appeal. *See, e.g., In re Living Hope Sw. Med. Servs., LLC*, 598 Fed. Appx. 467, 467 (8th Cir. 2015) (per curiam) (concluding that appellant lacked standing because bankruptcy court correctly denied his motion to intervene); *In re Thompson*, 965 F.2d 1136, 1140-46 & n.9 (1st Cir. 1992) (equating person aggrieved test with the test for intervention under Rule 7024, and concluding that because bankruptcy court properly denied motion to intervene in adversary proceeding, appellant lacked standing to appeal judgment); *In re S. State St. Bldg. Corp.*, 140 F.2d 363, 367 (7th Cir. 1943) ("If one who has a right to intervene, but does not, has no standing to appeal, a fortiori, one who has no right to intervene, and does not, has no standing to appeal."); *see also In re Blair*, 2016 WL 8608454, at *5 (D. Colo. Aug. 24, 2016) ("One might expect that [the person aggrieved] doctrine would not apply to a party that sought and was denied intervention. Or, at a minimum, it seems incongruous to permit a party to file an unsuccessful motion to intervene and nonetheless be permitted to appeal under the persons aggrieved doctrine and immediately attack the Bankruptcy Court's substantive rulings, rather than first challenging the denial of intervention."). Other courts disagree. *See Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 747 (2d Cir. 1991) (holding that "[Rule 2018,] governing permissive

Case 19-34054-sgj11 Doc 3596-19 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 19 Filed 06/26 85 Page 459 of 1017 PageID 16120
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 29 of 84 PageID 98022

intervention, does not limit the rights of a 'person aggrieved' to be heard" on appeal).

It is also possible that, had Neutra been allowed to intervene, it would have had standing to appeal by virtue of its intervention alone. *See First Colonial*, 544 F.2d at 1296-98 (finding that appellant was a person aggrieved, and then adding, as alternative ground for its holding, that "[appellant] has standing to appeal from all of the fee awards because the bankruptcy judge granted its motion to intervene [under what is now Rule 7024] without qualifying its right to participate in the proceeding"); *see also Int'l Trade Admin.*, 936 F.2d at 747 (stating that permissive intervention under Rule 2018 "provides a formal mechanism that expands the right to be heard to a wider class than those who qualify under the 'person aggrieved' standard"). *But see Troutman Enters.*, 286 F.3d at 363-64 (holding that parties who were permitted to intervene in bankruptcy proceeding nonetheless lacked appellate standing because they were not persons aggrieved).

Because the bankruptcy court's decision to deny intervention could affect Neutra's standing to bring the present appeal, the court will consider the merits of Neutra's appeal of that decision.

2

"A ruling denying intervention of right is reviewed *de novo*." *St. Bernard Par. v. Lafarge N. Am., Inc.*, 914 F.3d 969, 973 (5th Cir. 2019) (quoting *Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir. 1996) (en banc)). Although generally "the timeliness of an intervention motion is reviewed for abuse of discretion," if the bankruptcy court did not explain its ruling on timeliness, review is *de novo*. *See id.* (citing *Sommers v. Bank of Am.*,

App. 02576
015138

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19    Filed 03/25/85    Page 460 of 1017    PageID 16121

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 30 of 84    PageID 98023

*N.A.*, 835 F.3d 509, 513 (5th Cir. 2016)).  The court reviews the denial of a motion for

permissive intervention for "clear abuse of discretion," and will disturb the bankruptcy

court's ruling "only under extraordinary circumstances." *Id.* (quoting *Edwards*, 78 F.3d at

995).

Neutra sought intervention as of right under Rule 1018, which provides that Rule 7024

applies in proceedings to contest an involuntary petition.  Rule 7024, in turn, states that

"[Fed. R. Civ. P. 24] applies in adversary proceedings."

> A party is entitled to an intervention of right under Rule
> 24(a)(2) if (1) the motion to intervene is timely, (2) the interest
> asserted by the potential intervenor is related to the action, (3)
> that interest may be impaired or impeded by the action, and (4)
> that interest is not adequately represented by the existing parties.

*Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 2012 WL 2133667, at

*1 (N.D. Tex. June 12, 2012) (Fitzwater, C.J.) (citing *In re Lease Oil Antitrust Litig.*, 570

F.3d 244, 247 (5th Cir. 2009); *Sierra Club v. Espy*, 18 F.3d 1202, 1204-05 (5th Cir. 1994)),

*rev'd on other grounds*, 747 F.3d 275 (5th Cir. 2014), *aff'd*, ___ U.S. ___, 135 S. Ct. 2507

(2015).  "Failure to satisfy any one requirement precludes intervention of right." *Haspel &*

*Davis Milling & Planting Co. v. Bd. of Levee Comm'rs*, 493 F.3d 570, 578 (5th Cir. 2007).

Neutra also sought permissive intervention under Rule 2018.  That rule provides that

"after hearing on such notice as the court directs and for cause shown, the court may permit

any interested entity to intervene generally or with respect to any specified matter." Rule

2018(a).

Appx 02577
015139

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19 Filed 03/26/25    Page 461 of 1017    PageID 16122
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 31 of 84    PageID 98024

In deciding whether to permit intervention under Rule 2018(a), courts look to various factors, including (1) whether the moving party has an economic or similar interest in the matter; (2) whether the interest of the moving party [is] adequately represented by the existing parties; [(3)] whether the intervention will cause undue delay to the proceedings; and (4) whether the denial of the movant's request will adversely affect their interest.

*Pasternak & Fidis, P.C. v. Wilson*, 2014 WL 4826109, at *6 (D. Md. Sept. 23, 2014) (collecting cases).  Thus "[t]he standards under Rule 2018 and [Rule] 24 overlap."  *In re Adilace Holdings, Inc.*, 548 B.R. 458, 462 (Bankr. W.D. Tex. 2016).  "The decision whether to allow intervention is wholly discretionary under Rule 2018 . . . even where each required element is met."  *Id.* at 463 (citing *Staley v. Harris County*, 160 Fed. Appx. 410, 414 (5th Cir. 2005) (per curiam); *In re Durango Ga. Paper Co.*, 336 B.R. 594, 596 (Bankr. S.D. Ga. 2005)).

3

Neutra was not entitled to intervention of right in the trial of the involuntary petitions because it did not have a sufficiently direct interest in the proceedings.  The only interest that Neutra asserted was its property interest in Acis.  But in the intervention context, "[t]he term 'interest' is narrowly read to mean a *direct* and substantial interest in the proceedings . . . that the substantive law recognizes as belonging to or being owned by *the party seeking intervention*."  *Rigco*, 110 F.R.D. at 183 (emphasis added).  Accordingly, the shareholder standing rule applies to Rule 24(a) motions to intervene.  *See id.* at 183-84.  Neutra's property interest in the alleged debtors therefore could not support Neutra's claimed right to

App. 02578
015140

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19 Filed 03/26/85   Page 462 of 1017   PageID 16123
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 32 of 84   PageID 98025

intervene in the trial on the involuntary petitions. *See supra* § III(B). Because one of the four Rule 24(a) factors was not met, the bankruptcy court did not err by denying Neutra's motion to intervene as of right. *See Haspel*, 493 F.3d at 578.

For similar reasons, the bankruptcy court did not abuse its discretion by denying Neutra permissive intervention under Rule 2018. This is because Neutra lacked a sufficiently direct interest in the proceedings. And even if Neutra had such an interest, this court still would not disturb the bankruptcy court's ruling. This court reviews the bankruptcy court's denial of a Rule 2018 motion under a deferential standard—the bankruptcy court has discretion to deny such a motion even if all four factors are met. *See Adilace Holdings*, 548 B.R. at 463; *see also St. Bernard*, 914 F.3d at 973 (providing that orders as to permissive intervention are reviewed for clear abuse of discretion). Neutra offers no argument on appeal that the bankruptcy court committed a clear abuse of its discretion by denying its motion. *Cf. Brinkmann v. Dall. Cty. Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987) (holding that arguments not briefed on appeal are deemed abandoned). In the absence of such an argument, the court will not disturb the bankruptcy court's ruling.

IV

Neutra argues in the First Appeal that, regardless whether it has standing to appeal the orders for relief, it can challenge the bankruptcy court's denial of the Arbitration Motion because mandatory arbitration agreements implicate the court's subject matter jurisdiction. The appellants in the Second Appeal and Third Appeal make the same argument, and contend that every subsequent order entered by the bankruptcy court is void for lack of

App. 02579
0151141

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 19 FilePage 33 of 25 85   Page 463 of 1017   PageID 16124
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 33 of 84   PageID 98026

subject matter jurisdiction.

The Fifth Circuit recently reiterated that it has not yet decided the question whether a dismissal based on an arbitration provision is a dismissal for lack of subject matter jurisdiction. *See McDonnel Grp., L.L.C. v. Great Lakes Ins. SE, UK Branch*, 923 F.3d 427, 430 n.5 (5th Cir. 2019); *see also McGee v. W. Express, Inc.*, 2016 WL 1622632, at *2 (N.D. Tex. Apr. 5, 2016) (Horan, J.) (explaining that the Fifth Circuit has not yet decided the issue), *rec. adopted*, 2016 WL 1627662, at *1 (N.D. Tex. Apr. 22, 2016) (Kinkeade, J.). Neutra relies, however, on another Fifth Circuit opinion, *Gilbert v. Donahoe*, 751 F.3d 303 (5th Cir. 2014), in which the panel stated: "We have held that a district court lacks subject matter jurisdiction over a case and should dismiss it pursuant to Federal Rule of Civil Procedure 12(b)(1) when the parties' dispute is subject to binding arbitration." *Id.* at 306. The *Gilbert* panel cited two supporting cases in a footnote: *Ballew v. Continental Airlines, Inc.*, 668 F.3d 777 (5th Cir. 2012), and *Omni Pinnacle, LLC v. ECC Operating Services, Inc.*, 255 Fed. Appx. 24 (5th Cir. 2007) (per curiam). In both of these supporting cases the Fifth Circuit affirmed a district court's dismissal of a case under Rule 12(b)(1) pursuant to an arbitration agreement. The *Gilbert* opinion also acknowledged precedent indicating that the issue was previously unsettled. *See Gilbert*, 751 F.3d at 306 n.1 (citing *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 472 n.3 (5th Cir. 2010) ("Our court has not previously definitively decided whether Rule 12(b)(1) or Rule 12(b)(3) is the proper rule for motions to dismiss based on an arbitration or forum-selection clause.")). Thus *Gilbert*—if read in a vacuum—appears to settle the issue in a precedential decision.

Appx. 02589
015142

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 3 Exhibit 19   Filed 05/25/85   Page 464 of 1017   PageID 16125
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 34 of 84   PageID 98027

But in *Ruiz v. Donahoe*, 784 F.3d 247 (5th Cir. 2015) (on petition for rehearing), Judge Owen—who authored *Gilbert* just one year before—wrote for the panel that "[a]lthough in *Gilbert* we spoke in terms of subject-matter jurisdiction, we used the term imprecisely." *Id.* at 249. The *Ruiz* panel observed that whereas subject matter jurisdiction can be raised at any time and cannot be waived by the parties, a party *can* waive its right to compel arbitration. *See id.* And "[i]f a dispute is subject to mandatory grievance and arbitration procedures, then the proper course of action is usually to stay the proceedings pending arbitration." *Id.* Thus "agreements to arbitrate implicate forum selection and claims-processing rules *not subject matter jurisdiction*." *Id.* at 250 (emphasis added).

This court is persuaded by the reasoning of *Ruiz* and follows *Ruiz*'s explanation that the *Gilbert* panel was imprecise when it spoke in terms of subject matter jurisdiction. It is well-established in the Fifth Circuit that a party can waive its right to compel arbitration. *See, e.g., Petroleum Pipe Ams. Corp. v. Jindal Saw, Ltd.*, 575 F.3d 476, 480 (5th Cir. 2009); *Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 577 (5th Cir. 1991); *Tenneco Resins, Inc. v. Davy Int'l, AG*, 770 F.2d 416, 420 (5th Cir. 1985). It is equally well-established that a party *cannot* waive challenges to the court's subject matter jurisdiction; the issue can be raised at any time by any party or by the court *sua sponte*. *See, e.g., Simon v. Wal-Mart Stores, Inc.*, 193 F.3d 848, 850 (5th Cir. 1999). Moreover, in the Fifth Circuit a court may order a stay pending arbitration instead of dismissing a case outright. *See, e.g., Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656, 662 (5th Cir. 1995); *see also* 9 U.S.C. § 3 (authorizing courts to grant stays pending arbitration). But when a court lacks subject matter jurisdiction over a

App. 02581
015143

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19   Page 36 of 85   Page 465 of 1017   PageID 16126
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 35 of 84   PageID 98028

controversy, it cannot enter a stay order—or *any* order besides an order dismissing the case.

*See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 434 (2007) ("[O]nce

a court determines that jurisdiction is lacking, it can proceed no further and must dismiss the

case on that account."). Thus if the *Gilbert* panel actually held that a dismissal based on an

arbitration clause is jurisdictional, then it impliedly overruled many years of precedent set

by many prior panels. Under the Fifth Circuit's rule of orderliness, however, the *Gilbert*

panel lacked the power to do so. *See, e.g., Odle v. Flores*, 683 Fed. Appx. 288, 289 (5th Cir.

2017) (per curiam) ("[U]nder the rule of orderliness, to the extent that a more recent case

contradicts an older case, the newer language has no effect." (alteration in original) (quoting

*Arnold v. U.S. Dep't of Interior*, 213 F.3d 193, 196 n.4 (5th Cir. 2000))). Fifth Circuit

precedent instead supports the conclusion that a dismissal based on an arbitration agreement

does *not* implicate the court's subject matter jurisdiction.

Indeed, it would be strange if parties by contract could divest a federal court of subject

matter jurisdiction or confer such jurisdiction. "Only Congress may determine a lower

federal court's subject-matter jurisdiction." *Kontrick v. Ryan*, 540 U.S. 443, 452 (2004)

(citing U.S. Const. art. III, § 1). "[N]o action of the parties can confer subject-matter

jurisdiction upon a federal court" if such jurisdiction is otherwise lacking. *Ins. Corp. of Ir.,*

*Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). And federal courts

have long resisted attempts by private parties to manipulate their jurisdiction—including

attempts to deprive courts of removal jurisdiction where that jurisdiction properly exists.

*See, e.g., Smallwood v. Ill. Cent. R.R. Co.*, 385 F.3d 568, 576 (5th Cir. 2004) (en banc) ("The

App. 02582
015144

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19    Filed 06/20/25    Page 466 of 1017    PageID 16127
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 36 of 84    PageID 98029

doctrine of improper joinder implements our duty to not allow manipulation of our jurisdiction."). It follows that "if a court has jurisdiction of an action, the parties cannot deprive the court thereof by contract." 17A C.J.S. *Contracts* § 309 (2019). Parties may not, in the course of ordering their private affairs, enlarge *or shrink* Article III or the federal statutes governing subject matter jurisdiction.[25]

Nor does the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-14, mandate that a dismissal based on an arbitration agreement is a dismissal for lack of subject matter jurisdiction. The Supreme Court has urged caution in interpreting statutory provisions to be jurisdictional. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006) ("'Jurisdiction,' this Court has observed, 'is a word of many, too many, meanings.' This Court, no less than other courts, has sometimes been profligate in its use of the term." (citation omitted) (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 90 (1998))). This is because calling an issue "jurisdictional" has profound consequences. If an issue implicates the court's subject matter jurisdiction, then it cannot be waived or forfeited, and the court has a duty to raise the issue on its own; the trial judge (instead of a jury) can resolve factual disputes underlying the issue; and if subject matter jurisdiction is lacking, the court must dismiss the entire complaint. *See id.* at 514-15. The Supreme Court has therefore established clear interpretive rules on the subject:

_____

[25]For similar reasons, the waiver clause in the Acis LPA does not divest this court or the bankruptcy court of subject matter jurisdiction.

015145
Appx 02583

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19    Filed 03/26/25    Page 467 of 1017    PageID 16128
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 37 of 84    PageID 98030

> [i]f the Legislature clearly states that a threshold limitation on a
> statute's scope shall count as jurisdictional, then courts and
> litigants will be duly instructed and will not be left to wrestle
> with the issue.  But when Congress does not rank a statutory
> limitation on coverage as jurisdictional, courts should treat the
> restriction as nonjurisdictional in character.

*Id.* at 515-16 (footnote and citation omitted).

Nothing in the FAA indicates that Congress intended arbitration agreements to divest

federal courts of subject matter jurisdiction.  To the contrary, the FAA authorizes courts to

issue orders that would be beyond the power of a court that lacks jurisdiction.  *See Sinochem*

*Int'l*, 549 U.S. at 434.  For instance, courts must, in certain circumstances, issue orders

staying their proceedings pending arbitration, *see* 9 U.S.C. § 3; orders compelling recalcitrant

parties to submit to arbitration, *see id.* § 4; orders appointing an arbitrator, *see id.* § 5; and

orders compelling witnesses to appear before an arbitrator, *see id.* § 7.  Thus the text of the

FAA—far from containing a clear statement that arbitration agreements are

jurisdictional—suggests instead that the opposite is true.  The court therefore concludes that

Congress did not intend for dismissals based on arbitration agreements to be dismissals for

lack of subject matter jurisdiction.[26]

---

[26]Neutra contends in the First Appeal that the Acis LPA's arbitration clause deprived
Terry of *standing*, and that a creditor who lacks *standing* cannot confer subject matter
jurisdiction on the bankruptcy court by filing an involuntary petition.  But "[s]tanding is a
species of subject matter jurisdiction."  *In re Rhinesmith*, 450 B.R. 630, 631 (Bankr. W.D.
Tex. 2011) (citing *Cadle Co. v. Neubauer*, 562 F.3d 369, 371 (5th Cir. 2009)).  To conclude
that arbitration agreements do not implicate a court's subject matter jurisdiction is also to
conclude that they do not implicate standing.  Thus Neutra's circuitous logic does not allow
it to escape the court's conclusion on this issue.

App. 02584
015146

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19 Filed 03/26/25    Page 468 of 1017    PageID 16129

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 38 of 84    PageID 98031

Because the bankruptcy court's order denying the Arbitration Motion does not implicate subject matter jurisdiction, it can only be challenged by a party with standing. Neutra lacks standing to do so in the First Appeal. *See supra* § III. In the Second and Third Appeals, the appellants who challenge the order do not contend that they have standing to do so; instead, they rely on what they maintain is the jurisdictional nature of the order. They have therefore failed to carry their burden to establish standing. *See Rohm*, 32 F.3d at 208. Thus the court will not consider the merits of appellants' challenges to the bankruptcy court's order denying the Arbitration Motion.

V

Highland argues in the Second Appeal that the Break-Up Fee does not satisfy the requirements of 11 U.S.C. § 503, which governs administrative expenses; the Break-Up Fee is unreasonably large; and the Expense Reimbursement was not a reasonable exercise of the Trustee's business judgment under 11 U.S.C. § 363(b).[27]

A

The court first considers whether the bankruptcy court abused its discretion by finding that the Break-Up Fee satisfies § 503(b)(1)(A).[28]

_____

[27]As a creditor of the estates, Highland has standing to appeal the order approving the Break-Up Fee and Expense Reimbursement because that order disposes of estate assets. *See, e.g., In re Gucci*, 126 F.3d 380, 388 (2d Cir. 1997). Neither Oaktree nor the Trustee contends otherwise.

[28]The parties do not dispute that § 503 applies to the bankruptcy court's decision to approve a break-up fee. *See In re ASARCO, L.L.C.*, 650 F.3d 593, 602 (5th Cir. 2011) (suggesting, in *dicta*, that § 503 is "the proper channel for requesting payment" of a break-up

0115147
App. 02585

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19 Filed 04/25 85   Page 469 of 1017   PageID 16130
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 39 of 84   PageID 98032

In bankruptcy, administrative expenses—such as the "actual and necessary costs and expenses of preserving the estate"—are given priority over other non-secured claims in the distribution of the estate. *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir. 2001). "In order to qualify as an 'actual and necessary cost' under section 503(b)(1)(A), a claim against the estate must have arisen post-petition and as a result of actions taken by the trustee that benefi[t]ed the estate." *Id.* (citing *In re TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992)). Such claims "generally stem from voluntary transactions with third parties who lend goods or services necessary to the successful reorganization of the debtor's estate." *Id.* "Crucial to satisfying the § 503 test is that the estate receive a 'discernible benefit' as a result of the expenditure." *In re ASARCO LLC*, 441 B.R. 813, 824 (S.D. Tex. 2010) (quoting *Jack/Wade Drilling*, 258 F.3d at 387), *aff'd*, 650 F.3d 593 (5th Cir. 2011); *see also In re DeSardi*, 340 B.R. 790, 799 (Bankr. S.D. Tex. 2006) ("The court's administrative expense inquiry centers upon whether the estate has received an *actual benefit, as opposed to the loss a creditor might experience*[.]" (quoting *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 866 (4th Cir. 1994))). The claimant bears the burden of proving by a preponderance of the evidence that its claim qualifies as an administrative expense. *See TransAmerican*, 978 F.2d at 1416. Once the claimant has established a prima facie case, the burden of production shifts to the objector—but the burden of persuasion remains at all times upon the claimant. *See id.*

fee).

- 39 -

0I5148

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19    Filed 04/25/25    Page 470 of 1017    PageID 16131

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 40 of 84    PageID 98033

The bankruptcy court did not abuse its discretion by concluding that the Break-Up Fee
was an actual and necessary expense that conferred a discernible benefit upon the debtors'
estates.  Courts have recognized that a break-up fee can confer a benefit on the estate even
though the contemplated transaction with the claimant was not consummated.  *See, e.g., In
re Energy Future Holdings Corp.*, 904 F.3d 298, 313-14 (3d Cir. 2018) (recognizing that
break-up fee can benefit estate if, *inter alia*, the "assurance of a break-up fee promote[s]
more competitive bidding," or the fee "induce[s] a bidder to research the value of the debtor
and convert the value to a dollar figure on which other bidders can rely"); *In re Lamb*, 2002
WL 31508913, at *1 (Bankr. D. Md. Oct. 11, 2002) (recognizing that break-up fees are
appropriate where they incentivize a "stalking horse" bidder).

Here, the primary benefit identified by the bankruptcy court was that the Break-Up
Fee facilitated the plan confirmation process.  Without the Break-Up Fee, the Trustee would
have had no ready, willing, and able partner for the proposed Plan A transaction, because
Oaktree would not have made an offer or undertaken the expense and effort of preparing for
the contemplated transaction.  In this respect, the present case is similar to a traditional
"stalking horse" situation, where a break-up fee induces a bidder to research a potential
transaction and make an initial bid.  *See, e.g., Energy Future Holdings*, 904 F.3d at 313-14.
Without Plan A, the bankruptcy court faced the possible "doomsday" scenario, Second
Appeal R. 78, of Acis' fee-generating PMAs being rendered worthless by HCLOF's exercise
of its optional redemption right.  The bankruptcy court did not abuse its discretion by
recognizing these benefits.

App. 02587

015149

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19 Filed 04/25 85   Page 471 of 1017   PageID 16132

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 41 of 84   PageID 98034

The record also reflects that the Break-Up Fee conferred other benefits on the estates, although the bankruptcy court did not expressly acknowledge them. Oaktree's initial bid was meant to start a public sale process. *Cf. Energy Future Holdings*, 904 F.3d at 313-14 (citing *In re O'Brien Envt'l Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999)) (acknowledging that break-up fees can benefit estate by initiating a public bidding process, even where claimant was eventually outbid). And the Break-Up Fee was part of a transaction by which Oaktree agreed to step into Highland's shoes as Acis LP's sub-advisory and shared services provider, for a significantly lower price than what Highland was charging.

Of course, the Break-Up Fee is unique in one significant respect: it was expressly conditioned on the bankruptcy court's approval of Plan A. Plan A was based on the doctrine of equitable subrogation, "the legal fiction through which a person or entity, the subrogee, is substituted, or subrogated, to the rights and remedies of another by virtue of having fulfilled an obligation for which the other was responsible." *Gen. Star Indem. Co. v. Vesta Fire Ins. Corp.*, 173 F.3d 946, 949-50 (5th Cir. 1999). Under the Trustee's theory, HCLOF was to be treated as a creditor of the estates on the basis of its adversary claim against the Trustee seeking specific performance of its optional redemption right. The Trustee proposed to monetize HCLOF's claim, and to satisfy that claim by paying HCLOF the sum of $100 million (provided by Oaktree). The Trustee would then, as subrogee, substitute himself as the holder of HCLOF's rights in the subordinated CLO notes. Finally, the Trustee would use his position as subrogee to transfer HCLOF's interest in the subordinated notes to Oaktree. The bankruptcy court acknowledged that "[t]he legal theories [underpinning Plan A] are not

Appx 02588
015150

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19 Filed 04/25 Page 46 of 85   Page 472 of 1017   PageID 16133

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 42 of 84   PageID 98035

at all clear cut and are likely to be hotly contested by [HCLOF] and Highland."  Second Appeal R. at 78.  Despite this uncertainty, the bankruptcy court approved the Break-Up Fee.[29]

Break-up fees are by nature contingent upon uncertain future events.  If a transaction were sure to happen, there would be no need for a break-up fee.  Highland essentially contends that there was *too much* uncertainty here—that the bankruptcy court abused its discretion by approving the Break-Up Fee "in the face of [a] huge execution risk and the substantial legal authority that the Trustee's proposed transaction with Oaktree could not be approved."  Highland Second Appeal Br. 31.  But Highland overstates the degree to which the Trustee's theory was foreclosed by existing law.  The bankruptcy court was aware of authority suggesting that, in some circumstances, an entity's claim for specific performance may be treated as a monetary claim against the bankruptcy estate under 11 U.S.C. § 101(5).  *See In re Davis*, 3 F.3d 113, 116 (5th Cir. 1993).  And under New York law, which ostensibly governs the PMAs between Acis and the CLO-SPEs, the doctrine of equitable subrogation is interpreted

> broad[ly] enough to include every instance in which one party
> pays a debt for which another is primarily answerable and which
> in equity and good conscience should have been discharged by
> the latter, so long as the payment was made either under
> compulsion or for the protection of some interest of the party

---

[29]The bankruptcy court later decided that Plan A was unconfirmable because the Trustee could not be subrogated to the rights of an entity that did not hold a claim against the estates.  The bankruptcy court concluded that HCLOF did not hold such a claim because the Equity PMA was not then in effect, and HCLOF could not sue to enforce the PMAs between Acis and the CLO-SPEs because HCLOF was not a party to, or a third-party beneficiary of, those PMAs.  This decision is not part of the record in the Second Appeal.

Appx 02589
015151

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-20   19   Filed 04/25   Page 473 of 1017   PageID 16134

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 43 of 84   PageID 98036

making the payment, and in discharge of an existing liability.

*Hamlet at Willow Creek Dev. Co. v. Ne. Land Dev. Corp.*, 878 N.Y.S.2d 97, 112 (N.Y. App.

Div. 2009) (quoting *Gerseta Corp. v. Equitable Tr. Co. of N.Y.*, 150 N.E. 501, 504 (N.Y.

1926)).  The bankruptcy court was thus within its discretion to conclude that the Trustee's

theory was at least colorable.

More important, whether the benefits of the Break-Up Fee outweighed the risks is not

for this court to decide.  Unless the bankruptcy court committed a clear error of fact or

incorrectly applied the law, this court cannot disturb its decision.  *See Grigson*, 210 F.3d at

528.  There is no indication that the bankruptcy court committed such an error here.  The

bankruptcy court recognized the potential benefits *and* the potential risks of approving the

Break-Up Fee, and it properly applied the correct legal test—the § 503(b)(1)(A) standard—in

coming to its conclusion that the Break-Up Fee benefited the estate.

The principal authority on which Highland relies, *Energy Future Holdings*, is not to

the contrary.  In that case, the Third Circuit affirmed the bankruptcy court's reconsideration

of its own decision to authorize a break-up fee.  *See Energy Future Holdings*, 904 F.3d at

301.  The bankruptcy court originally approved the break-up fee on the premise that the fee

would not be paid if a certain regulatory body did not permit the proposed transaction to go

forward.  *See id.* at 304.  When the bankruptcy court learned that this premise was incorrect,

it reconsidered the order and came to a different conclusion.  *See id.* at 307.  The Third

Circuit, in affirming the bankruptcy court, *deferred to the bankruptcy court's discretion* to

weigh the potential risks and benefits of allowing the fee:

App. 02599
015152

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19 Filed 04/25/25    Page 474 of 1017    PageID 16135
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 44 of 84    PageID 98037

> In sum, the Termination Fee provision had the potential
> of providing a large benefit to the estates, but it also had the
> possibility to be disastrous. Once it had a complete
> understanding, the Bankruptcy Court properly weighed the
> various considerations and determined that the potential benefit
> was outweighed by the harm that would result under predictable
> circumstances. In other words, the risk was so great that the Fee
> was not necessary to preserve the value of Debtors' estates.
> Having made such a determination, the Bankruptcy Court did
> not abuse its discretion in denying the Fee in part.

*Id.* at 315 (footnote omitted). Likewise, the bankruptcy court in the present appeal was within its discretion to conclude that the benefits of the Break-Up Fee outweighed the risks, despite the uncertainty of the Trustee's legal theory.

B

The court considers next whether the Break-Up Fee was so large as to be unreasonable.

Highland cites no binding authority for the proposition that a break-up fee that meets the requirements of § 503(b)(1)(A) must be rejected if it is "unreasonable," nor does Highland explain what test a break-up fee must pass in order to be "reasonable." *See* Highland Second Appeal Br. 32-33. Assuming *arguendo* that it would be error to approve an "unreasonable" break-up fee, the court concludes that the bankruptcy court did not err in this respect. The bankruptcy court found that the Break-Up Fee constituted roughly 2.3% of the total price that Oaktree would pay under the terms of the proposed transaction. This amount is in line with break-up fees authorized by other courts. *See, e.g., In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("Except in extremely large transactions,

Appx 02591
015153

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19    Filed 04/25/25    Page 475 of 1017    PageID 16136

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 45 of 84    PageID 98038

break-up fees ranging from one to two percent of the purchase price have been authorized
by some courts."); *see also Samjens Partners I v. Burlington Indus., Inc.*, 663 F. Supp. 614,
625 (S.D.N.Y. 1987) (approving 2% break-up fee); *In re Sea Island Co.*, 2010 WL 4393269,
at *3 (Bankr. S.D. Ga. Sept. 15, 2010) (approving 3% break-up fee).

Highland contends that the relevant benchmark is not the total transaction price, but
is instead the amount of money that Acis LP would retain after the transaction was complete.
Applying Highland's logic, the Break-Up Fee is actually *26%* of the transaction's value. But
Highland's logic does not stand up in light of the legal theory proposed by the Trustee in
support of the transaction.    Under Plan A, Oaktree was not purchasing HCLOF's
subordinated notes outright.    Rather, it was funding the proposed plan so that Acis could
satisfy all of its creditors' claims—including HCLOF's liquidated claim for specific
performance—in exchange for the Trustee's promise to use the doctrine of equitable
subrogation to transfer the subordinated notes to Oaktree.    There is no principled reason to
compare the Break-Up Fee to the amount of money retained by Acis *after* paying off
HCLOF's claim, but *before* paying off any other creditor's claim.    Highland's
unreasonableness argument lacks merit.

C

Finally, the court considers whether the bankruptcy court abused its discretion by
concluding that the Expense Reimbursement was a proper exercise of the Trustee's business
judgment.

Expense reimbursements are governed by 11 U.S.C. § 363(b), which incorporates a

- 45 -

015154

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19   Filed 04/25/25   Page 476 of 1017   PageID 16137

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 46 of 84   PageID 98039

business judgment standard. *See ASARCO*, 650 F.3d at 601-03. Section 363(b) permits a trustee, after notice and a hearing, to use, sell, or lease estate property other than in the ordinary course of business. *See id.* at 601. "In such circumstances, 'for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.'" *Id.* (quoting *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986)). "The business judgment standard in section 363 is flexible and encourages discretion." *Id.*; *see also GBL Holding Co. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (N.D. Tex. 2005) (Lynn, J.) ("Great judicial deference is given to the Trustee's exercise of business judgment.").

The bankruptcy court acknowledged that "Oaktree has spent significant time and expense related to the [Plan A] Transaction," and that "[i]t is reasonable to anticipate that Oaktree will continue to incur additional significant time and expense." Second Appeal R. 78. The bankruptcy court found that the Expense Reimbursement, along with the Break-Up Fee, was an "essential inducement[]" for Oaktree's continuing commitment to the Plan A transaction. *Id.* Oaktree's commitment to the proposed transaction was beneficial to the estates for the reasons explained *supra* at § V(A). Thus the bankruptcy court concluded that "the Trustee has established, in his business judgment, that the Expense Reimbursement is necessary here." *Id.* at 77. The bankruptcy court did not abuse its discretion.

Highland's arguments to the contrary are unavailing. Highland contends that the Trustee lacked any reasonable business justification for allowing the Expense

App. 02593
015155

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19    Filed 04/28/25    Page 477 of 1017    PageID 16138

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 47 of 84    PageID 98040

Reimbursement because he knew in advance that Plan A was unconfirmable, as evidenced by his proposing Plans B and C at the same time.  The court disagrees.  If the Trustee knew that Plan A could not be confirmed, then he would have had *no reason* to propose it in the first place—let alone any reason to go through the effort and expense of negotiating with Oaktree.  Highland also argues that Oaktree "assume[d] the risk" of losing any money it spent in relation to the Plan A transaction, because Oaktree was experienced enough to know that Plan A could not be approved.  Highland Second Appeal Reply 16.  But the question is not whether Oaktree assumed any particular risk; the question is whether the Trustee had an "articulated business justification for" the Expense Reimbursement.  *ASARCO*, 650 F.3d at 601 (quoting *Cont'l Air Lines*, 780 F.2d at 1226).  The bankruptcy court did not abuse its discretion by concluding that he did.

The court therefore affirms the bankruptcy court's order approving the Break-Up Fee and Expense Reimbursement.

VI

In the Third Appeal, Highland and Neutra contend that the filing of the First Appeal divested the bankruptcy court of subject matter jurisdiction to confirm the Plan.

A

"It is a fundamental tenet of federal civil procedure that—subject to certain, defined exceptions—the filing of a notice of appeal from the final judgment of a trial court divests the trial court of jurisdiction and confers jurisdiction upon the appellate court."  *In re Transtexas Gas Corp.*, 303 F.3d 571, 578-79 (5th Cir. 2002) (citing *Griggs v. Provident*

015156
Appx 02594

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19   Filed 04/25/25   Page 478 of 1017   PageID 16139

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 48 of 84   PageID 98041

*Consumer Co.*, 459 U.S. 56, 58 (1982)).  "This rule applies with equal force to bankruptcy cases." *Id.* at 579.  Thus while an appeal is pending, the bankruptcy court cannot exercise control over "those aspects of the case involved in the appeal." *In re Scopac*, 624 F.3d 274, 280 (5th Cir. 2010) (quoting *Griggs*, 459 U.S. at 58), *modified on denial of reh'g*, 649 F.3d 320 (5th Cir. 2011)*.*

But "the bankruptcy court retains jurisdiction to address elements of the bankruptcy proceeding that are not the subject of that appeal." *Transtexas*, 303 F.3d at 580 n.2.  The Fifth Circuit "has specifically rejected 'the broad rule that a bankruptcy court may not consider any request which either directly or indirectly touches upon the issues involved in a pending appeal and may not do anything which has any impact on the order on appeal.'" *Scopac*, 624 F.3d at 280 (quoting *In re Sullivan Cent. Plaza I, Ltd.*, 935 F.2d 723, 727 (5th Cir. 1991)).  Instead, the Fifth Circuit has adopted a "functional test: 'once an appeal is pending, it is imperative that a lower court not exercise jurisdiction over those issues which, although not themselves expressly on appeal, nevertheless so impact the appeal so as to interfere with or effectively circumvent the appeal process.'" *Id.* (quoting *In re Whispering Pines Estates, Inc.*, 369 B.R. 752, 759 (B.A.P. 1st Cir. 2007)).

Where courts have held that a bankruptcy court was divested of jurisdiction to enter a subsequent order, it is usually because the subsequent order would have modified, or would have been inconsistent with, an order pending on appeal.  *See, e.g., Transtexas*, 303 F.3d at 574, 582 (holding that bankruptcy court was divested of jurisdiction to supplement plan confirmation order that was then pending on appeal); *Whispering Pines*, 369 B.R. at 760

App. 02595
015157

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19   Filed 06/26/25   Page 479 of 1017   PageID 16140

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 49 of 84   PageID 98042

(concluding that bankruptcy court could not issue stay relief order that essentially modified confirmed plan while plan confirmation order was pending on appeal); *In re BNP Petroleum Corp.*, 2012 WL 7620694, at *3 (S.D. Tex. Feb. 27, 2012) (observing that bankruptcy court can consider motion to set aside sale agreement, and can deny that motion, but cannot *grant* it while the order approving the sale agreement is pending on appeal); *In re Southold Dev. Corp.*, 129 B.R. 18, 19, 21 (E.D.N.Y. 1991) (invalidating order that modified reorganization plan, where plan confirmation order was already pending on appeal); *In re 710 Long Ridge Rd. Operating Co., II, LLC*, 2014 WL 1648725, at *1, *3-6 (Bankr. D.N.J. Apr. 24, 2014) (refusing to consider motion to clarify plan confirmation order that was pending on appeal, because a court "cannot take action that will alter or modify its prior order while that order is pending on appeal"); *In re New Century TRS Holdings, Inc.*, 2012 WL 2064500, at *1-3 (Bankr. D. Del. June 7, 2012) (dismissing motion for sanctions where motion essentially repackaged issues and arguments then pending in appeal of motion for reconsideration); *In re Wallace's Bookstores, Inc.*, 330 B.R. 193, 195 (Bankr. E.D. Ky. 2005) (denying adversary plaintiff's motion to dismiss claims whose resolution was then pending on appeal); *see also Wireless Agents, LLC v. Sony Ericsson Mobile Comms. AB*, 2006 WL 1189687, at *3 (N.D. Tex. May 3, 2006) (Fitzwater, J.) ("Because Wireless has appealed the court's denial of a preliminary injunction, the Federal Circuit has exclusive jurisdiction over the preliminary injunction motion, and this court cannot modify its preliminary findings of fact and conclusions of law during the pendency of the appeal.").  Attempting to modify an order pending on appeal, or issuing a subsequent order that is inconsistent with the order being

Appx 02596
015158

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19   Filed 05/26/25   Page 480 of 1017   PageID 16141
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 50 of 84   PageID 98043

appealed, circumvents the appellate process. *Cf. Scopac*, 624 F.3d at 280 (holding that a bankruptcy court cannot "interfere with or effectively circumvent the appeal process").

B

Neutra identifies three issues on appeal in the First Appeal that supposedly divested the bankruptcy court of jurisdiction to confirm the Plan: (1) whether the bankruptcy court erred by denying the Arbitration Motion; (2) whether the bankruptcy erred by not abstaining under 11 U.S.C. § 305; and (3) whether Terry filed the involuntary petitions in good faith.

The appeal of the bankruptcy court's denial of the Arbitration Motion did not divest the bankruptcy court of jurisdiction to issue further orders. In *Weingarten Realty Investors v. Miller*, 661 F.3d 904 (5th Cir. 2011), the Fifth Circuit held that the appeal of an order denying a motion to compel arbitration does not divest a district court of jurisdiction to decide the merits of a case, even though a motion to compel arbitration—if granted—would effectively end the case. *See id.* at 907-10. The *Weingarten* panel interpreted the divestiture doctrine "narrowly." *See id.* at 908-09. It reasoned that, because the denial of a motion to compel arbitration does not, as a matter of law, determine the merits of the case, the merits question is not an "aspect[] of the case involved in the appeal," and the district court may decide it. *See id.* at 909 (alteration in original) (quoting *Griggs*, 459 U.S. at 58). The Fifth Circuit rejected the Seventh Circuit's reasoning that the appeal of a motion to compel arbitration—much like the appeal of a motion to dismiss based on double jeopardy, sovereign immunity, or qualified immunity—results in an automatic stay of the proceedings below because "the appeal is to determine whether the matter should be litigated in the district court

- 50 -

at all." *Id.* at 908 (citing *Bradford-Scott Data Corp. v. Physician Comput. Network*, 128 F.3d

504, 505-06 (7th Cir. 1997)). Under *Weingarten*, because the bankruptcy court's ruling on

the Arbitration Motion is separate from the merits of Plan confirmation, the appeal of that

prior ruling did not divest the bankruptcy court of jurisdiction to confirm the Plan.

The reasoning of *Weingarten* applies with full force to the § 305 abstention issue.

Highland and Neutra have not shown that there is any overlap, as a matter of law, between

the bankruptcy court's decision to confirm the Plan and its decision not to abstain from ruling

on the involuntary petitions. Thus even though the bankruptcy court's abstention decision

"determine[d] whether the matter should be litigated in the [bankruptcy] court at all," *id.* at

908, the appeal of that decision did not divest the bankruptcy court of jurisdiction to confirm

the Plan.

The issue of Terry's good faith in filing the involuntary petitions presents a closer

question. For the bankruptcy court to confirm a plan, it must find, *inter alia*, that the plan

was "proposed in good faith and not by any means forbidden by law." 11 U.S.C.

§ 1129(a)(3). The Eleventh Circuit has held that where an involuntary petition is filed in bad

faith, any subsequently-proposed reorganization plan is *necessarily* proposed in bad faith and

cannot be confirmed. *See In re Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987); *but

see In re Landing Assocs., Ltd.*, 157 B.R. 791, 812 (Bankr. W.D. Tex. 1993) ("Bank United

relies on the legal standard established in several bad-faith filing cases for this proposition.

However, a different legal standard is employed when evaluating good faith for plan

confirmation purposes under [11 U.S.C.] § 1129(a)(3)." (citations omitted)). Under the

Appx 02598

015160

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19 Filed 05/23/25    Page 482 of 1017    PageID 16143

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 52 of 84    PageID 98045

Eleventh Circuit's rule, the bankruptcy court's ruling that Terry filed the involuntary petitions in good faith has some bearing on its decision to confirm the Plan.

But even assuming that the Eleventh Circuit's rule applies, the court is not convinced that, under these circumstances, the First Appeal divested the bankruptcy court of jurisdiction to confirm the Plan. In issuing the confirmation order, the bankruptcy court did not directly exercise jurisdiction over the question of Terry's good faith in filing the involuntary petitions—it did not revisit, comment upon, or supplement its earlier decision. *See In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 680 (Bankr. S.D.N.Y. 2016) ("[A] confirmation order does not 'tamper' with prior rulings in the case; rather, to state the obvious, it confirms a plan of reorganization."); *cf. Transtexas*, 303 F.3d at 574, 582 (holding that bankruptcy court lacked jurisdiction to supplement plan confirmation order that was then pending on appeal); *Southold Dev. Corp.*, 129 B.R. at 18, 21 (vacating order that modified reorganization plan that was pending on appeal); *710 Long Ridge, II, LLC*, 2014 WL 1648725, at *1, *3-6 (refusing to consider motion to clarify plan confirmation order that was pending on appeal). Nor did the bankruptcy court issue any order that was inconsistent with, or that implicitly modified, its previous ruling. *Cf. Whispering Pines*, 369 B.R. at 760 (concluding that bankruptcy court could not issue stay relief order that was inconsistent with confirmed plan while plan confirmation order was pending on appeal). Instead, the bankruptcy court proceeded in accordance with that ruling. It was entitled to do so—just as it was entitled to carry out the confirmed Plan in the absence of a stay order, even while the Plan confirmation order was pending on appeal. *See In re Prudential Lines, Inc.*, 170 B.R. 222, 243-44

App. 02599
015161

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 13-20    Filed 03/25/25    Page 483 of 1017    PageID 16144
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 53 of 84    PageID 98046

(S.D.N.Y. 1994). If the bankruptcy court had instead *denied* plan confirmation on the ground that Terry filed the involuntary petitions in *bad faith*, the divestiture analysis might be different. *Cf. BNP Petroleum*, 2012 WL 7620694, at *3 (observing that bankruptcy court can deny motion to set aside sale agreement, but cannot grant it while the order approving the sale agreement is pending on appeal). As it is, however, the bankruptcy court's Plan confirmation order did not in any way interfere with, or circumvent, this court's consideration of the First Appeal.

Moreover, to conclude that Neutra's appeal of the orders for relief divested the bankruptcy court of jurisdiction to confirm the Plan would be to hold that whenever an order for relief is entered, any disappointed litigant—even a litigant who *lacks standing to appeal*—can bring the bankruptcy case grinding to a halt. But the divestiture doctrine is not intended to "cede control of the conduct of a chapter 11 case to disappointed litigants. This cannot be, and is not, the law." *Sabine*, 548 B.R. at 680. And such a decision would be contrary to Fifth Circuit precedent indicating that "a narrow interpretation [of divestiture doctrine] is normally appropriate." *See Weingarten*, 661 F.3d at 908. The court thus concludes that the First Appeal did not divest the bankruptcy court of jurisdiction to confirm the Plan.

VII

The court now turns to the contention of HCLOF (joined by Highland and Neutra) in the Third Appeal that the bankruptcy court erred by confirming the Plan because the Temporary Injunction—a crucial part of the Plan—is unlawful.

- 53 -

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19   Filed 05/26/85   Page 484 of 1017   PageID 16145
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 54 of 84   PageID 98047

A

The bankruptcy court had authority to enter the Temporary Injunction under 11 U.S.C.

§§ 105(a) and 1123(b)(6), and had jurisdiction to do so under 28 U.S.C. § 157(b)(2)(L).

Section 157(b)(2)(L) grants the bankruptcy court jurisdiction to enter final orders concerning

the confirmation of plans.[30]  Section 1123(b)(6) gives bankruptcy courts residual authority

to include in a plan "any other appropriate provision not inconsistent with the applicable

provisions of this title."  11 U.S.C. § 1126(b)(6).  The bankruptcy court can exercise its

residual authority via § 105(a), which provides that "[t]he court may issue any order, process,

or judgment that is necessary or appropriate to carry out the provisions of this title."  11

U.S.C. § 105(a).

Section 105(a) permits a bankruptcy court "to fashion such orders as are necessary to

further the substantive provisions of the Bankruptcy Code."  *In re Sadkin*, 36 F.3d 473, 478

(5th Cir. 1994) (per curiam) (quoting *In re Oxford Mgmt. Inc.*, 4 F.3d 1329, 1333 (5th Cir.

1993)).  But the bankruptcy court's § 105(a) powers are not unlimited: the statute "does not

authorize the bankruptcy courts to create substantive rights that are otherwise unavailable

---

[30]To the extent that a temporary plan injunction restrains a third-party *lawsuit*, the bankruptcy court must have statutory "related to" jurisdiction over that lawsuit per 28 U.S.C. § 157(a).  *See In re Seatco, Inc.*, 257 B.R. 469, 475-76 (Bankr. N.D. Tex.) (Houser, J.), *modified on reh'g by* 259 B.R. 279 (Bankr. N.D. Tex. 2001) (Houser, J.).  For the reasons discussed *infra* at note 34, the bankruptcy court has statutory "related to" jurisdiction over all lawsuits potentially restrained by the Temporary Injunction.  For the reasons discussed *infra* at § VII(B), the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011), does not affect the bankruptcy court's statutory jurisdiction to issue a temporary plan injunction.

015163
Appx 02691

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19    Filed 06/26/25    Page 485 of 1017    PageID 16146

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 55 of 84    PageID 98048

under applicable law, or constitute a roving commission to do equity." *Id.* (quoting *Oxford Mgmt.*, 4 F.3d at 1333). The Trustee[31] contends that the bankruptcy court's § 105(a) powers are broad enough to allow it to temporarily enjoin a non-debtor, non-creditor entity—HCLOF—from attempting to assert certain contractual rights, at least where such an injunction is necessary to the debtors' successful reorganization.[32]

Fifth Circuit precedent indicates that § 105(a) *does*, under some circumstances, permit a bankruptcy court to enjoin a non-debtor, non-creditor entity from taking particular actions. *In re Zale Corp.*, 62 F.3d 746 (5th Cir. 1995), involved a challenge to a § 105(a) injunction that prohibited certain nonparties from filing lawsuits against certain other nonparties. *See id.* at 750-51. The Fifth Circuit—citing 11 U.S.C. § 524, which forbids the discharge of the debts of nondebtors—invalidated the injunction insofar as it constituted a *permanent* release of the nonparties' claims. *See id.* at 760-61. But the court noted that "[t]he impropriety of a permanent injunction does not necessarily extend to a temporary injunction of third-party actions." *Id.* at 761. The court provided a non-exhaustive list of "unusual circumstances" that might justify such an injunction: "1) when the nondebtor and the debtor enjoy such an identity of interests that the suit against the nondebtor is essentially a suit against the debtor, and 2) when the third-party action will have an adverse impact on the debtor's ability to

---

[31]On April 12, 2019 Acis filed a motion to substitute itself as the appellee in the Third Appeal, arguing that once the Plan took effect, Acis became the Trustee's successor-in-interest. The court addresses this motion *infra* at § XI.

[32]The court expresses no opinion on the question whether the Equity PMA or any other contract presently entitles HCLOF to demand an optional redemption of the CLOs.

App. 02692
015164

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19   Filed 05/26/25   Page 486 of 1017   PageID 16147
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 56 of 84   PageID 98049

accomplish reorganization." *Id.* Bankruptcy judges in this district have approved temporary injunctions under *Zale* multiple times. *See In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109, 117 (Bankr. N.D. Tex. 2002) (Hale, J.); *In re Seatco, Inc.*, 257 B.R. 469, 476-78 (Bankr. N.D. Tex.) (Houser, J.), *modified on reh'g by* 259 B.R. 279 (Bankr. N.D. Tex. 2001) (Houser, J.); *see also In re Couture Hotel Corp.*, 536 B.R. 712, 749-53 (Bankr. N.D. Tex. 2015) (Houser, J.) (applying *Zale* unusual-circumstances test and declining to issue injunction). As discussed below, the second unusual circumstance described in *Zale* is present here.[33]

The court recognizes that the bankruptcy court did not rely on this rationale. Instead, it based the Temporary Injunction on its ostensible authority over the Trustee Adversary. The bankruptcy court described the Trustee Adversary as "a somewhat significant part of the Plan; it is what justifies the temporary injunction that is a critical part of the Plan." *Acis II*, 2019 WL 417149, at *8. It conducted its four-prong preliminary-injunction analysis in the context of, and based on the likelihood of success of, the Trustee Adversary. *See id.* at *10-12. This court, of course, can affirm the bankruptcy court on alternative grounds. *See, e.g., Cimmaron Oil Co. v. Cameron Consultants, Inc.*, 71 B.R. 1005, 1011 (N.D. Tex. 1987)

---

[33]The *Zale* panel ultimately vacated the temporary injunction because it was not issued after an adversary proceeding, as required at the time by Rule 7001(7). *See Zale*, 62 F.3d at 764-65. But Rule 7001(7) was amended in 1999 so that it does not apply where, as here, "a . . . chapter 11 . . . plan provides for the [injunctive] relief." Rule 7001(7); *see* Rule 7001 advisory committee's note (1999 amendments). And HCLOF, unlike the objectors in *Zale*, had a full and fair opportunity to present its objections to the bankruptcy court. *Cf. Zale*, 62 F.3d at 763-64.

Appx. 02603
015165

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19   Filed 05/25   Page 487 of 1017   PageID 16148
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 57 of 84   PageID 98050

(Fitzwater, J.) ("[T]his court may affirm a correct judgment for reasons not given by the court below or advanced to it."). But here, the bankruptcy court's rationale is significant because "[i]f the bankruptcy court does not determine that unusual circumstances exist, the court may not enter an injunction of the third-party actions." *Zale*, 62 F.3d at 761.

The bankruptcy court's factual findings are nonetheless sufficient to satisfy the "unusual circumstances" requirement. The bankruptcy court expressly found that the Temporary Injunction is a "critical component of the Plan," *Acis II*, 2019 WL 417149, at *10, and that "[t]he Temporary Plan Injunction is essential to [Acis'] ability to perform the Plan," *In re Acis Capital Mgmt., L.P.*, 2019 WL 406137, at *14 (Bankr. N.D. Tex. Jan. 31, 2019) (Jernigan, J.). HCLOF has twice demanded that Acis effect an optional redemption of the CLOs, and its directors testified that it will do so again if given the chance. *See Acis II*, 2019 WL 417149, at *10. The bankruptcy court found that an optional redemption would be an economically "[ir]rational" transaction that would serve as the last step in Highland's "intentional scheme to keep assets away from Mr. Terry as a creditor." *Id.* at *12. It further found that if HCLOF succeeds in forcing an optional redemption, Acis "[will] have no going concern value," and "Terry will be precluded from reorganizing the business and paying creditors" in accordance with the Plan. *Id.* at *10. Thus the Temporary Injunction enjoins third-party conduct that would adversely impact the ability of Acis to reorganize. These are unusual circumstances that justify the bankruptcy court's Temporary Injunction. *Cf. Zale*, 62 F.3d at 762 ("We hold that [the bankruptcy court's] language satisfies the 'unusual circumstances' requirement because it clearly identifies the settlement as providing

App. 02694
015166

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19 Filed 09/26/85   Page 488 of 1017   PageID 16149
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 58 of 84   PageID 98051

'substantial consideration' to the estate and constituting part of a 'key provision' of the plan.").[34]

B

HCLOF argues that the Trustee cannot invoke § 105(a) to support an injunction that is prohibited under *Stern v. Marshall*, 564 U.S. 462 (2011). In *Stern* the Supreme Court concluded that certain claims and controversies must, as a constitutional matter, be resolved by an Article III court, even if they are statutorily committed to the jurisdiction of the bankruptcy court. *See id.* at 482. HCLOF contends that the Trustee Adversary, which "is

---

[34]The Fifth Circuit's recent decision in *SEC v. Stanford International Bank, Ltd.*, 927 F.3d 830, ___, 2019 WL 2496901, at *5-7 (5th Cir. June 17, 2019), is not to the contrary. The *Stanford* panel interpreted *Zale*'s discussion of certain limits on a bankruptcy court's statutory "related to" jurisdiction to be a broad "maxim of law" that applies to all receiverships, regardless of the statutory basis of jurisdiction. *See id.* at ___, 2019 WL 2496901, at *6. *Zale* and *Stanford* thus stand for the proposition that a court overseeing a receivership lacks jurisdiction to enjoin third-party lawsuits whose resolution would have no effect on the *res* of the estate. *See id.* at ___, 2019 WL 2496901, at *7 (stating that courts lack jurisdiction "to permanently bar and extinguish independent, non-derivative third-party claims that do not affect the *res* of the receivership estate"); *Zale*, 62 F.3d at 752 ("Those cases in which courts have upheld 'related to' jurisdiction over third-party actions do so because the subject of the third-party dispute is property of the estate, or because the dispute over the asset would have an effect on the estate." (footnotes omitted)); *see also In re FoodServiceWarehouse.com, LLC*, 601 B.R. 396, ___, 2019 WL 1877006, at *10 (E.D. La. Apr. 26, 2019) ("If the outcome of a proceeding could conceivably have *any effect* on the estate being administered in bankruptcy, then 'related to' jurisdiction will generally exist." (citing *Zale*, 62 F.3d at 755)). The Temporary Injunction, however, enjoins certain acts that *would* affect the *res* of the bankruptcy estate. The bankruptcy court found that after an optional redemption, Acis "would have no going-concern value" because it would no longer receive any management fees with which to pay creditors. *Acis II*, 2019 WL 417149, at *10. Thus the equitable principles endorsed by *Stanford* do not prevent the bankruptcy court from issuing the Temporary Injunction pursuant to § 157(b)(2)(L)'s conferral of subject matter jurisdiction.

- 58 -

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19   Filed 06/26   Page 489 of 1017   PageID 16150

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 59 of 84   PageID 98052

essentially a multi-faceted fraudulent transfer action," *Acis II*, 2019 WL 417149, at *8, involves such a claim. Thus, according to HCLOF, the bankruptcy court lacks authority to grant final relief in the Trustee Adversary, and where a court lacks the power to grant a litigant *final* relief, it cannot grant *preliminary* relief. *See* HCLOF Third Appeal Br. 22 (citing *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 561-62 (5th Cir. 1987)). HCLOF maintains that, because *Stern* prohibits the bankruptcy court from issuing the Temporary Injunction in the context of the Trustee Adversary, the bankruptcy court cannot issue the Temporary Injunction as part of the confirmed Plan.

Assuming *arguendo* that a fraudulent transfer claim brought by a bankruptcy trustee against a non-creditor is a *Stern* claim—i.e., "a claim designated for final adjudication in the bankruptcy court as a statutory matter, but prohibited from proceeding in that way as a constitutional matter," *Executive Benefits Insurance Agency v. Arkison*, 573 U.S. 25, 30-31 (2014)—the court disagrees with HCLOF's contention. Whatever the precise contours of *Stern*, it only concerns the power of a bankruptcy court to enter a "final judgment" on certain causes of action. *See Stern*, 564 U.S. at 503 ("The Bankruptcy Court below lacked the constitutional authority to enter a *final judgment* on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." (emphasis added)). When the bankruptcy court exercises powers that are *independent of* its authority to enter a final judgment on a claim—e.g., when it makes use of its authority under § 105(a) to issue a temporary plan injunction—*Stern* simply does not apply. *See, e.g., In re Yellowstone Mountain Club, LLC*, 646 Fed. Appx. 558, 558-59 (9th Cir. 2016) (per curiam) (holding that

Appx. 02696
015168

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19   Filed 06/26   Page 490 of 1017   PageID 16151
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 60 of 84   PageID 98053

*Stern* did not apply because "the bankruptcy court issued a preliminary injunction [pursuant to § 105(a)], not a final judgment"); *In re Quigley Co.*, 676 F.3d 45, 52 (2d Cir. 2012) ("[A]t issue here [is] the stay of litigation during the pendency of [debtor's] bankruptcy, rather than the entry of final judgment on a common law claim.").

This conclusion is consistent with the Article III concerns underlying *Stern*. According to *Stern*, Article III creates an independent judiciary by guaranteeing federal judges life tenure and an irreducible salary. *See Stern*, 564 U.S. at 483-84. But "Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III." *Id.* at 484. Thus, as a general rule, "Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty,'" and place that matter within the authority of an Article I bankruptcy court. *Id.* (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1856)).

The Temporary Injunction does not "withdraw from judicial cognizance any matter" of any kind whatsoever. *Id.* (quoting *Murray's Lessee*, 59 U.S. (18 How.) at 284). Instead, it *temporarily* enjoins a number of parties and non-parties from taking any action—including, presumably, pursuing a lawsuit—in furtherance of an optional redemption or liquidation of the Acis CLOs. To the extent that the Temporary Injunction affects any legal claims, it does not prevent an Article III court from entering a final judgment on those claims after the Temporary Injunction is lifted. In other words, it has no *res judicata* effect on those claims.

- 60 -

APP 02687
015169

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19 Filed 06/26/25    Page 491 of 1017    PageID 16152
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 61 of 84    PageID 98054

*Cf.* 43A C.J.S. *Injunctions* § 378 (2019) ("A temporary or preliminary injunction does not adjudicate the ultimate rights in controversy and it is not conclusive on the court on a subsequent hearing."). In this respect, the Temporary Injunction is similar to other mine-run, temporary bankruptcy injunctions—including the automatic stay, a hallmark of bankruptcy law that bars creditors from commencing or continuing any judicial action to recover a debt from the debtor after a bankruptcy petition is filed. *See* 11 U.S.C. § 362(a); *see also In re Quigley*, 676 F.3d at 52 ("Enjoining litigation to protect bankruptcy estates during the pendency of bankruptcy proceedings, unlike the entry of the final tort judgment at issue in *Stern*, has historically been the province of the bankruptcy courts."). Thus even if *Stern* prevents the bankruptcy court from entering a final judgment in the Trustee Adversary, it has no bearing on whether the bankruptcy court can issue the Temporary Injunction as part of the confirmed Plan.[35]

C

When a bankruptcy court issues a temporary injunction under § 105(a) as part of a confirmed plan, the bankruptcy court must still consider the four-prong preliminary injunction test. *See, e.g., Seatco*, 257 B.R. at 477 (applying traditional preliminary-injunction factors in approving a temporary plan injunction under *Zale*). The factors are (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury

---

[35]The present appeal does not involve, and the court does not address, the propriety of a plan provision that finally adjudicates a *Stern* claim. Nor does the court decide whether a bankruptcy court can grant preliminary relief on a *Stern* claim outside the context of a plan confirmation order.

- 61 -

App. 023808
015170

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19   Filed 06/26/25   Page 492 of 1017   PageID 16153
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 62 of 84   PageID 98055

if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *See, e.g., Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

The first factor, when applied to a temporary plan injunction, turns on whether the reorganization plan is likely to succeed. *See Seatco*, 257 B.R. at 477. In support of the Temporary Injunction, the bankruptcy court evaluated the likelihood of success of the Trustee Adversary, not the likelihood of success of the Plan. *See Acis II*, 2019 WL 417149, at *11-12. But the bankruptcy court separately determined that the Plan is feasible, *see id.* at *14, and its factual findings in that context support the conclusion that the Plan is substantially likely to succeed. The bankruptcy court found that Terry has an excellent track record as a portfolio manager; that Terry will be able to generate new business for Acis; and that Brigade is qualified to serve as the sub-advisor to Acis. *See id.* Thus in the absence of an optional redemption, it is substantially likely that the reorganized Acis will be able to satisfy its creditors' claims and emerge from bankruptcy.

The bankruptcy court did not clearly err in finding that, without the Temporary Injunction, Acis faces a substantial threat of irreparable injury: specifically, "evisceration of the Acis CLOs, by parties with unclean hands." *Id.* at *10. The bankruptcy court found that an optional redemption would leave Acis with nothing to manage, and thus no going-concern value and no means of satisfying its creditors' claims. *See id.* Highland and Neutra argue that Acis has an adequate remedy at law because all it stands to lose is money—i.e., the

App. 02800
015171

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19    Filed 06/25    Page 493 of 1017    PageID 16154
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 63 of 84    PageID 98056

management fees generated by the PMAs—and it can recover that money via a final judgment in the Trustee Adversary. But there is more at stake here than money. Without the Temporary Injunction, Acis will have no opportunity to *reorganize* instead of *liquidate*—and, "[a]s the Code contemplates, the Debtor should be given the opportunity to successfully reorganize." *Seatco*, 257 B.R. at 477. To deny Acis the chance to reorganize would be to subject it to a substantial threat of irreparable injury.

The bankruptcy court likewise did not clearly err in finding that the risk of harm to Acis in the absence of an injunction outweighs any potential harm to HCLOF. Indeed, the bankruptcy court found that there *is* no potential harm to HCLOF because "a rational investor would not want to liquidate the Acis CLOs, but rather would acquire them to do a reset under the Plan." *Acis II*, 2019 WL 417149, at *12. The Plan allows for just such a reset.[36] Thus HCLOF's complaint that it is losing money on the CLOs as they are currently structured lacks force.

Finally, the bankruptcy court did not clearly err in finding that the public interest favors an injunction. The public has an interest in allowing businesses to reorganize instead of liquidate. And, more important, there is a strong public interest *against* "allowing potential wrongdoers to complete the last step in what appears likely to have been a scheme

---

[36]HCLOF contends that a reset is impossible under the terms of an offering memorandum that it issued in November 2017—i.e., within a month after Terry's arbitration award was issued—but the bankruptcy court did not find this contention to be credible, and this court will not disturb the bankruptcy court's credibility findings in the absence of clear error.

App. 02810
015172

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19 Filed 06/05/25   Page 494 of 1017   PageID 16155

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 64 of 84   PageID 98057

to strip [Acis] of its assets, steal its business, and leave it unable to pay creditors." *Id.*  The

bankruptcy court therefore did not err by concluding that the four-part preliminary injunction

test supports the Temporary Injunction.

VIII

Highland and Neutra argue that the Trustee proposed the Plan in bad faith, contrary

to 11 U.S.C. § 1129(a)(3).

A

The first contention that Highland and Neutra advance is that Terry filed the

involuntary petitions in bad faith per 11 U.S.C. § 303(i)(2), and, as a result, any

subsequently-proposed plan was necessarily proposed in bad faith.  Highland and Neutra

base their argument on *Natural Land Corp.*, 825 F.2d 296, in which the Eleventh Circuit held

that "the taint of a petition filed in bad faith must naturally extend to any subsequent

reorganization proposal." *Id.* at 298.  It is not clear that this rule applies in the Fifth Circuit,

and at least one bankruptcy court has declined to apply it.  *See Landing Assocs.*, 157 B.R. at

812.  But assuming *arguendo* that *Natural Land Corp.* does apply, Highland and Neutra have

nonetheless failed to establish that Terry filed the involuntary petitions in bad faith.

1

The first question the court must resolve is what standard of review to apply.  In their

briefing in the First Appeal, Neutra and Terry agreed that the question whether Terry filed

the involuntary petitions in good faith is a factual determination governed by the clear error

standard.  At oral argument, however, Neutra challenged whether this is the correct standard

- 64 -

Appx 02811

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19 Filed 06/25/25   Page 495 of 1017   PageID 16156
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 65 of 84   PageID 98058

of review.  But case law supports applying the clear error standard to the question of the

petitioner's good faith.  *See, e.g., In re Macke Int'l Trade, Inc.*, 370 B.R. 236, 245 (B.A.P.

9th Cir. 2007) ("The bankruptcy court's finding of the absence of bad faith is reviewed under

the clearly erroneous standard."); *In re Funnel Sci. Internet Mktg., LLC*, 551 B.R. 262, 269

(E.D. Tex. 2016) ("The Court reviews the Bankruptcy Court's determination of bad faith for

clear error as a finding of fact."); *Forever Green Athletic Fields, Inc. v. Dawson*, 514 B.R.

768, 785 (E.D. Pa. 2014) ("'Proving an involuntary petition was filed in bad faith requires

an inquiry into the creditor's knowledge,' a factual question that is reviewed for clear error."

(quoting *In re Bock Transp., Inc.*, 327 B.R. 378, 381 (B.A.P. 8th Cir. 2005))), *aff'd sub nom.

In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015).  Moreover, Fifth

Circuit case law provides that, post-filing, "[a] bankruptcy court's determination that a debtor

has acted in bad faith is a finding of fact reviewed for clear error."  *In re Jacobsen*, 609 F.3d

647, 652 (5th Cir. 2010).  The parties do not cite any cases suggesting that *de novo* review

would apply; nor would it make sense to conduct a *de novo* review of what is, in large part,

a question of the petitioner's intentions.  The court will therefore apply the clear error

standard.[37]

---

[37]There is some case law suggesting that, where a bankruptcy court dismisses an
involuntary petition on the ground that the petitioner filed it in bad faith, the *dismissal*
is reviewed for abuse of discretion.  *See, e.g., Forever Green*, 804 F.3d at 335.  But even then,
the bankruptcy court's finding that the petitioner acted in bad faith is reviewed for clear error.
*See In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007); *see also Jacobsen*, 609 F.3d at 652
(observing that "[a] bankruptcy court's determination that a debtor has acted in bad faith is
a finding of fact reviewed for clear error," even while "[t]he decision to convert a Chapter
13 case to Chapter 7" on that ground "is reviewed for abuse of discretion").

APPX 02312
015174

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19   Filed 06/06/25   Page 496 of 1017   PageID 16157
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 66 of 84   PageID 98059

2

The court next considers what legal test governs a determination of bad faith.  This is not a clear-cut or easy question: courts have developed a "dizzying array of standards" that can be applied to the issue.  *Forever Green*, 804 F.3d at 335.  Some of these tests include:

> (1) the "improper use" test, which finds bad faith when a petitioning creditor uses involuntary bankruptcy proceedings in an attempt to obtain a disproportionate advantage for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interests in a different forum[;]
>
> (2) the "improper purpose" test, which finds bad faith based upon the petitioner's improper motivation for filing the petition. Cases under this line of reasoning have emphasized that the petition was motivated by ill will, malice or for the purpose of harassing the debtor[;]
>
> (3) the "objective test," which essentially asks the question whether or not a reasonable person would have filed the involuntary petition under the same circumstances;
>
> (4) the "subjective test" which is almost identical to the "improper purpose" test in that they both look to the subjective motivation of the petitioning creditor for the filing; and
>
> (5) the "combined" or "two part" test which finds bad faith based upon consideration of both the subjective motivation and the objective reasonableness of the petitioning creditor(s).[38]

---

[38]The "combined test" is often guided by principles from Rule 9011, which mirrors Fed. R. Civ. P. 11.  *See In re Landmark Distribs., Inc.*, 189 B.R. 290, 310 n.24 (Bankr. D.N.J. 1995).  The Second and Eleventh Circuits have likewise observed that "a number of courts have sought to model the bad faith inquiry on the standards set forth in Bankruptcy Rule 9011."  *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 106 (2d Cir. 2000) (citing *Gen. Trading, Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1501-02 (11th Cir. 1997)).

Appx. 02813
015175

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19 Filed 08/26/25    Page 497 of 1017    PageID 16158

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 67 of 84    PageID 98060

*In re Landmark Distribs., Inc.*, 189 B.R. 290, 309-10 (Bankr. D.N.J. 1995) (citations and footnotes omitted).  Courts have also applied a "totality of circumstances" test, which essentially combines the improper use, improper purpose, and objective tests.  *See, e.g., Forever Green*, 804 F.3d at 336 (citing *In re John Richards Homes Bldg. Co.*, 439 F.3d 248, 255 n.2 (6th Cir. 2006)).  This test has been used by at least one bankruptcy court in this circuit.  *See In re TRED Holdings, L.P.*, 2010 WL 3516171, at *7 (Bankr. E.D. Tex. Sept. 3, 2010).

The Fifth Circuit has not expressly endorsed any particular standard, but it has considered both objective and subjective factors in deciding whether an involuntary petition was filed in bad faith.  *See In re Sims*, 994 F.2d 210, 222 (5th Cir. 1993) (considering whether "the filing of the petitions was 'motivated by ill will, malice or for the purpose of embarrassing or harassing the debtor[s],'" and whether petitioners "conducted a reasonable inquiry into the facts and the law prior to filing the petitions, as required by Bankruptcy Rule 9011" (alteration in original) (quoting *In re W. Side Cmty. Hosp., Inc.*, 112 B.R. 243, 258 (Bankr. N.D. Ill. 1990))).  Any test that considers *only* subjective or objective factors thus cannot be correct.  The court will therefore apply a totality of circumstances or combined test in analyzing Terry's good faith.

3

Applying the above principles, the court concludes that the bankruptcy court did not clearly err by holding that Terry filed the involuntary petitions in good faith.

On the question of Terry's alleged bad faith, the bankruptcy court found:

Appx. 02814
015176

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19 Filed 06/26/25    Page 498 of 1017    PageID 16159

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 68 of 84    PageID 98061

> the evidence suggested that Mr. Terry and his counsel filed the
> Involuntary Petitions out of a legitimate concern that Highland
> was dismantling and denuding Acis LP of all of its assets and
> value and that a bankruptcy filing was the most effective and
> efficient way to preserve value for the Acis LP creditors.

*Acis I*, 584 B.R. at 144. This finding is not clearly erroneous. The record before the

bankruptcy court showed that Acis and Highland had engaged in numerous transactions that

stripped Acis of much of its value, and that Terry only filed the involuntary petitions after

learning about these transactions during post-judgment discovery. *See supra* § I(C). Terry

testified that he believed bankruptcy was the best way to stop Acis from making further

fraudulent transfers, so that the entire community of Acis' creditors could receive an

equitable distribution of assets. The bankruptcy court was entitled to credit this testimony.

Terry also took the objectively reasonable step of consulting with bankruptcy counsel, albeit

briefly, before making the filing. He reasonably believed that Acis had fewer than 12

creditors based on a net-worth affidavit he received during post-judgment discovery in the

44th Judicial District Court of Dallas County. As for whether Acis was paying its debts as

they came due, Terry was aware of a number of accruing debts that Acis owed—including

his own judgment against Acis. He also reasonably concluded that if Acis were stripped of

its assets, then *no* creditor would be paid. The bankruptcy court did not clearly err by finding

that Terry filed the petitions based on a legitimate, good-faith belief that Acis was

fraudulently transferring assets to the detriment of all creditors.

Terry's motive, as characterized by the bankruptcy court, is a proper bankruptcy

purpose. The Third Circuit, in a case relied upon by Neutra, describes "protect[ing] against

Appx. 02815
015177

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19    Filed 07/06/25    Page 499 of 1017    PageID 16160

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 69 of 84    PageID 98062

the preferential treatment of other creditors or the dissipation of the debtor's assets" as legitimate purposes of an involuntary petition. *Forever Green*, 804 F.3d at 335. An additional "purpose of an involuntary procedure is to provide a method for creditors to protect their rights against debtors who are not meeting their debts" by "forc[ing] [them] to submit to the jurisdiction of the bankruptcy court." *In re All Media Props., Inc.*, 5 B.R. 126, 137 (Bankr. S.D. Tex. 1980), *aff'd*, 646 F.2d 193 (5th Cir. Unit A May 1981) (adopting opinion of bankruptcy court). The bankruptcy court's characterization of Terry's "concern that Highland was dismantling and denuding Acis LP of all of its assets and value," to the detriment of all of Acis' creditors, fits comfortably into the bankruptcy purposes described above. *See Acis I*, 584 B.R. at 144.

Neutra argues that the timing of Terry's petitions reveals that he was not actually concerned about fraudulent asset transfers. Neutra points out that Terry filed the involuntary petitions mere hours before a scheduled temporary injunction hearing in Texas state court, and following a single meeting with bankruptcy counsel. According to Neutra, Terry's real motive was to collect his judgment in a more favorable forum. But Neutra's argument constitutes, at best, a plausible alternative view of the evidence. On appellate review, this court may not substitute its own interpretation of the evidence for that of the bankruptcy court in the absence of clear error. *See Johnson Sw.*, 205 B.R. at 827. Because the bankruptcy court did not commit clear error, its pertinent factual findings must be affirmed. *See id.*

Neutra cites a number of cases for the proposition that when an involuntary petition

App. 015178

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19   Filed 06/06/25   Page 500 of 1017   PageID 16161
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 70 of 84   PageID 98063

is filed as a collection remedy in what is essentially a two-party dispute, the petition is necessarily filed in bad faith.  But Neutra's cases are distinguishable.

In *In re Smith*, 243 B.R. 169 (Bankr. N.D. Ga. 1999), the court found bad faith using a combined subjective and objective test where: (1) the petitioning creditor based its petition on the claim that the alleged debtor was fraudulently transferring assets, but had no evidence of any such transfers; (2) the case involved essentially a two-party dispute, and the petitioning creditor had sufficient remedies under state law; (3) the evidence showed that the petitioning creditor was motivated by a desire to shut down the debtor's business operations and to have the debtor criminally prosecuted; (4) the petitioning creditor failed to conduct critical research before filing its petition; and (5) the petitioning creditor failed to disclose the existence of additional creditors.  *See id.* at 195-201.  Here, by contrast, there *is* evidence that Highland was denuding Acis of assets; the bankruptcy court found that this is not a two-party dispute and that Terry's remedies under state law were insufficient; Terry conducted sufficient research before filing; and the bankruptcy court did not find that Terry was motivated by ill will or malice toward the debtor.

In *In re Frailey*, 144 B.R. 972 (Bankr. W.D. Pa. 1992), the court stated that "[a] bankruptcy court should refuse to enter an order for relief where petitioning creditors can go into state court to satisfy a debt."  *Id.* at 977-78.  But the cases cited by the *Frailey* court indicate that it did not make this statement in the context of a bad-faith filing analysis.  *See id.* (citing *In re Cent. Hobron Assocs.*, 41 B.R. 444, 451 (D. Haw. 1984) (applying balancing test to exclude unpaid debt from "not generally paying" determination); *In re Kass*, 114 B.R.

- 70 -

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19   Filed 07/26/25   Page 501 of 1017   PageID 16162
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 71 of 84   PageID 98064

308, 309 (Bankr. S.D. Fla. 1990) (conducting abstention analysis under 11 U.S.C. § 305)).

Indeed, the court in *Frailey* declined (on other grounds) to award the alleged debtor damages

under § 303(i). *See id.* at 978. The case is therefore inapposite.[39]

*In re Tichy Elec. Co.*, 332 B.R. 364 (Bankr. N.D. Iowa 2005), states: "[t]he power of

an involuntary petition must be exercised for the good of the entire creditor body and for

legitimate bankruptcy purposes. It is not intended to be used in an exclusively self-serving

manner as a collection device." *Id.* at 376. But in the present case, the bankruptcy court

found that Terry acted out of concern for the entire body of Acis' creditors. And the

petitioning creditors in *Tichy* did not actually intend to liquidate or reorganize the debtor.

Rather, "[t]hey understood that after filing, some negotiations would occur, payments would

be made, and the case dismissed." *Id.* In other words, the petitioning creditor intended to

use the threat of bankruptcy as leverage to negotiate a settlement with the debtor. That does

not appear to be the case here. Finally, unlike the present appeals, there is no indication in

*Tichy* that the alleged debtor was fraudulently transferring assets in order to frustrate

collection efforts. *See generally id.*

---

[39]Similarly, *In re Tarletz*, 27 B.R. 787 (Bankr. D. Colo. 1983), states that "it is obvious
that the use of the bankruptcy court as a routine collection device would quickly paralyze this
Court." *Id.* at 794. But this was in the context of 11 U.S.C. § 305 abstention, *not* a bad-faith
filing analysis. *See id.* at 793. And *In re Spade*, 258 B.R. 221 (Bankr. D. Colo. 2001), holds
that where a petitioning creditor seeks only to gain a litigation advantage over the debtor, and
does not seek the orderly distribution of the debtor's assets to all creditors, § 305 abstention
is appropriate. *See id.* at 233. Not only does *Spade* not involve a § 303(i) bad-faith analysis,
it is also factually inapposite: the bankruptcy court here found that Terry *was* motivated by
concern for all of Acis' creditors.

APPX-02618
015180

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19 Filed 06/03/25    Page 502 of 1017    PageID 16163

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 72 of 84    PageID 98065

In sum, because the bankruptcy court did not commit clear error in determining that Terry filed the involuntary petitions in good faith, its relevant findings on this issue must be affirmed.  Neutra and Highland's argument that the proposed Plan was tainted by Terry's bad-faith filing therefore fails to establish that the bankruptcy court committed reversible error.

B

Highland and Neutra maintain that the Plan fails to satisfy § 1129(a)(3) because it effects an unlawful result: allowing a portfolio manager to veto the wishes of the portfolio's owner.  They cite *In re Noll*, 172 B.R. 122 (Bankr. M.D. Fla. 1994), for the premise that a reorganization plan cannot be proposed in order to obtain a result that would be unobtainable in state court.  Highland and Neutra's reliance on *Noll* is misplaced.  *Noll* is, by its own terms, of limited instructive value—it states that "one cannot define [bad faith] but will readily recognize it when one sees it." *Id.* at 124.  The case is factually distinguishable because it involves a proposed plan that, in essence, would have constituted self-dealing by the plan proponent (who was not a disinterested trustee). *See id.*  And it is difficult to square Highland and Neutra's characterization of the holding of *Noll*—that a reorganization plan cannot be used to obtain results that are unobtainable in state court—with Neutra's argument in the bad-faith filing context that filing involuntary petitions is *only* appropriate when the petitioner lacks adequate remedies in state court.

Highland and Neutra argue that the Plan is unlawful because it contains an overbroad release.  They complain about language "vesting assets in the reorganized debtor 'free and

- 72 -

Appx 02619
015181

Case 19-34054-sgj11 Doc 3596-19 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 19 Page 74 of 85 Page 503 of 1017 PageID 16164
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 73 of 84 PageID 98066

clear of all right, title, interests, claims, liens, encumbrances and charges'; purporting to compromise all claims against the estates; preserving estates' right of setoff and recoupment; and enjoining the 'continuation' of lawsuits against the debtors." Highland & Neutra Third Appeal Br. 30. But this language merely effects the express terms of 11 U.S.C. §§ 524(a) and 1141(c). *See* 11 U.S.C. § 524(a) ("A discharge in a case under this title . . . operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor[.]"); 11 U.S.C. § 1141(c) ("[A]fter confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor."); *see also In re Coho Res., Inc.*, 345 F.3d 338, 343 (5th Cir. 2003) ("11 U.S.C. § 524(a) operates as an injunction against actions against a debtor subsequent to a discharge of a debt. The bankruptcy discharge and § 524 injunction serve to give the debtor a financial fresh start." (internal quotation marks, emphasis, and footnote omitted)). The challenged language does not render the Plan unlawful.[40] Highland and Neutra have failed to demonstrate reversible error much less any error.

IX

The court now considers the argument of Highland and Neutra that the Plan fails to meet the requirements of 11 U.S.C. § 1129(a)(5).

---

[40]Highland and Neutra also cite several cases for the proposition that a plan is proposed in bad faith when it seeks merely to delay or frustrate the efforts of a secured creditor. But Highland and Neutra are not secured creditors.

015182
Appx 02620

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19 Filed 05/25   Page 504 of 1017   PageID 16165
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 74 of 84   PageID 98067

A

Section 1129(a)(5) provides that a plan may only be confirmed if:

> (A)(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and
>
> (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and
>
> (B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

*Id.* Neutra and Highland contend that the Plan is deficient because Terry is actually a non-statutory insider, and because Terry's ownership of Acis is not in the best interests of creditors, Acis' investors, or public policy.[41]

B

The court affirms the bankruptcy court's conclusion that Terry is not an insider.

---

[41]Neutra and Highland also contend that § 1129(a)(5)(A)(i) requires disclosure of the corporate structure of the reorganized debtor, and that the confirmed Plan is deficient because it merely states that Terry will have control over the structure of Acis instead of defining that structure in advance. In support of this argument, Neutra and Highland cite *In re GAC Storage El Monte, LLC*, 489 B.R. 747, 765-66 (Bankr. N.D. Ill. 2013). But the plan in *GAC Storage* did not fail because it left the management structure of the reorganized debtor undefined; rather, it failed because it did not disclose that the reorganized debtor's sole owner "intend[ed] to bring on either himself or another entity which he would control as the manager of [the debtor] and that the manager would have a 1% ownership interest in [the debtor]." *Id.* at 766. Thus *GAC Storage* is not controlling.

Appx. 02621
015183

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19 Filed 07/25/85   Page 505 of 1017   PageID 16166
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 75 of 84   PageID 98068

11 U.S.C. § 101(31) provides a list of persons who are considered to be "insiders" of

the debtor based on their relationship with the debtor.  A person not included in the statutory

list can nonetheless qualify as a "non-statutory insider" under certain circumstances.  In

deciding whether a person is a non-statutory insider, the court considers two factors: "(1) the

closeness of the relationship between the [putative insider] and the debtor; and (2) whether

the transactions between the [putative insider] and the debtor were conducted at arm's

length."  *In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992); *accord In re A. Tarricone,*

*Inc.*, 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002).  Highland and Neutra contend that a person

can be a non-statutory insider based on his relationship with a statutory insider of the debtor,

regardless of his relationship with the debtor itself.  *See A. Tarricone*, 286 B.R. at 263-64.

They then assert that the Trustee, as a person in control of the debtor, is a statutory insider.

*See In re GSC, Inc.*, 453 B.R. 132, 158 n.31 (Bankr. S.D.N.Y. 2011).  The court will assume

*arguendo* that these legal assertions are correct.  Highland, Neutra, and the Trustee agree that

the bankruptcy court's determination of insider status is a question of fact that is reviewed

for clear error.  *See U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at*

*Lakeridge, LLC,* ___ U.S. ___, 138 S. Ct. 960, 966 (2018).

Highland and Neutra posit that the relationship between the Trustee and Terry is

unusually close.  The controlling question under the first factor is whether the relationship

is close enough for the alleged insider to gain advantage due to affinity.  *See In re Rexford*

*Props., LLC*, 557 B.R. 788, 797 (Bankr. C.D. Cal. 2016).  Among the indicators of closeness

cited by Highland and Neutra are: that the lawyers who represented Terry in the filing of the

Appx. 02622
015184

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19 Filed 06/25 Page 506 of 1017    PageID 16167
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 76 of 84    PageID 98069

involuntary petitions now represent the Trustee; that the Trustee relied on Terry's financial advice for a period of time after the Trustee's appointment; that Terry's expert witness in the arbitration was engaged by the Trustee to testify at the confirmation hearings; that Terry's counsel in related litigation in Guernsey testified as an expert at the confirmation hearings; and that Terry introduced Oaktree to the Trustee's predecessor.  As for whether the Plan was negotiated at arm's length, Highland and Neutra point out that the Trustee did not solicit competing bids for Acis' equity, and that there was essentially no negotiation between the Trustee and Terry regarding that price.

But after reviewing the record, the court is not "left with the definite and firm conviction that a mistake has been committed." *Johnson Sw.*, 205 B.R. at 827 (quoting *Placid Oil*, 158 B.R. at 412).  The Trustee testified that, before the bankruptcy cases, he had no relationship with Terry—and after he was appointed, his relationship with Terry was typical of that between a trustee and the debtor's largest creditor.  He relied on Terry's financial advice for a brief time out of necessity, not affinity.  Terry appears to have been represented by independent counsel in his dealings with the Trustee.  The lack of an auction can be explained by the Trustee's assertion—credited by the bankruptcy court—that no other creditor was a logical choice to be Acis' equity owner.  And the record indicates that there was at least some negotiation between Terry and the Trustee regarding the amount of the reduction of Terry's claim against the estates.  Indeed, according to the Trustee's testimony, Terry thought the price for Neutra's equity was *too high*, but the Trustee held firm and Terry gave in.  These facts plausibly support the findings that Terry and the Trustee were not so

Appx. 02623
015185

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 13-20    Filed 08/25    Page 507 of 1017    PageID 16168
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 77 of 84    PageID 98070

close as to give Terry an advantage based on affinity, and that the Plan was negotiated at arm's length. The bankruptcy court thus did not commit clear error by finding that Terry was not an insider.[42]

C

Highland and Neutra's remaining § 1129(a)(5) arguments—that Terry's appointment as Acis' new equity owner is contrary to the interests of creditors, investors, and the public—are unavailing.

Highland and Neutra first contend that "[c]onfirmation of a Chapter 11 plan of reorganization that was designed to allow an *insider* to obtain ownership of the reorganized debtor for an improper purpose is against public policy." Highland & Neutra Third Appeal Br. 43 (emphasis added) (citing *In re S. Beach Sec., Inc.*, 606 F.3d 366, 371 (7th Cir. 2010)). But Terry is not an insider, and—as discussed *supra* at § VIII(A)(3)—he pursued Acis' involuntary bankruptcy in good faith and for a proper bankruptcy purpose.

Highland and Neutra also assert that "a bankruptcy court must, by considering the broader public policy interests, prevent the appointment of a proposed leader who has a conflict of interest or other financial or personal affiliation that would make his or her control inappropriate." Highland & Neutra Third Appeal Br. 44. They note that Terry is embroiled in a battle with HCLOF over control of the subordinated notes, and with Highland itself over

---

[42]As an additional ground for finding that Terry is an insider, Highland and Neutra assert that Terry had access to voluminous insider information during the pendency of these cases. But they cite no evidence in the record on appeal in support of this assertion.

Appx 02624
015186

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19    Filed 07/09/25    Page 508 of 1017    PageID 16169

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 78 of 84    PageID 98071

myriad issues in state court. But this assertion is not entirely accurate: it is *Acis*, not Terry, who is battling with HCLOF over the subordinated notes. And even if Terry has disagreements with Highland in state court, this fact is not necessarily dispositive of whether the Plan is in the public interest. According to case law cited by Highland and Neutra, there are numerous factors to consider in deciding whether a proposed plan is in the public interest, and the weight given to each factor varies depending on the circumstances of the case. *See In re Digerati Techs., Inc.*, 2014 WL 2203895, at *5 (Bankr. S.D. Tex. May 27, 2014). Relevant factors include whether the appointment "perpetuate[s] incompetence, lack of direction, [or] inexperience," and whether "the individual [is] capable and competent to serve in the proposed capacity assigned to him." *Id.* The bankruptcy court found that Terry is "well qualified to reorganize" Acis and that his new role "will be similar to the role he very successfully performed for" Acis. *Acis II*, 2019 WL 417149, at *14. Giving appropriate weight to all of the public policy factors in the context of this case—particularly in light of the bankruptcy court's finding that Highland has "unclean hands," *id.* at *10—the court concludes that the bankruptcy court did not clearly err by finding that confirmation of the Plan was consistent with public policy.

## X

Finally, the court considers the contention of Highland and Neutra that the Plan does not satisfy the cram-down requirements of 11 U.S.C. § 1129(b).

It is familiar jurisprudence that the acceptance of all impaired classes of claims or interests required by § 1129(a)(8) is not necessary for plan confirmation when § 1129(b) is

Appx 02625
015187

Case 19-34054-sgj11 Doc 3596-19 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 19 Filed 06/26/25 85 Page 509 of 1017 PageID 16170
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 79 of 84 PageID 98072

satisfied. Section 1129(b) permits confirmation when all other requirements of § 1129(a) are met and "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." § 1129(b)(1). The court reviews the bankruptcy court's finding that the cram-down requirements are met for clear error. *See In re Block Shim Dev. Co.-Irving*, 118 B.R. 450, 452 (N.D. Tex. 1990) (Fitzwater, J.).

Highland and Neutra challenge the bankruptcy court's finding that the Plan meets these requirements, contending the Plan is neither fair nor equitable to them, in violation of § 1129(b)(1).[43] More specifically, Highland and Neutra assert that the Plan violates the absolute priority rule and its corollaries.

Under the absolute priority rule, "fairness and equity require[] that 'the creditors . . . be paid before the stockholders [can] retain [equity interests] for any purpose whatever.'" *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle Street P'ship*, 526 U.S. 434, 444 (1999) (last alteration in original) (quoting *N. Pac. R.R. Co. v. Boyd*, 228 U.S. 482, 508 (1913)). The reason for the rule is "the danger inherent in any reorganization plan proposed by a debtor . . . that the plan will simply turn out to be too good a deal for the debtor's owners." *Id.* The rule is embodied in § 1129(b)(2)(B)(ii). *See LaSalle*, 526 U.S. at 449. The debtor's old equity owners *can* retain their interest in the debtor if they contribute new value to the bankruptcy estate, and this new value "makes the senior creditors (and the estate as a whole)

---

[43]Highland and Neutra also argue that the requirements of § 1129(a)(3) are not met. For the reasons discussed *supra* at § VIII, the court rejects this argument.

App. 02626
015188

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 19 Filed 06/26/85   Page 510 of 1017   PageID 16171
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 80 of 84   PageID 98073

better off." *In re Castleton Plaza, LP*, 707 F.3d 821, 821 (7th Cir. 2013).  The way to assess

whether the value contributed by the old equity owners makes the senior creditors better off

is to allow for a market valuation of the debtor's equity.  *See LaSalle*, 526 U.S. at 454-58.

Highland and Neutra contend that the Plan violates the absolute priority rule because

there was no market test to assess the value of Acis' equity—instead, the Trustee unilaterally

selected the $1 million number without soliciting competing bids.  But the absolute priority

rule, by its own terms, only applies when the debtor's old equity owners will retain their

equity interest after bankruptcy.  *See LaSalle*, 526 U.S. at 444.  Where, as here, a non-insider

creditor becomes the debtor's new owner, there is no "danger . . . that the plan will simply

turn out to be too good a deal for the debtor's [old] owners."  *Id.*  Whatever the significance

of the Trustee's failure to solicit competing bids, it does not violate the absolute priority rule

in this instance.

Highland and Neutra also argue that the Plan violates a corollary of the absolute

priority rule: "that a senior class cannot receive more than full compensation for its claims."

*In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) (quoting *In re Genesis Health

Ventures, Inc.*, 266 B.R. 591, 612 (Bankr. D. Del. 2001)).  They assert that "to obtain

confirmation of a reorganization plan that completely extinguishes equity interests, the plan's

proponent must prove that there is no value left once the creditors have had their turn."

Highland & Neutra Third Appeal Br. 47 (quoting *In re Dave's Detailing, Inc.*, 2015 WL

4601726, at *16 (Bankr. S.D. Ind. July 30, 2015)).  This, in turn, requires a showing that no

creditor is paid more than in full.  *See In re MCorp Fin., Inc.*, 137 B.R. 219, 235 (Bankr. S.D.

App. 02627
015189

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19    Filed Page 08/26/85    Page 511 of 1017    PageID 16172

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 81 of 84    PageID 98074

Tex. 1992), *abrogated on other grounds by In re Briscoe Ents., Ltd., II*, 994 F.2d 1160, 1164 n.11 (5th Cir. 1993).  Highland and Neutra maintain that the Plan violates this rule in two ways.

First, they contend that the bankruptcy court wrongly inflated the value of the secured portion of Terry's partially-secured claim from approximately $634,000 to $1 million.  This argument rests on an erroneous understanding of the Plan.  The Plan reduces the *total* value of Terry's partially-secured claim—i.e., the sum of both the secured and unsecured portions of his claim—by $1 million, and then treats the remaining *total* balance of Terry's claim as a general unsecured claim.  The Plan does not inflate the value of his secured claim.

Second, Highland and Neutra argue that, without a market test of Acis' value, the bankruptcy court could not have determined whether Terry was overcompensated when he received Acis' equity in exchange for a $1 million reduction in his claim.  But there *was* a market valuation in the present case.  In *LaSalle* the Supreme Court suggested (but did not decide) that the termination of exclusivity—i.e., allowing any interested person to submit a competing reorganization plan—can constitute a sufficient market test of a debtor's value. *See LaSalle*, 526 U.S. at 458.  Since then, courts have concluded in a number of cases that opening the bankruptcy process to competing plan proposals is a valid market test.  *See H.G. Roebuck & Son, Inc. v. Alter Commc'ns, Inc.*, 2011 WL 2261483, at *7 (D. Md. June 3, 2011) ("Indeed, if the Bankruptcy Court simply allowed Roebuck to file a competing plan, and the creditors found that plan to be inferior, they could still vote for Alter's original plan, and [*LaSalle*] would have been satisfied."); *Dave's Detailing*, 2015 WL 4601726, at *18

App. 02628
015190

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 19    Filed 08/26    Page 512 of 1017    PageID 16173

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 82 of 84    PageID 98075

("The termination of exclusivity provides an open market for competition in the form of competing plans."); *In re Situation Mgmt. Sys., Inc.*, 252 B.R. 859, 866 (Bankr. D. Mass. 2000) ("[T]he competing plan approach provides for a more informed process for creditors and to interested bidders than an auction of equity interests in the context of a Debtor's plan."); *In re Homestead Partners, Ltd.*, 197 B.R. 706, 716-17 (Bankr. N.D. Ga. 1996) ("Competing plans certainly would foster alternate bids for control of the reorganized debtor, and would thereby dispel any concerns regarding the necessity and value of the shareholder's offer."); *In re SM 104 Ltd.*, 160 B.R. 202, 227 (Bankr. S.D. Fla. 1993) ("[A]t least in all but the largest bankruptcy cases, the disclosure and confirmation procedures provided by Chapter 11 offer an acceptable alternative for marketing the ownership interests of the reorganized debtor.").[44]

No party in the present case held the exclusive right to propose a reorganization plan. Highland and Neutra could have proposed a competing plan if they believed that the Trustee's plan undervalued Acis' equity. They did not do so. Thus the bankruptcy court did not err by approving a Plan that valued Acis' equity at $1 million.

---

[44]Highland and Neutra's argument to the contrary, based on the Seventh Circuit's opinion in *Castleton*, 707 F.3d 821, is unpersuasive. The court in *Castleton* concluded that the termination of exclusivity was insufficient to constitute a market test in the context of the absolute priority rule. *See id.* at 823-24. The court applied that rule because the person receiving the debtor's equity under the plan was an insider. *See id.* In contrast, Terry is not an insider, and the absolute priority rule does not apply in the present case. *See Dave's Detailing*, 2015 WL 4601726, at *18 ("The holding in *Castleton Plaza* applies to shareholders or insiders—not to non-insider third parties—obtaining equity in a reorganized debtor.").

APPX-02629
0115191

Case 19-34054-sgj11    Doc 3596-19    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 13-20   19   Filed 03/25   Page 83 of 25   85    Page 513 of 1017    PageID 16174

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 83 of 84   PageID 98076

XI

On April 12, 2019 Acis filed a motion to substitute itself as the appellee in the Third

Appeal.  It maintains that, once the Plan took effect, Acis became the Trustee's successor-in-

interest.  But as Acis recognizes, "the Federal Rules of Bankruptcy Procedure applicable to

this case, those numbered 8001-8028, do not provide a specific rule governing substitution

of parties in bankruptcy appeals to the district court."  Acis Mot. Substitute 3.  Acis also fails

to cite, and the court has not found, any case in which a district court allowed such party

substitution while an appeal was pending.  Accordingly, the court in its discretion denies

Acis' motion.  *Cf. Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 743 (7th

Cir. 1985) (holding that substitution of parties under an analogous rule, Fed. R. Civ. P. 25(c),

is within court's discretion).  If Acis wishes to take the place of the Trustee in any further

appeal to the Fifth Circuit, it may make a request under the procedure prescribed by Fed. R.

App. P. 43.

*   *   *

In the First Appeal, the clerk is directed to strike ECF Doc. No. 2 from the docket of

No. 3:18-CV-1084-D and to refile that document in No. 3:18-CV-1057-D with a filing date

of April 27, 2018.

The court DISMISSES the appeals of the orders denying intervention in Nos. 3:18-

CV-1056-D and 3:18-CV-1084-D, and DISMISSES the appeals of the orders for relief in

Nos. 3:18-CV-1057-D and 3:18-CV-1073-D.

The court AFFIRMS the Break-Up Fee and Expense Reimbursement order at issue

Appx. 02639
015192

Case 19-34054-sgj11   Doc 3596-19   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S     Document Exhibit 19 Filed 05/20/25   Page 514 of 1017     PageID 16175

Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 84 of 84   PageID 98077

in the Second Appeal, No. 3:18-CV-1822-D.

In the Third Appeal, No. 3:19-CV-0291-D, the court AFFIRMS the bankruptcy court's order confirming the Plan and approving the disclosure statement.

The court DENIES Acis' April 12, 2019 motion to substitute party.

AFFIRMED in part; DISMISSED in part.

July 18, 2019.

SIDNEY A. FITZWATER
SENIOR JUDGE

- 84 -

015193

Appx 02631

# EXHIBIT 20

Appx. 02632
015194

Case: 19-10847      Document: 00515903826      Page: 1      Date Filed: 06/17/2021

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 17, 2021

Lyle W. Cayce
Clerk

———————

No. 19-10847

———————

IN THE MATTER OF: ACIS CAPITAL MANAGEMENT, L.P.,

*Debtor,*

----------------------------

NEUTRA LIMITED;

*Appellant,*

*versus*

ROBIN E. PHELAN, CHAPTER 11 TRUSTEE,

*Appellee.*

———————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CV-291

———————————————————

015195

Appx. 02628

No. 19-10847

Before SMITH, HO, and OLDHAM, *Circuit Judges*.

PER CURIAM:*

 Having thoroughly reviewed the parties' briefs and arguments, we conclude the district court's judgment affirming the bankruptcy court's order confirming the Chapter 11 plan must be AFFIRMED. We further conclude the appeal of the district court's plan injunction is moot and must be DISMISSED.

---

 * Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

Appx. 02624
015196

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

June 17, 2021

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW

Regarding: Fifth Circuit Statement on Petitions for Rehearing
or Rehearing En Banc

No. 19-10847   Neutra v. Phelan
USDC No. 3:19-CV-291

Enclosed is a copy of the court's decision.  The court has entered
judgment under Fed. R. App. P. 36.  (However, the opinion may yet
contain typographical or printing errors which are subject to
correction.)

Fed. R. App. P. 39 through 41, and 5th Cir. R. 35, 39, and 41
govern costs, rehearings, and mandates.  **5th Cir. R. 35 and 40
require you to attach to your petition for panel rehearing or
rehearing en banc an unmarked copy of the court's opinion or order.**
Please read carefully the Internal Operating Procedures (IOP's)
following Fed. R. App. P. 40 and 5th Cir. R. 35 for a discussion
of when a rehearing may be appropriate, the legal standards applied
and sanctions which may be imposed if you make a nonmeritorious
petition for rehearing en banc.

<u>Direct Criminal Appeals</u>.  5th Cir. R. 41 provides that a motion
for a stay of mandate under Fed. R. App. P. 41 will not be granted
simply upon request.  The petition must set forth good cause for
a stay or clearly demonstrate that a substantial question will be
presented to the Supreme Court.  Otherwise, this court may deny
the motion and issue the mandate immediately.

<u>Pro Se Cases</u>.  If you were unsuccessful in the district court
and/or on appeal, and are considering filing a petition for
<u>certiorari</u> in the United States Supreme Court, you do not need to
file a motion for stay of mandate under Fed. R. App. P. 41.  The
issuance of the mandate does not affect the time, or your right,
to file with the Supreme Court.

<u>Court Appointed Counsel</u>.  Court appointed counsel is responsible
for filing petition(s) for rehearing(s) (panel and/or en banc) and
writ(s) of certiorari to the U.S. Supreme Court, unless relieved
of your obligation by court order.  If it is your intention to
file a motion to withdraw as counsel, you should notify your client
promptly, **and advise them of the time limits for filing for**
**rehearing and certiorari**.  Additionally, you MUST confirm that
this information was given to your client, within the body of your
motion to withdraw as counsel.

App. 02635
015197

Case: 19-10847     Document: 00515903827     Page: 2     Date Filed: 06/17/2021

The judgment entered provides that appellant pay to appellee the
costs on appeal.  A bill of cost form is available on the court's
website www.ca5.uscourts.gov.

                              Sincerely,

                              LYLE W. CAYCE, Clerk

                              By: _____
                              Charles B. Whitney, Deputy Clerk

Enclosure(s)

Ms. Annmarie Antoniette Chiarello
Mr. Phillip Lewis Lamberson
Mr. Jeffrey Scott Levinger
Mrs. Rakhee V. Patel

# EXHIBIT 21

Appx 02637
015199

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) **Hearing Date: TBD** |
| | ) **Objection Deadline: TBD** |

### MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER TRANSFERRING VENUE OF THIS CASE TO THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS

The official committee of unsecured creditors (the "Committee") of Highland Capital

Management, L.P. (the "Debtor"), hereby submits this motion (this "Motion") for entry of an order,

substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to

28 U.S.C. §§ 1408 and 1412 and Rule 1014 of the Federal Rules of Bankruptcy Procedure

("Bankruptcy Rules"), transferring the venue of the above-captioned chapter 11 case to the United

States Bankruptcy Court for the Northern District of Texas.

### PRELIMINARY STATEMENT

1.      Although a debtor's choice of venue generally warrants deference, this case

presents unique facts that make a change in venue appropriate. The Debtor has only one location

in the United States—its Dallas, Texas headquarters, which houses the Debtor's management and

key personnel. In fact, the Debtor's headquarters sit less than two miles from the United States

Bankruptcy Court for the Northern District of Texas (the "Dallas Bankruptcy Court"), making the

venue clearly more convenient for the Debtor and its management than Delaware. Additionally,

---

[1]     The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Appx. 92628

015200

although the Debtor's creditors span the nation, a substantial number of the Debtor's creditors (including several of the top twenty unsecured creditors and Committee members) are concentrated in Texas, or the Midwest more broadly.  Likewise, nearly all of the professionals active in this case are concentrated in Texas, Chicago, or Los Angeles.  The Dallas Bankruptcy Court is more centrally located and easily accessible to the key parties in this case, along with their advisors.  Transferring venue from Wilmington, Delaware to Dallas, Texas would result in greater efficiencies and significant cost savings for the Debtor's estate.

2.      Moreover, the Dallas Bankruptcy Court is already intimately familiar with the Debtor's principals and complex organizational structure—the involuntary chapter 11 cases of the Debtor's former affiliates and current Committee members, Acis Capital Management, L.P. and Acis Capital Management GP, L.P. (collectively, "Acis") are pending in the Dallas Bankruptcy Court.  Specifically, the Dallas Bankruptcy Court has (a) heard multiple days' worth of material testimony from the Debtor's principal owner (James Dondero), the Debtor's minority owner (Mark Okada), the Debtor's general counsel, at least two assistant general counsels, and numerous other employees of the Debtor and other witnesses; and (b) issued at least six published opinions to date, many of which have been affirmed on appeal to the United States District Court for the Northern District of Texas (the "Dallas District Court") in subsequent published opinions.  The Dallas Bankruptcy Court is still presiding over an adversary proceeding commenced by the Debtor and its affiliates, and the Debtor's appeal of Acis's confirmed chapter 11 plan is still pending before the Fifth Circuit.  As evidenced by the published opinions, the Dallas Bankruptcy Court and the Dallas District Court are intimately familiar with the Debtor's business, principal owner, and key executives.  For these reasons, the Dallas Bankruptcy Court is uniquely positioned to oversee this chapter 11 case.

ACTIVE 250501748

Appx 92639

015201

3.       The Committee respectfully submits that, for the reasons set forth above and discussed more fully below, based on the unique facts of this case, both the interests of justice and convenience of the parties justify an exception to the general deference granted to a debtor's choice of venue and warrant the transfer of venue to the Dallas Bankruptcy Court.

## JURISDICTION

4.       The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Committee confirms its consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.       The statutory and other bases for the relief requested herein are 28 U.S.C. §§ 1408 and 1412, Bankruptcy Rule 1014, and Local Rule 1014-1.

## BACKGROUND

6.       On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").  The Committee was appointed by the United States Trustee on October 29, 2019 [Docket No. 65].

### I.       The Debtor's Connections to Dallas.

7.       As noted in the Voluntary Petition [Docket No. 1], the Debtor's principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201, which also serves as the Debtor's

3

Appx 02649
015202

international headquarters, and, in fact, its only office in the United States. *See Declaration of
Frank Waterhouse in Support of First Day Motions* [Docket No. 9] (the "First Day Declaration"),
¶ 7. Although it is unclear how many of the Debtor's 76 employees are based in the Debtor's
international offices, presumably those employees based in the U.S. live in or around the Debtor's
headquarters in Dallas, Texas. Furthermore, all but one of the Debtor's equity holders are also
located in Dallas, Texas. *See* Voluntary Petition [Docket No. 1], at pg. 14. In sum, Dallas, Texas
is the epicenter of the Debtor's operations.

**II.     The Dallas Bankruptcy Court's Familiarity with the Debtor.**

8.      Prior to the commencement of this chapter 11 case, the Debtor was (and currently
remains) actively involved in the involuntary chapter 11 case of Acis, its then-affiliate and current
Committee member, captioned *In re Acis Capital Mgmt., L.P.*, Case No. 18-30264 (SGJ) (the
"Acis Bankruptcy"). Until 2019, Acis was the "structured credit arm of Highland." *In re Acis
Capital Mgmt., L.P.*, Nos. 18-30264 (SGJ), 2019 Bankr. LEXIS 292, at *17 n. 21 (Bankr. N.D.
Tex. Jan. 31, 2019) (the "Acis Confirmation Opinion"), *aff'd*, 604 B.R. 484 (N.D. Tex. 2019).[2]
Acis did not have any of its own employees and, instead, contracted with the Debtor to perform
all day-to-day functions, meaning that all Acis corporate representatives and witnesses in the Acis
Bankruptcy were employees of the Debtor. *Id.* at *9. Moreover, there was complete overlap
between Acis and the Debtor at the executive level, with the Debtor's CEO James Dondero serving
as President of Acis and the Debtor's CFO, and first day declarant, Frank Waterhouse serving as
Treasurer.

9.      The Acis Bankruptcy commenced on January 30, 2018, when Joshua N. Terry filed
involuntary petitions against Acis to commence chapter 7 cases in the Dallas Bankruptcy Court.

---

[2] The Acis Confirmation Opinion is attached hereto as **Exhibit B**.

App. 02641
015203

In connection with a hotly-contested trial on the involuntary petitions, the Dallas Bankruptcy Court heard seven days of testimony and argument, entered orders for relief and issued a written opinion, which is attached hereto as **Exhibit C** (the "Acis Involuntary Opinion").  Testimony included that of the Debtor's co-founder and CEO, James Dondero, the Debtor's co-founder and then-Chief Investment Officer, Mark Okada, the Debtor's General Counsel, Scott Ellington, the Debtor's Controller, David Klos, and the Debtor's Assistant General Counsel, Isaac Leventon.

10.     In May 2018, the Acis bankruptcy cases were converted from Chapter 7 to Chapter 11, and a Chapter 11 Trustee was appointed "due to what the bankruptcy court perceived to be massive conflicts of interest with regard to the Debtors' management."  *See* Acis Confirmation Op. at *15.

11.     The Debtor and its affiliates were, and remain, exceptionally active throughout the Acis Bankruptcy, objecting to virtually every action proposed by the Chapter 11 Trustee throughout the case.  *See In re Acis Capital Mgmt., L.P.*, 603 B.R. 300, 302 (Bankr. N.D. Tex. 2019).  As a result, the Dallas Bankruptcy Court was forced to conduct many evidentiary hearings, during which the Debtor's executives and employees were often called to testify.  Overall, between the Acis Bankruptcy and related adversary proceedings, the Dallas Bankruptcy Court has to date reviewed approximately 700 exhibits, heard more than thirty days of testimony and oral argument, and issued six opinions.  The Dallas District Court has also ruled on three appeals related to the Acis Bankruptcy, all of which were filed by the Debtor and/or its affiliates.  The Debtor's appeal of the Acis confirmation order is now pending before the Fifth Circuit.[3]

12.     The Dallas Bankruptcy Court is also currently adjudicating a number of fraudulent transfer causes of action that Acis has brought against the Debtor and certain of its non-debtor

---

[3]     *See generally Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel Nunc Pro Tunc to the Petition Date* [Docket No. 69] and

App. 02642

015204

affiliates in a consolidated adversary case (the "<u>Acis Adversary Proceeding</u>").  Distilled to its

essence, the Acis Adversary Proceeding concerns actions taken by the Debtor and its affiliates to

denude the Acis debtors' estates of their value and frustrate an imminent, substantial judgment

against Acis.  *See Acis Capital Mgmt., GP, LLC v. Highland Capital Mgmt., L.P. (In re Acis*

*Capital Mgmt., L.P.)*, 600 B.R. 541, 549 (Bankr. N.D. Tex. 2019) (the "<u>Acis Arbitration</u>

<u>Opinion</u>").[4]

13.      In sum, the Dallas Bankruptcy Court and the Dallas District Court are already

intimately familiar with the Debtor's complex structure, its management, and key personnel, and

are well-versed in the contentious relationship between the Debtor and several of its largest

creditors, including members of the Committee.  Accordingly, the Dallas Bankruptcy Court is

uniquely situated to oversee this chapter 11 case.

**RELIEF REQUESTED**

14.      By this Motion, the Committee requests entry of the Proposed Order, substantially

in the form attached hereto as **Exhibit A**, transferring the venue of this chapter 11 case to the

Dallas Bankruptcy Court.

**BASIS FOR RELIEF**

**III.      The Dallas Bankruptcy Court is an Appropriate Venue Under 28 U.S.C. § 1408.**

15.      Section 1408 of title 28 of the United States Code provides that bankruptcy cases

may be commenced in the district court for the district "in which the domicile, residence, principal

place of business in the United States, or principal assets in the United States" of the debtor is

---

*Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as*
*Special Texas Litigation Counsel* Nunc Pro Tunc *to the Petition Date* [Docket No. 70] (describing the Debtor's
ongoing litigation and involvement with the Acis Bankruptcy).

[4] A copy of the Acis Arbitration Opinion is attached hereto as **Exhibit D**.

ACTIVE 250501748

Appx 02643

015205

located or the district "in which there is a pending case under title 11 concerning such person's affiliate."

16.    The Debtor's headquarters, and indeed its only office in the United States, is located in Dallas, Texas.  Moreover, had this chapter 11 case commenced mere months ago, the Acis Bankruptcy would be a "pending case under title 11 concerning" the Debtor's affiliate.[5]  The Dallas Bankruptcy Court easily satisfies the statutory venue requirements under 28 U.S.C. § 1408.

**IV.    The Court Should Exercise its Discretion to Transfer Venue to the Dallas Bankruptcy Court.**

17.    It is within a court's discretion to transfer a case to another venue if it is "in the interest of justice or for the convenience of the parties." 28 U.S.C. § 1412.  Courts have interpreted this statutory provision to create two distinct bases upon which transfer of venue may be granted: interest of justice *or* convenience of the parties.  *See In re Qualtec Inc.*, No. 11-12572 (KJC), 2012 WL 527669, at *6 (Bankr. D. Del. Feb. 16, 2012).  Movants for transfer of venue have the burden of showing that a transfer is warranted based on the preponderance of the evidence.[6]  *Id.* at *5.

**A.    Transferring Venue to the Dallas Bankruptcy Court Would Serve the Convenience of the Parties.**

18.    In determining whether a venue transfer would serve the convenience of the parties, courts generally examine the following six factors: "(a) proximity of the creditors of every kind to the court; (b) proximity of the debtor; (c) proximity of the witnesses who are necessary to the administration of the estate; (d) the location of the debtor's assets; (e) the economic administration of the estate; and (f) the necessity for ancillary administration in the event of liquidation." *In re*

---

[5] The Debtor ceased to be an affiliate of Acis following confirmation of the Acis plan of reorganization in January 2019, when equity in reorganized Acis was distributed to Mr. Terry in exchange for a reduction of his allowed claim.

[6]  To meet its burden herein, the Committee is relying on the record of this case, including the First Day Declaration, and the established record of the Acis Bankruptcy.  The Committee therefore does not anticipate there being any need to hold an evidentiary hearing on this Motion.

ACTIVE 250501748

Appx. 02644
015206

*Rests. Acquisition I, LLC*, No. 15-12406 (KG), 2016 WL 855089, at *2 (Bankr. D. Del. Mar. 4, 2016) (*quoting Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co. (In re Commonwealth Oil Refining Co.)*, 596 F.2d 1239, 1247 (5th Cir. 1979)).  Under this analysis, the factor given the most weight is the economic and efficient administration of the estate.  *Id.*

### 1.    Proximity of Creditors of Every Kind to the Court.

19.    Of the Debtor's twenty largest unsecured creditors, at least seven[7] are listed as having Texas addresses:  Acis, Joshua and Jennifer Terry, McKool Smith, P.C., Foley Gardere, DLA Piper LLP (US), Lackey Hershman LLP, and Andrews Kurth LLP.  *See* Voluntary Petition [Docket No. 1].  Additionally, of the total known claims at this juncture, it appears that a significant number of the Debtor's creditors are located in Texas, and the rest of the creditors appear to be scattered across the United States.  No known creditors appear to be based in Delaware.  *See id.*

20.    Courts may also focus on the location of the debtor's and creditors' professionals in deciding whether to transfer venue.  *See In re Caesars Entm't Operating Co., Inc.*, No. 15-10047 (KG), 2015 WL 492529, at *6 (Bankr. D. Del. Feb. 2, 2015).  The Committee's proposed counsel is primarily located in Chicago, Illinois, but also maintains an office in Dallas, Texas (where its litigation team for this case is based).  If this case were to proceed before this Court, the Committee would have to retain Delaware co-counsel.[8]  Additionally, several of the Debtor's largest creditors are separately represented by counsel based in the Midwest: the Acis is represented by the Rogge Dunne Group and Winstead PC in Dallas [Docket No. 81], the Redeemer Committee of the Highland Crusader Fund is represented by Jenner & Block LLP primarily out of its Chicago office

---

[7] Additionally, although listed with a North Carolina address, CLO Holdco, Ltd. is an affiliate of and controlled by the Debtor, whose principal place of business is in the Northern District of Texas.  The Debtor also lists Reid Collins & Tsai's New York office, despite the fact that the firm is a Texas limited liability partnership based in Texas.

[8] Under Local Rule 9010-1(d), the Committee has until November 27, 2019, to obtain Delaware co-counsel, if necessary.

ACTIVE 250501748

Appx. 02645
0115207

[Docket Nos. 1, 36], and USB Securities LLC and UBS AG London Branch is represented by Latham & Watkins LLP, which has an office in Houston [Docket No. 85].

21.    Considering the proximity of both the Debtor's creditors and their professionals to the Dallas Bankruptcy Court, this factor should weigh in favor of transfer. *See In re Rehoboth Hosp., LP*, No. 11-12798 (KG), 2011 WL 5024267, at *3 (Bankr. D. Del. Oct. 19, 2011) (concluding that, on balance, this factor favored transfer to Texas when the overwhelming majority of creditors were located in Texas).

### 2.    Proximity of the Debtor to the Court.

22.    Courts have noted that this inquiry should focus primarily on the parties that must appear in court. *See Caesars Entm't Operating Co., Inc.*, 2015 WL 495259, at *6. The Debtor's headquarters, and only office located in the United States, is in Dallas, Texas. *See* First Day Decl., at ¶ 7. As a result, it is likely that any of the Debtor's personnel who would have to appear in court are located in Dallas, Texas. The Debtor has no connection to Delaware other than the fact that it was formed there.

23.    The Committee concedes that Debtor's counsel maintains an office in Delaware but does not have an office in Dallas. That said, Debtor's counsel represents itself as having a "national presence," including in the Fifth Circuit,[9] and its lead lawyers on this matter are based in Los Angeles. The Debtor's proposed financial advisor team is also predominantly based in Los Angeles with several members located in Chicago. No proposed advisor from Development Specialists, Inc. is located on the East Coast, let alone in Delaware. *See Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain Development Specialists, Inc. to Provide a Chief Restructuring Officer, Additional Personnel, and Financial Advisory and*

---

[9] *See* http://www.pszjlaw.com/about-presence.html#circuit5.

Appx. 92646
015208

*Restructuring-Related Services,* Nunc Pro Tunc *as of the Petition Date* [Docket No. 75], Ex. A.

Accordingly, the Committee respectfully submits that this factor weighs in favor of transferring

venue to the Dallas Bankruptcy Court.

### 3.    Proximity of the Witnesses Necessary to the Administration of the Estate.

24.    The Committee anticipates that the witnesses likely to be necessary in this

chapter 11 case are the Debtor's management, who are all located in Dallas, Texas, or the Debtor's

financial advisors, who are all located in either Chicago, Illinois, or Los Angeles, California.

Dallas, Texas, is significantly closer to any potential witness than Wilmington, Delaware.  Thus,

the Committee respectfully submits that this factor also weighs in favor of transferring venue to

the Dallas Bankruptcy Court.

### 4.    Location of the Assets.

25.    The location of the Debtor's assets is not as important as other factors where "the

ultimate goal is rehabilitation rather than liquidation."  *See In re Caesars Entm't Operating Co.,*

*Inc.*, 2015 WL 495259, at *6 (quoting *In re Enron Corp.*, 274 B.R. 327, 347 (Bankr. S.D.N.Y.

2002)).  Although the Committee believes that the Debtor's U.S. assets would be located at the

Debtor's headquarters in Dallas, Texas, the Committee does not believe this factor important to

the Court's decision.

### 5.    Economic Administration of the Estate.

26.    As noted above, the most important factor is the economic and efficient

administration of the Debtor's estate.  *Id.*  The Committee does not dispute the ability of this Court

to administer this chapter 11 case in a just and efficient manner.  That said, there are many factors

that make the Dallas Bankruptcy Court the more economical venue.  As discussed in more detail

below as part of the "interests of justice" analysis: (1) there is a higher concentration of creditors

ACTIVE 250501748

0115209
App. 02665

and creditors' counsel in Texas and the Midwest than elsewhere in the country; (2) the Debtor and

all of its U.S. personnel are in Dallas, Texas; (3) Dallas, Texas is more centrally located in the

United States than Wilmington, Delaware and arguably easier and cheaper for parties to travel to;

(4) most creditors would need to obtain Delaware co-counsel if venue remains before this Court;

and (5) the Dallas Bankruptcy Court and the Dallas District Court has already expended great time

and effort familiarizing itself with the Debtor, the Debtor's operations, and the disputes between

the Debtor and some of its largest creditors.  For these reasons and the reasons set forth below in

Section II.B, this factor weighs heavily in favor of transferring venue to the Dallas Bankruptcy

Court.  *See In re Qualteq, Inc.* 2012 WL 527669, at *6 (noting that same considerations for this

factor arise in applying the "interest of justice" prong).

> **6.      Necessity for Ancillary Administration if Liquidation Should Result.**

27.      "Most cases do not consider liquidation because it is illogical to focus on liquidation

contingencies when the goal of the bankruptcy is reorganization."  *In re Dunmore Homes, Inc.*,

380 B.R. 663, 672 (Bankr. S.D.N.Y. 2008).   However, should this case be converted to a

liquidation, the Debtor's personal property would be predominantly located in Dallas, Texas.  As

a result, this factor also weighs in favor of transfer.

> **B.      Interests of Justice**.

28.      When determining whether a transfer would serve the interests of justice, courts

consider whether such transfer "would promote the efficient administration of the estate, judicial

economy, timeliness, and fairness."  *Caesars Entm't Operating Co., Inc.*, 2015 WL 495259, at *7

(quotations omitted).  The interests of justice standard is a "broad and flexible standard which must

be applied on a case-by-case basis."  *In re Safety-Kleen Corp.*, Adv. Proc. No. 00-1984, 2001

Bankr. LEXIS 1296, at *6 (Bankr. D. Del. Aug. 27, 2001) (citing *Gulf States Expl. Co. v. Manville

Forest Prods. Corp. (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1391 (2d Cir. 1990)).

ACTIVE 250501748

Appx 92648
0?3210

1.      **Judicial Economy.**

29.      Judicial economy would be served by transferring this case to the Dallas Bankruptcy Court.  At the time of this filing, this Court has only held one hearing, granting interim relief for a handful of routine "first day" motions.  In contrast, the Dallas Bankruptcy Court has heard at least 30 days of testimony, including that of the Debtor's executives, and conducted countless hearings in the Acis Bankruptcy.  With the exception of the Debtor's proposed chief restructuring officer and Mr. Waterhouse, the Dallas Bankruptcy Court is familiar with nearly all of the Debtor's senior management.  As summarized above, the Dallas Bankruptcy Court and Dallas District Court have already devoted multiple days of court time to the Debtor.

30.      Additionally, Acis's claim against the Debtor (which is listed on the list of twenty largest unsecured creditors) and the Debtor's proof of claim and administrative claim against Acis (which is technically an asset of the Debtor's estate) are currently pending in the Dallas Bankruptcy Court.  Judicial economy would best be served by utilizing the time and resources already extended by the Dallas Bankruptcy Court in connection with these claims.  This factor weighs overwhelmingly in favor of transfer.  Indeed, it is hard to imagine a case where judicial economy would be better served by a transfer of venue under 28 U.S.C. § 1412.

31.      Courts in this district have historically placed a particular emphasis "on the "learning curve" that typically militates against a transfer.  *See In re Rests. Acquisition I, LLC*, No. 15-12406 (KG), 2016 WL 855089, at *5 (Bankr. D. Del. Mar. 4, 2016).  This case is unique in that the "learning curve" that typically militates against a transfer in the interests-of-justice basis is actually *inverted*.  That is, it is not the proposed transferee court that will have a "learning curve," but rather it is this Court that would.  Given that this Court has only considered first day relief, and on an interim basis, while the Dallas Bankruptcy Court and Dallas District Court both have

ACTIVE 250501748

APPX 92649
0152111

intimate familiarity with the parties and their businesses, transferring the venue would be in furtherance of judicial economy.

**2.    Economic and Efficient Administration of the Bankruptcy Estate**.

32.    As previously noted, there are economic efficiencies available in Dallas, Texas that are not available in Wilmington, Delaware.  Venue in Dallas would allow the Debtor's employees to easily attend hearings in this case and thus eliminate the need for air travel for most witnesses. The Debtor's headquarters are located in The Crescent in Dallas, Texas, approximately 1.2 miles from the Dallas Bankruptcy Court.  By contrast, this Court is located approximately 1,437 miles from the Debtor's headquarters.  Travel to this Court from the Debtor's headquarters requires, at a minimum, a 30-minute car ride to Dallas/Fort Worth International Airport, approximately three hours flying time to Philadelphia International Airport, and then a 30-minute car ride to Wilmington, Delaware.  The foregoing does not take into account recommended early arrival times at airports for check-in, flight delays, traffic, or the need for overnight stays in Wilmington.  If this case remains in Delaware, critical management personnel will be required to spend extended periods away from their offices when they should be focused on maximizing value for all creditors.

33.    Additionally, as the Debtor's professionals and proposed CRO are primarily located in Los Angeles, venue in Dallas would eliminate hours of travel time and the administrative expense associated with the same.  Dallas-Fort Worth International Airport, consistently the third-busiest airport in the country (behind Chicago O'Hare and Atlanta Hartsfield-Jackson), offers nearly 1,800 flights per day.  American Airlines alone offers approximately 14 non-stop flights per day from LAX to DFW.  According to FlightSphere.com, there are approximately 20 total flights per day from LAX to DFW and 7 flights per day from DAL to LAX.  By contrast, according to FlightSphere.com, there are approximately 10 flights per day from DFW to Philadelphia and approximately 8 flights per day from DAL to Philadelphia.  The flight from LAX to DFW is

ACTIVE 250501748

APPX 92659

015212

approximately 3 hours, whereas the flight from LAX to Philadelphia is approximately 6 hours. *See In re Rehoboth Hosp., LP,* No. 11-1279 (KG), 2011 Bankr. LEXIS 3992, at *15 (Bankr. D. Del. October 19, 2011) (transferring venue of a single asset real estate case from Delaware to Texas because "the estate may incur significant travel costs to obtain the testimony of witnesses that are located in Texas").

34.     Additionally, Rule 45 of the Federal Rules of Civil Procedure, incorporated by Bankruptcy Rule 9016, mandates that contested non-party discovery disputes (potentially like those related to the Debtor's approximately 2,000 non-debtor affiliates) be heard in the place of compliance, which would most likely be in the Northern District of Texas.  The Committee is already aware of the Debtor's history of contesting discovery.  *See, e.g., Hamilton Partners, L.P. v. Highland Capital Mgmt., L.P.*, CV 6547-VCN, 2016 WL 61223, at *1 (Del. Ch. Feb. 2, 2016). It is therefore likely that the Dallas District Court and Dallas Bankruptcy Court will need to hear and resolve multiple discovery disputes.  In light of that inevitability, it would be sensible to transfer this case so that related disputes aren't being heard in multiple venues.

35.     There is no doubt that transferring venue to Dallas would promote the economic and efficient administration of this chapter 11 case.  This factor weighs in favor of transfer.

### 3.     Timeliness.

36.     As of the date of this Motion, this case has only been pending for 16 days.  The Committee is also seeking to have this Motion heard on an expedited basis, as set forth in the motion to shorten notice filed concurrently herewith.  *Cf. In re Jones*, 39 B.R. 1019, 1020 (Bankr. S.D.N.Y. 1984) ("[t]he debtor's motion to change venue is untimely given the fact that this case was commenced over one and one-half years ago").  The Court has only considered the Debtor's request for first day relief on an interim basis.  The next hearing is not scheduled until November 19, 2019.  The Motion is timely and this factor weighs in favor of transfer.

ACTIVE 250501748

App. 02651

015213

### 4.     Fairness.

37.     Transferring this chapter 11 case to a venue where employees, creditors, and numerous other parties-in-interest may more easily participate in the restructuring process would be manifestly fair.  To the extent the Debtor chose this forum in order to distance itself from largely unfavorable findings, fairness dictates that this case should be transferred.

*     *     *     *     *

38.     For the foregoing reasons, it is both in the interest of justice and for the convenience of the parties that this chapter 11 case be transferred to the Dallas Bankruptcy Court.  The majority of the parties and professionals involved in this chapter 11 cases are more centrally located to Dallas, Texas than Wilmington, Delaware, which would create significant costs savings to the Debtor's estate compared to keeping the case in Delaware.  Moreover, the Dallas Bankruptcy Court and Dallas District Court are both well-versed in the facts and issues that will undoubtedly need to be addressed in this chapter 11 case.  As such, the Committee respectfully requests that this Court transfer venue of this case to the Dallas Bankruptcy Court.

**<u>NOTICE</u>**

39.     Notice of this Motion will be provided to (i) the Debtor, (ii) the Office of the United States Trustee for the District of Delaware, and (iii) any party that has requested notice pursuant to Local Rule 2002-1 as of the date of this Motion.  In light of the nature of the relief requested herein, the Committee submits that no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

Appx. 02652
015214

WHEREFORE, the Committee respectfully requests that the Court enter the Proposed

Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein

and such other and any further relief as the Court may deem just and proper.


Dated:  November 1, 2019                SIDLEY AUSTIN LLP
   Wilmington, Delaware

            */s/ Bojan Guzina*
            Bojan Guzina
            Matthew A. Clemente
           Alyssa Russell
           One South Dearborn Street
           Chicago, Illinois 60603
           Telephone:  (312) 853-7000
           Facsimile:  (312) 853-7036

              -and-

           Jessica C. K. Boelter
           787 Seventh Avenue
           New York, New York 10019
           Telephone: (212) 839-5300
           Facsimile: (212) 839-5599

              -and-

           Penny P. Reid
           Paige Holden Montgomery
           2021 McKinney Avenue
           Suite 2000
           Dallas, Texas 74201
           Telephone: (214) 981-3300
           Facsimile: (214) 981-3400

           PROPOSED ATTORNEYS FOR THE OFFICIAL
           COMMITTEE OF UNSECURED CREDITORS

ACTIVE 250501748

Appx. 02653

015215

**Exhibit A**

**Proposed Order**

Appx. 02654
015216

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) **Ref. Docket No.:** ___ |

### ORDER TRANSFERRING VENUE OF THIS CASE TO THE UNITED STATES
### BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS

Upon the motion (the "Motion")[2] of the Committee requesting entry of an order (this "Order") transferring the venue of the above-captioned chapter 11 case to the United States Bankruptcy Court for the Northern District of Texas; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue of this Motion being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and adequate notice of, and the opportunity for a hearing on, the Motion having been given; and it appearing that no other or further notice need be provided; and this Court having found that the relief requested in the Motion and provided for herein is in the best interest of the Debtor, creditors of the Debtors, and other parties in interest; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon the record herein, and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

---

[1]   The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2]   Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

Appx. 02655

015217

     1.     Pursuant to Rule 1014(b), in the interest of justice and for the convenience of parties, the above-captioned chapter 11 case shall proceed in the Dallas Bankruptcy Court. Accordingly, the Court will transfer this case to the Dallas Bankruptcy Court pursuant to 28 U.S.C. § 1412.

Dated: _____, 2019
Wilmington, Delaware

_____
Honorable Christopher S. Sontchi
United States Bankruptcy Judge

ACTIVE 250501748

Appx. 02656
015218

## **Exhibit B**

### **Acis Confirmation Opinion**

Appx 02657

015219

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 5-30    Exhibit 21    Filed 02/26/25160    Page 541 of 1017    PageID 16202
Case 18-30264-sgj11    Doc 1389    Filed 01/31/19    Entered 01/31/19 12:04:48    Page 1 of 47



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 31, 2019**

_____
**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **CASE NO. 18-30264-SGJ-11** |
| | § | **(Chapter 11)** |
| Debtor. | § | |

_____

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT GP, L.L.C.,** | § | **CASE NO. 18-30265-SGJ-11** |
| | § | **(Chapter 11)** |
| | § | |
| Debtor. | § | |

### BENCH RULING AND MEMORANDUM OF LAW IN SUPPORT OF:
### (A) FINAL APPROVAL OF DISCLOSURE STATEMENT; AND (B)
### CONFIRMATION OF CHAPTER 11 TRUSTEE'S THIRD AMENDED JOINT PLAN

Before this court is a request by the Chapter 11 Trustee (herein so called) for final

approval of the adequacy of a disclosure statement and for confirmation of his Third Amended

Appx. 02658
015220

Joint Plan of Reorganization,[1] as amended, modified or supplemented (the "Plan"), for the two

above-referenced debtors:  (1) Acis Capital Management, L.P. (the "Debtor-Acis"), a Delaware

limited partnership, and (2) Acis Capital Management GP, LLC, a Delaware limited liability

company (the general partner of the Debtor-Acis; collectively, the "Debtors").  The two chapter

11 cases have been administratively consolidated.[2]

       The hearing on these matters transpired over multiple days in December 2018, and the

court considered the testimony of more than a dozen witnesses, more than 700 exhibits, and

hundreds of pages of legal briefing.  Based on the foregoing, the court ***overrules all objections***

and will confirm the Plan, including all proposed modifications to it.  The Chapter 11 Trustee has

demonstrated, by a preponderance of the evidence, that the Plan, as modified, satisfies the

applicable provisions of the Bankruptcy Code including but not limited to Sections 1122, 1123,

1127, and 1129 of the Bankruptcy Code.[3]  The court also approves on a final basis the adequacy

of the accompanying disclosure statement to the Plan, determining that it meets the requirements

set forth in Section 1125 of the Bankruptcy Code.  Notice and solicitation with respect to the

---

[1] Exhs. 508 & 509; *see also* DE ## 660, 661, 693, 702, & 769.  References to "DE # __" from time to time in this ruling relate to the docket number at which a pleading or other item appears in the docket maintained in these administratively consolidated Bankruptcy Cases, in Case # 18-30264.

[2] Note that the Debtor-Acis is, essentially, the debtor that is the operating company.  As a general partner, Acis Capital Management GP, LLC is legally obligated on all of the operating company's debt. *See* 6 Del. C. § 17-403(b) ("Except as provided in this chapter, a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law in effect on July 11, 1999 (6 Del. C. § 1501 et seq.) to persons other than the partnership and the other partners."); *see also* 6 Del. C. § 15-306(a) ("(a) Except as otherwise provided in subsections (b) and (c) of this section, all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law").  The Plan jointly addresses both of the Debtors' debts.

[3] *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.),* 994 F.2d 1160, 1165 (5th Cir. 1993); *In re Sears Methodist Ret. Sys.,* No. 14-32821-11, 2015 Bankr. LEXIS 709, at *8 (Bankr. N.D. Tex. Mar. 5, 2015); *In re Couture Hotel Corp.*, 536 B.R. 712, 732 (Bankr. N.D. Tex. 2015); *In re Mirant Corp.*, No. 03-46590, 2007 Bankr. LEXIS 4951, at *19-20 (Bankr. N.D. Tex. Apr. 27, 2007).

Appx. 02650
015221

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 21 Filed 06/26/25160 Page 543 of 1017    PageID 16204
Case 18-30264-sgj11  Doc 823925-5 Filed 01/33/619   Entered 01/31/19 Page 14:04:48 Page 3 of 47

Plan is determined to have complied with the applicable Bankruptcy Rules and due process. The
court provides reasoning for its ruling below. The court directs the Chapter 11 Trustee to submit
to the court for signing the proposed Findings of Fact and Conclusions of Law and Order that
were filed at DE # 814. This Bench Ruling supplements those Findings of Fact and Conclusions
of Law and Order and, where appropriate, should be considered additional findings and
conclusions as contemplated by Fed. R. Bankr. Proc. 7052.

## I.    __Background.__[4]

The above-referenced bankruptcy cases (the "Bankruptcy Cases") have been pending
since January 30, 2018 and have been astonishingly contentious. The Chapter 11 Trustee has
been in place since on or about May 14, 2018. The Plan (which is the fourth one proposed by the
Chapter 11 Trustee) has been objected to by three related entities: (a) Highland Capital
Management, L.P. ("Highland"), (b) Highland CLO Funding Ltd. ("HCLOF Guernsey"), and (c)
Neutra, Ltd. ("Neutra Cayman"). The Chapter 11 Trustee loosely refers to these three objectors
(the "Objectors") as "the Highlands" because they are not only related to each other (*i.e.,* they
are all, directly or indirectly, part of the Highland 2,000-member corporate organizational
structure), but they also have been in "lockstep" with one another in objecting to virtually every
position taken by the Chapter 11 Trustee during the Bankruptcy Cases.[5] These Objectors'
parties-in-interest status will be explained below.

---

[4] For a complete set of background facts, the court incorporates herein by reference its Findings of Fact
and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary
Petitions, entered April 13, 2018. DE # 118. Exh. 243.

[5] It is also undisputed that, prior to the appointment of the Chapter 11 Trustee, **the Debtors** and Highland
were affiliated and had a close relationship. Exhs. 17, 18, 22-27, 251, 619 & 649.

Appx. 02609
015222

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-20    Filed 06/25/25    Page 544 of 1017    PageID 16205
Case 18-30264-sgj11  Doc 1273-5  Filed 01/31/19  Entered 01/31/19 15:04:48  Page 4 of 47

In simplest terms, the Debtor-Acis, which was formed in the year 2011, is primarily a

CLO portfolio manager. [6]  It manages hundreds of millions of dollars' worth of CLOs (which is

an acronym for "collateralized loan obligations").  Specifically, it provides fund management

services to various special purpose entities that hold CLOs.  The Debtor-Acis was providing

management services for five such special purpose entities (the "Acis CLOs") as of the time that

it and its general partner were put into the involuntary Bankruptcy Cases.  The parties have

informally referred to the special purpose entities themselves as the "CLO Issuers" or "CLO Co-

Issuers" but, to be clear, these special purpose entities (hereinafter, the "CLO SPEs") are

structured as follows:  (a) on the asset side of their balance sheets, the entities own pieces of

senior debt owed by large corporations and, therefore, earn revenue from the variable interest

payments made by those corporations on such senior debt; and (b) on the liability side of their

balance sheets, the entities have obligations in the form of notes (*i.e.,* tranches of fixed interest

rate notes) on which the CLO SPEs themselves are obligated—the holders of which notes are

mostly institutions and pension funds (these tranches of notes are usually rated anywhere from

Triple A to Single B, depending upon things such as their interest rate and perceived risk).  The

CLO SPEs make a profit, based on the spread or "delta" between: (a) the variable rates of

interest paid on the assets that the CLO SPEs own (*i.e.,* the basket of senior notes); and (b) the

fixed rates of interest that the CLO SPEs must pay on their own tranches of debt.  At the bottom

of the CLO SPEs' capital structure is their equity (sometimes referred to as "subordinated notes,"

but these "notes" are genuinely equity).  As portfolio manager, the Debtor-Acis manages the

CLO SPEs' pools of assets (by buying and selling senior loans to hold in the CLO SPEs'

---

[6] The Debtor-Acis has managed other funds, from time to time, besides CLOs.

Appx. 02661
015223

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 35-20 21 Filed 06/26/25160 Page 545 of 1017   PageID 16206
Case 18-3026 Case 19-1283927 SS led Doc 33619   Entered 11/01/39/19 15 15:0448 Page 5 of 47

portfolios) and communicates with investors in the CLO SPEs.  The CLO SPEs' tranches of

notes are traded on the Over-the-Counter market.

To be perfectly clear, none of the CLO SPEs themselves are in bankruptcy.  This has

never been threatened or a concern.  Only the Debtor-Acis which *manages* the CLO business is

in bankruptcy.  For the most part, the CLO SPEs have continued somewhat "business as usual"

during the Chapter 11 Bankruptcy Cases (*i.e.,* they have continued to receive interest payments

on their baskets of loans; the usual interest payments on their tranches of debt have been paid;[7]

and baskets of loans have been bought and sold from time to time).  The CLO SPEs have

retained their own separate counsel during the Chapter 11 cases, have appeared from time-to-

time on matters, and are not currently objecting to the Plan.  There is also an indenture trustee

(U.S. Bank National Association) for the CLO SPEs' debt, that has seemingly faithfully carried

on its role during the Chapter 11 Bankruptcy Cases without many objections to the bankruptcy

process—only making occasional statements aimed at ensuring that the indentures for the CLOs

are not interfered with or disrespected.  The indenture trustee has retained and appeared through

its own separate counsel during the Chapter 11 Bankruptcy Cases and is not currently objecting

to the Plan.

Historically, the Debtor-Acis has had four main sets of contracts that were at the heart of

its business and allowed it to function.  The Chapter 11 Trustee has from time-to-time credibly

---

[7] The evidence reflected that there have been a couple of occasions recently when there were insufficient
funds to make distributions to the equity.  *E.g.,* Transcript 12/11/18 (PM) [DE # 790], at p. 15 (line 2)
through p. 16 (line 18).  But it appears to this court that these missed distributions were due to actions of
Highland—as later explained herein—in improperly, surreptitiously attempting to liquidate the Acis
CLOs, from the time period after the Chapter 11 Trustee was appointed, until the bankruptcy court issued
an injunction to temporarily halt Highland's actions.  *E.g.,* Transcript 12/11/18 (AM) [DE # 789], p. 67
(line 14) through p. 68 (line 6).

Appx 02662
015224

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 35-20   Filed 07/25/25   Page 546 of 1017   PageID 16207
Case 18-30264-sgj11   Doc 3927-5   Filed 01/31/19   Entered 01/31/19 21:04:48   Page 6 of 47

testified that these agreements essentially created an "eco-system" that allowed the Acis CLOs to

be effectively and efficiently managed by the Debtor-Acis.

### 1.   The PMAs with the CLO SPEs.[8]

First, the Debtor-Acis has various portfolio management agreements (the "PMAs") *with*

*the CLO SPEs*, pursuant to which the Debtor-Acis earns management fees.  The PMAs have

been the primary "assets" (loosely speaking) of the Debtor-Acis (to be more precise, the PMAs

are executory contracts pursuant to section 365 of the Bankruptcy Code).  They are what

generate revenue for the Debtor-Acis.

### 2.   The Sub-Advisory Agreement with Highland.[9]

Second, the Debtor-Acis had a Sub-Advisory Agreement (herein so called) with an

insider, *Highland* (*i.e.,* one of the Objectors).  Highland's "insider" status will be further

explained below.  Pursuant to this agreement, the Debtor-Acis essentially sub-contracted for the

use of Highland front-office personnel/advisors to perform management services for the Debtor-

Acis (*i.e.,* so that the Debtor-Acis could fulfill its obligations to the CLO SPEs under the PMAs).

The Debtor-Acis paid handsome fees to Highland pursuant to this agreement.  This, too, was an

executory contract pursuant to section 365 of the Bankruptcy Code.  As explained below, this

agreement was rejected (with bankruptcy court approval)[10] by the Chapter 11 Trustee during the

Bankruptcy Cases, when the Chapter 11 Trustee credibly represented that he had not only found

resources to provide these services at a much lower cost to the estate, but he also had begun to

---

[8] Exhs. 6-10.

[9] Exh. 17.

[10] *See* 11 U.S.C. § 365(a).

Appx. 02663
015225

believe that Highland was engaging in stealth efforts to liquidate the Acis CLOs, to the detriment

of the Debtor-Acis's creditors.[11]

### 3.   The Shared Services Agreement with Highland.[12]

Third, the Debtor-Acis also had a Shared Services Agreement (herein so called) with

Highland, pursuant to which the Debtor-Acis essentially sub-contracted for the use of Highland's

back-office services (again, so that the Debtor-Acis could fulfill its obligations to the CLO SPEs

under the PMAs).  To be clear, the Debtor-Acis had no employees of its own—only a couple of

officers and members.  The Debtor-Acis paid handsome fees to Highland for the personnel and

back-office services that Highland provided to the Debtor-Acis.  This, too, was an executory

contract pursuant to section 365 of the Bankruptcy Code.  As explained below, this agreement

was also rejected by the Chapter 11 Trustee during the Bankruptcy Cases (with bankruptcy court

approval) for the same reasons that the Sub-Advisory Agreement with Highland was rejected.

### 4.   The Equity PMA.[13]

Fourth, until a few weeks before the Bankruptcy Cases were filed, the Debtor-Acis also

had yet another portfolio management agreement (distinct from its PMAs with the CLO SPEs)

whereby the Debtor-Acis provided services not just to the CLO SPEs themselves, but separately

to the equity holder in the CLO SPEs.  This portfolio management agreement with the equity

holder in the CLO SPEs is sometimes referred to by the parties as the "ALF PMA," but it would

probably be easier to refer to it as the "Equity PMA" (for ease of reference, the court will refer to

---

[11] *See* Transcript 12/11/18 (AM) [DE # 789], at p. 48 (line 15) through p. 49 (line 16); p. 50 (line 12) through p. 52 (line 7).

[12] Exh. 18.

[13] Exh. 11.

Appx. 02604
015226

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 21    Page 26 of 160    Page 548 of 1017    PageID 16209
Case 18-30264-sgj11    Doc 3927    Filed 01/31/19    Entered 01/31/19 19:04:48    Page 8 of 47

it as the "Equity/ALF PMA").[14]  The Debtor-Acis did not earn a specific fee pursuant to the

Equity/ALF PMA, but the Chapter 11 Trustee and certain of his witnesses credibly testified that

the Debtor-Acis considered the agreement valuable and very important, because it essentially

gave the Debtor-Acis the ability to control the whole Acis CLO eco-system—in other words,

gave the Debtor-Acis the ability to make substantial decisions on behalf of the CLO SPEs'

*equity*—distinct from making decisions for the CLO SPEs themselves pursuant to the PMAs.

The more credible evidence before the court suggests that the Equity/ALF PMA delegated to the

portfolio manager (*i.e.,* the Debtor-Acis) the right to control the terms of any liquidation of

collateral in an optional redemption under the terms of the CLO indentures.[15]  In any event,

shortly before the Bankruptcy Cases were filed, agents of Highland and/or others controlling the

Debtor-Acis (including but not limited to Mr. James Dondero—the chief executive officer of

both the Debtor-Acis and of Highland):  (a) caused the Debtor-Acis to terminate this Equity/ALF

PMA (notably, the counter-party to this agreement, the equity owner, would have only been able

to terminate it "for cause"[16]); and (b) then caused the equity owner to enter into a new Equity

PMA with a newly formed offshore entity called Highland HCF Advisor, Ltd. ("Highland

HCF").[17]  Mr. Dondero, in addition to being the chief executive of Highland and the Debtor-

Acis, also became the president of the newly formed Highland HCF.[18]  The Equity/ALF PMA

---

[14] There were actually different iterations of the Equity/ALF PMA including one dated August 10, 2015, and another dated December 22, 2016.

[15] Transcript 12/18/18 [DE # 804], at pp. 77-78.  *See also* Exh. 11 at §§ 5 and 6.

[16] The Equity/ALF PMA provided that the Debtor-Acis could only be removed as portfolio manager "for cause" at § 14(a)-(e).  Exh. 11.  On the contrary, the Debtor-Acis could terminate the Equity/ALF PMA without cause upon at least ninety (90) days' notice, pursuant to § 13(a)-(c).  Exh. 11.

[17] Exh. 23 (testimony of Scott Ellington), p. 175 (lines 6-25); *see also* Transcript 12/11/18 (AM) [DE # 789], at p. 54 (line 11) through p. 55 (line 5).

[18] *Id.* at p. 266 (lines 1-4).

Appx. 02665
015227

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 5-20  21  Filed 08/25/160  Page 549 of 1017    PageID 16210
Case 18-30264-sgj11  Doc 982-7  SE  Filed 06/29  Entered 01/13/19  Page 100 of 48  Page 9 of 47

would have been an executory contract of the Debtor-Acis, pursuant to section 365 of the

Bankruptcy Code, if it had not been terminated shortly before the Bankruptcy Cases.  The court

has heard credible testimony that leads it to conclude that the Equity/ALF PMA would have been

assumed by the Debtor-Acis, pursuant to section 365 of the Bankruptcy Code, if not terminated

by agents of Highland on the eve of bankruptcy.  The court has heard credible testimony that it is

important for a portfolio manager to have not only the PMAs with the CLO SPEs themselves,

but also with the equity owners of the CLO SPEs.

## II.    A Few More Basics About CLOs.

In the world of CLOs (like other public debt instruments) there are occasionally

redemptions, refinancings, and resets.  A redemption is essentially when the equity in the CLO,

before maturity, calls for the liquidation of the collateral in the CLO and the repayment of the

tranches of notes, so that the CLO comes to an end.  A refinancing is when a lower interest rate

can be accomplished in the market place on the tranches of debt of the CLO, but the maturity

date and other terms remain in place (similar to a refinancing on a home mortgage).  This can

happen typically after a two-year non-call period.  A reset is when the maturity date, the

reinvestment period, or other changes in the terms of a CLO (beyond simply interest rate) are

accomplished.[19]

It should be noted that the top tranche of notes in the CLO SPEs (AAA-rated) is

considered the "controlling" class, and a majority of holders in this class can terminate the CLO

manager (*i.e.,* the Debtor-Acis LP) for cause on 45 days' notice, but these folks have apparently

been content to ignore the Bankruptcy Cases and the fighting between the Debtor-Acis and

---

[19] *See generally* Transcript 2/9/2018 [DE # 26], at p. 74-75.

Appx. 02606
015228

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 35-20   Filed 06/25/25   Page 550 of 1017   PageID 16211
Case 18-30264-sgj11   Doc 2275   Filed 01/31/19   Page 10 of 47

Highland (as further described below)—no doubt because they are earning their fixed income stream without a hitch.  And the bottom tranche of "notes" in the CLO SPEs (the equity) has voting rights and is a capital provider and, in certain ways, controls the CLO SPEs, by virtue of having the ability to make a redemption call after a certain "no-call" period—which would force a liquidation of the basket of loans in the CLO, with the proceeds paying down the tranches of notes, starting at the top with the Triple A's.  But, by virtue of the Equity/ALF PMA, the Debtor-Acis was really acting for the equity.  It seems substantially likely to the court that this is why Highland and its agents caused the Debtor-Acis to terminate the Equity/ALF PMA (which, as mentioned above, was an agreement that the equity could have only terminated "for cause"—and it appears there would have been no "cause").

### III.    The Non-Insider Creditors.

The Debtor-Acis does not have many creditors.  The non-insider creditors are, for the most part, Joshua Terry ("Mr. Terry") and a few vendors (most of which are law firms).

Mr. Terry commenced the Bankruptcy Cases with the filing of involuntary bankruptcy petitions.  Mr. Terry was the human being who formerly, quite successfully served as the portfolio manager for the Debtor-Acis for many years.  Mr. Terry was terminated under contentious circumstances on June 9, 2016, after getting into disagreements with Mr. Dondero.  Mr. Terry was technically an employee of Highland itself (like all employees are, in the Highland family of companies—no matter which subsidiary or affiliate they work for).  After his employment termination, Highland sued Mr. Terry in September 2016.  Mr. Terry asserted claims back against Highland and both of the above-referenced Debtors.  The litigation was referred to arbitration, and, after a ten-day arbitration trial in September 2017 before "JAMS," Mr. Terry obtained an Arbitration Award (herein so called), on October 20, 2017, jointly and

015229
Appx. 02667

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 31-20   Filed 08/05/25   Page 551 of 1017   PageID 16212
Case 18-30264-sgj11   Doc 3927-5   Filed 01/31/19   Entered 01/31/19   Page 11 of 47

severally, against both of the Debtors in the amount of $7,949,749.15, plus post-award interest at the legal rate.  A Final Judgment (the "Terry Judgment") confirming the Arbitration Award was entered on December 18, 2017, in the same amount as that contained in the Arbitration Award— $7,949,749.15.

Mr. Terry commenced the Bankruptcy Cases when he became concerned that the Debtor-Acis was being rendered insolvent and unable to pay creditors including himself, due to actions undertaken by Highland and its agents immediately after entry of the Arbitration Award (*e.g.,* transfers of assets, contracts, and business away from the Debtor-Acis).

The Debtor-Acis also is obligated on large administrative expense claims, since: (a) a Chapter 11 Trustee was appointed very early—due to what the bankruptcy court perceived to be massive conflicts of interest with regard to the Debtors' management; and (b) the Objectors have opposed virtually every action taken by the Chapter 11 Trustee during the Bankruptcy Cases, resulting in many long hearings.

## IV.    The Objectors (all of which are "Insiders").

*There are no non-insider creditors objecting to the Plan*.  Mr. Terry supports the Plan. The CLO SPEs and Indenture Trustee do not oppose the Plan.  None of the vendors oppose the Plan.  The U.S. Trustee is not opposing the Plan.  As a technical matter, two impaired classes of creditors voted to accept the Plan.[20]  *So who are the Objectors to the Plan (which Plan will be further described below) and what is their party-in-interest status here?*

As earlier mentioned, the Objectors are: (a) Highland, (b) HCLOF Guernsey, and (c) Neutra Cayman.  As noted earlier, the Chapter 11 Trustee frequently refers to them collectively as "The Highlands"—but the Objectors do not like this conflation.  At one time Highland and

---

[20] Classes 2 and 3.  *See* Exh. 613.

Appx. 02568
015230

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 31-20   Filed 08/25/160   Page 552 of 1017   PageID 16213
Case 18-30264-sgj11   Doc 927   Filed 01/31/19   Page 12 of 47

HCLOF Guernsey had the same lawyers.  They do not anymore.  However, they frequently file joint pleadings and take the same positions.  Highland and Neutra Cayman do still have the same lawyers.

    1.   <u>Highland.</u>

    Highland is a Dallas, Texas-based company that is a Registered Investment Advisor. Highland was founded in 1993 by Mr. Dondero, originally with a 75% ownership interest, and Mark K. Akada ("Mr. Akada"), originally with a 25% ownership interest.  As mentioned earlier, Mr. Dondero is the chief executive of Highland.  Highland, through its organizational structure of approximately 2,000 separate business entities, manages approximately $14-$15 billion of investor capital in vehicles including CLOs, private equity funds, and mutual funds.  Highland provides employees to entities in the organizational structure, such as it did with the Debtor-Acis, through the mechanism of shared services agreements and sub-advisory agreements (as mentioned above).  ***Notably, Highland's chief executive, Mr. Dondero, served as the President of the Debtor-Acis at all relevant times prepetition***.[21]  Highland claims to be a large creditor of the Debtor-Acis for services provided to the Debtor-Acis under the Shared Services Agreement and the Sub-Advisory Agreement.  The Chapter 11 Trustee disputes these claims and has asserted numerous claims back against Highland in an adversary proceeding (the "Highland Entities Adversary Proceeding").

    In any event, Highland is a ***disputed insider creditor***.  It is an "insider," as contemplated by Bankruptcy Code section 101(31)(C), because it, beyond any shadow of a doubt, controlled the Debtor-Acis until these Bankruptcy Cases developed to the point of having a Chapter 11

---

[21] One witness, Hunter Covitz, referred to the Debtor-Acis as the "structured credit arm of Highland." Transcript 12/13/18 (AM) [DE # 793], at p. 57.

App. 02660
015231

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 45-30   Filed 04/25/60   Page 553 of 1017   PageID 16214
Case 18-30264-sgj11   Doc 2795   Filed 01/31/19   Entered 01/31/19 11:11:04   Page 13 of 47

Trustee take charge of the Debtor-Acis.  Highland does not seem to dispute that it is an insider.[22]

But, for the avoidance of doubt, Highland should be considered an insider of the Debtor-Acis for

at least the following reasons:  (a) the same human being (Mr. Dondero) was president of the

Debtor-Acis and was the chief executive of Highland; (b) Highland's General Counsel, Scott

Ellington, testified that Mr. Dondero controlled them both;[23] and (c) Highland provided the

Debtor-Acis with employees and management services pursuant to the Sub-Advisory Agreement

and Shared Services Agreement.[24]

     Additionally, the court believes that the Chapter 11 Trustee made a convincing argument

in connection with Plan confirmation (and his justification for the separate classification of

Highland's claim in the Plan from other general unsecured creditors) that Highland should also

be regarded as a "competitor" of the Debtor-Acis at this juncture, since they are both in the fund

management business and Highland's control over the Debtor-Acis has now been divested.

Highland's competitor status, in addition to its insider status, warrants additional scrutiny of its

---

[22] Under section 101(31) of the Bankruptcy Code, an insider includes certain enumerated parties, such as an officer of the debtor, affiliate, *etc.*  Further, the list of enumerated "insiders" is not exclusive or exhaustive.  *See Wilson v. Huffman (In re Missionary Baptist Foundation of Am., Inc.),* 712 F.2d 206, 210 (5th Cir. 1983). Recently, the United States Supreme Court stated: "Courts have additionally recognized as insiders some persons not on that [101(31)] list—commonly known as 'nonstatutory insiders.'  The conferral of that status often turns on whether the person's transactions with the debtor (or another of its insiders) were at arm's length."  *U.S. Bank N.A. v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 963 (2018).  The Fifth Circuit has noted that "cases which have considered whether insider status exists generally have focused on two factors in making that determination: (1) the closeness of the relationship between the parties and (2) whether the transaction . . . [was] conducted at arm's length."  *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992).

[23] *E.g.,* Exh. 23, at pp. 160 (line 15) through 161 (line 4); p. 196 (lines 14-19); p. 219 (lines 1-21).

[24] *See* 11 U.S.C. §§ 101(2)(D); (31)(C)(5).  The court notes that, although Highland has, from time to time, alleged that Mr. Terry is a "non-statutory insider" of the Trustee, it has never put on any credible evidence to support this contention.

13

Appx. 02679
015232

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 21    Filed 08/25/160    Page 554 of 1017    PageID 16215
Case 18-30264-sgj11    Doc 892-75    Filed 11/13/19    Entered 11/13/19    Page 14 of 47

motivations in objecting to the Plan.  More importantly, it provides a sound legal and business justification for separately classifying its claim in the Plan.

    2.  <u>HCLOF Guernsey.</u>

    The second Objector, HCLOF Guernsey, is an entity formed in the island nation of Guernsey.  It has two allegedly independent Directors from Guernsey who have provided testimony in connection with confirmation of the Plan.  It was enormously clear to the court (as will be elaborated upon below) that the two Directors of HCLOF Guernsey are—stated in the kindest way possible—mere "figureheads" for HCLOF Guernsey and they defer to Highland *entirely* to tell them what to do, what to say, and when.  In any event, HCLOF Guernsey is the owner of the equity in the CLO SPEs (as earlier mentioned, this equity is sometimes referred to as the "subordinated notes" in the CLO SPEs).  According to HCLOF Guernsey's 2017 Annual Report and Audited Financials, all of its subordinated notes issued by the Acis CLOs are physically held at and are pledged to HCLOF Guernsey's lender, NexBank, which happens to be a Dallas bank that is an affiliate of Highland.[25]  HCLOF Guernsey was created in the year 2015 and was formerly known as "ALF."[26]  Its name was changed on October 30, 2017 (ten days after Mr. Terry's Arbitration Award was entered), to allegedly distance itself from the Debtor-Acis. The equity owner HCLOF Guernsey, in turn, has three equity owners:  (i) a 49% equity owner that is a charitable fund (*i.e.,* a donor advised fund or "DAF") that was seeded with contributions from **Highland**, is managed/advised by **Highland**, and whose **independent trustee is a long-time friend of Highland's chief executive officer, Mr. Dondero**; (ii) 2% is owned by **Highland employees**; and (iii)  a 49% equity owner that is a third-party institutional investor based in

---

[25] Exh. 647.

[26] "ALF" is short-hand for Acis Loan Funding, Ltd.

Appx. 02671
015233

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-20   Filed 06/25/25   Page 555 of 1017   PageID 16216
Case 18-30264-sgj11   Doc 3927-5   Filed 01/31/19   Page 16 of 48   Page 15 of 47

Boston, Massachusetts that only recently invested in HCLOF Guernsey (*i.e.,* in November 2017,

just after the Terry Arbitration Award was issued), and desires to remain passive and anonymous

(hereinafter, the "Passive Investor").[27]  Notably, the Debtor-Acis itself owned a small percentage

of HCLOF Guernsey, in addition to providing management services to it, until October 24, 2017

(four days after the Terry Arbitration Award was issued).

The court has allowed HCLOF Guernsey to vigorously participate in the confirmation

hearing (and other hearings during the Bankruptcy Cases), although its party-in-interest status

has been questionable.  So how is HCLOF Guernsey a party-in-interest?  The answer is a bit of a

stretch—but the court has decided it is impacted by the Plan, so it should have the right to object.

Its party-in-interest status has evolved during the Bankruptcy Cases.

First, early on in these Bankruptcy Cases, HCLOF Guernsey (together with Highland)

sued the Chapter 11 Trustee in the above-mentioned "Highland Entities Adversary

Proceeding"—mostly, if not entirely, seeking injunctive relief.  At that point, the Chapter 11

Trustee treated HCLOF Guernsey as a disputed creditor,[28] since it was seeking equitable relief

that could arguably be monetized.[29]  However, HCLOF Guernsey subsequently withdrew its

requests for relief in that Highland Entities Adversary Proceeding.  But then, the Chapter 11

Trustee subsequently filed claims ***against*** HCLOF Guernsey in the Highland Entities Adversary

Proceeding (along with his claims against Highland and a couple of other Highland entities)

asserting avoidance actions and other causes of action against HCLOF Guernsey (among other

---

[27] The testimony was that the Passive Investor committed to a $150 million investment ($75 million immediately and $75 million callable over the next several years).

[28] In fact, on August 15, 2018, the Chapter 11 Trustee filed a proof of claim on behalf of HCLOF Guernsey.  HCLOF Guernsey has since objected to the proof of claim.

[29] *See* 11 U.S.C. §§ 101(5)(B) & 101(10).

App. 02672
015234

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-20    Filed 07/25/25    Page 556 of 1017    PageID 16217
Case 18-30264-sgj11    Doc 3896-21    Filed 07/31/19    Entered 01/31/19 13:17:04    Page 16 of 47

things, the Chapter 11 Trustee alleged that HCLOF Guernsey schemed with Highland to

terminate the Equity/ALF PMA, in a step toward systematically dismantling the Debtor-Acis of

its value.  Thus, HCLOF Guernsey may ultimately owe money to this estate.  But most

importantly, HCLOF Guernsey should be deemed a party-in-interest because of a proposed

temporary injunction in the Plan that essentially would enjoin (for a finite, defined period)

HCLOF Guernsey from exercising certain of its rights with regard to its equity in the CLO SPEs,

pending resolution of the Highland Entities Adversary Proceeding.  This temporary injunction in

the Plan, directed towards HCLOF Guernsey and affiliates, will be further described below.

   3.   Neutra Cayman.

   Neutra Cayman is a Cayman island exempted company that is the equity owner **of the

Debtor-Acis itself** (in contrast to HCLOF Guernsey, which only owns equity in the CLO SPEs).

Neutra Cayman only acquired its equity interest in the Debtor-Acis the day after the Terry

Judgment was entered (on December 18, 2017), and for no consideration, from the Dugaboy

Investment Trust (a family trust on which Mr. Dondero's sister is named trustee, that previously

owned 74.9% of the Debtor-Acis) and from Mr. Akada (who previously owned 25% of the

Debtor-Acis).[30]  The court concludes that Neutra Cayman has standing to object to the Plan,

---

[30] The court is repeatedly referring to the Debtor-Acis but, to be clear, there are two consolidated Debtors:
Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP/LLC").
*See* note 2, *supra*.  When Acis LP was first formed, it was owned by one general partner (Acis GP/LLC,
with a .1% interest) and it had three limited partners: (a) the Dugaboy Investment Trust (a Dondero family
trust of which either Mr. Dondero or his sister, Nancy Dondero, have been the trustee at all relevant
times) with a 59.9% interest; (b) Mr. Terry with a 25% interest; and (c) Mr. Akada with a 15% interest.
When Acis GP/LLC was formed (*i.e.*, the .1% owner of Acis LP), its sole member was the Dugaboy
Investment Trust.  After Mr. Terry was terminated by Highland, his 25% limited partnership interest in
Acis LP was forfeited and divided among the two remaining limited partners: Mr. Akada (increasing his
interest by 10% up to 25%), and the Dugaboy Investment Trust (increasing its interest by 15% up to
74.9%).  But, most importantly, on the day after entry of Mr. Terry's Final Judgment (*i.e.*, on December
18, 2017), both Mr. Akada and the Dugaboy Investment Trust conveyed their entire limited partnership
interests in Acis LP—25% and 74.9%, respectively—to Neutra Cayman.  The Dugaboy Investment Trust
also conveyed its 100% membership interest in Acis GP/LLC to Neutra Cayman.

Appx. 02673
015235

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-20   Filed 06/06/25   Page 557 of 1017   PageID 16218
Case 18-30264-sgj11   Doc 1873   Filed 01/31/19   Page 17 of 47

since it is an equity owner of the Debtors (albeit only having acquired its equity about a month
before the bankruptcy).  As with HCLOF Guernsey, the court also concludes that Neutra-
Cayman is absolutely, beyond any reasonable doubt, controlled by Highland, as explained
further below.

**V.**     **The Plan.**

The Plan is fairly simple, considering the complexity of the business and the
relationships, and the contentiousness of the Bankruptcy Cases.  Again, there aren't many
creditors.

The Plan proposes[31] that the Debtor-Acis, as a "Reorganized Debtor," will continue with
the business operations of the Debtors after the Effective Date[32] of the Plan.  Specifically, the
Debtor-Acis will assume, pursuant to section 365 of the Bankruptcy Code, its CLO PMAs and
continue to serve as the portfolio manager to the CLO SPEs (and as to any resets of the CLOs
therein).  The Reorganized Debtor will continue to earn fees and will pay claims from post-
Effective Date income as provided in the Plan.  The Reorganized Acis will actively pursue
additional fund management contracts.  Again, there is no objection by the CLO SPEs to the
Plan, and the indenture trustee on the tranches of CLO notes has no objection.

Mr. Terry (again, the former human manager of the Debtor-Acis and also the largest
creditor) shall receive 100% of the equity interests in the Reorganized Debtor, in exchange for a
negotiated $1 million reduction in his partially secured claim.[33]  The remainder of his claim will

---

[31] This is merely a high-level summary of the Plan.  The Plan terms, as modified, shall in all ways govern,
not this summary.

[32] The "Effective Date" is defined, essentially, as the first business day which is fourteen (14) days after
entry of an order confirming the Plan, if the confirmation order is not stayed.

[33] Mr. Terry has asserted partial secured status as to his claim in the proofs of claim he has filed in these
cases.  The Chapter 11 Trustee credibly testified that there was no other logical party to take the equity of

App. 02674
015236

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 5-20   Filed 09/06/25   Page 558 of 1017    PageID 16219
Case 18-30264-sgj11   Doc 3392-75   Filed 01/31/19   Page 18 of 47

be treated as an unsecured claim.  Each unsecured creditor will receive on the Plan Effective

Date an unsecured cash flow note in the full amount of its claim, which notes will mature three

years after the Effective Date of the Plan, with equal quarterly payments of principal and interest,

at 5% interest per annum.  These cash flow notes are expected to yield payment in full (actually

102%) to the unsecured creditors.[34]

  As for the sub-advisory and shared services agreements with Highland, as noted earlier,

the Chapter 11 Trustee, with bankruptcy court approval, has already (as of August 2018) rejected

these during the Bankruptcy Cases, pursuant to section 365 of the Bankruptcy Code.  The

Chapter 11 Trustee caused the Debtor-Acis to subsequently contract, with bankruptcy court

approval, with a different entity, Brigade Capital Management, L.P. ("Brigade"), to provide the

sub-advisory and shared services going forward, for a minimum two-year term (unless the

Reorganized Debtor and Brigade otherwise agree), at a much cheaper cost than Highland.[35]

Thus, Brigade will provide sub-servicing and sub-advisory services to the Reorganized Debtor.

---

the Reorganized Debtor, at this juncture, and that he had negotiated this reduction to Mr. Terry's secured
claim, and he thought it was justified by the circumstances of this case.  While the Objectors have argued
that the secured status of Mr. Terry's claim may be subject to challenge under section 547(b) of the
Bankruptcy Code, section 547(b) is discretionary (*e.g.*, a "trustee may avoid any transfer" that might be
avoidable as a preference).  The Chapter 11 Trustee credibly emphasized that this was negotiated
treatment of an asserted secured claim, and he had no "exclusivity" on proposing a plan if someone else
had wanted to propose something different.  Transcript 12/11/18 (AM) [DE # 789], at p. 70 (line 3)
through p. 71 (line 2).

[34] Insider claims—namely Highland—are separately classified from general unsecured claims under the
Plan.  To the extent such claims are ultimately allowed (after any allowed defenses and offsets), and to the
extent such claims are not equitably subordinated by Bankruptcy Court adjudication, these claims will
receive the same treatment as other general unsecured claims (cash flow notes).  To the extent any of
these claims are ultimately allowed but equitably subordinated, they will receive subordinated promissory
notes, accruing interest at 5% per annum, that will not be payable until all non-subordinated claims have
been paid in full (they will have maturity dates to occur on the earlier of:  (i) the date that is two years
after the date all Unsecured Cash Flow Notes have been paid in full, or (ii) five years after the Effective
Date).  The expected recovery under the Plan for the insider claims is from 65% to 100%.

[35] An entity named Cortland Capital Markets Services LLC ("Cortland") is actually providing some of the
back-office shared services agreement type functions.

Appx. 02675
015237

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 35-20   Filed 04/25/25   Page 559 of 1017   PageID 16220
Case 18-30264-sgj11   Doc 1292   Filed 01/31/19   Entered 01/31/19 15:52:04   Page 19 of 47

As for the Equity/ALF PMA, it is not an agreement with the Debtor-Acis anymore to either be assumed or rejected, pursuant to section 365.  However, in the Highland Entities Adversary Proceeding, the Chapter 11 Trustee seeks to avoid the termination of the Equity/ALF PMA.  Pursuant to the Plan, the Reorganized Debtor will be vested with certain Assets of the Debtors, including Estate Claims and Estate Defenses, to be administered and liquidated by the Reorganized Debtor.

1.   The Highland Entities Adversary Proceeding (Adv. Proc. No. 18-03212).

Suffice it to say that the Highland Entities Adversary Proceeding is a somewhat significant part of the Plan; it is what justifies the temporary injunction that is a critical part of the Plan.  With regard to the Highland Entities Adversary Proceeding, the Defendants in it (there are five of them) are: (i) Highland; (ii) HCLOF Guernsey; (iii) Highland HCF (*i.e.,*  the Cayman Island entity that was recently formed to essentially replace the Debtor-Acis under the Equity/ALF PMA); (iv) Highland CLO Management, Ltd. ("Highland Management") (an entity registered in the Cayman Islands on October 27, 2017—seven days after Mr. Terry's Arbitration Award); and (v) Highland CLO Holdings, Ltd. (yet another entity incorporated in the Cayman Island on October 27, 2017).  The Highland Entities Adversary Proceeding is essentially a multi-faceted fraudulent transfer action. The statutory predicates for the relief sought are sections 502, 542, 544, 547, 548, and 550 of the Bankruptcy Code and Texas Business & Commerce Code § 24.001 et seq. ("TUFTA").

Distilled to its essence, the Highland Entities Adversary Proceeding argues that Highland, along with its related Co-Defendants, ***orchestrated a systematic transfer of value away from the Debtor-Acis to other Highland entities*** (all of those transferee-entities are offshore entities—whereas the Debtor-Acis is a Delaware entity), beginning almost immediately after Mr. Terry

Appx. 02676
015238

Case 19-34054-sgj11 Doc 3596-21 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 21 Filed 06/25/160 Page 560 of 1017 PageID 16221
Case 18-30264-sgj11 Doc 892-5 Filed 01/31/19 Entered 01/31/19 Page 20 of 47
Case 19-12382-CSS Doc 336 Filed 11/08/19 Page 20 of 47

was terminated in June 2016, and continuing on during Mr. Terry's litigation/arbitration with the Debtor-Acis, and then rapidly unfolding after the Arbitration Award. This was allegedly done to denude the Debtor-Acis of value and make the Debtors "judgment proof." This was allegedly also done to ensure that the Debtor-Acis's very valuable business as portfolio manager would be taken over by other Highland entities and remain under Highland's and Mr. Dondero's control.[36]

The evidence is rather startling on this point. Among other things, pursuant to amendments made to the Debtor-Acis's Sub-Advisory Agreement and Shared Services Agreements with Highland, starting soon after Mr. Terry was terminated, the fees owed by the Debtor-Acis to Highland under these agreements shot up to an enormously higher level. Then, in April 2017, a new CLO was issued (or actually a former Acis CLO was reset) and a new Highland-affiliated Cayman Island entity was ultimately put in place to manage it instead of the Debtor-Acis (even though the Debtor-Acis managed all other CLOs in the Highland corporate empire). Numerous other transactions were undertaken through the Fall of 2017, removing assets and agreements away from the Debtor-Acis. For example, a multi-million dollar note receivable owed to the Debtor-Acis by Highland was transferred out of the Debtor-Acis,[37] and

---

[36] Exh. 627.

[37] On November 3, 2017, the Debtor-Acis, Highland, and Highland Management (a newly created, offshore Highland affiliate) entered into that certain Agreement for Assignment and Transfer of Promissory Note (the "Note Assignment and Transfer Agreement"). Exh. 225. The Note Assignment and Transfer Agreement, among other things, transferred a $9.5 million principal amount promissory note executed by Highland and payable to the Debtor-Acis (the "Note"), Exh. 218, from the Debtor-Acis to Highland Management (the "Note Transfer"). The Assignment and Transfer Agreement memorializing this transaction is signed by Mr. Dondero for the Debtor-Acis. The document recites that (i) Highland is no longer willing to continue providing support services to the Debtor-Acis, (ii) the Debtor-Acis, therefore, can no longer fulfill its duties as a collateral manager, and (iii) Highland Management agrees to step into the collateral manager role if the Debtor-Acis will assign the Note to it. Notably, Highland Management was registered in the Cayman Islands on October 27, 2017, roughly a week before the Note Transfer. Thus, Highland Management had no portfolio or collateral management experience whatsoever when it entered the Assignment and Transfer Agreement. To the contrary, it appears Highland Management was an entity that was created specifically to hold the Note and eventually take possession of the CLO PMAs in an international forum that would be difficult for Mr. Terry to reach. The Debtor-

20

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 21 Filed 06/02/25160 Page 561 of 1017    PageID 16222
Case 18-3026 Case 19-12239275 Filed Doc 361-19    Entered 01/39/19 Page 1204 of 47 Page 21 of 47

shares in HCLOF Guernsey held by the Debtor-Acis were sold back to HCLOF Guernsey (four days after the Arbitration Award). And then the Equity/ALF PMA was terminated so that the Debtor-Acis would no longer have management-control over HCLOF Guernsey as its portfolio manager—arguably putting Highland in a position to liquidate the Acis CLOs and put the Debtor-Acis out of business. Specifically, on October 27, 2017, just seven days after Mr. Terry's Arbitration Award, the Debtor-Acis ostensibly terminated its own portfolio management rights under the Equity/ALF PMA[38] and transferred its authority and its valuable portfolio management rights—for no value—to Highland HCF, an affiliate of Highland. It appears that the only alleged consideration for these transfers, to the extent there was any, was the satisfaction of purported debts owed to other Highland entities or their representatives.

---

Acis appears to have received no or insufficient consideration for the Note Transfer. The primary consideration for the Note Transfer was an alleged payable due from the Debtor-Acis to Highland in the approximate amount of $7.5 million for participation fees, which was transferred to Highland Management shortly before the Note Assignment and Transfer Agreement was entered. The validity of the alleged "participation fees" is unknown. The remainder of the consideration for the Note Transfer is a promise to pay certain expenses of the Debtor-Acis, which has apparently never occurred. In any event, it appears highly likely that the Note Transfer took away the Note as an asset from which Mr. Terry could collect his judgment.

[38] As mentioned earlier, the Equity/ALF PMA provided that the Debtor-Acis could only be removed as portfolio manager by the equity owner (now known as HCLOF Guernsey) **"for cause"** at § 14(a)-(e). Exh. 11. Meanwhile, the Debtor-Acis could terminate the Equity/ALF PMA without cause upon at least ninety (90) days' notice, pursuant to § 13(a)-(c). Exh. 11. It would appear that these terms were wholly ignored by the persons orchestrating the Equity/ALF PMA termination. It appears that the Debtor-Acis was simply manipulated to consent and agree to its removal and replacement as portfolio manager of HCLOF Guernsey. This transfer of the Debtor-Acis's portfolio management rights to the offshore entity Highland HCF was accomplished by way of a new portfolio management agreement entered into by the equity owner (now known as HCLOF Guernsey) and Highland HCF on October 27, 2017, which empowered Highland HCF with the same broad authority to direct the management of HCLOF Guernsey as was previously held by the Debtor-Acis LP under the Equity/ALF PMA. *See* Exh. 19, October 27, 2017 PMA §§ 1 & 5(a)-(q). This agreement appears to have been further solidified in a second portfolio management agreement dated November 15, 2017. Exh. 215. The Debtor-Acis received no consideration for this transfer.

Appx. 02678
015240

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 21   Page 46 of 160    Page 562 of 1017    PageID 16223
Case 18-30264-sgj11   Doc 3872-75   Filed 01/31/19   Entered 01/31/19   Page 22 of 47

The Highland Defendants argue that the Equity/ALF PMA (its termination being
arguably the most significant transfer referenced in the Highland Entities Adversary Proceeding)
did not have value.  But the evidence convinces the court that it absolutely did.  A witness, Mr.
Zachary Alpern, credibly testified that the portfolio manager (under the Equity/ALF PMA) made
decisions regarding the underlying financial instruments including seeking an optional
redemption and negotiating a reset.  Mr. Alpern also credibly testified about the importance, in
the CLO industry, of the portfolio manager having control of a CLO's equity to ensure an
"evergreen fee stream."[39]  Additionally, Mr. Terry also credibly testified that the portfolio
manager (not the CLO equity interest holder) has the right to control the terms of the liquidation
of collateral in an optional redemption under the terms of the indentures.[40]  The Chapter 11
Trustee also credibly testified that the Equity/ALF PMA allowed the Debtor-Acis to have control
of an optional redemption.[41]  Finally, a witness, Mr. Klein, credibly testified about the value of
the Equity/ALF PMA and the negative impact of its transfer on the Debtor-Acis LP. [42]

To be clear, Highland and HCLOF Guernsey have argued in opposition to the Chapter 11
Trustee's position that it is HCLOF Guernsey—the actual equity holder of the CLO SPEs—that
had/has the absolute power and authority to control the CLO SPEs' destinies and it is ludicrous
to suggest otherwise.  However, not only does the Equity/ALF PMA appear to this court to have
delegated the relevant power and authority **to the Debtor-Acis**, but Highland's own expert on this

---

[39] Exh. 404, Transcript 8/23/18 (AM) at pp. 65-67, 81-93 and Transcript 8/23/18 (PM) at pp. 34-35, 38-
40, 46, and 49.

[40] Transcript 12/18/18 [DE # 804], at pp. 77-78.  *See also* Exh. 405, Transcript 8/27/18 (AM) at pp. 63-75.

[41] Exh. 405, Transcript 8/27/18 (AM) at p. 53.

[42] Exh. 405, Transcript 8/27/18 (PM) at pp. 143-144, 147-159 and 205-207.

Appx. 02679
015241

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-30   Exhibit 21   Filed 04/25/160   Page 563 of 1017   PageID 16224
Case 18-30264-sgj11   Doc 1389-2755   Filed 01/31/19   Entered 01/31/19   Page 1204 of 49   Page 23 of 47

topic, Mr. Castro, testified that the "actual humans" who would make the decision for HCLOF
Guernsey as to whether to request an optional redemption of the Acis CLOs were not the
HCLOF Guernsey directors but, rather, Highland executives Mr. Dondero, Mr. Okada, and
Highland employee Mr. Covitz (acting for Highland HCF).[43]  Moreover, Mr. Alpern credibly
testified that, before the Terry Arbitration Award, the Debtor-Acis, as the portfolio manager
under the Equity/ALF PMA, rather than the HCLOF Guernsey's directors, issued the notices of
optional redemption for HCLOF Guernsey.[44]

        The court concludes that the Chapter 11 Trustee has demonstrated a likelihood of
success on the merits with regard to his claims set forth in the Highland Entities Adversary
Proceeding.  Therefore, the Temporary Injunction that is part of the Plan is supportable (as
further explained below).  Of course, the nature and extent of the rights ultimately recovered by
the Debtor-Acis will either be determined in the Highland Entities Adversary Proceeding or, as
HCLOF Guernsey's own Guernsey expert conceded, in a binding arbitration in Dallas, Texas
under the terms of the Equity/ALF PMA.[45]

        2.    The Plan Injunction.

        The most controversial aspect of the Plan—the aspect of it that seems to be the primary
focus of the Objectors—is a *portion* of an injunction in the Plan (the "Temporary Injunction").
The Temporary Injunction would *temporarily* enjoin the following parties *from effectuating an
optional redemption or liquidating the Acis CLOs* and related actions: (i) Highland; (ii) HCLOF

---

[43] Exh. 406, Transcript 8/28/18 (PM) at pp. 61-63.

[44] Exh. 404, Transcript 8/23/18 (AM) at pp. 85-89 and Exhs. 323-325 (Notices of Optional Redemption signed by the Debtor-Acis as portfolio manager of HCLOF).

[45] Transcript 12/13/18 (PM) [DE #794], at pp. 116, 118-19, 122, 124 (Corfield); *see also*, p. 140 (McGuffin).

Appx. 02689
015242

Guernsey; (iii) CLO Holdco, Ltd. (the donor advised fund, seeded with Highland contributions and managed by Highland that owns 49% of HCLOF Guernsey); (iv) Neutra Cayman; (v) Highland HCF (the Cayman Island entity created shortly before the Bankruptcy Cases to replace the Debtor-Acis under the Equity/ALF PMA); (vi) Highland Management (the Highland-created entity that entered into a portfolio management agreement with a new Acis-CLO that was established in 2017); and (vii) any affiliates of Highland and their respective employees, agents, representatives, transferees, assigns, and successors.[46]  This Temporary Injunction is proposed to only last until the earlier of when:  (a) the creditors of the Debtors are paid in full; (b) resolution of the Highland Entities Adversary Proceeding; (c) a material breach in the Plan; or (d) the bankruptcy court terminates the Temporary Injunction upon request of a party-in-interest.  ***Fully consensual resets of the Acis CLOs are permissible if HCLOF Guernsey, as the equity owner in the CLO SPEs, chooses to agree to resets***.  The basis for the Temporary Injunction is as follows:  The Chapter 11 Trustee has asserted numerous claims in the Highland Entities Adversary Proceeding against Highland, HCLOF Guernsey, and affiliates, including claims to recover the Debtor-Acis's rights under the Equity/ALF PMA.[47]  The Temporary Plan Injunction essentially provides for the continuation, after the Effective Date, of injunctive relief that the bankruptcy court previously granted in its Preliminary Injunction Order (the "Preliminary Injunction") [DE # 21 in Adversary No. 18-03212-sgj] entered on July 10, 2018 in the Highland Entities Adversary Proceeding.  The Preliminary Injunction was originally set to expire by its

---

[46] There is another portion of this Plan injunction that is more of a general plan injunction (*i.e.,* very typical) that would prohibit actions against the Debtors, Reorganized Debtor and the Estate Assets, based on acts occurring before the Effective Date, which would be permanent and would not expire upon the occurrence of any event that causes the Temporary Plan Injunction to expire.

[47] *See* Exh. 627, Trustee's Counterclaims and Claim Objection.

Appx. 92681
015243

Case 19-34054-sgj11 Doc 3596-21 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 21 Page 46 of 160 Page 565 of 1017 PageID 16226
Case 18-30264-sgj11 Doc 1423-25 Filed 01/31/19 Entered 01/31/19 Page 25 of 47

own terms upon confirmation of the Plan but would be extended pursuant to an order confirming
the Plan, through the Effective Date of the Plan.

As the Fifth Circuit has stated, the four elements to justify a preliminary injunction are (a)
substantial likelihood of success on the merits; (b) substantial threat that the plaintiff will suffer
irreparable injury; (c) the threatened injury outweighs any harm the injunction might cause the
defendant; and (d) the injunction is in the public interest.[48]  Each element is present in these
cases.

*Immediate and Irreparable Harm.*  The court finds and concludes that the Temporary
Injunction is legally permissible, necessary, and appropriate to avoid immediate and irreparable
harm to the Reorganized Debtor (*i.e.,* evisceration of the Acis CLOs, by parties with unclean
hands, that would have no authority to effectuate a liquidation of the CLOs, absent the
prepetition wrongful termination of the Equity/ALF PMA).  Mr. Scott, a director of HCLOF
Guernsey, testified that, absent the Temporary Plan Injunction, HCLOF Guernsey would call for
an optional redemption of the Acis CLOs.[49]  The testimony of Ms. Bestwick, the other director
of HCLOF Guernsey, also implied that, when the injunction expires, HCLOF Guernsey would
redeem the Acis CLOs so that they could once again be managed by Highland.[50]  The Chapter 11
Trustee credibly testified that if the Acis CLOs are liquidated, there is nothing for the Debtor-
Acis to manage.[51]  The Chapter 11 Trustee credibly testified that the Temporary Plan Injunction

---

[48] *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *Women's Med. Ctr. of N.W. Houston v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001); *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998).

[49] Exh. 721, Mr. Scott Depo. at pp. 204.

[50] Exh. 719, Bestwick Depo. at p. 112.

[51] Exh. 405, Transcript 8/27/18 (AM) at p. 40.

25

App. 02682
015244

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-20   Filed 06/25/25   Page 566 of 1017   PageID 16227
Case 18-30264-sgj11   Doc 3927-35   Filed 01/31/19   Entered 01/31/19   Page 1704 of 48   Page 26 of 47

is very important because it protects the revenues under the Acis PMAs, which is a source of

potential recovery to creditors under the Plan.[52]  Mr. Terry credibly testified that the Temporary

Plan Injunction is a critical component of the Plan and that the Debtor-Acis would have no going

concern value without it.  In fact, without the Plan Injunction, Mr. Terry will be precluded from

reorganizing the business and paying creditors.[53]

　　　　The Objectors have argued that the Chapter 11 Trustee cannot suffer irreparable harm

because he has an adequate remedy at law.  This argument misses the mark.  The destruction of

the Debtors' ongoing business, which has the potential to repay creditors under the Plan in two

years, constitutes irreparable harm.  The fact that the estate possesses a number of avoidance

claims for damages against Highland and its affiliates, and could potentially obtain damages on

such claims, does not render the destruction of the Debtor-Acis's ongoing business any less

harmful.  Indeed, according to the Fifth Circuit:

> [T]he mere fact that economic damages may be available does not always mean
> that a remedy at law is 'adequate.' For example, some courts have found that a
> remedy at law is inadequate if legal redress may be obtained only by pursuing a
> multiplicity of actions.[54]

*Likelihood of Success on the Merits.*  The Chapter 11 Trustee has also demonstrated a

likelihood of succeeding on the merits in the Highland Entities Adversary Proceeding.

---

[52] Transcript 12/11/18 (AM) [DE # 789], at pp. 71-72.

[53] Transcript 12/12/18 (AM) [DE # 791], at pp. 40-41, 54-55.

[54] *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (citing *Lee v. Bickell*, 292 U.S. 415, 421 (1934)
("we are not in doubt, the multiplicity of actions necessary for redress at law [is] sufficient . . . to uphold
the remedy by injunction.")).

Appx. 02683
0̶1̶5̶2̶4̶5

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-20   Exhibit 21   Filed 08/26/160   Page 567 of 1017   PageID 16228
Case 18-30264-sgj11   Doc 832-53   Filed 01/31/19   Entered 01/31/19 12:04:48   Page 27 of 47

The record contains substantial evidence of both intentional and constructive fraudulent transfers with regard to the Equity/ALF PMA and other assets.[55]  The numerous prepetition transfers that occurred around the time of and after the Terry Arbitration Award appear more likely than not to have been made to deprive the Debtor-Acis of value and with actual intent to hinder, delay or defraud the Debtors' creditors.  Highland's only purported business justifications for the prepetition transfers were that the Passive Investor demanded it and that the Debtor-Acis's brand was toxic in the market place.[56]  However, these business justifications were not supported (and, in fact, were contradicted) by the evidence.

Indeed, while representatives of Highland and its affiliates said that the Passive Investor's demands were the reason for the termination (*i.e.,* essentially a "transfer") of the Equity/ALF PMA, the Passive Investor's representative testified that this was untrue and that these alleged demands were never made by the Passive Investor.[57]  In fact, the Passive Investor was just that— a passive, minority investor in HCLOF Guernsey with no ability to influence or control any of

---

[55] *E.g.,* Exh. 22, Transcript 2/6/18 at pp. 82-109, 130, 202-244, and the exhibits discussed therein; Exh. 201, Transcript 3/21/18 at pp. 110-133 & 186-191; Exh. 24, Transcript 3/22/18 at pp. 71-75 & pp. 204-205; Transcript 12/11/18 [DE # 789], at pp. 52-56; *see also* Transcript 8/27/18 (AM) [DE # 552], at p. 52; Transcript 12/12/18 (PM) [DE # 792], at pp. 92-98;

[56] Highland General Counsel Scott Ellington testified that the Passive Investor said it had no interest in doing business with the Debtor-Acis because the Debtor-Acis brand was purportedly toxic and, consequently, nothing associated with the Debtor-Acis could be managed or marketed as a CLO.  Exh. 23, Transcript 2/7/18 at pp. 55-58.  Mr. Ellington further testified that the Passive Investor demanded that the Equity/ALF PMA be transferred.  Exh. 23, Transcript 2/7/18 at pp. 203-204.  Mr. Ellington also testified that, because the Passive Investor would be putting in additional capital in connection with any reset CLOs, it had the ability to "start calling the shots" and dictate the terms of any reset transactions.  Exh. 23, Transcript 2/7/18 at p. 226.  Additionally, Highland executive Mark Okada testified that a reset transaction could not be performed by the Debtor-Acis because the market would not accept the Debtor-Acis as a portfolio manager and the Debtor-Acis was no longer risk-retention compliant.  Exh. 25, Transcript 3/23/18 at p. 53.  Additionally, Mr. Dondero testified that the "Boston investor" deal was contingent on getting away from the Debtor-Acis and getting a new collateral manager.  Exh. 25, Transcript 3/23/18 at pp. 143-144.

[57] *See* Exh. 720 and excerpts read in to the trial record on 12/11/18 (PM) at pp. 149-157.

27

Appx. 02684
015246

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 45-20   Filed 06/25/160   Page 568 of 1017   PageID 16229
Case 18-30264-sgj11   Doc 338   Filed 01/31/19   Page 28 of 47

the actual investment decisions.[58]  The only other business justification Highland and HCLOF

Guernsey have suggested for the prepetition transfers was that the Debtor-Acis "was a shell" and

not capable of being risk retention compliant.[59]  However, Highland portfolio manager Hunter

Covitz testified that in October 2017, prior to the Terry Arbitration Award, there was a structure

in place that would comply with risk retention.[60]  Mr. Covitz could not convincingly distinguish

why the "shell" status of the Debtor-Acis was distinguishable from the "shell" status of other

Highland-related entities that were the recipients of various fraudulent transfers.[61]  Mr. Covitz

also subsequently admitted that the Passive Investor did not request that the Debtor-Acis end its

involvement with HCLOF Guernsey through the Equity/ALF PMA fraudulent transfer or request

that ALF change its name to HCLOF [Guernsey].[62]  Mr. Covitz's testimony contradicted the

testimony provided by Scott Ellington, General Counsel[63] and Mr. Dondero.[64]  And, at bottom, if

the Debtor-Acis was a thinly capitalized "shell," it appears to be only because Highland

systematically made it that way after the Terry Arbitration Award.

       The evidence established overwhelmingly that there is a substantial likelihood that the

transfers were part of an intentional scheme to keep assets away from Mr. Terry as a creditor.

Highland put on an expert, Mr. Greenspan, who testified that he did not consider whether the

---

[58] Exh. 720, Depo. of Passive Investor representative at pp. 32-33.

[59] Transcript 12/13/18 (AM) [DE # 793], at pp. 55-58.

[60] Transcript 12/13/18 (AM) [DE # 793], at pp. 77-78.

[61] Transcript 12/13/18 (AM) [DE # 793], at p. 78; Transcript 12/18/18 [DE # 804], at pp. 59-63.

[62] Transcript 12/13/18 (AM) [DE # 793], at p. 103.

[63] See Exh. 23, Transcript 2/7/18 at pp. 177-178.

[64] See Ex. 25, Transcript 3/23/28 at pp. 143-44.

015247
Appx. 02685

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 21    Page 56 of 160    Page 569 of 1017    PageID 16230
Case 18-3026    Case 19-1238275    Filed 01/31/19    Entered 01/31/19    Page 300 of 48    Page 29 of 47

Equity/ALF PMA transfer was an "actual" fraudulent transfer, but only considered whether the transfer was "constructively" fraudulent.[65]  While Highland has taken the position that termination of the Equity/ALF PMA was not a transfer, Mr. Greenspan testified that the termination of a contract can constitute a transfer and acknowledged that the definition of a transfer in the Bankruptcy Code does not include a value component.[66]

   *Balance of Harms.*  The Chapter 11 Trustee has also shown the balance of harms weighs in his and the estates' favor in granting the Plan's Temporary Injunction.  The Chapter 11 Trustee is entitled to the Temporary Injunction pending resolution of the claims asserted in the Highland Entities Adversary Proceeding.  The Chapter 11 Trustee credibly testified that the Temporary Plan Injunction is important to the Plan, because it allows the cash flow from the CLO management to be collected by the Reorganized Debtor, and that is the source of revenue available at this time to pay creditors.[67]  Mr. Terry also credibly testified that the Temporary Plan Injunction is a critical component of the Plan necessary to preserve the Debtors' going concern value and allow the Reorganized Debtor to generate new business and repay creditors.[68] Conversely, in this court's view, there is no real harm to Highland or the Co-Defendants because they can ask for a reset under the Plan.[69]  Mr. Scott, a director of HCLOF Guernsey, testified that

---

[65] Transcript 12/12/18 (PM) [DE # 792], at pp. 116-117 and 161.

[66] Transcript 12/12/18 (PM) [DE # 792], at pp. 92-98.  Section 548(a)(1)(A) of the Bankruptcy Code only requires that a transfer be made with actual intent to hinder, delay or defraud creditors.  In the context of an intentionally fraudulent transfer claim, questions of value are immaterial. 11 U.S.C. § 548(a)(1)(A). The definition of "transfer" under the Texas Uniform Fraudulent Transfer Act ("TUFTA") also does not include a value component.  Tex. Bus. & Comm. Code Ann. § 24.002(12) (West, Westlaw through 2017).

[67] Transcript 12/11/18 (AM) [DE # 789], at pp. 71-72.

[68] Transcript 12/12/18 (AM) [DE # 791], at pp. 40-41, 54-55.

[69] Transcript 12/11/18 (AM) [DE # 792], at p. 92.

Appx. 02686
015248

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exh-20 21 Filed 06/25160 Page 570 of 1017    PageID 16231
Case 18-30264-sgj11 Doc 1238 275 Filed 01/31/19 Entered 01/31/19 Page 30 of 47

HCLOF Guernsey can sell its interest in the subordinated notes in the market.[70]  The Chapter 11 Trustee credibly testified that the Temporary Plan Injunction would not impair the value of the subordinated notes because a rational investor would not want to liquidate the Acis CLOs, but rather would acquire them to do a reset under the Plan.[71]  Mr. Terry credibly testified that even if the Acis CLOs are not reset, it still does not make sense to redeem the Acis CLOs.[72]

 *Public Interest.*  Finally, issuance of the Plan Injunction is consistent with public policy. Public policy favors the equitable collecting of a debtor's assets, maximizing the value of those assets, and distributing the proceeds in an orderly fashion in accordance with the priorities and safeguards set forth in the Bankruptcy Code, rather than in an uncontrolled, piecemeal, and potentially wasteful way.  Public policy also supports successful reorganizations.[73]  The public interest is furthered by confirming a plan that saves the Debtor-Acis's business operations and allows it to pay its creditors under a successful plan of reorganization.  The public interest is also furthered by maintaining the status quo through the Temporary Plan Injunction so that the avoidance action relating to the Equity ALF PMA can be determined on its merits.  The public interest is not furthered by allowing potential wrongdoers to complete the last step in what appears likely to have been a scheme to strip the Debtor-Acis of its assets, steal its business, and leave it unable to pay creditors.  The public interest is not furthered by leaving the Debtors

---

[70] Exh. 721, Mr. Scott Depo. at p. 28.

[71] Transcript 12/11/18 (PM) [DE # 790], at pp. 23-24.

[72] Transcript 12/12/18 (AM) [DE #791], at p. 82.

[73] *Tex. Comptroller of Pub. Accounts v. Transtexas Gas Corp. (In re Transtexas Gas Corp.)*, 303 F.3d 571, 580 (5th Cir. 2002).

Appx. 02687
015249

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 21   Filed 05/26/160   Page 571 of 1017   PageID 16232
Case 18-3026   Case 19-3392755   Filed Document 33619   Entered 01/31/19   Page 31 of 47   Page 31 of 47

without sufficient resources to pursue and effectively litigate potentially valuable causes of action.

In sum, the court finds and concludes that the proposed Plan injunction (including the Temporary Injunction) is legally permissible and justified under all the circumstances. It is narrowly tailored to address the specific harm to which it is directed and comports with governing case and statutory authority and applicable rules of bankruptcy and civil procedure. The Plan Injunction is consistent with Fifth Circuit precedent.[74] Such an injunction would not violate section 524(e) of the Bankruptcy Code. That subsection provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."[75] The Plan Injunction would not affect the liability of any entity, or the liability of any property. The injunction would only temporarily prohibit Highland and its Co-Defendants from exercising one form of economic recourse, thereby preserving the status quo while the Chapter 11 Trustee and/or Reorganized Debtor has a fair opportunity to prosecute the

---

[74] The Fifth Circuit, in an unpublished opinion, has recognized the propriety of an injunction to preserve the status quo in cases where equitable relief is sought. *See Animale Group v. Sunny's Perfume, Inc.,* 256 F. App'x 707, 709 (5th Cir. 2007) ("Because Defendants seek equitable relief, the district court was authorized to preserve the status quo by entering a limited asset freeze."). The Chapter 11 Trustee's claims in the Highland Entities Adversary Proceeding to avoid fraudulent transfers seek equitable relief. *See United States ex rel. Rahmen v. Oncology Assocs., P.C.,* 198 F.3d 489, 498 (4th Cir. 1999) ("The complaint's request to void transfers as fraudulent—a form of rescission—is also an equitable remedy."); *Dong v. Miller,* No. 16-CV-5836 (NGG) (JO), 2018 U.S. Dist. LEXIS 48506, at *30-31 (E.D.N.Y. Mar. 23, 2018) ("The setting-aside of a fraudulent conveyance is a form of equitable relief."). *See also Iantosca v. Step Plan Servs.,* 604 F.3d 24, 33 (1st Cir. 2010) (affirming preliminary injunction where creditors had a "colorable claim that appellants' own supposed interest under the settlement rests upon a fraudulent conveyance"); *Seidel v. Warner (In re Atlas Fin. Mortg., Inc.),* Adv. No. 13-03222, 2014 Bankr. LEXIS 140 at *10 (Bankr. N.D. Tex. Jan. 14, 2014) (granting preliminary injunction where complaint sought avoidance of fraudulent transfers under the Bankruptcy Code and the Texas Uniform Fraudulent Conveyance Act); *Paradigm Biodevices, Inc. v. Centinel Spine, Inc.,* No. 11 Civ. 3489 (JMF), 2013 U.S. Dist. LEXIS 66858, at *7 (S.D.N.Y. May 9, 2013) (authority to grant preliminary injunction existed because plaintiff alleged not only a legal claim for money damages, but also an equitable claim to avoid fraudulently transferred assets).

[75] 11 U.S.C. § 524(e).

Appx. 02688
015250

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-20 21 Filed 06/23/25 160 Page 572 of 1017    PageID 16233
Case 18-30264-sgj11   Doc 33927-3 55 Filed 01/31/22  Entered 01/31/19 12:33:04 49 Page 32 of 47

Highland Entities Adversary Proceeding.[76]  Likewise, the proposed injunction does not

contravene any other provision of the Bankruptcy Code or the Bankruptcy Rules.[77]  Finally, the

Chapter 11 Trustee's avoidance claim relating to the Equity/ALF PMA transfer under TUFTA

also provides a statutory basis for injunctive relief.[78]

  3. Feasibility of the Plan—Specific Findings and Conclusions Regarding Mr. Terry and
    Brigade.

   The Objectors have challenged the feasibility of the Plan.[79]  The court finds and

concludes that the preponderance of the evidence supported the feasibility of the Plan.  Among

other things, the Chapter 11 Trustee credibly testified that Mr. Terry has an excellent track

record as a portfolio manager, and that there is no reason why Mr. Terry will not be able to

obtain new business—that is, new portfolios to manage which will provide additional revenue

streams for the Reorganized Debtor.[80]  The evidence was credible and compelling that Mr. Terry

---

[76] *See In re Seatco, Inc.*, 259 B.R. 279, 283-84 (Bankr. N.D. Tex. 2001) (approving temporary injunction of suit against nondebtor on guaranty of debt treated in plan).

[77] *Compare Omni Mfg. v. Smith (In re Smith)*, 21 F.3d 660, 666-67 (5th Cir. 1994) (disapproving injunction extending time to file proof of claim beyond limits set in Bankruptcy Rules 3003(c)(3) and 9006(b)(1)); *Chiasson v. Bingler (In re Oxford Mgmt.),* 4 F.3d 1329, 1334 (5th Cir. 1993) (disapproving injunction ordering payment that altered distribution scheme set forth in § 726(b)); *Unites States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986) (disapproving injunction ordering spousal support payments contrary to § 523(a)(5)).

[78] Tex. Bus. & Comm. Code Ann. § 24.008 (West, Westlaw through 2017) (providing a creditor may obtain "an injunction against further disposition by the debtor or the transferee, or both, of the asset transferred or of other property . . . [or] any other relief the circumstances may require.").  TUFTA's injunction provision is construed broadly and courts have found that "[a] claim for fraudulent transfer under Texas law contemplates the issuance of a preliminary injunction."  *Sargeant v. Al Saleh*, 512 S.W.3d 399, 413 (Tex. App.—Corpus Christi 2016, no pet.); *accord, Janvey v Alguire*, 647 F.3d 585, 602-03 (5th Cir. 2011).

[79] 11 U.S.C. § 1129(a)(11).

[80] Transcript 12/11/18 (AM) [DE # 789], at p. 90 (lines 5-12).  Moreover, to the extent there are any gaps, recoveries from the Highland Entities Adversary Proceeding might eventually be available for ongoing operations and payment of creditors.

Appx. 02680
015251

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 55-20   Page 54/65160   Page 573 of 1017   PageID 16234
Case 18-30264-sgj11   Doc 1389-2   Filed 01/31/19   Entered 01/31/19 13:04:49   Page 33 of 47

will be capable of fulfilling the equity owner position in the Reorganized Debtor (stepping in to essentially run the Reorganized Debtor) and will be able to ensure the feasibility of the Plan.  He is well qualified to reorganize the Debtor-Acis.  Mr. Terry testified that his role with the Reorganized Debtor will be similar to the role he very successfully performed for the Debtor-Acis.[81]  The Debtor-Acis received numerous awards during Mr. Terry's service as the portfolio manager of the Acis CLOs.[82]  The arbitration panel that issued the Arbitration Award found that Mr. Terry was terminated for essentially doing the right thing for investors.[83]  Mr. Terry credibly testified that numerous market participants have expressed an interest in working with the Reorganized Debtor if the Plan is confirmed.[84]

Moreover, the court finds and concludes that Brigade (who stepped in as sub-advisor in place of Highland during the Bankruptcy Cases and is a registered investment advisor) is qualified to serve as a sub-advisor to the Reorganized Acis.  Mr. Jared Worman, a portfolio manager for Brigade,[85] credibly testified that Brigade, founded in the year 2007, currently has $20 billion of total assets under management, $5 billion of which consists of six U.S. CLOs, two U.S. CDOs, and three European CLOs.[86]  Mr. Worman credibly testified that Brigade has issued 17 CLOs and has reset or refinanced several of them.[87]  Mr. Worman and Mr. Terry credibly

---

[81] Transcript 12/11/18 (PM) [DE # 790], at pp. 172-73.

[82] Transcript 12/11/18 (PM) [DE # 790], at pp. 162-163 and Exh. 752.

[83] Transcript 12/11/18 (PM) [DE # 790], at pp. 161-62.

[84] Transcript 12/12/18 (AM) [DE # 791], at pp. 16-18.

[85] Mr. Worman has an undergraduate degree from Emory University and an MBA from Wharton.

[86] Transcript 12/11/18 (PM) [DE # 790], at p. 84.

[87] Transcript 12/11/18 (PM) [DE # 790], at p. 86.

Appx. 02699
015252

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S      Document 35-20   Filed 06/05/25   Page 574 of 1017      PageID 16235
Case 18-30264-sgj11   Doc 2275   Filed 01/31/19   Entered 01/31/19 13:50:41   Page 34 of 47

testified that Brigade is willing to serve as sub-advisor to the Reorganized Acis for fifteen basis

points.[88]  Highland attempted to show with evidence and argument that Brigade had made some

failed trades since stepping in as sub-advisor to the Acis CLOs and that this perhaps made them

unfit to serve in this role.  But Mr. Terry credibly testified that the fact that a few failed trades

were made by Brigade does not make them unfit to serve as sub-advisor to Reorganized Acis,

and that trades out of compliance with the applicable CLO tests occasionally happen, and

Brigade has handled them appropriately.[89]  In fact, the evidence suggested that at least ten failed

trades occurred while Highland was acting as sub-advisor to the Debtor-Acis.[90]

Highland's suggestions that Brigade is not up to the task to manage the Reorganized

Debtor are specious.  Likewise, HCLOF Guernsey's insistence that it will not be getting the

benefit of its bargain if the Acis CLOs are not managed by Highland personnel going forward

appears to be a manufactured position aimed at thwarting Mr. Terry at all costs.  Not only is

there no credible evidence of Brigade mismanagement but, to the contrary, it appears that

Highland (prior to the Debtor-Acis's rejection of the Sub-Advisory Agreement and Shared

Services Agreement), intentionally liquidated assets of the CLO SPEs and built up cash without

reasonable justification.  Specifically, Mr. Terry credibly testified that there were $85 million in

purchases in the Acis CLOs in the hours leading up to the entry of the orders for relief, but

virtually no purchases of loans in the CLOs afterwards—only sales.[91]  And Mr. Worman further

---

[88] Transcript 12/11/18 (PM) [DE # 790], at p. 89; Transcript 12/12/18 (AM) [DE # 791], at p. 62.

[89] Transcript 12/11/18 (PM) [DE # 790], at pp. 182-83; Transcript 12/18/18 [DE # 804], at pp. 72-73.

[90] *See* Exhs. 727, 728; Transcript 12/11/18 (PM) [DE # 790], at pp. 71-74, 182-83.

[91] Transcript 12/12/18 (AM) [DE # 791], at pp. 18-19, 28-31; Transcript 12/18/18 [DE # 804], at pp. 87-89; *see also,* Terry Demonstrative.

Appx. 02691
015253

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 21 Filed 06/05/160 Page 575 of 1017    PageID 16236
Case 18-3026 Case 19-1238 275 Filed Doc 3619    Entered 01/31/19 Page 35 of 47 Page 35 of 47

credibly testified that Highland, while acting as sub-advisor, allowed approximately $380 million in cash to build up in the Acis CLOs.  Meanwhile, Brigade has subsequently reduced that cash balance by $280 million to approximately $100 million.[92]  Mr. Worman also credibly testified that Brigade has purchased approximately $300 million in loans for the Acis CLOs.[93]  The Chapter 11 Trustee and Mr. Terry both credibly testified that the build-up of cash in the Acis CLOs while Highland was sub-advisor, rather than the loans acquired by Brigade, left the Acis CLOs without sufficient interest income to make a distribution to the equity holders.[94]  Certain contradictory testimony of Hunter Covitz was not convincing that:  (a) there were very few conforming loans available to be purchased for the Acis CLOs in the approximately four months that elapsed between the entry of the Order for Relief and the time when Highland was terminated as sub-advisor;[95] and (b) it made more sense to accumulate cash to pay down the AAA notes rather than invest in new loans.[96]  The court found more convincing the testimony of Mr. Terry:  (a) that there was $310 billion of performing loans rated above CCC in the S&P loan index in May of 2018 available for purchase in CLO-6 that would have satisfied the weighted average life test;[97] (b) that Highland purchased loans for CLO-7 that would have satisfied the weighted average life constraints in the Debtor-Acis's CLO-4, CLO-5, and CLO-6;[98] and (c)

---

[92] Transcript 12/11/18 (PM) [DE # 790], at p. 100.

[93] Transcript 12/11/18 (PM) [DE # 790], at pp. 70, 94.

[94] Transcript 12/11/18 (AM) [DE # 789], at pp. 67-69; Transcript 12/11/18 (PM) [DE # 790], at pp. 70-71; Transcript 12/12/18 (AM) [DE # 791] at p. 34-37.

[95] Transcript 12/13/18 (AM) [DE # 793], at pp. 12-13.

[96] Transcript 12/13/18 (AM) [DE # 793], at pp. 13-16.

[97] Transcript 12/18/18 [DE # 804], at p. 87.

[98] Transcript 12/18/18 [DE # 804], at pp. 87-88.

Appx. 02692
015254

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S     Document 55-20   Filed 10/06/25160   Page 576 of 1017     PageID 16237
Case 18-30264-sgj11   Doc 1382   Filed 01/31/19   Page 370 of 47   Page 36 of 47

that, although there was no change in market conditions, Highland essentially stopped buying collateral for the Acis CLOs[99] after the entry of the Orders for Relief.[100]

    4.   Resets—Non-impairment of Anyone's Rights.

The Plan only contemplates ***consensual*** resets of the Acis CLOs—in other words, only if HCLOF Guernsey requests resets.[101]  Messrs. Worman and Terry both credibly testified that they believed the Reorganized Acis and Brigade could perform a consensual reset of the Acis CLOs.[102]  Mr. Terry credibly testified that other asset managers have been able to issue or reset CLOs after a bankruptcy proceeding.[103]  Mr. Terry also credibly testified that he wants to come to a resolution with HCLOF Guernsey and consensually reset the Acis CLOs.[104]

HCLOF Guernsey has taken the position that it and its new Passive Investor (new as of mid-November 2017—just before the Bankruptcy Cases) only want to be involved with CLOs that are managed by Highland or Highland affiliates.  Is the Plan impairing their rights—to the extent the Plan (and any subsequent re-sets) brings in Brigade as the sub-advisor to the Reorganized Debtor (whereas Highland was in that sub-advisor role before)?  It appears no.  The

---

[99] Transcript 12/18/18 [DE # 804], at pp. 88-89.

[100] Highland has also argued that the Plan is not feasible because the administrative expense claims are extremely high (to which the Chapter 11 Trustee responds, it is of Highland's making, since Highland has objected to literally every action proposed by the Chapter 11 Trustee).  The court does not believe there is a legitimate feasibility problem here.  Not only has the court not ruled yet on final professional fee applications, but the Chapter 11 Trustee represented that certain professionals have agreed to defer their fees (beyond payment in full on the Effective Date) as necessary.

[101] *See* Plan § 6.08.

[102] Transcript 12/11/18 (PM) [DE # 790], at pp. 86-90, 176-178; Transcript 12/12/18 (AM) [DE # 793], at pp. 16-18.

[103] Transcript 12/11/18 (PM) [DE # 790], at pp. 179-180.

[104] Transcript 12/18/18 [DE # 804], at p. 74.

Appx 02693
015255

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exh-20 21 Filed 05/05/160 Page 577 of 1017    PageID 16238
Case 18-3026 Case 19-12389275 Filed Doc 3612    Entered 01/31/19 Page 180 of 47 Page 37 of 47

Offering Memorandum between HCLOF Guernsey and the Passive Investor, dated November 15, 2017, pursuant to which the Passive Investor agreed to invest in HCLOF Guernsey, provided that there may be a change in circumstances following the date of the Offering Memorandum and that any forward-looking statements in the Offering Memorandum involved risks and uncertainties "because they relate to events and depend on circumstances that may or may not occur in the future."[105]  Heather Bestwick, one of the HCLOF Guernsey directors, testified that the Offering Memorandum does not require HCLOF Guernsey to invest only in Highland-managed funds[106] and instead expressly provides that HCLOF Guernsey will invest in "CLOs managed by other asset managers."[107]  Another witness, Mr. McGuffin, testified that the HCLOF Guernsey directors' fiduciary duties require them to act independently and objectively in the best interests of HCLOF Guernsey, and also require them to consider a change in circumstances.[108]  HCLOF Guernsey's counsel, HCLOF Guernsey's director, and the Passive Investor have all testified that they would consider doing a reset with the Reorganized Acis in the event the Plan is confirmed.[109]

Mr. Terry credibly testified that a reset of the Acis CLOs can occur after the expiration of the reinvestment periods of the Acis CLOs.[110]  The Plan is feasible regardless of whether a reset of the Acis CLOs is requested by HCLOF Guernsey.  Messrs. Phelan and Terry both credibly

---

[105] *See* Exh. 90, HCLOF Guernsey Offering Memorandum, at pp. 4-5.

[106] *See* Exh. 719, Bestwick Depo., at pp. 109, 118-121.

[107] *See* Exh. 90, HCLOF Offering Memorandum, at p. 12.

[108] Transcript 12/13/18 (PM) [DE # 794], at pp. 142-145.

[109] *See* Exh. 602, p. 12 of 70 (statement by HCLOF Guernsey's Counsel); Exh. 719 at pp. 166-167 (Heather Bestwick); Exh. 720, p. 72.

[110] Transcript 12/18/18 [DE # 804], at pp. 82-83.

Appx. 02694
015256

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 31-20    Filed 05/25/160    Page 578 of 1017    PageID 16239
Case 18-30264-sgj11    Doc 1382-73    Filed 01/31/19    Page 38 of 47

testified that the Reorganized Debtor will have cash flow from multiple potential sources—including the revenues from the CLO PMAs with the Acis CLOs, potential new business developed by the Reorganized Acis, and the outcome of any potential litigation claims.[111]

## VI.   General Credibility Assessments.

In ruling in a contested matter such as confirmation, and weighing the preponderance of the evidence, the credibility of witnesses and contradictions in their testimony naturally can be significant.  Here, there were some noteworthy problems and contradictions with some of the testimony provided by the Objectors' witnesses.  They are summarized below.

1.   Scott Ellington: A Seemingly Manufactured Narrative to Justify Prior Actions.

Scott Ellington testified on February 7, 2018 at the trial on the involuntary petitions, and the court was asked to consider his testimony again in connection with confirmation (he did not attend the confirmation hearing).  He is the General Counsel, Chief Legal Officer, and a Partner at Highland.  Mr. Ellington testified that the Debtor-Acis's name is "toxic" in the market place and that, due to the litigation with Mr. Terry and allegations in that litigation, "nothing can be associated with the Acis brand and be managed as a CLO or marketed as a CLO."[112]   Mr. Ellington elaborated that it had been determined in late 2016 or 2017 that re-sets or re-financings of the Acis CLOs were a prudent thing to pursue (in fact, there was indeed a trend of refinancings and resets for this vintage of CLOs in the market place) and, in connection with that, the Debtor-Acis's contracts and assets needed to be diverted to different, newly created entities because:  (a) the "Acis" name was toxic and underwriters and investors were not going to

---

[111] Transcript 12/11/18 (AM) [DE # 789], at pp. 72, 88-90; Transcript 12/12/18 (AM) [DE # 791], at p. 53.

[112] Exh. 23, p. 55 (line 17) through p. 56 (line 7); p. 98 (lines 8-12).

Appx. 02695
015257

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 5-20    Filed 06/25/160    Page 579 of 1017    PageID 16240
Case 18-30264-sgj11    Doc 1382-3    Filed 04/18/19    Entered 01/18/19    Page 440 of 47    Page 39 of 47

be interested in re-financings or resets for CLOs managed by the Debtor-Acis;[113] and (b) the new Passive Investor wanted the Debtor-Acis out of the picture.[114]  Mr. Ellington further elaborated: "The equity, you know, calls the tune, so to speak, in terms of the CLO . . .."[115]  In summary, an overarching theme of Mr. Ellington's testimony was that the Debtor-Acis was tainted or toxic in the marketplace and the Passive Investor wanted the Debtor-Acis out of the picture—thus, this was the motivation for the prepetition transactions orchestrated by Highland prior to the Bankruptcy Cases.  The problems with the Scott Ellington testimony were at least two-fold. First, there is no credible evidence that the Debtor-Acis is/was toxic in the market place.  In fact, in April 2017 (well after the litigation with Mr. Terry commenced), the Debtor-Acis issued a new CLO (CLO-7).  And in market publications as recently as August 21, 2017, Highland was touting the *Acis* structure stating "our vehicle will allow us to issue between six and 12 CLOs over the next few years."[116]  Second, the Passive Investor denies demanding that the Debtor-Acis be removed as the CLO manager.  Term sheets as recent as August 21, 2017 contemplated the Debtor-Acis as the continuing portfolio manager of CLOs, with apparently no protestations by the Passive Investor.[117]

---

[113] *E.g., Id.* at p. 177 (line 21) though p. 178 (line 12); p. 184 (lines 13-17) ("The underwriters in this case, Mizuho, Goldman, et al., the equity, they said we want every possible relation to anything that could be legacy Acis or Acis-related affiliates to be severed").

[114] *Id.* at p. 202 (lines 11-13) ("we have third-party investors that said we don't want to be involved in this brand; and their equity is one of the reasons that new CLOs can be launched"); p. 203 (lines 7-8) ("It was call the deal and terminate the CMAs or transfer the CMAs"); p. 223 (lines 8-12) ("Because if the involuntary remains, and I'm just – I'm just being frank – we've already been told by equity holders, including the separate account, BBK, that you may have seen on some of the exhibits, they're pulling everything.").

[115] *Id.* at p. 74 (lines 3-6).

[116] Exh. 801, pp. 3 & 5.

[117] Exh. 802, p.1.

Appx 02696
015258

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 55-20   Filed 06/06/25   Page 580 of 1017   PageID 16241
Case 18-30264-sgj11   Doc 238-2   Filed 03/31/19   Entered 03/31/19 Page 14 Page 40 of 47

2.   <u>Michael Pugatch: The Passive Investor Made Into a Scapegoat.</u>

The reality is that Highland, indeed, started working on the concept of doing resets of

some of the older vintage Acis CLOs in at least early 2017 (and perhaps late 2016).  Highland, in

fact, completed a reset of one Acis CLO in April 2017 (with the Debtor-Acis still in place as the

portfolio manager for that reset in April 2017).  As part of that process of implementing resets

for the Acis CLOs, Highland worked on bringing in a new investor or investors to have a share

of the equity tranche of the Acis CLOs.  Highland finally obtained the commitment of the

Passive Investor in November 2017, after starting initial discussions with them in the second

quarter of 2017.[118]  A representative for the Passive Investor referred to itself as "passive" in a

deposition.[119]  Concepts and documentation for the Passive Investor's investment in the Acis

CLOs were discussed for a while during 2017.  As recently as August 2017, the negotiations

with the Passive Investor appeared to contemplate the Debtor-Acis still as the portfolio manager

for the CLOs.[120]  Then the arbitration trial with Mr. Terry began in September 2017 and the

Terry Arbitration Award was issued on October 20, 2017.  Suddenly, it appears that the

dismantling of the Debtor-Acis began with all deliberate speed.  The court believes, based on the

totality of the evidence, that it was Highland who did not want the Debtor-Acis as CLO manager

going forward, so that Highland could keep reaping the benefits of the reset CLOs.  Specifically,

when deposed on the topic, a representative for the Passive Investor, Mr. Pugatch, denied the

accuracy of Mr. Ellington's testimony, stating that the Passive Investor "viewed Acis and

Highland as interchangeable from the perspective of the—you know, the actual investment

---

[118] *See* Exh. 720, Pugatch Deposition Transcript dated November 27, 2018, p. 18, lines 14-20.

[119] *Id.* at p. 22 (lines 2-3) ("we're you know, 49 percent sort of passive minority investor").

[120] Exh. 802, p. 1.

Appx. 02687
015259

Case 19-34054-sgj11 Doc 3596-21 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 35-20 21 Filed 06/26/25160 Page 581 of 1017 PageID 16242
Case 18-30264-sgj11 Doc 2395-3 Filed 03/11/19 Entered 01/31/19 14:20 Page 41 of 47 Page 41 of 47

opportunity."[121]  When asked, "Are you aware that Scott Ellington, general counsel for HCM, testified that [the Passive Investor] said with absolute certainty that they had no interest in doing business with Acis because the Acis brand was purportedly toxic and, consequently, nothing associated with Acis could be managed or marketed as a CLO?" Mr. Pugatch testified that he had read that testimony and that the statement was not true.[122]  He further stated that "the ultimate sort of name change did not come from [the Passive Investor]."[123]  In fact, when further asked whether the Passive Investor knew why Acis CLO Funding Limited changed its name to Highland CLO Funding Limited (*i.e.,* HCLOF Guernsey), Mr. Pugatch testified, "We were told that it was a change in the brand or the name, as requested by Highland."[124]  And when asked "Did [the Passive Investor] request that the name be changed?" he answered "No."[125]  When asked whether the Passive Investor considered "Acis toxic in the industry?" Mr. Pugatch answered:  "No. What I would say is, when the suggested name change did occur, there were commercial reasons given to us as to why that would be beneficial in terms of the ongoing management of those CLOs and the intended investment thesis around the investment that we had made, which seemed to make commercial sense."[126]  When Mr. Pugatch was asked, "Those reasons were given by Highland, correct?" he replied "Correct" and confirmed that they were not demanded by the Passive Investor.[127]  Mr. Pugatch was emphatic that the Passive Investor was

---

[121] *Id.* at p. 30 (lines 19-20).

[122] *Id.* at p. 31 (lines 6-19).

[123] *Id.* (lines 24-25).

[124] *Id.* at p. 27 (lines 24-25).

[125] *Id.* at p. 28 (lines 1-3).

[126] *Id.* at p. 32 (lines 1-8).

[127] *Id.* at p. 32 (lines 9-12).

Appx. 02698
015260

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 45-20   Filed 06/06/25   Page 582 of 1017   PageID 16243
Case 18-30264-sgj11   Doc 892-75   Filed 01/31/19   Entered 01/31/19   Page 42 of 47

just that—a passive investor—that did not have the ability to "start calling the shots" and dictate
the terms of any reset transactions.[128]  When asked if the Passive Investor was concerned about
the Terry Arbitration Award, Mr. Pugatch replied:  "The award itself, no.  I think the only thing
we were concerned about or focused on was that vis-à-vis our equity investment in Highland
CLO Funding Limited and, in turn, the equity that that vehicle held in the various CLOs was
appropriately, you know, ring-fenced or not exposed to any potential damages or economic loss
in value as a result of that arbitration award."[129]

The Passive Investor further testified that Brigade has "a fine reputation in the market"
but that it had no interaction with them historically.[130]  The Passive Investor also testified that it
was concerned about the cash buildups that had happened recently due to actions while Highland
had still been the sub-advisor on the Acis CLOs.[131]

### 3.   The Seemingly Rehearsed Testimony of the Two HCLOF Guernsey Witnesses.

The court was presented with video depositions of HCLOF Guernsey's two non-
executive directors (*i.e.,* its only directors):  Mr. William Scott[132] and Ms. Heather Bestwick.[133]
It was very apparent to the court that HCLOF Guernsey is controlled by Highland in every way.
Putting things in the kindest way possible, Mr. Scott and Ms. Bestwick appear to be nominal
figureheads who are paid to act like they are in charge, while they are not.  They are both

---

[128] *Id.* at p. 32 (lines 16-17); pp. 33-35.

[129] *Id.* at p. 43 (lines 3-9); p. 89.

[130] *Id.* at p. 68 (lines 11-13).

[131] *Id.* at p. 82, lines 9-24.

[132] *See* Exh. 721.

[133] *See* Exh. 719.

App. 02699
015261

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-20   Filed 04/25/160   Page 583 of 1017   PageID 16244
Case 18-30264-sgj11   Doc 1392-5   Filed 01/31/19   Page 43 of 47

basically professional directors-for-hire, for companies that choose to form/organize in the nation of Guernsey.

Ms. Bestwick testified that she is a nonexecutive director for six companies in Guernsey (none of the others are in the CLO business).[134]  She testified that she earned £35,000 per year to serve as a director of HCLOF Guernsey.[135]  She testified that she was selected by Highland[136] and that Highland also made the decision to hire HCLOF Guernsey's law firm in the Bankruptcy Cases.[137]  Ms. Bestwick, when questioned as to why the Equity/ALF PMA it had with the Debtor-Acis was terminated shortly after the Terry Arbitration Award was issued, testified that she was told it was "a condition precedent to the new Passive Investor" coming in and that she was told this by Highland.[138]  She also testified that she had never talked to the Passive Investor (who, of course, is a 49% owner of HCLOF Guernsey)[139] or Grant Scott (the trustee of the charitable organization that owns 49% of HCLOF Guernsey).[140]  She reiterated that she only talks to Highland employees.  She also was under the impression that terminating the Equity/ALF PMA would improve marketability of the CLOs going forward but that it was the same people and "business as usual for us."[141]  She testified that she learned of the Terry

---

[134] *Id.* at pp. 7-8; p. 21 (line 5) through p. 22 (line 20); p. 26 (lines 10-12).

[135] *Id.* at p. 43 (lines 18-19).

[136] *Id.* at p. 42 (lines 17-25).

[137] *Id.* at p. 53 (lines 7-20).

[138] *Id.* at p. 16 (line 13) through p. 17 (line 23); p. 58 (line 21) through p. 60 (line 17).

[139] *Id.* at p. 188 (lines 12-15).

[140] *Id.* at p. 188 (line 19) through p. 189 (line 9).

[141] *Id.* at p. 189 (lines 12-15); p. 200 (line 22).

Appx. 02700
015262

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 5-30    Filed 10/05/25    Page 584 of 1017    PageID 16245
Case 18-30264-sgj11    Doc 1873-75    Filed 11/31/19    Page 44 of 47    Page 44 of 47

Arbitration Award in mid-April 2018 (some six months after the fact)[142] and "[y]ou'd have to ask Highland"[143] why it did not inform her sooner.  Her testimony was clear that she defers to Highland on everything, stating that as directors they were "heavily reliant on our service providers, and that means Highland."[144]  With regard to a lawsuit that HCLOF Guernsey filed against Mr. Terry in Guernsey during the Bankruptcy Cases, she testified that it was neither her nor the other director, William Scott's, idea.

Mr. Scott, the other HCLOF Guernsey director, is a "professional director" for 10-15 Guernsey companies[145]—all of which are "paying assignments."[146]  He became rather incensed when testifying, at the suggestion that he and Ms. Bestwick were not in control of HCLOF Guernsey, stating that board minutes and other documents would show that they took a great level of interest in running the company.[147]  He testified that he earned £40,000 per year to serve as a director of HCLOF Guernsey and that, due to the extra work of the Bankruptcy Cases, he also was charging another £350 per hour, after the first 35 hours[148] (the court notes, anecdotally, that it required participation in court hearings by a director of HCLOF Guernsey each time that HCLOF Guernsey took a position in court).  Mr. Scott confirmed that he was not aware of the litigation with Mr. Terry nor the Acis Bankruptcy Cases until April 2018.[149]  He also testified

---

[142] *Id.* at p. 61 (lines 3-19); p. 130 (line 14) through p. 136 (line 2).

[143] *Id.* at p. 137 (line 21).

[144] *Id.* at p. 152 (lines 18-19).

[145] *See* Exh. 721 at p 8 (line 9) through p. 9 (line 5); p. 79 (lines 20-25).

[146] *Id.* at p. 80 (lines 3-5).

[147] *Id.* at p. 13 (lines 1-12); p. 22 (line 23) through p. 23 (line 12).

[148] *Id.* at p. 80 (lines 6-18).

[149] *Id.* at p. 132 (line 20) through p. 135 (line 10).

Appx. 02701
015263

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-20   Filed 06/25 160   Page 585 of 1017   PageID 16246
Case 18-30264-sgj11   Doc 2397-35   Filed 01/31/19   Page 45 of 47

that Highland had proposed the legal counsel HCLOF Guernsey used in the Bankruptcy Cases
and that he had never disagreed with Highland's advice.[150]  He confirmed that all investment
decisions were made by Highland and that he and Ms. Bestwick's role was to "police" service
providers.[151]  Like Ms. Bestwick, Mr. Scott testified that they were told that the Passive Investor
had made it a condition precedent to their investment in HCLOF Guernsey that "Acis depart."[152]
But he had not talked to the Passive Investor.[153]  As if all this deference to Highland were not
enough, HCLOF Guernsey's lender is NexBank (an affiliate of Highland—which is based in
Dallas, not Guernsey) and HCLOF Guernsey has given its actual equity notes to NexBank as
security for its loans from NexBank.[154]  Also, interestingly, when asked about the adversary
proceeding that HCLOF Guernsey filed against the Chapter 11 Trustee a few months ago in the
Bankruptcy Cases (*i.e.,* the Highland Entities Adversary Proceeding—it was originally
commenced by Highland and HCLOF Guernsey as Plaintiffs), Mr. Scott testified that "we
haven't sued the trustee, he has sued us" but later acknowledged his mistake when corrected by
counsel.

This court is not naïve—it realizes that so-called "fiduciary services firms" are apparently
a typical thing in the world of off-shore jurisdictions that are large financial centers.[155]  Maybe

---

[150] *See generally id.* at pp. 277-280.

[151] *Id.* at p. 106 (lines 1-7).

[152] *Id.* at p. 254 (line 20) through p. 260.

[153] *Id.* at p. 155 (lines 2-25).

[154] *See* Exh. 719 at p. 213 (line 2-22); Exh. 721 at p. 129 (line 10) through p. 130 (line 13).

[155] During the testimony of both Ms. Bestwick and Mr. Scott, the court was reminded of an old TV commercial in which an actor states, "I am not a doctor, but I play one on TV."  The court could not help but conclude that these were not real directors but were playing them (when legally necessary).

Appx. 02702
015264

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 55-20   Filed 06/06/25   Page 586 of 1017   PageID 16247
Case 18-30264-sgj11   Doc 3922-5   Filed 11/31/19   Entered 11/01/19 Page 1704   Page 46 of 47

the system works, for the most part and in many business contexts. But not when trying to convince a bankruptcy court of the bona fides of transactions that look like attempts to denude another party of value and/or to thwart creditors. And not when accusations are made that you are the alter ego of the party (Highland) who orchestrated the company's creation. The evidence was overwhelming that: (a) the HCLOF Guernsey Directors do whatever they are told to do by Highland; (b) they do not talk to anyone else but Highland; (c) they have never challenged Highland; (d) they let Highland pick and consult with their lawyers; and (e) they were not made aware by Highland of the Terry Arbitration Award, the Terry Judgment, the involuntary bankruptcy petitions, or pleadings that lawyers filed in the Bankruptcy Cases on HCLOF Guernsey's behalf.

In summary, the testimony of these two HCLOF Guernsey Directors was of little or no value in convincing the court that the Objector, HCLOF Guernsey, has valid concerns of its own (separate from Highland's) with regard to the bona fides of the Plan.

**VII.** **Conclusion**.

This Bench Ruling and Memorandum Opinion is intended to address some of the most pertinent facts and issues raised in connection with confirmation of the Plan. Among other things, the court believed it was necessary to stress, in a separate ruling: (a) *the unique status of the Objectors* (they are "insiders" as defined in the Bankruptcy Code whose prepetition actions suggest unclean hands—this seems highly relevant to consider, when there are no non-insider creditors or other relevant parties objecting to the Plan); (b) *the appropriateness and legality of the proposed Plan Injunction* that would temporarily prevent nonconsensual redemptions/liquidations (it is in all ways justified given the allegations in the Highland Entities Adversary Proceeding and under the traditional four-prong test for preliminary injunctions); and

Appx. 02703
015265

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 45-30    Filed 06/06/25    Page 587 of 1017    PageID 16248
Case 18-30264-sgj11    Doc 3827-55    Filed 01/31/19    Entered 01/31/19 15:14:04    Page 47 of 47

(c) *the feasibility of the Plan* (Mr. Terry and Brigade are well qualified to perform their

contemplated roles).

      The court will separately sign the Findings of Fact, Conclusions of Law and Order

Confirming Plan submitted by the Chapter 11 Trustee to address all other relevant issues.

      **#### End of Bench Ruling and Memorandum Opinion ####**

Appx 02504

015266

**Exhibit C**

**Acis Involuntary Opinion**

Appx. 02705
015267

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 5-20 21 Filed 06/25160 Page 589 of 1017    PageID 16250
Case 18-30264-sgj11-DC39183 Filed 04/13/18   Entered 04/13/18 16:32:58 54 Page 1 of 53



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed April 13, 2018

_____

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **CASE NO. 18-30264-SGJ-7** |
| | § | |
| Alleged Debtor. | § | |

---

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT GP, L.L.C.,** | § | **CASE NO. 18-30265-SGJ-7** |
| | § | |
| | § | |
| Alleged Debtor. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ORDERS FOR RELIEF ISSUED AFTER TRIAL ON CONTESTED INVOLUNTARY BANKRUPTCY PETITIONS

Joshua N. Terry (the "Petitioning Creditor" or "Mr. Terry") filed involuntary bankruptcy

petitions (the "Involuntary Petitions") against each of the two above-referenced related

1

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 5-20    Filed 06/25/60    Page 590 of 1017    PageID 16251
Case 18-3026-sgj11   Doc 3918   Filed 04/13/18   Entered 04/13/18 08:56:54   Page 2 of 53

companies (the "Alleged Debtors") on January 30, 2018.[1]   The Involuntary Petitions were

contested, and the court held a multi-day trial (the "Trial") spanning March 21, 22, 23, 27, and

March 29, 2018.[2]   This constitutes the court's findings of fact, conclusions of law and ruling,

pursuant to Fed. Rs. Bankr. Proc. 7052 and 9014.[3]   As explained below, the court has decided

that Orders for Relief are legally required and appropriate as to each of the Alleged Debtors.

**I.**    **FINDINGS OF FACT**

    **A.**    **Introduction.**

    1.    The Alleged Debtors—Acis Capital Management, L.P. ("Acis LP"), a Delaware

limited partnership, and ACIS Capital Management GP, L.L.C. ("Acis GP/LLC"), a Delaware

limited liability company—are two entities in the mega-organizational structure of a company

that is known as Highland Capital Management, L.P. ("Highland").

    2.    Highland is a Dallas, Texas-based company that is a Registered Investment

Advisor.  Highland was founded in 1993 (changing its original name from "Protective Asset

Management" to Highland in 1997) by James D. Dondero ("Mr. Dondero"), originally with a

---

[1] Exhs. 50 & 51.

[2] Shortly after the Involuntary Petitions were filed, the court held hearings on February 6-7, 2018, on the
Petitioning Creditor's Emergency Motion to Abrogate or Modify 11 U.S.C. § 303(f), Prohibit Transfer of Assets,
and Import, Inter Alia, 11 U.S.C. § 363 [DE # 3] (the "303(f) Motion") and the Alleged Debtors' Emergency Motion
to Seek Emergency Hearing on the Alleged Debtors' Motion to Dismiss Involuntary Petitions and Request for
Award of Fees, Costs, and Damages [DE # 9] (the "Emergency Motion to Set Hearing on Motion to Dismiss").  The
court ultimately granted the 303(f) Motion and denied the Emergency Motion to Set Hearing on Motion to Dismiss.
Both the Petitioning Creditor and the Alleged Debtors have proposed that the court should consider the evidence it
heard at the hearings held on February 6-7, 2018, in determining whether it should enter orders for relief.  The court
has, accordingly, considered such evidence in this ruling.

[3] Bankruptcy subject matter jurisdiction exists in this contested matter, pursuant to 28 U.S.C.
§ 1334(b). This is a core proceeding over which the bankruptcy court may exercise subject matter jurisdiction,
pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O) and the Standing Order of Reference of Bankruptcy Cases and
Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. This bankruptcy court
has Constitutional authority to issue a final order or judgment in this matter, as it arises under a bankruptcy statute—
11 U.S.C. § 303. Venue is proper in this district, pursuant to 28 U.S.C. § 1409(a), as the Alleged Debtors have their
business headquarters in this district.

Appx. 02707
015269

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 21    Filed 05/23/25  Page 591 of 1017    PageID 16252
Case 18-30264-sgj11    Doc 291-3    Filed 04/13/18    Entered 04/13/18 14:54:54  Page 3 of 53

75% ownership interest, and Mark K. Akada ("Mr. Akada"), originally with a 25% ownership interest.[4]

3.      Both Mr. Dondero and Mr. Akada provided witness testimony at the Trial on the Involuntary Petitions, and their names are mentioned numerous times herein—since they were generally the subject of significant evidence and argument presented at the Trial.  Mr. Dondero is the chief executive officer for Highland and Mr. Akada is the chief investment officer.  Mr. Dondero is also the president of each of the two Alleged Debtors.

4.      Highland, through its organizational structure of approximately 2,000 separate business entities, manages approximately $14-$15 billion of investor capital in vehicles ranging from:  collateral loan obligation funds ("CLOs"); private equity funds; and mutual funds.

5.      Highland's CLO business was front-and-center at the Trial on the Involuntary Petitions.  The Alleged Debtor, Acis LP, for approximately the past seven years, has been the vehicle through which Highland's CLO business has been managed.

6.      The Petitioning Creditor, Mr. Terry, became an employee of Highland in the year 2005, starting as a portfolio analyst, promoting to a loan trader, then ultimately becoming the portfolio manager for (and 25% limited partner in) Highland's CLO business—specifically, Mr. Terry was the human being who was acting for the CLO manager, Acis LP.

7.      Mr. Terry was highly successful in his role in the CLO business, managing billions of dollars of assets during his tenure, but Mr. Terry and Mr. Dondero had a bitter parting of ways on June 9, 2016.  Specifically, Mr. Terry's employment was terminated on that date (for

---

[4] Mr. Dondero testified at the Trial that, three years ago, Messrs. Dondero and Akada sold their interests in Highland to a charitable remainder trust in exchange for a 15 year note receivable.

App. 015270

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 55-20 21 Filed 06/06/25 Page 76 of 160   Page 592 of 1017   PageID 16253
Case 18-3026ase g19-12238BSFiledDo4/183/18   Entered 04/13/18 Page 35:5854 Page 4 of 53

reasons that have been highly disputed) and his 25% limited partnership interest in Acis LP was deemed forfeited without any payment of consideration to him.

8.    In September 2016, Highland sued Mr. Terry in the 162nd Judicial District Court of Dallas County, Texas ("State Court 1") for breach of fiduciary duty/self-dealing, disparagement, breach of contract, and various other causes of action and theories.  Mr. Terry asserted his own claims against Highland, and also claims against the two Alleged Debtors, Mr. Dondero, and others and demanded arbitration.  On September 28, 2016, State Court 1 stayed the litigation and ordered the parties to arbitrate.  The parties participated in ten days of arbitration in September 2017 before JAMS.  On October 20, 2017, Mr. Terry obtained an Arbitration Award (herein so called),[5] jointly and severally against both of the Alleged Debtors in the amount of $7,949,749.15, plus post-award interest at the legal rate, which was based on theories of breach of contract and breach of fiduciary duties.

9.    There are still claims pending between and among the Petitioning Creditor, Highland, and others (not including the Alleged Debtors) in State Court 1.

10.    A Final Judgment (herein so called) confirming the Arbitration Award was entered by the 44th Judicial District Court of Dallas County, Texas ("State Court 2") on December 18, 2017, in the same amount as that contained in the Arbitration Award— $7,949,749.15.[6]

11.    Mr. Terry began pursuing post-judgment discovery soon after obtaining his Arbitration Award and even more so after entry of the Final Judgment.  Mr. Terry undertook a UCC search on November 8, 2017, to investigate whether there were any liens on the Alleged

---

[5] Exh. 1.

[6] Exh. 105.

Appx. 02700
015271

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 21 Filed 04/25/160 Page 593 of 1017    PageID 16254
Case 18-30264-sgj11   Doc 239-13 Filed 04/13/18   Entered 04/13/18 16:36:58 Page 5 of 53

Debtors' assets (none appeared).[7]  Mr. Terry also pursued a garnishment of an Acis LP bank

account (at a time when there was only around $2,000 in the account).  Mr. Terry's counsel

deposed Highland's General Counsel Scott Ellington (who sat for the deposition as a

representative of Acis, LP) on January 26, 2018, and asked numerous questions about: (a) how

many creditors the Alleged Debtors had, [8] and (b) whether Acis LP was able to pay its debts as

they became due,[9] but did not receive meaningful answers.

12.     Mr. Terry requested a temporary restraining order ("TRO") from State Court 2, on

January 24, 2018, after discovering certain transactions and transfers involving Acis LP's

interests, that he believed were pursued without any legitimate business purpose and with the

purpose of denuding Acis LP of its assets and to make it judgment proof.  Most particularly, it

appeared as though Highland was engaged in a scheme to transfer certain fee-generating CLO

management contracts of Acis LP away from it and into a Cayman Island affiliate of Highland.[10]

At a January 24, 2018 hearing on the request for a TRO, Acis LP agreed and State Court 2

ordered that, between that hearing and a later hearing on a request for a temporary injunction, no

CLO management contracts would be transferred away from Acis LP and that no monies would

be diverted from it.[11]

13.     Then, on January 29, 2018, the Controller of and CPA for Highland  (David Klos)

submitted a Declaration to State Court 2 concerning the net worth of the Alleged Debtors, stating

---

[7] Exh. 84.

[8] Exh. 25, pp. 7-9.

[9] *Id.* at pp. 102-04.

[10] Exh. 27.

[11] Exh. 28.

Appx. 02710
015272

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 35-20    Filed 05/25/25160  Page 594 of 1017    PageID 16255
Case 18-30264-sgj11  Doc 391-1 Filed 04/13/18    Entered 04/13/18 16:37:58  Page 6 of 53

that Acis GP/LLC had a net worth of $0 and that Acis LP might have a net worth, at best, of $990,141.[12]  Mr. Terry thought this was preposterous—given the management fees that Acis LP was entitled to and the receivables that should be owing to it.  Mr. Terry believes that the collateral management agreements on which Acis LP receives management fees have a present value of $30 million (about $6 million for each of the five CLOs which Acis LP has been managing).

14.    On January 29, 2018, the Alleged Debtors filed a motion for leave to post a supersedeas bond in the amount of **$495,070.50** with State Court 2 (purportedly half of the net worth of the two Alleged Debtors—as stated in the David Klos Declaration), so that they could suspend enforcement of the Final Judgment while they appealed it.[13]  Although there is a very stringent standard for appealing an Arbitration Award, the Alleged Debtors apparently believe they have an argument that State Court 2 lacked the subject matter jurisdiction to confirm the Arbitration Award (a motion to vacate the Final Judgment based on this argument has previously been denied by State Court 2).[14]

15.    Meanwhile, Mr. Terry was learning of more transactions and transfers involving Acis LP's assets and interests.  On January 29, 2018, Mr. Terry filed supplemental pleadings with State Court 2, alleging that further shenanigans (*i.e.,* transfers and transactions that would amount to fraudulent transfers) were underway at Acis LP and seeking a receiver.[15]  Also, at

---

[12] Exh. 26.

[13] Exh. 73.

[14] *See* DE # 35, in Case No. 18-30264 and DE # 34 in Case No. 18-30265.  Unless otherwise noted, references to "DE #" herein refer to the docket entry number at which a pleading appears in the docket maintained with the Bankruptcy Clerk in the Acis Capital Management L.P. bankruptcy case (Case No. 18-30264).

[15] Exhs. 28-31.

App. 015273

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exh-20 21 Filed 06/25/160 Page 595 of 1017    PageID 16256
Case 18-30264-sgj11    Doc 239-13 Filed 04/13/18    Entered 04/13/18 08:55:54 Page 7 of 53

some point, in the weeks leading up to this, an Acis LP lawyer represented to Mr. Terry's

counsel that the Alleged Debtors were "judgment proof."[16]

16.    At approximately 11:57 p.m. on January 30, 2018 (on the evening before a

scheduled temporary injunction hearing in State Court 2—at which time State Court 2

presumably might have considered the Alleged Debtors' request to post the $495,070.50

supersedeas bond to stay enforcement of the Final Judgment), Mr. Terry filed the Involuntary

Petitions, as a sole petitioning creditor, against both Acis LP and Acis GP/LLC.

17.    For purposes of this Trial (and this Trial only), the Alleged Debtors do not dispute

that Mr. Terry has standing to be a petitioning creditor pursuant to Bankruptcy Code section

303(b)—in other words, they do not dispute that Mr. Terry is a holder of a claim against the

Alleged Debtors that is not contingent as to liability or the subject of a bona fide dispute as to

liability or amount and that aggregates at least $15,775 in unsecured amount.  However, the

Alleged Debtors argue that:  (a) the Alleged Debtors have *12 or more creditors* and, thus, three

or more petitioning creditors were required to prosecute the Involuntary Petitions pursuant to

Bankruptcy Code section 303(b)(1); (b) the Petitioning Creditor did not establish, pursuant to

Bankruptcy Code section 303(h)(1), that the Alleged Debtors are not *generally paying their*

*debts as such debts become due* unless such debts are the subject of a bona fide dispute as to

liability or amount; (c) regardless of whether the Petitioning Creditor has met the statutory tests

in sections 303(b)(1) and (h)(1), the Petitioning Creditor has acted in *bad faith*—which serves as

an equitable basis for dismissal of the Involuntary Petitions; and (d) if the court disagrees with

the Alleged Debtors and determines that the section 303(b) and (h) statutory tests are met, and

also determines that the Petitioning Creditor has not acted in bad faith, the court should

---

[16] Exh. 27 (exhibit 3 thereto).

App. 015274

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exh 20    21 Filed 07/06/25    Page 596 of 1017    PageID 16257
Case 18-3026-sgj11  Doc 3913  Filed 04/13/18    Entered 04/13/18 09:5854 Page 8 of 53

nevertheless **abstain** in this matter, pursuant to Bankruptcy Code **section 305**, since this is essentially a two-party dispute and the interests of creditors and the debtor would be better served by dismissal.

18.     The Petitioning Creditor argues that he has met the statutory tests of sections 303(b) and (h) but, even if he has not, there is a **"special circumstances"** exception to the section 303 statutory requirements, whenever a petitioning creditor establishes fraud, trick, scheme, artifice or the like on the part of an alleged debtor—which "special circumstances," Mr. Terry alleges, have been established here.  Moreover, the Petitioning Creditor argues that the facts here **do not warrant section 305 abstention** because the interests of creditors and the Alleged Debtors would not be better served by dismissal.

19.     As further explained below, the court finds and concludes that the Petitioning Creditor has met his burden of proving by a preponderance of the evidence that the statutory tests of sections 303(b) and (h) are met here.  Thus, the court does not need to reach the question of whether there is a **"special circumstances"** exception to the section 303 statutory requirements, whenever a petitioning creditor establishes fraud, trick, scheme, artifice or the like on the part of an alleged debtor, and—if so—whether the exception is applicable here.[17]

20.     Moreover, the Alleged Debtors have not shown by a preponderance of the evidence that the Petitioning Creditor acted in bad faith, such that the Involuntary Petitions should be dismissed.

---

[17] *See e.g., In re Norriss Bros. Lumber Co.*, 133 B.R. 599 (Bankr. N.D. Tex. 1991); *In re Moss*, 249 B.R. 411 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222 (Bankr. N.D. Tex. 2009).

App. 015275

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-20   Filed 06/05/160   Page 597 of 1017   PageID 16258
Case 18-30264-sgj11   Doc 891-13   Filed 04/18/18   Entered 04/18/18   Page 9 of 53

21.     Finally, the Alleged Debtors also have **not shown facts here that warrant section 305 abstention** because they have not shown that the interests of creditors and the Alleged Debtors would be better served by dismissal.

> **B.     The CLO Business:  Understanding the Alleged Debtors' Business Operations, Structure, and What Creditors and Interest Holders They Actually Have.**

22.     Highland set up its first CLO in the year 1996.  Highland was one of the early participants in the CLO industry.

23.     The Alleged Debtors were formed in 2011 to be the new "brand" or face of the Highland CLO business, after Highland's name had suffered some negative publicity in the marketplace.

24.     Acis LP has acted as the portfolio manager of Highland's CLOs since 2011.  Acis LP currently has a contractual right to CLO portfolio management fees on five CLOs[18] which were referred to at the Trial as CLO 2013-1; CLO 2014-3; CLO 2014-4; CLO 2014-5; and CLO 2016-6.  CLOs typically have an 8-12 year life.  Thus, there are still several years of life left on these CLOs (since the oldest one was established in the year 2013).

25.     The key "players" in and features with regard to the Highland CLOs, during the time period relevant to the issues adjudicated at the Trial, have been:

(a)     The CLO manager.  As mentioned earlier, the CLO manager is the Alleged Debtor, Acis LP.  Acis LP, has collateral management agreements (hereinafter, the "CLO Collateral Management Agreements") with the CLOs (which CLOs were set up as special purpose entities) and, pursuant thereto, receives

---

[18] There is still another Highland CLO (CLO 2017-7, set up in April 2017, as to which Acis LP's contractual right to manage was terminated shortly before the Petition Date, as will be further described herein.

App. 015276

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-30   Exhibit 21   Page 76 of 160   Page 598 of 1017   PageID 16259
Case 18-30264-sgj11   Doc 13913-5   Filed 04/13/18   Entered 04/13/18 21:34:53   Page 10 of 53

management fees[19] from the CLOs in exchange for managing the pool of assets within the CLOs and communicating with investors in the CLOs.[20]  As mentioned earlier, Mr. Terry was the human being that performed the management function at Acis LP until Highland fired him on June 9, 2016 and also terminated his limited partnership interest in Acis LP.  Mr. Terry, and all employees who have ever provided services to the CLO manager, are Highland employees—which were provided to Acis LP through shared and sub-advisory services agreements— as further explained below.  Thus, to be clear, Acis LP has always essentially subcontracted its CLO managerial function out to Highland.

(b)    <u>The pool of assets.</u> Within each CLO that the CLO manager manages is a basket of loans that the CLO manager purchases.  The basket of loans typically consists of approximately 200 loans-payable (or portions of loans payable), on which large well-known companies typically are the makers/obligors (and which loans, collectively, provide a variable rate of interest).[21]  The CLO manager can typically decide to buy and sell different loans to go into the pool of assets, with certain restrictions, during a four or five year reinvestment time period.

---

[19] These fees typically include "senior fees" (*e.g.,* 15 basis points); additional "subordinate fees" (*e.g.,* 25 basis points) if the CLOs are passing certain tests; and perhaps even an "incentive fee" beyond a certain hurdle rate (*e.g.,* after the equity in the CLO received an internal rate of return of 10%, the CLO manager would get 15% of the excess).  Exh. 82, p. 59, lines 14-25.

[20] *See,* as an example, Exh. 3 (the collateral management agreement between Acis LP and CLO 2014-3). Note that the document is entitled "Portfolio Management Agreement" but, to avoid confusion with other similarly titled documents and to highlight the true nature of the agreement, the court uses the defined term "CLO Collateral Management Agreement," which terminology the lawyers also sometimes used at the Trial.

[21] Exh. 8.

Appx. 02715
015277

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-30   Filed 06/06/25   Page 599 of 1017   PageID 16260
Exhibit 21   Page 86 of 160   PageID 16260
Case 18-30264-sgj11   Doc 1389-53   Filed 04/13/18   Entered 04/13/18 16:34:50   Page 11 of 53

(c)    The CLO investors (*i.e.,* CLO note holders).  These may be any number of
persons or entities, including pension funds, life insurance companies, or others
who decide to invest in the CLOs and contribute capital to fund the purchase of a
CLO's loan pool, and, in return, receive fixed rate notes payable—the ratings on
which can range anywhere from Triple-A to Single-B, depending upon the risk
option the investor chooses.  There are typically five or six traunches of notes
issued by the CLO (with the top AAA-rated traunche being the least risky and the
bottom traunche being the most risky) and—to be clear—the CLO itself (again, in
each case, the CLO is a special purpose vehicle) is the obligor.  As the CLO
manager receives income from the pool of loans in the CLO, he distributes that
income to the CLO investors, in accordance with their note indentures,[22] starting
with the top traunche of notes and then down to the other traunches.  The top
traunche of notes (AAA-rated) is considered the "controlling" class and a
majority of holders in this class can terminate the CLO manager (*i.e.,* Acis LP) for
cause on 45 days' notice, although all parties seem to agree this would be a rare
event.

(d)    The CLO equity holder.  The CLO equity holder actually is a holder of
subordinated notes issued by the CLOs (*i.e.,* the bottom traunche of notes on
which the CLO special purpose entity is obligated), and has voting rights and is
itself a capital provider, but it takes the most risk and receives the very last cash

---

[22] The indenture trustee on the CLO notes may actually operate as a payment agent in some cases, for
purposes of making the quarterly note payments to holders.

App. 015278

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 5-30    21 Filed 05/25/160    Page 600 of 1017    PageID 16261
Case 18-30264-sgj11  Doc 1339-1 Filed 04/13/18   Entered 04/13/18  Page 12 of 53

flow from the CLOs.  It, in certain ways, controls the CLO vehicle[23]—for
example, by virtue of having the ability to make a redemption call after a certain
"no-call" period—which would force a liquidation of the basket of loans in the
CLO, with the proceeds paying down the traunches of notes, starting at the top
with the Triple A's).  Note that, until recently, a separate entity known as Acis
Loan Funding, Ltd. ("ALF"), which was incorporated under the laws of the island
nation of Guernsey,[24] was the CLO equity holder.  To be clear, *ALF was
essentially the equity owner in the CLO special purpose entities—not the equity
owner of Acis LP*.  Acis LP was a party to a separate portfolio management
agreement with ALF (hereinafter, the "ALF Portfolio Management Agreement"—
not to be confused with the CLO Collateral Management Agreements that Acis
LP separately has with the special purpose CLOs).  No fees were paid from ALF
to Acis LP pursuant to the ALF Portfolio Management Agreement (rather, fees
are only paid to Acis LP on the CLO Collateral Management Agreements).  The
complicated structure of the CLO business—all parties seemed to agree—has
been developed, among other reasons, to comply with "risk-retention
requirements" imposed by the U.S. Congress's massive Dodd-Frank financial
reform legislation[25] enacted in year 2010, in response to the financial crisis and
recession that first began in 2008.

---

[23] The top tranche of AAA notes also has certain control—such as the ability to terminate the portfolio manager for cause, on notice.

[24] Guernsey is located in the English Channel.  ALF was created in August 2015.

[25] Simply put, one of the results of the Dodd-Frank legislation (*i.e.*, the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, H.R. 4173, 124 Stat. 1376-2223, 111th Congress, effective July 21, 2010), which was implemented over a period of several years, was that, *subsequent to December 2016*, managers of securitizations needed to retain at least a 5% interest in that securitization.  Thus, if a $400 million CLO were to be

App. 015279

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-20   Filed 03/05/... Page 601 of 1017   PageID 16262
Case 18-3026... Case 19-12339... Filed 04/13/18   Entered 04/13/18 ... Page 34 of 5... Page 13 of 53

(e)    The Equity Owners of ALF.  Until recently (*i.e.,* until October 24, 2017—four

days after the Arbitration Award), Acis LP itself, as required for a CLO manager,

had a 15% indirect ownership in ALF, in order to be regulatory compliant.[26]  The

parties sometimes refer to ALF (and the web of ownership between it and Acis

LP) as the "risk retention structure."[27]  The evidence at the Trial revealed that

ALF (which has recently been renamed), now, has three equity owners:  (i) a 49%

equity owner that is a charitable fund (*i.e.,* a donor advised fund or "DAF") that

was seeded with contributions from Highland, is managed/advised by Highland,

and whose independent trustee is a long-time friend of Highland's chief executive

officer, Mr. Dondero; (ii) 2% is owned by Highland employees; and (iii) finally,

ALF *may* be 49% owned by a third-party institutional investor based in Boston

that Highland believed it was required to keep anonymous at the Trial.  Not only

is the court unaware of who this independent third-party is, but the evidence

seems to suggest that it may have acquired its interest fairly recently or may have

simply committed to invest recently.[28]

---

issued, the CLO manager would need to retain at least 5% or $20 million of the assets in the CLO (which 5% could
be either all at the equity level or vertically, up and down the note traunches).  There are multiple ways to
accomplish this 5% retention (*i.e.,* with either the CLO manager directly investing in at least 5% of the CLO or
doing it through a controlled subsidiary).  This particular rule was announced in *December 2014* and the SEC
thereafter issued a no action letter stating that *if a CLO was issued prior to December 2014*, then any refinancing of
such CLO that happens within four years can be done without risk retention in place.  Resets of any CLO (*i.e.,*
changes in terms and maturity—as opposed to mere changes in interest rates), on the other hand, must have risk
retention in place.  *Four of Acis LP's current CLOs were issued prior to December 2014*.  Thus, these four CLOs
are still technically able to do a refinancing without a risk retention structure in place.  In any event, by early-to-
middle 2017, Acis LP was risk retention compliant.  Exh. 82, pp. 65-69 & 75.  That was recently changed—on
October 24, 2017—four days after the Arbitration Award—as later explained herein.

[26] *See* n.23, *supra*.

[27] *See* Demonstrative Aid No. 3.

[28] *See* Exh. 173, which seems to suggest that the only equity owners of ALF just prior to October 24, 2017
were Acis LP and the DAF, until Acis LP's interest in ALF was sold back to ALF on October 24, 2017.  *See also*
Exh. 82, p. 162, lines 2-7.

App. 02718
015280

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exh 20 21 Filed 08/25160 Page 602 of 1017   PageID 16263
Case 18-30264-sgj11   Doc 339 3 Filed 04/13/18   Entered 04/13/18 Page 458 of 5 Page 14 of 53

(f)   <u>The underwriter for the CLO notes.</u>  As with any publicly traded notes, there is an underwriter for the CLO notes which solicits investors for the CLO notes (examples given at the Trial:  Mizuho Securities USA, LLC; Merrill Lynch; JP Morgan Chase).[29]  The CLO notes are traded on the Over-the-Counter Market.

(g)   <u>The independent indenture trustee for the CLO notes.</u>  As also with any issuance of publicly traded notes, there is an indenture trustee (example given at the Trial: U.S. Bank).[30]

26.   Mr. Terry, the Petitioning Creditor, as earlier mentioned, began working for Highland in 2005 until his employment was terminated on June 9, 2016.

27.   Acis LP and Acis GP/LLC have never had any employees.  Rather, all employees that work for any of the Highland family of companies (including Mr. Terry) have, almost without exception, been employees of Highland itself.  Highland has approximately 150 employees in the United States.  Highland provides employees to entities in the organizational structure, such as Acis LP and Acis GP/LLC, through both the mechanism of:  (a) a Shared Services Agreement (herein so called),[31] which provides "back office" personnel—such as human resources, accounting, legal and information technology to the Highland family of companies; and (b) a Sub-Advisory Agreement (herein so called),[32] which provides "front office" personnel to entities—such as the managers of investments like Mr. Terry.  The evidence indicated that this is typical in the CLO industry to have such agreements.  The court notes that

---

[29] *See* Exh. 193.

[30] *See* Exh. 7.

[31] Exhs. 17, 99, 179 & 5.

[32] Exhs. 18, 178 & 4.

App. 02719
015281

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exh-21   Filed 04/25/160   Page 603 of 1017   PageID 16264
Case 18-30264-sgj11   Doc 133-1   Filed 04/13/18   Entered 04/13/18   Page 3450 of 5   Page 15 of 53

all iterations of the Shared Services Agreements and Sub-Advisory Agreements between Acis LP
and Highland were signed by Mr. Dondero both as President of Acis LP and as President of the
General Partner of Highland.

28.     Because Acis LP essentially subcontracts out all of its functions to Highland
pursuant to the Shared Services Agreement and the Sub-Advisory Agreement, Acis LP has very
few vendors or creditors.  Rather Highland incurs expenses and essentially bills them to Acis LP
through these two agreements.[33]  In other words, Highland is one of Acis LP's largest and most
frequent creditor.

29.     The evidence reflected that at all times Mr. Dondero has been the President of
both of the Alleged Debtors, and there have been, at all times, very few, if any, other officers. It
appears that the only other officer of Acis GP/LLC that ever existed was Frank Waterhouse,
Treasurer.[34]  It also appears that the only other officer of Acis LP that ever existed was Frank
Waterhouse, Treasurer, Mr. Terry as Portfolio Manager, and someone named Patrick Boyce as
Secretary at one time.[35]

30.     Mr. Dondero testified that he has decision making authority for the Alleged
Debtors but usually delegates that authority to Highland's in-house lawyers, Scott Ellington
(General Counsel, Chief Legal Officer, and Partner of Highland) and Isaac Leventon (Assistant
General Counsel of Highland) and is rarely involved in "nitty gritty negotiations."   Sometimes
instructions will come to him from the compliance group headed up by Chief Compliance
Officer Thomas Surgent.  Additionally, he testified that he signs hundreds of documents per

---

[33] Exh. 83, pp. 228 (line 8)-230 (line 14).

[34] *See, e.g.*, Exh. 10 & Exh. 173, p.3

[35] Exhs. 14 & 15.

App. 02520
015282

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 85-20  21 Filed 04/25/25160  Page 604 of 1017   PageID 16265
Case 18-30264-sgj11  Doc 1311-35Filed 04/13/18  Entered 11/04/19/18 Page 3476 of 5Page 16 of 53

week, and much of what he signs is on advice of counsel and he sometimes even delegates to his

assistant the authority to sign his name.  As set forth above, Mr. Ellington (who **did not** testify at

the Trial)[36] and Mr. Leventon (who **did** testify at the Trial) are not officers, directors, or

employees of the Alleged Debtors.  Mr. Leventon is designated to be the representative for the

Alleged Debtors (and testified as a Rule 30(b)(6) witness during pre-Trial discovery)—he

explained that this representative-authority derives from the Shared Services Agreement.  Mr.

Leventon testified that he takes his instructions generally through his direct supervisor, Mr.

Ellington, although Highland partners can ask him to perform legal services for any of

Highland's 2,000 entities.

      C.      **Transfers and Transactions Involving the Alleged Debtors Since the
Litigation with Mr. Terry Commenced—and Especially After the
Arbitration Award.**

     31.     Below is a listing of some (but not necessarily all) of the transfers and

transactions that the Alleged Debtors, Highland, and related parties undertook **after** the litigation

with Mr. Terry commenced.

     (a)     <u>Acis LP's Sale to Highland of a "Participation Interest" in its CLO Cash Flow
Stream.</u>  On October 7, 2016 (approximately one month after the litigation arose

among Mr. Terry, Highland, and the Alleged Debtors), Acis LP sold to Highland

a participation interest in its expected future cash flow from the CLO Collateral

Management Agreements—specifically, it sold a portion of the cash flow it

expected to earn from November 2016 to August 2019 (not the full life of the

CLOs), for $666,655 cash, plus a $12,666,446 note payable from Highland to

---

[36] Mr. Ellington did testify at a hearing in the bankruptcy court on February 6, 2018—which the parties
asked this court to take judicial notice of—and also provided deposition testimony that was submitted into evidence.
*See* Exh. 25.

App. 02721
015283

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 45-20  21  Filed 06/25/160   Page 605 of 1017    PageID 16266
Case 18-30264-sgj11  Case 19-12339-BLS  Filed 11/13/13  Doc 3613  Entered 11/04/19/18  Page 345 of 53  Page 17 of 53

Acis LP (hereinafter, the "Acis LP Note Receivable from Highland"). Mr.
Dondero signed the purchase and sale agreement for both purchaser and seller.[37]
Mr. Dondero signed the Acis LP Note Receivable from Highland, which accrued
interest at 3% per annum. It appears that the $666,665 cash down payment was
actually paid, and a payment required on the Acis LP Note Receivable from
Highland of $3,370,694 on May 31, 2017, was actually made. The Acis LP Note
Receivable from Highland was payable in three installments, with a $5,286,243
payment required on May 31, 2018, and a $4,677,690 payment required on May
31, 2019. When viewed in complete isolation, this transaction does not
necessarily appear problematic. Although there was evidence that Acis LP had
been managing the five CLOs for about $10 million per year of fees, some of the
recitals in the purchase and sale agreement suggest that there may have been a
sound business reason for the transaction and the arbitration panel,[38] viewing this
transaction in isolation, did not think it was necessarily problematic or actionable.
In any event, Highland is adamant it was a net neutral transaction.

(b)     Transfer of Acis LP's interest in ALF. Recall that ALF was the entity that held
equity (*i.e.,* the subordinated notes) in the CLO special purpose vehicles, and held
voting rights and was a capital provider to the overall risk retention structure
supporting the CLOs. And Acis LP, in turn, held a 15% indirect interest in ALF.
On October 24, 2017 (***four days after the Arbitration Award***), Acis, LP entered
into an agreement with ALF whereby ALF acquired back the shares that Acis LP

---

[37] Exhs. 14 & 15.

[38] Exh. 1, p. 18.

App. 02722
015284

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exh-20    21 Filed 10/87/25160  Page 606 of 1017    PageID 16267
Case 18-3026 Case 19-12239 CSS Filed 04/13/18 Filed 11/01/18 Page 34 of 53 Page 18 of 53

indirectly held in ALF (966,679 shares) for the sum of $991,180.13.[39]  No

credible business justification was offered for this transaction, other than mostly

uncorroborated (and self-serving) statements from Highland witnesses that Acis

LP was "toxic" in the market place (due to the litigation with Mr. Terry) and this

was a step in the process of extricating Acis LP from the CLO business.[40]  The

court finds the testimony about Acis LP's toxicity in the marketplace to not be

credible or at all convincing.  For one thing, a new CLO (Acis CLO 2017-7, Ltd.)

was closed on April 10, 2017 with Acis LP as the portfolio manager.  Moreover,

Acis LP subcontracts all of its CLO management function to Highland—and there

was no evidence to suggest that anyone in the marketplace at this juncture

differentiates between Acis LP (whose president is Mr. Dondero) and Highland

(whose president is Mr. Dondero).  *In any event, the October 24, 2017*

*transaction had the highly consequential effect of making Acis LP*

*"noncompliant" or unable to continue serving as a CLO manager for*

*regulatory purposes for any new CLOs or reset CLOs (or for a refinancing of*

*any of the Highland CLOs that had been created after December 2014)[41]*

*because aspects of the federal Dodd Frank legislation require CLO managers to*

*have "skin in the game" with regard to the CLOs they manage (i.e., they must*

*retain at least 5% of CLOs they manage).*  Mr. Akada, who testified that he had

been involved with the CLO business from the beginning and that the CLO team

---

[39] Exh. 173.

[40] There were also a few hearsay-laden emails offered, that the court did not find probative.  Exhs, 19-22.

[41] *See* n.23 *supra.*

App. 02528
015285

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exh 21 Filed 06/86/25160    Page 607 of 1017    PageID 16268
Case 18-30264-sgj11  Doc 1316-3 Filed 04/13/18    Entered 04/13/18 Page 19 of 53

reported to him (including Mr. Terry before his termination), testified that he had

no knowledge of this particular transaction.  The document effectuating this

transaction was signed by Frank Waterhouse, Treasurer for and on behalf of Acis

LP, acting by its general partner, Acis GP/LLC.[42]

(c)     ALF Next Decides to Jettison Acis, LP as its Portfolio Manager and Replace it
        with a new Highland Cayman Island Entity.  On October 27, 2017 (seven days

        after the Arbitration Award), ALF—having purchased back the ownership interest

        that Acis LP had in it, just three days earlier—decided that it would no longer use

        Acis LP as its portfolio manager and entered into a new portfolio management

        agreement to supersede and replace the ALF Portfolio Management Agreement.

        Specifically, on October 27, 2017, ALF entered into a new Portfolio Management

        Agreement with a Cayman Island entity called Highland HCF Advisor, Ltd.,

        replacing Acis LP in its role with ALF.[43]  This agreement appears to have been

        further solidified in a second portfolio management agreement dated November

        15, 2017.[44]

(d)     The Acis LP Note Receivable from Highland is Transferred from Acis LP to Yet
        Another Highland Cayman Island Entity.  On November 3, 2017 (10 days after

        the Arbitration Award), Acis LP assigned and transferred its interests in the Acis

        LP Note Receivable from Highland—which at that point had a balance owing of

        over $9.5 million—to a Highland Cayman Island entity known as Highland CLO

---

[42] Exh. 173, p. 3.

[43] Exh. 43.

[44] Exh. 168.

Appx. 02724
015286

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exh 20   Page 86/25160   Page 608 of 1017   PageID 16269
Case 18-30264-sgj11   Doc 1363   Filed 04/13/18   Entered 04/13/18   Page 20 of 53   Page 20 of 53

Management Ltd. which apparently was created sometime recently to be the new
collateral manager of the CLOs (in other words, the new Acis LP).[45]   The
Assignment and Transfer Agreement memorializing this transaction is signed by
Mr. Dondero for Acis LP and Mr. Dondero for Highland and some
undecipherable name for Highland CLO Management Ltd.[46]   The document
recites that (i) Highland is no longer willing to continue providing support
services to Acis LP, (ii) Acis LP, therefore, can no longer fulfill its duties as a
collateral manager, and (iii) Highland CLO Management Ltd. agrees to step into
the collateral manager role if Acis LP will assign to it the Acis LP Note
Receivable from Highland.   One more thing:  since Acis LP was expected to
potentially incur future legal and accounting/administrative fees, and might not
have the ability to pay them when due, ***Highland CLO Management Ltd.*** agreed
to reimburse Acis LP (or pays its vendors directly) up to $2 million of future legal
expenses and up to $1 million of future accounting/administrative expenses.[47]

(e)   <u>Various Additional Transactions that further Transitioned CLO Management and
Fees Away from Acis LP to Highland Cayman Island Entity.</u>  On December 19,
2017—just one day after the Arbitration Award was confirmed with the entry of
the Final Judgment—the vehicle that can most easily be described as the Acis LP
"risk retention structure" (necessitated by federal Dodd Frank law) was
transferred away from Acis LP and into the ownership of Highland CLO

---

[45] Exh. 16.

[46] *Id.* at p.6.

[47] *Id.* at pp. 1 & 2.

Appx. 02725
015287

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exh 20 21 Filed 10/31/22 06/25/160 Page 609 of 1017    PageID 16270
Case 18-30264-sgj11    Doc 1335 13    Filed 04/13/18 04/13/18    Page 21 25 of 57 53    Page 21 of 53

Holdings, Ltd. (yet another Cayman Island entity, incorporated on October 27, 2017[48]).

(f)    In addition to transferring Acis LP's interest in the Acis LP risk retention structure on December 19, 2017, Acis LP also transferred its contractual right to receive management fees for Acis CLO 2017-7, Ltd. (which had just closed April 10, 2017), which Mr. Terry credibly testified had a combined value of $5 million, to Highland CLO Holdings, Ltd., another Cayman entity, purportedly in exchange for forgiveness of a $2.8 million receivable that was owed to Highland under the most recent iteration of the Shared Services Agreement and Sub-Advisory Agreement for CLO-7.[49]    In conjunction with this transfer, Highland CLO Holdings, Ltd. then entered into new Shared Services and Sub-Advisory Agreements with Highland.[50]

(g)    <u>Change of Equity Owners of the Alleged Debtors</u>.  When Acis LP was first formed, it was owned by one general partner (Acis GP/LLC, with a .1% interest) and it had three limited partners:  (a) Dugaboy Investment Trust (a Dondero family trust of which either Mr. Dondero or his sister, Nancy Dondero, have been the Trustee at all relevant times) with a 59.9% interest; (b) Mr. Terry with a 25% interest; and (c) Mr. Akada with a 15% interest.   When Acis GP/LLC was formed

---

[48] Exh. 157.

[49] *See* Ex. 45 (the Transfer Document); *see also* Exh. 4 (the March 17, 2017 Third Amended and Restated Sub-Advisory Agreement between Acis LP and Highland); Exh. 5 (the March 17, 2017 4th Amended & Restated Shared Services Agreement between Acis LP and Highland); Exh. 165 (March 17, 2017 Staff and Services Agreement between Acis CLO Management, LLC and Acis LP); Exh. 166 (March 17, 2017 Master Sub-Advisory Agreement between Acis CLO Management, LLC and Acis LP).

[50] *See* Exhs. 161 & 162.

Appx. 02726
015288

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-20   Filed 09/05/25   Page 610 of 1017   PageID 16271
Case 18-30264-sgj11   Doc 1183-11   Filed 11/04/19   Entered 11/04/19 15:34:50   Page 22 of 53

(*i.e.,* the .1% owner of Acis LP), its sole member was the Dugaboy Investment

Trust.   After Mr. Terry was terminated by Highland, his 25% limited partnership

interest in Acis LP was forfeited and divided among the two remaining limited

partners: Mr. Akada (increasing his interest by 10% up to 25%), and Dugaboy

Investment Trust (increasing its interest by 15% up to 74.9%).  But, more

importantly, on the day after entry of Mr. Terry's Final Judgment (*i.e.,* on

December 18, 2017), both Mr. Akada and Dugaboy Investment Trust conveyed

their entire limited partnership interests in Acis LP—25% and 74.9%,

respectively—to a Cayman Island entity called Neutra, Ltd., a Cayman Islands

exempted company.   Dugaboy Investment Trust also conveyed its 100%

membership interest in Acis GP/LLC to Neutra, Ltd.  Mr. Akada testified that he

did this on advice of counsel.  He also did not dispute that he had made millions

of dollars of equity dividends from his equity investment in Acis LP in recent

years[51]—which he conveyed away for no consideration on December 18, 2017.

(h)     <u>The Intended Reset of Acis CLO 2014-3.</u>  With all of the above maneuverings

having been accomplished, Highland was posed to do a reset on Acis CLO 2014-3

in February 2018 (until Mr. Terry filed the Involuntary Petitions).  The investment

bank Mizuho Securities USA, LLC was engaged November 15, 2017[52] and a final

offering circular was issued in January 2018[53]—contemplating a reset of Acis

CLO 20-14-3 with the recently created Highland CLO Management Ltd.

---

[51] Exh. 23, p.3.

[52] Exh. 104.

[53] Exh. 31.

App. 02727
015289

Case 19-34054-sgj11 Doc 3596-21 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-20 Exhibit 21 Filed 06/02/25 Page 611 of 1017 PageID 16272
Case 18-30264-sgj11 Doc 138-13 Filed 04/19/18 Entered 04/19/18 Page 23 of 53 Page 23 of 53

Identified as the new portfolio manager, rather than Acis LP. The act of implementing a reset on the CLO was not in itself suspect. However, the reset would, of course, have the effect of depriving Acis LP from a valuable asset—an agreement that could realistically be expected to provide millions of dollars of future collateral management fees—coincidentally (or not) just after Mr. Terry obtained his large judgment.

**D.     Findings Regarding Credibility of Witnesses.**

32.     The court found the testimony of Mr. Terry to be very credible. He was very familiar with the financial condition of the Alleged Debtors, since he presided over the business of the Alleged Debtors from their inception until June 9, 2016, and has also closely followed publicly available information regarding the companies since his termination. Mr. Terry credibly testified that the Alleged Debtors have never had a significant number of creditors, since most of the Alleged Debtors' vendors are engaged by and send their invoices to Highland, and Highland simply obtains reimbursement from the Alleged Debtors (and other entities in the Highland family), as its in-house lawyers determine is appropriate, through the Shared Services Agreement and Sub-Advisory Agreement. Thus, Highland should at all times be the Alleged Debtors' main creditor. The court finds that Mr. Terry had a good faith belief that the Alleged Debtors had only a handful of creditors (maybe four or so) besides him and Highland. The court also finds that Mr. Terry—at the time he filed the Involuntary Petitions—had a good faith belief that the Alleged Debtors and those controlling them were engaged in an orchestrated, sophisticated effort to denude the Alleged Debtors of their assets and value (*i.e.*, transferring assets and rights for

Appx. 02728
015290

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exh-20 21 Filed 09/05/60  Page 612 of 1017    PageID 16273
Case 18-30264-sgj11  Doc 339-13  Filed 04/13/18    Entered 04/13/18 Page 3 of 5  Page 24 of 53

less than reasonably equivalent value), which started with intensity after issuance of the
Arbitration Award (if not sooner).[54]

      33.     The court found the testimony of almost all of the witnesses for the Alleged
Debtors to be of questionable reliability and, oftentimes, there seemed to be an effort to convey
plausible deniability.  For example, sometimes business decisions concerning the Alleged
Debtors were said to have been made by a "collective," and other times the in-house Highland
lawyers (who, of course, are not themselves officers or employees of Acis LP and Acis GP/LLC)
stressed that Mr. Dondero (the president and manager of the two entities) had ultimate decision
making authority for them.  Meanwhile, Mr. Dondero testified that, while he has decision
making authority at Acis LP, he usually delegates to Highland's in-house lawyers Scott Ellington
and Isaac Leventon.   He testified that he signs hundreds of documents per week and often must
rely on information of others when signing.  Additionally, Mr. Dondero (again, the President of
each of the Alleged Debtors) testified that he had never even read the Arbitration Award.  While
Mr. Dondero is the chief executive of a multi-billion dollar international investment company,
and naturally has widespread responsibilities and must delegate to and rely upon others including
lawyers, this court simply does not believe that he never read the Arbitration Award.  The court
perceived the animosity between Mr. Dondero and Mr. Terry to be rather enormous and Mr.
Dondero even testified (as did others) that the litigation with Mr. Terry was hurting Acis LP and
Highland in the CLO marketplace (*i.e.,* no investors or underwriters wanting to be associated

---

[54] The court also found that the deposition testimony of Brian Shaw and Rahkee Patel (counsel for Mr.
Terry) was also credible and did not demonstrate any bad faith on their parts in filing the Involuntary Petitions on
behalf of Mr. Terry.

Appx. 02529
015291

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 21 Filed 09/06/25160    Page 613 of 1017    PageID 16274
Case 18-30264-sgj11    Doc 133-3    Filed 11/04/19    Page 25 of 53

with the Acis brand).[55]  If that were the case, it strains credulity to suggest Mr. Dondero never

even read the Arbitration Award.

34.    As mentioned earlier, in December 2017, Acis GP/LLC became 100% owned by

a Cayman Island entity known as Neutra, Ltd. (whose beneficial owner is a Dondero family

trust) and Acis LP became 99.9% owned by Neutra, Ltd.  The directors of Acis GP/LLC and

Acis LP are provided to it now by an entity known as "Maples Fiduciary Services"—another

Cayman Island entity, but the Highland Assistant General Counsel could not remember the

names of those directors provided to Acis GP/LLC and Acis LP, except for perhaps one.  Mr.

Dondero, when questioned about some of the recent transactions pertaining to Acis LP, testified

that there were tax reasons—tax lawyers recommended the recent transactions and transfers.  No

tax lawyers testified.  Mr. Dondero also testified that certain transactions were at the directive of

the Thomas Surgent group (the Highland chief compliance officer).  Neither Mr. Surgent nor

anyone else from the compliance group testified.

35.    Meanwhile, Mr. Akada, who, while testifying, seemed like a generally lovely

person and seemed as knowledgeable as a human being could possibly be on the topic of CLOs

generally, had no idea if he was an officer or director of the Alleged Debtors, nor did he know

whom its officers were.  He could not testify as to the meaning of certain transactions in which

Acis LP had engaged in during recent weeks and said that he signed certain documents on advice

of counsel.  He also could not even testify as to whether Highland was opposing the Involuntary

Petitions.

36.    Again, there was a lot of plausible deniability at Trial as to the "whos" and

"whys" for the recent maneuverings involving the Alleged Debtors assets and rights in the weeks

---

[55] No such investors or underwriters provided testimony.

Appx. 02730
015292

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 35-20   Filed 06/25/25   Page 614 of 1017    PageID 16275
Case 18-30264-sgj11  Doc 133  Filed 04/13/18   Entered 04/13/18 Page 26 of 53

since the Arbitration Award.  The one thing that the court was wholly convinced of was that

conflicts of interest among Highland and the Alleged Debtors abound, and no one is looking out

for the interests of the Alleged Debtors as a fiduciary should.

### E.    Evidence Regarding the Number of Creditors of the Alleged Debtors.[56]

37.    The Alleged Debtors do not dispute Mr. Terry's claim for the purposes of

counting creditors under section 303(b) of the Bankruptcy Code.  However, Mr. Terry asserts

that the Alleged Debtors have fewer than 12 creditors, and the Alleged Debtors dispute this fact.

Specifically, the Alleged Debtors initially filed on January 31, 2018, a Notice of List of Creditors

Pursuant to Fed. R. Bankr. P. 1003(b) signed by Mr. Dondero listing 18 creditors (the "Original

Notice of Creditors").[57]  The Alleged Debtors subsequently filed on February 5, 2018, a First

Amended Notice of List of Creditors Pursuant to Fed. R. Bankr. P. 1003(b) signed by Mr.

Leventon listing 19 creditors (the "First Amended Notice of Creditors").[58]  Finally, the Alleged

Debtors filed on March 6, 2018, a Second Amended Notice of List of Creditors Pursuant to Fed.

R. Bank. P. 1003(b) signed by Mr. Leventon listing 20 creditors (the "Second Amended List of

Creditors").[59]  The following chart summarizes the name, amount, and nature of the 20 creditors

listed by the Alleged Debtors in their Second Amended List of Creditors.

---

[56] The court notes that neither Mr. Terry nor the Alleged Debtors attempted to differentiate between the
creditors of Acis GP/LLC versus the creditors of Acis LP, but rather presented evidence regarding the collective
number of creditors for both of the Alleged Debtors.  This seems legally appropriate, since Acis LP is the entity that
incurred most of the debt, and ACIS GP/LLC would be liable on such debt as the general partner of Acis LP.

[57] *See* DE # 7 in Case No. 18-30264 & DE # 7 in Case No. 18-30265.

[58] *See* DE # 17 in Case No. 18-30264 & DE # 16 in Case No. 18-30265.

[59] *See* DE # 39 in Case No. 18-30264 & DE # 38 in Case No. 18-30265.

App. 015293

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-30 21   Filed 06/25/160   Page 615 of 1017   PageID 16276
Case 18-30264-sgj11   Doc 3918-5   Filed 04/13/18   Entered 04/13/18 Page 258 of 54   Page 27 of 53

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness[60] |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| 2 | Case Anywhere, LLC | Law Firm Vendor | $417.20 |
| 3 | CSI Global Deposition Services | Law Firm Vendor | $38,452.56 |
| 4 | David Langford | Court Reporter/Law Firm Vendor | $550 |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| 6 | Elite Document Technology | Data Hosting/Law Firm Vendor | $199.72 |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| 8 | Highland Capital Management, L.P. | Advisory and Participation Fees | $2,770,731.00 |
| 9 | JAMS, Inc. | Law Firm Vendor | $1,352.27 |
| 10 | Jones Day | Legal Fees | $368.75 |
| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |
| 16 | Stanton Advisors LLC | Testifying Expert Fees/Law Firm Vendor | $10,000 |
| 17 | Stanton Law Firm | Legal Fees | $88,133.99 |
| 18 | The TASA Group. Inc. | Testifying Expert Fees/Law Firm Vendor | $14,530.54 |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

38.     First, the court believes it necessary to remove certain insider creditor claims,

which are required not to be counted pursuant to section 303(b)(2) of the Bankruptcy Code.[61]

This would clearly include Highland (the Alleged Debtors do not dispute this).

---

[60] The dollar amounts listed here are based upon the amounts listed in the Second Amended List of Creditors.

[61] *In re Moss*, 249 B.R. 411, 419 n. 6 (Bankr. N.D. Tex. 2000).

APP 02732
015294

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 21   Filed 06/25/160   Page 616 of 1017   PageID 16277
Case 18-3026 Case 19-12239 JSF Filed Doc 13613   Entered 11/04/19/18 Page 2453 of 53   Page 28 of 53

39.     Additionally, there were certain creditors that filed sworn statements saying they were not creditors of the Alleged Debtors or were subsequently removed from the creditor list by agreement of the Alleged Debtors.  These creditors would include Case Anywhere, CSI Global Deposition Services,[62] Elite Document Technology, JAMS, Inc.,[63] Stanton Advisors LLC,[64] and the TASA Group, Inc..[65]  Thus, the updated chart now shows 13 creditors of the Alleged Debtors.

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| ~~2~~ | ~~Case Anywhere, LLC~~ | ~~Law Firm Vendor~~ | ~~$417.20~~ |
| ~~3~~ | ~~CSI Global Deposition Services~~ | ~~Law Firm Vendor~~ | ~~$38,452.56~~ |
| 4 | David Langford | Court Reporter/Law Firm Vendor | $550 |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| ~~6~~ | ~~Elite Document Technology~~ | ~~Data Hosting/Law Firm Vendor~~ | ~~$199.72~~ |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| ~~8~~ | ~~Highland Capital Management, L.P.~~ | ~~Advisory and Participation Fees~~ | ~~$2,770,731.00~~ |
| ~~9~~ | ~~JAMS, Inc.~~ | ~~Law Firm Vendor~~ | ~~$1,352.27~~ |
| 10 | Jones Day | Legal Fees | $368.75 |
| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |

---

[62] CSI Global Deposition Services was removed as a creditor by the agreement of the Alleged Debtors.

[63] JAMS, Inc. was removed as a creditor by agreement of the Alleged Debtors.

[64] Stanton Advisors LLC was removed as a creditor by agreement of the Alleged Debtors.

[65] *See* Exh. 40B, Exh. 186, Exh. 92, and Exh. 94.

App. 02538
015295

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exh-21 Filed 09/05/160   Page 617 of 1017   PageID 16278
Case 18-30264-sgj11   Doc 3910-3 Filed 04/13/18   Entered 11/04/19 Page 30 of 53   Page 29 of 53

| 16 | ~~Stanton Advisors LLC~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$10,000~~ |
| 17 | Stanton Law Firm | Legal Fees | $88,133.99 |
| 18 | ~~The TASA Group, Inc.~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$14,530.54~~ |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

40.    Next, the court finds that there are certain creditors included in the "Law Firm

Vendor" category (*e.g.*, experts, data hosting, document managers, court reporters) that are really

creditors of the individual law firms and/or Highland, and that these law firm vendor creditors

should not be considered creditors of the Alleged Debtors.  For these, there was no evidence of a

direct contractual obligation on the part of either the Alleged Debtors or Highland—although the

court certainly understands that, when the law firms would retain vendors, they would bill these

to either the Alleged Debtors or Highland as an expense to be reimbursed.  Most of these were

already eliminated with agreement of the Alleged Debtors but, from the remaining list of

creditors, this would include David Langford (a Dallas County court reporter).[66]  To be clear,

while the individual law firm creditors may ultimately have a right to reimbursement for these

vendor expenses from Highland (who may then potentially have a right to reimbursement from

the Alleged Debtors via the Shared Services and Sub-Advisory Agreements), the court does not

find this vendor to have a claim ***directly*** against the Alleged Debtors for purposes of section

303(b) of the Bankruptcy Code.

---

[66] *See* Exh. 40D, Exh. 187, Exh. 40O.

Appx. 02524
015296

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-20   Filed 09/05/25   Page 618 of 1017   PageID 16279
Case 18-30264-sgj11   Doc 239-1   Filed 04/13/18   Entered 04/13/18 Page 30 of 53

41.     Next, as to the Stanton Law Firm, the court finds that this creditor should also be removed from the pool of creditors that "count," for section 303(b) purposes, since this claim appears to be the subject of a "bona fide dispute as to liability or amount,"[67] based on the evidence presented at the Trial.  First, there was no engagement letter between either of the Alleged Debtors and the Stanton Law Firm produced.[68]  Second, the heavily redacted invoice of the Stanton Law Firm dated October 18, 2016 shows only that it was relating to the "Joshua Terry Matter" and that it was billed to Highland.[69]  Third, the Responses and Objections to Mr. Terry's Notice of Intention to Take Depositions by Written Questions sent to the Stanton Law Firm[70] provides the following responses:

> **Question No. 11**: What is the total amount of debt Acis Capital Management L.P. to the Firm. is liable to the Firm.
>
> **Answer**: Acis Capital Management L.P.'s debt to the Firm is unknown at this time.
>
> **Question No. 12**: What is the total amount of debt Acis Capital Management GP, LLC is liable for to the firm?
>
> **Answer**: Acis Capital Management GP, LLC to the Firm is unknown at this time.
>
> **Question No. 13**: Is any other party also liable for the debt of Acis Capital Management L.P. to the Firm? If so, please state the liable party and portion of Acis Capital Management L.P. debt the other party is liable for to the Firm.

---

[67] *See Credit Union Liquidity Servs., L.L.C. v. Green Hills Dev. Co., L.L.C. (In re Green Hills Dev. Co., L.L.C.)*, 741 F.3d 651, 655 (5th Cir. 2014) (a claimholder does not have standing to file a petition under section 303(b) if its claim is "the subject of a bona fide dispute as to liability or amount"); *In re Smith*, 415 B.R. 222, 237 (Bankr. N.D. Tex. 2009) (only "a holder of a claim ... that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount" is counted in determining the number of creditors necessary to file an involuntary petition).

[68] Rather, there is only an engagement letter between Lackey Hershman LLP (acting on behalf of its client, Highland) and Stanton Advisors LLC to act as an expert in the Terry litigation.  *See* Exh. 144.  As previously noted, the claim of Stanton Advisors LLC was removed from the creditor list by agreement of the Alleged Debtors.

[69] *See* Exh. 40R.

[70] The court notes that these responses were actually signed by James Michael Stanton, attorney for Stanton LLP.  *See* Exh. 139.

Appx. 02735
015297

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21   Filed 06/06/25   Page 619 of 1017   PageID 16280
Case 18-30264-sgj11   Doc 391   Filed 04/13/18   Entered 04/13/18   Page 31 of 53   Page 31 of 53

**Answer**: Whether any other party is also liable to the firm for the debt of Acis Capital Management, L.P. is unknown at this time.

**Question No. 14**: Is any other party also liable for the debt of Acis Capital Management GP, LLC to Firm? If so, please state the liable party and portion of Acis Capital Management GP, LLC debt the other party is liable for to the Firm.

**Answer**: Whether any other party is also liable for the debt of Acis Capital Management GP, LLC is unknown at this time. . . .

**Question No. 21**: Does the Firm currently represent Acis Capital Management, L.P.? If so, please state the representation.

**Answer**: Based on Acis's assertion that this question calls for information protected by the attorney-client privilege, the Firm cannot answer this question at this time.

**Question No. 22**: Does the Firm currently represent Acis Capital Management GP, LLC? If so, please state the representation?

**Answer**: Based on Acis's assertion that this question calls for information protected by the attorney-client privilege, the Firm cannot answer this question at this time. . . .[71]

The court finds that this evidence demonstrates that the claim of the Stanton Law Firm is the subject of a bona fide dispute as to either liability or amount and should not be counted since there is no real way of even knowing who the Stanton Law Firm was engaged by and, thus, whether the Alleged Debtors are even responsible for these alleged legal fees. The court would also specifically refer to the testimony of Mr. Leventon, the in-house lawyer employed by Highland who was in charge of allocating all of the bills that came into Highland's legal invoicing system, where he described a process in which all legal bills relating to the "Terry Matter" would automatically be assigned to the Alleged Debtors, without any real regard to whether the particular law firm had even been engaged by the Alleged Debtors or if whether the

---

[71] *See* Exhibit 139.

App. 015298

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21   Filed 00/05/25   Page 620 of 1017   PageID 16281
Case 18-30264-sgj11   Doc 1391-13   Filed 04/13/18   Entered 04/13/18   Page 33 of 53   Page 32 of 53

representation was actually relating to one of the other parties in the Terry litigation (*e.g.*, Highland, Mr. Dondero, etc.). Accordingly, the court finds that there is a bona fide dispute as to whether the Alleged Debtors are actually liable for the Stanton Law Firm legal fees and that they should not be counted as a creditor for purposes of section 303(b) of the Bankruptcy Code.[72]

42.     Thus, it appears, at most, that there are 11 creditors[73] of the Alleged Debtors as set forth in the chart below:

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| ~~2~~ | ~~Case Anywhere, LLC~~ | ~~Law Firm Vendor~~ | ~~$417.20~~ |
| ~~3~~ | ~~CSI Global Deposition Services~~ | ~~Law Firm Vendor~~ | ~~$38,452.56~~ |
| ~~4~~ | ~~David Langford~~ | ~~Court Reporter/Law Firm Vendor~~ | ~~$550~~ |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| ~~6~~ | ~~Elite Document Technology~~ | ~~Data Hosting/Law Firm Vendor~~ | ~~$199.72~~ |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| ~~8~~ | ~~Highland Capital Management, L.P.~~ | ~~Advisory and Participation Fees~~ | ~~$2,770,731.00~~ |
| ~~9~~ | ~~JAMS, Inc.~~ | ~~Law Firm Vendor~~ | ~~$1,352.27~~ |
| 10 | Jones Day | Legal Fees | $368.75 |

---

[72] *See also In re CorrLine Int'l, LLC*, 516 B.R. 106, 152 (Bankr. S.D. Tex. 2014) (bankruptcy court found that creditors contained in the alleged debtor's list of creditors with uncertain or unknown amounts could not be counted towards the numerosity requirement of section 303(b)).

[73] The court notes that, in all likelihood, the list of creditors that should be tallied for purposes of section 303(b) may actually be less than 11, because certain of the remaining creditors (*i.e.*, Drexel Limited, Highfield Equities, Inc., Lackey Hershman LLP, and David Simek) received payments during the 90 days preceding the Petition Date—and, thus, arguably should not be counted as creditors pursuant to section 303(b) of the Bankruptcy Code (which instructs that transferees of voidable transfers should not be counted). *See, e.g.*, Exh. 124 & Exh. 131. Additionally, certain of the remaining law firm creditors that are owed legal fees are also creditors of Highland and Highland-affiliates, not just the Alleged Debtors. To elaborate, many of these law firm creditors were employed to represent not only the Alleged Debtors, but also Highland and Highland-affiliates, so there may be an actual dispute as to the allocation of these legal fees among Highland and the Alleged Debtors (thus there could be bona fide disputes as to the amounts allocated by Highland's in-house lawyers to the Alleged Debtors). *See, e.g.*, Ex. 123 (McKool Smith, P.C. engagement letter referencing representation of numerous parties) & Exhibit 90 (Reid Collins & Tsai's Answers and Objections to Mr. Terry's Deposition by Written Questions, questions 13 & 14, stating that based upon allocation determinations to be made by Highland, other individuals may be liable for the full amount of the debt including Acis LP, Highland, Mr. Dondero, and Mr. Okada).

Appx. 02727

015299

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-21 Filed 01/02/25   Page 621 of 1017    PageID 16282
Case 18-30264-sgj11   Doc 1839-13 Filed 04/13/18   Entered 11/04/13/18 Page 33 of 53   Page 33 of 53

| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees[74] | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |
| ~~16~~ | ~~Stanton Advisors LLC~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$10,000~~ |
| ~~17~~ | ~~Stanton Law Firm~~ | ~~Legal Fees~~ | ~~$88,133.99~~ |
| ~~18~~ | ~~The TASA Group. Inc.~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$14,530.54~~ |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

43.     Finally, on the topic of creditor numerosity, the court further finds that the evidence strongly suggested hurried manufacturing of creditors on the part of the Alleged Debtors and Highland, in order to bolster an argument that having a sole petitioning creditor was legally inadequate in this case.[75]  For example, the Klos Declaration and other information, that was provided to State Court 2 and in discovery, only days before the Involuntary Petitions were filed,

---

[74] Mr. Terry has also argued that certain of the law firm creditors (McKool Smith, P.C., Lackey Hershman, LLP, and Reid Collins & Tsai) are "insiders" that must be excluded from the creditor list pursuant to section 303(b) of the Bankruptcy Code.  While there may be some support in case law for such an argument, Mr. Terry would ultimately need to show by a preponderance of the evidence that the law firms exercised such control or influence over the Alleged Debtors as to render their transactions not at arm's length.  *See In re CorrLine Intern., LLC*, 516 B.R. 106, 157-58 (Bankr. S.D. Tex. 2014) (citing to *Kepler v. Schmalbach (In re Lemanski)*, 56 B.R. 981, 983 (Bankr.W.D.Wis.1986)).  *See also In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992) (in evaluating whether insider status existed for purposes of evaluating alleged fraudulent conveyance court considered  (1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length).  Because there was no evidence suggesting abuse or control by these law firm creditors, nor was there any evidence that would suggest that their dealings with the Alleged Debtors were anything but arm's length, the court finds that these law firm creditors should not be excluded from the creditor list as "insiders" pursuant to section 303(b) of the Bankruptcy Code.

[75] *See* the Original Notice of Creditors, the First Amended Notice of Creditors, and the Second Amended Notice of Creditors.

App. 02738
015300

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1021    Filed 05/25    Page 622 of 1017    PageID 16283
Case 18-3026...sgj11...32918...filed...13613    Entered 04/13/18 Page 34 of 53    Page 34 of 53

seemed to show only a small number of creditors of Acis LP—Mr. Terry credibly testified that

he thought there were less than 12 creditors based on his review of such information, as well as

his understanding of the Alleged Debtors' business.  Yet, only a few days later, the Alleged

Debtors filed their Original Notice of Creditors, which showed 18 creditors, which was amended

twice to add another creditor and then yet another.  This simply does not jive in the court's mind

and supports this court's belief that the Alleged Debtors were scurrying to determine which

Highland creditors might cogently be painted as Acis LP creditors—so as to preclude Mr. Terry

from being able to file the Involuntary Petitions as the single, petitioning creditor.

 **F.** **Evidence Regarding Whether the Alleged Debtors are Generally Not Paying Debts as They Become Due (Unless Such Debts are the Subject of a Bona Fide Dispute as to Liability or Amount).**

 44. The evidence submitted reflects that, for the 11 creditors identified above, 9 out of

11 have unpaid invoices that were more than 90 days old.  The remaining 2 of the 11 were

McKool Smith, P.C. (current counsel for the Alleged Debtors) and the Petitioning Creditor.[76]

The court makes findings with regard to each of the 11 creditors below—focusing specifically on

whether the Alleged Debtors have been paying these creditors as their debts have become due.

 45. First, with regard to Andrews Kurth & Kenyon ("AKK"), the evidence reflected

that out of the $211,088.13 allegedly owed by Acis LP to AKK, the great majority of it—

$173,448.42—was invoiced on November 16, 2016[77] (more than 14 months before the Petition

Date).  Other, smaller amounts were invoiced on a monthly basis in each of the months August

2017, September 2017, October 2017, November 2017, and December 2017.  Although

requested in discovery, no engagement letter for AKK was produced and AKK represented in

---

[76] Exhs. 40 & 54.

[77] Exh. 40.

015301

written discovery that, to its knowledge, none existed.[78]  The court notes anecdotally that AKK's invoices (although allegedly related to Acis LP legal matters) were addressed to Highland.[79]  In any event, AKK represented that both the Alleged Debtors and Highland are jointly and severally liable for the fees owed to it.[80]  AKK also represented that, to its knowledge, the amounts owing to it by Acis LP and Highland are not disputed.[81]  AKK also represented that it has not provided legal work on a contingency basis for the Alleged Debtors or Highland.[82]  The court makes a logical inference that AKK expected timely payment of its invoices—the largest of which was dated more than 14 months prior to the Petition Date—and, thus, it has generally not been paid timely.

46.    Next, with regard to Drexel Limited, the Petitioning Creditor concedes that its $6,359.96 indebtedness (which is a fee rebate owing to it) is not past-due.

47.    Next, with regard to Highfield Equities, Inc., the Petitioning Creditor concedes that its $2,510.04 indebtedness (which is also a fee rebate owing to it) is not past-due.

48.    Next, with regard to the Jones Day law firm, the $368.75 indebtedness owed to it is well more than 90 days old.  Specifically, there is a six-and-a-half-month old invoice dated July 19, 2017 invoice in the amount of $118.75, and two five-month old invoices dated August 30, 2017 (both in the amount of $150).[83]  The court makes a logical inference that Jones Day

---

[78] Exh. 98, Requests 1-2.

[79] Exh. 98, pp. AKK000061-AKK000060.

[80] Exh. 98, Question 13.

[81] Exh. 98, Questions 52-55.

[82] Exh.  98, Questions 73-75.

[83] Exh. 40K.

Appx. 02749

015302

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Page 105 of 160    Page 624 of 1017    PageID 16285
Case 18-30264-sgj11    Doc 1338    Filed 04/13/18    Entered 04/13/18 13:37:55    Page 36 of 53

expected timely payment of its invoices prior to the Petition Date and, thus, it has generally not been paid timely.

49.    Next with regard to the Petitioning Creditor, Mr. Terry, the court notes that his liquidated claim in the amount of $8,060,827.84 first arose with the final Arbitration Award on October 20, 2017 (although such award was not confirmed by State Court 2 until December 18, 2017).  The judgment was unstayed as of the January 30, 2018 Petition Date, although the Alleged Debtors state that they still desire to appeal it—as difficult as that is in the situation of an arbitration award.  The court makes a logical inference that the Alleged Debtors had, on the Petition Date, no intention of paying this claim any time soon based on their conduct after the Arbitration Award—although the Arbitration Award had only been in existence for three-and-a-half months as of the Petition Date. The cash in the Alleged Debtors' bank accounts is wholly insufficient to cover the Arbitration Award and, meanwhile, corporate transactions have been ongoing to ensure that no cash streams will be coming into Acis LP in the future in the same way that they have in the past.  Thus, this court finds that this large claim, as of the Petition Date, was not being paid timely.

50.    Next with regard to KPMG LLP, the $34,000 indebtedness owed to it was for the service of auditing Acis LP's financial statements, pursuant to an engagement letter with it dated March 1, 2017.[84]  KPMG's engagement letter reflected a $40,000 flat fee was agreed to by Acis LP for the service, of which 40% was due October 2017 (*i.e.,* $16,000), with another 45% was due in January 2018 ($18,000), and the remaining 15% would be due at the time that a final bill was sent.  Acis LP has only paid $6,000 of the agreed upon amount—meaning $28,000 was overdue as of the January 30, 2018 Petition Date (with $10,000 of that being four months past

_____

[84] Exh. 40M.

Appx. 02541
015303

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21   Page 106/25 160   Page 625 of 1017   PageID 16286
Case 18-30264-sgj11   Doc 1358   Filed 04/13/18   Entered 04/13/18   Page 37 of 53   Page 37 of 53

due).  The court makes a logical inference that KPMG LLP expected payment of its audit fees in

accordance with its engagement letter and, thus, it has generally not been paid timely.

      51.     Next with regard to Lackey Hershman LLP, the $236,977.54 indebtedness owed

to it was for legal services provided to the Alleged Debtors and Highland in connection with the

arbitration and litigation with Mr. Terry.  No engagement letter was provided, but the invoices

for their services are all directed to Highland.[85]  The evidence reflected that three invoices had

not been paid as of the Petition Date:  an October 31, 2017 invoice in the amount of $56,909.53;

a November 30, 2017 invoice setting forth new fees in the amount of $84,789.83; and a

December 31, 2017 invoice setting forth new fees in the amount of $95,278.18.[86]  The court

makes a logical inference that Lackey Hershman LLP expected prompt payment on its invoices

(if nothing else, the statement on its invoice indicating "Total now due")[87] and, thus, it has

generally not been paid timely.

      52.     Next with regard to Reid Collins & Tsai LLP, the $17,383.75 indebtedness owed

to it was billed in an invoice dated August 31, 2017, indicating an August 31, 2017 "Due Date"

(five months before the Petition Date).[88] Although requested in discovery, no engagement letter

for this firm was produced and Reid Collins & Tsai LLP in fact represented in written discovery

that none existed.[89]  Moreover, written discovery propounded on the law firm indicated that,

while Acis LP was liable on this debt, other parties including Acis GP/LLC, Highland, Mr.

---

[85] Demonstrative Aid No. 1 (Lackey Hershman tab).

[86] Exh. 40, p. 3.

[87] Demonstrative Aid No. 1 (Lackey Hershman tab).

[88] Exh. 40P; Exh. 130, pp. 7-8.

[89] Exh. 90, Requests 1 & 2; Ex. 130, Requests 1 & 2.

App. 02742
015304

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Filed 06/26    Page 626 of 1017    PageID 16287
Case 18-30264-sgj11    Doc 391-3    Filed 04/13/18    Entered 04/13/18    Page 38 of 53    Page 38 of 53

Dondero, the Dugaboy Trust, and Mr. Akada might also be liable for the full amount of the debt—subject to Highland's allocation determinations.[90]  Based on this evidence, the court makes a logical inference that Reid Collins & Tsai LLP generally has not been paid timely.

53.     Next with regard to CT Corporation and the $517.12 indebtedness that the Alleged Debtors represent is owed, CT Corporation asserts that $4,074.84 is, in fact, owed to it by Acis LP and Acis GP/LLC.[91]  CT Corporation also believes Highland has liability for the Alleged Debtors' indebtedness.[92]  CT Corporation also believes the amount owed to it is undisputed.[93]  CT Corporation further represents that its invoices are due upon receipt.[94] CT Corporation produced several invoices in discovery, all showing due upon receipt, and one was dated as far back as December 31, 2016 (in the amount of $932).[95]  Based on this evidence, the court makes a logical inference that CT Corporation expected prompt payment on its invoices and, thus, has not been paid timely.

54.     Next with regard to David Simek, the Petitioning Creditor concedes that his $1,233.19 indebtedness (which is apparently an expense reimbursement relating to some consulting) is not past-due.

---

[90] Exh. 90, Questions 13 & 14; Exh. 130, Questions 13-14.

[91] Exh. 143, Questions 12 & 13.

[92] *Id.* at Question 14.

[93] *Id.* at Questions 22 & 23.

[94] *Id.* at Question 30.

[95] *Id.* at p. 8; Exh. 40T.

Appx. 02548
015305

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1021   Filed 08/25   160   Page 627 of 1017    PageID 16288
Case 18-3026-sgj11  Doc 339  Filed 11/13/18   Entered 11/13/18  Page 39 of 53

55.    In summary, the evidence reflects that the creditors of the Alleged Debtors are generally not being paid timely (except for perhaps four that are relatively insignificant and which may also be able to look to Highland for payment).[96]

56.    Further on the topic of timeliness, Mr. Leventon (Highland's in-house Assistant General Counsel) testified that 96% of bills submitted get paid more than 90 days after they are submitted, that approximately 70% of bills are later than 120 days after they are submitted, and some are even later than 150 days.  Mr. Leventon testified that this was a result of Acis LP receiving cash on a quarterly basis from the CLOs.  He further elaborated and testified that, for example, if Acis LP got cash on say February 1st, and it received a legal bill on that same day, that he would probably not approve it and allocate it until say February 8th.  By that time, Acis LP would have already used up all its cash, and that particular creditor would need to wait until the next quarterly payment was received in order to be paid.  He further testified that he explained this to law firms before their engagements and that, if they wanted the business, they would need to understand the process.  There are several things the court finds problematic about this testimony.  First, no testimony was offered showing that this was, in fact, the understanding of the law firms or other creditors, and, moreover, none of the engagement letters or invoices submitted into evidence reflect such payment terms.  Without this additional evidence, the court believes that the Alleged Debtors' testimony regarding how it paid invoices was mostly self-serving and did not support a finding that the Alleged Debtors were generally paying their debts

---

[96] Courts have also held that a debtor is generally not paying its debts as they become due when a debtor is found to have been transferring assets so as to avoid paying creditors.  *See, e.g., In re Moss*, 249 B.R. 411, 423 (Bankr. N.D. Tex. 2000) (bankruptcy court determined that an alleged debtor was not paying its debts as they came due when the alleged debtor "attempted to delay creditors through the transfers of assets she has made," concluding that "[the alleged debtor's] overall conduct of her financial affairs has been poor").  This court has also found that there may have been significant transfers of the Alleged Debtors' assets prior to the filing of the Involuntary Petitions to potentially avoid paying creditors (*i.e.*, Mr. Terry) and this may provide further support for the court's finding that the Alleged Debtors are generally not paying their debts as they become due under section 303(h).

App. 02544
015306

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Filed 05/25    Page 628 of 1017    PageID 16289
Case 18-30264-sgj11    Doc 138-3    Filed 01/19/18    Page 40 of 53

as they became due.[97]  Second, to the extent Mr. Leventon's testimony demonstrates that

creditors of the Alleged Debtors expected to be paid on a quarterly basis (at the latest), certain of

the remaining 11 creditors have debts that are significantly older than four months (*i.e.*, CT

Corporation, Jones Day, AKK, and possibly even Reid Collins & Tsai LLP).  Third, the

Financial Statements of Acis LP submitted into evidence do not support the notion that the cash

balances at Acis LP were only sufficient enough to pay vendors once every quarter.[98]  For

example, the balance sheet for January 31, 2017 shows a cash balance in Acis LP bank accounts

of $1,061,663.19; the balance sheet for February 28, 2017 shows a cash balance in Acis LP bank

accounts of $905,212.36; the balance sheet for March 31, 2017 shows a cash balance in Acis LP

bank accounts of $525,626.59; the balance sheet for April 30, 2017 shows a cash balance in Acis

LP bank accounts of $117,885.96; the balance sheet for May 31, 2017 shows a cash balance in

Acis LP bank accounts of $62,733.31; the balance sheet for June 30, 2017 shows a cash balance

in Acis LP bank accounts of $10,329.15; the balance sheet for July 31, 2017 shows a cash

balance in Acis LP bank accounts of $701,904.39; the balance sheet for August 31, 2017 shows a

cash balance in Acis LP bank accounts of $332,847.05.[99]  In summary, while there may be cash

fluctuations with Acis LP, there is not a clear pattern of Acis LP being only able to pay vendors

once every quarter.

---

[97] *See In re Trans-High Corp.*, 3 B.R. 1, 2-3 (Bankr. S.D.N.Y. 1980) (bankruptcy court found that evidence
showing that the petitioning creditor gave the debtor generous terms of payment (90 days) which were substantially
better than the terms set forth in the actual writings between the parties supported finding that the alleged debtors
were generally paying debts as they became due and that the involuntary petition must be dismissed).

[98] Exh. 147.

[99] *Id.*

Appx. 02545
015307

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Filed 01/16/25    Page 629 of 1017    PageID 16290
Case 18-30264-sgj11    Doc 1813-53    Filed 04/13/18    Entered 04/13/18    Page 41 of 53    Page 41 of 53

## II.    Conclusions of Law

Section 303 of the Bankruptcy Code sets forth the various requirements for initiating an involuntary bankruptcy case.  First, pursuant to section 303(b) of the Bankruptcy Code, an involuntary case may be filed against a person by the filing with the bankruptcy court of a petition under Chapter 7—

> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount ... [that] aggregate at least $15,775 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

> (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $15,775 of such claims . . .[100]

Thus, if there are twelve or more eligible creditors holding qualified claims on the Petition Date, three or more entities must participate in the involuntary filing and must hold unsecured claims aggregating $15,775.00.  If there are less than twelve creditors, a single creditor with an unsecured claim of $15,775.00 may file the involuntary petition.  To the extent a bankruptcy court finds that the requisite number of petitioning creditors have commenced the involuntary case, the court shall order relief against the debtor under the chapter under which the petition was filed only if "the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount."[101]

Here, as noted earlier, the Alleged Debtors have made four arguments as to why an order for relief should not be entered against the Alleged Debtors: (1) the Alleged Debtors have 12 or

---

[100] 11 U.S.C.A § 303(b) (West 2018).

[101] 11 U.S.C.A § 303(h) (West 2018).

APPX 02516
015308

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10 21    Filed 01/16/25 160    Page 630 of 1017    PageID 16291
Case 18-30264-sgj11  Doc 13-13  Filed 04/13/18  Entered 04/13/18 13:43:50  Page 42 of 53

more creditors, and, thus, with Mr. Terry being the sole petitioning creditor, the Involuntary

Petitions were not commenced by the requisite number of creditors; (2) the Alleged Debtors are

generally paying their debts as they become due; (3) the Involuntary Petitions were filed in bad

faith by Mr. Terry; (4) the interests of creditors and the debtors would be better served by

dismissal and the court should abstain pursuant to section 305 of the Bankruptcy Code.

### A.     Have the Requisite Number of Creditors Commenced the Involuntary Proceedings?

Pursuant to section 303(b)(2) of the Bankruptcy Code, a sole petitioning creditor holding

at least $15,775 in claims can initiate an involuntary bankruptcy case so long as the alleged

debtors have fewer than 12 creditors.  After the Second Amended List of Creditors was filed, Mr.

Terry had the burden, by a preponderance of the evidence, of showing that the Alleged Debtors

actually had less than 12 qualified creditors.[102]  Here, the court has found that the Alleged

Debtors have, *at most*, 11 qualified creditors.[103]  Accordingly, Mr. Terry has met his burden of

showing that the Alleged Debtors have less than 12 creditors for section 303(b) purposes, and

that he, as the sole petitioning creditor, was permitted to file the Involuntary Petitions.  While

Mr. Terry has made additional arguments as to why certain of these 11 creditors should not be

counted as creditors for purposes of section 303(b) of the Bankruptcy Code, the court does not

believe it necessary to address these arguments at this time.[104]

---

[102] *See In re Moss*, 249 B.R. 411, 419 n. 6 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222, 229 (Bankr. N.D. Tex. 2009).

[103] To be clear, the court believes that even on these 11, there are likely bona fide disputes as to the liability or amount that *Acis LP* has—as opposed to the liability or amount that Highland or other insiders bear responsbility.

[104] Moreover, as previously stated, since the court has determined there are fewer than 12 creditors, the court need not address whether there is a "special circumstances" exception to the statutory requirements of section 303, in situations where an alleged debtor may have engaged in fraud, schemes, or artifice to thwart a creditor or creditors.  *See, e.g., In re Norriss Bros. Lumber Co.*, 133 B.R. 599 (Bankr. N.D. Tex. 1991); *In re Moss*, 249 B.R. 411 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222 (Bankr. N.D. Tex. 2009).

App. 02745
015309

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10    Filed 06/16/25    Page 631 of 1017    PageID 16292
Case 18-30264-sgj11    Doc 139    Filed 11/01/18    Entered 11/01/18 23:45:43    Page 43 of 53

### B.    Are the Alleged Debtors Generally Paying Their Debts as They Become Due?

Section 303(h) of the Bankruptcy Code requires that a court shall enter order for relief in an involuntary case "if … (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount . . . ."[105] Again, the burden is on the Petitioning Creditor to prove this element by a preponderance of the evidence.[106] The determination is made as of the filing date of the Involuntary Petitions.[107] In determining whether an alleged debtor is generally paying its debts as they come due, courts typically look to four factors: (i) the number of unpaid claims; (ii) the amount of such claims; (iii) the materiality of the non-payments; and (iv) the nature of the debtor's overall conduct in its financial affairs.[108] No one factor is more meritorious than another; what is most relevant depends on the facts of each case.[109] Courts typically hold that "generally not paying debts" includes regularly missing a significant number of payments *or* regularly missing payments which are significant in amount in relation to the size of the debtor's operation.[110]

---

[105] 11 U.S.C.A § 303(h) (West 2018).

[106] *See Norris v. Johnson (In re Norris)*, No. 96-30146, 1997 WL 256808, at *3-*4 (5th Cir. Apr. 11, 1997) (unpublished).

[107] *Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 222 (5th Cir. 1993).

[108] *See, e.g., In re Moss*, 249 B.R. 411, 422 (Bankr. N.D. Tex. 2000) (citing *In re Norris*, 183 B.R. 437, 456-57 (Bankr. W.D. La. 1995)).

[109] *In re Bates*, 545 B.R. 183, 186 (Bankr. W.D. Tex. 2016) (also noting that petitioning creditors' counsel consistently argued that the final prong—overall conduct in financial affairs—should be afforded more weight than the other factors, and the court found no authority to support this assertion).

[110] *See, e.g., In re All Media Props., Inc.*, 5 B.R. 126, 143 (Bankr. S.D. Tex. 1980). See also *Concrete Pumping Serv., Inc. v. King Constr. Co. (In re Concrete Pumping Serv., Inc.)*, 943 F.2d 627, 630 (6th Cir.1991) (a debtor was not paying his debts as they became due where the debtor was in default on 100% of its debt to only one creditor); *Knighthead Master Fund, L.P. v. Vitro Packaging, LLC (In re Vitro Asset Corp.)*, No. 3:11–CV–2603–D (N.D.Tex. Aug. 28, 2012) (district court found error in bankruptcy court ruling that the debtors were generally paying their debts as they became due, where bankruptcy court had relied on the fact that the alleged debtors had a significant number of third-party creditors/trade vendors, which had been continually paid, even though the unpaid debts to the petitioning creditors far exceeded the paid debts in terms of dollar amount; petitioning creditors were holders of promissory notes that were guaranteed by the alleged debtors, as to which the primary obligor and alleged

Appx. 02748
015310

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21   Filed 03/25   Page 632 of 1017   PageID 16293
Case 18-3026-sgj11   Doc 139-3   Filed 04/13   Entered 04/13/18   Page 44 of 53   Page 44 of 53

Furthermore, any debt which the alleged debtor is not current on as of the petition date should be considered as a debt not being paid as it became due.[111]

Here, the court concludes that the creditors of the Alleged Debtors—what few there are—are generally not being paid as their debts have become due (except for perhaps four[112] that are relatively insignificant and which may also be able to look to Highland for payment). Mr. Terry has met his burden by a preponderance of the evidence as to section 303(h) of the Bankruptcy Code.

### C.   *With the Section 303 Statutory Requirements Being Met by the Petitioning Creditor, Should the Court, Nonetheless, Dismiss the Involuntary Petitions Because They Were Filed in Bad Faith?*

Despite Mr. Terry meeting the necessary statutory requirements for this court to enter orders for relief as to the Alleged Debtors pursuant to section 303 of the Bankruptcy Code, the Alleged Debtors have argued that the Involuntary Petitions must, nonetheless, be dismissed because they were filed in "bad faith" by Mr. Terry. As support for this argument, the Alleged Debtors rely primarily on the Third Circuit's decision in *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015). While the court certainly acknowledges that authority exists in other circuits that suggests that dismissal of an involuntary bankruptcy case may be appropriate—even when section 303's statutory requirements have been met—based upon an

---

debtors had ceased making interest payments; the unpaid debts represented 99.9% of the total dollar amount of debt of each of the alleged debtors); *Crown Heights Jewish Cmty. Council, Inc. v. Fischer (In re Fischer)*, 202 B.R. 341, 350–51 (E.D.N.Y. 1996) (even though the debtor only had two outstanding debts, the total dollar amount failed to establish that, in terms of dollar amounts, the debtor was paying anywhere close to 50% of his liabilities, so he was not generally paying his debts as they became due); *In re Smith*, 415 B.R. 222, 231 (Bankr. N.D. Tex. 2009) (while the debtor was paying small recurring debts, he was not paying 99 percent of his debts in the aggregate amount and thus was not generally paying his debts as they became due).

[111] *In re Bates*, 545 B.R. 183, 188 (Bankr. W.D. Tex. 2016).

[112] Those four are: Drexel Limited ($6,359.96); Highfield Equities ($2,510.04); David Simek ($1,233.19); and McKool Smith ($70,082.18).

App. 02740
015311

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-1021 Filed 01/06/25    Page 633 of 1017    PageID 16294
Case 18-30264-sgj11  Doc 1389  Filed 04/13/18    Entered 04/13/18  Page 45 of 53    Page 45 of 53

independent finding of "bad faith," the court need not ultimately decide the efficacy or

applicability of such authority, because the court does not believe that the evidence demonstrated

any "bad faith" on the part of Mr. Terry (or his counsel) in filing the Involuntary Petitions.

Indeed, the evidence suggested that Mr. Terry and his counsel filed the Involuntary Petitions out

of a legitimate concern that Highland was dismantling and denuding Acis LP of all of its assets

and value and that a bankruptcy filing was the most effective and efficient way to preserve value

for the Acis LP creditors.  The court concludes that Mr. Terry was wholly justified in pursuing

the Involuntary Petitions.

> **D.      Should This Court, Nonetheless, Abstain and Dismiss the Involuntary Petitions
> Pursuant to Section 305 of the Bankruptcy Code?**

Section 305(a)(1) of the Bankruptcy Code provides that:

> (a) The court, after notice and a hearing, may dismiss a case under this title, or
> may suspend all proceedings in a case under this title, at any time if—
>      (1) the interests of creditors and the debtor would be better served by such
> dismissal or suspension; . . .[113]

Courts construing section 305(a)(1) of the Bankruptcy Code have found that abstention in a

properly filed bankruptcy case is an ***extraordinary remedy***.[114]  Moreover, granting an abstention

motion pursuant to section 305(a)(1) of the Bankruptcy Code requires more than a simple

balancing of harm to the debtor and creditors; rather, the interests of ***both*** the ***debtor*** and its

***creditors*** must be served by granting the request to abstain.[115]  The moving party bears the

---

[113] 11 U.S.C.A. § 305(a)(1) (West 2018).

[114] *In re AMC Investors, LLC*, 406 B.R. 478, 487 (Bankr. D. Del. 2009); *see also In re Compania de Alimentos Fargo, S.A.*, 376 B.R. 427, 434 (Bankr. S.D.N.Y. 2007); *In re 801 S. Wells St. Ltd. P'ship*, 192 B.R. 718, 726 (Bankr. N.D. Ill. 1996).

[115] *In re Smith*, 415 B.R. 222, 238-39 (Bankr. N.D. Tex. 2009) (citing to *AMC Investors, LLC*, 406 B.R. at 488).

Appx. 02759
015312

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Filed 01/15/25    Page 634 of 1017    PageID 16295
Case 18-30264-sgj11    Doc 913-5    Filed 01/13/18    Entered 01/13/18    Page 46 of 53

burden to demonstrate that dismissal benefits the debtor and its creditors.[116]  Courts must look to

the individual facts of each case to determine whether abstention is appropriate.[117]

Case law has set forth a litany of factors to be considered by the court to gauge the

overall best interests of the creditors and the debtor for section 305(a)(1) purposes:

> (1) the economy and efficiency of administration;
> (2) whether another forum is available to protect the interests of both parties or
> there is already a pending proceeding in state court;
> (3) whether federal proceedings are necessary to reach a just and equitable solution;
> (4) whether there is an alternative means of achieving an equitable distribution of
> assets;
> (5) whether the debtor and the creditors are able to work out a less expensive out-
> of-court arrangement which better serves all interests in the case;
> (6) whether a non-federal insolvency has proceeded so far in those proceedings that
> it would be costly and time consuming to start afresh with the federal bankruptcy
> process; and
> (7) the purpose for which bankruptcy jurisdiction has been sought.[118]

While all factors are considered, not all are given equal weight in every case and the court should

not conduct a strict balancing.[119]

> i.    Factor 1: The Economy and Efficiency of Administration.

---

[116] *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462-63 (Bankr. S.D.N.Y. 2008).

[117] *In re Spade*, 258 B.R. 221, 231 (Bankr. D. Colo. 2001).

[118] *Monitor Single Lift I, Ltd.*, 381 B.R. at 464-65 (citing to *In re Paper I Partners, L.P.*, 283 B.R. 661, 679 (Bankr. S.D.N.Y. 2002)); *see also Smith*, 415 B.R. at 239; *AMC Investors, LLC*, 406 B.R. at 488; *In re Euro-American Lodging Corp.*, 357 B.R. 700, 729 (Bankr. S.D.N.Y. 2007); *but see Spade*, 258 B.R. at 231-32 (Bankr. D. Colo. 2001) (applied a four criteria test in evaluating section 305 abstention which included:  (1) the motivation of the parties who sought bankruptcy jurisdiction; (2) whether another forum was available to protect the interests of both parties or there was already a pending proceeding in state court; (3) the economy and efficiency of administration; and (4) the prejudice to the parties).  The Alleged Debtors cite to the case of *In re Murray*, 543 B.R. 484 (Bankr. S.D.N.Y. 2016), in particular, as support for why this court should abstain under section 305(a) of the Bankruptcy Code and dismiss the Involuntary Petitions.  However, in *Murray*, Judge Gerber was analyzing dismissal of an involuntary proceeding pursuant to section 707 of the Bankruptcy Code, more specifically for "cause," and not based upon abstention under section 305(a) of the Bankruptcy Code.  Thus, the court is not convinced *Murray* is relevant to this court's section 305 abstention analysis.

[119] *In re TPG Troy, LLC*, 492 B.R. 150, 160 (Bankr. S.D.N.Y. 2013) (citing *Monitor Single Lift*, 381 B.R. at 464).

Appx 02751
015313

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 55-21    Page 635 of 160    Page 635 of 1017    PageID 16296
Case 18-30264-sgj11    Doc 1391-3    Filed 04/13/18    Entered 04/13/18 Page 458 of    Page 47 of 53

The economy and efficiency of administering a case in the bankruptcy court is routinely evaluated in considering abstention under section 305 of the Bankruptcy Code. Here, the evidence suggests that the most economical and efficient forum for these parties to resolve their disputes is the bankruptcy court. The court heard ample evidence that the Alleged Debtors are already, essentially, in the process of being liquidated by Highland. This is not a situation where an ably-functioning, going-concern business is being foisted in disruptive fashion into a bankruptcy.[120] Because of the fact that the Alleged Debtors are already in the process of being liquidated, the bankruptcy court (and not a state court) is the most efficient and economical forum to complete this liquidation and distribute whatever assets remain to creditors in accordance with the distribution scheme set forth in the Bankruptcy Code and with the oversight of a neutral third-party trustee. Thus, with the bankruptcy court being the more economic and efficient forum for administering this case, this factor goes against abstention.

> ii.   *Factors 2, 3, 4, 5, and 6: Whether Another Forum is Available to Protect the Interests of Both Parties or There is Already a Pending Proceeding in State Court; Whether Federal Proceedings are Necessary to Reach a Just and Equitable Solution; Whether There is an Alternative Means of Achieving an Equitable Distribution of Assets; Whether the Debtor and the Creditors are Able to Work Out a Less Expensive Out-of-Court Arrangement Which Better Serves All Interests in the Case; and Whether a Non-Federal Insolvency Has Proceeded so Far in Those Proceedings That it Would Be Costly and Time Consuming to Start Afresh With the Federal Bankruptcy Process.*

---

[120] *See, e.g., In re The Ceiling Fan Distrib., Inc.*, 37 B.R. 701 (Bankr. M.D. La. 1983) (noting that while the dissection of a living business may not properly be the business of a bankruptcy court, the division of a "carcass" and the reclamation of pre-petition gouging may well be); *In re Bos*, 561 B.R. 868, 898-99 (Bankr. N.D. Fla. 2016) (citing as one of the reasons to abstain under section 305 of the Bankruptcy Code the fact that entities and subsidiaries under the alleged debtor's umbrella were still operating successful businesses and had employed more than 500 people); *but see Remex Elecs. Ltd. v. Axl Indus., Inc. (In re Axl Indus., Inc.)*, 127 B.R. 482, 484-86 (S.D. Fla. 1991) (in affirming the bankruptcy court's decision to dismiss an involuntary bankruptcy case, the district court also found that "the interests of a defunct business enterprise would be little affected by the pendency of a bankruptcy proceeding," which the district court believed favored abstention).

App. 02752
015314

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21   Filed 06/26/25   Page 636 of 1017   PageID 16297
Case 18-30264-sgj11   Doc 1838   Filed 04/13/18   Entered 04/13/18 10:34:50   Page 48 of 53

The court believes that factors 2-6 should be grouped together for purposes of its abstention analysis, since all of these factors specifically touch on the availability of an alternative forum to achieve an *equitable* distribution.[121]  By way of example, where bringing a case into the bankruptcy court would simply add an additional layer of expense to the resolution of a two-party dispute and another forum already provides a suitable place to resolve the dispute, some courts have found that abstention is the more appropriate choice since keeping the case would transform the bankruptcy process into a collection device.[122]  Here, the Alleged Debtors have repeatedly argued that, because there is already pending state court litigation involving Mr. Terry, Highland, and the Alleged Debtors, these cases should be dismissed and the parties should go back to state court to resolve their issues.  The court does not agree for several reasons.

First, it is worth noting that this court has already heard multiple days of evidence in this case (including almost five days just for the Trial) and would certainly not be "starting afresh" by any means if things go forward in the bankruptcy court.  Additionally, while the Alleged Debtors have argued that a significant amount of attorney's fees have already been spent litigating this case in state court (which they believe supports abstention), the court surmises that these fees have not been wasted dollars, as the money expended by the parties developed discovery of facts that could assist a bankruptcy trustee in pursuing avoidance actions that may be viable and might lead to value that could pay creditors' claims.[123]

---

[121] *See, e.g., In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 460-70 (Bankr. S.D.N.Y. 2008).

[122] *AMC Investors, LLC*, 406 B.R. at 488; *see also Axl Indus., Inc.*, 127 B.R. at 484-86.

[123] *See, e.g., The Ceiling Fan Distributor, Inc.*, 37 B.R. at 703 (the court noted that, despite there being significant legal expenses in the state court, such expenses were not wasted since the legal work done to date would be quite helpful to a trustee).

Appx. 02753
015315

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Filed 06/25    Page 637 of 1017    PageID 16298
Case 18-30264-sgj11    Doc 3913    Filed 04/13/18    Entered 04/13/18 Page 49 of 53

Second, this court heard considerable evidence involving potentially voidable transfers
that may have occurred involving the Alleged Debtors and Highland/Highland-affiliates and,
while the state court certainly provides a forum for eventually bringing fraudulent transfer
claims, the court also heard evidence that none of these claims have actually been brought in the
state court.[124]   Moreover, to the extent fraudulent transfer claims were to be pursued in state
court and were successful, the state court would still need the ability to reach the assets of
alleged fraudulent transfer recipients (which, in this situation, include certain Highland-affiliates
located in the Cayman Islands).   The bankruptcy court has concerns whether a state court process
could efficiently accomplish this task.[125]   Similarly, it is worth noting that, while a request for a
receiver was filed in the state court by Mr. Terry, such request had not yet been heard and
decided by the state court.   Thus, at the present time, it does not appear that there is an alternative
forum to address the pertinent issues in this case, without the necessity of significant, additional
steps being taken by the parties in the state court.

Third, this court believes that a federal bankruptcy proceeding is necessary in order to
achieve an equitable result in this case.   Specifically, the court heard evidence from the Alleged
Debtors that, if this court chose to abstain and dismiss the Involuntary Petitions, the Alleged
Debtors would ultimately pay all of their creditors in full, except for Mr. Terry.   This clearly
demonstrates how keeping the case in the bankruptcy court is necessary to allow an equitable

---

[124] *See, e.g., In re Texas EMC Mgmt., LLC,* Nos. 11-40008 & 11-40017, 2012 WL 627844, at *3 (Bankr.
S.D. Tex. 2012) (noting that one of the reasons abstention was proper under section 305 of the Bankruptcy Code
was because the issues to be litigated amongst the parties were already joined in the state court litigation); *Spade*,
258 B.R. at 236 (court held that one of the reasons abstention was warranted under section 305 of the Bankruptcy
Code was because the petitioning creditors had already filed and had pending a "collection case" in the state court).

[125] *See, e.g., Smith*, 415 B.R. at 239 (the bankruptcy court held that there "are remedies under the
Bankruptcy Code that are not available to Rhodes under state law, due to Mr. Smith's transfer of the majority of his
assets to the Cook Island Trust," and "federal proceedings may be necessary to reach a just and equitable solution").

Appx. 02754
015316

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21   Filed 01/09/25   Page 638 of 1017   PageID 16299
Case 18-30264-sgj11   Doc 13-3   Filed 04/13/18   Entered 04/13/18   Page 50 of 53

distribution to **all creditors**, including Mr. Terry.  Additionally, a federal bankruptcy court has certain tools available to it that are not available to a state court such as the ability to invalidate potential *ipso facto* clauses in contracts pursuant to section 365 of the Bankruptcy Code, sell assets free and clear of liens, claims and encumbrances pursuant to section 363 of the Bankruptcy Code, and impose the automatic stay pursuant to section 362 of the Bankruptcy Code.  These are all useful tools available to the Alleged Debtors in a bankruptcy case that would be lost if this court were to ultimately abstain.

Finally, there was more than enough evidence showing the acrimonious and bitter relationship that exists between Mr. Terry and Mr. Dondero.  Thus, the availability of an out-of-court arrangement being obtained in this case is, in this court's mind, slim to none.

In summation, the court finds that all of the factors above support this case staying with the bankruptcy court.

      iii.    *Factor 7: The Purpose for Which Bankruptcy Jurisdiction Has Been Sought.*

The Alleged Debtors have repeatedly argued that Mr. Terry filed this case in bad faith and as a litigation tactic to gain some sort of advantage in the state court proceedings.  The court has already found above that these cases were not filed in bad faith and that Mr. Terry has met the necessary statutory requirements of section 303 of the Bankruptcy Code.  Moreover, it is worth noting that at least one court has stated that the filing of an involuntary bankruptcy petition is always a "litigation tactic," but whether the filing is inappropriate for abstention purposes is a fact-dependent determination.[126]  Here, the facts show that there was no inappropriateness

---

[126] *In re Marciano*, 459 B.R. 27, 50 (B.A.P. 9th Cir. 2011) (noting that while the filing of the involuntary bankruptcy was a litigation tactic, the bankruptcy court did not abuse its discretion in denying the alleged debtor's motion to dismiss based upon the bankruptcy court's primary concern that the issue of equality of distribution would not effectively be dealt with in another forum).

App. 02755
015317

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-21   Filed 01/26/25   Page 639 of 1017    PageID 16300
Case 18-30264-sgj11   Doc 391-35   Filed 04/13/18   Entered 04/13/18   Page 525 of 54   Page 51 of 53

behind Mr. Terry's decision to file the Involuntary Petitions. Specifically, Mr. Terry repeatedly and credibly testified that the purpose for filing the Involuntary Petitions was to ensure that creditors (including him) were treated fairly and received an equal distribution from the Alleged Debtors' assets, not to gain some sort of advantage in the state court. This testimony was absolutely consistent with additional evidence showing that, since the entry of the arbitration award, there has been a calculated effort (largely by Highland) to effectively liquidate the Alleged Debtors. Unlike the bankruptcy court in *In re Selectron Mgmt. Corp.*,[127] which had no evidence or "smoking gun" showing that steps were being taken by the alleged debtor to evade payment on the petitioning creditor's judgment, thereby necessitating abstention, this court has heard ample evidence showing that the Alleged Debtors, with the aid of Highland, were transferring assets away from the Alleged Debtors, so that Mr. Terry would have nowhere to look at the end of the day.

In light of the court's analysis of all the seven factors above, the Alleged Debtors have not credibly shown how both the Alleged Debtors and the creditors are better served outside of bankruptcy. If this matter were to remain outside of bankruptcy, there seems to be a legitimate prospect that the Alleged Debtors and Highland will continue dismantling the Alleged Debtors, to the detriment of Acis LP creditors. Abstention would fly in the face of fundamental fairness and the principles underlying the Bankruptcy Code.

Beyond just addressing the factors above, the Alleged Debtors have also argued that, if this court were to not abstain under section 305 of the Bankruptcy Code, there would be

---

[127] *In re Selectron Mgmt. Corp.*, No. 10-75320-DTE, 2010 WL 3811863, at *6-7 (Bankr. E.D.N.Y. Sept. 27, 2010); *see also In re White Nile Software, Inc.*, No. 08–33325–SGJ–11, 2008 WL 5213393, at *4 (Bankr. N.D. Tex. Sept. 16, 2008) (finding that where the filing of a voluntary chapter 11 did not appear to be about insuring a distribution to creditors or winding down or giving a soft landing to a business or avoiding dismantling and dissipation of valuable assets or preserving avoidance actions, but rather was about changing the forum of ongoing litigation between the parties, abstention under section 305 was proper).

Appx 02756
015318

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10 Filed 01/26/25    Page 640 of 1017    PageID 16301
Case 18-30264-sgj11    Doc 339    Filed 04/13/18    Entered 04/13/18 Page 52 of 53    Page 52 of 53

significant harm to the "equity" of the Alleged Debtors. Specifically, the Alleged Debtors have argued that, if this court were to enter orders for relief, the equity would be forced to "call" and ultimately liquidate CLO 2014-3 (and perhaps all of the CLOs Acis LP manages), resulting in substantial losses to the equity on their investments. First, to be clear, the current equity of the Alleged Debtors is being held by a Highland-affiliate called Neutra, Ltd., which actually only became the equity of the Alleged Debtors on December 19, 2017. But this is not the "equity" being referred to by the Alleged Debtors in its argument. Rather, the so-called "equity," about which the Alleged Debtors seemed so concerned, is actually *certain parties that own the equity of the entity that owns the equity in the CLOs*—which includes (a) an unnamed third-party investor out of Boston (49%),[128] (b) a charitable foundation managed by a Highland-affiliate (49%), and (c) Highland employees (2%). However, abstention under section 305 of the Bankruptcy Code does not require this court to look at what is in the best interests of these third-parties (who are not current creditors or interest holders of the Alleged Debtors), but rather what is in the best interests of the Alleged Debtors and the creditors. Accordingly, the Alleged Debtors' effort to argue potential harm to these parties is misplaced for purposes of evaluating abstention under section 305 of the Bankruptcy Code, and, if anything, further highlights who the Alleged Debtors are really out to protect—Highland and Highland-affiliates. Moreover, the court would note that, even if there were to be a "call" and liquidation of CLO 2014-3, thereby ending the Alleged Debtors' right to receive future management fees, there would still be potential assets for a chapter 7 trustee to administer such as chapter 5 causes of action (which include fraudulent transfers) as well as the Alleged Debtors' contingent claim for approximately

---

[128] Notably, this entity never appeared at the Trial or filed papers stating that it would be harmed by entry of orders for relief in these cases.

App. 02755
015319

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Page 123/25 160    Page 641 of 1017    PageID 16302
Case 18-30264-sgj11  Doc 339  Filed 04/13/18    Entered 04/13/18  Page 53 of 53    Page 53 of 53

$3 million in expense reimbursement owing by Highland CLO Management Ltd., as part of the November 3, 2017 transfer of the Acis LP Note Receivable from Highland.  Thus, even if the so-called doomsday scenario of an equity call on CLO 2014-3 (or other CLOs) were to happen, there is still a potential benefit to creditors if this court chooses not to abstain.

## III.    CONCLUSION

In conclusion, these involuntary proceedings were appropriately filed under section 303, and orders for relief will be issued forthwith.   This court declines to exercise its discretion to abstain, because a chapter 7 trustee appears necessary to halt the post-Arbitration Award transactions and transfers of value out of Acis LP, as discussed above.  A chapter 7 trustee appears necessary to resolve the inherent conflicts of interest between the Alleged Debtors and Highland.  A chapter 7 trustee will have tools available to preserve value that a state court receiver will not have.  The bankruptcy court is single handedly the most efficient place to administer property of the estate for creditors.  This is not just a two party dispute between Mr. Terry and the Alleged Debtors, and even if it were, dismissal or abstention is clearly not warranted.

**###END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW###**

Appx. 02758
015320

**Exhibit D**

**Acis Arbitration Opinion**

Appx. 02759
015321

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21   Filed 02/28/25   Page 643 of 1017   PageID 16304
Case 18-03078-sgj   Doc 123   Filed 04/16/19   Entered 04/16/19 Page 328   Page 1 of 30



**CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

Signed April 16, 2019

_____

**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, GP, | § | CASE NO. 18-30265-SGJ-11 |
| LLC, | § | (Jointly Administered Under |
|    Debtors. | § | Case No. 18-30264-SGJ-11) |
| _____ | § | (Chapter 11) |
| | § | |
| ROBIN PHELAN, CHAPTER 11 | § | |
| TRUSTEE, | § | |
|    Plaintiff, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 18-03078-SGJ |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., HIGHLAND CLO FUNDING | § | |
| LTD, HIGHLAND HCF ADVISOR, LTD., | § | |
| HIGHLAND CLO MANAGEMENT, LTD., | § | |
| and HIGHLAND CLO HOLDINGS, LTD., | § | |
|    Defendants. | § | |

### MEMORANDUM OPINION AND ORDER DENYING MOTION TO COMPEL
### ARBITRATION [DE # 102]

Appx. 02560
015322

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-21   Filed 01/25/25 160   Page 644 of 1017    PageID 16305
Case 18-03078-sgj   Doc 123   Filed 04/16/19   Entered 04/16/19 15:18:28   Page 2 of 30

## I.    Introduction.

Before this court is a Motion to Compel Arbitration (the "Arbitration Motion"),[1]

requesting that the bankruptcy court send to arbitration only a ***sub-set*** of claims asserted in the

above-referenced adversary proceeding (the "Adversary Proceeding").  Some procedural context

is crucial in analyzing the merits of the Arbitration Motion and, thus, is set forth immediately

below.

This Adversary Proceeding has morphed into a large, complex lawsuit—at this stage

primarily involving 35 claims, 20 of which are grounded in fraudulent transfer theories.[2]  The

Arbitration Motion, as explained below, seeks arbitration of ***eight*** of the 35 claims (*i.e.,* Counts

1-8).

The Arbitration Motion was filed by party Highland Capital Management, L.P.

("Highland").  Highland and a related company, Highland CLO Funding Ltd. ("HCLOF"), were

originally the plaintiffs in this Adversary Proceeding, suing the Chapter 11 Trustee for injunctive

relief (arguing early during the above-referenced Chapter 11 bankruptcy cases that the Chapter

11 Trustee was interfering with their business rights and decisions, essentially).  The Chapter 11

Trustee fired back with 35 counterclaims against Highland and HCLOF (adding three parties

related to Highland as third-party defendants with regard to some of those 35 counterclaims).

Notably, these 35 counterclaims—***as directed toward Highland***—were also alleged to be

objections to Highland's two $4,672,140.38 proofs of claim filed in the underlying bankruptcy

cases.[3]  In that regard, the Chapter 11 Trustee stated that his Answer and Counterclaims included

---

[1] DE # 102.

[2] There is also a preference count and a section 550 recovery count—thus, 22 out of the 35 claims are chapter 5 avoidance actions and recovery.  11 U.S.C. §§ 544, 547, 548 & 550.

[3] *See Defendant's Amended Answer, Counterclaims (Including Claim Objections) and Third-Party Claims* (DE # 84), filed November 13, 2018, in response to the *Original Complaint and Request for Preliminary Injunction of*

Appx. 02561
015323

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Filed 01/26/25    Page 645 of 1017    PageID 16306
Case 18-03078-sgj    Doc 236-21    Filed 04/03/24    Entered 04/11/19 15:18:20    Page 3 of 30

"an objection to Highland Capital's proofs of claim pursuant to Federal Rule of Bankruptcy

Procedure 3007(b), and the counterclaims asserted herein shall constitute recoupment and/or

offset to such proofs of claim, to the extent such claims are otherwise allowed."[4]  In fact, after

the 35 counts were articulated in the Chapter 11 Trustee's Answer and Counterclaims, there were

20 paragraphs (¶¶ 252-271, pp. 70-77) solely articulating the Chapter 11 Trustee's objections to

Highland's proofs of claim.[5]  The Chapter 11 Trustee also filed yet a separate adversary

proceeding, Adv. Proc. No. 18-03212, seeking his own injunctive relief, which has recently been

consolidated with this Adversary Proceeding.[6]

The Chapter 11 Trustee ultimately proposed and obtained confirmation of a Chapter 11

plan in the underlying bankruptcy cases, and the Reorganized Debtors, now under new

ownership and management, were vested in that plan with the counterclaims in this Adversary

Proceeding (among other rights and claims).  The injunctive relief initially sought by Highland

and HCLOF, as plaintiffs in the Adversary Proceeding, later became mooted by various orders in

---

*Highland CLO Funding, Ltd and Highland Capital Management Against Chapter 11 Trustee of Acis Capital
Management, L.P. and Acis Capital Management GP, LLC* (DE # 1), filed May 30, 2018, and also in response to the
proofs of claims filed by Highland Capital Management, L.P. (*see Proof of Claim No. 27*, filed in Case No. 18-
30264, and *Proof of Claim No. 13* filed in Case No. 18-30265, each in the amount of $4,672,140.38, with the basis
of each of the proofs of claim listed as "Sub-Advisory Services and Shared Services"; these proofs of claim are
virtually identical).

[4] DE # 84, ¶ 6.  The Chapter 11 Trustee has argued that the Highland proofs of claim should be disallowed under (i)
section 502(b)(1) of the Bankruptcy Code (in that the Highland proofs of claim are allegedly unenforceable against
the Debtors under the limited partnership agreement of Acis Capital Management, L.P. and applicable law); (ii)
section 502(b)(4) of the Bankruptcy Code (in that the proofs of claim are for services of an insider of the Debtors
and allegedly exceed the reasonable value of the services); and (iii) under section 502(d) of the Bankruptcy Code (in
that the Trustee has asserted avoidance actions against Highland).  Finally, to the extent allowed at all, the Trustee
has argued that the Highland proofs of claim should be equitably subordinated under section 510(c) of the
Bankruptcy Code.  In summary, pursuant to section 502(b) and (d) of the Bankruptcy Code and Federal Rule of
Bankruptcy Procedure 3007, the Trustee has sought entry of an order disallowing and expunging the Highland
proofs of claim from the Debtors' claims registers.  *See id.* at ¶¶ 251-272.

[5] *Id.*

[6] DE # 124.

015324

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Filed 01/27/25    Page 646 of 1017    PageID 16307
Case 18-03078-sgj Doc 123-35 Filed 04/03/19 Entered 04/16/19 Page 520 3 Page 4 of 30

the bankruptcy cases and such claims were voluntarily dismissed without prejudice.[7]  Thus,

Highland, which is pursuing the Arbitration Motion, now wears the hat of only a defendant (and

proof of claimant), and the Reorganized Debtors are the plaintiffs asserting the 35 original

"counterclaims" asserted by the Chapter 11 Trustee against Highland (which 35 claims are also

objections to Highland's proof of claim).  The separate adversary proceeding that was filed by

the Chapter 11 Trustee seeking injunctive relief  (Adv. Proc. No 18-03212) was consolidated into

this Adversary Proceeding, and the style of this Adversary Proceeding was adjusted to reflect

that the Chapter 11 Trustee had become situated as plaintiff.[8]  But, to be clear, the Reorganized

Debtors are actually now plaintiffs in place of the Chapter 11 Trustee.  The Reorganized Debtors

are Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis

GP"), and they oppose the Arbitration Motion.[9]

Citing to the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 *et seq.*, Highland argues

that the bankruptcy court must enter an order compelling arbitration as to counts 1-8 because:

(a) these eight counts revolve around the interpretation of certain prior versions of a Sub-

Advisory Agreement and Shared Services Agreement (later defined); and (b) the aforementioned

agreements contained binding arbitration clauses.  Highland also requests that the Adversary

Proceeding be stayed regarding counts 1-8, pending binding arbitration.  The Reorganized

Debtors dispute that there are binding arbitration clauses applicable to counts 1-8.  As explained

further below, the aforementioned agreements were amended many times and the arbitration

clauses were eventually eliminated in the last versions of the agreements.  The Reorganized

---

[7] DE # 79.

[8] DE # 124.

[9] DE # 123.

Appx. 02503
015325

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10 21    Filed 01/28/25 160    Page 647 of 1017    PageID 16308
Case 18-03078-sgj Doc 136 Filed 04/16/19 Entered 04/16/19 Page 5 of 30    Page 5 of 30

Debtors also urge that, even if there are applicable arbitration clauses, the court may and should exercise discretion and decline to order arbitration, since core bankruptcy matters are involved and arbitration would conflict with the purposes of the Bankruptcy Code.  For the reasons set forth below, the Arbitration Motion is denied.  This means that Counts 1-26 & 33-35 will go forward and be adjudicated in this Adversary Proceeding.[10]  But as will be explained in a separate order that is being issued shortly following this order, there are certain counts complaining of **postpetition** state law torts and breaches of contract in this Adversary Proceeding (Counts 27-32) that this court believes should be separated out into a different adversary proceeding and consolidated with a contested matter involving a Highland request for allowance of a postpetition administrative expense claim [DE # 772].

## II.    Background Facts.

### A.    First, the Agreements Between the Parties.

As this court has noted on various occasions, Acis LP was formed in the year 2011, and is primarily a CLO portfolio manager.[11]  Specifically, Acis LP provides fund management services to various special purpose entities that hold CLOs (which is an acronym for "collateralized loan obligations").  Acis LP was providing management services for five such special purpose entities (the "Acis CLOs") as of the time that it and its general partner were put into the above-referenced involuntary bankruptcy cases (the "Bankruptcy Cases").  The parties have informally referred to the special purpose entities themselves as the "CLO Issuers" or "CLO Co-Issuers" but, to be clear, these special purpose entities (hereinafter, the "CLO SPEs")

---

[10] The court notes that a Supplemental Motion to Withdraw the Reference in this Adversary Proceeding has recently been filed by Highland and HCLOF [DE # 134] and that motion will be addressed in due course hereafter.  The ruling herein with regard to the Arbitration Motion does not affect such motion and such motion will be separately addressed, after a status conference, and through a report and recommendation to the District Court.

[11] Acis LP has managed other funds, from time to time, besides CLOs.

Appx. 02504
015326

are structured as follows:  (a) on the asset side of their balance sheets, the entities own pieces of senior debt owed by large corporations and, therefore, earn revenue from the variable interest payments made by those corporations on such senior debt; and (b) on the liability side of their balance sheets, the entities have obligations in the form of notes (*i.e.,* tranches of fixed interest rate notes) on which the CLO SPEs themselves are obligated—the holders of which notes are mostly institutions and pension funds.  The CLO SPEs make a profit, based on the spread or "delta" between:  (a) the variable rates of interest paid on the assets that the CLO SPEs own (*i.e.,* the basket of senior notes); and (b) the fixed rates of interest that the CLO SPEs must pay on their own tranches of debt.  At the bottom of the CLO SPEs' capital structure is their equity (sometimes referred to as "subordinated notes," but these "notes" are genuinely equity).  As portfolio manager, Acis LP manages the CLO SPEs' pools of assets (by buying and selling senior loans to hold in the CLO SPEs' portfolios) and communicates with investors in the CLO SPEs.  The CLO SPEs' tranches of notes are traded on the Over-the-Counter market.

     To be perfectly clear, none of the CLO SPEs themselves have been in bankruptcy.  Only Acis LP which *manages* the CLO business and its general partner, Acis GP, were put into bankruptcy.

     Historically, Acis LP has had four main sets of contracts that were at the heart of its business and allowed it to function.  They are described below.  The second and third agreements set forth below are highly relevant to the Arbitration Motion before the court.  The Chapter 11 Trustee, from time-to-time, credibly testified that these agreements collectively created an "eco-system" that allowed the Acis CLOs to be effectively and efficiently managed by Acis LP.

Appx 02565

015327

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Filed 03/25    Page 649 of 1017    PageID 16310
Case 18-03078-sgj   Doc 296-5   Filed 04/01/94   Entered 04/01/19 Page 7 of 30   Page 7 of 30

1.    The PMAs with the CLO SPEs.

First, Acis LP has various portfolio management agreements ("PMAs") **with the CLO SPEs**, pursuant to which Acis LP earns management fees.  The PMAs have been the primary "assets" (loosely speaking) of Acis LP.  They are what generate revenue for Acis LP.

2.    The Sub-Advisory Agreement with Highland.

Second, Acis LP had a Sub-Advisory Agreement (herein so called) with **Highland**. Pursuant to this agreement, Acis LP essentially sub-contracted for the use of Highland front-office personnel/advisors to perform management services for Acis LP (*i.e.,* so that Acis LP could fulfill its obligations to the CLO SPEs under the PMAs).  Acis LP paid handsome fees to Highland pursuant to this agreement.  This agreement was rejected (with bankruptcy court approval) by the Chapter 11 Trustee during the Bankruptcy Cases, when the Chapter 11 Trustee credibly represented that he had not only found resources to provide these services at a much lower cost to the estate, but he also had begun to believe that Highland was engaging in stealth efforts to liquidate the Acis CLOs, to the detriment of Acis LP's creditors.

*There were five iterations of the Sub-Advisory Agreement between the parties over time*:  (a) the initial Sub-Advisory Agreement, "made effective January 1, 2011" (which had an arbitration clause at section 16(f));[12] (b) an Amended and Restated Sub-Advisory Agreement, "made" May 5, 2011, "to be effective January 1, 2011" (which also had an arbitration clause at section 16(f))[13]; (c) an Amendment to Amended and Restated Sub-Advisory Agreement "entered into as of" July 1, 2011 (which did not seem to affect in any way the aforementioned arbitration

---

[12] Exh. 1 to Arbitration Motion.

[13] Exh. 2 to Arbitration Motion.

Appx. 02786

015328

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21   Filed 03/25   Page 650 of 1017   PageID 16311
Exh 15-21   Page 136 of 160
Case 18-03078-sgj   Doc 239   Filed 04/03/19   Entered 04/03/19   Page 8 of 30

clause);[14] (d) Second Amended and Restated Sub-Advisory Agreement "made" on July 29, 2016,

"to be effective January 1, 2016" (which had an arbitration clause at section 16(f));[15] and (e) the

Third Amended and Restated Sub-Advisory Agreement "dated as of March 17, 2017" (***which***

***suddenly contained no arbitration clause, with no explanation***).[16]

     3.    <u>The Shared Services Agreement with Highland.</u>

     Third, Acis LP also had a Shared Services Agreement (herein so called) with Highland,

pursuant to which Acis LP essentially sub-contracted for the use of Highland's back-office

services (again, so that Acis LP could fulfill its obligations to the CLO SPEs under the PMAs).

To be clear, Acis LP had no employees of its own—only a couple of officers and members.  Acis

LP paid handsome fees to Highland for the personnel and back-office services that Highland

provided to Acis LP.  This agreement was also rejected by the Chapter 11 Trustee during the

Bankruptcy Cases (with Bankruptcy Court approval) for the same reasons that the Sub-Advisory

Agreement with Highland was rejected.

     ***There were five iterations of the Shared Services Agreement between the parties over***

***time***:  (a) the initial Shared  Services Agreement "effective as of January 1, 2011" (which had an

arbitration clause at section 9.14);[17] (b) an Amendment to Shared Services Agreement, "entered

into as of" July 1, 2011 (which did not seem to affect in any way the aforementioned arbitration

clause);[18] (c) a Second Amended and Restated Shared Services Agreement "dated effective

---

[14] Exh. 3 to Arbitration Motion.

[15] Exh. 4 to Arbitration Motion.

[16] Exh. 5 to Arbitration Motion.

[17] Exh. 6 to Arbitration Motion.

[18] Exh. 7 to Arbitration Motion.

Appx. 02787
015329

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Filed 03/25/25    Page 651 of 1017    PageID 16312
Case 18-03078-sgj    Doc 166-4    Filed 11/04/19    Page 108 of 31    Page 9 of 30

January 1, 2015" (which had an arbitration clause at section 9.14);[19] (d) a Third Amended and Restated Shared Services Agreement "dated effective as of January 1, 2016 (which had an arbitration clause at section 9.14;[20] and (e) a Fourth Amended and Restated Shared Services Agreement "dated as of March 17, 2017" (***which suddenly contained no arbitration clause, with no explanation***).[21]

    4.    <u>The Equity/ALF-PMA.</u>

        Fourth, until a few weeks before the Bankruptcy Cases were filed, Acis LP also had yet another portfolio management agreement (distinct from its PMAs with the CLO SPEs) whereby Acis LP provided services not just to the CLO SPEs themselves, but separately to the equity holder in the CLO SPEs. This portfolio management agreement with the equity holder in the CLO SPEs is sometimes referred to by the parties as the "ALF PMA," but it would probably be easier to refer to it as the "Equity PMA"[22] (for ease of reference, the court will refer to it as the "Equity/ALF PMA"). Acis LP did not earn a specific fee pursuant to the Equity/ALF PMA, but the Chapter 11 Trustee and others credibly testified during the Bankruptcy Cases that Acis LP considered the agreement valuable and very important, because it essentially gave Acis LP the ability to control the whole Acis CLO eco-system—in other words, it gave Acis LP the ability to make substantial decisions on behalf of the CLO SPEs' ***equity***—distinct from making decisions for the CLO SPEs themselves pursuant to the PMAs. In any event, shortly before the Bankruptcy Cases were filed, agents of Highland and/or others controlling Acis LP: (a) caused

---

[19] Exh. 8 to Arbitration Motion.

[20] Exh. 9 to Arbitration Motion.

[21] Exh. 10 to Arbitration Motion.

[22] There were actually different iterations of the Equity/ALF PMA including one dated August 10, 2015, and another dated December 22, 2016.

Appx. 02766
015330

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21   Filed 03/25   Page 652 of 1017   PageID 16313
Case 18-03078-sgj   Doc 296-3   Filed 04/03/19   Entered 04/16/19 Page 12 of 31   Page 10 of 30

Acis LP to terminate this Equity/ALF PMA; and (b) then caused the equity owner to enter into a
new Equity PMA with a newly formed offshore entity called Highland HCF Advisor, Ltd. (one
of the Defendants in this Adversary Proceeding).

     5.     Limited Partnership Agreement of Acis LP.

There is actually a fifth agreement that should be mentioned.  Although not as integral as
the previous four agreements, there was a certain Amended and Restated Agreement of Limited
Partnership of Acis Capital Management, L.P., dated to be effective as of January 1, 2011 (the
"LPA"), entered into among the general partner and limited partners of Acis LP.  Reorganized
Acis has argued in the Adversary Proceeding that this LPA limited in some respects the
compensation that could be paid to Highland under the Sub-Advisory Agreement and the Shared
Services Agreement.

**B.**    **Next, the 35 Counts Asserted Against Highland in this Adversary
Proceeding.**

The Adversary Proceeding, distilled to its essence—and as currently framed—is all about
certain activities of Highland and some of its affiliates and actors who controlled it, which
activities were allegedly aimed at ***denuding Acis LP of all of its value,*** at a time when the former
portfolio manager for Acis LP was on the verge of obtaining a very large judgment claim against
Acis LP.  Specifically, these activities of Highland began soon after:  (a) it terminated former
Acis CLO manager Joshua Terry ("Terry") in June 2016; (b) it began litigating with him (which
litigation was sent to arbitration) in September 2016; and (c) Terry obtained an approximately $8
million arbitration award against Acis LP in October 2017, which was confirmed by a judgment
in December 2017.  The activities and counts revolve around:  (a) Highland's alleged
overcharging of Acis LP by more than $7 million for fees/expenses under the Sub-Advisory and
Shared Services Agreement, as limited by the LPA (Counts 1-4); (b) alleged fraudulent transfers

Appx. 02769
015331

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Filed 03/26    Page 653 of 1017    PageID 16314
Case 18-03078-sgj    Doc 296-35    Filed 04/08/19    Page 11 of 30

of value out of Acis LP, by virtue of various amendments and modifications of the Sub-Advisory
and Shared Services Agreements (Counts 5-8); (c) an alleged fraudulent transfer as to the
Equity/ALF PMA (Counts 9-12); (d) an alleged fraudulent transfer pertaining to Acis LP's
conveyance away of its so-called ALF Equity (Counts 13-16); (e) an alleged fraudulent transfer
of a $9.5 million note receivable Acis LP held (Counts 17-20); (f) various other fraudulent
transfers (Counts 21-24); (g) preferences (Count 25); (h) assertion of a section 550 recovery
remedy for the aforementioned avoidance actions (Count 26); and (i) requests for punitive
damages, an alter ego/veil piercing remedy, and attorneys' fees (Counts 33-35).  There are also
some counts complaining of postpetition state law torts and breaches of contract (Counts 27-32).

As mentioned earlier, Highland's Arbitration Motion only requests the court defer to
arbitration Counts 1-8—that is the counts relating to:  (a) Highland's alleged overcharging of
Acis LP  by more than $7 million for fees/expenses under the Sub-Advisory and Shared Services
Agreement, as perhaps limited by the LPA (Counts 1-4); and (b) the alleged fraudulent transfers
of value out of Acis LP, by virtue of various amendments and modifications of the Sub-Advisory
and Shared Services Agreements (Counts 5-8).  Highland argues that, ***since all of these counts
pertain to the Sub-Advisory Agreement and Shared Services Agreement*** between Acis LP and
Highland, the arbitration clauses in those agreements dictate that the counts be carved out from
this Adversary Proceeding and sent to binding arbitration.  Highland acknowledges that these
two agreements were amended and restated numerous times, and that the last time they were
amended (March 17, 2017) the arbitration clauses were eliminated, but Highland argues that,
since all of the activity complained of in Counts 1-8 occurred ***prior*** to March 17, 2017, ***the older
iterations of the Sub-Advisory and Shared Services Agreements, with arbitration clauses,
govern***.  Highland zeroes in on the fact that Counts 1-4, at their essence, are assertions that the

Appx 02579
015332

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Filed 05/26    Page 654 of 1017    PageID 16315
Case 18-03078-sgj    Doc 396    Filed 04/04/19    Entered 04/04/19 Page 12 of 30

fees for services charged by Highland in the Sub-Advisory and Shared Services Agreements were excessive for the years 2013, 2014, 2015, and through May 2016 (all before the March 17, 2017 iteration of the agreements). And Counts 5-8, while articulated as fraudulent transfer claims, pertain to the modifications made to the Sub-Advisory and Shared Services Agreements at various stages up to the March 17, 2017 versions.

The Reorganized Debtors have argued that it is quite clear that the last iterations of the Sub-Advisory and Shared Services Agreements intended to supersede in every way the prior versions. That includes the provisions directing arbitration. And, they argue, it does not matter **when** the causes of action occurred/accrued or not. What matters is that the parties agreed at some point that their disputes would not be sent to arbitration and this was the last governing document.

**C.**    **The Relevant Language in the Sub-Advisory and Shared Services Agreements Pertaining to (i) Arbitration and (ii) Superseding of Prior Agreements.**

As mentioned earlier, there was an arbitration clause at Section 16(f) of the Sub-Advisory Agreement until the last March 17, 2017 version. The clause read as follows:

> [I]n the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act. . . .[23]

In the Shared Services Agreement, an arbitration clause appeared at Section 9.14, as follows:

> Notwithstanding anything contained in this Agreement or the Annexes hereto to the contrary, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act. . . .[24]

---

[23] Exh. 1 of Arbitration Motion, at 7-8.

[24] Exh. 6 of Arbitration Motion, at 9-10.

Appx. 02571
015333

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21   Filed 03/26/25   Page 655 of 1017   PageID 16316
Case 18-03078-sgj   Doc 396-3   Filed 04/03/19   Entered 04/11/19 Page 13 of 30

As earlier mentioned, these two agreements were later amended and restated several times. The arbitration provisions remained identical until they were completely eliminated in March 2017. The Reorganized Debtor argues that this is a short analysis: there was no longer an operative arbitration provision as of March 17, 2017.

In the March 17, 2017 version of the Shared Services Agreement, the parties agreed "that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or noncontractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as 'Proceedings') may be brought in such courts."[25]

The same type language appeared in the March 17, 2017 version of the Sub-Advisory Agreement: "The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby."[26]

More generally, the March 17, 2017 versions of the agreements each provided that they "amended, restated and replaced the existing agreements *in [their] entirety*."[27] The March 17, 2017 agreements also each provided that they "supersede[d] all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter."[28]

---

[25] Exh. 10 of Arbitration Motion, § 8.04(b).

[26] Exh. 5 of Arbitration Motion, § 13.

[27] Exhs. 5 and 10 of Arbitration Motion, each at p. 1 (emphasis added).

[28] Exh. 5 of Arbitration Motion, ¶ 20; Exh.10 of Arbitration Motion, ¶ 8.14.

Appx. 02572
015334

Case 19-34054-sgj11 Doc 3596-21 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-21 Filed 03/25/25 Page 656 of 1017 PageID 16317
Case 18-03078-sgj Doc 123-3 Filed 04/03/19 Entered 04/03/19 Page 14 of 30 Page 14 of 30

In summary, the Reorganized Debtors argue that, under Texas common law, basic principles of contract interpretation, and the plain language of the March 17, 2017 version of the agreements, there is no agreement to arbitrate. "A contract's plain language controls."[29] Because the prior versions of the agreements were "amended, restated and replaced in [their] entirety" with the March 17, 2017 agreements—which not only omit an arbitration provision, but also expressly provide for jurisdiction and venue in Texas state or federal courts—the Reorganized Debtors argue that there exists no valid agreement to arbitrate between Highland and Acis LP. The court's inquiry can and should end there. But, if the court concludes the arbitration clauses are still applicable, the Reorganized Debtors argue that the bankruptcy court has discretion ***not*** to compel arbitration when (a) bankruptcy core matters are involved, and (b) arbitration would conflict with the purposes of the Bankruptcy Code. Therefore, this is further reason why the Arbitration Motion should be denied.

### III.    Legal Analysis.

### A.    The Federal Arbitration Act and Arbitration Clauses Generally.

The FAA provides that arbitration agreements are always "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[30] Thus, the FAA reflects a liberal federal policy favoring arbitration, and requires arbitration agreements to be rigorously enforced according to their terms.[31] The FAA "expresses a strong national policy favoring arbitration of disputes, and all doubts concerning the

---

[29] *Great Am. Ins. Co. v. Primo,* 512 S.W.3d 890, 893 (Tex. 2017).

[30] 9 U.S.C. § 2.

[31] *See AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 339 (2011) (citations omitted).

Appx. 02573
015335

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-10   Filed 08/25   Page 657 of 1017   PageID 16318
Case 18-03078-sgj   Doc 239   Filed 04/06/19   Entered 04/06/19 Page 15 of 30

arbitrability of claims should be resolved in favor of arbitration."[32]  "There is a strong

presumption in favor of arbitration and the party seeking to invalidate an arbitration agreement

bears the burden of establishing its invalidity."[33]

When considering a motion to compel arbitration, the Fifth Circuit has held there are two

threshold questions:  (1) whether an arbitration agreement is valid; and (2) whether the dispute

falls within the scope of the agreement.[34]  To evaluate the enforceability of an arbitration

agreement, courts apply the contract law of the state that governs the agreement,[35] whereas the

scope of the agreement is a matter of federal substantive law.[36]

## B.    Is There a Valid Agreement to Arbitrate that Applies Here and is Still Enforceable?[37]

With respect to the first element—whether a valid agreement to arbitrate exists—federal

courts "apply ordinary state-law principles that govern the formation of contracts."[38]  Here, the

choice of law provisions of the Highland-Acis Agreements state:  "This Agreement shall be

---

[32] *Primerica Life Ins. Co. v. Brown,* 304 F.3d 469, 471 (5th Cir. 2002) (citing *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984)).

[33] *Carter v. Countrywide Credit Indus., Inc.,* 362 F.3d 294, 297 (5th Cir. 2004).

[34] *See Agere Sys. Inc. v. Samsung Elecs. Co. Ltd.*, 560 F.3d 337, 339 (5th Cir. 2009).

[35] *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004) (citation omitted).

[36] *Graves v. BP Am., Inc.,* 568 F.3d 221, 222-23 (5th Cir. 2009); *see also Neal v. Hardee's Food Sys., Inc.,* 918 F.2d 34, 37 (5th Cir. 1990) (under federal law, courts "resolve doubts concerning the scope of coverage of an arbitration clause in a contract in favor of arbitration," and arbitration should not be denied "unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue").

[37] The court is assuming, without analysis, that the Chapter 11 Trustee (and the Reorganized Debtors) are bound by the arbitration clauses, if Acis LP affirmatively agreed to be bound by them and would still be bound by them outside of bankruptcy.  Case law has stated that a bankruptcy trustee "stands in the shoes of the debtor for the purposes of [an] arbitration clause" and "the trustee-plaintiff is bound by the clause to the same extent as would the debtor." *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153 (3d Cir. 1989); *see also Janvey v. Alguire*, No. 3:09-CV-0724-N, 2014 WL 12654910 at *6 (N.D. Tex. July 30, 2014) (quoting *Hays*).

[38] *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Wash. Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004).

Appx. 02574
015336

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Filed 03/25    Page 658 of 1017    PageID 16319
Case 18-03078-sgj    Doc 396-21    Doc 16694    Filed 11/11/19    Page 16 of 30

governed by the laws of Texas. . . ."[39]  "Under the Texas rules, in those contract cases in which the parties have agreed to an enforceable choice of law clause, the law of the chosen state must be applied."[40]  Accordingly, Texas law governs whether the parties are subject to an enforceable agreement to arbitrate.

Here, obviously the parties entered into an agreement to arbitrate in both the Sub-Advisory Agreement (Section 16(f))[41] and the Shared Services Agreement Section 9.14.[42]  And, it would seem to be beyond peradventure that this was, at one time, enforceable between the parties, with regard to any disputes that arose regarding the agreements.  The tricky conundrum here is that those arbitration provisions were deleted in the most recent iterations of the agreements—that is, the March 17, 2017 versions of the agreements.  Highland argues that, since Counts 1-8 involve alleged overcharges under the agreements in years 2013-2016, and alleged fraudulent transfers up to March 17, 2017 (such fraudulent transfers allegedly occurring by virtue of modifications to the agreements that were made up to March 17, 2017), the pre-March 17, 2017 version of the agreements must be applied with respect to these Counts 1-8 and, thus, the arbitration provisions apply.  In other words, what matters is when causes of action *accrue* not when they are ultimately asserted.

The parties have cited a handful of cases to the court, but the one that the court believes is most analogous is the *Coffman v. Provost * Umphrey Law Firm, L.L.P.* case.[43]  In the *Coffman* case,

---

[39] *See, e.g.,* Exh. 1 to Arbitration Motion, § 16(a); Exh. 5 to Arbitration Motion, § 13; Exh. 6 to Arbitration Motion, § 9.05; Exh. 10 to Arbitration Motion, § 8.04(a).

[40] *Resolution Trust Corp. v. Northpark Joint Venture*, 958 F.2d 1313, 1318 (5th Cir. 1992) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex. 1990)).

[41] Exhs. 1-4 of the Arbitration Motion.

[42] Exhs. 6-9 of the Arbitration Motion.

[43] *Coffman v. Provost * Umphrey Law Firm, L.L.P.*, 161 F. Supp. 2d 720 (E.D. Tex. 2001).

Appx. 02775
015337

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Filed 04/25/25    Page 659 of 1017    PageID 16320
Case 18-03078-sgj    Doc 2-96    Filed 04/06/19    Entered 04/06/19 15:28:31    Page 17 of 30

the plaintiff was a former non-equity partner of a law firm and brought a lawsuit against the firm

and its equity partners, alleging *inter alia*, breach of contract, breach of fiduciary duty, violations

of Title VII and/or the Texas Commission on Human Rights Act ("TCHRA"), and violations of

the Equal Pay Act.  The law firm filed a motion to compel arbitration with regard to all of these

claims.  The law firm's motion to compel was based upon various partnership agreements which

governed the law firm.  The original partnership agreement was first effective on August 26,

1986, and the plaintiff did not sign that agreement.  Subsequent to that time, however, the

original partnership agreement was amended and restated on several occasions.  The plaintiff

admitted that she signed four partnership agreement documents:  (1) a Restated Partnership

Agreement of Provost * Umphrey Law Firm, L.L.P.—Effective January 1, 1994 ("1994

Partnership Agreement"); (2) a Restated Partnership Agreement of Provost * Umphrey Law

Firm, L.L.P.—Effective January 1, 1996 ("1996 Partnership Agreement"); (3) an Amendment

No. 1 to the Restated Partnership Agreement of Provost * Umphrey Law Firm, L.L.P., Dated

January 1, 1996—Effective January 1, 1997 ("1996 Amendment No. 1"); and (4) a Partnership

Agreement of Provost * Umphrey Law Firm, L.L.P., As Restated —Effective January 1, 1998

("1998 Partnership Agreement").  The earlier two agreements—*i.e.,* the 1994 and 1996

Partnership Agreements—did ***not*** contain an arbitration clause. The 1996 Amendment No. 1 and

the 1998 Partnership Agreement, on the other hand, both contained an identical arbitration clause

as follows:

> Binding Arbitration. The equity partners and non-equity partners shall make a good
> faith effort to settle any dispute or claim arising under this partnership agreement.
> If the equity or non-equity partners fail to resolve a dispute or claim, such equity or
> non-equity partner shall submit the dispute or claim to binding arbitration under the
> rules of the American Arbitration Association then in effect. Judgment on
> arbitration awards may be entered by any court of competent jurisdiction.[44]

---

[44] *Id.* at 723.

Appx. 02776
015338

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-21 Filed 04/16/25 160    Page 660 of 1017    PageID 16321
Case 18-03078-sgj Doc 123-21 Filed 04/03/19   Entered 04/03/19 Page 18 of 30

Additionally, all four of the above-referenced partnership agreements contained an integration clause stating that "[t]his agreement contains the entire agreement . . . and all prior agreements . . . are terminated."[45]

Interestingly, the plaintiff **conceded** that claims she asserted involving the 1996 Amendment No. 1 and the 1998 Partnership Agreement were required to go to arbitration (such claims requested determinations regarding:  (1) the enforceability of the 1996 Amendment No. 1 and the 1998 Partnership Agreement; (2) breach of the 1996 Amendment No. 1 and the 1998 Partnership Agreement; (3) repudiation; and (4) breach of the duty of good faith and fair dealing).  However, the plaintiff disagreed that her remaining claims were also required to go to arbitration and those were:  (a) breach of the 1994 and 1996 Partnership Agreements; (b) breach of fiduciary duty; (c) violations of Title VII and/or TCHRA; and (d) violations of the Equal Pay Act.  The district court granted in part and denied in part the motion to compel arbitration, holding that:  (1) the plaintiff's contract claims arising under **earlier** partnership agreements, which **did not** contain arbitration clauses, were **not arbitrable**; (2) a common law breach of fiduciary duty claim was arbitrable under the agreements (it appears that these claims arose after the 1996 Amendment No. 1 and 1998 Partnership Agreement); and (3) statutory sex-based discrimination claims were not arbitrable under the agreements.[46]

Relevant to the case at bar, the *Coffman* court noted, first, that the conduct underlying the alleged breaches of the 1994 and 1996 contracts occurred at a time when no arbitration clause was in effect.  The plaintiff's complaint specifically alleged that, during the time the four

---

[45] *Id.*

[46] *Id.* at 733.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Filed 04/25/25    Page 661 of 1017    PageID 16322
Case 18-03078-sgj    Doc 296-2    Filed 04/16/19    Page 19 of 30

agreements were in effect, the law firm failed to properly calculate Plaintiff's compensation, failed to promote her, and deprived her of benefits from a tobacco case. The court noted that, if the law firm did participate in such conduct during the time that the 1994 and 1996 Partnership Agreements were in effect, such conduct could not have "arisen under" the 1996 Amendment No. 1 or the 1998 Partnership Agreement *because those agreements did not even exist at that time*. But, to the extent that the conduct Plaintiff complained of occurred when the 1996 Amendment No. 1 and the 1998 Partnership Agreement were in effect, her claims would be subject to arbitration.[47]

The court further noted that the arbitration clause should not be interpreted as covering the plaintiff's claims for breach of the 1994 and 1996 Partnership Agreements because the plain grammatical language of the arbitration clause gave no indication that it would apply retroactively. "To interpret the arbitration clause to apply retroactively would cause Plaintiff to forego her vested right to litigate an accrued claim."[48]

---

[47] *Id.* at 726 (citing *Sec. Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 372 (6th Cir. 1999) (arbitration provision in 1994 shipping agreement did not cover conduct that occurred under prior shipping agreements); *Necchi S.p.A. v. Necchi Sewing Mach. Sales Corp.*, 348 F.2d 693, 698 (2d Cir. 1965) (claim based on conduct which had arisen "prior to" effective date of arbitration clause was not within scope of arbitration agreement); *Hendrick v. Brown & Root, Inc.*, 50 F. Supp. 2d 527, 533-34 (E.D.Va. 1999) (arbitration clause in fourth contract did not cover conduct that occurred when third contract was in effect); *Connett v. Justus Enters. of Kansas, Inc.*, Civ. A. No. 87–1739–T, 1989 WL 47071, at *2 (D. Kan. March 21, 1989) (arbitration clause did not apply when alleged fraudulent conduct occurred before plaintiff executed contract with arbitration clause); *George Wash. Univ. v. Scott*, 711 A.2d 1257, 1260-61 (D.C. Ct. App. 1998) (conduct that occurred before arbitration clause took effect was not arbitrable).

[48] *Coffman*, 161 F. Supp. 2d at 726-27 (citing *Sec. Watch*, 176 F.3d at 372–73 (arbitration clause did not reach disputes arising under earlier agreements because it is "nonsensical to suggest that [the plaintiff] would abandon its established right to litigate disputes arising under the [prior] contracts"); *Choice Sec. Sys. v. AT&T Corp*, No. 97-1774, 1998 WL 153254, at *1 (1st Cir. Feb.25, 1998) (arbitration clause in 1994 contracts did not apply to pre–1994 contracts when the language of the arbitration clause did not indicate "that the parties ever contemplated so radical a retroactive renegotiation of their earlier agreements"); *Hendrick*, 50 F. Supp. 2d at 535 (arbitration clause was not retroactive when the text of the clause expressed no language providing that it "reache[d] back in time to require an employee to arbitrate a claim which had accrued before the contract was signed or the [arbitration clause] took effect"); *Connett*, 1989 WL 47071, at *2 (arbitration clause did not apply retroactively when it did not specify that it applied to past conduct); *Kenworth of Dothan, Inc. v. Bruner–Wells Trucking, Inc.*, 745 So.2d 271, 275-76 (Ala. 1999) (arbitration clause was not retroactive when language of the clause did not so state); *George Wash. Univ.*, 711 A.2d at 1261 (arbitration clause was not retroactive when "the arbitration clause itself contained no indication whatsoever that its terms would apply . . . before [its effective date]").

Appx. 02778
015340

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10    Filed 04/23/25    Page 662 of 1017    PageID 16323
Case 18-03078-sgj    Doc 396    Filed 04/06/24    Entered 04/16/19 15:12:8    Page 20 of 30

Bottom line, the court in *Coffman* seemed to focus on **when each cause of action accrued** and looked to the **agreement that governed at such time**. This court agrees with that reasoning and sees no reason why the result should be different in the case at bar, simply because the arbitration clauses in the case at bar were in **earlier** versions of the Sub-Advisory and Shared Services Agreements as opposed to being in the **later** versions of those agreements (in other words, the opposite sequence as in the *Coffman* case).

The Reorganized Debtors have cited a couple of cases that they believe justify a determination that there is no binding arbitration clause in the case at bar. One is the case of *Goss-Reid & Assocs. Inc. v. Tekniko Licensing Corp.*[49] This case involved a motion to compel arbitration that was denied (which denial was affirmed by the Fifth Circuit). Like the case at bar, it involved a situation where there had been a succession of agreements, with earlier agreements containing arbitration provisions and the last agreement containing no arbitration clause. Specifically, in the *Goss-Reid* case, there were three agreements that were relevant. First, a **Franchise Agreement** between a franchisor named Transformational Technologies, Inc. ("TTI") and a party named Rittenhaus-Tate Organization ("RTO"). RTO was a business owned by Tracy Goss and Sheila Reid. The Franchise Agreement, among other things, provided that RTO's owners Tracy Goss and Sheila Reid would be "licensed franchisees of TTI" and would have use of certain of TTI's intellectual property. During the term of the Franchise Agreement, Tracy Goss and Sheila Reid developed certain consulting services technology they called "The Winning Strategy" and it apparently was built off of TTI's intellectual property. This first agreement contained a mandatory arbitration provision. Second, there was a **License**

---

[49] *Goss-Reid & Assocs. Inc. v. Tekniko Licensing Corp.*, 54 Fed. Appx. 405 (5th Cir. 2002) (per curium opinion which is designated as having no precedential effect).

Appx. 02779
015341

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Filed 04/25/25    Page 663 of 1017    PageID 16324
Case 18-03078-sgj    Doc 396-5    Filed 04/05/19    Page 21 of 30

**Agreement** between the apparent successor-in-interest of TTI called Tekniko, Inc., on the one hand, and Tracy Goss, Sheila Reid and Goss-Reid & Associates, Inc. (collectively, "Goss/Reid"), on the other, pursuant to which Goss/Reid obtained a "a non-exclusive license to use the same intellectual property covered by the Franchise Agreement." This second agreement also contained a mandatory arbitration agreement. Third, there was a **Transfer Agreement** that appears to have been entered into by the same parties as the second agreement (Tekniko, Inc. and Goss/Reid). The Transfer Agreement "permanently transferred [to Goss/Reid] the non-exclusive right to use the intellectual property that was the subject of the prior agreements in exchange for a percentage of [Goss & Reid's] adjusted gross profits for that year." There was no arbitration provision in this third agreement and the agreement did not adopt or refer to the arbitration provisions contained in the earlier agreements. The third agreement stated that it constituted "an amendment to the License Agreement . . . between you and this company ('TEKNIKO'), supersedes all prior agreements between you and TEKNIKO and, except as provided below, will terminate your rights and those of TEKNIKO under the License Agreement."

At some subsequent time, Goss/Reid filed a lawsuit alleging improper use of "The Winning Strategy" by the entities Tekniko Licensing Corporation and Landmark Education Company. These Defendants (hereafter so called) asserted ownership themselves of "The Winning Strategy" based on the Franchise Agreement. The Defendants—citing to the arbitration clauses in both the Franchise Agreement and the License Agreement—filed a motion to compel arbitration, which was denied at the district court level and also at the Fifth Circuit. The district court determined that New York law applied (*i.e.,* the Transfer Agreement was governed by New York law and apparently the parties agreed that New York law applied), and that the Transfer Agreement constituted a novation and extinguished the arbitration provisions of the previous

App. 02789
015342

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Filed 04/25/25    Page 664 of 1017    PageID 16325
Case 18-03078-sgj Doc 2-396 Filed 04/03/94    Entered 04/11/19 Page 23 of Page 22 of 30

agreements. On appeal, the Fifth Circuit stated that the issue before it was "whether the arbitration provisions of the Franchise and License Agreements were superseded by the Transfer Agreement. Thus, the question before us is one of contractual interpretation."[50]

The Fifth Circuit stated certain principles that apply under both New York and Texas law. Among other principles, the Fifth Circuit noted that courts construing contracts "should strive to give effect to the intentions of the parties, as expressed in the terms of the contract."[51] The Transfer Agreement stated that "it supersedes all prior agreements" between Goss/Reid and the predecessor-in-interest of one of the Defendants, Tekniko Licensing Corporation.[52] "This type of agreement clearly constitutes a novation under New York law."[53] The court also noted that it was not appropriate to consider any extrinsic or parol evidence, since there was no ambiguity in the Transfer Agreement. The court further stated that "[t]he only potential ambiguity raised by the Defendants is that the Transfer Agreement refers to itself as an 'amendment to the License Agreement.' Read as a whole, however, the Transfer Agreement plainly manifests an intention to supersede all prior agreements between the parties and, except as specifically provided, to terminate all rights and obligations under the License Agreement."[54]

The other case that the Reorganized Debtors have significantly relied upon to justify a determination that there is no binding arbitration clause in the case at bar is *Valero Energy Corp. v. Teco Pipeline Co.*[55] In *Valero*, there had been numerous agreements entered into over time

---

[50] *Id.* at *1.

[51] *Id.*

[52] *Id.*

[53] *Id.* (citing various New York state court cases).

[54] *Id.* at *2.

[55] *Valero Energy Corp. v. Teco Pipeline Co.*, 2 S.W.3d 576 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

Appx. 02781
015343

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-10   Filed 04/25/25   Page 665 of 1017   PageID 16326
Case 18-03078-sgj   Doc 21-19   Filed 04/06/19   Page 23 of 30

amongst the litigating parties, all of which involved gas pipelines and transportation rights, and
those various agreements were not amendments or restatements of one initial agreement.  Rather,
there was an Operating Agreement, there were documents that were alleged to create a joint
venture or partnership, a Purchase Agreement, an Ownership Agreement, a Transportation
Agreement, and a couple of Settlement Agreements entered into later when various disputes
arose.  One of the key agreements, the so-called Operating Agreement, contained an arbitration
clause.  When party Teco Pipeline sued party Valero and other related parties, Valero moved to
compel arbitration, arguing that the litigation was subject to the arbitration clause in the
Operating Agreement.  The trial court denied Valero's motion, but the court of appeals reversed.

Teco had argued that the claims it was asserting were not based on the Operating
Agreement that contained the arbitration clause but, even if they were, a later Settlement
Agreement essentially redefined the parties' relationship—essentially superseding the parties'
relationship that had been set forth in the numerous prior agreements—and it did not have an
arbitration clause.  Rather the Settlement Agreement stated that:

> Each party irrevocably consents and agrees that any legal action, suit or proceeding
> against any of them with respect to their obligations, liabilities, or any other matter
> under or arising out of or in connection with this Agreement may be brought in the
> United States District Court for the Western District of Texas, San Antonio
> Division, or in the courts of the State of Texas, and hereby irrevocably accepts and
> submits to the jurisdiction of each of the aforesaid court in personam, generally and
> unconditionally with respect to any such action, suit or proceeding for itself and in
> respect of its properties, assets and revenues.[56]

Teco asserted that the quoted clause provided for the procedure to be used in future disputes, *i.e.,*
that the parties would go through judicial channels, not arbitration.  Teco also asserted that the
intent to revoke the arbitration clause was signified by a typical merger clause contained in the

---

[56] *Id.* at 587.

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Filed 04/25/25    Page 666 of 1017    PageID 16327
Case 18-03078-sgj    Doc 296-05    Filed 04/08/19    Entered 04/11/19 15:23:29    Page 24 of 30

Settlement Agreement. The appeals court disagreed with Teco's argument and determined arbitration was required. First, the court determined that the provision regarding litigation applied only to disputes arising under the Settlement Agreement not the previously executed Operating Agreement, Purchase Agreement, Ownership Agreement, or Transportation Agreements. There was nothing to indicate that all the terms of those previous agreements had been superseded by the Settlement Agreement. In fact, it appeared that only select terms of the earlier agreements were being modified. Significantly, the Settlement Agreement referred to an "Amendment No. 1" to the Operating Agreement being attached as an Exhibit D to the Settlement Agreement—suggesting that it remained in intact (except for the amendment attached). Moreover, there was a post-Settlement Agreement letter submitted into evidence stating that the prior Operating Agreement and arbitration provision were still in effect. The court addressed many other arguments made by Teco and, in the end, found nothing had superseded or otherwise revoked the prior arbitration clause.

This bankruptcy court does not consider the *Valero* or *Goss-Reid* cases to be dispositive of the situation in the case at bar. Those cases clearly dealt with a myriad of agreements—for example, in *Valero*, one key agreement had an arbitration clause, and an allegedly superseding Settlement Agreement (with no arbitration clause) was determined not to have been intended to supersede or replace the agreement with the arbitration clause. In *Goss-Reid*, there were also a myriad of agreements (*i.e.,* a franchise agreement, a license agreement and then a transfer agreement), and the last one containing no arbitration clause was held to have been a novation of the prior agreements. In *Valero* and *Goss-Reid*, the various agreements were not amendments or restatements of one initial agreement. The case at bar is more analogous to the *Coffman* case (involving amendments and restatements of an initial agreement) and the logic of that holding

Appx. 02795

015345

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Filed 04/18/25    Page 667 of 1017    PageID 16328
Case 18-03078-sgj    Doc 396-58    Filed 04/08/19    Entered 04/08/19 18:28:28    Page 25 of 30

seems sound to apply here—especially given the fact that there is nothing in the March 17, 2017

version of the agreements that suggests that the agreement to submit disputes to litigation in

Texas and the deletion of the arbitration clauses should be applied retroactively. The court

believes it should look at when a cause of action accrued and determine if there was a binding

arbitration clause between the parties at that time in the governing version of the agreement.

Thus, the court determines that there were valid arbitration agreements that applied to all

disputes arising out of the Sub-Advisory Agreement and Shared Services Agreement—to the

extent that those disputes involved conduct prior to March 17, 2017. Since Counts 1-8 involve

conduct prior to March 17, 2017, Counts 1-8 fall within the scope of the arbitration agreements

in the Sub-Advisory Agreement and Shared Series Agreement.

## C.    But Wait, this is Bankruptcy and Core Matters and a Proof of Claim Objection are Involved.

The analysis does not end here. Yes, there is an otherwise valid, binding arbitration

clause that was contained in each of the Sub-Advisory and Shared Services Agreements (prior to

March 17, 2017). And, yes, Counts 1-8 involve conduct and disputes arising under these pre-

March 17, 2017 agreements. But what about the fact that these disputes arise in an adversary

proceeding that involves mostly, if not entirely, "core" matters (*e.g.,* Counts 5-25 are all

fraudulent transfers or preference claims under Section 544,[57] 547,[58] or 548;[59] Count 2 is a

Section 542 turnover request;[60] Count 26 is a request for Section 550 recovery[61])? And what

---

[57] *See* 28 U.S.C. § 157(b)(2)(H).

[58] *See* 28 U.S.C. § 157(b)(2)(F).

[59] *See* 28 U.S.C. § 157(b)(2)(H).

[60] *See* 28 U.S.C. § 157(b)(2)(E).

[61] *See* 28 U.S.C. § 157(b)(2)(F) & (H).

Appx 02784
015346

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21   Filed 04/25/25   Page 668 of 1017   PageID 16329
Case 18-03078-sgj   Doc 396-58   Doc 3694   Filed 11/04/19   Filed 10/16/19   Page 27 of 31   Page 26 of 30

about the fact that Highland (the counter-party to the Sub-Advisory and Shared Services

Agreement who has asked for enforcement of the arbitration clauses in those agreements) has

filed proofs of claim?[62]  And what about the fact that Counts 1-8 (as with every count in the

Adversary Proceeding) are all urged to be *offsets* to Highland's proofs of claim?[63]  Highland's

proofs of claim are based on the post-March 17, 2017 versions of the Sub-Advisory and Shared

Services Agreements (*i.e.,* the versions that have no arbitration clauses).  Highland has not

argued that its proofs of claim are subject to arbitration (likely because they are governed by the

post-March 17, 2017 versions of the Sub-Advisory and Shared Services Agreements).  But,

again, Highland argues that Counts 1-8 must be sent to arbitration, and the Reorganized Debtors

argue that each of these counts present potential offsets to Highlands' proofs of claim.  As a

reminder, these counts are:

**COUNT 1**:   Declaratory Judgment of Ultra Vires Acts by Acis LP in Violation of the LPA
(Highland allegedly overcharged expenses by $7M+ (*i.e.,* excessive fees) under
the Sub-Advisory and Shared Services Agreements).

**COUNT 2**:   Turnover of Property of the Estate Under § 542 for Unauthorized Overpayments
(turnover the $7M+ overcharged).

**COUNT 3**:   Money Had and Received for Overcharges and Unauthorized Overpayments
(again, seeking redress for the $7M+ overcharged—implicating the Sub-Advisory
Agreement and Shared Services Agreement).

**COUNT 4**:   Conversion for Unauthorized Overpayments (again, seeking redress for the $7M+
overcharged implicating the Sub-Advisory Agreement and Shared Services
Agreement).

**COUNT 5**:   Actual Fraudulent Transfer under § 548 related to the Sub-Advisory Agreement
(modifications to the Sub-Advisory Agreement in subsequent iterations were
allegedly fraudulent transfer, as were payments thereunder).

---

[62] *See* 28 U.S.C. § 157(b)(2)(B).

[63] *See* 28 U.S.C. § 157(b)(2)(C).

Appx. 02785
015347

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Filed 06/25    Page 669 of 1017    PageID 16330
Case 18-03078-sgj    Doc 189-3    Filed 04/03/19    Entered 04/11/19 Page 28 of 31    Page 27 of 30

**COUNT 6**:      Actual Fraudulent Transfer Under TUFTA, § 24.005(a)(1) related to the Sub-Advisory Agreement (same theory as Count 5, asserted through section 544 of the Bankruptcy Code).

**COUNT 7**:      Constructive Fraudulent Transfer Under § 548(a)(1)(B) related to the Sub-Advisory Agreement (same facts as Count 5 only constructive not actual fraud).

**COUNT 8**:      Constructive Fraudulent Transfer Under TUFTA §§ 24.005(a)(2) and 24.006(a) related to the Sub-Advisory Agreement (same facts as Count 5, only constructive fraud under TUFTA, and asserted through section 544 of the Bankruptcy Code).

Thus, to recap, *five of the eight counts that Highland wants arbitrated* (Counts 2, and 5-8) clearly involve statutory core matters.[64]  Moreover, *all* of the counts in the Adversary Proceeding are asserted *defensively* to two proofs of claim—meaning *all eight counts that Highland wants arbitrated* (even Counts 1, 3, and 4) have transformed into statutory core matters.[65]  Does this matter?  This court believes yes.

The Fifth Circuit has shed some light on this topic in the cases of *In re Gandy* and *In re National Gypsum*.[66]  In those cases, the Fifth Circuit instructed that a bankruptcy court may decline to enforce arbitration clauses when it finds:  (a) the underlying nature of the proceeding

---

[64] *See* 28 U.S.C. § 157(b)(2)(E), (F), and (H).

[65] *See* 28 U.S.C. § 157(b)(2)(C).  This court realizes that, from a *Stern v. Marshall* perspective, 131 S. Ct. 2594 (2011), being a **statutory** "core" matter does not necessarily mean a bankruptcy court has Constitutional authority to issue final orders or judgments in the matter.  However, even if this *Stern* pronouncement has any relevance, when evaluating an arbitration clause/right, the court perceives that the various counterclaims here (*i.e.,* all 35 counts) are likely **inexplicably intertwined** with the Highland proofs of claim, such that the bankruptcy court would likely have Constitutional authority to adjudicate them.  While Highland's proofs of claim merely seek payment for services under the post-March 17, 2017 versions of the agreements—which is *after* the time frame that Counts 1-8 implicate—it is not so simple as dividing claims and counterclaims into discreet time periods.  For one thing, the Reorganized Debtors argue that modifications to the Sub-Advisory and Shared Services Agreements that increased fees that Highland could charge (and that Highland is now seeking in its proofs of claim) were tantamount to fraudulent transfers.  Thus, how does one evaluate the proofs of claim separately from this argument?  Additionally, Highland **has asserted unliquidated indemnification claims** in its proofs of claim that presumably reach back to earlier iterations of the Sub-Advisory and Shared Services Agreement (meaning that claims ultimately awarded to the Reorganized Debtors under earlier versions of the agreements might result in indemnification claims being asserted back against them by Highland relating to those very claims).  The point being that all of Highland's assertions in its proofs of claim seem inextricably intertwined with all the Counts in the Adversary Proceeding.

[66] *Gandy v. Gandy (In re Gandy)*, 299 F.3d 489 (5th Cir. 2002); *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.)*, 118 F.3d 1056 (5th Cir. 1997).

015348

Case 19-34054-sgj11    Doc 3596-21    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Filed 05/25/25    Page 670 of 1017    PageID 16331
Case 18-03078-sgj    Doc 296-38    Doc 604    Filed 11/11/19    Page 28 of 30

derives from the provisions of the Bankruptcy Code; and (b) that enforcement of the arbitration

provision would conflict with the purposes/goals of the Bankruptcy Code.[67]  Some

purposes/goals of the Code that might support a denial of arbitration, include: (1) the equitable

and expeditious distribution of assets of the Debtor's estate; (2) centralized resolution of pure

bankruptcy issues; (3) protection of creditors and reorganizing debtors from piecemeal litigation,

and (4) the undisputed power of a bankruptcy court to enforce its orders.[68]

The *In re Gandy* opinion from the Fifth Circuit is worthy of discussion here.  In *Gandy*,

an individual Chapter 11 debtor had first, prepetition, filed a state court lawsuit against various

business partners, asserting causes of action against them for making transfers out of a

partnership affecting her ownership interests, and the causes of action included breach of

contract, negligence, breach of fiduciary duty, fraud and constructive trust.  There was an

arbitration clause in the applicable partnership agreement and the state court granted a motion to

compel arbitration.  Then, the debtor filed a Chapter 11 case and removed the state court lawsuit

to the bankruptcy court and filed new claims under sections 544, 548, 550, civil "RICO," and

alter ego in a separate adversary proceeding, and requested substantive consolidation.  The

bankruptcy court granted consolidation of the two actions and then the defendants filed a motion

to compel arbitration.  The bankruptcy court denied the motion, after finding that the debtor was

essentially seeking avoidance of fraudulent transfers.  The Fifth Circuit affirmed the bankruptcy

court's refusal to enforce an arbitration clause contained in the underlying partnership

agreement.  The court agreed with the bankruptcy court that the complaint essentially—more

than anything else—sought avoidance of fraudulent transfers, and the court not only determined

---

[67] *Id.* at 1069.

[68] *Id.*

015349
App. 02787

Case 19-34054-sgj11 Doc 3596-21 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-21 Filed 05/22/25 160 Page 671 of 1017 PageID 16332
Case 18-03078-sgj Doc 296-9 Filed 04/05/19 Entered 04/16/19 Page 29 of 30

that such rights derived from the Bankruptcy Code (fully acknowledging the fact that there were

state law tort claims and breach of contract also asserted) but also—in looking at whether

enforcing the arbitration clause would conflict with the purposes of the Bankruptcy Code—noted

that one central purpose of the Bankruptcy Code is the expeditious and equitable distribution of

the assets of a debtor's estate. The court thought the avoidance actions predominated over the

"peripheral" contract and tort claims and, in such a circumstance, "the importance of the federal

bankruptcy forum provided by the Code is at its zenith."[69] The court stated that "[s]ome of the

purposes of the Code we mentioned in *National Gypsum*[70] as potentially conflicting with the

Arbitration Act include the goal of centralized resolution of purely bankruptcy issues, the need to

protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of

the bankruptcy court to enforce its own orders."[71]

      This court believes, like the court in *Gandy*, that this Adversary Proceeding—more than

anything else—seeks avoidance of fraudulent transfers. Such avoidance theories derive from the

Bankruptcy Code. Sections 542, 547, 548 and 550 of the Bankruptcy Code are front and center,

as are the "strong arm" powers of section 544(a). Enforcing the arbitration clause here would

conflict with the purposes of the Bankruptcy Code—one of the central purposes of which is the

---

[69] *Gandy,* 299 F.3d at 497.

[70] In the *National Gypsum* case, an asbestos litigation trust created under a confirmed plan filed a post-confirmation adversary proceeding against debtor's liability insurer, seeking a declaratory judgment that the plan had discharged its obligations to the insurance company. The insurance company, in response to the litigation, sought to exercise its rights to seek arbitration under a certain agreement. The Fifth Circuit, in affirming the lower courts' refusal to compel arbitration, stated that, "We believe that nonenforcement of an otherwise applicable arbitration provision turns on the underlying nature of the proceeding, *i.e.*, whether the proceeding derives exclusively from the provisions of the Bankruptcy Code and, if so, whether arbitration of the proceeding would conflict with the purposes of the Code." *Nat'l Gypsum Co.*, 118 F.3d at 1067. Because the debtor sought to bar the insurance company's actions either by invoking section 524(a)'s discharge injunction or by invoking the terms of a confirmed plan, the proceeding derived entirely from the provisions of the Bankruptcy Code, and, hence, the *National Gypsum* court would not send the dispute to arbitration.

[71] *Gandy*, 299 F.3d at 500.

Appx. 02788
015350

expeditious and equitable distribution of the assets of a debtor's estate.  The avoidance actions in this Adversary Proceeding predominate over all other counts and, in such a circumstance, "the importance of the federal bankruptcy forum provided by the Code is at its zenith."  Arbitrating Counts 1-8 would seriously jeopardize the Adversary Proceeding because they are an integral part of determining Highland's proofs of claim and the other core counts in the Adversary Proceeding.  The bankruptcy court's quintessential duties are to adjudicate proofs of claim and to provide a central forum for litigation, whenever feasible and jurisdictionally sound.  Indeed, in *Gandy*, the Fifth Circuit noted that when a proof of claim is filed, one of the "peculiar powers" of the bankruptcy court has been invoked and the nature of estate claims becomes "different from [their] nature . . . following the filing of a proof of claim."[72]

In summary, this court believes it has discretion under established Fifth Circuit authority to decline to order arbitration here.[73]  It is, therefore,

**ORDERED** that the Arbitration Motion is **DENIED**.

**#### END OF MEMORANDUM OPINION AND ORDER####**

---

[72] *Id.* at 499 (citing *Wood v. Wood (In re Wood),* 825 F.2d 90, 97 (5th Cir. 1987)).

[73] *See also Anderson v. Credit One Bank, N.A. (In re Anderson)*, 884 F.3d 382, 389-90 (2d Cir. 2018) (in proceeding involving whether section 524 discharge was violated by credit card company whose agreement with debtor contained arbitration clause, Second Circuit held that bankruptcy court had discretion to decline to enforce the arbitration agreement; Second Circuit engaged in a particularized inquiry into the nature of the claim and the facts of the specific bankruptcy and determined that arbitrating claims for violations of the 524 injunction would "seriously jeopardize a particular core bankruptcy proceeding" because: "(1) the discharge injunction is integral to the bankruptcy court's ability to provide debtors with a fresh start, (2) the claim relates to an ongoing matter with continuing court supervision, and (3) the equitable powers of the court to enforce its own injunctions are central to the structure of the Code.").

Appx. 02789

015351

Case 19-12239-CSS    Doc 86-5    Filed 11/01/19    Page 1 of 7

## <u>CERTIFICATE OF SERVICE</u>

I, Elliot Bromagen, certify that I am not less than 18 years of age, and that service

of the foregoing was caused to be made on November 1, 2019, in the manner indicated on the

parties on the attached service list.

Date: November 1, 2019                    */s/ Elliot Bromagen*
                                          Elliot Bromagen

Case 19-34054-sgj11   Doc 3596-21   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 55-21   Filed 01/15/25   Page 674 of 1017   PageID 16335

Case 19-12239-CSS   Doc 86-5   Filed 11/01/19   Page 2 of 7

**HAND DELIVERY**
([Proposed] Counsel for the Debtor and
Debtor in Possession)
James O'Neill, Esquire
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19899 (Courier 19801)

**OVERNIGHT DELIVERY**
([Proposed] Counsel for the Debtor and
Debtor in Possession)
Richard M. Pachulski, Esquire
Jeffrey N. Pomerantz, Esquire
Ira D. Kharasch, Esquire
Maxim B. Litvak, Esquire
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA 90067

**HAND DELIVERY**
(United States Trustee)
Jane M. Leamy, Esquire
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801

**HAND DELIVERY**
(State Attorney General)
Kathy Jennings, Esquire
Delaware Department of Justice
Carvel State Office Building, 6th Floor
820 N. French Street
Wilmington, DE 19801

**HAND DELIVERY**
Zillah A. Frampton
Bankruptcy Administrator
Delaware Division of Revenue
Carvel State Office Building, 8th Floor
820 N. French Street
Wilmington, DE 19801

**HAND DELIVERY**
(United States Attorney)
David C. Weiss
c/o Ellen Slights
US Attorney's Office
District of Delaware
Hercules Building, Suite 400
1313 N. Market Street
Wilmington, DE 19801

**HAND DELIVERY**
(Top 20 Unsecured Creditor)
Ryan P. Newell, Esquire
Connolly Gallagher LLP
1201 N. Market Street, 20th Floor
Wilmington, DE 19801

**HAND DELIVERY**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Sean M. Beach, Esquire
Jaclyn C. Weissgerber, Esquire
Young Conaway Stargatt & Taylor, LLP
1000 North King Street, Rodney Square
Wilmington, DE 19801

**HAND DELIVERY**
(Counsel to the Redeemer Committee of the
Highland Crusader Fund)
Curtis S. Miller, Esquire
Morris, Nichols, Arsht & tunnel LLP
Kevin M. Coen, Esquire
1201 North Market Street, Suite 1600
Wilmington, DE 19801

**HAND DELIVERY**
(Counsel to Acis Capital Management GP
LLC and Acis Capital Management, L.P.)
John E. Lucian, Esquire
Josef W. Mintz, Esquire
Jose F. Bibiloni, Esquire
Blank Rome LLP
1201 N Market Street, Suite 800
Wilmington, DE 19801

App.x 02791
015353

**HAND DELIVERY**
(Counsel to Patrick Daugherty)
Michael L. Vild, Esquire
Cross & Simon, LLC
1105 N. Market Street, Suite 901
Wilmington, DE  19801

**HAND DELIVERY**
(Counsel to Hunter Mountain Trust)
William A. Hazeltine, Esquire
Sullivan Hazeltine Allinson LLC
901 North Market Street, Suite 1300
Wilmington, DE  19801

**OVERNIGHT DELIVERY**
(Counsel to Acis Capital Management GP
LLC and Acis Capital Management, L.P.)
Rakhee V. Patel, Esquire
Phillip Lamberson, Esquire
Winstead PC
2728 N. Harwood Street, Suite 500
Dallas, TX  75201

**OVERNIGHT DELIVERY**
(United States Attorney General)
William Barr, Esquire
Office of the US Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW,
Room 4400
Washington, DC  20530-0001

**OVERNIGHT DELIVERY**
State of Delaware
Division of Corporations - Franchise Tax
PO Box 898
Dover, DE  19903

**OVERNIGHT DELIVERY**
Delaware Secretary of Treasury
820 Silver Lake Blvd, Suite 100
Dover, DE  19904

**OVERNIGHT DELIVERY**
Office of General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC  20220

**OVERNIGHT DELIVERY**
Office of General Counsel
Securities & Exchange Commission
100 F Street, NE
Washington, DC  20554

**OVERNIGHT DELIVERY**
Sharon Binger, Regional Director
Philadelphia Regional Office
Securities & Exchange Commission
One Penn Center, Suite 520
1617 JFK Boulevard
Philadelphia, PA  19103

**OVERNIGHT DELIVERY**
Andrew Calamari, Regional Director
New York Regional Office
Securities & Exchange Commission
Brookfield Place, Suite 400
200 Vesey Street
New York, NY  10281

**OVERNIGHT DELIVERY**
Office of the General Counsel
Michael I. Baird, Esquire
Pension Benefit Guaranty Corporation
1200 K Street, NW
Washington, DC  20005-4026

**OVERNIGHT DELIVERY**
Internal Revenue Service
Centralized Insolvency Operation
PO Box 7346
Philadelphia, PA  19101

Appx. 02792
015354

**OVERNIGHT DELIVERY**
BBVA
Michael Doran
8080 N. Central Expressway
Suite 1500
Dallas, TX  75206

**OVERNIGHT DELIVERY**
NexBank
John Danilowicz
2515 McKinney Avenue
Suite 1100
Dallas, TX 75201

**OVERNIGHT DELIVERY**
KeyBank National Association
as Administrative Agent
225 Franklin Street, 18th Floor
Boston, MA 02110

**OVERNIGHT DELIVERY**
KeyBank National Association
as Agent
127 Public Square
Cleveland, OH 44114

**OVERNIGHT DELIVERY**
Prime Brokerage Services
Jefferies LLC
520 Madison Avenue
New York, NY 10022

**OVERNIGHT DELIVERY**
Office of the General Counsel
Re: Prime Brokerage Services
Jefferies LLC
520 Madison Avenue, 16th Floor
New York, NY 10022

**OVERNIGHT DELIVERY**
Director of Compliance
Re: Prime Brokerage Services
Jefferies LLC
520 Madison Avenue, 16th Floor
New York, NY 10022

**OVERNIGHT DELIVERY**
Frontier State Bank
Attn:  Steve Elliot
5100 South I-35 Service Road
Oklahoma City, OK 73129

**OVERNIGHT DELIVERY**
Strand Advisors, Inc.
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
The Dugaboy Investment Trust
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
Mark K. Okada
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
The Mark and Pamela Okada Family
Trust – Exempt Trust #1
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
The Mark and Pamela Okada Family
Trust – Exempt Trust #2
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
Hunter Mountain Investment Trust
c/o Rand Advisors LLC
John Honis
87 Railroad Place Ste 403
Saratoga Springs, NY 12866

Appx. 02798

015355

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Acis Capital Management, L.P.
  and Acis Capital Management GP, LLC
c/o Brian P. Shaw, Esquire
Rogge Dunn Group, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
American Arbitration Association
Elizabeth Robertson, Esquire
120 Broadway, 21st Floor,
New York, NY 10271

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Andrews Kurth LLP
Scott A. Brister, Esquire
111 Congress Avenue, Ste 1700
Austin, TX 78701

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Bates White, LLC
Karen Goldberg, Esquire
2001 K Street NW
North Bldg Suite 500
Washington, DC 20006

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
CLO Holdco, Ltd.
Grant Scott, Esquire
Myers Bigel Sibley & Sajovec, P.A.
4140 Park Lake Ave, Ste 600
Raleigh, NC 27612

**OVERNIGHT DELIVERY**
Cole, Schotz, Meisel, Forman & Leonard,
P.A.
Michael D. Warner, Esquire
301 Commerce Street, Suite 1700
Fort Worth, TX 76102

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Debevoise & Plimpton LLP
Michael Harrell, Esquire
c/o Accounting Dept 28th Floor
919 Third Avenue
New York, NY 10022

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
DLA Piper LLP (US)
Marc D. Katz, Esquire
1900 N Pearl St, Suite 2200
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Duff & Phelps, LLC
c/o David Landman
Benesch, Friedlander, Coplan & Aronoff
LLP
200 Public Square, Suite 2300
Cleveland, OH 44114-2378

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Foley Gardere
Holly O'Neil, Esquire
Foley & Lardner LLP
2021 McKinney Avenue Suite 1600
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Joshua & Jennifer Terry
c/o Brian P. Shaw, Esquire
Rogge Dunn Group, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201

Appx. 02794
015356

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Lackey Hershman LLP
Paul Lackey, Esquire
Stinson LLP
3102 Oak Lawn Avenue, Ste 777
Dallas, TX 75219

**OVERNIGHT DELIVERY**
Lynn Pinker Cox & Hurst, L.L.P.
Michael K. Hurst, Esquire
2100 Ross Avenue, Ste 2700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
McKool Smith, P.C.
(Top 20 Unsecured Creditor)
Gary Cruciani, Esquire
300 Crescent Court, Suite 1500
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Meta-e Discovery LLC
Paul McVoy
Six Landmark Square, 4th Floor
Stamford, CT 6901

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
NWCC, LLC
c/o of Michael A. Battle, Esquire
Barnes & Thornburg, LLP
1717 Pennsylvania Ave N.W. Ste 500
Washington, DC 20006-4623

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Patrick Daugherty
c/o Thomas A. Uebler, Esquire
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Rd #401
Wilmington, DE 19808

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Redeemer Committee of the Highland
Crusader Fund
c/o Terri Mascherin, Esquire
Jenner & Block
353 N. Clark Street
Chicago, IL 60654-3456

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Reid Collins & Tsai LLP
William T. Reid, Esquire
810 Seventh Avenue, Ste 410
New York, NY 10019

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
UBS AG, London Branch and UBS
Securities LLC
c/o Andrew Clubock, Esquire
Latham & Watkins LLP
555 Eleventh Street  NW Suite 1000
Washington, DC 20004-130

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Scott E. Gant, Esquire
Boies, Schiller & Flexner LLP
1401 New York Avenue, NW
Washington, DC  20005

**OVERNIGHT DELIVERY**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Marshall R. King, Esquire
Michael A. Rosenthal, Esquire
Alan Moskowitz, Esquire
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10066

Appx. 02795
015357

**OVERNIGHT DELIVERY**
(Counsel to California Public Employees'
Retirement System ("CalPERS"))
Louis J. Cisz, III, Esquire
Nixon Peabody LLP
One Embarcadero Center, 32nd Floor
San Francisco, CA 94111

**OVERNIGHT DELIVERY**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Matthew G. Bouslog, Esquire
Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, CA 92612

**OVERNIGHT DELIVERY**
(Counsel to Redeemer Committee of the
Highland Crusader Fund)
Marc B. Hankin, Esquire
Richard Levin, Esquire
Jenner & Block LLP
919 Third Avenue
New York, New York 10022-3908

**OVERNIGHT DELIVERY**
(Counsel to Coleman County TAD, et al.)
Elizabeth Weller, Esquire
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons Freeway, Suite 1000
Dallas, TX 75207

**OVERNIGHT DELIVERY**
(Counsel to Jefferies)
Patrick Maxcy, Esq.
Dentons US LLP
233 South Wacker Drive Suite 5900
Chicago, Illinois 60606-6361

**OVERNIGHT DELIVERY**
(Proposed Official Committee of Unsecured
Creditors)
Bojan Guzina, Esquire
Matthew Clemente, Esquire
Alyssa Russell, Esquire
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

**OVERNIGHT DELIVERY**
(Proposed Official Committee of Unsecured
Creditors)
Jessica Boelter, Esquire
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019

**OVERNIGHT DELIVERY**
(Proposed Official Committee of Unsecured
Creditors)
Penny P. Reid, Esquire
Paige Holden Montgomery, Esquire
Sidley Austin LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201

Appx. 02796
015358

# EXHIBIT 22

Appx 02787
015359

# In Re:

*HIGHLAND CAPITAL MANAGEMENT, L.P.*

*Case No. 19-12239(CSS)*

---

*December 2, 2019*

---

*eScribers, LLC*

*(973) 406-2250*

*operations@escribers.net*

*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone or email*

Appx. 92798
015360

1

1   

2   UNITED STATES BANKRUPTCY COURT

3   DISTRICT OF DELAWARE

4   - - - - - - - - - - - - - - - - - - - - - -x

5   In the Matter of:

6   HIGHLAND CAPITAL MANAGEMENT, L.P.,      Case No.

7           Debtor.                         19-12239(CSS)

8   - - - - - - - - - - - - - - - - - - - - - -x

9

10

11              United States Bankruptcy Court

12              824 North Market Street

13              Wilmington, Delaware

14

15              December 2, 2019

16              10:07 AM

17

18

19  B E F O R E:

20  HON. CHRISTOPHER S. SONTCHI

21  CHIEF U.S. BANKRUPTCY JUDGE

22

23  ECR OPERATOR:  LESLIE MURIN

24

25

Appx. 02799
015361

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 131-20   Filed 06/02/25   Page 683 of 1017   PageID 16344

2

 1

 2  Motion for Entry of an Order (I) Authorizing Bradley D. Sharp

 3  to Act as Foreign Representative Pursuant to 11 U.S.C. Section

 4  1505 and (II) Granting Related Relief (Docket No. 68).

 5

 6  Motion of the Official Committee of Unsecured Creditors for

 7  Entry of an Order Authorizing Filing Under Seal of the Omnibus

 8  Objection of the Official Committee of Unsecured Creditors to

 9  the Debtor's (1) Motion for Final Order Authorizing Continuance

10  of the Existing Cash Management System, (II) Motion to Employ

11  and Retain Development Specialists, Inc. to Provide a Chief

12  Restructuring Officer, and (III) Precautionary Motion for

13  Approval of Protocols for "Ordinary Course" Transactions

14  (Docket No. 123).

15

16  Motion of Debtor for Entry of Interim and Final Orders

17  Authorizing Debtor to File Under Seal Portions of Its Creditor

18  Matrix Containing Employee Address Information (Docket No. 8).

19

20  Debtor's Application for an Order Authorizing the Retention and

21  Employment of Foley Gardere, Foley & Lardner LLP as Special

22  Texas Counsel, Nunc Pro Tunc to the Petition Date (Docket No.

23  69).

24

25

Appx. 02800
015362

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-201   Filed 06/02/25   Page 684 of 1017   PageID 16345
Exhibit 22   Page 562 of 639

3

1

2   Debtor's Application for an Order Authorizing the Retention and

3   Employment of Lynn Pinker Cox & Hurst LLP as Special Texas

4   Litigation Counsel, Nunc Pro Tunc to the Petition Date (Docket

5   No. 70).

6

7   Motion of Debtor for Entry of Interim and Final Orders

8   Authorizing (A) Continuance of Existing Cash Management System

9   and Brokerage Relationships, (B) Continued Use of the Prime

10   Account, (C) Limited Waiver of Section 345(b) Deposit and

11   Investment Requirements, and (D) Granting Related Relief

12   (Docket No. 5).

13

14   Motion Pursuant to 11 U.S.C. Sections 105(a) and 363(b) to

15   Employ and Retain Development Specialists, Inc. to Provide a

16   Chief Restructuring Officer, Additional Personnel, and

17   Financial Advisory and Restructuring-Related Services, Nunc Pro

18   Tunc as of the Petition Date (Docket No. 75).

19

20   Precautionary Motion of the Debtor for Order Approving

21   Protocols for the Debtor to Implement Certain Transactions in

22   the Ordinary Course of Business (Docket No. 77).

23

24

25

Appx. 02801
015363

4

1

2      Motion of the Official Committee of Unsecured Creditors for an

3      Order Transferring Venue of This Case to the United States

4      Bankruptcy Court for the Northern District of Texas (Docket No.

5      86).

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     Transcribed by:  Clara Rubin

Appx 02802
015364

5

```
 1
 2   A P P E A R A N C E S :
 3   PACHULSKI STANG ZIEHL & JONES LLP
 4         Attorneys for Debtor
 5   BY:   JAMES E. O'NEILL, ESQ.
 6         GREGORY DEMO, ESQ.
 7         IRA D. KHARASCH, ESQ.
 8         MAXIM LITVAK, ESQ.
 9         JOHN A. MORRIS, ESQ.
10         JEFFREY N. POMERANTZ, ESQ.
11
12
13   UNITED STATES DEPARTMENT OF JUSTICE
14         Office of the United States Trustee
15   BY:   JANE LEAMY, ESQ.
16
17
18   SIDLEY AUSTIN LLP
19         Proposed Counsel for Official Committee of Unsecured
20         Creditors
21   BY:   MATTHEW A. CLEMENTE, ESQ.
22         PENNY P. REID, ESQ.
23         DENNIS M. TWOMEY, ESQ.
24
25
```

015365

6

YOUNG CONAWAY STARGATT & TAYLOR, LLP

     Attorneys for Official Committee of Unsecured Creditors

BY:   SEAN M. BEACH, ESQ.

     KEVIN A. GUERKE, ESQ.

     MICHAEL R. NESTOR, ESQ.


ASHBY & GEDDES, P.A.

     Attorneys for Jefferies, LLC

BY:   WILLIAM P. BOWDEN, ESQ.


BLANK ROME LLP

     Attorneys for Acis Capital Management GP, et al.

BY:   JOHN E. LUCIAN, ESQ.

     JOSE F. BIBILONI, ESQ.


DENTONS US, LLP

     Attorneys for Jefferies

BY:   LAUREN MACKSOUD, ESQ. (TELEPHONICALLY)

     PATRICK C. MAXCY, ESQ. (TELEPHONICALLY)

Appx. 02804
015366

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 33-20   Exhibit 22   Filed 06/25/39   Page 688 of 1017    PageID 16349

7

```
 1
 2    GIBSON, DUNN & CRUTCHER LLP
 3          Attorneys for Alvarez & Marsal
 4    BY:   MICHAEL A. ROSENTHAL, ESQ.
 5
 6
 7    JENNER & BLOCK
 8          Attorneys for Redeemer Committee of Crusader Fund
 9    BY:   MARC B. HANKIN, ESQ.
10          TERRI L. MASCHERIN, ESQ.
11
12
13    LATHAM & WATKINS, LLP
14          Attorneys for UBS Securities LLC and UBS London Bank
15    BY:   ASIF ATTARWALA, ESQ. (TELEPHONICALLY)
16          JEFF BJORK, ESQ. (TELEPHONICALLY)
17          ANDREW B. CLUBOK, ESQ. (TELEPHONICALLY)
18          KUAN HUANG, ESQ. (TELEPHONICALLY)
19          KIMBERLY A. POSIN, ESQ. (TELEPHONICALLY)
20
21
22    MORRIS, NICHOLS, ARSHT & TUNNELL LLP
23          Attorneys for Redeemer Committee of Crusader Fund
24    BY:   CURTIS S. MILLER, ESQ.
25
```

015367

8

1

2  POTTER ANDERSON & CORROON LLP

3        Attorneys for Alvarez & Marsal

4  BY:   JEREMY W. RYAN, ESQ.

5

6

7  ROGGE DUNN GROUP, PC.

8        Attorneys for Acis Capital Management GP, et al.

9  BY:   BRIAN P. SHAW, ESQ.

10

11

12  SCHULTE ROTH & ZABEL LLP

13        Attorneys for CLO Entities, Intertrust Entities

14  BY:   JAMES T. BENTLEY, ESQ. (TELEPHONICALLY)

15

16

17  WINSTEAD, P.C.

18        Attorneys for Acis Capital Management GP, et al.

19  BY:   RAKHEE V. PATEL, ESQ.

20

21

22

23

24

25

Appx 02806
015368

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-30   Filed 06/06/25   Page 690 of 1017   PageID 16351

9

1

2      ALSO PRESENT:

3             ISAAC D. LEVENTON, ESQ., Asst. General Counsel, Highland

4             Capital Management

5             FRANK WATERHOUSE, Partner and CFO, Highland Capital

6             Management

7             BRADLEY SHARP, Pres. and CEO, Development Specialists,

8             Inc.

9             FRED CARUSO, COO, Development Specialists, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Appx. 02805
015369

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-20   Filed 02/05/139   Page 691 of 1017   PageID 16352

HIGHLAND CAPITAL MANAGEMENT, L.P.                    10

1              P R O C E E D I N G S

2         THE CLERK:  All rise.

3         THE COURT:  Please be seated.

4         MR. O'NEILL:  Good morning, Your Honor.

5         THE COURT:  Good morning.

6         MR. O'NEILL:  James O'Neill, Pachulski Stang Ziehl &

7    Jones, here today on behalf of the debtor, Highland Capital

8    Management.  With me, Your Honor, at counsel table is Jeff

9    Pomerantz, Ira Kharasch, John Morris, Greg Demo, and Max

10   Litvak, representing the debtor.  Also in the courtroom with

11   us, from our client, Isaac Leventon and Frank Waterhouse and,

12   from DSI, Brad Sharp and Fred Caruso.

13        THE COURT:  Welcome.

14        MR. O'NEILL:  Your Honor, we have a number of matters

15   on the agenda today, but we are going to proceed with item

16   number 12 on the agenda, which is the committee's venue motion.

17   So I will yield the podium to them.

18        THE COURT:  Okay.

19        MR. CLEMENTE:  Good morning, Your Honor.

20        THE COURT:  Good morning.

21        MR. CLEMENTE:  Matthew Clemente from Sidley Austin,

22   proposed counsel to the official committee of unsecured

23   creditors.  With me here today, my colleagues Dennis Twomey and

24   Penny Reid, along with our co-counsel from Young Conaway, Mike

25   Nestor and Sean Beach.

Appx. 02808
015370

```
 1            Your Honor, we have filed our venue motion.  We
 2   believe that venue -- it's appropriate to transfer venue to the
 3   bankruptcy court in the District of Texas for the reasons that
 4   we laid out in the motion.  Based on Your Honor's --
 5   discussions with Your Honor this morning, we understand that we
 6   would proceed with what I believe would be a short proffer from
 7   the debtor, we would have an opportunity to cross, and then we
 8   would proceed to argument from there.  If that's acceptable to
 9   Your Honor, that's --
10            THE COURT:  That's fine.  Thank you.
11            MR. CLEMENTE:  -- that's the way we'd proceed.
12            THE COURT:  Yes.
13            MR. CLEMENTE:  Thank you, Your Honor.
14            MR. POMERANTZ:  Good morning, Your Honor.  Jeff
15   Pomerantz, Pachulski Stang Ziehl & Jones, on behalf of the
16   debtor.  We'd also like at this time, Your Honor, to move into
17   evidence Exhibits A through U, except for Exhibit G.  Exhibit G
18   is one of those documents that we refer to in chambers as would
19   be subject to seal.  We don't need to refer to it in connection
20   with the venue motion.  But if Your Honor would like, I can
21   approach with a binder containing the --
22            THE COURT:  Yeah, I don't have those.
23            MR. POMERANTZ:  -- exhibits.  There have been no
24   objections to them.
25            MR. POMERANTZ:  Your Honor, if Mr. Sharp were called
```

Appx. 02800
015371

 1  to testify, he would testify --

 2          THE COURT:  Hang --

 3          MR. POMERANTZ:  Oh, sorry.

 4          THE COURT:  Hang on.  Okay.

 5          MR. POMERANTZ:  Okay.

 6          THE COURT:  Look at the documents.  It's the first

 7  I've seen them.

 8      (Pause)

 9          THE COURT:  So you're moving A through U, except for

10  G?

11          MR. POMERANTZ:  Correct, Your Honor.

12          THE COURT:  Any objection?

13          MR. CLEMENTE:  Sorry, Your Honor, one --

14          THE COURT:  No; yeah, that's fine.

15          MR. CLEMENTE:  No objection, Your Honor.

16          THE COURT:  All right, they're admitted without

17  objection, other than G.  G is not admitted at this time.

18      (Debtors' Exhibits A through U, except for Exhibit G, were

19  hereby received into evidence, as of this date.)

20          THE COURT:  All right, you may proceed with the

21  proffer.

22          MR. POMERANTZ:  Thank you, Your Honor.

23          If Mr. Sharp were called to testify, he would testify

24  that he is the proposed chief restructuring officer of the

25  debtor; he's also the president of Development Specialists,

Appx. 02810
015372

1   Inc., a financial advisory firm.  He would testify that he's

2   been a restructuring professional with over twenty-five years

3   of experience as a trustee, a chief restructuring officer, and

4   a financial advisor, in a myriad of industries.  He would

5   testify that he has been appointed as chief restructuring

6   officer in four cases in Delaware, including In re Variant

7   before Judge Shannon, In re Woodbridge before Judge Carey, In

8   re WL Homes before Judge Shannon, and In re Beverly Hills

9   Bancorp before Judge Carey.

10          He would testify that he has a national practice, he's

11  physically headquartered in Los Angeles, and it would be as

12  convenient for him to travel to this court in Delaware than it

13  would be for him to travel to Dallas.  He would testify that

14  the debtor's counsel, Pachulski Stang Ziehl & Jones, has

15  offices in Delaware and, if the case were transferred, the

16  debtor would need to retain local counsel in Dallas.

17          He would testify that he was initially engaged by the

18  debtor on October 7, 2019 and that, prior to his engagement as

19  a CRO, he had no prior involvement with Highland or any of its

20  senior management employees or principals.  He would testify

21  that he was introduced to Highland by Pachulski Stang Ziehl &

22  Jones.

23          He would testify that, since his engagement, he and

24  his colleague, Fred Caruso, who functions as an extension of

25  him in his role as chief restructuring officer, and other

Appx. 02811
015373

Case 19-34054-sgj11    Doc 3596-22    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 35-20   Filed 06/06/25   Page 695 of 1017    PageID 16356
Exhibit 22   Page 695 of 1017   PageID 16356

HIGHLAND CAPITAL MANAGEMENT, L.P.                    14

 1   employees of DSI have devoted themselves to learning about the

 2   debtor's business and financial affairs, knowledge that only

 3   increases as the days go by.  He would testify that he and

 4   others from DSI have spent hundreds of hours meeting with

 5   various employees of the debtor and reviewing and accessing the

 6   debtor's books and records.  He would testify that he's been

 7   given complete access to a wealth of information by the debtor,

 8   and nothing he or his team have requested from the debtor have

 9   been withheld by them.

10         He would testify that the debtor's a limited

11   partnership organized under the laws of Delaware and that the

12   debtor's general partner, Strand Advisors, is a corporation

13   organized under Delaware law as well, and Strand is the manager

14   of the debtor.  He would testify that over ninety-nine percent

15   of the debtor's limited partnerships are held by Delaware

16   entities.

17         He would testify that the debtor owns and manages a

18   sophisticated financial-advisory-services and money-management

19   business that has assets and interests all over the world; that

20   the debtor's assets under management, including its own

21   proprietary assets and those of its clients, through various

22   related parties, exist in the United States, Asia, South

23   America, and Europe.

24         He would testify that the debtor has over two-and-a-

25   half billion dollars of assets under management and receives

Appx. 02812
015374

1    management and advisory fees from a multitude of sources around

2    the world.  He would also testify that the debtor provides

3    shared services for approximately 7.5 billion of assets managed

4    by a variety of affiliated and unaffiliated entities, including

5    other affiliated registered investment advisors.

6          He would testify that although the debtor is based in

7    Dallas, the debtor's affiliates and related parties maintain

8    offices or have personnel in many international locales,

9    including Buenos Aires, Rio de Janeiro, Singapore, and Seoul.

10   He would testify that the debtor owns and manages targeted

11   funds in Korea, South America, and Singapore.

12         He would testify that the debtor's filed the motion

13   that's pending today to appoint him as foreign representative

14   in order to manage certain foreign interests, including those

15   proceedings pending in Bermuda and Cayman.  He would testify

16   that the principal assets in the United States consist of

17   custodial and noncustodial interests and investments located

18   all over the country, and that the debtor's prime brokerage

19   account that holds the bulk of the debtor's liquid assets is

20   located in New York City with Jefferies.

21         He would testify the debtor owes approximately 30

22   million dollars to Jefferies on account of margin obligations

23   that are secured by the securities in the prime account, and

24   that the debtor's other principal secured creditor, Frontier

25   State Bank, is based in Oklahoma City and is owed approximately

Appx. 02813
015375

 1  5.2 million dollars as of the petition date.

 2         He would testify that one aspect of the debtor's

 3  business is management advisory services in connection with

 4  various investments and collateralized loan obligations, or

 5  "CLOs", and that the debtor previously provided submanager,

 6  subadvisory, and shared services to Acis CLOs pursuant to

 7  certain contractual agreements that were terminated during the

 8  course of Acis' bankruptcy in or around August 2018.  He would

 9  testify that he's informed and believes that the compensation

10  structure for subadvisory and shared-service agreements is

11  different for CLOs than with other types of private equity or

12  hedge funds that the debtor manages.

13         He will testify that a focus of DSI's efforts in this

14  case will be to evaluate the appropriateness and the economics

15  of the shared-service agreements and subadvisory agreements

16  that the debtor's a party to with both affiliated and

17  unaffiliated third parties, and he would determine what

18  modifications are appropriate given the facts and

19  circumstances.

20         He would testify that, since the petition date and, he

21  believes, since August 2018, the debtor has not had any direct

22  business dealings with respect to Acis or the CLO assets for

23  which Acis serves as CLO manager, and that the debtor no longer

24  advises or subadvises any active CLOs; the debtor only has CLOs

25  that are in liquidation and in the process of monetizing their

Appx. 02814
015376

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 22 Filed 09/05/25   Page 698 of 1017   PageID 16359

HIGHLAND CAPITAL MANAGEMENT, L.P.                    17

1    underlying assets and paying off their remaining investors'

2    revenues that will decrease over time; and that the CLO portion

3    of the debtor's business provides just ten percent of the

4    debtor's revenue, which, again, will shrink over time.

5             He would testify that the debtor derives ninety

6    percent of its other revenue from managing asset classes that

7    have nothing to do with Acis, including private equity, hedge

8    fund, mutual funds, open-ended retail funds, and real-estate

9    funds.

10            He would testify that the debtors and Acis assert

11   various substantial disputed and unliquidated claims against

12   each other, and the debtor has outstanding claims against Acis

13   that total no less than eight million dollars for services

14   rendered.  He would testify that the debtor and Acis have been,

15   and continue to be, involved in highly contentious litigation,

16   including matters that are subject to multiple appeals from the

17   bankruptcy court and pending fraudulent-transfer claims brought

18   by Acis against the debtor, in Texas.  He would testify the

19   debtor is currently supporting two pending appeals of orders of

20   the Texas bankruptcy court, granting the involuntary petition

21   against Acis and confirming Acis' Chapter 11 plan that put Mr.

22   Terry in charge of Acis.

23            He would testify that, although he serves subject to

24   the debtor's ability to terminate him, he has full

25   responsibility with respect to analyzing and pursing insider

Appx. 02315
015377

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-20   Filed 06/06/25   Page 699 of 1017   PageID 16360

HIGHLAND CAPITAL MANAGEMENT, L.P.                    18

 1  transactions and is in charge of the debtor's restructuring

 2  efforts, and that he has no prior relationship with either Acis

 3  or the Texas bankruptcy court with respect to this matter.  He

 4  would testify that his goal in this case is to maximize the

 5  value of the debtor's estate for the benefit of all

 6  constituents, and he intends to evaluate all available

 7  strategic options for accomplishing the goal, and hopes to work

 8  constructively with the committee in that regard.

 9          He believes that the outcome of this case will not

10  turn on the day-to-day management of the debtor's assets but

11  instead will be driven by the debtor's ability to restructure

12  its balance sheet and maximize the value of its assets, many of

13  which are liquid.  He would testify that either he or Fred

14  Caruso would provide substantially all the testimony that would

15  be provided for the debtor in this case.

16          Lastly, he would testify that he's been on the job for

17  over a month-and-a-half, that the debtor has been following the

18  protocols set out in the motion for which approval is being

19  sought today.  He would testify the debtor's being transparent

20  with the creditors' committee, has met with and communicated

21  with FTI on many occasions, and shared a lot of information.

22  And he would testify that there have been no allegations made

23  by the committee or any other party, regarding any post-

24  petition impropriety by the debtor.

25          That concludes my proffer of Mr. Sharp's testimony.

Appx. 02816

015378

 1          THE COURT:  All right, thank you very much.

 2          Does anyone wish to cross-examine the witness?

 3          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

 4          THE COURT:  Yes?

 5          UNIDENTIFIED SPEAKER:  Yeah.

 6          THE COURT:  Okay.

 7          MS. REID:  Yes, Your Honor.

 8          THE COURT:  Mr. Sharp, would you please take the

 9    stand?  And remain standing for your affirmation.

10          THE CLERK:  Would you step up to the stand, please?

11    Raise your right hand.

12        (Witness affirmed)

13          THE CLERK:  Please state and spell your name for the

14    record.

15          THE WITNESS:  Bradley Sharp, B-R-A-D-L-E-Y; last name,

16    S-H-A-R-P.

17          THE CLERK:  Thank you.

18          THE COURT:  Very good.

19          MS. REID:  Good morning, Your Honor.  Penny Reid on

20    behalf of the creditors' committee.

21          THE COURT:  Good morning.

22          Mr. Sharp, just -- you look like a veteran, but if you

23    could stay close to the microphone, I'd appreciate it.

24          THE WITNESS:  Yes, sir.

25          THE COURT:  Thank you.

Appx. 02915
015379

```
 1   CROSS-EXAMINATION

 2   BY MS. REID:

 3   Q.  Mr. Sharp, you've only met Mr. Dondero once; correct?

 4   A.  That is correct.

 5   Q.  And that was in Dallas; correct?

 6   A.  That is correct.

 7   Q.  And your team has been at the debtor's offices; correct?

 8   A.  Yes.

 9   Q.  And worked over a hundred hours at the debtor's offices;

10   correct?

11   A.  Yes.

12   Q.  And that's all been in Dallas; correct?

13   A.  Yes.

14   Q.  Your team has not been to a New York office; has it?

15   A.  No.

16   Q.  Has your team -- your team has not been to Korea; has it?

17   A.  No.

18   Q.  Your team has not been to Singapore; has it?

19   A.  With respect to this engagement, no.

20   Q.  Okay.  And you haven't met any employees in the Singapore

21   office; have you?

22   A.  No.

23   Q.  And under this proposed engagement, you're going to report

24   to Mr. Dondero; correct?

25   A.  Yes.
```

Appx. 02818
015380

         1          MS. REID:  We will reserve our rights to further

         2    question him on the other issues, non-venue issues.

         3          THE COURT:  Of course.

         4          MR. SHAW:  Good morning, Your Honor.  Brian Shaw on

         5    behalf of Acis Capital Management, a creditor.

         6          THE COURT:  Yes, Mr. Shaw, you may proceed.

         7    CROSS-EXAMINATION

         8    BY MR. SHAW:

         9    Q.  Mr. Sharp, you were hired nine days before the bankruptcy

        10    petition was filed in this case; correct?

        11    A.  Correct.

        12    Q.  Other than the retention of DSI, are there any other new

        13    managers at the debtor, that didn't exist prior to the

        14    bankruptcy filing?

        15          MR. MORRIS:  Objection.  Beyond the scope, Your Honor.

        16    This should be a traditional cross.

        17          THE COURT:  You're going to need to find a microphone

        18    or talk into one that's in front of you.

        19          MR. MORRIS:  John Morris, Pachulski Stang Ziehl &

        20    Jones, for the debtor.

        21          This line of questioning is beyond the scope.  This

        22    should be a traditional cross.  The moving parties have called

        23    no witnesses, as Your Honor is aware.

        24          THE COURT:  Well, they reserved the right to call

        25    witnesses based on what you did in your direct.  So I'm not

Appx. 02819
015381

 1  going to hold them to technicalities.

 2          You may proceed.

 3          MR. SHAW:  Thank you, Judge.

 4          THE COURT:  Do you remember the question, Mr. Shaw?

 5          THE WITNESS:  I do.

 6  A.  Not that I'm aware of.

 7  Q.  Okay.  So other than -- so DSI is the only difference pre-

 8  petition and post-petition; is that right?

 9  A.  With respect to management.  Obviously, the company's now

10  operating in bankruptcy, which is significantly different.

11  Q.  You testified, in your proffer, regarding the provision of

12  shared services and subadvisory to Acis; do you remember that

13  proffer your counsel commented about?

14  A.  I do.

15  Q.  And one of the core parts of the debtor's business is the

16  provision of shared services and subadvisory services to

17  affiliates and nonaffiliates; right?

18  A.  Yes.

19  Q.  Okay.  And so that was true for Acis and it's true for

20  current affiliates of the debtor; right?

21  A.  Yes, except for, you know, Acis was primarily CLOs, which

22  is a reducing part of the debtor's business.

23  Q.  Do you have any reason to believe that the Northern

24  District of Texas cannot hear this case expeditiously and

25  fairly?

Appx. 02820
015382

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 55-20 22 Filed 06/25/25139 Page 704 of 1017   PageID 16365

HIGHLAND CAPITAL MANAGEMENT, L.P.                    23

 1    A.   No.

 2              MR. SHAW:  Pass the witness.

 3              THE COURT:  Any other cross-examination?

 4              Hearing none, any -- redirect; that's what it's

 5    called.  There we go.

 6              MR. MORRIS:  No, thank you, Your Honor.

 7              THE COURT:  All right.  Thank you, sir.  You may step

 8    down.

 9              THE WITNESS:  Thank you.

10              THE COURT:  Any further evidence by any party, in

11    connection with the venue motion only?

12              MR. CLEMENTE:  Your Honor, I believe we would like to

13    call Mr. Waterhouse to the stand to testify in connection with

14    the venue motion briefly.

15              THE COURT:  All right.  Mr. Waterhouse.  I thought

16    we -- there we go.  If you could please take the stand as well,

17    sir, and remain standing.

18              MR. GUERKE:  May it please the Court.  Good morning,

19    Your Honor.  Kevin Guerke on behalf of the creditors'

20    committee.

21              THE CLERK:  Please raise your right hand.

22         (Witness affirmed)

23              THE CLERK:  Please state and spell your name for the

24    record.

25              THE WITNESS:  Yes; it's Frank Waterhouse, F-R-A-N-K,

Appx. 02821
015383

 1  W-A-T-E-R-H-O-U-S-E.

 2          THE CLERK:  Thank you.

 3          THE COURT:  Thank you.  Please be seated and try to

 4  remain close to the microphone, if you would, please.  It's a

 5  little awkward here.

 6          You may proceed.

 7  DIRECT EXAMINATION

 8  BY MR. GUERKE:

 9  Q.  Mr. Waterhouse, you've worked for the debtor, Highland

10  Capital Management, L.P., since 2006; correct?

11  A.  Yes.

12  Q.  You started there as a senior accountant; right?

13  A.  That is correct.

14  Q.  You were promoted to chief financial officer at the end of

15  2011; correct?

16  A.  Yes.

17  Q.  That's the title that you hold today; right?

18  A.  Yes.

19  Q.  You also currently hold the title of partner; right?

20  A.  Yes.

21  Q.  You were made partner three or four years ago; correct?

22  A.  Yes.  I mean, I don't remember the exact time but, yeah,

23  approximately three or four years ago.

24  Q.  You are an officer in Highland Affiliates; correct?

25  A.  Yes.

Appx. 02822
015384

1  Q.  James Dondero is the president of Highland Capital

2  Management, L.P.; right?

3  A.  Yes.

4  Q.  Mr. Dondero owns and controls Highland's general partner,

5  Strand Advisors, Inc.; right?

6          MR. MORRIS:  Your Honor, I'm just going to object for

7  the record.  This is supposed to be a rebuttal witness.  This

8  isn't rebutting anything; it's just new facts --

9          THE COURT:  He's laying

10          MR. MORRIS:  -- that they're seeking --

11          THE COURT:  I'm sure he's laying foundation.

12          MR. GUERKE:  I am, Your Honor.  It's background, it's

13  foundation.  It has to go (sic) with the organizational

14  structure.

15          THE COURT:  That's fine.  Objection overruled.

16  Q.  Mr. Waterhouse, Mr. Dondero owns and control Highland's

17  general partner, Strand Advisors, Inc.; correct?

18  A.  I don't remember his exact title but, yes, he is

19  president.

20  Q.  He owns a hundred percent of the equity in Strand; right?

21  A.  Yes.

22  Q.  He also has a limited-partnership interest in Highland;

23  correct?

24  A.  That is correct.

25  Q.  Mr. Dondero's the portfolio manager of all Highland funds;

Appx. 02825
015385

 1   right?

 2            MR. MORRIS:  Objection to the form of the question.

 3            THE COURT:  Overruled.

 4            You can answer.

 5   A.  Yes, he -- he is the portfolio manager or the -- or a co-

 6   portfolio manager.  We have several funds.  I -- I -- I can't

 7   recall if he is the sole portfolio manager on every single fund

 8   or -- but he -- he -- but yes, he is -- he is a portfolio

 9   manager.

10   Q.  As the president of Highland, Mr. Dondero promoted you to

11   CFO back in 2011; right?

12   A.  Yes.  My -- my promotion was recommended by the -- the

13   former CFO and, as president, Mr. Dondero had to, you know,

14   obviously, approve that taking.

15   Q.  You report to Mr. Dondero; right?

16   A.  Yes.

17   Q.  He's your boss; correct?

18   A.  Yes.

19   Q.  And after the transition period from the old CFO to you,

20   you've reported only to Mr. Dondero; right?

21   A.  That is correct.

22   Q.  After the bankruptcy was filed, you still report to Mr.

23   Dondero; right?

24   A.  Yes.

25   Q.  And Mr. Dondero doesn't report to anyone; correct?

Appx 02824
015386

 1  A.  Yeah, not -- not to my knowledge.  Yeah, it's correct.

 2  Q.  Mr. Dondero has the ability to terminate you; right?

 3  A.  Again, I -- I assume so.  Again, I think I -- I testified

 4  earlier last week, I -- I -- I -- you know, again, I don't know

 5  through this process -- again, I'm not -- bankruptcy is not

 6  something that I -- I am, you know, a specialist.  I'm not a

 7  bankruptcy attorney.  But maybe the CRO can, or Jim, or

 8  something in -- in conjunction.  But I think, theoretically,

 9  yes.

10  Q.  Post-bankruptcy, you don't report to Bradley Sharp; right?

11          MR. MORRIS:  Objection, Your Honor.  Same objection:

12  beyond the scope.

13          THE COURT:  Overruled.

14  A.  I do not.

15  Q.  Post-bankruptcy, you don't report to Fred Caruso; correct?

16  A.  I do not.

17  Q.  Mr. Sharp doesn't have the power to terminate your

18  employment; right?

19  A.  Again, I'll --

20          THE COURT:  Actually, he already answered that

21  question; said he wasn't sure.

22  Q.  Mr. Waterhouse, there are six groups below Mr. Dondero in

23  Highland's organizational chart; correct?

24  A.  Give or -- give or take.

25  Q.  The heads of those groups are the executive-level

Appx. 02825
015387

```
 1  management employees that you describe in your declaration that

 2  was submitted in association with the first-day motions; right?

 3  A.  Yes.

 4  Q.  You manage one of those teams; correct?

 5  A.  Yes.

 6  Q.  Your team is made up of the corporate accounting folks,

 7  Funding Accounting, the tax group, Valuation, Operations,

 8  Retail Fund Operations, Human Resources, and IT; right?

 9  A.  That -- that is correct.

10  Q.  The other Highland teams are the legal-compliance team --

11  correct?

12  A.  Yes.

13  Q.  The credit-research team; right?

14  A.  Yes.

15  Q.  Public-relations team; correct?

16  A.  Yes.

17  Q.  Private-equity team; right?

18  A.  Yes.

19  Q.  And the trading team; true?

20  A.  Yes.

21  Q.  The heads of each one of those groups report up to Mr.

22  Dondero; isn't that true?

23  A.  Yes, and we -- we -- well, and we also -- and -- but we

24  have a risk-management team as well, at Highland.  That -- that

25  risk-management team reports up through the trading team.
```

Appx. 02826
015388

1   Q.  As the CFO, your office is in Dallas, Texas; right?

2   A.  Yes.  My -- yes, we office in -- or my office is in

3   Dallas, Texas.

4   Q.  That's been the location of your office since you joined

5   Highland; correct?

6   A.  My current location in Dallas, Texas, is not the same as

7   it was when I joined Highland Capital in October of 2006.

8   Q.  You started in 2006 and your office was in Dallas; right?

9   A.  Well, my offices were in Dallas but it was not at the same

10  location as we are currently.

11  Q.  Your current offices are also in Dallas; right?

12  A.  Yes, their address is in Dallas, Texas.

13  Q.  Over seventy Highland employees work out of Highland's

14  Dallas office; right?

15  A.  Yes.

16  Q.  Dallas is the only location where Debtor Highland

17  employees work; correct?

18  A.  Yes.

19  Q.  Mr. Dondero's office is in Dallas; true?

20  A.  Yes.

21  Q.  Members of the legal team have offices in Dallas; right?

22  A.  Yes.

23  Q.  You meet with Mr. Dondero at a minimum of once a week;

24  correct?

25  A.  Yes, give or take.

Appx. 02827

015389

HIGHLAND CAPITAL MANAGEMENT, L.P.                    30

1   Q.  Usually those meetings are in his office in Dallas; right?

2   A.  Yes.

3   Q.  All the group heads that we just discussed all have

4   offices in Dallas; right?

5   A.  Yes.  We used to -- our -- our risk-management team used

6   to be officed in New York.  But yes, we -- we -- yes.

7   Q.  You mentioned New York.  There's a location in New York

8   that we discussed at your deposition; do you remember that?

9   A.  Yes.

10  Q.  That office in New York is not in Highland -- the debtor's

11  name; true?

12  A.  That is correct.

13  Q.  It's in another nondebtor-entity name; correct?

14  A.  Yes.

15  Q.  There are no Highland employees in that New York location;

16  correct?

17  A.  That is correct.

18  Q.  In the proffer that you just heard, and at your

19  deposition, there was some discussion about offices outside of

20  the United States.  Do you recall that?

21  A.  Yes.

22  Q.  The people who work in those locations are not employees

23  of the debtor, Highland Capital Management, L.P.; right?

24  A.  That's right.

25  Q.  The offices outside the U.S. are subsidiary offices with

Appx. 02626
015390

 1   subsidiary employees; correct?

 2   A.  That is correct.

 3   Q.  You've never been to those offices; right?

 4   A.  I have not.

 5   Q.  You have members of team who include David Klos, Clifford

 6   Stoops, and some other folks; right?

 7   A.  Yes.

 8   Q.  You have standing weekly meetings with those folks --

 9           THE COURT:  All right --

10   Q.  -- right?

11           THE COURT:  -- I'm going to reprimand -- this is well

12   beyond -- I was giving you some leeway but, if this is what you

13   wanted to put on -- it's your motion, sir.  I mean, this is --

14   you're laying your foundation in your case-in-chief.  Why

15   didn't you put this on to begin with?

16           MR. GUERKE:  Your Honor, it's rebuttal to the proffer

17   that Mr. Sharp just offered.

18           THE COURT:  In what way?

19           MR. GUERKE:  Related to the organizational structure

20   and how decisions are made currently at the debtor.

21           MR. MORRIS:  Your Honor, if I may.  I don't believe

22   any aspect of the proffer went to the location of decision-

23   making.

24           THE COURT:  Would you like to reply to that?

25           MR. GUERKE:  Yes.  The proffer was made that decisions

Appx. 02629
015391

HIGHLAND CAPITAL MANAGEMENT, L.P.                32

1    are made in California and around the country, and around the

2    world I believe.  And this evidence rebuts that; that the

3    organizational structure and the day-to-day operations are

4    still run in Dallas, Texas, as they were before bankruptcy.

5            And, Your Honor, I have three questions, then I'll sit

6    down.

7            THE COURT:  Okay.  All right, I'll allow it.

8    Q.  When you meet with people on your team that we just

9    identified, you meet with them in Dallas; correct?

10   A.  That's correct.

11           MR. GUERKE:  Those are my only questions.  Thank you,

12   Mr. Waterhouse.

13           THE COURT:  All right.

14           THE WITNESS:  Thank you.

15           THE COURT:  That was direct.  Any further direct?

16           Yes, sir.

17           MR. SHAW:  Real briefly, Your Honor.

18   DIRECT EXAMINATION

19   BY MR. SHAW:

20   Q.  Mr. Waterhouse, as the CFO of the debtor, were you aware

21   that the debtor intended to file bankruptcy prior to the

22   filing?

23           MR. MORRIS:  Objection.  Beyond the scope.

24           MR. SHAW:  Judge, we designated any witness that they

25   designated, so I don't know that we necessarily have called --

Appx. 02639
015392

1           THE COURT:  Well, yeah, but it's your motion --

2           MR. SHAW:  Correct.

3           THE COURT:  -- and you declined to put any evidence on

4   in support of your motion.  They then put on evidence in

5   opposition to your motion.  So you're limited, sir, to

6   rebutting the evidence they put on.  You had your chance to

7   make your case-in-chief; you decided not to do it.  It's not my

8   fault.

9           MR. SHAW:  My understanding was that we were -- that,

10  depending upon what the proffer was, which we -- we're not

11  aware of what the proffer was before today, that we reserved

12  the right to call Mr. Waterhouse, which I understood from our

13  chambers conference is what we exercised that right to do.  If

14  I misunderstood how procedurally we were going about it,

15  then --

16          THE COURT:  Well, I don't understand how -- that

17  doesn't make any sense to me.  You get a free shot to hear

18  their case first, and then you get to make your direct case?

19  Why would I allow that?  It's your motion.

20          MR. SHAW:  Understood.

21          THE COURT:  All right, so let's stick to rebutting

22  what they put on.

23          MR. SHAW:  Okay.

24          THE COURT:  I gave a lot of leeway to your colleague;

25  I'll give you leeway.  But I don't really want to sit through

Appx. 02831
015393

```
 1  forty-five minutes of direct that you could have done in the

 2  first place.

 3          MR. SHAW:  And I promise you, I have a very few

 4  limited questions.

 5          THE COURT:  All right.

 6  BY MR. SHAW:

 7  Q.  With regard -- where is Mr. Dondero today?

 8  A.  I don't know.

 9  Q.  For the shared services and subadvisory services that the

10  debtor previously provided Acis -- are you aware of those?

11  A.  I'm aware of them generally.

12  Q.  All right.  Have you ever reviewed the shared-services and

13  subadvisory agreements between Acis and Highland?

14  A.  I'm sure I reviewed them at -- at some point, but I

15  honestly can't recall.

16  Q.  How are those agreements different than the shared-

17  services and subadvisory agreements currently between the

18  debtor and various affiliates?

19          MR. MORRIS:  Objection.  No foundation.

20          MR. SHAW:  It's directly relevant to -- the foundation

21  being he said he's aware of them.  I --

22          MR. MORRIS:  The witness just testified that he's not

23  familiar with them as he sits here --

24          THE COURT:  I can't hear you.

25          MR. MORRIS:  The witness just testified that he's not
```

Appx. 02632
015394

1  familiar with them as he sits here today.  He may have seen

2  them in some -- at some point in the past.

3          THE COURT:  Well, he can qualify the answer further.

4  Overruled.

5          You can answer.

6  A.  You know, again, I -- I don't -- I don't know.  I don't

7  have the documents in front of me.  I -- I -- like I said, I'm

8  generally aware of -- of the Acis agreements.  You know, I

9  don't have these agreements memorized to any certain degree, so

10 I -- I -- I -- I don't know specifically.

11 Q.  As -- you're familiar with the -- as the CFO, with the

12 shared-services and subadvisory agreements that govern the

13 seven billion dollars in assets under management that the

14 debtor provides for affiliates and nonaffiliates; right?

15 A.  Yes, I'm generally aware of those agreements.

16 Q.  And are those agreements typical in form?  Do they differ

17 widely in their content?

18 A.  Again, I don't know -- I mean, they -- they can.  Again,

19 it -- it depends on the nature of the services.  And -- you

20 know, it -- there isn't a standard template, I would say, for

21 shared services.  Yes, they can differ.  As I said, I don't

22 have those agreements memorized, so I can't speak as to how

23 they are similar or how they are not.

24          MR. SHAW:  Pass the witness.

25          THE COURT:  Thank you.

Appx 02635
015395

```
 1              I guess it'll be cross of your own witness.  Any
 2    cross?
 3              MR. MORRIS:  No, thank you, Your Honor.
 4              THE COURT:  All right, sir, thank you.  Mr.
 5    Waterhouse, you may step down.
 6              THE WITNESS:  Thank you.
 7              THE COURT:  You're welcome.
 8              Any further evidence?
 9              MS. PATEL:  Your Honor, as I referenced, we just have
10    some exhibits; I believe these to be the unobjected-to pieces
11    of it.  We -- Acis provided a witness-and-exhibit list.  These
12    are the unobjected-to exhibits, and we would just move them in.
13    And --
14              THE COURT:  Is this the ones I already have?
15              MS. PATEL:  No, Your Honor.  I believe you only have
16    the debtor's.
17              THE COURT:  Yeah.
18              MS. PATEL:  And I will apologize, Your Honor; we've
19    given debtors a copy of the exhibits.  Our -- there was
20    miscommunication.  They are not bound.
21              THE COURT:  That's fine.
22              MS. PATEL:  But they are numbered.
23              THE COURT:  All right.
24              MS. PATEL:  If I may approach?
25              THE COURT:  Yes.  Please don't hurt yourself.  It's a
```

Appx. 02624
015396

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 22 Filed 06/06/25 Page 718 of 1017   PageID 16379

HIGHLAND CAPITAL MANAGEMENT, L.P.                    37

```
 1   bit of a mess there.
 2            MS. PATEL:  There's a little trash back here.
 3            THE COURT:  These are all not objected to; is that
 4   correct?
 5            MS. PATEL:  (Indiscernible), Your Honor, but I go
 6   through them.
 7            THE COURT:  Are they -- okay.
 8            MS. PATEL:  What I've handed the Court and to opposing
 9   counsel are Exhibits 1 -- Acis Exhibits 1 through 18, with the
10   exclusion of Exhibit 3 and Exhibit 9, which were objected to;
11   and then also Exhibit Numbers 24 and 25, which were not
12   objected to.  We do have one additional exhibit, Your Honor,
13   that was objected to, that I would like to move in.
14            THE COURT:  All right.  Is there any objection to the
15   admission of the documents that counsel has represented there's
16   no objection to?
17            MR. MORRIS:  No, Your Honor.
18            THE COURT:  Okay.  They are admitted without
19   objection.
20        (Acis' Exhibits 1 through 18, with the exception of Nos. 3
21   and 9; and Exhibits 24 and 25, were hereby received into
22   evidence, as of this date.)
23            MS. PATEL:  If I may approach, Your Honor?
24            THE COURT:  Yes.
25            Thank you.
```

App. 02635
015397

1         MS. PATEL:  And, Your Honor, my co-counsel will handle

2    that -- will handle it since we -- this was a late objection

3    and he prepared with respect to this; I prepared with respect

4    to argument.

5         THE COURT:  Okay.

6         Yes, sir.

7         MR. CLEMENTE:  I believe there's a hearsay objection

8    regarding this.

9         MR. MORRIS:  Relevance and hearsay, Your Honor.

10         THE COURT:  Okay.

11         MR. CLEMENTE:  Your Honor, I'll address hearsay first.

12    Federal Rule of Evidence 807 is a residual exception to the

13    hearsay rule; provides that a hearsay statement is admissible

14    if the statement is supported by sufficient guarantees of

15    trustworthiness, after considering the totality of the

16    circumstances under which it was made and evidence, if any,

17    corroborating the statement, and (2) it is more probative on

18    the point for which it is offered, than any other evidence that

19    the proponent can obtain through reasonable efforts.

20         This is an email exchange between counsel for Acis and

21    the courtroom deputy for Judge Jernigan, just requesting and

22    ask -- inquiring about the court's availability.  Everything

23    about that email supports the fact that it is -- that it is

24    authentic and that there's no question about whether or not it

25    is -- it's trustworthy.  How would we put on evidence of

Appx 02636
015398

1    whether or not Judge Jernigan in the Northern District of Texas

2    has sufficient time to hear these numerous motions that are

3    set, other than by providing something like this?  I mean, we

4    can't call or depose the courtroom deputy or the judge.  So

5    based upon that, also -- there also is an exception, under the

6    hearsay rule, to a public record.  I think this also falls

7    within that exception to the rule.  So for that reason, we

8    don't believe the hearsay objection is proper.

9              As far as relevance, it goes to the argument about

10   transfer and whether or not the transferee court can

11   expeditiously hear the matter.  And that's one of the elements

12   and one of the core questions about judicial efficiency.

13             So for those reasons, we believe that the objections

14   are not well-founded and we offer this exhibit.  And it's

15   Exhibit 26.

16             THE COURT:  Reply?

17             MR. MORRIS:  Briefly, Your Honor.

18             THE COURT:  Yes.

19             MR. MORRIS:  I'm not aware of any case where a court

20   has ever considered, let alone decided, a venue motion on the

21   availability of another court's time.  So I don't think it's

22   relevant at all.  I do think it's an out-of-court statement

23   being offered for the truth of the matter asserted, and I do

24   believe it's hearsay.

25             MR. CLEMENTE:  It most certainly is hearsay, Judge;

Appx. 02637
015399

```
 1   just to respond.  But the question is not whether it's hearsay
 2   but whether it's admissible.  And of course the Court is well
 3   aware that hearsay can be admissible, and one of the exceptions
 4   is the exception that I outlined.
 5            THE COURT:  All right, I'll overrule the objection and
 6   admit the document.  It is hearsay but it clearly meets the
 7   reliability aspects for the exception to hearsay.  With regard
 8   to the relevance, I think its relevance is very -- well, let me
 9   put it this way; I think it's tangentially relevant.  I mean,
10   it certainly is relevant whether the Northern District of Texas
11   has the ability to handle the case were it transferred there.
12   To me that's -- I don't even think that's disputed, I mean,
13   it's obvious, it's a fantastic bankruptcy court.  They're more
14   than capable of handling it.  So I -- it's probably
15   duplicative, if nothing else.
16            Also, it's very carefully written so that you don't
17   actually identify what case you're talking about.  So whether
18   the courtroom deputy realized what you were saying or not
19   saying with regard to this specific motion is obviously
20   unclear.  But I will allow it for very limited purposes.
21         (Email exchange between Acis' counsel and Hon. Jernigan's
22   courtroom deputy was hereby received into evidence as Acis'
23   Exhibit 26, for the stated limited purposes, as of this date.)
24            MR. CLEMENTE:  Thank you, Your Honor.
25            THE COURT:  Any other evidence?
```

Appx. 02638

015400

Case 19-34054-sgj11 Doc 3596-22 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 5-20 22 Filed 08/25/25 139 Page 722 of 1017 PageID 16383

HIGHLAND CAPITAL MANAGEMENT, L.P. 41

 1          I'm going to -- all right, last chance.  I'm going to

 2   close the evidentiary record.

 3          All right, the evidentiary record's closed.  Let's

 4   take a short recess; then I'll hear argument.  We will start

 5   with the movants and their supporters, and then we'll turn it

 6   over to the debtor.  Okay?  We'll take a short recess.

 7          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

 8        (Recess at 10:48 a.m. until 11:05 a.m.)

 9          THE COURT:  Be seated.  Sorry about the delay.  We had

10   some computer difficulties.  But they're all ironed out.

11          You may proceed.

12          MR. CLEMENTE:  Thank you, Your Honor.  Again, Matthew

13   Clements from Sidley Austin, on behalf of the committee.

14          Your Honor, to begin, everything we rely on in our

15   venue argument is uncontested and uncontroverted and is in the

16   record that either the debtor's exhibits or the Asic's (sic)

17   exhibits or the record of this case, or published opinions of

18   the Dallas bankruptcy court, and which Your Honor can take

19   judicial notice of -- we believe that that record more than

20   amply carries our evidentiary burden with respect to the venue

21   motion.

22          With respect to the Sharp proffer, Your Honor, it

23   attempted to create the appearance of a debtor with operations

24   in far-flung jurisdictions, employees at nondebtor entities

25   that may be located in places other than Dallas, offices that

Appx. 02639
015401

1   may be in New York that aren't actually debtor offices.  And

2   the testimony of Mr. Waterhouse rebutted that and made clear

3   that the debtor has no employees other than in Dallas and that

4   Mr. Dondero makes all of the decisions, and he is in Dallas.

5   The nerve center of this debtor is in Dallas.  And we wanted to

6   make that clear, Your Honor, after the proffer, the rebuttal,

7   and the evidentiary record.  We believe that the evidentiary

8   record is largely uncontroverted with respect to the arguments

9   that we're going to be made (sic) in our venue motion, and that

10  Mr. Sharp's testimony has been effectively rebutted.

11          With that, Your Honor, we believe that this case is

12  atypical and presents a set of unique facts which we believe

13  are uncontroverted, that warrant transfer of venue to the

14  Dallas bankruptcy court.  And frankly, Your Honor, it does beg

15  the question as to why the debtor chose not to file in Dallas,

16  what we believe the most logical venue is, in the first

17  instance.  Let's talk about some of these unique facts here;

18  then we'll move into some of the arguments we made in our

19  motion, and then we'll talk about some of the things that the

20  debtor made (sic) in its reply.

21          First and perhaps most importantly, which is obvious

22  from the nature of this proceeding, not a single creditor or

23  party-in-interest has filed papers supporting the debtor's

24  venue in Delaware, other than, obviously, the debtor.  The

25  official committee has unanimously supported venue transfer to

015402

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 22 Filed 04/05/25139 Page 724 of 1017   PageID 16385

HIGHLAND CAPITAL MANAGEMENT, L.P.                          43

 1   Dallas, Texas.  Acis, in its own capacity as creditor, has

 2   joined the transfer request.  It's not surprising to us, Your

 3   Honor, that no creditor has affirmatively come out in favor of

 4   venue in Delaware, because the debtor is in Dallas and, in

 5   fact, that is where its nerve center is.

 6          Your Honor, we do believe that it's particularly

 7   significant because in this case, although schedules and

 8   statements have not yet been filed, the creditors' committee

 9   makes up the vast majority of creditors in this case, in terms

10   of absolute dollar amounts.  There may be multiple creditors in

11   number, but the vast majority of dollar amount of creditors are

12   represented by the official committee of unsecured creditor

13   (sic).

14          There was reference to Jefferies.  They're owed thirty

15   million dollars.  There was reference to Frontier Bank.

16   They're owed five million dollars.  A single claim of one

17   committee member dwarfs that by multiples, Your Honor.  So we

18   believe the fact that no other creditor supports venue in

19   Delaware is a very significant fact, Your Honor, and is not

20   controverted.

21          Second, Your Honor, until a few months ago, the Acis

22   case, which is pending in the Dallas bankruptcy court, was an

23   affiliated case.  And again, this can be gleaned from the

24   published decisions and the record that's been put into

25   evidence.  Had this case been filed prior to confirmation of

015403

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 45-20   22 Filed 04/25/139   Page 725 of 1017   PageID 16386

HIGHLAND CAPITAL MANAGEMENT, L.P.                    44

 1   the Acis plan, under Rule 1014 the Dallas bankruptcy court

 2   would be the appropriate court to determine venue.  And

 3   although I would never suppose to predetermine how a judge

 4   would rule, I think there would have been a high probability

 5   that the Dallas court would have taken venue over the debtor's

 6   case.

 7            This is important, Your Honor, because the third point

 8   I'd like to make is that Highland and the debtor, and as we

 9   have described in our papers and related attachments, and as

10   Mr. Sharp referred to in his proper -- in his proffer, has

11   itself filed an appeal, seeking to overturn the confirmed Acis

12   plan of reorganization and return the equity that was

13   distributed to Mr. Terry under that confirmed plan, to an

14   entity called Nutro (ph.).

15            Second on Nutro, Your Honor.  Nutro's wholly owned by

16   Mr. Dondero and, therefore, if Acis were returned underneath

17   Nutro, it would become an affiliate of this debtor, and Acis

18   would once again be subject to, as an initial matter, a

19   venue -- excuse me, this debtor would be subject to, as an

20   initial matter, a venue determination by the Dallas bankruptcy

21   court.  If we have a successful appeal, we would have

22   affiliated cases with dueling jurisdictions, Your Honor, and

23   the Dallas bankruptcy court, as I mentioned, would determine

24   venue.

25            On that, Your Honor, the debtor must believe -- it's

Appx. 02842
015404

1   not just me speculating.  The debtor must believe that there is

2   a material possibility of this occurrence, as it has been

3   seeking to employ counsel -- and you'll hear about that

4   shortly -- and expend estate resources on behalf of Nutro, a

5   nondebtor affiliate, in an attempt to have the Acis

6   confirmation order overturned, with, again, the result being

7   Acis would, again, be a debtor affiliate.  Therefore, the

8   debtor cannot argue that such possibility does not materially

9   impact the venue decision or is remote, in particular where

10  they're trying to convince the committee and this Court to use

11  estate resources to achieve that very outcome.  The debtor's

12  effectively arguing for a ruling on appeal, but the debtor is

13  an affiliate of Acis, in which case the current Chapter 11

14  proceeding should be in Dallas, Texas.

15          Fourth, Your Honor --

16          THE COURT:  Well --

17          MR. CLEMENTE:  Yes, Your Honor.

18          THE COURT:  -- let me interrupt you for a moment,

19  because that hasn't happened.  As we sit here today --

20          MR. CLEMENTE:  That's correct, Your Honor.

21          THE COURT:  -- they're not affiliates.  There seems to

22  be an assumption that, were this case to be transferred to the

23  Northern District of Texas, it would be assigned to -- sorry,

24  I'm losing my notes --

25          MR. CLEMENTE:  Judge Jernigan, Your Honor.

Appx. 02845
015405

 1           THE COURT:  Jernigan, yes.  Thank you.  Sorry.  I know

 2    Judge Jernigan fairly well.

 3           But if they're not affiliates, isn't the case subject

 4    to random assignment under the normal procedures in the

 5    Northern District of Texas?  And if it's not assigned to Judge

 6    Jernigan, don't your arguments about judicial knowledge and

 7    experience in connection with this case fall away because

 8    nobody other than Judge Jernigan has that special knowledge in

 9    Texas?  And all -- what other colleagues would be able to do

10    there is simply walk down the hall and talk to her.  And of

11    course, I can pick up the phone and talk to her any time, as

12    well.

13           So I'm just teasing out this assumption that

14    definitely feels to be behind everybody's arguments, that she's

15    going to get this case.  Is there anything in the record that

16    would support that?  Is there some sort of rule I'm not aware

17    of in Texas or that I'm -- am I assuming something that's not

18    consistent with practice down there, which is that this case

19    would be randomly assigned?

20           MR. CLEMENTE:  Your Honor, I believe you are correct

21    in the sense that the case would be randomly assigned, but I

22    believe Your Honor could look at -- as I understand, there are

23    three judges located in the Dallas court district; one is

24    obviously Judge Houser.  I could be getting the name wrong.

25    But she's overseeing the Puerto Rican proceeding --

Appx. 02844
015406

```
 1            THE COURT:  Um-hum.

 2            MR. CLEMENTE:  -- so her docket is clearly beyond --

 3            THE COURT:  She's also --

 4            MR. CLEMENTE:  -- full.

 5            THE COURT:  -- about to retire, so I don't even know

 6    if she's taking new cases.

 7            MR. CLEMENTE:  Correct.  So that leaves two judges,

 8    Your Honor.  And we understand -- perhaps Acis' counsel would

 9    be able to expand on that, given their familiarity with the

10    Dallas bankruptcy court, but that judge is not being assigned

11    new cases, given a circumstance with that particular judge.

12            But to answer your direct question, Your Honor, I

13    believe you are correct; it would be a random assignment.  But

14    we do believe that there is a high probability it would wind up

15    with Judge Jernigan.

16            THE COURT:  But it might be a pool of one; right?

17            MR. CLEMENTE:  That is correct, Your Honor.  And even

18    if it wasn't, I think, clearly, for all the reasons we'll

19    discuss, we would have a very strong case to make that it

20    should be transferred to Judge Jernigan, even if it initially

21    got somebody else on the --

22            THE COURT:  Well, you know, I mean, if a judge were a

23    lawyer, a judge couldn't have both these cases.  A judge (sic)

24    couldn't have a case with two warring former affiliates,

25    because it would create a conflict of interest.  Now, those
```

Appx. 02845

015407

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-20   Filed 06/06/25   Page 729 of 1017   PageID 16390

HIGHLAND CAPITAL MANAGEMENT, L.P.                    48

 1   rules don't apply to judges.  We're assumed to be above all

 2   that.  But -- since we don't have clients.  But it does -- it

 3   might inform someone's decision about do I really feel

 4   comfortable having Acis and Highland, given the situation -- I

 5   mean, they wouldn't be jointly administered, certainly, of

 6   course.  They're --

 7        MR. CLEMENTE:  That's correct, Your Honor.

 8        THE COURT:  Again, they're not affiliates, at least as

 9   we stand here today; although the debtors are trying to change

10   that, purportedly.  It might create a situation where a judge

11   might take that into consideration in deciding whether to have

12   the case or not.  And I --

13        Now, we deal all the time with jointly administered

14   affiliated cases, right, because there's always intercompany

15   debt --

16        MR. CLEMENTE:  That's correct.

17        THE COURT:  -- and we all just assume it away (ph.).

18        MR. CLEMENTE:  That's correct, Your Honor.

19        THE COURT:  But this is a little different in that

20   they're not affiliates.

21        MR. CLEMENTE:  I do think, Your --

22        THE COURT:  Again, she would -- the judge wouldn't be

23   required -- Judge Jernigan wouldn't be required -- it's not a

24   recusal issue.  It's not a disqualification issue.  It's just

25   a -- sort of something to think about in making the decision.

Appx. 02846
015408

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 22   Filed 06/06/25   Page 730 of 1017    PageID 16391

HIGHLAND CAPITAL MANAGEMENT, L.P.                    49

 1          MR. CLEMENTE:  I don't disagree, Your Honor.  I do

 2  think Your Honor hit on it, though.  Bankruptcy judges are

 3  unique in that perspective that they're put in situations all

 4  the time where a decision may impact one particular entity to

 5  the detriment of another entity that's also before Your Honor

 6  in connection with a particular bankruptcy proceeding.

 7          THE COURT:  Yeah.

 8          MR. CLEMENTE:  With that, Your Honor, I'll continue to

 9  move forward.

10          THE COURT:  Yeah, please.

11          MR. CLEMENTE:  Fourth, and this gets back to the point

12  we were just discussing with Your Honor, we do not believe

13  there's any credible dispute that the Dallas court has already

14  upped the learning curve relative to this Court.  Again, not

15  that Your Honor wouldn't be able to come up to speed and that

16  Your Honor has tremendous capacity to do that, but the record

17  is clear, from our perspective, that the Dallas bankruptcy

18  court has already had to wrestle with issues involving the

19  debtor.  There has been extensive proceeding (sic) in the

20  Dallas bankruptcy court, not just the bankruptcy court but also

21  the district court, with respect to the Acis case.

22          There are several written opinions, again, that Your

23  Honor can take judicial notice of and which are also in the

24  record, that provide, after an extensive and developed factual

25  record, that Acis only operated through Debtor Highland -- the

Appx. 02865
015409

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 35-20 22 Filed 06/25/139 Page 731 of 1017   PageID 16392

HIGHLAND CAPITAL MANAGEMENT, L.P.                    50

 1   debtor, Highland.  It is clear that the Dallas court had to

 2   develop an understanding of how the debtor's complex business

 3   worked.  It is the same business as the debtor engages in here,

 4   albeit a subset.

 5        That's consistent with Mr. Sharp's testimony.  Mr.

 6   Sharp didn't say that they no longer are in the CLO business.

 7   He characterized it in a certain fashion, but the debtor

 8   clearly still manages and advises CLOs.  That is a part of the

 9   debtor's business.  That is what was at issue in the Acis

10   proceeding. And also, as Mr. Waterhouse testified to quite

11   clearly in the rebuttal, and as Mr. Sharp testified to in the

12   cross, it's the same principal actors:  Mr. Dondero and others

13   on his management team.

14        Your Honor, this case, although the idea is to get a

15   fresh start, we believe will necessary require a backward-

16   looking review of the facts.  And the Dallas court has upped

17   the learning curve from that perspective.  The committee

18   recognizes that the Dallas court would take time and determine

19   issues as presented to it.  And depending on the issue, the

20   past experience of the court will have varying degrees of

21   relevance.  But that experience is nonetheless important to the

22   committee to ensure maximum efficiency, with an entity that has

23   demonstrated itself to be highly litigious, Your Honor.  One

24   needs only to review the top-twenty list of creditors, made up

25   largely of law firms and other professionals, to make the

Appx. 02848

015410

1  determination that the debtor is highly litigious, as well as

2  the record in this proceeding.

3          So Your Honor, those four facts, we believe, are

4  unique, and we believe that they strike in favor of

5  transferring venue to Dallas.  I do want to walk through some

6  of the arguments we made in our papers, as well, but I wanted

7  to highlight what we believe are truly distinguishing features

8  of this particular situation.

9          Your Honor, as we more fully lay out in our papers, we

10 do believe the convenience of the parties supports transfer of

11 venue.  The debtor's nerve center is in Dallas; Mr. Waterhouse

12 was clear on that.  Mr. Dondero is the portfolio manager for

13 all of the Highland funds, and he is the one-hundred-percent

14 owner of Strand.  Strand's the general partner of this debtor.

15 All decisions run through Mr. Dondero.  And it's clear that Mr.

16 Dondero and all of the other key personnel are located in

17 Dallas.

18         Your Honor, a large number of creditors are located in

19 Dallas; you need not look past the list of twenty largest

20 unsecured creditors to determine that.  There are almost a

21 majority of those creditors that are located in Texas.  While

22 the committee agrees that the overall organization with several

23 thousand affiliates is complex -- and you'll hear about that as

24 we go on this afternoon -- there's 2,000 affiliated entities

25 with Highland -- the debtor is only Highland.  And so the idea

Appx. 02849

015411

 1   that there may be offices in far-flung jurisdictions, those are

 2   not debtor offices.

 3           Your Honor, the interests of justice also support the

 4   transfer of venue.  The Dallas bankruptcy court has clearly

 5   invested time and resources that are applicable to this debtor.

 6   In this context, the learning curve that is referred to in the

 7   cases clearly favors transfer of venue to Dallas.  Although

 8   this case has been pending for a while, Your Honor, there's

 9   only been a first-day hearing with very limited relief granted,

10   and one brief status conference.

11           There are also economic efficiencies in Dallas.

12   Dallas is convenient for all debtor employees.  Yes, people can

13   get on planes, but it's hard to argue that being a mile-and-a-

14   half away from the courthouse isn't more convenient.

15           THE COURT:  I don't know.  Parking's tough.

16           MR. CLEMENTE:  And perhaps an overnight trip is

17   helpful for the family life, Your Honor.  It depends.

18           Dallas is convenient for the professionals.  It's easy

19   to fly in and out of Dallas, as we point out in our papers,

20   Your Honor.  There's no real, I believe, disagreement that

21   Dallas would not be convenient.

22           Additionally, Your Honor, and we think that this is a

23   unique factor as well, if the long history of Highland's

24   litigious nature is any indicator here, there will be discovery

25   disputes.  And under Rule 45, contested nonparty discovery

Appx. 02659
015412

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-20 22 Filed 06/55/25139 Page 734 of 1017   PageID 16395

HIGHLAND CAPITAL MANAGEMENT, L.P.                    53

 1  would likely occur in the Northern District in Texas, in

 2  Dallas.  Given the massive number of nondebtor affiliates --

 3  again, we only have 1 box here; there's, like, 2,000 others.

 4  It is highly likely that nonparty discovery will become an

 5  issue.

 6          The fact that -- I heard Mr. Sharp testify in his

 7  proffer that he believes he and Mr. Caruso will provide all of

 8  the testimony.  That's great and good and well for him to think

 9  that.  I think the committee's going to take a different view

10  of that, Your Honor.

11          Our own limited history in this case shows the

12  relevance of Dallas.  Two of the three depositions occurred in

13  Dallas.  I believe we informed Your Honor of that on the status

14  call that we had.  And the third didn't, only because we

15  believe Mr. Sharp was not able to travel to Dallas.

16          The justice that the debtor seeks in the Acis case,

17  Your Honor, yields a result that this places -- excuse me, Your

18  Honor.  The justice that we talked about in the appeal with

19  respect to the Acis confirmation order yields a result that

20  places this debtor in the Dallas bankruptcy court, which is

21  also in the interest of justice.

22          So, Your Honor, we believe there are several unique

23  factors.  We believe that the traditional factors, as we lay

24  out in our papers, support the transfer of venue.  And I wanted

25  to just briefly touch on some of the objections that the debtor

Appx. 02851

015413

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 22 Filed 06/25139 Page 735 of 1017   PageID 16396

HIGHLAND CAPITAL MANAGEMENT, L.P.                      54

 1    raised to our venue motion.  First, the debtor thinks too

 2    little of the Dallas court, in asserting that we're trying to

 3    gain some type -- the committee is trying to gain some type of

 4    litigation advantage.  We have no doubt, as Your Honor has

 5    tremendous respect for the Dallas court, that the Dallas court

 6    will take each issue as it comes to it, without prejudice or

 7    predetermination.  History and experience doesn't mean

 8    prejudice or predetermination; it just means familiarity, Your

 9    Honor.  That's all it means.

10         Our point is simply that the Dallas court clearly had

11    to spend time wrestling with the debtor, how it operated, and

12    its opaque structure.  And let me spend a second on how.  As we

13    point out in our reply and, again, as the record is clear based

14    on the published opinions, Acis had no employees; it was a box.

15    And it subcontracted its management services to the debtor.

16    The Dallas court examined that contract, that subadvisory

17    agreement that Mr. Sharp and, I believe, Mr. Waterhouse

18    referred to, and had to become familiar with it.  That's clear

19    from the published opinions.  And the debtor has numerous other

20    similar contracts.

21         The Dallas court also made determinations -- and

22    these, again, are in published opinions -- whether certain of

23    the debtor's contracts with Acis were personal-services

24    contracts.  Again, they may differ, Your Honor, in terms of the

25    specifics, but these are clear examples of where the Dallas

Appx. 02852
015414

1    bankruptcy court had to wrestle with contracts of Highland, the

2    way Highland operated, and the way that it was managed.

3            Additionally, Your Honor, on the point of litigation

4    advantage, as I thought about this, I think the debtor's, sort

5    of, arguments regarding a litigation advantage, frankly, worked

6    the other way.  If I may, here, for a second, Your Honor.  Mr.

7    Dondero is the sole controlling party, as the testimonies made

8    clear.  He's based in Dallas.  As we demonstrated in our

9    papers, Dallas is clearly the most efficient and convenient

10   forum for the creditors.  And the creditors have sent this

11   message loud and clear through this motion to transfer and the

12   lack of any party affirmatively supporting the debtor and venue

13   in Delaware.

14           Mr. Dondero, in our view, as he has shown in the past,

15   consistently makes decisions that are in his best interest,

16   potentially fleeing from a jurisdiction and not his creditors.

17   And we believe that fleeing from the Dallas court, that is,

18   steps away from his office -- and that is convenient for his

19   creditors and, frankly, seems to be the most logical choice of

20   venue -- again, understanding -- we don't dispute that the

21   debtor is a Delaware limited partnership.  We're not disputing

22   that.  But we're talking about what's logical.  That's the

23   point that I would like to make here, Your Honor.

24           Again, back to --

25           THE COURT:  Well, I mean --

1          MR. CLEMENTE:  Yes, Your Honor.

2          THE COURT:  -- I mean, a cynic -- and after almost

3    fourteen years, maybe I'm becoming one; I don't know.  But a

4    cynic would say -- and not necessarily badly (ph.), that both

5    sides want -- are interested in forum-shopping; the debtor

6    fleeing, obviously, adverse rulings in Texas, and the creditors

7    fleeing Delaware to go back to the home of adverse rulings

8    against the debtor in Texas.  And it's six one, half dozen the

9    other.  However, at least the cases -- or some of the cases say

10   that the debtor is entitled to some deference in its forum-

11   shopping, as opposed to the creditor, in their opposition, in

12   their forum-shopping.  I'm not sure I buy that.  And as a

13   matter of fact, I've ruled previously that there is no

14   deference --

15          MR. CLEMENTE:  Correct.

16          THE COURT:  -- that should be afforded to the debtor,

17   in the EFH case.  But --

18          MR. CLEMENTE:  That's correct, Your Honor.

19          THE COURT:  -- I just throw that out there.

20          MR. CLEMENTE:  And I believe Your Honor also made a

21   point, in the EFH ruling, regarding the support of the various

22   parties for the venue.  And so I believe that is actually a

23   very strong factor that weighs in favor of transfer to --

24          THE COURT:  Well, and -- yeah, I mean --

25          MR. CLEMENTE:  -- Dallas.

Appx. 02854
015416

1      THE COURT:  -- and that case had -- the government of

2   Texas or the committee, or both, supported venue.  That case

3   probably, thankfully, would have been sent to Texas, freed up

4   five years of my life, and twenty appeals and --

5      MR. CLEMENTE:  You're stronger for it, though --

6      THE COURT:  -- everything else.

7      MR. CLEMENTE:  -- Your Honor.

8      THE COURT:  Yeah -- I don't know about that.  I'm

9   heavier, that's for sure.

10      MR. CLEMENTE:  I wish I could blame that for my

11   weight, Your Honor, but I can't.

12      Your Honor, back -- very briefly, because we did touch

13   on it already.  We do believe that the Dallas court experience

14   is highly relevant, contrary to what the debtor remarks in

15   their objection.  The debtor again tries to cast the Acis

16   bankruptcy as being narrow and only involving CLOs.  Again, the

17   testimony, I believe, showed, in -- shows, in point of fact,

18   the debtor does manage a significant number of CLOs.  Even if

19   they are in liquidation, there are still decisions that are

20   being made.  And therefore, exposure to how the debtor operated

21   with respect to CLOs is highly relevant.

22      Your Honor, I already mentioned, so I won't repeat

23   myself, that Acis was a box and it had no employees, and

24   therefore, obviously, the court had to look through to what was

25   going on at Highland in terms of how the debtor was managed.

Appx. 02855
015417

1          Your Honor, the CRO, unfortunately, I believe, for the

2     debtor, does not cleanse the venue choice.  The CRO was not

3     around.  The CRO didn't decide venue.  And as clear from the

4     testimony, the CRO reports to Mr. Dondero.  Nothing has

5     changed.  There has been no management changes.  I believe that

6     was also consistent with the testimony.  And everybody still

7     reports to Mr. Dondero, and he's located in Dallas, and Dallas

8     is the nerve center.

9          Additionally, as I mentioned, the cases will be very

10    much about the past, unfortunately, Your Honor, a time when the

11    CRO was not involved, and about transactions and conduct

12    engaged in by the debtor and Mr. Dondero in the run-up to this

13    bankruptcy.

14         In short, I believe the CRO issue is a red herring,

15    Your Honor; it doesn't erase the history the Dallas bankruptcy

16    court has with the debtor through the Acis proceeding, and it

17    doesn't erase the history of the decision-making process that

18    the debtor engaged in, in the past and currently engages in

19    today.

20         With that, Your Honor -- we already had a colloquy

21    about how we do not believe the Dallas bankruptcy court is

22    conflicted, so I won't spend any further time on that.  But I

23    would like to sum up.  Your Honor, let me be very clear.  We

24    have the utmost respect for you and for this Court, so I want

25    to make sure that Your Honor is very clear on that.  However,

Appx. 02856
015418

 1    the committee respectfully believes that this case presents the

 2    unique combination of facts which dictate that the transfer of

 3    venue to the Dallas bankruptcy court is appropriate.

 4            THE COURT:  You don't need to worry.  My ego assumes

 5    you have respect for me.

 6        (Laughter)

 7            MR. CLEMENTE:  Thank you for that, Your Honor.  Unless

 8    Your Honor has any questions, I'll sit.

 9            THE COURT:  I do not.  There may be others in support

10    who want to be heard.

11            Mr. Pomerantz (sic).

12            MR. LUCIAN:  Your Honor, for the record, John Lucian

13    of Blank Rome, local counsel for Acis.

14            Just during the break, we had a binder made for Your

15    Honor so that the exhibits that Ms. Patel had handed up that

16    were admitted -- I know Mr. Morris has no objection to us

17    handing that up, Your Honor.  It's the -- 1 through 26, with

18    the ones that were not admitted.  This will save you from --

19            THE COURT:  Is that these?

20            MR. LUCIAN:  Yeah.  That's the -- you got them in the

21    binder now.

22            THE COURT:  Okay.  Is this in there --

23            MR. LUCIAN:  Yeah.

24            THE COURT:  -- the email?

25            MR. LUCIAN:  Yes; 26, yes.  If you want to switch to

Appx. 02857
015419

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 22 Filed 06/06/25139 Page 741 of 1017   PageID 16402

HIGHLAND CAPITAL MANAGEMENT, L.P.                    60

```
 1   that.  Perfect.

 2          MS. PATEL:  Thank you, Your Honor.  For the record,

 3   Rakhee Patel on behalf of Acis Capital Management, L.P., who

 4   joined in the committee's motion.  And I will make reference to

 5   those -- certain of those documents.  I'm generally loathe to

 6   hand up big binders or big stacks of documents without telling

 7   the Court of what's been handed up.  So, very briefly, Your

 8   Honor, I will say, Exhibits 1 and 2 (sic) in the binder are the

 9   involun -- the issue -- I'm sorry, the opinion issued by the

10   Dallas bankruptcy court, in connection with the involuntary

11   trial, and Exhibit number 2 is the opinion that was issued in

12   connection with confirmation of Acis' plan.  I would also point

13   the Court to Exhibit Number 17, which is the actual

14   confirmation order in Acis Capital Management.  And I'll make

15   reference to one other exhibit as I go through my presen -- or

16   a number of other exhibits, but -- one additional ruling by the

17   court, as I go through my presentation.

18          THE COURT:  What was the date of -- oh, okay.  Never

19   mind.  So the confirmation was late January?

20          MS. PATEL:  Yes, Your Honor.  January 31st, 2019.  And

21   the plan went effective on February 15th of 2019.

22          THE COURT:  Okay.

23          MS. PATEL:  And the Highland bankruptcy, I believe,

24   was just a little bit over eight months later.

25          And, Your Honor, I'll try not to duplicate necessarily
```

015420

1   what the committee did, and I will promise to keep this as

2   brief as I can.  I'm happy to answer any questions, because

3   standing here before you is the counsel -- at least the

4   bankruptcy counsel that lived and breathed the Acis case from

5   the date that they were filed on January 30th of 2018, through

6   today.

7            Now, Your Honor -- and along with my co-counsel, Mr.

8   Shaw, who has been living and breathing, frankly, the issues

9   longer than I have, even.

10           Your Honor, I will repeat something that was in our

11  moving papers.  And I know Your Honor and Your Honor's team has

12  probably read all the moving papers. but I think this bears

13  repeating, and that is that this case is unique.  It is, in my

14  mind, exceptionally unique.  These facts are so unique, Your

15  Honor, that I would venture to say I don't think that this is

16  necessarily a case that would even possibly or remotely or even

17  tangentially open any floodgates, because these facts are so

18  different from the typical motion to transfer venue.

19           Your Honor, touching quickly on the burden-of-proof

20  issue that Your Honor referenced in your colloquy with Mr.

21  Clemente.  Your Honor, Acis concedes, obviously, the burden of

22  proof is clear that it's the preponderance of the evidence.

23  And I won't go through ad nauseum all of the factors.  I know

24  the Court is exceptionally familiar with all the factors on

25  both the convenience-of-the-parties and interest-of-justice

015421
Appx. 02859

```
 1   side.  But I would just note that, at least in the Court's
 2   prior rulings, you've said that the factors are not really a
 3   scorecard, that we're not counting three factors versus three
 4   factors, or four versus two.
 5           And I would just --
 6           THE COURT:  Well, that follows with my fundamental
 7   tenet, which is that any legal test with more than three
 8   factors is useless.  It's just a -- it's just a question of
 9   discussion.
10           MS. PATEL:  I think -- and I think this Court has wide
11   discretion with whether to transfer this case or not.
12           Your Honor, one final quick point that I'll call
13   the -- kind of the four corners or setting the table, for
14   purposes of go-forward, is back to the reference to the -- that
15   there's no real deference, necessarily, to the debtor's choice
16   of venue.  That's sort of subsumed in the burden of proof.  The
17   movant bears a burden of proof and, if they meet the
18   preponderance of the evidence, then the burden shifts.  And
19   that's really kind of where the debtor's choice of forum weighs
20   in.
21           Now, Your Honor, one other quick point is that there's
22   been a lot of discussion in the objections and the responses
23   and the replies, indicating that this whole issue is about Acis
24   as a creditor.  And what I'm here to say, Your Honor, is that
25   this, actually, the issue, the motion to transfer venue, is not
```

Appx. 02869
015422

HIGHLAND CAPITAL MANAGEMENT, L.P.                      63

1    really about Acis as a creditor.  And I'm here representing

2    Acis as a creditor.  This has been painted as there's one

3    creditor that's driving this, and that's Acis.  That's just

4    simply not the case, Your Honor.

5          The reality is that you've got hundreds of millions of

6    dollars or claims represented by the committee, as a fiduciary

7    to those claims, that have made this motion.  This is not Acis'

8    motion.  Yes, we did join with respect to it.  And really, it

9    has -- that has more to do with the fact that we're the Texas

10   folks, we're the Texas creditor.  And we -- again, I and Mr.

11   Shaw lived and breathed the Texas cases.  And I'm here to stand

12   before the Court and answer any questions you may have with

13   respect to what happened, what transpired, but, more

14   importantly, what could happen on a go-forward basis.

15         Your Honor, it's important -- and I -- again, harking

16   back to this concept of this is unique.  As Your Honor noted in

17   EFH, had the committee signed on, had the Texas comptroller

18   signed on, perhaps that outcome would have been a little bit

19   different.  But here, Your Honor, we've got the committee

20   moving for transfer of venue.  And I think that's really

21   significant.  And I'll go through in a little bit sort of the

22   debt stack that we're dealing with here, and you'll see that,

23   hands down, the committee is the fulcrum debt here.  It is the

24   fulcrum debt, Your Honor.

25         Your Honor, one final quick note on forum-shopping.

Appx. 02981
015423

1    And there's been conversation with respect to the committee's

2    forum-shopping, the debtor's relationship.  Look, I've read

3    Your Honor's prior opinions and I really do think the issue

4    boils down to -- I think it's probably neutral with respect to

5    both sides.  As Your Honor pointed out, the debtor has the

6    ability to choose the state of its incorporation as its venue

7    for filing of bankruptcy.  And also, the committee has the

8    ability to move, to transfer, pursuant to 1412, to a place that

9    is the interest of justice and the convenience of the parties.

10   I really view that as being the -- there should be no negatives

11   cast on, frankly, either side, with respect to forum-shopping,

12   because it's kind of invited by the structure of the statute.

13          So if the case isn't about Acis as a creditor, what is

14   this case about?  Well, I -- or what is this motion about?

15   Here I really do think that -- at its heart, that this

16   particular motion to transfer, and probably motions to transfer

17   in general, boil down to the bankruptcy case itself.  So here

18   that would be -- this is all about Highland's bankruptcy and

19   where it should be administered, what makes sense.

20          And, Your Honor, I want to go through a couple of

21   different subtopics on this.  First I want to talk about the

22   business lines that the debtor engages in.  What does it do?

23   And this is all from the -- what I'm going to refer the Court

24   to is all included in the first-day declaration of Mr.

25   Waterhouse, which is Debtor's Exhibit O.

 1          And, Your Honor, in Mr. Waterhouse's declaration, he
 2    goes through the three kind of general lines of the debtor's
 3    business.  First is proprietary trading.  And that involves
 4    sort of trading with the debtor's money or leveraged money in
 5    certain brokerage accounts.  And I really think that
 6    proprietary trading is probably that line of business -- when
 7    we're thinking about which court is best suited to oversee that
 8    line of business and what's going to happen with respect to it,
 9    I think that's really neutral.  I think both Delaware and
10    Dallas could adequately handle that issue.
11          The issue really becomes a lot more focused, though,
12    when we look at the other two lines of business.  The next line
13    of business is investment management services.  And this is --
14    and a big piece of that is the debtor's operation of its CLOs
15    or collateralized loan obligations.
16          If the 2018 financials -- again, I believe they're
17    contained in debtor's exhibits -- if you take a look at those
18    you'll see that as a part of investment management fee revenue,
19    a lot of the revenue that was generated is related to the
20    debtor's operation of eighteen CLOs along with some managed
21    separate accounts, et cetera.
22          Your Honor, the CLO piece and the separate accounts
23    are issues that the Dallas court was faced with through Acis'
24    bankruptcy and Highland's management of it.  And I'll borrow
25    from Mr. Clemente his phrase:  Acis was effectively a box.  It

Appx. 02863
015425

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 22 Filed 06/05/25139 Page 747 of 1017   PageID 16408

HIGHLAND CAPITAL MANAGEMENT, L.P.                    66

 1  had no employees of its own.  It only had two officers, Mr.

 2  Dondero and Mr. Waterhouse, who was the treasurer of Acis,

 3  until their resignation shortly after the appointment of --

 4  shortly after the involuntary filings and the appointment of a

 5  trustee.

 6         Now, Your Honor, the other -- the last piece that's

 7  also involved is shared services.  So we've got investment

 8  management, and there's subpieces of it.  And I won't represent

 9  to the Court that is Judge Jernigan familiar with every aspect

10  of Highland's investment management services?  No, likely not.

11  But neither is this Court.  This Court is still, very much so,

12  on the learning curve with respect to that.

13         And I would submit, Your Honor, that Judge Jernigan is

14  frankly just further along that learning curve with respect to

15  the investment management services.

16         On shared services, Your Honor, as Mr. Clemente

17  referenced, the opinions are very clear -- again, Exhibits 1

18  and 2 -- with respect to there is -- it's clear that Judge

19  Jernigan had to evaluate shared services.  And I'll kind of

20  summarize what the structure of what Judge Jernigan had to

21  evaluate was.  Again, Acis is a box.  It was provided its

22  services by Highland, pursuant to two key agreements:  a

23  subadvisory agreement and a shared-services agreement.  And

24  that shared-services agreement is relatively generic.  And all

25  that is is the subadvisory -- I like to think of it as that's

Appx. 02804
015426

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 22 Filed 06/06/25   Page 748 of 1017   PageID 16409

HIGHLAND CAPITAL MANAGEMENT, L.P.                    67

1    the thinking brain stuff.  That's the investment advisory.

2    Does this comply with SEC guidelines?  Should these trades be

3    made?  What does the marketplace look like?

4          Shared services, on the other hand, Your Honor, are

5    all that middle- and back-office typical type stuff.  There's

6    no real rocket science with respect to it.  It's just providing

7    infrastructure:  accounting, legal, bookkeeping functions, all

8    those things that any sort of generic business would provide.

9          And again, that is something that Judge Jernigan is

10   just more familiar with.  She is familiar with Highland's

11   business modus operandi.

12         And, Your Honor, if you look sort of across the

13   Highland structure, you will see that Acis really was just a

14   little microcosm.  It's a little template, because it gets

15   repeated throughout the Highland empire.

16         And one of the exhibits -- and forgive me; I didn't

17   bring up the other exhibit list, but multiple parties have

18   designated it, and it's the entities list.  And there's 2,000

19   entities, approximately.  I didn't count them all up.  But

20   that's a number that's been thrown around:  2,000 entities

21   under this.  And they are all each little microcosms.

22   Certainly, Judge Jernigan is further along with respect to the

23   Acis microcosm, but also with respect to the template as well.

24         Your Honor, with respect to then, therefore, economy

25   or -- judicial economy or efficiency, again, Judge Jernigan,

Appx. 02865
015427

 1   further along the learning curve.

 2           Your Honor, now turning then to the debt stack, as I

 3   had referenced earlier -- again, this is all set forth in the

 4   declaration of Mr. Waterhouse -- you've got two secured

 5   lenders, Jefferies and Frontier.  And no one's heard with

 6   respect to -- from them with respect to their position.  Your

 7   Honor, these are two creditors that are vastly oversecured, and

 8   so really they -- I'll put them as sort of neutral with respect

 9   to what's going to happen in this bankruptcy case.

10           Then the next item in the debt stack that Mr.

11   Waterhouse identifies is Highland CLO Management.  Well, Your

12   Honor, it's a note that was transferred -- Highland is the

13   obligor on the note.  It's about nine-and-a-half million

14   dollars.  And it was a note that was previously held by Acis

15   and that was transferred to an entity by the name of Highland

16   CLO Management, by Mr. Dondero.

17           Highland CLO Management, in turn -- Mr. Waterhouse

18   references that there's sort of -- Highland doesn't have a

19   beneficial interest with respect to it.  But if you look at the

20   retention applications that are set for hearing a little bit

21   later today, you'll see that actually the debtors (sic) are

22   claiming there is an interest in this, that the debtor has an

23   interest in making sure that Highland CLO Management has a

24   defense when it comes to the issue of was that transfer from

25   Acis to Highland CLO Management a fraudulent transfer.

Appx. 02806
015428

1          And again, these are issues that Judge Jernigan has
2     had to grapple with all throughout the bankruptcy case.  There
3     have been no -- there has been no adjudication that it was a
4     fraudulent transfer; but certainly she's had to evaluate it in
5     connection with four injunctions that were issued in connection
6     with the Acis case.

7          First there was a -- excuse me -- a sua sponte
8     injunction.  Second there came an ex parte injunction.  Third
9     there was a preliminary injunction.  And then fourth there was
10    a plan injunction.  And that plan injunction, Your Honor, is
11    embodied in Exhibit Number 17.  And again, all of these
12    transfers and transactions -- part of the debt stack of
13    Highland has been evaluated by Judge Jernigan.

14         Last in the debt stack, but certainly not least, Your
15    Honor, we have the general unsecureds.  And Mr. Waterhouse, in
16    his deposition that was held in Dallas, estimated that perhaps
17    the general unsecureds could be upwards of two billion dollars,
18    all told.

19         Now, just looking at the twenty largest, we're still
20    in the hundreds of millions, and we don't have the benefit of
21    schedules yet.  But this is -- this is the big dog.  This is
22    the big layer of debt.  This is who is really the fulcrum here.

23         And keep in mind, Your Honor, this is a free-fall
24    bankruptcy.  No one knows where this is going to go.  At the
25    first-day hearings, debtor's Counsel referenced that there

015429

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-20   Exhibit 22   Filed 06/03/25   Page 751 of 1017   PageID 16412

HIGHLAND CAPITAL MANAGEMENT, L.P.                    70

 1   could be sales of assets and divestiture of certain things,

 2   operational restructuring.  There's really no idea where this

 3   case is headed.  And I think that's significant, Your Honor,

 4   because this is an operational restructure or perhaps a

 5   liquidation.

 6           I hope not.  I hope that this is an operational

 7   restructure and that all creditors can be paid either in full

 8   or close to in full, but that's significant.  And the reason

 9   why it's significant here is because, Your Honor, you've got

10   the fiduciary for that fulcrum debt voting with their feet with

11   what could happen -- what should happen on a plan.

12           And they're saying we think this case should be

13   administered in Texas.  And I think, again, going back to what

14   makes this case so unique, I think that's what makes it so

15   unique is that there are -- just from a dollar perspective and

16   volume perspective, the significant creditors and the committee

17   with respect to who's a fiduciary telling you, Judge, we think

18   this case should be administered in Texas.  And those votes are

19   going to be important with respect to any exit that happens

20   here.

21           Your Honor, I'll hit sort of on another factor, the

22   sort of forum's interest or a local interest in the

23   controversy.  And I concede, clearly -- and I think Your Honor

24   has referenced in the past -- Delaware, when it -- when an

25   entity is organized under Delaware law, that the forum state

Appx. 02808
015430

 1  has an interest in protecting its entities.  However, I will

 2  say, I think what's different here is --

 3            THE COURT:  Say that again?

 4            MS. PATEL:  I'm sorry, Your Honor.  I probably

 5  misstated that.  That the state of incorporation has an

 6  interest in entities that are --

 7            THE COURT:  Yeah, but --

 8            MS. PATEL:  -- formed under its state's law.

 9            THE COURT:  -- you're in the wrong court for that.

10  That's state court.  This is --

11            MS. PATEL:  I'm sorry?

12            THE COURT:  -- the --

13            MS. PATEL:  Oh, yeah.

14            THE COURT:  You're in the wrong court for that.  I

15  don't care about that.  This is --

16            MS. PATEL:  All right.

17            THE COURT:  -- this is federal court.

18            MS. PATEL:  Fair enough.  I'll take that one, then.

19            THE COURT:  This is federal court.  That's for the

20  chancery and the governor.

21            MS. PATEL:  Well, Your Honor, and going back just to

22  the issue of the unique factors here, usually, Your Honor, in a

23  motion to transfer venue, you have what I'll call relatively

24  similarly situated courts, certainly if you've got a transfer-

25  of-venue motion that was filed as early as the one that was

Appx. 02869
015431

1    filed in this case, within the first few weeks of the case, and

2    within, I believe, two days of the committee's formation.

3              That's just not the scenario here, Your Honor.  You

4    have a bankruptcy court in Texas who is familiar with various

5    aspects of the debtor's business.  Is it familiar with every

6    aspect of the debtor's business?  No.  But that certainly can't

7    be said as to the Delaware Court either, that you are familiar

8    with every aspect of the debtor's business.

9              Your Honor, in Texas there's not only a bankruptcy

10   court, there's a district court who is familiar with all of

11   the -- with aspects of the debtor's business, and that is the

12   Honorable Judge Fitzwater.

13             And what I will say -- Your Honor was asking questions

14   with respect to the judge -- the bankruptcy judge that it would

15   be assigned to.  I'm happy to address those from my

16   perspective.  But what I will note is that every appeal that

17   stemmed out of the Acis bankruptcy case -- and there were in

18   excess of ten -- every single one was transferred ultimately to

19   Judge Fitzwater for adjudication.

20             So even if -- even if we look just one layer up from

21   the bankruptcy court to the district court, Judge Fitzwater is

22   intimately familiar.  And now we've got three -- in connection

23   with the Acis cases -- three appeals that are pending before

24   the Fifth Circuit, two of which involve Highland or a Highland-

25   related entity.

Appx. 02879
015432

HIGHLAND CAPITAL MANAGEMENT, L.P.                73

 1          Your Honor, I want to quickly touch on the --

 2          THE COURT:  Is it the practice in the -- it's the

 3  practice in our district court that once a district judge is

 4  assigned an appeal in connection with a bankruptcy, any further

 5  appeals in that bankruptcy go to that district judge.  Is that

 6  the practice in Texas?

 7          MS. PATEL:  It's the practice, Your Honor.  I don't

 8  believe that there's a specific local rule that says that that

 9  will happen, but that's functionally what happens.  And

10  sometimes you have to make a motion to transfer between two

11  courts, but invariably, it usually goes to sort of either the

12  first-filed court or kind of the first court to really get into

13  a substantive issue.

14          THE COURT:  Okay.

15          MS. PATEL:  Your Honor, I'll touch on a couple more

16  quick points.  It is offensive to me when I read through the

17  debtor's pleadings and that there is an implication that the

18  Dallas court is somehow biased.  I think of Judge Jernigan and

19  I think of this Court and I think of virtually every bankruptcy

20  court that I've ever had the privilege of appearing before as

21  being fair and impartial.  And this concept of bias, that's

22  only grounded in the fact that the debtors have -- or I'm

23  sorry -- the debtor has lost a few.

24          And I will say, just to kind of forestall that easy

25  conclusion based on the opinions, I would note, in Acis'

Appx. 02871
015433

1  exhibits, if you look at Exhibit Number 12, that is -- it's an

2  email that the court sent in connection with Acis' first

3  confirmation hearing.  And that was a confirmation hearing that

4  occurred in August of 2018.  And the court ultimately denied

5  confirmation of the first sort of plan.  And there were kind of

6  three sub-plans.  But the court denied it.

7         And so again, I'm offended that there would be even an

8  implication that the court is somehow biased, because this

9  isn't a scenario where there have been only adverse rulings to

10 Highland in connection with the Acis bankruptcy case.  Judge

11 Jernigan has called the balls and strikes as she sees them,

12 Your Honor.

13        Your Honor, I'll conclude with the following, which is

14 that I would venture to guess that if this Court were in sort

15 of -- if we reversed the scenario and this Court had expended

16 hundreds of hours, hundreds of pages of opinions, untold hours

17 of its courtroom staff's time, going through and poring through

18 an exceptionally voluminous record, over 100,000 pages, and

19 having expended over forty days of courtroom time, with that

20 significant of an interest in the case and that expenditure of

21 time, I would venture to guess that this Court would want this

22 case transferred back to Delaware, if it had been filed

23 anywhere else.

24        And so I would submit to Your Honor that this Court

25 should -- this case should be transferred to Dallas for all of

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 22 Filed 06/06/25  Page 756 of 1017    PageID 16417

HIGHLAND CAPITAL MANAGEMENT, L.P.                75

1  the reasons proffered by the committee and as joined by Acis.

2  Thank you, Your Honor.

3          THE COURT:  You're welcome.

4          Anyone else in favor of the motion?

5          All right.  This time it will be short.  We're going

6  to take a very short recess, and then I'll hear from the

7  debtor.

8      (Recess at 11:50 a.m. until 12:00 p.m.)

9          THE CLERK:  All rise.

10          THE COURT:  Please be seated.  I apologize.  I know

11  it's getting warmer and warmer in here.  And we're trying to

12  contact -- we're trying to find someone in Maintenance who's

13  working today.

14          MR. POMERANTZ:  It's usually motivation to get the

15  hearings done quickly, in my experience.

16          THE COURT:  Yeah, it's -- if I take off my robe, don't

17  be offended.  I do have clothes on underneath.

18          MR. BOWDEN:  Thank you.

19          THE COURT:  I heard you, Mr. Bowden.

20          All right, go ahead.

21          MR. POMERANTZ:  Good afternoon, again, Your Honor.

22  Jeff Pomerantz, Pachulski Stang Ziehl & Jones, on behalf of the

23  debtors-in-possession (sic).  Before I go on to my prepared

24  remarks, I just want to address a couple of the points that

25  were raised by Mr. Clemente and Acis' Counsel.

Appx. 02873
015435

1        First, we are not aware of any formal statement that

2   Judge Hale, in the Northern District of Texas, is not taking

3   cases.  So I think Your Honor's point was a good one.  There's

4   no definite -- there's no requirement, and it may or may not be

5   that this case gets transferred, if Your Honor were to transfer

6   it.

7        Second, Your Honor, Highland has -- there have been

8   appeals made not only from confirmation of the plan but also

9   from the involuntary itself.  If the involuntary appeal

10  succeeded, there wouldn't even be a bankruptcy case to be

11  related to.  And in any event, the case law says that events

12  that may or may not happen in the future are not really

13  relevant to the venue analysis.

14       Lastly, Your Honor, Mr. Clemente started by saying he

15  thinks the facts are largely in dispute, and you heard Counsel

16  then go through in detail, as did Acis' Counsel, about how

17  there's no dispute that Judge Jernigan has a learning curve.

18       Of course they need to say that because that is the

19  focus and the crux of their venue-transfer argument.  As I will

20  demonstrate in my comments and as the evidence is before the

21  Court, other than the opinions that were written and other than

22  the amount of time the court has spent, there is no real nexus

23  between what happened in that case and what happened in this

24  case.

25       We have no doubt that Judge Jernigan learned all about

Appx. 02874
015436

 1   Acis, learned all about Acis' relationship to Highland.  But
 2   the real issue before Your Honor is what does that have to do
 3   with this debtor, this debtor's assets and liabilities, and
 4   this debtor's operations.  And as my comments will show, we
 5   think that's a significantly overblown argument.

 6          Your Honor, during their presentation, Counsel really
 7   strayed a little bit from what the motion and the joinders sort
 8   of said.  There they went through a painstaking analysis of the
 9   various factors supporting venue.  I know Your Honor said that
10   over three factors, you don't find that helpful, but the courts
11   have relied on a series of factors.

12          And I think the reason why they have strayed away from
13   that and focused on the committee being the one to support the
14   transfer-of-venue motion and the facts of the Acis case is
15   because when you pare it down, the actual factors demonstrate
16   that there is no way the committee can carry its burden to
17   demonstrate that venue should be transferred.

18          However -- Your Honor pointed to this at the
19   beginning, in mentioning comments about forum-shopping -- the
20   committee and Acis are really being disingenuous, and they have
21   not told you the real reason that they want the case before
22   Judge Jernigan.

23          At the first-day hearing, Your Honor, Acis said they
24   intended to file a motion for an appointed trustee.  The
25   committee has told the debtor it intends to file a motion to

Appx. 02875
015437

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 22 Filed 06/06/25   Page 759 of 1017   PageID 16420

HIGHLAND CAPITAL MANAGEMENT, L.P.                    78

 1   appoint a trustee after this hearing.  The motion has not yet

 2   been filed, Your Honor, because they want Judge Jernigan to

 3   rule on that motion.  And it's not because she's familiar with

 4   this debtor's business, this debtor's assets, or this debtor's

 5   liabilities, because she generally is not.  It is because she

 6   formed negative views regarding certain members of the debtor's

 7   management that the committee and Acis hope will carry over to

 8   this case.

 9         The convenience of the parties and the interests of

10   justice and how this case is so unique are just a pretext.

11   They want a trustee to run the debtor, and they want Judge

12   Jernigan and not Your Honor to rule on that motion.  That, Your

13   Honor, is not a proper reason to transfer venue, but rather a

14   transparent litigation ploy.

15         Similarly, Acis also wants the case to proceed in its

16   home court where it has enjoyed success in litigating against

17   the debtor.  Your Honor mentioned the conflicts-of-interest

18   theories.  They're not just conflicts of interest between two

19   jointly administered debtors.  These go to the crux of what the

20   Acis case is about and significant claims against the debtor.

21         The Court may ask, appropriately -- and the Court

22   did -- why would the debtor file the case in Delaware?  Chapter

23   11 is all about a fresh start.  The debtor recognized concerns

24   that the creditors had with certain aspects of its pre-petition

25   conduct, and proactively appointed Brad Sharp as chief

Appx. 02876
015438

 1  restructuring officer with expanded powers, to oversee the

 2  debtor's operations.

 3          Mr. Sharp worked with the debtor and Counsel to craft

 4  a protocol for transactions that would be subject to increased

 5  transparency.  The debtor didn't have to do that.  As Your

 6  Honor mentioned at the first-day hearing, the debtor operates

 7  its business in the ordinary course.  But given the

 8  circumstances surrounding this case, given the history, we

 9  felt, and the CRO, importantly, felt it was important to get on

10  the table what the debtor, through the CRO, believed was

11  ordinary and what was not, so we could have a transparent

12  discussion, discussion that, while we've made headway with the

13  committee, we have not yet been able to come to an agreement.

14          The debtor filed the case in this district because it

15  wanted a judge to preside over this case that would look at

16  what's going on with this debtor, with this debtor's

17  management, this debtor's post-petition conduct, without the

18  baggage of what happened in a previous case, which contrary to

19  what Acis and the committee says, has very little to do with

20  this debtor.

21          These form insufficient grounds, Your Honor, to

22  overturn the debtor's choice of venue, and the motion should be

23  denied.

24          I would like to now walk through the statutory

25  analysis, something that Counsel avoided, because again, I

Appx. 02877
015439

1    think it highlights the weakness of their argument.

2         It is clear that the Delaware venue is proper, and

3    1408 says the places where a Chapter 11 debtor can file the

4    case.  As the vast majority of debtors who file cases in this

5    district, the debtor filed here because it was domiciled in

6    Delaware.  It is a Delaware LP.  But it goes further than that.

7    99.94 percent of its LP interests are owned by Delaware

8    entities.  And the general partner, Strand Advisors, is a

9    Delaware general partner.

10        While many cases, Your Honor, before this court, rely

11   on the domicile of one affiliate to bring other non-Delaware

12   related affiliates before the court, that's not the case here.

13   All you have, virtually, are Delaware entities, through the

14   ownership structure.

15        As I will also discuss in a few moments, Your Honor,

16   domicile is not the only connection that this debtor has to

17   this district, as significant litigation matters involving the

18   debtor, including those commenced by committee members, that

19   was the catalyst to the filing, are pending in Delaware.

20   Accordingly, the committee acknowledges, as they must, that

21   Delaware is, of course, a proper venue.

22        However, they rely on 1412 which sets forth the

23   standard -- test that the movant has to meet in order to

24   transfer venue, either for the convenience of the parties or

25   the interest of the justice.

Appx. 02878
015440

1    And courts, including the written opinions in this

2 district by your colleagues, most often cite to the six factors

3 in the CORCO decision in the Fifth Circuit in 1979. And as

4 Judge Gross, in his 2016 opinion in Restaurants Acquisition

5 makes clear, the movant bears the burden of demonstrating that

6 the factors strongly weigh in favor of a transfer.

7    Similarly, Judge Gross stated in that case -- and I

8 know Your Honor may not fully subscribe -- that courts

9 generally grant substantial deference to the debtor's choice of

10 forum.

11    And in the case here, where not only do you have the

12 debtor is a Delaware entity, but virtually all of its holdings

13 are well -- are Delaware entities as well, it is even more

14 appropriate to defer to the debtor's choice of forum. As Judge

15 Walsh said in his 1998 opinion at PWS Holding, it is a

16 fundamental legal tenet that every citizen of a state is

17 entitled to take advantage of the state and federal judicial

18 process in that state.

19    So the question before Your Honor is whether the facts

20 in this case strongly weigh in favor of a venue transfer such

21 that the Court will disregard the debtor's reasoned business

22 judgment to commence the case in this district?

23    We submit, Your Honor, that the committee and Acis

24 have not come close to meeting that standard, and the CORCO

25 factors do not support a transfer.

Appx. 02879
015441

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 5-20   Exhibit 22   Filed 04/25/25   Page 86 of 139   Page 763 of 1017   PageID 16424

HIGHLAND CAPITAL MANAGEMENT, L.P.                     82

1          The first one is the proximity of creditors.  And the

2    committee is focused on the fact that the committee -- the

3    representative fiduciary of the estate -- has determined that

4    venue is appropriate.  But the factor not only looks at the

5    number of creditors, it looks at the dollar amount of the

6    creditors.  And if you analyze -- an analysis of either

7    demonstrates that convenience of the parties does not support a

8    transfer of venue in this case.

9          The debtor has two secured creditors.  Jefferies is

10   headquartered in New York City.  Frontier Bank is headquartered

11   in Oklahoma.  There was reference by Acis' Counsel to HCLOF.

12   Their secured claim is unrelated to the note that was at issue

13   in Acis, and there's nothing in the record to say that that

14   secured instrument has anything to do with the Acis case.

15   Neither of those creditors has weighed in on the motion to

16   transfer venue.

17         So let's look at the unsecured creditors.  Of the

18   twenty that were listed in the debtor's petition, seven have

19   Texas addresses.  Five of those are debtor's either current or

20   former law firms.  Two of them are in the courtroom today.  And

21   as Your Honor I'm sure appreciates, debtor professionals --

22   former debtor professionals are not usually active in

23   bankruptcy cases.  Indeed, none of them filed a notice of

24   appearance in this case.

25         The other two that have Texas addresses are the claims

Appx. 02880
015442

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 22 Filed 08/25/139 Page 764 of 1017   PageID 16425

HIGHLAND CAPITAL MANAGEMENT, L.P.                    83

 1  related to Acis:  the Acis claim and the Josh Terry claim.

 2  There are no other unsophisticated creditors that the Court

 3  needs to worry about that would not be able to travel to

 4  Delaware, as needed.

 5         The two largest unsecured creditors in the top twenty

 6  are the Redeemer Committee and Patrick Daugherty, each of whom

 7  had pre-petition litigation pending against the debtor that

 8  they each commenced in the Delaware Chancery Court.  And the

 9  arbitration proceeding that preceded the Redeemer chancery

10  court litigation was pending in New York City.

11         UBS, a member of the committee, listed as number

12  nineteen with a disputed and unliquidated claim, will likely

13  claim it is the largest creditor of the estate.  It is based in

14  New York.  It has litigation pending against the debtor in New

15  York, and used Latham & Watkins' DC office for that litigation.

16         And lastly, the fifth largest creditor, Your Honor,

17  Meta-e Discovery, is also on the committee.  Where is their

18  address?  Stamford, Connecticut.

19         As Judge Gross reasoned in Restaurants Acquisition, in

20  order to overcome the strong presumption in favor of the venue

21  transfer, a transfer must substantially improve the

22  administrative feasibility with respect to the creditor body as

23  a whole.  So the committee sits out there and Acis sits out

24  there saying that it's convenient for the creditors, it's much

25  more convenient in Dallas.  Their actions belie their

Appx. 02881

015443

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 22 Filed 06/06/25   Page 765 of 1017   PageID 16426

HIGHLAND CAPITAL MANAGEMENT, L.P.                    84

1  statements.  All this litigation was focused on either Delaware

2  or the Northeast.  It is just simply disingenuous for them to

3  argue otherwise.

4          The next factor, Your Honor, is the proximity of the

5  debtor.  And in applying this factor, the courts focus

6  primarily on the parties who appear in court.  The debtor

7  retained Brad Sharp, and he has demonstrated its intention --

8  and the debtor has demonstrated its intention of having Mr.

9  Sharp be the face of the reorganization efforts before the

10 Court.

11         Indeed, in cases where a CRO is reported, Your Honor,

12 the CRO is more apt to testify in court than any other debtor

13 representative.  And I believe Mr. Sharp's testimony, which was

14 uncontroverted, was that he expects that he and Mr. Caruso will

15 provide the bulk of the testimony required from debtor

16 representatives during this bankruptcy case; and that's because

17 the debtor has given Mr. Sharp broad authority to evaluate the

18 propriety of post-petition transactions and to pursue and

19 analyze insider claims.

20         And at today's hearing the debtor will offer the

21 testimony of Mr. Sharp and his colleague, Mr. Caruso, to

22 support the relief requested.  They have developed a

23 substantial amount of knowledge regarding the debtor's assets,

24 liabilities, and operations, in the six weeks they've been on

25 the job; and that knowledge will continue to grow.

Appx. 02882
015444

1          And Mr. Sharp has significant experience, as he

2     testified to, being a CRO in cases in this district; and he

3     could travel just as easily to Delaware as he can to Texas.

4          While the debtor acknowledges that other debtor

5     employees like Frank Waterhouse may be called to testify, as he

6     was today, the involvement of the debtor's personnel in this

7     court is likely to be immaterial.  And he was the only Texas

8     person called to testify in this case.  And if the committee

9     and Acis felt it was so important that representatives of the

10    debtor be -- it would be easier for them to travel to court,

11    they didn't call any witnesses in today, which is the most

12    important hearing in the case.

13         Also, Your Honor, our offices, as you know, are in

14    Delaware.  And while it's true that we practice all around the

15    country, we would need separate counsel if we were to -- if the

16    case was to be -- to move.

17         And similarly, the committee retained Young Conaway,

18    which took a significantly active role in the litigation

19    leading up to today.  That information and knowledge and

20    expertise would be lost if the case was transferred.

21         Next, Your Honor, related, is the proximity of

22    witnesses.  And a I said, the committee can't demonstrate that

23    witnesses in this case would find Texas a substantially more

24    convenient forum than this court.  And you would have expected

25    them to have subpoenaed Texas witnesses if that were so

Appx. 02883
015445

 1   important.

 2          Location of assets, Your Honor, is one of the CORCO

 3   factors.  And the committee makes a big point that all the

 4   decision-making is in Texas and all the people are in Texas and

 5   the office is in Texas.  The courts that look at location of

 6   assets as being critical typically involve cases that are

 7   single-asset real-estate cases, or cases that are small local

 8   businesses that have significant regional connections.

 9          But if you look at the debtor's assets here, it's not

10   the case.  Their assets generally include financial instruments

11   and investments in a wide variety of public stock; advisory

12   contracts; shared services; and interests in nonpublic hedge

13   funds and private equity funds.

14          The assets are located throughout the United States

15   and in Latin America, Korea, and Singapore.  And the majority

16   of the debtor's liquid assets are in New York.  We were not --

17   we don't dispute the point that there aren't significant people

18   in Dallas and that the offices are in Dallas and all the

19   employees.  We don't dispute that.  But the assets are far-

20   flung around the country, and the cases, again, that focus on

21   the assets, focus on local expertise that the court will bring

22   to bear, particularly in real-estate cases with respect to

23   valuation.  You have nothing of that here.

24          The debtor intends to use its Chapter 11 to provide

25   breathing room and to evaluate, hopefully in a constructive way

Appx. 02884
015446

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 35-20   Filed 10/06/25   Page 768 of 1017   PageID 16429
Exhibit 22   Page 86 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    87

1   with the committee, how best to maximize value for the debtor's

2   assets through a consensual restructuring; and there's no

3   reason to believe why Texas rather than this court, would be a

4   more appropriate forum for this restructuring.

5            The last factor, Your Honor, is the economic

6   administration of the estate, which the courts generally point

7   to as the most important factor.  And the committee points to

8   five reasons, which is essentially retreads of its previous

9   arguments.

10           Again, they argue a higher concentration of creditors

11  in Texas and Midwest.  That's not the case, as I mentioned.

12  They argue that there's a higher concentration of professionals

13  in Texas and Midwest.  And if you look at all the

14  professionals, they're all from national firms; they're all

15  metropolitan areas that practice routinely before this Court.

16  And the concept that the flights being different and the

17  mileage being different is in any way -- is in any way

18  important, is just not -- is just not the case.

19           People practice in a global, national world, these

20  days.  And if that argument succeeded, most of the -- your

21  brethren and yourself would not have much to do, because that

22  argument could support transfers in most cases.

23           THE COURT:  Well, I think really goes to why -- I

24  mean, I know this is the standards that are generally applied,

25  but it's a case from 1979.  It's really behind the times.  I

Appx. 02885

015447

Case 19-34054-sgj11    Doc 3596-22    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 35-20 22   Filed 06/06/25   Page 96 of 139   Page 769 of 1017    PageID 16430

HIGHLAND CAPITAL MANAGEMENT, L.P.                88

1  don't think the factors reflect corporate practice of

2  bankruptcy reality of 2019.

3            MR. POMERANTZ:  And that's exactly what Judge Gross

4  said in the Caesar's opinion --

5            THE COURT:  Right.

6            MR. POMERANTZ:  -- which is cited in the material,

7  that this argument, given technology, given frequency of air --

8  ease of air travel, it's just not a relevant factor anymore.

9            And the two pages that the movants spent in the brief

10  talking to you about how many direct flights there are from LA

11  to Delaware as opposed to LA to Dallas, that, Your Honor, I

12  think is just silly.

13            The committee also argues that most creditors would

14  need to retain local counsel if they were here.  Well, if you

15  look, the case has been pending a month-and-a-half, and other

16  than notices of appearance filed by committee members, there

17  have only been two notices of appearance that have been filed

18  that are unrelated to debtor entities.  And one of those is

19  Daugherty, who commenced litigation in chancery court.  So the

20  argument that is made typically in cases where they're filed in

21  jurisdictions far off from where the debtor's operating is, is

22  that it'll be burdensome on the mom-and-pop creditor, Your

23  Honor, we don't have mom-and-pop creditors here.  And there's

24  nobody out there with material claims against the estate that

25  will not have the ability and have trouble and demonstrated the

Appx. 02886

015448

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 35-20   Exhibit 22   Filed 06/06/25   Page 770 of 1017   Page 96 of 139   PageID 16431

HIGHLAND CAPITAL MANAGEMENT, L.P.                    89

```
 1  willingness to hire Delaware Counsel.

 2          The last argument --

 3          THE COURT:  Even when you do have mom and -- again, to

 4  comment on reality, even when you do have mom-and-pop creditors

 5  in businesses that are very locally focused, general practice

 6  today is to make their claims irrelevant, in that to the extent

 7  they have avoidance claims, they're paid on the first day.

 8  Their real concern is whether the business will continue or

 9  not.

10          Now, it's certainly true that pension claims are

11  important, and proofs of claim are important.  But we have

12  many -- all courts have many procedures in place to ensure that

13  those types of creditors can participate without having to go

14  to the courthouse.

15          MR. POMERANTZ:  Yes.  So, Your Honor, Judge Gross also

16  mentioned that in the Restaurants Acquisition case, which was a

17  Texas-based --

18          THE COURT:  He's a smart guy.

19          MR. POMERANTZ:  We'll be sorry to see him go, Your

20  Honor.

21          THE COURT:  Yeah, absolutely.

22          MR. POMERANTZ:  Which was a Texas-based restaurant

23  chain that had more of a local flair.  But he made the comments

24  Your Honor made.

25          The last argument the committee makes is that Texas is
```

Appx. 02887
015449

 1   more convenient.  And this is really the crux, which I'll spend

 2   some time over the next few minutes.

 3            Texas is more convenient -- convenient -- because the

 4   Texas bankruptcy court, where Acis is pending has, in their

 5   words, already expended great time and effort familiarizing

 6   itself with the debtor and its operations.  You've heard

 7   statements like "learning curve".  You heard statements about

 8   everything that the debtor -- that Judge Jernigan has found out

 9   about this debtor, and how important and how helpful it is, and

10   how Your Honor will be behind the learning curve.  We just

11   don't buy that, Your Honor.

12            And aside from that argument, the arguments that the

13   committee makes for transfer are arguments that could be made

14   in any case before Your Honor.

15            THE COURT:  Yeah, I was going to say that's kind of an

16   interesting argument, because actually it assumes Judge

17   Jernigan's going to ignore the rules of evidence in making

18   factual findings, because you're limited to the record before

19   you on a specific motion.  And what fact you may have learned

20   with regard to something a person has done, maybe that goes

21   into questions of credibility on cross-examination or direct

22   testimony, but to actually base your decision on a fact that's

23   not in the record for the specific proceeding would be

24   improper.

25            MR. POMERANTZ:  Look, I agree, Your Honor.  And the

Appx. 02888
015450

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 22 Filed 06/06/25139 Page 772 of 1017   PageID 16433

HIGHLAND CAPITAL MANAGEMENT, L.P.                    91

1  familiarity with the type of business -- if I wasn't speaking

2  to Your Honor or your brethren or many other judges around the

3  country, I'd say well, maybe there are certain judges who

4  haven't dealt with large financial services company, may not

5  know what a CLO, may not know what a hedge fund is or private

6  equity fund is.  I'm very confident that Your Honor has had

7  many cases with sophisticated financial instruments, likely CLO

8  obligations, so that Your Honor not only has a good base of

9  knowledge that would give you the same base of knowledge that

10 Judge Jernigan has, but as we've also found, you are a fairly

11 quick study and that I have no doubt that you could come up-to-

12 speed without very little effort.

13          So their argument is a grossly overstated

14 interpretation of what the Acis case was about and that what

15 was learned in that case has any relevance.  As a part -- as a

16 result of the Acis plan confirmation, Acis is no longer part of

17 the debtor's organizational structure.  The debtor owns no

18 equity in Acis.  And the debtor no longer provides any advisory

19 services to Acis.

20          We admit that Judge Jernigan conducted many hearings,

21 and she issued several lengthy opinions, and she heard from a

22 variety of witnesses.  And I'm sure Your Honor -- if Your Honor

23 has not -- Your Honor might read the opinions that she wrote

24 that are attached to the exhibits, the plan confirmation

25 opinion, the arbitration opinion, the involuntary opinion; and

Appx. 02889
015451

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 22 Filed 04/25/25   Page 773 of 1017   PageID 16434

HIGHLAND CAPITAL MANAGEMENT, L.P.                92

1    you will conclude, I believe, as I have concluded, that ninety-

2    five percent of that stuff has nothing to do with this debtor.

3            It focused on the CLO obligations -- CLO business, the

4    relationship, the transfers of certain assets away from Acis

5    that basically Acis is claiming were fraudulent conveyances,

6    and that was the real focus; not on any of the debtor's

7    business operations.

8            Acis was the advisory arm through which the debtor

9    structured its collateral loan portfolio.  The fees -- the

10   uncontroverted evidence is the fees generated from the CLO

11   business represent approximately ten percent of the debtor's

12   revenue and that that will reduce over time, because since the

13   market crash in 2009 the debtor has not created any new CLO

14   funds.  So there's no active management and advisory services

15   going on for the CLOs.  They're just being liquidated in the

16   normal course.  Their importance will continue to decrease.

17   And even right now, it's only ten percent.

18           The debtor generates its revenues from trading public

19   securities; its equity positions in a variety of nonpublic,

20   private-equity, and hedge funds; and advisory and back-office

21   service provided to third parties.  It is the monetization of

22   those assets that will provide the basis for the restructuring

23   of this debtor.  And Judge Jernigan's prior experience with the

24   small sliver of what the debtor's business currently is, will

25   be only marginally relevant, at all.

Appx. 02890
015432

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 22 Filed 06/05/25 Page 774 of 1017   PageID 16435

HIGHLAND CAPITAL MANAGEMENT, L.P.                    93

1    Acis didn't have any other balance-sheet assets.  They
2    were basically an advisor of CLOs.
3         For example, Judge Jernigan has no experience or
4    knowledge surrounding the debtor's multi-strat. fund; its
5    Korean, Latin American, or Singapore private-equity
6    investments; its investments in the PetroCap funds; or the
7    other myriad of assets that are on the debtor's balance sheet
8    which Your Honor will likely will hear about in connection with
9    the hearings that will go on later.
10        The committee and Acis make a big point of arguing
11   that Judge Jernigan is familiar with the shared-service and
12   management agreements between Acis and the debtor.  However,
13   there was a lot of testimony from the podium on that.  The only
14   testimony before Your Honor is that the contracts are
15   different.  Mr. Waterhouse wasn't even familiar with the
16   contracts, couldn't provide any testimony.  But Mr. Sharp
17   testified that the type of shared-service and advisory
18   agreements for CLOs are markedly different than the type of
19   services and advisory agreements for non-CLO entities.  While
20   Acis' Counsel stood up there and said there's a template and
21   they're pretty much the same, that was purely argument.  There
22   was no evidence in the record to reflect that.
23        And in fact, the only two agreements that involved
24   Highland in the Acis case were these two agreements.  But
25   again, they're like apples and oranges.

Appx. 02891
015453

1        In any event, Your Honor, one of the matters that Mr.

2   Sharp is focusing on will be the appropriate economic

3   arrangement between the debtor and its affiliates and

4   nonaffiliates, through its shared-services and advisory

5   agreements.  That has been a focus of DSI's analysis.  The

6   committee has indicated that's something that they want to

7   focus on.  And Mr. Sharp will come up with a recommendation as

8   to what those should be, and it'll be that recommendation

9   that'll be based on the market rate for these contracts in

10  these particular businesses that will be relevant for Your

11  Honor to consider, at some point.

12       They attached a post-confirmation opinion that Judge

13  Jernigan issued with respect to denial of a motion to seek

14  arbitration regarding provisions of those agreements.  But if

15  you read that opinion carefully, you will see that the primary

16  issues in that case were whether an arbitration provision

17  actually survived, given that the last version of the agreement

18  did not have them -- there were five different iterations in

19  each of the agreements.  And after concluding that the

20  arbitration provision did survive, she ultimately ruled that

21  that notwithstanding, she would not enforce arbitration because

22  the claims were too related to the other claims that were being

23  asserted.  Again, nothing to do with the debtor's business.

24       In fact, Your Honor, after today, I have no doubt that

25  Your Honor will be a lot more familiar -- if Your Honor is not

Appx. 02892
015454

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 22   Filed 09/05/25   Page 776 of 1017   PageID 16437

HIGHLAND CAPITAL MANAGEMENT, L.P.                    95

 1   already -- with what the debtor does.  So Your Honor will hear

 2   testimony from Mr. Caruso; Your Honor will hear testimony from

 3   Mr. Sharp, about various aspects of the debtor's business, what

 4   it's doing, its management structure, how that structure is

 5   working.  All that you will hear, which will put you in an

 6   advanced state, compared to Judge Jernigan, as opposed to being

 7   behind.

 8          And there are other aspects of this case that are on

 9   the way that have nothing to do with Acis.  For example, we

10   just filed a motion to approve ordinary-course bonuses to

11   employees.  And we may also seek approval of a KERP and a KEIP.

12   Acis had their own employees, and Judge Jernigan had no special

13   knowledge of the debtor that would put her in a better position

14   to give her an advantage over this Court in determining an

15   appropriate compensation structure.

16          It isn't that difficult.  Your Honor hears it all the

17   time:  KEIPs, KERPs.  Judge Jernigan hears it all the time.  My

18   point is, Your Honor, there's nothing that would help her, from

19   her knowledge of Acis, that would justify a transfer of venue.

20          They also stress that -- in their papers, that Judge

21   Jernigan heard a lot of testimony from debtor's management.

22   But they really don't discuss what the content of that

23   testimony is or how it's, in any event, relevant to this case.

24   They just really want to rely on the sheer volume of

25   information that they have foisted on Your Honor, citing to the

Appx. 02893
015455

Case 19-34054-sgj11 Doc 3596-22 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 22 Filed 06/06/25 Page 777 of 1017 PageID 16438

HIGHLAND CAPITAL MANAGEMENT, L.P.                                    96

1    entire record, by saying there's so much; there's been hundreds

2    of pages, dozens of hearings, and then that means Judge

3    Jernigan is in a much better position.

4         If they wanted to point to specific things in the

5    record where the judge had specific knowledge, they could have.

6    They shouldn't (sic) have.  And they're trying to do this on a

7    big holistic view, but when Your Honor looks at the record, I

8    think Your Honor will conclude otherwise.

9         In any event, it's not really -- they don't explain

10   why familiarity with the debtor's management is at all

11   relevant.  Look, they clearly want a trustee in this case and

12   believe that because Judge Jernigan found debtor's management

13   to not be credible, she'll be more apt to appoint a trustee

14   than this Court.  But that argument doesn't withstand scrutiny.

15        This case is different.  This case is being managed by

16   a CRO.  This case had the debtor file a motion it didn't have

17   to file for ordinary-course protocols.  This case has -- thus

18   far, you haven't heard anything about any discovery disputes,

19   you haven't heard anything -- although you heard a couple weeks

20   ago there might be issues with cooperation, we provided a

21   substantial amount of documents, produced witnesses, in a

22   significantly accelerated time frame.  You have heard nothing

23   about that.

24        So any un-cooperation or difficulty of any -- that

25   they may have encountered in the Acis case, there's no evidence

Appx. 02894
015456

1    that that's occurring here, for good reason; because Mr. Sharp

2    is in charge.  And although he is still reporting to Mr.

3    Dondero, as his corporate structure, Mr. Dondero can terminate

4    him, and if he terminates him, he has to give notice.  That's

5    appropriate.  That's one of the issues we address in connection

6    with the U.S. Trustee's concerns with the CRO motion.  In order

7    to file a corporate governance, he has to report.  But there

8    are certain things, as you'll hear later, that he has been

9    given primary responsibility for.

10          Your Honor, Chapter 11 is about giving a debtor a

11   fresh start, and this court is no -- this case is no exception.

12   This Court is fully capable of evaluating the veracity of the

13   debtor's witnesses; and transferring the case to Judge

14   Jernigan, when the real motivation is because of how she has

15   dealt with the prior case -- which they may not say it, but

16   that's clearly what's happening here -- would be unduly

17   prejudicial to the debtor.

18          We have nothing against Judge Jernigan.  She is a fine

19   jurist.  But in this case I think it's a challenge and there's

20   a reason why we decided to have the case filed here.

21          And then I'll also point to Your Honor the significant

22   adversity between the two estates.  Your Honor mentioned that.

23   Counsel said, well, it happens in all cases.  True.  We've been

24   involved in many, many cases with multi debtors, that they have

25   issues in intercompany claims.  That's a fact of modern

Appx. 02895
015437

 1   corporate life.

 2           But this is different.  The whole -- one of the -- the

 3   most significant asset of Acis are their claims against this

 4   debtor.  How those claims are prosecuted and when they succeed,

 5   may make or break the Acis case as to whether unsecured

 6   creditors get paid or not.

 7           In a case like this, this factor does not support a

 8   transfer of venue; we argue that it supports keeping the case

 9   before Your Honor so that it can maintain the separateness of

10   the estates.

11           In conclusion, Your Honor, we don't believe the

12   committee has come close to satisfying its burden that a change

13   of venue is appropriate under 1412.  And as I mentioned at the

14   beginning of my presentation, the committee's motive in

15   bringing the motion and Acis' motive in joining the motion is

16   clear.  Even though the debtor has installed a CRO with

17   expanded powers, with impeccable credentials to address

18   creditor concerns, the committee and Acis are focused on the

19   appointment of a Chapter 11 trustee and believe the transfer of

20   the case to Texas is the most likely to get that goal

21   accomplished.

22           But rather than filing the case -- or filing a trustee

23   motion here, they took their shot on a venue motion and hope

24   that Your Honor will give them a shot to do it in Texas.

25           Your Honor, for those reasons, we respectfully request

Appx. 02896
015458

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-10   Filed 06/03/25   Page 780 of 1017   PageID 16441
Exhibit 22   Page 101 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    99

```
 1    that Your Honor deny the motion.
 2            THE COURT:  Thank you.
 3            MR. POMERANTZ:  Does Your Honor have any more
 4    questions?
 5            THE COURT:  No.
 6            MR. POMERANTZ:  Thank you, Your Honor.
 7            THE COURT:  Reply?
 8            MR. CLEMENTE:  Briefly, Your Honor.  I will be brief.
 9    It will be a little less organized, because I'll just run
10    through some points very quickly.
11            THE COURT:  Okay.
12            MR. CLEMENTE:  First of all, on Restaurant
13    Acquisitions, I believe in that opinion, Your Honor, there were
14    creditors that supported venue in Delaware.  We do not have a
15    single creditor on the record supporting Delaware -- excuse
16    me -- supporting venue in Delaware.
17            Regarding the litigation in New York and Delaware,
18    that's a red herring, Your Honor.  They're forced creditors.
19    They were forced to bring lawsuits to achieve their view of
20    justice.  It's not relevant to whether -- the location of
21    that -- those lawsuits being in Delaware and New York.  They
22    were forced to bring those lawsuits in order to get paid by Mr.
23    Dondero and the debtor.
24            Your Honor, we didn't call witnesses this morning,
25    because we believe -- as I mentioned in my argument -- that the
```

Appx. 02887
015459

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-10   Filed 10/02/25   Page 781 of 1017   PageID 16442

HIGHLAND CAPITAL MANAGEMENT, L.P.                    100

1   uncontroverted facts support our venue-transfer motion.  The

2   other motions are their burden, Your Honor.  And so I wanted to

3   remind Your Honor of that.

4          Regarding Young Conaway, obviously, we shouldn't -- it

5   shouldn't be held against us that we decided that the smart and

6   prudent thing to do is to have able Co-Counsel advise us as we

7   proceed in front of Your Honor.  So I believe that that's

8   something that simply is of no moment.

9          The location of the assets, Your Honor, these are

10  financial instruments.  They're interests in limited

11  partnerships.  They're documents.  They're things that are

12  created by documents.  And again, it's not controverted.

13  That's all located in Dallas, Your Honor.

14         So this idea of far-flung assets throughout the

15  country just simply isn't true.  These are documents.  They're

16  interests.  They're things that exist on paper.

17         Your Honor, we have not made this about the mom-and-

18  pop creditors.  We take Your Honor's comments to heart on that.

19  As Counsel for Acis suggested, this is about the large body of

20  unsecured creditors that are sitting at the bottom of this cap

21  structure with oversecured creditors on top of it.  And this

22  large body of unsecured creditors has said we believe that

23  venue is appropriate in Dallas.

24         Regarding the rules of evidence, of course Judge

25  Jernigan is not going to ignore the rules of evidence.  But

Appx. 02898
015460

 1   we're talking about judicial efficiency.

 2           For example, when I need to look at an indenture, I

 3   know in article 2 it's going to have payment terms.  That's the

 4   type of thing that we're talking about, Your Honor; not that

 5   she's going to pre-judge or ignore the rules of evidence as she

 6   makes her determinations.

 7           Finally, Your Honor, two things that I would -- that I

 8   would like to say.  The testimony you may hear this afternoon,

 9   obviously that should not factor into what you're up the

10   learning curve today, right now, in terms of considering the

11   venue motion.  That would put the cart before the horse, I

12   think.

13           And, Your Honor, I'd be remiss if I didn't talk about

14   this ordinary-course motion that we keep hearing about.  If

15   they didn't need it, they shouldn't have filed it.  But

16   instead, what they're trying to do is create some type of

17   transparency and legitimacy around transactions that I think

18   we'll make clear, are not in the ordinary course.

19           And the final point that I would make there, Your

20   Honor; it's interesting Mr. Pomerantz referred to the multi-

21   strategy transaction.  That one is -- Your Honor, I will

22   call -- a doozy.  And you will hear more about it this

23   afternoon, to the extent Your Honor decides not (sic) to keep

24   venue.

25           With that, unless you have questions for me, I'll sit

Appx. 02899
015461

Case 19-34054-sgj11 Doc 3596-22 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-10 Filed 10/03/25 Page 783 of 1017 PageID 16444

HIGHLAND CAPITAL MANAGEMENT, L.P.                    102

 1  down.

 2           THE COURT:  No questions.

 3           MR. CLEMENTE:  Thank you.

 4           THE COURT:  Thank you.

 5           MS. PATEL:  Your Honor, I'll be brief, and I won't

 6  repeat anything that Mr. Clemente, on behalf of the committee,

 7  said.  But I did want to just address kind of the first point

 8  Mr. Pomerantz made with respect to Judge Hale, and he's not

 9  aware of any formal statement that Judge Hale is not taking

10  cases.  Your Honor, that's accurate.  I'm not aware of any

11  formal statement that Judge Hale is not taking cases either.

12           So to answer Your Honor's question, in terms of random

13  assignment, in the Northern District of Texas, where I have

14  practiced my entire career, and primarily practice before the

15  courts that are there -- and I'm a former law clerk to Judge

16  Hale also -- I will say that although there may be a random

17  assignment, it is not -- absolutely not unheard of that when

18  you've got the matter -- for example, if a case were assigned

19  to Judge Hale, but Judge Houser were to hear first-day matters

20  and other significant matters, that Judge Hale would then

21  transfer that case for judicial efficiency and economy within

22  the district, to Judge Houser for further proceedings.

23           In other words, the Northern District of Texas always

24  finds the easiest way in which to handle matters.  And I am

25  confident, Your Honor, that if this matter were transferred to

Appx. 02900
015462

 1   the Northern District of Texas, that despite whoever it would

 2   be assigned to, that everyone is well aware of the time that

 3   Judge Jernigan has spent becoming familiar with Highland, these

 4   issues, and the amount of court resources that have been

 5   expended, such that this case would be transferred to Judge

 6   Jernigan.

 7          But perhaps that's just a question for Judge Jernigan

 8   and her courtroom staff or the Northern District of Texas and

 9   the courtroom -- I'm sorry -- the court clerk or the staff

10   that's there.

11          Your Honor, one last very quick point.  The comment

12   was made that -- with respect to CLOs that Highland hasn't had

13   a new CLO since 2009.  That, Your Honor, is because every new

14   CLO that was issued from 2009 going forward to 2017, every one

15   of those was issued in Acis.  Acis was the structured-credit

16   arm of Highland.  It is how it issued new CLOs.

17          Indeed, it issued seven CLOs under Acis, with over two

18   billion dollars in assets under management.  The fact that

19   there have been no new CLOs since then, simply means that they

20   haven't been able to get one off the ground.

21          But make no mistake, Your Honor, the CLO business is

22   valuable enough that it is now the subject of significant

23   litigation because of all of the attempts to transfer those CLO

24   assets away.  So in terms of the court's familiarity, I would

25   submit, again, that the bankruptcy court is clearly more

Appx. 02901
015463

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-13 Filed 06/25   Page 106 of 139   Page 785 of 1017   PageID 16446

HIGHLAND CAPITAL MANAGEMENT, L.P.                    104

1    familiar with a significant piece of Highland's business.

2              One last thing, Your Honor, and somewhat similar to

3    that, that Judge Jernigan was not familiar with the Korean

4    entities, the Singapore entities, or the multi-strat.  I submit

5    to Your Honor that this Court hasn't been exposed to those

6    things as well, other than conclusory statements that well,

7    we've got some Korean assets; oh, we've got some Singapore

8    assets; and we've got multi-strat; and other than Mr.

9    Waterhouse's, like, five-minute testimony at the first-day

10   hearing where I was questioning him with respect to the assets

11   which he didn't really quite know about what's inside a

12   multi-strat.

13             Other than that, this Court hasn't been exposed either

14   to those assets, so when we're looking at the broad playing

15   field rather than looking at specific assets, there is a

16   learning curve.  Judge Jernigan is further along it with

17   respect to certain things.  Otherwise both courts are similarly

18   situated or neutral to each other.  But it's those assets that

19   she is familiar with, the business model of Highland, and that

20   further along the learning curve that she is, that's what's

21   significant here, Your Honor.

22             And that will play into, clearly, what will ultimately

23   be how Highland is going to restructure.  Again, the creditors

24   here have voted with their feet in filing this transfer motion.

25   And these are the very same creditors, Your Honor, that will be

Appx. 02902

015464

1  necessary in order for this -- if it's going to be a successful

2  restructure, they're the ones that are necessary to make it a

3  successful restructure.  Thank you.

4          THE COURT:  You're welcome.

5          All right, let's break for lunch until 1:45.  And when

6  I come back at 1:45 -- when we come back at 1:45, I am going to

7  issue an oral decision on this motion.  All right.

8      (Recess at 12:39 p.m. until 1:47 p.m.)

9          THE CLERK:  All rise.

10         THE COURT:  Please be seated.

11         Okay, good afternoon.  Thank you for coming back.  I'm

12  now prepared to rule on the motion to transfer venue, which I'm

13  going to grant.

14         So I think, as I hinted at during argument, that the

15  case law that we're kind of clinging to on motions to transfer

16  venue, really do not reflect the modern reality of Chapter 11

17  practice in the U.S. and internationally.  And I think a lot of

18  the parts of the test really don't reflect what's going on

19  generally in Chapter 11 cases.

20         The thing I take greatest umbrage -- no, "umbrage"

21  isn't the right word -- but disagree with the most is the idea

22  that there's somehow a strong presumption of the debtor's

23  choice of forum.

24         Look, every debtor that files bankruptcy -- certainly

25  every sophisticated Chapter 11 debtor that files bankruptcy --

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-10  Filed 08/26/25   Page 787 of 1017   PageID 16448
Exhibit 22   Page 108 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                              106

1   is engaged in forum-shopping.  There is an element to that.

2   Where you file will depend on a lot of things that are unique

3   to the forum.

4         I don't think you need to be ashamed of that.  I don't

5   think that's bad.  As long as the venue you're choosing is

6   appropriate under the law, certainly you're going to make

7   decisions based on what the law is in that particular district,

8   perhaps even a preference to individual judges or judge in that

9   district.

10        To compound that with a strong presumption in favor of

11  the debtor is to really give a boost to the debtor's choice of

12  forum, which is made -- included in the decision-making process

13  is an element of forum-shopping, to a level that makes it very

14  difficult to overcome that presumption.

15        Of course, the creditors that file a motion to

16  transfer venue are engaged in forum-shopping themselves.

17  Otherwise, why would they be switching forums and going for a

18  different location.  Again, I don't think that the word "forum-

19  shopping" should have the negative connotation that it has come

20  to have in the law.  It is the reality of bankruptcy practice.

21        Now, if that's involved -- if that goes a step further

22  and somehow involves chicanery or something inappropriate just

23  from an ethical standpoint, of course that's problematic.  But

24  there's absolutely no indication here whatsoever that anyone,

25  on behalf of the debtor or the creditors or the Dallas court or

Appx. 02994
015466

Case 19-34054-sgj11    Doc 3596-22    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 55-10 2022 Filed 05/09/25    Page 788 of 1017    PageID 16449

HIGHLAND CAPITAL MANAGEMENT, L.P.                    107

 1  the Delaware court, is doing anything other than acting

 2  appropriately.

 3          The question about a motion to transfer venue is

 4  whether the motion should be granted by a preponderance of the

 5  evidence.  If you add a strong presumption, you're turning it

 6  into a harder motion to be granted; and I don't think that's

 7  appropriate.

 8          However, I find the laundry list of factors that are

 9  generally discussed to be irrelevant or almost irrelevant to

10  the actual issues that are going on, particularly in a case

11  like this.  And I'll get to that in a second.

12          So six of the debtors are located in Texas; UBS is

13  located in New York.  UBS is located everywhere.  Wells Fargo

14  is located everywhere.  Certainly companies have executive

15  suites.  But whether or not that should be the decision about

16  where a case should file, to me, isn't particularly clear.  It

17  depends on the facts of the case.

18          I think a more general approach that would involve

19  looking at the facts and circumstances of a case and seeing

20  whether it points to a specific jurisdiction might be a more

21  helpful way of proceeding.  And that's what this case is really

22  about.

23          This is a unique case, I think.  It is a different

24  case than those that we usually run into.  And although maybe

25  not completely different from every case, but in any event,

Appx. 02905
015467

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-10   Filed 01/10/25   Page 789 of 1017   PageID 16450
Exhibit 22   Page 110 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    108

1  this case is very focused on responding to existing litigation.

2  And that existing litigation of a former affiliate, as of a few

3  months ago, and a pending appeal that could make it a current

4  affiliate, is located in the Northern District of Texas.

5         The judge in the Northern District of Texas has done a

6  tremendous amount of work and has done -- issued a number of

7  opinions, had a number of trials.  That work creates a

8  familiarity with the facts, issues, and players in a case

9  which, while it may not affect the actual decision based on

10  evidence on a motion-by-motion basis, certainly could color a

11  judge's approach to a case.

12         Judges are human.  Judges make judgments over time as

13  to the parties, as to the lawyers.  That's not inappropriate,

14  as long as you stick by the rules of evidence.  But it

15  certainly can color what credibility you might give to a

16  witness or to counsel.

17         I think here we have a situation where the real

18  gravitas of this case is in Dallas.  The two facts that really

19  come out to me are, in this case, the fact that the executive

20  suite is very focused and very Dallas-oriented.  It's a global

21  empire, but it's clearly focused in Dallas.  And the existing

22  litigation in the Acis bankruptcy that's been going on for some

23  time; those are the two predominant factors.

24         Everything else kind of falls away.  The creditors are

25  scattered.  The assets are scattered.  The economic

Appx. 02906

015468

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-10   Filed 01/16/25   Page 790 of 1017   PageID 16451
Exhibit 22 Page 116 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    109

 1    administration isn't being affected one way or the other.  I

 2    mean, people can get on planes and you can go to Philly or you

 3    can go to Dallas.  Either way, you're stuck on American

 4    Airlines.  But so be it.

 5          It can be done.  And as a result, I think that the

 6    best solution here, to give the debtors a fair shot at

 7    reorganization, but to balance the creditors' rights and the

 8    creditors' desires, is to move the case to Texas.

 9          And on that latter point, just to finish up.  As I

10    said with my previous decision in EFH, it was striking in that

11    case that only one creditor moved to transfer venue and that

12    none of the other creditors either actively opposed or simply

13    stayed silent with regard to that motion, including significant

14    creditors, like the official committee.

15          In this case, we have the opposite.  We have the

16    debtor defending its venue choice, of course.  But there's a

17    lot of silence, because there's no one else on that side.  I

18    thought it highly significant that Jefferies and -- is it

19    Fortress?

20          UNIDENTIFIED SPEAKER:  Frontier.

21          THE COURT:  Frontier, thank you.  That Jefferies and

22    Frontier did not take a position.  And no other creditors

23    opposed the committee's motion.  And the committee consists of

24    a series of very large creditors.

25          So I think that given these facts and circumstances,

Appx. 02907
015469

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-10   Filed 01/06/25   Page 791 of 1017   PageID 16452
Exhibit 22   Page 106 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                    110

 1   particularly the unique nature of the ongoing litigation and

 2   the existing tie to Dallas, the executive suite and management,

 3   principal place of business, if you will, being focused in

 4   Dallas, and creditors -- as Counsel said -- voting with their

 5   feet to move the case to Dallas, and applying just a good old

 6   fashioned preponderance of the evidence standard, that the

 7   Court should grant the motion, which I will do.

 8           Now, I need an order.  And we will get the machinery

 9   in place, as soon as I get the order signed, to transfer the

10   file as quickly as possible.

11           I did call Judge Jernigan prior -- right before I came

12   out -- well, right before I went and got lunch and then came

13   out -- to inform her what I was going to do, so the Dallas

14   court is aware that this is -- that this is an issue that's

15   coming their way.

16           Is there anything -- I'm not going to create a lot of

17   law of the case for Judge Jernigan on matters that don't need

18   to be decided today.  Is there anything the parties actually

19   agree on that needs to go forward today or can go forward

20   today?  If not, I'd rather just save everything for Judge

21   Jernigan to have a fresh look at.  I know that she did mention

22   that she has availability on her calendar over the next several

23   weeks.  So you should be able to get on it rather quickly, once

24   the case gets transferred.

25           We used to send big boxes in the mail to do this, but

Appx. 02908
015470

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 25-12022 Filed 01/03/25  139 Page 792 of 1017    PageID 16453

HIGHLAND CAPITAL MANAGEMENT, L.P.                    111

 1   now it's just hitting a couple buttons on a computer to take

 2   care of that.

 3          So is there anything we could -- we need to decide?

 4          Okay.  Just a question.  Obviously there are estate

 5   professionals -- Pachulski not really a problem, since you'll

 6   stay in the case, but I'm thinking of Young Conaway -- and I

 7   don't know if there are any other firms that are Delaware firms

 8   that might fall out of the case that would be subject to the

 9   Court.  But I'll leave that for Judge Jernigan to decide

10   whether to retain them for a limited period of time or to pay

11   them or not pay them.  Hopefully, of course, they've earned

12   their money; they should be paid.

13          Yes, sir.

14          MR. KHARASCH:  Your Honor, Ira Kharasch of Pachulski.

15   I think Your Honor, there is one vital matter that you should

16   hear today and rule on.  I would think it would be generally an

17   easy motion.  It is the application to employ the CRO.  That is

18   within the debtor's business judgment, given -- as we described

19   the reasons for that, considering the concerns raised by

20   creditors.

21          I think it's critical that the CRO be formally

22   engaged.  They've done a tremendous amount of work in the past

23   six weeks.  They've been at the company full time, for a team,

24   for a month.  They have done a lot of good stuff in this case.

25   They have a lot more things to do.

Appx. 02909
015471

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-10   Filed 01/04/26   Page 793 of 1017    PageID 16454
Exhibit 22   Page 106 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.                         112

 1            The CRO has been tasked under the modified -- under

 2    the protocols, with broadened authority to take all kinds of

 3    and accept all kinds of decision-making over key decisions of

 4    this case, involving insider transactions, ordinary-course

 5    transactions.  We've done a lot of work modifying the protocols

 6    that relate to that.

 7            This company is operating every day.  I think the CRO

 8    and his team deserve some comfort that they should get employed

 9    as of today, Your Honor.  I -- you know --

10            THE COURT:  Let me hear from the committee.

11            MR. CLEMENTE:  Thank you, Your Honor.  Matthew

12    Clemente on behalf of the committee.

13            Your Honor, we don't agree with that.  Again, it's not

14    about DSI being paid or not being paid.  As Your Honor

15    mentioned with Young Conaway, that isn't the issue.  But to the

16    extent Your Honor has any familiarity with the motions, they're

17    all intertwined.  The CRO is all part of the protocols that

18    they're advancing in the ordinary-course motion.

19            So this isn't about simply retaining a professional to

20    ensure that that professional gets paid.  It really is about

21    setting what I like to call concrete pillars in the ground in

22    terms of how the debtor views the case should be managed going

23    forward.  And I think based on Your Honor's ruling, that's

24    something that Judge Jernigan should be given the opportunity

25    to weigh in on.

Appx. 02910
015472

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-10   Filed 10/15/25   Page 794 of 1017   PageID 16455

HIGHLAND CAPITAL MANAGEMENT, L.P.                    113

1          So again, it's not about Mr. Sharp and his firm

2    getting paid.  I don't believe that that is the issue.  They

3    can continue doing what they've been doing, up to this point,

4    just like we have, for example, at Sidley, and the rest of the

5    professionals that haven't been retained.  And I don't see why

6    that should cause a problem.

7          But we do believe that that is integrated with the

8    other suite of motions that would be before Your Honor; and we

9    think it's appropriate for Judge Jernigan to make those

10   decisions.

11         THE COURT:  All right.  Well, I don't view a retention

12   application to be an emergent basis to hear a motion anyway.

13   But I'm certainly not going to agree to sign it over objection

14   of the committee, given how I just ruled.  So --

15         MR. CLEMENTE:  Thank you, Your Honor.

16         THE COURT:  -- I'd also say.  So I'd ask the committee

17   Counsel to circulate a form of order and submit it under

18   certification of counsel.  I think the simpler the better; just

19   for the reasons set forth on the record, and it's transferred.

20   Don't put a lot of findings in there.  That'll just cause

21   trouble.  That's my belief.  But you can negotiate what you

22   want to negotiate, and as soon as that's ready, upload it,

23   inform chambers, we'll get it signed, and we'll start the

24   machinery in place.

25         MR. CLEMENTE:  Great.  Thank you very much, Your

Appx. 02911

015473

1   Honor.  We appreciate it.

2           THE COURT:  All right.  We're adjourned.

3       (Whereupon these proceedings were concluded at 2:02 PM)

Appx. 02912
015474

```
 1                      I N D E X

 2    WITNESS                EXAMINATION BY         PAGE

 3    Bradley Sharp          Ms. Reid                20

 4    Bradley Sharp          Mr. Shaw                21

 5    Frank Waterhouse       Mr. Guekre              24

 6    Frank Waterhouse       Mr. Shaw                32

 7

 8                    E X H I B I T S

 9    DEBTOR'S          DESCRIPTION                 PAGE

10    --          A thru U, except for G            12

11    ACIS'             DESCRIPTION                 PAGE

12    --          Exhibits 1 through 18, with        37

13                the exception of Nos. 3 and

14                9; and Exhibits 24 and 25

15    26          Email exchange between Acis'       40

16                counsel and Hon. Jernigan's

17                courtroom deputy

18

19                      RULINGS

20                                    Page     Line

21    Motion of the Official Committee of      105      13

22    Unsecured Creditors for an Order

23    Transferring Venue of this Case to the

24    United States Bankruptcy Court for the

25    Northern District of Texas, granted.
```

Appx. 02913
015475

Case 19-34054-sgj11    Doc 3596-22    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10    Filed 06/18/25    Page 797 of 1017    PageID 16458

116

1

2                      C E R T I F I C A T I O N

3

4    I, Clara Rubin, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7

8

9

10                                        December 3, 2019

11   _____      _____

12   CLARA RUBIN                       DATE

13

14   eScribers, LLC

15   352 Seventh Avenue, Suite #604

16   New York, NY 10001

17   (973) 406-2250

18   operations@escribers.net

19

20

21

22

23

24

25

Appx. 02914
015476

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

# A

**ability (7)**
17:24;18:11;27:2;
40:11;64:6,8;88:25
**able (9)**
46:9;47:9;49:15;
53:15;79:13;83:3;
100:6;103:20;
110:23
**above (1)**
48:1
**absolute (1)**
43:10
**absolutely (3)**
89:21;102:17;
106:24
**accelerated (1)**
96:22
**accept (1)**
112:3
**acceptable (1)**
11:8
**access (1)**
14:7
**accessing (1)**
14:5
**accomplished (1)**
98:21
**accomplishing (1)**
18:7
**Accordingly (1)**
80:20
**account (3)**
15:19,22,23
**accountant (1)**
24:12
**accounting (3)**
28:6,7;67:7
**accounts (3)**
65:5,21,22
**accurate (1)**
102:10
**achieve (2)**
45:11;99:19
**Acis (106)**
6:15;8:8,18;16:6,
22,23;17:7,10,12,14,
18,21,22;18:2;21:5;
22:12,19,21;34:10,
13;35:8;36:11;37:9;
38:20;43:1,21;44:1,
11,16,17;45:5,7,13;
48:4;49:21,25;50:9;
53:16,19;54:14,23;
57:15,23;58:16;
59:13;60:3,14;61:4,
21;62:23;63:1,2,3;
64:13;65:25;66:2,
21;67:13,23;68:14,
25;69:6;72:17,23;
74:10;75:1;77:1,14,

20,23;78:7,15,20;
79:19;81:23;82:13,
14;83:1,1,23;85:9;
90:4;91:14,16,16,18,
19;92:4,5,8;93:1,10,
12,24;95:9,12,19;
96:25;98:3,5,18;
100:19;103:15,15,
17;108:22
**Acis' (17)**
16:8;17:21;37:20;
40:21,22;47:8;
60:12;63:7;65:23;
73:25;74:2;75:25;
76:16;77:1;82:11;
93:20;98:15
**acknowledges (2)**
80:20;85:4
**Acquisition (3)**
81:4;83:19;89:16
**Acquisitions (1)**
99:13
**across (1)**
67:12
**acting (1)**
107:1
**actions (1)**
83:25
**active (4)**
16:24;82:22;
85:18;92:14
**actively (1)**
109:12
**actors (1)**
50:12
**actual (4)**
60:13;77:15;
107:10;108:9
**Actually (10)**
27:20;40:17;42:1;
56:22;62:25;68:21;
90:16,22;94:17;
110:18
**ad (1)**
61:23
**add (1)**
107:5
**additional (2)**
37:12;60:16
**Additionally (3)**
52:22;55:3;58:9
**address (8)**
29:12;38:11;
72:15;75:24;83:18;
97:5;98:17;102:7
**addresses (2)**
82:19,25
**adequately (1)**
65:10
**adjourned (1)**
114:2
**adjudication (2)**
69:3;72:19

**administered (6)**
48:5,13;64:19;
70:13,18;78:19
**administration (2)**
87:6;109:1
**administrative (1)**
83:22
**admissible (3)**
38:13;40:2,3
**admission (1)**
37:15
**admit (2)**
40:6;91:20
**admitted (5)**
12:16,17;37:18;
59:16,18
**advanced (1)**
95:6
**advancing (1)**
112:18
**advantage (5)**
54:4;55:4,5;81:17;
95:14
**adverse (3)**
56:6,7;74:9
**adversity (1)**
97:22
**advise (1)**
100:6
**advises (2)**
16:24;50:8
**advisor (2)**
13:4;93:2
**Advisors (5)**
14:12;15:5;25:5,
17;80:8
**advisory (12)**
13:1;15:1;16:3;
67:1;86:11;91:18;
92:8,14,20;93:17,19;
94:4
**affairs (1)**
14:2
**affect (1)**
108:9
**affected (1)**
109:1
**affiliate (7)**
44:17;45:5,7,13;
80:11;108:2,4
**affiliated (7)**
15:4,5;16:16;
43:23;44:22;48:14;
51:24
**affiliates (15)**
15:7;22:17,20;
24:24;34:18;35:14;
45:21;46:3;47:24;
48:8,20;51:23;53:2;
80:12;94:3
**affirmation (1)**
19:9
**affirmatively (2)**

**43:3;55:12**
**affirmed (2)**
19:12;23:22
**afforded (1)**
56:16
**afternoon (5)**
51:24;75:21;
101:8,23;105:11
**again (52)**
17:4;27:3,3,4,5,19;
35:6,18,18;41:12;
43:23;44:18;45:6,7;
48:8,22;49:14,22;
53:3;54:13,22,24;
55:20,24;57:15,16;
63:10,15;65:16;
66:17,21;67:9,25;
68:3;69:1,11;70:13;
71:3;74:7;75:21;
79:25;86:20;87:10;
89:3;93:25;94:23;
100:12;103:25;
104:23;106:18;
112:13;113:1
**against (13)**
17:11,12,18,21;
56:8;78:16,20;83:7,
14;88:24;97:18;
98:3;100:5
**agenda (2)**
10:15,16
**ago (5)**
24:21,23;43:21;
96:20;108:3
**agree (4)**
90:25;110:19;
112:13;113:13
**agreement (6)**
54:17;66:23,23,
24;79:13;94:17
**agreements (22)**
16:7,10,15,15;
34:13,16,17;35:8,9,
12,15,16,22;66:22;
93:12,18,19,23,24;
94:5,14,19
**agrees (1)**
51:22
**ahead (1)**
75:20
**air (2)**
88:7,8
**Aires (1)**
15:9
**Airlines (1)**
109:4
**al (3)**
6:15;8:8,18
**albeit (1)**
50:4
**allegations (1)**
18:22
**allow (3)**

**32:7;33:19;40:20**
**almost (3)**
51:20;56:2;107:9
**alone (1)**
39:20
**along (8)**
10:24;61:7;65:20;
66:14;67:22;68:1;
104:16,20
**although (11)**
15:6;17:23;43:7;
44:3;48:9;50:14;
52:7;96:19;97:2;
102:16;107:24
**Alvarez (2)**
7:3;8:3
**always (2)**
48:14;102:23
**America (3)**
14:23;15:11;86:15
**American (2)**
93:5;109:3
**amount (8)**
43:11;76:22;82:5;
84:23;96:21;103:4;
108:6;111:22
**amounts (1)**
43:10
**amply (1)**
41:20
**analysis (5)**
76:13;77:8;79:25;
82:6;94:5
**analyze (2)**
82:6;84:19
**analyzing (1)**
17:25
**ANDERSON (1)**
8:2
**ANDREW (1)**
7:17
**Angeles (1)**
13:11
**answered (1)**
27:20
**anymore (1)**
88:8
**apologize (2)**
36:18;75:10
**appeal (8)**
44:11,21;45:12;
53:18;72:16;73:4;
76:9;108:3
**appeals (6)**
17:16,19;57:4;
72:23;73:5;76:8
**appear (1)**
84:6
**appearance (4)**
41:23;82:24;
88:16,17
**appearing (1)**
73:20

Appx. 02915
015477

Case 19-34054-sgj11    Doc 3596-22    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10    Filed 12/02/25    Page 799 of 1017    PageID 16460
Exhibit 22    Page 126 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                      December 2, 2019

**apples (1)**
93:25
**applicable (1)**
52:5
**application (2)**
111:17;113:12
**applications (1)**
68:20
**applied (1)**
87:24
**apply (1)**
48:1
**applying (2)**
84:5;110:5
**appoint (3)**
15:13;78:1;96:13
**appointed (3)**
13:5;77:24;78:25
**appointment (3)**
66:3,4;98:19
**appreciate (2)**
19:23;114:1
**appreciates (1)**
82:21
**approach (5)**
11:21;36:24;
37:23;107:18;
108:11
**appropriate (15)**
11:2;16:18;44:2;
59:3;81:14;82:4;
87:4;94:2;95:15;
97:5;98:13;100:23;
106:6;107:7;113:9
**appropriately (2)**
78:21;107:2
**appropriateness (1)**
16:14
**approval (2)**
18:18;95:11
**approve (2)**
26:14;95:10
**approximately (6)**
15:3,21,25;24:23;
67:19;92:11
**apt (2)**
84:12;96:13
**arbitration (6)**
83:9;91:25;94:14,
16,20,21
**areas (1)**
87:15
**argue (6)**
45:8;52:13;84:3;
87:10,12;98:8
**argues (1)**
88:13
**arguing (2)**
45:12;93:10
**argument (21)**
11:8;38:4;39:9;
41:4,15;76:19;77:5;
80:1;87:20,22;88:7,

20;89:2,25;90:12,16;
91:13;93:21;96:14;
99:25;105:14
**arguments (9)**
42:8,18;46:6,14;
51:6;55:5;87:9;
90:12,13
**arm (2)**
92:8;103:16
**around (10)**
15:1;16:8;32:1,1;
58:3;67:20;85:14;
86:20;91:2;101:17
**arrangement (1)**
94:3
**ARSHT (1)**
7:22
**article (1)**
101:3
**ashamed (1)**
106:4
**ASHBY (1)**
6:9
**Asia (1)**
14:22
**Asic's (1)**
41:16
**aside (1)**
90:12
**ASIF (1)**
7:15
**aspect (5)**
16:2;31:22;66:9;
72:6,8
**aspects (6)**
40:7;72:5,11;
78:24;95:3,8
**assert (1)**
17:10
**asserted (2)**
39:23;94:23
**asserting (1)**
54:2
**asset (2)**
17:6;98:3
**assets (40)**
14:19,20,21,25;
15:3,16,19;16:22;
17:1;18:10,12;
35:13;70:1;77:3;
78:4;84:23;86:2,6,9,
10,14,16,19,21;87:2;
92:4,22;93:1,7;
100:9,14;103:18,24;
104:7,8,10,14,15,18;
108:25
**assigned (9)**
45:23;46:5,19,21;
47:10;72:15;73:4;
102:18;103:2
**assignment (4)**
46:4;47:13;
102:13,17

**association (1)**
28:2
**Asst (1)**
9:3
**assume (2)**
27:3;48:17
**assumed (1)**
48:1
**assumes (2)**
59:4;90:16
**assuming (1)**
46:17
**assumption (2)**
45:22;46:13
**attached (2)**
91:24;94:12
**attachments (1)**
44:9
**ATTARWALA (1)**
7:15
**attempt (1)**
45:5
**attempted (1)**
41:23
**attempts (1)**
103:23
**attorney (1)**
27:7
**Attorneys (12)**
6:3,10,15,21;7:3,8,
14,23;8:3,8,13,18
**atypical (1)**
42:12
**August (3)**
16:8,21;74:4
**Austin (2)**
10:21;41:13
**authentic (1)**
38:24
**authority (2)**
84:17;112:2
**availability (3)**
38:22;39:21;
110:22
**available (1)**
18:6
**avoidance (1)**
89:7
**avoided (1)**
79:25
**aware (17)**
21:23;22:6;32:20;
33:11;34:10,11,21;
35:8,15;39:19;40:3;
46:16;76:1;102:9,
10;103:2;110:14
**away (8)**
46:7;48:17;52:14;
55:18;77:12;92:4;
103:24;108:24
**awkward (1)**
24:5

| | B | |
|---|---|---|

**back (14)**
26:11;37:2;49:11;
55:24;56:7;57:12;
62:14;63:16;70:13;
71:21;74:22;105:6,6,
11
**background (1)**
25:12
**back-office (2)**
67:5;92:20
**backward- (1)**
50:15
**bad (1)**
106:5
**badly (1)**
56:4
**baggage (1)**
79:18
**balance (3)**
18:12;93:7;109:7
**balance-sheet (1)**
93:1
**balls (1)**
74:11
**Bancorp (1)**
13:9
**Bank (4)**
7:14;15:25;43:15;
82:10
**bankruptcy (63)**
11:3;16:8;17:17,
20;18:3;21:9,14;
22:10;26:22;27:5,7;
32:4,21;40:13;
41:18;42:14;43:22;
44:1,20,23;47:10;
49:2,6,17,20,20;
52:4;53:20;55:1;
57:16;58:13,15,21;
59:3;60:10,23;61:4;
64:7,17,18;65:24;
68:9;69:2,24;72:4,9,
14,17,21;73:4,5,19;
74:10;76:10;82:23;
84:16;88:2;90:4;
103:25;105:24,25;
106:20;108:22
**base (3)**
90:22;91:8,9
**Based (13)**
11:4;15:6,25;
21:25;39:5;54:13;
55:8;73:25;83:13;
94:9;106:7;108:9;
112:23
**basically (2)**
92:5;93:2
**basis (4)**
63:14;92:22;
108:10;113:12

**BEACH (2)**
6:4;10:25
**bear (1)**
86:22
**bears (3)**
61:12;62:17;81:5
**become (3)**
44:17;53:4;54:18
**becomes (1)**
65:11
**becoming (2)**
56:3;103:3
**beg (1)**
42:14
**begin (2)**
31:15;41:14
**beginning (2)**
77:19;98:14
**behalf (12)**
10:7;11:15;19:20;
21:5;23:19;41:13;
45:4;60:3;75:22;
102:6;106:25;
112:12
**behind (4)**
46:14;87:25;
90:10;95:7
**belie (1)**
83:25
**belief (1)**
113:21
**believes (5)**
16:9,21;18:9;53:7;
59:1
**below (1)**
27:22
**beneficial (1)**
68:19
**benefit (2)**
18:5;69:20
**BENTLEY (1)**
8:14
**Bermuda (1)**
15:15
**best (4)**
55:15;65:7;87:1;
109:6
**better (3)**
95:13;96:3;113:18
**Beverly (1)**
13:8
**Beyond (6)**
21:15,21;27:12;
31:12;32:23;47:2
**bias (1)**
73:21
**biased (2)**
73:18;74:8
**BIBILONI (1)**
6:17
**big (9)**
60:6,6;65:14;
69:21,22;86:3;

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

93:10;96:7;110:25
**billion (5)**
14:25;15:3;35:13;
69:17;103:18
**binder (4)**
11:21;59:14,21;
60:8
**binders (1)**
60:6
**bit (6)**
37:1;60:24;63:18,
21;68:20;77:7
**BJORK (1)**
7:16
**blame (1)**
57:10
**BLANK (2)**
6:14;59:13
**BLOCK (1)**
7:7
**body (3)**
83:22;100:19,22
**boil (1)**
64:17
**boils (1)**
64:4
**bonuses (1)**
95:10
**bookkeeping (1)**
67:7
**books (1)**
14:6
**boost (1)**
106:11
**borrow (1)**
65:24
**boss (1)**
26:17
**both (8)**
16:16;47:23;56:4;
57:2;61:25;64:5;
65:9;104:17
**bottom (1)**
100:20
**bound (1)**
36:20
**BOWDEN (3)**
6:11;75:18,19
**box (5)**
53:3;54:14;57:23;
65:25;66:21
**boxes (1)**
110:25
**Brad (3)**
10:12;78:25;84:7
**BRADLEY (3)**
9:7;19:15;27:10
**B-R-A-D-L-E-Y (1)**
19:15
**brain (1)**
67:1
**break (3)**
59:14;98:5;105:5

**breathed (2)**
61:4;63:11
**breathing (2)**
61:8;86:25
**brethren (2)**
87:21;91:2
**BRIAN (2)**
8:9;21:4
**brief (5)**
52:10;61:2;88:9;
99:8;102:5
**briefly (7)**
23:14;32:17;
39:17;53:25;57:12;
60:7;99:8
**bring (5)**
67:17;80:11;
86:21;99:19,22
**bringing (1)**
98:15
**broad (2)**
84:17;104:14
**broadened (1)**
112:2
**brokerage (2)**
15:18;65:5
**brought (1)**
17:17
**Buenos (1)**
15:9
**bulk (2)**
15:19;84:15
**burden (9)**
41:20;61:21;
62:16,17,18;77:16;
81:5;98:12;100:2
**burden-of-proof (1)**
61:19
**burdensome (1)**
88:22
**business (39)**
14:2;19;16:3,22;
17:3;22:15,22;50:2,
3,6,9;64:22;65:3,6,8,
12,13;67:8,11;72:5,
6,8,11;78:4;79:7;
81:21;89:8;91:1;
92:3,7,11,24;94:23;
95:3;103:21;104:1,
19;110:3;111:18
**businesses (3)**
86:8;89:5;94:10
**buttons (1)**
111:1
**buy (2)**
56:12;90:11

**C**

**Caesar's (1)**
88:4
**calendar (1)**
110:22

**California (1)**
32:1
**call (12)**
21:24;23:13;
33:12;39:4;53:14;
62:12;71:23;85:11;
99:24;101:22;
110:11;112:21
**called (9)**
11:25;12:23;
21:22;23:5;32:25;
44:14;74:11;85:5,8
**came (3)**
69:8;110:11,12
**can (31)**
11:20;26:4;27:7;
35:3,5,18,21;38:19;
39:10;40:3;41:18;
43:23;46:11;49:23;
52:12;61:2;70:7;
77:16;80:3;85:3;
89:13;97:3;98:9;
108:15;109:2,2,3,5;
110:19;113:3,21
**cap (1)**
100:20
**capable (2)**
40:14;97:12
**capacity (2)**
43:1;49:16
**Capital (13)**
6:15;8:8,18;9:4,5;
10:7;21:5;24:10;
25:1;29:7;30:23;
60:3,14
**care (2)**
71:15;111:2
**career (1)**
102:14
**carefully (2)**
40:16;94:15
**Carey (2)**
13:7,9
**carries (1)**
41:20
**carry (2)**
77:16;78:7
**cart (1)**
101:11
**CARUSO (9)**
9:9;10:12;13:24;
18:14;27:15;53:7;
84:14,21;95:2
**case (149)**
13:15;16:14;18:4,
9,15;21:10;22:24;
33:18,18,19;39;
40:11,17;41:17;
42:11;43:7,9,22,23,
25;44:6;45:13,22;
46:3,7,15,18,21;
47:19,24;48:12;
49:21;50:14;52:8;

53:11,16;56:17;57:1,
2;59:1;61:4,13,16;
62:11;63:4;64:13,14,
17;68:9;69:2,6;70:3,
12,14,18;72:1,1,17;
74:10,20,22,25;76:5,
10,11,23,24;77:14,
21;78:8,10,15,20,22;
79:8,14,15,18;80:4,
12;81:7,11,20,22;
82:8,14,24;84:16;
85:8,12,16,20,23;
86:10;87:11,18,25;
88:15;89:16;90:14;
91:14,15;93:24;
94:16;95:8,23;96:11,
15,15,16,17,25;
97:11,13,15,19,20;
98:5,7,8,20,22;
102:18,21;103:5;
105:15;107:10,16,
17,19,21,23,24,25;
108:1,8,11,18,19;
109:8,11,15;110:5,
17,24;111:6,8,24;
112:4,22
**case-in-chief (2)**
31:14;33:7
**cases (31)**
13:6;44:22;47:6,
11,23;48:14;52:7;
56:9,9;58:9;63:11;
72:23;76:3;80:4,10;
82:23;84:11;85:2;
86:6,7,7,20,22;
87:22;88:20;91:7;
97:23,24;102:10,11;
105:19
**cast (2)**
57:15;64:11
**catalyst (1)**
80:19
**cause (2)**
113:6,20
**Cayman (1)**
15:15
**center (4)**
42:5;43:5;51:11;
58:8
**CEO (1)**
9:7
**certain (14)**
15:14;16:7;35:9;
50:7;54:22;60:5;
65:5;70:1;78:6,24;
91:3;92:4;97:8;
104:17
**certainly (15)**
39:25;40:10;48:5;
67:22;69:4,14;
71:24;72:6;89:10;
105:24;106:6;
107:14;108:10,15;

113:13
**certification (1)**
113:18
**cetera (1)**
65:21
**CFO (7)**
9:5;26:11,13,19;
29:1;32:20;35:11
**chain (1)**
89:23
**challenge (1)**
97:19
**chambers (3)**
11:18;33:13;
113:23
**chance (2)**
33:6;41:1
**chancery (4)**
71:20;83:8,9;
88:19
**change (2)**
48:9;98:12
**changed (1)**
58:5
**changes (1)**
58:5
**Chapter (10)**
17:21;45:13;
78:22;80:3;86:24;
97:10;98:19;105:16,
19,25
**characterized (1)**
50:7
**charge (3)**
17:22;18:1;97:2
**chart (1)**
27:23
**chicanery (1)**
106:22
**chief (6)**
12:24;13:3,5,25;
24:14;78:25
**choice (10)**
55:19;58:2;62:15,
19;79:22;81:9,14;
105:23;106:11;
109:16
**choose (1)**
64:6
**choosing (1)**
106:5
**chose (1)**
42:15
**Circuit (2)**
72:24;81:3
**circulate (1)**
113:17
**circumstance (1)**
47:11
**circumstances (5)**
16:19;38:16;79:8;
107:19;109:25
**cite (1)**

015479

Case 19-34054-sgj11    Doc 3596-22    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-12    Filed 01/26/25    Page 801 of 1017    PageID 16462
Exhibit 22    Page 126 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                December 2, 2019

81:2
**cited (1)**
  88:6
**citing (1)**
  95:25
**citizen (1)**
  81:16
**City (4)**
  15:20,25;82:10;
  83:10
**claim (7)**
  43:16;82:12;83:1,
  1,12,13;89:11
**claiming (2)**
  68:22;92:5
**claims (17)**
  17:11,12,17;63:6,
  7;78:20;82:25;
  84:19;88:24;89:6,7,
  10;94:22,22;97:25;
  98:3,4
**classes (1)**
  17:6
**cleanse (1)**
  58:2
**clear (22)**
  42:2,6;49:17;50:1;
  51:12,15;54:13,18,
  25;55:8,11;58:3,23,
  25;61:22;66:17,18;
  80:2;81:5;98:16;
  101:18;107:16
**clearly (15)**
  40:6;47:2,18;50:8,
  11;52:4,7;54:10;
  55:9;70:23;96:11;
  97:16;103:25;
  104:22;108:21
**CLEMENTE (51)**
  10:19,21,21;11:11,
  13;12:13,15;23:12;
  38:7,11;39:25;
  40:24;41:12;45:17,
  20,25;46:20;47:2,4,
  7,17;48:7,16,18,21;
  49:1,8,11;52:16;
  56:1,15,18,20,25;
  57:5,7,10;59:7;
  61:21;65:25;66:16;
  75:25;76:14;99:8,
  12;102:3,6;112:11,
  12;113:15,25
**Clements (1)**
  41:13
**CLERK (11)**
  10:2;19:10,13,17;
  23:21,23;24:2;75:9;
  102:15;103:9;105:9
**client (1)**
  10:11
**clients (2)**
  14:21;48:2
**Clifford (1)**

31:5
**clinging (1)**
  105:15
**CLO (21)**
  8:13;16:22,23;
  17:2;50:6;65:22;
  68:11,16,17,23,25;
  91:5,7;92:3,3,10,13;
  103:13,14,21,23
**CLOs (19)**
  16:5,6,11,24,24;
  22:21;50:8;57:16,18,
  21;65:14,20;92:15;
  93:2,18;103:12,16,
  17,19
**close (6)**
  19:23;24:4;41:2;
  70:8;81:24;98:12
**closed (1)**
  41:3
**clothes (1)**
  75:17
**CLUBOK (1)**
  7:17
**co- (1)**
  26:5
**co-counsel (4)**
  10:24;38:1;61:7;
  100:6
**collateral (1)**
  92:9
**collateralized (2)**
  16:4;65:15
**colleague (3)**
  13:24;33:24;84:21
**colleagues (3)**
  10:23;46:9;81:2
**colloquy (2)**
  58:20;61:20
**color (2)**
  108:10,15
**combination (1)**
  59:2
**comfort (1)**
  112:8
**comfortable (1)**
  48:4
**coming (2)**
  105:11;110:15
**commence (1)**
  81:22
**commenced (3)**
  80:18;83:8;88:19
**comment (2)**
  89:4;103:11
**commented (1)**
  22:13
**comments (5)**
  76:20;77:4,19;
  89:23;100:18
**Committee (66)**
  6:3;7:8,23;10:22;
  18:8,20,23;19:20;

23:20;41:13;42:25;
  43:8,12,17;45:10;
  50:17,22;51:22;
  54:3;57:2;59:1;61:1;
  63:6,17,19,23;64:7;
  70:16;75:1;77:13,16,
  20,25;78:7;79:13,19;
  80:18,20;81:23;82:2,
  2;83:6,11,17,23;
  85:8,17,22;86:3;
  87:1,7;88:13,16;
  89:25;90:13;93:10;
  94:6;98:12,18;
  102:6;109:14,23;
  112:10,12;113:14,16
**committee's (7)**
  10:16;53:9;60:4;
  64:1;72:2;98:14;
  109:23
**communicated (1)**
  18:20
**companies (1)**
  107:14
**company (3)**
  91:4;111:23;112:7
**company's (1)**
  22:9
**compared (1)**
  95:6
**compensation (2)**
  16:9;95:15
**complete (1)**
  14:7
**completely (1)**
  107:25
**complex (2)**
  50:2;51:23
**comply (1)**
  67:2
**compound (1)**
  106:10
**comptroller (1)**
  63:17
**computer (2)**
  41:10;111:1
**CONAWAY (6)**
  6:2;10:24;85:17;
  100:4;111:6;112:15
**concede (1)**
  70:23
**concedes (1)**
  61:21
**concentration (2)**
  87:10,12
**concept (3)**
  63:16;73:21;87:16
**concern (1)**
  89:8
**concerns (4)**
  78:23;97:6;98:18;
  111:19
**conclude (3)**
  74:13;92:1;96:8

**concluded (2)**
  92:1;114:3
**concludes (1)**
  18:25
**concluding (1)**
  94:19
**conclusion (2)**
  73:25;98:11
**conclusory (1)**
  104:6
**concrete (1)**
  112:21
**conduct (3)**
  58:11;78:25;79:17
**conducted (1)**
  91:20
**conference (2)**
  33:13;52:10
**confident (2)**
  91:6;102:25
**confirmation (12)**
  43:25;45:6;53:19;
  60:12,14,19;74:3,3,
  5;76:8;91:16,24
**confirmed (2)**
  44:11,13
**confirming (1)**
  17:21
**conflict (1)**
  47:25
**conflicted (1)**
  58:22
**conflicts (1)**
  78:18
**conflicts-of-interest (1)**
  78:17
**conjunction (1)**
  27:8
**Connecticut (1)**
  83:18
**connection (17)**
  11:19;16:3;23:11,
  13;46:7;49:6;60:10,
  12;69:5,5;72:22;
  73:4;74:2,10;80:16;
  93:8;97:5
**connections (1)**
  86:8
**connotation (1)**
  106:19
**consensual (1)**
  87:2
**consider (1)**
  94:11
**consideration (1)**
  48:11
**considered (1)**
  39:20
**considering (3)**
  38:15;101:10;
  111:19
**consist (1)**
  15:16

**consistent (3)**
  46:18;50:5;58:6
**consistently (1)**
  55:15
**consists (1)**
  109:23
**constituents (1)**
  18:6
**constructive (1)**
  86:25
**constructively (1)**
  18:8
**contact (1)**
  75:12
**contained (1)**
  65:17
**containing (1)**
  11:21
**content (2)**
  35:17;95:22
**contentious (1)**
  17:15
**contested (1)**
  52:25
**context (1)**
  52:6
**continue (6)**
  17:15;49:8;84:25;
  89:8;92:16;113:3
**contract (1)**
  54:16
**contracts (8)**
  54:20,23,24;55:1;
  86:12;93:14,16;94:9
**contractual (1)**
  16:7
**contrary (2)**
  57:14;79:18
**control (1)**
  25:16
**controlling (1)**
  55:7
**controls (1)**
  25:4
**controversy (1)**
  70:23
**controverted (2)**
  43:20;100:12
**convenience (5)**
  51:10;64:9;78:9;
  80:24;82:7
**convenience-of-the-parties (1)**
  61:25
**convenient (13)**
  13:12;52:12,14,18,
  21;55:9,18;83:24,25;
  85:24;90:1,3,3
**conversation (1)**
  64:1
**conveyances (1)**
  92:5
**convince (1)**
  45:10

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

COO (1)
9:9
cooperation (1)
96:20
copy (1)
36:19
CORCO (3)
81:3,24;86:2
core (2)
22:15;39:12
corners (1)
62:13
corporate (5)
28:6;88:1;97:3,7;
98:1
corporation (1)
14:12
corroborating (1)
38:17
CORROON (1)
8:2
Counsel (33)
9:3;10:8,22;13:14,
16;22:13;37:9,15;
38:20;40:21;45:3;
47:8;59:13;61:3,4;
69:25;75:25;76:15,
16;77:6;79:3,25;
82:11;85:15;88:14;
89:1;93:20;97:23;
100:19;108:16;
110:4;113:17,18
count (1)
67:19
counting (1)
62:3
country (6)
15:18;32:1;85:15;
86:20;91:3;100:15
couple (5)
64:20;73:15;
75:24;96:19;111:1
course (15)
16:8;21:3;40:2;
46:11;48:6;76:18;
79:7;80:21;92:16;
100:24;101:18;
106:15,23;109:16;
111:11
COURT (260)
10:3,5,13,18,20;
11:3,10,12,22;12:2,
4,6,9,12,14,16,20;
13:12;17:17,20;
18:3;19:1,4,6,8,18,
21,25;21:3,6,17,24;
22:4;23:3,7,10,15,
18;24:3;25:9,11,15;
26:3;27:13,20;31:9,
11,18,24;32:7,13,15;
33:1,3,16,21,24;
34:5,24;35:3,25;
36:4,7,14,17,21,23,

25;37:3,7,8,14,18,
24;38:5,10;39:10,16,
18,19;40:2,5,13,25;
41:9,18;42:14;
43:22;44:1,2,5,21,
23;45:10,16,18,21;
46:1,23;47:1,3,5,10,
16,22;48:8,17,19,22;
49:7,10,13,14,18,20,
20,21;50:1,16,18,20;
52:4,15;53:20;54:2,
5,5,10,16,21;55:1,17,
25;56:2,16,19,24;
57:1,6,8,13,24;
58:16,21,24;59:3,4,
9,19,22,24;60:7,10,
13,17,18,22;61:24;
62:6,10;63:12;
64:23;65:7,23;66:9,
11,11;71:3,7,9,9,10,
12,14,14,17,17,19,
19;72:4,7,10,10,21,
21;73:2,3,12,12,14,
18,19,20;74:2,4,6,8,
14,15,21,24;75:3,10,
16,19;76:21,22;
78:16,21,21;80:10,
12;81:21;83:2,8,10;
24;86:21;87:3,15,23;
88:5,19;89:3,18,21;
90:4,15;95:14;
96:14;97:11,12;99:2,
5,7,11;102:2,4;
103:4,9,25;104:5,13;
105:4,10;106:25;
107:1;109:21;110:7,
14;111:9;112:10;
113:11,16;114:2
courthouse (2)
52:14;89:14
courtroom (10)
10:10;38:21;39:4;
40:18,22;74:17,19;
82:20;103:8,9
courts (11)
71:24;73:11;
77:10;81:1,8;84:5;
86:5;87:6;89:12;
102:15;104:17
court's (4)
38:22;39:21;62:1;
103:24
craft (1)
79:3
crash (1)
92:13
create (5)
41:23;47:25;
48:10;101:16;
110:16
created (2)
92:13;100:12

creates (1)
108:7
credentials (1)
98:17
credibility (2)
90:21;108:15
credible (2)
49:13;96:13
creditor (21)
15:24;21:5;42:22;
43:1,3,12,18;56:11;
62:24;63:1,2,3,10;
64:13;83:13,16,22;
88:22;98:18;99:15;
109:11
Creditors (50)
6:3;10:23;43:9,10,
11;50:24;51:18,20,
21;55:10,10,16,19;
56:6;68:7;70:7,16;
78:24;82:1,5,6,9,15,
17;83:2,5,24;87:10;
88:13,23;89:4,13;
98:6;99:14,18;
100:18,20,21,22;
104:23,25;106:15,
25;108:24;109:12,
14,22,24;110:4;
111:20
creditors' (6)
18:20;19:20;
23:19;43:8;109:7,8
credit-research (1)
28:13
critical (2)
86:6;111:21
CRO (21)
13:19;27:7;58:1,2,
3,4,11,14;79:9,10;
84:11,12;85:2;
96:16;97:6;98:16;
111:17,21;112:1,7,
17
cross (6)
11:7;21:16,22;
36:1,2;50:12
CROSS-EXAMINATION (4)
20:1;21:7;23:3;
90:21
cross-examine (1)
19:2
Crusader (2)
7:8,23
CRUTCHER (1)
7:2
crux (3)
76:19;78:19;90:1
current (6)
22:20;29:6,11;
45:13;82:19;108:3
currently (7)
17:19;24:19;
29:10;31:20;34:17;

58:18;92:24
CURTIS (1)
7:24
curve (12)
49:14;50:17;52:6;
66:12,14;68:1;
76:17;90:7,10;
101:10;104:16,20
custodial (1)
15:17
cynic (2)
56:2,4

### D

Dallas (96)
13:13,16;15:7;
20:5,12;29:1,3,6,8,9,
11,12,14,16,19,21;
30:1,4;32:4,9;41:18,
25;42:3,4,5,14,15;
43:1,4,22;44:1,5,20,
23;45:14;46:23;
47:10;49:13,17,20;
50:1,16,18;51:5,11,
17,19;52:4,7,11,12,
18,19,21;53:2,12,13,
15,20;54:2,5,5,10,16,
21,25;55:8,9,17;
56:25;57:13;58:7,7,
15,21;59:3;60:10;
65:10,23;69:16;
73:18;74:25;83:25;
86:18,18;88:11;
100:13,23;106:25;
108:18,21;109:3;
110:2,4,5,13
Dallas-oriented (1)
108:20
date (7)
12:19;16:1,20;
37:22;40:23;60:18;
61:5
Daugherty (2)
83:6;88:19
David (1)
31:5
day (2)
89:7;112:7
days (5)
14:3;21:9;72:2;
74:19;87:20
day-to-day (2)
18:10;32:3
DC (1)
83:15
de (1)
15:9
deal (1)
48:13
dealing (1)
63:22
dealings (1)

16:22
dealt (2)
91:4;97:15
debt (10)
48:15;63:22,23,
24;68:2,10;69:12,14,
22;70:10
debtor (159)
10:7;10;11:7,16;
12:25;13:16,18;14:5,
7,8,14,17,24;15:2,6,
10,21;16:5,12,21,23,
24;17:5,12,14,18,19;
18:15,17,24;21:13,
20;22:20;24:9;
29:16;30:23;31:20;
32:20,21;34:10,18;
35:14;41:6,23;42:1,
3,5,15,20,24;43:4;
44:8,17,19,25;45:1,
7,8,12;49:19,25;
50:1,3,7;51:1,14,25;
52:2,5,12;53:16,20,
25;54:1,11,15,19;
55:12,21;56:5,8,10,
16;57:14,15,18,20,
25;58:2,12,16,18;
64:5,22;68:22;
73:23;75:7;77:3,25;
78:11,17,20,22,23;
79:3,5,6,10,14,16,20;
80:3,5,16,18;81:12;
82:9,21,22;83:7,14;
84:5,6,8,12,15,17,20;
85:4,4,10;86:24;
88:18;90:6,8,9;
91:17,18;92:2,8,13,
18,23;93:12;94:3;
95:1,13;96:16;97:10,
17;98:4,16;99:23;
105:24,25;106:11,
25;109:16;112:22
debtors (10)
17:10;36:19;48:9;
68:21;73:22;78:19;
80:4;97:24;107:12;
109:6
Debtors' (1)
12:18
debtor's (88)
13:14;14:2,6,10,
12,15,20;15:7,12,18,
19,24;16:2,16;17:3,
4,24;18:1,5,10,11,
19;20:7;9;22:15,22;
30:10;36:16;41:16;
42:23;44:5;45:11;
50:2,9;51:11;54:23;
55:4;62:15,19;64:2,
25;65:2,4,14,17,20;
69:25;72:5,6,8,11;
73:17;77:3,4;78:4,4,
4,6;79:2,16,17,22;

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(5) COO - debtor's

Appx. 02919
015481

Case 19-34054-sgj11    Doc 3596-22    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-10    Exhibit 22    Filed 08/26/25    Page 803 of 1017    PageID 16464

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                                December 2, 2019

81:9,14,21;82:18,19;
84:23;85:6;86:9,16;
87:1;88:21;91:17;
92:6,11,24;93:4,7;
94:23;95:3,21;96:10,
12;97:13;105:22;
106:11;111:18
**debtors-in-possession (1)**
75:23
**decide (3)**
58:3;111:3,9
**decided (5)**
33:7;39:20;97:20;
100:5;110:18
**decides (1)**
101:23
**deciding (1)**
48:11
**decision (10)**
45:9;48:3,25;49:4;
81:3;90:22;105:7;
107:15;108:9;
109:10
**decision- (1)**
31:22
**decision-making (4)**
58:17;86:4;
106:12;112:3
**decisions (10)**
31:20,25;42:4;
43:24;51:15;55:15;
57:19;106:7;112:3;
113:10
**declaration (4)**
28:1;64:24;65:1;
68:4
**declined (1)**
33:3
**decrease (2)**
17:2;92:16
**defending (1)**
109:16
**defense (1)**
68:24
**defer (1)**
81:14
**deference (4)**
56:10,14;62:15;
81:9
**definite (1)**
76:4
**definitely (1)**
46:14
**degree (1)**
35:9
**degrees (1)**
50:20
**Delaware (42)**
13:6,12,15;14:11,
13,15;42:24;43:4,19;
55:13,21;56:7;65:9;
70:24,25;72:7;
74:22;78:22;80:2,6,

6,7,9,13,19,21;81:12,
13;83:4,8;84:1;85:3,
14;88:11;89:1;
99:14,15,16,17,21;
107:1;111:7
**delay (1)**
41:9
**Demo (1)**
10:9
**demonstrate (4)**
76:20;77:15,17;
85:22
**demonstrated (5)**
50:23;55:8;84:7,8;
88:25
**demonstrates (1)**
82:7
**demonstrating (1)**
81:5
**denial (1)**
94:13
**denied (3)**
74:4,6;79:23
**Dennis (1)**
10:23
**DENTONS (1)**
6:20
**deny (1)**
99:1
**depend (1)**
106:2
**depending (2)**
33:10;50:19
**depends (3)**
35:19;52:17;
107:17
**depose (1)**
39:4
**deposition (3)**
30:8,19;69:16
**depositions (1)**
53:12
**deputy (4)**
38:21;39:4;40:18,
22
**derives (1)**
17:5
**describe (1)**
28:1
**described (2)**
44:9;111:18
**deserve (1)**
112:8
**designated (3)**
32:24,25;67:18
**desires (1)**
109:8
**despite (1)**
103:1
**detail (1)**
76:16
**determination (2)**
44:20;51:1

**determinations (2)**
54:21;101:6
**determine (5)**
16:17;44:2,23;
50:18;51:20
**determined (1)**
82:3
**determining (1)**
95:14
**detriment (1)**
49:5
**develop (1)**
50:2
**developed (2)**
49:24;84:22
**Development (3)**
9:7,9;12:25
**devoted (1)**
14:1
**dictate (1)**
59:2
**differ (3)**
35:16,21;54:24
**difference (1)**
22:7
**different (19)**
16:11;22:10;
34:16;48:19;53:9;
61:18;63:19;64:21;
71:2;87:16,17;93:15,
18;94:18;96:15;
98:2;106:18;107:23,
25
**difficult (2)**
95:16;106:14
**difficulties (1)**
41:10
**difficulty (1)**
96:24
**direct (11)**
16:21;21:25;24:7;
32:15,15,18;33:18;
34:1;47:12;88:10;
90:21
**directly (1)**
34:20
**disagree (2)**
49:1;105:21
**disagreement (1)**
52:20
**discovery (5)**
52:24,25;53:4;
83:17;96:18
**discretion (1)**
62:11
**discuss (3)**
47:19;80:15;95:22
**discussed (3)**
30:3,8;107:9
**discussing (1)**
49:12
**discussion (5)**
30:19;62:9,22;

79:12,12
**discussions (1)**
11:5
**disingenuous (2)**
77:20;84:2
**dispute (6)**
49:13;55:20;
76:15,17;86:17,19
**disputed (3)**
17:11;40:12;83:12
**disputes (2)**
52:25;96:18
**disputing (1)**
55:21
**disqualification (1)**
48:24
**disregard (1)**
81:21
**distinguishing (1)**
51:7
**distributed (1)**
44:13
**District (30)**
11:3;22:24;39:1;
40:10;45:23;46:5,
23;49:21;53:1;
72:10,21;73:3,3,5;
76:2;79:14;80:5,17;
81:2,22;85:2;102:13,
22,23;103:1,8;106:7,
9;108:4,5
**divestiture (1)**
70:1
**docket (1)**
47:2
**document (1)**
40:6
**documents (10)**
11:18;12:6;35:7;
37:15;60:5,6;96:21;
100:11,12,15
**dog (1)**
69:21
**dollar (4)**
43:10,11;70:15;
82:5
**dollars (11)**
14:25;15:22;16:1;
17:13;35:13;43:15,
16;63:6;68:14;
69:17;103:18
**domicile (2)**
80:11,16
**domiciled (1)**
80:5
**Dondero (32)**
20:3,24;25:1,4,16;
26:10,13,15,20,23,
25;27:2,22;28:22;
29:23;34:7;42:4;
44:16;50:12;51:12,
15,16;55:7,14;58:4,
7,12;66:2;68:16;

97:3,3;99:23
**Dondero's (2)**
25:25;29:19
**done (9)**
34:1;75:15;90:20;
108:5,6;109:5;
111:22,24;112:5
**doozy (1)**
101:22
**doubt (4)**
54:4;76:25;91:11;
94:24
**down (10)**
23:8;32:6;36:5;
46:10,18;63:23;64:4,
17;77:15;102:1
**dozen (1)**
56:8
**dozens (1)**
96:2
**driven (1)**
18:11
**driving (1)**
63:3
**DSI (6)**
10:12;14:1,4;
21:12;22:7;112:14
**DSI's (2)**
16:13;94:5
**dueling (1)**
44:22
**DUNN (2)**
7:2;8:7
**duplicate (1)**
60:25
**duplicative (1)**
40:15
**during (5)**
16:7;59:14;77:6;
84:16;105:14
**dwarfs (1)**
43:17

---

**E**

**earlier (2)**
27:4;68:3
**early (1)**
71:25
**earned (1)**
111:11
**ease (1)**
88:8
**easier (1)**
85:10
**easiest (1)**
102:24
**easily (1)**
85:3
**easy (3)**
52:18;73:24;
111:17
**economic (4)**

Appx. 02929
015482

Case 19-34054-sgj11 Doc 3596-22 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit Filed 01/25/26 Page 804 of 1017 PageID 16465

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

52:11;87:5;94:2;
108:25
**economics (1)**
16:14
**economy (3)**
67:24,25;102:21
**effective (1)**
60:21
**effectively (3)**
42:10;45:12;65:25
**efficiencies (1)**
52:11
**efficiency (5)**
39:12;50:22;
67:25;101:1;102:21
**efficient (1)**
55:9
**effort (2)**
90:5;91:12
**efforts (4)**
16:13;18:2;38:19;
84:9
**EFH (4)**
56:17,21;63:17;
109:10
**ego (1)**
59:4
**eight (2)**
17:13;60:24
**eighteen (1)**
65:20
**either (15)**
18:2,13;41:16;
64:11;70:7;72:7;
73:11;80:24;82:6,
19;84:1;102:11;
104:13;109:3,12
**element (2)**
106:1,13
**elements (1)**
39:11
**else (7)**
40:15;47:21;57:6;
74:23;75:4;108:24;
109:17
**email (5)**
38:20,23;40:21;
59:24;74:2
**embodied (1)**
69:11
**emergent (1)**
113:12
**empire (2)**
67:15;108:21
**employ (2)**
45:3;111:17
**employed (1)**
112:8
**employees (20)**
13:20;14:1,5;
20:20;28:1;29:13,
17;30:15,22;31:1;
41:24;42:3;52:12;

54:14;57:23;66:1;
85:5;86:19;95:11,12
**employment (1)**
27:18
**encountered (1)**
96:25
**end (1)**
24:14
**enforce (1)**
94:21
**engaged (6)**
13:17;58:12,18;
106:1,16;111:22
**engagement (4)**
13:18,23;20:19,23
**engages (3)**
50:3;58:18;64:22
**enjoyed (1)**
78:16
**enough (2)**
71:18;103:22
**ensure (3)**
50:22;89:12;
112:20
**entire (2)**
96:1;102:14
**Entities (18)**
8:13,13;14:16;
15:4;41:24;51:24;
67:18,19,20;71:1,6;
80:8,13;81:13;
88:18;93:19;104:4,4
**entitled (2)**
56:10;81:17
**entity (8)**
44:14;49:4,5;
50:22;68:15;70:25;
72:25;81:12
**equity (8)**
16:11;17:7;25:20;
44:12;86:13;91:6,
18;92:19
**erase (2)**
58:15,17
**ESQ (22)**
6:4,5,6,11,16,17,
22,23;7:4,9,10,15,16,
17,18,19,24;8:4,9,14,
19;9:3
**essentially (1)**
87:8
**estate (8)**
18:5;45:4,11;82:3;
83:13;87:6;88:24;
111:4
**estates (2)**
97:22;98:10
**estimated (1)**
69:16
**et (4)**
6:15;8:8,18;65:21
**ethical (1)**
106:23

**Europe (1)**
14:23
**evaluate (7)**
16:14;18:6;66:19,
21;69:4;84:17;86:25
**evaluated (1)**
69:13
**evaluating (1)**
97:12
**even (19)**
40:12;47:5,17,20;
57:18;61:9,16,16;
72:20,20;74:7;
76:10;81:13;89:3,4;
92:17;93:15;98:16;
106:8
**event (5)**
76:11;94:1;95:23;
96:9;107:25
**events (1)**
76:11
**everybody (1)**
58:6
**everybody's (1)**
46:14
**everyone (1)**
103:2
**everywhere (2)**
107:13,14
**evidence (30)**
11:17;12:19;
23:10;32:2;33:3,4,6;
36:8;37:22;38:12,16,
18,25;40:22,25;
43:25;61:22;62:18;
76:20;90:17;92:10;
93:22;96:25;100:24,
25;101:5;107:5;
108:10,14;110:6
**evidentiary (5)**
41:2,3,20;42:7,7
**ex (1)**
69:8
**exact (2)**
24:22;25:18
**exactly (1)**
88:3
**EXAMINATION (2)**
24:7;32:18
**examined (1)**
54:16
**example (5)**
93:3;95:9;101:2;
102:18;113:4
**examples (1)**
54:25
**except (4)**
11:17;12:9,18;
22:21
**exception (7)**
37:20;38:12;39:5,
7;40:4,7;97:11
**exceptionally (3)**

61:14,24;74:18
**exceptions (1)**
40:3
**excess (1)**
72:18
**exchange (2)**
38:20;40:21
**exclusion (1)**
37:10
**excuse (4)**
44:19;53:17;69:7;
99:15
**executive (3)**
107:14;108:19;
110:2
**executive-level (1)**
27:25
**exercised (1)**
33:13
**Exhibit (17)**
11:17,17;12:18;
37:10,10,11,12;
39:14,15;40:23;
60:11,13,15;64:25;
67:17;69:11;74:1
**Exhibits (20)**
11:17,23;12:18;
36:10,12,19;37:9,9,
20,21;41:16,17;
59:15;60:8,16;
65:17;66:17;67:16;
74:1;91:24
**exist (3)**
14:22;21:13;
100:16
**existing (4)**
108:1,2,21;110:2
**exit (1)**
70:19
**expand (1)**
47:9
**expanded (2)**
79:1;98:17
**expected (1)**
85:24
**expects (1)**
84:14
**expeditiously (2)**
22:24;39:11
**expend (1)**
45:4
**expended (4)**
74:15,19;90:5;
103:5
**expenditure (1)**
74:20
**experience (10)**
13:3;46:7;50:20,
21;54:7;57:13;
75:15;85:1;92:23;
93:3
**expertise (2)**
85:20;86:21

**explain (1)**
96:9
**exposed (2)**
104:5,13
**exposure (1)**
57:20
**extension (1)**
13:24
**extensive (2)**
49:19,24
**extent (3)**
89:6;101:23;
112:16

**F**

**face (1)**
84:9
**faced (1)**
65:23
**fact (17)**
38:23;43:5,18,19;
53:6;56:13;57:17;
63:9;73:22;82:2;
90:19,22;93:23;
94:24;97:25;103:18;
108:19
**factor (11)**
52:23;56:23;
70:21;82:4;84:4,5;
87:5,7;88:8;98:7;
101:9
**factors (20)**
53:23,23;61:23,
24;62:2,3,4,8;71:22;
77:9,10,11,15;81:2,
6,25;86:3;88:1;
107:8;108:23
**facts (18)**
16:18;25:8;42:12,
17;50:16;51:3;59:2;
61:14,17;76:15;
77:14;81:19;100:1;
107:17,19;108:8,18;
109:25
**factual (2)**
49:24;90:18
**Fair (3)**
71:18;73:21;109:6
**fairly (3)**
22:25;46:2;91:10
**fall (2)**
46:7;111:8
**falls (2)**
39:6;108:24
**familiar (21)**
34:23;35:1,11;
54:18;61:24;66:9;
67:10,10;72:4,5,7,
10,22;78:3;93:11,15;
94:25;103:3;104:1,3,
19
**familiarity (7)**

Appx. 02921
015483

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

47:9;54:8;91:1;
96:10;103:24;108:8;
112:16
**familiarizing (1)**
90:5
**family (1)**
52:17
**fantastic (1)**
40:13
**far (3)**
39:9;88:21;96:18
**far- (1)**
86:19
**far-flung (3)**
41:24;52:1;100:14
**Fargo (1)**
107:13
**fashion (1)**
50:7
**fashioned (1)**
110:6
**fault (1)**
33:8
**favor (8)**
43:3;51:4;56:23;
75:4;81:6,20;83:20;
106:10
**favors (1)**
52:7
**feasibility (1)**
83:22
**features (1)**
51:7
**February (1)**
60:21
**Federal (4)**
38:12;71:17,19;
81:17
**fee (1)**
65:18
**feel (1)**
48:3
**feels (1)**
46:14
**fees (3)**
15:1;92:9,10
**feet (3)**
70:10;104:24;
110:5
**felt (3)**
79:9,9;85:9
**few (7)**
34:3;43:21;72:1;
73:23;80:15;90:2;
108:2
**fiduciary (4)**
63:6;70:10,17;
82:3
**field (1)**
104:15
**Fifth (3)**
72:24;81:3;83:16
**file (14)**

32:21;42:15;
77:24,25;78:22;80:3,
4;96:16,17;97:7;
106:2,15;107:16;
110:10
**filed (22)**
11:1;15:12;21:10;
26:22;42:23;43:8,
25;44:11;61:5;
71:25;72:1;74:22;
78:2;79:14;80:5;
82:23;88:16,17,20;
95:10;97:20;101:15
**files (2)**
105:24,25
**filing (7)**
21:14;32:22;64:7;
80:19;98:22,22;
104:24
**filings (1)**
66:4
**final (3)**
62:12;63:25;
101:19
**Finally (1)**
101:7
**financial (8)**
13:1,4;14:2;24:14;
86:10;91:4,7;100:10
financial-advisory-services (1)
14:18
**financials (1)**
65:16
**find (5)**
21:17;75:12;
77:10;85:23;107:8
**findings (2)**
90:18;113:20
**finds (1)**
102:24
**fine (5)**
11:10;12:14;
25:15;36:21;97:18
**finish (1)**
109:9
**firm (2)**
13:1;113:1
**firms (5)**
50:25;82:20;
87:14;111:7,7
**first (19)**
12:6;33:18;34:2;
38:11;42:16,21;
54:1;64:21;65:3;
69:7;72:1;73:12;
74:2,5;76:1;82:1;
89:7;99:12;102:7
**first-day (8)**
28:2;52:9;64:24;
69:25;77:23;79:6;
102:19;104:9
**first-filed (1)**
73:12

**Fitzwater (3)**
72:12,19,21
**five (5)**
43:16;57:4;82:19;
87:8;92:2;94:18
**five-minute (1)**
104:9
**flair (1)**
89:23
**fleeing (4)**
55:16,17;56:6,7
**flights (2)**
87:16;88:10
**floodgates (1)**
61:17
**flung (1)**
86:20
**fly (1)**
52:19
**focus (8)**
16:13;76:19;84:5;
86:20,21;92:6;94:5,7
**focused (11)**
65:11;77:13;82:2;
84:1;89:5;92:3;
98:18;108:1,20,21;
110:3
**focusing (1)**
94:2
**foisted (1)**
95:25
**folks (4)**
28:6;31:6,8;63:10
**following (2)**
18:17;74:13
**follows (1)**
62:6
**forced (3)**
99:18,19,22
**foreign (2)**
15:13,14
**forestall (1)**
73:24
**forgive (1)**
67:16
**form (4)**
26:2;35:16;79:21;
113:17
**formal (3)**
76:1;102:9,11
**formally (1)**
111:21
**formation (1)**
72:2
**formed (2)**
71:8;78:6
**former (5)**
26:13;47:24;
82:20,22;102:15;
108:2
**forth (3)**
68:3;80:22;113:19
**Fortress (1)**

109:19
**forty (1)**
74:19
**forty-five (1)**
34:1
**forum (10)**
55:10;62:19;
70:25;81:10,14;
85:24;87:4;105:23;
106:3,12
**forum- (2)**
56:10;106:18
**forums (1)**
106:17
**forum's (1)**
70:22
**forum-shopping (9)**
56:5,12;63:25;
64:2,11;77:19;106:1,
13,16
**forward (5)**
49:9;103:14;
110:19,19;112:23
**found (3)**
90:8;91:10;96:12
**foundation (5)**
25:11,13;31:14;
34:19,20
**four (7)**
13:6;24:21,23;
51:3;62:4,13;69:5
**fourteen (1)**
56:3
**Fourth (3)**
45:15;49:11;69:9
**frame (1)**
96:22
**FRANK (4)**
9:5;10:11;23:25;
85:5
**F-R-A-N-K (1)**
23:25
**frankly (6)**
42:14;55:5,19;
61:8;64:11;66:14
**fraudulent (3)**
68:25;69:4;92:5
**fraudulent-transfer (1)**
17:17
**FRED (5)**
9:9;10:12;13:24;
18:13;27:15
**free (1)**
33:17
**freed (1)**
57:3
**free-fall (1)**
69:23
**frequency (1)**
88:7
**fresh (4)**
50:15;78:23;
97:11;110:21

**front (3)**
21:18;35:7;100:7
**Frontier (7)**
15:24;43:15;68:5;
82:10;109:20,21,22
**FTI (1)**
18:21
**fulcrum (4)**
63:23,24;69:22;
70:10
**full (5)**
17:24;47:4;70:7,8;
111:23
**fully (3)**
51:9;81:8;97:12
**functionally (1)**
73:9
**functions (2)**
13:24;67:7
**Fund (8)**
7:8,23;17:8;26:7;
28:8;91:5,6;93:4
**fundamental (2)**
62:6;81:16
**Funding (1)**
28:7
**funds (13)**
15:11;16:12;17:8,
8,9;25:25;26:6;
51:13;86:13,13;
92:14,20;93:6
**further (15)**
21:1;23:10;32:15;
35:3;36:8;58:22;
66:14;67:22;68:1;
73:4;80:6;102:22;
104:16,20;106:21
**future (1)**
76:12

## G

**gain (2)**
54:3,3
**gave (1)**
33:24
**GEDDES (1)**
6:9
**General (13)**
9:3;14:12;25:4,17;
51:14;64:17;65:2;
69:15,17;80:8,9;
89:5;107:18
**generally (12)**
34:11;35:8,15;
60:5;78:5;81:9;
86:10;87:6,24;
105:19;107:9;
111:16
**generated (2)**
65:19;92:10
**generates (1)**
92:18

Appx. 02922
015484

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

generic (2)
    66:24;67:8
gets (5)
    49:11;67:14;76:5;
    110:24;112:20
GIBSON (1)
    7:2
given (18)
    14:7;16:18;36:19;
    47:9,11;48:4;53:2;
    79:7,8;84:17;88:7,7;
    94:17;97:9;109:25;
    111:18;112:24;
    113:14
giving (2)
    31:12;97:10
gleaned (1)
    43:23
global (2)
    87:19;108:20
goal (3)
    18:4,7;98:20
goes (7)
    39:9;65:2;73:11;
    80:6;87:23;90:20;
    106:21
go-forward (2)
    62:14;63:14
Good (18)
    10:4,5,19,20;
    11:14;19:18,19,21;
    21:4;23:18;53:8;
    75:21;76:3;91:8;
    97:1;105:11;110:5;
    111:24
govern (1)
    35:12
governance (1)
    97:7
government (1)
    57:1
governor (1)
    71:20
GP (3)
    6:15;8:8,18
grant (3)
    81:9;105:13;110:7
granted (3)
    52:9;107:4,6
granting (1)
    17:20
grapple (1)
    69:2
gravitas (1)
    108:18
great (3)
    53:8;90:5;113:25
greatest (1)
    105:20
Greg (1)
    10:9
Gross (5)
    81:4,7;83:19;88:3;

89:15
grossly (1)
    91:13
ground (2)
    103:20;112:21
grounded (1)
    73:22
grounds (1)
    79:21
GROUP (3)
    8:7;28:7;30:3
groups (3)
    27:22,25;28:21
grow (1)
    84:25
guarantees (1)
    38:14
GUERKE (9)
    6:5;23:18,19;24:8;
    25:12;31:16,19,25;
    32:11
guess (3)
    36:1;74:14,21
guidelines (1)
    67:2
guy (1)
    89:18

## H

Hale (7)
    76:2;102:8,9,11,
    16,19,20
half (3)
    14:25;52:14;56:8
hall (1)
    46:10
hand (4)
    19:11;23:21;60:6;
    67:4
handed (3)
    37:8;59:15;60:7
handing (1)
    59:17
handle (5)
    38:1,2;40:11;
    65:10;102:24
handling (1)
    40:14
hands (1)
    63:23
Hang (2)
    12:2,4
HANKIN (1)
    7:9
happen (7)
    63:14;65:8;68:9;
    70:11,11;73:9;76:12
happened (5)
    45:19;63:13;
    76:23,23;79:18
happening (1)
    97:16

happens (3)
    70:19;73:9;97:23
happy (2)
    61:2;72:15
hard (1)
    52:13
harder (1)
    107:6
harking (1)
    63:15
HCLOF (1)
    82:11
headed (1)
    70:3
headquartered (3)
    13:11;82:10,10
heads (3)
    27:25;28:21;30:3
headway (1)
    79:12
hear (20)
    22:24;33:17;
    34:24;39:2,11;41:4;
    45:3;51:23;75:6;
    93:8;95:1,2,5;97:8;
    101:8,22;102:19;
    111:16;112:10;
    113:12
heard (14)
    30:18;53:6;59:10;
    68:5;75:19;76:15;
    90:6,7;91:21;95:21;
    96:18,19,19,22
Hearing (12)
    23:4;52:9;68:20;
    74:3,3;77:23;78:1;
    79:6;84:20;85:12;
    101:14;104:10
hearings (5)
    69:25;75:15;
    91:20;93:9;96:2
hears (2)
    95:16,17
hearsay (13)
    38:7,9,11,13,13;
    39:6,8,24,25;40:1,3,
    6,7
heart (2)
    64:15;100:18
heavier (1)
    57:9
hedge (5)
    16:12;17:7;86:12;
    91:5;92:20
held (4)
    14:15;68:14;
    69:16;100:5
help (1)
    95:18
helpful (4)
    52:17;77:10;90:9;
    107:21
hereby (3)

12:19;37:21;40:22
herring (1)
    58:14;99:18
high (2)
    44:4;47:14
higher (1)
    87:10,12
Highland (53)
    9:3,5;10:7;13:19,
    21;24:9,24;25:1,22,
    25;26:10;28:10,24;
    29:5,7,13,16;30:10,
    15,23;34:13;44:8;
    48:4;49:25;50:1;
    51:13,25,25;55:1,2;
    57:25;60:23;66:22;
    67:13,15;68:11,12,
    15,17,18,23,25;
    69:13;72:24;74:10;
    76:7;77:1;93:24;
    103:3,12,16;104:19,
    23
Highland- (1)
    72:24
Highland's (10)
    25:4,16;27:23;
    29:13;52:23;64:18;
    65:24;66:10;67:10;
    104:1
highlight (1)
    51:7
highlights (1)
    80:1
highly (7)
    17:15;50:23;51:1;
    53:4;57:14,21;
    109:18
Hills (1)
    13:8
hinted (1)
    105:14
hire (1)
    89:1
hired (1)
    21:9
history (6)
    52:23;53:11;54:7;
    58:15,17;79:8
hit (2)
    49:2;70:21
hitting (1)
    111:1
hold (3)
    22:1;24:17,19
Holding (1)
    81:15
holdings (1)
    81:12
holds (1)
    15:19
holistic (1)
    96:7
home (2)

56:7;78:16
Homes (1)
    13:8
Hon (1)
    40:21
honestly (1)
    34:15
Honor (276)
    10:4,8,14,19;11:1,
    5,9,13,14,16,20,25;
    12:11,13,15,22;19:3,
    7,19;21:4,15,23;
    23:6,12,19;25:6,12;
    27:11;31:16,21;32:5,
    17;36:3,9,15,18;
    37:5,12,17,23;38:1,
    9,11;39:17;40:24;
    41:7,12,14,18,22;
    42:6,11,14;43:3,6,
    17,19,21;44:7,15,22,
    25;45:15,17,20,25;
    46:20,22;47:8,12,17;
    48:7,18;49:1,2,5,8,
    12,15,16,23;50:14,
    23;51:3,9,18;52:3,8,
    17,20,22;53:10,13,
    17,18,22;54:4,9,24;
    55:3,6,23;56:1,18,
    20;57:7,11,12,22;
    58:1,10,15,20,23,25;
    59:7,8,12,15,17;
    60:2,8,20,25;61:7,
    10,11,15,19,20,21;
    62:12,21,24;63:4,15,
    16,19,24,25;64:5,20;
    65:1,22;66:6,13,16;
    67:4,12,24;68:2,7,
    12;69:10,15,23;70:3,
    9,21,23;71:4,21,22;
    72:3,9,13;73:1,7,15;
    74:12,13,24;75:2,21;
    76:5,7,14;77:2,6,9,
    18,23;78:2,12,13,17;
    79:6,21;80:10,15;
    81:8,19,23;82:21;
    83:16;84:4,11;85:13,
    21;86:2;87:5;88:11,
    23;89:15,20,24;
    90:10,11,14,25;91:2,
    6,8,22,22,23;93:8,
    14;94:1,11,24,25,25;
    95:1,2,16,18,25;
    96:7,8;97:10,21,22;
    98:9,11,24,25;99:1,
    3,6,8,13,18,24;100:2,
    3,7,9,13,17;101:4,7,
    13,20,21,23;102:5,
    10,25;103:11,13,21;
    104:2,5,21,25;
    111:14,15;112:9,11,
    13,14,16;113:8,15;
    114:1
Honorable (1)

Appx. 02923

015485

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

72:12
**Honor's (7)**
11:4;61:11;64:3;
76:3;100:18;102:12;
112:23
**hope (4)**
70:6,6;78:7;98:23
**hopefully (2)**
86:25;111:11
**hopes (1)**
18:7
**horse (1)**
101:11
**hours (4)**
14:4;20:9;74:16,
16
**Houser (3)**
46:24;102:19,22
**HUANG (1)**
7:18
**Human (2)**
28:8;108:12
**hundred (2)**
20:9;25:20
**hundreds (6)**
14:4;63:5;69:20;
74:16,16;96:1
**hurt (1)**
36:25

**I**

**idea (5)**
50:14;51:25;70:2;
100:14;105:21
**identified (1)**
32:9
**identifies (1)**
68:11
**identify (1)**
40:17
**ignore (3)**
90:17;100:25;
101:5
**immaterial (1)**
85:7
**impact (2)**
45:9;49:4
**impartial (1)**
73:21
**impeccable (1)**
98:17
**implication (2)**
73:17;74:8
**importance (1)**
92:16
**important (14)**
44:7;50:21;63:15;
70:19;79:9;85:9,12;
86:1;87:7,18;89:11,
11;90:9
**importantly (3)**
42:21;63:14;79:9

**improper (1)**
90:24
**impropriety (1)**
18:24
**improve (1)**
83:21
**inappropriate (2)**
106:22;108:13
**Inc (5)**
9:8,9;13:1;25:5,17
**include (2)**
31:5;86:10
**included (2)**
64:24;106:12
**including (10)**
13:6;14:20;15:4,9,
14;17:7,16;80:18;
81:1;109:13
**incorporation (2)**
64:6;71:5
**increased (1)**
79:4
**increases (1)**
14:3
**Indeed (3)**
82:23;84:11;
103:17
**indenture (1)**
101:2
**indicated (1)**
94:6
**indicating (1)**
62:23
**indication (1)**
106:24
**indicator (1)**
52:24
**Indiscernible (1)**
37:5
**individual (1)**
106:8
**industries (1)**
13:4
**inform (3)**
48:3;110:13;
113:23
**information (4)**
14:7;18:21;85:19;
95:25
**informed (2)**
16:9;53:13
**infrastructure (1)**
67:7
**initial (2)**
44:18,20
**initially (2)**
13:17;47:20
**injunction (5)**
69:8,8,9,10,10
**injunctions (1)**
69:5
**inquiring (1)**
38:22

**inside (1)**
104:11
**insider (3)**
17:25;84:19;112:4
**installed (1)**
98:16
**instance (1)**
42:17
**instead (2)**
18:11;101:16
**instrument (1)**
82:14
**instruments (3)**
86:10;91:7;100:10
**insufficient (1)**
79:21
**integrated (1)**
113:7
**intended (2)**
32:21;77:24
**intends (3)**
18:6;77:25;86:24
**intention (2)**
84:7,8
**intercompany (2)**
48:14;97:25
**interest (15)**
25:22;47:25;
53:21;55:15;64:9;
68:19,22,23;70:22,
22;71:1,6;74:20;
78:18;80:25
**interested (1)**
56:5
**interesting (2)**
90:16;101:20
**interest-of-justice (1)**
61:25
**interests (9)**
14:19;15:14,17;
52:3;78:9;80:7;
86:12;100:10,16
**international (1)**
15:8
**internationally (1)**
105:17
**interpretation (1)**
91:14
**interrupt (1)**
45:18
**Intertrust (1)**
8:13
**intertwined (1)**
112:17
**intimately (1)**
72:22
**into (14)**
11:16;12:19;
21:18;37:21;40:22;
42:18;43:24;48:11;
73:12;90:21;101:9;
104:22;107:6,24
**introduced (1)**

13:21
**invariably (1)**
73:11
**invested (1)**
52:5
**investment (7)**
15:5;65:13,18;
66:7,10,15;67:1
**investments (5)**
15:17;16:4;86:11;
93:6,6
**investors' (1)**
17:1
**invited (1)**
64:12
**involun (1)**
60:9
**involuntary (6)**
17:20;60:10;66:4;
76:9,9;91:25
**involve (3)**
72:24;86:6;107:18
**involved (6)**
17:15;58:11;66:7;
93:23;97:24;106:21
**involvement (2)**
13:19;85:6
**involves (2)**
65:3;106:22
**involving (4)**
49:18;57:16;
80:17;112:4
**Ira (2)**
10:9;111:14
**ironed (1)**
41:10
**irrelevant (3)**
89:6;107:9,9
**ISAAC (2)**
9:3;10:11
**issue (23)**
48:24,24;50:9,19;
53:5;54:6;58:14;
60:9;61:20;62:23,
25;64:3;65:10,11;
68:24;71:22;73:13;
77:2;82:12;105:7;
110:14;112:15;
113:2
**issued (10)**
60:9,11;69:5;
91:21;94:13;103:14,
15,16,17;108:6
**issues (14)**
21:2,2;49:18;
50:19;61:8;65:23;
69:1;94:16;96:20;
97:5,25;103:4;
107:10;108:8
**item (2)**
10:15;68:10
**iterations (1)**
94:18

**J**

**JAMES (3)**
8:14;10:6;25:1
**Janeiro (1)**
15:9
**January (3)**
60:19,20;61:5
**JEFF (4)**
7:16;10:8;11:14;
75:22
**Jefferies (9)**
6:10,21;15:20,22;
43:14;68:5;82:9;
109:18,21
**JENNER (1)**
7:7
**JEREMY (1)**
8:4
**Jernigan (52)**
38:21;39:1;45:25;
46:1,2,6,8;47:15,20;
48:23;66:9,13,19,20;
67:9,22,25;69:1,13;
73:18;74:11;76:17,
25;77:22;78:2,12;
90:8;91:10,20;93:3,
11;94:13;95:6,12,17,
21;96:3,12;97:14,18;
100:25;103:3,6,7;
104:3,16;110:11,17,
21;111:9;112:24;
113:9
**Jernigan's (3)**
40:21;90:17;92:23
**Jim (1)**
27:7
**job (2)**
18:16;84:25
**JOHN (4)**
6:16;10:9;21:19;
59:12
**join (1)**
63:8
**joinders (1)**
77:7
**joined (5)**
29:4,7;43:2;60:4;
75:1
**joining (1)**
98:15
**jointly (3)**
48:5,13;78:19
**Jones (6)**
10:7;11:15;13:14,
22;21:20;75:22
**JOSE (1)**
6:17
**Josh (1)**
83:1
**Judge (97)**
13:7,7,8,9;22:3;

Appx. 02924
015486

Case 19-34054-sgj11    Doc 3596-22    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 22    Filed 02/26/25    Page 808 of 1017    PageID 16469

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                    December 2, 2019

32:24;38:21;39:1,4,
25;44:3;45:25;46:2,
5,8,24;47:10,11,15,
20,22,23,23;48:10,
22,23;66:9,13,18,20;
67:9,22,25;69:1,13;
70:17;72:12,14,14,
19,21;73:3,5,18;
74:10;76:2,17,25;
77:22;78:2,11;
79:15;81:4,7,14;
83:19;88:3;89:15;
90:8,16;91:10,20;
92:23;93:3,11;
94:12;95:6,12,17,20;
96:2,5,12;97:13,18;
100:24;102:8,9,11,
15,19,19,20,22;
103:3,5,7;104:3,16;
106:8;108:5;110:11,
17,20;111:9;112:24;
113:9
**judges (9)**
46:23;47:7;48:1;
49:2;91:2,3;106:8;
108:12,12
**judge's (1)**
108:11
**judgment (2)**
81:22;111:18
**judgments (1)**
108:12
**judicial (8)**
39:12;41:19;46:6;
49:23;67:25;81:17;
101:1;102:21
**jurisdiction (2)**
55:16;107:20
**jurisdictions (4)**
41:24;44:22;52:1;
88:21
**jurist (1)**
97:19
**justice (8)**
52:3;53:16,18,21;
64:9;78:10;80:25;
99:20
**justify (1)**
95:19

## K

**keep (4)**
61:1;69:23;
101:14,23
**keeping (1)**
98:8
**KEIP (1)**
95:11
**KEIPs (1)**
95:17
**KERP (1)**
95:11

**KERPs (1)**
95:17
**KEVIN (2)**
6:5;23:19
**key (3)**
51:16;66:22;112:3
**Kharasch (3)**
10:9;111:14,14
**KIMBERLY (1)**
7:19
**kind (12)**
62:13,19;64:12;
65:2;66:19;73:12,
24;74:5;90:15;
102:7;105:15;
108:24
**kinds (2)**
112:2,3
**Klos (1)**
31:5
**knowledge (13)**
14:2;27:1;46:6,8;
84:23,25;85:19;91:9,
9;93:4;95:13,19;
96:5
**knows (1)**
69:24
**Korea (3)**
15:11;20:16;86:15
**Korean (3)**
93:5;104:3,7
**KUAN (1)**
7:18

## L

**LA (2)**
88:10,11
**lack (1)**
55:12
**laid (1)**
11:4
**large (5)**
51:18;91:4;
100:19,22;109:24
**largely (3)**
42:8;50:25;76:15
**largest (5)**
51:19;69:19;83:5,
13,16
**last (11)**
19:15;27:4;41:1;
66:6;69:14;87:5;
89:2,25;94:17;
103:11;104:2
**Lastly (3)**
18:16;76:14;83:16
**late (2)**
38:2;60:19
**later (4)**
60:24;68:21;93:9;
97:8
**LATHAM (2)**

7:13;83:15
**Latin (2)**
86:15;93:5
**latter (1)**
109:9
**Laughter (1)**
59:6
**laundry (1)**
107:8
**LAUREN (1)**
6:22
**law (12)**
14:13;50:25;
70:25;71:8;76:11;
82:20;102:15;
105:15;106:6,7,20;
110:17
**laws (1)**
14:11
**lawsuits (3)**
99:19,21,22
**lawyer (1)**
47:23
**lawyers (1)**
108:13
**lay (2)**
51:9;53:23
**layer (2)**
69:22;72:20
**laying (3)**
25:9,11;31:14
**leading (1)**
85:19
**learned (4)**
76:25;77:1;90:19;
91:15
**learning (13)**
14:1;49:14;50:17;
52:6;66:12,14;68:1;
76:17;90:7,10;
101:10;104:16,20
**least (5)**
48:8;56:9;61:3;
62:1;69:14
**leave (1)**
111:9
**leaves (1)**
47:7
**leeway (3)**
31:12;33:24,25
**legal (4)**
29:21;62:7;67:7;
81:16
**legal-compliance (1)**
28:10
**legitimacy (1)**
101:17
**lenders (1)**
68:5
**lengthy (1)**
91:21
**less (2)**
17:13;99:9

**level (1)**
106:13
**LEVENTON (2)**
9:3;10:11
**leveraged (1)**
65:4
**liabilities (3)**
77:3;78:5;84:24
**life (3)**
52:17;57:4;98:1
**likely (8)**
53:1,4;66:10;
83:12;85:7;91:7;
93:8;98:20
**limited (7)**
14:10,15;33:5;
34:4;40:20,23;52:9;
53:11;55:21;90:18;
100:10;111:10
**limited-partnership (1)**
25:22
**line (2)**
21:21;65:6,8,12
**lines (3)**
64:22;65:2,12
**liquid (3)**
15:19;18:13;86:16
**liquidated (1)**
92:15
**liquidation (3)**
16:25;57:19;70:5
**list (6)**
36:11;50:24;
51:19;67:17,18;
107:8
**listed (2)**
82:18;83:11
**litigating (1)**
78:16
**litigation (19)**
17:15;54:4;55:3,5;
78:14;80:17;83:7,10,
14,15;84:1;85:18;
88:19;99:17;103:23;
108:1,2,22;110:1
**litigious (3)**
50:23;51:1;52:24
**little (15)**
24:5;37:2;48:19;
54:2;60:24;63:18,
21;67:14,14,21;
68:20;77:7;79:19;
91:12;99:9
**Litvak (1)**
10:10
**lived (2)**
61:4;63:11
**living (1)**
61:8
**LLC (2)**
6:10;7:14
**LLP (8)**
6:2,14,20;7:2,13,

22;8:2,12
**loan (3)**
16:4;65:15;92:9
**loathe (1)**
60:5
**local (8)**
13:16;59:13;
70:22;73:8;86:7,21;
88:14;89:23
**locales (1)**
15:8
**locally (1)**
89:5
**located (15)**
15:17,20;41:25;
46:23;51:16,18,21;
58:7;86:14;100:13;
107:12,13,13,14;
108:4
**location (12)**
29:4,6,10,16;30:7,
15;31:22;86:2,5;
99:20;100:9;106:18
**locations (1)**
30:22
**logical (3)**
42:16;55:19,22
**London (1)**
7:14
**long (3)**
52:23;106:5;
108:14
**longer (3)**
16:23;50:6;61:9;
91:16,18
**Look (24)**
12:6;19:22;46:22;
51:19;57:24;64:2;
65:12,17;67:3,12;
68:19;72:20;74:1;
79:15;82:17;86:5,9;
87:13;88:15;90:25;
96:11;101:2;105:24;
110:21
**looking (5)**
50:16;69:19;
104:14,15;107:19
**looks (3)**
82:4,5;96:7
**Los (1)**
13:11
**losing (1)**
45:24
**lost (2)**
73:23;85:20
**lot (16)**
18:21;33:24;
62:22;65:11,19;
93:13;94:25;95:21;
105:17;106:2;
109:17;110:16;
111:24,25;112:5;
113:20

Appx. 02925
015487

Case 19-34054-sgj11 Doc 3596-22 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-10 Filed 01/06/25 Page 809 of 1017 PageID 16470

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

**loud (1)**
  55:11
**LP (6)**
  24:10;25:2;30:23;
  60:3;80:6,7
**LUCIAN (6)**
  6:16;59:12,12,20,
  23,25
**lunch (2)**
  105:5;110:12

**M**

**machinery (2)**
  110:8;113:24
**MACKSOUD (1)**
  6:22
**mail (1)**
  110:25
**maintain (2)**
  15:7;98:9
**Maintenance (1)**
  75:12
**majority (5)**
  43:9,11;51:21;
  80:4;86:15
**makes (12)**
  42:4;43:9;55:15;
  64:19;70:14,14;
  81:5;86:3;89:25;
  90:13;101:6;106:13
**making (4)**
  31:23;48:25;
  68:23;90:17
**manage (3)**
  15:14;28:4;57:18
**managed (6)**
  15:3;55:2;57:25;
  65:20;96:15;112:22
**Management (45)**
  6:15;8:18;9:4,6;
  10:8;13:20;14:20,
  25;15:1;16:3;18:10;
  21:5;22:9;24:10;
  25:2;28:1;30:23;
  35:13;50:13;54:15;
  58:5;60:3,14;65:13,
  18,24;66:8,10,15;
  68:11,16,17,23,25;
  78:7;79:17;92:14;
  93:12;95:4,21;96:10,
  12;103:18;110:2
**manager (8)**
  14:13;16:23;
  25:25;26:5,6,7,9;
  51:12
**managers (1)**
  21:13
**manages (4)**
  14:17;15:10;
  16:12;50:8
**managing (1)**
  17:6

**many (12)**
  15:8;18:12,21;
  80:10;88:10;89:12,
  12;91:2,7,20;97:24,
  24
**MARC (1)**
  7:9
**margin (1)**
  15:22
**marginally (1)**
  92:25
**markedly (1)**
  93:18
**market (2)**
  92:13;94:9
**marketplace (1)**
  67:3
**Marsal (2)**
  7:3;8:3
**MASCHERIN (1)**
  7:10
**massive (1)**
  53:2
**material (3)**
  45:2;88:6,24
**materially (1)**
  45:8
**matter (9)**
  18:3;39:11,23;
  44:18,20;56:13;
  102:18,25;111:15
**matters (8)**
  10:14;17:16;
  80:17;94:1;102:19,
  20,24;110:17
**Matthew (3)**
  10:21;41:12;
  112:11
**Max (1)**
  10:9
**MAXCY (1)**
  6:23
**maximize (3)**
  18:4,12;87:1
**maximum (1)**
  50:22
**may (38)**
  12:20;21:6;22:2;
  23:7,18;24:6;31:21;
  35:1;36:5,24;37:23;
  41:11,25;42:1;
  43:10;49:4;52:1;
  54:24;55:6;59:9;
  63:12;76:4,4,12,12;
  78:21;81:8;85:5;
  90:19;91:4,5;95:11;
  96:25;97:15;98:5;
  101:8;102:16;108:9
**maybe (5)**
  27:7;56:3;90:20;
  91:3;107:24
**mean (14)**
  24:22;31:13;

35:18;39:3;40:9,12;
  47:22;48:5;54:7;
  55:25;56:2,24;
  87:24;109:2
**means (4)**
  54:8;9;96:2;
  103:19
**meet (5)**
  29:23;32:8,9;
  62:17;80:23
**meeting (2)**
  14:4;81:24
**meetings (2)**
  30:1;31:8
**meets (1)**
  40:6
**member (2)**
  43:17;83:11
**Members (5)**
  29:21;31:5;78:6;
  80:18;88:16
**memorized (2)**
  35:9,22
**mention (1)**
  110:21
**mentioned (12)**
  30:7;44:23;57:22;
  58:9;78:17;79:6;
  87:11;89:16;97:22;
  98:13;99:25;112:15
**mentioning (1)**
  77:19
**mess (1)**
  37:1
**message (1)**
  55:11
**met (3)**
  18:20;20:3,20
**Meta-e (1)**
  83:17
**metropolitan (1)**
  87:15
**MICHAEL (2)**
  6:6;7:4
**microcosm (2)**
  67:14,23
**microcosms (1)**
  67:21
**microphone (3)**
  19:23;21:17;24:4
**middle- (1)**
  67:5
**Midwest (2)**
  87:11,13
**might (9)**
  47:16;48:3,10,11;
  91:23;96:20;107:20;
  108:15;111:8
**Mike (1)**
  10:24
**mileage (1)**
  87:17
**mile-and-a- (1)**

52:13
**MILLER (1)**
  7:24
**million (6)**
  15:22;16:1;17:13;
  43:15,16;68:13
**millions (2)**
  63:5;69:20
**mind (3)**
  60:19;61:14;69:23
**minimum (1)**
  29:23
**minutes (2)**
  34:1;90:2
**miscommunication (1)**
  36:20
**misstated (1)**
  71:5
**mistake (1)**
  103:21
**misunderstood (1)**
  33:14
**model (1)**
  104:19
**modern (2)**
  97:25;105:16
**modifications (1)**
  16:18
**modified (1)**
  112:1
**modifying (1)**
  112:5
**modus (1)**
  67:11
**mom (1)**
  89:3
**mom-and- (1)**
  100:17
**mom-and-pop (3)**
  88:22,23;89:4
**moment (2)**
  45:18;100:8
**moments (1)**
  80:15
**monetization (1)**
  92:21
**monetizing (1)**
  16:25
**money (3)**
  65:4,4;111:12
**money-management (1)**
  14:18
**month (1)**
  111:24
**month-and-a-half (2)**
  18:17;88:15
**months (3)**
  43:21;60:24;108:3
**more (27)**
  38:17;40:13;
  41:19;51:9;52:14;
  62:7;63:9,13;65:11;
  67:10;73:15;81:13;

83:25;84:12;85:23;
  87:4;89:23;90:1,3;
  94:25;96:13;99:3;
  101:22;103:25;
  107:18,20;111:25
**morning (11)**
  10:4,5,19,20;11:5,
  14;19:19,21;21:4;
  23:18;99:24
**MORRIS (21)**
  7:22;10:9;21:15,
  19,19;23:6;25:6,10;
  26:2;27:11;31:21;
  32:23;34:19,22,25;
  36:3;37:17;38:9;
  39:17,19;59:16
**most (14)**
  39:25;42:16,21;
  55:9,19;81:2;85:11;
  87:7,20,22;88:13;
  98:3,20;105:21
**motion (66)**
  10:16;11:1,4,20;
  15:12;18:18;23:11,
  14;31:13;33:1,4,5,
  19;39:20;40:19;
  41:21;42:9,19;54:1;
  55:11;60:4;61:18;
  62:25;63:7,8;64:14,
  16;71:23,25;73:10;
  75:4;77:7,14,24,25;
  78:1,3,12;79:22;
  82:15;90:19;94:13;
  95:10;96:16;97:6;
  98:15,15,23,23;99:1;
  100:1;101:11,14;
  104:24;105:7,12;
  106:15;107:3,4,6;
  109:13,23;110:7;
  111:17;112:18;
  113:12
**motion-by-motion (1)**
  108:10
**motions (7)**
  28:2;39:2;64:16;
  100:2;105:15;
  112:16;113:8
**motivation (2)**
  75:14;97:14
**motive (2)**
  98:14,15
**movant (3)**
  62:17;80:23;81:5
**movants (2)**
  41:5;88:9
**move (9)**
  11:16;36:12;
  37:13;42:18;49:9;
  64:8;85:16;109:8;
  110:5
**moved (1)**
  109:11
**moving (5)**

Appx. 02926

015488

Case 19-34054-sgj11    Doc 3596-22    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 5-1 Filed 01/31/25    Page 810 of 1017    PageID 16471
Exhibit 22    Page 136 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                    December 2, 2019

12:9;21:22;61:11,
12;63:20
**much (9)**
19:1;58:10;66:11;
83:24;87:21;93:21;
96:1,3;113:25
**multi (1)**
97:24
**multi- (1)**
101:20
**multiple (3)**
17:16;43:10;67:17
**multiples (1)**
43:17
**multi-strat (4)**
93:4;104:4,8,12
**multitude (1)**
15:1
**must (4)**
44:25;45:1;80:20;
83:21
**mutual (1)**
17:8
**myriad (2)**
13:4;93:7
**myself (1)**
57:23

**N**

**name (7)**
19:13,15;23:23;
30:11,13;46:24;
68:15
**narrow (1)**
57:16
**national (3)**
13:10;87:14,19
**nature (4)**
35:19;42:22;
52:24;110:1
**nauseum (1)**
61:23
**necessarily (5)**
32:25;56:4;60:25;
61:16;62:15
**necessary (3)**
50:15;105:1,2
**need (14)**
11:19;13:16;
21:17;51:19;59:4;
76:18;85:15;88:14;
101:2,15;106:4;
110:8,17;111:3
**needed (1)**
83:4
**needs (3)**
50:24;83:3;110:19
**negative (2)**
78:6;106:19
**negatives (1)**
64:10
**negotiate (2)**

113:21,22
**neither (2)**
66:11;82:15
**nerve (4)**
42:5;43:5;51:11;
58:8
**NESTOR (2)**
6:6;10:25
**neutral (4)**
64:4;65:9;68:8;
104:18
**New (25)**
15:20;20:14;
21:12;25:8;30:6,7,7,
10,15;42:1;47:6,11;
82:10;83:10,14,14;
86:16;92:13;99:17,
21;103:13,13,16,19;
107:13
**next (6)**
65:12;68:10;84:4;
85:21;90:2;110:22
**nexus (1)**
76:22
**NICHOLS (1)**
7:22
**nine (1)**
21:9
**nine-and-a-half (1)**
68:13
**nineteen (1)**
83:12
**ninety (1)**
17:5
**ninety- (1)**
92:1
**ninety-nine (1)**
14:14
**nobody (2)**
46:8;88:24
**nonaffiliates (3)**
22:17;35:14;94:4
**non-CLO (1)**
93:19
**noncustodial (1)**
15:17
**nondebtor (3)**
41:24;45:5;53:2
**nondebtor-entity (1)**
30:13
**non-Delaware (1)**
80:11
**none (3)**
23:4;82:23;109:12
**nonetheless (1)**
50:21
**nonparty (2)**
52:25;53:4
**nonpublic (2)**
86:12;92:19
**non-venue (1)**
21:2
**normal (2)**

46:4;92:16
**Northeast (1)**
84:2
**Northern (13)**
22:23;39:1;40:10;
45:23;46:5;53:1;
76:2;102:13,23;
103:1,8;108:4,5
**Nos (1)**
37:20
**note (8)**
62:1;63:25;68:12,
13,14;72:16;73:25;
82:12
**noted (1)**
63:16
**notes (1)**
45:24
**notice (4)**
41:19;49:23;
82:23;97:4
**notices (2)**
88:16,17
**notwithstanding (1)**
94:21
**number (16)**
10:14,16;43:11;
51:18;53:2;57:18;
60:11,13,16;67:20;
69:11;74:1;82:5;
83:11;108:6,7
**numbered (1)**
36:22
**Numbers (1)**
37:11
**numerous (2)**
39:2;54:19
**Nutro (4)**
44:14,15,17;45:4
**Nutro's (1)**
44:15

**O**

**object (1)**
25:6
**objected (4)**
37:3,10,12,13
**objection (20)**
12:12,15,17;
21:15;25:15;26:2;
27:11,11;32:23;
34:19;37:14,16,19;
38:2,7;39:8;40:5;
57:15;59:16;113:13
**objections (4)**
11:24;39:13;
53:25;62:22
**obligations (5)**
15:22;16:4;65:15;
91:8;92:3
**obligor (1)**
68:13

**obtain (1)**
38:19
**obvious (2)**
40:13;42:21
**Obviously (11)**
22:9;26:14;40:19;
42:24;46:24;56:6;
57:24;61:21;100:4;
101:9;111:4
**occasions (1)**
18:21
**occur (1)**
53:1
**occurred (2)**
53:12;74:4
**occurrence (1)**
45:2
**occurring (1)**
97:1
**October (2)**
13:18;29:7
**off (4)**
17:1;75:16;88:21;
103:20
**offended (2)**
74:7;75:17
**offensive (1)**
73:16
**offer (2)**
39:14;84:20
**offered (3)**
31:17;38:18;39:23
**office (14)**
20:14;21;29:1,2,2,
4,8,14,19;30:1,10;
55:18;83:15;86:5
**officed (1)**
30:6
**officer (7)**
12:24;13:3,6,25;
24:14,24;79:1
**officers (1)**
66:1
**offices (18)**
13:15,15:8;20:7,9;
29:9,11,21;30:4,19,
25,25;31:3;41:25;
42:1;52:1,2;85:13;
86:18
**Official (5)**
6:3;10:22;42:25;
43:12;109:14
**often (1)**
81:2
**of-venue (1)**
71:25
**Oklahoma (2)**
15:25;82:11
**old (2)**
26:19;110:5
**once (5)**
20:3;29:23;44:18;
73:3;110:23

**one (49)**
11:18;12:13;16:2;
21:18;22:15;28:4,
21;37:12;39:11,12;
40:3;43:16;46:23;
47:16;49:4;50:23;
52:10;56:3,8;60:15,
16;62:12,21;63:2,25;
67:16;69:24;71:18,
25;72:18,20;76:3;
77:13;80:11;82:1;
86:2;88:18;94:1;
97:5;98:2;101:21;
103:11,14,20;104:2;
109:1,11,17;111:15
**one-hundred-percent (1)**
51:13
**O'NEILL (4)**
10:4,6,6,14
**ones (3)**
36:14;59:18;105:2
**one's (1)**
68:5
**ongoing (1)**
110:1
**only (32)**
14:2;16:24;20:3;
22:7;23:11;26:20;
29:16;32:11;36:15;
49:25;50:24;51:25;
52:9;53:3,14;57:16;
66:1;72:9;73:22;
74:9;76:8;80:16;
81:11;82:4;85:7;
88:17;91:8;92:17,
25;93:13,23;109:11
**opaque (1)**
54:12
**open (1)**
61:17
**open-ended (1)**
17:8
**operandi (1)**
67:11
**operated (4)**
49:25;54:11;55:2;
57:20
**operates (1)**
79:6
**operating (3)**
22:10;88:21;112:7
**operation (2)**
65:14,20
**operational (3)**
70:2,4,6
**Operations (9)**
28:7,8;32:3;41:23;
77:4;79:2;84:24;
90:6;92:7
**opinion (11)**
60:9,11;81:4,15;
88:4;91:25,25,25;
94:12,15;99:13

Appx. 02927

015489

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                                                December 2, 2019

| | | | | |
|---|---|---|---|---|
| **opinions (14)** | 39:22 | 21;21:19;75:22; | 35:2;50:20;51:19; | **Philly (1)** |
| 41:17;49:22; | **outside (2)** | 111:5,14 | 55:14;58:10,18; | 109:2 |
| 54:14,19,22;64:3; | 30:19,25 | **pages (4)** | 70:24;111:22 | **phone (1)** |
| 66:17;73:25;74:16; | **outstanding (1)** | 74:16,18;88:9; | **PATEL (27)** | 46:11 |
| 76:21;81:1;91:21, | 17:12 | 96:2 | 8:19;36:9,15,18, | **phrase (1)** |
| 23;108:7 | **over (26)** | **paid (9)** | 22,24;37:2,5,8,23; | 65:25 |
| **opportunity (2)** | 13:2;14:14,19,24; | 70:7;89:7;98:6; | 38:1;59:15;60:2,3, | **physically (1)** |
| 11:7;112:24 | 15:18;17:2,4;18:17; | 99:22;111:12; | 20,23;62:10;71:4,8, | 13:11 |
| **opposed (5)** | 20:9;29:13;41:6; | 112:14,14,20;113:2 | 11,13,16,18,21;73:7, | **pick (1)** |
| 56:11;88:11;95:6; | 44:5;60:24;74:18, | **painstaking (1)** | 15;102:5 | 46:11 |
| 109:12,23 | 19;77:10;78:7; | 77:8 | **PATRICK (2)** | **piece (4)** |
| **opposing (1)** | 79:15;90:2;92:12; | **painted (1)** | 6:23;83:6 | 65:14,22;66:6; |
| 37:8 | 95:14;103:17; | 63:2 | **Pause (1)** | 104:1 |
| **opposite (1)** | 108:12;110:22; | **paper (1)** | 12:8 | **pieces (1)** |
| 109:15 | 112:3;113:13 | 100:16 | **pay (2)** | 36:10 |
| **opposition (2)** | **overall (1)** | **papers (10)** | 111:10,11 | **pillars (1)** |
| 33:5;56:11 | 51:22 | 42:23;44:9;51:6,9; | **paying (1)** | 112:21 |
| **options (1)** | **overblown (1)** | 52:19;53:24;55:9; | 17:1 | **place (6)** |
| 18:7 | 77:5 | 61:11,12;95:20 | **payment (1)** | 34:2;64:8;89:12; |
| **oral (1)** | **overcome (1)** | **pare (1)** | 101:3 | 110:3,9;113:24 |
| 105:7 | 83:20;106:14 | 77:15 | **PC (2)** | **places (4)** |
| **oranges (1)** | **overnight (1)** | **Parking's (1)** | 8:7,17 | 41:25;53:17,20; |
| 93:25 | 52:16 | 52:15 | **pending (14)** | 80:3 |
| **order (12)** | **overrule (1)** | **part (7)** | 15:13,15;17:17, | **plan (13)** |
| 15:14;45:6;53:19; | 40:5 | 22:22;50:8;65:18; | 19;43:22;52:8; | 17:21;44:1,12,13; |
| 60:14;80:23;83:20; | **overruled (4)** | 69:12;91:15,16; | 72:23;80:19;83:7,10, | 60:12,21;69:10,10; |
| 97:6;99:22;105:1; | 25:15;26:3;27:13; | 112:17 | 14;88:15;90:4;108:3 | 70:11;74:5;76:8; |
| 110:8,9;113:17 | 35:4 | **parte (1)** | **Penny (2)** | 91:16,24 |
| **orders (1)** | **oversecured (2)** | 69:8 | 10:24;19:19 | **planes (2)** |
| 17:19 | 68:7;100:21 | **participate (1)** | **pension (1)** | 52:13;109:2 |
| **ordinary (3)** | **oversee (2)** | 89:13 | 89:10 | **play (1)** |
| 79:7,11;101:18 | 65:7;79:1 | **particular (8)** | **people (7)** | 104:22 |
| **ordinary-course (5)** | **overseeing (1)** | 45:9;47:11;49:4,6; | 30:22;32:8;52:12; | **players (1)** |
| 95:10;96:17; | 46:25 | 51:8;64:16;94:10; | 86:4,17;87:19;109:2 | 108:8 |
| 101:14;112:4,18 | **overstated (1)** | 106:7 | **percent (8)** | **playing (1)** |
| **organization (1)** | 91:13 | **particularly (5)** | 14:14;17:3,6; | 104:14 |
| 51:22 | **overturn (2)** | 43:6;86:22; | 25:20;80:7;92:2,11, | **pleadings (1)** |
| **organizational (5)** | 44:11;79:22 | 107:10,16;110:1 | 17 | 73:17 |
| 25:13;27:23; | **overturned (1)** | **parties (15)** | **Perfect (1)** | **Please (14)** |
| 31:19;32:3;91:17 | 45:6 | 14:22;15:7;16:17; | 60:1 | 10:3;19:8,10,13; |
| **organized (4)** | **owed (3)** | 21:22;51:10;56:22; | **perhaps (8)** | 23:16,18,21,23;24:3, |
| 14:11,13;70:25; | 15:25;43:14,16 | 64:9;67:17;78:9; | 42:21;47:8;52:16; | 4;36:25;49:10; |
| 99:9 | **owes (1)** | 80:24;82:7;84:6; | 63:18;69:16;70:4; | 75:10;105:10 |
| **others (4)** | 15:21 | 92:21;108:13; | 103:7;106:8 | **ploy (1)** |
| 14:4;50:12;53:3; | **own (6)** | 110:18 | **period (2)** | 78:14 |
| 59:9 | 14:20;36:1;43:1; | **Partner (9)** | 26:19;111:10 | **pm (4)** |
| **otherwise (4)** | 53:11;66:1;95:12 | 9:5;14:12;24:19, | **person (2)** | 75:8;105:8,8; |
| 84:3;96:8;104:17; | **owned (2)** | 21;25:4,17;51:14; | 85:8;90:20 | 114:3 |
| 106:17 | 44:15;80:7 | 80:8,9 | **personal-services (1)** | **podium (2)** |
| **out (22)** | **owner (1)** | **partnership (2)** | 54:23 | 10:17;93:13 |
| 11:4;18:18;29:13; | 51:14 | 14:11;55:21 | **personnel (3)** | **point (29)** |
| 41:10;43:3;46:13; | **ownership (1)** | **partnerships (2)** | 15:8;51:16;85:6 | 34:14;35:2;38:18; |
| 51:9;52:19,19; | 80:14 | 14:15;100:11 | **perspective (6)** | 44:7;49:11;52:19; |
| 53:24;54:13;56:19; | **owns (6)** | **parts (2)** | 49:3,17;50:17; | 54:10,13;55:3,23; |
| 64:5;72:17;83:23, | 14:17;15:10;25:4, | 22:15;105:18 | 70:15,16;72:16 | 56:21;57:17;60:12; |
| 23;88:24;90:8; | 16,20;91:17 | **party (5)** | **petition (7)** | 62:12,21;76:3;86:3, |
| 108:19;110:12,13; | | 18:16;118:23; | 16:1,20;17:20; | 17;87:6;93:10; |
| 111:8 | **P** | 23:10;55:7,12 | 18:24;21:10;22:8; | 94:11;95:18;96:4; |
| **outcome (2)** | | **party-in-interest (1)** | 88:12 | 97:21;101:19;102:7; |
| 18:9;45:11;63:18 | **PA (1)** | 42:23 | **PetroCap (1)** | 103:11;109:9;113:3 |
| **outlined (1)** | 6:9 | **Pass (2)** | 93:6 | **pointed (2)** |
| 40:4 | **Pachulski (8)** | 23:2;35:24 | **ph (3)** | 64:5;77:18 |
| **out-of-court (1)** | 10:6;11:15;13:14, | **past (8)** | 44:14;48:17;56:4 | **points (5)** |

App. 02928
015490

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                December 2, 2019

| | | | | |
|---|---|---|---|---|
| 73:16;75:24;87:7;<br>99:10;107:20<br>**Pomerantz (23)**<br>10:9;11:14,15,23,<br>25;12:3,5,11,22;<br>59:11;75:14,21,22;<br>88:3,6;89:15,19,22;<br>90:25;99:3,6;<br>101:20;102:8<br>**pool (1)**<br>47:16<br>**pop (1)**<br>100:18<br>**poring (1)**<br>74:17<br>**portfolio (7)**<br>25:25;26:5,6,7,8;<br>51:12;92:9<br>**portion (1)**<br>17:2<br>**POSIN (1)**<br>7:19<br>**position (4)**<br>68:6;95:13;96:3;<br>109:22<br>**positions (1)**<br>92:19<br>**possibility (2)**<br>45:2,8<br>**possible (1)**<br>110:10<br>**possibly (1)**<br>61:16<br>**post- (1)**<br>18:23<br>**Post-bankruptcy (2)**<br>27:10,15<br>**post-confirmation (1)**<br>94:12<br>**post-petition (2)**<br>22:8;79:17;84:18<br>**potentially (1)**<br>55:16<br>**POTTER (1)**<br>8:2<br>**power (1)**<br>27:17<br>**powers (2)**<br>79:1;98:17<br>**practice (14)**<br>13:10;46:18;73:2,<br>3,6,7;85:14;87:15,<br>19;88:1;89:5;<br>102:14;105:17;<br>106:20<br>**practiced (1)**<br>102:14<br>**pre- (1)**<br>22:7<br>**preceded (1)**<br>83:9<br>**predetermination (2)**<br>54:7,8 | **predetermine (1)**<br>44:3<br>**predominant (1)**<br>108:23<br>**preference (1)**<br>106:8<br>**pre-judge (1)**<br>101:5<br>**prejudice (2)**<br>54:6,8<br>**prejudicial (1)**<br>97:17<br>**preliminary (1)**<br>69:9<br>**prepared (4)**<br>38:3,3;75:23;<br>105:12<br>**pre-petition (2)**<br>78:24;83:7<br>**preponderance (4)**<br>61:22;62:18;<br>107:4;110:6<br>**Pres (1)**<br>9:7<br>**presen (1)**<br>60:15<br>**PRESENT (1)**<br>9:2<br>**presentation (3)**<br>60:17;77:6;98:14<br>**presented (1)**<br>50:19<br>**presents (2)**<br>42:12;59:1<br>**preside (1)**<br>79:15<br>**president (5)**<br>12:25;25:1,19;<br>26:10,13<br>**presumption (5)**<br>83:20;105:22;<br>106:10,14;107:5<br>**pretext (1)**<br>78:10<br>**pretty (1)**<br>93:21<br>**previous (3)**<br>79:18;87:8;109:10<br>**previously (4)**<br>16:5;34:10;56:13;<br>68:14<br>**primarily (3)**<br>22:21;84:6;102:14<br>**primary (2)**<br>94:15;97:9<br>**prime (2)**<br>15:18,23<br>**principal (4)**<br>15:16,24;50:12;<br>110:3<br>**principals (1)**<br>13:20<br>**prior (11)** | 13:18,19;18:2;<br>21:13;32:21;43:25;<br>62:2;64:3;92:23;<br>97:15;110:11<br>**private (4)**<br>16:11;17:7;86:13;<br>91:5<br>**Private-equity (3)**<br>28:17;92:20;93:5<br>**privilege (1)**<br>73:20<br>**proactively (1)**<br>78:25<br>**probability (2)**<br>44:4;47:14<br>**probably (7)**<br>40:14;57:3;61:12;<br>64:4,16;65:6;71:4<br>**probative (1)**<br>38:17<br>**problem (2)**<br>111:5;113:6<br>**problematic (1)**<br>106:23<br>**procedurally (1)**<br>33:14<br>**procedures (2)**<br>46:4;89:12<br>**proceed (11)**<br>10:15;11:6,8,11;<br>12:20;21:6;22:2;<br>24:6;41:11;78:15;<br>100:7<br>**proceeding (11)**<br>42:22;45:14;<br>46:25;49:6,19;<br>50:10;51:2;58:16;<br>83:9;90:23;107:21<br>**proceedings (3)**<br>15:15;102:22;<br>114:3<br>**process (5)**<br>16:25;27:5;58:17;<br>81:18;106:12<br>**produced (1)**<br>96:21<br>**professional (3)**<br>13:2;112:19,20<br>**professionals (8)**<br>50:25;52:18;<br>82:21,22;87:12,14;<br>111:5;113:5<br>**proffer (15)**<br>11:6;12:21;18:25;<br>22:11,13;30:18;<br>31:16,22,25;33:10,<br>11;41:22;42:6;<br>44:10;53:7<br>**proffered (1)**<br>75:1<br>**promise (1)**<br>34:3;61:1<br>**promoted (2)** | 24:14;26:10<br>**promotion (1)**<br>26:12<br>**proof (3)**<br>61:22;62:16,17<br>**proofs (1)**<br>89:11<br>**proper (5)**<br>39:8;44:10;78:13;<br>80:2,21<br>**proponent (1)**<br>38:19<br>**proposed (3)**<br>10:22;12:24;20:23<br>**proprietary (3)**<br>14:21;65:3,6<br>**propriety (1)**<br>84:18<br>**prosecuted (1)**<br>98:4<br>**protecting (1)**<br>71:1<br>**protocol (1)**<br>79:4<br>**protocols (5)**<br>18:18;96:17;<br>112:2,5,17<br>**provide (8)**<br>18:14;49:24;53:7;<br>67:8;84:15;86:24;<br>92:22;93:16<br>**provided (7)**<br>16:5;18:15;34:10;<br>36:11;66:21;92:21;<br>96:20<br>**provides (5)**<br>15:2;17:3;35:14;<br>38:13;91:18<br>**providing (2)**<br>39:3;67:6<br>**provision (4)**<br>22:11,16;94:16,20<br>**provisions (1)**<br>94:14<br>**proximity (3)**<br>82:1;84:4;85:21<br>**prudent (1)**<br>100:6<br>**public (3)**<br>39:6;86:11;92:18<br>**Public-relations (1)**<br>28:15<br>**published (5)**<br>41:17;43:24;<br>54:14,19,22<br>**Puerto (1)**<br>46:25<br>**purely (1)**<br>93:21<br>**purportedly (1)**<br>48:10<br>**purposes (3)**<br>40:20,23;62:14 | **pursing (1)**<br>17:25<br>**pursuant (2)**<br>16:6;64:8;66:22<br>**pursue (1)**<br>84:18<br>**put (16)**<br>17:21;31:13,15;<br>33:3,4,6,22;38:25;<br>40:9;43:24;49:3;<br>68:8;95:5,13;<br>101:11;113:20<br>**PWS (1)**<br>81:15<br><br>---**Q**---<br><br>**qualify (1)**<br>35:3<br>**quick (6)**<br>62:12,21;63:25;<br>73:16;91:11;103:11<br>**quickly (6)**<br>61:19;73:1;75:15;<br>99:10;110:10,23<br>**quite (2)**<br>50:10;104:11<br><br>---**R**---<br><br>**Raise (2)**<br>19:11;23:21<br>**raised (3)**<br>54:1;75:25;111:19<br>**RAKHEE (2)**<br>8:19;60:3<br>**random (4)**<br>46:4;47:13;<br>102:12,16<br>**randomly (2)**<br>46:19,21<br>**rate (1)**<br>94:9<br>**rather (6)**<br>78:13;87:3;98:22;<br>104:15;110:20,23<br>**re (4)**<br>13:6,7,8,8<br>**read (5)**<br>61:12;64:2;73:16;<br>91:23;94:15<br>**ready (1)**<br>113:22<br>**Real (11)**<br>32:17;52:20;<br>62:15;67:6;76:22;<br>77:2,21;89:8;92:6;<br>97:14;108:17<br>**real-estate (3)**<br>17:8;86:7,22<br>**reality (5)**<br>63:5;88:2;89:4;<br>105:16;106:20 |

015491

**realized (1)**
40:18
**really (35)**
33:25;48:3;62:2,
19;63:1,8,20;64:3,
10,15;65:5,9,11;
67:13;68:8;69:22;
70:2;73:12;76:12;
77:6,20;87:23,25;
90:1;95:22,24;96:9;
104:11;105:16,18;
106:11;107:21;
108:18;111:5;
112:20
**reason (9)**
22:23;39:7;70:8;
77:12,21;78:13;
87:3;97:1,20
**reasonable (1)**
38:19
**reasoned (2)**
81:21;83:19
**reasons (8)**
11:3;39:13;47:18;
75:1;87:8;98:25;
111:19;113:19
**rebuts (1)**
32:2
**rebuttal (4)**
25:7;31:16;42:6;
50:11
**rebutted (2)**
42:2,10
**rebutting (3)**
25:8;33:6,21
**recall (3)**
26:7;30:20;34:15
**received (3)**
12:19;37:21;40:22
**receives (1)**
14:25
**recess (6)**
41:4,6,8;75:6,8;
105:8
**recognized (1)**
78:23
**recognizes (1)**
50:18
**recommendation (2)**
94:7,8
**recommended (1)**
26:12
**record (29)**
19:14;23:24;25:7;
39:6;41:2,16,17,19;
42:7,8;43:24;46:15;
49:16,24,25;51:2;
54:13;59:12;60:2;
74:18;82:13;90:18,
23;93:22;96:1,5,7;
99:15;113:19
**records (1)**
14:6

**record's (1)**
41:3
**recusal (1)**
48:24
**red (2)**
58:14;99:18
**Redeemer (4)**
7:8,23;83:6,9
**redirect (1)**
23:4
**reduce (1)**
92:12
**reducing (1)**
22:22
**refer (3)**
11:18,19;64:23
**reference (6)**
43:14,15;60:4,15;
62:14;82:11
**referenced (6)**
36:9;61:20;66:17;
68:3;69:25;70:24
**references (1)**
68:18
**referred (4)**
44:10;52:6;54:18;
101:20
**reflect (4)**
88:1;93:22;
105:16,18
**regard (6)**
18:8;34:7;40:7,19;
90:20;109:13
**regarding (11)**
18:23;22:11;38:8;
55:5;56:21;78:6;
84:23;94:14;99:17;
100:4,24
**regional (1)**
86:8
**registered (1)**
15:5
**Reid (6)**
10:24;19:7,19,19;
20:2;21:1
**relate (1)**
112:6
**related (11)**
14:22;15:7;31:19;
44:9;65:19;72:25;
76:11;80:12;83:1;
85:21;94:22
**relationship (4)**
18:2;64:2;77:1;
92:4
**relative (1)**
49:14
**relatively (2)**
66:24;71:23
**Relevance (7)**
38:9;39:9;40:8,8;
50:21;53:12;91:15
**relevant (13)**

34:20;39:22;40:9,
10;57:14,21;76:13;
88:8;92:25;94:10;
95:23;96:11;99:20
**reliability (1)**
40:7
**relied (1)**
77:11
**relief (2)**
52:9;84:22
**rely (4)**
41:14;80:10,22;
95:24
**remain (3)**
19:9;23:17;24:4
**remaining (1)**
17:1
**remarks (2)**
57:14;75:24
**remember (5)**
22:4,12;24:22;
25:18;30:8
**remind (1)**
100:3
**remiss (1)**
101:13
**remote (1)**
45:9
**remotely (1)**
61:16
**rendered (1)**
17:14
**reorganization (3)**
44:12;84:9;109:7
**repeat (3)**
57:22;61:10;102:6
**repeated (1)**
67:15
**repeating (1)**
61:13
**replies (1)**
62:23
**reply (5)**
31:24;39:16;
42:20;54:13;99:7
**report (8)**
20:23;26:15,22,
25;27:10,15;28:21;
97:7
**reported (2)**
26:20;84:11
**reporting (1)**
97:2
**reports (3)**
28:25;58:4,7
**represent (2)**
66:8;92:11
**representative (3)**
15:13;82:3;84:13
**representatives (2)**
84:16;85:9
**represented (3)**
37:15;43:12;63:6

**representing (2)**
10:10;63:1
**reprimand (1)**
31:11
**request (2)**
43:2;98:25
**requested (2)**
14:8;84:22
**requesting (1)**
38:21
**require (1)**
50:15
**required (3)**
48:23,23;84:15
**requirement (1)**
76:4
**reserve (1)**
21:1
**reserved (2)**
21:24;33:11
**residual (1)**
38:12
**resignation (1)**
66:3
**Resources (5)**
28:8;45:4,11;52:5;
103:4
**respect (43)**
16:22;17:25;18:3;
20:19;22:9;38:3,3;
41:20,22;42:8;
49:21;53:19;54:5;
57:21;58:24;59:5;
63:8,13;64:1,4,11;
65:8;66:12,14,18;
67:6,2,22,23,24;68:6,
6,8,19;70:17,19;
72:14;83:22;86:22;
94:13;102:8;103:12;
104:10,17
**respectfully (1)**
59:1;98:25
**respond (1)**
40:1
**responding (1)**
108:1
**responses (1)**
62:22
**responsibility (2)**
17:25;97:9
**rest (1)**
113:4
**restaurant (2)**
89:22;99:12
**Restaurants (3)**
81:4;83:19;89:16
**restructure (6)**
18:11;70:4,7;
104:23;105:2,3
**restructuring (11)**
12:24;13:2,3,5,25;
18:1;70:2;79:1;87:2,
4;92:22

**result (5)**
45:6;53:17,19;
91:16;109:5
**retail (2)**
17:8;28:8
**retain (3)**
13:16;88:14;
111:10
**retained (3)**
84:7;85:17;113:5
**retaining (1)**
112:19
**retention (3)**
21:12;68:20;
113:11
**retire (1)**
47:5
**retreads (1)**
87:8
**return (1)**
44:12
**returned (1)**
44:16
**revenue (5)**
17:4,6;65:18,19;
92:12
**revenues (2)**
17:2;92:18
**reversed (1)**
74:15
**review (2)**
50:16,24
**reviewed (2)**
34:12,14
**reviewing (1)**
14:5
**Rican (1)**
46:25
**right (71)**
12:16,20;19:1,11;
21:24;22:8,17,20;
23:7,15,21;24:12,17,
19;25:2,5,20;26:1,
11,15,20,23;27:2,10,
18;28:2,8,13,17;
29:1,8,11,14,21;
30:1,4,23,24;31:3,6,
9,10;32:7,13;33:12,
13,21;34:5,12;35:14;
36:4,23;37:14;40:5;
41:1,3;47:16;48:14;
71:16;75:5,20;88:5;
92:17;101:10;105:5,
7,21;110:11,12;
113:11;114:2
**rights (2)**
21:1;109:7
**Rio (1)**
15:9
**rise (3)**
10:2;75:9;105:9
**risk-management (3)**
28:24,25;30:5

Appx. 02939
015492

Case 19-34054-sgj11 Doc 3596-22 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 22 Filed 03/25/25 Page 814 of 1017 PageID 16475

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                December 2, 2019

robe (1)
75:16
rocket (1)
67:6
ROGGE (1)
8:7
role (2)
13:25;85:18
ROME (2)
6:14;59:13
room (1)
86:25
ROSENTHAL (1)
7:4
ROTH (1)
8:12
routinely (1)
87:15
Rule (13)
38:12,13;39:6,7;
44:1,4;46:16;52:25;
73:8;78:3,12;
105:12;111:16
ruled (3)
56:13;94:20;
113:14
rules (6)
48:1;90:17;
100:24,25;101:5;
108:14
ruling (4)
45:12;56:21;
60:16;112:23
rulings (4)
56:6,7;62:2;74:9
run (5)
32:4;51:15;78:11;
99:9;107:24
run-up (1)
58:12
RYAN (1)
8:4

## S

sales (1)
70:1
Same (8)
27:11;29:6,9;50:3,
12;91:9;93:21;
104:25
satisfying (1)
98:12
save (2)
59:18;110:20
saying (6)
40:18,19;70:12;
76:14;83:24;96:1
scattered (2)
108:25,25
scenario (3)
72:3;74:9,15
schedules (2)

43:7;69:21
SCHULTE (1)
8:12
science (1)
67:6
scope (4)
21:15,21;27:12;
32:23
scorecard (1)
62:3
scrutiny (1)
96:14
seal (1)
11:19
SEAN (2)
6:4;10:25
seated (5)
10:3;24:3;41:9;
75:10;105:10
SEC (1)
67:2
Second (7)
43:21;44:15;
54:12;55:6;69:8;
76:7;107:11
secured (6)
15:23,24;68:4;
82:9,12,14
Securities (3)
7:14;15:23;92:19
seeing (1)
107:19
seek (2)
94:13;95:11
seeking (3)
25:10;44:11;45:3
seeks (1)
53:16
seems (2)
45:21;55:19
sees (1)
74:11
send (1)
110:25
senior (2)
13:20;24:12
sense (3)
33:17;46:21;64:19
sent (3)
55:10;57:3;74:2
Seoul (1)
15:9
separate (3)
65:21,22;85:15
separateness (1)
98:9
series (2)
77:11;109:24
serves (2)
16:23;17:23
service (1)
92:21
services (26)

15:3;16:3,6;17:13;
22:12,16,16;34:4,9,
17;35:19,21;54:15;
65:13;66:7,10,15,16,
19,22;67:4;86:12;
91:4,19;92:14;93:19
set (6)
18:18;39:3;42:12;
68:3,20;113:19
sets (1)
80:22
setting (2)
62:13;112:21
seven (3)
35:13;82:18;
103:17
seventy (1)
29:13
several (6)
26:6;49:22;51:22;
53:22;91:21;110:22
Shannon (2)
13:7,8
shared (12)
15:3;16:6;18:21;
22:12,16;34:9;
35:21;66:7,16,19;
67:4;86:12
shared- (1)
34:16
shared-service (1)
16:10,15;93:11,17
shared-services (5)
34:12;35:12;
66:23,24;94:4
SHARP (32)
9:7;10:12;11:25;
12:23;19:8,15,22;
20:3;21:9;27:10,17;
31:17;41:22;44:10;
50:6,11;53:6,15;
54:17;78:25;79:3;
84:7,9,17,21;85:1;
93:16;94:2,7;95:3;
97:1;113:1
S-H-A-R-P (1)
19:16
Sharp's (4)
18:25;42:10;50:5;
84:13
SHAW (21)
8:9;21:4,4,6,8;
22:3,4;23:2;32:17,
19,24;33:2,9,20,23;
34:3,6,20;35:24;
61:8;63:11
sheer (1)
95:24
sheet (2)
18:12;93:7
shifts (1)
62:18
shopping (2)

56:11;106:19
short (6)
11:6;41:4,6;58:14;
75:5,6
shortly (3)
45:4;66:3,4
shot (4)
33:17;98:23,24;
109:6
show (1)
77:4
showed (1)
57:17
shown (1)
55:14
shows (2)
53:11;57:17
shrink (1)
17:4
sic (13)
25:13;41:16;42:9,
20;43:13;47:23;
49:19;59:11;60:8;
68:21;75:23;96:6;
101:23
side (3)
62:1;64:11;109:17
sides (2)
56:5;64:5
Sidley (3)
10:21;41:13;113:4
sign (1)
113:13
signed (4)
63:17,18;110:9;
113:23
significant (22)
43:7,19;57:18;
63:21;70:3,8,9,16;
74:20;78:20;80:17;
85:1;86:8,17;97:21;
98:3;102:20;103:22;
104:1,21;109:13,18
significantly (4)
22:10;77:5;85:18;
96:22
silence (1)
109:17
silent (1)
109:13
silly (1)
88:12
similar (3)
35:23;54:20;104:2
similarly (5)
71:24;78:15;81:7;
85:17;104:17
simpler (1)
113:18
simply (9)
46:10;54:10;63:4;
84:2;100:8,15;
103:19;109:12;

112:19
Singapore (8)
15:9,11;20:18,20;
86:15;93:5;104:4,7
single (5)
26:7;42:22;43:16;
72:18;99:15
single-asset (1)
86:7
sit (5)
32:5;33:25;45:19;
59:8;101:25
sits (4)
34:23;35:1;83:23,
23
sitting (1)
100:20
situated (2)
71:24;104:18
situation (4)
48:4,10;51:8;
108:17
situations (1)
49:3
six (6)
27:22;56:8;81:2;
84:24;107:12;
111:23
sliver (1)
92:24
small (2)
86:7;92:24
smart (2)
89:18;100:5
sole (2)
26:7;55:7
solution (1)
109:6
somebody (1)
47:21
somehow (4)
73:18;74:8;
105:22;106:22
someone (1)
75:12
someone's (1)
48:3
sometimes (1)
73:10
somewhat (1)
104:2
soon (2)
110:9;113:22
sophisticated (3)
14:18;91:7;105:25
sorry (11)
12:3,13;41:9;
45:23;46:1;60:9;
71:4,11;73:23;
89:19;103:9
sort (16)
46:16;48:25;55:4;
62:16;63:21;65:4;

015493

Case 19-34054-sgj11   Doc 3596-22   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-10   Filed 10/16/25   Page 815 of 1017   PageID 16476
Exhibit 22 Page 136 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                December 2, 2019

67:8,12;68:8,18;
70:21,22;73:11;74:5,
14;77:7
**sought (1)**
  18:19
**sources (1)**
  15:1
**South (2)**
  14:22;15:11
**speak (1)**
  35:22
**SPEAKER (4)**
  19:3,5;41:7;
  109:20
**speaking (1)**
  91:1
**special (2)**
  46:8;95:12
**specialist (1)**
  27:6
**Specialists (3)**
  9:7,9;12:25
**specific (8)**
  40:19;73:8;90:19,
  23;96:4,5;104:15;
  107:20
**specifically (1)**
  35:10
**specifics (1)**
  54:25
**speculating (1)**
  45:1
**speed (2)**
  49:15;91:12
**spell (2)**
  19:13;23:23
**spend (4)**
  54:11,12;58:22;
  90:1
**spent (4)**
  14:4;76:22;88:9;
  103:3
**sponte (1)**
  69:7
**stack (5)**
  63:22;68:2,10;
  69:12,14
**stacks (1)**
  60:6
**staff (2)**
  103:8,9
**staff's (1)**
  74:17
**Stamford (1)**
  83:18
**stand (6)**
  19:9,10;23:13,16;
  48:9;63:11
**standard (4)**
  35:20;80:23;
  81:24;110:6
**standards (1)**
  87:24

**standing (4)**
  19:9;23:17;31:8;
  61:3
**standpoint (1)**
  106:23
**Stang (6)**
  10:6;11:15;13:14,
  21;21:19;75:22
**STARGATT (1)**
  6:2
**start (5)**
  41:4;50:15;78:23;
  97:11;113:23
**started (3)**
  24:12;29:8;76:14
**State (11)**
  15:25;19:13;
  23:23;64:6;70:25;
  71:5,10;81:16,17,18;
  95:6
**stated (2)**
  40:23;81:7
**statement (7)**
  38:13,14,17;
  39:22;76:1;102:9,11
**statements (3)**
  43:8;84:1;90:7,7;
  104:6
**States (4)**
  14:22;15:16;
  30:20;86:14
**state's (1)**
  71:8
**status (2)**
  52:10;53:13
**statute (1)**
  64:12
**statutory (1)**
  79:24
**stay (2)**
  19:23;111:6
**stayed (1)**
  109:13
**stemmed (1)**
  72:17
**step (4)**
  19:10;23:7;36:5;
  106:21
**steps (1)**
  55:18
**stick (2)**
  33:21;108:14
**still (8)**
  26:22;32:4;50:8;
  57:19;58:6;66:11;
  69:19;97:2
**stock (1)**
  86:11
**stood (1)**
  93:20
**Stoops (1)**
  31:6
**Strand (7)**

14:12,13;25:5,17,
20;51:14;80:8
**Strand's (1)**
  51:14
**strategic (1)**
  18:7
**strategy (1)**
  101:21
**strayed (2)**
  77:7,12
**stress (1)**
  95:20
**strike (1)**
  51:4
**strikes (1)**
  74:11
**striking (1)**
  109:10
**strong (6)**
  47:19;56:23;
  83:20;105:22;
  106:10;107:5
**stronger (1)**
  57:5
**strongly (2)**
  81:6,20
**structure (15)**
  16:10;25:14;
  31:19;32:3;54:12;
  64:12;66:20;67:13;
  80:14;91:17;95:4,4,
  15;97:3;100:21
**structured (1)**
  92:9
**structured-credit (1)**
  103:15
**stuck (1)**
  109:3
**study (1)**
  91:11
**stuff (4)**
  67:1,5;92:2;
  111:24
**sua (1)**
  69:7
**subadvises (1)**
  16:24
**subadvisory (12)**
  16:6,10,15;22:12,
  16;34:9,13,17;35:12;
  54:16;66:23,25
**subcontracted (1)**
  54:15
**subject (9)**
  11:19;17:16,23;
  44:18,19;46:3;79:4;
  103:22;111:8
**submanager (1)**
  16:5
**submit (6)**
  66:13;74:24;
  81:23;103:25;104:4;
  113:17

**submitted (1)**
  28:2
**subpieces (1)**
  66:8
**sub-plans (1)**
  74:6
**subpoenaed (1)**
  85:25
**subscribe (1)**
  81:8
**subset (1)**
  50:4
**subsidiary (2)**
  30:25;31:1
**substantial (4)**
  17:11;81:9;84:23;
  96:21
**substantially (3)**
  18:14;83:21;85:23
**substantive (1)**
  73:13
**subsumed (1)**
  62:16
**subtopics (1)**
  64:21
**succeed (1)**
  98:4
**succeeded (2)**
  76:10;87:20
**success (1)**
  78:16
**successful (3)**
  44:21;105:1,3
**sufficient (2)**
  38:14;39:2
**suggested (1)**
  100:19
**suite (3)**
  108:20;110:2;
  113:8
**suited (1)**
  65:7
**suites (1)**
  107:15
**sum (1)**
  58:23
**summarize (1)**
  66:20
**support (13)**
  33:4;46:16;52:3;
  53:24;56:21;59:9;
  77:13;81:25;82:7;
  84:22;87:22;98:7;
  100:1
**supported (4)**
  38:14;42:25;57:2;
  99:14
**supporters (1)**
  41:5
**supporting (6)**
  17:19;42:23;
  55:12;77:9;99:15,16
**supports (4)**

38:23;43:18;
51:10;98:8
**suppose (1)**
  44:3
**supposed (1)**
  25:7
**sure (9)**
  25:11;27:21;
  34:14;56:12;57:9;
  58:25;68:23;82:21;
  91:22
**surprising (1)**
  43:2
**surrounding (2)**
  79:8;93:4
**survive (1)**
  94:20
**survived (1)**
  94:17
**switch (1)**
  59:25
**switching (1)**
  106:17

―――――――――

**T**

**table (3)**
  10:8;62:13;79:10
**talk (3)**
  21:18;42:17,19;
  46:10,11;64:21;
  101:13
**talked (1)**
  53:18
**talking (5)**
  40:17;55:22;
  88:10;101:1,4
**tangentially (2)**
  40:9;61:17
**targeted (1)**
  15:10
**tasked (1)**
  112:1
**tax (1)**
  28:7
**TAYLOR (1)**
  6:2
**team (23)**
  14:8;20:7,14,16,
  16,18;28:6,10,13,15,
  17,19,24,25,25;
  29:21;30:5;31:5;
  32:8;50:13;61:11;
  111:23;112:8
**teams (2)**
  28:4,10
**teasing (1)**
  46:13
**technicalities (1)**
  22:1
**technology (1)**
  88:7
**TELEPHONICALLY (8)**

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

6:22,23;7:15,16,
17,18,19;8:14
**telling (2)**
60:6;70:17
**template (4)**
35:20;67:14,23;
93:20
**ten (4)**
17:3;72:18;92:11,
17
**tenet (2)**
62:7;81:16
**terminate (4)**
17:24;27:2,17;
97:3
**terminated (1)**
16:7
**terminates (1)**
97:4
**terms (8)**
43:9;54:24;57:25;
101:3,10;102:12;
103:24;112:22
**TERRI (1)**
7:10
**Terry (3)**
17:22;44:13;83:1
**test (3)**
62:7;80:23;105:18
**testified (8)**
22:11;27:3;34:22,
25;50:10,11;85:2;
93:17
**testify (42)**
12:1,1,23,23;13:1,
5,10,13,17,20,23;
14:3,6,10,14,17,24;
15:2,6,10,12,15,21;
16:2,9,13,20;17:5,
10,14,18,23;18:4,13,
16,19,22;23:13;53:6;
84:12;85:5,8
**testimonies (1)**
55:7
**testimony (22)**
18:14,25;42:2,10;
50:5;53:8;57:17;
58:4,6;84:13,15,21;
90:22;93:13,14,16;
95:2,2,21,23;101:8;
104:9
**Texas (59)**
11:3;17:18,20;
18:3;22:24;29:1,3,6,
12;32:4;39:1;40:10;
43:1;45:14,23;46:5,
9,17;51:21;53:1;
56:6,8;57:2,3;63:9,
10,11,17;70:13,18;
72:4,9;73:6;76:2;
82:19,25;85:3,7,23,
25;86:4,4,5;87:3,11,
13;89:25;90:3,4;

98:20,24;102:13,23;
103:1,8;107:12;
108:4,5;109:8
**Texas-based (2)**
89:17,22
**thankfully (1)**
57:3
**that'll (2)**
94:9;113:20
**theoretically (1)**
27:8
**theories (1)**
78:18
**therefore (5)**
44:16;45:7;57:20,
24;67:24
**thinking (3)**
65:7;67:1;111:6
**third (5)**
16:17;44:7;53:14;
69:8;92:21
**thirty (1)**
43:14
**though (4)**
49:2;57:5;65:11;
98:16
**thought (3)**
23:15;55:4;109:18
**thousand (1)**
51:23
**three (13)**
24:21,23;32:5;
46:23;53:12;62:3,3,
7;65:2;72:22,23;
74:6;77:10
**throughout (4)**
67:15;69:2;86:14;
100:14
**throw (1)**
56:19
**thrown (1)**
67:20
**thus (1)**
96:17
**tie (1)**
110:2
**times (1)**
87:25
**title (3)**
24:17,19;25:18
**today (27)**
10:7,15,23;15:13;
18:19;24:17;33:11;
34:7;35:1;45:19;
48:9;58:19;61:6;
68:21;75:13;82:20;
85:6,11,19;89:6;
94:24;101:10;
110:18,19,20;
111:16;112:9
**today's (1)**
84:20
**told (3)**

69:18;77:21,25
**took (2)**
85:18;98:23
**top (2)**
83:5;100:21
**top-twenty (1)**
50:24
**total (1)**
17:13
**totality (1)**
38:15
**touch (3)**
53:25;57:12;73:1,
15
**touching (1)**
61:19
**tough (1)**
52:15
**trades (1)**
67:2
**trading (6)**
28:19,25;65:3,4,6;
92:18
**traditional (3)**
21:16,22;53:23
**transaction (1)**
101:21
**transactions (8)**
18:1;58:11;69:12;
79:4;84:18;101:17;
112:4,5
**transfer (47)**
11:2;39:10;42:13,
25;43:2;51:10;52:4,
7;53:24;55:11;
56:23;59:2;61:18;
62:11,25;63:20;64:8,
16,16;68:24,25;69:4;
71:23;73:10;76:5;
78:13;80:24;81:6,20,
25;82:8,16;83:21,21;
90:13;95:19;98:8,
19;102:21;103:23;
104:24;105:12,15;
106:16;107:3;
109:11;110:9
**transfer- (1)**
71:24
**transferee (1)**
39:10
**transfer-of-venue (1)**
77:14
**transferred (16)**
13:15;40:11;
45:22;47:20;68:12,
15;72:18;74:22,25;
76:5;77:17;85:20;
102:25;103:5;
110:24;113:19
**transferring (2)**
51:5;97:13
**transfers (2)**
69:12;87:22;92:4

**transition (1)**
26:19
**transparency (2)**
79:5;101:17
**transparent (3)**
18:19;78:14;79:11
**transpired (1)**
63:13
**trash (1)**
37:2
**travel (7)**
13:12,13;53:15;
83:3;85:3,10;88:8
**treasurer (1)**
66:2
**tremendous (4)**
49:16;54:5;108:6;
111:22
**trial (1)**
60:11
**trials (1)**
108:7
**tries (1)**
57:15
**trip (1)**
52:16
**trouble (2)**
88:25;113:21
**true (10)**
22:19,19;28:19,
22;29:19;30:11;
85:14;89:10;97:23;
100:15
**truly (1)**
51:7
**trustee (9)**
13:3;66:5;77:24;
78:1,11;96:11,13;
98:19,22
**Trustee's (1)**
97:6
**trustworthiness (1)**
38:15
**trustworthy (1)**
38:25
**truth (1)**
39:23
**try (2)**
24:3;60:25
**trying (8)**
45:10;48:9;54:2,3;
75:11,12;96:6;
101:16
**TUNNELL (1)**
7:22
**turn (3)**
18:10;41:5;68:17
**turning (2)**
68:2;107:5
**twenty (5)**
51:19;57:4;69:19;
82:18;83:5
**twenty-five (1)**

13:2
**two (28)**
17:19;47:7,24;
53:12;62:4;65:12;
66:1,2,22;68:4,7;
69:17;72:2,24;
73:10;78:18;82:9,20,
25;83:5;88:9,17;
93:23,24;97:22;
101:7;103:17;
108:18,23
**two-and-a- (1)**
14:24
**Twomey (1)**
10:23
**type (8)**
54:3,3;67:5;91:1;
93:17,18;101:4,16
**types (2)**
16:11;89:13
**typical (3)**
35:16;61:18;67:5
**typically (2)**
86:6;88:20

---

## U

**UBS (5)**
7:14,14;83:11;
107:12,13
**ultimately (4)**
72:18;74:4;94:20;
104:22
**umbrage (2)**
105:20,20
**Um-hum (1)**
47:1
**unaffiliated (2)**
15:4;16:17
**unanimously (1)**
42:25
**unclear (1)**
40:20
**uncontested (1)**
41:15
**uncontroverted (6)**
41:15;42:8,13;
84:14;92:10;100:1
**un-cooperation (1)**
96:24
**under (22)**
14:11,13,20,25;
20:23;35:13;38:16;
39:5;44:1,13;46:4;
52:25;67:21;70:25;
71:8;98:13;103:17,
18;106:6;112:1,1;
113:17
**underlying (1)**
17:1
**underneath (2)**
44:16;75:17
**understood (2)**

Appx. 02938
015495

Case 19-34054-sgj11    Doc 3596-22    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 55-10    Filed 05/30/25    Page 817 of 1017    PageID 16478
Exhibit 22    Page 136 of 139

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                December 2, 2019

33:12,20
**unduly (1)**
  97:16
**unfortunately (2)**
  58:1,10
**unheard (1)**
  102:17
**UNIDENTIFIED (4)**
  19:3,5;41:7;
  109:20
**unique (18)**
  42:12,17;49:3;
  51:4;52:23;53:22;
  59:2;61:13,14,15;
  63:16;70:14,15;
  71:22;78:10;106:2;
  107:23;110:1
**United (4)**
  14:22;15:16;
  30:20;86:14
**Unless (2)**
  59:7;101:25
**unliquidated (2)**
  17:11;83:12
**unobjected-to (2)**
  36:10,12
**unrelated (2)**
  82:12;88:18
**Unsecured (9)**
  6:3;10:22;43:12;
  51:20;82:17;83:5;
  98:5;100:20,22
**unsecureds (2)**
  69:15,17
**unsophisticated (1)**
  83:2
**untold (1)**
  74:16
**up (24)**
  19:10;28:6,21,25;
  43:9;46:11;47:14;
  49:15;50:24;57:3;
  58:23;59:15,17;60:6,
  7;67:17,19;72:20;
  85:19;93:20;94:7;
  101:9;109:9;113:3
**upload (1)**
  113:22
**upon (2)**
  33:10;39:5
**upped (2)**
  49:14;50:16
**up-to- (1)**
  91:11
**upwards (1)**
  69:17
**use (2)**
  45:10;86:24
**used (4)**
  30:5,5;83:15;
  110:25
**useless (1)**
  62:8

**Usually (6)**
  30:1;71:22;73:11;
  75:14;82:22;107:24
**utmost (1)**
  58:24

### V

**valuable (1)**
  103:22
**Valuation (2)**
  28:7;86:23
**value (3)**
  18:5,12;87:1
**Variant (1)**
  13:6
**variety (4)**
  15:4;86:11;91:22;
  92:19
**various (9)**
  14:5,21;16:4;
  17:11;34:18;56:21;
  72:4;77:9;95:3
**varying (1)**
  50:20
**vast (3)**
  43:9,11;80:4
**vastly (1)**
  68:7
**venture (3)**
  61:15;74:14,21
**venue (71)**
  10:16;11:1,2,2,20;
  23:11,14;39:20;
  41:15,20;42:9,13,16,
  24,25;43:4,18;44:2,
  5,19,20,24;45:9;
  51:5,11;52:4,7;
  53:24;54:1;55:12,
  20;56:22;57:2;58:2,
  3;59:3;61:18;62:16,
  25;63:20;64:6;
  71:23;76:13;77:9,
  17;78:13;79:22;
  80:2,21,24;81:20;
  82:4,8,16;83:20;
  95:19;98:8,13,23;
  99:14,16;100:23;
  101:11,24;105:12,
  16;106:5,16;107:3;
  109:11,16
**venue-transfer (2)**
  76:19;100:1
**veracity (1)**
  97:12
**version (1)**
  94:17
**versus (2)**
  62:3,4
**veteran (1)**
  19:22
**view (6)**
  53:9;55:14;64:10;

96:7;99:19;113:11
**views (2)**
  78:6;112:22
**virtually (3)**
  73:19;80:13;81:12
**vital (1)**
  111:15
**volume (2)**
  70:16;95:24
**voluminous (1)**
  74:18
**voted (1)**
  104:24
**votes (1)**
  70:18
**voting (2)**
  70:10;110:4

### W

**walk (3)**
  41:6;51:5;79:24
**Walsh (1)**
  81:15
**wants (1)**
  78:15
**warmer (2)**
  75:11,11
**warrant (1)**
  42:13
**warring (1)**
  47:24
**WATERHOUSE (24)**
  9:5;10:11;23:13,
  15,25;24:9;25:16;
  27:22;32:12,20;
  33:12;36:5;42:2;
  50:10;51:11;54:17;
  64:25;66:2;68:4,11,
  17;69:15;85:5;93:15
**W-A-T-E-R-H-O-U-S-E (1)**
  24:1
**Waterhouse's (2)**
  65:1;104:9
**WATKINS (1)**
  7:13
**Watkins' (1)**
  83:15
**way (16)**
  11:11;31:18;40:9;
  55:2,2,6;77:16;
  86:25;87:17,17;
  95:9;102:24;107:21;
  109:1,3;110:15
**weakness (1)**
  80:1
**wealth (1)**
  14:7
**week (2)**
  27:4;29:23
**weekly (1)**
  31:8
**weeks (5)**

72:1;84:24;96:19;
  110:23;111:23
**weigh (3)**
  81:6,20;112:25
**weighed (1)**
  82:15
**weighs (2)**
  56:23;62:19
**weight (1)**
  57:11
**Welcome (4)**
  10:13;36:7;75:3;
  105:4
**well-founded (1)**
  39:14
**Wells (1)**
  107:13
**what's (10)**
  55:22;60:7;65:8;
  68:9;71:2;79:16;
  97:16;104:11,20;
  105:18
**whatsoever (1)**
  106:24
**Whereupon (1)**
  114:3
**whole (3)**
  62:23;83:23;98:2
**wholly (1)**
  44:15
**who's (2)**
  70:17;75:12
**wide (2)**
  62:10;86:11
**widely (1)**
  35:17
**WILLIAM (1)**
  6:11
**willingness (1)**
  89:1
**wind (1)**
  47:14
**WINSTEAD (1)**
  8:17
**wish (2)**
  19:2;57:10
**withheld (1)**
  14:9
**within (5)**
  39:7;72:1,2;
  102:21;111:18
**without (7)**
  12:16;37:18;54:6;
  60:6;79:17;89:13;
  91:12
**withstand (1)**
  96:14
**witness (18)**
  19:2,12,15,24;
  22:5;23:2,9,22,25;
  25:7;32:14,24;34:22,
  25;35:24;36:1,6;
  108:16

**witness-and-exhibit (1)**
  36:11
**witnesses (10)**
  21:23,25;85:11,22,
  23,25;91:22;96:21;
  97:13;99:24
**WL (1)**
  13:8
**Woodbridge (1)**
  13:7
**word (2)**
  105:21;106:18
**words (2)**
  90:5;102:23
**work (8)**
  18:7;29:13,17;
  30:22;108:6,7;
  111:22;112:5
**worked (4)**
  20:9;24:9;50:3;
  55:5;79:3
**working (2)**
  75:13;95:5
**world (4)**
  14:19;15:2;32:2;
  87:19
**worry (2)**
  59:4;83:3
**wrestle (2)**
  49:18;55:1
**wrestling (1)**
  54:11
**written (4)**
  40:16;49:22;
  76:21;81:1
**wrong (3)**
  46:24;71:9,14
**wrote (1)**
  91:23

### Y

**years (5)**
  13:2;24:21,23;
  56:3;57:4
**yield (1)**
  10:17
**yields (2)**
  53:17,19
**York (16)**
  15:20;20:14;30:6,
  7,7,10,15;42:1;
  82:10;83:10,14,15;
  86:16;99:17,21;
  107:13
**YOUNG (6)**
  6:2;10:24;85:17;
  100:4;111:6;112:15

### Z

**ZABEL (1)**
  8:12

015496

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                    December 2, 2019

**Ziehl (6)**
  10:6;11:15;13:14,
  21;21:19;75:22

## 1

**1 (7)**
  37:9,9,20;53:3;
  59:17;60:8;66:17
**1:45 (3)**
  105:5,6,6
**1:47 (1)**
  105:8
**10:48 (1)**
  41:8
**100,000 (1)**
  74:18
**1014 (1)**
  44:1
**11 (10)**
  17:21;45:13;
  78:23;80:3;86:24;
  97:10;98:19;105:16,
  19,25
**11:05 (1)**
  41:8
**11:50 (1)**
  75:8
**12 (2)**
  10:16;74:1
**12:00 (1)**
  75:8
**12:39 (1)**
  105:8
**1408 (1)**
  80:3
**1412 (3)**
  64:8;80:22;98:13
**15th (1)**
  60:21
**17 (2)**
  60:13;69:11
**18 (2)**
  37:9,20
**1979 (2)**
  81:3;87:25
**1998 (1)**
  81:15

## 2

**2 (5)**
  38:17;60:8,11;
  66:18;101:3
**2,000 (4)**
  51:24;53:3;67:18,
  20
**2:02 (1)**
  114:3
**2006 (3)**
  24:10;29:7,8
**2009 (3)**
  92:13;103:13,14

**2011 (2)**
  24:15;26:11
**2016 (1)**
  81:4
**2017 (1)**
  103:14
**2018 (5)**
  16:8,21;61:5;
  65:16;74:4
**2019 (4)**
  13:18;60:20,21;
  88:2
**24 (2)**
  37:11,21
**25 (2)**
  37:11,21
**26 (4)**
  39:15;40:23;
  59:17,25

## 3

**3 (2)**
  37:10,20
**30 (1)**
  15:21
**30th (1)**
  61:5
**31st (1)**
  60:20

## 4

**45 (1)**
  52:25

## 5

**5.2 (1)**
  16:1

## 7

**7 (1)**
  13:18
**7.5 (1)**
  15:3

## 8

**807 (1)**
  38:12

## 9

**9 (2)**
  37:10,21
**99.94 (1)**
  80:7

Appx. 02935
015497

# EXHIBIT 23

Appx. 02936
015498

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                    )    Case No. 19-34054-sgj-11
 3     In Re:                       )    Chapter 11
                                    )
 4     HIGHLAND CAPITAL             )    Dallas, Texas
       MANAGEMENT, L.P.,            )    January 9, 2020
 5                                  )    9:30 a.m. Docket
                                    )
 6            Debtor.               )
                                    )    DEBTOR'S MOTION TO COMPROMISE
 7                                  )    CONTROVERSY WITH OFFICIAL
                                    )    COMMITTEE OF UNSECURED
 8     _____)    CREDITORS [281]

 9                      TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                  UNITED STATES BANKRUPTCY JUDGE.

11     APPEARANCES:

12     For the Debtor:              Jeffrey N. Pomerantz
                                    PACHULSKI STANG ZIEHL & JONES, LLP
13                                  10100 Santa Monica Blvd.,
                                     13th Floor
14                                  Los Angeles, CA  90067-4003
                                    (310) 277-6910
15
       For the Debtors:            Ira D. Kharasch
16                                  PACHULSKI STANG ZIEHL & JONES, LLP
                                    10100 Santa Monica Blvd.,
17                                   13th Floor
                                    Los Angeles, CA  90067-4003
18                                  (310) 277-6910

19     For the Debtor:              John A. Morris
                                    PACHULSKI STANG ZIEHL & JONES, LLP
20                                  780 Third Avenue, 34th Floor
                                    New York, NY  10017-2024
21                                  (212) 561-7700

22     For the Debtors:            Melissa S. Hayward
                                    Zachery Z. Annable
23                                  HAYWARD & ASSOCIATES, PLLC
                                    10501 N. Central Expressway,
24                                   Suite 106
                                    Dallas, TX  75231
25                                  (972) 755-7104
```

2

```
 1    APPEARANCES, cont'd.

 2    For the Official Committee   Matthew A. Clemente
      of Unsecured Creditors:      Dennis M. Twomey
 3                                 SIDLEY AUSTIN, LLP
                                   One South Dearborn Street
 4                                 Chicago, IL  60603
                                   (312) 853-7539
 5
      For the Official Committee   Penny P. Reid
 6    of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                   2021 McKinney Avenue, Suite 2000
 7                                 Dallas, TX  75201
                                   (214) 981-3413
 8
      For the Issuer Group:        James T. Bentley
 9    (Telephonic)                 SCHULTE ROTH & ZABEL, LLP
                                   919 Third Avenue
10                                 New York, NY  10022
                                   (212) 756-2000
11
      For the Issuer Group:        James E. Bain
12    (Telephonic)                 JONES WALKER, LLP
                                   811 Main Street, Suite 2900
13                                 Houston, TX  77002
                                   (713) 437-1820
14
      For Acis Capital             Rakhee V. Patel
15    Management GP, LLC:          Annmarie Antoinette Chiarello
                                   WINSTEAD, P.C.
16                                 2728 N. Harwood Street, Suite 500
                                   Dallas, TX  75201
17                                 (214) 745-5250

18    For Redeemer Committee of    Terri L. Mascherin
      the Highland Crusader        JENNER& BLOCK, LLP
19    Fund:                        353 N. Clark Street
      (Telephonic)                 Chicago, IL  60654-3456
20                                 (312) 923-2799

21    For Redeemer Committee of    Mark B. Hankin
      the Highland Crusader        JENNER & BLOCK, LLP
22    Fund:                        919 Third Avenue
      (Telephonic)                 New York, NY  10022-3098
23                                 (212) 891-1600

24

25
```

015300

3

1    APPEARANCES, cont'd.:

2    For the U.S. Trustee:        Lisa L. Lambert
                                  Meredyth A. Kippes
3                                 OFFICE OF THE UNITED STATES
                                    TRUSTEE
4                                 1100 Commerce Street, Room 976
                                  Dallas, TX  75242
5                                 (214) 767-8967

6    For Jefferies, LLC:          Patrick C. Maxcy
     (Telephonic)                 DENTONS US, LLP
7                                 233 South Wacker Drive, Suite 5900
                                  Chicago, IL  60606-6361
8                                 (312) 876-8000

9    For Patrick Daugherty,       Patrick Daugherty
     Pro Se:
10

11   Recorded by:                 Hawaii S. Jeng
                                  UNITED STATES BANKRUPTCY COURT
12                                1100 Commerce Street, 12th Floor
                                  Dallas, TX  75242
13                                (214) 753-2006

14   Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
15                                Shady Shores, TX  76208
                                  (972) 786-3063

16

17

18

19

20

21

22

23

24

25       Proceedings recorded by electronic sound recording;
          transcript produced by transcription service.

Case 19-34054-sgj11    Doc 3596-23    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-20    Exhibit 23    Filed 06/05/2592    Page 823 of 1017    PageID 16484

4

1              DALLAS, TEXAS - JANUARY 9, 2020 - 9:56 A.M.

2              THE COURT:  All right.  Let's roll to Highland now.

3      Let's get appearances from lawyers in the courtroom, please.

4              MR. POMERANTZ:  Good morning, Your Honor.  Jeff

5      Pomerantz; Pachulski Stang Ziehl & Jones.  Happy New Year,

6      Your Honor.

7              THE COURT:  Happy New Year.

8              MR. POMERANTZ:  Here on behalf of the Debtor.

9              THE COURT:  Okay.  Thank you.

10             MS. HAYWARD:  Good morning, Your Honor.  Melissa

11     Hayward and Zachery Annable on behalf of the Debtor.

12             THE COURT:  Good morning.

13             MS. LAMBERT:  Lisa Lambert, and I think Ms. Kippes

14     will be joining me, representing William Neary, the United

15     States Trustee.

16             THE COURT:  Thank you.

17             MS. CHIARELLO:  Good morning, Your Honor.  Annmarie

18     Chiarello and Rakhee Patel here on behalf of Acis Capital

19     Management, LP and Acis Capital Management GP, LLC.

20             THE COURT:  Thank you.

21             MR. CLEMENTE:  Good morning, Your Honor.  Matthew

22     Clemente from Sidley Austin on behalf of the Official

23     Committee of Unsecured Creditors.  With me today are my

24     partners Dennis Twomey and Penny Reid.

25             THE COURT:  Okay.  Good morning.  All right.  Is that

5

1  all of the courtroom appearances?

2     All right.  We have several people on the phone.  I think

3  most of them are just listening in.  If you're on the phone,

4  though, and you wish to appear, you may do so at this time.

5          MR. BENTLEY:  Good morning, Your Honor.  This is

6  James Bentley of Schulte Roth & Zabel.  Also on the line is my

7  co-counsel, Joseph Bain of Jones Walker.  We represent the

8  Issuers.

9          THE COURT:  Okay.  Good morning.

10          MS. MASCHERIN:  Good morning, Your Honor.  This is --

11          MR. MAXCY:  Good morning.  Patrick --

12          MS. MASCHERIN:  Good morning, Your Honor.  This is

13  Terri Mascherin of Jenner & Block.  Also on the line with me

14  is my partner, Mark Hankin.  We represent the Redeemer

15  Committee of the Highland Crusader Fund, which is one of the

16  members of the Unsecured Creditors' Committee.

17          THE COURT:  Okay.  Good morning.

18          MR. MAXCY:  Good morning, Your Honor.  This is

19  Patrick Maxcy from Dentons US, LLP on behalf of Jefferies,

20  LLC.

21          THE COURT:  Okay.  Thank you.  All right.  Well, I

22  guess that is it for the phone appearances.

23     Mr. Pomerantz, we're -- we have just one matter on the

24  calendar, the motion to compromise with the Committee.  I saw

25  two limited objections, and then a U.S. Trustee's broader

6

```
 1    objection.  I'll start with, Do you have any of these
 2    objections worked out?
 3              MR. POMERANTZ:  Yes, we do.
 4              THE COURT:  Okay.
 5              MR. POMERANTZ:  We believe we have the Jefferies
 6    objection worked out, as well as the objection of the Issuers.
 7    And I'll, during the course of my presentation, alert Your
 8    Honor to how that's worked out.
 9              THE COURT:  Okay.
10              MR. POMERANTZ:  And then we'll have a revised order
11    that basically addresses each of their concerns, or at least
12    Jefferies' concerns, but the statements on the record for the
13    Issuers' concerns.
14              THE COURT:  Okay.  Very good.
15              MR. POMERANTZ:  Good morning again, Your Honor.  Jeff
16    Pomerantz; Pachulski, Stang, Ziehl & Jones.  I'm joined in the
17    courtroom by Ira Kharasch, Greg Demo, and John Morris from my
18    office.  I would also like to introduce the Court to the
19    proposed new members of the board of directors of Strand
20    Advisors, which is the Debtor's general partner.  They're all
21    sitting in the first row behind counsel's well.  And that's
22    Mr. James Seery, --
23              THE COURT:  Good morning.
24              MR. POMERANTZ:  -- Mr. John Dubel, --
25              THE COURT:  Good morning.
```

Case 19-34054-sgj11    Doc 3596-23    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 23 Filed 06/08/2592    Page 826 of 1017    PageID 16487

7

1          MR. POMERANTZ:  -- and the Honorable Russell Nelms.

2          THE COURT:  Yes.  I've met him before.

3          MR. POMERANTZ:  As have we.  We thought you would

4    remember him.

5        The resumes of Mr. Seery and Mr. Dubel were attached to

6    the motion filed on December 27th, and those two resumes and

7    the resume of the Honorable Judge Nelms were attached to the

8    reply that was filed last evening.  And while Mr. Seery and

9    Mr. Dubel may be new names to Your Honor, we know that you are

10   familiar with Judge Nelms, who sat with you in this district.

11         THE COURT:  Uh-huh.

12         MR. POMERANTZ:  Also in the courtroom, Your Honor, is

13   Brad Sharp, the Debtor's chief restructuring officer from DSI,

14   --

15         THE COURT:  Good morning.

16         MR. POMERANTZ:  -- and his colleague, Fred Caruso,

17   who spends most of his working hours at the Debtor's Dallas

18   headquarters.

19         THE COURT:  Good morning.

20         MR. POMERANTZ:  We have the declaration of Mr. Sharp

21   that we would move into evidence at this point in time.

22         THE COURT:  All right.  I've got a stack of paper.

23   If you have an extra copy for me to use, --

24         MS. HAYWARD:  Your Honor, may I approach with the --

25         THE COURT:  You may.

8

```
 1              MS. HAYWARD:  Your Honor, it was filed, the
 2    declaration was filed.  I'm not sure that we have a copy of --
 3              MR. POMERANTZ:  Your Honor, we will also at the
 4    appropriate time during my presentation, I'll bring up to Your
 5    -- ask to bring up to Your Honor revisions to the term sheet
 6    that was attached to the motion.
 7              THE COURT:  Okay.
 8              MR. POMERANTZ:  Copies have been given to Ms. Lambert
 9    as well as the Committee.
10              THE COURT:  Okay.  Very good.  All right.  Well, what
11    was handed to me was the preliminary term sheet as well as the
12    CVs for the proposed new board members.  I don't see the
13    declaration --
14              MR. POMERANTZ:  Your Honor, if I may approach, I have
15    a copy.
16              THE COURT:  You may.  All right.  Very good.
17              MR. POMERANTZ:  So we would move that declaration
18    into evidence.
19              THE COURT:  All right.  The Court will admit this.
20    It was filed on the docket at 327, but I will additionally
21    admit it as Exhibit 1 today.
22         (Debtor's Exhibit 1 is received into evidence.)
23              THE COURT:  At some point in time, I want to give
24    parties the opportunity to cross-examine Mr. Sharp.  Do you
25    want to do that now, or shall we hear an opening statement?
```

Case 19-34054-sgj11    Doc 3596-23    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 23    Filed 08/01/25    Page 828 of 1017    PageID 16489
Page 160 of 192

9

1          MR. POMERANTZ:  However Your Honor prefers.  I mean,

2    maybe it's helpful to hear argument first, and then, before

3    the Trustee --

4          THE COURT:  I think I'd like to hear opening

5    statements and then we'll --

6          MR. POMERANTZ:  Thank you.

7          THE COURT:  -- make the opportunity available.  Okay.

8          OPENING STATEMENT ON BEHALF OF THE DEBTOR

9          MR. POMERANTZ:  Your Honor, by way of background, we

10   appeared before Your Honor on December 6th and December 19th.

11   And during each of those hearings, we described for the Court

12   negotiations that were underway between the Committee and the

13   Debtor which, if successful, would have -- would eliminate the

14   need for contested and uncertain and costly litigation

15   regarding the appointment of a Chapter 11 trustee and really

16   put this case in a position where the Debtor and the Committee

17   would be able to work together constructively towards

18   negotiation of a plan.

19      As a result of our hearing on December 19th, Your Honor

20   entered a scheduling order that set deadlines for either the

21   filing of a motion to approve a settlement, or alternatively,

22   the filing of one or more motions for the appointment of a

23   trustee.

24      As set forth and required by the scheduling order, we

25   filed our motion on December 27th, and in that motion we

10

1   sought approval of a term sheet and ancillary documents

2   between the Debtor and the Committee, which I'll describe

3   shortly.

4        While a couple of items had not yet been agreed to at the

5   time the motion was filed, I'm pleased to report that over the

6   last couple of days we've been able to reach closure with the

7   Committee with respect to those items, and there would also be

8   some modifications to the term sheet, which I'll go through in

9   a few moments.

10       The motion, Your Honor, seeks approval of the term sheet,

11  which accomplishes a variety of things that, again, will allow

12  the Debtor and the Committee to put the acrimony that has

13  existed in this case for the first three months behind us and

14  allow us to focus on productive matters.  In the last 24

15  hours, as I mentioned, there have been a few changes to the

16  term sheet that I will describe.  And I would like to hand up

17  Your Honor a redline and a clean copy of the revised term

18  sheet and exhibits.  May I approach?

19          THE COURT:  All right.  You may.  Do you have an

20  extra for the law clerk?  Okay.  Thank you.

21       (Pause.)

22          MR. POMERANTZ:  Your Honor, the term sheet does a

23  number of things.  Would you like me to give Your Honor some

24  time to look through the redlines?

25          THE COURT:  No.  You may proceed.

11

1          MR. POMERANTZ:  Okay.  The term sheet does a number

2    of things.  The first thing the term sheet does is appointment

3    of an independent board at Strand Advisors.  Strand Advisors

4    is the GP of the Debtor.  The Debtor is an LP.  The Debtor

5    previously had filed a motion to approve the retention of Brad

6    Sharp as the chief restructuring officer, and that initial

7    agreement and motion contain details regarding the scope of

8    Mr. Sharp's authority and the scope of what the Debtor could

9    do without Mr. Sharp's prior consent.

10        The Committee raised concerns that the structure was not

11   sufficient to ensure that decisions were being made for the

12   Debtor only in their best interests and without any

13   inappropriate influence from Mr. Dondero.

14        To address the Committee's concerns, a focal point of the

15   settlement was the Debtor's agreement to appoint an

16   independent board of directors at Strand who would be

17   responsible for managing the operations of the Debtor.

18        Over the last few weeks, a principal aspect of the

19   negotiations between the Committee and the Debtor have been

20   discussing who should the independent directors be.

21   Conceptually, the Debtor and the Committee both agreed that

22   the board should include, first, a person with significant

23   industry experience in which the Debtor operates -- hedge

24   funds, money management; second, a person with deep

25   restructuring experience from the financial advisor side; and

Exhibit 23    Page 69 of 92

12

1   third, a person with some sort of judicial or governmental

2   experience.

3        The Debtor originally provided the Committee with three

4   proposed candidates.  The Committee considered the Debtor's

5   request, but instead presented the Debtor with four different

6   candidates and asked the Debtor to choose from those four.

7   The Debtors interviewed each of those people and ultimately

8   agreed on Messrs. Dubel and Seery, who were each on the

9   original list.

10       As of the deadline to file the motion on December 27th,

11  the Committee and the Debtor had still not agreed on the

12  identity of the third board member, but the parties were

13  hopeful that an agreement could ultimately be reached and we

14  decided to go ahead and file the motion.  As I'm sure Your

15  Honor saw in the motion, it was contingent upon everyone

16  agreeing on the third board member.

17       Ultimately, the Debtor and the Committee both agreed that

18  Mr. Dubel and Mr. Seery could identify the third board member

19  out of a pool of four people:  Two of the people originally

20  requested by the Committee and two people identified by the

21  Debtor.  This week and over the weekend, Mr. Seery and Mr.

22  Dubel interviewed each of the four candidates, and ultimately

23  decided on the appointment of Judge Nelms as the third

24  independent board member.

25       The board, as it will be constituted going forward, in the

Case 19-34054-sgj11   Doc 3596-23   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-20   Exhibit 23   Page 63 of 92   Filed 08/08/25   Page 832 of 1017   PageID 16493

13

1   Debtor's opinion, consists of three exceptional individuals

2   who are independent of the Debtor, have a sterling reputation

3   in the community, and bring to the Debtor a variety of the

4   skills that we believe, and believe the Committee agrees,

5   gives the Debtor the best opportunity to achieve a consensual

6   restructuring and otherwise manage the affairs of the Debtor

7   in the best interests of the stakeholders.

8       It is contemplated that the Debtor will continue to retain

9   the services of DSI as the chief restructuring officer, and

10  ultimately the board will determine if it's important to

11  retain a CEO going forward.

12      The second thing that the term sheet does, Your Honor, was

13  the removal of Mr. Dondero as an officer and director of

14  Strand and eliminate all of his control over decision-making

15  of the Debtor.  The Debtor recognized early on in this case

16  that Mr. Dondero's continuing role with the Debtor in a

17  position of authority made the Committee extremely uneasy.

18  Accordingly, the term sheet provides for him removing himself

19  as an officer and director of Strand and that he would no

20  longer be in a position of control at the Debtor.

21      However, since the filing of the motion, over the last

22  several days, concerns have been raised about whether removing

23  Mr. Dondero from the business entirely would have unintended

24  consequences.  I believe I may have mentioned at prior

25  hearings that, because of his involvement as a portfolio

015311

Case 19-34054-sgj11    Doc 3596-23    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 23    Filed 05/26    Page 833 of 1017    PageID 16494

14

1    manager under various contracts with third parties, that there

2    could be adverse economic consequences to the Debtor if he

3    didn't stay in some role.

4        As a result of discussions over the last 24 hours, the

5    Committee has agreed and the Debtor agreed to modify the term

6    sheet to allow the new board to decide whether to retain Mr.

7    Dondero in his capacity as a portfolio manager, provided,

8    however, that he will not receive any compensation and he will

9    agree to resign if requested by the board.

10        In any event, he will have no decision-making control at

11    all and he will report to the independent board.

12        The corporate governance documents that create the new

13    independent board of Strand also provide that Mr. Dondero, as

14    the owner of the equity in Strand, may not replace the board

15    without the Committee consent or court order.

16        The third major aspect of the term sheet, Your Honor, was

17    the agreement on operating protocols, and it really relates to

18    the ground rules for the Debtor's operations going forward and

19    when notice to the Committee is required of certain

20    transactions that would otherwise be in the ordinary course of

21    business.

22        Importantly, Your Honor, we are not trying to modify the

23    Bankruptcy Code in any way.  Any transactions out of the

24    ordinary course of business would still be subject to Your

25    Honor's approval.

15

1         However, in this case, as we indicated in the initial

2    motion we filed when the case was in Delaware, whether or not

3    something is ordinary is not straightforward in a case such as

4    the Debtor's, given the nature of the Debtor's operations.  So

5    we thought it was important to establish ground rules up

6    front, and establishing those ground rules was one of the

7    things we did initially in the case.  We had opposition from

8    the Committee, and we've worked through the opposition and

9    ultimately arrived at the operating protocols that are

10   attached to the term sheet.

11        They have been slightly modified in nonmaterial ways in

12   the documents I handed up to Your Honor.

13        They were subject to substantial negotiations between the

14   Debtor and the Committee, and we also expect them to be the

15   subject of future discussions with the Committee and the

16   independent board after the independent board takes -- takes

17   place.  Takes over.

18        Two parties in interest, Your Honor, Jefferies and a group

19   of Issuers, the CLOs, have filed comments to the term sheet,

20   which I'll describe in a few moments.

21             THE COURT:  Okay.

22             MR. POMERANTZ:  The next aspect, Your Honor, of the

23   term sheet was the provision of standing to the Creditors'

24   Committee to pursue certain insider claims.

25        During the negotiations, the Committee requested immediate

16

1  standing to investigate and potentially prosecute claims

2  against insiders to the extent those insiders were not

3  employed by the Debtor.  Granting standing at this stage of

4  the case was a difficult give by the Debtor.  However, the

5  Committee impressed upon the Debtor the importance of them

6  being able to control the filing of any actions against the

7  insiders, and the Debtor decided to accede to the Committee's

8  request.

9      It still remains the Debtor's hope that, with the creation

10  of the independent board, that the Debtor, the Committee, and

11  any insiders who might be subject to any such claims will be

12  able to come together and negotiate a consensual resolution of

13  this case.  While all parties, I'm sure, can and know how to

14  litigate, hopefully they will agree that a negotiated outcome

15  is better than a litigated outcome.

16      The next aspect of the term sheet, Your Honor, was the

17  document preservation protocols, and it provides for certain

18  procedures to be put in place to address the Committee's

19  concerns about document preservation.  They are contained in

20  an exhibit to the term sheet.  Again, slight nonmaterial

21  modifications were made in what I handed up to Your Honor.

22  And essentially they provide also for the Committee's access

23  to privileged documents to aid in their investigation and

24  prosecution of claims to which they are granted standing, and

25  also sets forth a procedure to be followed to address concerns

17

1    if the information is subject to shared privileges by several

2    entities.

3        As I mentioned, Your Honor, three parties have filed

4    responses to the motion.  The first is Jefferies.  Jefferies

5    is a secured creditor of the Debtor with respect to its margin

6    account held at Jefferies, and also has a similar account held

7    by a non-debtor affiliate.  They have asked for clarification

8    that, one, nothing in the protocols or the motion affects its

9    rights under the underlying agreements or the safe harbor

10   provisions of the Bankruptcy Code entitling them to enforce

11   their remedies; and two, that the Debtors will not trade in

12   the prime account without Jefferies' consent, and if that

13   consent is sought and not obtained, only subject to court

14   order.

15       The Debtor has agreed to include language in the order to

16   address Jefferies' concern, and at the conclusion of my

17   presentation I'll submit to Your Honor an order and a redline

18   containing that language.

19            THE COURT:  Okay.

20            MR. POMERANTZ:  The second objection -- or not

21   objection, Your Honor -- the second statement was filed by a

22   group of Issuers of CLO obligations.

23            THE COURT:  Uh-huh.

24            MR. POMERANTZ:  And they were concerned that certain

25   aspects of the operating protocols which require notice to the

Case 19-34054-sgj11   Doc 3596-23   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 23   Filed 09/25   Page 837 of 1017   PageID 16498

18

1    Committee prior to the Debtor being able to take certain

2    actions could conflict with the provisions of the underlying

3    agreements which might require the Debtor to take action on a

4    more expedited basis.

5        Neither the Issuers or the Debtor are aware of any

6    potential transactions that will arise prior to the next

7    hearing before Your Honor on January 21st.  We understand --

8    we were not party to these discussions between the Committee

9    and the Issuers yesterday, but we understand the way it's been

10   resolved is that the Issuers will withdraw their objection as

11   it relates to going forward today, subject to being able to

12   come back to the Court on the 21st and revisit the issue if

13   additional changes are not made acceptable to them to resolve

14   their issues and concerns.

15           THE COURT:  Okay.

16           MR. POMERANTZ:  But I think all parties acknowledge

17   that over the next 12 days this is a theoretical issue rather

18   than a practical issue.

19           THE COURT:  Okay.

20           MR. POMERANTZ:  This brings us, Your Honor, to the

21   United States Trustee's opposition, which is really the only

22   true objection to the motion that has been filed.  No creditor

23   has filed an objection, no investor has filed an objection,

24   and no governmental agency -- which the U.S. Trustee in its

25   objection purports to be pursuing their interests -- has filed

19

1  an objection, either.

2      As Your Honor probably recalls, at the December 19th

3  hearing the Trustee indicated its intent to oppose any

4  agreement between the Debtor and the Committee that would

5  involve corporate governance and to file its own motion for

6  the appointment of the trustee.  That motion is currently

7  scheduled for hearing on January 21st.  We had asked the U.S.

8  Trustee to reserve judgment on the Committee's and Debtor's

9  agreement until after we had come to an agreement and after we

10  had presented it to the Trustee, in hopes that it would

11  address their concerns.  However, as the Court told us -- as

12  the U.S. Trustee told us and Your Honor at the December 19th

13  hearing, there was nothing short of appointment of a trustee

14  that would satisfy the Trustee.

15      The comments really didn't make sense to us, and I believe

16  it perplexed Your Honor, but here we are.

17      At its core, Your Honor, the U.S. Trustee's objection is

18  really a request that the Court substitute its business

19  judgment for that of the Debtor and the Committee, the

20  Committee who represents the substantial majority of all

21  claims in this case, when both of them have decided that

22  agreeing to certain changes in corporate governance, among

23  other things, is preferable to the uncertain, costly, and

24  time-consuming litigation over a trustee, and also the

25  uncertainty, even if a trustee was appointed, on how the case

20

1   would be administered.

2       To the contrary, under the corporate governance proposal,

3   we have three highly-qualified individuals who are poised to

4   take over management of the Debtor, and each bring with them

5   various skills that one trustee would not have.

6       The Trustee has filed its motion for appointment of a

7   trustee, and I'm sure on the 21st will argue that the Code

8   requires it.  However, that's not the issue before Your Honor

9   today.  It's not whether a trustee is appropriate.  It's

10  whether the motion and the term sheet is a sound exercise of

11  the Debtor's business judgment under Section 363, and,

12  importantly, a reasonable compromise of the pending disputes

13  between the Debtor and the Committee.

14      The Trustee's objection raises three general points, none

15  of which have any merit.  First, the Trustee argues that there

16  is a lack of disclosure of significant matters.  The first

17  aspect that the Trustee raises to, or points to, is the

18  absence of identification of the third board member and the

19  absence of disclosure of the compensation that the board

20  members will receive, which will be backstopped by the Debtor.

21      As I described before, Your Honor, the identity of the

22  third member of the board was a fluid process which was only

23  resolved earlier this week, and the Debtor did not believe

24  that it was appropriate to reach agreement on director

25  compensation until all board members could provide input.

21

1  Last night, we filed a reply to the Trustee's objection in

2  which we disclosed the identity of the third board member, and

3  we'll also disclose the proposed compensation to be provided

4  to them, which essentially is as follows.  Each member of the

5  board will receive $60,000 a month for the first three months

6  of the case, $50,000 a month for the next three months of the

7  case, and the presumption thereafter would be $30,000 a month.

8  However, people recognize that this case will look a lot

9  differently six months from now, and while the presumption is

10  $30,000, the Debtor, the independent board members, and the

11  Committee will sit down, see how the case looks, and decide

12  whether any modifications are appropriate.

13      The amount of compensation, which at first blush may seem

14  significant, really reflects the significant amount of work

15  that the Debtor, the Committee, and the independent directors

16  anticipate will be required from them not only to get up to

17  speed about the case, but to effectively manage this complex

18  Debtor's business operations.  The directors have heard from

19  the Debtor and the Committee of all the issues, of all the

20  concerns, and this is not an enviable task that they are

21  undertaking.  The compensation they are being provided thus

22  far we believe is appropriate under the circumstances and

23  commensurate with the work that they are going to be expected

24  to complete.

25      If they are successful and they are able to achieve a

Case 19-34054-sgj11    Doc 3596-23    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 23 Filed 06/23/25    Page 841 of 1017    PageID 16502

22

1   consensual restructuring here, the million and a half or so

2   that will be spent on them will be best million and a half

3   dollars I think spent in this case.

4       Your Honor, we also have updated corporate governance

5   documents which --

6       (Pause.)

7           MR. POMERANTZ:  Your Honor, may I approach with the

8   updated corporate governance documents?

9           THE COURT:  You may.  Okay.

10          MR. POMERANTZ:  As I will discuss in a moment, Your

11  Honor, there is really no need for the Court to approve the

12  corporate governance documents, as they have been executed by

13  Strand, which is not a debtor before this Court.  However,

14  there are a couple of matters in those documents that I want

15  to bring to the Court's attention that do impact on the

16  Debtor.

17          THE COURT:  Okay.

18          MR. POMERANTZ:  First, as is typical for board

19  members, Strand has agreed to indemnify the independent

20  directors to the full extent permitted by law.  The

21  independent directors have requested that the Debtors backstop

22  Strand's agreement, and the Debtor and the Committee agree,

23  and the documents so provide.

24      Strand has also committed to obtain directors and officers

25  coverage for the independent directors.  It has been located,

Case 19-34054-sgj11    Doc 3596-23    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 23    Filed 09/25/25    Page 842 of 1017    PageID 16503

23

1    it's in the process of being finalized and bound, and the

2    Debtor will pay the cost of that coverage.

3        The independent directors have also asked for language in

4    the order approving the settlement that requires a party

5    seeking to assert a claim against the independent directors

6    relating to their role as an independent director to

7    demonstrate to this Court that a claim is colorable before

8    filing the claim and providing the Court with jurisdiction

9    over any such claim.  This is language that's similar in other

10   similar types of cases.

11            THE COURT:  Uh-huh.

12            MR. POMERANTZ:  That will be reflected in the order.

13       Next, the Trustee objects to the failure of the Debtor to

14   identify who the potential chief executive officer of the

15   Debtor will be.  And essentially, she's arguing that you have

16   to identify that CEO now; it has to be subject to court

17   approval.  However, there's no requirement that any company

18   retain a CEO.  It's not a corporate law requirement.  And the

19   fact that the board reserves the right to retain a CEO in the

20   future is consistent with corporate law and is not a basis to

21   deny the motion.  And in any event, normally, the retention of

22   a CEO is not a subject that is brought to the Court's

23   attention for Court approval.

24       So the lack of any clarity over the identity of the CEO is

25   a reflection of the fact that this independent board does not

24

1    know if a CEO is required.  They will come in, they are going

2    to interview all the employees, they're going to sit down with

3    the CRO, they're going to sit down with counsel, they're going

4    to sit down with the Committee, and ultimately they will

5    decide if a CEO is to be retained.  And if a CEO is to be

6    retained, they will go through the process of identifying who

7    that CEO is.  But again, it's not a reason to deny the motion.

8         The Trustee has also argued that because the Committee is

9    not granted standing to pursue claims against current

10   employees, as opposed to former employees, that there might be

11   some statute of limitations concerns with respect to claims

12   against those employees.  The argument doesn't really make

13   sense to us.  In the standard case, the Debtor retains causes

14   of action.  And the Committee can investigate causes of

15   action.  And at some point during the case, a Committee could

16   come in and could demand that the Debtor prosecute them, and

17   if the Debtor unreasonably refuses, could seek standing before

18   the Court.

19        In this case, the Debtors agreed up front that the

20   Committee has the standing to prosecute certain claims against

21   insiders that are not employees of the Debtor, which obviates

22   the need for standing.  So we've gone one step more.  But the

23   Trustee is arguing that that leaves a void for the claims that

24   are not subject to the agreement on standing.

25        However, the term sheet provides that the board is going

Case 19-34054-sgj11   Doc 3596-23   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 23 Filed 06/26/25   Page 844 of 1017   PageID 16505

25

1   to make determinations on what employees should remain, what

2   employees should not remain.  To the extent the board

3   terminates any employees and there are claims against them,

4   then basically the Committee will have the ability to bring

5   those claims.

6       To the extent that those people aren't terminated, we have

7   no doubt that the Committee, in the course of its

8   investigation, will determine whether claims should be brought

9   against those people, and at some point in time may ask the

10  Debtor to prosecute those claims or ultimately seek standing.

11      In any event, these things are not being swept under the

12  rug.  There's no real legitimate concern that there's any

13  statute of limitations issue that will prevent those claims

14  from being prosecuted.

15      I am very much aware and have no doubt that the Committee

16  is going to be laser-focused on claims, and any concern that

17  statute of limitations is going to lapse I think is not well-

18  taken.

19      The Trustee next argues that the Court does not have the

20  jurisdiction to implement the corporate governance matters,

21  and for that reason the motion should be denied.  They -- she

22  argues that because Strand is not a debtor, that the Court has

23  no authority to appoint --

24          MS. LAMBERT:  Your Honor, I object.  The United

25  States Trustee is a he.  I am not the United States Trustee,

26

1    and the attacks *ad hominem* are inappropriate.

2        THE COURT:  All right.  Well, clarification, the U.S.

3    Trustee is the guy in Washington.  But anyway, you may

4    proceed.

5        MR. POMERANTZ:  I apologize to Ms. Lambert.

6        MS. LAMBERT:  Actually, he's downstairs right now.

7    Bill Neary.

8        MR. POMERANTZ:  I apologize to --

9        THE COURT:  Oh, well, I thought you meant the big guy

10   in Washington.  But anyway, you may proceed.

11       MR. POMERANTZ:  I apologize to Ms. Lambert and no

12   offense was meant.

13       THE COURT:  Okay.

14       MR. POMERANTZ:  So, the U.S. Trustee argues that

15   because Strand is not a debtor that the Court has no authority

16   to appointment the independent directors and limit Mr.

17   Dondero's right to remove the independent directors.  The

18   Debtor is not really seeking authority to appoint -- to have

19   court authority for the appointment of the directors at

20   Strand.  Again, as I mentioned before, that authority exists

21   outside of bankruptcy.  Strand is not a debtor.  Strand could

22   appoint anyone it wants to carry out its responsibility as the

23   general partner of the Debtor, and it's exercising its

24   corporate authority to do so by installing a board at Strand.

25       Nor is the Debtor seeking court authority for Strand to

27

1  enter into the corporate governance documents.  Other than the

2  couple of items I mentioned before, Your Honor, Strand can

3  enter into these documents without authority from this Court.

4  The only court authority that was required:  Debtor to

5  backstop the indemnification obligations, Debtor to pay

6  compensation to the board members, and Debtor to pay for the

7  D&O policy.

8       With respect to the Court's right to limit Mr. Dondero's

9  ability to terminate the independent directors, the term sheet

10  contemplates the Court approving a stipulation which limits

11  Mr. Dondero's ability to terminate the independent directors,

12  and if he does in fact seek to terminate the appointment of

13  the independent directors, he would be in violation of court

14  order.  But even more importantly, Your Honor, if he decided

15  to terminate the independent directors without the Committee's

16  consent and without the Debtor's consent, I wouldn't imagine

17  it would take anyone very long to come back before Your Honor

18  and ask Your Honor to very quickly appoint a trustee.

19       Accordingly, Your Honor, I think the argument of lack of

20  jurisdiction over Strand is a red herring and should be

21  denied.

22       Lastly, Your Honor, the Trustee makes a curious argument

23  that a trustee is needed to protect all investors and

24  governmental authorities.  The Trustee argues that this case

25  demands transparency which can only be accomplished by a

1   Chapter 11 trustee.

2       One thing I think the Debtor and the Committee and the

3   U.S. Trustee will agree on, this case does demand

4   transparency.  And we believe we've installed a corporate

5   governance structure, an operating protocol structure, a

6   document preservation structure, that does just that, provides

7   transparency that this Debtor has not been subject to and

8   which is quite different from the case that was before Your

9   Honor before.

10      So we believe that what the Debtor and the Committee have

11  done is not only in the interests of the Debtor, the

12  creditors, but investors and all governmental entities.

13      And no investor or governmental entity has had any

14  concerns or any problems with what is being done.  They

15  haven't filed any objection.  The U.S. Trustee apparently is

16  proceeding by proxy asserting those interests.

17      Second, nothing in the term sheet or any of the documents

18  limits the rights of investors or of governmental entities to

19  seek a trustee, to seek documents, or to do anything they

20  would -- that they would be entitled to do under the

21  Bankruptcy Code.

22      In any event, Your Honor, the fact that the Trustee

23  believes that a trustee is more appropriate, again, is an

24  argument that they can make at the January 21st hearing.  It's

25  not a basis for denial of this motion.

29

1    In conclusion, Your Honor, the only economic stakeholders

2    in this case believe that proceeding with the transactions

3    contemplated by the term sheet is in the best interest of the

4    estate, will maximize their ability to achieve a consensual

5    restructuring, and move this case through the system as

6    quickly and efficiently as possible.  The term sheet is a

7    valid exercise of the Debtor's business judgment under 363 and

8    an appropriate compromise of controversy, and the Trustee's

9    objections are really nothing more than a rehash of its

10   request for an appointment of a trustee.

11       For all these reasons, Your Honor, we request that the

12   Court overrule the U.S. Trustee's objection and approve the

13   motion.

14           THE COURT:  All right.  Well, before I hear from our

15   objectors, is there any friendly commentary?  Mr. Clemente, I

16   figured you might want to address this.

17           MR. CLEMENTE:  I do, Your Honor.  And good morning.

18           THE COURT:  Good morning.

19       OPENING STATEMENT ON BEHALF OF THE OFFICIAL COMMITTEE OF

20                        UNSECURED CREDITORS

21           MR. CLEMENTE:  For the record, Matthew Clemente from

22   Sidley Austin on behalf of the Official committee of Unsecured

23   Creditors.  I do have some comments that I would like to make,

24   Your Honor, some, so please bear with me.  I will try and be

25   brief.

30

1          THE COURT:  Okay.

2          MR. CLEMENTE:  I think as late as 1:00 o'clock in the

3    morning I wasn't sure that I would be in front of you with

4    this settlement fully in place in a manner that was

5    satisfactory to my Committee.  As I mentioned to you in my

6    prior appearances in front of you, every provision was

7    important to the Committee, and they all work together.  As

8    Your Honor can imagine, there was a lot of negotiation that

9    took place, including late in the day and early morning, to

10   come to that conclusion.

11       Some comments on our perspective as a committee, Your

12   Honor.  As an initial matter, we were absolutely not okay with

13   the governance structure that was in place when the petition

14   was filed.  As we detailed in our objections to the CRO motion

15   and the protocol motion back when the case was in Delaware,

16   the Committee has very real and identifiable concerns about

17   the Debtor's ability to dispatch its fiduciary duty.  And the

18   Committee very seriously contemplated moving for a Chapter 11

19   trustee daily.  That conversation is something that the

20   Committee continues to -- continued to engage in, Your Honor.

21   So it's something that they considered very, very carefully.

22       That was the lens through which the Committee was

23   approaching negotiations over the settlement agreement and the

24   independent director structure.  That's how they viewed it.

25   That's the backdrop against which they came to it.

31

1       The Committee had two primary goals that it had sought to

2   achieve with the settlement agreement.  The first was to

3   ensure that Mr. Dondero does not remain in a position of

4   management authority or control in any fashion with the

5   Debtor.  Goal number two was to ensure that the value of the

6   Debtor's estate is preserved and maximized.  Those two goals

7   needed to work together.

8       The Committee  believes that the carefully-crafted

9   settlement agreement achieves these objectives in a manner

10  that is more beneficial to the estate than a potential Chapter

11  11 trustee and a related fight over its appointment at this

12  time.

13      The lynchpin of the settlement, Your Honor, is the

14  appointment of the three independent directors.  And as Mr.

15  Pomerantz outlined for you, that was the subject of intense

16  discussion, negotiation, debate among the Committee and with

17  the Debtor.  But we believe that Mr. Seery, Mr. Dubel, and

18  Judge Nelms are fully independent, highly qualified, and bring

19  relevant and complementary skillsets to this board.  Mr.

20  Pomerantz referred to that, but we believe that the three

21  directors all bring unique talents and attributes that will

22  allow them to function effectively as a board and provide the

23  appropriate oversight and direction that we believe is

24  necessary here.

25      However, regardless of how independent or highly skilled

32

```
 1   they may be, they would be of no use if they weren't bestowed
 2   with the appropriate power.  So that was another point that
 3   was very important to the Committee, and we believe that the
 4   settlement does this.  The settlement makes clear that the
 5   independent directors are granted exclusive control over the
 6   Debtor, including over all employees.  That's absolutely
 7   critical to the Committee.
 8       The settlement also provides that the CRO and the Debtor's
 9   professionals shall report and serve at the direction of the
10   independent directors.  That is also very important.
11       And let me be clear, Your Honor, because I think you may
12   have raised this at a prior hearing:  This is not a board that
13   we expect to work at 50,000 feet, as demonstrated by the
14   compensation structure that Mr. Pomerantz outlined for you.
15   This will be a board that's hands-on, members of which will be
16   on the ground, at the Debtor, with a strong presence and a
17   clear message of who is in charge.  That is critical for this
18   Committee.
19       Additionally, as Mr. Pomerantz mentioned, the new board,
20   in consultation with the Committee, is empowered to determine
21   whether a CEO should be retained.  It's possible that one of
22   the independent directors could be that CEO, Your Honor.  But
23   we wanted to make clear that that was an important part of the
24   structure, should the board determine that that was the way it
25   wanted to go.
```

Case 19-34054-sgj11    Doc 3596-23    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 33-20    Filed 03/25    Page 852 of 1017    PageID 16513

33

```
 1        So, in sum, Your Honor, we believe that the independent

 2   board has the clear authority and the skillset that's

 3   necessary to take control and will be actively and

 4   aggressively doing so.

 5        But let me be clear, rest assured, Your Honor, this is not

 6   going to be a board that answers to the Committee in that

 7   sense.  I think that we will all be moving together

 8   directionally, but it's very possible that I will be in front

 9   of Your Honor arguing against a decision that this independent

10   board made.  So I want to assure Your Honor that although the

11   Committee was very active and in fact picked Mr. Seery and Mr.

12   Dubel, and then Mr. Pomerantz detailed how the third director

13   was picked, we understand who their duty -- what their duty is

14   and we also understand that they're not a rubberstamp for the

15   Committee, Your Honor.  And so I wanted to make that point to

16   you to assure Your Honor that that's not the structure that's

17   being set up here, nor are they the type of individuals that

18   would allow that to happen.

19        Additionally, Your Honor, the settlement grants the

20   Committee standing to pursue estate causes of action against

21   the related parties.  That was very important to us, Your

22   Honor.

23        And in addition to that, the settlement provides the

24   Committee access to privileged documents and sets forth a

25   discovery protocol that will assist the Committee in its
```

34

 1  investigation.

 2      The Committee strongly believes that Mr. Dondero's

 3  repeated past behavior, that there are many questionable

 4  transactions that will need to be thoroughly investigated and

 5  pursued.  And so having those causes of action with the

 6  economic party in interest related to those causes of action,

 7  the Committee and its constituencies, we thought was very

 8  important and very critical.

 9      Granting standing, Your Honor, as I mentioned, avoids any

10  issues regarding who will be controlling those claims.

11      I'll touch on this in a moment, but Mr. Pomerantz talked

12  about Mr. Dondero remaining in name as an employee.  Let me

13  assure Your Honor that that is not a backdoor around the

14  Committee's ability to investigate and immediately pursue

15  claims against him should that be the course that we choose to

16  take.  So he's not part of that carve-out for current

17  employees.  That's not at all happening.  That would never be

18  something that my Committee would be comfortable with.  So I

19  wanted to make clear to Your Honor that that's not something

20  that's happening with sort of this late edition of Mr.

21  Dondero's continuing on in name as an employee.

22      Your Honor, the settlement also lays out a very detailed

23  set of operating protocols which we do believe are appropriate

24  and provides the Committee with transparency, which I've been

25  expressing to Your Honor we've needed since this case has

35

 1   started.

 2       Finally, as we point out in our reply and as would always

 3   be the case, should new facts develop or the situation demand

 4   it, the Committee reserves the right to seek a Chapter 11

 5   trustee, as does any other party in interest, to the extent it

 6   may be appropriate at that time.

 7       In short, Your Honor, the Committee very carefully and

 8   diligently weighed the independent director option versus the

 9   Chapter 11 trustee option.  The Committee had very clear goals

10   in mind, as I expressed to you, and determined that those

11   goals could be achieved in a value-maximizing manner through

12   the independent director structure.

13       The negotiations were very intense, and it was only after

14   the Committee determined that each piece of the settlement was

15   to its satisfaction did it ultimately conclude that the

16   settlement maximizes value for all stakeholders while at the

17   same time protecting those stakeholders from exposure to

18   continuing insider dealing, breaches of duty, and

19   mismanagement.

20       Therefore, the Committee believes approving the settlement

21   is in the best interest of the estate, and therefore it

22   believes it should be approved.

23       I do want to offer a word about Mr. Dondero continuing as

24   an employee.  As Your Honor was aware, the term sheet as

25   originally filed provided that Mr. Dondero would, among other

36

```
 1   things, resign as an employee of the Debtor.  Mid to late
 2   afternoon yesterday, Mr. Ellington called me and said that the
 3   Debtor was now of the view that Mr. Dondero should remain on
 4   as an employee in that capacity for the benefit of the estate.
 5   The Committee was, very appropriately, very skeptical of this,
 6   as well as the sort of last-minute offer, last-minute, you
 7   know, addition, however you want to view it -- some might
 8   argue retrade -- that Mr. Dondero was to leave the Debtor,
 9   period.  That was our view.  That was the way that the term
10   sheet was initially structured.  And under no circumstances
11   was the Committee going to allow Mr. Dondero to have any
12   control over this Debtor.
13       Your Honor, the Committee doesn't know what, if any, the
14   consequences are of removing Mr. Dondero as an employee.  And
15   we're not conceding at all that there are any value lost by
16   removing Mr. Dondero as an employee.  Instead, what we're
17   doing is we're staying true to our structure with the
18   independent directors and we're empowering them to decide.
19   And so it's consistent with, you know, our goals of having the
20   independent director structure in place.  And under the
21   settlement as now constructed, even with this late addition or
22   adjustment, Mr. Dondero would remain as an employee in name
23   only, subject in all respects to the direction, oversight, and
24   removal by the independent board.  And importantly, should
25   they decide to do that, Mr. Dondero shall resign.  And he
```

37

1   shall receive no compensation.

2       So he will not be in control of this Debtor.  The

3   independent directors are.  And he's not going to be empowered

4   to make decisions on behalf of the Debtor.  Instead, we're

5   empowering our independent directors to make those decisions

6   and determinations on behalf of the Debtor.

7       I wanted -- I thought it was important that I provide that

8   perspective to Your Honor, as this is something that came in

9   at a very, very late hour.

10      Overall, Your Honor, for the reasons I have stated and the

11  reasons in our reply, the Committee, as a fiduciary of all

12  creditors in this case, believes that the settlement is in the

13  best interests of the creditors and should be approved.  And

14  at this time, it's the better alternative than the cost,

15  delay, and uncertainty resulting from a Chapter 11 trustee

16  fight and the potential appointment of a Chapter 11 trustee.

17      It is time to put the governance issues behind us, Your

18  Honor, and to move forward to determine how to maximize value

19  for the creditors and how to get them paid.

20      Your Honor, just regarding the specific resolutions of

21  objections that Mr. Pomerantz put on the record, I agree with

22  how Mr. Pomerantz characterized those, and the Committee is

23  supportive of those resolutions as well.

24      Those are all my remarks, Your Honor, but I am happy to

25  answer any questions or address any concerns Your Honor may

38

```
 1   have.
 2            THE COURT:  Okay.  Two follow-up questions.  First, I
 3   know I asked you this at a previous hearing and you told me,
 4   but your Committee, as I recall, is very well constituted.
 5   Just remind me of the members.
 6            MR. CLEMENTE:  Yes.
 7            THE COURT:  You have a representative from the
 8   Redeemer Committee, --
 9            MR. CLEMENTE:  Yes, Your Honor.
10            THE COURT:  -- which is a $140 million or so
11   arbitration award?
12            MR. CLEMENTE:  Yes, Your Honor.
13            THE COURT:  Okay.  And who else is on the Committee?
14   Is an Acis representative?
15            MR. CLEMENTE:  Acis is on the Committee, Your Honor.
16            THE COURT:  Uh-huh.
17            MR. CLEMENTE:  Meta-e Discovery, who is a trade
18   vendor of the Debtor, is on the Committee.  And UBS
19   Securities, who is also --
20            THE COURT:  Okay.
21            MR. CLEMENTE:  -- a litigation claimant, is on the
22   Committee.
23       It was the U.S. Trustee in Delaware's parting gift to me
24   to name a four-member committee, Your Honor.
25       (Laughter.)
```

39

1          THE COURT:  Okay.  Makes it awkward at times.  And
2     then back to the Dondero subject.

3          MR. CLEMENTE:  Yes, Your Honor.

4          THE COURT:  I mean, again, both Mr. Pomerantz and you
5     clarified that the proposal now is the new board will decide
6     if he stays on, Mr. Pomerantz said as a portfolio manager.

7          MR. CLEMENTE:  That is correct, Your Honor.

8          THE COURT:  Am I -- I mean, I'm hearing that
9     correctly?

10          MR. CLEMENTE:  That is correct, Your Honor.

11          THE COURT:  So, right now, whatever officer positions
12     he has, he's technically not resigning?  Or --

13          MR. CLEMENTE:  He is resigning as an officer of the
14     company, Your Honor.

15          THE COURT:  Okay.  He's resigning?  So the board will
16     just decide, is he going to be a portfolio manager or some --
17     whatever the employee title is?

18          MR. CLEMENTE:  Or they could decide that he's not
19     necessary.

20          THE COURT:  Or not necessary?  In any event, no
21     compensation?

22          MR. CLEMENTE:  That is correct, Your Honor.

23          THE COURT:  Okay.

24          MR. CLEMENTE:  And as you can see, the term sheet
25     provides that Mr. Dondero shall not cause any related entity

40

 1   to terminate any agreements with the Debtor as well.  That was

 2   language that was added last night as well.

 3          THE COURT:  All right.  So they're going to make the

 4   decision, does he help preserve value by staying in some

 5   capacity or not?

 6          MR. CLEMENTE:  That is correct, Your Honor.

 7          THE COURT:  Okay.

 8          MR. CLEMENTE:  That, cutting through it, that is the

 9   way that ultimately the Committee views it.

10          THE COURT:  Okay.

11          MR. CLEMENTE:  And if there's an opportunity -- and

12   I'm not conceding that there is.  I'm not conceding that he

13   preserves any value.

14          THE COURT:  Uh-huh.

15          MR. CLEMENTE:  But we wanted to give the option to

16   our independent directors to make that determination.  Because

17   if there's an opportunity to preserve value, that's what we're

18   trying to achieve.

19          THE COURT:  Okay.  And I don't even know if you've

20   thought through this.  Would there be some sort of notice

21   filed on record in the case if --

22          MR. CLEMENTE:  If --

23          THE COURT:  -- if the decision is made to --

24          MR. CLEMENTE:  To -- to --

25          THE COURT:  -- hire him or keep him as a portfolio

41

 1  manager?

 2          MR. CLEMENTE:  So, I think the default under the term

 3  sheet, as revised, is he stays in that capacity in terms of

 4  name.  The independent directors will -- they're subject to

 5  his control and direction, and they could decide to remove

 6  him.

 7          THE COURT:  Uh-huh.

 8          MR. CLEMENTE:  Perhaps if Your Honor --

 9          THE COURT:  Okay.

10          MR. CLEMENTE:  We could provide notice if they make

11  the determination to remove him, but I think the default is

12  that, you know, he's in that -- he's remaining as that

13  employee name currently.  So that's the current default.

14          THE COURT:  Okay.  All right.  Thank you.

15          MR. CLEMENTE:  Thank you very much, Your Honor.

16          THE COURT:  Well, Ms. Patel, you're getting up so

17  I'll hear -- I don't know who all has been in the loop over

18  this overnight development.

19      OPENING STATEMENT ON BEHALF OF ACIS CAPITAL MANAGEMENT

20          MS. PATEL:  Your Honor, Acis has been in the loop as

21  a member of the Committee.  And I will be very brief with

22  respect to Acis's individual comments.  And I just want to be

23  clear:  Obviously, I'm here as counsel for Acis, and so this

24  is Acis's individual position.  Mr. Clemente aptly and very

25  ably handled the Committee's overall position with respect to

42

1  this.

2      But Your Honor, I just want to, on behalf of Acis, make

3  sure that, because of these developments, that's really -- I

4  really had hoped to have zero role today, but I want to make

5  sure that we're -- Acis is on record with respect to our

6  position.  And obviously, given Your Honor's knowledge and

7  oversight of the long history of Acis's bankruptcy case and

8  seeing some of the events that transpired there, I'm sure that

9  this will all, against that backdrop, make an awful lot of

10  sense.

11      But, you know, it's this continued role for Mr. Dondero

12  that is of concern.  You know, this issue even being raised

13  within like the last 48 hours by Mr. Ellington, the timing of

14  it just creates an issue.  I mean, did this -- how could this

15  possibly have come out of left field when this is such a huge

16  part of what the Debtor does in its ordinary course of

17  business, is serve as a portfolio manager, and these are

18  contracts that have been negotiated, generally speaking,

19  internally by Highland.  So the fact that if Mr. Dondero were

20  to exit the structure and there would be some potential

21  ramifications to that, I've got to wonder how much of a

22  surprise could that really have been to Highland folks.

23      But I just wanted to highlight, in connection with the

24  term sheet -- this is the preliminary term sheet that was

25  handed up Your Honor, and I believe Your Honor has a redline

43

1   version of it as well --

2           THE COURT:  Uh-huh.

3           MS. PATEL:  -- on Page 2, with respect to the role of

4   Mr. James Dondero, there's various provisions in there.  And I

5   guess I would be remiss, Your Honor, if I didn't say, at least

6   out of the gate, Acis obviously supports the implementation of

7   this independent board of directors.  We believe all the

8   candidates are very capable and are -- we put our reliance

9   upon them.

10      Obviously, we don't concede any issues.  We'll see what

11  we're going to do.  But certainly, for the time being, we do

12  support the entry of this agreement of the settlement -- or,

13  I'm sorry, approval of the settlement agreement by the Court

14  that lets the independent board be put into place.

15      But what I'll focus the Court on, on Page 2 under the role

16  of Mr. James Dondero, it goes through various provisions as to

17  what he'll resign to -- positions he'll resign from and that

18  he will remain as an employee of the Debtor, including

19  maintaining his title as portfolio manager for all funds and

20  investment vehicles for which he currently holds that title.

21  And then it goes on to provide as to who he'll report to and

22  how he will be governed, which includes by the independent

23  board, he will receive no compensation, and that he will be

24  subject to at all times the supervision, direction, and

25  authority of the independent directors.

44

1      Again, we have faith that the independent directors will

2   oversee this and will govern his role accordingly.  However,

3   given Acis's history with how transactions have transpired at

4   Highland, we remain highly cautious with respect to what

5   happens next.

6      And to that end, Your Honor, the very last sentence there

7   on Page 2, "Mr. Dondero shall not cause any related entity to

8   terminate any agreements with the Debtor," is a key provision

9   of this that keeps Acis, as a Committee member, on board with

10  this agreement.  I wanted to highlight that and note that, in

11  the last less than 48 hours, in the last 12 hours, or maybe a

12  little bit more than that, call it 18 to be safe, that's where

13  -- that's a provision that's been -- that's where we've ended

14  up.  It's all of these issues have been going at lightning

15  speed, but I did want to just, for the record and so everybody

16  is clear, that is an important piece of this agreement to --

17  for Acis.

18      And as Your Honor knows, this Debtor, Highland, is wont to

19  try to terminate agreements and to try -- in an attempt to try

20  and transfer valuable contracts away and valuable revenue

21  stream away from an entity to an alternate entity.  And that's

22  really the heart of our concern, Your Honor.

23      So, with that, I just wanted to be clear and be on record

24  as to Acis's position.  Thank you.

25          THE COURT:  Thank you.  All right.

45

1        MR. POMERANTZ:  Your Honor, if I briefly may respond

2   to the issues with Mr. Dondero while they are fresh in Your

3   Honor's mind?

4        THE COURT:  Okay.  Okay.

5        MR. POMERANTZ:  Your Honor, look, we appreciate the

6   timing of this coming to the attention of the Committee as

7   being less than optimal.  As Your Honor can appreciate, this

8   case that's been filed three months ago, a lot of people are

9   looking very carefully at what's happening to the Debtor.

10  Investors are looking.  There was a transfer of venue.  There

11  have been a lot of reports about potential trustee motions.

12  And we believe a lot of parties are waiting to see the outcome

13  of this hearing and the trustee hearing to determine whether

14  they will determine to continue to do business with the

15  Debtor.

16     It's not only an issue of contractual rights.  It's also

17  an issue of whether investors feel comfortable on who is

18  managing, who is managing their investments.

19     This issue of Mr. Dondero's continuing role has been

20  something that at the Debtor we've continued to grapple with

21  over the last several weeks.  It's always been our thought

22  that we should do nothing that would unduly harm the company

23  from an economic standpoint.  I think the Committee shares

24  that.  That if it's determined by an independent board -- and

25  don't take current Debtor professionals, don't take current

46

1    Debtor employees' word for it -- but if they determine that

2    there's an economic benefit by keeping him on to preserve

3    material revenue stream, they should be able to make that

4    determination.  I think that's really at the core here.  And I

5    think the Committee got ultimately comfortable with it because

6    it will be an independent board, the majority of the members

7    identified and chosen by them and accepted by the Debtor.

8        So, again, we apologize to the parties and the Court for

9    bringing this on late.  It wasn't my intent to come here and

10   present modified versions of the term sheet that hadn't been

11   filed.  But that's where we are, and that's why it has come

12   up, and that's why it's an extremely important issue, because

13   preserving whatever revenue we can for the Debtor is

14   important.

15       Now, at the end of the day, the board may either decide

16   that he doesn't preserve the revenue, or the negatives from

17   keeping him involved with the company outweigh any benefits.

18   And that's a decision they will have to make, and it'll be

19   their province to make.  So I just wanted to give Your Honor

20   that perspective.

21           THE COURT:  Okay.

22           MR. DAUGHERTY:  Your Honor, may I approach?

23           THE COURT:  Mr. Daugherty?  You may.

24       OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

25           MR. DAUGHERTY:  I apologize.  I was not planning to

47

 1  address the Court at all today.  I would have had my attorney

 2  here for it.  But I just ask a little bit of indulgence to

 3  represent myself *pro se* for this issue.

 4     This is the first I've heard that Mr. Dondero would stay

 5  with the company.  I think it's an awful idea.  There's a

 6  litany of reasons for that.

 7     By the way, I'm completely in support of this -- of this

 8  board that's been chosen.  I have every confidence that

 9  they'll be able to make good decisions eventually.  But

10  they're stepping into this thing new.  Obviously, I've been

11  through this in your court with *Acis* and other matters, and I

12  have deep, deep concerns about Mr. Dondero continuing in that

13  role, simply because of the influence it has on the rest of

14  the organization and the message that it sends, both

15  internally and externally, of where the company goes from

16  here.

17     So I just wanted to let you know my thoughts.  I wasn't

18  planning to make them.  I haven't filed anything.  But that's

19  where I stand.

20        THE COURT:  All right.  Thank you, Mr. Daugherty.

21     All right.  Before we hear from the U.S. Trustee, who I

22  know is going to have a lot to say, let me just circle back

23  briefly to Jefferies counsel and the CLO Issuers' counsel.

24  You heard the representations of Mr. Pomerantz earlier about,

25  well, first, in the case of Jefferies, that the Debtor has

48

```
 1    agreed to language to address your concerns.  Do you want to

 2    weigh in on that and confirm that you're content that you're

 3    going to have language to work out your concerns?

 4            OPENING STATEMENT ON BEHALF OF JEFFERIES, LLC

 5            MR. MAXCY:  Thank you, Your Honor.  Patrick Maxcy for

 6    Jefferies.

 7        No, I don't have anything additional to add to what Mr.

 8    Pomerantz said.  The language that we have worked out will

 9    speak for itself and will be included in the order.

10            THE COURT:  All right.  Thank you.

11        And counsel for the CLO and CDO Issuers, do you confirm

12    that you would be in agreement to basically withdraw your

13    objections for now, but perhaps come back and make argument on

14    the 21st if you have not worked out language with the

15    Committee that you think works?

16            OPENING STATEMENT ON BEHALF OF THE ISSUER GROUP

17            MR. BENTLEY:  James Bentley from Schulte Roth for the

18    Issuers, Your Honor.

19        I believe the deal that Mr. Pomerantz and Mr. Clemente

20    and I have discussed was adjourning our objection to the 21st,

21    --

22            THE COURT:  Okay.

23            MR. BENTLEY:  -- rather than withdrawing it.

24            THE COURT:  Okay.

25            MR. BENTLEY:  We're -- we believe we will be able to
```

015346

Case 19-34054-sgj11   Doc 3596-23   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 23 Filed 06/25 92   Page 868 of 1017    PageID 16529

49

1   come up with language acceptable to the Issuers, but we would

2   like to reserve the right to come back to the Court on our

3   limited objection if we cannot, given that our issue is really

4   -- really only relates to the 25 Issuers we represent.

5          THE COURT:  Okay.  Thank you very much.

6      All right.  Ms. Lambert?

7     OPENING STATEMENT ON BEHALF OF THE UNITED STATES TRUSTEE

8          MS. LAMBERT:  May it please the Court.  As the Debtor

9   acknowledges, the motion that they are settling, the issues

10  that they are settling, are the issues that the U.S. Trustee

11  has raised in his motion to appoint a Chapter 11 trustee.  As

12  a matter of statutory construction, Section 1104 does not

13  contemplate settlement of these issues.  1112, in contrast,

14  has a provision that if the Court finds and determines that

15  there is cause to convert a case, there are unusual

16  circumstances and the Court can find a reasonable

17  justification for the wrongdoing or the error that occurred

18  that led to cause -- for example, administrative defects in

19  1112, not filing monthly operating reports -- and that can be

20  cured.  The Court has to make a finding that those -- these

21  defects can be cured within a reasonable period of time.

22  Section 1104 contains no analog to his.

23     If the Court finds cause to direct the appointment of a

24  Chapter 11 trustee, then the Court is supposed to appoint a

25  Chapter 11 trustee.  And *Trailer Ferry* and *AWECO* both stand

50

 1   for the proposition that, on today's day, we're supposed to

 2   have evidence about what the management issues are that led to

 3   this agreement.  There's been no evidence.  There's been no

 4   allegations in the motion for settlement.  And so the U.S.

 5   Trustee is prepared to put that evidence on.

 6       And Your Honor, one aspect of this is that the arbitration

 7   agreement has been sealed.  And there are people on the phone.

 8   I don't know who's on the phone.  The U.S. Trustee has opposed

 9   the sealing of the arbitration -- not arbitration agreement,

10   the arbitration judgment -- has opposed the sealing of that.

11   And then they referenced a confidentiality order as the basis

12   to seal it.  The U.S. Trustee also opposed that

13   confidentiality motion, which was filed subsequently to the

14   motion to seal.

15       There is no confidentiality order.  An interim order was

16   entered sealing the arbitration award, but -- and the U.S.

17   Trustee has honored that by redacting all of the pleadings

18   that we filed relating to that, but it's important today for

19   the U.S. Trustee to be able to discuss it in argument, and it

20   is here -- and we have it prepared to be admitted into an

21   exhibit.

22       So, to proceed with my argument, Your Honor, I need some

23   clarification about what I can say.

24           THE COURT:  You want clarification from me on what

25   you can say?

Case 19-34054-sgj11   Doc 3596-23   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 23 Filed 05/22/25 92   Page 870 of 1017   PageID 16531

51

1        MS. LAMBERT:  Well, I mean, either that or we need to

2   clear the room.

3        THE COURT:  I've read the arbitration award.

4        MS. LAMBERT:  Right.

5        THE COURT:  It's in my brain.

6        MS. LAMBERT:  Right.  Okay.

7        THE COURT:  Uh-huh.

8        MS. LAMBERT:  And so one of the arguments here today

9   is that the U.S. Trustee is representing the SEC and

10  representing other Government agencies and things.  No.

11  Obviously, that is not the U.S. Trustee --

12       THE COURT:  I didn't hear that.

13       MS. LAMBERT:  Okay.  The -- one of the positions has

14  been, in the papers, is, well, that we don't have standing to

15  raise their issues.  And that's true.

16       THE COURT:  Okay.

17       MS. LAMBERT:  But the problem is that the U.S.

18  Trustee has been constrained from discussing those issues with

19  the SEC.  The arbitration award is very relevant to the SEC's

20  oversight.  I anticipate the evidence today will be that the

21  SEC, after the financial crisis of 2008, imposed restrictions

22  on this Debtor on breach of fiduciary duty issues.  I

23  anticipate that the arbitration findings would be very

24  relevant to whether those issues are ongoing or not.

25       THE COURT:  Okay.  Let me weigh in.  I view the legal

52

 1   standard that this Court has to weigh today as being:  Is the

 2   Debtor proposing something that is reflective of sound

 3   business judgment, reasonable business judgment?  And to the

 4   extent this is a compromise of controversies with the

 5   Committee, is this fair and equitable and in the best interest

 6   of the estate?

 7       And as Mr. Pomerantz has said, you know, a lot of this

 8   maybe doesn't even need Court approval.  But to the extent

 9   there are aspects of this that are appropriate to seek Court

10   approval on, you know, this is my task.  I have to look at

11   what's presented, and is this reflective of sound business

12   judgment?  Is this fair and equitable?  Is it in the best

13   interest?

14       So, assuming there are tons of bad facts here reflected in

15   the arbitration award, reflected in other evidence, bad facts

16   that might justify a trustee, a Chapter 11 trustee, is this

17   nevertheless, what's proposed today, a reasonable compromise

18   of, you know, the trustee arguments the Committee could make

19   or, you know, is this a reasonable framework for going

20   forward?  Okay?

21       So I guess what I'm saying is I'm confused about, you

22   know, do I need to look at the arbitration award?  Do we need

23   to have evidence of all of that?  I can assume that there are

24   terrible facts out there that might justify a trustee, but I'm

25   looking at what's proposed.  Is this a fair and equitable way

53

 1   to resolve the disputes?  Is it sound business judgment?

 2   Frankly, is it a pragmatic solution here to preserve value?

 3   So that's the legal standard I have in my mind here.

 4           MS. LAMBERT:  Yes, Your Honor.

 5           THE COURT:  Okay.

 6           MS. LAMBERT:  The standard is whether it is fair and

 7   equitable to resolve the issues in the Chapter 11 trustee

 8   motion, and it is the U.S. Trustee's position that they are

 9   not resolved by this.  And how are they not resolved?  Number

10   one, they're not resolved because the problems that led to the

11   breach of fiduciary duty issues and findings are more

12   pervasive, both based on this Court' finding in the *Acis* case

13   and in the arbitration court's finding in Mr. Dondero.  Other

14   officers are implicated.

15           THE COURT:  But how --

16           MS. LAMBERT:  Other employees are implicated.

17           THE COURT:  Okay.  I feel like maybe we're talking at

18   each other, not getting each other.  I've got a proposed

19   solution here to totally change the playing field, if you

20   will.  Bring in incredibly qualified people to --

21           MS. LAMBERT:  Those people --

22           THE COURT:  -- to change out the, you know, the

23   person that you say breached fiduciary duties, the, you know,

24   mismanagement, whatever bad labels we have here, but bring in

25   a clean slate.

Appx. 02989
015351

54

```
 1              MS. LAMBERT:  No, Your Honor, because employees
 2    remain at the Debtor who are problematic.  The board that is
 3    appointed owes a fiduciary duty to whom?  Strand.  Dondero.
 4    He's still the board -- he is the sole stockholder.  Yes.  In
 5    addition, --
 6              THE COURT:  And they won't be taking directions from
 7    him.
 8              MS. LAMBERT:  In addition, --
 9              THE COURT:  The term sheet is they won't be taking
10    directions from him.
11              MS. LAMBERT:  Your Honor, there is no evidence before
12    the Court today that Mr. Dondero has entered a stipulation.
13    This is part of the problem.  This continues --
14              THE COURT:  Well, if he doesn't, in five minutes the
15    Committee is going to be filing their trustee motion, right?
16              MS. LAMBERT:  Well, then we haven't saved any time or
17    any money.  This is the whole issue.  They have to put on
18    evidence that this is a resolution of issues.  We're going to
19    have the motion to appoint a Chapter 11 trustee either way.
20              THE COURT:  All right.  Well, we did have the
21    evidence of Mr. Sharp.  Would you like to cross-examine him at
22    this point?
23              MS. LAMBERT:  Your Honor, I would like to put the
24    U.S. Trustee's exhibits into evidence and then cross-examine
25    him.
```

55

```
 1            THE COURT:  All right.  Your exhibits?

 2            MR. POMERANTZ:  Your Honor, we would object to any

 3    exhibits.  The Trustee has not filed an exhibit list.

 4            MS. LAMBERT:  Your Honor, this matter was set on an

 5    expedited basis and the Court does not require exhibit and

 6    witnesses lists when a matter is filed on an expedited basis.

 7    It's impossible, when a response is filed at 5:00 o'clock the

 8    evening before and supplements are made in the morning of the

 9    hearing, for the U.S. Trustee to put on a witness and exhibit

10    list.

11            MR. POMERANTZ:  Your Honor, we were here on the 19th.

12    We set out a briefing schedule.  And maybe it was a couple

13    days short of normal notice.  Ms. Lambert agreed to issue

14    discovery by a certain date, and she at no point said that

15    because there was 13 days' notice as opposed to longer period

16    that she couldn't comply and provide a witness list.

17        We provided with a witness list.  We provided an exhibit

18    list.  The Trustee's effort and attempt to now submit exhibits

19    and rely on maybe there were some changes this morning, that

20    just doesn't cut it, and that's not fair and that's not due

21    process.

22            THE COURT:  Okay.  I sustain the objection.  The

23    exhibits won't be admitted since there was no exhibit list.

24            MS. LAMBERT:  Your Honor, I do not have an exhibit

25    list from them.  And they --
```

Case 19-34054-sgj11   Doc 3596-23   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-20   Filed 07/25   Page 875 of 1017   PageID 16536

56

1          THE COURT:  Well, they haven't offered any.

2          MS. LAMBERT:  They put on new exhibits this morning.

3    The exhibits that the U.S. Trustee has are all things that

4    they are familiar with.

5          THE COURT:  Let me back up.  They didn't introduce

6    any exhibits.  They --

7          MS. LAMBERT:  But they introduced the declaration,

8    they introduced the supplements to the agreement that were

9    drafted this morning, they've introduced the new corporate

10   resolutions, all of which they handed me this morning.

11         THE COURT:  All right.  Well, the declaration of Mr.

12   Sharp, it's two pages long.  It is, I don't think, any kind of

13   surprise information.

14         MS. LAMBERT:  Your Honor, --

15         THE COURT:  I'll allow you to cross-examine him.

16         MS. LAMBERT:  -- the U.S. Trustee's exhibits are no

17   surprise, either.  The *Acis* opinion is no surprise to anybody

18   in this courtroom.

19         THE COURT:  Okay.  Well, what are your exhibits?

20         MS. LAMBERT:  The --

21         THE COURT:  I probably should have asked.

22         MS. LAMBERT:  The exhibits are the *Acis* opinion, the

23   arbitration awards or the determinations, both the partial and

24   the final, and the SEC's original judgment.  There are four

25   exhibits.

57

```
 1          THE COURT:  All right.  Well, Mr. Pomerantz, what
 2    would you like to say?  One of them I have obviously seen,
 3    since I wrote it.
 4          MR. POMERANTZ:  Yes, you've written it.  You wrote
 5    it.
 6       (Laughter.)
 7          MR. POMERANTZ:  Your Honor, I think this is a tempest
 8    in a teapot.  The Committee's brief that it filed in
 9    opposition to the CRO retention, the ordinary course
10    protocols, and the cash management motion had a litany of
11    description of the Redeemer litigation, of the SEC litigation.
12    There are plenty of bad facts out here.  Okay?  We have an
13    interim order to seal.  There was no hearing set today for our
14    final hearing.
15       The Trustee has objected to that order, and I suspect that
16    will be heard on the 21st.  We don't think it's appropriate to
17    introduce the Redeemer award.  However, we have read the
18    redacted provisions or portion of the U.S. Trustee's brief,
19    and we have no problem if the U.S. Trustee limits its argument
20    to the redacted portion in presenting that to the Court.
21       In other words, we don't believe that the few sentences
22    that were redacted need to be redacted.
23       However, to the extent they intend to submit the
24    arbitration award, we don't think it's appropriate, we don't
25    think it's necessary, we think Your Honor hit it right, that
```

58

1   the issues today are not whether there's mismanagement at the

2   Debtor.  Okay?

3       The U.S. Trustee's position is, notwithstanding this new

4   structure, it doesn't work.  She has a trustee motion on.  She

5   can argue on the 21st that it doesn't work.  Nobody is

6   prejudicing her right to do so.

7       We think it's prejudicial, it's unfair, it's procedurally

8   improper to submit the Redeemer arbitration award and to allow

9   the Trustee to do anything other than describe exactly what

10  she has in her pleading.

11          THE COURT:  Okay.  I sustain the objection to those

12  exhibits.  Again, I've read them.  They're in my brain.  I

13  wrote one of them.  But I will allow you to cross-examine Mr.

14  Sharp.  So, Mr. Sharp, would you please come to the witness

15  stand?  Please raise your right hand.

16          BRADLEY SHARP, DEBTOR'S WITNESS, SWORN

17          THE COURT:  All right.  Please be seated.

18          MS. LAMBERT:  To clarify, Your Honor, has the Court

19  considered the *Acis* opinion and the arbitration opinions based

20  on judicial notice?

21          THE COURT:  And we're doing a lot of hair-splitting

22  here.  I'm just letting you know I -- the facts are in my

23  brain.  You can't extract them from my brain.  Okay?

24          MS. LAMBERT:  Okay.

25          THE COURT:  I know there have been a lot of bad

Sharp - Cross                          59

1    things, arguably bad things.  But to me, the real issue here

2    today is whether this framework that has been heavily

3    negotiated with the Committee reflects reasonable business

4    judgment on the part of the Debtor, is a fair and equitable

5    resolution of the Committee's, you know, arguments in favor of

6    a trustee, and whether this makes, you know, sense going

7    forward to allow this Debtor to go forward without a trustee.

8    Okay?

9        So I really think that the evidence you want is not

10   terribly relevant.  We technically aren't here on a trustee

11   motion today.  We're here on whether a new board and the

12   terms, the protocols suggested, reflect reasonable business

13   judgment and reflect a fair compromise of arguments the

14   Committee has raised.  All right?  So I don't know how much

15   more clear I can make that.  I guess the technical answer is

16   I'm not taking judicial notice of those things for purposes of

17   today.

18       All right.  You may proceed.

19                    CROSS-EXAMINATION

20   BY MS. LAMBERT:

21   Q   Mr. Strand, can you state your name for --

22   A   Sorry.  Bradley Sharp, S-H-A-R-P.

23   Q   Sharp.  Mr. -- oh, sorry.

24   A   No relation to Strand.

25   Q   All right.  Strand is the general partner of the Debtor,

Sharp - Cross                                      60

1   right?

2   A    That is correct.

3   Q    And there has been no change in the board of the Debtor

4   except Mr. Dondero's resignation; is that right?

5   A    Well, it's a little different, because the -- Strand is

6   the general partner of the Debtor.

7   Q    Yes.

8   A    So the new board will be acting and in control of the

9   Debtor.

10  Q    Yes.  And there is -- Strand is a non-debtor, correct?

11  A    That is correct.

12  Q    And the stock of the non-debtor, Strand, is owned by

13  Dondero?

14  A    Mr. Dondero owns Strand Advisors.

15  Q    In its entirety?

16  A    That is correct.

17  Q    So the board will owe a fiduciary duty to Mr. -- to Mr.

18  Dondero?

19  A    The board will have a fiduciary duty to the Debtor and to

20  Strand Advisors.

21  Q    All right.

22  A    Their duty is to the entity.

23  Q    The -- Strand, as the general partner, as an entity, owes

24  a fiduciary duty to the Debtor, right?

25          MR. MORRIS:  Objection to the extent it calls for a

Sharp - Cross                              61

 1  legal conclusion.

 2          THE COURT:  Sustained.

 3  BY MS. LAMBERT:

 4  Q    Do you know?

 5  A    As a lay person.  I'm not an attorney.

 6  Q    Okay.  So you don't know what the fiduciary roles of the

 7  board will be; is that right?

 8  A    Well, the fiduciary board will be acting -- you know,

 9  looking at it from my perspective as the chief restructuring

10  officer, the new board will be acting as the Debtor-in-

11  Possession.  And, you know, they will be directing the Debtor-

12  in-Possession.  You know, the Debtor-in-Possession has duties

13  to all parties in interest, and they will be directing the

14  Debtor.  They will be directing me as CRO.

15  Q    And, in addition, there may be a CEO, right?

16  A    That is contemplated, correct.

17  Q    It is contemplated?  It --

18  A    It is -- it is an option that the board has if they think

19  a CEO is necessary.

20  Q    But you don't know whether a CEO is going to be appointed

21  or not?

22  A    That's up to the board.

23  Q    And you don't know what the compensation for that

24  individual might be, right?

25  A    Again, that's up to the board.

015359
Appx 02987

Sharp - Cross                                62

1    Q    Mr. Dondero is going to be an employee of the Debtor,

2    right?

3    A    That's correct.

4    Q    And Mr. Dondero started the Debtor, correct?

5    A    I believe so.

6    Q    And he also started Strand, right?

7    A    I believe that's correct.

8    Q    And he is also in control of a number of entities that the

9    Debtor does business with; is that right?

10   A    That is correct.

11   Q    Mr. Ellington is going to remain on with the Debtor?

12   A    That -- Mr. Ellington is an employee.  All employees are

13   now subject to the board.

14   Q    Okay.  And Mr. Ellington's role with the Debtor is what?

15   A    He is general counsel with the Debtor.

16   Q    And there are other in-house attorneys with the Debtor,

17   right?

18   A    That's correct.

19   Q    And who else is there currently?

20   A    I don't have the list in front of me, you know, the

21   employee list.  As of now, because obviously this is still --

22   hasn't been effected, so the board has not made any decisions

23   with respect to any employees going forward.

24   Q    And the CFO remains the same?

25   A    Yeah, that is, again, as of now.  I don't know what the

Appx 02998

Sharp - Cross                          63

1   board is going to do, if anything.

2   Q   Do you have any anticipation of what you would recommend

3   to the board regarding the CFO?

4   A   You know, I have many recommendations I have not made to

5   the board yet.  I just met them this morning.

6   Q   Are you aware that historically this Court has found that

7   the lawyers provided bad advice to the Debtor?

8           MR. MORRIS:  Objection to the form of the question.

9           THE COURT:  Sustained.

10  BY MS. LAMBERT:

11  Q   Do you have any knowledge about whether there have been

12  findings that the law firm gave erroneous advice to the

13  Debtor?  Or, I mean, the in-house counsel gave erroneous

14  advice.

15          MR. MORRIS:  Objection to the form of the question.

16          THE COURT:  Sustained.

17          MS. LAMBERT:  Your Honor, I'm asking for the

18  foundation.

19          THE COURT:  Rephrase.

20  BY MS. LAMBERT:

21  Q   Do you -- are you aware of any concerns about the in-house

22  counsel?

23  A   Yes.

24  Q   What is your knowledge?

25  A   I have read the rulings from this Court.

Sharp - Cross                      64

1  Q    And what is your understanding of those rulings?

2  A    I don't recall specifically.  I read that early on when I

3  was first employed.  But there have been concerns with respect

4  to, you know, management of the Debtor.

5  Q    As the CRO, have you made any recommendations to change

6  employees to date?

7  A    As of now, I don't have a -- the board.  You know, the

8  board has just been employed.  We have not made

9  recommendations up to this point.  We are still -- obviously,

10  have been evaluating our position and what needs to happen.  I

11  think it's important for the Debtor at this time, a little

12  stability would be a good thing for -- until we develop the

13  direction going forward.

14  Q    Are you familiar with the compensation terms for the

15  directors?

16  A    Yes.

17  Q    And the directors are employees of Strand but paid by the

18  Debtor; is that right?

19  A    Oh, I'm not sure they're employees of Strand, but they are

20  paid by the Debtor, their compensation.  That's correct.

21  Q    And yet the compensation is technically through Strand,

22  right?

23  A    They -- they are.  They have to act through the general

24  partner of the Debtor because of the corporate structure.

25  Q    One of the portions of the agreement is that the Committee

Case 19-34054-sgj11    Doc 3596-23    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 23    Filed 06/25/92    Page 884 of 1017    PageID 16545

Sharp - Cross                         65

1   acquires litigation claims.  Are you familiar with that?

2   A    I am.

3   Q    Have you parsed out which litigation claims those might be

4   at this point?

5   A    I think the agreement says they have litigation claims

6   against insiders and related parties.  So I don't know what

7   those individual claims are.  I don't know what exists.

8   Q    Are you aware that the Committee obtains the attorney-

9   client privilege and work product privilege?

10  A    Yeah.  Subject to the terms of those agreements, correct.

11  Q    Have you gone through the documents and determined which

12  ones would fall on -- which attorney files would fall on which

13  side?

14  A    Not as of yet.

15  Q    Have you been taking direction from Mr. Dondero?

16  A    We've had -- I've had limited interaction with Mr. Dondero

17  since my retention.  You know, we have been complying with the

18  protocols that we had been negotiating with the Committee and

19  providing information to the Committee.  We have been, as a

20  result of those protocols, instructing management of the

21  company on compliance with those protocols.  So they have

22  brought to us transactions that they would like to do.  We

23  have reviewed those transactions and compared it to the

24  proposed protocols and have been enforcing those.  So if

25  management has asked to do a transaction that does not meet

Case 19-34054-sgj11   Doc 3596-23   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 23 Filed 06/26/25   Page 885 of 1017   PageID 16546
Page 66 of 92

Sharp - Cross                                66

1    within those protocols, we have been declining the

2    transaction.  And that -- you know, the company has agreed

3    with that decision and accepted that decision.

4    Q    When you say management, who are you -- to whom are you

5    referring?

6    A    You know, the whole management team at the company.  In-

7    house counsel.  The CFO.  You know, I've had limited

8    interaction with Mr. Dondero.  One interaction was he did

9    question one of my decisions that I made.  We discussed it and

10   he accepted my conclusion.

11   Q    You're at the Debtor every day?

12   A    My team is.

13   Q    You are not?

14   A    I have had some travel restrictions due to a medical

15   issue, but I have three of my team there every day.

16   Q    Is Mr. Dondero there every day?

17   A    I don't know.  I don't think so.  In the few days I'm

18   there, I've not seen him.

19   Q    Is Mr. Ellington there every day?

20   A    No.

21   Q    Who on the management team is there every day?

22   A    You know, our primary interaction is with Isaac Leventon,

23   Frank Waterhouse, the CFO.  You know, primary interaction, you

24   know, with David Klos, who is the controller, in dealing with

25   the financial issues.

Appx. 02902
015364

Sharp - Cross                              67

1      Obviously, we spend a lot -- my team spends a lot of time

2   with the head of compliance.

3   Q   Were you surprised by this addition that Mr. Dondero would

4   remain as an employee?

5   A   I can't say I was surprised.  It is an issue that we

6   struggle with, given the nature of this company's business.

7   You know, I see the change in the language and, you know, as

8   CRO, I am comfortable with it.

9   Q   So, as CRO, if Mr. Dondero is necessary now, you recognize

10  that he was necessary three weeks ago?

11  A   I'm not saying that he's necessary.  I'm saying that it is

12  important for the board to be able to make that decision.

13  Q   And it wasn't important when the settlement was filed?

14  A   It was the -- it was a struggle at the time.  I was

15  concerned at the time it was filed the unintended consequences

16  of Mr. Dondero resigning completely and disappearing, because

17  there are a significant number of funds that the Debtor deals

18  with related parties that are controlled by Mr. Dondero, and I

19  was worried about the financial impact with it.  I knew this

20  issue was important to the Committee.  And if that's something

21  that the Debtor agreed to and the Committee agreed to, so be

22  it.

23      You know, I think the last-minute compromise is acceptable

24  and appropriate.  I think the language as negotiated is going

25  to be very helpful to the Debtor.  And I think, then, it's up

                        Sharp - Cross                    68

1   to the board to make the decision, with full knowledge on

2   what's the best avenue forward.

3   Q    And the language as negotiated was added because, in the

4   past, there have been problems with Mr. Dondero changing or

5   terminating agreements with related entities, right?

6   A    There was that -- I've seen that -- issues raised in the

7   *Acis* case.

8            MS. LAMBERT:  No further questions.

9            THE COURT:  All right.  Any redirect?

10           MR. POMERANTZ:  Not from the Debtor.

11           THE COURT:  Anyone have examination?  No?  All right.

12  Thank you, Mr. Sharp.  You're excused.

13           THE WITNESS:  Thank you.

14     (The witness steps down.)

15           THE COURT:  All right.  Are we going to have any

16  other, I guess, witnesses, evidence?

17             CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

18           MR. POMERANTZ:  No, Your Honor.  I just had a couple

19  points.  One, Ms. Lambert mentioned that she hadn't seen a

20  copy of the stipulation referred to, which was prohibiting Mr.

21  Dondero from terminating the board.  There's a good reason for

22  her not having seen it.  I hadn't provided it to her.  It just

23  came this morning, right before the hearing.  I have one

24  signed copy.  I have other copies that I could represent, even

25  though they're unsigned, are the same, so I would like to

015366

69

```
 1   provide Your Honor.  I'll keep the signed copy but provide you
 2   with an unsigned copy, but it's the same, and also give one to
 3   the U.S. Trustee.
 4           THE COURT:  But you've got a signature of Mr. Dondero
 5   on that?
 6           MR. POMERANTZ:  Yes, I do.
 7           THE COURT:  Okay.
 8           MR. POMERANTZ:  May I approach?
 9           THE COURT:  You may.  Thank you.
10           MR. POMERANTZ:  Your Honor, maybe for the record it
11   would be appropriate for me to show Your Honor the signature,
12   so you could say that you've seen it?
13           THE COURT:  Yes.  Yes.
14           MR. POMERANTZ:  May I approach again?
15           THE COURT:  You may.  (Pause.)  Okay.  Thank you.
16   The record will reflect I've seen Mr. Dondero's signature.
17           MR. POMERANTZ:  Your Honor, one of the threads that
18   Ms. Lambert said to Your Honor is that there were employees
19   still remaining at the Debtor and that those employees may
20   have been involved in some wrongdoing.
21       I submit, Your Honor, if Your Honor appointed a Chapter 11
22   trustee today, what would a Chapter 11 trustee do?  A Chapter
23   11 trustee wouldn't terminate every employee at the Debtor.  A
24   Chapter 11 trustee, if he or she was doing what they should
25   do, would go down to the company, would interview members of
```

70

1    the company, senior management, and decide who should stay on

2    and who should not stay on.

3         That, I submit, Your Honor, is exactly what this board

4    will do.  So the concept of there being something different

5    done, if you have a board here or not, I don't think makes

6    sense.

7         And lastly, Your Honor, Ms. Lambert expressed the issue as

8    whether it's fair and equitable to resolve the U.S. Trustee

9    issues in this way.  I don't think that's the standard.  The

10   only fair and equitable I understand is in plan confirmation.

11   I think Your Honor said it straight, which is:  Is this a

12   valid exercise of the Debtor's business judgment and is it an

13   appropriate compromise of controversy?  That is the standard.

14   And, again, we have always acknowledged that, notwithstanding

15   how Your Honor rules today, the Trustee reserves the right to

16   come back to court and argue a trustee is appropriate on the

17   21st.

18        We believe, Your Honor, that many of the cases, in this

19   circuit and elsewhere, look to the continuing management of

20   the company and whether management issues have been addressed

21   as a significant factor in determining whether a trustee is

22   appointed.  And it'll come as no surprise, of course, if Your

23   Honor grants our motion today, this will be a lynchpin of our

24   opposition to the trustee motion.

25        But, again, those issues are for another day, and we

71

1   believe that we have satisfied our standard, and we request

2   that Your Honor approve the motion.

3         THE COURT:  All right.  Other closing arguments?

4      CLOSING ARGUMENT ON BEHALF OF THE UNITED STATES TRUSTEE

5         MS. LAMBERT:  Yes, Your Honor.  As the Debtor

6   acknowledges, the Court has no jurisdiction over Strand.  This

7   is a complicated structure.  A trustee avoids all of the

8   complications involved in the Court exercising jurisdiction

9   over an entity that it doesn't have jurisdiction over.

10      To enter a stock stipulation related to a non-debtor is

11   highly irregular, and Mr. Dondero is the person behind that.

12   It has happened in cases where people have been in these kinds

13   of structures, like that FSLIC used to put in these kinds of

14   structures -- there's published opinion, the *Goubert*

15   (phonetic) case -- where the person continued to exercise

16   control even though they had a stock trust.

17      The Court needs a person beholden to the Court.  The

18   evidence is that, historically, this Debtor has entered into

19   things that breached its fiduciary duty and resulted in self-

20   dealing and liability for the Debtor.  The evidence is that

21   these go beyond Mr. Dondero and the Court does not have

22   jurisdiction over his stock.  The Court does not have

23   jurisdiction over Strand.  The board members of Strand are not

24   employees of the Court, they're employees of Strand, a non-

25   debtor.  These members have a fiduciary duty to Strand.

Appx. 02007

015369

72

1       Yes, Strand is the general partner of this Debtor and has

2    a fiduciary duty, but all these fiduciary duties intermix in

3    ways that result in conflicts for this case.  These conflicts

4    are unnecessary.  The Court could just appoint a trustee who

5    only owes a fiduciary duty to the members and creditors of

6    this case, as well as the next (inaudible).

7       There is no evidence that this is cheaper.  There is no

8    evidence that this is a total resolution, because issues are

9    left open, such as whether or not a CEO is going to be

10   appointed, how much that person is going to cost.

11      Finally, Your Honor, the sealing has constrained the

12   ability of some of the parties to understand what's going on

13   in this case.  And that is material to the argument about who

14   is here, because we don't know who -- that all the people who

15   would have participated in this discussion had an opportunity

16   to participate in it.

17      Yes, the creditors have a fiduciary duty, and I believe

18   that they represented to the best of their ability, but they

19   are not charged with the issues that others are charged with,

20   such as the SEC.

21      There is no evidence that the officers are disinterested.

22   Rather, the new officers are going to be conflicted by the

23   nature of their position.  There's no evidence that it's

24   cheaper.  And a trustee, if appointed, could be appointed on

25   an hourly basis.  This is a Chapter 11 trustee.

015370

73

1      They argue that the trustee would not have the knowledge,

2    and yet they've been able to find three candidates to serve

3    for the board who are qualified.  So there's no evidence that

4    it would not be better to have a trustee for that reason as

5    well.

6      The evidence is that, historically, the Redeemer Committee

7    was set up to prevent these kinds of transactions and have

8    oversight.  Historically, the evidence is it did not work.

9    For this reason, the statute provides a solution, and the

10   Court should impose it.  The Court should deny this motion as

11   not being in the interest of the estate, as not being a sound

12   exercise of discretion, because it's really the discretion of

13   Strand, not the Debtor, and it will remain the discretion of

14   Strand, not the Debtor.

15     Thank you.

16         THE COURT:  All right.  Anyone else have comments?

17         MR. POMERANTZ:  Your Honor, just a couple of minor

18   points.

19         THE COURT:  Okay.

20         CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

21         MR. POMERANTZ:  Ms. Lambert started by saying the

22   Court doesn't have jurisdiction over Strand.  I know I just

23   handed her the stipulation, but the last paragraph of the

24   stipulation specifically says that the parties stipulate and

25   agree that the Court shall have exclusive jurisdiction over

Appx. 03909
015371

Case 19-34054-sgj11    Doc 3596-23    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 23    Filed 07/25/25    92    Page 893 of 1017    PageID 16554

74

1   all matters arising from or related to the interpretation and

2   implementation of this stipulation and the adjudication of any

3   parties breaching the stipulation.

4        So the Court does have jurisdiction now that the

5   stipulation has been signed, assuming that the Court enters

6   it, so I think that addresses that issue.

7        Your Honor, the evidence of the disinterestedness of the

8   members of the board, we've provided their *curriculum vitaes*.

9   We've made representations that they have no connections with

10  the Debtor or any of the parties in interest.  We don't think

11  that, just because they become appointed and become a director

12  of Strand, that that renders them disinterested [sic], and we

13  think that the Trustee's arguments that being at a different

14  level creates different duties is just not -- is not accurate.

15  I don't think that the Committee would have had any appetite

16  for this type of structure had they believed that each of

17  these board members wouldn't feel that their fiduciary duty

18  was to the Debtor's estate.  And they all are seasoned

19  restructuring people from different aspects, all understand

20  their fiduciary duties well, and all are prepared to carry

21  them out.

22        Lastly, the Trustee points to the historic issues, and

23  specifically mentioned the Redeemer Committee and that

24  structure didn't work.  Well, I think it speaks volumes, Your

25  Honor, that not only the Redeemer Committee, are they on the

1   Committee and the Committee has supported this motion, but the

2   Redeemer Committee hasn't come to Your Honor and said that,

3   notwithstanding that structure that may or may not have been

4   effective, this structure is ineffective.

5       And at the end, Your Honor, the Trustee is trying to

6   replace the business judgment of the Debtor.  The Debtor is

7   entitled to deference of the judgment, again, focusing on the

8   correct standard.  And, again, the Trustee will have her day

9   in -- his day in court in connection with the ultimate trustee

10  motion on the 21st.

11      Thank you, Your Honor.

12          THE COURT:  Anyone else?

13      All right.  Well, the Court is going to note a few things

14  as part of its ruling, obviously.  The new proposed

15  independent board members for Strand, Strand obviously being

16  the general partner of the Debtor, Highland -- Mr. James

17  Seery, Mr. John Dubel, and retired Judge Russ Nelms -- are

18  highly-qualified individuals with respect to the industry.

19  Some of them with respect to restructuring.  Certainly, in the

20  case of retired Judge Nelms, with regard to fiduciary duties

21  and the Bankruptcy Code requirements.

22      These three individuals were chosen by the Creditors'

23  Committee, whose constituency is broad, whose constituency is

24  owed well over $100 million.  And they were chosen by the

25  Committee after literally months of negotiation.  Obviously,

Case 19-34054-sgj11   Doc 3596-23   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-20   Filed 06/26/25   Page 895 of 1017   PageID 16556
Exhibit 23   Page 76 of 92

76

1   this bankruptcy was filed in October, and it appears to this

2   Court, from the representations of counsel, that from the very

3   beginning of the case -- the Committee was, I guess, appointed

4   a week or two after the case was filed in October -- there's

5   been haggling over corporate governance of this Debtor.

6       So we have highly-qualified individuals.  We have

7   individuals who were chosen by the well-constituted Creditors'

8   Committee.  And what has been proposed to the Court is that it

9   is these independent directors that would have sole and

10  exclusive management and control of the Debtor.

11      An interesting jurisdictional argument has been made, and

12  it's one of those arguments that, frankly, you know, sounds

13  good when you first hear it, but when you really drill down

14  about the governance structure here, I mean, obviously, this

15  Debtor is a limited partnership and it acts through a general

16  partner.  It's the general partner that controls the Debtor

17  entity.  And while Strand Advisors, Inc., the general partner,

18  may not technically be in bankruptcy, it's the structure of

19  these entities such that it controls the Debtor.  So the

20  jurisdictional argument, when you drill down, feels a little

21  off.

22      Moreover, we have language in the stipulation where Strand

23  is stipulating and consenting, if you will, to this Court's

24  exercise of jurisdiction over it.

25      There are many things about the compromise here that have

77

 1   very compelling appeal.  Among them, certainly, the Committee

 2   that's negotiated this term sheet retains the right at any

 3   time to move for a Chapter 11 trustee if it believes there are

 4   grounds.  The Committee is granted standing to pursue estate

 5   claims, certain estate claims right off the bat, without

 6   having to come back and ask the Court, without having to rely

 7   on the Debtor to pursue that.  There are document production

 8   provisions, document preservation provisions, a shared

 9   privilege negotiated, that are very powerful tools for the

10   Committee, and certainly operating protocols that have been

11   negotiated regarding the Debtor's operations that are very

12   powerful tools for the Committee.

13       I said many times during the *Acis* case -- those who were

14   here will remember -- that the company, *Acis*, was not a great

15   fit for Chapter 11.  Lots of companies aren't great fits for

16   Chapter 11, I suppose, but the kind of business it was was

17   kind of tough to maneuver in Chapter 11.  Human beings and

18   their expertise create value.  And while we had a Chapter 11

19   trustee, a stranger come in and take control over Acis, you

20   know, there's great uncertainty whether that stranger is going

21   to be able to preserve value and have the smooth transition

22   into Chapter 11 that's really going to be the best fit.

23       Here, as I've said earlier, the legal standard I view as

24   controlling here is 363 and whether what has been proposed

25   reflects reasonable business judgment.  Is there a sound

1   business justification for proposing the independent slate of

2   directors at the GP level for the Debtor, the protocols, the

3   negotiation with the Committee, the document sharing, the

4   standing given to them?  Does all of this reflect reasonable

5   business judgment?  And I find, quite clearly, it does.  I

6   find it to be a pragmatic solution to the Committee's concerns

7   about existing management and control.

8       And I think I used the words "fair and equitable," not

9   just Ms. Lambert, because it is also presented to the Court as

10  a 9019 compromise of disputes with the Committee, and we

11  traditionally use a fair and equitable and best interest of

12  the estate analysis in this context.  So, to the extent that

13  applies, I do find this a fair and equitable way of resolving

14  the disputes with the Committee, and I find this to be in the

15  best interest of the estate.  So I do approve this.

16      And by approving this motion, I'm approving the term sheet

17  as it's been presented, the various terms therein, the

18  exhibits thereto.  I'm specifically approving the new

19  independent directors, the document management and

20  preservation process, the standing to the Committee over

21  certain of the estate claims, the reporting requirements, the

22  operating protocols, the whole bundle of provisions.

23      Now, there is one specific thing I want to say about the

24  role of Mr. Dondero.  When Ms. Patel got up and talked about

25  the newest language that has been added to the term sheet, she

015376

Case 19-34054-sgj11   Doc 3596-23   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 23   Filed 08/26/25   Page 898 of 1017   PageID 16559

79

1   highlighted in particular the very last sentence on Page 2 of

2   the term sheet, the sentence reading, "Mr. Dondero shall not

3   cause any related entity to terminate any agreements with the

4   Debtor."  Her statement that that was important, it really

5   resonated with me, because, you know, as I said earlier, I

6   can't extract what I learned during the *Acis* case, it's in my

7   brain, and we did have many moments during the *Acis* case where

8   the Chapter 11 trustee came in and credibly testified that,

9   whether it was Mr. Dondero personally or others at Highland,

10   they were surreptitiously liquidating funds, they were

11   changing agreements, assigning agreements to others.  They

12   were doing things behind the scenes that were impacting the

13   value of the Debtor in a bad way.

14       So not only do I think that language is very important,

15   but I am going to require that language to be put in the

16   order.  Okay?  So we're not just going to have an order

17   approving the term sheet that has that language.  I want

18   language specifically in the order.  You know, you can figure

19   out where the appropriate place to stick it in the order is,

20   but I want specific language in here regarding Mr. Dondero's

21   role.  I also -- the language in there that his role as an

22   employee of the Debtor will be subject at all times to the

23   supervision, direction, and authority of the Debtors, I want

24   that language in there as well.  Let's go ahead and put the

25   language in there that at any time, in any event, the

Case 19-34054-sgj11    Doc 3596-23    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 23    Filed 08/25    Page 899 of 1017    PageID 16560

80

 1   independent directors can determine he's no longer going to be

 2   retained.  I want that in the order.

 3      And I'm sure most of you can read my mind why, but I want

 4   it crystal clear that if he violates these terms, he's

 5   violated a federal court order, and contempt will be one of

 6   the tools available to the Court.  He needs to understand

 7   that.  Mr. Ellington needs to understand that.  You know, if

 8   there are any games behind the scene, not only do I expect the

 9   Committee  is going to come in and highlight that to the Court

10   and file a motion for a trustee or whatever, but we're going

11   to have a contempt of court issue.

12      So, anybody want to respond to that?

13         MR. POMERANTZ:  Your Honor, Jeff Pomerantz; Pachulski

14   Stang Ziehl & Jones.

15      We hear Your Honor.  What I thought I'd do now is I have a

16   clean redline of the order, of course not including the

17   provision you just requested, --

18         THE COURT:  Uh-huh.

19         MR. POMERANTZ:  -- which we will go back and upload

20   and hope to get an order signed by Your Honor today, if you're

21   around.  But to go over the other changes, the changes to

22   Jefferies, the other language changes I discussed before.  I

23   gave a copy to Ms. Lambert and to the Committee.  May I

24   approach with a --

25         THE COURT:  You may.

81

1              MR. POMERANTZ:  Thank you.

2              THE COURT:  Okay.  All right.  (Pause.)  All right.

3      The form of order looks fine to me.  Obviously, you'll add the

4      Dondero-related language, and we may have further wording

5      tweaks negotiated with the CLO Issuers.  But, again, I approve

6      all of this.  I didn't say on the record the compensation, but

7      certainly I am approving that as reasonable.  I expect these

8      three directors are going to be working very, very hard.  And

9      so, as you said, not 50,000-foot level monitoring, actually

10     rolling up sleeves on-site, so I think the compensation is

11     reasonable.

12             MR. POMERANTZ:  Thank you, Your Honor.  We will

13     submit an order shortly that includes Your Honor's language

14     requested.

15             THE COURT:  Okay.

16             MR. POMERANTZ:  Are you around this afternoon?

17             THE COURT:  I am around, --

18             MR. POMERANTZ:  Okay.

19             THE COURT:  -- so just pick up the phone or send an

20     email to Traci, my courtroom deputy, --

21             MR. POMERANTZ:  Yes.

22             THE COURT:  -- so she can tell me, "It's in your

23     queue to sign."

24             MR. POMERANTZ:  She has been extremely helpful and

25     responsive.

82

1          THE COURT:  Good.  I'm glad to hear that.

2          MR. POMERANTZ:  Yes.

3          THE COURT:  Now, as far as future scheduling, I did

4    have her sitting by, listening, in case we needed to discuss

5    anything.  Obviously, we're going to have a kind of a

6    carryover placeholder on the 21st as part of the trustee

7    motion hearing for any remaining issues with the CLO Issuer.

8    And, you know, that's just a placeholder if necessary to hear

9    language controversies.

10      My courtroom deputy was concerned, because you have a lot

11   of pending motions that have just sort of sat there pending

12   because this was the big issue, right?  She wants to make sure

13   she sets anything you need a setting on.  And I don't know if

14   you want to discuss that today or go back as a group and --

15         MR. POMERANTZ:  We're happy to -- I think, you know,

16   I think that's appropriate to do.  We had the motion to

17   appoint the CRO.

18         THE COURT:  Uh-huh.

19         MR. POMERANTZ:  That was pending.  That gets resolved

20   by this motion.  We will submit an order --

21         THE COURT:  Okay.

22         MR. POMERANTZ:  -- with the new agreement that was

23   attached to the term sheet.

24      We had the cash management order which Judge Sontchi had

25   issued an interim order.  We will have a final order with

Appx. 03918

83

1    respect to that.

2            THE COURT:  Okay.

3            MR. POMERANTZ:  We will be withdrawing the motion to

4    approve ordinary course protocols which was originally on for

5    hearing.

6            THE COURT:  Uh-huh.

7            MR. POMERANTZ:  I think on the 21st we have currently

8    set a motion to approve the retention or Mercer, which is the

9    Debtor's compensation consultant, --

10           THE COURT:  Uh-huh.

11           MR. POMERANTZ:  -- and an analog motion that was

12   originally set for today with respect to insiders, non-

13   insiders, but is on for non-insiders and insiders on the 21st,

14   --

15           THE COURT:  Uh-huh.

16           MR. POMERANTZ:  -- which is the motion to approve

17   bonuses.

18           THE COURT:  Uh-huh.

19           MR. POMERANTZ:  Of course, the Debtor's new board is

20   going to be wanting to very carefully review that.  And we are

21   going back and today having our first new board meeting with

22   the board to start bringing them up to speed.  But we

23   presently intend, subject to, obviously, their direction, to

24   go forward on the 21st.

25       We also have the retention of Lynn Pinker and Foley

015581

84

1  Gardere, which had been filed and was brought on for hearing

2  previously.  It had been delayed, again, for the board to look

3  at the issues.  We expect to have that on for the 21st.  And I

4  believe, I believe that would be it.

5        MS. LAMBERT:  No, Your Honor, the --

6        MR. POMERANTZ:  No?

7        MS. LAMBERT:  -- U.S. Trustee has objected to the

8  motion to seal, which was the second item on the Wilmington

9  Court's docket that got -- and it got transferred here.  The

10  U.S. Trustee has also objected to the motion for protective

11  order.  The issues overlap.  We request that they be set as

12  quickly as possible.

13        MR. POMERANTZ:  We're happy to set both of those for

14  the 21st as well.

15        THE COURT:  All right.  So I think what I'm going to

16  ask you to do is just get on the phone, one of you, with Traci

17  and just make sure she's clear on everything you need set on

18  the 21st, and then you can do a big notice of hearing, just

19  kind of listing all of these matters.

20        MR. POMERANTZ:  Your Honor, with respect to the CRO

21  motion -- order and the cash management order, I was wondering

22  if it would be helpful for my colleague Mr. Demo to go over

23  the amendments to those orders -- we would like those to be

24  entered today -- to see if Your Honor has any questions.

25        THE COURT:  All right.  That would be good.  Mr.

85

1   Clemente, did you have something first?

2          MR. CLEMENTE:  Just very quickly, Your Honor.  We had

3   filed our retention applications for the Committee

4   professionals and filed CNOs, and your office had indicated

5   you wanted to get through today, which I totally understand,

6   but I just wanted to make sure that Your Honor didn't lose

7   sight of those.  I don't believe there were any objections to

8   those, but I think your intent was probably to deal with them

9   after today, but I just wanted to --

10         THE COURT:  All right.  Yes, it was to get through

11  today.

12         MR. CLEMENTE:  Yes.

13         THE COURT:  So, since you've had plenty of time run

14  on those, you can submit orders and I'll get them signed in

15  chambers.

16         MR. CLEMENTE:  Thank you very much, Your Honor.

17  Appreciate it.

18         THE COURT:  Okay.  Thank you.  Counsel?

19         MR. DEMO:  Good afternoon, Your Honor.  Greg Demo,

20  Pachulski Stang, on behalf of the Debtor.  I'm happy to keep

21  this as brief as possible, but I think walking through the

22  cash management motion has the most changes.

23         THE COURT:  Okay.

24         MR. DEMO:  The biggest change there, and we had

25  discussed this with the United Stated Trustee in Delaware, is

86

1   that in our initial motion we disclosed that the Debtor had

2   bank accounts at BBVA and then also at NexBank.  Those

3   accounts have been moved to East West Bank, --

4           THE COURT:  Okay.

5           MR. DEMO:  -- which is a party to a depository

6   agreement with the United Stated Trustee.

7           THE COURT:  Okay.

8           MR. DEMO:  The only exception to that is a

9   certificate of deposit that is at NexBank.  It's a relatively

10  small amount of money.  It's $135,000.  But it also is pledged

11  as collateral on a lease.  So that has been -- proven

12  problematic to move.  The Trustee for Delaware did say that

13  was okay.  I would hope that the Trustee for Texas would agree

14  with that.  We did disclose it in the initial debtor

15  interview.

16      But those are the bank accounts.  The bank accounts at

17  BBVA and NexBank, with the exception of that CD, were all

18  closed as of yesterday.

19          THE COURT:  Okay.

20          MR. DEMO:  So now we are going to be using East West

21  Bank for all operating accounts, all cash, going forward.

22      The other two accounts are the account at Jefferies, which

23  is the prime brokerage account.

24          THE COURT:  Uh-huh.

25          MR. DEMO:  That account, we are keeping open.

015584

87

1   Obviously, there have been conversations with Jefferies that

2   are going to be reflected in the proposed order on the

3   settlement, but we do propose to keep the Jefferies prime

4   brokerage account open as well.

5       And then we filed a supplement for another prime brokerage

6   account that we have at a prime broker called Maxim Group.

7   That account has $30 million in securities in it, give or

8   take, and then literally like $100 in cash.  The Debtor

9   considers that account more an investment than actual

10  operating account, but we would like to keep that account open

11  as well, just so it can continue holding those securities.

12      Jefferies and Maxim, neither of them are on the depository

13  list, so we are requesting a waiver of 345(b) for those two

14  accounts, and then also requesting a waiver of 345(b) with

15  respect to the certificate of deposit at NexBank.

16          THE COURT:  Okay.

17          MR. DEMO:  That's where we're at at cash management.

18  And I guess, sorry, one more thing.  In the original cash

19  management motion, we had a series of intercompany

20  transactions that we disclosed, and we had gotten interim

21  relief from the Delaware court to make those payments up to a

22  hundred -- or, $1.7 million.  We are below that account, and

23  on a go-forward basis, all of those intercompany transactions

24  are getting subsumed into the settlement motion and the

25  operating protocols and all of that.  But we are asking for

88

1   final relief on the intercompany transactions that we made

2   under the interim order.

3        THE COURT:  Okay.  All right.  Who wishes to be heard

4   on this?  I don't know how much discussion we've had outside

5   the courtroom on this.

6        MS. LAMBERT:  We haven't -- normally, a bond would be

7   appropriate for the Jefferies and the other small account.

8   The estate is at risk on the CD, but it's not that much money.

9   It's not worth bonding.  It'll be more expensive to bond it.

10       NexBank, as you know, Your Honor, is a bank where Mr.

11  Dondero is the CEO.  So that was part of the reason that

12  NexBank was carved out.  But the -- so I would like them to

13  bid bonds on the Jefferies and the other account.  And if we

14  -- let's carry it on those issues so that we can see how

15  expensive bonding it would be, and if it's cost-prohibitive,

16  maybe we reconsider.  But in the past, the bonds haven't been

17  very expensive, relatively.

18       MR. DEMO:  We're happy to discuss that with the U.S.

19  Trustee.  I mean, just for the record, the Jefferies account,

20  you know, does support a margin loan.  It's $80 million in

21  securities.  It's $30 million at Maxim.  They're SIPC.  I

22  mean, it's Jefferies and, you know, another large prime

23  broker.  Again, we're happy to discuss it with the Trustee.  I

24  don't know that it's necessary, but we will discuss it.

25       THE COURT:  Okay.  Well, you all can discuss it, and

015386

89

```
 1  if you have an unopposed order, an agreed order, --

 2          MR. DEMO:  Uh-huh.

 3          THE COURT:  -- you can upload it and I'll sign it.

 4  Otherwise, if you need hearing time on the 21st, --

 5          MR. DEMO:  Okay.

 6          THE COURT:  -- we'll get it all figured out then and

 7  --

 8          MR. DEMO:  Okay.  All right.

 9          THE COURT:  -- resolve it then.

10          MR. DEMO:  Thank you, Your Honor.  And then I guess

11  the other motion is the CRO retention.  This one should

12  hopefully be pretty brief.  We are just filing a new proposed

13  order that attaches the engagement letter, as has been

14  modified by all of the settlement discussions.  I believe the

15  Committee is on board with that, and it's consistent.  It was

16  one of the attachments that you approved this morning in

17  connection with the settlement.

18          THE COURT:  All right.  Comments on that?

19          A VOICE:  None, Your Honor.

20          THE COURT:  Committee, you're good?

21          MS. LAMBERT:  The U.S. Trustee had also objected to

22  the CRO motion, but it's some of the same issues that the

23  Committee raised.  And the CRO, my understanding, is now not

24  an employee of the board but totally overseen by the board,

25  and with that, we can withdraw our objection.
```

90

1           THE COURT:  All right.  Very good.  I'll sign your

2    order on the CRO, then.

3           MR. DEMO:  Okay.  Thank you, Your Honor.

4           THE COURT:  All right.  Well, if there's nothing

5    else, I'll be on the lookout for your orders.  And, again, if

6    you could coordinate with Traci to make sure she's clear on

7    everything you need set on the 21st.

8           MR. POMERANTZ:  Thank you very much, Your Honor.

9           THE COURT:  All right.

10          MR. CLEMENTE:  Thank you, Your Honor.

11          MR. DEMO:  Thank you, Your Honor.

12          THE CLERK:  All rise.

13       (Proceedings concluded at 11:54 a.m.)

14                          --oOo--

15

16

17

18

19

20                       CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                      **12/10/2020**

24   _____        _____
     Kathy Rehling, CETD-444                          Date
25   Certified Electronic Court Transcriber

91

                                    INDEX

PROCEEDINGS                                                        4

OPENING STATEMENTS

By Mr. Pomerantz                                                  9
By Mr. Clemente                                                  29
By Ms. Patel                                                     41
By Mr. Pomerantz                                                 45
By Mr. Daugherty                                                 46
By Mr. Maxcy                                                     48
By Mr. Bentley                                                   48
By Ms. Lambert                                                   49

WITNESSES

Debtor's Witnesses

Bradley Sharp
- Direct Testimony by Declaration                                8
- Cross-Examination by Ms. Lambert                              59

EXHIBITS

Debtor's Exhibits                          Identified Received

1    Bradley Sharp Declaration                 8        8

CLOSING ARGUMENTS

By Mr. Pomerantz                                                 68
By Mr. Clemente                                                  71
By Mr. Pomerantz                                                 73

RULINGS                                                          75

END OF PROCEEDINGS                                               90

INDEX                                                            91

Appx. 03927

# EXHIBIT 24

Appx 02928
015390

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

                                )  Case No. 19-34054-sgj-11
In Re:                          )
                                )
HIGHLAND CAPITAL                )  Dallas, Texas
MANAGEMENT, L.P.,               )  February 19, 2020
                                )  9:30 a.m.
            Debtor.             )
                                )  MOTIONS
_____ )

                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Debtor:                 Greg Demo
                                John A. Morris
                                PACHULSKI STANG ZIEHL & JONES, LLP
                                780 Third Avenue, 34th Floor
                                New York, NY  10017-2024
                                (212) 561-7700

For the Debtor:                 Jeffrey N. Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
                                10100 Santa Monica Blvd., 13th
                                  Floor
                                Los Angeles, CA  90067
                                (310) 277-6910

For the Debtor:                 Melissa S. Hayward
                                Zachery Z. Annable
                                HAYWARD & ASSOCIATES, PLLC
                                10501 N. Central Expressway,
                                  Suite 106
                                Dallas, TX  75231
                                (972) 755-7104

For the Official Committee      Matthew A. Clemente
of Unsecured Creditors:         SIDLEY AUSTIN, LLP
                                One South Dearborn Street
                                Chicago, IL  60603
                                (312) 853-7539
```

2

```
 1   APPEARANCES, cont'd.:

 2   For the Official Committee   Juliana Hoffman
     of Unsecured Creditors:      SIDLEY AUSTIN, LLP
 3                                2021 McKinney Avenue, Suite 2000
                                  Dallas, TX  75201
 4                                (214) 981-3413

 5   For Acis Capital            Rakhee V. Patel
     Management GP, LLC,          Annmarie Antoinette Chiarello
 6   et al.:                      Phillip L. Lamberson
                                  WINSTEAD, P.C.
 7                                2728 N. Harwood Street, Suite 500
                                  Dallas, TX  75201
 8                                (214) 745-5250

 9   For Acis Capital            Brian Patrick Shaw
     Management GP, LLC,          ROGGE DUNN GROUP, P.C.
10   et al.:                      500 N. Akard Street, Suite 1900
                                  Dallas, TX  75201
11                                (214) 239-2707

12   For the Issuer Group:       Amy K. Anderson
                                  JONES WALKER, LLP
13                                811 Main Street, Suite 2900
                                  Houston, TX  77002
14                                (713) 437-1866

15   For the Issuer Group:       James T. Bentley
     (Telephonic)                 SCHULTE ROTH & ZABEL, LLP
16                                919 Third Avenue
                                  New York, NY  10022
17                                (212) 756-2000

18   For Redeemer Committee of   Mark A. Platt
     the Highland Crusader        FROST BROWN TODD, LLC
19   Fund:                        100 Crescent Court, Suite 350
                                  Dallas, TX  75201
20                                (214) 580-5852

21   For Redeemer Committee of   Marc B. Hankin
     the Highland Crusader        JENNER & BLOCK, LLP
22   Fund:                        919 Third Avenue
     (Telephonic)                 New York, NY  10022-3098
23                                (212) 891-1600

24

25
```

015392

3

APPEARANCES, cont'd.:

For the U.S. Trustee:        Lisa L. Lambert
                             OFFICE OF THE UNITED STATES
                               TRUSTEE
                             1100 Commerce Street, Room 976
                             Dallas, TX  75242
                             (214) 767-8967 Ext. 1080

Recorded by:                 Michael F. Edmond
                             UNITED STATES BANKRUPTCY COURT
                             1100 Commerce Street, 12th Floor
                             Dallas, TX  75242
                             (214) 753-2062

Transcribed by:              Kathy Rehling
                             311 Paradise Cove
                             Shady Shores, TX  76208
                             (972) 786-3063

              Proceedings recorded by electronic sound recording;
                  transcript produced by transcription service.

015593

4

1          <u>DALLAS, TEXAS - FEBRUARY 19, 2020 - 9:43 A.M.</u>

2          THE COURT:  All right.  Well, we have Highland

3    matters.  Let's get lawyer appearances, in the courtroom

4    first.

5          MR. DEMO:  Good morning, Your Honor.  Greg Demo;

6    Pachulski Stang Ziehl & Jones, on behalf of the Debtor.  With

7    me are Jeff Pomerantz and John Morris.

8          THE COURT:  Okay.  Good morning.

9          MR. POMERANTZ:  Good morning.

10         MR. CLEMENTE:  Good morning, Your Honor.  Matthew

11   Clemente and Juliana Hoffman from Sidley Austin on behalf of

12   the Official Committee of Unsecured Creditors.

13         THE COURT:  Good morning.

14         MS. HAYWARD:  Good morning, Your Honor.  Melissa

15   Hayward and Zachery Annable also on behalf of the Debtor.

16         THE COURT:  Good morning.

17         MS. LAMBERT:  Lisa Lambert with the U.S. Department

18   of Justice on behalf of the U.S. Trustee, William Neary.

19         THE COURT:  Good morning.

20         MS. PATEL:  Good morning, Your Honor.  Rakhee Patel,

21   Phil Lamberson, and Annemarie Chiarello of Winstead, P.C., and

22   also Brian Shaw of Rogge Dunn Group, on behalf of Acis Capital

23   Management, LP and Acis Capital Management, GP, LLC.

24         THE COURT:  Thank you.

25         MR. PLATT:  Good morning, Your Honor.  Mark Platt

5

```
 1   from Frost Brown Todd on behalf of the Redeemer Committee of
 2   the Highland Crusader Fund.  I believe that at least Marc
 3   Hankin from Jenner & Block is on the line as well.
 4              THE COURT:  Okay.  Thank you.
 5              MS. ANDERSON:  Good morning, Your Honor.  Amy
 6   Anderson with Jones Walker on behalf of the Issuers.  And I
 7   believe Mr. James Bentley with Schulte Roth is also on the
 8   phone.
 9       And I apologize for interrupting the flow.  I would ask if
10   Mr. Bentley and I could be excused after the uncontested
11   matters are taken up this morning, just to avoid  --
12              THE COURT:  Okay.
13              MS. ANDERSON:  -- having us -- I don't want to re-
14   interrupt later, if that is all right with Your Honor.
15              THE COURT:  Okay.  That's fine.  Thank you.
16              MS. ANDERSON:  Okay.
17              THE COURT:  All right.  That looks like all the
18   courtroom appearances.  On the phone, we heard that James
19   Bentley is there.  Do you want to appear, Mr. Bentley?
20              MR. BENTLEY:  Yes, that's correct, Your Honor.  Good
21   morning.
22              THE COURT:  All right.
23              MR. BENTLEY:  Good morning, Your Honor.  James
24   Bentley; Schulte Roth & Zabel; for the Cayman Issuers.
25              THE COURT:  All right.  And someone else was there
```

6

 1   for the Redeemer Fund.  I can't remember.  Was it Mr. Clubok
 2   you said, or anyone else on the phone?
 3          MR. HANKIN:  Marc Hankin from Jenner & Block, --
 4          THE COURT:  Oh, okay.
 5          MR. HANKIN:  -- Your Honor.
 6          THE COURT:  All right.  Mr. Hankin.  Anyone else on
 7   the phone who wants to appear may go ahead.
 8       All right.  I guess we're good to go.  Well, I'll turn now
 9   -- Mr. Demo, are you going to start us off today?
10          MR. DEMO:  Yes, Your Honor.
11          THE COURT:  Someone delivered a wonderful notebook
12   and an easy-to-follow agenda.  I appreciate whoever hard work
13   was behind that.  It really helps us get prepared back in
14   chambers.  So, thank you.
15          MR. DEMO:  And we're happy to do it, Your Honor,
16   because, honestly, it helps us, I think, as much as it helps
17   you.
18          THE COURT:  Okay.
19          MR. DEMO:  And we do have extra copies if anybody
20   needs a copy of the agenda.
21          THE COURT:  Okay.
22          MR. DEMO:  Generally speaking, we'd kind of like to
23   go in the order of the agenda, I think, with two exceptions.
24   I know that Ms. Adams and Mr. Bentley have to move, so I
25   thought maybe we could do their objection to the settlement

7

1   motion first.

2           THE COURT:  Okay.  So that's the carryover matter.

3           MR. DEMO:  Correct, Your Honor.

4           THE COURT:  We obviously have an order in place, but

5   we kept it open to accommodate their issues.

6           MR. DEMO:  Correct.

7           THE COURT:  Okay.

8           MR. DEMO:  And that's Item 7 on Page 7.

9           THE COURT:  All right.

10          MR. DEMO:  And I think this one -- and anybody can

11  correct if I'm wrong -- will go pretty easily.  We've come to

12  an agreement with the Objecting Parties.

13          THE COURT:  All right.

14          MR. DEMO:  We are planning on submitting, under a

15  notice, a revised copy of the operating protocols that were

16  approved by this Court in connection with the settlement that

17  addresses those Objectors' concerns.  And then once that is

18  filed, the Objecting Parties will withdraw their objection.

19          THE COURT:  All right.  Anyone wish to speak up on

20  this matter?

21      All right.  Well, as I recall, the concern had been that

22  they didn't want the agreed-upon operating protocols with the

23  Committee to somehow change contractual rights of the parties,

24  and so --

25          MR. DEMO:  That is correct, Your Honor.  And we took

8

1    their language and we carved out a small universe of CLO

2    Issuers, --

3            THE COURT: Okay.

4            MR. DEMO:  -- exactly as they asked for.

5            THE COURT:  All right.  Well, again, I'll ask:  Does

6    anyone have any comment about this revised process?

7        All right.  Well, that sounds perfectly fine to me, so

8    we'll look for the revised copy of the operational procedures.

9            MR. DEMO:  Okay.  Great, Your Honor.

10       And then I guess the only other exception to the order of

11   the agenda --

12       (Garbled phone noises.)

13           THE COURT:  Is someone on the phone wishing to speak

14   up?  (no response)  All right.  I guess not.

15           MR. DEMO:  Yeah.  I guess the only other exception to

16   the order in the agenda is the Foley Gardere retention

17   application.

18           THE COURT:  Okay.

19           MR. DEMO:  We would like to do that last.  It is a

20   contested hearing and I think we are going to have some

21   evidence on that.

22           THE COURT:  All right.  All right.  Sounds fine.

23           MR. DEMO:  Then, I guess, just going through the

24   agenda in the order that it's written, the first one is the

25   Lynn Pinker retention application.  We had originally filed

9

1    that retention application back in October.  We recently

2    withdrew it.  We're not going to go forward on it.

3              THE COURT:  All right.

4              MR. DEMO:  The second matter, and I guess the second

5    two matters, hopefully, we can take at the same time.  These

6    are two uncontested matters.  Certificates of no objection

7    have been filed for both of them.  The first is the foreign

8    representative motion.

9              THE COURT:  Yeah, and I will tell you, I don't know

10   if it's shown up on PACER yet, --

11             MR. DEMO:  Okay.

12             THE COURT:  -- but I actually already signed an order

13   on that, --

14             MR. DEMO:  Okay.

15             THE COURT:  -- as well as exclusivity.

16             MR. DEMO:  Perfect.

17             THE COURT:  But, you know, I saw the certificates of

18   no objection, but perhaps we need to talk about it in case

19   anyone wants to comment in any way.

20             MR. DEMO:  If anybody does, I mean, if you've already

21   entered them -- I know PACER was down, so I don't think we've

22   seen it yet.

23             THE COURT:  Okay.

24             MR. DEMO:  But we're fine moving on if --

25             THE COURT:  Well, yeah.  The foreign representative

10

1   motion looked like a no-brainer, if you will.

2           MR. DEMO:  Uh-huh.

3           THE COURT:  It was filed way back in October, right?

4           MR. DEMO:  Correct.  Right.

5           THE COURT:  And no one had ever objected.  It's just

6   that there are some foreign proceedings out there; --

7           MR. DEMO:  Right.  Right.

8           THE COURT:  -- you wanted to make sure that there was

9   a human being who had authority to act in those?

10          MR. DEMO:  Correct.

11          THE COURT:  All right.  So, if no one has any

12  comment, I did go ahead and sign the order approving that.

13          MR. DEMO:  Okay.

14          THE COURT:  Similarly, exclusivity.  I signed an

15  order on that yesterday.  In probably nine out of ten cases, I

16  would have had a hearing with evidence.

17          MR. DEMO:  Uh-huh.

18          THE COURT:  But, again, that one seemed like a no-

19  brainer.  We had no objections, and obviously you've been in

20  court a lot, with a lot of things happening.

21          MR. DEMO:  Yes.

22          THE COURT:  So it seemed like a no-brainer to give

23  more time on that.  So, does anyone have anything they wanted

24  to say about that?  (no response)  All right.

25          MR. DEMO:  Okay.

Case 19-34054-sgj11    Doc 3596-24    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 30-24 Filed 02/05/25189 Page 922 of 1017    PageID 16583

11

 1           THE COURT:  So that is granted.  I can't remember,

 2    off the top of my brain, what the extended time frame was.  Do

 3    you want to say that on the record?  Because I've just blanked

 4    out at the moment.

 5        (Counsel confer.)

 6           MR. DEMO:  It's -- we extended it for four months,

 7    Your Honor.

 8           THE COURT:  Okay.  All right.  So that was June, June

 9    12th as the deadline for filing a plan, and then the

10    solicitation period would expire on August 11th, 2020.  That's

11    what I've approved.

12           MR. DEMO:  Yes.

13           THE COURT:  All right.

14           MR. DEMO:  Okay.  The next matter is the bar date

15    motion.  There was an automatic bar date set for April 8th --

16           THE COURT:  Uh-huh.

17           MR. DEMO:  -- in connection with the 341 notice.  We

18    just wanted to have procedures for filing claims approved by

19    this Court.

20           THE COURT:  Okay.

21           MR. DEMO:  You know, we filed the motion.  There are

22    no objections.  We did have some comments from the United

23    States Trustee, which we've incorporated into a redlined

24    order.

25        Something came up last night where, the way that it works

12

 1   because we have a lot of investors, is that a lot of people

 2   get notice through their custodians and through the different

 3   administrators.

 4           THE COURT:  Uh-huh.

 5           MR. DEMO:  And so we worked that into the motion.

 6   The United States Trustee has asked for an extension of 45

 7   days for those folks to file their claim.  We're okay with

 8   that.  We're going to work with her afterwards, and we will

 9   submit a revised form of order.

10           THE COURT:  Okay.  So, just to be clear, the proposed

11   deadlines, as revised, would be what?

12           MR. DEMO:  It depends on when the notice is actually

13   able to be sent out.

14           THE COURT:  Okay.

15           MR. DEMO:  We need to work through some technical

16   issues on that.

17           THE COURT:  Okay.  Ms. Lambert?

18           MS. LAMBERT:  So, Judge Jernigan, I think the Court

19   is familiar with this from when we solicit Equity Committees.

20   It's the same issue here.  You go to TD Ameritrade and then

21   they send the notice to the direct holders, but also asked

22   that they include correspondence to the TD Ameritrade or

23   Merrill Lynch equivalents saying -- instructing them to send

24   the notice of the bar date to their direct holders.

25       So we're going to agree on the phrasing of the letter.

13

1   I'm hopeful that we can attach that to the order so the Court

2   can see what it looks like.

3           THE COURT:  All right.

4           MR. DEMO:  Okay.  And we'll work through those

5   issues, Your Honor, and have something to you as soon as

6   possible.

7           THE COURT:  All right.  And you're also asking for

8   bar dates, really, bar date for 503(b)(9) claims as well?

9           MR. DEMO:  Yeah.  We don't think we're going to have

10  any.

11          THE COURT:  Okay.

12          MR. DEMO:  So it's really just out of an abundance of

13  caution.

14          THE COURT:  Okay.  All right.  Well, I'll look for

15  that form of order --

16          MR. DEMO:  Okay.

17          THE COURT:  -- and be happy to sign it as you all

18  have negotiated it.

19          MR. DEMO:  Okay.  And then skipping over Foley

20  Gardere, there is one still outstanding objection on that, so

21  we will hear that in due course.

22          THE COURT:  Okay.

23          MR. DEMO:  The next one is Item 6 on Page 6, and

24  that's the PensionDanmark motion to lift the stay.  We have an

25  agreement in principle with PensionDanmark that the Committee

Case 19-34054-sgj11   Doc 3596-24   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 35-30 24   Filed 10/05/25189   Page 925 of 1017   PageID 16586

14

 1 | has signed off on.  We're just going through and working

 2 | through the paperwork.  And so we would like to just push this

 3 | to the next hearing date, with the expectation that we would

 4 | get the paperwork filed in between then and we wouldn't have

 5 | to have it set.

 6 |         THE COURT:  All right.  So we will carry this to our

 7 | next omnibus hearing date.  I don't know if we have one

 8 | automatically set at this point or --

 9 |         MR DEMO:  It's March 13th.

10 |         THE COURT:  March--?

11 |         MR. DEMO:  12th.

12 |         MS. HAYWARD:  11th.

13 |         MR. DEMO:  11th.  I'm sorry.  I was in the ballpark.

14 |         THE COURT:  Okay.  So, carried to March 11th, as

15 | necessary.

16 |         MR. DEMO:  Uh-huh.

17 |         THE COURT:  All right.

18 |         MR. DEMO:  And then I guess the next thing, skipping

19 | over the CLO Issuers' objection, which we already addressed,

20 | --

21 |         THE COURT:  Uh-huh.

22 |         MR. DEMO:  -- is the sealing conference motion.

23 |         THE COURT:  Okay.

24 |         MR. DEMO:  And I would turn this over to my

25 | colleague, John Morris.

Case 19-34054-sgj11    Doc 3596-24    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 45-30    Filed 06/06/25    Page 926 of 1017    PageID 16587

15

1          THE COURT:  All right.

2          MR. MORRIS:  Good morning, Your Honor.  John Morris,

3    Pachulski Stang Ziehl & Jones.

4          THE COURT:  Good morning.

5          MR. MORRIS:  I hope that this doesn't take too much

6    time.  But following the last hearing that we had, the Court

7    had rendered a ruling with respect to the Committee's sealing

8    motion.  And regrettably, the Debtor and the U.S. Trustee's

9    Office were unable to agree on a form of order.  And that led

10   to kind of a back-and-forth about the scope of the protective

11   order that had been entered.

12      So, because we couldn't come to an agreement, and because

13   the Debtor had concerns about the interpretation and the

14   position, frankly, that the U.S. Trustee was taking with

15   respect to the protective order, we filed our motion for the

16   entry of an order concerning the sealing motion and for a

17   conference.  And that was filed at Docket 397.

18      The Court subsequently entered the Debtor's proposed order

19   on the sealing motion, on the Committee's sealing motion.  So

20   that's moot.

21      The only issue, to the extent there is an issue, and I'm

22   not sure that there is, but to the extent that there is an

23   issue, it was just the Debtor's desire to make clear on the

24   record that the words of the protective order are clear and

25   unambiguous and that they apply to any party who receives

Case 19-34054-sgj11    Doc 3596-24    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 35-30 24  Filed 06/06/25189    Page 927 of 1017    PageID 16588

16

1    documents in this bankruptcy case, whether it's in connection

2    with a contested matter or an adversary proceeding, and that

3    order applies both to documents previously received and to

4    documents that will be received in the future.

5        We had asked the U.S. Trustee's Office to make -- just to

6    agree that they would abide by the protective order.  And I'm

7    not casting aspersions, I'm not saying, you know, they're bad

8    people or anything, but we never got the crystal-clear

9    response that we needed and expected, frankly, that the order

10   says what the order says and the U.S. Trustee's Office would,

11   you know, would abide by it.

12             THE COURT:  Okay.  So, --

13             MR. MORRIS:  So that's why we asked for this status

14   conference.

15             THE COURT:  So this is more than just the issue of

16   the Redeemer Committee arbitration award --

17             MR. MORRIS:  Correct.

18             THE COURT:  -- that was the attachment to the --

19             MS. LAMBERT:  No, Your Honor.

20             THE COURT:  Wait.  Oh, okay.  Well, what I was about

21   to say is I was understanding from your presentation that you

22   thought this was about more than just the arbitration award,

23   the Redeemer Committee arbitration award that had been

24   attached to that Committee objection and that was subject to

25   the motion to seal.

Case 19-34054-sgj11   Doc 3596-24   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 24   Filed 06/06/25189   Page 928 of 1017   PageID 16589

17

 1      You think it is also about items marked Confidential that

 2  the U.S. Trustee received before the entry of the protective

 3  order?

 4          MR. MORRIS:  As it explicitly provides for.  And I'll

 5  just say that the concerns arise from the written

 6  communications that we received, where the U.S. Trustee's

 7  Office specifically said that they would file matters

 8  unredacted and without seal.  And we asked them to simply

 9  retract that statement, because the order says what the order

10  says.  And I think it's a fair concern that the Debtor has in

11  this regard, and it was really a very simple request.  Please,

12  please, I mean, you can't file documents unredacted and

13  without seal because there's a protective order in place.

14          THE COURT:  Okay.  Now, Ms. Lambert, you say -- what

15  were you about to say?

16          MS. LAMBERT:  First, Your Honor, I want to be clear

17  that the U.S. Trustee -- everyone in the U.S. Trustee's Office

18  intends to honor the Court's orders.  There are many things

19  that we debate hotly and that we feel animated about in terms

20  of legal advocacy, but we intend to honor both the office and

21  the individual that holds that office when the Court has made

22  a ruling.

23      The issue that is presented to the Court is what is the

24  effect of dismissing a motion to seal on the basis that it is

25  moot?  There's black-letter law that sealing should be for

Appx. 02045
015607

18

 1   limited time periods and things should be unsealed --

 2          THE COURT:  Okay.  Can I stop you?  Are you saying

 3   that you think the sole issue here is just the arbitration

 4   award?

 5          MS. LAMBERT:  Yes, Your Honor.

 6          THE COURT:  Okay.  So, so --

 7          MS. LAMBERT:  And this is how it springs back to the

 8   protective order.

 9          THE COURT:  Okay.  Let me --

10          MS. LAMBERT:  The U.S. --

11          THE COURT:  Let me stop you, because what about other

12   documents besides the arbitration award that the U.S. Trustee

13   might have received prior to the Court signing the protective

14   order?

15          MS. LAMBERT:  The U.S. Trustee did not receive any

16   other items that --

17          THE COURT:  Okay.  So we are just talking about the

18   arbitration?

19          MS. LAMBERT:  We have not to this date received any

20   other items than those items --

21          THE COURT:  Okay.

22          MS. LAMBERT:  -- that were subject to the motion to

23   seal.

24          THE COURT:  Okay.

25          MS. LAMBERT:  And this is the U.S. Trustee's

19

 1   position.  The Court --

 2        THE COURT:  I will say that one of the Debtor's

 3   lawyers is shaking his head.  I want to see if there's a

 4   disagreement about, did the U.S. Trustee receive more items?

 5   Was that --

 6        MR. MORRIS:  I would say, Your Honor, I don't know

 7   exactly what was delivered, because I'm, --

 8        THE COURT:  Okay.

 9        MR. MORRIS:  -- right, I'm part of a team.  But I do

10   know that we gave, for example, information about bonus --

11   about, you know, personnel bonus motions that is confidential.

12        MS. LAMBERT:  But the issue about what was going to

13   be filed unsealed was related to the items in the motion to

14   seal and the U.S. Trustee's attendant motion for the

15   appointment of a Chapter 11 Trustee, which had been redacted.

16        THE COURT:  Okay.  Let me -- I'm going to take a shot

17   at making this go quicker.  What I meant when I ruled that,

18   well, the objection of the Committee is moot now because it

19   was resolved by other orders; therefore, I think the motion to

20   file under seal the arbitration award is moot because it was

21   connected to the Committee's objection; you know, that was a

22   quick, off-the-cuff comment.  What I was trying to say is I

23   didn't think this needed any more court time.  There was no

24   case in controversy anymore.  I didn't know why I needed to

25   resolve an objection to the motion to file under seal.

20

1    What I meant is it's going to be like it never even

2    happened, right?  And what I probably should have done is

3    said, Committee, you want to make an oral motion to withdraw

4    your objection and withdraw your motion to seal, you know,

5    orally, I'll grant it orally and just remove it from the

6    record, so to speak.

7        And I thought we were passing off to another day whether

8    that arbitration award, if someone wanted to file it and file

9    it publicly or disclose it, they could then file a motion

10   later.

11           MR. MORRIS:  Your Honor?

12           MS. LAMBERT:  Here's the -- here's the --

13           MR. MORRIS:  Your Honor, if I may?

14           THE COURT:  Uh-huh.

15           MR. MORRIS:  You've done exactly what you've said.

16           THE COURT:  Okay.

17           MR. MORRIS:  I don't think there is an issue now.

18           THE COURT:  Okay.

19           MR. MORRIS:  I've heard from the U.S. Trustee's

20   Office what I asked for probably three times in writing, that

21   they are going to abide by the terms of the protective order.

22   With respect to the sealing order, Your Honor has entered an

23   order.  It declared the Committee's motion to seal moot, and

24   it specifically provided that anybody who's received the

25   awards has to treat them in accordance with the protective

21

```
 1   order.
 2          THE COURT:  Yeah.
 3          MR. MORRIS:  Nobody's appealed that order.
 4          THE COURT:  Okay.
 5          MR. MORRIS:  It's now the -- it's -- whatever the
 6   U.S. Trustee's interpretation is of the law is kind of
 7   irrelevant at this point because the order has been entered
 8   and it hasn't been appealed.
 9          THE COURT:  Okay.
10          MS. LAMBERT:  Here's the thing, Your Honor.  The case
11   law, *Omni Video*, similar things.  There are two issues.
12   Number one is whether the mootness of the underlying issue
13   means that the pleadings should be unredacted, which is black
14   letter that at some point pleadings should be unredacted and
15   made available to the public.  And the Court's ruling is that
16   by replacing the management the Court has mooted anything that
17   might be scandalous about that or that might be problematic
18   about it, and therefore --
19          THE COURT:  What is the it?  I'm not following.
20          MS. LAMBERT:  -- the arbitration award and the
21   pleadings attendant were redacted, but the --
22          THE COURT:  I haven't said anything about -- I mean,
23   I denied a Chapter 11 trustee motion because I thought the new
24   management was a correct way to go forward in this case.
25          MS. LAMBERT:  Correct.
```

Case 19-34054-sgj11    Doc 3596-24    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-30    24 Filed 06/26/25189    Page 933 of 1017    PageID 16594

22

1          THE COURT:  The arbitration award, what I meant was

2    it's like it never happened now.  And if I --

3          MS. LAMBERT:  Right.

4          THE COURT:  -- need to do an amended order saying the

5    Committee has permission to withdraw the objection and

6    withdraw the motion to seal, I'll --

7          MS. LAMBERT:  That's --

8          THE COURT:  -- I'll do that, --

9          MS. LAMBERT:  But --

10          THE COURT:  -- so there's nothing on the record to

11    make public.

12          MS. LAMBERT:  But withdrawing the motion, objection,

13    does not delete it from the record, Your Honor.

14          THE COURT:  Well, I'm going to make it so.  I'm going

15    to make it so.  And then if, one day, you or someone else --

16          MS. LAMBERT:  Your Honor, currently, --

17          THE COURT:  -- wants to be relieved from the

18    protective order and asks that it be publicly filed, I'll

19    consider --

20          MS. LAMBERT:  Your Honor?

21          THE COURT:  -- the merits of that.

22          MS. LAMBERT:  Your Honor, the thing is that the

23    Committee, when it filed its original objection, did not

24    redact.  So this information has been in the public domain for

25    months now.  And the arbitration --

23

1          THE COURT:  Wait.  Okay.  This all happened in

2     Delaware, so I don't know their procedure.  Are you saying it

3     was on the public PACER?

4          MS. LAMBERT:  They didn't redact.

5          MR. MORRIS:  No.  Your Honor, the Redeemer Award

6     (inaudible).  The order says what the order says.  It's been

7     entered.  I mean, this is the concern, is that we have this

8     never-ending debate.  I've heard -- the Debtor has heard what

9     it needed to hear, and that is the U.S. Trustee's Office will

10    abide by the terms of the protective order.

11        With respect to the Committee's motion to seal, we're done

12    with that.

13         MS. LAMBERT:  There is no --

14         MR. MORRIS:  An order has been entered.

15         MS. LAMBERT:  There is no motion to seal.  The normal

16    effect of -- the dismissal of a motion to seal on the basis

17    that it is moot is that everything attendant to that becomes

18    unredacted and unsealed.

19        In addition, there's a separate issue that the Debtor gets

20    to talk about what the amounts in the Redeemer awards were

21    unilaterally, without -- and the Committee gets to talk about

22    it unilaterally.  They've mentioned what the findings were in

23    four different spots in their objection that are not redacted.

24    And the U.S. Trustee is the only one that's held to the motion

25    to seal, which we have honored, but the --

24

```
 1          THE COURT:  I don't understand why we're having this
 2   discussion.  For now, I've made it a moot issue, a dead issue.
 3   The objection to which the arbitration award was attached as
 4   an exhibit became moot.  Maybe I'm not using the best legal
 5   description, but it was resolved.  And I didn't feel the need
 6   for us to have a dispute about whether that motion to seal,
 7   which related to the objection --
 8          MS. LAMBERT:  The motion to seal --
 9          THE COURT:  -- was meritorious or not.  If -- again,
10   --
11          MS. LAMBERT:  But the motion to --
12          THE COURT:  -- to me, there's an easy fix.  If you're
13   -- if you think it's necessary, I'll grant the --
14          MR. MORRIS:  Your Honor?
15          THE COURT:  This seems like wasted energy, --
16          MS. LAMBERT:  But --
17          THE COURT:  -- granting the Committee authority to
18   withdraw their objection and their motion to seal --
19          MS. LAMBERT:  But, Your Honor, --
20          THE COURT:  -- so that it's off the record.
21          MS. LAMBERT:  -- the interim sealing order didn't
22   impact just their objection.  It impacted the U.S. Trustee's
23   motion to dismiss.  It impacted the evidence.  The finding
24   that these issues are moot because they're resolved means that
25   the Court should unredact them because it's no longer
```

25

1   confidential.  It's no longer a problem.  If the evidence is

2   --

3           THE COURT:  Why are we having this discussion?  Why

4   is this important in this Chapter 11 case?  The arbitration

5   award may get in one day, and someone may ask me, and I may

6   say yes, I may say no.  It depends on what the legal arguments

7   are.

8           MS. LAMBERT:  It's --

9           THE COURT:  Why is this relevant right now?

10          MS. LAMBERT:  It's important to the public's

11  perception, and the U.S. Trustee is charged with making the

12  information about a case available to the public.

13          MR. MORRIS:  Your Honor, there is no motion --

14          MS. LAMBERT:  This -- these -- these arbitration --

15          MR. MORRIS:  There's no relief that's been sought.

16          MS. LAMBERT:  The arbitration awards have been

17  discussed in the press, Your Honor.  And the press --

18          THE COURT:  Well, let me just say this.  Okay?  This

19  was obviously -- there was an arbitration award.  It was never

20  confirmed with a judgment by a court.  And I am presuming -- I

21  don't need to decide today -- but I'm presuming that there is

22  some legal argument that someone feels can be made about why

23  that arbitration award is confidential.  You know, it

24  obviously --

25          MR. MORRIS:  The Committee made that argument in

26

```
 1    their motion.

 2            THE COURT:  Obviously, if there had been a judgment,

 3    it all would have been out in the world.  And I will say I

 4    cannot remember ever being in a situation where someone wanted

 5    to keep an arbitration award confidential in a bankruptcy

 6    case.  Maybe it happens.  I'm just -- I've never seen it.  So

 7    if there is a day where someone wants me to find this

 8    arbitration award can be made public, I may very well do it.

 9    I don't know.  I'll hear the legal arguments.  But I am just

10    asking, why are we arguing about this today?

11            MS. LAMBERT:  We're arguing about it today because it

12    remains a point of interest and a point of information sharing

13    to government creditors and other creditors that are involved

14    in the case, as well as the public.

15            THE COURT:  They're not in here, the SEC or whoever

16    you're --

17            MS. LAMBERT:  Well, how would they know to be in

18    here?

19            THE COURT:  Because maybe they've seen the press that

20    you're talking about.  All right.  I don't know --

21            MR. MORRIS:  Your Honor, we -- the Debtor's heard

22    what --

23            THE COURT:  The protective order governs.  And my

24    prior order with regard to the sealing motion I think made

25    clear, but if it didn't, I'm going to say right now:  As far
```

27

1   as I'm concerned, the arbitration award, nothing gets unsealed

2   on the Court's docket, and no one will file it or disclose it

3   without bringing a motion, and we'll have a legal argument and

4   evidence or whatever we need and I'll rule on the issue.

5        MS. LAMBERT:  So, Your Honor, my understanding is

6   that the Court is striking the objection to the CRO that the

7   Committee filed and striking the U.S. Trustee's motion to

8   dismiss, which was redacted, and striking the evidence, and

9   those will not be on the docket available to the public at

10  all.

11       THE COURT:  That's not what I'm doing.  I don't -- I

12  don't even know -- I don't understand why you're saying that.

13       MS. LAMBERT:  Well, you can't just withdraw the

14  objection.  The objection had the exhibits attached to it.

15  The issue that the U.S. Trustee -- I'm sorry, but I'm always

16  charged with this issue -- is trying to unseal documents and

17  trying to determine the proper date for unsealing them.  They

18  attached to the arbitration award, like a motion for summary

19  judgment.  That's the practice in Delaware.  And so the issue

20  is, at what point will that become unsealed?  It's a higher

21  standard --

22       THE COURT:  The answer is no, without an order from

23  this Court.

24       MS. LAMBERT:  It is a higher standard than for

25  confidentiality.  And in addition, --

Case 19-34054-sgj11    Doc 3596-24    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 55-30    Filed 06/26/25    Page 939 of 1017    PageID 16600

28

```
 1              THE COURT:  All right.  If you want to file a motion
 2    and we set it for hearing and we have briefing, we'll do that.
 3    But, for now, there's -- there are two orders that I will tell
 4    you on the record what they mean is, right now, the
 5    arbitration award is not to be publicly disclosed.  Not by the
 6    Court on the docket system.  Not by any person.
 7         If someone wants to publicly disclose it, they can file a
 8    motion and we'll talk about whether it's protected or not.
 9              MR. MORRIS:  Thank you.
10              THE COURT:  Whether there are grounds, legal grounds,
11    to protect it.
12              MR. MORRIS:  Thank you, Your Honor.
13              THE COURT:  I've told you I'm skeptical.  I'm
14    skeptical.  But, you know, we'll see.  Okay?
15              MS. LAMBERT:  Okay.  Your Honor, the FJC publication
16    is very clear that the Court should be trying, when issues are
17    moot, to unseal items.  And this is why our advocacy is this
18    way.  And I will move to unseal it.
19              THE COURT:  All right.
20              MR. DEMO:  For the record, Your Honor, again, Greg
21    Demo; Pachulski Stang Ziehl & Jones; for the Debtor.
22         Before we move on to the Foley retention, two quick
23    housekeeping matters.
24              THE COURT:  Uh-huh.
25              MR. DEMO:  We would like to set the next omnibus
```

29

```
 1   hearing date on April 22nd.  At that date, we would do the
 2   quarterly fee applications and whatever else comes up onto the
 3   docket.
 4           THE COURT:  All right.  Have you run that by Traci
 5   Ellison yet?
 6           MR. DEMO:  We have not.
 7           THE COURT:  Okay.
 8           MR. DEMO:  We've talked to the Committee about it,
 9   though.
10           THE COURT:  So I will call her right now.
11           MR. DEMO:  And then, I guess, Your Honor, before you
12   do that, we are actually asking for a hearing date on March
13   4th at 1:30 as well.  We're going to have an expedited motion
14   that we'll be filing, I think, this week.  So if you're going
15   to check with her, I guess it might make sense to check on
16   both of those dates.
17           THE COURT:  Okay.
18      (Court confers with Clerk telephonically.)
19           THE COURT:  Okay.  We can give you April 22nd, as you
20   requested, at 9:30.
21           MR. DEMO:  Okay.  Thank you.
22           THE COURT:  Okay.  So that's going to be an omnibus.
23      (Court confers with Clerk telephonically.)
24           THE COURT:  All right.  We can give you March 4th at
25   1:30.
```

015619

30

1        How about a preview of what we're going to -- what are we

2   going to be seeing?

3            MR. DEMO:  And, Your Honor, I guess we had also

4   reserved March 2nd, and we can release that date.

5            THE COURT:  What?  I'm sorry.

6            MR. DEMO:  We had previously reserved March 2nd at

7   9:30 for the expedited motion, which I'll describe briefly in

8   a second.  We don't need the March 2nd date.

9            THE COURT:  So, okay.

10            MR. DEMO:  Yeah.

11            THE COURT:  All right.  So I'll tell Traci that one

12   --

13            MR. DEMO:  Yeah.  Okay.  Perfect.  Thank you.

14            THE COURT:  -- is off.  Okay.  What is this going to

15   be?

16            MR. DEMO:  The expedited motion, we obviously run a

17   series of investment funds.  From time to time, those funds,

18   either through liquidation or just through normal proceeds

19   generation, make distributions out to their investors.

20        Under the protocols, distributions out to what are

21   related, called related entities under the protocols, which

22   include Mr. Dondero, entities owned by Mr. Dondero, and

23   numerous other categories, those entities cannot receive their

24   distributions from those investment vehicles if the Committee

25   objects to those distributions unless we come to the Court and

31

1   we get Your Honor's approval.

2        That issue has come up.  We are hoping to make those

3   distributions to these related entities.  The Committee has

4   said that they will object, but they've also agreed to the

5   motion to expedite.

6              THE COURT:  All right.

7              MR. DEMO:  So that's the issue that's going to be in

8   front of Your Honor on March 4th.

9              THE COURT:  All right.  When are you going to file

10  the motion?

11             MR. DEMO:  We are hoping to file it, I think, by

12  Friday.

13             THE COURT:  Okay.  So that would be -- what are we at

14  now, the 19th?

15             MR. DEMO:  Yeah.

16             THE COURT:  Okay.  So that'd be --

17             MR. DEMO:  Yeah.  And obviously, --

18             THE COURT:  -- a couple weeks.

19             MR. DEMO:  -- yeah, we'll endeavor to get it filed as

20  soon as possible.

21             THE COURT:  Okay.

22             MR. DEMO:  And then I guess the last item, Your

23  Honor, is the Foley Gardere retention application.

24             THE COURT:  Okay.

25             MR. DEMO:  And, you know, this should be a relatively

32

```
1    simple retention application.  You know, we'll get into it a
2    little bit more.  There are two objections that were
3    originally filed, one by the Committee and one by Acis.
4    Yesterday morning, the Committee withdrew their objection, so
5    the only objection to the Foley Gardere retention application
6    is by Acis.
7        In the courtroom with me are Holland O'Neil with Foley
8    Gardere -- she's the partner in charge of that representation
9    -- and then also The Honorable Russell Nelms, who's a member
10   of the Independent Board of Directors of Strand Advisors, the
11   party that manages the Debtor.  And I should be remiss if I
12   didn't mention that the two other independent directors, James
13   Seery and John Dubel, are also in the courtroom, --
14            THE COURT:  Okay.
15            MR. DEMO:  -- as is the Debtor's chief restructuring
16   officer.
17       And as I said, Your Honor, really, the only thing, the
18   only substantive thing we're here this morning on is this
19   retention application.  The retention application is under
20   Section 327 of the Bankruptcy Code, and it's to represent the
21   Debtor in three matters related to the Acis bankruptcy and the
22   resulting litigation.
23       Judge Nelms is going to be testifying in support of the
24   Foley retention this afternoon.
25            THE COURT:  Okay.
```

33

1              MR. DEMO:  We filed the retention application on

2     October 29th, along with the retention application of Lynn

3     Pinker.  As I mentioned earlier, the Lynn Pinker retention

4     application was withdrawn.  Two objections were filed to the

5     Foley retention:  One by the Committee, one by Acis.

6         The Committee -- or, sorry, the Debtor addressed those two

7     objections in an omnibus reply that we filed on November 21st.

8     The primary response to those objections was providing

9     additional disclosure to this Court concerning the parties

10    being represented by Foley, the proceedings in which Foley was

11    going to represent those parties, and the allocation of fees,

12    of Foley's fees, across those parties.

13        The reply disclosed, and Judge Nelms will also testify,

14    that the Debtor had originally intended to engage Foley on

15    four matters, not three.  The first matters is general matters

16    just relating to the Acis bankruptcy, status conferences,

17    proof of claim issues.  The second matter is the appeal to the

18    Fifth Circuit of the confirmation order.  The third matter was

19    the appeal, again to the Fifth Circuit, of the entry of the

20    involuntary petition.  And then the fourth matter was the

21    appeal of Winstead's retention as counsel to both Mr. Terry,

22    who is a pre-petition creditor of Acis, and Robert [sic]

23    Phelan as the Chapter 11 trustee.

24        The two appeals, the appeal of the confirmation order and

25    the appeal of the involuntary petition, have been fully

Case 19-34054-sgj11    Doc 3596-24    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-20 24 Filed 06/35/25189  Page 945 of 1017    PageID 16606

34

 1  briefed to the Fifth Circuit, and some of that briefing was

 2  done, by necessity, post-petition, because of the drag in time

 3  between when we filed the retention and now.  And the Fifth

 4  Circuit has actually set both of those appeals for oral

 5  argument.  They've been consolidated for purposes of oral

 6  argument, and both of the appeals are set for March 30th, so

 7  about six weeks away.

 8      Now, it's an understatement to say a lot has happened in

 9  this case since we filed the reply on November 21st.  One of

10  the most major things in this case, as the Court knows, is the

11  appointment of the Board of Directors.  The Board of Directors

12  was appointed on January 9th and it oversees the management of

13  the Debtor.  Judge Nelms is in this courtroom and will be

14  testifying as to what the Board did to familiarize itself with

15  the Acis litigation and with Foley's retention.  And you'll

16  hear from Judge Nelms that the Board had extensive

17  conversation with the Debtor's employees, including the

18  Debtor's internal legal team, Ms. O'Neil with Foley Gardere,

19  attorneys from Pachulski regarding the status of the Acis

20  litigation and the bankruptcy and Foley's retention.

21      You'll also hear that Judge Nelms reached out directly to

22  Josh Terry, the major party in the Acis litigation, and that

23  Judge Nelms met with both Josh Terry and Ms. Patel to discuss

24  the status of the Acis litigation.

25      And then finally you'll hear, as part of that diligence,

35

```
 1   that the Board analyzed the economic benefit of proceeding
 2   with Foley's retention in all three of those matters that I
 3   mentioned and also conducted their own diligence on the claims
 4   that are being raised in those matters.
 5       As a result of that diligence, and I'll discuss the
 6   explicit reasons later, the Board determined that it is in the
 7   best interest of the Debtor and its estate to proceed with
 8   Foley's retention with respect to the three matters I
 9   mentioned earlier:  the Acis general bankruptcy, the appeal of
10   the confirmation order, and the appeal of the involuntary
11   petition.
12       The Debtor has also asked for Foley's assistance on
13   certain ancillary matters, like including about disclosures of
14   the Acis litigation, including what needs to go on the
15   schedules and things like that.
16       As a result of this diligence, however, the Board decided
17   to drop the Winstead appeal.  So Acis -- I'm sorry, Foley is
18   not going to be retained to challenge Winstead's retention in
19   that proceeding.  And assuming that Foley is retained, Foley
20   will prepare the papers to withdraw that objection as soon as
21   possible.
22       As a quick aside, though, you know, Foley was directed by
23   the Debtor to continue with the Winstead matter post-petition.
24   Incurred about $25,000 of fees.  And we believe that Foley was
25   working in good faith on that.  So although we're not going to
```

Case 19-34054-sgj11   Doc 3596-24   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 35-30   24   Filed 06/36/25189   Page 947 of 1017   PageID 16608

36

1    proceed with the Winstead matter, we would still ask that

2    Foley be entitled to file a fee application for those fees.

3    The Committee has agreed with this, and we have a form of

4    proposed order with the Committee that contemplates Foley's

5    payment or Foley's receiving payment for the Winstead fees of

6    $25,000.

7            THE COURT:  Wait.  You're talking about, if I approve

8    their retention, rolling that into the retention order?

9            MR. DEMO:  We are, Your Honor.

10           THE COURT:  Okay.

11           MR. DEMO:  No?

12           THE COURT:  That's a no-go, I'll tell you right now.

13           MR. DEMO:  Okay.

14           THE COURT:  I mean, --

15           MR. DEMO:  And we can, we can deal with that.

16           THE COURT:  Yeah.

17           MR. DEMO:  But I --

18           THE COURT:  I'm not going to say yes or no to any

19   fees I haven't seen.

20           MR. DEMO:  Okay.  And -- well, I'm sorry.  What's

21   going to be rolled into the order is their ability to file for

22   those fees.  Everybody would still have the right to object to

23   those fees.  You would have the right to say yes or no on

24   those fees.  The only thing that we would be asking for is

25   that they would be able to apply for those fees and that the

37

1    fact that they weren't retained on that matter specifically

2    would not be a basis for an objection to those fees.  So it's

3    a little bit different.

4                THE COURT:  Okay.

5                MR. DEMO:  We're not trying to cut off anybody's

6    right to object to those fees.

7                THE COURT:  Okay.  But I don't want to put some

8    imprimatur on their ability to ask for them.

9                MR. DEMO:  Okay.

10                THE COURT:  Okay?  So, you know, it's just another

11   day.

12                MR. DEMO:  Yeah.

13                THE COURT:  If they ask for that in a fee app -- if I

14   approve their retention and they ask for it in a fee app,

15   we'll --

16                MR. DEMO:  Okay.  Understood, Your Honor.

17                THE COURT:  -- decide whether it's meritorious or

18   not.

19                MR. DEMO:  Okay.

20                THE COURT:  Okay.

21                MR. DEMO:  And then I guess, just moving on, you

22   know, as you'll hear from Judge Nelms, all of the elements of

23   227(e), you know, have been met.  You know, first, Foley is

24   being retained for a special purpose.  Nobody has objected on

25   that basis.

38

1        Second, Foley is not being retained to conduct the

2    Debtor's bankruptcy case.  That's my firm, Pachulski Stang.

3    Again, nobody has objected on that basis.

4        Third, Foley represented the Debtor prior to the petition

5    date on these matters.  Again, nobody has objected on that

6    basis.

7        And, fourth, you know, as Judge Nelms will testify, the

8    retention of Foley and Foley's continued prosecution of the

9    Acis matters is in the best interest of the Debtor's estate.

10        And then fifth and finally, Foley has no adverse interest

11    with respect to the matters on which it is being retained.

12        Now, as I mentioned, there were two omnibus objections

13    that were filed.  There was the Committee's objection and then

14    there was Acis's objection.  Both of these objections really

15    had one common theme, which was that there was insufficient

16    disclosure as to how the fees were going to be allocated, and,

17    honestly, whether or not Mr. James Dondero would benefit from

18    Foley's retention without paying his share of those fees.

19        Now, we had a meeting with the Committee on Friday and we

20    walked through this issue.  And as a result of that, the

21    Committee withdrew its objection.

22        What we told to the Committee is that, prior to the Acis

23    bankruptcy -- and this goes primarily to the retention -- or,

24    the prosecution of the involuntary petition appeal.  In that

25    appeal, Foley is representing just Neutra.  Foley is not

015628

39

1    representing the Debtor.  Now, the economic benefit to the

2    estate, though, in that appeal accrues almost solely to the

3    Debtor.  It does not accrue to Neutra or to Neutra's economic

4    interest owners, which, full disclosure, are Mr. James Dondero

5    and Mr. Mark Okada.

6        The reason why the Debtor -- and you'll hear, again, hear

7    this from Judge Nelms -- believes that it's in the economic

8    best interest of its estate to pay for Neutra's fees in that

9    appeal is that, if Neutra is successful in that appeal, the

10   involuntary petition obviously will be struck, the involuntary

11   will be unwound, and the economic interest and the economic

12   ownership of Acis will revert to Neutra.

13       Upon that reversion, Highland Capital Management will be

14   reinstated as the advisor to Neutra.

15       Now, if Neutra -- I'm sorry, if Acis then generates fees,

16   those fees are going to be paid about 85 percent to satisfy

17   the contractual obligations under that advisory agreement.

18       So, on a go-forward basis, again, if Neutra is successful,

19   85 percent of the revenue generated by Acis will go to Neutra.

20   That remaining 15 percent will be used to satisfy the claim

21   that Acis -- I'm sorry, that Highland Capital Management has

22   against Acis for the pre-, post-petition, and gap period

23   services that it provided to Acis under the advisory

24   agreements.  That claim is about $8 million.

25       So, 85 percent of the revenue on a go-forward basis is

Case 19-34054-sgj11   Doc 3596-24   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 30-24   Filed 06/06/25   Page 951 of 1017   PageID 16612

40

1   going to be used to satisfy the obligations under the

2   management agreement.  The balance of that is going to be used

3   to satisfy that $8 million claim.

4       That means that, you know, if our math is right -- and

5   obviously, the numbers are not static -- that there's not

6   going to be any contributions or any distributions to the

7   upstream equity, to Mr. Dondero or Mr. Okada, for about four

8   years.  After that four years, 85 percent of the revenue is

9   still going to go to Highland Capital Management, the Debtor,

10  under those advisory agreements.

11      So for that reason, we do believe, and Judge Nelms will

12  testify, that the true economic beneficiary of the Neutra

13  appeal of the involuntary petition is actually Highland

14  Capital Management.

15          THE COURT:  I don't want to jump ahead too much, but

16  are we going to talk today about mootness as a potential issue

17  with both of these appeals?  I mean, you know, I have to say

18  it's very compelling to me that you tell me all the briefing

19  has been done --

20          MR. DEMO:  Uh-huh.

21          THE COURT:  -- and oral argument is set in March, so

22  -- but is mootness a --

23          MR. DEMO:  We don't --

24          THE COURT:  Was there ever a motion to dismiss for

25  mootness or --

015630

41

```
1              MR. DEMO:  Not that I'm aware of, Your Honor.

2              THE COURT:  Okay.

3              MR. DEMO:  And all the briefing has been done.

4              THE COURT:  Okay.

5              MR. DEMO:  Again, oral argument is set.  And as far

6    as I know, nobody has raised that issue.

7              THE COURT:  Okay.

8              MR. DEMO:  So I think that we're still proceeding as

9    to whether --

10             THE COURT:  And, again, I'm leaping ahead, but I'm

11   just -- you know, you went through the scenario --

12             MR. DEMO:  Uh-huh.

13             THE COURT:  -- to show that, you know, Dondero and --

14   if the involuntary was reversed, you know, no money would ever

15   get there.  But you're painting a picture, to me, that, again,

16   it feels a little farfetched.  But the evidence will either,

17   you know, bear it out or not.

18             MR. DEMO:  Again, the evidence, you know, I think,

19   will bear it out.

20      And I think what's important also is, when you're thinking

21   about this, is to think of the actual universe of post-

22   petition fees that Foley is going to incur for those services,

23   for the briefing of the two appeals and then for the

24   bankruptcy services, versus the actual economic gain that the

25   Debtor could and hopefully will get if those appeals are
```

42

1   successful.

2           THE COURT:  Okay.

3           MR. DEMO:  So, Foley --

4           THE COURT:  And hopefully the evidence will really go

5   to this.

6           MR. DEMO:  Yes.

7           THE COURT:  I'm trying to think of -- I'm trying to

8   decide what life looks like --

9           MR. DEMO:  Right.

10          THE COURT:  -- if there is a successful reversal.

11          MR. DEMO:  Right.

12          THE COURT:  And I'm not at all clear.  So the

13  evidence and argument will hopefully make me clear.

14          MR. DEMO:  Yes.  And, honestly, Your Honor knows the

15  facts and circumstances --

16          THE COURT:  Right.

17          MR. DEMO:  -- better than me and probably better than

18  anyone.

19          THE COURT:  Uh-huh.

20          MR. DEMO:  But I think what's --

21          THE COURT:  I mean, we've had -- we had terminated

22  contracts --

23          MR. DEMO:  Right.

24          THE COURT:  -- with Highland.  We have a Reorganized

25  Debtor now, which, you know, --

43

1              MR. DEMO:  Right.

2              THE COURT:  -- has new contractual arrangements.

3              MR. DEMO:  Right.

4              THE COURT:  I just, I'm not sure how that all goes

5      away if there's a reversal.  So I'm --

6              MR. DEMO:  Right.

7              THE COURT:  I'm really wanting to drill down on the

8      benefit --

9              MR. DEMO:  Okay.  And --

10             THE COURT:  -- to Highland.

11             MR. DEMO:  And we can do that.  But I think --

12             THE COURT:  Okay.

13             MR. DEMO:  -- it's helpful to talk about --

14             THE COURT:  Uh-huh.

15             MR. DEMO:  -- the universe of fees first and then

16     talk about the related benefit for that.

17         Foley Gardere has helpfully filed two post-petition fee

18     applications.  Those fee applications disclose that, on all

19     three of these matters, Foley has billed about $330,000.  We

20     believe that Foley was probably going to bill, up through the

21     end of oral argument, about $500,000.

22         And then, you know, again -- and not getting too deep into

23     it, because I do think this is something that's better for

24     testimony because I think it goes to, you know, what the Board

25     believes is the economic benefit to the estate -- but if the

44

1    Neutra appeal is successful, if the confirmation order appeal

2    is successful, then the post-petition fees that are going to

3    accrue or we believe are going to accrue to Highland Capital

4    Management under those contracts are tens of millions of

5    dollars a year.

6        The post-petition and gap period and pre-petition fees

7    that we believe that Acis owes to Highland are $8 million a

8    year.  And then there's the go-forward fees.

9        So we believe that, for spending $500,000, the benefits to

10   the estate are actually going to be in the tens of millions of

11   dollars.  So, you know, even though, you know, reasonable

12   minds can differ as to the merits -- and, again, we'll put on

13   some testimony about that, although there's obviously

14   privilege issues and things like that -- the actual economic

15   benefit to the estate is $500,000 versus the possible benefit

16   of $50 million, possibly more dollars, plus the removal of a

17   substantial portion of Acis's proof of claim, which is -- I

18   think it says not less than $75 million.  So you're looking

19   at, if we're successful, fees into the estate --

20           THE COURT:  Well, that's a different issue, though.

21   Isn't that --

22           MR. DEMO:  It is, but it --

23           THE COURT:  Isn't that the Acis adversary proceeding

24   component?

25           MR. DEMO:  Yes.

45

```
 1            THE COURT:  So, --
 2            MR. DEMO:  But if the -- if the -- and, again, I
 3   don't want to get too far into this --
 4            THE COURT:  Uh-huh.
 5            MR. DEMO:  -- because I don't want to get into, you
 6   know, legal arguments that are going to be on appeal.
 7            THE COURT:  Uh-huh.
 8            MR. DEMO:  But what we believe is that, and what
 9   Judge Nelms will testify to and what you'll hear, is that if
10   the confirmation order and the involuntary petition are
11   erased, especially the involuntary petition, and we go back to
12   status quo ante, the benefit to the estate is going to be in
13   the tens of millions of dollars, at a minimum, plus the
14   possible diminution, to a large extent, of a proof of claim
15   that is not less than $75 million, and we've heard numbers of
16   up to $300 million.
17        So you're looking to spend $500,000 on these two matters
18   for a benefit to the estate that's going to be astronomically
19   more than that.  So the benefit to the estate versus the money
20   that is going out of the estate, especially since everything
21   has been briefed and set for oral argument, I guess,
22   personally, I find it difficult to not see that benefit and
23   not to see that spending that half a million dollars to
24   possibly get back $50-plus million, I just don't see how
25   that's not a benefit to the estate and how that does not
```

Appx 03073

46

 1   warrant the retention of Foley Gardere in the limited matters
 2   that we're honestly asking them to be retained for.
 3            THE COURT:  All right.
 4            MR. DEMO:  Okay.
 5            THE COURT:  I'll hear other opening statements on
 6   this.
 7            MR. LAMBERSON:  Good morning, Your Honor.  Phillip
 8   Lamberson on behalf of Acis Capital Management.
 9        First of all, let me start off with outlining exactly what
10   our limited objection relates to.  We are not objecting to the
11   Debtor retaining Foley Gardere to handle the litigation
12   matters for the Debtor.  So, for example, the Acis litigation,
13   anything related to the Acis bankruptcy, that's fine.  We
14   don't have any objection to that.
15            THE COURT:  So the mega-adversary proceeding against
16   Highland and affiliates that is stayed, --
17            MR. LAMBERSON:  Uh-huh.
18            THE COURT:  -- I have a giant Report and
19   Recommendation on my desk that was ready to go about the time
20   the Highland bankruptcy was filed -- but it's stayed:  You
21   would have no objection to Gardere defending Highland --
22            MR. LAMBERSON:  Correct.
23            THE COURT:  -- in that if ever a motion to lift stay
24   is filed and that goes forward?
25            MR. LAMBERSON:  Correct.

47

1          THE COURT:  Okay.

2          MR. LAMBERSON:  And, for example, I believe counsel

3     mentioned this:  To the extent that there's a status

4     conference in the Acis case or something like that, we don't

5     have any issue with Foley representing the Debtor as it

6     relates to that.

7          We don't have any objection to the representation of the

8     Debtor as it relates to the Debtor's appeal of the

9     confirmation order.  We don't have any objection to Neutra's

10    retention of Foley at all.  In fact, we don't have any basis

11    to object to Neutra's retention of Foley Gardere.  Neutra is

12    not a debtor.

13         We fully expect and anticipate that we'll be opposite

14    Foley Gardere in the appeal which is going to be argued at the

15    end of next month, as well as any matters in front of this

16    Court.

17         What we do object to is the Debtor agreeing -- frankly,

18    pre-agreeing -- to pay Foley Gardere for litigation costs

19    incurred by non-debtors, and, specifically, Neutra.  And as

20    counsel outlined, and the reply filed by the Debtors is very

21    clear on this point, Neutra is not a subsidiary of the Debtor.

22    Neutra is ultimately owned one hundred percent by Mr. Dondero

23    and Mr. Okada.

24         So why, why are we objecting?  There's a couple of

25    reasons.  Number one, this is obviously an extremely unusual

48

1   request.  It's not really a --

2          THE COURT:  Okay.  Let me just make sure I heard you

3   correct.  The only thing that Acis is objecting to is the

4   Debtor paying fees for Gardere -- Foley Gardere's

5   representation of Neutra?

6          MR. LAMBERSON:  Correct.

7          THE COURT:  Okay.  So, --

8          MR. LAMBERSON:  Right.  And let me --

9          THE COURT:  -- you don't have a problem with Foley

10  representing the Debtor in these appeal -- well, the Debtor

11  isn't an appellant in the involuntary appeal, right?  Or no?

12         MR. LAMBERSON:  It is -- no.  So, the Debtor is an

13  appellant in the --

14         THE COURT:  The confirmation order.

15         MR. LAMBERSON:  -- confirmation order appeal.

16         THE COURT:  Uh-huh.

17         MR. LAMBERSON:  It's one of two appellants.

18         THE COURT:  Uh-huh.

19         MR. LAMBERSON:  The other one is Neutra.

20         THE COURT:  Uh-huh.

21         MR. LAMBERSON:  Neutra is the only appellant in the

22  confirmation order -- I'm sorry, in the order for relief

23  appeal.

24         THE COURT:  Okay.  So you don't have any problem with

25  Foley's retention; it's just you don't want the Debtor to pay

49

1   Neutra's legal fees?

2          MR. LAMBERSON:  Correct.

3          THE COURT:  And there needs to be some allocation in

4   the confirmation appeal between Neutra and the Debtor, and it

5   needs to all be paid by Neutra, --

6          MR. LAMBERSON:  Correct.

7          THE COURT:  -- not the Debtor?  Okay.

8          MR. LAMBERSON:  Yeah.  That's exactly correct, Your

9   Honor.

10         THE COURT:  Okay.  Just --

11         MR. LAMBERSON:  So I wanted to be clear on that, --

12         THE COURT:  Okay.

13         MR. LAMBERSON:  -- that we're not -- we understand

14   that they're --

15         THE COURT:  Okay.

16         MR. LAMBERSON:  -- going to be our opponents going

17   forward, and we're fine with that.

18         THE COURT:  Uh-huh.

19         MR. LAMBERSON:  I actually like Mrs. O'Neil.

20      So, why are we objecting?  So, there's a couple of

21   reasons.  One is procedural and one is really more

22   substantive.  So, this is obviously a strange request under

23   Section 327.  327 is to approve counsel for the Debtor, for

24   the estate.  And this request doesn't really fit.

25      So, for example, you engage Foley Gardere.  You agree that

50

1    the Debtor is going to pay fees under 330.  Okay.  Well, how

2    do we apply 330 in this situation, right?  What constitutes

3    reasonable and necessary as it relates to the Debtor when the

4    work wasn't done for the Debtor?  What constitutes a

5    determination of whether it was beneficial to the Debtor when,

6    again, the work wasn't done for the Debtor?

7         There's other issues, obviously.  Who controls Neutra?

8    It's not controlled by the Debtor.  The Debtor doesn't own any

9    of Neutra.  Who is making litigation decisions for Neutra?

10   All we know is that the Debtor is paying the freight for

11   whatever Neutra decides to do going forward.

12        The other issue, Your Honor, and this is probably the

13   broader issue, is this decision evidences a continuation of a

14   failed litigation strategy that precipitated this bankruptcy

15   in the first place.  Right?  So, we all heard that the reason

16   Highland Capital Management had to file bankruptcy is because

17   they couldn't pay the Crusader judgment.  Right?  They had a

18   $190 million judgment, or about to be judgment against them,

19   and they couldn't pay it.

20        So let's look at the Committee.  Right?  We have a

21   Committee with four members on it.  Three of them are

22   litigants.  Three of them are in active litigation against the

23   Debtor.

24        If you look at the Top 20 List in this case, of the Top

25   10, only one of them is not a litigation creditor, and that's

51

1    -- I'm trying to -- is an insider creditor.  The rest of the

2    Top 10 are either litigation adversaries or they're law firms

3    that were paid to fight the litigation adversaries.

4         So why is the Debtor continuing its strategy of fighting

5    every last issue, and using various instrumentalities to do

6    it, and then paying the freight for all of it?  That's exactly

7    how we got to where we are today in this case.

8         So, let me address also the benefit from the Neutra

9    appeal.  And, Your Honor, I think that's definitely an area

10   that we need to probe.  Because, like you, I don't get it.  I

11   think what they're outlining is sort of a fantasyland where

12   money is going to rain from the sky when they win this appeal,

13   or if they win this appeal.  And obviously, their reply goes

14   on for pages about the benefit to the Debtor.

15        So, just using basic odds of winning -- and I'm not going

16   to go to the substance of this appeal, which I think is

17   probably worse than the basic odds -- there's a 90 percent

18   chance that the Fifth Circuit just affirms the -- Judge

19   Fitzwater's ruling.  Right?  I mean, there's a 90 percent

20   chance that what the Debtor gets out of this is an affirmance

21   that says, "You lose."  Right?

22        But even if it's reversed, --

23             THE COURT:  What are you basing that on?  Because

24   Fitzwater affirmed 90 percent of the time?

25             MR. LAMBERSON:  Well, so, actually, Judge -- and Ms.

52

1    Chiarello can probably address this more specifically -- Judge

2    Fitzwater actually gets affirmed, I think, more than 90

3    percent of the time, --

4              THE COURT:  Probably, yes.

5              MR. LAMBERSON:  -- but the general reversal rate at

6    the Fifth Circuit is about ten percent.  So, and that

7    obviously includes things like 1983 appeals and things like

8    that.

9         But even if it is reversed, which I think we'd all agree

10   is fairly unlikely, again, money isn't just going to start

11   raining down on Highland Capital.  So what's most likely going

12   to happen if the Fifth Circuit decides to reverse -- and let

13   me, let me point out one issue, Your Honor.  The only issue on

14   appeal, I should say the only -- there are various issues on

15   appeal, and I'll just click through them.  So, one of them is

16   whether Neutra has standing to appeal.  Right?  Whether they

17   qualify under the person aggrieved standard that the Fifth

18   Circuit uses.  That's obviously a gating issue.  And, by the

19   way, that's the basis of Judge Fitzwater's ruling affirming

20   this Court's ruling, which was basically Neutra doesn't have

21   standing to appeal the order for relief.  They're not the

22   Debtor.

23        So the first issue is whether Neutra is a person

24   aggrieved.  Okay?

25        The second issue, and this is the substantive bankruptcy

53

1   issue, the only substantive bankruptcy issue, is whether the

2   order for relief should have been arbitrated.  Right?  So

3   that's the next issue.  That would be, frankly, the issue that

4   the Fifth Circuit would have to reverse on, is that well, yes,

5   this should have been arbitrated.  Right?  The order for

6   relief should have been arbitrated.

7        And then the final issue that we raised on appeal is

8   whether, even if Neutra has standing and even if there was

9   some right to arbitration, whether Neutra, via the putative

10  debtor, waived its right to arbitration by waiting until

11  literally, and you'll remember this, literally the day before

12  the order for relief file started, to raise its request for

13  arbitration.  Right?

14       So, assuming that they get some reversal, what's really

15  likely to happen is that the Court, the Fifth Circuit is going

16  to send it back to you on a remand and say, This is the

17  standard you should have applied, you need to make this

18  finding, or something like that, right?  It's very unlikely

19  the Fifth Circuit is going to say, We're going to reverse and

20  we're just going to render, right, and this thing just goes

21  away forever, particularly considering that the only live

22  substantive issue is whether the order for relief should have

23  been arbitrated, right?

24       But even if Neutra wins and its relief is wholly granted,

25  well, what does that mean?  That doesn't mean that the

54

1    involuntary goes away.  It doesn't mean the order for relief

2    permanently goes away.  It means that we go arbitrate it.

3    Right?  That's what they asked for, is that we go arbitrate

4    it.  So now we go arbitrate it.  Right?

5        So, basically, if you break it down, if, in the unlikely

6    event Neutra wins on appeal, it doesn't mean the bankruptcy

7    permanently goes away.  What it means is we have more

8    litigation.  Right?  And that's what normally happens when

9    there's a reversal on appeal, right?  You relitigate the

10   issues that were litigated in the first place.

11       So this concept -- you're exactly right, Your Honor.  This

12   sounds like fantasyland.  This concept that money is just

13   going to fall out of the sky and onto Highland because Neutra

14   got a reversal is just not going to happen.

15       There's some other problems here, obviously.  Counsel just

16   spent a lot of time talking about how all of Acis's funds are

17   going to get paid to Highland.  Well, that completely misses

18   the point that Josh Terry has an eight, probably somewhere in

19   the neighborhood of maybe $12 million judgment now against

20   Acis.  They're just going to ignore that?  They're just going

21   to ignore the fact that their largest creditor has a judgment

22   against them and is just hanging out there?  That's going to

23   have some impact on what happens to all that cash flow.

24       And then, finally -- and we'll talk about this in more

25   substance when we get to the testimony -- as you recall, this

015644

55

1    was the entire basis of the Acis case:  Mr. Dondero and

2    Highland Capital were aggressively trying to liquidate Acis

3    when we showed up in your Court asking for relief.  So what

4    makes anybody think that that isn't going to continue

5    happening if there's not a bankruptcy anymore?  Right?

6        And Your Honor will recall that you had to twice enjoin

7    Dondero affiliates, HCLOF, from liquidating the PMAs and

8    Acis's assets during the bankruptcy.  Right?  So the concept

9    that if they win on appeal and there is no bankruptcy,

10   everything just goes away and we're not in this Court at all,

11   that Acis is going to have all of these valuable PMAs and cash

12   flow and it's all going to go to the benefit of Highland, is

13   completely contrary to what happened during the Acis case and

14   what precipitated the Acis case.

15       One other issue that we raised in the objection and in the

16   Debtor's omnibus reply is what we call the DAF litigation,

17   which is litigation filed in the Southern District  of New

18   York.  And Your Honor, I think you probably remember that from

19   the pleadings.  I do want to point out that -- so this, this

20   is a serious issue for Acis.  And the reason is because,

21   contrary to what was stated in the reply -- admittedly, this

22   happened after the reply -- but contrary to what happened --

23   was stated in the reply, that litigation has now been expanded

24   to include Acis and Mr. Terry and Brigade, and with basically

25   the same allegations of CLO mismanagement that were raised in

Case 19-34054-sgj11    Doc 3596-24    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 130-24 Filed 05/30/25189 Page 967 of 1017    PageID 16628

56

1  this Court during the confirmation hearing.

2      So this is a very significant matter to us.  We are very

3  concerned that this Debtor is involved in that and is

4  promoting it in some way.  And we want Your Honor to be aware

5  of that litigation and the actions that are taken challenging

6  your rulings in a court that's miles and miles away from here.

7      Thank you, Your Honor.

8          THE COURT:  All right.  Mr. Morris, are you ready to

9  call your witness?

10          MR. MORRIS:  Yes, I am, Your Honor.  The Debtor calls

11  Russell Nelms.

12          THE COURT:  All right.

13          MR. MORRIS:  Your Honor, I have some exhibit binders.

14  May I hand up?

15          THE COURT:  You may.  All right.  Well, odd as it is,

16  I suppose I in this context need to swear you in.

17              RUSSELL NELMS, DEBTOR'S WITNESS, SWORN

18          THE COURT:  All right.  Please be seated.

19          MR. MORRIS:  John Morris for Pachulski Stang Ziehl &

20  Jones on behalf of the Debtor, Your Honor.

21      Before we get to the testimony, the Debtor has put on its

22  exhibit list nine specific documents that are in the binder

23  before you, and the Debtor moves for the introduction of those

24  documents into evidence.

25          THE COURT:  All right.  Any objection?

Nelms - Direct                          57

1          MR. LAMBERSON:  No objections, Your Honor.

2          THE COURT:  Exhibits 1 through 9 are admitted.

3      (Debtor's Exhibits 1 through 9 are received into

4  evidence.)

5          MR. MORRIS:  Thank you, Your Honor.

6                      DIRECT EXAMINATION

7  BY MR. MORRIS:

8  Q    Mr. Nelms, do you currently have a relationship to the

9  Debtor?

10  A    I do.

11  Q    And what is that relationship?

12  A    I am one of three independent directors of the Debtor.

13  Q    And when were you appointed?

14  A    January the 9th of this year.

15  Q    Did you just listen to the opening statement on behalf of

16  Acis?

17  A    I did.

18  Q    And did you hear the reference to the DAF litigation?

19  A    I did.

20  Q    And did you hear the allegation that the Debtor somehow

21  was involved in the prosecution of the DAF litigation?

22  A    I heard that, yes.

23  Q    Okay.  Did there come a time last week that the Board

24  learned of the possibility of a filing with respect to the DAF

25  litigation?

Nelms - Direct                                58

1   A    We learned about the filing of the DAF litigation sometime

2   within the last two weeks.

3   Q    And what did the Board do in response to learning that

4   information?

5   A    Well, first of all, I -- we met with Ms. Patel and her

6   client, Josh Terry.  They expressed their concerns about the

7   DAF litigation.  And so the Board used its influence to

8   encourage the trustee of the DAF, Grant Scott, to dismiss that

9   litigation, and we have gotten Mr. Scott's commitment to

10  dismiss the litigation.

11       There's a little bit of an issue there concerning about

12  whether some of the claims can -- they may need to be

13  dismissed without -- the preference is, of course, to dismiss

14  them without prejudice, but there are some issues about that.

15  But I'm told by Mr. Scott that he's going to dismiss the

16  litigation.

17  Q    Let's go back in time before this was filed.  Did the

18  Board express its view as to whether there should be a filing

19  at all?

20  A    It was really a very brief thing.  This was probably a

21  couple weeks or so ago, kind of late in the day at the end of

22  a long, long day, one of those long days we've been having.

23  Someone brought into a board meeting I guess a copy of this

24  new DAF complaint.  It had not been filed at that time.  They

25  showed it to Mr. Dubel.  He looked at it and just kind of

015648

Nelms - Direct                                    59

1    asked what it was.  There was a brief explanation of what it

2    was.  And Mr. Dubel said, Tell them not to file this.  He

3    goes, This is only going to cause us problems.  And that's the

4    last we heard of it before it was filed.

5    Q    And what law firm filed that complaint?

6    A    That was filed by the Lynn Pinker firm.

7    Q    And after the Board learned that Lynn Pinker filed this,

8    in spite of the Board's instructions, did the Board take any

9    steps with respect to Lynn Pinker?

10   A    Well, of course, we -- one of the matters that previously

11   was before the Court was the Lynn Pinker application to be

12   retained in this case.  And I'll just say that it was -- it

13   was a factor that went into our deliberations concerning our

14   decision not to go forward with the Lynn Pinker litigation.

15   Q    So, I just want to make sure I have this right.  So the

16   Board, upon learning of a possible filing, gave instructions

17   not to do so; is that right?

18   A    It did.

19   Q    And upon learning that it was filed, it became one of the

20   factors that the Board relied upon in determining not to

21   pursue the Lynn Pinker retention; is that right?

22   A    That's correct.

23   Q    And you personally reached out to Mr. Terry and Ms. Patel

24   to discuss the issue; is that right?

25   A    Mr. Seery and I did, the two of us.

Nelms - Direct                              60

1  Q    And you used whatever influence you had to try to reach an
2  agreement for the withdrawal of that complaint without
3  prejudice; is that right?
4  A    That's correct.
5  Q    Okay.  Now, let's get back to the issues that are relevant
6  to the actual motion.  Are you aware that the Debtor has
7  sought the Court's approval to retain Foley Gardere as special
8  counsel?
9  A    I am.
10 Q    And have you reviewed the court filings with respect to
11 that motion?
12 A    Yes, I have.
13 Q    Okay.  Can you describe for the Court generally the
14 matters for which the Debtor seeks to retain Foley Gardere?
15 A    There are three matters, essentially.  One is an appeal in
16 the Fifth Circuit which concerns the entry of the order for
17 relief in the involuntary petition itself.  The second is an
18 appeal in the Fifth Circuit that concerns the confirmation of
19 the Acis plan.  And the third matter is the assertion of,
20 prosecution of a proof of claim that Highland Capital
21 Management would have in the Acis bankruptcy.
22 Q    Okay.  And are these the special purposes for which the
23 Debtor seeks to retain Foley?
24 A    Yes.
25 Q    Do you know whether there are matters that were part of

Nelms - Direct                              61

1    the original motion but which the Debtor no longer seeks to

2    pursue?

3    A    One of the matters that was pending when we took office

4    was an appeal, and I believe it was still in the District

5    Court, and that related to an alleged conflict of interest by

6    the Winstead firm.  And so there was an objection to their

7    fees and an appeal concerning payment of Winstead fees.  And

8    the Board has decided not to go forward with that appeal.

9    Q    Okay.  So the Board -- did you hear the opening from

10   Acis's counsel that charged that the Debtor was just doing

11   more scorched-earth litigation tactics?  Did you hear that

12   charge?

13   A    I heard that, yes.

14   Q    Okay.  But yet the Board has instructed Foley not to

15   pursue the Winstead matter; is that right?

16   A    That's correct.

17   Q    And just again, for the record, why did the Board make

18   that decision?

19   A    The Board made that decision because we just thought it

20   was in the best interest of the Debtor and this estate not to

21   do that.

22   Q    And did the Debtor see any benefit to pursuing that

23   particular litigation?

24   A    You know, there -- a benefit could be articulated, but we

25   decided not to pursue it.

Nelms - Direct                              62

1   Q    Okay.  So, that, plus the Neutra appeal, are two -- I

2   mean, I apologize, withdrawn.  That, plus the DAF matter, are

3   two examples where the Board exercised its judgment not to

4   pursue pending litigation; is that fair?

5   A    That's correct.

6   Q    Okay.  Is the Board supportive of the Debtor's application

7   to retain Foley for the three matters you have described?

8   A    It is.

9   Q    And without revealing privileged communications, can you

10  describe generally the diligence that the Board conducted to

11  reach that decision?

12  A    Well, we met with some of the people that work at

13  Highland.  We met with the Debtor's attorneys, the Pachulski

14  firm.  We did have a couple of meetings with Ms. Patel and Mr.

15  Terry.  Some of us have reviewed the pleadings, some more than

16  others.  And, well, we may have done other things, but those

17  are the ones that come to mind right now.

18  Q    I don't know if you mentioned it, but did you confer with

19  Ms. O'Neil?

20  A    Oh, yes, we did.  We talked with Ms. O'Neil about it.

21  Q    Okay.  And what was the purpose of the diligence that you

22  just described for the Court?

23  A    Well, ultimately, what we as a board were trying to do was

24  to conduct kind of a cost-benefit analysis to the estate:  How

25  much will this potentially cost us?  What's the potential

Nelms - Direct                           63

1   upside of pursuing it?  And based upon that cost-benefit
2   analysis, we thought that this was the best thing to do.
3   Q   Okay.  Let's just focus on a couple of very narrow 327(e)
4   issues.  Is the Debtor seeking to retain Foley to act as
5   general bankruptcy counsel?
6   A   No.
7   Q   And which firm serves as general bankruptcy counsel?
8   A   That would be the Pachulski firm.
9   Q   Okay.  And do you know whether Foley Gardere represented
10  the Debtor's interest in each of the three matters that you've
11  described?
12  A   It has been representing the Debtor previously.
13  Q   Okay.  So let's talk about those three matters.  The first
14  one I believe you said was with respect to the representation
15  of the Debtor in connection with an $8 million claim that it
16  has against Acis; is that right?
17  A   That's correct.
18  Q   And is that the claim -- is that the subject of a formal
19  proof of claim?
20  A   Yes.
21  Q   Okay.
22  A   It is a claim filed in the Acis case.
23  Q   I've placed before you an exhibit binder, and I would ask
24  you to turn first to Exhibit 4.
25  A   Okay.

Nelms - Direct                              64

1   Q    And is that one of the proofs of claim that the Debtor has

2   filed against Acis?

3   A    It is.

4   Q    And you'll see that attached to the proof of claim a few

5   pages in there's a document called the Third Amended and

6   Restated Sub-Advisory Agreement.  Do you see that?

7   A    Yes.

8   Q    Do you know what that document is?  Generally?

9   A    Well, generally, I know what this document is.

10  Q    All right.  And what's your general understanding of the

11  document?

12  A    This is an advisory agreement that -- the only thing that

13  I know, I can tell you, really, about this agreement is it

14  gives rise to and generates fees that would inure to the

15  benefit of the Debtor.

16  Q    Okay.  And a few pages past that, you'll see something

17  called a Fourth Amended and Restated Shared Services

18  Agreement.  Do you see that?

19  A    Yes.

20  Q    Is it your understanding that that was another source of

21  revenue that the Debtor generated when it had this agreement

22  in place with Acis?

23  A    Yes.

24  Q    Okay.  Do you have an understanding as to, you know,

25  ballpark, what the annual fees were that the Debtor received

1   pursuant to these agreements prior to the Acis bankruptcy?

2   A   Well, I think, prior to the bankruptcy, it was more, and

3   perhaps significantly more, than it is today.  It may have

4   been in the $12 million range per annum.  I think it's less

5   than that today.

6   Q   Okay.  And can you turn to Exhibit 5, please?  Is that

7   another proof of claim that was filed in the bankruptcy case,

8   the Acis bankruptcy case?

9   A   Yes.  This is a little bit different.  This is an

10  application for an administrative expense claim.  The prior

11  proof of claim that we looked at related to a pre-petition

12  claim that the Debtor had, then a gap period claim that the

13  Debtor had, and this is post-petition.  So this is an

14  administrative claim.  It's basically for the same services,

15  but just different time periods.

16  Q   Okay.  And who was responsible for preparing Exhibits 4,

17  5, and 6?

18  A   Ms. O'Neil and the Foley firm.

19  Q   Okay.  And has the Board reached a conclusion that it's in

20  the Debtor's best interest to retain Foley on a post-petition

21  basis to prosecute these claims?

22  A   It has.

23  Q   And why -- what's the justification for that?  Why did the

24  Board reach that decision?

25  A   Well, we believe it's in the best interest of the Debtor.

Nelms - Direct                          66

1    Obviously, a couple of things there.  I realize we may have a

2    very long road ahead of us with respect to these things.  But

3    the overall aspirational goal is to have an income stream

4    that's associated with these agreements.  The goal is to have

5    an amount of money out there that's available to pay our pre-

6    petition claims, the gap claims, the administrative claims,

7    while at the same time acknowledging that this company has the

8    obligation to satisfy and fulfill Mr. Terry's claim as well.

9    Q    All right.  Let's just focus for the moment on the three

10   proofs of claim.  The aggregate amount is approximately $8

11   million.  Do I have that right?

12   A    Yes, that's right.

13   Q    And from the Board's perspective, is the -- are those

14   claims an asset of the estate?

15   A    They are.

16   Q    And does the Board want to retain Foley for the purpose of

17   trying to recover that asset?

18   A    It does.

19   Q    And has the Board concluded that Foley is familiar with

20   these particular claims?

21   A    Foley is familiar with these claims, yes.

22   Q    And -- okay.  Let's move on, then, to the second task for

23   which the Debtor seeks approval to retain Foley, and that is

24   with respect to the confirmation order.  That's one of the

25   tasks, right?

Nelms - Direct                              67

1   A    It is.

2   Q    Okay.  And this is one of the Fifth Circuit arguments

3   that's scheduled for six weeks from now; is that right?

4   A    That's correct.

5   Q    Okay.  And has Foley represented the Debtor throughout the

6   proceedings that are leading up to this oral argument?

7   A    It has.

8   Q    And did Foley prepare all of the briefing in connection

9   with the arguments?

10  A    It did prepare the briefing.  It did that, in some

11  respects, along with Lynn Pinker.

12  Q    Okay.  Did you personally review the Debtor's briefs that

13  were filed in connection with the appeal?

14  A    I have reviewed those.

15  Q    Okay.  Have you reviewed every single piece of the record

16  on appeal?

17  A    I would doubt that I have.

18  Q    Okay.  Do you have a general understanding of the nature

19  of the appeal?  Of -- and this would --

20  A    Are we talking now about the confirmation appeal?

21  Q    Yes.  Just the confirmation.  Yeah.

22  Q    Well, the appeal has basically two broad elements, and the

23  first is an argument that the plan was not brought in good

24  faith.  Section 1129(a)(3).  And that goes back to the

25  arbitration issue.  Generally speaking, that because -- the

Nelms - Direct                        68

1   allegation is that because Mr. Terry refused to arbitrate,

2   then the plan was tainted by that lack of good faith.  And the

3   second issue, broad issue that's involved in that appeal has

4   to do with, oh, the injunction, the breadth and scope of the

5   injunction, which the Debtor contends is -- was improper.

6   Q    And if the Fifth Circuit reverses the underlying decision,

7   has the Board made a determination of the possible benefits

8   that the Debtor may receive?

9   A    Well, there's two aspects of that appeal.  One would be a

10  narrower decision.  I suppose, if it's just related to the

11  injunction, it's -- it's hard to quantify exactly what that

12  would mean.

13  Q    Okay.

14  A    The bigger issue, of course, has to do with the

15  arbitration.  And if the -- theoretically, at least, the

16  arbitration, if the Fifth Circuit agreed on the issue of

17  arbitration, then the argument would be that we would -- that

18  in the arbitra... well, it is true to say that -- well, I

19  think I'm kind of getting ahead of myself here.

20  Q    You are, just a bit.  Let's just focus on the confirmation

21  appeal.  That's been consolidated for oral argument purposes

22  --

23  A    It has.

24  Q    -- with the appeal of the involuntary; is that right?

25  A    That's correct.

Nelms - Direct                                    69

1    Q    Okay.  And just to sum up this piece of it, did Foley

2    represent the Debtor with respect to all of the underlying

3    proceedings?

4    A    It did.

5    Q    And why does the Board believe it's in the Debtor's best

6    interest to retain Foley to conduct the oral argument and to

7    finish up this proceeding?

8    A    Well, first of all, I think the Court would agree with me

9    that Foley is a very competent law firm.  It's competent to do

10   the work that they've been charged to do.

11        Second, pretty much all the work on the appeal is already

12   in the can.  The only thing that's left to be done at this

13   point in time is to make the oral argument.  Obviously, if we

14   didn't go forward with the Foley firm, we'd have to find

15   somebody who could make the argument.  So, we would -- but we

16   would lose the benefit of Foley's experience that they have in

17   the case so far.

18        I think there will be a cost element that would be

19   associated with bringing somebody new up to speed with respect

20   to this.

21        So, those, generally speaking, are the benefits that we

22   see.

23   Q    Okay.  Let's turn then, finally, to the Neutra appeal.  Do

24   you have a general understanding of that matter for which the

25   Debtor seeks to retain Foley?

Nelms - Direct                              70

1  A    Yeah.  The Neutra appeal, what happened in Neutra is that

2  Neutra, to my understanding, moved to intervene in the

3  involuntary proceeding.  I think that intervention was denied.

4  And so that appeal has to do with the fact that Neutra

5  contends that it should have been permitted to intervene, that

6  the matter of collections should have been arbitrated.

7       I think that one of the issues in there is this -- in that

8  appeal is who decides on the issue of arbitrability.  Is it

9  this Court, or is it the arbitrators themselves?

10      So, those are the issues that are present in the Neutra

11 appeal.

12 Q    Okay.  Is the Debtor named a party to the appeal?

13 A    The Debtor is not a named party in the Neutra appeal.

14 Q    But the Board nevertheless wants to retain Foley on a

15 post-petition basis to prosecute that appeal; is that right?

16 A    That's correct.

17 Q    And why is that?

18 A    Well, I think both -- we recognize and I think the Fifth

19 Circuit recognizes as well that these two things, that these

20 two appeals kind of go hand-in-glove.  The 1129(a)(3) argument

21 basically is dependent upon the arbitration issue, which is

22 fleshed out in the Neutra appeal.

23      And so, at the end of the day, the way that the Board sees

24 this is that the Debtor is the most immediate beneficiary of

25 the economic benefit of the Neutra appeal.  We see the

Appx. 02098

015660

Nelms - Direct                    71

1    possibility of an income stream there.  We see the possibility

2    of the ability to pay our claims in the Acis case.  And I

3    think -- one of the things I think that is of particular focus

4    when it comes to all of this litigation is the fact that, as I

5    understand it, Mr. Terry started out with an $8 million claim,

6    and I think he bid $1 million of that claim for the interest

7    that he got in Acis, which reduced it, say, to $7 million.

8    And I think Mr. Terry's interest now over time I believe it's

9    been reduced to somewhere between $4 to $6 million.  So

10   that's, that's a claim.

11       But in this case, Mr. Terry has filed a proof of claim for

12   $70 million.  And my understanding from our visit with Mr.

13   Terry and his counsel is that that claim could get up to $300

14   million.  And so, as a board, we look at that and what we're

15   concerned about is the migration, the alleged migration of a

16   tremendous amount of value from Highland down to Acis.  So, at

17   the end of the day, it doesn't really matter who you regard as

18   the ultimate equity owner of Acis, whether it's Mr. Terry or

19   whether it's Mr. Dondero:  The migration of that value

20   downstream to Acis is of no real benefit to Highland Capital

21   at all.

22   Q   Is this one of the issues that the Board discussed with

23   the Committee last week in connection with this motion?

24   A   Yes.  It is.

25   Q   Okay.  And let's just go back to the income stream for a

1    second.  The income stream that the Board is hoping it will

2    get if the decision is reversed, is that income stream derived

3    from the two agreements that we just looked at?

4    A    It is.

5    Q    So those are the two very agreements that the Board would

6    look to have reinstated if it were to succeed on the appeal;

7    is that right?

8    A    Yes.

9    Q    Now, does the Board know exactly the form of relief the

10   Fifth Circuit is going to grant?

11   A    I have no earthly idea.

12   Q    Right?  But has the Board made a determination that the

13   outcome of Neutra obtaining control of Acis is one

14   possibility?

15   A    It's certainly a possibility.

16   Q    And is that the potential benefit that the Board focused

17   on in deciding to pursue this motion?

18   A    Yes.  I mean, I'm glad to adopt the percentages that Mr.

19   Terry's counsel has mentioned today.  I guess if the cost-

20   benefit analysis is that we're going to pay a couple hundred

21   thousand dollars here to get to the end of the road, and the

22   benefit is millions of dollars, well, even if our chances are

23   only ten percent, I think that's a shot worth taking.

24   Q    Thank you very much.  If the Fifth Circuit reversed,

25   because this is a point that was also made in the Acis

Nelms - Direct                          73

1   opening, what would happen to Mr. Terry's claim?  Or what's

2   your understanding or what's the Board's view as to whether or

3   not it would intend to satisfy Mr. Terry's claim?

4   A    I know, speaking on my behalf, that I'd -- the claim that

5   Mr. Terry got through arbitration I regard as a valid claim.

6   I think it's one that would have to be addressed no matter who

7   is in charge of paying the obligations of Neutra.

8   Q    Has the Board concluded that it's in the Debtor's best

9   interest to retain Foley for the purpose of prosecuting the

10  Neutra appeal, or at least in issuing the oral argument?

11  A    Yes.

12  Q    Okay.  And when is the argument scheduled for?

13  A    March the 30th.

14  Q    And is the fact that that's all that's left with respect

15  to this aspect of the engagement a factor that the Board took

16  into account in its decision?

17  A    Yes.

18  Q    Has the Board reached a decision as to who the real

19  economic party in interest is with respect to the Neutra

20  appeal?

21  A    Yes.  We believe ultimately that our Debtor would bear the

22  most economic interest in the outcome.  And, really, because

23  of the amount of the obligations that are owed, both to Mr.

24  Terry, to Highland Capital, by the time that you have this

25  kind of runoff of all the revenue streams, I'm not really sure

Nelms - Direct                      74

1   that there would be anything left for either Mr. Dondero or

2   Mr. Okada.

3   Q    So, --

4   A    That's -- that's a view from 50,000 feet, not even 30,000

5   feet.

6   Q    Okay.  Well, let's talk about the specific benefits,

7   potential benefits, if it's reversed on appeal.  Does the

8   Board believe it's possible that the two contracts get

9   reinstated?

10  A    It is possible.

11  Q    And is that a motivating factor in supporting this motion?

12  A    It is.

13  Q    What would happen to the $8 million claim that the Debtor

14  has against Acis right now in the Acis bankruptcy?  Does the

15  Board have a view as to what would happen to that?

16  A    It would be our aspiration to collect that claim on behalf

17  of our client, which is Highland Capital Management.

18  Q    And would -- is it the Board's expectation that if it was

19  in that position it would get paid hundred-cent dollars,

20  rather than at least a portion of it as a general unsecured

21  claim?

22  A    Again, that would be our aspiration.

23  Q    Uh-huh.  What would happen to the adversary proceeding?

24  Do you have an understanding as to what would happen in the

25  adversary proceeding with respect to Mr. Terry if the Fifth

Nelms - Direct                        75

1   Circuit reverses and Neutra regains control of Acis?

2   A    Well, I'm assuming -- I'm assuming that that adversary

3   proceeding would go away.

4   Q    Okay.  And would that -- is that a potential benefit to

5   the estate?

6   A    That would be a benefit to the estate if it did.

7   Q    And do all of the factors that we just discussed go into

8   the cost-benefit analysis that the Board did in deciding to

9   pursue only these three very limited aspects of the

10  engagement?

11  A    Yes.

12  Q    Okay.  Has the Board considered the potential harm to the

13  Debtor if the motion is denied?

14  A    We have.

15  Q    And have -- can you share with the Court the issues that

16  the Board has identified as potentially being adverse if the

17  motion is denied?

18  A    It's really just the other -- the flip side of the coin of

19  benefit, which is added expense, loss of the experience that

20  the Foley firm has, perhaps delay of time in finding somebody

21  else, bringing them up to speed, not just with respect to the

22  two appeals but with respect to the proof of claim.  And there

23  may be others that I'm not thinking of right now.

24  Q    Did the Board consider the potential loss of the

25  institutional knowledge that Foley has and the potential

Case 19-34054-sgj11   Doc 3596-24   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 5-30   24 Filed 07/06/25189 Page 987 of 1017    PageID 16648

Nelms - Direct                                    76

 1  adverse impact it would have on the quality of the oral
 2  argument?
 3  A    It did.
 4  Q    Okay.  So, two of the three matters that the Debtor seeks
 5  to retain Foley for are appeals to the Fifth Circuit; is that
 6  right?
 7  A    Yes.
 8  Q    And did those matters originate in this courtroom?
 9  A    They did.
10  Q    And you were colleagues with Judge Jernigan at one time,
11  weren't you?
12  A    Yes.  We were bench colleagues for twelve years.
13  Q    And do you believe Judge Jernigan is a good judge?
14  A    I do.
15  Q    Do you believe she's a fair judge?
16  A    I do.
17  Q    Do you believe she tries to get it right every single
18  time?
19  A    I know she tries to get it right every time.
20  Q    So then why is the Board seeking to prosecute these
21  appeals of Judge Jernigan's decision?
22  A    Well, it's in the best interest of our client to do that.
23  And I have not -- I have to say there's always a little bit of
24  discomfort that comes with something like this, but I do know
25  this from my time on the bench, and that is that when you take

Case 19-34054-sgj11   Doc 3596-24   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-30 24 Filed 06/06/25189 Page 988 of 1017   PageID 16649

Nelms - Direct                              77

1   the job that Judge Jernigan has, you take it with full

2   understanding of how the system works.  And in the system,

3   half the people lose at any one given time.  And when you

4   lose, you tend to be disappointed in the result, and the

5   result of that is that you get the right to go to the next

6   court and have someone say that the judge got it wrong.

7       So those of us that take the bench understand that that's

8   the system, and I don't think -- for the most part, we're not

9   threatened by that.  And so I, you know, as uncomfortable as

10  this may -- this may put -- a position it may put me in from

11  time to time, I think that -- I think Judge Jernigan

12  understands the roles that we all play in this system.  And so

13  --

14  Q   Just, okay, just to summarize:  If the motion is granted,

15  what's the absolute worst-case scenario here for the Debtor?

16  A   I'm sorry.  Would you say that again?

17  Q   If the motion is granted and the Debtor is allowed to

18  retain Foley for the three tasks which you have described, do

19  you have an understanding as to what -- what's the worst that

20  could happen?  They'd have to pay Foley's fees, right?

21  A   We'd have to pay -- well, subject to Judge Jernigan's

22  approval, --

23  Q   Right.

24  A   -- those fees would be paid.

25  Q   And subject to everybody's opportunity to object, right?

Nelms - Direct                         78

1  A    Right.

2  Q    But if the fees were paid at a hundred percent, nobody

3  objected and Judge Jernigan approved of them, what's the

4  maximum exposure that the Debtor has from this?

5  A    I think Foley has about $311,000, I believe, right now in

6  time.  And I think they would probably have about maybe

7  another $100,000 more.  And I know -- I hate to scoff at the

8  notion that $400,000 is a lot of -- is not a lot of money.

9  But, you know, in the grand scheme of things in this case,

10 it's -- I won't say it's a rounding error, but it's not a lot

11 of money.

12 Q    And forget about, I mean, not forget about, but in

13 addition to its relative size to the overall case, how does

14 that compare to the relative economic benefit that the Debtor

15 believes it will recover if the appeal is successful?

16 A    Well, I think the cost is -- the cost is less than half a

17 million, and the potential benefits are in the millions.

18         MR. MORRIS:  Okay.  Just one moment, Your Honor, if I

19 may?

20         THE COURT:  Okay.

21     (Pause.)

22         MR. MORRIS:  All right.  Just a few more questions,

23 Your Honor.

24         THE COURT:  Okay.

25 BY MR. MORRIS:

Nelms - Direct                                      79

1    Q    Mr. Nelms, did Neutra pay a portion of the fees, Foley's

2    fees prior to the petition date in connection with an April

3    litigation?  Do you know?

4    A    If they did, I'm not aware of it.

5    Q    Okay.  Do you know what would happen to the appeal if

6    there was no funding for the appeal?

7    A    Well, I think I know what the result of the appellant not

8    showing up for an appellant argument would be.

9    Q    And what would that be?

10   A    Well, I think that would be a pretty quick resolution.

11   Q    Do you think the case would be dismissed, the appeal would

12   be dismissed?

13   A    I think so.

14   Q    And would that be the loss of a potential material benefit

15   and asset of the Debtor's estate?

16   A    It would be.

17   Q    Can you think of any way to ensure the appeal is

18   prosecuted today other than making sure the Debtor funds it?

19   A    I'll put it this way.  I think the most certainty can be

20   added to this case by having the Debtor fund this matter

21   through the end of March.

22   Q    And from --

23   A    I think that's -- that's -- for the time being, that's the

24   easiest, most simple path.

25   Q    And you say for the time being.  Has the Board reached an

Nelms - Direct                           80

1    agreement to never request, from Neutra or anybody else,

2    contributions for the funding of this case?

3    A    No.  Ultimately, there is going to be at some point in

4    this case a settling of accounts between the Debtor and Mr.

5    Dondero, just as there are -- will be a settling of accounts

6    between the Debtor and other parties in interest.  We, as the

7    Board, have just chosen not to have that fight today.

8    Q    And why did the Board reach that decision?

9    A    Because we just thought it was in the best interest of the

10   Debtor to proceed that way.

11   Q    And is that because you need this appeal argued on March

12   30th?

13   A    It is.

14   Q    And that's because of all of the potential benefits that

15   you've identified; is that right?

16   A    Right.

17   Q    Okay.

18          MR. MORRIS:  I have no further questions, Your Honor.

19          THE COURT:  Okay.  Cross?

20          MR. LAMBERSON:  Yes, Your Honor.

21                      CROSS-EXAMINATION

22   BY MR. LAMBERSON:

23   Q    Good morning, Mr. Nelms.

24   A    Good morning.

25   Q    How's it to be on that side of the bench?

Nelms - Cross                          81

 1  A    Not so fun.

 2  Q    It's not great, right?

 3         MR. LAMBERSON:  And Your Honor, we have an exhibit

 4  notebook, which we're not -- we're not going to use all these

 5  exhibits.  We actually -- you'll notice that there are some

 6  empty tabs in here.  We downsized the exhibits from the

 7  exhibit list, and I'm not going to use all these.  So I'll

 8  just introduce them as I get to them.

 9         THE COURT:  Okay.

10  BY MR. LAMBERSON:

11  Q    Let me pick up on your last point.

12         MS. CHIARELLO:  Your Honor, may we approach?  We have

13  binders.

14         THE COURT:  You may.

15  BY MR. LAMBERSON:

16  Q    So, let me pick up on your last point, Mr. Nelms.  So, who

17  -- who owns Neutra?

18  A    Well, if you follow the stream all the way up, it is owned

19  75 percent by Mr. Dondero and 25 percent by Mr. Okada.

20  Q    Okay.  And Mr. Dondero is one of the richest men in

21  Dallas.  Correct?

22  A    I don't know.

23  Q    Presumably?  Mr. Okada is also one of the richest men in

24  Dallas?

25  A    I don't know.  I haven't lived in Dallas in 17 years.

Case 19-34054-sgj11    Doc 3596-24    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-30 24 Filed 06/06/25189 Page 993 of 1017    PageID 16654

Nelms - Cross                            82

 1  Q    Okay.  Fair enough.  But they can't -- they can't pay the
 2  litigation costs for their own entity?
 3  A    Well, I don't know that they -- whether they can or
 4  whether they can't.
 5  Q    Right.  So, are you familiar with an entity called
 6  Highland CLO Funding?
 7  A    Vaguely, yeah.
 8  Q    Okay.  And Highland CLO Funding is one of the appellants
 9  in the appeal of the confirmation order, correct?
10  A    That's correct.
11  Q    Okay.  And one of the issues on appeal is actually the
12  plan injunction that's embedded in the confirmed plan,
13  correct?
14  A    That's correct.
15  Q    Right.  And is your understanding that that's really
16  Highland CLO Funding's main appeal issue?
17  A    I think it probably would be, yes.
18  Q    Okay.  And is there any reason that Highland CLO Funding
19  can't pay Neutra's legal fees to have -- have another
20  appellant in the Fifth Circuit?
21  A    I don't know the answer to that question.
22  Q    Okay.  So, let me -- let me -- I'm going to try to keep
23  this coordinated, but my notes are a little bit over the
24  place, so I apologize in advance if I move around a little
25  bit.

015672

Nelms - Cross                          83

1        So, you had testified earlier that -- and I'm just trying

2   to synopsize your testimony -- that you -- that the Board

3   believes the primary benefit of paying Neutra's legal expenses

4   related to the order for relief appeal and the confirmation

5   appeal is the income stream that would be evidenced by the

6   sub-advisory agreement, right?

7   A    Yes.

8   Q    Okay.  And I'm -- when I say sub-advisory agreement, I'm

9   talking about this is the attachment to the Debtor's Exhibit

10  4, which is the proof of claim.

11  A    Right.

12  Q    Right?  And so it's your understanding that the way that

13  works is Acis Capital Management, my client, is the portfolio

14  manager for a bundle of CLOs, right?

15  A    That's my understanding.

16  Q    And that before the Acis bankruptcy, the sub-advisory

17  agreement allowed Highland Capital Management to sub-advise

18  those CLOs for a fee, correct?

19  A    That's correct.

20  Q    Okay.  So, I'm going to focus on the confirmation appeal.

21  So, you understand that the plan injunction prevents the

22  liquidation of the CLOs and the Acis portfolio management

23  agreement?

24  A    That is my understanding.

25  Q    Okay.  And the reason that, frankly, we had to get the

Nelms - Cross                          84

 1  plan injunction is because HCLOF three times tried to

 2  liquidate, redeem the CLOs, including twice in the bankruptcy

 3  case?

 4  A    I understand that was an issue.  But -- I have a general

 5  understanding as to what you're saying, but not a specific

 6  understanding.  But I'm not disagreeing with you.

 7  Q    Yeah.  Okay.  And so if the plan goes away, the plan

 8  injunction goes away, then is there any reason to think that

 9  HCLOF isn't going to liquidate the CLOs?

10  A    I would not know.

11  Q    And in that case, there's not going to be any cash flow

12  under the portfolio management agreements or the sub-advisory

13  agreements, right?

14  A    If you're asking me if that's a possibility, I'd say it's

15  certainly within the realm of possibilities.

16  Q    Okay.  So, staying on the confirmation appeal, so let's --

17  let's assume that, for whatever reason, the Fifth Circuit

18  decides that the confirmation order needs to be reversed and

19  they send it back down to Judge Jernigan and say, "Try again."

20  Would you agree that that would effectively reactivate the

21  Acis case?

22  A    Well, I don't know, because, you know, one of the issues

23  in the appeal is who gets to make the decision with respect to

24  arbitrability.  Because I know that it's the Appellants'

25  position that the decision as to whether or not it should be

Nelms - Cross                          85

1   arbitrated, something such as collections, should they go to

2   be decided by the arbitrator, --

3   Q    Let me stop you, just to be clear.  I'm talking about the

4   confirmation appeal, the appeal of the confirmation order.

5   A    Uh-huh.

6   Q    Right?  Okay.  I'm not talking about the order for relief

7   appeal.

8   A    I may be conflating the two, so I'm sorry.

9   Q    Yeah, yeah, and I -- and it's -- yeah, it's -- but it is

10  confusing.  But I'm talking about the confirmation appeal.  So

11  the appeal of the Court's confirmation order confirming the --

12  I think was the third amended plan.  Okay?  So, I'm focusing

13  on that appeal only.  If the Fifth Circuit says, "Nope.  Try

14  again," then you would agree with me that that effectively

15  reactivates the Acis Chapter 11 case?

16  A    Well, I think it depends.  If you -- would you like me to

17  explain why I think it depends?

18  Q    Yeah.  Go ahead.  I don't -- because, I mean, honestly,

19  I'm not exactly sure what happened, so I would actually -- I

20  would like your opinion.

21  A    Well, given that the first issue in the confirmation

22  appeal is the issue of good faith, and the foundation of that

23  pretty much is the whole arbitration issue, if the Fifth

24  Circuit were to reverse on that basis, then I don't

25  necessarily know that it would go back to the Bankruptcy

Nelms - Cross                              86

 1   Court.
 2        If it was reversed just on the narrower issue with respect
 3   to the injunction, and maybe whether the injunction was too
 4   broad or something like that, --
 5   Q    Uh-huh.
 6   A    -- and that was the only basis for reversal, I would agree
 7   with you it would go back to Bankruptcy Court.
 8   Q    Okay.  So there's some possibility that a result of the
 9   confirmation appeal is that the Acis Chapter 11 case is
10   reactivated and we're back in front of Judge Jernigan on that
11   case, too?
12   A    That would be a possibility.
13   Q    Okay.  And then you'd get to talk with Mr. Phelan, right?
14   That would be fun.
15   A    Right.
16   Q    So, so how much money did Highland Capital spend in the
17   Acis bankruptcy case?
18   A    I don't know.
19   Q    Was it -- it was millions and millions, right?
20   A    I don't know, but I'm -- I'm assuming it exceeded a
21   million.
22   Q    Okay.  Well, aren't there -- aren't there claims of unpaid
23   fees just in the Top 20 list, which we'll point to here in a
24   minute, in the millions of dollars that relate to the
25   attorneys that represented Highland in the bankruptcy -- in

Appx 05114

Case 19-34054-sgj11   Doc 3596-24   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 51-30 24 Filed 08/06/25189 Page 998 of 1017    PageID 16659

Nelms - Cross                          87

1   the Acis bankruptcy case?

2   A    I don't know.

3   Q    Okay.  So, why, you know, assuming that a result of the

4   confirmation appeal is that the Acis bankruptcy case is

5   reactivated, how is that in Highland's best interest?  And I'm

6   not talking about Neutra, and I'm not talking about HCLOF.

7   I'm talking about Highland.

8   A    Well, the -- what would be in our best interest would be

9   to once again control the sub-advisory agreement and to

10  generate revenues for the benefit of this estate.  Use those

11  -- that revenue stream both to address any claims that

12  Highland might have, as well as Mr. Terry.  That would be the

13  benefit as we see it.

14  Q    Right.  But by the time of the confirmation order, --

15  A    But if your question is, oh, but you're going to be

16  involved in a lot of other litigation and so how does that

17  benefit, then I guess my answer to that is it's a -- my answer

18  is a "Yes, but," and but may exceed the scope of your

19  question, so I won't --

20  Q    Okay.

21  A    -- I won't give you the but answer unless you want me to

22  do it.

23  Q    That's fine.  I just -- if we go back, if we go back to

24  where we were before confirmation, I mean, I'm not talking

25  about the order for relief, I'm talking about confirmation,

Nelms - Cross                          88

1   the sub-advisory agreement had been terminated.  Highland had

2   been fired and Brigade was managing everything.

3   A    Right.

4   Q    So, there wouldn't be any cash flow going to Highland

5   based on the -- just the reversal of the confirmation order.

6   A    Well, what would have to happen, of course, is that Neutra

7   would have to -- would have to appoint us as -- would have to

8   allow us to come in under the sub-advisory agreement to

9   perform those services.

10  Q    Right.  Except that there's a trustee, right?  Robin

11  Phelan was in charge of everything.

12  A    Well, you're assuming there's still a bankruptcy.

13  Q    Right.  Yeah.  Well, I am.  I mean, again -- and maybe I'm

14  being simplistic about this, but if the confirmation order is

15  reversed, --

16          THE COURT:  Counsel is standing.  Do you have an

17  objection?

18          MR. MORRIS:  Yeah.  I do, Your Honor, to this whole

19  line of hypothetical questions.  We do understand, I think

20  everybody understands, that we don't know if the appeal will

21  be granted.  I think we do all understand that we don't know

22  what the form of relief, the exact form of relief will be.

23  But the testimony here is that the Board has decided that one

24  possible form of relief is that -- is that Neutra will regain

25  control of Acis and get these contracts reinstated, get the

Case 19-34054-sgj11    Doc 3596-24    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 24 Filed 06/26/25    Page 1000 of 1017    PageID 16661
Page 1000 of 189

                                        Nelms - Cross                        89

 1   adversary proceeding dismissed, and get paid on its $8 million

 2   claim.

 3        If there's questions about that, I think it's relevant,

 4   but I don't know why we're spending a lot of time on

 5   hypotheticals with a fact witness.

 6              THE COURT:  But the --

 7              MR. MORRIS:  Not an expert witness.

 8              THE COURT:  The business judgment of the Board of the

 9   Debtor is at issue here, correct?

10              MR. MORRIS:  Correct.  Absolutely.

11              THE COURT:  Don't these hypotheticals go to, is

12   reasonable business judgment being exercised here?

13              MR. MORRIS:  I think he has to lay a foundation and

14   say, Is this -- is this a hypothetical you considered?  Is

15   this a hypothetical that you considered?  Because we're just

16   -- this is like expert testimony almost.  There is no evidence

17   that any of these factors were considered.  And at the end of

18   the day, there is no dispute that the scenario that the Board

19   is saying is worth the investment, basically, is also a

20   possibility.

21              THE COURT:  Okay.  I overrule the objection.

22              MR. LAMBERSON:  Okay.

23              THE COURT:  You can proceed.

24              MR. LAMBERSON:  And Your Honor, I'm just about done.

25              THE COURT:  Okay.

Nelms - Cross                          90

1    BY MR. LAMBERSON:

2    Q    So, okay.  So, we -- but we can agree that -- okay.  Let

3    me -- let me hopefully do this.  Okay.  So, I mean, I think

4    that's fine for the confirmation appeal, so now I want to talk

5    about the order for relief appeal.  Right?  So this is the

6    appeal of the order for relief or the -- and I stated this

7    earlier to the Court, but the sole substantive issue in that

8    appeal is whether this Court should have compelled the order

9    for relief to arbitration.  Is that right?

10   A    The sole substantive issue?  I think, if you paint with a

11   broad brush, yeah.  I would agree with you, yes.

12   Q    Okay.  Well, and again, I'm not trying to --

13   A    I know.  So, --

14   Q    I'm not trying to trap anybody.  The three issues --

15   A    And I'm not trying to be evasive, either.

16   Q    Yeah.

17   A    Yeah.

18   Q    Are the standing issue, which, in my mind, isn't really a

19   substantive issue.  And then there's the issue about the

20   arbitration of the order for relief.  And then, finally, as I

21   mentioned, we've raised a waiver argument that basically, if

22   they had a right to arbitrate, which we think they don't, they

23   waited too long to raise it.  Right?  Those are the three

24   issues.  Correct?

25   A    That's correct.

Nelms - Cross                           91

1    Q    Okay.  So, let me ask you.  And I'm not going to -- I'm

2    not going to hold this against you at the Fifth Circuit level,

3    but, I mean, do you -- do you think an order for relief is

4    subject to arbitration?

5           MR. MORRIS:  Objection, Your Honor.  Calls for a

6    legal conclusion.

7           THE COURT:  Overruled.

8           MR. LAMBERSON:  Sure it does.

9           THE COURT:  Overruled.

10          THE WITNESS:  I think the -- I think it's a -- I

11   think there's a colorable argument.

12   BY MR. LAMBERSON:

13   Q    Uh-huh.

14          MR. MORRIS:  Objection withdrawn.

15   BY MR. LAMBERSON:

16   Q    So you don't think *National Gypsum* and *Gandy* would apply

17   to an involuntary petition and order for relief?

18   A    Well, I'll put it this way.  I guess they'll apply if the

19   Fifth Circuit tells us they do.

20   Q    Right.

21   A    That's as much as I can tell you.

22   Q    Okay.  So, so if that ruling is reversed, right, as I

23   mentioned earlier -- and let me ask you, actually, another

24   thing.  So, how often, when you were a judge, how often were

25   -- I shouldn't say how often -- how many times were your

Nelms - Cross                                  92

1    rulings reversed?  Just roughly?

2    A    Was I reversed?

3    Q    Yeah.

4    A    I think six.

5    Q    Not very many claims, right?

6    A    No.

7    Q    So how many times was there a reverse and a render?

8    A    I'm sorry.  Say again?

9    Q    How many times was there a reverse and a render, where

10   nothing came back to you, that basically the higher court just

11   said, It's done?

12   A    Well, it was rendered every time except on one occasion,

13   and that --

14   Q    Uh-huh.

15   A    -- *Stern v. Marshall* had just been decided, and so --

16   gosh, I can't remember the district judge.

17   Q    Okay.

18   A    One of the judges reversed but sent it back to me to

19   reconsider it under the light of the ruling in *Stern v.*

20   *Marshall*, a jurisdictional issue.  So, in all those instances,

21   it was rendered.

22   Q    Okay.  So there was nothing -- there was no issue that

23   came back to you?  The case was just resolved?

24   A    No.  No issue came back to me.

25   Q    Okay.

Nelms - Cross                                    93

1   A    No, you know what, there was a second one.  I think the

2   second one was *In re Mirant*.  *Commerzbank versus -- MCAR v.*

3   *Commerzbank*.  That came back as well.

4   Q    Right.  Okay.  So, again, but focusing on the order for

5   relief appeal, one possibility is that the Fifth Circuit says,

6   okay, this may be subject to arbitration, and sends it back to

7   Judge Jernigan to make additional findings, apply a different

8   standard, right?  That's possible, right?

9   A    That's possible.

10  Q    Okay.  So, in that case, nothing necessarily came out of

11  the appeal, right?  Like you're just basically back in front

12  of her on the same issues?

13  A    Well, I -- that may very well be the case, but --

14  Q    Okay.  Well, let's assume that the Fifth Circuit does

15  reverse and render.  Wouldn't -- isn't what they would render

16  would be a -- compelling this case to arbitration?  Right?

17  Not that the bankruptcy goes away, disappears.  It would

18  basically be, "Should have been arbitrated.  Go arbitrate."

19  A    It's a good question, what the effect of reversing it

20  would be and sending it back, remanding it.  They -- I mean,

21  one of the things that they might decide is to say that the

22  whole issue of arbitration should be decided by an arbitrator.

23  Q    Uh-huh.

24  A    That's a possibility.

25  Q    Right.  But in that situation, the bankruptcy doesn't go

Nelms - Cross                                94

1   away.  It just moves to a different forum, right?

2   A    No, I mean, you're probably right.  That, in and of

3   itself, would not eviscerate the bankruptcy filing.

4   Q    Uh-huh.

5   A    That's true.

6   Q    And so, in that situation, the result is -- and this is --

7   that's, frankly, the best situation, is --

8   A    But, of course, I mean -- can I go back to that?  Just,

9   I'm not sure about that.  Because, after all, this was an

10  involuntary petition.

11  Q    Uh-huh.

12  A    If it was a voluntary petition, then I would certainly

13  agree with you wholeheartedly.  Inasmuch as it was an

14  involuntary petition, I'm not sure about the answer to that

15  question.

16  Q    Uh-huh.  Okay.

17  A    That's a good question.

18  Q    But you would agree with me that a possible result of even

19  a reversal of the order for relief appeal would just be more

20  litigation?

21  A    Yes.  That's certainly a possibility.

22  Q    Right.  In this Court?  Maybe in front of an arbitrator?

23  Maybe both?

24  A    Yes.  That's possible.

25  Q    Okay.  All right.  So, still focusing on the order for

Case 19-34054-sgj11   Doc 3596-24   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 33-20   Filed 06/25/25   Page 1006 of 1017   PageID 16667

Nelms - Cross                    95

 1   relief appeal, but I want to go to this idea that, again,

 2   there's this cash flow stream that is going to be reinstated

 3   for the benefit of Highland Capital under the sub-advisory

 4   agreement.  Okay?

 5   A    Right.

 6   Q    All right.  So, before the Acis bankruptcy was filed,

 7   Dondero, and at that time, in control of Highland, were

 8   actually in the process of liquidating Acis, weren't they?

 9   A    Were they in the process of liquidating Acis?

10   Q    Uh-huh.

11   A    And I take it these are the transfers that were --

12   concerning your client that prompted the filing of the

13   involuntary petition itself?

14   Q    Correct.

15   A    Is that what you're referring to as the --

16   Q    Yes.

17   A    -- liquidation?

18   Q    Yes.

19   A    Well, I certainly know that -- I understand those

20   transfers were taking place.  Now, whether you'd call that a

21   liquidation or not, I don't know, but I know what you're

22   referring to --

23   Q    Okay.

24   A    -- and I think the answer to your --

25   Q    So, --

Nelms - Cross                          96

1    A    Yeah.

2    Q    Yeah.  So there were a variety of transfers of assets away

3    from Acis before --

4    A    Right.

5    Q    -- the Acis bankruptcy filing, right?  And, actually, are

6    you aware that there was actually an agreement between

7    Highland CLO Management and Acis to transfer those PMAs to

8    HCLOF Management?

9    A    No, I'm not aware of that.

10   Q    Okay.  And as we talked about earlier, HCLOF repeatedly

11   attempted to redeem the CLOs, even during the Acis bankruptcy,

12   right?

13   A    I read about that in Judge Jernigan's opinion, so I'm

14   assuming that's the case.

15   Q    Right.  Okay.  And then -- and, in fact, if HCLOF was

16   successful, that would liquidate the CLOs and it would

17   effectively terminate the Acis portfolio management

18   agreements, right?

19   A    I don't know.

20   Q    Okay.  But if that was the case, if the portfolio

21   management agreements went away or no longer had assets to

22   manage, then the sub-advisory agreement would have no income,

23   right?

24   A    If you're asking me if that's something within the realm

25   of possibilities, I suppose so.

015686

Nelms - Cross                          97

1   Q    Okay.  So, if, because of the appeal, the Acis bankruptcy

2   -- because of the order for relief appeal, if the bankruptcy

3   -- if the Acis bankruptcy just went entire away, just

4   disappeared, right, so Mr. Dondero would be in control of

5   Acis, not you, right?

6   A    He would be in control.  That's correct.

7   Q    Okay.  And so if he wanted to terminate the PMAs and enter

8   new PMAs with Dondero Capital Management, you couldn't keep

9   him from doing that, could you?

10  A    Well, I -- no, I could not keep him from doing that.

11  Q    Okay.  Or if he wanted to terminate the sub-advisory

12  agreement and enter into a different agreement, I mean, you

13  couldn't keep him from doing that, either, could you?

14  A    No, I couldn't.

15  Q    Right.  So what makes you think that Highland Capital

16  Management, a debtor that he lost control of, just like Acis,

17  would benefit from Acis's PMAs, when he was actively trying to

18  take Acis's PMAs away from Acis?

19  A    Well, I have -- I spoke to Mr. Dondero about this, and he

20  -- I asked him the question, and he said that he would

21  reinstate Highland under the sub-advisory agreement and the

22  shared services agreement.

23  Q    Okay.  So, on that point, you did mention earlier that, as

24  part of your -- as part of the Board's diligence, you talked

25  with Mrs. O'Neil and you talked to Pachulski.  Obviously,

Nelms - Cross                         98

1   you've analyzed the issues.  I can tell you're familiar with
2   all these, all of the pleadings.  But you also talked with
3   different Highland Capital employees about the litigation and
4   the appeals, correct?
5   A   I did.
6   Q   Okay.  Who did you talk with?
7   A   Well, I have to say that the interaction with Highland
8   employees was actually fairly abbreviated.
9   Q   Uh-huh.
10  A   We spoke very, very briefly about this with Isaac Leventon
11  on the day that we were appointed.  I don't know if the Court
12  is aware of this or not, but we spoke about it very briefly,
13  and then he was injured later that night and he really hasn't
14  been back at the office since then.  So, --
15  Q   Oh.
16  A   -- I would say, for the most part, I have relied mainly on
17  Pachulski.
18  Q   Okay.  But you did indicate you talked to Mr. Dondero as
19  well?
20  A   I talked to him about this issue about reinstatement, yes.
21          MR. LAMBERSON:  So, Your Honor, I'd like to turn to
22  --
23          THE WITNESS:  Oh, you don't have to call me Your
24  Honor.
25          THE COURT:  There are two Your Honors.

                              Nelms - Cross                        99

 1              MR. LAMBERSON:  Your Honors.  How about that?

 2              THE COURT:  Okay.

 3              THE WITNESS:  Yeah, there's only one judge in the

 4    court today.

 5    BY MR. LAMBERSON:

 6    Q    Could you turn to Exhibit 16, please?  This is Acis's

 7    Exhibit 16.  I'm sorry.  Do you have that, Mr. Nelms?

 8    A    I do.

 9    Q    And could you identify Acis Exhibit 16?

10    A    Yes.  This is Official Form 204 in the current case, the

11    one we're here for today.

12    Q    Right.  So it's the Top 20 List of Creditors for Highland

13    Capital Management?

14    A    Yes, that's correct.

15    Q    Okay.  And have you seen Exhibit 16 before?

16    A    Pardon me?

17    Q    Have you seen Exhibit 16 before, the Top 20 List?

18    A    No, I have not seen it before.

19    Q    Okay.

20              MR. LAMBERSON:  Your Honor, we'd ask for the

21    admission of Exhibit 16.

22              THE COURT:  Any objection?

23              MR. MORRIS:  Just on relevance grounds.  Can we at

24    least establish a foundation as to which element of 327(e)

25    this goes to?

Nelms - Cross                                    100

 1          THE COURT:  Response?

 2          MR. LAMBERSON:  Well, Your Honor, what I'm going to

 3   point out is that the top ten creditors, other than an insider

 4   creditor, are all litigation-based, and that the, as I pointed

 5   out in my opening, the origin of this case was a bad

 6   litigation strategy.

 7          MR. MORRIS:  No objection to the introduction of this

 8   exhibit for that limited purpose.

 9          THE COURT:  All right.  It's admitted.

10      (Acis Capital Management GP, LLC's Exhibit 16 is received

11   into evidence.)

12   BY MR. LAMBERSON:

13   Q   All right.  So, Mr. Nelms, you said you hadn't seen this

14   before, but I think you'll probably be familiar with the

15   information on it generally.  So let's walk through this

16   quickly.  So, this is the Top 20 List of Creditors.  The first

17   creditor is Redeemer Committee, listed as litigation, do you

18   see that, for about $190 million?

19   A   Yes.

20   Q   And that's the arbitration award that precipitated this

21   filing, correct?

22   A   It is.

23   Q   Okay.  So the next claim is Pat Daugherty, litigation

24   claim.  It's $11.7 million.  Do you see that?

25   A   Yes.

Appx 02128
015690

Nelms - Cross                                    101

1    Q    So, do you know what is Mr. Daugherty's history with

2    Highland Capital?  And try to keep it under five minutes.

3    A    Yeah.  Mr. Daugherty is a former employee.  And I know he

4    has some contractual disputes with the company based upon his

5    separation.

6    Q    Right.  And he's a long-time litigant with Highland

7    Capital, correct?

8    A    He is, yes.

9    Q    Yes.  So the next one is CLO HoldCo.  This is about $11.5

10   million.  CLO HoldCo is an insider of the Debtor, correct?  If

11   you know.

12   A    Is -- is it an insider?  I don't know.

13   Q    Okay.  Well, Grant Scott, the party here, is Mr. Dondero's

14   college roommate.  Do you know that?

15   A    That's my understanding, yes.

16   Q    Okay.  So, Creditor #4, McKool Smith, for two point --

17   roughly $2.1 million.  Do you see this?  This is for

18   attorneys' fees incurred by Highland Capital, correct?

19         MR. MORRIS:  Objection, Your Honor.  I still fail to

20   see how this is at all connected to any of the elements of

21   327(e) or the retention of Foley.

22         THE COURT:  Okay.  I overrule.

23   BY MR. LAMBERSON:

24   Q    So, this is -- this -- these are fees incurred by Highland

25   Capital, you know, a variety of venues, right, including this

015691

Nelms - Cross                        102

1   one, state court fights against Mr. Terry, right?

2   A    I thought -- McKool Smith, I thought they were involved in

3   the Redeemer litigation, but they may be involved in other

4   litigation as well.

5   Q    Okay.  Fair enough.  And do you know, this claim is

6   disputed by the Debtor, correct?

7   A    Yes.

8   Q    Okay.  And do you know, obviously subject to the stay, but

9   do you know if this claim is being arbitrated or has been sent

10  to arbitration?

11  A    No, I don't know any -- no, I don't know.

12  Q    Okay.  That's fair enough.  So, then #5 -- I'll move it

13  along here.  Meta Discovery, Meta-e Discovery, they're a

14  litigation vendor, right?

15  A    I'm sorry, would you ask your question again?

16  Q    Meta-e Discovery, the next creditor.  They're a litigation

17  vendor and they provide litigation support services?

18  A    I don't know what they do.

19  Q    Okay.  Fair enough.  Foley Gardere.  Obviously, that's the

20  law firm you all are seeking to have engaged.  DLA Piper.

21  This relates to fees incurred in connection with the Terry

22  arbitration award, correct?

23  A    I think so.

24  Q    Okay.  Reid Collins.  These are fees related to the UBS

25  lawsuit, correct?

Nelms - Cross                               103

1   A    I don't know.

2   Q    Okay.  Josh and -- Joshua and Jennifer Terry.  This is a

3   litigation claim, right?  This is -- this is an IRA claim,

4   right?

5   A    It is.

6   Q    NWCC.  This is also a litigation claim?  In other words, a

7   litigant fighting with Highland?

8   A    I can only intuit that just because of the fact that it's

9   a law firm.

10  Q    Okay.  Fair enough.  So, out of the Top 20 -- or, out of

11  the Top 10 Creditors, basically, they're all litigants or

12  attorneys paid to fight litigants, with the exception of

13  Dondero's college roommate.  Right?

14  A    With the exception of what?

15  Q    Mr. Dondero's college roommate that has a claim based on

16  some entity.

17  A    Yes.  They're -- they all have some nexus to litigation.

18  Q    Okay.  And let me just ask you:  If you were able to

19  completely set aside all of Highland Capital's litigation

20  issues, right, just like -- just like the concept of the order

21  for relief appeal makes the Acis bankruptcy go away forever,

22  if you could snap your fingers and make all of Highland's

23  litigation go away forever, would Highland have any financial

24  problems at all?

25  A    Well, I don't know that I know the answer to that, but I

Nelms - Cross                                              104

1   -- but it's certainly to say that litigation up to this point

2   has been the driving force behind its bankruptcy filing.

3   Q    Okay.  Fair enough.  Okay.  So, Mr. Nelms, would you turn

4   -- could you turn to Acis Exhibit 27?

5   A    Okay.

6   Q    Do you have that?

7   A    I do.

8   Q    Okay.  And can you identify Exhibit 27?

9   A    Yes.  My understanding is that this was the lawsuit that

10  was filed by the DAF and CLO HoldCo in the Southern District

11  of New York.

12  Q    Okay.  And so I had mentioned this in my opening, and I

13  believe counsel had asked you about what we call the DAF

14  litigation.  Is this the complaint that's the basis of the DAF

15  litigation?

16  A    Yeah, that's my understanding.  It is.

17  Q    Okay.  And I think you had testified earlier that the

18  board was actually shown a copy of this complaint, was before

19  it was filed, and --

20  A    I wouldn't call it -- I'm sorry, go ahead, ask your

21  question.

22  Q    No, no, I -- that's fine.

23  A    I wouldn't call it a board presentation.  I just remember

24  it being handed to Mr. Dubel and Mr. Dubel looking at it,

25  asking what it was, and saying, Tell them not to do this.

Nelms - Cross                                    105

1   Q    Okay.  Thank you.  And -- but it's your understanding that

2   the complaint was filed anyway?

3   A    It is my understanding it was filed later.

4   Q    Okay.  And in fact, this has a file-stamp at the top,

5   which I'm sure you're very familiar with.  Correct?  Has a

6   PACER file-stamp at the top.

7   A    Right.

8   Q    Right.

9            MR. LAMBERSON:  So, Your Honor, we'd ask for the

10  admission of Exhibit 27.

11           THE COURT:  Any objection?

12           MR. MORRIS:  No objection.

13           THE COURT:  Admitted.

14       (Acis Capital Management GP, LLC's Exhibit 27 is received

15  into evidence.)

16           MR. LAMBERSON:  And I'll be relatively quick.

17  BY MR. LAMBERSON:

18  Q    I had mentioned in my opening that we -- I should say Acis

19  was concerned that Highland Capital Management had some

20  participation in this, and I probably should have been clearer

21  in saying that Highland Capital Management employees had some

22  participation in Exhibit 27.  Has the Board done any

23  investigation as to whether any Highland Capital employees

24  were involved in the preparation of Exhibit 27 or the filing

25  of Exhibit 27?

Nelms - Cross                    106

1   A    No, we have not.  At least, let me speak for myself.  I
2   haven't done that investigation.
3   Q    Uh-huh.  And your counsel had mentioned that -- I believe
4   this is correct -- your counsel had mentioned that you all had
5   reached out -- the Board, I should say -- reached out to Grant
6   Scott, who's the -- who's in control of the DAF as well as CLO
7   HoldCo, and, you know, had sort of convinced them that it
8   probably -- to dismiss this lawsuit.  Correct?
9   A    Yes.
10  Q    Okay.  And but do you -- as far as you know, it hasn't
11  been dismissed yet?
12  A    It hasn't been dismissed.  There's some kind of technical
13  things there, and I don't know if you want to go into them or
14  not, but it hasn't been dismissed, but I have a high degree of
15  certainty that this is going to get dismissed.
16  Q    Okay.  Fair enough.  And are you aware that there was
17  already a press release issued related to this lawsuit that
18  was picked up by various CLO publications?
19  A    When you say "already," are you talking about a specific
20  time?
21  Q    Well, that -- I guess what's I'm getting at is are you
22  aware that the filing of this lawsuit has already resulted in
23  various articles in CLO journals, periodicals?
24  A    I'm aware of it having appeared in one publication.
25  Q    Okay.  And so is it fair to say that the damage is already