**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re: Highland Capital Management, L.P.**

|  |  |
|---|---|
| | § |
| | §    Case No. **19-34054-sgj11** |
| **The Dugaboy Investment Trust et al- Appellant** | |
| | § |
| vs. | § |
| | |
| **Highland Capital Management, L.P.** | |
| **Et al-** Appellee | |
| | §                    **3:25-cv-02072-S** |
| | § |

**[4333]  Memorandum of Opinion and Order Regarding Stay Requests (Addressing DE #4326 and 4308) entered on 7/21/25**

# Volume 21

# APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | |

*INDEX*

**APPELLANT THE DUGABOY INVESTMENT TRUST'S STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL FROM THE BANKRUPTCY COURT'S ORDER REGARDING STAY REQUESTS [ADDRESSING DE ## 4326 & 4308]**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4353] on August 4, 2025 in the above-captioned case from the Bankruptcy Court's July 21, 2025 *Memorandum Order and Opinion Regarding Stay Requests [Addressing DE ## 4326 & 4308]*[Docket No. 4333], hereby submits this *Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1. **Did the Bankruptcy Court err in faulting Dugaboy's Stay Request because Dugaboy did not make a "standard" request for a stay pending appeal pursuant to Federal Bankruptcy Rule 8007?**

2. **Did the Bankruptcy Court err in determining that the Bankruptcy Rule 9019 settlement proceeding was not "a proceeding involving a charitable trust"?**

3. **Did the Bankruptcy Court err in concluding there was insufficient evidence connecting Mark Patrick's involvement in this Court's Rule 9019 settlement proceedings to the allegations of wrongdoing against Patrick in the Cayman Islands proceeding?**

4. **Did the Bankruptcy Court err in failing to recognize that the new evidence of Mark Patrick's misconduct exposed in the Cayman Islands proceeding fatally undermines the 9019 settlement by establishing that Patrick lacked authority to enter into the settlement?**

5. **Did the Bankruptcy Court err in concluding that a stay was unnecessary because Dugaboy could still pursue remedies against Mark Patrick in the Cayman Islands proceeding?**

6. **Did the Bankruptcy Court err in failing to recuse itself under 28 U.S.C. § 455 due to the appearance of partiality created by the presiding judge's authorship of novels that bear striking factual and thematic similarities to the Highland Capital Management bankruptcy proceedings and portray hedge fund principals in an overtly negative**

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow.

1

light, thereby depriving Dugaboy of an impartial judge with respect to the stay motion?

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

*Vol. 1*

*000001*

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4353] filed by Appellant;

*000023*

2. Bankruptcy Court's *Memorandum Opinion and Order Regarding Stay Requests [Addressing DE ## 4236 & 4308* [Docket No. 4333];

*000039*

3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June 25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

*Vol. 2*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 3/18/2021 | 2060 | Motion to recuse Judge Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| 3/18/2021 | 2061 | Brief in support filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/18/2021 | 2062 | Support/supplemental document Appendix to Motion to Recuse filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/23/2021 | 2083 | Order denying motion to recuse (related document #2060) Entered on 3/23/2021. (Okafor, M.) |

*000569*

*000730*

*000734*

*Vol. 3*

*000771 Thru vol. 5*

*Vol 5 003493*

2

| | | | |
|---|---|---|---|
| *Vol. 5*<br>003504 | 4/6/2021 | 2169 | Amended notice of appeal filed by Interested Party James Dondero (RE: related document(s)2149 Notice of appeal). (Lang, Michael) |
| 003519 | 4/15/2022 | 2205 | Statement of issues on appeal, filed by Interested Party James Dondero (RE: related document(s)2083 Order on motion to recuse Judge). (Lang, Michael) |
| 003521 | 4/15/2021 | 2206 | Appellant designation of contents for inclusion in record on appeal filed by Interested Party James Dondero (RE: related document(s)2169 Amended notice of appeal). Appellee designation due by 04/29/2021. (Lang, Michael) |
| 003530 | 2/9/2022 | 3264 | DISTRICT COURT MEMORANDUM OPINION AND ORDER - The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292 (a) and the Court is without jurisdiction over this appeal of the Bankruptcy Court's Recusal Order. The Court further denies Appellants leave to appeal the Recusal Order under § 1292 (b), denies Appellants' request to withdraw the reference of their motion to recuse, and denies Appellants' request to construe their appeal as a petition for writ of mandamus. Accordingly, the Court dismisses this appeal for lack of jurisdiction. (Ordered by Judge Ed Kinkeade on 2/9/2022). Civil Action number:3:21-cv-00879-K, DISMISSED for lack of jurisdiction (RE: related document(s)2083 Order on motion to recuse Judge). Entered on 2/9/2022 (Whitaker, Sheniqua) Modified on 2/25/2022 (Whitaker, Sheniqua). (Entered: 02/25/2022) |
| *Vol 6*<br>003544 | 7/20/2022 | 3406 | Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: #1 Appendix Appendix (Lang, Michael) Modified text on 7/21/2022 (Ecker, C.). |
| 003909 | 8/1/2022 | 3422 | Notice of hearing on Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.).). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3406, (Lang, Michael) |

| | | | |
|---|---|---|---|
| *Vol 6* *003912* | 8/15/2022 | 3444 | Response opposed to (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Attachments: #1 Exhibit A (Annable, Zachery) |
| *Vol. 7* *003936* *Thru END of Vol 14* | 8/15/2022 | 3445 | Exhibit List (Appendix in Support of Highland Capital Management, L.P.'s Objection to Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 USC 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3444 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Index 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 (Annable, Zachery) |
| *Vol 15* *011840* | 8/15/2022 | 3446 | Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

| | | | |
|---|---|---|---|
| *Vol. 15* | | | Depositions) Filed by Debtor Highland Capital Management, L.P. (Annable, Zachery) |
| *011855* | 8/15/2022 | 3447 | Declaration re: (Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi). (Annable, Zachery) |
| *011864* | 8/17/2022 | 3456 | Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.)). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3446 and for 3449, (Annable, Zachery) |
| *011869* | 8/22/2022 | 3463 | Reply to (related document(s): 3444 Response filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. (Lang, Michael) |
| *011874* | 8/24/2022 | 3466 | Amended Notice of hearing filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.)., 3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

| | | | |
|---|---|---|---|
| *Vol 15* | | | Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.), 3462 Order converting the August 31, 2022 at 9:30 AM Hearing on (A) The motion for final appealable order and supplement to motion to recuse and (B) related motions to strike and compel to a preliminary status/scheduling conference (RE: related document(s)3406 Motion for leave filed by Interested Party James Dondero, 3446 Motion to strike document filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel filed by Debtor Highland Capital Management, L.P.). Entered on 8/19/2022 (Ecker, C.)). Status Conference to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga. (Lang, Michael) |
| *011877* | 8/26/2022 | 3470 | Amended motion for final appealable order and proposed supplement to the record filed by Interested Party James Dondero (RE: related document(s)3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support). (Attachments: #1 Appendix (Lang, Michael) MODIFIED text to match PDF on 9/1/2022 (Ecker, C.). |
| *012039* | 8/26/2022 | 3471 | Stipulation by James Dondero and Highland Capital Management, L.P.. filed by Interested Party James Dondero (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi, 3449 Motion to compel Lawyers' Depositions.). (Lang, Michael) |
| *NO PDF AVAILABLE* | 8/31/2022 | 3478 N/A | 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.) (Edmond, Michael) |
| *012047* | 9/1/2022 | 3479 | Order denying amended motion of James Dondero, Highland Capital Management Fund Advisors, L.P., Nexpoint Advisors, |

*Vol. 15*

*012050*

*012077*

*Vol. 16*

*012079*

*012357*

| | | | |
|---|---|---|---|
| | | | L.P. The Dugaboy Investment Trust Get Good Trust and, Nexpoint Real Estate Partners, LLC, F/K/A HCRE Partners, A Delaware Limited Liability Company for final appealable order and supplement to motion to recuse pursuant to 28 U.S.C. Section 455 (RE: related document(s)3470 Brief filed by Interested Party James Dondero). Entered on 9/1/2022 (Okafor, Marcey) |
| | 9/1/2022 | 3480 | Transcript regarding Hearing Held 08/31/2022 (27 pages) RE: Status Conference Re: Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 (#3406). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 11/30/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.)). Transcript to be made available to the public on 11/30/2022. (Rehling, Kathy) |
| | 9/27/2022 | 3541 | Motion to recuse Judge Stacey G. C. Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| | 9/72/2022 | 3542 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3541 Motion to recuse Judge Stacey G. C. Jernigan). (Attachments: #1 Appendix (Lang, Michael) |
| | 10/14/2022 | 3567 | Agreed Scheduling Order on renewed motion to recuse (related document #3541) Entered on 10/14/2022. (Okafor, Marcey) |

| | | | |
|---|---|---|---|
| Vol. 16 012361 | 10/17/2022 | 3570 | Motion to recuse Judge Stacey G. C. Jernigan - AMENDED Filed by Interested Party James Dondero (Lang, Michael) |
| Vol. 17 012363 | 10/17/2022 | 3571 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Attachments: #1 Appendix (Lang, Michael) |
| 012641 | 10/31/2022 | 3595 | Response opposed to (related document(s): 3541 Motion to recuse Judge Stacey G. C. Jernigan filed by Interested Party James Dondero, 3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| Vol. 18 012697 Thru END of Vol. 21 | 10/31/2022 | 3596 | Support/supplemental document (Appendix in Support of Highland's Objection to Renewed Motion to Recuse Pursuant to 28 U.S.C. 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3595 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 (Annable, Zachery) |
| Vol. 22 016732 | 3/3/2023 | 3673 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Lang, Michael) |
| 016737 | 3/6/2023 | 3675 | Memorandum of Opinion and Order Denying Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. Section 455 (RE: related document(s)3570 Motion to recuse Judge filed by Interested Party James Dondero). Entered on 3/6/2023 (Okafor, Marcey) |
| 016773 | 3/6/2023 | 3676 | Order Denying Amended Renewed Motion to Recuse Pursuant to U.S.C. Section 455 (related document #3570) Entered on 3/6/2023. (Okafor, Marcey) |
| 016809 | 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland |

*Vol. 22*

*016827*

*016830*

*016855*

*016863*

*016865*

*Vol. 23*

*016867*

*Thro end of Vol. 25*

| | Date | Doc # | Description |
|---|---|---|---|
| | | | Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery) |
| | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| | 6/20/2025 | 4255<br><br>*(to be submitted to Clerk on flash drive)* | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 |

| | | | |
|---|---|---|---|
| | | | Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| *Vol. 26*<br><br>*019524* | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |
| *019527* | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent |

| | | | Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart, #3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
|---|---|---|---|
| *Vol. 27* *019847* | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| *019871* | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| *019998* | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| *Vol. 28* *020013* | 6/23/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| *020230* | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 (Deitsch-Perez, Deborah) |
| *020241* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 126 (Annable, Zachery) |

| | | | |
|---|---|---|---|
| *Vol. 28*  *020266* | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| *Vol. 29*  *020267* | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| *020271* | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust. Entered on 6/27/2025 (Okafor, M.) |
| *020282* | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| *020289* | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |

| | | | |
|---|---|---|---|
| *Vol. 29* | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| *020296* | | | |
| *020298* | 7/10/2025 | 4308 | Notice Letter from the Office of the Texas Attorney General Requesting a Stay filed by Interested Party State of Texas. (Stone, Johnathan) |
| *020300* | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| *020309* | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *020311* | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| *Vol. 30* *020407* | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related |

| | | | |
|---|---|---|---|
| *Vol. 31* | | | document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *020686* | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| *020696* | 7/21/2025 | 4334 | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M.) |
| *020808* | 8/4/2025 | 4353 | Notice of appeal. Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A) (Harper, Geoffrey) |
| *020830* | 8/5/2025 | 4359 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| *020837* | 8/15/2025 | 4372 | Motion to recuse Judge Filed by Interested Parties James Dondero, NexPoint Advisors, L.P., NexPoint Asset Management, L.P., NexPoint Real Estate Advisors, L.P., The Dugaboy Investment Trust, The Get Good Non Exempt Trust No 2 (Attachments: #1 Proposed Order (Harper, Geoffrey) |

Dated: August 18, 2025

Respectfully submitted,

**WINSTON & STRAWN LLP**

By: */s/ Geoffrey S. Harper*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

14

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**CRAWFORD, WISHNEW & LANG PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

***Counsel for Appellant The Dugaboy Investment Trust***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 18, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

Nelms - Cross                                    107

1   done and that, you know, dismissal of these claims probably

2   isn't really all that -- isn't really all that significant

3   when they've already, you know, put it in the press?

4   A    I don't know if the damage has already been done or not.

5   Q    Okay.

6          MR. LAMBERSON:  Give me just a second, Your Honor.

7          THE COURT:  Okay.

8      (Pause.)

9   BY MR. LAMBERSON:

10  Q    So, there is actually one other -- there is one point.

11  And I told you in advance that I was afraid I might be jumping

12  around a little bit, so I'm going to jump around a little bit.

13  Let me go back to the order for relief appeal.  So, this is

14  the appeal of the Court's order for relief that started the

15  Acis bankruptcy.

16     One of the things you testified about related -- on your

17  direct testimony is one of the benefits, one of the potential

18  benefits, understanding we don't know what's going to happen,

19  of the order for relief appeal is that if the -- if that

20  ruling was reversed and the Acis bankruptcy went away, then

21  the adversary would go away, the adversary between Acis

22  Capital Management and Highland Capital Management.  Correct?

23  A    Well, yes.  In my opinion, the adversary opinion -- excuse

24  me, the adversary proceeding would go away.  Would a lawsuit

25  under TUFTA be avoided altogether by Mr. Terry?

Nelms - Cross                              108

1  Q   Right.

2  A   I don't know that it would take that away.

3  Q   Okay.  And that's -- you actually anticipated my question,

4  --

5  A   Uh-huh.

6  Q   -- which was:  It's fair to say that, even if the

7  adversary went away between Acis and Highland Capital

8  Management, that the -- certain of the claims in the adversary

9  -- for example, the fraudulent transfer claims or derivative

10 claims -- would not necessarily go away because they could be

11 asserted by Mr. Terry as a judgment creditor, correct?

12 A   They could, but the consequences of asserting that claim

13 outside of bankruptcy are vastly different than asserting them

14 inside of a bankruptcy case.

15 Q   Uh-huh.  Right.

16 A   At least potentially.

17 Q   And just to close the thought here, are you aware that one

18 of Acis's main arguments during the order for relief trial was

19 that we didn't need an involuntary, that Mr. Terry could just

20 go litigate all that stuff in state court?

21 A   Yeah, I think so.  I think I am aware of that.  Yes.

22 Q   Okay.  So you'd agree with me that, even on your possible

23 day on the order for relief appeal, that doesn't make the --

24 what I'll call the Terry litigation, right, the judgment

25 litigation, go away?

Nelms - Redirect                    109

```
 1  A    No.  No.  The reversal on appeal would not necessarily

 2  make the Terry litigation go away.

 3  Q    Okay.  Thank you.

 4            MR. LAMBERSON:  That's all I have, Your Honor.

 5            THE COURT:  All right.  Redirect?

 6            MR. MORRIS:  I just have a few questions, Your Honor.

 7            THE COURT:  Okay.

 8                      REDIRECT EXAMINATION

 9  BY MR. MORRIS:

10  Q    Can you turn to Exhibit 16 in your binder, sir?

11  A    Which one?

12  Q    I guess it's the Acis exhibits.

13  A    The Acis?  Okay.

14  Q    Yeah.  The List of Top 20 Creditors.

15  A    Okay.

16  Q    You were taken through each and every one of those to make

17  the point that they're largely litigation claims.  Is that

18  fair?

19  A    Say again, please?

20  Q    You were taken through many of those creditors to

21  establish that --

22  A    I was.

23  Q    -- that the Debtor was involved in a lot of litigation; is

24  that right?

25  A    It was.
```

                         Nelms - Redirect                    110

 1    Q    Okay.  And the Board was appointed on January 9th; is that
 2    right?
 3    A    Yes.
 4    Q    Did the Board have anything to do with any of the claims
 5    that are set forth in Exhibit 16?
 6    A    No.
 7    Q    Did the Board authorize the filing of any suits that are
 8    related to any of the claims that are set forth in Exhibit 16?
 9    A    No.
10    Q    Did the Board direct the defense of any suits that were
11    commenced against Highland with respect to Exhibit 16?
12    A    No.
13    Q    Okay.  Has the Board been trying to diminish and eliminate
14    litigation where it thought it was in the Debtor's best
15    interests?
16    A    It has.
17    Q    And is that, for example, why the Board decided not to
18    pursue the Winstead matter?
19    A    It is.
20    Q    Is that why the Board has used its efforts to try to
21    thwart the DAF litigation?
22    A    Yes.
23    Q    Does the Debtor control DAF?
24    A    The Debtor does not control the DAF.
25    Q    Okay.  Did the Debtor authorize -- withdrawn.  Did the

Appx. 02138

Nelms - Redirect                                111

1    Board authorize the filing of the DAF complaint?

2    A    It did not.

3    Q    Did the Board know the DAF complaint was going to be

4    filed?

5    A    Well, I mean, I know Mr. Dubel was presented with a copy

6    of the complaint.  We had noticed that that document existed.

7    But it came as somewhat of a surprise to us when it got filed.

8    Q    It came as a surprise to you?

9    A    It did.

10   Q    Because that's not what was expected after Mr. Dubel said,

11   Don't file it.  Right?

12   A    Right.

13   Q    Okay.  You were asked a bunch of questions on cross about

14   different possibilities and results and potential orders from

15   the Fifth Circuit on the assumption that the appeal was

16   granted.  Do you remember that?

17   A    Yes.

18   Q    And some of them were purported to be better or worse for

19   the Debtor.  Do you remember that?

20   A    Yes.

21   Q    If the appeal is not prosecuted, is there any chance that

22   the contracts that the Board has focused on will be

23   reinstated?

24   A    No.

25   Q    Is it fair to say that if the appeal is not prosecuted the

Nelms - Redirect                                          112

1    chances of the Debtor recovering the tens of millions of

2    dollars of revenue will be exactly zero?

3    A    Well, I don't know that it's exactly zero, but severely

4    diminished.

5    Q    Yeah.  How about getting paid a hundred-cent dollars on

6    the $8 million claim that's in the Acis litigation?  If the

7    appeal is not prosecuted, is there any chance that the Debtor

8    is likely to recover hundred-cent dollars?

9    A    Again, that possibility is severely diminished.

10   Q    Uh-huh.  How about with respect to terminating the

11   adversary proceeding in the Acis litigation?  If the appeal is

12   not prosecuted, is there any possibility of that adversary

13   proceeding just going away and being left with the arbitration

14   that you've described?

15   A    Again, a severely diminished possibility.

16   Q    You mentioned that the $8 million fraudulent transfer as

17   part of an arbitration would be very different outside of a

18   bankruptcy case.  Do you remember saying that?

19   A    I do.

20   Q    Can you explain to the Court why you believe it would be

21   different outside of a bankruptcy case?

22   A    Well, it actually goes to a case that started in my court.

23   This was the *MCAR v. Commerzbank* case in *In re Mirant*, and the

24   issue in that case, Mirant, when it filed its petition in

25   bankruptcy, was insolvent, but by the time that its bankruptcy

Nelms - Redirect                          113

1   concluded, Mirant was a solvent entity.  And so all of its

2   creditors were paid in full, but the trust that was

3   established in the *Mirant* case brought some fraudulent

4   transfer claims that were predicated on solvency, where these

5   were constructively fraudulent as opposed to actual.

6        And so the question was, if all the creditors had been

7   paid in full, is there standing to bring fraudulent transfer

8   claims that would basically not benefit creditors but would go

9   to equity?

10       I originally -- I ruled that there was no such -- that you

11  couldn't bring such a cause of action, that the satisfaction

12  of claims in full extinguished those claims.  And I do recall

13  that one of the interesting things about that case is that a

14  lady named Elizabeth Warren wrote -- or proposed -- she

15  submitted -- they submitted an expert opinion on her behalf,

16  which I wouldn't let them file because I took the position

17  that I was an expert, the expert in the Court.

18       And in any event, it turns out I wasn't the expert.  I was

19  reversed by Judge Means on that, who said that it's not

20  limited.  It went up to the Fifth Circuit, and the Fifth

21  Circuit ruled the same thing.

22       So my takeaway from all of this is that, in a bankruptcy

23  setting, as opposed to just a state court setting, that the

24  potential recovery on account of fraudulent transfers is much

25  broader, much more unlimited than it would be in the context

1    of a state court lawsuit.

2        So, now, there may be things that would distinguish that,

3    but that's something to be -- that's something to be troubled

4    about if you're a director of this company.

5    Q    And are these the types of things that, without, you know,

6    just divulging privileged communications, are these the type

7    of experiences and perspectives that you've shared with the

8    other board members in the context of considering the various

9    motions, the various matters for which Foley's retention is

10   sought?

11   A    Yes.

12   Q    Okay.

13            MR. MORRIS:  Just one second, Your Honor.

14            THE COURT:  Okay.

15       (Pause.)

16            MR. MORRIS:  Nothing further, Your Honor.

17            THE COURT:  All right.  Any recross on that redirect?

18            MR. LAMBERSON:  No, Your Honor.

19            THE COURT:  All right.  Thank you, Mr. Nelms.

20       (The witness steps down.)

21            THE COURT:  Any other evidence from Highland?

22            MR. MORRIS:  Your Honor, we have had admitted our

23   exhibits.  Among those exhibits are two declarations from Ms.

24   O'Neil, and so she's available in the courtroom today if

25   anybody wants to cross-examine on those issues.

                              O'Neil - Cross                    115

 1              THE COURT:  All right.  Well, I will accept those

 2    declarations as direct evidence.  Any desire to cross-examine

 3    Ms. O'Neil?

 4              MS. PATEL:  Yes, Your Honor.

 5              THE COURT:  All right.  Ms. O'Neil, we'll go ahead

 6    and swear you in on this today.

 7                HOLLAND O'NEIL, DEBTOR'S WITNESS, SWORN

 8              THE COURT:  All right.  Please be seated.

 9                         CROSS-EXAMINATION

10    BY MS. PATEL:

11    Q    Good afternoon, Ms. O'Neil.

12    A    Good afternoon.

13    Q    Ms. O'Neil, do you concurrently represent both Highland

14    Capital Management and Neutra, which is a Cayman entity,

15    correct?

16    A    Yes.

17    Q    Okay.  There are other entities that you either represent

18    or have represented that are kind of affiliated or within the

19    Highland umbrella; is that correct?

20    A    Yes.

21    Q    Okay.  And that includes, for example, CLO HoldCo was one

22    such representation.  Isn't that right?

23    A    Previous.  Previously.

24    Q    Okay.

25    A    Not currently.

Appx. 02143

O'Neil - Cross                                    116

1   Q    Okay.  So, and I believe you say that in your declaration,

2   right, that you didn't -- that you no longer represent CLO

3   HoldCo?

4   A    Correct.

5   Q    Okay.  And when did that representation cease?

6   A    It was -- it was very brief.  I came into the case after

7   the involuntary -- after the orders for relief were entered.

8   And at that time, there had been the motion to intervene that

9   included that entity, and it was determined to proceed with an

10  appeal on that motion to intervene, or the denial of the

11  motion to intervene, as well as the orders for relief.

12  Actually, there was a compendium of orders that were appealed

13  all at the same time.

14       And so, because that entity had also filed a motion to

15  intervene, we had included that in the appeal.  And at that

16  time I was retained, but then by the time we kind of analyzed

17  the issues, determined it was not necessary to proceed with

18  that appeal, then I no longer represented that entity and

19  disengaged.

20  Q    Okay.  But CLO -- to be clear, CLO HoldCo was actually an

21  appellant for the order for relief appeal that we've been

22  talking about today, correct?

23  A    Initially, yes.

24  Q    Okay.  And it still remains an appellant; it just didn't

25  file a brief in the involuntary appeal.  Isn't that right?

O'Neil - Cross                          117

1   A    It has not filed any brief.  And I would have to look at

2   the record if it even filed a notice to the Fifth Circuit.  It

3   did -- was included in the notice to the District Court.  I

4   just honestly can't recall if it was included in the -- in any

5   notice to the Fifth Circuit.

6   Q    Okay.  And did you ever withdraw from your representation

7   of CLO HoldCo in the District Court appeal?

8   A    What do you mean, withdraw?

9   Q    Well, I mean, you entered an appearance.

10  A    You mean file a notice with the -- with the Court?

11  Q    Right.

12  A    I can't recall.

13  Q    Okay.  Ms. O'Neil, with respect to Neutra, you understand

14  and you've heard testimony, and I believe it's in the

15  declarations in support of the retention papers for Foley, and

16  if you need to look at that I can direct you to the exhibit

17  book, but it's -- is it your understanding that ultimately

18  Neutra is owned 75 percent by Mr. Dondero and 25 percent by

19  Mr. Okada?

20  A    Yes.

21  Q    Okay.  And Ms. O'Neil, in connection with your

22  representation of Neutra, who are the human beings that you

23  interact with?  Who directs your services?

24  A    At -- currently?  Are you --

25  Q    Just on behalf of Neutra.

O'Neil - Cross                          118

1   A    Predominantly, I get direction from Highland's in-house

2   counsel.

3   Q    Okay.  And who would that be?  Who are the people?

4   A    The people are Mr. J.P. Sevilla, Mr. Isaac Leventon, Ms.

5   Stephanie Vitiello.  Those are the primary individuals that

6   direct vis-à-vis Neutra.

7   Q    Okay.  Have you ever spoke with Mr. Dondero regarding your

8   representation of Neutra?

9   A    Yes.

10  Q    Okay.  And when was that?  When was the last time?

11  A    It has -- it's been a while.  Certainly, it hasn't been

12  since this bankruptcy was commenced.  I think the last time I

13  recall discussing that specifically is when we were together

14  at the mediation during the course of the bankruptcy.  And I'd

15  have to look at my calendar.  I can't recall exactly when that

16  was.

17  Q    Okay.  And what about Mr. Okada?  Have you -- when was the

18  last time you spoke with Mr. Okada?

19  A    I have never spoken with Mr. Okada.

20  Q    During the course of your entire representation of Neutra,

21  you've never spoken with Mr. Okada?

22  A    That is correct.

23  Q    Okay.  And under -- do you have an understanding of under

24  what authority Mr. Sevilla or Mr. Leventon or Ms. Vitiello

25  would have to direct your legal services on behalf of Neutra?

Appx. 02116

015708

O'Neil - Cross                          119

1  A    Generally, yes, through the direction from the owners of

2  Neutra.

3  Q    Okay.  That would be Mr. Dondero and Mr. Okada?

4  A    Correct.

5  Q    Okay.  And it's your understanding, then, that Mr. Dondero

6  and Mr. Okada have directed Highland's legal department to

7  direct your services?

8  A    Yes.  Previously, yes.

9  Q    Okay.  Do you have -- is there a contract between Neutra

10  and Highland, or --

11  A    I don't know.

12  Q    Okay.  Did you ever ask if there was one?

13  A    No, I did not.

14  Q    Okay.  In connection with your representation of Neutra,

15  do you bill separately for the Neutra representation?

16  A    Since the bankruptcy was -- since the Highland bankruptcy

17  was commenced, we set up a separate task code to track the

18  fees being incurred on the Neutra appeal.  Prior to the

19  bankruptcy, we did not have a reason to do that.

20  Q    Okay.  So let's talk about prior to the bankruptcy.  I

21  believe in your declaration it was disclosed that there were

22  approximately $2.1 million in billings relating to your

23  representation of Highland, Neutra, and certain of the

24  Highland Cayman entities:  Highland CLO Management, Highland

25  CLO Holdings, and HCF Advisor, amongst others.  Right?

1   A    That sounds about right.  I might want to look at the

2   declaration just to confirm on the number, but that sounds

3   about right.

4   Q    Okay.  Well, your declaration can be found under Tab 10.

5   A    Okay.  (Pause.)  And are you referring to Paragraph 16?

6   Q    Well, if you look at Page -- at the bottom, you'll see

7   that there's page numbers, and it says Page 15 of 48.  And

8   this would be your declaration.

9   A    Oh, thank you.  I was looking at the --

10  Q    Uh-huh.  Paragraph 3.

11  A    -- at the application, that's all.  Correct.  Yes.  Thank

12  you.

13  Q    Firm-earned fees of two point -- roughly $2.15 million,

14  almost, correct?

15  A    Yes.

16  Q    Okay.  And there's about $1.4 million of that that was

17  unpaid from the pre-petition period, correct?

18  A    Correct.

19  Q    Okay.  And is it your testimony that, of the $2.15 million

20  in fees, that there was no apportionment between Highland,

21  Neutra, and the Cayman defendants?

22  A    Correct.

23  Q    Okay.  So, --

24  A    Not -- not in my account -- not through my accounting

25  processes.  Obviously, the time entries, you could parse them

O'Neil - Cross                          121

1  out, if need be.

2  Q    Okay.  But you didn't keep your time necessarily that way,

3  where they were already apportioned and parsed?

4  A    Not under separate task codes, --

5  Q    Okay.

6  A    -- as we have done post-bankruptcy.

7  Q    So, in connection with the billings that would have

8  represented that $2.15 million, were those bills submitted to

9  Highland, to Neutra, to the Cayman defendants?

10  A    They are submitted through an e-billing process that it

11  goes through a Highland portal and -- in the aggregate.  So

12  they're submitted through that portal.

13  Q    Okay.  But the portal goes to Highland, correct?

14  A    I do not know.  I honestly -- our e-billing department

15  handles it and I just know it goes through e-billing, an e-

16  billing portal, and I don't know exactly.  I'm assuming

17  obviously it goes to Highland.  They certainly get copies of

18  it.

19  Q    Okay.  Did you or Foley ever submit a bill to Neutra?

20  A    I mean, my understanding is that, going through the

21  portal, we would go to the various parties that are affiliated

22  with Highland.

23  Q    Okay.  But you've never directly sent a bill to Neutra for

24  your representation of Neutra?

25  A    As I said, it goes through e-billing, so that could be

O'Neil - Cross                            122

1    interpreted to go directly to them if it goes through an e-
2    billing process.
3    Q    Okay.  But I'm asking, have you ever --
4    A    I'm -- maybe I'm being hyper-technical, but I'm just --
5    Q    Right.
6    A    It's being submitted through --
7    Q    I understand, but I just -- here's where I want to just
8    direct us, is:  Have you ever addressed a bill to Neutra, Ltd.
9    care of either Mr. Dondero, Mr. Okada, or its formal business
10   address?
11   A    As I indicated, post-petition, we have been segregating
12   them under a different task code and indicating it's Neutra.
13   Pre-petition, it was all under the same invoice.
14   Q    That was submitted to Highland only?
15   A    Submitted through the e-billing process.
16   Q    To Highland only, right?
17          MR. LAMBERSON:  Objection to the form of the
18   question.  This has been asked about four times.  The witness
19   is very clear.
20          THE COURT:  Overruled.  I think she's trying to get
21   an exact answer to her question, and she feels like she's not
22   getting it.  So, overruled.
23          THE WITNESS:  Okay.  Then I apologize, Your Honor.
24   I'm not -- I just don't know technically, once it goes through
25   the e-billing, how it's distributed on the other side.  I

                          O'Neil - Cross                      123

 1   just, I honestly --
 2          THE COURT:  I think the question is, to whom was the
 3   invoice directed?
 4          THE WITNESS:  In terms of the -- not where it was
 5   sent, but who it's directed to?
 6   BY MS. PATEL:
 7   Q    Yes.
 8   A    It would have -- I believe it has the entities on it.  It
 9   definitely has Highland on it for sure.
10   Q    Okay.  Does it have Neutra on it?
11   A    Neutra is subject to the engagement letter, so it would be
12   applicable to -- if our accounting department didn't
13   technically put Neutra on it, that is not necessarily at any
14   moment being -- as the engagement letter is -- was with all
15   those parties.  So I would have to look at the invoice, if it
16   has all of the clients listed on there.  I honestly -- I just
17   can't remember right now.
18   Q    Okay.  Well, --
19   A    We do have some post-petition invoices, and you'll see
20   where they're segregated with Neutra.
21   Q    You raise an interesting point.  If Highland and Neutra
22   and the other entities are all part of the engagement letter,
23   is Neutra also liable for all of Highland's legal fees?
24   A    I don't know the answer to that.
25   Q    Okay.  Is it your position that because Highland, Neutra,

O'Neil - Cross                    124

```
 1   and the Cayman defendants are all part of the engagement
 2   letter, that Highland is responsible for Neutra's legal fees?
 3   A    From my firm's standpoint?
 4   Q    Yes.
 5   A    I think the, you know, our perspective is that they were
 6   -- we were primarily working for Highland, so the beneficial
 7   work, and as I think the Court knows, most of the work here
 8   was on behalf of Highland Capital Management.  And it's in our
 9   engagement letter to that effect, effectively.
10   Q    Sitting here today, Ms. O'Neil, post-petition, who's
11   calling the legal shots for purposes of Neutra?
12   A    The -- well, where we have been is the process with the
13   Fifth Circuit.  The Fifth Circuit schedule was already set
14   pre-petition, and we have just been complying with the pre-
15   petition -- or, rather, that schedule, which has rolled post-
16   petition.  And so our direction pre-petition has just
17   continued in terms of proceeding with the briefing.  And so,
18   again, going back to who it was pre-petition, it's the same
19   legal team giving instructions on behalf of Neutra.
20   Q    Okay.  And if the question were to be posed, for example,
21   whether the Neutra involuntary or the order for relief appeal
22   should be dismissed, for example, who would call the legal
23   shots on that?  Who would make the decision on that?
24   A    To dismiss the appeal?
25   Q    Yeah.
```

Appx 03152

O'Neil - Cross                          125

1    A    Not proceed with it up to this point?  Despite where we

2    are at this point, to just -- to just drop it?

3    Q    Yes.

4    A    It would be the owners of Neutra.

5    Q    So that would be Mr. Dondero and Mr. Okada, right?

6    A    Yes.

7    Q    Okay.  You -- Ms. O'Neil, were you in the courtroom when

8    Mr. Demo or -- and Mr. Nelms -- when Mr. Demo made the opening

9    statement and then when Mr. Nelms was testifying?

10   A    Yes.

11   Q    Okay.  And you heard, again, the opening statement and

12   then the testimony regarding the benefit to Highland of

13   Highland paying for Neutra's legal fees in connection with the

14   appeals, correct?

15   A    I did hear that, yes.

16   Q    Okay.  All right.  And can you, in your words, then,

17   articulate, from your perspective as legal counsel to both

18   entities, what the benefit is to Highland in this bankruptcy

19   for Foley's representation of Neutra and Highland paying the

20   bill for it?

21   A    I just want to make sure I'm not, you know, getting onto

22   attorney-client privileged discussions in terms of the

23   benefit.  I think I would agree with what has been stated in

24   court today.

25   Q    Okay.  So, so, and just to kind of recap that, if I

O'Neil - Cross                     126

1    understand it, it's that if Neutra is successful in its appeal

2    of the involuntary orders for relief and also its appeal of

3    the confirmation order, then everything goes back and Highland

4    gets this revenue stream, correct, of about $12 million, plus

5    it gets paid on an $8 million, approximately, purported claim.

6    Right?

7    A    That the -- the agreements would be reinstated, which

8    would then yield approximately that type of revenue stream as

9    -- pursuant to the sub-advisor and sub-management agreements

10   that were in place.

11   Q    Okay.  And one of the entities -- and I know that the

12   retention application doesn't actually go to, anymore, Foley's

13   representation of the Cayman entities, but -- that's kind of

14   been put to the side.  But you do -- and you do represent

15   Highland CLO Management, correct, which is a Cayman entity?

16   A    Correct.

17   Q    All right.  And it's one of the defendants in the Acis

18   adversary proceeding, right?

19   A    And that is the only engagement that we have for that

20   party, is in conjunction with that adversary proceeding, which

21   is stayed.  So nothing is going on with that right now.

22   Q    Well, I understand that, but you --

23   A    Okay.

24   Q    My question was, you represent Highland CLO Management,

25   correct?

Appx 93454

015716

O'Neil - Cross                     127

1   A    In that adversary proceeding.

2   Q    Okay.  So -- but you also represent it in connection with

3   -- in -- generally with the bankruptcy as well, Acis's

4   bankruptcy?

5   A    There was no involvement until the adversary proceeding,

6   until they were sued in the adversary proceeding.

7   Q    Okay.  And in the adversary proceeding, Highland CLO

8   Management was sued for a few things, correct?

9   A    In the adversary proceeding?

10  Q    Yes.

11  A    Yes.

12  Q    Okay.  Highland CLO Management, for example, received a

13  $9.5 million note that Acis was previously the holder of and

14  that was transferred after Mr. Terry's judgment, correct?

15  A    Are you asking if that was an allegation in the adversary

16  proceeding?

17  Q    Sure.

18  A    I --

19  Q    Right.

20  A    That sounds right.  That's been stayed, and I would have

21  to defer to the -- obviously, the second amended complaint and

22  the allegations therein.  So, --

23  Q    Okay.  And are you aware that your client, Highland CLO

24  Management, was also sued because it was to receive the

25  portfolio management agreements under which Acis represents --

O'Neil - Cross                                128

1  or, I'm sorry, manages the Acis CLOs?

2  A    That was -- that sounds like one of the allegations from

3  that point in time.

4  Q    Okay.  So I guess let me -- let me ask you a slightly

5  different way.  Are you aware that there was a pre-petition

6  agreement that was entered into and signed by Mr. Dondero that

7  transferred the PMAs from Acis to Highland CLO Management?

8  A    I cannot recall the -- all the evidence at the -- in

9  conjunction with that at this time, but if that's one of your

10 representations.  I wasn't representing any of the parties at

11 that time, but I do recall that there may have been some

12 evidence presented in that regard.  But I would have to look.

13 It's been a long time.  And that record is hundreds of

14 thousands of pages.  I would need to check back on that.

15 Q    Okay.  But if there were such an agreement, for example,

16 that transferred the portfolio management agreements from Acis

17 to another entity, a Cayman entity, can you agree with me,

18 then, that Mr. Dondero's ownership interest in Neutra would

19 really be of no import anymore because there wouldn't be a $12

20 million revenue stream anymore, would there, if Acis wasn't

21 the portfolio manager of the Acis CLOs?

22 A    I don't agree with the premi... at the end, when you said,

23 if Acis isn't the CLO manager, then there would be no revenue

24 stream from the CLOs if it's not reinstated as the -- as the

25 manager.

1   Q    Okay.  So you agree that if Acis isn't the portfolio

2   manager of the Acis CLOs, there's no $12 million revenue

3   stream potential to Highland by virtue of Highland coming back

4   in as the sub-advisor and shared services provider, right?

5   A    Okay.  Now, the -- no, I don't know that that's

6   necessarily the case.

7   Q    Well, why not?

8   A    It could be appointed to be the sub-advisor, sub-manager

9   for -- through a different entity.

10  Q    Okay.  So it would basically be -- but, again, going back,

11  it would be through a different entity.  Again, Mr. Dondero's

12  ownership of Neutra would be of no import then, right?

13  A    Perhaps I'm not understanding your question.

14  Q    Well, --

15  A    I -- it's a hypothetical, and I --

16  Q    If Acis -- if Acis didn't have these portfolio management

17  agreements, it doesn't matter if Mr. Dondero wins the Neutra

18  appeal or not, right?  Because he wouldn't have control of the

19  Acis entity within which to redirect, through Acis, the sub-

20  advisory and the shared services agreements, correct?

21  A    He could direct it through another entity, as I think it's

22  been well-discussed that Highland had -- Highland had the

23  personnel to manage the CLOs.  In fact, Mr. Terry was a

24  Highland employee when he managed the CLOs.  So he could

25  certainly direct that management through another entity, even

O'Neil - Cross                          130

 1   if it wasn't Acis.  But vis-à-vis Neutra, Neutra would be --

 2   well, before the confirmation of the plan, Neutra owned Acis.

 3   So, vis-à-vis through Neutra, I believe your statement would

 4   be correct.

 5   Q    Okay.  Ms. O'Neil, also as sort of a participant during

 6   the Acis bankruptcy cases --

 7           MS. PATEL:  And Your Honor, I know you're intimately

 8   familiar with all of these.

 9   BY MS. PATEL:

10   Q    But Ms. O'Neil, do you recall the multiple attempts during

11   the bankruptcy case to effectuate what was called an optional

12   redemption, which sought to liquidate the Acis CLOs?

13   A    By HCLOF, I believe there were two instances, yes.

14   Q    Okay.  HCLOF executed those optional redemptions, correct?

15   Mr. Bill Scott, one of the independent directors?  Is that

16   right?

17   A    I believe the evidence was presented before the Court --

18   Q    Okay.

19   A    -- in that regard.

20   Q    And during the course of the -- all of those proceedings

21   with the optional redemptions, Highland was the ultimate

22   advisor to HCLOF, was it not?

23   A    I'm not sure I understand what you mean by the ultimate

24   advisor.

25   Q    Well, the technical contractual advisor was an entity by

1   the name of Highland HCF Advisor, right?  Is the portfolio

2   manager for Highland CLO Funding?

3   A    It has been a while since I looked at that org chart or

4   those issues, so I do not recall off the top of my head.

5   Q    Okay.  Well, you said that you interacted, for example,

6   with Neutra -- on your Neutra issues with JP Sevilla, Mr.

7   Leventon, and Stephanie Vitiello, correct?

8   A    Yes.

9   Q    Okay.  Wasn't it really, from a legal perspective, at

10  least, Mr. Sevilla, Mr. Leventon, who were all advising

11  Highland CLO Funding as well?

12  A    I don't know the answer.  You'd have to inquire of them.

13  Q    So, is it your testimony, then, that Highland had nothing

14  to do with the optional redemption notices that were issued

15  during the course of the Acis bankruptcy cases?

16  A    I'm not sure that I understand the relevance of that as to

17  whether Highland had any -- had nothing to do with it.  I

18  think they were certainly involved and were aware.  But they

19  weren't the -- independently making those determinations.

20  Q    Okay.

21  A    As you know, Ms. Patel, there were directors that were

22  involved.  They testified before this Court.  There -- HCLOF

23  was represented by counsel as well.  King & Spalding.  So

24  there were multiple parties involved.

25  Q    Okay.  So is it, again, your testimony that Highland had

O'Neil - Cross                    132

1    nothing to do with the optional redemption notices that were

2    issued during the Acis bankruptcy case?

3            MR. MORRIS:  Objection, Your Honor.  It may be me,

4    but I don't understand what this has to do with the Foley

5    retention application.

6            THE COURT:  Okay.  We do seem like we're getting a

7    little far afield.  What's your response to that?

8            MS. PATEL:  Your Honor, the contention has been made

9    that if these bankruptcy appeals are somehow granted or in the

10   District Court and this Court are reversed, --

11           THE COURT:  Uh-huh.

12           MS. PATEL:  -- that these cases are going to come

13   back and that suddenly, magically, there's going to be a $12

14   million revenue stream flowing out of Acis back into Highland,

15   and they're going to be able to collect on an $8 million

16   objected-to claim.

17      I'm just trying to get to how likely is that really to

18   happen.  I mean, given the course -- and again, I know Your

19   Honor was a viewer of all of this -- of the multiple attempts

20   to try to liquidate these assets, --

21           THE COURT:  Okay.  I'll allow the question, but it'll

22   be the end of the line of questioning.  Okay?

23           MS. PATEL:  Understood.  And Your Honor, just

24   additionally, it's -- that's part of the appeal that Foley is

25   handling on the confirmation appeal.  As Mr. Nelms said, it's

O'Neil - Cross                          133

1    also based on the plan injunction.

2            THE COURT:  All right.  She can answer the question,

3    but then we move on to another area.

4            MS. PATEL:  Okay.

5    BY MS. PATEL:

6    Q    So is it your testimony, Ms. O'Neil, that Highland had

7    absolutely nothing to do with the optional redemptions --

8    A    I did not --

9    Q    -- during the bankruptcy case?

10   A    That is not what I said.

11   Q    Okay.  So, -- and I get it.  Highland CLO Funding is a

12   different entity, and the Bankruptcy Court made findings with

13   respect to the fact that it is controlled in every way by

14   Highland.  Do you recall that finding?

15   A    Preliminary findings in conjunction with determining

16   whether there was a likelihood of success on the merits.  I do

17   recall that --

18   Q    Okay.

19   A    -- those conclusions by the Court.

20   Q    As a part of the bench memorandum in support of the

21   confirmation order, correct?

22   A    Yes.

23   Q    Okay.

24   A    Actually, I will -- I will -- I'll correct that.  I'll let

25   that -- the Court's order speak for itself.  You may have said

O'Neil - Cross                        134

1  a few things that were more or less than what the Court's

2  order said, so I'd just defer to what the Court's order said.

3  Q   Okay.  Well, part of the representation for Foley here is

4  to represent Highland and Neutra in connection with the

5  confirmation appeal, correct?

6  A   Yes.

7  Q   And part of that confirmation appeal is also -- one of the

8  grounds there is that you're appealing the plan injunction,

9  which the plan injunction is what stops the CLOs from being

10 redeemed, correct?

11 A   Correct.

12 Q   Okay.  So, how is Highland damaged by the plan injunction?

13 A   I think it's fairly obvi... again, I want to not tread too

14 much on attorney-client privilege.  But, obviously, I have yet

15 to have a client over my 30-plus years of practicing law that

16 likes to be subject to any kind of injunction.  It limits --

17 that injunction is more than just on the -- it's a very broad

18 injunction.  So I'd like -- if I had the injunction in front

19 of me, there's -- there's lots of restrictions under that

20 injunction, and that is prejudicial to Highland to be able to

21 act freely.

22 Q   Able to act freely to liquidate CLOs?

23 A   Among other things, as it may do in the ordinary course of

24 business, in its opinion, that may be beneficial to his

25 clients.

O'Neil - Cross                                135

1    Q    Okay.  Now, Ms. O'Neil, --

2    A    If I may, may I add one more thing?

3              THE COURT:  You may.

4              THE WITNESS:  Okay.  Highland, at least in that role,

5    could not liquidate CLOs.  So I think that was an improper

6    statement.  Or suggestion.

7    BY MS. PATEL:

8    Q    Okay.  Well, then, what specific actions that Highland

9    would like to take is it being damaged by the injunction?

10   A    I would need to look at the -- the injunction is very,

11   very broad.  So, anything that it can't do freely that is

12   covered by the injunction is obviously a detriment to

13   Highland.

14   Q    Okay.  Now, Ms. O'Neil, if you would turn to Tab 31 in the

15   book, --

16   A    All right.

17   Q    -- please.  And I will ask you, this is the declaration of

18   Bradley Sharp that was in support of the order authorizing the

19   retention of Foley Gardere.  Have you had an opportunity to

20   review this?

21   A    Yes.

22   Q    Any dispute with any of the statements in here?

23   A    I don't recall having a -- I don't -- I think it was

24   accurate, but --

25   Q    Okay.  Well, when you read it, did you have any disputes

O'Neil - Cross                            136

1  with the statements that were in here?

2  A   I did not see it before it was filed, so -- but having

3  read it after it was filed, I don't recall having any disputes

4  with anything that was in it.

5  Q   Okay.  And I'll turn you specifically to Paragraph 13,

6  which is found on Page 4 of 5.

7  A   Okay.

8  Q   And I'll -- well, let's look at this together.  (reading)

9  Prior to the petition date, the majority of Foley's and Lynn

10 Pinker's fees and expenses were paid by a non-debtor entity,

11 Highland CLO Funding Limited.

12     Do you see that?

13 A   Yes.

14 Q   Okay.  And were Foley's bills sent to Highland CLO

15 Funding?

16 A   Yes.

17 Q   Okay.  And is -- were those bills separate and apart from

18 the $2.15 million that we talked about earlier that were

19 remitted through the Highland e-billing system?

20 A   Separate, yes.

21 Q   Okay.  About how much in fees has Highland CLO Funding

22 paid to Foley to date?

23 A   Nothing post-petition.  Prior -- I mean, during -- from

24 the inception of the representation of Highland, probably

25 approximately -- over a million dollars, for sure.

O'Neil - Cross                           137

1    Q    Over $2 million?

2    A    I do not believe it is over $2 million.  It's somewhere

3    between $1 and $2 million.

4    Q    Okay.  And those separate matters that were billed to

5    Highland CLO Funding, how did those differ from what was

6    billed to Highland or to Neutra or to the Cayman defendants?

7    A    If it was a matter that was clearly of some benefit to

8    HCLOF, it was billed directly.  Otherwise, there was an

9    allocation billing for just the general work.  And that was

10   primarily through an indemnity agreement, as I understood it,

11   between Highland and HCLOF.

12   Q    Okay.  And who did the allocation between Highland and

13   Highland CLO Funding?

14   A    I was instructed as to what the allocation should be or

15   asked what I thought the allocation should be on any given

16   time, and I believe it was the -- it was discussed with the

17   board of HCLOF as to the allocation.

18   Q    Okay.  And who were you directed as to the categories of

19   allocation by that you just referenced?

20   A    You mean in terms of a person?

21   Q    Yes.

22   A    I most frequently discussed this with Mr. Sevilla, but

23   also had conversations with Mr. Maloney, with King & Spalding,

24   who was representing HCLOF, and occasionally would have direct

25   conversations with Mr. Maloney and Mr. Scott and Ms. Bestwick,

015727

O'Neil - Cross                           138

1   who were the two independent directors of HCLOF.

2   Q   Okay.  And what types of work generally either were

3   allocated or apportioned or billed in full to Highland CLO

4   Funding.  What was the benefit there?

5   A   The work was -- the work that was going on in the

6   bankruptcy case.

7   Q   Okay.  But I -- I understand that it was work in the

8   bankruptcy case because that's where Foley represented

9   Highland and various other entities, but I'm asking you

10  specifically:  What types of categories, and I don't -- you

11  don't have to go task by task -- but categories of work that

12  you performed for Highland or Neutra or for the Highland

13  Cayman defendants that benefited and were billed to Highland

14  CLO Funding?

15          MR. MORRIS:  Your Honor, I'm going to again assert a

16  relevance objection to any of this post-petition stuff.  This

17  is an application to retain Foley on a post-petition basis

18  for the benefits to this estate, not with respect to what

19  happened on a pre-petition basis.

20          THE COURT:  Your response?

21          MS. PATEL:  Your Honor, there's been much discussion

22  about what -- whether Neutra should have to pay this bill or

23  whether it should not have to pay its own way here.  This is

24  -- this is, in my mind, a bit of an extraordinary application

25  in that we're asking a debtor entity to pay for non-debtor

015728

O'Neil - Cross                          139

1   representation.

2      I want to inquire as to sort of this jumbled mix of work

3   that's been performed.  There's -- clearly, Ms. O'Neil said

4   she hasn't been paid by HCLOF post-petition, but I think we

5   need to separate out all of these representations, who's

6   controlling what, and how -- how these bills really should be

7   paid.

8             THE COURT:  How the allocation has worked --

9             MS. PATEL:  Yes.

10            THE COURT:  -- thus far?

11            MS. PATEL:  Yes, Your Honor.

12            THE COURT:  I overrule the relevance objection, but

13  let me tell you a pickle we're getting into timewise.  I have

14  a confirmation hearing starting at 1:30.  And we've gone three

15  hours on this without a bathroom break.  How much longer do

16  you think you're going to need?  Because we might have to stop

17  and come back at 2:30 if you're going to need much longer.

18            MS. PATEL:  Your Honor, I would say give me ten

19  minutes and I can wrap it up.

20            THE COURT:  Okay.  Ten minutes.

21            MS. PATEL:  Okay.

22            THE WITNESS:  I'm sorry.  What was the question?  I

23  apologize.

24  BY MS. PATEL:

25  Q   I'm trying to remember it myself, Ms. O'Neil.  The

O'Neil - Cross                          140

 1  question was, what specifically -- what -- and I don't -- you

 2  don't have to go task by task.  But categorically, what was

 3  the work that was performed that you would have billed

 4  directly to HCLOF?

 5  A    Prior to King & Spalding's involvement, you may recall

 6  that we were representing HCLOF as well.  So there was direct

 7  bill for the work during the bankruptcy by Foley Gardere for

 8  specific work for HCLOF.

 9        The -- the -- pursuant to the indemnification, as I

10  understood it, although I never read the indemnification

11  personally, that there would be an allocation between Highland

12  to HCLOF for that, for work that they performed that was of

13  benefit to HCLOF or its equity interest in the CLOs.

14        And so I was more directed as to what that allocation

15  should be vis-à-vis the work that was going on.  I think,

16  generally speaking, because the CLOs were being impacted, as

17  was well-discussed during the course of the Acis bankruptcy,

18  by the issues in the bankruptcy, by the temporary injunction

19  that were in place vis-à-vis their inability to seek an

20  optional redemption during the course of the bankruptcy, that

21  they were being significantly impacted by the actions in the

22  bankruptcy, even though they were not specifically a creditor

23  in the bankruptcy.

24  Q    So you performed services on behalf of your client,

25  Highland, that you then billed to Highland CLO Funding because

O'Neil - Cross                          141

1   Highland CLO Funding couldn't effectuate an optional

2   redemption?

3   A    It was -- it was in conjunction with the overall

4   activities that were going on in the bankruptcy.

5   Q    Okay.

6   A    Not that specifically, no.

7   Q    All right, Ms. O'Neil.  I've only got a few minutes left.

8   So let me ask you:  Towards the end of January, did there come

9   a time where you sent me an email regarding Acis's quarterly

10  operating reports?

11  A    Yes.

12  Q    Okay.  And you copied Mr. Hurst on that email as well,

13  correct?

14  A    Correct.

15  Q    Okay.  And your email was to say, hey, can we set up a

16  time to talk because I've got -- Highland's got some questions

17  about the quarterly operating report.  Do you recall that?

18  A    Yes.

19  Q    Okay.  And again, just so we're clear, this is around end

20  of January 2020, right, after the appointment of the Board?

21  A    Yes.  You --

22  Q    Okay.

23  A    I think there's an exhibit.  One of your exhibits is that.

24  Q    There is.  If you turn to --

25  A    Or it's a portion of that email communication.

O'Neil - Cross                              142

1   Q    It is.  It's -- if you turn to Tab 28, this is sort of

2   your initial email to me, correct?

3   A    Yeah.  This is not the entire email dialogue, because --

4   Q    There were other emails afterward.

5   A    -- I did not get a response and sent a couple of emails

6   later, several days later, asking for a response.

7   Q    Right.  And I actually did respond to you after that,

8   correct?

9   A    Approximately a week later, yeah.

10  Q    Okay.  Because I was out sick, actually.

11  A    Yeah.  That's what you said.

12  Q    Right.  So, --

13  A    You didn't say sick, but you were out, so it's okay.

14  Q    Yeah.  I was out.  And so -- and I will tell you, I was

15  sick.  So I responded, albeit a little bit late, but I did

16  respond to you and say, Ms. O'Neil, could you tell me what

17  your questions are so that I can be prepared?

18       Does that sound about right?

19  A    Yeah.

20  Q    Okay.

21  A    Yes.

22  Q    And I never -- I never got a response to that.  You never

23  told me what your questions were with respect to the quarterly

24  operating report, right?

25  A    Yes.  And I --

O'Neil - Cross                              143

1  Q    Okay.

2  A    I can explain that.  Because Mr. -- I believe Mr.

3  Pomerantz said that there was a meeting that was -- and they

4  would discuss it then, so --

5  Q    Okay.

6  A    Or Mr. Demo.  I'm sorry.  Somebody from Pachulski told me

7  that that would be addressed.  Also, the status conference --

8  I mean, the questions we had were because there was a February

9  3rd status conference coming, and I wanted to see if we could

10 get some clarity so that when we appeared before the status

11 conference we could limit what we were going to be discussing

12 with the Court, if anything.

13 Q    Okay.  Well, what were -- what were the nature of your

14 questions?  Because there was a conversation between Mr. Terry

15 and myself and the Board and -- well, certain members of the

16 Board.  But what were your questions pertaining to?

17 A    Oh, okay.  Happy to discuss that.  It's kind of awkward to

18 have it in -- on this, in this --

19 Q    On Q and A.

20 A    -- forum, but --

21 Q    I hear you.

22 A    We sent -- as the Court will recall, the confirmation

23 injunction can be lifted if all the claims are paid.  So,

24 since the plan, the Acis plan was confirmed, we have been

25 tracking -- and the only way to track it is through the QORs

015733

Appx. 9317

1  -- what the revenues were coming in and what has been paid.

2  And so -- in terms of expenses and then claims.  And so we

3  have been -- my paralegal has been tracking this.

4      As the Court may know from looking at the record, almost

5  all of -- any other claims that were in the case were either

6  disallowed or withdrawn.  And so, really, the only claim,

7  other than Highland's, was Mr. Terry's that was really left to

8  be paid, other than administrative claims.  And I believe the

9  administrative claimants had agreed to deferral on some of

10 their payments after the effective date.

11     So we had been tracking the payments, which you can track

12 through the QORs, and it appeared that all of -- including Oak

13 Tree's most recently allowed administrative claim -- that all

14 of the administrative claims had been paid, and it appeared at

15 least approximately a half of Mr. Terry's claim had been paid.

16     When you look at the QORs, it doesn't specifically say,

17 "Here's who got what payment," but it shows the claims being

18 paid down, in addition to just general expenses of the post-

19 confirmation Debtor.  And I'm -- this is taking a little bit,

20 but in the disclosure statement to the plan, there had also

21 been plan projections that set forth the revenues that were

22 anticipated post-confirmation to pay the claims.  And so

23 likewise -- as well as the expenses, including to Brigade or

24 just general operating expenses for Acis.

25     So, likewise, through the QORs, we had been comparing

O'Neil - Cross                                145

1    those against what was in the plan projection.  And there were

2    some things that weren't matching and we simply were having

3    questions about the expenses seemed to be much higher.

4    However, the claims were being paid down, so it looked like

5    Mr. Terry was the only claimant left and was probably owed, by

6    our calculation, around $4-1/2 million, and that was the only

7    thing left to be paid.  And, but the revenues per the QOR was

8    showing cash available of over five and -- $5.3 million.

9         So, one of the things we wanted to discuss was the

10   application of using the cash to go ahead and pay down what

11   was left of Mr. Terry's claim so that the injunction could be

12   lifted.  But wanted to discuss that with you.  That was the

13   purpose of that.

14   Q   Okay.  And I guess let me back up.  One, let me kind of

15   correct you on a technical point, which is Mr. Terry's claim

16   isn't the only claim that's left outstanding.  There were also

17   law firm claims that were lodged as against Acis, correct?

18   A   I believe there were two --

19             MR. MORRIS:  Objection, Your Honor.  Just relevance.

20   I don't get it.

21             THE COURT:  Okay.  Sustained.  You've gone seven

22   minutes.  So, three more minutes and we need to wrap it up.

23             MS. PATEL:  Okay.

24   BY MS. PATEL:

25   Q   Well, I guess, Ms. O'Neil, kind of in line with the email,

O'Neil - Cross                          146

1   the email came in shortly before Acis was sued by your co-

2   counsel, Lynn Pinker, on behalf of the Charitable DAF and CLO

3   HoldCo.  Are you aware of this lawsuit?

4   A    After it was filed.  I was not aware of it before it was

5   filed.  The second one.  I had seen the first one after it was

6   filed.  I had not seen the second one until after it was

7   filed.  We have a conflict with one of the defendants in that,

8   so --

9   Q    Okay.  So, and when you say "the first one," are you

10  talking about when it was originally the Charitable DAF versus

11  U.S. Bank National Association and Moody's Investors Service?

12  A    Yes.

13  Q    Okay.  And that all involved claims by the DAF brought

14  against U.S. Bank and Moody's at the time relating to the Acis

15  bankruptcy, right?  It's claims that U.S. Bank didn't manage

16  --

17  A    Ms. --

18  Q    -- as a trustee correctly, correct?

19  A    Ms. --

20       MR. MORRIS:  Objection, Your Honor.  She's got no

21  foundation.  She said she has a conflict and wasn't involved

22  with this case.

23       THE COURT:  Sustained.

24       THE WITNESS:  That's correct.

25  BY MS. PATEL:

Appx. 03174

O'Neil - Cross                                 147

1   Q    Okay.  I guess, Ms. O'Neil, let me just ask you:  Did you

2   have any involvement with -- if you look at Tab 27, that's a

3   copy of the lawsuit, so that we're all clear exactly which one

4   I'm asking you about.  This is the lawsuit between the

5   Charitable DAF and CLO HoldCo, your former client, versus U.S.

6   Bank National Association, Moody's Investors Service, Acis

7   Capital Management, Brigade, and Josh Terry.  Did Foley have

8   any involvement in the drafting or formulation of this

9   lawsuit?

10  A    None.

11  Q    Okay.

12          MS. PATEL:  No further questions, Your Honor.

13          THE COURT:  All right.  Any redirect?

14          MR. MORRIS:  Very briefly.

15          THE COURT:  Okay.

16                  REDIRECT EXAMINATION

17  BY MR. MORRIS:

18  Q    Ms. O'Neil, you've been representing a number of different

19  entities associated with Highland since 2018, right?

20  A    Correct.

21  Q    And are those entities identified in Plaintiff's Exhibit

22  #2 in the engagement letter?

23  A    Plaintiff's 2 or -- sorry.

24  Q    The Debtor's.

25  A    The Debtor's 2.  Okay.  Let me switch.  They are.

O'Neil - Redirect                              148

1   Q    Okay.  And since the Board has been appointed, have you
2   met with board members to discuss the status of the matters
3   that your firm has been handling?
4   A    Yes.
5   Q    And without disclosing attorney-client communications, did
6   that involve providing a history of the work that you'd done?
7   A    Yes.
8   Q    Did that involve providing a history of the work that you
9   expected to do in the future?
10  A    Yes.
11  Q    Did the Board have an opportunity to ask questions of you?
12  A    Yes.
13  Q    And did you, in fact, answer the Board's questions?
14  A    I endeavored to do so to the best of my ability, yes.
15  Q    Okay.
16  A    Or I followed up if -- with information via email if I
17  needed to get additional information.
18  Q    And is it your understanding that the Board supports your
19  retention for the purposes that were described earlier by Mr.
20  Nelms?
21  A    Yes.
22  Q    Okay.
23           MR. MORRIS:  I have nothing further, Your Honor.
24           THE COURT:  Any recross on that redirect?
25           MS. PATEL:  No, Your Honor.

O'Neil - Redirect                         149

1              THE COURT:  All right.  Ms. O'Neil, you're excused.

2              THE WITNESS:  Thank you.

3         (The witness steps down.)

4              THE COURT:  All right.  Highland, any more evidence?

5              MR. MORRIS:  No, Your Honor.  We rest.

6              THE COURT:  All right.  Is there any evidence from

7    Acis?

8              MR. LAMBERSON:  No, ma'am.

9              THE COURT:  All right.  Let's take a five-minute --

10   please, five-minute break -- and then we'll hear your closing

11   arguments.

12             THE CLERK:  All rise.

13        (A recess ensued from 12:47 p.m. until 12:56 p.m.)

14             THE CLERK:  All rise.

15             THE COURT:  All right.  Please be seated.  We're

16   going back on the record in Highland.  I'll hear closing

17   arguments.

18        I'm going to ask a question.  I need clarification --

19             MR. DEMO:  Of course.

20             THE COURT:  -- on this.  First off, in the Acis

21   adversary that's stayed in the Acis bankruptcy case, Foley,

22   it's proposed, would represent Highland.  But is Foley also

23   representing co-defendants in that adversary?  You know, I

24   think King & Spalding is representing all the co-defendants,

25   or someone else is, but am I wrong or right about that?

150

1          MR. DEMO:  Yes and no, Your Honor.  I think there's

2   been some miscommunication on that.  The adversary, as we

3   understand it, is stayed, and because of that we are not

4   seeking to represent -- or retain Foley in that adversary,

5   although we will if that comes up again.  So, in the

6   adversary, pre-petition, Foley did represent the Debtor and

7   then a handful of other creditors who were brought into that

8   adversary, as we understand it, as defendants.  On a go-

9   forward basis, though, we are proposing to retain Foley on

10  three things:  General matters in the bankruptcy proceeding;

11  the appellate --

12         THE COURT:  General matters in the Acis bankruptcy

13  proceeding?

14         MR. DEMO:  Correct, Your Honor.  The appeal involving

15  the confirmation order.  And the appeal involving the Neutra

16  litigation.  And --

17         THE COURT:  Okay.  On the appeal of the involuntary,

18  --

19         MR. DEMO:  Yes, ma'am.

20         THE COURT:  -- only Neutra --

21         MR. DEMO:  That is correct.

22         THE COURT:  -- is an appellant.  Okay.  So what

23  you're asking is for authority for Highland to pay the legal

24  fees of Neutra on that?

25         MR. DEMO:  Yes, Your Honor.

151

```
 1              THE COURT:  Okay.

 2              MR. DEMO:  We are.  And we, again, to the --

 3              THE COURT:  And let me -- let me -- and then the

 4    appeal of the confirmation order, are the appellants Highland

 5    and Neutra only, or is HCLOF an appellant?

 6              MR. DEMO:  In terms of Foley's representation, it's -

 7    -

 8              THE COURT:  No, no, no.  Just answer the question.

 9    Who are the appellants in the confirmation order?

10              MR. DEMO:  Highland, Neutra, and HCLOF.

11              THE COURT:  Okay.  Who is representing HCLOF?

12              MR. DEMO:  King & Spalding.

13              THE COURT:  Okay.  And Foley has thus far been

14    representing Neutra and Highland?

15              MR. DEMO:  Correct, Your Honor.

16              THE COURT:  Okay.  Well, okay.  You may proceed.

17              MR. DEMO:  And I will be brief.  And I think

18    ultimately this, this is a relatively simple thing, and I

19    think you've nailed it.

20         What are the benefits to the estate of -- because nobody

21    has objected, again, to Foley representing the Debtor.  What

22    are the benefits to the estate for Foley representing Neutra

23    and being paid for that by the Debtor?  And to answer that

24    question, I think you have to look to all the testimony that

25    we've heard today, and you also have to look at who's
```

Appx. 03479
015741

1    objecting, Your Honor.  The Committee is not objecting.  There

2    is no other committee member objecting besides Acis.  The only

3    party objecting to Neutra -- or, I'm sorry, to Highland paying

4    Neutra's fees in the appeal, which, again, are a portion of

5    the $500,000 that we think is going to be incurred post-

6    petition on this, excluding today, because today has obviously

7    gone a little bit long -- the only party objecting to paying a

8    portion of that $500,000 to have Foley represent Neutra in an

9    appeal that is happening less than six weeks from now is Acis.

10        Acis is the party opponent in that.  Acis is the party

11    that stands to benefit, not just because the involuntary

12    petition will not be overturned, but because there will be a

13    lack of leverage and a lack of ability to contest their $75

14    million, which is where it started, but it keeps growing.

15    It's at $300 million now.  The only party who's objected to

16    that is Acis.  None of the other creditors have objected.

17            THE COURT:  Well, until the past 24 hours, the

18    Committee was objecting.

19            MR. DEMO:  Correct, Your Honor.  And we had a --

20    finally had a chance, with the new Board in place, to discuss

21    it with the Committee.  And the new Board explained to the

22    Committee that, in their business judgment, spending this

23    money, this $500,000 -- which, again, is going to be allocated

24    across these three matters; not all of it's going to be

25    allocated to Neutra; a portion of it is going to be allocated

153

1    to Neutra -- $500,000 for the possibility of a recovery to the

2    estate, the possibility of the ability to challenge a $300

3    million proof of claim that impacts not just the estate but

4    the other creditors in the estate, substantially, because

5    there's only so much money here.  So, --

6              THE COURT:  Okay.  Let me ask you to recap what the

7    evidence was on benefit to Highland --

8              MR. DEMO:  On benefit --

9              THE COURT:  -- from the overturning of the order for

10   relief in Acis.

11             MR. DEMO:  In terms of the overturning of the order

12   for relief in Acis, there were -- there was testimony on the

13   possibility -- and again, it's a possibility, and we're not

14   disputing that.  Acis's attorneys said it was 10 percent.

15   That's fine.  Maybe it's 10 percent.  There was evidence

16   presented by Mr. Nelms on the possibility that if the Acis

17   involuntary is overturned, that the contracts at issue, the

18   advisory and the sub-management agreements, --

19             THE COURT:  Well, let's take it sequentially, because

20   you've got to, you know, look at benefit of the estate --

21             MR. DEMO:  Understood.

22             THE COURT:  -- versus time and cost, to some degree,

23   right?

24             MR. DEMO:  Right.

25             THE COURT:  So, Neutra wins.

015743

154

 1              MR. DEMO:  Okay.

 2              THE COURT:  Okay?  That means, according to Mr.

 3   Lamberson's argument, which I think is the correct argument,

 4   that we send to arbitration whether it's appropriate for Acis

 5   to be in a bankruptcy.

 6              MR. DEMO:  Correct, Your Honor.

 7              THE COURT:  Okay.

 8              MR. DEMO:  Well, may be correct.

 9              THE COURT:  So, --

10              MR. DEMO:  I think we did hear there's a different

11   possibility from Mr. Nelms.

12              THE COURT:  Well, what is the other possibility?

13              MR. DEMO:  Well, okay.  Understood, Your Honor.

14   Okay.

15              THE COURT:  Okay.

16              MR. DEMO:  So, say we -- assuming we send it to

17   arbitration, --

18              THE COURT:  So that means an arbitration panel is

19   convened, and at some point, many months from now, an

20   arbitration panel will either say yes or no, involuntary, you

21   know, should have gone forward.

22              MR. DEMO:  Okay.

23              THE COURT:  Okay?  Let's say the arbitration panel

24   says no, should not have gone forward.  Then what does the

25   world look like for Highland?

Case 19-34054-sgj11    Doc 3596-24    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 68-24    Filed 06/06/25    Page 66 of 1052    PageID 16744

155

1          MR. DEMO:  I guess, taking it a step back, Your

2   Honor, assuming that this does go to arbitration, it also

3   means that the involuntary petition was not entered.  If the

4   involuntary petition was not entered, which means that the

5   Acis equity did not go to Mr. Terry, it stayed under Neutra,

6   at that point --

7          THE COURT:  Wait, wait, wait.

8          MR. DEMO:  -- you also go into arbitration.

9          THE COURT:  Wait, wait.  Wait, wait.  So you're

10  saying that everything is wiped out in the involuntary, the

11  Acis bankruptcy case?

12         MR. DEMO:  Your Honor, and I do want to be really,

13  honestly, very, very clear about this.  I am -- I am not

14  saying anything.  I'm not -- trying very hard not to draw a

15  legal conclusion.  What I'm saying is that the Board has

16  analyzed this, the Board has applied business --

17         THE COURT:  But I'm trying to understand --

18         MR. DEMO:  -- judgment to this, and that there is a -

19  - there is a possibility.  Now, --

20         THE COURT:  I'm trying --

21         MR. DEMO:  -- obviously, reasonable minds can --

22         THE COURT:  Okay.  Here's where I'm coming from.  And

23  you can tell me if I'm analyzing this incorrectly, in your

24  view.  Okay.  We used to have this terrible Fifth Circuit case

25  -- you know, God help me if this transcript gets sent -- but

156

 1   called *Pro-Snax*.  Okay?

 2          MR. DEMO:  Okay.

 3          THE COURT:  I think the Fifth Circuit has decided

 4   itself that it was terrible, so it's not going to come back to

 5   haunt me, saying that.  So, *Pro-Snax* said basically the

 6   Bankruptcy Court is a Monday-morning quarterback in looking at

 7   the reasonableness of fees.  You know, did it provide a

 8   benefit to the estate?

 9          MR. DEMO:  Uh-huh.

10          THE COURT:  And then that got reversed a few years

11   ago.  I think it was the *Woerner* case -- *Baron & Newburger*

12   *(Woerner)* -- where the Court said, no, you don't do a

13   hindsight look.  You look at, at the time fees were expensed,

14   --

15          MR. DEMO:  Uh-huh.

16          THE COURT:  -- was there something like a reasonable

17   possibility they would benefit the estate?

18          MR. DEMO:  Yes.

19          THE COURT:  Okay?  So I'm looking through it in that

20   lens, so to speak, and I'm like, what benefit to the Highland

21   estate could there be if the confirmation -- well, if the

22   order for relief is unwound or the confirmation order is

23   unwound?  And I'm not there.  I'm not there understanding any

24   benefit for Highland.

25       I can understand a benefit, maybe, for Neutra, although I

157

1   am even hard-pressed to see that, because it looks like years

2   of more litigation.

3         MR. DEMO:  And Your Honor, I mean, I do think that

4   there was -- and again, I'm not going to challenge your legal

5   conclusions -- I do think that there was evidence that in the

6   Board's business judgment they did analyze this and they see

7   it, I think, a little bit differently.

8         THE COURT:  And I should defer heavily to a Board's

9   reasonable exercise of business judgment.  I've got trouble.

10  So I'm just trying to --

11        MR. DEMO:  Understood.  And I think, when you look at

12  that business judgment, --

13        THE COURT:  Uh-huh.

14        MR. DEMO:  -- you know, obviously, I don't disagree.

15  I do think that when you have a three-person independent board

16  of this caliber who's come into a difficult situation, has

17  reviewed all of the evidence, talked to all the applicable

18  people, when things happened with the DAF litigation that they

19  didn't like, they took action to stop that.  When they looked

20  at the Winstead appeal and they said, you know, there's not a

21  benefit to the estate here, let's drop they, they dropped it.

22        THE COURT:  But again, work with --

23        MR. DEMO:  When they --

24        THE COURT:  Work with me.  Fifth Circuit reverses the

25  order for relief.  I don't think you have disagreed with

158

 1   Lamberson's argument that best-case scenario in that reversal

 2   scenario is that an arbitration panel now looks at, should

 3   this Acis -- you know, should it have gone forward in a

 4   bankruptcy?

 5           MR. DEMO:  Well, I guess, Your Honor, then maybe I --

 6           THE COURT:  So, in that many --

 7           MR. DEMO:  -- I'm not being clear.

 8           THE COURT:  -- months, let's say eight months that an

 9   arbitration panel takes to decide, what happens during that

10   eight months?

11           MR. DEMO:  Well, then I guess, Your Honor, I need to

12   step back, because I have not -- absolutely not been clear.

13   If it goes to an arbitration panel, our view -- and I think

14   Ms. O'Neil's briefs to the Fifth Circuit are clear on this --

15   the arbitration panel is going to arbiter or arbitrate whether

16   or not there was a fraudulent conveyance.  It's going to

17   arbitrate how to resolve the claims.  It's not going to

18   arbitrate whether or not the involuntary petition should ever

19   have been entered.

20           THE COURT:  Wait, wait.  What does that mean?  Of

21   course.  That's the starting point of it all, right?  The

22   appeal is the Bankruptcy Court wrongly held a trial on the

23   involuntary petition and ordered for relief.  It should have

24   deferred to an arbitration panel to do that.  Isn't that

25   appeal number one that we're talking about?

159

 1              MR. DEMO:  Yes, but --

 2              THE COURT:  Neutra's appeal?

 3              MR. DEMO:  Yes, it is.

 4              THE COURT:  Okay.

 5              MR. DEMO:  But I do think there's a nuance.  And I do

 6    want to defer to the pleadings that were filed with the Fifth

 7    Circuit, because I don't want here to get myself out in front

 8    of that Fifth Circuit appeal, because obviously I do very much

 9    want that appeal to go forward.  And maybe we lose and maybe

10    we win, but if we win, I think the --

11              THE COURT:  If Neutra wins.

12              MR. DEMO:  If Neutra wins, one of the outcomes -- and

13    again, I understand that, you know, reasonable minds can

14    differ that there --

15              THE COURT:  Okay.

16              MR. DEMO:  -- of the outcomes.

17              THE COURT:  But one of the outcomes.

18              MR. DEMO:  One of the outcomes is that the

19    involuntary petition is unwound, withdrawn, and the parties go

20    to arbitration on the claims.  If that were to happen, --

21              THE COURT:  Wait.  It's unwound and they go to

22    arbitration on what claims?  The claims in the adversary

23    proceeding that's been filed in Acis?

24              MR. DEMO:  Again, Your Honor, I'm not the appellate

25    lawyer here.  I mean, this is why we are here.

160

1          THE COURT:  But how do you skip over the arbitration

2     of the order for relief?  Because if Joshua Terry, who

3     commenced it, you know, he has the right now to argue to an

4     arbitration panel that this should have been in bankruptcy,

5     right?  He doesn't have to just agree that the adversary

6     proceeding is now arbitrated.  Right?

7          MR. DEMO:  Well, again, Your Honor, I don't want to

8     substitute my judgment for the judgment of the Board.  I think

9     the judgment of the Board is that there is a scenario and that

10    it's worth exploring and that it's worth the -- what we

11    honestly think is a limited amount of money to explore.

12    Because I think, if we explore that, we explore the

13    possibility, quite honestly, of taking it out of bankruptcy,

14    then, yes, in that scenario, and which we do it think is

15    possible, in that scenario, and call it whatever probability

16    you want, but if you're going to spend half a million dollars

17    to get to a scenario that could reap you -- and I don't want

18    to put a number on it -- but millions of dollars in future

19    revenue, millions of dollars in terms of --

20         THE COURT:  You're melding.  You're collapsing.  And

21    we all know as lawyers that's not how it works.  Things happen

22    sequentially, okay?

23         MR. DEMO:  Okay.  Then I guess, going --

24         THE COURT:  There's a setting aside -- well, there's

25    a reversal of the Bankruptcy Court's issuance of an order for

Appx 93188
015750

1    relief.

2            MR. DEMO:  Okay.

3            THE COURT:  And that means you should have deferred

4    to an arbitration panel, Judge Jernigan.  And so they remand

5    so that I can, consistent with that appellate ruling, say,

6    We're staying the bankruptcy and it's going to arbitration to

7    decide whether an order for relief.  Is there really any

8    realistic scenario where we skip that step?

9            MR. DEMO:  We think that there's a scenario that is

10   worth exploring.

11           THE COURT:  I feel like your colleagues are really

12   dying to chime in because they think they've got the answer to

13   my question, no offense to you.

14           MR. MORRIS:  I really -- I don't, Your Honor, but if

15   I may.

16           THE COURT:  Uh-huh.

17           MR. MORRIS:  I think Ms. O'Neil is the appellate

18   lawyer.  Maybe she should speak on this very precise point, --

19           THE COURT:  Okay.  Because --

20           MR. MORRIS:  -- if that's okay with the Court.

21           THE COURT:  Because I see many miles --

22           MR. MORRIS:  Yeah.

23           THE COURT:  -- to go before we sleep if there's a

24   reversal, and I'm trying to figure -- well, you know, we all

25   know that, right?

162

 1            MS. O'NEIL:  Your Honor, if I may.

 2            THE COURT:  Uh-huh.

 3            MS. O'NEIL:  And I did not want to interrupt Mr.

 4    Demo, and he's done a great job, but obviously we've been

 5    involved with the appeal.

 6            THE COURT:  Right.

 7            MS. O'NEIL:  We've prepared the briefs.

 8            THE COURT:  So how does it play out if there's a

 9    reversal in favor of Neutra --

10            MS. O'NEIL:  If I may, Your Honor.

11            THE COURT:  -- of the order for relief?

12            MS. O'NEIL:  The issue on the appeal is not to send

13    the concept to arbitration of the involuntary petitions.

14            THE COURT:  Okay.

15            MS. O'NEIL:  It is that Mr. Terry was not a qualified

16    petitioner because he was bound by an arbitration, a binding

17    arbitration agreement, and that the issue that he -- by

18    proceeding with these involuntary petitions, he commenced a

19    suit, a proceeding that was, at its core, about fraudulent

20    transfers, and that that should have gone to arbitration.  And

21    to proceed and try to engage this Court's jurisdiction on

22    something that he had contractually agreed to go to

23    arbitration on was improper.

24        So, if Neutra wins on that argument, and I would encourage

25    the Court, we -- I think the briefs are in one of the

163

1   exhibits, but certainly I would provide them to the Court

2   before the Court makes a determination if it would help.  If

3   there -- if Neutra wins on that appeal, then our position

4   would be that yes, the bankruptcy is effectively void *ab*

5   *initio*, and that's what we believe the case law supports.

6        Where that would put the parties, potentially -- and

7   again, we're speculating what the Fifth Circuit may or may not

8   due to instruct this Court to do -- could reverse and render,

9   as it were, as Mr. Nelms testified happened to him previously,

10  but could instruct this Court to abstain, which I think was --

11  and that is one of the various motions and the orders that the

12  Court had denied.  All of these are wrapped up in the appeal,

13  Your Honor.  And in doing so, instruct the petitioner, Mr.

14  Terry, and Acis to go arbitrate the issue of the fraudulent

15  transfers.  That would reinstate Acis.  Acis could reinstate

16  Highland as the manager of the CLOs.

17        THE COURT:  So every single order in the Acis case

18  would be null and void?

19        MS. O'NEIL:  We believe that the case law is that it

20  would be void *ab initio*.  And now, Your Honor, practically

21  speaking, --

22        THE COURT:  Void *ab initio*?  Okay.  That could only

23  -- is that hinged to a subject matter jurisdiction, lack of

24  subject matter jurisdiction --

25        MS. O'NEIL:  Partially, that's part of the argument.

164

1          THE COURT:  -- theory?

2          MS. O'NEIL:  That's part of the argument.  Yes, Your

3    Honor.

4          THE COURT:  Okay.

5          MS. O'NEIL:  Practically speaking, it is our belief,

6    although it is not clear, is what I've tried to kind of convey

7    to the Court, and in conjunction with this conversation I was

8    trying to have with Mr. Terry's counsel/Acis's counsel, is

9    that we believe Mr. Terry has been paid down.  Practically

10   speaking, if that happens and he's only left with a claim or

11   currently has a claim of $4 million, $4-1/2 million, which is

12   what we think it is, or it's somewhere in that neighborhood,

13   that -- and there's sufficient cash in Acis to pay that claim

14   off -- it is a claim Judge -- Mr. Nelms testified to the fact

15   that it would need to be paid -- then there may not even need

16   to be a fraudulent transfer lawsuit because the claim would --

17   what's left of the claim would just be paid off.  And then

18   Acis -- Neutra would be back in ownership of Acis, Acis would

19   engage Highland to come back in and do what it was doing

20   before, Mr. Terry got his claim paid off, and there we are.

21          THE COURT:  Okay.

22          MR. DEMO:  That's honestly pretty much it, Your

23   Honor.  And we think that -- and the Board thinks that the

24   benefit of pursuing that is worth it, quite honestly.  And

25   they think, in their business judgment, that it's worth paying

165

1     those Neutra fees -- which again, are a portion of the

2     $500,000, only a portion -- because that benefit accrues to

3     the estate, or could accrue to the estate in a situation

4     where, in their business judgment, it's worth going forward on

5     this.

6             THE COURT:  Okay.  The appeal -- okay.  Let me make

7     sure I heard this correctly.  The appeal of the confirmation

8     order, whereas we have Neutra only on the appeal --

9             MR. DEMO:  Correct.

10            THE COURT:  -- of the order for relief, the appeal of

11    the confirmation order is Highland, Neutra, and HCLOF.

12            MR. DEMO:  Correct.

13            THE COURT:  And King & Spalding still represents

14    HCLOF in connection with that appeal.

15            MR. DEMO:  Correct.  And they're the only law firm

16    representing HCLOF in that appeal.

17            THE COURT:  So here's what I'm struggling with.  You

18    know, what initially seemed like kind of a compelling argument

19    -- all the briefing has been done, oral argument is set in

20    March -- it feels like to me the main beneficiaries of a

21    reversal of that confirmation order are HCLOF and Neutra.

22    Foley can represent Neutra.  Neutra can pay.  King & Spalding

23    can represent HCLOF.  HCLOF can pay.  And that seems like the

24    reasonable scenario to me.

25            MR. DEMO:  And I hear that.  But I think -- and I

166

 1    think Mr. Nelms --

 2            THE COURT:  Because let's --

 3            MR. DEMO:  -- testified to it, but --

 4            THE COURT:  Work with me.  Let's say they don't

 5    reverse the order for relief --

 6            MR. DEMO:  Okay.

 7            THE COURT:  -- but they do reverse the confirmation

 8    order.

 9            MR. DEMO:  Okay.

10            THE COURT:  So, Chapter 11 Trustee is in place

11    representing Highland, and he can -- I'm sorry -- he is the

12    spokesperson for the Acis, the controller of the Acis estate.

13    He might go forward with plan number four, five, whatever it

14    would be.

15            MR. DEMO:  Okay.

16            THE COURT:  Or say, I think it's time to convert this

17    to 7.  I mean I'm just trying to figure out --

18            MR. DEMO:  And I guess I do want to go back to one

19    thing, --

20            THE COURT:  Uh-huh.

21            MR. DEMO:  -- because I do not think there is another

22    economic beneficiary that would pay Neutra's fees.  I think if

23    the Debtor is not allowed to pay Neutra's fees, nobody will

24    pay Neutra's fees, and that portion of the appellate argument

25    will fall by the wayside.  Because --

1          THE COURT:  So Neutra loses, but I don't see how

2    Highland loses.  You have not painted a scenario where it's

3    clear to me there's any economic benefit to the estate.

4          MR. DEMO:  I would, I would, with all --

5          THE COURT:  And you're telling me, Defer to the

6    Board's business judgment.  But I'm --

7          MR. DEMO:  Well, I --

8          THE COURT:  I'm concerned that the evidence hasn't

9    shown me --

10          MR. DEMO:  I would also ask, Your Honor, --

11          THE COURT:  -- all of the --

12          MR. DEMO:  -- in all --

13          THE COURT:  -- scenarios that lead to their

14    reasonable business judgment on this.

15          MR. DEMO:  As Ms. O'Neil just said, I mean, this is

16    above the Fifth -- to the Fifth Circuit.  The Fifth Circuit is

17    set to hear this in six weeks.  And if the Fifth Circuit rules

18    the way that Ms. O'Neil just said, I do think, and I think the

19    Board thinks -- actually, I know the Board thinks -- that

20    there is a tangible benefit to the estate here.  And so I know

21    that I'm asking you to defer to their judgment, --

22          THE COURT:  All I heard was --

23          MR. DEMO:  -- but I'm also asking just for --

24          THE COURT:  -- that they'd reinstate the sub-advisory

25    and shared services agreements.

168

1          MR. DEMO:  Which are --

2          THE COURT:  Which, by the way, Highland moved to

3     terminate, moved to compel rejection at one point during the

4     case, and then, when that didn't work, HCLOF started calling

5     for redemption.

6          MR. DEMO:  And it's not the --

7          THE COURT:  This is nuts for me --

8          MR. DEMO:  It's not -- it's not the -- Your Honor,

9     it's --

10         THE COURT:  Tell me why it's not nuts for me to think

11    --

12         MR. DEMO:  Because it's not the same Highland.

13         THE COURT:  -- that Highland would be thrilled to

14    have Acis back managing the CLOs and subcontracting with

15    Highland.  I mean, that --

16         MR. DEMO:  It's not, it's not the same Highland.  The

17    stuff that happened prior to the institution of the Board was

18    the stuff that happened prior to the institution of the Board.

19    There is new management of Highland.  That new management is

20    working very hard.  As you've seen, Your Honor, that new

21    management is willing to push back.  That new management, with

22    the DAF, which you've heard testimony of, that new management

23    is working to get that motion withdrawn.  That new management

24    is not going forward with Lynn Pinker because of actions that

25    it took that it thought subverted their control and their

169

 1   management of the Debtor.  The new management decided to drop

 2   an appeal that they did not think had any merit.

 3       It's not the same Debtor, Your Honor.  It is a board

 4   consisting of three highly-qualified people who are exercising

 5   their own judgment.  So all of that stuff that happened prior

 6   to January 9th, I don't want to say hey, it's a clear line in

 7   the sand, but it is.  Mr. Dondero is not in control of

 8   Highland Capital Management.

 9           THE COURT:  But he is in control of Neutra.

10           MR. DEMO:  He is the economic beneficiary of Neutra.

11   That is correct.  But Mr. Dondero did tell Mr. Nelms, as Mr.

12   Nelms testified, that he would reinstate those contracts.  And

13   I understand that.  But again, as you've seen, Mr. Nelms and

14   the Board have been able to push back, have been able to exert

15   control, to exert influence, and to exert management over an

16   institution that is very difficult to manage.

17       And I do think that deference to that is something that

18   should very much be considered, because it's very easy to

19   think of this as Old Highland, but this is New Highland, who

20   has done an independent, objective review of these claims, who

21   has sat with Ms. O'Neil, who has sat with Pachulski, who has

22   sat with Mr. Terry and Ms. Patel and talked about this stuff,

23   and still thinks that there is a benefit here to the estate,

24   and that spending the $500,000 to pursue that benefit, which

25   is not just a benefit to Highland but it's a benefit to

015759

 1   Highland other -- to Highland's other creditors, I guess, Your

 2   Honor, quite honestly, I would ask that you to defer to that

 3   new management, because it is not -- it is not Old Highland.

 4       All that stuff that people have talked about -- I mean,

 5   you've seen today in court, you've heard testimony about very

 6   qualified people working to stop that and working to put this

 7   estate into a position where it can reorganize, where it can

 8   come to agreements with its creditors, where it can work

 9   through this process, where it can come out the other side.

10       But if we take away that Board's ability to manage

11   litigation with one of their biggest creditors, whose

12   litigation claim keeps growing, all you're doing is

13   benefitting that one creditor, not to the detriment of Mr.

14   Dondero but to the detriment of the other creditors in this

15   case.

16       UBS has a claim.  Redeemer has a claim.  Meta-e has a

17   claim.  McKool's has a claim.  You can run through that whole

18   list.  And if you take away the Board's right to direct

19   litigation that is going directly to the Board's ability to

20   control runaway claims, to negotiate with creditors, and to

21   come up with an idea of how to split the pie, then, with all

22   respect, Your Honor, you are infringing on that Board's

23   business judgment and that Board's ability to reorganize this

24   case.

25       This case isn't just about --

171

```
 1              THE COURT:  It wouldn't be taking away.  And here is

 2    a nuance that -- I think it is perfectly reasonable, in case

 3    you don't know where I'm heading on this, for Foley to

 4    represent Highland in the Acis case, in that adversary

 5    proceeding, if it goes forward, because heck yeah, Highland

 6    has been sued for huge amounts of money.

 7              MR. DEMO:  Understood.

 8              THE COURT:  Their claim, that is many millions, has

 9    been objected to.  So, heck yeah, this estate needs good

10    representation of Highland in that case, where there are many

11    unresolved issues still in the Acis case.

12         But on the appeal, I am just still lost as to how there is

13    any chance in the world Highland benefits in those appeals.

14    Neutra, heck yeah.  Maybe they get their Acis back and can

15    instruct it to, you know, stop suing Highland or whatever.

16    Dondero controlling Neutra can do that.  Okay?  And HCLOF, it

17    doesn't want Acis to have anything to do anymore with managing

18    its equity piece of those CLOs.  Sure.  But how -- I mean,

19    you're telling me that there could be a scenario -- here's

20    what I'm hearing.  That there is a benefit in having all those

21    fraudulent transfer claims arbitrated, I guess, not litigated

22    in the Bankruptcy or District Court, and there's a benefit in

23    having all of the management agreements, portfolio management

24    agreements reinstated.  And I just, I don't see how that

25    happens anytime soon based on how I perceive a reversal of
```

172

1   orders on appeal happening.

2         MR. DEMO:  And I guess I don't know what else to say

3   on that point.  We do think there's a $12 million tangible

4   benefit to reinstating those contracts.  We think there's a

5   tangible benefit to allowing Neutra to go forward with its

6   appeal.  And again, there is nobody else who I think would pay

7   that freight besides the Debtor, because that benefit, we

8   believe, goes to the Debtor.

9         THE COURT:  How many years of life are there left on

10  the CLOs that Acis manages?

11        MR. DEMO:  I would have to check, Your Honor.  I

12  don't know off the top of my head.  I can ask.  But --

13        THE COURT:  I mean, you're saying $12 million.  I

14  mean, I don't --

15        MR. DEMO:  I, you know, --

16        THE COURT:  There's not a -- I'm just not sure where

17  that number is coming from.  I never heard direct evidence of

18  that.

19        MR. DEMO:  Okay.  Well, I guess, Your Honor, I mean,

20  again, I would just ask that you defer to the business

21  judgment of the Board and allow them to position this

22  litigation in a way that best enables them to deal with every

23  creditor's claim, and not just the claims of one creditor.

24  And if they cannot fight the claims of the creditor, then they

25  can't negotiate how that pot is going to be split in a fashion

173

1   that benefits everybody.

2       So I guess, Your Honor, I mean, I don't know what else to

3   say about the benefits of the Neutra appeal except that the

4   testimony, I think, speaks for itself.  But, you know, I --

5   and in terms of --

6           THE COURT:  Again, fight the claim of a creditor.

7   Foley can represent Highland in the adversary proceeding,

8   wherever that goes forward.

9           MR. DEMO:  Yeah.

10          THE COURT:  Probably District Court, not this Court.

11  At least some of it, if not all of it.  But anyway, I'm

12  digressing.  They can object to Acis's proof of claim.  They

13  can object to Terry's proof of claim.  I mean, --

14          MR. DEMO:  And conversely, Your Honor, if -- if --

15          THE COURT:  -- this has nothing to do with -- I mean,

16  I don't get the appeal.  I mean, I --

17          MR. DEMO:  Right.

18          THE COURT:  Neutra can appeal, HCLOF can appeal, but

19  I'm not seeing the benefit to Highland.

20          MR. DEMO:  And I guess the only thing I would say,

21  Your Honor, is if there is an improper benefit, we are not

22  saying that the fee applications are sacrosanct.  People can

23  challenge the improper benefit there.

24      And again, the settlement gave broad discretion to the

25  Committee to pursue insider claims.  So if an insider is

015763

174

1   receiving a benefit from this, the Committee has standing to

2   pursue that.

3       So it's not a null set, Your Honor, whereas cutting off

4   the appeal now does take away that possibility.

5           THE COURT:  How would I be cutting off the appeal?

6   I'm not cutting off the appeal.  King & Spalding can go in

7   there and fight hard.  Foley can go in there and fight hard

8   for Neutra.  So, --

9           MR. DEMO:  One second, Your Honor.

10      (Counsel confer.)

11          MR. DEMO:  And I guess, you know, Your Honor, and I

12  do want to reiterate that there is no other party with an

13  economic incentive to fight the Neutra appeal the way that the

14  Debtor has an economic incentive.

15          THE COURT:  That makes no sense to me.  HCLOF is the

16  one who hated this injunction.

17          MR. DEMO:  That's not the Neutra appeal, Your Honor.

18  That's the confirmation order.

19          THE COURT:  Well, okay.  Neutra gets its company back

20  if they win.

21          MR. DEMO:  And we would get our contracts back.

22          THE COURT:  And arguably, it can control Acis, maybe,

23  okay, and it can assign management contracts to whoever it

24  wants.  That just -- and it says it'll assign them to

25  Highland.  If you can trust Jim Dondero, then Highland's going

015764

175

1     to benefit if Neutra wins that appeal.  Right?

2              MR. DEMO:  Yes.  Yes, Your Honor.

3              THE COURT:  Okay.  So that --

4              MR. DEMO:  Highland would benefit greatly --

5              THE COURT:  Okay.

6              MR. DEMO:  -- if Neutra were to win that appeal.

7              THE COURT:  Okay.  Okay.  Well, but first Neutra

8     benefits, right?  And then --

9              MR. DEMO:  No.

10             THE COURT:  -- Highland only secondarily benefits --

11             MR. DEMO:  I -- I --

12             THE COURT:  -- if Jim Dondero keeps his word and

13    gives the management contracts back to Highland.

14             MR. DEMO:  Jim Dondero would also have to repay the

15    $8 million in claim, even if he didn't reinstate those

16    contracts.  And that $8 million would be hundred-cent dollars.

17             THE COURT:  Okay.

18             MR. DEMO:  So, worst case, --

19             THE COURT:  It would have been nice to have him

20    testify as to all of this.

21             MR. DEMO:  Worst --

22             THE COURT:  It would be more compelling if I had him.

23             MR. DEMO:  Well, --

24             THE COURT:  Okay?  But I don't think --

25             MR. DEMO:  -- I can only do so much, Your Honor.

176

 1          THE COURT:  -- that's going to happen anytime soon.

 2          MR. DEMO:  But I guess worst-case scenario is that

 3   it's $8 million in hundred-cent dollars.

 4          THE COURT:  Okay.

 5          MR. DEMO:  And that's not nothing for $500,000.  And

 6   only a portion of that $500,000.

 7          THE COURT:  Okay.

 8          MR. DEMO:  Thank you, Your Honor.

 9          THE COURT:  Okay.  Mr. Lamberson?

10          MR. LAMBERSON:  Your Honor, do you want a closing

11   from me?  Or no?

12          THE COURT:  I don't really need it.  Thank you.

13          MR. LAMBERSON:  Okay.

14          THE COURT:  Okay.

15          MR. LAMBERSON:  Because I know your hearing starts in

16   about two minutes.

17          THE COURT:  All right.  So, I just hate it that we

18   spent so much time on this.  I hate it that we spent so much

19   time, but, I mean, I understand.  I understand.  You know, I

20   think the employment application was filed pretty early in the

21   case, right, and -- October 29th.  And it was continued,

22   continued, continued, because we were getting objections from

23   the Committee, or they wanted time to look at it, I guess.

24   And now you're kind of up against the wire, right, because

25   oral arguments are set at the Fifth Circuit next month.  So I,

177

1   you know, I hate it that we were here, but I understand it.

2       But I'm concerned.  I'm concerned -- well, here's the

3   deal.  We have a great board, and I totally get that

4   Bankruptcy Courts should defer heavily to the reasonable

5   exercise of business judgment by a board.  And we've got great

6   professionals.  And we've got this case, I think, on a good

7   track as a general matter now.  But I'm concerned that Dondero

8   or certain in-house counsel has -- you know, they're smart,

9   they're persuasive -- that -- what are the words I want to

10  look for -- they have exercised their powers of persuasion or

11  whatever to make the Board and the professionals think that

12  there is some valid prospect of benefit to Highland with these

13  appeals, when it's really all about Neutra, HCLOF, and Mr.

14  Dondero.  That's what I believe.

15      I mean, this is awkward, right, because you want to defer

16  to the debtor-in-possession, but I have this long history, and

17  I can think through the scenarios.  If this is reversed, here

18  is how it will play out.  If this is reversed, here is how it

19  might play out.  And I know, you know, there are multiple ways

20  it might play out, but I cannot believe there is a chance in

21  the world there is economic benefit to Highland if these

22  things get reversed.  Economic benefit to Neutra:  Yeah,

23  maybe.  Economic benefit to HCLOF:  Well, they'll get what

24  they want.  You know, whether it's an economic benefit, I

25  don't know.  But benefit to Highland?  I just don't think the

Case 19-34054-sgj11   Doc 3596-24   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 62-24   Filed 07/09/25   Page 89 of 1052   PageID 16767

178

1   evidence has been there to convince me it's reasonable

2   business judgment for Highland to pay the legal fees

3   associated with the appeal.

4        And even more concerning to me is a valid point was made

5   that Highland is in bankruptcy because of litigation,

6   litigation, litigation.  The past officers and directors and

7   controls' propensity to fight about everything.  This isn't a

8   balance sheet restructuring, okay?  It's not a Chapter 11

9   caused by operational problems or revenue disruption or who

10  knows what kind of disruption.  It's about years of litigation

11  finally coming home to roost.  And this just appears to be

12  more of the same, potentially.

13       Okay.  Parties have a right to appeal.  I respect that.

14  Neutra, go for it.  HCLOF, go for it.  But this estate and its

15  creditors should not bear the burden of having Highland pay

16  for that, when, again, I don't think there's any evidence to

17  suggest they could benefit at the end of the day.

18       So what I'm going to do is I'm going to approve the

19  retention of Foley to represent Highland in the Acis case.  We

20  all know the adversary is stayed right now.  It may or may not

21  ever be un-stayed, depending on what strategies people want to

22  pursue.  But Highland, I think a meritorious case has been

23  presented, and under 327(e) I will approve Foley representing

24  Highland in all Acis matters.  Okay?  The Acis bankruptcy

25  case.  The adversary proceeding, if it goes forward.  And so

Case 19-34054-sgj11   Doc 3596-24   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 58-124   Filed 08/06/25   Page 90 of 1052   PageID 16768
Exhibit 24   Page 180 of 189

179

1   that's my ruling.

2       I will additionally rule, for the avoidance of doubt, that

3   if Foley wants to represent Neutra in the appeals and get paid

4   by Neutra, I don't have any problem with that.  In other

5   words, I'm not going to find something like there's a conflict

6   with the estate, you know, because of its simultaneous

7   representation of Neutra.  That's fine.  But I'm not going to

8   approve Highland paying anything in connection with either of

9   those appeals.  So that is the ruling of the Court.

10       Have I left any gaps here?

11           MR. DEMO:  Your Honor, just one clarification.

12           THE COURT:  Uh-huh.

13           MR. DEMO:  Foley is representing Highland Capital

14  Management in the appeal of the confirmation order to the

15  Fifth Circuit.  I just want to clarify that your ruling that

16  Highland can represent -- I'm sorry -- Foley can represent

17  Highland in all Acis matters extends to their representation

18  of Highland Capital Management in the appeal of the

19  confirmation order that's set for March 30th.

20           THE COURT:  Okay.  Let me think through that.

21           MR. DEMO:  And again, Your Honor, there's been no

22  objection to that.

23           THE COURT:  King & Spalding is in there representing

24  HCLOF.  Foley would be representing both Neutra and Highland

25  in connection with the confirmation order?

180

1            MR. DEMO:  Technically, but Neutra really has

2    nothing.  It's a coattail party in that case.  Highland

3    Capital Management, to the extent that they could bifurcate

4    Neutra, it would still be doing the exact same work.  So if

5    there is an issue there with the representation of Neutra,

6    we'd still ask that Foley be allowed to represent Highland

7    Capital Management in that appeal.

8            THE COURT:  Okay.  So you're telling me Neutra

9    doesn't really benefit from that appeal, so you want Highland

10   to pay all of the fees of Foley in connection with the

11   confirmation order appeal?

12           MR. DEMO:  All I'm asking, Your Honor, is that Foley

13   can represent Highland Capital Management in that appeal.  And

14   again, there's been no objection to that.  What happens with

15   Neutra, I, you know, I understand your position.  I am simply

16   asking for a clarification that Foley can continue

17   representing the Debtor in the Debtor's appeal of the

18   confirmation order.

19           THE COURT:  All right.  I will say yes to that, but

20   they need to be prepared to have their fees split.  I'm not

21   saying 50/50, I don't know what the percentage is, but they

22   are going to be allocated between Neutra and Highland, and

23   they should not expect to get a hundred percent of those

24   covered by Highland at the end of the day.  Okay?  There's

25   going to be a deep dive into looking at how that allocation

015770

181

```
 1   should work, okay?

 2           MR. DEMO:  And they will be filing fee apps,

 3   obviously, on all of the matters that they are --

 4           THE COURT:  Okay.  Anything else?

 5           MR. POMERANTZ:  One moment, Your Honor.

 6           THE COURT:  Okay.

 7      (Pause.)

 8           MR. DEMO:  Yeah.  And Your Honor, I do just want to

 9   clarify that when we talk about the involuntary petition

10   appeal, that when we talk about its effect on the fraudulent

11   conveyance action, to the extent that -- and I would like to

12   clarify your position on this, Your Honor.  Is your position

13   that the appeal of the involuntary, if successful, would have

14   no impact on the fraudulent conveyance actions in the Acis

15   litigation?

16      Because I do think that it is clear that --

17           THE COURT:  I think we don't know.  We would have to

18   see --

19           MR. DEMO:  And I guess that's -- that's --

20           THE COURT:  -- what the Fifth Circuit states.

21           MR. DEMO:  And my --

22           THE COURT:  And it may be:  Bankruptcy Court, stay

23   the proceedings and defer, send it to arbitration.  "It" being

24   re-litigation of --

25           MR. DEMO:  Understood.
```

182

1           THE COURT:  -- the involuntary.

2           MR. DEMO:  And --

3           THE COURT:  That may be, to me, a likely scenario,

4   but maybe not.

5           MR. DEMO:  And -- and --

6           THE COURT:  Maybe they'll say something else.

7           MR. DEMO:  Understood.  And I think we're honestly on

8   the same page with that.

9           THE COURT:  Uh-huh.

10          MR. DEMO:  Because to the extent that it does put it

11  into arbitration, to the extent that there is that

12  possibility, that it changes the color of those fraudulent

13  conveyance claims, changes the color of Acis's $300 million

14  proof of claim, which goes to settlement strategy, which goes

15  to the benefits to other creditors, which goes to a whole

16  panoply of other things that tie into a benefit to the estate.

17  And I don't want to re-argue what we've already argued, but I

18  think, as Your Honor said, that chance that there is going to

19  be a change to the fraudulent conveyance, either because it

20  throws them into an arbitration or because it somehow

21  otherwise colors it, is, in and of itself, a substantial

22  benefit to the estate -- leaving aside the dollars from the

23  contracts, leaving aside the $8 million proof of claim --

24  because that benefit goes to, again, that $300 million proof

25  of claim that Acis has filed, which impacts the estate, which

183

 1   impacts other creditors, and which impacts the settlement

 2   mechanics in this case.

 3       So to the extent that there is a chance that the

 4   involuntary changes that and recolors it, there is a

 5   substantial benefit to the estate in that, because it allows

 6   the estate to work with creditors --

 7           THE COURT:  I mean, --

 8           MR. DEMO:  -- to figure out a way to settle claims in

 9   a way that are --

10           THE COURT:  I get what you're saying, but guess what?

11   You can object to that $300 million proof of claim.  And we

12   might have a very interesting conversation about --

13           MR. DEMO:  What --

14           THE COURT:  Well, it's the same judge either way, but

15   -- well, I guess I don't get what you're saying.  You have the

16   ability to object to the proof of claim whether there's

17   affirmance or --

18           MR. DEMO:  Yeah.  But --

19           THE COURT:  -- reversal, right?  I'm just --

20           MR. DEMO:  We don't have a -- you know, we may not

21   have to get -- I'm sorry, Your Honor, and I'll stop it -- but

22   we may not have to get there.  Objecting to the proof of claim

23   is quali... it is quantitatively and qualitatively different

24   than a Fifth Circuit order saying that there are changes to

25   the fraudulent conveyance, there are changes to the

184

 1    distribution of equity under the plan.  Maybe there is no plan
 2    -- or maybe there is no bankruptcy at all.
 3       Those things fundamentally change the dynamics of this
 4    case in a way that's good for the estate.  And those things
 5    can only happen if there's an order from the Fifth Circuit
 6    entering that.  We can object all down the pipe, and we are
 7    going to object, Your Honor, and I assume other people will
 8    object as well.  But our objecting does not have the same
 9    benefit to the estate as a Fifth Circuit opinion saying,
10    Fraudulent conveyance claims go to arbitration; saying, There
11    is no involuntary petition.
12       Now, I understand that there are questions as to the
13    probability of those things, but the fact that there is a
14    probability of those things happening and the cost to the
15    estate is a hundred thousand dollars, I understand what Your
16    Honor has said and I don't want to overstay my welcome, but I
17    do think we are -- at least maybe I am presenting it wrong --
18    but that Fifth Circuit order either way is going to calcify
19    and solidify this in ways that are beneficial to the estate
20    and beneficial to how this bankruptcy is going to progress.
21          THE COURT:  Okay.  I understand you feel passionately
22    about that, but just so you know, for future purposes or not,
23    I'm not there because, you know, among other things, we -- you
24    know, life has changed.  You know, if the Fifth Circuit says
25    reversal, not a darn thing should happen in a bankruptcy case

1   of Acis, you know, it can all go to arbitration, well, that's

2   the Acis litigation, right?  But Acis has filed a proof of

3   claim now.  And are you going to tell me the Fifth Circuit is

4   going to say the arbitration that should have happened in the

5   earlier Acis case trumps, if you will, adjudication of a proof

6   of claim now in a new case?

7           MR. DEMO:  And the claims are --

8           THE COURT:  I mean, I'm just -- someone mentioned

9   *Gandy* and *National Gypsum*, and there's even a more recent

10  Fifth Circuit case dealing with arbitration which --

11          MR. DEMO:  The claims, Your Honor, are state law

12  claims if there's no bankruptcy, and I think --

13          THE COURT:  But there is a bankruptcy.  There's a

14  Highland bankruptcy now.  And there's a proof of claim --

15          MR. DEMO:  Not if the Fifth Circuit --

16          THE COURT:  -- in the Highland case.

17          MR. DEMO:  -- overturns the involuntary petition.

18          THE COURT:  Yeah.  I just -- okay.  We're just, we're

19  having academic conversations, and I'm probably guilty for

20  going down this trail.  So, anyway, is there anything further,

21  then?

22          MR. LAMBERSON:  No, Your Honor.

23          THE COURT:  I need a few orders.

24          MR. LAMBERSON:  If they want to prepare an order and

25  send it to us, we're happy to look --

186

1          THE COURT:  Okay.  Thank you all.

2       (Proceedings concluded at 1:44 p.m.)

3                      --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                   CERTIFICATE

21     I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22   above-entitled matter.

23   **/s/ Kathy Rehling**                    **02/20/2020**

24   _____        _____

   Kathy Rehling, CETD-444                      Date
25   Certified Electronic Court Transcriber

App. 03214

187

```
                              INDEX

PROCEEDINGS                                              4

WITNESSES

Debtors' Witnesses

Russell F. Nelms
- Direct Examination by Mr. Morris                     57
- Cross-Examination by Mr. Lamberson                   80
- Redirect Examination by Mr. Morris                  109

Holland O'Neil
- Direct Testimony via Declaration                    115
- Cross-Examination by Ms. Patel                      115
- Redirect Examination by Mr. Morris                  147

EXHIBITS

Debtor's Exhibits                       Identified Received

1 through 9                                 57        57

Acis Capital Management GP's Exhibits   Identified Received

16   Top 20 List of Creditors               99       100
27   DAF Lawsuit                            104       105

RULINGS

Motion to Compromise Controversy with Official Committee   8
of Unsecured Creditors filed by Debtor Highland Capital
Management, L.P. (carryover issues) (281) - Revised
Operating Protocols to be Submitted

Lynn Pinker Retention Application - Withdrawn              8

Foreign Representative Motion - Order Signed             10

Motion to Extend Exclusivity Period filed by Debtor      11
Highland Capital Management, L.P. (395)- Order Signed

Debtor's Motion for an Order (i) Establishing Bar Dates  13
for Filing Claims, Including 503(b)(9) Claims; and (ii)
Approving the Form and Manner of Notice Thereof (421) -
Agreed Order to be Uploaded
```

Appx. 03215
015777

188

```
 1                            INDEX
                             Page 2
 2
     RULINGS, cont'd.
 3
     Motion for Relief from Stay by Creditor PensionDanmark     14
 4   (218) - Continued to March 11, 2020

 5   Status Conference Re: Motion of the Debtor for the Entry   28
     of an Order Concerning the "Sealing Motion" and for a
 6   Conference Concerning the Substance, Scope, and Intent
     of Certain Recent Rulings (397)
 7
     Motion to Employ/Retain Foley Gardere, Foley & Lardner    176
 8   LLP as Special Texas Counsel filed by Highland Capital
     Management, L.P. (68)
 9
     END OF PROCEEDINGS                                        186
10
     INDEX                                                187-188
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 25

Appx. 03217
015779

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

IN RE:                    .    Case No. 19-34054-11(SGJ)
                          .
HIGHLAND CAPITAL          .    Earle Cabell Federal Building
MANAGEMENT, L.P.,         .    1100 Commerce Street
                          .    Dallas, TX  75242-1496
                          .
          Debtor.         .    March 4, 2020
. . . . . . . . . . . . . ..    1:31 p.m.


 TRANSCRIPT OF HEARING ON MOTION OF THE DEBTOR FOR ENTRY OF AN
  ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE
         DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES"
           BEFORE HONORABLE STACEY G. JERNIGAN
           UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For Highland Capital      Pachulski Stang Ziehl & Jones, LLP
Management:               By:  JEFF POMERANTZ, ESQ.
                               GREG DEMO, ESQ.
                          10100 Santa Monica Blvd., 13th Floor
                          Los Angeles, CA 90067


                          Hayward & Associates PLLC
                          By:  MELISSA HAYWARD, ESQ.
                               ZACHARY ANNABLE, ESQ.
                          10501 N. Central Expry, Ste. 106
                          Dallas, TX 75231




Audio Operator:           Michael F. Edmond

 Proceedings recorded by electronic sound recording, transcript
             produced by a transcript service.

_____

               **J&J COURT TRANSCRIBERS, INC.**
                   **268 Evergreen Avenue**
               **Hamilton, New Jersey 08619**
               **E-mail:  jjcourt@jjcourt.com**

       **(609) 586-2311     Fax No. (609) 587-3599**

Appx. 03218
015780

2

APPEARANCES (Cont'd):

```
For Acis Capital           Winstead, P.C.
Capital Management:        By:  RAKHEE V. PATEL, ESQ.
                           2728 N. Harwood Street, Suite 500
                           Dallas, TX  75201

                           Rogge Dunn Group, PC
                           By:  BRIAN SHAW, ESQ.
                           500 N. Akard St., Suite 1900
                           Dallas, TX 75201

For Official Committee     Sidley Austin LLP
of Unsecured Creditors:    By:  MATT CLEMENTE, ESQ.
                                DENNIS TWOMEY, ESQ.
                           One South Dearborn
                           Chicago, IL 60603

                           Sidley Austin LLP
                           By:  PENNY REID, ESQ.
                           2021 McKinney Avenue, Suite 2000
                           Dallas, TX 75201

For CalPERS:               Singer & Levick, P.C.
                           By:  MICHELLE SHRIRO, ESQ.
                           16200 Addison Road, Suite 140
                           Addison, TX 75001

For James Dondero:         Lynn, Pinker, Cox & Hurst, LLP
                           By:  MICHAEL LYNN, ESQ.
                                JOHN BOND, ESQ.
                           2100 Ross Avenue, Suite 2700
                           Dallas, Texas 75201

For Redeemer Committee:    Frost Brown Todd LLC
                           By:  MARK PLATT, ESQ.
                           100 Crescent Court, Suite 350
                           Dallas, TX 75201


For Issuers Group:         Jones Walker LLP
                           By:  AMY ANDERSON, ESQ.
                           811 Main Street, Suite 2900
                           Houston, TX 77002
```

**WWW.JJCOURT.COM**

Appx. 03219
015781

3

```
APPEARANCES (Cont'd):

TELEPHONIC APPEARANCES:

For CalPERS:            Nixon Peabody, P.C.
                        By:  LOUIS CISZ, ESQ.
                        One Embarcadero Center, 32nd Floor
                        San Francisco, CA 94111

                              - - -
```

Appx 03329

015782

4

**INDEX**

| WITNESSES | PAGE |
|---|---|
| **JAMES P. SEERY, JR.** | |
| Direct Examination by Ms. Hayward | 60 |
| Cross-examination by Ms. Reid | 84 |
| Cross-examination by Ms. Patel | 97 |
| Examination by the Court | 103 |
| | |
| Closing argument by Mr. Pomerantz | 110 |
| Closing argument by Mr. Clemente | 113 |

| EXHIBITS | | ID | EVID |
|---|---|---|---|
| **FOR THE DEBTOR:** | | | |
| 1 | Chart of Dynamic Income Fund structure | | 83 |
| 2 | Partnership agreement for Dynamic Income Fund | | 83 |
| 3 | Chart of Latin America Argentina Fund | | 83 |
| 4 | Partnership agreement for Argentina Fund | | 83 |
| 5 | Chart Fund | | 83 |
| 6 | Limited partnership agreement | | 83 |
| 7 | Order re ordinary course governance procedures | | 83 |
| 8 | Final term sheet | | 83 |
| 9 | Notice of amended operating protocols | | 83 |
| | CVs of Board members | | 83 |

Appx. 9321
015783

5

1          THE COURT:  -- set a motion of the debtor for entry

2   of an order authorizing but not directing the debtor to cause

3   distributions to certain related entities.

4          Let's get lawyer appearances in the courtroom.

5          MR. POMERANTZ:  Good afternoon, Your Honor.  Jeff

6   Pomerantz and Greg Demo, Pachulski Stang Ziehl & Jones, on

7   behalf of the debtors.

8          THE COURT:  Thank you.

9          MS. HAYWARD:  Good afternoon, Your Honor.  Melissa

10  Hayward and Zachary Annable of Hayward & Associates on behalf

11  of the debtor.

12          THE COURT:  Thank you.

13          MR. CLEMENTE:  Good afternoon, Your Honor.  Matthew

14  Clemente, Dennis Twomey, and Penny Reid from Sidley Austin on

15  behalf of the Official Committee of Unsecured Creditors.

16          THE COURT:  Thank you.

17          MS. SHRIRO:  Good afternoon, Your Honor.  Michelle

18  Shriro on behalf of CalPERS.  And I also have my co-counsel

19  Louis Cisz from Nixon Peabody, and he is -- he should be on the

20  line.

21          THE COURT:  Okay.  Thank you.

22          MR. LYNN:  Good afternoon, Your Honor.  Michel Lynn

23  and John Bonds for James Dundero.

24          THE COURT:  Okay.  Thank you.

25          MS. PATEL:  Good afternoon, Your Honor.  Rakhee

**WWW.JJCOURT.COM**

015784

6

1  Patel, Winstead PC, on behalf of Acis Capital Management, LP,

2  and Acis Capital Management, GP, LLC.  Also, I have my co-

3  counsel Mr. Brian Shaw of the Rogge Dunn Firm on behalf of the

4  same clients.

5          THE COURT:  Thank you.

6          MR. PLATT:  Good afternoon, Your Honor.  Mark Platt

7  firm Frost Brown Todd on behalf of the Redeemer Committee of

8  the Highland Crusader Fund.  And I believe Terry Mascherin is

9  on the phone, as well --

10          THE COURT:  All right.

11          MR. PLATT:  -- from Jenner & Block.

12          THE COURT:  Thank you.

13          MS. ANDERSON:  Good afternoon, Your Honor.  Amy

14  Anderson with Jones Walker on behalf of the Issuers.  I believe

15  Mr. James Bentley with Schulte Roth is also on the phone on

16  behalf of the same parties.

17          THE COURT:  Okay.  Thank you.

18          All right.  We do have a large number of people on

19  the phone.  I'm just going to go through the live lines and

20  take roll.  Asif Attarwalla for UBS, are you there?

21          MR. ATTARWALLA:  Here.  Yes, Your Honor.

22          THE COURT:  All right.  James Bentley?

23          MR. BENTLEY:  Yes, Your Honor.  I'm here.

24          THE COURT:  Okay.  Also Jeff Bjork from Latham?

25  Yes/no?

**WWW.JJCOURT.COM**

7

1              (No response)

2         THE COURT:  All right.  Earnestiena Cheng for FTI?

3         MS. CHENG:  Yes, Your Honor.

4         THE COURT:  Okay, thank you.  And Louis Cisz, I think

5    we heard he was CalPERS co-counsel.  Are you there?

6         MR. CISZ:  Yes, I am, Your Honor.

7         THE COURT:  All right.  Thank you.  Kimberly Gianis

8    for Contrarian?  Yes/no?

9              (No response)

10        THE COURT:  All right.  Terry Mascherin, I think we

11   heard he was there for the Redeemer Committee.

12        MR. MASCHERIN:  Yes, Your Honor.

13        THE COURT:  Okay.  I'll just ask anyone else on the

14   phone who wishes to appear, go ahead at this time.

15              (No response)

16        THE COURT:  All right.  That may be it.

17        All right.  Mr. Pomerantz, I see a 20-minute time

18   estimate on our calendar.  I'm not sure where that came from,

19   but that --

20        MR. POMERANTZ:  I think that's quite aggressive.

21        THE COURT:  Okay.

22        MR. POMERANTZ:  Good afternoon again, Your Honor.

23   Jeff Pomerantz, Pachulski Stang Ziehl & Jones.  First, I want

24   to thank Your Honor for scheduling the hearing on shortened

25   time.  I would also like to introduce once again the three

Appx. 03324
015786

8

1  members of the independent board who have been appointed

2  pursuant to the settlement, Your Honor, that Your Honor

3  approved on January 9th.  That's James Seery, John Dubel, and

4  Russell Nelms.

5          THE COURT:  Okay.  Hello.

6          MR. POMERANTZ:  I thought it might be helpful, Your

7  Honor, to provide Your Honor with a brief background of each

8  board member, how they have been approaching their duties as

9  independent directors, and what the focus has been the first

10  two months of the case.  And then I will go into the background

11  of this present motion.

12          THE COURT:  Okay.

13          MR. POMERANTZ:  James Seery will be the debtor's

14  witness at today's hearing, and he's a 30-year restructuring

15  lawyer with extensive experience with high-yield and distressed

16  investing both as a principal and manager which is precisely

17  the business in which the debtors operate.  He is an attorney

18  licensed to practice in New York who has passed and held the

19  Series 7, 63, 79, SIE and Series 24 FINRA principal

20  designations.

21          From April 2012 to 2017, he was the president and

22  senior investing manager of RiverBirch Capital.  And RiverBirch

23  is an SEC-registered investment advisor managing a $1.3 billion

24  global long short fund that focused on high yield loans, bonds,

25  CLOs, and distressed investments.  Prior to that, Mr. Seery

Appx. 03325

015787

9

1  spent ten years as a senior high yield manager at Lehman

2  Brothers, and he was the global head of Lehman Brothers fixed-

3  income loan business.

4          Accordingly, Mr. Seery brings to his role as an

5  independent director a unique combination of a legal

6  background, restructuring experience, and a deep knowledge of

7  the highly regulated business in which the debtor operates.

8          Mr. Dubel brings 35 years' practice in the

9  restructuring area.  His experience includes turnaround

10 management, crisis management, operational restructurings, and

11 corporate acquisitions and divestitures.  He's worked at both

12 sides of the table, both on the company side and other side.

13 And he brings a unique perspective to each situation, and he

14 spent the last ten years being an independent director for a

15 wide range of distressed companies including Purdue Pharma

16 which obviously is the newest in current Chapter 11, WMC

17 Mortgage, Wartaco (phonetic), FXI, and ResCap.

18         And as an independent board member, he's plated a

19 principle role in overseeing management, negotiating with

20 creditors, supervising and investigating resolution, either

21 consensually or through litigation of insider and affiliate

22 claims, and also spearheading reorganization efforts.

23         I'm sure Your Honor is familiar with Russell Nelms

24 but briefly he was a distinguished bankruptcy litigator with

25 Carrington Coleman for 20 years which followed a stint of six

**WWW.JJCOURT.COM**

Appx. 03326

015788

10

1  years as a United States Army judge advocate, and also he sat

2  with the bankruptcy court here in Fort Worth from 2004 to 2018.

3          Your Honor, these individuals bring a complementary

4  skill set to the independent board that have made them uniquely

5  qualified to manage the debtor's restructuring efforts in this

6  case, that bring a combination of sophisticated asset

7  management experience, financial restructuring, a legal

8  insolvency background, and judicial experience.  They've been

9  involved in many cases on all sides of the aisle, whether it's

10 been alleged wrongdoing or questionable conduct with people

11 they've ever had to supervise as a board member, advise as a

12 restructuring lawyer, work with as a financial advisor, or

13 administer their cases as a judge.

14         Mr. Seery and Dubel were selected by the Committee

15 not only because of their relevant expertise but because of

16 their commitment to independence and ability to stand up to

17 strong personalities that exist on all sides of this case.  Mr.

18 Nelms, while originally identified by the debtor, was scheduled

19 by the Committee, and was ultimately chosen to be the third

20 board member by Mr. Seery and Dubel from a group of highly-

21 qualified candidates.

22         Your Honor, I provide this background to stress that

23 the independent board consists of individuals whose background

24 and experience speak to their independence, experience, and

25 strength, and who take their job seriously to do what they

Appx. 03325

015789

11

1  believe is right for this debtor, and they're not bring

2  influenced by any party in this case, be that the debtor, Jim

3  Dondero, members of the management committee, members of the

4  debtor's management, or the creditors' committee.  The

5  reputations of each of these gentlemen at are stake in a case

6  like this, and they take their attendance very seriously.

7         Upon taking over on January 9th, 2020, the board

8  quickly made a few observations about the current circumstances

9  that have guided their actions today.  First, the board

10  understood that the debtor was where it was in part due to many

11  years of intense litigation arising out of sometimes aggressive

12  management decisions or failure to settle certain employee

13  disputes and that the litigation led to cost and diversion of

14  time and energy for what the debtor did best which was manage

15  assets.

16         The board concluded that for case to succeed, the

17  board would have to chance the culture from one of litigation

18  to reconciliation and consensus building.  It doesn't mean that

19  the debtor will back down from defending itself from claims

20  that it doesn't believe are legitimate but rather the

21  litigation that the company under their watch would be involved

22  in would need to be carefully vetted by the independent board,

23  outside advisors, and the results of which would guide the

24  board's conduct.

25         The board's focus has and continues to be operating

**WWW.JJCOURT.COM**

Appx. 02328
015790

12

1 the debtor's business in accordance with its obligations of

2 their debtor in possession in conformance with its statutory,

3 contractual, and fiduciary obligations as an investment

4 advisor. By scrupulously meeting its obligations as an

5 investment advisor, the debtor will continue to enhance the

6 asset management business and avoid the litigation that

7 contributed to this case.

8         Second, the board understood the relationship between

9 the debtor's largest creditors and senior management had

10 materially deteriorated and that there was severe lack of trust

11 that creditors had with respect to management. The board

12 initially determined, has determined to continue retaining the

13 services of senior management because it believes that their

14 historical background and deep knowledge of the debtor's assets

15 provide material value to the estate. However, the board's

16 decisions thus far have and will continue to be based upon

17 their independent review of the facts and circumstances and

18 based upon consultation with outside advisors as appropriate.

19         Third, the board believe that a lengthy stay in

20 Chapter 11 only would serve to erode asset value while at the

21 same time leading to extensive restructuring costs. The Court

22 and the board developed a timeline that will hopefully lead to

23 a confirmed plan at the end of the year.

24         Against this backdrop, the board is focused on the

25 following things the first two months of the case. Initially,

WWW.JJCOURT.COM

Appx. 03329
015791

13

1  the board met with all department heads and other members of

2  senior management including Mr. Dondero and let them know that

3  the board was now in charge and that all business decisions

4  needed to be run by the board subject to the board delegating

5  authority as it deemed appropriate.

6         The board has had several calls with the committee

7  and its professionals to discuss among other things the board's

8  initial determination as to staffing levels and employee

9  compensation, time-sensitive transactions that needed the

10 committee's input under the Court's approved operating

11 protocols, and the proposed timeline for achieving

12 restructuring.  There is an in-person meeting scheduled next

13 week in New York City between all the committee members and

14 their professionals and the debtor and their professionals.

15        Members of the board have also reached out to

16 individual committee members and have had or will have meetings

17 with them to understand their specific concerns with the debtor

18 and to importantly have a dialogue about the claims they have

19 against the debtor, as resolving the claims against the debtor

20 is a key part of achieving a consensual restructuring in this

21 case.

22        The debtor's asset basis is also extremely complex,

23 and the board has worked hard to get a grasp on how best to

24 maximize their value.  The board has analyzed the debtor's

25 liquidity needs and worked with the debtor's chief

Appx. 02330

015792

14

1   restructuring officer to develop a 13-week cash flow and

2   otherwise address how to enhance liquidity.  The board has also

3   conducted a thorough review of the debtor's employee basis,

4   including performance reviews and address ongoing staffing and

5   compensation in a manner that the board believes will sustain

6   the debtor's business operations and maximize value.

7          Related to the motion before the Court, the board has

8   evaluated the status of certain funds which were in the process

9   of being wound down at the commencement of the case and has

10  supervised their wind-down in a manner consistent with the

11  debtors' fiduciary, statutory, contractual liabilities.  The

12  board has also commissioned outside counsel to provide an

13  independent analysis of the significant litigation claims that

14  are facing the debtor.  And as I mentioned, the board

15  anticipates engaging with these creditors to seek a resolution.

16         The board is acutely aware that resolving

17  consensually claims of creditors and claims the estate has

18  against third parties is the only way to restructure this

19  debtor efficiently and economically.  I'll now turn Your Honor

20  to the background with respect to the motion, explain the

21  relief requested, and address the two objections that are

22  before the Court.

23         Your Honor will hear testimony from Mr. Seery that

24  the debtor is the asset manager of two hedge funds, Dynamic and

25  ARF, that are in liquidation because of redemption requests

Appx. 02331
015793

15

1  from large non-affiliated investors that render the funds

2  economically not viable.  The term of the third fund, which is

3  a private equity fund, Restoration Capital expired, and the

4  governing board comprised of large institutional pension funds

5  has refused to grant further extensions.

6          Mr. Seery will testify that while these wind-downs

7  were already in process and fully disclosed to the Court prior

8  to the installation of the independent board, the board

9  evaluated the decision to wind down the funds independently of

10 the debtor's decision and decided that the prudent exercise of

11 the debtor's business judgment was to continue with the wind-

12 down.  Neither the committee nor Acis challenge the board's

13 selection to continue with the wind-down.

14         You will hear testimony from Mr. Seery that a

15 priority of the independent board was to make sure that the

16 debtor operated in accordance with applicable law to ensure

17 that the debtor fills its obligations to investors and doesn't

18 act or fail to act in a manner which could expose the debtor to

19 liability.  After all, as I mentioned, Your Honor, a material

20 reason why the debtor is before the Court is because of

21 litigation claims that have plagued it over the last several

22 years.

23         Mr. Seery will testify that in evaluating the

24 debtor's duties and obligations as an asset manager of these

25 three funds, the board consulted with bankruptcy counsel with

Appx. 03232

015794

16

1   respect to the applicability of the operated protocols and

2   domestic and Cayman counsel specializing in advising funds with

3   respect to their obligations under the transactional documents,

4   the Advisors Act, and general fiduciary duty obligations.

5          Tim Silva, a partner of WilmerHale, the debtor's

6   outside firm that provides fund advice, is present in the

7   courtroom and will be available to answer any questions the

8   Court or the parties have.  Dennis Olarou, a partner with Carey

9   Olsen, is on the phone.  He is the debtor's Cayman counsel and

10  also available.

11         Importantly, Mr. Seery will testify that the

12  independent board made the decisions that led to the filing of

13  this motion based upon their own expertise and the advise of

14  outside counsel and did not rely on the advice of the debtor's

15  employees or any of the related parties.

16         He will further testify that based upon the input of

17  outside counsel, the independent board concluded, one, that the

18  operating documents governing the funds did not permit the

19  debtor to unilaterally withhold distributions from some

20  investors and not others; that, two, the debtor risked

21  breaching its fiduciary duty to investors under principles of

22  common law if it withheld distributions on its own; and that,

23  three, the debtor risked liability under the Advisors Act if it

24  essentially attempted to use its position as an investment

25  manager to gain leverage against investors in connection with

015795

Appx. 02328

17

1  an unrelated matter, to wit, potential claims that the estate

2  may have.

3        The motion describes in detail the nature and extent

4  of the debtor's obligations, and I think the substance of that

5  is not challenged by either the Committee or Acis.  I didn't

6  read their objections to challenge that the debtor has these

7  obligations and seeks to fulfill them.

8        Based upon the foregoing and to make sure that the

9  debtor didn't expose itself to liability, Mr. Seery will

10 testify that the board decided that it was obligated to

11 exercise its authority as asset manager to distribute the funds

12 to all investors.  After consultation with the bankruptcy

13 counsel, Mr. Seery will testify that the independent board

14 decided to provide the Committee with notice prior to making

15 such distributions as were required by the operating protocols

16 approved as part of the settlement.

17       The Committee objected to the distributions which led

18 to the filing of this motion.  The objections relate to

19 distributions to be made as follows.  Mr. Seery will testify

20 that Dynamic proposes to distribute $35 million of investor

21 funds that are held by Dynamic of which CLO Holdco stands to

22 receive $872,000 and Mr. Okada stands to receive $4,176,000.

23       With respect to ARF, Mr. Seery will testify that they

24 propose to distribute $22 million of investor funds held by

25 ARF.  HoldCo stands to receive $1.5 million.  And with respect

Appx. 02324
015796

18

to Restoration Capital Partners, it proposes to distribute

$123,250,000 of which 2.1 million will be received by ACM

Services and, importantly, the debtor will receive 18 and a

half million dollars, the balance of approximately 121 million

would be distributed to non -- or 103 million would be

distributed to non-related parties, including CalPERS which

filed the statement with the Court.

          The Committee and Acis argue that the Court should

prohibit the debtor from making distributions to related

parties, notwithstanding the debtor has contractual, fiduciary,

statutory obligations to do so as an asset manager.  It is

important for the Court to understand that the money to be paid

to these related parties is not the debtor's money, it's not

property of the estate.  It's actually funds that are the

investors' funds that were invested in these various funds.

          Essentially, the Committee argues and Acis argues

that because the debtor may assert claims against some of all

of these related parties at some time in the future, the Court

should prohibit the debtor from authorizing the distribution of

non-debtor estate funds.  Essentially as we said in our papers,

the objectors are asking this Court to issue a pre-judgment

write of attachment adjoining these distributions without the

filing of any complaint which would assert causes of action,

without the need to satisfy applicable standards for a pre-

judgment writ either under Federal Rule of Civil Procedure 64

015797
Appx. 02335

19

1  estate law, and without appropriate notice to the parties and

2  an opportunity to object.

3       The objectors want to use the debtor's position as an

4  asset manager to stop distribution of funds in which the debtor

5  has no interest to gain a potential litigation advantage

6  against these related parties.  The debtor just submits that is

7  not appropriate.  The Committee and Acis spent a lot of time in

8  their papers talking about the allegations and in some estate

9  case findings against the debtor's prior management relating to

10 the operation of the debtor's business, some of which have

11 matured into claims against the estate.

12      However, the fact that the debtor's actions taken by

13 prior management led to claims against the debtor is not

14 legally relevant as to whether the debtor should be permitted

15 to make these distributions of non-estate funds.  Allegations

16 of prior wrongdoing would not be sufficient in the context of a

17 pre-judgment attachment, and it should not form the basis for

18 essentially the injunctive relief the Committee and Acis urge

19 to the Court.

20      The Committee also argues that because the

21 Committee's currently investigating claims against the released

22 parties and other insiders that the distribution should be held

23 up essentially indefinitely until the Committee completes its

24 investigation.  Whether or not the estate has claims against

25 the related parties and insiders is unknown at this point

Appx. 02336
015798

20

1  except for the notes which I will address in a moment.

2          Also, whether or not there are claims and how the

3  related parties acquired their investment in the funds is also

4  unknown at this time.  Since January 9th, the Committee has had

5  standing to investigate and prosecute these claims and the

6  debtor is cooperating with the Committee in its investigation.

7  If legitimate claims exist, they should most certainly be

8  prosecuted, and the independent board will cooperate with the

9  Committee in its efforts.

10          However, at this point other than with respect to the

11  notes, there is no admissible evidence that any claims exist,

12  and no claims have been clearly articulated other than some

13  vague allegations of fraudulent conveyance, breach of fiduciary

14  duty, the garden variety of claims you would expect to be

15  asserted in a case like this.  Again, no bankruptcy court, no

16  non-bankruptcy court would be authorized to enjoin payments on

17  the basis of these vague and unasserted claims, and the Court

18  shouldn't accept the invitation to do so wither.

19          The Committee also points to certain demand notes

20  executed by Jim Dondero, Mark Okada, and ACM Services in favor

21  of the debtor as a basis for withholding the distributions.

22  The debtor has made a demand on Mr. Okada to pay back the note,

23  and he has asserted that he may have potential offsets and the

24  nature of potential service obligations and expense

25  reimbursements allegedly owed to.  At some point in time, we

Appx. 02327

015799

21

1   suspect those issues will be resolved either consensually or

2   there will be litigation to recover the demand.

3        ACM Services which is owned 75 percent by Mr. Dondero

4   and 25 percent by Mr. Okada, executed several notes in favor of

5   the debtor of which 850,000 are demand notes. The total amount

6   is approximately seven and a half million. The remaining notes

7   are current and have been paid down over the years.

8        The debtor has not made demand on ACM Services for

9   payment of the notes, nor have they made demand on Mr. Dondero

10  for payment of the notes he issued in favor of the debtor.  Mr.

11  Seery will testify that the reason for that is that, as I

12  indicated before, the board recognizes that in order for there

13  to be a consensual restructuring in this case, it's going to

14  involve not only resolution with the creditors and their claims

15  but also resolution with Mr. Dondero or potential claims the

16  estate has.

17       The independent board at this early stage in the case

18  does not believe that commencement of an adversary proceeding

19  against Mr. Dondero at this time is in their best interest.  If

20  this case turns into a litigation case, and as Your Honor

21  experienced previously, then such litigation will be commenced.

22  However, until the board has the opportunity to try to forge a

23  consensual resolution, aggressive action is premature.   The

24  last thing, Your Honor, CLO Holdco is not a party to any demand

25  notes.

**WWW.JJCOURT.COM**

Appx 02338

015800

22

```
 1              THE COURT:  Let me stop you.

 2              MR. POMERANTZ:  Sure.

 3              THE COURT:  You mentioned dollars on the notes.  The

 4   note receivable from Okada I think is 1.3 million.

 5              MR. POMERANTZ:  With credentials, yes.

 6              THE COURT:  And then you mentioned roughly seven and

 7   a half million of notes receivable from HCM Services.

 8              MR. POMERANTZ:  Of which 950 are demand notes.  The

 9   rest are currently before me in accordance with the terms.

10              THE COURT:  Okay.  You didn't mention a dollar amount

11   on the note receivable from Dondero.  My notes show 9.3

12   million.

13              MR. POMERANTZ:  Yeah, and so I think that's around

14   that --

15              THE COURT:  Is that a demand note or notes?

16              MR. POMERANTZ:  That is a demand note and then the

17   related party notes, yes --

18              THE COURT:  Okay.

19              MR. POMERANTZ:  -- Your Honor.  And, again, we're now

20   the board knows, fully aware.  The board could have commenced a

21   lawsuit.  Honestly, Your Honor, the Committee could have

22   commenced a lawsuit in the last two months.  I suspect the

23   Committee also would like to see a consensual restructuring.

24              And I think parties are taking the view of, again,

25   this can be a litigation case which would be like a lot of
```

Appx. 02339
015801

23

1  money for all the professionals, not really do all that well

2  for the creditors.  Or the parties could cooperatively work

3  towards a restructuring to see based upon the leverage, based

4  upon the claims everyone has that it makes more sense.  And the

5  board's determination, again, made on its own coming into this

6  case in the last two months is that proceeding aggressively now

7  just does not make sense.

8          Even though it has not commenced any litigation

9  against the related parties nor presented any evidence of any

10  claims against the related parties, the Committee asks this

11  Court to use its equitable powers under Section 105 to enjoin

12  the distribution again of non-estate funds to the related

13  parties.  Your Honor, bankruptcy court -- bankruptcy

14  practitioners in certain cases love to use 105, assert 105.  My

15  experience has been when you assert 105 and that's all you

16  assert 105, it really means you don't have much authority and I

17  think that's the case here.

18          The courts have held that 105 is not -- grant the

19  court authority to be a roving commission to do equity because

20  it has to be tethered to something in the Bankruptcy Code.

21  Here the proper way for the Committee to obtain the relief they

22  sought was to file a complaint and seek pre-judgment remedy,

23  either an attachment under Rule 64 or an attachment under

24  applicable provisions of Texas law or other applicable law, or

25  an injunction under FRCP 65.

Appx 02349
015802

24

1          The debtor would not stand in the way if the

2   Committee decided to do that.  That's what the debtor bargained

3   for.  They gave the Committee the authority to do that.  The

4   Committee has not yet done that.  And the Court should just not

5   allow the debtor -- the Committee to use the debtor's position

6   as fiduciary to its investors as leverage.  That's what's

7   really happening.  The only reason we're here is because the

8   debtor is the asset manager of these other funds, and the

9   Committee and Acis want the debtor to use that leverage and

10  somehow to gain an advantage.

11         Your Honor, we would submit that the fiduciary duty

12  of the estate is to act in accordance with its obligations, and

13  that's the primary fiduciary duty and that the creditors are

14  best served if the company complies with its obligations and

15  doesn't expose the estate to any liability.

16         Lastly, Your Honor, I want to address the Committee

17  and Acis's allegations regarding the circumstances surrounding

18  the sale of the MGM shares, the proceeds of which the debtors

19  intend to use to distribute as part of the RCP fund.  Whether

20  or not Mr. Dondero's authorized to make that trade, it's really

21  irrelevant to the issues before the Court.  The independent

22  board first learned about the trade only a few weeks ago, and

23  the independent board -- and, again, this happened back in

24  November, two months before the independent board took over.

25  They promptly investigated the circumstances around the trade,

Appx. 02841
015803

25

1  engaged counsel to advise whether it was binding and,

2  importantly, evaluated whether the trade was a sound exercise

3  in the debtor's business judgment at that time.

4        The board concluded that the trade was binding and

5  that it in fact was a good trade as of November 2019 and

6  disclosed that information to the Committee and engaged the

7  Committee in a dialogue to discuss the options that the debtor

8  had with respect to that trade.  The Committee, while I

9  understand was not unanimous, ultimately agreed with the

10 independent board that it was in the debtor's best interest to

11 consummate that trade.  While we understand that the Committee

12 and Acis may want to investigate the circumstances surrounding

13 that trade to determine whether the estate has any colorable

14 claims that could be asserted, that doesn't provide a basis for

15 enjoying the distribution of the funds.

16       Moreover, the allegation in Acis papers that Mr.

17 Dondero used his position on the board of MGM to facilitate the

18 trade so that ACM Services could receive $2.1 million of 123

19 and $250,000 sale, it just lacks and factual support.  And, in

20 fact, Mr. Dondero has steadfastly encouraged the investment

21 board not to sell the MGM shares because he believes they will

22 continue to appreciate and the estate and its creditors would

23 be benefitted thereby.

24       The reason that the RCP shares were sold is as I

25 mentioned before, the RCP, the term of that private equity fund

Appx 02342

015804

26

1  expired.  No more extensions were given, and the debtor as a

2  fiduciary and as an asset manager needed to liquidate the

3  assets in that estate which included the shares.  But, again,

4  if there are claims surrounding how that happened, we

5  understand there's concern that the creditors have about the

6  circumstances, they can investigate them and the independent

7  board will surely cooperate with such investigation.

8          In conclusion, Your Honor, this independent board was

9  installed because of its independence and sophistication in

10  managing a business as complex as the debtor's.  As you will

11  hear in the testimony, the independent board has been

12  thoughtful and thorough in its approach to the issues raised by

13  this motion and is trying to manage the debtor in a responsible

14  way to maximize value and prevent the estate from incurring any

15  liability.  The independent board understands and shares the

16  Committee's and Acis's decision to hold other parties

17  accountable for any liability they have against the debtor

18  arising out of conduct that occurred pre- or post-bankruptcy.

19  But trying to use the debtor's role as an independent asset

20  manager and fiduciary duty to investors is inappropriate and

21  create risks for the estate.

22          For these reasons, Your Honor, the debtor

23  respectfully requests that the Court approve the motion and

24  overrule the objections.

25          THE COURT:  All right, thank you.  Other opening

Appx. 02345

015805

27

1 statements, Mr. Clemente?

2        MR. CLEMENTE:  Yes, Your Honor.  You actually touched

3 on a question that I had.  I assume I have more fulsome

4 comments that I had anticipated making after testimony, but so

5 I would reserve the opportunity to do that.  It was quite a

6 lengthy opening there, so I didn't know whether there was going

7 to be the opportunity for that after testimony, but --

8        THE COURT:  Certainly.

9        MR. CLEMENTE:  -- I certainly want to reserve that.

10 Thank you, Your Honor.

11        So I do have some opening remarks prepared, but I'm

12 going to react a little bit to what I just heard.  I and the

13 Committee do not dispute the credentials of the board.  We

14 obviously were involved in choosing them.  I heard a lot about

15 the duty to, quote/unquote, investors.  I don't think I heard a

16 word about the duty to the creditors and to the estate.  And I

17 think it's important when thinking about the investors that Mr.

18 Pomerantz keeps referring to, the Committee is not talking

19 about the legitimate third party investors, the CalPERS.  The

20 Committee is talking about the very people that were in charge

21 of this debtor while breaches of fiduciary duty were rampant

22 and their related entities that resulted in the filing of this

23 bankruptcy case.

24        And I find it a little bit rich, Your Honor, that

25 their debtor is using the duty to investors to include third

Appx 02344
015806

28

1  parties to try and come in here and passionately argue that

2  distribution should be made at this time to these insider

3  parties without a word at all about why it may actually be in

4  the creditors' best interest or this estate's best interest to

5  not make those distributions at this time.  So those were a

6  couple of comments that struck me as I was listening to what

7  Mr. Pomerantz said.

8          But let me be clear, Your Honor, as Your Honor is

9  aware the debtor is in bankruptcy because of the documented and

10 egregious breaches of fiduciary duties and contractual

11 obligations to its creditors and its propensity for fraudulent

12 and litigious conduct as documented.  Mr. Dondero and until

13 recently Mr. Okada dominated all aspects of the debtor and

14 controlled all of its decision-making, including the decision-

15 making that led various tribunals, including this Court, to

16 conclude that the debtor had breached its fiduciary duty,

17 engaged in fraudulent conduct, and employed persons who are not

18 credible and not truthful.

19         Against this backdrop, Your Honor, the debtor wants

20 to make distributions to investors, again, the investors we're

21 talking about here are Mr. Okada, and entities owned and/or

22 controlled by Mr. Dondero and Mr. Okada without regard

23 apparently because I didn't hear anything about that to the

24 interest of creditors under the rubric of a fiduciary duty that

25 is supposedly owed to those insider parties, the same insider

Appx. 02345
015807

Case 19-34054-sgj11   Doc 3596-25   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 25 Filed 06/30/25122 Page 129 of 1052   PageID 16807

29

1  parties, Your Honor, who were found to have breached the duties

2  to the creditors of this estate or to the investors which then

3  resulted in them becoming creditors of this estate and led to

4  the bankruptcy.

5           Your Honor, I think the irony is fairly thick, and I

6  don't think the Court should allow the distributions at this

7  time.  These insider parties, and I'm glad Mr. Pomerantz

8  mentioned it to you because their papers did not mention the

9  notes that were owed, they owe the debtor millions of dollars.

10  The numbers that Your Honor read are just the direct notes

11  among those parties.  They do not include the notes that are

12  owed by, for example, affiliated entities of Mr. Dondero.  So

13  those numbers are even larger than what Mr. Pomerantz suggested

14  to Your Honor.

15           Second, as the debtors do finally disclose in their

16  papers, the insider parties receive certain of the insider

17  interests from the debtor pursuant to transactions that were

18  only recently disclosed to the Committee and not have been

19  examined by the Committee.  So in many of the circumstances,

20  the very interests that are giving rise to the basis for these

21  distributions once belonged to the debtor.

22           Third, obviously, the insider parties are the focus

23  of the Committee's ongoing investigation of the estate causes

24  of action, and that's entirely appropriate given the long

25  history and the findings made by this Court and others

Appx. 02345
015808

30

1    regarding the behavior of this debtor prior to the bankruptcy.

2         Your Honor, instead of allowing the distributions to

3    be made, the Court should direct that the distributions that

4    the debtor seeks to make to the insider parties to be placed

5    into a segregated interest-bearing account pending the

6    resolution of potential claims against the insider parties

7    including the collection of notes owed by the insider parties

8    and the investigation into the validity of the insider

9    interests.

10        If the insider parties have an issue with this,

11   obviously, they can come before Your Honor, perhaps they'll

12   come before Your Honor today, and explain to you why what is

13   being proposed is unfair to them or why despite the

14   circumstances surrounding this case, the rampant breaches of

15   fiduciary duty, the questionable transactions, and the

16   existence of the notes they owe the debtor they should receive

17   those distributions now.  And we can do that after a fulsome

18   discovery of those parties, a fulsome record, full opportunity

19   to brief.

20        I believe, the Committee believes this is a very

21   sensible proposal, and it would seem to serve all interests.

22   The interests of the estate would be protected.  Let's talk

23   about those.  Obviously, we're more likely to recover on the

24   notes and any potential claims, including claims that the

25   insider interests were inappropriately obtained.

**WWW.JJCOURT.COM**

31

1        Mr. Pomerantz referred to the word "leverage."

2  Again, it's the estate, the estate should be thinking about how

3  it can actually collect on its claims and notes.  So the word

4  "leverage" I don't think is appropriate here.  It just seems

5  sensible.  The interest of the insider parties would also be

6  protected.  The money will be placed in a segregated account,

7  and the status quo would be preserved.  And legitimate third

8  party investors, we are all fully in support of the legitimate

9  third party investors receiving their distributions.  We've

10 never had an issue with that, Your Honor.

11       Mr. Pomerantz referred to the authority, Section 105.

12 I do believe the Court has ample authority under Section 105 of

13 the Bankruptcy Code to order the relief requested by the

14 Committee.  Obviously, Section 105 is broad and, as we'll

15 discuss further later, it's been interpreted by this Court and

16 other courts to apply very broadly and in circumstances similar

17 to this.

18       Additionally, Your Honor, although I do not believe

19 105 needs to be tethered, I believe is the word that was used,

20 to other sections of the Code.  I do believe that other

21 sections of the Code are implicated as the relief the Committee

22 requests impacts property of the estate which includes the

23 notes and potential claims against the insider parties as well

24 as the rights and obligations of the debtor under the various

25 contracts that Mr. Pomerantz referred to.

Appx 03248

015810

32

1          So, we have 105.  If we need to tether it to

2  something, we can tether it to 541 and we can tether it to 363.

3  What we're asking the Court to do impacts property of the

4  estate, impacts the rights and obligations of the debtor.

5          Finally, Your Honor, there was a long discussion or

6  somewhat of a discussion about the fact that the Committee has

7  not sought a preliminary injunction or has not filed claims

8  against the insider parties.  First, again, I believe Section

9  105 gives the Court the authority that it needs to provide the

10  relief.  Second, the Court has the flexibility should it choose

11  to construe or find it necessary to construe our objection as a

12  request for a preliminary injunction and the request satisfies

13  that standard.

14          Third, Your Honor, this has been an expedited process

15  initiated by the debtor.  If this Court believes that other or

16  further proceedings or processes are necessary or appropriate,

17  the Court should allow the parties the time for that.  We

18  agreed to an expedited motion practice under the protocols.

19  That's a fact.  The protocols cover a variety of circumstances

20  designed with the exigencies of the debtor's business in mind,

21  not designed with trying to speed distributions to Dondero,

22  Okada, and the insider parties.  There simply is no exigencies

23  surrounding that, and the Committee should not be prejudiced if

24  this Court believes a further or other procedural vehicle is

25  necessary.

Appx 03249

015811

33

1    And a moment, Your Honor, on the investigation, as

2    Your Honor is aware the insider parties have dominated the

3    debtor for years.  Only recently January 9th the Committee has

4    gotten the ability to investigate.  And to date, we've been

5    doing that.  I do dispute what Mr. Pomerantz said about the

6    debtor's cooperation.  I believe that they've used words to

7    that effect but we've not gotten the documents that we need.

8    This is a complicated enterprise as Your Honor is aware.  It's

9    unrealistic to think that we would be in a position to bring

10   claims against insider parties at this particular time in the

11   case.  And we cannot be prejudiced by saying we should have

12   completed our investigation and had brought claims every time

13   the debtor thinks it should make a distribution to Mr. Dondero

14   or one of its related entities.

15   And so, Your Honor, to sum up, we think that the most

16   logical solution here and frankly the one that I assume the

17   debtor would have agreed with me on would be to come to this

18   Court, allow the distributions to be made to all the third

19   party investors, to withhold the distributions to the related

20   parties while the investigation occurs, while the notes are

21   settled, and while the Committee determines and the Court may

22   perhaps ultimately determine whether the interest that gave

23   rise to those distributions were in fact appropriately with

24   those parties.

25   Instead, we're here talking about duties owed to,

Appx 03250

015812

34

1    quote/unquote, the investors without considering what it is

2    that's owed to these creditors and to this estate.  And with

3    that, Your Honor, we would ask that the motion be denied or

4    however you'd look at it but that the relief we noticed in our

5    paper be ordered by Your Honor.

6           THE COURT:  Let me follow up and make sure I

7    understand a couple of things.  You've said a couple of times

8    that it's just the distributions that would go to related

9    investors, Mark Okada, CLO Holdco, HCM Services.  And I got the

10   impression from your pleadings as well as your oral statements

11   that the Committee is not challenging in any way the decision

12   to wind down these three funds, if you will.  You know, my

13   reading of the pleadings was November 2019, you know, less than

14   a month after the bankruptcy was filed or about a month after

15   the bankruptcy was filed, you know, there were significant

16   redemptions.  In the face of significant redemptions, the

17   debtor decided it was appropriate to wind these down.

18          Is that going to be the subject of evidence and

19   testimony today?  Is the Committee at all concerned about how

20   that all played out, whether it was legitimate unaffiliated

21   investors seeking redemption or if it was by chance insider

22   investors?

23          MR. CLEMENTE:  No, Your Honor.  The Committee is not

24   challenging the wind-down as I believe you're referring to.  We

25   are not doing that, Your Honor.

**WWW.JJCOURT.COM**

35

1          THE COURT:  Okay.  And this may be one instance where

2    it's kind of hard for me to separate what happened in the

3    related case of Acis versus this where we had all of a sudden

4    we don't want Acis to, you know, manage these in that case CLOs

5    anymore until redemptions were happening.

6          MR. CLEMENTE:  I understand, Your Honor.

7          THE COURT:  And the business judgment of that --

8    well, it's complicated, right.

9          MR. CLEMENTE:  I completely understand.

10          THE COURT:  It was, in the end of the day, depriving

11   Acis debtor of management fees.  Same thing is happening here,

12   right?  Highland is being deprived of management fees by the

13   wind-down of these three funds, but you're not challenging the

14   business judgment of the --

15          MR. CLEMENTE:  That is correct, Your Honor.

16          THE COURT:  -- whole process of the redemptions

17   period?

18          MR. CLEMENTE:  That is correct, Your Honor.

19          THE COURT:  Okay.

20          MR. CLEMENTE:  There is a pot of funds sitting in

21   those funds, and there is a pot of funds sitting in RCP --

22          THE COURT:  It was a legitimate non-affiliated

23   entity's --

24          MR. CLEMENTE:  We're not challenging it, Your Honor.

25          THE COURT:  Okay.


WWW.JJCOURT.COM

015814

36

 1          MR. CLEMENTE:  What we are challenging obviously is
 2  now the distribution of those funds to the related entities.
 3  That's where we take issue with it at this particular moment in
 4  time.
 5          THE COURT:  Okay.
 6          All right.  Who else wishes to make an opening
 7  statement?  I know Acis had a joinder or a slightly different
 8  objection, I think.
 9          MS. PATEL:   Yes, Your Honor.  Good afternoon.
10  Again, Rakhee Patel on behalf of Acis.  And I'll address Your
11  Honor's question first.  Acis has concerns about the wind-down
12  of these funds.  I'll just clear with respect to it.  And Your
13  Honor referenced, you know, perhaps we need to separate what
14  happened in the Acis case and whether that's happening here or
15  not.
16          Your Honor, I'm not sure from Acis's perspective that
17  we don't object to the wind-down of these funds.  We just
18  frankly don't have enough information to kind of take a
19  position with respect to that whether these funds should be
20  wound down.  But the fact of the matter is is in the lead-in
21  into this motion -- and this is sort of the source and subject
22  of Acis's additional objection and not just plain vanilla
23  joinder and with the Committee -- is is that the transactions
24  happened.  The sale of the stock has happened.  So whether it's
25  in connection with the wind-down of the funds or whether it's

Appx. 03255

015815

37

1  just a sale, it's happened now.

2          So I'm not sure that we can unring that bell, but

3  Acis's whole point and as we sort of set out in our joinder and

4  our separate comment or objection was, Your Honor, the light of

5  day needs to be cast on this transaction as a whole and we need

6  to be talking about it that the transaction needs to be

7  discussed here in open court.  And, frankly, the entire

8  creditor body needs to have and the Court needs to have

9  transparency with respect to that.

10         So to that point, Your Honor, the debtor filed the

11 motion to approve the distributions of the proceeds from the

12 sale in accordance with the procedures approved as part of the

13 broader settlement motion that Your Honor heard in January.

14 Now the debtor incredibly takes the position that this Court

15 and the creditors are effectively powerless to stop these

16 distributions.  And here's the problems with that position.

17         First, from a technical legal perspective, the debtor

18 ignores the language of Section 363.  Frankly, it's easy to

19 have a strong initial knee-jerk reaction that Section 363

20 doesn't apply here because there's no sale of property to the

21 estate.  The MGM stock was held down in a different entity.

22 Your Honor, frankly, I did it myself.  But when you analyze the

23 language of Section 363, it also prescribes the use of property

24 of the estate outside of the ordinary course of business.  And

25 here, the use of property of the estate is the debtor's

Appx. 03254

38

1  valuable management rights of the various entities, so Dynamic,

2  AROF or AROF or NRCP.

3          And let's just assume for argument's sake that the

4  debtor's statement is correct and enforceable and there's no

5  problem with it that the funds are in liquidation.  No one can

6  rationally argue that that liquidation of a fund or a manager's

7  actions in liquidating said fund are ordinary course.  So there

8  is sort of the Section 363 hook for lack of a better term.

9          Second, from an equity perspective, it is wholly

10 inequitable for the debtor in an attempt to derail the Court

11 and the creditors from inserting a Chapter 11 trustee -- and

12 recall, Your Honor, that this case was filed on October 16th of

13 2019 where the debtor filed to seek protection from the

14 imminent within minutes if not hours of entry of $189 million

15 judgment against the debtor.  And it's really frankly, and as

16 Mr. Pomerantz acknowledged, the product of failed -- numerous

17 other failed litigation strategies.  Acis, UBS, Pat Daugherty,

18 quickly all -- and all of those the pieces of litigation

19 quickly coming home to roost.

20         Acis was clear right out of the gate, Your Honor, at

21 the first day hearings held on October the 18th, 2019 that it

22 would seek the appointment of a trustee.  And in an attempt to

23 sort of take itself out of a trustee potentially being

24 appointed or, you know, as to forestall that happening, the

25 debtor filed an ordinary course protocol motion.  And this is

Appx 03255
015817

39

1   in October of 2019.  And as a part of that ordinary course

2   protocol motion, the proposal was that Mr. Sharp, the CRO of

3   the debtor, be appointed the CRO of the debtor and that he

4   would be the gatekeeper, he would be in charge of all related

5   party transactions, and he would oversee all of those

6   transactions.

7           And, Your Honor, indeed Mr. Sharp testified that he

8   was the gatekeeper.  He was the guy in charge, and that was on

9   I want to say like November 20th of 2019.  And commensurately,

10  Mr. Waterhouse, the CFO for Highland Capital Management, also

11  testified and Mr. Waterhouse was the first day declarant for

12  Highland as well.  He testified that everyone understood that

13  Mr. Sharp was to be the gatekeeper.  And, indeed, Mr. Sharp

14  would -- they had training at Highland Capital Management to

15  the effect that all employees knew if you've got a related

16  party transaction, it's got to go through Brad Sharp.

17          So in an attempt to sort of derail Acis from getting

18  a trustee appointed, they affirmatively sought out these

19  protocols and ultimately agreed to protocols that look similar,

20  not exactly but similar to those proposed ordinary course

21  protocols.  And the protocols that ultimately were approved

22  required court approval.  And now we've got them coming back

23  and saying, ha ha, just kidding, no one can do anything about

24  it anyway and we have to make these distributions because we've

25  got a fiduciary duty to do it.

**WWW.JJCOURT.COM**

Appx 03256
015818

40

1        On that note, the debtor who should be fully

2   transparent during this process while it seeks the benefit of

3   bankruptcy including the automatic stay, argues in its reply

4   brief filed this morning at Footnote 9 that the underlying sale

5   transaction in excess of $123.25 million is sacrosanct and

6   irrelevant because the Committee blessed it.  Acis objected,

7   Your Honor.  When that transaction was presented to the

8   Committee, Acis objected.

9        First, it would have its cake and eat it, too.  It

10  can't take advantage of the protocols it likes while at the

11  same time stiff-arming those that are inconvenient to it.  It

12  can't say the transaction's good because the Committee blessed

13  it, but the Committee didn't bless the distributions to the

14  insiders and, oh well, you can't do anything about that anyway.

15       Second, the broader transaction is violative of at a

16  minimum traditional notions of transparency in bankruptcy and

17  likely 363 along what the debtor's fiduciary duties to its

18  creditors.  As Mr. Clemente pointed out, the debtor has dueling

19  fiduciary duties, and we didn't hear nearly a word with respect

20  to the debtor's fiduciary duties to its creditors.  And, Your

21  Honor, we're not looking to generally micromanage what this

22  debtor is doing, but this transaction is fundamentally flawed

23  and at a minimum has red flags all over it.

24       As we now know from the CalPERS objection, Mr.

25  Dondero entered into a transaction with Highland Capital

Appx. 03255
015819

41

1  Management buying CalPERS' interest and likely others'

2  interests at June 30 prices or by giving over a set number of

3  MGM shares to CalPERS.  That's the agreement that's attached to

4  the CalPERS objection.  The agreement was always a win-win for

5  Highland Capital Management because it could either make money

6  on the arbitrage of the stock -- it bought it at a particular

7  price, and if it's ordered at a different price, you got to

8  keep the differential -- or give over the stock if the stock be

9  valued and priced.  Win-win.

10          He then immediately the very next day fraudulently

11  transferred that agreement from Highland Capital Management to

12  Highland Capital Management Services, an entity in which he is

13  the 75-percent owner and Mr. Okada is the 25-percent owner.

14  That is 15 days before filing this Chapter 11 bankruptcy case.

15  The only purported consideration for the transfer, and I think

16  this is Exhibit B, to the CalPERS objection, was an indemnity

17  by Highland Capital Management Services.  That's the only

18  consideration that was transferred as a part of that

19  transaction, Your Honor.

20          Then when the stock price rises in November, he seeks

21  committee approval for a transaction that still benefits

22  Highland Capital Management Services.  Despite not having a

23  Committee response, he enters into a rogue unauthorized trade

24  of MGM stock on whose board he serves on and is thus privy to

25  information, violative of the very protocols that the debtor

Appx. 03358

015820

42

1   was pressing so strenuously to avoid the appointment of a

2   trustee.  Indeed, Brad Sharp testified the day before the rogue

3   trade that this exact type of transaction had to go through

4   him.  And Mr. Waterhouse's testimony came right after that to

5   indicate that everybody at the debtor knew that Mr. Sharp had

6   to approve it.

7          Ultimately, the Committee rejected that transaction

8   in November, but the trade was already done.  If Mr. Dondero

9   had his way, Highland Capital Management Services would have

10  benefitted from the transaction.  Frankly, every one of these

11  transactions needs the light of day shed upon them here in

12  court to determine what is in the best interest of creditors.

13  The debtor's attempt to cloak itself in the Committee's non-

14  objection, and I want to be clear on this, it was a non-

15  objection.  I think reference was made that the Committee

16  agreed to the sale of the MGM stock.  That's not what happened.

17  The Committee just did not object to the transaction which can

18  likely best be characterized frankly as everyone plugging their

19  nose while simultaneously telling this Court it can't do

20  anything about the proceeds is the exact reason why the Court

21  should be inquiring into the transaction in the first place.

22          And not so incidentally, that stock that Mr. Dondero

23  traded without authority in November is trading approximately

24  20 percent higher today, around the low 90s.

25          THE COURT:  All right.  Thank you.


**WWW.JJCOURT.COM**

Appx. 02350
015821

43

1          Thank you.  All right.

2          Do we have any other opening statements?  I'm

3   probably going to have to take a break before we do evidence

4   and hear my 2:30 matter, which I don't think is going to take

5   very long, at all.

6          All right.  Judge Lynn.

7          MR. LYNN:  Your Honor, thank you.

8          We're not opposed to the motion, and we understand

9   the concerns expressed both by the debtor, the debtor's

10  independent board, which feels that it's compelled to make the

11  distribution to insiders.  And while we don't necessarily agree

12  with them, we understand the Creditors Committee's concerns as

13  well.

14         We'd like to suggest the following should the Court

15  determine that the motion should be denied.  And that is that

16  instead of the debtor retaining the funds, that the debtor

17  distribute the funds into the registry of the Court.  That way,

18  they lose control over the funds and they can say that they've

19  distributed them in accordance with their agreements and

20  applicable law.

21         The funds would remain there until either a recipient

22  or prospective recipient posts a bond or other suitable

23  collateral or the Creditors Committee agrees to the

24  distribution to the insider or there is a Court entered for

25  another reason after a showing made before Your Honor.  The

**WWW.JJCOURT.COM**

015822

44

 1  debtor and the Creditors Committee would, of course, retain all

 2  rights to seek the funds they would have had, which rights they

 3  would have had immediately before the distribution to the

 4  registry, plus any rights that would be gained by reason of the

 5  distribution itself.

 6          The debtor thus distributes, the Creditors Committee

 7  retains its rights, the Court retains control, and this can all

 8  be done, we believe, by a Court order and we hope this may give

 9  the Court a suitable alternative.

10          THE COURT:  Okay.  Let me make sure I understand.

11  You said, if the Court is inclined to deny the motion.  Are you

12  offering, I guess Mr. Dondero's proposal that -- I mean, these

13  aren't disbursements that would all go to him, they would --

14  some would go to Okada, and -- who's not objected or appeared.

15  But -- let me cut to the chase.

16          Are you trying to avoid a hearing and evidence

17  altogether by saying, you know, these related entities agree

18  their distributions will go into the registry of the Court

19  right now?

20          MR. LYNN:  Mr. Dondero supports this position.  We do

21  not speak for Mr. Okada.

22          THE COURT:  Right.

23          MR. LYNN:  I understand that more than one of the

24  entities -- and Your Honor must forgive me.  We're relatively

25  new to this case.

**WWW.JJCOURT.COM**

Appx 02301

015823

45

 1          THE COURT:  Yeah.  One is Holdco, and that is

 2   technically a DAF, a charitable entity that --

 3          MR. LYNN:  Yes.  I believe that's so, and I

 4   understand there may have been communications between the

 5   independent board and the trustee of a DAF, but I was not a

 6   party to those communications.  I'm just trying to give the

 7   Court an alternative -- Mr. Dondero is doing so -- that might

 8   be acceptable to the debtor and at the same time would

 9   accomplish what the Creditors Committee wants, which is to

10   retain control of the funds.

11          I must say, Your Honor, that having been there

12   myself, I have a great deal more confidence in the registry of

13   the Court protecting funds than I do in just about anyone else.

14          THE COURT:  All right.  Well, that would certainly

15   seem to give the Committee everything it's asking for, and --

16          MR. POMERANTZ:  Your Honor, if I may interrupt.

17          I understand from members of the debtor's independent

18   board who have spoken to Grant Scott, who is the principal in

19   charge of CLO Holdco, that CLO Holdco would also support the

20   proposal that has just been made by Judge Lynn.  We do not have

21   the agreement of Mr. Okada to support that proposal.

22          THE COURT:  Okay.  Although, he has not weighed in

23   with any sort of -- well, I don't know.  How do we feel about

24   Mr. Okada's interest here?  I mean, he's obviously been given

25   notice of all of that, and --

Appx. 03362

015824

46

1           MR. POMERANTZ:  Well, actually we asked him --

2           THE COURT:  Okay.

3           MR. POMERANTZ:  -- when we heard last night that this

4   might be a possibility.  He has rejected that.  And in light of

5   his rejection of that proposal, we as the debtor feel we need

6   to proceed with the motion.  I would think it substantially

7   narrows the issues that are going to be in evidence, all the

8   stuff we've heard about MGM Trade, which may at some point in

9   time be something that people don't testify from the podium and

10  that actually the subject of real evidence.  But with respect

11  to Mr. Okada, we will have to go forward with the motion.

12          MR. LYNN:  Yeah, so let me express that at this

13  point, Mr. Dondero is of course not supporting the Acis

14  suggestion that a trustee should be appointed.  We did not

15  understand that this hearing would address that issue.

16          THE COURT:  Yeah.  I'm not sure.  That's what they

17  were suggesting today.  I think they were just saying at one

18  point, they adamantly wanted a trustee, and these protocols

19  alleviated their concerns and caused them to back off.  And

20  now, they're upset that, you know, the debtor is resisting the

21  protocols in a way.  So -- all right.

22          Mr. Clemente, what say you?  I --

23          MR. CLEMENTE:  Your Honor, I --

24          MR. LYNN:  Thank you, Your Honor.

25          THE COURT:  Thank you.


**WWW.JJCOURT.COM**

47

1          MR. CLEMENTE:  -- I think you can tell from our

2    papers, this is effectively what we asked for.

3          THE COURT:  Right.

4          MR. CLEMENTE:  I don't even know why it took us to

5    get to this point for that.  It seemed so obvious to me.  But

6    when it was articulated by the former Judge here, it -- I think

7    it just held more -- maybe it made more sense.

8          As far as Mr. Okada's concerned, I think Your Honor

9    could clearly deposit the funds in the registry of the Court,

10   and he's free to come in.  I think that's what Counsel for

11   Mr. Dondero was actually suggesting.  So I'm not sure that

12   anything is required further with respect to Mr. Okada, unless

13   he has a representative here that would like to raise something

14   with Your Honor.  So, to me, on behalf of the Committee, I

15   think that accomplishes what the Committee was trying to do

16   with its objection.

17         THE COURT:  All right.

18         Anyone else wish to be heard?  Ms. Shriro, I know

19   that you filed something for CalPERS, but obviously, your

20   client is an unaffiliated investor in the private equity fund,

21   RCP.  You just want to get paid.

22         MS. SHRIRO:  That's correct.  We just want to get

23   paid, and I would defer to my co-counsel on the phone.  If he

24   has any comments, this would be the time to raise them.

25         THE COURT:  All right.

Appx. 03304
015826

48

1          Co-Counsel on the phone, I think it's Mr. Cisz.  Is

2    that correct?

3          MS. SHRIRO:  Yes.

4          THE COURT:  Okay.  Anything you want to say about

5    what's (indiscernible)?

6          MR. CISZ:  That's correct, Your Honor.  This is Louis

7    Cisz on behalf of CalPERS, and Ms. Shriro is correct.  So long

8    as CalPERS receives its distribution relative to the sale of

9    the MGM stock, CalPERS otherwise doesn't take a position with

10   respect to the motion.

11         THE COURT:  Okay.  Thank you.

12         All right.  Well, turning to the literal terms of the

13   motion, the relief the motion sought was simply an order

14   authorizing distribution of the cash from these wind-downs of

15   the three funds to insider investors.  And so we have the

16   Committee objection, we have the Acis objection, we have

17   Dondero's counsel here appearing.  I think I can, given this

18   request for relief and the opposition of the Committee, as well

19   as one of the Committee members, Acis, and due to these

20   representations of Dondero's counsel and the board, I can order

21   that the money that would otherwise go to insider investors --

22   I think it's roughly about 8.6 million -- will, instead of

23   going to the insider investors, will go into the registry of

24   the Court with reservation of everyone's rights later to file

25   motions requesting that it be disbursed to them.  So everyone

015827

Appx 03365

49

1  understands, this is just kind of a holding place for the funds

2  right now.

3          MR. POMERANTZ:  Your Honor, we do not have

4  Mr. Okada's representation and the debtor is not modifying its

5  motion.  The debtor would like to proceed with respect to

6  Mr. Okada.  We asked him, he did not want to agree to the same

7  things that would be in consideration by CLO Holdco, and for

8  the reasons we've identified in the motion and I've expressed

9  to Your Honor, we feel we have the obligation, we have the duty

10 to proceed, and we would request the opportunity to put on

11 evidence so you can hear from Mr. Seery and ultimately make a

12 determination whether the Committee and Acis have laid out a

13 legitimate basis for use of 105.  I'll reserve my comments and

14 their comments until the end.

15         But we would want to proceed in that limited matter

16 because we don't have all agreements of the parties and the

17 same reasons stand for why we filed the motion to proceed with

18 the distribution for Mr. Okada.

19         THE COURT:  Okay.  Well, I guess I misinterpreted

20 everything that I thought was going on out there.  Mr. Okada, I

21 guess, you said is owed 4.176 million from the Dynamic Hedge

22 Fund, and then -- I don't know if that was the total amount

23 from the three funds, but you feel like you have a fiduciary

24 duty to pursue that disbursement.

25         MR. POMERANTZ:  Absolutely, Your Honor.

015828

50

1            THE COURT:  All right.

2            MR. POMERANTZ:  And again, you know, we could get

3   this into argument.  Mr. Okada is in a much different position

4   than some of the other insiders.  We understand the comments

5   about Mr. --

6            THE COURT:  Well, I remember some of the dynamics

7   here, but let me tell you what I'm going to feel the need to

8   get into if we hear evidence.  And what we'll do is we're going

9   to take a short break in a minute.  Let me ask the Barker

10  people who I think are in the back.

11      (Off record discussion 2:34:51 to 2:35:01)

12           THE COURT:  Okay.  So we'll take a 10-minute break in

13  a minute.

14           But again, one reason I was sort of delighted to get

15  the suggestion of Judge Lynn is I see this evidentiary hearing

16  as being a little more involved than looking at contractual

17  obligations and whatnot, and you know, the fact that these are

18  non-property of the estate funds that we're talking about.  I

19  have fundamental questions having read the pleadings about the

20  decision to wind-down these funds that was made in November

21  2019, days after Highland filed bankruptcy.

22           Who made the decision?  Was it insider investors

23  seeking redemption?  Or was it, you know, did we have large

24  unaffiliated investors exercising redemptions, and so

25  therefore, it was reasonable business judgment, you know, we

015829
Appx. 02387

51

1  need to wind down?

2         I know the issues are a little bit different with the

3  two hedge funds versus the RCP fund that had the term.  And I

4  understand, I read the pleadings, how the term expired in April

5  2018, it was extended for one year, and then the advisory board

6  didn't consent to an additional extension.

7         Again, maybe the new board has thoroughly scrubbed

8  this and you're going to tell me that in evidence.  And maybe

9  the Committee has thoroughly scrubbed this, and you're going to

10  tell me that with evidence.  But I -- I'll want to hear that.

11  I'll want to hear that this was all legitimate, independent,

12  non-affiliated investors pressing for the wind-down of these

13  funds, and we didn't have what I refer to as the Acis situation

14  where -- well --

15         MR. POMERANTZ:  Your Honor, Mr. Seery is prepared to

16  testify to each of those.  And as I mentioned, the board did

17  thoroughly consider it and you will -- Your Honor will hear

18  evidence that led Mr. Seery and the board to conclude that each

19  of these were appropriate.  But we intended to get into that in

20  the evidence.

21         THE COURT:  Okay.

22      (Proceedings recessed from 2:37 p.m. to 3:01 p.m.)

23         THE COURT:  All right.  We're going back on the

24  record in Highland.  Mr. Pomerantz, are you ready to call your

25  witness?

Appx 03308
015830

52

1          MR. CLEMENTE:  Your Honor, if I might before.

2          THE COURT:  Mr. Clemente?

3          MR. CLEMENTE:  Matt Clemente on behalf of the

4   Committee, again.

5          I would just like to revisit the colloquy we had

6   before we broke.

7          THE COURT:  Okay.

8          MR. CLEMENTE:  I'm still confused as to why Your

9   Honor just can't enter or so order that the debtor has

10  satisfied its duty upon depositing the money into the Court

11  registry.  And we don't need to have any of this this

12  afternoon.  I see it as similar to the Foley hearing where Your

13  Honor expressed some frustration.  It's kind of maybe not the

14  best use of time.  I'm not sure what exactly we're trying to

15  accomplish here.

16          If the debtor's concerned about its duty to a

17  constituent who is not present in Court today, I think Your

18  Honor can deal with that by entering an order that says, you

19  know, based on the pleadings and the record so far, the debtor

20  has satisfied its duty and placed the money in the Court

21  registry.

22          And if Mr. Okada has an issue with that, he can come

23  back before Your Honor.  I'm just not quite sure what the point

24  is here, Your Honor.

25          THE COURT:  All right.  Well, let's turn back to

**WWW.JJCOURT.COM**

015831

Appx. 03369

53

 1  Mr. Pomerantz, and let's talk about what my, I guess, unrefuted

 2  evidence is.  I have -- Mr. Okada would be due for the Dynamic

 3  Hedge Fund, 4.176 million is what I read in the pleadings where

 4  you told me.

 5          And then, I don't know that I have written down what

 6  he would be owed from either the Argentina Fund or the RCP

 7  Fund.  Anything?

 8          MR. POMERANTZ:  Zero.

 9          THE COURT:  Zero.  So we're talking about the 4.176

10  from termination of the Dynamic Fund.

11          MR. POMERANTZ:  Right.

12          THE COURT:  Meanwhile, we know there is a $1.3

13  million demand note --

14          MR. POMERANTZ:  Correct.

15          THE COURT:  -- owing to Highland from Okada.  And I

16  feel like I heard that there was more, but that's the only --

17          MR. POMERANTZ:  That is the only note from Mr. Okada.

18          Your Honor, I think part of it is I stood up and gave

19  a lengthy presentation, and I told Your Honor what the

20  testimony would show.  Now there's been a lot of issues in this

21  case about what the board's doing, what it's not doing.  Part

22  of our reason for being here today and part of my presentation

23  was to get Your Honor comfortable with how the board is

24  handling its duties.  I didn't want you to hear that just from

25  me.  I wanted you to hear that from Mr. Seery.

Appx. 03379
015832

54

1          There also have been allegations by Acis and concerns

2    Your Honor has raised as to what went into the wind-down of

3    these funds, given Your Honor's past experience with Acis.  And

4    I'm sure Ms. Patel's past experience with Acis.

5          I think it's important to hear from Mr. Seery because

6    he has good explanations of why each of these funds are in

7    wind-down.  And then, furthermore, look, Your Honor will decide

8    what Your Honor decides and whether the Committee and Acis have

9    met the showing under 105 to hold back the Okada funds.  If

10   Your Honor decides that, of course we will abide by that

11   decision.

12         But we didn't want any implication that we were sort

13   of laying down for that issue.  So I think it would be helpful

14   maybe to hear some testimony from Mr. Seery.  If Your Honor

15   then concludes that funds shouldn't be disbursed, Your Honor

16   will conclude that funds shouldn't be disbursed.  I don't think

17   this has to be very lengthy.  I think we've -- we've narrowed

18   the issues, given that we don't have an issue with respect to

19   RCP anymore.  We don't have the issue with HCM Services

20   receiving money on account of a trade that Acis is very

21   critical about.  Again, those issues at an appropriate time can

22   be raised in appropriate form, and Your Honor will have a full

23   evidentiary hearing, as opposed to a tail wagging the dog on

24   this motion when it's not even relevant anymore.

25         So what I would propose is that we allow Mr. Seery to

Appx. 02271
015833

55

1  take the stand.  We allow him to address Your Honor's concerns.

2  We allow him to testify to the things that I said he would

3  testify to so it gives Your Honor some comfort, and hopefully

4  the other parties comfort, exactly how Mr. Seery and the other

5  board members are performing their duties.

6          THE COURT:  Okay.  Can we all agree to some

7  reasonable time limitations here?  I'm thinking we're done in

8  an hour.  Maximum 30 minute direct of debtor, or redirect, and

9  maximum 30 minute cross of all objectors.  Can we do that

10 today?

11         MR. POMERANTZ:  I think we can do that, Your Honor.

12         THE COURT:  Okay.  Then that's --

13         MR. CLEMENTE:  My only question, Your Honor -- Matt

14 Clemente on behalf of the Committee -- is what are we still

15 talking about here?  Are we just talking about the distribution

16 to Mr. Okada?  And the other distributions are off the table as

17 suggested by -- or as agreed to at least on behalf of

18 Mr. Dondero?  I don't even know what we're talking about.

19         MR. POMERANTZ:  That is correct, Your Honor.  It's

20 only the distributions to Mr. Okada.

21         THE COURT:  Although, I think he wanted the Court to

22 get some testimony from Mr. Seery about sort of the business

23 judgment of the three wind-downs, but I don't think that's

24 going to --

25         MR. POMERANTZ:  That shouldn't take a long time.

**WWW.JJCOURT.COM**

Appx. 03372
015834

56

1          THE COURT:  -- be a probe today of MGM stock sales.

2          MR. POMERANTZ:  No, it won't be at all, Your Honor.

3  And again, look, we understand Your Honor has had experience

4  with Acis, and we understand the concerns, Your Honor, coming

5  in, seeing redemptions, and the questions you asked.

6          Again, it's important for the debtor to be able to

7  demonstrate to Your Honor that this board is doing its

8  appropriate things and hearing from Mr. Seery why he made these

9  decisions so Your Honor can get comfortable, not only in these

10  matters, but in other matters that brought before Your Honor in

11  the future that this board is doing exactly what they should be

12  doing acting as an independent fiduciary.

13          That's why I think some of our testimony, but we're

14  happy to live within the time frame that Your Honor has given

15  us.

16          THE COURT:  Okay.  All right.  Thank you.

17          MS. PATEL:  Your Honor, I just wanted to follow along

18  with one of the comments that I made during my opening

19  statement and hopefully, it will help further narrow the issues

20  and keep us within the time limits, is is that when -- in

21  responding to Your Honor's question about the wind-down of

22  these funds, and I said Acis had concerns, I want to say we've

23  got concerns with respect to the Argentina and the Dynamic

24  fund.  We frankly just don't understand or have that much

25  information with which to really evaluate the transaction, so

WWW.JJCOURT.COM

Appx. 03375
015835

57

 1  we're a little hamstrung today for purposes of cross-

 2  examination because that's not something that necessarily Acis

 3  has inquired into.

 4          But separate and apart from that, just again so

 5  everyone's clear, with respect to the wind-down of RCP, Acis

 6  does not take issue with respect to the genesis of the wind-

 7  down.  So the decision to wind it down is a find from Acis's

 8  perspective that should probably have been wound down.  Now,

 9  the methodology of how it's being wound-down, that's fair game.

10          THE COURT:  I don't know what that meant --

11          MS. PATEL:  Okay.

12      (Laughter)

13          THE COURT:  -- the methodology of how it's being

14  wound-down.

15          MS. PATEL:  Okay.  Let me --

16          THE COURT:  Very quickly because, you know --

17          MS. PATEL:  Yes.  Your Honor, what I meant by that

18  was, in terms of the decision to wind-down RCP, that makes

19  sense to Acis because it is a fund that should have been wound-

20  down.  How it is going about being wound-down, that is open for

21  dispute, and one of those things being here this MGM stock

22  sale, etcetera.

23          THE COURT:  We'll hear from Mr. Seery.  I thought

24  there was a pile of cash at this point, but maybe I misread the

25  pleadings.

Appx. 02374

015836

58

1          Okay.

2          MR. POMERANTZ:  Your Honor, let's remember what this

3   motion is.  This motion wasn't a referendum on wind-down, it

4   was the ability to make a distribution.

5          THE COURT:  Right.

6          MR. POMERANTZ:  Mr. Dondero's counsel, who is

7   speaking on behalf of ACM Services, said they're prepared to

8   hold those distributions in the registry of the Court.  The

9   issues regarding what Ms. Patel testified from the podium, at

10  some point, they may very well be the subject of a hearing in

11  the Court.  We're happy to continue responding to the Committee

12  and Ms. Patel's comments and questions about how, but it's just

13  not relevant here.

14          And, Your Honor, there is no way if Ms. Patel is

15  going to go down that road that we will ever be here only an

16  hour.  That is a much longer discussion.

17          THE COURT:  And let me just clarify where I was

18  coming from.

19          I thought if we were evaluating whether insiders

20  should get $8.6 million of distributions, the bona fides of the

21  decision to go into wind-down mode needed to be explored a

22  little bit and see if some of these insiders were improperly

23  exercising control in that.

24          So I agree with what you're saying.  Now, that we're

25  just talking about deferring to another day all but maybe

Appx. 02275
015837

59

 1  Mr. Okada's disbursement, we don't need to hear great detail

 2  about the whole decision-making process for the wind-down of

 3  these three.  A little bit of background would be useful,

 4  but --

 5          MR. POMERANTZ:  Absolutely, Your Honor, and we

 6  will --

 7          THE COURT:  -- it doesn't need to be, you know --

 8          MR. POMERANTZ:  -- tailor our testimony to the issues

 9  that Your Honor was concerned about and the comments that I

10  made, and we will keep within the time limit that Your Honor

11  wants us to keep it to.

12          THE COURT:  All right.  Very good.

13          Mr. Seery?

14          MR. SEERY:  Yes, Your Honor.

15          THE COURT:  There you are.  If you could approach the

16  witness stand.  I know I've been introduced to you before.  I'm

17  not sure if you've taken the witness stand yet.

18          MR. SEERY:  I have not.

19          THE COURT:  I don't think you have.

20          Please raise your right hand.

21          JAMES P. SEERY, JR., DEBTOR'S WITNESS, SWORN

22          THE COURT:  All right.  Please be seated.

23          MS. HAYWARD:  Your Honor, may I approach with an

24  exhibit binder?

25          THE COURT:  You may.

**WWW.JJCOURT.COM**

Seery - Direct/Hayward                60

1          MS. HAYWARD:  Or two?

2          THE COURT:  Okay.  One for the Court.

3     Thank you.

4          MS. HAYWARD:  May I approach the witness?

5          THE COURT:  You may.

6                    DIRECT EXAMINATION

7     BY MR. HAYWARD:

8     Q    Well, good afternoon, Mr. Seery.  Since this is your first

9     time testifying, would you introduce yourself to the Court and

10    give her just a little bit of background?

11    A    I'll go pretty quickly because of the time constraints.

12    James P. Seery, Jr., for the record.  I am an independent

13    director for Highland Capital.  I've been in the asset

14    management restructuring business for about 32 years.

15         I started as a restructuring lawyer handling

16    everything from real estate to debtor's side to financial

17    transactions.  From there, I moved into asset management and

18    distressed investing.

19         From there, I moved into managing a large global loan

20    portfolio for a big investment bank.  That included teams of

21    people who both underwrote, distributed, held, managed,

22    restructured, and traded both loans, indicated loan assets,

23    primarily, but also high end bonds, distressed assets, as well

24    as CLO assets.

25         After that, I went into a hedge fund.  We had a

Appx. 02375
015839

Seery - Direct/Hayward                          61

1  billion, three long-short credit fund.  I was the senior

2  investment partner and president of that firm.  We did similar

3  types of investments, high yield, high yield loans, distressed

4  loans, CLO assets, and some other structured products, long-

5  shorts.  So we were domestic primarily, but we also had a

6  global investment view and an office in London.

7        Subsequent to that, I was a co-head of a credit

8  business for an investment bank.  And then, in the last six

9  months, I've decided to do this job.

10 Q    So of the three board members, you're kind of the stock

11 guy.  Would that be a fair --

12 A    I think -- stock isn't really my stock and trade, but I do

13 know my way a little bit around the stock market.  But it's

14 primarily been credit products, but I do -- I am familiar with

15 equities and equity trade.

16 Q    Okay.  So since coming onto the board, give the Court a

17 day in the life, if you don't mind, and maybe starting with the

18 day that the board took over on January 9th.

19 A    I think, as Your Honor will recall, when we left and we

20 talked about what the role would be and what the compensation

21 would be, I think your comment was, Your Honor, that it -- we

22 wouldn't be 50,000 feet.  Well, we -- we're actually fully on

23 the ground.  We're not even five feet above.  We don't keep

24 track of our hours like lawyers, but probably logged about 190

25 hours in January starting on the 9th, and then about 150 hours,

Appx 03278
015840

Seery - Direct/Hayward                      62

1  160 hours in February.  And I know my fellow board members are

2  similar time commitments.

3        We're involved day-to-day in each of the decisions

4  that the debtor makes from assets management decisions,

5  understanding how the funds are being managed and what the ways

6  that they could either be walled off if they're in liquidation,

7  or if what the proper way to treat them on a day-to-day basis

8  is, evaluating assets that the debtor owns directly or through

9  funds, be thinking about ways to monetize those assets;

10  employee issues, what they're doing, who they're reporting to,

11  how they're -- how they're performing, how they're being paid;

12  claims issues.

13        This case got started, as we all know, by three major

14  litigations, and they're not all easy to understand.  They've

15  got the redeemer arbitration, which I think is fairly

16  straightforward in terms of liability and amount.  There's a

17  number of offsets that are complicated.

18        We've got the UVS litigation that is a lot more

19  complicated because it's not against the debtor.  The judgment

20  is against two offshore funds that are, in essence, shells, and

21  there's a very complex history around the 10-year litigation

22  that that is.

23        Then we have the Acis litigation, which comes out of

24  the Acis bankruptcy, but is an unliquidated claim.  So

25  understanding those thinking about what the pros and cons of

Appx 03279

015841

Seery - Direct/Hayward                         63

1  those claims are, how we would manage them down the road, how

2  we would go forward.  Thinking about how to resolve them has

3  been a key part of what we're doing on a day-to-day basis.

4  Q    So has the board done an independent analysis of all these

5  various litigation claims?

6  A    Not yet.  So we've -- we've done a preliminary analysis,

7  and then we've gone further.  So with respect -- we haven't sat

8  down with -- frankly with Redeemer, yet, although one of the

9  board members has had a call with them separately.  But we have

10 sat down with the Acis creditors, and we've done some

11 significant analysis around that.  And we have sat down with

12 UBS claimants, and we've done significant analysis around that.

13        All three of those require a ton more work, and not

14 because it's not easy to figure out what the numbers are.  It's

15 really difficult to figure out what the liability is, how it

16 rolls up to the debtor, and then how to satisfy it, and so

17 we're trying to get our hands around that.  But that is a

18 critical component of resolving this case.

19 Q    When the board took over, did -- what types of things did

20 you do immediately upon taking over control of this debtor?

21 Did you meet with people at the facility?

22 A    Oh, sure.  So the first thing we did, actually, is have

23 lunch with the Committee and with Acis, and we wanted to get

24 their perspective because they were here and it was easier to

25 do that than to run back to the debtor and try to -- try to

Appx. 03280
015842

Seery - Direct/Hayward                          64

1  then set up another meeting.

2          And so we wanted to get their perspective.  They'd

3  been living with the debtor from the litigations and through

4  the time in Delaware and the litigation in this case.  So we

5  got a feel for them of what their desires were, how they

6  thought the case would work out or potentially resolve, and

7  also, how they thought about our role.

8          One of the things we stressed at that time, and I

9  stressed when I was interviewed for the role, is that -- I know

10 my fellow directors feel the same way, but I'm a pretty

11 independent person, and I wasn't going to be certainly the

12 management of Highlands guy, nor would I be the guy of the

13 Committee.  So we're going to -- I'm going to work

14 independently make decisions with the fellow board members in

15 what I think is the best way.

16         I'm going to try to exercise my duty in both care and

17 loyalty to the estate, but then if the estate has duties, I'm

18 going to make sure we exercise those.  And I feel very strongly

19 about that because this is just one -- a decent sized matter,

20 but one small piece of a career, and I'm not going to

21 compromise myself to satisfy either people on the management

22 side or people on the Committee side.

23 Q    Yeah.  Well, and I want to talk a little bit about the

24 duties since you mentioned them, because we heard I think the

25 Committee say that we -- the debtor has not mentioned the

Appx 03281
015843

Seery - Direct/Hayward                    65

1  fiduciary duties to the estate in the opening statement.  Do

2  you think that by presenting this motion the debtor -- does

3  this motion contemplate protecting the fiduciary duties that

4  the debtor owes to the estate?

5  A    To me, it absolutely does.  But to be fair, I think that

6  the rhetorical flair and opening remarks and missing the duties

7  to the estate, we're very conscious as a board of our duties to

8  the estate.  We're also very conscious of our duties as an

9  asset manager.  And what is in the pleadings is absolutely the

10 case, it's been -- it's my experience, my understanding of the

11 law, and it's being confirmed by both Cayman counsel, and by

12 fund counsel in the U.S. separate from bankruptcy counsel.

13        We owe a duty under the Advisor's Act to the funds

14 and to the investors in those funds.  That duty actually

15 supercedes the benefit to the estate, but it doesn't undercut

16 it because by vindicating the duty to the funds, you actually

17 vindicate the duty to the estate.  If you create liability at

18 the funds, it will roll to the estate.  So by exercising your

19 duty correctly, you do in fact, vindicate the duty of the

20 estate.

21        And what's important in the Advisor's Act, and it's

22 an interesting part of U.S. law.  At least my understanding,

23 it's been confirmed by outside counsel, is if the manager,

24 which would be Highland, has an interest, it's actually

25 required to subordinate that interest to the interest of the

Appx. 03282
015844

Seery - Direct/Hayward                          66

1  investors in the funds it managed.  And it makes sense.

2          If you have funds invested in a fund with an outside

3  investor, you want to make sure that that investor is not --

4  that manager is not using your funds to aggrandize itself as

5  opposed to looking out for your best interest.  And so, I think

6  by vindicating our obligations with respect to the funds, we

7  actually enhance our obligations with respect to the estate.

8  Q    Let's talk a little bit about the funds now.  So

9  originally, the motion pertained to three different funds.

10  Could you just briefly explain to the Court the status of those

11  funds and how they got there?

12  A    Yeah.  I'll try to go quickly, and if I skip something or

13  I go too quickly, Your Honor, please let me know.

14          The Highland Dynamic Fund, which is the primary one

15  we're talking about now, I think you'll see at the end of Tab 1

16  how it's set up right before Tab 2.  And I haven't looked at

17  these exhibits in a long time, so I apologize.  I didn't know I

18  was getting this.  But it's really straightforward.

19          These funds are set up, and this is a pretty typical

20  structure.  It's a limited partnership structure.  It's got a

21  master feeder structure.  And what does that mean?  The master

22  is the main fund.  That's the King Exemptive Limited

23  Partnership at the bottom.

24          It's fed by two feeders, a domestic feeder and an

25  offshore feeder.  Why is it done that way?  Purely tax.

015845

Appx 03285

Seery - Direct/Hayward                          67

1  Offshore investors, non-taxables in the U.S. who are worried

2  about ECI or UVTI, or unrelated business income, we want to

3  make sure that there's no withholding or any tax ramifications

4  with respect to the distributions they get off the fund.  Since

5  it's a pass-through entity, both of those investors, either

6  domestic or foreign, are non-taxables in the U.S., will have

7  their own tax treatment when it gets up to them.  So they don't

8  want anything withheld.

9          When you look at the left side of the page, Dynamic

10  domestic feeder, the other investors is where you'd include

11  Mark Okada.  This fund was founded originally under a different

12  name.  I believe it was called the Highland Loan Fund.  It

13  might have been CLO Loan Fund, I apologize.  And then that was

14  in 2013.

15          Mark Okada put $2 million cash into the fund at that

16  time.  Why did he put it in?  This fund was designed to own CLO

17  assets and loan assets.  Okada was the founder of that part of

18  the business and the driver of that business.  It was pretty

19  essential that he put some money in.

20          However, in '13, they did get third-party investors,

21  but this fund never got real scale.  I think it was only a bit

22  over $100 million.  Not insignificant, but not a big fund.  And

23  they went out looking for loan funds, loan opportunities, and

24  CLO paper.  So the CLO papers, the debt of the CLOs, generally

25  (indiscernible) type paper that was higher yielding unless

Appx 03284
015846

Seery - Direct/Hayward                    68

1  there was some interesting opportunity in the -- in the higher

2  rated tranches.

3          In 2018, the fund got restructured, and they -- I'm

4  pretty sure that's when the name change occurred.  Okada put

5  another two and a half million dollars of cash in.  So he

6  didn't get this as free-carry or anything.  This was actually

7  cash that he deposited in the fund.

8          In 2019, Okada in the spring of 2019, determined that

9  he was leaving Highland.  And his separation was finally

10 completed in September of 2019.  So he is no longer an employee

11 of the debtor.  He has no influence, say, discussion, he's not

12 involved in anything.  He hasn't been since we've been there.

13         The investor, I think it was late summer, either

14 understood that or the fund hadn't performed that well.

15 Frankly, it was undersized anyway.  Realdania, a third-party, I

16 believe they're European, issued a redemption notice.  This was

17 a hedge fund style fund.  So we've got three different funds

18 here, two of them are hedge fund, and we explained a little bit

19 in the papers, but the real dynamic, no pun intended,

20 difference between the two is that Dynamic and Argentina are

21 hedge funds which provide liquidity to the investor.

22         What does that mean?  Monthly, quarterly, semi-

23 annually, they can look for redemptions.  The fund manager

24 sales assets because the assets are supposed to be a little bit

25 more liquid, makes distributions per the redemptions.

Appx. 03285
015847

Seery - Direct/Hayward                    69

1        If the redemptions are too big and the sales will

2   somehow disadvantage the remaining investors, either gates come

3   down or you put the fund into liquidation.  Realdania had made

4   a, I believe it's a $65 million -- it was initially a smaller

5   one, then there was a $65 million redemption, and it -- this is

6   prepetition.  The debtor determined we've got to wind this fund

7   up because we can't basically more than halve it and then

8   continue to try to function.  It would have been far too

9   undersized.

10       So the debtor then went about selling the assets,

11  creating a pool of cash, and then this motion is to liquidate

12  it and pay the investors, including Okada.  When it's done,

13  assuming they made the full distributions, about 80-something

14  percent of the assets will have been distributed.  There's a

15  few small assets that are left.  They're not particularly

16  liquid, but they're small and I'm relatively certain we can

17  unload those at decent prices, create cash for the investors,

18  make the final distribution, so it would be a hold cash to

19  wind-down and then dissolve the various little limited

20  partnerships.

21       Argentina is similar.  The basically different

22  premise of why that fund existed, the original theory was post

23  the Argentina crisis with the election of Macri in '15.  Late

24  '15, Argentina started going through a number of changes in its

25  economy and the thought was that Argentina would start to grow

Appx 03286
015848

Seery - Direct/Hayward                    70

1   and really be able to realize the potential of its people and

2   its resources.  That didn't work out that well, and then at the

3   end of, I think it was '18, Macri was voted out and the former

4   Kirchner, effectively, government is going to back.  Argentina

5   economy has slid into basically -- certainly recession over

6   multiple quarters, but even some would say depression.

7          Very difficult time.  This was not a unique fund for

8   Highland.  There were a lot of these Argentina-type opportunity

9   funds, and that -- that performance has not been particularly

10  good.  The decision there was made to wind-down a third-party

11  investor who made a 15 percent withdrawal, and that a number of

12  other funds that I forget the percentage, but they're managed

13  by UBS, third parties made a -- indicated that they were going

14  to have full redemptions, as well, so that fund was put into

15  liquidation.

16         Importantly, I think something that was mentioned

17  before, there's no benefit to keeping these funds around.  They

18  don't make any fees.

19  Q    Why is that?

20  A    And once they've gone into liquidation, they're not paying

21  any fees.  Similarly, RCP -- now, RCP is a different style of

22  fund, and I think Your Honor, you mentioned it in the papers,

23  you saw that it was a 10-year old fund.  That term was

24  extended.  It was originally a 2008 fund.  It was done as a

25  distressed for control.  Very different opportunity,

Appx 03285
015849

Seery - Direct/Hayward                71

1  (indiscernible), at the time, they probably didn't see the

2  global financial crisis, but saw it as distressed and the

3  opportunity to do distressed for control positions had to be

4  long term.  So that fund had no liquidity provisions for

5  investors.  Typical PE-style fund.

6        The -- when it got to the end of its life, the 10-

7  year life, Highland didn't have the ability to extend the term.

8  A steering committee of third-party institutional investors

9  with no Highland influence whatsoever, Ontario Teachers,

10  CalPERS, some of the biggest, most sophisticated investors in

11  the world in both debt, equity, and distress were driving that.

12  There was also a couple of other funds that are third parties

13  on that steering group.  And they still exist.  They gave a

14  one-year extension.  Highland had no ability to do anything

15  about that.

16        In exchange for the extension, Highland waived fees.

17  So there are no fees being paid on the RCP Fund.  There was a

18  series of one-month extensions that went -- was finished in

19  November of 2019.  And with this distribution, there's still a

20  lot of assets in RCP that have to be managed, about 175

21  million.  And so we're going to -- after we make the

22  distribution -- we've had a few calls and I've been on them,

23  with the steering group.

24        We've told them we're coming to Court to make the

25  distribution.  We were confident that we would be able to -- to

Appx. 03288
015850

Seery - Direct/Hayward                72

 1  be able to make a distribution to them subject to the Court's
 2  order, that we make that distribution and somewhere in the next
 3  two weeks we're going to have a steering group meeting to talk
 4  about the other assets and how we monetize them.
 5          They are different types of assets.  Some have more
 6  liquidity than others, so we're going to need to come up with a
 7  plan.  It's 85 percent, roughly, third parties.  Highland
 8  Capital Management, the debtor, actually has a roughly 15
 9  percent interest in HCM Services, has as a couple percentage,
10  because I think there would have been about 2 percent of the
11  distribution.
12          So it's vast -- the vast majority of the owners of
13  the fund are outsiders, and we're going to need to come up with
14  a structured plan to get them their cash because they've been
15  invested for 12 years in this fund.
16  Q   Do you agree, having had the chance to come in and look
17  over all these things, that these funds should be wound-down?
18  A   Oh, absolutely.  So I think it's easiest to say,
19  Dynamic -- Okada was the driver.  It never got to where it
20  wanted.  The biggest investor wanted out.  It's not big enough
21  to support itself.  Even if one were to look today, and say, it
22  should have, frankly, owning CLO paper when this fund was
23  started until today, there should have been good appreciation
24  in it, and it just didn't -- I don't know the reasons it
25  didn't, but it didn't perform the way it should have, and it

WWW.JJCOURT.COM

Appx. 03289
015851

Seery - Direct/Hayward                                73

1  didn't attract the investors it should have.  Perhaps that had

2  something to do with it, you know, the way the other cases or

3  litigations were going on and the public nature of them.

4          And frankly, coming out of the global financial

5  crises, Highland had had a tough time of it, so it wasn't as if

6  it was the easiest thing to raise funds.  Argentina, there's

7  absolutely no question that the purpose and structure of that

8  fund and what it set out to do doesn't work, just doesn't work.

9  So it makes no sense to keep that going, and that's why the

10  investors -- third-party investors sought redemptions.

11          The insider interests, while not immaterial, are

12  pretty small.  Okada's interest is about 12 percent in the

13  fund, and he's not driving it.  Like I said, he's not even at

14  the debtor.  These two -- but to be fair -- both the decisions

15  to wind-down Dynamic and Argentina were made before the board

16  was involved and before the petition was filed, and they really

17  related to the withdrawals from third parties.

18  Q    So why are we here today?  Do you -- do these funds wind-

19  down in the ordinary course of their business?

20  A    Well, it -- they all have life.  So I'd say in the case of

21  RCP, it's pretty clearly in the ordinary course because it

22  reached the end of its life.  And the investors were very clear

23  that they wanted to be cashed out.  So the difficult part is

24  that it -- because of its structure and in the way it was

25  originally set up as a PE-style fund, it has illiquid, a number

Appx. 03290
015852

1  of illiquid assets.

2         And the challenge in any of the PE funds is to time

3  your exit, and the timing on this hasn't been opportune because

4  the opportunity to sale has not been as good as one might hope

5  and the investors are just at the point where they want to get

6  cashed out as we've heard today from CalPERS.  But we've seen

7  it in the documents and our discussions -- and my discussions

8  directly with them.

9         The other funds, once they've reached this -- it's an

10 ordinary course thing for funds.  When funds either they're --

11 they've reached their life or investors redeem and they get to

12 this state where they really can't support themselves, it's a

13 very ordinary thing for managers to wind-down funds.

14 Q    And as part of the winding down of the funds, is it also

15 ordinary then to make distributions once the funds have become

16 liquid?

17 A    Well, I mean one of the questions you started to ask, or

18 maybe did ask, and I didn't answer, was why are we here?

19        Our view as an independent board, my view as an

20 independent board member, is we have an obligation to all

21 investors.  It would be really easy if the documents or the law

22 said all investors, other than ones who might have been related

23 somehow to the asset manager.  It just doesn't say that.  And

24 as we talked about, this is -- these are not funds from

25 Highland.  If they were funds from Highland, again, it would be

Appx 03291

015853

Seery - Direct/Hayward                              75

1  really easy.

2          As I described for Highland Dynamic, I don't need to

3  hold and carry water for Mark Okada.  But I do need to carry my

4  own fiduciary duties and make sure that I exercise them well.

5  The gentleman put $2 million in -- this is April 2013, put 2

6  million -- 2.5 million in cash in 2018, and the fund is being

7  wound down.  It's not the debtor's money.  If it was the

8  debtor's money, it would be really easy to say, you know,

9  Mr. Okada, I'm not going to give you the money because we may

10  have claims against you, and a different discussion would

11  ensue.

12  Q    Well, I want to walk through that just a little bit.  You

13  say it's not the debtor's money.  Where is the money?

14  A    This money sits in funds or in bank accounts.  Its assets

15  are denominated and they're held in trust.  And the cash that's

16  in accounts, they're denominated in the name of the fund.  The

17  asset manager, Highland, has the ability to access the accounts

18  and use the funds in accordance with the fund documents.  It

19  does not have the ability to access the accounts and use the

20  funds however it see fit.

21  Q    So it's like an authorized signer?

22  A    It's certainly an authorized signer in terms of what its

23  ability to do in terms of accessing the funds.  Typically,

24  that's done through the trustee.  But it can manage the funds.

25  It couldn't take the funds and make an unrelated investment.

WWW.JJCOURT.COM

015854

Appx 03292

Seery - Direct/Hayward                     76

1  It couldn't take the funds and use it for its own purposes and

2  pay them back later.  It's just simply not permitted.

3  Q    Well, taking that to the next level.  If the Court did not

4  allow these distributions to be made, would the distributions

5  then go to the debtor?

6  A    No.

7  Q    Where would they go?

8  A    There's really no provision for it.  There are certain

9  provisions in the underlying documents that would enable the

10 manager to withhold funds.  If there was a change in law that

11 didn't permit a distribution.  If there was some other reason

12 that it became unfeasible to make the distribution.  If you

13 couldn't find the investor, and sometimes that happens.  There

14 are provisions of how you deal with those funds.  But they

15 never would go to the manager.

16 Q    So what is the -- why is the primary reason then that

17 we're here today asking this Court for permission to distribute

18 these funds?

19 A    It's pretty straightforward.  We have a fiduciary duty and

20 we've confirmed that with outside counsel, both Cayman and

21 domestic fund counsel, to make distributions and treat all

22 investors in the funds pro rata.  And we're here to make sure

23 we vindicate our duties, not exercising our fiduciary duties,

24 doing things that were not permitted.  One, we don't think

25 that's right or appropriate.  Two, that's not going to help

Appx 03295
015855

Seery - Direct/Hayward                    77

1  resolve this case that probably contributes to some of the

2  things that led to this case.  So we're not real interested as

3  an independent board in doing things that are close to the

4  edge, along the margin, try to use our positions to leverage

5  investors.

6  Q    Are you familiar with the protocols?

7  A    I am.

8  Q    Okay.  But for the protocols, do you believe that the

9  debtor would need to obtain the Court's permission in order to

10  makes these distributions on behalf of these funds?

11  A    I don't think so, no.

12  Q    So then, why are we asking the Court's permission?

13  A    Well, the protocols require it, and I think the Committee,

14  you know, with due respect and I mean that truly, would like us

15  to withhold the funds, and that provides certain leverage

16  potentially over insiders.  I think when I look at the

17  protocols, I think the main function of the protocols is to

18  assure that there isn't undue influence by insiders over the

19  actions of the company, and that insiders are not somehow

20  benefitting themselves by virtue of their control over the

21  company.

22        The independent board has control over the company.

23  We're not naive and think we have control over every single

24  persons every single second of every day, but we do have

25  control over what happens with the accounts, how payments are

WWW.JJCOURT.COM

Appx 03294
015856

Seery - Direct/Hayward                78

1  made, when we wind something down, when an asset is sold, how

2  the proceeds will be used.  That's the board.  That's not

3  anybody in management.  The decision around these distributions

4  was made by the board independently.  We did consult with the

5  CCO, and that was important to make sure we got all the facts

6  with respect to these funds.

7          We then sought outside counsel to inform our

8  decision, both Cayman and domestic.  We didn't have any

9  influence whatsoever and we didn't speak to Mr. Dondero nor

10  Mr. Okada other than to tell Mr. Okada that we were coming to

11  court and then to ask him if he would defer his distribution.

12  And we know his response.

13  Q   I want to ask you just a couple -- I know I'm almost at my

14  30 minutes here, so I just want to ask you a few quick

15  questions because one of the issues that came up were these

16  demand notes.  I understand that Mr. Okada does have a demand

17  note.

18  A   He does.  We've --

19  Q   And has the board --

20  A   And we've sent a demand.

21  Q   Okay.  And what was -- what is the status of that demand

22  note?

23  A   He acknowledges that he signed it and he said that he's

24  owed certain things from the company.  He's asked how we work

25  those through because he was severed -- or severed himself in

WWW.JJCOURT.COM

Appx 03295

Seery - Direct/Hayward                    79

1  September, and he has -- they reached a severance agreement

2  according to Mr. Okada.  I haven't personally investigated it

3  yet, but we will get to it quickly.  And he has some expenses

4  that are owed, but I don't think those are material.

5          I'm quite confident.  He said his severance was

6  agreement not money, but terms, was very standard.  We'll take

7  a look at that and make sure there's agreement on that.

8          I think it would be covered by the protocol, but it's

9  probably a transaction, so we'd have to talk to the Committee

10  about it, but we'll work -- I'm confident that we can work our

11  way through a standard severance agreement very quickly and

12  resolve that issue and collect on the note.

13  Q    Now, to be clear, the demand note is payable to whom?

14  A    The demand note is payable to the debtor.

15  Q    Okay.

16  A    It was actually a note that was -- he didn't receive cash

17  for the note.  It's basically a tax -- rather than gross-up

18  salary sometime in the past, for whatever reason they decided

19  not to gross it up to cover taxes.

20          Because of the structure of the limited partnership,

21  they could have had taxable income without matching cash, and

22  so they issued notes back to Highland to cover certain of those

23  obligations rather than actually making a distribution.

24  Q    To you knowledge, does Mr. Okada owe any money to the

25  fund?

Appx 03296

015858

Seery - Direct/Hayward                    80

1  A    No.  Not a -- my knowledge is that he does not.  So I am

2  knowledgeable of it, and he does not owe any money to the fund.

3  Q    Okay.  Quickly, I just want to talk a little bit about

4  Mr. Dondero.  One of I think the points that was made at the

5  very beginning of opening statements was that Mr. Dondero is

6  still around.  Why is that?

7  A    He's around because he has incredible knowledge about the

8  investments.  He is a portfolio manager for the fund.  He does

9  work with respect to non-Highland unrelated funds, some of

10 which Highland employees do work under shared services

11 arrangement and we get paid for them.  But Mr. Dondero is

12 around for those reasons and his knowledge about a number of

13 the investments in which we're involved.

14 Q    Does the Debtor -- or does the board have the power to

15 terminate Mr. Dondero if it decides to?

16 A    Yeah, he's -- we could, he's unpaid so there's no cost to

17 his involvement.  His expertise around certain investments,

18 particularly the equity funds as well as some of the larger

19 investments, including the PE investments, is really important.

20 Q    And with respect to the Dondero notes, what are the status

21 of those demand notes?

22 A    We've done an investigation of the notes and I wouldn't

23 say it's as exhaustive as -- it's in similar stages as our

24 examination of other assets.  We've looked at Dondero's notes,

25 we made a decision to send a demand letter to Okada because

Appx 03297
015859

Seery - Direct/Hayward                          81

1  he's no longer a part of the company and there's no real

2  benefit that we saw strategically to not making that demand.

3  It's a small amount of money relative to the size of the case,

4  it's real money, but it's a small amount of money relative to

5  the size of the case.  We should clean that up and move on from

6  Mr. Okada.

7        With respect to the Dondero notes on Dondero entity

8  notes, we want to think about those strategically.  They're a

9  sizable amount of money, not just the ones that are demand, but

10  also there's a number of the notes that ate notes with

11  maturities and they're actually current, they're all current,

12  but how can we use those cash, can we collect those, and I

13  think that's more strategic in terms of how we resolve this

14  case.

15        I agree with Mr. Pomerantz's statement that I think

16  it evolves into a pure litigation case and we really hope it

17  doesn't.  That then -- those can just be sued on and the demand

18  notes are pretty clear as to how they work and even include

19  cost of collection.  So they're pretty straightforward notes.

20  Q    But so for now the board --

21  A    Well, we thought about it, we don't think it makes sense

22  to make that demand at this time.  There's -- our initial --

23  we're not -- we haven't come up with what the plan is for this

24  case, but we have ideas.  We do think they involve Mr. Dondero

25  and they involved contributions from Mr. Dondero whether in the

Appx 02298
015860

Seery - Direct/Hayward                82

1  form of notes, whether in the form of cash, whether in the form
2  of other assets.  We haven't discussed those with him, but we
3  do think that's ultimately, at least preliminarily, where we're
4  going to end up somewhere.  So strategically we think that
5  that'll make sense to include in that sort of a resolution.
6  Q    Okay.  And --
7              THE COURT:  You have one minute.
8              MS. HAYWARD:  Yes, thank you, Your Honor.
9  BY MS. HAYWARD:
10  Q    Last question I'm going to ask you, are you aware of any
11  legal basis to withhold these funds now from Mr. -- from these
12  investors and these related parties?
13  A    I'm not aware of any, but as the Court has contemplating,
14  as the Committee has said, perhaps now that Section 105, you
15  know, grants that sort of authority, but that'll be up to the
16  Judge.
17              MS. HAYWARD:  Your Honor, a housekeeping matter.  I
18  move for the admission of Exhibits 1 through 12.  I don't think
19  any of them are controversial.  But I will let --
20              THE COURT:  You want me to look through
21              MS. HAYWARD:  Your Honor, they are --
22              THE COURT:    -- all of these.
23        (Laughter.)
24              MS. HAYWARD:  Your Honor, just for the record, they
25  are Number -- Exhibit 1 is the chart showing the structure of

Appx. 02290
015861

                            Seery - Direct/Hayward                    83

1  the Dynamic Income Fund.

2              THE COURT:  Right.  We looked at that.

3              MS. HAYWARD:  Exhibit 2 is the partnership agreement,

4  so I know they're large documents, but they're not numerous

5  documents.  Exhibit 3 is just the chart of the Latin America

6  Argentina Fund.  Four, the partnership agreement for that fund.

7  Five, the chart (indiscernible) Third Fund.  Six would be the

8  agreement, the limited partnership agreement for that fund.

9  Seven, Your Honor, is Your Honor's order on the ordinary course

10 governance procedures.

11             THE COURT:  Okay.

12             MS. HAYWARD:  Eight is the final term sheet.  Nine is

13 the notice of amended operating protocols that was filed last

14 week.

15             THE COURT:  All right.  And then CVs of our board

16 members.

17             MS. HAYWARD:  And then the CVs for the board members.

18             THE COURT:  Any objections to these?

19             MS. REID:  No objection, Your Honor.

20             THE COURT:  Okay.  They're admitted.

21             MS. HAYWARD:  Okay.

22             THE COURT:  All right.  Any cross-examination?

23             MS. REID:  Yes, Your Honor.

24             THE COURT:  Okay.

25             MS. REID:  Good afternoon, Your Honor.  Penny Reid on

015862
Appx. 02300

Seery - Cross/Reid                                    84

1  behalf of the Creditors Committee.

2                        CROSS-EXAMINATION

3  BY MS. REID:

4  Q    Good afternoon, Mr. Seery.

5  A    Good afternoon.

6  Q    You are aware, Mr. Seery, aren't you, of the Acis

7  bankruptcy?

8  A    I'm aware of it, yes.

9  Q    Okay.  And you're aware that prior to that bankruptcy Mr.

10  Terry obtained an arbitration award in October of 2017.

11  Correct?

12  A    I'm aware of that, yes.

13  Q    And, Mr. Seery, are you aware that four days after that

14  arbitration award assets started being transferred away from

15  Acis, stripping it of its value at that time?

16  A    I've read the judge's decision in the Acis case but I'm

17  not aware of any of the underlying facts, other than from

18  reading that case.

19  Q    So you aren't aware of all the assets that went out of

20  Acis the day after an arbitration award was entered.

21  A    No, I haven't looked at any of those.

22  Q    Okay.  And you're not aware that the day after a final

23  judgment was entered more assets were stripped from Acis.  Is

24  that correct?

25  A    Other than reading the Judge's decision I'm not aware of

**WWW.JJCOURT.COM**

Seery - Cross/Reid                                      85

1 any of the specific assets, no.

2 Q   Are you aware that two days after that, or entry of the

3 final judgment was ordered, Acis' entire risk retention

4 structure was transferred away from it and into the ownership

5 of Highland CLO Holdings?

6 A   I'm aware of some of the facts relating to the Acis case

7 from the decision and I'm aware of some of the facts from the

8 Acis case because of my discussions with Ms. Patel and Mr.

9 Terry.  I'm not aware of the specific transfers to which you're

10 referring without having -- looking at them.

11 Q   Okay.  So you're not aware that some of the assets that

12 were stripped from Acis went to one of the entities you're

13 wanting to send money to today.  Is that right?

14        MS. HAYWARD:  Objection.  Your Honor, I'm not sure

15 how this is relevant to the Debtor's distribution motion --

16        MS. REID:  Well, it's relevant to the distributions

17 that you're trying to give to the same entity.

18        MS. HAYWARD:  Your Honor, I think right now Mr.

19 Okada --

20        THE WITNESS:  What I --

21        THE COURT:  Just a minute.

22        THE WITNESS:  Sorry.

23        THE COURT:  We have an objection.  Let me hear the

24 objection.

25        MS. HAYWARD:  Your Honor, I think at this point Mr.

Appx 02302
015864

Seery - Cross/Reid                          86

 1  Okada is the only one getting a distribution at issue in this

 2  case as of now in light of the representation that was made by

 3  Judge Lynn.

 4          THE COURT:  All right.  Well, what is your response

 5  to the relevance objection?  She's saying that this line of

 6  inquiry has kind of been taken off the table since -- I'm not

 7  sure which entity, I think you're talking about the Holdco, CLO

 8  Holdco.  Right?

 9          MS. HAYWARD:  Yes, Your Honor.

10          THE COURT:  Since now the disbursement that would

11  have gone to it is being put off the table and would go into

12  the registry of the Court.  So what is your response?

13          MS. REID:  Well, Your Honor, and I can take it off,

14  but currently it's my understanding that Mr. Okada is a 25

15  percent owner in Holdco.  But I can move on to the next

16  question.

17  BY MS. REID:

18  Q    Which is, are you aware that Mr. Okada right after the

19  final judgment was entered transferred their entire interest to

20  Nutra Limited?

21  A    Who transferred to whom?

22  Q    Right after the final judgment --

23  A    Right.

24  Q    -- that Mr. Terry obtained, Mr. Okada transferred their

25  entire limited partner interest in Acis, LP to Nutra.

**WWW.JJCOURT.COM**

015865

Seery - Cross/Reid                               87

1  A    So I apologize.  A couple of things.  One is it goes to
2  what you said, I don't believe Mr. Okada has any interest in
3  sale of Holdco, but you're saying Mr. Okada and their in your
4  question, and so it doesn't make sense.  He's an individual.
5  So I just don't know what you're asking me.  You said Mr. Okada
6  transferred their interest.   Who's their?
7  Q    Are you aware that Acis -- that you're aware that after
8  the entry of the Acis judgment that Mr. Okada's limited
9  partners interest in Acis was transferred to Nutra?
10        MS. HAYWARD:  Again, Your Honor, I lodge the same
11  objection to relevance.
12        THE COURT:  All right.  Again, what is your response
13  to the relevance objection?
14        MS. REID:  I think it's very relevant because I mean
15  he has been saying that they have a fiduciary duty to
16  investors.  Mr. Okada is not your normal independent investor.
17  It's a related party that has engaged in prior improper acts in
18  this court which you're aware, aren't you -- well.
19        THE COURT:  Yeah, I'll overrule the objection and
20  allow a little latitude.
21        THE WITNESS:  So I think what you're referring to is
22  the position in Nutra and I'm aware of some of those issues.
23  Mr. Okada apparently owns 25 percent of Nutra, Mr. Dondero owns
24  75 percent of it.  The control in Nutra is actually vested in
25  Highland Capital Management through a control agreement.  So

Appx 02304
015866

Seery - Cross/Reid                          88

1  I'm not -- I'm aware that they made a transfer and that Nutra

2  owns that interest now, and I'm aware that that split is 75-25,

3  I assume because of that split just like ATM Services, Mr.

4  Okada doesn't have any say in how it's run.  And the control in

5  that entity anyway is vested in Highland, the Debtor.

6  BY MS. REID:

7  Q    So you're aware there were improper transfers made at --

8  during -- before the Acis bankruptcy.  Is that correct?

9  A    I'm aware --

10 Q    You're not aware?

11 A    I'm aware of the decision and I'm aware of the transfers.

12 The designation of it then as improper, I'm not sure that I can

13 say one way or the other because I've looked at the transfers

14 and I can't tell you whether that transfer was improper.  So if

15 you're asking me if I'm aware that that transfer occurred, I

16 think I said I was.  I don't think it's fair for you to color

17 that the transfer was improper.  If somebody --

18 Q    Are you aware of the Court's decision --

19 A    I am --

20 Q     -- that they were improper?

21 A     -- I don't recall the Court's decision with respect to

22 that transfer.  There were a lot of transfers, a number of

23 which the Judge ruled were improper.

24 Q    Okay.  So you are aware that there were improper transfers

25 made from Acis that the Judge found were improper.  Correct?

Appx. 02305

015867

Seery - Cross/Reid                          89

1  A     Yes, I am.

2  Q     Okay.  And you're aware that Mr. Okada was the Chief

3  Investment Officer at the time those transfers were made.

4  Correct?

5  A     Of which entity?

6  Q     Of Highland, of the Debtor.

7  A     I believe he was -- I believe he was a co-CIO of the

8  Debtor at that time, but I'm not positive.

9  Q     So you don't know.

10  A     I'm not sure, no.

11  Q     Okay.  Do you know he was -- he was the Debtor's -- so you

12  do not know one way or the other.

13  A     I am aware that at some time he was the CIO and then the

14  co-CIO.  I don't know the specific time that he was the sole

15  CIO.  I just don't know.

16  Q     Do you know if he was involved with the Debtor at the time

17  these improper transfers were made?

18  A     He definitely worked for the Debtor at that time.

19  Q     Okay.  You -- the reply that was filed today by the --

20  this morning by the Debtor states that the making of these

21  distribution to Mr. Dondero and Mr. Okada is essential to

22  rebuilding the Debtor's reputation in the marketplace.  Is that

23  correct?

24  A     I believe that's what it says, yes.  I assume you're

25  reading it?

Appx 02306
015868

Seery - Cross/Reid                                90

1  Q    I am.

2  A    Okay.

3  Q    Aren't you -- is the marketplace not well aware of

4  Highland's history including the Acis and the Redeemer

5  Committee litigation?

6  A    I believe the market is aware of the Acis and Redeemer

7  litigations.

8  Q    Okay.  And is the marketplace well aware of the extensive

9  wrongdoing that Mr. Okada and Mr. Dondero engaged in as found

10 by this Court and the other tribunals?

11 A    I don't know how the marketplace -- I know that they're

12 aware of the decisions, I can't tell you whether the

13 marketplace as a large general matter knows the specifics.  I

14 don't know.

15 Q    Have any non-insider investors expressed concern to you

16 over the possibility of Mr. Okada not receiving the

17 distribution?

18 A    No, I don't believe so.  I think -- just to make sure I

19 answered your question, have the non-insiders raised issues

20 about Mr. Okada --

21 Q    Not getting distribution.

22 A    No, there won't --

23 Q    No one is really concerned about that except Mr. Okada.

24 Correct?

25 A    I think each investor is concerned about their own

Appx. 02307

015869

Seery - Cross/Reid                               91

1  distributions, so like with respect to RCP I don't CalPERS

2  referred at all to the distributions to Ontario, they probably

3  don't care, they care about their own distributions.

4  Q    And the only one we're talking about right now is the one

5  to Mr. Okada.  Correct?

6  A    That's correct.  I hope so.  Right?  Meaning I'm under the

7  impression that the Committee doesn't object to the investment,

8  to the release of funds and the distribution to third-party

9  investors.

10 Q    Mr. Seery, you testified that one of the reasons you're

11 seeking to distribute these funds is because the Debtor has

12 fiduciary duties to investors.  Correct?

13 A    Yes.

14 Q    Okay.  But these funds aren't being distributed to just

15 regular investors.  Correct?  They're being distributed to

16 insiders.

17 A    Again, unfortunately these are things one has to be

18 precise with.  The question is insider under some securities

19 law, or insider under the Bankruptcy Code?  So --

20 A    Insider under the protocols.

21 Q    I believe the term there, again, we should be precise, is

22 related party.  So he's a related party under the protocols.

23 As far as I know there's no separation under the Investment

24 Advisors Act, under the Cayman law, under Delaware law, or

25 under the contracts with respect to persons who might have

Appx. 03308
015870

Seery - Cross/Reid                                      92

1  worked for the investment manager who made an investment in the

2  fund.

3  Q    Are you aware that the Debtor also has duties to the

4  Creditors Committee?

5  A    I don't believe the Debtor has any duties to the Creditors

6  Committee.

7  Q    To the estate?

8  A    I believe the Debtor has significant and overriding

9  duties, but that's what we're here for, to the estate.

10 Q    To the estate.  And were very conscious of those duties.

11 Correct?

12 A    I am indeed.

13 Q    That's what you testified.  Right?

14 A    Yes.

15 Q    Okay.  So can you explain to me what -- how you consider

16 the estate's considerations in deciding to distribute these,

17 what was your consideration of the estates, how does this

18 benefit the estate?

19 A    This benefits the estate because we have an obligation to

20 the funds and to the investors in the funds to perform

21 according to the terms of the funds.  Unfortunately there is no

22 provision in the fund documents or in the law that allows us to

23 treat the investors in the funds in a disparate way.  And we

24 believe, after consulting with outside counsel, domestic and

25 Cayman, considering federal law under the Advisors Act, as well

Appx. 05309
015871

Seery - Cross/Reid                                    93

1  as Delaware law, that the only way to make distributions, other

2  than if there was a law change, was pro rata to all of the

3  investors.

4        So in order to vindicate our obligations to the

5  outside investors, we also have to pay the inside investors.

6  In addition, if we don't pay the inside investors, there's no

7  basis not to do that.  Now there may ultimately be no liability

8  because it will be hard to bring a case.  But it seems to me

9  that incurring potentially liability is not in the best

10  interest of the estate.  Holding up a distribution from non-

11  estate property doesn't seem to do anything to help the estate.

12  In fact, it puts it at risk.

13        And so we did the work and that's how we determined,

14  exercising what I think is our duty of care, which is really

15  researching this, and we spent a lot of time and a lot of money

16  making sure we got this right.  And our duty of loyalty.  Is

17  there some good reason that the fund could hold up the

18  distribution.  Until we have a claim is there a valid to attack

19  these distributions.

20        By the way, there were $8 million out of 180 million.

21  Now if there had been 180 -- if there had been 172 out of 180,

22  maybe we would come in here and say, We should something a

23  little bit different because we're really letting the small

24  outside investors dictate us and force us to make distributions

25  to related parties that the Committee has some concern about.

Appx. 05319
015872

Seery - Cross/Reid                            94

1          But while $8 million is real money, and I don't deny

2     that, again, it's not huge in this case.  And it seemed to us,

3     after doing the work, that we were putting the estate at risk

4     by no exercising our fiduciary duties.  Moreover, we each have

5     reputations, and they're important to us, and they don't

6     override our fiduciary duties.  We're not going to do things to

7     aggrandize ourselves, to help our reputation versus the estate.

8     But running this Debtor correctly seems to us, looking at the

9     history, was the right thing to do.

10    Q    Has anyone, Mr. Seery, threatened to bring a fiduciary

11    duty claim against you if you don't pay these funds?

12    A    No.

13    Q    Has any -- has Mr. Okada said he's going to bring a claim

14    against you if you don't distribute these funds?

15    A    No, and nor did I consult him about it.  We just told him

16    what we were doing.  We're not -- I'm not inviting someone to

17    sue us.  That I think would be, you know, grossly wrong for us.

18    Q    Now we've touched a little bit on this, Mr. Okada owes the

19    Debtor 1.3 million.  Correct?  In the demand note?

20    A    Approximately, yes.

21    Q    All right.  And you have made a demand on Mr. Okada.

22    Correct?

23    A    That's correct.

24    Q    And he hasn't paid it.  Right?

25    A    No, he has not.

015873

Seery - Cross/Reid                              95

1  Q     And that's money into the estate.  Correct?

2  A     That will be, yes.

3  Q     Now do you still think it's okay to just hand him off, you

4  know, $4 million and even though he's not paying the estate

5  that you have a duty to?

6  A     There's no such thing in my life as just handing off $4

7  million.  This is fund money --

8  Q     Distributable.

9  A      -- that will be distributed to the owners of the fund pro

10 rata.  We're not handing off anything to Mr. Okada or anybody

11 else.

12 Q     But Mr. Okada has not agreed to pay back his note.

13 Correct?

14 A     He's not agreed to pay it back, no.  Technically I would

15 say no.

16 Q     Okay.  And that's because of some severance agreement that

17 you're not aware of what the terms are.  Is that right?

18 A     I have not -- we have not -- I have not looked at the

19 terms, I don't believe many of my fellow directors yet have.

20 It's something that is on the burner for us to get to as soon

21 as this is over.

22 Q     And are --

23 A     He's pushing for it.

24 Q      -- are you aware that the Committee has asked for that

25 severance agreement?

015874

Seery - Cross/Reid                                96

1  A    I was not aware of that, no.

2  Q    You're not aware of that.

3  A    I haven't seen it.

4  Q    And you don't know that it hasn't been produced to us.  Is

5  that correct?

6  A    I don't -- I have not seen it myself, I don't -- didn't

7  know that you'd asked for it, nor do I know that it hadn't been

8  produced.

9  Q    Okay.  And you haven't looked at it.

10  A    I haven't seen it.

11  Q    So you don't know if his failure to pay that money back is

12  valid or not.  Is that correct?

13  A    That's -- I don't -- he still owes the money whether he

14  has appropriate setoffs and whether a settlement agreement

15  would actually work as one.  I don't -- haven't really analyzed

16  that and I don't know that our counsel has either.  It may be

17  that he owes the money and we're holding a severance agreement,

18  but those aren't mutual obligations that are subject to setoff.

19  Q    You don't know one way or the other whether he has a right

20  of setoff.  Correct?

21  A    I don't believe he -- other than perhaps expenses I

22  don't -- haven't heard any articulated monetary setoff against

23  the obligations he owes.

24  Q    If the Court orders that his distribution be put into the

25  Court registry, do you still think you've breached your duty to

WWW.JJCOURT.COM

015875

                            Seery - Cross/Patel                      97

1  the estate somehow by that?

2  A    I think if the Court orders it, I don't think we would be

3  subject to a breach of liability.  I think that we're here

4  vindicating our responsibilities and our duties to investors.

5  If there's an interceding court order, we will follow it.

6  Q    Thank you.

7             MS. HAYWARD:  I have no further questions.

8             THE COURT:  All right.  I think that was about 17

9  minutes.  Any other examination?  Okay.  You'll have 13

10 minutes.

11            MS. PATEL:  Just a few questions, Your Honor.

12                     CROSS-EXAMINATION

13 BY MS. PATEL:

14 Q    Good afternoon, Mr. Seery.

15 A    Good afternoon.

16 Q    Mr. Seery, I think your testimony was that the fund, let's

17 use RCP -- or I'm sorry, that's the wrong one --

18 A    Dynamic?

19 Q    I think it was the Dynamic --

20 A    Dynamic.

21 Q    -- Income Fund is the one that Mr. Okada has an

22 investment in.  Correct?

23 A    That's correct.

24 Q    Okay.  And the fund has duties to Mr. Okada including

25 fiduciary duties as an investor.  Right?

                          WWW.JJCOURT.COM

Seery - Cross/Patel                                    98

1  A    That's correct.

2  Q    Okay.  Does Mr. Okada have duties to the fund?

3  A    I don't believe he does, no.

4  Q    Okay.  Did he ever?

5  A    I believe he did.

6  Q    Okay.  That was during his tenure at Highland Capital

7  Management.  Right?

8  A    I think as an officer of Highland Capital Management, the

9  investment manager, he would have had duties to the fund, yes.

10 Q    Okay.  And have you investigated whether he's breached any

11 of his duties to the fund?

12 A    We have looked, we have not seen anything.  We know that

13 the redemptions came in without any objection.  We have not

14 spoken to the individual investors.

15 Q    Okay.  So would it be fair to say then that you haven't

16 concluded your investigation of whether Mr. Okada has breached

17 any of his duties to the fund itself?

18 A    I don't think that would be fair.  I think what would be

19 fair to say is we've taken a look, we see no evidence

20 whatsoever that there were any breaches by Mr. Okada of his

21 duty to that fund, so there would be no reason to undertake an

22 investigation that we had yet to complete.

23 Q    Okay.  And who undertook that investigation, was it just

24 the board or did you have others involved?

25 A    It was the board.

WWW.JJCOURT.COM

015877

Seery - Cross/Patel                    99

1  Q    Okay.  No one else?

2  A    The investigation with respect to the -- we got data from

3  other people but I'm the one who looked at whether there were

4  any claims related to the redemptions, any objections to any of

5  the other distributions, any objections to the fees, and we

6  found none.

7  Q    Okay.  So no outside counsel advised you with respect to

8  whether Mr. Okada had potentially breached any duties to the

9  fund?

10  A   No, again, it's not something that we would have looked at

11  with no evidence whatsoever that there was any sort of

12  complaint or breach.

13  Q    Okay.  All right.  Mr. Seery, with respect to the, I'll

14  call it the agreement because I'm assuming that it is an

15  agreement, that Mr. Dondero's counsel announced on the record

16  regarding putting the funds that would otherwise be payable to

17  Mr. Dondero into the registry of the Court.  Do you have an

18  understanding whether that agreement also extends to Highland

19  Capital Management Services?

20  A   Yeah, just to be clear because, again, we should be

21  precise, Mr. Dondero was not going to receive any money.  The

22  CLO Holdco, which is owned by the charitable DAF has

23  investments in the Argentina Fund and the Dynamic Fund.  It was

24  going to receive money.  Highland Capital Services has around a

25  2 percent interest in RCP, it was going to receive money.

**WWW.JJCOURT.COM**

Appx 05316
015878

Seery - Cross/Patel                    100

1    I understand that Mr. Dondero, through his counsel,

2  directed that the distribution to Highland Capital Services

3  would not be made.  Mr. Okada owns 25 percent of that, he was

4  not consulted.  I know that because I spoke to Mr. Okada.  The

5  distribution with respect to the CLO Holdco has been similarly

6  treated, but that was done by Grant Scott talking to Mr. Nelms

7  (phonetic) for the charitable DAF that controls the CLO Holdco.

8  Q    Okay.  So, again, to be clear, Mr. Okada has not consented

9  to the agreement that was announced on the record with respect

10  to any distributions to Highland Capital Management Services.

11  Correct?

12  A    He has not, but since he doesn't control it and Mr.

13  Dondero does, the agreement is binding.

14  Q    Okay.  And how do you know that Mr. Dondero controls

15  Highland Capital Management Services?

16  A    Mr. Okada told me.

17  Q    Okay.  All right.  Mr. Seery, with respect to Mr. Okada, I

18  believe your testimony was he separated from Highland Capital

19  Management in September of 2019.  Correct?

20  A    I believe I testified that he originally began his

21  separation in the spring, I don't know exactly when it was, and

22  I believe his official resignation was some time around

23  September.

24  Q    Okay.  Would September 30 of 2019 sound about right?

25  A    It -- approximately, I don't know the date.

Appx. 05315
015879

Seery - Cross/Patel                        101

1  Q    Okay.  So it was towards the end of September though.

2  Correct?

3  A    I don't -- I don't know whether it was September 1,

4  September 15 or September 30, I just don't know the answer.

5  Q    Okay.  And at the time Mr. Okada separated from Highland

6  or any time before then, did Mr. Okada have a non-compete

7  agreement?

8  A    I have not looked at Mr. Okada's contract.

9  Q    Okay.

10  A    So I don't know.

11  Q    All right.  Does -- did Mr. Okada have something called a

12  non-solicit --

13  A    I don't know.

14  Q    -- where he wouldn't solicit clients for example of

15  Highland Capital Management?

16  A    I don't know.

17  Q    Okay.  Did Mr. Okada have what's called a non-recruit

18  where he wouldn't come in and try and recruit employees of

19  Highland Capital Management?

20  A    Again, because I haven't looked at his contract, if he had

21  one, I don't know that he did, and because I haven't looked at

22  it, and I testified that I haven't seen this severance

23  agreement he's talking about, I don't have any understanding of

24  the terms of Mr. Okada's employment with Highland Capital

25  Management.

Appx. 03318
015880

Seery - Cross/Patel                    102

1    Q    Okay.  So you just haven't looked at any of those things.

2    A    That's correct.

3    Q    All right.  Are you aware -- well, did you have an

4    opportunity to look at -- I believe there was a press release

5    that was somewhere around September 2019 where Mr. Okada said

6    he was actually retiring from Highland Capital Management?

7    A    I would have no reason to have looked at such a thing in

8    September.

9    Q    Okay.  All right.  So you haven't seen that.  Let me ask

10   you another question, are you aware that Mr. Okada has a new

11   business by the name of Sycamore Tree Capital?

12   A    I'm aware that he intends to start a new fund, I have no

13   idea what the name is and I'd have no idea what development --

14   stage of development it's in.

15   Q    Okay.  Are you aware if any Highland employees have been

16   engaged by Sycamore Tree Capital

17   A    I'm aware that at least one maybe, I'd have no idea

18   whether that employee, ex-employee now, is involved or not.

19   Q    And isn't that employee Troy Parker?

20   A    That's correct, yes.

21   Q    Okay.  What did Troy Parker do for Highland Capital

22   Management?

23   A    Most recently he ran the PE book.

24   Q    Okay.

25            MS. PATEL:  No further questions, Your Honor.

Appx. 03319

015881

                      Seery - By the Court                    103

1           THE COURT:  All right.  We have seven minutes.  Do

2  you have questions, Judge Lynn?  We have a little bit of time?

3           JUDGE LYNN:  No, but I just want to make clear Mr.

4  Dondero's suggestion for resolving the motion was not a

5  dickered agreement, it was a suggestion that we would hope

6  would make life easier for the parties and the Court.

7           THE COURT:  Okay.  Thank you.  Thank you.

8           I had one or two questions.  Is there going to be

9  redirect?  Well, no, you used all your time, you don't get

10 redirect.

11      (Laughter.)

12

13           MS. HAYWARD:  And, Your Honor, I don't have redirect.

14           THE COURT:  Oh, very good.

15                          EXAMINATION

16 BY THE COURT:

17 Q   Let me ask you, sir, I want to revisit Dynamic, that's the

18 one I hear most about obviously since that's the one that Mr.

19 Okada --

20 A   Yes.

21 Q    -- has the distribution rights from.  You know, I was

22 fixated before I came out here a little on the time line.

23 Right?  So the pleadings said Dynamic, the termination date was

24 November 15, 2019.

25 A   Correct, Your Honor.

Appx. 03329
015882

Seery - By the Court                    104

1  Q    About 30 days after the Highland bankruptcy was filed.

2  What I heard your testimony to be was that pre-petition the

3  largest third-party investor -- I wrote it down phonetically --

4  A    Realdania.

5  Q     -- Realdania --

6  A    I'm not sure if there's someone in the courtroom who know

7  them.

8  Q    Sounds like a Spanish company maybe.

9  A    I believe they're a European company, it's an investor I'm

10 not familiar with, Your Honor, but I have seen the redemption

11 notices.

12 Q    Okay.  They issued a $65 million --

13 A    I believe it was in the neighborhood of 65 million, yes.

14 Q    And it was pre-petition?  You wouldn't know?

15 A    It was pre-petition, I think it was around 40 percent of

16 the fund.

17 Q    Okay.  I mean do you remember when?  Was I t --

18 A    I believe it was in the spring and it followed a -- spring

19 or early summer and it followed a separate redemption from a

20 different investor.

21 Q    Okay.  So there was another third-party investor, even

22 before Realdania that --

23 A    That's my recollection, yes, Your Honor.

24 Q     -- that was unaffiliated with Highland.

25 A    That's correct.

Appx. 02321
015883

Seery - By the Court                    105

1  Q    Okay.  So it's your business judgment that once these two

2  biggies issued their redemptions, it just wasn't worthwhile to

3  keep this fund going anymore.

4  A    That's correct, Your Honor.  And as I said, Mr. Okada was

5  a driver to that fund and he had left.  He did not actually

6  redeem, but he was being compulsory redeemed as the fund went

7  into liquidation.  So all of the investors, redeemed and non,

8  will be treated the same.

9  Q    All right.  So I guess one thing I'm getting at is timing

10  of Mr. Okada leaving versus timing of these third-party

11  redemptions happening.

12  A    Right.  I could --

13  Q    Is there any --

14  A    I see no connection whatsoever.  And, again, his piece of

15  the fund was about -- I believe it was round 12 percent of the

16  fund.

17  Q    Yeah, his --

18  A    And it's a material amount of money I suppose to most

19  folks, including myself, but it's not -- it wasn't a driver

20  whatsoever that we could see, and he did not redeem.  So the

21  third-party redeemed, Okada was leaving having been the driver

22  of the fund, it was an undersized fund anyway, there was no

23  real valid reason to keep a small fund trying to do this around

24  after Mr. Okada left.

25  Q    Okay.  I'm just wondering whether I should or not, you

**WWW.JJCOURT.COM**

Seery - By the Court                    106

1  know, the timing of this.  So this is -- starts spring of 2019,

2  but then a month post-petition let's terminate this thing.  I

3  mean who actually makes that decision?

4  A    Well, the decision to continue forward is made by the

5  board.  Before that it would have been made by the managers of

6  the funds or the compliance group.  So I have not looked into

7  specifically who said, Let's terminate it.  To be perfectly

8  frank, I don't know --

9  Q    But it would --

10 A     -- the specifics.

11 Q     -- the manager, Highland?

12 A    It's Highland who determines to terminate it.  Ultimately,

13 if all the investors issued redemption notices, then the fund

14 would have to liquidate --

15 Q    Right.

16 A     -- on its own.  So Highland --

17 Q    Right.

18 A     -- wouldn't have any say about it.  But to put it into

19 liquidation, I believe it was Highland that did it.  Some of

20 the funds, it could be foreign directors, but that's not what

21 happened.

22 Q    Uh-huh.  Okay.  So there are third-party non-affiliated

23 investors still in it, there's 35 million that would go out the

24 door and --

25 A    It's about -- there's a couple of assets that still have

Appx 03325
015885

Seery - By the Court                    107

1  to be liquidated.  Approximately 85 percent of the distribution

2  is to third-party un-affiliated investors.  And then we --

3  we'll have -- we'll retain some cash to make sure that we can

4  manage the liquidation of the fund and the dissolution of the

5  entities.  But we still have to get rid of a small amount of

6  assets that are pretty liquid.

7  Q    Okay.  Now I heard you also say that Highland isn't owning

8  any fees anymore on these refunds.  Did I not hear you say

9  that?

10 A    Yeah, certainly -- so I think on ours I think.  On Dynamic

11 and on AROF, the Argentina Recovery Opportunity Fund, once they

12 were put into liquidation they don't earn any fees anymore.

13 The --

14 Q    Okay.  Let me -- okay, so when did that stop, when were

15 they "put into liquidation" so the management fees stop?

16 A    I believe that Dynamic would have been in the fall, I

17 don't know the exact date, and Argentina --

18 Q    Well --

19 A    -- was before that.

20 Q    -- the Court termination date used in the pleadings was

21 November 20, 2019.

22 A    Yeah, but I don't recall the exact date, Your Honor.  We

23 can certainly figure that out, I just don't recall off the top

24 of my head.  When the fee cutoff date -- the fee cutoff date

25 for RCP was I believe in April of 2018 when the one-year

WWW.JJCOURT.COM

Appx 03324
015886

Seery - By the Court                    108

1  extension was given.  That was the trade for the extension.

2  Q    Okay.  But you don't know for sure when the management fee

3  cutoff was --

4  A    No.

5  Q    -- on either Argentina or Dynamic.

6  A    No, that's correct, Your Honor.

7  Q    I mean would it have been in November 2019 you think?

8  A    I think it was before that, but I don't -- I believe so

9  but I don't know for sure.

10 Q    Okay.

11 A    If I'm wrong, I'll figure that out and correct it to you.

12 Q    Okay.  All right.  Thank you.  You're --

13 A    Thank you.

14 Q    -- excused.

15 A    Thank you.

16         THE COURT:  Does anyone in the room know the answer

17 to that?

18         MS. HAYWARD:  Your Honor, we can figure it out very

19 quickly I think.

20         THE COURT:  Really?  Okay.

21     (Pause in the proceedings.)

22         THE COURT:  Actually I had one more question for Mr.

23 Seery.

24         THE WITNESS:  Yes.

25 BY THE COURT:

WWW.JJCOURT.COM

015887
Appx 03325

Seery - By the Court                    109

1  Q    Do we have any other Highland managed funds out there that

2  are imminently going to be going into wind-down mode?  Is that

3  easy to answer?

4  A    We have a number of CLO funds that are what we call 1.0

5  CLOs.  They're old and they're effectively winding down.  And a

6  number of those we don't get fees off of, but they had --

7  because they own very illiquid assets, we have to realize on

8  those assets.  May of those have cross-ownership to funds that

9  we do get fees on.  We need --

10 Q    Let me back you up.  Why didn't Highland get fees on

11 those?

12 A    Because sometimes in the CLO structure it depends on what

13 kind of asset gets treated under the net asset value, so for

14 example if it's equity, it may not count, even if it has a

15 value, you don't get paid a fee on it.  So if you had a loan

16 that converted to equity, some of those CLOs you  may not get a

17 fee on because you don't own any loans anymore.  So, but most

18 of those assets, if a CLO owned equity for example in a PE

19 company, we would have other funds that owned additional equity

20 in that same PE company.

21          We do have other assets where they aren't necessarily

22 wind-down, but there will be distributions to entities that may

23 or may not be related parties under the protocols, and we are

24 in the process, and the Committee's aware of it, selling

25 certain assets, and hopefully those sales will go the way we

Appx 03326
015888

Seery - By the Court                    110

1  want them to.  They're valuable assets so we feel we have a

2  good opportunity to realize good value for the estate.  There

3  would be requirements on certain of them to pay off debt from

4  certain entities before we can distribute money back up to

5  Highland Capital.

6  Q    All right.  Thank you.

7  A    Thank you.

8            THE COURT:  You're excused.

9            All right.  Anything else today?

10           MR. POMERANTZ:  Do you want to hear closings, or have

11 you heard enough, Your Honor?

12           THE COURT:  I mean if you  have a quick one or two

13 minute closing, I'll hear that, to recap anything.  Did you

14 have that quick answer that Ms. Hayward --

15           MR. POMERANTZ:  We are --

16           THE COURT:   -- was confident about?

17           MR. POMERANTZ:  We are trying to find it.

18           THE COURT:  Okay.

19           MR. POMERANTZ:  We have a couple of emails out,

20 hopefully by, we get a couple of answers.

21           THE COURT:  Okay.  Okay.

22            CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23           MR. POMERANTZ:  Your Honor, I just wanted the

24 highlight the fiduciary duty as you -- I know it was a subject

25 of discussion with Mr. Seery, cross-examination.  Again, as you

WWW.JJCOURT.COM

Appx. 03327

015889

111

1  heard, and as the only evidence before Your Honor is, Mr.

2  Seery, who as Your Honor knows is a restructuring lawyer,

3  practice in it.  He's fully aware of what the fiduciary duty

4  requires.

5         And first and foremost, I think it may even be 28 USC

6  959, the Debtor has to operate in accordance with applicable

7  law.  Every debtor before Your Honor has to act in accordance

8  with applicable law, and if the debtor is not acting in

9  accordance with applicable law, then they are creating

10  liability.  As Mr. Seery testified, that is exactly what that

11  the Debtor is doing. And this concept of dueling fiduciary

12  duties or the board taking certain actions that just happened

13  to benefit insiders as indicating that they are not looking out

14  for the estate is just not accurate.  That's not how the law

15  works and I think Mr. Seery said it correctly, that the Debtor

16  fulfills its fiduciary duty to the estate by operating in

17  accordance with applicable law.

18         With respect to 105, Your Honor, the cases cited by

19  the Committee don't support granting injunctive relief forward

20  of attachment without going through the necessary process.

21  They do cite the DeLorean case which at first blush sounds like

22  a court authorized the holding of money, but if you read that

23  case carefully, it was done because there was a complaint and

24  because the Court ultimately determined that the evidence

25  before the Court established grounds for preliminary

Appx 02328
015890

112

1  injunction.

2          Mr. Clemente has asked Your Honor to hold that the

3  objection filed satisfies the standard.  But the objection

4  isn't a legal document.  The Committee has not put on any

5  evidence to support any claims that exist.  The testimony from

6  Mr. Seery is that there's a claim under a note and that there

7  are defenses to the note.  So Your Honor does not have the

8  sufficient evidentiary basis in order to meet the standards of

9  the injunction of which irreparable harm -- there's a whole

10  host of reasons.

11          So while we understand what the Committee wanted to

12  do.  If they wanted to file an action, they could have.  We

13  don't expect them to have completed their investigation on all

14  the types of claims they're looking at.  But they've been aware

15  of this Okada note for a couple of months.  It would not have

16  been difficult for them to file, as they have standing, a

17  lawsuit to recover any.  They asked us to issue a demand note,

18  we did, and we got the answer.

19          So, Your Honor, I don't think there's a basis under

20  105, the way it's being used here and the lack of evidentiary

21  record to support it.  And for those reasons, Your Honor, we

22  would ask that Your Honor support the motion and other than the

23  distributions that are being held in the registry, allow the

24  distribution to be made to Mr. Okada.

25          THE COURT:  Okay.

Appx. 02329
015891

113

1          MR. POMERANTZ:  Thank you, Your Honor.

2          THE COURT:  All right.  Other quick closings?

3          MR. CLEMENTE:  Your Honor, I'll be very quick.

4          CLOSING ARGUMENT ON BEHALF OF THE COMMITTEE

5          MR. CLEMENTE:  There's obviously a lot more that I

6  could say, but I'll be respectful and be very quick.

7          First of all, Your Honor is the judge and you're the

8  one that determines what the law is and what the duties

9  ultimately are for this Debtor.  Mr. Seery I think indicated in

10  his testimony that, for what it's worth, he does not believe

11  that there would be a viable claim for breach of fiduciary duty

12  if Your Honor ordered the distribution to Mr. Okada be put in

13  the Court registry.

14          I think the testimony was clear from Mr. Seery that

15  Mr. Okada, at all times relevant, when all the things that

16  happened that involved the Redeemer Committee, that involved

17  Acis, that involved UBS, Mr. Okada was at least co-Chief

18  Investment Officer and we all know he was co-founder of

19  Highland.  I think Your Honor's questions, and perhaps

20  frustration with sort of trying to figure out some of the

21  answers, show how interrelated all of these things are and the

22  various capacities and roles that Mr. Okada had back at the

23  time when all these different transactions occurred.

24          I think the testimony we heard is that Mr. Seery did

25  a lot of work around why we should pay Mr. Okada, but almost no

Appx. 02839
015892

114

1  work around why we shouldn't pay Mr. Okada.  And so I go back

2  to what I said earlier, Your Honor, I think Mr. Okada is

3  perfectly capable of coming into this court and arguing that

4  once the monies that were put into this Court's registry should

5  be distributed to him, he can come in and do that.

6        But I think for purposes of today, Your Honor has

7  heard more than enough to come to the conclusion that the

8  appropriate remedy here is to place the money within the

9  registry of this Court.  It satisfies the fiduciary duty of the

10  Debtor and it protects the interest of Mr. Okada, who is free

11  to come into this court and make whatever argument he so

12  chooses as to his entitlement to those funds.

13        Unless Your Honor has any questions of me, I'll sit

14  down.

15        THE COURT:  Thank you.

16        MR. CLEMENTE:  Thank you.

17        THE COURT:  Anything else?

18        MR. POMERANTZ:  Your Honor, in answer to you

19  question, November 11 was the date that the fees were no longer

20  payable to the Debtor in the Dynamic Fund.

21        THE COURT:  November 11 post-petition.

22        MR. POMERANTZ:  Correct.

23        THE COURT:  I like being transparent and I -- and so

24  I sometimes share my thoughts hoping that it will help.  But

25  I'm -- you all get why I'm fixated on this point?  Maybe I'm

Appx 02331
015893

115

1   sharing my thoughts when I don't have to.  But the time line

2   looks suspect, whether it should be or not, it looks maybe

3   problematic.  Do you see what I'm saying?

4          We had this fund that I understand never got to real

5   scale and in spring 2019 we have a couple of big unrelated

6   third-parties -- third-party investors issue redemptions and

7   that makes it really not a very worthwhile fund, so maybe it

8   should go into wind-down mode.  Nevertheless, Highland has been

9   continuing to get its management fee.  I don't know how much

10  management fee, but it's been getting a management fee until it

11  files bankruptcy, and then, Oh, let's wind this sucker down.

12         Do you see what -- you know, I don't know.  I mean

13  again, a hearing for another day.  But this is the kind of

14  thing I get concerned about, and maybe kind of want to look

15  into the bona fides of the decision making process to wind

16  down, let's terminate this thing and make disbursements.  And,

17  you know, did we have any fingerprints of this on insiders that

18  should make me troubled.  I don't know.  I mean if I'm going

19  out on a lark here, just stop me.

20         MR. POMERANTZ:  Well, look, Your Honor, I certainly

21  understand why you're concerned.  As you said at the first

22  hearing, you have stuff in your head that you can't forget, and

23  I understand.  I wasn't around but I understand the history and

24  especially the history with certainly similar things that may

25  have happened in the Acis case.

**WWW.JJCOURT.COM**

116

1          The facts are that Realdania made its redemption

2   request on August 15, the fees that the -- August 15, but that

3   the liquidation was the time where the management fees stopped,

4   which incidentally were $12,000 a month based upon the level of

5   this spot.

6          THE COURT:  Okay.

7          MR. POMERANTZ:  So, Your Honor, I understand your

8   concerns, however, what I would say is, you have Mr. Seery here

9   answering your questions.  You have Mr. Seery who said he's

10  conducted an thorough investigation.  At some point, and I'm --

11  you know, obviously you brought up a couple of questions, at

12  some point the creditors -- Your Honor has to accept that if

13  the board has done a thorough analysis, and we're coming into

14  this hearing today, and before we filed the motion, as Mr.

15  Seery said, we crossed all our Ts and dotted all our Is.

16         We spent a lot of money collectively, the different

17  firms that are involved, because we wanted to make sure it's

18  the right thing.  We understood that coming to Your Honor

19  asking to pay investors who are related parties, given the

20  context of this case and given the Committee's opposition, was

21  going to be a big challenge.  We thought it was the right thing

22  to do, but we wanted to make sure Your Honor knows that the

23  board actually did a thorough investigation, again, spearheaded

24  by Mr. Seery, who is not just someone off the street, but as he

25  testified, this is what he's done over the last 10-15 years.

**WWW.JJCOURT.COM**

117

1          So I certainly understand Your Honor's concerns.  Mr.

2   Seery I think has testified about the thorough investigation,

3   and that the 12,000 a month, that I think if he got back on the

4   stand, he would testify that would be a breach of duty to the

5   investors to continue on getting fees.  There's an obligation

6   at some point, when the redemptions happened, to either pay the

7   redemptions, put the fund in liquidation, and that's what

8   happened.

9          And just because it wasn't done by the board, it was

10  done before, it was important, as I mentioned in my opening,

11  and as Mr. Seery testified, he looked at that carefully and

12  thoroughly.  He didn't want to be embarrassed, we didn't want

13  to be embarrassed coming in and not having those answers.  So,

14  Your Honor, this is a long way of saying I think at some point

15  the board is entitled to the deference of business judgment if

16  they can demonstrate that they've gone through the process

17  necessary to earn the deference to business judgment, which I

18  think Mr. Seery has done.

19         THE COURT:  Okay.  And while we're on the subject, I

20  mean 12,000 a month was the management fee to Highland from

21  Dynamic.  What was the management fee from Argentina, do you

22  have that off the top of your head?

23         MR. SEERY:  It would have been in the same -- these

24  are approximately --

25         THE COURT:  The same range?

**WWW.JJCOURT.COM**

Appx 02324
015896

118

1          MR. SEERY:   -- the same neighborhood.

2          THE COURT:  Okay.

3          MR. SEERY:  That the meetings would be based upon

4  fees.

5          THE COURT:  Okay.

6          MR. SEERY:  Or the redemptions (indiscernible)

7  variable asset now (indiscernible).

8          THE COURT:  Okay.

9          MR. SEERY:  (indiscernible).

10         THE COURT:  Okay.  All right.  Just a minute while I

11  do some math.

12      (Pause in the proceedings.)

13         THE COURT:  All right.  I'm doing this math in my

14  head.  There's a $7.4 million note receivable from HCM Services

15  of which Okada is the 25 percent owner of.

16         MR. POMERANTZ:  Your Honor, 7.4 is not the demand

17  notes.  Again, 985,000 is the demand notes.  The rest of those

18  notes are performing and not in the fall.

19         THE COURT:  Okay.  All right.  With regard to the

20  motion and the objection and the Committee there's been a lot

21  of argument about 105 and what it permits the Court to do and

22  what it doesn't as far as fashioning an equitable remedy here.

23  Here I mean it's clear that this Debtor has receivables owed by

24  these related parties, although they don't necessarily match up

25  perfectly with the amount of disbursements that are owed by

Appx. 02885
015897

1  these funds and of course the funds are separate legal entities

2  than the Debtor.  So I'm not glossing over that fact or

3  ignoring that fact.

4       But I do think the Court has broad equitable powers

5  to remedy -- to fashion remedies that preserve the status quo

6  and I think it is appropriate here to order that most of this

7  money, that most of the 8.6 million that would go to related

8  investors in these three funds, be put into the registry of the

9  court pending further motions, orders, adversary proceedings

10  anyone wants to file to make a claim to that money.  I said

11  most of it.

12       I am going to order that with regard to the amount

13  that would be payable to Mr. Okada, the 4.176 million, we will

14  subtract from that the 1.3 million that represents the demand

15  note receivable that the Debtor has so that I'm essentially

16  doing an equitable offset at that point.  So he can only be

17  paid -- he should only be paid from the Dynamic Fund whatever

18  4.176 million minus 1.3 million is, and the rest shall be put

19  into the registry of the court.  And everybody's rights are

20  reserved on anything and everything with regarding to do tos

21  and do froms.

22       I reserve the right to supplement in more detail in a

23  written form of order to justify the Court's 105 action here.

24  But, Mr. Pomerantz, I'd ask you to upload a form of order on

25  this, please.

Appx. 02336
015898

120

1          MR. POMERANTZ:  We'll be happy to, Your Honor.  We'll
2  circulate it to the Committee and Ms. Patel as well.
3          THE COURT:  All right.  Well, thank you all, and --
4          MR. CLEMENTE:  Your Honor, but just to be clear
5  though, the other amounts, correct, to HCM Services and CLO
6  Holdco, would that be part of the order or what did Your Honor
7  have in mind with respect to that?
8          THE COURT:  Well --
9          MR. CLEMENTE:  Because I believe those are to be
10  deposited with the Court as well, yes.
11          THE COURT:  -- all of -- everything gets deposited
12  in the registry of the court, except Mr. Okada will get
13  whatever the differential is of 4.176 minus 1.3.  Okay?
14          MR. CLEMENTE:  Thank you, Your Honor.
15          THE COURT:  All right.  Thank you.
16          COURT SECURITY OFFICER:  All rise.
17                          *****
18
19
20
21
22
23
24
25

**WWW.JJCOURT.COM**

Appx. 02337
015899

121

# **C E R T I F I C A T I O N**

1
2          We, DIPTI PATEL, KAREN WATSON and TERRI STARKEY,

3   court approved transcriber, certify that the foregoing is a

4   correct transcript from the official electronic sound recording

5   of the proceedings in the above-entitled matter, and to the

6   best of my ability.

7

8   /s/ Dipti Patel

9   DIPTI PATEL

10

11   /s/ Karen Watson

12   KAREN WATSON

13

14   /s/ Terri Starkey

15   TERRI STARKEY

16   J&J COURT TRANSCRIBERS, INC.        DATE:  March 6, 2020

17

18

19

20

21

22

23

24

25

**WWW.JJCOURT.COM**

App. 02838
015900

# EXHIBIT 26

015901

```
                    IN THE UNITED STATES BANKRUPTCY COURT
  1                  FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
  2
                                    )    Case No. 19-34054-sgj-11
  3   In Re:                        )    Chapter 11
                                    )
  4   HIGHLAND CAPITAL              )    Dallas, Texas
      MANAGEMENT, L.P.,             )    Wednesday, December 16, 2020
  5                                 )    1:30 p.m. Docket
                                    )
  6            Debtor.              )
                                    )    - MOTION FOR ORDER IMPOSING
  7                                 )    TEMPORARY RESTRICTIONS [1528]
                                    )    - DEBTOR'S EMERGENCY MOTION TO
  8                                 )    QUASH SUBPOENA AND FOR ENTRY
                                    )    OF PROTECTIVE ORDER [1564,
  9                                 )    1565]
                                    )    - JAMES DONDERO'S MOTION FOR
 10                                 )    ENTRY OF ORDER REQUIRING
      _____)    NOTICE AND HEARING [1439]
 11
                       TRANSCRIPT OF PROCEEDINGS
 12          BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                  UNITED STATES BANKRUPTCY JUDGE.
 13
      WEBEX APPEARANCES:
 14
      For the Debtor:              Jeffrey N. Pomerantz
 15                                PACHULSKI STANG ZIEHL & JONES, LLP
                                   10100 Santa Monica Blvd.,
 16                                  13th Floor
                                   Los Angeles, CA  90067-4003
 17                                (310) 277-6910

 18   For the Debtor:              John A. Morris
                                   Gregory V. Demo
 19                                PACHULSKI STANG ZIEHL & JONES, LLP
                                   780 Third Avenue, 34th Floor
 20                                New York, NY  10017-2024
                                   (212) 561-7700
 21
      For the Official Committee   Matthew A. Clemente
 22   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                   One South Dearborn Street
 23                                Chicago, IL  60603
                                   (312) 853-7539
 24

 25
```

2

```
 1   APPEARANCES, cont'd.:

 2   For James Dondero:          D. Michael Lynn
                                 Bryan C. Assink
 3                               BONDS ELLIS EPPICH SCHAFER
                                   JONES, LLP
 4                               420 Throckmorton Street,
                                   Suite 1000
 5                               Fort Worth, TX  76102
                                 (817) 405-6900
 6
     For the Issuer Group:       James E. Bain
 7                               JONES WALKER, LLP
                                 811 Main Street, Suite 2900
 8                               Houston, TX  77002
                                 (713) 437-1820
 9
     For the NexPoint Parties:   James A. Wright, III
10                               K&L GATES
                                 State Street Financial Center
11                               One Lincoln Street
                                 Boston, MA  02111
12                               (617) 261-3193

13   For Highland CLO Funding,   Rebecca Matsumura
     Ltd.:                       KING & SPALDING, LLP
14                               500 West 2nd Street, Suite 1800
                                 Austin, TX  78701
15                               (512) 457-2024

16   Recorded by:               Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
17                               1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
18                               (214) 753-2062

19   Transcribed by:            Kathy Rehling
                                 311 Paradise Cove
20                               Shady Shores, TX  76208
                                 (972) 786-3063
21

22

23

24
            Proceedings recorded by electronic sound recording;
25             transcript produced by transcription service.
```

015903

Case 19-34054-sgj11    Doc 3596-26    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21  Exhibit 26  Filed 06/04/25  Page 225 of 1052    PageID 16903

3

| 1 | <u>DALLAS, TEXAS - DECEMBER 16, 2020 - 1:35 P.M.</u> |

2        THE COURT:  All right.  This is Judge Jernigan.  We

3   have settings in Highland.  We have -- I guess the very first

4   thing that we had set today was a motion of Dondero, Mr.

5   Dondero wanting some sort of revised procedures for "future

6   estate transactions occurring outside the ordinary course of

7   business."  Then, related to that, we received the other day

8   -- I'm not showing it on the calendar, I'm not sure if that

9   means it's moot now or not, but we had a motion for protective

10  order and a motion to quash with regard to certain depositions

11  that Mr. Dondero wanted in connection with his motion.  The

12  Debtor filed that motion to quash.  It was to quash a

13  deposition of Mr. Dubel, Mr. Nelms, Mr. Sevilla, and Mr.

14  Caruso.  And then we have the CLO Motion, what I'm calling the

15  CLO Motion, of --

16      (Interruption.)

17          THE COURT:  Okay.  Let's --

18          MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

19  The first two motions have been resolved.  And after Your

20  Honor takes appearances, I'm happy to inform the Court of the

21  proposed resolution, and there's an agreed order that we would

22  upload after the hearing.

23          THE COURT:  Okay.  Well, that is certainly music to

24  my ears.  All right.  So I was just trying to lay out the

25  program for what I thought was set, potentially three motions,

4

1   one of which was a deposition dispute.

2       All right.  So let's go ahead and get appearances.  Mr.

3   Pomerantz, you're obviously appearing for the Debtor team.

4           MR. POMERANTZ:  Yes.  Good morning, Your Honor.  Or

5   good afternoon, Your Honor.  Jeff Pomerantz; Pachulski Stang

6   Ziehl & Jones.  Also on the video with me today are John

7   Morris and Greg Demo.  They will be handling the CLO Motion,

8   and I will be reporting to the Court on the resolution of Mr.

9   Dondero's motion and our corollary discovery motions.

10          THE COURT:  Okay.  All right.  Well, why don't I take

11  an appearance from Mr. Dondero next.  Mr. Lynn, I see you

12  there.

13          MR. LYNN:  Yes, Your Honor.  I am here with Bryan

14  Assink, who will replace me after the preliminaries when our

15  business is done.  Other than concurring with Mr. Pomerantz, I

16  wanted to advise Your Honor that in the last 30 minutes we

17  filed an additional motion where we're seeking a clarification

18  with respect to the temporary restraining order that the Court

19  entered last week.

20          THE COURT:  All right.  Well, I did see an email from

21  my courtroom deputy right before walking in about that motion,

22  and so that's why I was a little surprised and said "Music to

23  my ears" that there was an agreed order on the Dondero

24  motions.  But I'll get the details --

25          MR. LYNN:  Well, we're --

Case 19-34054-sgj11    Doc 3596-26    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 26 Filed Page 6 of 57    Page 227 of 1052    PageID 16905

5

1          THE COURT:  I'll get the details about that in a

2     minute.  Let me go ahead and get the other appearances.

3        For the Movants on what I've called the CLO Motion, who do

4     we have appearing?

5          MR. WRIGHT:  Good afternoon, Your Honor.  It's James

6     Wright of K&L Gates for the -- I guess I'll call them the

7     Movant for this motion.

8          THE COURT:  Yes.  Sometimes you're referred to as the

9     Advisors and the Funds and -- but Movants on Docket Entry

10    1528.

11       All right.  For the Committee, I know you have weighed in

12    on a couple of these motions.  Who do we have?

13         MR. CLEMENTE:  Good afternoon, Your Honor.  Matt

14    Clemente with Sidley Austin on behalf of the Committee.

15         THE COURT:  All right.  Well, we have a lot of folks

16    on the phone.  I think I've covered everybody who filed a

17    pleading for today.  Is there anyone else who would like to

18    appear?  I'd really like to restrict it only to those who have

19    filed pleadings today.

20         MS. MATSUMURA:  This is Rebecca Matsumura from King &

21    Spalding representing Highland CLO Funding, Ltd.  I don't

22    expect I'll be weighing in today, but there are a couple

23    issues that I may say a sentence on, so I want to go ahead and

24    make my appearance now.

25         THE COURT:  All right.  Thank you.  Anyone else?

6

1          MR. BAIN:  Yes, Your Honor.  Joseph Bain; Jones

2    Walker; on behalf of the CLO Issuers.

3          THE COURT:  All right.

4          MR. BAIN:  And Your Honor, if we may make certain

5    comments at the requisite time, we'd appreciate it.

6          THE COURT:  All right.  Thank you.  Anyone else?

7      All right.  Well, Mr. Pomerantz, let's hear about the

8    agreements you have on the Dondero-related motions.

9          MR. POMERANTZ:  Happy to, Your Honor.  And yes, Mr.

10   Lynn is correct, we saw also an emergency motion that came

11   through that I'll have a couple of comments at the end of my

12   presentation.

13     So, as I mentioned before, Your Honor, I'm pleased to

14   report that with respect to the two motions that Your Honor

15   scheduled for today's hearing, we have an agreement with Mr.

16   Dondero.  One was the motion of Mr. Dondero requiring

17   transactions out of the ordinary course to be brought before

18   this Court.  The second was the Debtor's motion to quash a

19   series of subpoenas that had been issued in the last two days,

20   requiring board members and others to testify.

21     As part of the agreement, we have agreed with Mr. Dondero

22   that his motion, which is presently set for today, shall be

23   continued to January 4th, which is the same date set as the

24   continued hearing on the preliminary injunction relating to

25   the TRO that Your Honor had entered last week.

Appx 02345
015907

7

1     As part of that agreement, the Debtor has agreed that it

2   will provide Mr. Dondero with three business days' notice

3   before selling any non-security assets from any managed funds

4   accounts through and including January 13th, which is the date

5   set for confirmation.

6     While, as the Court is aware, the Debtor doesn't believe

7   that any notice, opportunity for hearing, or an order from the

8   Court is required in connection with such transactions, as the

9   Debtor does not have any current plans to sell non-security

10  assets from managed funds before confirmation, it was willing

11  to agree to the notice requirement as essentially a way of

12  resolving the motion before Your Honor today and continuing

13  until the 4th.

14     As part of the agreement as well, Your Honor, the parties

15  have agreed that there will be no further discovery in

16  connection with the motion that is set.  That'll be no

17  additional discovery by Mr. Dondero, so he is withdrawing the

18  subpoenas as it relates to this motion, and there will be no

19  further discovery as -- by the Debtor.  As Your Honor, I

20  think, is aware, there were depositions conducted of both Mr.

21  Seery and Mr. Dondero on Monday in connection with this

22  motion, but the discovery will not happen over the next couple

23  of weeks.

24     Mr. Dondero wanted to make sure, and the Debtor didn't

25  have any opposition, that that agreement with respect to no

8

 1   discovery only relates to the pending motion before the Court.

 2   And in connection with any other matters relating to this

 3   bankruptcy case, Mr. Dondero would reserve the right to pursue

 4   discovery, and of course the Debtors would reserve the right

 5   to challenge discovery if we believed it was inappropriate or

 6   unduly burdensome.

 7       With respect to the motion that was just filed, Your

 8   Honor, we had a chance to briefly review it.  We haven't had a

 9   chance to discuss it with the board.  In any event, we don't

10   think there's an emergency.  Mr. Dondero wants the opportunity

11   to approach and communicate with the board.  I've told Mr.

12   Lynn that communications regarding the plan are to go through

13   Mr. Seery.  Mr. Seery is the Debtor's chief executive officer.

14   He's the chief restructuring officer.  And at this point, the

15   board doesn't see a reason or have a desire to meet with Mr.

16   Dondero to talk about his plan, but, again, would be happy to

17   receive any written communications that Mr. Dondero has.

18       Mr. Dondero has sought to modify the TRO to allow him to

19   speak to the board.  Again, if the board agreed to speak with

20   Mr. Dondero, that wouldn't violate the TRO, provided that

21   counsel would be present.  But at this point, the board has

22   decided that it would be inappropriate and not a good use of

23   anyone's time to have that communication and that Mr. Dondero

24   should continue to communicate through Mr. Seery, the Debtor's

25   chief executive officer.

015909

9

```
 1       If Your Honor, after reading the motion and hearing my

 2   comments, and I'm sure Judge Lynn's comments that he will make

 3   to Your Honor, Your Honor wants to set it for hearing, we

 4   would submit, Your Honor, there's no emergency and that a

 5   hearing could be set next week, but we would think Your Honor

 6   might be able to dispose of the motion just on the papers and

 7   the limited argument that would go on today.

 8            THE COURT:  All right.

 9            MR. POMERANTZ:  Thank you, Your Honor.

10            THE COURT:  All right.  Mr. Lynn, first, could you

11   confirm the terms of the agreed order that Mr. Pomerantz just

12   announced are consistent with what you and your client

13   believed was negotiated?

14            THE CLERK:  He's on mute.

15            THE COURT:  You're on mute, sir.

16            MR. LYNN:  Mr. Pomerantz has correctly stated the

17   agreement of the parties.  I am pleased to advise Your Honor

18   that I expect that we will withdraw the motion that is

19   presently pending to be heard on January 4th, since all we

20   were asking for was notice until confirmation date.  If those

21   sales are going to take place before then, we don't have a

22   problem any longer with the pre-confirmation activity of Mr.

23   Seery.

24       With regard to the motion that we filed requesting that

25   the temporary restraining order be modified, we would point
```

10

 1   out, respectfully, that the independent board is the board of

 2   directors of Strand Advisors.  Strand Advisors belongs to Mr.

 3   Dondero.  It is not unreasonable for the sole stockholder of

 4   Strand Advisors to ask the board questions or present thoughts

 5   to the board or ask its advice.  Mr. Seery, on the other hand,

 6   while being a member of the board of Strand, is the chief

 7   executive officer and the chief restructuring officer of

 8   Highland, which is not the same as Strand.

 9       Furthermore, Your Honor, Mr. Dondero has been attempting

10   for several months to negotiate an arrangement by which the

11   Debtor can continue as a going concern.  It is his desire to

12   discuss further with the board as a whole what he can do in

13   that regard.  I think the Court, by directing him originally

14   to participate in the mediation that took place in September,

15   expected him to do so.  He has attempted to do so.  And while

16   he has not gotten a response from the Creditors' Committee

17   that is definitive, he has at least caught the interest of Mr.

18   Seery, though that interest may have died for a variety of

19   reasons in recent weeks.

20       And by the way, next week is fine with us.  We're not in a

21   hurry beyond that if the Court feels further discussion would

22   be useful.

23           MR. POMERANTZ:  Your Honor, just a couple of points

24   in response.

25       Mr. Dondero has the right to request an audience with the

11

 1   board.  He has requested the audience with the board.  The

 2   board has considered it and decided not to communicate in that

 3   fashion with Mr. Dondero at this time.  There is nothing that

 4   Your Honor can do in the TRO that would change that, other

 5   than ordering the board to speak with Mr. Dondero, which I

 6   highly doubt Your Honor would do.

 7       Having said that, this board in general and Mr. Seery in

 8   particular have been very supportive of an overall resolution

 9   to this case, not only with the creditors, but with Mr.

10   Dondero.  Mr. Seery has spent tens if not hundreds of hours

11   over the last several months working with Mr. Dondero to try

12   to get him in a position to present something that would have

13   traction with the Unsecured Creditors.  Unfortunately, that

14   hasn't occurred.  We understand there have been communications

15   between Mr. Lynn and Mr. Clemente.  And if there is any hope

16   of a plan and any traction with the creditors, this Debtor in

17   general and Mr. Seery in particular stands ready, willing, and

18   able to do anything within the Debtor's power to help that

19   out.

20       So, it's not really the Debtor standing in the way.  It's

21   an economic agreement ultimately that needs to be reached with

22   Mr. Clemente and his constituents and Mr. Lynn.  And if that

23   can be reached, we will be the first to jump on that bandwagon

24   and do everything humanly possible to have that occur.

25       Thank you, Your Honor.

015912

12

1          THE COURT:  All right.  Well, again, I've not read

2     the motion.  I've just seen an email that I have this motion.

3     I'm a little bit confused.  I don't want to spend too long on

4     this because we have another motion to get to.  But I'm a

5     little bit confused on how Dondero wants the TRO to be

6     modified.  If he has the right already to request an audience

7     of the board, what is it that is problematic about the TRO

8     that he wants modified?

9          THE CLERK:  He's on mute.

10         THE COURT:  You're on mute.

11         MR. LYNN:  Sorry, Your Honor.  As I told you before,

12    you must forgive me, my command of technology is not great.

13       In response, I would say that I question whether it is

14    appropriate, in advance of a meeting with the board of his

15    company, that what he wants to talk about should be screened.

16    And that is what has occurred in our effort to meet by

17    telephone with the board.

18       Any such meeting would, of course, be subject to the

19    restraints that are included in the temporary restraining

20    order, in that both Mr. Pomerantz or his designee and I would

21    participate in any such discussion.  I respectfully submit

22    Strand is his.  Nobody may like that, but it is his, and he

23    ought to be able to talk to his own board.

24         THE COURT:  Is this about having a conversation

25    without the Committee's involvement?  I just don't -- hmm.  I

015913

13

 1   just need to see the motion.

 2        Mr. Clemente, anything you want to add at this juncture?

 3   Have you even reviewed the motion yet?

 4             MR. CLEMENTE:  Your Honor, I apologize.  I haven't

 5   actually even seen the motion.  And so I have no comment on

 6   it, Your Honor.  I apologize for not having been able to look

 7   at it.

 8             THE COURT:  Okay.  Well, what about the agreed order

 9   that's been announced?  Any comment on that?

10             MR. CLEMENTE:  Your Honor, we support the resolution

11   that Mr. Pomerantz announced on the record.

12             THE COURT:  Okay.  All right.  Well, I assume there's

13   nothing further, then, on the Dondero motions that were

14   scheduled today?

15        All right.  So I will happily accept the agreed order that

16   has been announced.  For now, we will continue the Dondero

17   motion that was Docket Entry No. 1439 to January 4th, when the

18   preliminary injunction hearing is set.  And we -- I understand

19   there are going to be no more discovery requests in connection

20   with these matters that were set today.

21        And I will review the motion that Mr. Dondero has filed

22   shortly before today's hearing in chambers later, and I will

23   have my courtroom deputy communicate to the lawyers whether I

24   see fit to set it for an emergency hearing next week or rule

25   on the pleadings or set it for January 4th.  Those are, I

Case 19-34054-sgj11 Doc 3596-26 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 13-21 26 Filed 05/25 67 Page 236 of 1052 PageID 16914

14

 1   guess, the three possibilities I can think of that I might

 2   decide upon.

 3       So, again, I'm not making any ruling at all on a motion I

 4   haven't read yet.  So I'll -- the courtroom deputy will let

 5   you all know, if not later today, tomorrow.  Probably

 6   tomorrow, because I have a confirmation hearing set later

 7   today in another case.

 8       All right.  So, thank you all for working these issues

 9   out.  And Mr. Pomerantz, Mr. Dondero -- or, excuse me, Mr.

10   Lynn, anything further on the Dondero disputes?

11           MR. POMERANTZ:  Nothing from the Debtor, Your Honor.

12           MR. LYNN:  Your Honor, nothing from Mr. Dondero.  May

13   I be excused?

14           THE COURT:  Is anyone anticipating needing Mr.

15   Dondero's counsel for the other matter?  All right.  If not,

16   then I certainly have no problem with you dropping off the

17   line, Mr. Lynn.  Thank you.

18           MR. LYNN:  Thank you, Your Honor.

19           THE COURT:  Okay.  All right.  So let's turn next to

20   the CLO Motion.  I take it there are no agreements on this

21   one?

22           MR. POMERANTZ:  There are not, Your Honor.

23           MR. WRIGHT:  There are not, Your Honor.  I can

24   confirm that.

25           THE COURT:  All right.  Mr. Wright, do you have

Case 19-34054-sgj11   Doc 3596-26   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 26   Filed 06/25   Page 237 of 1052    PageID 16915

15

 1   anything you want to say as far as an opening statement before

 2   we go to the evidence?

 3         MR. WRIGHT:  I don't, Your Honor.  My intention, if

 4   it's okay with you, you asked me to bring a witness, so I do

 5   have Mr. Norris from my client, and I was going to just remind

 6   the Court who I am and state the name of all of my Movants,

 7   and then I was going to move directly to put him on the stand

 8   and go through a brief direct.

 9         THE COURT:  All right.  I think I heard Mr. Morris is

10   going to handle this phase of the hearing.

11         MR. DEMO:  And Your Honor, this is Greg Demo from

12   Pachulski on behalf of the Debtor.

13         THE COURT:  Oh, okay.

14         MR. DEMO:  We would like to make a brief opening

15   statement before we have witnesses, if that's all right with

16   Your Honor.

17         THE COURT:  All right.  I'm fine with that.  So, --

18         MR. DEMO:  All right.

19         THE COURT:  -- go ahead.

20         MR. DEMO:  All right.  Well, thank you, Your Honor.

21   Again, Greg Demo; Pachulski Stang; on behalf of the Debtor.

22      We are here today on what really amounts to the third of

23   three motions that deal with Mr. Dondero's attempts, either

24   directly or through a proxy, to transfer control away from the

25   Debtor and back to Mr. Dondero.

16

1      The current motion is filed by NexPoint Capital and

2   Highland Capital Management Fund Advisors and three of their

3   managed funds:  Highland Income Fund, NexPoint Capital, and

4   NexPoint Strategic Opportunities Funds.

5      Mr. Dondero owns and controls NexPoint Capital and

6   Highland Capital Management Fund Advisors.  While both

7   NexPoint Capital and Highland Capital Management Fund Advisors

8   are governed by boards, the boards have no investment

9   authority with respect to the funds they manage, nor was the

10  boards' approval necessary to file the motion, or obtained.

11     Mr. Dondero is the sole portfolio manager for NexPoint

12  Strategic Opportunities Fund and Highland Income Fund.  Mr.

13  Dondero is one of three portfolio managers for NexPoint

14  Capital.  Mr. Dondero's decisions are not subject to

15  oversight.

16     The Movants disclosed these facts in their recent SEC

17  filings, and there can be no dispute that Mr. Dondero is the

18  controlling figure behind the Movants in the relief being

19  sought in the motion which seeks to impede the Debtor's

20  efforts to exercise its rights as a CLO manager.

21     The fact that this motion was even filed is quite

22  surprising, since on December 7th the Debtor filed a complaint

23  and TRO based upon Mr. Dondero's unlawful efforts to frustrate

24  the Debtor's efforts to sell assets from the very CLOs that

25  are the subject of this motion.

17

1      The Court granted the TRO on December 10th.  Mr. Dondero

2   also filed a motion seeking similar relief in November, which

3   has now been adjourned to January 4th.

4      The Movants are essentially now seeking an order from this

5   Court enjoining the Debtor from exercising its rights as a CLO

6   manager and requiring the Debtor to seek the Movants' and Mr.

7   Dondero's permission to fulfill its obligations as a manager

8   for the CLOs.

9      The Movants, however, do not come right out and say this,

10  and instead couch the motion as seeking to simply pause the

11  CLOs' asset sales while the Movants and the Debtor engage in

12  discussions regarding the future of the CLOs' management.

13     In the motion, the Movants also argue the Debtor has made

14  decisions detrimental to the interests of the preference

15  shareholders because the Debtor is trying to monetize its

16  assets in a manner inconsistent with the preference shares'

17  objectives.

18     The Movants simply mischaracterize the facts, the parties'

19  respective rights under contracts, and the law.

20     First, to the extent the Movants hold interests, they hold

21  only preference shares in the CLOs and are minority investors

22  in the preference shares of 12 of the 15 CLOs at issue.  In

23  one third of the CLOs, the Movants' interests sit behind

24  senior debt which must be paid first.

25     Notably, Your Honor, no other investors in the CLOs are

18

 1   here or have expressed support for the Movants' position.

 2        Second, the Movants simply have no right under the

 3   contracts governing the CLOs to the relief they are

 4   requesting.  The CLOs are governed by a series of agreements

 5   which were agreed to long ago and dictate the rights of all

 6   investors of the CLOs.  The enforceability of those agreements

 7   is relied on by all investors, not just the Movants.

 8        Under these agreements, investment discretion is given to

 9   the CLOs' manager -- in this case, the Debtor -- and no

10   investor has the right to direct the CLO manager.  The manager

11   was chosen to manage the CLOs' assets.  No individual investor

12   was chosen to manage the CLOs' assets.

13        Simply said, there will be no evidence that the Movants

14   have the right to do what they're trying to do, and there will

15   be no evidence that the Movants' preferences with respect to

16   the CLOs' assets is in line with that of the other investors

17   in the CLOs.

18        Under the relevant agreements, if an investor is not happy

19   with a manager's performance, the investor's rights are

20   generally limited to replacing the manager.  The investors

21   here -- excuse me, the Movants here -- have not done that and

22   cannot do that.  Under the agreements, replacement requires at

23   least the majority of the preference shares that are not

24   affiliates of the managers.  In 12 of the 15 CLOs, the Movants

25   hold a substantial minority interest position.  They are not

Case 19-34054-sgj11   Doc 3596-26   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-21   Filed 20/26/25   Page 241 of 1052   PageID 16919
Exhibit 26   Page 20 of 67

19

1   the majority.  In the three CLOs in which they are the

2   majority, the Movants still cannot replace the Debtor as the

3   investment manager because they are the Debtor's affiliates.

4        It is indisputable that, prior to January 9th, when Mr.

5   Dondero was removed from control of the Debtor, that the

6   Debtor, NexPoint Advisors, Highland Capital Management Fund

7   Advisors, and the three funds were the Debtor's affiliates

8   because of Mr. Dondero's common control.

9        After January 9th, where the Court removed Mr. Dondero

10  from control of the Debtor, the Debtor is arguably, under the

11  documents, not an affiliate.  However, Your Honor, the Movants

12  have disclosed in their recent proxy statements filed in 2020

13  that they still consider themselves the Debtor's affiliate,

14  and they should be bound by that statement.  The Movants, by

15  virtue of Mr. Dondero's being removed from control of the

16  Debtor, should not be able to use that removal to reassert

17  control over the CLOs that were taken away from Mr. Dondero

18  when he was removed in January 2020.

19       The Debtor believes that additional briefing may be needed

20  on this issue, and that a ruling specifically on this issue

21  and the parties' relative rights under the CLO management

22  agreements may be needed.  The Debtor reserves its right to

23  brief this issue and to bring it before this Court, either as

24  a declaratory judgment or any other procedurally-appropriate

25  motion.

20

1        Because the Debtor -- excuse me.  The Movants have no

2    right to the relief requested.  They argue that the relief is

3    justified because of the mismatch between the investors'

4    timelines and the Movants'.  This is not true.  The Movants

5    cite to three transactions to justify their statement in the

6    motion:  SSP, OmniMax, and certain recent transactions.

7        The recent transactions were the attempted sales of two

8    public equities immediately before Thanksgiving that Mr.

9    Dondero interfered with.  You'll hear testimony from Mr. Seery

10   about each of these transactions and how each was in the best

11   interest of the CLOs.

12       First, SSP.  SSP is a steel business that was suffering

13   for a number of reasons.  The Debtor's investment team

14   believed SSP should be sold since 2019.  The Debtor received

15   multiple offers for SSP, the Debtor evaluated these offers,

16   and the Debtor choose the one that was the best.  The SSP sale

17   closed in early November.

18       Notably, Your Honor, none of the CLOs held an equity

19   interest in SSP, its parent, or in Trussway.  Instead, they

20   held debt, and they got exactly what they bargained for,

21   repayment of their debt obligations in full.

22       OmniMax, Your Honor, is the second one.  It is a

23   fabricator of building materials.  The CLOs and the Movants

24   held an interest in OmniMax debt which they have been trying

25   to refinance or equitize since 2019.  That deal was intended

Appx. 02359
015921

21

1   to include the Movants, but instead of working with the

2   Debtor, Mr. Dondero held out and used the threat of litigation

3   against OmniMax to secure a higher price for the Movants, to

4   the detriment of the CLOs.

5       As Mr. Seery will testify, these two transactions were all

6   about maximizing value and have nothing to do with investment

7   timelines.

8       Finally, Your Honor, the Movants reference the

9   Thanksgiving transactions.  These transactions were discussed

10  in the context of Mr. Dondero's TRO.  Mr. Seery directed

11  Debtor personnel, on the advice of his investment team, to

12  sell these securities.  Mr. Dondero blocked those trades.  Now

13  the Movants argue that the reason those trades were blocked

14  was because of a mismatch between the Movants' and the

15  Debtor's investment timelines.  That is not the case.  Mr.

16  Seery will testify as to these trades.  The Debtor is an

17  investment manager and appreciates that its decisions with

18  respect to how it manages its assets are -- is a judgment

19  call.  The evidence, however, will show that the Debtor at all

20  times exercised that judgment in good faith based on all

21  available information.

22      The Movants may disagree with the Debtor's judgment, Your

23  Honor, but that is irrelevant.  The Movants have no right to

24  interfere with the Debtor's management of the CLOs.  There is

25  simply no statutory or contractual basis for this, not under

22

 1   Section 363 and not under the CLO agreements.

 2        Finally, Your Honor, -- I guess not finally.  There's one

 3   more point I want to make.  But Your Honor, this -- what we're

 4   here on today is notably similar to the Acis bankruptcy that

 5   Your Honor noted last time we were here last week.  In that

 6   bankruptcy, HCLOF tried to direct the collateral manager to

 7   take certain actions that HCLOF thought were in the best

 8   interest of the CLOs.  In this case, the Movants, through Mr.

 9   Dondero, are trying to file an action that functionally seeks

10   to direct the Debtor to take interests that the Movants

11   believe are in their best interest.  There is substantial

12   overlap between the litigation in Acis and the litigation

13   here.

14        Finally, Your Honor, the Debtor has been in discussions

15   with the CLOs' counsel on this issue.  And the Debtor has been

16   informed that the CLOs' position is that the Debtor's ability

17   to operate under the management agreements should not be

18   interfered with, not by the Movants or not by any other party.

19        Thank you, Your Honor.  With that, I will turn it over to

20   Mr. Norris.  Or, I'm sorry, Mr. Wright.

21             THE COURT:  All right.  Mr. Wright, you may call your

22   witness.

23             MR. WRIGHT:  All right, Your Honor.  Dustin Norris

24   should be -- should be dialed in and should be available on

25   screens.

                              Norris - Direct                    23

 1            THE COURT:  Okay.  I'm going to --

 2            MR. WRIGHT:  I'll pause and have him confirm that.

 3            THE COURT:  I'm going to ask you, Mr. Wright, to

 4     speak up or closer to your device.  I didn't hear the name of

 5     your witness.

 6            MR. WRIGHT:  Sure.  Sorry.  It's Dustin Norris.  I --

 7     last time, you were having trouble hearing me, and so I'm

 8     trying a different device this time.  I actually followed the

 9     instructions that I found very helpful, so I'm trying my phone

10     in hopes that it will work better.

11            THE COURT:  All right.

12            MR. WRIGHT:  But, yeah, it's Dustin Norris.  D-U-S-T-

13     I-N, N-O-R-R -- N-O-R-R-I-S.

14            THE COURT:  All right.  Mr. Norris, can you say

15     "Testing one two" so we pick up your video?

16            MR. NORRIS:  Testing one two.

17            THE COURT:  All right.

18            MR. NORRIS:  Testing one two.

19            THE COURT:  All right.  Please raise your right hand.

20              DUSTIN NORRIS, MOVANTS' WITNESS, SWORN

21            THE COURT:  All right.  Mr. Wright, you may proceed.

22            MR. WRIGHT:  Thank you, Your Honor.

23                         DIRECT EXAMINATION

24     BY MR. WRIGHT:

25     Q   Mr. Norris, you're employed by NexPoint Advisors?

Norris - Direct                        24

1   A    I am.  That's correct.

2   Q    And what is your title and role there?

3   A    Yeah.  I am the executive vice president of NexPoint

4   Advisors.  In that role, I oversee business development,

5   marketing, sales, investor relations.  And as far as the funds

6   advised by the advisor, I'm the liaison with the independent

7   board on the business side.

8   Q    Thank you.  Do you also have a role for Highland Capital

9   Management Fund Advisors?

10  A    I do.  I'm also the same executive vice president and

11  fulfill that same role as it pertains to business development,

12  sales, investor relations.  And in both, I'm also working on

13  product development.  So, launching, developing new products

14  and investment funds.

15  Q    Do you also have a role for Highland Income Fund, NexPoint

16  Strategic Opportunities Fund, and NexPoint Capital, Inc.?

17  A    I do.  I'm also executive vice president for each of those

18  funds.

19  Q    Thank you.  Have you ever served on the boards of these

20  three funds?

21  A    I have.  I've served as the interested trustee, sole

22  interested trustee for each of these funds.  I'm no longer the

23  board member or interested trustee, but still serve as an

24  officer, executive vice president, for each fund.

25  Q    At times, I'm going to refer to NexPoint Advisors, LP and

Appx 02303

Norris - Direct                    25

1   Highland Capital Management Fund Advisors, LP simply as the

2   Advisors, to avoid having to keep saying their long names.

3   And similarly with the three funds that are part of the

4   motion, I may just call them the Funds.

5       Can you explain the relationship between the Advisors and

6   the Funds, briefly?

7   A    Yeah.  So, each of these are investment companies that are

8   registered under the Investment Company Act of 1940.  So, with

9   that comes a unique relationship between an investment advisor

10  and the funds themselves.  The Funds don't have employees.

11  They rely on the investment advisor and investment advisor

12  employees.  And between the Funds and the Advisors is an

13  investment advisory agreement.  And the Funds themselves are

14  also overseen by an independent board, and that's by statute

15  by the 1940 Act.

16  Q    Okay.  And just to be clear, when you said that these are

17  -- entities are investment companies, you meant that the three

18  Funds are investment companies?

19  A    Correct.  Correct.  The three Funds are investment

20  companies.  The investment advisors are not investment

21  companies.

22  Q    Thank you.  Can you explain the role of the board for the

23  Funds?

24  A    Yeah.  So, as prescribed by the Investment Company Act of

25  1940, there are certain obligations related to an investment

Norris - Direct                    26

1  company, and one of those is they must be overseen by an

2  independent board.  And the independent board has a

3  responsibility to oversee the -- certain material agreements,

4  including the advisory agreement.  And we meet regularly with

5  the boards.  They overseas certain processes and, again, all

6  material contracts.  And the board is, by Section 15(c) of the

7  1940 Act, required by law to annually review the capabilities

8  of the Advisor and to either approve or reject the advisory

9  contracts.  So, each year, those contracts are renewed by the

10  independent board.

11       There are certain obligations of the Fund and operations

12  that are delegated responsibility to the investment advisors.

13  That includes portfolio management and investment decisions.

14  But all those are overseen by the board.

15  Q    Okay.  And are the boards involved in the day-to-day

16  operations of the Funds?

17  A    They're not.

18  Q    Okay.  And do you know who the members of the boards of

19  these three Funds are?

20  A    I do.

21  Q    Could you share that with us?

22  A    Yeah.  So, the -- there is one interested trustee of each

23  board, and that's John Honis.  And then for the Highland

24  Income Fund and the NexPoint Strategic Opportunities Fund --

25  sorry, for NexPoint -- for Highland Income Fund and NexPoint

Norris - Direct                          27

1   Capital, we have the same three disinterested or independent

2   trustees, and that's Bryan Ward, Dr. Bob Froehlich, and Ethan

3   Powell.  And for NexPoint Strategic Opportunities Fund, we

4   have the same four trustees, one interested, three

5   independent, but there's another fourth independent trustee,

6   Ed Constantino.

7   Q   And when you refer to independent trustees, do you mean

8   independent for purposes of the Investment Company Act of

9   1940, as amended?

10  A   That's correct.  They, by statute, they are independent

11  trustees.  They also have an independent legal counsel.  Stacy

12  Louizos represents them from Blank Rome.  And also two of

13  these Funds are listed on the New York Stock Exchange, and the

14  New York Stock Exchange has various independence requirements

15  that each independent director has met.

16  Q   Thank you.  And which are the two Funds that are listed on

17  NYSE?

18  A   The Highland Income Fund and the NexPoint Strategic

19  Opportunities Fund are both NYSE-listed.

20  Q   And I know you probably haven't memorized everybody who

21  invests in the Funds, but can you give us a general idea of

22  who invests in these Funds?

23  A   Certainly.  I definitely have not memorized them.  There

24  are thousands of individual investors in each of these Funds.

25  Part of my role overseeing investor relations and sales, I do

Norris - Direct                         28

1    talk to a lot of those investors.  But the majority of the

2    investors in each of these Funds are individual investors.

3        As '40 Act Funds, almost anybody with a brokerage account

4    can buy them.  They have tickers, particularly the Funds that

5    are listed.  Closed-end funds.  And so, with that, it is mom-

6    and-pop investors.  It's retail investors, including myself.

7    I've allocated my 401(k) to these funds, the majority of my

8    401(k) to these funds.  But there are also institutional

9    investors.  There's hedge funds.  There's ETFs.  There are

10   large high-net-worth individuals.  But the majority of it is

11   individual investors that have invested through their

12   brokerage firms, be it Wells Fargo, Morgan Stanley, or Cetera.

13   These are -- these are -- these are the individual investors.

14   Q    Thank you.  Does Mr. Dondero have investments in the

15   Funds?  Do you know?

16   A    He does.  He's invested in each of the Funds.

17   Q    Does he have a majority investment in any of the Funds?

18   A    He does not have a majority investment in any of the

19   Funds.

20   Q    Thank you.  Does Mr. Dondero have a control relationship

21   with the two Advisors?

22   A    Yes.  He does.  With the Advisors.

23   Q    And does he have a control relationship with the Funds?

24   A    As it pertains to portfolio management, he is a portfolio

25   manager of each Fund.  But as discussed, as I mentioned, the

Norris - Direct                           29

1    independent board on an annual basis has the ability to

2    terminate or renew our advisory contracts, and that -- that

3    dynamic removes the control, overall control, of the Funds in

4    that regard.

5    Q    Are you familiar with the motion that the Court I think

6    has accurately referred to as the CLO Motion that was filed by

7    the two Advisors and the three Funds?

8    A    Yes.  I am familiar with it.

9    Q    And I'm going to ask you a question now that I think is of

10   interest to the Court, based on the last time I was in front

11   of Judge Jernigan.  Were any employees of the Debtor involved

12   in deciding to bring this motion or in preparing the motion?

13   A    No.  None of the HCMLP employees, to my knowledge, were

14   involved in preparing or deciding to bring the motion.

15   Q    Okay.  And you investigated who was involved in preparing

16   the motion, so your knowledge is pretty good on this point?

17   A    Correct.  I have.  And none were involved, based on that

18   investigation.

19   Q    (garbled) involved in deciding to bring a motion,

20   preparing it, other than outside counsel and my firm?

21   A    Yeah.  So, the initial cause for concern was raised by Mr.

22   Dondero himself to our legal -- internal legal team and

23   compliance team.  And working together with them, myself, and

24   outside counsel, and senior management of Highland Capital

25   Management Fund Advisors, including Joe Sowin, we prepared the

Norris - Direct                                    30

1    order.  Or, sorry, not the order, the motion.

2    Q    All right.  Thank you.  Were the boards of the three Funds

3    involved at all with bringing the motion?

4    A    They were not involved in the preparation of the motion

5    itself.  They were aware and supportive, but they did not

6    prepare the motion.

7    Q    You provided a (audio gap), correct?

8    A    Sorry.  You did cut out there.  I didn't hear the

9    question.

10   Q    I'll try again.  You provided a declaration (garbled)

11   motion, correct?

12   A    I did, yes.

13   Q    And there are two exhibits to your declaration.  There's

14   an Exhibit A and an Exhibit B.

15   A    Correct.

16   Q    Exhibit A, does this reflect the current repayment status

17   of the various CLOs as we -- as you understand it to be as of

18   December 1st?

19   A    Yes, it does.

20   Q    And does Exhibit (garbled) of the three Funds --

21        THE COURT:  Okay.  Mr. --

22   BY MR. WRIGHT:

23   Q    -- and the various CLOs, --

24        THE COURT:  Mr. Wright?

25   BY MR. WRIGHT:

Norris - Direct                          31

1  Q   -- as you understand it?

2         THE COURT:  Mr. Wright, time out.  Two things.

3  First, I don't know what you can do to improve --

4         MR. WRIGHT:  Sure.

5         THE COURT:  -- your connection, but you're

6  occasionally breaking up a little.

7     But second, can we be clear for myself, the record,

8  everyone else, what you're referring to right now?  We have an

9  Advis... your witness and exhibit list is at Docket 1573.  Is

10 that what I should be looking at first?

11        MR. WRIGHT:  Yes, Your Honor.  The declaration of Mr.

12 Norris.  It's Docket 1522-1.  And it's on our exhibit list.

13 It may be the only exhibit on our exhibit list, frankly.

14        THE COURT:  Okay.  So you're talking about his

15 declaration now, not the witness and exhibit list with the

16 attachments to it?  Actually, it is attached here.  Exhibit A.

17 Okay.  I'm there.  I went to Exhibit A in your attachments to

18 your exhibit list at 1573.

19    All right.  Let's try again with your question you just

20 asked.

21        MR. WRIGHT:  Sure.

22 BY MR. WRIGHT:

23 Q   So, Mr. Norris, Exhibit A, this reflects the current

24 repayment status of the CLOs that are the subject of the

25 motion as of December 1.  Correct?

Appx 02379
015932

Norris - Direct                              32

1    A    Correct.

2    Q    And then --

3              MR. WRIGHT:  Your Honor, if you turn to Exhibit B,

4    which is just a couple pages forward.

5              MR. MORRIS:  Your Honor, I would ask that this be put

6    up on the screen, if possible.

7              THE COURT:  Yes.  Can you do that, please?

8              MR. WRIGHT:  I'm sorry.  I couldn't hear that, John.

9              THE COURT:  He asked if you could --

10             MR. MORRIS:  I would --

11             THE COURT:  -- share your screen.  Can you share your

12   screen as to what you're looking at?

13             MR. WRIGHT:  Can I share my screen?  Last time I was

14   using a computer and you were having trouble hearing me, so

15   this time I'm doing it on my phone.  So my phone, no, I don't

16   have this on my phone to share my screen that way.  It's

17   Docket 1522-1, and it's the only exhibit that was on our

18   exhibit list.

19             MR. MORRIS:  No objection, Your Honor.

20             MR. WRIGHT:  All it shows is the holdings in Funds in

21   the CLOs.  That's all it is.

22             MR. MORRIS:  No objection, Your Honor.

23             THE COURT:  Okay.

24             MR. NORRIS:  I'm sorry, John.  I didn't hear.

25             THE COURT:  Give me a minute, because I was at 1573,

Norris - Direct                          33

1   your witness and exhibit list.

2       (Pause.)

3           THE COURT:  Okay.  That's not the correct docket

4   number.

5           MR. MORRIS:  Your Honor?

6           THE COURT:  Yes?

7           MR. MORRIS:  If I may, it's John -- it's John Morris.

8   It's Docket No. 1528.  And the declaration can be found at

9   Page 12 of 26.

10          MR. WRIGHT:  Thank you.

11          THE COURT:  1528?

12          MR. WRIGHT:  That's bizarre, because I have a

13  printout of it and it says Docket 1522-1.

14          THE COURT:  Okay.  1528 is the -- the actual motion

15  we've set for hearing.

16          MR. MORRIS:  And it's attached to that, yes.  If you

17  -- if you go to PDF Page 12, it's the first page of the

18  declaration.

19          THE COURT:  Okay.  I'm there now.  Okay.  So we're on

20  that declaration.  And then you were having the witness look

21  first at Exhibit A to that declaration.  And then where are

22  you having him look next?  Exhibit B, which is entitled

23  "Holdings of Preferred Shares in CLOs"?

24          MR. WRIGHT:  Exhibit B, Your Honor.

25          THE COURT:  Okay.  Continue.

Appx 02372
015934

Norris - Direct                          34

1          MR. WRIGHT:  (garbled) I think some of the exhibits

2     that I have had the wrong docket number printed on the top,

3     and I --

4     BY MR. WRIGHT:

5     Q    Exhibit B.  So, Mr. Norris, Exhibit B to your declaration

6     shows the holdings of the preference shares of the Funds in

7     the various CLOs that are the subject of the motion, correct?

8     A    That's correct.  One clarification.  It shows the

9     percentage ownership of each of those preference share

10    tranches that each Fund owns.

11    Q    Thank you.  Mr. Norris, do the three Funds have a date by

12    which they have to liquidate their investments?

13    A    Sorry, you did skip out there.  If you could you repeat

14    the question.  I apologize.

15    Q    It's frustrating.  Do the three Funds have a date by which

16    they must liquidate their investments?

17    A    No.  They do not.

18    Q    Okay.  Can you briefly explain why the Advisors and the

19    Funds brought this motion?

20    A    Yeah.  The Advisors and the Funds were concerned with

21    certain transactions, as described in the motion.  As

22    preference share owners, we own the majority or a substantial

23    portion of the economics of most of these CLOs, and in three

24    instances the majority of the economic benefit.  And there was

25    concern with the way that the sales were executed.  And so,

Norris - Cross                             35

1   with that, we're simply asking for a temporary relief in order

2   to benefit and to maximize the recovery for our preference

3   shares that we own.

4   Q    Thank you.

5        MR. WRIGHT:  All right, Your Honor.  I have no

6   further questions for Mr. Norris, although I guess I reserve

7   the right to redirect.

8        THE COURT:  All right.  Cross-examination?

9        MR. MORRIS:  Thank you, Your Honor.

10                        CROSS-EXAMINATION

11  BY MR. MORRIS:

12  Q    Good afternoon, Mr. Norris.  Can you hear me?

13  A    I can.  Thank you, Mr. Morris.

14  Q    All right.  I'm going to go into a little bit more detail

15  about some of the topics that you discussed.  To be clear

16  here, there are five moving parties; is that right?

17  A    That's correct.  The two Advisors and the three Funds.

18  Q    And one of the advisory firms is Highland Capital

19  Management Fund Advisors, LP; is that right?

20  A    That's correct.

21  Q    And I'll refer to that as Fund Advisors; is that okay?

22  A    That's great.

23  Q    James Dondero and Mark Okada are the beneficial owners of

24  Fund Advisors, correct?

25  A    That is my understanding, yes.

Norris - Cross                            36

1    Q    And your understanding is that Mr. Dondero controls Fund

2    Advisors, correct?

3    A    That's correct.

4    Q    And the other advisory firm that brought the motion is

5    NexPoint Advisors, LP; is that right?

6    A    That is correct.

7    Q    And Mr. Dondero is the beneficial owner of NexPoint; is

8    that right?

9    A    A family trust where Jim is the sole beneficiary, I

10   believe, controls or owns NexPoint Advisors.

11   Q    Okay.  And Mr. Dondero --

12   A    Or 99.9 percent of NexPoint Advisors.

13   Q    Thank you for the clarification.  Mr. Dondero controls

14   NexPoint; is that right?

15   A    Correct.

16   Q    All right.  And I'm going to refer to Fund Advisors and

17   NexPoint as the Advisors going forward; is that fair?

18   A    That's fair.

19   Q    Each of the Advisors manages certain funds; is that right?

20   A    That is correct.

21   Q    And three of those funds that are managed by the Advisors

22   are the Movants on this motion, correct?

23   A    Correct.

24   Q    All right.  The Advisors caused these three Funds to

25   invest in CLOs that are managed by the Debtor; is that right?

015937

Norris - Cross                          37

1   A    The portfolio managers working for the Advisors did.

2   That's correct.

3   Q    And Mr. Dondero is the portfolio manager of the Highland

4   Income Fund; is that right?

5   A    He is one of the portfolio managers for that Fund.

6   Q    And he's also --

7   A    I believe there are two.

8   Q    And he's also a portfolio manager of NexPoint Capital,

9   Inc., one of the Movants here, right?

10  A    That is correct.

11  Q    And he's also the portfolio manager of NexPoint Strategic

12  Opportunities Fund, another Movant; is that right?

13  A    Yes.  That is correct.

14  Q    Okay.  And I think you testified earlier that each of

15  these Funds has a board.  Is that right?

16  A    That is correct.

17  Q    But the boards don't make investment decisions for the

18  Funds, do they?

19  A    They do not.  They have delegated that authority.

20  Q    And that authority to make investment decisions is

21  delegated to the Advisors; is that right?

22  A    Yes.

23  Q    Okay.  And none of the boards of the Funds who are Movants

24  here adopted any resolution authorizing the Funds to file this

25  motion; is that right?

Norris - Cross                          38

 1  A    To my knowledge, that is correct.
 2  Q    And in fact, the boards were not required to approve the
 3  filing of this motion, correct?
 4  A    I'm not -- I believe that's a legal question, but to my
 5  knowledge, there was not a requirement of the board to -- or,
 6  to adopt a resolution for that.
 7  Q    Okay.  Let's talk a little bit about your background.  I
 8  think you testified that you're the executive vice president
 9  at NexPoint Advisors, one of the Movants.  Is that right?
10  A    That's right.
11  Q    Who's the president of NexPoint Advisors, LP?
12  A    Mr. Dondero.
13  Q    And you report directly to him; is that right?
14  A    I do.
15  Q    You're also the executive vice president of Fund Advisors,
16  another Movant; is that right?
17  A    Correct.
18  Q    And Mr. Dondero is the president of Fund Advisors; is that
19  right?
20  A    He is not.  There is no president of Fund Advisors.  But
21  he -- yeah.
22  Q    You're the president of another entity called NexPoint
23  Securities; is that right?
24  A    That's correct.
25  Q    And you're also the executive vice president of the 11 or

1   12 funds that are managed by the Advisors here, right?

2   A    Yes.  That is correct.

3   Q    Okay.  You've been working for Highland Capital Management

4   or other Highland-related entities for a little more than a

5   decade; is that right?

6   A    That's correct.  Since June 2010.

7   Q    Okay.  Now, you don't personally make any investment

8   decisions for -- for the Funds.  Is that right?

9   A    That's correct.

10  Q    And you don't hold yourself out as an investment manager,

11  do you?

12  A    I do not.

13  Q    And you've never worked for a CLO, have you?

14  A    Never worked for a -- for a C -- employed by a CLO.

15  Worked on accounting, various other aspects, but never worked

16  for a CLO.

17  Q    Okay.  You referred earlier to the declaration that you've

18  submitted in support of the motion.  Do you remember that?

19  A    I do.

20  Q    I've got an assistant on the line here.

21       MR. MORRIS:  Ms. Cantey, can we put up onto the

22  screen Debtor's Exhibit C, which I believe was Mr. Norris's

23  declaration?  And if we could go to Page 12 of 26.  Oh, all

24  right.

25  BY MR. MORRIS:

Norris - Cross                          40

1   Q    And, again, Mr. Norris, as we did in the deposition

2   yesterday, I'll remind you of the difficulty of doing a

3   virtual examination.  And if at any time I ask you a question

4   about your declaration that prompts you to think you need to

5   see another portion of the declaration, will you let me know

6   that?

7   A    Yes, I will.

8   Q    Okay.  Because I'm not here to test your memory.  I'm just

9   here to ask you certain questions.  So please let me know if

10  you need to see something that's not on the screen itself.

11       You didn't write any portion of this declaration; is that

12  right?

13  A    I did not.

14  Q    And you didn't provide any substantive comments to the

15  declaration as drafted because you agreed with -- with the

16  declaration as written by others; is that fair?

17  A    Correct.

18  Q    And all of the key information in your declaration was

19  supplied by NexPoint's management; isn't that right?

20  A    Correct.

21  Q    The individuals who provided the information that's in

22  your declaration include D.C. Sauter, Jason Post, Mr. Dondero,

23  and outside counsel at K&L Gates; is that right?

24  A    Correct.

25  Q    And Mr. Sauter is in-house counsel at the Advisors; is

Norris - Cross                               41

1    that right?

2    A    That is right.

3    Q    And Mr. Post is the chief compliance officer at NexPoint;

4    is that right?

5    A    That's correct.

6    Q    The whole idea for this motion initiated with Mr. Dondero;

7    isn't that right?

8    A    The concern, yes, the concern originated, and his concern

9    was voiced to our legal and compliance team.

10   Q    Okay.

11             MR. MORRIS:  Can we take the declaration down for --

12   oh, actually, no, I'm sorry, leave it there, and let's talk

13   about Exhibit B.  Now we can all see it.  If you can scroll

14   down to Exhibit B, please.  Okay.

15   BY MR. MORRIS:

16   Q    This page is attached to your declaration, right?

17   A    That's correct.

18   Q    And this page is intended to show the percentage of

19   preferred shares owned by each of the Movant Funds and the 15

20   different CLOs, right?

21   A    That's right.

22   Q    And the Debtor is the portfolio manager for each of these

23   CLOs; is that right?

24   A    Yes.

25   Q    And it's your understanding that the Debtor's management

015942

Case 19-34054-sgj11    Doc 3596-26    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 26    Filed 04/25/25    Page 264 of 1052    PageID 16942

Norris - Cross                          42

 1   of the CLOs on this page is governed by written agreements

 2   between the Debtor and each of the CLOs, right?

 3   A    Yes.

 4   Q    None of the Movants are parties to the agreements between

 5   the Debtor and each of the CLOs pursuant to which the Debtor

 6   serves as portfolio manager; is that correct?

 7   A    I believe that is correct.  One, I think, important --

 8   even though they're not subject to the agreement, they are the

 9   -- they have the economic ownership of each of these CLOs.

10   Q    But they're not party to the agreement; is that right?

11   A    Not that I'm aware of.

12   Q    Okay.  And in preparing for this motion and preparing for

13   your testimony, you didn't personally review any of the

14   agreements between the Debtor and any of the CLOs listed on

15   this page, right?

16   A    No.  I relied on legal counsel for that review.

17   Q    Okay.  And, but even though you didn't review the

18   agreements, it's your understanding that among the

19   responsibilities that the Debtor has as the portfolio manager

20   is buying and selling assets on behalf of the CLOs; is that

21   right?

22   A    Yes.  And I believe I specifically stated in my statement,

23   if you want to turn to it, what I (audio gap) to regarding the

24   CLOs' duties under the agreements.

25   Q    Okay.  It's your understanding, in fact, that nobody other

Norris - Cross                         43

1  than the Debtor has the right or the authority to buy and sell

2  assets on behalf of the CLOs listed on Exhibit B, correct?

3  A    That's my understanding.

4  Q    Okay.  And it's also your understanding, your specific

5  understanding, that holders of preferred shares do not make

6  investment decisions on behalf of the CLO; is that right?

7  A    Correct.

8  Q    And that's something that the Advisors knew when they

9  decided to invest in the CLOs on behalf of the Movant Funds;

10 is that fair?

11 A    That's right.  And at that time, the knowledge in the

12 purchase was with Highland Capital Management, LP and the

13 portfolio management team at that time.

14 Q    And it's still with Highland Capital Management, LP; isn't

15 that right?

16 A    That's correct.  I'm not sure that the portfolio

17 management team looks the same, but it was HCMLP.

18 Q    Okay.  Let's just look at this document for a second.  The

19 first column has the list of the CLOs in which the Movant

20 Funds have invested; is that right?

21 A    Correct.

22 Q    And the second column, HIF, that stands for Highland

23 Income Fund; is that right?

24 A    Yes, sir.

25 Q    And Highland Income Fund is one of the Funds who are the

Case 19-34054-sgj11    Doc 3596-26    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 26    Filed 04/25/25    Page 266 of 1052    PageID 16944

Norris - Cross                                    44

1   Movants here, right?

2   A    That is correct.

3   Q    And the percentages below that show the percentage of the

4   preference shares of each of the CLOs that that particular

5   fund holds; is that right?

6   A    That's right.

7   Q    And then the third column relates to NexPoint Strategic

8   Opportunities Fund, one of the Movants here; is that right?

9   A    That's correct.

10  Q    And the next column, the fourth column, relates to

11  NexPoint Capital, Inc.'s holding of preference shares in the

12  15 CLOs, right?

13  A    That's right.

14  Q    So, NexPoint Capital doesn't hold any preference shares in

15  any of the CLOs except for a less-than-one-percent interest in

16  Grayson; am I reading that correctly?

17  A    Yes, that's correct.

18  Q    Okay.  And then the last column is intended to show the

19  aggregate portion or percentage of preference shares that the

20  three moving Funds have in each of the 15 CLOs; is that right?

21  A    Yes, that's right.

22  Q    Okay.  Am I reading this correctly that, for 12 of the 15

23  Funds, the moving Funds own less than a majority of the

24  outstanding preferred shares?

25  A    Yes, that's correct.

Norris - Cross                          45

1   Q    And is it also -- am I also reading this correctly to

2   conclude that the moving Funds owned less than 70 percent of

3   every one of these CLOs; is that right?

4   A    That's correct.

5   Q    You don't know who owns the preferred shares in the CLOs

6   that are not owned by the Movant Funds, do you?

7   A    I don't know any -- any specific owners.

8   Q    And some of these CLOs still have notes that are

9   outstanding; is that right?

10  A    Yes.  Very small amounts as a percentage of the overall

11  CLO original capital structure, but yes, some still have small

12  --

13  Q    So, --

14  A    -- notes.  Small amounts of notes.

15  Q    Okay.  I'm sorry to interrupt.  If we looked at Exhibit A,

16  if we took the time to look at Exhibit A, Exhibit A would

17  show, for each of the 15 CLOs, which of those CLOs still had

18  notes outstanding and the amount of out -- the dollar value of

19  those notes.  Is that right?

20  A    That's correct.

21  Q    Okay.  And your understanding is that -- your

22  understanding -- withdrawn.  The payment -- the distributions

23  from the CLOs are made pursuant to a waterfall; is that right?

24  A    Yes, that's correct.

25  Q    And your understanding of the waterfall process is that

Appx 03884
015946

Norris - Cross                          46

1   the notes that are still outstanding at any CLO must be paid

2   -- must be paid in full before the preferred shares receive

3   any recovery; is that right?

4   A    So, I would say that my understanding is slightly

5   different.  It's going to be dependent on each indenture.

6   But, in general, interest payments are made to the debt

7   holders, and anything extra is then allocated to the equity.

8   But ultimate recovery, to your point, would be once those --

9   once the debt is paid off.  And that's the critical thing

10  here, where the preference shares here now with most of these

11  CLOs almost all the way wound down, with the exception of a

12  small piece of debt.  The equity owns the lion's share of the

13  economic interest of every one of these CLOs.  And I think

14  that's important.

15  Q    Okay.  Some of the CLOs still have outstanding notes.  Is

16  that right?

17  A    Yes.  As we discussed on -- Exhibit A will have the notes

18  that are -- that are remaining on those.

19  Q    And you don't know who holds the notes in the other CLOs,

20  right?

21  A    I don't.

22  Q    The only holders of preferred shares that are pursuing

23  this motion are the three Funds managed by the Advisors,

24  right?

25  A    In this motion, yes.

Appx 03885
015947

Norris - Cross                          47

1   Q    You're not aware of any holder of preferred shares

2   pursuing this motion other than the three Funds managed by the

3   Advisors, correct?

4   A    No, I'm not aware of any others.

5   Q    You didn't personally inform any holder of preferred

6   shares, other than the Funds that are the Movants, that this

7   motion would be filed, did you?

8   A    No, I did not.

9   Q    You're not aware of any steps taken by either of the

10  Advisors to provide notice to holders of preferred shares that

11  this motion was going to be filed, are you?

12  A    I'm not, no.

13  Q    And you're not aware of any attempt that was made to

14  obtain the consent of all of the holders of the preferred

15  shares to seek the relief sought in this motion, correct?

16  A    That's correct.

17  Q    You don't have any personal knowledge, personal knowledge,

18  as to whether any holder of preferred shares other than the

19  Funds managed by the Advisors wants the relief sought in the

20  motion, correct?

21  A    Correct.

22  Q    You don't have any personal knowledge as to whether any of

23  the CLOs that are subject to the contracts that you described

24  want the relief that's being requested in this motion, right?

25  A    That's correct.  I have not spoken or been involved at all

Norris - Cross                              48

1    directly with the CLOs.  I'm representing the Funds.

2    Q    Okay.  Now, two of the Funds, two of the three Movant

3    Funds, I believe you testified are publicly traded; is that

4    right?

5    A    That's correct.

6    Q    And that's the Highland Income Fund and the NexPoint

7    Strategic Opportunities Fund; is that right?

8    A    That's right.  That's right.

9    Q    And because they are publicly-traded, the shareholders in

10   those two funds can sell their shares any time the market is

11   open; is that right?

12   A    If they're willing to take the price that the market is

13   willing to give, yes.

14   Q    Yes.

15   A    Between market hours.

16   Q    And if they -- if they don't like the way the assets that

17   are -- that the Funds have been invested, one of the things

18   they could do is simply sell their shares, right?

19   A    Yes.

20   Q    And the third fund, the shareholders in the third fund

21   have the right to sell out not on a public market but on a

22   quarterly basis; is that right?

23   A    Correct.

24   Q    That third Movant Fund is NexPoint Capital; do I have that

25   right?

Norris - Cross                              49

1   A    Correct.

2   Q    So they also have the ability to exit if they don't like

3   management on a quarterly basis; is that right?

4   A    Correct.

5   Q    All right.  Can we turn to Paragraph -- Paragraphs 8 and 9

6   of your declaration?  Okay.  Paragraph 8 describes a

7   transaction that's been referred to as OmniMax; is that right?

8   A    Yes.

9   Q    And Paragraph 9 refers to a transaction involving SSP

10  Holdings, LLC; do I have that right?

11  A    That's correct.

12  Q    Do you know what SSP stands for?

13  A    See if we say it in there.  SSP Holdings, LLC.

14  Q    Right.  Do you know what SSP stands for?

15  A    I don't.  Something Steel Products.  I --

16  Q    Okay.  You don't need to guess.  These are the only two

17  transactions that the Movants question; is that right?

18  A    These transactions, as well as certain transactions around

19  Thanksgiving time.

20  Q    Okay.  We'll talk about those.  But those transactions

21  about -- around Thanksgiving time aren't in your declaration,

22  are they?

23  A    Not specifically mentioned by name.

24  Q    Okay.  Let's talk about the two that are mentioned by

25  name, Trussway and SSP.  The Movants do not contend that

Norris - Cross                           50

1    either transaction was the product of fraudulent conduct, do

2    they?

3    A    No.

4    Q    The Movants do not contend that the Debtor breached any

5    agreement by effectuating these transactions, do they?

6    A    I don't believe so.

7    Q    In fact, the Movants do not contend that the Debtor

8    violated any agreement at any time in the management of the

9    CLOs listed on Exhibit B; is that right?

10   A    That's right.

11   Q    The Movants don't even question the Debtor's business

12   judgment, only the results of the trans -- of these two

13   transactions.  Is that right?

14   A    That's right.  And results is the key here and the

15   approach.

16   Q    I see.  And the reason the Movants do not question the

17   Debtor's business judgment is because you don't know what

18   factor or factors the Debtor considered in executing these

19   transactions, right?

20   A    That's right.  I can't look into the mind or know the

21   business judgment and the inputs that went into this.  We do

22   know the outcomes.  And to us, that's troubling, right, as the

23   owners of the lion's share or the majority or even significant

24   amounts of the economic ownership of the CLOs.  And having

25   insight into those transactions, as mentioned in my statement,

Case 19-34054-sgj11    Doc 3596-26    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 26    Filed 05/22/25 67    Page 273 of 1052    PageID 16951

                                    Norris - Cross                              51

1  really just trying to maximize recoveries for our Funds.

2           MR. MORRIS:  Your Honor, I move to strike the portion

3  of his answer following that which was responsive to the

4  question.

5           THE COURT:  All right.  I grant that motion.

6           MR. MORRIS:  Okay.

7  BY MR. MORRIS:

8  Q    Sir, you never asked the Debtor what factors it considered

9  in making these trades, right?

10  A    I did not.

11  Q    And you have no reason to believe that anyone on behalf of

12  the Movants ever asked the Debtor why it executed these

13  trades, right?

14  A    I don't have any knowledge.  There could have been

15  somebody from -- from the Movants.  But I did not.

16  Q    Okay.  On OmniMax, the Movants disagree with the price at

17  which the Debtor effectuated the trade, right?

18  A    Correct.

19  Q    And I believe there was a meeting of the boards of the

20  Funds back in August at which Mr. Seery appeared.  Do I have

21  that right?

22  A    I believe it was August, but he did appear.

23  Q    And the purpose of the appearance was so that Mr. Seery

24  could give an update on the bankruptcy; is that right?

25  A    That's correct, and on the services provided by Highland

015952

Norris - Cross                                52

1   Capital Management, LP to our Advisor.  Advisors.  They

2   provide various shared services.

3   Q   And it was during that meeting that Mr. Seery forthrightly

4   told the boards the price at which he was planning to execute

5   the OmniMax transaction, correct?

6   A    Correct.

7   Q   The transaction hadn't yet occurred, right?

8   A   I'm not sure if it had been finalized.  He had a price,

9   and these -- these things are negotiated.  This was, I

10  believe, a company in restructuring.  So I don't know whether

11  it had been transacted or not.

12  Q   Okay.  The board didn't ask Mr. Seery not to execute the

13  transaction, did it?

14  A    Not to my knowledge.  The board wouldn't -- I don't think

15  the board would have that authority, either.

16  Q   Okay.  But it's here asking the Court to cause the Debtor

17  to pause in the execution of any trades in the CLOs; is that

18  right?

19  A   I think the order speaks in that regard.

20  Q   Yeah.  Okay.  Let's talk about the SSP transaction for a

21  moment.  It's your understanding that Trussway Holdings, LLC

22  owned a majority interest in SSP Holdings, LLC, right?  That's

23  in Paragraph 9.

24  A   Yes.  The statement in Paragraph 9 is what I believe is

25  correct.

Norris - Cross                              53

1   Q   Okay.  And it's also your understanding that Trussway is a

2   wholly-owned subsi... I'm sorry, that SSP Holdings is a

3   wholly-owned subsidiary -- withdrawn.  It's also your

4   understanding that Trussway is a wholly-owned subsidiary of

5   the Debtor, right?

6   A   Yes.

7   Q   But Trussway is not a debtor in bankruptcy, right?

8   A   I'm not sure.

9   Q   Okay.  You have no reason to believe that; is that fair?

10  A   That it's not a debtor in bankruptcy?  That Trussway is

11  not in bankruptcy itself?

12  Q   Correct.

13  A   Yeah.  I have no knowledge of Trussway's situation.

14  Q   Okay.  But you -- but according to your declaration that

15  was prepared by the Advisors' management team, Trussway and

16  not the Debtor owned SSP Holdings, LLC.  Is that right?

17  A   I'm looking here at the statement just to make sure.

18  Q   Sure.

19      (Pause.)

20  A   I -- again, I -- the statement is correct, and I believe

21  speaks for itself regarding entity ownership.

22  Q   The only things you know about the SSP transaction are,

23  one, that you believe it was made without a formal bidding

24  process; and two, that it resulted in a $10 million loss.  Is

25  that right?

Appx 03892
015954

Norris - Cross                              54

1  A    Correct.

2  Q    Okay.  But, again, neither you, or to the best of your

3  knowledge, anybody at Advisors, ever spoke with anybody at the

4  Debtor about the circumstances concerning either of the

5  transactions, right?

6  A    I don't know the conversations that were had at anyone

7  else from our Advisors, but this is the knowledge that -- that

8  I have.

9  Q    Okay.  And it's the only knowledge you have, right?  You

10 don't know anything about the SSP transaction other than those

11 two facts, right?

12 A    Correct.

13 Q    In fact, I think you testified yesterday that you've been

14 very remote from the SSP transaction, right?

15 A    That's correct.

16 Q    And that it's not a transaction that you have much

17 knowledge on.  Fair?

18 A    Fair.

19 Q    Let's just talk briefly about the transactions that

20 occurred (garbled) Thanksgiving.  They're not specifically

21 referred to in your declaration; is that right?

22 A    That's correct.

23 Q    And you have no knowledge about any transaction that Mr.

24 Seery wanted to execute around Thanksgiving; is that right?

25 A    I know there were transactions and there were concerns

Norris - Cross                                55

1    from our management team, but I'm not aware of what the

2    transactions were.

3    Q    In fact, you can't even identify the assets that Mr. Seery

4    wanted to sell around Thanksgiving, or at least you couldn't

5    at the time of your deposition yesterday.  Is that right?

6    A    That's correct.

7    Q    And you have no knowledge as to why Mr. Seery wanted to

8    make those particular trades at around Thanksgiving?

9    A    No, I don't.

10   Q    And in fact, you don't even know if the transactions that

11   Mr. Seery wanted to close around Thanksgiving ever in fact

12   closed.  Is that fair?

13   A    Correct.

14   Q    Okay.  Let's just -- let's just finish up with a few

15   questions about the boards.

16           MR. MORRIS:  Ms. Cantey, can we put up Debtor's

17   Exhibit EEEE?  Four E's, Your Honor.  Thank you.

18   BY MR. MORRIS:

19   Q    This particular page identifies the directors for each of

20   the three Movant Funds; is that right?

21   A    Let me take a look and confirm.  (Pause.)  Yes.  That

22   looks correct.

23   Q    Okay.  And this was prepared by the Movants; is that

24   right?

25   A    I'm not sure who prepared it.

Norris - Cross                                56

1    Q    Okay.  To the best of your knowledge, does this document

2    accurately reflect the composition of the boards of each of

3    the three Movant Funds?

4    A    Yes, it does.

5    Q    Okay.  John Honis, I think you mentioned him earlier.

6    He's on all three boards.  Is that right?

7    A    That's correct.  And the reason being we have a unitary

8    board structure, so -- which is very common in '40 Act Fund

9    land, where the board sits, for efficiency purposes, on

10   multiple fund boards, and there's a lot of economies of scale

11   from an operating standpoint.  So, yes, they sit on multiple

12   boards.

13   Q    Okay.  And for purposes of the '40 Act, Mr. Honis has been

14   deemed to be an interested trustee.  Is that right?

15   A    That's correct.

16   Q    Okay.  But you don't specifically know what facts caused

17   that designation; you only know that the designation exists.

18   Right?

19   A    That's right.  And I know they are disclosed in the proxy

20   -- or, in the -- the relative filings related to those Funds.

21   Q    Okay.  Three other people are common to all three of the

22   Movant Funds.  I think you've got Dr. Froehlich, Ethan Powell,

23   --

24   A    Froehlich.

25   Q    Froehlich.  Ethan Powell and Bryan Ward.  Right?

Norris - Cross                              57

1   A    That is correct.

2   Q    Okay.  All three of those individuals actually serve on

3   the 11 or 12 boards that you mentioned earlier that are

4   managed by the Advisors, right?

5   A    Yes, that is correct.

6   Q    And they're the same Funds for which you serve as an

7   executive vice president, right?

8   A    Yes.  That's correct.

9   Q    So, for all of the Funds that are managed by the Advisors,

10  you serve as executive vice president and all four of these

11  directors -- trustees serve as trustees on the boards, right?

12  A    Yes, that's correct.

13  Q    Okay.  In exchange for serving on all of these boards, the

14  three individuals -- Dr. Froehlich, Mr. Ward, and Mr. Powell

15  -- each receive $150,000 a year for services across the

16  Highland complex; is that right?

17  A    That's correct.

18  Q    Dr. Froehlich has been serving as a board member across

19  the Highland complex for seven or eight years now; is that

20  right?

21  A    That's correct.

22  Q    Mr. --

23  A    I believe it's about seven or eight years.

24  Q    And Mr. Powell, he actually was employed by Highland or

25  related entities from about 2007 or 2008 until 2015, right?

Appx. 03396

015958

Norris - Cross                          58

1   A    That's correct.

2   Q    And Mr. Ward, the third of the independent trustees, he's

3   been serving as a board member on various Highland-related

4   funds on a continuous basis since about 2004.  Do I have that

5   right?

6   A    Yeah, I believe that's correct.

7   Q    Okay.  Just a couple of final questions.  You would agree,

8   would you not, sir, that portfolio managers have an obligation

9   to effectuate transactions concerning the assets that they

10  manage based on their business judgment?

11  A    Yes.  And in accordance with whatever governing documents

12  govern the fund structure.

13  Q    And you would personally expect a portfolio manager to

14  execute a transaction that he or she reasonably believes in

15  good faith and in their business judgment would maximize value

16  for the CLO, even if the CLO did not need cash at that

17  particular time.  Is that right?

18  A    I think it would come down to the governing documents.

19  And I think what you're getting at here is, in this instance,

20  these sales and the intent of the portfolio manager.  And our

21  view, again, is -- and the request for the motion is simply

22  there is a lot at play here.  Several negotiations.  And in

23  order to maximize returns, simply asking for a pause on

24  transactions.

25  Q    All right.  Let me -- let me ask the question again, and I

Appx 02387
015959

Norris - Cross                                          59

1   would ask that you please listen carefully to the question.

2   You would expect a portfolio manager would execute a

3   transaction that he or she believes maximizes value, even if

4   the CLO didn't need cash at that particular moment in time.

5   Correct?

6   A    Yeah.  As long as that is maximizing value for the

7   stakeholders, and in the instance of a CLO, the economic

8   interest is owned by the equity holders.  So, to their

9   benefit, yes, that -- that would be the idea.

10              MR. MORRIS:  Your Honor, I have no further questions.

11              THE COURT:  Any redirect, Mr. Wright?

12              MR. WRIGHT:  Only briefly, Your Honor.

13                       REDIRECT EXAMINATION

14   BY MR. WRIGHT:

15   Q    Mr. Norris, I think you were asked at one point about how

16   long you'd been working for Highland Capital Management, which

17   there's -- there's Highland Capital Management Fund Advisors

18   and then there's Highland Capital Management, LP, Debtor.  And

19   I wanted to give you an opportunity to just explain when and

20   what years you worked for HCMLP and then when and what years

21   you worked for NexPoint Advisors or Highland Capital

22   Management Fund Advisors.

23   A    Yes.  From June 2010, I was employed by Highland Capital

24   Management, LP, until July or August of 2012, at which time I

25   was then hired by Highland Capital Management Fund Advisors,

Norris - Redirect                    60

1    not HCML -- no longer employed by HCMLP, and have worked since

2    that time for HCMFA and NexPoint Advisors and not for the

3    Debtor, HCMLP.

4    Q   Okay.  So -- and I'm sorry if I missed a year, but it's

5    been about ten years since you had worked for HCMLP or been an

6    employee of HCMLP, correct?

7    A   Yeah.  It's been over eight years since I have left

8    employment by HCMLP.  Ten and a half years ago, I started

9    working for HCMLP, and then two years after that transitioned

10   away and started working for the Advisors that are part of

11   this motion.

12   Q   Thank you for clarifying.

13           MR. WRIGHT:  Your Honor, I hope -- you directed us to

14   have a witness here today, and so we do.  And I know that you

15   had asked me at the last hearing some questions about the

16   involvement of people at HCMLP, which I tried to address with

17   Mr. Norris in my direct.  But I, you know, I do want to make

18   sure that we've answered any questions that you have.

19           THE COURT:  All right.  Yes, that's fine.  Are you

20   -- does that conclude your redirect?

21           MR. WRIGHT:  It does, Your Honor.

22           THE COURT:  Any recross, Mr. Morris, on that

23   redirect?

24           MR. MORRIS:  No, thank you, Your Honor.

25           THE COURT:  All right, then.  That concludes the

61

 1  testimony of Mr. Norris.

 2      Any other evidence, Mr. Wright?

 3          MR. WRIGHT:  I do not, Your Honor, although I guess I

 4  would offer the Exhibit A and Exhibit B to Mr. Norris's

 5  declaration --

 6          THE COURT:  Any objection to that?

 7          MR. WRIGHT:  -- into evidence.

 8          MR. MORRIS:  No, Your Honor.

 9          THE COURT:  All right.  Those are admitted.

10      (Movants' Exhibits A and B are received into evidence.)

11          THE COURT:  All right.  Well, Mr. Morris, did you

12  want to put on any evidence?

13          MR. MORRIS:  Does the -- do the Movants rest, Your

14  Honor?

15          THE COURT:  I understood that they rest.  Correct,

16  Mr. Wright?

17          MR. WRIGHT:  That's correct, Your Honor.

18          MR. MORRIS:  Your Honor, I would move, effectively,

19  for a directed verdict here.  The Movants have the burden of

20  establishing a *prima facie* case to entitlement to the relief

21  that's been requested, and they have failed to meet that

22  burden.  The Debtor has -- we -- the undisputed facts are the

23  Debtor has the contractual right, and indeed, the obligation,

24  to serve as the portfolio manager of the CLOs pursuant to

25  written agreements.

Case 19-34054-sgj11    Doc 3596-26    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 26    Filed 03/25/67    Page 284 of 1052    PageID 16962

62

1    The Movants are not parties to those agreements.  The

2    testimony is undisputed that there are many holders of

3    preferred shares and notes that have had no notice of this

4    proceeding that will undoubtedly be impacted by the tying of

5    the hands of the portfolio manager.  The chart that was

6    attached as Exhibit B expressly shows just what a large

7    portion of interested parties and people who would be affected

8    by this motion are not -- they didn't get notice.  There was

9    no attempt to get notice.  There was no attempt to get their

10   consent.  All of that testimony is now in the record, and I

11   think due process alone would prevent the entry or even the

12   consideration of an order of this type.

13   There is nothing improper that's been alleged.  There is

14   no -- there is no allegation of fraud.  There is no allegation

15   of breach of contract of any kind.  There's not even a

16   question of business judgment.  The Movants didn't even do

17   their diligence to ask the Debtor why they made these

18   transactions.  There is nothing in the record that shows that

19   the Debtor, as the portfolio manager of the CLOs, did anything

20   improper.

21   The only thing that the Movants care about is that they

22   don't like the results in two particular trades.  I don't

23   think that that meets their burden of persuasion that the

24   Court should enter an order of this type, and I would like to

25   relieve Mr. Seery of the burden, frankly, and the Court, of

63

1   having to put on testimony to justify transactions that really

2   aren't even being questioned, Your Honor.

3       So the Debtor would respectfully move for the denial of

4   the motion and the relief sought therein.

5           THE COURT:  All right.  Your request for a directed

6   verdict, something equivalent to a directed verdict here, is

7   granted.  I agree that the Movant has wholly failed to meet

8   its burden of proof here today to show the Court, persuade the

9   Court that, as Mr. Morris said, I should essentially tie the

10  hands of the Debtor as a portfolio manager here, as stated.

11  Nothing improper has been alleged.  There has been no showing

12  of a statutory right here, or a contractual right here, on the

13  part of the Movants.

14      I am -- I'm utterly dumbfounded, really.  I agree with the

15  -- I was going to say innuendo; not really innuendo -- I agree

16  with part of the theme, I think, asserted by the Debtor here

17  today that this is Mr. Dondero, through different entities,

18  through a different motion.  I feel like he sidestepped the

19  requirement that I stated last week that if we had a contested

20  hearing on his motion, Dondero's motion, that I was going to

21  require Mr. Dondero to testify.  He apparently worked out an

22  eleventh hour agreement with the Debtor on his motion to avoid

23  that.  But, again, these so-called CLO Motions very clearly,

24  very clearly, in this Court's view, were pursued at his sole

25  direction here.

015964

64

1      This is almost Rule 11 frivolous to me.  You know, we're

2    -- we didn't have a Rule 11 motion filed, and, you know, I

3    guess, frankly, I'm glad that a week before the holidays begin

4    we don't have that, but that's how bad I think it was, Mr.

5    Wright and Mr. Norris.  This is a very, very frivolous motion.

6    Again, no statutory basis for it.  No contractual basis.  You

7    know, you didn't even walk me through the provisions of the

8    contracts.  I guess that would have been fruitless.  But you

9    haven't even shown something equitable, some lack of

10    reasonable business judgment.

11      Bluntly, don't waste my time with this kind of thing

12    again.  You wasted my time.  We have 70 people on the video.

13    Utter waste of time.

14      All right.  So, motion is denied.  Mr. Morris, please

15    upload an order.

16          MR. MORRIS:  Thank you, Your Honor.

17          THE COURT:  All right.  Do we have any other business

18    to accomplish today?

19          MR. POMERANTZ:  I don't think so, Your Honor.  I know

20    we will see you tomorrow in connection with Mr. Daugherty's

21    relief from stay motion.

22          THE COURT:  Well, yeah, we do have that.  Okay.  We

23    will see you tomorrow.  We stand adjourned.

24          MR. CLEMENTE:  Thank you, Your Honor.

25          MR. MORRIS:  Thank you, Your Honor.

65

1          THE CLERK:  All rise.

2          (Proceedings concluded at 3:05 p.m.)

3                      --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                      CERTIFICATE

20     I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
21 above-entitled matter.

22   **/s/ Kathy Rehling**                    **12/17/2020**

23 _____     _____

   Kathy Rehling, CETD-444                      Date
24 Certified Electronic Court Transcriber

25

Appx 024194
015966

66

INDEX

PROCEEDINGS                                                            3

WITNESSES

Movants' Witnesses

Dustin Norris
- Direct Examination by Mr. Wright                                    23
- Cross-Examination by Mr. Morris                                     35
- Redirect Examination by Mr. Wright                                  59

EXHIBITS

Movants' Exhibits A and B                               Received 61

RULINGS

Debtor's Emergency Motion to Quash Subpoena and for           13
Entry of a Protective Order or, in the Alternative,
for an Adjournment (1564, 1565) - *Agreed Order*

James Dondero's Motion for Entry of an Order Requiring        13
Notice and Hearing for Future Estate Transactions
Occurring Outside the Ordinary Course of Business (1439)
- *Continued to 01/04/2021*

Motion for Directed Verdict - *Granted*                               63

Motion for Order Imposing Temporary Restrictions on          63
Debtor's Ability, as Portfolio Manager, to Initiate Sales
by Non-Debtor CLO Vehicles Highland Capital Management Fund
Advisors, L.P., Highland Fixed Income Fund, NexPoint
Advisors, L.P., NexPoint Capital, Inc., NexPoint Strategic
Opportunities Fund (1528) - *Denied*

END OF PROCEEDINGS                                                    65

INDEX                                                                66

# EXHIBIT 27

Appx_02406
015968



December 22, 2020

A. Lee Hogewood, III
Lee.hogewood@klgates.com

T: 1-919-743-7306

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Dear Counsel:

     I am writing to you on behalf of our clients Highland Capital Management Fund Advisors, L.P. ("HMCFA") and NexPoint Advisors, L.P. ("NexPoint", and together with HMCFA, the "Advisors"), and Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "Funds"). CLO Holdco, Ltd. ("CLO Holdco") whose counsel is copied below, joins in this notice and request.

     As you are aware, certain registered investment companies and a business development company managed by either NexPoint or HMCFA own preference shares in many of the CLOs. In the following cases those companies own a majority of such shares[1]:

- Stratford CLO, Ltd. 69.05%
- Grayson CLO, Ltd. 60.47%
- Greenbriar CLO, Ltd. 53.44%

---

[1] These ownership percentages are derived from information provided by the Debtor. If the Debtor contends that the ownership percentages are inaccurate, please inform us of the Debtor's differing calculations.

308494123.3

Appx. 02407

015969

December 22, 2020
Page 2

In other cases, such companies in combination with CLO Holdco hold all, a super-majority, or a majority of the preference shares in the following CLOs:

- Liberty CLO, Ltd. 70.43%
- Stratford CLO, Ltd. 69.05%*[2]
- Aberdeen Loan Funding, Ltd. 64.58%
- Grayson CLO, Ltd. 61.65%*
- Westchester CLO, Ltd. 58.13%
- Rockwall CDO, Ltd. 55.75%
- Brentwood CLO, Ltd. 55.74%
- Greenbriar CLO, Ltd. 53.44%*

Additionally, such companies own significant minority stakes in the following CLO's:

- Eastland CLO, Ltd. 41.69%
- Red River CLO, Ltd. 33.33%

The ownerships described above represent in many cases the total remaining outstanding interests in such CLOs, because the noteholders have been paid in full. In others, the remaining noteholders represent only a small percentage of remaining interests. Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco largely represent the investors in the CLOs identified above.

Contractually, the Debtor is obligated to maximize value for the benefit of the preference shareholders. Accordingly, we respectfully request that no further dispositions of CLO interests occur pending the confirmation hearing. While we recognize the Court denied the Advisor and Funds motion on this subject, the Court did not require liquidations occur immediately, and we reserve all rights to and remedies against the Debtor should the Debtor continue to liquidate CLO interests in contravention of this joint request. Given the Advisor, Funds, and CLO Holdco's requests, it is difficult to understand the Debtor's rationale for continued liquidations, or the benefit to the Debtor from pursuing those sales.

As you know, HCMLP's duties are set forth in the portfolio management agreements of the CLOs, which themselves have been adopted under the Investment Advisers Act of 1940 ("Advisers Act"). As HCMLP readily admits, it is: (i) terminating employees on January 31, 2021, which will result in a loss of the employees that have traditionally serviced those CLOs; (ii) ignoring the requests of the Advisors, Funds, and CLO Holdco, which together account for all or a majority of interests in certain CLOs, and selling assets of those CLOs prior to plan-confirmation; and (iii) adding a replacement manager as subadviser prior to January 31, 2021. The Advisors, Funds, and CLO Holdco assert that those actions run in contravention to HCMLP's duty to maximize value for the holders of preference shares and thus what HCMLP has agreed to under the portfolio management agreement, as well as its duties under the Advisers Act, which ultimately will adversely impact the economic owners noted above.

---

[2] CLO's marked with an asterisk (*) appear in the foregoing list as well.



App. 05498
015970

December 22, 2020
Page 3

      For the forgoing and other reasons, we request that no further CLO transactions occur at least until the issues raised by and addressed in the Debtor's plan are resolved at the confirmation hearing.

Sincerely,

*A. Lee Hogewood, III*

A. Lee Hogewood, III

308494123.3

Appx. 05409
015971

# EXHIBIT 28

App. 05410
015972



December 23, 2020

A. Lee Hogewood, III
Lee.hogewood@klgates.com

T: 1-919-743-7306

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Dear Counsel:

I am writing to you on behalf of our clients Highland Capital Management Fund Advisors, L.P. ("HMCFA") and NexPoint Advisors, L.P. ("NexPoint", and together with HCMFA, the "Advisors"), and Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "Funds"). CLO Holdco, Ltd. ("CLO Holdco") whose counsel is copied below, joins in this notice and request.

As you are aware, certain registered investment companies and a business development company managed by either NexPoint or HCMFA own preference shares in many of the CLOs. In the following cases those companies own a majority of such shares[1]:

- Stratford CLO, Ltd. 69.05%
- Grayson CLO, Ltd. 60.47%
- Greenbriar CLO, Ltd. 53.44%

---

[1] These ownership percentages are derived from information provided by the Debtor. If the Debtor contends that the ownership percentages are inaccurate, please inform us of the Debtor's differing calculations.

308545876.3

Appx 05411

015973

December 23, 2020
Page 2

In other cases, such companies in combination with CLO Holdco hold, a super-majority, or a majority of the preference shares in the following CLOs:

- Liberty CLO, Ltd. 70.43%
- Stratford CLO, Ltd. 69.05%*[2]
- Aberdeen Loan Funding, Ltd. 64.58%
- Grayson CLO, Ltd. 61.65%*
- Westchester CLO, Ltd. 58.13%
- Rockwall CDO, Ltd. 55.75%
- Brentwood CLO, Ltd. 55.74%
- Greenbriar CLO, Ltd. 53.44%*

Additionally, such companies own significant minority stakes in the following CLO's:

- Eastland CLO, Ltd. 41.69%
- Red River CLO, Ltd. 33.33%

The ownerships described above represent in many cases the total remaining outstanding interests in such CLOs, because the noteholders have been paid in full.  In others, the remaining noteholders represent only a small percentage of remaining interests. Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco largely represent the investors in the CLOs identified above.

In pleadings filed with the Bankruptcy Court, you asserted that one or more of the entities identified above lacked the authority to seek a replacement of the Debtor as fund manager because of the alleged affiliate status of the beneficial owners of such entities.  We disagree.

Consequently, in addition to our request of yesterday, where appropriate and consistent with the underlying contractual provisions, one or more of the entities above intend to notify the relevant trustees and/or issuers that the process of removing the Debtor as fund manager should be initiated, subject to and with due deference for the applicable provisions of the United States Bankruptcy Code, including the automatic stay of Section 362. The basis for initiating the process for such removal includes, but is not limited to, the fact that HCMLP's duties, as set forth in the portfolio management agreements of the CLOs, are subject to the requirements of the Investment Advisers Act of 1940 ("Advisers Act"). HCMLP appears to be acting contrary to those duties under the agreements and where HCMLP is not fulfilling its duties under the portfolio management agreement it is therefore violating the Advisers Act. Thus, because HCMLP is (i) terminating employees on January 31, 2021, which will result in a loss of the employees that have traditionally serviced, including key investment professionals identified in the transactional documents for those CLOs (generally Mark Okada and Jim Dondero); (ii) ignoring the requests of the Advisors, Funds, and CLO Holdco, which together account for all or a majority of interests in certain CLOs, and selling assets of those CLOs prior to plan confirmation;  (iii)

---

[2] CLO's marked with an asterisk (*) appear in the foregoing list as well.

Appx. 03412
015974

December 23, 2020
Page 3

adding a replacement manager as subadviser prior to January 31, 2021; and (iv) for other cause, the Advisors, Funds, and CLO Holdco have concluded that they have no choice but to initiate HCMLP's removal as fund manager where such entities are contractually and legally permitted or obligated to do so.

Because the process of removal is being initiated, subject to the applicable provisions of the Bankruptcy Code, we respectfully request that no further CLO transactions occur at least until the issues raised by and addressed in the Debtor's plan are resolved at the confirmation hearing.   To the extent there are CLO transactions prior to the confirmation, we intend to fully explore the business justification for doing so, as we do not believe there is any rational business reason to liquidate securities prior to that time.

Sincerely,

*A. Lee Hogewood, III*

A. Lee Hogewood, III

308545876.3

015975

# EXHIBIT 29

Appx 05414
015976

```
                    IN THE UNITED STATES BANKRUPTCY COURT
1                     FOR THE NORTHERN DISTRICT OF TEXAS
                             DALLAS DIVISION
2
                                    )     Case No. 19-34054-sgj-11
3    In Re:                         )     Chapter 11
                                    )
4    HIGHLAND CAPITAL               )     Dallas, Texas
     MANAGEMENT, L.P.,              )     Tuesday, January 26, 2021
5                                   )     9:30 a.m. Docket
                                    )
6            Debtor.                )     MOTION FOR ENTRY OF ORDER
                                    )     AUTHORIZING DEBTOR TO
7                                   )     IMPLEMENT KEY EMPLOYEE
                                    )     PLAN [1777]
8    _____)
                                    )
9    HIGHLAND CAPITAL               )     Adversary Proceeding 21-3000-sjg
     MANAGEMENT, L.P.,              )
10                                  )
                                    )
11           Plaintiff,            )
                                    )
12   v.                             )     PLAINTIFF'S MOTION FOR A
                                    )     PRELIMINARY INJUNCTION AGAINST
13   HIGHLAND CAPITAL               )     CERTAIN ENTITIES OWNED AND/OR
     MANAGEMENT FUND ADVISORS,      )     CONTROLLED BY MR. JAMES
14   L.P., et al.                   )     DONDERO [5]
                                    )
15           Defendants.            )
     _____)
16
                         TRANSCRIPT OF PROCEEDINGS
17             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                   UNITED STATES BANKRUPTCY JUDGE.
18
     WEBEX APPEARANCES:
19
     For the Debtor:             Jeffrey Nathan Pomerantz
20                               PACHULSKI STANG ZIEHL & JONES, LLP
                                 10100 Santa Monica Blvd.,
21                                 13th Floor
                                 Los Angeles, CA  90067-4003
22                               (310) 277-6910

23   For the Debtor:             John A. Morris
                                 PACHULSKI STANG ZIEHL & JONES, LLP
24                               780 Third Avenue, 34th Floor
                                 New York, NY  10017-2024
25                               (212) 561-7700
```

2

APPEARANCES, cont'd.:

For the Official Committee    Matthew A. Clemente
of Unsecured Creditors:       SIDLEY AUSTIN, LLP
                              One South Dearborn Street
                              Chicago, IL  60603
                              (312) 853-7539

For CLO Holdco, Ltd.:         John J. Kane
                              KANE RUSSELL COLEMAN LOGAN, P.C.
                              901 Main Street, Suite 5200
                              Dallas, TX  75202
                              (214) 777-4261

For Certain Defendants:       Davor Rukavina
                              Julian Vasek
                              MUNSCH, HARDT, KOPF & HARR
                              500 N. Akard Street, Suite 3800
                              Dallas, TX  75201-6659
                              (214) 855-7587

For Certain Defendants:       A. Lee Hogewood, III
                              Emily Mather
                              K&L GATES, LLP
                              4350 Lassiter at North Hills
                                Avenue, Suite 300
                              Raleigh, NC  27609
                              (919) 743-7306

For James D. Dondero:         John T. Wilson
                              BONDS ELLIS EPPICH SCHAFER
                                JONES, LLP
                              420 Throckmorton Street,
                                Suite 1000
                              Fort Worth, TX  76102
                              (817) 405-6900

For the U.S. Trustee:         Lisa L. Lambert
                              OFFICE OF THE UNITED STATES
                                TRUSTEE
                              1100 Commerce Street, Room 976
                              Dallas, TX  75242
                              (214) 767-8967

Recorded by:                  Michael F. Edmond, Sr.
                              UNITED STATES BANKRUPTCY COURT
                              1100 Commerce Street, 12th Floor
                              Dallas, TX  75242
                              (214) 753-2062

3

Transcribed by:                    Kathy Rehling
                                   311 Paradise Cove
                                   Shady Shores, TX  76208
                                   (972) 786-3063

          Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.

015979

Case 19-34054-sgj11    Doc 3596-29    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 29    Filed 05/07/25    Page 301 of 1052    PageID 16979

4

1          DALLAS, TEXAS - JANUARY 26, 2021 - 9:40 A.M.

2          THE COURT:  All right.  We have Highland settings

3    this morning:  a Motion for Approval of a KERP, which I didn't

4    see objections to, and then a Preliminary Injunction hearing.

5    Let me get appearances from the parties who have filed

6    pleadings.

7        For the Debtor team, I see Mr. Morris.  Who do we have

8    appearing?

9          MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

10   Pomerantz and John Morris appearing on behalf of the Debtor.

11   I will handle the KERP motion, which we'll propose goes first

12   and quickly, and then Mr. Morris will handle the adversary

13   proceeding.

14         THE COURT:  All right.  Very good.

15       All right.  Let me get appearances from the Defendants in

16   the preliminary injunction matter.  Do we have Mr. Kane or

17   someone for CLO Holdco?

18         MR. KANE:  Yes, Your Honor.  John Kane for CLO

19   Holdco, Ltd.

20         THE COURT:  All right.  What about for the Funds and

21   Advisors?  I guess we have a couple of law firms involved.

22   Who do we have appearing for the K&L Gates firm?

23         MR. HOGEWOOD:  Good morning, Your Honor.  This is Lee

24   Hogewood with K&L Gates, and also with our firm appearing

25   today is Emily Mather.

5

1          THE COURT:  Okay.  I didn't get Emily's last name.

2     Could you repeat that?

3          MR. HOGEWOOD:  I'm sorry, Your Honor.  Emily Mather,

4     M-A-T-H-E-R.

5          THE COURT:  Thank you.

6       All right.  For the Munsch Hardt team, do we have Mr.

7     Rukavina or someone else appearing?

8          MR. RUKAVINA:  Your Honor, good morning.  This is

9     Davor Rukavina.  I represent all of the Defendants in the

10    adversary except CLO Holdco.

11      Pursuant to the Court's instructions, Mr. Dondero is also

12    present here in my conference room, so he is here.  He is not

13    on the camera, but he is here.

14         THE COURT:  Okay.  All right.  And does Mr. Dondero

15    have counsel, his individual counsel appearing today?

16         MR. WILSON:  Your Honor, John Wilson for Jim Dondero.

17         THE COURT:  Okay.  Thank you.  Do we have Creditors'

18    Committee lawyers on the phone today?

19         MR. CLEMENTE:  Yes, Your Honor.  Good morning.

20    Matthew Clemente; Sidley Austin; on behalf of the Official

21    Committee of Unsecured Creditors.

22         THE COURT:  All right.  Thank you.

23      All right.  Well, obviously, if any other lawyer is dying

24    to chime in at some point today, I will consider letting that

25    happen.  But, again, I think we've got the parties who have

6

1    filed pleadings having appeared at this point.  So, let's turn

2    to the KERP motion.  Mr. Pomerantz?

3            MR. POMERANTZ:  Yes, Your Honor.  Good morning again.

4    On January 19th, the Debtor filed its motion for approval of a

5    Key Employee Retention Program which would substitute out its

6    annual bonus plan.

7        We have not received any opposition to the motion,

8    although the United States Trustee did ask some questions

9    which we are prepared to address in connection with the

10   proposed proffer of Mr. Seery's testimony.  I'm happy to make

11   a full presentation of the motion to Your Honor, if you would

12   like, or I could just present Mr. Seery's proffer, which I

13   should -- which I believe will establish the factual predicate

14   and the evidence to support the motion.

15           THE COURT:  All right.  Let's just go straight to the

16   proffer, please.

17           MR. POMERANTZ:  Okay.  Thank you, Your Honor.

18             PROFFER OF TESTIMONY OF JAMES P. SEERY

19           MR. POMERANTZ:  Mr. Seery is on the video today, and

20   if he was called to testify he would testify that his name is

21   James P. Seery, Jr. and that he is the chief executive officer

22   and chief restructuring officer of Highland Capital

23   Management.

24       He would also testify that he was one of the independent

25   directors appointed to the Court on January 9th, 2020.

Appx. 03429
015982

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-21   Filed 08/01/25   Page 304 of 1052   PageID 16982

7

1   Because of his role with the Debtor, he is familiar with the

2   company's day-to-day operations, including its -- the

3   company's employee and wage benefit and bonus plans relating

4   to the employees.

5       He would testify that he has been involved in the

6   negotiation and drafting of the company's plan of

7   reorganization, and is familiar with the expected operation of

8   the Claimant Trust and Reorganized Debtor post-confirmation in

9   connection with the plan.

10      He would testify that the plan generally provides for the

11  monetization of the company's assets for the benefit of

12  creditors and stakeholders, and he would testify that, as part

13  of the plan process, he worked closely with DSI, the company's

14  financial advisor, to assess both the costs of the Debtor's

15  current employee base and the projected cost of operations in

16  connection with the Reorganized Debtor and Claimant Trust

17  following the effective date.

18      He would testify that, to ensure the continued smooth

19  operation of the company in connection with the continuation

20  and consummation of the plan for the benefit of all

21  stakeholders, that he worked with DSI to determine the

22  appropriate staffing needs necessary for the company's

23  remaining operations.

24      He would testify that he analyzed the current employees to

25  determine which, if any, would need to be continued to be

8

1   retained by the Debtor and operate during the Reorganized

2   Debtor and Claimant Trust period following the effective date

3   of the plan.

4       He would testify as part of that analysis he reviewed the

5   roles and functions of the non-insider employees with respect

6   to the services that they needed, and he reviewed the wages,

7   benefits, and bonuses for those remaining non-insider

8   employees necessary for those functions.

9       He would testify, that based upon his review, the company

10  determined that it was in the best interests of the estate to

11  terminate the existing annual bonus plan, as it was no longer

12  necessary to effectively incentivize the remaining non-insider

13  employees who would be terminated prior to being entitled to

14  any further payments under the annual bonus plan.

15      He would testify that, instead, the company developed a

16  new retention plan that was designed to incentivize the non-

17  insider employees to remain with the company for as long as

18  they are needed to assist in the effectuation of the plan.

19      He would testify that Mr. Waterhouse and Surgent, arguably

20  two insiders of the Debtor, are not eligible for the retention

21  plan, and that's not because there is any concern regarding

22  their loyalty, but the Debtor is looking at ways to

23  appropriately incentivize and compensate those people as

24  appropriate in the future.

25      He would testify that there are a few persons on the list

Appx 03422
015984

9

 1    of people who are part of the retention plan with a title that

 2    includes director or manager; however, he would testify that

 3    none of those individuals are corporate officers or directors

 4    of the Debtors -- the Debtor, and that the titles are for

 5    convenience only.  He would testify that the individuals who

 6    are employed in these roles do not have any authority

 7    whatsoever to make any decisions on behalf of the Debtor.

 8        He would testify that in connection with the new retention

 9    plan, the non-insider employees may be offered the opportunity

10    to enter into a termination agreement with the company that

11    will provide specified benefits and payments in return for the

12    non-insider employee remaining as an employee in good standing

13    with the company through the separation date.

14        He would testify that a key component of the retention

15    plan is that non-insider employees will be entitled to the

16    specific bonus payments provided that they do not voluntarily

17    terminate their employment with the Debtor prior to the

18    separation date and are not terminated for cause.

19        He would testify that that is in contrast to the existing

20    or the prior annual bonus plan, which provided that non-

21    insider employees would not receive their bonus payments if

22    they were not employed by the Debtor on the vesting date for

23    any reason except on account of disability, including

24    termination without cause.

25        Mr. Seery would further testify that the retention plan is

015985

10

1   being offered to approximately 53 employees, and the projected

2   aggregate amount of payments under the retention plan is

3   approximately $1,481,000, which is $32,000 approximately less

4   than the amount that would have been paid to such employees

5   under the annual bonus plan.

6       He would testify that the retention plan includes 20

7   employees who are not entitled to benefits under the annual

8   bonus plan.  Fourteen employees are entitled to receive more

9   under the retention plan than they would have received under

10  the annual bonus plan.

11      With respect to the 20 employees I've previously mentioned

12  who are not otherwise entitled to receive anything under the

13  annual bonus plan, the vast majority of those -- 18 -- will be

14  entitled to payments of $2,500 each, and the other two

15  entitled to payments of $10,000 and $7,500, respectively.

16      Mr. Seery would testify that he believes that these

17  additional payments are reasonable in light of the current

18  status of the company and the value to be added to the estate

19  through the retention of these employees, and that this plan

20  is more accurately and narrowly-tailored to achieve the

21  company's reorganization goals.

22      On this basis, Your Honor, Mr. Seery would testify that he

23  presented the proposed retention plan to the independent

24  directors and they agreed with Mr. Seery's assessment that

25  entry into the retention plan was in the best interests of the

11

1  estate and its creditors.

2      He would also testify that he had negotiations with the

3  Creditors' Committee and its advisors regarding the retention

4  plan and that the Committee is supportive of the retention

5  plan.

6      And that would conclude my proffer of testimony from Mr.

7  Seery, Your Honor.

8          THE COURT:  All right.  Mr. Seery, if you could say

9  "Testing, one, two" so we can catch your audio and video,

10 please?

11         MR. SEERY:  Testing, one, two, Your Honor.

12         THE COURT:  All right.  There you are.  Please raise

13 your right hand.

14         JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

15         THE COURT:  All right.  Thank you.  Is there anyone

16 who has questions at this time for Mr. Seery?

17     (No response.0

18         THE COURT:  All right.  Well, I'll just double-check

19 with the Committee.  It's been represented that you all are in

20 support of this.  Mr. Clemente, if you could confirm that on

21 the record?

22         MR. CLEMENTE:  That's correct, Your Honor.  The

23 Committee has no objection to the motion, so Mr. Pomerantz's

24 statements are accurate.

25         THE COURT:  All right.  Anyone else?

12

```
 1          MS. LAMBERT:  This is Lisa Lambert for the United

 2   States Trustee.  The U.S. Trustee has reviewed the actual data

 3   about the comparatives, and the U.S. Trustee, based on the

 4   stipulations, has no objection.

 5          THE COURT:  All right.  Thank you.  Anyone else?

 6      All right.  Well, the Court will approve this motion.

 7   First, while the notice was expedited, the Court finds that it

 8   was sufficient under the circumstances.  We are many months

 9   into the case, it's been vetted by the Committee, and the

10   Court is satisfied with the level of notice here.

11      The Court finds that this is a KERP that is justified by

12   all the facts and circumstance of this case, to use the

13   wording of Section 503(c)(3) of the Bankruptcy Code.  There

14   also appears to be a very sound business purpose justifying

15   the proposed KERP.  It appears to be reasonable in all ways,

16   and fair under the circumstances, so I do approve it.

17      All right.  So if you all will get the order uploaded

18   electronically, I will promise to sign it promptly.

19          MR. POMERANTZ:  We will do so, Your Honor.  Thank

20   you.

21          THE COURT:  All right.  So, the preliminary

22   injunction.  Mr. Morris, I heard you were going to be taking

23   the lead on that, so go ahead.

24          MR. MORRIS:  Indeed.  Good morning, Your Honor.  John

25   Morris; Pachulski, Stang, Ziehl & Jones; for the Debtor.
```

13

 1          THE COURT:  Good morning.

 2          MR. MORRIS:  A few items before I give what I hope

 3   will be an informative opening statement.  I trust that Your

 4   Honor has not had the opportunity, because it was just filed a

 5   moment ago, to see that the Debtor filed on the docket notice

 6   of a settlement with CLO Holdco, Ltd., one of the Defendants

 7   here today.

 8          THE COURT:  I have not seen that.  Okay.

 9          MR. MORRIS:  Right.  So you'll find that at Docket

10   1838.

11          THE COURT:  Okay.

12          MR. MORRIS:  It really is a very simple settlement,

13   Your Honor.  In exchange for the withdrawal of CLO Holdco's

14   objection to the Debtor's plan of reorganization, the Debtor

15   is dismissing CLO Holdco from this adversary proceeding with

16   prejudice.  There are, you know, some other bells and whistles

17   there, the most important of which to the Debtor is simply

18   that, under the CLO management agreements, most of them but

19   not all of them require that a level of cause be established

20   before the contracts can be terminated, and CLO Holdco has

21   agreed that, before it seeks to terminate a contract for

22   cause, there will be a gating provision or a gatekeeping

23   provision that requires them to come to this Court to simply

24   establish whether or not there is a colorable claim -- not for

25   a determination on the merits, but simply to protect the

Appx 03427

015989

Case 19-34054-sgj11    Doc 3596-29    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 29 Filed 05/05/25258 Page 311 of 1052    PageID 16989

14

1  Debtor from frivolous lawsuits.

2      So that's really the sum and substance of it.  Mr. Kane is

3  on the line now, and if I've either inaccurately or

4  incompletely characterized the settlement, I'm sure he'll take

5  the opportunity to supplement the record.  But we don't see

6  any need, really, to go through a full 9019 motion here.

7  There's no releases.  There's no exchange of money.  It's the

8  withdrawal of a plan objection in consideration for the

9  dismissal of an injunctive proceeding.

10      So we did want to alert you to that.  And as a result,

11  there was one witness that we intended to call today, Grant

12  Scott.  Mr. Scott is the director of CLO Holdco.  And with the

13  resolution of the issues between the Debtor and CLO Holdco, we

14  have no intention of calling Mr. Scott today.  But I'd like to

15  give Mr. Kane an opportunity to be heard just in case he's got

16  anything to add.

17          THE COURT:  All right.  Mr. Kane, can you confirm?

18  Do you have anything to change about what you heard?

19          MR. KANE:  Your Honor, I do not.  The settlement

20  agreement speaks for itself.  We did reach an agreement with

21  Debtor's counsel and the Debtor yesterday evening, fairly late

22  in the evening.  Mr. Morris's synopsis of the proposed

23  settlement is accurate.  The Debtor has agreed to dismiss CLO

24  Holdco from the preliminary injunction adversary proceeding

25  with prejudice.

15

```
 1          THE COURT:  All right.  Well, thank you.  I've pulled
 2   it up on my screen.  It's very short and to the point.  And I
 3   agree with the comment of Mr. Morris that I don't think a
 4   formal 9019 motion is required here, given no consideration is
 5   going back and forth, or releases.  It's just exactly as you
 6   described orally.  So, I appreciate that.  It simplifies a
 7   little bit what we have set today.  And we will accept this
 8   settlement as being in place as we roll forward.  All right?
 9   Thank you.
10          MR. MORRIS:  Thank you, Your Honor.
11       So, before I get to the substance of the argument, I would
12   like to take care of some housekeeping items relative to
13   today's proceedings.
14          THE COURT:  Okay.
15          MR. MORRIS:  You know, this has been a bit of a
16   challenge for me personally, and it's going to be a little bit
17   of a challenge today for Ms. Canty, my assistant, in part
18   because it's almost like Groundhog's Day.  This is, I think,
19   the third time that we're covering some of the same issues.
20   We had covered them the first time on December 16th in
21   connection with what I'll now just simply refer to as the
22   Defendants, the Defendants' motion to try to limit the Debtor
23   from trading the CLO assets.  We heard a lot of what we're
24   going to hear today again on January 8th in connection with
25   the preliminary injunction motion against Mr. Dondero.  And so
```

16

1   there's already a ton of evidence in the record.  We do

2   believe that we need to present our evidence today, but one of

3   the challenges that we'll face, and I think we'll be able to

4   do it efficiently, Your Honor, is there may just be some back

5   and forth between various documents.  But everything's gone

6   pretty smoothly, and I'm optimistic we'll get through that

7   part of it today.

8       So I want to deal with the exhibits themselves, Your

9   Honor.  As you may have seen, there have been a number of

10  different filings relating to the Debtor's exhibits for this

11  particular motion, and I just want to go through the exhibits

12  and make sure that we're all on the same page here.  I want to

13  tell the Court exactly what happened and why and where we are

14  today.

15      The Debtor timely filed its original witness and exhibit

16  list on January 22nd.  They filed that witness and exhibit

17  list at Docket 39 in this Adversary Proceeding 21-3000.  The

18  exhibit list referenced Exhibits A through I'll just say

19  AAAAA.  It was a lot of exhibits, and somebody had the wise

20  idea to convert them to numbers, but it wasn't me, so I can't

21  take credit.  But we're left with letters, and they go from A

22  through AAAAA.

23      After filing that initial exhibit list, we realized that

24  --

25      (Interruption.)

17

1          THE COURT:  All right.  Does someone have their

2   device unmuted?  Okay.  It went away.  Go ahead, Mr. Morris.

3          MR. MORRIS:  Thank you.  So, shortly after filing

4   that initial exhibit list, we realized that we forgot to file

5   among the exhibits AAAAA.  So at Docket #40 in the adversary

6   proceeding, the Court can find Debtor's Exhibit AAAAA.

7       And then we're going to -- I'm going to refer in a few

8   minutes -- I'm going to use in a few minutes some

9   demonstrative exhibits, and I'm going to use them again with

10  Mr. Seery.  And these exhibits concern trading in AVYA and SKY

11  securities that you've heard about previously.

12      But I'm pointing that out now because I'm kind of old

13  school, Your Honor, and I won't use a demonstrative exhibit if

14  it doesn't have the evidence in the record.  And what we

15  realized, Your Honor, is we made two additional mistakes on

16  Friday with all the papers that we filed.  The backup for

17  these demonstratives was mistakenly included on the exhibit

18  list for the confirmation hearing as opposed to the

19  preliminary injunction hearing.  That was error number one.

20  And error number two, we hadn't redacted the information to

21  show only the SKY and AVYA.

22      And that's why, Your Honor, at Docket #48, you will find

23  our amended exhibit list that includes what we have identified

24  as Exhibits BBBBB as in boy through SSSSS as in Sam.  And

25  those exhibits, Your Honor, are the backup to the

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 29 Filed 06/09/25258 Page 315 of 1052   PageID 16993

18

1    demonstrative exhibits.  I don't expect to use them at all,

2    but I do believe strongly that one should not use a

3    demonstrative exhibit unless the evidence is in the record to

4    support it, and now it is.

5       So that's why, Your Honor, I do appreciate your court

6    staff.  I do appreciate Your Honor.  I think you either had

7    before you and you may have signed an order on redacting.

8    This is what it was all about.  It was just to make sure we

9    had the proper evidence in the record, so I appreciate that.

10      At this time, Your Honor, I think, just because I'll be

11   referring to it in the opening, the Debtor would move for the

12   admission into evidence of Exhibits A through SSSSS.

13           THE COURT:  All right.  Is there any objection?

14           MR. RUKAVINA:  Your Honor, there is.  Your Honor, I

15   object to UUUU.  I'll object to VVVV as in Victor.  I object

16   to AAAAA.  That's it, Your Honor.

17      I will note that there are several exhibits in here of

18   relevance to CLO Holdco that may not be relevant to my

19   clients, but those are my limited objections for now.

20           THE COURT:  All right.  Before we ask the nature of

21   your objection, let me ask Mr. Morris:  Shall we just --

22           MR. MORRIS:  Yeah.

23           THE COURT:  -- carve these out for now, and then if

24   you want to offer them the old-fashioned way, we'll hear the

25   objection then?

1        MR. MORRIS:  Yes, although I can make it very clear

2   that UUUU should not be in there precisely because it's

3   demonstrative.  We had talked that yesterday and I agreed; I

4   just forgot that.  UUUU should not be part of the record.

5        THE COURT:  Okay.  And so you'll just decide later do

6   you want to offer VVVV and AAAAA the old-fashioned way?

7        MR. MORRIS:  Correct.

8        THE COURT:  All right.  So, for the record, I am

9   admitting by stipulation -- with three exceptions I'll note --

10  all of the exhibits of the Debtor that appear at Exhibits 39

11  and, well, and 48.  And we're carving out of that admission

12  UUUU, VVVV, and AAAAA, which actually appears at Exhibit --

13  Docket Entry 40.  Those are not admitted at this time.

14     (Debtor's Exhibits A through SSSSS, exclusive of Exhibits

15  UUUU, VVVV, and AAAAA, are received into evidence.)

16       THE COURT:  All right.  Go ahead, Mr. Morris.

17       MR. MORRIS:  Yes.

18       MR. RUKAVINA:  Well, Your Honor, while we're talking

19  about housekeeping -- Mr. Morris, I apologize.  Is there more

20  housekeeping?

21       MR. MORRIS:  I'd like to continue.  I was going to

22  describe the witnesses.

23        OPENING STATEMENT ON BEHALF OF THE DEBTOR

24       MR. MORRIS:  So, Your Honor, the Debtor is going to

25  call three witnesses today.  The first witness will be Mr.

20

1  Dondero, the second will be Jason Post, and then the third

2  will be Mr. Seery.

3      Obviously, Mr. Dondero and Mr. Seery are very familiar to

4  the Court and they will cover much but not all of the same

5  ground that you've heard previously.

6      Mr. Post, I believe, is a new witness appearing in this

7  court for the first time.  I understand that he is the chief

8  compliance officer of each of the Debtors [sic].  He had

9  worked at Highland Capital Management, the Debtor, for more

10  than a decade, I believe, but moved over to NexPoint to work

11  with Mr. Dondero shortly after Mr. Dondero resigned from

12  Highland Capital on or about October 10th last year.

13      So those are the three witnesses that we plan to present

14  today, and I'd like to describe briefly kind of what we think

15  the evidence will show.

16      The theme from our perspective here, Your Honor, is that

17  this is a case that is about power and not rights.  The Debtor

18  brings this motion for preliminary injunction in order to

19  protect itself from the interference of Mr. Dondero and the

20  Defendants, entities that there will be no dispute he owns and

21  controls.

22      You may have read in the papers, and I suspect you will

23  hear today from the Defendants, the clarion call for

24  contractual rights and the need for this Court to protect

25  their contractual rights.  This is a red herring, Your Honor.

Case 19-34054-sgj11    Doc 3596-29    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 29 Filed 06/26/25258 Page 318 of 1052    PageID 16996

21

 1  There are no contractual rights at issue here.  What Mr.

 2  Dondero and the Defendants really want is to maintain control,

 3  or at least to deny Mr. Seery from exercising the Debtor's

 4  valuable contractual rights.  If there are any contractual

 5  rights at issue here, it is the Debtor's.  The Debtor is the

 6  party to the CLO management agreements, and it's those very

 7  rights that are being infringed upon.

 8      This was supposed to have been resolved 53 or 54 weeks ago

 9  now, Your Honor, when Mr. Dondero agreed and this Court

10  ordered that Mr. Dondero could not use related entities to

11  terminate any of the Debtor's agreements.  There is no dispute

12  that each of the Defendants is a related entity for purposes

13  of the January 9th order, since Mr. Dondero and Mr. Norris

14  have already testified that the Defendants are owned and/or

15  controlled by Mr. Dondero.

16      Notwithstanding the plain language of the January 9th

17  order, which Mr. Dondero not only agreed to, but it may be one

18  of the very few orders in this case that he hasn't appealed,

19  notwithstanding the plain language, Your Honor, he persists,

20  and that is why we are here.

21      How do we know that this is about power and not rights?

22  How do we know that everything that's going to be described

23  for you, what the evidence is going to show that this is about

24  power and not rights, is very simple.  Mr. Dondero and Mr.

25  Post will testify -- I'm just going to give four, five, six

Appx 02495

015997

22

 1   examples here -- are going to testify that Mr. Seery's AVYA

 2   trades were not in the Funds' best interests.  It's an

 3   irrelevant point, Your Honor.  There is no contractual right

 4   that gives them the ability to terminate because they don't

 5   like trades that are being made.  They can sell.  If they

 6   don't like it, they can sell.  That's what's really funny

 7   about this.

 8        But what's -- what makes it even more clear that this is

 9   about power and not rights is the evidence is going to show

10   that Mr. Dondero sold AVYA shares throughout 2020.  He sold

11   those shares right up until the day he resigned.  And yet six

12   days after resigning, NexPoint sends a letter saying, Don't

13   sell any assets.

14        Ms. Canty, can we put up Exhibit number -- Demonstrative

15   Exhibit 1, please?

16        Okay, Your Honor.  We have redacted this to shield from

17   public disclosure the name of each fund that's trading, but

18   the backup, as I alluded to earlier, in Exhibits BBBBB through

19   SSSSS, some portion of those documents, that's where these

20   demonstrative figures come from.

21        And as you can see, beginning on January 29, 2000,

22   continuing through the bottom of the page, October 9th, 2020,

23   when Mr. Dondero left Highland Capital, he traded millions and

24   millions and millions of dollars in AVYA stock.

25        Can we go to Demonstrative Exhibit #2, please?

23

1      This chart is really -- no, I apologize if I -- the other

2  one.  The AVYA trading activity chart.  Yeah.

3      This one is really interesting, Your Honor, because it

4  shows the trading throughout the year of AVYA stock, and you

5  can see the brown bars there represent Mr. Dondero's trades.

6  And you can see just how many trades there are.  There are

7  over a million shares, I think, if you added it up.  They're

8  represented by the brown bars.  You can see him selling AVYA

9  stock throughout the period, sometimes at a price really near

10  its bottom.

11      And then Mr. Seery tries and actually does sell some stock

12  toward the end of the year.  That's the green bars on the

13  right.  A very, very tiny amount compared to Mr. Dondero.  And

14  he sells it at a substantially greater price than Mr. Dondero

15  sold the AVYA stock.  And yet they're here telling you, Your

16  Honor, that somehow Mr. Seery is mismanaging the CLOs and they

17  disagree with what he's doing and he's not acting in the best

18  interests of the investors.  That's what they want -- but this

19  is what the evidence shows, Your Honor.

20      With respect to SKY, if we could go to the next slide,

21  please.

22      So this is SKY.  Now, Mr. Dondero did not trade any SKY

23  securities, but Mr. Seery did.  And this was another security

24  -- and we'll get to the evidence in a moment -- that Mr.

25  Dondero interfered with and tried to stop.  So Mr. Seery

24

 1   succeeded sometimes and he was stopped sometimes, but the

 2   point is, Your Honor, look at the price that Mr. Seery sold.

 3       And remember, you heard this before and you're going to

 4   hear it again.  Nobody from the Defendants ever asked Mr.

 5   Seery, Why do you want to trade this?  Not that they even had

 6   to.  Not that Mr. Seery needs to defend himself, frankly.

 7   He's got the authority under the management contracts to act

 8   in the way that he thinks is in the best interest.  But look

 9   at this chart.  He made these sales, Your Honor, at more than

10   twice the price of the bottom.

11       How can they have any credibility?  How can Mr. Dondero

12   and Mr. Post come into this courtroom and assert that Mr.

13   Seery is doing anything other than a fabulous job?  He is

14   selling at the top of the market.  Because they think that

15   some high -- in the future, it's going to go higher?  It's

16   prudent, Your Honor.

17       Mr. Seery is going to tell you the work that he did.  He

18   is going to give you the rationale for his decisions.  And the

19   only conclusion that I hope and believe the Court will be able

20   to reach is that these were not only rational decisions but

21   they were prudent, taking some money off the table when the

22   stock was near its high.

23       That's how we know, this is more evidence how we know this

24   is about power.  It's not about rights.  It's not about

25   justice.  It's not about anything having to do with anything

25

1    other than Mr. Dondero wanting to maintain control.

2        How else do we know?  What other evidence is there that

3    this is about power and not rights?  Again, the timing.  The

4    calendar here is going to be very, very important.  The first

5    demand from NexPoint from the Defendants that Mr. Seery stop

6    trading came on October 16th.  It was less than a week after

7    Mr. Dondero -- like, where does this come from?  There's no

8    right to demand stopping of trading.  You don't get to do it.

9    And they're going to minimize it.  They're going to spend the

10   whole day, Your Honor, either -- either focusing on the law or

11   trying to minimize.  And they'll say, well, it was just a

12   request, Your Honor.  And if it was a third-party request, I

13   bet Mr. Seery -- Mr. Seery is going to tell you, if it was a

14   third party, he wouldn't care.  But when you put all of this

15   together, it is oppressive.  It is an exertion -- it's an

16   attempt at exertion of control.  That's how it's perceived and

17   that's actually what happened.

18       Do you need more evidence?  Again, they'll talk about

19   termination for cause and how they have the right and the

20   Court -- you, Your Honor, don't have the power to infringe

21   upon their contractual rights.  But there will be no evidence.

22   Absolutely none.  Mr. Post is going to tell you, in fact, that

23   he has no evidence of any breach, of any default, of any

24   reason whatsoever that cause might exist for the termination

25   of these contracts.  That's how you know this is about power

26

1    and not rights.

2        Last point on the issue of power versus rights:  Who were

3    the counterparties to the CLO agreements?  Did the CLO Issuers

4    -- where are they?  They're not here.  They're not here to

5    tell the Court that Mr. Seery is breaching his duty.  They're

6    not here to tell the Court that the Debtor is in default.  In

7    fact, what Mr. Seery is going to tell you, and it won't be

8    rebutted, is that the CLO Issuers are close to finalizing a

9    deal that will permit the Debtor to assume the CLO management

10    contracts.

11        Mr. Post or Mr. Dondero might get up on the stand today

12    and say, oh, because people have left the firm, that somehow

13    they don't have the ability to service the contracts anymore.

14    You know who doesn't believe that?  The contractual

15    counterparty, the Issuers.  It's about power, Your Honor.

16    It's not about rights.

17        There is substantial evidence that warrants the imposition

18    of a preliminary injunction, substantial evidence, much of

19    which you've heard already.

20        The October and November letters demanding or requesting

21    that the Debtor halt trades.  There's no right to that.

22        Mr. Dondero's interference with the support of Joe Sowin,

23    the Advisors' trader, around Thanksgiving, when they actively

24    moved in.  And it's in the emails.  It's in the record.  We'll

25    put in the record again.

27

1       And then he made the threat to Thomas Surgent -- Mr.

2    Dondero made the threat to Thomas Surgent about potential

3    personal liability.

4       The ridiculous -- remember the ridiculous motion that was

5    heard on December 16th, a motion so devoid of factual or legal

6    basis that the Court granted the Debtor a directed verdict and

7    dismissed the motion as frivolous?  Notably, neither Mr.

8    Dondero nor Mr. Post testified at that hearing.  Yet, within a

9    week, Your Honor -- the hearing was on a Wednesday.  The

10    hearing was on Wednesday, December 16th.  The Court entered

11    the order on Friday, December 18th.  On Monday, December 21st,

12    the next business day, Mr. Dondero and Mr. Post and the

13    lawyers for the Defendants held conference calls to figure out

14    what to do next.

15       And the very next day, the evidence is going to show --

16    it's already in the record -- Mr. Dondero again actively

17    stopped Mr. Seery's trades from being effectuated.  They sent

18    their first letter.  This is less than a week after that

19    hearing, Your Honor.  They sent another letter asking the

20    Debtor -- again, they requested -- minimize -- this is what

21    you're going to hear:  Well, we just sent a letter requesting

22    no more trading.

23       What happened the next day, December 23rd?  They send

24    another letter and they say, We're thinking about terminating

25    the contracts.  Now we think we're going to terminate the

28

1    contracts.  And we just want to let you know we're thinking

2    about terminating the contracts.

3        And we call them -- and Mr. Seery is going to testify to

4    this -- we say, What are you doing?  Every time we just said,

5    Please withdraw your letter.  There's no basis for doing this.

6    Leave us alone and let us do our job.  They wouldn't -- they

7    refused to withdraw the letter.

8        And finally -- again, Mr. Seery will testify to this -- we

9    told them, If you think you really have a basis for

10   terminating the contract, make your motion to lift the stay.

11   And if you don't, the Debtor will file the motion that brings

12   us here today.

13       And that's how we got here, because they continued to

14   interfere with the trading.  They continued to send these

15   specious letters that are implicit threats.  Mr. Seery is

16   going to tell you that every one of these, he -- is an

17   implicit threat.  We asked them, Just withdraw the letters and

18   stop it.  We asked them to make their own motion if you think

19   so strongly of it.  They wouldn't do that, either.  They just

20   want it hanging out there.  They just want it all hanging out

21   there over Mr. Seery's head so that he knows somebody's --

22   somebody's watching and somebody's planning, you know, to take

23   action.

24       It's not right, Your Honor.  They have no right to any of

25   this.  There's nothing in the contract that allows them to

016004

29

 1   make even a good-faith -- to make any claim that they have

 2   cause to terminate the contract.  They have no right under any

 3   circumstances to stop Mr. Seery from trading.

 4        What they are going to tell you is there's no agreement

 5   between the Advisors and the Debtor that requires the Advisors

 6   to execute the trades.  And they're right about that.  They're

 7   actually right about that.  But here's the thing, Your Honor.

 8   What Mr. Seery is going to tell you is that Advisors has the

 9   trading desk.  For more than a decade, they executed the

10   trades.  Through the entirety of this bankruptcy case, until

11   Mr. Dondero left Highland, they executed the trades.  Even

12   after Mr. Dondero left Highland in October, they continued to

13   execute the trades.  And on December 22nd, they fold their

14   hands and they say, Nope, I don't care about the course of

15   dealing, I don't care what impact it has, you can't make me do

16   it.  So Mr. Seery has tried end-arounds, and that'll be in the

17   record, too, and that's when the threats to Surgent come.

18   That's when the threat to Surgent come, when we try to do the

19   workaround.  Cannot do it.

20        This is just not right, Your Honor.  It's just not right.

21   There's order -- there's the January 9th order.  There was the

22   TRO that was in effect that we're going to hear about again,

23   because that TRO not only applied to Mr. Dondero, it prevented

24   him from conspiring with or even encouraging a related entity

25   from engaging in prohibited conduct.  And that prohibited

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 29Filed 06/06/25258 Page 327 of 1052    PageID 17005

30

1   conduct, as Your Honor knows, because it's your order, is

2   plain and as unambiguous as can possibly be:  Don't interfere

3   with the Debtor's business.  It's all we're asking for.  It's

4   the only reason we're here today.

5       Interestingly, Your Honor, probably the best piece of

6   evidence that I'll put in front of you today are going to be

7   the words out of Mr. Post's mouth, because basically what he's

8   going to tell you is that, as chief compliance officer, he has

9   never once in the history of his employment told Mr. Dondero

10  to stop.  In fact, what he's going to tell you is that he

11  defers to the investment professionals, and that but for the

12  TRO that is consensually in place today, it would depend on

13  the facts and circumstances as to whether or not he actually

14  does anything as chief compliance officer to stop this

15  conduct.  Depends on the -- maybe he can explain to Your Honor

16  what facts and circumstances he thinks, as chief compliance

17  officer, would allow the Advisors to interfere with the

18  Debtor's business.  It'll be interesting to hear him answer

19  that question.

20      That's all I have, Your Honor.  I look forward to

21  presenting the evidence today.  I'd like this done once and

22  for all.  It's time to move on.  And the Debtor -- the Debtor

23  is in bankruptcy.  Your Honor, I think, has every power, every

24  right, and frankly, you know -- I feel very strongly about

25  this, obviously, Your Honor -- the Debtor needs the breathing

31

1   space and to be left alone so it can do its job.  And we'll

2   respectfully request at the end of this that the Court enter

3   an order allowing it to do so.

4        Thank you, Your Honor.

5            THE COURT:  All right.  We were hearing some

6   distortion there, I'm not sure where it was coming from, but

7   we'll try to keep it reined in.

8        Mr. Rukavina, your opening statement.

9            MR. RUKAVINA:  Your Honor, thank you.  Can the Court

10  hear me?

11           THE COURT:  Yes.

12       OPENING STATEMENT ON BEHALF OF CERTAIN DEFENDANTS

13           MR. RUKAVINA:  Your Honor, I think it's important

14  first to note a few obvious things.  One, what we're talking

15  about today is enjoining future rights, future rights under a

16  contract.  Hearing Mr. Morris's opening, it sounds like we're

17  trying a breach of contract case.  There is no declaratory

18  relief sought for whether there is grounds for a breach of

19  contract case.  And prior to assumption and prior to

20  confirmation, the automatic stay applies.

21       So let me be clear that what they're asking the Court to

22  do today is to excise from these contracts our rights in the

23  future, effectively for all time, as I'll explain.

24       The second thing that merits real consideration is that it

25  is the Funds, Your Honor, not the Advisors, it is the Funds

32

1   that have the right to remove the Debtor as manager.

2        Those Funds, as you will hear, have independent boards.

3   Mr. Dondero doesn't own those Funds.  He's not on those

4   boards.  He doesn't control them.

5        When Mr. Morris talks about Mr. Norris's prior testimony,

6   that testimony was limited to the Advisors.  And yes, Mr.

7   Dondero does own the Advisors, and Mr. Dondero, while I won't

8   say controls the Advisors, certainly has a lot of input.  That

9   is not the case for the Funds, which are the ones with the

10  contractual powers here to remove the Debtor.

11       You will hear that those -- that that board or those

12  boards meet frequently, they have independent counsel, and

13  they take separate actions, including very recently where they

14  did not do something that was advised and acted independently.

15       And the third thing that makes this case different and

16  that all of us should bear in mind is that we're talking today

17  about other people's money.  There's more than one billion

18  dollars of investment funds, retirement funds, pension funds,

19  firefighter funds, school funds, wealthy individuals, having

20  nothing in the world to do with Mr. Dondero or anyone in this

21  case.

22       So what we're talking about here today, Your Honor, is

23  that if my retirement manager files bankruptcy, that I for all

24  time would be effectively enjoined from removing him, no

25  matter what he may do in the future, just because he needs

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21   Exhibit 29   Filed 04/04/25   Page 330 of 1052   PageID 17008

33

1   that revenue.

2       That is an absolutely inappropriate use of a preliminary

3   injunction.  It is the modification of a contract that the

4   Debtor seeks to assume, and there is going to be no evidence

5   on the underlying elements that the Court must consider.

6       I say that, Your Honor, because I'm new to -- I'm late to

7   this case but I have studied in detail what Your Honor did in

8   the *Acis* case.  And I think that we have to qualitatively

9   differentiate today from *Acis*.  In *Acis*, there were

10  allegations of fraudulent transfer.  When Your Honor enjoined

11  future actions, I believe in part it was because the

12  legitimate owner of those rights might not have been having

13  those rights.

14      So that was a very important difference.  Here, there's no

15  question that we have more than billion dollars of other

16  people's funds at issue.

17      Also in *Acis*, as confirmed by the District Court, there

18  was the exercise of an optional redemption right, which could

19  have very well been used as a weapon to strip the manager of

20  its rights.  That's not the case here today.  We are talking

21  about removing the Debtor in the future -- not today, not

22  prior to assumption, in the future -- for such things as if

23  the Debtor commits fraud, if Mr. Seery is indicted for

24  felonies, if the Debtor absconds with our funds.  We are

25  talking about potential hypothetical actions in the future

34

1   that are not even ripe based on the Debtor's potential

2   wrongful actions, not based anything on our motivations or our

3   intentions.

4       So this is a different case than Your Honor has heard so

5   far in these cases.  And what it boils down to, Your Honor, is

6   will the Court give judicial immunity to the post-assumption,

7   post-confirmation Debtor over the next two or three years as

8   it manages and liquidates more than a billion dollars of other

9   people's funds?  It is their money at issue.

10      So, in order to do this, the Debtor first has to tell Your

11  Honor that it has a likelihood of merits on the success [sic]

12  of some claim.  The Debtor cannot just come to you -- because

13  the Debtor knows Your Honor's opinion on 105(a) and the

14  Supreme Court law -- and the Debtor cannot just say, Judge,

15  please give us an injunction because it's convenient or

16  because we don't want to comply with our obligations.  So they

17  concoct a tortious interference claim.  They argue that there

18  is an automatic stay violation, which, as Your Honor knows,

19  all of us bankruptcy lawyers take most seriously.  And they

20  argue that, well, whatever Mr. Dondero has been enjoined from

21  doing, somehow we *a priori* are also enjoined.  Basically, an

22  alter ego with no facts, law, trial, or due process.

23      On the tortious interference, Your Honor will hear

24  absolute evidence that cannot be refuted that all that we did,

25  all that we did was we refused, our employees refused to make

35

 1   a ministerial entry into a computer program of two trades that

 2   Mr. Seery authorized.  Those trades closed exactly as Mr.

 3   Seery wanted.  Those trades closed, were executed, before Mr.

 4   Seery asked our employees to do his bidding.  And the reason

 5   why our employees were instructed not to do what Mr. Seery

 6   wanted was because our chief compliance officer looked at it,

 7   those employees looked at it, and they all said, What is this?

 8   Our internal protocols were not followed.  We don't know

 9   anything about these trades.  We have fiduciary duties, we

10   have SEC obligations, and Mr. Seery has his own employees whom

11   he can instruct to enter these two trades into the computer

12   and our employees aren't going to do it.  It's as simple as

13   that.

14        Mr. Dondero did not command that decision.  Mr. Dondero

15   did not instruct that decision.

16        Our employees not doing what Mr. Seery requested of them

17   is not tortious interference.  It is not interference as a

18   matter of law.  There was no breach of contract as a result.

19        So the two elements -- two of the elements required for

20   tortious interference, there will be zero evidence on.  But in

21   the bigger picture, what they're talking about again is

22   restraining our rights in the future.  And whether -- whether

23   we are party to these contracts or a third-party beneficiary,

24   it doesn't matter, because we are not a stranger to these

25   contracts.  These contracts expressly give us rights.  And a

Appx 03449

016011

36

1    party exercising their right under a contract, it could be

2    breaching that contract, but it cannot be tortious

3    interference as a matter of law.

4        And if Your Honor is concerned about us tortiously

5    interfering in the future, then the Court should enjoin us

6    from tortious interference in the future, not excise from the

7    contract the remedies that the Debtor must accept if it wants

8    to assume these contracts.

9        Moving to the automatic stay issue, the sole and exclusive

10   argument for why we violated the stay is because our counsel,

11   a seasoned, gentlemanly bankruptcy lawyer of many years'

12   experience, sent two letters to seasoned veteran bankruptcy

13   lawyers for the Debtor.  Communications.  Communications

14   amongst counsel.

15       The first, the December 22nd letter, is a request:  Okay,

16   we lost in front of Judge Jernigan, Judge Jernigan called our

17   motion frivolous, we get that, but we ask you to please stop

18   trading until the plan is confirmed.  A request which the

19   Debtor ignored.  Or that's not true, didn't ignore:  refused

20   to comply with.

21       The second letter, a day later, after various

22   communications, was:  Okay, we are going to initiate the

23   process of terminating you as the servicer.

24       Mr. Dondero had nothing in the world to do with these

25   letters.  Mr. Dondero did not direct these letters.  This was

37

1   professional advice from outside counsel and the independent

2   boards of the Advisors believing that their fiduciary duty

3   compelled that.

4       And guess what, that letter even said:  subject to the

5   automatic stay.  You heard from Mr. Morris that they basically

6   said, File your stay motion.

7       Our follow-up letter clarified anything that we might do

8   is subject to the automatic stay.  We never said we're going

9   to act in a way that the stay doesn't permit.  We said we're

10  going to come to this Court first.

11      But even all that, all those communications, while it may

12  be interesting, are irrelevant, because we never took any

13  action.  You will hear that we never communicated with the

14  CLOs, the Trustees, or the Issuers, anything like we went over

15  with the Debtor, anything like, Please start the process of

16  removing the Debtor.  We have done nothing of the sort, we

17  will do nothing of the sort, precisely because of the

18  automatic stay.

19      So I equate this, Your Honor, to your average home lender

20  whose lawyer sends a letter to the borrower saying, You don't

21  have insurance; we're going to start the process of

22  foreclosure.  You're past due on your post-petition adequate

23  protection payments; we're going to start the foreclosure

24  process; we're going to go seek a list of stay.  That is not

25  actionable.  It is not a stay violation.  Those are

38

1  communications, not actions.  And that is precisely what

2  seasoned professional counsel should be doing.

3      And now, Your Honor, we move to the Mr. Dondero issue.

4  The argument is, well, on January the 9th, Mr. Dondero,

5  apparently for all time, in perpetuity, agreed that he will

6  not cause the related entities to terminate these agreements.

7  And then the argument is, well, the Court entered a TRO

8  against Mr. Dondero and the Court entered a preliminary

9  injunction against Mr. Dondero.  Okay?

10      I don't see where the problem is.  Mr. Dondero is

11  prohibited from causing us to terminate these agreements.

12  There are many ways, with independent boards, that Mr. Dondero

13  has nothing to do with that.  And he will have nothing to do

14  with that in the future.  So if the concern is enjoining us

15  because of an injunction against Mr. Dondero, enjoin Mr.

16  Dondero.  Just like if the concern is that we're going to

17  tortiously interfere, you enjoin us from tortious

18  interference.  Or if we're going to violate the stay, enjoin

19  us from violating the stay.  But do not for all time assume

20  that any right that we may exercise in the future will

21  necessarily be tainted and the corrupt product of Mr.

22  Dondero's instructions.  You will see today on the evidence

23  that that has not happened and it will not happen.

24      And whatever Mr. Dondero may have agreed to, we are

25  separate entities.  Again, the Funds have -- are not

016014

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21   Exhibit 29   Filed 04/06/25   Page 336 of 1052   PageID 17014

39

1    controlled or owned, and Mr. Dondero is not on the board.  So

2    whatever he may have agreed to is between the Court and the

3    Debtor and him, but he never agreed to that on behalf of the

4    Funds.  He never agreed to that on behalf of the Advisors, who

5    have their own independent fiduciary duties and duties under

6    the law.

7        So, Your Honor, there will be no substantial likelihood of

8    success on the merits.  There will be no likelihood of success

9    on the merits.  And I'm talking about the post-assumption,

10   post-confirmation time frame.  The issue is fundamentally

11   different pre-assumption and pre-confirmation.  But post-

12   assumption and post-confirmation, the Debtor will not show a

13   likelihood of success on the merits.  The Debtor will not show

14   any irreparable injury.  None.

15       Mr. Seery will testify that managing these agreements for

16   the coming couple or three years will have some value to the

17   Debtor.  He doesn't know what the profitability of that is to

18   the Debtor.  You will hear that, in fact, managing these

19   contracts for the next two years does not bring any

20   profitability to the Debtor.  The Debtor will lose money

21   managing of them.  But whatever damages there are are monetary

22   damages, and monetary damages are not an irreparable injury as

23   a matter of law.

24       Now, the Debtor says, well, the Court can enter an

25   injunction in the aid of restructuring, but this injunction

40

 1   will happen after restructuring.

 2       On the balance of harm and public interest, Your Honor, I

 3   think we're dealing with more than a billion dollars of clean,

 4   innocent third-party funds.  The balance of harm here weighs

 5   against granting this injunction.  If we try to do anything in

 6   the post-confirmation world, the Debtor has all of its rights

 7   and remedies to contest what we do.  If we do it wrong, we're

 8   liable in contract or in tort, there's monetary damages, and

 9   the Debtor has already successfully organized.

10       But if the Debtor does something wrong in the future and

11   we cannot take action to stop a gross mismanagement or a

12   denution [sic] of the Debtor or an abscondence with funds,

13   then think about the harm to the innocent investors here.

14   Because if we even go to court, your Court, any court, we will

15   be in violation of a federal court injunction.

16       Your Honor, this is not the appropriate purpose of an

17   injunction for the preservation of the status quo.  The status

18   quo, by definition, cannot extend post-assumption or post-

19   confirmation.  This is not a proper exercise of equity.  We

20   have done nothing wrong, we have threatened to do nothing

21   wrong, and we will do nothing wrong to justify forever being

22   prejudiced and enjoined from exercising our contractual and

23   statutory rights.

24       Your Honor, this TRO extends through February the 15th.

25   We asked the Debtor to continue this hearing.  We asked the

41

1    Debtor to go to our independent boards and seek approval of

2    the same settlement that the Debtor has with CLO Holdco, which

3    we learned about last night.  We simply haven't had the time

4    to get those boards aligned up and present a settlement to

5    them.  We're trying to put together a competing plan.

6        Your Honor, there is no reason to go forward today except,

7    like Mr. Morris said, power.  Power.  Mr. Seery's power, Your

8    Honor.  Not ours.  Mr. Seery's power in perpetuity or for

9    judicial immunity, get out of jail free card.  Thank you.

10            THE COURT:  All right.  Mr. Morris, you may call your

11   witness.

12            MR. MORRIS:  Yeah.  I just want to make a motion to

13   strike the notion of a get out of jail free card.  I

14   appreciated everything counsel had to say, but I think that's

15   a little -- a little over the top.

16       We call Mr. James Dondero, please.

17            THE COURT:  Mr. Dondero, --

18            MR. RUKAVINA:  Your Honor, bear with me.

19            THE COURT:  Okay.

20            MR. RUKAVINA:  Your Honor, bear with me.  I'm going

21   to get out of this chair.  Mr. Dondero will get in this chair.

22   And so that there's no reverberation, I will be sitting next

23   to Mr. Dondero in case I have to make any objections.

24            THE COURT:  Okay.  All right.  Good morning, Mr.

25   Dondero.

Dondero - Direct                          42

1              MR. DONDERO:  Good morning.

2              THE COURT:  Please raise your right hand.

3                  JAMES DONDERO, DEBTOR'S WITNESS, SWORN

4              THE COURT:  Thank you.  Mr. Morris, go ahead.

5              MR. MORRIS:  May I proceed, Your Honor?

6              THE COURT:  Yes.

7                         DIRECT EXAMINATION

8    BY MR. MORRIS:

9    Q    Good morning, Mr. Dondero.  Okay.  John Morris; Pachulski,

10   Stang, Ziehl & Jones; for the Debtor.  Can you hear me okay,

11   sir?

12   A    Yes.

13   Q    There are no board members here on behalf of any of the

14   Funds to testify or offer any evidence; isn't that right?

15   A    Not that I'm aware of.

16   Q    Okay.  And you knew the hearing was going to be today on

17   the preliminary injunction, right?

18   A    Yes.

19   Q    And you had an opportunity to confer with the boards of

20   the Funds in advance of this hearing, right?

21   A    No.

22   Q    There's no -- there's no -- no board member is expected to

23   testify, fair?

24   A    Correct.

25   Q    So the Court isn't going to hear any evidence as to the

Dondero - Direct                              43

1   board's perception of what's happening here, right?

2   A    Not that I'm aware of.

3   Q    Okay.  Until January 9th, 2020, you controlled the debtor

4   Highland Capital Management, LP; isn't that right?

5   A    I don't remember exactly when these -- when the

6   independent board was put in place, but up until around that

7   time, I believe.

8   Q    Okay.  So, January 2020?

9   A    Yes.

10  Q    And during that month, you completed an agreement with the

11  Creditors' Committee where you ceded control of the Debtor

12  pursuant to a court order, right?

13  A    Pursuant to a court ...?  I thought it was pursuant to a

14  negotiation where they would have fiduciary responsibility to

15  the estate in my absence.  That's -- that's what I think the

16  (garbled).

17  Q    Okay.  You're aware -- so you entered into an agreement

18  with the Creditors' Committee pursuant to which you ceded

19  control of the Debtor, right?

20       MR. RUKAVINA:  Your Honor, I'll object.  That

21  agreement speaks for itself.  And if Mr. Morris wants to

22  present it to Mr. Dondero, he can.

23       THE COURT:  Um, --

24       MR. MORRIS:  Sure.  Ms. Canty, can we please put up

25  --

Dondero - Direct                    44

1            THE COURT:  All right.  Well, I --

2            MR. MORRIS:  I'm happy to put it up, Your Honor.

3            THE COURT:  I overrule that objection.  You can ask.

4     And then if he's not sure, you can present the agreement.  All

5     right?  Go ahead.

6            MR. MORRIS:  Okay.

7     BY MR. MORRIS:

8     Q    Mr. Dondero, is there any doubt in your mind that in

9     January of 2020 you gave up control of Highland in favor of an

10    independent board at the Strand Advisors level?

11    A    No.  I -- yes, I agree with that.

12    Q    Okay.  And do you recall that, in connection with that

13    agreement, the Court entered an order?

14    A    Several orders.  Which one?

15    Q    Okay.

16           MR. MORRIS:  Can we please put up Docket No. 339?

17           MS. CANTY:  Sure, just one second.

18           MR. RUKAVINA:  And you have it here.

19       John, I have the order if just want Mr. Dondero to review

20    it.

21           MR. MORRIS:  I think -- I think everybody should have

22    the benefit of seeing it.  But thank you very much.

23       Your Honor, while we take this moment, can you just remind

24    me of when the Court needs to take a break today, so that I'm

25    mindful of that and respectful of your time?

Dondero - Direct                          45

 1              THE COURT:  11:30.

 2              MR. MORRIS:  Okay.  And what time will we reconvene?

 3              THE COURT:  Well, I have said 1:00.  I hope it can be

 4      a little sooner, but let's just plan on 1:00, okay, so there's

 5      no confusion.

 6              MR. MORRIS:  Okay.  All right.  All right.  So, on

 7      the screen here, we have Exhibit OOOO, which is in the record.

 8      BY MR. MORRIS:

 9      Q    This is an order that was entered by the Court on January

10      9th, 2020.  Do you see that, sir?

11      A    Yes.

12              MR. MORRIS:  Can we scroll down to Paragraph 9,

13      please?  (Pause.)  Are you having problems, Ms. Canty?

14              MS. CANTY:  It's on the screen.  You can't see it?

15              MR. MORRIS:  Yeah.  Can you scroll down to Paragraph

16      9?

17              MS. CANTY:  It's on Paragraph --

18              MR. MORRIS:  That's on Page 2, I believe.

19              MS. CANTY:  Yeah, I have it up.  I'm not sure what

20      the disconnect is, because I can see it on my screen.  I'm

21      going to stop it and reshare it.

22              MR. MORRIS:  Thank you very much.

23          (Pause.)

24              MS. CANTY:  Do you see it now?

25              MR. MORRIS:  Okay.  Beautiful.

Dondero - Direct                              46

 1  BY MR. MORRIS:

 2  Q    Mr. Dondero, if you'd just read Paragraph 9 out loud.

 3  A    (reading)  Mr. Dondero shall not cause any related entity

 4  to terminate any agreements with the Debtor.

 5  Q    Okay.  So you understood, as part of the corporate

 6  governance settlement pursuant to which you avoided the

 7  imposition of a trustee, that you agreed that you wouldn't

 8  cause any related entity to terminate any agreements with the

 9  Debtor, right?

10  A    Uh, --

11  Q    Is that correct?  You understood that paragraph?

12  A    Yes.

13  Q    Okay.  And you didn't appeal this particular order, did

14  you, sir?

15  A    I -- I believe I've refuted -- I've adhered to that order

16  entirely.

17  Q    Okay.  NexPoint Advisors LP, is one of the defendants in

18  this matter, right?

19  A    Yes.

20       (Pause.)

21  Q    Can you hear me, sir?

22  A    Yes.  Yes, I said, "Yes."

23            MR. NICHOLSON:  Well, John, did you -- did you ask a

24  question?  Because you went offline for a few seconds there.

25            MR. MORRIS:  I asked whether NexPoint Advisors, LP

Dondero - Direct                              47

1   was an advisory firm.

2           THE WITNESS:  Yes.

3   BY MR. MORRIS:

4   Q   And you have a direct or indirect ownership interest in

5   NexPoint Advisors, LP, correct?

6   A   Yes.

7   Q   And you understand that, based on that direct or indirect

8   ownership interest, NexPoint Advisors, LP is a related entity

9   under Paragraph 9 of this order, right?

10  A   Yes.

11  Q   Okay.  Highland Capital Management Fund Advisors, LP is

12  one of the other defendants in this case, right?

13  A   Yes.

14  Q   And we'll refer to that entity as Fund Advisors; is that

15  fair?

16  A   Yes.

17  Q   And we'll refer to Fund Advisors together with NexPoint

18  Advisors, LP as the Advisors; is that fair?

19  A   Yes.

20  Q   Okay.  Fund Advisors is also an advisory firm; is that

21  (audio gap)?

22  A   I missed that last question.

23          MR. RUKAVINA:  John, you're freezing up on us.  Is it

24  on our end, Your Honor, or is it on Mr. Morris's end?

25          MR. MORRIS:  Just let me know -- just let me know

Dondero - Direct                               48

1    when it happens.

2            THE COURT:  Yes.  I'm hearing him.  But go ahead, Mr.

3    Morris.  Let's try again.

4            MR. MORRIS:  Okay.

5    BY MR. MORRIS:

6    Q   You have a direct or indirect ownership interest in Fund

7    Advisors, correct, sir?

8    A   Yes.

9    Q   (audio garbled)  And based on that direct or indirect

10   interest, you would agree that Fund Advisors is a related

11   entity for purposes of this order, correct?

12   A   Yes.

13   Q   In addition to your ownership interest, you're also the

14   president of Fund Advisors; is that (audio gap)?

15           THE COURT:  All right.  Now --

16           THE WITNESS:  I believe so.

17           THE COURT:  Yes.  Now I'm starting to have some

18   trouble, Mr. Morris.  Every once in a while, you're freezing

19   towards the end of a sentence.  So I don't know what can be

20   done, but it's --

21           MR. MORRIS:  All right.  Let me know if that

22   continues.

23           THE COURT:  Okay.

24   BY MR. MORRIS:

25   Q   To use your words -- to use your words, Mr. Dondero, it's

016024

Dondero - Direct                        49

1   fair to say that you generally control Fund Advisors, right?

2   A    Yes.

3   Q    And based on that, you acknowledge that Fund Advisors is a

4   related entity under the Court's order, correct?

5   A    Yes.

6   Q    And together, the Advisors that you own and control manage

7   certain investment funds, correct?

8   A    Yes.

9   Q    And three of those funds are defendants in this case,

10  correct?

11  A    Yes.

12  Q    And you are the portfolio manager of each of those funds;

13  is that right?

14  A    I believe so.

15  Q    Okay.  Let's talk about the events that led to this

16  matter.  CLO stands for Collateralized Loan Obligations,

17  correct?

18  A    I'm sorry.  Repeat that, please?

19  Q    Sure.  CLO stands for Collateralized Loan Obligations,

20  correct?

21  A    Yes.

22  Q    Years ago, the Advisors that you own and control caused

23  the investment funds that they manage to buy the interests in

24  CLOs that are managed by the Debtor, correct?

25  A    Yes.  Yes.

Dondero - Direct                    50

 1  Q    Okay.  And those Funds still hold an equity interest

 2  today, correct?

 3  A    Yes.

 4  Q    And K&L Gates is one of the law firms that represents the

 5  Advisors and the Funds that are managed by the Advisors,

 6  correct?

 7  A    Yes.

 8  Q    You would agree that the Debtor is party to certain

 9  contracts that give it the right and the responsibility to

10  manage certain CLO assets, right?

11  A    Yes.

12  Q    And you recall that --

13        MR. RUKAVINA:  Your Honor, Mr. Morris is frozen on

14  our end.

15        THE COURT:  Yes.  Mr. Morris, you just froze.

16        MR. RUKAVINA:  We heard nothing, Mr. Morris.

17        THE COURT:  Yes.

18        MR. MORRIS:  Okay.

19  BY MR. MORRIS:

20  Q    Sir, do you recall that you resigned from the Debtor on or

21  around October 10th, 2020?

22  A    Yes.

23  Q    Okay.  And shortly thereafter, K&L Gates sent a couple of

24  letters to the Debtor on behalf of the Advisors and the Funds,

25  correct?

Appx. 03494

Dondero - Direct                    51

1   A    Yes.

2   Q    Okay.

3            MR. MORRIS:  Can we take a look at these?  These are

4   documents that were admitted into evidence in a different

5   matter, but they're actually referred to in his prior

6   testimony, which is in evidence in this case.  So I would just

7   ask Ms. Canty to go to Trial Exhibit B, which was filed in the

8   Adversary Proceeding 20-3190 at Docket 46.  And for the

9   record, it's PDF Page #184 out of 270.  I just want to take a

10  look at these two letters.

11  BY MR. MORRIS:

12  Q    Okay.  Do you see this letter, sir?

13  A    Yes.

14  Q    And NexPoint is one of the defendants here; is that right?

15  A    Yes.

16  Q    And that's one of the Advisors that you own and generally

17  control, correct?

18  A    Yes.

19  Q    And so this letter is sent less than a week after you've

20  left Highland Capital Management, right?

21  A    Yes.

22  Q    Do you recall this particular letter?

23  A    No.

24  Q    Can -- you're familiar with the substance of this letter

25  and the other one that was sent in November, correct?

Dondero - Direct                          52

1   A    Could you pull it a little higher and let me read it?

2   Q    Yes.  Sure.

3          MR. RUKAVINA:  If this is an exhibit, I can show it

4   to him as an exhibit, Mr. Morris.

5          MR. MORRIS:  I don't know that this is one of the

6   marked exhibits.  It's one of the exhibits that's used within

7   his prior testimony.  So, but I want to give Mr. Dondero a

8   chance to review it.  And please let us know if you need to

9   scroll further down.

10      (Pause.)

11          MR. RUKAVINA:  You're going to have to scroll down.

12          THE WITNESS:  Scroll down a little further, please.

13      (Pause.)

14          MR. RUKAVINA:  Mr. Morris, can you please scroll

15  down?  Neither Mr. Dondero nor I can read the balance.

16  BY MR. MORRIS:

17  Q   There you go.  (Pause.)  So, you see at the top of the

18  page there there is a reference to the sale of assets and a,

19  quote, "a rush to sell these assets at fire sale prices."  Is

20  that what you think -- did you think that Mr. Seery was

21  selling (audio garbled) CLO assets at fire sale prices in

22  October 2020, --

23          MR. RUKAVINA:  Your Honor, --

24          MR. MORRIS:  -- less than a week after --

25          MR. RUKAVINA:  Your Honor, I'll object.  We did not

Dondero - Direct                          53

1  hear Mr. Morris's question.

2          THE COURT:  All right.  Could you repeat the

3  question?

4          MR. MORRIS:  Okay.  Yes, Your Honor.

5  BY MR. MORRIS:

6  Q   Mr. Dondero, on or about October 16th, did you personally

7  believe that Mr. Seery was in a rush to sell CLO assets at

8  fire sale prices?

9  A   I believe he had no business purpose to sell any of the

10  assets, which I believe he stated that to Joe Sowin, our

11  trader.  I -- I -- there was no business purpose stated or

12  ever given or obvious from the sales.  And --

13  Q   Okay.

14  A   -- I (indecipherable) draft this letter.

15  Q   Okay.

16          MR. MORRIS:  I move to strike, Your Honor.  It's a

17  very simple question --

18          THE COURT:  Sustained.

19          MR. MORRIS:  -- and it has to do solely with Mr.

20  Dondero's state of mind.

21  BY MR. MORRIS:

22  Q   Mr. Dondero, on or about October 16th, did you personally

23  believe that Mr. Seery was in a rush to sell CLO assets at

24  fire sale prices?

25  A   He was in a rush to sell them for some reason with no

                          Dondero - Direct                    54

1   business purpose.  I don't know the reason.

2             THE COURT:  All right.  Can you --

3   BY MR. MORRIS:

4   Q    Okay.  And you never asked him, right?

5             THE COURT:  Yes.  Yes or no answer, Mr. Dondero.

6             THE WITNESS:  Never asked him.

7             MR. MORRIS:  Okay.  Can we turn to the next exhibit,

8   which is Exhibit C on that same docket?

9        (Pause.)

10  BY MR. MORRIS:

11  Q    While we're waiting, can you just read the last sentence

12  of the paragraph that ends at the top of the page, Mr.

13  Dondero, beginning, "Accordingly"?

14  A    (reading)  Accordingly, we hereby request that no CLO

15  assets be sold without prior notice and prior consent from the

16  Advisors.

17  Q    Are you aware of any contractual provision pursuant to

18  which the Funds or the Advisors can -- can expect that the

19  Debtor will refrain from any -- selling any assets without

20  giving prior notice and obtaining prior consent from those

21  entities?

22  A    I think the documents have an overall good-faith/fair-

23  dealing clause which would cover something like this, I

24  believe.

25  Q    Your -- is it your testimony, sir, that the duty of good

Dondero - Direct                           55

1  faith and fair dealing requires the Debtor to give notice to

2  the Advisors and to obtain the Advisors' prior consent before

3  they can sell any CLO assets?

4  A    Well, I think -- yes, I do.  I think --

5  Q    All right.

6  A    Yes.  Yeah.

7  Q    Okay.  And then the next month, another letter was sent by

8  NexPoint to Mr. Seery.  Do you recall that?

9  A    Not specifically.  If you bring it up, we can talk about

10 it.

11         MR. MORRIS:  Can we scroll down a little bit?

12     (Pause.)

13         MS. CANTY:  John, are you talking to me?  I was

14 frozen out.  I just got back on.  I apologize.

15         MR. MORRIS:  That's okay.  Can we just scroll down so

16 Mr. Dondero can see more of this particular letter?

17         MS. CANTY:  Okay.

18         MR. MORRIS:  Okay.

19 BY MR. MORRIS:

20 Q    Can you just read out loud, Mr. Dondero, out loud the last

21 two sentences, please, beginning with, "We understand"?

22 A    (reading)  We understand that Charitable DAF Holdco, Ltd.

23 has made a similar request.  Accordingly, we hereby re-urge

24 our request that no CLO assets be sold without prior notice to

25 and prior consent from the Advisors.

Appx. 02469
016031

Dondero - Direct                      56

1   Q    What's the Charitable DAF Holdco, Ltd.?

2   A    I think that's who you settled with yesterday.

3   Q    Do you have an interest in that entity?

4   A    No.  It's a bona fide charity.  It was one of the largest

5   in Dallas before it got cut in half by Acis.

6   Q    Does -- are you familiar with the Get Good and the Dugaboy

7   Investment Trusts?

8           MR. RUKAVINA:  Your Honor, at this time I would

9   object to relevance.  I don't see what this has to do with

10  tortious interference and stay violation on December 22nd and

11  December 23rd, 2020.

12          THE COURT:  Response?

13          MR. MORRIS:  Your Honor, I'm trying to establish that

14  Charitable DAF Holdco, Ltd. is another entity in which Mr.

15  Dondero holds a beneficial interest.

16          THE COURT:  Okay.  Overrule the objection.

17          MR. RUKAVINA:  John, you're not only frozen, now

18  you're off.

19          MR. MORRIS:  Yeah, I can see myself.  You can't hear

20  me?

21          MR. RUKAVINA:  We can now, but Your Honor, we lost

22  Mr. Morris for a bit there.

23          THE COURT:  All right.  I think we were --

24          MR. MORRIS:  Okay.

25          THE COURT:  -- waiting on an answer from Mr. Dondero,

Dondero - Direct                          57

1    actually.

2              THE WITNESS:  We didn't hear the question at --

3    BY MR. MORRIS:

4    Q    Sure.  Are you familiar with the Get Good and Dugaboy

5    Investment Trusts?

6    A    Yes.

7    Q    Are you the beneficiary of those trusts?

8              MR. RUKAVINA:  Your Honor, again, objection to

9    relevance.  These are non-parties, and what his personal

10   interests are has no relevance to this.

11             THE COURT:  Overruled.

12             THE WITNESS:  The Get Good Trust, Get -- I believe

13   those are defective grantor trusts.  I don't believe I have

14   any interest whatsoever in those.  Dugaboy is a perpetual

15   Delaware trust.  I don't know how that's set up, but I believe

16   I do have an interest there until I pass.

17   BY MR. MORRIS:

18   Q    In fact, you're -- you're the sole beneficiary of the

19   Dugaboy Investment Trust, right?

20   A    Until I pass.  It's a -- it's a estate planning trust.

21   Q    I appreciate that.  And the Dugaboy and the Get Good

22   Trusts are the owners of the Charitable DAF Holdco Ltd.,

23   correct?

24   A    No.  Not as far as I know.

25   Q    Okay.

Dondero - Direct                    58

1   A   (garbled) time at all.

2   Q   All right.  So we just looked at these two letters, sir.

3   And you were familiar with the substance of the letters before

4   they were sent, right?

5   A   Uh, just --

6           MR. MORRIS:  You can take it down, Ms. Canty.

7           THE WITNESS:  Just generally.  Again, I wasn't

8   involved directly with the letters.

9   BY MR. MORRIS:

10  Q   You were aware of the letters before they were sent,

11  right?

12  A   Yes.

13  Q   And you discussed the substance of the letters with

14  NexPoint, correct?

15  A   Not the substance of the letters, just the substance of

16  the issue.

17  Q   You actually discussed the substance of the letters with

18  NexPoint, correct?

19  A   I -- Again, I remember it being the substance of the

20  issue.  Generally, at most, the substance of the letters.

21  Q   And you discussed the substance of the letters with the

22  Advisors' internal counsel, too, right?

23  A   The sub -- generally, the substance, yes, but more the

24  issue than the letter.

25  Q   Okay.  If I pull up your transcript from the TRO hearing,

016034

Dondero - Direct                          59

1   would that refresh your recollection that you discussed the

2   substance of these letters with NexPoint and with the

3   Advisors' internal counsel?

4   A    I'd like to clarify with the testimony I just gave.

5   Q    Okay.  Would you -- do you have any reason to believe that

6   you did not previously testify that you discussed the

7   substance of the letters with NexPoint and with NexPoint

8   Advisors' internal counsel?

9   A    I repeat the same testimony.  Generally.  Like, those

10  letters that you put on the screen, I have no recollection of

11  those specifically.

12          MR. MORRIS:  Ms. Canty, can we please call up on the

13  screen Exhibit NNNN, which was the transcript from the January

14  8th, 2021 preliminary injunction hearing?

15          MR. RUKAVINA:  Mr. Morris, just one sec.  I'm trying

16  to find it on paper.

17          MR. MORRIS:  Yeah.  It's four Ns.

18          MR. RUKAVINA:  One, two, three, four.  (inaudible)

19  put that on the screen.

20          MS. CANTY:  John, I'm not sure what's going on, but

21  it won't come up on the screen.  I've tried three times.  I'm

22  going to keep trying.

23          MR. MORRIS:  All right.  I have it in front of me.

24  Do you have it, too?

25          MR. RUKAVINA:  Yes, the witness has it --

Dondero - Direct                          60

 1            MR. MORRIS:  Okay.

 2            MR. RUKAVINA:  -- in front of him.  This is NNNN,

 3   just to confirm?

 4            MR. MORRIS:  Yes.  And it is the January 8th

 5   transcript.

 6   BY MR. MORRIS:

 7   Q   Mr. Dondero, were you asked these questions and did you

 8   give these answers?  Question:  Are you familiar with --

 9            MR. RUKAVINA:  Where are you, John?  Where are you?

10   Where are you?  We -- we -- we --

11            MR. MORRIS:  I apologize.  Page 40.  I'm going to

12   read Page 40, Lines 1 through 14.

13            MR. RUKAVINA:  Okay.  He has it in front of him, if

14   you just want him to read it.

15   BY MR. MORRIS:

16   Q   Did you give these answers at Page 40, beginning Line 1:

17        "Q   And were you -- and you were familiar, you were

18        aware of these letters before they were sent; is that

19        correct?

20        "A   Yes.

21        "Q   And you generally discussed the substance of these

22        letters with NexPoint; is that right?

23        "A   Generally, yes.

24        "Q   You discussed the letters with the internal

25        counsel; is that right?

Dondero - Direct                          61

```
 1        "A    Yes.

 2        "Q    That's D.C. Sauter?

 3        "A    Yes.

 4        "Q    And you have been on some calls with K&L Gates

 5        about these letters, right?

 6        "A    I believe so.

 7        "Q    And you knew these letters were being sent,

 8        correct?

 9        "A    Yeah.  They're -- they're reported.

10   Q    Did you give those answers to those questions at the prior

11   hearing?

12   A    I -- I believe it's what I -- it's almost exactly what I

13   just said, but yes.

14   Q    And you supported the sending of the letters; isn't that

15   right?

16   A    Absolutely.

17   Q    And you encouraged the sending of the letters, right?

18   A    Absolutely.

19   Q    Around Thanksgiving, you learned that Mr. Seery had given

20   a direction to sell certain securities owned by CLOs managed

21   by the Debtor, correct?

22   A    Yes.

23   Q    And when you learned that, you personally intervened to

24   stop the trades, correct?

25   A    Yes.
```

016037

Dondero - Direct                          62

1   Q    Let's -- I want to look at that email string that we

2   looked at once before.  It can be found at Trial Exhibit D

3   found on Docket No. 46 in the adversary proceeding. It's PDF

4   Number -- it's PDF Page 189 of two (garbled).

5           MR. RUKAVINA:  Did you catch that?

6           THE COURT:  Which -- which exhibit number -- letter

7   is it?

8           MR. MORRIS:  It's on the docket in the Adversary

9   Proceeding 20-3190.  And in that adversary proceeding, at

10  Docket No. 46, you've got the Debtor's exhibit list.  And

11  Exhibit D, which can be found at PDF Page 189 of 270, is the

12  email string I'm looking for.

13      I apologize, Your Honor.  It wasn't until I was reading

14  the transcript yesterday that I realized I needed these

15  documents.  But they are in the record.  Obviously, they're

16  referred to in the transcript that is in the record.

17          THE COURT:  Okay.

18          MR. RUKAVINA:  Your Honor, I would like to interject

19  for the record here that this is the first time my clients

20  have been sued.  They have a right to be confronted with the

21  witnesses and testimony and evidence against them.  So if Mr.

22  Morris wants to introduce this as an exhibit here today,

23  that's one thing, but I object to any notion that there's a

24  prior record that is going to tie my clients' hands.  It might

25  tie Mr. Dondero's hands, but not my clients' hands.

Dondero - Direct                    63

1          MR. MORRIS:  I'd move for the introduction into

2    evidence of this document that has emails not only from Mr.

3    Dondero, but from Joe Sowin, the head trader of the

4    Defendants.

5          MR. RUKAVINA:  And Your Honor, I have no problem with

6    that admission.  I just want to make it clear that we're not

7    conceding that whatever happened in this case previous to this

8    is a part of today's record.  That's all.  So I do not have a

9    problem with the admission of this.  I would, however, ask

10   you, Mr. Morris, to have someone email it to us so that I can

11   use it today if I need to.

12         THE COURT:  All right.

13         MR. MORRIS:  Okay.  Will do.

14         THE COURT:  So, I'll --

15         MR. MORRIS:  We'll do that at the --

16         THE COURT:  I'll admit it into evidence.  You'll need

17   to not only email it Mr. Rukavina, but you'll need to file a

18   supplement to your exhibit and witness list after the hearing

19   showing the admission of --

20         MR. RUKAVINA:  And Mr. Morris, if you could email it

21   to Mr. -- if you could email it to Mr. Vasek as well, because

22   obviously I can't get to it now.  Thank you.

23         MR. MORRIS:  Sure.

24         THE COURT:  All right.  So this --

25         MR. MORRIS:  Okay.  So, --

Dondero - Direct                    64

1          THE COURT:  For the record, let's just be clear what

2    the record is -- this is going to be called on the record.  I

3    think you are up to SSSSS, so this would be TTTTT when you

4    file it on the record.  All right?  Go ahead.

5          MR. MORRIS:  Thank you very much, Your Honor.

6       (Debtor's Exhibit TTTTT is received into evidence.)

7    BY MR. MORRIS:

8    Q   Mr. Dondero, you recall looking at this email string at

9    the last hearing, right?

10   A   Yes.

11   Q   Let's start at the bottom, please, with Mr. Covitz's

12   email.

13         (Pause.)

14         MR. RUKAVINA:  Hey, John, real quick, now we've lost

15   you.  We've lost you and we're not seeing anything from your

16   assistant.  Do you have the email, Mr. Vasek?

17         MR. MORRIS:  I'm here.  Can you hear me?

18         MS. CANTY:  I'm here.  (garbled) on the screen.

19         MR. MORRIS:  Yeah.  Can we scroll down to the bottom?

20         MS. CANTY: I did.  I don't know why it's not showing

21   on you guys' screen.

22         MR. MORRIS:  Hopefully this gets fixed.  Yeah.  We've

23   never had this problem before, Your Honor.  I'm not sure what

24   the issue is, but I do apologize.

25         THE COURT:  All right.  Well, I can hear you, but we

Dondero - Direct                    65

1   don't see movement of the exhibit.

2        MR. MORRIS:  Yeah.  When I began earlier today by

3   suggesting that this was going to be challenging, this was not

4   one of the challenges I anticipated.

5        THE COURT:  Okay.  All right.

6        MR. RUKAVINA:  Do you have the email yet?

7        MS. CANTY: I'm sorry.  I don't know what's happening

8   on this end.  I have three streams of Internet going, and I

9   don't think it's the Internet.  I don't know what's going on.

10       MR. MORRIS:  Hmm.

11       MR. RUKAVINA:  Yeah, John, what I'm suggesting is

12  that you have an associate email it to Mr. Vasek immediately

13  and then we can present it to Mr. Dondero.

14       MR. MORRIS:  I'll tell you what.  While that -- one

15  more try.

16       MR. CANTY:  Can you see it now?

17       MR. MORRIS:  Okay.  Yes.

18  BY MR. MORRIS:

19  Q   All right.  Mr. Dondero, Hunter Covitz is an employee of

20  the Debtor, right?

21       MR. RUKAVINA:  Hold on a sec.  Hold on a sec.

22     Your Honor, I believe that I have the right to see the

23  full email here.  I believe that Mr. Dondero does.  And we've

24  just seen the first little bit and now some middle piece.

25       THE COURT:  All right.  So are you saying --

Dondero - Direct                    66

1              MR. MORRIS:  And in the order that --

2              THE COURT:  -- you want to see the whole string?

3              MR. RUKAVINA:  Well, I think -- Mr. Dondero, do you

4    need to see the whole string?  I don't know what this is, but

5    maybe you do.

6              MR. DONDERO:  It depends on what the question is.  I

7    can answer some questions off of this email.

8              THE COURT:  Okay, let's go.

9              MR. MORRIS:  Yeah.

10   BY MR. MORRIS:

11   Q    All right.  So, for the moment, Mr. Covitz is an employee

12   of the Debtor, correct?

13   A    Yes.

14   Q    And he's the author of this email in front of us, correct?

15   A    Yes.

16   Q    And Mr. Covitz helps to manage the CLO assets on behalf of

17   the Debtor, correct?

18   A    Yes.

19   Q    Mr. Covitz is giving directions to Matt Pearson and Joe

20   Sowin to sell certain securities held by the CLOs, correct?

21   A    Yes.

22   Q    And if we can scroll up, I think we can see that you

23   received a copy of this email?

24        (Pause, 11:15 a.m.)

25              MR. MORRIS:  What I would like to do instead, we'll

016042

Dondero - Direct                    67

1    take a break in about 15 or 20 (audio gap).  When we

2    disconnect, we'll get a better connection after the break.

3    And in the interim, I've got testimony that I would like

4    that's already been admitted into the record but there's

5    portions of which I would like to read into the record from

6    Dustin Norris, who is the executive vice president for each of

7    the Defendants.  And maybe it would be easiest for me to do

8    that.

9              THE COURT:  Okay.

10             MR. MORRIS:  All right.  On Docket No. 39.

11             MR. RUKAVINA:  Your Honor, I apologize.  Your Honor,

12   I apologize.  We did not hear --

13             MR. MORRIS:  I'm going to read into the record a

14   portion of Mr. Norris' testimony from the December 16th

15   hearing.

16             MR. RUKAVINA:  Your Honor, I do not see that

17   transcript in the exhibits.  If Mr. Morris could give me an

18   exhibit.

19             MR. MORRIS:  Exhibit B as in boy.

20             MR. RUKAVINA:  Thank you.

21             MR. MORRIS:  All right.  Instead of putting it on the

22   screen, if we could take the exhibit down, Ms. Canty.  He can

23   just follow along.  Beginning at Page 38, Line 7 through  -- 7

24   through 17.

25        Are you there, Mr. Rukavina?

Dondero - Direct                    68

1          MR. RUKAVINA:  I am.  Thank you.  I have it in front

2     of Mr. Dondero.

3          MR. MORRIS:  Okay.  Page 38, Lines 7 through 17:

4      "Q   I  think  you  testified  that  you're  one  of  the

5      executive vice presidents at NexPoint Advisors, one of

6      the Movants.  Is that right?

7      "A   That's right.

8      "Q   Who is the president of NexPoint Advisors, LP?

9      "A   Mr. Dondero.

10     "Q   And you report directly to him; is that right?

11     "A   I do.

12     "Q   You're also the executive vice president of Fund

13     Advisors, another Movant; is that right?

14     "A   Correct."

15          MR. MORRIS:  Beginning on Page 38, Line 25:

16     "Q   You're  also  the  executive  vice  president  (audio

17     gap) that are managed by the Advisors here, right?

18     "A   Yes.  That is correct."

19          MR. MORRIS:  Then going back to Page 35, beginning at

20     Line 15:

21     "Q   To be clear here, there are five moving parties;

22     is that right?

23     "A   That's correct.  The two Advisors and the three

24     Funds.

25     "Q   And one of the advisory firms is Highland Capital

016044

Dondero - Direct                          69

1    Management Fund Advisors, LP; is that right?

2    "A    That's correct.

3    "Q    And I'll refer to that as Fund Advisors; is that

4    okay?

5    "A    That's great.

6    "Q    James Dondero and Mark Okada are the beneficial

7    owners of Fund Advisors, correct?

8    "A    That is my understanding.

9    "Q    And your understanding is that Mr. Dondero

10   controls Fund Advisors, correct?

11   "A    That's correct.

12   "Q    And the other advisory firm that brought the

13   motion is NexPoint Advisors, LP; is that right?

14   "A    That is correct.

15   "Q    And Mr. Dondero is the beneficial owner of

16   NexPoint; is that right?

17   "A    A family trust where Jim is the sole beneficiary,

18   I believe, controls or owns NexPoint Advisors.

19   "Q    Okay.  And Mr. Dondero --

20   "A    Or 99 percent of NexPoint Advisors.

21   "Q    Mr. Dondero controls NexPoint; is that right?

22   "A    Correct."

23        MR. MORRIS:  Continuing at Line 16 on Page 36:

24   "Q    All right.  And I'm going to refer to Fund

25   Advisors and NexPoint as the Advisors going forward; is

Dondero - Direct                    70

1      that fair?

2      "A    That's fair.

3      "Q    Each of the Advisors manages certain funds; is

4      that right?

5      "A    That is correct.

6      "Q    And three of those funds that are managed by the

7      Advisors are Movants on this motion, correct?

8      "A    Correct.

9      "Q    All right.  The Advisors caused these three Funds

10     to invest in CLOs that are managed by the Debtor; is

11     that right?"

12     "A    --"

13          MR. RUKAVINA:  Your Honor, I object.  Is there a

14     question at the end of this?  I mean, Mr. Dondero can't

15     possibly remember all this and then be asked a question.

16          MR. MORRIS:  He doesn't have to answer any questions.

17     I'm just reading the evidence into the record.

18          THE COURT:  Okay.

19          MR. RUKAVINA:  Your Honor?

20          MR. MORRIS:  Since we're having difficulty --

21          MR. RUKAVINA:  Your Honor, that's a matter for

22     summation.  That's -- this is a question and answer, I submit.

23          THE COURT:  Well, I overrule.

24          MR. MORRIS:  Your Honor, here's -- here's --

25          THE COURT:  This has been admitted into --

Dondero - Direct                    71

1          MR. MORRIS:  Yeah.

2          THE COURT:  -- evidence.  And if he wants to

3    highlight to the Court portions of the evidence, he can.

4       Go ahead.

5          MR. MORRIS:  Thank you, Your Honor.

6       "A   The portfolio managers working for the Advisors

7       did.  That's correct.

8       "Q   And Mr. Dondero is the portfolio manager of the

9       Highland Income Fund; is that right?

10      "A   He is one of the portfolio managers for that Fund.

11      "Q   And he's also --

12      "A   I believe there are two.

13      "Q   And he's also a portfolio manager of NexPoint

14      Capital, Inc., one of the Movants here, right?

15      "A   That is correct.

16      "Q   And he's also the portfolio manager of NexPoint

17      Strategic Opportunities Fund, another Movant; is that

18      right?

19      "A   Yes.  That is correct."

20         MR. MORRIS:  Going to Line -- Page 41, Lines 6

21   through 9:

22      "Q   The whole idea for this motion initiated with Mr.

23      Dondero; isn't that right?

24      "A   The concern, yes, the concern originated, and his

25      concern was voiced to our legal and compliance team."

016047

Dondero - Direct                            72

1              MR. MORRIS:  Page 42, Lines 4 through 11:

2         "Q   None of the Movants are parties to the agreements

3         between the Debtor and each of the Debtors pursuant --

4         each of the CLOs pursuant to which the Debtor serves as

5         portfolio manager; is that correct?

6         "A   I believe that is correct.   One, I think,

7         important -- even though they're not (audio gap), they

8         are the -- they have the economic ownership of each of

9         these CLOs.

10        "Q   But they're not party to the agreement; is that

11        right?

12        "A   Not that I am aware of."

13             MR. MORRIS:  Page 42, Line 25:

14        "Q   Okay.   It's your understanding, in fact, that

15        nobody other than the Debtor has the right or the

16        authority to buy and sell assets on behalf of the CLOs

17        listed on Exhibit B, correct?

18        "A   That is my understanding.

19        "Q   Okay.   And it's also your understanding, your

20        specific understanding, that holders of preferred

21        shares do not make investment decisions on behalf of

22        the CLO; is that right?

23        "A   (audio gap)

24        "Q   And that's something the Advisors knew when they

25        decided to invest in the CLOs on behalf of the Movant

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 29  Filed 04/25258  Page 370 of 1052   PageID 17048

Dondero - Direct                    73

 1    Funds; is that fair?

 2    "A   That's right.  And at that time, the knowledge in

 3    the purchase was with Highland Capital Management, LP

 4    and the portfolio management team at the time.

 5    "Q   And it's still with Highland Capital Management,

 6    LP; isn't that right?

 7    "A   That's correct.  I'm not sure that the portfolio

 8    management team looks the same, but it was HCMLP."

 9        MR. MORRIS:  Moving on to Page 46, Line 22:

10    "Q   The only holders of preferred shares that are

11    pursuing this motion are the three Funds managed by the

12    Advisors, right?

13    "A   In this motion, yes.

14    "Q   You're not aware of any holder of preferred shares

15    pursuing this motion other than the three Funds managed

16    by the Advisors, correct?

17    "A   No, I'm not aware of any others.

18    "Q   You didn't personally inform any holder of

19    preferred shares, other than the Funds that are the

20    Movants, that this  motion would be filed, did you?

21    "A   No, I did not.

22    "Q   You're not aware of any steps taken by either of

23    the Advisors to provide notice to holders of preferred

24    shares that this motion was going to be filed, are you?

25    "A   I'm not, no.

Dondero - Direct                    74

1        "Q   And you're not aware of any attempt that was made

2        to obtain the consent of all of the noteholder -- of

3        all the holders of the preferred shares to seek the

4        relief that is sought in this motion, correct?

5        "A   That's correct.

6        "Q   You don't have any personal knowledge, personal

7        knowledge, as to whether any holder of preferred shares

8        other than the Funds managed by the Advisors wants the

9        relief sought in this motion, correct?

10       "A   Correct.

11       "Q   You don't have any personal knowledge as to

12       whether any of the CLOs that are subject to the

13       contracts that you described want the relief that's

14       being requested in this motion, right?

15       "A   That's correct.   I have not spoken or been

16       involved at all directly with the CLOs.   I'm

17       representing the Funds."

18            MR. MORRIS:  Moving to Page 49.  I just have a bit

19  more, Your Honor.  Page 49, Line 9.  And this is the reference

20  to his declaration.

21       "Q   And Paragraph 9 refers to a transaction involving

22       SSP Holdings, LLC; do I have that right?

23       "A   That's correct.

24       "Q   Do you know what SSP stands for?

25       "A   See if we say it in there.  SSP Holdings, LLC.

Dondero - Direct                    75

1    "Q   Right.  Do you know what SSP stands for?

2    "A   I don't.  Something Steel Products.  I --

3    "Q   Okay.  You don't need to guess.  These are the

4    only two transactions that the Movants question; is

5    that right?

6    "A   These  transactions,  as  well  as  certain

7    transactions around Thanksgiving time.

8    "Q   Okay.  We'll talk about those.  But those

9    transactions about -- around Thanksgiving time aren't

10   in your (audio gap)?

11   "A   Not specifically mentioned by name.

12   "Q   Okay.  Let's talk about the two that are mentioned

13   by name, Trussway and SSP.  The Movants do not contend

14   that either transaction was the product of fraudulent

15   conduct, do they?

16   "A   No.

17   "Q   The  Movants  do  not  contend  that  the  Debtor

18   breached  any  agreement  by  effectuating  these

19   transactions, do they?

20   "A   I don't believe so.

21   "Q   In fact, the Movants do not contend that the

22   Debtor violated any agreement at any time in the

23   management of the CLOs listed on Exhibit B; is that

24   right?

25   "A   That's right.

Appx. 03489
016051

Dondero - Direct                    76

1        "Q   The  Movants  don't  even  question  the  Debtor's

2        business judgment, only the results of the trans -- of

3        these two transactions.   Is that right?

4        "A   That's right.  And the results is the key here,

5        and the approach."

6             MR. MORRIS:  Moving on to Page 51, Line 8:

7        "Q   Sir, you never asked the Debtor what factors it

8        considered in making these trades, right?

9        "A   I did not.

10       "Q   And you have no reason to believe that anyone on

11       behalf  of  the  Movants  ever  asked  the  Debtor  why  it

12       executed these (audio gap), right?

13       "A   I don't have any knowledge.  There could have been

14       somebody from (audio gap) Movants.  But I do not."

15            MR. MORRIS:  Page 54, Line 19:

16       "Q   Let's  just  talk  briefly  about  the  transactions

17       that  occurred  (garbled)  Thanksgiving.   They're  not

18       specifically referred to in your declaration; is that

19       right?

20       "A   That's correct.

21       "Q   And you have no knowledge about any transaction

22       that Mr. Seery wanted to execute around Thanksgiving;

23       is that right?

24       "A   I  know  there  were  transactions  and  there  were

25       concerns from our management team, but I'm not aware of

Dondero - Direct                    77

 1    what those transactions were.

 2    "Q   In fact, you can't even identify the assets that

 3    Mr. Seery wanted to sell around Thanksgiving, or at

 4    least you couldn't at the time of your deposition

 5    yesterday.  Is that right?

 6    "A   That's correct.

 7    "Q   And you have no knowledge as to why Mr. Seery

 8    wanted to make particular trades around Thanksgiving?

 9    "A   No, I don't.

10    "Q   And in fact, you don't even know if the

11    transactions that Mr. Seery wanted to close around

12    Thanksgiving ever in fact closed.  Is that fair?

13    "A   Correct."

14        MR. MORRIS:  Last one.  Page 56, Line 1:

15    "Q   Okay.  To the best of your knowledge, does this

16    document accurately reflect the composition of the

17    boards of each of the three Movant Funds?

18    "A   Yes, it does.

19    "Q   Okay.  John Honis, I think you mentioned him

20    earlier.  He's on all three boards.  Is that right?

21    "A   Yeah, that's correct.  And the reason we're --

22    we're being -- we have a unitary board structure, so --

23    which is very common in '40 Act Fund land, where the

24    board sits, for efficiency purposes, on multiple fund

25    boards, and there's a lot of economies of scale from an

Dondero - Direct                          78

1      operating standpoint.  So, yes, they sit on multiple

2      boards.

3      "Q   Okay.  And for purposes of the '40 Act, Mr. Honis

4      has been deemed to be an interested trustee.  Is that

5      right?

6      "A   That's correct.

7      "Q   Okay.  But you don't specifically know what (audio

8      gap) caused that designation; you only know that the

9      designation exists.  Right?

10     "A   That's right.  And I know they are disclosed in

11     the proxy -- or, in the -- the relative filings related

12     to those Funds.

13     "Q   Okay.  Three other people are common to all three

14     Movant Funds.  I think you've got Dr. Froehlich, Ethan

15     Powell, --

16          MR. MORRIS:  I think he -- pronunciation.

17     "A   Froehlich.

18     "Q   Ethan Powell and Bryan Ward.  Right?

19     "A   That is correct.

20     "Q   Okay.  All three of those individuals actually

21     serve on the 11 or 12 boards that you mentioned earlier

22     that are managed by the Advisors, right?

23     "A   That is correct.

24     "Q   And they're the same Funds for which you serve as

25     the executive vice president, right?

Appx 03492

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 29 Filed 06/06/25258 Page 376 of 1052    PageID 17054

Dondero - Direct                    79

1    "A   This is correct -- yes.  That's correct.

2    "Q   So, for all of the Funds that are managed by the

3    Advisors, you serve as executive vice president and all

4    four of these directors -- trustees serve as trustees

5    on the boards, right?

6    "A   Yes, that's correct.

7    "Q   Okay.  In exchange for serving on all of these

8    boards, the three individuals -- Dr. Froehlich, Mr.

9    Ward, and Mr. Powell  -- each receive $150,000 a year

10   for services across the Highland complex; is that

11   right?

12   "A   That's correct.

13   "Q   Dr. Froehlich has been serving as a board member

14   across the Highland complex for seven or eight years

15   now; is that right?

16   "A   That's correct.

17   "Q   Mr. --

18   "A   I believe it's about seven or eight years.

19   "Q   Mr. Powell, he actually was employed by Highland

20   related -- Highland or related entities from about 2007

21   or 2008 until 2015, right?

22   "A   That's correct.

23   "Q   And Mr. Ward, the third of the independent

24   trustees, he's been serving on a board or various of --

25   on various Highland-related funds on a continuous basis

Dondero - Direct                        80

1    since about 2004.  Do I have that right?

2    "A   Yeah, I believe that's correct."

3         MR. MORRIS:  Your Honor, that concludes the reading

4    of the portions of Mr. Norris's testimony that I wanted to

5    present to the Court.

6    I know it's 11:30 now, and I would respectfully request

7    that we simply adjourn and let Your Honor tend to your

8    business.

9         THE COURT:  Okay.

10        MR. MORRIS:  And hopefully when we come back at 1:00

11   o'clock, we'll have a better connection.

12        THE COURT:  All right.  So, we are going to go into

13   recess until 1:00 o'clock Central.  Mike, can people just stay

14   connected, or should they --

15        THE CLERK:  Yes.  They can stay.  Yes.

16        THE COURT:  You can stay or reconnect, whichever you

17   want.  But we'll see you at 1:00.

18        MR. MORRIS:  Thank you, Your Honor.

19        THE CLERK:  All rise.

20   (A luncheon recess ensued from 11:33 a.m. until 1:37 p.m.)

21        THE CLERK:  All rise.  The United States Bankruptcy

22   Court for the Northern District of Texas, Dallas Division, is

23   now in session, the Honorable Stacey Jernigan presiding.

24        THE COURT:  Good afternoon.  Please be seated.

25   Apologies.  I was a little ambitious in my time estimate.  So,

Dondero - Direct                    81

1   anyway, I didn't have any control over getting in and out of

2   Parkland Hospital, so I'm just grateful to be here.

3       All right.  We were in the middle of direct examination of

4   Mr. Dondero.  Mr. Morris, are you ready to proceed?

5           MR. MORRIS:  I am, Your Honor, and I'm hopeful that

6   the computer issues have resolved themselves.  It remains to

7   be seen once we try.  If problems arise again, I plan on just

8   putting this on mute and dialing in through the telephone,

9   kind of the other alternative.

10          THE COURT:  All right.

11          MR. MORRIS:  So (garbled) and I apologize to Mr.

12  Dondero, too.  I know I'm testing his patience.  But it's not

13  for any reason other than technological.

14          THE COURT:  All right.

15          MR. MORRIS:  And Your Honor, you don't have to

16  apologize for keeping us waiting.  That's okay.

17          THE COURT:  Okay.

18          MR. MORRIS:  But thank you.

19          THE COURT:  All right.  Mr. Dondero, --

20          MR. MORRIS:  All right.  So, --

21          THE WITNESS:  Yeah.

22          THE COURT:  I was just going to remind you, I have to

23  remind you you're still under oath.

24      Are you ready, Mr. Morris?

25          MR. MORRIS:  I am, Your Honor.

Appx. 03495

Dondero - Direct                          82

1           THE COURT:  All right.  You may proceed.

2           MR. MORRIS:  And we're going to begin with the

3   document that we had difficulty scrolling through earlier,

4   which we have now sent to counsel, and that would be what was

5   marked as Exhibit D on Docket No. 46.

6           THE COURT:  All right.

7           MR. MORRIS:  That's the email string that we had seen

8   earlier that I think Your Honor admitted into evidence.  Do I

9   have that right?

10          THE COURT:  Yes.

11          MR. MORRIS:  Okay.

12                  DIRECT EXAMINATION, RESUMED

13  BY MR. MORRIS:

14  Q   So, let's just start at the bottom and see if we can do

15  this more easily, Mr. Dondero.  And again, I apologize for

16  keeping you waiting before.  Starting at the bottom, that's an

17  email from Hunter Covitz.  Do you see that?

18  A   Yeah, I see it.

19  Q   And he's an employee of the Debtor, right?

20  A   Yes.

21  Q   And your understanding is that Mr. Covitz actually helps

22  the Debtor manage the CLO assets, right?

23  A   Yes.

24  Q   And in this email, Mr. Covitz is giving directions to Matt

25  Pearson and Joe Sowin regarding certain securities held by the

Dondero - Direct                        83

1  CLOs, right?

2  A    Yes.

3  Q    And if we could scroll up, hopefully, we can see that you

4  received a copy of this email.

5         MR. MORRIS:  Yeah.  Right there.

6  BY MR. MORRIS:

7  Q    Do you see that?

8  A    Yes.

9  Q    And then -- and then you instructed the recipients of Mr.

10  Covitz's email not to sell the SKY securities as had been

11  instructed by Mr. Seery, correct?

12  A    Yes.

13  Q    And you understood when you gave that instruction that the

14  people on the email were trying to execute trades that Mr.

15  Seery had authorized, correct?

16  A    Incorrect.

17  Q    You didn't know that, sir?

18  A    What I knew was that Seery had not authorized the trade,

19  he had orchestrated the trade.  Hunter is not an analyst with

20  any particular knowledge.  I called Hunter, why would he sell

21  those?  And he said Seery told him to sell those.  So it

22  wasn't that Seery authorized Hunter trading it.  It was Seery

23  told Hunter to trade it, which is -- which is a material

24  difference in my mind.

25  Q    Okay.  So I'll ask you again.  At the time you gave the

016059

Dondero - Direct                        84

 1  instruction, "No, do not," you knew that you were stopping

 2  trades that had been authorized and directed by Mr. Seery,

 3  correct?

 4  A    Yes.

 5  Q    You didn't speak with Mr. Seery before sending this email,

 6  did you?

 7  A    No.

 8  Q    And you took no steps to seek the Debtor's consent before

 9  instructing the recipients of this email to stop executing the

10  SKY transactions.  Is that right?

11  A    I'm sorry.  I missed the first part of that question.

12  Q    Okay.  You took no steps to seek the Debtor's consent

13  before instructing the recipients of this email to stop

14  executing the SKY transactions that were authorized by Mr.

15  Seery, correct?

16  A    I don't -- I'm not sure I was permitted to talk to Seery

17  at this point, but I don't recall specifically, no.

18  Q    You didn't seek consent, did you, before stopping these

19  trades?

20  A    No.

21  Q    Okay.  In response to your instruction --

22           MR. MORRIS:  If we could scroll up to the next

23  response.

24  BY MR. MORRIS:

25  Q    You see the response from Mr. Pearson?

Dondero - Direct                    85

1   A    Yes.

2   Q    And in response to your instructions, Mr. Pearson canceled

3   all of the SKY and AVYA sales that the Debtor had directed but

4   which had not yet been executed, right?

5   A    Yes.

6   Q    Okay.

7          MR. MORRIS:  Can we scroll up to the next email,

8   please?

9   BY MR. MORRIS:

10  Q    And you responded again, right?  That's your response?

11  A    Yes.

12  Q    Can you read your response out loud, please?

13  A    (reading) HFAM and DAF have instructed Highland in writing

14  not to sell any CLO underlying assets.  There is potential

15  liability.  Don't do it again, please.

16  Q    And the writings that you refer to there are the two

17  letters that we looked at earlier, the October 16 and the

18  November 24 letter, right?

19  A    I believe so.  If not, if there's a third or fourth

20  letter, all the letters in aggregate.

21  Q    All right.  And you, you interpreted those letters not as

22  requests but, as you tell the recipients of your email here,

23  that they were actually instructions, right?

24  A    That was -- that was my choice of words.  I don't know if

25  I thought about it that clearly.

Dondero - Direct                    86

1   Q    Okay.  But the reci... you have no reason to believe that

2   the recipient of this email wouldn't understand that you

3   believed that Highland had been instructed not to do these

4   trades, right?

5   A    I'm sorry.  Can you ask that again?  I had no reason to

6   believe what?

7   Q    That's okay.  I'll move on.  At this juncture, the

8   reference to potential liability was intended for Mr. Pearson,

9   right?

10  A    Frankly, when you violate the Advisers Act, the CFO has

11  liability.  I mean, I'm sorry, the chief compliance officer

12  has liability, and anybody who has an awareness that it

13  violates the Advisers Act has potential liability also.

14  Q    And is it -- is it your testimony and your position that

15  Mr. Pearson had potential liability under the Advisers Act for

16  carrying out Mr. Seery's trade requests?

17  A    Yes, once he was informed that the underlying investors

18  didn't want assets sold and Seery had stated he had no

19  business purpose in selling those assets.

20       MR. MORRIS:  I move to strike the latter part of the

21  answer, Your Honor.  Mr. Dondero has testified repeatedly

22  multiple times that he has never communicated with Mr. Seery

23  about why he wanted to make these transactions.

24       THE COURT:  I grant that.

25  BY MR. MORRIS:

Dondero - Direct                          87

1   Q    Mr. Sowin responded and indicated that he would follow

2   your instructions, right, if we scroll to the next email?

3   A    I'm sorry.  What part are you saying, or what part are you

4   referring to?

5   Q    Mr. Sowin.  Who is Mr. Sowin?

6   A    He's Matt Pearson's boss.  He's the head trader.

7   Q    And he works for the Advisors, right?

8   A    Yes.

9   Q    He's one of your employees, right?

10  A    Yes.

11  Q    Mr. Sowin followed your instructions as set forth in this

12  email, right?

13  A    He did a bunch of things, but, yes, I believe -- yes,

14  that's a fair way to characterize.

15  Q    And the only information that you know of that he's

16  relying upon to state that Compliance should never have

17  approved this order was your email that preceded it, right?

18  A    No.

19  Q    No?  There's nothing else on this email other than your

20  email that preceded it, correct?

21  A    Correct.

22  Q    Okay.  A few days later, you learned that Mr. Seery was

23  trying a workaround to effectuate the trades anyway, right?

24  A    I believe so.

25       MR. MORRIS:  Can we scroll up to the next email?

Dondero - Direct                          88

BY MR. MORRIS:

Q    This is your response to Mr. Surgent, right?

A    Yes.

Q    Now, Mr. Surgent hasn't written anything.  He is not part

of this conversation, is he?

A    No.

Q    But you bring him into the conversation, right?

A    Because he's the chief compliance officer at Highland,

yes.

Q    He's not -- he's not the chief compliance officer for the

Advisors.  He's the chief compliance officer for a company

that you no longer work for, right?

A    Correct, but he has personal liability for violations of

the Advisers Act.

Q    Okay.  And you thought it was your responsibility to

remind him of that, right?

A    It was my view of the situation, and at least he could

evaluate it himself if I reminded him of it, yes.

Q    Uh-huh.  What does it mean to do a workaround?  What did

you mean by that?

A    There's a concept in compliance called you can't do

something indirectly that you can't do directly, and that's

what I was referring to there.

Q    Does that mean that he was trying to effectuate the trade

without the assistance of the Advisors?

Dondero - Direct                    89

1   A    I believed he was trying to do it without compliance and

2   without proper regard for investors, so that's why I described

3   it as a workaround.

4              MR. MORRIS:  I move to strike.

5              THE COURT:  Sustained.

6   BY MR. MORRIS:

7   Q    I'm asking you a very specific question.

8              MR. MORRIS:  Can I have a ruling, Your Honor?  Thank

9   you.

10             THE COURT:  Yes.

11  BY MR. MORRIS:

12  Q    Did you, when you used the phrase workaround, did you mean

13  that he was trying to effectuate the trade without relying on

14  the Advisors' employees?

15  A    No.

16  Q    Okay.  But you found out about the trade and you thought

17  it was a good idea to send Mr. Surgent this email, right?

18  A    Yes.

19  Q    Can you read the last line of your email?

20  A    (reading)  You might want to remind him and yourself that

21  the chief compliance officer has personal liability.

22  Q    Personal liability for effectuating a trade that Mr. Seery

23  had authorized, correct?

24  A    For violating the Advisers Act, is what I meant.

25  Q    Uh-huh.  Did you report anybody to the SEC?

Dondero - Direct                              90

1    A    I would be happy to if it's permitted by the Court.

2    Q    But you didn't -- you never asked the Court to do that,

3    right?

4    A    No.

5    Q    It didn't seem important enough for you to take that step,

6    right?  But you wanted -- you had to make sure that you told

7    Mr. Surgent that he might be personally liable, right?  That

8    was what you needed to do?

9    A    Could you repeat that question, please?

10   Q    You needed to make sure that Mr. Surgent knew that you

11   were threatening him with personal liability if he followed

12   Mr. Seery's instructions, right?

13   A    No.

14   Q    As a factual matter, you never asked Mr. Seery why he

15   wanted to make these trades, right?

16   A    I asked Joe Sowin to ask him.

17   Q    As a factual matter, you never asked Mr. Seery why he

18   wanted to make these trades, correct?

19   A    I believe I wasn't permitted to talk to him.

20   Q    In November 2020?  What would have prevented that?

21   A    I believe Scott Ellington was the go-between at that

22   point in time.

23   Q    Is it your testimony that you never spoke with Jim Seery

24   in November 2020?

25   A    I believe in an unauthorized fashion, the day after

Appx 02504
016066

Dondero - Direct                          91

1  Thanksgiving I talked to him, but that's the only day I can

2  remember.

3  Q    Should we call up the email where you threatened him not

4  to do it again?

5  A    That was an email.

6  Q    Ah.  So you could communicate by email?  Did you ever send

7  Mr. Seery an email and say, Why do you want to do these

8  trades?

9  A    No.

10 Q    But somehow you thought you couldn't even speak to him?

11 You couldn't speak to him but you can send him emails?  That's

12 the world that you live in, right?  That's what you think?

13 A    I have no comment on that.

14 Q    All right.  So, after this exchange, --

15           MR. MORRIS:  And this is what I read out-of-order

16 before, Your Honor.  We moved to the December 16th hearing.

17 BY MR. MORRIS:

18 Q    And you remember, Mr. Dondero, that the Defendants made

19 that motion that asked the Court to stop the Debtor from

20 trading in the CLO assets?  Do you remember that?

21 A    I'm sorry.  You're asking me do I remember letters were

22 sent?  Yes.

23 Q    No.  Do you remember that there was a hearing in mid-

24 December?

25 A    Yes.

Dondero - Direct                          92

1   Q    Okay.

2         MR. MORRIS:  And Your Honor, for the record, Exhibit

3   A is the Debtor -- is the Defendants' motion.  Exhibit B is

4   the transcript that we had looked at earlier or that I had

5   read portions of earlier.

6         THE COURT:  Okay.

7         MR. MORRIS:  And Exhibit C is the order that the

8   Court entered denying the Defendants' motion.

9       Can we call up Exhibit C, please?

10  BY MR. MORRIS:

11  Q    All right.  Do you see --

12        MR. MORRIS:  If we could scroll to the very top,

13  please.  All right.

14  BY MR. MORRIS:

15  Q    Do you see this document is dated December 18th, sir?

16  A    Yes.

17  Q    And if we scroll down, this is the order denying the

18  motion of the Advisors and the Funds for an order trying to

19  temporarily restrict the Debtor's ability as portfolio manager

20  from initiating sales.  Do you see that?

21  A    Yes.

22  Q    Okay.  So, this is December 18th.  And if you'll recall,

23  the TRO was issued against you on December 10th.  Do you

24  remember that?

25  A    I don't believe it was the 10th.

Dondero - Direct                          93

1   Q    Okay.  It was in December, and it was just before this.

2   Is that fair?

3   A    I believe there was an intent, and then the actual filing

4   I think was much later.  I don't have -- I don't have the

5   knowledge.  I don't have the knowledge of when the TRO was put

6   in place.

7   Q    Okay.  (Pause.)  Okay.  We talked earlier about how you

8   interfered with Mr. Seery's trading activities around

9   Thanksgiving.  Do you remember that?

10  A    Yes, I do.  I do remember the trading then, also.

11  Q    Okay.  And do you remember that just before Christmas you

12  interfered with Mr. Seery's tradings again?

13  A    Yes.

14  Q    Okay.

15        MR. MORRIS:  If we can call up Exhibit K from Docket

16  No. 46, which I have shared with counsel?

17        THE WITNESS:  You know what?

18  BY MR. MORRIS:

19  Q    Yeah.

20  A    Let's handle these each incident one at a time.  And I

21  don't want to use the word "interfering" or accept the word

22  "interfering" as an answer because I think my participation in

23  each situation was very different.

24        MR. MORRIS:  All right.  Can we scroll down?

25  BY MR. MORRIS:

Dondero - Direct                    94

1  Q    This is a letter that my firm wrote to Mr. Lynn.  Mr. Lynn

2  is your lawyer.  Is that right?

3  A    Yes.

4            MR. MORRIS:  And if we could start down at the first

5  page.  We've seen these letter before.  A little further.

6  BY MR. MORRIS:

7  Q    Do you see there is a reference there to the Debtor's

8  management of CLOs?

9  A    Yes.

10  Q    And there is a recitation of the history that we talked

11  about a bit earlier.  If we -- if we look further in that

12  paragraph to around Thanksgiving, when you intervened to block

13  the trades.

14  A    Yes, I see that sentence.

15  Q    Okay.

16            MR. MORRIS:  And then if we can go to the next page,

17  the next paragraph.  Yeah, that's where.

18  BY MR. MORRIS:

19  Q    Then we referred to the December 16th hearing, right?  And

20  then the next paragraph says, "On December 22, 2020" --

21            MR. MORRIS:  Can you scroll down just a little bit?

22  Nope, the other way.  Yeah, right there.

23  BY MR. MORRIS:

24  Q    "On December 22, 2020, employees of NPA and HCMFA" --

25  those are the Advisors, right?

Dondero - Direct                          95

1   A    Yes.

2   Q    -- "notified the Debtor that they would not settle the

3   CLO's sale of the AVYA and SKY security."  Have I read that

4   correctly?

5   A    Yes.

6   Q    All right.  On or about December 22nd, you personally

7   instructed employees of the Advisors not to trade the SKY and

8   AVYA securities that Mr. Seery had authorized.  Is that right?

9   A    No.

10  Q    You personally instructed, on or about December 22, 2020,

11  employees of those Advisors to stop doing the trades that Mr.

12  Seery had authorized with respect to SKY and AVYA, right?

13  A    No.  You know, we need to look at source documents.  My

14  recollection is I encouraged Compliance to look at those

15  trades.  But I'm willing to be -- I'm willing to be -- get

16  source documents again, if you'd like.

17  Q    All right.  My source document is your prior testimony.

18       MR. MORRIS:  Can we please call up Exhibit NNNN at

19  Page 73?  Beginning at Line 2?  Okay.

20  BY MR. MORRIS:

21  Q    Page 73, beginning at Line 2, did you give the following

22  answer to my question?

23       "Q   And  you  personally  instructed,  on  or  about

24       December  22nd,  2020,  employees  of  those  Advisors  to

25       stop  doing  the  trades  that  Mr.  Seery  had  authorized

016071

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 29 Filed 09/05/25258 Page 393 of 1052   PageID 17071

Dondero - Direct                              96

1    with respect to SKY and AVYA, right?

2        "A   Yeah.   Maybe we're splitting hairs here, but I

3        instructed them not to trade them.   I never gave

4        instructions not to settle the trades that occurred,

5        but that's a different ball of wax."

6   Q   Did you give that answer, sir?

7   A   I believe I confused dates or misspoke there, but I did

8   give that answer.

9   Q   Okay.   Thank you.   Stated a different way, you personally

10  instructed the Advisors' employees not to execute the trades

11  that Mr. Seery had authorized but which had not yet been made,

12  right?

13  A   No.   Not -- not on December 22nd.   That was in November.

14  November 22nd, I did not do that.

15  Q   Okay.

16        MR. MORRIS:   Can we go to Page 76, please?   Line 15.

17  BY MR. MORRIS:

18  Q   Did you give this answer to my question?

19       "Q   And you would agree with me, would you not, that

20       you instructed the employees of the Advisors not to

21       execute the very trades that Mr. Seery identifies in

22       this email, correct?

23       "A   Yes."

24  Q   Did you give that answer, sir?

25  A   Well, like I said, I -- I confused the Thanksgiving

016072

Dondero - Direct                    97

1   trades, the week of Thanksgiving, with my more nuanced

2   responses to later trades.

3           MR. MORRIS:  I move to strike, Your Honor.  It's a

4   very simple question.

5           THE COURT:  Granted.

6   BY MR. MORRIS:

7   Q    Did you give that answer to my question, sir?

8   A    I -- yes, I did.

9   Q    Thank you.  Now, all of this is just a week after that

10  December 16th hearing, right?

11  A    Yes.

12  Q    And right after that hearing, the K&L Gates firm sent, on

13  behalf of the Defendants, more letters to the Debtors, right?

14  A    Yes.

15          MR. MORRIS:  Can we please pull up the first letter?

16  It's Exhibit DDDD.  And if we can go not to our response but

17  to the original letter that was sent that's attached to this.

18  I think it is Exhibit A.  Right there.

19  BY MR. MORRIS:

20  Q    That's the first of the letters, December 22, 2020.  Do

21  you see that?

22  A    Yes.

23          MR. MORRIS:  And can we scroll down to the end of the

24  letter to see what the request is here?  Right there.

25  BY MR. MORRIS:

Dondero - Direct                          98

1   Q    Can you read the end of that letter right there, sir?

2   A    (reading)  Sincerely, A. Lee Hogewood, III.

3   Q    Nice.  I meant the actual substance.

4   A    (reading)  For the foregoing and other reasons, we request

5   that no further CLO transactions occur, at least until the

6   issues raised by and addressed in the Debtor's plan are

7   resolved at the confirmation hearing.

8   Q    Okay.  And that's similar in substance to the letter that

9   was sent on behalf of the Defendants on October 16th that you

10  saw and approved, right?

11  A    I did not see and approve.

12  Q    All right.  The record will speak for itself.  And it's

13  similar in substance to the letter that was sent on November

14  24th by the K&L Gates clients on behalf of the Defendants,

15  right?

16  A    I don't know.

17  Q    We looked at it before.  Should we get it again?

18  A    It's a -- all the letters, as far as I understand, were

19  similar in requesting that the -- the beneficial owners of the

20  CLOs were requesting that no wholesale liquidation of their

21  assets occur.  That's how I understand it.

22  Q    And that's --

23  A    You asked my understanding.  That's my understanding.

24  Q    Okay.  And notwithstanding the request in this letter,

25  when you were -- when you were talking to the traders at your

Dondero - Direct                                99

1    shop, you actually told them that the Debtor was instructed

2    not to do these trades, right?

3    A    Are you parsing "instructed" versus "requested"?  I don't

4    understand the question.

5    Q    I am, in fact.  You used a very different phrase when

6    speaking to your employees than you did -- then your lawyers

7    did when they wrote to the Debtor, right?

8    A    It seems to be a difference, yes.

9    Q    Okay.  So, this is on December 22nd.  Now, the night

10   before, you participated in a meeting with Grant Scott and

11   with the lawyers for the Defendants, right, to talk about what

12   you guys were going to do with respect to the Debtor's

13   management of the CLOs.  Isn't that right?

14   A    I don't remember specifically.

15   Q    Okay.  But is it fair to say it's true, is it not, that

16   during the week leading up to Christmas you participated in

17   several phone calls with the K&L Gates firm and with other

18   members of the Defendants' -- the Advisors, Mr. Sowin or Mr.

19   Post or Mr. Sauter, and the lawyers, right?  You were all

20   together talking about these issues during the week before

21   Christmas, right?

22            MR. RUKAVINA:  Your Honor, I'm going to object.  If

23   counsel is asking what was discussed with counsel present for

24   the purpose of legal advice, that is an inappropriate

25   question.

016075

Dondero - Direct                        100

 1          THE COURT:  Okay.

 2          MR. MORRIS:  I'm certainly not.  I'm asking if the

 3   conversations took place.

 4          MR. RUKAVINA:  And the conversations -- the question

 5   was, did they discuss what to do with respect to the CLOs?

 6   That would be privileged, Your Honor.  If they discussed

 7   football, that's not privileged, but what to do with the CLO

 8   management agreements is privileged.

 9          THE COURT:  Okay.  I sustain.

10          MR. MORRIS:  Can we please call up Exhibit TT?  I'm

11   sorry, TTT.  Nope, TTTT.  TTTT.  Can you scroll down a bit?

12   Right there.

13   BY MR. MORRIS:

14   Q    Do you see -- this is an email from Grant Scott to Scott

15   Ellington; do you see that?

16   A    Yes.

17   Q    And at this point, Mr. Ellington is still working for the

18   Debtor, right?

19   A    Yes.  I believe he was settlement counsel.

20   Q    Uh-huh.  And do you see that this is an email that refers

21   to your availability for a 9:00 a.m. call?

22   A    Yes.

23   Q    And do you see that there's a question as to whether the

24   K&L people can make it?

25   A    Yes.

Dondero - Direct                          101

1   Q    And you understand that refers to K&L Gates, right?

2   A    I -- I guess so.

3   Q    And so does this refresh your recollection that at or

4   around Christmas, or in the days leading up to Christmas, you

5   participated in calls with Mr. Scott, with Scott Ellington,

6   and with the K&L Gates folks?

7   A    I -- I don't know.  I don't know if -- if I actually did

8   or not.  But I was highly concerned with inappropriate

9   behavior.

10  Q    And you were available -- and did you tell somebody that

11  you were available for this call on the morning of the 23rd?

12  A    I don't know.

13  Q    This is the day after you stopped the trades, right?

14  A    Again, I didn't stop the trades on the 23rd.

15  Q    You stopped them on the 22nd, right?

16  A    No, I stopped them on the week of Thanksgiving.

17         MR. MORRIS:  Can we go back to Exhibit NNNN, the

18  transcript?  Page 73?

19  BY MR. MORRIS:

20  Q    Let me see if I can refresh your recollection.  Tab 2.

21  Did you give this answer to this question:

22         "Q    And  you  personally  instructed,  on  or  about

23         December 22, 2020, employees of those Advisors to stop

24         doing  the  trades  that  Mr.  Seery  had  authorized  with

25         respect to SKY and AVYA, right?

Dondero - Direct                                    102

1        "A     Yeah.   Maybe we're splitting hairs here, but I

2        instructed them not to trade them."

3   Q    Did you give that answer to the question?

4   A    Yes.

5   Q    Okay.

6   A    But we -- we corrected.

7   Q    All right.  You didn't correct it at the preliminary

8   injunction hearing, did you?

9   A    No, I did not.

10  Q    Okay.  So as far as the Court knows as of this moment,

11  that's the only testimony that you've ever given on the topic,

12  right?

13  A    I'm trying to give some now.

14  Q    Okay.  And on December 22nd, that's the date that the

15  first letter was also sent, right, we just looked at?

16  A    All right.  Okay.

17  Q    You agree with that, right?

18  A    I don't remember the date on the letter.  If you want to

19  pull it up, I'll say it is the 22nd or the 23rd, whatever it

20  says.  I don't know.

21  Q    Sure.

22            MR. MORRIS:  Let's go back to DDDD, please.  And if

23  we can just go to the top of the letter.  Thank you.

24  BY MR. MORRIS:

25  Q    K&L Gates.  December 22nd.  That's the letter, right?

Dondero - Direct                          103

1   A    Yes.

2   Q    And according to the testimony that you gave at the

3   preliminary injunction hearing on January 8th, that's the day

4   that you also stopped AVYA and SKY trades, right?

5   A    I'm not agreeing to that testimony.  I am changing the

6   testimony.

7   Q    Okay.  And then we just saw that other exhibit where they

8   were trying to arrange a phone call with you, the K&L Gates

9   lawyers, and Mr. Ellington and Grant Scott for the 23rd.  Do

10  you remember that one we just looked at?

11  A    Yes.

12  Q    And then later on the day on the 23rd, K&L Gates sends

13  another letter, right?

14        MR. MORRIS:  Can we call up EEEE?  And can we scroll

15  to the Exhibit A, to our response?  Right there.

16  BY MR. MORRIS:

17  Q    That's the 23rd.  Do you see that letter?

18  A    Yes.

19  Q    Again, this is one week after the hearing, right?

20  A    Yes.

21  Q    Okay.  And this is a letter where K&L Gates states on

22  behalf of the Defendants that they are contemplating taking

23  steps to terminate the CLO management agreements, right?

24  A    I don't know.  Can you scroll down, if you want to ask me

25  --

Dondero - Direct                          104

1  Q    Sure.

2           MR. MORRIS:  Can we flip to the next page, please?

3  Keep going.  Right there.

4  BY MR. MORRIS:

5  Q    Can you read the first sentence of the paragraph

6  beginning, "Consequently"?

7  A    (reading)  Consequently, in addition to our request of

8  yesterday, where appropriate and consistent with the

9  underlying contractual provisions, one or more of the entities

10 above intend to notify the relevant Trustees and/or Issuers

11 that the process of removing the Debtor as fund manager should

12 be initiated, subject to and with due deference to the

13 applicable provisions of the United States Bankruptcy Code,

14 including the automatic stay of Section 362.

15 Q    Okay.  So, on December 23rd, the Defendants told the

16 Debtor that they intended to notify the relevant Trustees

17 and/or the Issuers that the process of removing the Debtor as

18 the fund manager should be initiated, right?

19 A    That's what it says.

20 Q    And then the K&L Gates firm sent yet another letter to the

21 Debtor, right?  Do you remember that?

22 A    No.

23           MR. MORRIS:  Can we get up FFFF, please?

24 BY MR. MORRIS:

25 Q    This is dated December 31st.  Do you see that?

Dondero - Direct                          105

1    A    Yes.

2         MR. MORRIS:  Can we scroll down a bit?

3    BY MR. MORRIS:

4    Q    Do you recall this is the letter where they claim that

5    they've been damaged by the Debtor's eviction of you from the

6    Highland offices?

7    A    I don't remember specifically, but that's true.

8    Q    Okay.  So we just saw these three letters, in addition to

9    your -- the -- at least the testimony you gave regarding your

10   conduct on the 22nd of December.  You were aware that all of

11   these letters were being sent by K&L Gates, correct?

12   A    Yes, generally.

13   Q    And you were supportive of the sending of these letters,

14   right?

15   A    Absolutely.  They were appropriate.

16   Q    And you pushed and encouraged the chief compliance officer

17   and the general counsel to send these letters, right?

18   A    I'd like to think that they believed and they acted

19   largely on their own judgment, but I strongly believed it was

20   a violation of the Advisers Act, and stated that numerous

21   times.

22   Q    Sir, you pushed and encouraged the chief compliance

23   officer and the general counsel to send these letters,

24   correct?

25   A    No, I wouldn't use those words.

016081

Dondero - Direct                                    106

1   Q    Do you understand that the Debtor demanded that the K&L

2   Gates clients or the Defendants withdraw these letters?

3   A    I believe they requested it.  I didn't -- I didn't know

4   the former, what you mean by demand, but --

5   Q    Well, it's fair to say you never instructed the K&L Gates

6   clients or the Defendants to withdraw these letters, right?

7   A    No.  I still believe they are appropriate and accurate.  I

8   wouldn't withdraw them today.

9   Q    Okay.  Sir, throughout 2020, when you were still the

10  portfolio manager at Highland Capital Management, it's true

11  that you sold AVYA shares on numerous occasions on behalf of

12  both the CLOs and on behalf of the Funds outside of the

13  holdings of the CLOs?

14  A    Always with a business purpose, yes.  That is still a

15  small percentage of our total AVYA holdings, and we still

16  liked AVYA.

17  Q    Sir, I'm going to ask you just one more time.  In 2020,

18  you sold AVYA stock many times on behalf of the CLOs and on

19  behalf of the Funds?

20  A    Yes.

21  Q    Thank you.

22        MR. MORRIS:  No further questions, Your Honor.

23        THE COURT:  All right.  Mr. Rukavina?

24        MR. RUKAVINA:  Your Honor, I will reserve my

25  questions to my case in chief, and I would request a very

Dondero - Direct                        107

 1   short restroom break.

 2           THE COURT:  All right.  Mr. Dondero, we're --

 3           MR. RUKAVINA:  And I do mean short.  I will --

 4           THE COURT:  I'm sorry.  What?

 5           MR. RUKAVINA:  And I do mean short, Your Honor.  I

 6   just need to run and be back -- I can be back in three

 7   minutes.

 8           MR. MORRIS:  No problem, Your Honor.

 9           THE COURT:  Okay.  You're finished for now, Mr.

10   Dondero, but you're going to be recalled, so hang tight.

11       Your next witness, Mr. Morris?

12           MR. MORRIS:  The Debtor calls Jason Post.

13           MR. RUKAVINA:  Your Honor, may I be excused to run to

14   the restroom and Mr. Vasek take over for a few minutes?

15           THE COURT:  Oh.  Okay.  I'm sorry.  If you made that

16   request, I didn't hear you.  So that's fine.

17       All right.  Mr. Post, --

18           MR. MORRIS:  Your Honor, can we just -- I apologize

19   for interrupting.  Can we just direct Mr. Dondero not to speak

20   with anybody about anything at any time?  Not by phone, not by

21   text, not by email, not by meeting, not by anything?  Because

22   he's still on the stand.

23           MR. RUKAVINA:  Well, Your Honor, anything at any

24   time.  I think I know that Mr. Morris is being facetious, but

25   if he's trying to get the rule invoked, that's different.

1          MR. MORRIS:  Okay.  I'm trying to get the rule

2   invoked.

3          THE COURT:  Okay.  All right.  I'm not going to make

4   that instruction.  All right.  So, --

5          MR. RUKAVINA:  I've got to run to the restroom.  I'll

6   be -- listen for the instructions.

7          THE COURT:  Jason Post, you've been called to the

8   witness stand.  Could you say, "Testing, one, two"?

9          MR. POST:  (Indiscernible.)

10          THE COURT:  All right.  Please raise --

11          MR. POST:  Testing, one, two.

12          THE COURT:  Thank you.  Please raise your right hand.

13              JASON POST, DEBTOR'S WITNESS, SWORN

14          THE COURT:  All right.  Mr. Morris, go ahead.

15                   DIRECT EXAMINATION

16   BY MR. MORRIS:

17   Q   Good afternoon, Mr. Post.  We met the other day.  Do you

18   remember that?

19   A   I do.

20   Q   Okay.  So, again, just to remind you, my name is John

21   Morris.  I'm an attorney at Pachulski, Stang, Ziehl & Jones.

22   We represent the Debtor here.  You're the chief compliance

23   officer for each of the Defendants; is that right?

24   A   I am.

25   Q   And in your role as the chief compliance officer, your job

Case 19-34054-sgj11    Doc 3596-29    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 29    Filed 06/06/25    Page 406 of 1052    PageID 17084

Post - Direct                                        109

 1 | is to act as a liaison between regulatory bodies and internal

 2 | working groups with respect to the rules and regulations for

 3 | the funds advised by the Advisors; is that correct?

 4 | A    Correct, that's -- that's the (inaudible).  Correct.

 5 | Q    All right.  And internally, you report to Mr. Dondero.

 6 | Isn't that right?

 7 | A    Correct.

 8 | Q    And you've been working with Mr. Dondero since 2008 when

 9 | you joined Highland Capital Management, correct?

10 | A    I worked at Mr. Dondero's firm since 2008, but I reported

11 | to other direct reports during that time outside of Mr.

12 | Dondero.  I started to report to him directly in October of

13 | 2020.

14 | Q    Okay.

15 | A    (overspoken)

16 | Q    But you've -- you've worked at Highland -- you worked at

17 | Highland since 2008, fair?

18 | A    Yes.

19 | Q    Okay.  And you were employed by Highland up until October

20 | 2020, correct?

21 | A    Yes.

22 | Q    Okay.  And at that time, Mr. Dondero left and he went to

23 | NexPoint and you went to NexPoint.  Is that right?

24 | A    Shortly after Mr. Dondero left Highland, I transitioned

25 | over to NexPoint.

Post - Direct                                    110

1   Q    And that's where Mr. Dondero is, right?

2   A    Correct.

3   Q    Okay.  You joined Highland in 2008, and in around 2011 you

4   joined Highland's internal legal and compliance team, correct?

5   A    That's correct.

6   Q    And in 2015, while still employed by Highland, Mr. Dondero

7   appointed you as the chief compliance officer of the Advisors

8   and the Funds, right?

9   A    Technically, the retail board appointed me the CCO of the

10  Funds, and then I was appointed internally.  I believe Mr.

11  Dondero was part of that decision for the Advisors.

12  Q    Had you ever worked with the retail boards before that?

13  A    There was about -- I worked with them for about a year

14  prior to that.

15  Q    Okay.  And you've served as the CCO, the chief compliance

16  officer, of each of the Advisors and each of the Funds since

17  September 2015 on a continuous basis, right?

18  A    That is correct.

19  Q    You know Thomas Surgent; is that right?

20  A    I do.

21  Q    Mr. Surgent has been the Debtor's chief compliance officer

22  since around 2013 or 2014; is that right?

23  A    I believe -- uh -- I -- I think that's correct.  It may be

24  a year or two off.  He took the role after the former CO

25  resigned, which I don't know if that was 2011 or 2012.  I

Post - Direct                                    111

1  can't recall specifically.

2  Q   Okay.  But he's been -- he's been in that position for a

3  long time, right?  Fair enough?

4  A   Yes, that's fair.

5  Q   And during the whole time that you were employed by

6  Highland and serving as the chief compliance officer for the

7  Funds and the Advisors, you reported to Mr. Surgent?

8  A   Internally.  Yes, that's correct.

9  Q   Yeah.  And you respect Mr. Surgent; isn't that right?

10 A   During the time I reported to him, yes.

11 Q   Yeah.  And you believed that he did his job well, right?

12 A   As far as I could see, yes.

13 Q   You viewed it as -- you viewed him as a mentor, did you

14 not?

15 A   Yes.  I mean, when I joined the legal compliance team, you

16 know, he was there.  He was a senior member on the team.  And

17 he, you know, helped educate me, along with other, you know,

18 external sources, et cetera, on the compliance function.

19 Q   Uh-huh.  He trained you for the work you're doing now,

20 right?

21 A   With respect to the on-the-job training, yes.

22 Q   Uh-huh.  Despite all of that, throughout all the

23 proceedings, the court hearings, all of the issues that we're

24 talking about in this case, you never, ever stopped to discuss

25 any of these issues with your former mentor, Mr. Surgent; is

Case 19-34054-sgj11    Doc 3596-29    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21129  Filed 0/16/26 258  Page 409 of 1052    PageID 17087

Post - Direct                                          112

1  that right?

2  A    The -- with respect to, for example, the trade (garbled)

3  that you were talking about earlier?

4  Q    Let's do it this way.  From the time that you left

5  Highland until today, you've never discussed with Mr. Surgent

6  Mr. Seery's trades; is that right?

7  A    I believe there was a discussion after -- I can't recall

8  exactly the context.  There was a discussion after the trades

9  in the November time frame.  And then I believe there was a --

10  I responded to an email exchange in the December time frame

11  regarding booking of the trades.

12  Q    Sir, you -- you've never spoken with Mr. Surgent about any

13  issue concerning the Debtor's management of the CLOs, correct?

14  A    I don't recall directly, no.

15  Q    In fact, you're not aware of anyone acting on behalf of

16  the Advisors or the Funds who has reached out to Mr. Surgent

17  to get his views on any of the issues related to this motion.

18  Isn't that right?

19  A    I believe previously there's correspondence that Mr.

20  Dondero had with Surgent.  But aside from that, I'm not aware

21  of any.

22  Q    Is that the email where he reminded him of his personal

23  liability?  Is that the one you're thinking of?

24  A    Correct.

25  Q    Yeah.  Do you know of any other communication -- do you

Post - Direct                                    113

1    know of any other communication that any of the Defendants had

2    with Mr. Surgent concerning the Debtor's management of the

3    CLOs?

4    A    With Mr. Surgent directly, I don't -- I don't -- I don't

5    believe so.

6    Q    Yeah.  You graduated from Baylor; is that right?

7    A    Correct.

8    Q    But you don't have any certifications or licenses

9    applicable to your work, correct?

10   A    Correct.

11   Q    You don't have any specialized training or education

12   that's relevant to your work as a chief compliance officer,

13   correct?

14   A    Correct.

15   Q    Your job -- your training is limited to on-the-job

16   training; isn't that right?

17   A    That is correct.

18   Q    You've never spoken at any conferences on compliance

19   matters, have you?

20   A    Spoken, no.  Attended, yes.

21   Q    You don't recall presenting any papers at any compliance-

22   related conferences, do you?

23   A    That is correct.

24   Q    You've never published anything in connection with your

25   work as a compliance officer; isn't that right?

1  A    Not that I can recall.

2  Q    Let's talk about the CLO management agreements briefly.

3  You're aware that the Debtor is party to certain management

4  agreements pursuant to which it serves as the portfolio

5  manager for certain CLOs, correct?

6  A    Correct.

7  Q    And until your lawyers recently asked you to review them,

8  you last had reason to review a CLO management agreement about

9  five or six years ago; isn't that right?

10 A    I believe that's correct.

11 Q    And the request from your lawyers to look at the CLO

12 management agreements, that request came in late November/

13 early December; isn't that right?

14 A    I believe that's around the right time frame.

15 Q    And the portions of the management agreements that you

16 read were the portions that your counsel asked you to read;

17 isn't that right?

18 A    Correct.

19 Q    And other than the general recollection of having read

20 something about the rights of preference shareholders, you

21 don't recall much about the agreements at all; isn't that

22 right?

23 A    I mean, the agreements are very lengthy in nature.  You

24 know, I think it was probably rights that the preference

25 shareholders had, and, you know, possibly indemnification

Post - Direct                               115

1    provisions.  But aside from that, I don't recall anything else

2    specifically right now.

3    Q   As the chief compliance officer of the Advisors and the

4    Funds, you don't know whether any of them are party to the CLO

5    management agreements between the Debtors and -- between the

6    Debtor and the Issuers, correct?

7            MR. RUKAVINA:  And Your Honor, I would just object to

8    the extent that that calls for a legal conclusion.  This

9    witness is not a lawyer.

10           THE COURT:  Overruled.

11           THE WITNESS:  I'm sorry.  Can you repeat the

12   question, please?

13   BY MR. MORRIS:

14   Q   Sure.  As the chief compliance officer for each of the

15   Defendants, you don't know whether any of them are party to

16   the CLO management agreements between the Debtor and the

17   Issuers, correct?

18   A    They're not the named collateral manager, but they're a

19   security holder of the CLOs, so they should be entitled to,

20   you know, the rights that those security holders are afforded

21   under those agreements.

22           MR. MORRIS:  I move to strike, Your Honor.

23           THE COURT:  Granted.

24   BY MR. MORRIS:

25   Q   All right.  So, now, Mr. Post, I know this is difficult,

1  and I do appreciate that it's difficult just to focus on the

2  question.  Your counsel will have the opportunity to ask you

3  whatever he wants.  But I would respectfully request that you

4  listen to my question and only answer my question.  It really

5  is very likely to require just a yes or no answer.

6       So, let me try again.  As the chief compliance officer of

7  the Advisors and the Funds, you don't know whether any of them

8  are a party to the CLO management agreements between the

9  Debtor and the Issuers, correct?

10 A   I don't believe they are, correct.

11 Q   Okay.  Let's talk about that prior hearing.  Now, by the

12 way, Mr. Post, did you listen in to Mr. Dondero's testimony

13 earlier?

14        MR. RUKAVINA:  Mr. Post was here with me --

15        MR. MORRIS:  Yeah.

16        MR. RUKAVINA:  -- as my representative..

17        MR. MORRIS:  Okay.  I -- there's no problem.  I just

18 -- I just -- that way there's some background and he has some

19 context.  That's the only reason I asked.

20 BY MR. MORRIS:

21 Q   You're aware that the Funds and the Advisors previously

22 filed a motion in the Bankruptcy Court asking the Court to

23 institute a pause in the Debtor's ability to sell CLO assets,

24 correct?

25 A   Correct.

Post - Direct                              117

1  Q    And you recall that that happened in mid-December, around

2  December 16th; is that right?

3  A    That sounds correct.

4  Q    And in connection with that motion, you provided

5  information to counsel that they requested from you, right?

6  A    Yes.  I was part of the working -- internal working group,

7  with internal and external counsel.

8  Q    Other than providing that information, you generally

9  agreed with the position being taken that it wasn't in the

10 best interest of the Funds involved for Highland to make any

11 trades; isn't that right?

12 A    Yes.  And that was based off of discussions with the

13 investment professionals.

14 Q    And the investment professionals are Mr. Sowin and Mr.

15 Dondero, correct?

16 A    Correct.

17 Q    Okay.  So you're the chief compliance officer, and they

18 made a motion that was based on the idea that the fund

19 manager, Highland Capital Management, shouldn't trade any

20 assets in the CLOs.  Do I have that right?

21 A    I believe that's what the motion contained.

22 Q    But you don't even remember who authorized the filing of

23 the motion; isn't that right?

24 A    I believe it was pursuant to discussions internally and

25 with external counsel, and I believe Mr. Norris signed the

Post - Direct                                118

1   filing, if I -- if I recall correctly.

2   Q   Sir, you don't remember who authorized the filing of the

3   motion, correct?

4   A    It -- it was pursuant to a discussion with the investment

5   professionals and counsel, and it was in the best interest of

6   the Funds to make the filing.  So I think it was a

7   collaborative determination.

8           MR. MORRIS:  I move to strike, Your Honor.

9           THE COURT:  Granted.

10          MR. MORRIS:  Ms. Canty, can we please pull up Mr.

11  Post's deposition transcript?  And let's go to Page 35.  Line

12  21.  Okay.

13  BY MR. MORRIS:

14  Q   Do you remember giving the following answer to the

15  following question:

16      "Q   Who authorized the filing of this motion?

17      "A   I can't recall specifically who authorized it."

18  Q   Did you give that answer to my question just the other

19  day?

20  A   That's -- that's what it says there, yes.

21  Q   And it says that because that's, in fact, what you

22  testified to under oath the other day, right?

23  A   Correct.

24  Q   Okay.  And the one thing that you know for certain is that

25  you didn't authorize the filing of the motion; isn't that

Post - Direct                        119

1  right?

2  A    I didn't sign anything in connection with the filing.

3  Q    All right.  Listen carefully to my question.  The one

4  thing that you're certain of is that you did not authorize the

5  filing of the motion as the chief compliance officer of the

6  Debtors, correct?

7  A    Correct.

8  Q    Okay.  But you did participate in conversations with Mr.

9  Dondero and counsel concerning the motion; is that fair?

10 A    There were conversations with Mr. Dondero initially, and

11 then the conversations were then more so with internal and

12 external counsel in terms of the filing.

13 Q    Okay.  So they started just with Mr. Dondero, and then

14 they moved on to counsel.  Is that what you're saying?

15 A    I can't recall specifically.  It may have been part of a

16 discussion internally with internal counsel and Mr. Dondero.

17 I just -- I can't recall the specifics.

18 Q    Okay.  But Mr. Dondero certainly supported the filing of

19 the motion, right?

20 A    Yes.  From an investment perspective, it was in the best

21 interest of the Funds in terms of the sales that were

22 occurring.

23 Q    Okay.

24         MR. MORRIS:  I move to strike.

25         THE COURT:  Granted.

Post - Direct                                           120

1   BY MR. MORRIS:

2   Q    It's a very simple question.  Mr. Dondero supported the

3   filing of the motion; is that correct?

4   A    Yes.

5   Q    You did not file a declaration in support of the motion;

6   is that correct?

7   A    Me personally, no.

8   Q    Okay.  So you're the chief compliance officer of the

9   Defendants; is that right?

10  A    Correct.

11  Q    But instead of you filing a declaration, Mr. Norris filed

12  the declaration.  Do I have that right?

13  A    Correct.  My understanding is one person needs to sign the

14  declaration.

15  Q    And remind me, what is Mr. Norris's position?  He's the

16  executive vice president, right?

17  A    Correct.

18  Q    What responsibilities does he have?  Does he have trading

19  responsibility?

20  A    He does not.

21  Q    Does he have compliance responsibility?

22  A    Not directly, no.

23  Q    Does he have investment responsibility?

24  A    He's familiar with the composition of the portfolios in

25  his role as a product strategy team member.

Post - Direct                          121

1   Q    Does he have investment responsibility, sir?

2   A    He is not making direct investments for the -- for the

3   Funds.

4   Q    Okay.  So he doesn't -- and he's not a compliance person,

5   right?

6   A    Correct.

7   Q    And he's not a lawyer, right?

8   A    Correct.

9   Q    But nevertheless, as the chief compliance officer, you

10  believed that Mr. Norris's declaration contained all of the

11  information that was relevant to support the motion, right?

12  A    It was a determin... or a collaborative determination in

13  conjunction with counsel.  But I, you know, I don't -- yeah,

14  it was -- it was a collaborative determination.  There were

15  multiple elements that went into that -- the letter.

16  Q    Okay.  You believed that the motion and Mr. Norris's

17  declaration contained all the relevant facts that supported

18  the Advisors and the Funds' requests to the Court, correct?

19  A    Yes.

20  Q    In fact, you believed that Mr. Norris was the most

21  knowledgeable person to testify on behalf of the Movants;

22  isn't that right?

23  A    I think it was -- he was identified pursuant to

24  discussions with counsel to be the most knowledgeable.

25  Q    I'm going to ask you just about you and not counsel.  You

Post - Direct                                    122

1  believed at the time that Mr. Norris was the most
2  knowledgeable witness to testify on behalf of the Movants;
3  isn't that right?
4  A    Yes.
5  Q    And you didn't testify -- not only didn't you submit a
6  declaration, but you didn't testify at the hearing, did you?
7  A    Correct on both.
8  Q    Okay.  And you listened to parts of the hearing, but not
9  all of it, because you were busy doing other stuff, right?
10 A    Correct.
11 Q    You didn't listen to Mr. Norris's testimony at all, right?
12 A    I don't believe I did.
13 Q    You didn't listen to the Court when the Court rendered its
14 decision, did you?
15 A    I don't -- I don't believe I did.
16 Q    And you didn't read the transcript from the hearing, did
17 you?
18 A    I don't -- correct.  I did not.
19 Q    Okay.  So in your capacity as the chief compliance
20 officer, you didn't believe that you should take the time to
21 review the transcript, did you?
22 A    Correct.  I mean, just it was filed based off of the
23 belief that the -- that the trades weren't in the best
24 interest, and I -- and no, I didn't read it personally.
25 Q    And you didn't believe, in -- that in your capacity as the

Post - Direct                                    123

1   CCO, the chief compliance officer, that it was in the scope of

2   your responsibility to listen to the hearing, correct?

3   A    I was -- I wasn't asked to listen, and quite frankly, I

4   don't -- I don't recall if I remember the timing, but I did

5   not listen.

6   Q    Okay.  And in your capacity as the chief compliance

7   officer, you didn't believe that it was in the scope of your

8   responsibilities to listen to the hearing; isn't that right?

9   A    Correct.

10  Q    And because you didn't listen to the hearing or review the

11  transcript, you were unaware of what the Court said or how

12  Judge Jernigan described the motion or the people involved in

13  presenting the case on behalf of the Defendants, right?

14  A    Correct, but I -- I believe I probably would have received

15  some guidance from counsel who attended or listened to the

16  hearing.

17  Q    Well, after the hearing was over, you did speak to Mr.

18  Norris, right?

19  A    Very briefly.

20  Q    In fact, --

21  A    Very --

22  Q    In fact, the only thing you can remember about your

23  conversation with Mr. Norris following the hearing was

24  discussing with him how long the hearing took.  Isn't that

25  right?

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 05/25/25   Page 421 of 1052   PageID 17099

                              Post - Direct                              124

 1   A   Correct, because I -- I believe I heard it was a short

 2   hearing.

 3   Q   And that's -- that's all -- that's all you asked Mr.

 4   Norris about, about the hearing, right?  That's all you

 5   remember talking to him about?

 6   A   I believe so, correct.

 7   Q   You don't recall discussing with Mr. Norris any other

 8   aspect of the hearing other than the length of time it took to

 9   conduct, correct?

10   A   I don't recall specifically.

11   Q   And you have no recollection of ever discussing with Mr.

12   Dondero what happened at the hearing, right?

13   A   I don't think I talked with Jim, Jim Dondero about that.

14   Q   Nor did you talk to Mr. Dondero about the Court's ruling;

15   isn't that right?

16   A   Correct.

17   Q   Okay.  Let's talk about the events that occurred after the

18   hearing, in the two weeks following the hearing.  The

19   Defendants for which you serve as the chief compliance officer

20   sent three separate letters to the Defendant [sic], correct?

21   A   If you could bring them up, I can confirm.

22   Q   Sure.

23       MR. MORRIS:  Let's start with DDDD, please.  Okay.

24   Okay.  Can we scroll to the attachment, please?

25   BY MR. MORRIS:

Post - Direct                        125

1   Q    All right.  So this is the first letter, Mr. Post.  Do you

2   recall, on or about December 22nd, the K&L Gates firm sent, on

3   behalf of the Advisors and Funds for which you serve as the

4   chief compliance officer, a letter to the Debtors?

5   A    Yes.

6   Q    Okay.

7        MR. MORRIS:  And can we call the next exhibit?  I

8   guess it's EEEE.

9        And I don't mean to be quick about these.  If there's any

10  reason that you want to read them, I wasn't planning on asking

11  any questions about the substance of the letters of this

12  witness.

13  BY MR. MORRIS:

14  Q    But Mr. Post, I don't mean to be quick here.  So if you

15  think there's a benefit to you to reading the letters, please

16  let me know.

17       Do you see, December 23rd, the next day, another letter

18  was sent by K&L Gates?

19  A    Yes.

20  Q    Okay.  And do you recall generally that the Advisors and

21  Funds for which you serve as chief compliance officer told the

22  -- told the Debtor that they were going to begin the process

23  of seeking to terminate the CLO management agreements?

24  A    I believe -- I believe that was contained in the letter,

25  so long as it was done in compliance with the Court.

Post - Direct                                126

1   Q    Uh-huh.  And do you remember there was a third letter that

2   was sent?

3   A    If you wouldn't mind pulling it up.

4   Q    Yeah, not at all.

5        MR. MORRIS:  Can we get the December 31st letter?  I

6   think it might be -- yeah.

7   BY MR. MORRIS:

8   Q    Now, here's the December 31st letter.  Do you remember the

9   December 31st letter was the one where K&L Gates suggested

10  that the Advisors and the Funds had suffered damages because

11  the Debtor evicted Mr. Dondero from the Highland suite of

12  offices?

13  A    I -- I had heard of that letter being drafted, but I don't

14  recall -- I obviously don't recall a specific date.  But if it

15  says December 31st, --

16  Q    Okay.  Mr. Dondero was one of the main voices in the

17  decision to send these letters, correct?

18  A    He was part of the preliminary conversation and expressed

19  his opinion, and then myself and others internally, and with

20  external counsel, then worked to draft the letters.

21       THE COURT:  All right.  Mr. Post, I am going to

22  interject.  I have heard Mr. Morris give you this instruction

23  many times.  Maybe it's time for me to.  Maybe it's past time

24  for me to.

25       Most of his questions simply require a yes or no answer.

Appx. 02549

016102

Post - Direct                          127

1    If you feel like there are other things that you want to

2    supplement your testimony with, Mr. Rukavina is going to have

3    a chance to question you, and that would be the situation

4    where maybe you could give more fulsome answers.  But please

5    listen to the question.  If it's a yes or no answer, that's

6    all we want you to give right now.  Okay?  Got it?

7              THE WITNESS:  Understood.

8              THE COURT:  Okay.

9              MR. MORRIS:  Thank you, Your Honor.

10   BY MR. MORRIS:

11   Q   Mr. Post, Mr. Dondero was one of the main voices in the

12   decision to send the letters; isn't that correct?

13   A   He was a voice.

14             THE COURT:  That was not a yes --

15   BY MR. MORRIS:

16   A   And he was -- he --

17             THE COURT:  Okay.

18             THE WITNESS:  I'm --

19             THE COURT:  Please, just a yes or no answer, okay?

20             THE WITNESS:  No.

21             MR. MORRIS:  Okay.  Can we go to Mr. Post's

22   transcript, please, Page 47?  Line 22?

23        And Your Honor, when we pull it up on the screen, there is

24   an objection, and I would respectfully request that the Court

25   rule on the objection before I read the question and the

 1   answer.

 2            THE COURT:  All right.

 3            MR. MORRIS:  So if we could just call up Page 47

 4   beginning at Line 22.

 5            MR. RUKAVINA:  Page 47, Line 22.

 6            THE COURT:  Okay.

 7            MR. MORRIS:  One moment.  Give her a moment.  She's

 8   not there.

 9            MR. RUKAVINA:  Do you remember what exhibit this is?

10            MR. MORRIS:  Yeah.  There it is.  Beginning at Line

11   22, "Do you know?"  And there is Mr. Rukavina's objection.

12            MR. RUKAVINA:  Your Honor, it's very simple.  He

13   can't go into Mr. Dondero's head.  But he -- but if Mr.

14   Dondero told him something, that's different.  So I think

15   counsel can rephrase the question and it's perfectly fine, but

16   he can't go into Mr. Dondero's state of mind.

17            MR. MORRIS:  Your Honor, I'm not asking for Mr.

18   Dondero's state of mind.  I'm asking for Mr. Post's knowledge.

19   "Do you know?"

20            THE COURT:  Okay.  I'll overrule the objection.  He

21   can answer.

22   BY MR. MORRIS:

23   Q   All right.  So, Mr. Post, do you remember giving this

24   answer to the following question:

25        "Q   Do you know whether Mr. Dondero supported the

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-11 29  Filed 01/30/25 258  Page 426 of 1052    PageID 17104

Post - Direct                                         129

1       sending of each of these three letters?

2       "A   I don't -- I don't recall specifically.  I think

3       he had his views on certain of the transactions that

4       were occurring, and he wasn't in agreement with those

5       transactions, as one of the main voices."

6   Q   Do you see that?

7   A   I do.

8   Q   Does that refresh your recollection that Mr. -- that you

9   testified that Mr. Dondero was one of the main voices?

10  A   Yes.

11  Q   Okay.  Mr. Dondero --

12        MR. MORRIS:  You can take that down now for the

13  moment, please.

14  BY MR. MORRIS:

15  Q   Mr. Dondero had his views on certain of the transactions

16  that were occurring, and he wasn't in agreement with those

17  transactions.  Isn't that right?

18  A   Yes.

19  Q   All right.  Going back to the letters that we just looked

20  at quickly, you recall the Debtor responded to each of those

21  letters, but as the chief compliance officer, you couldn't

22  really recall what the Debtor said in response.  Is that fair?

23  A   I'm -- I believe they -- I'm sorry.  I can't recall

24  specifically without seeing the letters.

25  Q   Okay.  So you don't recall that, in response, the Debtor

1   requested that the Advisors and the Funds withdraw the

2   letters, right?

3   A    I believe that was requested in the letters.

4   Q    Okay.  But the Funds and the Advisors didn't comply with

5   that request, right?

6   A    To my knowledge, they have not withdrawn the letters.

7   Q    You do recall that the Debtor specifically asked the

8   Defendants to file their lift stay motion so that they could

9   finally resolve the issue of whether or not the Advisors and

10  the Funds could actually terminate the agreement, right?

11  A    I -- I'm sorry.  Can you repeat that question, please?

12  Q    Do you recall that the Funds and the Advisors informed the

13  Debtor that they were going to initiate steps to terminate the

14  CLO management agreements, including moving to lift the stay?

15  A    I think they indicated that they were going to take steps,

16  but it would be pursuant to what was permitted in the court.

17  Q    And do you remember that the Debtor specifically asked the

18  Defendants to do exactly that, to bring this matter to a

19  conclusion, to file the motion so that the Court could resolve

20  the issue of whether or not they had a right to terminate the

21  agreement?  You remember that, right?

22          MR. RUKAVINA:  Objection, compound, Your Honor.

23          THE WITNESS:  I can't --

24          THE COURT:  I'm sorry.

25          MR. MORRIS:  I can't recall.

1          THE COURT:  Was there an objection?

2          MR. RUKAVINA:  Yes, Your Honor.  That's four

3     questions in one.  That's compound.

4          MR. MORRIS:  I'll rephrase, Your Honor.

5          THE COURT:  Okay.  And let me interject a minute.

6     Mr. Post, you have this habit of not looking squarely at the

7     camera but looking over to your right.  And in a normal

8     courtroom setting, that might be fine, but I have no way of

9     knowing if some lawyer or some other person is -- you're

10    looking at them and they're somehow instructing you.  I would

11    certainly hope that's not what's going on, but it just kind of

12    leaves room for me to wonder when you're not looking squarely

13    at the camera.  So can you start looking squarely at the

14    camera, please?

15         MR. RUKAVINA:  Your Honor, I can explain that, and

16    certainly there's no funny business going on.  There are two

17    cameras on Mr. Post.  One is on a laptop.  We're looking at

18    the Court on the big camera.  I'm sitting behind Mr. Post.  So

19    if the Court would prefer that Mr. Post look directly into the

20    laptop, then that's what he'll do, or if the Court would

21    prefer that he look into the big camera.

22         THE COURT:  Okay.  Well, I prefer he look into the

23    big camera just because it --

24         MR. RUKAVINA:  So keep looking there?  Yeah.

25         THE COURT:  No, no, no, no.  Okay.  I don't know what

Case 19-34054-sgj11    Doc 3596-29    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-11 29    Filed 03/25    Page 429 of 258    Page 429 of 1052    PageID 17107

Post - Direct                                    132

1    -- I thought -- okay.  Do you see what I'm seeing?  I don't

2    know if you can see what I'm seeing.

3            MR. MORRIS:  Yes.

4            THE COURT:  I'm seeing the left side of his face.

5            THE WITNESS:  I'm sorry.  I'll just look at the

6    laptop.  Sorry.  I was -- I was looking at who was speaking to

7    me.

8            THE COURT:  Okay.  Well, I don't --

9            MR. MORRIS:  Okay.

10           THE COURT:  I don't know the setup, so it was

11   confusing to me.

12       All right.  This is better.  Thank you.

13           THE WITNESS:  Yeah.  I apologize.

14           MR. RUKAVINA:  We'll focus on the laptop, Judge.

15   BY MR. MORRIS:

16   Q   All right.  So the question, Mr. Post, is:  You do recall

17   that the Debtor specifically asked the Defendants to file

18   their motion to lift the stay so that the issue could finally

19   be resolved; isn't that right?

20   A   I can't recall that specifically.

21   Q   You believe that may be one of the options that the Debtor

22   specifically proposed, right?

23   A   It -- yes.

24   Q   Okay.  But the Defendants never filed their lift stay

25   motion to terminate the agreements; isn't that right?

Post - Direct                                    133

1  A    I don't believe so.

2  Q    Right.  So the Debtor filed its complaint and its request

3  for the injunction, right?

4  A    Correct.

5  Q    As the CO -- as the CCO, you may have reviewed the

6  Debtor's complaint and motion, but you can't recall, given all

7  the documentation that's involved, right?

8  A    Correct.

9  Q    You can't recall any facts that the Debtor asserted in

10 support of its motion; isn't that right?

11 A    I can't recall specifically.  Correct.

12 Q    But the one thing you do know is that the Debtor's motion

13 is based on its entitlement to transact business pursuant to

14 their arrangement with the CLOs as collateral manager,

15 correct?

16 A    Yes.

17 Q    Now, you heard that there was supposed to be an initial

18 hearing on the Debtor's motion for a temporary restraining

19 order against the Defendants, right?

20 A    Correct.

21 Q    But you don't believe the motion for the TRO got heard,

22 and you presume it got resolved, right?

23 A    I don't believe it was heard.

24 Q    Okay.  And you understand that there is a TRO in place

25 now, pursuant to which the Advisors and the Funds are

Post - Direct                                    134

1  prevented from interfering with the Debtor's execution of its

2  rights under the CLO management agreements, right?

3  A    Correct.

4  Q    Before the TRO was resolved, you weren't personally

5  involved in the process of deciding what witnesses would be

6  called and what exhibits would be offered into evidence; is

7  that right?

8  A    No.

9         MR. MORRIS:  During the deposition, Your Honor,

10  subject to correction from Mr. Rukavina, I believe that the

11  Defendants and the Debtor reached the following two

12  stipulations.

13     First, the Defendants and the Debtor stipulate that Mr.

14  Post was not going to be called as a witness at the TRO

15  hearing.

16         MR. RUKAVINA:  That is correct.

17         MR. MORRIS:  And second, the Defendants and the

18  Debtor stipulate that the Defendants were not going to offer

19  into evidence any exhibits other than those specifically

20  listed on their witness and exhibit list.

21         MR. RUKAVINA:  That being the witness and exhibit

22  list filed before the TRO.  That is correct.

23         MR. MORRIS:  Okay.

24  BY MR. MORRIS:

25  Q    Let's talk about Mr. Seery for a minute.  You know who Mr.

Post - Direct                          135

1    Seery is, correct?

2    A    Correct.

3    Q    You understand he's an independent director and the CEO of

4    the Debtor, right?

5    A    Correct.

6    Q    And you also understand that his -- in his capacity as the

7    Debtor's CEO, Mr. Seery is authorized to sell certain

8    securities and assets that are owned by the CLOs, correct?

9    A    Correct.

10   Q    In your opinion as the CCO, the chief compliance officer

11   of the Advisors and the Funds, Mr. Seery has the knowledge and

12   experience to trade securities on behalf of the CLOs, correct?

13   A    Correct.

14   Q    But you don't believe that it's in the Funds' best

15   interest for Mr. Seery to sell SKY and AVYA securities, right?

16   A    Correct.

17   Q    But even though you reached that decision about Mr. Seery,

18   you have no knowledge as to whether Mr. Dondero ever traded

19   either of those securities before he resigned from Highland;

20   isn't that right?

21   A    I saw some trades that were shown on the screen earlier.

22   I don't think I recalled at the time I was asked on Friday.

23   Q    As of the time -- as of Friday, you had no knowledge as to

24   whether Mr. Dondero had traded in AVYA securities prior to his

25   departure from Highland, correct?

1   A    Correct.

2   Q    And before, before forming your view as the chief

3   compliance officer that Mr. Seery's trading of AVYA was not in

4   the best interest of the Funds, you made no effort to see if

5   Mr. Dondero had sold the exact same securities Mr. Seery was

6   selling, correct?

7   A    Correct.

8   Q    And the sole source of information that you relied upon to

9   reach your opinion that the trades weren't in the best

10  interest of the Funds is Jim Dondero and Joe Sowin, correct?

11  A    I'm sorry.  Can you repeat that?  You kind of cut out at

12  the beginning.

13  Q    Sure.  And please, any time that happens, let me know.  We

14  had some problems this morning.

15      The sole source of information that you relied upon to

16  reach your opinion that the trades weren't in the best

17  interest of the funds is Jim Dondero and Joe Sowin; isn't that

18  correct?

19  A    Correct.  They're the investment professionals, yes.

20  Q    And you have no understanding as to why Mr. Seery wanted

21  to sell the AVYA and SKY securities, do you?

22  A    I was told that -- I don't know why he wanted to sell them

23  personally, correct.

24  Q    Okay.  In fact, before reaching your conclusion as the CCO

25  that Mr. Seery's trades were not in the best interest of the

Post - Direct                              137

1   Fund, you did not undertake any investigation of any kind to

2   try to determine why Mr. Seery wanted to sell AVYA or SKY

3   stock, correct?

4   A   Correct.  I didn't reach out to Mr. Seery.

5   Q   All right.  You believe that Mr. Dondero and Mr. Sowin's

6   opinion that Mr. Seery's trades aren't in the Funds' best

7   interest should be heard pursuant to the Advisers Act, right?

8   A   Correct.

9   Q   Specifically, Section 2000 -- 206 of the Advisers Act,

10  right?

11  A   Correct.

12  Q   Have you ever read Section 206 of the Advisers Act?

13  A   Yes.

14  Q   Okay.

15          MR. MORRIS:  Ms. Canty, can you please put up the

16  demonstrative for Section 206 of the Advisers Act?

17          MR. RUKAVINA:  Your Honor, the witness just asked me

18  for water.  Nothing more.

19          THE COURT:  Okay.

20          MR. MORRIS:  Yeah.  No problem.

21  BY MR. MORRIS:

22  Q   I've put on the screen Section 206 of the Advisers Act,

23  Mr. Post.  Can you please tell the Court what provision of 206

24  you believe Mr. Seery allegedly breached when he sought to

25  sell AVYA and SKY securities?

Post - Direct                          138

1   A    It would be Number 4.

2   Q    Do you believe that Mr. Seery engaged in fraudulent,

3   deceptive, or manipulative practices by trying to trade AVYA

4   and SKY securities?

5   A    The -- as collateral manager for the CLOs, they're

6   supposed to maximize returns for the preference shares, which

7   we didn't believe the sales reflected that, and so they

8   weren't acting, --

9            THE COURT:  Okay.

10           THE WITNESS:  -- you know, pursuant to their duties

11  --

12           THE COURT:  Here I -- here I go --

13           THE WITNESS:  -- under the collateral management --

14           THE COURT:  Here I go again.  Here you go again.

15           THE WITNESS:  I'm sorry.

16           THE COURT:  It really was a yes or no question.  All

17  right?

18  BY MR. MORRIS:

19  Q    You're the -- you're the chief compliance officer, right?

20  A    Yes.

21  Q    And this is the provision in Section 4 that you cite to as

22  the provision that Mr. Seery violated when he attempted to

23  sell SKY and AVYA securities, correct?

24  A    Yes.

25  Q    Did Mr. Seery engage in an act, practice, or course of

Appx 03652

1    business which was fraudulent when he looked to sell those

2    securities?

3    A    No.

4    Q    Do you believe that Mr. Seery engaged in an act, a

5    practice, or a course of business which was deceptive when he

6    went to sell the SKY and the AVYA securities?

7    A    Yes.

8    Q    Who did he deceive?

9    A    The investors of the CLOs, --

10   Q    How?

11   A    -- the preference shareholders.

12   Q    How?

13   A    By selling securities that the preference shareholder

14   investors believed had further upside to them.

15   Q    Did he lie to them?

16   A    I don't believe he talked to the investors.

17   Q    But you're putting your reputation on the line here and

18   you're swearing under oath that Mr. Seery deceptively tried to

19   sell SKY and AVYA securities?

20   A    I believe that based off of a review and discussion with

21   counsel.

22   Q    Do you think he was manipulative?

23   A    No.

24   Q    Did you -- did you check in with the SEC to tell them that

25   you had a bad actor here?

Case 19-34054-sgj11    Doc 3596-29    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21 Filed 04/25/25    Page 437 of 1052    PageID 17115

Post - Direct                                           140

1   A    No.

2   Q    You first formed your view that the Debtor violated

3   Section 206 of the Advisers Act after the sales started to

4   occur in the CLOs, correct?

5   A    Correct.

6   Q    But you don't know when the sales actually started, right?

7   A    I believe there were sales --

8   Q    And I assume, since you were the chief compliance officer

9   since 2015, you don't believe that Mr. Dondero's sale of AVYA

10  stock was deceptive, right?

11  A    You would have to ask Mr. Dondero that, but I believe he

12  was selling for cash, cash needs for other funds.

13          MR. MORRIS:  Okay.  I move to strike.  I'm asking him

14  not --

15          THE COURT:  Sustained.

16  BY MR. MORRIS:

17  Q    I'm asking about you.  I'm asking about you.  You're the

18  chief compliance officer, right?

19  A    Yes.

20  Q    And you don't believe that when Mr. Dondero sold AVYA

21  stock that he was engaged in deceptive practices, do you?

22  A    No.

23  Q    And that's because you don't even know whether he sold

24  AVYA stock; isn't that right?

25  A    On Friday, I -- that is correct.

Post - Direct                                    141

1    Q    In fact, the only reason you learned that Mr. Seery wanted

2    to sell AVYA and SKY stock is because Mr. Dondero told you;

3    isn't that right?

4    A    I believe I was forwarded the email after -- after there

5    was communications on the sales.

6    Q    And that's the email where Mr. Dondero told Mr. Surgent

7    that he had personal liability, correct?

8    A    I -- I believe it was an email prior to that about were

9    trades being requested and Mr. Dondero responding.

10   Q    You're familiar with the email where Mr. Dondero

11   interfered with Mr. Seery's trades?

12   A    Yes.

13   Q    Okay.  And you're aware that Mr. Dondero told Mr. Surgent

14   that he faced potential liability if he continued to follow

15   Mr. Seery's instructions, correct?

16   A    Correct.  Based off of Mr. Dondero's view.

17   Q    Notwithstanding all of that, in your capacity as the chief

18   compliance officer, you don't believe it's ever appropriate

19   for an investor to step in and impede transactions that have

20   been authorized by the portfolio manager unless the contract

21   permits the investor to step in; isn't that right?

22   A    I believe -- I'm sorry, can you repeat that, please?

23   There was a lot of question.

24   Q    Sure.  Sure.  In your capacity as the chief compliance

25   officer, you don't believe it's ever appropriate for an

1   investor to step in and impede transactions that were

2   authorized by the portfolio manager unless the contract

3   permits the investor to do so; isn't that correct?  Isn't that

4   correct?

5   A    Yes.

6   Q    Okay.  I know you're not a lawyer, but you are the chief

7   compliance officer of the Funds; isn't that right?

8   A    Correct.

9   Q    And you can't point to anything in any contract that gives

10  Mr. Dondero the right to step in and impede transactions that

11  have been authorized by Mr. Seery; isn't that correct?

12  A    He's entitled rights as preference shareholders for the --

13  for the Funds that hold those preference shareholders.  So,

14  indirectly, he should be afforded those rights as portfolio

15  manager for those Funds.

16  Q    Sir, you can't point to anything in any contract that

17  gives Mr. Dondero the right to step in and impede transactions

18  that have been authorized by Mr. Seery; isn't that correct?

19  A    Correct.

20  Q    Okay.  But yet you have never told Mr. Dondero that he

21  should not interfere with Mr. Seery's trades; isn't that a

22  fact?

23  A    Correct.

24  Q    In fact, you never personally took any steps at any time

25  to make sure that there would be no further interference with

Post - Direct                                    143

1   the Debtor's trading activities; isn't that correct?

2   A   Correct.

3   Q   And that's because you believe, as the chief compliance

4   officer of the Funds, that Mr. Dondero should have the leeway

5   to make the determination as to whether or not the

6   transactions are appropriate; isn't that correct?

7   A   He should be able to be heard in the transactions that are

8   being made, correct.

9   Q   Sir, not to be heard, but to make the determination.  Let

10  me ask the question again.  You believe, as the CO -- CCO of

11  the Funds, that Mr. Dondero should have the leeway to make the

12  determination as to whether or not the transactions are

13  appropriate; isn't that correct?

14  A   Yes.

15  Q   Okay.  And you completely deferred to Mr. Dondero; isn't

16  that right?

17  A   For the investment determination, yes.

18  Q   And based on that deference, you never took any steps at

19  any time to make sure no one on behalf of the Advisors or the

20  Funds impeded or stopped transactions authorized by Mr. Seery,

21  correct?

22  A   Correct.

23  Q   You understand there's a TRO in place today that prevents

24  Mr. Dondero and the Advisors and the Funds from interfering

25  with Mr. Seery's trading activities; isn't that right?

Post - Direct                                    144

1            MR. RUKAVINA:  I'm going to object to that, Your

2    Honor, to the extent that calls for a legal conclusion.  And I

3    do think it mischaracterizes the testimony.  I'm sorry.  The

4    TRO.

5            THE COURT:  Overruled.

6    BY MR. MORRIS:

7    Q    You can answer, sir.  Would you like me to repeat the

8    question?

9    A    Yes, please.

10   Q    You understand that there is a TRO in place -- TRO in

11   place today that prevents Mr. Dondero, the Advisors, and the

12   Funds from interfering with Mr. Seery's trading activities on

13   behalf of the CLOs, correct?

14   A    Correct.

15   Q    But in the absence of the TRO, in your view, whether you

16   tell Mr. Dondero not to interfere with Mr. Seery's trades

17   depends on the facts and circumstances that exist at the time,

18   right?

19   A    Correct.  From a -- yes.

20   Q    Okay.  And up until this point, there have been no facts

21   and circumstances that have caused you to tell Mr. Dondero not

22   to interfere with Mr. Seery's trades on behalf of the CLOs,

23   correct?

24   A    He can't because of the TRO.

25   Q    Correct.  But if the TRO wasn't in place, it's possible

Post - Direct                                    145

1   that you wouldn't take any steps to stop Mr. Dondero from

2   impeding Mr. Seery's trades; isn't that right?

3   A   I mean, if Mr. Dondero or other investment professionals

4   have a view, that they should be -- they should have a right

5   to be heard as preference shareholders of the CLOs.

6   Q   Okay.  But if the TRO wasn't in place, you wouldn't act to

7   stop Mr. Dondero from interfering or impeding the Debtor's

8   trades on behalf of the CLO; isn't that right?

9   A   He would -- if he would be permitted to talk to Mr. Seery.

10  Q   Okay.  Prior to the imposition of the TRO, you took no

11  steps to stop Mr. Dondero from interfering with Mr. Seery's

12  trades, correct?

13  A   Correct.

14  Q   And if the TRO wasn't in place, it's possible you wouldn't

15  take any steps to stop Mr. Dondero from impeding -- impeding

16  Mr. Seery's trades again; isn't that right?

17  A   If there's an investment rationale as to why they feel the

18  trades shouldn't be done, I -- again, I feel like Mr. Dondero

19  or the other investment professionals should be able to raise

20  those points with Mr. Seery.

21  Q   Do you think they should be able to stop the trades?

22  A   I -- I -- I think they should be able to question the

23  trades.  But flat-out stop them, I'd probably say no.

24  Q   Then why didn't you do anything before the TRO was

25  entered?

Post - Direct                                    146

 1    A    Um, I'm sorry, can you repeat the -- do anything in -- in
 2    what manner?
 3    Q    Why didn't you take any steps before the TRO was entered
 4    to stop Mr. Dondero from interfering and stopping and impeding
 5    the Debtor's trades?
 6    A    I think, as I recall, there was only one -- one set of
 7    trades in question that he stepped in on.
 8    Q    So, one is okay?  How about two?
 9    A    Or, sorry.  There were two trades on one day that -- that,
10    you know, he questioned.  Or stepped in on.  I don't -- I
11    don't recall him stopping any other trades thereafter.
12    Q    That's all you know about, right?
13    A    Correct.
14    Q    And with that knowledge, it never occurred to you to tell
15    Mr. Dondero to knock it off, did it?
16    A    He believed the trades weren't in the best interest for
17    the investors, so I did not.
18    Q    And that's what you mean by deferring to him; isn't that
19    right?
20    A    From the investment perspective, yes.
21    Q    Thank you for your -- thank you for your honesty.  As the
22    CCO, you have never communicated with the Issuers about the
23    Debtor's performance under the CLO management agreements;
24    isn't that right?
25    A    Correct.

Post - Direct                               147

1  Q   And that's because you didn't believe it was in your

2  responsibility as the CCO to check with the Issuers to see if

3  the Issuers believed that the Debtor was in compliance with

4  the CLO management agreements, correct?

5  A   That communication would have involved counsel and that

6  communication didn't occur.  I wouldn't have reached out to

7  them directly.

8  Q   Yeah.  You didn't believe it was within your

9  responsibility as the chief compliance officer to communicate

10 with the Issuers to see if they had any views as to Mr.

11 Seery's performance as portfolio manager, correct?

12 A   Correct, because it would have involved me working with

13 counsel and there was never direction to do that.

14 Q   As the chief compliance officer of the Defendants, you

15 have no idea if anyone on behalf of the Advisors or the Funds

16 ever asked the Issuers whether they believed the Debtor was in

17 default under the CLO management agreements, correct?

18 A   Correct.

19 Q   As the CCO, you have no idea if anyone on behalf of the

20 Advisors or the Funds ever asked the Issuers whether they

21 believed was in breach under the CLO management agreements,

22 correct?

23 A   Correct.  I believe there was a call that I wasn't a part

24 of, that it was just involving lawyers, that I don't know what

25 was discussed on the call.  So, correct.

Post - Direct                            148

1    Q    As the CCO, you have no idea if anyone on behalf of the

2    Advisors or Funds ever asked the Issuers whether they believed

3    it was appropriate to try to take steps to terminate the CLO

4    management agreements; isn't that right?

5    A    Correct.

6    Q    None of the Issuers joined any of the letters that were

7    sent on behalf of the Funds and the Advisors, right?

8    A    I didn't -- I don't recall seeing their names listed.

9    Q    As the CCO, you don't have any understanding as to what

10   the standard is for terminating the CLO management agreements

11   unless you get legal advice; isn't that right?

12   A    Yes.  It was -- it would be a discussion with counsel,

13   given the complexity of the agreements.

14   Q    But as a factual matter, you're not aware of any facts

15   that would support the termination of the CLO management

16   agreements except that there were trades that Mr. Dondero

17   didn't think were in the best interests of the Funds; isn't

18   that right?

19   A    Yes.  And because the belief was those trades weren't

20   maximizing value for the preference shareholders.

21        MR. MORRIS:  I move to strike everything after the

22   word yes, Your Honor.

23        THE COURT:  Granted.

24        MR. MORRIS:  I have no further questions.

25        THE COURT:  All right.  Mr. Rukavina?

Post - Direct                                    149

1          MR. RUKAVINA:  Your Honor, I'll reserve my questions

2    for my case in chief.

3          THE COURT:  All right.  Mr. Post, that concludes your

4    testimony for now.  Stick around.

5       Mr. Morris?

6          MR. MORRIS:  Your Honor, last witness, and I hope

7    it's rather brief, actually.  The Debtor calls James Seery.

8          MR. RUKAVINA:  Your Honor, may we have a brief

9    restroom break, all of us in this room, before we start the

10   next witness?

11         THE COURT:  All right.  We'll take a five-minute

12   restroom break.  I know part of the long day is because of my

13   commitment at the lunch hour, but you all did estimate three

14   or four hours for this hearing, right?  That's what I recall.

15         MR. MORRIS:  We did.

16         MR. RUKAVINA:  Your Honor, I was never consulted on a

17   time estimate.  I had no idea that someone said three to four

18   hours.

19         THE COURT:  All right.

20         MR. MORRIS:  And part -- part of that is my fault and

21   the technological problems we had this morning, so I take

22   responsibility for that, Your Honor, and I sincerely

23   apologize.

24         THE COURT:  Okay.  Well, just so you know, we cannot

25   come back tomorrow.  I've got two -- too booked today tomorrow

Appx. 03503
016125

150

```
 1   to come back, so --
 2             MR. MORRIS:  I don't expect Mr. Seery to be more than
 3   about 15 minutes.
 4             THE COURT:  Okay.  We'll take a five-minute break.
 5             THE CLERK:  All rise.
 6        (A recess ensued from 3:22 p.m. until 3:32 p.m.)
 7             THE CLERK:  All rise.
 8             THE COURT:  All right.  Please be seated.  I wanted
 9   to clarify one thing I said, just so no one is confused.  I
10   know that originally you had today, Wednesday, and Thursday,
11   26th, 27th, and 28th, for confirmation.  So if anyone thought,
12   oh, we're coming back tomorrow on this if we don't finish,
13   because originally you had all three of those days, you know,
14   as soon as we continued the confirmation hearing, we started
15   filling in Wednesday.  So we have three different Chapter 11
16   case matters set tomorrow.  And so it was, you know, you give
17   up time and we have people usually wanting to get that time,
18   so that's what happened.
19        But anyway, people, we'll talk fast and we'll get it done
20   today, right?
21             MR. RUKAVINA:  Your Honor, my -- Your Honor?  Oh,
22   wait.  I need to --
23             THE COURT:  Ooh, it sounds like you're in a cave.
24   Let's get those headphones on.
25             MR. MORRIS:  I promise to be as quick as I can, Your
```

151

1   Honor.

2           THE COURT:  Okay.  Mr. Rukavina, were you trying to

3   say something?

4           MR. RUKAVINA:  I was, Your Honor.  Can you hear me?

5           THE COURT:  Yes.

6           MR. RUKAVINA:  This darn video.  Too many -- Your

7   Honor, we have an agreed TRO that goes through February the

8   15th.  And I'm certainly not suggesting taking any more of the

9   Court's time than is necessary, but I cannot commit to

10  finishing today, especially because Mr. Morris has taken so

11  much time.  So I think we will do our best, but I just want

12  the Court to know that there's no urgency to this, and if we

13  have to come back at some point after Tuesday or Wednesday,

14  there's no possible harm to the Debtor.

15          MR. MORRIS:  Your Honor, it's my hope that we can get

16  this done, and I think the sooner we begin the better.

17          THE COURT:  Okay.  Well, we're going to try to get it

18  done.  All right, Mr. Seery.  You've called Mr. Seery to the

19  stand now?

20          MR. MORRIS:  Yes, Your Honor.  The Debtor calls James

21  Seery.

22          THE COURT:  All right.  Mr. Seery, please raise your

23  right hand.

24              JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

25          THE COURT:  All right.  Thank you.

Seery - Direct                                152

1           MR. MORRIS:  May I proceed?

2           THE COURT:  You may.

3           MR. MORRIS:  Thank you, Your Honor.

4                      DIRECT EXAMINATION

5    BY MR. MORRIS:

6    Q    Good afternoon, Mr. Seery.  Can you hear me okay?

7    A    I can, yes.

8    Q    Okay.  Let's just cut to the chase here.  You're the CEO

9    of the Debtor; is that right?

10   A    That's correct.

11   Q    And in that capacity, do you understand that the Debtor is

12   party to contracts pursuant to which it manages certain CLO

13   assets?

14   A    Yes.

15   Q    And are you personally involved in the management of those

16   assets?

17   A    Yes.

18   Q    Do you have any prior experience managing other people's

19   money or other people's assets?

20   A    Yes.

21   Q    Can you please explain to the Court your experience and

22   your knowledge as to investing other people's money?

23   A    Yes.  I was a finance lawyer -- I'll go quickly, if it's

24   okay.  I can fill in later, if you like.  I was a finance and

25   bankruptcy lawyer for ten years before I went to Lehman on the

Seery - Direct                                      153

1   business side in 1999.

2        In that role, I started immediately in distressed

3   investing.  I worked as part of a team of analysts and traders

4   to build distressed positions in prop (phonetic) business,

5   trading Lehman Brothers balance sheet at the time.  This was

6   in 1999 and 2000.  We were one of the most significant

7   investors on the Street, and I was part of that team, and a

8   leading part of the team, putting on significant investments

9   of our balance sheet, which was Lehman's money, into different

10  kinds of stressed, distressed, high yield investments.  That

11  included bonds, that included loans, unsecured, subordinated.

12  Sometimes equity.  Typically, we stayed in credit, but a lot

13  of this was very distressed credit, which often ended up as

14  reorg equity.

15       After that, I began running different teams for making

16  distressed loans to companies that no one else would lend

17  money to.  These investments were significant, anywhere from

18  fifty to a billion dollars.  Some of the largest transactions

19  in the world at the time were transactions I ran, like a

20  rescue loan to PG&E for a billion dollars.  That was in 2000.

21       After that, I continued to grow my career there, running

22  distressed investments.  In 2005, I took over the loan

23  business at Lehman.  That included all high-grade loans, high-

24  yield loans, trading and sales of those loans; managing that

25  portfolio, which was in excess of $10 or $20 billion,

Seery - Direct                    154

1   depending on the time; exposure both in committed transactions

2   as well as funded loans; the hedging of that portfolio;

3   traders and salespeople working for me.  In addition, I had

4   significant responsibility for the distressed book, as well as

5   all restructuring business at Lehman.

6       After Lehman, I -- and I was one of the people who sold

7   Lehman -- I became a senior investing partner at RiverBirch

8   Capital.  We were about a billion and a half dollar long/short

9   investor, mostly stressed and distressed, but a lot of high-

10  grade trades as well, particularly in preferred stocks.  That

11  was a global business, but primarily U.S., Europe, some Asian

12  investments as well.

13      Since then, I've gotten to Highland.  I've been

14  responsible for Highland's investments.  After the first

15  quarter, when the performance managed by Mr. Dondero was

16  absolutely disastrous -- we lost about $80 million in equity

17  securities, positions that he managed, about $50 million in

18  the Select Equity Fund, and about $30 million in the -- in the

19  Highland internal account.  After Jefferies seized the Select

20  account, I took over the --

21          A VOICE:  I think Mr. Seery has sort of gone beyond

22  the question of his background.

23          THE WITNESS:  He's asked me if I was experienced in

24  investing other people's money.  I was giving that background.

25  But we -- I can stop or I can keep going, if you like.

1          THE COURT:  Okay.  If that was an objection, --

2          MR. MORRIS:  Let's --

3          THE COURT:  -- I overrule it.  Go ahead.

4          THE WITNESS:  I've been managing that portfolio.  In

5    addition, after Mr. Dondero left, but I actually started

6    looking at it before that, started taking over the CLO

7    portfolio, or taking a look at it, frankly.  We have a -- we

8    have an experienced professional sitting on top of it, Hunter

9    Covitz, who manages the day-to-day exposure.  But those

10   portfolios -- we call them CLOs, Your Honor, but I think

11   you've heard testimony before, they're not really.  Acis 7 is

12   a CLO.  The 1.0 CLOs are very old investment vehicles that are

13   primarily structured as, right now, closed-end investment

14   funds.  They don't have the typical diverse portfolio of loans

15   that a CLO has.  They have mostly reorg equity or positions in

16   real estate and in MGM.  So the -- the securities we've been

17   talking about in these trades are publicly-traded liquid

18   securities that Highland took as post-reorganization equity.

19   Q    Thank you, Mr. Seery.  Let's cut to the chase on the AVYA

20   and the SKY.  Nobody seems to have asked you this question,

21   but did you -- have you looked to sell AVYA and SKY securities

22   since the time that Mr. Dondero left in October?

23   A    I have, yes.

24   Q    Can you please explain to the Court your investment

25   rationale, the reason why you wanted to sell -- let's just

Seery - Direct                    156

1    take them one at a time.  Let's start with AVYA.  In the last

2    couple of months, why have you wanted to sell AVYA?

3    A    Well, the original impetus to sell AVYA came from Mr.

4    Covitz when it started moving up as a post-reorg security in

5    the communications space that had -- had really performed

6    extremely poorly post its Chapter 11.  Mr. Covitz over the

7    summer felt we should start lightening up on that position.  I

8    agreed.  He did that.  And Mr. Dondero eventually cut him off.

9         As it got to the fall, what I did was I got Mr. Covitz, as

10   well as then the analyst -- the analyst on that is Kunal

11   Sachdev.  That's the Highland analyst on the position -- as

12   well as Joe Sowin and Matthew Gray, who's another senior

13   analyst.  And I looked at all of the equity positions in the

14   CLOs and wondered why we had them.  What was the view?  Were

15   they worth keeping?

16        Primarily, the ones we looked at were four of the post-

17   reorg equities that were liquid.  A company called Vistra, a

18   company called Arch Coal.  Vistra is the old TXU, a well-known

19   bankruptcy.  Arch Coal, another well-known bankruptcy.  Avaya,

20   a bankruptcy; and Sky Champion, a less -- less-known

21   bankruptcy but came out of there.

22        Mr. Gray is the analyst on Vistra and Arch.  We

23   determined, based upon his recommendations, not to sell those.

24   Mr. Sachdev was the analyst on Avaya, and he believed that it

25   had reached its peak, and even though it could continue to go

Seery - Direct                                    157

1    up or down -- stocks often do that -- he did not think that

2    the value was there.  His recommendation was to sell.

3        Mr. Sowin was in those meetings.  Prior testimony to the

4    contrary or any statements that were said before are

5    completely false, they're completely made up, so I know it's

6    frustrating and I apologize for -- for being frustrated.

7        So we decided that we would sell the Sky Champion.  A

8    pretty simple answer.  Highland didn't have an analyst.

9    Literally didn't have an analyst.  Nobody had a view as to

10   what the stock was.  It just sat in there, in two CLOs,

11   without anybody paying any attention to it.

12       I had Matthew Gray take a look.  He felt that it was at

13   fair value.  I did my own work on it, felt it was at fair

14   value, notwithstanding some good tailwinds in -- secular

15   tailwinds in the home building space, and determined that that

16   CLO should sell those securities.

17   Q   Thank you, sir.  Prior to his departure at Highland, did

18   Mr. Dondero have responsibility over the management of any of

19   the CLO assets?

20   A   He did, yes.

21   Q   And do you understand, do you know whether Mr. Dondero

22   sold AVYA securities on behalf of the CLOs and on behalf of

23   the Funds during the time that he was employed as the

24   portfolio manager from January until October 2020?

25   A   I do.  And he did sell those securities.  The chart you

Seery - Direct                          158

1    put up, based upon our business record, is accurate, and he

2    engaged in significant sales of those securities throughout

3    the year.

4    Q    Okay.

5         MR. MORRIS:  Can we please put upon Demonstrative #1?

6    BY MR. MORRIS:

7    Q    Okay.  And can you just explain to the Court what this

8    document is?

9    A    It's a trade report, one of Highland's -- this shows the

10   whole platform, so it's the aggregate sales.  The name of the

11   email -- I apologize, I forgot the system; it just left my

12   mind.  But the email you saw before is anybody on the platform

13   used for various trades if they're part of a trading group.

14   And that's to make sure that, across the portfolio, in its

15   corporate platform, you aren't running into either compliance

16   problems or allocation problems that could lead to a

17   compliance problem.

18   Q    So this shows sales of Avaya on these particular dates.

19   The trade is -- the trade symbol is AVYA.  This is a liquid

20   security.  Trades in, you know, liquid equity markets.  I

21   believe its average trading volume is somewhere about a

22   million and a half a day, approximately.  So you have a trade

23   date.  You have the type of transaction.  It could be a buy or

24   a sell.  These are all sales.  The quantity.  And then the

25   price.  And then it would have the Fund, and then the

Seery - Direct                                    159

1    aggregate dollars, which is simply multiplying the price times

2    the quantity.

3    Q    And if we just scroll down to the end of the document,

4    October 9th, is that around the time that Mr. Dondero left

5    Highland?

6    A    Right around that time.  This was coming into a number of

7    hearings that we thought it was most important to have Mr.

8    Dondero depart, particularly in light of some of the positions

9    that he and his companies were taking vis-à-vis the Debtor.

10            MR. MORRIS:  Can we put up Demonstrative Exhibit #2,

11   please?

12   BY MR. MORRIS:

13   Q    Can you explain to the Court what this is?

14   A    Uh, --

15            MR. MORRIS:  And again, just for -- just for the

16   record -- sorry to interrupt, Mr. Seery -- the backup for this

17   information can be found at Debtor's Exhibits BBBBB to SSSSS

18   BY MR. MORRIS:

19   Q    Go ahead, sir.  Could you explain to the Court what this

20   is?

21   A    Yeah.  This is just a pretty straightforward chart showing

22   the bars being sales and the lines being the -- the closing

23   sale price of a buy on that day.  And so you can see, you

24   know, with the market fallout in the early part of the year,

25   AVYA hit a low, but like most of the securities in the market,

Seery - Direct                        160

1   it has come back very strongly.  And you see Mr. Dondero's

2   trades earlier in the year, the rest of it during the middle

3   part of the year, sales in the third quarter, and then, when

4   he's gone, I began selling in November and December.

5   Q   Now, so is it fair to say that Mr. Dondero and the

6   Defendants didn't completely impede and stop the Debtor from

7   selling AVYA shares?

8   A   That's fair.  What -- there's a little bit of confusion.

9   The way the trading desk worked previously is that you have

10  these separate companies but they're not really separate

11  companies.  HCFMA is populated by about seven employees.  Many

12  of them have functions across a number of different companies.

13  HCFMA exists solely because Highland funds it.  They haven't

14  paid fees of about three million bucks this year.  They owe

15  $10 million related to a disastrous bailout of what was an

16  open-end fund called Global Al a couple years ago where the

17  SEC, you know, came in and took significant action, almost

18  shut significant parts of Highland down.  And these traders do

19  the trading of all the equities across the platform.

20      So I typically would call them, and this is how we worked

21  in the spring when I took over the internal account after the

22  seizure by Jefferies of Mr. Dondero's management of the Select

23  Equity account.  I would work with Joe Sowin as the trader,

24  make decisions on what we wanted to do for the day, he would

25  execute those trades by going out in the market with a broker,

1   selling them to -- to the dealer on the other side, run it

2   through our automated system, and then the trades get closed

3   with the back office.

4       So there's the trade, which is your agreement to buy or

5   sell at a particular dollar price.  That gets inputted into

6   the OMS system, and then from there it's the back office takes

7   over, and then ultimately securities are delivered versus

8   payment to the counterparty.

9   Q   Okay.  And can you just describe, you know, in one or two

10  sentences, your interpretation of this chart and how your

11  sales and the green bars compare to Mr. Dondero's sales and

12  the brown bars?

13  A   Well, the two simple obvious answers are, one, they're

14  smaller, and two, they're at higher prices.

15  Q   Okay.  You also traded, since Mr. Dondero's departure,

16  securities known as SKY; is that right?

17  A   That's correct.  It's Sky Champion Corp.  The ticker is

18  SKY.

19  Q   And did Mr. -- to the best of your knowledge, Dr. Mr.

20  Dondero trade in SKY securities prior to his departure?

21  A   I don't believe so.  As I said earlier, we didn't appear

22  to have an analyst on that for some time.  I don't even know

23  how far back it goes.  It was a bit of an orphan security

24  sitting in the portfolio.  It's only -- it was only in two of

25  the CLOs.

Seery - Direct                                    162

1    Q    Okay.

2            MR. MORRIS:  Can we please put up Demonstrative #3,

3    please?  Okay.

4    BY MR. MORRIS:

5    Q    And can you just explain to the judge what's depicted on

6    this page?

7    A    Again, similar to the last chart, you have the dollar

8    price of the security at the close each day, throughout the

9    year, and then the green bar showing where we began to sell

10   securities for those CLOs.

11   Q    And so, again, is it fair to say that Mr. Dondero and the

12   Defendants haven't completely stopped the Debtor from engaging

13   in SKY transactions?

14   A    That's correct.  What we did was the so-called workaround

15   previously mentioned, was that we decided that I would have to

16   do the trading directly.  So I'd literally look at the stock

17   each day, talk to the broker at Jefferies, determine what

18   level to sell at, communicate with him throughout the day,

19   work through transactions.  Then he reports in whether he's

20   been able to sell and execute on our behalf.  When he's done

21   that, then we have the back office manually enter the trades,

22   as opposed to doing it from the automated trading desk, and

23   then have those trades close.  So, so far, knock on wood, we

24   haven't failed on any trades.

25   Q    Okay.

Case 19-34054-sgj11    Doc 3596-29    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-129    Filed 01/03/25    Page 460 of 1052    PageID 17138

Seery - Direct                                    163

1          MR. MORRIS:  We can the demonstrative down, please.

2     BY MR. MORRIS:

3     Q    Just two more topics here, sir.  Can we talk briefly about

4     what efforts, if any, the Debtors have made to avoid this

5     litigation?  I'll just ask them one at a time.  Has the Debtor

6     made any attempt to transfer the CLO management agreements to

7     the Defendants or to others?

8     A    Well, our original construct of our plan was to do that.

9     We've since determined, when we tried to do that, we got

10    virtually no response from the Dondero interests.  The

11    structure of the original thought of the plan was if we didn't

12    get a grand bargain we would effectively transition a

13    significant part of the business to Dondero entities, they

14    would assume employee responsibilities and the operations, and

15    then assure that the third-party funds were not impacted.

16         As I think I testified on the -- I can't recall if it was

17    the deposition or my prior testimony in court -- Mr. Dondero,

18    true to his word, told me that would be very difficult, he

19    would not agree, and he has made that very difficult.

20         So we examined it.  We've determined that we're going to

21    maintain the CLOs and assume them.  But we originally tried to

22    contemplate a way to assign those management agreements.

23    We've had --

24    Q    All right.

25    A    -- significant discussions with the CLO Issuers, and

Seery - Direct                          164

1  they're supportive of us retaining them.

2  Q    Okay.  You were on the -- you've been participating or

3  listening in to the hearing throughout the day; is that right?

4  A    I have, yes.  I apologize.  I didn't leave the screen on

5  because I didn't want to suck up bandwidth.

6  Q    Are you familiar with all of the K&L Gates letters that

7  that were reviewed today?

8  A    I am, yes.

9  Q    Did the Debtor request that the Defendants withdraw those

10 letters?

11 A    Yes, we did.

12 Q    Had the Defendants withdrawn those letters, might that

13 have avoided this whole litigation?

14 A    I think it would have.  What we wanted to have here is a

15 withdrawal of the letters and an agreement by the clients for

16 the -- the K&L Gates clients that they wouldn't interfere with

17 the operations of the Debtor and our drive towards a plan.

18 They could take their legal positions and object to the plan,

19 if they like, but interfering on a day-to-day basis was

20 unacceptable to us in terms of trying to operate this business

21 in the most efficient manner.

22     We specifically requested that they do that.  This is, I

23 don't think, lost on anybody, certainly not on me in my

24 experience here for years:  These entities are all dominated

25 and controlled by Mr. Dondero, and each of these attacks is

Case 19-34054-sgj11    Doc 3596-29    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-31    Filed 06/25    Page 462 of 1052    PageID 17140

Seery - Direct                                    165

1  specifically coordinated for the purpose of diverting the

2  Debtor, causing confusion, and forcing us to spend estate

3  resources.

4  Q    Do you know if the Debtor also asked the Defendants to

5  avoid this whole injunction proceeding by simply filing their

6  motion to lift the stay and see if they could actually win a

7  motion to terminate the contract?

8  A    Well, what we did was we contemplated the best, most

9  efficient way out, and it was either withdrawing the

10 agreement; if they didn't agree, then we'd said you should

11 file your stay motion immediately and let's have this

12 determined.  We told them, short of that, if they weren't

13 willing to do that, then we would have to put this in front of

14 the Court to try to make sure that we could operate the

15 business.

16 Q    All right.  So, just to summarize, you attempted to sell

17 the CLO management agreements, but were unable to do so; is

18 that right?

19 A    I would say assign.  We would have looked for a payment,

20 there is a cure payment that we have to make, but we didn't

21 we didn't conduct an auction for the CLO assets.

22 Q    And to the best of your knowledge, the Defendants never

23 withdrew the letters; is that right?

24 A    They did not.

25 Q    And to the best of your knowledge, the Debtors -- the

Seery - Direct                              166

1   Defendants never brought their contemplated lift stay motion,

2   right?

3   A    They have not, no.

4   Q    And so why did the Debtor bring this action?

5   A    Well, quite clearly, to try to prevent the managers and

6   Mr. Dondero and the Funds from interfering with the way that

7   we operate the business.  We intend to continue to manage the

8   CLOs, we intend to assume those contracts, we intend to manage

9   them post-confirmation, after exit from bankruptcy.  And

10  causing confusion among the employees, preventing the Debtor

11  from consummating trades in the ordinary course, deferring

12  those transactions, we thought put the estate at significant

13  risk, in addition to the cost.

14  Q    Did you hear Mr. Rukavina in the opening suggest that

15  these might, in fact, be money-losing contracts?

16  A    I did, yes.

17  Q    Why would the Debtor want to assume money-losing

18  contracts?

19  A    They're not money losing contracts.

20  Q    And why, why do you say that?

21  A    They generate fee income.  So the fees on each of these

22  CLOs get paid to the Debtor.  Now, not all of these CLOs, as I

23  mentioned earlier, are -- none of them are ordinary CLOs,

24  other than Acis 7.  But not all -- because they don't all have

25  liquid assets that are able to pay their fees each quarter,

Seery - Direct                                    167

1   some are deferred.  There are some CLOs that will probably
2   never pay any deferred fee because they are underwater.  Those
3   are not CLOs that Mr. Dondero or the Funds own any of.  That's
4   not really a surprise.  But we will continue to manage those
5   and look for ways to exit for those investors who are
6   noteholders who are underwater in those CLOs.
7   Q    Okay.  Can you describe for the Court the Debtor's
8   contentions as to how the conduct that has been adduced
9   through today's evidence, how is the Debtor harmed by Mr.
10  Dondero's interference in the trades and the sending of these
11  letters?
12  A    I think it's clear in terms of operational risk.  Being
13  forced to construct a workaround to consummate trades that we
14  think are in the best interest of the Funds.
15       It's telling not only that neither Mr. Dondero nor Mr.
16  Sowin nor -- Mr. Sowin was on the calls and agreed to the
17  analyst view, by the way -- nor anybody from MHF ever asked me
18  a question, their lawyers in the deposition never asked me why
19  we were selling these securities.  They simply want to get in
20  the way, cause additional risk to the estate, and cause
21  additional exposure with respect to legal fees, divert our
22  attention from trying to consummate the case.  I think that's,
23  in my opinion, that's pretty clear.
24  Q    Is there any concern on the part of the Debtor that
25  that Mr. Dondero's emails and conduct is creating uncertainty

Case 19-34054-sgj11    Doc 3596-29    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-129    Filed 06/09/25    Page 465 of 1052    PageID 17143

Seery - Direct                                      168

1  among the staff as to who's in charge?

2  A    I think they did initially, and if they continued, they

3  would.  Right now, the workaround is working pretty well.  We

4  still do keep Mr. Sowin on the emails to make sure that, you

5  know, from a compliance perspective, that our sales, he knows

6  about; that we're not stepping on each other's markets, if you

7  will; that we're not getting in the way that -- in the way if

8  he wants to sell assets from a different MHF other managed

9  asset holding, but we do have a workaround that works right

10  now.

11      I think the biggest risk is, because it's much more

12  manual, you have risk of so-called fat-finger trades, where

13  you think you're selling a thousand and you sell 10,000, you

14  think you're executing a sale and you're executing a buy, you

15  think you're executing from an account that has the securities

16  and end up selling short from an account that doesn't.  So

17  we've got to be very careful of that, but the team is doing

18  that now.  There certainly was confusion at the start.

19  Q    And can you just explain to the Court your view as to how

20  the Debtor is able to -- how the Debtor will be able to

21  service the contract on a go-forward basis?

22  A    The CLO contracts?

23  Q    Yes.

24  A    We'll have a team of folks able to manage these assets

25  with professionals that are experienced credit analysts,

Seery - Direct                                    169

1   equity analysts.  I think we'll be able to manage this --

2   these assets in a pretty straightforward manner.  It's not

3   going to be very difficult.

4   Q   Has the Debtor been harmed through the diversion of your

5   personal attention as CEO in responding to all of this?

6   A   I like to think that I can juggle a lot of different

7   things.  I would prefer not to have to be looking at the

8   securities levels each day and feeding out securities that we

9   determine to sell through the broker at Jefferies, who,

10  notwithstanding, is doing a great job.  It's the job of the

11  trader to actually do that and day-to-day -- throughout the

12  day monitor the markets and look for the best place to sell.

13      So do I think I'm getting the best execution?  I think the

14  trader at Jefferies is excellent.  Do I think if a trader on

15  the Highland side was involved every step of the way, I think

16  it would be better.

17  Q   Have the Debtor's professionals' attention and resources

18  been diverted to deal with all of this stuff?

19  A   That -- I think that's -- that's quite clear as well.

20  It's a significant expense.

21  Q   Okay.

22          MR. MORRIS:  Your Honor, I have no further questions

23  of this witness.

24          THE COURT:  All right.  Mr. Rukavina?

25          MR. HOGEWOOD:  Your Honor, if you please, Lee

Seery - Cross                    170

1    Hogewood from North Carolina.  You've admitted me *pro hac*

2    *vice*.  If I may do cross-examination, I would appreciate it.

3              THE COURT:  All right.  Go ahead.

4              MR. HOGEWOOD:  Thank you, Your Honor.

5                          CROSS-EXAMINATION

6    BY MR. HOGEWOOD:

7    Q    Mr. Seery, let me ask you about the letters that came from

8    our firm, and especially from me, beginning on December 22nd.

9    I think you spoke about those generally.  If you need them to

10   be called up, I think my questions will be crisp as to the

11   letters generally, but we could certainly look at them

12   specifically, if need be.

13        There was initially a letter dated December 22nd, 2020,

14   that's Debtor's Exhibit DDDD, at Docket 39.  I take it you've

15   read that letter?

16   A    I have, yes.

17   Q    And it's fair to say that was a request you had seen

18   before?

19   A    I don't think that's fair to say, no.

20   Q    You had not seen a request to discontinue trades until the

21   confirmation hearing?

22   A    I don't believe so, no.

23   Q    Okay.  So that, that was the first time a request had been

24   made not to trade in the CLO securities prior to confirmation?

25              MR. MORRIS:  Objection to the form of the question.

Seery - Cross                                    171

1              THE COURT:  Overruled.

2              THE WITNESS:  I --

3              THE COURT:  Go ahead.  You can answer.

4              THE WITNESS:  I don't recall you sending me a letter

5       before that, but I -- if you have, then I apologize.  I

6       thought I was pretty familiar with them, but I don't recall

7       you sending me that request previously.

8       BY MR. HOGEWOOD:

9       Q    Okay.  I'm sorry.  That was the first request you had

10      received from me, is that -- that's correct?

11      A    Yes.

12      Q    But there had been prior requests of a similar nature?

13      A    Not to my recollection.  Is there a letter?

14      Q    All right.  Well, let me -- let me move on.  You

15      weren't intimidated by my letter, were you?

16      A    Was I intimidated by your letter?  No, I was not

17      intimidated.

18      Q    And it didn't cause -- the letter itself did not cause you

19      or the Debtor to alter your investment strategy?

20      A    It did not, no.

21      Q    And it did not cause you or the Debtor to refrain from

22      operating the company in the manner that you perceived to be

23      in its best interest?

24      A    It did not.

25      Q    It did not cause you to change any of your trading

Seery - Cross                                      172

1   decisions?

2   A    No.

3   Q    You and your counsel responded -- or, your counsel

4   responded to the letter a couple of days later; isn't that

5   correct?

6   A    Yes.

7   Q    And the response rejected the request that had been made

8   and demanded that the letter be withdrawn; is that right?

9   A    Yes.

10  Q    So the range of communication is a set of lawyers

11  representing adverse parties asserting their respective

12  positions?  Is that a fair characterization of that set of

13  communications?

14  A    No.

15  Q    Okay.  Would you characterize it differently?

16  A    Yes.

17  Q    All right.  How so?

18  A    I believe you sent a letter with no good-faith basis,

19  knowing what the contracts say as an experienced lawyer,

20  knowing there was not cause, yet still making the same

21  threats, basically couching them as a request.  But I don't

22  think there was any good-faith exchange of ideas.  No one even

23  asked me why I was making the trades.  I think you were aware

24  of that.

25  Q    You -- but you testified that, nonetheless, the letter did

1  not cause you to conduct yourself in any other manner than you

2  would have conducted had you not received the letter; isn't

3  that right?

4  A    That's correct.

5  Q    So I think there's some confusion, then, and I just want

6  to clear this up.  There was earlier testimony, both at your

7  deposition, that -- that my clients actually interfered with

8  and caused trades not to occur on or around December 22nd and

9  23rd of 2020.  And that's not correct.

10        MR. MORRIS:  Objection.  Your Honor, the evidence is

11 in the record.

12        MR. HOGEWOOD:  Okay.  Well, let me --

13        THE COURT:  All right.  You're going to have to

14 rephrase.

15 BY MR. HOGEWOOD:

16 Q    Yeah.  Let me -- let me say it differently.  Focusing

17 solely on December of 2020, every trade that you initiated

18 closed; isn't that correct?

19 A    Every trade.  Yes.  We did not fail one trade.

20 Q    Okay.  And so the issue that you have raised in your

21 pleading is that there were -- there was an expectation that

22 employees of my clients would book trades, which is

23 essentially a backroom operation, after the trade has closed.

24 Isn't that right?

25 A    That's incorrect.

Seery - Cross             174

1   Q    Okay. So, once again, let me just get -- there were no

2   trades that you initiated that failed to close; is that right?

3   A    That's correct.

4   Q    And nothing that was done by the Defendants resulted in a

5   trade that you wished to make in December of 2020 to fail to

6   occur or fail to close; isn't that right?

7   A    That incorrect.

8   Q    So you initiated a trade that did not close?

9   A    Yes.

10   Q    In December of 2020? And when was that?

11   A    I believe that's the case, yes.

12   Q    And specifically what trade did not close that you

13   initiated?

14   A    I'd have to check the notes, but the specific trades were

15   my attempt to initiate the trade with the desk. Then the

16   trading desk goes into the market and makes the sale. Once

17   it's inputted into the order management system, referred to as

18   an OMS, then it gets processed for closing. In November and

19   in December, Mr. Dondero instructed those employees not to

20   initiate those trades. So there was never an agreement. When

21   I initiated a trade, which was the workaround you saw referred

22   to, I quite simply called Jefferies directly and I had the

23   back-office folks manually input it instead of the trading

24   desk.

25      Sorry. I just wanted to make sure we cleared that up.

Seery - Cross                          175

1   Q   No, just -- that -- that's helpful to understand.  But I

2   think, focusing again solely on December, every trade you

3   initiated closed?

4   A   Every trade that I actually went and made in the market

5   closed.

6   Q   And indeed, if --

7           MR. HOGEWOOD:  I observed your demonstrative

8   exhibits, and if I could ask that the one related to the Avaya

9   trades be called up, Mr. Morris.  is that possible?

10          MR. MORRIS:  Yeah, sure.  Is that the first one with

11  Mr. Dondero's trades, or do you want the chart?

12          MR. HOGEWOOD:  The -- the -- I think it was your

13  Demonstrative #2 that showed the timeline of the trades.

14          MR. MORRIS:  Yeah.  You bet.

15      (Pause.)

16          MR. HOGEWOOD:  Thank you.  Thank you very much.

17  BY MR. HOGEWOOD:

18  Q   So, just so I understand this document, the bottom axis is

19  the passage of time, and when we get into the period between

20  November of 2020 and the end of 2020, 12/31/2020, there are --

21  there's a green bar that has the numbers 50,000 at the top of

22  it.  That reflects what, Mr. Seery?  The number of shares or

23  the dollar amount of the trades?

24  A   Number of shares.

25  Q   And while this is not date-specific, do you know when

Seery - Cross                           176

1   those sets of $50,000 trades happened?  Or --

2   A   I don't --

3   Q   -- 50,000 shares trades happened?

4   A   I don't know the specific dates off the top of my head,

5   no.

6   Q   But looking at it just in comparison to the calendar, that

7   -- that's awfully close to December 22nd and 23rd, is it not?

8   A   It appears to be, yes.

9           MR. HOGEWOOD:  And Mr. Morris, if the I guess it's

10  the SKY document could be pulled up as well?  I just want to

11  be clear --

12          MR. MORRIS:  Demonstrative #3, please.

13          MR. HOGEWOOD:  Yes.  Thank you.

14  BY MR. HOGEWOOD:

15  Q   The  timeline on this demonstrative is similar, is it not?

16  A   Yes, it is.

17  Q   It's showing trades by day throughout the course of the

18  year?

19  A   That's correct.

20  Q   And again, there are a significant number of trades in SKY

21  on what looks awfully close to the few days before Christmas

22  of 2020; is that right?

23  A   That's correct.

24  Q   Okay.  And this is the period of time that we're talking

25  about there being interference by the Defendants' employees;

Seery - Cross                                    177

 1   is that right?

 2   A    Yes.

 3   Q    Okay.  I'll move on.  So, the next letter in question was

 4   one that came the day after, on December 23rd.  Again, that

 5   was a letter from me to your counsel.  Do you recall that

 6   letter?

 7   A    Yes.

 8   Q    And the letter of the 23rd, if we need to look at it, is

 9   the EEEE, Docket 39.  You read that letter as well?

10   A    Yes.

11   Q    And you disagreed with the position taken in the letter?

12   A    I'm trying to remember the specific position in that one.

13   Was that the one threatening to try to terminate the CLOs

14   without having checked whether there's cause?  I just don't

15   recall.

16   Q    Why don't we call it up, if we can?

17         MR. HOGEWOOD:  Mr. Morris, if you could help us,

18   because it's one of your exhibits, that would be great.  But

19   Ms. Mather has got it up, so that's great.

20   BY MR. HOGEWOOD:

21   Q    Mr. Seery, can you see the December 23rd letter?

22   A    I can, yes.

23   Q    And I think you referred to it as a threat to terminate

24   the portfolio management contracts?

25   A    I wasn't sure.  That's why I was just asking if this was

Seery - Cross                                    178

1    that one.  I don't -- I don't recall.

2    Q    Right.  And if you review the first page and the second

3    page, does that confirm your recollection that that is the one

4    related to portfolio management contracts?

5    A    I can't see the second page.  I believe it is.  I'm not

6    trying to --

7    Q    Yeah, no, --

8    A    If you represent, I'll accept it.

9    Q    Take your time.

10   A    (Pause.)  Yes.

11   Q    Okay.  And I think you already said this:  You strenuously

12   disagreed with the positions stated in the letter?

13   A    Yes.

14   Q    But again, you were not intimidated by the letter?

15   A    Intimidated?  No.

16   Q    The letter didn't cause you to change your investment

17   strategy?

18   A    No.

19   Q    It didn't cause you to trade or not trade in a particular

20   manner?

21   A    No.

22   Q    You continued to function the Debtor's operations as you

23   deemed appropriate?

24   A    Yes.

25   Q    To your knowledge, no CLO or Issuer has taken any steps to

Seery - Cross                                    179

1    remove the Debtor as the portfolio manager?

2    A    The CLO or the Issuers?

3    Q    Yeah.  No one's -- no one's taken a position that you

4    should -- that the Debtor should be removed as a portfolio

5    manager?

6    A    Not -- not from the Issuers, no.

7    Q    And -- or, I'm sorry.  And so when you -- when you brought

8    a distinction between the Issuer and the CLO, are you -- are

9    you referring to CLO Holdco?

10   A    No.

11   Q    Okay.  Has a CLO taken steps to remove the Debtor as a

12   portfolio manager?

13   A    The CLO is the Issuer.

14   Q    Okay.

15   A    So the answer is no.

16   Q    Okay.  So no one has -- no one has acted to take any -- to

17   do anything as it relates to the removal of the Debtor as the

18   portfolio manager?

19        MR. MORRIS:  Objection to the form of the question.

20        THE COURT:  Overruled.

21        THE WITNESS:  I'm quite sure the CLO Issuers haven't,

22   as they agreed and we've been working with them on an

23   assumption.  With respect to what your clients have done, I

24   don't know.

25   BY MR. HOGEWOOD:

Seery - Cross                                    180

1   Q    But you don't have any evidence that my clients have taken

2   any action in violation of the automatic stay to -- to move or

3   encourage the removal of the Debtor as the portfolio manager,

4   do you?

5   A    Other than the letter?  No.

6   Q    Other than the letter between me and your counsel?

7   A    Correct.

8   Q    All right.  So, and that letter expressly states that any

9   of those actions that would be taken are subject to the

10  automatic stay and the Bankruptcy Code; is that right?

11  A    That's correct.

12  Q    And as we sit here today, the Debtor is not in breach of

13  any contract with any of the Issuers; is that right?

14  A    That's correct.

15  Q    And the letter didn't cause the Debtor to breach any

16  contract with any Issuer, did it?

17  A    Did not.

18  Q    And I think you've already testified today and you also

19  testified in deposition that you anticipate that the -- all of

20  the CLOs will consent to the assumption of the portfolio

21  management agreements in the context of confirmation; is that

22  right?

23  A    Yes.

24  Q    And the plan supplement that you recently filed, you

25  provide a mechanism by which the issue of for-cause

Appx. 03594
016156

Seery - Cross                          181

1    termination is to be resolved, do you not?

2    A    I don't recall if there's a specific provision in the plan

3    supplement.  We certainly have, either in the plan or in the

4    plan supplement, a provision related to the gatekeeper

5    function.

6    Q    And that's similar to the settlement that you entered into

7    with CLO Holdco in terms of resolving both their objection to

8    confirmation and the lawsuit against them today; is that

9    right?

10   A    I believe it's similar.

11   Q    Okay.  And the gatekeeper is the Bankruptcy Court to

12   determine, short of a full-blown trial, that if cause exists,

13   isn't that correct, under the plan?

14   A    Among other functions, yes.

15   Q    So if the Court confirms the plan, then the concerns that

16   you have are resolved by the gatekeeper function that is the

17   subject of this motion; is that right?

18   A    I think it depends on the contents of the confirmation

19   order.

20   Q    And if the Court denies confirmation, then the stay

21   remains in effect and the letter related to the removal of the

22   portfolio manager was expressly subject to the stay; isn't

23   that right?

24   A    If the letter says it's subject to the stay?  It does say

25   that, but it says other false things as well, so I'm not sure

Seery - Cross                                    182

 1   -- I don't know exactly what you're asking me there.

 2   Q   All right.  It wasn't a very good question, frankly.

 3       Your counsel responded to the December 23rd letter as well

 4   and demanded a retraction; isn't that right?

 5   A   Yes.

 6   Q   And that was sort of a separate (audio gap) with counsel?

 7   A   I'm sorry.  You broke up for a second there, sir.  I'm

 8   sorry.

 9   Q   I'm sorry.  That -- that' -- let's just skip that.  You

10   had testified that neither letter was withdrawn?

11   A   I believe that's correct, yes.

12   Q   Are you familiar -- and -- are you familiar with the fact

13   that, in the response letters, your counsel insisted that

14   there be a response and withdrawal by not later than, I

15   believe, 5:00 on December 28th?  Do you recall that?

16   A   I don't recall that specifically, but I accept your

17   representation.

18   Q   And do you know whether or not there was a response dated

19   December 28th?

20   A   I don't believe there was a written response.  I don't --

21   I don't recall.

22   Q   All right.

23       MR. HOGEWOOD:  Ms. Mather, can you call up

24   Defendant's Exhibit 84, which is at Docket 45, please?  Thank

25   you.

Seery - Cross                                   183

BY MR. HOGEWOOD:

Q   So, Mr. Seery, have you ever seen this letter dated
December 28?

A   I believe I have, yes.

Q   And this letter was not attached to the complaint nor your
declaration nor the request for a TRO or preliminary
injunction, was it?

A   If you say it wasn't.  I don't recall specifically.

Q   Okay.  So, you, by seeing this, you realize now there was
a response by the 28th.  Is that right?

A   Yes.

Q   And in the -- let me just direct your attention to the
final sentence of the first paragraph.  It says -- it makes
once again clear that the -- any efforts to remove the Debtor
as manager would be subject to applicable orders of the
pending bankruptcy case, provisions of the Bankruptcy Code,
and specifically, the automatic stay.  Do you see that?

A   I apologize.  I don't see it.  Which paragraph?

Q   I'm at the very last sentence of the first paragraph.
There's a sentence that --

A   (reading)  Subject to applicable orders in the pending
bankruptcy case, provisions of the Bankruptcy Code,
specifically, the automatic stay.

    I read that, yes.

Q   Yes.  Okay.  There was some testimony about the letter

Seery - Cross                                        184

1   related to Mr. Dondero's eviction.  I don't intend to belabor

2   that.  But once again, that was a letter between counsel, was

3   it not?

4   A   I believe it -- I believe it was.  I don't recall

5   specifically now.  I assume -- I assume all of these were

6   directed to counsel.

7   Q   Right.  And again, the fact that counsel wrote a letter

8   requesting that the eviction not occur did not change your

9   process and you proceeded with the eviction, did you not?

10  A   I think the letter came after Mr. Dondero was no longer

11  permitted.  Eviction is an odd word.  He was no longer an

12  employee, so employee not being able to come into the office

13  and hang around and disrupt business isn't exactly an

14  eviction.  So I disagree with your characterization there.

15  Q   Okay.  Well, so I'll just leave that.  I mean, the --

16  since this exchange of letters, are you aware -- I mean, there

17  was some testimony about the Debtors presenting the Defendants

18  with the choice of either filing a motion for relief from stay

19  or this injunction proceeding would be brought.  Isn't that

20  right?

21  A   Yes.

22  Q   And no motion for relief from stay was filed, and

23  therefore this injection proceeding was brought.  Is that

24  correct?

25  A   Yes.

Seery - Cross                          185

1    Q    So the other thing that you know was filed by the

2    Defendants was an objection to confirmation, which was due on

3    January 5th of 2020, correct?

4    A    I'm sorry, Mr. Hogewood.  You broke up.  Did you say the

5    other paper or pleading that was filed?

6    Q    The pleading that was filed by the -- these who are

7    Defendants as well as other parties to this case was an

8    objection to confirmation, the deadline for which was January

9    5, 2020.  Are you familiar that an objection to confirmation

10   was filed?

11   A    I'm familiar that one was filed, yes.

12   Q    And so the objection to confirmation raised many of these

13   same issues regarding the circumstances under which the

14   various CLO agreements could be assumed; isn't that right?

15   A    I'm not aware of the specifics of the objection.

16   Q    Okay.  But nonetheless, my client was under no obligation

17   to initiate yet another motion or lawsuit or pleading against

18   the Debtor beyond objecting to confirmation, was it?

19   A    An obligation?  No.

20   Q    And since the objection to confirmation has been filed,

21   there have been a number of pleadings filed in the case.  We

22   obviously were required to respond to the motion for

23   preliminary injunction, and it says there's been an objection

24   filed to that.  Are you aware of that?

25   A    That -- that you objected to the preliminary injunction?

Seery - Cross                                    186

 1   Q    Yes.

 2   A    Yes, yes, I'm aware of that.

 3   Q    And --

 4   A    I'm very aware.

 5   Q    And you're aware that there was a proposed settlement with

 6   HarbourVest; is that correct?

 7   A    We have an approved settlement with HarbourVest.

 8   Q    Right.  And there were objections filed to that particular

 9   -- or, to that particular settlement agreement, were there

10   not?

11   A    Yes.

12   Q    But none of my clients participated in that objection, did

13   they?

14   A    I don't recall the specifics of your clients versus the

15   other Dondero entities, but I'm certain Mr. Dondero

16   participated.

17   Q    But the De... the parties that we represent did not object

18   to the settlement?

19   A    I don't recall specifically.

20   Q    Okay.  And another motion that was filed was for an

21   examiner.  Isn't that correct?

22   A    I believe that's the case, yes.

23   Q    Yeah.  And my clients didn't join that motion, either?

24   A    No.  It's a bit of whack-a-mole, but they did not -- they

25   did not -- I don't -- I don't know.  To be honest, I don't

 1  know if they did or not.

 2  Q    All right.  Toward the end of your testimony, you were

 3  giving some information about the value of these management

 4  contracts in terms of income over the course of the coming

 5  year or two.  What is the projected revenue with respect to

 6  these management contracts?

 7  A    Do you mean the CLO 1.0 management contracts?

 8  Q    Yes.

 9  A    They generate about four-and-a-half to five million

10  dollars a year, depending on the asset base in total, but

11  that's accrual, as I mentioned earlier.  It doesn't all come

12  in in cash.  It depends on the waterfall.  Expect about two-

13  and-a-half to 2.7 million to come in per year during the

14  course of the projected time period.

15      (Echoing.)

16  Q    Have you done any sort of profitability analysis on the

17  management contracts?

18  A    Not specifically on those contracts, no.  We look at the

19  --

20  Q    Okay.

21  A    -- aggregate of the Debtor's receipts versus its costs.

22  Q    Can you -- so, --

23          MR. HOGEWOOD:  Ms. Mather, can you call up the

24  disclosure statement?  This is Docket 1473.  And in

25  particular, Page 176.

Seery - Cross                               188

1   BY MR. HOGEWOOD:

2   Q    So, I'm, Mr. Seery, I'm trying to square the 779 for the

3   month ended -- month period ended in March '21 and no further

4   revenue coming in on management fees with what you just said.

5   A    I'm not -- I'm not sure why.  This should -- certainly

6   should have the management fees according to the CLOs if this

7   was included in the assumption of those.  We have revenue,

8   they do generate revenue, they currently generate and they

9   will continue to generate.

10  Q    But this is the disclosure statement approved by the

11  Court, right?

12  A    Yes.  I'll have to come back and check why that for the

13  year doesn't have it, unless we were assuming that we wouldn't

14  receive any into the -- into this vehicle.  I just, I don't

15  know the answer.

16         MR. HOGEWOOD:  Your Honor, that's all the questions I

17  have.  Thank you very much.

18         THE COURT:  All right.  Redirect?

19         MR. MORRIS:  Can we just leave this up on the screen

20  for a second, very quickly, for Mr. Seery?  Can we put the

21  document back?

22                      REDIRECT EXAMINATION

23  BY MR. MORRIS:

24  Q    Mr. Seery, do you recall that the disclosure statement was

25  approved back in November?

Seery - Redirect                          189

1  A    Yes.

2          THE COURT:  Could you repeat the question?  I

3  couldn't hear it.

4          MR. MORRIS:  Yeah.  That is -- I don't know if

5  somebody's phone is not on mute.

6          THE COURT:  Yes.  Please put your device on mute if

7  you're not the one talking.  Okay.  Someone did.  Go ahead.

8          MR. MORRIS:  Thank you.

9  BY MR. MORRIS:

10 Q   Mr. Seery, do you recall that this disclosure statement

11 was approved back in November?

12 A    Yeah.  What I'd said earlier was that I'm not sure if the

13 -- this plan projection conforms with our decision to maintain

14 the CLO management contracts, and so there certainly should be

15 revenue, while it comes in quarterly on the management fee,

16 the base management fee.  And it's not always -- each CLO is

17 not always able to pay it in cash.  It will depend on our

18 ability to monetize assets, because they don't -- a lot of the

19 assets are not cash-generative.  Some are.  For example, the

20 Trussway loan is cash generative.  The CCS loan is not.

21     But I'm just not sure why this doesn't show the management

22 fees at all.  At least for the whole year, we certainly will

23 have them, unless this is prior to the determination to assume

24 those agreements.

25 Q   Okay.  So if the assumption in November was that the

Seery - Redirect                            190

1    agreements would be assigned, there would be no revenue shown.

2    Is that fair?

3    A    That would have been the assumption prior to us

4    determining that we wanted to assume them, yes.

5    Q    Okay.  And do you recall whether the Debtor became more

6    convinced that it would assume the contracts rather than

7    assign them before or after the disclosure statement was

8    approved?

9    A    I don't recall the specific timing, but a number of things

10   happened around this time.  First, the Dondero entities were

11   unwilling to even engage on assignment because they were on a

12   much more aggressive, quote, blow up the place strategy.

13   That's Mr. Dondero's quote.

14        Number two, we settled with HarbourVest, and that

15   significantly increased the value of maintaining the CLO

16   management.  The HarbourVest --  or the HCLOF entities own

17   significant preferred shares in the 1.0 CLO structures, and

18   having management of those and being able to monetize those in

19   accordance with the agreement, maximizing value for the

20   benefit of HCLOF, would be far, far better for the estate than

21   letting these assets just sit.  We're not trying to drive the

22   price down, because we wouldn't be in the business of trying

23   to buy back those securities on the cheap.  We're in the

24   business of trying to maximize value.

25   Q    All right.

Seery - Examination by the Court                191

1          MR. MORRIS:  I have nothing further, Your Honor.

2          THE COURT:  Any recross on that redirect?

3          MR. HOGEWOOD:  No, thank you, Your Honor.  Appreciate

4     the opportunity to appear before you.

5          THE COURT:  All right.  Thank you.

6       Mr. Seery, before we let you go, I have a couple of

7     follow-up questions.

8                    EXAMINATION BY THE COURT

9          THE COURT:  These CLOs, I mean, you've said a couple

10    of times they're not really traditional CLOs, except for the

11    Acis 7 one.  But I have this question.  I've learned back in

12    the Acis case most of what I know about CLOs, I suppose.  And

13    what the witnesses told me there were they typically had a 12-

14    year life, and then, yeah, there was some period, you know,

15    the first five years, seven years, something like that, where

16    it was in a reinvestment/refinancing phase, but then after

17    that, you know, we couldn't do that anymore and it was kind of

18    heading towards wind-down.

19       Anyway, my long-winded question is:  Do these CLOs work

20    generally like that or not?  Because you said they're

21    atypical.

22          THE WITNESS:  They -- they --

23          THE COURT:  Go ahead.

24          THE WITNESS:  They used to.

25          THE COURT:  Okay.

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-11 29   Filed 09/03/25   Page 489 of 1052    PageID 17167

Seery - Examination by the Court                192

1           THE WITNESS:  So these are extremely old.  These go

2    back to 2006, '07, '08.  These are very old CLOs.  So they're

3    far beyond their investment periods.  Some of them are coming

4    up on their maturities on their debt.  Many of them don't have

5    any debt at all.

6        So you'll recall, Your Honor, that a CLO is a vehicle

7    where you take x-hundred million -- we'll use 400 for fun --

8    million dollars.  You ramp up $400 million of assets.  You

9    sell off, for our purposes, $350 million of securities.  You

10   have the AAA securities, the AAs, all the way down.  And then

11   you have these preference shares.

12       During a period of time, as cash is generated in the CLO,

13   the CLO is entitled to reinvest it.  And that keeps it going.

14   And then it gets beyond its reinvestment period and it's in

15   what folks usually refer to as its harvest period.  That's

16   when oftentimes, depending on where rates are, depending on

17   asset value, the rates for the debt obligations or the rate

18   you can receive on your assets, you may see refinancings or

19   resets.  Otherwise, the CLOs begin to wind down.  They have --

20   they don't have a life, like a partnership with a final date,

21   but there's maturities on the debt and then there's an

22   expectation that they would wind down.

23       These CLOs -- which typically CLOs only invest in

24   performing loans, and oftentimes, particularly Highland -- and

25   I could regale you with stories how Highland would take

Seery - Examination by the Court                    193

1   virtually non-interest-bearing, seventh lien debt -- that's a

2   bit of an exaggeration -- but just to keep the fees going, and

3   not actually convert to equity.  A lot of these, that wasn't

4   an option, so they've converted to equity.  So I just have one

5   that I happen to have on my screen, Your Honor, Gleneagles.

6   The assets in Gleneagles (echoing) are 16 -- MGMs.

7          THE COURT:  Okay.  Someone needs to put their phone

8   on mute.  All right.  I'm sorry.

9          THE WITNESS:  So it has -- it has -- the specifics

10  aren't particularly important, but its assets are -- just this

11  one I just pulled up; they're all a little different, and --

12  but mostly the same -- MGM stock.  This is MGM Studios, which

13  you read about with James Bond, a very valuable asset.  Across

14  the Highland platform, there's roughly $500 million worth of

15  stock.  It doesn't pay off any income.  So if it had debt --

16  and I'm not sure if Gleneagles still has any; I'd have to

17  switch screens; I don't believe it does; if it does, it's

18  small -- it wouldn't get any income-generating -- that's not

19  income generating asset.

20      Vistra, which is the TXU stock I talked about before, is

21  the next biggest asset.  Skyline Corporation, which was the

22  one we were selling.  That's no longer in there.  TCI

23  portfolio, which is a Dondero real estate asset it has, it's

24  an old Las Vegas and Phoenix, Arizona real estate

25  developments.  Not income-generating.  Not that they don't

Seery - Examination by the Court          194

1   have value, but this is much more like what would be referred

2   to as a closed-end fund.  It's not going to go out and buy

3   anything.  It can't.  It can only generate cash by selling

4   assets, give that cash to the trustee, and then the trustee

5   pays it through the waterfall.  And that's the way all of

6   these CLOs work.

7        Now, some of them do have debt.  And some of them have a

8   lot of debt, and the preferred shares will never be worth any

9   money, so we refer to those as being underwater.  No surprise,

10  the Dondero-related entities don't own any of those junior

11  securities.

12       The -- some do have debt.  A lot of that debt is going to

13  get paid off in the first half of the year because there'll be

14  refinancings at Trussway and a refinancing at Cornerstone.

15  They own debt, and that'll generate cash.  It'll go to the

16  CLOs, go to the trustee.  First it goes to pay the obligations

17  for the outstanding debt of the CLO, and then the asset

18  dollars, they get put through the waterfall to pay the more

19  junior securities.

20            THE COURT:  Okay.  And --

21            THE WITNESS:  And I --

22            THE COURT:  The --

23            THE WITNESS:  I was going to give you -- I contrast

24  that to a more typical CLO, which is whether it's beyond its

25  investment period or not, will have something like 150 to 250,

1   sometimes more, loans in it.  150 would be on the loan side.

2   It'll own -- own those in smaller amounts.  It has

3   requirements as to what its concentrations are in different

4   buckets of types of assets.  It has to return -- it has to

5   have an income-generating ability to satisfy certain covenants

6   in its debt obligations and in the indenture.  And then it

7   will, once it gets past its investment period, it will start

8   to harvest those assets.

9       There are different ways for the CLO manager to swap

10  assets, to stay in compliance, to extend out the tenure, but

11  usually markets start to move and there's some reason for the

12  CLO manager to do something like a reset or a refinancing or

13  to call the CLO.

14      So you'll see a number -- there was one this week, and

15  there'll be a number because of the conditions in the market

16  -- of CLOs called by the, effectively, the equity, saying,

17  Great time to sell, I don't need the short income, call the

18  CLO, do a BWIC or some other way to get dollars for all of the

19  assets, pay off all of my debt, and give me the balance of the

20  proceeds.

21          THE COURT:  Okay.  All right.  And the plan

22  contemplates that these will all be wound down over a two-year

23  period, correct?

24          THE WITNESS:  It's not a hard -- it's not a hard

25  period.

Appx. 03609

1          THE COURT:  Okay.

2          THE WITNESS:  So it's not a two-year period.  We're

3     going to -- we're going to manage these assets, as any asset

4     manager would, and we've had direct discussions with some of

5     the underlying holders, including one of the biggest investors

6     in the world who's an investor in the CLO but also has a

7     couple separate accounts which they want us to manage, and

8     we'll look for opportunities, depending on the market.  We're

9     not going to -- we're not going to just sell.  It's not a

10    liquidation.  We're going to find opportunities where, if we

11    believe it's the right value, we'll sell.  That doesn't mean

12    we'll sell it all in a big chunk.  We may manage pieces.  We

13    may hold on to some.

14       Some of them may perform -- some of the assets may

15    actually do things differently than others.  For example,

16    Cornerstone, for unknown reasons, has $60 million of MGM

17    stock, not an asset that you'd think you'd stuff into a

18    healthcare business, but this is Highland.  That may be sold

19    before, for example, Gleneagles sells its MGM.  It'll just

20    depend on, you know, market and the need of the specific

21    investor.

22         THE COURT:  All right.  Thank you.  That's all the

23    questions I have.

24         THE WITNESS:  Thank you, Your Honor.

25         THE COURT:  All right.  So, Mr. Seery, I think we're

Seery - Examination by the Court                197

1   done with you, but we hope you'll stick around for however

2   longer this goes.

3           THE WITNESS:  I will indeed.

4           THE COURT:  Okay.

5           THE WITNESS:  Thank you.

6           THE COURT:  Does the Debtor rest, Mr. Morris?

7           MR. MORRIS:  Yes, Your Honor.  There were those

8   couple of documents that we had used from the different docket

9   that we'll certainly put on the docket with the supplement

10  witness and exhibit list.  I just wanted to point that out.

11  And I, you know, I don't recall, frankly, if I moved into

12  evidence each of those extras, and I'm happy to go through it,

13  but it's very important to me that those documents be part of

14  the record.  So --

15          THE COURT:  Okay.  I think what you added was TTTTT,

16  and I think I admitted it.  You moved to admit it, and I said

17  yes, but you're going to have to file it on the docket --

18          MR. MORRIS:  Yeah.

19          THE COURT:  -- as a supplemental exhibit.

20          MR. MORRIS:  Right.  And then there were the couple

21  from the other -- let me see if I can get them.

22          THE COURT:  I admitted everything else that you filed

23  on the docket except UUUU, VVVV, and AAAAA.

24          MR. HOGEWOOD:  Yeah.  And that's fine.

25       Can we, Ms. Canty, going from Docket No. 46, can we just

Case 19-34054-sgj11    Doc 3596-29    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-11    Exhibit 29    Filed 09/09/25    Page 495 of 1052    PageID 17173
Page 199 of 258

198

1    call up Exhibit K to make sure that that's in evidence?

2    Docket 46 from the Dondero adversary proceeding.

3        Okay.  So this was the letter, Your Honor, that I used

4    earlier today with Mr. Dondero.  If you scroll down, where I

5    examined him on the trading.  This is what led into the

6    December 22nd trading, if you go to the next page.  So if it's

7    not in evidence, I would respectfully request that this

8    document be admitted into evidence, Your Honor.

9            MR. RUKAVINA:  Your Honor, I object.  This document

10   is hearsay of Mr. Pomerantz.

11           THE COURT:  Okay.

12           MR. MORRIS:  Mr. Dondero has already -- I'm sorry,

13   Your Honor.

14           THE COURT:  Okay.  So this is -- I wholesale-admitted

15   all of your exhibits with those three carved out that I

16   mentioned.  So you're saying I've not admitted this one yet?

17           MR. MORRIS:  I just don't recall, because this wasn't

18   on the exhibit list. I will point out that we had no objection

19   to the entry into the evidence of all of K&L Gates letters,

20   and I'm really a little surprised, having heard the testimony

21   from Mr. Dondero on this particular letter, that there would

22   be an objection.  But I would respectfully request that it be

23   admitted as an exception to the hearsay rule.

24           THE COURT:  All right.  Well, I'm going to overrule

25   the objection.  I'll admit it.

199

1    So, again, it has to be supplemented on the docket.

2    (Debtor's Exhibit K is received into evidence)

3         MR. MORRIS:  Yes.  And there's just one other

4    document, Your Honor, from that same docket.  It's Exhibit D,

5    Ms. Canty.  I just want to make sure that's in the record as

6    well.  And I do apologize again, Your Honor.

7         THE COURT:  Okay.

8         MR. MORRIS:  I didn't realize until I was reading --

9         THE COURT:  We're getting terrible distortion.   I

10   don't know where it's coming from, but --

11        MR. MORRIS:  Okay.  And this is, this is the email

12   that I -- it's Mr. Dondero's own statement, so it's not even

13   hearsay, but I just want to make sure this is part of the

14   evidentiary record, Your Honor.  So I move for the admission

15   of this document as well to our exhibit list.

16        MR. RUKAVINA:  I believe this document has been

17   admitted.  I believe -- I believe --

18     (Echoing.)

19        MR. RUKAVINA:  Is that us?  Testing.

20        THE COURT:  All right.  Mike, where is that coming

21   from?

22     (Clerk advises.)

23        THE COURT:  Okay.  Mike thinks it's Mr. Morris, but

24   -- so put yourself on mute.

25     Mr. Rukavina, go ahead.

200

 1          MR. RUKAVINA:  Your Honor, I think this exhibit is in

 2    already.  If it's not, no objection.

 3          THE COURT:  All right.  So it will be admitted, and

 4    again, you need to file it as a supplement, Mr. Morris.

 5       (Debtor's Exhibit D is received into evidence)

 6          MR. MORRIS:  Yeah.  Thank you, Your Honor.  The

 7    Debtor rests.

 8          THE COURT:  All right.  Mr. Rukavina, I want to go a

 9    while longer, so let's at least -- do you have Mr. Dondero as

10    well as Mr. Post?

11          MR. RUKAVINA:  I do, Your Honor.  I have both.

12          THE COURT:  Okay.  Well, let's go.  You may call your

13    witness.

14          MR. RUKAVINA:  Your Honor, we'll call Jason Post.

15          THE COURT:  All right.  Mr. Post, I swore you in

16    earlier and I consider you still under oath.  Do you

17    understand that?

18          MR. POST:  I do.

19          THE COURT:  All right.  Go ahead.

20       JASON POST, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

21          MR. RUKAVINA:  Oh, turn on the video.  Can you see

22    how to do that?  Is Jason on the video?  Okay.  All right.

23    Mr. Post?  Hold on a second.  I'm hearing myself.

24          THE WITNESS:  I'm hearing the same.

25          MR. RUKAVINA:  Let me turn down my volume.  Testing.

Post - Direct                                   201

1    Okay.  Mr. Post, can you hear me?

2             THE WITNESS:  Yes.

3             MR. RUKAVINA:  Okay.

4                     DIRECT EXAMINATION

5    BY MR. RUKAVINA:

6    Q    You were asked about some of your background and

7    qualifications.  Just so that the record is clear, you are the

8    chief compliance officer for both two Advisors and each of the

9    Funds, correct?

10   A    Correct.

11   Q    And I think we refer to these three defendant funds as

12   retail funds; is that correct?

13   A    Correct.

14   Q    Describe what we mean or what you mean by a retail fund.

15   A    I look at it two ways.  There's private funds, which are

16   institutional in nature, and retail funds, which are comprised

17   of open-end funds, closed-end funds, BDCs, ETFs, and that

18   constitutes the suite of funds that are advised by Highland

19   Capital Management Fund Advisors and NexPoint Advisors.  And

20   they generally have a broad swath of investors, including

21   institutional investors, but also, you know, just regular mom-

22   and-pop investors.

23   Q    Okay.  So, for the Highland -- I'm sorry, for the three

24   retail funds, how much in ballpark investments do they have in

25   the CLOs that are at issue today?  Ballpark.

Post - Direct                                    202

1    A    Maybe call it a hundred million, ballpark.  Or a hundred

2    million, give or take.

3    Q    Okay.  And for all of the CLOs that Highland manages that

4    the Advisors and other Funds have an interest in, do you have

5    an estimate of how much it manages of CLO assets?

6    A    I believe it's approximately a billion, a little over a

7    billion that HCMLP manages for its CLO assets.

8    Q    Do you have an estimate of how many individual investors

9    there are in the three retail funds?

10   A    I -- thousands.  I don't have an exact number.

11   Q    Okay.  And I think you mentioned some of the types.  Do

12   you have any names of the types of investors that Her Honor

13   might know or have heard of before?

14   A    Off the top of my head, I do not, just -- but they're

15   generally constituted or characterized of the investor types

16   that I mentioned earlier.

17   Q    Okay.  Now, these three retail funds, do they own voting

18   preference shares in any of the CLOs that the Debtor manages?

19   A    Yes.

20   Q    Okay.  Do they own a majority in any of those CLOs' voting

21   preference shares?

22   A    In aggregate, across the three, they would.

23   Q    Okay.

24   A    With other CLOs.

25   Q    What are those three CLOs, sir?

Post - Direct                                    203

1   A    I believe it's Greenbrier, Graceland, and Stratford, if I

2   recall correctly.

3            MR. RUKAVINA:  Your Honor, have you received a

4   couriered binder of our exhibits?

5            THE COURT:  I have.  I've got them right here.

6            MR. RUKAVINA:  Now I can't hear the judge.  What's

7   she saying?

8            THE COURT:  Yes.  I've got them.

9            MR. RUKAVINA:  I think you're on mute, Judge.

10           MR. VASEK:  No, you turned your volume down.

11           MR. RUKAVINA:  Oh.  I apologize, Your Honor.

12       So, Mr. Vasek, if you'll please put Exhibit 2 up.

13  BY MR. RUKAVINA:

14  Q    Mr. Post, are you the custodian of records for the Funds

15  and Advisors?

16  A    Yes.  We're required to keep records of ownership and

17  trades for the Funds involved.

18  Q    And you are an actual officer of these Funds and Advisors,

19  correct?

20  A    Correct.

21  Q    Okay.  Are you familiar with this Exhibit 2?

22  A    I am.

23  Q    Did you participate in pulling together the underlying

24  information with others to prepare Exhibit 2?

25  A    I did.

Appx. 05817

Post - Direct                                    204

1  Q    Does Exhibit 2 accurately reflect the current ownership of

2  the various CLOs by the three retail funds that are --

3  A    At the time it was put together, I believe it did.

4  Q    And approximately when was that?

5  A    I believe it was in the November time frame, middle of

6  November, end of November.

7  Q    Do you have reason to believe that the numbers we're

8  referring to would be materially different today?

9  A    I don't believe they would be materially different.

10           MR. RUKAVINA:  Your Honor, I move for the admission

11  of Exhibit 2 as a summary of underlying data.

12           THE COURT:  All right.  Any objection?

13           MR. MORRIS:  Yes, Your Honor.  It's hearsay.  I

14  understand that the witness has testified to it, but just as I

15  put in the backup for my demonstrative, where's the backup?

16  We're just supposed to take his word for it?  There's no

17  ability to check this.  This is not evidence.  It's a

18  demonstrative.

19           THE COURT:  All right.  Mr. Rukavina, do you have

20  backup?

21           MR. RUKAVINA:  Let me ask the witness a couple more

22  questions.

23  BY MR. RUKAVINA:

24  Q    What would be the backup for this Exhibit 2?

25  A    We'd have to pull the holdings from the intranet and that

Case 19-34054-sgj11    Doc 3596-29    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 29    Filed 06/25/25    Page 502 of 1052    PageID 17180

Post - Direct                                    205

 1   would identify the quantity that's held by each of the

 2   respective funds and then an aggregate that, over the

 3   preference shares outstanding, would give you the percentages

 4   that are outlined in this exhibit.

 5   Q    Okay.  And is that a database that you have personal

 6   access and authority over?

 7   A    I have personal access to it.  Yes.

 8   Q    Okay.

 9           MR. MORRIS:  Your Honor, *voir dire*?

10   BY MR. RUKAVINA:

11   Q    Can you easily take that data from a computer and show it

12   to the Court here today?

13   A    Yes.  It would just require the CUSIPs for each of the

14   preference shares and then plug it into the intranet and then

15   that would provide a screenshot of the ownership of the CLOs.

16   Q    And is this what that is, basically?

17   A    This is an aggregation -- or, this is a percentage of the

18   shares outstanding, the preference shares.  So what would be

19   shown on the intranet would be the quantity and then you'd

20   have to tie that back to the shares outstanding and that would

21   give you the percentages that are shown on this exhibit.

22           MR. MORRIS:  *Voir dire*, Your Honor?

23           THE COURT:  I'm sorry?

24           MR. MORRIS:  May I inquire before this --

25           THE COURT:  Mr. Morris, is that you?  Okay.  You want

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-129   Filed 02/07/25   Page 503 of 1052   PageID 17181

Post - Voir Dire                           206

1  to take him on *voir dire*?

2          MR. MORRIS:  Yes.

3          THE COURT:  Go ahead.  Uh-huh.

4                  VOIR DIRE EXAMINATION

5  BY MR. MORRIS:

6  Q    Yes.  Mr. Post, did you prepare this document?

7  A    I provided information and the document was ultimately

8  prepared by counsel.

9  Q    So you didn't personally prepare this, right?

10  A    I didn't personally put this chart together.

11  Q    And you didn't personally make the calculations on this

12  chart, right?

13  A    I would have supplied or assisted in supplying the

14  holdings with reference to the shares outstanding and then

15  they would have done the math to place the percentages.

16  Q    I'm asking a very specific question.  You didn't do the

17  calculations necessary to come up with the percentages on this

18  chart, right?

19  A    Me personally, no, I did not.

20  Q    And you can't verify that this chart is accurate, can you?

21  A    I provided, provided the information.  Then it's a

22  mathematical calculation.

23  Q    Okay.  You didn't take any steps to determine the accuracy

24  of this chart, right?  You relied on others?

25  A    There's a -- I would have cross -- you know, maybe cross-

Post - Voir Dire                               207

1   referenced some of the percentages against another spreadsheet

2   that was -- that we had internally.

3   Q   Sir, I didn't want to know what you would have done.  You

4   didn't do anything to confirm the accuracy of all of the

5   numbers on this page, correct?

6   A   I believe I may have spot-checked a couple of them.  I

7   can't recall specifically.

8            MR. MORRIS:  Your Honor, not only don't we have the

9   backup, but this witness isn't even competent to testify to

10  the accuracy of the chart.  I renew my objection.

11           THE COURT:  All right.  I sustain the objection.

12           MR. RUKAVINA:  Your Honor, I'll --

13           THE COURT:  It's not allowed.

14           MR. RUKAVINA:  Going back to the -- take that down.

15           THE COURT:  All right.  Mr. Rukavina, we're -- our

16  connection to your office is suddenly not very good.  Both you

17  and Mr. Post are very hard to hear.  So let's see what we can

18  to improve.

19           MR. RUKAVINA:  Is it a question of loudness or

20  quality?

21           THE COURT:  Quality.  And I heard you fine just then,

22  but -- so let's try again.

23                  DIRECT EXAMINATION, RESUMED

24  BY MR. RUKAVINA:

25  Q   Mr. Post, let's go back to those retail funds.  How are

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-21   Filed 09/25/25    Page 505 of 1052    PageID 17183

Post - Direct                                                    208

 1   those funds managed at the top level?

 2   A    They're overseen by a board of trustees.

 3   Q    Okay.  Do you interact with that board of trustees

 4   periodically?

 5   A    I do.

 6   Q    Okay.  Approximately how often?

 7   A    At least quarterly, and generally intervening periods.

 8   I'd probably say anywhere from every five to six weeks, if not

 9   more frequent.

10   Q    Have you been communicating with them more frequently

11   recently?

12   A    Yes.

13   Q    As the CCO of the funds, who do you ultimately report to?

14   A    The board.

15   Q    Is Mr. Dondero on any of those boards?

16   A    He is not.

17   Q    Okay.  Are those boards capable, to your experience, of

18   making independent decisions?

19              MR. MORRIS:  Objection to the form of the question.

20              THE COURT:  Overruled.

21              THE WITNESS:  I think the question, is are they

22   capable of making independent determinations?  Yes.

23   BY MR. RUKAVINA:

24   Q    Okay.  Explain the interaction between the Fund Advisors

25   and the retail funds.  What -- what does the one do for the

Post - Direct                                              209

1   other, if you will?

2   A    I'm sorry.  Can you repeat that?  I didn't -- I didn't

3   hear the question.

4   Q    So, we have the three retail funds.

5   A    Yes.

6   Q    What relationship, if any, is there between the two

7   Advisor defendants and any retail fund defendants?

8   A    So, there's an investment advisory agreement that the

9   Funds have entered into with the investment advisor, and the

10  investment advisor performs investment functions on behalf of

11  those Funds, along with other noninvestment functions.

12  Q    Okay.  So is it fair to conclude that, for investment

13  purposes, the Advisors make pretty much all, if not all,

14  decisions for the three Funds?

15  A    Yes.

16  Q    Okay.  What about other matters that the board might

17  consider?  Do the Funds make -- I'm sorry.  Do the Advisors

18  make other decisions for the Funds, or is it an advisory role?

19  A    The Advisors may make other decisions or recommendations,

20  which they then set forth to the board for their approval, if

21  needed.

22  Q    Okay.  Does the board have independent counsel?

23  A    They do.

24  Q    Okay.  Have you interacted before?

25  A    I have.

Post - Direct                                    210

 1   Q    And is it fair to conclude that the board not only is

 2   capable of making independent decisions but has made

 3   independent decisions recently?

 4            MR. MORRIS:  Objection.  Leading.

 5            THE COURT:  Sustained.

 6            THE WITNESS:  They have.

 7            MR. RUKAVINA:  Okay.

 8            THE COURT:  That was --

 9            MR. RUKAVINA:  And we'll get --

10            THE COURT:  You don't answer.

11            MR. RUKAVINA:  Go into that in another bit.

12            THE WITNESS:  Oh.  Sorry.

13            MR. RUKAVINA:  Okay.

14   BY MR. RUKAVINA:

15   Q    Explain to the Court what your role as the chief

16   compliance officer for the Advisors and the Funds is.

17   A    I think, as you mentioned earlier, it's interaction with

18   the board.  Also with regulatory bodies to the extent

19   examinations occur.  It could be to ensure oversight and

20   compliance with a fund's prospectus and SAI limitations, and

21   then it's establishing policies and procedures and ensuring

22   that those policies and procedures are adequate to detect any

23   sort of violations that could occur by the Funds.

24   Q    And are you an attorney?

25   A    I am not.

1   Q    Do you frequently work with attorneys?

2   A    I do.

3   Q    Both in-house and external?

4   A    Yes.

5   Q    Good.  And do you frequently rely on the advice of

6   counsel?

7   A    I do.  At times will present, you know, if there is a

8   question or an issue, present the background to either

9   internal or external counsel and then request their advice on

10   certain matters.

11   Q    So when counsel was asking about why you wouldn't appear

12   at a hearing or listen to a hearing or read a transcript of a

13   hearing, are those the kinds of things that you would rely on

14   counsel?

15   A    Yes.  If counsel were to tell me to, you know, attend the

16   hearing, I would have attended the hearing.

17   Q    Okay.  Does -- do the Funds and Advisors also have in-

18   house counsel?

19   A    Yes.

20   Q    I think we established that's D.C. Sauter?

21   A    He's been the primary point of in-house counsel more

22   recently, I'd say, within the past three to four months.

23   Q    Okay.  And would you expect that perhaps he would be

24   attending hearings and reading transcripts instead of you for

25   some of these litigated matters?

Post - Direct                                          212

 1              MR. MORRIS:  Objection to the form of the question.

 2              THE COURT:  Overruled.

 3              MR. MORRIS:  Leading.

 4              THE COURT:  Overruled.

 5              THE WITNESS:  I believe he would be.

 6   BY MR. RUKAVINA:

 7   Q    Okay.  Well, the implication was made, Mr. Post, that

 8   somehow you were negligent as CCO by not following the

 9   December 16th hearing.  I'd like to know, --

10              THE COURT:  Okay.  Could you -- could you repeat --

11   BY MR. RUKAVINA:

12   Q    -- Did you have counsel at the hearing and did you hear

13   from --

14              THE COURT:  Mr. Rukavina, start over with your

15   question.  It was a little hard to hear.

16              MR. RUKAVINA:  Okay.

17   BY MR. RUKAVINA:

18   Q    Mr. Post, the implication had been made that, because you

19   weren't at the December 16th hearing and because you had not

20   read the transcript, that you were somehow deficient as a CCO.

21   I'd like to know, Did you have the benefit of outside

22   counsel's views both before and after that hearing as to that

23   hearing and what happened?

24   A    Yes.

25   Q    It's not that you put your head in the sand and ignored

Post - Direct                                    213

1   what's happening, is it?

2   A    That is correct.

3   Q    Okay.  And is it fair to say that when you deal with

4   compliance, you deal with complicated statutes and

5   regulations?

6   A    That is correct.

7   Q    Okay.

8          MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

9   (garbled).

10       (Pause.)

11  BY MR. RUKAVINA:

12  Q    Okay.  Taking you back to Mr. Morris's questions, do you

13  recall Mr. Morris asking you whether you believe that any of

14  the trades that were being discussed were deceptive?

15         MR. MORRIS:  Hold on one second, Your Honor.  What

16  exhibit is this?

17         THE COURT:  I don't know.  What is it?

18         MR. RUKAVINA:  Can you hear me, Mr. Post?

19         THE WITNESS:  They're asking a question as to what

20  exhibit this is.

21         MR. RUKAVINA:  Your Honor, this is not an exhibit.

22  This is a Commission Interpreting Regarding Standard of

23  Conduct for Investment Advisors, an SEC regulation in

24  conjunction with 17 CFR 276.

25         THE COURT:  Okay.  How are we --

1              MR. RUKAVINA:  So, Your Honor, these are the actual

2     regulations.

3              THE COURT:  I mean, it's -- okay.  The answer to the

4     question is it's not an exhibit.  You have pulled up 17 CFR

5     part 276.  Is that what the answer is?

6              MR. RUKAVINA:  Yes, Your Honor.  And I haven't

7     offered this as an exhibit.

8              THE COURT:  All right.

9              MR. MORRIS:  You have -- Your Honor, I don't know why

10    this is being put up on the screen now.  It's not an exhibit.

11    It's not in the record like a couple of those that I had.  I

12    used the statute that he relied on to cross-examine him with

13    the 206.  I don't know what this is.  I don't know if it's

14    accurate.  I don't know anything about it.

15             MR. RUKAVINA:  Your Honor, this is a rule and

16    regulation.  This is not an exhibit.  If it is an exhibit, I

17    haven't moved to admit it yet.  I'm going to use this to

18    refresh his memory and explain why he believed that the

19    actions were deceptive, a door opened solely by Mr. Morris.

20             MR. MORRIS:  His recollection hasn't -- there's no

21    need to refresh it yet.  He hasn't even answered a question

22    where he says, "I don't remember."

23             THE COURT:  Okay.  I sustain the objection here.  I

24    mean, you can ask him a question, but, again, it's kind of

25    hard for us to tell what this is, actually.  I mean,

Post - Direct                                    215

1   Commission Interpretation Regarding Standard of Conduct for

2   Investment Advisors.  I mean, is this actually a -- I mean,

3   it's not a statute.  I'm not even sure it's a reg.  It's --

4        MR. MORRIS:  Okay.

5        THE COURT:  I don't know what it is.  So, --

6        MR. RUKAVINA:  Your Honor, we'll lay a predicate

7   later.  First, let me ask some other questions.

8   BY MR. RUKAVINA:

9   Q   Again, you recall that you were asked whether, pursuant to

10  Section 206 of the Advisers Act, you believed the trades that

11  have been discussed were deceptive.  Do you recall?

12  A   Yes.

13  Q   Okay.  And you answered that you believed that they were

14  deceptive?

15  A   Correct.  I did.

16  Q   As the CCO, do you have an understanding of what role, if

17  any, conflicts of interest play in an advisor's duties under

18  the Advisers Act?

19  A   Yes.

20  Q   Okay.  What is your understanding?

21  A   All -- all known material conflicts of interests need to

22  be disclosed -- need to be disclosed by the advisor to the

23  underlying investors.

24  Q   Okay.  And why, why do those conflicts of interests have

25  to be disclosed?

Post - Direct                                    216

1   A    Because an advisor could have a view that may deviate from

2   the underlying investors' view of how the portfolio could be

3   managed and in contradiction to it.

4   Q    And do you have an understanding as to whether, pursuant

5   to your experience as the CEO [sic], the Advisers Act and the

6   SEC regulations (garbled) it require an advisor to adopt the

7   principal's goals as opposed to his or her own goals?

8           MR. MORRIS:  Objection to the form of the question.

9   Your Honor, he has not been offered as an expert.  He

10  shouldn't be permitted to provide -- this is -- this would be,

11  at best, expert testimony.  I asked him 30 different questions

12  about his background.  He's got no training.  He's got no

13  licenses.  He's taken no special courses.  He doesn't have

14  anything except on-the-job training.  This is not right.

15          MR. RUKAVINA:  Your Honor, Mr. Morris got to ask yes-

16  and-no questions all day, leading questions, and the witness

17  was told that he could explain his answers.  The Court told

18  him that.  And I am trying to explain his answer as to why he

19  believed that these transactions were deceptive, especially

20  because the allegation is that we willfully and intentionally

21  violated the stay by sending letters that this witness

22  authorized.  So understanding his understanding is very

23  important to Your Honor's determination of the actual --

24          THE COURT:  Well, I sustain the objection.

25          MR. RUKAVINA:  And Mr. Morris opened this door.

Post - Direct                                          217

1          THE COURT:  You can ask him why he thought the

2   actions were deceptive, but he's starting to go into what may

3   or may not be CFRs and conflicts of interest.  No.  This is

4   going well beyond asking him, Why do you think it was

5   deceptive?  And I agree:  It's straying into expert testimony.

6   BY MR. RUKAVINA:

7   Q   Mr. Post, you are familiar with the December 22nd AVYA

8   and SKY sales and transactions which you were asked about by

9   Mr. Morris and that you previously have testified about,

10  correct?

11  A   Correct.

12  Q   Okay.  How are you familiar with those sales and

13  transactions as they were occurring?  How did you learn about

14  them?

15  A   There was some internal email correspondence.  If I recall

16  from memory, at the bottom it provided fill information that

17  Jefferies provided to, I believe, Mr. Seery and others on the

18  email.  And then it kind of worked its way up to get the

19  trades that had been executed administratively booked into the

20  OMS.

21  Q   Why did you get involved with those transactions?

22  A   They were requesting that employees of HCMFA book those --

23  I'm sorry, Highland Capital Management Fund Advisors -- book

24  those into the system.  And those employees were not a party

25  to the trade.  I don't believe --

Case 19-34054-sgj11    Doc 3596-29    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-129    Filed 02/19/25    Page 515 of 1052    PageID 17193

Post - Direct                                      218

1   Q    Well, let me pause you.  Let me pause you.  Those two

2   employees, who were they?

3   A    Joe Sowin and Matt Pearson.

4   Q    Were they at that time employees of the Debtor?

5   A    They were not.

6   Q    Okay.  So, how did you come to learn about this ask that

7   those two employees book -- book it?

8   A    I believe there was an email that was sent to me, or I was

9   on it.  I can't recall specifically.

10  Q    Okay.  And did you undertake any review as to whether

11  those two employees should or should not do what was being

12  asked of them?

13  A    Once it was brought to my attention, I discussed with -- I

14  looked at it.  It looked like, pursuant to prior

15  correspondence with -- that Joe Sowin made, he wasn't aware of

16  the trades.

17      You know, I also had a discussion with K&L based off of --

18  our legal counsel based off of a prior letter that was sent,

19  and just it didn't -- it didn't look right that they would be

20  booking trades on behalf of the two Advisors that are named in

21  the letters when they had nothing to do with it and weren't --

22  weren't a part of any of the pre-trade compliance checks, et

23  cetera.

24  Q    What is a pre-trade compliance check?

25  A    Well, there's an electronic system, a -- or a management

Post - Direct                                    219

```
1   system we have, the OMS, which is called Verda (phonetic).

2   And generally, trades are entered into the system by the

3   portfolio manager, and they then go through pre-trade

4   compliance checks.  And once those compliance checks are

5   passed, they're then routed to the trading desk for direction

6   or execution, where the executing brokers and the trading desk

7   will then monitor that execution over the course of the day.

8   And at the conclusion of the trading day, those trades, if

9   they weren't already allocated, would be allocated, and then a

10  trade would be sent to custodian prime brokers to identify the

11  trades that occurred in the respective Funds for those -- or,

12  on that day, and then they would then be dropped into the

13  database and our -- the settlement team would kind of work to

14  settle those trades or ensure that those trades were settled

15  based off of the stipulated time frame for settlement on the

16  trades.

17  Q    So, in all that course of a transaction, what exactly was

18  it that those two employees of the Advisors were being asked

19  to do on behalf of the Debtor?  What exactly were they being

20  asked to do?

21  A    To just book them in the system because they are trades

22  that already have been executed.

23  Q    Did you stop that?

24  A    I believe I responded and said, you know, it -- they're

25  employees of, if I recall, employees of one of the named
```

Post - Direct                          220

1  Advisors, and believe those trades are in the best interest of

2  those Advisors, and separately, you know, the Debtor has

3  designated operators/traders that should be able to enter

4  those trades as well, aside from Mr. Sowin and Matt Pearson.

5  Q    So can you think of any reason why Mr. Seery would ask

6  your employees, as with his own employees, to book these

7  trades?

8  A    I believe based off of past practice.

9  Q    Okay.  But nevertheless, those two trades did not comply

10 with internal compliance?

11 A    They weren't run through the OMS.  We try and route trades

12 through the order management system because there's pre-trade

13 compliance checks that can be performed, and it reduces any

14 sort of back-end reallocation or trade errors that may occur

15 as a result of, you know, trades being entered after the fact,

16 because quantities could be, you know, referenced incorrectly

17 or funds could be identified incorrectly.

18 Q    Based on prior practices, have these internal policies

19 been followed when perhaps employees of the Debtor asked

20 employees of the Advisors to take a particular action in the

21 course of a transaction?

22 A    Yes.

23 Q    When internal practices are not followed, what is your

24 job?  What are you supposed to do?

25 A    When internal practices are followed, --

Post - Direct                                221

1   Q    Are not followed.

2   A    Oh.  Not followed?  To the extent that they're not

3   followed, we would question, you know, number one, why weren't

4   they followed?  You know, we -- we try and have all trades

5   booked in the OMS so that the necessary checks could be

6   performed, and as I mentioned earlier, to avoid any

7   reallocation or trade errors.  So I would then question, you

8   know, why was this done outside of the system?

9   Q    And if you did not get an appropriate response back to

10  your question, what are you supposed to do?

11  A    If I didn't get an appropriate response, would, you know,

12  research it further and elevate it to senior management and/or

13  any of the board if it was ultimately an issue.

14  Q    Are you supposed to stop trades or stop the process if you

15  see something that you believe is not compliant with your

16  obligations and the fiduciary obligations of the Advisors?

17  A    Yes.

18  Q    Have you done that in the past?

19  A    Yes.

20  Q    Have you done that frequently, or infrequently?

21  A    I would say it's -- it's infrequent, but they do occur.

22  For example, if a fund is trading in a security that it's not

23  permitted to invest in based off of a prospectus limitation,

24  it would get flagged in the OMS and we would then not permit

25  the trade to go forward because it could cause the breach to

Post - Direct                                222

1   go further offsides or it could cause it to go offsides.

2   Q   Okay.  And these December 22nd trades, were they the type

3   of, in your past experience, problematic trades like you have

4   interfered or stopped or intervened to stop in other

5   situations in the past?  Do you understand my question?  That

6   was an inartful question.  Do you understand it?

7   A   If the question is because they were done outside of the

8   system?

9   Q   Yes.

10  A   And repeatedly?

11  Q   Yes.

12  A   I would have raised the question with the trading desk or

13  the portfolio manager as to why that's being done, because it

14  was not in -- not consistent with how we instruct trades be

15  booked.

16  Q   Did Mr. Dondero, for these December 22nd transactions,

17  tell these two employees not to book the trades?

18          THE COURT:  Okay.  Please repeat the question.  It

19  was garbled.

20          MR. RUKAVINA:  Thank you, Your Honor.

21  BY MR. RUKAVINA:

22  Q   For these December 22nd trades, did Mr. Dondero tell those

23  two employees not to book the trades?

24          MR. MORRIS:  I object, Your Honor.  No foundation.

25  This witness has no personal knowledge to testify to this --

1    to answer this question.

2            THE COURT:  Overruled.  If he knows.

3            THE WITNESS:  I do not know.

4    BY MR. RUKAVINA:

5    Q    Okay.  Do you have a reason to believe that he did?

6    A    I don't know.  I just saw the email traffic and Mr. Sowin,

7    I believe, was questioning the trades, you know, more in the

8    sense that he wasn't aware of them.  So, I don't -- I don't

9    know what kind of conversations, what happened in the

10   background, just that he -- he didn't recognized that rates.

11   Q    Let me try it this way.  You determined that these trade

12   would have violated the Advisors' policies and procedures,

13   correct?

14   A    Yes, because they were done outside of the OMS.

15   Q    Did Mr. Dondero tell you to come to that conclusion?

16   A    He did not.

17   Q    Did Mr. Dondero pressure you to come to that conclusion?

18   A    He did not.  He had indicated that there -- there are

19   these trades, and you should take a look at it from a legal

20   compliance perspective, which I did.

21   Q    And you talked to K&L Gates?

22   A    Correct.

23   Q    And when Mr. Dondero told you to look at these trades, did

24   he suggest to you in any way, shape, or form what you should

25   conclude or decide to do, if anything, with respect to these

Post - Direct                                      224

1  trades?

2  A    I don't believe so.

3  Q    Okay.  Let's go back to that question about your view that

4  some of what Mr. Seery was doing was deceptive under the 1940

5  Investors Act.  When did you form that view?

6  A    I believe it was after it was identified that there was

7  not (inaudible) on certain of the trades that were entered

8  into at the end of the November time frame, the SKY and AVYA

9  trades.

10 Q    And why did you form the opinion that those trades that

11 Mr. Seery was attempting to do or had done were deceptive

12 under the statute that Mr. Morris asked you about?

13 A    It was pursuant to reviewing them and supplemental

14 discussion.  A review with the portfolio managers and then

15 supplemental discussion with K&L be it from a (inaudible)

16 perspective, through, you know, perform in the best interest

17 of your clients, it was expressed that, at least with respect

18 to preference shareholders, they were supposed to maximize

19 value, and those sales, they're not really maximizing value.

20     And it was also identified that the Debtor was planning to

21 liquidate the CLOs based off of a filing within the Court

22 within a few-year period.  And the investors -- or, the Funds

23 that invested and the preference shareholders, or preference

24 shares, had a longer-time view in those assets.

25     So the sales, coupled with the short duration, or the

Post - Direct                        225

1  anticipated, you know, two-year duration, didn't line up with
2  the investment objective that they were seeking to maximize
3  returns.
4  Q   To your understanding and your experience, does the
5  servicer of the CLOs owe fiduciary duties to anyone?
6         THE COURT:  Okay.  I cannot -- someone is flipping
7  paper.  Please stop flipping paper.  Okay.  Repeat your
8  question, Mr. Rukavina.
9         MR. RUKAVINA:  Thank you, Your Honor.
10  BY MR. RUKAVINA:
11  Q   In your experience and in your knowledge, does the
12  servicer of the CLOs owe fiduciary duties to anyone?
13  A   They should, yeah, the underlying investors in the CLO,
14  whether it be the Debtor or the equity holders.
15  Q   Do the Advisors owe fiduciary duties to anyone?
16         MR. MORRIS:  Your Honor, I'm sorry, I apologize.  I
17  really do move to strike.  He's not a lawyer.  There is no
18  foundation.  He's not here as an expert.  There's no basis for
19  this witness to be talking about who owes who fiduciary
20  duties.  I don't even think that's the law, what's just been
21  stated.
22         THE COURT:  Okay.  I sustain.
23         MR. RUKAVINA:  Okay.
24  BY MR. RUKAVINA:
25  Q   Well, let me make it very easy, then.  Do you have an

Post - Direct                                226

1    understanding as to whether Advisors subject to the 1940 Act

2    owe a fiduciary duty?

3    A    Yes.

4    Q    Do you have an understanding of how a conflict of interest

5    plays into a fiduciary duty?

6    A    Yes.

7    Q    What is your understanding?

8    A    If there's a material conflict of interest, it should be

9    disclosed.

10   Q    And what did you conclude with respect to Mr. Seery and

11   the Debtor once the Debtor stated that it will liquidate

12   within two years?

13   A    That's not the investment horizon that the underlying

14   preference shareholders have, especially with respect to the

15   underlying assets held in those CLOs.  More or less, you're --

16   they're now put on a clock, and those preference shareholders

17   may have a longer-term view on the underlying assets of those

18   CLOs.

19   Q    Let's move on to those December 22nd and December twenty

20   -- well, let me strike that.  You heard Mr. Seery testify that

21   those December 22nd trades closed, correct?

22   A    I did.

23   Q    And did you independently look at whether that's true?

24   A    I did.

25   Q    And what did you conclude?

Appx 02649

016202

Post - Direct                                227

1   A    They showed a sale in the -- on the intranet.

2   Q    Okay.  Let's move on to the December 22nd and December

3   23rd letters.  Are you familiar with those letters from K&L

4   Gates to counsel for the Debtor?

5   A    I am.

6   Q    And did you participate in preparing those letters?

7   A    I did.

8   Q    Okay.  And I think Mr. Morris asked you and I think you

9   testified you supported or agreed with the sending of those

10  letters.  Is that generally accurate?

11  A    Yes.

12  Q    Why?  Why did you support sending those letters?

13  A    It wasn't in the best interest of the Funds pursuant to

14  discussions with the portfolio managers and the investment

15  objectives that they were looking to seek any of those

16  investment in the preference -- preference securities and

17  CLOs.

18  Q    Was that a purpose that you were trying to achieve by

19  sending those?

20         THE COURT:  Repeat the question.

21         THE WITNESS:  Ah, --

22         THE COURT:  Repeat the question.

23  BY MR. RUKAVINA:

24  Q    Was that a purpose that you were trying to achieve by

25  sending those letters?

1  A    Yes.  I believe there was something towards the end of one

2  or both letters that said, to the extent, you know,

3  transactions occur, if, for lack of better words, a courtesy

4  heads up could be given to the Funds and the Advisor.

5  Q    Did you intend in any way to intimidate the Debtor by

6  authorizing or supporting the sending of those letters?

7  A    No.

8  Q    Did you intend in any way to violate the automatic stay by

9  sending those letters?

10  A    No.

11  Q    Were you trying to engage the Debtor in a dialogue at that

12  time as to what to do with these CLO management agreements?

13  A    Yes.  I believe that was stated at one -- at the end of

14  one or both of the letters.

15  Q    And I think Mr. Morris discussed with you that the Debtor

16  sent back letters asking you to withdraw these two letters.

17  Do you recall that discussion?

18  A    Yes.

19  Q    And do you recall saying that we never withdrew these

20  letters, right?

21  A    Correct.

22  Q    Why did we not withdraw these letters?

23  A    Because we don't believe that the trades that are being

24  entered into are in the best interest of the shareholders --

25  *i.e.*, the Funds.

Post - Direct                                    229

1    Q    To your knowledge, did we ever, or did you ever,

2    communicate to the Trustees or Issuers anything in the nature

3    of instructing them to terminate the CLO management agreements

4    with the Debtor?

5    A    I did not.

6    Q    To your knowledge, did anyone, for the Funds or Advisors?

7    A    I don't believe so.

8    Q    Did you or anyone to your knowledge communicate to the

9    Issuers or Trustees that the process of removing the Debtor as

10   manager should commence?

11   A    I don't believe so.

12   Q    Okay.  To your knowledge, have any of the Issuers or

13   Trustees undertaken any steps to remove the Debtor or

14   terminate these contracts?

15        MR. MORRIS:  Objection to the extent it calls for the

16   conduct or knowledge of the Issuers.

17        THE COURT:  Overruled.  He can answer if he knows.

18        THE WITNESS:  I don't believe so.

19   BY MR. RUKAVINA:

20   Q    Had they, is that something that you would have expected

21   them to inform the Funds of?

22   A    Yes.  The Funds would have received some type of

23   notification if there was a new Advisor on the CLOs.

24   Q    So, other than these two letters -- let me stop there.

25   Did any discussion of trying to terminate these contracts

Post - Direct                    230

1   basically cease with the sending of these two letters and the

2   Debtor's responsive letters?

3   A    That's my understanding, yes.

4   Q    Okay.  And we never did file a motion for lift stay.  Can

5   you explain to the judge why we didn't file a motion for

6   relief from the stay?

7   A    It's my understanding that the intent was that the

8   management of the CLOs was going to be heard in conjunction

9   with the confirmation hearing.

10  Q    And do you recall when that confirmation hearing was

11  originally set for?

12  A    I believe it was supposed to start today.  Or tomorrow.

13  Q    Well, wasn't it earlier in January?  Around January 11th?

14  A    Uh, I -- I don't recall specifically.

15         MR. RUKAVINA:  Mr. Vasek, if we could pull up the

16  Form CLO agreement.  What exhibit is that?

17      (Pause.  Counsel confer.)

18         MR. RUKAVINA:  No, that's not.

19         THE COURT:  Can I ask what we're about to start

20  doing?

21         MR. RUKAVINA:  Eight.

22         THE COURT:  Can I ask what we are about to start

23  doing?

24         MR. RUKAVINA:  Your Honor, I apologize.  I'm trying

25  to find one of the CLO portfolio management agreements.  I'm

Post - Direct                                      231

 1  trying to pull it up for you.

 2          THE COURT:  Okay.

 3          MR. RUKAVINA:  It should be in your binder.

 4          THE COURT:  All right.  Well, --

 5          MR. RUKAVINA:  Where is it, Julian?

 6          MR. VASEK:  It should be 8.

 7          MR. RUKAVINA:  I'm sorry?

 8          MR. VASEK:  8.

 9          MR. RUKAVINA:  Your Honor, it's Exhibit 8 in your

10  binder.

11          THE COURT:  Exhibit --

12  BY MR. RUKAVINA:

13  Q    And Mr. Post, you have that in front of you, right?

14          MR. RUKAVINA:  Mr. Vasek, if you'll go to Page 14,

15  please.  Section 14.  Termination by the Issuer for Cause.

16          MR. VASEK:  Okay.

17          MR. RUKAVINA:  Your Honor, the contract speaks for

18  itself, and I'm not about to read the contract to the Court.

19  The Court can read.  I want to ask him certain questions about

20  this.  And you'll note that the contract gives the requisite

21  holders of voting preference shares certain rights.

22          MR. MORRIS:  Your Honor, respectfully, the witness

23  has testified that he hadn't seen any of these contracts for

24  five or six years, until the lawyers asked him to look at it,

25  and they told him which specific provisions to look at.

Post - Direct                              232

1        The document does speak for itself.  Counsel should just

2    make it part of his closing argument.  There's no evidence

3    that there's a quote/unquote Form CLO Management Agreement.

4    And I would just respectfully suggest that this is better

5    saved for closing argument.

6            THE COURT:  Yes.  What are we going to do here?  He

7    did not seem like he was an expert on these CLOs in his

8    earlier testimony.  He hadn't read much of them until

9    recently.  So where are we going with this?

10           MR. RUKAVINA:  Well, Your Honor, the question, again,

11   is -- can you hear me?  The question again is, Are we going to

12   be enjoined from exercising any rights in the future, so I

13   would like to take the witness through the importance from a

14   regulatory perspective and a fiduciary perspective of some of

15   these rights.  If Your Honor thinks that that's for closing

16   argument, that's fine.  But I will note that that Your Honor

17   allowed Mr. Morris for some forty minutes to read prior

18   testimony into the record.

19           MR. MORRIS:  I'm happy to respond if Your Honor needs

20   me to.

21           THE COURT:  Go ahead.

22           MR. MORRIS:  There is a complete difference, Your

23   Honor.  To read statements against interest, to read defense's

24   own sworn statements that they made at a prior proceeding, as

25   opposed to trying to get a witness who has admitted that he's

Post - Direct                         233

1   not familiar with these documents, to try to convince the

2   Court that they said something that the witness doesn't have

3   any personal knowledge or expertise about.  It's completely

4   different.

5           THE COURT:  All right.  I sustain the objection.  You

6   can make whatever argument you want in the closing arguments

7   about whatever provisions of whichever CLO agreements justify

8   actions.  I guess that's where we're going.

9           MR. RUKAVINA:  Then, if you could pull up Exhibit 78,

10  and if Your Honor could turn to Exhibit 78.

11          THE COURT:  All right.

12          MR. RUKAVINA:  Is this a confidential -- Julian, what

13  does it mean, it's confidential?  78.  Is this confidential?

14          MR. VASEK:  It says confidential on the --

15          MR. RUKAVINA:  Your Honor, apparently this is a

16  confidential document, so how does the Court want to proceed

17  on this WebEx?

18          THE COURT:  All right.  We're stopping.  We're

19  stopping.  We have protocols in place in this case, and people

20  usually file motions to present things under seal or

21  redactions.  My patience is shot, so we're going to stop.

22  Let's talk about where we go from here.

23          MR. MORRIS:  If I may, Your Honor?

24          THE COURT:  Yes.

25          MR. MORRIS:  John Morris from Pachulski Stang --

234

1          THE COURT:  Uh-huh.

2          MR. MORRIS:  -- for the Debtor.

3          MR. RUKAVINA:  We filed this under seal, right?

4          MR. MORRIS:  We were --

5          MR. RUKAVINA:  Oh, I thought we had.

6          MR. MORRIS:  -- hoping that we would get this

7    finished today, Your Honor, and the Debtor was really hoping

8    to get a ruling before confirmation.  But given all that's in

9    front of us, including the contempt hearing next Friday, just

10   a couple of days after the confirmation hearing, I think the

11   Debtor at this point is prepared to agree, if it's okay with

12   the Defendants' counsel, to push this to the following week,

13   since the -- you know, with the understanding that everybody

14   stipulate on the record that the TRO stays in place.  And if

15   we could have this particular motion heard, I guess, somewhere

16   -- it's the week of February 8th, the Debtor would consent to

17   that.

18          THE COURT:  All right.  Do we already have a --

19          MR. RUKAVINA:  Your Honor, can the Court --

20          THE COURT:  -- setting that week?  Because I know we

21   have confirmation, what, are we set for the 2nd, 3rd, and 4th?

22   Three days next week.

23          MR. MORRIS:  I believe -- yeah.  I think it's just

24   two, Your Honor.  I think --

25          THE COURT:  Okay.

235

  1          MR. MORRIS:  -- confirmation is the 2nd and the 3rd,

  2   and then I think the 5th is the contempt hearing.  I'm not

  3   aware, but I don't -- I don't profess to know the entirety of

  4   the calendar.  I'm not aware of anything that's on for the

  5   following week.

  6          THE COURT:  Does it make sense to continue this to

  7   the 5th?  Because the issues are so overlapping here.  I feel

  8   like it's been a contempt hearing half of today, actually.

  9          MR. MORRIS:  Yeah.

 10          THE COURT:  So, shall we just set it for -- is it

 11   Friday, the 5th?

 12          MR. MORRIS:  It is.

 13          THE COURT:  At 9:30?

 14          MR. MORRIS:  And I think that's a great idea, yeah.

 15   Yeah.

 16          THE COURT:  What do you want to say about that, Mr.

 17   Rukavina?

 18          MR. RUKAVINA:  Thank you, Your Honor.  We're fine

 19   with that.

 20      Let me just point out, so that if the Court is impatient

 21   or frustrated, we did move Exhibit 78 to be filed under seal.

 22   The Court did enter an order allowing it to be filed under

 23   seal.  So that the Court doesn't think that somehow we were

 24   negligent in that.

 25      But February the 5th works for us.

236

 1           THE COURT:  Okay.  All right.  So I have an

 2    unredacted clean copy up here, which, if and when I admit it,

 3    we will put it under seal in our exhibit room, or I guess our

 4    electronic exhibit room.

 5       So, we'll come back on the 5th at 9:30.  But I am not -- I

 6    am not done.  Yes, I am frustrated.  Yes, I'm impatient.  I

 7    have asked myself "Why are we here?" so many times today.  Why

 8    are we here?  I mean, I've had this conversation before.  I

 9    mean, we had a, as you know, a very lengthy hearing on the

10    motion for a TRO or preliminary injunction against Mr. Dondero

11    personally.  And I think it was Mr. Morris who said, it's a

12    little bit like Groundhog Day.  You know, that was actually a

13    more flattering way of describing it than I might have.  I

14    might have said this is reminding me of Albert Einstein's

15    definition of insanity.  You all know what I'm talking about?

16    When you're doing the same thing over and over again and

17    expecting a different result.

18       And, you know, no offense, Mr. Dondero, if you're still

19    there listening, but that's what it feels like to me.  I mean,

20    it is -- it's the same thing over and over again.  And we've

21    spent very, very, very little time talking about the January

22    9th, 2020 corporate governance settlement agreement.  Of

23    course, it was mentioned extensively in the pleadings, at

24    least by the Debtor.  But, you know, I've heard all of this

25    evidence today, and I'm going to hear more evidence,

Appx. 03659
016212

1   apparently, on the 5th.  But Paragraph -- was it 9? --

2   Paragraph 9 of the January 9th, 2020 settlement agreement.

3   The order directed Mr. Dondero not to "cause any related

4   entity to terminate any agreements with the Debtor."

5       And, you know, I thought to myself as I was reading,

6   preparing for this hearing, that, you know, I seem to remember

7   those words meant so, so much to me.  And then this reply

8   brief was filed by the Debtor at 6:00 or 7:00 o'clock last

9   night, and it gave an excerpt of the transcript, the hearing

10  where I approved this corporate governance settlement

11  agreement, and I said, that language is so important to me

12  because of my history in the *Acis* case, I want it in the

13  order.  I don't even -- I don't want it merely in the term

14  sheet, and then, of course, the order cross-references,

15  approves the term sheet.  I want that in the order.  Because,

16  you know, I knew, even with this highly-qualified independent

17  board of directors, and even with this very sophisticated

18  Creditors' Committee with very sophisticated professionals

19  monitoring everything that happened, and having not just the

20  monitoring rights but the standing to pursue things, I knew,

21  even with this great system that had been negotiated in the

22  January term sheet, there was the possibility of things

23  happening through Dondero-controlled entities indirectly.  And

24  so that's why we had that Paragraph 9.  So, --

25      (Interruption.)

238

1            THE COURT:  I don't know what that was I just heard,

2    but someone needs to put me on mute.

3        So, I mean, we've heard a lot.  We've heard a lot, but --

4            MR. DONDERO:  Hello?  Your Honor?  Your Honor?

5            THE COURT:  Okay.  I --

6            MR. DONDERO:  Hi.  Jim Dondero.

7            THE COURT:  Oh, okay.  I'm still talking.  I'm still

8    talking.  But I --

9            MR. DONDERO:  Okay.

10           THE COURT:  But I said --

11           MR. DONDERO:  I'm sorry.

12           THE COURT:  I said at the hearing on the preliminary

13   injunction as to Mr. Dondero personally, do you remember what

14   I said, I said life changed when you put your company in

15   Chapter 11.  And, you know, even if you had stayed on as

16   president of the Debtor, life changed.  Okay?  Because you're

17   a debtor-in-possession.  You have to say, "Mother, may I?" to

18   the Court.  Creditors get to object to things.  So things

19   changed.

20       But things really, really, really changed, you know, they

21   changed in October 2019, and then they changed dramatically in

22   January 2020, when independent board members were put in place

23   and you were taken out of management.

24       So, the reason I'm coming back to that concept is this:

25   I've heard a lot about the preferred shareholders didn't like

239

       1    the trades Mr. Seery was implementing, the sale of AVYA, the

       2    sale of SKY.  They didn't like it.  Well, I mean, I hate to

       3    say something flippant like tough luck, but really:  Tough

       4    luck.  Okay?  We all know that with a company like this, with

       5    a company like Acis, it's complicated, right?  Because you've

       6    got a fiduciary duty to your creditors to maximize value of

       7    the estate so creditors get paid in Chapter 11, right?  But

       8    meanwhile, you know, you've got to have fiduciary duties, I

       9    don't know if it's directly to preferred shareholders or just

      10    to the CLOs.  But whatever it is, you know, there may be

      11    differing views that individual preferred shareholders have.

      12    But Mr. Seery is in charge.  The Debtor is in charge.  You

      13    don't like it, I'm sorry, but he's in charge.

      14        So, you know, I thought, am I going to come in here today

      15    and see all kinds of specific contractual references, where, I

      16    don't know, somehow you have an argument that you can control

      17    buys and sells?  Of course, in this case, it would just be

      18    sells at this point.  You know, no.  I knew I wasn't going to

      19    see that.  And I haven't.

      20        So I don't know what I'm going to hear more on the 5th

      21    that is going to tilt me a different way, but right now, if I

      22    had to rule right now, this would be a total no-brainer to

      23    issue this preliminary injunction.  Okay?  I feel like it's

      24    been teed up almost like find Dondero in contempt, find these

      25    entities in contempt.  What I'm here on today is whether I

240

1   should issue a preliminary injunction, and the December

2   letters, the emails, the communications, they lead me to

3   believe that this preliminary injunction is needed because

4   someone doesn't understand that Mr. Seery is in charge and the

5   preferred shareholders, the Funds, the Advisors, they don't

6   have the ability to interfere with what he's doing in running

7   the company.

8       And the threats of we're going to, you know, direct -- we

9   may direct the CLO Issuer to terminate the Debtor:  I mean,

10  it's just -- there's no sound business justification for that.

11  Okay?  I don't know what we're doing, where we're going.

12      Mr. Dondero, I said to you in December, you know, I really

13  wanted to encourage good-faith negotiations on your possible

14  pot plan because I thought you wanted to save your baby.  But

15  the more I hear, the more I feel you're just trying to burn

16  the house down.  Okay?  Maybe it's an either/or proposition

17  with you:  I'll either get my company back or I'll burn the

18  house down.  That's what it feels like.  And I have no choice

19  but to enter preliminary injunctions with this kind of

20  behavior.

21      So, I'm very frustrated.  I'm very frustrated.  I don't

22  know if anyone wants to say anything or we just end it on this

23  frustrating note.

24      Mr. Rukavina, did you want to let your client speak, or

25  no?

241

```
 1            MR. RUKAVINA:  Your Honor?

 2            THE COURT:  Not your client.

 3            MR. RUKAVINA:  No, but --

 4            THE COURT:  The client representative.

 5            MR. RUKAVINA:  Your Honor, I take issue with what the

 6   Court has said, but we did file a motion yesterday to file a

 7   plan under seal.  It is -- Mr. Dondero, can you mute your

 8   phone?  The Court should have seen that by now.  It is a pot

 9   plan with much more cash consideration.  We have discussed it

10   with the Debtor and the Committee.  We are in earnest

11   negotiations.  I have no reason to believe or disbelieve that

12   we're close to a settlement.

13       But recall what I said at the beginning.  We asked the

14   Debtor to continue this hearing.  We said, You have a TRO that

15   ends February the 15th.  Why are you doing this?  Well, the

16   Debtor did it to smear Mr. Dondero on a very carefully crafted

17   record, without telling you the other half of it.  And when I

18   tried to have Mr. Post explain it, opposing counsel won't let

19   me even tell you our views.  So there is a competing plan.  We

20   want to try --

21            THE COURT:  You tried to get him to testify about

22   comments to CFRs when he has shown no expertise whatsoever --

23            MR. RUKAVINA:  That's fine.

24            THE COURT:  -- to permit that.

25            MR. RUKAVINA:  And I understand, Your Honor.  I don't
```

016217

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-11   Filed 04/25/25   Page 539 of 1052   PageID 17217
Exhibit 29   Page 246 of 258

242

1   want -- Your Honor has made her evidentiary rulings.  I'm not

2   here to second-guess them.

3       I'm telling you that Mr. Dondero -- and more importantly,

4   the other companies, *i.e.*, NexPoint -- we heard you loud and

5   clear.  We did not just send forward some cocktail-napkin term

6   sheet.  I spent the weekend and Friday preparing a

7   comprehensive plan and disclosure statement.  I hope that the

8   Court will allow it to be filed under seal.  Exclusivity has

9   expired.  I am asking to file it under seal only.

10          THE COURT:  Tell me what utility that has.  What

11   utility does that have if you don't have one plan supporter?

12   I mean, where are we going with this?  I have invited, I have

13   encouraged, I have directed good-faith negotiations with the

14   Committee.  If you don't have the Committee on board, what

15   utility is there in allowing you to file a plan under seal?

16          MR. RUKAVINA:  Well, if it's filed under seal, Your

17   Honor, then, really, no one is going to be prejudiced or hurt.

18   But we have not been told --

19          THE COURT:  Then why --

20          MR. RUKAVINA:  -- from the Committee --

21          THE COURT:  Then why are we doing it?  Help me to

22   understand the strategy.  Maybe I'm just naïve.

23          MR. RUKAVINA:  Your Honor, there is no strategy and

24   the Court is not naïve.  Pursuant to an agreement of the

25   Committee and the Debtor, I sent that draft plan to them over

243

 1   the weekend, and they agree it's not solicitation.  It has not

 2   gone to the creditors.  No one has seen it.

 3       The reason why we sent it to the Committee and the Debtor

 4   was to foster ongoing negotiations.  We had negotiations last

 5   night.  The Committee and the Debtor had negotiations last

 6   night.  We've been promised a response in the next couple of

 7   days, and we have a follow-up meeting scheduled for Thursday.

 8       The reason why I wanted the plan filed under seal is so

 9   that there is a record of what is being discussed so the U.S.

10   Trustee can see it, if she wants to, and so that other key

11   constituents, if they want to or have a reason to, can see it.

12       But I agree with you:  That plan ain't going nowhere if we

13   don't have some material creditor support.  We won't know that

14   for a couple more days.

15       So my only point in saying this to Your Honor is that we

16   are working earnestly, we are increasing our consideration, we

17   have heard you loud and clear, and all the parties are

18   negotiating.

19       Again, we did not want this hearing to happen today

20   because it's a step backwards from negotiations, not a step

21   forward.  Thank you.

22           MR. POMERANTZ:  Your Honor, may I be heard?

23           THE COURT:  Go ahead, Mr. Pomerantz.  Go ahead.

24           MR. POMERANTZ:  Mr. Rukavina sent us over the plan,

25   and we had no problem with it being sent to the Committee.  He

244

1    then sent us over the motion.  Now, aside from the fact that

2    the motion contains some statements which the Debtor strongly

3    disagrees with, with respect to the ability of administrative

4    claims or other claims to be assumed, but putting that aside,

5    we were concerned that the filing of a plan on the docket,

6    unsealed, would be a distraction.

7        Having said that, we also saw utility in the plan being

8    put in the hands of the largest creditors so that they can

9    evaluate what was being proposed.

10       We told Mr. Rukavina we have no problem if the plan was

11   filed under seal, stayed under seal until after confirmation,

12   and then, in exchange, we would agree to something that we

13   don't think we had to agree:  That he could send the plan to

14   UBS, to Acis, to Redeemer, to Meta-e, to HarbourVest, and

15   Daugherty.  Essentially, all the players in the case.  Mr.

16   Rukavina said he would consider that, and then just filed his

17   motion.

18       We don't have any problem with him doing that still,

19   sending it to the six creditors so they can look at it.  We

20   don't think it should be unsealed on the docket.

21       And the discussion of status of negotiations, Your Honor,

22   as we've told you many times before, we would love there to be

23   a plan.  We would love there to be support of a plan.  Mr.

24   Dondero asked to approach the board and speak to the board

25   yesterday.  We heard him out.  The plan essentially is the

245

1    same document and the same term sheet, I think, that has been

2    floating around for several weeks.

3        Having said that, we said, We are not going to stand in

4    the way of Mr. Dondero and the Creditors' Committee.  And if

5    the Creditors' Committee and Mr. Dondero have a meeting of the

6    minds, if there's any desire of them to have more time, we

7    would be supportive of it.  I'll let Mr. Clemente respond as

8    to whether there's any negotiation -- (echoing.)  But when Mr.

9    Rukavina said that last night there were negotiations between

10   the Debtor and Mr. Dondero, that's just not accurate.  We, we

11   look at ourselves as the honest broker.  But at the end of the

12   day, as Your Honor has remarked many times throughout this

13   case and just remarked a few moments ago, unless the

14   Creditors' Committee supports this plan, it is DOA.  And we

15   have communicated that several times to Mr. Dondero and his

16   team.

17       So, I just wanted to speak to correct the record.  We're,

18   again, supportive of a plan if there can be one.  But at this

19   point, we haven't seen anything, the parties coming any closer

20   or any more negotiations, and we just have to get confirmed

21   sooner rather than later (echoing), prepared to go forward.

22           MR. CLEMENTE:  Your Honor, it's Matt Clemente at

23   Sidley.  I'm happy to make some comments to Your Honor, --

24           THE COURT:  Okay.

25           MR. CLEMENTE:  -- if you -- if you wish.

246

```
 1              THE COURT:  Please do.
 2              MR. CLEMENTE:  I think it's fair to say that the
 3    Committee believes the plan needs to go forward next week,
 4    Your Honor.  We have, of course, taken your direction very
 5    seriously, and we very seriously consider all of the
 6    communications we get from Mr. Dondero.  There exists still a
 7    material value gap in what is being offered under Mr.
 8    Dondero's plan, as well as a quality of the value.
 9         So, Your Honor, while we continue to consider the plan and
10    what we receive from Mr. Dondero, I do not want to leave Your
11    Honor with the impression that the Committee feels like we are
12    close to an agreement, and we anticipate going forward with
13    the plan next week.
14         That being said, we of course will respond to Mr. Dondero
15    as we review the plan, but as I sit here today, I don't
16    believe that we are close.  But, again, the Committee will
17    continue to review it, and we should anticipate going forward
18    with confirmation next week.
19              THE COURT:  All right.  So, you don't have any
20    problem with the plan being filed under seal?
21              MR. CLEMENTE:  Your Honor, we -- the Committee does
22    have the plan, and I guess I'm not sure I'd see the point of
23    having it filed it under seal.  I think it serves to confuse
24    issues.  But, you know, hearing what Your Honor said earlier,
25    I don't think we need to continue to bring different fights in
```

016222

1  front of Your Honor, so I'm not sure that I see necessarily

2  the harm in a plan being filed under seal, again, with the

3  idea that, you know, why bring -- continue to bring fights to

4  Your Honor if we don't need to?

5          THE COURT:  All right.

6          MR. CLEMENTE:  But what I do think is clear, Your

7  Honor, that I do want to express to you is that the

8  representations in that motion the Committee do not believe

9  are accurate.  We do not believe that there's been a

10  significant value increase.  We do not believe that we are

11  close.  That would be the point that I would make in

12  connection with a response to that motion.  So, but in terms

13  of filing it under seal, I'm not sure the Committee has a

14  strong feeling that that should not happen.

15          THE COURT:  Yes.

16          MR. RUKAVINA:  And Your Honor, very quickly, --

17          THE COURT:  The words --

18          MR. RUKAVINA:  -- I never represented that we're

19  close.

20          THE COURT:  The words I remember in the motion were

21  significant value increase, something to that effect.  But

22  also more recovery than the plan that's on file.

23      (Echoing.)

24          THE COURT:  So I was kind of darn curious to see it

25  just for that.

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11 Exhibit 29   Filed 04/25/25   Page 249 of 258   Page 545 of 1052   PageID 17223

248

1          MR. RUKAVINA:  And Your Honor, obviously, because

2     there's many people on this call, I don't want to run afoul of

3     any kind of procedures.  I'd be happy to walk Your Honor

4     through, but I can't, not with 90 people on the call.

5          THE COURT:  Right.

6          MR. RUKAVINA:  I did not represent that we're close

7     to a settlement in that motion, and I did not send the plan to

8     those people that Mr. Pomerantz mentioned.

9        So, right now, the Committee, the Debtor, and the

10    employees, because they requested it after Mr. Pomerantz

11    approved it, have what I would like to file under seal.  I'm

12    not suggesting here today that it go any farther than being

13    filed under seal, but at least it be there for some record.

14         THE COURT:  Well, didn't you -- did I dream this? --

15    didn't you say that there would be something like 48 hours for

16    people to object or then it would be filed not under seal?

17    Did I dream that?

18         MR. RUKAVINA:  Your Honor, that was my proposal, and

19    Your Honor can certainly reject that.  Mr. Pomerantz asked

20    that the plan should never be unsealed pending confirmation of

21    the Debtor's plan.  I have a different proposal.  Your Honor

22    will rule and we'll comply with Your Honor's ruling.

23         MR. DONDERO:  Jim Dondero here.  Can I have two --

24    two quick minutes and just say two quick things?

25         THE COURT:  Well, only if your counsel permits it.  I

016224

249

1   don't want to get in --

2       MR. RUKAVINA:  I just don't -- yeah.  Mr. Dondero, if

3   you would please just not describe the substance, the economic

4   substance of our proposed plan, not with so many people on the

5   line.

6       MR. DONDERO:  Sure.  I just want to make two quick

7   points.  I couldn't apologize more for taking the Court's time

8   today.  It wasn't our 'druthers.  You heard, I think, at least

9   five or six hours from the Debtor.  You never once heard them

10  say that their activities didn't violate the Advisers Act.

11  And they never once said that violating the Advisers Act

12  wasn't a big deal.  You know, they never said that.

13      What they tried to say, oh, we have these other contracts.

14  Let's try and turn this into an injunction against Dondero

15  interfering.  But they never -- they never denied that Dondero

16  and the NexPoint team was trying to do what was in the best

17  interest of investors and that they had violated the Advisers

18  Act.

19      I think, in normal course, each side would have had an

20  expert and you could have opined on whether it was a violation

21  of the Advisers Act, but they know they did something wrong so

22  they're trying to make it an injunction against me.   Okay.

23  That's all I have to say about that point.

24      As far as the alternative plan, Your Honor, we heard you

25  loud and clear.  And the economics that we put forward, I

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-129   Filed 03/25/25   Page 547 of 1052   PageID 17225
Exhibit 129   Page 250 of 258

250

  1   can't talk them about specifically, but they're at least 20
  2   percent better than what the Debtor has put forward as far as
  3   a plan.  And what we put forward is elegant, it's simpler, it
  4   treats the employees fairly, it gives the business continuity,
  5   it gives investors continuity, and it's not just a harsh,
  6   punitive liquidation that's going to end up in a myriad of
  7   litigation.
  8       We're paying a premium, it's a capitulation price, to try
  9   and get to some kind of settlement.  And I encourage you to
 10   look at it.  It's elegant.  It's straightforward.  It's
 11   simple.  And now that you've encouraged and gotten us up to a
 12   number that's well in excess of the Debtor, maybe a little
 13   pressure on other people to treat employees fairly, maybe not
 14   liquidate a business that's important in Dallas, that has been
 15   a big business for a number of years, doing enormous good
 16   things for a lot of people.
 17       You know, we went into bankruptcy with $450 million of
 18   assets and almost no debt.  And we've been driven into the
 19   ground by the process.  And then the plan is to just harshly
 20   liquidate going forward.  I -- I -- it's crazy.  I don't know
 21   what else to do to stop the train other than what we've
 22   offered.
 23           THE COURT:  All right.  Well, I hear what you're
 24   saying, and I do, just because -- I don't know if you left the
 25   room or not, but we did have discussion of Section 206 of the

Case 19-34054-sgj11   Doc 3596-29   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11  Filed 05/23/25   Page 548 of 1052   PageID 17226
Exhibit 29   Page 252 of 258

251

1   Investment Advisers Act today.  It was put on the screen.  Mr.

2   Post was asked what was unlawful as far as what had happened

3   here, what was going on here, what was fraudulent, deceptive,

4   or manipulative, in parsing through the words of the statute.

5   And he said Mr. Seery engaged in deceptive acts because he

6   wasn't trying to maximize value.  Okay?  I'm not an expert on

7   the Investment Advisers Act, but I know that that was not a

8   deceptive act.

9        And so I'll allow the plan to be filed under seal, but

10  it's not going to be unsealed absent an order of the Court.

11  Okay?  So we'll just leave it at that for now.  And while I

12  still encourage good-faith negotiations here, I've said it

13  umpteen times, where you're tired of the cliché, probably:

14  The train is leaving the station.  And if you want the Court

15  to have patience in the process and if you want the parties to

16  cooperate in good faith, it might help if we didn't have

17  things like Dugaboy and Get Good Trust filing a motion for an

18  examiner 15 months into the case.

19       I mean, it feels to me, Mr. Dondero, whether I'm right or

20  wrong, that it's like you've got a twofold approach here:  I

21  either get the company back or I burn the house down.  And I'm

22  telling you right now, if we don't have agreements, --

23            MR. DONDERO:  That's not true.

24            THE COURT:  -- if we don't have agreements and we

25  come back on the 5th for a continuation of this hearing and a

252

1   motion to hold you in contempt, you know, I'm leaning right

2   now, based on what I've heard so far, and I know I haven't

3   heard everything, but I'm leaning right now towards finding

4   contempt and shifting a whole bundle of attorneys' fees.

5   That, to me, seems like the likely place we're heading.

6       I mean, I commented at the December hearing on the

7   preliminary injunction against you personally that it had been

8   like a $250,000 hearing, I figured, okay, just guesstimating

9   everybody's billable rate times the hours we spent.  Well,

10  here we were again, and I know we've got all this time outside

11  the courtroom preparing, taking depositions.  I mean, what

12  else is a judge to think except, by God, let's drive up

13  administrative expenses as much as we can; if we can't win,

14  we're going to go down fighting?  That's what this looks like.

15  Okay?  So if it's not really what's going on, then you've got

16  to work hard to change my perceptions at this point.

17          MR. RUKAVINA:  Your Honor, I hear everything what

18  you're saying, and I'm going to discuss it very bluntly with

19  my clients.  But we're being asked not to exercise contract

20  rights in the future.  This is not a contempt hearing.  And

21  Your Honor, we did ask and offered the estate a million

22  dollars, found money, plus to waive almost all our plan

23  objections, if they would just put this case on pause for 30

24  days.

25      So we are trying.  We are trying creative solutions here.

253

 1   We know that the train is leaving.  We've put our money where
 2   our mouth is.  We will continue trying.  But Your Honor, this
 3   is not a contempt proceeding, and my clients are not Mr.
 4   Dondero.  You've heard they're independent boards.
 5        MR. POMERANTZ:  I can't leave that last comment
 6   without a response.  Yes, there was an offer of a million
 7   dollars, by an entity that owes the estate multiples of that.
 8   So they are offering to pay us something that they already owe
 9   us.  So Mr. Rukavina continues try to do this.  We will not
10   stand for it.
11        MR. RUKAVINA:  That is not a fair statement, sir.  I
12   misrepresented nothing.  We were offering you a million
13   dollars, with no conditions, earned upon receipt, with no
14   credit, no deduction for any of our liability.  So you're free
15   to say no, sir, but you're not going to tell the judge that I
16   misrepresented something.
17        THE COURT:  All right.
18        MR. POMERANTZ:  Should tell the Court --
19        THE COURT:  You know what?
20        MR. POMERANTZ:  -- that that entity owed the Debtor.
21        THE COURT:  You know what?  You know what?  I am more
22   focused on, Mr. Rukavina, your comment that this Court can't
23   enjoin your clients from exercising contractual rights when,
24   again, in January of 2020, the representation was made and it
25   was ordered, "Mr. Dondero shall not cause any related entity

254

1    to terminate any agreements with the Debtor."  Okay?  That was

2    -- go back and look at the transcript.  That was so meaningful

3    to me.

4        We were facing a possible trustee.  And that's what I did

5    in the *Acis* case.  Okay?  I had a Chapter 11 trustee.  And it

6    was not a perfect fit, to be sure.  But it is where we were

7    heading in this case, had the lawyers and parties not

8    negotiated what they did.  That was a very important

9    provision, convincing me that, you know what, I think the

10   structure they've got will be better than a trustee.  And it

11   has, for the most part.  But the fees have gone out the roof,

12   and I lay that at the feet of Mr. Dondero, for the most part.

13   Okay?  We have a bomb thrown every five minutes by either him

14   personally or the Dugaboy or the Get Good Trust or the Funds

15   or the Advisors or I don't know who else.  Okay?

16       So the train is leaving the station, unless you all come

17   to me and say, okay, we've maybe got a -- Mr. Pomerantz's word

18   -- grand solution here.  Okay?  If you get there in the next

19   few days, wonderful.  Okay?  But I don't know what else to say

20   except I'm tired of the carpet-bombing, and if I had to rule

21   this minute, there would be a huge amount of fee-shifting for

22   what we went through today, for what we went through in

23   December, for the restriction motion that, after I called it

24   frivolous, the lawyers were sending letters pretty much

25   regurgitating the same arguments.  All right.  So, not a happy

255

1  camper.

2      But upload your order on the motion to seal the plan.

3  And, again, it's not going to be unsealed absent a further

4  order of the Court.  And if you all come to me next week and

5  say, hey, we've got something in the works here, okay, I'll

6  consider unsealing it and letting you go down a different

7  path.  But I'm not naïve.  I feel like this is just more

8  burning the house down, maybe.  I don't know.  I hope I'm

9  wrong.  I hope I'm wrong.  But all right.  So I guess we'll

10  see you next week.

11          MR. POMERANTZ:  Thank you, Your Honor.

12          MR. MORRIS:  Thank you, Your Honor.

13          THE COURT:  All right.  We're adjourned.

14          MR. RUKAVINA:  Thank you, Your Honor.

15          THE CLERK:  All rise.

16      (Proceedings concluded at 6:08 p.m.)

17                      --oOo--

18

19

20                    CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                        01/28/2021

24  _____      _____

    Kathy Rehling, CETD-444                      Date
25  Certified Electronic Court Transcriber

256

INDEX

PROCEEDINGS                                                           4

OPENING STATEMENTS

- By Mr. Morris                                                      19
- By Mr. Rukavina                                                    31

WITNESSES

<u>Debtor's Witnesses</u>

James P. Seery
- Proffer of Direct Testimony by Mr. Pomerantz                       6

James D. Dondero
- Direct Examination by Mr. Morris                                  42

Jason Post
- Direct Examination by Mr. Morris                                 108

James P. Seery, Recalled
- Direct Examination by Mr. Morris                                 152
- Cross-Examination by Mr. Hogewood                                170
- Redirect Examination by Mr. Morris                               188
- Examination by the Court                                         191

<u>Defendants' Witnesses</u>

Jason Post
- Direct Examination by Mr. Rukavina                               201
  *Voir Dire* Examination by Mr. Morris                            206
  Direct Examination, Resumed, by Mr. Rukavina                     207

EXHIBITS

Debtor's Exhibits A through SSSSS *(exclusive of*   Received  19
  *Exhibits UUUU, VVVV, and AAAAA)*
Debtor's Exhibit D (Email)                          Received 200
Debtor's Exhibit K (Letter)                         Received 198
Debtor's Exhibit TTTTT                              Received  64

257

INDEX
Page 2

RULINGS

19-34054-sgj11 - Highland Capital Management, L.P.

    Motion of the Debtor for Entry of an Order                    12
    Authorizing the Debtor to Implement a Key Employee
    Retention Plan with Non-Insider Employees and
    Granting Related Relief filed by Debtor Highland
    Capital Management, L.P. (1777) - *Granted*


21-03000-sgj - Highland Capital Management, L.P. v.
Highland Capital Management Fund Advisors, L.P. et al.

    Agreed Settlement with CLO Holdco, Ltd.                       15

    Plaintiff's Motion for a Preliminary Injunction              233
    against Certain Entities Owned and/or Controlled
    by Mr. James Dondero (5) - *Continued*

END OF PROCEEDINGS                                                255

INDEX                                                        256-257

# EXHIBIT 30

Appx 03672

016234

```
                     IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                               )      Case No. 19-34054-sgj-11
 3   In Re:                    )      Chapter 11
                               )
 4   HIGHLAND CAPITAL          )      Dallas, Texas
     MANAGEMENT, L.P.,         )      Monday, February 8, 2021
 5                             )      9:00 a.m. Docket
                               )
 6          Debtor.           )
                               )      BENCH RULING ON CONFIRMATION
 7                             )      HEARING [1808] AND AGREED
                               )      MOTION TO ASSUME [1624]
 8   _____)
                         TRANSCRIPT OF PROCEEDINGS
 9            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.
10
     WEBEX APPEARANCES:
11
     For the Debtor:            Jeffrey Nathan Pomerantz
12                              PACHULSKI STANG ZIEHL & JONES, LLP
                                10100 Santa Monica Blvd.,
13                                13th Floor
                                Los Angeles, CA  90067-4003
14                              (310) 277-6910

15   For the Official Committee Matthew A. Clemente
     of Unsecured Creditors:    SIDLEY AUSTIN, LLP
16                              One South Dearborn Street
                                Chicago, IL  60603
17                              (312) 853-7539

18   For James Dondero:         D. Michael Lynn
                                John Y. Bonds, III
19                              Bryan C. Assink
                                BONDS ELLIS EPPICH SCHAFER
20                                JONES, LLP
                                420 Throckmorton Street,
21                                Suite 1000
                                Fort Worth, TX  76102
22                              (817) 405-6900

23   For Get Good Trust and     Douglas S. Draper
     Dugaboy Investment Trust:  HELLER, DRAPER & HORN, LLC
24                              650 Poydras Street, Suite 2500
                                New Orleans, LA  70130
25                              (504) 299-3300
```

2

```
 1   APPEARANCES, cont'd.:

 2   For Certain Funds and        Davor Rukavina
     Advisors:                    MUNSCH, HARDT, KOPF & HARR
 3                                500 N. Akard Street, Suite 3800
                                  Dallas, TX  75201-6659
 4                                (214) 855-7587

 5   For Certain Funds and        A. Lee Hogewood, III
     Advisors:                    K&L GATES, LLP
 6                                4350 Lassiter at North Hills
                                    Avenue, Suite 300
 7                                Raleigh, NC  27609
                                  (919) 743-7306
 8
 9   Recorded by:                 Michael F. Edmond, Sr.
                                  UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
10                                Dallas, TX  75242
                                  (214) 753-2062
11
12   Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
                                  Shady Shores, TX  76208
13                                (972) 786-3063

14

15

16

17

18

19

20

21

22

23

24
              Proceedings recorded by electronic sound recording;
25               transcript produced by transcription service.
```

016236

3

|  | |
|--|--|
| 1 | DALLAS, TEXAS - FEBRUARY 8, 2021 - 9:08 A.M. |
| 2 | THE COURT:  Please be seated. |
| 3 | (Beeping.) |
| 4 | THE COURT:  Someone needs to turn off their whatever. |
| 5 | All right.  Good morning.  This is Judge Jernigan, and we |
| 6 | have scheduled today a bench ruling regarding the Debtor's |
| 7 | plan that we had a confirmation trial on last week.  This is |
| 8 | Highland Capital Management, LP, Case No. 19-34054. |
| 9 | Let me first make sure we've got Debtor's counsel on the |
| 10 | line.  Do we have -- |
| 11 | MR. POMERANTZ:  Yes. |
| 12 | THE COURT:  -- Mr. Pomerantz? |
| 13 | MR. POMERANTZ:  Yes, Your Honor.  Good morning, Your |
| 14 | Honor.  Jeff Pomerantz; Pachulski Stang Ziehl & Jones; on |
| 15 | behalf of the Debtor. |
| 16 | THE COURT:  Okay.  Good morning.  Do we have the |
| 17 | Creditors' Committee on the phone? |
| 18 | MR. CLEMENTE:  Good morning, Your Honor.  Matthew |
| 19 | Clemente of Sidley Austin on behalf of the Creditors' |
| 20 | Committee. |
| 21 | THE COURT:  Good morning.  All right.  We had various |
| 22 | Objectors.  Do we have Mr. Dondero's counsel on the phone? |
| 23 | MR. LYNN:  Yes, Your Honor.  Michael Lynn, together |
| 24 | with John Bonds and Bryan Assink, for Jim Dondero. |
| 25 | THE COURT:  Good morning.  For the Trusts, the |

4

1  Dugaboy and Get Good Trusts, do we have Mr. Draper?

2          MR. DRAPER:  Yes.  Douglas Draper is on the line,

3  Your Honor.

4          THE COURT:  Good morning.  Now, for what I'll call

5  the Funds and Advisor Objectors, do we have Mr. Rukavina and

6  your crew on the line?

7          MR. RUKAVINA:  Davor Rukavina.  And Lee Hogewood is

8  also on the line.

9          THE COURT:  All right.  Good morning to you.  All

10 right.  And we had objections pending from the U.S. Trustee as

11 well.  Do we have the U.S. Trustee on the line?

12     (No response.)

13         THE COURT:  All right.  If you're appearing, you're

14 on mute.  We're not hearing you.

15     All right.  Well, we have lots of other folks.  I don't

16 mean to be neglectful of them, but we're going to get on with

17 the ruling this morning.  This is going to take a while.  This

18 is a complex matter, so it should take a while.

19     All right.  Before the Court, of course, for consideration

20 is the Debtor's Fifth Amended Plan, first filed on November

21 24, 2020, as later modified on or around January 22, 2021,

22 with more amendments filed on or around February 1, 2021.  The

23 Court will hereinafter refer to this as the "Plan."

24     The parties refer to the Plan as a monetization plan

25 because it involves the gradual wind-down of the Debtor's

5

1   assets and certain of its funds over time, with the

2   Reorganized Debtor continuing to manage certain other funds

3   for a while, under strict governance and monitoring, and a

4   Claimants Trust will receive the proceeds of that process,

5   with the creditors receiving an interest in that trust.  There

6   is also anticipated to be Litigation Sub-Trust established for

7   the purpose of pursuing certain avoidance or other causes of

8   action for the benefit of creditors.

9        The recovery for general unsecured creditors is estimated

10  now at 71 percent.

11       The Plan was accepted by 99.8 percent of the dollar amount

12  of voting creditors in Class 8, the general unsecured class,

13  but as to numerosity, a majority of the class of general

14  unsecured creditors did not vote in favor of the plan.

15  Specifically, 27 claimants voted no and 17 claimants voted

16  yes.  All but one of the rejecting ballots were cast by

17  employees who, according to the Debtor, are unlikely to have

18  allowed claims because they are asserted for bonuses or other

19  compensation that will not become due.

20       Meanwhile, in a convenience class, Class 7, of general

21  unsecured claims under one million dollars, one hundred

22  percent of the 16 claimants who chose to vote in that class

23  chose to accept the Plan.

24       Because of the rejecting votes in Class 8, and because of

25  certain objections to the Plan, the Court heard two full days

Case 19-34054-sgj11   Doc 3596-30   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-20 Filed 06/06/25   Page 561 of 1052   PageID 17239

6

1    of evidence, considering testimony from five witnesses and

2    thousands of pages of documentary evidence, in considering

3    whether to confirm the Plan pursuant to Sections 1129(a) and

4    (b) of the Bankruptcy Code.

5        The Court finds and concludes that the Plan meets all of

6    the relevant requirements of Sections 1123, 1124, and 1129 of

7    the Code, and other applicable provisions of the Bankruptcy

8    Code, but is issuing this detailed ruling to address certain

9    pending objections to the Plan, including but not limited to

10   objections regarding certain Exculpations, Releases, Plan

11   Injunctions, and Gatekeeping Provisions of the Plan.

12       The Court reserves the right to amend or supplement this

13   oral ruling in more detailed findings of fact, conclusions of

14   law, and an Order.

15       First, by way of introduction, this case is not your

16   garden-variety Chapter 11 case.  Highland Capital Management,

17   LP is a multibillion dollar global investment advisor,

18   registered with the SEC pursuant to the Investment Advisers

19   Act of 1940.  It was founded in 1993 by James Dondero and Mark

20   Okada.  Mr. Okada resigned from his role with Highland prior

21   to the bankruptcy case being filed.  Mr. Dondero was in

22   control of the Debtor as of the day it filed bankruptcy, but

23   agreed to relinquish control of it on or about January 9,

24   2020, pursuant to an agreement reached with the Official

25   Unsecured Creditors' Committee, which will be described later.

Case 19-34054-sgj11    Doc 3596-30    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21 30   Filed 06/08/2552    Page 562 of 1052    PageID 17240

7

1      Although Mr. Dondero remained on as an unpaid employee and

2  portfolio manager with the Debtor after January 9, 2020, his

3  employment with the Debtor terminated on October 9, 2020.  Mr.

4  Dondero continues to work for and essentially control numerous

5  nondebtor companies in the Highland complex of companies.

6      The Debtor is headquartered in Dallas, Texas.  As of the

7  October 2019 petition date, the Debtor employed approximately

8  76 employees.

9      Pursuant to various contractual arrangements, the Debtor

10  provides money management and advisory services for billions

11  of dollars of assets, including CLOs and other investments.

12  Some of these assets are managed pursuant to shared services

13  agreements with a variety of affiliated entities, including

14  other affiliated registered investment advisors.  In fact,

15  there are approximately 2,000 entities in the Byzantine

16  complex of companies under the Highland umbrella.

17      None of these affiliates of Highland filed for Chapter 11

18  protection.  Most, but not all, of these entities are not

19  subsidiaries, direct or indirect, of Highland.  And certain

20  parties in the case preferred not to use the term "affiliates"

21  when referring to them.  Thus, the Court will frequently refer

22  loosely to the so-called, in air quotes, "Highland complex of

23  companies" when referring to the Highland enterprise.  That's

24  a term many of the lawyers in the case use.

25      Many of the companies are offshore entities, organized in

8

1   such faraway jurisdictions as the Cayman Islands and Guernsey.

2     The Debtor is privately owned 99.5 percent by an entity

3   called Hunter Mountain Investment Trust; 0.1866 percent by the

4   Dugaboy Investment Trust, a trust created to manage the assets

5   of Mr. Dondero and his family; 0.0627 percent by Mark Okada,

6   personally and through family trusts; and 0.25 percent by

7   Strand Advisors, Inc., the general partner.

8     The Debtor's primary means of generating revenue has

9   historically been from fees collected for the management and

10   advisory services provided to funds that it manages, plus fees

11   generated for services provided to its affiliates.

12     For additional liquidity, the Debtor, prior to the

13   petition date, would sell liquid securities in the ordinary

14   course, primarily through a brokerage account at Jefferies,

15   LLC.  The Debtor would also, from time to time, sell assets at

16   nondebtor subsidiaries and distribute those proceeds to the

17   Debtor in the ordinary course of business.

18     The Debtor's current CEO, James Seery, credibly testified

19   that the Debtor was "run at a deficient for a long time and

20   then would sell assets or defer employee compensation to cover

21   its deficits."  This Court cannot help but wonder if that was

22   necessitated because of enormous litigation fees and expenses

23   that Highland was constantly incurring due to its culture of

24   litigation, as further addressed hereafter.

25     Highland and this case are not garden-variety for so many

016242

9

1    reasons.  One is the creditor constituency.  Highland did not

2    file bankruptcy because of some of the typical reasons a large

3    company files Chapter 11.  For example, it did not have a

4    large asset-based secured lender with whom it was in default.

5    It only had relatively insignificant secured indebtedness

6    owing to Jefferies, with whom it had a brokerage account, and

7    one other entity called Frontier State Bank.

8        Highland did not have problems with trade vendors or

9    landlords.  It did not suffer any type of catastrophic

10   business calamity.  In fact, it filed Chapter 11 six months

11   before the COVID-19 pandemic was declared.  The Debtor filed

12   Chapter 11 due to a myriad of massive unrelated business

13   litigation claims that it was facing, many of which had

14   finally become liquidated or were about to become liquidated

15   after a decade or more of contentious litigation in multiple

16   fora all over the world.

17       The Unsecured Creditors' Committee in this case has

18   referred to the Debtor under its former chief executive, Mr.

19   Dondero, as a serial litigator.  This Court agrees with that

20   description.  By way of example, the members of the Creditors'

21   Committee and their history of litigation with the Debtor and

22   others in the Highland complex are as follows:

23       First, the Redeemer Committee of the Highland Crusader

24   Fund, which I'll call the Redeemer Committee.  This Creditors'

25   Committee member obtained an arbitration award against the

Case 19-34054-sgj11    Doc 3596-30    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 30    Filed 06/06/25    Page 565 of 1052    PageID 17243

10

1  Debtor of more than $190 million, inclusive of interest,

2  approximately five months before the petition date from a

3  panel of the American Arbitration Association.  It was on the

4  verge of having that award confirmed by the Delaware Chancery

5  Court immediately prior to the petition date, after years of

6  disputes that started in late 2008 and included legal

7  proceedings in Bermuda.  This creditor's claim was settled

8  during the bankruptcy case in the amount of approximately

9  $137.7 million.  The Court is omitting various details and

10  aspects of that settlement.

11      The second Creditors' Committee member, Acis Capital

12  Management, LP, which was formerly in the Highland complex of

13  companies but was not affiliated with Highland as of the

14  petition date.  This UCC member and its now-owner, Josh Terry,

15  were involved in litigation with Highland dating back to 2016.

16  Acis was forced into an involuntary bankruptcy in the

17  Bankruptcy Court for the Northern District of Texas, Dallas

18  Division, by Josh Terry, who was a former Highland portfolio

19  manager, in 2018 after Josh Terry obtained an approximately $8

20  million arbitration award and judgment against Acis that was

21  issued by a state court in Dallas County, Texas.  Josh Terry

22  was ultimately awarded the equity ownership of Acis by the

23  Dallas Bankruptcy Court in the Acis bankruptcy case.

24      Acis subsequently asserted a multimillion dollar claim

25  against Highland in the Dallas Bankruptcy Court for Highland's

11

 1   alleged denuding of Acis in fraud of its creditors, primarily

 2   Josh Terry.

 3        The litigation involving Acis and Mr. Terry dates back to

 4   mid-2016, and has continued on, with numerous appeals of

 5   bankruptcy court orders, including one appeal still pending at

 6   the United States Court of Appeals for the Fifth Circuit.

 7        There was also litigation involving Josh Terry and Acis in

 8   the Royal Court of the Island of Guernsey and in a court in

 9   New York.

10        The Acis claim was settled during this bankruptcy case in

11   court-ordered mediation for approximately $23 million.  Other

12   aspects and details of this settlement are being omitted.

13        Now, the third Creditors' Committee member, UBS

14   Securities.  It's a creditor who filed a proof of claim in the

15   amount of $1,039,000,000 in the Highland case.  Yes, over one

16   billion dollars.  The UBS claim was based on the amount of a

17   judgment that UBS received from a New York state court in 2020

18   after a multi-week bench trial which had occurred many months

19   earlier on a breach of contract claim against other entities

20   in the Highland complex.  UBS alleged that the Debtor should

21   be liable for the judgment.  The UBS litigation related to

22   activities that occurred in 2008.  The litigation involving

23   UBS and Highland and its affiliates was pending for more than

24   a decade, there having been numerous interlocutory appeals

25   during its history.

12

1      The Debtor and UBS recently announced a settlement of the

2   UBS claim, which came a few months after court-ordered

3   mediation.  The settlement is in the amount of $50 million as

4   a general unsecured claim, $25 million as a subordinated

5   claim, and $18 million of cash coming from a nondebtor entity

6   in the Highland complex known as Multistrat.  Other aspects of

7   this settlement are being omitted.

8      The fourth and last Creditors' Committee member is Meta-e

9   Discovery.  It is a vendor who happened to supply litigation

10   and discovery-related services to the Debtor over the years.

11   It had unpaid invoices on the petition date of more than

12   $779,000.

13      It is fair to say that the members of the Creditors'

14   Committee in this case all have wills of steel.  They fought

15   hard before and during the bankruptcy case.  The members of

16   the Creditors' Committee are highly sophisticated and have had

17   highly sophisticated professionals representing them.  They

18   have represented their constituency in this case as

19   fiduciaries extremely well.

20      In addition to these Creditors Committee members, who were

21   all embroiled in years of litigation with Highland and its

22   affiliates in various ways, the Debtor has been in litigation

23   with Patrick Daugherty, a former limited partner and employee

24   of Highland, for many years in both Delaware and Texas state

25   courts.  Patrick Daugherty filed a proof of claim for "at

Case 19-34054-sgj11   Doc 3596-30   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 31-21   Filed 04/25   Page 568 of 1052   PageID 17246

13

1  least $37.4 million" relating to alleged breached employment-
2  related agreements and for the tort of defamation arising from
3  a 2017 press release posted by the Debtor.
4      The Debtor and Patrick Daugherty recently announced a
5  settlement of the Patrick Daugherty claim in the amount of
6  $750,000 cash on the effective date, an $8.25 million general
7  unsecured claim, and a $2.75 million subordinated claim.
8  Other aspects and details of this settlement are being
9  omitted.
10      Additionally, an entity known as HarbourVest, who invested
11  more than $70 million with an entity in the Highland complex,
12  asserted a $300 million proof of claim against Highland,
13  alleging, among other things, fraud and RICO violations.  The
14  HarbourVest claim was settled during the bankruptcy case for a
15  $45 million general unsecured claim and a $35 million junior
16  claim.
17      Other than these claims just described, most of the other
18  claims in this case are claims asserted against the Debtor by
19  other entities in the Highland complex, most of which entities
20  the Court finds to be controlled by Mr. Dondero; claims of
21  employees who believe that they are entitled to large bonuses
22  or other types of deferred compensation; and claims of
23  numerous law firms that did work for Highland and were unpaid
24  for amounts due to them on the petition date.
25      Yet another reason this is not your garden-variety Chapter

14

1   11 case is its postpetition corporate governance structure.

2   Highland filed bankruptcy October 16, 2019.  Contentiousness

3   with the Creditors' Committee began immediately, with first

4   the Committee's request for a change of venue from Delaware to

5   Dallas, and then a desire by the Committee and the U.S.

6   Trustee for a Chapter 11 or 7 trustee to be appointed due to

7   concerns over and distrust of Mr. Dondero and his numerous

8   conflicts of interest and alleged mismanagement or worse.

9        After many weeks of the threat of a trustee lingering, the

10  Debtor and the Creditors' Committee negotiated and the Court

11  approved a corporate governance settlement on January 9, 2020

12  that resulted in Mr. Dondero no longer being an officer or

13  director of the Debtor or of its general partner, Strand.

14       As part of the court-approved settlement, three eminently-

15  qualified Independent Directors were chosen by the Creditors'

16  Committee and engaged to lead Highland through its Chapter 11

17  case.  They were James Seery, John Dubel, and Retired

18  Bankruptcy Judge Russell Nelms.  They were technically the

19  Independent Directors of Strand, the general partner of the

20  Debtor.  Mr. Dondero had previously been the sole director of

21  Strand, and thus the sole person in ultimate control of the

22  Debtor.

23       The three independent board members' resumes are in

24  evidence.  James Seery eventually was named CEO of the Debtor.

25  Suffice it to say that this changed the entire trajectory of

Appx 03686
016248

Case 19-34054-sgj11   Doc 3596-30   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 30   Filed 06/26/25   Page 570 of 1052   PageID 17248

15

1   the case.  This saved the Debtor from a trustee.  The Court

2   trusted the new directors.  The Creditors' Committee trusted

3   them.  They were the right solution at the right time.

4       Because of the unique character of the Debtor's business,

5   the Court believed this solution was far better than a

6   conventional Chapter 7 or 11 trustee.  Mr. Seery, in

7   particular, knew and had vast experience at prominent firms

8   with high-yield and distressed investing similar to the

9   Debtor's business.  Mr. Dubel had 40 years of experience

10  restructuring large, complex businesses and serving on their

11  boards of directors in this context.  And Retired Judge Nelms

12  had not only vast bankruptcy experience but seemed

13  particularly well-suited to help the Debtor maneuver through

14  conflicts and ethical quandaries.

15      By way of comparison, in the Chapter 11 case of Acis, the

16  former affiliate of Highland that this Court presided over two

17  or three years ago, which company was much smaller in size and

18  scope than Highland, managing only five or six CLOs, a Chapter

19  11 trustee was elected by the creditors that was not on the

20  normal rotation panel for trustees in this district, but

21  rather was a nationally-known bankruptcy attorney with more

22  than 45 years of large Chapter 11 case experience.  This

23  Chapter 11 trustee performed valiantly, but was sued by

24  entities in the Highland complex shortly after he was

25  appointed, which this Court had to address.  The Acis trustee

16

1   could not get Highland and its affiliates to agree to any

2   actions taken in the case, and he finally obtained

3   confirmation of a plan over Highland and its affiliates'

4   objections in his fourth attempted plan, which confirmation

5   then was promptly appealed by Highland and its affiliates.

6       Suffice it to say it was not easy to get such highly-

7   qualified persons to serve as independent board members and

8   CEO of this Debtor.  They were stepping into a morass of

9   problems.  Naturally, they were worried about getting sued, no

10  matter how defensible their efforts might be, given the

11  litigation culture that enveloped Highland historically.  It

12  seemed as though everything always ended in litigation at

13  Highland.

14      The Court heard credible testimony that none of them would

15  have taken on the role of Independent Director without a good

16  D&O insurance policy protecting them, without indemnification

17  from Strand, guaranteed by the Debtor; without exculpation for

18  mere negligence claims; and without a gatekeeper provision,

19  such that the Independent Directors could not be sued without

20  the bankruptcy court, as a gatekeeper, giving a potential

21  plaintiff permission to sue.

22      With regard to the gatekeeper provision, this was

23  precisely analogous to what bankruptcy trustees have pursuant

24  to the so-called "Barton Doctrine," which was first

25  articulated in an old U.S. Supreme Court case.

Case 19-34054-sgj11    Doc 3596-30    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 33-21 30    Filed 06/06/25 52    Page 572 of 1052    PageID 17250

17

1    The Bankruptcy Court approved all of these protections in

2    a January 9, 2020 order.  No one appealed that order.  And Mr.

3    Dondero signed the settlement agreement that was approved by

4    that order.

5        An interesting fact about the D&O policy came out in

6    credible testimony at the confirmation hearing.  Mr. Dubel and

7    an insurance broker from Aon, named Marc Tauber, both credibly

8    testified that the gatekeeper provision was needed because of

9    the so-called, and I quote, "Dondero Exclusion" in the

10    insurance marketplace.

11        Specifically, the D&O insurers in the marketplace did not

12    want to cover litigation claims that might be brought against

13    the Independent Directors by Mr. Dondero because the

14    marketplace of D&O insurers are aware of Mr. Dondero's

15    litigiousness.  The insurers would not have issued a D&O

16    policy to the Independent Directors without either the

17    gatekeeping provision or a "Dondero Exclusion" being in the

18    policy.

19        Thus, the gatekeeper provision was part of the January 9,

20    2020 settlement.  There was a sound business justification for

21    it.  It was reasonable and necessary.  It was consistent with

22    the Barton Doctrine in an extremely analogous situation --

23    *i.e.*, the independent board members were analogous to a three-

24    headed trustee in this case, if you will.  Mr. Dondero signed

25    off on it.  And, again, no one ever appealed the order

18

1    approving it.

2        The Court finds that, like the Creditors' Committee, the

3    independent board members here have been resilient and

4    unwavering in their efforts to get the enormous problems in

5    this case solved.  They seem to have at all times negotiated

6    hard and with good faith.  As noted previously, they changed

7    the entire trajectory of this case.

8        Still another reason why this was not your garden-variety

9    case was the mediation effort.  In summer of 2020, roughly

10   nine months into the Chapter 11 case, this Court ordered

11   mediation among the Debtor, Acis, UBS, the Redeemer Committee,

12   and Mr. Dondero.  The Court selected co-mediators, since this

13   seemed like such a Herculean task, especially during COVID-19,

14   where people could not all be in the same room.  Those co-

15   mediators were Retired Bankruptcy Judge Allan Gropper from the

16   Southern District of New York, who had a distinguished career

17   presiding over complex Chapter 11 cases, and Ms. Sylvia Mayer,

18   who likewise has had a distinguished career, first as a

19   partner in a preeminent law firm working on complex Chapter 11

20   cases, and subsequently as a mediator and arbitrator in

21   Houston, Texas.

22       As noted earlier, the Acis claim was settled during the

23   mediation, which seemed nothing short of a miracle to this

24   Court, and the UBS claim was settled many months later, and

25   this Court believes the groundwork for that ultimate

Case 19-34054-sgj11    Doc 3596-30    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 30    Filed 06/26/25    Page 574 of 1052    PageID 17252

19

1   settlement was laid, or at least helped, through the

2   mediation.  And as earlier noted, other enormous claims have

3   been settled during this case, including that of the Redeemer

4   Committee, who, again, had asserted approximately or close to

5   a $200 million claim; HarbourVest, who asserted a $300 million

6   claim; and Patrick Daugherty, who asserted close to a $40

7   million claim.

8       This Court cannot stress strongly enough that the

9   resolution of these enormous claims and the acceptance of all

10  of these creditors of the Plan that is now before the Court

11  seems nothing short of a miracle.  It was more than a year in

12  the making.

13      Finally, a word about the current remaining Objectors to

14  the Plan before the Court.  Once again, the Court will use the

15  phrase "not garden-variety."  Originally, there were over one

16  dozen objections filed to this Plan.  The Debtor has made

17  various amendments or modifications to the Plan to address

18  some of these objections.  The Court finds that none of these

19  modifications require further solicitation, pursuant to

20  Sections 1125, 1126, 1127 of the Code, or Bankruptcy Rule

21  3019, because, among other things, they do not materially

22  adversely change the treatment of the claims of any creditor

23  or interest holder who has not accepted in writing the

24  modifications.

25      Among other things, there were changes to the projections

20

1   that the Debtor filed shortly before the confirmation hearing

2   that, among other things, show the estimated distribution to

3   creditors and compare plan treatment to a likely disbursement

4   in a Chapter 7.

5       These do not constitute a materially adverse change to the

6   treatment of any creditors or interest holders.  They merely

7   update likely distributions based on claims that have now been

8   settled, and they've otherwise incorporated more recent

9   financial data.  This happens often before confirmation

10  hearings.  The Court finds that it did not mislead or

11  prejudice any creditors or interest holders, and certainly

12  there was no need to resolicit the Plan.

13      The only Objectors to the Plan left at this time were Mr.

14  Dondero and entities that the Court finds are controlled by

15  him.  The standing of these entities to object to the Plan

16  exists, but the remoteness of their economic interest is

17  noteworthy, and the Court questions the good faith of the

18  Objectors.  In fact, the Court has good reason to believe that

19  these parties are not objecting to protect economic interests

20  they have in the Debtor, but to be disruptors.

21      Mr. Dondero wants his company back.  This is

22  understandable.  But it's not a good faith basis to lob

23  objections to the Plan.  The Court has slowed down

24  confirmation multiple times on the current Plan and urged the

25  parties to talk to Mr. Dondero.  The parties represent that

21

1   they have, and the Court believes that they have.

2      Now, to be specific about the remoteness of the objectors'

3   interests, the Court will address them each separately.

4   First, Mr. Dondero has a pending objection.  Mr. Dondero's

5   only economic interest with regard to the Debtor at this point

6   is an unliquidated indemnification claim.  And based on

7   everything this Court has heard, his indemnification claim

8   will be highly questionable at this juncture.

9      Second, a joint objection has been filed by the Dugaboy

10  Trust and the Get Good Trust.  As for the Dugaboy Trust, it

11  was created to manage the assets of Mr. Dondero and his

12  family, and it owns a 0.1866 percent limited partnership

13  interest in the Debtor.  The Court is not clear what economic

14  interest the Get Good Trust has, but it likewise seems to be

15  related to Mr. Dondero, and it has been represented to the

16  Court numerous times that the trustee is Mr. Dondero's college

17  roommate.

18     Another group of Objectors that has joined together in one

19  objection is what the Court will refer to as the Highland and

20  NexPoint Advisors and Funds.  The Court understands they

21  assert disputed administrative expense claims against the

22  estate.  While the evidence presented was that they have

23  independent board members that run these companies, the Court

24  was not convinced of their independence from Mr. Dondero.

25  None of the so-called independent board members of these

22

 1   entities have ever testified before the Court.  Moreover, they

 2   have all been engaged with the Highland complex for many

 3   years.

 4       The witness who testified on these Objectors' behalves at

 5   confirmation, Mr. Jason Post, their chief compliance officer,

 6   resigned from Highland after more than twelve years in October

 7   2020, at the same time that Mr. Dondero resigned or was

 8   terminated by Highland.  And a prior witness recently for

 9   these entities whose testimony was made part of the record at

10   the confirmation hearing essentially testified that Mr.

11   Dondero controlled these entities.

12       Finally, various NexBank entities objected to the Plan.

13   The Court does not believe they have liquidated claims.  Mr.

14   Dondero appears to be in control of these entities as well.

15       To be clear, the Court has allowed all of these objectors

16   to fully present arguments and evidence in opposition to

17   confirmation, even though their economic interests in the

18   Debtor appear to be extremely remote and the Court questions

19   their good faith.  Specifically on that latter point, the

20   Court considers them all to be marching pursuant to the orders

21   of Mr. Dondero.

22       In the recent past, Mr. Dondero has been subject to a TRO

23   and preliminary injunction by the Bankruptcy Court for

24   interfering with the current CEO's management of the Debtor in

25   specific ways that were supported by evidence.  Around the

23

1    time that this all came to light and the Court began setting

2    hearings on the alleged interference, Mr. Dondero's company

3    phone supplied to him by Highland, which he had been asked to

4    turn in, mysteriously went missing.  The Court merely mentions

5    this in this context as one of many reasons that the Court has

6    to question the good faith of Mr. Dondero and his affiliated

7    objectors.

8        The only other pending objection besides these objections

9    of the Dondero and Dondero-controlled entities is an objection

10   of the United States Trustee pertaining to the release,

11   exculpation, and injunction provisions in the Plan.

12       In juxtaposition to these pending objections, the Court

13   notes that the Debtor has resolved earlier-filed objections to

14   the Plan filed by the IRS, Patrick Daugherty, CLO Holdco,

15   Ltd., numerous local taxing authorities, and certain current

16   and former senior-level employees of the Debtor.

17       With that rather detailed factual background addressed,

18   because certainly context matters here, the Court now

19   addresses what it considers the only serious objections raised

20   in connection with confirmation.  Specifically, the Plan

21   contain certain releases, exculpation, plan injunctions, and a

22   gatekeeper provision which are obviously not fully consensual,

23   since there are objections.  Certainly, these provisions are

24   mostly consensual when you consider that parties with hundreds

25   of millions of dollars' worth of legitimate claims have not

Case 19-34054-sgj11   Doc 3596-30   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 30 Filed 05/25    Page 579 of 1052    PageID 17257

24

1    objected to them.

2       First, a word about plan releases generally, since the

3    Objectors at times seem to gloss over, in this Court's view,

4    relevant distinctions, and seem to refer to the plan releases

5    in this Plan and the exculpations and the plan injunctions all

6    as impermissible third-party releases, when, in fact, they are

7    not, *per se*.

8       It has, without a doubt, become quite commonplace in

9    complex Chapter 11 bankruptcy cases to have three categories

10   of releases in plans.  These three types are as follows.

11      First, Debtor Releases.  A debtor release involves a

12   release by the debtor and its bankruptcy estate of claims

13   against nondebtor third-parties.  For example, a release may

14   be granted in favor of creditors, directors, officers,

15   employees, professionals who participated in the bankruptcy

16   process.  This is the least-controversial type of release

17   because the debtor is extinguishing its own claims, which are

18   property of the estate, that a debtor has authority to utilize

19   or not, pursuant to Sections 541 and 363 of the Bankruptcy

20   Code.

21      Authority for a debtor release pursuant to a plan arises

22   out of Section 1123(b)(3)(A), which indicates that a plan may

23   provide for "the settlement or adjustment of any claim or

24   interest belonging to the debtor or to the estate."

25      In this context, it would appear that the only analysis

25

1    required is to determine whether the release or settlement of

2    the claim is an exercise of reasonable business judgment on

3    that part of the debtor, is it fair and equitable, is it in

4    the best interest of the estate, given all the relevant facts

5    and circumstances?  Also relevant is whether there's

6    consideration given of some sort by the releasees.

7         Now, the second type of very commonplace Chapter 11 plan

8    release is an exculpation.  Chapter 11 plans also very often

9    have these exculpation provisions, and they're something much

10   narrower in scope and time than a full-fledged release.  An

11   exculpation provision is more like a shield for a certain

12   subset of key actors in the case for their acts during and in

13   connection with the case, which acts may have been merely

14   negligent.

15        Specifically, a plan may absolve certain actors -- usually

16   estate fiduciaries -- such as an Official Unsecured Creditors'

17   Committee and its members, Committee professionals, sometimes

18   Debtor professionals, senior management, officers and

19   directors of the Debtor, from any liability for postpetition

20   negligent conduct -- *i.e.*, conduct which occurred during the

21   administration of the Chapter 11 case and in the negotiation,

22   drafting, and implementation of a plan.  An exculpation

23   provision typically excludes gross negligence and willful

24   misconduct.  It is usually worded in a passive voice, so it

25   may seem a little unclear as to whether it is actually a

Case 19-34054-sgj11   Doc 3596-30   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 33-21   Filed 08/26/25   Page 581 of 1052   PageID 17259

26

1   release and by whom.

2       In any event, the rationale is that parties who actively

3   participate in a court-approved process -- often, court-

4   approved transactions by court order -- should receive

5   protection for their work.  Otherwise, who would want to work

6   in such a messy, contentious situation, only to be sued for

7   alleged negligence for less-than-perfect end results?

8       Chapter 11 end results are not always pretty.  One could

9   argue that these exculpation provisions, though, are much ado

10  about nothing.  Why?  For one thing, again, the shield is only

11  as to negligent conduct.  There is no shield for other

12  problematic conduct, such as gross negligence or willful

13  misconduct.

14      Second, in many situations, any claims or causes of action

15  that might arise will belong to the Debtor or its estate.

16  Thus, they would already be released pursuant to a debtor

17  release.

18      Additionally, there is case law stating that, where a

19  claim is brought against an estate professional whose fees

20  have already been approved in a final fee application, any

21  claims are barred by *res judicata*.  Thus, exculpated

22  professionals would only have potential exposure for a very

23  short window of time, until final fee applications.

24      Additionally, certain case law in Texas makes clear that

25  an attorney generally does not owe any duties to persons other

27

 1   than his own client.

 2       All of this suggests that the shield of a typical

 3   exculpation provision may rarely become useful or needed.

 4       Moving now to the third type of release, a true third-

 5   party release, Chapter 11 plans also sometimes contain third-

 6   party releases.  A true third-party release involves the

 7   release of claims held by nondebtor third parties against

 8   other nondebtor third parties, and there is often no

 9   limitation on the scope and time of the claims released.

10       This is the most heavily scrutinized of the three types of

11   plan releases.  Much of the case authority focuses on whether

12   a third-party release is consensual or not in analyzing their

13   propriety and/or enforceability.

14       In Highland, there are no third-party releases.  Rather,

15   there are debtor releases and exculpations.  There also happen

16   to be plan injunctions and gatekeeper provisions that have

17   been challenged.  The Objectors argue that these provisions

18   violate the Fifth Circuit's opinion in *Pacific Lumber* or are

19   otherwise beyond the jurisdiction or authority of the

20   bankruptcy court.  These arguments are now addressed.

21       First, the debtor release is found at Article IX.D of the

22   Plan.  The language, in pertinent part, reads as follows.  "On

23   and after the effective date, each Released Party is deemed to

24   be hereby conclusively, absolutely, unconditionally,

25   irrevocably, and forever released and discharged by the Debtor

28

and the Estate, in each case on behalf of themselves and their
respective successors, assigns, and representatives, including
but not limited to the Claimant Trust and the Litigation Sub-
Trust, from any and all causes of action, including any
derivative claims, asserted on behalf of the Debtor, whether
known or unknown, foreseen or unforeseen, matured or
unmatured, existing or hereafter arising, in law, equity,
contract, tort, or otherwise, that the Debtor or the Estate
would have been legally entitled to assert in their own right,
whether individually or collectively, or on behalf of the
holder of any claim against, or interest in, a debtor or other
person."

There are certain exceptions discussed, and then Released
Parties are defined at Definition 113 of the Plan collectively
as:  the Independent Directors; Strand, solely from the date
of the appointment of the Independent Directors through the
effective date; the CEO/CRO; the Committee, the members of the
Committee, in their official capacities; the professionals
retained by the Debtor and the Committee in the Chapter 11
case; and the employees.  This is a defined term in the Plan
Supplement and does not include certain employees.

To be clear, these are not third-party releases such as
addressed in the *Pacific Lumber* case.  These are the Debtor's
and/or the bankruptcy estate's causes of action that are
proposed to be released.  Releases by a debtor are

29

1    discretionary and can be provided by a debtor to persons who

2    have provided consideration to the debtor and the estate.

3    Section 1123(b)(3)(A) of the Bankruptcy Code permits this.

4        The evidence here supported the notion that these releases

5    are a *quid pro quo* for the Released Parties' significant

6    contributions to a highly complex and contentious

7    restructuring.  The Debtor is releasing its own claims.  Some

8    of the Released Parties would have indemnification rights

9    against the Debtor.  And the Debtor's CEO, James Seery,

10   credibly testified that he does not believe any claims exist

11   as to the Released Parties.  The Court approves the Debtor

12   releases and overrules the objections to them.

13       Next, the exculpations appear at Article IX.C of the Plan

14   and provide as follows:  Subject in all respects to Article

15   XII.D of the Plan, to the maximum extent permitted by

16   applicable law, no Exculpated Party will have or incur, and

17   each Exculpated Party is hereby exculpated from, any claim,

18   obligation, suit, judgment, damage, demand, debt, right, cause

19   of action, remedy, loss, and liability for conduct occurring

20   on or after the petition date in connection with or arising

21   out of the filing and administration of the Chapter 11 case,

22   the negotiation and pursuit of a disclosure statement, the

23   Plan, or the solicitation of votes for or confirmation of the

24   Plan, the funding or consummation of the Plan, or any related

25   agreements, instruments, et cetera, et cetera, whether or not

Case 19-34054-sgj11    Doc 3596-30    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 30    Filed 03/26    Page 585 of 1052    PageID 17263

30

1  such Plan distributions occur following the effective date,

2  the implementation of the Plan, and any negotiation,

3  transactions, and documentation in connection with the

4  foregoing clauses, provided, however, the foregoing will not

5  apply to any acts or omissions of any Exculpated Party arising

6  out of or related to acts or omissions that constitute bad

7  faith, fraud, gross negligence, criminal misconduct, or

8  willful misconduct; or Strand or any employee other than with

9  respect to actions taken by such entities from the date of

10  appointment of the Independent Directors through the effective

11  date.

12      Exculpated Parties are later defined at Section -- or,

13  earlier defined at Section 62 of the Plan, Definition No. 62

14  of the Plan, as later limited by the Debtor, as announced in

15  the confirmation hearing.  And so these are the Exculpated

16  Parties:  the Debtor and its successors and assigns; the

17  employees, certain employees, as defined; Strand; the

18  Independent Directors; the Committee, the members of the

19  Committee, in their official capacities; the professionals

20  retained by the Debtor and the Committee in the Chapter 11

21  case; the CEO and CRO; and the related persons as to each of

22  these parties listed in Part (iv) through (viii) above;

23  provided, for the avoidance of doubt, and it goes on to say

24  Dondero, Mark Okada, and various others aren't Exculpated

25  Parties.

Case 19-34054-sgj11    Doc 3596-30    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 30 Filed 03/25/52  Page 586 of 1052    PageID 17264

31

1    Now, as earlier mentioned, the Objectors argue that

2    *Pacific Lumber*, 584 F.3d 229, a Fifth Circuit case from 2009,

3    categorically rejects the permissibility of nonconsensual

4    exculpations as well as third-party releases in a Chapter 11

5    plan.  So the Court is going to take a deep dive into that

6    assertion.

7        In *Pacific Lumber*, the Fifth Circuit reviewed on appeal

8    numerous challenges to a confirmed plan of affiliated debtors

9    known as Palco and Scopac and four subsidiaries.  The debtor

10   Palco owned and operated the sawmill, a power plant, and even

11   a town called Scotia, California.  The debtor Scopac owned

12   timberlands.  A creditor, a secured creditor called Marathon

13   had a claim against Palco's assets.  Marathon estimated

14   Palco's assets were worth $110 million.  Its claim was $160

15   million.  Meanwhile, other parties had large secured claims

16   against the other debtor, Scopac.

17       The plan that the bankruptcy court confirmed, which was on

18   appeal to the Fifth Circuit, was filed by both the secured

19   creditor Marathon and a joint plan proponent called MRC.  MRC

20   was a competitor of the debtor Palco.  The Marathon/MRC plan

21   proposed to dissolve all the debtors, cancel intercompany

22   debts, and create two new entities, Townco and Newco.  Almost

23   all of the debtor Palco's assets, including the town of

24   Scotia, California, would be transferred to Townco.  The

25   timberlands and other assets, including the sawmill, would be

Case 19-34054-sgj11   Doc 3596-30   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 53-21   Filed 03/25   Page 587 of 1052   PageID 17265

32

1  placed in Newco.

2      Marathon and MRC proposed to contribute $580 million to

3  Newco to pay claims against Scopac.  And Marathon would

4  convert its secured claim against Palco's assets into equity,

5  giving it full ownership of Townco, a 15 percent stake in

6  Newco, and a new note for the sawmill's working capital.  MRC

7  would own the other 80 percent of Newco and would manage and

8  run the company.

9      An indenture trustee for the secured indebtedness against

10  Scopac -- which, by the way, had also been a plan proponent of

11  a competing plan -- appealed the confirmation order, raising

12  eight distinct issues on appeal.  One of the eight issues

13  pertained to what the Fifth Circuit referred to as a

14  "nondebtor exculpation and release clause."  This issue is

15  discussed on the last two pages of a very lengthy opinion.

16      While the complained-of provision is not quoted verbatim

17  in the *Pacific Lumber* opinion, it appears to have been a

18  typical exculpation clause.  Not a third-party release; a

19  typical exculpation clause.  The Fifth Circuit stated, "The

20  plan releases MRC, Marathon, Newco, Townco, and the Unsecured

21  Creditors' Committee, and their personnel, from liability,

22  other than for willful and gross negligence related to

23  proposing, implementing, and administering the plan" at Page

24  251.

25      The Fifth Circuit held that "the nondebtor releases must

Appx 02504
016266

33

1    be struck except with respect to the Creditors' Committee and

2    its members."

3        Footnote 26 of the opinion also states that the appellants

4    had "not briefed why Newco and Townco or their officers and

5    directors should not be released," and so "we do not analyze

6    their position."  Rather, the Fifth Circuit merely analyzed

7    why the exculpation provision was not permissible as to the

8    two plan proponents, MRC and Marathon.

9        Thus, the Court views *Pacific Lumber* as being a holding

10   that squarely addressed the propriety of two plan proponents,

11   a secured lender and a third-party competitor purchaser of the

12   Debtors, obtaining nonconsensual exculpation in the plan.

13   However, its reasoning certainly cannot be ignored, strongly

14   suggesting it would not be inclined to approve an exculpation

15   for any party other than a Creditors' Committee or its

16   members.

17       As far as the Fifth Circuit's reasoning, it relied on

18   Bankruptcy Code Section 524(e) for striking down the

19   exculpations, stating, "The law states, however, that

20   discharge of a debt of the debtor does not affect the

21   liability of any other entity on such debt."  Page 251.  The

22   opinion suggests that MRC and Marathon may have tried to argue

23   that 524(e) did not apply to their exculpations because MRC

24   and Marathon were not liable as co-obligors in any way on any

25   of the debtor's debt.

34

1      The Fifth Circuit seemed dismissive of this argument,

2  stating as follows, "MRC/Marathon insist the release clause is

3  part of their bargain because, without the clause, neither

4  company would have been willing to provide the plan's

5  financing.  Nothing in the records suggests that MRC/Marathon,

6  the Committee, or the Debtor's officers and directors were co-

7  liable for the Debtor's prepetition debts.  Instead, the

8  bargain the proponents claim to have purchased is exculpation

9  from any negligence that occurred during the course of the

10 case.  Any costs the released parties might incur defending

11 against suits alleging such negligence are unlikely to swamp

12 either of these parties or the consummated reorganization.  We

13 see little equitable about protecting the released nondebtors

14 from negligence suits arising out of the reorganization."

15     The Court goes on to note that, in a variety of cases,

16 that releases have been approved, but these cases "seem

17 broadly to foreclose nonconsensual nondebtor releases and

18 permanent injunctions."

19     The Court then adds at Footnote 27 that the Fifth Circuit

20 in the past did not set aside challenged plan releases that

21 were in final nonappealable orders and were the subject of

22 collateral attack much later, citing its famous *Republic*

23 *Supply v. Shoaf* case, where the Fifth Circuit ruled that *res*

24 *judicata* barred a debtor from bringing a claim that was

25 specifically and expressly released by a confirmed

35

1    reorganization plan because the debtor -- the objector failed

2    to object to the release at confirmation.

3        The Fifth Circuit in *Pacific Lumber* also noted that the

4    Bankruptcy Code permits bankruptcy courts to enjoin third-

5    party asbestos claims under certain circumstances, 524(g),

6    which the Court said suggests nondebtor releases are most

7    appropriate as a method to channel mass tort claims towards a

8    specific pool of assets, citing numerous cases, including

9    *Johns-Manville*.

10       In reach its holding, the Fifth Circuit saw no reason to

11   uphold exculpation to the plan proponents MRC and Marathon,

12   seeming to find it inconsistent with 524(e) under the facts at

13   bar, but the Court did uphold exculpation for the Creditors'

14   Committee and its members, stating, "We agree, however, with

15   courts that have held that 1103(c) under the Code, which lists

16   the Creditors' Committee's powers, implies Committee members

17   have qualified immunity for actions within the scope of their

18   duties."  Numerous cites.  "The Creditors' Committee and its

19   members are the only disinterested volunteers among the

20   parties sought to be released here.  The scope of protection,

21   which does not insulate them from willful and gross

22   negligence, is adequate."

23       Thus, the Court held that the exculpation provisions in

24   *Pacific Lumber* must be struck except with regard to the

25   Creditors' Committee and its members.

016269

36

1      Now, after all of that, this Court believes the following

2   can be gleaned from *Pacific Lumber*.  First, the Fifth Circuit

3   hinted that consensual exculpations and/or consensual

4   nondebtor third-party releases are permissible.  The Court

5   was, of course, dealing with nonconsensual exculpations in

6   *Pacific Lumber*.  In this regard, I note Page 252, where the

7   Court cited various prior Fifth Circuit authority and then

8   stated, "These cases seem broadly to foreclose nonconsensual

9   nondebtor releases and permanent injunctions."

10     The second thing that can be gleaned from *Pacific Lumber*:

11  The Fifth Circuit hinted that nondebtor releases may be

12  permissible in cases involving global settlements of mass

13  claims against the debtors and co-liable parties.  The Court,

14  of course, referred to 524(g), but various other cases which

15  approved nondebtor releases where mass claims were channeled

16  to a specific pool of assets.

17     Third, the Fifth Circuit outright held that exculpations

18  from negligence for a Creditors' Committee and its members are

19  permissible because the concept is both consistent with

20  1103(c), "which implies Committee members have qualified

21  immunity for actions within the scope of their duties," and a

22  good policy result, since "if members of the Committee can be

23  sued by persons unhappy with the outcome of the case, it will

24  be extremely difficult to find members to serve on an official

25  committee."

37

1    Fourth, the Fifth Circuit recognized in *Pacific Lumber*

2    that *res judicata* may bar complaints regarding an

3    impermissible plan release, citing to its earlier *Republic*

4    *Supply v. Shoaf* opinion.

5    Now, being ever-mindful of the Fifth Circuit's words in

6    *Pacific Lumber*, this Court cannot help but wonder about at

7    least three things.

8    First, did the Fifth Circuit leave open the door that

9    facts/equities might sometimes justify approval of an

10   exculpation for a person other than a Creditors' Committee and

11   its members?  For example, the Fifth Circuit stated, in

12   referring to the plan proponents Marathon and MRC, that "Any

13   costs the released parties might incur defending against suits

14   alleging such negligence are unlikely to swamp either of these

15   parties or the consummated reorganization."  Here, this Court

16   can easily expect the proposed exculpated parties to incur

17   costs that could swamp them and the reorganization based on

18   the past litigious conduct of Mr. Dondero and his controlled

19   entities.  Do these words of the Fifth Circuit hint that

20   equities/economics might sometimes justify an exculpation?

21   Second, did the Fifth Circuit's rationale for permitted

22   exculpations to Creditors' Committee and their members, which

23   was clearly policy-based, based on their implied qualified

24   immunity flowing from their duties in Section 1103 and their

25   disinterestedness, and the importance of their role in a

016271

38

1    Chapter 11 case, did this rationale leave open the door to

2    sometimes permitting exculpations to other parties in a

3    particular Chapter 11 case besides Creditors' Committees and

4    their members?  For example, in a situation such as the

5    Highland case, in which Independent Directors, brought in to

6    avoid a trustee, are more like a Creditors' Committee than an

7    incumbent board of directors.

8        Third, the Fifth Circuit's sole statutory basis was

9    Section 524(e).  This Court would humbly submit that this is a

10   statute dealing with prepetition liability in which some

11   nondebtor is liable with the Debtor.  Exculpation is a concept

12   dealing with postpetition liability.

13       The Ninth Circuit recently, in a case called *Blixseth v.*

14   *Credit Suisse*, 961 F.3d 1074 (9th Cir. 2020), approved the

15   validity of an exculpation clause incorporated into a

16   confirmed Chapter 11 plan that purported to absolve certain

17   nondebtor parties that were "closely involved" in drafting the

18   plan.  They were the largest secured creditor, a purchaser,

19   and an individual who was an indirect owner of certain of the

20   debtor companies.  The exculpation was from any negligence,

21   liability, for "any act or omission in connection with,

22   related to, or arising out of the Chapter 11 cases."

23       By the time the appeal was before the Ninth Circuit, the

24   only issue was the propriety of the exculpation clause as to

25   the large secured creditor, which was also a plan proponent,

Case 19-34054-sgj11   Doc 3596-30   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 33-21 30   Filed 04/25/25   Page 594 of 1052    PageID 17272

39

1    since all the other exculpated parties had settled with the

2    appellant.

3        The Court, in determining that the exculpation clause was

4    permissible as to the secured lender, concluded that Section

5    524(e) "does not bar a narrow exculpation clause of the kind

6    here at issue -- that is, one focused on actions of various

7    participants in the plan approval process and relating only to

8    that process," Page 1082.  Why?  Because "Section 524(e)

9    establishes that discharge of a debt of the debtor does not

10   affect the liability of any other entity on such debt."  In

11   other words, the discharge in no way affects the liability of

12   any other entity for the discharged debt.  By its terms,

13   524(e) prevents a bankruptcy court from extinguishing claims

14   of creditors against nondebtors over the very discharged debt

15   through the bankruptcy proceedings.

16       The Court went on to explicitly disagree with *Pacific

17   Lumber* in its analysis of 524(e), reiterating that an

18   exculpation clause covers only liabilities arising from the

19   bankruptcy proceedings and not of any of the debtor's

20   discharged debt.  Footnote 7, Page 1085.

21       Ultimately, the Court held that under Section 105(a),

22   which empowers a bankruptcy court to issue any order, process,

23   or judgment that is necessary or appropriate to carry out the

24   provisions of Chapter 11 and Section 1123, which establishes

25   the appropriate content of the bankruptcy plan, under these

Case 19-34054-sgj11    Doc 3596-30    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 13-21 30   Filed 04/25 52   Page 595 of 1052    PageID 17273

40

1    sections, the bankruptcy court had authority to approve an

2    exculpation clause intended to trim subsequent litigation over

3    acts taken during the bankruptcy proceedings and so render the

4    plan viable.

5        This Court concludes that, just as the Fifth Circuit left

6    open the door for consensual exculpations and releases in

7    *Pacific Lumber*, just as it left open the door for consensual

8    exculpations and releases in *Pacific Lumber*, its dicta

9    suggests that an exculpation might be permissible if there is

10   a showing that "costs that the released parties might incur

11   defending against suits alleging such negligence are likely to

12   swamp either the Exculpated Parties or the reorganization."

13   Again, that was a quote from the Fifth Circuit.

14       If ever there were a risk of that happening in a Chapter

15   11 reorganization, it is this one.  The Debtor's current CEO

16   credibly testified that Mr. Dondero has said outside the

17   courtroom that if Mr. Dondero's own pot plan does not get

18   approved, that he will "burn the place down."  Here, this

19   Court can easily expect the proposed exculpated parties might

20   expect to incur costs that could swamp them and the

21   reorganization process based on the past litigious conduct of

22   Mr. Dondero and his controlled entities.

23       Additionally, this Court concludes that the Fifth

24   Circuit's rationale in *Pacific Lumber* for permitted

25   exculpations to Creditors' Committees and their members, which

41

 1   was clearly policy-based based on their implied qualified

 2   immunity flowing from Section 1103 and their importance in a

 3   Chapter 11 case, leaves the door open to sometimes permitting

 4   exculpations to other parties in a particular Chapter 11 case

 5   besides a UCC and its members.

 6       Again, if there was ever such a case, the Court believes

 7   it is this one, in which Independent Directors were brought in

 8   to avoid a trustee and are much more like a Creditors'

 9   Committee than an incumbent board of directors.  While,

10   admittedly, there are a few exculpated parties here proposed

11   beyond the independent board, such as certain employees, it

12   would appear that no one is invulnerable to a lawsuit here if

13   past is prologue in this Highland saga.

14       The Creditors' Committee was initially not keen on

15   exculpations for certain employees.  However, Mr. Seery

16   credibly testified that there was a contentious arm's-length

17   negotiation over this and that he needs these employees to

18   preserve value implementing the Plan.  Mr. Dondero has shown

19   no hesitancy to litigate with former employees in the past, to

20   the *nth* degree, and there is every reason to believe he would

21   again in the future, if able.

22       Finally, in this situation, in the case at bar, we would

23   appear to have a *Shoaf* reason to approve the exculpations.

24   The January 9, 2020 order of this Court, Docket Entry 339,

25   which approved the independent board and an ongoing corporate

42

 1    governance structure for this case, and which is incorporated

 2    into the Plan at Article IX.H, provided as follows:  "No

 3    entity may commence or pursue a claim or cause of action of

 4    any kind against any Independent Director, any Independent

 5    Director's agents, or any Independent Director's advisors

 6    relating in any way to the Independent Director's role as an

 7    Independent Director of Strand without the Court (1) first

 8    determining, after notice, that such claim or cause of action

 9    represents a colorable claim of willful misconduct or gross

10    negligence against Independent Director, any Independent

11    Director's agents, or any Independent Director's advisors; and

12    (2) specifically authorizing such entity to bring such a

13    claim.  The Court will have sole jurisdiction to adjudicate

14    any claim for which approval of the Court to commence or

15    pursue has been granted."

16        This was both an exculpation from negligence as to the

17    Independent Directors and their agents and advisors, as well

18    as a gatekeeping provision.  This Court believes that this

19    provision basically approved an exculpation for the

20    Independent Directors way back on January 9, 2020 for their

21    postpetition conduct that might be negligent.  And this is the

22    law of the case and has *res judicata* preclusive effect now.

23        Thus, as to the three Independent Directors, as well as

24    the other named parties in the January 9, 2020 order, their

25    agents, their advisors, we have a situation that fits within

016276

Case 19-34054-sgj11   Doc 3596-30   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 31-30   Filed 03/03/25   Page 598 of 1052   PageID 17276

43

1   *Republic Supply v. Shoaf*, and we fit within the exception

2   articulated in *Pacific Lumber*.

3       The Court reserves the right to supplement these findings

4   and conclusions as to the exculpations, but based on the

5   foregoing, they are approved and the objections are overruled.

6       Now, turning to the Plan objection, it appears at Article

7   IX.F of the Plan and provides, in pertinent part, as follows:

8   Upon entry of the confirmation order, all enjoined parties are

9   and shall be permanently enjoined on and after the effective

10  date from taking any action to interfere with the

11  implementation or consummation of the Plan.  Except as

12  expressly provided in the Plan, the confirmation order, or a

13  separate order of the Bankruptcy Court, all Enjoined Parties

14  are and shall be permanently enjoined on and after the

15  effective date, with respect to any claims and interests, from

16  directly or indirectly -- and then commencing, conducting,

17  continuing any suit, action, proceeding of any kind, and

18  numerous other acts of that vein.

19      The injunction set forth herein shall extend to and apply

20  to any act of the type set forth in any of the causes above

21  against any successors to the Debtor, including but not

22  limited to the Reorganized Debtor, the Litigation Sub-Trust,

23  and the Claimant Trust, and their respective property and

24  interests in property.

25      Plan injunctions like this are commonplace and

44

 1   appropriate.  They are entirely consistent with and

 2   permissible under Bankruptcy Code Sections 1123(a)(5),

 3   1123(a)(6), 1141(a) and (c), and 1142, as well as Bankruptcy

 4   Rule 3016(c), which articulates the form that a plan

 5   injunction must be set forth in a plan.

 6       The Court finds the objections to the Plan Injunctions to

 7   be unfounded, and they are thus overruled without much

 8   discussion here.

 9       Now, lastly, the Gatekeeper Provision.  It appears at

10   Paragraph 4 of Article IX.F of the Plan and provides, in

11   pertinent part, "Subject in all respects to Article XII.D, no

12   Enjoined Party may commence or pursue a claim or cause of

13   action of any kind against any Protected Party that arose or

14   arises from or is related to the Chapter 11 case, the

15   negotiation of the Plan, the administration of the Plan, or

16   property to be distributed under the Plan, the wind-down of

17   the business of the Debtor or Reorganized Debtor, the

18   administration of the Claimant Trust or the Litigation Sub-

19   Trust, or the transactions in furtherance of the foregoing,

20   without the Bankruptcy Court (1) first determining, after

21   notice and a hearing, that such claim or cause of action

22   represents a colorable claim of any kind, including but not

23   limited to negligence, bad faith, criminal misconduct and

24   willful misconduct, fraud, or gross negligence against a

25   Protected Party; and (2) specifically authorizing such

45

1    Enjoined Party to bring such claim or cause of action against

2    such Protected Party, provided, however, that the foregoing

3    will not apply to a claim or cause of action against Strand or

4    against any employee other than with respect to actions taken,

5    respectively, by Strand or any such employee from the date of

6    appointment of the Independent Directors through the effective

7    date.  The Bankruptcy Court will have sole and exclusive

8    jurisdiction to determine whether a claim or cause of action

9    is colorable and, only to the extent legally permissible and

10   as provided for in Article XI, shall have jurisdiction to

11   adjudicate the underlying colorable claim or cause of action."

12       This gatekeeper provision appears necessary and reasonable

13   in light of the litigiousness of Mr. Dondero and his

14   controlled entities that has been described at length herein.

15   Provisions similar to this have been approved in this district

16   in the *Pilgrim's Pride* case and the *CHC Helicopter* case.  The

17   provision is within the spirit of the Supreme Court's Barton

18   Doctrine.  And it appears consistent with the notion of a pre-

19   filing injunction to deter vexatious litigants that has been

20   approved by the Fifth Circuit in such cases as *Baum v. Blue*

21   *Moon Ventures*, 513 F.3d 181, and in the *In re Carroll* case,

22   850 F.3d 811, which arose out of a bankruptcy pre-filing

23   injunction.

24       The Fifth Circuit, in fact, noted in the *Carroll* case that

25   federal courts have authority to enjoin vexatious litigants

46

1   under the All Writs Act, 28 U.S.C. § 1651.  And additionally,

2   under the Bankruptcy Code, a bankruptcy court can issue any

3   order, including a civil contempt order, necessary or

4   appropriate to carry out the provisions of the Code, citing,

5   of course, 105 of the Bankruptcy Code.

6       The Fifth Circuit stated that, when considering whether to

7   enjoin future filings against a vexatious litigant, a

8   bankruptcy court must consider the circumstances of the case,

9   including four factors:  (1)  the party's history of

10  litigation; in particular, whether he has filed vexatious,

11  harassing, or duplicative lawsuits; (2) whether the party had

12  a good faith basis for pursuing the litigation, or perhaps

13  intended to harass; (3) the extent of the burden on the courts

14  and other parties resulting from the party's filings; and (4)

15  the adequacy of alternatives.

16      In the *Baum* case, the Fifth Circuit stated that the

17  traditional standards for injunctive relief -- *i.e.*,

18  irreparable harm and inadequate remedy at law -- do not apply

19  to the issuance of an injunction against a vexatious litigant.

20      Here, although I have not been asked to declare Mr.

21  Dondero and his affiliated entities as vexatious litigants *per*

22  *se*, it is certainly not beyond the pale to find that his long

23  history with regard to the major creditors in this case has

24  strayed into that possible realm, and thus this Court is

25  justified in approving this provision.

Case 19-34054-sgj11    Doc 3596-30    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 30    Filed 04/25/2 52    Page 602 of 1052    PageID 17280

47

1       One of the Objectors' lawyers stated very eloquently in

2   closing argument, in opposing the plan injunction and

3   gatekeeping provisions, that "Even a serial killer has

4   constitutional rights," suggesting that these provisions would

5   deprive Mr. Dondero and his controlled entities of fundamental

6   rights or due process somehow.  But to paraphrase the district

7   court in the *Carroll* case, no one, rich or poor, is entitled

8   to abuse the judicial process.  There exists no constitutional

9   right of access to the courts to prosecute actions that are

10  frivolous or malicious.  The Plan injunction and gatekeeper

11  provisions in Highland's plan simply set forth a way for this

12  Court to use its tools, its inherent powers, to avoid abuse of

13  the court system, protect the implementation of the Plan, and

14  preempt the use of judicial time that properly could be used

15  to consider the meritorious claims of other litigants.

16      Accordingly, the Objectors' objections to this provision

17  are overruled.

18      As earlier stated, this Court reserves the right to alter

19  or supplement this ruling in a written order.  In this regard,

20  the Court directs Debtor's counsel -- I hope you are still

21  awake; it's been a long time -- the Court directs Debtor's

22  counsel to submit a form of order.  And specifically, I assume

23  that you've already prepared or have been in the process of

24  preparing a set of findings of fact, conclusions of law, and

25  confirmation order that tracks the confirmation evidence and

48

1    recites conclusions of law that the Plan complies with all the

2    various provisions of Section 1123, 1129, and other applicable

3    Code provisions.

4         What I want you to do is take this bench ruling and add it

5    to what you've prepared.  And what I mean is, as you can tell,

6    I've been reading:  I will have my courtroom deputy email to

7    you all a copy of what I just read.  I'll have her obviously

8    copy the Debtor's counsel, Creditors' Committee, Dondero and

9    the other Objectors, copy them on this written document she's

10   going to send out.  And, again, I want you to kind of meld it

11   into what you've already been preparing.

12        Obviously, I did not address in this oral ruling every

13   provision of 1129(a) and (b).  I did not address every 1123

14   objection.  I did not even address every single objection of

15   the Objectors.  But, again, any objection I've not

16   specifically addressed today is overruled.

17        The briefing, I should say, that the Debtor submitted,

18   there was a Memorandum of Law in Support of Confirmation filed

19   on January 22nd.  There was also a reply brief, a hundred

20   pages or so, separately filed, replying to all the objections.

21   I don't disagree with anything that was in that.  So, again,

22   to the extent you want to send me conclusions of law that are

23   along the lines of that briefing, I would consider that.

24        And so what I thought is you'll send me the melded

25   document and I will edit it if I see fit.  I recognize this

Appx. 03729
016282

49

 1  may take a few days, so I don't give you a strict timetable,

 2  just hopefully it won't take too many days.

 3      All right.  Is there anyone out there -- Mr. Pomerantz,

 4  you had to go to jury duty, except I can't believe --

 5          MR. POMERANTZ:  No, I --

 6          THE COURT:  I can't believe you were called, but are

 7  you there?

 8          MR. POMERANTZ:  Your Honor, I am here.  I was luckily

 9  excused, because I probably wouldn't have made it.

10      Your Honor, one just comment I'd make.  You referred to

11  the January 9th order.  You didn't refer to the CEO order,

12  which is your order July 16th, which had the same gatekeeper

13  provision.  I assume that was the same analysis?

14          THE COURT:  That was an oversight.  Same analysis.

15  And that's exactly why I said I reserve the right to

16  supplement or amend, because I know there had to be places

17  like that where I omitted to mention something important.

18          MR. POMERANTZ:  But thank you, Your Honor, for your

19  thoughtful ruling, and we will certainly incorporate your

20  materials into the order that we're working on and get it to

21  you when we can.  But we appreciate it on behalf of the

22  Debtor.  We know this took a lot of time and a lot of effort.

23  Hopefully, you got a chance to still watch the Super Bowl

24  yesterday.

25          THE COURT:  Well, when I saw that Tom Brady was going

50

1   to win, I turned it off.

2      I'm sorry.  That's terrible.  You know, my law clerk, my

3   law clerk that you can't see, Nate, he is from Ann Arbor,

4   Michigan, University of Michigan, and he almost cried when I

5   said I didn't like Tom Brady the other day.  So, I apologize.

6           MR. POMERANTZ:  Your Honor, one other comment.  We

7   had our motion to assume our nonresidential real property

8   lease that was also on.  It got missed in all the fanfare, but

9   it was -- it has been unopposed and essentially done pursuant

10  to stipulation.  So we'd like to submit an order on that as

11  well.

12          THE COURT:  Okay.  I have seen that, and I approve it

13  under 365.  You may submit the order.  Okay.  Thank you.

14          MR. POMERANTZ:  Thank you, Your Honor.

15          THE CLERK:  All rise.

16      (Proceedings concluded at 10:35 a.m.)

17                          --oOo--

18

19

20                       CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                    **02/09/2021**

24  _____         _____

    Kathy Rehling, CETD-444                      Date
25  Certified Electronic Court Transcriber

016284

51

INDEX

PROCEEDINGS                                                                3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS

Confirmation Hearing [1808]                                                3

Agreed Motion to (1) Assume Non-Residential Real Property    50
Lease with Crescent TC Investors, LP upon Confirmation of
Plan and (II) Extend Assumption Deadline [1624]

END OF PROCEEDINGS                                                         50

INDEX                                                                      51

016285

# EXHIBIT 31

Appx 93724

016286

```
                    IN THE UNITED STATES BANKRUPTCY COURT
1                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
2
                                    )      Case No. 19-34054-sgj-11
3       In Re:                      )      Chapter 11
                                    )
4       HIGHLAND CAPITAL            )      Dallas, Texas
        MANAGEMENT, L.P.,           )      Friday, January 8, 2021
5                                   )      9:30 a.m. Docket
                                    )
6             Debtor.               )
        _____)
                                    )
7       HIGHLAND CAPITAL            )      Adversary Proceeding 20-3190-sgj
        MANAGEMENT, L.P.,           )
8                                   )
                                    )
9             Plaintiff,            )      PRELIMINARY INJUNCTION
                                    )      HEARING [#2]
10      v.                          )
                                    )
11      JAMES D. DONDERO,           )
                                    )
12            Defendant.            )
        _____)
13                      TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
14                  UNITED STATES BANKRUPTCY JUDGE.

15      WEBEX/TELEPHONIC APPEARANCES:

16      For the Debtor/Plaintiff:    Jeffrey N. Pomerantz
                                     PACHULSKI STANG ZIEHL & JONES, LLP
17                                   10100 Santa Monica Blvd.,
                                      13th Floor
18                                   Los Angeles, CA  90067-4003
                                     (310) 277-6910
19
        For the Debtor/Plaintiff:    John A. Morris
20                                   PACHULSKI STANG ZIEHL & JONES, LLP
                                     780 Third Avenue, 34th Floor
21                                   New York, NY  10017-2024
                                     (212) 561-7700
22

23

24

25
```

2

```
1    APPEARANCES, cont'd.:

2    For James Dondero,          D. Michael Lynn
     Defendant:                  John Y. Bonds, III
3                                Bryan C. Assink
                                 BONDS ELLIS EPPICH SCHAFER
4                                  JONES, LLP
                                 420 Throckmorton Street,
5                                  Suite 1000
                                 Fort Worth, TX  76102
6                                (817) 405-6900

7    For the Official Committee  Matthew A. Clemente
     of Unsecured Creditors:     SIDLEY AUSTIN, LLP
8                                One South Dearborn Street
                                 Chicago, IL  60603
9                                (312) 853-7539

10   For the Funds and           Davor Rukavina
     Advisors:                   MUNSCH HARDT KOPF & HARR, P.C.
11                               500 N. Akard Street, Suite 3800
                                 Dallas, TX  75201-6659
12                               (214) 855-7554

13   For Certain Employees:      Frances A. Smith
                                 ROSS & SMITH, P.C.
14                               Plaza of the Americas
                                 700 N. Pearl Street, Suite 1610
15                               Dallas, TX  75201
                                 (214) 593-4976
16
     Recorded by:                Michael F. Edmond, Sr.
17                               UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
18                               Dallas, TX  75242
                                 (214) 753-2062
19
     Transcribed by:             Kathy Rehling
20                               311 Paradise Cove
                                 Shady Shores, TX  76208
21                               (972) 786-3063

22

23

24
             Proceedings recorded by electronic sound recording;
25               transcript produced by transcription service.
```

3

<u>DALLAS, TEXAS - JANUARY 8, 2021 - 9:41 A.M.</u>

1

2          THE COURT:  All right.  We are here for Highland

3    Capital Management, L.P. versus James Dondero, a preliminary

4    injunction hearing.  This is Adversary 20-3190.

5       All right.  Let's start out by getting appearances from

6    counsel.  First, for the Plaintiff/Debtor, who do we have

7    appearing?

8          MR. MORRIS:  Your Honor, John Morris; Pachulski Stang

9    Ziehl & Jones.  I'm here with my partner, Jeff Pomerantz, and

10   others.

11         THE COURT:  All right.  Good morning.  All right.

12   For Mr. Dondero, who do we have appearing?

13         MR. LYNN:  Michael Lynn, together with John Bonds,

14   for Mr. Dondero.

15         THE COURT:  Good morning.

16      All right.  I know we have a lot of parties in interest

17   represented on the video or phone today.  I'm not going to go

18   through a roll call, other than I'll see if we have the

19   Committee, the Unsecured Creditors' Committee counsel on the

20   line.  Do we have anyone appearing for them?

21         MR. CLEMENTE:  Yes, good morning, Your Honor.

22   Matthew Clemente from Sidley Austin on behalf of the

23   Committee.

24         THE COURT:  Okay.  Thank you.  All right.

25         MR. CLEMENTE:  Thank you, Your Honor.

4

 1          THE COURT:  Well, as I said, I'm not going to do a

 2     roll call.  I don't think we had any specific parties in

 3     interest, you know, file a pleading, or any other parties

 4     other than the Debtor and Mr. Dondero in this adversary.  So

 5     I'll just let the others kind of listen in without appearing.

 6        All right.  Mr. Morris, are you going to start us off this

 7     morning with, I don't know, an opening statement or any

 8     housekeeping matters?

 9          MR. MORRIS:  I have both an opening statement and

10     housekeeping matters.  I just wanted to see if Mr. Pomerantz

11     has anything he wants to convey to the Court before I begin.

12          MR. POMERANTZ:  (garbled)

13          THE COURT:  Mr. Pomerantz, if you could take your

14     device off mute, please.

15          THE CLERK:  He's off mute.  I don't know what --

16          THE COURT:  Okay.  Well, we're showing you're not on

17     mute, but we can't hear you.  What now?

18          THE CLERK:  He's not on mute now.  He's --

19          THE COURT:  Okay.  Go ahead, Mr. Pomerantz.

20        (Pause.)

21          THE CLERK:  He's not coming through.

22          THE COURT:  We're -- you're not coming through, and

23     we're not sure what the problem is.  We're not showing you on

24     mute.

25        (Pause.)

5

1          THE COURT:  All right.  Should we have him call back

2     in on his phone?  All right.  If you could, if you have a

3     phone, maybe you can try calling in on your phone and speak

4     through your phone, not your computer.

5          MR. MORRIS:  You know what, Your Honor?  I'm going to

6     proceed, and Mr. Pomerantz will address the Court at the

7     conclusion of the hearing on the motion.

8          THE COURT:  Okay.  Very good.  We usually hear him

9     loud and clear, so I don't know what's going on this morning.

10     Go ahead, Mr. Morris.

11          OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

12          MR. MORRIS:  Yes.  Thank you very much, Your Honor.

13     John Morris; Pachulski Stang; for the Debtor.

14       We are here this morning, Your Honor, on the Debtor's

15     motion for preliminary injunction against Mr. Dondero.  We

16     filed last night also an emergency motion for an order to show

17     cause as to why this Court should not hold Mr. Dondero in

18     contempt of court --

19          THE COURT:  All right.

20          MR. MORRIS:  -- for violating a previously-issued

21     TRO.

22          THE COURT:  Yes.  Let me just interject, in case

23     there's any confusion by anyone.  I am not going to hear the

24     motion for show cause order this morning.  While I understand

25     you think there might be some efficiency and overlap in

016291

6

 1  evidence, it's not enough notice.  So we'll talk about

 2  scheduling that at the end of the presentations this morning.

 3  All right?

 4          MR. MORRIS:  Thank you for addressing that, Your

 5  Honor.

 6          THE COURT:  Okay.

 7          MR. MORRIS:  Your Honor, then let's just proceed

 8  right to the preliminary injunction motion.  There is ample

 9  evidence to support the Debtor's motion for a preliminary

10  injunction.  There would have been substantial evidence to

11  support it based on the conduct that occurred prior to the

12  issuance of the TRO, but the conduct that did occur following

13  the TRO only emphasizes the urgent need for an injunction in

14  this case.

15      I want to begin by just telling Your Honor what evidence

16  we intend to introduce here today.  We filed at Docket 46 in

17  the adversary proceeding our witness and exhibit list.  The

18  exhibit list contains Exhibits A through Y.  And at the

19  appropriate time, I will move for the admission into evidence

20  of those exhibits.

21      The exhibit list and the witness list also identifies

22  three witnesses for today.  Mr. Dondero.  Mr. Dondero is here

23  today.  Notwithstanding Your Honor's comments on December 10th

24  and on December 16th, when I deposed him on Tuesday he was

25  unsure whether he was going to come here today to testify.

7

1   And he will inform Your Honor of that on cross-examination.

2   And so the Debtor was forced to prepare and serve a subpoena

3   to make sure that he was here today.  But Mr. Dondero is here

4   today.

5       Following the conclusion of Mr. Dondero's deposition on

6   Tuesday, and based in part on the evidence adduced during that

7   deposition, the Debtor terminated for cause Scott Ellington

8   and Isaac Leventon.  We had asked counsel for those former

9   employees to accept service of a trial subpoena so that they

10  would appear today.  We were told that they would do so if we

11  gave them a copy of the transcript of Mr. Dondero's

12  deposition.

13      We thought that was inappropriate and we declined to do

14  so, and they declined to accept service of the subpoenas.  We

15  have spent two days with a professional process server

16  attempting to effectuate service of the trial subpoenas for

17  Mr. Ellington and Mr. Leventon, but we were unsuccessful in

18  doing that.  So we'll only have one witness today, unless we

19  have cause to call anybody on rebuttal, and that witness will

20  be Mr. Dondero.

21      I want to talk for a few moments as to what Mr. Dondero

22  will testify to and what the evidence will show.  Mr. Dondero

23  will testify that he never read the TRO, Your Honor.  He will

24  testify that he didn't participate in the motion on the

25  hearing for the TRO, that he never read Mr. Seery's

Case 19-34054-sgj11    Doc 3596-31    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 31  Filed 06/03/25    Page 615 of 1052    PageID 17293
Page 601 of 1206

8

1   declaration in support of the Debtor's motion for the TRO,

2   that he never bothered to read the transcript of the

3   proceedings on December 10th so that he could understand the

4   evidence that was being used against him.  He had no knowledge

5   of the terms of the TRO when he was deposed on Tuesday.

6       And that's the backdrop of what we're doing here today,

7   because he didn't know what he was enjoined from doing, other

8   than speaking to employees.  He actually did testify and he

9   will testify that he knew he wasn't supposed to speak with the

10  Debtor's employees, but he spoke with the Debtor's employees

11  in all kinds of ways, as the evidence will show.

12      The evidence will also show that Mr. Dondero violated the

13  TRO by throwing away the cell phone that the company bought

14  and paid for after the TRO was entered into.  He's going to be

15  unable to tell you who threw it away.  He's going to be unable

16  to tell you who gave the order to throw it away.  He's going

17  to be unable to tell you when after the TRO was entered the

18  phone was thrown away.

19      But we do have as one fact and as I believe one violation

20  of the TRO --

21          MR. POMERANTZ:  So, I'm on a WebEx.

22          MR. MORRIS:  Jeff, --

23          THE COURT:  Mr. Pomerantz, we heard you.  We heard

24  you say something.  So, apparently, you got your audio

25  working.

9

1    All right.  Mr. Morris, continue.

2         MR. MORRIS:  Yeah.  And what Mr. Dondero may tell

3    you, Your Honor, is that it's really Mr. Seery's fault that

4    the phone got thrown away, because Mr. Seery announced that

5    all of the employees were going to be terminated at the end of

6    January, and because Mr. Seery did that, he and I believe Mr.

7    Ellington thought it was appropriate to just throw their

8    phones away, without getting the Debtor's consent, without

9    informing the Debtor, and switching the phone numbers that

10   were in the Debtor's account to their own personal names.  So

11   that's Item No. 1.

12       Item No. 2 -- and this is in no particular order, Your

13   Honor.  I don't want you to think that I'm bringing these

14   things up in terms of priority.  But they're just the order in

15   which they came up in the deposition, and so I'm just

16   following it as well.

17       Item No. 2 is trespass.  On December 22nd, you will hear

18   evidence that Mr. Dondero personally intervened to yet again

19   stop trades that Mr. Seery was trying to effectuate in his

20   capacity as portfolio managers of the CLOs.  He did that just

21   six days after Your Honor dismissed as frivolous a motion

22   brought by the very Advisors and Funds that he owns and

23   controls.

24       Therefore, the very next day, the Debtor sent him a

25   letter, sent through counsel a letter, evicting him from the

10

 1  premises, demanding the return of the phone, and telling him

 2  that he had to be out by December 30th.

 3      I was stunned, Your Honor, stunned, when I took his

 4  deposition on Tuesday and he was sitting in Highland's

 5  offices.  He hadn't asked for permission to be there.  He

 6  hadn't obtained consent to be there.  But he just doesn't care

 7  what the Debtor has to say here.  He just doesn't.

 8      I don't know when he got there or when he left.  I don't

 9  know if he spoke to anybody while he was there.  But he just

10  took it upon himself to show up in the Debtor's office,

11  notwithstanding the very explicit eviction notice that he got

12  on December 23rd.

13      Mr. Dondero, as I mentioned, clearly violated the TRO by

14  knowingly and intentionally and purposely interfering with the

15  Debtor's trading as the portfolio manager of the CLOs.  This

16  has just gone on too long.  There have been multiple hearings

17  on this matter, but he doesn't care.  So he gave the order to

18  stop trades that Mr. Seery had effectuated.  That's a clear

19  violation of the TRO, and it certainly supports the imposition

20  of a preliminary injunction.

21      Mr. Seery -- Mr. Dondero is going to testify that multiple

22  letters -- that I'm going to refer to them, Your Honor, as the

23  K&L Gates Parties, and those are the two Advisors and the

24  three investment funds and CLO Holdco that are all owned and/

25  or controlled by Mr. Dondero -- after that hearing on the

11

1   16th, K&L Gates, the K&L Gates Parties sent not one, not two,

2   but three separate letters.  They said they may take steps to

3   terminate the CLO management agreements.  After we evicted Mr.

4   Dondero, sent a letter suggesting that we would be held liable

5   for damages because we were interfering with their business.

6       And Mr. Dondero is going to tell you, Your Honor, that he

7   encouraged the sending of those letters, that he approved of

8   those letters, that he thought those letters were the right

9   things to send to the Debtor, even after -- even with the

10  knowledge of what happened on December 16th.

11      He's going to tell you he knew about that hearing and he

12  still, he still approves of those letters, and never bothered

13  to exercise his control to have those letters withdrawn upon

14  the Debtor's request.  We asked them to withdraw it, and when

15  they wouldn't do it, Your Honor, that's what prompted the

16  filing of yet another adversary proceeding.  And we're going

17  to have another TRO hearing next Wednesday because they won't

18  stop.

19      Next, a preliminary injunction should issue because Mr.

20  Dondero violated the TRO by communicating with the Debtor's

21  employees to coordinate their legal strategy against the

22  Debtor.  The evidence will show, in documents and in

23  testimony, that on December 12th, while he was prohibited from

24  speaking to any employee except in the context of shared

25  services, you're going to see the documents and you're going

12

 1   to hear the evidence that on December 12th Scott Ellington was

 2   actively involved in identifying a witness to support Mr.

 3   Dondero's interests at the December 16th hearing.

 4        You will receive evidence that on December 15th Mr.

 5   Ellington and Mr. Leventon collaborated with Mr. Dondero's

 6   lawyers to prepare a common interest agreement.

 7        You will hear evidence that on the next day, December

 8   16th, the day of that hearing, that Mr. Dondero solicited Mr.

 9   Ellington's help to coordinate all of the lawyers representing

10   Mr. Dondero's interests, telling Mr. Ellington that he needed

11   to show leadership, and Mr. Ellington readily agreed to do

12   just that.

13        You will hear evidence that on December 23rd Mr. Ellington

14   and Grant Scott communicated in connection with calls that

15   were being scheduled with Mr. Dondero and with K&L Gates, the

16   very K&L Gates Clients who filed the frivolous motion that was

17   heard on December 16th and that persisted in sending multiple

18   letters threatening the Debtor thereafter.

19        You will hear evidence that late in December Mr. Dondero

20   sought contact information for Mr. Ellington and Mr.

21   Leventon's lawyer, and he will tell you that he did it for the

22   explicit purpose of advancing their mutual shared interest

23   agreement, while they were employed by the Debtor.  While they

24   were employed by the Debtor.

25        Finally, you will hear evidence, and it will not be

13

1  disputed, you will see the evidence, it's on the documents,

2  that Mr. Dondero personally intervened to stop the Debtor from

3  producing the financial statements of Get Good and Dugaboy,

4  two entities that he controls, that the U.C.C. had been asking

5  for for some time, that the Debtor had been asking of its

6  employees for some time to produce.  And it was only when we

7  got, frankly, the discovery from Mr. Dondero when there's a

8  text message that says, Not without a subpoena.

9      The documents are on the Debtor's system.  We just don't

10  know where they are because they're hidden someplace.  But Mr.

11  Dondero knows where they are.  He can certainly force -- he

12  can certainly get them produced.  And one of the things we'll

13  be asking for when we seek the contempt motion is the

14  production of those very documents.

15      So, Your Honor, that's what the evidence is going to show.

16  I don't think there's going to be any question that a

17  preliminary injunction ought to issue.  But I do want to spend

18  just a few minutes rebutting some of the assertions made in

19  the filing by Mr. Dondero last night.

20      Of course, they offer no evidence.  There is no

21  declaration.  There is no document.  There is merely argument.

22  It's been that way throughout this case.  For a year, Mr.

23  Dondero has never stood before Your Honor to tell you why

24  something was wrong being done to him, why -- he hasn't

25  offered to be here at all, and he's here today, again, only

14

1  because he got a subpoena.  That's the only reason we know

2  he's here today.

3      So let's just spend a few minutes talking about the

4  assertions made in the document last night.  Mr. Dondero

5  complains about the scope of the injunction, and I say to

6  myself, in all seriousness, Are you kidding me?  You didn't

7  even read the TRO and you're going to be concerned about what

8  the scope of the injunction is?  You didn't even have enough

9  respect for the Court to read the TRO and we're going to worry

10 about the scope of some future injunction?  Doesn't make any

11 sense to me.

12     But let's talk about the specific arguments that they

13 make.

14     Third parties.  They're concerned that somehow third

15 parties don't have notice of the injunction.  Your Honor,

16 third parties are not impacted by the injunction.  The only

17 third parties that are impacted by the injunction are those

18 that are owned and/or controlled by Mr. Dondero.  If he

19 doesn't tell them, that's his breach of duty.  He created the

20 Byzantine empire of over 2,000 entities, and he wants the

21 Debtor to have the burden of notifying all of them so that

22 they can all come in here and make 2,000 arguments as to why

23 they shouldn't be enjoined?

24     He owns and controls them.  They are the only third

25 parties who are impacted by this proposed preliminary

15

 1   injunction, and he has the responsibility, he has the duty to

 2   inform them, because he owns and controls them.

 3       We know of the K&L Gates Parties.  We know Get Good and

 4   Dugaboy are in this courtroom.  We know CLO Holdco.  So many

 5   of these parties have been so -- they're on the phone now.

 6   They don't have notice?  It is insulting, frankly, to suggest

 7   that the Debtor somehow has some obligation to figure out who

 8   Mr. Dondero owns and controls.  He should know that.  That's

 9   number one.

10       Number two, there is a statement in there about employees

11   and how he should be able to speak with them about personal

12   and routine matters.  As to that, Your Honor, he has forfeited

13   that opportunity.  He cannot be trusted.  There cannot be any

14   communication because nobody can police it.  And so we think a

15   complete bar to any discussion with any employee, except as it

16   relates to shared services -- because we do have a contractual

17   obligation; that's what was in it -- ought to be barred.

18   That's number one.

19       Number two, there's a reference in the objection to Mr.

20   Dondero's personal assistant.  I'd like to know who that is,

21   Your Honor.  I wasn't aware that he still was using a personal

22   assistant at the Debtor.  I want to know specifically who that

23   is.  I don't know that they -- you know, I just -- we need to

24   cut that off.  And he should not be communicating with any

25   employee.  The Debtor should not be paying for his personal

Case 19-34054-sgj11   Doc 3596-31   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 31 Filed 07/25206 Page 623 of 1052   PageID 17301

16

1   assistant.

2       It's offensive to think that he's still doing that,

3   particularly after he was terminated or his resignation was

4   requested back in October precisely because his interests were

5   adverse to the Debtor.

6       Number three, he's concerned that the Debtor is somehow

7   preventing him from speaking to former employees.  We now

8   know, Your Honor, that that's a, I'm sure, a very specific

9   reference to Mr. Ellington and Mr. Leventon.  Right?  He wants

10  a green light to be able to do that.  And you know, I'll leave

11  it to Your Honor as to whether that's appropriate.  I'll leave

12  it to their counsel as to whether, going forward, colluding

13  together against the Debtor at this point in time is in

14  anybody's best interest.  But I will -- what I will demand in

15  the preliminary injunction is a very explicit statement that

16  Mr. Ellington and Mr. Leventon are not to share any

17  confidential or privileged information that they received in

18  their capacity as general counsel and assistant general

19  counsel of the Debtor.

20      The pot plan.  He's afraid somehow the order is going to

21  prevent him from pursuing the pot plan.  He's had over a year

22  to pursue this pot plan, Your Honor.  Frankly, I don't, you

23  know, I don't know what to say.  He has never made a proposal

24  that has gotten any traction with the only people who matter.

25  And it's not the Debtor.  It's the creditors.  It's the

17

1    Creditors' Committee.

2       If you want to put in an exception that he can call Matt

3    Clemente, I don't mean to put this on Mr. Clemente, he can

4    decide whether or not that's appropriate, but the creditors

5    are the only ones who matter here.  Your Honor, it's not the

6    Debtor.

7       And I'll let Mr. Dondero's counsel explain to Your Honor

8    why he thinks he still needs to pursue a pot plan, and Your

9    Honor can decide.  I trust Your Honor to decide what

10   boundaries and what guardrails might be appropriate for him to

11   continue to pursue his pot plan.

12      That's all I have, Your Honor.  Not much.

13           THE COURT:  All right.

14           MR. MORRIS:  But I think there's going to be --

15   there's going to be an awful lot of evidence.  This is going

16   to be a lengthy examination.  I ask the Court for your

17   patience.

18           THE COURT:  I've got --

19           MR. MORRIS:  But that's all I have.

20           THE COURT:  I've got all day, if we need it.

21           MR. MORRIS:  Okay.

22           THE COURT:  I hope we don't, but I've got all day if

23   we need it.  All right.

24           MR. MORRIS:  That's what I have, Your Honor.

25           THE COURT:  All right.  Mr. Dondero's counsel, your

18

1   opening statement?

2          MR. BONDS:  Your Honor, I would reserve my opening

3   statement to the end of the hearing.

4      I would also point out that anything that Mr. Morris just

5   said was not evidence, and we think that the evidence will

6   show completely differently than argued or articulated by Mr.

7   Morris.

8          THE COURT:  All right.

9          MR. BONDS:  That's all.

10          THE COURT:  Thank you, Mr. Bonds.

11     Mr. Morris, you may call your witness.

12          MR. MORRIS:  The Debtor calls James Dondero.

13          THE COURT:  All right.  Mr. Dondero, this is Judge

14   Jernigan.  I would ask you to say, "Testing, one, two," so we

15   pick up your video so I can swear you in.

16     All right.  Mr. Dondero, if you're speaking up, we're not

17   hearing you, so please make sure you're unmuted and have your

18   video --

19     (Echoing.)

20          MR. DONDERO:  Hello.  One, two.

21          THE COURT:  Okay.  We got you.

22          MR. DONDERO:  One, two three.

23          THE COURT:  We got you now.

24          JAMES D. DONDERO, PLAINTIFF'S WITNESS, SWORN

25          THE COURT:  All right.  Thank you.

Dondero - Direct                    19

1        Mr. Morris, go ahead.

2            MR. MORRIS:  Thank you, Your Honor.

3        (Echoing.)

4            THE COURT:  I'm going to ask everyone except Mr.

5    Dondero and Mr. Morris to put your device on mute.  We're

6    getting a little distortion.

7        All right.  Go ahead.

8                    DIRECT EXAMINATION

9    BY MR. MORRIS:

10   Q   Good morning, Mr. Dondero.  Can you hear me?

11   A   Yes.

12       (Echoing.)

13           THE COURT:  Ooh.  Okay.  We're having a little echo

14   when you speak, Mr. Dondero.  Do you have -- well, first, you

15   have headphones.  That always helps.

16       (Echoing.)

17           THE COURT:  Okay.  That may help as well.

18       (Pause.)

19           THE COURT:  Okay.  Let's try again.  If you could

20   say, "Testing, one, two."

21           THE WITNESS:  Is that better?

22           THE COURT:  That is better, yes.

23       All right.  Go ahead.

24           THE WITNESS:  Okay.  Great.

25           MR. MORRIS:  Thank you.

Dondero - Direct                          20

BY MR. MORRIS:

1    Q    Can you hear me, Mr. Dondero?

2    A    You're a bit faint.  Give me one second.  Okay.  Got you.

3    Q    Okay.  Thank you.  Who is in the room with you right now?

4    A    Bonds, Lynn, and a tech.

5          A VOICE:  Bryan Assink.

6          THE WITNESS:  Oh, is Assink here?  Oh, okay, I'm

7    sorry.  All right.  I'm sorry.  Bonds, Lynn, and Bryan Assink.

8    BY MR. MORRIS:

9    Q    Okay.  You're testifying today pursuant to a subpoena,

10   correct?

11   A    Yes.

12   Q    Okay.

13         MR. MORRIS:  And Your Honor, that subpoena can be

14   found at Docket No. 44 in the adversary proceeding.

15         THE COURT:  All right.

16   BY MR. MORRIS:

17   Q    In the absence of a subpoena, in the absence of a

18   subpoena, you didn't know if you would show up to testify at

19   this hearing; is that right?

20   A    I -- I do what my counsel directs me to do, and I didn't

21   know at that time whether they would direct me to come or not.

22   Q    Okay.  And when I -- when I deposed you earlier this week,

23   you agreed that you may or may not testify; is that right?

24   A    It depends on what counsel instructs me to do, correct.  I

Dondero - Direct                    21

1  didn't know at the time.

2  Q    Okay.  And you didn't mention anything about counsel when

3  I asked you the questions earlier this week, correct?

4  A    That was the undertone in almost all my answers, that I

5  relied on counsel.

6          MR. MORRIS:  Your Honor, I move to strike.  I'm

7  asking very specific questions.  And if I need to go to the

8  deposition transcript, I'm happy to do that.

9          THE COURT:  All --

10          MR. MORRIS:  Just going forward, Your Honor, this is

11  cross-examination.  It's really yes or no at this point.

12  That's what I would request, anyway.

13          THE COURT:  All right.  Mr. Dondero, do you

14  understand --

15      (Echoing.)

16          THE COURT:  Do you understand what Mr. Morris was

17  raising there?  We really need you to give specific answers --

18  and usually they're going to be yes or no answers -- to Mr.

19  Morris's questioning.  Okay?  So let's try again.  Mr. Morris,

20  go ahead.

21          THE WITNESS:  Yeah.

22  BY MR. MORRIS:

23  Q    Mr. Dondero, you're aware that Judge Jernigan granted the

24  Debtor's request for a TRO against you on December 10th,

25  correct?

Dondero - Direct                    22

1    A    Yes.

2    Q    But you never reviewed the declaration that Mr. Seery

3    filed in support of the Debtor's motion for a TRO, correct?

4    A    I relied on counsel.

5    Q    Sir, you never reviewed the declaration that Mr. Seery

6    filed in support of the Debtor's motion for a TRO, correct?

7    A    Correct.

8    Q    You didn't even know the substance of what Mr. Seery

9    alleged in his declaration at the time that I deposed you on

10   Tuesday, correct?

11   A    Correct.

12   Q    And that's because you didn't even think about the fact

13   that the Debtor was seeking a TRO against you; isn't that

14   right?

15   A    No.

16   Q    That's not right?

17   A    No.

18   Q    All right.

19        MR. MORRIS:  Your Honor, could I ask my assistant,

20   Ms. Canty, to put up on the screen what had been designated as

21   the Debtor's Exhibit Z in connection with the motion for

22   contempt?  Exhibit Z is the transcript from Tuesday's hearing.

23        THE COURT:  All right.

24        MR. MORRIS:  And I would like to -- I'd like to

25   cross-examine Mr. Dondero on his testimony on Tuesday.

Dondero - Direct                          23

 1              THE COURT:  All right.  You may.

 2              MR. MORRIS:  Can we put up Page 15, please?  And go

 3   to Lines 15 through 17.

 4   BY MR. MORRIS:

 5   Q    Sir, you recall being deposed on Tuesday by my -- by me,

 6   correct?

 7   A    Yes.

 8   Q    Okay.  Did you hear this question and did you hear this

 9   answer?

10        "Q   Did  you  care  that  the  Debtor  was  seeking  a  TRO

11        against you?

12        "A   I didn't think about it."

13   Q    Is that -- is that your testimony from the other day?

14   A    Yes.

15   Q    You didn't dial in to the hearing when the Court

16   considered the Debtor's motion for a TRO against you, did you?

17   A    I -- I don't recall.  I don't think so.

18   Q    You never read the transcript in order to understand what

19   took place in this courtroom when Judge Jernigan decided to

20   enter a TRO against you; isn't that right?

21   A    I relied on counsel, which has been my testimony all

22   along.

23              MR. MORRIS:  Can we go to Page 13 of the transcript,

24   please?  Beginning at Line 24.

25   BY MR. MORRIS:

Dondero - Direct                    24

1    Q    (reading)

2         "Q   Did you read a transcript of the hearing?

3         "A   No."

4    Q    Did you testify on Tuesday that you did not read a

5    transcript of the hearing?

6    A    Yes.

7    Q    In fact, as of at least last Tuesday, you hadn't even

8    bothered to read the TRO that this Court entered against you.

9    Isn't that right?

10        MR. BONDS:  Your Honor, I'm going to object.

11        (Echoing.)

12        THE COURT:  Okay.  We're getting that echo from you

13   now, Mr. Bonds.  So maybe you need to turn your volume down a

14   little.  But what is the basis for your objection?

15        (Echoing.)

16        MR. BONDS:  Leading and rhetorical.

17        MR. MORRIS:  I think it's because they're in the same

18   room.

19        THE COURT:  Okay.  Do you have -- I don't know what

20   you're doing.  I guess you're moving to a different room?

21        MR. BONDS:  I am, Your Honor.

22        THE COURT:  Okay.

23        (Echoing.)

24        THE COURT:  Okay.  I'm waiting for the objection

25   basis.

Dondero - Direct                    25

1          MR. BONDS:  The basis of the objection, Your Honor,

2     is that --

3        (Echoing.)

4          THE COURT:  Okay.  We're going to have to do

5     something different here.  We can't have this issue for the

6     entire hearing.  Do you need to get a tech person in there, or

7     maybe call in on your phone?  I don't know.

8          MR. BONDS:  Your Honor, I'm going into the conference

9     room.

10       (Pause.)

11         THE COURT:  Okay.  Are we going to try again here?

12         MR. BONDS:  Yes.  Is this working?

13         THE COURT:  Yes.

14         MR. BONDS:  Perfect.  Your Honor, my objection is

15    that Mr. Dondero has already testified that he relied on his

16    lawyers.  I don't know where Mr. Morris is going with this,

17    but it's pretty clear that Mr. Dondero simply relies on his

18    lawyers to tell him what happened.  I don't know that that's

19    that different than any other layperson.

20         MR. MORRIS:  Your Honor, if this is --

21         THE COURT:  Well, --

22         MR. MORRIS:  If I may?

23         THE COURT:  Yes.

24         MR. MORRIS:  I believe it's terribly relevant to know

25    how seriously Mr. Dondero takes this Court and this Court's

016311

Dondero - Direct                          26

1    proceedings and this Court's orders.  If the Court decides

2    that it doesn't matter whether or not he read the transcript,

3    you're the fact-finder and you'll make that decision.  But I

4    believe it's at least relevant.

5            THE COURT:  Okay.  I agree and I overrule the

6    objection.

7        Go ahead.

8    BY MR. MORRIS:

9    Q   Mr. Dondero, as of at least Tuesday, you never bothered to

10   read the TRO that was entered against you, correct?

11   A   I'm sorry.  We're dealing with some tech stuff here for a

12   second.  Can you repeat the question?

13   Q   Yes.

14       (Echoing.)

15   Q   As of Tuesday, you had not bothered to read the TRO that

16   was entered against you?

17       (Echoing.)

18           MR. MORRIS:  Your Honor, can we take a break?  I

19   can't do this.  I just --

20           THE COURT:  Okay.  I agree.  Okay.  Mr. Bonds, what

21   do we need to do to fix these technical problems?  Do I need

22   to get my IT guy in here and help you?  This is terrible.

23   This connection is terrible.  And I understand people have

24   technical problems sometimes, but we've been doing these video

25   hearings since March, so --

Dondero - Direct                    27

1           MR. BONDS:  Your Honor, I have simply gone to another

2    conference room.  The Debtor (garbled) I think that Mr.

3    Dondero should be fine.

4           THE COURT:  Okay.  I don't know what you said except

5    that you think Mr. Dondero should be fine.  I --

6           MR. MORRIS:  Is there anybody in that room with a

7    cell phone on, Mr. Dondero?

8           THE WITNESS:  No.

9           MR. BONDS:  And I'm completely over in --

10          THE COURT:  Okay.

11          MR. MORRIS:  Can I try and proceed?

12          THE COURT:  Try to proceed.

13          MR. MORRIS:  Okay.

14       (Echoing.)

15   BY MR. MORRIS:

16   Q   Mr. Dondero, as of Tuesday you only had a general view of

17   what this Court restrained you from doing; is that correct?

18       (Echoing.)

19          MR. MORRIS:  I'd still -- I -- there's too much

20   noise, Your Honor.  I can't do it.

21          THE COURT:  Okay.  We're going to take a five-minute

22   break.  Mr. Bonds, can you get a technical person there to

23   work through these problems?

24       And Mike, let's get Bruce up here to --

25          THE CLERK:  It's because they're in the same room.

016313

Dondero - Direct                    28

1   That's the problem.

2          THE COURT:  They're -- they're --

3          THE CLERK:  Judge Jernigan, this is Traci.  Bruce is

4   on his way up there.

5          THE COURT:  Thank you.

6      Mike, explain it to me, because I don't understand.

7   You're saying if they have two devices on in the same room?

8          THE CLERK:  The same -- that's the problem.  They're

9   so close.  And they're trying to use the same device, give it

10  back to you.

11         A VOICE:  He has a phone on in the room.

12         MR. MORRIS:  I asked that question.

13         THE COURT:  Okay.

14         MR. MORRIS:  Please instruct the witness to exclude

15  everybody from the room, to turn off all electronic devices

16  except the device that's being used for this (garbled).  At

17  least have --

18         THE COURT:  All right.  So, the consensus of more

19  technical people than me is you've got two devices on in the

20  same room and that's what's causing the distortion and echo.

21  So I don't know if it's somebody's phone that needs to be

22  turned off or if you have two iPads or laptops.

23      (Court confers with Clerk.)

24      (Pause.)

25         MR. BONDS:  I think I'm unmuted.  Can people hear me?

Dondero - Direct                    29

1           THE WITNESS:  Yes.

2        (Pause.)

3           THE COURT:  Okay.  Bruce, can you walk their office

4    through?  They have, I think, two devices in the same room.

5    It's a horrible echo.  So, Mr. Bonds or some --

6           MR. BONDS:  Yes, Your Honor.

7           THE COURT:  We have a lawyer and the lawyer's client

8    who is testifying right now in the same room.

9           I.T. STAFF:  Uh-huh.

10          THE COURT:  And --

11          I.T. STAFF:  Yeah.  Yeah.  Because -- is one a call-

12   in user on a telephone?

13          THE COURT:  I don't know.  I don't --

14          I.T. STAFF:  Yeah.  Whatever's coming -- the audio is

15   feeding back in.  They need to separate if they're both on.

16   Or just use one and the attorney can slide over and the client

17   can --

18          THE COURT:  Okay.

19          I.T. STAFF:  -- go in his place.  Just use one --

20          THE COURT:  Our IT person is confirming what everyone

21   else has been saying, that you really can only have one device

22   in the same room.  It's just unavoidable, the echoing.

23          I.T. STAFF:  Unless everybody has --

24          THE COURT:  Unless everyone has headphones on.

25          I.T. STAFF:  Right.

Dondero - Direct                    30

1           THE COURT:  So we either need everyone to have

2   headphones on, or one device in the room.  And you all,

3   awkward as it is, just have to share.  Or I guess you could

4   have two laptops, but one person has to --

5           I.T. STAFF:  Has to have a headset.

6           THE COURT:  Has to --

7           I.T. STAFF:  Because the other one, the audio is

8   going to be feeing into the microphone of the other one.

9           THE COURT:  Okay.  So, Mr. Bonds, I don't know if

10  you've heard any of that, but --

11          THE CLERK:  He needs to unmute himself.

12          THE COURT:  You're on mute, Mr. Bonds.

13          MR. BONDS:  I'm sorry, Your Honor.  I'm going to sit

14  next to Mr. Dondero and answer any questions that may come up.

15          THE COURT:  Okay.

16          MR. BONDS:  If any objections --

17          THE COURT:  Okay.  So we're going to have one device?

18          MR. BONDS:  Yes.

19          THE COURT:  Okay.  Let's try again.

20      Okay.  Go ahead, Mr. Morris.

21  BY MR. MORRIS:

22  Q   Mr. Dondero, is Mr. Ellington listening to this hearing?

23          THE COURT:  I didn't hear you, Mr. Morris.  What?

24  BY MR. MORRIS:

25  Q   Mr. Dondero, is Mr. Ellington listening to this hearing?

Case 19-34054-sgj11   Doc 3596-31   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 31 Filed 06/30/25206 Page 638 of 1052    PageID 17316

Dondero - Direct                    31

1   A    I have no idea.

2   Q    Is Mr. Leventon listening to this hearing?

3   A    I have no idea.  I haven't spoken with him.

4   Q    Okay.  So let's try again.  At least as of today, you

5   never bothered to read the TRO that was entered against you,

6   correct?

7   A    Correct.

8   Q    As of Tuesday, you only had a general understanding of

9   what the Court restrained you from doing, correct?

10       (Echoing.)

11  A    I had an adequate understanding.

12  Q    You had a what?

13  A    Adequate understanding.

14  Q    Your understanding --

15            A VOICE:  Your Honor?

16  BY MR. MORRIS:

17  Q    -- was that you were prohibited from speaking to the

18  Debtor's board without counsel and from speaking to the

19  Debtor's employees; is that right?

20  A    No.

21  Q    Okay.

22            MR. MORRIS:  Can we go to Page 13, Line 8, please?

23  BY MR. MORRIS:

24  Q    Were you asked this question and did you give this answer?

25       "Q   Tell me your understanding of what the temporary

Dondero - Direct                              32

1        restraining order restrains you from doing.

2        "A    To talk to Independent Board directly or talking

3        directly with employees.

4        "Q    Is there any other aspect of the temporary

5        restraining order that you're aware of that would

6        otherwise constrain or restrain your conduct?

7        "A    Those are the points I (garbled)."

8   Q    Did you give those answers to the questions that I asked?

9   A    Yes.

10  Q    And even with that general understanding, you went ahead

11  and communicated directly (garbled) employees many, many, many

12  times after the TRO was entered?

13  A    Only with regard to shared services, pot plan, and

14  Ellington, the settlement counsel.

15  Q    Does the restraining order permit you to speak with

16  Debtor's employees about the pot plan?

17       (Echoing.)

18            THE COURT:  Mr. Morris, let me stop.

19            MR. MORRIS:  Yeah.  I appreciate that, Your Honor.

20            THE COURT:  Even --

21            MR. MORRIS:  It's not working.

22            THE COURT:  Even your sound is not coming through

23  clearly.  And I think it's the echo coming out of their

24  speakers, Mr. Dondero and Mr. Bonds' speakers.  But before we

25  conclude that, would you turn off your video and ask your

Dondero - Direct                          33

1   question again and see if it's any better, just to confirm

2   it's not a bandwidth issue on your end?  I doubt it is, but --

3   okay.  So, try asking your question again, and I'm going to

4   see if it's still distorted.

5   BY MR. MORRIS:

6   Q   There's nothing in the TRO that permitted you to speak

7   with Debtor employees about the pot plan, correct?

8            THE COURT:  Okay.  Mr. Morris, it's not at your end.

9   It's -- it's their end.  Okay.  So you can turn your video

10  back on.

11      Mr. Bonds?

12           MR. BONDS:  Yes, ma'am.

13           THE COURT:  You all are going to have to use earbuds,

14  apparently.  We're getting -- we're getting a feedback loop,

15  okay?  Whenever Mr. Morris talks or I talk, we're hearing

16  ourselves echo through your speakers.

17           MR. BONDS:  Can you check right now to see if it's

18  true, if we're experiencing the same problem?

19           THE WITNESS:  In other words, is this better?  We

20  unplugged the cord here.

21           THE COURT:  Well, when you all speak, it's -- it's

22  better now.  But when --

23           MR. MORRIS:  It is better.

24           THE COURT:  But when Mr. Morris asks a question, it's

25  echoing through your speakers.  But I don't hear myself

Dondero - Direct                        34

1   echoing through your speakers.

2           I.T. STAFF:  Can Mr. Morris say something, please?

3           THE COURT:  Mr. Morris, say something.

4           MR. MORRIS:  They may have solved the problem.  They

5   may have solved the problem.  How's that?

6           THE COURT:  Okay.  I think the problem is solved,

7   whatever you did, so let's try once again.

8       Go ahead, Mr. Morris.  Repeat your last question.  I

9   didn't hear it.

10  BY MR. MORRIS:

11  Q   Mr. Dondero, the temporary restraining order doesn't

12  permit you to speak with the Debtor's employees about a pot

13  plan; isn't that right?

14  A   There was a presentation on the pot plan given to the

15  Independent Board after the restraining order was put in

16  place.  What are you implying, that that wasn't proper?

17          MR. MORRIS:  Your Honor, I move to strike.  It's a

18  very simple question.

19          THE COURT:  Okay.  Sustained.  If you could just

20  answer the specific question, Mr. Dondero.

21          THE WITNESS:  I don't know.

22  BY MR. MORRIS:

23  Q   Fair enough.  Sir, let's talk about some of the events

24  that led up to the imposition of the TRO.  I appreciate the

25  fact that you hadn't read Mr. Seery's declaration or any of

Dondero - Direct                    35

 1   the evidence that was submitted in connection with the TRO, so
 2   let's spend some time talking about that now.  CLO stands for
 3   Collateralized Loan Obligation, correct?
 4   A    Yes.
 5   Q    And the Debtor is party to certain contracts that give it
 6   the exclusive right and responsibility to manage certain CLOs,
 7   correct?
 8   A    Yes.
 9   Q    NexPoint Advisors, LP is an advisory firm.  Do I have that
10   right?
11   A    Yes.
12   Q    And we can refer to that, that firm, as NexPoint; is that
13   fair?
14   A    Yes.
15   Q    You have a direct or indirect ownership interest in
16   NexPoint, correct?
17   A    Yes.
18   Q    You're the president of NexPoint; isn't that right?
19   A    Yes.
20   Q    And as the president of NexPoint, it's fair to say that
21   you control that entity, correct?
22   A    To a certain extent.
23   Q    Sir, as the president of NexPoint, it's fair to say that
24   you control that entity, correct?
25   A    To a certain extent.

Case 19-34054-sgj11    Doc 3596-31    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 31 Filed 07/07/25206 Page 643 of 1052    PageID 17321

Dondero - Direct                          36

1        MR. MORRIS:  Can we go to Page 18 of the transcript,

2   please?  Lines 19 and 21.

3   BY MR. MORRIS:

4   Q    Were you asked this question and did you give this answer?

5        "Q    As  the  president  of  NexPoint,  it's  fair  to  say

6        that you control that entity?

7        "A    Generally."

8   Q    Is that the right answer that you gave the other day?

9   A    I think it's similar to what I just said, yeah, yeah.

10  Q    Sir, you're familiar with Highland Capital Management Fund

11  Advisors, LP; is that right?

12  A    Yes.

13  Q    And we'll call that Fund Advisors; is that fair?

14  A    Yes.

15  Q    And we'll refer to Fund Advisors and NexPoint together as

16  the Advisors; is that okay?

17  A    Yes.

18  Q    Fund Advisors is also an advisory firm, correct?

19  A    Yes.

20  Q    You have a direct or indirect ownership interest in Fund

21  Advisors, correct?

22  A    Yes.

23  Q    You're the president of Fund Advisors, correct?

24  A    Yes.

25  Q    And you also have an ownership interest in the general

Appx. 03709
016322

Dondero - Direct                          37

1   partner of Fund Advisors; isn't that right?

2   A    I believe so.

3   Q    It's fair to say that you control Fund Advisors, correct?

4   A    Generally.

5   Q    NexPoint and Fund Advisors manage certain investments

6   funds; is that right?

7   A    Yes.

8   Q    Among the funds that they manage are High Point Income

9   Fund; is that right?

10  A    I don't think that's a name that we manage.

11  Q    Let's put it this way.  There are three funds that are

12  represented by K&L Gates that are managed by the Advisors,

13  correct?

14  A    I don't know.

15  Q    Okay.  You're the portfolio manager of the investment

16  funds advised by NexPoint and Fund Advisors, correct?

17  A    Largely.

18  Q    And NexPoint and Fund Advisors caused the investment funds

19  that they manage to invest in CLOs that are managed by the

20  Debtors, correct?

21  A    Years ago, they bought the equity interests, if that -- if

22  that's what you're asking me, in various CLOs.

23  Q    The two Advisors that you own and control caused the

24  investment funds to purchase interests in CLOs that are

25  managed by the Debtor, correct?

Dondero - Direct                          38

1   A    Not recently.  Not recently.  Years ago.  Yes.

2   Q    And they still hold those interests today, correct?

3   A    Yes.

4   Q    And K&L Gates represents all of those entities, correct?

5   A    Yes.

6   Q    And we'll call those the K&L Gates Clients; is that fair?

7   A    Yes.

8   Q    Before the TRO was entered, the K&L Gates Clients sent two

9   letters to the Debtor concerning the Debtor's management of

10  certain CLOs, right?

11  A    Yes.

12  Q    Okay.

13         MR. MORRIS:  Your Honor, I just want to take a moment

14  now, because we're going to start to look at some documents.

15  The Debtor would respectfully move into evidence Exhibits A

16  through Y that are on their exhibit list.

17         THE COURT:  All right.

18         MR. BONDS:  Your Honor, we have no objection.

19         THE COURT:  A through Y are admitted.  And for the

20  record, these appear at Docket No. 46 in this adversary.

21      (Plaintiff's Exhibits A through Y are received into

22  evidence.)

23         MR. MORRIS:  Okay.  Can we please put up Exhibit B as

24  in boy?  (Pause.)  Ms. Canty?  If you need a moment, just let

25  us know.

Dondero - Direct                          39

1        MS. CANTY:  Yeah.  I'm pulling it up right now.

2        MR. MORRIS:  Thank you.  (Pause.)  Can you scroll

3   down just a bit?

4   BY MR. MORRIS:

5   Q   All right.  Can you see this letter was sent on October

6   16th?

7   A   Yes.

8   Q   And we see the entities that are reflected on this letter.

9   We've got Highland Capital Management, LP.  That's the

10  question that they're asking.  And the questions and the

11  statements are being asserted on behalf of NexPoint Advisors,

12  LP.  Do you see that?

13  A   Yes.

14  Q   And Highland Capital Management Fund Advisors, LP.  Those

15  are the two Advisors that you own and control, correct?

16  A   Control to a large extent.

17  Q   Okay.

18        MR. MORRIS:  And can we put up Exhibit C, please?

19  BY MR. MORRIS:

20  Q   This is a second letter sent by NexPoint on November 24th.

21  Do you see that?

22  A   Yes.

23  Q   Okay.  And you're familiar with the substance of these

24  letters, correct?

25  A   Yes.

Dondero - Direct                              40

1   Q    And you were familiar -- you were aware of these letters

2   before they were sent.  Is that correct?

3   A    Yes.

4   Q    And you generally discussed the substance of these letters

5   with NexPoint; is that right?

6   A    Generally, yes.

7   Q    And you discussed the substance of the letters with the

8   Advisors' internal counsel; is that right?

9   A    Yes.

10  Q    That's D.C. Sauter?

11  A    Yes.

12  Q    And you have been on some calls with K&L Gates about these

13  letters, right?

14  A    I believe so.

15  Q    And you knew these letters were being sent, correct?

16  A    Yeah, they're -- they're reported.

17  Q    You knew these letters for being sent; isn't that right,

18  sir?

19  A    Yes.

20  Q    And you didn't object to the sending of these letters,

21  correct?

22  A    No.

23  Q    In fact, you supported the sending of these letters.  Is

24  that right?

25  A    Yes.

016326

Dondero - Direct                    41

1   Q    And you have never directed NexPoint to withdraw these

2   letters, correct?

3   A    No.

4   Q    Around Thanksgiving, you learned that Mr. Seery had given

5   a direction to sell certain securities owned by the CLOs

6   managed by the Debtors, correct?

7   A    Yes.

8   Q    And when you learned that, you personally intervened to

9   stop the trades, correct?

10  A    Yes.  I believe they were inappropriate.

11           MR. MORRIS:  I move to strike the latter part of the

12  answer, Your Honor.

13           THE COURT:  It's stricken.

14           MR. MORRIS:  Can we put up Exhibit D, please?

15  BY MR. MORRIS:

16  Q    We looked at this email string the other day.  Do you

17  recall that?

18  A    Yes.

19           MR. MORRIS:  Can we start at the bottom, please?

20  BY MR. MORRIS:

21  Q    There's an email from Hunter Covitz.  Do you see that?

22  A    Yes.

23  Q    Now, this is November 24th.  It's before the TRO.  Is that

24  fair?

25  A    Yes.

016327

Dondero - Direct                    42

1  Q    Mr. Covitz is an employee of the Debtor, right?

2  A    I believe so.

3  Q    And Mr. Covitz helps manage the CLOs on behalf of the

4  Debtor.  Is that your understanding?

5  A    Yes.

6  Q    And Mr. Covitz in this email is giving directions to Matt

7  Pearson and Joe Sowin to sell certain securities held by the

8  CLOs.  Is that correct?

9  A    No.  He's giving Jim Seery's direction.

10         MR. BONDS:  And Your Honor, I'm going to object.

11  This is all before the TRO was ever entered.  It doesn't have

12  anything to do with today's hearing.

13         THE COURT:  Overruled.

14         MR. MORRIS:  May I respond, Your Honor?

15         THE COURT:  I --

16         MR. MORRIS:  Okay.  Thank you.

17         THE COURT:  I think it's relevant.  Go ahead.

18         MR. MORRIS:  Thank you.  Okay.

19  BY MR. MORRIS:

20  Q    Mr. Seery is the CEO of the Debtor; is that right?

21  A    Yes.

22  Q    And the Debtor is the contractual party with the CLOs

23  charged with the exclusive responsibility of managing the

24  CLOs, correct?

25  A    I don't believe so.  The Debtor is in default of the

Dondero - Direct                    43

 1  agreements.

 2          MR. MORRIS:  I move to strike, Your Honor.

 3          THE COURT:  Sustained.

 4  BY MR. MORRIS:

 5  Q   Sir, the Debtor has the exclusive contractual right and

 6  obligation to manage the CLOs, correct?

 7  A   I don't agree with that.

 8  Q   Okay.

 9          MR. MORRIS:  Can we scroll up to the -- just --

10  BY MR. MORRIS:

11  Q   Do you see that Mr. Pearson acknowledges receipt of Mr.

12  Covitz's email?

13  A   Yes.

14  Q   And you received a copy of Mr. Covitz's email, did you --

15  did you not?

16  A   Yes.

17          MR. MORRIS:  Can you scroll up a little bit, please?

18  BY MR. MORRIS:

19  Q   And can you just read for Judge Jernigan your response

20  that you provided to Mr. Pearson, Mr. Covitz, and Mr. Sowin on

21  November 24th?

22  A   (reading)  No, do not.

23  Q   You instructed the recipients of Mr. Covitz's email not to

24  sell the SKY securities as had been specifically instructed by

25  Mr. Seery, correct?

Dondero - Direct                          44

1   A    Yes.

2   Q    And you understood when you gave that instruction that the

3   people on the email were trying to execute trades that Mr.

4   Seery had authorized, correct?

5   A    No.  I -- no, that isn't how I would describe it.

6           MR. MORRIS:  A second, Your Honor?

7           THE COURT:  Okay.

8       (Pause.)

9   BY MR. MORRIS:

10  Q    Sir, when you gave the instruction reflected in this

11  email, you knew that you were stopping trades that were

12  authorized and directed by Mr. Seery, correct?

13  A    I don't think -- I -- I wasn't -- I wasn't sure at the

14  moment I did that.  I didn't find out until later that it was

15  Seery who directed it.

16          MR. MORRIS:  Can we please go back to the deposition

17  transcript, Debtor's Exhibit Z, at Page 42?  Line 12.

18  BY MR. MORRIS:

19  Q    Were you asked this question and did you give this answer?

20      "Q   At the time that you gave the instruction, "No, do

21      not," you knew that you were stopping trades that had

22      been authorized and directed by Mr. Seery, correct?

23      "A   Yes."

24  Q    Did you give that answer to my question on Tuesday?

25  A    I'd like to clarify it, but yes, I did give that answer.

Dondero - Direct                    45

1   Q   Okay.  You didn't speak with Mr. Seery before sending your

2   instructions interfering with his trade, the trades that he

3   had authorized, correct?

4   A   No, I did not.

5   Q   And you took no steps to seek the Debtor's consent before

6   instructing the recipients of your email to stop executing the

7   SKY transactions that had been authorized by Mr. Seery,

8   correct?

9   A   I'm sorry.  Can you repeat the question?

10  Q   You took no steps to seek the Debtor's consent before

11  stepping in to stop the trades that Mr. Seery had authorized,

12  correct?

13  A   I took other actions instead.

14  Q   Okay.  But you didn't seek the Debtor's consent?  That's

15  not one of the actions you took, right?

16  A   No, I educated the traders as to why it was inappropriate.

17          MR. MORRIS:  I move to strike, Your Honor.

18          THE COURT:  Sustained.

19  BY MR. MORRIS:

20  Q   Sir, did you seek the Debtor's consent before stepping in

21  to stop the trades that Mr. Seery had authorized?

22  A   No, I did not seek consent.

23  Q   In response to your instruction, Mr. Pearson canceled all

24  of the trades that Mr. Seery had authorized, correct?

25  A   Yes.

Dondero - Direct                46

1         MR. MORRIS:  Can we go back to the exhibit, please?

2   And if we could just scroll -- stop right there.

3   BY MR. MORRIS:

4   Q    That's -- that's Mr. Pearson's response to your email,

5   confirming that he had canceled both the SKY and the AVAYA

6   trades that had not yet been executed, correct?

7   A    Yes.

8         MR. MORRIS:  Can we scroll to the response to that?

9   BY MR. MORRIS:

10  Q    Is this your response?

11  A    Yes.

12  Q    Can you read that aloud, please?

13  A    (reading)  HFAM and DAF have instructed Highland in

14  writing not to sell any CLO underlying assets.  There is

15  potential liability.  Don't do it again, please.

16  Q    The writings that you're referring to are the two letters

17  from NexPoint, Exhibits B and C that we just looked at,

18  correct?

19  A    Yeah.  There might have been a third letter.  I don't

20  know.  But, yes, generally, those letters.

21  Q    Okay.  And at this juncture, the reference to potential

22  liability was a statement intended for Mr. Pearson.  Is that

23  correct?

24  A    Um, I -- no.  Pearson wouldn't have had any personal

25  liability.  It was -- it was meant for the -- there was

                          Dondero - Direct                    47

1   potential liability to the Debtor or to the compliance

2   officers at the Debtor.

3            MR. MORRIS:  Can we go to Page 45 of the deposition

4   transcript, please?  Line -- beginning at Line 11, through 18.

5   BY MR. MORRIS:

6   Q    Did I ask these questions and did you give these answers?

7        "Q   Do  you  see  the  reference  there  in  the  latter

8        portion  of  your  email,  'There  is  potential  liability.

9        Don't do it again'?

10       "A   Yes.

11       "Q   Who  was  the  intended  recipient  of  that  message?

12       "A   At this juncture, it's Matt Pearson, I believe."

13  Q    Did you give those answers to my questions on Tuesday?

14  A    Yeah.  That's not inconsistent.

15           MR. MORRIS:  Let's go back to the email, please.

16  BY MR. MORRIS:

17  Q    Mr. Sowin responded to your email; is that right?

18           MR. MORRIS:  Can we scroll up?

19  BY MR. MORRIS:

20  Q    Okay.  Who's Mr. Sowin?

21  A    He's the head trader.

22  Q    Who's he employed by?

23  A    I believe he's employed by HFAM but not the Debtor.

24  Q    Okay.  So he's -- he's somebody who's employed by one of

25  the Advisors; is that right?

Appx. 09371
016333

Dondero - Direct                    48

1   A    I believe so.

2   Q    And Mr. Sowin responded to your email and he indicated

3   that he would follow your instructions.  Is that right?

4   A    Yeah.  He understands that it's inappropriate.  That's

5   what he's reflecting.  Yes.

6            MR. MORRIS:  I move to strike, Your Honor.

7            THE COURT:  Sustained.

8   BY MR. MORRIS:

9   Q    Sir, Mr. Sowin responded and indicated that he would

10  follow your instructions, correct?

11  A    (no audible response)

12  Q    Did you answer?  I'm sorry.

13  A    No, I didn't answer.  It's -- I don't know if you could

14  expressly say that from that email.  Maybe we should read the

15  email.

16           MR. MORRIS:  Let's just move on, Your Honor.

17           THE COURT:  Okay.

18  BY MR. MORRIS:

19  Q    A few days later, you learned -- you learned that Mr.

20  Seery was trying a workaround to effectuate the trades anyway,

21  correct?

22  A    I believe so.

23  Q    Uh-huh.  And when you learned that, you wrote to Thomas

24  Surgent; is that right?

25  A    I -- I believe so.

Dondero - Direct                        49

1   Q    I don't -- I don't mean to -- this is not a test here.

2            MR. MORRIS:  Can we just scroll up to the next email,

3   please?  Okay.  Stop right there.

4   BY MR. MORRIS:

5   Q    When you -- when you learned that Mr. Seery was trying a

6   workaround, you wrote to Mr. Surgent when you learned that,

7   right?

8   A    Yes.

9   Q    And Mr. Surgent is an employee of the Debtor; is that

10  correct?

11  A    I believe he's still the chief compliance officer of the

12  Debtor.

13  Q    Okay.  Now, as a factual matter, you never asked Mr. Seery

14  why he wanted to make these trades; isn't that right?

15  A    I -- I did not.

16  Q    Okay.  And before the TRO was entered, there was nothing

17  that prevented you from picking up the phone and asking Mr.

18  Seery why he wanted to make these trades, correct?

19  A    That's not true.

20           MR. MORRIS:  One second, please, Your Honor.

21           THE COURT:  Okay.

22       (Pause.)

23           MR. MORRIS:  Can we go to Page 60 of the transcript?

24  Mr. Bonds says -- beginning at Line 14.  There is an objection

25  there, Your Honor, and I would ask that the Court rule on the

Dondero - Direct                         50

1   objection before I read from the transcript.

2          THE COURT:  Okay.

3          MR. MORRIS:  There you go.

4          THE COURT:  (sotto voce)  (reading)  Is there

5   anything that you're aware of that prevented you from picking

6   up the phone and asking Mr. Seery for his business

7   justification for these trades prior to December 10.

8   Objection, form.

9       I overrule the objection to the form of that question.

10         MR. MORRIS:  Okay.

11  BY MR. MORRIS:

12  Q   Mr. Dondero, were you asked this question and did you give

13  this answer?

14      "Q   Is there anything that you're aware of that

15      prevented you from picking up the phone and asking Mr.

16      Seery for his business justification for these trades

17      prior to December 10, 2010?

18      "A   No.  I expressed my disapproval via email."

19  Q   Is that right?

20  A   I'd like to adjust that answer to the answer I just gave.

21  Q   Okay.

22         MR. MORRIS:  And I move to strike.

23  BY MR. MORRIS:

24  Q   I'm just asking you if that's the answer you gave on

25  Tuesday.

Dondero - Direct                    51

1           THE COURT:  Sustained.

2           THE WITNESS:  Yes.

3  BY MR. MORRIS:

4  Q    Thank you.  Now, you wrote to Mr. Surgent because you

5  wanted to remind him of his personal liability for regulatory

6  breaches and for doing things that aren't in the best interest

7  of investors, correct?

8  A    Yes.

9  Q    And you actually thought about this and you -- because you

10 didn't believe that Mr. Surgent had extra insurance and

11 indemnities like Mr. Seery, right?

12 A    No.

13 Q    Didn't you testify to that the other day?

14 A    I don't remember, but that isn't the only reason.

15 Q    I didn't ask you if it was the only reason.  Listen

16 carefully to my question.  Did you send this email because you

17 -- because you wanted to remind him of his personal liability

18 for regulatory breaches and for doing things that aren't in

19 the -- I apologize.  Withdrawn.

20      You did not believe at the time that you sent this email

21 that he, Mr. Surgent, had insurance and indemnities like Mr.

22 Seery, correct?

23 A    Yes.

24 Q    Okay.

25           MR. MORRIS:  Can we go back to the email, please?

Dondero - Direct                         52

1   BY MR. MORRIS:

2   Q    Can you just read the entirety of your email to Mr.

3   Surgent out loud?

4   A    (reading)  I understand Seery is working on a workaround

5   to trade these securities anyway, trades that contradict

6   investor desires and have no business purpose or investment

7   rationale.  You might want to remind him and yourself that the

8   chief compliance officer has personal liability.

9   Q    Okay.  That's -- that's the message you wanted to convey

10  to Mr. Surgent, right?

11  A    Yes.

12  Q    And, again, you never bothered to ask Mr. Seery what his

13  businessperson -- purpose or investment rationale was,

14  correct?

15  A    I -- I didn't believe I could talk to him directly.

16  Q    This is before the --

17  A    That's why I never picked up the phone.

18  Q    Okay.  You intended to convey the message to Mr. Surgent

19  that, by following Mr. Seery's orders to execute the trades,

20  that Mr. Surgent faced personal liability, correct?

21  A    Yes, he does.

22  Q    And that's the message you wanted to send to him, right?

23  A    It's a true and accurate message, yes.

24  Q    Okay.  Just a few days earlier, you also threatened Mr.

25  Seery, right?

Dondero - Direct                              53

1   A    I wouldn't use the word "threatened."

2   Q    Okay.  Let's let -- let's let it speak for itself.

3          MR. MORRIS:  Can we go to Exhibit E, please?  Keep

4   scrolling down just a bit.

5   BY MR. MORRIS:

6   Q    This is an email that you sent to Mr. Seery on November

7   24th.  And as always, Mr. Dondero -- this is the third time

8   we're meeting -- if there's something in the document that you

9   need to see, please just let me know, because I don't -- I

10  don't mean to test your memory if the document can help

11  refresh your recollection.

12         MR. MORRIS:  Can we just scroll up a little bit

13  further to the top to see the date?

14  BY MR. MORRIS:

15  Q    Okay.  So, Jim, there, JD, who is that?

16  A    That's me.

17  Q    Okay.  And can you tell by the substance of the email, of

18  the text messages, this is communications between you and Mr.

19  Seery, right?

20  A    Yes.

21  Q    Okay.  And you see that it's dated November 24th there?

22  A    Yes.  Right after we were discussing the pipeline.  Or

23  right when we were working on the pipeline.

24  Q    Okay.

25         MR. MORRIS:  Can you scroll down a little bit,

Dondero - Direct                        54

1    please?

2    BY MR. MORRIS:

3    Q    At 5:26 p.m., you sent Mr. Seery a text, correct?

4    A    Yes.

5    Q    Can you read that, please?

6    A    (reading)  Be careful what you do.  Last warning.

7    Q    Okay.  This was a warning telling Mr. Seery to stop

8    selling assets out of the CLOs or the beneficial owners would

9    take more significant action against him, correct?

10   A    It was a general statement that what he was doing was

11   regulatorily inappropriate and ethically inappropriate and he

12   was in breach of the contracts he was operating.

13   Q    Neither you nor any entity owned or controlled by you are

14   parties to the contracts you just referred to; isn't that

15   correct?

16   A    I believe they're indirectly parties to those contracts,

17   especially when they're in default.

18   Q    Neither you nor any entity owned or controlled by you is a

19   signatory to any CLO management contract pursuant to which the

20   Debtor is a party, correct?

21   A    I -- I don't know and I don't want to make legal

22   conclusions on that.

23   Q    Okay.  At the deposition the other day, some of the things

24   that you suggested the beneficial owners of the CLO interests

25   might do against Mr. Seery and the Debtor are class action

Appx 03778
016340

Dondero - Direct                              55

1    lawsuits.  Is that right?

2    A    I -- I did not suggest the entities I control would do

3    that.  If anybody on this call were to call a class action

4    lawsuit -- a class action law firm and tell them what's been

5    going on with the CLOs, I think a class action law firm would

6    file it on their own regard, not on the behalf of my entities.

7              MR. MORRIS:  I move to strike, Your Honor.

8              THE COURT:  Sustained.

9    BY MR. MORRIS:

10   Q    Let's talk about that cell phone.  Okay?  Until at least

11   December 10th, the day the TRO was entered, you had a cell

12   phone that was bought and paid by the Debtor, right?

13   A    Yes.

14   Q    But sometime after December 10th, your phone was disposed

15   of or thrown in the garbage; is that right?

16   A    Yes.

17   Q    And you don't know when after December 10th the cell phone

18   that was the Debtor's property was disposed of, right?

19   A    I don't believe at that point it was the Debtor's

20   property.  I think I paid it off in full and the Debtor had

21   announced that they were canceling everybody's cell phones so

22   it was appropriate for me to get another one.

23             MR. MORRIS:  I move to strike, Your Honor.

24             THE COURT:  Sustained.

25             MR. BONDS:  Your Honor, at some point, I mean, Mr.

Dondero - Direct                    56

1    Morris just ought to go on and testify.

2            MR. MORRIS:  No, this is Mr. Dondero's testimony,

3    Your Honor.  He gave it the other day.  I'm just asking him to

4    confirm it, basically.

5            THE COURT:  Okay.  I overrule the objection, if any

6    there was, on the part of Mr. Bonds.

7    BY MR. MORRIS:

8    Q   Sometime after December 10th, the cell phone that prior to

9    that time had been owned and paid for by the Debtor was thrown

10   in the garbage or otherwise disposed of, correct?

11   A   Yes.

12   Q   And you don't know when after December 10th that was --

13   the phone was disposed of, correct?

14   A   It was on or about that date, I'm sure.

15   Q   Well, we know it was after December 10th, right?

16   A   Okay.  Or about that date.

17   Q   You testified the other day that you just don't know who

18   made the decision to throw your phone away, right?

19   A   I could find out, but I don't know.  I would have to talk

20   to employees.

21   Q   Did you make any request of the Debtor since your

22   deposition to try to find out the answer as to who made the

23   decision to throw your phone away?

24   A   No.

25   Q   How did you learn that your phone was thrown away?

Dondero - Direct                    57

1   A    As I testified, it's standard operating procedures every

2   time a senior executive gets a new phone.

3   Q    Hmm.  You don't know exactly who threw the phone away; is

4   that right?

5   A    No, but I can find out.

6   Q    Okay.  I'm just asking -- I'm not asking you to find out.

7   I'm just asking you if you know.  Do you know who threw your

8   phone away?

9   A    No.

10  Q    Do you know who made the decision to throw your phone

11  away?

12  A    It -- there wasn't a decision.  It was standard operating

13  procedure.

14          MR. MORRIS:  I move to strike.

15          THE COURT:  Sustained.

16  BY MR. MORRIS:

17  Q    You and Mr. Ellington disposed of your phones at the same

18  time, correct?

19  A    I don't have specific awareness regarding what Mr.

20  Ellington did with his phone.

21  Q    It never occurred to you to get the Debtor's consent

22  before throwing the phone that they had purchased away, right?

23  A    I'm not permitted to talk to the Debtor.

24  Q    Sir, it never occurred to you to get the Debtor's consent

25  before throwing the phone away, correct?

Case 19-34054-sgj11   Doc 3596-31   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 55-31   Filed 06/06/25   Page 665 of 1052    PageID 17343
Exhibit 31 Page 59 of 206

Dondero - Direct                          58

1  A    I'm going to stick with the answer I just gave.

2          MR. MORRIS:  Can we go to Page 75 of the transcript?

3  Lines 12 through 15.  There is an objection there, Your Honor.

4  I would respectfully request that the Court rule on the

5  objection before I read the testimony.

6          THE COURT:  Okay.  Starting at Line 12?

7          MR. MORRIS:  12.

8          THE COURT:  (sotto voce)  (reading)  Did it ever

9  occur to you to get the Debtor's consent before doing this?

10  Objection, form.

11      That objection is overruled.

12  BY MR. MORRIS:

13  Q    All right.  Mr. Dondero, did you give this answer to my

14  question on Tuesday?

15      "Q    Did it ever occur to you to get the Debtor's

16      consent before doing this?

17      "A    No."

18  A    Yes, I gave that testimony.

19  Q    Okay.  And you also had the phone number changed from the

20  Debtor's account to your own personal account; is that right?

21  A    The phone number changed?  The phone number stayed the

22  same.

23  Q    But you had the number changed from the Debtor's account

24  to your own personal account, correct?

25  A    The Debtor said they wouldn't pay for it anymore.  Who

Dondero - Direct                         59

1  else could I change it to?

2          MR. MORRIS:  Your Honor, I move to strike.  It's a

3  very simple question.

4          THE COURT:  Sustained.

5  BY MR. MORRIS:

6  Q   I'll ask it one more time, Mr. Dondero.  You had the phone

7  number changed from the Debtor's account to your personal

8  account, correct?

9  A   I didn't change the number.  I had the billing changed to

10  my personal account versus the company account.

11  Q   And you never asked the Debtor for permission to do that,

12  correct?

13  A   No.

14  Q   And you never told Debtor you were doing that, correct?

15  A   No.

16  Q   And nobody ever told Mr. Seery or anybody at my firm that

17  the phone was being thrown in the garbage, correct?

18  A   Well, --

19          MR. BONDS:  To the extent he knows.

20          THE WITNESS:  Yeah.  I have no idea.  But I didn't.

21  BY MR. MORRIS:

22  Q   You didn't believe it was necessary to give the Debtor

23  notice that you were taking the phone number for your own

24  personal account and throwing the phone in the garbage,

25  correct?

Dondero - Direct                    60

1   A    Correct.

2   Q    The phone --

3          MR. BONDS:  Your Honor, I'm going to object.  He --

4   Mr. Dondero did not testify he personally threw the phone in

5   the garbage.

6          MR. MORRIS:  Withdrawn.

7          THE COURT:  Okay.

8   BY MR. MORRIS:

9   Q    Mr. Dondero, the phone was in Highland's offices on

10  December 10th, the date the TRO was in effect, correct?

11  A    I -- I don't -- I -- I -- I don't know.  You know, I don't

12  know.  It's -- I remember going over to -- well, anyway, I --

13  I don't know.  We'll leave it at that.

14         MR. MORRIS:  Can we go to Exhibit G, please?

15  BY MR. MORRIS:

16  Q    Who's Jason Rothstein, while we wait?

17  A    Jason, Jason is our -- is the Highland head of technology.

18  Q    Okay.  And did you text with him from time to time?  On or

19  about December 10th?

20  A    Yes.

21  Q    Okay.

22         MR. MORRIS:  Can we just scroll up a little bit?

23  BY MR. MORRIS:

24  Q    Is that Mr. Rothstein there?

25  A    Yes.  Yeah.

Dondero - Direct                    61

1  Q    Okay.  And do you see that there's a text message that you

2  sent to him on December 10th, right at the top?  Can you read

3  -- can you read the text message Mr. Rothstein --

4  A    He sent that to me.  At the top.

5  Q    I apologize.  Thank you for the correction.  Can you read

6  what Mr. Rothstein told you on December 10th?

7  A    That my old phone is in the top drawer of Tara's desk.

8  Q    And who's Tara?

9  A    My assistant.

10 Q    Is she still your assistant today?

11 A    Yes.

12 Q    And has she been serving as your assistant since the TRO

13 was entered into on December 10th?

14 A    Yes.

15 Q    Okay.  Is it fair to say that you were informed on

16 December 10th that the phone was not thrown in the garbage,

17 had not been disposed of, but was instead sitting in Tara's

18 desk?

19 A    As of that moment, yes.

20 Q    Okay.  And it's also fair to say that, as of December

21 10th, Mr. Rothstein didn't take it upon himself to throw your

22 old phone in the garbage, right?

23 A    Not as of that moment.  But like I said, I can find out

24 how it was disposed of.

25 Q    If you were curious to do that, would you have done that

Dondero - Direct                          62

1   before today?

2   A    I haven't been curious.

3   Q    Thank you very much.  Someone you can't identify made the

4   decision after December 10th to throw the phone in the garbage

5   without asking the Debtor for permission or seeking the

6   Debtor's consent, correct?

7        MR. BONDS:  I'm going to object, Your Honor.  To the

8   extent that the witness knows, he can answer.

9        THE COURT:  I -- I didn't hear --

10       THE WITNESS:  I don't know.

11       THE COURT:  I didn't hear what your objection was,

12   Mr. Bonds.  Repeat.

13       MR. BONDS:  Your Honor, my objection was along the

14   lines of to the extent that the witness knows, he could

15   testify, but if he doesn't know, he doesn't need to speculate.

16       THE COURT:  All right.  Well, I don't hear an

17   objection there, but go ahead, Mr. Dondero, if you have

18   knowledge and can answer the question.

19       THE WITNESS:  I don't know.

20   BY MR. MORRIS:

21   Q    Do you recall that the Debtor subsequently gave notice to

22   you to vacate its offices and to return its cell phone?

23   A    I don't know.

24   Q    Did you ever --

25   A    I know I -- I know I was told to vacate the offices.  I

016348

Dondero - Direct                        63

1   didn't see the specific --

2   Q    Uh-huh.  Your lawyer -- your lawyers never told that

3   Debtor that the cell phone had been disposed of or thrown in

4   the garbage, consistent with company practice, right?

5   A    I don't know.

6        MR. MORRIS:  Can we put up Exhibit K, please?

7   BY MR. MORRIS:

8   Q    This is the letter that my firm sent to your lawyer on

9   December 23rd.  Do you see that?

10  A    Yeah, I see it.

11  Q    Okay.

12       MR. MORRIS:  Can we scroll down a little bit?  Keep

13  going.  Okay.  Stop right there.

14  BY MR. MORRIS:

15  Q    Do you see that it says that, as a result of the conduct

16  described above, that the Debtor "has concluded that Mr.

17  Dondero's presence at the HCMLP office suite and his access to

18  all telephonic and information services provided by HCMLP are

19  too disruptive"?

20  A    Yeah, I see it.

21  Q    And this is the letter that gave you notice that you had

22  to vacate the premises by December 30th, correct?

23  A    I believe so.

24       MR. MORRIS:  Can we scroll down a little bit?

25  BY MR. MORRIS:

Dondero - Direct                    64

1   Q    You see at the bottom there's a reference to a defined

2   term of "cell phones"?

3   A    Yes.

4   Q    And it says that the Debtor "will also terminate Mr.

5   Dondero's cell phone plan and those cell phone plans

6   associated with parties providing personal services to Mr.

7   Dondero."  Do you see that?

8   A    Yes.  Yeah.

9   Q    Have I read that accurately?

10  A    Yes.

11  Q    And then my colleagues went on to write, "HCMLP demands

12  that Mr. Dondero immediately turn over the cell phones to

13  HCMLP by delivering them to you, Mr. Lynn."  Do you see that?

14  A    Yes.

15  Q    Have I read that accurately?

16  A    Yes.

17  Q    The last sentence on the page begins, "The cell phones

18  and."

19          MR. MORRIS:  And let's scroll down further.

20  BY MR. MORRIS:

21  Q    "The cell phones and the accounts are property of HCMLP.

22  HCMLP further demands that Mr. Dondero refrain from deleting

23  or wiping any information or messages on the cell phone.

24  HCMLP, as the owner of the account and cell phones, intends to

25  recover all information related to the cell phones and

Dondero - Direct                     65

1   accounts, and reserves the right to use the business-related

2   information."  Have I read that accurately?

3   A    Yes.

4   Q    Okay.  We were a couple of weeks too late, huh?

5   A    It sounds like it.

6   Q    Yeah.  Because the phones were already in the garbage,

7   right?

8   A    Yes.

9   Q    Uh-huh.  But that's not what Mr. Lynn told the Debtor on

10  your behalf, right?

11  A    I don't know.

12  Q    Mr. Lynn -- all right.  Let's -- let's see what Mr. Lynn

13  said.

14          MR. MORRIS:  Can we go to Exhibit U, please?

15  BY MR. MORRIS:

16  Q    It took Mr. Lynn six days to write a one-paragraph letter

17  in response, right?  December 29th, he responded?

18          MR. MORRIS:  Can we scroll down a bit?

19  BY MR. MORRIS:

20  Q    Let me read beginning with the second sentence of the

21  first substantive paragraph.  "We are at present not sure of

22  the location of the cell phone issued to Mr. Dondero by the

23  Debtor, but we are not prepared to turn it over without

24  ensuring the privacy of the attorney-client communications."

25  And then he goes on.

Dondero - Direct                        66

1    Have I read that correctly?

2  A    Yes.

3  Q    Okay.  So Mr. Lynn didn't say anything about the phone

4  being thrown in the garbage, right?

5  A    No.

6  Q    He didn't say that it was disposed of, did he?

7  A    No.

8  Q    He didn't refer to any company practice or policy, right?

9  A    No.

10  Q    Mr. Lynn's not a liar, is he?

11  A    No, he's not.

12  Q    He's a decent and honest professional.  Wouldn't you agree

13  with that?

14  A    Yes.

15  Q    And is it fair to say that he conveyed only the

16  information that he had at the time?

17  A    I don't know.

18  Q    Do you have any reason to believe that Mr. Lynn would

19  withhold from the Debtor the information that the cell phone

20  had been thrown in the garbage, consistent with company

21  practice?

22  A    No, I don't believe he would withhold whatever he knew.

23  Q    All right.  Let's talk about -- let's talk about other

24  matters.  You do know, sir, do you not, that the Debtor is

25  subject to the Bankruptcy Court's jurisdiction?

Dondero - Direct                                67

1    A    Yes.

2    Q    Okay.  And we just saw in the December 23rd letter that

3    the Debtor demanded that you vacate their offices a week

4    later, right?

5    A    Yes.

6    Q    And you knew that at or around the time the letter was

7    sent on December 23rd, correct?

8    A    I -- I don't remember when I knew.

9    Q    Well, in fact, in fact, you or through counsel asked for

10   an accommodation and asked for an extension of time to

11   December 31st; isn't that right?

12   A    I had to pack up 30 years of stuff in three days.  I -- I

13   know we asked for some forbearance.  I don't think we got any.

14   I don't remember the details.  I don't understand why it's

15   important.

16   Q    Okay.  It was actually -- withdrawn.  The Debtor actually

17   gave you seven days' notice, right?  They sent the letter on

18   December 23rd and asked you to vacate on December 30th,

19   correct?

20   A    I don't -- I don't remember.  But, again, I think the

21   initial response was it was inconsistent with shared services

22   agreement.  No Highland employees are coming into the office

23   anyway.  So kicking me out of my office was -- seemed

24   vindictive and overreaching.  And we tried to get some, you

25   know, forbearance.

                        Dondero - Direct                        68

1   Q    Okay.

2           MR. MORRIS:  I move to strike, Your Honor.

3           THE COURT:  Sustained.

4   BY MR. MORRIS:

5   Q   Mr. Dondero, you were given seven days' notice before --

6   before you were going to be barred from the Debtor's office,

7   correct?

8   A   I don't know.

9   Q    Okay.

10          MR. MORRIS:  Can we go back to Exhibit K, please?

11  Oh, actually, it's okay.

12  BY MR. MORRIS:

13  Q   We just read, actually, the piece from the Debtor's letter

14  of December 23rd barring you from the Debtor's office.  Do you

15  remember that?  And we can go back and look at it if you want.

16  A    Yes.

17  Q   Was there anything ambiguous that you recall about the

18  Debtor's demand that you not enter their offices after

19  December 30th?

20  A   Ambiguous?  I can tell you what my understanding was or I

21  can tell you what the letter says.  What would you like to

22  know?

23  Q    I'd just like to know if, as you sit here right now, you

24  believe there was anything ambiguous about the Debtor's demand

25  that you vacate the offices as of December 30th?

Dondero - Direct                    69

1    A    I mean, I did vacate the offices as of December 30th.

2    Q    Correct.  And you knew that -- and you were complying with

3    the Debtor's demand you do that, right?

4    A    Well, with the Court's demand, I guess.

5    Q    Okay.  And it's your understanding that you would not be

6    permitted in the Debtor's offices after that time, correct?

7    A    Um, (pause), uh, I don't know how to answer that question.

8    I knew I wouldn't be residing in the offices anymore.  But for

9    legitimate business purposes, to visit the people at NexPoint

10   who were in the office, since there are no Highland people in

11   the office, or to handle a deposition, you know, there was

12   nothing I thought inappropriate about that.

13   Q    Did the Debtor tell you that they would allow you to enter

14   the offices any time you just believed that it would be

15   appropriate to do that?

16   A    I used my business judgment.

17         MR. MORRIS:  I move to strike.

18   BY MR. MORRIS:

19   Q    I'm asking you a very --

20         THE COURT:  Sustained.

21   BY MR. MORRIS:

22   Q    -- specific question, sir.  Did the Debtor ever tell you

23   that they -- that you would be permitted to enter their

24   offices after December 30th if you, in your own personal

25   discretion, believed it to be appropriate?

Dondero - Direct                          70

1  A    No.

2  Q    Did the Debtor provide you any exception to their demand

3  that you vacate the offices, without access, by and after

4  December 30th?

5  A    I always do what I think is appropriate and in the best

6  interests.  I don't know.  I didn't know the specifics of the

7  Debtor's -- okay, yeah, what the specifics of the Debtor was.

8  Q    Despite the unambiguous nature of the Debtor's demands

9  letter, on Tuesday you just walked right into the Debtor's

10  office and sat for the deposition, correct?

11  A    I believe that was reasonable, yes.

12  Q    Okay.  But you didn't -- you didn't have the Debtor's

13  approval to do that, correct?

14  A    We didn't have technology to do it anywhere else, so if

15  the deposition was going to occur, it had to occur there.

16  Q    Sir, --

17         MR. MORRIS:  Move to strike.

18         THE COURT:  Sustained.

19  BY MR. MORRIS:

20  Q    And I ask you to just listen very carefully.  And if it's

21  not clear to you, please let me know.  You did not have the

22  Debtor's approval to enter their offices on Tuesday to give

23  your deposition, correct?

24  A    No.

25  Q    And you did not even bother to ask the Debtor for

Dondero - Direct                    71

1  permission, correct?

2  A    I'm prohibited from contacting them, so no, I did not.

3  Q    Okay.  Let's talk about other events that occurred after

4  the entry of the TRO.  We talked earlier about how you

5  interfered with Mr. Seery's trading activities on behalf of

6  the CLOs around Thanksgiving.  Do you remember that?

7  A    Yes.

8  Q    But after the TRO was entered, the K&L Gates Clients also

9  interfered with the Debtor's trading activities, correct?

10  A    No.

11       MR. MORRIS:  Can we go to Exhibit K, please?  Can we

12  start at the first page?  And scroll down just a bit.

13  BY MR. MORRIS:

14  Q    Do you see there's an explanation there about the Debtor's

15  management of CLOs?

16  A    Yes.

17  Q    And there's a recitation of the history that we talked

18  about earlier, where around Thanksgiving you intervened to

19  block those trades?

20  A    Yes.

21  Q    And then the next paragraph refers to the prior motion

22  that was brought by the CLO entities?  I mean, the K&L Gates

23  entities, right?

24  A    Yes.

25  Q    And you were aware of that motion at the time it was made,

Dondero - Direct                              72

1    right?

2    A    Yes.

3    Q    And you were supportive of the making of that motion,

4    right?

5    A    Supportive?  Yes.

6            MR. MORRIS:  And scroll down to the next paragraph,

7    please.

8    BY MR. MORRIS:

9    Q    Okay.  So, my colleague wrote that, "On December 22nd,

10   2020, employees of NPA and HCMFA notified the Debtor that they

11   would not settle the CLO sale of the AVAYA and SKY

12   securities."  Have I read that right?

13   A    Yes.

14   Q    And that took place six days after the motion that the

15   Court characterized as frivolous was denied on December 16th?

16   A    Yes.  I wasn't aware of that, for what that's worth.

17   Q    Okay.  You personally instructed the employees --

18   withdrawn.  NPA -- that refers to NexPoint, correct?

19   A    Yes.

20   Q    That's an entity you own and control, right?

21   A    I -- largely.

22   Q    And that's one of the Advisors we defined earlier, right?

23   A    Yes.

24   Q    And HCMFA, that's Fund Advisors, another advisory firm

25   that you own and control, correct?

Appx 03796
016358

Dondero - Direct                          73

1  A    Yes.

2  Q    And you personally instructed, on or about December 22nd,

3  2020, employees of those Advisors to stop doing the trades

4  that Mr. Seery had authorized with respect SKY and AVAYA,

5  right?

6  A    Yeah.  Maybe we're splitting hairs here, but I instructed

7  them not to trade them.  I never gave instructions not to

8  settle trades that occurred.  But that's a different ball of

9  wax.

10  Q    Okay.  But you did instruct them not to execute trades

11  that had not been made yet, right?

12  A    Yeah.  Trades that I thought were inappropriate, for no

13  business purpose, I -- I told them not to execute.

14  Q    Okay.  You actually learned that Mr. Seery wanted to

15  effectuate these trades the Friday before, right?

16  A    I don't know, but what did I do?  When did I know it?

17  What did I do?  When I knew things are inappropriate, I

18  reacted immediately.  I don't -- I don't -- whenever --

19  whenever I found out about inappropriate things, I reacted to

20  the best of my ability.

21  Q    Okay.

22         MR. MORRIS:  I move to strike, Your Honor.

23         THE COURT:  Sustained.

24     Mr. Dondero, I'm going to -- I'm going to interject some

25  instructions once again here.  Remember we talked about early

Dondero - Direct                    74

1   on, and I know you've testified before, but I'll repeat it:

2   You need to just give direct yes or no answers.

3       And let me just say that we see witnesses all the time do

4   what you're doing here, and that is they feel they need to say

5   more than yes or no.  They feel the need to clarify or

6   supplement the yes or no answer they give.  And just to remind

7   you how this works, your lawyer, Mr. Bonds, is going to be

8   given the opportunity when Mr. Morris is through to ask you

9   all the questions he wants, and that will be your chance to

10  clarify yes and no answers to the extent he asks you to

11  revisit certain of these questions and answers.  Okay?

12      So I'm going to remind you once again:  yes or no or

13  direct -- you know, other appropriate direct answers.  Mr.

14  Bonds can let you clarify later.  All right?

15      Mr. Morris, continue.

16          MR. MORRIS:  Okay.  Thank you, Your Honor.

17      Can we please put up on the screen Exhibit L?  And at the,

18  I guess, the bottom of Page 1.

19  BY MR. MORRIS:

20  Q   This is an email string.  And --

21          MR. MORRIS:  Go to the email below that, please.

22  Yeah.  Okay.  Right there.

23  BY MR. MORRIS:

24  Q   This is an email from Mr. Seery dated December 18th at

25  (garbled) :30 p.m.  Do you see that?

Dondero - Direct                        75

1   A    Yes.

2   Q    And in the substantive portion of his email, continuing on

3   to the next page, he's giving instructions to sell certain SKY

4   and AVAYA securities that are held by CLOs, correct?

5   A    Yes.

6   Q    And Mr. Sowin forwarded this email to you, right?

7   A    Yes.

8            MR. MORRIS:  If we can scroll up.

9   BY MR. MORRIS:

10  Q    And you forwarded it to Mr. Ellington, right?  I'm sorry.

11  Let's just give Ms. Canty a chance.

12           MR. MORRIS:  Keep scrolling up.

13  BY MR. MORRIS:

14  Q    So, Mr. Sowin forwarded it to you at 3:34 p.m.  Do you see

15  that?

16  A    Yes.

17  Q    And if we scroll up, you turn around and give it to Mr.

18  Ellington a few minutes later, right?

19  A    Yes.

20  Q    So that you and Mr. Ellington and Mr. Sowin are all aware

21  that Mr. Seery wants to sell AVAYA and SKY securities on

22  behalf of the CLOs, right?

23  A    Yes.

24  Q    Why did you decide to forward this email to Mr. Ellington?

25  A    Ellington's role has been of settlement counsel that

Dondero - Direct                          76

1    supposedly everybody is able to talk to to try and bridge some

2    kind of settlement.  Ellington, I thought, should be aware of

3    things that would make settlement more difficult or create

4    liabilities for the Debtor.  And so I thought it was

5    appropriate for him to know.

6    Q    Okay.  This is the email that caused you to put a stop to

7    the trades that Mr. Seery wanted to effectuate, correct?

8    A    This is the -- I'm sorry.  Ask the question again.  This

9    is the email that what?

10   Q    This is -- this is how you learned that Mr. Seery wanted

11   to effectuate rates in AVAYA and SKY securities, right?

12   A    I -- I learned about it pretty early on of him trading it.

13   I don't know if it was this email or -- or one of the others.

14   But yes, it was from -- it was from Joe Sowin.

15   Q    And you would agree with me, would you not, that you

16   personally instructed the employees of the Advisors not to

17   execute the very trades that Mr. Seery identifies in this

18   email, correct?

19   A    Yes.

20   Q    At no time after December 10th, when the TRO was entered

21   into, did you instruct the employees of the Funds that you own

22   and control not to interfere or impede the Debtor's management

23   of the CLOs, correct?

24          MR. BONDS:  Can you repeat the question?  I'm sorry.

25   BY MR. MORRIS:

Dondero - Direct                    77

1   Q   At no time after December 10th, when the TRO was entered,

2   did Mr. Dondero instruct any employee of either of the

3   Advisors that he owns and controls not to interfere or impede

4   with the Debtor's business and management of the CLOs,

5   correct?

6   A   I did not.

7   Q   Okay.  Neither you nor anybody that you know of ever

8   provided a copy of the TRO to the employees of the Advisors

9   that you own and control, correct?

10  A   I don't know.

11  Q   Okay.  After the TRO was entered, the K -- after the TRO

12  was entered, and after the hearing on December 16th, the K&L

13  Gates Clients sent three more letters to the Debtor, right?

14  A   Yes.

15  Q   Okay.

16      MR. MORRIS:  Your Honor, those are Exhibits M as in

17  Mary, N as in Nancy, and X as in x-ray.

18      THE COURT:  Okay.

19      MR. MORRIS:  Unless the witness thinks there is a

20  need to look at them specifically -- oh, let me just ask a

21  couple of questions.

22  BY MR. MORRIS:

23  Q   Mr. Dondero, in those letters, it's your understanding

24  that the K&L Gates Clients again requested that the Debtor not

25  trade any securities on behalf of the CLOs, right?

Dondero - Direct                          78

1   A    Yes.

2   Q    And it's your understanding that in those letters the K&L

3   Gates Clients suggested that they might seek to terminate the

4   CLO management agreements to which the Debtor was a party,

5   correct?

6   A    I don't know specifically, but that wouldn't surprise me.

7   Q    Okay.

8   A    So, --

9   Q    Is it your understanding that the K&L Gates Clients also

10  sent the letter a Debtor -- the Debtor a letter in which they

11  asserted that your eviction from the offices might cause them

12  damages and harm?

13  A    I know there was objections to me -- I assume so.  I don't

14  know specifically.

15  Q    And you were aware of these letters at the time that they

16  were being sent, right?

17  A    I'm sorry, what?

18  Q    You were aware of these letters at the time they were

19  being sent by the K&L Gates Clients, right?

20  A    Generally, yes.

21  Q    And you were generally supportive of the sending of those

22  letters, right?

23  A    I'm always supportive of doing what we believe is the

24  right thing, yes.

25  Q    And in this case, you were supportive of the sending of

Dondero - Direct                        79

 1  these three letters, correct?

 2  A    I -- yes.

 3  Q    In fact, you pushed and encouraged the chief compliance

 4  officer and the general counsel to send these letters, right?

 5  A    I push them to do the right thing.  I didn't push them

 6  specifically.

 7  Q    Okay.  At the time the letters were sent, you were aware

 8  that the K&L Gates Clients had filed that motion that was

 9  heard on the 16th of December, correct?

10  A    Yes.

11  Q    And you were aware that they advanced the very same --

12  withdrawn.  You're aware that in the letters they advance some

13  of the very same arguments that Judge Jernigan had dismissed

14  as frivolous just six days earlier, right?

15  A    I wasn't at the hearing.  I don't know if it was the same

16  arguments or similar arguments.  I -- I can't -- I can't

17  corroborate the similarity or contrast the differences between

18  the two.

19  Q    All right.  So it's fair to say, then, that you were

20  supportive of the sending of these letters, you were aware of

21  the December 16 argument, but you didn't take the time to see

22  whether or not any of the arguments being advanced in the

23  letters were consistent or any different from the arguments

24  that were made at the December 16th hearing, correct?

25  A    Correct.  I wasn't directly involved, but still believed

Dondero - Direct                              80

1   that fundamentally Seery's behavior was wrong.

2   Q   You never instructed the K&L Gates Clients to withdraw the

3   three letters that were sent after December 10th, correct?

4   A   No.

5   Q   And you're aware that the Debtor had demanded that those

6   letters be withdrawn or it would seek a temporary restraining

7   order against the K&L Gates Clients, correct?

8   A   I'm not aware of the back and forth.

9   Q   Okay.  Let's talk about your communications with Mr.

10  Ellington and Mr. Leventon.  You communicated with them on

11  numerous occasions after December 16th, correct?

12  A   No.

13  Q   No, you didn't communicate with them many times after

14  December 10th?

15  A   You're lumping in Ellington and Isaac, and numerous times

16  is a bad clarifier, so the answer is no.

17  Q   I appreciate that.  You communicated many times with Mr.

18  Ellington after December 10th, right?

19  A   Not -- not outside shared services, pot plan, and him

20  being the go-between between me and Seery.  I would say

21  virtually none.

22  Q   Okay.  On Saturday, December 12th, two days after the

23  temporary restraining order was entered against you, Mr.

24  Ellington was involved in discussions with your personal

25  counsel about who would serve as a witness at the upcoming

Dondero - Direct                                    81

 1  December 16th hearing, correct?

 2  A    I don't -- I don't remember.

 3  Q    Let's see if we can refresh your recollection.

 4          MR. MORRIS:  Can we please put up Exhibit P?  Can we

 5  scroll down?  Okay.

 6  BY MR. MORRIS:

 7  Q    Do you see where Mr. Lynn writes you an email on Saturday,

 8  December 12th, and he says, among other things, it looks like

 9  trial?

10  A    Yes.

11  Q    And then if we scroll up a little bit, he wrote further,

12  "That said, we must have a witness now."  Have I read that

13  accurately?

14  A    Yes.

15  Q    Okay.

16          MR. MORRIS:  Can we scroll back up?

17  BY MR. MORRIS:

18  Q    And this is Mr. Ellington's response, right?

19  A    Yes.

20  Q    Can you read Mr. Ellington's response for Judge Jernigan?

21  A    (reading)  It will be J.P. Sevilla.  I'll tell him that he

22  needs to contact you first thing in the morning.

23  Q    Is it your testimony that this email relates to --

24  withdrawn.  Mr. Ellington is not your personal lawyer, right?

25  A    No.  Mr. Ellington has been functioning as settlement

Dondero - Direct                              82

 1   counsel, trying to bridge settlement, --

 2   Q    Okay.

 3   A    -- which is what this email looks like to me.

 4   Q    Okay.  I'll let -- I'll let the judge --

 5          MR. MORRIS:  I move to strike, Your Honor.

 6          THE COURT:  Sustained.

 7   BY MR. MORRIS:

 8   Q    So, after the TRO was entered, you and Mr. Ellington not

 9   only communicated but Mr. Ellington was actively involved in

10   identifying witnesses to testify on behalf of your interests

11   at the December 16th hearing, correct?

12   A    I -- I don't know what the witness was for, but I believe

13   Ellington was doing his job as settlement counsel, trying to

14   facilitate settlement.  I don't -- I have no reason to think

15   this was anything more nefarious.

16   Q    Okay.  You looked to Mr. Ellington for leadership in

17   coordinating with all of the lawyers who were working for you

18   and your personal interests, right?

19   A    I'm not agreeing with that.

20   Q    No?  All right.

21          MR. MORRIS:  Let's look at the next exhibit.  I think

22   it's Exhibit Q.  And if we could stop right there.

23   BY MR. MORRIS:

24   Q    There's an email from Douglas Draper, do you see that, on

25   December 16th?

Dondero - Direct                        83

1   A    Yes.

2   Q    So this is after the TRO was entered into, right?

3   A    I believe so.

4   Q    And Mr. Draper represents Get Good and Dugaboy; is that

5   right?

6   A    I believe so.

7   Q    And he was new to the case at that moment in time, right?

8   A    On or about, I believe so.

9   Q    And he was looking to -- he was looking for a joint

10  meeting among all of the lawyers representing your personal

11  interests, right?

12  A    No.  I think he was trying to coordinate -- coordinate or

13  understand whatever.  But not everybody -- he doesn't just

14  talk to lawyers around my interests.  I mean, and he hasn't

15  sought agreements with just lawyers reflecting my interests.

16  Q    You forwarded Mr. Draper's email to Mr. Ellington, right?

17  A    Yes.

18  Q    But you can't remember why you did that, right, or at

19  least -- withdrawn.  You couldn't remember as of Tuesday's

20  deposition why you forwarded this email to Mr. Ellington,

21  right?

22  A    Not specifically.  But, again, Ellington is settlement

23  counsel.

24        MR. MORRIS:  I move to strike, Your Honor, after the

25  initial phrase "Not specifically."

Case 19-34054-sgj11   Doc 3596-31   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 31 Filed 08/05/25 206 Page 691 of 1052    PageID 17369

Dondero - Direct                    84

 1          THE COURT:  Sustained.

 2          MR. MORRIS:  Can we scroll up a little bit, please?

 3   BY MR. MORRIS:

 4   Q   Mr. Lynn responded initially with a reference to the

 5   assumption that a particular lawyer was with K&L Gates, right?

 6   A   Yes.

 7          MR. MORRIS:  And if we could scroll up a little bit.

 8   BY MR. MORRIS:

 9   Q   That's where you forward this email to Mr. Ellington,

10   right?

11   A   Yes.

12   Q   And can you read to Judge Jernigan what you wrote at 1:33

13   p.m.?

14   A   (reading)  I'm going to need you to provide leadership

15   here.

16   Q   But at least as of Tuesday's deposition, you couldn't

17   remember why you needed Mr. Ellington to provide leadership,

18   right?

19   A   Correct.  Nor if he did.

20          MR. MORRIS:  I move to strike the latter portion of

21   the answer, Your Honor.

22          THE COURT:  Sustained.

23   BY MR. MORRIS:

24   Q   So you have no --

25          (Echoing.)

Dondero - Direct                    85

1          MR. MORRIS:  We're getting --

2          THE WITNESS:  Can I -- can I hold -- can I hold on

3   for one second here?  Can I just put you guys on mute, please?

4          MR. MORRIS:  Sure.

5      (Pause.)

6          THE COURT:  All right.

7          THE CLERK:  John, there's some feedback again.  I'm

8   sorry.

9          MR. MORRIS:  That's okay.

10         THE COURT:  Mr. Bonds, --

11         MR. MORRIS:  We lost Mr. --

12         THE COURT:  Mr. Bonds, what's going on?

13         MR. MORRIS:  We've lost -- the screen --

14         THE COURT:  You know you can't counsel your client in

15  the middle of court testimony.  I thought maybe Mr. Dondero

16  had some non-legal thing going on in the background.  Mr.

17  Bonds?

18         MR. BONDS:  Your Honor, I -- I did not in any way

19  counsel Mr. Dondero.

20         THE COURT:  Okay.  Well, I'll take your

21  representation on that.  Are we ready to go forward?

22         MR. MORRIS:  I'll readily accept Mr. Bonds'

23  representation as well, Your Honor.

24         THE COURT:  Okay.

25         MR. MORRIS:  But I'd ask that it not happen again.

Dondero - Direct                          86

1          THE COURT:  Well, fair enough.  I think Mr. Bonds

2    understands.

3    BY MR. MORRIS:

4    Q    Mr. Dondero, you have no recollection of why you forwarded

5    this email to Mr. Ellington and why you told him you needed

6    him to provide leadership, correct?

7    A    Correct.

8          MR. MORRIS:  And if we can scroll up, can we just see

9    how Mr. Ellington responded?

10   BY MR. MORRIS:

11   Q    All right.  And can you just read for Judge Jernigan what

12   Mr. Ellington said on December 16th in response to your

13   statement that you're going to need him to provide leadership

14   here?

15   A    (reading)  On it.

16   Q    Thank you.  In your deposition, you testified without

17   qualification that Scott Ellington and Isaac Leventon did not

18   participate in the drafting of a joint interest or mutual

19   defense agreement.  Do you recall that testimony?

20   A    Yes, as far as I knew.

21   Q    And you also testified that you never discussed with

22   either of them the topic of a joint defense or mutual defense

23   agreement; is that right?

24   A    Correct.  That was Draper.

25   Q    Okay.

Appx 05819
016372

Dondero - Direct                          87

1        MR. MORRIS:  Can we put up Exhibit 11, please?  I

2   apologize.  It's Exhibit W.  Okay.  Can we stop right there?

3   BY MR. MORRIS:

4   Q    This is an email between some of your counsel and Mr.

5   Ellington.  Do you see that?

6   A    Yes.

7   Q    And a common interest agreement is attached to the

8   communication.  Is that a fair reading of the portion of the

9   exhibit that's on the screen?

10  A    Yes.

11       MR. MORRIS:  And can we scroll to the top of the

12  exhibit, please?

13  BY MR. MORRIS:

14  Q    And do you see that there is an email exchange between Mr.

15  Ellington and Mr. Leventon concerning the common interest

16  agreement?

17  A    Yes.

18  Q    Okay.  So it's your testimony that this email may exist

19  but you had no idea that Mr. Ellington and Mr. Leventon were

20  working with your lawyers to draft a common interest

21  agreement?  Is that your testimony?

22  A    I wasn't part of this.  It looks to me like they were just

23  included in a -- a final draft.  And, again, Ellington is

24  settlement counsel.  I -- but I don't want to speculate why or

25  what they were doing.

Dondero - Direct                    88

1  Q    Do you remember that I asked you a few questions the other

2  day about Multi-Strat financial statements and whether or not

3  you'd ever given -- you'd ever received any of those documents

4  from Mr. Ellington and Mr. Leventon?

5  A    Yes.

6  Q    Okay.  And you testified under oath that you never got any

7  financial information, including balance sheets, concerning

8  Multi-Strat from either of those lawyers, correct?

9  A    I -- hmm.  I -- I don't remember.  Yeah, I don't remember.

10  I may have to clarify that, but I don't remember.

11  Q    You testified under oath the other day that you wouldn't

12  even think to ask them for financial information relating to

13  Multi-Strat because it's not natural for them to have it,

14  right?

15  A    I -- I'm sorry.

16        THE WITNESS:  Your Honor, do I just have to answer

17  these questions yes or no, or is that the -- can I clarify at

18  all, or can I --

19        THE COURT:  Well, I mean, if the question simply

20  directs a yes or no answer, that's correct, you just answer

21  yes or no.  And I think this one did.

22      Again, your lawyer is going to have the chance to do

23  follow-up examination later.

24  BY MR. MORRIS:

25  Q    So let me try again.  During your deposition, you

Dondero - Direct                          89

1    testified under oath without qualification that you never got

2    any financial information, including balance sheets,

3    concerning Multi-Strat from Scott Ellington or Isaac Leventon,

4    correct?

5    A    I believe I might have misspoken there.

6    Q    Okay.  But that was your testimony the other day, right?

7    A    Yes.

8    Q    And today, you believe you might have gotten that

9    information from them, right?

10   A    Only because Ellington was supposed to be the go-between

11   and I couldn't go directly to somebody.  But he wouldn't

12   normally have that information, which is what I was saying.

13          MR. MORRIS:  Your Honor, I have an exhibit that's not

14   on the Debtor's exhibit list, and I was going to use it for

15   impeachment purposes to establish the fact that Mr. Ellington

16   and Mr. Leventon in fact gave to Mr. Dondero, after December

17   10th, financial information concerning Multi-Strat, which Mr.

18   Dondero had previously denied receiving.  May I -- may I use

19   that document to impeach Mr. Dondero?

20          THE COURT:  You may.

21          MR. BONDS:  Your Honor, I'm going to object.  This is

22   pretty clearly something that should have been disclosed and

23   it wasn't.

24          THE COURT:  Well, he says it's purely to impeach the

25   testimony that Mr. Dondero just now gave.  So we'll -- we'll

Dondero - Direct                    90

1   see the document and, you know, I'll either agree with that

2   being impeachment or not.  So, he may proceed.

3          MR. BONDS:  Your Honor, I think that the testimony

4   -- Your Honor, I'm sorry.  I think that the testimony that was

5   (inaudible) given was that he thought that he may have talked

6   to Scott or Isaac, not that he did not.

7          MR. MORRIS:  Your Honor, if I may, the testimony the

8   other day was unequivocal and unambiguous that not only didn't

9   he get this information from the two lawyers, but that he had

10  no reason to believe he would ever get the information from

11  those two lawyers.

12     I appreciate the fact that Mr. Dondero today is suggesting

13  that he may have, but I -- I would still like to use this

14  document to refresh his recollection and to impeach even the

15  possibility that he's giving this qualified testimony that he

16  may have.

17         THE COURT:  All right.

18         MR. MORRIS:  There's no doubt that he did.

19         THE COURT:  I overrule the objection.  You can go

20  forward.

21         MR. MORRIS:  Can we please put up on the screen -- I

22  believe it's Debtor's Exhibit AA.  And if we can scroll down,

23  please.  And just stop, yeah, towards the top.  All right.

24  Stop right there.

25  BY MR. MORRIS:

Dondero - Direct                        91

 1   Q    Do you see in the first email Mr. Klos -- he's an employee
 2   of the Debtor, right?
 3   A    Yes.
 4   Q    And he provides Multi-Strat balance sheet and financial
 5   information to Mr. Leventon, Mr. Ellington, and Mr.
 6   Waterhouse.  Do you see that?
 7   A    Yes.  He's the person I would normally go to.
 8   Q    Okay.  And they're all Debtor employees, right?
 9   A    Yes.
10   Q    Okay.  And then Mr. Leventon sends it to you and Mr.
11   Ellington on February 4th, 2020; is that correct?
12   A    Yes.
13   Q    And this is confidential information; is that fair?
14   A    No.
15   Q    Okay.  Let's -- let's talk about the next --
16   A    No, it's not -- wait, wait, hold on a second.  Judge, I
17   need to clarify this.  I -- it's not confidential information.
18   It's available to every investor, of which I was one of them.
19   Okay?  So, let's -- let's not mischaracterize this as some
20   corporate secret.
21   Q    Okay.  You interfered with the Debtor's production of
22   documents; isn't that right?
23   A    No.
24   Q    Several times in the last year, various entities have
25   requested that Dugaboy produce its financial statements,

Dondero - Direct                                    92

1   correct?

2   A    Dugaboy is my personal trust.  It's not an entity of the

3   Debtor in any form or fashion.

4   Q    Sir, you're aware that several times in the last year

5   various entities requested that the Debtor produce Dugaboy

6   financial information, correct?

7   A    The Debtor is not in a position to do it.  I -- I don't

8   know if it's been several times or whatever, but it's not

9   appropriate.

10           MR. MORRIS:  I move to strike, Your Honor.

11           THE COURT:  Sustained.

12   BY MR. MORRIS:

13   Q    I'll try one more time.  If we need to go to the

14   transcript, we can.  It's a very simple question.  You knew

15   and you know that several times in the last year various

16   entities have requested that the Debtor produce Dugaboy

17   financial statements, correct?

18   A    Yes.

19   Q    Do you recall at the deposition the other day I asked you

20   whether you had ever discussed with Mr. Ellington and Mr.

21   Leventon whether or not the Dugaboy financial statements

22   needed to be produced, and you were directed not to answer the

23   question by counsel and you followed those directions?

24   A    Yes.

25   Q    But you communicated with at least one employee concerning

Dondero - Direct                             93

1   the production of the Dugaboy financial statements, correct?

2   A    Yes.

3   Q    And that's Melissa Schroth; is that right?

4   A    Yes.

5   Q    She's an executive accountant employed by the Debtor,

6   right?

7   A    Yes.

8   Q    And on December 16th, after the TRO was entered into, you

9   instructed Ms. Schroth not to produce the Dugaboy financials

10  without a subpoena, correct?

11  A    That was the advice I had gotten from counsel, yes.

12  Q    Okay.  The Dugaboy and Get Good financial statements are

13  on the Debtor's platform, correct?

14  A    I do not know.

15  Q    There is no shared services agreement between Dugaboy or

16  Get Good and the Debtor, correct?

17  A    I don't know.

18  Q    You're not aware of any; is that fair?

19  A    Yes.

20  Q    Okay.

21         MR. MORRIS:  Can we put on the screen Exhibit R?  And

22  can you scroll down a bit?

23  BY MR. MORRIS:

24  Q    Okay.  That's Melissa Schroth at the top there; is that

25  right?

Dondero - Direct                    94

1  A    Yes.

2  Q    And these are texts that you exchanged with her after the

3  TRO was entered into, correct?

4  A    Yes.

5          MR. MORRIS:  Can we scroll down a little bit?

6  BY MR. MORRIS:

7  Q    And do you see on December 16th you sent Ms. Schroth an

8  email -- I apologize -- a text that says, "No Dugaboy details

9  without subpoena"?

10  A    Yeah.

11  Q    But you can't remember why you sent this text, correct?

12  At least you couldn't as of Tuesday?

13  A    I believe it was on advice of counsel.

14  Q    But that's not what you said on Tuesday, correct?

15  A    I don't remember.

16  Q    You sent this text even though you knew that various

17  entities had requested the Dugaboy financials, but you have no

18  recollection of ever talking to anyone at any time about the

19  production of those documents, right?

20  A    Can you repeat the question?

21  Q    I'll move on.  Let me just -- last topic, and then I'm

22  going to respectfully request that we just take a short break.

23  You're familiar with the law firm of Baker & McKenzie; is that

24  right?

25          (Echoing.)

Dondero - Direct                          95

1    A    I'm sorry.  You broke up on us there.

2    Q    No problem.  You're familiar with the law firm Baker &

3    McKenzie, correct?

4    A    Yes.

5    Q    That firm has never -- never represented you or any entity

6    in which you have an ownership interest, correct?

7    A    Correct.

8    Q    But in December, the Employee Group, of which Mr. Leventon

9    and Mr. Ellington was a part, was considering changing counsel

10   from Winston & Strawn to Baker & McKenzie, right?

11   A    I believe so.

12   Q    And you asked -- and because of that, you specifically

13   asked Mr. Leventon for the contact information for the lawyers

14   at Baker & McKenzie, right?

15   A    I believe so.

16   Q    Okay.

17        MR. MORRIS:  Can we put up Exhibit S, please?

18   BY MR. MORRIS:

19   Q    And who is that email sent from?  I apologize.  Withdrawn.

20   Who is that text message exchange with?

21   A    Isaac Leventon.

22   Q    Okay.  And Mr. Leventon was an employee of the Debtor

23   after December 10th, correct?

24   A    Yes.

25        MR. MORRIS:  Can we scroll down a little bit?

Appx. 03819
016381

Dondero - Direct                           96

BY MR. MORRIS:

Q    And on December 22nd, you asked Mr. Leventon for the

contact information at Baker & McKenzie, correct?

A    Yes.

Q    And the reason you asked Mr. Leventon for the contact

information, that was in connection with the shared defense or

mutual defense agreement, right?

A    I -- I don't remember why.  It might have just been for my

records.  I don't know.

Q    The only reason that you could think of for asking for

this information was for the shared defense or mutual defense

agreement, correct?

A    I -- no, it -- I don't know and I don't want to speculate.

I don't want to -- I don't want to speculate.  I -- did -- I

don't think I ever got -- I don't know what your point is.

        MR. MORRIS:  May we please go back to the transcript

at Page 136?  At the bottom, Line 23.

BY MR. MORRIS:

Q    Were you asked this question and did you give this answer?

     "Q   Do  you  recall  asking  Isaac  Leventon  for  the

     contact  information  for  the  --  for  the  lawyers  at

     Bakers & McKenzie?

     "A   I -- I don't -- I don't -- it might have been for

     part  of  the  shared  defense,  mutual  defense  whatever

     agreement, but that's -- that's the only reason I would

Dondero - Direct                          97

1      have asked for it."

2    Q    Did you give that answer to my question?

3    A    Yeah.  I shouldn't have speculated.

4    Q    Okay.  But that's the answer you gave the other day; is

5    that right?

6    A    I shouldn't have speculated.  That's my answer today.

7    Q    And today -- withdrawn.  In fact, you wanted the Baker

8    contact information in order to help Mr. Draper coordinate the

9    mutual defense agreement, correct?

10   A    I don't want to speculate.

11           MR. MORRIS:  Can we go to Page 139, please?  Lines 2

12   to 5.

13   BY MR. MORRIS:

14   Q    Did you -- did you hear this question and did you give

15   this answer on Tuesday?

16       "Q    Why did you want the Baker & McKenzie contact

17        information?

18       "A    I was trying to help Draper coordinate the mutual

19        shared defense agreement, period."

20   Q    Did you give that answer to my question on Tuesday?

21   A    Yes.

22           MR. MORRIS:  Your Honor, I'd respectfully request a

23   short break to see if I've got anything more.

24           THE COURT:  All right.  Well, I was going to ask you

25   how much more do you think you have.  We've been going almost

Dondero - Direct                    98

1   two hours.

2       So we'll take a break.  Let's make it a ten-minute break.

3   And then, depending on how much more you have and how much Mr.

4   Bonds is going to have, we'll figure out are we going to need

5   a lunch break in just a bit.

6       All right.  So it's 12:00 noon Central.  We'll come back

7   at 12:10.  Ten minutes.

8           MR. MORRIS:  Your Honor, may I have an instruction of

9   the witness not to check his phone for any purposes, not to

10  make -- not to communicate with anybody until -- until his

11  testimony is completed?

12          THE COURT:  All right.  Any -- any --

13          MR. BONDS:  Your Honor, he's going to speak with me.

14          THE COURT:  Pardon?

15          MR. BONDS:  I assumed he will speak to me about just

16  general events.  I mean, I don't want to be in breach of some

17  order.

18          MR. MORRIS:  Yeah.  I would -- I would -- I would ask

19  for -- you know, it's not -- he's on the stand.  He's still on

20  the stand.

21          THE COURT:  Yeah.  He --

22          MR. MORRIS:  He shouldn't be conferring with counsel,

23  either.  No disrespect to Mr. Bonds at all.

24          THE COURT:  Exactly.  I mean, you all can talk about,

25  you know, the national champion football game or whatever, but

Dondero - Direct                    99

 1   it would be counseling your client in the middle of testimony

 2   if you -- if you talk about this case at the moment.  So, you

 3   know, --

 4          MR. BONDS:  I understand, Your Honor.

 5          THE COURT:  All right.

 6          MR. BONDS:  I just didn't want to be --

 7          THE COURT:  All right.  So now we'll come back at

 8   12:11.

 9          THE CLERK:  All rise.

10          MR. MORRIS:  Thank you, Your Honor.

11       (A recess ensued from 12:01 p.m. until 12:12 p.m.

12          THE CLERK:  All rise.

13          THE COURT:  Please be seated.  This is Judge

14   Jernigan.  We're going back on the record in Highland Capital

15   versus Dondero.  We have taken an 11-minute break.  It looks

16   like we have Mr. Dondero and counsel back.  And Mr. Morris,

17   are you out there, ready to proceed?

18          MR. MORRIS:  I am, Your Honor.  And I do have just a

19   few more questions.

20          THE COURT:  Okay.  I'm sorry.  Mr. Lynn, I see you're

21   there in the room with Mr. Dondero.  Now, did you want to --

22          MR. LYNN:  Here's Mr. Bonds.  I apologize.  He was in

23   the restroom.

24          THE COURT:  Okay.  All right.  Everyone ready to

25   proceed?

Case 19-34054-sgj11   Doc 3596-31   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-11   Filed 01/25/206   Page 707 of 1052   PageID 17385

Dondero - Direct                                    100

1          MR. MORRIS:  Yes, Your Honor.

2          THE COURT:  Okay.  Mr. Morris, go ahead.

3          MR. MORRIS:  Thank you, Your Honor.

4                    DIRECT EXAMINATION, RESUMED

5    BY MR. MORRIS:

6    Q    Can you hear me, Mr. Dondero?

7    A    Yes.

8    Q    Did you ever discuss the request of any party to produce

9    the financial statements of Get Good and Dugaboy with Scott

10   Ellington?

11   A    Not that I recall.

12   Q    Did you ever communicate with Mr. Leventon on the subject

13   matter of whether or not the financial statements for Get Good

14   and Dugaboy needed to be produced by the Debtor?

15   A    No.

16   Q    Those are the two questions that you were directed not to

17   answer the other day, right?

18   A    I don't remember.

19   Q    Okay.  You mentioned that Mr. Ellington serves in some

20   capacity as settlement counsel.  Do I have that right?

21   A    Yes.

22   Q    Do you know if there's any exception in the TRO that

23   permits you to communicate directly with Mr. Ellington in his

24   so-called capacity as settlement counsel?

25   A    There was no change in his status in the TRO.  It's -- and

Dondero - Direct                                    101

1   I think he was still used by both the Debtor and by me in that

2   function.

3   Q   You said that -- you testified earlier that you understood

4   that you were prohibited from speaking with the Debtor's

5   employees, correct?

6   A   Except for -- except for with regard to the pot plan,

7   shared services, and Ellington as settlement counsel.  But I

8   continued to talk to employees about the pot plan as recently

9   as the end of the year, and I continued to talk to employees

10  about shared services based on the shared services proposal

11  that was sent to Ellington and forwarded to me as recently as

12  two days ago.

13  Q   You never -- you never read the TRO, right?

14  A   No.

15          MR. MORRIS:  Can we have it put up on the screen?  I

16  don't know the exhibit number, Ms. Canty, but hopefully it's

17  clear on the exhibit list.

18          MS. CANTY:  I'm sorry, John.  Can you repeat what

19  you're looking for?

20          MR. MORRIS:  The TRO.  (Pause.)  Can we scroll down

21  to Paragraph 2, please?  Okay.

22  BY MR. MORRIS:

23  Q   I appreciate the fact that you've never seen this before,

24  Mr. Dondero, but let me know if I'm reading Section 2(c)

25  correctly.  "James Dondero is temporarily enjoined and

Dondero - Direct                102

1   refrained from" -- subparagraph (c) -- "communicating with any

2   of the Debtor's employees, except for specifically -- except

3   as it specifically relates to shared services currently

4   provided to affiliates owned or controlled by Mr. Dondero."

5       Have I read that correctly?

6   A   Yes.

7   Q   Does that provide for any exceptions concerning the pot

8   plan?

9   A   The Independent Board requested a meeting on the pot plan.

10  Q   Okay.  But does it -- I appreciate that, and we'll talk

11  about that in a moment, but my question is very specifically

12  looking at the order.  And I, again, appreciate that you've

13  never seen it before.  But looking at the order now, is there

14  any exception for you to communicate with the Debtor's

15  employees concerning the pot plan?

16  A   I would think the pot plan would fall under that, since

17  some of the pot plan value is coming from affiliated entities

18  that are subject to the shared services agreement.  I would

19  think that would be reasonable, again, plus the -- well, it

20  was the subject of a meeting with the Independent Board at the

21  end of the month.

22  Q   Okay.

23  A   I still think it's the best alternative for this estate.

24  Q   Okay.  Did you -- did you ever -- did you ever ask

25  anybody, on your behalf, have asked the Debtors whether they

Appx. 03826
016388

Dondero - Direct                         103

1    agreed with what you believed was a reasonable interpretation

2    of the restraining order?

3    A    I did not.

4    Q    Okay.  And let's just deal with the notion of settlement

5    counsel.  Do you see anywhere in this TRO -- and if you want

6    to read anything more, please let me know -- do you see

7    anything in this TRO that would permit you to speak with Mr.

8    Ellington in his so-called role as settlement counsel?

9    A    Well, I would say, more importantly, I don't see anything

10   that takes away his role as settlement counsel, which was

11   formally done six months ago.

12   Q    Okay.  I did read Section 2(c) correctly, right?

13   A    Yes.

14   Q    And the only exception that's in Judge Jernigan's

15   restraining order that she entered against you relates to

16   shared services.  Have I read that correctly?

17   A    Yes.

18   Q    Okay.  Let's talk about the pot plan for a moment.  After

19   the TRO was entered, you were interested in continuing to

20   pursue the pot plan; is that right?

21   A    I still believe it's the best possible result for this

22   estate.

23   Q    And you sought a forum with the Debtor's board, correct?

24   A    Yes.

25   Q    And you knew that you couldn't speak directly with any

Dondero - Direct                        104

1    member of the Debtor's board unless your counsel and the

2    Debtor's counsel was -- was present at the same time.

3    Correct?

4    A    Yeah.  As a matter of fact, I didn't go.  I just had

5    counsel go.

6    Q    And the Debtor's board gave Mr. Lynn a forum for him to

7    present your pot plan after the TRO was entered.  Isn't that

8    right?

9    A    I believe so.

10   Q    And are you aware that the Debtor's board spent more than

11   an hour and a half with Mr. Lynn talking about your pot plan

12   after the TRO was entered?

13   A    Yes.

14   Q    And is it fair to say that, notwithstanding Mr. Lynn's

15   goodwill and Mr. Lynn's efforts to try to get to a successful

16   resolution here, the terms on which the pot plan were offered

17   were unacceptable to the Debtor?

18   A    I wasn't there.  I -- I don't know.

19   Q    The Debtor never made a counteroffer, did it?

20   A    Not that I heard.

21   Q    You'll admit, will you not, that over the last year you or

22   others acting on behalf -- on your behalf have made various

23   pot plan proposals to the Official Committee of Unsecured

24   Creditors?

25   A    Quite generous pot plans that I think will exceed any

Dondero - Direct                         105

1   other recoveries.

2   Q   Okay.  So you're aware that your pot plan was delivered

3   either by you or on your behalf to the U.C.C., correct?

4   A   I -- some were.  Some, I don't know.

5   Q   Okay.  Has the U.C.C. ever made a counterproposal to you?

6   A   Nope.

7          MR. MORRIS:  I have no further questions, Your Honor.

8          THE COURT:  All right.  Pass the witness.

9       Mr. Bonds, do you have any time estimate for me,

10  guesstimate?

11         MR. BONDS:  My guess is, Your Honor, it'll be about

12  an hour.  I would hope that we could take some type of a

13  break, just because I'm a diabetic and need to have some --

14         THE COURT:  All right.  Well, --

15         MR. MORRIS:  I have no objection, Your Honor.

16  Whatever suits the Court.  I'm willing to accommodate Mr.

17  Bonds always.

18         THE COURT:  Okay.  Let's take a 45-minute break.

19  Forty-five minutes.  So, it's 12:22.  We'll come back at seven

20  minutes after 1:00 Central time.

21      All right.  We're in recess.

22         THE CLERK:  All rise.

23      (A luncheon recess ensued from 12:23 p.m. to 1:15 p.m.)

24         THE CLERK:  All rise.

25         THE COURT:  Please be seated.  This is Judge

Case 19-34054-sgj11   Doc 3596-31   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 31   Filed 10/07/25   Page 713 of 1052   PageID 17391

Dondero - Cross                        106

1    Jernigan.  We are going back on the record in Highland Capital

2    Management versus Dondero.  We took a lunch break.  And when

3    we broke, Mr. Bonds was going to have the chance to examine

4    Mr. Dondero.

5        Let me just make sure we have, first, Mr. Dondero and Mr.

6    Bonds.  Are you there?

7             MR. BONDS:  Yes, we are.

8             THE COURT:  All right.  Very good.  I don't see your

9    video yet, but -- there you are.  All right.  Mr. Morris, are

10   you there?

11            MR. MORRIS:  I am here.  Can you hear me, Your Honor?

12            THE COURT:  I can.  All right.

13            MR. MORRIS:  Thank you.

14            THE COURT:  Well, we've got lots of other people, but

15   that's all I'll make sure we have at this moment.  All right.

16   Mr. Bonds, you may proceed.

17       And, Mr. Dondero, I know you know this, but I'm required

18   to remind you you're still under oath.

19       Okay, go ahead.

20                    CROSS-EXAMINATION

21   BY MR. BONDS:

22   Q   Before you resigned as portfolio manager, how long had you

23   had with Highland Capital Management?

24   A   Since inception in 1994.

25   Q   Okay.  And how long have your offices been at the

1  Crescent?

2  A    Eight years.

3  Q    Okay.  Before you resigned as portfolio manager, did you

4  spend a lot of time in the office?

5  A    Yes.  I spent every business day this -- or 2020,

6  including COVID, in the office.

7  Q    Okay.  And this is the first time that you are not in the

8  office, is that right, in decades?

9  A    Yes.

10 Q    Can you tell us about the shared services agreement that

11 exists between the Debtor and the other entities in which you

12 have an interest?

13 A    NexPoint, NexBank, the DAF, HFAM, primarily.  I don't know

14 what other entities paid.  Shared services, which is typical

15 in finance, for centralized tax, accounting, RICO function, so

16 that we don't have to have redundant, multiple high-paid

17 people in different entities.  We'd have them centralized and

18 with collective experience and collective functionality.  And

19 so, historically and recently, they pay Highland for those --

20 fees for those services.  And I, as a non-paid employee, or a

21 non-employee of Highland but a paid employee of NexBank -- of

22 NexPoint, was -- and my occupancy and support were part of

23 those shared services agreement.

24 Q    What do those agreements allow those entities to do?

25 A    Would it allow those entities to do?  Well, to access the

1   Highland functionality as appropriate, because most of those

2   entities, as is typical in finance, did not have their own

3   functionality, legal, tax, and -- legal, tax, and accounting,

4   but although they've been -- they've been building it lately

5   in anticipation of the pot plan not going through at Highland.

6   Q   Okay.  Do those agreements allow you to share office space

7   with --

8           MR. MORRIS:  Objection --

9           THE WITNESS:  Yes.

10          MR. MORRIS:  -- to the form of the question, Your

11  Honor.  I think the exhibits and the agreements themselves

12  would be the best evidence.  They're not in evidence.  They

13  haven't been offered in evidence.  I have no way to challenge

14  the witness on anything he's saying.  And on that basis, I'd

15  -- it's not fair to the Plaintiff.

16          THE COURT:  All right.  Mr. Bonds, can I ask you to

17  repeat your question?  It was muffled and I was about to ask

18  you to repeat it before I got the objection.  So, repeat the

19  question so I can --

20          MR. BONDS:  Okay.  I'm going to repeat it and amend

21  it.

22          THE COURT:  Okay.

23  BY MR. BONDS:

24  Q   Is it your understanding that those agreements allow you

25  to share office space with the Debtor?

Dondero - Cross                           109

1   A    Yes.  Virtually all of NexPoint's employees share the

2   Highland office space as part of a shared services agreement.

3   Q    Do those agreements allow you to share -- I'm sorry,

4   excuse me.  Strike that.  What else do they allow?

5   A    Typically is used in coordination of systems, servers,

6   software, cloud software, Internet software, office software,

7   tax, accounting, and legal functionality are all part of the

8   shared services agreement, although, you know, much of -- much

9   of that was stripped, you know, four or five months ago,

10  especially legal functionality and the accounting

11  functionality, without the concurrent adjustment in the

12  building.

13  Q    Okay.  And you previously testified that you generally

14  control NexPoint; is that correct?

15  A    Generally.  And the distinction I was trying to make is,

16  you know, following the financial crisis in '08, compliance

17  and the chief compliance officer has personal liability. along

18  with the rest of the C Suite, and operates independently, with

19  primary loyalty to the regulatory bodies.  And they're --

20  they're not controlled, bamboozled, or segued away from their

21  responsibility.  And at all times, they're supposed to be

22  doing what they believe is right, regulatorily-compliant, and

23  in the best interest of investors.

24       So that was the distinction I was drawing between, A, what

25  I was trying to remind Thomas of, that he should be

Dondero - Cross                          110

1   independent of Seery, in terms of following what he believes

2   is correct and regulatory-compliant.  And I don't have to push

3   the NexPoint compliance people and general counsel to do

4   anything specific, nor could I.  They are supposed to do what

5   is right from a regulatory investor standpoint, and I believe

6   that's what they've done.

7   Q   All right.  And what do you mean by the term or the usage

8   of the word "generally"?

9   A   Well, that's the distinction I was just drawing.  I mean,

10  generally, on regular business strategy, you know, major

11  investments, you know, other business items, I'm in control of

12  those entities.  But in terms of the content and allegations,

13  regulatory opinions that come from compliance and the general

14  counsel, that is their best views on their own, knowing they

15  have compliance obligations and personal liability.

16  Q   Do you believe that NexPoint and its other owners and

17  interest holders have rights independent from your own in this

18  case?

19  A   Right, yes, and obligations, and responsibilities to

20  investors.  I believe the attempt by the Debtor or Seery to

21  hide behind contracts that the Debtor has with the CLOs are --

22  are a spurious, incomplete argument.  You know, they're not in

23  compliance with those contracts.  Bankruptcy alone is an event

24  of default.  Not having the key man -- the key men, the

25  required requisite professionals that they're obligated to

Dondero - Cross                            111

1  contractually have working at the Debtor is a clear breach, in

2  violation of those CLO contracts.  Not having adequate staff

3  or investment professionals to analyze, evaluate, or follow

4  the investments in the portfolio is a clear violation.  And

5  specifically telling investors in the marketplace that you

6  plan to terminate all employees, a date certain January 24th,

7  is a proclamation that you're not going to be in any form able

8  to be a qualified registered investment advisor or qualified

9  in any which way to manage the portfolio or be in compliance

10 with the CLO contracts.

11     I would -- I would further add that the selling of the

12 securities, and the SKY securities, represent incomplete

13 intentional incurring of loss against the investors.  You have

14 securities that are less liquid with, you know, restructured

15 securities that have been owned for ten years, and they were

16 sold during the most illiquid weeks of the year, the couple

17 days before and after Thanksgiving, couple days before and

18 after Christmas, where the investors could have gotten 10 or

19 15 percent more on their monies if they were just sold in a

20 normal week.  It's -- it's preposterous to me.  It's

21 consistent with Seery not being an investment (garbled).

22     But it's preposterous to me that -- that this treatment of

23 investors is allowed or being camouflaged as some kind of

24 contractual obligation, when the investors have said these

25 funds are clearly in transition and the manager clearly is

Dondero - Cross                          112

1   incapable of managing them.  You know, please don't transact

2   until the transition is complete.  But Jim Seery has traded

3   every day, including -- I don't know about today, but every

4   day this week, selling securities for no investment rationale

5   and no business purpose.

6   Q    Are you also portfolio manager for NexPoint?

7   A    Yeah, I'm a portfolio manager for the closed-end retail

8   funds, which do have a higher fiduciary obligation than

9   anything on the institutional side.  I'm a portfolio manager

10  for those '40 Act funds that are the primary owners of the

11  CLOs that Seery is selling securities in for some unknown

12  reason.

13  Q    And what shared service agreements exist between NexPoint

14  and the Debtor?

15  A    Those are the shared service agreements I spoke of.  I

16  don't want to repeat myself.

17  Q    And I'm going to call Highland Capital Management Fund

18  Advisors, LP just Fund Advisors.  Is that okay with you?

19  A    Yes.

20  Q    Okay.  And you testified generally -- that you generally

21  control Fund Advisors; is that correct?

22  A    Yes.

23  Q    Do you believe that Fund Advisors and its owners and

24  interest holders have rights independent from your own in this

25  case?

Case 19-34054-sgj11   Doc 3596-31   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-31    Filed 01/24/25   Page 720 of 1052    PageID 17398

Dondero - Cross                          113

 1  A    Yes.

 2  Q    Are you the portfolio manager for Fund Advisors?

 3  A    Yes.

 4  Q    What shared services agreements exist between Fund

 5  Advisors and the Debtor?

 6          MR. MORRIS:  Objection, Your Honor.  The agreements

 7  themselves are the best evidence of the existence in terms of

 8  any agreement between the Debtor and these entities.

 9          MR. BONDS:  Your Honor, I can fix that.

10          THE COURT:  Okay.

11  BY MR. BONDS:

12  Q    I'm just asking:  What is your understanding, Mr. Dondero,

13  of the shared service agreements between the Debtor and Fund

14  Advisors?

15  A    It's similar to the agreement I mentioned earlier.  It

16  covers a broad range of centralized services historically

17  provided by Highland, but now those, while still paying

18  smaller than historic fees, those entities now have been

19  required to incur the expenses of duplicating those functions.

20  Q    Okay.  Do you recall the email string dated November 24th

21  regarding SKY equity that the Debtor talked about?

22  A    Yes.

23  Q    What did you mean when you sent that email about the

24  trade?  What did you mean, I'm sorry?

25  A    I was trying to inform the traders, and once they knew --

Dondero - Cross                          114

1   they weren't willing to do the trades anymore once they knew

2   that the underlying investors had requested that their

3   accounts not being traded until the transition be -- until the

4   transition of the CLOs was effectuated.

5       It's -- it's standard by, you know, statute or

6   understanding, in the money and management business, when

7   you're moving accounts from one asset manager to another, and

8   someone requests that you don't do anything to their account,

9   you don't trade it whimsically.  And so I was -- I was making

10  sure the traders knew that the underlying investors had

11  requested that no trades occur in their accounts.

12      And then I believed it was a clear violation of the

13  Registered Investment Adviser's Act.  I believe that people

14  involved at a senior level or at a compliance level could have

15  material liability, and could create material liability for

16  the Debtor.  And I think if, as I said before, I think if

17  anybody on this call were to call the SEC, they would start on

18  audit on this.

19          MR. MORRIS:  Your Honor, I move to strike the first

20  portion of the answer prior to when he started to describe

21  what he believes and what he thinks.  The first portion of the

22  answer was devoted to testifying about what is in the

23  knowledge of the people who he was communicating with.

24  There's no evidence.  Mr. Dondero, of course, was free to call

25  any witness he wanted.  He could have called the chief

Dondero - Cross                        115

1    compliance officer.  He could have called the general counsel.

2    He could have called all the people he's now testifying on

3    behalf of, and he did not.

4       So I move to strike anything in the record that purports

5    to reflect or suggest the knowledge on behalf of any party

6    other than Mr. Dondero.

7             THE COURT:  Okay.  I'm --

8             MR. BONDS:  Let me rephrase -- Your Honor, I'm going

9    to rephrase the question.

10            THE COURT:  Okay.  Very well.

11            MR. BONDS:  I'm sorry.

12            THE COURT:  So the motion to strike is granted.  If

13   you're going to rephrase, go ahead.

14            MR. BONDS:  Okay.

15   BY MR. BONDS:

16   Q   Mr. Dondero, what did you mean when you said -- that the

17   emails about the trade?

18   A   Okay.  I'll give my intention by sending emails to stop

19   the trade and my basis for those emails.  My intentions were

20   to inform the traders and to inform the compliance people that

21   I believe there was a trade that wasn't in the best interest

22   of the employees that had no business purpose for its

23   occurring.  And the people involved weren't aware that the

24   investors had sent over requests not to trade their accounts

25   while they were in transition.

Appx. 02839
016401

Dondero - Cross                        116

1    So I made the traders aware of that.  I made compliance

2    aware of that also.  And it's my belief, based on 30 years'

3    experience in the industry, that it is entirely inappropriate

4    to trade the accounts of investors that are in transition, and

5    especially when you're not -- you're not contractually -- you

6    are contractually in default with that client, to trade their

7    account whimsically, for no business purpose.  And I thought

8    it was a clear breach of both regulatory, ethical, and

9    fairness with regard to the investors.

10   So I -- what did you know, when did you know it, what did

11   you do?  I did what I felt was the right thing, which I try

12   and do every day, and made all the relevant parties aware of

13   what was going on.

14   Q   Mr. Dondero, do you recall the text message you sent to

15   Mr. Seery in which you said, "Be careful what you do"?

16   A   Yes.

17   Q   What did you mean by that message?

18   A   It's -- I even said, Last warning.  I mean, I -- he's

19   doing things against the interests of investors.  He's

20   purposely incurring losses by trading in days and weeks and

21   time of the year, the day before and after Thanksgiving, where

22   any novice knows the markets are illiquid and anybody who can

23   read a computer screen can see you get ten percent less --

24   five or ten percent less than you would the week before or the

25   week after.  And with as much professional umbrage as

Case 19-34054-sgj11   Doc 3596-31   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 151-31   Filed 06/18/25   Page 724 of 1052   PageID 17402

Dondero - Cross                          117

 1  possible, I was recommending that he stop.

 2  Q   Did you intend to personally threaten Mr. Seery in any

 3  way?

 4  A   No.  It was bad -- bad intentional professional acts

 5  against the interests of investors that flow through to '40

 6  Act retail mom-and-pop investors.  I was trying to prevent

 7  those losses and those bad acts from occurring.  And I believe

 8  everybody who's -- everybody around that issue should be

 9  ashamed of themselves, in my opinion.

10  Q   Do you now regret sending the text?

11  A   No.  No, I mean, I could have worded it differently.  I

12  was angry on behalf of the investors.

13  Q   And Mr. Dondero, you have management ownership interest in

14  that entity; is that right?

15  A   Yes.

16  Q   Do you believe the interests or other entities in which

17  you are involved are independent from your personal rights in

18  this case?

19  A   Yes.

20  Q   And do you believe you caused anyone to violate the TRO?

21  A   No.  I've been -- I've been very conscious to just try and

22  champion the thing that -- things that I think are important

23  and the things that I've been tasked to do, like an attractive

24  pot plan to help resolve this case.  I spend time on that.

25  But every once in a while, do I have to access, let's say,

Dondero - Cross                    118

1  David Klos, who is the person who put the model together, who

2  has been working on it for six or nine months, and no one else

3  S has a copy of?  Yes.  Yeah, I have to -- I have to access

4  him.  I don't believe that's the -- inappropriate or in any

5  way violating the spirit of the TRO.

6      I believe settlement in this case is only going to happen

7  with somebody fostering communication.  And Ellington's role,

8  which I thought was a good one and I thought he was performing

9  well as settlement counsel, was an important role.  And I used

10 him for things like -- and Seery also used him for things.  As

11 recently as two days before Ellington was fired, Seery gave

12 him a shared services proposal to negotiate with me.

13 Ellington has always been the go-between from a settlement and

14 a legal standpoint.  I think his role there was -- it was

15 valued.  To try to honor the TRO was things like Multi-Strat,

16 that I didn't remember correctly.  Ninety percent of the time

17 or for the last 20 years I would have gone directly to

18 Accounting and Dave Klos for it, but I purposely went to

19 settlement counsel in terms of Ellington in order to get the

20 Multi-Strat information which we needed in order to put the

21 pot plan together that we went to the Independent Board with

22 at the end of December.

23 Q   (faintly)  And do you recall the questions that Debtor's

24 counsel had regarding the letters sent by K&L Gates to clients

25 of the Debtor?

Appx. 02642
016404

1        MR. MORRIS:  I'm sorry, Your Honor.  I had trouble

2   hearing that question.

3        THE COURT:  Please repeat.

4        MR. BONDS:  Sure.

5   BY MR. BONDS:

6   Q   Do you recall the questions Debtor's counsel had regarding

7   the letters sent by K&L Gates to the clients of the Debtor --

8   to the Debtor?

9   A   Yes.

10  Q   You testified on direct that the letters were sent to do

11  the right thing; is that correct?

12  A   Yes.

13  Q   What did you mean by that?

14  A   I don't want to repeat too much of what I just said, but

15  the Debtor has a contract to manage the CLOs, which in no way

16  is it not in default of.  It doesn't have the staff.  It

17  doesn't have the expertise.  Seery has no historic knowledge

18  on the investments.  The investment staff of Highland has been

19  gutted, with me being gone, with Mark Okada being gone, with

20  Trey Parker being gone, with John Poglitsch being gone.

21       And there's -- there's a couple analysts that are a year

22  or two out of school.  The overall portfolio is in no way

23  being understood, managed, or monitored.  And for it to be

24  amateur hour, incurring losses for no business purpose, when

25  the investors have requested numerous times for their account

1   not to be traded, is crazy to me.  Where the investors say, We

2   just want our account left alone.  We just want to keep the

3   exposure.  And Jim Seery decides no, there's -- I'm going to

4   turn it into cash for no reason.  I'm just going to sell your

5   assets and turn them to cash and incur losses by doing it the

6   week of Thanksgiving and the week of Christmas.  I think it's

7   -- it's shameful.  I'm glad the compliance people and the

8   general counsel at HFAM and NexPoint saw it the same way.  I

9   didn't edit their letters, proof their letters, tell them how

10  to craft their letters.  They did that themselves, with

11  regulatory counsel and personal liability.  They put forward

12  those letters.

13          MR. MORRIS:  Your Honor (garbled) the testimony that

14  Mr. Dondero just gave about these people saw it.  They're not

15  here to testify how they saw it.  We know that Mr. Dondero

16  personally saw and approved the letters before they went out.

17  He can testify what he thinks, what he believes.  I have no

18  problem with that.  But there should be no evidence in the

19  record of what the compliance people thought, believed,

20  understood, anything like that.  It's not right.

21          THE COURT:  All right.  That's essentially a --

22          MR. BONDS:  Your Honor?

23          THE COURT:  -- a hearsay objection, I would say, or

24  lack of personal knowledge, perhaps.  Mr. Bonds, what is your

25  response?

Dondero - Cross                         121

1              MR. BONDS:  Your Honor, my response would be that

2    there are several exhibits the Debtor introduced today that

3    stand for the proposition that the compliance officers were

4    concerned.  So I think there is ample evidence of that in the

5    record.

6              THE COURT:  I didn't --

7              MR. MORRIS:  Your Honor, the letter --

8              THE COURT:  I did not understand what you said is in

9    the record.  Say again.

10             MR. BONDS:  Your Honor, I'm sorry.  The -- there are

11   -- there are references that are replete in the record that

12   have to do with the compliance officers' understanding of the

13   transactions.

14             THE COURT:  I don't know what you're referring to.

15             THE WITNESS:  Your Honor?

16             THE COURT:  I've got a lot of exhibits.  You're going

17   to have to point out what you think --

18             THE WITNESS:  Can I -- can I -- can I -- can I answer

19   for -- that for a second?  The letters that were signed by the

20   compliance people or by the businesspeople at NexPoint and

21   HFAM objecting to the transactions, those letters were their

22   beliefs, their researched beliefs.  They weren't --

23             THE COURT:  Okay.

24             THE WITNESS:  -- micromanaged by me.  You know, they

25   weren't -- I agree with them, but those weren't my beliefs

1  that they've stated.  Those were their own beliefs and their

2  own research, --

3              THE COURT:  All right.

4              THE WITNESS:  -- and the record should reflect --

5              THE COURT:  This is clearly hearsay.  I mean, it's

6  one thing to have a letter, but to go behind the letter and

7  say, you know, what the beliefs inherent in the words were is

8  inadmissible.  All right?  So I strike that.

9              THE WITNESS:  Maybe ask your question again.

10  BY MR. BONDS:

11  Q    Yeah.  What is your understanding of the rights that these

12  parties had and what do you believe that was intended to be

13  conveyed by the compliance officers?

14              MR. MORRIS:  Objection.  Calls -- calls for Mr.

15  Dondero to divine the intent of third parties.  Hearsay.

16              THE COURT:  I sustain.

17              MR. BONDS:  Your Honor, --

18              MR. MORRIS:  No foundation.

19              MR. BONDS:  -- I don't agree.  I think that this is

20  asking Mr. Dondero what he thinks.

21              MR. MORRIS:  The letters speak for themselves, Your

22  Honor.

23              THE COURT:  Okay.  I sustain --

24              MR. MORRIS:  And Mr. --

25              THE COURT:  I sustain the objection.

Dondero - Cross                                    123

 1          MR. MORRIS:  All right.  Thank you.

 2          THE WITNESS:  Ask me what I know.  Or ask me what my

 3   concerns --

 4   BY MR. BONDS:

 5   Q    Let me ask you this.  What were your concerns relating to

 6   the compliance officers' exhibit?

 7   A    My concerns regarding the transaction, the transactions,

 8   which may repeat what I've said before, but I do want to make

 9   sure it gets in the record.  So if we have to make a -- these

10   were my concerns, whether or not they were the compliance

11   people's concerns.  I believe they were, and I believe they

12   were similar, but I'm just going to say these are -- these

13   were my concerns.

14          The Debtor, with its contractual -- with its contract with

15   the CLOs, were in no way -- was in no way compliant with that

16   contract or not in default of that contract.  Bankruptcy is a

17   reason for default.  Not having the key men specified in the

18   contract currently employed by the Advisor is a violation.

19   Not having adequate investment staff to manage the portfolio

20   is a violation of that contract.  Announcing that you're

21   laying off everybody and will no longer be a registered

22   investment advisor is proclaiming that you, if you even have

23   any -- any -- pretend that you're qualified or in compliance

24   with the contract now, you're broadcasting that you won't be

25   in three weeks, are -- are all mean that you're not in good

Dondero - Cross                    124

1    standing.  Okay?  Number one.

2        Number two, when the investors know that it's in

3    transition, you're not in compliance as a manager, you're not

4    going to be an RIA in three weeks, the accounts are going to

5    have to transition to somebody else in three weeks, and the

6    investors ask you, Please don't trade my accounts between now

7    and then, that is -- that is a -- if it's not a *per se*, it's

8    an ethical and a spirit violation of any relationship between

9    an investor and an asset manager.

10        To then sell assets -- not replace assets, just sell

11   assets for cash -- and purposely do it on the least liquid

12   days of the year -- the day before Thanksgiving, the day after

13   Thanksgiving, the week of Christmas, this past week, whatever

14   -- to purposely incur losses so that the investors suffer ten

15   or fifteen percent losses that other -- on each of those sales

16   that they wouldn't otherwise have to incur, and for no stated

17   business purpose, for no investment rationale, with no staff

18   to even say whether the investment is potentially going up or

19   down, is -- is -- is -- I've never seen anything else like it.

20        And I will stand up and say it every day:  I'm glad the

21   letters went out from HFAM and from NexPoint.  I would never

22   recommend they get retracted.  And I believe everybody who

23   signed those letters meant everything in those letters.  And I

24   believe the letters are correct.  And I believe the whole

25   selling of CLO assets is a travesty.

Dondero - Cross                         125

1      My personal opinion, we need an examiner or somebody here

2   to look at this junk and look at some of the junk that

3   occurred earlier this year.  This -- this stuff is

4   unbelievable to me.

5   Q   Generally, who holds interests in the CLOs?

6   A   A vast majority of the CLOs that we're speaking of that

7   Seery has been selling the assets of are owned by the two

8   mutual funds, the two '40 Act -- the two '40 Act mutual funds

9   and the DAF.  Between them, I think out of -- eleven out of

10  the sixteen CLOs, they own a vast majority, and then I think,

11  whatever, two or three they own a hundred percent, and I think

12  two or three they own a significant minority.

13      And just because they don't own a hundred percent doesn't

14  somehow allow a registered investment advisor to take

15  advantage of an investor.  And I -- I've never understood that

16  defense.  I wouldn't be able -- in my role of 30 years, I

17  wouldn't be able to tell that to an investor, that, hey, you

18  had a contract with us, we did something that wasn't in your

19  best interest, but we got away with it because you didn't own

20  a hundred percent, you only owned eighty percent.

21          MR. MORRIS:  Your Honor, I move to strike.  There's

22  no contract between the Debtor and Mr. Dondero's -- and the

23  entities that he owns and controls for purposes of the CLO.

24  The only contract is between the Debtor and the CLOs

25  themselves.

Appx. 03849
016411

Dondero - Cross                    126

1          THE COURT:  All right.  Well, I overrule whatever

2   objection that is.  Again, if you want to bring something out

3   on cross-examination or through Mr. Seery, you know, you're

4   entitled to do that.

5      All right.  Please continue.

6   BY MR. BONDS:

7   Q   Do you believe these letters were sent by the Funds to the

8   Advisors because they are trying to protect the independent

9   entities?

10  A   They're trying to protect their investors.  They were

11  trying to protect their regulatory liability for activities

12  they see that are not in the best interests of investors.

13         MR. MORRIS:  Objection, Your Honor.  I move to

14  strike.  He's again testifying as to the intent of the people

15  who sent the letters who are not here to testify today.

16         THE COURT:  Sustained.

17  BY MR. BONDS:

18  Q   Mr. Dondero, what is your belief as to the letters that

19  were sent by the Funds and Advisor?  Is -- are they trying to

20  protect their independent interests?

21         MR. MORRIS:  Objection, Your Honor.  Asked and

22  answered.

23         THE COURT:  Sustained.

24         THE WITNESS:  Ask me --

25  BY MR. BONDS:

016412

Dondero - Cross                    127

1   Q   What is your understanding of why the letters were sent?

2           MR. MORRIS:  Objection, Your Honor.  Asked and

3   answered.

4           THE COURT:  Sustained.

5   BY MR. BONDS:

6   Q   Mr. Dondero, would you have sent the letters?

7   A    I would have sent the letters exactly or very similar or

8   probably even more strongly than the letters were stated, for

9   the purposes of protecting investors, to protecting mom-and-

10  pop mutual fund investors from incurring unnecessary losses by

11  an entity that was no longer in compliance with their -- with

12  their asset management contract and because the investors had

13  requested that their account just be frozen until it was

14  transitioned.

15      That's why I would have sent the letter.  That's why I

16  believe the letter should be sent.  That's why I'm happy they

17  were sent.  That's why we've never retracted.

18  Q   Mr. Dondero, who is Jason Rothstein?

19          THE COURT:  I did not hear the question.

20          THE WITNESS:  Jason -- Jason --

21          MR. BONDS:  Who --

22          THE COURT:  Please repeat.

23          MR. BONDS:  Yes.  I asked Mr. Dondero who Jason

24  Rothstein was.

25          THE WITNESS:  Jason Rothstein heads up our systems

Dondero - Cross                          128

1   department at Highland Capital.

2   BY MR. BONDS:

3   Q    Can you explain what your text message to Mr. Rothstein

4   was about?

5   A    Which text message?  The one where it was in the drawer?

6   Q    Yeah.

7   A    Uh, --

8   Q    And that was actually from him, not you.

9   A    Yeah.  That was from him.  I think he transferred icons or

10  set up personal stuff to the new phone, and he was just saying

11  that the old phone was in Tara's drawer.

12  Q    And you don't know whether -- what's happened to the

13  phones, do you?

14  A    No.  Like I said, I believe they've been destroyed, but I

15  -- I can find out.  I mean, I can query and find out who

16  destroyed it, if that's important.

17  Q    And you understood that you were not supposed to talk to

18  the Debtor's employees; is that correct?

19  A    Like I said, except for my roles regarding shared

20  services, the pot plan, and trying to reach some type of

21  settlement, I've had painfully few conversations with the

22  Debtor's employees.

23  Q    When you talked to certain employees, did you think it was

24  an -- under an exception to the TRO, like shared services,

25  related to the pot plan, or settlement communications?

Appx. 03852
016414

Dondero - Cross                                129

1  A    Yes.

2           MR. MORRIS:  Your Honor, I move to strike.  Mr.

3  Dondero never read the TRO.  He's got no basis to say what the

4  TRO required and didn't require.

5           MR. BONDS:  That wasn't the -- that wasn't the

6  question.

7           THE COURT:  Okay.

8           MR. BONDS:  I'm sorry.

9           THE COURT:  Okay.  Rephrase the question, please.

10          MR. BONDS:  Okay.  I'm sorry.

11  BY MR. BONDS:

12  Q    When you talked to these -- to certain employees, did you

13  think it was under an exception to the TRO, like shared

14  services, relating to the pot plan, or settlement

15  communications?

16  A    Yes.  Absolutely.

17          MR. MORRIS:  I object.  No foundation.

18          THE COURT:  Sustained.

19  BY MR. BONDS:

20  Q    Mr. Dondero, do you understand -- did your lawyers explain

21  to you the TRO?

22  A    Yes.

23  Q    And who was the lawyer that explained the TRO to you?

24          MR. MORRIS:  Your Honor, I don't know if we're

25  getting into a waiver of privilege, but I just want to tell

Dondero - Cross                         130

1   you that my antenna are up very high.

2          THE COURT:  Okay.  Mine are as well, Mr. Bonds.  Are

3   you about to waive the privilege?

4          MR. BONDS:  No, Your Honor, I am not.

5          THE COURT:  Okay.  Well, it sounded like perhaps we

6   were about to have the witness testify about conversations he

7   had with lawyers.

8          MR. BONDS:  I'm sorry, Your Honor.  That was not my

9   intention.  Again, I'm asking Mr. Dondero to explain for us

10  his contact with -- or, his impression of the TRO.

11  BY MR. BONDS:

12  Q    What did the TRO mean to you?

13  A    The TRO meant to me that I was precluded from talking to

14  Highland employees -- which, again, very few, if any, were

15  coming into the office.  I was not talking to Highland

16  employees with any regularity anyway.  But there was an

17  exception with regard to Scott Ellington regard -- Scott

18  Ellington in terms of him functioning as settlement attorney

19  to try and bridge the U.C.C., the Independent Board, Jim

20  Seery, other people, and things that impacted me or other

21  entities.

22      I also viewed that there was an exception for the pot

23  plan, which had been presented and gone over as recently as

24  December 18th and 20th.  And -- or December 18th, I think, was

25  the date.

Dondero - Cross                    131

1      And you know what, I want to clarify a characterization of

2   the pot plan.  I still believe it's the best and most likely

3   alternative for this estate in the long run.  I think what

4   we've proposed numerous times is more generous than what

5   anyone will receive in a liquidation and in a more timely

6   fashion.

7      And the last time we presented it to the Independent

8   Board, the Independent Board thought it was attractive and

9   thought we should go forward with it to the U.C.C. and other

10  parties.

11          MR. MORRIS:  Your Honor, I move to strike the last

12  portion of the answer that purports to describe what the

13  Independent Board thought.

14          THE COURT:  Well, --

15          MR. MORRIS:  No foundation.  Hearsay.

16          THE COURT:  What is your response to the hearsay

17  objection, Mr. Bonds?

18          MR. BONDS:  Your Honor, I don't have one.

19          THE COURT:  Okay.  I sustain.

20  BY MR. BONDS:

21  Q    What exceptions did you believe there were for

22  communications with employees?

23  A    Okay.  Thank you.  Yeah.  Like I said, I covered Scott

24  Ellington and settlement counsel.  I covered the pot plan.

25  Q    Okay.

016417

Case 19-34054-sgj11    Doc 3596-31    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-31    Filed 03/25    Page 739 of 1052    PageID 17417

Dondero - Cross                    132

1    A    My -- my view of the pot plan as -- my view of the pot

2    plan was that it was very attractive, and I had received

3    encouragement to go forward with it as something that should

4    be workable.  That's my testimony on that.

5        And then -- and we talk about negotiating shared services.

6    So, there's shared services in terms of overlap in

7    functionality, but there's also, in terms of negotiating the

8    shared services agreement, which, as I said, was something

9    that Ellington was put in charge of three or four days ago by

10   Jim Seery to negotiate with us.  And he reached out to me to

11   negotiate it.  And I think the Pachulski deadline on it was

12   three days later.  That whole process was something that I

13   viewed as separate from the TRO, especially since it was

14   initiated by Jim Seery, DSI, et cetera, and consistent with

15   what Scott Ellington's role had been for the last six, nine

16   months.

17   Q    As to the Debtor's request that you vacate the office

18   space, did you comply with this request?

19   A    Yes.

20   Q    What did you think that vacating meant?

21   A    I moved out all my -- my personal items to a new office at

22   NexBank.

23   Q    (faintly)  And, in fact, did you work on the last day over

24   to 3:00 a.m.?

25   A    Yes.  4:00.

Dondero - Cross                          133

1           THE COURT:  Mr. Bonds, I didn't hear your question.

2   I didn't hear your question.

3           MR. BONDS:  Okay.  I'm sorry.

4   BY MR. BONDS:

5   Q    Did -- isn't it true that you worked through the night, to

6   3:00 or 4:00 a.m., to vacate the premises?

7   A    Yes.  Until 4:00 a.m. on the last day, to organize and

8   pack up all my stuff, yes.

9   Q    Did you think your presence in the office, with no other

10  employees there, violated the spirit of the TRO?

11  A    No.  I thought it was over the top and meant to tweak me,

12  but, yeah, there's no -- there's not Debtor employees coming

13  in since COVID.

14  Q    (faintly)  Okay.  And you thought you could talk to Mr.

15  Ellington and -- as settlement counsel; is that correct?

16          MR. MORRIS:  I'm having trouble hearing it, Your

17  Honor.

18          THE WITNESS:  Yes.

19          THE COURT:  Yeah.  We're -- Mr. Bonds, please make

20  sure you speak into the device.

21          MR. BONDS:  I'm sorry.  I'll try to get closer.

22  Okay.  I asked the Debtor -- or I, excuse me, I asked Mr.

23  Dondero if he thought he could talk to Ellington as a go-

24  between or settlement counsel.  And I asked him if that was

25  correct.

Case 19-34054-sgj11 Doc 3596-31 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-31 Filed 03/25 Page 741 of 1052 PageID 17419

Dondero - Cross                    134

1        THE WITNESS:  Yes.  For settlement, shared services,

2    the pot plan.  Nothing that interrupts or affects the Debtor,

3    but for those purposes, as has consistently occurred for the

4    last six months.

5    BY MR. BONDS:

6    Q    Okay.  And you saw the texts and emails presented by the

7    Debtor between you and Mr. Leventon; is that correct?

8    A    The one regarding Multi-Strat?

9    Q    Yes.

10   A    Yes.

11   Q    In your understanding, did you believe those

12   communications were allowed under the TRO?

13   A    Well, yes.  And, again, to clarify my -- my contrasting

14   testimony, I would never typically have gone to them for that

15   kind of information, but to be compliant with the TRO, for

16   Multi-Strat information, which I needed in order to put

17   together the pot plan that the Independent Board audienced on

18   December 18, I needed the information on Multi-Strat, and I

19   requested it as appropriate through settlement counsel

20   Ellington.  And I think Ellington requested it from Isaac, who

21   requested it from David Klos.

22       The whole purpose, I believe -- my belief is the whole

23   purpose of this TRO is to make it impossible for us to get

24   information to come up with alternatives other than a -- the

25   plan proposed by Jim Seery.  It's our -- if -- if -- without

Dondero - Cross                    135

1   Ellington in the go-between, which he's now no longer an

2   employee, I assume the only way we get any information,

3   balance sheet or anything from Highland Capital, is with a

4   subpoena.

5       And as much as I've tried to engage or make an attractive

6   pot plan for everybody, each one of them has been a complete

7   shot in the dark, without even knowing the assets and

8   liabilities of Highland, but just estimating where they were

9   or were likely to be.

10  Q   Do you believe your text message with Leventon caused any

11  harm to the Debtor's business?

12  A   No.  It potentially fostered a pot plan, because, you have

13  to know, the pot plan needed -- one of the aspects of the pot

14  plan was the --

15  Q   Do you still want to advocate for your pot plan?

16  A   I think that's eventually where we ultimately end up.  Or

17  -- or should end up.  Otherwise, I fear it's going to be an

18  extended, drawn-out process.

19  Q   And how much did you initially propose to pay creditors in

20  this case?

21  A   The most recent -- the most recent pot plan?

22  Q   No.  The -- initially.

23  A   The initial pot plan, I believe, was $160 million.

24  Q   And what about the notes?

25  A   There was $90 [million] of cash and I believe $70

Dondero - Cross                               136

1   [million] of notes.

2   Q    And what is Multi-Strat?

3   A    Multi-Strat is a fund that's managed by Highland.  They

4   used to have $40 or $50 million in value.  It used to contain

5   a lot of life settlement policies.  And I believe now has $5

6   or $6 million of value, after assets have been sold.

7   Q    Do you recall the email Debtor's counsel presented

8   regarding the balance sheet today?

9   A    The balance sheet of Multi-Strat?

10  Q    Correct.

11  A    Yes.

12  Q    Do you believe you were entitled to see that document?

13  A    Yes.  It's just -- again, for the pot plan, I needed it.

14  But also I'm an investor in that fund and I'm entitled to it.

15  It's -- there was nothing in there that was improper or

16  untoward or in any way damaged the Debtor.

17  Q    And you recall the request for documents sent by the

18  Debtor; is that correct?

19  A    On my -- my personal estate plan?

20  Q    No, on Multi-Strat.

21  A    The Debtor's request on -- I'm sorry.  What was that?

22  Q    The Debtor sent you a request for Multi-Strat.  For Duga

23  -- I'm sorry.

24  A    For Dugaboy?  Okay.

25  Q    Dugaboy.

Dondero - Cross                      137

1   A    Yeah.  There's -- there's personal estate planning trusts.

2   Some are active.  Some are inactive.  Some have been around

3   for 15 years.  But they're -- they're not assets or anything

4   that's related to the estate.  And that was -- that was my

5   text to Melissa that said, you know, Not without a subpoena.

6   Q   Mr. Dondero, if you remember back on Exhibit K, there was

7   some request that you terminate your offices at the Crescent,

8   and I think you were given seven days' notice to do that.  Do

9   you know if Christmas occurred during that time?

10  A   I believe it did.

11  Q   So, if Christmas and Christmas Eve are both holidays, how

12  many days, business days, did they give you to terminate or to

13  get out of the space?

14  A   There would have been three business days.  It was Monday

15  through Wednesday that I moved out.

16          MR. BONDS:  Your Honor, I'll pass the witness.

17          THE COURT:  All right.  Mr. Morris?

18          THE WITNESS:  Take a break.  I hope.

19          MR. BONDS:  Your Honor, I'm sorry, can I take a ten-

20  minute break?  I think that I'm going to be through, but I

21  don't know.

22          THE COURT:  All right.  I'll give you a ten-minute

23  break.

24          MR. BONDS:  All right.  Thank you, Your Honor.

25          THE COURT:  We're coming back at 2:15.

Dondero - Cross                    138

1              THE CLERK:  All rise.

2        (A recess ensued from 2:06 p.m. until 2:16 p.m.)

3              THE CLERK:  All rise.

4              THE COURT:  All right.  Please be seated.  We're back

5    on the record in Highland versus Dondero.  Mr. Bonds, do you

6    have more examination?

7              MR. BONDS:  Your Honor, I have one question.

8              THE COURT:  Okay.

9              MR. BONDS:  And that's --

10             MR. LYNN:  And one more witness.

11             MR. BONDS:  And one more witness.

12                    CROSS-EXAMINATION, RESUMED

13   BY MR. BONDS:

14   Q    Do you think that Scott Ellington and Isaac Leventon were

15   treated appropriately by the Debtor?

16   A    No, I do not.  I don't think they've been treated fairly,

17   nor do I think other senior employees have been treated

18   fairly.  I've never seen a bankruptcy like this where, during

19   complex unwinding of 20 years of various different entities

20   and structures, relying on the staff, working them hard,

21   working overtime, a lot of investment professionals like

22   lawyers and DSI just putting their name on the work of stuff

23   that was done by internal employees, getting to the end of the

24   year, trying to pay people zero bonuses and retract prior

25   years' bonuses, and try and come up with legal charges against

Dondero - Cross                                139

1   those people is unusual to this case and my experience, in the

2   bankruptcies we've been involved in, where typically

3   management teams get paid multiples of current salary to stay

4   on and be the experts.

5       I also think they were put in difficult spots from the

6   very beginning.  It was Jim Seery that made Scott Ellington

7   the settlement counsel six, seven months ago.  It was a

8   broadly-defined role that was never retracted, never adjusted,

9   never modified, yet somehow he and Isaac violated it.  I don't

10  know.  I haven't spoken to them since they've been terminated.

11  They aren't allowed to speak to me, from what I hear.  But I

12  wish them luck in their claims.

13          THE COURT:  Okay.  You pass the witness?

14          MR. BONDS:  Yes, Your Honor.

15          THE COURT:  All right.  Mr. Morris, do you have

16  further examination?

17          MR. MORRIS:  Just a few questions.

18                  REDIRECT EXAMINATION

19  BY MR. BONDS:

20  Q   Mr. Dondero, you knew about this hearing for some time,

21  right?

22  A   No.

23  Q   When did you first learn this hearing was going to take

24  place?

25  A   Two days ago.

Appx. 02893

016425

Dondero - Redirect                          140

1   Q    Two days ago?

2   A    When was the depo, three days ago?  Whatever.

3   Q    And you didn't know prior to the deposition that we would

4   be having a hearing today on the Debtor's motion for a

5   preliminary injunction?

6   A    No.  I thought it was going to be postponed or canceled.

7   I was waiting for the text last night.

8   Q    You had an opportunity to call any witness in the world

9   you wanted to today, right?

10  A    I guess.

11  Q    You could have called -- you could have called the chief

12  compliance officer at the Advisors if you thought the Court

13  should hear from him as to the compliance issues that you've

14  testified to, right?

15  A    I think their letters stand on their own.

16  Q    Okay.  So you didn't think that it was important for the

17  Court to hear from Mr. Sowin directly, correct?

18  A    Sowin is a trader.

19  Q    I'm sorry.  Who's the chief compliance officer of the

20  Advisors?

21  A    Jason Post, as far as NexPoint is concerned.  He's the one

22  that would have been behind the K&L -- K&L letters.

23  Q    And he is not here today to testify, right?

24  A    I think his letters stand on their own and I think

25  everybody should read them, make sure they read them.

Dondero - Redirect                    141

1   Q    Okay.  But Mr. Post is not here to answer any questions;

2   is that right?

3   A    I don't know if there are any questions beyond what's

4   obviously stated in the letters.  You should read the letters

5   carefully.  They're -- they're -- they talk about clear

6   violations.

7           MR. MORRIS:  Your Honor, I move to strike.  It's a

8   very simple question.

9           THE COURT:  Sustained.  That was another yes or no

10  answer, Mr. Dondero.   Go ahead.

11          THE WITNESS:  I'm sorry.

12  BY MR. MORRIS:

13  Q    Mr. Dondero, Mr. Post is not here to testify in order to

14  explain to the Court what he thinks the regulatory issues are,

15  correct?

16  A    He's not here today.

17  Q    And you could have called him as a witness, correct?

18  A    Yes.

19  Q    And you thought Mr. Ellington and Mr. Leventon were

20  treated unfairly, right?

21  A    Yes.

22  Q    And there's no reason why they couldn't have come today to

23  testify, correct?

24  A    I guess they could have.

25  Q    And there's no reason why anybody on behalf of the K&L

Dondero - Redirect                    142

1    Gates clients couldn't have been here to testify, correct?

2    A    I didn't deem it necessary, I guess.

3    Q    Okay.  You could have offered into evidence, at least

4    offered into evidence, any document you wanted, right?

5    A    Yes.

6    Q    And you could have offered the judge, for example, the

7    shared services agreement, the shared services agreements for

8    which you gave the Court your understanding, right?

9    A    Which shared services, the one that Seery gave Ellington

10   three days ago or the original one from years ago?

11   Q    Any of the ones -- any of the ones that you have referred

12   to today.  You could have given any of them to the judge,

13   right?

14   A    Correct.

15   Q    And you didn't, right?

16   A    I did not.

17   Q    In fact, there's not a single piece of evidence in the

18   record that corroborates anything you say; isn't that right?

19   A    I -- I believe all those documents are in the record.

20   They're just not in the record of this TRO.  But they're all

21   --

22   Q    Oh.

23   A    They're all in the record.

24   Q    Do you remember that there was a hearing on December 16th?

25   I think you -- you testified that you're fully aware of that

Dondero - Redirect                      143

 1   hearing that was brought by the K&L Gates Clients.  Do you
 2   remember that?
 3   A    Yes.
 4   Q    Who testified at that hearing on behalf of the K&L Gates
 5   Clients?  Dustin Norris?
 6   A    I believe -- I believe Dustin Norris testified.
 7   Q    Uh-huh.  And what's Mr. Norris's role at the Advisors?
 8   A    He's one of the senior managers.
 9   Q    Is he a compliance officer?
10   A    No.
11   Q    Is he a trader?
12   A    No.  But he's one of the senior managers.
13   Q    Okay.  They could have called anybody they wanted, to the
14   best of your understanding, right?
15   A    I don't think they got a chance to.  Wasn't it an
16   abbreviated hearing?
17   Q    They offered Mr. Norris as a witness.  Do you understand
18   that?
19   A    I -- all I -- I wasn't there.  I didn't attend virtually.
20   I -- but I did know that Norris testified.  But I don't know
21   who else was called, wasn't called, was going to be called,
22   was on the witness list.  I have no awareness.
23   Q    Okay.  You were pretty critical of the trades that Mr.
24   Seery wanted to make that you interfered to stop, right?
25   A    I think he's subsequently done most of those trades.

Dondero - Redirect                    144

1  Q   And you called them preposterous because he wanted to do
2  it around Thanksgiving or around Christmas, at least based on
3  your testimony, correct?
4  A   That's when it did occur.
5  Q   And is it your testimony -- is it your testimony that
6  every single person in the world who trades securities near a
7  holiday is making a preposterous trade?
8  A   I think it's amateur and not what an investment
9  professional would do.
10 Q   So you never trade on holidays; is that your testimony?
11 You've never done it once in your life?
12 A   Very rarely, unless there's another overriding reason.
13 And there was no overriding reasons, period.
14 Q   How would you know that when you didn't even ask Mr. Seery
15 why he wanted to make the trades?
16 A   I asked Joe Sowin, who asked Jim Seery.  And Joe Sowin
17 said that Jim Seery just said for risk reduction.
18        MR. MORRIS:  I move to strike on the grounds that
19 it's hearsay, Your Honor.
20        THE COURT:  Sustained.
21 BY MR. MORRIS:
22 Q   You never asked Mr. Seery why he wanted to make the
23 trades, correct?
24 A   I'm not allowed to talk to Mr. Seery.
25 Q   You certainly were around Thanksgiving; isn't that right?

Appx. 02808

Dondero - Redirect                          145

1   A    I don't know.

2   Q    There was no TRO in place at that time, correct?

3   A    That's true.

4   Q    You're pretty critical of Mr. Seery and his capabilities;

5   is that right?

6   A    He's a lawyer.  He's not an investment professional.

7   Q    Did you object to his appointment as the CEO of the

8   Debtor?

9   A    No.

10  Q    Have you made any motion to the Court to have him removed

11  as unqualified?

12  A    Not yet.

13  Q    Okay.  But with all the knowledge of all the preposterous

14  things that he's been doing for months now, you haven't done

15  it, right?

16  A    No.

17  Q    When you -- when -- before you threw the phone in the

18  garbage, did you back it up?

19  A    No.

20  Q    Did it occur to you that maybe you should save the data?

21  A    No.

22  Q    You said that the only way you think you might be able to

23  get information going forward is through a subpoena.  Do I

24  have that right?

25  A    I mean, that's how it seems.  I mean, it seems at every

Dondero - Redirect                                146

1  turn -- and now with Scott Ellington being gone and Isaac

2  being gone -- I have no idea how the Debtor is ever going to

3  defend against UBS.

4           THE COURT:  I did not --

5           THE WITNESS:  I have no idea how --

6           THE COURT:  I didn't hear the answer after with

7  Ellington and Leventon being gone.  I didn't hear the rest of

8  the answer.  Could you repeat?

9           THE WITNESS:  I said I have no idea how the Debtor is

10  ever going to defend itself against UBS.  But I also have no

11  idea how we're ever going to get any information or ever push

12  forward any kind of settlement without having any access to

13  information or anybody to talk to.

14  BY MR. MORRIS:

15  Q    Do you trust Judge Lynn?

16       (Echoing.)

17  A    Yes.

18  Q    Is he a good advocate?

19  A    Yes.  If anybody returns his phone calls.

20  Q    Do you recall that on October 24th Judge Lynn specifically

21  asked my law firm to provide information on your behalf in

22  connection with the Debtor's financial information, their

23  assets and their liabilities?

24  A    Yes.

25  Q    Do you recall that the Debtor simply asked that you

Dondero - Redirect                              147

1    acknowledge in an email between and among counsel that you

2    would abide by the confidentiality agreement that was entered

3    by the Court?

4    A    I wasn't involved in those details.

5    Q    Didn't you send an email in which you agreed to receive

6    the financial information subject to the protective order that

7    this Court entered?

8    A    I'm sure I would.  I just don't remember.

9    Q    That was a condition that the Debtors made.  That doesn't

10   refresh your recollection?

11   A    I'm not denying it.  I just don't remember, and --

12   Q    Okay.  And --

13   A    (overspoken)

14   Q    I'm sorry, I don't mean to cut you off.  And in fact, on

15   December 30th, the day you were supposed to vacate the office,

16   the Debtor voluntarily provided to Judge Lynn all of the

17   information that had been requested on your behalf without the

18   need for a subpoena, right?

19   A    Yeah.  It took a week.  It's 40,000 pages of mixed

20   gobbledygook that we're -- we're going through.  But it should

21   provide enough information for us to negotiate a pot plan if

22   anybody so chose.

23   Q    So you didn't need to (echoing) the 40,000 pages of

24   financial information from the Debtor; all you needed was an

25   agreement that you would abide by the protective order.

Dondero - Redirect                              148

1   Correct?

2   A   I think that was the first thing that was ever produced on

3   request that I can remember.  But yes.

4   Q   And it was just a week ago, right?

5   A   Yes.

6            MR. MORRIS:  I have no further questions, Your Honor.

7            THE COURT:  All right.  Mr. Bonds, do you have

8   anything else?

9            MR. BONDS:  I do not, Your Honor, as to this witness.

10  I have one other witness.

11           THE COURT:  All right.

12           MR. MORRIS:  Your Honor, I don't know who they plan

13  on calling, but he's not on the witness list.

14           THE COURT:  All right.  Well, --

15           MR. BONDS:  Your Honor, this other witness --

16           THE COURT:  Just a moment.  This concludes, for the

17  record, Mr. Dondero's testimony.  But, obviously, stick

18  around, because we're going to have a lot to talk about when

19  this is finished as far as the evidence.

20      All right.  Now, who are you wanting to call that you did

21  not identify?

22           MR. BONDS:  I'd like to call Mike Lynn for the

23  purpose -- or, to -- as a rebuttal witness.

24           THE COURT:  Lawyer as witness?

25           MR. MORRIS:  Your Honor?

149

```
 1              THE COURT:  Well, you know, first off, rebuttal of

 2     what?  Rebuttal --

 3              MR. MORRIS:  Exactly.  He's going to rebut his own

 4     client, Your Honor?  He's going to rebut his own client?

 5     There's only been one witness to testify here.  He was on

 6     their exhibit list.  How do they call a witness to rebut their

 7     own client?

 8              THE COURT:  Yes.  What -- I don't --

 9              MR. BONDS:  Your Honor?

10              THE COURT:  Go ahead.

11              MR. BONDS:  Mr. Morris testified or attempted to

12     testify that the pot plan didn't gain any traction.  We will

13     submit Mike Lynn on that issue.

14              THE COURT:  No.

15              MR. MORRIS:  Your Honor?

16              THE COURT:  I'm not going to allow a lawyer to

17     testify to rebut lawyer argument.  That's very inappropriate,

18     in my view.  So, not going to happen.

19              MR. LYNN:  (garbled)

20              MR. BONDS:  Your Honor, he would be a fact witness to

21     discussions with the other side.

22              MR. MORRIS:  Your Honor, I strenuously object.

23     They're -- he's only rebutting -- my questions are not

24     evidence.  The only evidence in the record is Mr. Dondero's

25     testimony.  Mr. Dondero is their client.  Mr. Dondero was on
```

150

 1   their witness list.  They should not be permitted to call any

 2   witness, with all due respect to Mr. Lynn, to rebut their own

 3   witness.

 4            THE COURT:  All right.

 5            MR. BONDS:  Your Honor, we're not rebutting our

 6   witness.  We are rebutting the testimony that Mr. Morris gave.

 7            THE COURT:  Mr. Morris is a lawyer.  He makes

 8   argument.  He asks questions.  He was not a witness today.

 9   Okay?

10       So if you want to say whatever you want to say as lawyers

11   in closing arguments, then obviously you can do that.  But I'm

12   not going to allow a lawyer to be a witness to rebut something

13   another lawyer said in argument or in a question.  I -- it's

14   -- so, I disallow that.

15       Anything else, then?

16            MR. BONDS:  No.

17            THE COURT:  Okay.  And while we're talking about

18   procedure, actually, Mr. Morris, it's the Debtor's motion, and

19   I'm not even sure that's all of your evidence.  So, do you

20   have any more evidence as Movant?

21            MR. MORRIS:  No, Your Honor.  The Plaintiff and the

22   Debtor rest.

23            THE COURT:  All right.  So, at the risk of repeating,

24   now that the Movant has rested, it would be Mr. Dondero's

25   chance to put on supplemental evidence.  But what I'm hearing

151

1    from Mr. Morris is there were no witnesses identified on your

2    witness list?

3         MR. BONDS:  Other than Mr. Dondero, Your Honor.

4         THE COURT:  Okay.  All right.  Well, was there any

5    stipulated documentary evidence that -- that you had --

6         MR. BONDS:  No, Your Honor.

7         THE COURT:  All right.  Well, I guess we're done with

8    evidence.

9      Mr. Morris, your closing argument?

10        MR. MORRIS:  All right.  Before I get to that, Your

11   Honor, I just want to make a very brief statement.  When the

12   Debtor objected to Mr. Dondero's emergency motion for a

13   protective order, the Debtor stated that it sought discovery

14   from Mr. Dondero to determine whether Mr. Dondero may have

15   violated the TRO by interfering and impeding the Debtor's

16   business, including by potentially colluding with UBS.  After

17   that motion was decided, both Mr. Dondero and UBS produced

18   documents to the Debtor.

19     Based on the review of that information, the Debtor found

20   no evidence that Mr. Dondero and UBS colluded to purchase

21   redeemed limited partnership interests of Multi-Strat, nor any

22   inappropriate conduct by UBS or its counsel.

23     The Debtor appreciates the opportunity to clear that part

24   of the record.

25        THE COURT:  All right.

152

1          CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

2          MR. MORRIS:  Now, with respect to the motion at hand

3   today, Your Honor, I want to take you back just about a month

4   ago to December 10th, 2020.  At that time, we had a hearing on

5   the Debtor's motion for a TRO.  The motion had been filed in

6   advance.  Mr. Dondero had filed an objection.  He had concerns

7   about the scope and the language of the terms of the proposed

8   TRO.

9       And at that hearing, Your Honor, if you'll recall, you

10  listened carefully to the arguments that were made on behalf

11  of Mr. Dondero.  You heard carefully -- you listened carefully

12  to the proposed changes that he sought to make.  And you went

13  through that proposed TRO word by word, Paragraph 2 and 3, and

14  you read them out loud, and you made decisions at that time as

15  to whether the Court believed any portion of that was

16  ambiguous or whether it was clear.  You made determinations at

17  that time whether or not the provisions were reasonable.

18      Mr. Dondero wasn't there.  He didn't read the transcript.

19  He has no idea what you said.  But his lawyers were there, and

20  they had an opportunity to object and they had an opportunity

21  to make comments, and the order is what the order is.  And for

22  whatever reason, Mr. Dondero chose not to read it, or,

23  frankly, even understand it, based on his testimony.

24      The fact is, Your Honor, the one thing that the evidence

25  shows very clearly here is that Mr. Dondero thinks that he is

153

 1   the judge.  He believes that he is the decider.  He believes

 2   that he decides what the TRO means, even though he never read

 3   it.  He believes that he decides what exceptions exist in the

 4   TRO, even though he never read it.

 5       He believes that he decides that it's okay to ditch the

 6   Debtor's cell phone without even seeking, let alone obtaining,

 7   the Debtor's consent.  I guess he decides that he can ditch

 8   the phone and trash it without seeking to back it up or

 9   informing the Debtor.

10       Mr. Dondero believes that he gets to decide that it's okay

11   to take a deposition from the Debtor's office, even when the

12   Debtor specifically says you're evicted and you're not allowed

13   to have access.

14       Mr. Dondero believes that he gets to decide that Mr. Seery

15   has no justification for making trades, even though he

16   couldn't take the time to pick up the phone or otherwise

17   inquire as to why Mr. Seery wanted to do that.

18       Mr. Seery -- Mr. Dondero believes that he is the arbiter

19   and the decision-maker and gets to decide to stop trades,

20   notwithstanding the TRO, notwithstanding the CLO agreements

21   that he is not a party to, that his entities are not a party

22   to.

23       Mr. Dondero thinks that he gets to decide that the Debtor

24   has breached the agreements with the CLOs.  He gets to decide

25   that the Debtor is in default under those agreements.  He gets

Appx. 02877

154

1   to decide that it's perfectly fine for Ellington and Leventon

2   to support his interests while they have obvious duties of

3   loyalty to the Debtor.

4        It is not right, Your Honor.  It is not right.  I stood

5   here, I sat here, about four hours ago, five hours ago, and

6   told the Court what the evidence was going to show, and it

7   showed every single thing that I expected it to show and

8   everything I just described for the Court about Mr. Dondero's

9   belief that he's the decider.

10       He's not the decider, Your Honor.  You are.  And you made

11  a decision on June -- on December 10th that he ignored.

12       There is ample evidence in the record to support the

13  imposition of a preliminary injunction.  And Your Honor, I'm

14  putting everybody on notice now that we're amending our

15  complaint momentarily to add all of the post-petition parties,

16  because this has to stop.  The threats have to stop.  The

17  interference has to stop.  Mr. Dondero can always make a

18  proposal if he thinks that there's something that will capture

19  the imagination and the approval -- more importantly, the

20  approval -- of the Debtor's creditors.  We have no interest in

21  stopping him from doing that.  He's got very able and

22  honorable counsel, and he can go to them and through them any

23  time he wants.

24       But the record is crystal clear here that, notwithstanding

25  Your Honor's order, one entered after serious deliberation, is

016440

155

1   of no meaning to him.  And we'll be back at the Court's

2   convenience on the Debtor's motion to hold him in contempt.

3   It'll just be a repeat of what we've heard today, because,

4   frankly, the evidence is exactly the same.

5        With that, Your Honor, unless you have any questions, the

6   Debtor rests.

7             THE COURT:  All right.  I do not.

8        Mr. Bonds?

9             MR. BONDS:  Your Honor, we would like to divide our

10   time between Mike Lynn and myself.  Is that a problem?

11             THE COURT:  That's fine.  Go ahead.

12             MR. LYNN:  Are we on mute?

13             MR. BONDS:  No.

14             CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

15             MR. LYNN:  Your Honor, I'm taking a leaf out of Mr.

16   Phelan's book.  I happened to read the confirmation hearing in

17   the *Acis* case regarding what was referred to as Clients A, B,

18   and C.  And Mr. Phelan, who testified, really gave an oral

19   argument to the Court which was very persuasive and very

20   thorough.  So I'm going to sort of do the reverse, because I

21   hope that the Court would find useful some information

22   regarding the pot plan about which you've heard many words

23   spoken but very little to do with what that plan was or how it

24   came about.

25        The pot plan was proposed by Mr. Dondero for the first

156

1    time in September of 2020, shortly after the conclusion of the

2    first round of mediations.  Though there had been versions of

3    it before, and lesser versions, the pot plan was finally in

4    the form that would more or less survive it in September.

5    Under the pot plan, Mr. Dondero proposed to come up with $90

6    million of cash and $70 million in promissory notes, and that

7    was to form a pot which creditors would share in.

8        The proposal was provided to the Debtor and then shared

9    with the Committee.  Mr. Seery responded with a degree, a

10   degree only, of enthusiasm to the pot plan, and indeed

11   provided a counter-term sheet to the pot plan.  He also, so he

12   said, and I believe him, approached the Committee and said

13   this is a proposal to be taken seriously.

14       He proposed some improvements in his view to the pot plan.

15   No response was received from the Creditors' Committee at that

16   time.

17       After going back and forth with the Debtor -- and Mr.

18   Seery, not unreasonably, was unwilling to propose the pot plan

19   without some support on the Creditors' Committee -- I

20   contacted Matt Clemente.  We had a nice conversation.  And at

21   that time, Mr. Clemente raised two particular concerns.  The

22   $160 million, which creditors did not think was enough, was

23   not enough, in part, because that included no consideration

24   for the acquisition of promissory notes executed some by Mr.

25   Dondero and some by entities controlled by Mr. Dondero, which

016442

Case 19-34054-sgj11   Doc 3596-31   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-31   Filed 08/25/25   Page 764 of 1052   PageID 17442
Exhibit 31   Page 156 of 206

157

1   notes total approximately $90 million.

2       The second concern was that Mr. Dondero would get a

3   release under the plan.  During that call, I said the issue of

4   the notes is subject to negotiation and might well result in a

5   transfer of those notes, possibly with some amendments, to the

6   pot, and that Mr. Dondero was prepared, in all likelihood, to

7   forego a release.

8       Mr. Clemente agreed to get back to me.  He did.  And he

9   said to me, I have talked to the Committee about this and they

10  would like you to go to or they want you to go first to Mr.

11  Seery, work off of his revised timesheet -- or term sheet,

12  sorry -- and after you have reached an agreement with him,

13  come to us, come to the Committee, and we'll negotiate with

14  you.

15      Now, I might have agreed that that was a reasonable

16  approach if there were a possibility that Mr. Seery would

17  propose a plan without the agreement of creditors.  But the

18  way I took it was that the Committee was saying go make a deal

19  with Seery and then we'll start negotiating, and we know,

20  correctly, that Mr. Seery will not propose a plan that does

21  not have our support.

22      So, effectively, we get to go through two rounds of

23  negotiations, even though effectively everything that is in

24  the estate, everything -- causes of action against Mr.

25  Dondero, promissory notes from Mr. Dondero -- everything that

158

1    they would get under a plan or under a liquidation, they would

2    get under the pot plan.

3         Now, I wanted you to know that, Your Honor, not because

4    I'm now trying to get you or anyone else to sell the pot plan.

5    But I think it's important that Your Honor know that Mr.

6    Dondero's approach in this case has not been a hostile

7    approach.

8         I know the Court had what it found to be an unsatisfactory

9    experience with Mr. Dondero in the *Acis* case.  But from the

10   time I became involved in this case and Mr. Bonds became

11   involved, we have been quiet, we have said nothing, and we've

12   done virtually nothing in the case, up until the time after

13   the mediation, when negotiations regarding a pot plan broke

14   down.

15        Since that time, regrettably, there has been a good deal

16   of hostility, and it's spreading.  I would like to see it stop

17   spreading.  I will do what I can to make it stop spreading.

18   But I need others to help me on that.  And it's my hope that I

19   can count on the Pachulski law firm, the Sidley law firm, and

20   the firms representing the major creditors to help make that

21   happen.

22        I do not think, and I would submit that it is not to the

23   benefit of the estate, it is not to the likely workout of this

24   case, that it would be best served by entering a preliminary

25   injunction, which it appears to me prevents Mr. Dondero from

016444

159

1    saying good morning to one of the employees of the Debtor that

2    he knows.

3        It seems to me, Your Honor, that the injunction, by its

4    terms, as Mr. Morris would have it, is an injunction that

5    would prevent Mr. Dondero from discussing politics with Mr.

6    Ellington.  And it seems to me that an injunction that broad,

7    that extensive, and one which lasts, as far as I can tell,

8    until infinity, that such an injunction is not the right thing

9    to do, given, if nothing else, the First Amendment to the

10   United States Constitution.

11       That will conclude my presentation, and I will turn it

12   over to the wiser and better-spoken colleague, John Bonds.

13   Thank you, Your Honor.

14            THE COURT:  Thank you.  Mr. Bonds, what else do you

15   have to say?

16            CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

17            MR. BONDS:  Your Honor, has the Debtor met the

18   requirements for the issuance of a preliminary injunction?  We

19   submit that they have not.  And the Fifth Circuit's rules are

20   fairly clear as to the awarding of a preliminary injunction.

21       First, let's look at the type of preliminary injunction

22   that the Debtor would like you to enter today.  It provides

23   that Mr. Dondero cannot talk to any employee, regardless of

24   what is being communicated.  Mr. Dondero can pass an employee

25   on the street, but he can't acknowledge the employee, with

Case 19-34054-sgj11   Doc 3596-31   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 151-31   Filed 06/25/25   Page 767 of 1052    PageID 17445
Exhibit 31   Page 163 of 206

160

1   whom he may have worked for years.  Nor can he talk to his

2   personal assistants, again, which he has worked with for

3   years.  Does that violate the First Amendment of the

4   Constitution?

5       What about the shared services agreement?  What about the

6   pot plan which he is advocating as a means of reorganizing the

7   Debtor?  Not the liquidation proposed by the Debtor.  Can Mr.

8   Dondero communicate with creditors about the pot plan and the

9   other proposals without violating the TRO or the preliminary

10  injunction which deals with interfering with the Debtor's

11  business?

12      Your Honor, I think it's important to note that a

13  preliminary injunction is an extraordinary remedy that may

14  only be awarded upon a clear showing that the Plaintiff is

15  entitled to such relief.  Plaintiffs are entitled to a

16  preliminary injunction if they show, one, a substantial

17  likelihood that they will prevail on the merits of their

18  claims; two, a substantial threat that they will suffer an

19  irreparable injury if the injunction is not granted; three,

20  their threatened injury outweighs the harm to the estate or

21  the other party; and four, the public interest will not be

22  disserved, misserved, if the preliminary injunction is

23  granted.

24      The party seeking the preliminary injunction bears the

25  burden of persuasion on all four requirements.  We believe

Case 19-34054-sgj11   Doc 3596-31   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 15-31   Filed 06/25   Page 768 of 1052    PageID 17446
Exhibit 31    Page 162 of 206

161

1  that the Debtor today has failed to carry its burden of

2  persuasion of proof with regard to the second element, which

3  I'm going to refer to as the irreparable injury requirement.

4  In order to show irreparable harm to the Court, the Plaintiff

5  must prove that if the District Court denied the grant of a

6  preliminary injunction, irreparable harm would be the result.

7  Injuries are irreparable only when they cannot be undone

8  through monetary remedies.  There is no evidence before the

9  Court today that Mr. Dondero cannot respond to any judgment

10  that is rendered against him by this Court.

11      Your Honor, this preliminary injunction does not involve

12  real property.  Unlike the *Saldana* case, this request for the

13  issuance of a preliminary injunction involves personal

14  property only.  The request that Mr. Dondero cease and desist

15  all contact with employees is just wrong and may violate the

16  First Amendment of the Constitution, as I previously stated.

17      We have other concerns regarding the issuance of a

18  preliminary injunction.  We feel that the preliminary

19  injunction is too broad.  It lacks a beginning and an end.

20  When does the preliminary injunction terminate?  What about

21  the former employees?  Once they are terminated, can Mr.

22  Dondero speak to them?  What about the pot plan?  Is it gone

23  forever?  Can Mr. Dondero talk with the mediators about the

24  pot plan?  Can Mr. Dondero speak with the members of the

25  U.C.C.?

162

1      It is easy to criticize Mr. Dondero.  Did he violate the
2   TRO?  We submit that he didn't and the Debtor says that he
3   did.  What matters going forward is the lack of evidence of
4   irreparable harm.
5      Mr. Seery sure wants to keep Mr. Dondero from talking to
6   anyone in this case.  Why is that?  Does Mr. Seery believe
7   that the only way to get his liquidation plan confirmed is to
8   keep Mr. Dondero from talking to anyone?  How will the
9   preliminary injunction help the Debtor's creditors?  Does
10  keeping Mr. Dondero from talking with anyone mean that there
11  will be a greater return to the creditor body?  Does
12  precluding Mr. Dondero from talking about his pot plan mean
13  that the creditors will take home more money on their claims,
14  or does it eliminate the possibility that they may take home
15  more money on their claims?
16     Your Honor, what we are seeing here today is an attempt by
17  a group to destroy what Mr. Dondero has built over the last
18  few years.  That isn't the way Chapter 11 should work.
19     Just one last thing to keep in mind, Your Honor.  Mr.
20  Seery's plan is a liquidation of the Debtor.  Mr. Dondero's
21  pot plan is a reorganization of the Debtor.
22     Thank you, Your Honor.
23         THE COURT:  All right.  Mr. Morris, you get the last
24  word.  Anything in rebuttal?
25         MR. MORRIS:  I would just point out, Your Honor, that

Case 19-34054-sgj11    Doc 3596-31    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-31    Filed 06/13/25    Page 770 of 1052    PageID 17448

163

1   nobody here has objected to the Debtor's motion for the entry

2   of a preliminary injunction except Mr. Dondero.  While I

3   appreciate that this is an adversary proceeding, anybody who

4   felt strongly about the matter certainly could have moved to

5   intervene.  The Creditors' Committee could have moved to

6   intervene.  Mr. Clemente could have stood at the podium and

7   begged Your Honor not to impose the injunction because he

8   thought it was in the best interest of creditors to allow Mr.

9   Dondero to interfere with the Debtor's business and to speak

10  with their employees.  Nobody has done that, Your Honor.

11  Nobody's here speaking on behalf of Mr. Dondero.  Nobody's

12  here to testify on his behalf.  Nobody's -- there's no

13  evidence in the record that supports or corroborates anything

14  that he said at all, Your Honor.

15      Unless Your Honor has any specific questions, the Debtor

16  is prepared to rest.

17          THE COURT:  All right.  I do not have any follow-up

18  questions.

19      All right.  I have a lot to say.  I'm sorry, I apologize

20  in advance, but I've got a heck of a lot to say right now.

21  I'm going to give you a ruling on the motion before me, but

22  I've got a lot to add onto that, so I hope all the key parties

23  in interest are listening carefully.  Mr. Bonds, in the video,

24  I can only see you.  I hope Mr. Dondero is just right there

25  out of the video camera view.  Okay, there you are.  I wanted

164

1  to make sure you didn't wander off to take a bathroom break or

2  anything.  So, again, I have a whole lot to say here today.

3      First, I'm going to rule on the motion.  The Court does

4  find there is sufficient compelling evidence to grant a

5  preliminary injunction that is completely consistent with the

6  prior TRO.  Okay?  So, specifically, the Court today is going

7  to continue to prevent Mr. Dondero from (a) communicating in

8  any way, directly or indirectly, with any of the Debtor's

9  board members -- I think that's really Strand board members --

10  unless Mr. Dondero's counsel and counsel for the Debtor are

11  included.  Okay.  I'm saying those words slowly and carefully.

12  There is no bar on Mr. Dondero talking to the board about a

13  pot plan or anything else in the universe Mr. Dondero wants to

14  talk to them about.  There's just a preclusion from him doing

15  it without his counsel and the Debtor's counsel present.

16  Okay?

17      I did that before and I'm doing it now because I've seen

18  concerning evidence that some communications to Mr. Seery and

19  others had an intimidating tone, a threatening tone one or two

20  times, an interfering tone.  So, guess what, we're just going

21  to have lawyers involved if any more conversations happen.

22  Okay.

23      So (b) the preliminary injunction, just as the TRO did, is

24  going to prevent Mr. Dondero from making any threats of any

25  nature against the Debtor or any of its directors, officers,

165

1    employees, professionals, or agents.  Okay.  It's almost

2    embarrassing having to say that or order that with regard to

3    such an accomplished and sophisticated person, but, you know,

4    I saw the evidence.  I've got to do what I've got to do.  You

5    know, words in a text like, Don't do it, this is your last

6    warning, and some of the other things, that has a threatening

7    tone, so I'm going to order this.

8        Third, the preliminary injunction will prevent Mr. Dondero

9    from communicating with any of the Debtor's employees except

10   as it specifically relates to shared services provided to

11   affiliates owned or controlled by Mr. Dondero.

12       Now, I'm going to elaborate in a couple of ways here.  I

13   think in closing argument there was a suggestion that he can't

14   even talk to his friend, Mr. Ellington, about anything.  Well,

15   I heard today that Mr. Ellington and Mr. Leventon are no

16   longer employees of the Debtor, so actually that's not an

17   issue.  But while this is very restrictive, while this

18   prevents Mr. Dondero from engaging in small talk with Debtor

19   employees about the weather or the football game or whatever,

20   it's regrettable, but I feel like I'm forced to order this

21   now, because, again, the communications that were put in the

22   record.  Okay?  We just can't take any chances, as far as I'm

23   concerned, with regard to there being potential interference

24   with the Debtor's operations that might be harmful or contrary

25   to creditors' interests.

166

1      Fourth, the preliminary injunction, just like the TRO,

2    will prevent Mr. Dondero from interfering with or otherwise

3    impeding the Debtor's business, including but not limited to

4    the Debtor's decisions concerning its operations, management,

5    treatment of claims, disposition of assets owned or controlled

6    by the Debtor, and pursuit of any plan or alternative to the

7    plan.

8      Now, I understand the argument that this is pretty broad

9    and might be, I don't know, subject to some disputes regarding

10    was it interference, did it impede the Debtor's business or

11    not?  You know what, if you follow the other prongs of the

12    preliminary injunction, that you don't talk to the board

13    without your counsel, Mr. Dondero, and the Debtor's counsel,

14    and you don't talk to Debtor's employees except with regard to

15    matters pertaining to the shared services agreement, and,

16    bottom line, if you just run everything by your attorneys,

17    you'll be okay.  We won't have this ambiguous, vague,

18    problematic territory.

19      Fifth, I will go ahead and, for good measure, belts and

20    suspenders, whatever you want to call it, prevent Mr. Dondero

21    from otherwise violating Section 362(a) of the Bankruptcy

22    Code.

23      Now, I read the response filed at 9:30 last night by Mr.

24    Dondero's counsel.  It's a good response.  It makes legal

25    arguments about that being, you know, it just being too vague.

167

1  Well, to the contrary, it just restates what's already in the

2  Bankruptcy Code, right?  Persons are prohibited from violating

3  Section 362(a) of the Bankruptcy Code.  If anything, it's the

4  sky is blue, right, just stating what is true.  But I

5  understand Debtor wanting some clarity in an order, because we

6  want you to take this seriously, Mr. Dondero, and not just do

7  something and then say, well, you didn't know what was in the

8  Code.  You know, you need to consult with your lawyer.  That's

9  going to be in there.

10      Bottom line, I want that language in there because, Mr.

11  Dondero, I want you to see an order that this Court expects

12  you to comply with the Bankruptcy Code.  And again, if you

13  don't understand, if you're unsure whether you can take action

14  *x* or *y*, consult with your very capable lawyers.

15      I note that if you listened carefully to these words,

16  there was nothing in here that stopped Mr. Dondero from

17  talking to the Creditors' Committee about a pot plan.  Nothing

18  in this injunction, nothing in the previous TRO, ever

19  prohibited that.

20      Last, with regard to the ruling -- and again, I've got a

21  lot more to say when I'm done -- I am going to further enjoin

22  Mr. Dondero from what we said in the TRO:  causing,

23  encouraging, or conspiring with any entity controlled by him

24  and/or any person or entity acting on his behalf from directly

25  or indirectly engaging in any of the aforementioned items.

168

1   This is not an injunction as to nonparties to the adversary

2   proceeding.  It is an injunction as to Mr. Dondero from doing

3   the various enjoined acts that I previously listed under the

4   guise of another entity or a person that he controls.

5       Again, if you're dealing with and through your attorneys,

6   Mr. Dondero, I don't think this will be hard to maneuver.

7       I guess I'm actually not through with my ruling yet.  I do

8   want to add that the Court rules that the injunction shall

9   last through the time of confirmation of a plan in this case

10  unless otherwise ordered by this Court.

11      And as to the legal standards, I want to be clear for the

12  record that the Court believes this injunction is necessary to

13  avoid immediate and irreparable harm to the Debtor's estate

14  and to its reorganization prospects.  I believe that there's a

15  strong likelihood the Debtor will succeed in a trial on the

16  merits of this adversary proceeding.  I believe the public

17  interest strongly favors this injunction.  And I believe the

18  balance of harms weighs in favor of the Debtor on all of these

19  various issues.

20      Again, I want to reiterate, the intimidation and

21  interference that came through in some of these email and text

22  communications was concerning to the Court and is a motivation

23  for this preliminary injunction.

24      Now, I'm going to add on a couple of things today.  The

25  first thing I'm going to add on -- and I want this, Mr.

169

1   Morris, in the order you submit.  You didn't ask me for this,

2   but I'm going to do it.  I'm going to order you, Mr. Dondero,

3   to attend all future hearings in this bankruptcy case unless

4   and until this Court orders otherwise.  And I'm doing this --

5   it's not really that unusual a thing for me to do.  I

6   sometimes order this in cases when I'm concerned about, you

7   know, is the businessperson paying attention to what's going

8   on in the case and is he engaged, is he invested, is he

9   available when we need him?

10       In this case in particular, the evidence was that you

11  didn't read the TRO.  You were not aware of its basic terms

12  and you didn't read it.  Okay?  So that was what sent me over

13  the edge as far as requiring this new element that you're

14  going to attend every hearing.  Obviously, we're doing video

15  court, so that's not that much of a burden or imposition.  You

16  can pretty much be anywhere in the world and patch in by

17  video, since we're in the pandemic and not doing live court.

18  But I think it's necessary so I know you hear what I rule and

19  what goes on in this case.

20       I will tell you that I was having a real hard time during

21  your testimony deciding if I believe you didn't read the TRO

22  or know about the different things that were prohibited.  You

23  know, I was thinking maybe you're not being candid to help

24  yourself in a future contempt hearing, or actually maybe

25  you're being a hundred percent honest and candid but you're

170

1    kind of hiding behind your lawyers so that you can argue the

2    old plausible deniability when it suits you.

3        But no more.  No more.  I'm not going to risk this

4    situation again of you not knowing what's in an order that

5    affects you.  So you must be in court by video until I order

6    otherwise.

7        Second, and I regret having to do this, but I want it

8    explicit in the preliminary injunction that Mr. Dondero shall

9    not enter Highland Capital Management's offices, regardless of

10   whether there are subleases or agreements of Highland

11   affiliates or Dondero-controlled entities to occupy the

12   office, unless Mr. Dondero has explicit written permission

13   that comes from Highland's bankruptcy counsel to Dondero's

14   bankruptcy counsel.  Okay?  If he does, it will be regarded as

15   trespassing.

16       And, I don't know, are there security guards on the

17   premises?  I mean, gosh, I hate to be getting into this

18   minutia, but -- well, I just want it explicit in the order

19   that Mr. Dondero, I'm sorry, but you can't go to these offices

20   without written permission.  And again, that can only be given

21   from Debtor's counsel to Mr. Dondero's counsel.  Okay?  So

22   it's going to be trespassing.  You know, someone can call the

23   Dallas Police Department and have you escorted out.  Again, I

24   hate having to do that.  It's just, it's embarrassing for me.

25   I think it's embarrassing for everyone.  But I'm backed up in

Appx. 03894
016456

171

1   that corner.

2       Next, I am going to ask that it be clear that Mr. Dondero

3   can deal with the Unsecured Creditors' Committee and its

4   professionals with regard to talking about a pot plan.

5       And next, I'm going to add -- and I think, Mr. Morris, you

6   requested this at some point today in oral argument -- Mr.

7   Ellington and Mr. Leventon shall not share any confidential

8   information that they received as general counsel, assistant

9   general counsel for the Debtor, without Debtor's counsel's

10  explicit written permission.  Okay?  So we've got that in

11  writing.

12      And, you know, that's a little awkward because they're not

13  here, they weren't parties to the injunction, but they were

14  Debtor employees until recently.  If they want to risk

15  violating that and come back to the Court and argue about

16  whether they got notice and whatnot of that, they can argue

17  that, but I want it in the order regardless.

18      So that is the ruling.  And now I want to kind of talk

19  about a few other things.  And before we're done here, Mr.

20  Morris, I'll ask do you have questions, does Mr. Bonds have

21  questions, does anyone have questions about the ruling.  But I

22  want to talk about a couple of things.  And again, I hope that

23  I'm coming through loud and clear, Mr. Bonds, in your office

24  for Mr. Dondero to hear this.  It's really, really important

25  that he heard what I'm about to say.  I'm going to say some

172

1   kind of unpleasant things and then I'm going to say some

2   hopeful things, okay?

3       Mr. Dondero?  Okay.  Mr. Dondero, I'm going to -- Mr.

4   Morris, you've got your hands on your head.  Did I miss

5   something?

6           MR. MORRIS:  No.  I was just surprised to see Mr.

7   Dondero on his phone.  I apologize, Your Honor.

8           THE COURT:  Oh, my goodness.  Were you on your phone,

9   Mr. Dondero?

10          MR. DONDERO:  No, I was not.

11          THE COURT:  Okay.  I want you to listen to this

12  really closely, and then I promise I'm going to have something

13  hopeful to say after this very unpleasant stuff.  You know, I

14  keep a whiteboard up at my bench.  I don't know if you can

15  read it.  But sometimes I hear something in a hearing and I

16  think, okay, this is one of my major takeaways from what I

17  heard today.  And I've got two, I've got two big takeaways

18  here.  Number one on my whiteboard is Dondero's spoliated

19  evidence.  Game-changer for all future litigation.  Okay.

20          MR. DONDERO:  I'm sorry.  I didn't hear that.  I

21  didn't hear that.  Could you repeat that, please?

22          THE COURT:  Mr. Dondero, spoliated evidence, game-

23  changer in future litigation.

24      Okay.  Let me tell you, the throwing away of the phone,

25  that was the worst thing I heard all day.  That was far and

173

1    away the worst thing I heard all today.  I don't know what I'm

2    going to hear down the road to fix this, but if it's really

3    gone, let me tell you how bad this is.  We have all sorts of

4    Federal Rules of Civil Procedure that talk about this being a

5    bad thing, but I wrote an opinion a couple years ago dealing

6    with spoliation of electronic evidence, and I think it might

7    be helpful for everyone to read.  It was called *In re Correra*,

8    C-O-R-R-E-R-A.  I have no idea what the cite on it is.  But in

9    this case, *Correra*, we had a debtor who had a laptop, and he

10   gave the laptop to his personal assistant, who took it away to

11   another state.  And at some point during the case, parties

12   discovered, oh, there's a laptop that may have a treasure

13   trove of information.  Who knows?  Maybe it does; maybe it

14   doesn't.  But there's a laptop that we just now learned about

15   that the personal assistant has.

16       And so I issued an order that she turn it over, and there

17   were subpoenas and depositions, blah, blah, blah.  Long story

18   short, the evidence ended up being that she deleted everything

19   on the laptop, and then -- this would almost be funny if it

20   wasn't so serious -- she downloaded thousands of pictures of

21   cats onto the laptop.  I kid you not, cats.  Meow, meow, cats.

22   And she downloaded a hundred-something full-length movies.

23   And we had two days of forensic experts come in and take the

24   witness stand and tell me about how, okay, this is like an

25   amateurish -- you've talked about amateur hour today -- this

174

1    is kind of an amateurish way of deleting data, right.  You

2    first delete all the files on the laptop and then you cover

3    over all the space to make sure the information is not

4    retrievable.  You know, this genius ended up retrieving some

5    of the information.

6       But the long story short is I sanctioned the debtor and

7    his assistant jointly and severally.  You'll have to go back

8    and look at the opinion.  I'm pretty sure it was over a

9    million dollars.  And I can't remember if that was attorneys'

10   fee-shifting only, or monetary, like penalty on top of the

11   attorneys' fees-shifting.  I just can't remember.  But maybe

12   poor Tara needs to be advised of that opinion, too.  I mean,

13   --

14       But the other reason I put game-changer in future

15   litigation is, in my *Correra* case, it wasn't just the monetary

16   million-dollar sanction or whatever it was; it was a game-

17   changer in future litigation because the adverse party to the

18   debtor ended up arguing -- and it was the state of New Mexico,

19   by the way -- they ended up saying, in all future litigation,

20   we want you -- some adversaries, we want you to make an

21   adverse inference.  In other words, for all of these elements

22   that we're trying to prove in our fraudulent transfer

23   litigation and whatever else was going on, we want you to make

24   an adverse inference that there would have been evidence there

25   on that laptop that would have supported some of our causes of

175

1    action and it was destroyed to keep us from having that

2    evidence.

3        And they brought forth all kinds of case law.  It's a hard

4    area.  It's a really, really hard area.  But I ended up --

5    again, it's not in the main opinion.  It was in subsequent

6    orders.  I ended up saying, yeah, I think you've met the

7    standard here to draw adverse inferences.

8        So, again, this is a very unpleasant message for me to

9    deliver today.  But the destruction of the phone is my biggest

10   takeaway of concern today, how that might have ramifications.

11   You know, there are other bad things, too, about that.  I'm

12   not even going to go there right now.  But the, you know,

13   Title 18, you can ask your lawyer what that means, but okay.

14       My second big takeaway before we get to the hopeful stuff

15   is -- and this is kind of harsh, what I'm about to say -- but

16   Ellington and Leventon maybe care more about you, Mr. Dondero,

17   than their law license.  You know, I guess it's great to have

18   people in your life who are very, very loyal to you.  I mean,

19   loyalty is a wonderful thing.  But I am just so worried about

20   things I've heard.  Again, the phone and in-house lawyers.

21   The biggest concerns in my brains right now.  I have worried

22   about them for a while.

23       You all will -- well, Mr. Dondero, you might not know

24   this.  But we had a hearing a few months ago, maybe September,

25   October, where the Creditors' Committee was trying to get

176

```
 1   discovery of documents.  And we had some sort of hearing,
 2   maybe a motion to compel production.  And we had many, many
 3   entities that you control file objections:  NexPoint, NexBank.
 4   I can't even remember.  We just had a whole slew.  CLO Holdco.
 5   Many, many of these entities objected.  And I was trying to
 6   figure out that day who was instructing them.  And oh my
 7   goodness, I hope the in-house layers are not involved in this
 8   document discovery dispute, because, you know, they have
 9   fiduciary duties.  And are -- you know, is it -- it feels like
10   it's breaching a duty to the bankruptcy estate when it's in
11   the bankruptcy estate's best interest to get these documents
12   if you're meanwhile hiring lawyers for these other entities,
13   Holdco, et cetera, and saying, Fight this.
14       I never really pressed it very hard back then, but I
15   raised the issue and I said, I'm really, really concerned
16   about this.  And I continue to be concerned about it.  I had
17   experiences with Mr. Ellington in the *Acis* case where he
18   testified on the witness stand, and later it looked a heck of
19   a lot like he might have committed perjury.  I hate to use
20   such blunt terms.  But I let it go.  I'm just like, you know,
21   I'm not going to -- you know, I'm going to just hope for the
22   best that he misspoke.
23       But I'm getting a really bad taste in my mouth about
24   Ellington and Leventon, and I hope that they will be careful
25   and you will be careful, Mr. Dondero, in future actions.
```

Appx. 02909
016462

177

 1      Is Mr. -- I can't see Mr. Dondero.  I want to make sure

 2   he's not on the phone.  Okay.  Okay.  Thank you.

 3      So where was I going to head next?  I guess I want to say

 4   a couple of things now that I would describe as a little bit

 5   more hopeful, and that is pertaining to this whole pot plan

 6   thing.

 7      You know, I tend to think, without knowing what's being

 8   said outside the courtroom, that a pot plan would be the best

 9   of all worlds, okay, because the plan that we have set for

10   confirmation next week, I understand we have a lot of

11   objections, and if I approve it, if I confirm the plan, we're

12   going to have a lot of appeals and motions for stay pending

13   appeal, and no matter how that turns out, we're going to have

14   a lot of litigation.  Okay?  You know, we're going to have

15   adversaries.  And we have a not-very-workable situation here

16   where we have these Dondero-controlled affiliates questioning

17   Mr. Seery's every move.

18      I would love to have a pot plan that would involve, Mr.

19   Dondero, you getting to keep your baby, okay?  I acknowledge,

20   everyone here acknowledges, you are the founder of this

21   company.  This is your baby.  You created a multi-billion-

22   dollar empire, okay?  I would be shocked if you didn't want to

23   keep your baby.  Okay?  If there was a reasonable pot plan, I

24   would love it.

25      But I'm telling you, the numbers I heard didn't impress me

Case 19-34054-sgj11    Doc 3596-31    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-31    Filed 10/09/25    Page 785 of 1052    PageID 17463

178

1   a heck of a lot.  I'm not an economic stakeholder.  It's not

2   my claim that would be getting paid.  But I can see where

3   these Creditor Committee members, they're not going to think

4   $160 million -- $90 million in cash, $70 million in notes, or

5   vive-versa -- is nearly enough.  Okay?

6        So I am going -- what just happened?  What just happened?

7   I lost Mr. Dondero.  Okay.  This is getting kind of humorous,

8   almost.

9        Okay.  I am going to order that between now and the end of

10  the day Tuesday there be good-faith, and I'll say face-to-face

11  -- Zoom, WebEx, whatever -- negotiations between Mr. Dondero

12  and his counsel and at least the Committee and its

13  professionals regarding this pot plan.

14       Now, the train is leaving the station next Wednesday,

15  okay?  If we don't have Creditors' Committee and Debtor and

16  Dondero rushing in here saying, Please continue the

17  confirmation hearing next Wednesday, if we don't have like

18  unanimous sentiment to do that, you know, this is a 15-month-

19  old case, I'm going to go forward with the plan that's on

20  file.

21       And it's been a long, expensive case.  I had great

22  mediators try to give it their best shot to get a grand

23  compromise.  I just, I'm not going to drag this out unless you

24  all tell me Wednesday morning, We want you to continue this a

25  week or two.

Case 19-34054-sgj11    Doc 3596-31    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-31    Filed 08/06/25    Page 786 of 1052    PageID 17464
Exhibit 31    Page 180 of 206

179

```
 1       And let me tell you -- this may be the stars lining up, or

 2   it may not be -- I was supposed to have a seven-day trial

 3   starting the week after next, and then I was supposed to have

 4   a four- or five-day day trial starting immediately after that.

 5   And all of those lawyers came in and asked for a continuance

 6   because of COVID.  They wanted a face-to-face trial, and so

 7   I've put them off until April.

 8       So if you wanted to postpone the confirmation hearing to

 9   the following week or even the following week, I have the gift

10   of time to give you.  But I'm not going to do it lightly.

11   I'm, again, I'm just going to order face-to-face meetings.

12   And I said Dondero and his counsel and the Committee and its

13   professionals.  You know, if -- I'm not slighting the Debtor

14   here or Mr. Seery, but I'm kind of taking a cue from what Mr.

15   Morris, I think I heard you say, that at this point it's the

16   Committee, it's the Committee's money, and I think that's the

17   starting place.  And if they want to join the Debtor in at the

18   beginning or midway through, you know, wonderful, but I think

19   it needs --

20            MR. POMERANTZ:  Your Honor, this is Jeff -- this is

21   Jeff Pomerantz.  I hate to interrupt, and I never do that to a

22   judge, but I did have something to say in my comments about a

23   continuance that we've talked about with the Committee and

24   some other developments in the case.

25            THE COURT:  Oh.
```

1            MR. POMERANTZ:  I'm happy to wait.  But it has -- it

2    has nothing to do with the comments you said, although, as I

3    think you've heard from me before, the Debtor has been a

4    supporter, a supporter of a pot plan.  Mr. Seery has done a

5    tremendous amount of work working with Mr. Dondero, working

6    with Mr. Lynn, to try to make that happen.  And if the

7    Committee is willing to engage in a pot plan, we would

8    definitely support that.  Because we do agree with Your Honor

9    that, absent a pot plan, we are looking at a lot of

10   litigation.

11      Some of the issues you're going to have to deal with at

12   the confirmation hearing if we do not have a peace-in-the-

13   valley settlement is exculpations, releases, moratoriums on

14   litigation, extensions of your January 9th order --

15           THE COURT:  Uh-huh.

16           MR. POMERANTZ:  -- with respect to pursuing certain

17   people.

18      So, we get it, and we've gotten it from the beginning.

19   And Mr. Seery, sometimes even at a fault, has been

20   singlehandedly focused on trying to get that done.  It's just

21   unfortunate where we are here.

22      But having said that, I wanted to first apprise the Court

23   of a recent major development in the case.  I'm pleased to

24   report that the Debtor and UBS have reached a settlement in

25   principle which will resolve all of UBS's claims against the

181

1    estate, all of UBS's claims against Multi-Strat.  The parties

2    are working on documentation.  The settlement is subject to

3    internal approvals from UBS, but we've been led to believe

4    those approvals will occur, and we would hope to file a Rule

5    9019 motion in the near future.

6        I'm sure Your Honor is quite pleased to hear that.  The

7    UBS matters have taken a substantial amount of time.  And with

8    the settlement of UBS's claims, the only material unresolved

9    claim, unrelated to Mr. Dondero or the employees, are Mr.

10   Daugherty.  And Mr. Seery will continue to work with Mr.

11   Daugherty to try to settle that.

12           THE COURT:  Okay.

13           MR. POMERANTZ:  With respect to the scheduling, with

14   respect to the scheduling, Your Honor, there are three

15   significant matters on for hearing on the 13th.  The first is

16   the Debtor's motion to approve a settlement with HarbourVest,

17   which Mr. Dondero is contesting.  Depositions are being

18   conducted on Monday, and we anticipate an evidentiary hearing

19   in connection therewith.

20       The Debtors, as Mr. Morris indicated earlier on in the

21   hearing, have also filed a complaint and a motion for a

22   temporary restraining order against certain of the Advisors

23   and Funds owned and controlled by Mr. Dondero which relate to

24   the CLO management agreements for which Your Honor has heard a

25   lot of testimony today.  We also expect that TRO to be

182

1    contested and for the Court to have an evidentiary hearing.

2        And as Your Honor mentioned, the confirmation of the plan

3    was scheduled for Wednesday, and there were 15 objections.  I

4    would point out, Your Honor, all but four of which were Mr.

5    Dondero, his related entities that he owns or controls, and

6    employees or former employees.

7        The Court previously gave us time on the 13th and the

8    14th, I think anticipating that we would have a lot and it may

9    be necessary to go into two days.  However, Your Honor, those

10   two days are not going to be enough to deal with all the

11   issues that we have before Your Honor.

12       So what we suggest, and we've spoken to the Committee and

13   the Committee is supportive, that we continue confirmation to

14   a day around January 27th.  This will enable the Debtor to not

15   only -- and the Committee -- not only to take Your Honor up on

16   what you'd like to see accomplished in the next few days.  I'm

17   sure the Debtor is supportive and will be supportive, and we

18   hope the Committee will engage in good-faith negotiations, and

19   if there's a way to do a pot plan, we are all for it.  It'll

20   give time for that to happen.

21       But at the same time, and I think what you'll hear from

22   Mr. Clemente, that we're willing to give a continuance, we all

23   know that if there is not a settlement to be had, if there is

24   not a pot plan to be had, this case has to confirm, it has to

25   exit bankruptcy, and at least from the Debtor's perspective, a

Case 19-34054-sgj11    Doc 3596-31    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-31    Filed 08/25/25    Page 790 of 1052    PageID 17468

183

1   lot of protections will have to be in place that basically

2   this has not just been a pit stop in Bankruptcy Court and we

3   return to the litigation ways that Highland is involved in.

4       So, Your Honor, we believe that the two evidentiary

5   hearings on for next week probably will fill up both days.  We

6   would suggest that the first day be the complaint and the TRO

7   against the Advisors and the Funds for the 13th, and the 14th

8   be the HarbourVest.

9       We also recognized as we were preparing for today, Your

10  Honor, looking ahead, that we thought it was not fair for us,

11  although we know Your Honor works tirelessly and as hard as

12  anyone on this hearing and that Your Honor would be prepared

13  for confirmation and would be prepared for each of those

14  trials, given the gravity of these issues, the extensive

15  pleadings, pleadings that you would get in confirmation on

16  Monday from the Debtor, that it made sense to continue the

17  hearing.

18      So, again, fully supportive of Your Honor's mandate to try

19  to see if we could work things out, fully supportive of a

20  continuance until the 27th, if that date works for Your Honor,

21  but we believe we do need to go ahead with the two matters

22  that are on for calendar next week.

23          MR. RUKAVINA:  Your Honor, this is Davor Rukavina.

24  May I be heard briefly?

25          THE COURT:  Oh my goodness.  Who do you represent,

184

 1    Mr. Rukavina?

 2          MR. RUKAVINA:  And I apologize -- Your Honor, I am

 3    the new counsel who will be representing the Funds and

 4    Advisors.  I will probably be taking the laboring oar at

 5    confirmation.

 6       I apologize I'm not wearing a suit and tie.  I did not

 7    anticipate speaking right now.

 8       I support -- to the extent that that's an oral motion for

 9    continuance by Mr. Pomerantz, I certainly support that.  I

10    would suggest that the Court give us an understanding of that

11    today, because we do have depositions and discovery lined up

12    which we can then push if the hearing on confirmation is

13    pushed to the 27th.  And we have no problem going forward on

14    the other matters on the 13th.

15       So, I am co-counsel to K&L Gates, Your Honor, so whoever

16    the K&L Clients are, they're now my clients as well.  I just

17    wanted to be heard briefly that we support the recommendation

18    by Mr. Pomerantz and just urge that the Court give us finality

19    on that issue today so that we're not burning the midnight

20    oil, many sets of lawyers preparing for confirmation on the

21    13th.

22       Thank you for hearing me, Your Honor.

23          THE COURT:  All right.  So, just to be clear, the

24    proposal is that we go forward next Wednesday on the newest

25    request for a TRO with regard to -- is -- the CLO Funds and

016470

185

```
 1    the Advisors.  I'm forgetting the exact names.  And then that
 2    would take likely the whole day, but whether it does or does
 3    not, we would roll over to Wednesday of next week -- that'd be
 4    the 14th -- to do the HarbourVest.  It's a compromise motion,
 5    right?  Is there anything else?
 6            MR. POMERANTZ:  No, correct, it's the compromise
 7    motion, Your Honor.  There are two pending objections on this
 8    and discovery scheduled for Monday.
 9            THE COURT:  All right.  Well, as far as --
10            MR. CLEMENTE:  Your Honor?
11            THE COURT:  Yes, who is that?
12            MR. CLEMENTE:  Oh, Your Honor, it's Matt Clemente at
13    Sidley on behalf of the Committee.  I'm here, and I thought
14    maybe I'd offer just a couple of comments at this point, but
15    I'm happy to hold them.
16            THE COURT:  Well, --
17            MS. SMITH:  And Your Honor, this is Frances Smith.  I
18    would also like to be heard before you wrap up.
19            THE COURT:  Okay.  Well, I guess generally I want to
20    know, does anyone have any objection -- I can't imagine they
21    would -- but any objection to pushing confirmation out to
22    around the 27th?  I'm going to say that because I have an
23    issue middle of the day the 28th.  If we do it the 27th, I
24    could only go a day and a half, okay?  I have to go out of
25    town the evening of the 28th, and I would be out the 29th as
```

186

 1  well.  That's Thursday and Friday.  So we'll talk about that.
 2  But anyone, Mr. Clemente or anyone else, want to say anything
 3  about continuing the confirmation?

 4       MR. CLEMENTE:  Your Honor, it's Matt Clemente at
 5  Sidley.  No, Your Honor, we're supportive of that schedule.

 6     And Your Honor, just briefly, I heard my name discussed
 7  quite a bit at this hearing as well as the Committee.  I'm not
 8  going to get into it unless Your Honor would like me to, but
 9  let me be very clear:  The committee has taken very seriously
10  the pot plan proposals that Mr. Dondero has presented, and
11  there's much more to the discussion other than what Mr. Lynn
12  suggested in his remarks.

13     So I'm not going to get into all that unless Your Honor
14  thinks it's necessary.  I think it's of no moment here.  But I
15  did want Your Honor to know that we have carefully considered
16  the pot plan proposals and have communicated a variety of
17  issues about that to Mr. Lynn and will continue to take the
18  direction of Your Honor and engage on a pot plan, Your Honor.
19  But I did not want there to be any suggestion that we did not
20  take it seriously and that there was much, much more
21  consideration and discussion about it than what was suggested.

22       THE COURT:  Uh-huh.

23       MR. CLEMENTE:  Thank you, Your Honor.

24       THE COURT:  All right.

25       MS. SMITH:  Your Honor, this is Frances Smith.

016472

187

1          THE COURT:  Who do you represent, Ms. Smith?

2          MS. SMITH:  Your Honor, we were recently retained by

3     the four senior employees:  Tom Surgent, Frank Waterhouse,

4     Scott Ellington, Isaac Leventon, along with Baker & McKenzie,

5     and I believe we have the Baker & McKenzie lawyers Deb

6     Dandeneau and Michelle Hartmann on the line.

7        Your Honor, we have listened to the whole hearing.  And I

8     was not going to make an appearance.  I was following your

9     instructions and listening carefully.  But Your Honor, I --

10    first of all, we hate to be before you for the first time in a

11    discovery dispute.  We did file a very limited objection to

12    the plan because of the disparate treatment of our clients,

13    which we are not arguing today, of course.  We received -- it

14    is our usual practice, Your Honor -- you've known me for a

15    long time -- to cooperate on having witnesses appear.  We got

16    -- we were notified very late Tuesday that the Debtor's

17    counsel would like two of our clients to appear.  We made what

18    we thought was a reasonable request for a copy of the

19    transcript from the deposition.  We were invited to the

20    deposition and then told we could not attend, or our clients

21    could not attend.  When we offered to make it lawyers-only,

22    they said no.  So we did not produce our clients without a

23    subpoena.

24       Our clients have not been evading service.  As far as we

25    know, they were each attempted service one time, late

188

1    Wednesday, when they were -- around dinnertime.  Mr. Leventon

2    was home all day today.  Didn't go any -- or yesterday.

3    Didn't go anywhere.  Was not served.  Wasn't served this

4    morning.  The same, as far as we know, with Mr. Ellenton.

5        Your Honor, on the order that you just entered, I am a

6    little unclear of where your findings of fact stopped.  First

7    of all, I do not think that you can enjoin Mr. Ellenton and

8    Mr. Leventon.  They are not parties to the adversary

9    proceeding.

10        You know, we did some very quick research.  There's a

11   Seventh Circuit case, a district court may not enjoin

12   nonparties who are not either acting in concert with an

13   enjoined party nor in the capacity of agents, employees,

14   officers of the enjoined party.  Mr. Ellington and Mr.

15   Leventon are not agents, employees, officers of Mr. Dondero.

16   So I think that, Your Honor, you cannot make that ruling.

17        Of course, you can rule that Mr. Dondero cannot talk to

18   Mr. Leventon and Mr. Ellington.  That might be a way to fix

19   that one part.  But as nonparties, I don't believe that you

20   can enjoin them.

21        Also, Your Honor, there was just no evidence against them

22   to support that.  Out of more than two dozen exhibits, there

23   was one mention of Mr. Leventon, where all he did was give Mr.

24   Dondero Matt Clemente's phone number.  And you yourself ruled,

25   Your Honor, that Mr. Dondero could speak with the Committee,

189

1   so that wouldn't even have been a violation of your orders.

2   There's three related to Mr. Ellington, but no evidence of

3   confidential information.

4        And, Your Honor, I'm very concerned about the comments

5   that you made about Mr. Ellington and perjury.  I just want to

6   make sure that it's clear on the record that those were not

7   findings of fact.  That did not -- there was no evidence about

8   that today.  And I understand Your Honor's frustration.  I was

9   -- but I just want to be very clear on the record that those

10  were not findings of fact that you were making during that

11  part of your comments.  I was a little unclear about where the

12  ruling exactly stopped when you said you wanted to add onto

13  the order and then you were going to make a few more comments.

14       So that's all I have, Your Honor.

15            THE COURT:  Okay.

16            MS. SMITH:  Thank you for listening and --

17            THE COURT:  Thank you.  Fair comments, one and all.

18  I'm first going to tweak.  I was concerned.  You heard me

19  express concern about, you know, Ellington and Leventon aren't

20  parties to this adversary.  Not here.  So here's -- Mr.

21  Morris, I assume you're the scrivener.  Let's change what I

22  said earlier and have the injunction read that Mr. Dondero

23  shall not request that Mr. Ellington or Mr. Leventon share any

24  confidential information they received as general counsel or

25  assistant general counsel for the Debtor without Debtor's

190

 1  counsel's explicit written permission, nor accept any

 2  confidential information that the two of them may have

 3  received as general counsel or assistant general counsel for

 4  the Debtor.  Okay?  So the injunction is --

 5          MR. MORRIS:  Your Honor, if I may, --

 6          THE COURT:  Who?

 7          MR. MORRIS:  Your Honor, if I may, that is not

 8  sufficient for us, because that means that they can actually

 9  share it with him as long as he doesn't request it.  I'm a

10  little surprised --

11          THE COURT:  No.  You didn't hear the accept -- the

12  last part.

13          MR. MORRIS:  Okay.

14          THE COURT:  I added on at the end, nor shall Mr.

15  Dondero accept any confidential information.  They -- he shall

16  not request that they share it, nor shall he accept it.  Okay?

17  I --

18          MR. MORRIS:  So, but that -- my concern is that that

19  makes Mr. Dondero the arbiter of what's confidential and

20  what's privileged.  And I think that's improper.  I think it's

21  really reasonable, and I'm surprised -- you know, we're all

22  advocates here, so I take no issue with counsel, but the order

23  was going to be pretty simple:  Don't disclose privileged or

24  confidential information.  If they don't like that, that's

25  fine.  Just bar Mr. Dondero from speaking to either one of

016476

191

1    them, period, full stop.  Because we should not be in a

2    position where he doesn't request it but somehow they send it

3    to him.  It is confidential.

4        I mean, who's deciding what's confidential here?  Mr.

5    Ellington?  Mr. Leventon?  Mr. Dondero?  Just stop their

6    communication.  Mr. Dondero is subject to the Court's order.

7    He's the one who's subject to this motion.  Bar him from

8    speaking to either one of them.  It's a very -- very simple

9    solution.

10        MR. BONDS:  Your Honor, I agree that it's a simple

11    solution.  It's, I mean, not correct to assume that Mr.

12    Dondero is in any way going to breach his obligations to the

13    Court or to Mr. Ellington and Mr. Leventon.  I don't see where

14    -- what we're talking about.

15        MS. SMITH:  Also, Your Honor, I have to object to him

16    disparaging my clients that way.  There's been no evidence

17    that they improperly shared any information.  They are

18    licensed lawyers and they know the Rules of Professional --

19    they know the rules of professionalism, so --

20        THE COURT:  Okay.  I, you know, I didn't make a

21    finding earlier when I held out my two giant takeaways, to get

22    to your later question, no findings.  But I really hope you

23    share with them everything I said, the concerns I expressed.

24    Maybe get the transcript.

25        MS. SMITH:  Absolutely, Your Honor.

192

1          THE COURT:  Because I have huge concerns about

2    conflicts of interest here.  Okay?  Huge, huge concerns.  I

3    had them back when we had the discovery fight, Committee

4    wanting documents, and, you know, and I still have them.  You

5    know, did Ellington know about the TRO?

6          MS. SMITH:  Understood, Your Honor.

7          THE COURT:  Okay.  So let me backtrack.  We already

8    had a TRO that prevented Mr. Dondero from talking to any

9    employees of the Debtor unless it was about shared services

10   agreement.

11      So, Mr. Bonds, I'm going to flip it back to you on this

12   one.  Why shouldn't I at this point just say, okay, guess

13   what, no talking to Mr. Leventon or Ellington for the time

14   being?  Why --

15         MR. BONDS:  First of all, --

16         MS. SMITH:  Your Honor, that's acceptable to us.

17         THE COURT:  Okay.  What's wrong with that, Mr. Bonds?

18         MR. BONDS:  Your Honor, we don't believe that Mr.

19   Dondero has violated the TRO.

20      And secondly and more importantly, we don't believe that

21   there's any way that you can enter an order that singles out

22   two former employees.  I mean, that's bizarre.

23         THE COURT:  If I'm concerned that it's thwarting the

24   reorganization efforts and there are conflicts of interest

25   here, why can't I?

Case 19-34054-sgj11    Doc 3596-31    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-31    Filed 09/04/25    Page 800 of 1052    PageID 17478
Exhibit 31    Page 193 of 206

193

 1      You know, this is -- I hate to say it, but I feel like
 2    I've been in the role of a divorce judge today.  We have very
 3    much a corporate divorce that has been in the works, unless we
 4    get this pot plan on track, okay, and I'm a judge having to
 5    enter interim orders keeping one spouse away from the other,
 6    keeping one spouse out of the house, keeping one spouse away
 7    from the kids.  It's not pleasant at all.  But I don't -- the
 8    more I think about it, the more I have authority to do it just
 9    to protect, to protect the nest egg here.
10          MS. SMITH:  Your Honor, we are perfectly fine with
11    you enjoining Mr. Dondero from speaking to our clients, and we
12    will convey that to our clients.
13          THE COURT:  Okay.  Mr. Bonds, I can't hear you.
14          MR. BONDS:  I'm sorry, Your Honor.  What evidence is
15    there of irreparable harm as to Mr. Dondero talking with
16    either Mr. Leventon or Mr. Ellington?
17          THE COURT:  Okay.  Do I need to parse through the
18    communications I saw?  Do I need to parse-
19          MR. BONDS:  Yeah, I think so.  I mean, I don't
20    understand.
21          THE COURT:  Okay.  I never authorized Mr. Ellington
22    to be the settlement lawyer or whatever, okay?  I never would
23    have, okay?  And maybe Mr. Seery, you know, said something to
24    -- early on in the case to make him think he had that
25    authority, but no, we're done.  Okay?  And I feel like it's

016479

194

1   causing more harm than good right now.  Okay?

2       I don't know who instructed all of these Dondero-

3   controlled entities to hire lawyers.  I don't know if

4   Ellington and Leventon have been giving instructions to these

5   entities.  But we've got conflicts everywhere now.  Okay?

6   We've got -- and by the way, I'm just going to list them now.

7   We have, of course, Bonds Ellis representing Dondero.  We have

8   Doug Draper, Heller Draper, now representing these trusts, Get

9   Good Trust, Dugaboy Investment Trust.  We have K&L Gates and

10  now Munsch Hardt also representing the Advisors, NexPoint and

11  the various CLO or other Funds.  We have CLO Holdco

12  represented by Kane Russell Coleman Logan.  We have NexPoint

13  Real Estate represented by Wick Phillips.  Who have I left --

14  and, of course, the employees, Baker & McKenzie and Ms. Smith.

15  We have Spencer Fane in there for other current or former

16  employees.  We have Loewinsohn Flegle in there for certain

17  former or current employees.

18      I mean, the proliferation of lawyers.  And again, I don't

19  know if Mr. Ellington and Mr. Leventon have had a role in

20  hiring counsel, wearing their hat for these other entities or

21  not.  Can anyone tell me?  Maybe I'm worried about something I

22  shouldn't be worried about.

23          MR. DONDERO:  You're worried about something you

24  shouldn't worry about, Your Honor.

25          THE COURT:  Okay.  So Ellington --

Case 19-34054-sgj11    Doc 3596-31    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 31    Filed 09/26/25    Page 802 of 1052    PageID 17480

195

```
 1              MR. MORRIS:  Your Honor, I would just point to the
 2    evidence that's in the record, Your Honor.  You have Mr.
 3    Dondero asking Mr. Ellington to show leadership in
 4    coordinating all of the lawyers you just mentioned.  It's in
 5    the record.
 6              THE COURT:  Yes.  I'm just going to, until otherwise
 7    ordered, no conversations between Dondero and Ellington and
 8    Leventon, and that's just going to be my ruling until further
 9    order.  That's what I feel best about.
10         Now, let me ask you, knowing that I could only give you a
11    half a day on the 28th of January, if we start the
12    confirmation hearing on whatever the plan looks like on
13    January 27th, I mean, do people want to go with that, --
14              MR. POMERANTZ:  Your --
15              THE COURT:  -- even knowing we might not finish that
16    day, or no?
17              MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.
18    Maybe if we could start on the 26th, have the 26th, 27th, and
19    then maybe half of the 28th.  I would think two and a half
20    days should be enough, notwithstanding the volume of
21    objections, because I think you'll find that, while there may
22    be some evidence, I think the majority of the objections are
23    really legal in nature.
24              THE COURT:  All right.  Traci, are you out there in
25    video-land?
```

```
 1              THE CLERK:  Yes, I'm here.

 2              THE COURT:  Okay.  Have I overcommitted the 26th?  If

 3    we start the 26th at 9:30 in the morning, can we do that?  Or

 4    --

 5              MR. BONDS:  Your Honor?

 6              THE CLERK:  That'd be fine.

 7              THE COURT:  Okay.

 8              THE CLERK:  Just remember that you have an

 9    appointment at lunchtime that day at noon on the 26th.

10              THE COURT:  Okay.  I --

11              THE CLERK:  You don't have any court hearings.

12              THE COURT:  Okay.

13              MR. BONDS:  Your Honor, I'm sorry.

14              THE COURT:  Go ahead.

15              MR. BONDS:  Your Honor, I'm sorry.  This is John

16    Bonds.  I have a hearing on the 26th that I can't miss.

17              THE COURT:  Well, can someone else --

18              MR. POMERANTZ:  Your Honor, we would request, right,

19    that Mr. Lynn lead the confirmation hearing.  There's a lot of

20    lawyers.  If we try to look at everyone's calendar, we're

21    never going to be able --

22              THE COURT:  Yes.

23              MR. POMERANTZ:  -- to get something that's good for

24    everyone.

25              THE COURT:  Okay.  Yes.  Well, Mr. Lynn or Mr. Assink
```

016482

197

 1   can handle it, Mr. Bonds.

 2       So we're going to start the 26th at 9:30.  We'll go all

 3   day, except I have something at lunchtime, apparently.  And

 4   then we'll go all day on the 27th, and then I can give you

 5   half a day on the 28th.

 6       So you'll upload immediately a notice to that effect, Mr.

 7   Pomerantz.

 8           MR. POMERANTZ:  Yes, we would.

 9       Your Honor, in terms of our documents in support of

10   confirmation, we want to make it convenient with the Court.

11   We know your Court would at least need one business day, so we

12   would prefer to file, say, by 2:00 Central on the 24th, on a

13   Sunday.  Everyone will have it, and have one business day.  I

14   mean, the old order only had one business day in advance as

15   well.  So that's what we would propose for our confirmation

16   documents to be filed.

17           MR. RUKAVINA:  Your Honor, this is Davor Rukavina.

18   An important issue here is how the creditors have voted, and I

19   have no idea how they have voted.  The voting deadline has

20   expired.  So I have no problem with what Mr. Pomerantz

21   suggests, but I do think that the Debtor should file its

22   tabulation of votes sooner rather than later so we all know

23   one of the central elements for the hearing that we'll have.

24           THE COURT:  Okay.

25           MR. POMERANTZ:  That's fair, Your Honor.  We're

198

1  prepared to file the summary of voting and tabulation by the

2  15th of January.

3          THE COURT:  Okay.  Very good.

4      So, backing up, Mr. Pomerantz, you asked that I approve

5  you filing any plan modifications by noon on Sunday, the 24th?

6  Is that what you said?

7          MR. POMERANTZ:  Yeah.  So, there's a couple of

8  things.  There's our confirmation brief.

9          THE COURT:  Uh-huh.

10          MR. POMERANTZ:  There is our -- any evidence we would

11  submit, although I suspect we are likely to provide live

12  testimony, as opposed to a declaration.  There was our summary

13  of ballots, which we will now do on the 15th.  And to the

14  extent we have any modifications, we would provide them on

15  Sunday by 12:00 noon Central time as well.  Yes.

16          THE COURT:  All right.

17          MR. RUKAVINA:  Well, Your Honor, this is Davor

18  Rukavina.  Does that mean the witness and exhibit lists also

19  will not be due until Sunday at noon?  Because I would request

20  that we have the normal period of time to exchange exhibits

21  and witnesses.

22          MR. BONDS:  Your Honor, I think that the normal time

23  period is also important in this case.

24          THE COURT:  Okay.  I'm going to --

25          MR. POMERANTZ:  Your Honor, we could -- if everyone

199

 1   agrees on witness lists, we could do those by 5:00 p.m.

 2   Central on the 22nd.

 3           THE COURT:  Okay.  Let's do that.  Okay.

 4           MR. POMERANTZ:  But that -- but that needs to be for

 5   everybody.

 6           THE COURT:  Oh, it will be for everyone.

 7           MR. RUKAVINA:  Your Honor, no problem.

 8           THE COURT:  Okay.  Let's --

 9           MR. POMERANTZ:  5:00 p.m. Central Standard Time.

10           THE COURT:  No more discussions.  That'll be the

11   ruling, okay?  Everything is going to be due by 5:00 p.m.

12   Central time on Friday, the 22nd.  All right.

13           MR. POMERANTZ:  Your Honor, is that our brief as

14   well, or --

15           THE COURT:  Yes.

16           MR. POMERANTZ:  -- was that just the witness list?

17           THE COURT:  Everything.  Brief, witness list, and --

18           MR. POMERANTZ:  Okay.

19           THE COURT:  -- plan mods.

20     Let me look through my notes and see if there's anything

21   else I want to say.  You know, let me do some quick math here.

22   I know there was one other thing I wanted to say that involves

23   math.  Okay.  I think my math is right here.  Okay.  You know,

24   I mentioned the proliferation of lawyers.  And let me just say

25   this.  We had -- we've had about 90 people on the -- showing

200

 1   up on the video screen today -- 89, 90, 91, 92.  A few, a
 2   little over 90.  Okay?  So let's say 90.  It's been up to 95
 3   earlier.  But let's pretend that 60 of those are lawyers
 4   billing by the hour.  That's very conservative.  Probably many
 5   more than 60.  And let's assume conservatively that the
 6   average billing rate is $700 an hour.  That's probably very
 7   low, right?  We probably don't have many baby lawyers on the
 8   phone.  So that's a very low average.  So, 60 lawyers times
 9   $700 an hour, $42,000 an hour this hearing has cost.  And then
10   we've been going over seven hours.  So let's say seven,
11   conservatively, times $42,000.  This hearing has cost $294,000
12   today.  A preliminary injunction hearing.  I mean, no one
13   thinks that's chump change.  I don't know, maybe some people
14   do.  This just seems like a ridiculous way to spend resources.
15   No offense to all the wonderful lawyers, but this is just --
16   it's crazy-town, right?  It is crazy-town.  So I implore you,
17   okay, how about I use that word, I implore you to have these
18   good-faith discussions on a pot plan.
19       Please, Mr. Dondero, I mean, don't waste people's time.
20   $160 million, I know that's not going to cut it.  Okay?  So
21   it's going to have to be more meaningful.  I just know that in
22   my gut.
23       But having said that, I mean, I honestly mean I think a
24   pot plan -- I think you getting your baby back is the best
25   thing for everyone.  Okay?  I think it's the best thing for

016486

201

1    everyone.  So I want you all to --

2            MR. DONDERO:  Judge, I -- Judge, I just need to

3    interject for a second, because no one follows the big

4    picture.  We filed for bankruptcy with $450 million of assets.

5    $360 million of third-party net assets, $90 million of

6    affiliated notes.  The third-party assets are down to $130

7    million and falling fast.

8            MR. POMERANTZ:  Your Honor, I hate to interrupt Mr.

9    Dondero, but that is not the purpose of this hearing.

10           THE COURT:  Well, --

11           MR. POMERANTZ:  Mr. Dondero's statement of the assets

12   and value is just not something that the Debtors would agree

13   and support.  I'm sure it's not something the creditors -- I

14   think we understand what Your Honor is saying.  I think the

15   Committee understands.  And Your Honor knows that the Debtor

16   and the Committee are close to the asset values.  And Mr.

17   Dondero should be making his argument to the Debtor and the

18   Committee, not Your Honor, in this open forum.

19           THE COURT:  Okay.

20           MR. POMERANTZ:  It's just not appropriate.

21           THE COURT:  And I understand where you're both coming

22   from.  And he's saying that because I made the comment I made

23   about $160 million not being enough.

24       I've seen the evidence.  I've heard the evidence at prior

25   hearings, Mr. Dondero.  We've had a lot of hearings.  And I

202

 1    remember writing that down.  Wow, why did that happen?  Seeing

 2    the dissipation of value.  I couldn't remember the exact

 3    numbers, but I thought it was like $500 million something and

 4    then $300 million or whatever.  And I remember Multi-Strat,

 5    that being sold, and blah, blah, blah, blah.

 6        But having said that, there are a lot of causes of action

 7    that have been hinted at by the Creditors' Committee and

 8    others.  So, causes of action is one of the things they are

 9    looking at when they start thinking about what's appropriate

10    value.

11        So I just, I get where everyone is coming from.  I get

12    where everyone is coming from.  But, again, let's take one

13    more stab at this, please.  Okay?

14            MR. POMERANTZ:  Yeah.  And Your Honor, my last

15    comment.  We're commercial people.  The creditors are

16    commercial people.  I think we've done a tremendous job in

17    being able to resolve most every one of the significant

18    claims.  I think the Court should trust the process.  Mr.

19    Dondero should trust the process.

20        And again, if there's a commercial deal to be worked out,

21    I don't think there's anyone more than of course the Debtor

22    and the people on the Committee, who have been litigating in

23    many cases with Mr. Dondero and Highland for ten years, I

24    don't think it's anyone's desire.  So if there's a reasonable,

25    rational proposal that the creditors can get behind and want

203

1   to engage, then there'll be a discussion.  If they don't

2   believe it's a reasonable, rational proposal, they won't.

3        THE COURT:  Yes.  All right.  Well, I do feel very

4   good about what I've heard about the UBS issues being worked

5   out.  I mean, we have come a long way in 15 months, even

6   though it's frustrating to me and others.  But, again, I know

7   you all are going to do what you need to do.  And I'll look

8   for the form of order.  I'm going to see you all, Mr. Dondero,

9   including you, next Wednesday.  And if there's nothing else,

10  we stand adjourned.

11       MS. SMITH:  Your Honor, I'd like to review the form

12  of order as it regards my clients before it's submitted.

13       THE COURT:  Okay.

14       MS. SMITH:  If I could have a courtesy copy, please.

15       THE COURT:  Yes.  Well, yes.  I'm not going to

16  require 90 lawyers to get the order, but I will ask Mr.

17  Pomerantz, Mr. Morris, make sure Ms. Smith gets it and

18  obviously Mr. Dondero's counsel gets it.  And I probably won't

19  get it until Monday, it sounds like, but --

20       MR. POMERANTZ:  That's likely.

21       THE COURT:  But I'll be on the lookout for it.  Okay.

22  Thank you.  We stand adjourned.

23       MS. SMITH:  Thank you, Your Honor.

24       THE CLERK:  All rise.

25       MR. MORRIS:  Thank you, Your Honor.

016489

204

1          MR. BONDS:  Thank you, Your Honor.

2       (Proceedings concluded at 4:09 p.m.)

3                     --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18                    CERTIFICATE

19       I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
20   above-entitled matter.

21    **/s/ Kathy Rehling**                        **01/11/2021**

22   _____     _____
   Kathy Rehling, CETD-444                        Date
23   Certified Electronic Court Transcriber

24

25

205

INDEX

PROCEEDINGS                                                          3

OPENING STATEMENTS

- By Mr. Morris                                                      5

WITNESSES

Plaintiff's Witnesses

James D. Dondero
- Direct Examination by Mr. Morris                                  19
- Cross-Examination by Mr. Bonds                                   106
- Redirect Examination by Mr. Morris                              139

EXHIBITS

Plaintiff's Exhibits A through Y                       Received 38

CLOSING ARGUMENTS

- By Mr. Morris                                                    152
- By Mr. Lynn                                                      155
- By Mr. Bonds                                                     159

RULINGS                                                       163/189

END OF PROCEEDINGS                                                204

INDEX                                                             205

# EXHIBIT 32

Appx. 12930
016492

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 32 Filed 06/03/2587   Page 814 of 1052   PageID 17492
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 1 of 86

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, JUDGE

| | |
|---|---|
| In Re: | ) Case No. 19-34054-sgj11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) |
| | ) |
| Debtor. | ) |
| ―――――――――――――――――――――――――――――――― | ) |
| | ) |
| OFFICIAL COMMITTEE OF UNSECURED | ) Adv. Proc. No. 20-03195-sgj |
| CREDITORS, | ) |
| | ) PLAINTIFF'S MOTION for |
| Plaintiff, | ) CONTINUANCE |
| | ) |
| v. | ) |
| | ) |
| CLO HOLDCO, LTD., et al., | ) |
| | ) |
| Defendants. | ) |
| ―――――――――――――――――――――――――――――――― | ) |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) Adv. Proc. No. 21-03003-sgj |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) DEFENDANT DONDERO'S MOTION |
| v. | ) to COMPEL DISCOVERY, the |
| | ) TESTIMONY of JAMES P. |
| JAMES DONDERO, | ) SEERY, JR. |
| | ) |
| Defendant. | ) May 20, 2021 |
| ―――――――――――――――――――――――――――――――― | ) Dallas, Texas (Via WebEx) |

Appearances in 21-03003:

| | |
|---|---|
| For Plaintiff Highland Capital Management, | John A. Morris Pachulski Stang Ziehl & Jones LLP 10100 Santa Monica Boulevard, 13th Floor Los Angeles, California  90067 |
| For Defendant-Movant James Dondero: | Michael P. Aigen Stinson, L.L.P. 3102 Oak Lawn Avenue, Suite 777 Dallas, Texas  75219 |
| | Bryan C. Assink Bonds Ellis Eppich Schafer Jones LLP 420 Throckmorton Street, Suite 1000 Forth Worth, Texas  76102 |

Appearances continued on next page.

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21   Filed 06/03/25   Page 815 of 1052   PageID 17493
Exhibit 32 Page 3 of 87
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 2 of 86

2

<u>Appearances in 20-3195</u>:

| | |
|---|---|
| For the Official Committee of Unsecured Creditors: | Paige Holden Montgomery<br>Sidley Austin LLP<br>2021 McKinney Avenue, Suite 2000<br>Dallas, Texas  75201 |
| | Matthew A. Clemente<br>Sidley Austin LLP<br>One South Dearborn<br>Chicago, Illinois  60603 |
| For Defendants Highland Dallas Foundation and CLO Holdco Ltd.: | Louis M. Phillips<br>Kelly Hart & Pitre<br>301 Main Street, Suite 1600<br>Baton Rouge, Louisiana  70801 |
| | Amelia L. Hurt<br>Kelly Hart & Pitre<br>400 Poydras Street, Suite 1812<br>New Orleans, Louisiana  70130 |
| For Defendants The Dugaboy Investment Trust and The Get Good Nonexempt Trust: | Douglas S. Draper<br>Heller, Draper, Patrick & Horn, L.L.C.<br>650 Poydras Street, Suite 2500<br>New Orleans, Louisiana  70130-6103 |
| For Grant James: Scott, III: | John J. Kane<br>Kane Russell Coleman Logan<br>Bank of America Plaza<br>901 Main Street, Suite 5200<br>Dallas, Texas  75202 |
| For UBS Securities LLC: | Andrew Clubok<br>Latham & Watkins, LLP<br>555 Eleventh Street, NW, Suite 1000<br>Washington, D.C.  20004-1304 |
| For Scott Ellington, Jean Paul Sevilla, Isaac Leventon, and others: | Frances Smith<br>Ross & Smith, PC<br>Plaza of the Americas<br>700 North Pearl Street, Suite 1610<br>Dallas, Texas  75201 |
| Digital Court Reporter: | United States Bankruptcy Court<br>Michael F. Edmond Sr., Judicial<br> Support Specialist<br>1100 Commerce Street, Room 1254<br>Dallas, Texas  75242 |
| Certified Electronic Transcriber: | Susan Palmer<br>Palmer Reporting Services |

Proceedings recorded by digital recording;
transcript produced by federally-approved transcription service.

Appx. 02932
016494

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-31 Filed 06/06/25   Page 816 of 1052   PageID 17494
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 3 of 86

3

I N D E X

Adversary Proceeding 21-3003,
 Defendant Dondero's Motion to Compel:      page   5
      The Ruling of the Court:              page  33


Adversary Proceeding 20-3195:
      Committee's Motion for Continuance:   page  35
      The Ruling of the Court:              page  78

      Witnesses:
                        Direct    Cross    Redirect    Recross

      Marc Kirschner
       Declaration:        61
       By Mr. Phillips:             62
       By Ms. Montgomery:                     65


      Exhibits Received in Evidence:

          Defendants' 1 - 6:                 page  70

Appx. 02928

016495

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 32    Filed 06/05/25    Page 817 of 1052    PageID 17495
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 4 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    4

1  <u>Thursday, May 20, 2021</u>                    <u>9:40 o'clock a.m.</u>

2              P R O C E E D I N G S

3         THE COURT:  — settings in Highland Capital adversary

4  proceedings.

5         Before I start with that, I want to let anyone who is

6  on the line for a different case, RE Palm Springs II, LLC, that

7  the hearing we had on that matter was continued.  Certain of the

8  parties filed an agreed motion to continue, and so I continued

9  that to June 9th at 9:30.  So to the extent you are on the line

10 only for the Palm Springs matter, that matter is not going

11 forward today.

12        All right.  So turning to Highland, I will start with

13 the first-filed emergency motion.  It was in Highland versus

14 Dondero, Adversary 21-3003.  Counsel for Dondero filed a motion

15 to compel testimony of James Seery.  So who do we have appearing

16 for Mr. Dondero this morning?

17        All right.  So —

18        MR. [SPEAKER]:  I think he's on mute, Your Honor.

19        THE COURT:  Sir, you are on mute.  Try again.

20        MR. AIGEN:  Ah, I apologize, Your Honor.  Is this

21 better?

22        THE COURT:  Yes.

23        MR. AIGEN:  Okay.  Good morning, Your Honor.  Michael

24 Aigen from Stinson, representing Mr. Dondero.  I apologize for

25 that.

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 35-21 Exhibit 32 Filed 06/06/25 Page 6 of 6   Page 818 of 1052   PageID 17496
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 5 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    5

1          THE COURT:  All right.  So you are now co-counsel with

2   Bond Ellis, perceive?

3          MR. AIGEN:  That is correct.  The lead counsel from

4   our firm is Ms. Deborah Deitsch-Perez.  She unfortunately has

5   medical emergencies going on with her family and is

6   unfortunately unable to be here for this hearing.

7          THE COURT:  All right.  Thank you.

8          For Highland, who do we have appearing on this matter?

9          MR. MORRIS:  Good morning, Your Honor.  It's John

10  Morris From Pachulski Stang Ziehl and Jones for the debtor.

11         THE COURT:  All right.  Thank you.  I presume those

12  are the only appearances on this discovery dispute.

13         MR. AIGEN:  That's correct.

14         THE COURT:  All right.  Well, Ms. — Mr. Aigen, you're,

15  I guess, new on the scene in the Highland matters.  And let me

16  just tell you I've read all the pleadings.  So I am aware that

17  of our numerous adversary proceedings, this is the one only

18  involving Dondero as a defendant and only involving three notes.

19  So, to help you find your argument, I'm going to say this.  I

20  remember when I was in law school — here comes a story — one of

21  our law professors said a suit on a note is the simplest kind of

22  lawsuit there is.  And probably when you are a young lawyer and

23  if you go to a civil business practice type law firm, this is

24  probably where you're going to get your feet wet.

25         And so, with that in my brain and having read the

Appx. 02935
016497

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21 32 Filed 06/06/25    Page 819 of 1052    PageID 17497
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 6 of 86

*Adversary 21-3003, Motion to Compel Discovery*                           6

1   pleadings, I'm asking:  Why is this going to be complicated

2   where we need extensive discovery from the CRO/CEO who came on

3   the scene post bankruptcy two plus years after the notes?

4           So that's what's in my brain having read the

5   pleadings.  And so convince me why I'm totally misreading the

6   situation.

7           MR. AIGEN:  Thank you, Your Honor.  I appreciate that.

8   One thing I want to make sure we understand is this is we're

9   seeking to compel deposition testimony for Mr. Seery in his

10  corporate rep capacity.  We're not specifically asking for Mr.

11  Seery.  We sent corporate rep depo topics over.  They told us

12  Mr. Seery would be the corporate rep but they objected to

13  certain topics, as is their right.  The specific topics, as you

14  know, we're seeking discovery on, there's Numbers 9, 14 through

15  17 go together, Number 20.  In that sense what we're seeking

16  discovery on is a defense that we have asserted in this

17  proceeding that's currently pending.

18          As I'm sure you know from reading the pleadings, one

19  of Mr. Dondero's defenses is that there was a subsequent oral

20  agreement that the home would be discharged based upon certain

21  conditions being met.  Highland, as is their right, believes

22  that this oral agreement never happened.  And, as a result, it

23  contends that the defense has no merit.  In their motion, I

24  think it was, or in their response, paragraph 4, they

25  specifically say that this defense has no basis in fact.  That's

Appx. 02936
016498

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 32 Filed 06/06/25   Page 820 of 1052   PageID 17498
Case 21-03003-sgj   Doc 50   Filed 05/25/21   Entered 05/25/21 12:59:11   Page 7 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    7

1    their right.  The problem, however, is just taking this

2    position, based on this position they're also saying, well, we

3    don't get discovery on this event.

4            And although we're talking about six different

5    requests, it really comes down to three different areas, and

6    I'll jump into those and explain each one.  The first one, which

7    I think is the most straightforward, is topic nine, which asks

8    for testimony regarding Mr. Dondero's defenses.  Initially we

9    got a response saying that the objection wasn't relevant and

10   then they filed a response.  And I think they realized that

11   might not have made a lot of sense saying it wasn't relevant, so

12   they said it was vague or invalid.

13           Counsel's well aware, as you are, what are defenses in

14   this case.  They served discovery on these defenses.  We

15   responded.  They never complained that they're inadequate.  They

16   know that our defense, at least one of them, is there had been

17   oral agreement on the loan, that it would be forgiven if certain

18   conditions occur, and that's what we want to take discovery on.

19           I'm confident counsel has interviewed Highland

20   employees to see who knows anything about this agreement.  I'm

21   sure it's very possible that no one knows anything about this

22   agreement, and that's fine.  But we certainly have a right to

23   ask the corporate rep about this and find out if anyone's going

24   to talk about this oral agreement at trial.  This isn't

25   burdensome discovery —

Appx. 02937
016499

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 32 File Page 09/05/25   Page 821 of 1052   PageID 17499
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 8 of 86

*Adversary 21-3003, Motion to Compel Discovery*                                8

1        THE COURT:  Can I — can I — let me ask a question

2   right there.  The defense is based on an oral agreement.  I mean

3   your client is the payee on the notes — excuse me — excuse me —

4   the maker.  It's easy to get confused here.  He's the maker on

5   the notes, but he was the CEO of the payee on the notes.  So

6   this is not Bank of America makes a loan to Joe, the plumber,

7   or, you know, I mean this is — he's on both sides of the

8   transaction.  So he knows who the oral agreement was made with,

9   right?

10        MR. AIGEN:  Correct, Your Honor.

11        THE COURT:  So, again, I'm trying to understand —

12        MR. AIGEN:  May I follow up —

13        THE COURT:  — the depth of the discovery needed.

14   Presumably, I think I read in here, that you're deposing — or I

15   don't know if it's agreed or not — you're deposing various other

16   Highland former employees.  But — but I don't understand why the

17   current CEO that was not around before the bankruptcy would have

18   any personal knowledge about oral agreements.  I mean this would

19   all be in Mr. Dondero's head, right?

20        MR. AIGEN:  Your Honor, I absolutely agree.  And there

21   are, I guess, two parts to that answer.  One is we aren't taking

22   other Highland employees' depositions.  We've asked for them,

23   and they have refused to give them to us and said they're

24   irrelevant.  We're trying to work that issue out.  And we may

25   get one of their depositions.  If they go give us one for a

Appx 02938

016300

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 32    Filed 06/26    Page 822 of 1052    PageID 17500
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 9 of 86

*Adversary 21-3003, Motion to Compel Discovery*                                      9

1   couple hours and drop off, but this is — right now this is the

2   only discovery we're getting.  Their doc requests, they're not

3   going to give us any documents related to these topics.  So this

4   is our chance to get discovery on it.

5              As to his personal knowledge, he's their corporate

6   rep.  As a corporate rep, he can go figure out what other people

7   know.  But they're going to put someone on the stand — and I

8   think it's important, Your Honor, obviously they're going to

9   make a defense in this case — or, sorry — which stops our

10  defense with legal arguments saying even if this oral agreement

11  occurred and took place, it's not legally enforceable.  I

12  understand.

13             THE COURT:  Yeah, and what about —

14             MR. AIGEN:  I mean this is —

15             THE COURT:  — what about that?  What about that?  I

16  mean it's hard not to separate the need for discovery from that,

17  so what about that?

18             MR. AIGEN:  Well, your — yeah.  No, that's — if they

19  file a summary judgment on a legal issue, then we will address

20  that in our summary judgment legal issue, but right now we have

21  a pending defense.  And, Your Honor, one of their responses to

22  our defense, as they put in their response in paragraph 4, they

23  specifically state that this oral agreement never occurred.  So

24  I need to know how they know that, who are they going to put on

25  the stand.  I don't know which people are saying that.  So we

Appx 02939
016501

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 13-20    Exhibit 32 Filed 06/06/25    Page 823 of 1052    PageID 17501
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 10 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    10

1    ask for — to put it down into corporate rep topic.  They could

2    have given us anyone.  They decided to give us Mr. Seery.  But,

3    yes, he may not have personal knowledge, but that's who they

4    chose for their corporate rep to testify on this topic.

5          He's the only one I'm able to get this information

6    from.  And he may come up and say no one knows anything about

7    that.  That's fine.  But they have already said:  We're taking

8    the position that this oral agreement never occurred.  I don't

9    know how they know that, I don't know who they're going to put

10   on the stand, but they are taking a factual position on that.

11   So we should have a right to take discovery on it.  Whether they

12   don't think this is a legally-valid defense, well, that's fine,

13   they could have moved for summary judgment on day one.  They

14   didn't.  As of now, this defense is still pending.

15         We have less than two months until trial.  I don't

16   know when the summary judgment's going to come, so there's not

17   going to be a chance to wait until the legal aspects of these

18   defenses are heard and then take discovery.  This is our one

19   opportunity to do it.

20         THE COURT:  Okay.  So this is topic number nine.  And

21   you say why not, let us ask a few questions, it may be five

22   minutes of questioning if he doesn't really know anything.  Is

23   that a summary of your position?

24         MR. AIGEN:  Well, yeah, he may not know anything and

25   they may not know anything, or they may, yes.  I don't know how

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 32 Filed 06/06/25    Page 824 of 1052    PageID 17502
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 11 of 86

*Adversary 21-3003, Motion to Compel Discovery*                 11

1    much time it's going to take.  The fact that they put in writing

2    that this agreement never occurred makes me think that someone

3    must know something, but I don't know.  It could be on that.

4    that —

5             THE COURT:  All right.

6             MR. AIGEN:  — it's certainly possible, Your Honor.

7             THE COURT:  All right.

8             MR. AIGEN:  That — and then the second topic or

9    second, I guess, group is 14 through 17 where we ask about

10   information about loans made by Highland or the debtor that were

11   particular to other people.  And the reason these requests are

12   relevant is, once again, — well, not once again — but it's our

13   position that Highland commonly entered into these types of

14   agreements.  They're saying:  Hey, this never happened, this

15   agreement didn't take place.

16            So the fact that Highland entered into other similar

17   type loan agreements with similar type business group

18   provisions, although maybe not dispositive, it certainly leads

19   to evidence that this agreement did in fact take place in the

20   situation where they're telling you and putting a pleading and

21   writing in the pleading, hey, this never — this agreement never

22   took place.  So this is relevant —

23            THE COURT:  So — so — so —

24            MR. AIGEN:  — and, like I said, —

25            THE COURT:  — on topics 14 through 17 you're saying

Appx. 02941
016503

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 32   Filed 06/23/25   Page 825 of 1052   PageID 17503
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 12 of 86

*Adversary 21-3003, Motion to Compel Discovery* 12

1   it's relevant if loans were made to other employees or officers

2   besides Mr. Dondero and it's relevant if those loans were

3   forgiven or not as to these three notes?

4           MR. AIGEN:  Correct, Your Honor.  Because they are

5   challenging that this agreement took place, for the —

6           THE COURT:  Well, —

7           MR. AIGEN:  — fact that other similar —

8           THE COURT:  — what if they did do this with another

9   employee, why is that relevant these three notes?

10          MR. AIGEN:  Well, because they're challenging that our

11  oral agreement took place.  The fact that oral agreements like

12  this were routine at Highland would make it more believable and

13  factual that our agreement took place, in light of their

14  challenge to the fact that the agreement took place.

15          Like I said, if they were just making legal challenges

16  to whether the agreement is enforceable, that would be one

17  thing.  So instead they're also taking the position, hey, we

18  don't think this actually took place.  So all — if Highland

19  routinely entered into agreements like this for other employees,

20  like I said, I understand that wouldn't be dispositive, but that

21  would tend to show that this pattern and practice of Highland

22  did include oral agreements like this.

23          THE COURT:  Okay.  I don't mean to get off on a

24  tangent here, but, you know, are there going to be a lot of

25  fraudulent-transfer lawsuits if in fact there was debt forgiven

Appx 02942
016304

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 32   Filed 06/26   Page 826 of 1052   PageID 17504
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 13 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    13

1   in the couple of years or four years leading up to bankruptcy?

2   And are we going to have — well, I just don't understand, you

3   know, the obvious big tax exposure to your client and other

4   human beings if your — if your argument prevails, but I guess I

5   shouldn't — I shouldn't second guess legal strategy, but my

6   brain can't help to go there.

7          All right.  But, again to the relevance, your defense

8   is:  There was an agreement to forgive these notes.  It was oral

9   and we're entitled to discovery regarding other loans to other

10  employees for which there might have been oral forgiveness

11  because that will help establish our defense; that's the sum and

12  substance of categories 14 through 17?

13          MR. AIGEN:  That's correct, Your Honor.

14          THE COURT:  Okay.

15          MR. AIGEN:  And obviously I don't think there's any

16  need to try the ultimate legal issues here, but we're well aware

17  of these tax issues and we've worked into it, and so there are

18  different tax consequences depending on how conditions are

19  structured and it's my understanding that in situations like

20  this there wouldn't be sort of tax consequences, but that's an

21  issue for another day.  But because you raised it, Your Honor, I

22  want to make sure that you know we are aware of that issue and

23  that is something we're prepared to address when it — when it

24  comes before this.

25          So should I move on to the last — last topic, Your

Appx 02943
016305

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 32    Filed 06/26    Page 827 of 1052    PageID 17505
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 14 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    14

1    Honor?

2              THE COURT:  Okay.

3              MR. AIGEN:  The last topic is Request Number 20 which

4    asks for testimony regarding compensation paid by Highland to

5    Mr. Dondero.  And I know this might be a little unusual because

6    someone should know what they were paid, but obviously in a

7    situation like this where we don't have control of all the

8    records and the pay structure is complicated, we don't have all

9    of that, so it's a little different than your usual situation.

10   And the reason this is relevant, obviously this goes to the

11   forgiveness aspect of it, and basically information regarding

12   Mr. Dondero's compensation will be helpful or relevant because

13   it shows part of the story here is that if you look at his

14   compensation as a whole, he was underpaid and the notes were

15   forgiven as part of this compensation which goes along with the

16   underpaid.  In other words, it puts this oral agreement into

17   context and explains why it is thus.  Again, they're saying this

18   never happened, so as part of our presentation of our case,

19   we're going to explain why this was done and why it makes sense.

20   And to put that into context, we want information related to Mr.

21   Dondero's compensation.  We're not asking for other people's

22   compensation on this, we said information related to Mr.

23   Dondero's own compensation.

24              And, again, I understand that counsel thinks that

25   these defenses have no merit.  That's their right.  That makes

Appx. 02944
016306

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 13-20    Exhibit 32    Filed 06/26/25    Page 828 of 1052    PageID 17506
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 15 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    15

1    sense.  And I assume they will file a summary judgment on these,

2    but they haven't done it.  These defenses are currently pending.

3    We're going to trial in less than two months.  We may not be

4    getting anyone else's depositions.  They're not giving us

5    documents on this topic.  And I understand it may be a little

6    unique to have Mr. Seery testify on this, but that's because we

7    just presented them with topics.  That's the witness they are

8    putting forward, which is their right.  I have no problem with

9    that.  But this is our one opportunity to get discovery on this

10   and that's why we're before the Court today.  Thank you for your

11   time.

12          THE COURT:  Okay.  Just to clarify, I think I heard

13   you saying Mr. Dondero doesn't have access to the records.  Mr.

14   Dondero doesn't have records regarding the compensation paid by

15   Highland to him and any agreements related to that?

16          MR. AIGEN:  He — he had some but not all.

17          THE COURT:  Okay.  Well, I don't understand that.  Why

18   would that be?  He's the founder, he was the CEO of this company

19   until three months after the bankruptcy was filed.  He — I mean

20   it sounds inconceivable to me that he wouldn't have everything

21   he needs as far as what he was paid in the agreements regarding

22   what he was paid by his company Highland.

23          MR. AIGEN:  Well, Your Honor, fortunately or

24   unfortunately I have not been involved what I understand is sort

25   of disagreements between the parties here on Mr. Dondero's

Appx 02945
016307

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 13-20    Filed 06/26/25    Page 829 of 1052    PageID 17507
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 16 of 86

*Adversary 21-3003, Motion to Compel Discovery*                      16

1   access to certain documents of Highland, but my understanding is

2   he — Highland now has possession of all its documents.  And he —

3   I know there were requests between counsels on Dondero to get

4   particular documents in other matters and other situations going

5   on.  But he — Highland is the one that has possession of those

6   documents now, not — not Mr. Dondero.

7              THE COURT:  Okay.  He'd at least have his tax returns,

8   right, and files regarding his tax returns?

9              MR. AIGEN:  Correct, correct.  Correct.  Yes.  Yes,

10  Your Honor.

11             THE COURT:  All right.  Well, Mr. Morris, now for your

12  responses in — I'm playing devil's advocate with you.  If y'all

13  have named Mr. Seery as a 30(b) corporate rep and out of these

14  20 topics you agree to — two, three, four, five, six — I guess

15  13 of the subject matters, what's the big deal about a few extra

16  questions?

17             MR. MORRIS:  A few — a few issues.

18             First, Your Honor, is Mr. Dondero on the line?

19             THE COURT:  Well, that's a good question.  I forgot to

20  check that because I have ordered him in the past to be at every

21  hearing.

22             Mr. Dondero, are you with us this morning?

23             Mike, did you see him —

24             MR. ASSINK:  No, Your Honor.  This is —

25             THE REPORTER:  I haven't seen Mr. Dondero.

Appx 02946
016308

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-20   Exhibit 32   Filed 06/25/25   Page 830 of 1052   PageID 17508
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 17 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    17

1        THE COURT:  Okay.  Well, Mr. Aigen, what do you know

2   about that?  Or I see Mr. Bryan Assink is out there as well.

3   What do y'all know about that?

4        THE REPORTER:  He's on mute, Your Honor.

5        THE COURT:  You're on mute, sir.

6        MR. ASSINK:  Your Honor, I apologize.  This is Bryan

7   Assink of Bonds Ellis.  I'm just trying to — I'm just trying

8   to —

9        THE COURT:  Okay.  It sounds like someone's speaking,

10  but I can't hear it.

11       THE REPORTER:  Bryan Assink, his voice is low.  He's —

12       THE COURT:  Okay.  Mr. Assink, please turn your volume

13  up.  We can barely, barely, barely hear you.

14       Mr. Assink.

15       MR. ASSINK:  Your Honor, is that — is that better?

16  I'm sorry.  I tested this before —

17       THE COURT:  Okay, it's better now.  Go ahead.

18       MR. ASSINK:  — I joined and —

19       THE COURT:  Go ahead.

20       MR. ASSINK:  Your Honor, this was set on an emergency

21  basis, and we just didn't coordinate with Mr. Dondero.  We

22  didn't think he needed to attend these kind of nonevidentiary

23  hearings and —

24       THE COURT:  Mr. Assink, you asked for the emergency

25  hearing.  And you filed your motion Friday afternoon.  We were

Appx 03967

016309

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-20   Exhibit 32   Filed 04/9/25   Page 831 of 1052   PageID 17509
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 18 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    18

1   in court Tuesday.  And I was happy that you resolved our

2   disputes Tuesday.  And I remember saying:  Preview of coming

3   attractions, I guess I'll see y'all Friday, right.  Right,

4   nobody said anything about, uh, we have an emergency setting,

5   we're hoping to have.

6           But, anyway, be that as it may, an hour or two after I

7   got out of court Tuesday, my Courtroom Deputy was telling me

8   that you were wanting the hearing this week.  And I first said

9   it'll have to be Monday.  I mean we're — we've got a backlog of

10  stuff in our queue that we're really trying to get out.  And —

11  and I understood that you really pressed for having this hearing

12  today.  I didn't see the — all the emails, but my Courtroom

13  Deputy said you all really wanted this hearing today, not

14  Monday.

15          So, with that, why would you press for today if Mr.

16  Dondero wasn't available, number one?  And, number two, why

17  would you think he wasn't needed?  I mean it was a couple of

18  hearings ago that I said someone pull out my order and see what

19  I said, because I couldn't remember the exact wording —

20          MR. ASSINK:  No, Your Honor, I apologize.  I'm sorry,

21  Your Honor.  I apologize.  There's been a lot going.  I think it

22  — the coordination might have just slipped.  I'm not sure, Your

23  Honor, I wasn't sure what order required him to be here today

24  with the preliminary injunction dissolves but, you know, it

25  wasn't our intention that he would not — he would not appear.

Appx. 03048
016510

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 33-21 Filed 06/20/25   Page 832 of 1052   PageID 17510
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 19 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    19

1    We — it was more just a coordination thing.  We intend that he

2    will be at all hearings before, Your Honor, you know, Friday's

3    hearing and substantive hearings.  I just — I think this is more

4    of a coordination issue, Your Honor, and I apologize.

5              THE COURT:  Okay.

6              MR. ASSINK:  There has been a lot going on.

7              THE COURT:  Oh, don't I know.  There's two of us, me

8    and my Law Clerk working on this, and there are a bunch of

9    y'all.  So, yes, I feel — I feel absolutely what you feel and

10   more as far as a lot going on.

11             So let me clarify.  My language that ordered Mr.

12   Dondero to be at every hearing was in the preliminary injunction

13   that's now superseded by the agreed order y'all announced

14   Tuesday.  So are you telling me you thought now that mandate

15   didn't apply?  Is that one of the things —

16             MR. ASSINK:  Not — not specifically, Your Honor, —

17             THE COURT:  — I'm hearing?

18             MR. ASSINK:  Not specifically, Your Honor.  We thought

19   perhaps the formal mandate in the order was no longer applying,

20   but our understanding was you would want Mr. Dondero at

21   substantive hearings going forward, and that has been our

22   understanding.  And we would expect him to be before Your Honor

23   at all such hearings.  Part of the basis, the reasoning he's not

24   here today was perhaps as an oversight on my part due to the

25   scheduling, and I had a lot of deadlines yesterday and I think

Appx. 03040
016311

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 33-21    Filed 03/31/25    Page 833 of 1052    PageID 17511
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 20 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    20

1    it just maybe fell through the cracks, and I apologize, Your

2    Honor.

3              THE COURT:  All right.

4              MR. ASSINK:  You know, we — Your Honor, —

5              THE COURT:  Well, I'm going to say a couple of things.

6    You know this could have been raised Tuesday, when we were here

7    on the adversary proceeding, in which the preliminary injunction

8    was issued, okay, it would have been — it would have been wise,

9    it would have been very wise to raise the issue.

10             Second, it screams irony, if nothing else, that at a

11   time when I have under advisement a motion to hold Mr. Dondero

12   in contempt of Court that there would be a trip-up, the

13   second-recent trip-up, by the way, where he didn't appear at a

14   hearing.  There was a time a few weeks ago, two or three weeks

15   ago, can't remember what hearing it was then, but he wasn't

16   here.

17             Okay.  The —

18             MR. ASSINK:  Well, Your Honor, I just want to say —

19             THE COURT:  — the third thing I'm going to say — the

20   third thing I'm going to say is I guess I'll issue an order in

21   the main case now, you know, a one- or two-sentence order in the

22   main case saying repeating the sentence that was in the

23   preliminary injunction, that he's going to show up at every

24   hearing.  I never said only at substantive hearings.  The only

25   thing I hesitated on at all, because I've done this in other

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 1-20   Exhibit 32   Filed 02/25/25   Page 834 of 1052   PageID 17512
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 21 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    21

1   cases, is sometimes I'll say any hearing at which, you know, the

2   person is taking a position, okay, an opposition, an objection,

3   you know, even if you file a pleading taking a neutral stand, if

4   he's going to file a pleading that requires the Court and all

5   the lawyers' attention to some extent, he's going to need to be

6   in court.  So that's something I thought about doing, but then I

7   was reminded, that I said, no, he's just going to be at all

8   hearings in the future.

9           And procedural, substantive, I never made that

10  distinction and I never would because — because it's taking up

11  time, it's taking up time of the Court, lawyers, parties.  And

12  if he is going to use the offices of this Court or, you know,

13  take up the time of any lawyers, then he needs to be a part of

14  it, okay?

15          MR. ASSINK:  Your Honor, yes, I —

16          THE COURT:  So I thought I made that very clear the

17  last time he didn't show up, but I think —

18          MR. ASSINK:  Your Honor, I apologize.  You know that's

19  certainly not our intention here.  We've been rushing around.  I

20  think this is more — this is more on — on me and just the fast

21  pace with everything.  We would intend that he would be here at

22  all hearings.  We're not trying to make any exception.  We're

23  not trying to say that the preliminary injunction got rid of his

24  obligation to be before, Your Honor.  You know, we weren't clear

25  exactly what the directive was for these kinds of hearings, or

Appx 03051
016313

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 32 Filed 06/23/25   Page 835 of 1052   PageID 17513
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 22 of 86

*Adversary 21-3003, Motion to Compel Discovery*                22

 1   at least perhaps I wasn't fully, and — but, nevertheless, Your

 2   Honor, we would — we would have had him be here.  I think the

 3   fast pace with the hearing settings and just everything going

 4   on, it might have slipped through the cracks.  It's not — there

 5   was no ill will with him not being here, Your Honor.  I

 6   apologize.  It's just an oversight on our part.  We would

 7   anticipate that he will be here for all future hearings.  You

 8   know it's no disrespect to the Court.  It was not an intentional

 9   thing.  We apologize, Your Honor.  So I understand the Court's

10   comments.  It's — but I just want to make clear it's we're not

11   trying to be cute, we're not trying to say that, oh, the

12   preliminary injunction is gone, he doesn't have to be here.

13   That's not our intention, Your Honor.  It was I think just an

14   oversight and a scheduling issue this time, but Mr. Dondero will

15   of course appear before Your Honor in all matters going forward,

16   so I apologize.

17           THE COURT:  All right.  Well, again, you're

18   scheduling.  You sought the scheduling, you sought the emergency

19   hearing, and this is the second time we've had this discussion

20   in less than a month.

21           All right.  So, Mr. Morris, back to you.  I think —

22           MR. MORRIS:  Yeah.

23           THE COURT:  — you were about to answer the question of

24   if Mr. Seery is going to be produced and talk about 13 different

25   topics, why is it a big deal to talk about these other seven

Appx 03052
016314

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 31-20   Exhibit 32   Filed 09/26/25   Page 836 of 1052   PageID 17514
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 23 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    23

 1   topics.

 2            MR. MORRIS:  Because there is no way to prepare a

 3   witness for the vague statements that are being offered by

 4   counsel.  I'll point out that Mr. Aigen is yet another former —

 5   a lawyer who formerly represented Highland and is now suing us,

 6   but we'll dispense with the disqualification motion right now.

 7            Your Honor, here is the deal.  There have to be some

 8   limits, there have to be some reasonable limits.  As you

 9   started, Your Honor, in law school you're taught that a

10   collection case under demand notes is the simplest thing there

11   is.  In fact, in New York there's a special provision in state

12   law that permits a plaintiff to file a motion for summary

13   judgment in lieu of a complaint when they have an instrument

14   such as a note, which is exactly what we have here.

15            Mr. Dondero has already admitted in his answer, in his

16   interrogatories, and in his answers to several requests to admit

17   that the notes are valid, that he received the money

18   contemporaneously with the notes.  When he signed the note, he

19   received the money.  The debtor has made demand and he hasn't

20   paid, so we will be moving for summary judgment on that basis.

21            So let's look at what the defenses are and why we just

22   feel like it's a burden on the debtor to even entertain these

23   concepts.  His first answer, Your Honor, said that the notes

24   were forgiven based on an agreement.  So we asked him in the

25   interrogatory or request to admit, I forget which, show us your

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-20   Filed 04/25/25   Page 837 of 1052   PageID 17515
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 24 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    24

1    tax returns that you paid the taxes.  Of course he didn't pay

2    taxes because of course the note wasn't forgiven.  So instead he

3    amends his answers, he amends the affirmative defense to add the

4    words:  Pursuant to a condition subsequent.  Okay, he didn't say

5    that the first time.

6            The first time it was — it was forgiven and now it's

7    not forgiven but it's basically deferred until a condition

8    subsequent.  So he is not even contending.  If you look at his

9    amended answer, he's not even contending that it was forgiven,

10   he's simply saying that the obligation to repay has been

11   deferred pursuant to an oral agreement under which he does have

12   to pay until the debtor completes the liquidation of his assets,

13   basically, if you read it.  That's what it says.  And that's how

14   we got here.

15           I don't know if you picked up on it, Your Honor, but

16   in response to an interrogatory, when we said who made the

17   agreement on behalf of the debtor, Mr. Dondero said that he did.

18   Okay, this isn't an oral agreement unless he was talking to

19   himself.  This is something that happened, according to him, in

20   his head; that somehow he, as the maker of the note, had a

21   discussion with himself in his capacity as the chief executive

22   officer of the debtor, and the two of them, in his head, agreed

23   that he wouldn't have to pay.  Initially wouldn't have to pay at

24   all and now apparently doesn't have to pay until the debtor

25   completes its sale of assets.  That is what the defense is here,

Appx 03954
016516

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 31-21    Filed 06/26/25    Page 838 of 1052    PageID 17516
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 25 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    25

1    so let's be very, very clear about it.

2              It's not an oral agreement, it's something that he's

3    making up in his head that he didn't make up the first time,

4    that he changed the second time, and that he — that he can't

5    describe at all.  One of the interrogatories said:  When did

6    this take place.  He didn't answer that part of the

7    interrogatory.  He hasn't told us.

8              And here is the interesting thing, Your Honor.  He's

9    partially performed.  He has admitted in response to — I forget

10   if it was an interrogatory or a request to admit, it's in our

11   papers — he has admitted that in December 2019, after the

12   petition date, and while he was still in control of the debtor,

13   that he made a payment to the debtor, a portion of which was

14   used to pay principal and interest on one or more of the notes,

15   so.  So either he made that payment after he made his agreement

16   in his head that it would be deferred, which makes no sense, or

17   he entered the agreement in his head after the time that he made

18   the payment, which would be in violation of the automatic stay,

19   because how did he just get to forgive or to defer payment of an

20   obligation to the debtor without seeking permission from the

21   Bankruptcy Court.  Those are the only two possibilities here,

22   okay.

23             So I don't want to have to prepare my client for such

24   nonsense.  I don't think we should be required to prepare my

25   client for such nonsense.  And if you take a look at the other

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 32    Filed 06/26/25    Page 839 of 1052    PageID 17517
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 26 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    26

1    so-called affirmative defenses, he's got waiver, but he doesn't

2    know — he doesn't identify how we waived, when we waived, who

3    waived.  And, in fact, it's completely contradicted from the

4    evidence that's already in the record.  Every single monthly

5    operating report, all of the debtor's contemporaneous books and

6    records, they're in the record.  I actually submitted them in

7    opposition to his first request for an adjournment of this

8    proceeding because I wanted — I put my cards on the table, Your

9    Honor.  I really don't — I don't like to play games.  I put my

10   cards on the table.  They see all of that.  All of that is

11   there.  The debtor has — can see them.  So how could we have

12   waived everything.

13          Consideration, I'm supposed to prepare my client to

14   answer questions on his defense of lack of consideration, when

15   Mr. Dondero has already admitted that he received the face

16   amount of each note at the time the note was executed?  What —

17   we should not be entertaining this.

18          And let's talk about topics 14 to 17, the so-called

19   other loans that were forgiven.  Mr. Dondero was the president

20   and chief executive officer of this company for decades.  Has he

21   identified one single person who received a forgiven loan?

22   Nope.  Has he identified one loan that was ever forgiven?  Nope.

23   Has he ever contended that he had a forgivable loan?  Nope.

24   He's got this vague and ambiguous defense that somehow — it's

25   not even a defense, frankly.  His defense is that he had an oral

Appx 03956
016518

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-201 32  Filed 06/26/25   Page 840 of 1052   PageID 17518
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 27 of 86

*Adversary 21-3003, Motion to Compel Discovery*                        27

 1   agreement with himself, either he did or he didn't, right.

 2   We've got document requests outstanding.  They were due weeks

 3   ago.  Mr. Aigen has promised me in writing tomorrow, tomorrow,

 4   Friday.  May 21st, he's going to complete his document

 5   production.

 6            We've gotten two documents so far, two bank statements

 7   that show his receipt of the loan proceeds, right.  We don't

 8   have — there is no evidence for this.  We don't have the

 9   identification of a loan that was ever forgiven.  We don't have

10   the identification of a person whose loan was forgiven.  We have

11   nothing.  How can we possibly prepare?

12            Rule 30(b)(6) actually requires them to describe with

13   reasonable particularity the matters for examination.  How do I

14   prepare my client on — on these things?  What he's trying to do,

15   I think what they're trying to do is be cute, of course, and

16   they're trying to — they want to ask Mr. Seery and Mr. Seery

17   will say, 'I don't have any knowledge of this.'  And then

18   they're going to show up to trial and they're going to put on a

19   case and say, 'Mr. Seery didn't have any knowledge of it, so he

20   can't rebut,' or something — something silly like — I mean I

21   don't really know what they're doing.  This is just such bad

22   faith.

23            Your Honor, you heard counsel say that the loan was

24   forgiven or deferred, but it's not even forgiven.  So — so it

25   doesn't even make sense, but you heard him say that he was

Appx 03057
016319

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-201   Exhibit 32   Filed 06/25/25   Page 841 of 1052   PageID 17519
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 28 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    28

1   underpaid, that Mr. Dondero was underpaid and that there's some

2   connection not with forgiveness because he's admitted that he's

3   now changed his story, it hasn't been forgiven.  It was

4   originally forgiven, now it's just deferred, and that that

5   happened because he was underpaid.  Does that make any sense at

6   all?

7          The guy who was in control of this enterprise from day

8   one, and I'm supposed to prepare my client to provide a history

9   of Mr. Dondero's compensation.  He doesn't know what he was —

10  did he not pay his taxes?  Should we go down that path and

11  should I now start subpoenaing his tax returns?  Because I think

12  that's appropriate.  If you want to ask what I have, I want to

13  know what you have.  So maybe Mr. Aigen can agree on the record

14  that I can have Mr. Dondero's tax returns.  If he'll do that

15  maybe I'll reconsider, because this is nonsense, Your Honor.

16  And that's really the point.  And I want to nip this in the bud

17  now because this is the first of five note cases for entities

18  owned and controlled by Mr. Dondero, and the same thing is

19  happening in some of these other cases, Your Honor.  It is.

20         And — and if we go down this path, you know you're the

21  Judge, you make the call, but we're going to be having a lot of

22  these because I'm not volunteering putting my client through

23  this process.  It's not right.  It's just not right.

24         He made an oral agreement with himself?  Please.  You

25  either violated the automatic stay or you partially performed,

Appx 03958
016320

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 33-20   Filed 06/26/25   Page 842 of 1052   PageID 17520
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 29 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    29

1   thereby proving it never happened.  Mr. Aigen says, oh, we

2   contest it.  We don't sit here and contest it.  The proof is in

3   the record.  The proof is his client's own words.  The proof of

4   the documents that we've already put before the Court.  (Briefly

5   garbled audio) — never happened.

6           And I just — I just want to nip this in the bud.

7   That's really our point, Your Honor.  To put forth a client in —

8   in a notes action, the simplest form of action there could

9   possibly be, to answer questions on 13 different topics, but

10  there's a limit to what we'll do, and this is our limit.  And

11  that's why we won't — we won't do it in the absence of a court

12  order.

13          THE COURT:  Okay.

14          MR. MORRIS:  Thank you, Your Honor.

15          THE COURT:  All right.  So I will give the last word

16  to you, Mr. Aigen.  What would you like to say in rebuttal?

17          All right.  You must be on mute.

18          MR. [SPEAKER]:  He's on mute.

19          MR. AIGEN:  Sorry.

20          THE COURT:  Okay.

21          MR. AIGEN:  A few quick points, Your Honor.  Number

22  one, counsel has referred to New York procedure on how he could

23  file a quick summary judgment.  Well, he can file summary

24  judgment here too.  They didn't do it.  These defenses are

25  pending, we have a right to take discovery on it.  I think

Appx. 03959
016321

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 13-20    Filed 03/26/25    Page 843 of 1052    PageID 17521
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 30 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    30

1    that's pretty straightforward.

2            Number two, counsel has repeatedly stated, as he

3    states in his pleading, that we changed our position and that

4    first answer it said that the notes were forgiven.  It doesn't

5    say that.  I'm reading from their pleading at paragraph 16 where

6    they quote our answer, the original one where it says,

7    "Defendant asserts that plaintiff's claim should be barred

8    because it was previously agreed by plaintiff that plaintiff

9    would not collect on the note."  There's no change in the

10   position.  It wasn't asserted before these notes were actually

11   forgiven, so that's just not true, and his own pleadings reflect

12   that.

13           We also heard a lot of conversation about what we have

14   given them.  We have answered their interrogatories.  They

15   didn't ask about other people who may have loans forgiven.  They

16   had never asked about that.  That's why we haven't told them.

17   They could get that information.  They could serve discovery.

18   They're the one that wanted this case on a fast track.  So keep

19   talking about discovery or answers he doesn't have because those

20   are answers to questions he never asked.  There is no discovery

21   out there where they said to us identify the individual who you

22   believe received loans that are forgiven.  They never asked

23   that.  That's why they don't —

24           THE COURT:  Let me —

25           MR. AIGEN:  — that answer, so I don't think that's

Appx 03909
016322

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 32 Filed 06/26/25    Page 844 of 1052    PageID 17522
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 31 of 86

*Adversary 21-3003, Motion to Compel Discovery*                              31

1    right.

2              THE COURT:  Let me ask you this.  If Bank of America

3    loaned money to Mr. Dondero and he defaulted and they sued him

4    on the note, do you think Mr. Dondero could get discovery

5    regarding all other borrowers or any other borrower that Bank of

6    America may have lent money to and did they forgive some of

7    their indebtedness, did they have special arrangements?  Do you

8    think in a million years a state court judge would allow

9    discovery on this?

10             MR. AIGEN:  Not under that hypothetical, but I would —

11   what I would say, Your Honor, if there was an oral condition as

12   part of that loan and it turns out that everyone knew that Bank

13   of America provided those same oral conditions to a subset other

14   group of lenders — or borrowers, for whatever reason, and the

15   parties disputed that, then I think it would be discoverable.

16   So I think the situation here is —

17             THE COURT:  Oral agreements —

18             MR. AIGEN:  — different from your situation.  I agree

19   with the hypothetical.

20             THE COURT:  I mean again I — you know, oral

21   agreements.  I mean give me examples of case law where oral

22   agreements somehow prevailed at the end of the day.  I mean I

23   just...

24             MR. AIGEN:  And, Your Honor, at summary judgment, when

25   we have to present our case, we'll present our case.  Like I

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 32 Filed 06/26   Page 845 of 1052   PageID 17523
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 32 of 86

*Adversary 21-3003, Motion to Compel Discovery*                    32

1   said, they could have filed the summary judgment on day one,

2   just like they could do in New York, and said, you know, on the

3   defenses, but we're doing this and we're doing it on a fast

4   track obviously with trial in less than two months.  So this is

5   our one opportunity to get discovery.  And when they filed their

6   summary judgment, we'll respond with the law.  But until they

7   do, for whatever reason they have waived it.  They have told you

8   that it would be burdensome to allow him to answer a few other

9   questions.  I don't — for one thing, burden was not an objection

10  they made, so he's talking about how it's burdensome and he

11  doesn't want to do it.  But this is our one opportunity to get

12  this information.  And if they file summary judgment, and, you

13  know, these defenses go away, obviously it won't be an issue

14  later, but this is our one opportunity to get this discovery.

15          THE COURT:  Okay.

16          MR. MORRIS:  Your Honor, if I may?  Just one last

17  point.  There is zero chance, zero chance that if any loan was

18  ever forgiven by the debtor that it was on the same terms on

19  which Mr. Dondero now claims his loan would be forgiven or

20  deferred.  And how do I know that?  Because if you look at his

21  response to the interrogatory, the condition subsequent, by

22  them.  And Mr. Aigen is just wrong, he did change his answer.

23  His original answer was that he wouldn't have to pay.  And then

24  his new answer, his amended answer is that he wouldn't have to

25  pay until a condition subsequent.  And when we asked him what

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 31-21    Filed 03/26/25    Page 846 of 1052    PageID 17524
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 33 of 86

*The Court's Ruling on the Motion to Compel* 33

1   that condition subsequent was, it was the liquidation of certain

2   assets.  Since the liquidation of those assets has not been

3   completed, by definition, no other maker could have had a note

4   or an oral agreement or an agreement of any kind of the type

5   that Mr. Dondero has.  So yet another reason why it fails to

6   meet the burden, they fail to meet the burden under Rule 26.

7   Nobody could have ever had the same note forgiven or agreement,

8   because the condition subsequent hasn't been met yet.

9            THE COURT'S RULING ON THE MOTION TO COMPEL

10           THE COURT:  All right.  Well, I'm going to deny the

11  motion to compel.  I don't think that the burden has been met to

12  establish the relevance of these, I guess it's — one, two,

13  three, four, five — six topics that are now at issue, topics 9,

14  14 through 17, or 20, and, you know, I don't think the

15  proportionality standard is met here.

16           I do think it would be not proportionate to the needs

17  of the case for the CEO, who came in place in 2020,

18  postpetition, two years after these notes were executed, to have

19  to go do research about any loans made by Highland to any

20  officers and employees over the years and, you know, I don't

21  know who he's going to question, what policy he is going to look

22  into that might be some substance or evidence as to oral

23  agreements or forgiveness.  I don't think he should have any

24  obligation to search files and interview people to figure out

25  what the affirmative defenses and Mr. Dondero are all about or

Appx 03903
016325

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 35-21   Filed 06/25/25   Page 847 of 1052   PageID 17525
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 34 of 86

*The Court's Ruling on the Motion to Compel*                                    34

 1   based in.  And, again, no one would have better information

 2   about his own compensation than Mr. Dondero himself.

 3          I mean I want to stress that this comes against a

 4   backdrop of — well, it seems like some antagonism, to say the

 5   least, on the part of Mr. Dondero where Mr. Seery's concerned.

 6   It seems like it's always a fight with Mr. Seery.  And you say,

 7   well, we didn't handpick him as the 30(b)(6) witness, but, you

 8   know, the motion to compel names him by name.  It just — it

 9   feels like another antagonistic move.

10          You've got him for a deposition next Monday on 13 or

11   so different topics.  I think it is appropriate to draw the line

12   on these six or so topics that again just don't seem relevant or

13   proportional to the needs of the case.

14          All right.  So, Mr. Morris, would you please upload

15   just a simple order reflecting the Court's ruling?

16          MR. MORRIS:  I would be happy to, Your Honor.

17          THE COURT:  Okay.  Actually I'm going to ask Mr. Aigen

18   to do it.  I'm sorry.  I need to be thinking about attorney's

19   fees and who should bear the costs of what.

20          So, Mr. Aigen, would you please electronically submit

21   an order?

22          MR. AIGEN:  Yes.

23          THE COURT:  All right.  Thank you.

24          All right.  Well, if there's nothing else on this

25   particular adversary, let me just double check.  Any

Appx 03904

016326

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-20   Exhibit 32   Filed 06/06/25   Page 848 of 1052   PageID 17526
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 35 of 86

*Adversary 20-3195, Committee's Motion to Stay*                    35

```
 1   housekeeping matters before I move onto the other adversary?

 2          MR. AIGEN:  Not from the debtor, Your Honor.

 3          MR. CLUBOK:  Your Honor, —

 4          THE COURT:  All right.

 5          MR. CLUBOK:  I don't know if you're about to move on.

 6   Your Honor, can you hear me?

 7          THE COURT:  I'm sorry, Mr. Clubok?

 8          MR. CLUBOK:  Your Honor, —

 9          THE COURT:  Were you weighing in on —

10          MR. CLUBOK:  Yeah, I'm — I'm sorry.  It's not about

11   that proceeding, but are you about to move on beyond — beyond

12   the Highland matters?

13          THE COURT:  No, no, no.

14          MR. CLUBOK:  There was another Highland matter —

15          THE COURT:  I was next — I was next going to go to the

16   other adversary, the dispute between the committee and seven or

17   so defendants.  And, yes, I know we have UBS I guess all day

18   tomorrow unless anything has changed.  So we'll — we'll hear

19   before we're done any previews about tomorrow.

20          All right, so moving on —

21          MR. CLUBOK:  Thank you.

22          THE COURT:  — the Committee versus CLO Holdco,

23   20-3195.  We have a committee motion to basically stay the

24   adversary proceeding for 90 days.  So I will get lawyer

25   appearances on that.
```

Appx 03965

016527

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-20   Filed 06/26/25   Page 849 of 1052   PageID 17527
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 36 of 86

*Adversary 20-3195, Committee's Motion to Stay*                      36

```
 1              Who do we have appearing for the committee, the

 2    movant?

 3              MS. MONTGOMERY:  Yes, Your Honor.  Paige Montgomery

 4    for the committee.

 5              THE COURT:  All right.  And for the defendants, who do

 6    we have appearing?

 7              MR. PHILLIPS:  Good morning, Your Honor.  Louis M.

 8    Phillips on behalf of Highland Dallas Foundation and CLO Holdco

 9    Ltd., along with my associate Amelia Hurt.

10              THE COURT:  All right.  I saw your —

11              MR. DRAPER:  Good morning, Your —

12              THE COURT:  — pleading filed at 9:00 something last

13    night.

14              Any other defendant appearances?

15              MR. KANE:  Yes, Your Honor, —

16              MR. DRAPER:  Yes, Your Honor.  Douglas Draper on

17    behalf of the Dugaboy Investment Trust —

18              THE COURT:  All right.  Thank you.

19              MR. DRAPER:  — and Get Good.

20              THE COURT:  Oh, okay.  Thank you.

21              Other appearances?

22              MR. KANE:  Yes, Your Honor.  John Kane on behalf of

23    Grant James Scott, III.

24              THE COURT:  Okay.  Mr. Kane, your volume was very low.

25    You're — you're Mr. Scott's counsel as trustee for these trusts?
```

016528

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 32   Filed 06/26/25   Page 850 of 1052   PageID 17528
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 37 of 86

*Adversary 20-3195, Committee's Motion to Stay*                    37

1          MR. KANE:  In — in a sense, Your Honor, and in his

2    individual capacity.  I no longer represent CLO Holdco.

3          THE COURT:  Okay.  I don't know if you got that at

4    all, Michael.  It was so faint.

5          THE REPORTER:  Yeah, I got a little of it, but it —

6          THE COURT:  Okay. you're no longer representing CLO

7    Holdco, Ltd., but you're representing Grant Scott in his trustee

8    capacity for these two trusts?

9          MR. KANE:  Your Honor, Grant Scott is no longer the

10   acting director or trustee of CLO Holdco, but he was a named

11   defendant in this action based on his time as trustee or

12   director of CLO Holdco, and I represent him in that capacity.

13         THE COURT:  Okay.  Any other defendant appearances?

14         MR. ASSINK:  Good morning, Your Honor.  This is Bryan

15   Assink for Mr. Dondero.

16         THE COURT:  Okay.  Any other appearances?

17         All right.  Well, Ms. Montgomery, you may make your

18   argument.

19         MS. MONTGOMERY:  Thank you, Your Honor.  And thank you

20   for taking the time to consider our motion so quickly.

21         I'd like to just briefly address how we plan to

22   proceed today.  To make more time, we'd like to give a brief

23   opening statement.  I'm not sure who among the defendants

24   intends to be heard specifically today in opening, but at the

25   conclusion of that we would like to proceed to testimony.  We

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 32 Filed 09/25/25 87   Page 851 of 1052   PageID 17529
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 38 of 86

*Adversary 20-3195, Committee's Motion to Stay*                    38

 1  have Mr. Kirschner, who you can see on the screen, Your Honor,

 2  and he's here today.  We plan, for efficiency sake, to put him

 3  on by proffer to the extent that that is acceptable to the

 4  Court.  And then he will be available to answer any questions

 5  that the Court or the defendants may have.

 6          THE COURT:  All right.

 7          MS. MONTGOMERY:  As you can see in our motion, we're

 8  requesting a 90-day stay of the adversary proceeding.  And the

 9  purpose for that stay is to allow Mr. Kirschner and his firm,

10  Teneo, the time they need to get up to speed on this case.

11          Stepping back for a moment, it was always the

12  committee's intention have these claims prosecuted by the

13  ultimate litigation trustee.  However, due to a disagreement

14  about certain funds that are held in the Court's registry, the

15  clock started ticking on the committee's time to bring this

16  adversary proceeding.  So but for the order that the committee

17  commenced an adversary proceeding by a date certain, this action

18  would have been brought at a later time by a litigation trustee

19  post effective date as part of a comprehensive litigation

20  strategy related to all estate claims.

21          For a variety of reasons the effective date of the

22  plan has been repeatedly delayed, which has necessarily delayed

23  the formation of the litigation subtrust.  We're coming up on

24  two years since the filing of the bankruptcy proceeding and

25  there's limited time available for the trust to be formed and

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 31-21 32 Filed 04/25/25 87  Page 852 of 1052    PageID 17530
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 39 of 86

1  the trustee to develop a comprehensive litigation strategy.

2          As the Court may have noted, as we are wrapping things

3  up, two of our four committee members have also recently

4  retired/withdrawn from the committee.  So as a result last

5  Friday, the committee filed an application —

6          THE COURT:  Just inquiring minds want to know.  I mean

7  did they — did they by chance sell their claims or they just

8  were tired of the committee role?

9          MR. CLEMENTE:  Your Honor, if I may?  It's Matt

10  Clemente.  I'll just jump in on that, Your Honor, —

11          THE COURT:  Um-hum.

12          MR. CLEMENTE:  — very quickly.  I don't know how

13  anybody could be tired of being on the committee, but the answer

14  is, Your Honor, that they both sold their claims and

15  claim-transfer notices have been placed on the docket.  The

16  United States Trustee is aware and the trustee's position at

17  this point is to keep the committee at the two members, which

18  are Meta E and UBS, as we continue forward here through the case

19  and hopefully to an effective date in the near future.

20          THE COURT:  All right.  Thank you.

21          All right.  Ms. Montgomery, continue.

22          MS. MONTGOMERY:  Thank you, Your Honor.

23          So as a result, last Friday the committee filed an

24  application to retain Mr. Kirschner and his firm as litigation

25  advisor to the committee until the plan goes effective and the

Appx 03969
016531

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 25-20    Filed 04/25    Page 853 of 1052    PageID 17531
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 40 of 86

*Adversary 20-3195, Committee's Motion to Stay*                    40

1  litigation subtrust is formed.  At that point Mr. Kirschner will

2  become the litigation trustee under the plan and he'll be

3  responsible for all claims brought seeking recovery on behalf of

4  the estate.  So obviously under the terms of the plan, our

5  client, the committee, will cease to exist at that point and

6  responsibility for the adversary proceeding that we're currently

7  being heard in will pass to the litigation trustee.  And there

8  will be a new oversight committee, which has not been formed yet

9  either as of the effective date.

10         So because this adversary proceeding will transfer to

11  the litigation subtrust upon the effective date of the plan,

12  it's imperative that Mr. Kirschner be involved in the

13  prosecution of the adversary proceeding immediately and the

14  development of legal strategy for all of the estate claims as a

15  whole.  For a number of reasons, the 90-day stay of the

16  adversary proceeding will provide Mr. Kirschner with the

17  necessary time he needs to get up to speed.

18         Mr. Kirschner needs to familiarize himself with the

19  Byzantine structure of the debtor and the relationships among

20  the debtor and its thousands of related entities and insiders.

21  The corporate structure, as you have noted on several occasions,

22  is highly complicated.  And the ownership and beneficial

23  ownership of entities is confusing enough even before you

24  consider the variety of transfers of estate assets between and

25  among those entities — entities.  We've heard these

Appx 03979
016532

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 33-20   Filed 04/25/25   Page 854 of 1052   PageID 17532
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 41 of 86

*Adversary 20-3195, Committee's Motion to Stay*                41

1   relationships described as tentacles.  I tend to think of them

2   as a web, and the allegations of this adversary proceeding

3   represent only a small section of strands.

4        Mr. Kirschner also needs time to familiarize himself

5   with the pending motions to withdraw the reference and the

6   motions to dismiss, and to develop the strategy which could

7   significantly change the trajectory of the adversary proceeding

8   and future adversary proceedings.  Mr. Kirschner's decisions

9   regarding how to respond to these motions may change the course

10  of the litigation in ways that are material to the pending

11  motions.  For example, he could determine to amend the complaint

12  or he could bring additional claims that the committee does not

13  have standing to bring on its own.  For example, breach of

14  fiduciary duty.  Importantly, there could be arguments

15  surrounding the motion to withdraw the reference and have

16  impacts on the other actions that may be brought by Mr.

17  Kirschner in his role as litigation trustee.

18        The strategy surrounding plaintiff's response to the

19  motion to withdraw the reference may also depend on facts that

20  have not yet been developed.  Mr. Kirschner should be given at

21  least some time to develop that strategy.

22        It's also worth noting that the notice period on Mr.

23  Kirschner's retention application does not end until June 7th,

24  which is after the current hearing date for the motions to

25  withdraw the reference, which are set for June 3rd.  Given his

Appx. 02971
016533

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 32   Filed 04/25/25   Page 855 of 1052   PageID 17533
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 42 of 86

 1   proposed role as litigation advisor and his future role as

 2   litigation trustee, he will be responsible for this adversary

 3   proceeding, he should be involved in the strategy to oppose the

 4   motions to withdraw the reference.

 5          As you know, Your Honor, the Highland entities have an

 6   extremely complex structure involving obscure relationships and

 7   ownership structures.  Mr. Kirschner not only has to get up to

 8   speed with those facts, but he also needs to wrap his hands

 9   around the transfer of information obtained from both the debtor

10   and the committee over the course of these proceedings.  So this

11   adversary proceeding is just one part of the complexity that is

12   the estate claims, but it's an important part and he should have

13   time to ensure that he's proceeding in the most efficient way

14   and in the way that's best for the debtor's estate.

15          In addition to needing to get up to speed on the facts

16   giving rise to this case, Mr. Kirschner is also — will be

17   working on a comprehensive strategy for all estate claims.  As

18   pointed out in the response that was filed last night, since he

19   is familiar with the adversary proceeding, obviously, we filed

20   it, and we did so after tedious review of thousands of

21   documents, and it took us months to put together a picture of

22   the transactions that are underlying the complaint, and those

23   months were after we had been actively involved in these

24   proceedings for over a year, so it's a very complicated —

25   there's some pretty complicated stuff going on there.

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 32   Filed 04/26   Page 43 of 86   Page 856 of 1052   PageID 17534
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 43 of 86

*Adversary 20-3195, Committee's Motion to Stay*                    43

1          We also believe that we provide competent

2    representation, which is at least tangentially challenged in

3    that response, but we're the lawyers that represent the

4    committee.  We're not the party that's responsible for the

5    decisions of the underlying management of the litigation.

6    Obviously lawyers take direction from their clients and ours as

7    of the effective date will no longer exist, and Mr. Kirschner

8    will be the person who's responsible for making those decisions.

9          So to put it slightly differently, we may be driving

10   the car but we're not deciding, you know, where the car is

11   going.  That's the client's decision.

12         I am at least somewhat offended by opposing counsel's

13   implication that the motion to stay was brought in bad faith

14   because it smelled that there might be some litigation

15   advantage.  All I can do in response to that, Your Honor, is

16   assure the Court that the stay is not being sought for such a

17   purpose.  To the extent that there's any gamesmanship occurring

18   in these proceedings, it's not us that's engaging in it.

19         Mr. Kirschner is entitled to gain his own

20   understanding of the issues underlying this adversary and of the

21   litigation landscape as a whole, and to have an orderly

22   transition of responsibilities from the committee, the debtor,

23   and counsel for both before he's asked to make important

24   strategic decisions that could have long-lasting implications on

25   his work.

Appx. 02973
016535

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 32 Filed 04/25/25    Page 857 of 1052    PageID 17535
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 44 of 86

1    In short, Your Honor, there is no rush to have the

2    pending motions heard and no prejudice to defendants by a stay

3    of proceedings.  As they point out in their response, the Court

4    has delayed the hearing on the motion to dismiss until after

5    consideration on the motion to withdraw the reference.

6    Additionally, as they make clear in their response, discovery is

7    not underway at this point.  We still haven't effectuated

8    service as to all defendants.  We have some defendants that are

9    foreign entities and we're still working through the service of

10   process.  We're not entirely sure how much longer that's going

11   to take, but it has proven to be a lengthy process to date, and

12   we don't really have an estimated time for when that will be

13   done.  So, if anything, there is an ideal time for a pause on

14   proceedings that won't prejudice any party.

15       The only purported harm our opponents have identified

16   is the delay itself, and I have to admit, Your Honor, that this

17   is the first time I've ever heard a defendant argue that they're

18   prejudiced by litigation against them not proceeding.  In fact,

19   we reviewed the cases that are cited in the response that

20   purport to support a right of good — to a determination of

21   rights and liabilities without undue delay.  Unsurprisingly,

22   both involve instances of a defendant seeking to delay

23   prosecution of a plaintiff's case rather than the reverse, as we

24   see here.  And in those cases, the stays that were sought were

25   either indefinite or extremely long.  They were not a brief

Appx 02974
016536

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 32    Filed 04/25    Page 858 of 1052    PageID 17536
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 45 of 86

*Adversary 20-3195, Committee's Motion to Stay*                                     45

1    90-day extension of the sort recognize requested here.  There's

2    simply no prejudice to the defendant in the adversary by staying

3    the proceeding for 90 days.

4              On the other hand, the 90-day stay of the adversary

5    proceeding will provide Mr. Kirschner with the time that he

6    needs to develop an understanding of this adversary proceeding

7    and the litigation strategy as a whole.  And moving forward

8    without the stay may very well prejudice the future litigation

9    subtrust and harm the debtor's estate.

10             That's all I have for now, Your Honor.

11             THE COURT:  All right.  A couple of questions.  You

12   said there's been no service on certain defendants, and I know

13   that certain of these defendants are said to be Cayman Island

14   entities, these various Charitable — Charitable Daf (phonetic),

15   maybe CLO Holdco Ltd, Charitable Daf Fund, those three in

16   particular, right, right foreign entities?  Okay, so they have

17   gone —

18             MS. MONTGOMERY:  Yes, Your Honor.

19             THE COURT:  — they have not — those are the three, I

20   presume, that have not been served?

21             MS. MONTGOMERY:  CLO Holdco has been served, the

22   others have not.

23             THE COURT:  Okay, okay.  Thank you.  I'm sorry, I'm

24   getting a little mixed up.  So there's been money in the

25   registry of the Court and I remember that was why early on I

Appx 02975
016537

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 33-20   Filed 04/25   Page 859 of 1052   PageID 17537
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 46 of 86

*Adversary 20-3195, Committee's Motion to Stay*                                   46

1  sort of created a quick time table for you all getting this

2  filed.  How much money is still in the registry of the Court?  I

3  remember there were agreed orders that some of it could be paid

4  over, I think, to Mr. Rocatta (phonetic).  I can't remember who

5  — who all.  But is there still a substantial fund in the

6  registry of the Court without me going online and looking that

7  up?

8          MS. MONTGOMERY:  I'm going to have to look and get the

9  exact numbers as well, Your Honor, but it's the portion of the

10  moneys that were purportedly payable to CLO Holdco are still in

11  the Court's registry.

12          THE COURT:  Okay.  So it's just that defendant's

13  funds.  And am I also correct that now the debtor ultimately has

14  a majority interest in CLO Holdco, the debtor itself, because of

15  that Harbor Vest (phonetic) settlement?

16          MR. PHILLIPS:  No, Your Honor.

17          THE COURT:  Oh, that's not right?

18          MR. PHILLIPS:  I don't think so, no.

19          MR. KANE:  Your Honor, this is John Kane.  I can

20  actually provide some clarity on that.  The Harbor Vest

21  acquisition by the debtor's affiliate relates to HCLOF, Highland

22  CLO Funding, not CLO Holdco.  CLO Holdco is the 49-percent

23  interest owner in HCLOF.

24          THE COURT:  Okay.

25          MR. DEMO:  And this is Greg Demo, Your Honor, from the

Appx 02976
016538

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 31-20   Filed 04/25   Page 860 of 1052   PageID 17538
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 47 of 86

*Adversary 20-3195, Committee's Motion to Stay*                    47

1   debtor.  I can confirm what Mr. Kane just said.

2           THE COURT:  Okay, okay.  So CLO Holdco is just

3   strictly in that line of the Charitable Daf and as far as who

4   owns — who owns it —

5           MS. MONTGOMERY:  That is — that's my understanding,

6   Your Honor.

7           THE COURT:  Okay, okay, so I — once again I have

8   flipped the organizational structure.

9           All right.  And then my last question for you, Ms.

10  Montgomery, is the effective date of the plan has not occurred.

11  There's obviously an appeal now at the Fifth Circuit, a direct

12  appeal of the confirmation order.  Is there still a stay pending

13  appeal — a motion for a stay pending appeal pending out there

14  either at the District Court or Fifth Circuit, or have those

15  been ruled on one way or the other?

16          MS. MONTGOMERY:  Mr. Demo, could you — were you

17  popping on to answer that question?

18          MR. DEMO:  Yes, Ms. Montgomery.

19          This is Greg Demo, Your Honor, from Highland Capital

20  Management.  We still intend to try to go effective after the

21  hearing on the exit financing, which has been postponed until

22  June 25th.  That's counsel to NexPoint Advisors, and counsel to

23  Highland Capital Management Fund Advisors filed a motion last

24  night with the Fifth Circuit seeking a further stay of the — of

25  the effective date, pending the resolution of their appeal.  So

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-21   Filed 04/25/87   Page 861 of 1052   PageID 17539
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 48 of 86

*Adversary 20-3195, Committee's Motion to Stay*                    48

 1   we don't know how that's going to shake out, but the debtor does

 2   anticipate trying to go effective following June 25th.

 3            THE COURT:  All right.  So has there been a stay of

 4   the confirmation order?

 5            MR. DEMO:  We've agreed to a short administrative

 6   stay —

 7            THE COURT:  Okay.

 8            MR. DEMO:  — as all this stuff has been going on.  I

 9   believe the administrative stay — actually I can't remember when

10   it expires, but we have agreed to a short administrative stay.

11            THE COURT:  Okay.  And so it's —

12            MR. DRAPER:  Your Honor, this is Douglas Draper.

13            THE COURT:  Okay, go ahead.

14            MR. DRAPER:  Just to give the Court some background, —

15            THE COURT:  Go ahead.

16            MR. DRAPER:  — there were two — you denied the stay

17   pending appeal.  There were two appeals taken from your ruling.

18   One by myself on behalf of Dugaboy and one by Devor (phonetic)

19   on behalf of other entities.  They both went up to Judge Godbey.

20   He has never ruled on the stays pending appeal.  So what was

21   done is inasmuch as the motion — the appeal of the confirmation

22   order is up in the Fifth Circuit, last night Devor filed a

23   motion for a stay pending appeal in the Fifth Circuit, and

24   that's pending.  So that's the procedural background of what's

25   gone on.

Appx 03078

016340

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 32 Filed 06/25 87   Page 862 of 1052   PageID 17540
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 49 of 86

*Adversary 20-3195, Committee's Motion to Stay*                              49

1            THE COURT:  All right.  Thank you, Mr. Draper.

2            All right.  Well, I'll hear opening statements from

3       our defendants.  And I ask you please not to be duplicative of

4       each other.  So who wants to go first for the defendants?

5            MR. PHILLIPS:  Your Honor, Louis M. Phillips on behalf

6       of Highland Dallas Foundation and CLO Holdco Ltd.  We filed a

7       response in opposition to the motion to stay.  And we are the

8       ones who, my firm and I, and I'm the one that filed, that sent

9       messages across to counsel for the committee in response to the

10      request for consent or notice of opposition.  So I guess since

11      we filed the response we ought to go forward.

12           We have reviewed the — we laid out a time line in our

13      response.  We've laid out communications between counsel and our

14      response.  We laid out what we think the burden is.  And we've

15      laid out the case law that we think establishes the burden for a

16      stay.

17           What we are concerned about is the — first of all, the

18      90-day stay, it might even come around as far as further

19      activity in the lawsuit because we don't know what the Court

20      would do on June 3rd.  We know that the Local Rules require that

21      — or set forth that the Court will issue a report after the

22      conference on June 3rd about — to the District Court concerning

23      the motion to withdraw reference.  We filed a motion to withdraw

24      reference.  We filed a first response to the litigation, A, a

25      motion to withdraw reference; and, B, a motion to dismiss under

Appx 03070
016541

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 32 Filed 05/25 87   Page 863 of 1052    PageID 17541
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 50 of 86

*Adversary 20-3195, Committee's Motion to Stay*                    50

1    Rule 12(b)(6) and a motion for a more definite statement as

2    well.  Both our filings were followed by other defendants who

3    sought withdrawal of the reference and also dismissal.

4            This Court has pushed aside the motion to dismiss

5    pending resolution of the — of the motion to withdraw reference,

6    which we think is entirely appropriate and we're fine with, so

7    where we are, Your Honor, —

8            THE COURT:  And let me — let me just interject there.

9    That is always 100 percent of the time my practice, and I think

10   the other bankruptcy judges here.  It's out of deference to the

11   District Court.  If the District Court ends up withdrawing the

12   reference, they may want to say, 'I want to withdraw the whole

13   darn thing.  We don't even want you doing pretrial matters,' so

14   we don't want to get ahead of them by considering a pretrial

15   matter.  So I did what I do in every case and will take the next

16   steps —

17           MR. PHILLIPS:  And we agree a hundred percent with

18   that approach, Your Honor.  We didn't really know how we were

19   going to proceed on the motions to dismiss.  But we had

20   deadlines to filing and we got very brief extensions for one of

21   our clients to file a response to the complaint after service.

22   On the other client, we didn't get any extension to file a

23   response.  So we filed timely responses and we didn't know how

24   the Court was going to handle the motion to dismiss.  And the

25   way the Court just handled them is entirely what we — we agreed

Appx 03989
016342

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 32    Filed 05/26/25    Page 864 of 1052    PageID 17542
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 51 of 86

*Adversary 20-3195, Committee's Motion to Stay*                    51

1    that that was the way to do it, because the District Court has

2    several alternatives if it determines to withdraw the reference.

3    And we know the courts, we've looked at the Court's Local Rule.

4    We just don't know how long, and we have no control and we're

5    fine with having no control over how long the Court would —

6    would have to take, given its docket, to issue its report to the

7    District Court.  And we have no control over what the District

8    Court would do.

9            Our problem with the motion for a stay is that we know

10   that the only things really pending now are motions to withdraw

11   reference.  Those are subject to being brought before Your Honor

12   at either kind of a hearing/conference where the parties will

13   put forth their legal arguments and any evidence, but the

14   evidence will basically be the nature of a litigation and the

15   situation of the docket.  So there's no real factual issues in

16   dispute.  We have a lawsuit, we have a motion to withdraw

17   reference that's been briefed.  We grant an extension of the

18   response deadline to May 21st in connection with the request by

19   counsel.  And we purposely asked the Court for the June 3rd

20   date, all with agreement of all counsel.  And then two days we

21   get the emergency motion — or last night, yesterday we get the

22   emergency motion to stay when the litigation assistant was, in

23   fact, retained on the day or two after we filed our responses.

24   And there was no mention in any way, shape, or form of a need to

25   stay at that time.

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 32    Filed 05/26    Page 865 of 1052    PageID 17543
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 52 of 86

*Adversary 20-3195, Committee's Motion to Stay*                          52

1        So we have one thing pending:  Motions to withdraw the

2   reference.  We have reviewed and set forth in our response the

3   scope of services for which Teneo was being retained.  It does

4   look to us like it is — it looks like litigation support and

5   litigation analysis.

6        And I hear what counsel for the plaintiff is saying,

7   but there have been — she's — we agree that there has been

8   months and months and months of analysis, there have been

9   millions and millions and millions of dollars spent on U.S. —

10  UCC counsel fees.  They have gone through thousands and

11  thousands of documents.  They came up with this piece of

12  litigation.  This is the one I know about.  This is the one

13  pending before the Court.  And there might be — there is a

14  suggestion that there is an overarching litigation strategy

15  being employed, but this is what we have right here.  And that's

16  speculation that we have no idea about and we assume the Court

17  has no idea about.

18        So we have one thing that we want decided and it's

19  easy for a plaintiff to say — and, look, we're chastised for

20  being defendants who want to move the lawsuit.  One of our

21  clients didn't even ask for an extension of the deadline to

22  respond.  We have — we asked for one extension for one of

23  clients.  And that extension dovetailed into the response date

24  for the other client so that we could file a single response for

25  both clients.  That was granted.  We appreciate that.  And when

Appx 03082

016344

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 32   Filed 05/26   Page 866 of 1052   PageID 17544
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 53 of 86

1   the committee asked for an additional time, we granted it with

2   the proviso that we get the June 3rd date so that if we need to

3   file a reply, we'd have three or four days to file the reply.

4        We have been — we have not been the ones asking for

5   any delay and we're not going to ask for any delay.  And so I

6   don't care what other cases say, I don't care what the

7   plaintiff's lawyer says about defendants always want to delay.

8   We're not asking for any kind of delay.  We want to move

9   forward.  And we think we have the right to figure out and find

10  out what court is going to be handling our litigation.  That's

11  what we're asking for.

12       We've already said in the communications that we've

13  listed on our witness and exhibit list that we'll be more than

14  happy to talk about some type of stay about motions — you know,

15  discovery, whatever, whatever, if there — if the litigation

16  advisor needs to get up to speed on what documents are out

17  there, what documents it would have to review, that's fine.

18  We're probably going to do some discovery.  But we're only going

19  to discovery if our motion to dismiss under 12(b) are not

20  granted, because if they are there doesn't need to be any

21  litigation advice or any analysis about alternatives or

22  objectives or overarching strategy to deal with the motion to

23  dismiss under Rule 12(b).  That's a legal issue.  And the

24  counsel is very adept — we say counsel's adept.  We know they're

25  adept.  That's why we know that they are ready to proceed in

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-20   Exhibit 32   Filed 05/25/26   Page 867 of 1052   PageID 17545
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 54 of 86

*Adversary 20-3195, Committee's Motion to Stay*                               54

1    response to our motion to withdraw reference.

2         And then if the District Court takes it after Your

3    Honor gives her report, then we'll bring the motions, we'll get

4    with the lawyers for the plaintiff and we'll make — bring our

5    motion to dismiss before the District Court on some kind of

6    agreed schedule, but those are legal issues.  There is no advice

7    needed for a motion to withdraw reference.  There's no advice

8    needed for a motion to dismiss under 12(b).  Those are legal

9    questions and — and the idea that Sidley and Austin needs

10   assistance from an advisor as to how to approach a legal issue,

11   we don't think is meritorious.

12        So, Your Honor, we have put — we have a witness and

13   exhibit list of six documents.  One is — Document 1 is the

14   application to employ the Teneo firm.  2 is the — 2, 3, 4, 5,

15   and 6 are email communications we have provided them.  They are

16   between counsel that are before the Court here today, just to

17   show that we granted extension for them to respond, then they

18   ask, and we responded, and so that they were on notice that we

19   opposed the requested stay.  And we would like for the motion to

20   withdraw reference to go forward.

21        The parties will have plenty of time to work out

22   discovery, Rule 26 issues, motion for relief — motion to dismiss

23   under 12(b) in front of whichever court is going to handle it.

24   Certainly this Court is — if the motion to withdraw reference is

25   denied, this Court will be in full control of when we have

Appx. 03084

016346

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 31-20   Exhibit 32   Filed 06/25   Page 868 of 1052   PageID 17546
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 55 of 86

1    hearings on the motion to dismiss.  And we understand that.  So

2    will the District Court if the District Court grants the motion

3    to withdraw the reference.  The District Court will determine

4    hearings on the motion to dismiss under Rule 12(b).  And then we

5    have those two things to get past.  And those are legal

6    questions, legal questions that are already before the Court or

7    already there.  So we don't see how additional time is necessary

8    with respect to that.

9         We think by the time the stay — quote stay expires

10   we'll have a determination at least on the withdrawal motions.

11   And we can probably have a setting on the dismissal motions.

12   And if there — if the plaintiffs survive dismissal, then we'll

13   have discovery that all litigants will be involved in and

14   agreeing to and with scheduling orders, et cetera, from whatever

15   court is going to try this case.

16        And I'd like to say also that once we have — CLO

17   Holdco has been involved in the bankruptcy case.  We recognize

18   that.  I was not the lawyer for CLO Holdco, but I'm representing

19   CLO Holdco now.  The Highland Dallas Foundation has not been.

20   And the Highland Dallas Foundation is a charitable organization

21   that has institutional people on the board, has one donor seat

22   on the board, but it's — it's being sued for twenty something

23   million dollars.  And the idea that it has no interest in

24   getting this resolved is not correct.  It wants to get it

25   resolved and that's why we're opposing this stay.  Thank you,

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 31-21    Filed 05/26/25    Page 869 of 1052    PageID 17547
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 56 of 86

*Adversary 20-3195, Committee's Motion to Stay*      56

1    Your Honor.

2         THE COURT:  All right.  A couple of follow-up

3    questions.  I'm struggling a bit with the fact that we have a

4    couple of defendants, two or three defendants that have not even

5    been served yet.  So is it appropriate for this Court to be

6    going forward on a motion to withdraw the reference when I don't

7    know what's going to happen with those two defendants.  Are they

8    going to be served?  If so, what sort of position are they going

9    to have with regard to the reference being withdrawn?

10        And, in any event, ultimately I'm going to have to

11   slice and dice this in a report to the District Court saying,

12   you know, these entities filed proofs of claim and that may

13   affect the authority of the Court, you know, maybe it does.  I

14   mean a part of me thinks what's going on here and should we just

15   wait till they have been served so we have the ability to report

16   to the District Court:  Here is every defendants' position on

17   this.

18        MR. PHILLIPS:  Your Honor, I can't answer the

19   question.  I don't — I mean it seems to me like we have — we

20   have — CLO Holdco was served.  And it is a foreign entity.  We

21   don't know why the other two have not been served.  I'm not — we

22   just don't know.  So I mean does that mean if we — I mean we had

23   to go forward, we had to answer, we had to respond.  We had a

24   deadline to do it.  It didn't matter that two hadn't been

25   served.  And so we — you know, if we hadn't responded, given our

Appx 03986
016548

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-21   Filed 06/26   Page 870 of 1052   PageID 17548
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 57 of 86

*Adversary 20-3195, Committee's Motion to Stay*                                57

1    service, we would have had a default entered against us and a

2    request for a default judgment.  So I don't know the answer to

3    the question because I can't imagine that a plaintiff can file a

4    lawsuit and then the lawsuit was filed months ago and not serve

5    two people and keep the defendants hung up.

6              I don't know if there is a problem of service.  There

7    was one entity that got served that is a foreign entity.  I

8    don't know why the other ones haven't been served.  The Highland

9    Dallas Foundation was served.  The other parties who have

10   appeared were served.  So we have no control over that because

11   we're not serving anybody.  And I would think that the part — I

12   did some looking in the — in the record and it seems to me like

13   we don't have — you know, I can't tell you whether we have —

14   what the arguments would be for the parties who have not been

15   served.

16             I would assume given that everybody has — my two

17   clients have filed what they filed.  CLO Holdco filed a proof of

18   claim, but it was in effect disallowed and converted to a claim

19   for zero.  My other client, Highland Dallas Foundation, has not

20   made any appearance in this case.  So all I can say is we think

21   two — I think the two clients that I'm currently representing,

22   we know they have been served.  We had a deadline to respond.

23   We have responded.  And we think we're entitled to a jury trial

24   and withdrawal of the reference.

25             MS. MONTGOMERY:  Your Honor, if I can answer the

Appx 03987
016349

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 32 Filed 05/26/25   Page 871 of 1052   PageID 17549
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 58 of 86

*Adversary 20-3195, Committee's Motion to Stay*                58

 1   question.  CLO Holdco was served through its counsel, whereas

 2   the other two foreign entities require domestication of the

 3   subpoena in the Caymans.  And it's our understanding that may

 4   take as long as — just having heard — as another two months for

 5   that process to be complete.

 6            THE COURT:  All right.  My other question I guess is

 7   maybe more rhetorical than something you could really answer.  I

 8   — you know — on the one hand, you know, what Ms. Montgomery is

 9   arguing:  Our true plaintiff contemplated for this lawsuit isn't

10   in place yet because the plan hadn't gone effective and, you

11   know, some — some of the defendants here or affiliates of

12   defendants are wanting to delay, delay, delay further when the

13   plan can go effective.  You know last night a motion for stay

14   pending appeal with the Fifth Circuit was filed.  So it's like,

15   no, don't let the plan go forward, let's not get Mr. Kirschner

16   in place.  But, oh, don't issue a stay on this lawsuit.  It just

17   feels a little bit inconsistent, the two positions.  What — do

18   you have anything to say to that?

19            MR. PHILLIPS:  I have — all I have to say, all I can

20   say, Your Honor, and that is CLO Holdco, as I understand it, is

21   not an appealing party.  My other client that's been served,

22   Highland Dallas Foundation, is not an appealing party.  We're a

23   defendant in — in this lawsuit.  And so we don't see — we're not

24   in a position to be inconsistent about anything.  We're not an

25   appellant.  We're not seeking any kind of relief on appeal.  And

Appx 03988
016550

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 32 Filed 06/25 87 Page 872 of 1052    PageID 17550
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 59 of 86

1    we — but we are defendants who have been served and who have

2    filed motions to withdraw reference.  So you will have to ask

3    other people about that.  I'm completely consistent in my

4    position.

5            MR. DRAPER:  Your Honor, this is Douglas Draper on

6    behalf of Dugaboy, who has both —

7            THE COURT:  All right.

8            MR. DRAPER:  — appealed your decision —

9            THE COURT:  Okay.

10           MR. DRAPER:  — and has asked for a stay pending

11   appeal.

12           THE COURT:  Okay.

13           MR. DRAPER:  It's not an inconsistent position because

14   two reasons.  Number one, you gave the committee authority to

15   file this suit.  The committee took that authority and filed the

16   suit within the time period.  So whether the case is going

17   forward or — the stay — the case is stayed and the confirmation

18   order is stayed or not, this action and this entity and this

19   proceeding is going to go forward.

20           And so all we're talking about here, just so we — it's

21   all clear, we're just talking about who is going to try this

22   suit.  We're not talking about a master litigation strategy.

23   We're talking about a location.  And, quite frankly, it would

24   surprise the hell out of me if — if the new person, or whoever,

25   says, look, I want to go to the District Court.

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 32  Filed 06/26  Page 873 of 1052    PageID 17551
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 60 of 86

1          This is just a location issue, nothing more.  You can

2     sift through each one of these defendants who have been served

3     as to whether we have a right to a jury trial or not.  And each

4     one, as the Court recognized, is on a — on a defendant-by-

5     defendant basis.  I did file a proof of claim.  Whether I have a

6     right to a jury trial, you're going to have to look at to see if

7     in fact my proof of claim relates to this claim.

8          Mr. — Mr. Phillips is a defendant set of facts.  And

9     these other defendants may be a different set of facts.  So all

10    we're talking about is location.  It is purely procedural.  And

11    I don't think the stay at the district — of the confirmation

12    order or not is — is in any way impacts this whatsoever.  This

13    is a location question.

14         THE COURT:  All right.  Any other opening statements

15    from defendants?

16         All right.  Ms. Montgomery, you may put on your

17    witness.  And I'm fine with the proffer, but we'll then swear

18    him in and see if there cross-examination from the others.  All

19    right, you may proceed.

20         MS. MONTGOMERY:  Yes, Your Honor.  At this point we'd

21    like to proffer Mr. Kirschner's declaration that was submitted

22    in support of our motion for the stay as the content of his

23    proposed testimony.  Mr. Kirschner is obviously here to answer

24    any questions you have or on cross-examination after he's been

25    sworn in.  And, Your Honor, we would just reserve our right to a

Appx 03990
016552

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 32   Filed 06/26/25   Page 874 of 1052   PageID 17552
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 61 of 86

*Adversary 20-3195, Committee's Motion to Stay*     61

1   brief redirect should that prove necessary.

2        THE COURT:  All right.  So I have in front of me the

3   Declaration of Marc S. Kirschner.  It was actually attached to

4   the committee's motion for stay.  It's about four pages long.

5        Let me ask:  Are there lawyers who are going to want

6   to cross-examine Mr. Kirschner?

7        Going once, going twice, no one wishes to

8   cross-examine him?

9        THE REPORTER:  He's on mute.

10        THE COURT:  Oh, Mr. Phillips, —

11        MR. PHILLIPS:  Your Honor, I'm sorry.  I was on mute.

12   I'm on mute, as I probably already muted, but I was on mute and

13   I apologize.

14        Your Honor, this — this is — this declaration, there's

15   no way to cross-examine a declaration that speaks in conclusory

16   language.  The declaration, it was mimicked and mirrors —

17   mirrors exactly as the party looking into the mirror, not as the

18   reverse of the party looking into the mirror, argument by —

19   opening statement by counsel.  I would ask a couple of questions

20   of Mr. Kirschner, please.

21        THE COURT:  All right.  Mr. Kirschner, I need to swear

22   you in.  Would you speak up, say, "testing one, two."

23        MR. KIRSCHNER:  Yes.  Testing one, two.

24        THE COURT:  All right.

25        MR. KIRSCHNER:  Coming through?

Appx. 03991
016553

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 33-20 Filed 06/26 87   Page 875 of 1052   PageID 17553
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 62 of 86

Kirschner - Cross/Phillips                                    62

1          THE COURT:  I — I hear you, I don't see —

2          MR. KIRSCHNER:  Okay.

3          THE COURT:  There you are.  Please raise your right

4    hand.

5          MR. KIRSCHNER:  I can.

6      MARC S. KIRSCHNER, COMMITTEE'S WITNESS, SWORN/AFFIRMED

7          THE WITNESS:  I do.

8          THE COURT:  All right.  Thank you.

9          Mr. Phillips, go ahead.

10         MR. PHILLIPS:  Yes, Your Honor.  Thank you.  Just a

11   couple of questions.

12                      CROSS-EXAMINATION

13   BY MR. PHILLIPS:

14   Q.  Mr. Kirschner, in paragraph 7 of your declaration, if you

15   could find it.  Just let me know when you're there.

16   A.  I'm there.  Thank you.

17   Q.  Okay.  Thanks.  You say that it's important for your firm to

18   gain an understanding of the complex transactions described in

19   the adversary proceeding, particularly in connection with the

20   motion to dismiss and motions to withdraw reference and complex

21   issues before the Court.  What does that mean?

22   A.  That means that, as Ms. Paige indicated in her opening

23   statement and as the Court and all the defendants understand, I

24   was — when I was designated as litigation trustee in January,

25   there has been delay after delay after delay in the effective

Appx 03992
016554

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 33-20    Filed 04/25    Page 876 of 1052    PageID 17554
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 63 of 86

*Kirschner - Cross/Phillips*                                            63

1    date of the plan, and now we're even at the Fifth Circuit, so

2    the trust and my role as subtrustee has not yet gone into

3    effect.  Prior to April 15th, I had no access to the debtor, to

4    the committee, or any of the attorneys, no access through any

5    protected information.  I had no input on the complaint.

6         I became worried as the passage of time went on about

7    the possible running of statute of limitations later on this

8    year in October.  And it was I who suggested to Mr. Clemente to

9    come up with what is an extremely unusual procedure, to permit

10   the committee retain me on an interim basis until the

11   effectiveness of the trust, and then to flip my work effectively

12   into the trust.

13        This is very unusual.  It's not even yet approved by

14   the Court.  Nevertheless, I and my firm have worked very

15   diligently since April 15th to get up to speed on this entire

16   complex factual and legal situation.  I cannot just look at the

17   Holdco adversary in a vacuum.

18        There has been as the Court and all the parties here

19   know much better than I, there has been ongoing litigation on

20   many fronts for quite a long time.  There has been supplied a

21   Byzantine web of some 1400 entities —

22        MR. PHILLIPS:  Your Honor, Your Honor, —

23        THE WITNESS:  — to accomplish —

24        MR. PHILLIPS:  Your Honor, could I interrupt?  He

25   needs to answer the question.

Appx 03993
016555

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 13-20    Exhibit 32    Filed 05/25    Page 877 of 1052    Page 877 of 1052    PageID 17555
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 64 of 86

*Kirschner - Cross/Phillips*                                          64

1   BY MR. PHILLIPS:

2   Q.  What does — what does — what does the understanding about

3   the motion to withdraw reference mean?  What do you need to get

4   up to date on the motion to withdraw reference?

5   A.  I'm responding to your question.

6           THE WITNESS:  If I may, Your Honor, I'm responding to

7   the question.  I'm almost done —

8           MR. PHILLIPS:  Your Honor, a narrative, a preexisting

9   narrative —

10          THE COURT:  Ah, —

11          MR. PHILLIPS:  We just — I just want to know.  We have

12  legal issues.

13          THE COURT:  Okay, I sustain the objection —

14          MR. PHILLIPS:  I want to know what he —

15          THE COURT:  If you could reask the question and we'll

16  see if we can get an answer —

17          MR. PHILLIPS:  All right.  I'll reask the question,

18  Your Honor.  I'm sorry.  I apologize.

19          Your Honor, I'm going to withdraw any questions.  I'm

20  — this is — this is going to turn into just an argument.  His

21  declaration and conclusory and it's just going to be more

22  conclusion.  So I'm — I'm willing to argue from his declaration

23  in closing.

24          THE COURT:  All right.  Any other questions?

25          No other —

Appx 03994

016556

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 32   Filed 06/25   Page 878 of 1052   PageID 17556
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 65 of 86

*Kirschner - Redirect/Montgomery*                                    65

1          MR. DRAPER:  None, Your Honor, from Dugaboy.

2          THE COURT:  Okay.  Anyone else?

3          Ms. Montgomery, do you have any redirect on that brief

4    cross?

5                    REDIRECT EXAMINATION

6          MS. MONTGOMERY:  Yes.  I think, Your Honor, I would

7    just ask if there is anything else that Mr. Kirschner feels the

8    Court should be aware of before reaching a decision on today's —

9    on today's motion?

10         MR. PHILLIPS:  Your Honor, we object to that question.

11   That's not even a question.

12         THE COURT:  I overrule.  He can answer.

13         THE WITNESS:  Okay.  Thank you very much, Your Honor.

14         As I was saying, there is a Byzantine web here of over

15   1400 entities, many moving intertwined parts.  I have literally

16   and my firm has literally had to triage the monumental amount of

17   work that is necessary to get my hands on this overall

18   situation.  There's allegations that money's been flying all

19   over the world —

20         MR. PHILLIPS:  Your Honor, this is not — this is not

21   appropriate testimony.  This is — that's hearsay.  There's

22   allegations all — money flowing all over the world.  This is —

23   this is a narrative that has nothing to do with the pending

24   motion to withdraw reference and is, in essence, an

25   assassination piece.  This is — what we —

Case 19-34054-sgj11 Doc 3596-32 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 32 Filed 06/26/87 Page 879 of 1052 PageID 17557
Case 21-03003-sgj Doc 50 Filed 05/25/21 Entered 05/25/21 12:59:11 Page 66 of 86

*Kirschner - Redirect/Montgomery*        66

1       THE COURT: I overrule. He's trying to explain why he

2   needs 90 days at bottom here, so I think it's relevant.

3       MR. PHILLIPS: Well, the long —

4       THE COURT: And I understand everything's an

5   allegation subject to evidence.

6       MR. PHILLIPS: Well, we're talking about

7   allegations, —

8       MR. [SPEAKER]: Right.

9       MR. PHILLIPS: — we're talking about — we just heard

10   they're allegations about money flying all over the world.

11   That's not an acceptable testimony. You know that and everybody

12   on this call knows that. That's absolute abject hearsay and the

13   idea that you could — you could buttress a motion for stay after

14   you've had 30 days to review a legal analysis about a motion to

15   withdraw reference, because there are allegations of money

16   flowing all over the world is ridiculous. Your Honor, we — we

17   firmly and in this way object —

18       THE COURT: Overruled. I understand you don't like

19   the emotional, if you want to call it, emotional language. You

20   think it's hyperbole, you think it's hearsay, but he didn't — he

21   didn't offer an out-of-court statement. He's just saying the

22   allegations — you know, they're in pleadings, they're

23   allegations in many different adversaries, and so I overrule the

24   objection.

25       You can complete your answer, Mr. Kirschner.

Appx 03996
016558

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 31-20   Exhibit 32   Filed 06/26/25   Page 880 of 1052   PageID 17558
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 67 of 86

*Kirschner - Redirect/Montgomery*                                    67

1          THE WITNESS:  Thank you very much, Your Honor.

2          All of these complexities in my view potentially

3    impact on the motions to withdraw.  I recently realized that I

4    cannot properly perform my fiduciary duty to all creditors by

5    the deadline for a response to the motion to withdraw and the

6    motions to dismiss.  I am in fact considering potential

7    amendments to the existing Holdco adversary to possibly other

8    issues that may impact the withdrawal motion.

9          Your Honor said this morning that it's important to

10   take into consideration both procedural and substantive matters.

11   I am worried about potential impacts of whatever I do.  And bear

12   in mind, as Ms. Paige indicated, I am — (brief garbled audio) —

13   no process plan.  All of this was supposed to have been put in

14   the litigation trust under my auspices.  I am now litigation

15   advisor, not yet approved by the Court.  It is the client, I,

16   who direct, after consultation, all strategy by lawyers.

17         I have a long history, as Your Honor has seen from my

18   C.V., of directing complex billions of dollars of litigations.

19   I rely on lawyers, but I am very involved in every aspect of the

20   case.  This is very confusing, not just the CLO Holdco itself

21   but the entire complexity of all of the potential matters here

22   that I need to study in a very short period of time.  I'm

23   concerned that dealing just with this in this couple of days is

24   going to be harmful to creditors ultimately and respectfully

25   request the Court to grant the 90-days adjournment.

Appx 03987
016559

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 32 Filed 06/26 87 Page 881 of 1052    PageID 17559
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 68 of 86

*Committee's Motion for Continuance*                                        68

1            Maybe I'm being overly cautious and I apologize for

2    that, but I feel strongly about my fiduciary duty and want to do

3    the best I can to understand everything that's going on before

4    we have to respond both to the withdrawal motion and the motion

5    to dismiss.  So thank you, Your Honor.

6            THE COURT:  Thank you.

7            Anything else, Ms. Montgomery, as far as examination?

8            MS. MONTGOMERY:  No, Your Honor.  I have no further

9    questions.

10           THE COURT:  All right.  Mr. Phillips, or anyone else,

11   any recross on that redirect?

12           No?  All right.  Thank you.

13           All right.  This —

14           MR. PHILLIPS:  No, Your Honor.  I muted myself again.

15   No, Your Honor.

16           THE COURT:  Okay.  Is that all of the evidence you're

17   going to present, Ms. Montgomery?

18           MS. MONTGOMERY:  It is, Your Honor.

19           THE COURT:  All right.  Well, I'll turn to our

20   objectors —

21           MR. PHILLIPS:  We —

22           THE COURT:  I'm sorry?

23           MR. PHILLIPS:  We'd like the enter and offer — we'd

24   like to offer and introduce our exhibits that we put on our

25   witness and exhibit list, Your Honor.

Appx 02998
016360

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 32 Filed 06/06/25   Page 882 of 1052   PageID 17560
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 69 of 86

*Committee's Motion for Continuance*                                      69

1          THE COURT:  Okay.

2          MR. PHILLIPS:  And we've submitted them to the Court,

3     Exhibit 1 through 6, as itemized in our witness and exhibit

4     list.

5          THE COURT:  All right.  This is Docket Number 52 in

6     the adversary, correct?

7          MR. PHILLIPS:  Yes.  Yes, ma'am.

8          THE COURT:  All right.  So let me pull it up here.

9     Okay, we've got the application to employ Teneo and different

10    emails.

11         Any objection, Ms. Montgomery, to this?

12         MS. MONTGOMERY:  I have no objection to Exhibit 1,

13    Your Honor, the application, and obviously it's a pleading that

14    we filed.  I have questions about the relevance of the other

15    exhibits, but I have no objection to their admission.  They're

16    emails that went back and forth between the parties.

17         THE COURT:  All right.  Well, do you want to address

18    that relevance?  I'm not sure if it was an objection or — was it

19    an objection ultimately?  Was it —

20         MR. PHILLIPS:  I didn't hear an objection, Your Honor.

21         THE COURT:  Ms. Montgomery.

22         MS. MONTGOMERY:  Your Honor, for purposes of today's

23    hearing, I have — I have no concerns about their admission for

24    your consideration.

25         THE COURT:  Oh, okay, so —

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 13-21    Filed 06/06/25    Page 883 of 1052    PageID 17561
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 70 of 86

*Committee's Motion for Continuance*                                    70

1      MS. MONTGOMERY:  We're not contesting the history of

2  the back-and-forth between the parties.

3      THE COURT:  Okay.  I will admit 1 through 6.

4      (Defendants' Exhibits 1 through 6 received in evidence.)

5      THE COURT:  All right.  Any — any other evidence from

6  our defendants?

7      MR. PHILLIPS:  No, Your Honor.

8      THE COURT:  All right.  Well, anything in the way of

9  closing argument?  Ms. Montgomery, you are the movant.  You go

10 first.

11     MS. MONTGOMERY:  Yes, Your Honor, just very briefly to

12 address a couple of points.  First of all, I think that there's

13 been some sort of misconstruing of Mr. Kirschner's role as the

14 litigation advisor and ultimately the litigation trustee.  He —

15 functionally, the litigation advisor — we're in a very unique

16 situation here.

17     The parties never expected that the effective date

18 would be delayed in the way that it has been.  We're coming up

19 on the two-year anniversary of the filing of the proceedings.

20 There are a number of claims that need to be investigated and

21 decisions make about how they will be pursued in the next couple

22 of months.  And so this litigation advisor role, as Mr.

23 Kirschner testified, is somewhere unique in that we're trying to

24 work around the constraints that have been created by the way

25 that these proceedings have moved forward.

016562

Appx 04000

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 33-21   Exhibit 32   Filed 06/26   Page 884 of 1052   PageID 17562
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 71 of 86

*Committee's Motion for Continuance*                    71

```
 1          The litigation advisor is really functionally a proxy

 2    for the role that Mr. Kirschner will have upon the effective

 3    date of the plan as litigation trustee.  He's not acting in the

 4    capacity of a law firm or like and FTI or a DSI, or any of the

 5    other professionals that have been specifically retained in the

 6    bankruptcy to date because the role isn't the same traditional

 7    role.  Right, he is functioning in a way that will allow him

 8    access that he needs to the data to get up to speed to make the

 9    decisions that have to be made so that he can, you know, proceed

10    in the way that is best for meeting his fiduciary duties to the

11    ultimate litigation subtrust.

12          So to the extent that there is any sort of argument

13    that, you know, he — that his role is duplicative or any of the

14    other things that we've heard today or that we've seen in the

15    response, I think that those are just a misunderstanding of what

16    he will actually be doing.  He is going to be the client, Your

17    Honor.  He is not going to be the lawyer.

18          The other thing I think that we talked about a bit is,

19    you know, this argument that Mr. Kirschner has been involved in

20    the case since April 15th and therefore he's had plenty of time

21    to understand everything that he needs to know to be able to

22    move forward.  Technically, Your Honor, I think it goes without

23    saying he's not officially retained until after the return date

24    on the motion to withdraw.  And even so, just based on the years

25    now that we've spent in this case, I can — I can argue to you
```

Appx. 04901
016363

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-20   Filed 03/26   Page 885 of 1052   PageID 17563
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 72 of 86

*Committee's Motion for Continuance*                72

1  and I think Your Honor will feel the same way, there's too much

2  learn in that short a time period to be able to say that you are

3  proceeding in the way that is going to be best for the estate in

4  that short timeframe.

5           We're working to get Mr. Kirschner up to speed, the

6  debtor is working to get Mr. Kirschner up to speed, but there is

7  a lot that has happened here and that continues to change on a

8  daily basis, including the stay that was filed just last night.

9           And then, finally, Your Honor, I would argue that

10  there has been no harm established by virtue of the stay.  And,

11  in fact, all of the things we've heard today established the

12  fact that there may be harm if the stay is denied.  So, for

13  example, Your Honor you know very correctly pointed out that we

14  have two international defendants who haven't even appeared at

15  this proceeding yet, right.  We may not effectuate service for

16  another two months.  It may be another 60 of these 90 days that

17  we're requesting for a stay may be required just to get them

18  properly served and into this proceeding.

19           And, you know, I agree, Your Honor, that there may be

20  issues that surround those two defendants that, you know, we

21  won't be able to take into consideration until they're properly

22  here in the Court and able to file their own motion to withdraw,

23  if that's what they want, or state their position with regard to

24  it.

25           You know, Your Honor, moreover, there is a lot going

Appx 04902

016564

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 33-21 Exhibit 32 Filed 07/02/25   Page 886 of 1052   PageID 17564
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 73 of 86

*Committee's Motion for Continuance*                73

1   on here and Mr. Kirschner does realistically need time to be

2   able to develop his approach and make decisions about whether or

3   not there will be amendments to the complaint that could impact

4   the motion to withdraw.  He needs to make decisions about other

5   claims that may be brought.  There are a lot of moving parts.

6   It's a unique situation.  And we would urge the Court to allow

7   him the time that he needs to be able to effectuate his duties

8   in the way that he sees fit.

9          THE COURT:  And I know I have it right in front of me,

10  but the employment application for Mr. Kirschner and his firm to

11  potentially be litigation advisor until the plan goes effective,

12  when is that set for hearing?

13         MS. MONTGOMERY:  It's set for June 7th, Your Honor,

14  and the motion to withdraw is currently set for June 3rd.  And

15  that — that motion to retain Mr. Kirschner was only filed on

16  Friday of last week, and our motions that you're hearing today

17  were filed on Tuesday.

18         THE COURT:  Okay.

19         MS. MONTGOMERY:  So it's a very short delay of time

20  between the two.

21         THE COURT:  All right.  I'll hear other closing

22  arguments.

23         MR. PHILLIPS:  Your Honor, thank you.  As far as harm,

24  we have one — we have one client, Highland Dallas Foundation,

25  who has made no appearance in this case, as has very — and

016565

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-20   Filed 05/25   Page 887 of 1052   PageID 17565
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 74 of 86

1   assume they're being sued for $24 million, and that's not a

2   problem.

3           Under the argument structure we're hearing today, we

4   could never really get until a plaintiff has said, 'I have no

5   further ability to amend the complaint,' a hearing on a motion

6   to withdraw reference.  Look, we didn't file the complaint.  The

7   complaint was filed four or five months ago.  And very able

8   counsel looked, and as counsel has argued, has looked at

9   thousands and thousands of documents, have been paid millions

10  and millions of dollars for its work, and it came up with this

11  lawsuit that was filed — I've forgotten the filing date, but it

12  was filed at least four and a half months ago, January of this

13  year I believe.  Ms. Montgomery — counsel for plaintiff can say

14  the exact date.

15          But we've got two defendants who haven't been served,

16  but I've got one — I've got two that have been served.  And we

17  have established a basis upon which we can get — we have a right

18  to a jury trial and a right to withdrawal of the reference.  And

19  that motion has been filed.  And the idea that I'm going to

20  bring — I'm going to change clients — and it's really

21  complicated.  After we've done millions and millions and

22  millions of dollars worth of work, looked at thousands and

23  thousands and thousands of documents, that we may come in and do

24  a different lawsuit that pleads around a motion to withdraw

25  reference is no basis for a stay.

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-20   Filed 07/25   Page 888 of 1052   PageID 17566
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 75 of 86

*Committee's Motion for Continuance*                                    75

1          That — that — the narrative about, you know, the

2    hearsay, the narrative about the aspersions, the this and the

3    that, this is really complicated, this is really hard, well, we

4    have a lawsuit in front of you, Your Honor, and it's been

5    pending for months.  And it was filed by the committee that had

6    authority to file it and it was filed by the law firm for the

7    committee that had authority to represent the client who filed

8    it.  And that's what they came up with after months and months

9    and months of years of looking at stuff and looking at documents

10   and deciding what to bring as far as claims of this nature

11   against these defendants.  I'm worried about two of them.

12          I'm worried about — particularly worried with respect

13   to the stay, I'm worried about both of them for — with respect

14   to the stay, but one of my clients, Highland Dallas Foundation,

15   has had no involvement in this bankruptcy case.  And now let's

16   just wait around.  It's got a $24 million cloud hanging over its

17   head and it's expected to continue to try to raise money and try

18   to act as a charity while — while Mr. Kirschner gets familiar —

19   refamiliarized and gets familiar with the situation where

20   counsel and the committee have been working for, what, a year

21   and a half, two years, to get ready, and here's what the lawsuit

22   — here's the lawsuit they came up with.

23          So no harm has been alleged.  In fact, harm will be —

24   all you heard about the potential harm to the estate is that

25   notwithstanding millions and tens of millions of dollars of fees

Appx 04005
016567

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 53-201 32 Filed 06/26/25   Page 889 of 1052   PageID 17567
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 76 of 86

*Committee's Motion for Continuance*                    76

 1   paid to professionals to determine litigation claims and we have

 2   barely, what, two months left to bring them?  That's 22 months

 3   worth of looking into things, millions and millions of fees.

 4   The estate might be irretrievably harmed if a motion to withdraw

 5   reference moves forward, when the committee and counsel were

 6   responsible and filed this complaint, and they were responsible

 7   to file the complaint under the transaction and occurrences,

 8   standards such that whatever they haven't pled, whatever they

 9   haven't pled by the time to plead is gone.  And the idea that we

10   need another 22 months for Mr. Kirschner to get up to speed or

11   some other to come up with additional litigation and additional

12   amendments to postpone a withdrawal of reference means that you

13   can never get a hearing on a withdrawal of reference.

14           We think the pleadings are there.  They have been —

15   they have been investigated, we assume.  They're subject to

16   motions to dismiss, which are legal questions.  They're subject

17   to motions to withdraw reference, which are legal questions.

18   And we're ready for a decision on what court's going to handle

19   this.  And by the time that's done, Mr. Kirschner will have

20   whatever rights he has, as if he has any.  The plan will either

21   be confirmed and effective or it won't be, but that's not our

22   problem.  Thank you.

23           THE COURT:  Any other closing arguments?

24           Going once, going twice.

25           MR. ASSINK:  Your Honor, I apologize.  Just for the

Appx 04996
016368

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-201 32   Filed 03/28/25   Page 890 of 1052   PageID 17568
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 77 of 86

*Committee's Motion for Continuance* 77

```
 1   record, this is Bryan Assink for Mr. Dondero.  And Mr. Dondero

 2   joins in the objections made by defendants in this proceeding

 3   and adopts the arguments made by Mr. Phillips.  That is all,

 4   Your Honor.  Thank you.

 5            MR. DRAPER:  Your Honor, can the Court hear me?

 6            THE COURT:  Yes.

 7            MR. DRAPER:  This is Douglas — okay.  What I'd like to

 8   make, a short comment.  The argument that there are unserved

 9   parties is a red herring and it's a red herring for the

10   following reason.  The Court has to go through each defendant to

11   determine if they have a right to — a right to withdraw a

12   reference.  The facts with respect to Mr. Phillips' clients are

13   different than the facts with respect to my clients.  So the two

14   unserved parties may have a right to do it, they may not, but it

15   doesn't affect your ruling with respect to Mr. Phillips' clients

16   or mine because we have either waived or didn't waive our right

17   to a jury trial.  And so this argument that there's two other

18   parties out there, again, is a red herring.  They have their own

19   right and it will not affect Mr. Phillips' right or mine.  So I

20   think that needs to be taken into account.

21            And, again, all we're talking about is location.  The

22   — if they want to amend their suit at a later point, that's

23   fine, but we are just talking about who's going to hear the

24   case.  And, quite frankly, Mr. Phillips is right, I don't think

25   the Court can in a very short period of time unpack these
```

Appx 04987
016369

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 33-21 Filed 06/26/25   Page 891 of 1052   PageID 17569
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 78 of 86

*The Ruling of the Court on the Motion to Continue*                    78

```
 1   withdrawal issues.  And so you may be looking at a

 2   recommendation that you make that takes 30 or 60 days.  We don't

 3   know what the District Court's going to do with it.  And, quite

 4   frankly, you know we may be 90 or 120 days down the road before

 5   the location is even determined.

 6            That's all I have to say, Your Honor.

 7            THE COURT:  All right.  Anyone else?

 8                  THE RULING OF THE COURT

 9            THE COURT:  All right.  I'll just be honest, I've

10   tried hard to understand where everyone is coming from here, but

11   this has been yet another hearing where I just frankly don't

12   understand why the big fight, why all the papers, and why all

13   the Court time used.

14            I mean I think I hear everyone agreeing that the

15   plaintiff is essentially going to get its/his 90-day stay here.

16   I mean if I were to go forward on the motions, plural, motions

17   to withdraw the reference, let's be real, it's going to take:

18   This Court two or three or four weeks to get a report and

19   recommendation to the District Court, given the complexity here

20   of the parties and, you know, we try to do a very clear roadmap

21   for the District Court, what's this lawsuit about, who are the

22   parties; and then it's going to take a few weeks for the

23   District Court to rule on that.  So I mean optimistically, the

24   most optimistic thing I can imagine is 60 days from now you have

25   an order from the District Court saying where the lawsuit's
```

016370

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 31-20    Exhibit 32 File Page 80 of 26 87    Page 892 of 1052    PageID 17570
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 79 of 86

*The Ruling of the Court on the Motion to Continue*                    79

1   going to go forward.

2          I mean so we're fighting, to me, over a big nothing

3   burger.  I think the stay is, in effect, going to happen.  So

4   all we're talking about here is pushing a plaintiff to go

5   forward, who at this point is working for free because the plan

6   hadn't gone effective and he hadn't been appointed.  I mean it

7   seems like from my perspective the defendants — again I'm trying

8   to understand the practicalities here, but I'm going to be

9   honest, it almost feels like defendants tweaking with the future

10  litigation trustee, 'We're going to make you go forward and work

11  for free when at the end of the day you're probably going to get

12  a stay anyway,' because there's no way a district judge is going

13  to rule on this in much sooner than 90 days.  It's like you're

14  just forcing him to work for free and move fast on the motion to

15  withdraw the reference.

16         And it is a red herring?  I don't know, maybe.  I

17  think likely this is ultimately going to be tried in the

18  District Court since certain parties haven't filed proofs of

19  claim.  But if the District Court does what it always does, in

20  my experience, I've never had, I can't remember ever having a

21  district court say, 'I'm withdrawing the whole darn thing.'

22  They almost always use the — they almost always use the

23  bankruptcy judges as their magistrates in a case when they

24  withdraw the reference.

25         Bankruptcy judge, handle all the pretrial stuff, the

Appx. 04900
016371

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 32    Filed 08/26    Page 893 of 1052    PageID 17571
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 80 of 86

1   discovery disputes, the motions to dismiss, motions for summary

2   judgment.  If you were on a motion to dismiss or a motion for

3   summary judgment in a way that would finally dispose of any

4   claims, well, you have to do that in a report and recommendation

5   to me.  So I feel like we all know that's likely where this is

6   heading, so I don't know why we had to have an hour fight.

7           I don't know why it's any big shakes to just stay the

8   whole darn thing for 90 days, especially when we have the whole

9   reason the plaintiff, liquidating trustee is not in place yet,

10  because of a stay, that some of these defendants or their

11  affiliates have wanted.  It just seems silly to me.

12          And I do want to address one other thing.  There has

13  been an argument that Sidley and Austin and the committee have

14  had months to get up to speed on the issues in the lawsuit, they

15  had months to bring it.  It's been pending months.  But I'll say

16  something for the benefit of those who have not been around for

17  this whole case, in July of last year, July 2020, which by that

18  point was about 10 months into the case, it was front and center

19  to this Court the difficulty the committee was having getting

20  discovery.  They had served four requests for production, going

21  back to before this case was even pending before me.  When the

22  case was in Delaware, they were already filing, serving requests

23  for production of documents, wanting to get a protocol in place

24  for ESI, and then finally it all kind of came to a head in July.

25          And I remember saying, 'I'm sure there's a transcript

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 32 Filed 06/02/25   Page 894 of 1052   PageID 17572
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 81 of 86

*The Ruling of the Court on the Motion to Continue*                   81

1    out there you can access.'  Gee, I may not have pressed the

2    issue so much on this lawsuit being filed involving CLO Holdco.

3    I may not have pressed the committee's feet to the fire so much

4    on getting that filed if I had been fully aware at all of these

5    efforts going on outside of the Court to get documents, to get

6    documents, four requests for production, and then finally the

7    protocol order, if you will, that the committee filed, asking

8    this Court to put in place some protocol to get ESI from like

9    nine different custodians of debtor records.  So my point is

10   those who have not lived with this case for the whole time, they

11   don't know that I kind of live to regret pressing the committee

12   to get this lawsuit on file.  You know I was worried because of

13   Holdco.  I had like ordered money to be put in the registry of

14   the Court before I had, you know, litigation pending.  So that's

15   why I put pressure.  But then I learned and had a multi-hour

16   hearing on what the committee had gone through trying to get

17   documentation.  So that's very much in the back of my mind here

18   in my ruling.

19          And my ruling is going to be that I grant the 90-day

20   continuance.  Again, I hope that in 90 days, we — I don't know

21   if we'll know something from the Fifth Circuit on the plan or

22   not, but at least we'll be closer to that point.  And, again,

23   we're looming, you know October 16th, 2021 as a deadline for

24   bringing claims, and I think that's relevant here.  There's a

25   lot to be focused on that may or may not impact the way this

Appx 04911

016573

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 32   Filed 03/26   Page 895 of 1052   PageID 17573
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 82 of 86

*The Ruling of the Court on the Motion to Continue*                82

1    lawsuit ultimately is mapped out.  I think the fact that we have

2    two unserved defendants, I think it does matter.

3          I think a district court may be a little hesitant,

4    really want to see the complete picture on each defendants'

5    position before it rules.  So the 90-day stay is granted.

6          All right.  So please upload the order, Ms.

7    Montgomery.

8          Thank you, all, for your arguments.

9          Before we wrap it up, Mr. Clubok, if you're still with

10   us, I think you were hoping to raise something that might

11   pertain to tomorrow's hearing on the UBS debtor compromise.  If

12   you're still there, you may speak to whatever it was you wanted

13   to present.

14         MR. CLUBOK:  Good morning, Your Honor.  Still — still

15   the morning.  Hopefully you can hear me.

16         THE COURT:  I can.

17         MR. CLUBOK:  Your Honor, I'm really just previewing an

18   issue.  In light of the comment that you made earlier today

19   about having this motion, discovery, and then folks not

20   previewing it, I just wanted to alert you to the fact that in

21   our adversary proceeding we have sought discovery against five

22   third parties, Scott Ellington, Isaac Ellington, three other

23   folks, all of whom are represented by Ms. Smith, who is here,

24   you can see.  And we first sought —

25         MS. SMITH:  This is Frances Smith.  Your Honor,

Appx 04912
016374

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 32 Filed 06/25    Page 896 of 1052    PageID 17574
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 83 of 86

*The Ruling of the Court on the Motion to Continue*                                       83

1    Frances Smith on behalf of Mr. Ellington, J.P. Sevilla, Mr.

2    Isaac Leventon, Matt VRO, and Mary Catherine Lucas (phonetics).

3             I just received an email earlier this morning from Mr.

4    Clubok that he was going to do this preview for you.  To the

5    extent he gets into the substance of any motions that are not

6    filed, that's inappropriate.  And so —

7             THE COURT:  Okay.

8             MS. SMITH:  — if he wants to take Your Honor offer of

9    a preview to say what he is going to file, I'm fine with that.

10   But if he's going to start going into the substance, that is not

11   appropriate.

12            THE COURT:  Okay.  We'll let Mr. Clubok get a little

13   further into what he was going to say, and then we'll decide do

14   we need to cut it off.

15            Mr. Clubok, go ahead.

16            MR. CLUBOK:  Thank you, Your Honor.  I was about to

17   say that there were five — there's the five individuals that Ms.

18   Smith represents, we sought discovery from in April 2nd, and,

19   namely, depositions.  After a long period of time culminating in

20   a meet-and-confer last week, Ms. Smith filed a motion to quash

21   on behalf of these five individuals on Monday and set a hearing

22   date for July 29th.

23            All I'm — all I'm previewing, Your Honor, is to alert

24   you that in response to that motion to quash, a hearing date set

25   for July 29th, so effectively will end up being, you know,

Appx 04913
016375

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 32   File Page 85 of 87   Page 897 of 1052   PageID 17575
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 84 of 86

*The Ruling of the Court on the Motion to Continue*                84

 1    months and months of delay to these individuals who are needed

 2    to move this conjunctive-relief proceeding forward, we are

 3    filing our response today to Ms. Smith's motion and a

 4    countermotion to compel.  And I'm merely flagging this issue for

 5    Your Honor because we are going to ask either Your Honor or Ms.

 6    Ellison, we're going to style our motion as an expedited

 7    request, we would just simply love to have a hearing as early as

 8    reasonably practicable on these issues.  And I have no intention

 9    of getting into the merits now, but happy to do so.  I think it

10    will all be familiar to you from their discussions in the

11    Dondero deposition dispute, but we just — or simply I'm just

12    flagging for you, because you raised it this morning, you know,

13    why didn't people tell me, so we just are going to ask the

14    hearing, the soonest-possible hearing, and I don't think it has

15    to be a very long hearing, on whether or not we get third-party

16    discovery, depositions of Mr. Ellington, Mr. Leventon, and the

17    other three individuals that Ms. Smith represents; subject to

18    one of them is on maternity leave, and we're going to be

19    pursuing discovery of that while she's in that state, but —

20            THE COURT:  All right.

21            MR. CLUBOK:  — but other than that we just ask that a

22    hearing to be scheduled.  And I'm just alerting you that we're

23    going to be making that request.

24            THE COURT:  Okay.  Well, I have been forewarned.  I

25    have been forewarned.  And I'll wait to see the motion for

Appx 04914

016576

Case 19-34054-sgj11   Doc 3596-32   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-21   Filed 08/25/25   Page 898 of 1052   PageID 17576
Case 21-03003-sgj Doc 50 Filed 05/25/21   Entered 05/25/21 12:59:11   Page 85 of 86

*The Ruling of the Court on the Motion to Continue*                    85

1   expedited hearing and decide if I think it's appropriate to give

2   an expedited hearing, okay?  I'll look at the pleadings and

3   likely just rule on the pleadings on the timing, okay?

4           Thank you.

5           MR. CLUBOK:  Your Honor, —

6           MS. SMITH:  Your Honor, since we're previewing, we

7   will be filing a response to that as well.

8           THE COURT:  All right.

9           MS. SMITH:  Thank you, Your Honor.

10          COURT SECURITY OFFICER:  All rise.

11      (The hearing was adjourned at 11:45 o'clock a.m.)

12                              —o0o—

13

14

15

16

17

18

19

20

21

22

23

24

25

Appx 04915
016377

Case 19-34054-sgj11    Doc 3596-32    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 33-21  Filed 06/26/25    Page 899 of 1052    PageID 17577
Case 21-03003-sgj Doc 50 Filed 05/25/21    Entered 05/25/21 12:59:11    Page 86 of 86

State of California          )
                            )     SS.
County of San Joaquin       )


          I, Susan Palmer, certify that the foregoing is a true

and correct transcript, to the best of my ability, of the above

pages, of the digital recording provided to me by the United

States Bankruptcy Court, Northern District of Texas, Office of

the Clerk, of the proceedings taken on the date and time

previously stated in the above matter.

          I further certify that I am not a party to nor in any

way interested in the outcome of this matter.

          I am a Certified Electronic Reporter and Transcriber

by the American Association of Electronic Reporters and

Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer

Reporting Services is approved by the Administrative Office of

the United States Courts to officially prepare transcripts for

the U.S. District and Bankruptcy Courts.



                              Susan Palmer
                              Palmer Reporting Services

                              Dated May 22, 2021

Appx 04916

016378

# EXHIBIT 33

Appx 04917

Case 19-34054-sgj11   Doc 3596-33   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document Exhibit 33Filed 06/03/25   Page 901 of 1052    PageID 17579
Case 3:21-cv-03129-B   Document 28   Filed 09/02/22   Page 1 of 21   PageID 3611

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| HIGHLAND CAPITAL | § |
| MANAGEMENT, L.P., | § |
| | § |
|    Debtor, | § |
| ----------------------------------------------------- | § |
| THE CHARITABLE DAF FUND, L.P. | § |
| and CLO HOLDCO, LTD., | § |
| | § |
|    Plaintiffs/Appellants, | § |
| | § |
| v. | §   CIVIL ACTION NO. 3:21-CV-3129-B |
| | § |
| HIGHLAND CAPITAL | § |
| MANAGEMENT, L.P., | § |
| | § |
|    Defendant/Appellee. | § |

### MEMORANDUM OPINION AND ORDER

Before the Court are Appellants The Charitable DAF Fund, L.P. (Charitable DAF) and CLO

Holdco, Ltd. (CLO Holdco)'s appeals from the bankruptcy court's Motion to Dismiss Order and

Motion to Stay Order. For the reasons that follow, the Motion to Dismiss Order is **REVERSED** and

**REMANDED**. The Motion to Stay Order is **AFFIRMED**.

016580
Appx 84918

Case 19-34054-sgj11   Doc 3596-33   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-31 38 Filed 09/03/25   Page 902 of 1052   PageID 17580
Case 3:21-cv-03129-B   Document 28   Filed 09/02/22   Page 2 of 21   PageID 3612

# I.

## BACKGROUND[1]

These are consolidated appeals from an adversary proceeding in a bankruptcy case. The Debtor, Highland Capital Management, L.P. (HCM), filed for Chapter 11 bankruptcy on October 16, 2019, in the United States Bankruptcy Court for the District of Delaware and that court transferred venue to the United States Bankruptcy Court for the North District of Texas. *In re Highland Cap. Mgmt. L.P.*, 2022 WL 780991, at *1 (Bankr. N.D. Tex. Mar. 11, 2022).

In 2017, Charitable DAF—through the holding entity CLO Holdco—purchased 49.02% of the available shares of Highland CLO Funding, Ltd. (HCLOF) based upon investment advice from HCM.[2] Doc. 9, Appellant's Br., 5. Another entity, HarbourVest, acquired 49.98% of the HCLOF shares and HCM and its employees acquired the remaining 1%. *Id.*; Doc. 21, Appellee's Br., 7. A company agreement (the HCLOF Member Agreement) governing the rights and obligations of HCLOF shareholders purportedly prohibited a member from "sell[ing] shares to another member without first providing all other members the right to purchase a pro rata portion thereof at the same price" (the Right of First Refusal). Doc. 9, Appellant's Br., 6. The value of the HCLOF shares fluctuated throughout the bankruptcy proceedings; the actual value is one of the issues giving rise to some of Charitable DAF's causes of action. *Id.* at 6–7; R. at 551–65.

---

[1] Because these are two consolidated appeals with separate appellate records, the Court indicates when it switches between the separate appellate records by footnotes. The Appellant's Brief and record cites in this Background section are in Doc. 6 in case No. 3:22-CV-0695-B. Appellee's Brief, which was filed after consolidation, is in case No. 21-CV-3129-B.

[2] Except where otherwise stated, the Court refers to Charitable DAF and CLO Holdco collectively as Charitable DAF because Charitable DAF controls and owns CLO Holdco and both entities have the same director. Doc. 21, Appellee's Br., 7 & n.6. Appellant Charitable DAF does not dispute this relationship and imputes the actions of CLO Holdco to itself throughout Appellant's brief. *See* Doc. 9, Appellant's Br., 13–14 (imputing the Objection to both Appellants).

Appx. 04919
016581

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-21    Filed 04/04/25    Page 903 of 1052    PageID 17581
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 3 of 21    PageID 3613

During the bankruptcy, "HarbourVest filed proof of claims against [HCM] totaling over $300 million, notionally." Doc. 9, Appellant's Br., 6. As part of the settlement for these claims, "HarbourVest agreed to sell its interest in HCLOF to [HCM]." *Id.* at 8. HCM would then have majority ownership of HCLOF. *See id.* at 5; Doc. 21, Appellee's Br., 7. "CLO Holdco filed an objection to the settlement, contending that the HCLOF Member Agreement entitled [CLO] Holdco to a Right of first Refusal" (the Objection). Doc. 9, Appellant's Br., 8. At the beginning of the settlement hearing (the Rule 9019 Settlement Hearing), CLO Holdco withdrew its Objection. Doc. 21, Appellee's Br., 10–11; R. at 6269–70. After overruling the remaining objections from the other parties, the bankruptcy court approved the HarbourVest Settlement. Doc. 9, Appellant's Br., 9.

This Adversary Proceeding stems from the complaint filed by Appellants on April 12, 2021, in this Court in *Charitable DAF Fund, L.P. et al. v. Highland Capital Management, L.P., et al.*, Case No. 3:21-CV-0842-B. *Id.*; Complaint, *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.*, No. 3:21-CV-0842-B (N.D Tex. Apr. 12, 2021), Doc. 1. On September 20, 2021, this Court referred that case to the bankruptcy court for "docket[ing] as an Adversary Proceeding associated with the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P." Order of Reference, *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.*, No. 3:21-CV-0842-B (N.D. Tex. Sept. 20, 2021), Doc. 64. During the Adversary Proceeding, Appellants moved for a stay of the case (the Motion to Stay) and Appellees moved to dismiss the case (the Motion to Dismiss). R. at 1634–67, 3248–52. On November 23, 2021, the bankruptcy court held a hearing on the Motion to Stay and Motion to Dismiss. *Id.* at 5951. The bankruptcy court denied the Motion to Stay at the hearing and later entered an order granting the Motion to Dismiss, dismissing all causes of action with prejudice. *Id.* at 5977; *In re Highland*, 2022 WL 780991, at *12. Appellants promptly appealed both orders; this

Appx. 04929
016382

Case 19-34054-sgj11   Doc 3596-33   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21   Exhibit 33   Filed 05/05/22   Page 904 of 1052   PageID 17582
Case 3:21-cv-03129-B   Document 28   Filed 09/02/22   Page 4 of 21   PageID 3614

Court consolidated the appeals. *In re Highland Cap. Mgmt.*, 2022 WL 2193000, at *1, *4 (N.D. Tex. June 17, 2022). While the appeals were pending, the Fifth Circuit affirmed the HCM reorganization plan (the Plan), but vacated the exculpatory provision "as to all parties *except* [HCM], the Committee and its members, and the Independent Directors for conduct within the scope of their duties." *Highland Cap. Mgmt., L.P. v. NexPoint Advisors, L.P.*, 2022 WL 3571094, at *14 (5th Cir. Aug. 19, 2022).

The appeals are fully briefed and ripe for review. The Court considers them below.

## II.

## LEGAL STANDARDS

Final judgments, orders, and decrees of a bankruptcy court may be appealed to a federal district court. 28 U.S.C. § 158(a). Because the district court functions as an appellate court in this scenario, it applies the same standards of review that federal appellate courts use when reviewing district court decisions. *In re Webb*, 954 F.2d 1102, 1103–04 (5th Cir. 1992) (citations omitted).

A.     *Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim*

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) authorizes a court to dismiss a plaintiffs complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). But the court will "not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

Appx. 04921
016583

Case 19-34054-sgj11 Doc 3596-33 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 15-21 Exhibit 33Filed 06/06/22 Page 905 of 1052 PageID 17583
Case 3:21-cv-03129-B Document 28 Filed 09/02/22 Page 5 of 21 PageID 3615

To survive a motion to dismiss, plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). When well-pleaded facts fail to meet this standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (quotation marks and alterations omitted).

B.      *Motion to Stay*

Incidental to a court's inherent power to control its docket is the power to stay proceedings before it. *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). A court considers four factors when determining whether to stay a case pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)). "The first two factors of the traditional standard are the most critical." *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016) (quoting *Nken*, 556 U.S. at 434).

Appx 04922
016584

Case 19-34054-sgj11   Doc 3596-33   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21   Exhibit 33   FiledPage 07/06/25   Page 906 of 1052   PageID 17584
Case 3:21-cv-03129-B   Document 28   Filed 09/02/22   Page 6 of 21   PageID 3616

## III.

## ANALYSIS

The Court begins with the appeal of the Motion to Dismiss Order because it can only review the appeal of the Motion to Stay Order if it reverses the bankruptcy court's decision to dismiss the causes of action in the adversary proceeding. *In re Highland*, 2022 WL 2193000, at \*2. Finding reversal of the Motion to Dismiss Order warranted, the Court then reviews the appeal of the Motion to Stay Order.

A.     *Appeal of the Motion to Dismiss Order*[3]

Charitable DAF raises three issues in its appeal of the Motion to Dismiss Order: (1) whether the bankruptcy court "commit[ted] reversible error by sua sponte dismissing this action on the basis of collateral estoppel without giving notice and an opportunity to respond"; (2) whether collateral estoppel barred Charitable DAF's claims when the claims were adjudicated in a Rule 9019 Settlement Hearing; and (3) whether the bankruptcy court's application of judicial estoppel erroneously relied on a transcription error, an ostensibly inconsistent position of Charitable DAF, or a failure to conclude that "subsequently discovered evidence . . . render[ed] the ostensible inconsistency 'inadvertent.'" Doc. 9, Appellant's Br., 2.

An appellate court reviews a dismissal under Rule 12(b)(6) de novo. *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 868 (5th Cir. 2000). "[T]he application of collateral estoppel is" also reviewed de novo. *Id.* (quoting *United States v. Brackett*, 113 F.3d 1396, 1398 (5th Cir. 1997)). However, "a [bankruptcy] court's decision to invoke the equitable doctrine of judicial estoppel [is reviewed] for abuse of discretion." *Cox v. Richards*, 761 F. App'x 244, 246 (5th Cir. 2019) (citing

---

[3] For this appeal, the record and document citations are in case No. 3:22-CV-0695-B. However, Appellee's Brief is in case No. 21-CV-3129-B.

016585
Appx 04928

Case 19-34054-sgj11   Doc 3596-33   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21   Filed 06/03/25   Page 907 of 1052   PageID 17585
Case 3:21-cv-03129-B   Document 28   Filed 09/02/22   Page 7 of 21   PageID 3617

*United States ex rel. Long v. GSDMIdea City, L.L.C.*, 798 F.3d 265, 271 (5th Cir. 2015)). Therefore, this Court reviews the bankruptcy court's sua sponte invocation of collateral estoppel de novo, the application of collateral estoppel de novo, and the invocation of judicial estoppel for abuse of discretion. The Court addresses each in turn below.

### 1.   Sua Sponte Dismissal

The bankruptcy court dismissed Charitable DAF's claims with prejudice based on collateral estoppel—even though neither party raised the issue "per se"—finding their res judicata arguments relevant to the issue. *In re Highland*, 2022 WL 780991, at *7. The Court first considers whether the sua sponte application was proper.

Charitable DAF challenges the bankruptcy court's sua sponte invocation of collateral estoppel to dismiss its claims. Doc. 9, Appellant's Br., 11–12. Specifically, Charitable DAF argues that the bankruptcy court could "only do so if the 'procedure employed is fair'—that is, if prior notice is given with adequate time for the plaintiff to prepare a response." *Id.* at 12 (quoting *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1177–78 (5th Cir. 2006)). The failure to provide "notice and an opportunity to dispute the claimed bases for dismissal is reversible error," according to Charitable DAF. *Id.*

The Court disagrees. The Fifth Circuit has recognized two instances when a court may dismiss a case sua sponte on the basis of collateral estoppel: when (1) "both actions were brought in courts of the same district" or (2) "all of the relevant facts are contained in the record and . . . uncontroverted." *OneBeacon Am. Ins. Co. v. Barnett*, 761 F. App'x 396, 399 (5th Cir. 2019) (first quoting *Trammell Crow Residential Co. v. Am. Prot. Ins. Co.*, 574 F. App'x 513, 522 (5th Cir. 2014); and then quoting *Mowbray v. Cameron Cnty.*, 274 F.3d 269, 281 (5th Cir. 2001)). This case easily

Appx. 04924
016586

Case 19-34054-sgj11   Doc 3596-33   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 33 Filed 09/05/22   Page 908 of 1052   PageID 17586
Case 3:21-cv-03129-B   Document 28   Filed 09/02/22   Page 8 of 21   PageID 3618

fits into the first category because all of the proceedings at issue took place in the bankruptcy court before the same judge. *See In re Highland*, 2022 WL 780991, at *7 (relying on the former category to dismiss the case). Thus, the bankruptcy court did not err by raising the collateral estoppel issue sua sponte.

This case is unlike the *Carroll* case cited by Charitable DAF, which did not involve collateral estoppel. 470 F.3d 1171. In *Carroll*, the Fifth Circuit held that a court may dismiss a case sua sponte under Federal Rule of Civil Procedure 12(b)(6) if the "procedure employed is fair[,]" which requires "both notice of the court's intention and an opportunity to respond." *Id.* at 1177 (quoting *Bazrowx v. Scott*, 136 F.3d 1053, 1054 (5th Cir. 1998)). The district court erred by not providing "notice or opportunity to be heard" and "did not even . . . mention [some of the dismissed] claims in its order of dismissal." *Id.*

This case is more akin to *McIntyre v. Ben E. Keith Co.* where the Fifth Circuit upheld the district court's sua sponte raising of the issue of res judicata to dismiss the case under Rule 12(b)(6). 754 F. App'x 262, 265 (5th Cir. 2018). In *McIntyre*, the plaintiff's "Civil Rights Act and FLSA actions were brought before the same federal district court." *Id.* Because the latter action closely resembled the former action, the Fifth Circuit found no reversible error with the district court's raising the issue of res judicata sua sponte. *Id.*

First, dismissal for failure to state a claim like in *Carroll* and dismissal for collateral estoppel as in the instant case are conceptually and procedurally different. In the former, the plaintiff is in the process of attempting to "allege[] [their] best case," *Bazrowx*, 136 F.3d at 1054, while collateral estoppel occurs after a plaintiff "alleged [their] best case" and fully litigated the issue. *See Allen v. McCurry*, 449 U.S. 90, 94 (1980). Put more succinctly, collateral estoppel eliminates "unnecessary

App. 04925
016587

Case 19-34054-sgj11   Doc 3596-33   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 33   Filed 10/26   Page 909 of 1052   PageID 17587
Case 3:21-cv-03129-B   Document 28   Filed 09/02/22   Page 9 of 21   PageID 3619

judicial waste" from repeated attempts at alleging the best case. *Arizona v. California*, 530 U.S. 392, 412 (2000) (quoting *United States v. Sioux Nation*, 448 U.S. 371, 432 (1980) (Rehnquist, J., dissenting)). Second, the parties addressed res judicata during oral argument and in their pleadings before the bankruptcy court. While res judicata is not collateral estoppel, it is closely related. *Hous. Prof'l Towing Ass'n v. City of Houston*, 812 F.3d 443, 447 (5th Cir. 2016) ("[R]es judicata encompasses two separate but linked preclusive doctrines: (1) true res judicata or claim preclusion and (2) collateral estoppel or issue preclusion."). Thus, the bankruptcy court employed a fair procedure by allowing the parties to litigate the issues, including res judicata, before dismissing the case sua sponte. *See generally Carver v. Atwood*, 18 F.4th 494, 497 (5th Cir. 2021) ("District courts may, for appropriate reasons, dismiss cases *sua sponte*.").

The Court next considers whether the bankruptcy court's substantive application of collateral estoppel was proper.

### 2.      Collateral Estoppel

"Collateral estoppel prevents litigation of an issue when: '(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; and (3) the previous determination was necessary to the decision.'"[4] *Bradberry v. Jefferson Cnty.*, 732 F.3d 540, 548 (5th Cir. 2013) (quoting *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005)). "Relitigation of an issue is not precluded unless the facts and the legal standard used to assess them are the same in both proceedings." *In re Southmark Corp.*, 163 F.3d at 932.

Charitable DAF attacks each element of collateral estoppel, so the Court addresses each

---

[4] Appellant lists a fourth element occasionally referenced by the Fifth Circuit—"there is no special circumstance that would make it unfair to apply the doctrine"—but the Court finds no reason to address this possible fourth element in this case. *See In re Southmark Corp.*, 163 F.3d 925, 932 n.9 (5th Cir. 1999) (declining to apply the fourth element because appellant "failed to support it factually").

Appx 04926
016588

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 33    Filed 06/26/22    Page 910 of 1052    PageID 17588
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 10 of 21    PageID 3620

element individually.

>    i.    *Identical issue*

The bankruptcy court found "(a) consideration of the value that the estate was both receiving and paying, as well as (b) the potential existence of a 'Right of First Refusal' . . . [were] the gravamen of [Charitable DAF's] Complaint." *In re Highland*, 2022 WL 780991, at *9 (emphasis omitted). During the settlement hearing, the bankruptcy court had to determine whether the HarbourVest Settlement "was 'fair and equitable' and in the 'best interests of creditors,' and whether it was the 'product of arms-length bargaining, and not of fraud or collusion[.]'" *Id.* at *8. This determination entailed "arguments and evidence regarding the methodology for the valuation of the HCLOF interest and the existence or non-existence of a 'Right of First Refusal.'" *Id.*

Charitable DAF argues that the issues are not identical because the Objection "only addressed whether HarbourVest . . . had performed all conditions precedent to being able to transfer the interest to Highland *as another co-investor*" and did not present an identical claim "for breach of the HCLOF [Member] Agreement" and associated damages. Doc. 9, Appellant's Br., 13–14. Further, "even if this one contract issue was fully . . . litigated," only the second cause of action in Charitable DAF's complaint arguably parallels that issue, according to Charitable DAF—the others are distinct. *Id.* at 14–15. Charitable DAF contends that these non-contract causes of action rely on evidence that was not known at the Rule 9019 Settlement Hearing, "stem from events that either occurred post-hearing, or were not discovered until after the hearing." *Id.* at 15.

The Court finds the issues are identical. CLO Holdco's Objection specifically argued:

> Harbourvest has no authority to transfer its interests in HCLOF without first complying with the Right of First Refusal. The only way to effectuate such a transfer without first providing other members the Right of First Refusal is an intentionally

Appx 04927
016589

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 33    Filed 06/25/22    Page 911 of 1052    PageID 17589
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 11 of 21    PageID 3621

inaccurate interpretation of the Member Agreement's contractual provisions that
would render specific passages redundant and meaningless.

R. at 4730. The bankruptcy court also heard argument and testimony from Seery, HCM's chief

executive and chief restructuring officer, and Pugatch, a managing director of HarbourVest, about

the valuation of HCLOF's assets at the settlement hearing. *Id.* at 6273, 6292, 6303–05 ("The twenty-

two and a half [million] is the current—actually, the November value of HCLOF—the HarbourVest

interests in HCLOF."), 6358, 6374 ("The current value is right around $22-1/2 million.").

In the Original Complaint, Charitable DAF brought five causes of action: breach of fiduciary

duties, breach of the HCLOF Member Agreement, negligence, RICO, and tortious interference. *Id.*

at 551–65. The breach of fiduciary duties and negligence causes of action center around the alleged

concealment of the rising value of HCLOF's assets and failing to offer the purchase of the assets to

CLO Holdco or Charitable DAF before offering to HCM. *Id.* at 553–55, 559–60. The breach of the

HCLOF Member Agreement cause of action encompasses the Right of First Refusal in the

agreement. *Id.* at 558–59. The RICO cause of action alleges that HCM used mail and wire fraud "to

obtain or arrive at valuations of the HCLOF interests," and "conceal[ ] the true value of the HCLOF

interests." *Id.* at 560–64. Lastly, the tortious interference cause of action stems from HCM's alleged

interference with CLO Holdco's Right of First Refusal in the Member Agreement and

"misrepresenting the fair market value" of HCLOF's assets. *Id.* at 564–65. In sum, all of these causes

of action involve either the valuation of HCLOF or the Right of First Refusal, so the issues are the

same as those before the bankruptcy court at the Rule 2019 Settlement Hearing.

     ii.    *Actually Litigated*

The bankruptcy court found the same arguments were also actually litigated, reasoning:

Appx 04928
016590

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 33 Filed 03/26/22    Page 912 of 1052    PageID 17590
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 12 of 21    PageID 3622

> The Bankruptcy Court would never have approved the HarbourVest Settlement if
> it thought the value being exchanged was not fair, or if it thought the HCLOF
> Interests could not be transferred and that someone might later sue the Debtor,
> claiming the Transfer was improper. All parties had the chance to argue and present
> evidence about this. The Bankruptcy Court made a ruling based on the evidence and
> argument.

*In re Highland*, 2022 WL 780991, at *9.

Charitable DAF argues that because the Objection was withdrawn and no one objected to
the withdrawal, the issue asserted therein was not litigated. Doc. 9, Appellant's Br., 16. Additionally,
it claims the Rule 9019 Settlement Hearing is not a mini-trial and, therefore, cannot serve as an
opportunity for a party to litigate their claims. *Id.* at 17–18 (citing *Off. Comm. of Unsecured Creditors
v. Moeller (In re Age Refin., Inc.)*, 801 F.3d 530, 541 (5th Cir. 2015)).

An issue is not actually litigated and, thus, precluded unless the legal standard in the prior
action mirrors the legal standard of the latter action. *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415,
1422 (5th Cir. 1995) (citations omitted). The bankruptcy court approved the HarbourVest
Settlement after applying the *Jackson Brewing* test, which considers:

> (1) the probability of success in litigating the claims subject to the Settlement
> Agreement, with due consideration for the uncertainty in fact and law, (2) the
> complexity and likely duration of litigation and any attendant expense,
> inconvenience, and delay, and (3) all other factors bearing on the wisdom of the
> compromise, including: (i) the best interests of the creditors, with proper deference
> to their reasonable views, and (ii) the extent to which the settlement is truly the
> product of arms-length bargaining, and not of fraud or collusion.

R. at 5568; *see also In re Highland*, 2022 WL 780991, at *8 (quoting *Off. Comm. of Unsecured
Creditors v. Moeller (In re Age Ref., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015)). Stated more succinctly,
when faced with a settlement, the bankruptcy court ensures the "compromise is truly 'fair and
equitable' and 'in the best interest of the estate.'" *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th

016591

Case 19-34054-sgj11   Doc 3596-33   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 33   Filed 04/25   Page 913 of 1052   PageID 17591
Case 3:21-cv-03129-B   Document 28   Filed 09/02/22   Page 13 of 21   PageID 3623

Cir. 1980) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson (TMT Trailer)*, 390 U.S. 414, 424 (1968)).

However, in the context of litigating actual claims—such as those asserted by Charitable DAF—a court applies a preponderance of the evidence standard, not the probability of success standard from *Jackson Brewing*. *Copeland*, 47 F.3d at 1423; *In re Zale Corp.*, 62 F.3d 746, 766 n.60 (5th Cir. 1995) ("We also note for future reference that the legal standard in a settlement hearing differs from that applicable in an adversary proceeding or state court trial . . . . Consequently, we doubt that the findings of the bankruptcy court in a settlement hearing would have preclusive effect in adversary proceedings or state court trials."). *See generally Weaver v. Aquila Energy Mktg.*, 196 B.R. 945, 957 (S.D. Tex. 1996) ("[S]ettlement hearings and preference actions involve the application of different legal standards."). "Examining whether a particular settlement is fair or equitable and in the best interest of the estate and creditors is a different inquiry, driven by different policies, than litigation of the actual claim." *Copeland*, 47 F.3d at 1423. While the issues of the Right of First Refusal and the valuation of HCLOF were raised in the Rule 9019 Settlement Hearing, the parties did not fully litigate the issues as one would at trial, and the bankruptcy court did not resolve the issues according to a preponderance of the evidence standard. Because the bankruptcy court applied a legal standard in the Rule 9019 Settlement Hearing that is inapplicable to the adjudication of Charitable DAF's causes of action, the issues were not actually litigated in the Rule 9019 Settlement Hearing and collateral estoppel does not apply.[5] The Court **REVERSES** the bankruptcy court on this issue.

---

[5] Having found the second element of collateral estoppel unmet, the Court need not address the third element—necessity of the previous determination to the prior decision.

Appx. 04939
016592

Case 19-34054-sgj11 Doc 3596-33 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document Exhibit 33 Filed 06/25 22 Page 914 of 1052 PageID 17592
Case 3:21-cv-03129-B Document 28 Filed 09/02/22 Page 14 of 21 PageID 3624

3.     Judicial Estoppel

The bankruptcy court found the elements of judicial estoppel met and barred the second and fifth causes of action, which rely on the Right of First Refusal. *In re Highland*, 2022 WL 780991, at *12. The Court now addresses whether judicial estoppel applies to Charitable DAF's second and fifth causes of action.

Judicial estoppel is an equitable common law doctrine aimed at preventing a party from asserting an inconsistent legal position from a previous proceeding. *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999). "The purpose of the doctrine is 'to protect the integrity of the judicial process', by 'prevent[ing] parties from playing fast and loose with the courts to suit the exigencies of self interest.'" *Id.* (alteration in original) (quoting *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988)). A court examines three criteria when determining the applicability of judicial estoppel: "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011) (en banc).

Charitable DAF raises arguments for each of the judicial estoppel elements, so the Court addresses each element below.

i.     *Inconsistent legal position*

Charitable DAF argues that the bankruptcy court's determination relies on a transcription error that amounted to an admission of HCM's compliance with the Right of First Refusal. Doc. 9, Appellant's Br., 22–23. The corrected transcript makes clear that no admission was made on behalf of CLO Holdco, according to Charitable DAF. *Id.* at 23–24.

The relevant portion of the original transcript reads:

016593
Appx 04931

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 33    Filed 06/25/22    Page 915 of 1052    PageID 17593
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 15 of 21    PageID 3625

> In response to Mr. Morris, I'm not going to enter into a stipulation on behalf of my client, **but** the Debtor is compliant with all aspects of the contract. We withdrew our objection, and we believe that's sufficient.

R. at 6280. The corrected transcript reads:

> In response to Mr. Morris, I'm not going to enter into a stipulation on behalf of my client **that** the Debtor is compliant with all aspects of the contract. We withdrew our objection, and we believe that's sufficient.

Doc. 9-1, Appellant's Br. Ex. A, 4.

Accepting this verison of the record, CLO Holdco refused to "enter into a short stipulation on the record reflecting that the Debtor's acquisition of HarbourVest's interests in HCLOF is compliant with all of the applicable agreements between the parties." *Id.*; R. at 6280. However, moments before this, CLO Holdco withdrew its Objection premised on the Right of First Refusal stating:

> CLO Holdco has had an opportunity to review the reply briefing, and after doing so has gone back and scrubbed the HCLOF corporate documents. Based on our analysis of Guernsey law and some of the arguments of counsel in those pleadings and our review of the appropriate documents, I obtained authority from my client, Grant Scott, as Trustee for CLO Holdco, to withdraw the CLO Holdco objection based on the interpretation of the member agreement.

R. at 6269–70. The bankruptcy court's decision rests primarily on this earlier withdrawal of the Objection and only later buttresses its argument with the then-unknown transcription error. *In re Highland*, 2022 WL 780991, at *11 (following discussion of the withdrawal of the Objection with "[i]f that weren't enough" before mentioning the then-unknown transcription error). Thus, if the earlier withdrawal—without the transcription error—satisfies the first element of judicial estoppel then the bankruptcy court did not commit any error even if it referenced an incorrect transcription of the latter exchange.

Appx. 04932
016594

Case 19-34054-sgj11   Doc 3596-33   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 33   Filed 06/26/25   Page 916 of 1052   PageID 17594
Case 3:21-cv-03129-B   Document 28   Filed 09/02/22   Page 16 of 21   PageID 3626

The Court finds the bankruptcy court did not err in finding the first element of judicial estoppel. CLO Holdco made clear in the withdrawal of its objection that it no longer disputed the other parties' interpretation of the Right of First Refusal, which now forms the basis of Charitable DAF's second and fifth causes of action. *See* R. at 6269–70. Thus, the withdrawal of the objection put CLO Holdco on the opposite side of the legal argument that Charitable DAF now makes in its second and fifth causes of action. The first element of judicial estoppel is established because Charitable DAF has taken inconsistent positions in separate proceedings.

ii.     *The bankruptcy court accepted the prior position*

The bankruptcy court solely relied on the withdrawal of the Objection to find the second element of judicial estoppel established. *In re Highland*, 2022 WL 780991, at *12. In the words of the bankruptcy court, it "perceived [this objection] as one of the major arguments that was relevant to the HarbourVest Settlement." *Id.* "The [b]ankruptcy [c]ourt relied upon that withdrawal of CLO Holdco's objection in making the determination to approve of the HarbourVest Settlement and, specifically, that Highland would not be running afoul of any obligation in entering into the HarbourVest Settlement." *Id.*

Charitable DAF argues that there is no acceptance by the bankruptcy court of a prior position because without the transcription error, there is no admission and no inconsistent position. Doc. 9, Appellant's Br., 25–26. Further, it contends that the withdrawal of the Objection is not the equivalent of stating the Right of First Refusal causes of action are meritless. *Id.* at 26–27.

The bankruptcy court did not err in finding the second element of judicial estoppel met because it necessarily relied on the change in CLO Holdco's assessment of its Objection. The Right of First Refusal created a major obstacle to approval of the HarbourVest Settlement. When CLO

Appx 016595

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 33    Filed 06/25/22    Page 917 of 1052    PageID 17595
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 17 of 21    PageID 3627

Holdco withdrew its Objection based on the Right of First Refusal, the Court had to accept CLO Holdco's position that the Right of First Refusal no longer posed an obstacle to the HarbourVest Settlement. Thus, the Court finds no error by the bankruptcy court for the second element of judicial estoppel.

      iii.    *Inadvertence of Charitable DAF*

The bankruptcy court did not examine the inadvertence of Charitable DAF in asserting inconsistent legal positions. *See In re Highland*, 2022 WL 780991, at *12.

Charitable DAF argues that it did not know the facts for several of its claims until after the settlement hearings, so it could not have asserted these claims at the hearing. Doc. 9, Appellant's Br., 27. Charitable DAF relies on the allegations surrounding the valuations of the HCLOF assets and the alleged acts violating the RICO statutes. *Id.* at 27–29. Additionally, the bankruptcy court did not address the inadvertence element for judicial estoppel and a failure to apply the correct legal standard is reversible error, Charitable DAF contends. Doc. 9, Appellant's Br., 27; Doc. 27, Appellant's Reply, 3–4.

The Court agrees with Appellant's last argument. A court abuses its discretion by applying the wrong legal standard. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990); *Def. Distrib. v. Bruck*, 30 F.4th 414, 427 (5th Cir. 2022). And the misapplication of a legal standard is reviewed de novo. *In re Woerner*, 783 F.3d 266, 270–71 (5th Cir. 2015). By not addressing the third element of judicial estoppel, the bankruptcy court applied the wrong legal standard. The Fifth Circuit implicitly recognized this third element—inadvertence—in *In re Coastal Plains, Inc.*, 179 F.3d at 206, 210, which the bankruptcy court cited for its legal standard. *In re Highland*, 2022 WL 780991, at *11. The Fifth Circuit has since clarified that "[t]his circuit . . . recognizes *three* particular requirements"

016596
Appx 01934

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 33    Filed 10/9/25    Page 918 of 1052    PageID 17596
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 18 of 21    PageID 3628

for judicial estoppel. *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 386 (5th Cir. 2008) (emphasis added). Because the bankruptcy court did not address the inadvertence element in its order dismissing Charitable DAF's second and fifth causes of action, the bankruptcy court abused its discretion. While the district court finds no issue in the bankruptcy court's analysis of the first two elements of judicial estoppel, the bankruptcy court did not address this third element, warranting remand for determination by the bankruptcy court whether Charitable DAF acted inadvertently to change its legal position.

### 3.    Leave to Amend

Charitable DAF requested leave to amend its complaint in its response to the motion to dismiss, R. at 2272–73, which the bankruptcy court denied by dismissing all claims with prejudice. *In re Highland*, 2022 WL 780991, at *12. The Court need not address this argument because, upon remand, the bankruptcy court will have the opportunity to reassess Charitable DAF's claims and determine whether amendment should be allowed under Federal Rule of Civil Procedure 15(a). *See Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014) (listing factors a court considers when determining whether to allow amendment of the complaint).

**C.**    *Appeal of the Motion to Stay Order*[6]

Appellant Charitable DAF raises one issue on appeal of the Motion to Stay Order: "Did the bankruptcy court err by proceeding with the case rather than staying it" when Charitable DAF was enjoined "from litigating any action against Appellee [HCM]"? Doc. 11, Appellant's Br., 2. The bankruptcy court denied Charitable DAF's Motion to Stay All Proceedings and the subsequent Amended Motion to Stay All Proceedings, reasoning:

---

[6] For this appeal, the record and document citations are in case No. 3:21-CV-3129-B.

Appx 016595
016597

Case 19-34054-sgj11   Doc 3596-33   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 33   Filed 06/26/22   Page 919 of 1052   PageID 17597
Case 3:21-cv-03129-B   Document 28   Filed 09/02/22   Page 19 of 21   PageID 3629

> I just don't think that you have shown that, you know, either the exculpation clause or the injunction provisions of the plan somehow tie your hands in arguing the 12(b)(6) motion, defending against the 12(b)(6) motion today or I just think that your arguments reflect, frankly, a misunderstanding of how the injunction language and exculpation language applies here.

R. at 2087; *see also id.* at 4–5.

On appeal, Charitable DAF argues that the bankruptcy court erred in its denial of the motion for a stay because the Plan Confirmation Order's injunction prohibited Charitable DAF from participating in the case, "terminat[ing] any case or controversy and stripp[ing] the bankruptcy court of jurisdiction." Doc. 11, Appellant's Br., 7. Accordingly, "[t]he bankruptcy court could only stay the case pending the [appeal of the Plan Confirmation Order's injunction], or dismiss the case as barred by the injunction[,]" Charitable DAF contends." *Id.* at 9.

As noted above, the Fifth Circuit affirmed the Plan in all respects except one and specifically affirmed the injunction. *Highland*, 2022 WL 3571094, at *13–14. The injunction in the Plan provides that "all Enjoined Parties are and shall be permanently enjoined . . . from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind . . . against or affecting the Debtor or the property of the Debtor." R. at 2401. And the term Enjoined Parties includes "(i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor [and] . . . (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case." *Id.* at 2358.

Appx. 04936
016398

Case 19-34054-sgj11    Doc 3596-33    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 33 Filed 04/25/22    Page 920 of 1052    PageID 17598
Case 3:21-cv-03129-B    Document 28    Filed 09/02/22    Page 20 of 21    PageID 3630

Relatedly, the Plan exculpates HCM[7] "from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of [execution of the Plan]." *Id.* at 2398. However, this exculpation provision[8] does "not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) [other specific entities actions]." *Id.* at 2398–99.

The bankruptcy court did not abuse its discretion[9] in denying the motion for a stay of the case. The bankruptcy court found that the Plan's injunction and exculpation provisions—*which it approved*—did not prevent Charitable DAF from pursuing its causes of action. *Id.* at 2087. In effect, the bankruptcy court held that Charitable DAF could continue to litigate its causes of action and the Court agrees. *See id.* Just like the bankruptcy court, this Court does not see how the injunction and exculpation provisions prohibit Charitable DAF from participating in the below action. The exculpation provision permits Charitable DAF to bring claims against HCM for "bad faith, fraud,

---

[7] The Plan makes clear that the term Exculpated Party does not include Charitable DAF. R. at 2359 ("Exculpated Parties" means, collectively, (i) the Debtor . . . provided, however, that, for the avoidance of doubt, none of . . . the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities) . . . is included in the term 'Exculpated Party.'").

[8] Subsequently to this appeal, the Fifth Circuit vacated a portion of the exculpation provision. *Highland*, 2022 WL 3571094, at *12. The Fifth Circuit held that "the exculpation of certain non-debtors . . . was unlawful" so the court "str[uck] all exculpated parties from the Plan except for [HCM], the Committee and its members, and the Independent Debtors." *Id.* Charitable DAF brings its causes of action against HCM, so what remains of the exculpation provision still applies to this case. *See id.*

[9] The parties disagree on whether this Court reviews the denial of the stay for abuse of discretion or de novo. Doc. 11, Appellant's Br., 6 ("Questions of law are reviewed de novo."); Doc. 16, Appellee's Br., 2 ("The Court reviews the bankruptcy court's order for abuse of discretion."). Charitable DAF does not pursue this argument in its Reply, so this argument is considered waived, *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006), as well as incorrect. *See Moore v. Tangipahoa Par. Sch. Bd.*, 507 F. App'x 389, 392 (5th Cir. 2013) (citing *Wildmon v. Berwick Universal Pictures*, 983 F.2d 21, 23 (5th Cir. 1992)) ("We review a district court's denial of a stay pending appeal for abuse of discretion.").

Appx 016599

Case 19-34054-sgj11   Doc 3596-33   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 33   Filed 07/22/25   Page 921 of 1052   PageID 17599
Case 3:21-cv-03129-B   Document 28   Filed 09/02/22   Page 21 of 21   PageID 3631

gross negligence, criminal misconduct, or willful misconduct" and Charitable DAF's causes of action—breach of fiduciary duty, breach of contract, negligence, and RICO—appear to fit within these categories of claims. *Id.* at 490–504, 2398–99. Further, Charitable DAF continued to participate by responding to HCM's motion to dismiss and participating in the hearing regarding the motion to dismiss. *See* Section III(A) *supra*. Lastly and importantly, Charitable DAF did not even attempt to address the traditional stay elements. R. at 2087 ("I guess one might say the traditional four-factor test for a stay of a proceeding has really not been the subject of the argument here for a stay."). Without argument on the factors for a stay, this Court lacks any basis to overturn the bankruptcy court.

The bankruptcy court's Motion to Stay Order is **AFFIRMED**.

## IV.

## CONCLUSION

For the foregoing reasons, the Court **REVERSES** and **REMANDS** the bankruptcy court's Motion to Dismiss Order and **AFFIRMS** the bankruptcy court's Motion to Stay Order.

**SO ORDERED**.

SIGNED: September 2, 2022.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

Appx 04928
016600

# EXHIBIT 34

Appx 04039

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21   Filed 06/03/25   Page 923 of 1052   PageID 17601
Case 19-34054-sgj11 Doc 2421 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 1 of 8

Docket #2421 Date Filed: 06/07/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## DEBTOR'S AMENDED WITNESS AND EXHIBIT LIST WITH RESPECT
## TO EVIDENTIARY HEARING TO BE HELD ON JUNE 8, 2021

Highland Capital Management, L.P. (the "Debtor") submits the following amended

witness and exhibit list with respect to the *Order Requiring the Violators to Show Cause Why*

*They Should Not Be Held in Civil Contempt for Violating Two Court Orders* [Docket No. 2255]

---

1   The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210607000000000015

Appx. 04949

016602

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 34   Filed 08/05/25   Page 924 of 1052   PageID 17602
Case 19-34054-sgj11   Doc 2421   Filed 06/07/21   Entered 06/07/21 20:02:45   Page 2 of 8

(the "<u>Show Cause Order</u>"), which the Court has set for hearing at 9:30 a.m. (Central Time) on

June 8, 2021 (the "<u>Hearing</u>") in the above-styled bankruptcy case (the "<u>Bankruptcy Case</u>").

    A.    <u>Witnesses</u>:

        1.    James Dondero;

        2.    Mark Patrick;

        3.    Grant Scott (by deposition designation);

        4.    Gregory V. Demo;[2]

        5.    Any witness identified by or called by any other party; and

        6.    Any witness necessary for rebuttal.

    B.    <u>Exhibits</u>:

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 1. | Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-1] | | |
| 2. | Declaration of John A. Morris in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-2] | | |
| 3. | Exhibit A, the [Proposed] Order on the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-3] | | |
| 4. | James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest [Docket No. 2237-4] | | |
| 5. | Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-5] | | |

---

[2] If needed, Mr. Demo will be called as a witness for the sole purpose of authenticating Exhibits 54 and 55, time records from Pachulski Stang Ziehl & Jones, LLP relating to the Show Cause Order.

016603
Appx. 04944

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21it 34iledP0606/0564   Page 925 of 1052   PageID 17603
Case 19-34054-sgj11 Doc 2421 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 3 of 8

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| 6. | CLO Holdco's Objection to HarbourVest Settlement. [Docket No. 2237-6] | | |
| 7. | Notice of Deposition to James Dondero [Docket No. 2237-7] | | |
| 8. | Transcript of January 11, 2021 Deposition of Michael Pugatch [Docket No. 2237-8] | | |
| 9. | Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-9] | | |
| 10. | Transcript of January 14, 2021 Hearing [Docket No. 2237-10] | | |
| 11. | Order Approving Debtor's Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-11] | | |
| 12. | Original Complaint (Charitable DAF Fund, L.P. v. Highland Capital Management, L.P., Case No. 21-cv-00842, U.S. District Court Northern District of TX) (GScott000389) [Dondero June 1, 2021 Deposition Exhibit 7] [Docket No. 2237-12] | | |
| 13. | Email string dated April 19, 2021, between counsel for the Debtor and counsel for the plaintiffs in the DAF Action [Docket No. 2237-13] | | |
| 14. | Second email string dated April 19, 2021, between counsel for the Debtor and counsel for the plaintiffs in the DAF Action [Docket No. 2237-14] | | |
| 15. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 2237-15] | | |
| 16. | Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative *Nunc Pro Tunc* to March 15, 2020 [Docket No. 2237-16] | | |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21   Filed 06/05/25   Page 926 of 1052   PageID 17604
Case 19-34054-sgj11 Doc 2421 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 4 of 8

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 17. | Plaintiff's Motion for Leave to File First Amended Complaint (Charitable DAF Fund, L.P. v. Highland Capital Management, L.P., Case No. 21-cv-00842, U.S. District Court Northern District of TX) [Docket No. 2237-17] | | |
| 18. | CM/ECF Notice dated April 20, 2020 and lodged as Docket No. 8 in the DAF Action [Docket No. 2237-18] | | |
| 19. | Transcript of March 22, 2021 Hearing [Docket 2351-1] | | |
| 20. | Email from DAF counsel to Debtor's counsel dated April 20, 2021 [Docket 2351-2] | | |
| 21. | All communications between Debtor's counsel and the Bankruptcy Court courtroom deputy [Docket 2355-3] | | |
| 22. | Debtor's Motion for an Order to Enforce the Order of Reference [Docket 2351-4] | | |
| 23. | Transcript Designations from the January 21, 2021 Deposition of Grant Scott | | |
| 24. | Transcript Designations from the June 1, 2021 Deposition of Grant Scott | | |
| 25. | DAF/CLO Holdco Structure Chart (GScott000007) [Dondero June 1, 2021 Deposition Exhibit 1] | | |
| 26. | Amended and Restated Limited Liability Company Agreement of Charitable DAF GP, LLC, effective as of January 1, 2012 (PATRICK_000031) [Dondero June 1, 2021 Deposition Exhibit 2] | | |
| 27. | Amended and Restated Investment Advisory Agreement by and between Charitable DAF Fund, L.P., Charitable DAF GP, LLC, and HCMLP, effective July 1, 2014 (GScott000325) [Dondero June 1, 2021 Deposition Exhibit 3] | | |
| 28. | January 31, 2021 Meeting Appointment (GScott000011) [Dondero June 1, 2021 Deposition Exhibit 4] | | |
| 29. | Email chain re Grant Scott's notice of intent to resign (GScott000018) [Dondero June 1, 2021 Deposition Exhibit 5] | | |

Appx. 04943

016605

Case 19-34054-sgj11 Doc 3596-34 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 35-21 Exhibit 34 Filed 06/06/25 Page 927 of 1052 PageID 17605
Case 19-34054-sgj11 Doc 2421 Filed 06/07/21 Entered 06/07/21 20:02:45 Page 5 of 8

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 30. | Email chain re Highland Adherence Agreement in connection with HarbourVest shares (GScott000085) [Dondero June 1, 2021 Deposition Exhibit 6] | | |
| 31. | Email and attached A&R Service and Advisory Agreements and GP Resolutions (GScott000312) [Scott June 1, 2021 Deposition Exhibit 8] | | |
| 32. | Notice of CLO Holdco Settlement Agreement [Scott June 1, 2021 Deposition Exhibit 9] | | |
| 33. | Email between Grant Scott and Mark Patrick re Complaint (GScott000080) [Scott June 1, 2021 Deposition Exhibit 10] | | |
| 34. | Email chain re TerreStar Corporation Equity Investment and Residual Assets held by HOCF (GScott000138) [Scott June 1, 2021 Deposition Exhibit 11] | | |
| 35. | Email chain re request for information from Elysium Fund Management, Ltd. (GScott000361) [Scott June 1, 2021 Deposition Exhibit 12] | | |
| 36. | Assignment and Assumption of Membership Interest Agreement between Grant J. Scott and Mark E. Patrick dated March 24, 2021 (PATRICK_000006) [Scott June 1, 2021 Deposition Exhibit 13] | | |
| 37. | Written Resolutions of the Sole Director of the Company Dated March 25, 2021 (PATRICK_000003) [Scott June 1, 2021 Deposition Exhibit 14] | | |
| 38. | Written Shareholder Resolutions of the Sole Shareholder of the Company Made on March 24, 2021 (PATRICK_000012) [Scott June 1, 2021 Deposition Exhibit 15] | | |
| 39. | Written Shareholder Resolutions of the Sole Shareholder of the Company Made on March 31, 2021 (PATRICK_000001) [Scott June 1, 2021 Deposition Exhibit 16] | | |
| 40. | Written Shareholder Resolutions of the Sole Shareholder of the Company Made on April 2, 2021 (PATRICK_000002) [Scott June 1, 2021 Deposition Exhibit 17] | | |
| 41. | Amended and Restated Investment Advisory Agreement by and between Charitable DAF Fund, L.P., Charitable DAF GP, LLC, and HCMLP, effective July 1, 2014 (PATRICK_000923) | | |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21   Filed 06/06/25   Page 928 of 1052   PageID 17606
Case 19-34054-sgj11 Doc 2421 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 6 of 8

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 42. | Amended and Restated Service Agreement by and among HCMLP, Charitable DAF Fund, L.P., and Charitable DAF GP, LLC , effective July 1, 2014 (PATRICK_000938) | | |
| 43. | Email from Mark Patrick to Grant Scott dated April 6, 2021 re Urgent Questions (PATRICK_001129) | | |
| 44. | Original Complaint (Docket No. 1, PCMG Trading Partners XXIII, LP v. Highland Capital Management, L.P., Case No. 21-cv-01169, U.S. District Court Northern District of TX) | | |
| 45. | Defendant's Motion For Leave to Amend Answer (Docket No. 32, Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., Adv. Pro. No. 21-03004) | | |
| 46. | Email chain re NDA for D&O Insurance Quote (GScott000172) | | |
| 47. | Check Request dated April 7, 2021 (D1 Landscape & Irrigation) (GScott000354) | | |
| 48. | Check Request dated April 7, 2021 (Sanders Lawn & Maintenance) (GScott000355) | | |
| 49. | Check Request dated April 7, 2021 (BB Services) (GScott000358) | | |
| 50. | Highland Capital Management, L.P.'S Notice of Amended Subpoena to Grant Scott [Docket No. 2366] | | |
| 51. | Certificate of Service for Notice of Deposition of Grant Scott (Docket No. 41, Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., et al., Adv. Pro. No. 21-03000) | | |
| 52. | Email re Zoom Instructions for June 1, 2021 Deposition of Grant Scott | | |
| 53. | Email re Zoom Instructions for January 21, 2021 Deposition of Grant Scott | | |
| 54. | Pachulski Stang Billing Detail (April 18 – April 30, 2021) | | |
| 55. | Pachulski Stang Billing Detail (May 1 – June 7, 2021) | | |

Appx. 04945

016607

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 15-21   Exhibit 34   Filed 06/03/25   Page 929 of 1052   PageID 17607
Case 19-34054-sgj11 Doc 2421 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 7 of 8

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 56. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| 57. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| 58. | All exhibits identified by or offered by any other party at the Hearing | | |

[*Remainder of Page Intentionally Blank*]

Appx. 04946
016608

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 15-31    Filed 06/09/25    Page 930 of 1052    PageID 17608
Case 19-34054-sgj11 Doc 2421 Filed 06/07/21 Entered 06/07/21 20:02:45    Page 8 of 8

Dated:  June 7, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*



# EXHIBIT 54

# Pachulski Stang Ziehl & Jones LLP

10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067

Board of Directors
Highland Capital Management LP
300 Crescent Court ste. 700
Dallas, TX  75201

April 30, 2021
Invoice    127680
Client     36027
Matter     00002
**JNP**

RE:  Postpetition

<br>

### STATEMENT OF PROFESSIONAL SERVICES RENDERED THROUGH  04/30/2021

| | |
|---|---|
| FEES | $1,286,897.00 |
| EXPENSES | $8,173.58 |
| **TOTAL CURRENT CHARGES** | **$1,295,070.58** |
| **BALANCE FORWARD** | **$5,472,625.24** |
| **LAST PAYMENT** | **$3,187,420.34** |
| **TOTAL BALANCE DUE** | **$3,580,275.48** |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 33-21    Exhibit 34    Filed 06/25/25    Page 933 of 1052    PageID 17611
Case 19-34054-sgj11 Doc 2483-1 Filed 05/07/21 Entered 05/07/21 22:58:25 Page 93 of 119

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:     32

Invoice 127680

April 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 04/18/2021 | GVD | BL | Draft summary of DAF litigation to I. Pachulski | 0.90 | 950.00 | $855.00 |
| 04/19/2021 | IDK | BL | Numerous E-mails with J Pomerantz, others re DAF lawyers correspondence to add CEO to DAF lawsuit, and how to respond (.3); Telephone conferences with J Pomerantz re same (.3); Review of correspondence with J Pomerantz and DAF lawyers re our response to their request and potential contempt, and their feedback re same on no violation of prior court orders (.2). | 0.80 | 1325.00 | $1,060.00 |
| 04/19/2021 | IDK | BL | E-mails with J Pomerantz re DAF District Court action and related issues (.4); E-mails with R Saunders re same and timing, including list of issues to research and relevant documents for same (.5). | 0.90 | 1325.00 | $1,192.50 |
| 04/19/2021 | JNP | BL | Conference with J. Dubel regarding District Court DAF litigation and related issues (several). | 0.40 | 1295.00 | $518.00 |
| 04/19/2021 | JNP | BL | Review and respond to various emails from counsel for DAF regarding District Court litigation. | 0.30 | 1295.00 | $388.50 |
| 04/19/2021 | JNP | BL | Conference with Ira D. Kharasch and then John A. Morris regarding  DAF District Court litigation. | 0.30 | 1295.00 | $388.50 |
| 04/19/2021 | JNP | BL | Emails to Board regarding DAF District Court litigation. | 0.30 | 1295.00 | $388.50 |
| 04/19/2021 | JNP | BL | Conference with John A. Morris and J. Seery regarding DAF District Court litigation. | 0.40 | 1295.00 | $518.00 |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 33-21   Filed 03/26   64   Page 934 of 1052   PageID 17612
Case 19-34054-sgj11 Doc 2423-1 Filed 05/07/21 Entered 05/07/21 22:50:45 Page 604 of 129

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

| | | | | | | |
|---|---|---|---|---|---|---|
| 04/19/2021 | JAM | BL | Tephone conference with J. Pomerantz re: DAF lawsuit (0.1); review e-mails between J. Pomerantz and counsel to the DAF re: DAF intention to name Seery as a defendant (0.2); telephone conference with J. Seery, J. Pomerantz re: DAF intention to name Seery as a defendant (0.4). | 0.70 | 1245.00 | $871.50 |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 33-20   Filed 08/08/25   Page 935 of 1052   PageID 17613
Case 19-34054-sgj11 Doc 2423 Filed 05/07/21 Entered 05/07/21 22:58:45 Page 15 of 49

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:   34
Invoice 127680
April 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | | | | |
| 04/20/2021 | IDK | BL | E-mails with R Saunders re DAF action and prioritizing various issues re same (.2); Review of DAF motion for leave to amend and add CEO and D Court denial of same (.3); Review of correspondence with Board, J Pomerantz re same (.1). | 0.60 | 1325.00 | $795.00 |
| | | | | | | |
| 04/20/2021 | JNP | BL | Conference with J. Dubel regarding DAF litigation and related. | 0.30 | 1295.00 | $388.50 |
| 04/20/2021 | JNP | BL | Review DAF motion to amend to add Seery as defendant. | 0.20 | 1295.00 | $259.00 |
| 04/20/2021 | JNP | BL | Conference with John A. Morris regarding DAF motion to amend and response. | 0.10 | 1295.00 | $129.50 |
| 04/20/2021 | JNP | BL | Conference with John A. Morris regarding DAF District Court lawsuit and employee claims litigation issues. | 0.50 | 1295.00 | $647.50 |
| 04/20/2021 | JNP | BL | Conference with J. Dubel regarding DAF District Court lawsuit. | 0.30 | 1295.00 | $388.50 |

Case 19-34054-sgj11  Doc 3596-34  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:25-cv-02072-S  Document 33-21  Filed 05/25/64  Page 936 of 1052  PageID 17614
Case 19-34054-sgj11 Doc 2423-1 Filed 05/07/21 Entered 05/07/21 22:58:25 Page 26 of 49

Pachulski Stang Ziehl & Jones LLP                     Page:    35
Highland Capital Management LP                        Invoice 127680
36027    - 00002                                     April 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 04/20/2021 | JAM | BL | Telephone conference with J. Pomerantz re: DAF complaint and strategy concerning the same (0.5); outline of issues for contempt motion concerning DAF complaint/Seery (0.8). | 1.30 | 1245.00 | $1,618.50 |
| 04/20/2021 | JAM | BL | Review DAF complaint (0.4); telephone conference with J. Seery re: DAF complaint and related matters (0.2); research re: factual issues concerning DAF complaint (0.3); e-mail to J. Seery, J. Pomerantz re: factual issues concerning DAF complaint (0.2). | 1.10 | 1245.00 | $1,369.50 |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 35-21 34 Filed 06/26 Page 937 of 1052   PageID 17615
Case 19-34054-sgj11 Doc 2423 Filed 05/07/21 Entered 05/07/21 22:58:25 Page 37 of 129

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:    36

Invoice 127680

April 30, 2021

| Date | | | | Hours | Rate | Amount |
|------|---|---|---|-------|------|--------|
| 04/20/2021 | GVD | BL | Review DAF/CLOH lawsuit | 0.50 | 950.00 | $475.00 |
| 04/21/2021 | IDK | BL | Telephone conference with J Pomerantz re DAF action issues (.1). | 0.10 | 1325.00 | $132.50 |
| 04/21/2021 | JNP | BL | Conference with John A. Morris regarding potential contempt motion. | 0.20 | 1295.00 | $259.00 |
| 04/21/2021 | JHD | BL | Correspondence from Ira D. Kharasch re DAF litigation; correspondence from Isaac M. Pachulski re same; correspondence from Gregory V. Demo re same | 0.30 | 1645.00 | $493.50 |
| 04/21/2021 | JHD | BL | Research re DAF litigation issues; prepare | 0.80 | 1645.00 | $1,316.00 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 34    Filed 06/26/25 64    Page 938 of 1052    PageID 17616
Case 19-34054-sgj11 Doc 2423-1 Filed 05/07/21 Entered 05/07/21 22:08:45 Page 48 of 149

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027   - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | correspondence to Ira D. Kharasch re same; correspondence from Ira D. Kharasch re same | | | |
| 04/22/2021 | JNP | BL | Review motion for contempt. | 0.30 | 1295.00 | $388.50 |
| 04/22/2021 | JNP | BL | Conference with John A. Morris regarding motion for contempt. | 0.20 | 1295.00 | $259.00 |

Appx 04055

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-20   Filed 06/26   Page 939 of 1052   PageID 17617
Case 19-34054-sgj11 Doc 2423-1 Filed 05/07/21 Entered 05/07/21 22:00:24 Page 59 of 129

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:     38

Invoice 127680

April 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|

| 04/22/2021 | JAM | BL | Work on DAF contempt motion (9.7); e-mails with J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: draft DAF contempt motion (0.2); telephone conference with J. Pomerantz re: draft DAF | 10.00 | 1245.00 | $12,450.00 |

| 04/22/2021 | HRW | BL | Draft motion for order to show cause and ancillary documents for DAF contempt motion (2.5); Draft witness and exhibit list for trial on Dondero adversary proceeding for injunctive relief (0.6); Call with J. Morris re: DAF contempt motion (0.1); Call with J. Morris, T. Surgent, and G. Demo re: discovery responses (0.2). | 3.40 | 695.00 | $2,363.00 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 34 Filed 09/25/64    Page 940 of 1052    PageID 17618
Case 19-34054-sgj11 Doc 2431 Filed 05/07/21 Entered 05/07/21 22:30:02 Page 40 of 49
21

Pachulski Stang Ziehl & Jones LLP                                      Page:    39
Highland Capital Management LP                                         Invoice 127680
36027    - 00002                                                      April 30, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
| 04/23/2021 | JNP | BL | Conference with John A. Morris regarding DAF litigation and motion for contempt. | 0.20 | 1295.00 | $259.00 |
| 04/23/2021 | JNP | BL | Review final version of contempt motion. | 0.20 | 1295.00 | $259.00 |
|  |  |  |  |  |  |  |
| 04/23/2021 | JMF | BL | Review contempt pleadings. | 0.40 | 1050.00 | $420.00 |
|  |  |  |  |  |  |  |
| 04/23/2021 | GVD | BL | Review motion for contempt | 0.50 | 950.00 | $475.00 |
| 04/23/2021 | GVD | BL | Correspondence with counsel to HCLOF re contempt motion | 0.20 | 950.00 | $190.00 |
| 04/23/2021 | GVD | BL | Conference with J. Morris re next steps on contempt motion | 0.20 | 950.00 | $190.00 |
|  |  |  |  |  |  |  |
| 04/23/2021 | GVD | BL | Conference with J. Morris re status of contempt motion | 0.20 | 950.00 | $190.00 |
| 04/23/2021 | HRW | BL | Review DAF/CLO Holdco Contempt Motion. | 0.60 | 695.00 | $417.00 |

016619

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 33-21    Filed 04/26/25    Page 941 of 1052    PageID 17619
Case 19-34054-sgj11 Doc 2321 Filed 05/07/21 Entered 05/07/21 20:02:45 Page 41 of 149

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:    40
Invoice 127680
April 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|

| 04/24/2021 | HRW | BL | Review DAF/CLO Holdco motion to amend complaint. | 0.40 | 695.00 | $278.00 |

| 04/26/2021 | IDK | BL | Review of correspondence with Wilmer Hale on DAF action and related federal law issues for their review and coordination of call re same (.2); Review of further R Saunders memo/research on DAF and enforcing the reference re same (.3). | 0.50 | 1325.00 | $662.50 |

Appx. 04958

016620

Case 19-34054-sgj11 Doc 3596-34 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 33-21 Filed 06/26/25 Page 942 of 1052 PageID 17620
Case 19-34054-sgj11 Doc 2421 Filed 05/06/21 Entered 05/06/21 22:30:02 Page 42 of 49
21

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|

| 04/26/2021 | JNP | BL | Conference with J. Dubel regarding contempt motion and related issues. | 0.20 | 1295.00 | $259.00 |

Appx. 04959

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 13-21    Filed 03/22/25    Page 943 of 1052    PageID 17621
Case 19-34054-sgj11    Doc 2421    Filed 05/26/21    Entered 05/26/21 20:02:45    Page 43 of
21

Pachulski Stang Ziehl & Jones LLP                          Page:     42
Highland Capital Management LP                             Invoice 127680
36027   - 00002                                           April 30, 2021

|            |      |      |                                                                                                                                                                                                                                                                                                                     | Hours | Rate    | Amount     |
|------------|------|------|-----|---------|------------|
| 04/26/2021 | JAM  | BL   | E-mail to T. Ellison, J. Pomerantz, G. Demo, M. Heyward re: hearing date for contempt motion (0.2); telephone conference with J. Pomerantz re: e-mail to Ms. Ellsion concerning contempt hearing (0.2); telephone conference with J. Seery re: possible motion for Rule 11 sanctions (0.1); telephone conference with J. Pomerantz, R. Feinstein, T. Silva re: possible defenses to DAF complaint (0.4). | 0.90 | 1245.00 | $1,120.50 |
| 04/26/2021 | JAM  | BL   | Telephone conference with J. Pomerantz, G. Demo, King & Spalding re: DAF litigation matters (0.4); telephone conference with J. Seery, J. Pomerantz re: litigation matters (0.5) | 0.90 | 1245.00 | $1,120.50 |

Appx. 04909

Pachulski Stang Ziehl & Jones LLP                                    Page:    43
Highland Capital Management LP                                       Invoice 127680
36027    - 00002                                                     April 30, 2021

|  |  |  | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|

| 04/27/2021 | IDK | BL | E-mails with J Morris, others on court's email setting contempt hearing as live hearing. | 0.20 | 1325.00 | $265.00 |
| 04/27/2021 | IDK | BL | E-mails with R Saunders, J Pomerantz re DAF | 0.30 | 1325.00 | $397.50 |

**Appx. 04901**

016623

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 134-20   Filed 03/25   Page 945 of 1052   PageID 17623
Case 19-34054-sgj11   Doc 2421   Filed 05/07/21   Entered 05/07/21 22:20:02   Page 45 of 49
21

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:    44

Invoice 127680

April 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | action and Barton doctrine re same. | | | |
| 04/27/2021 | JNP | BL | Conference with John A. Morris regarding email to court regarding contempt motion. | 0.10 | 1295.00 | $129.50 |

016624

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 34    Filed 08/25/25    Page 946 of 1052    PageID 17624
Case 19-34054-sgj11    Doc 2431    Filed 05/07/21    Entered 05/07/21 20:02:45    Page 72 of 149

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:    45

Invoice 127680

April 30, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 04/27/2021 | JAM | BL | Communications with T. Ellison, J. Pomerantz, Z. Annable re: notice of motion for contempt hearing (DAF) (0.2) draft notice of hearing for contempt motion (0.3); e-mails with Z. Annable, J. Pomerantz, G. Demo, H. Winograd re: notice of hearing for contempt motion (0.2); e-mails with M. Sbaiti, C. Taylor re: notice of motion for contempt hearing and related matters (0.4). | 1.10 | 1245.00 | $1,369.50 |

016625

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S    Document 13-31 34   Filed 06/26/25   Page 947 of 1052    PageID 17625
Case 19-34054-sgj11   Doc 2421   Filed 05/07/21   Entered 05/07/21 22:20:02   Page 47 of 49
21

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Invoice 127680

April 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 04/28/2021 | JNP | BL | Conference with J. Dubel regarding contempt motion and related issues (2x). | 0.20 | 1295.00 | $259.00 |

Appx. 04964

016626

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:    47

Invoice 127680

April 30, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 04/28/2021 | JAM | BL | Communications with Z. Annable, J. Pomerantz, G. Demo, H. Winograd re: Order to Show Cause (0.3); review/revise Order to Show Cause (0.2). | 0.50 | 1245.00 | $622.50 |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 33-21 34   Filed 08/26/25   Page 949 of 1052   PageID 17627
Case 19-34054-sgj11   Doc 2421   Filed 05/06/21   Entered 05/06/21 20:02:45   Page 49 of 49
21

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:    48

Invoice 127680

April 30, 2021

| | Hours | Rate | Amount |
|---|---|---|---|

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 33-21 34   Filed 09/26   Page 950 of 1052   PageID 17628
Case 19-34054-sgj11   Doc 2431-1   Filed 05/07/21   Entered 05/07/21 20:03:45   Page 70 of 49
21

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027   - 00002

| | Hours | Rate | Amount |
|---|---|---|---|

0116629

Appx 04907

Case 19-34054-sgj11 Doc 3596-34 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 131-21 Filed 06/26/25 Page 951 of 1052 PageID 17629
Case 19-34054-sgj11 Doc 2381 Filed 05/07/21 Entered 05/07/21 20:02:45 Page 77 of 149
21

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002



016630

# EXHIBIT 55

Appx 04969

016631

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 33-21 34 Filed 03/25/26 64   Page 953 of 1052   PageID 17631

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 2 of 34

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027   -00002

| | Hours | Rate | Amount |
|---|---|---|---|

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 83-21 34 Filed 03/25 Page 954 of 1052    PageID 17632

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 3 of 34

Pachulski Stang Ziehl & Jones LLP                          Page:   100
Highland Capital Management LP                             Prebill#283067
36027    -00002                                           June 07, 2021

|  | Hours | Rate | Amount |
|---|---|---|---|

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 33-21 34  Filed 03/25  Page 955 of 1052    PageID 17633

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 4 of 34

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:   101
Prebill#283067
June 07, 2021



| 05/05/2021 | JNP | DAF | Conference with King and Spalding and PSZJ regarding DAF lawsuit status. | 0.40 | 1295.00 | $518.00 |

Appx 04972

016634

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 33-21 34 Filed 05/25 Page 35 of 64   Page 956 of 1052      PageID 17634

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 5 of 34

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:   102
Prebill#283067
June 07, 2021

| | | | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| RJF Bill | 05/05/2021 | | DAF | 0.40 | 0.40 | 1,395.00 | | 558.00 |
| 05/05/2021 | RJF | DAF | Telephone conference with Jeffrey N. Pomerantz, Gregory V. Demo and John A. Morris regarding complaint. | | | 0.40 | 1395.00 | $558.00 |
| RJF Bill | 05/05/2021 | | DAF | 0.40 | 0.40 | 1,395.00 | | 558.00 |
| 05/05/2021 | RJF | DAF | Call with CLO Holdco's attorney regarding case status. | | | 0.40 | 1395.00 | $558.00 |
| RJF Bill | 05/05/2021 | | DAF | 0.40 | 0.40 | 1,395.00 | | 558.00 |
| 05/05/2021 | RJF | DAF | Research response date, related emails, civil action coversheet. | | | 0.40 | 1395.00 | $558.00 |
| JAM Bill | 05/05/2021 | | DAF | 1.00 | 1.00 | 1,245.00 | | 1,245.00 |
| 05/05/2021 | JAM | DAF | Telephone conference with J. Pomerantz, R. Feinstein, G. Demo re: strategic issues concerning DAF litigation (0.4); telephone conference with J. Pomerantz, G. Demo, M. Maloney re: DAF litigation issues including service of process and timing (0.4); research re: Rule 11 motion (0.2). | | | 1.00 | 1245.00 | $1,245.00 |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 131-21 34-Filed 06/25/64   Page 957 of 1052   PageID 17635
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 6 of 34

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:   103
Prebill#283067
June 07, 2021

| | Hours | Rate | Amount |
|---|---|---|---|

**016636**

Case 19-34054-sgj11  Doc 3596-34  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:25-cv-02072-S  Document 33-21  Exhibit 34  Filed 06/25/64  Page 958 of 1052  PageID 17636
Case 19-34054-sgj11  Doc 2421-2  Filed 06/07/21  Entered 06/07/21 20:02:45  Page 7 of 34

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:    104

Prebill#283067

June 07, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| HRW Bill | 05/06/2021 | DAF | 1.20 | 1.20 | 695.00 | 834.00 |
| 05/06/2021 | HRW | DAF | Research re: meaning of "related to" on civil cover sheet for DAF/CLO Holdco litigation (1.2). | 1.20 | 695.00 | $834.00 |
| 05/07/2021 | JAM | DAF | Telephone conference with J. Pomerantz, R. Feinstein, G. Demo re: strategic issues concerning DAF Action, including responding to complaint and timing of related motions (0.8). | 0.80 | 1245.00 | $996.00 |
| GVD Bill | 05/07/2021 | DAF | 0.80 | 0.80 | 950.00 | 760.00 |
| 05/07/2021 | GVD | DAF | Conference with PSZJ team re planning for DAF action response | 0.80 | 950.00 | $760.00 |

Appx 04975

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027   - 00002

|  | Hours | Rate | Amount |
|---|---|---|---|

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 131-21 34 Filed 09/25/64   Page 960 of 1052   PageID 17638
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 9 of 34

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

|  | Hours | Rate | Amount |
|---|---|---|---|

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 13-21    Filed 04/25/64    Page 961 of 1052    PageID 17639
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 10 of 34

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

| | Hours | Rate | Amount |
|---|---|---|---|

016640

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-21   Exhibit 34   Filed 06/26/25   Page 962 of 1052   PageID 17640
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 11 of 34

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:   108
Prebill#283067
June 07, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| JE Bill | 05/11/2021 | DAF | 8.70 | 8.70 | 1,195.00 | 10,396.50 |

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/11/2021 | JE | DAF | Review draft revisions to objection from Mr. Pomerantz and review and revise same accordingly (7.7); call with Mr. Demo regarding reference and contempt pleadings (.2); review contempt pleadings and applicable documents attached to contempt pleadings for fact section (.8). | 8.70 | 1195.00 | $10,396.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   -00002

Page:   109
Prebill#283067
June 07, 2021



Case 19-34054-sgj11 Doc 3596-34 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 131-21 34 FilePage 04/25/64 Page 964 of 1052 PageID 17642
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21 Entered 06/07/21 20:02:45 Page 13 of 34

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    110
Prebill#283067
June 07, 2021

016643

Appx 04081

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 33-21 34    Filed 04/25 04/25 64    Page 965 of 1052    PageID 17643

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 14 of 34

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

Page:    111

Prebill#283067

June 07, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| JNP Bill | 05/14/2021 | DAF | 0.10 | 0.10 | 1,295.00 | 129.50 |
| 05/14/2021 | JNP | DAF | Conference with John A. Morris regarding discovery regarding contempt motion and related. | 0.10 | 1295.00 | $129.50 |
| JNP Bill | 05/14/2021 | DAF | 0.20 | 0.20 | 1,295.00 | 259.00 |
| 05/14/2021 | JNP | DAF | Review discovery regarding contempt motion and provide comments. | 0.20 | 1295.00 | $259.00 |
| JNP Bill | 05/14/2021 | DAF | 0.30 | 0.30 | 1,295.00 | 388.50 |
| 05/14/2021 | JNP | DAF | Review responses to contempt motion filed by various parties. | 0.30 | 1295.00 | $388.50 |
| 05/14/2021 | JAM | DAF | Preliminary review of objection to contempt motion (0.4); telephone conference with J. Pomerantz re: objections to contempt motion (0.2). | 0.60 | 1245.00 | $747.00 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 31-21 34 Filed 04/25/25 64    Page 966 of 1052    PageID 17644

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 15 of 34

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:   112
Prebill#283067
June 07, 2021

|  | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  | | | | | | |
| JAM Bill | 05/15/2021 | | DAF | 6.30 | 6.30 | 1,245.00 | | 7,843.50 |
| 05/15/2021 | JAM | DAF | Draft document requests for Dondero, Patrick, CLO Holdco/DAF for contempt proceeding (3.6); e-mails to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: draft document requests for Dondero, Patrick, CLO Holdco/DAF for contempt proceeding (0.2); telephone conference with J. Dubel re: objections to contempt motion and related matters (0.7); revisions to draft document requests for Dondero, Patrick, CLO Holdco/DAF for contempt proceeding (0.6); e-mails to J. Seery, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: draft document requests for Dondero, Patrick, CLO Holdco/DAF for contempt proceeding (0.2); draft subpoena for Grant Scott (0.4); telephone conference with J. Seery re: discovery in connection with contempt motion (0.2); telephone conference with G. Demo re: discovery in connection with contempt motion (0.1); e-mails to counsel for Violators re: discovery in connection with contempt motion (0.3). | 6.30 | 1245.00 | $7,843.50 |
| GVD Bill | 05/15/2021 | | DAF | 0.20 | 0.20 | 950.00 | | 190.00 |
| 05/15/2021 | GVD | DAF | Review draft discovery requests re contempt hearing | 0.20 | 950.00 | $190.00 |
| GVD Bill | 05/15/2021 | | DAF | 0.30 | 0.30 | 950.00 | | 285.00 |
| 05/15/2021 | GVD | DAF | Review responses to order to show cause | 0.30 | 950.00 | $285.00 |
| JE Bill | 05/16/2021 | | DAF | 1.60 | 1.60 | 1,195.00 | | 1,912.00 |
| 05/16/2021 | JE | DAF | Review responses of DAF and others to Order to show cause, look at certain cited case law and | 1.60 | 1195.00 | $1,912.00 |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 33-21 34 Filed 04/25/25 64   Page 967 of 1052   PageID 17645

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 16 of 34

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   -00002

Page:   113
Prebill#283067
June 07, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  |  |  | correspondence with team regarding same. |  |  |  |
| IDK Bill | 05/17/2021 |  | DAF | 0.80 | 0.80 | 1,325.00 | 1,060.00 |
| 05/17/2021 | IDK | DAF | Attend conference call with J Pomerantz, others re DAF opposition to OSC re contempt, contempt powers, damages and reply issues (.6); E-mails with J Morris, others re same DAF opposition and related errant E-mail issue (.2). | 0.80 | 1325.00 | $1,060.00 |
| IDK Bill | 05/17/2021 |  | DAF | 1.00 | 1.00 | 1,325.00 | 1,325.00 |
| 05/17/2021 | IDK | DAF | Attend conference call with J Pomerantz, others on DAF and OSC as well as other litigation matters (1.0). | 1.00 | 1325.00 | $1,325.00 |
| JNP Bill | 05/17/2021 |  | DAF | 0.60 | 0.60 | 1,295.00 | 777.00 |
| 05/17/2021 | JNP | DAF | Conference with PSZJ team regarding contempt reply. | 0.60 | 1295.00 | $777.00 |
| JNP Bill | 05/17/2021 |  | DAF | 0.10 | 0.10 | 1,295.00 | 129.50 |
| 05/17/2021 | JNP | DAF | Conference with R. Nelms regarding contempt issues. | 0.10 | 1295.00 | $129.50 |
| JNP Bill | 05/17/2021 |  | DAF | 1.40 | 1.40 | 1,295.00 | 1,813.00 |
| 05/17/2021 | JNP | DAF | Detailed review of DAF response to contempt motion and draft comments thereto. | 1.40 | 1295.00 | $1,813.00 |
| JNP Bill | 05/17/2021 |  | DAF | 0.10 | 0.10 | 1,295.00 | 129.50 |
| 05/17/2021 | JNP | DAF | Conference with John A. Morris regarding DAF contempt issues. | 0.10 | 1295.00 | $129.50 |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 34-21 Filed 06/25/64   Page 968 of 1052   PageID 17646

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 17 of 34

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

Page:   114
Prebill#283067
June 07, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| JNP Bill | 05/17/2021 | DAF | 0.50 | 0.50 | 1,295.00 | 647.50 |
| 05/17/2021 | JNP | DAF | Conference with PSZJ team regarding DAF response. | 0.50 | 1295.00 | $647.50 |
| JNP Bill | 05/17/2021 | DAF | 0.40 | 0.40 | 1,295.00 | 518.00 |
| 05/17/2021 | JNP | DAF | Conference with R. Nelms and John A. Morris regarding contempt issues. | 0.40 | 1295.00 | $518.00 |
| JNP Bill | 05/17/2021 | DAF | 0.20 | 0.20 | 1,295.00 | 259.00 |
| 05/17/2021 | JNP | DAF | Conference with John A. Morris regarding contempt reply. | 0.20 | 1295.00 | $259.00 |
| JNP Bill | 05/17/2021 | DAF | 0.10 | 0.10 | 1,295.00 | 129.50 |
| 05/17/2021 | JNP | DAF | Emails regarding jurisdiction regarding DAF proceeding. | 0.10 | 1295.00 | $129.50 |
| JNP Bill | 05/17/2021 | DAF | 0.20 | 0.20 | 1,295.00 | 259.00 |
| 05/17/2021 | JNP | DAF | Consider issues regarding pending contempt motion. | 0.20 | 1295.00 | $259.00 |
| RJF Bill | 05/17/2021 | DAF | 0.80 | 0.80 | 1,395.00 | 1,116.00 |
| 05/17/2021 | RJF | DAF | Review opposition to contempt motion, related emails. | 0.80 | 1395.00 | $1,116.00 |
| RJF Bill | 05/17/2021 | DAF | 0.50 | 0.50 | 1,395.00 | 697.50 |
| 05/17/2021 | RJF | DAF | Internal call regarding contempt motion. | 0.50 | 1395.00 | $697.50 |
| JAM Bill | 05/17/2021 | DAF | 2.00 | 2.00 | 1,245.00 | 2,490.00 |
| 05/17/2021 | JAM | DAF | E-mails with L. Phillips, M. Sbaiti, others re: | 2.00 | 1245.00 | $2,490.00 |

Appx. 04085

016647

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 31-34   Filed 04/28/25   Page 969 of 1052   PageID 17647
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 18 of 34

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

Page:   115
Prebill#283067
June 07, 2021

| | | | | Hours | | Rate | Amount |
|---|---|---|---|---|---|---|---|
| | | | discovery (0.3); telephone conference with J. Pomerantz, J. Elkin, G. Demo, I. Kharasch re: legal and factual issues concerning Contempt Motion (0.6); telephone conference with J. Pomerantz, J. Elkin, G. Demo, I. Kharasch, R. Feinstein re: legal and factual issues concerning Contempt Motion (0.7); telephone conference with J. Pomerantz, R. Nelms re: DAF contempt issues (0.4). | | | | |
| GVD Bill | 05/17/2021 | | DAF | 0.70 | 0.70 | 950.00 | 665.00 |
| 05/17/2021 | GVD | DAF | Conference with PSZJ re reply to responses to order to show cause | 0.70 | | 950.00 | $665.00 |
| GVD Bill | 05/17/2021 | | DAF | 0.60 | 0.60 | 950.00 | 570.00 |
| 05/17/2021 | GVD | DAF | Conference (internal) re contempt motion and next steps | 0.60 | | 950.00 | $570.00 |
| GVD Bill | 05/17/2021 | | DAF | 0.30 | 0.30 | 950.00 | 285.00 |
| 05/17/2021 | GVD | DAF | Review contempt motions re research issues | 0.30 | | 950.00 | $285.00 |
| JE Bill | 05/17/2021 | | DAF | 5.00 | 5.00 | 1,195.00 | 5,975.00 |
| 05/17/2021 | JE | DAF | Call with PSZJ team to discuss show cause reply (.6); second call with PSZJ team to discuss show cause reply (.8); review comments of Mr. Pomerantz and Mr. Feinstein regarding reply (.4); research issues for reply on civil contempt and jurisdiction (3.2). | 5.00 | | 1195.00 | $5,975.00 |
| IDK Bill | 05/18/2021 | | DAF | 0.30 | 0.30 | 1,325.00 | 397.50 |
| 05/18/2021 | IDK | DAF | Attend part of conference call with J Pomerantz, | 0.30 | | 1325.00 | $397.50 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document Exhibit 34 Filed 04/25/64    Page 970 of 1052    PageID 17648

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 19 of 34

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:   116
Prebill#283067
June 07, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | others on contempt motion and opposition thereto and potential response | | | |
| JNP Bill | 05/18/2021 | | DAF | 0.70 | 0.70 | 1,295.00 | | 906.50 |
| 05/18/2021 | JNP | DAF | Conference with PSZJ team regarding DAF contempt reply. | 0.70 | 1295.00 | $906.50 |
| RJF Bill | 05/18/2021 | | DAF | 0.70 | 0.70 | 1,395.00 | | 976.50 |
| 05/18/2021 | RJF | DAF | Call with Jeffrey N. Pomerantz, Gregory V. Demo, Judith Elkin, John A. Morris regarding DAF contempt reply. | 0.70 | 1395.00 | $976.50 |



| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 05/18/2021 | RJF | DAF | Review Villegas case. | 0.20 | 1395.00 | $279.00 |
| RJF Bill | 05/18/2021 | | DAF | 0.30 | 0.30 | 1,395.00 | | 418.50 |
| 05/18/2021 | RJF | DAF | Review Elkin contempt research, related emails. | 0.30 | 1395.00 | $418.50 |
| JAM Bill | 05/18/2021 | | DAF | 1.10 | 1.10 | 1,245.00 | | 1,369.50 |
| 05/18/2021 | JAM | DAF | Telephone conference with J. Elkin re: issues concerning reply brief for Contempt motion (0.4); telephone conference with J. Pomerantz, I. Kharasch, R. Feinstein, J. Elkin, G. Demo re: reply brief on contempt motion (0.7). | 1.10 | 1245.00 | $1,369.50 |
| GVD Bill | 05/18/2021 | | DAF | 0.70 | 0.70 | 950.00 | | 665.00 |
| 05/18/2021 | GVD | DAF | Conference with PSZJ working group re contempt proceedings | 0.70 | 950.00 | $665.00 |
| JE Bill | 05/18/2021 | | DAF | 6.90 | 6.90 | 1,195.00 | | 8,245.50 |
| 05/18/2021 | JE | DAF | Call with team regarding show cause reply (.7); research various issues raised in show cause | 6.90 | 1195.00 | $8,245.50 |

Appx 04087
016649

Pachulski Stang Ziehl & Jones LLP                              Page:   117
Highland Capital Management LP                                 Prebill#283067
36027   -00002                                                June 07, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | response (5.8); call with Mr. Morris regarding fact | | | | |



| JNP Bill | 05/19/2021 | DAF | 1.00 | 1.00 | 1,295.00 | 1,295.00 |

| 05/19/2021 | JNP | DAF | Review and revise sections of contempt reply brief. | 1.00 | 1295.00 | $1,295.00 |



| 05/19/2021 | RJF | DAF | Comment on deposition notices to DAF and CLC. | 0.20 | 1395.00 | $279.00 |



| RJF Bill | 05/19/2021 | DAF | 0.40 | 0.40 | 1,395.00 | 558.00 |

| 05/19/2021 | RJF | DAF | Research regarding contempt, related emails. | 0.40 | 1395.00 | $558.00 |
| JAM Bill | 05/19/2021 | DAF | 8.10 | 8.10 | 1,245.00 | 10,084.50 |

| 05/19/2021 | JAM | DAF | Prepare notice of deposition for Mark Patrick (0.3); | 8.10 | 1245.00 | $10,084.50 |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-21   34   Filed 05/25/64   Page 972 of 1052   PageID 17650
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 21 of 34

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   -00002

Page:   118
Prebill#283067
June 07, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | e-mails with Z. Annable, H. Winograd re: Patrick notice of deposition (0.1); prepare Rule 30(b)(6) deposition notice for DAF/CLO Holdco (0.6); e-mails with J. Pomerantz, R. Feinstein, G. Demo, Z. Annable re: Rule 30(b)(6) deposition notice for DAF/CLO Holdco (0.1); work on reply brief for contempt motion (6.8); e-mails with L. Phillips, others re: depositions (0.1); e-mail to J. Pomerantz, R. Feinstein, J. Elkin re: reply brief for contempt motion (0.1). | | | | | |
| GVD Bill | 05/19/2021 | DAF | 0.10 | 0.10 | 950.00 | 95.00 |
| 05/19/2021 | GVD | DAF | Correspondence with J. Elkin re contempt motion | 0.10 | 950.00 | $95.00 |
| JE Bill | 05/19/2021 | DAF | 13.30 | 13.30 | 1,195.00 | 15,893.50 |
| 05/19/2021 | JE | DAF | Review and comment on discovery notice (.3); review cases cited by DAF in brief (2.3); work on reply brief and miscellaneous correspondence with Mr. Morris and Mr. Pomerantz regarding same (10.7). | 13.30 | 1195.00 | $15,893.50 |
| JNP Bill | 05/20/2021 | DAF | 1.00 | 1.00 | 1,295.00 | 1,295.00 |
| 05/20/2021 | JNP | DAF | Review and revise reply regarding contempt motion. | 1.00 | 1295.00 | $1,295.00 |
| JAM Bill | 05/20/2021 | DAF | 5.10 | 5.10 | 1,245.00 | 6,349.50 |
| 05/20/2021 | JAM | DAF | Continued work on reply brief on contempt motion (4.5); telephone conference with J. Elkin re: reply brief on contempt motion (0.2); e-mails to counsel for the alleged Violators re: discovery (0.2); review document requests (0.1); telephone conference with J. Pomerantz re: document requests (0.1). | 5.10 | 1245.00 | $6,349.50 |
| GVD | 05/20/2021 | DAF | 0.30 | 0.30 | 950.00 | 285.00 |

Case 19-34054-sgj11  Doc 3596-34  Filed 10/31/22  Entered 10/31/22 15:27:09  Desc
Case 3:25-cv-02072-S  Document 33-21 34  Filed 05/25 64  Page 973 of 1052  PageID 17651

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21  Entered 06/07/21 20:02:45  Page 22 of 34

Pachulski Stang Ziehl & Jones LLP                          Page:   119
Highland Capital Management LP                             Prebill#283067
36027   -00002                                            June 07, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| **Bill** | | | | | | |
| 05/20/2021 | GVD | DAF | Review reply to contempt motion | 0.30 | 950.00 | $285.00 |
| **JE Bill** | 05/20/2021 | | DAF | 13.10  13.10 | 1,195.00 | 15,654.50 |
| 05/20/2021 | JE | DAF | Work on reply brief (11.0); review motion to amend complaint (.4); call with Mr. Morris regarding briefing (.3); research judgment issues (1.4). | 13.10 | 1195.00 | $15,654.50 |
| **JNP Bill** | 05/21/2021 | | DAF | 1.00  1.00 | 1,295.00 | 1,295.00 |
| 05/21/2021 | JNP | DAF | Emails and review and revised reply regarding contempt motion. | 1.00 | 1295.00 | $1,295.00 |
| **RJF Bill** | 05/21/2021 | | DAF | 0.50  0.50 | 1,395.00 | 697.50 |
| 05/21/2021 | RJF | DAF | Review and comment on contempt motion reply. | 0.50 | 1395.00 | $697.50 |
| **JAM Bill** | 05/21/2021 | | DAF | 4.50  4.50 | 1,245.00 | 5,602.50 |
| 05/21/2021 | JAM | DAF | E-mails to counsel for the Violators re: discovery (0.2); review/revise draft reply on Contempt Motion (3.3); e-mail to J. Seery, PSZJ team re: draft Reply on Contempt Motion (0.1); telephone conference with G. Demo re: facts concerning contempt motion (0.1); review/revise draft Reply on Contempt Motion (0.4); communications with J. Elkin, H. Winograd, Z. Annable re: Reply and supporting declaration on Contempt Motion (0.2); revise subpoena for Grant Scott (0.1); e-mails with J. Kane, J. Pomerantz, G. Demo, H. Winograd re: Scott subpoena (0.1). | 4.50 | 1245.00 | $5,602.50 |
| **GVD Bill** | 05/21/2021 | | DAF | 1.50  1.50 | 950.00 | 1,425.00 |
| 05/21/2021 | GVD | DAF | Review draft reply to contempt motion | 1.50 | 950.00 | $1,425.00 |
| **GVD Bill** | 05/21/2021 | | DAF | 0.10  0.10 | 950.00 | 95.00 |
| 05/21/2021 | GVD | DAF | Conference with J. Morris re contempt reply | 0.10 | 950.00 | $95.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:    120
Prebill#283067
June 07, 2021



| HRW Bill | 05/21/2021 | | DAF | 1.20 | 1.20 | 695.00 | | 834.00 |
|---|---|---|---|---|---|---|---|---|
| 05/21/2021 | HRW | DAF | Prepare declaration and gather exhibits for reply in support of DAF contempt motion (1.2). | | 1.20 | 695.00 | | $834.00 |



| JE Bill | 05/22/2021 | | DAF | 0.60 | 0.60 | 1,195.00 | | 717.00 |
|---|---|---|---|---|---|---|---|---|
| 05/22/2021 | JE | DAF | Miscellaneous correspondence regarding preparation for hearings on Motion to Modify and Contempt Motion. | | 0.60 | 1195.00 | | $717.00 |



| JNP Bill | 05/23/2021 | | DAF | 0.60 | 0.60 | 1,295.00 | | 777.00 |
|---|---|---|---|---|---|---|---|---|
| 05/23/2021 | JNP | DAF | Conference with John A. Morris and M. Sbaiti regarding discovery. | | 0.60 | 1295.00 | | $777.00 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 13-21  Exhibit 34 Filed 05/26/25  Page 975 of 1052    PageID 17653

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 24 of 34

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    -00002

Page:    121

Prebill#283067

June 07, 2021

| | | | | Hours | | Rate | Amount |
|---|---|---|---|---|---|---|---|
| JNP Bill | 05/23/2021 | | DAF | 0.10 | 0.10 | 1,295.00 | 129.50 |
| 05/23/2021 | JNP | DAF | Review email from M. Sbaiti; Conference with John A. Morris regarding same. | 0.10 | | 1295.00 | $129.50 |
| JAM Bill | 05/23/2021 | | DAF | 1.40 | 1.40 | 1,245.00 | 1,743.00 |
| 05/23/2021 | JAM | DAF | Prepare Notice of Service of Subpoena (Grant Scott) (0.2); e-mails to J. Seery, T. Surgent, J. Pomerantz, Z. Annable re: subpoena for Scott (0.2); e-mail to C. Taylor, J. Bonds, J. Pomerantz, G. Demo, H. Winograd re: discovery in connection with contempt motion (0.3); meet and confer call with J. Pomerantz, M. Sbaiti re: Violators' document requests and related matters (0.5); telephone conference with J. Pomerantz re: discovery requests (0.2). | 1.40 | | 1245.00 | $1,743.00 |
| IDK Bill | 05/24/2021 | | DAF | 0.30 | 0.30 | 1,325.00 | 397.50 |
| 05/24/2021 | IDK | DAF | Attend conference call with internal team re DAF (.3). | 0.30 | | 1325.00 | $397.50 |
| JNP Bill | 05/24/2021 | | DAF | 0.30 | 0.30 | 1,295.00 | 388.50 |
| 05/24/2021 | JNP | DAF | Conference with PSZJ team regarding strategy issues concerning DAF lawsuit. | 0.30 | | 1295.00 | $388.50 |
| JNP Bill | 05/24/2021 | | DAF | 0.40 | 0.40 | 1,295.00 | 518.00 |
| 05/24/2021 | JNP | DAF | Conference with J. Elkin, John A. Morris, Gregory V. Demo, and Ira D. Kharasch regarding issues relating to DAF. | 0.40 | | 1295.00 | $518.00 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 13-20    Filed 05/25/64    Page 976 of 1052    PageID 17654
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 25 of 34

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| RJF Bill | 05/24/2021 | | DAF | 0.30 | 0.30 | 1,395.00 | 418.50 |
| | 05/24/2021 | RJF | DAF | Internal call regarding DAF. | | 0.30 | 1395.00 | $418.50 |
| JMF Bill | 05/24/2021 | | DAF | 0.30 | 0.30 | 1,050.00 | 315.00 |
| | 05/24/2021 | JMF | DAF | Status call re contempt motion and litigation issues. | | 0.30 | 1050.00 | $315.00 |
| GVD Bill | 05/24/2021 | | DAF | 0.40 | 0.40 | 950.00 | 380.00 |
| | 05/24/2021 | GVD | DAF | Conference with PSZJ team re response to contempt action (partial attendance) | | 0.40 | 950.00 | $380.00 |
| GVD Bill | 05/24/2021 | | DAF | 0.30 | 0.30 | 950.00 | 285.00 |
| | 05/24/2021 | GVD | DAF | Attend PSZJ status conference on DAF litigation | | 0.30 | 950.00 | $285.00 |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 13-21 34 Filed 06/26/25 64   Page 977 of 1052   PageID 17655
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 26 of
34

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027   - 00002

Page:   123

Prebill#283067

June 07, 2021

016656

Appx 04094

Case 19-34054-sgj11 Doc 3596-34 Filed 10/31/22 Entered 10/31/22 15:27:09 Desc
Case 3:25-cv-02072-S Document 33-21 34 Filed 05/25 64 Page 978 of 1052 PageID 17656

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21 Entered 06/07/21 20:02:45 Page 27 of 34

Pachulski Stang Ziehl & Jones LLP                    Page: 124
Highland Capital Management LP                       Prebill#283067
36027    - 00002                                     June 07, 2021

| GVD Bill | 05/26/2021 | DAF | | 0.50 | 0.50 | 950.00 | | 475.00 |

| 05/26/2021 | GVD | DAF | Review and update Morris declaration in support of order to show cause | | 0.50 | 950.00 | $475.00 |

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 13-21    Exhibit 34 Filed 06/26/25    Page 979 of 1052    PageID 17657
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 28 of
34

Pachulski Stang Ziehl & Jones LLP                                      Page:   125
Highland Capital Management LP                                         Prebill#283067
36027    -00002                                                       June 07, 2021

|  | Hours | Rate | Amount |
|---|---|---|---|

Appx. 04896

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 33-21 34 Filed 05/25/64    Page 980 of 1052    PageID 17658
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 29 of
34

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

| | Hours | Rate | Amount |
|---|---|---|---|

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document Exhibit 34 Filed 06/25/64   Page 981 of 1052   PageID 17659

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 30 of 34

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    -00002

Page:   127

Prebill#283067

June 07, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | | | | |



| JNP Bill | 05/30/2021 | | DAF | 0.20 | 0.20 | 1,295.00 | | 259.00 |
|---|---|---|---|---|---|---|---|---|
| 05/30/2021 | JNP | DAF | Conference with John A. Morris regarding contempt hearing and discovery. | | 0.20 | 1295.00 | $259.00 |
| GVD Bill | 05/30/2021 | | DAF | 1.10 | 1.10 | 950.00 | | 1,045.00 |
| 05/30/2021 | GVD | DAF | Conference with J. Morris re document discovery | | 1.10 | 950.00 | $1,045.00 |
| GVD Bill | 05/30/2021 | | DAF | 1.30 | 1.30 | 950.00 | | 1,235.00 |
| 05/30/2021 | GVD | DAF | Review document production re DAF issues | | 1.30 | 950.00 | $1,235.00 |



| GVD Bill | 05/30/2021 | | DAF | 0.60 | 0.60 | 950.00 | | 570.00 |
|---|---|---|---|---|---|---|---|---|
| 05/30/2021 | GVD | DAF | Conference with J. Morris re deposition preparation | | 0.60 | 950.00 | $570.00 |
| JE | 05/30/2021 | | DAF | 4.80 | 4.80 | 1,195.00 | | 5,736.00 |

Appx. 04998

016660

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 33-21 34 Filed 06/13/25 64    Page 982 of 1052    PageID 17660

Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 31 of 34

Pachulski Stang Ziehl & Jones LLP                                    Page:    128
Highland Capital Management LP                                       Prebill#283067
36027    -00002                                                     June 07, 2021

|  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|
| GVD Bill | 06/01/2021 | DAF | 2.30 | 2.30 | 950.00 | 2,185.00 |

| 06/01/2021 | GVD | DAF | Attend Dondero deposition (partial attendance) | 2.30 | 950.00 | $2,185.00 |

Case 19-34054-sgj11   Doc 3596-34   Filed 10/31/22   Entered 10/31/22 15:27:09   Desc
Case 3:25-cv-02072-S   Document 33-21 34 Filed 06/25/64   Page 983 of 1052   PageID 17661
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21   Entered 06/07/21 20:02:45   Page 32 of 34

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:   129
Prebill#283067
June 07, 2021

| | | | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| GVD Bill | 06/01/2021 | | DAF | 2.20 | 2.20 | 950.00 | | 2,090.00 |
| 06/01/2021 | GVD | DAF | Attend G. Scott deposition (partial) | | | 2.20 | 950.00 | $2,090.00 |



| | | | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| GVD Bill | 06/02/2021 | | DAF | 1.00 | 1.00 | 950.00 | | 950.00 |
| 06/02/2021 | GVD | DAF | Conference with J. Morris and HCMLP re M. Patrick deposition prep | | | 1.00 | 950.00 | $950.00 |
| GVD Bill | 06/02/2021 | | DAF | 0.10 | 0.10 | 950.00 | | 95.00 |
| 06/02/2021 | GVD | DAF | Conference with J. Morris re follow up to M. Patrick deposition prep | | | 0.10 | 950.00 | $95.00 |
| GVD Bill | 06/02/2021 | | DAF | 0.20 | 0.20 | 950.00 | | 190.00 |
| 06/02/2021 | GVD | DAF | Conference with J. Donohue re M. Patrick deposition issues | | | 0.20 | 950.00 | $190.00 |
| GVD Bill | 06/03/2021 | | DAF | 3.50 | 3.50 | 950.00 | | 3,325.00 |
| 06/03/2021 | GVD | DAF | Review M. Patrick document production and correspondence with J. Morris re same | | | 3.50 | 950.00 | $3,325.00 |



| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| GVD | 06/04/2021 | | DAF | 0.20 | 0.20 | 950.00 | | 190.00 |

Appx. 04109

016662

Case 19-34054-sgj11    Doc 3596-34    Filed 10/31/22    Entered 10/31/22 15:27:09    Desc
Case 3:25-cv-02072-S    Document 13-21    34 Filed 06/25/ 64    Page 984 of 1052    PageID 17662
Case 19-34054-sgj11 Doc 2421-2 Filed 06/07/21    Entered 06/07/21 20:02:45    Page 33 of
34

Pachulski Stang Ziehl & Jones LLP                                      Page:    130
Highland Capital Management LP                                        Prebill#283067
36027    - 00002                                                     June 07, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| **Bill** | | | | | | |
| 06/04/2021 | GVD | DAF | Conference with J. Morris re preparation for M. Patrick deposition | 0.20 | 950.00 | $190.00 |
| GVD | 06/04/2021 | | DAF | 2.20 | 2.20 | 950.00 | 2,090.00 |
| **Bill** | | | | | | |
| 06/04/2021 | GVD | DAF | Attend deposition of M. Patrick (partial) | 2.20 | 950.00 | $2,090.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

Page:   249
Prebill#283067
June 07, 2021

---

### REMITTANCE ADVICE

**Please include this Remittance with your payment**

**For current services rendered through:**    **06/07/2021**

**Total Fees**                                                      **$1,450,912.50**

**Total Expenses**                                                      **14,097.56**

**Total Due on Current Invoice**                              **$1,465,010.06**

   **Outstanding Balance from prior invoices as of**      **06/07/2021**      **(May not include recent payments)**

| A/R Bill Number | Invoice Date | Fees Billed | Expenses Billed | Balance Due |
|---|---|---|---|---|
| 127680 | 04/30/2021 | $1,286,897.00 | $8,173.58 | $1,295,070.58 |

   **Total Amount Due on Current and Prior Invoices:**                    **$4,009,430.04**

# EXHIBIT 35

Appx 04195

016665

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS (DALLAS)

```
IN RE:                        .   Case No. 19-34054-11(SGJ)
                              .
HIGHLAND CAPITAL              .   Earle Cabell Federal Building
MANAGEMENT, L.P.,             .   1100 Commerce Street
                              .   Dallas, TX  75242-1496
                              .
             Debtor.          .   Monday, September 12, 2022
. . . . . . . . . . . . . .   .   9:40 a.m.
```


TRANSCRIPT OF HEARING ON MOTION TO WITHDRAW PROOF OF CLAIM #146
BY HCRE PARTNERS, LLC (3443) AND
REORGANIZED DEBTOR'S (A) OBJECTION TO MOTION TO QUASH AND FOR
PROTECTION [DOCKET NO. 3464] AND
(B) CROSS-MOTION TO ENFORCE SUBPOENAS TO ENFORCE SUBPOENAS AND
TO COMPEL A DEPOSITION (3484)

BEFORE HONORABLE STACEY G. JERNIGAN
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE


TELEPHONIC APPEARANCES:

```
For Highland Capital      Pachulski Stang Ziehl & Jones LLP
Management, L.P.:         BY:  JOHN MORRIS, ESQ.
                          780 3rd Avenue, 34th Floor
                          New York, New York 10017


For NexPoint Real         Hoge & Gameros, L.L.P.
Estate Partners LLC       BY:  CHARLES W. GAMEROS, JR., ESQ.
f/k/a HCRE Partners       6116 North Central Expressway
LLC:                      Suite 1400
                          Dallas, Texas 75206


Audio Operator:           Michael F. Edmond
```

Proceedings recorded by electronic sound recording, transcript
produced by a transcript service.

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail:  DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

2

**INDEX**

Page

MOTION TO WITHDRAW PROOF OF CLAIM #146 BY HCRE
PARTNERS, LLC (3443)

**Court's Ruling - Denied**                                          **55**

REORGANIZED DEBTOR'S (A) OBJECTION TO MOTION TO
QUASH AND FOR PROTECTION [DOCKET NO. 3464] AND
(B) CROSS-MOTION TO ENFORCE SUBPOENAS TO ENFORCE
SUBPOENAS AND TO COMPEL A DEPOSITION (3484)

**Court's Ruling - Granted**                                        **55**


**WITNESSES**

MOTION TO WITHDRAW PROOF OF CLAIM #146 BY HCRE PARTNERS, LLC
(3443)

**FOR THE DEBTOR:**

James Dondero
   Direct Examination by Mr. Gameros                           40/43


**FOR HCRE:**

(None)

REORGANIZED DEBTOR'S (A) OBJECTION TO MOTION TO QUASH AND FOR
PROTECTION [DOCKET NO. 3464] AND
(B) CROSS-MOTION TO ENFORCE SUBPOENAS TO ENFORCE SUBPOENAS AND
TO COMPEL A DEPOSITION    (3484)


**FOR THE DEBTOR:**

(None)

**FOR HCRE:**

(None)

016667

Appx 04105

3

INDEX

**EXHIBITS**

MOTION TO WITHDRAW PROOF OF CLAIM #146 BY HCRE PARTNERS, LLC
(3443)

|  | ID | EVD |
|---|---|---|

**FOR THE DEBTOR:**

| | | ID | EVD |
|---|---|---|---|
| 1 through 16 | Docket Number 3488 With Declaration of John Morris | 9 | 9 |

**FOR HCRE:**

(None)


REORGANIZED DEBTOR'S (A) OBJECTION TO MOTION TO QUASH AND FOR
PROTECTION [DOCKET NO. 3464] AND (B) CROSS-MOTION TO ENFORCE
SUBPOENAS TO ENFORCE SUBPOENAS AND TO COMPEL A DEPOSITION
(3484)


**FOR THE DEBTOR:**

| | | | |
|---|---|---|---|
| 1 through 6 | Docket Numbers 3485 and 3486 With Declaration of John Morris | 7 | 8 |

**FOR HCRE:**

(None)

**WWW.LIBERTYTRANSCRIPTS.COM**

4

1       (Proceedings commenced at 9:40 a.m.)

2           THE COURT:  All right.  We have a setting this

3   morning in Highland Capital, Case Number 19-34054.  We have

4   both a motion to withdraw proof of claim of HCRE Partners, LLC,

5   as well as the reorganized debtor's objection to a motion to

6   quash and cross-motion to enforce subpoenas.

7           All right.  So let's start by getting lawyer

8   appearances, please.  For HCRE, who do we have appearing?

9           Let me get appearances first from the main parties.

10  For the debtor this morning, who is appearing?

11          MR. GAMEROS:  Good morning, Your Honor.  Bill Gameros

12  for NexPoint Real Estate Partners f/k/a HCRE.

13          THE COURT:  All right.  Thank you.

14          For Highland, who do we have appearing this morning?

15          MR. MORRIS:  Good morning, Your Honor.  John Morris,

16  Pachulski Stang Ziehl & Jones for Highland Capital Management,

17  L.P.

18          THE COURT:  Good morning.

19          All right.  I'm guessing these are our only

20  appearances.  These are the only parties involved who filed

21  pleadings.  If there is anyone who felt the need to appear, go

22  ahead.

23      (No audible response)

24          THE COURT:  All right.  Well, I don't know if you all

25  have talked about the sequence we are going to take things this

**WWW.LIBERTYTRANSCRIPTS.COM**

5

1  morning.  Obviously, the first filed motion is HCRE's motion to

2  withdraw proof of claim.  But we have a discovery dispute and I

3  think -- well, we've got Highland objecting to the motion to

4  withdraw the proof of claim, but I think the backup argument is

5  at the very least let us take discovery before you rule on the

6  motion to withdraw proof of claim.

7         So have you all talked about who's going to go first

8  on this one?

9         MR. GAMEROS:  Your Honor, we haven't spoken about it,

10 but it makes sense to me that if we withdraw the proof of

11 claim, it moots everything else.  And I think that's really

12 what we ought to do, take it all at one time.

13        THE COURT:  All right.  Mr. Morris, do you agree on

14 that sequence?

15        MR. MORRIS:  I'm happy to cede the podium and let Mr.

16 Gameros go first since he filed the first motion, but I do

17 think that Your Honor had your finger on the pulse that before

18 -- either the motion should be denied for the reasons set forth

19 in our papers or we should be permitted discovery.

20        THE COURT:  All right.

21        With that, Mr. Gameros, I'll hear your opening

22 statement and hear what your evidence is going to be.

23        MR. GAMEROS:  We didn't file any evidence today.  We

24 just simply want to withdraw the proof of claim.  I think that

25 we've satisfied the Manchester factors.

**WWW.LIBERTYTRANSCRIPTS.COM**

6

1          Quite frankly, there's only been the filing of the

2  proof of claim and a scheduling order entered.  Since I've been

3  involved in it, we've only had the scheduling order entered.

4  Anything else that's happened in this case was a motion to

5  disqualify that precipitated our appearance.  We filed the

6  motion to withdraw.  There's no summary judgments pending, no

7  dispositive motions pending.

8          Quite frankly, we've looked at it as the company

9  continued to operate.  The things we were worried about

10  happening didn't happen.  And as a result, we decided we don't

11  need the proof of claim, we don't want to continue it because I

12  think we satisfy Manchester.  If the Court has any concerns at

13  all, A, the debtor's reorganized so proceeding with our proof

14  of claim or withdrawing it doesn't affect it and, B, you can

15  conditionally withdraw with a forecreduous [*sic*] order

16  withdrawing the proof of claim.

17          But, quite frankly, I don't think we could amend it

18  and we passed the claims bar date.  So the Court should simply

19  allow NexPoint Real Estate Partners to discontinue pursuing a

20  proof of claim that they don't want to continue anymore.

21  Everything else falls after that.  That's it.

22          THE COURT:  All right.  Well, assuming the Manchester

23  factors apply here, you're not going to have any evidence on

24  any of these factors?

25          MR. GAMEROS:  I don't believe that we need to have

Appx. 04109

016671

7

1  evidence on those.  The only one that could possibly be at

2  issue is one that the debtor might be able to bring but they

3  haven't, and that's actual legal prejudice.

4          The withdrawal of the proof of claim here essentially

5  says they win.  And they've objected to our proof of claim, and

6  now we're withdrawing it.  So the proof of claim is resolved in

7  their favor except we're withdrawing it instead of going

8  through all of the exercise to get to a hearing where we don't

9  want to pursue the proof of claim anymore.

10         THE COURT:  All right.  But is it a withdrawal that

11 you seek with prejudice with any bells and whistles about

12 future preclusion of litigation?

13         MR. GAMEROS:  Your Honor, the proof of claim -- I

14 know the Court knows this, it's its own type of proceeding.

15 This isn't a adversary proceeding or a different kind of

16 lawsuit.  It's simply a proof of claim, and we know we're not

17 going to be able to amend it, we're not going to be able to re-

18 assert it because it's after the bar date.  That's why the

19 Court should allow the withdrawal and, to the extent the Court

20 wishes to condition it, condition it with prejudice.  That's

21 it.

22         THE COURT:  Mr. Morris, I'll hear from you.

23         MR. MORRIS:  Thank you, Your Honor.

24         Before I begin, I'd like to move into evidence

25 Exhibits 1 through 6 that appear at Docket 3485 and 3486.

016672

8

1  They're mirror images of each other.  They're duplicates of

2  each other, Your Honor.

3        But because our motion -- our objection to the motion

4  for a protective order and the cross-motion to compel were

5  filed as one document, the Court had us file it basically twice

6  so that one is serving as the objection to the motion for the

7  protective order and the other is serving as the cross-motion

8  to compel.  And so you'll see at Dockets 3485 and 3486

9  duplicate declarations from me with Exhibits 1 through 6.

10        THE COURT:  All right.  Any objections?

11        MR. GAMEROS:  Your Honor?

12        THE COURT:  Any objection?

13        MR. MORRIS:  And then -- and then, Your Honor?

14        THE COURT:  I'm sorry, I did not hear what Mr.

15  Gameros said.

16        MR. GAMEROS:  Your Honor, we don't object.

17        THE COURT:  All right.

18        MR. GAMEROS:  We don't necessarily believe it's

19  relevant, but we don't object to its admission.

20        THE COURT:  All right.  They'll --

21        MR. MORRIS:  And then, Your Honor, we've got --

22        THE COURT:  Docket -- Exhibits 1 through 6 are

23  admitted.

24        Go ahead.

25    (Debtor's Exhibits 1 through 6 admitted into evidence)

**WWW.LIBERTYTRANSCRIPTS.COM**

9

 1          MR. MORRIS:  And then at Docket 3488 we have another

 2   declaration under my signature with Exhibits 1 through 16,

 3   which are offered in opposition to HCRE's motion to withdraw

 4   their proof of claim.

 5          THE COURT:  Any objection?

 6          MR. GAMEROS:  No, Your Honor.

 7          THE COURT:  Okay.  Those exhibits and that

 8   declaration are admitted, as well.

 9      (Debtor's Exhibits 1 through 16 admitted into evidence)

10          MR. MORRIS:  So, Your Honor, if I may, please, you

11   know, the lack of evidence and the dismissiveness with which

12   HCRE is approaching this proceeding is alarming.

13          We have litigated for two years.  We were forced to

14   move and litigate vigorously a motion to disqualify our prior

15   counsel even though we put into evidence a document that said

16   Wick Phillips represents Highland Capital Management.  We were

17   still forced to do that.  We were forced to engage in expert.

18   We were forced to have a hearing on this.

19          We have gone through discovery not once but twice.

20   We have fulfilled every single obligation that were were

21   required to fulfill under the scheduling orders.  We have

22   engaged in two rounds of written discovery.  We have offered up

23   every witness that has been noticed.  We have produced

24   thousands of pages of documents.

25          We took discovery from third parties, and this is

**WWW.LIBERTYTRANSCRIPTS.COM**

016674

10

1  really important for a number of reasons, Your Honor.  We

2  served subpoenas on BH Equities.  BH Equities is not subject to

3  the jurisdiction in Dallas, so we served the subpoena.  We took

4  the deposition.

5      They can't be compelled to testify at a hearing.

6  HCRE chose not to ask any questions.  The accounting firm, they

7  chose not to ask any questions.  Discovery is over, okay.  I

8  hear Counsel talk about the proof of claim.  We need -- and

9  this is where the prejudice comes in.  We need an order on the

10  merits.  We need to know that HCRE is never going to challenge

11  again Highland's 46.06 percent interest in SE Multifamily.

12  That's what we need, because that's what we were about to get

13  and they know that.  And that's why they're folding their tent.

14      We informed them that we were moving for summary

15  judgment.  In fact, just seven days before they filed their

16  motion, we negotiated a stipulation in order to extend the

17  expert discovery deadline so that they could file an expert

18  report while preserving Highland's ability to move for summary

19  judgment.  HCRE knew this when it filed its motion.

20      Discovery is now closed.  There's only three things

21  left to do.  There's four things left to do: take the

22  deposition of Mr. Dondero, Mr. McGraner (phonetic) and HCRE and

23  have a hearing on the merits.

24      I want to say right now, Your Honor, Highland is

25  willing to forego its right to move for summary judgment.  We

**WWW.LIBERTYTRANSCRIPTS.COM**

Appx 04413
016675

11

1  don't need to take that step.  Let's just proceed.  This motion

2  should be denied.  They offer no evidence whatsoever.  Let's

3  just proceed with the three depositions because discovery is

4  otherwise closed and let's have a one-day trial live in your

5  courtroom, Your Honor.  We could have this done in six weeks.

6          The legal prejudice is enormous.  We've set it out in

7  our papers.  Our evidence supports it.  But I want to just

8  highlight a few things.  Again, I hear vagueness here.  I hear

9  you can dismiss the proof of claim with prejudice, but somehow

10  I get the feeling from their papers from the cases that they

11  cited to, from the quotations that say just because we get a

12  tactical advantage doesn't mean that the motion should be

13  denied, just because we may choose to file this in a different

14  forum.

15          And that's the question that I really hope the Court

16  will ask Mr. Gameros.  Is HCRE waiving its right to ever

17  challenge this again because if you can't get an unambiguous

18  answer to that question, the motion must be denied because

19  that's the prejudice.

20          But there's more prejudice, too.  They've taken our

21  deposition and based on what Mr. Gameros just told you, based

22  on what's in their papers, they perceive something that

23  happened in that deposition as being advantageous to them.  If

24  this Court were to consider dismissing this case with

25  prejudice, it should do so on the condition that that

Appx 04414

016676

12

1  transcript cannot be used for any purpose at any time anywhere

2  because otherwise it's not fair, otherwise we've been

3  prejudiced by them being permitted to take our deposition but

4  foreclosing us from taking their deposition.  Either the

5  playing field needs to be level or that deposition transcript

6  should never see the light of day.

7          That's condition number two, not just the dismissal

8  with prejudice here, we need an ironclad commitment that HCRE

9  is irrevocably waiving its right to challenge Highland's

10  interest in SE Multifamily because that would be the result if

11  this went to trial.  And that transcript of Mr. Seery as

12  Highland's 30(b)(6) witness should never see the light of day

13  because they're playing games.  They want to use that for some

14  other purpose.  And if they want to do that, that's fine, but I

15  get to take their depositions.  The playing field has to be

16  level, Your Honor.

17          We have spent hundreds of thousands of dollars on

18  this case.  The excuse that they're giving, the reason that

19  they're giving for dismissing the case at this time makes no

20  sense whatsoever.  There's nothing in the proof of claim,

21  nothing in the pleadings.  There will never be any evidence.

22          There's no affidavit suggesting that Highland was

23  interfering with SE Multifamily, that Highland threatened to

24  interfere with SE Multifamily, that until this motion was filed

25  that HCRE had any concerns whatsoever that Highland would be

Appx 04115

016677

13

1   engaging in wrongful conduct.  There will never be any evidence

2   whatsoever that HCRE ever took any steps to protect itself from

3   this so-called interference that they're now so fearful of.

4          And I do want to -- I have to ask this question, Your

5   Honor.  If HCRE believed that they were at risk on Wednesday,

6   August 10th, so that they had to take Mr. Seery's deposition,

7   what happened after that that caused them 48 hours later to

8   file this motion with no notice whatsoever?

9          It's not right, Your Honor.  So let me get to the

10  substance.  This is not a motion under Rule 41.  Under Rule 41,

11  plaintiffs sometimes have the right, the unilateral right to

12  withdraw a pleading.  HCRE has no right to that today.  Rule

13  3006 is very clear.  When there is a proof of claim that is

14  contested, the proof of claim can only be withdrawn with court

15  approval after a hearing and subject to whatever conditions the

16  Court decides are appropriate.

17         And that's to protect the integrity of the process.

18  And that's what we're asking the Court to do, to protect the

19  integrity of the claims resolution process.

20         It is a fact-intensive inquiry.  In this district, as

21  HCRE has pointed out, there is precedent, the Manchester case,

22  that sets forth a long list of factors that a court could

23  consider in the face of such a motion.  As we explain in our

24  opposition, we believe that every single one of those factors

25  weighs in favor of denying the motion.

016678

14

1      I'm going to go through just a bit of it, Your Honor,

2   because I think it's very important that everybody see exactly

3   what's happening.  In contrast to the lack of evidence by HCRE,

4   we have all of the exhibits that have just been admitted into

5   evidence here.  The claims stated, the proof of claims, start

6   with the proof of claim, stated that some or all of Highland's

7   interest in SE Multifamily might be the property of HCRE.

8      It's a proof of claim that was signed by Jim Dondero.  It

9   was signed under the penalty of perjury.  There is no good-

10  faith basis for that proof of claim to have been filed, none

11  whatsoever.  If you take a look at their response to Highland's

12  initial objection which can be found at Exhibit 7 on the

13  initial docket, we'll put it up on the screen jut -- here's

14  Exhibit 7 from Docket Number 3488.

15     And this is HCRE's response.  And if we can go to

16  Paragraph 5.  This is the -- this is really their response

17  here.  And it says:

18          "After reviewing what documentation is available to

19          HCRE with the debtor, HCRE believes the

20          organizational documents relating to SC Multifamily

21          improperly allocates the ownership percentages of the

22          members thereto due to mutual mistake, lack of

23          consideration, and/or the failure of consideration.

24          As such, HCRE has a claim to reform, rescind, or

25          modify the agreement."

15

1          This is their proof of claim, that there was some

2   mistake that happened in the drafting of the SE Multifamily

3   documents.  There is no good-faith basis for this proof of

4   claim.  There is no good-faith basis for this response that's

5   up on the screen.  And let me show you why.

6          If Your Honor had an opportunity to review BH

7   Equities' deposition transcript, at least the portions that we

8   specifically cited to, BH Equities is a truth third party.

9   They're the only third party that is a member of SE

10  Multifamily.  I took their deposition.  They retained Dentons.

11  They produced documents.  They acted professionally.

12          And their witness testified up, down, and sideways

13  that from their perspective, it was a bilateral negotiation

14  with them on one side and the grand Highland on the other side

15  and that Highland drafted the ultimate agreement, the amended

16  and restated LLC agreement.

17          It's an issue that is not in dispute.  Highland

18  drafted the document.  People working on the Highland platform

19  in the spring of 2019 when Mr. Dondero was in control, solely

20  in control of Highland and HCRE.

21          So they say in that response and in the proof of

22  claim that the allocation, the allocation is the allocation of

23  the membership interest in SE Multifamily, they say, oh my

24  goodness, that allocation was wrong because Highland only put

25  in $49,000.  And Mr. Dondero signed the agreement.

Appx 04118

016680

16

1          Let's take a look just quickly at Exhibit 5, and

2    let's see how it's possible that Mr. Dondero could swear under

3    oath that he made a mistake.  If we can go to Schedule A.

4          Take a look at this, Your Honor.  This is Schedule A.

5    It's about a page or two after Mr. Dondero's signature.  It has

6    the percentage interest that he says was a mistake as if he

7    didn't know the capital contribution that Highland put in.  And

8    if we got to a trial, Your Honor, we would show that Highland

9    actually reached into its pocket for the $49,000.  HCRE, in

10   contrast, borrowed all the money, even though Highland was on

11   the hook for the obligations to Key Bank.

12         But, nevertheless, here it is.  It's in plain, plain,

13   plain terms.  The numbers are next to each other.  It's not

14   just the percentage interest.  It shows the capital

15   contribution.  I'd be really interested in asking Mr. Dondero

16   did he review this.  I suspect he'll say no because that's what

17   he usually says.  But doesn't that scream fraud?  How do you

18   say you made a mistake when the numbers are on that page?  I

19   don't understand it.

20         Yet, we've spent two years and hundreds of thousands

21   of dollars litigating this case.  But here's the thing, Your

22   Honor, it's not just in Schedule A.  If we could go to Section

23   1.7 earlier in the agreement.

24         And remember, this is a document that BH Equities

25   says was drafted by Highland.  Look at 7; 7 is company

17

1  ownership.  That's the name of the section.  Again, HCMLP has

2  46.06 percent.  Is that a mistake?  How did this -- somebody

3  should explain how this mistake happened.

4          Let's go to Section 6.1.  Section 6.1 is critical,

5  and we'll see this in a moment.  This is what's known as the

6  waterfall.  It shows how the distributions of cash from SE

7  Multifamily are going to be made to its members.  And you'll

8  see in Section 6.1A that after certain things occur, cash is

9  going to be distributed 46.06 percent to Highland.  Another

10  mistake, I guess, without explanation.

11          Section 9.3.  Section 9 deals with liquidation and

12  termination, and 9.3 is effectively the waterfall that's

13  supposed to be in place upon a liquidation.  And at the bottom

14  of the waterfall in 9.3(e), not surprisingly, you see the exact

15  same allocation.

16          So the allocation that Mr. Dondero swore under oath

17  was the result of a mutual mistake was an allocation that

18  appears in four separate places in a document that was drafted

19  by people under his authority.  Think about that.  It's

20  extraordinary.  We spent two years litigating this case, and

21  now they just want to go home.

22          But wait, there's so much more, Your Honor.  I'm not

23  going to go through all of it, but I want to just show you two

24  other documents because these numbers are not in this document

25  by accident.  They're there on purpose.

Appx 04129
016682

18

1          If we could go to Exhibit Number 11.

2          So if you've seen from our papers and at all, Your

3     Honor, Highland presented an initial draft of the amended and

4     restated agreement to BH Equities on March 14th.  It had to be

5     completed by March 15th in order t make it retroactive to the

6     prior August because that's for tax reasons.  And you'll see up

7     on the screen there's an email exchange from Mr. Broaddus at

8     Highland to a fellow named Dusty Thomas at BH Management.

9          And it's two emails.  The first one is sent on the

10    afternoon of March 15th.  And the important point is a little

11    bit down where he says: "The contributions schedule in the

12    attached needs to be updated with the actual contribution

13    numbers."

14         So this is Highland telling BH Equities that the

15    contribution schedule, which is Schedule A, needs to be updated

16    so that the actual contribution numbers are in it.  This is the

17    mistake.  This is the mistake, right.  And notice that Mr.

18    McGraner, I'm told is one of the Apex employees, he's got

19    notice of this.  He know exactly what's happening, right.

20         And Mr. Broaddus follows up.  He follows up the next

21    day and says the contribution schedule is attached.  Well,

22    let's take a look at what the contribution schedule is, if we

23    can go to the next page.  Look at that.

24         It's the same contribution schedule that appears in

25    the final agreement.  And this is just critical, Your Honor,

016683

Appx 04121

19

1  because this shows that Highland, people working at the

2  direction of Highland are preparing this document and it's a

3  stand-alone document.  So it's not as if somebody can say, gee,

4  you know, it got lost in the sauce, it was deep in the details,

5  deep in the weeds and I just missed it.

6          The very purpose of the sending of this document was

7  to show the other counterparty, BH Equities, exactly what the

8  capital contribution and percentage interest were going to be,

9  not just the percentage interest but the capital contributions.

10         Later on that day, if we can go the next document,

11 Exhibit 13.  BH Equities was very concerned about the

12 waterfall.  They wanted to make sure that they were going to

13 get back their capital before other distributions were made.

14 And you can see here this is an email from Mr. Thomas back to

15 Mr. Broaddus where he raises this issue, and I'll just kind of

16 cut to the chase.  Attached to Mr. Thomas' email was a proposal

17 that BH Equities had made the prior fall with respect to the

18 waterfall.

19         There's no dispute that Mr. Broaddus on behalf of

20 Highland, the big Highland, rejected BH Equities' proposal.

21 And if we can go the prior page and see exactly what they did

22 in response.  Instead, you can see Mr. Chang, Freddie Chang,

23 another member of the Highland complex, with a very private

24 email to Mr. Broaddus, right, BH Equities isn't even copied on

25 it.  And he comes up, it's labeled 6.1, but this is what

20

1  becomes -- it's labeled 1.1, but this is what becomes 6.1 in

2  the actual agreement.  This is the waterfall.  This is Mr.

3  Chang and Mr. Broaddus exchanging an email with a new version

4  of the waterfall that they wanted.  And the new version that

5  they wanted shows in Section 1.1(a) here that Highland was

6  going to get 46.06 percent of the distributable cash as set

7  forth therein.

8          A mistake?  A mutual mistake when people working

9  under Mr. Dondero's direction drafted these documents in

10 specific -- as part of a negotiation?  This is about the only

11 thing that was the subject of a negotiation.

12         And, of course, there's more because if you take a

13 look at the deposition transcript that we cited from BH

14 Equities from BH Equities' perspective, Section 1.7, 6.1, and

15 9.3 and Schedule A all reflects the parties' intent.  And that

16 deposition is closed, right.  I mean they chose not to ask any

17 questions.  They didn't challenge that.  There is no good-faith

18 basis for this proof of claim to have ever been filed.  And

19 that, Your Honor, is the definition of vexatiousness, and that

20 is one of the <u>Manchester</u> factors.

21         Another one of the factors is the extent to which the

22 suit has progressed.  Other than the depositions that they

23 unilaterally shut down, the only thing left was either a

24 summary judgment motion or a trial.  Again, discovery is over.

25 Highland has fulfilled its obligations.  There is nothing left

**WWW.LIBERTYTRANSCRIPTS.COM**

21

 1  to do here except to take three depositions and have a trial on

 2  the merits.  So the suit has progressed far.

 3         Duplicate of expense of re-litigation, are we really

 4  going to do this again?  Are they really going to get the

 5  benefit of new discovery in a new lawsuit somewhere else that's

 6  not a proof of claim but that somehow tries to recraft it

 7  because we've seen stuff like this before from Mr. Dondero.

 8  He's going to say, oh, that was just a proof of claim, that's a

 9  different standard that somehow, you know, I can bring a

10  different claim in a different court at a different time.

11  We're going to do this again?  I hope not.

12         How about the adequacy of the explanation?  They

13  concluded that Highland wasn't interfering.  Where was the

14  evidence that Highland ever interfered?  Where was the evidence

15  that Highland ever threatened to interfere?  Where was the

16  evidence that HCRE ever expressed a concern that Highland would

17  interfere?  Where's their application to the Court for some

18  kind of protective order or some type of protection, some type

19  of injunction relief to prevent us from interfering?  There's

20  nothing.

21         HCRE filed this -- and I'll have to speculate here

22  because they're not -- I don't thing they're being candid with

23  the Court.  They filed it because they hoped to do this trial

24  in a different forum at a different time elsewhere.

25         They're shutting it down because they know that their

22

1   witnesses are going to be asked questions that are going to

2   further buttress Highland's claims to breach of contract, going

3   to get into some serious tax questions where even BH Equities

4   wouldn't even rely on the K-1s that HCRE caused to be prepared.

5   Really tough questions.

6           I know they want to get out now, but they never

7   should have filed the proof of claim.  And forcing Highland to

8   go down this path to incur this expense, to take our deposition

9   and then try to shut the door, can't think of a better fact

10  scenario for the denial of a 3006 motion than we have here.

11          Look at just what happened in the seven days before

12  they filed their motion because it is extraordinary, and I

13  didn't even put everything in the papers because one of the

14  things I forgot to put in is Mr. Gameros sent to me seven days

15  before the motion the 30(b)(6) notice for Highland.  So that's

16  sent on August 5th.

17          On August 5th, we finish negotiating and sign a

18  stipulation that extends the expert discovery deadline to allow

19  them to call an expert which we think had no merit which is why

20  we reserve the right on the motion to strike because we don't

21  think -- as described to us at the time, but nevertheless, we

22  reserved our right to either make a motion to strike or to

23  proceed right to summary judgment.  It's all in the stipulation

24  that we negotiated, that we signed on behalf of the clients,

25  and that Your Honor's approved just two days before this is

23

1  filed.

2          I think Mr. Seery's deposition was the 10th.  At 4:00

3  on the 9th, HCRE produced over 4,000 pages of documents like

4  six weeks after the deadline, right.  And Counsel and I spent

5  the next 24 hours -- you know, I was pretty upset, I'll admit

6  it, but you've got -- you know, it's in the record, you know,

7  what my written responses were.  And I tried very hard to avoid

8  motion practice, and I tried very hard as I always do to try to

9  come to a reasonable resolution.  And we actually got to that

10  point just moments before Mr. Seery's deposition.  And then

11  they take Mr. Seery's deposition.

12          So think about it.  They serve a 30(b)(6) notice,

13  they take a deposition, they produce 4,000 pages of documents,

14  they negotiate and sign a stipulation to extend the discovery

15  deadline, the Court takes the time to review the stipulation,

16  orders it.  All of this happens within seven days of their

17  motion, two days after they take Mr. Seery's deposition and

18  just two days before I'm scheduled to take their client's

19  depositions.

20          Based on the complete lack of evidence on HCRE's part

21  and the evidence that I've just shown the Court, we believe the

22  Court should simply deny the -- deny all three motions, you

23  know what I mean?  Let's just cut to the chase, let's take

24  three substantive depositions, and let's set a trial date.

25  That, I believe, is the most appropriate result here.

24

1    If the Court is not inclined to rule on the motion to

2  withdraw, the Court should then deny the motion for a

3  protective order and grant our cross-motion to compel the

4  depositions on this motion.  I assure the Court that if the

5  Court decides to follow that path, my questioning will be

6  limited to the Manchester factors.  And I won't get into the

7  substance because that wouldn't be ripe.

8    The first question is whether or not they have a

9  right to -- whether the Court should grant their motion to

10  withdraw, and I will limit my questioning if we go down, you

11  know, option B to those questions, to the Manchester questions,

12  right.  There's no question that we have the right to

13  discovery.  They filed a motion.  We filed an objection.  We

14  now have a contested matter under the bankruptcy rules.  We're

15  entitled to discovery.

16    I want to address, I guess, on this topic some of the

17  issues that were raised in the motion for the protective order.

18  They say, oh, we didn't serve the witnesses.  That's easily --

19  well, first, I would point out that if you looked at Exhibit 1,

20  you know, Counsel previously accepted service of subpoenas on

21  Mr. Dondero and Mr. McGraner's behalf.  Maybe he's got an

22  explanation why he did it before but he won't do that now.  But

23  if that's the way HCRE wants to do it, we'll hire professional

24  process servers that can -- that give us a couple of weeks and

25  we'll find them.  We'll find them.  And if not, we'll get the

25

1  adverse inference.

2       They said we didn't give enough time, that we didn't

3  take into account their scheduling.  Just look at Exhibit 4,

4  Your Honor.  I specifically wrote to Counsel, it's there in

5  writing.  You know, it's there in writing.  If you need an

6  accommodation, let me know.  Let me know if the dates and times

7  work.  I have flexibility.  I told him that in writing.  And

8  yet, the reason the Court should enter a protective order is

9  because we didn't give them sufficient time or we wouldn't take

10 into account their schedules.

11      We've got all the time now, Your Honor.  I'm actually

12 not available next week, but after that, I can take these

13 depositions any time the last week of September, the first week

14 of October, whatever is convenient for them.  That is no reason

15 to grant a protective order.

16      And then, finally, this notion that, you know, Mr.

17 McGraner and Mr. Dondero are some Apex employees, Your Honor,

18 HCRE has no employees.  None.  Mr. Dondero signed the original

19 LLC agreement.  He signed the amended LLC agreement.  He signed

20 the proof of claim.  Who else should I be deposing?  Mr.

21 McGraner owns a substantial interest of HCRE.  He's on the

22 emails that show he had contemporaneous knowledge that people

23 working in the Highland complex were drafting Schedule A in a

24 manner that was ultimately accepted not just by Highland and

25 HCRE but by a third party, BH Equities.

Appx 04128

016690

26

 1          There's nobody to depose other than Mr. McGraner and

 2   Mr. Dondero.  I mean I guess Mr. Ellington, I haven't thought

 3   about that.  He is a five percent owner.  But for a company

 4   with no employees, who else am I supposed to depose?

 5          Finally, Your Honor, I've taken probably enough time

 6   here.  But option C, right, I think this just be denied

 7   outright.  If not, we should at least be permitted to get some

 8   discovery before the Court rules on the motion.  Option C, if

 9   the Court really wants to dismiss this -- grant the motion in

10   any respect, there ought to be severe conditions on it.

11          It has to be a dismissal on the merits.  It has to be

12   a dismissal that pays Highland its reasonable legal fees

13   incurred for this waste of time.  And it has to be conditioned

14   on the fact that Mr. Seery's deposition transcript will be

15   barred from use in any proceeding going forward or they have

16   got to show up for the depositions to level the playing field.

17          So that's where we are, Your Honor.  Three choices.

18   You know, they're in the order that we think are most

19   appropriate.  But I've got nothing further at this point, Your

20   Honor.

21          THE COURT:  All right.  A couple of questions for

22   you.

23          You've represented as an officer of the Court that

24   your client, the estate, has incurred hundreds of thousands of

25   dollars of attorneys' fees and costs relating to this proof of

Appx 004129

016691

27

 1  claim.  Is that correct?

 2          MR. MORRIS:  Yes, Your Honor.

 3          THE COURT:  Okay.  And I'm just curious, did this

 4  claimant, HCRE, file other pleadings during the Highland case,

 5  like objections to the plan or -- I remember discovery disputes

 6  when Wick Phillips was involved in the main case.  But I'm just

 7  curious, did you look at other times they may have participated

 8  as a party, a creditor?

 9          MR. MORRIS:  In all candor, Your Honor, I haven't --

10          THE COURT:  Okay.

11          MR. MORRIS:  -- looked at that.  My memory, which

12  could be wrong, my memory is that they did file other things,

13  although it's possible I'm just confusing it with Wick Phillips

14  representing different entities of Mr. Dondero.  But I believe

15  that Wick Phillips was involved in other matters.  I think HCRE

16  filed other things, but I don't know off the top of my head.

17          THE COURT:  Okay.  So the representation that

18  hundreds of thousands of dollars were spent on this proof of

19  claim dispute, I mean you're zeroing in on this proof of claim

20  dispute.  Is that correct?

21          MR. MORRIS:  One hundred percent limited to this

22  proof of claim.

23          I mean think about what we did here, Your Honor.  We

24  had a whole litigation over Wick Phillips.  Both sides retained

25  experts.  We took fact discovery.  We participated in written

Appx 04139

016692

28

1  discovery, something that never ever should have happened.  But

2  we were forced to do that, and I do include that as part of

3  this.

4          What else have we done?  Because I think it's -- I

5  think Your Honor's asking a fair question, like how do you get

6  to that number.  Before the Wick Phillips' disqualification

7  motion and the reason that we got to that point is we had

8  engaged in written discovery.  And this is back in the spring

9  of 2021.  We served, you know, document requests, we served

10 requests to admit, we served interrogatories.  All of that was

11 answered.

12         We produced thousands of pages of documents at that

13 time.  And it was in preparing for the depositions that were

14 then scheduled that we saw in the documents the conflict that

15 Wick Phillips had.  So we went though that whole process

16 throughout the rest of 2021, completely unnecessary.  Just

17 completely unnecessary, but nevertheless, we did.  We

18 prevailed.

19         New counsel came in in January and did nothing,

20 right.  It took us six months to get to a scheduling order.  It

21 took me almost three months to get them to respond at all.  But

22 we did the whole thing again, and we went through more written

23 discovery and more interrogatories and more requests to admit

24 and more document requests.  And we produced more documents.

25         We served subpoenas on Mark Patrick, on BH Equities,

**WWW.LIBERTYTRANSCRIPTS.COM**

29

1  on Baker Vigotto, the accounting firm that prepares the tax

2  returns at the direction of HCRE on behalf of SE Multifamily.

3  There's lots of negotiations in there.  There's -- I mean Your

4  Honor can see just how many times depositions were scheduled

5  and rescheduled and rescheduled again to accommodate

6  everybody's summer and business, right.

7          So we took the deposition of Mr. Patrick.  We took

8  the deposition of Barker Vigotto.  We took the deposition of BH

9  Equities.  We defended Mr. Seery and his deposition.  We took

10 the time to prepare for that.  We were reviewing the 4,000

11 documents that they produced belatedly, right.  We're

12 marshaling our evidence, getting ready for our summary judgment

13 motion.  We're negotiating amendments to scheduling orders at

14 HCRE's request.

15          Yeah, we spent several hundred thousand dollars, Your

16 Honor, for sure.

17          THE COURT:  Okay.

18          All right, Mr. Gameros, do you have cross-examination

19 of Mr. Morris?

20          MR. GAMEROS:  I don't have cross-examination of Mr.

21 Morris.  I'd just like to respond to a few points if I could.

22          Is that permitted, Your Honor?

23          THE COURT:  Oh, yes.  I mean this was your chance to

24 cross-examine Mr. Morris since he submitted a declaration with

25 exhibits.  But if you decline to do that, I think Mr. Morris --

30

 1            MR. GAMEROS:  Cross-examine Mr. Morris, Your Honor?

 2            THE COURT:  Just -- Mr. Morris, the reorganized

 3   debtor rests, right?  I got the impression you were resting?

 4            MR. MORRIS:  Yes, Your Honor.

 5            THE COURT:  All right.

 6            MR. MORRIS:  Yes.

 7            THE COURT:  Mr. Gameros, now your chance for

 8   rebuttal.

 9            MR. GAMEROS:  All right.

10            First, in terms of hundreds of thousands of dollars

11   of fees and the activity level since my firm appeared in

12   January of 2022, I think we need to look back at the

13   disqualification proceeding and remember that the estate was

14   denied its request for attorneys' fees on the disqualification

15   and that's in this Court's order.

16            If we proceed to trial, they won't be entitled to

17   attorneys' fees for winning, if they do.  There's no claim here

18   that entitles the estate to shift its attorneys' fees to

19   NexPoint.  None.

20            And I think that's important.  The relief that he's

21   asking for, Your Honor, if you listen to what the estate's

22   requesting, it wants to limit the use of Mr. Seery's

23   deposition.  It wants to have a trial.  Now apparently they may

24   not move for summary judgment.  Okay.  Things that they would

25   like, but all they get is a ruling on a proof of claim.  And

31

1  we've already said the Court should allow us to withdraw the

2  proof of claim and condition it with prejudice.

3          There is no other lawsuit out there.  There is no

4  other position being taken anywhere.  Frankly, Your Honor, the

5  reason why I said admit the exhibits and I question their

6  relevance is because none of them go to actual legal prejudice.

7  Can't show it, hasn't shown it, hasn't demonstrated it.  It

8  says they did a lot of work, gave you the greatest hits of some

9  email, but quite frankly, Your Honor, that goes to merit, not

10 legal prejudice.  That goes to, I believe, part of their story

11 as to what happened.

12         The story that matters to me is we think things were

13 going to happen during the estate, he's right.  We didn't move

14 for them.  We looked back at it and said we don't need the

15 proof of claim anymore, we should withdraw it.  That's the only

16 thing that's happened, and that's why we're here.  We don't

17 think he's entitled to discovery as to why we withdrew the

18 proof of claim.

19         It's his burden to show legal prejudice.  He can show

20 it or he can't.  He hasn't.

21         THE COURT:  Okay.

22         MR. GAMEROS:  The estate hasn't.

23         THE COURT:  Mr. Gameros?

24         MR. GAMEROS:  (Indiscernible) Mr. Dondero.

25         THE COURT:  I have a question.  I mean I'm looking at

Appx 04124

016696

32

1   your pleading, your motion to withdraw the proof of claim, and

2   I'm looking at this wonderful chart you have on Page 7 saying

3   here are the standards under Bankruptcy Rule 3006, you, Court,

4   should consider.  They were articulated in the <u>Manchester</u> case.

5         And it's not merely about is there any prejudice to

6   the estate.  I mean you set forth five factors.  One is "reason

7   for dismissal."  One is diligence in bringing the motion to

8   withdraw.  One is undue vexatiousness.  One is the matter's

9   progression including trial preparation.  One is duplication of

10  expense of relitigation.

11        This is your own authority, which I believe actually

12  is correctly articulating the standards.  It's not just about

13  prejudice.  Yes, I agree that some of the case law has zeroed

14  in on that one in particular.  But I mean you say yourself

15  reason for dismissal is a factor the Court must consider.

16        MR. GAMEROS:  That's correct, Your Honor.  Those are

17  the factors, and I think our analysis on them is correct.

18        If we go all the way to trial and the result is that

19  our proof of claim is denied, we're in the same position we are

20  right now.  So why should the parties, the estate, and the

21  Court go through that exercise?

22        THE COURT:  Okay.  Well, that's another issue, I

23  think, other than the reason for dismissal.  But a follow-up

24  question to what you just said is this.

25        Would you agree to a condition on the withdrawal of

Appx 04135
016697

33

1  your proof of claim that your client agrees that Highland has a

2  46-point whatever it was percent interest in SE Multifamily

3  Holdings and your client waives any right in the future to

4  challenge that interest?

5          MR. GAMEROS:  Your Honor, if that's what the Court

6  wants to put in an order and I have a chance to confer with my

7  client on it, I'm pretty sure that would be agreeable.

8          THE COURT:  Today's the day.  I'm not going to

9  continue.  I've got, you know, the whole day booked if I needed

10  it because I wasn't sure what you all were going to want to put

11  on.

12          MR. GAMEROS:  Your Honor, we'd agree with that.

13          MR. MORRIS:  Your Honor, I'm sorry to interrupt, but

14  a waiver of any appeal, too.  I just hard that if that's what

15  you want to put in the order, that's okay.  But this case has

16  to end, and that's what we're looking for.

17          We're a post-confirmation estate that will not go

18  forward with the possibility hanging over its head that it may

19  be divested of this asset.  That is what this proof of claim

20  and this dispute is about.

21          And what the debtor needs in order to avoid legal

22  prejudice is the complete elimination of any uncertainty that

23  it owns 46.06 percent of SE Multifamily.  And if HCRE is not

24  willing to give that comfort today, we again renew our request

25  for a direction that the three HCRE witnesses appear for

016698

34

1  substantive depositions and we get this on the trial calendar.

2          MR. GAMEROS:  Your Honor, we'll agree to it.

3          THE COURT:  Well, you know what, this is such a big

4  deal I really need a client representative to say that.  It

5  would be that --

6          MR. GAMEROS:  I don't have one here today, but I can

7  get you one.

8          THE COURT:  How soon --

9          MR. GAMEROS:  Do you want me to file a stipulation or

10  an affidavit?

11          THE COURT:  Pardon?

12          MR. GAMEROS:  Do you want me to file an affidavit?

13          THE COURT:  Well, let's be a hundred percent clear.

14  Your client would state that with the granting of the motion to

15  withdraw proof of claim number 146, HCRE is irrevocably waiving

16  the right to ever challenge Highland Capital Management's 46

17  percent interest -- and I know it's 46-point something -- 46

18  percent interest in SE Multifamily Holdings, LLC and is,

19  likewise, waiving the right to appeal or challenge the order to

20  this effect.

21          MR. MORRIS:  Your Honor, if I may, perhaps we can

22  take a ten-minute recess and allow him to consult with his

23  client and perhaps get a client representative on the phone who

24  can make that representation?

25          THE COURT:  All right.  Mr. Gameros, you think you

Appx 04127

016699

35

1   can get a client rep on the WebEx?

2            MR. GAMEROS:  I'm pretty sure I can, Your Honor.

3            THE COURT:  All right.  Well, how about we take a 15-

4   minute recess.  Does that sound a reasonable amount of time?

5   We've got, you know, two dozen people --

6            MR. GAMEROS:  It does, Your Honor.

7            THE COURT:  Two dozen people on the WebEx.  I don't

8   know if maybe one is a client representative, but we'll take a

9   15-minute break and I'll come back.  Okay.

10           THE CLERK:  All rise.

11       (Recess at 10:33 a.m./Reconvened at 10:50 a.m.)

12           THE CLERK:  All rise.

13           THE COURT:  Please be seated.

14           We're back on the record in Highland.

15           Mr. Gameros, how did you want to proceed now?

16           MR. GAMEROS:  Your Honor wanted me to get a

17  representative of NexPoint Real Estate Partners to state that

18  they agree that the estate has its 46 percent interest in the

19  company agreement subject to the company agreement.  And I've

20  got Mr. Sauter here who has authority to speak on behalf of

21  NexPoint Real Estate Partners.

22           THE COURT:  All right.  Well, so what is his position

23  with HCRE?

24           MR. SAUTER:  Your Honor, I don't have -- this is DC

25  Sauter.  I don't have an official position with HCRE, but I

**WWW.LIBERTYTRANSCRIPTS.COM**

36

1  have spoken with Mr. Dondero and he has authorized me to appear

2  here today and agree to the conditions that Mr. Gameros just

3  outlined.

4          THE COURT:  All right.  Well, it sounds like hearsay

5  to me.  I don't know -- Counsel, let me have you both respond.

6  You know, I worry about this will fall apart the minute Mr.

7  Dondero is instructing a lawyer, I never agreed to that.  I

8  mean I just don't know.  This is highly unusual.

9          First --

10          MR. GAMEROS:  Your Honor, if I might?

11          THE COURT:  Please.

12          MR. GAMEROS:  Mr. Sauter is an officer of the Court.

13  He works, you know, with Mr. Dondero at his business at

14  NexPoint; certainly an authorized agent on behalf of NexPoint

15  Real Estate Partners to make this agreement on behalf of

16  NexPoint Real Estate Partners.

17          To the extent that the condition that you originally

18  described as a conclusory matter, in other words, how to end

19  the withdrawal, we already agreed to that, that we also can

20  agree on the record to waive any appeal.  Mr. Sauter is

21  authorized to agree to that, as well.

22          So I think as an agent and a lawyer on behalf of

23  NexPoint Real Estate Partners, he's fully able to do that.

24          THE COURT:  How do I know he's able to do that?

25          And, by the way, if Mr. Dondero is in I guess the

Appx. 04139
016701

37

1  last 15 minutes given him authority to testify before the

2  Court, why couldn't Dondero just get on the WebEx himself?

3          MR. SAUTER:  Your Honor, I think he felt more

4  comfortable with me being a lawyer agreeing to those terms so

5  that he wouldn't misstate something.  He has been listening.  I

6  believe he's still on, although I'm not certain.

7          THE COURT:  Mr. Morris, do you want to respond?  I

8  mean I'm not sure, frankly, I care what you say, no offense.  I

9  don't think I have a person with clear authority here.

10          MR. MORRIS:  I'll just be quick and say I agree.

11          THE COURT:  Okay.  Mr. Gameros --

12          MR. GAMEROS:  As an attorney for NexPoint Real Estate

13  Partners, I have the authority to make that agreement on the

14  record and it be binding.  Mr. Sauter is confirming that

15  authority having spoken with Mr. Dondero about it.

16          I think that the Court is fully --

17          THE COURT:  Mr. Gameros --

18          MR. GAMEROS:  -- capable of doing that --

19          THE COURT:  Mr. Gameros, come on.  You know this is

20  the client's decision to make.  Okay.  I don't have a client

21  representative.  I don't have an officer or controlling

22  equityholder as evidence here of --

23          MR. MORRIS:  Mr. Dondero --

24          THE COURT:  -- the willingness to make the agreement.

25          Pardon?

Appx. 94149
016702

38

 1          MR. MORRIS:  Can Mr. Dondero make the representation

 2   on the record to the Court that he is authorizing Mr. Sauter to

 3   waive any claim that HCRE has to Highland's 46.06 percent

 4   interest in SE Multifamily along with any appeal?  This is just

 5   step one.  But if Mr. Dondero was on the phone, let him speak

 6   up and make it crystal clear that he is delegating the full

 7   authority to Mr. Sauter to negotiate and enter into this

 8   consensual order on behalf of HCRE.

 9          THE COURT:  All right.  Mr. Gameros, do you want to

10   give your client authority to speak up?  Your client

11   representative, someone who's actually an officer or a

12   controller or equity owner?

13          MR. GAMEROS:  Your Honor, if Mr. Dondero can do that,

14   that would be great.  I don't know if he's in a place where he

15   can do that.

16          THE COURT:  All right.  Mr. Dondero, if you can hear

17   us, are you willing to give some quick testimony in that

18   regard?

19      (No audible response)

20          MR. DONDERO:  I can't see the box --

21          UNIDENTIFIED SPEAKER:  Surprising that -- surprising

22   he was on the phone before, but now he's not after delegating.

23   Just I'm not --

24          MR. SAUTER:  Your Honor, he's on the phone.  I'm just

25   -- if you will give me a minute, I got to run around the corner

**WWW.LIBERTYTRANSCRIPTS.COM**

39

1  and try to make sure he knows how to unmute himself.

2          THE COURT:  Star 6.  If he's on a phone, star 6 is

3  the way to unmute himself.  But I want to see video, too.

4          THE OPERATOR:  There we go.  Try again.

5          MR. DONDERO:  Hello?

6          THE COURT:  All right.

7          MR. DONDERO:  Hello?

8          THE COURT:  Mr. Dondero, is that you?

9          MR. DONDERO:  It's me.  I've been on the entire time.

10          THE COURT:  All right.  Can you turn your video on,

11  please?

12          MR. DONDERO:  I am on my cell phone.

13          THE COURT:  Okay.  Well, so I guess you just called

14  in on your cell phone, you don't have a WebEx connection on

15  your cell phone?

16          MR. DONDERO:  I don't have a WebEx.

17          THE COURT:  Okay.  Well -- yeah, it sounded like you

18  were in the same office as Mr. Sauter.  Is that -- did I

19  misunderstand?

20          MR. DONDERO:  We work in the same office.  I'm in my

21  car.  I just stepped out of my car.

22          THE COURT:  All right.  Well, this is not ideal, you

23  know, without us seeing you.  But I'll go ahead and swear you

24  in.  All right.  Can you hear me okay?  I need to swear you in.

25          MR. DONDERO:  Yes.

Dondero - Direct                                    40

1          THE COURT:  All right.

2               JAMES DONDERO, HCRE'S WITNESS, SWORN

3          THE COURT:  All right.

4          Mr. Gameros, do you want to ask him the questions we

5     need to hear answers on, please?

6          MR. GAMEROS:  Thank you, Your Honor.

7                    DIRECT EXAMINATION

8     BY MR. GAMEROS:

9     Q    Mr. Dondero, on behalf of HCRE, do you agree as a

10    condition for withdrawing the proof of claim that HCRE will not

11    challenge the estate's ownership or equity interest in SE

12    Multifamily subject to the company agreement?

13    A    Yes.

14    Q    Do you agree that you will not appeal and that, therefore,

15    HCRE is waiving any appeal right to that determination as a

16    condition of withdrawing the proof of claim?

17    A    Yes.

18         MR. GAMEROS:  Those are the questions for Mr.

19    Dondero.

20         MR. MORRIS:  Your Honor, if I may?

21         THE COURT:  Mr. Morris, you may.

22         MR. MORRIS:  I'm very uncomfortable.  I'm very

23    uncomfortable with the inclusion of the language subject to the

24    company agreement.  It sounds like a very conditional waiver.

25    We need an irrevocable unconditional admission by HCRE that

41

1  Highland owns 46.06 percent of SE Multifamily, period, full

2  stop.  If they want to keep conditions in there and make it

3  conditional and make it subject to other things, let's please

4  deny the motion and proceed to trial.

5          THE COURT:  All right.  Well, Mr. --

6          MR. GAMEROS:  The equity that they own is part of the

7  company agreement.  It's not modifying the company agreement by

8  saying.

9          THE COURT:  Well --

10         MR. MORRIS:  Our ownership is not subject to the

11 agreement.  We either have an ownership interest or we don't.

12 Our rights and obligations as a member of SE Multifamily are

13 subject to the agreement, but our ownership interest is not.

14 And that's the ambiguity that we need to remove.

15         THE COURT:  Okay.  Well, Mr. Gameros, do you want to

16 rephrase the question or are you not willing to make the

17 agreement as specific as Mr. Morris says he needs it?

18         MR. GAMEROS:  That's what I'm -- I guess I don't

19 understand what his complaint is.  If the estate owns 46

20 percent of the equity of SE Multifamily, it owns that subject

21 to the company agreement.  It's not a separate ownership

22 interest.  So I don't know what the problem is.

23         THE COURT:  Okay.  Let me try to phrase it as I

24 understand it.

25         What I understand has been asserted in the proof of

Appx 04144

016706

42

1  claim is that what was set forth in the agreement was a
2  mistake, okay.  A mistake.  And it sounds like you're using
3  language that says we'll agree the agreement, you know, they
4  have a 46 percent interest pursuant to the agreement.  But that
5  doesn't change -- that does not really zero in on the argument
6  made in the proof of claim that there was a mistake in the
7  agreement, right?

8        So you'd have to go broader to completely resolve the
9  issues raised in your proof of claim and say we agree, Highland
10  has a 46.06 interest in SE Multifamily and we agree that is
11  correct and we waive any right to challenge it in the future
12  and we waive any right to appeal this order.

13        MR. GAMEROS:  And, Your Honor, if that's the
14  condition, I guess my concern is that the 46 percent is still
15  part of the company agreement.  We agree not to challenge it on
16  the basis of anything asserted in the proof of claim, that
17  being mistake, lack of consideration, or failure of
18  consideration.  Their 46 percent is their ownership interest in
19  SE Multifamily and HCRE won't challenge that.

20        Is that sufficient?

21        THE COURT:  Well, I need to hear from your client.  I
22  mean he needs to be asked every which way from Sunday whether
23  he is waiving the right to challenge Highland's 46.06 interest
24  from now until eternity, okay.  That's basically, you know, we
25  either have that agreement or we'll just have a trial.

016707

Appx 04145

                          Dondero - Direct                    43
1                CONTINUED DIRECT EXAMINATION
2  BY MR. GAMEROS:
3  Q    Mr. Dondero, do you agree that NexPoint Real Estate
4  Partners will not challenge in any way the estate's interest in
5  SE Multifamily, its 46-point whatever percent interest that is?
6  A    I think the nuance is that agreement is okay in current as
7  of today.  But it's part of an operating agreement, and that
8  percentage ownership can change due to capital calls and other
9  things.  And it could change over time.  It's never in a
10 partnership agreement fixed into perpetuity.  And so no
11 businessman can agree to that.
12     If the Court wants it fixed into perpetuity, that would be
13 very odd.
14          MR. MORRIS:  Can we go to trial, Your Honor?  Can we
15 just deny the motion and go to trial?  Let me have my
16 depositions and go to trial.  This is -- if Mr. Dondero wants
17 to take that position, he's welcome to do that.  But I'm
18 entitled to finality, and I'd like to get there.
19          THE COURT:  All right.  Well, Mr. Gameros, anything
20 else you want to ask your client that you think might be
21 helpful?
22 BY MR. GAMEROS:
23 Q    Mr. Dondero, you desire to withdraw the proof of claim.
24 Correct?
25 A    Yes.


                    **WWW.LIBERTYTRANSCRIPTS.COM**

44

1  Q    And you agree to an order denying the proof of claim with

2  prejudice.   Correct?

3  A    Yes.

4  Q    And can you agree that HCRE will not challenge the equity

5  ownership of its member in SE Multifamily of the estate?

6  A    Yes.

7           MR. GAMEROS:  Your Honor, I think there it is.

8           THE COURT:  Mr. Morris, do you have any --

9           MR. GAMEROS:  He agrees.

10          THE COURT:  -- do you have any follow-up questions --

11          MR. MORRIS:  The waiver of the right to --

12          THE COURT:  -- Mr. Dondero?

13          MR. MORRIS:  The waiver of the right to any appeal

14  whatsoever.  And I do have -- you know, there are the other

15  conditions that we mentioned earlier, right?  Either they have

16  to also agree that Mr. Seery's deposition transcript shall

17  never be used for any purpose at any time or they need to level

18  the playing field and submit their witnesses to examination.

19          The playing field needs to be level here.  Either if

20  they want to use that deposition transcript for some purpose, I

21  have no problem with that.  Just let me take my depositions.

22  If they don't want to submit their witnesses to depositions,

23  then they also have to agree that that transcript will never be

24  used for any other purpose.  It's as if this proof of claim has

25  never been filed, right, for that purpose, right.  Because

Appx. 04105
016709

45

1  that's just not fair.  That's the legal prejudice.

2        How do you take my client's deposition on Wednesday

3  and file this motion on Friday knowing your client's supposed

4  to be deposed on Tuesday?  Level the playing field.  That's

5  conditional number two.

6        And condition number three, frankly, Your Honor, this

7  proof of claim was fraudulent.  I mean my client has been

8  damaged.  My client has spent an enormous amount of money on

9  this, and I'd like them to agree to if not make us whole, you

10 know, do something because it's wrong.  It's just wrong that

11 Mr. Dondero files proofs of claim under penalty of perjury that

12 have absolutely no basis in fact.

13        It's distressing.  I'd like those two last issues

14 addressed, as well.

15        MR. GAMEROS:  Your Honor, in terms of the Court's

16 questions in terms of finality with respect to the membership

17 interest in SE Multifamily, Mr. Dondero agrees with the Court.

18 He's already said that he won't waive -- that he waives, rather

19 -- I'm sorry, let me start again.

20        He has said very clearly that he has waived appeal of

21 this order allowing the withdrawal of the proof of claim with

22 the conditions that you asked for.  I think you should grant

23 the motion to withdraw and we can put an end to all of this.

24        THE COURT:  Okay.

25        MR. MORRIS:  Here's the thing, Your Honor.  We know

Appx. 04148
016710

46

1  there's going to be more litigation with HCRE.  We know they've

2  breached the contract.  We know because the evidence is in the

3  record.  We know that Highland demanded access to books and

4  records as is its contractual right back in June.  We know that

5  that notice was sent to all of Mr. Dondero's lawyers and HCRE's

6  lawyers.  And we know that that request has been absolutely

7  categorically ignored.  Okay?

8         We are going to --

9         MR. GAMEROS:  This has nothing to do with the proof

10 of claim.

11        MR. MORRIS:  We are going to get -- well, no.

12        To be clear, Your Honor, that is what's driving this

13 concern is because we know that there's going to be additional

14 litigation.  We know the tax forms are not accurate.  We know

15 there's already an existing breach of contract.

16        And what we're trying to make sure is that HCRE is

17 not able to resurrect this concept that we don't have an

18 ownership interest, that it's not 46.06 percent, that Mr. Seery

19 made some admission that they're going to use in some future

20 litigation.  That's the prejudice, okay.

21        So I think step one is (indiscernible), but then we

22 need either an agreement that the transcript isn't going to be

23 used elsewhere or that I get the deposition of the HCRE

24 witnesses because it's unfair prejudice to use this process to

25 take that deposition on Wednesday, August 10th and to file this

Appx 04149
016711

47

1  motion on Friday, August 12th.  That is unfair prejudice for

2  them to have taken my client's sworn testimony and then shut it

3  down before I could take theirs.

4          So either eliminate it all or let it all in, right?

5  It can't be.  They can't possibly benefit from this.

6          THE COURT:  Let me understand something, Mr. Morris,

7  you just said.  We know we're going to have future litigation.

8  I mean I'm not asking for revelation of attorney-client

9  privilege, but -- communications, but you kind of dangled it

10 out there.

11         You're saying that the reorganized debtor intends to

12 file litigation against HCRE because of what you think are

13 breaches by it as manager of SE Multifamily of the existing

14 agreement.

15         MR. MORRIS:  The evidence is already in the record,

16 Your Honor.  We have -- Highland as a member of SE Multifamily

17 has the contractual right to obtain access to inspect and copy

18 -- those are the words, inspect and copy SEC *[sic]*

19 Multifamily's books and records.

20         We made that request at the end of June.  It's one of

21 the exhibits that's attached that's in the record now.  I made

22 probably three different follow-up emails, and it's been

23 completely ignored, okay.

24         HCRE is the manager of SE Multifamily, right.

25 They're in control.  They're the ones who dictate how the

Appx. 04159
016712

48

1  accounting is done.  They're the ones who dictate how

2  distributions are made.  They're the ones who dictate how tax

3  forms are prepared.  They have an obligation under the amended

4  and restated agreement to cause SE Multifamily to prepare the

5  tax returns.  They're the ones who are in direct contact with

6  Barker Vigotto.

7          There's a whole host of issues we're going to

8  examine, but the one thing that I do know for certain, Your

9  Honor, is that they are in breach of the agreement today

10 because they have refused for three months now to give us what

11 we're entitled to.  And that is access to inspect and copy SE

12 Multifamily's books and records.

13         So unless they agree to do that, and I mean pretty

14 soon, we're not going to have any alternative.  If you recall,

15 Your Honor, Mr. Dondero's trust, the Dugaboy Trust, filed this

16 valuation motion which we'll address in due course.  I don't

17 know where they got the number, but according to Mr. Dondero's

18 trust, Highland's interest in SE Multifamily is worth $20

19 million.  This is not a small asset.  This is not harassment.

20         But they're not complying with their contractual

21 obligation to give us access to inspect and copy SE

22 Multifamily's books and records.  For a $20-million asset where

23 it's -- I mean they're conceding now that we're the owner of

24 those membership interest.  How can they deny us access?

25         And if they don't give us that access so that we can

**WWW.LIBERTYTRANSCRIPTS.COM**

49

1  verify the value of this asset, so that we can verify whether

2  or not we've gotten the distributions that we're entitled to,

3  so that we can verify that the profits and losses that have

4  been allocated to Highland were actually proper and consistent

5  with the agreement, I'm afraid that there will be further

6  litigation, and that's why we need to -- we need to nail this

7  down right now because I don't want to get a counterclaim that

8  says we left the deal open to challenging Highland's interest

9  in SE Multifamily.  That door needs to close today.

10         THE COURT:  Okay.  All right.  Well, I'm going to

11  start out by saying we're in a very unusual procedural posture.

12         Before I forget, Mr. Gameros, I meant to mention this

13  at the very beginning.  The motion to withdraw the proof of

14  claim of your client, you had an odd way of signing it.  I

15  wonder if this was a mistake or you always sign this way.  You

16  signed the pleading signature Charles W. Gameros, Jr., PC.

17         Is that -- was that inadvertent or do you always sign

18  that way?  I mean a lawyer's supposed to personally sign under

19  Rule 11 a pleading.  Was that just inadvertent or do you think

20  that's fine?

21         MR. GAMEROS:  I've used that signature block for over

22  20 years, and I've never -- no one has ever asked.  I thought

23  it was fine.

24         THE COURT:  Okay.  Well, no one's ever asked and you

25  think it's fine.  I think you need to go back and do some

50

1  research on that, okay.  I'm not sure it's fine.  I'm not sure

2  it's fine.

3          I mean you would agree that you're personally bound

4  under Rule 11 when you file a pleading, right?

5          MR. GAMEROS:  Yes, Your Honor.

6          THE COURT:  I mean I know it feels a little different

7  if you're -- well, I don't know.  You're not a -- you have a

8  firm, Hoge & Gameros, L.L.P.   I mean it wouldn't be

9  appropriate for Mr. Morris to sign a pleading Pachulski Stang,

10 right?  He has to sign his name personally on a pleading,

11 right?

12         MR. GAMEROS:  Your Honor, I'll make that change.

13         THE COURT:  Okay.

14         Well, so we're in an unusual procedural context.  We

15 I think all agree that Bankruptcy Rule 3006 is the applicable

16 authority, and it provides that, you know, a creditor can't

17 just withdraw a claim when there's been an objection filed to

18 it.  There has to be notice and an order from the Court.

19         And so we don't run into this situation very often,

20 but I have seen it before.  And as someone or both correctly

21 noted, it is a rule that sort of goes to the integrity of the

22 system.  Filing a proof of claim is obviously a very

23 significant act in the context of a bankruptcy case.

24         You file a proof of claim under penalty of perjury so

25 it's a big deal from, you know, a criminal exposure standpoint

**WWW.LIBERTYTRANSCRIPTS.COM**

51

1  but it's also a big deal because we want to make sure only

2  parties with legitimate claims are given a seat at the table,

3  so to speak, in bankruptcy as far as, you know, their right to

4  a distribution, their right to be heard in a case.

5       So, you know, that's the reason for the rule.  We

6  don't see it come into play very often, but it's there because

7  we want to make sure that we protect the integrity of the

8  bankruptcy process.  And if someone files a proof of claim and

9  it's pending and, you know, activity happens in the bankruptcy

10  case as a result of it, that we don't just let a party say

11  never mind.

12       So the Manchester case, which you both cited in your

13  pleadings, has set forth fact-intensive factors -- fact-

14  intensive inquiry.  And, again, I'm just looking at HCRE's

15  motion, Page 7.  There was a chart and it sets forth the

16  Manchester factors.  Factor number one, diligence in bringing

17  the motion to withdraw the proof of claim.

18       In Mr. Gameros' chart, his response to that factor is

19  that HCRE brought its motion to withdraw immediately after

20  conferring with debtor's counsel.  I don't even know what that

21  means, okay.  But what I do know is in looking at diligence of

22  bringing the motion, the proof of claim was filed April 8th,

23  2020.  It was objected to, the proof of claim, July 30th, 2020.

24  And then on August 12th, 2022, this motion to withdraw the

25  proof of claim was filed.

52

1        So two years and one month after the objection was

2  filed to the proof of claim HCRE withdraws it.  So that doesn't

3  seem very diligent.  It's not diligent at all, to be honest.

4        Your second factor, you cited, Mr. Gameros, undue

5  vexatiousness, and you say HCRE has not been vexatious in

6  pursuing its proof of claim.  And outside the motion to

7  disqualify previous counsel, which is not substantive,

8  everything in the matter has proceeded by agreement and there

9  have been no hearings set or held.

10        Okay.  Well, debtor has represented in its pleadings

11  and today through counsel on the record that it has spent

12  hundreds of thousands of dollars litigating this.  It has

13  mentioned that four depositions have been taken.  It was Mr.

14  Mark Patrick.  It was the tax accounting firm.  We had the B --

15  the entity -- BH Equities, LLC, their representative.  And then

16  Mr. Seery.  So four depositions, and I'm told a lot of written

17  discovery.

18        And on the day before the -- well, the day after, day

19  or two after the Seery deposition, the motion to withdraw the

20  proof of claim was filed after 5:00 in the evening on a Friday,

21  August 12th, and I guess a couple of business days before the

22  depositions were to occur of Mr. Dondero and the fellow, Mr.

23  McGraner, and I feel like there was one other deposition.  I'm

24  losing track of those.

25        But --

53

 1            THE CLERK:  The 30(b)(6).

 2            THE COURT:  Oh, the 30(b)(6).  The 30(b)(6)

 3  representative.

 4            So on top of all of that, you know, Highland argues

 5  there was just simply no good-faith basis for the proof of

 6  claim.  Proof of claim asserted the membership interest,

 7  Highland's 46.06 interest, set forth in the Multifamily LLC

 8  agreement were the result of mistake.

 9            Mr. Dondero signed the agreement for both parties,

10  HCRE and Highland.  And then now the motion to withdraw says

11  something to the effect of the anticipated issues have not

12  materialized.  So anyway, the undue vexatiousness factor I

13  think weighs -- because of these factors I've mentioned, weighs

14  in favor of there has been undue vexatiousness.

15            Factor number three, according to HCRE's motion to

16  withdraw the proof of claim, is matter's progression including

17  trial preparation.  Again, four depositions, thousands of pages

18  of written discovery.  We were days away from the last

19  depositions occurring, those of HCRE's potential witnesses and

20  we have trials set.  We have a trial set in November.  So that

21  factor, again, seems to weigh heavily in favor of Highland's

22  objection here.

23            Duplication of expense of relitigation, here's why we

24  got Mr. Dondero on the phone or wanted to have a witness with

25  authority.  Highland is saying we are concerned about

54

1  relitigation of this ownership interest issue.  And as part of

2  its argument, Highland has said we've got claims, we've got our

3  own claims for breach of agreement and different things that

4  are going to cause us to have to drill down on terms of the LLC

5  agreement.

6        And we can't -- we don't want to face exposure on

7  this issue of, well, you don't have the ownership interest or

8  the rights you say you do, Highland.  So, you know, if we could

9  get ironclad language here of, you know, we waive the right, we

10 agree that Highland has the 46.06 interest and we waive the

11 right to challenge that, then I don't think we'd have to worry

12 about relitigation of the issues in the proof of claim.  But it

13 feels like we had a little bit of reluctance to say it as

14 forcefully as we would need to have it said to avoid

15 relitigation.

16       Reason for dismissal, I don't know.  I don't know

17 what the reason for dismissal.  Again, to quote HCRE's pleading

18 on Page 7, the reason for dismissal is, "The operation of the

19 company" -- I think that means SE Multifamily -- "during the

20 case and the anticipated issues therewith have not materialized

21 and NREP no longer desires to proceed in the matters raised in

22 the proof of claim."

23       I mean that's just not in sync with the theory

24 espoused in the proof of claim that we think there was a

25 mistake made in the LLC agreement.  So, again, looking at these

55

 1  legal factors, I do not think that the correct result is to

 2  grant the motion to withdraw the proof of claim under Rule 3006

 3  under the Manchester factors.  I will throw in that I think

 4  there is potential for prejudice here of the debtor.

 5          I mean not even considering that hundreds of

 6  thousands of dollars have been spent over two-plus years on

 7  this issue, you know, I remember very well the disqualifying

 8  motion.  And I said Wick Phillips should be disqualified.  I

 9  didn't shift fees because I just wasn't sure at the time that,

10  frankly, HCRE should be imposed with the fees attributable to

11  its lawyers, not recognizing the conflict of interest when they

12  saw one.  It was just a little fuzzy in my mind.

13          But I'm just letting you know that now that we are

14  here many years later, many months later and we have all the

15  sudden, okay, never mind, this is just a situation where I have

16  some regrets I didn't shift fees, to be honest.  But -- so the

17  motion is denied.  The depositions shall go forward.  I'm not

18  sure, you know, if the dates that have been proposed are still

19  workable, but if someone wants to speak up now about those

20  deposition dates to avoid an emergency hearing, I'm willing to

21  hear that.

22          I think what I heard was, well, I don't know what --

23  have you talked about dates at all?  Probably not, Mr. Morris,

24  in light of this hearing today.

25          MR. MORRIS:  We have not, Your Honor.  But I do think

**WWW.LIBERTYTRANSCRIPTS.COM**

56

 1  that Counsel and I can work that out.  I'm not available until

 2  the week of the 26th.  So it won't be early that week but

 3  sometime between let's say the 28th of September and the 7th of

 4  October, I'll be prepared to take these depositions.  And I

 5  would respectfully request, and we can work with Ms. Ellison to

 6  try to find a trial date sometime the last week of October,

 7  first week of November so we can get this finished.

 8          THE COURT:  Okay.  Did I dream up that there was a

 9  trial set already in November?

10          MR. MORRIS:  You know what?

11          You know what, let's just keep that date, Your Honor.

12  Let's just keep that date.

13          THE COURT:  All right.  Traci, are you still on the

14  line?  Can you confirm my memory?  I thought we had a two-day

15  trial set aside for this in November.

16          MS. ELLISON:  Is this on the merits of HCRE's claims,

17  Judge Jernigan?  I have a note holding November 1 and 2.

18          THE COURT:  Okay.

19          MR. MORRIS:  Yeah.

20          THE COURT:  So we'll go ahead and mark that down.

21          Now the last -- so you'll work on an a mutually

22  agreeable date for these three remaining depositions sometime,

23  you know, late September, early October.  And I trust you will

24  --

25          MR. MORRIS:  Yeah.  I would respectfully request that

**WWW.LIBERTYTRANSCRIPTS.COM**

57

 1   Counsel just propose dates for the depositions.  I'll wait to

 2   hear from him.  But I think -- I'm representing to the Court

 3   that any time between September 28th and let's just give it two

 4   full weeks, October 12th.  That's plenty of time in advance of

 5   the trial.

 6          THE COURT:  All right.  Mr. Gameros, anything you

 7   want to add on that?

 8          MR. GAMEROS:  No, Your Honor.  I'm sure we can work

 9   with Mr. Morris to get those scheduled.

10          THE COURT:  All right.  And here's actually the last

11   thing I wanted to say.

12          You know, I had thought about, you know, waiting 24

13   hours to give you a ruling on this motion to withdraw the proof

14   of claim and directing you all to kind of talk and see if maybe

15   you could work out language, you know, without the pressure of

16   the Court hovering over you that could make both of your

17   clients satisfied.

18          I still encourage you to do that, but I'm going to

19   pick on our U.S. Trustee.  I see she's observing today, and I'm

20   not going to ask you to say anything, Ms. Lambert.  But if you

21   all do agree, if you all in the next, you know, 24 hours come

22   to some sort of agreement, I don't mean to be alarming, but I

23   want it run by the U.S. Trustee because, you know, I've heard

24   some things that have troubled me about the, you know, lack of

25   good faith with regard to the proof of claim and, you know,

58

1  alleged gamesmanship.

2          And, you know, I talked earlier about this goes to

3  the integrity of the system, you know, filing a proof of claim

4  under penalty of perjury.  Anyway, I'm feeling a little bit

5  uncomfortable about signing off on an agreed order where there

6  may be quid pro quos that went back and forth in connection

7  with withdrawing a proof of claim.  I mean at some point --

8  well, that's why we have scrutiny of these things under Rule

9  3006, right?

10         Again, there are integrity issues.  And so I just --

11  you know, if you were to work out language, I want you to run

12  it by Ms. Lambert and I want to hear that either she was okay

13  with it or she wasn't okay with it or maybe she declines to

14  comment.  You know, I'm not going to tell her how to do her

15  job, but I feel like that needs to happen, okay?

16         It's just something uncomfortable going on in my

17  brain about, you know, again a proof of claim being on file

18  two, almost two and a half years and then, you know, okay,

19  never mind, okay, I agree to never mind as long as you agree to

20  XYZ.

21         And I have no idea what's in the Seery transcript.  I

22  don't have it before me.  But, you know, I don't even know what

23  that's all about.  I don't even know if I care what that's all

24  about.  I just know if there are quid pro quos I feel like, you

25  know, maybe I need to have the U.S. Trustee, you know, not per

59

1  se signing off on any agreed order but at least kind of looking

2  at it and telling me either U.S. Trustee's fine with it, U.S.

3  Trustee is not fine with it, or U.S. Trustee declines to

4  comment.  Just I know that I've gone through the drill, okay?

5          So just letting you know I am still, you know, all

6  open to an agreed resolution of this, okay.  But we're going

7  forward as if you can't get there, okay?

8          All right.  I'll look for -- what am I going to look

9  for?  I'm going to look for an order denying the motion to

10  withdraw proof of claim.  I'm going to look for an order

11  granting the -- well, an order resolving the objection to

12  motion to quash and cross-motion for subpoenas saying that

13  these three witnesses are going to appear at a mutually

14  agreeable time either late September or early October.

15          All right.  We're adjourned.

16          THE CLERK:  All rise.

17          MR. MORRIS:  Thank you, Your Honor.

18      (Proceedings concluded at 11:35 a.m.)

19                  *  *  *  *  *

20

21

22

23

24

25

**WWW.LIBERTYTRANSCRIPTS.COM**

60

# C E R T I F I C A T I O N

I, DIPTI PATEL, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Dipti Patel
_____
DIPTI PATEL, CET-997


LIBERTY TRANSCRIPTS                DATE: September 13, 2022

016725

Appx. 84193

61

016726

Appx. 34104

# EXHIBIT 36

Appx. 04165
016727

# MATTERS AWAITING FINAL JUDGMENT*

**Pending Adversary Proceedings:**

- ***Marc S. Kirschner, as Litigation Trustee for the Litigation Sub-Trust v. James D. Dondero, et al. (In re Highland Capital Management, L.P.)***, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex.).

  James Dondero and his controlled entities filed motions to dismiss the Kirschner Adversary on July 11 and July 12, 2022, and the Litigation Trustee filed his response to the motions to dismiss on September 19, 2022.  Mr. Dondero and his controlled entities responses are due November 14, 2022.

- ***Charitable DAF Fund, L.P., and CLO Holdco, Ltd., v. Highland Capital Management, L.P., Highland HCF Advisor, Ltd., and Highland CLO Funding, Ltd. (In re Highland Capital Management, L.P.)***, Adv. Proc. No. 21-03067-sgj (Bankr. N.D. Tex.)

  On April 12, 2021, plaintiffs filed a complaint in the District Court alleging, among other things, that Highland had breached its fiduciary duty to plaintiffs in connection with the HarbourVest settlement.  On September 29, 2021, the District Court referred the matter to this Court, and this Court dismissed the action on March 11, 2022.  Plaintiffs appealed to the District Court, which remanded to this Court. Highland filed its renewed motion to dismiss on October 14, 2022.

**Pending Bankruptcy Court Matters, Case No. 19-34054-sgj:**

- ***Motion for Determination of the Value of the Estate and Assets Held by the Claimant Trust*** [Docket No. 3382], as amended and supplemented by ***Supplemental and Amended Motion for Determination of the Value of the Estate and Assets Held by the Claimant Trust*** [Docket No. 3533]

  On June 20, 2022, Dugaboy filed a motion seeking a valuation of Highland's and supplemented that motion on September 21, 2022. Hunter Mountain Investment Trust filed a response effectively joining Dugaboy's motion on August 24, 2022 [Docket No. 3467]. Highland objected on August 24, 2022 [Docket No. 3465].  Responses to Highland's objections are due November 1, 2022, and Highland may respond on or before November 8, 2022.  A status conference is scheduled for November 15, 2022.

- ***Motion to Conform Plan*** [Docket No. 3503]

  On September 9, 2022, Highland filed a motion seeking to conform the Plan to the Fifth Circuit's opinion affirming, in material part, the Confirmation Order.  The Funds and the Advisors objected on September 27, 2022, and September 30, 2022, respectfully.  A hearing was held on October 26, 2022 at which this Court orally approved Highland's motion, denied the Funds and Advisors' objections, and stated that it would issue a memorandum opinion.

---

\* Chart includes pending matters as of October 31, 2022, exclusive of the Renewed Motion.  All capitalized terms used but not defined in this chart have the meanings given to them in *Highland's Objection to Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support*.

Appx. 4386
016728

- ***Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No-Liability Claims; and (f) Insufficient Documentation Claims* [Docket No. 906] (hearing scheduled for November 1, 2022)**

  On April 8, 2020, HCRE filed its proof of claim (Claim No. 146), and Highland objected. On August 12, 2022, HCRE filed a motion to withdraw its proof of claim, which was denied. A hearing is scheduled on HCRE's proof of claim for November 1 and 2, 2022.

**Pending Appeals Before the District Court:**

- ***Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. (In re Highland Capital Management, L.P.)*, Adv. Proc. No. 21-03010-sgj (Bankr. N.D. Tex.), consolidated with Docket No. 1826.**

  On September 14, 2022, this Court found that the Advisors breached their payment obligations to Highland under certain shared service and payroll reimbursement agreements [Adv. Docket No. 126]. The Advisors appealed to the District Court. A briefing schedule has not yet been set.

- ***Consolidated Notes Litigation*, Adv. Proc. Nos. 21-03003-sgj, 21-03004-sgj, 21-03005-sgj, 21-03006-sgj, 21-03007-sgj (Bankr. N.D. Tex.).**

  James Dondero and certain of his controlled entities issued promissory notes in favor of Highland prior to the bankruptcy case and subsequently defaulted on their payment obligations. Highland filed multiple adversary proceedings to collect on the notes and moved for summary judgment. On April 20, 2022, this Court held a trial, and on July 19, 2022, issued its report and recommendation to the District Court recommending summary judgment be granted. Mr. Dondero and his controlled entities have objected to the reports and recommendation, and the matter is currently pending before the District Court.

- ***The Charitable DAF Fund, LP v. Highland Capital Management, L.P. (In re Highland Capital Management, L.P.)*, Adv. Proc. No. 22-03052-sgj (Bankr. N.D. Tex.)**

  Plaintiff filed its original complaint on July 22, 2021, in the District Court alleging that Highland breached its fiduciary duties to the DAF as an investor in Highland Multi-Strategy Credit Fund, L.P. On May 19, 2022, the District Court referred the matter to this Court for adjudication, and Highland filed its amended motion to dismiss on May 27, 2022, alleging that the DAF's claims should be dismissed for failure to comply with the administrative expense claim bar date. On September 30, 2022, this Court granted Highland's motion to dismiss, and the DAF appealed to the District Court. A briefing schedule has not been set.

- ***Motion for Modification of Order Authorizing Appointment of James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction* [Docket No. 2242]**

  DAF and CLOH filed a motion seeking modification of this Court's order appointing Mr. Seery as Highland's chief executive officer and chief restructuring officer, which was denied on June 25, 2021 [Docket No. 2506]. DAF and CLOH appealed to the District Court and moved to stay the appeal pending resolution of the appeal of the Confirmation Order. The District Court granted the motion to stay. On

Appx. 7485
016729

September 26, 2022, after the Fifth Circuit affirmed the Confirmation Order in material part, Highland filed a motion in the District Court for summary affirmance of this Court's order. The matter has been fully briefed and is under advisement.

**Pending Appeals to the Fifth Circuit:**

- ***Debtor's Motion for Entry of an Order (i) Authorizing the (a) Creation of an Indemnity Subtrust and (b) entry into an Indemnity Trust Agreement and (ii) Granting Related Relief* [Docket No. 2491]**

  Highland filed a motion seeking authority to create an indemnity subtrust, which this Court granted over Mr. Dondero, the Advisors, and Dugaboy's objections [Docket No. 2599]. Mr. Dondero, the Advisors, and Dugaboy appealed to the District Court, which affirmed this Court's order. On February 24, 2022, the Dondero entities appealed to the Fifth Circuit. Briefing is complete and oral argument is tentatively scheduled for the week of December 4, 2022.

- ***Fifth and Final Application for Compensation and Reimbursement of Expenses of Pachulski Stang Ziehl & Jones, LLP* [Docket No. 2906]**

  NexPoint objected to the fees incurred by Highland's various professionals during the bankruptcy case [Docket No. 2977]. This Court denied NexPoint's objection on November 22, 2021 [Docket No. 3047]. NexPoint appealed to the District Court which denied its appeal as moot on May 9, 2022. NexPoint appealed to the Fifth Circuit on June 7, 2022. Highland's responsive brief is due on November 18, 2022.

- ***Highland Capital Management, L.P. v. James D. Dondero (In re Highland Capital Management, L.P.)*, Adv. Proc. No. 20-03190-sgj (Bankr. N.D. Tex.)**

  On June 7, 2021, this Court found Mr. Dondero in contempt for violating this Court's temporary restraining order [Adv. Docket No. 190]. Mr. Dondero appealed to the District Court which upheld this Court's order on August 17, 2022. Mr. Dondero has appealed to the Fifth Circuit. His opening brief is due December 19, 2022.

- ***Motion to Compel Compliance with Bankruptcy Rule 2015.3* [Docket No. 2256] (appeal denied by District Court, appealed to Fifth Circuit)**

  Dugaboy and Get Good filed a motion seeking to compel Highland to file certain reports under Rule 2015.3 [Docket No. 2256]. After a hearing, this Court denied the motion on September 7, 2021 [Docket No. 2812]. Dugaboy and Get Good appealed to the District Court, which dismissed their appeal as moot on August 8, 2021. Dugaboy and Get Good appealed to the Fifth Circuit on August 24, 2022. The Fifth Circuit has not yet set a briefing schedule.

- ***Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625]**

  HarbourVest filed claims against Highland in excess of $300 million.  HarbourVest and Highland executed a settlement agreement which was approved by this Court over the objection of Mr. Dondero, Dugaboy, and Get Good [Docket No. 1788].  CLOH also objected but subsequently withdrew its objection.  Dugaboy and Get Good appealed to the District Court.  The District Court affirmed this Court's ruling on September 26, 2022.  Dugaboy and Get Good appealed to the Fifth Circuit on October 4, 2022.  The Fifth Circuit has not yet set a briefing schedule.

- ***Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2199]**

  Highland and UBS entered into a settlement agreement which was approved by this Court over the objection of Mr. Dondero and Dugaboy [Docket No. 2389].  Dugaboy and Mr. Dondero appealed to the District Court, which affirmed this Court's order on September 22, 2022.  Dugaboy and Mr. Dondero appealed to the Fifth Circuit on October 4, 2022.  The Fifth Circuit has not yet set a briefing schedule.

- ***Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* [Docket No. 2247]**

  On August 4, 2021, this Court found Mr. Dondero, CLOH, the DAF, and others in contempt for violating this Court's order appointing Mr. Seery as Chief Executive Officer and Chief Restructuring Officer.  The contemptors appealed to the District Court, which affirmed this Court's order on September 28, 2022.  On October 28, 2022, the contemptors appealed to the Fifth Circuit.  The Fifth Circuit has not yet set a briefing schedule.

**Potential Appeals to the U.S. Supreme Court:**

- ***Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943]**

  On September 7, 2022, the Fifth Circuit entered its order affirming this Court's Confirmation Order in material part.  Certain of the Dondero parties requested an extension of time to file a petition for a writ of certiorari in the U.S. Supreme Court, which was granted and the deadline extended to January 5, 2023.

016731